# EXHIBIT 5

UNITED STATES DISTRICT COURT

CENTRAL DIESTRICT OF CALIFORNIA

WESTERN RIVERSIDE COUNCIL OF  )
GOVERNMENTS, a California     )
Joint Powers Authority,       )
                              )
            Plaintiff,        )
                              )
            -vs-              )   Case No.: 5:20-cv-02164
                              )   -GW(KKx)
NATIONAL UNION FIRE           )
INSURANCE COMPANY OF          )
PITTSBURGH, PA, and DOES      )
 through 50, inclusive,       )
                              )
            Defendants.       )
_____)

DEPOSITION OF BRIAN DE FORGE

Thursday, April 28, 2022

Riverside, California

Reported By: Tracey R. Boyer

CSR No. 12346



**2**

```
 1              UNITED STATES DISTRICT COURT
 2              CENTRAL DIESTRICT OF CALIFORNIA
 3
 4
 5  WESTERN RIVERSIDE COUNCIL OF  )
    GOVERNMENTS, a California     )
 6  Joint Powers Authority,       )
                                  )
 7              Plaintiff,        )
                                  )
 8            -vs-                )   Case No.: 5:20-cv-02164
                                  )   -GW(KKx)
 9  NATIONAL UNION FIRE           )
    INSURANCE COMPANY OF          )
10  PITTSBURGH, PA, and DOES      )
    1 through 50, inclusive,      )
11                                )
                Defendants.       )
12  _____)
13
14  Deposition of BRIAN DE FORGE, taken on behalf of the
15  Defendants, at 3390 University Avenue, Fifth Floor,
16  Riverside, California, beginning at 10:02 a.m. and
17  ending at 12:04 p.m., Thursday, April 28, 2022 before
18  Tracey R. Boyer, CSR 12346, a Certified Shorthand
19  Reporter within and for the State of California,
20  pursuant to Notice.
21
22
23
24
25
```

**3**

```
 1  APPEARANCES
 2
 3  For the Plaintiff:
 4  GORDON, REES, SCULLY, MANSUKHANI, LLP
    BY: MEAGAN VANDER WEELE
 5  Attorney at Law
    5 Park Plaza
 6  Suite 1100
    Irvine, California 92614
 7  (312)980-6679
    mvanderweele@grsm.com
 8
 9
    For the Defendant:
10
    BEST, BEST & KREIGER, LLP
11  BY: JEFFREY DUNN, ESQ.
    Attorney at Law
12  18101 Von Karman Avenue
    Suite 1000
13  Irvine, California 92612
    (949)263-2600
14  jeff.dunn@bbklaw.com
15
16
17
18
19
20
21
22
23
24
25
```

**4**

```
 1                     INDEX
 2
 3  EXAMINATION BY:                    PAGE
 4  MR. DUNN                     6
    MS. VANDERWEELE                    74
 5
 6
 7
                     E X H I B I T S
 8
    PLAINTIFF'S EXHIBITS:
 9
    NUMBER       DESCRIPTION          PAGE
10
    1     Deposition Subpoena         13
11
    2     Notice Of Deposition        13
12
    3     Declaration                 13
13
14  DEFENDANT'S EXHIBITS:
15  4     Letter                      87
16  5     Letter                      88
17  6     Resolution                  92
18
19
20
21            INSTRUCTION NOT TO ANSWER
22                 page 91 line 21
23
24
25
```

**5**

```
 1              RIVERSIDE, CALIFORNIA
 2              Thursday, April 28, 2022
 3                   10:02 a.m.
 4
 5         THE VIDEOGRAPHER:  Good morning.  We're on the
 6  record.  This begins video number one in the deposition
 7  of Brian DeForge in the matter of Western Riverside
 8  Council of Governments et al. versus National Union Fire
 9  Insurance et al. in the United States District Court
10  Central District of California.  Today's date is April
11  28th, 2022 and the time is 10:02 a.m.
12         This deposition is being taken at 3390
13  University Avenue, fifth floor in Riverside, California
14  at the request of Best, Best and Kreiger.  The
15  videographer is Sergio Esparza of Magna Legal Services
16  and the court reporter is Tracey Boyer of Magna Legal
17  Services.
18         Will Counsel and all parties present state
19  their appearances and who they represent.
20         MR. DUNN:  Yes, my name is Jeffrey Dunn and I'm
21  with the Law Firm of Best, Best and Kreiger.  We
22  represent both the City of Beaumont and Western
23  Riverside Council of Governments in this case.
24         MS. VANDERWEELE:  Meagan Vanderweele on behalf
25  of defendant National Union Fire Insurance Company of
```



6

1    Pittsburgh, PA.
2              BRIAN DE FORGE,
3    called as a witness on behalf of the Defendant, having
4    been first duly administered an oath pursuant to C.C.P.
5    Section 2094, was examined and testified as follows:
6
7              EXAMINATION
8    BY MR. DUNN:
9        Q  Good morning, Mr. DeForge. I previously
10   introduced myself on the record and I'm here today on
11   behalf of both the City of Beaumont and WR --
12       THE COURT REPORTER:  I'm sorry, W-r?
13       MR. DUNN:  W-r-c-g --
14       THE WITNESS:  C-o-g.
15       MR. DUNN:  C-o-g, thank you.
16   BY MR. DUNN:
17       Q  When I use, Mr. DeForge the term WRCOG do you
18   understand that to mean Western Riverside Council of
19   Governments?
20       A  Yes I do.
21       Q  And the term WRCOG is a term that you've heard
22   before?
23       A  That's correct.
24       Q  And that's again referring to Western Riverside
25   Council of Governments?

7

1        A  Yes.
2        Q  At any time this morning I use a term that you
3    don't understand or need clarification, please don't
4    hesitate to let me know.  You can interrupt me.  You can
5    let me know anyway you like, "Hey, I don't understand
6    what you're saying," or "I don't understand that word."
7    Otherwise I'll assume for purposes of this deposition
8    that the terms that we use will be mutually
9    understandable.
10           Is that okay?
11       A  I understand, yes.
12       Q  We were talking a little bit before the
13   deposition.  But now that we're on the record it's
14   important that we make every opportunity available for
15   the court reporter to take down everything that is being
16   said here today.  So I'm going to do my very best not to
17   interrupt you when you're talking.  And if you will
18   allow the same opportunity for legal Counsel.
19           That way it helps the court reporter.  It's
20   very difficult for the court reporter to take down what
21   is being said today if we're talking over each other.
22   And that's not that we would do that intentionally.  But
23   it's just in every day conversation it's very natural
24   for someone to anticipate their answer to a question
25   before the question is fully developed and put on the

8

1    record.
2              That's very common.  So we sort of have to
3    change a little bit how we talk and communicate and
4    build in some pauses.  I'll try to do that.  Counsel
5    here is helpful if I start to talk over you she will let
6    me know not to do that.  One of the most important
7    things we need to talk about up front is the nature of
8    this deposition.
9              Now you have been deposed before; is that
10   correct?
11       A  That's correct.
12       Q  How many times?
13       A  Probably three to five times.
14       Q  Okay.  And in any of those three to five
15   estimated deposition number that you gave did anything
16   have to do with your connection to the City of Beaumont
17   as a city counsel member?
18       A  No, it did not.
19       Q  Was it -- is it fair to say that it was all
20   done outside of the context of your involvement with the
21   City?  In other words, it was something for personal or
22   your business?
23       A  It was work-related.
24       Q  Work-related.  Okay.  How long ago was the last
25   deposition?

9

1        A  Probably three years ago.
2        Q  Has the case been resolved or is it over?
3        A  Not that I'm aware of.
4        Q  Was it a deposition for a case that you
5    personally were involved with as a party to the lawsuit?
6        A  No, it was not.
7        Q  And that same question really for the other
8    depositions.  Were any of the previous depositions that
9    you've been involved with, were they part of a lawsuit
10   that you personally were involved with either as a
11   plaintiff or a defendant?
12       A  No, they were not.
13       Q  And are you currently involved personally in
14   any litigation?
15       A  Not that I'm aware of.
16       Q  And do you have a business entity that you --
17   you're still working; correct?
18       A  Yes.  That's correct.
19       Q  And do you have like a corporation or a sole
20   proprietorship that's the business that you're involved
21   with, your personal business?
22       A  Yes, I have both, a sole proprietorship and a
23   corporation, S corp.
24       Q  Are they currently involved in any litigation?
25       A  No, they are not.



10

```
1      Q   All right.  As you've already figured out we
2   have talked about the court reporter is taking down
3   everything that is said today and eventually that will
4   be prepared in a transcript form.  It looks like a
5   booklet.  You'll have an opportunity to review that.
6   Couple of points on that, one is that it's important
7   today to give your best testimony.
8        Because if you have to make some changes to the
9   testimony that you give here today, so if you make
10   changes for example to the booklet form or transcript
11   someone could comment on that at a later point in the
12   proceedings even at trial.  And it could call into
13   question your credibility.
14        So you want to give your best testimony here
15   today, is that okay?
16      A   I understand, yes.
17      Q   Now we don't want you to guess or speculate.
18   But we are entitled to your best estimate.  Some of the
19   things that we'll talk about today go back a number of
20   years.  And it may take you a few moments to sort of
21   think and remember your best recollection of that.  We
22   want your best recollection.  And you can take all the
23   time you need to answer a question.
24        What we don't want you to do is guess.  So if
25   you had never seen or heard something and you were asked
```

11

```
1   about it, for you to explain that that would be a guess.
2   But if you were involved in a conversation recently or
3   in the past that wouldn't be a guess.  We would want
4   your best recollection of that conversation or event.
5        Do you understand that?
6      A   Yes, I do.
7      Q   Okay.  Good.  Is there any reason today why you
8   could not give your best testimony?  Are you under the
9   influence of any medication that may affect your ability
10   to remember, to communicate?
11      A   No, I'm not.
12      Q   All right.  No alcohol this morning yet?
13      A   No.  No.
14      Q   Okay.  You can take a break any time you want
15   for any reason.
16      A   I understand.
17      Q   Just let us know.  Like I said this morning I
18   don't think we'll be here for very long at least with my
19   questions.  Don't have a lot of documents to go through
20   with you this morning.  But I do want to put some
21   documents into the record I'll do that very quickly up
22   front.
23        So the first thing I want to put in as your
24   first Exhibit Number 1 is a three-page document.  On the
25   first page it says, "United States District Court for
```

12

```
1   the Central District of California."  It has below that
2   it says, "Subpoena to testify at a deposition in a civil
3   action," and we'll make this Exhibit Number 1.
4        Mr. DeForge, just take a moment and look at
5   this three-page document, if you would please.  And my
6   question for you is have you seen this document before
7   or a copy of it?
8      A   Yes, I have.
9      Q   And to be marked as next in order which I think
10   is Exhibit 2 is a three-page document and it's titled,
11   "Amended notice of taking deposition of Brian DeForge
12   pursuant to Federal Rules of Civil Procedure, rule
13   number 30 B1."
14        And Mr. DeForge, if could you take a moment to
15   look at this document.  I just want to know if you've
16   seen this before?
17      A   I don't believe I have.
18      Q   All right.
19        MS. VANDERWEELE:  For the record I don't
20   believe this was ever actually served.
21        MR. DUNN:  Okay.  You haven't seen it before
22   and Counsel you don't think it's been served?
23        MS. VANDERWEELE:  Correct.
24        MR. DUNN:  Okay.  To be marked next in order is
25   a five-page document entitled, "Declaration of Brian E.
```

13

```
1   DeForge."
2   BY MR. DUNN:
3      Q   Mr. DeForge, do you have Exhibit 3 the
4   declaration before you?
5      A   Yes, I do.
6      Q   You can take a moment to review.  But my
7   question is have you seen this before?
8      A   Yes, I have.
9      Q   And Mr. DeForge, that's your signature on the
10   last page on page five?
11      A   Yes, it is.
12      Q   Okay.  And there's a date there of the 24th --
13   the 24th day of January 2022.
14        Do you see that on the last page?
15      A   Yes, I do.
16      Q   And is that the date on which you signed this
17   document?
18      A   Yes, it is.  Sorry.
19        (Exhibits 1, 2 and 3 were marked for
20   identification and attached hereto.)
21   BY MR. DUNN:
22      Q   And I note that it doesn't state where you
23   signed the document.
24        Where did you sign this?  Did you do it at your
25   house?
```



14

1    A  I signed it at my home.
2    Q  Okay.
3    A  Yes.  Yes, I did.
4    Q  Okay.  Then did you -- did you then fax or send
5  a copy of this document in email to the legal Counsel
6  for AIG?
7    A  Yes, I believe I did.  It was either faxed or
8  scanned.
9    Q  Okay.  And do you remember to whom you sent
10  that to?  Was it Counsel who is present here today?
11    A  I believe it was, yes.  The only reason I am
12  hesitant there was another lady I was working with as
13  well.  So I sent it to the Counsel.  I signed it,
14  scanned and sent it to them.
15    Q  So there were two attorneys with AIG that you
16  were working with?
17    A  I believe it was a second attorney or maybe it
18  was paralegal or someone.  I'm not sure.
19    Q  Yeah.  My question -- I'm sorry if I didn't
20  phrase it properly.  By the time that you signed this
21  document you were working with two attorneys with AIG;
22  is that correct?
23    A  I believe they were both attorneys.  I know
24  Meagan is.  I don't know if the other one was her helper
25  or something of that sort.

15

1    Q  Okay.  Let's do this -- for exhibit -- I'm
2  going to ask you a fair amount of questions about this
3  Exhibit Number 3.
4    You received Exhibit Number 3 from whom?  Do
5  you remember how you first got this?
6    A  From the legal counsel, from legal counsel I
7  believe for National Union Fire.
8    Q  Okay.  I'm trying to figure out a shorter way
9  to refer to them.  Can we call them either AIG counsel
10  or insurance company counsel?
11    A  That would be fine.
12    Q  So you first got this document from the
13  insurance company attorney; correct?
14    A  That's correct.
15    Q  And before you got this document were there
16  earlier drafts that you reviewed or did you get just one
17  draft and sign it?
18    A  We got one draft and we reviewed it together
19  via Zoom.
20    Q  Okay.
21    A  Then I signed the draft.
22    Q  Okay.  Now I want to take you all the way back
23  in time when you first had contact with the insurance
24  company attorney.
25    Do you remember when that was?

16

1    A  No, I do not.
2    Q  Was it in -- I'm going to see if I'm going to
3  test your memory here by trying to get your best
4  estimate or recollection.  This Exhibit Number 3 was
5  signed on January 24th of 2022.
6    In December were you in contact with the
7  insurance company attorney, December of 2021?
8    A  It's very possible, yes.
9    Q  Do you remember how you were first contacted?
10    A  I believe I was called via cell phone.
11    Q  Who called you?
12    A  I do not recall her name.  I could look back on
13  my emails.  I think the name is on there.  But I'm not
14  sure of her name.  I don't believe it was Meagan the
15  first time.
16    Q  And you mentioned some emails, did you have
17  some subsequent email communication with the insurance
18  company attorneys?
19    A  Just to set up this meeting, yes.
20    Q  Do you have copies of those emails somewhere?
21    A  I have them on my phone.  I don't have them
22  on...
23    Q  Do you still have them on your phone?
24    A  I believe so.
25    Q  I'm going to ask you to hold onto those and not

17

1  delete those.  Would you do that, please?
2    A  Yes.
3    Q  Is there a way to print them out those emails
4  from your phone?  Can you print out just t hose emails?
5    A  Yes, I could.
6    Q  Okay.  Would you do that and send them to me?
7  I'll give you an address and you can just email them to
8  me?
9    A  Yes.
10    Q  Okay.  Great.  I'll do that at the end of the
11  deposition.  Okay.  But the first contact you had was
12  over the phone with the insurance company attorney?  It
13  was a telephone call?
14    A  Yes.
15    Q  And what took place in that conversation?  What
16  do you remember?
17    A  There was a basic introduction of who they were
18  and why they were calling me.
19    Q  What did they tell you in terms of who they are
20  or who they were?
21    A  The initial call I did not answer.  Because I
22  get so many spam calls.  I listened to the voicemail and
23  I realized it was an attorney and I don't really care to
24  talk to attorneys.  So then when I got a little more
25  information I think it was a second call I got a little



18

```
1    more information.  Then I responded back and called to
2    them.  I couldn't hide.  So I went ahead and called and
3    found out what it was about.
4        Q   So the first information you had was in the
5    voicemail that they left on your cell phone?
6        A   I believe so, yes.
7        Q   Do you still have that voicemail?
8        A   I don't believe so.
9        Q   Do you remember what the voicemail said?
10       A   Again an introductory telling me who they were
11   and kind of a little bit of what they were calling
12   about.
13       Q   Can you give me more information about that?
14       A   Well they were -- let me know that they were an
15   attorney litigating a case and I initially thought it
16   was between the City of Beaumont against someone else.
17   I didn't realize what the case was about.  And to be
18   honest I've been out since 2014 from council and I said,
19   "I don't want to have anything to do with it."  So
20   that's why I didn't answer.
21       Q   Was your initial understanding from that
22   voicemail that the insurance company attorney said that
23   they were an insurance company for the city?
24       A   I didn't catch that on the first one.  I didn't
25   understand what it was about.
```

19

```
1        Q   Did the voicemail explain that the insurance
2    company was in litigation with the city?
3        A   No.
4        Q   What was your understanding of who the
5    insurance company was upon listening to the voicemail?
6        A   Initially I thought it had something to do
7    again with the WRCOG City of Beaumont --
8            THE COURT REPORTER:  TUMF?
9            THE WITNESS:  T-u-m-f, Traffic Uniform
10   Mitigation Fee.  And so again I didn't want anything to
11   do with it.  I've been out eight years so I didn't
12   respond to it.
13   BY MR. DUNN:
14       Q   So was the next thing that happened is that you
15   got another phone call from the insurance company
16   attorney?
17       A   I got another call from those attorneys, yes.
18   Once I listened to the email and I got the second call I
19   answered it and got a little more information on what
20   they were calling about.  What were they requiring of
21   me, what did they want with me.
22       Q   So I just want to keep the sequence of events
23   clear.  First contact was a voicemail that was left with
24   you.  The next contact from the insurance company
25   attorney was it a phone call or an email?
```

20

```
1        A   I believe it was a phone call.  And again I
2    might have let it go to voicemail.  Then when I listened
3    to it I called back at that time.  I mean very shortly
4    after that call came in to get the information.  I can
5    remember I was at Home Depot in Beaumont during the
6    course of my regular workday.  So I walked out, left my
7    partner with the salesperson and I called.
8        Q   I take it it would be rather unusual for you
9    now that -- it would be unusual for you today to get
10   phone calls on your cell phone from attorneys?
11       A   Yes.
12       Q   Can you think of any other time in the last --
13   since 2014 where an attorney has called you on your cell
14   phone?
15       A   Yes.
16       Q   You can.  But not recently I take it?
17       A   It was the period when I did the last
18   deposition.
19       Q   Got it.
20       A   Attorneys for that case.
21       Q   Let's move forward and I just want to make sure
22   between the first and second phone calls from the
23   insurance company attorneys was there any -- do you
24   remember receiving any email?
25       A   I may have received an email.  I'm not exactly
```

21

```
1    sure.  I'd have to go back and look in my archives --
2        Q   Okay.
3        A   -- see if there's something there.
4        Q   Second -- second time that your cell phone gets
5    a call from insurance company attorney do you remember
6    if it was -- if it went to voicemail or did you pick it
7    up and start talking?
8        A   I believe I picked it up and we started
9    talking.
10       Q   And I think you said you remembered when that
11   happened you were at Home Depot and you had to get out
12   the Home Depot checkout line and take the call or?
13       A   We were in the process of ordering cabinets for
14   a house we were building.  So I left my business partner
15   with the salesperson then I walked out actually into the
16   garden section.
17       Q   And tell me how the phone call started?  You
18   pick up the phone and who started talking first after
19   you said, "Hello"?
20       A   I believe it was Counsel who identified
21   themselves and who they were and again in regards to
22   what they were calling about.  We had some initial
23   discussion to further clarify what they were calling
24   about and why they were calling me.
25       Q   Okay.  So let's break it up then into those
```



22

```
1    three parts.  How did they introduce themselves when you
2    were actually talking to them on the phone?
3        A   Introduced herself by her name.
4        Q   Was it Counsel who is here this morning?
5        A   No, it was not.  Then again explained to me why
6    they were calling and what it was in regards to.
7        Q   Let me stop you right there.  What did they
8    say?
9        A   They are Counsel representing my understanding
10   and I may get this wrong, my understanding was they were
11   representing I thought the City of Beaumont against
12   WRCOG.
13       Q   And you based that understanding on what was
14   told to you?
15       A   Just what was told to me, yeah.
16       Q   Okay.  So with that understanding that you had,
17   which was that they were representing the City in a
18   matter WRCOG, did you then proceed to talk to them in
19   that conversation?
20       A   Yes, I did.
21       Q   What was -- what was next -- what was the next
22   part of that conversation?
23       A   An explanation regarding I believe an insurance
24   policy that the city had taken out.  And I'm still not a
25   100 percent clear on what this insurance policy covers.
```

23

```
1    If I remember correctly I believe it had to do with
2    recouping funds if -- I'm not sure how to word this.  If
3    certain events happened, illegal events or something of
4    that sort.
5        Q   Again I don't want to put words in your mouth,
6    but was your understanding at the time that when you
7    were given this explanation this was a lawsuit between
8    the insurance company and WRCOG?
9        A   That was my understanding.
10       Q   And was it also your understanding that this
11   lawsuit between the insurance company and WRCOG that
12   somehow the insurance company was on the side of the
13   City?
14       A   Yes.
15       Q   That was based on what was told you?
16       A   Yes.
17       Q   And so you were given an explanation by the
18   insurance company attorney about the policy.
19           Was it more than one policy that was described
20   to you or was it just a single policy?
21       A   Just a single policy.
22       Q   Did they tell you what was the dispute that
23   created the lawsuit over the policy?  Did you get an
24   explanation?
25       A   No, I did not.
```

24

```
1        Q   At that point in the conversation were you
2    wondering why on earth you're being contacted by the
3    insurance company --
4        A   Yes.
5        Q   -- attorney?
6        A   Yes.
7        Q   Did you ask them that?
8        A   Yes.
9        Q   What did they tell you?
10       A   Well having been through a number of
11   depositions regardless from the city, regardless from
12   the school district I work for, they're always looking
13   for someone who has information regarding that would
14   help their case.  And of course being on the city
15   council as long as I was on there I had -- you know I
16   was privy to a lot of information that went through
17   during that period of time that I was on the council.
18       Q   Did you know in that second phone call that you
19   did not have to talk to them on the phone, you could
20   have just hung up; right?
21       A   No, I didn't realize that.
22       Q   Did you have an understanding in your mind in
23   that second conversation that you were being asked to
24   help the city?
25       A   Yes.
```

25

```
1        Q   And did you have in your mind and your
2    understanding at that time that by engaging in this
3    conversation with the insurance company attorney over
4    the phone that you would be helping the city?
5            MS. VANDERWEELE:  Objection.  Leading.
6            THE WITNESS:  I was never given that particular
7    scenario or that this would be helping the city.  In my
8    mind, this is my mind, I felt that there was going to be
9    the City against WRCOG.
10   BY MR. DUNN:
11       Q   That was based on what you were told?
12       A   Yes.
13       Q   Okay.  And again just so I'm clear,
14   Mr. DeForge, the reason why you moved forward with your
15   participation that led to this declaration was based on
16   that understanding; is that correct?
17           MS. VANDERWEELE:  Leading.
18           THE WITNESS:  Yes.  That's correct.
19   BY MR. DUNN:
20       Q   That second conversation how long do you think
21   it lasted on the phone?
22       A   Probably 15 minutes.
23       Q   That's -- would you agree with me 15 minutes is
24   a -- probably in your experience that's a fairly long
25   cell phone conversation; right?
```



7  (Pages 22 to 25)

26

1    A  Yes, it was.
2    Q  And we've already talked about how the call
3  developed.  Let's go into as much of that 15 minute
4  phone call that you remember.  So you formed some
5  understandings based on the information that you were
6  initially given.
7       At some point in that conversation, that
8  telephone call, were you asked questions?
9    A  Yes.
10   Q  What questions were you asked?
11   A  My role as a council member.  My role as a
12  mayor.  Because they are two separate things.  My --
13  what sort of duties we did, what sort of things I had
14  signed as a mayor.
15   Q  Were you asked about the type of meetings that
16  you were involved with?
17   A  No, I was not.
18   Q  Were you asked about events that happened in
19  city council meetings?
20   A  No, I was not.
21   Q  Not during that conversation?
22   A  No.
23   Q  Later?
24   A  I'm kind of vague on what you're asking me.
25   Q  Sure.  I'll rephrase.  I'm going to keep this

27

1  -- I'm going to try and keep this just to the second
2  telephone conversation that you had.  Because I'm
3  assuming there were -- after the second telephone
4  conversation there were other communications with the
5  attorneys for the insurance company; correct?
6    A  One other, yes.
7    Q  One other phone call?
8    A  One other, Zoom.
9    Q  Zoom, got it.  Again going back to that second
10  telephone conversation what other questions did they
11  have for you?
12   A  One of the questions was, "Are you aware of," I
13  wasn't aware of this lawsuit.  "ARE you aware of this
14  lawsuit?"  I was not aware of it.  Again being out of it
15  for eight years I don't know when this started.  So I
16  wasn't aware of that.  Then again what things did I
17  sign.  You know as from the different -- when you're
18  sitting on city council you're -- especially a small
19  city we are under -- we wear a lot of different hats
20  regarding the financial authority, the redevelopment
21  committee, some different hats as we're sitting there.
22  We adjourn from council and then go into finance
23  authority or go into redevelopment committee something
24  of that sort.  Really more procedural of what we did as
25  council.

