JEFFREY V. DUNN, Bar No. 131926
jeffrey.dunn@bbklaw.com
CHRISTOPHER E. DEAL, Bar No. 186754
chris.deal@bbklaw.com
DANIEL L. RICHARDS, Bar No. 315552
daniel.richards@bbklaw.com
BEST BEST & KRIEGER LLP
18101 Von Karman Avenue
Suite 1000
Irvine, California 92612
Telephone:   (949) 263-2600
Facsimile:   (949) 260-0972

Attorneys for Plaintiffs
Western Riverside Council of Governments
and City of Beaumont

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WESTERN RIVERSIDE COUNCIL OF GOVERNMENTS, a California Joint Powers Authority; CITY OF BEAUMONT, a public entity in the State of California<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, and DOES 1 through 50, inclusive,<br><br>Defendants. | Case No. 5:20-cv-02164- GW (KKx)<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date:          August 1, 2022<br>Time:          8:30 a.m.<br>Courtroom:     9D |

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................. 1

II.  FACTUAL BACKGROUND .............................................................................. 2

    A.  City's Contracts with ULC and James Gregg ......................................... 2

    B.  The Riverside County District Attorney's Office Arrests the ULC Principals and Kapanicas and Charges them with Embezzlement ........................................................................................... 2

    C.  History of Insurance Claim .................................................................... 3

III.  LEGAL ARGUMENT ......................................................................................... 6

    A.  Legal Standards ..................................................................................... 6

    B.  The Discovery Clause was Not Triggered ............................................. 7

        1.  Discovery Clause Standard .......................................................... 7

        2.  Plaintiffs are Not Seeking Coverage for 1090 Violations .......... 7

        3.  NUFIC Fail to Prove Section 1090 Violations ........................... 9

        4.  James Gregg was the Risk Management Department ............... 10

        5.  James Gregg had No Knowledge of ULC Wrongdoing ........... 12

        6.  The City Council had no Knowledge of ULC Wrongoing ...... 13

        7.  The Discovery Period Was Tolled by Adverse Domination ............................................................................... 15

        8.  NUFIC Fails to Prove the City had Knowledge of or Approved Billing Exceeding the 4.5 Percent Cap ................... 16

        9.  NUFIC Ignores the Fraudulent Overbilling ............................ 19

    C.  The Termination Clause was not Triggered ........................................ 19

    D.  NUFIC is Liable for Bad-Faith and Punitive Damages ...................... 21

        1.  The Genuine Dispute Doctrine is Inapplicable ........................ 21

        2.  Punitive Damages are Warranted and Available ...................... 23

    E.  NUFIC Ignores the Faithful Performance Insuring Agreement ......... 24

    F.  NUFIC's Argument Regarding BFA is Meritless ............................... 25

IV.  CONCLUSION ................................................................................................. 25

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

1

# TABLE OF AUTHORITIES

2

**Page**

3

**Federal Cases**

4

*Bulthuis v. Rexall Corp*
   789 F.2d 1315 (9th Cir. 1985) ......................................................................... 23

5

6

*Cal. Union Ins. Co. v. Am. Diversified Sav. Bank*
   948 F.2d 556 (9th Cir. 1991) ........................................................................... 15

7

8

*Eastman Kodak Co. v. Image Technical Services, Inc.*
   504 U.S. 451 (1992) .......................................................................................... 6

9

10

*F.D.I.C. v. Denson*
   908 F.Supp.2d 792 (S.D. Miss. 2012) ............................................................. 20

11

12

*Fidelity Nat. Financial, Inc. v. National Union Fire Ins. Co. of Pittsburg, PA*
   2014 WL 4909103 (S.D. Cal., Sept. 30, 2014) ................................................. 7

13

14

*Gulf USA Corp. v. Federal Ins. Co.*
   259 F.3d 1049 (9th Cir. 2001) ........................................................................... 7

15

16

*Hawthorne Sav. F.S.B. v. Reliance Ins. Co. of Illinois*
   421 F.3d 835 (9th Cir. 2005) ............................................................................. 6

17

*Seiler v. Lucasfilm, Ltd.*
   808 F.2d 1316 (9th Cir. 1986) ......................................................................... 17

18

19

**State Cases**

20

*Admiralty Fund v. Peerless Ins. Co.*
   143 Cal.App.3d 379 (1983) ............................................................................. 15

21

22

*AIU Ins. Co. v. Superior Court*
   51 Cal.3d 807 (1990) ........................................................................................ 6

23

24

*Aydin Corp. v. First State Ins. Co.*
   18 Cal.4th 1183 (1998) ..................................................................................... 6

25

26

*Bennett v. Northwestern Nat. Ins. Co.*
   84 Cal.App. 130 (1927) ..................................................................................... 9

27

28

*Borough of Totowa v. American Sur. Co. of N.Y.*
   39 N.J. 332, 188 A.2d 586 (1962) ................................................................... 24

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

# TABLE OF AUTHORITIES

**Page**

*Brandt v. Superior Court* (1985)
    37 Cal.3d 813 .................................................................................. 23, 24

*Brehm v. 21st Century Ins. Co.*
    166 Cal.4th 1225 (2008) .................................................................... 21

*Cecil v. Gila County*
    71 Ariz. 320, 227 P.2d 217 (Ariz. 1951) .......................................... 24, 25

*Commisso v. Meeker*
    8 N.Y.2d 109, 168 N.E.2d 365 (1960) .............................................. 24

*Egan v. Mutual of Omaha Ins. Co.*
    24 Cal.3d 809 (1979) ......................................................................... 22

*Lexin v. Superior Court*
    47 Cal.4th 1050 (2010) ...................................................................... 10

*Nickerson v. Stonebridge Life Ins. Co.*
    63 Cal.4th 363 (2016) ........................................................................ 24

*Pacific–Southern Mortg. Trust Co. v. Ins. Co. of N. Am.*
    166 Cal.App.3d 703 (1985) ................................................................ 7

*People v. Honig*
    48 Cal.App.4th 289 (1996) ............................................................ 19, 20

*Santa Clarita Organization for Planning & the Environment v. Abercrombie*
    240 Cal.App.4th 300 (2015) ............................................................... 20

*Sec'y of State v. Hanover Ins. Co.*
    242 Or. 541, 411 P.2d 89 (1966) ....................................................... 25

*Shepard v. CalFarm Life Ins. Co.*
    5 Cal.App.4th 1067 (1992) .................................................................. 6

*St. Paul Mercury Ins. Co. v. Coconut Grove Bank*
    106 So.3d 452 (Fla. Dist. Ct. App. 2009) ........................................... 20

*State Farm Mut. Auto. Ins. Co. v. Partridge*
    10 Cal.3d 94 (1973) ..................................................................... 6, 19

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

1

2

# TABLE OF AUTHORITIES

**Page**

*Thomson v. Call*
 38 Cal.3d 633 (1985)...................................................................20

*Town of City of Peoria v. Rauschkolb*
 333 Ill. App. 411, 78 N.E.2d 123 (1948)......................................24

*Town of Evans v. Catalino*
 88 A.D.2d 780, 451 N.Y.S.2d 523 (1982)......................................24

*White v. Western Title Ins. Co.*
 40 Cal.3d 870 (1985)..........................................................6, 22, 23

*Wilson v. 21st Century Ins. Co.*
 42 Cal.4th 713 (2007)...................................................................21

**State Statutes**

Cal. Government Code § 1090 ...............................................*passim*

Cal. Government Code §§ 45950 *et seq*.........................................17

**Rules**

Federal Rule of Civil Procedure Rule 26(a)(2)(B) ...................19

Federal Rule of Civil Procedure Rule 56(c) .................................6

**Regulations**

10 Cal. Code of Regs. § 2695.7(b) ................................................4

10 Cal. Code of Regs. § 2695.7(b)(4)............................................4

10 Cal. Code of Regs. § 2695.7(c)(1).......................................5, 22

10 Cal. Code of Regs. § 2695.7(d) ................................................4

**Other Authorities**

California Government Claims Act ..............................................11

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

- iv -

## I.    **INTRODUCTION**

Plaintiff City of Beaumont ("City") is an insured under Government Crime Policies issued by Defendant National Union Fire Insurance Company of Pittsburgh ("NUFIC"). Plaintiff Western Riverside Council of Governments (WRCOG") is the assignee of insurance claims assigned to WRCOG as part of a settlement involving the City's participation in a regional infrastructure funding program (the "TUMF Program"). Crime policies  insure against defalcations and dishonesty by employees, among other things. Through endorsements, the crime policies in this case also insure against losses caused by theft or the "faithless performance" of City Officials.

