# EXHIBIT 1

Page 1

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION


WESTERN RIVERSIDE COUNCIL OF
GOVERNMENTS, a California
Joint Powers Authority; CITY
OF BEAUMONT, a public entity
in the State of California,

        Plaintiffs,

        vs.                  Case No.
                        5:20-cv-02164 GW
NATIONAL UNION FIRE      (KKx)
INSURANCE COMPANY OF
PITTSBURGH, PA, and DOES 1
through 50, inclusive,

        Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~


VIDEOTAPED DEPOSITION OF ROGER BERG


THURSDAY, MARCH 31, 2022

9:03 A.M.


5 PARK PLAZA, SUITE 1100

IRVINE, CALIFORNIA


Reported by Megan M. Grossman-Sinclair
CSR No. 12586

Exhibit 1
Page 1 of 24



Page 7

```
 1                    IRVINE, CALIFORNIA;

 2            THURSDAY, MARCH 31, 2022; 9:03 A.M.

 3

 4                    VIDEOGRAPHER:  Good morning.  We

 5       are on the record.  This begins video No. 1 in the

 6       deposition of Roger Berg in the matter of Western

 7       Riverside Council of Governments vs. National

 8       Union Fire Insurance in the United States District

 9       Court for the State of California.  Today's date

10       is March 31st, 2022, and the time is 9:03 a.m.

11                    This deposition is being taken at

12       5 Park Plaza in Irvine, California.  I am Sergio

13       Esparza, the videographer of Magna Legal Services.

14       The court reporter is Megan Grossman of Magna

15       Legal Services.  Will counsel and all parties

16       present state their appearances and whom they

17       represent?

18                    MS. VANDERWEELE:  Meagan

19       VanderWeele on behalf of the defendant National

20       Union.

21                    MS. LEWOSZ:  Angela Lewosz on

22       behalf of the defendant National Union.

23                    MR. DUNN:  Jeffrey Dunn on behalf

24       of plaintiff Western Riverside Council of

25       Governments.
```

Exhibit 1
Page 2 of 24



```
                                                   Page 8
 1                    THE COURT REPORTER:  Okay.  I will
 2     now swear you in.  Please raise your right hand.
 3
 4                    ROGER BERG,
 5                having been first duly sworn,
 6                   testifies as follows:
 7
 8                         EXAMINATION
 9     BY MS. VANDERWEELE:
10             Q.    Good morning, sir.  Could you
11     please state your full name and spell your last
12     name for the record?
13             A.    Roger Norman Berg, B-e-r-g.
14                   MS. VANDERWEELE:  Let the record
15     reflect this is the deposition of Roger Berg taken
16     pursuant to subpoena and notice and set to today's
17     time by agreement of the parties and the witness.
18     BY MS. VANDERWEELE:
19             Q.    Sir, what is your date of birth?
20             A.    December 7th, 1954.
21             Q.    And where do you currently live?
22             A.    I live in Beaumont, California.
23             Q.    And how long have you lived in
24     Beaumont?
25             A.    I have lived in Beaumont all my
```

Exhibit 1
Page 3 of 24



MAGNA
LEGAL SERVICES

Page 28

```
 1                    A.   Closed sessions would deal with
 2     pending and ongoing litigation, negotiations with
 3     labor, and discussions with the City Attorney
 4     about items that may be real estate purchases and
 5     things like that.
 6                    Q.   And if there was an item that was
 7     discussed during a closed session that was voted
 8     on and approved by the Council, would that
 9     ultimately be mentioned in the -- like open --
10     or strike that.
11                    If the City Council voted on
12     something during a closed session, how would that
13     be reflected in the minutes?
14                    A.   If it was disclosable at that time,
15     it would be disclosed right then.  If it was a
16     vote for something that required approval by
17     another agency, it would have to wait until
18     they -- they approved it, then we could make a
19     joint announcement.
20                    Q.   Okay.  During your tenure on City
21     Council, did the City of Beaumont have a separate
22     risk management department?
23                    A.   Yes.
24                    Q.   When did the city -- it's my
25     understanding that there wasn't -- strike that.
```

Exhibit 1
Page 4 of 24




Page 78

1              A.    That's correct.

2              Q.    And at any time during your tenure

3    on City Council did you have any reason to believe

4    that Urban Logic was submitting false invoices?

