# EXHIBIT 4

Page 1

UNITED STATES DISTRICT COURT
CENTRAL DIESTRICT OF CALIFORNIA

WESTERN RIVERSIDE COUNCIL OF  )
GOVERNMENTS, a California    )
Joint Powers Authority,      )
                             )
          Plaintiff,         )
                             )
       -vs-                  )  Case No.: 5:20-cv-02164
                             )  -GW(KKx)
NATIONAL UNION FIRE          )
INSURANCE COMPANY OF         )
PITTSBURGH, PA, and DOES     )
 through 50, inclusive,      )
                             )
          Defendants.        )
_____)

DEPOSITION OF BRIAN DE FORGE
Thursday, April 28, 2022
Riverside, California
Reported By: Tracey R. Boyer
CSR No. 12346

Exhibit 4
Page 1 of 18



Page 5

```
 1              RIVERSIDE, CALIFORNIA
 2             Thursday, April 28, 2022
 3                    10:02 a.m.
 4
 5        THE VIDEOGRAPHER:  Good morning.  We're on the
 6   record.  This begins video number one in the deposition
 7   of Brian DeForge in the matter of Western Riverside
 8   Council of Governments et al. versus National Union Fire
 9   Insurance et al. in the United States District Court
10   Central District of California.  Today's date is April
11   28th, 2022 and the time is 10:02 a.m.
12        This deposition is being taken at 3390
13   University Avenue, fifth floor in Riverside, California
14   at the request of Best, Best and Kreiger.  The
15   videographer is Sergio Esparza of Magna Legal Services
16   and the court reporter is Tracey Boyer of Magna Legal
17   Services.
18        Will Counsel and all parties present state
19   their appearances and who they represent.
20        MR. DUNN:  Yes, my name is Jeffrey Dunn and I'm
21   with the Law Firm of Best, Best and Kreiger.  We
22   represent both the City of Beaumont and Western
23   Riverside Council of Governments in this case.
24        MS. VANDERWEELE:  Meagan Vanderweele on behalf
25   of defendant National Union Fire Insurance Company of
```

Exhibit 4
Page 2 of 18



Page 6

1  Pittsburgh, PA.
2                      BRIAN DE FORGE,
3  called as a witness on behalf of the Defendant, having
4  been first duly administered an oath pursuant to C.C.P.
5  Section 2094, was examined and testified as follows:
6
7                       EXAMINATION
8  BY MR. DUNN:
9      Q   Good morning, Mr. DeForge.  I previously
10 introduced myself on the record and I'm here today on
11 behalf of both the City of Beaumont and WR --
12          THE COURT REPORTER:  I'm sorry, W-r?
13          MR. DUNN:  W-r-c-g --
14          THE WITNESS:  C-o-g.
15          MR. DUNN:  C-o-g, thank you.
16 BY MR. DUNN:
17     Q   When I use, Mr. DeForge the term WRCOG do you
18 understand that to mean Western Riverside Council of
19 Governments?
20     A   Yes I do.
21     Q   And the term WRCOG is a term that you've heard
22 before?
23     A   That's correct.
24     Q   And that's again referring to Western Riverside
25 Council of Governments?

Exhibit 4
Page 3 of 18



Page 22

1  three parts.  How did they introduce themselves when you
2  were actually talking to them on the phone?
3      A   Introduced herself by her name.
4      Q   Was it Counsel who is here this morning?
5      A   No, it was not.  Then again explained to me why
6  they were calling and what it was in regards to.
7      Q   Let me stop you right there.  What did they
8  say?
9      A   They are Counsel representing my understanding
10 and I may get this wrong, my understanding was they were
11 representing I thought the City of Beaumont against
12 WRCOG.
13     Q   And you based that understanding on what was
14 told to you?
15     A   Just what was told to me, yeah.
16     Q   Okay.  So with that understanding that you had,
17 which was that they were representing the City in a
18 matter WRCOG, did you then proceed to talk to them in
19 that conversation?
20     A   Yes, I did.
21     Q   What was -- what was next -- what was the next
22 part of that conversation?
23     A   An explanation regarding I believe an insurance
24 policy that the city had taken out.  And I'm still not a
25 100 percent clear on what this insurance policy covers.



