# EXHIBIT 5

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

```
_____
                                     )
WESTERN RIVERSIDE COUNCIL OF         )
GOVERNMENTS, a California Joint      )
Powers Authority,                    )
                                     )
          Plaintiff,                 )
                                     )
     vs.                             ) CASE NO. 5:20-CV-02164-
                                     )           GW(KKx)
NATIONAL UNION FIRE INSURANCE        )
COMPANY OF PITTSBURGH, PA, and DOES  )
 through 50, inclusive,              )
                                     )
          Defendants.                )
_____)
```

VIDEOTAPED DEPOSITION OF

NANCY GALL

April 29, 2022

10:03 a.m.

3390 University Avenue
5th Floor
Riverside, California

Kelly M. Bates, CSR NO. 12935

MAGNA LEGAL SERVICES
(866)624-6221
www.MagnaLS.com

Exhibit 5
Page 1 of 11



Page 2

```
 1              APPEARANCES OF COUNSEL
 2
 3   For the Plaintiff:
 4
        BEST, BEST & KRIEGER, LLP
 5      JEFFREY V. DUNN, ESQ.
        18101 Von Karman Avenue
 6      Suite 1000
        Irvine, California 92612
 7      949.263.2600
        jeffrey.dunn@bbklaw.com
 8
 9   For the Defendants:
10
        GORDON, REES, SCULLY & MANSUKHANI, LLP
11      MEAGAN VANDERWEELE, ESQ.
        5 Park Plaza
12      Suite 1100
        Irvine, California 92614
13      312.980.6779
        mvanderweele@grsm.com
14
15
16   VIDEOGRAPHER:
17      SERGIO ESPARZA
```

Page 3

```
 1             INDEX OF EXAMINATION
 2
 3   WITNESS:  NANCY GALL
 4   EXAMINATION                    PAGE
 5   By Mr. Dunn                     6
 6   By Ms. VanderWeele              89
 7
 8
 9           INFORMATION REQUESTED
10              (None)
11
12
13   QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER
14              (None)
15
16
17                 * * *
```

Page 4

```
 1              INDEX TO EXHIBITS
 2
 3   Exhibit     Description           Page
 4
       1        Subpoena                11
 5
 6
       2        Declaration of Nancy Gall    61
 7
 8
       3        Declaration of Nancy Gall    63
 9
10
       4        Correspondence          67
11
12                 * * *
```

Page 5

```
 1       VIDEOTAPED DEPOSITION OF NANCY GALL
 2                April 29, 2022
 3
 4        THE VIDEOGRAPHER:  Good morning.  We are on the
 5   record.  This begins Video No. 1 in the deposition of
 6   Nancy Gall in the matter of Western Riverside Council of
 7   Governments versus National Union Fire Insurance in the
 8   United States District Court, Central District of
 9   California.  Today's date is April 29th, 2022, and the
10   time is 10:03 a.m.  This deposition is being taken at
11   3390 University Avenue, 5th Floor, in Riverside,
12   California at the request of Best, Best & Krieger.  The
13   videographer is Sergio Esparza of Magna Legal Services,
14   and the court reporter is Kelly Bates of Magna Legal
15   Services.  Will counsel and all parties present state
16   their appearances and whom they represent.
17        MR. DUNN:  Yes.  Good morning.  My name is
18   Jeffrey Dunn, and I represent the City of Beaumont and
19   Western Riverside Council of Governments commonly known
20   as WRCOG.
21        MS. VANDERWEELE:  Meaghan VanderWeele on behalf
22   of the Defendant National Union Fire Insurance Company
23   of Pittsburgh, PA.
24        THE WITNESS:  My name is Nancy Gall.  I'm here
25   because I -- in 2008 to 2012 I was on the council for
```

2 (Pages 2 to 5)

Exhibit 5
Page 2 of 11



Page 6

1  Beaumont.
2  THE VIDEOGRAPHER: Thank you. Would you court
3  reporter please administer the oath.
4  NANCY GALL,
5  having been first duly sworn, testifies as follows:
6
7  EXAMINATION
8  BY MR. DUNN:
9  Q. Good morning, Ms. Gall. As I previously
10 introduced myself, my name is Jeffrey Dunn and I
11 represent the City of Beaumont and Western Riverside
12 Council of Governments in this lawsuit in which you are
13 now giving a deposition. And we have a few documents
14 that I'll show you. Mainly just two. And then I'll ask
15 you some questions today. And counsel -- the other
16 counsel present today may have some questions for you as
17 well.
18      I don't anticipate we will be here very long
19 today. Maybe past noon. So for a couple hours perhaps.
20      Maybe a little bit longer. But if you want to
21 take a break at any time for any reason, just let us
22 know. You can take a break anytime you want. And
23 that's very common in a deposition to take a break if
24 you need to stretch your legs or for whatever reason.
25      Have you ever had your deposition taken before?

