# EXHIBIT 7

Page 1

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

WESTERN RIVERSIDE COUNCIL OF

GOVERNMENTS, a California

Joint Powers Authority; CITY

OF BEAUMONT, a public entity

in the State of California,   Case No. 5:20-cv-02164

    Plaintiffs,              GW (KKx)

  vs.

NATIONAL UNION FIRE INSURANCE

COMPANY OF PITTSBURGH, PA; and

DOES 1 through 50, inclusive,

    Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~


VIDEOTAPED REMOTE 30(b)(6) DEPOSITION OF

ELIZABETH GIBBS

May 24, 2022

9:03 a.m.

Beaumont, California


Karen Aligo, CSR No. 13418

Exhibit 7
Page 1 of 17



MAGNA LEGAL SERVICES

```
                                                        Page 7
 1        VIDEOTAPED REMOTE 30(b)(6) DEPOSITION OF
 2                      ELIZABETH GIBBS
 3                       May 24, 2022
 4
 5          THE VIDEOGRAPHER:  We are now on the
 6   record.  This begins Videotape Number 1, in the
 7   deposition of City of Beaumont, in the matter of
 8   Western Riverside Council of Governments, et al., v.
 9   National Union Fire Insurance, et al., in the United
10   States District Court for the Central District of
11   California, Eastern Division, Case Number
12   5:20-CV-02164GWKKX.
13          Today's date is May 24th, 2022, and the
14   time on the monitor is 9:03 a.m.  This deposition is
15   being taken at a virtual Zoom room at the request of
16   Gordon & Rees Scully Mansukhani, LLP.
17          The videographer is Alexander Asdourian of
18   Magna Legal Services.  The court reporter is
19   Karen Aligo of Magna Legal Services.
20          Will counsel, and all parties present,
21   state their appearances and whom they represent,
22   then the court reporter may swear in the witness.
23          MS. VANDERWEELE:  Meagan VanderWeele on
24   behalf of the defendant, National Union Fire
25   Insurance Company of Pittsburgh, PA.
```

Exhibit 7
Page 2 of 17



```
                                                         Page 8
 1           MR. DUNN:  Good morning.  Jeffrey Dunn on
 2   behalf of the defendant -- excuse me.  Plaintiffs.
 3   I'm sorry.  Plaintiffs.
 4           MR. NOLAN:  Good morning.  Peter Nolan on
 5   behalf of City of Beaumont.
 6
 7                   ELIZABETH GIBBS,
 8   having been first duly sworn, testifies as follows:
 9
10           MS. VANDERWEELE:  Let the record reflect
11   that this is the deposition of Elizabeth Gibbs, as
12   the Rule 30(b)6 representative of Plaintiff City of
13   Beaumont, taken pursuant to notice and agreement of
14   the parties, and taken pursuant to the Federal Rules
15   of Civil Procedure and all applicable local rules
16   for the Central District of California.
17
18                     EXAMINATION
19   BY MS. VANDERWEELE:
20       Q. Ma'am, could you please state your full
21   name and spell your last name for the record.
22       A. My name is Elizabeth Marie Gibbs, and
23   that's spelled, G-i-b-b-s, as in "Sam."
24       Q. And you are currently employed by the City
25   of Beaumont as the interim city manager, correct?
```

Exhibit 7
Page 3 of 17



Page 63

1      I want to clarify something.  When you say
2  "department," they were departments of one.
3      Q. The City had at least a name, a Planning
4  Department, Economic Development Department, and a
5  Public Works Department, correct?
6      A. Correct.
7      Q. And the City appointed Mr. Dillon to serve
8  as the City's economic development director,
9  correct?
10     A. The city manager did, yes.
11     Q. And the City entered into a contract in
12 which Urban Logic was contracted to provide a head
13 of the Economic Development Department, correct?
14     A. Correct.
15     Q. Pursuant to the contract entered into by
16 Beaumont and Urban Logic, the City knew that
17 Mr. Moorjani would be serving as the head of the
18 Public Works Department, correct?
19     A. Correct.
20     Q. Pursuant to the agreement that the City
21 entered into with Urban Logic, the City knew that
22 Mr. Egger would be serving as the planning director
23 for the City, correct?
24     A. Correct.  So the contract required that
25 they fill those positions.

