# EXHIBIT 8

Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CASE NO. 5:20-CV-02164-GW(KKx)

_____ )

WESTERN RIVERSIDE COUNCIL OF GOVERNMENTS, )
a California Joint Powers Authority,               )
                                                   )
                        Plaintiff,                 )
vs.                                                )
                                                   )
NATIONAL UNION FIRE INSURANCE COMPANY              )
OF PITTSBURGH, PA, and DOES 1 through              )
50, inclusive,                                     )
                                                   )
                        Defendants.                )
_____ )


Videotaped Deposition of

JAMES GREGG

(Conducted Remotely)

Tuesday, April 26, 2022

10:01 a.m. PDT


Magna Legal Services
(866) 624-6221
www.MagnaLS.com

Job No.: 822124

Reported by: BRENDA MATZOV, CSR NO. 9243

Exhibit 8
Page 1 of 43



Page 12

1          TUESDAY, APRIL 26, 2022

2              10:01 A.M. PDT

3

4          THE VIDEOGRAPHER:  Good morning.

5          We are now on the record.  This

6     begins the deposition of James Gregg, in

7     the matter of Western Riverside Council of

8     Governments, et al., versus National Union

9     Fire Insurance, et al., in the United States

10    District Court, Central District of California.

11          Today's date is Tuesday, April 26,

12    2022.  And the time is 10:01.  This deposition

13    is being taken virtually at the request of Best

14    Best & Krieger, LLP.

15          The videographer is Nicholas Hemphill,

16    of Magna Legal Services.  And the court reporter

17    is Brenda Matzov, of Magna Legal Services.

18          Will counsel and all parties present

19    state their appearance and whom they represent,

20    after which will the court reporter please swear

21    in the witness.

22          MR. DEAL:  This is Christopher Deal,

23    for the plaintiff -- plaintiffs.

24          MR. SCHMOOKLER:  Scott Schmookler,

25    for the defendant.

Exhibit 8
Page 2 of 43



Page 13

```
 1              MR. ROSS:  This is Brian Ross,
 2   from Rains Lucia Stern St. Phalle & Silver,
 3   representing the deponent James Gregg.
 4
 5                    JAMES GREGG,
 6              called as a witness, being duly
 7              sworn remotely, was examined and
 8              testified as hereinafter set forth.
 9
10                    EXAMINATION
11   BY MR. DEAL:
12       Q.   Good morning, Mr. Gregg.
13       A.   Good morning.
14       Q.   My name is Chris Deal.  I represent
15   WRCOG.
16              You're familiar with WRCOG; correct?
17       A.   Yeah.  Uh-huh.
18       Q.   What's -- have you ever had your
19   deposition taken before?
20       A.   No.
21       Q.   Are you a lawyer?
22       A.   I am.
23       Q.   Despite that fact, I'm going to go
24   over some of the basic rules of deposition
25   with you.
```

Exhibit 8
Page 3 of 43



1    manager program through them.

2            The city had a need for a risk

3    manager.  So they hired me to perform not

4    only the ERMAC duties but as well as act

5    as the risk manager for the city, handling

6    their claims and risk management issues

7    with the city.

8        Q.   And so who approached you about

9    possibly working for the city of Beaumont?

10       A.   Mr. Kapanicas.

11       Q.   Okay.  And how did -- how did that

12   come -- how did he do that?

13       A.   I think it was in a telephone call.

14   But I -- I don't exactly remember.

15       Q.   And then you had -- did you have

16   a formal interview with Mr. Kapanicas?  Or --

17       A.   There was a --

18       Q.   -- was it -- go ahead.

19       A.   There was a -- I did -- I did sit

20   down and talk to him about what the duties

21   and responsibilities of the job would be.

22   He indicated that I'd be hired on a tentative

23   basis and then the city would go through a

24   recruitment process, posting of the job spec

25   and so on.

Exhibit 8
Page 4 of 43



MAGNA
LEGAL SERVICES

Page 30

1     Q.  Did it ever, during your tenure,

2  develop a risk management department?

3     A.  It was a small city.  I was basically

4  the department.  I was -- there were certain

5  staff assigned to assist me.

6     Q.  And who were those staff?

7     A.  Roxann Sherwood.  And Elizabeth

8  Gibbs I would work with quite a bit.  And

9  then she had her own staff that she may assign

10  on particular projects.

11     Q.  And in 2006 when you started, what

12  was Elizabeth Gibbs' title?

13     A.  I believe it was human resources

14  director.

15     Q.  And how would she help with the

16  risk management services you would perform?

17     A.  So when we would collect application

18  data for excess, to apply for insurance, she

19  would assist in that.  She would assist with

20  forwarding claims from the city.  So she --

21  she maintained, like, the camera.  She also

22  kept the files -- the risk management or

23  claim files within her office in a locked

24  file cabinet.

25     We would discuss risk management

Exhibit 8
Page 5 of 43



Page 37

1       A.    That's the approach --

2       Q.    -- of play it by ear.

3       A.    -- I have to take, you know --

4             THE COURT REPORTER:  Wait.

5             THE WITNESS:  -- at this point.

6             THE COURT REPORTER:  Wait.

7             THE WITNESS:  Yeah.

8             THE COURT REPORTER:  You guys are

9    talking at the same time.

10   BY MR. DEAL:

11      Q.    Let's play it by ear and kind of

12   go question by question and see what we can

13   do.

