# EXHIBIT 10

1  JEFFREY V. DUNN, Bar No. 131926
   jeffrey.dunn@bbklaw.com
2  CHRISTOPHER E. DEAL, Bar No. 186754
   chris.deal@bbklaw.com
3  DANIEL L. RICHARDS, Bar No. 315552
   daniel.richards@bbklaw.com
4  BEST BEST & KRIEGER LLP
   18101 Von Karman Avenue
5  Suite 1000
   Irvine, California 92612
6  Telephone:  (949) 263-2600
   Facsimile:   (949) 260-0972
7
   Attorneys for Plaintiffs
8  Western Riverside Council of Governments
   and City of Beaumont
9

10             UNITED STATES DISTRICT COURT

11             CENTRAL DISTRICT OF CALIFORNIA

12

13 | WESTERN RIVERSIDE COUNCIL OF | Case No. 5:20-cv-02164- GW (KKx)
   | GOVERNMENTS, a California Joint
14 | Powers Authority; CITY OF | **DECLARATION OF ELIZABETH
   | BEAUMONT, a public entity in the | GIBBS IN SUPPORT OF
15 | State of California, | OPPOSITION TO DEFENDANT'S
   | | MOTION FOR SUMMARY
16 | Plaintiff, | JUDGMENT**
17 | v.
18 | NATIONAL UNION FIRE | Date:       August 1, 2022
   | INSURANCE COMPANY OF | Time:       8:30 a.m.
19 | PITTSBURGH, PA, and DOES 1 | Courtroom:  9D
   | through 50, inclusive,
20
   | Defendants.
21

- 1 -

DECLARATION

Exhibit 10
Page 1 of 17
5:20-CV-02164- GW (KKX)

## **DECLARATION OF ELIZABETH GIBBS**

I, Elizabeth Gibbs, declare as follows:

1. I have personal knowledge of the matters and facts set forth below and am competent to testify to such matters and facts.

2. I am a resident of the City of Beaumont, California. I began working for the City of Beaumont in 1996. From March 2006- to June 2015, I was the Resources Director for the City of Beaumont, and was responsible for customer service operations, utility billing, human resources, transit services, and special projects. From June 2015 to May 2016, I was the interim City Manager. From May 2016 to July 2018, I was the Transit Director. From July 2018 to January 2022, I was the Community Services Director. Since April 2022, I have been the interim City Manager of the City of Beaumont.

3. In this lawsuit, I was designated as the City's corporate representative and testified on the topics identified on the notice of deposition attached hereto as Exhibit 1. In the course of preparing to testify as the City's corporate representative, I reviewed and analyzed 100s of pages of records of the City of Beaumont, and the review of these records refreshed my recollection of events that occurred over the past twenty six years of my employment with the City of Beaumont.

4. In 1993 and 1994, the City of Beaumont entered into contracts with Urban Logic Consultants, Inc. ("ULC") to provide staff to provide the planning, engineering, and economic development services of the City of Beaumont.

5. Pursuant to this contract, and beginning in 1993, David Dillon served as the City's Economic Development Director; Ernest Egger served as the City's Planning Director, and Deepak Moorjani served as the City's Public Works Director/City Engineer.

6. From approximately 1993 to 2015, Alan Kapanicas was the City Manager for the City of Beaumont. Mr. Kapanicas was not, at first, a City employee but the City hired Mr. Kapanicas through his company, General Government Management Services, Inc. Later, Mr. Kapanicas became a City employed City Manager.

7. Over the next two decades, the ULC principals operated as Department Heads at the City of Beaumont, and also performed plan check, construction management, and other work pursuant to the ULC Contract.

8. After the ULC Principals became city officials, no further contracts were entered into between the City and ULC or the principles – rather, all work was performed pursuant to the ULC contract entered into before the ULC principals became officials.

9. Because no further contracts were entered into between Beaumont and ULC, I understood that all work performed by ULC was performed pursuant to the original contracts entered into with ULC before the ULC principals became City Officials. Based on this fact, I understood at all times that the ULC principals were not financially interested in any contract made by them in their official capacity. This understanding was informed by discussions with Alan Kapanicas and numerous City Council members.

10. ULC performed no work for the Beaumont Financing Authority ("BFA"). While BFA was involved in payment to ULC of Community Facilities District and bond funds, the work performed by ULC was performed for the City and pursuant to ULC's contracts with the City. BFA was only a financing mechanism, it did not independently contract with ULC or other entities and did not purchase or construct any facilities or manage the purchase or construction of any facilities or projects.

