# EXHIBIT 17

```
┌─────────────┐
│  EXHIBIT    │
│             │
│     28      │
│  _____  │
└─────────────┘
```

August 20, 2001

David Sheppard, Acting Regional
  Inspector General for Audits
Office of Inspector General
U.S. Department of Commerce
915 Second Avenue, Room 3062
Seattle, Washington   98174

      Re:    Draft Audit Report No. STL-14258-1-XXXX/July 2001

|  |  |
|---|---|
| Recipient: | Beaumont Redevelopment Agency, Beaumont, California |
| Award No.: | EDA Award No. 07-01-04112 |
| Funding Agency: | Economic Development Administration |

Dear Mr. Sheppard:

I am responding to your letter of July 25, 2001 to me, Roger Berg, the Mayor of the City of Beaumont, advising the City of its opportunity to review the above-referenced draft audit. Pursuant to that notice, we wish to report that the draft report contains several errors which we describe more fully below. We also disagree with the two recommendations set forth on pages 8 and 11 of the draft report. Although it is not clear, we believe we agree with the third recommendation set forth on page 13 of the draft report.

A.    <u>Introduction</u>

Most, if not all, of the errors relate to several important facts taken out of context. Because it appears that the Office of Audits does not possess all of the facts, it is important to have a complete understanding of this five-year long project. When placed in context, the errors set forth in the draft report will become apparent.

Exhibit 17
Page 1 of 10

BEAUAIG0008399

David Sheppard, Acting Regional
  Inspector General for Audits
Page 2
August 20, 2001


B.Factual Summary

Although the grant was awarded in June 1996, the story begins in 1993. As of March of that year, the City had been without full time department heads and staff capable of providing the technical and professional urban planning, environmental, and economic development services needed by the City. As a result, unlike most other communities in Riverside County, the City was unable to take advantage of many opportunities for growth, especially jobs growth. Fundamentally, the City lacked a comprehensive infrastructure expansion and maintenance program to support industrial growth.

California law gives cities specific statutory authority to contract for services for financial, economic, accounting, engineering or legal or administrative matters (California Government Code, Sections 37103 and 53060). Exercising its authority, the City Council authorized, on September 28, 1992, the issuance of a Request for Qualifications for Master Urban and Infrastructure Planning, Financing and Environmental Impact Analysis (see Exhibit "1", Agenda and Minutes of City Council meeting of September 28, 1992). Six firms responded. On March 22, 1993, the City Council awarded a contract to Urban Logic Consultants, Inc. to provide public works, planning and economic development services to the City (see Exhibit "2", Council Minute Order and Contract dated March 22, 1993). Compensation for such services includes a flat monthly rate for the performance of routine administrative duties (e.g., maintaining regular office hours in City Hall, attending City meetings, providing clerical staffing and processing routine planning, engineering and development matters). All other services are authorized by the City Council. Thus, it is the City's practice and procedure, and the City Council's expectation, that upon Council approval of a project and funding therefor, Urban Logic, as City staff, has the authority it needs to implement the project. The rail project is an example of this process, as more fully explained below.

Pursuant to the contract with Urban Logic, the City has a Planning Director (Mr. Ernest Egger), a Director of Public Works (Mr. Dee Moorjani) and a Director of Economic Development (Mr. David Dillon), each with his own clerical support. In addition to providing routine services, each Director is charged with the responsibility of performing specific tasks, from time-to-time. As a result of this contractual arrangement, the City of Beaumont has accomplished a variety of important projects, as listed on Exhibit "3". One of these projects includes the rail project that is the subject of the above-referenced grant.

