# EXHIBIT 19



August 16, 2019

**VIA EMAIL**
Ms. Jennifer Rocha
Complex Claims Director, Fidelity Bonds
Financial Lines Claims
AIG Property Casualty
175 Water Street, 5th Floor
New York, NY 10038
Jennifer.Rocha@aig.com

**VIA EMAIL**
Mr. Kenneth Watnick
Anderson McPharlin & Conners
707 Wilshire Blvd
Suite 4000
Los Angeles, CA 90017-3623
kdw@amclaw.com

Re:  Insured - City of Beaumont, California
     Employee Theft Claim
     Date of Discovery – May 17, 2016
     AIG Claim Number – 3409580528US
     HSNO File Number – 10022193
     **Supplemental Report**

Dear Ms. Rocha and Mr. Watnick:

This correspondence will serve to provide you with an updated status of our evaluation to date regarding the claims made by the City of Beaumont, California, for employee dishonesty, other fraud, and corruption.  This correspondence supplements our previous status report dated May 15, 2019 based on our meeting with the insured's forensic accountants, Hemming Morse, LLP ("Hemming Morse/HM") the insured's counsel, Best, Best & Krieger LLP ("BBK"), on July 11, 2019 in Walnut Creek, California, as well as additional discussions with AIG counsel.

The analysis performed by Hemming Morse appears to focus on Urban Logic Consultants (ULC) billing the City for professional subcontractor services in excess of the alleged limits imposed by the 1993 and 1994 service contracts and related amendments.  This allegation of overbilling was not asserted as part of the Stradling proof of loss.

As noted in our status report dated May 15, 2019, it was our understanding that the analysis performed by Hemming Morse asserted that billings by ULC to the City were limited to 4.5% of the costs incurred for the City's capital improvement projects, and that the amount of funds received by ULC far exceeds the allowed cap of 4.5%.  According to the Hemming Morse report, based on a billing cap of 4.5% of approximately $177,809,377 in capital improvement expenditures, ULC should not have billed the City more than approximately $8,000,000 over the period of 1993 through August of 2012.  Based on our discussions with Hemming Morse and BKK on July 11, 2019, it is now our understanding that the claim is based on billings in excess of $8,000,000.

Atlanta | Boston | Chicago | Dallas | Houston | Jersey City | London | Los Angeles | Mexico City | New York City
Newport Beach | Oakland | Philadelphia | Providence | Sacramento | Salt Lake City | San Francisco | Seattle | Stamford
647 Putnam Pike | Greenville, Rhode Island 02828 | Phone: (401) 949-8001 | www.HSNO.com

Exhibit 19
Page 1 of 9

NUFIC_002280

Ms. Jennifer Rocha and Mr. Kenneth Watnick
August 16, 2019
Page 2 of 7

The Hemming Morse report does "estimate" that 25% of the funds paid to ULC were not subject to the 4.5% cap. However, they did not provide any basis for the 25% "estimate," nor have they provided any support as to exactly what constituted the Time and Material services that were to be supplied by ULC that may have fallen within the 4.5% cap.

Although Hemming Morse estimates that approximately 25% of capital expenditures would not be subject to the 4.5% cap, it is unclear how they arrived at this estimate. Based on our review of the various Agreements, it appears that the 4.5% cap relates only to "Plan Checking and Construction Inspection" and "Public Works Construction Management" (Section V), excerpted as follows:

> *V. Plan Checking and Construction Inspection* (**Original September 1993 Agreement**)
>
> *The CONSULTANT shall provide all necessary plan checking and inspection services for public works projects in the City of Beaumont as follows:*
>
> *V-A. Plan Checking*
>
> *On behalf of the City, ULC, under the direction of the Director of Public Works, shall review the plans prepared by civil engineers and other appropriate professionals on behalf of the City or private development interests for compliance with the ordinances of the City. The Director of Public Works shall arrange reviews by other appropriate agencies having jurisdiction in such matters relative to the enforcement of relevant codes and compliance with UBC (Uniform Building Code, 1991) and Caltrans. Only when satisfied that all conditions of approval and the appropriate requirements of the City's codes and other relevant codes and standards have been met, the Public Works Director shall approve or recommend approval of plans as relevant.*
>
> *V-B. Construction Inspection*
>
> *On behalf of the City, ULC, under the supervision of the Director of Public Works, shall provide inspection services during all phases of construction to enforce compliance with codes and conditions of approval, provisions of the City ordinances, Uniform Building Code (1991) and other requirements set forth on the plans for which permits were issued for construction. In the performance of such duties, ULC shall provide inspection for each project during and after completion of various stages of construction to confirm compliance with approved plans.*
>
> *V.1 Public Works Construction Management* (**Added per April 1994 Amendment**)
>
> *On behalf of the City, ULC, under the supervision of the Director of Public Works, shall provide construction management services during all phases of public works construction to enforce compliance with codes and conditions of approval, provisions of the City ordinances, Uniform Building code (1991) and other requirements set forth on the plans and specifications for which permits are issued for construction. In the performance of such duties, ULC shall provide construction management for each public works project before, during and after completion of various stages of construction including the following services related to the planning, control, scheduling, estimating and value engineering of public works projects:*

Ms. Jennifer Rocha and Mr. Kenneth Watnick
August 16, 2019
Page 3 of 7

>   A. *Construction Management Services*
>
>   1. *Coordinate, receive, review and evaluate bids*
>   2. *Award bids, make appropriate recommendations, and prepare contracts*
>   3. *Manage, coordinate and inspect all work*
>   4. *Provide contract and subcontract coordination*
>   5. *Prepare and monitor construction schedules*
>   6. *Make adjustments to accommodate changing and unforeseen conditions*
>   7. *Prepare progress reports*
>   8. *Review and recommend progress payments*
>   9. *Obtain, review and evaluate shop drawings*
>   10. *Provide laboratory testing of materials as required and monitor test results*
>   11. *Evaluate quality and workmanship of construction*
>   12. *Maintain daily logs and records and such other services as are required to manage the work in accordance with City objectives*
>   13. *Schedule project meetings*
>   14. *Liaison with controlling agencies and design and construction engineers*
>   15. *Monitor and record correspondence between City contractors, subcontractors and design professionals*
>   16. *Prepare transmittals and labor reports*
>   17. *Provide labor and payroll compliance*
>   18. *Provide change order management and coordination*
>   19. *Provide plan interpretation as required*
>   20. *Administer extensions of time (force majeure delay) reports*
>   21. *Administer release and waivers of lien*

As discussed in our May 15, 2019 report, Subsection 4 of Section IX of the Agreement states that compensation for "Additional Services" set forth in Section VII "shall be in accordance with the Hourly Rate Schedule attached to this Agreement as Exhibit A, or based upon a negotiated fixed fee rate." We note that subsection 4 makes no reference to the 4.5% cap, or any such limit. However, Hemming Morse does not consider compensation for services performed pursuant to Section VII of the 1993 Agreement.

At the request of Counsel, we analyzed the ULC invoices in an attempt to identify the billings that may potentially relate to the Section V Construction Management tasks, and extrapolate the percentage of total ULC billings that may have been subject to the noted 4.5% cap. Based on our analysis of the ULC invoices, the descriptions of tasks are vague, and do not provide detailed explanations of the tasks performed. However, we only identified three billing titles which appear consistent with the construction management related duties noted above under Section V.; Construction Manager, Inspector, and Plan Checker.

As shown on Schedule 1, we analyzed ULC invoices from 2008 through 2012 and segregated the amounts billed for the noted timekeepers. Although Hemming Morse contends that approximately 25% of the amounts billed by ULC would not be subject to the 4.5% cap, billings for the noted construction management type timekeepers totaled only 13.82% of all billings

Ms. Jennifer Rocha and Mr. Kenneth Watnick
August 16, 2019
Page 4 of 7

from 2008 through 2012, indicating that as much as 86.18% of ULC billings may not have been subject to the 4.5% cap.