28

1    Q  And that's pretty common for cities; right?  At
2  least in your understanding.
3    A  At least smaller cities from my understanding.
4    Q  Big cities too.
5    A  Yes.
6    Q  Yeah, big ones too.  In that phone conversation
7  you were asked some questions.
8       Were there any questions that you didn't know
9  how to respond to?
10   A  Not that I'm aware of.
11   Q  Were you able to answer all their questions?
12   A  I would not say that I 100 percent answered all
13  their questions.
14   Q  What did -- okay.  Aside from answering
15  questions that they had for you were there some -- was
16  there one or more items that you wanted to share with
17  them?  Did you give them any information other than what
18  you were asked for?
19   A  I gave them historic information regarding
20  myself.
21   Q  Tell me what you told them about the historic
22  information about yourself?
23   A  Well in regards to WRCOG and the city council
24  of Beaumont and my role as a city councilman slash
25  mayor.  What I felt about WRCOG and what I felt about

29

1  their TUMF program, traffic uniform mitigation fee.  How
2  I was not for that from the very beginning.  How I spoke
3  with two separate supervisors and some of their
4  personnel who were going to be running that for WRCOG
5  and some of the answers that they gave us in regards to
6  my questions and my concerns.  So that is the historic
7  knowledge that I gave them.
8    Q  Did that second telephone conversation that
9  we've now been discussing generally focus on your
10  involvement, your personal involvement through the city
11  with WRCOG?
12   A  I would say the telephone conversation that
13  we're speaking of generally centered on historic
14  knowledge that I had and for better word getting
15  familiar with me and what role I may have played in
16  these different...
17   Q  Who brought up WRCOG?  Did you bring it up
18  first or did the insurance company attorney?
19   A  I believe it was first brought up by the
20  insurance company when they explained what they were
21  calling about.
22   Q  Okay.  As part of that explanation again they
23  were talking about WRCOG?
24   A  That was my understanding, yes.
25   Q  Was it your understanding that they were



30

1    talking about the TUMF dispute with WRCOG?
2        A  That was my understanding, yes.
3        Q  Okay.
4        A  Let me clarify that.
5        Q  Sure.
6        A  No, that was not -- initially that's not what I
7    was understanding.  My understanding was that WRCOG was
8    trying to sue the insurance carrier that the city
9    carried to recoup funds from the City versus WRCOG
10   lawsuit in regarding the TUMF.
11       Q  Was there -- was there any explanation about
12   the lawsuit that it had to do with things other than the
13   TUMF?
14       A  No.  No.  Let me clarify that.
15       Q  Sure.
16       A  My understanding was that it had to do with
17   illegalities from the key department people, contract
18   hired by the city.
19       Q  Did you talk about those illegalities with the
20   insurance company attorney during that second phone call
21   or did that not come up?
22       A  Not specific charges against them or any of
23   that sort of thing.
24       Q  So that was something you had in the back of
25   your mind that was separate and independent of the phone

31

1    call; correct?
2        A  That's correct.
3        Q  Is it fair to say that the phone call focused
4    on the TUMF WRCOG?
5        A  My portion of the phone call focused on the
6    TUMF.  I was never led into -- I offered my information
7    on the TUMF.
8        Q  And the information you offered I think you
9    generally described earlier you had some conversations
10   in the past with people associated with WRCOG.  You had
11   some disagreements with WRCOG over the TUMF while you
12   were on the council, is that fair to say?
13       A  Yes.
14       Q  And you shared that with the insurance company
15   attorney?
16       A  Yes.
17       Q  Did you have -- did you have any question in
18   your mind or was it explained to you during that
19   conversation why WRCOG would be pursuing insurance
20   policies that were issued to the city?
21       A  Did I have any question about that?
22       Q  Yes.
23       A  I would say yes.
24       Q  Was that explained to you during that second
25   phone call?

32

1        A  No.
2        Q  Was it ever explained to you?
3        A  You know I would -- I would say that it was
4    explained to me and even perhaps in that first phone
5    call.  My understanding again was WRCOG was trying to
6    recoup funds that they believe were owed to them through
7    that TUMF program.
8        Q  Mr. DeForge, did you know at the time that you
9    were -- this goes now back to the first voicemail from
10   the insurance company attorney.
11          At that time did you know that WRCOG and the
12   city had settled their TUMF litigation?  Did you know
13   there was a settlement?
14       A  Yes, I did.
15       Q  Did you ever see a copy of that settlement
16   agreement or the terms of it?
17       A  No, I did not.
18       Q  Have you ever seen it at any time?
19       A  All I saw was what I read in the local paper
20   that they had settled.  I never saw the actual terms of
21   that.
22       Q  Okay.  Now going back to the second -- I'm
23   sorry we're hopping around a little bit I apologize for
24   that.  But I want to try and keep this in order, you
25   know, as the communications developed.  Back to the

33

1    second phone call you had with the insurance company
2    attorney.
3           There was in questions and answers, yes?
4        A  Yes.
5        Q  Lasted about 15 minutes in your estimate?
6        A  Correct.
7        Q  Were -- by the end of that phone call did you
8    know that there was going to be further communication
9    between you and the insurance company attorney?
10       A  Yes, I did.
11       Q  How did you have that understanding?
12       A  I was told that they would want to do a
13   declaration and that we would do it via Zoom call.
14       Q  Okay.  Were you told by the insurance company
15   attorney that if you did a declaration that you would
16   not have to do a deposition?
17       A  A deposition for who?
18       Q  Like the deposition we're in right now, any
19   deposition?
20       A  I was told that the declaration would keep me
21   from doing a deposition through them.
22       Q  Were they specific in telling you that a
23   declaration would keep you from having to do a
24   deposition through them and not anybody else?  What were
25   you told?



34

1      A  I would -- I was understanding that I would do
2  a declaration through them.  However, knowing that if I
3  did this declaration, which would become -- what is the
4  word?  Discoverable.  That at some point in time the
5  other side would come knocking at the door wanting a
6  deposition.
7      Q  Did they tell you that the City of Beaumont
8  would come knocking at the door looking for a deposition
9  if you did a declaration?
10     A  No, they did not.
11     Q  Did they tell that you WRCOG might?
12     A  No, they didn't tell me.
13     Q  Did you have an understanding in your mind that
14 if you were to give a declaration that you would not be
15 deposed by the city?
16     A  No, I did not.
17     Q  Did you think that you could be deposed by the
18 city?  I'm not talking WRCOG.  I'm talking the City of
19 Beaumont?
20     A  I figured that when I did the declaration that
21 would start some sort of wheels turning to where that I
22 would start getting calls or mails or subpoenas to come
23 and talk to the other side.
24     Q  Yeah.  Did you think that the other side was
25 the City of Beaumont or just WRCOG?

35

1      A  I thought the other side was WRCOG.
2      Q  Just WRCOG?
3      A  Yes.
4      Q  So after you had this first voicemail from the
5  insurance company attorney and this conversation with
6  the insurance company attorney over the cell phone in
7  the Home Depot, did you think to contact the City of
8  Beaumont in any way to notify them that you had been
9  contacted by the insurance company attorneys?
10     A  No, I did not.
11     Q  Do you know why -- why not?
12     A  When I left the City of Beaumont as a
13 councilman I left the City of Beaumont.  I try not to
14 have anything to do with anything down at the city hall.
15 I stayed fairly clear of there.
16     Q  If you had the understanding at the time that
17 you -- of the second telephone conversation that you're
18 communication with the city -- excuse me with the
19 insurance company attorneys would lead to city
20 involvement in this -- in this lawsuit would you have
21 contacted the city in some fashion?
22     A  No.
23     Q  At any time -- or strike that.  After the
24 second phone call with the insurance company attorney,
25 just want to make sure I understand for the record, did

36

1  you talk to anybody associated with the City of Beaumont
2  about that conversations?
3      A  No, I did not.
4      Q  Did you talk to any former council members?
5      A  No, I did not.
6      Q  Other than your spouse perhaps did you talk to
7  anyone else about the phone call?
8      A  My business partner.
9      Q  Who is your business partner?
10     A  Adrian Chetney.
11     Q  And does Adrian Chetney have any involvement
12 currently with the City of Beaumont in any kind of a
13 role or a position?
14     A  No, he does not.
15     Q  In the past?
16     A  No, he did not.
17     Q  So mostly reaching out to him as a business
18 partner and friend?
19     A  As I left him sitting there with the
20 salesperson I had to give him an excuse where I went.
21        MS. VANDERWEELE:  Fair enough.
22        MR. DUNN:  I understand.  Yeah, fair enough.
23 BY MR. DUNN:
24     Q  Before that second telephone conversation ended
25 what was understood in your mind as to what would be the

37

1  next communication with the insurance company attorney?
2      A  That we would set up a Zoom call and produce
3  this declaration.
4      Q  Okay.  How long after the second telephone call
5  was it before you had that Zoom?
6      A  I would say it in January of 2022,
7  somewhere in the mid portion of that.
8      Q  And I take it that you received the
9  instructions for the Zoom call via email, is that how
10 you got it?
11     A  That is correct.
12     Q  Okay.  And was that the first email that you
13 received from the insurance company or had there been
14 earlier emails?
15     A  I believe that was the first one.
16     Q  In that second conversation were you asked to
17 look or provide any documents to the insurance company
18 attorney?
19     A  I may have been.  But I -- I do not have any
20 documents.
21     Q  Have you ever provided any documents to them?
22     A  No, I have not.
23     Q  I mean other than this declaration?
24     A  Yeah, other than this declaration.
25     Q  Fair enough.  Okay.  Did you look for documents



38

1   or you just knew that you didn't have any?
2       A   Any documents that I have had have long been
3   gone.  The only documents that I ever saved were certain
4   things that I personally wanted to keep for history like
5   getting a park named after my dad, just historic things
6   in that respect.  Not so much things in regard to
7   operations of the City.
8       Q   In between the second conversation over the
9   cell phone and Zoom was there any other telephone
10  conversations you had with the insurance company
11  attorney?
12      A   No, there was not.
13      Q   There were some emails, yes?
14      A   I believe the email that I was sent to set up
15  the Zoom call.
16      Q   Did the email have attached to it any document
17  for you to review or anything to look at?
18      A   Are you speaking of prior to Zoom call?
19      Q   Yes.  Thank you.
20      A   No.  No.
21      Q   And prior to the Zoom call were you given any
22  document to look at to prepare for the Zoom call?
23      A   No, I was not.
24      Q   Were you told what the Zoom call would -- prior
25  to the Zoom call did you know what was going to be

39

1   discussed on the Zoom?
2       A   Yes, I did.
3       Q   Tell me what your understanding or memory was?
4       A   We would discuss the operations of what went on
5   in regards to, you know, looking back at this
6   declaration, the rolls of the different contracted city
7   employees regarding the Urban Logic people as well as
8   Allan --
9           THE COURT REPORTER:  I'm sorry, Urban Logic
10  people and?
11          THE WITNESS:  Urban Logic people and Allan --
12          THE COURT REPORTER:  Last name spelled?
13          MR. DUNN:  I can do it for her.
14          THE WITNESS:  Okay.  Go ahead.
15          MR. DUNN:  K-a-p-a-n-i-c-a-s.
16          THE COURT REPORTER:  Let me double check that
17  K-a-p-a-n-i-c-a-s, Allan Kapanicas.
18          THE WITNESS:  Kapanicas, and his firm was GGMS.
19  BY MR. DUNN:
20      Q   So when you did the Zoom call were you at home?
21      A   Yes, I was.
22      Q   And I think your best estimate is that was in
23  January of this year; correct?
24      A   I believe so, yes.
25      Q   How long did that Zoom call last?

40

1       A   Probably 45 minutes to an hour.
2       Q   And at your home were you by yourself in the
3   room?
4       A   Yes, I was.
5       Q   Who was on the other end of the Zoom?
6       A   Meagan and the other lady who I cannot remember
7   her name.
8       Q   But the same person who was on the previous
9   cell phone calls?
10      A   Yes.
11      Q   So just two of them?
12      A   Yes.
13      Q   And I want to break down that call or that Zoom
14  call.  How did it start?  What is your first
15  recollection of it?
16      A   Of course we zoomed in and Meagan introduced
17  herself to me who she was and her relationship to the
18  case.  And then the other lady, which is really
19  bothering me that I can't remember her name, just again
20  kind of refresh what we were going to be going over and
21  then we went over the questions we had concerning what
22  we put in the declaration.
23      Q   Okay.  Did they have a document like this
24  already on the screen to show you or did they show you
25  any documents during the Zoom call like this one?

41

1       A   No -- I believe, no.
2       Q   Could you tell if they were looking at any
3   documents?
4       A   I don't believe they were.
5       Q   Okay.  Did the conversation on the Zoom start
6   with sort of your, you know, your introduction to the
7   City of Beaumont, how you first got involved with the
8   City?  Trying to figure out how the conversation
9   developed?
10      A   Well again they identified why they were
11  calling, what we are doing in regards to this lawsuit.
12  And then I verified who I was and why, you know, my role
13  in the city as a councilman, mayor and then the
14  different hats I wore under the different committees
15  that we had as a council and then we went into what we
16  have on the declaration here.
17      Q   Okay.  At some point after the Zoom call you
18  were given a declaration to sign; correct?
19      A   That's correct.
20      Q   Were you given only one draft?  Was there only
21  one version that you were given?
22      A   Yes.
23      Q   And before you signed it you reviewed it?
24      A   That's correct.
25      Q   Didn't make any changes to it?



42

```
1        A  I think there was a minor change or something
2   in regards to something that I felt needed to be
3   changed.  To be honest with you I can't remember what
4   that was at the moment.
5        Q  Okay.  We'll go through it?
6        A  It was a very minor thing.
7        Q  But the point is you didn't write this document
8   this was written by the insurance company attorney;
9   correct?
10       A  Yes.
11       Q  And again you're understanding about the
12  involvement of the insurance company in the WRCOG, did
13  that change after the Zoom call or was it still your
14  understanding what you talked about earlier?  You
15  thought this was a dispute between WRCOG and the
16  insurance company?
17       MS. VANDERWEELE:  Leading.
18       THE WITNESS:  I felt it was -- initially saying
19  is what I spoke of.
20  BY MR. DUNN:
21       Q  Is that your understanding today too?
22       A  Yes.
23       Q  Okay.  All right.  During the Zoom call were
24  you asked about city council meetings?
25       A  Again I think that's kind of vague.
```

43

```
1        Q  Were you asked about any meetings that you
2   attended at the city counsel?  Any city council meetings
3   that you attended?  Were you asking about anything?
4        A  Not specifically, no.  It was more asked about
5   procedures that we did as a council in regards to again
6   the financing authority or the redevelopment agency, the
7   different operations as a council that we did.
8        Q  And as part of that explanation did you tell
9   the insurance company attorneys that, you know, that you
10  met together as a council to do business for the city as
11  opposed to you doing it individually?
12       MS. VANDERWEELE:  Form.  Vague.
13  BY MR. DUNN:
14       Q  Go ahead?
15       A  I believe that's a little confusing.  When we
16  met as a council we're all in there unless someone was
17  absent.
18       Q  Right.
19       A  So there was no conversation in regards to
20  meeting separately with any members of the city
21  services.
22       Q  That's what I'm looking for.
23       A  Okay.
24       Q  Thank you.  That was very helpful, thank you.
25  So the information that you've provided was based on
```

44

```
1   your involvement in city council meetings; correct?
2        A  That's correct.
3        Q  All right.  Was that true for the full panoply
4   of city council meetings?  Sometimes you were wearing
5   your different hat as it were for the Beaumont Financing
6   Authority, sometimes for the redevelopment agency,
7   sometimes for the city itself?
8        A  Yes, and those were all taking place in the
9   total umbrella of a city council meeting again.
10       Q  Yeah.  And sometimes it was fairly common for
11  the city council to go into a closed session as well,
12  that's part of your meetings; correct?
13       A  That's correct.
14       Q  And that's some of the information that you
15  shared with the attorneys?
16       MS. VANDERWEELE:  Objection to form.
17       THE WITNESS:  No.
18  BY MR. DUNN:
19       Q  Did you share any closed session information
20  with them?
21       A  No.
22       Q  Why not?
23       A  Because I can't do that.
24       Q  Were you asked to?
25       A  No, I was not.
```

45

```
1        Q  Were you explained or told not to share closed
2   session information?
3        A  No, I was not.  I'm aware of that having been a
4   councilman.
5        Q  Good.  Okay.  Let's do this, let's -- let's I
6   think the easiest thing now to do is -- do you want to
7   take a break?
8        A  I'm all right.
9        MS. VANDERWEELE:  I'm fine.
10       MR. DUNN:  Let's keep going.
11  BY MR. DUNN:
12       Q  Let's go into this Exhibit Number 3.  I just
13  want to take you through it then I think we'll be done
14  here today.  We're going to go through it in detail.
15       Exhibit Number 3 is your declaration?
16       A  That's correct.  Yes.
17       Q  Okay.  Perfect.  So if you could put that in
18  front of you?
19       A  No, I have it.  I'm sorry.
20       Q  Whichever one works for you.  That's great.
21  Just to make sure up in the upper left-hand corner you
22  see where it says, "Scott L. Schmookler"?  Do you see
23  that?
24       A  Yes, I do.
25       Q  Okay.  Ever speak with Mr. Schmookler?
```



46

1    A  No, I have not.
2    Q  Okay.  In your experience had you ever signed a
3  declaration for a legal matter before?
4    A  Not that I'm aware of.
5    Q  First time you had signed a declaration?
6    A  That's correct.
7    Q  Okay.  Given deposition testimony but not a
8  declaration; correct?
9    A  That is correct.
10    Q  Was it ever explained to you by the insurance
11  company attorneys that signing a declaration under
12  penalty of perjury is like giving testimony in a court?
13    A  Yes.
14    Q  Okay.  All right.  Let's go to paragraph number
15  one on the first page.
16    Do you see that?
17    A  Yes, I do.
18    Q  And you had read that paragraph before;
19  correct?
20    A  Yes.
21    Q  Okay.  Let's go to the second paragraph.  It
22  says -- begins, "I'm a resident of the city of
23  Beaumont."
24    Do you see that?
25    A  Yes, I do.

47

1    Q  Okay.  Now it says in that first sentence in
2  paragraph two that you were on the Beaumont City Council
3  from 1999 to 2014.
4    Do you see that?
5    A  Yes, I do.
6    Q  Okay.  Can you be more precise as to when you
7  were on the city council like what months and you
8  started in 1999?
9    A  I started July 27th.
10    Q  Okay.
11    A  1999, my middle daughter's birthday.  Then I
12  stepped off or actually was escorted off, I don't know
13  the best way to put it.  I got beat in re-election.  So
14  my last time on the council was December of 2014.
15    Q  I see.  End of the calendar year?
16    A  Yeah, the end of the calendar year.  That's
17  correct.
18    Q  Got it.  When you first joined the Beaumont
19  City Council did you run for office or were you
20  appointed?
21    A  I was appointed.
22    Q  Then how quickly did you have to run for the
23  city council seat?
24    A  Oh, gosh.  You make me do math.
25    Q  Just your best estimate?