In 2016, following an investigation by the Riverside District Attorney's ("DA") office into the City's participation in the TUMF Program and just prior to the DA's indictment of the subject City Officials for embezzlement and theft of public funds, the City submitted a claim to NUFIC relating to the DA investigation.

More than six years later, NUFIC still has not issued a formal coverage opinion denying or accepting the claim, and has not paid any loss to the City. Instead, it has elected to engage in an endless coverage investigation spanning more than six years. Through this motion, it seeks to void the City's coverage entirely.

Plaintiffs, however, will demonstrate that NUFIC's latest basis for denying coverage (i.e., alleged knowledge of Government Code section 1090 violations) is meritless because (1) NUFIC cannot demonstrate 1090 violations; (2) knowledge of 1090 violations does not equate to knowledge of theft or dishonesty; and (3) any deadline to submit a claim was tolled by the doctrine of adverse domination.[1]

Further, NUFIC is not entitled to summary adjudication of the bad faith or punitive damages claims. NUFIC's six year delay in issuing a coverage opinion coupled with its egregious and unlawful claims handling practices preclude

---

[1] In general, the adverse domination doctrine tolls the deadline to submit a claim for the period during which the insured was controlled by the bad actor(s).

5:20-CV-02164- GW (KKX)
OPPOSITION

1   summary adjudication of the bad faith and punitive damages claims.

2       NUFIC issued the City crime insurance policies covering losses caused by

3   defalcations or faithless performance. The City's "reasonable expectation" was that

4   losses caused by the criminal theft and dishonesty of its city Officials would be

5   covered by the crime policies at issue.  The City has established that it has suffered

6   more than $60,000,000 in covered losses, and NUFIC has had more than six years

7   to establish grounds to deny coverage. Its utter failure to do so mandates denial of

8   this motion.

9   **II.    FACTUAL BACKGROUND**

10      **A.    City's Contracts with ULC and James Gregg**

11      In 1993 and 1994, the City of Beaumont ("City") entered into contracts with

12  Urban Logic Consultants, Inc. ("ULC") for it to manage the City's planning,

13  engineering, and economic development departments (collectively, the "ULC

14  Contract"). Undisputed Fact ("UF") No. 12; *see also* NUFIC Appendix of Evidence

15  ("NAOE") Ex. 10 (Declaration of Lawrence Dressel, ECF No. 49-5 pp. 215–254) at

16  ECF No. 49-5 pp. 221–231 & pp. 252–254 (copies of ULC contracts). ULC

17  principals David Dillon served as the City's Economic Development Director;

18  Ernest Egger served as the City's Planning Director; and Deepak Moorjani served

19  as the City's Public Works Director (together, the "ULC Principals"). (UF Nos. 13–

20  15.) Once the ULC Principals became city officials, no further contracts were

21  entered into between the City and ULC or the ULC Principals – rather, all work

22  was performed pursuant to the original ULC Contract. *See, e.g.,* Plaintiff Appendix

23  of Evidence ("PAOE") Ex. 10 (Gibbs Decl.) at ¶ 8; PAOE Ex. 11 (Castaldo Decl.)

24  at ¶¶ 7–8; PAOE Ex. 17 at p. 7.)

25      **B.    The Riverside County District Attorney's Office Arrests the ULC**
        **Principals and Kapanicas and Charges them with Embezzlement**

26  On April 22, 2015, the Riverside DA's office raided Beaumont City Hall,

27  and seized documentary and electronic evidence related to the ULC Principals and

28

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

- 2 -

City Manager Alan Kapanicas. PAOE Ex. 6 (Gibbs Depo.) at pp. 198:13–200:2.)

On May 17, 2016, Egger, Dillon, Moorjani, Kapanicas, and other former City officials were charged with a litany of felonies, including multiple counts of embezzlement and misappropriations of public funds, falsifying public records to hide their crimes, and criminal conspiracy. In total, 33 counts were bought, and the District Attorney's office sought a "aggravated White Collar Crime Enhancement" against Kapanicas, Egger, Dillon, Moorjani and others. NAOE Exhibit 14 (Felony Complaint in Case No. RIF1602262, ECF No. 49-5 at pp. 291–303).

Prior to these arrests, neither the City Council nor the City's Risk Management Department had knowledge of the criminal activity of Egger, Dillon, Moorjani, and Kapanicas. *See, e.g.,* PAOE; Ex. 1 (Berg Depo.) at pp. 106:19–107:3, 117:7–13, 227:8–23, 229:22–230:2; Ex. 4 (Deforge Depo.) at pp. 65:23–66:1, 101:9–16; Ex. 6 (Gibbs Depo.) at pp. 174:4–8, 185:15–186:23; Ex. 8 (Gregg Depo.) at pp. 61:4–8, 77:13–17, 82:16–83:3, 127:21–128:1, 135:19–138:11; Ex. 10 (Gibbs Decl.) at ¶¶ 16, 25–30; Ex. 11 (Castaldo Decl.) at ¶¶ 12–13, 29–30.

Ultimately, Egger, Dillon and Moorjani pled guilty to the lesser crime of violating Government Code section 1090 (hereinafter, "section 1090"), and, among other consequences, were ordered to pay restitution. NAOE Ex. 15 (ECF No. 49-5 at pp. 305–310. This restitution was paid to WRCOG, not to the City, because these same persons were responsible for the City misappropriating more than $40 million of funds from WRCOG. PAOE Ex. 13 (DeBaun Decl.) at ¶ 14.

Following these raids and arrests, the City was left without almost any management. As former City Resources Director and interim City Manager, and current interim City Manager Elizabeth Gibbs testified: "The FBI and D.A. took all the [City] documents and . . . there was no staff. We literally lost the entire management team in one fell swoop." PAOE Ex. 7 (Gibbs Depo.) at p. 179:14–19.

### C.    History of Insurance Claim

While the City did not (and could not) know the full extent of the

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

wrongdoing on the part of the ULC Principals and Kapanicas, the City nonetheless submitted a claim to the City's insurance carrier that had issued a crime loss policy to the City on April 5, 2016. PAOE Ex. 22 at pp. 1–35. On November 3, 2016, the City transmitted a more thorough proof of loss, describing the theft and faithless performance of the ULC Principals, Kapanicas, and others, to the extent the bad acts were known to the City at that time. *Id.* at pp. 182–201.

For the next *four years* the City tried to get NUFIC to pay proceeds under the policy. Not only did NUFIC refuse to do so, it would not even provide a coverage determination, but kept delaying a final decision with requests for more and more voluminous (and irrelevant) productions. PAOE Ex. 21 at, e.g., pp. 244; *compare with* 10 Cal. Code of Regs. § 2695.7(b) ("Upon receiving proof of claim, every insurer, except as specified in subsection 2695.7(b)(4) below [regarding disability insurance], shall immediately, but in no event more than forty (40) calendar days later, accept or deny the claim, in whole or in part.") *and* Cal. Code of Regs. § 2695.7(d) ("Every insurer shall conduct and diligently pursue a thorough, fair and objective investigation and shall not persist in seeking information not reasonably required for or material to the resolution of a claim dispute.")