5              A.    No.

6              Q.    Did you -- strike that.

7                    During your time on City Council

8    did you have any reason to believe that Urban

9    Logic was submitting grossly inflated invoices?

10             A.    No.

11             Q.    And I take it given that you knew

12   what Urban Logic was doing for the city, the work

13   they were providing, and the projects that were

14   being undertaken by the City, if you had suspected

15   that Urban Logic was submitting invoices that were

16   grossly inflated or false, those would not have

17   been approved under your watch?

18             A.    That's correct.

19             Q.    If we turn to the next page of

20   Exhibit 22 -- actually, if we look at Paragraph 2

21   this talks about the request for proposal that I

22   was asking you about earlier.  Does the history of

23   development services staffing described here on

24   Exhibit 2, is this an accurate summary of kind of

25   what led to the city hiring Urban Logic

Exhibit 1
Page 5 of 24



Page 92

1              Q.   Just generally, the staff reports

2     that -- I have seen numerous staff reports

3     throughout this case, staff reports would be

4     submitted to City Council for review?

5              A.   Yes.

6              Q.   And this particular Staff Report

7     includes a recommendation that's being made;

8     correct?

9              A.   Yes.

10             Q.   And it looks like Mr. Dillon here

11    is recommending -- or strike that.

12             It looks like the economic

13    development department is recommending that the

14    City Council approve a street closure and a

15    project report and asking that the mayor execute

16    the project report.

17             A.   Yes.

18             Q.   And if we look at the first page of

19    Exhibit 25, this is a project progress report.  Is

20    this the project progress report that's being

21    referenced in the Staff Report on the next page of

22    this exhibit?

23             A.   Yes.

24             Q.   Okay.  So the Staff Report dated

25    February 3, 2004, and signed by Mr. Dillon, is

Exhibit 1
Page 6 of 24



Page 93

```
1      recommending that the City Council approve and the

2      mayor sign the project report here that's on the

3      first page of Exhibit 25 dated February 3, 2004;

4      is that correct?

5              A.   Yes.

6              Q.   And so it looks like this -- the

7      first page of Exhibit 22 is signed by the mayor?

8              A.   Yes.

9              Q.   Do you recognize the signature?

10             A.   Yes.

11             Q.   Whose signature is this?

12             A.   Larry Dressel.

13             Q.   And he was mayor in 2004?

14             A.   Yes.

15             Q.   Mr. Dressel served on City Council

16     with you?

17             A.   Yes.

18             Q.   The fact that Mr. Dressel as the

19     mayor signed this document, it looks like this

20     is -- does this mean that the City Council

21     approved authorization of this project report?

22                 MR. DUNN:  Objection; calls for

23     legal opinion or conclusion.

24                 THE WITNESS:  Yes.

25
```

Exhibit 1
Page 7 of 24



Page 94

1    BY MS. VANDERWEELE:

2            Q.   When the staff reports would be

3    submitted to City Council for approval, at the top

4    here it says Agenda Item 2.f.

5            A.   Yes.

6            Q.   So does that mean that this Staff

7    Report was an agenda item for one of the City

8    Council meetings?

9            A.   Yes.

10           Q.   And correct me if I'm wrong, I want

11   to make sure I understand this.  A Staff Report

12   would be submitted making a retention to City

13   Council, it would be placed on the agenda for the

14   City Council during one of its meetings, and then

15   the City Council would have to vote to either

16   approve or to not approve the recommendation being

17   made here in the Staff Report?