Page 23

1  If I remember correctly I believe it had to do with
2  recouping funds if -- I'm not sure how to word this.  If
3  certain events happened, illegal events or something of
4  that sort.
5      Q   Again I don't want to put words in your mouth,
6  but was your understanding at the time that when you
7  were given this explanation this was a lawsuit between
8  the insurance company and WRCOG?
9      A   That was my understanding.
10     Q   And was it also your understanding that this
11 lawsuit between the insurance company and WRCOG that
12 somehow the insurance company was on the side of the
13 City?
14     A   Yes.
15     Q   That was based on what was told you?
16     A   Yes.
17     Q   And so you were given an explanation by the
18 insurance company attorney about the policy.
19         Was it more than one policy that was described
20 to you or was it just a single policy?
21     A   Just a single policy.
22     Q   Did they tell you what was the dispute that
23 created the lawsuit over the policy?  Did you get an
24 explanation?
25     A   No, I did not.

Exhibit 4
Page 5 of 18



```
                                                  Page 24
 1       Q    At that point in the conversation were you
 2   wondering why on earth you're being contacted by the
 3   insurance company --
 4       A    Yes.
 5       Q    -- attorney?
 6       A    Yes.
 7       Q    Did you ask them that?
 8       A    Yes.
 9       Q    What did they tell you?
10       A    Well having been through a number of
11   depositions regardless from the city, regardless from
12   the school district I work for, they're always looking
13   for someone who has information regarding that would
14   help their case.  And of course being on the city
15   council as long as I was on there I had -- you know I
16   was privy to a lot of information that went through
17   during that period of time that I was on the council.
18       Q    Did you know in that second phone call that you
19   did not have to talk to them on the phone, you could
20   have just hung up; right?
21       A    No, I didn't realize that.
22       Q    Did you have an understanding in your mind in
23   that second conversation that you were being asked to
24   help the city?
25       A    Yes.
```



Page 25

```
 1       Q    And did you have in your mind and your
 2   understanding at that time that by engaging in this
 3   conversation with the insurance company attorney over
 4   the phone that you would be helping the city?
 5            MS. VANDERWEELE:  Objection.  Leading.
 6            THE WITNESS:  I was never given that particular
 7   scenario or that this would be helping the city.  In my
 8   mind, this is my mind, I felt that there was going to be
 9   the City against WRCOG.
10   BY MR. DUNN:
11       Q    That was based on what you were told?
12       A    Yes.
13       Q    Okay.  And again just so I'm clear,
14   Mr. DeForge, the reason why you moved forward with your
15   participation that led to this declaration was based on
16   that understanding; is that correct?
17            MS. VANDERWEELE:  Leading.
18            THE WITNESS:  Yes.  That's correct.
19   BY MR. DUNN:
20       Q    That second conversation how long do you think
21   it lasted on the phone?
22       A    Probably 15 minutes.
23       Q    That's -- would you agree with me 15 minutes is
24   a -- probably in your experience that's a fairly long
25   cell phone conversation; right?
```

Exhibit 4
Page 7 of 18



Page 45

1  Q   Were you explained or told not to share closed
2  session information?
3  A   No, I was not.  I'm aware of that having been a
4  councilman.
5  Q   Good.  Okay.  Let's do this, let's -- let's I
6  think the easiest thing now to do is -- do you want to
7  take a break?
8  A   I'm all right.
9      MS. VANDERWEELE:  I'm fine.
10     MR. DUNN:  Let's keep going.
11 BY MR. DUNN:
12 Q   Let's go into this Exhibit Number 3.  I just
13 want to take you through it then I think we'll be done
14 here today.  We're going to go through it in detail.
15     Exhibit Number 3 is your declaration?
16 A   That's correct.  Yes.
17 Q   Okay.  Perfect.  So if you could put that in
18 front of you?
19 A   No, I have it.  I'm sorry.
20 Q   Whichever one works for you.  That's great.
21 Just to make sure up in the upper left-hand corner you
22 see where it says, "Scott L. Schmookler"?  Do you see
23 that?
24 A   Yes, I do.
25 Q   Okay.  Ever speak with Mr. Schmookler?

Exhibit 4
Page 8 of 18



Page 51

1   policies?

2       A   No, I did not.

3       Q   Do you remember anything about them?

4       A   I know that we are given initially we were
5   going to have this policy or that policy in regards to
6   and then they would go over it slightly or give us the
7   summary of what we were going to be having.  We would
8   bring that up and vote in open session whether or not we
9   would want that.

10      Q   Okay.  How about the next sentence it says --
11  this is now at the top of page two, we're still in
12  paragraph three.  Quote, "The city council would
13  consider whether to pursue an insurance claim in private
14  session and upon reaching a conclusion announce the
15  decision in public session."