Page 7

1  A. Yes, I have in the past. Yeah.
2  Q. Okay. Do you remember how many times?
3  A. No.
4  Q. One of the things that we will do today is when
5  we ask questions we'll be asking for your best
6  testimony, your best recollection. We don't want you to
7  guess or speculate, but we may ask a series of questions
8  to sort of help you remember. And it's not unusual
9  particularly when events happened sometime in the past
10 for a person who's answering questions in a deposition
11 to maybe not in the first question be able to remember
12 everything about the response to the question, but
13 sometimes with a series of questions it sort of jogs or
14 prompts the memory and the memory starts to come back.
15      So today we don't want you to guess or
16 speculate, but we do want to get your best remembrance,
17 your best recollection.
18 A. Uh-huh.
19 Q. Now, speculation or guessing would take place
20 if I asked you or someone asked you a question about
21 something that you were never involved with or had no
22 connection to at all. So, for example, if I were to ask
23 you, for example, have you ever been to Australia?
24 A. No.
25 Q. Okay. So if I asked you --

Page 8

1  A. I would have liked to be.
2  Q. So if I were to ask you any questions about
3  Australia, you know, what it looks like and whatever,
4  unless you had seen it in a book or somewhere else, you
5  wouldn't be able to answer because you would tell me
6  "I've never been to Australia. I couldn't tell you."
7       Yeah, so that's the difference. Now, if you
8  had been to Australia, let's say, when you were much
9  younger, maybe a child, you might have some recollection
10 or remembrance of what it was like to either live in
11 Australia or visit Australia and you might be able to
12 say "Well, I remember this or that."
13      And I might ask you a few follow-up questions
14 and that help you remember something more, but that's
15 the difference between guessing, speculating on the one
16 hand and testing and trying to get your best
17 recollection and memory on the other hand. Does that
18 make sense to you?
19 A. Yes.
20 Q. Yeah. Okay. Also, when we go through this
21 process today, if you have any questions, particularly
22 if you don't understand any question that I may ask you,
23 please let me know. I'm happy to repeat the question.
24      I'm happy to rephrase it, try to clarify it.
25      Our purpose here today is to get information.

Page 9

1  It's not to -- it's not to make this a confusing or
2  unnecessarily stressful experience. Is that okay?
3  A. Okay.
4  Q. And so one of the things I want to share with
5  you is unless you let me or the other attorney know that
6  you don't understand the question, it will be assumed
7  that the question the way it was given to you was
8  understood. So it's important to let us know if you
9  have any questions or confusion about the questions.
10     Okay?
11 A. Uh-huh.
12 Q. All right. Now, one of the other aspects of a
13 deposition -- and I'm sure our court reporter is giving
14 me this look right now is -- our court reporter is
15 carefully taking down every word that is being said here
16 today.
17 A. Oh, okay.
18 Q. So for that reason some of the types of
19 communication that we commonly use like nods of the head
20 or mmm-hmms or uh-huhs, those do not get transcribed
21 very well on the deposition transcript. So from time to
22 time I or the other attorney or even the court reporter
23 may ask you is that a yes or is that a no or could you
24 articulate or give a verbal response. And that's not to
25 annoy you. It's just to make sure that we have a full

3 (Pages 6 to 9)

Exhibit 5
Page 3 of 11



Page 26

1  investigating what they were doing and we went to the
2  FBI because of -- several times. And we --
3      Q. Was that before or after you got --
4      MS. VANDERWEELE: You gotta let her finish,
5  Jeff.
6      MR. DUNN: Oh, I thought she was finished.
7      Q. Let me just stop you. When you went to the
8  FBI, was that before or after you got on the city
9  council?
10     A. Well, it was after, but other people that
11 were -- there was another lady that has a name almost
12 like mine called Nancy Hall. And she had been to the --
13 she had gone to the FBI several times. And then I went
14 when they -- because I saw something that I knew was
15 wrong, very wrong.
16     We were -- between -- they had gotten in the
17 middle of my thing in 2000 -- 8000 -- whatever. And
18 right in the middle of my term they changed some of the
19 people there and we got another councilperson and stuff.
20     And the police chief -- and this was the police
21 chief that was doing it at the time. And he doesn't --
22 he's not a police chief now, but they -- this man that
23 came out of the jail, it wasn't -- the jail just in
24 the -- in the building.
25     It wasn't -- they didn't even take him to the

Page 27

1  jail, but anyhow he -- he wanted them to return his
2  clothes and his -- all that kind of stuff to him.
3  Return his stuff. And they didn't think we should even
4  talk about it.
5      And he had a right to talk to the council.
6      Anybody does. And I said that. I said "Look,
7  he can come and talk to us now." And he didn't. And
8  then the police chief and another policeman that was in
9  the -- in there, they lifted him up and they took him
10 out and when we -- when the meeting ended and we went
11 home, there was blood all over the stairs leaving that
12 place.
13     And it was -- I don't know. We tried to find
14 out where he was or -- I mean, I really did. I made a
15 big -- but I don't know. I think he -- they take him to
16 some other county and dropped him off there or whatever
17 they do and -- but it wasn't right. And none of it was
18 right.
19     And it was just so -- the people that were
20 elected at that time, they were happy with and they
21 wanted to have this big old party across the hall from
22 the city council. And I thought this is -- I didn't go
23 to their party. But they were having a -- maybe I
24 should have seen what was happening, but -- I don't
25 know, but I was very upset with them for that because I

Page 28

1  don't know.
2      And so because of that and because I found out
3  that he was pretty well beaten up, I went to the FBI.
4      And, actually, that FBI office couldn't help
5  with that because it was -- and -- but then he said --
6  he told me about all the other stuff because it had to
7  go to L.A. because of the way it was. I don't know.
8      But he told me that it would go -- if you could
9  go to L.A. and do that that's what you have to do
10 because we don't handle that kind of stuff. But --
11 and -- but there were several other times. I went, I
12 think, three or four times to see the FBI.
13     Q. This -- was this when you were on the council?
14     A. Uh-huh.
15     Q. Did any other council member go with you?
16     A. Not with me, but -- they weren't councilmen.
17     Because they didn't care. The other four
18 people didn't care.
19     Q. Did you think that you were alone in the way
20 that you saw how the city was being operated? Alone in
21 the sense that you were the only one on the council that
22 you think thought that way?
23     A. Oh, yeah, I was alone on that, but I knew that.
24 I knew that was going to happen when I went on because
25 we only -- we needed to -- we needed to have three