Exhibit 7
Page 4 of 17



Page 124

```
 1        Q. David Dillon was the economic director,
 2   correct?
 3        A. Economic development director, yes.
 4        Q. Thank you for clarifying.  And as economic
 5   development director, Mr. Dillon had submitted staff
 6   reports to city council, correct?
 7        A. At times, yes.
 8        Q. And some of those staff reports would
 9   include recommendations to city council to approve
10   public works projects that included work that would
11   be performed by Urban Logic, correct?
12        A. Mr. Dillon would submit staff reports to
13   city council, recommending contract award for
14   individual contractors.  And I believe -- again,
15   they would not -- he -- I don't recall him ever
16   submitting a contract award recommendation to
17   counsel to award Urban Logic the contract.
18        Q. I'm looking for one thing here.
19            I'm going to show you what I'll mark as --
20   I think we're at 10.
21            (Exhibit 10 marked for identification.)
22   BY MS. VANDERWEELE:
23        Q. Showing you what I've marked as Exhibit 10,
24   the first page is Bates-stamped
25   LOC4-077348.  This is a staff report dated June 6th,
```

Exhibit 7
Page 5 of 17



Page 152

1 Logic was violating 1090, correct?
2     A. I don't remember anybody from the public
3 specifically saying, "1090." But as public
4 servants, we get accused -- I was just accused of
5 fraud on Friday.
6     So there was no basis, at the time, to any
7 claim from Ms. Hall or Ms. Bingham about any kind of
8 criminal activity, and there was just simply no
9 basis for it.
10     Q. Was any investigation done by the City to
11 determine whether Urban Logic Consultants was
12 violating Section 1090?
13     A. In 2007?
14     Q. Correct.
15     A. Not that I recall, but the only person that
16 would initiate that investigation was the city
17 manager, who was ultimately arrested, along with six
18 other individuals.
19     Q. Did the City launch an investigation in
20 2008 regarding whether the Urban Logic principals
21 were violating Section 1090?
22     A. The City did not. I -- I do want to note
23 that the City would not do that investigation but
24 FPPC would.
25     Q. Did anyone from the City ever report to the

Exhibit 7
Page 6 of 17



```
 1   City commenced an investigation into the activities
 2   of the Kapanicas administration," "largely related
 3   to the fact that Kapanicas allowed the ULC
 4   principles [sic] to enter into self-dealing
 5   contracts with the City without adequate competitive
 6   bidding," correct?
 7        A.  Yes, but there's no time frame there.
 8        Q.  Certainly after the FBI raided the City,
 9   the City was capable of investigating the conduct of
10   Mr. Kapanicas, correct?
11        A.  No.
12        Q.  Mr. Kapanicas was placed on leave in May of
13   2015, true?
14        A.  That's true, but there was -- there was --
15   there was no way that we could have started an
16   investigation immediately following.  Number one,
17   the FBI and the D.A. took all the documents; and
18   number two, there was no staff.  We literally lost
19   the entire management team in one fell swoop.
20        Q.  Who was appointed the interim finance
21   director after the FBI raid?
22        A.  I don't remember the gentleman's name.  He
23   was from a temp agency, and he did -- he only lasted
24   a few weeks before I fired him, um, and then we had
25   somebody else.  And then sometime around July or
```



1  August, I found Onyx Jones, and she came for about
2  ten months.
3       Q. You were the interim city manager
4  between Jul- -- June 2nd of 2015 to May 16 of 2017,
5  correct?
6       A. 2016, yes.
7       Q. Thank you.  And if we look at paragraph 26
8  of the first amended complaint, you understand that
9  the Riverside D.A. filed a felony complaint against
10 Mr. Kapanicas and the Urban Logic principals the day
11 after your -- you ended your role as interim city
12 manager, correct?
13      A. Yes.
14      Q. Paragraph 28 of the complaint alleges that
15 "The City did not discover the bad acts of the
16 Kapanicas administration, involving theft and
17 dishonesty, until it had conducted its own
18 investigation in May of 2016," do you see that?
19      A. Yes.
20      Q. And what did the City learn in May of 2016
21 that it had not previously known?
22      A. That the schemes of the inflated billings,
23 there was sus- -- what's the word I'm looking for?
24 There was sus- -- what's the word I'm looking for?
25           We suspected it, but we couldn't confirm,