14            Your -- your general practice was,

15   once a claim was worked up, it would be

16   submitted to the city attorney?

17      A.    No.  The city attorney already had

18   the claim.

19      Q.    But you did some work-up and you

20   would essentially present that to him to be

21   looked at in conjunction with a claim?

22      A.    We would discuss all claims.

23      Q.    And then Al -- was Alan Kapanicas

24   involved in that process?

25      A.    There would be discussions with the

Exhibit 8
Page 6 of 43



Page 38

```
 1    city manager on -- on how to handle claims.
 2         Q.   Who would have the ultimate authority
 3    as to whether to submit a claim or not?
 4              MR. SCHMOOKLER:  Object to form.
 5              THE WITNESS:  I don't know.
 6    BY MR. DEAL:
 7         Q.   Well, let me give you a hypothetical.
 8              You -- you presented this package
 9    or your work-up to Mr. Aklufi.  Mr. Kapanicas
10    let's say he's involved in this claim.  You
11    recommend that a claim is submitted.
12              Does Mr. Kapanicas have the ability
13    to say no, we're not going to submit that
14    claim, for whatever reason?
15              MR. SCHMOOKLER:  Object to form.
16    Calls for a hypothetical.
17              THE WITNESS:  The city attorney
18    and the city manager would advise me, one
19    or the other, whether or not to -- to file
20    the claim.  They -- they work together.
21    So -- and their conversations oftentimes
22    I was not privy to.
23    BY MR. DEAL:
24         Q.   Okay.  Is -- is -- is there any
25    circumstances in which, if Mr. Kapanicas
```

Exhibit 8
Page 7 of 43



Page 39

1    or Mr. Aklufi instructed you not to submit

2    a claim, that you would still do so?

3         A.    No.

4              MR. SCHMOOKLER:  Object to form.

5    BY MR. DEAL:

6         Q.    Did the city council play any

7    part in analyzing claims or making any

8    type of determination as to whether to

9    submit a claim?

10             MR. SCHMOOKLER:  Object to form.

11             THE WITNESS:  I only know that

12   the city attorney would discuss claims in

13   closed session.  What those discussions

14   were I have no idea.  I was never privy

15   to those.  So I --

16   BY MR. DEAL:

17        Q.    Were you ever -- did you ever

18   participate in closed-session meetings?

19        A.    No.

20        Q.    Do you know if Mr. Kapanicas

21   needed -- well, strike that.

22             Do you know if Mr. Kapanicas

23   or Mr. Aklufi needed the city council's

24   permission to submit a claim?

25             MR. SCHMOOKLER:  Object to form.

Exhibit 8
Page 8 of 43



Page 43

```
 1        A.   I do.  Uh-huh.

 2        Q.   Okay.  If you could skim through

 3   this.

 4             And I -- my question's:  Are you

 5   familiar with it?

 6        A.   I just -- I want to make sure it

 7   starts with:

 8             "September 1993 - Amendment No. 1."

 9             Is that the -- the document?

10        Q.   Correct.

11        A.   Okay.

12        Q.   It's entitled as:

13             "September 1993 - Amendment No. 1

14   to March 1993 Agreement."

15        A.   I've never seen this document.

16        Q.   Okay.  So you -- you've never looked

17   through it?

18        A.   No.

19             (Exhibit 3 marked.)

20   BY MR. DEAL:

21        Q.   Exhibit 3 starts with the No. 672.

22   If you'd like, I could just share the screen.

23        A.   Oh, I have it.  (Examining.)

24        Q.   Okay.  This is:

25             "1995 Additional Services Provided
```

Exhibit 8
Page 9 of 43



Page 44

1    by Urban Logic Consultants at No Additional

2    Cost to the City of Beaumont."

3            Are you familiar with this document

4    at all?

5        A.   No.

6        Q.   Never seen it before?

7        A.   No.

8        Q.   Okay.  Thank you.

9            (Exhibit 4 marked.)

10   BY MR. DEAL:

11       Q.   Exhibit 4 starts with Bates 695.

12       A.   465?  What was the number again?

13   I'm sorry.

14       Q.   I'm sorry.  I'm trying to find it,

15   Mr. Gregg.

16       A.   All right.

17       Q.   It's 695.  So it should be up on

18   your screen.

19       A.   Yeah.  Okay.  I've got it on mine.

20   I can read it.  (Examining.)  My eyes are

21   getting a little old.  I can read it on my

22   screen.  It just came up.  This is --

23       Q.   So I think this is Exhibit 4.  It's

24   an:

25            "Agreement For Planning, Economic

Exhibit 8
Page 10 of 43



MAGNA ➤
LEGAL SERVICES

Page 45

1    Development, and Public Works Services."

2              Dated September 27th, 1993.

3              Have you ever seen this document

4    before?

5         A.   No.

6         Q.   Have you ever read through it?

7         A.   No.

8         Q.   Thank you.

9              Kind of circling back to some of

10   my prior questions, did Elizabeth Gibb --

11   Gibbs have the ability to submit claims on

12   her own?

13        A.   That wouldn't be within her scope

14   of work.

15        Q.   She would have to go to you or

16   someone else at the city in order to obtain

17   authorization to submit a claim?

18              That's -- that's kind of a bad

19   question.

20              She would have to seek authorization

21   or make a recommendation to the city to submit

22   a claim?  But she herself lacked authority to

23   do so on her own?