- 3 -

Exhibit 10
Page 3 of 17
5:20-CV-02164- GW (KKX)
DECLARATION

11. While the ULC principals signed staff reports concerning projects that their respective departments were responsible for, the ULC principals never recommended or discussed the formation of any new contract in which they or ULC were financially interested.

12. Beginning in 2006, James Gregg was the City's Risk manager and effectively the head of the City's risk management department to the extent the City had such a department. James Gregg, acting under the sole direction and control of City Manager Alan Kapanicas, was responsible for handling all insurance matters on behalf of the City.

13. In my time with the City, Gregg was not required to and did not seek approval of the City Council before tendering a claim to an insurance company under an insurance policy. Consistent with this history, the City's Risk Manager does not currently require the approval of the City Council to submit an insurance claim. In regards to this lawsuit, the City Council was not required to and did not approve the submittal of the City's insurance claim to National Union.

14. To the extent "claims" were brought before the City Council for consideration by the City Council, they were not insurance claims, but claims under California's Government Claims Act. Under this statute, when a person is harmed and believes the City is responsible, they must present a written "claim" to the City to provide the City an opportunity to investigate the claim and potentially settle the claim before filing a lawsuit against the City.

15. Under the Beaumont Municipal Code, the City Council does not exercise direct control over individual employees or officers of the City. The City Council is the legislative head of the City Government, but the City Manager, an office I currently hold, is the administrative head of the City Government and has the power and duty to control, order, and give directions to City employees and inferior officers, including the City's Risk Manager. This understanding is based on Beaumont Municipal Code section 2.12.060 and my understanding and extensive experience with the day-to-day functions of the City of Beaumont.

16. I had no knowledge of any overcharging by ULC or the principals of ULC, and in my discussion with other employees and officials of the City of Beaumont I understood that no employees or officials of the City of Beaumont not in league with Kapanicas and the ULC principals had any knowledge of overbilling on the part of ULC or the principals of ULC before this overbilling was discovered by Dan Ray.

17. The City Council did not (and does not) review and approve detailed invoices submitted by ULC or other contractors. Rather, the City Council approves "warrant lists" which identify overall payments to specific vendors.

18. In my capacity as interim City Manager, I have reviewed many Capital Improvement Plans. Capital Improvement Plans do not disclose what individuals or contractors will perform what type of work on any particular project. While some Capital Improvement Plans include a list of authorized contractors, Capital Improvement Plans do not identify which specific contactors will perform what work.

19. Capital Improvement Plans set broad, forward-looking budgets, and do not authorize any specific work or authorize any specific contractor to perform any specific work. Any work performed by any employee or contractor is required to be separately authorized by a contract, in accordance with the Beaumont Municipal Code, or come within the scope of an employee's duties.

- 5 -

Exhibit 10
Page 5 of 17
5:20-CV-02164- GW (KKX)
DECLARATION

20. If the Capital Improvement Plan approves a project that cannot be performed in whole or part by a particular contractor or employee (e.g., that the work would not be permitted by the contractor's contract) another employee or contractor will perform the work or a contract will be amended to allow the work to be performed. Approval of a Capital Improvement Plan does not permit any City employee or contractor to perform work for the City and does not require the City to incur debts or obligations that are not otherwise permitted by a contract or statute.

21. I understood and understand that ULC's contract with the City imposed a "cap" of payment to ULC of 4.5 percent of the construction cost for public improvement for certain services provided by ULC and the ULC principals. In my review of all relevant City files and records, I was unable to locate any document, communications, or legislative act on the part of the City authorizing ULC to ever exceed this 4.5 percent cap for any project. In my time as Resources Director and Interim City Manager, to my knowledge no person at the City, not in league with Alan Kapanicas and the ULC principals. had any knowledge that ULC exceeded the 4.5 percent cap.To my knowledge, no person, not in league with Alan Kapanicas and the ULC principals, authorized ULC to exceed this 4.5 percent cap.

22. Based on my review of dozens of Capital Improvement Plans, warrants, and other documents submitted to the City Council, no documents that were before the City Council would have provided adequate information to determine that ULCs services would exceed the 4.5 percent cap.