The primary project beneficiary identified in the grant application is Dura Plastic Products, Inc. In 1995, Dura Plastic advised the City of plans to expand its business, which plans included the relocation of the business to another community. Facing the loss of its largest employer, the City

Exhibit 17
Page 2 of 10

BEAUAIG0008400

David Sheppard, Acting Regional
 Inspector General for Audits
Page 3
August 20, 2001

offered Redevelopment Agency assistance, which included a cooperative effort to obtain rail service from the adjacent railroad.  As that cooperative effort proceeded, the Beaumont City Council processed and approved Dura Plastic's expansion plans (Exhibit "4", Minutes of the City Council meeting of January 27, 1998).  As a result, Dura Plastic expanded its factory from nearly 150,000 square feet to nearly 300,000 square feet and added 200 employees.  Dura Plastic's expansion was completed in 2000.

As the first step to obtain rail service for Dura Plastic, the Redevelopment Agency approved the preparation and submittal of the grant application, and the Agency and the City amended the Capital Improvement Plan for the 1995-96 Fiscal Year to include the rail project (see Staff Report and Resolutions dated August 14, 1995, Exhibit "5").[1]  The grant application was filed shortly thereafter.  In addition to the construction of a rail spur to serve Dura Plastic, the application proposed improvements to the City's sewer system to better serve the City's industrial zone.  At the time the application was submitted, no specific plans or designs for the rail project existed; the project was in its conceptual stage, as noted in the draft audit report at page 2.

As originally drawn, the rail project plans included the acquisition of a small parcel of land from Dura Plastic adjacent to the railroad, upon which to locate a "Team Track" proposed to serve other industries in the City not contiguous to the railroad (see plat map, Exhibit "7A").

For purposes of the audit, it is important to understand the concept of a "Team Track".  A significant portion of the draft audit report utilizes a faulty description of the concept which, in turn, leads to an erroneous recommendation.

Industry can be served by railroads in at least two important ways:  direct service to industry adjacent to the railroad right-of-way and by means of a "Team Track", a centrally-located railroad spur that is available for general public use upon coordination with the railroad.  (See Union Pacific Railroad letter dated August 15, 2001, defining Team Track, Exhibit "8").  Importantly, a Team Track is NOT defined by its amenities.  A Team Track is simply a public point of access to railroad transportation; it provides a place for loading and off-loading railroad cars by (usually) industrial users who do not enjoy railroad frontage.  Team Tracks will consist of varying amenities.  Some Team Tracks offer paved surfaces (for example, Los Angeles, Indio) and others gravel (Beaumont, Fontana, Cabazon).  Some have security fencing (Los Angeles), and some do not (Indio, Fontana, Cabazon).  Others have lighting (Los Angeles), while still others do not (Cabazon, Fontana).  All of these Team Tracks are located on Railroad right-of-way.

---

[1] Since 1995, the City Council regularly reauthorized and approved funding for the rail project, as reflected in the Council's Resolutions included in Exhibit "6".  In accordance with City Procedures, City staff was thereupon authorized to expend the funds necessary to implement the Council's action.

Exhibit 17
Page 3 of 10

BEAUAIG0008401

David Sheppard, Acting Regional
 Inspector General for Audits
Page 4
August 20, 2001

In early 1998, the plans were submitted to EDA and to the Union Pacific Railroad for review and approval. By letter dated March 30, 1998 the EDA approved the plans (Exhibit "9A"), but the Railroad wanted the plans revised to reflect a project it was about to implement through the City of Beaumont, namely, the construction of a new main line. As a result of the Railroad's requirements, the plans were revised to reflect (among other changes) the addition of 4,000 feet of rail spur. The new design was submitted to EDA, and by letter dated November 24, 2000, EDA approved the redesign (Exhibit "9B").[2]

The new design, as compared to the old design (see Exhibit "7B") substantially increased the economic benefits of the project without increasing its total cost. As reconfigured, the longer rail spur would not only serve Dura Plastic, but serve an additional 50 parcels, totalling 22.5 acres. Where, formerly, the City had only one parcel served by direct rail access, it now has a substantial marketing tool to attract new industries to the City (see industry correspondence and news articles, Exhibit "10").