According to Exhibit B of the Hemming Morse report, the Hemming Morse compares ULC billings of $66,273,223, net of the estimated 25% not subject to the 4.5% limit, to $8,001,422 to calculate "Implied Overpayment" of $58,271,801.  The limit of $8,001,422 represents $177,809,377 in capital improvement expenditures multiplied by the noted 4.5% limit, as summarized below:

| Description | Amount | Comments |
|---|---|---|
| Total Billings | $74,938,238 | |
| Not Subject to 4.5% Limit | 8,665,014 | Based on estimated 25% (A) |
| Claimed Subject to 4.5% Limit | $66,273,224 | |
| Est. Cap. Ex. | $177,809,377 | |
| 4.5% of Cap. Ex. | 8,001,422 | |
| Claimed Implied Overpayment | $58,271,802 | |
| Note (A): Hemming Morse only applied 25% estimate to payments from the City, not from bond proceeds. | | |

Although Hemming Morse estimates that 25% of payments received by ULC from City of Beaumont funds would not be subject to the noted 4.5% cap, based on our analysis the actual amount that may or may not be subject to any such limit cannot reasonably be determined by Hemming Morse from the UCL invoices provided.  However, using our calculation of 86.18% based on timekeeper titles that mirrored the Section V construction management related duties, the potential amount that may not be subject to the noted 4.5% cap increases significantly.  The result is a potential implied overbilling of $2,357,181, as summarized below:

| Description | Amount | Comments |
|---|---|---|
| Total Billings | $74,938,238 | |
| Not Subject to 4.5% Limit | 64,579,635 | Based on 86.18% (Schedule 1) |
| Potentially Subject to 4.5% Limit | 10,358,603 | |
| Est. Cap. Ex. | 177,809,377 | |
| 4.5% of Cap. Ex. | 8,001,422 | |
| Potential Implied Overpayment | $2,357,181 | |

As discussed in our May 15, 2019 status report, Hemming Morse also contends that ULC was subject to a limitation of billing the City no more than 15% above the actual costs of any subcontractor costs.  However, based on our discussions with Hemming Morse and BBK on

Ms. Jennifer Rocha and Mr. Kenneth Watnick
August 16, 2019
Page 5 of 7

July 11, 2019, it is now our understanding that the Hemming Morse and BBK contend that ALL billings, regardless of the timekeeper status, are limited to the 4.5% cap. However, it seems inconsistent that there would be a cap on the billing of subcontractor's fees and that those same subcontractor costs would also be subject to an overall 4.5% cap on any capital improvement work.

It is our opinion that Hemming Morse has not substantiated what amounts billed by ULC were subject to a limit of 4.5% of capital expenditures, nor what services were limited to time and materials plus 15%. We leave any and all legal interpretation of the agreements between the City and ULC to counsel, including what, if any, services were subject to the noted limits.

Because the ULC invoices provided to the City do not explicitly state the work descriptions noted in Section V-A, Section V-B, Section V-1, and Section VII of the Agreement, it remains unclear how much of the time billed by ULC was attributed to those tasks subject to the 4.5% limits and those not subject to any limit. In fact, it is possible that the on-going billings from ULC to the City may relate more to the "additional services" covered by section VII of the agreements, which as noted above, are not subject to any billing cap.

As discussed in our May 15, 2019 status report, we previously identified and analyzed vendor invoices to ULC totaling $3,414,320 from 2008 through 2010. Due to the difficulty in identifying the surveyor services performed exclusively by subcontractors, we segregated all survey related billing descriptions and performed two calculations; one based on the ULC time and billing reports and one based solely on Dennis Janda, Inc. invoices.