48

1    A  I believe it was 2000, perhaps 2002.  It was
2  2000 or 2002.  Just trying to do the four-year thing
3  here.
4    Q  Fair to say until that next municipal election
5  cycle?
6    A  That's correct, yeah.
7    Q  Who appointed you?
8    A  I was appointed by the city council.
9    Q  Okay.  Who was mayor at that time?
10    A  Jan Lesia.
11    Q  Mr. DeForge, in that same paragraph number two
12  the second sentence says, "Based upon my tenure on the
13  Beaumont City Council, I had knowledge of and was aware
14  prior to 2011 that the following facts set forth in
15  paragraph three through paragraph 15."
16    Do you see that?
17    A  Yes, I do.
18    Q  I just want to get your understanding.  Is it
19  your understanding that you had knowledge prior to 2011
20  by virtue of being on the city council of the City of
21  Beaumont?  In other words your knowledge prior to 2011
22  starts with your appointment to the city council in 2000
23  -- excuse me, in 1999.  Do you see that?  I apologize if
24  I'm being vague.  Does that make sense?
25    A  It reads -- I understand where you're at.  It

49

1  reads a little funny on there.
2    Q  Yeah, it does.
3    A  But I believe when you go forward into the
4  other paragraphs it's just reiterating that I had the
5  knowledge of those previous paragraphs.
6    Q  What -- what I want to say just focusing on
7  paragraph two that's not entirely accurate is it the
8  second sentence?  Because you're knowledge of events
9  prior to 2011 goes back to the time when you were first
10  appointed to the city council?
11    A  That would be correct, yes.
12    Q  But that doesn't say that here, does it?
13    A  Not that I'm reading, no.
14    Q  Let's go to the next paragraph, "The City of
15  Beaumont," it begins -- this is paragraph number three.
16  "The City of Beaumont did not maintain a separate risk
17  management or insurance department."
18    Do you see that?
19    A  Yes, I do.
20    Q  What was you understanding?  What did you mean
21  by, "Separate risk management"?
22    A  My understanding was that it was really more of
23  a policy or an in-house department of safety risk
24  management or insurance department.  In school
25  districts, for example, we have a safety risk manager.

50

```
1    We have a person who runs an insurance coordinator.  The
2    City of Beaumont at that time did not have it.
3        Q  Was it your understanding that there was an
4    outside person who was handling risk management for the
5    city?
6        A  That was my understanding it was an outside
7    company who handling that for the city.
8        Q  Not an employee?
9        A  Not an employee, a company.
10       Q  And then the next sentence, "The city council
11   had final authority over the city's insurance."  What
12   did you understand by that?  What does, "Final authority
13   over the city's insurance," mean?
14       A  If staff came to a city manager per se and
15   decided that we wanted to pursue an insurance,
16   everything like that would come to the council first.
17   All of the information would be given, staff report and
18   the council would have the authority to approve or
19   disapprove insurance company.  Example, we entered into
20   a JPA with other cities and that was brought to the
21   council for approval prior to us joining the JPA.
22       Q  And Mr. DeForge your knowledge or understanding
23   regarding the insurance policy or policies at issue in
24   this litigation, in that time period when you were on
25   the city council did you know anything about these
```

51

```
1    policies?
2        A  No, I did not.
3        Q  Do you remember anything about them?
4        A  I know that we are given initially we were
5    going to have this policy or that policy in regards to
6    and then they would go over it slightly or give us the
7    summary of what we were going to be having.  We would
8    bring that up and vote in open session whether or not we
9    would want that.
10       Q  Okay.  How about the next sentence it says --
11   this is now at the top of page two, we're still in
12   paragraph three.  Quote, "The city council would
13   consider whether to pursue an insurance claim in private
14   session and upon reaching a conclusion announce the
15   decision in public session."
16       I take it that's not your language?  That was
17   given to you by the insurance attorneys; correct?
18       A  I believe that's probably 50-50.  And speaking
19   of this my understanding is this is citizens who bring
20   claim against the city.  We always have that listed on
21   the agenda items.  Joe Smith versus City of Beaumont
22   closed session item.  And with attorney present, city
23   manager we would discuss those and whether or not we
24   would pay it out or refuse to pay and go to litigation
25   and that sort of thing.  That's my understanding of
```

52

```
1    that.
2        Q  So from time to time like every city in
3    California perhaps you would get what are called written
4    claims?
5        A  Yes.
6        Q  So when I say, "Written claim," you know what
7    I'm referring to?
8        A  Yes, I do.
9        Q  Some of the written claims that your city
10   received during the time that you were on the council
11   they would not be deemed to be covered by insurance;
12   correct?  Some claims are, some claims aren't.  Fair
13   enough?
14       A  That's correct.  Yeah, that's fair.
15       Q  So not every claim, written claim that comes to
16   the city council is covered by insurance, that's
17   according to your understanding?
18       A  That is correct.
19       Q  When you were given this paragraph number three
20   to first review, I take it after the Zoom call, did you
21   wonder why you're being asked to sign something about
22   what is in paragraph number three?  Did you have a
23   question in your mind, "Why am I signing a statement
24   that talks about this"?
25       A  No, I didn't.
```

53

```
1        Q  Okay.  And this was discussed during the
2    previous Zoom call?  This paragraph three the topics
3    that are indicated there were they discussed in the Zoom
4    call or did you see this for the first time in the
5    declaration that was presented for you to sign?
6        A  No, I believe it was in the Zoom call.  That's
7    why we have it in there.  There were certain questions
8    that led to the summary that we got out of it.
9        Q  Again focusing your attention on paragraph
10   number three, during the Zoom call were you asked any
11   questions about how the City handled this -- any claim
12   involving these insurance policies?
13       A  Not insurance policies, no.
14       Q  Were you asked -- what type of claims were you
15   asked about?
16       A  Just the closed session, most of these again
17   come from a person trips over a sidewalk, person hits a
18   pothole front end gets hurt, that was my understanding
19   what we were discussing.
20       Q  Okay.  Let's move to number four, paragraph
21   number four on this Exhibit 3.  The sentence says -- it
22   begins, "City of Beaumont contract with Urban Logic
23   consultants," then goes on from there.
24       Did you personally know these individuals,
25   Ernest Eger or Ernie Eger, Dave Dillon, David Dillon, D.
```



54

1   Pac Marjani, did you know these gentlemen?
2       A  Yes, I did.
3       Q  And you know them just in terms of your
4   involvement as a member of the city council; correct?
5       A  Yes.
6       Q  And take a look at paragraph five of Exhibit 3
7   that begins, "Mr. Dillon served as the City of
8   Beaumont's economic development," and then goes on from
9   there.  Just take a moment if you could review that
10  paragraph.
11      A  Uh-huh.
12      Q  I take it that what is in paragraph number five
13  regarding Mr. Dillon, Mr. Eger -- strike that.  Yes.
14  Regarding Mr. Dillon, Mr. Marjani and Mr. Eger what is
15  indicated in here was something that was known to you at
16  the time that you were on the city council; correct?
17      A  Yes.
18      Q  Number six, the paragraph number six do you see
19  that?
20      A  Yes, I do.
21      Q  If you would take a moment to review that short
22  paragraph.  I have just a short question or maybe two.
23      A  Okay.
24      Q  Based on your time and experience as a member
25  of the Beaumont city council what is indicated in

55

1   paragraph number six was known and true to you;
2   corrected?
3       A  That is correct.
4       Q  Okay.  Number seven, if could you take a look
5   at that paragraph, please?  If you could focus just when
6   you get there just on the last sentence of that
7   paragraph.
8       A  Yes.
9       Q  Okay.  I take it that when you were first given
10  this declaration to review and then ultimately to sign
11  it was no surprise to you that Mr. Eger, Mr. Dillon,
12  Mr. Marjani were getting financial benefits from ULC's
13  contracts with the City of Beaumont; correct?
14      A  Correct.
15      Q  That's how they got compensated; correct?
16      A  Correct.  Yes.
17      Q  They did work for the city and that's how they
18  got paid for it?
19      A  Yes, contract work.
20      Q  Contract work.  Thank you.  Number eight,
21  paragraph number eight for what time period were you
22  mayor?
23      A  I served mayor three separate times.
24      Q  One year period -- one year each time or?
25      A  The way the council is set up we could be mayor

56

1   for one year and then you could have a second year if
2   the council -- council voted on the mayor and mayor pro
3   tem.  So you could have two years straight then you had
4   to step off the council for at least a year -- step off
5   from being mayor or being mayor pro tem.
6       Q  So you were a popular person on that council to
7   be mayor that many times during your tenure?
8       A  Either that or I was good a target, whatever.
9       Q  Fair enough.  We talked about what I called
10  different hats, wearing different hats as a member of
11  the city council.  Sometimes you're meeting in your
12  official capacity as a city council for the City of
13  Beaumont, other times as the governing body for the
14  Beaumont financing authority; correct?
15      A  That's correct.  Yes.
16      Q  Now if you could take a look at the last
17  sentence of paragraph eight or the last actually clause.
18  The sentence is really the second sentence it says,
19  "While I served as chair person on the Beaumont
20  financing authority, Beaumont financing authority
21  issued," I'm sorry it's the second sentence, "Issued a
22  series of revenue bonds.  As chair person on the
23  Beaumont financing authority I had knowledge of these
24  bonds and reviewed official statements associated with
25  these bonds."  It's the later part I want to ask you

57

1   about.
2           Would you agree with me, Mr. DeForge, that
3   municipal financing documents could be fairly complex?
4       A  Yes.
5       Q  And so what I wanted to do is give you an
6   opportunity to explain sort of your knowledge of these
7   -- it says, "Knowledge of these bonds and reviewed
8   official statements."
9           Would you -- is that something that you would
10  normally do is review the official statements for all
11  these bonds?  Or -- the reason I ask is I read them and
12  I just, you know, it's like Greek to me.
13          MS. VANDERWEELE:  I'm sorry what was the
14  question?
15  BY MR. DUNN:
16      Q  Do you understand these documents when you read
17  them?
18      A  I understand them enough to be dangerous.
19      Q  Okay.
20      A  That's being glib.
21      Q  I understand.
22      A  But the truth is having served on there for as
23  many years as I have at first they're an excellent way
24  to fall asleep at night.  But then as you start going
25  through, and again as Beaumont was developing and we got



15 (Pages 54 to 57)

58

1  more and more of these, we would get documents for our
2  council meeting and financial authority, but you don't
3  read each individual line.  You learn not to read.
4        You look at the key areas of where it is.  How
5  much is this bond for?  Which improvement area?  How
6  long will they pay for that?  What is the amount of this
7  bond?  And we understood that these bonds were allowing
8  us to bring in infrastructure and things ahead of the
9  homes coming in.
10       So that homeowners coming in he's got to park
11 there not waiting for the 100th house to be built on a
12 99 -- 100 house tract and then stop at 99 and the park
13 never gets there.  This allowed the city to build ahead
14 of time and get the infrastructure and different things
15 in before the people moved into the homes.
16       Q  Yeah.  Would you agree with me for those
17 municipal financing there are a team of advisors that
18 the city would have or did have to walk you through or
19 if not walk you through to complete the municipal
20 finance process?
21       A  That is correct.
22       Q  Yeah.  And a fairly sophisticated legal team;
23 correct and financing team?
24       A  Yes.
25       Q  In fact lawyers in all sorts of capacities

59

1  involved with municipal finances and disclosures; is
2  that correct?
3        A  That is correct.
4        Q  And the city had those?
5        A  They had them through the finance -- the bond
6  companies.
7        Q  Got it.  Okay.  Sometimes your city staff -- my
8  understanding is Mr. Kapanicas was fairly knowledgeable
9  in the municipal finance area?
10       A  That is correct.
11       Q  Yeah.  So is it fair to say as a council you
12 would rely on your advisors and consultants and Mr.
13 Kapanicas to successfully get you through these
14 offerings?
15       MS. VANDERWEELE:  Form.  Leading.
16       THE WITNESS:  I would say as a city council we
17 hire staff that we can trust to do that for us.  And
18 then we take their reports, we read through those
19 reports and we have questions we asked to get those
20 clarifications.  Their job is to put them together.  Our
21 job is to read them, understand them, question what we
22 don't know and then approve or disapprove.
23       Q  Yeah.  Was it your understanding at the time
24 that an important part of that process is for there to
25 be disclosure to the city council about the relevant

60

1  aspects of these finances.  In other words you need to
2  be informed by your team of advisors what is at stake
3  here?
4        MS. VANDERWEELE:  Leading.
5        THE WITNESS:  I think that your question or
6  your comment to me is somewhat correct.  But we as a
7  council have to take the lead on that.  We take the
8  information that's given to us and we get that
9  information with the best knowledge available.  Then we
10 have to make our decision on that.  So it's a -- whether
11 you want to call it a symbiotic relationship or
12 something we have to have trust, both of us have to do
13 our work.
14 BY MR. DUNN:
15       Q  Thank you for clarifying that.  I guess where
16 I'm really going with that is in order for you to make
17 those informed decisions you need to get the
18 information?
19       A  That is correct.
20       Q  And much -- perhaps if not all of that
21 information that gets presented to you is going to come
22 through the team of advisors and consultants that the
23 city has?
24       A  Yes.
25       MS. VANDERWEELE:  Form.  Leading.  They're all

61

1  leading.
2        MR. DUNN:  Thank you.
3  BY MR. DUNN:
4        Q  Let's look at paragraph number nine.  If you
5  could take just a moment and review that, please.
6        Do you see in paragraph nine right at the
7  beginning it talks about ULC principals.  Do you see
8  that?
9        A  Yes, I do.
10       Q  Those are defined -- that's a defined or
11 defined term, those are defined terms.  Was it your
12 understanding that principals of ULC were Mr. Eger and
13 Mr. Dillon and Mr. Marjani?
14       A  That's correct.
15       Q  Okay.  And they all participated in the making
16 of revenue bond?
17       A  Yes.
18       Q  Mr. Marjani too?
19       A  Yes.
20       Q  I just want to make sure that this is true of
21 your own knowledge and understanding, Mr. DeForge
22 paragraph nine.  I mean you did know that the ULC
23 principals were acting in their official capacity for
24 the city when they worked with bond counsel and
25 financial analysts in preparation of the bonds?



62

1      A  Yes.
2      Q  That was your understanding at the time?
3      A  Yes.
4      Q  The rest of that paragraph or that paragraph is
5  accurate in your mind?  And take your time.
6      A  That's correct.  Yes.
7      Q  Take a look if you would and review paragraph
8  ten for me.
9      A  Okay.
10     Q  When you are given this declaration to sign and
11  you first read this paragraph ten, did you have any
12  question in your mind why you were being asked to sign a
13  declaration that talked about Misters Dillon, Eger and
14  Marjani getting -- you know receiving a financial
15  benefit in excess of $25,000?  Do you know why you were
16  being asked to sign a statement to this effect?
17     A  No, I didn't.  I just assumed maybe incorrectly
18  or correctly that this was all in regards to how the
19  bonds were developed and made.  And then once they were
20  authorized that they -- the principals of ULC did
21  receive funds from those bonds.
22     Q  At any time when you were communicating, any
23  time you were communicating with the insurance company's
24  attorneys did they tell you that they were trying to
25  show Mr. Dillon, Mr. Eger, Mr. Marjani had conflicts of

63

1  interest in the city?
2      A  No, they did not.
3      Q  Is that a surprise to hear that from me today?
4      A  Somewhat.  But I shouldn't say it seems like a
5  surprise.  But it isn't.  Because I've heard it now for
6  over eight years.  So...
7      Q  We'll come back to that.  Okay.  Take a look at
8  paragraph number 11 and just review that briefly or take
9  your time on it.
10        And paragraph 11 reflects your, you know,
11  understanding at the time that you were on the council.
12     A  That's correct.
13     Q  Okay.  12, let's take a look at paragraph 12.
14  Excuse me.  Was this something that you had knowledge of
15  at the time -- what's indicated here in paragraph 12 did
16  you know about that at the time that you were on the
17  council or was this something that you knew after you
18  were on the council?
19     A  No, we knew that.  Mr. Kapanicas was very open
20  on how things went.
21     Q  Take a look now at paragraph 13.  Because it
22  sort of changes.  Here we get now reference to a member
23  of the public Judy, Judith --
24        THE COURT REPORTER:  Last name again?  Bingham?
25        MR. DUNN:  Uh-huh, B-i-n-g-h-a-m.

64

1  BY MR. DUNN:
2      Q  And let me know when you're finished reviewing
3  paragraph 13.
4      A  Okay.
5      Q  Are you familiar with the term gadfly?
6      A  Yes.
7      Q  Commonly used to describe individuals, some
8  individuals who frequently appear before city councils
9  in open session and public comment; correct?
10     A  Correct.
11     Q  Yeah.  And I'll represent to you that if you go
12  to Miriam Webster dictionary at least the one online
13  there's a definition that matches generally what I just
14  said.  So it's pretty commonly understood.  I think most
15  cities, if not all of them, have one or more individuals
16  who appear to be at least in some people's views
17  gadflies; correct?
18     A  Correct.
19     Q  Did you have sort of gadfly individuals who
20  would show up in your city council meetings?
21     A  Yes, we did.
22     Q  Would it be fair to characterize in your
23  opinion Ms. Bingham as one of those gadflies?
24     A  Yes.
25        MS. VANDERWEELE:  Object to the form of that

65

1  question and use of the term gadfly.
2  BY MR. DUNN:
3      Q  In fact Ms. Bingham would often appear at city
4  council meetings; correct?
5      A  That's right.
6      Q  And from what I understand would make all sorts
7  of accusations and allegations is that fair to say?
8      A  That's correct.
9      Q  And in your mind just because somebody makes an
10  accusation or allegation doesn't mean that he or she is
11  guilty of something that they're being accused of;
12  correct?
13     A  That's correct.
14     Q  When you were asked to first review this
15  declaration with regards to paragraph 13, did you have
16  any question in your mind why it is that you're being
17  asked to talk about Judy, Judith Bingham coming before
18  at least once city council meeting and something about
19  violations of conflict of interest law?  Did you have
20  any question in your mind why you were being asked to go
21  over this and sign this?
22     A  No.
23     Q  As far as you were concerned at the time you
24  were on the council there weren't any conflicts of
25  interest by these individuals; correct?

66

1    A  Not that I was aware of, no.
2    Q  Take a look at paragraph 14.
3    A  Yes, sir.  Okay.
4    Q  That's correct as to your understanding at the
5  time?
6    A  That is correct.
7    Q  Okay.  Let's look at paragraph 15.  Have you
8  had a chance to read paragraph 15?
9    A  Yes, I have.
10    Q  You were on the council during the litigation
11  with WRCOG over the TUMF fees?
12    A  Yes.
13    Q  And at some point the trial judge made a
14  decision in that case?
15    A  Yes.
16    Q  And the city subsequently -- the city council
17  subsequently decided to appeal?
18    A  That's correct.
19    Q  Was the case resolved before you left the city
20  council in 2014 or was it still on appeal?  Do you
21  remember?
22    A  I believe it was still on appeal.
23    Q  So the case hadn't been finally resolved;
24  correct?
25    A  I don't believe so, no.

67

1    Q  All right.  Now you can set this aside, this
2  Exhibit Number 3.  I don't have a whole lot of questions
3  you want to take a quick break?  I think we will be done
4  by noon it's up to you or we can just keep plowing
5  ahead.
6    MS. VANDERWEELE:  I'm fine to keep going.
7    MR. DUNN:  I'm good to.  It's up to you.
8    THE WITNESS:  I'm good.
9  BY MR. DUNN:
10    Q  All right.  So the Zoom conversation that you
11  had with the insurance company attorneys lasts about 45
12  minutes; correct, estimated?
13    A  Yes.
14    Q  Okay.  And was it your understanding at the end
15  of that conversation you would be sent a declaration
16  like Exhibit 3 to review and sign?
17    A  That is correct.
18    Q  And I don't know -- I apologize if I asked you
19  this already but how long was it after the Zoom
20  conversation before you got the declaration?
21    A  I would say not more than a week.
22    Q  Was there any telephonic communication during
23  that time period?  So that's after the Zoom and before
24  you got the declaration, did you have any phone calls
25  with the insurance company attorneys?

68

1    A  No.
2    Q  So the next thing that really happened -- was
3  there any email communication?
4    A  The only thing emailed was the declaration.
5    Q  So you get the email, you still have a copy of
6  it; right?
7    A  Yes, I believe so.
8    Q  You're going to hold onto that, print it and
9  send it to me?  I'll give you an address.
10    A  Yes, I will.
11    Q  Thank you.  Tell me what happened?  You open
12  your email, you look at your email one day and there's
13  an email from the insurance company with an attachment;
14  correct?
15    A  Yes.
16    Q  And the attachment is this declaration?
17    A  Yes.
18    Q  Was there any other document attached to it?
19    A  No, I believe just the declaration.
20    Q  Okay.  When you opened the email did you also
21  open the attachment?
22    A  I read the email and then I believe I did open
23  the attachment, yes.
24    Q  Did you read the whole attachment at the time
25  that you first opened it?