NUFIC would from time-to-time indicate that it was tentatively inclined to deny coverage on one ground, only to shift tack and focus on another exclusion or condition when the City rebutted the tentative grounds for denial. PAOE Ex. 22 at pp. 237-238 (April 26, 2018 letter at pp. 4–5 (arguing at length ULC Principals not "employees") *with* pp. 249–270 (demonstrating ULC Principals covered by policy) *and* pp. 281–295 (now arguing City discovered loss earlier than claimed).

Months would pass with no communication of any kind from NUFIC, and the City on multiple occasions was required to affirmatively request updates from NUFIC. *Compare* PAOE Ex. 22 at pp. 278–279 (April 29, **2019** letter: "The City has received no formal update or response since the April 26, **2018** [letter] and requests either a formal coverage response to the City's last few communications

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

and document productions, or an update on when the City can expect such a response.") (emphasis added) *with* 10 Cal. Code of Regs. § 2695.7(c)(1) ("Thereafter, the written notice shall be provided every thirty (30) calendar days until a determination is made or notice of legal action is served.")

In this time frame, and to better understand the scope of the criminal conduct of the ULC Principals and Kapanicas, the City retained forensic accountant Daniel Ray. Ray was well positioned to assist, as he had been retained by the Riverside County District Attorney's office to investigate and uncover the criminal activity of Kapanicas and the ULC Principals. PAOE Ex. 14 (Ray Decl.) at Ex. C.)

Based on an exhaustive analysis of banking records, tax filings, general ledgers, payroll records, invoices, and more, Ray discovered that the ULC Principals had stolen in excess of *$60,000,000* from the City of Beaumont. PAOE Ex. 14 (Ray Decl.) at Ex. C. Ray found that this fraud scheme involved multiple components, including billing for work that was not actually performed (relying, in part, on that fact that invoices could be submitted both directly to the City and to a bond trustee, with no independent reconciliation of these invoices) and hiring subcontractors for low rates and billing the City at a mark-up at times exceeding 300 percent, despite a contractual markup "cap" of 15 percent. *Id.*

NUFIC's forensic accountants, HSNO, similarly concluded the City had suffered millions in dollars in losses. PAOE Ex. 19 at pp. pp. 6–7 ("[W]e estimate overbilling ranging from $4,469,678 to $5,857,762. . . . Maximum combined overbilling . . . . $8,214,943."). NUFIC conceded the City has suffered at least some amount of covered loss because NUFIC offered $1.5 million in exchange for the City's release of all Plaintiffs' claims under the policy (an amount far lower than even the lower end of losses estimated by NUFIC's own forensic accountants). Deal Decl. at ¶ 21; PAOE Ex. 20. To this day, however, NUFIC has not issued a coverage determination, has not denied the claim, has not accepted any part of the claim, and has not paid the City any amount under the policies. Deal Decl. at ¶ 24.

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

## III.   LEGAL ARGUMENT

### A.   Legal Standards

Pursuant to Federal Rule of Civil Procedure Rule 56(c), summary judgment may only be granted if there is "no genuine issue as to any material fact." All inferences that may be drawn from the evidence presented in a motion for summary judgment must be viewed in the light most favorable to the responding party. *Eastman Kodak Co. v. Image Technical Services, Inc.,* 504 U.S. 451, 456 (1992).

A court interpreting an insurance policy will attempt to give effect to the mutual intention of the parties. *AIU Ins. Co. v. Superior Court*, 51 Cal.3d 807, 821-822 (1990).[2] Words in an insurance policy are to be interpreted as a layperson would interpret them, in their "ordinary and popular sense." *Id.* at 822. Any ambiguity in the policy is resolved against the insurance company and "if semantically permissible, the contract will be given such consideration as will fairly achieve its objective of providing indemnity for the loss to which the insurance relates." *White v. Western Title Ins. Co.*, 40 Cal.3d 870, 881 (1985). In interpreting an insurance policy, the court also considers the reasonable expectations of the public and the insured. *Id.* at 881, 882 n.7.

Coverage clauses are interpreted broadly so as to afford the greatest possible protection to the insured; exclusionary clauses, like the discovery clause and termination clause,[3] are interpreted narrowly against the insurer. *State Farm Mut. Auto. Ins. Co. v. Partridge*, 10 Cal.3d 94, 101-02 (1973). The burden is on the insurer to demonstrate the applicability of any exclusions. *Aydin Corp. v. First State Ins. Co.*, 18 Cal.4th 1183, 1188 (1998).

---

[2] California substantive law applies to Plaintiffs' claims. *Hawthorne Sav. F.S.B. v. Reliance Ins. Co. of Illinois*, 421 F.3d 835, 841 (9th Cir. 2005).

[3] Even when not expressly labeled an "exclusion," condition and clauses that serve to bar coverage when triggered are treated as exclusions and subject to a narrow construction. *See, e.g.*, *Shepard v. CalFarm Life Ins. Co.*, 5 Cal.App.4th 1067, 1076 (1992) (holding that a "transfer provision," which was placed under the heading "PLAN B MEDICARE SUPPLEMENT" and terminated coverage when the insured qualified for Medicare, was to be treated as an exclusion).

**B.**   **The Discovery Clause was Not Triggered**

**1.**   **Discovery Clause Standard**

Under California law, "[t]he test for discovery [under a crime policy] blends a subjective standard (i.e., the insured's actual awareness and knowledge of facts and circumstances) and an objective one (i.e., would a reasonable person conclude that fraud occurred). Mere suspicion of wrongdoing is not sufficient." *Fidelity Nat. Financial, Inc. v. National Union Fire Ins. Co. of Pittsburg, PA,* 2014 WL 4909103, at \*20 (S.D. Cal., Sept. 30, 2014) (citing *Pacific–Southern Mortg. Trust Co. v. Ins. Co. of N. Am.*, 166 Cal.App.3d 703, 709, 713 (1985); *Gulf USA Corp. v. Federal Ins. Co.*, 259 F.3d 1049, 1058 (9th Cir. 2001). To constitute discovery of fraud or criminal acts, the insured must know enough facts to justify charging the employee with dishonesty, fraud, or theft. *Gulf USA Corp.*, 259 F.3d at 1059–60.

There is no "duty to investigate suspicious facts" and an insured is not charged with the knowledge they would have discovered if they had investigated. This standard is based in part on the public policy that "California law permits the employer to trust its employees by presuming they made an innocent mistake rather than jumping to the conclusion that they intended to defraud their employer." *Fidelity Nat. Financial, Inc.*, 2014 WL 4909103 at \*65 (internal citations omitted); *see also Gulf USA Corp.*, 259 F.3d at 1059 ("[A] careful and prudent person does not lightly charge another with committing fraud or an act of dishonesty");

**2.**   **Plaintiffs are Not Seeking Coverage for 1090 Violations**

The gravamen of NUFIC's motion is that Plaintiffs are seeking insurance coverage based on a purported conflict of interest on the part of the ULC Principals, and that the City knew of this conflict and so the claim is barred. This argument fails for a host of reasons, most fundamentally that it is based on a misrepresentation: Plaintiffs are not seeking coverage based on conflicts of interest.