18           A.   That's --

19           MR. DUNN:  Objection; compound.

20           THE WITNESS:  That is correct

21   because it's got the City Council approval date on

22   there.

23   BY MS. VANDERWEELE:

24           Q.   Okay.  So the mayor cannot sign a

25   project progress report unless it's approved by

Exhibit 1
Page 8 of 24



Page 95

1      City Council?

2                  A.    That's correct.

3                  Q.    And are project progress reports

4      that are approved by the City Council, is that

5      done by resolution?

6                  A.    I believe so.

7                  Q.    Okay.  And that would be reflected

8      in meeting minutes?

9                  A.    Yes.

10                 Q.    All right.  And so the mayor has

11     signed the project -- progress report here in

12     Exhibit 25.  That's on the first page.  Indicating

13     to you that the City Council voted and approved of

14     the recommendation made in the Staff Report on the

15     second page of this exhibit; correct?

16                 A.    That's correct.

17                 Q.    And if we look at the project

18     progress report, it states in the "Recommendation

19     for City Council Action" section which is the

20     bottom section of this progress report, it states:

21                 "The recommendation for City

22                 Council is that it approve and

23                 authorize staff and qualified

24                 contractors to complete the

25                 following work:"

Exhibit 1
Page 9 of 24



Page 96

1               And then it says:

2               "Urban Logic:  Complete the

3               inspection and construction

4               management of the project."

5               Do you see that?

6          A.   Yes.

7          Q.   So this -- by approving the project

8     progress report that we see here, the City Council

9     is approving that Urban Logic complete the

10    inspection and construction management of the

11    project?

12         A.   Yes.

13              MR. DUNN:  Objection; legal opinion

14    or conclusion.  Move to strike.

15    BY MS. VANDERWEELE:

16         Q.   And the -- do you see where it says

17    recommendation for City Council action?

18         A.   Yes.

19         Q.   Is that referring to the

20    recommendation that's in the Staff Report signed

21    by Mr. Dillon?

22         A.   Yes.

23         Q.   So Mr. Dillon is recommending that

24    Urban Logic complete the inspection and

25    construction management of the project.  City

Exhibit 1
Page 10 of 24



Page 97

1    Council would have to consider that

2    recommendation?

3              A.   Yes.

4              Q.   And would have to vote on that

5    recommendation?

6              A.   Yes.

7              Q.   And as we can see here that

8    recommendation was approved; correct?

9              A.   Yes.

10             Q.   Let's go to Exhibit 26, please.

11             (Exhibit No. 26 was marked for

12             identification and is attached

13             hereto.)

14   BY MS. VANDERWEELE:

15             Q.   So Exhibit 26 is another -- it's a

16   Project Progress Report -- strike that.  Let me

17   back up.

18             Exhibit 26, for the record, is

19   Bates stamped BEAUMONTAIG82478 through 82479.

20   There is a Project Progress Report and then

21   another Staff Report, both dated June 15, 2004;

22   correct?

23             A.   Yes.

24             Q.   I want to start with the Staff

25   Report.  The Staff Report is the second page of

Exhibit 1
Page 11 of 24



Page 106

1                    (Document reviewed by witness.)

2                         THE WITNESS:  I am done.

3        BY MS. VANDERWEELE:

4                    Q.   Okay.  I take it when you were on

5        City Council and prior to 2011 you understood that

6        individuals were raising concerns about a

7        potential conflict of interest.

8                    A.   Yes.

9                    Q.   And based on your discussions with

10       the other City Council members, do you believe

11       that your fellow City Council members also

12       understood that there were concerns being raised

13       about a potential conflict of interest with Urban

14       Logic?

15                   A.   Yes.

16                        MR. DUNN:  Objection; lacks

17       foundation, calls for speculation.

18       BY MS. VANDERWEELE:

19                   Q.   Did you talk with other City

20       Council members about a potential conflict of

21       interest involving Urban Logic?