16          I take it that's not your language?  That was
17  given to you by the insurance attorneys; correct?

18      A   I believe that's probably 50-50.  And speaking
19  of this my understanding is this is citizens who bring
20  claim against the city.  We always have that listed on
21  the agenda items.  Joe Smith versus City of Beaumont
22  closed session item.  And with attorney present, city
23  manager we would discuss those and whether or not we
24  would pay it out or refuse to pay and go to litigation
25  and that sort of thing.  That's my understanding of

Exhibit 4
Page 9 of 18



Page 52

1   that.
2       Q   So from time to time like every city in
3   California perhaps you would get what are called written
4   claims?
5       A   Yes.
6       Q   So when I say, "Written claim," you know what
7   I'm referring to?
8       A   Yes, I do.
9       Q   Some of the written claims that your city
10  received during the time that you were on the council
11  they would not be deemed to be covered by insurance;
12  correct?  Some claims are, some claims aren't.  Fair
13  enough?
14      A   That's correct.  Yeah, that's fair.
15      Q   So not every claim, written claim that comes to
16  the city council is covered by insurance, that's
17  according to your understanding?
18      A   That is correct.
19      Q   When you were given this paragraph number three
20  to first review, I take it after the Zoom call, did you
21  wonder why you're being asked to sign something about
22  what is in paragraph number three?  Did you have a
23  question in your mind, "Why am I signing a statement
24  that talks about this"?
25      A   No, I didn't.



Page 53

```
 1      Q    Okay.  And this was discussed during the
 2   previous Zoom call?  This paragraph three the topics
 3   that are indicated there were they discussed in the Zoom
 4   call or did you see this for the first time in the
 5   declaration that was presented for you to sign?
 6      A    No, I believe it was in the Zoom call.  That's
 7   why we have it on there.  There were certain questions
 8   that led to the summary that we got out of it.
 9      Q    Again focusing your attention on paragraph
10   number three, during the Zoom call were you asked any
11   questions about how the City handled this -- any claim
12   involving these insurance policies?
13      A    Not insurance policies, no.
14      Q    Were you asked -- what type of claims were you
15   asked about?
16      A    Just the closed session, most of these again
17   come from a person trips over a sidewalk, person hits a
18   pothole front end gets hurt, that was my understanding
19   what we were discussing.
20      Q    Okay.  Let's move to number four, paragraph
21   number four on this Exhibit 3.  The sentence says -- it
22   begins, "City of Beaumont contract with Urban Logic
23   consultants," then goes on from there.
24           Did you personally know these individuals,
25   Ernest Eger or Ernie Eger, Dave Dillon, David Dillon, D.
```



1   question and use of the term gadfly.
2   BY MR. DUNN:
3       Q   In fact Ms. Bingham would often appear at city
4   council meetings; correct?
5       A   That's right.
6       Q   And from what I understand would make all sorts
7   of accusations and allegations is that fair to say?
8       A   That's correct.
9       Q   And in your mind just because somebody makes an
10  accusation or allegation doesn't mean that he or she is
11  guilty of something that they're being accused of;
12  correct?
13      A   That's correct.
14      Q   When you were asked to first review this
15  declaration with regards to paragraph 13, did you have
16  any question in your mind why it is that you're being
17  asked to talk about Judy, Judith Bingham coming before
18  at least once city council meeting and something about
19  violations of conflict of interest law?  Did you have
20  any question in your mind why you were being asked to go
21  over this and sign this?
22      A   No.
23      Q   As far as you were concerned at the time you
24  were on the council there weren't any conflicts of
25  interest by these individuals; correct?



Page 66

```
 1     A    Not that I was aware of, no.
 2     Q    Take a look at paragraph 14.
 3     A    Yes, sir.  Okay.
 4     Q    That's correct as to your understanding at the
 5   time?
 6     A    That is correct.
 7     Q    Okay.  Let's look at paragraph 15.  Have you
 8   had a chance to read paragraph 15?
 9     A    Yes, I have.
10     Q    You were on the council during the litigation
11   with WRCOG over the TUMF fees?
12     A    Yes.
13     Q    And at some point the trial judge made a
14   decision in that case?
15     A    Yes.
16     Q    And the city subsequently -- the city council
17   subsequently decided to appeal?
18     A    That's correct.
19     Q    Was the case resolved before you left the city
20   council in 2014 or was it still on appeal?  Do you
21   remember?
22     A    I believe it was still on appeal.
23     Q    So the case hadn't been finally resolved;
24   correct?
25     A    I don't believe so, no.
```