Page 29

1  people that thought like we did.
2      Q. Did you ever have those three people when you
3  were on the council?
4      A. No. No.
5      Q. During that entire time that you were on the
6  council, did you think that not only were you the lone
7  person that thought the way you did particularly on a
8  4-1 vote but that the city was being controlled by the
9  other council members and by Mr. Kapanicas and Urban
10 Logic?
11     MS. VANDERWEELE: Objection. Form.
12     THE WITNESS: Well, it wasn't really -- we
13 didn't control much, I didn't think, because Alan
14 Kapanicas would come and tell us what we're going to do
15 really and we -- so I don't know. There was times when
16 I thought I don't know why we have the city council
17 because we're not doing anything to improve the city.
18 BY MR. DUNN:
19     Q. Did you think that was because Mr. Kapanicas
20 and Urban Logic were in control?
21     MS. VANDERWEELE: Form.
22     THE WITNESS: Yes. That's -- yes.
23 BY MR. DUNN:
24     Q. Did you think that they had influence over the
25 other four members of the council?

8 (Pages 26 to 29)



Page 30

1    A.  Oh, yes.
2    Q.  Did you think that the other four members of
3  the council were essentially doing what -- pretty much
4  whatever Mr. Kapanicas and Urban Logic wanted them to
5  do?
6    A.  Oh, yeah, they would.
7    Q.  Did you think they were being controlled by the
8  four members of the council -- the other four members
9  were being controlled by Urban Logic and/or Mr.
10 Kapanicas?
11      MS. VANDERWEELE:  Asked and answered.
12      THE WITNESS:  Yes.
13 BY MR. DUNN:
14    Q.  And that was based on what you saw as a member
15 of the city council during your tenure?
16    A.  Uh-huh.  Yes.
17    Q.  And that concerned you, did it not?
18    A.  Oh, yeah, because the city council should have
19 had a much more -- much better saying about what's going
20 to happen and they didn't.  But the one reason they
21 didn't is because they only had one person like me,
22 but -- and I was wondering if there was a way we could
23 get to hire or elect two more council people.
24      I thought -- I thought we could because if we
25 could get three people, then you can do what you want

Page 31

1  more than if you're only one person.  Because that's the
2  way it works.  I mean, that's not good or bad, but it
3  does work that way.
4    Q.  Remember when you just told me that you went to
5  the FBI?
6    A.  Yeah.
7    Q.  You did that personally; correct?
8    A.  Yes.  I -- well, I talked to someone from my
9  church because I didn't know what to do.  And -- a man
10 from my church that's very nice.  He's not alive now,
11 but he was then.  And he said -- and I said "What shall
12 I do?"  I mean, it's the -- it's the head of the police
13 department that's doing it.
14      And he said, well, you'll have to, you know,
15 you know get some -- something.  And so I -- he
16 recommended that I go to the FBI, and I did.  And the
17 FBI had heard from us before.  The people that were not
18 happy with.
19    Q.  These are people that were not happy with the
20 government -- the city government?
21    A.  Yeah.
22    Q.  Ms. Gall, did you go to the FBI yourself
23 because you knew that the other members of the council
24 and the city government, Mr. Kapanicas and Urban Logic,
25 they weren't going to go tell the FBI?

Page 32

1    A.  No, they wouldn't.  They wouldn't have gone,
2  no.
3    Q.  So you had to do it yourself?
4    A.  Yeah.
5    Q.  And you did it because the other four members
6  of the city council were under the influence and control
7  of Mr. Kapanicas and Urban Logic; right?
8    A.  Yeah.
9      MS. VANDERWEELE:  Form.
10      THE WITNESS:  Yeah.  There wasn't another
11 person I could trust to come with me, I mean, that's in
12 the city.  I mean, there were people in the community
13 that I could trust.
14 BY MR. DUNN:
15    Q.  Could you trust Mr. Kapanicas?
16    A.  No.
17    Q.  Could you trust Urban Logic principals?
18    A.  No.
19    Q.  Could you even trust the other four members of
20 the city council?
21    A.  No, not completely.  We had that one person
22 that got -- we thought got elected.  And I was looking
23 forward to that because I think he would have been a
24 square.  But it only lasted for about two or three
25 meetings.

Page 33

1    Q.  Did it feel lonely at times once you were on
2  the city council being a city council member?
3    A.  I knew it was going to be that way.  I knew I
4  was going on and I knew it was going to be.
5    Q.  How did you get along with Mr. Kapanicas once
6  you were on the city council, if at all?
7    A.  Oh, we talked to each other.  Not very often.
8      He knew -- and he tried to be very nice
9  sometimes, but -- I don't know.  I don't think we -- if
10 he had been an honest person and a good person, I think
11 I would have -- I would have gone and discussed some of
12 the problems of the city with him.
13    Q.  Did you ever discuss some of those problems or
14 concerns you had with the city with Mr. Kapanicas?
15    A.  I can't remember doing it.  I mean, I -- I
16 might have told him some of the situations that he might
17 have not known about, yeah.
18    Q.  When you were on the city council, did you ever
19 think that Mr. Kapanicas was hiding information from you
20 and other members of the council?
21    A.  Oh, of course he was, yeah.
22    Q.  How about Urban Logic?  Now, when I say Urban
23 Logic, let me run some names by you.  Mr. Egger?
24    A.  Yeah.
25    Q.  Mr. Dillon?