Exhibit 7
Page 8 of 17

Page 181

```
 1   and then when the D.A. actually arrested the seven,
 2   that led us to believe that, yes, there was probably
 3   something going on.  But like I said before, there
 4   wasn't -- there were no documents, there was no
 5   staff, there was no time.
 6           We ended up adopting a budget late in the
 7   year after the fiscal year started.  We -- we were
 8   trying to hire interim staff.  There just wasn't
 9   enough time.
10           So that's why it took almost a year for us
11   to really think, Okay, maybe there is something
12   criminal here.  But then when they were arrested,
13   that's really when it started the ball rolling.
14        Q.  So in -- in May of 2016, the -- I'm just
15   trying to figure out, like, what's the new
16   information that the City learned?  And I think you
17   told me something about inflated billings?
18        A.  That's when we started to realize there was
19   a problem with the invoices from Urban Logic.  We
20   had -- we had started to question whether or not the
21   invoices that had been paid previously were actually
22   valid.
23        Q.  And what's -- what are the new facts that
24   were learned in May of 2016?  I'm trying to figure
25   out what it is that the City specifically learned
```

Exhibit 7
Page 9 of 17



Page 182

1   that made them realize that the Kapanicas
2   administration had been involved in theft and
3   dishonesty.
4       A. Well, I think I just answered that. It was
5   the -- it was the Urban Logic invoices that we
6   started to take a closer look at.
7       Q. And what prompted the City to take a closer
8   look at the Urban Logic invoices in May of 2016?
9       A. The arrests.
10      Q. You had -- I believe you had testified, a
11  moment ago, that the City had suspected something
12  was going on with Urban Logic; did I hear that
13  correctly?
14      A. Yeah, but we didn't have any -- I mean,
15  there was smoke but there was no fire. We didn't
16  have concrete proof.
17      Q. When -- when did the City suspect that
18  there was something going on with Urban Logic? Was
19  it following the judge's ruling in the WRCOG
20  lawsuit?
21      A. No. It wasn't until -- it wasn't until
22  later. I don't remember exactly when, but it was
23  definitely after I was appointed. After the dust
24  settled a little bit, we -- like I said, we didn't
25  have any staff. There was nobody to question

Exhibit 7
Page 10 of 17



```
 1   anything.
 2              THE WITNESS:  Can we take a break?
 3              MS. VANDERWEELE:  Of course.  How long
 4   would you like?
 5              THE WITNESS:  Just ten minutes.
 6              THE VIDEOGRAPHER:  All righty.  This will
 7   end Video Number 6, in the deposition of the City of
 8   Beaumont.  The time is 2:08 p.m.  We are off the
 9   record.
10              (Recess.)
11   BY MS. VANDERWEELE:
12       Q.  Who from the City was involved in preparing
13   the City's notice of claim to National Union?
14              THE VIDEOGRAPHER:  Excuse me.  Just for the
15   read-on --
16              MS. VANDERWEELE:  Oh, I'm sorry.
17              THE VIDEOGRAPHER:  No worries.
18              This will begin Videotape Number 7, in the
19   deposition of the City of Beaumont.  The time is
20   2:18 p.m.  We are back on the record.  Thank you.
21              MS. VANDERWEELE:  Sorry about that.
22   BY MS. VANDERWEELE:
23       Q.  Ma'am, who from the City prepared the
24   notice of claim that was submitted to National
25   Union?
```

Exhibit 7
Page 11 of 17



1   former employees of the City of Beaumont engaged in
2   potentially unlawful activities that resulted in
3   significant losses to the City," correct?
4        A.  Correct.
5        Q.  And this was provide- -- or submitted to
6   National Union in April of 2016, prior to the
7   indictments that were issued against Mr. Kapanicas
8   and others, correct?
9        A.  Correct.
10       Q.  The Urban Logic principals are not
11  identified in this initial notice of claim, correct?
12       A.  Correct.
13       Q.  There's no mention of the judgment that had
14  been entered by W -- strike that.
15            The initial notice of claim makes no
16  mention of the judgment that had been entered
17  against the City of Beaumont; is that correct?
18       A.  There -- there was no mention, correct.
19       Q.  Was the submission of this crime loss
20  report authorized or approved by the city council?
21       A.  I don't think so.  I don't know.  There was
22  no money involved.  So likely, it wasn't.
23       Q.  And what do you mean when you say "there
24  was no money involved"?
25       A.  City council's -- traditionally, we -- when

Exhibit 7
Page 12 of 17



Page 187

1  we are spending money, we take those items, that are
2  over the city manager's limit, to city council.  I
3  don't know of anything in the code that says
4  insurance claim has to go before city council --
5         In the public meeting, let me clarify that,
6  in the public meeting.
7         Q. And I'm sorry, can you explain what you
8  mean by that?
9         A. Meaning in an open city council session.
10        Q. So you're not aware of anything that
11 requires the city council to include, in the agenda
12 for a city council meeting, the submission of
13 insurance claims?
14        A. I'm not aware of any requirement, in the
15 Beaumont municipal code, that requires staff to get
16 city council approval, in a public meeting, to file
17 a claim for insurance or restitution or loss.
18        Q. Okay.  I'll show you Exhibit 26.
19          (Exhibit 26 marked for identification.)
20 BY MS. VANDERWEELE:
21        Q. Exhibit 26, for the record, is a
22 November 3, 2016, letter from Stradling Attorneys at
23 Law to Judith Blake of AIG.  Do you recognize this
24 document, ma'am?
25        A. Yes.