24              Is that correct?

25        A.   Her -- her work scope was -- that

Exhibit 8
Page 11 of 43



Page 46

1    was not within her scope of work.  So it's not

2    something she would do.  She would generally

3    ask authority of the city attorney.  You know,

4    if she was -- if I weren't around and they

5    wanted to submit a claim or -- they would

6    go through the city attorney.

7              (Exhibit 5 marked.)

8    BY MR. DEAL:

9        Q.   So I'm going to ask you to look

10   at Exhibit 5, which is Bates numbers 816.

11       A.   Okay.

12       Q.   I'm trying to find it here.  I

13   was going to put it up on the screen.

14            But you have it --

15       A.   I do.

16       Q.   -- in front of you?

17       A.   I do.

18       Q.   Okay.  It's a March 15, 2011,

19   staff report from the city manager to the

20   mayor and council members?

21       A.   (Examining.)  Uh-huh.  Yes.

22       Q.   Have you ever seen this document

23   before?

24       A.   I have not.

25       Q.   If you look towards the first

Exhibit 8
Page 12 of 43



Page 47

1    paragraph, "Background and Analysis,"

2    and there's a reference to a 4.5 percent

3    budget for construction management services.

4              Do you see that?

5         A.    I do.

6         Q.    Do you have an understanding of

7    what that relates to, what that's referring

8    to?

9              MR. SCHMOOKLER:  Object to form.

10             THE WITNESS:  It appears to be

11   recommending that the budget -- the -- the

12   annual budget include a four and a half

13   percent -- it -- it doesn't say of what --

14   a construction management services.

15   BY MR. DEAL:

16        Q.    Yeah.

17        A.    So it must be of something.  I

18   don't know what it is.  So yeah.

19        Q.    Mr. Gregg, I -- I don't want you

20   to speculate.

21        A.    Okay.

22        Q.    But --

23        A.    Yeah, I -- I really can't -- it --

24   it appears to be making reference to putting

25   some money into the budget.  But I can't tell

Exhibit 8
Page 13 of 43



Page 48

1    you what that amount or how it's calculated --

2        Q.   Do you --

3        A.   -- from that.

4        Q.   Are you aware of any of the details

5    of the Urban Logic agreement and on what basis

6    and how they were paid?

7            MR. SCHMOOKLER:  Object to --

8            THE WITNESS:  No.

9            MR. SCHMOOKLER:  -- form.

10           THE WITNESS:  I'm sorry.  I talked

11   over --

12   BY MR. DEAL:

13       Q.   There's a provision in their agreement

14   which provides that they're entitled to charge

15   4.5 percent of a project amount.  I -- I don't

16   want to mis-describe it.

17           There's a provision in there which

18   provides that they're entitled to 4.5 percent

19   of certain services provided.

20           Are you at all aware of this 4.5

21   percent cap?

22       A.   I have no idea of that.  No.

23       Q.   And there was also supposed to be

24   a limitation on the amount they could upcharge

25   for outside vendors at 15 percent.

Exhibit 8
Page 14 of 43



MAGNA
LEGAL SERVICES

Page 49

1            Do you have any knowledge of that?

2       A.   I have no knowledge of that.

3            (Exhibit 7 marked.)

4   BY MR. DEAL:

5       Q.   Okay.  If you could turn to what

6   is Exhibit 7.  And it's going to be Bates 9 --

7   991.

8            MR. SCHMOOKLER:  Are you skipping 6?

9            MR. DEAL:  Yes.

10           MR. SCHMOOKLER:  Okay.

11           MR. DEAL:  And to make this easier

12  on everyone, I'm going to make this Exhibit 7.

13  We'll just leave 6 blank.

14           THE WITNESS:  I have it.  (Examining.)

15  BY MR. DEAL:

16      Q.   Okay.  This is a December 17, 2013,

17  staff report from the city manager to the city

18  council.

19           This wouldn't have been sent to you;

20  correct?

21      A.   No.

22      Q.   Have you -- would you ever review

23  staff reports as part of your regular duties

24  as the risk manager for the city of Beaumont?

25      A.   Only reports that would relate maybe

Exhibit 8
Page 15 of 43



Page 50

1    to -- well, not even that.  No.  No.

2             The answer's no.  I didn't do any

3    staff reports.

4        Q.   Okay.  So your -- your testimony

5    is you probably -- not even -- not even for

6    matters where there was a potential claim

7    involved, it would -- you would typically

8    not review staff reports for any reason?

9        A.   I'm trying to think of that.  And

10   whether or not, you know, the city attorney

11   may provide confidential reports to the city

12   council, those may have ultimately ended up

13   in the claim files.  But, in general, no, I

14   did not review staff reports.

15       Q.   Thank you.

16            (Exhibit 8 marked.)

17   BY MR. DEAL:

18       Q.   Exhibit 8 starts with 1569.

19       A.   Uh-huh.  I have it.  (Examining.)

20       Q.   Okay.  This is a November 11, 2014,

21   e-mail string between James Gregg, Bill Aylward,

22   and Alan Kapanicas.

23            Does that appear to be what it is?

24       A.   It is.

25       Q.   And you're reporting to Alan that

Exhibit 8
Page 16 of 43



MAGNA ▶
LEGAL SERVICES

Page 61

1       Q.   Were you aware of any allegations

2    that Mr. Kapanicas had stolen money from --

3    strike that.