23. Detailed invoices of contractors, listing hours worked and who performed what work at what rate, are not presented to or reviewed by the City Council. Rather, warrants, Capital Improvement Plans, and other documents presented to and reviewed by the City Council contain only total dollar amounts and budgets.

24. Alan Kapanicas, when he was City Manager for the City of Beaumont, exercised an extraordinary degree of control over the City Council and City staff and officials. As is discussed above, the City Manager is the administrative head of the City and has the power to direct and control all City staff and most City officials. In addition, Kapanicas exercised almost total control over City finance and operation information provided to and received by the City Council. For example, Kapanicas on occasion refused to provide relevant information to the City Council and refused to provide staff reports that City staff had prepared.

25. On April 22, 2015, the FBI and Riverside District Attorney's office raided Beaumont City Hall, and seized an extraordinary amount of documentary and electronic evidence related to the ULC principals and Kapanicas. The amount of electronic information seized required them to stay overnight, almost 24 hours, to secure the level of electronic information from the City.

26. Prior to this raid, neither I know (to my knowledge) any employee or official with the City of Beaumont not in league with Kapanicas and the ULC principal had any knowledge of the criminal conduct of the ULC principal and Kapanicas. The belief that no other employee or official had knowledge of this criminal conduct is informed by two facts: First, no City employee or official expressed to me prior to the raid any belief or suspicion as to the criminal conduct of ULC or Kapanicas. Second, after the raid, employees and officials of the City of Beaumont not in league with Kapanicas and the ULC principals expressed their surprise, concern, and shock at the raid. I perceived this shock, concern, and surprise to be genuine. These employees and officials include: Kari Mendoza, Kyle Warsinski, Shelby Hanvey, Karee Keyser, Shay Norville, Nicole Wheelwright, Laurie Miller, Rebecca Deming, Kelsey Gormley, Shaina Harwood, Laura Vermillion, Eileen Rodriguez, Robert Sherwood, Ashley Starr, Christina Bowser, Kelly McCarthy, Keith Hightower, Jose Perez, Cynthia Overby, Michael Almandinger, Celina Cabrera, and Patricia Foster.

27. Shortly after the raid, on June 2, 2015, I was appointed interim City Manager. We did not at that time know what conduct was being investigated by the Riverside County District Attorney Office and did not know, at that time, whether the conduct being investigated caused or had the potential to cause any direct monetary loss to the City. Additionally, during the raid, computers, other electronic records, and *thousands* of documents were seized, making it essentially impossible to conduct any kind of independent investigation by the City. Additionally, the City lost almost all of its junior and senior staff and leadership, and in the initial time frame it took all of my and staff's efforts to begin to rebuild and keep the City functioning.

28. In May of 2016, Egger, Dillon, Moorjani, Kapanicas, and other former City officials were charged with numerous felonies by the Riverside County District Attorney, including multiple counts felony embezzlement and defalcation of public funds, falsifying public records to hide their crimes, and conspiracy. Until the arrests, I had no idea of the scope or extent the ULC principals and Kapanicas' alleged criminal conduct.

29. At no time prior to the arrests did I believe or suspect that the ULC principals or Kapanicas had engaged in theft or dishonest conduct that caused a loss of money or property to the City equaling or exceeding $25,000.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 11th day of July, 2022, at Beaumont, California.


Signername

# EXHIBIT 1

Exhibit 10
Page 9 of 17

# AMENDED BFA 30(B)(6) DEPOSITION RIDER

## DEFINITIONS

A. As used herein, the terms "City," "You" and "Your" mean The City

B. of Beaumont, including its City Council members, officers, employees, agents, attorneys affiliates, predecessors and successors.

C. "WRCOG" means Western Riverside Council of Governments, including its officers, directors, employees, attorneys, agents, independent contractors, affiliates, predecessors and successors.

D. "BFA" means the Beaumont Financing Authority and its officers, directors, employees, board members, attorneys and agents.

E. "Communication" or "Communications" mean any transmission of information (in the form of data, facts, statements, ideas, records, inquiries, or otherwise). The terms include, but are not limited to emails, correspondence, instant messages, text messages, telephone calls, and voicemails.

F. The term "related to" means to consist of, refer to, pertain to or be in any way logically or factually connected with the matter discussed.

G. "Relevant Period" extends from 1993 through 2012.

H. "Lawsuit" refers to the above-captioned lawsuit pending in the United States District Court for the Central District of California, Docket No. 5:20-cv-02164.