In order to remain within budget, and despite the additional 4,000 feet of rail spur, the project budget was reallocated. Some of the cost savings was realized in the deletion of Team Track amenities, such as the raised loading platform. Since all Team Track improvements would be no higher than ground level, security fencing and lighting to protect against unauthorized access to the raised loading platform would be unnecessary. Deletion of these amenities funded the longer rail spur, but the Team Track remains.

Additional project savings were realized in the successful negotiation of the use of the Railroad right-of-way for the Team Track. The Railroad's motivation lay in the promise of increased revenues, because this Team Track is the only such facility for miles in either direction (the nearest facility is 13 miles to the east, in Cabazon, and 30 miles to the west in Fontana (Exhibit "8"). Utilizing Railroad right-of-way eliminated the need to acquire privately-owned property at a cost of $270,000.00. That, in turn, further increased the economic benefit of the project, since the purchase of private property would have removed it from the tax roll and eliminated any possibility of its development by private industry and the creation of new jobs.

Construction of the revised rail project was completed in July, 2001 and was marked by a well-attended public dedication ceremony. Shortly thereafter, the Final Acceptance Report (of construction) was recorded in the office of the County Recorder of the County of Riverside (Exhibit "11").

---

[2]Contrary to the "Source" note on Appendix A-1, page 1 of 1 of the Draft Audit Report, the revised rail project plans were actually received by EDA in 2000, as Exhibit 9B reflects.

Exhibit 17
Page 4 of 10
BEAUAIG0008402

David Sheppard, Acting Regional
 Inspector General for Audits
Page 5
August 20, 2001

Although there are many more details, the foregoing description of the City's arrangement with Urban Logic and the evolution of the City's rail project, serves to place the issues raised in the draft audit report back into context. With that, we now turn to the errors we have found in the report.

    C.    <u>Beaumont's Comments Regarding Draft Report "Findings and Recommendations"</u>

        1.    <u>"Finding and Recommendation" No. 1: "The Current Rail Project Is An Impermissible Change Of Scope And Should Be Terminated."</u>

This recommendation is based entirely on (1) the erroneous premise that one amenity of the Team Track, the raised loading dock conceptually proposed in the original grant application, was not retained when the project was revised and, therefore, the economic benefits of the Team Track will not be realized, and (2) the factually-unsupported, speculative, observation that, because the Team Track will be located on Railroad property, "local industries may not have free access . . .". The recommendation is draconian: the de-obligation of $623,484.00.

The findings are erroneous because they do not accurately characterize the facts. The true facts are:

    a.    The number of primary project beneficiaries increased from one to fifty (see <u>Exhibit "7"</u>);

    b.    The Team Track was built and is now in operation (see <u>Exhibit "11"</u>);

    c.    A raised loading dock is not a "Team Track" but an amenity that can be added at a later date. Rather than off loading trucks onto the platform and into the railroad cars (and vice versa), trucks off-load directly into the railroad cars (and vice versa) (<u>Exhibit "8"</u>; see also City Attorney's letter, <u>Exhibit "15"</u>);

    d.    The Team Track is the property of the City of Beaumont and is located pursuant to a right-of-way agreement with the Railroad which, in turn, derives an economic benefit from the Team Track's existence. There are no facts in existence to support the auditor's speculative observation that access to the Team Track is impaired (see legal opinions, <u>Exhibits "12" and "15"</u>).

Exhibit 17
Page 5 of 10

BEAUAIG0008403

David Sheppard, Acting Regional
 Inspector General for Audits
Page 6
August 20, 2001

Thus, neither the <u>scale</u> of the project, nor its <u>intent</u> (Section I, Paragraph 20.b of EDA's <u>Requirements for Approved Projects</u> manual) has been changed:

    a.    The scale of the project remains the same, since it still provides direct rail access to Dura Plastic and the Team Track. However, by revising the rail spur to accommodate the requirements of the Railroad, 49 more "primary project beneficiaries" can be counted. Contrary to the auditor's findings, the economic impacts of the project actually increased.

    b.    The intent of the project also remained unchanged, for the reasons previously expressed.