Assuming that the 15% markup over actual cost incurred represents the amount that should have been billed to the City, total billings based on Dennis Janda, Inc. segregated invoices resulted in a potential overbilling of $1,605,735, and total billings including all survey crew invoices resulted in potential overbilling of $2,104,405. Compared to the actual ULC invoices analyzed of $21,846,497 for the comparable period, the potential overbillings of $1,605,735 represent approximately 7% of ULC billings to the City, and the potential overbillings of $2,104,405 represent approximately 10% of ULC billings to the City.

We then extrapolated these percentages over the 2004 through 2012 period, resulting in potential overbillings ranging from $4,469,678 to $5,857,762. However, these figures could be impacted by multiple factors, as noted below:

As previously explained, any extrapolation based on our analysis of the noted ULC invoices to the City and vendor invoices to ULC may be impacted by the following factors:

- This analysis is based on the documents that we identified as ULC subcontractor invoices within the voluminous document production. It is possible that other ULC vendors and their invoices were not provided or identified.

- Vendors such as LG Consulting, CHJ, Darrell L. Connerton, and Greg Russell did not begin billing until 2010, while others billed only prior to 2010

Ms. Jennifer Rocha and Mr. Kenneth Watnick
August 16, 2019
Page 6 of 7

- The percentage of markup from the subcontractor invoice rate to the ULC invoice rate varies drastically from vendor to vendor

- The total amount invoiced by subcontractors in 2010 was more than 228% of 2009 total billings, and more than 280% of 2008 total billings. As such, 2010 may not accurately represent what was billed prior to 2008.

- Because limited ULC payroll records for 2010 and 2011 were available for review by both HSNO and Hemming Morse, neither of us were able to confirm the actual ULC employees as opposed to subcontractors over the period tested. We confirmed with Hemming Morse that we have been provided with all available payroll records.

Summary

Based on our preliminary analysis of the Hemming Morse report and the documentation provided, to date, by BBK and Stradling, it appears that approximately 86.18% of ULC billings to the City of Beaumont may not have been subject to any limit as asserted by Hemming Morse and BBK. Where Hemming Morse estimates implied overpayments of $58,271,802 from 1993 through August of 2012, the ULC invoices do not provide sufficient descriptions of tasks performed in order to determine what was or was not subject to any contractual limits.

Based on our analysis of timekeeper descriptions, it appears that approximately 13.82% of billings ULC billings from 2008 through 2012 may have potentially been subject to a 4.5% limit under Section V of the 1994 Agreement. If in fact the 1994 Agreement was the governing document from 1993 through 2012, and it is determined that the timekeeper descriptions noted on Schedule 1 are consistent with the duties outlined in Section V, we would calculate a potential overbilling of $2,357,181.

As previously noted in our May 15, 2019 status report, it appears that ULC was utilizing subcontractors to perform certain professional services for the City of Beaumont, and those services were being billed to the City at rates charged by ULC for the same or similar professional services performed by their own employees. Hemming Morse has maintained that reimbursement for "Direct Services -professional sub-consultants" was to be billed by ULC at "actual cost plus 15%," per the service agreement with the City.

If it is determined that ULC should have billed the City of Beaumont the actual cost of subcontractors plus a 15% markup, then we estimate potential overbilling ranging from $4,469,678 to $5,857,762 for the period of 2004 through 2012. It remains unclear whether amounts billed for subcontractors at actual cost plus 15% markup would then also be potentially subject to the 4.5% limit. Please note that ALL asserted damages ULC billings to the City in their capacity as CONSULTANTS to the City, not as employees of the City.

Ms. Jennifer Rocha and Mr. Kenneth Watnick
August 16, 2019
Page 7 of 7

Please note that although Hemming Morse has relied exclusively on the 1993 and 1994 Agreements between the City and ULC, the contracts have not been fully vetted to determine what, if any, changes or side agreements were made with ULC between 1994 and 2012, and how this impacts who determined the claimed "overbilling," and at what point they came to that realization.