69

1    A  Not initially.
2    Q  Okay.  So it -- kind of when you had more time
3  available to you you were able to read in it's entirety
4  the attachment?
5    A  That's correct.
6    Q  Probably within what 24 hours of first opening
7  it?
8    A  It might have been somewhere in that time, yes.
9    Q  When you went through it did you have any
10  questions in your mind?
11    A  I believe there was some wording that we
12  changed, very minor.  Again as I said previously very
13  minor working just for clarification.
14    Q  Do you remember the wording that you changed?
15    A  No, I don't at this moment, I don't.
16    Q  So even going through it, the declaration like
17  we just did it didn't refresh your recollection?
18    A  I -- I believe now that you mention it I was
19  more concerned with there's this -- in the sentence here
20  that says about as my time as the authority or the
21  financing authority chair person, the clarification that
22  I wanted in there was just that I wasn't the chair
23  person at all times.
24    You're only the chair person of those different
25  authorities when you are the mayor, seated mayor that



70

```
 1    was the only -- so again three different times being
 2    mayor during those two-year periods I would have been
 3    the chair person of whatever redevelopment financing
 4    authority.  And I think we had another one too.  But
 5    that would have been the only time I was chairman.
 6    Again I believe that was a very minor point.  I just,
 7    you know...
 8         Q   And then when you saw something that you wanted
 9    to make that clarification on did you pick up the phone
10    and call the insurance company attorneys?  How did you
11    convey that edit or change to them?
12         A   After receiving the initial email and getting
13    the opportunity to read over the email we set up a
14    meeting to go over the declaration to make sure if there
15    were any changes I needed to make.  Very short phone
16    call, I believe.  Yeah, I believe it was a phone call.
17             It might have been a Zoom now just to go over
18    it and to make any changes that we needed and it was
19    probably less than 15 minutes.  And just I signed the
20    back page scanned and then send it over.  I don't
21    believe I emailed it.  I think I scanned it.
22         Q   Did any one of the insurance company attorneys
23    tell you then what was going to happen with this
24    declaration?  In other words where it was going to go or
25    how it was going to be used, something to that effect?
```

71

```
 1         A   No --
 2         Q   I'm sorry.
 3         A   They did not.  I knew where it would go.  Again
 4    having going through these situations previously whether
 5    it was a declaration or a deposition.  I know once I
 6    give a deposition then it's a free for all whoever is
 7    involved in the case to get their lawyers to depose me
 8    or try to get their own clarification of what I was
 9    saying.
10         Q   Okay.  So in that second phone call maybe was a
11    Zoom, lasted approximately 15 minutes, did you say,
12    "I'll sign it and send it back," the declaration is that
13    what happened?
14         A   The instructions were if everything is approved
15    by me, if I would please sign that and either email it
16    or scan it back.  I believe I chose scan.  Because it
17    was -- I mean I have a fax in my office.  But I think it
18    was...
19         Q   And there was another version that came with
20    some minor edits or corrections you said?
21         A   No, we didn't -- we didn't make any.  I brought
22    up points that I felt were.  But I don't think we made
23    any changes to it.  Because it was very minor.  Again
24    that was the idea that I was chair person at all time I
25    don't think it needed to be, you know, clarified while I
```

72

```
 1    was mayor I was chair person.  So that's why that was
 2    never put in.
 3         Q   So you signed it, it's emailed back to the
 4    insurance company attorneys, it's on January 24th of
 5    2022.
 6             When was the next time you had any further
 7    contact with them after that?
 8         A   Just prior to coming into here.
 9         Q   When was that?
10         A   I think this week.
11         Q   And how did that contact occur?  Did they call
12    you or you call them?
13         A   No, Meagan called me and let me know that I
14    asked if it was true that I was going to be deposed, if
15    I was going to be deposed and I said, "Yes," and the
16    day.  She said she would be here as well.
17         Q   What else was discussed?
18         A   That was it.  Did we need to meet?  And I said,
19    "No, I don't believe so."  So we never met until I saw
20    her in here this morning.  I didn't even now that was
21    Meagan because I only saw her on a Zoom call.
22         Q   All right.  Before this deposition today did
23    you ever talk with anyone else about this deposition?
24    In other words, you talked for example with your
25    business friend and partner who was waiting for you at
```

73

```
 1    the Home Depot.
 2             Have you ever talked with Mr. Burg or
 3    Mr. Castaldo or any other former members of the city
 4    council about this matter?
 5         A   No, I have not, no.
 6         Q   Okay.  All right.  Have any of them reached out
 7    to you?
 8         A   No.
 9             MR. DUNN:  Okay.  I think that's all the
10    questions I have.  So thank you.  I need to get you an
11    address.
12             MS. VANDERWEELE:  I have follow-up questions as
13    well.
14             MR. DUNN:  Sure.  Yeah.  Counsel will ask you
15    questions.  Did you want to take a break or do you want
16    to just go right into it?
17             MS. VANDERWEELE:  I'm fine to keep going unless
18    Mr. DeForge you'd like to take a break before my
19    questions?
20             MR. DUNN:  Would you like to trade spots?
21             MS. VANDERWEELE:  I'm fine.  Except will that
22    make the video difficult?
23             THE VIDEOGRAPHER:  He's going to be facing
24    towards you.
25             MS. VANDERWEELE:  Do you want me to just come
```



74

1    over to this other side?
2         THE VIDEOGRAPHER:  That will work.
3         MS. VANDERWEELE:  Sure.  Why don't we take a
4    quick break to refigure.
5         THE VIDEOGRAPHER:  Off the record.  The time is
6    11:26 a.m.
7         (Recess taken.)
8         THE VIDEOGRAPHER:  On the record the time is
9    11:30 a.m.
10        CROSS EXAMINATION
11   BY MS. VANDERWEELE:
12        Q  Mr. DeForge, I have just a few follow-up
13   questions based on Counsel's questioning.  I'm Meagan
14   Vanderweele you and I have spoken before; correct?
15        A  Yes.  Correct.
16        Q  And you understand that I represent National
17   Union Fire Insurance Company?
18        A  That is correct.
19        Q  And when we spoke on the phone before you
20   signed the declaration do you recall exchanging emails
21   with me with some questions about who the parties were
22   in the lawsuit?
23        A  I don't recall.
24        Q  Do you at least recall exchanging emails with
25   me?

75

1         A  Yes, I do recall exchanging them.
2         Q  And at any time did I ever tell you that I
3    represented the City of Beaumont?
4         A  Not that I recall.
5         Q  At all times I told you I represented the
6    defendant in this case National Union Fire Insurance; is
7    that correct?
8         A  That is correct.
9         Q  And if you look at actually the declaration
10   that you signed.  I don't know if you got it in front of
11   you?
12        A  Yes, I do.
13        Q  It's got the case caption on there at the top.
14   Do you see that?
15        A  Yes, I do.
16        Q  And it's Western Riverside Council of
17   Governments is one of the plaintiffs; correct?
18        A  That's correct.
19        Q  The other plaintiff is City of Beaumont;
20   correct?
21        A  Yes.
22        Q  And then National Union Fire Insurance Company
23   of Pittsburgh is the defendant; correct?
24        A  That is correct.
25        Q  And do you recall before I even sent you a

76

1    draft declaration to review I informed you that WRCOG
2    and the City of Beaumont were suing my client National
3    Union Fire Insurance Company?
4         A  I don't recall.  I don't recall.
5         Q  Okay.  Do you recall receiving a series of
6    emails to that effect?
7         A  I don't recall.  But I would have to go back
8    and again look at my email archives.
9         Q  Fair enough.  All of the information that's in
10   the declaration that you signed as you sit here today to
11   the best of your knowledge and belief everything in here
12   is true and correct?
13        A  That is correct.
14        Q  Are there any changes, additions or revisions
15   that you would like to make to this declaration?
16        A  No, I do not.
17        Q  And the information, in all fairness to you as
18   Counsel's asked you, I was the one who physically or my
19   office drafted this document; correct?
20        A  That's correct.
21        Q  And did we provide you a draft of this
22   declaration to review before signing it?
23        A  Yes, you did.
24        Q  And in fact we had a Zoom meeting to review
25   this declaration line by line; correct?

77

1         A  That's correct.
2         Q  And during that Zoom session I believe you made
3    some changes which we've already talked about today?
4         A  Yes.
5         Q  And then we sent you an updated declaration
6    based on our Zoom meeting; is that correct?
7         A  That would be correct, yes.
8         Q  And did you again have an opportunity to review
9    this declaration before signing it?
10        A  Yes.
11        Q  And did you do that?  Did you review the
12   updated declaration, review it, confirm that it was
13   accurate before you signed it?
14        A  Yes, I did.
15        Q  Counsel was asking you questions about
16   paragraph three of the declaration regarding insurance.
17   And I believe you told us that the city council had to
18   vote and approve matters concerning the claims that were
19   brought against the city.
20        Do I understand that correctly?
21        A  That is correct.
22        Q  Now if the city -- or strike that.  When you
23   were on city council are you aware that the city had
24   insurance policies that were issued to the city?
25        A  Yes, I did.  Yes, I was.

MAGNA ▶
LEGAL SERVICES

78

1  Q  All right.  Now if the city believed it had a
2  loss, that it was a loss that was covered by a policy,
3  okay?  Would the city council have to vote and approve
4  whether the city was going to pursue a claim against one
5  of the insurance companies that had issued the city a
6  policy?  Is that something that the city council would
7  have to vote on and approve?
8       MR. DUNN:  Objection.  Incomplete hypothetical.
9  Calls for speculation and legal conclusion.  You can
10 answer.
11      MS. VANDERWEELE:  I'm happy to rephrase it if
12 you don't understand.
13      THE WITNESS:  Please maybe clarify what you're
14 saying.
15 BY MS. VANDERWEELE:
16      Q  Sure.  So if the city -- the city has insurance
17 policies; correct?
18      A  Yes.
19      Q  When you were on city council?
20      A  Yes.
21      Q  And the city had a contracted risk manager when
22 you were on city council?
23      A  Correct.
24      Q  And would he -- who was that person?
25      A  I believe, I'm not a 100 percent sure, that it

79

1  was Keenon and Associates would have been our risk
2  management company, I believe.
3       Q  Do you recall a gentleman named James Gregg?
4       A  Yes, I do.
5       Q  And was Mr. Gregg did he work with ERMAC,
6  E-r-m-a-c?
7       A  I don't recall that company.  But I do remember
8  the name.
9       Q  Did Mr. Gregg -- do you recall any
10 conversations that you ever had with Mr. Gregg?
11      A  No, I do not in an official capacity.
12      Q  As you sit here today do you have any
13 understanding of what Mr. Gregg's role was for the city
14 of Beaumont?
15      A  Just off my head trying to understand that I
16 was -- thought he had to do with the bond sales.  But
17 that might be someone else.
18      Q  Okay.  Back to my original question about
19 insurance claims that the city would make.  So the city
20 had insurance policies.
21         Were there times when you were on city council
22 that the city would try to recover money from the
23 insurance companies?
24      A  I don't remember us ever going after an
25 insurance company to recover any money.

80

1  Q  If hypothetically speaking while you were on
2  city council, the city believed that it had a loss that
3  was covered under a policy, is that the type of thing
4  based on your knowledge and experience having been on
5  city council for 15 years, is that something that the
6  city council would have to vote and approve?  That
7  being whether to pursue a claim against one of the
8  city's insurer's?
9       MR. DUNN:  Objection.  Incomplete hypothetical.
10 Lacks foundation.  Calls for a legal opinion or
11 conclusion.
12      THE WITNESS:  I'm just waffling a little
13 because in our closed sessions when claims were
14 discussed we had legal counsel with us.  Legal counsel
15 would advise whether we should pay the claim out if it
16 was small enough from the city or we should deny the
17 claim and pursue it through a different way.
18      Whether it was JPA -- funding we had through
19 the JPA, however that might have looked.  We were not --
20 city council would have approved, if it came we suggest
21 you approve this.  And council would approve and then
22 come out of closed session and make an announcement that
23 we approve settlement on case XYZ whatever it might have
24 been.
25 BY MS. VANDERWEELE:

81

1  Q  And with respect to the settlements that city
2  council approved, before the city's lawyer would
3  announce in public session the approval of a settlement
4  that approval had to come from city council; correct?
5       A  Yes.
6       Q  That's okay.  Let me just reask that question
7  so we got a clean question and answer.  Before -- so you
8  just explained to me in closed session and again I don't
9  want to know anything about any specific closed session
10 discussion, that's privileged.
11      But generally speaking if a claim is made
12 against the city that claim would be discussed in closed
13 session; correct?
14      A  Correct.
15      Q  And then the city's lawyer would make a
16 recommendation to city's counsel about whether to settle
17 the claim?
18      A  That's correct.
19      Q  And then would the city council have to approve
20 of that settlement before the city's lawyer could
21 announce that settlement in public session?
22      A  That is correct.
23      Q  And the purchase of insurance on behalf of the
24 city, it's my understanding although city staff whether
25 it be the city manager or legal counsel, city staff



82

1 would make recommendations to city council about which
2 insurance package to purchase; is that correct?
3    A  That's correct.
4    Q  Ultimately the city council would have to vote
5 on and approve the purchase of insurance for the city?
6    A  That's correct.
7    Q  The information in the declaration regarding
8 the bond offering documents, so I'm talking about
9 paragraphs nine, ten, eleven and twelve.
10    A  Yes.
11    Q  Your knowledge about the ULC's principals
12 involved in those bonds is based on your knowledge and
13 experience that you gained while serving as city
14 council; correct?
15    A  That is correct.
16    Q  Then looking at paragraph 13 Counsel asked you
17 about gadflies, you remember that?
18    A  Yes, I do.
19    Q  All right. And Judy Bingham among others
20 members of the public would raise concerns to city
21 council during the public comment period?
22    A  That's correct.
23    Q  Okay. And one of the concerns that Ms. Bingham
24 raised was concerns regarding whether the retention of
25 ULC violated California conflict of interest law; is

83

1 that correct?
2    A  That is correct.
3    Q  And ultimately the ULC principals plead guilty
4 to violating California conflict of interest law;
5 correct?
6       MR. DUNN: Objection. Lacks foundation.
7 BY MS. VANDERWEELE:
8    Q  You can answer?
9    A  I don't -- I don't personally know if they pled
10 guilty to that particular charge or different charge or
11 lesser charges.
12    Q  Have you ever reviewed the plea agreements or
13 the plea documents that were signed by the ULC
14 principals?
15    A  No, I did not. Never had the opportunity.
16    Q  Okay. Ms. Bingham do you recall that she had
17 formed an organization or a group called Beaumont -- a
18 concerned citizens group?
19    A  Yes.
20    Q  And I think it was BCRG was the acronym. Do
21 you recall that at all?
22    A  Yes.
23    Q  And I believe that stands for Beaumont Citizens
24 for Responsible Growth?
25    A  That's correct. Yes.

84

1    Q  Okay. When you were on city council do you
2 recall that Urban Logic Consultants and the three
3 principals actually filed a defamation suit against the
4 BCRG group and it's members?
5    A  Yes, I do.
6    Q  And do you recall what that lawsuit was about?
7    A  I believe if I recall correctly regarding
8 Ms. Bingham posted things on that site, saying things,
9 publishing things that were -- what is the word I'm
10 looking for?
11    Q  Defamatory?
12    A  Defamatory against them, with malicious
13 content. I remember the record malice. Because I
14 remember that part of the judge's ruling was they didn't
15 show malice. They did show other things that she had
16 done.
17    Q  Was that -- when you were on city council are
18 you aware that that lawsuit was ultimately dismissed?
19    A  My understanding is it was dismissed, yes.
20    Q  And the website that Ms. Bingham and others
21 were posting on that was called, "Beaumont Gate," I
22 believe?
23    A  Beaumont Gate, yes.
24    Q  When you were on city council did you ever
25 actually go on and look at the Beaumont Gate website?

85

1    A  I may have gone on it a time or two, yes.
2    Q  When you served on city council I take it you
3 were aware of the California Fair Political Practices
4 Commission and the requirements under the FPPC?
5    A  I thought I was, yes.
6    Q  Did you have to fill out like a form 700?
7    A  Yes, I did.
8    Q  So did you understand that when you were on
9 city council you could not be financially interested in
10 any contract in which you are participating in your role
11 as a city council member?
12    A  That's correct. Yes.
13    Q  I take it you never did that; correct?
14    A  I thought I never did that, yes.
15    Q  All right. Counsel asked you about the WRCOG
16 litigation and when you were on city council actually
17 when you were mayor 2008 do you recall WRCOG sending you
18 a demand letter?
19    A  Sending me personally or the city?
20    Q  Fair. Do you remember in 2008 when you were
21 mayor that WRCOG sent the city a demand letter?
22    A  Could you please define for me what is a,
23 "Demand letter"?
24    Q  Sure. You know what I think we can just do
25 this an easier way and I will be quick. I guess we'll



86

1    mark this as Exhibit 4.  I've handed you what we'll mark
2    as Exhibit 4 to the deposition.  And I'll let you take a
3    moment to look at it.  So the court reporter has marked
4    the document that's in front of you Exhibit 4.  For the
5    record this is Bates stamped Beaumont AIG 00029989
6    through 29990 and it's a letter dated June 10, 2008 from
7    WRCOG to the honorable mayor Brian DeForge mayor city of
8    Beaumont.
9         Do you see that?
10   A   Yeah.  I see that.
11   Q   It's signed by Chuck Washington as chair of
12   WRCOG and Jeff Stone vice chair of WRCOG.
13        Do you see that?
14   A   Yes, I do.
15   Q   And you know who those individuals are?
16   A   Yes, I do.
17   Q   You understand that Mr. Dunn here represents
18   WRCOG?
19   A   Yes, I do.
20   Q   Do you also that Mr. Dunn today in this lawsuit
21   represents the city of Beaumont?
22   A   I do now, yes.
23   Q   And WRCOG -- do you understand in the lawsuit
24   that WRCOG ultimately filed against the city that
25   Mr. Dunn Counsel here today represented WRCOG in that

87

1    lawsuit?
2    A   I wasn't aware of that, no.
3    Q   Were you aware that his Law Firm Best, Best
4    Kreiger -- Krieger represented WRCOG in that lawsuit?
5    A   Yes.
6    Q   And that's the same law firm that's now
7    representing the city ironically; correct?
8    A   Yes.
9    Q   Do you find that a conflict of interest?
10       MR. DUNN:  Objection.  Calls for legal opinion
11   or conclusion.
12       THE WITNESS:  I just find it interesting.
13         (Exhibit 4 was marked for identification
14          and attached hereto.)
15   BY MS. VANDERWEELE:
16   Q   Why do you say that?
17   A   Politics make strange bedfellows.
18   Q   Understood.  Look at Exhibit 4 do you recall
19   receiving this letter when you were mayor of the city of
20   Beaumont?
21   A   I do not.
22   Q   Do you recall responding to this letter?
23   A   I don't remember.  I do not.
24   Q   We will mark this as Exhibit 5.  So the court
25   reporter has handed you what she has marked as Exhibit

88

1    5.  This is a July 2, 2008 letter from the city of
2    Beaumont signed by you as mayor; correct?
3    A   That's correct.
4    Q   And do you see in the first sentence it states,
5    "I am responding to your letter of June 10, 2008
6    regarding the TUMF program and a related audit being
7    conducted by WRCOG"?
8    A   Yes.
9    Q   Does this at all refresh your recollection
10   whether you would have received and reviewed the
11   document that has been marked as Exhibit 4?
12   A   Yes, it does.
13         (Exhibit 5 was marked for identification
14          and attached hereto.)
15   BY MS. VANDERWEELE:
16   Q   And the signature that's on the Exhibit 5
17   that's your signature?
18   A   Yes, it is.
19   Q   And I take it you would have reviewed this
20   letter before you signed it?
21   A   Yes.
22   Q   Turning back to Exhibit 4, I'm sorry to jump
23   around so let me know if I lose you.  In Exhibit 4 the
24   second paragraph talks about the dispute between the
25   city of Beaumont and WRCOG regarding Beaumont's

89

1    responsibility to remit fees in accordance with
2    Beaumont's TUMF, T-u-m-f, ordinance and administrative
3    plan.
4         Do you see that?
5    A   Yes.
6    Q   And the next sentence indicates that WRCOG felt
7    that the value of TUMF which should have been collected
8    from building permits since the inception of the program
9    was $59,000,000; correct?
10   A   Yes.
11   Q   And I understand you disagree with WRCOG's
12   position?
13   A   Yes, I do.
14   Q   All right.  But in any event WRCOG was claiming
15   that the city in June of 2008 owed WRCOG looks like
16   $55,000,000 if I'm doing my math correctly?
17   A   That's correct.  Yes.
18   Q   And if you look at the last page of this
19   document at the very end it states that, "WRCOG further
20   demands that any and all TUMF fees collected by Beaumont
21   pursuant to the terms of the Beaumont's TUMF ordinance
22   and the administrative plan B retained by Beaumont and
23   not expended."
24        Do you see that?
25   A   Yes.



90

1    Q   And WRCOG in the previous sentence was
2  demanding that the city of Beaumont pay the $54 and
3  $55,000,000 in unremitted TUMF fees that WRCOG was
4  claiming.
5        Do you understand that?
6    A   Yes.
7    Q   And ultimately a tolling agreement was entered
8  into. Do you recall that at all?
9    A   Yes, vaguely.
10   Q   WRCOG was threatening litigation against the
11  city in 2008?
12   A   Yes.
13   Q   And that's when you were mayor?
14   A   Yes.
15   Q   And to avoid litigation with WRCOG an agreement
16  was entered into tolling the time -- strike that.
17  Poorly phrased question.
18        When you were mayor to avoid WRCOG filing a
19  lawsuit with a tolling agreement entered into between
20  the city and WRCOG?
21   A   Yes.
22   Q   And did that tolling agreement have to be
23  approved by the city council for the city of Beaumont?
24   A   Yes.
25   Q   Because that's contract that the city entered

91

1  into; correct?
2    A   Correct.
3    Q   Ultimately however WRCOG did sue the city;
4  right?
5    A   Yes.
6    Q   Was that in 2009?
7    A   Yes.
8    Q   Then after the lawsuit was filed the city -- do
9  you recall -- I believe it was one the last city council
10  meetings that you would have been a part of, do you
11  recall that the city passed a resolution to withdraw
12  it's membership from WRCOG?
13   A   I do. I do remember that, yes.
14   Q   And the reason the city was withdrawing it's
15  membership from WRCOG was because WRCOG had sued the
16  city; right?
17      MR. DUNN:  Objection. Calls for information
18  protected by the --
19      THE COURT REPORTER:  I'm sorry the what
20  process?
21      MR. DUNN:  The deliberative and mental thought
22  process privileges. And since the city owns the -- or
23  has the privilege it asserts privilege at this point and
24  would ask that the former counsel member not answer that
25  question.

92

1      MS. VANDERWEELE:  I can ask it a different way.
2  I'll withdraw the question. I'm going to mark as
3  Exhibit 6, if would you hand that to the court reporter
4  to mark.
5        (Exhibit 6 was marked for identification
6        and attached hereto.)
7  BY MS. VANDERWEELE:
8    Q   So the court reporter has handed you what has
9  been marked as Exhibit 6. This is resolution number
10  2010-35. And it's a resolution of the city of Beaumont
11  authorizing withdrawal of the city of Beaumont from
12  membership and participation in the Western Riverside
13  Council of Governments; correct?
14   A   Yes.
15   Q   And actually if you turn to -- it's the eighth
16  page of this document. So it's -- the Bates page number
17  at the bottom is 701?
18   A   Okay.
19   Q   Are you there?
20   A   Yes.
21   Q   And do you see it says -- I believe your
22  signature is on this?
23   A   That's correct.
24   Q   And is that because you were mayor of the city
25  of Beaumont in December of 2010?

93

1    A   That is correct.
2    Q   And it looks like this resolution was passed,
3  approved and adopted on December 7th, 2010?
4    A   Yes.
5    Q   And it was signed by you and attested by the
6  deputy city clerk?
7    A   Yes.
8    Q   Do you recall approving this resolution when
9  you were on city council in 2010?
10   A   Yes.
11   Q   And I take it you would have reviewed this
12  document before it was signed?
13   A   Yes.
14   Q   If you turn to the fourth page of Exhibit -- of
15  this Exhibit, Exhibit 6, I want to focus your attention
16  to paragraph 27, 28.
17        Let me know when you're there?
18   A   Yes, I'm here.
19   Q   Paragraph 27 states that, "From and after
20  August 2008 WRCOG repeatedly threatened to sue the city
21  for a lack of participation in the TUMF program as it
22  relates to the CPFP demanding that the city pay WRCOG
23  some $59,000,000 and presumably forfeit any claim that
24  the city might have to the gas tax."
25        Do you see that?