Plaintiffs' First Amended Complaint does not allege coverage based on section 1090 violations. ECF No. 20 at ¶¶ 1–94. In discovery, Plaintiffs made clear

Best Best & Krieger LLP
ATTORNEYS AT LAW
18101 Von Karman Avenue, Suite 1000
Irvine, California 92612

that they are not seeking coverage based on allegations of conflicts of interest: "[T]he City does not currently contend that it suffered a "loss" covered by any insuring provision in the 2014 and the 2015 Policy resulting from a violation of Government Code section 1090." NAOE Ex. 20 (ECF No. 49-6, Plaintiffs' Interrogatory Responses) at p. 126:9–13; *see also id.* at p. 127:21–25 (same).

In the report prepared by the City's forensic accountant, Daniel W. Ray, which was shared with NUFIC by the City to prove its claimed losses, Ray did not conclude that any damages were attributable to payments pursuant to contracts entered into in violation of section 1090. PAOE Ex. 14 (Ray Decl.) at Ex. C. Defendant's forensic accountants similarly did not attribute any loss to section 1090 violations PAOE Ex. 19 (HSNO Report). To be clear, Plaintiffs' discovery responses and forensic accountant reports were accurate – Plaintiffs <u>do not</u> contend that payments made pursuant to a contract that was entered into in a violation of section 1090 constitute "Theft." *See* PAOE Ex. 7 (Gibbs Depo) at 201:15–202:1.)

In lieu of pointing to any evidence that the Plaintiffs *are* pursuing coverage on a theory of violation of section 1090, NUFIC points to a single paragraph in a letter written by Plaintiffs' counsel presenting a theory that payments made under a contract entered into in violation of section 1090 constitutes a loss. NAOE Ex. 25 (ECF 49-8 at p. 1255). Even this letter, however, recognized that coverage under this theory was not a foregone conclusion, and also provided evidence of millions of dollars' worth of overcharging and false invoices. *Id.* at p. 1256. Plaintiffs did not ultimately pursue this theory, because after further investigation and research Plaintiffs did not believe the evidence and law available at the time of filing the complaint supported the claim. *See* sections III.B.3, III.C.1, *infra*.

Without identifying the doctrine or making any attempt to satisfy its elements, NUFIC's argument seems to rest on a form of estoppel: In a letter, Plaintiffs' counsel suggested that violations of section 1090 resulted in a compensable loss, and so NUFIC may now use this correspondence to defeat

Best Best & Krieger LLP
Attorneys at Law
18101 Von Karman Avenue, Suite 1000
Irvine, California 92612

coverage. NUFIC satisfies none of the elements of estoppel, and identifies no authority suggesting that a legal theory presented in a tender, proof of loss, or other pre-suit correspondence can defeat coverage. NUFIC identifies no authority because none exists. *See Bennett v. Northwestern Nat. Ins. Co.*, 84 Cal.App. 130 (1927) (Statement in proof of loss that automobile was subject to lease contract held not to estop insured from showing legal effect of transaction).

Indeed, NUFIC cannot establish reasonable reliance, because NUFIC itself has never accepted the theory that a violation of section 1090 results in a compensable loss under the Policies. *See generally* PAOE Ex. 22. To this day, and even in NUFIC's motion, NUFIC does not concede that a violation of section 1090 results in a compensable loss, instead it relies on artful phrasing that (falsely) characterizes the theory as one through which Plaintiffs seek coverage.[4] In other words, NUFIC does not agree or contend that a payment made in violation of Section 1090 constitutes "Theft," but nonetheless contends coverage is precluded by the City's alleged knowledge of facts that NUFIC itself does not concede would show a compensable loss. This Court should not countenance this gamesmanship.

### 3.   NUFIC Fail to Prove Section 1090 Violations

NUFIC's motion is predicated upon the assumption that the ULC Principals violated section 1090 in connection with providing services to the City. However, NUFIC does not prove that section 1090 violations occurred.

Section 1090 provides in relevant part that: "[C]ity officers or employees shall not be financially interested in any contract made by them in their official

---

[4] Notably, in the years in which the parties were exchanging pre-suit correspondence, NUFIC took many coverage positions which it no longer pursues because those theories are contrary to its current litigation position. For example, for years NUFIC took the position that the ULC Principals were not appointed officials covered by the policy. *See, e.g.*, 4.26.18 preliminary coverage letter ("A. The Subject Individuals Appear to Have Been Independent Contractors. . . . In your April 20 letter you assert that the ULC principals were City officials. . . [various sources of information] show[] that numerous ULC representative performed services as independent contractors for the City."). NUFIC has abandoned this position, presumably because it conflicts with its current litigation position that the ULC Principals entered into contracts in their official capacity as officials.

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

capacity." Cal. Gov. Code. § 1090. "What differentiates section 1090 from other conflict of interest statutes . . . is its focus on the making of a contract in which one has an impermissible interest." *Lexin v. Superior Court*, 47 Cal.4th 1050, 1074 (2010). To violate this statute, a government employee must enter into a contract in which they are financially interested *while they are a government employee.*

All work performed by ULC was performed pursuant to the original ULC contracts, and no new contracts were formed. ("PAOE") Ex. 10 (Gibbs Decl.) at ¶ 8; PAOE Ex. 11 (Castaldo Decl.) at ¶¶ 7–8; PAOE Ex. 17 at p. 7.) ULC's work for the City was not performed in violation of section 1090.

NUFIC ignores the requirement of "making" a contract, and instead alleges that "the Former Officials prepared and presented capital improvements and public works proposals to the City Council." (Disputed Fact ("DF") # 16.) Although NUFIC fails to prove this is an undisputed fact, the mere presentation of capital improvement plans, public works proposals, or otherwise advising the City Council on whether certain work should be performed is not a violation of section 1090 unless it results in the making of a new contract in which an official is financially interested. *Lexin,* 47 Cal.4th at 1074. While NUFIC alleges ULC Principals submitted staff reports regarding work that would be performed pursuant to ULC's *pre-existing* contract, they never submitted a contract award recommendation recommending that the City Council award a new contract to ULC. PAOE Ex. 7 (Gibbs Depo.) at p. 124:8–17; Ex. 11 (Castaldo Decl.) at ¶ 11.

### 4.   James Gregg was the Risk Management Department

In addition to proving that section 1090 violations occurred, NUFIC must also establish that the "Risk Management Department or other department designated to handle insurance matter for the named insured" both discovered that the violations occurred and discovered that the violation resulted in a loss.

Incredibly, NUFIC contends that City's purchase of an endorsement restricting who may discover a loss to be the "Risk Management Department or

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

other Department Designated to Handle Insurance Matter for the Named Insurance"
in fact had the effect of *expanding* the universe of individuals who may discover a
loss to both James Gregg and the entire City Council. Mot. at p. 14, fn. 5. This
result would be contrary to the "reasonable expectations" of an insured.

Gregg was the head of the City's Risk Management department and the
person responsible for handling the City's insurance matters. PAOE Ex. 8 (Gregg
Depo.) at pp. 27:2–7, 30:1–5 ("Did it [the City of Beaumont] ever, during your
tenure, develop a risk management department? A: It was a small city. I was
basically the department."); 143:1–2 ("I was the risk management department . . .");
NAOE Ex. 6 (Gregg Decl.) at ¶ 5. Gregg further testified that insurance related
issues were rarely presented to the City Council, and they were essentially
exclusively questions concerning broad issues of funding and whether to revert to
self-insurance. PAOE Ex. 8 (Gregg Depo.) at pp. 198:18–199:13.