22                   A.   Yes, we did, because it was brought

23       to the public comment from Mrs. Hall.  And we

24       looked into the matter and we actually -- a letter

25       was written by then/later by Mayor Fox that

Exhibit 1
Page 12 of 24



MAGNA
LEGAL SERVICES

Page 107

1    explained what we did and why we had them we

2    didn't feel it was a conflict because it was a

3    professional services contract.

4             Q.   So you have seen documentation

5    letters from Nancy Hall in which she expressed a

6    concern about a conflict of interest involving

7    Urban Logic; correct?

8             A.   Yes.

9             Q.   Are you aware that in 2004 time

10   period Mrs. Hall was claiming that Urban Logic was

11   violating Section 1090, which is a conflict of

12   interest law in California?

13            A.   Yes.

14            Q.   And was the fact, this concern

15   about a potential violation of Section 1090, was

16   that something that was discussed by the City

17   Council?

18            MR. DUNN:   Objection; vague as to

19   time.

20            THE WITNESS:   Yes, it was and it

21   was discussed in closed session too.

22            MR. DUNN:   Hold on, counsel.

23   Mr. Berg you are advised not to respond to

24   questions that calls for information that was

25   shared in closed session.  Are you aware of that?

Exhibit 1
Page 13 of 24



Page 117

```
 1      draft audit report addressed the conflict of

 2      interest?

 3              A.   It did.  I think the only thing

 4      that happened was a small amount of money was

 5      given back to the federal government for the

 6      things that he didn't think qualified.

 7              Q.   Okay.  So in the final audit report

 8      that was issued by the Office of Inspector General

 9      from the U.S. Department of Commerce, they found

10      that Urban Logic had a conflict of interest?

11              A.   No.

12              Q.   They did not?

13              A.   They did not.

14              Q.   But you knew in August of 2001 that

15      there was a concern being raised from the Office

16      of Inspector General from the U.S. Department of

17      Commerce of a potential conflict of interest?

18              A.   They were only doing their job.

19              Q.   Of course.  Okay.  I want to talk

20      about capital improvement plans.

21                   Actually, let me back up.  So the

22      final audit report as you recall did not find a

23      conflict of interest?

24              A.   As I recall, yes.

25              Q.   Okay.  And that was in -- the draft
```

Exhibit 1
Page 14 of 24



Page 130

1    City Council with the opportunity to review prior

2    to approving it; correct?

3              A.   That's correct.

4              Q.   Going to Exhibit C of this Capital

5    Improvement Plan, it has a list of qualified

6    professional services contractors; correct?

7              A.   Yes.

8              Q.   And as we have been talking about

9    all along, Urban Logic Consultants is listed on

10   here as one of the professional services

11   contractors; right?

12             A.   Yes.

13             Q.   Mr. Moorjani, given his role as the

14   director of the Public Works Department, would it

15   be fair to say that he had an integral role in

16   preparing these plans?

17             A.   Yes.

18             Q.   Would the ULC principals in their

19   role as city officials make recommendations to the

20   City Council about capital improvement plans?

21             A.   Yes.

22             Q.   Did the ULC principals in their

23   role as city officials recommend that the city

24   adopt resolutions approving these plans that would

25   provide funding for projects on which ULC was

Exhibit 1
Page 15 of 24



Page 131

1    listed as a qualified professional services

2    contractor?

3              A.    Yes.

4              Q.    And so ULC, would it be fair to say

5    that the principals were making recommendations to

6    City Council about Public Works projects in the

7    capital improvement plans that Urban Logic would

8    be providing services on for a fee?

9              A.    Yes.

10             Q.    Separate and apart from the --

11   strike that.

12             Let me -- I am going to flip around

13   here.  Let me figure out where I want to go.  If

14   you can turn to Exhibit 11 for me.

15             (Exhibit No. 11 was marked for

16             identification and is attached

17             hereto.)