Page 80

```
 1       Q    If hypothetically speaking while you were on
 2   city council, the city believed that it had a loss that
 3   was covered under a policy, is that the type of thing
 4   based on your knowledge and experience having been on
 5   city council for 15 years, is that something that the
 6   city council would have to vote on and approve?  That
 7   being whether to pursue a claim against one of the
 8   city's insurer's?
 9            MR. DUNN:  Objection.  Incomplete hypothetical.
10   Lacks foundation.  Calls for a legal opinion or
11   conclusion.
12            THE WITNESS:  I'm just waffling a little
13   because in our closed sessions when claims were
14   discussed we had legal counsel with us.  Legal counsel
15   would advise whether we should pay the claim out if it
16   was small enough from the city or we should deny the
17   claim and pursue it through a different way.
18            Whether it was JPA -- funding we had through
19   the JPA, however that might have looked.  We were not --
20   city council would have approved, if it came we suggest
21   you approve this.  And council would approve and then
22   come out of closed session and make an announcement that
23   we approve settlement on case XYZ whatever it might have
24   been.
25   BY MS. VANDERWEELE:
```



Page 81

1  Q  And with respect to the settlements that city
2  council approved, before the city's lawyer would
3  announce in public session the approval of a settlement
4  that approval had to come from city council; correct?
5  A  Yes.
6  Q  That's okay.  Let me just reask that question
7  so we got a clean question and answer.  Before -- so you
8  just explained to me in closed session and again I don't
9  want to know anything about any specific closed session
10 discussion, that's privileged.
11      But generally speaking if a claim is made
12 against the city that claim would be discussed in closed
13 session; correct?
14 A  Correct.
15 Q  And then the city's lawyer would make a
16 recommendation to city's counsel about whether to settle
17 the claim?
18 A  That's correct.
19 Q  And then would the city council have to approve
20 of that settlement before the city's lawyer could
21 announce that settlement in public session?
22 A  That is correct.
23 Q  And the purchase of insurance on behalf of the
24 city, it's my understanding although city staff whether
25 it be the city manager or legal counsel, city staff



Page 101

```
 1   city?
 2        A    Yes, I did.
 3        Q    All right.  Did you understand based on the
 4   knowledge and information that you gained while you were
 5   on city council, that the engineering services that
 6   Urban Logic provided to the city were not subject to a
 7   fee cap?
 8        A    That was my understanding.
 9        Q    All right.  Now when you were on city council
10   did you ever believe that Urban Logic was submitting
11   inflated invoices?
12        A    No, I did not feel that.
13        Q    Did you ever believe that Urban Logic was
14   submitting invoices for phantom work, work that had not
15   been actually done?
16        A    No.
17        Q    And I take it given your construction
18   experience do you believe that you would have been able
19   to determine whether Urban Logic while you were on city
20   council was submitting false, inflated or phantom
21   invoices.
22             MR. DUNN:  Objection.  Lacks foundations.
23             THE WITNESS:  I on occasion reviewed their work
24   and their invoices together.  And from my personal
25   public contract code having used it as well in my
```

Exhibit 4
Page 16 of 18



```
                                                        Page 104
 1              (The proceedings were concluded at 12:04
 2         p.m.)
 3    ///
 4    ///
 5    ///
 6
 7
 8         PENALTY OF PERJURY CERTIFICATE
 9
10       I, Brian DeForge, do hereby declare under penalty of
11    perjury that I have read the foregoing transcript; that
12    I have made such corrections as noted herein, in ink,
13    initialed by me, or attached hereto; that my testimony
14    as contained herein, as corrected, is true and correct.
15         Executed this _____ day of _____, 2022
16         at _____, California.
17
18
19
20    _____
              BRIAN DE FORGE
21
22
23
24
25
```

Exhibit 4
Page 17 of 18



1    I, Tracey R. Boyer, CSR # 12346, a Certified
2    Shorthand Reporter in and for the County of Riverside,
3    State of California, do hereby certify:
4        That prior to being examined, the witness named in
5    the foregoing deposition was by me duly sworn to testify
6    the truth, the whole truth, and nothing but the truth.
7        That said deposition was taken before me at the time
8    and place set forth and was taken down by me in
9    shorthand and thereafter reduced to computerized
10   transcription under my direction and supervision, and I
11   hereby certify the foregoing deposition is a full, true
12   and correct transcript of my shorthand notes so taken.
13       I further certify that I am neither counsel for nor
14   related to any party to said action nor in anywise
15   interested in the outcome thereof.
16       IN WITNESS WHEREOF, I have hereunto subscribed my
17   name this 28th day of April, 2022.
18
19
20
     *Tracey R. Boyer*
21   _____
22       Tracey R. Boyer
         Certified Shorthand Reporter No. 12346
23
24
25

Exhibit 4
Page 18 of 18