Exhibit 5
Page 5 of 11



Page 54

```
 1     A.  Yeah.
 2     Q.  Mr. Aklufi is gone?
 3     A.  Yeah.
 4     Q.  Mr. Berg is no longer on the council?
 5     A.  Yeah.  Yeah.  Oh, he was terrible sometimes
 6  when -- it was just awful.
 7     Q.  Did you think he was a strong supporter or even
 8  a champion of Mr. Kapanicas?
 9     A.  I wasn't sure or if that came from someplace
10  else because even -- I mean, nobody else did that except
11  him.  I mean, you know...
12     Q.  When you say except him, you mean Mr. Berg?
13     A.  Yeah.  I mean, he would be saying awful things
14  to people and -- I don't know.  And he would yell and
15  yell and yell so you can -- nobody -- nobody could --
16  else could talk.
17     Q.  Do you think he has a temper?
18     A.  Yes.
19     Q.  Did you see that in open session?
20     A.  Yeah, he -- and I know also that he had -- that
21  his wife has a house next to him because she can't take
22  his temper.  So they have two.  And they had a -- and he
23  had physically harmed her.  And she should have gotten
24  herself out of that situation, but she seems like a --
25  she -- I only saw her a couple times, but she seemed
```

Page 55

```
 1  nice enough.
 2          But she doesn't seem to be a person that would
 3  assert herself and get herself out of a situation like
 4  that because it wasn't a good -- and I think almost
 5  everybody around there knows that.
 6     Q.  Are you still friends with Ms. Judy Bingham?
 7     A.  I've talked to her a couple times recently,
 8  yeah.
 9     Q.  And what about Ms. Hall?
10     A.  She's going to move to another place.  I don't
11  know.  I haven't -- I was never as -- I never had her --
12  I never considered her as much of a friend as I did Judy
13  and the other gal involved in that.  I don't -- I
14  probably couldn't identify her walking to me on the
15  street.
16          I really probably couldn't.  But she -- because
17  of all this stuff, she wanted to -- that woman wanted to
18  get out of it and try to just leave me alone, you know,
19  and I'm not going to...
20     Q.  Do you still go to city council meetings?
21     A.  No, I don't.  I've gone to a couple of them.  A
22  couple of them.  But, no, I'm -- I have that friend on
23  the council and he tells me what's going on.
24     Q.  As you look back on it, are you glad that you
25  ran for city council and were on the city council?
```

Page 56

```
 1     A.  Yes, I am.  I really am.  I'm glad that they
 2  talked me into it, but...
 3     Q.  Wasn't easy, was it?
 4     A.  Well, I was wondering what the work thing was
 5  because I was working full-time, but it -- that was --
 6  didn't turn out to be any real problem.  But, no, I
 7  don't know.  I would have -- I've been back a couple of
 8  times and to see if it -- if it's changed.
 9          And it has been changed and it's different
10  people.  And I hope they're doing better.  I know they
11  are.  And I get reports from them -- from my friend.
12     Q.  Tell me what you know about this lawsuit that
13  brings you here today to give a deposition.  What do you
14  know about it?
15     A.  I don't know too much about it.
16     Q.  Tell me what you know.
17     A.  Well, I know it's your suit -- that it's an
18  insurance company is being sued -- right?  Is it that?
19  I'm not sure.
20     Q.  Do you know who's suing the insurance company?
21     A.  Yeah, the guys we don't -- I don't like.
22     Q.  Who are those people?  Mr. Kapanicas?
23     A.  Kapanicas.
24     Q.  And Mr --
25     A.  No, I don't think it's Mr. Kapanicas.  It's the
```

Page 57

```
 1  other three guys, isn't it, the Urban Logic?
 2     Q.  Is that who you think filed the lawsuit?
 3     A.  And I don't know where Kapanicas is.  I hope
 4  he's far away.
 5     Q.  So you think this is a lawsuit against the
 6  insurance company by the people you don't like,
 7  Mr. Dillon, Egger and Moorjani; is that correct?
 8     A.  Uh-huh.
 9         MS. VANDERWEELE:  Hold on, Counsel.
10  BY MR. DUNN:
11     Q.  And how did you --
12         MS. VANDERWEELE:  Objection --
13         MR. DUNN:  State your objection.
14         MS. VANDERWEELE:  -- form.  You're trying to
15  confuse the witness.  I know where you're going.  You've
16  done this at the other depositions.
17         MR. DUNN:  Counsel, just state your objection
18  for the record.
19         MS. VANDERWEELE:  No, you are going to try to
20  accuse me of misleading this witness like you have at
21  the other depositions.  Let's be very clear that's what
22  you're doing.
23         MR. DUNN:  Any other objection?
24         MS. VANDERWEELE:  If you are going to try to
25  accuse me of misleading these witnesses, I would like to
```

15 (Pages 54 to 57)