Exhibit 7
Page 13 of 17



```
 1    legal conclusion.
 2    BY MS. VANDERWEELE:
 3         Q. You can still answer.
 4         A. Can you repeat the question?  It -- it
 5    sounded to me like a two-part question.
 6         Q. Do you believe that being paid for
 7    services, in violation of conflict of interest law,
 8    amounts to theft?
 9         A. Can you give me an example?
10         Q. Sure.  I mean, Urban Logic Consultants
11    pled -- the principals pled guilty to violating
12    conflict of interest law, we've -- we've gone over
13    that, right?
14         A. Right.
15         Q. And do you believe that the City's payment
16    of money to Urban Logic, in violation of conflict of
17    interest law, amounts to theft?
18              MR. NOLAN:  I'm going to object as worded.
19    If it's a criminal context, that's a different
20    crime, if they pled guilty to conflict of interest.
21    But theft is a different crime.
22              MS. VANDERWEELE:  I understand.
23    BY MS. VANDERWEELE:
24         Q. Are you able to answer my question, ma'am?
25         A. I believe that 1090 violations don't equate
```

Exhibit 7
Page 14 of 17



Page 202

```
 1   to theft.
 2        Q. So would you agree, then, that money paid
 3   to Urban Logic that violated -- or strike that.
 4   That's a bad question.
 5             Does the Urban Logic principals'
 6   participation in public works projects as city
 7   officials constitute dishonest conduct?
 8        MR. NOLAN:  Same objection.  If there's a
 9   definition of "dishonesty," please provide that;
10   otherwise, it's calling for a legal conclusion.
11   BY MS. VANDERWEELE:
12        Q. Ma'am, how do you define "dishonest
13   conduct"?
14        A. In its simplest terms, "not honest."
15        Q. And does Urban Logic principals'
16   participation in public works projects, is that --
17   was that honest conduct, in your opinion?
18        A. Well, I mean, it's -- it's not a blanket
19   statement.  You -- you have to look at each
20   individual action and decision and payment, and -- I
21   can't make that blanket statement.
22        Q. I'm just about done.  I'm just going
23   through my notes.  So just bear with me, and I think
24   we might be able to wrap up here.
25             (Pause during proceedings.)
```

Exhibit 7
Page 15 of 17



Page 219

```
 1              MR. DUNN:  We'll have her sign it.
 2              MR. NOLAN:  Yeah, I'd like to reserve.
 3              MS. VANDERWEELE:  All right.  Signature is
 4    reserved.
 5              Karen, I will e-mail you the exhibits.
 6    It'll probably be tomorrow since I assume my staff
 7    has left for the day.
 8              MR. DUNN:  That's fine.
 9              THE VIDEOGRAPHER:  All righty.  This
10    concludes Media Number 8, and finally concludes the
11    deposition of the City of Beaumont.  It is 3:08 p.m.
12    We are off the record.
13              (Deposition concluded at 3:08 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25
```

Exhibit 7
Page 16 of 17



Page 220

```
 1              REPORTER'S CERTIFICATION
 2
 3              I, the undersigned, a Certified Shorthand
 4   Reporter of the State of California, do hereby
 5   certify:
 6              That the foregoing proceedings were taken
 7   before me at the time and place herein set forth;
 8   that any witnesses in the foregoing proceedings,
 9   prior to testifying, were placed under oath; that a
10   verbatim record of the proceedings was made by me
11   using machine shorthand which was thereafter
12   transcribed under my direction; further, that the
13   foregoing is an accurate transcription thereof.
14              I further certify that I am neither
15   financially interested in the action nor a relative
16   or employee of any attorney of any of the parties.
17              IN WITNESS WHEREOF, I have this date
18   subscribed my name.
19
20   Dated:  May 30, 2022
21
22
             _Karen Aligo_____
23           KAREN ALIGO
             CSR No. 13418
24
25
```

Exhibit 7
Page 17 of 17