4            Were you aware in May 2015 of any

5    allegations that Urban Logic Consultants had

6    stolen money from the city?

7            MR. SCHMOOKLER:  Object to --

8            THE WITNESS:  No.

9            MR. SCHMOOKLER:  -- form.

10           THE WITNESS:  Oh, excuse me.  I'm

11   sorry.

12   BY MR. DEAL:

13      Q.   Had you heard of any allegations

14   that they were over-charging or over-billing

15   for projects?

16           MR. SCHMOOKLER:  Object to form.

17           THE WITNESS:  There had been some

18   citizens that had raised issues and concerns

19   in the past at council meetings.  But it

20   wasn't something that was generally accepted

21   or -- or general knowledge or acceptance of

22   that.

23   BY MR. DEAL:

24      Q.   Okay.  I -- I -- there were a couple

25   gadflies that would raise issues periodically

Exhibit 8
Page 17 of 43



Page 77

1          MR. SCHMOOKLER:  Hold on, sir.

2    Sir, you've got to let me get my objections.

3    I apologize --

4          THE WITNESS:  I apologize.

5          MR. SCHMOOKLER:  -- for interrupting

6    you.

7          Object to form.

8          THE COURT REPORTER:  And I don't

9    have the end of the question either.

10   BY MR. DEAL:

11      Q.   So in May 2015, in your mind, did

12   you have any concern that Dillon, Moorjani,

13   or Egger had over-charged the city for

14   services or stolen from the city?

15          MR. SCHMOOKLER:  Object to form.

16          THE WITNESS:  I -- I did not have

17   those concerns at that point.  No.

18   BY MR. DEAL:

19      Q.   And did you at any time discuss

20   with Dillon, Moorjani, or Egger any allegations

21   that they had acted -- strike that.

22          Had you -- at any point before

23   leaving the city, did you have any discussions

24   with Egger, Moorjani, or Dillon about allegations

25   that they over-charged the city for services?

Exhibit 8
Page 18 of 43



MAGNA
LEGAL SERVICES

Page 82

```
 1         A.    No.

 2         Q.    In 2009, were you at all aware

 3    of allegations that were being made by Judy,

 4    Victor, and Chris against Urban Logic and/or

 5    Alan Kapanicas?

 6         A.    I -- I don't know who Chris is.

 7    I believe Victor was another local citizen.

 8    And Judy Bingham obviously we've discussed.

 9    I don't recall -- you know, there was kind

10    of an ongoing issue overtime.  So I don't

11    recall this in particular.

12         Q.    Well, at this time, did you consider

13    making any claim under the crime policy?

14         A.    I had no reason to consider that

15    at this point.

16         Q.    Well, would it be a -- a fair

17    statement that, during the entire period

18    of your employment with Beaumont, you did

19    not see any conduct by Dillon, Moorjani,

20    Egger, or Mr. Kapanicas that would have

21    caused you to recommend filing a claim

22    under the crime policy?

23         A.    That's --

24               MR. SCHMOOKLER:  Object to --

25               THE WITNESS:  -- correct.
```

Exhibit 8
Page 19 of 43



Page 83

1           MR. SCHMOOKLER:  -- form.

2           THE WITNESS:  Oh, sorry.

3           That's correct.

4   BY MR. DEAL:

5      Q.   If you could look at what I'm

6   going to mark as Exhibit 14, which is 2783.

7   Hopefully we -- I can find that.

8           And, Mr. Gregg --

9           MR. SCHMOOKLER:  Already marked

10  this one.

11          MR. DEAL:  Did we?

12          MR. SCHMOOKLER:  Yeah.  It's --

13  I don't remember what exhibit.

14          MR. DEAL:  I think you're -- I

15  think you're right.

16          THE COURT REPORTER:  Scott, I

17  didn't understand what you said.

18          MR. SCHMOOKLER:  Exhibit 8.

19          THE COURT REPORTER:  Thank you.

20          MR. DEAL:  All right.  I'll pull

21  this one back.

22          (Exhibit 15 marked.)

23  BY MR. DEAL:

24      Q.   Exhibit 15 is 3256.

25      A.   I've got it.  (Examining.)

Exhibit 8
Page 20 of 43



Page 118

```
 1        Q.   And --
 2        A.   -- there was trainings that we'd
 3   go -- excuse me.  There were trainings that
 4   you do online.  There were some required
 5   that were, like, video trainings.  CSAC
 6   allowed us to access those sites.  So I
 7   believe any required training set forth
 8   by the FPPC, I would take it via that.
 9        Q.   And if you discovered that an
10   employee or a city official was -- was in
11   a potential conflict of interest, would
12   you have any responsibility to report that
13   employee or do anything?
14             MR. SCHMOOKLER:  Object to form.
15             THE WITNESS:  I'm -- I'm unaware
16   of any legal duty to -- to -- to -- that
17   I would have had to do anything.
18   BY MR. DEAL:
19        Q.   What about job duty?  That's
20   really what I'm focused on.
21             Was that part of your job?
22        A.   No.  That was not part of my
23   scope of work.
24        Q.   All right.  Now, starting on
25   paragraph 9 -- paragraphs 9 through 13
```

Exhibit 8
Page 21 of 43



Page 119

1    are based on your interactions with the

2    city manager, city attorney, and other

3    city officials; correct?

4        A.    Correct.

5        Q.    Okay.  Paragraph 9 says:

6             "The City of Beaumont contracted

7    with Urban Logic Consultants ... to perform

8    economic development, construction management,

9    design and inspection work."  (As read.)