I. "Claim" means The City's insurance claim, as described in the Complaint.

J. "ULC" means Urban Logic Consultants and its officers, directors, employees, agents, independent contractors, affiliates, predecessors and successors.

K. "ULS" means Urban Logic Services and its officers, directors, employees, agents, independent contractors, affiliates, predecessors and successors.

Exhibit 10
Page 10 of 17

**L.**     "Principals" means Alan Kapanicas; Ernest Egger; David Dillon; Deepak Moorjani; and any other individual you accuse of Theft, Dishonesty, Faithless Performance, or otherwise causing any loss alleged in the Complaint.

**M.**     "City Council" means Mr. Brian DeForge, Lawrence Dressel, Roger Berg, Jeffrey Fox, Placentia Valdivia, Martha Killough, Nancy Gall and David Castaldo.

## AMENDED TOPICS OF EXAMINATION

1.     The factual basis for Your contention that the Principals caused the City to suffer a loss.

2.     The amount of loss You contend the City suffered as a result of the Principals and how You computed that loss.

3.     Any action taken by the City after April 23, 2015 to preserve all documents and communications relating the City's retention of ULC, payments to ULC (including invoices from ULC) and discussions about ULC.

4.     The City's document retention policy during the Relevant Period.

5.     The identity and amount of each allegedly inflated invoice submitted by ULC and paid by the City prior to 2008, including the date of which invoice, the amount of the invoice, the services provided and whether the services provided related to a public project or private project.

6.     The identity of any individual, entity or body with authority to approve the purchase of insurance, or presentation of any insurance claim on behalf of BFA or the City.

7.     The date on which the City first retained ULC and any disclosure of the individuals that owned ULC to James Gregg, Exclusive Risk Management Authority of California, the City Council, and/or Elizabeth Gibbs.

Exhibit 10
Page 11 of 17

8. The employment of Elizabeth Gibbs and her duties during the Relevant Period, including any duties or responsibilities relating to the purchase of insurance and reporting of insurance claims.

9. The City's application for and purchase of insurance from Defendant, including the date on which the City first purchased insurance from the Defendant.

10. The City's retention of James Gregg and Exclusive Risk Management Authority of California, and the scope of any services provided by Mr. Gregg and/or Exclusive Risk Management Authority of California.

11. The relationship between the City and the Principals, including any services the Principals' provided to the City and their any positions held for the City.

12. The City's review, analysis, or consideration of any proposals by ULC or award of work to ULC, including: (a) the City Council's receipt and consideration of any staff reports executed by one or more of the Principals recommending that the City award work to ULC or approve projects on which ULC was the contractor; (b) Staff reports from the Community and Economic Development Department recommending that the City adopt resolutions approving Capital Improvement Plans which provided funding for projects on which Urban Logic Consultants was listed among the qualified contractors; (c) discussions between one or more of the Principals and the City about projects ULC completed, either itself or through sub-consultants, for the City; and (d) negotiations between one or more of the Principals and the City about projects ULC completed, either itself or through sub-consultants, for the City.

13. The City's review, processing and approval of ULC's invoices for payment, including: (a) the identity of any officers, directors, agents, staff members, employees, contractors, attorneys, representatives, or any other person(s) who participated in any way or performed any

Exhibit 10
Page 12 of 17

act related to the retention of ULC; and (b) the identity of any officers, directors, agents, staff members, employees, contractors, attorneys, representatives, or any other person(s) who participated in any way in or performed any act related to assessing, approving, and issuing payment for ULC invoices, including their participation in and/or performance of any act related thereto.

14. The identity and scope of projects awarded to or performed by ULC.

15. The terms of and approval of the September 1993 Agreement for Planning, Economic Development and Public Works Services Agreement between the City and ULC.

16. The terms of and approval of the April 1994 Amendment to the September 1993 Agreement for Planning, Economic Development and Public Works Services Agreement between the City and ULC.

17. The terms of and approval of the 1995 Wastewater Treatment Facility and Sewer Agreement between the City and Urban Logic Services ("ULS").

18. The terms of and approval of the 2002 Wastewater Treatment Facility and Sewer Agreement between the City and ULS.

19. The City's Capital Improvement Plans for the Relevant Period, including approval thereof.

20. The factual basis for all allegations in this action (including in the Complaint) and any claims asserted in the Complaint.