Lastly, Table 1 of the draft audit report is also in error. A corrected version of the Table is attached hereto as <u>Exhibit "13"</u>. Although there are a number of differences between the Tables, the primary difference is the correct characterization of the "Team Track" as something more than a "Loading Dock". Table 1 in the draft audit report conveys the erroneous impression that the loading dock <u>is</u> the Team Track and vice versa, leading to the erroneous contention that the deletion of the loading dock constitutes a deletion of the benefits of the Team Track which, in turn, constitutes a change in the scale and intent of the project, in violation of the <u>Requirements for Approved Projects</u> manual.[3]

To summarize, consideration of all of the facts of the project should lead to the following findings:

    a.    The rail spur was lengthened from about 1,000 feet to about 5,000 feet;

    b.    The number of primary project beneficiaries was increased from one to fifty;

    c.    The rail spur includes a Team Track owned by the City and located on Railroad property pursuant to a written right-of-way agreement which, in the opinion of legal counsel constitutes "good and merchantable title" in accordance with EDA Special Award Condition No. 6;

    d.    There is no evidence to suggest that industries will not have free access to the Team Track, or that the lack of a raised loading dock will preclude rail car loading and unloading.

---

[3]Another erroneous statement in the Draft Report concerns the allegation that "almost 40% of total costs incurred" were for consulting services (page 12, first sentence). In fact, the correct amount for such services was $369,490.83, representing 22.25% of the total cost of construction, $1,660,702.03.

Exhibit 17
Page 6 of 10

BEAUAIG0008404

David Sheppard, Acting Regional
 Inspector General for Audits
Page 7
August 20, 2001

    2.    <u>"Finding and Recommendation" No. 2: "City Staff Have A Conflict Of Interest In Managing The Project"</u>

As noted in our summary statement of the facts, our City has the authority to enter into contracts to carry out its functions, as opposed to hiring its own employees for such purposes (see City Attorney's letter, <u>Exhibit "15"</u>).

Also as noted above, the contract with Urban Logic Consultants, Inc. to provide public works, planning and economic development services to the City, was awarded in March 1993. In accordance with that contractual arrangement, Urban Logic provides Mr. Dillon as the City's Director of Economic Development, Mr. Moorjani as the City's Director of Public Works and Mr. Egger as the City's Planning Director, as well as their clerical support services. In addition, Urban Logic provides, from time-to-time, specialized services in a variety of forms, including the development of infrastructure financing programs (assessment districts, community facilities districts, etc.), community marketing programs, implementation of annexation and sphere of influence projects, the procurement of grants, loans and other sources of funding, and specific project administration.

All of the services provided by Urban Logic, by and through the City's Director of Economic Development, Director of Public Works and our Planning Director, come within the purview of the 1993 agreement.

In order to properly budget for each fiscal year, to meet audit requirements, and to assure the public that City funds are properly utilized, the City requires, and Urban Logic provides, routine documentation of expenditures incurred by Urban Logic to provide the aforementioned special project and non-routine services. An example of such documentation is attached as Appendix "C" to the draft audit report (two pages). The draft audit report erroneously characterizes such documentation as "contracts" upon which is based two erroneous conclusions: that the "contracts" were made without the benefit of City Council approval, and that the "award" of such "contracts" by Mr. Dillon, Mr. Moorjani or Mr. Egger to Urban Logic was a "conflict of interest" (because of the financial interest each Director has in Urban Logic).

The draft audit report is in error because there is only <u>one</u> contract involved in the rail project: the 1993 agreement between the City and Urban Logic Consultants, Inc., which authorizes all of the services provided by Urban Logic and its principals to the City. The prohibitions against conflicts of interest involving public officials are not violated if a public official has a financial interest in a contract <u>which has been entered into before the official assumes office</u>. Moreover, such contracts continue in force until their expiration.