Pending direction from Counsel regarding the correct interpretation and application of the contract provisions, we tentatively estimate potential overbilling ranging from $2,357,181 to $8,214,943.

| Description | Amount |
|---|---|
| Potential Overbilling Based on 4.5% of Cap. Ex. Applied to Total ULC Billings | $2,357,181 |
| Potential Overbilling Based on 15% Vendor Markup - DJI Actual Invoices | $4,469,678 |
| Potential Overbilling Based on 15% Vendor Markup - Survey Crew Billings | $5,857,762 |
| Maximum Combined Overbilling - $2,357,181 + $5,857,762 | $8,214,943 |

As noted above, we leave the interpretation of the noted service agreement and the appropriateness of ULC's billing practices to counsel. Whether these findings constitute a covered cause of loss under any area of coverage we leave for your determination. As previously stated, our analysis is preliminary, tentative, and ongoing, and as such subject to revision as new information becomes available.

We have enjoyed being of service to you and hope the enclosed accounting information will be of assistance to you in the adjustment of this claim. If you have any questions or require any additional information, please do not hesitate to contact us.

Very truly yours,

**HAGEN, STREIFF, NEWTON & OSHIRO, ACCOUNTANTS, P.C.**
By:     Peter Fogarty, CPA, CFE, CFF
        Philip J. Segerson, CFE

Prepared for AIG and Counsel  
Re: City of Beaumont, California  
Date of Discovery: May 17, 2016

Schedule 1  
Page 1 of 2

## Analysis of "Section V" Potential Construction Management Billing Descriptions (A)

| Description | Invoice Amount | | | | | | % of |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | 2008 | 2009 | 2010 | 2011 | 2012 | Total | Total |
| **Billing Descriptions Potentially Subject to the "Section V" 4.5% Cap:** | | | | | | | |
| Const Manager | $489,323 | $257,985 | $283,260 | $185,100 | $249,825 | $1,465,493 | 4.42% |
| Inspector | 1,240,335 | 613,170 | 364,500 | 21,600 | 248,400 | 2,488,005 | 7.51% |
| Inspector - Prev Wage | | | 172,250 | 182,031 | 152,880 | 507,161 | 1.53% |
| Inspector (Overtime) | | | 7,553 | | | 7,553 | 0.02% |
| Plan Checker | 52,560 | | | 6,750 | 52,950 | 112,260 | 0.34% |
| Subtotal | 1,782,218 | 871,155 | 827,563 | 395,481 | 704,055 | 4,580,471 | **13.82%** |
| | | | | | | | |
| **Other Billing Descriptions Potentially Not Subject to "Section V" 4.5% Cap:** | | | | | | | |
| 1-Man Survey Crew | 187,320 | 56,440 | 97,200 | 5,040 | 6,080 | 352,080 | 1.06% |
| 1-Man Survey Crew - Prev Wage | | | 26,475 | 4,125 | 1,890 | 32,490 | 0.10% |
| 2-Man Survey Crew | 505,733 | 628,215 | 190,995 | 39,270 | 41,055 | 1,405,268 | 4.24% |
| 2-Man Survey Crew - Prev Wage | | | 298,165 | 58,358 | 68,557 | 425,080 | 1.28% |
| 3-Man Survey Crew | 7,020 | 251,550 | 24,180 | | | 282,750 | 0.85% |
| Associate Engineer | | | 1,028 | 45,313 | | 46,340 | 0.14% |
| CADD Technician | 9,200 | 16,960 | 50,318 | 60 | | 76,538 | 0.23% |
| CAL 216 - Relative Compaction | | | | 1,080 | | 1,080 | 0.00% |
| CAL 231 - Use of Nuclear Gauges | | | | 448 | | 448 | 0.00% |
| Exec Secretary | 191,763 | 122,925 | 224,135 | 15,660 | 73,350 | 627,833 | 1.89% |
| Engineering Geologist | 6,785 | 14,548 | 17,969 | | 10,695 | 49,996 | 0.15% |
| Soils Technician | 422,145 | 312,525 | 103,605 | 3,500 | 125,700 | 967,475 | 2.92% |
| Soils Technician - Prev Wage | | | 81,835 | 66,021 | 41,223 | 189,079 | 0.57% |
| Office Manager | 125,220 | 107,160 | 127,375 | 40,485 | 92,205 | 492,445 | 1.49% |
| One 24x36 color photo print | | | | | 29 | 29 | 0.00% |
| Planner | 7,300 | 5,000 | | 220 | 130 | 12,650 | 0.04% |
| Principal | 857,894 | 779,888 | 1,085,849 | 408,755 | 803,498 | 3,935,883 | 11.88% |
| Project Engineer | | | 233,475 | | | 233,475 | 0.70% |
| Project Manager | 4,500 | 5,850 | | | | 10,350 | 0.03% |