94

```
1        A   Yes, I do.
2        Q   And then in paragraph 28 it states that, "By
3    October 2008 it had become clear to this council that
4    the city's continued participation in the TUMF program
5    as outlined above had become a legal liability for which
6    termination of the city's continued participation in the
7    TUMF program was necessary in order to reduce it's
8    exposure.  And that legal fees expected to be incurred
9    in the legal litigation will exceed $1,000,000."
10           Do you see that?
11       A   Yes, I do.
12       Q   Then this document goes on to discuss this
13   lawsuit that was filed by WRCOG in paragraph 34;
14   correct?
15       A   Yes.
16       Q   And paragraph 34, let me know when you're
17   there?
18       A   I'm here.
19       Q   Okay.  States that, "On September 15th, 2009
20   WRCOG sued the city asserting the city had failed to
21   transmit collected fees to WRCOG and demanded that the
22   city pay WRCOG an unspecified amount of TUMF program
23   monies allegedly due to WRCOG and presumably to forfeit
24   any claim that the city might have to the gas tax which
25   claim fails to acknowledge the CPFFP and the development
```

95

```
1    agreements entered by the city."
2        Do you see that?
3        A   Yes, I do.
4        Q   And these paragraphs I just read are recitals
5    set forth in this resolution; correct?
6        A   Yes.
7        Q   And are recitals the kind of the background or
8    the basis for resolutions that are passed by city?
9        A   Yes.
10       Q   So the paragraphs that I just read those were
11   all bases for passing the resolution to withdraw the
12   city of Beaumont from it's membership and participation
13   in WRCOG?
14       A   Yes.  Correct.
15       Q   I think before the deposition started you were
16   kind of telling us a little bit about your background.
17   I just want to make sure I've got some questions about
18   that.
19           I understand you're in the construction
20   business?
21       A   That is correct.
22       Q   You got a degree in facilities planning and
23   management, construction management; correct?
24       A   Yes.
25       Q   You also have a bachelor's of arts in business
```

96

```
1    leadership?
2        A   Yes, I do.
3        Q   And you own your own -- is it construction
4    management firm?
5        A   It's -- yes, it's construction management,
6    construction maintenance.
7        Q   And how long have you been in the construction
8    business?
9        A   Oh, officially since about 1977.
10       Q   Okay.  When you were on city council were you
11   also working in the construction business as a private
12   citizen?
13       A   Yes, I was.  As well as director of maintenance
14   and operations for a school district.
15       Q   How long were you director of operations and
16   maintenance for the school?
17       A   I have been director of maintenance and
18   operations for two school districts starting in 1995
19   with Beaumont, went to 1998.  From 1998 to 2009 I
20   believe I was with Hemet Unified School District.  Went
21   back into construction for a little bit and then
22   Beaumont School District called me back and I was their
23   director from 2013 to 2017.
24       Q   Given your background in construction and
25   construction management when you were on city council
```

97

```
1    would you review the plans and specifications for the
2    public works projects that the city council approved?
3        A   I did not review every one of them.  But I
4    reviewed a number of them, yes.
5        Q   And the public works projects that the city
6    undertook did all of those projects need to ultimately
7    be voted on and approved by city council?
8        A   That is correct.
9        Q   I understand that city officials like the Urban
10   Logic principals would make recommendations to city
11   council about public works projects; correct?
12       A   That is correct.
13       Q   But ultimately the city council had to review
14   the plans, specifications and make their own independent
15   judgment as to whether the city should undertake those
16   project?
17       A   That is correct.
18       Q   The invoices that ULC would submit to the city
19   for payment would those undergo a review process?
20       A   They would undergo -- in our agenda we had a
21   consent agenda and there's a list of items to be paid in
22   that consent agenda.  We would list them, see what they
23   were.  If we had specific questions regarding an invoice
24   we would ask -- any council member could ask a question
25   and get that answer.
```



```
                                              98
1        Q   Are you referring to the warrant list?
2        A   Yes, that's correct, yes.
3        Q   So the warrant list would identify payments
4   that the city either had or was going to make to the
5   various vendors and contractors that the city had
6   engaged?
7        A   That's correct.
8        Q   And city council had to vote on and approve all
9   of the payments identified on each warrant list?
10       A   That is correct.
11       Q   And if there were questions about a particular
12  invoice city council had the opportunity to ask those
13  questions?
14       A   That is correct.  We could get a copy of that
15  invoice as well.
16       Q   With the invoices, the actual individual
17  invoices that contractors and vendors submitted would
18  they be reviewed by the finance committee?
19       A   We did not have a finance committee at that
20  time per se.  They do now.  We did not have one.
21       Q   When did the city have a -- first have a
22  financial committee that you can recall?
23       A   I believe it came in after my term of city
24  council.
25       Q   I take it you're familiar with all of the work
```

```
                                              99
1   that Urban Logic did for the city over the decades that
2   they were engaged?
3        A   Well to say all of the work would be kind of --
4   but I'm familiar with the majority of what they did.
5        Q   Sure.  I can be more specific.  There's a
6   number of -- several -- countless -- I shouldn't say
7   that.  Let me strike that.
8            Urban logic provided work to the city for it's
9   public works projects; correct?
10       A   That is correct.
11       Q   And that's pursuant to contracts that Urban
12  Logic had entered into with the city before you joined
13  the counsel; correct?
14       A   That's correct.
15       Q   And did you ever have an opportunity to review
16  those contracts?
17       A   Before they came to -- I'm --
18       Q   Nope.  That's good.  Let me be a little bit
19  more specific.  When you were on city council as a city
20  counsel member did you ever review those contracts that
21  had previously been entered into between the city and
22  Urban Logic?
23       A   Yes, I did.
24       Q   And did you understand that there was a four
25  and a half percent fee cap for certain services that
```

```
                                             100
1   Urban Logic provided to the city?
2        A   That is correct.
3        Q   And that four and a half percent fee cap did
4   you understand applied to plan check, inspection and
5   construction management services?
6        A   That is correct.
7        Q   Other, I guess, more technical services like
8   engineering, design, contractor work were those services
9   subject to a four and a half percent fee cap?
10       MR. DUNN:  Objection.  Calls for legal opinion
11  or conclusion --
12       MS. VANDERWEELE:  I'm simply asking you --
13  sorry.
14       MR. DUNN:  Sorry.  The contract speaks for
15  itself.  Thanks.
16       MS. VANDERWEELE:  Let me reask the question.
17  BY MS. VANDERWEELE:
18       Q   You were on city council for 15 years; correct?
19       A   Yes.
20       Q   And when you were on city council were you kept
21  apprised of the work that Urban Logic was doing through
22  staff reports and things like that?
23       A   Yes, I was.
24       Q   All right.  And I take it you understood the
25  type of services that Urban Logic was providing for the
```

```
                                             101
1   city?
2        A   Yes, I did.
3        Q   All right.  Did you understand based on the
4   knowledge and information that you gained while you were
5   on city council, that the engineering services that
6   Urban Logic provided to the city were not subject to a
7   fee cap?
8        A   That was my understanding.
9        Q   All right.  Now when you were on city council
10  did you ever believe that Urban Logic was submitting
11  inflated invoices?
12       A   No, I did not feel that.
13       Q   Did you ever believe that Urban Logic was
14  submitting invoices for phantom work, work that had not
15  been actually done?
16       A   No.
17       Q   And I take it given your construction
18  experience do you believe that you would have been able
19  to determine whether Urban Logic while you were on city
20  council was submitting false, inflated or phantom
21  invoices.
22       MR. DUNN:  Objection.  Lacks foundations.
23       THE WITNESS:  I on occasion reviewed their work
24  and their invoices together.  And from my personal
25  public contract code having used it as well in my
```

102

1  position at school districts I found that their prices
2  and everything that they do was in line with their
3  contracts as well as in line with what was going to be
4  provided.
5  BY MS. VANDERWEELE:
6      Q  Counsel asked you questions about the bond
7  documents.  And I believe you had said that there was, I
8  think, financial analyst and bond counsel that would
9  assist the city council with the bond offering documents
10  and before they were approved by city council provided
11  by recommendations?
12     A  That's correct.  There's a whole team of
13  individuals that bring the bonds together.
14     Q  And ultimately the city council has to take the
15  information that's given to them exercise their own
16  independent judgement on whether to approve those
17  bond documents; correct?
18     A  That is correct.
19     Q  And that's what you did when you were on city
20  council; correct?
21     A  Yes.  Correct.
22     Q  I think those -- no, I do have a few more
23  questions.  Capital improvement plans those all had to
24  be approved by city council?
25     A  Yes.

103

1      Q  And the capital improvement plans would set
2  forth the public works projects that would be undertaken
3  by the city for a fiscal year?
4      A  Yes.
5      Q  And then the capital improvement plans as I
6  understand it would include the identification the funds
7  for each project, like where the money was coming from?
8      A  Yes.
9      Q  And then a budget for each public works
10  project; correct?
11     A  That is correct.
12     Q  And all of that information, the projects, the
13  funding for those projects and the budget for those
14  projects were all contained in the capital improvement
15  plans that were provided to the city council to review,
16  revise and ultimately vote on and approve; correct?
17     A  Correct.
18         MS. VANDERWEELE:  I think those are all the
19  questions I have for you.  I appreciate your time today,
20  sir.
21         MR. DUNN:  Yeah, I don't have any further
22  questions.  Thank you.
23         MS. VANDERWEELE:  Thank you.
24         THE VIDEOGRAPHER:  Off the record.  The time is
25  12:04 p.m.

104

1          (The proceedings were concluded at 12:04
2          p.m.)
3  ///
4  ///
5  ///
6
7
8          PENALTY OF PERJURY CERTIFICATE
9
10     I, Brian DeForge, do hereby declare under penalty of
11  perjury that I have read the foregoing transcript; that
12  I have made such corrections as noted herein, in ink,
13  initialed by me, or attached hereto; that my testimony
14  as contained herein, as corrected, is true and correct.
15     Executed this _____ day of _____, 2022
16  at _____, California.
17
18
19
20     _____
21          BRIAN DE FORGE
22
23
24
25

105

1      I, Tracey R. Boyer, CSR # 12346, a Certified
2  Shorthand Reporter in and for the County of Riverside,
3  State of California, do hereby certify:
4      That prior to being examined, the witness named in
5  the foregoing deposition was by me duly sworn to testify
6  the truth, the whole truth, and nothing but the truth.
7      That said deposition was taken before me at the time
8  and place set forth and was taken down by me in
9  shorthand and thereafter reduced to computerized
10  transcription under my direction and supervision, and I
11  hereby certify the foregoing deposition is a full, true
12  and correct transcript of my shorthand notes so taken.
13     I further certify that I am neither counsel for nor
14  related to any party to said action nor in anywise
15  interested in the outcome thereof.
16     IN WITNESS WHEREOF, I have hereunto subscribed my
17  name this 28th day of April, 2022.
18
19
20
21     _____
22          Tracey R. Boyer
23          Certified Shorthand Reporter No. 12346
23
24
25

```
 1            E R R A T A
 2    PAGE            LINE
 3    CORRECTION:
 4
 5    REASON FOR CORRECTION:
 6
 7
 8    PAGE            LINE
 9    CORRECTION:
10
11    REASON FOR CORRECTION:
12
13
14    PAGE            LINE
15    CORRECTION:
16
17    REASON FOR CORRECTION:
18
19
20    PAGE            LINE
21    CORRECTION:
22
23    REASON FOR CORRECTION:
24
25
```



**A**

**a.m**
2:16 5:3,11 74:6,9
**ability**
11:9
**able**
28:11 69:3 101:18
**absent**
43:17
**accurate**
49:7 62:5 77:13
**accusation**
65:10
**accusations**
65:7
**accused**
65:11
**acknowledge**
94:25
**acronym**
83:20
**acting**
61:23
**action**
12:3 105:14
**actual**
32:20 98:16
**additions**
76:14
**address**
17:7 68:9 73:11
**adjourn**
27:22
**administered**
6:4
**administrative**
89:2,22
**adopted**
93:3
**Adrian**
36:10,11
**advise**
80:15
**advisors**
58:17 59:12 60:2,22

**affect**
11:9
**agency**
43:6 44:6
**agenda**
51:21 97:20,21,22
**ago**
8:24 9:1
**agree**
25:23 57:2 58:16
**agreement**
32:16 90:7,15,19,22
**agreements**
83:12 95:1
**ahead**
18:2 39:14 43:14
    58:8,13 67:5
**AIG**
14:6,15,21 15:9 86:5
**al**
5:8,9
**alcohol**
11:12
**Allan**
39:8,11,17
**allegation**
65:10
**allegations**
65:7
**allegedly**
94:23
**allow**
7:18
**allowed**
58:13
**allowing**
58:7
**Amended**
12:11
**amount**
15:2 58:6 94:22
**analyst**
102:8
**analysts**
61:25
**announce**

51:14 81:3,21
**announcement**
80:22
**answer**
4:21 7:24 10:23
    17:21 18:20 28:11
    78:10 81:7 83:8
    91:24 97:25
**answered**
19:19 28:12
**answering**
28:14
**answers**
29:5 33:3
**anticipate**
7:24
**anybody**
33:24 36:1
**anyway**
7:5
**anywise**
105:14
**apologize**
32:23 48:23 67:18
**appeal**
66:17,20,22
**appear**
64:8,16 65:3
**appearances**
3:1 5:19
**applied**
100:4
**appointed**
47:20,21 48:7,8
    49:10
**appointment**
48:22
**appreciate**
103:19
**apprised**
100:21
**approval**
50:21 81:3,4
**approve**
50:18 59:22 77:18
    78:3,7 80:6,21,21

80:23 81:19 82:5
    98:8 102:16 103:16
**approved**
71:14 80:20 81:2
    90:23 93:3 97:2,7
    102:10,24
**approving**
93:8
**approximately**
71:11
**April**
1:16 2:17 5:2,10
    105:17
**archives**
21:1 76:8
**area**
58:5 59:9
**areas**
58:4
**arts**
95:25
**aside**
28:14 67:1
**asked**
10:25 24:23 26:8,10
    26:15,18 28:7,18
    37:16 42:24 43:1,4
    44:24 52:21 53:10
    53:14,15 59:19
    62:12,16 65:14,17
    65:20 67:18 72:14
    76:18 82:16 85:15
    102:6
**asking**
26:24 43:3 77:15
    100:12
**asleep**
57:24
**aspects**
60:1
**asserting**
94:20
**asserts**
91:23
**assist**
102:9



**associated**
31:10 36:1 56:24
**Associates**
79:1
**assume**
7:7
**assumed**
62:17
**assuming**
27:3
**attached**
13:20 38:16 68:18
87:14 88:14 92:6
104:13
**attachment**
68:13,16,21,23,24
69:4
**attended**
43:2,3
**attention**
53:9 93:15
**attested**
93:5
**attorney**
3:5,11 14:17 15:13
15:24 16:7 17:12,23
18:15,22 19:16,25
20:13 21:5 23:18
24:5 25:3 29:18
30:20 31:15 32:10
33:2,9,15 35:5,6,24
37:1,18 38:11 42:8
51:22
**attorneys**
14:15,21,23 16:18
17:24 19:17 20:10
20:20,23 27:5 35:9
35:19 43:9 44:15
46:11 51:17 62:24
67:11,25 70:10,22
72:4
**audit**
88:6
**August**
93:20
**authorities**

69:25
**authority**
1:6 2:6 27:20,23 43:6
44:6 50:11,12,18
56:14,20,20,23 58:2
69:20,21 70:4
**authorized**
62:20
**authorizing**
92:11
**available**
7:14 60:9 69:3
**Avenue**
2:15 3:12 5:13
**avoid**
90:15,18
**aware**
9:3,15 27:12,13,13
27:14,16 28:10 45:3
46:4 48:13 66:1
77:23 84:18 85:3
87:2,3

---
**B**
---

**B**
4:7 89:22
**B-i-n-g-h-a-m**
63:25
**B1**
12:13
**bachelor's**
95:25
**back**
10:19 15:22 16:12
18:1 20:3 21:1 27:9
30:24 32:9,22,25
39:5 49:9 63:7
70:20 71:12,16 72:3
76:7 79:18 88:22
96:21,22
**background**
95:7,16 96:24
**based**
22:13 23:15 25:11,15
26:5 43:25 48:12
54:24 74:13 77:6

80:4 82:12 101:3
**bases**
95:11
**basic**
17:17
**basis**
95:8
**Bates**
86:5 92:16
**BCRG**
83:20 84:4
**beat**
47:13
**Beaumont**
5:22 6:11 8:16 18:16
19:7 20:5 22:11
28:24 34:7,19,25
35:8,12,13 36:1,12
41:7 44:5 46:23
47:2,18 48:13,21
49:15,16 50:2 51:21
53:22 54:25 55:13
56:13,14,19,20,23
57:25 75:3,19 76:2
79:14 83:17,23
84:21,23,25 86:5,8
86:21 87:20 88:2,25
89:20,22 90:2,23
92:10,11,25 95:12
96:19,22
**Beaumont's**
54:8 88:25 89:2,21
**bedfellows**
87:17
**beginning**
2:16 29:2 61:7
**begins**
5:6 46:22 49:15
53:22 54:7
**behalf**
2:14 5:24 6:3,11
81:23
**belief**
76:11
**believe**
12:17,20 14:7,11,17

14:23 15:7 16:10,14
16:24 18:6,8 20:1
21:8,20 22:23 23:1
29:19 32:6 37:15
38:14 39:24 41:1,4
43:15 48:1 49:3
51:18 53:6 66:22,25
68:7,19,22 69:11,18
70:6,16,16,21 71:16
72:19 77:2,17 78:25
79:2 83:23 84:7,22
91:9 92:21 96:20
98:23 101:10,13,18
102:7
**believed**
78:1 80:2
**benefit**
62:15
**benefits**
55:12
**best**
3:10,10 5:14,14,21
5:21 7:16 10:7,14
10:18,21,22 11:4,8
16:3 39:22 47:13,25
60:9 76:11 87:3,3
**better**
29:14
**big**
28:4,6
**Bingham**
63:24 64:23 65:3,17
82:19,23 83:16 84:8
84:20
**birthday**
47:11
**bit**
7:12 8:3 18:11 32:23
95:16 96:21 99:18
**body**
56:13
**bond**
58:5,7 59:5 61:16,24
79:16 82:8 102:6,8
102:9,17
**bonds**



56:22,24,25 57:7,11
58:7 61:25 62:19,21
82:12 102:13
**booklet**
10:5,10
**bothering**
40:19
**bottom**
92:17
**Boyer**
1:18 2:18 5:16 105:1
105:22
**break**
11:14 21:25 40:13
45:7 67:3 73:15,18
74:4
**Brian**
1:15 2:14 5:7 6:2
12:11,25 86:7
104:10,20
**briefly**
63:8
**bring**
29:17 51:8,19 58:8
102:13
**brought**
29:17,19 50:20 71:21
77:19
**budget**
103:9,13
**build**
8:4 58:13
**building**
21:14 89:8
**built**
58:11
**Burg**
73:2
**business**
8:22 9:16,20,21
21:14 36:8,9,17
43:10 72:25 95:20
95:25 96:8,11

―――――――― **C** ――――――――

**C-o-g**

6:14,15
**C.C.P**
6:4
**cabinets**
21:13
**calendar**
47:15,16
**California**
1:2,5,17 2:2,5,16,19
3:6,13 5:1,10,13
12:1 52:3 82:25
83:4 85:3 104:16
105:3
**call**
10:12 15:9 17:13,21
17:25 19:15,17,18
19:25 20:1,4 21:5
21:12,17 24:18 26:2
26:4,8 27:7 30:20
31:1,3,5,25 32:5
33:1,7,13 35:24
36:7 37:2,4,9 38:15
38:18,21,22,24,25
39:20,25 40:13,14
40:25 41:17 42:13
42:23 52:20 53:2,4
53:6,10 60:11 70:10
70:16,16 71:10
72:11,12,21
**called**
6:3 16:10,11 18:1,2
20:3,7,13 52:3 56:9
72:13 83:17 84:21
96:22
**calling**
17:18 18:11 19:20
21:22,23,24 22:6
29:21 41:11
**calls**
17:22 20:10,22 34:22
40:9 67:24 78:9
80:10 87:10 91:17
100:10
**cap**
99:25 100:3,9 101:7
**capacities**

58:25
**capacity**
56:12 61:23 79:11
**capital**
102:23 103:1,5,14
**caption**
75:13
**care**
17:23
**carried**
30:9
**carrier**
30:8
**case**
1:8 2:8 5:23 9:2,4
18:15,17 20:20
24:14 40:18 66:14
66:19,23 71:7 75:6
75:13 80:23
**Castaldo**
73:3
**catch**
18:24
**cell**
16:10 18:5 20:10,13
21:4 25:25 35:6
38:9 40:9
**centered**
29:13
**Central**
1:2 2:2 5:10 12:1
**certain**
23:3 38:3 53:7 99:25
**CERTIFICATE**
104:8
**Certified**
2:18 105:1,22
**certify**
105:3,11,13
**chair**
56:19,22 69:21,22,24
70:3 71:24 72:1
86:11,12
**chairman**
70:5
**chance**

66:8
**change**
8:3 42:1,13 70:11
**changed**
42:3 69:12,14
**changes**
10:8,10 41:25 63:22
70:15,18 71:23
76:14 77:3
**characterize**
64:22
**charge**
83:10,10
**charges**
30:22 83:11
**check**
39:16 100:4
**checkout**
21:12
**Chetney**
36:10,11
**chose**
71:16
**Chuck**
86:11
**cities**
28:1,3,4 50:20 64:15
**citizen**
96:12
**citizens**
51:19 83:18,23
**city**
5:22 6:11 8:16,17,21
18:16,23 19:2,7
22:11,17,24 23:13
24:11,14,24 25:4,7
25:9 26:19 27:18,19
28:23,24 29:10 30:8
30:9,18 31:20 32:12
34:7,15,18,18,25
35:7,12,13,14,18,19
35:21 36:1,12 38:7
39:6 41:7,8,13
42:24 43:2,2,10,20
44:1,4,7,9,11 46:22
47:2,7,19,23 48:8