Several former City Councilmembers similarly testified that Gregg was
responsible for the City's Risk Management and insurance matters. (PAOE Ex. 1
(Berg Depo.) at p. 28:20–23; Ex. 3 (Castaldo Depo.) at p. 51:8–10; Ex. 11
(Castaldo Decl.) at ¶¶ 3–6. Elizabeth Gibbs, a long-time City resource manager and
resources director and current interim City Manager, similarly testified that the City
Council is not involved in the submission of insurance claims. PAOE Ex. 6 (Gibbs
Depo.) at p. 55:14–17; see also Ex. 10 (Gibbs Decl.) at ¶¶ 12–15. Gibbs, as
corporate representative, clarified that a number of "departments" in the City were
departments "of one" person, just as the city's Risk Management Department
consisted of only Risk Manager James Gregg. PAOE Ex. 7 (Gibbs Depo.) at pp.
63:1–2, 186:15–187:17.[5] NUFIC presents no evidence that the City Council ever
was responsible for determining whether an insurance claim should be submitted.

_____

[5] To the extent any declaration reflects otherwise, this seems to reflect confusion
created and seized upon by NUFIC. Council members testified that the language in
the declarations was inaccurate, and reflected a conflation on the part of NUFIC of
*insurance* claims and claims made under the California *Government Claims Act*.
PAOE Ex. 4 (DeForge Depo.) at pp. 51:10–52:1, 53:1–19, 80:1–81:22.

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

### 5.   James Gregg had No Knowledge of ULC Wrongdoing

Because Gregg was responsible for handling insurance matters, the Discovery Clause is only triggered when he learns of a loss covered by the policy. As Gregg testified at length, he had no knowledge of any section 1090 violation, or any other loss suffered by the City covered by the policies.

First, Gregg had no knowledge of the terms of the ULC Contract such that he could know of any conflict of interested represented by the contracts. PAOE Ex. 8 (Gregg Depo.) at pp. 43:2–45:5. Nor did Gregg have knowledge as to how ULC was paid, including the 4.5 percent cap. *Id.* at pp. 46:21–50:1

Gregg testified that he was aware that a citizen named Judith Bingham made complaints concerning ULC, but that he did not know the particulars of any complaints she made. *Id.* at pp. 163:18–164:11. Gregg further testified that, as of 2015, he had no knowledge of any allegations of theft on the part of ULC or its principals. *Id.* at p. 61:4–8. Gregg testified that as of May of 2015, he had no reason to believe that Dillon, Moorjani, and Egger had over-charged or stolen from the City. *Id.* at p. 77:13–17. Indeed, Gregg testified that during his entire tenure with the City of Beaumont, he saw no conduct that would have led him to believe a claim under the government crime policy should be submitted. *Id.* at pp. 82:16–83:3 He further testified that in his entire tenure at the City, he reached no conclusion that any ULC Principal or other person was involved in any conflict of interest. *Id.* at pp. 135:19–138:11.[6] The following exchange during Gregg's deposition aptly summarizes Gregg's lack of knowledge:

> Q.   . . . By the time you left the city , were you aware of any theft or any other dishonest acts committed by any employee involving a loss of money, securities, or other property in excess of $25,000?
>
> A.   No. . . . .
>
> Q.   Are you aware of ULC stealing monies, securities, or other

---

[6] In fact, Gregg testified that his declaration, which was drafted by NUFIC, and which NUFIC's counsel demanded he sign, originally included language concerning criminal conduct that he required be removed. *Id.* at pp. 134:10–135:17.

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

property in excess of $25,000[?] . . . .

The Witness: No.

*Id.* at pp. 125:14–18; 127:21-128:1 In other words, as a matter of undisputed facts, the City's Risk Management Department head had no knowledge of the facts NUFIC alleges gave the City notice of the purported section 1090 violations.

### 6.    The City Council had no Knowledge of ULC Wrongoing

Even if the knowledge of members of the City Council were relevant, NUFIC fails to demonstrate that the City Council had any knowledge of any section 1090 violation. On the contrary, the testimony and documentary evidence establishes that the members of the City Council had no such knowledge, and believed that the work of Urban Logic did not violate section 1090.

NUFIC relies in substantial part on evidence that lay members of the public made allegations that ULC violated section 1090. However, NUFIC ignores that the City investigated these allegations, and concluded that there were no violations. PAOE Ex. 1 at (Berg Depo.) at pp. 106:19–107:3. Former councilmember Berg also testified that while a draft audit report prepared by the Office of Inspector General for the U.S. Department of Commerce raised questions concerning potential conflicts of interest, the final audit report concluded that there *was no conflict of interest*. *Id.* at p. 117:7–13 In a letter former Mayor Berg wrote to the Office of Inspector General, he aptly described why no conflict of interest existed:

> All of the services provided by Urban Logic. . . came within the purview of the 1993 agreement. . . . [T]here is only <u>one</u> contract involved in the rail project: the 1993 agreement between the City and Urban Logic Consultants, Inc., which authorizes all of the services provided by Urban Logics and its principals to the City. The prohibitions against conflicts of interest involving public officials are not violated if a public official has a financial interest in a contract <u>which has been entered into before he official assumes office</u>. . . .

PAOE Ex. 17 at p. 7 (emphasis in original). As Berg also noted in a letter that he stands by today, PAOE Ex. 1 (Berg Depo.) at p. 233:11–22, in 2004 and 2005 the

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

- 13 -

District Attorney for Riverside County investigated allegations of conflicts of interest, and determined that no such conflicts existed. Both the City and ULC relied upon this "clean bill of health" for years: "[A]fter the 2004/2005 investigation which cleared ULC of conflict of interest and self-dealing, the DA shared his findings and opinion with the City and ULC who for years acted in reliance on the DA's findings and opinions." PAOE Ex. 18 at p. 8 (emphasis in original). Berg testified that to *this day* he believes that Kapanicas and the ULC Principals did not engage in illegal conduct. PAOE Ex. 1 (Berg Depo.) at pp. 227:8–23; 229:22–230:2. Berg further testified he never believed Dillon, Egger, Moorjani or Kapanicas had any conflict of interest. *Id.* at p. 230:23–231:9.

Former Councilmember Gall's subjective belief as to the dishonesty of the ULC Principals was apparently based in large part on a vague belief that the City did not adequately engage in competitive bidding, informed in part by the allegations of her friend, Judy Bingham. PAOE Ex. 5 (Gall Depo.) at pp. 81:13–89:6.[7] NUFIC can point to no testimony based on personal knowledge underlying Galls' apparent, but subjective, distrust of the ULC Principals, and certainly no personal knowledge of dishonesty or theft resulting in a loss exceeding $25,000.00.

Councilmember DeForge[8] testified that he had no knowledge of any conflict of interest. PAOE Ex. 4 (DeForge Depo.) at pp. 65:23–66:1. DeForge similarly

---

[7] While counsel for NUFIC contends they adequately disclosed who they represented to Ms. Gall in writing, Ms. Gall was undeniably deeply confused regarding the role of NUFIC's counsel, and testified that she believed the ULC Principals were suing NUFIC, not the City and WRCOG. *Id.* at pp. 56:17–61:11. Galls testimony in general reflected some degree of confusion, and the trier of fact must determine the accuracy of her recollections.

[8] While NUFIC contends it adequately disclosed its representation in writing to DeForge, DeForge was deeply confused as to NUFIC's adversity to the City. PAOE Ex. 4 (DeForge Depo.) at pp. 22:9–15 ("[M]y understanding was that they [NUFIC's counsel] were representing I thought the City of Beaumont against WRCOG. Q. And you based that understanding on what was told to you? A. Just what was told to me, yeah. Q. Okay. So with that understand that you had, which was that they were representing the City in a matter WRCOG, did you proceed to talk to them in that conversation? A. Yeah, I did."); 23:6–14, 24:22–25, 25:1–18. In these conversations with DeForge, during which he believed NUFIC represented the City's interests, NUFIC apparently failed to admonish DeForge to protect the City's privileged information. *Id.* at p. 45:1–3.