18   BY MS. VANDERWEELE:

19             Q.    Is Exhibit 11 a Capital Improvement

20   Plan for fiscal year 2002 to 2003?

21             A.    Yes.

22             Q.    Your name is listed on here as one

23   of the City Council members; correct?

24             A.    Yes.

25             Q.    The document is dated July 16,

Exhibit 1
Page 16 of 24



Page 211

1              Q.   Do you believe based on all of that

2    that Urban Logic was submitting grossly inflated

3    invoices?

4              A.   No.

5              Q.   Do you believe that Urban Logic was

6    submitting false invoices that were approved by

7    the City Council while you were on the City

8    Council?

9              A.   No.

10             Q.   And if we turn to the next page,

11   Page 12, it states:

12                  "The city believes that Urban

13                  Logic grossly overcharged for its

14                  services by inflating the total

15                  cost of the projects upon which

16                  they provided services."

17                  Do you see that?

18             A.   Yes.

19             Q.   And when you were on City Council

20   you would review the plans and specifications and

21   budgets for all the Public Works projects that

22   were going to be done.

23             A.   Yes.

24             Q.   Do you believe that any of the

25   projects, the costs for those projects were

Exhibit 1
Page 17 of 24



Page 227

1      been on a jury before.  I show up.  I do what I am

2      asked to do because that's just the way I was

3      taught and raised, to do the right thing and

4      that's what I do.

5              Q.   And did you do that the entire time

6      that you were on the Beaumont City Council?

7              A.   Yes, I did.

8              Q.   And it's always been your position,

9      has it not, that whatever was determined with

10     regards to Mr. Kapanicas, to Mr. Dillon, to

11     Mr. Egger, and Mr. Moorjani, you know, criminally,

12     you disagree with; correct?

13             A.   I am entitled to my opinion, yes, I

14     disagree with what happened.

15             Q.   And as you sit here today, that

16     belief and that opinion has never changed;

17     correct?

18             A.   That's true.  It hasn't changed

19     because it's just how I feel.  I think this was

20     more of a civil matter than a criminal matter but

21     that's beside the point.  This is a civil matter

22     now.  I am just giving information out the way I

23     know it.

24             Q.   Would you sit down and have similar

25     conversations like you have had with the insurance

Exhibit 1
Page 18 of 24



Page 229

1       hear what you had to say; right?

2                    A.    Because I wanted -- in the law

3       there is -- you have the trial and you have the

4       balance scales there.  And I don't think the

5       balance scales are out there and I felt I needed

6       to give my opinion as a citizen.  I am allowed to

7       do that.  And I did that.

8                    Q.    Which is why you are here today.

9                    A.    I am here today because once again

10      I was subpoenaed and I am doing what was required

11      of me.

12                   Q.    But that's not why you talked to

13      the insurance company attorneys early on, is it,

14      you weren't required to talk to them, were you?

15                   A.    If I want to talk to them, that's

16      my opinion.  If I want to talk to you, if you

17      asked me to come and talk to you, I would probably

18      come and talk to you.  Anybody that's willing to

19      listen, I will talk to them.  I am not biased.  Is

20      everybody perfect?  No.  Do people sometimes make

21      mistakes?  Yes.

22                   Q.    Do you think Mr. Dillon, Mr. Egger,

23      and Moorjani and Mr. Kapanicas made mistakes when

24      they were running the city while you were a City

25      Council member?  And I am talking mistakes here of

Exhibit 1
Page 19 of 24



Page 230

1       a very serious nature.

2                   A.    No.   I don't think so.

3                   Q.    So there were --

4                   A.    I will say that there is things

5       happened with some of the bonds and stuff was made

6       and Mr. Kapanicas had to pay some money out on

7       that, a fine, but they weren't materially the same

8       with the SEC.   Everyone makes mistakes.   I mean 20

9       plus years being in there, they are not going to

10      be perfect.

11                  Q.    You have always been a defender or

12      supporter of Mr. Kapanicas; is that correct?