Exhibit 5
Page 6 of 11

```
                                                    Page 58
 1   know.
 2            MR. DUNN:  I'm just asking questions.
 3            MS. VANDERWEELE:  The way that you are asking
 4   the question is entirely leading.
 5            MR. DUNN:  Counsel --
 6            MS. VANDERWEELE:  And you are purposely trying
 7   to confuse the witness.
 8            MR. DUNN:  Counsel, if you don't stop this
 9   obstreperous behavior, I will end this deposition right
10   now and take this to the federal magistrate and ask that
11   you not be allowed to do this.  You are entitled to make
12   objections when appropriate on the record.
13            MS. VANDERWEELE:  Objection.  Form.
14   BY MR. DUNN:
15       Q.  All right.  So your understanding is that the
16   people that you don't like, Mr. Dillon, Mr. Egger and
17   Mr. Moorjani, have sued the insurance company that this
18   attorney represents; is that correct?
19            MS. VANDERWEELE:  Objection.  Form.  Leading.
20            Misstates the evidence.
21   BY MR. DUNN:
22       Q.  Is that correct?
23       A.  Am I supposed to answer that?
24       Q.  Yeah, you have to answer the question.
25       A.  Yes.
```

```
                                                    Page 59
 1            MS. VANDERWEELE:  Any time I make an objection,
 2   you still answer.
 3   BY MR. DUNN:
 4       Q.  And how did you come to learn that?  How did
 5   you figure that out?  Did somebody tell you that?
 6       A.  Well, she told me what she was doing, that she
 7   was -- because I asked who it was because I had never
 8   heard of the -- just proponent about the name of their
 9   place and so forth.
10       Q.  So just so the record is clear, your
11   understanding what you think this lawsuit is about comes
12   from talking with counsel here?
13            MS. VANDERWEELE:  Objection.  Form.
14            THE WITNESS:  No.
15            MS. VANDERWEELE:  Leading.
16            THE WITNESS:  No, not -- I know -- I know about
17   what these people are.  I mean...
18   BY MR. DUNN:
19       Q.  How do you know that they're the ones suing the
20   insurance company?  How did you learn that?
21            MS. VANDERWEELE:  Form.  Leading.  Misstates
22   evidence.
23            THE WITNESS:  I guess I knew it from that.
24   BY MR. DUNN:
25       Q.  From what?  From talking to the attorney?
```

```
                                                    Page 60
 1       A.  Yeah.
 2       Q.  And that's this attorney right here?
 3       A.  Yeah.
 4       Q.  Have you talked to her before the deposition?
 5       A.  Before the deposition?
 6       Q.  I mean before today.  Have you ever talked with
 7   her before today?
 8       A.  Oh, before today?  Yes.  I have talked to her
 9   before today.
10       Q.  How many times?
11       A.  Twice.
12       Q.  On the phone?
13       A.  Yeah.
14       Q.  Did you ever do a video Zoom?  Do you know what
15   Zoom is?
16       A.  Yes.
17       Q.  Did you ever Zoom with the attorney?
18       A.  No.
19       Q.  Just over the phone?
20       A.  Yeah.
21       Q.  Anyone else with the attorney on the phone
22   besides the two of you?
23       A.  No, there was no one else.
24       Q.  When did the first phone call take place?
25       A.  I'm not sure.  Recently.  I mean, fairly
```

```
                                                    Page 61
 1   recently.
 2       Q.  And did she call your cell phone number?
 3       A.  No, she called my home phone number, I think.
 4       Q.  Did she tell you how she got your home phone
 5   number?
 6       A.  It's there.  Anybody can get it.  It's not a
 7   secret.
 8       Q.  And the phone rang and you picked it up and it
 9   was this attorney on the phone?
10       A.  Let's see.  I talked to her on the telephone a
11   couple times.  Two times, I think.
12            MR. DUNN:  Let me show you a document we'll
13   mark next in order.  This is going to be Exhibit No. 2.
14            (Exhibit 2 marked)
15   BY MR. DUNN:
16       Q.  I'm going to hand you a document to take a look
17   at and one for the court reporter.  Ms. Gall, just take
18   a moment if you would.  And this document we're going to
19   identify for the record as declaration of Nancy C. Gall,
20   G-a-l-l.
21       A.  Is this the same one I have?
22       Q.  Well, take a look at it and then I'll ask you
23   that.
24       A.  It looks like it's the same thing.  Yeah, it's
25   the same thing.
```