10            THE COURT REPORTER:  Chris, I --

11   I can't get it when you're facing away from

12   the camera and you're reading so fast.  Can

13   you just say that again?

14            MR. DEAL:  Sorry.  It's -- it's

15   hard because I have to turn away to read.

16   But I'll try.

17            THE COURT REPORTER:  No, it's

18   okay.  But when -- we all read faster than

19   we speak.  So ...

20            MR. DEAL:  I'll try.

21   BY MR. DEAL:

22       Q.    (Reading.)

23            "The City of Beaumont contracted

24   with Urban Logic Consultants ... to perform

25   economic development, construction management,

Exhibit 8
Page 22 of 43



Page 120

1    design and inspection work.  Ernest Egger,

2    David Dillon, and Deepak Moorjani owned ULC."

3    (As read.)

4              How do you know that?

5        A.   Just by working there and seeing

6    what they were involved in.  They were at

7    staff meetings.  And so these are the types

8    of things they were all working on.  And --

9    and, I mean, it was just common knowledge

10   who the owners were of Urban Logic.

11       Q.   Going kind of halfway through

12   that paragraph, there's a sentence that

13   starts:

14              "It is my understanding that

15   Mr. Dillon."

16              Do you see that?

17       A.   Yeah.

18       Q.   (Reading.)

19              "It is my understanding that

20   Mr. Dillon (as an economic development

21   consultant for the City) and Mr. Moorjani ...

22   made recommendations to the City Council

23   that included work to be supervised by ULC."

24   (As read.)

25              How did you reach that understanding?

Exhibit 8
Page 23 of 43



MAGNA
LEGAL SERVICES

```
 1        A.   Well, just in working with them on

 2   some risk management items.  With regards to

 3   the city engineer, for instance, we had a --

 4   there was a new high school built.  And where

 5   the roadway went, it became flooded during

 6   the rains.  And so there was going to be a

 7   bridge built -- a pedestrian bridge built.

 8   And -- and so I had gone out to do signage

 9   work, you know, "flooded when rain," making

10   sure that those types of things were happening.

11            But the overall discussion was how

12   to build this pedestrian bridge and that they

13   would be doing design and then they would --

14   I think they would bid it out and then they

15   would, you know, manage the -- the construction

16   inspect -- with inspections and so on.

17            So just those types of jobs, interacting

18   with them, I -- I --

19        Q.   So if --

20        A.   -- [audio fades] --

21        Q.   -- there was -- sorry to interrupt.

22            So if there was a risk management

23   type issue, you might interact with Mr. Dillon

24   regarding recommendations to the city council?

25        A.   It was very rare.  No, I wouldn't
```

Exhibit 8
Page 24 of 43



MAGNA
LEGAL SERVICES

Page 122

1   make recommendations to the council.

2           For instance, in this particular

3   example that I'm using, the -- the risk

4   that was identified was flooding of a public

5   street.  And so I wanted to make sure that

6   we had adequate signage out there so nobody

7   goes driving in there and dies or gets

8   injured or whatever so that ...

9           And then, you know, I'd be sitting

10  in the meeting and there would be discussions

11  of other things as well that were outside of

12  my scope.  But mine was just making sure that

13  we had taken the proper safety precautions

14  to try to avoid claims in the future.

15      Q.   So do you have personal knowledge

16  that Mr. Dillon made recommendations to the

17  city council that the work would be supervised

18  by ULC on all ULC projects or just the ones

19  where you had some interaction with him on?

20      A.   I really did not review city council

21  packages and those types of things.

22           My -- my -- my reason for this is

23  just a general understanding.  I don't have

24  specific knowledge meaning I've read or saw

25  them take these actions.

Exhibit 8
Page 25 of 43



Page 123

1      Q.   And then the next sentence says:

2           "Based upon discussions and

3      recommendations, the city council authorized

4      infrastructure and economic development

5      projects that ULC would supervise and manage."

6           Do you have personal knowledge of

7      that?  Or are you just basing it on your

8      generalized understanding of --

9      A.   Most of it --

10     Q.   -- [audio fades] work?

11     A.   Most of it is generalized knowledge.

12     But as a part of being on the staff, I was a

13     part of staff meetings where council agendas

14     were made.  And as I recall, there were items

15     on there that were -- that were relating to

16     projects within the city involving these --

17     these folks.

18     Q.   But, again, that's not your job

19     and you don't have personal knowledge of

20     what their specific job duties were; right?

21          MR. SCHMOOKLER:  Object to form.

22          THE WITNESS:  I reviewed those

23     documents, the -- the background documents.

24     I did not walk with them in the field.  I

25     did not do any of those things.  No.

Exhibit 8
Page 26 of 43



Page 124

1    BY MR. DEAL:

2        Q.    And the only document mentioned

3    earlier in the declaration is the city

4    handbook.

5            But are there any other specific

6    documents you're relying on to support the

7    statements in paragraph 9?

8        A.    No.

9        Q.    Paragraph 10:

10           "Mr. Dillon served as the City of

11   Beaumont's contracted economic development

12   consultant through a contract between ULC,

13   a company he held an ownership interest in,

14   and the City of Beaumont."

15           Earlier I asked you to look at the

16   ULC contracts.

17           Do you recall that?

18       A.    I do.

19       Q.    And -- and you never looked at those;

20   right?