21. The City's notice of claim and proof of loss, including the factual basis for the allegations in the proof of loss.

22. The factual basis for the allegation in your proof of loss that seven former employees of the City "engaged in and concealed a pervasive, multi-faceted scheme of fraud and

Exhibit 10
Page 13 of 17

corruption to channel money and benefits to themselves, their businesses, and a consortium of individuals, entities, and developers, without proper oversight or process, for the purpose and goal of maintaining control over all developments in the City for personal and financial gain."

23. Your discovery answers and responses, including each step taken to gather documents in response to the requests for production and information in response to interrogatories.

24. The factual basis for your claim under Policy No. 01-309-61-64 and effective from June 30, 2014 to June 30, 2015.

25. The factual basis for your claim under Policy No. 01-425-57-41 and effective from June 30, 2015 to June 30, 2017.

26. The amount and source of any funds the City and/or WRCOG recovered or received as reimbursement relating to the allegations in the Complaint, including any restitution paid in connection with any criminal or civil action against any party allegedly responsible for the loss alleged in the Complaint.

27. The factual basis for Your allegation in Paragraph 20 of the Complaint that "During the time period the Kapanicas administration worked for the City, they exercised pervasive control over all or nearly all of the City's critical functions, preventing the City Council from discovering their schemes and wrongdoing."

28. The factual basis for Your allegation in Paragraph 46 of the Complaint that "ULC principles (Egger, Dillon, and Moorjani) overbilled the City or otherwise stole or embezzled in excess of $58,000,000 through a number of schemes, including falsifying invoices, and fraudulently seeking payment for work performed by third parties by submitting invoices indicating the work had been performed by ULC staff."

Exhibit 10
Page 14 of 17

29. The amount of any damages the City claims in this lawsuit and computation of such damages.

30. The amount of attorney's fees paid by the City in connection with this lawsuit.

31. WRCOG's action against the City, findings in that action, the settlement of that action and the City's assignment in favor of WRCOG.

32. How and when the City Council first learned of any dishonest conduct alleged in the Claim.

33. How and when James Gregg first learned of any dishonest conduct alleged in the Claim.

34. How and when Alan Kapanicas' learned that ULC submitted inflated or fraudulent invoices.

35. How and when the City Council first learned that ULC submitted ULC inflated or fraudulent invoices.

36. How and when James Gregg first learned that ULC submitted ULC inflated or fraudulent invoices.

37. The name and position of any individuals involved in the decision to pursue the Claim, and that approved the submission of the Claim.

38. The termination of the City's relationship with Alan Kapanicas, including any notice of potential discipline and correspondence relating to such notice.

39. Any correspondence between the City and National Union about the City's insurance claim.

40. National Union's requests for information and the timing and substance of the City's responses to those requests.

Exhibit 10
Page 15 of 17

41. Any Form 700s by the Principals, Mr. Gregg, Ms. Gibbs, and City Council members during the Relevant Period.

42. Any communications from or by any members of the Beaumont Citizens for Responsible Growth to the City or the City Council.

43. The City's knowledge of the content of any websites published by the Beaumont Citizens for Responsible Growth.

44. The City's knowledge of any lawsuits between the Beaumont Citizens for Responsible Growth and ULC, and the results of any such lawsuits.

45. The identity of any attendees of any meetings of the City Council discussing whether the Principals had a conflict of interest or violated California Code 1090.

46. The issuance, substance and circulation of any audits by Moss Levy & Hartzheim and reports issued in connection with such audits.

47. Any communications with the Inspector General for the U.S. Department of Commerce (including draft audit report STL-14258-1/July 2001 and any response thereto), including the identity of anyone who drafted, reviewed or approved the response.

48. The communication of any allegation that the Principals had a conflict of interest or violated California Code 1090 to the City Council or any other person associated with the City that had any responsibility for risk management, the purchase of insurance or presentation of any insurance claims.

49. The City Council's receipt of, discussions about, and approval of any Capital Improvement Plans during the Relevant Period.

50. Any budget summaries contained in any Capital Improvement Plans provided to and/or approved by the City Council during the Relevant Period.

Exhibit 10
Page 16 of 17

51. Any discussions with the Principals about any Capital Improvement Plans (including budget summaries contained therein) provided to and/or approved by the City Council during the Relevant Period.

Exhibit 10
Page 17 of 17