Exhibit 17
Page 7 of 10

BEAUAIG0008405

David Sheppard, Acting Regional
 Inspector General for Audits
Page 8
August 20, 2001

The draft Audit Report is also in error in that it assumes that the City Council and its Redevelopment Agency did not approve funding and expenditures for the rail project, a portion of which compensated Urban Logic for its services. In fact, as Exhibit "6" reflects, the City Council and its Redevelopment Agency regularly visited the project and, at least annually, adopted resolutions approving funds and expenditures. In accordance with City procedures, City staff (including Urban Logic) was thereupon empowered to expend the authorized funds necessary to implement the Council's action.

The characterization of Urban Logic's documentation of expenditures for specialized, non-routine services as "contracts" between the City and its consultants is in error, and could only serve to discourage the continued preparation of such informative documentation.

To the extent that the City's consultant employs, from time-to-time, subcontractors to render specialized services, we note that the 1993 agreement authorizes Urban Logic to take such action on the City's behalf, in recognition of the fact that Urban Logic is not capable of providing all specialized services. We also note that the employment of such services does not violate California's competitive bidding laws (or federal procurement rules), both of which encourage the procurement of architectural/engineering professional services based primarily on qualifications.

Because conflict of interest rules have not been violated, we respectfully submit that the recommendations set forth in the draft audit report at page 11 is unsupported by any findings.

3.     "Finding and Recommendation" No. 3: "Consultant Contracts Were Unnecessary And Costs Are Out Of Control

The recommendation concerning this issue, set forth at the bottom of page 13 of the draft audit report, is unclear because it fails to specify the "costs associated with unfeasible rail project sites" or the amount in issue.

Nevertheless, the City is aware of the details concerning the allusion to such costs, which total $12,849.00, as more specifically described and explained on Exhibit "14". Because the record reflects that the City concurs with EDA's requirement to reimburse grant funds relative to work unrelated to the current rail project site, the City also concurs with the recommendation of the draft audit report to the extent that it is revised here:

Exhibit 17
Page 8 of 10

BEAUAIG0008406

David Sheppard, Acting Regional
 Inspector General for Audits
Page 9
August 20, 2001

> "Recommendation: we recommend that the Director of EDA's Seattle Regional Office require the grantee to refund the sum of $12,849.00, the amount of costs associated with unfeasible rail project sites."

D.   <u>Summary and Conclusion</u>

The City of Beaumont respectfully submits that the draft audit report is in error and, for that reason, we disagree with the recommendations:

1. The rail project, as constructed, does not constitute a change in the scope of the project as expressed in the grant application. Indeed, the economic benefits derived from the final project significantly exceed those which were originally proposed, and there is no evidence to indicate that such benefits will not be enjoyed in perpetuity;

2. There is no conflict of interest in the management of the project. Although City staff members are independent contractors, as opposed to employees, their contract predates the rail project. The documentation submitted by them to the City memorializing time and materials expenditures are not "contracts". The work performed by our staff was authorized under the 1993 agreement, including the as-needed retention of specialized subcontractors; and

3. The City has never disputed the reimbursement previously agreed to with EDA for work performed on unfeasible rail project sites. The draft audit report is in error in suggesting otherwise.

Therefore, the City of Beaumont respectfully requests that the draft audit report be revised in accordance with the foregoing comments.

Very truly yours,

CITY OF BEAUMONT

By _____
   ROGER BERG, Mayor

Enclosures

cc:   A. Leonard Smith, Regional Director
      Economic Development Administrator
      U.S. Department of Commerce
      915 Second Avenue, Room 1856

Exhibit 17
Page 9 of 10

BEAUAIG0008407

David Sheppard, Acting Regional
 Inspector General for Audits
Page 10
August 20, 2001

       Seattle, Washington   98174

Exhibit 17
Page 10 of 10
BEAUAIG0008408