PRELIMINARY:  
FOR DISCUSSION PURPOSES ONLY



Exhibit 19  
Page 8 of 9

NUFIC_002287

Prepared for AIG and Counsel  
Re: City of Beaumont, California  
Date of Discovery: May 17, 2016  

Schedule 1  
Page 2 of 2  

## Analysis of "Section V" Potential Construction Management Billing Descriptions (A)

| Description | Invoice Amount | | | | | | % of |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | 2008 | 2009 | 2010 | 2011 | 2012 | Total | Total |
| Project Manager/Engineer | 359,213 | 43,950 | 604,630 | | 1,458,388 | 2,466,180 | 7.44% |
| Project Mgr./ Sr. Engineer | | | | | $1,700 | $1,700 | 0.01% |
| Public Works Dept. | | | | | 1,920 | 1,920 | 0.01% |
| Sr Assoc/Eng | $1,662,525 | $1,372,463 | $1,479,353 | | | 4,514,340 | 13.62% |
| Sr. Designer II | 47,580 | 12,240 | 7,035 | $1,238,738 | 925,503 | 2,231,095 | 6.73% |
| Sr. Asso/Eng. | | | | 1,762,145 | 1,127,610 | 2,889,755 | 8.72% |
| Sr. Planner | 238,350 | 235,500 | 289,678 | 52,955 | 177,970 | 994,453 | 3.00% |
| Staff Engineer | 689,819 | 510,103 | 449,425 | 61,600 | 369,408 | 2,080,354 | 6.28% |
| Staff Engineer - Prev Wage | | | 130,260 | | | 130,260 | 0.39% |
| Surveyor | 958,238 | 809,513 | 842,888 | 196,286 | 737,663 | 3,544,586 | 10.70% |
| GIS/CADD Technician | 80,200 | 74,780 | | | | 154,980 | 0.47% |
| Tech/CADD Specialist | | | 32,310 | | | 32,310 | 0.10% |
| Technician | 8,200 | | | | | 8,200 | 0.02% |
| Technician/Drafter | 34,560 | | | | | 34,560 | 0.10% |
| (blank) | 8,409 | 7,803 | 188,000 | 121,906 | 4,375 | 330,493 | 1.00% |
| Subtotal | 6,411,971 | 5,367,411 | 6,586,180 | 4,121,964 | 6,068,946 | 28,556,472 | **86.18%** |
| Total | $8,194,189 | $6,238,566 | $7,413,742 | $4,517,445 | $6,773,001 | $33,136,943 | 100.00% |

Notes:  
(A) Because the ULC invoices provided to the City do not explicitly state the work descriptions noted in Section V-A, Section V-B, Section V-1, and Section VII of the Agreement, this analysis is based solely on the timekeeper descriptions that appear consistent with the duties listed in Section V. We leave any and all legal interpretation of the agreements between the City and ULC to counsel.

PRELIMINARY:  
FOR DISCUSSION PURPOSES ONLY



Exhibit 19  
Page 9 of 9

NUFIC_002288