48:13,20,20,22
49:10,14,16 50:2,5
50:7,10,14,25 51:12
51:20,21,22 52:2,9
52:16 53:11,22 54:4
54:7,16,25 55:13,17
56:11,12,12 58:13
58:18 59:4,7,16,25
60:23 61:24 63:1
64:8,20 65:3,18
66:16,16,19 73:3
75:3,19 76:2 77:17
77:19,22,23,23,24
78:1,3,4,5,6,16,16
78:19,21,22 79:13
79:19,19,21,22 80:2
80:2,5,6,16,20 81:1
81:4,12,19,24,24,25
81:25 82:1,4,5,13
82:20 84:1,17,24
85:2,9,11,16,19,21
86:7,21,24 87:7,19
88:1,25 89:15 90:2
90:11,20,23,23,25
91:3,8,9,11,14,16
91:22 92:10,11,24
93:6,9,20,22,24
94:20,20,22,24 95:1
95:8,12 96:10,25
97:2,5,7,9,10,13,15
97:18 98:4,5,8,12
98:21,23 99:1,8,12
99:19,19,21 100:1
100:18,20 101:1,5,6
101:9,19 102:9,10
102:14,19,24 103:3
103:15
**city's**
50:11,13 80:8 81:2
81:15,16,20 94:4,6
**civil**
12:2,12
**claim**
51:13,20 52:6,15,15
53:11 78:4 80:7,15
80:17 81:11,12,17

93:23 94:24,25
**claiming**
89:14 90:4
**claims**
52:4,9,12,12 53:14
77:18 79:19 80:13
**clarification**
7:3 69:13,21 70:9
71:8
**clarifications**
59:20
**clarified**
71:25
**clarify**
21:23 30:4,14 78:13
**clarifying**
60:15
**clause**
56:17
**clean**
81:7
**clear**
19:23 22:25 25:13
35:15 94:3
**clerk**
93:6
**client**
76:2
**closed**
44:11,19 45:1 51:22
53:16 80:13,22 81:8
81:9,12
**code**
101:25
**collected**
89:7,20 94:21
**come**
30:21 34:5,8,22
50:16 53:17 60:21
63:7 73:25 80:22
81:4
**comes**
52:15
**coming**
58:9,10 65:17 72:8
103:7

**comment**
10:11 60:6 64:9
82:21
**Commission**
85:4
**committee**
27:21,23 98:18,19,22
**committees**
41:14
**common**
8:2 28:1 44:10
**commonly**
64:7,14
**communicate**
8:3 11:10
**communicating**
62:22,23
**communication**
16:17 33:8 35:18
37:1 67:22 68:3
**communications**
27:4 32:25
**companies**
59:6 78:5 79:23
**company**
1:9 2:9 5:25 15:10,13
15:24 16:7,18 17:12
18:22,23 19:2,5,15
19:24 20:23 21:5
23:8,11,12,18 24:3
25:3 27:5 29:18,20
30:20 31:14 32:10
33:1,9,14 35:5,6,9
35:19,24 37:1,13,17
38:10 42:8,12,16
43:9 46:11 50:7,9
50:19 67:11,25
68:13 70:10,22 72:4
74:17 75:22 76:3
79:2,7,25
**company's**
62:23
**compensated**
55:15
**complete**
58:19

**complex**
57:3
**computerized**
105:9
**concerned**
65:23 69:19 83:18
**concerning**
40:21 77:18
**concerns**
29:6 82:20,23,24
**concluded**
104:1
**conclusion**
51:14 78:9 80:11
87:11 100:11
**conducted**
88:7
**confirm**
77:12
**conflict**
65:19 82:25 83:4
87:9
**conflicts**
62:25 65:24
**confusing**
43:15
**connection**
8:16
**consent**
97:21,22
**consider**
51:13
**construction**
95:19,23 96:3,5,6,7
96:11,21,24,25
100:5 101:17
**consultants**
53:23 59:12 60:22
84:2
**contact**
15:23 16:6 17:11
19:23,24 35:7 72:7
72:11
**contacted**
16:9 24:2 35:9,21
**contained**



103:14 104:14

**content**
84:13

**context**
8:20

**continued**
94:4,6

**contract**
30:17 53:22 55:19,20
85:10 90:25 100:14
101:25

**contracted**
39:6 78:21

**contractor**
100:8

**contractors**
98:5,17

**contracts**
55:13 99:11,16,20
102:3

**conversation**
7:23 11:2,4 17:15
22:19,22 24:1,23
25:3,20,25 26:7,21
27:2,4,10 28:6 29:8
29:12 31:19 35:5,17
36:24 37:16 38:8
41:5,8 43:19 67:10
67:15,20

**conversations**
31:9 36:2 38:10
79:10

**convey**
70:11

**coordinator**
50:1

**copies**
16:20

**copy**
12:7 14:5 32:15 68:5
98:14

**corner**
45:21

**corp**
9:23

**corporation**

9:19,23

**correct**
6:23 8:10,11 9:17,18
12:23 14:22 15:13
15:14 25:16,18 27:5
31:1,2 33:6 37:11
39:23 41:18,19,24
42:9 44:1,2,12,13
45:16 46:6,8,9,19
47:17 48:6 49:11
51:17 52:12,14,18
54:4,16 55:3,13,14
55:15,16 56:14,15
58:21,23 59:2,3,10
60:6,19 61:14 62:6
63:12 64:9,10,17,18
65:4,8,12,13,25
66:4,6,18,24 67:12
67:17 68:14 69:5
74:14,15,18 75:7,8
75:17,18,20,23,24
76:12,13,19,20,25
77:1,6,7,21 78:17
78:23 81:4,13,14,18
81:22 82:2,3,6,14
82:15,22 83:1,2,5
83:25 85:12,13 87:7
88:2,3 89:9,17 91:1
91:2 92:13,23 93:1
94:14 95:5,14,21,23
97:8,11,12,17 98:2
98:7,10,14 99:9,10
99:13,14 100:2,6,18
102:12,17,18,20,21
103:10,11,16,17
104:14 105:12

**corrected**
55:2 104:14

**CORRECTION**
106:3,5,9,11,15,17
106:21,23

**corrections**
71:20 104:12

**correctly**
23:1 62:18 77:20
84:7 89:16

**council**
1:5 2:5 5:8,23 6:18
6:25 18:18 24:15,17
26:11,19 27:18,22
27:25 28:23 31:12
36:4 41:15 42:24
43:2,5,7,10,16 44:1
44:4,9,11 47:2,7,14
47:19,23 48:8,13,20
48:22 49:10 50:10
50:16,18,21,25
51:12 52:10,16 54:4
54:16,25 55:25 56:2
56:2,4,6,11,12 58:2
59:11,16,25 60:7
63:11,17,18 64:20
65:4,18,24 66:10,16
66:20 73:4 75:16
77:17,23 78:3,6,19
78:22 79:21 80:2,5
80:6,20,21 81:2,4
81:19 82:1,4,14,21
84:1,17,24 85:2,9
85:11,16 90:23 91:9
92:13 93:9 94:3
96:10,25 97:2,7,11
97:13,24 98:8,12,24
99:19 100:18,20
101:5,9,20 102:9,10
102:14,20,24
103:15

**councilman**
28:24 35:13 41:13
45:4

**councils**
64:8

**counsel**
5:18 7:18 8:4,17
12:22 14:5,10,13
15:6,6,9,10 21:20
22:4,9 43:2 61:24
73:14 77:15 80:14
80:14 81:16,25
82:16 85:15 86:25
91:24 99:13,20
102:6,8 105:13

**Counsel's**
74:13 76:18

**countless**
99:6

**County**
105:2

**Couple**
10:6

**course**
20:6 24:14 40:16

**court**
1:1 2:1 5:9,16 6:12
7:15,19,20 10:2
11:25 19:8 39:9,12
39:16 46:12 63:24
86:3 87:24 91:19
92:3,8

**covered**
52:11,16 78:2 80:3

**covers**
22:25

**CPFFP**
94:25

**CPFP**
93:22

**created**
23:23

**credibility**
10:13

**CROSS**
74:10

**CSR**
1:19 2:18 105:1

**currently**
9:13,24 36:12

**cycle**
48:5

---
**D**
---

**D**
53:25

**dad**
38:5

**dangerous**
57:18

**date**



5:10 13:12,16
**dated**
86:6
**daughter's**
47:11
**Dave**
53:25
**David**
53:25
**day**
7:23 13:13 68:12
  72:16 104:15
  105:17
**DE**
1:15 2:14 6:2 104:20
**decades**
99:1
**December**
16:6,7 47:14 92:25
  93:3
**decided**
50:15 66:17
**decision**
51:15 60:10 66:14
**decisions**
60:17
**declaration**
4:12 12:25 13:4
  25:15 33:13,15,20
  33:23 34:2,3,9,14
  34:20 37:3,23,24
  39:6 40:22 41:16,18
  45:15 46:3,5,8,11
  53:5 55:10 62:10,13
  65:15 67:15,20,24
  68:4,16,19 69:16
  70:14,24 71:5,12
  74:20 75:9 76:1,10
  76:15,22,25 77:5,9
  77:12,16 82:7
**declare**
104:10
**deemed**
52:11
**defamation**
84:3

**Defamatory**
84:11,12
**defendant**
3:9 5:25 6:3 9:11
  75:6,23
**DEFENDANT'S**
4:14
**Defendants**
1:11 2:11,15
**define**
85:22
**defined**
61:10,10,11,11
**definition**
64:13
**DeForge**
5:7 6:9,17 12:4,11,14
  13:1,3,9 25:14 32:8
  48:11 50:22 57:2
  61:21 73:18 74:12
  86:7 104:10
**degree**
95:22
**delete**
17:1
**deliberative**
91:21
**demand**
85:18,21,23
**demanded**
94:21
**demanding**
90:2 93:22
**demands**
89:20
**deny**
80:16
**department**
30:17 49:17,23,24
**depose**
71:7
**deposed**
8:9 34:15,17 72:14
  72:15
**deposition**
1:15 2:14 4:10,11 5:6

5:12 7:7,13 8:8,15
  8:25 9:4 12:2,11
  17:11 20:18 33:16
  33:17,18,19,21,24
  34:6,8 46:7 71:5,6
  72:22,23 86:2 95:15
  105:5,7,11
**depositions**
9:8,8 24:11
**Depot**
20:5 21:11,12 35:7
  73:1
**deputy**
93:6
**describe**
64:7
**described**
23:19 31:9
**DESCRIPTION**
4:9
**design**
100:8
**detail**
45:14
**determine**
101:19
**developed**
7:25 26:3 32:25 41:9
  62:19
**developing**
57:25
**development**
54:8 94:25
**dictionary**
64:12
**DIESTRICT**
1:2 2:2
**different**
27:17,19,21 29:16
  39:6 41:14,14 43:7
  44:5 56:10,10 58:14
  69:24 70:1 80:17
  83:10 92:1
**difficult**
7:20 73:22
**Dillon**

53:25,25 54:7,13,14
  55:11 61:13 62:13
  62:25
**direction**
105:10
**director**
96:13,15,17,23
**disagree**
89:11
**disagreements**
31:11
**disapprove**
50:19 59:22
**disclosure**
59:25
**disclosures**
59:1
**Discoverable**
34:4
**discuss**
39:4 51:23 94:12
**discussed**
39:1 53:1,3 72:17
  80:14 81:12
**discussing**
29:9 53:19
**discussion**
21:23 81:10
**dismissed**
84:18,19
**dispute**
23:22 30:1 42:15
  88:24
**district**
1:1 2:1 5:9,10 11:25
  12:1 24:12 96:14,20
  96:22
**districts**
49:25 96:18 102:1
**document**
11:24 12:5,6,10,15
  12:25 13:17,23 14:5
  14:21 15:12,15
  38:16,22 40:23 42:7
  68:18 76:19 86:4
  88:11 89:19 92:16



93:12 94:12
**documents**
11:19,21 37:17,20,21
    37:25 38:2,3 40:25
    41:3 57:3,16 58:1
    82:8 83:13 102:7,9
    102:17
**doing**
33:21 41:11 43:11
    89:16 100:21
**door**
34:5,8
**double**
39:16
**draft**
15:17,18,21 41:20
    76:1,21
**drafted**
76:19
**drafts**
15:16
**due**
94:23
**duly**
6:4 105:5
**Dunn**
3:11 4:4 5:20,20 6:8
    6:13,15,16 12:21,24
    13:2,21 19:13 25:10
    25:19 36:22,23
    39:13,15,19 42:20
    43:13 44:18 45:10
    45:11 57:15 60:14
    61:2,3 63:25 64:1
    65:2 67:7,9 73:9,14
    73:20 78:8 80:9
    83:6 86:17,20,25
    87:10 91:17,21
    100:10,14 101:22
    103:21
**duties**
26:13

---
**E**
---
**E**
4:7 12:25 106:1

**E-r-m-a-c**
79:6
**earlier**
15:16 31:9 37:14
    42:14
**earth**
24:2
**easier**
85:25
**easiest**
45:6
**economic**
54:8
**edit**
70:11
**edits**
71:20
**effect**
62:16 70:25 76:6
**Eger**
53:25,25 54:13,14
    55:11 61:12 62:13
    62:25
**eight**
19:11 27:15 55:20,21
    56:17 63:6
**eighth**
92:15
**either**
9:10 14:7 15:9 56:8
    71:15 98:4
**election**
48:4
**eleven**
82:9
**email**
14:5 16:17 17:7
    19:18,25 20:24,25
    37:9,12 38:14,16
    68:3,5,12,12,13,20
    68:22 70:12,13
    71:15 76:8
**emailed**
68:4 70:21 72:3
**emails**
16:13,16,20 17:3,4

37:14 38:13 74:20
    74:24 76:6
**employee**
50:8,9
**employees**
39:7
**ended**
36:24
**engaged**
98:6 99:2
**engaging**
25:2
**engineering**
100:8 101:5
**entered**
50:19 90:7,16,19,25
    95:1 99:12,21
**entirely**
49:7
**entirety**
69:3
**entitled**
10:18 12:25
**entity**
9:16
**ERMAC**
79:5
**Ernest**
53:25
**Ernie**
53:25
**escorted**
47:12
**Esparza**
5:15
**especially**
27:18
**ESQ**
3:11
**estimate**
10:18 16:4 33:5
    39:22 47:25
**estimated**
8:15 67:12
**et**
5:8,9

**event**
11:4 89:14
**events**
19:22 23:3,3 26:18
    49:8
**eventually**
10:3
**exactly**
20:25
**EXAMINATION**
4:3 6:7 74:10
**examined**
6:5 105:4
**example**
10:10 49:25 50:19
    72:24
**exceed**
94:9
**excellent**
57:23
**excess**
62:15
**exchanging**
74:20,24 75:1
**excuse**
35:18 36:20 48:23
    63:14
**Executed**
104:15
**exercise**
102:15
**exhibit**
11:24 12:3,10 13:3
    15:1,3,4 16:4 45:12
    45:15 53:21 54:6
    67:2,16 86:1,2,4
    87:13,18,24,25
    88:11,13,16,22,23
    92:3,5,9 93:14,15
    93:15
**Exhibits**
4:8,14 13:19
**expected**
94:8
**expended**
89:23



**experience**
25:24 46:2 54:24
  80:4 82:13 101:18
**explain**
11:1 19:1 57:6
**explained**
22:5 29:20 31:18,24
  32:2,4 45:1 46:10
  81:8
**explanation**
22:23 23:7,17,24
  29:22 30:11 43:8
**exposure**
94:8

—————— F ——————
**facilities**
95:22
**facing**
73:23
**fact**
58:25 65:3 76:24
**facts**
48:14
**failed**
94:20
**fails**
94:25
**fair**
8:19 15:2 31:3,12
  36:21,22 37:25 48:4
  52:12,14 56:9 59:11
  64:22 65:7 76:9
  85:3,20
**fairly**
25:24 35:15 44:10
  57:3 58:22 59:8
**fairness**
76:17
**fall**
57:24
**false**
101:20
**familiar**
29:15 64:5 98:25
  99:4

**far**
65:23
**fashion**
35:21
**fax**
14:4 71:17
**faxed**
14:7
**Federal**
12:12
**fee**
19:10 29:1 99:25
  100:3,9 101:7
**feel**
101:12
**fees**
66:11 89:1,20 90:3
  94:8,21
**felt**
25:8 28:25,25 42:2
  42:18 71:22 89:6
**fifth**
2:15 5:13
**figure**
15:8 41:8
**figured**
10:1 34:20
**filed**
84:3 86:24 91:8
  94:13
**filing**
90:18
**fill**
85:6
**final**
50:11,12
**finally**
66:23
**finance**
27:22 58:20 59:5,9
  98:18,19
**finances**
59:1 60:1
**financial**
27:20 55:12 58:2
  61:25 62:14 98:22

  102:8
**financially**
85:9
**financing**
43:6 44:5 56:14,20
  56:20,23 57:3 58:17
  58:23 69:21 70:3
**find**
87:9,12
**fine**
15:11 45:9 67:6
  73:17,21
**finished**
64:2
**Fire**
1:9 2:9 5:8,25 15:7
  74:17 75:6,22 76:3
**firm**
5:21 39:18 87:3,6
  96:4
**first**
6:4 11:23,24,25 15:5
  15:12,23 16:9,15
  17:11 18:4,24 19:23
  20:22 21:18 29:18
  29:19 32:4,9 35:4
  37:12,15 40:14 41:7
  46:5,15 47:1,18
  49:9 50:16 52:20
  53:4 55:9 57:23
  62:11 65:14 68:25
  69:6 88:4 98:21
**fiscal**
103:3
**five**
8:13,14 13:10 54:6
  54:12
**five-page**
12:25
**floor**
2:15 5:13
**focus**
29:9 55:5 93:15
**focused**
31:3,5
**focusing**

49:6 53:9
**follow-up**
73:12 74:12
**following**
48:14
**follows**
6:5
**foregoing**
104:11 105:5,11
**forfeit**
93:23 94:23
**FORGE**
1:15 2:14 6:2 104:20
**form**
10:4,10 43:12 44:16
  59:15 60:25 64:25
  85:6
**formed**
26:4 83:17
**former**
36:4 73:3 91:24
**forth**
48:14 95:5 103:2
  105:8
**forward**
20:21 25:14 49:3
**found**
18:3 102:1
**foundation**
80:10 83:6
**foundations**
101:22
**four**
53:20,21 99:24 100:3
  100:9
**four-year**
48:2
**fourth**
93:14
**FPPC**
85:4
**free**
71:6
**frequently**
64:8
**friend**



36:18 72:25
**front**
8:7 11:22 45:18
53:18 75:10 86:4
**full**
44:3 105:11
**fully**
7:25
**funding**
80:18 103:13
**funds**
23:2 30:9 32:6 62:21
103:6
**funny**
49:1
**further**
21:23 33:8 72:6
89:19 103:21
105:13

_____

**G**

**gadflies**
64:17,23 82:17
**gadfly**
64:5,19 65:1
**gained**
82:13 101:4
**garden**
21:16
**gas**
93:24 94:24
**Gate**
84:21,23,25
**generally**
29:9,13 31:9 64:13
81:11
**gentleman**
79:3
**gentlemen**
54:1
**getting**
29:14 34:22 38:5
55:12 62:14 70:12
**GGMS**
39:18
**give**

10:7,9,14 11:8 17:7
18:13 28:17 34:14
36:20 51:6 57:5
68:9 71:6
**given**
23:7,17 25:6 26:6
38:21 41:18,20,21
46:7 50:17 51:4,17
52:19 55:9 60:8
62:10 96:24 101:17
102:15
**giving**
46:12
**glib**
57:20
**go**
10:19 11:19 20:2
21:1 26:3 27:22,23
39:14 42:5 43:14
44:11 45:12,14
46:14,21 49:3,14
51:6,24 64:11 65:20
70:14,17,24 71:3
73:16 76:7 84:25
**goes**
32:9 49:9 53:23 54:8
94:12
**going**
7:16 15:2 16:2,2,25
25:8 26:25 27:1,9
29:4 32:22 33:8
38:25 40:20,20
45:10,14 51:5,7
57:24 60:16,21 67:6
68:8 69:16 70:23,24
70:25 71:4 72:14,15
73:17,23 78:4 79:24
92:2 98:4 102:3
**good**
5:5 6:9 11:7 45:5
56:8 67:7,8 99:18
**GORDON**
3:4
**gosh**
47:24
**governing**

56:13
**Governments**
1:5 2:5 5:8,23 6:19
6:25 75:17 92:13
**great**
17:10 45:20
**Greek**
57:12
**Gregg**
79:3,5,9,10
**Gregg's**
79:13
**group**
83:17,18 84:4
**Growth**
83:24
**guess**
10:17,24 11:1,3
60:15 85:25 100:7
**guilty**
65:11 83:3,10
**GW(KKx)**
1:8 2:8

_____

**H**

**H**
4:7
**half**
99:25 100:3,9
**hall**
35:14
**hand**
92:3
**handed**
86:1 87:25 92:8
**handled**
53:11
**handling**
50:4,7
**happen**
70:23
**happened**
19:14 21:11 23:3
26:18 68:2,11 71:13
**happy**
78:11

**hat**
44:5
**hats**
27:19,21 41:14 56:10
56:10
**head**
79:15
**hear**
63:3
**heard**
6:21 10:25 63:5
**Hello**
21:19
**help**
24:14,24
**helper**
14:24
**helpful**
8:5 43:24
**helping**
25:4,7
**helps**
7:19
**Hemet**
96:20
**hereto**
13:20 87:14 88:14
92:6 104:13
**hereunto**
105:16
**hesitant**
14:12
**hesitate**
7:4
**Hey**
7:5
**hide**
18:2
**hire**
59:17
**hired**
30:18
**historic**
28:19,21 29:6,13
38:5
**history**



38:4
**hits**
53:17
**hold**
16:25 68:8
**home**
14:1 20:5 21:11,12
    35:7 39:20 40:2
    73:1
**homeowners**
58:10
**homes**
58:9,15
**honest**
18:18 42:3
**honorable**
86:7
**hopping**
32:23
**hose**
17:4
**hour**
40:1
**hours**
69:6
**house**
13:25 21:14 58:11,12
**hung**
24:20
**hurt**
53:18
**hypothetical**
78:8 80:9
**hypothetically**
80:1

———————————
                **I**
**idea**
71:24
**identification**
13:20 87:13 88:13
    92:5 103:6
**identified**
21:20 41:10 98:9
**identify**
98:3