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

testified that he had no knowledge of overbilling on the part of ULC. *Id.* at pp. 101:9–16; *see also* PAOE Ex. 6 (Gibbs Depo.) at pp. 174:4–8, 185:15–186:23.

In short, the City was aware of allegations by lay community members that the ULC contracts represented a conflict of interest, but investigated and determined that no violation of section 1090 existed. Both the U.S. Department of Commerce and the Riverside District Attorney's office concurred.

### 7. The Discovery Period Was Tolled by Adverse Domination

NUFIC's motion is based on the argument that the City should have discovered the wrongdoing of the ULC Principals earlier. However, the evidence establishes that City Manager Alan Kapanicas and the ULC Principals exercised such pervasive control over the City that doctrine of adverse domination applies. In *Admiralty Fund v. Peerless Ins. Co.*, 143 Cal.App.3d 379, 387–89 (1983), the court recognized that "If in fact the dishonest president and other high ranking officers controlled the [entities] operations to such an extent as to preclude discovery, the tolling of a discovery-of-loss provision [in a crime policy] should be considered." *Id.* at 387–89. Several other courts have applied *Peerless* and recognized the adverse domination theory of tolling. *See, e.g. Cal. Union Ins. Co. v. Am. Diversified Sav. Bank*, 948 F.2d 556 (9th Cir. 1991).

Kapanicas had control over all City employees and nearly all officers, including Risk Manager Gregg – the individual responsible for submitting insurance claims. As Gregg testified, he discussed all potential claims with Kapanicas, and there was never a circumstance in which he would submit a claim if directed not to do so by Kapanicas. PAOE Ex. 8 (Gregg Depo.) at pp. 37:23–38:1, 38:24–39:3. Further, the City Council itself had no direct authority to command Gregg to submit or refrain from submitting a claim. The Beaumont Municipal Code provides that the City Council had no direct power over City employees and subordinates of the City Manager, it could *only* direct these subordinate employees and officers through Kapanicas:

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

> [The City Manager] shall have the power: . . . . To control, order and give directions to all head of departments, subordinate officers and employees of the City . . . . To appoint, promote, demote and remove any officers and employees of the City . . . To exercise control over all departments of the City . . . .

> [N]either the City Council nor any members thereof shall give orders to any subordinate of the City Manager.

PAOE Ex. 21 at §§ 2.12.060, 2.12.090. Former councilmember Gall testified that Alan Kapanicas exercised complete control over the City and the City Council. PAOE Ex. 5 (Gall Depo.) at pp. 29:12–30:16. Former councilmember Castaldo similarly testified that Kapanicas exercised extraordinary control over the City Council, and prevented them from exercising independent judgment. PAOE Ex. 3 (Castaldo Depo.) at pp. 116:4–8, 145:19–22; Ex. 11 (Castaldo Decl.) at ¶ 27.

Former director of resources and current City Manager Gibbs testified that when Kapanicas was City Manager he exercised almost total control over the flow of information to the City Council. PAOE Ex. 6 (Gibbs Depo.) at pp. 75:24–76:6; *see also* PAOE Ex. 7 (Gibbs Depo.) at pp. 152:10–18; Ex. 10 (Gibbs Decl.) at ¶ 24. The adverse domination tolling doctrine applies.

### 8. NUFIC Fails to Prove the City had Knowledge of or Approved Billing Exceeding the 4.5 Percent Cap

NUFIC fails to prove that the City Council understood or approved the fact that ULC sought payments for amounts that exceeded its 4.5 percent contract cap. The only evidence NUFIC submits is the testimony of two former councilmembers concerning their recollection that fees were disclosed and approved. Tellingly, NUFIC fails to submit a single Capital Improvement Plan ("CIP"), invoice, warrant, or any other document tending to show that ULC's exceedance was disclosed to or approved by the City Council.

First, as is described in the concurrently filed evidentiary objections, Berg and Dressel's testimony that the CIPs disclosed that ULC would exceed the 4.5 percent cap is inadmissible as testimony to prove the contents of writings. The

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

theoretical underpinning for this evidentiary rule are well illustrated here,[9] in that Berg and Dressel's recollection and understanding of the information disclosed on the CIPs is incorrect. CIPs set broad, forward-looking budgets, and do not authorize any specific work or authorize any specific contractor to perform work. While CIPs include a list of authorized contractors, they do not identify which contactors will perform what work. Fundamentally, CIPs are not contracts or contract amendments, and do not authorize any work that is not otherwise permitted by a separate contract or agreement. PAOE Ex. 10 (Gibbs Decl.) at ¶¶ 18–23; Ex. 11 (Castaldo Decl.) at ¶¶ 18–24 & Ex. 2. In short, the CIPs neither disclosed that ULC would exceed the 4.5 percent cap nor authorized ULC to exceed the 4.5 percent cap.

Further, even if Berg and Dressel, as individuals, incorrectly understood that the CIPs represented a tacit approval by the City for ULC to exceed the 4.5 percent budget cap, NUFIC presents no evidence that a majority of the City Council understood or approved of any exceedance of the budget cap.[10] Two members of the City Council are not a majority of a five person council. There is no evidence that Dressel and Berg ever voiced or shared this subjective understanding with a majority of the City Council, or that the City Council as a body ever recognized that ULC would exceed the 4.5 percent cap and legislatively approved ULC performing work and seeking payment for amounts that exceeded the cap.

Had the City expressly exercised legislative authority and approved specific

---

[9] *See Seiler v. Lucasfilm, Ltd.*, 808 F.2d 1316, 1319 (9th Cir. 1986) ("The modern justification for the [best evidence] rule has expanded from prevention of fraud to a recognition that writings occupy a central position in the law. When the contents of a writing are at issue, oral testimony as to the terms of the writing is subject to a greater risk of error than oral testimony as to events or other situations. The human memory is not often capable of reciting the precise terms of a writing, and when the terms are in dispute only the writing itself, or a true copy, provides reliable evidence. To summarize then, we observe that the importance of the precise terms of writings in the world of legal relations, the fallibility of the human memory as reliable evidence of the terms, and the hazards of inaccurate or incomplete duplication are the concerns addressed by the best evidence rule.")

[10] Pursuant to the Ralph M Brown Act, Cal. Government Code §§ 45950 *et seq.*, any discussions with a majority of the board must occur in a noticed public meeting unless statutorily authorized for a closed session meeting. No minutes or agenda reports reflect any such disclosure by Berg or Dressel.

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

minor deviations over the 4.5 percent cap (it did not), this is still not proof that the City approved all billing which exceeded the 4.5 percent cap. If, as NUFIC contends, the City Council, acting as a legislative body, expressly "approved" specific CIPs which, somehow, authorized exceedance of the 4.5 percent cap, those exceedances may not constitute a loss. However, any exceedances that were *not* disclosed to and approved by the City would still constitute theft. NUFIC's reliance on the testimony of only two former councilmembers reflecting their own personal recollections that the City approved some exceedances of the 4.5 percent cap cannot establish that the City approved or knew of the *tens of millions of dollars* of exceedances identified by Dan Ray. PAOE Ex. 14 at Ex. C.

Additionally, NUFIC *itself* creates a factual dispute that precludes summary judgment. NUFIC contends that the City Council knew that the total fees charged by ULC exceeded the 4.5 percent cap, precluding coverage. Yet, NUFIC also contends that not all of ULC's services were subject to the 4.5 percent cap. Mot. at 24:13–15. Determining precisely which invoices, warrants, or other documents "approved" by the City reflected payment subject to the 4.5 percent cap, and which (if any) did not, is a deeply factual issue for determination by the trier of fact.