13                  A.    Not in everything, no.   There are

14      some things I didn't agree with.   But once --

15      there was five people on that Council and

16      sometimes I was the only one that voted against

17      things and things that happened.   I didn't like

18      some of the things that went on.   I didn't like

19      the way it was being done.   But as a Council as a

20      whole, we all agreed and we voted on it, and the

21      vote was -- or the majority voted on it and I went

22      ahead with whatever was done.

23                  Q.    For that entire time that you were

24      on the City Council, at no time did you ever think

25      that Mr. Kapanicas had a conflict of interest; is

Exhibit 1
Page 20 of 24


MAGNA
LEGAL SERVICES

Page 231

```
 1    that correct?
 2            A.   I don't think he ever had a
 3    conflict of interest, no.
 4            Q.   How about Mr. Dillon, Mr. Egger,
 5    and Moorjani, same question?
 6            A.   No.
 7            Q.   Do you think they ever did anything
 8    illegal or criminal?
 9            A.   No.
10            Q.   So as far as you are concerned, you
11    never would have had an opportunity to contact
12    anybody about illegal conduct because you just
13    didn't think it existed; correct?
14            A.   No.  That's totally wrong.  I did
15    complain about things that I thought were not
16    right with Mr. Dillon, but...
17                 MS. VANDERWEELE:  Are we marking
18    this as an exhibit?
19                 MR. DUNN:  Yes.  If we can mark
20    that next in order.  Which number is this?
21                 MS. VANDERWEELE:  30.
22            (Exhibit No. 30 was marked for
23            identification and is attached
24            hereto.)
25                 THE WITNESS:  I would like to say
```

Exhibit 1
Page 21 of 24



Page 233

1          A.   Yes.

2          Q.   Would you please take a moment and

3     just review this?  I don't want to rush you.

4          A.   Now, did I take things from other

5     people and put it in this letter?  Yes.  I wrote

6     the letter though.  I might have put stuff in

7     there.  Did I make it perfect all the way?  I

8     don't know.  I am not going to read this whole

9     thing because it has nothing to do with what I am

10    talking about here, I don't think.

11         Q.   No, I just want to ask you if this

12    is the letter that you wrote.

13         A.   Yeah, it's the letter.

14         Q.   Okay.

15         A.   I went to the presiding judge and

16    suggested to have the state bar take a look at it.

17         Q.   Mr. Berg, as you sit here today, is

18    there anything in this letter that you know in

19    retrospect you disagree with?

20         A.   I don't think so.

21         Q.   You stand by the letter?

22         A.   I stand by it.

23         Q.   Okay.  There were exhibits attached

24    to that letter; correct?

25         A.   Yes.

Exhibit 1
Page 22 of 24



Page 256

1      have no other questions.

2                      MR. DUNN:  I have no other

3      questions.

4                      MS. VANDERWEELE:  All right.

5                      VIDEOGRAPHER:  Off the record.  The

6      time is 1:33 p.m.

7

8          (Whereupon, at the hour of 1:33 p.m., the

9               proceedings were concluded.)

10                          oo0oo

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit 1
Page 23 of 24



```
 1                    REPORTER'S CERTIFICATION

 2

 3

 4

 5          I, Megan Grossman-Sinclair, Certified

 6     Shorthand Reporter, in and for the State of

 7     California, do hereby certify:

 8

 9          That the foregoing witness was by me duly

10     sworn; that the deposition was then taken before

11     me at the time and place herein set forth; that

12     said testimony and proceedings were reported

13     stenographically by me and later transcribed into

14     typewriting under my direction; that the foregoing

15     is a true record of the testimony and proceedings

16     taken at that time.

17

18          IN WITNESS WHEREOF, I have subscribed my name

19     this 13th day of April 2022.

20

21

22     _____

23     Megan Grossman-Sinclair, CSR No. 12586

24

25
```

Exhibit 1
257
Page 24 of 24