16 (Pages 58 to 61)



```
                                               Page 78
 1             THE WITNESS:  Oh, have a break?
 2             MS. VANDERWEELE:  I think what we're trying to
 3     figure out -- and, Jeff, correct me if I'm wrong -- is
 4     we've been going for two hours and I want to -- we want
 5     to make sure -- you know, we're getting tired.  You
 6     might be getting tired.  Jeff -- it sounds like the
 7     counsel has approximately 20 minutes left of
 8     questioning.
 9             I will not have many questions for you.  So
10     perhaps we can wrap up in a half hour.  So if you'd like
11     to take a quick five-minute break to stretch your legs
12     before we do the last half hour or we could take a lunch
13     break now if you're hungry.
14             THE WITNESS:  Be better to -- if it's 20
15     minutes, you know, for -- we get --
16             MS. VANDERWEELE:  Do you want a short break
17     like a five-minute break to use the restroom and walk
18     around, or would you like like a 30 to 40-minute break
19     to go get something to eat?
20             THE WITNESS:  Well, I think the short break.
21             MS. VANDERWEELE:  Short break?  Why don't we
22     take a short break then we'll come back and hopefully
23     we'll be done within the next 30 minutes.  Does that
24     sound okay?
25             THE WITNESS:  Okay.
```

```
                                               Page 79
 1             MS. VANDERWEELE:  And then we'll get you outta
 2     here.  All right?
 3             THE WITNESS:  Okay.
 4             MR. DUNN:  Yeah.
 5             MS. VANDERWEELE:  Okay.
 6             MR. DUNN:  And I'll do my very best to get you
 7     through this without rushing you.  I just want to take
 8     you through all these paragraphs, ask you if that's true
 9     according to your knowledge and experience and then
10     that's all I have.
11             MS. VANDERWEELE:  Okay.
12             THE WITNESS:  Well, I've been through this.  I
13     have read it several times.
14             MR. DUNN:  Okay.  Well, we're still on the
15     record?  I'll tell you what.  Let's take a five-minute
16     break right now and then I'll come back and try and take
17     you just through selected parts of this given your
18     testimony you've reviewed this.  So I can ask you a
19     blanket type of question on the whole declaration and if
20     I have any particular question or two, then I can focus
21     in on that.  Okay?
22             THE WITNESS:  Okay.
23             MR. DUNN:  All right.  Let's do that.
24             THE VIDEOGRAPHER:  Off the record.  The time is
25     11:58 a.m.
```

```
                                               Page 80
 1             (Recess)
 2             THE VIDEOGRAPHER:  On the record.  The time is
 3     12:08 a.m. -- excuse me -- p.m.
 4     BY MR. DUNN:
 5        Q.   Okay.  Ms. Gall, you've had a chance to review
 6     this entire exhibit.  This is the declaration of Nancy
 7     C. Gall.  This is the --
 8        A.   Right.
 9        Q.   -- Exhibit No. 2.  And you've had a chance to
10     review it today?
11        A.   Right.
12        Q.   And I don't -- I just want to ask you a broad
13     question because, you know, candidly we're trying to
14     move this deposition along.  But is there anything in
15     the declaration as you reread it today that you disagree
16     with?
17        A.   No.  I did look at it and read the whole thing
18     a couple of times but over a period of time, yes.
19        Q.   I'm almost done with my questions.  Let's go to
20     page 7 of that declaration.  Page No. 7.
21        A.   That's almost the last page.
22        Q.   And you'll see the second paragraph is No. 17
23     there.  Do you see that?
24        A.   Okay.  Let's see.  "I understood and advised
25     members of City Council and others city officials,
```

```
                                               Page 81
 1     including but not limited to City Manager Alan
 2     Kapanicas, that the ULC Principals' participation, as
 3     city officials, in planning, negotiating, recommending
 4     and awarding work ULC; the ULC Principals' supervision,
 5     as city officials, of the work ULC performed; and the
 6     ULC Principals' financial interest in the contracts and
 7     work awarded to ULC was dishonest, a conflict of
 8     interest, and violated California law."
 9        Q.   Okay.  And it's the last part of paragraph 17 I
10     want to ask you some questions about.  You use the word
11     "dishonest."  Do you see that?
12        A.   Yes.
13        Q.   Okay.  Can you tell me in your own words what
14     was dishonest about what's referenced there in 17?  What
15     was your understanding of what was dishonest at that
16     time?
17        A.   Well, they were awarding work to just the three
18     principals and not any -- anybody else.  I mean, no one
19     else could come in and say can I -- or probably like in
20     a decent city you would have maybe five, six, ten people
21     wanting the same contract.  And they didn't get any,
22     so...
23        Q.   When you say they didn't get -- I don't want to
24     stop you, but go ahead.
25        A.   I mean the other Joe Blow and someone else
```

21 (Pages 78 to 81)



Exhibit 5
Page 8 of 11

Page 82

1  didn't get -- didn't get a chance to tell them what they
2  could do.
3      Q.  Anything else?
4      A.  Well, I think they -- I think that Urban Logic
5  was dishonest and had a conflict of interest definitely
6  and violated California law.  Or anybody's laws.  I
7  mean, to steal the money would be anybody's law.
8      Q.  And before we leave the word "dishonest" here
9  that's in your declaration, is there -- I just want to
10 give you every opportunity to explain everything that
11 you thought was dishonest about Mr. Kapanicas and the
12 Urban Logic principals.  Is there anything else you
13 would like to add or can add?
14     A.  Well, I don't know.  Mr. Kapanicas is not an
15 honest person.  I mean, he wouldn't give you information
16 that was correct all the time.  And he wanted to do it a
17 different way, I guess, than -- but he -- yeah, I would
18 say he was dishonest.
19     Q.  As a city manager he was?
20     A.  Yeah.
21     Q.  Anything else?
22     A.  I can't think of anything else right now.
23     Q.  All right.  Then let me -- just moving along,
24 we're going to -- same type of question for conflict of
25 interest.  What was your understanding of what was the

Page 83

1  conflict of interest that Mr. Kapanicas and the Urban
2  Logic principals had?  What did you mean by conflict of
3  interest?
4      A.  The conflict of interest.  Well, we know what a
5  conflict of interest is.  Well, he was taking money that
6  he shouldn't have taken.  That would be a conflict of
7  interest.  And it's worse than that really, but...
8      Q.  Part of being dishonest, I take it?
9      A.  Yeah.
10     Q.  Anything else that you want to -- that you can
11 remember?
12     A.  I'm just --
13     Q.  On conflict of interest.
14     A.  Yeah.  Okay.
15     Q.  Yeah.
16     A.  Oh, this -- the next thing is the -- we were
17 trying to get them to do something and that was an email
18 that I sent to them.
19     Q.  Can you remember anything else about conflict
20 of interest that you recall about Mr. Kapanicas and/or
21 the Urban Logic individuals, principals?
22     A.  Well, let's see.  Well, I am -- I am sure that
23 there is plenty of different things when -- with this
24 whole thing.  Planning, negotiating, recommending and
25 awarding work to Urban Logic.  And that's a conflict of