21       A.    No.

22       Q.    How do you know that Mr. Dillon had

23   an ownership interest in ULC?

24       A.    Can -- can I take just about a -- a

25   one-minute break?  Somebody just walked in my

Exhibit 8
Page 27 of 43



Page 125

1    front door.  I just need to --

2         Q.   Of course.  It's -- it's actually

3    been about an hour.  So why don't we do five?

4         A.   Okay.  Thank you.

5              THE VIDEOGRAPHER:  The time is 1:25

6    p.m.  And we are off the record.

7              (Recess from 1:25 p.m. to 1:29 p.m.

8         PDT.)

9              THE VIDEOGRAPHER:  The time is 1:29

10   p.m.  And we are on the record.

11   BY MR. DEAL:

12        Q.   Mr. Gregg, I kind of want to clean

13   up something earlier.

14              By the time you left the city, were

15   you aware of any theft or any other dishonest

16   act committed by any employee involving a

17   loss of money, securities, or other property

18   in excess of $25,000?

19        A.   No.

20              MR. SCHMOOKLER:  Object to form.

21              Did you get my objection, ma'am?

22              THE COURT REPORTER:  Yes.  Barely.

23              MR. DEAL:  Okay.  Let's jump back

24   to the declaration.

25   //

Exhibit 8
Page 28 of 43



Page 127

1    in excess of $25,000 to supervise and manage

2    projects that Mr. Dillon ... and Mr. Moorjani ...

3    had discussed and recommended to the city

4    council."  (As read.)

5            Are you basing this on any specific

6    documents or just your generalized understanding

7    of how the city operated?

8        A.    That would be my generalized -- what --

9    whatever you said -- generalized understanding

10   of how the city operated.

11       Q.    And we -- we can conclude it's over

12   $25,000 because we know that ULC certainly did

13   projects worth more than $25,000 collectively;

14   right?

15       A.    That's correct.

16       Q.    It says here:

17            "ULC was paid fees in excess of

18   $25,000."

19            Do you see that?

20       A.    I do.

21       Q.    Are you aware of ULC stealing

22   monies, securities, or other property in

23   excess of $25,000 in connection with their

24   work for the city?

25            MR. SCHMOOKLER:  Object to form.

Exhibit 8
Page 29 of 43



MAGNA
LEGAL SERVICES

Page 128

```
 1              THE WITNESS:  No.
 2    BY MR. DEAL:
 3        Q.    And you were never aware of such
 4    conduct prior to leaving the city?
 5              MR. SCHMOOKLER:  Object to form.
 6              THE WITNESS:  No.
 7    BY MR. DEAL:
 8        Q.    Paragraph 12:
 9              "I" understand "that the city council
10    had the authority to consider whether Messrs.
11    Egger, Dillon, and Moorjani violated California
12    law and whether to remove Messrs. Egger, Dillon,
13    and Moorjani."  (As read.)
14              Where did you reach that understanding
15    from?
16        A.    That's my general educational background
17    that, you know, powers not to -- powers inherent
18    with the city council remain with the council.
19    And so ultimate power results -- resides there.
20              In a council manager form of government,
21    such as in Beaumont, much of the administrative
22    activities are handled by the city manager.  But
23    the ultimate authority in these things are with
24    the city council.  So it's simply a -- a general
25    statement of my understanding of how cities work.
```

Exhibit 8
Page 30 of 43



Page 134

1    with that person.

2        Q.   Did you ever have any discussions

3    with any other city officials about your

4    concern, as expressed in the declaration,

5    regarding potential conflicts of interest

6    involving the Urban Logic principals?

7        A.   I don't recall ever having any

8    conversations regarding conflicts of interest

9    regarding Urban Logic.

10       Q.   Would it be fair to say that this

11   declaration is the first time you're expressing

12   any concern about the issues with Form 700s

13   and conflicts of interest vis-a-vis the city

14   of Beaumont?

15       A.   It wasn't my intent to create a

16   declaration creating concern.  It was just

17   to create a declaration stating facts that

18   I knew.  But I'm not -- I'm not convinced,

19   as I told the attorney, that there is a

20   conflict.  I don't know that.  I -- I --

21   I haven't drawn a legal conclusion regarding

22   that.

23       Q.   And -- and what -- how did that

24   response come up?  What did she ask you?

25       A.   There was some edits that had to

Exhibit 8
Page 31 of 43



MAGNA ►
LEGAL SERVICES

Page 135

1    do with some edits of -- and I -- I believe

2    I indicated that that was a legal conclusion

3    that I couldn't make because -- and I told

4    her I wasn't convinced that there was, you

5    know, a conflict of interest or a crime.

6    I don't know.

7              I explained to her that, you

8    know, in my experience, that there are

9    a number of different places where folks

10   make recommendations to council and then

11   manage the process thereafter, not -- not

12   the least of which, in my area, was city

13   attorneys.  They may be a partner in a firm,

14   and then they refer the litigation out to,

15   you know, litigation counsel in their own

16   firm.  And they may be sharing in that.  So

17   I don't know the rules in -- in that regard.

18        Q.   Fair enough.

19              So would it be fair to say that

20   vis-a-vis, with respect to Mr. Kapanicas,

21   for the entire time that you worked at the

22   city and even after your role as ERMAC, you

23   do not know whether he violated any applicable

24   conflict of interest laws?