**illegal**
23:3
**illegalities**
30:17,19
**important**
7:14 8:6 10:6 59:24
**improvement**
58:5 102:23 103:1,5
    103:14
**in-house**
49:23
**inception**
89:8
**include**
103:6
**inclusive**
1:10 2:10
**Incomplete**
78:8 80:9
**incorrectly**
62:17
**incurred**
94:8
**independent**
30:25 97:14 102:16
**INDEX**
4:1
**indicated**
53:3 54:15,25 63:15
**indicates**
89:6
**individual**
58:3 98:16
**individually**
43:11
**individuals**
53:24 64:7,8,15,19
    65:25 86:15 102:13
**inflated**
101:11,20
**influence**
11:9
**information**
17:25 18:1,4,13
    19:19 20:4 24:13,16
    26:5 28:17,19,22

31:6,8 43:25 44:14
    44:19 45:2 50:17
    60:8,9,18,21 76:9
    76:17 82:7 91:17
    101:4 102:15
    103:12
**informed**
60:2,17 76:1
**infrastructure**
58:8,14
**initial**
17:21 18:21 21:22
    70:12
**initialed**
104:13
**initially**
18:15 19:6 26:6 30:6
    42:18 51:4 69:1
**ink**
104:12
**inspection**
100:4
**INSTRUCTION**
4:21
**instructions**
37:9 71:14
**insurance**
1:9 2:9 5:9,25 15:10
    15:13,23 16:7,17
    17:12 18:22,23 19:1
    19:5,15,24 20:23
    21:5 22:23,25 23:8
    23:11,12,18 24:3
    25:3 27:5 29:18,20
    30:8,20 31:14,19
    32:10 33:1,9,14
    35:5,6,9,19,24 37:1
    37:13,17 38:10 42:8
    42:12,16 43:9 46:10
    49:17,24 50:1,11,13
    50:15,19,23 51:13
    51:17 52:11,16
    53:12,13 62:23
    67:11,25 68:13
    70:10,22 72:4 74:17
    75:6,22 76:3 77:16

77:24 78:5,16 79:19
    79:20,23,25 81:23
    82:2,5
**insurer's**
80:8
**intentionally**
7:22
**interest**
63:1 65:19,25 82:25
    83:4 87:9
**interested**
85:9 105:15
**interesting**
87:12
**interrupt**
7:4,17
**introduce**
22:1
**introduced**
6:10 22:3 40:16
**introduction**
17:17 41:6
**introductory**
18:10
**invoice**
97:23 98:12,15
**invoices**
97:18 98:16,17
    101:11,14,21,24
**involved**
9:5,9,10,13,20,24
    11:2 26:16 41:7
    59:1 71:7 82:12
**involvement**
8:20 29:10,10 35:20
    36:11 42:12 44:1
    54:4
**involving**
53:12
**ironically**
87:7
**Irvine**
3:6,13
**issue**
50:23
**issued**



31:20 56:21,21
77:24 78:5
**item**
51:22
**items**
28:16 51:21 97:21

**J**

**James**
79:3
**Jan**
48:10
**January**
13:13 16:5 37:6
39:23 72:4
**Jeff**
86:12
**jeff.dunn@bbklaw...**
3:14
**Jeffrey**
3:11 5:20
**job**
59:20,21
**Joe**
51:21
**joined**
47:18 99:12
**joining**
50:21
**Joint**
1:6 2:6
**JPA**
50:20,21 80:18,19
**judge**
66:13
**judge's**
84:14
**judgement**
102:16
**judgment**
97:15
**Judith**
63:23 65:17
**Judy**
63:23 65:17 82:19
**July**

47:9 88:1
**jump**
88:22
**June**
86:6 88:5 89:15

**K**

**K-a-p-a-n-i-c-a-s**
39:15,17
**Kapanicas**
39:17,18 59:8,13
63:19
**Karman**
3:12
**Keenon**
79:1
**keep**
19:22 26:25 27:1
32:24 33:20,23 38:4
45:10 67:4,6 73:17
**kept**
100:20
**key**
30:17 58:4
**kind**
18:11 26:24 36:12
40:20 42:25 69:2
95:7,16 99:3
**knew**
38:1 63:17,19 71:3
**knocking**
34:5,8
**know**
7:4,5 8:6 11:17 12:15
14:23,24 18:14
24:15,18 27:15,17
28:8 32:3,8,11,12
32:25 33:8 35:11
38:25 39:5 41:6,12
43:9 47:12 50:25
51:4 52:6 53:24
54:1,3 57:12 59:22
61:22 62:14,15
63:10,16 64:2 67:18
70:7 71:5,25 72:13
75:10 81:9 83:9

85:24 86:15 88:23
93:17 94:16
**knowing**
34:2
**knowledge**
29:7,14 48:13,19,21
49:5,8 50:22 56:23
57:6,7 60:9 61:21
63:14 76:11 80:4
82:11,12 101:4
**knowledgeable**
59:8
**known**
54:15 55:1
**Kreiger**
3:10 5:14,21 87:4,4

**L**

**L**
45:22
**labeled**
12:10
**lack**
93:21
**Lacks**
80:10 83:6 101:22
**lady**
14:12 40:6,18
**language**
51:16
**lasted**
25:21 33:5 71:11
**lasts**
67:11
**law**
3:5,11 5:21 65:19
82:25 83:4 87:3,6
**lawsuit**
9:5,9 23:7,11,23
27:13,14 30:10,12
35:20 41:11 74:22
84:6,18 86:20,23
87:1,4 90:19 91:8
94:13
**lawyer**
81:2,15,20

**lawyers**
58:25 71:7
**lead**
35:19 60:7
**leadership**
96:1
**leading**
25:5,17 42:17 59:15
60:4,25 61:1
**learn**
58:3
**led**
25:15 31:6 53:8
**left**
18:5 19:23 20:6
21:14 35:12,13
36:19 66:19
**left-hand**
45:21
**legal**
5:15,16 7:18 14:5
15:6,6 46:3 58:22
78:9 80:10,14,14
81:25 87:10 94:5,8
94:9 100:10
**Lesia**
48:10
**lesser**
83:11
**let's**
15:1 20:21 21:25
26:3 45:5,5,5,10,12
46:14,21 49:14
53:20 61:4 63:13
66:7
**letter**
4:15,16 85:18,21,23
86:6 87:19,22 88:1
88:5,20
**liability**
94:5
**line**
4:22 21:12 58:3
76:25,25 102:2,3
106:2,8,14,20
**list**



97:21,22 98:1,3,9
**listed**
51:20
**listened**
17:22 19:18 20:2
**listening**
19:5
**litigating**
18:15
**litigation**
9:14,24 19:2 32:12
   50:24 51:24 66:10
   85:16 90:10,15 94:9
**little**
7:12 8:3 17:24,25
   18:11 19:19 32:23
   43:15 49:1 80:12
   95:16 96:21 99:18
**LLP**
3:4,10
**local**
32:19
**logic**
39:7,9,11 53:22 84:2
   97:10 99:1,8,12,22
   100:1,21,25 101:6
   101:10,13,19
**long**
8:24 11:18 24:15
   25:20,24 37:4 38:2
   39:25 58:6 67:19
   96:7,15
**look**
12:4,15 16:12 21:1
   37:17,25 38:17,22
   54:6 55:4 56:16
   58:4 61:4 62:7 63:7
   63:13,21 66:2,7
   68:12 75:9 76:8
   84:25 86:3 87:18
   89:18
**looked**
80:19
**looking**
24:12 34:8 39:5 41:2
   43:22 82:16 84:10

**looks**
10:4 89:15 93:2
**lose**
88:23
**loss**
78:2,2 80:2
**lot**
11:19 24:16 27:19
   67:2

_____

## M

**Magna**
5:15,16
**mails**
34:22
**maintain**
49:16
**maintenance**
96:6,13,16,17
**majority**
99:4
**making**
61:15
**malice**
84:13,15
**malicious**
84:12
**management**
49:17,21,24 50:4
   79:2 95:23,23 96:4
   96:5,25 100:5
**manager**
49:25 50:14 51:23
   78:21 81:25
**MANSUKHANI**
3:4
**Marjani**
54:1,14 55:12 61:13
   61:18 62:14,25
**mark**
86:1,1 87:24 92:2,4
**marked**
12:9,24 13:19 86:3
   87:13,25 88:11,13
   92:5,9
**matches**

64:13
**math**
47:24 89:16
**matter**
5:7 22:18 46:3 73:4
**matters**
77:18
**mayor**
26:12,14 28:25 41:13
   48:9 55:22,23,25
   56:2,2,5,5,7 69:25
   69:25 70:2 72:1
   85:17,21 86:7,7
   87:19 88:2 90:13,18
   92:24
**Meagan**
3:4 5:24 14:24 16:14
   40:6,16 72:13,21
   74:13
**mean**
6:18 20:3 37:23
   49:20 50:13 61:22
   65:10 71:17
**medication**
11:9
**meet**
72:18
**meeting**
16:19 43:20 44:9
   56:11 58:2 65:18
   70:14 76:24 77:6
**meetings**
26:15,19 42:24 43:1
   43:2 44:1,4,12
   64:20 65:4 91:10
**member**
8:17 26:11 54:4,24
   56:10 63:22 85:11
   91:24 97:24 99:20
**members**
36:4 43:20 73:3
   82:20 84:4
**membership**
91:12,15 92:12 95:12
**memory**
16:3 39:3

**mental**
91:21
**mention**
69:18
**mentioned**
16:16
**met**
43:10,16 72:19
**mid**
37:7
**middle**
47:11
**mind**
24:22 25:1,8,8 30:25
   31:18 34:13 36:25
   52:23 62:5,12 65:9
   65:16,20 69:10
**minor**
42:1,6 69:12,13 70:6
   71:20,23
**minute**
26:3
**minutes**
25:22,23 33:5 40:1
   67:12 70:19 71:11
**Miriam**
64:12
**Misters**
62:13
**mitigation**
19:10 29:1
**moment**
12:4,14 13:6 42:4
   54:9,21 61:5 69:15
   86:3
**moments**
10:20
**money**
79:22,25 103:7
**monies**
94:23
**months**
47:7
**morning**
5:5 6:9 7:2 11:12,17
   11:20 22:4 72:20



**mouth**
23:5
**move**
20:21 53:20
**moved**
25:14 58:15
**municipal**
48:4 57:3 58:17,19
  59:1,9
**mutually**
7:8
**mvanderweele@gr...**
3:7

**N**

**name**
5:20 16:12,13,14
  22:3 39:12 40:7,19
  63:24 79:8 105:17
**named**
38:5 79:3 105:4
**National**
1:9 2:9 5:8,25 15:7
  74:16 75:6,22 76:2
**natural**
7:23
**nature**
8:7
**necessary**
94:7
**need**
7:3 8:7 10:23 60:1,17
  72:18 73:10 97:6
**needed**
42:2 70:15,18 71:25
**neither**
105:13
**never**
10:25 25:6 31:6
  32:20 58:13 72:2,19
  83:15 85:13,14
**night**
57:24
**nine**
61:4,6,22 82:9
**noon**

67:4
**Nope**
99:18
**normally**
57:10
**note**
13:22
**noted**
104:12
**notes**
105:12
**notice**
2:20 4:11 12:11
**notify**
35:8
**number**
4:9 5:6 8:15 10:19
  11:24 12:3,13 15:3
  15:4 16:4 24:10
  45:12,15 46:14
  48:11 49:15 52:19
  52:22 53:10,20,21
  54:12,18,18 55:1,4
  55:20,21 61:4 63:8
  67:2 92:9,16 97:4
  99:6

**O**

**oath**
6:4
**Object**
64:25
**Objection**
25:5 44:16 78:8 80:9
  83:6 87:10 91:17
  100:10 101:22
**occasion**
101:23
**occur**
72:11
**October**
94:3
**offered**
31:6,8
**offering**
82:8 102:9

**offerings**
59:14
**office**
47:19 71:17 76:19
**official**
56:12,24 57:8,10
  61:23 79:11
**officially**
96:9
**officials**
97:9
**Oh**
47:24 96:9
**okay**
7:10 8:14,24 10:15
  11:7,14 12:21,24
  13:12 14:2,4,9 15:1
  15:8,20,22 17:6,10
  17:11 21:2,25 22:16
  25:13 28:14 29:22
  30:3 32:22 33:14
  37:4,12,25 39:14
  40:23 41:5,17 42:5
  42:23 43:23 45:5,17
  45:25 46:2,7,14,21
  47:1,6,10 48:9
  51:10 53:1,20 54:23
  55:4,9 57:19 59:7
  61:15 62:9 63:7,13
  64:4 66:3,7 67:14
  68:20 69:2 71:10
  73:6,9 76:5 78:3
  79:18 81:6 82:23
  83:16 84:1 92:18
  94:19 96:10
**once**
19:18 62:19 65:18
  71:5
**ones**
28:6
**online**
64:12
**open**
51:8 63:19 64:9
  68:11,21,22
**opened**

68:20,25
**opening**
69:6
**operations**
38:7 39:4 43:7 96:14
  96:15,18
**opinion**
64:23 80:10 87:10
  100:10
**opportunity**
7:14,18 10:5 57:6
  70:13 77:8 83:15
  98:12 99:15
**opposed**
43:11
**order**
12:9,24 32:24 60:16
  94:7
**ordering**
21:13
**ordinance**
89:2,21
**organization**
83:17
**original**
79:18
**outcome**
105:15
**outlined**
94:5
**outside**
8:20 50:4,6
**owed**
32:6 89:15
**owns**
91:22

**P**

**p.m**
2:17 103:25 104:2
**PA**
1:10 2:10 6:1
**Pac**
54:1
**package**
82:2



page
4:3,9,22 11:25 13:10
    13:10,14 46:15
    51:11 70:20 89:18
    92:16,16 93:14
    106:2,8,14,20
paid
55:18 97:21
panoply
44:3
paper
32:19
paragraph
46:14,18,21 47:2
    48:11,15,15 49:7,14
    49:15 51:12 52:19
    52:22 53:2,9,20
    54:6,10,12,18,22
    55:1,5,7,21 56:17
    61:4,6,22 62:4,4,7
    62:11 63:8,10,13,15
    63:21 64:3 65:15
    66:2,7,8 77:16
    82:16 88:24 93:16
    93:19 94:2,13,16
paragraphs
49:4,5 82:9 95:4,10
paralegal
14:18
park
3:5 38:5 58:10,12
part
9:9 22:22 29:22 43:8
    44:12 56:25 59:24
    84:14 91:10
participated
61:15
participating
85:10
participation
25:15 92:12 93:21
    94:4,6 95:12
particular
25:6 83:10 98:11
parties
5:18 74:21

partner
20:7 21:14 36:8,9,18
    72:25
parts
22:1
party
9:5 105:14
passed
91:11 93:2 95:8
passing
95:11
pauses
8:4
pay
51:24,24 58:6 80:15
    90:2 93:22 94:22
payment
97:19
payments
98:3,9
penalty
46:12 104:8,10
people
30:17 31:10 39:7,10
    39:11 58:15
people's
64:16
percent
22:25 28:12 78:25
    99:25 100:3,9
Perfect
45:17
period
20:17 24:17 50:24
    55:21,24 67:23
    82:21
periods
70:2
perjury
46:12 104:8,11
permits
89:8
person
40:8 50:1,4 53:17,17
    56:6,19,22 69:21,23
    69:24 70:3 71:24

72:1 78:24
personal
8:21 9:21 29:10
    101:24
personally
9:5,10,13 38:4 53:24
    83:9 85:19
personnel
29:4
phantom
101:14,20
phone
16:10,21,23 17:4,12
    18:5 19:15,25 20:1
    20:10,10,14,22 21:4
    21:17,18 22:2 24:18
    24:19 25:4,21,25
    26:4 27:7 28:6
    30:20,25 31:3,5,25
    32:4 33:1,7 35:6,24
    36:7 38:9 40:9
    67:24 70:9,15,16
    71:10 74:19
phrase
14:20
phrased
90:17
physically
76:18
pick
21:6,18 70:9
picked
21:8
Pittsburgh
1:10 2:10 6:1 75:23
place
17:15 44:8 105:8
plaintiff
1:7 2:7 3:3 9:11
    75:19
PLAINTIFF'S
4:8
plaintiffs
75:17
plan
89:3,22 100:4

planning
95:22
plans
97:1,14 102:23 103:1
    103:5,15
played
29:15
Plaza
3:5
plea
83:12,13
plead
83:3
please
7:3 12:5 17:1 55:5
    61:5 71:15 78:13
    85:22
pled
83:9
plowing
67:4
point
10:11 24:1 26:7 34:4
    41:17 42:7 66:13
    70:6 91:23
points
10:6 71:22
policies
31:20 50:23 51:1
    53:12,13 77:24
    78:17 79:20
policy
22:24,25 23:18,19,20
    23:21,23 49:23
    50:23 51:5,5 78:2,6
    80:3
Political
85:3
Politics
87:17
Poorly
90:17
popular
56:6
portion
31:5 37:7



**position**
36:13 89:12 102:1
**possible**
16:8
**posted**
84:8
**posting**
84:21
**pothole**
53:18
**Powers**
1:6 2:6
**Practices**
85:3
**precise**
47:6
**preparation**
61:25
**prepare**
38:22
**prepared**
10:4
**present**
5:18 14:10 51:22
**presented**
53:5 60:21
**presumably**
93:23 94:23
**pretty**
28:1 64:14
**previous**
9:8 40:8 49:5 53:2
  90:1
**previously**
6:9 69:12 71:4 99:21
**prices**
102:1
**principals**
61:7,12,23 62:20
  82:11 83:3,14 84:3
  97:10
**print**
17:3,4 68:8
**prior**
38:18,21,24 48:14,19
  48:21 49:9 50:21

**private**
51:13 96:11
**privilege**
91:23,23
**privileged**
81:10
**privileges**
91:22
**privy**
24:16
**pro**
56:2,5
**probably**
8:13 9:1 25:22,24
  40:1 51:18 69:6
  70:19
**procedural**
27:24
**Procedure**
12:12
**procedures**
43:5
**proceed**
22:18
**proceedings**
10:12 104:1
**process**
21:13 58:20 59:24
  91:20,22 97:19
**produce**
37:2
**program**
29:1 32:7 88:6 89:8
  93:21 94:4,7,22
**project**
97:16 103:7,10
**projects**
97:2,5,6,11 99:9
  103:2,12,13,14
**properly**
14:20
**proprietorship**
9:20,22
**protected**
91:18

**provide**
37:17 76:21
**provided**
37:21 43:25 99:8
  100:1 101:6 102:4
  102:10 103:15
**providing**
100:25
**public**
51:15 63:23 64:9
  81:3,21 82:20,21
  97:2,5,11 99:9
  101:25 103:2,9
**publishing**
84:9
**purchase**
81:23 82:2,5
**purposes**
7:7
**pursuant**
2:20 6:4 12:12 89:21
  99:11
**pursue**
50:15 51:13 78:4
  80:7,17
**pursuing**
31:19
**put**
7:25 11:20,23 23:5
  40:22 45:17 47:13
  59:20 72:2

**Q**

**question**
7:24,25 9:7 10:13,23
  12:6 13:7 14:19
  31:17,21 52:23
  54:22 57:14 59:21
  60:5 62:12 65:1,16
  65:20 79:18 81:6,7
  90:17 91:25 92:2
  97:24 100:16
**questioning**
74:13
**questions**
11:19 15:2 26:8,10

27:10,12 28:7,8,11
28:13,15 29:6 33:3
40:21 53:7,11 59:19
67:2 69:10 73:10,12
73:15,19 74:13,21
77:15 95:17 97:23
98:11,13 102:6,23
103:19,22
**quick**
67:3 74:4 85:25
**quickly**
11:21 47:22
**Quote**
51:12

**R**

**R**
1:18 2:18 105:1,22
  106:1,1
**raise**
82:20
**raised**
82:24
**re-election**
47:13
**reached**
73:6
**reaching**
36:17 51:14
**read**
32:19 46:18 57:11,16
  58:3,3 59:18,21
  62:11 66:8 68:22,24
  69:3 70:13 95:4,10
  104:11
**reading**
49:13
**reads**
48:25 49:1
**realize**
18:17 24:21
**realized**
17:23
**really**
9:7 17:23 27:24
  40:18 49:22 56:18



60:16 68:2
**reask**
81:6 100:16
**reason**
11:7,15 14:11 25:14
57:11 91:14 106:5
106:11,17,23
**recall**
16:12 74:20,23,24
75:1,4,25 76:4,4,5,7
79:3,7,9 83:16,21
84:2,6,7 85:17
87:18,22 90:8 91:9
91:11 93:8 98:22
**receive**
62:21
**received**
15:4 20:25 37:8,13
52:10 88:10
**receiving**
20:24 62:14 70:12
76:5 87:19
**Recess**
74:7
**recitals**
95:4,7
**recollection**
10:21,22 11:4 16:4
40:15 69:17 88:9
**recommendation**
81:16
**recommendations**
82:1 97:10 102:11
**record**
5:6 6:10 7:13 8:1
11:21 12:19 35:25
74:5,8 84:13 86:5
103:24
**recoup**
30:9 32:6
**recouping**
23:2
**recover**
79:22,25
**redevelopment**
27:20,23 43:6 44:6

70:3
**reduce**
94:7
**reduced**
105:9
**REES**
3:4
**refer**
15:9
**reference**
63:22
**referring**
6:24 52:7 98:1
**refigure**
74:4
**reflects**
63:10
**refresh**
40:20 69:17 88:9
**refuse**
51:24
**regard**
38:6
**regarding**
22:23 24:13 27:20
28:19 30:10 39:7
50:23 54:13,14
77:16 82:7,24 84:7
88:6,25 97:23
**regardless**
24:11,11
**regards**
21:21 22:6 28:23
29:5 39:5 41:11
42:2 43:5,19 51:5
62:18 65:15
**regular**
20:6
**reiterating**
49:4
**related**
88:6 105:14
**relates**
93:22
**relationship**
40:17 60:11

**relevant**
59:25
**rely**
59:12
**remember**
10:21 11:10 14:9
15:5,25 16:9 17:16
18:9 20:5,24 21:5
23:1 26:4 40:6,19
42:3 51:3 66:21
69:14 79:7,24 82:17
84:13,14 85:20
87:23 91:13
**remembered**
21:10
**remit**
89:1
**repeatedly**
93:20
**rephrase**
26:25 78:11
**report**
50:17
**Reported**
1:18
**reporter**
2:19 5:16 6:12 7:15
7:19,20 10:2 19:8
39:9,12,16 63:24
86:3 87:25 91:19
92:3,8 105:2,22
**reports**
59:18,19 100:22
**represent**
5:19,22 64:11 74:16
**represented**
75:3,5 86:25 87:4
**representing**
22:9,11,17 87:7
**represents**
86:17,21
**request**
5:14
**requirements**
85:4
**requiring**