Finally, NUFIC ignores the faithful performance clause. See Section III.E, *infra*. To the extent any individual council member subjectively understood that the fees charged by ULC exceeded the 4.5 percent cap and did not disclose that to the remainder of the City Council or cause it to remedy the overcharging, that failure triggers the faithful performance insuring agreement.

In any event, if NUFIC were correct and the City in fact approved of and consented to the overbilling, then that particular conduct did not constitute theft or dishonesty, and there was no loss, dishonesty or theft triggering either the discovery clause of termination clause. In other words, if NUFIC's is correct (it is not), the approval of ULC exceeding the 4.5 percent cap would not have placed the City on notice of ULC's fraudulent scheme of submitting false and inflated invoices, and

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

would not bar the City from pursuing those claims.

### 9.      NUFIC Ignores the Fraudulent Overbilling

NUFIC ignores millions of dollars of the City's claim: losses incurred by reason of ULC's submission of false, inflated, and fraudulent invoices.

As the City's forensic accountant concluded in 2018, in a report transmitted to NUFIC, ULC defrauded the City through two other distinct schemes. First, relying on the fact that ULC could submit invoices to both the bond trustee and the City, ULC submitted invoices for millions of dollars of work that was not performed. PAOE Ex. 14 at Ex. C. Second, ULC submitted invoices falsely attesting that work was done by highly paid ULC staff, when the work was in fact performed by subcontractors. *Id*. Ray recently reaffirmed these findings in an FRCP 26(a)(2)(B) report recently transmitted to NUFIC. *Id.* at Ex. A.

NUFIC submits no evidence demonstrating the City discovered these millions of dollars in fraudulent invoices. The City was, in fact, not aware of this fraud scheme. *See, e.g.,* PAOE Ex. 1 (Berg Depo.) at pp. 78:2–10, 211:1–9. As Ray opined, it would have been effectively impossible to uncover this scheme without obtaining possession of ULC's records that were seized by the District Attorney. PAOE Ex. 14 (Ray Decl.) Ex. C p. 20.

### C.      The Termination Clause was not Triggered

In addition to the discovery clause, NUFIC relies upon the termination clause. As an exclusion, this clause is interpreted narrowly against the insurer. *State Farm Mut. Auto. Ins. Co.,* 10 Cal.3d at 101-02.

Even if NUFIC could show the City had knowledge of section 1090 violations, California courts have squarely rejected the contention that payment made under a contract entered into in violation of section 1090 constitutes theft. As the court explained in *People v. Honig*, 48 Cal.App.4th 289 (1996):

> Because defendant's conduct was wrongful, so the argument goes, the state expenditure constituted "stolen" property. . . . Thus, the Attorney General argues that "it is reasonable to conclude that any loss resulting

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

> from a willful violation of section 1090 should fall within the scope of the word 'stolen' . . . . Th[is] argument misses the mark. Defendant did not steal the funds in question; he caused them to be improperly expended on contracts in which he was financially interested.

*Id.* at 357, 359. Similarly, numerous California decisions have held that a violation of section 1090 does require or equate to proof of dishonesty, theft, or actual loss. In other words, even if the City were aware of a section 1090 violation, this does not mean it was aware of theft, dishonesty, or a reportable loss under the Policies. *See, e.g., id.* at 343 ("Accordingly, [section 1090 and other conflict of interest statutes] establish a standard of official conduct which does not depend upon such things as fraud, dishonesty, unfairness or loss to the state, and which may be violated regardless how fair or beneficial the government contract may be."); *Santa Clarita Organization for Planning & the Environment v. Abercrombie*, 240 Cal.App.4th 300, 310 (2015) ("This [section 1090] prohibition applies regardless of whether the public official acted with fraudulent intent or in good faith; [and] whether the contract is unfair or fair . . . ."); *Thomson v. Call*, 38 Cal.3d 633, 648– 649 (1985) ("[T]he violation of section 1090 cannot turn on the question of whether actual fraud or dishonesty was involved. Nor is an actual loss to the city or public agency necessary . . . ."). Even if NUFIC had shown the existence of a section 1090 violation, this would not prove dishonesty, theft, or a loss.

Similarly, numerous courts across the country have concluded that whether particular conduct constitutes the undefined term "dishonest" in an insurance policy is a question of fact for the jury. *See, e.g., St. Paul Mercury Ins. Co. v. Coconut Grove Bank* 106 So.3d 452, 454 (Fla. Dist. Ct. App. 2009) ("The issue of whether Morales was dishonest during the 1988 incident is an issue of fact, and the trial court correctly sent the issue to the jury for determination. There was no reversible error when the trial court allowed the jury to determine the definition of 'dishonesty' since the term was not defined in the policy."); *F.D.I.C. v. Denson*,

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

908 F.Supp.2d 792, 805 (S.D. Miss. 2012) (whether knowledge of cash shortage at bank proof of employee dishonesty question for jury).

Finally, as is described above, NUFIC fails to prove a section 1090 violation or that the City Council had any knowledge of any section 1090 violation. In any event, the individual whose knowledge is pertinent in Gregg, and Gregg testified that he was aware of no dishonest conduct or theft on the part of the Principals.

### D.  NUFIC is Liable for Bad-Faith and Punitive Damages

NUFIC's argument that extra-contractual damages are unavailable is meritless. Plaintiffs' claims are covered, the genuine dispute doctrine is inapplicable, and punitive damages are available.

#### 1.  The Genuine Dispute Doctrine is Inapplicable

"A genuine dispute exists only where the insurer's position is maintained in good faith and on reasonable grounds." *Wilson v. 21st Century Ins. Co.*, 42 Cal.4th 713, 723 (2007). As is explained above, NUFIC's grounds for delaying coverage (NUFIC, incredibly, has still not issued a coverage decision) are not reasonable, and based on a seemingly willful misunderstandings of section 1090, the knowledge of the City and James Gregg, and the grounds upon which Plaintiffs seek coverage. Notably, NUFIC has not pointed to any expert opinion that no coverage exists, or the advice of disinterested outside counsel – only its own self-interested and firm determination to refuse to pay any loss on a clearly covered claim.

Further, "[t]he genuine dispute rule does not relieve an insurer from its obligation to thoroughly and fairly investigate, process and evaluate the insured's claim." *Wilson*, 42 Cal.4th at 723. In other words, even if an insurer's coverage position is ultimately wrong but reasonable, this does not preclude a finding of bad faith based on the insurer's investigation and claims handling.

An unreasonable delay in paying benefits can give rise to a bad faith claim. *Brehm v. 21st Century Ins. Co.*, 166 Cal.4th 1225, 1237 (2008). Despite the fact NUFIC's own consultants concluded Plaintiffs suffered a loss from $4,469,678 to

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

$8,214,943, NUFIC has not paid Plaintiffs a single dollar in compensable losses, despite Plaintiffs' original tender of claim more than half a decade ago.

There is at least a question of fact as to whether NUFIC thoroughly and fairly investigated, processed, and evaluated Plaintiffs' claim. There is at least a question of fact as to whether NUFIC's ever shifting coverage positions and myopic focus on exclusions and bars to coverage were reasonable, and reflect an at least equal consideration of Plaintiffs' interest. *Egan v. Mutual of Omaha Ins. Co.*, 24 Cal.3d 809, 818–819 (1979) ("For the insurer to fulfill its obligation not to impair the right of the insured to receive the benefits of the agreement, it again must give at least as much consideration to the latter's interests as it does to its own").

There is at least a question of fact as to whether NUFIC's undisputed failure to provide written notices of the status of the claim every 30 days constitutes bad-faith. *See* 10 Cal. Code of Regs. § 2695.7(C)(1).

Throughout this lawsuit and in pre-suit correspondence, NUFIC has ignored the City's claim under the faithful performance insuring agreement, instead focusing on the theft clause, presumably because NUFIC believes it can somehow defeat coverage under the theft clause. This is further evidence of bad faith.