Page 84

1  interest because it shouldn't -- it should be eligible
2  to -- for the general public and it's not.
3          Or at least people that are doing that kind of
4  work, it should be -- it should have been.  So this --
5  we're not talking about today.  We're talking about --
6  to obtain --
7      Q.  Is there anything else about conflict of
8  interest that you recall, or is that it?
9      A.  I don't know.  I'm getting tired, too.
10     Q.  I understand that.  Do you want to stop or take
11 a break?
12     A.  No.  No.  I want to get going.
13     Q.  Okay.  I'm almost done, yeah.  Now, that last
14 part of that sentence it says "and violated California
15 law."  Do you see that at the end of paragraph 17?  Do
16 you see where it says "and violated California law"?
17     A.  Well, I think they did that a lot.
18     Q.  Do you know in particular what law in
19 California or what laws did you have in mind?
20     A.  I know that we -- that Judy Bingham especially
21 had sent complaints to several of the people in
22 Sacramento.  I mean, they were aware that there were --
23 that this city had a really bad thing and it wasn't --
24 it wasn't a secret.
25     Q.  Do you remember if the people who received

Page 85

1  those complaints in Sacramento, any state agency ever
2  investigated those complaints?
3      A.  They didn't do as much as she wanted them to
4  do, but I think she -- they did some.
5      Q.  Do you remember what the outcome was of what
6  they did, the agencies or agency?  Do you remember what
7  they found or concluded or determined?
8      A.  Well, I'm sure they discussed it when they
9  looked at what they had in front of them.  I don't know,
10 but I do know that she consulted a lot of people in
11 California government to do.
12     Q.  Is it fair to say, Ms. Gall, that the
13 information about the wrongdoing on the part of the city
14 manager and the principals of Urban Logic, a lot of that
15 information came from Ms. Bingham to you?
16     A.  No, that's -- that's not true.  I probably had
17 more knowledge than she did.
18     Q.  All right.  Good.  Thank you for clarifying
19 that.
20     A.  Because I was there more often.
21     Q.  And you were on the council.
22     A.  Yeah.  And we did have close votes sometimes
23 and we talked about it, things.
24     Q.  Let me ask you -- and I am about ready to wrap
25 up.  This is the last paragraph.  Paragraph 19.  Can you

22 (Pages 82 to 85)

Exhibit 5
Page 9 of 11



Page 86

```
 1   take a look at that one more time for me.  It's very
 2   short, but I do need to ask you to review that.
 3        A.   "The city council considered whether to
 4   continue retaining Mr. Egger, Mr. Moorjani, Mr. Dillon
 5   in an official capacity in light of their dishonest" --
 6   is that -- yeah.  "Dishonest conduct and conflict of
 7   interest."
 8        Q.   Let me stop you right there.  Do you see where
 9   it says "The City Council considered"?  Do you see that
10   sentence there?
11        A.   Yeah.
12        Q.   Did that happen in open session or closed
13   session?
14        A.   Both, I would say.
15        Q.   And --
16        A.   But if it was -- if it was just -- sometimes
17   they -- we wouldn't want an audience with a -- for a big
18   thing that we had to do that's going take two or three
19   hours because people in the audience don't want to
20   listen to the two or three hours.  That wasn't what I
21   was thinking, but -- yeah.
22             Well, he -- here it says that he -- that it was
23   only Urban Logic that did all this.  Yeah, we had asked.
24   At one point we had asked whether they should get all
25   the -- all of the work and because, you know, there was
```

Page 87

```
 1   a lot of contractors out there that would like it.  And
 2   I know -- but we never -- they never did.
 3             They never did anybody but that.  Okay.
 4             MS. VANDERWEELE:  Counsel, I'm having some
 5   concerns about her fatigue if we're going to -- I don't
 6   want to stop you, but --
 7             MR. DUNN:  I'm just trying to --
 8             MS. VANDERWEELE:  -- we might need to take a
 9   break.
10             MR. DUNN:  I understand, yeah.  I think I've
11   got really just, I hope, one last question.
12             MS. VANDERWEELE:  Okay.  That's fine.  Not
13   trying to rush you.
14             MR. DUNN:  No, I know you're not.  Thank you.
15   I appreciate that.  We're trying to -- yeah, we're both
16   trying to let the witness have ample opportunity to
17   answer.  And I appreciate that.
18        Q.   I hope this will be the last question, but if
19   you could just take a moment and finish reading the rest
20   of paragraph 17 and I'll ask you a question.  It says
21   "Although City Council knew that Mr. Egger, Mr. Moorjani
22   and Mr. Dillon."  Do you see that?
23        A.   "From their official positions with the City of
24   Beaumont."
25        Q.   Yeah.  Do you see how that sentence starts
```

Page 88

```
 1   "Although City Council knew"?  Do you see that?
 2        A.   Let me look back.
 3        Q.   Sure.
 4        A.   It's a long sentence.
 5        Q.   Yes, it is.
 6        A.   "City Council considered whether to continue
 7   retaining Mr. Egger, Mr. Moorjani and Mr. Dillon in an
 8   official capacity in light of their dishonest conduct
 9   and conflict of interest.  Although City Council knew
10   that Mr. Egger, Mr. Moorjani and Mr. Dillon had a
11   financial interest in contracts and work awarded by the
12   City to Urban Logic, participated as city officers in
13   planning, negotiating, recommending and awarding
14   contracts and work to Urban Logic, and supervised as
15   city officers the work performed by Urban Logic, the
16   City Council decided to continue retaining Urban Logic
17   and did not remove Mr. Egger, Mr. Moorjani and
18   Mr. Dillon from their official positions with the City
19   of Beaumont."
20        Q.   Thank you.  So the beginning of that sentence,
21   it says -- do you see at the top of the page it says
22   "Although City Council knew"?  Do you see that?
23        A.   Yeah.
24        Q.   Here's my question.  It talks about "although
25   City Council knew."  Did they know that from open
```