25        A.   That's --

Exhibit 8
Page 32 of 43



Page 136

```
 1              MR. SCHMOOKLER:  Object to --

 2              THE WITNESS:  -- correct.

 3              MR. SCHMOOKLER:  -- form.

 4              THE WITNESS:  Oh, sorry.

 5              That's correct.

 6    BY MR. DEAL:

 7         Q.   How about Mr. Moorjani, same

 8    question?

 9              MR. SCHMOOKLER:  Same objection.

10              THE WITNESS:  That's correct.

11    BY MR. DEAL:

12         Q.   Same question for Mr. Dillon?

13              MR. SCHMOOKLER:  Same objection.

14              THE WITNESS:  That's correct.

15    BY MR. DEAL:

16         Q.   And same question for Mr. Egger?

17              MR. SCHMOOKLER:  Same objection.

18              THE WITNESS:  That's correct.

19    BY MR. DEAL:

20         Q.   And I don't -- Mr. Aklufi, do you

21    believe he was in any -- any type of conflict

22    of interest?

23         A.   I don't [audio fades] --

24              MR. SCHMOOKLER:  Same objection.

25              Sorry.
```

Exhibit 8
Page 33 of 43



MAGNA
LEGAL SERVICES

Page 137

```
 1              THE COURT REPORTER:  I don't have

 2    an answer.

 3              THE WITNESS:  "No."

 4    BY MR. DEAL:

 5        Q.   Did you ever have any discussions

 6    with anyone at Urban Logic about your feelings

 7    that perhaps there were conflict of issues

 8    here?

 9              Let -- let me rephrase that.

10              In paragraphs 11 -- in paragraphs

11    9 through 12 of your declaration, you're

12    certainly discussing conflict of interest

13    issues; right?

14        A.   In those paragraphs, I'm simply

15    trying to outline the facts that I know.

16    I don't know -- I -- I never drew any

17    conclusions about whether or not conflicts

18    of interest were occurring.  I'm not -- I'm

19    not inferring that.  I'm not stating that.

20    I'm just stating this is what I knew in the

21    process.  Whether that was or not, I -- I

22    can't tell you.

23        Q.   Okay.  And -- and I totally understand

24    that.  I'm just trying to figure out whether

25    any of the stuff that's outlined in paragraphs
```

Exhibit 8
Page 34 of 43



Page 138

1    9 through 12, whether you had any discussions

2    with Mr. Kapanicas, Mr. Dillon, any of these

3    gentlemen, regarding the matter that's in

4    paragraphs 9 through 12?

5         A.   I never had any discussions with

6    anyone regarding conflicts of interest.  I

7    did not -- those types of issues were -- I

8    had never raised them, nor did I have concerns

9    about them that I -- I'm aware of.  And so no,

10   I have not had any discussions with any of

11   these folks about conflicts of interest.

12        Q.   Thank you.

13             Do you have -- do you -- do you

14   know what the entity BSI Consultants, Inc.,

15   is?

16        A.   Say that again, please.

17             THE COURT REPORTER:  I -- I didn't

18   get it either.

19   BY MR. DEAL:

20        Q.   BSI Consultants, Inc.

21        A.   That sounds familiar.  But I --

22   I just don't recall.

23        Q.   Okay.  And you were the agent for --

24   for service of process for GGMS?

25        A.   I was.

Exhibit 8
Page 35 of 43


MAGNA
LEGAL SERVICES

Page 143

```
 1        A.   I was the risk management department

 2   or division.

 3        Q.   But within the terms of risk management,

 4   what -- lots of what the risk manager does is

 5   deal with insurance?

 6             Is that fair?

 7        A.   That's correct.

 8        Q.   And within the city, people who were

 9   involved in insurance were -- were technically

10   housed, from an organizational perspective,

11   in various departments; correct?

12             MR. DEAL:  Objection.

13             THE WITNESS:  [Audio fades].

14             MR. DEAL:  Form.

15   BY MR. SCHMOOKLER:

16        Q.   Sure.  Isn't it true, sir --

17             THE COURT REPORTER:  Wait.  Wait.

18   BY MR. SCHMOOKLER:

19        Q.   -- that there were --

20             THE COURT REPORTER:  Wait.  Wait.

21   I don't -- wait.  I didn't get his answer.

22   There was an objection --

23             MR. SCHMOOKLER:  I didn't -- I'm

24   rephrasing.  I'm rephrasing.

25             THE COURT REPORTER:  I know.  But
```

Exhibit 8
Page 36 of 43



Page 163

1   insurance through CSAC?

2       A.   I -- I understood that Mr. Moorjani

3   was -- hold -- held that title with the city.

4   I -- I don't know about Mr. Dillon.  There

5   were many changes that went on during the

6   city where there was a hiring of economic

7   development directors and other folks.

8            And so I don't know what their --

9   their exact positions.  It wasn't really

10  something relevant to my -- my understanding.

11           I did work with Mr. Moorjani as the

12  city engineer, because I needed him to sign

13  declarations when claims would occur outside

14  of the city.  So he would sign a declaration

15  so that we could sit, tell people to go and

16  file their claims, whether it's in the county

17  or the city neighborhoods.

18      Q.   Okay.  And, sir, you were asked

19  about Ms. Bingham.

20           Do you remember being asked about

21  Judy Bingham?

22      A.   I do.

23      Q.   She was a concerned citizen; is that

24  fair?