19:20
**resident**
46:22
**resolution**
4:17 91:11 92:9,10
93:2,8 95:5,11
**resolutions**
95:8
**resolved**
9:2 66:19,23
**respect**
38:6 81:1
**respond**
19:12 28:9
**responded**
18:1
**responding**
87:22 88:5
**responsibility**
89:1
**Responsible**
83:24
**rest**
62:4
**retained**
89:22
**retention**
82:24
**revenue**
56:22 61:16
**review**
10:5 13:6 38:17
52:20 54:9,21 55:10
57:10 61:5 62:7
63:8 65:14 67:16
76:1,22,24 77:8,11
77:12 97:1,3,13,19
99:15,20 103:15
**reviewed**
15:16,18 41:23 56:24
57:7 83:12 88:10,19
93:11 97:4 98:18
101:23
**reviewing**
64:2
**revise**



103:16
**revisions**
76:14
**right**
10:1 11:12 12:18
    22:7 24:20 25:25
    28:1 33:18 42:23
    43:18 44:3 45:8
    46:14 61:6 65:5
    67:1,10 68:6 72:22
    73:6,16 78:1 82:19
    85:15 89:14 91:4,16
    100:24 101:3,9
**risk**
49:16,21,23,25 50:4
    78:21 79:1
**Riverside**
1:5,17 2:5,16 5:1,7
    5:13,23 6:18,24
    75:16 92:12 105:2
**role**
26:11,11 28:24 29:15
    36:13 41:12 79:13
    85:10
**rolls**
39:6
**room**
40:3
**rule**
12:12
**Rules**
12:12
**ruling**
84:14
**run**
47:19,22
**running**
29:4
**runs**
50:1

─────── **S** ───────
**S**
4:7 9:23
**safety**
49:23,25

**sales**
79:16
**salesperson**
20:7 21:15 36:20
**saved**
38:3
**saw**
32:19,20 70:8 72:19
    72:21
**saying**
7:6 42:18 71:9 78:14
    84:8
**says**
11:25 12:2 45:22
    46:22 47:1 48:12
    51:10 53:21 56:18
    57:7 69:20 92:21
**scan**
71:16,16
**scanned**
14:8,14 70:20,21
**scenario**
25:7
**Schmookler**
45:22,25
**school**
24:12 49:24 96:14,16
    96:18,20,22 102:1
**Scott**
45:22
**screen**
40:24
**SCULLY**
3:4
**se**
50:14 98:20
**seat**
47:23
**seated**
69:25
**second**
14:17 17:25 19:18
    20:22 21:4,4 24:18
    24:23 25:20 27:1,3
    27:9 29:8 30:20
    31:24 32:22 33:1

35:17,24 36:24 37:4
    37:16 38:8 46:21
    48:12 49:8 56:1,18
    56:21 71:10 88:24
**section**
6:5 21:16
**see**
13:14 16:2 21:3
    32:15 45:22,22
    46:16,24 47:4,15
    48:16,23 49:18 53:4
    54:18 61:6,7 75:14
    86:9,10,13 88:4
    89:4,24 92:21 93:25
    94:10 95:2 97:22
**seen**
10:25 12:6,16,21
    13:7 32:18
**send**
14:4 17:6 68:9 70:20
    71:12
**sending**
85:17,19
**sense**
48:24
**sent**
14:9,13,14 38:14
    67:15 75:25 77:5
    85:21
**sentence**
47:1 48:12 49:8
    50:10 51:10 53:21
    55:6 56:17,18,18,21
    69:19 88:4 89:6
    90:1
**separate**
26:12 29:3 30:25
    49:16,21 55:23
**separately**
43:20
**September**
94:19
**sequence**
19:22
**Sergio**
5:15

**series**
56:22 76:5
**served**
12:20,22 54:7 55:23
    56:19 57:22 85:2
**services**
5:15,17 43:21 99:25
    100:5,7,8,25 101:5
**serving**
82:13
**session**
44:11,19 45:2 51:8
    51:14,15,22 53:16
    64:9 77:2 80:22
    81:3,8,9,13,21
**sessions**
80:13
**set**
16:19 37:2 38:14
    48:14 55:25 67:1
    70:13 95:5 103:1
    105:8
**settle**
81:16
**settled**
32:12,20
**settlement**
32:13,15 80:23 81:3
    81:20,21
**settlements**
81:1
**seven**
55:4
**share**
28:16 44:19 45:1
**shared**
31:14 44:15
**short**
54:21,22 70:15
**shorter**
15:8
**shorthand**
2:18 105:2,9,12,22
**shortly**
20:3
**show**



40:24,24 62:25
64:20 84:15,15
**side**
23:12 34:5,23,24
35:1 74:1
**sidewalk**
53:17
**sign**
13:24 15:17 27:17
41:18 52:21 53:5
55:10 62:10,12,16
65:21 67:16 71:12
71:15
**signature**
13:9 88:16,17 92:22
**signed**
13:16,23 14:1,13,20
15:21 16:5 26:14
41:23 46:2,5 70:19
72:3 74:20 75:10
76:10 77:13 83:13
86:11 88:2,20 93:5
93:12
**signing**
46:11 52:23 76:22
77:9
**simply**
100:12
**single**
23:20,21
**sir**
66:3 103:20
**sit**
76:10 79:12
**site**
84:8
**sitting**
27:18,21 36:19
**situations**
71:4
**six**
54:18,18 55:1
**slash**
28:24
**slightly**
51:6

**small**
27:18 80:16
**smaller**
28:3
**Smith**
51:21
**sole**
9:19,22
**somebody**
65:9
**somewhat**
60:6 63:4
**sophisticated**
58:22
**sorry**
6:12 13:18 14:19
32:23 39:9 45:19
56:21 57:13 71:2
88:22 91:19 100:13
100:14
**sort**
8:2 10:20 14:25 23:4
26:13,13 27:24
30:23 34:21 41:6
51:25 57:6 63:22
64:19
**sorts**
58:25 65:6
**spam**
17:22
**speak**
45:25
**speaking**
29:13 38:18 51:18
80:1 81:11
**speaks**
100:14
**specific**
30:22 33:22 81:9
97:23 99:5,19
**specifically**
43:4
**specifications**
97:1,14
**speculate**
10:17

**speculation**
78:9
**spelled**
39:12
**spoke**
29:2 42:19 74:19
**spoken**
74:14
**spots**
73:20
**spouse**
36:6
**staff**
50:14,17 59:7,17
81:24,25 100:22
**stake**
60:2
**stamped**
86:5
**stands**
83:23
**start**
8:5 21:7 34:21,22
40:14 41:5 57:24
**started**
21:8,17,18 27:15
47:8,9 95:15
**starting**
96:18
**starts**
48:22
**state**
2:19 5:18 13:22
105:3
**statement**
52:23 62:16
**statements**
56:24 57:8,10
**states**
1:1 2:1 5:9 11:25
88:4 89:19 93:19
94:2,19
**stayed**
35:15
**step**
56:4,4

**stepped**
47:12
**Stone**
86:12
**stop**
22:7 58:12
**straight**
56:3
**strange**
87:17
**strike**
35:23 54:13 77:22
90:16 99:7
**subject**
100:9 101:6
**submit**
97:18
**submitted**
98:17
**submitting**
101:10,14,20
**Subpoena**
4:10 12:2
**subpoenas**
34:22
**subscribed**
105:16
**subsequent**
16:17
**subsequently**
66:16,17
**successfully**
59:13
**sue**
30:8 91:3 93:20
**sued**
91:15 94:20
**suggest**
80:20
**suing**
76:2
**suit**
84:3
**Suite**
3:6,12
**summary**



51:7 53:8
**supervision**
105:10
**supervisors**
29:3
**sure**
14:18 16:14 20:21
21:1 23:2 26:25
30:5,15 35:25 45:21
61:20 70:14 73:14
74:3 78:16,25 85:24
95:17 99:5
**surprise**
55:11 63:3,5
**sworn**
105:5
**symbiotic**
60:11

---
T
---
**t**
4:7 17:4 106:1
**T-u-m-f**
19:9 89:2
**take**
7:15,20 10:20,22
11:14 12:4,14 13:6
15:22 20:8,16 21:12
37:8 45:7,13 51:16
52:20 54:6,9,12,21
55:4,9 56:16 59:18
60:7,7 61:5 62:5,7
63:7,8,13,21 66:2
67:3 73:15,18 74:3
85:2,13 86:2 88:19
93:11 98:25 100:24
101:17 102:14
**taken**
2:14 5:12 22:24 74:7
105:7,8,12
**talk**
8:3,5,7 10:19 17:24
22:18 24:19 30:19
34:23 36:1,4,6
65:17 72:23
**talked**

10:2 26:2 42:14 56:9
62:13 72:24 73:2
77:3
**talking**
7:12,17,21 21:7,9,18
22:2 29:23 30:1
34:18,18 82:8
**talks**
52:24 61:7 88:24
**target**
56:8
**tax**
93:24 94:24
**team**
58:17,22,23 60:2,22
102:12
**technical**
100:7
**telephone**
17:13 26:8 27:2,3,10
29:8,12 35:17 36:24
37:4 38:9
**telephonic**
67:22
**tell**
17:19 21:17 23:22
24:9 28:21 34:7,11
34:12 39:3 41:2
43:8 62:24 68:11
70:23 75:2
**telling**
18:10 33:22 95:16
**tem**
56:3,5
**ten**
62:8,11 82:9
**tenure**
48:12 56:7
**term**
6:17,21,21 7:2 61:11
64:5 65:1 98:23
**termination**
94:6
**terms**
7:8 17:19 32:16,20
54:3 61:11 89:21

**test**
16:3
**testified**
6:5
**testify**
12:2 105:5
**testimony**
10:7,9,14 11:8 46:7
46:12 104:13
**thank**
6:15 38:19 43:24,24
55:20 60:15 61:2
68:11 73:10 103:22
103:23
**Thanks**
100:15
**thereof**
105:15
**thing**
11:23 19:14 30:23
42:6 45:6 48:2
51:25 68:2,4 80:3
**things**
8:7 10:19 26:12,13
27:16 30:12 38:4,5
38:6 58:8,14 63:20
84:8,8,9,15 100:22
**think**
10:21 11:18 12:9,22
16:13 17:25 20:12
21:10 25:20 31:8
34:17,24 35:7 39:22
42:1,25 45:6,13
60:5 64:14 67:3
70:4,21 71:17,22,25
72:10 73:9 83:20
85:24 95:15 102:8
102:22 103:18
**thought**
18:15 19:6 22:11
35:1 42:15 79:16
85:5,14 91:21
**threatened**
93:20
**threatening**
90:10

**three**
8:13,14 9:1 22:1
48:15 49:15 51:12
52:19,22 53:2,10
55:23 70:1 77:16
84:2
**three-page**
11:24 12:5,10
**Thursday**
1:16 2:17 5:2
**time**
5:11 7:2 10:23 11:14
14:20 15:23 16:15
20:3,12 21:4 23:6
24:17 25:2 32:8,11
32:18 34:4 35:16,23
46:5 47:14 48:9
49:9 50:2,24 52:2,2
52:10 53:4 54:16,24
55:21,24 58:14
59:23 62:2,5,22,23
63:9,11,15,16 65:23
66:5 67:23 68:24
69:2,8,20 70:5
71:24 72:6 74:5,8
75:2 85:1 90:16
98:20 103:19,24
105:7
**times**
8:12,13 55:23 56:7
56:13 69:23 70:1
75:5 79:21
**today**
6:10 7:16,21 10:3,7,9
10:15,19 11:7 14:10
20:9 42:21 45:14
63:3 72:22 76:10
77:3 79:12 86:20,25
103:19
**Today's**
5:10
**told**
22:14,15 23:15 25:11
28:21 33:12,14,20
33:25 38:24 45:1
75:5 77:17



**tolling**
90:7,16,19,22
**top**
51:11 75:13
**topics**
53:2
**total**
44:9
**Tracey**
1:18 2:18 5:16 105:1
    105:22
**tract**
58:12
**trade**
73:20
**traffic**
19:9 29:1
**transcript**
10:4,10 104:11
    105:12
**transcription**
105:10
**transmit**
94:21
**trial**
10:12 66:13
**trips**
53:17
**true**
44:3 55:1 61:20
    72:14 76:12 104:14
    105:11
**trust**
59:17 60:12
**truth**
57:22 105:6,6,6
**try**
8:4 27:1 32:24 35:13
    71:8 79:22
**trying**
15:8 16:3 30:8 32:5
    41:8 48:2 62:24
    79:15
**TUMF**
19:8 29:1 30:1,10,13
    31:4,6,7,11 32:7,12

66:11 88:6 89:2,7
89:20,21 90:3 93:21
94:4,7,22
**turn**
92:15 93:14
**turning**
34:21 88:22
**twelve**
82:9
**two**
14:15,21 26:12 29:3
    40:11 47:2 48:11
    49:7 51:11 54:22
    56:3 85:1 96:18
**two-year**
70:2
**type**
26:15 53:14 80:3
    100:25

---

**U**

**Uh-huh**
54:11 63:25
**ULC**
61:7,12,22 62:20
    82:25 83:3,13 97:18
**ULC's**
55:12 82:11
**ultimately**
55:10 82:4 83:3
    84:18 86:24 90:7
    91:3 97:6,13 102:14
    103:16
**umbrella**
44:9
**undergo**
97:19,20
**understand**
6:18 7:3,5,6,11 10:16
    11:5,16 18:25 35:25
    36:22 48:25 50:12
    57:16,18,21 59:21
    65:6 74:16 77:20
    78:12 79:15 85:8
    86:17,23 89:11 90:5
    95:19 97:9 99:24

100:4 101:3 103:6
**understandable**
7:9
**understanding**
18:21 19:4 22:9,10
    22:13,16 23:6,9,10
    24:22 25:2,16 28:2
    28:3 29:24,25 30:2
    30:7,7,16 32:5
    33:11 34:1,13 35:16
    39:3 42:11,14,21
    48:18,19 49:20,22
    50:3,6,22 51:19,25
    52:17 53:18 59:8,23
    61:12,21 62:2 63:11
    66:4 67:14 79:13
    81:24 84:19 101:8
**understandings**
26:5
**understood**
36:25 58:7 64:14
    87:18 100:24
**undertake**
97:15
**undertaken**
103:2
**undertook**
97:6
**Unified**
96:20
**uniform**
19:9 29:1
**Union**
1:9 2:9 5:8,25 15:7
    74:17 75:6,22 76:3
**United**
1:1 2:1 5:9 11:25
**University**
2:15 5:13
**unremitted**
90:3
**unspecified**
94:22
**unusual**
20:8,9
**updated**

77:5,12
**upper**
45:21
**Urban**
39:7,9,11 53:22 84:2
    97:9 99:1,8,11,22
    100:1,21,25 101:6
    101:10,13,19
**use**
6:17 7:2,8 65:1

---

**V**

**vague**
26:24 42:25 43:12
    48:24
**vaguely**
90:9
**value**
89:7
**VANDER**
3:4
**Vanderweele**
4:4 5:24,24 12:19,23
    25:5,17 36:21 42:17
    43:12 44:16 45:9
    57:13 59:15 60:4,25
    64:25 67:6 73:12,17
    73:21,25 74:3,11,14
    78:11,15 80:25 83:7
    87:15 88:15 92:1,7
    100:12,16,17 102:5
    103:18,23
**various**
98:5
**vendors**
98:5,17
**verified**
41:12
**version**
41:21 71:19
**versus**
5:8 30:9 51:21
**vice**
86:12
**video**
5:6 73:22



**videographer**
5:5,15 73:23 74:2,5,8
103:24
**views**
64:16
**violated**
82:25
**violating**
83:4
**violations**
65:19
**virtue**
48:20
**voicemail**
17:22 18:5,7,9,22
19:1,5,23 20:2 21:6
32:9 35:4
**Von**
3:12
**vote**
51:8 77:18 78:3,7
80:6 82:4 98:8
103:16
**voted**
56:2 97:7
**vs-**
1:8 2:8

―――――――――
**W**
―――――――――
**W-r**
6:12
**W-r-c-g**
6:13
**waffling**
80:12
**waiting**
58:11 72:25
**walk**
58:18,19
**walked**
20:6 21:15
**want**
10:14,17,22,24 11:3
11:14,20,23 12:15
15:22 18:19 19:10
19:21,22 20:21 23:5

32:24 33:12 35:25
40:13 45:6,13 48:18
49:6 51:9 56:25
60:11 61:20 67:3
73:15,15,25 81:9
93:15 95:17
**wanted**
28:16 38:4 50:15
57:5 69:22 70:8
**wanting**
34:5
**warrant**
98:1,3,9
**Washington**
86:11
**wasn't**
27:13,16 69:22 87:2
**way**
7:19 15:8,22 17:3
35:8 47:13 55:25
57:23 80:17 85:25
92:1
**we'll**
10:19 11:18 12:3
42:5 45:13 63:7
85:25 86:1
**we're**
5:5 7:13,21 27:21
29:13 32:23 33:18
43:16 45:14 51:11
**we've**
26:2 29:9 77:3
**wear**
27:19
**wearing**
44:4 56:10
**website**
84:20,25
**Webster**
64:12
**week**
67:21 72:10
**WEELE**
3:4
**went**
18:2 21:6 24:16

36:20 39:4 40:21
41:15 63:20 69:9
96:19,20
**weren't**
65:24
**Western**
1:5 2:5 5:7,22 6:18
6:24 75:16 92:12
**wheels**
34:21
**WHEREOF**
105:16
**Whichever**
45:20
**withdraw**
91:11 92:2 95:11
**withdrawal**
92:11
**withdrawing**
91:14
**witness**
6:3,14 19:9 25:6,18
39:11,14,18 42:18
44:17 59:16 60:5
67:8 78:13 80:12
87:12 101:23 105:4
105:16
**wonder**
52:21
**wondering**
24:2
**word**
7:6 23:2 29:14 34:4
84:9
**wording**
69:11,14
**words**
8:21 23:5 48:21 60:1
70:24 72:24
**wore**
41:14
**work**
24:12 55:17,19,20
60:13 74:2 79:5
98:25 99:3,8 100:8
100:21 101:14,14

101:23
**work-related**
8:23,24
**workday**
20:6
**worked**
61:24
**working**
9:17 14:12,16,21
69:13 96:11
**works**
45:20 97:2,5,11 99:9
103:2,9
**wouldn't**
11:3
**WR**
6:11
**WRCOG**
6:17,21 19:7 22:12
22:18 23:8,11 25:9
28:23,25 29:4,11,17
29:23 30:1,7,9 31:4
31:10,11,19 32:5,11
34:11,18,25 35:1,2
42:12,15 66:11 76:1
85:15,17,21 86:7,12
86:12,18,23,24,25
87:4 88:7,25 89:6
89:14,15,19 90:1,3
90:10,15,18,20 91:3
91:12,15,15 93:20
93:22 94:13,20,21
94:22,23 95:13
**WRCOG's**
89:11
**write**
42:7
**written**
42:8 52:3,6,9,15
**wrong**
22:10

―――――――――
**X**
―――――――――
**X**
4:7
**XYZ**



80:23

**Y**

**yeah**
14:19 22:15 28:6
34:24 36:22 37:24
44:10 47:16 48:6
49:2 52:14 58:16,22
59:11,23 64:11
70:16 73:14 86:10
103:21
**year**
39:23 47:15,16 55:24
55:24 56:1,1,4
103:3
**years**
9:1 10:20 19:11
27:15 56:3 57:23
63:6 80:5 100:18

**Z**

**Zoom**
15:19 27:8,9 33:13
37:2,5,9 38:9,15,18
38:21,22,24,25 39:1
39:20,25 40:5,13,25
41:5,17 42:13,23
52:20 53:2,3,6,10
67:10,19,23 70:17
71:11 72:21 76:24
77:2,6
**zoomed**
40:16

**0**

**00029989**
86:5

**1**

**1**
2:10 4:10 11:24 12:3
13:19
**1,000,000**
94:9
**10**
86:6 88:5

**10:02**
2:16 5:3,11
**100**
22:25 28:12 58:12
78:25
**1000**
3:12
**100th**
58:11
**11**
63:8,10
**11:26**
74:6
**11:30**
74:9
**1100**
3:6
**12**
63:13,13,15
**12:04**
2:17 103:25 104:1
**12346**
1:19 2:18 105:1,22
**13**
4:10,11,12 63:21
64:3 65:15 82:16
**14**
66:2
**15**
25:22,23 26:3 33:5
48:15 66:7,8 70:19
71:11 80:5 100:18
**15th**
94:19
**18101**
3:12
**1977**
96:9
**1995**
96:18
**1998**
96:19,19
**1999**
47:3,8,11 48:23

**2**

**2**
4:11 12:10 13:19
88:1
**2000**
48:1,2,22
**2002**
48:1,2
**2008**
85:17,20 86:6 88:1,5
89:15 90:11 93:20
94:3
**2009**
91:6 94:19 96:19
**2010**
92:25 93:3,9
**2010-35**
92:10
**2011**
48:14,19,21 49:9
**2013**
96:23
**2014**
18:18 20:13 47:3,14
66:20
**2017**
96:23
**2021**
16:7
**2022**
1:16 2:17 5:2,11
13:13 16:5 37:6
72:5 104:15 105:17
**2094**
6:5
**21**
4:22
**24**
69:6
**24th**
13:12,13 16:5 72:4
**25,000**
62:15
**27**
93:16,19
**27th**
47:9

**28**
1:16 2:17 5:2 93:16
94:2
**28th**
5:11 105:17
**29990**
86:6

**3**

**3**
4:12 13:3,19 15:3,4
16:4 45:12,15 53:21
54:6 67:2,16
**30**
12:13
**312)980-6679**
3:7
**3390**
2:15 5:12
**34**
94:13,16

**4**

**4**
4:15 86:1,2,4 87:13
87:18 88:11,22,23
**45**
40:1 67:11

**5**

**5**
3:5 4:16 87:24 88:1
88:13,16
**5:20-cv-02164**
1:8 2:8
**50**
1:10 2:10
**50-50**
51:18
**54**
90:2
**55,000,000**
89:16 90:3
**59,000,000**
89:9 93:23



**6**

**6**
4:4,17 92:3,5,9 93:15

**7**

**700**
85:6
**701**
92:17
**74**
4:4
**7th**
93:3

**8**

**87**
4:15
**88**
4:16

**9**

**91**
4:22
**92**
4:17
**92612**
3:13
**92614**
3:6
**949)263-2600**
3:13
**99**
58:12,12