An unreasonable settlement offer is also evidence of bad faith. *White,* 40 Cal.3d at 885. Whether NUFIC's offer of $1,500,000 in exchange for a waiver of policy benefits (despite NUFIC's forensic accountant's conclusion that Plaintiffs suffered a loss of *at least* $4,469,678) was reasonable is a question for the jury.

There is no triable issue of fact as to whether the City suffered a loss. Both Plaintiffs' expert and NUFIC's expert conclude that the ULC Principals overcharged the City and the City suffered a loss.[11] The only question is whether it was reasonable (it was not) for NUFIC to refuse to pay a loss despite its own expert and forensic accountants conclusions.

---

[11] NUFIC's expert concludes that the City suffered no *compensable* loss, because it was made whole by restitution paid by the ULC Principals. This conclusion ignores that this restitution was paid to WRCOG, not the City. *See* PAOE Ex. 13 at ¶ 14.

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

The trier of fact may consider whether NUFIC's conduct in evaluating this claim even after suit was filed[12] is further evidence of bad faith, especially in that NUFIC has still failed to issue a coverage determination.[13] *White,* 40 Cal.3d at 885.

Plaintiffs' expert witness alone creates a genuine issue of material fact. Plaintiffs' expert witness opines at length that NUFIC acted unreasonably at every turn and breached the covenant of good faith and fair dealing. PAOE Ex. 16 (Lepire Decl.) at Ex. A; *see also Bulthuis v. Rexall Corp,* 789 F.2d 1315, 1318 (9th Cir. 1985) (Expert opinion is admissible and may defeat summary judgment). NUFIC, on the other hand, has disclosed no expert witness on the issue of bad faith, and will be able to present no opinion testimony that NUFIC's conduct was reasonable.[14]

In short, whether NUFIC's half a decade delay, oppressive tactics, refusal to pay any loss, unreasonable settlement offer, wildly shifting but consistently unreasonable coverage positions, myopic focus on exclusions and efforts to defeat coverage, and other conduct were "reasonable" is a question for the trier of fact.

### 2.    Punitive Damages are Warranted and Available

NUFIC's argument that punitive damages are unavailable is similarly meritless. The City is a Plaintiff in this action and is prosecuting a claim for breach of the covenant of good faith and fair dealing. *See* FAC, ECF No. 20, at ¶¶ 69–76. The City has incurred attorney's fees in seeking to recover the benefits due under the policy. PAOE Ex. 12 (Nolan Decl.) at ¶ 8–13. If Plaintiffs' prevail on the claims for breach of contract, the City will be entitled to between 35 and 50 percent of all proceeds on the breach of contract claim. PAOE Ex. 13 (Debaun Decl.) at ¶ 16. If the City prevails on the bad-faith claim, it will be entitled to *Brandt* fees, which are

---

[12] *E.g.*, conducting unilateral interviews with former City officials who believed, based on their oral conversation with NUFIC's representative, that NUFIC was not adverse to the City, and making no apparent efforts to admonish the former officials to protect the City's privileges.

[13] NUFIC seems to contend its answer in this lawsuit constitutes a denial, but neither case law nor the California Insurance Regulations, authorize an insurer to make a coverage determination in a pleading in an effort to cloak that determination in privilege and shield it from bad-faith liability. This gamesmanship is bad faith.

[14] Plaintiffs rebuttal expert may only challenge the opinions of Mr. Lepire.

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

damages in the form of attorneys fee incurred in seeking benefits under a policy. *See Nickerson v. Stonebridge Life Ins. Co.,* 63 Cal.4th 363, 372 (2016) (Citing *Brandt v. Superior Court* (1985) 37 Cal.3d 813, 817). *Brandt* fees are compensatory damages that can support punitive damages. *Nickerson,* 63 Cal.4th at 373 ("Nickerson argues, and Stonebridge does not dispute, that *Brandt* fees ordinarily qualify as compensatory damages for purposes of applying the second *Gore* guidepost [regarding punitive damages]. We agree.'").

### E.   NUFIC Ignores the Faithful Performance Insuring Agreement

NUFIC's motion, like NUFIC's pre-lawsuit correspondence, ignores an entire insuring provision of the Policy: the faithful performance insuring agreement.

In addition to theft, the Policies cover losses "resulting from the failure of any employee to faithfully perform his or her duties as prescribed by law, when such failure has as its direct and immediate result a loss of your covered property." NAOE Ex. 1 at ECF 49-4 p. 242; Ex. 2 at ECF 49-4 p. 532. This provision provides coverage for a broad range of acts.

In general, faithful performance clauses like the one in the policies covers both "nonfeasance" and "malfeasance." *Commisso v. Meeker*, 8 N.Y.2d 109, 123, 168 N.E.2d 365, 371 (1960). That is, this type of policy covers losses caused by bad acts, and the failure to perform acts that should have been performed. Examples of acts that have been determined to fall within the scope of faithful performance bonds include: (1) the embezzlement of public money or property, *Borough of Totowa v. American Sur. Co. of N.Y.*, 39 N.J. 332, 188 A.2d 586 (1962); (2) the intentional diversion of public monies from one fund to another, *Town of Evans v. Catalino*, 88 A.D.2d 780, 451 N.Y.S.2d 523 (1982); and (3) the approval of public contracts with entities in which the principal had a financial interest, contrary to public contracting requirements. *Town of City of Peoria v. Rauschkolb*, 333 Ill. App. 411, 78 N.E.2d 123 (1948). Liability under a faithful performance policy has been described as "absolute," *Cecil v. Gila County*, 71 Ariz. 320, 322, 227 P.2d

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

217, 218–19 (Ariz. 1951) and will cover, for example, when a public funds comes up missing even though the official responsible for the fund exercised due care in their custody and control. *Id.* The bond will also cover mispayment of public funds when the claim for payment was not properly substantiated. *Sec'y of State v. Hanover Ins. Co.*, 242 Or. 541, 548, 411 P.2d 89, 93 (1966).

Every loss suffered by the City is also covered by the faithful performance insuring agreement. The ULC Principals engaged in "malfeasance," and to the extent it was possible to uncover their scheme through the documentation disclosed to city staff or officials, those staff or officials permitted mispayment of public funds that triggers the faithful performance clause.

### F.   NUFIC's Argument Regarding BFA is Meritless

NUFIC's arguments that "any claims for amounts paid by BFA" are not covered is meritless, and again based on a seemingly willful misunderstanding. ULC and the ULC Principals provided no services to and performed no work for the Beaumont Financing Authority ("BFA"). The BFA is a financing mechanism, and does not independently procure contractors or approve or manage projects. ULC performed all of its work for the City of Beaumont pursuant to a contract with the City of Beaumont, and BFA was simply a mechanism for the payment of City funds for City projects. PAOE Ex. 10 (Gibbs Decl.) at ¶ 10. NUFIC does not and cannot point to a single instance of work performed by ULC for BFA.

In any event, if NUFIC contends that BFA paid funds it was not required to or permitted to because no contract existed, then such losses are covered by the faithful performance clause, and BFA has assigned its claim to WRCOG. PAOE Ex. 23 (assignment of claims from City and related entities to WRCOG).

### IV.   CONCLUSION

For all of the aforementioned reasons, the motion should be denied.

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

1

Dated: July 11, 2022                    BEST BEST & KRIEGER LLP

2

3                                        By: */s/ Jeffrey V. Dunn*
                                              JEFFREY V. DUNN
4                                             CHRISTOPHER E. DEAL
                                              DANIEL L. RICHARDS
5
                                              Attorneys for Plaintiffs
6                                             Western Riverside Council of
                                              Governments and City of Beaumont
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612