Page 89

```
 1   session or closed session meetings or both?
 2        A.   I think it's both.  Probably both, but mostly
 3   open because they didn't -- they said that these guys
 4   have these contracts and we pay them for it and nobody
 5   else could get one.  I mean, it really -- it was -- it
 6   really -- that kind of stuff was out there.
 7             MR. DUNN:  Ms. Gall, thank you very much for
 8   your cooperation.
 9             THE WITNESS:  You're welcome.
10             MR. DUNN:  And I'll turn the time over to
11   counsel for any questions.
12                       EXAMINATION
13   BY MS. VANDERWEELE:
14        Q.   I just have probably two questions for you,
15   Nancy.  Okay?
16        A.   Okay.
17        Q.   And since you're on video, you'll need to just
18   look forward.  I'm sorry.  I'll be quick.  Nancy, when I
19   first called you, I told you I represented an insurance
20   company; correct?
21        A.   Correct.
22        Q.   And when you look at actually the first page of
23   this declaration, and it says -- it's Western Riverside
24   Council of Governments and the City of Beaumont versus
25   National Union Fire Insurance Company.  Do you see that?
```

23 (Pages 86 to 89)

Exhibit 5
Page 10 of 11



Page 90

```
 1      A.  Yes.
 2      Q.  When we spoke on the phone initially and in a
 3  subsequent conversation, did I tell you that the City of
 4  Beaumont had sued my client the insurance company?
 5      A.  I'm sorry.  Say that again.
 6      Q.  Sure.  When we have spoken, Nancy, have I told
 7  you that the City of Beaumont had sued my client the
 8  insurance company?
 9      A.  No, I didn't know that they did.
10      Q.  So let me go back.  So, Nancy, I represent the
11  insurance company.  You understand that?
12      A.  Yeah.
13      Q.  And the City of Beaumont has sued the insurance
14  company.  Do you understand that?
15      A.  The City of Beaumont is suing the insurance
16  company?
17      Q.  Correct.
18      A.  Right now?
19      Q.  Correct, which is what's on the caption on the
20  declaration.
21      A.  Oh, okay.
22      Q.  Did I ever tell you in any of our conversations
23  that Urban Logic had filed the lawsuit, or is that just
24  your understanding based on what you know?
25      A.  I thought they had, but I don't know why.
```

Page 91

```
 1      Q.  Did I ever tell you that Urban Logic was the
 2  one that filed this lawsuit?
 3      A.  No.
 4      Q.  Okay.  Before you signed this declaration --
 5      A.  Yes.
 6      Q.  -- did you review it?
 7      A.  Yes, I read it.
 8      Q.  Did you review it several times?
 9      A.  Yes.
10      Q.  And before you signed the declaration do you
11  recall having a telephone conversation with me when we
12  went through this declaration line by line word for
13  word?
14      A.  Yeah, that's true.
15      Q.  And then I mailed you a copy of the
16  declaration.  I think two copies; correct?
17      A.  Yeah, because I signed one in February.  That's
18  what it says.
19      Q.  And then we talked about the declaration before
20  you signed it again.  Do you remember that?
21      A.  Yeah.
22      Q.  And then you signed the declaration and sent it
23  back to my firm via mail, I believe.  Do you remember
24  that?
25      A.  Yeah.  Yeah, whatever address you had.
```

Page 92

```
 1      Q.  And since -- and after you signed the
 2  declaration to prepare for this deposition, did you
 3  review the declaration again?
 4      A.  Yes.
 5      Q.  Several times?
 6      A.  Yes.
 7      Q.  And is everything that you -- that is stated in
 8  this declaration, is it all true and correct based on
 9  your knowledge and belief?
10      A.  Based on my knowledge and belief, yes.
11          MS. VANDERWEELE:  Okay.  Those are all the
12  questions I have for you.
13          MR. DUNN:  Thank you, Ms. Gall.
14          MS. VANDERWEELE:  Thank you.
15          THE VIDEOGRAPHER:  Off the record.  The time is
16  12:29 p.m.
17          MS. VANDERWEELE:  I'll take a copy, please.
18          (The deposition concluded at 12:29 p.m.)
19                        * * *
```

Page 93

```
 1                  REPORTER'S CERTIFICATION
 2
 3          I, KELLY M. BATES, a Certified Shorthand
 4  Reporter in and for the State of California, do hereby
 5  certify:
 6          That the foregoing witness was by me duly
 7  sworn; that the deposition was then taken before me at
 8  the time and place herein set forth; that the testimony
 9  and proceedings were reported stenographically by me and
10  later transcribed into typewriting under my direction;
11  that the foregoing is a true record of the testimony and
12  proceedings taken at that time.
13
14          IN WITNESS WHEREOF, I have subscribed my name
15  this 29th day of April, 2022.
16
17
18          _____
19          Kelly M. Bates, CSR No. 12935
```

24 (Pages 90 to 93)



Exhibit 5
Page 11 of 11