25      A.   That's true.

Exhibit 8
Page 37 of 43



MAGNA
LEGAL SERVICES

Page 164

1      Q.   And you understood that she, for

2    years, levied complaints against Urban Logic;

3    is that fair?

4      A.   That's fair.

5      Q.   And did you understand that, for

6    years, one of her complaints was that Urban

7    Logic and its owners had a conflict of interest?

8      A.   I didn't concern myself with her

9    particular concerns.  I just knew that she

10    was constantly complaining.  I don't know

11    particulars.

12      Q.   And -- and isn't it true, sir,

13    that the conduct that Ms. Bingham complained

14    about for years is the very same conduct

15    that Mr. Deal, on behalf of the city, now

16    characterizes as theft?

17          MR. DEAL:  Objection as to form.

18    And he just said he has no recollection of

19    what Ms. Bingham's complaint were.

20          MR. SCHMOOKLER:  You can -- you --

21    we don't need speaking objections.  You may

22    object to form.  We'll get there.

23          THE WITNESS:  Yeah, I -- I -- I

24    was going to say that anyways, that I don't

25    really remember all of her complaints.  They

Exhibit 8
Page 38 of 43



Page 198

1    can see the top of the memo.

2            Okay.  So in this instance, what --

3    what occurred was, we had had significant

4    losses in ERMAC.  And there were -- and --

5    and there was a question as to whether or

6    not -- at what level we wanted to fund our --

7    our reserves to handle future claims.

8            And so I had written a -- a -- a

9    sizable letter and analysis to all of the

10   members of ERMAC as the general manager.

11   And Elizabeth, she was an alternate member

12   of the board, Alan, who was on the board,

13   they all received my memos.  And she, I

14   believe, cut-and-pasted this and took it

15   to the board.  But I was unaware of this.

16   I -- I don't recall this going to the city

17   council.

18      Q.   Well, I guess my question is:  Were

19   there, in fact, during your time, instances

20   in which insurance related decisions were

21   funneled to the -- to the city council for

22   consideration?

23      A.   Well, based upon this -- this memo,

24   it appears that there were.  I -- I'm not

25   really aware of other ones outside of the

Exhibit 8
Page 39 of 43



Page 199

1    budget.  There may have been -- oh, actually,

2    no.  I -- I take that back.  Because as I

3    was leaving Beaumont, there -- they -- they

4    were participating in another pool for Workers'

5    Comp, and that was dissolving.

6            And so there were memoranda that

7    went to the city council relating to reverting

8    back to self-insurance with a third-party

9    administrator and joining CSAC, workers --

10   excess Workers' Compensation.

11           So there were times that there

12   were memos to the council.  Yes.  It was

13   infrequent, but it did occur on occasion.

14       Q.   So there were instances, then,

15   where insurance related decisions were

16   made by the city council, as opposed to

17   just the city manager or you as the risk

18   manager?

19       A.   Yeah, I -- I never made those

20   decisions.  So -- I'm sorry.

21           You'd -- you'd have to re-state

22   that question.

23       Q.   Sure.

24           So there were times when the city

25   council would make decisions about insurance;

Exhibit 8
Page 40 of 43



Page 208

1    BY MR. SCHMOOKLER:

2        Q.    Are you aware that, in the decision,

3    the judge made a very specific finding as

4    to the administration?

5        A.    Yes.

6        Q.    And are you aware that the judge

7    made a very specific decision about whether

8    the administration had engaged in fraud?

9        A.    I don't recall whether he said

10   "criminal fraud" or "civil fraud."  But

11   I do recall "fraud."

12       Q.    And -- and you were aware of that

13   decision prior to the purchase of the 2015,

14   2016 policy; correct?

15       A.    Yes.

16       Q.    And did you, on behalf of the city --

17   or strike that.

18           Did the city disclose to my client

19   that the ad -- that a judge had found fraud

20   against the administration?

21       A.    No.  Not -- not that I'm aware of.

22       Q.    And isn't it true, sir, that the

23   city of Beaumont, despite a decision finding

24   that the administration had engaged in fraud,

25   did not disclose that to my client when

Exhibit 8
Page 41 of 43



MAGNA
LEGAL SERVICES

Page 213

1          MR. DEAL:  I would.

2          MR. SCHMOOKLER:  I just need the

3   transcript for now, normal delivery.

4          THE COURT REPORTER:  Okay.  Brian,

5   do you need the transcript?

6          MR. ROSS:  No.

7          (The deposition concluded at 3:22 p.m.

8       PDT.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit 8
Page 42 of 43



Page 214

1                    CERTIFICATE OF REPORTER

2

3              I, BRENDA MATZOV, CSR NO. 9243, do hereby

4     certify:

5              That, prior to being examined, the witness

6     named in the foregoing deposition was remotely duly

7     sworn by me to testify the truth, the whole truth,

8     and nothing but the truth;

9              That the foregoing deposition was taken

10    remotely/virtually before me, at which time the

11    aforesaid proceedings were stenographically recorded

12    by me and thereafter transcribed by me;

13             That the foregoing transcript, as typed,

14    is a true record of the said proceedings;

15             And I further certify that I am not

16    interested in the action.

17

18             Dated this 10th day of May, 2022.

19

20             *Brenda Matzov*
               _____
               BRENDA MATZOV, CSR NO. 9243
21

22

23

24

25

Exhibit 8
Page 43 of 43



MAGNA
LEGAL SERVICES