# EXHIBIT 28

EXHIBIT 28
PAGE 1

Page 1

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| WESTERN RIVERSIDE COUNCIL OF GOVERNMENTS, a California Joint Powers Authority; CITY OF BEAUMONT, a public entity in the State of California, Plaintiffs, vs. NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA; and DOES 1 through 50, inclusive, Defendants. | Case No. 5:20-cv-02164 GW (KKx) |

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

VIDEOTAPED REMOTE 30(b)(6) DEPOSITION OF

ELIZABETH GIBBS

May 24, 2022

9:03 a.m.

Beaumont, California

Karen Aligo, CSR No. 13418



EXHIBIT 28
PAGE 2

Page 14

1  Q. Have you ever reviewed any declarations
2  that have been produced in this lawsuit?
3  A. No.
4  Q. You mentioned, earlier, that you reviewed
5  correspondence between the plaintiffs and the
6  defendants.
7      Was that correspondence that's been
8  exchanged between the parties since the filing of
9  this lawsuit?
10  A. I don't recall the exact dates. They were
11  letters between the two parties on their respective
12  letterheads. And then I also reviewed the crime
13  loss report that was initially submitted back in
14  2016.
15  Q. Did you review any correspondence from
16  National Union Fire Insurance Company of Pittsburgh,
17  PA, or from AIG?
18  A. Yes. I don't recall who actually signed
19  the letters, but they were definitely from the
20  defendant.
21  Q. Did you review e-mails that were exchanged
22  from employees of AIG with the City of Beaumont?
23  A. No.
24  Q. The extent of the correspondence that you
25  reviewed between the parties is letters?

Page 15

1  A. Yes.
2  Q. You did not review any e-mails; is that
3  correct?
4  A. Not that I recall, no, unless they were
5  cover e-mails with the letters attached.
6  Q. The correspondence that you reviewed
7  between the parties, was that correspondence that
8  was exchanged after the City submitted its notice of
9  claim to AIG?
10  A. Yes.
11  Q. And did those letters detail the parties'
12  analysis of the claim that was being advanced by the
13  City of Beaumont?
14  A. What I recall reading was requests from the
15  defendant for more information.
16  Q. And those were requests from the insurance
17  company to the City for additional information,
18  correct?
19  A. Yes.
20  Q. Did you also review correspondence that
21  reflected the City's production of information and
22  documents to the insurance company in response to
23  the insurance company's requests?
24  A. Yes, I believe so.
25  Q. So you're aware that the City of Beaumont

Page 16

1  produced nearly half a million documents to the
2  insurance company for the insurance company to
3  review as part of its analysis of -- of the City of
4  Beaumont's claim, correct?
5  A. I don't recall how many pages. I know -- I
6  know it was a lot.
7  Q. And when you say "a lot," are you able to
8  give any quantification to that?
9  A. No. I -- the correspondence that I read
10  was just -- if I recall correctly, it was,
11  basically, stating that we have produced documents
12  for their review.
13  Q. And those documents totalled hundreds and
14  thousands of pages, correct?
15  A. I don't recall. I don't know a number.
16  Q. Do you know how many documents or how many
17  pages of documents the City provided to the
18  insurance company to review?
19  A. I know it was tens of thousands of pages.
20  Q. The City's production of documents to the
21  insurance company, that was a rolling production,
22  correct?
23  A. I don't know.
24  Q. Do you have any information or knowledge
25  regarding the timing of the City's production of

Page 17

1  documents to the insurance company?
2  A. No. I know that the City complied with
3  every request.
4  Q. Are you able to provide any testimony
5  regarding the timeliness of the documents that were
6  produced by the City to the insurance company?
7  A. No, but I -- I know that we provided
8  everything that's been asked for.
9  Q. Did the City ever provide an amended proof
10  of loss to the insurance company?
11  A. I haven't reviewed that.
12  Q. As you sit here today, do you have any
13  information or knowledge regarding whether the City
14  provided an amended proof of loss to the insurance
15  company?
16  A. I understand that we did, but I have not
17  reviewed it.
18  Q. When did the City provide an amended proof
19  of loss to the insurance company?
20  A. I don't have that date.
21  Q. What additional or new information was
22  provided in that amended proof of loss?
23  A. Additional -- additional information on the
24  crimes that were committed that were uncovered.
25  Q. You mentioned that you reviewed contracts

Page 18

1  to prepare for this deposition. What contracts did
2  you review?
3      A. Contracts involving the City and Urban
4  Logic, and contracts involving the City and GG --
5  GGMS.
6      Q. Did you review any bond documents to
7  prepare for the deposition?
8      A. No, I did not.
9      Q. Did you review any invoices submitted by
10 Urban Logic Consultants to prepare for the
11 deposition?
12     A. Yes. There were some samplings.
13     Q. So you did review samplings of Urban Logic
14 invoices to prepare for this deposition?
15     A. Yes.
16     Q. Which invoices did you review?
17     A. I don't recall the invoice numbers.
18     Q. How many did you review?
19     A. Dozens.
20     Q. During what time period were those invoices
21 from?
22     A. Prior to -- I don't know the specific
23 dates, but it was prior to me being interim city
24 manager.
25     Q. Are you able to provide any additional

Page 19

1  information regarding the time frame of those Urban
2  Logic invoices that you reviewed to prepare for this
3  deposition?
4      A. No.
5      Q. Did you review any of the documents related
6  to the criminal indictments and plea agreements that
7  were entered into by the Urban Logic Consultants
8  principals?
9      A. No, I did not.
10     Q. Did you review any documents related to the
11 lawsuit that was filed by Western Riverside Council
12 of Governments against City of Beaumont?
13     A. Can you repeat that? I had background
14 noise.
15     Q. Did you review any of the documents related
16 to Western Riverside Council of Governments' lawsuit
17 against the City of Beaumont?
18     A. No.
19     Q. Did you review the insurance policies that
20 my client, National Union, issued to City of
21 Beaumont?
22     A. No.
23     Q. So other than the court documents,
24 correspondence, contracts, and invoices that you've
25 mentioned, you've not reviewed any other documents

Page 20

1  to prepare for the deposition; is that correct?
2      A. Correct.
3      Q. And who selected the documents that you
4  reviewed to prepare for the deposition?
5      A. Myself and my attorney.
6      Q. And when you say "my attorney," who are you
7  referring to?
8      A. Peter Nolan.
9      Q. Did you meet with Mr. Nolan to prepare for
10 the deposition?
11     A. Yes.
12     Q. Did you meet with any other attorneys to
13 prepare for your deposition today?
14     A. Yes. Mr. Dunn and Mr. Deal.
15     Q. When did you meet with Mr. Dunn and
16 Mr. Deal to prepare?
17     A. I don't recall the exact dates. They were
18 in the last few weeks, and I know they were on
19 Thursdays.
20     Q. How many times did you meet with Mr. Dunn
21 or Mr. Deal to prepare for your deposition?
22     A. Mr. Dunn was once, and Mr. Deal was three
23 times.
24     Q. How many times did you meet with Mr. Nolan
25 to prepare for the deposition?

Page 21

1      A. Four times.
2      Q. And your meetings with Mr. Nolan, did they
3  happen at the same time that you met with either
4  Mr. Dunn or Mr. Deal?
5      A. All but one.
6      Q. Did you speak with anyone else, other than
7  the attorneys that you've identified, to prepare for
8  the deposition?
9      A. No.
10     Q. Did you interview or have conversations
11 with any former or current employees of the City
12 other than the City's lawyer?
13     A. No.
14     Q. Did you speak with any former city council
15 members to prepare for the deposition?
16     A. No.
17     Q. I'm going to show you Exhibit 2.
18         (Exhibit 2 marked for identification.)
19 BY MS. VANDERWEELE:
20     Q. Exhibit 2, for the record, is Plaintiffs
21 Western Riverside Council of Governments and City of
22 Beaumont's Response to First Set of Interrogatories.
23 Are you able to see this document, ma'am?
24     A. Yes.
25     Q. And this is a -- the plaintiffs' answers to

Page 22

1  interrogatories. Is this one of the documents that
2  you reviewed to prepare for the deposition?
3      A. Yes.
4      Q. Is the information that's contained in the
5  plaintiffs' responses in this document, are those
6  responses accurate and up to date?
7      A. No, I'm sorry, say that again.
8      Q. Is the information that's contained in the
9  plaintiffs' responses, which are contained in
10 Exhibit 2, is that information accurate and up to
11 date?
12     A. Yes, unless there was an amendment filed.
13     Q. Did you have any involvement in preparing
14 the plaintiffs' responses that are contained in
15 Exhibit 2?
16     A. No.
17     Q. Are you able to provide any testimony
18 regarding how this document was prepared?
19     A. No.
20     Q. Are you able to provide any testimony
21 regarding how the information contained in this
22 document was verified by the City?
23     A. I understood -- and it may have been a
24 declaration, but I understood that Mr. Parton signed
25 a declaration. I don't know the term, the legal

Page 23

1  term, but it was an extensive and exhaustive
2  process.
3      Q. And how do you know that?
4      A. I understood that from my attorney.
5      Q. Okay. And I guess I should have prefaced
6  this at the beginning. I -- if I ask you any
7  question today that would require you to divulge
8  information that you've learned from your attorney,
9  that's privileged, and I -- and I don't want to know
10 that information. So if I do ask you a question --
11     A. Okay.
12     Q. -- that would require you to tell me
13 something you've learned from the attorneys in this
14 lawsuit for the City, just let me know, and I'll --
15 and I'm happy to move on to the next question, okay?
16     A. Okay.
17     Q. Did you ever speak to Todd Parton about the
18 process by which he verified the information
19 contained in Exhibit 2?
20     A. No.
21     Q. Todd Parton, he's the former city manager
22 of Beaumont; correct?
23     A. Yes.
24     Q. The City has terminated its relationship
25 with Mr. Parton, correct?

Page 24

1      A. The City entered into a settlement
2  agreement with Mr. Parton.
3      Q. Why did the City enter into a settlement
4  agreement with Mr. Parton?
5      A. It's -- it's outlined in the settlement
6  agreement.
7      Q. Have you reviewed that settlement
8  agreement?
9      A. No, I have not.
10     Q. Are you able to say -- strike that.
11        Are you able to provide any testimony as to
12 why Mr. Parton entered into a settlement agreement
13 with the City?
14     A. No.
15     Q. Given the fact that you haven't spoken to
16 Mr. Parton about the method by which he verified the
17 information in this document, you're not able to
18 provide any testimony regarding how it is that
19 Mr. Parton, on behalf of the City, confirmed that
20 the information in this document is accurate,
21 correct?
22     A. Correct.
23     Q. Other than Mr. Parton, do you know who else
24 from the City was involved in gathering information
25 to respond to the interrogatories contained in

Page 25

1  Exhibit 2?
2      A. No.
3      Q. When you reviewed Exhibit 2 to prepare for
4  the deposition, did you see anything that you felt
5  needed to be changed, amended, or revised?
6      A. I'd have to look through the document now.
7      Q. As you sit here today, are you able to
8  recall anything that you saw, when you reviewed this
9  document to prepare for the deposition, that you
10 felt needed to be changed, reviewed, or revised?
11     A. I don't recall.
12     Q. I'm going to show you Exhibit 3.
13        (Exhibit 3 marked for identification.)
14 BY MS. VANDERWEELE:
15     Q. Exhibit 3, for the record, is Plaintiffs
16 Western Riverside Council of Governments and City of
17 Beaumont's Supplemental Response to First Set of
18 Interrogatories. Have you seen this document
19 before?
20     A. Yes.
21     Q. Is this one of the documents you reviewed
22 to prepare for your deposition today?
23     A. Yes.
24     Q. Based on your review of this document, do
25 you believe the information contained in Exhibit 3

Page 34

1  Q. The city council responds to issues of the
2  community, correct?
3  A. No. City council only has authority as a
4  public body at city council meetings.
5  Q. Hold on one second. I want to post an
6  exhibit.
7  I'm going to show you what we'll mark as
8  Exhibit 7.
9  (Exhibit 7 marked for identification.)
10 BY MS. VANDERWEELE:
11 Q. Exhibit 7 is the beaumontca.gov website,
12 correct?
13 A. Correct.
14 Q. And do you see -- I'll zoom in. There's a
15 section about mayor and city council on this web
16 page, correct?
17 A. Yes.
18 Q. And I want to direct your attention to --
19 I'll try to highlight it here. The sentence in the
20 second paragraph that talks about "the city council
21 responds to issues and concerns of the community,"
22 do you see that?
23 A. I see it.
24 Q. And according to a website published by
25 Beaumont, "the city council responds to issues and

Page 35

1  concerns of the community by allocating resources,
2  developing policies, and formulating strategies that
3  support the vitality and economic viability of the
4  City," correct?
5  A. That's what it says.
6  Q. And that's true, correct?
7  A. They don't directly respond to the public.
8  They direct the city manager to implement their
9  decisions. That -- that word "respond" is not
10 accurate. They don't directly respond to issues and
11 concerns of the community.
12 Q. So information that's contained on a
13 website published by the City of Beaumont is
14 inaccurate; is that what you're telling me?
15 A. I would choose another word besides
16 "respond."
17 Q. So it's your testimony that the city
18 council for Beaumont does not respond to issues and
19 concerns of the community?
20 A. Not directly to the public. They only have
21 authority when they're in a group as a legislative
22 body.
23 Q. The city council appoints a city manager,
24 correct?
25 A. Yes.

Page 36

1  Q. And the city manager serves at the pleasure
2  and direction of city council, correct?
3  A. Correct.
4  Q. The city council, I believe in 1965,
5  adopted a municipal code, correct?
6  A. I don't know when the first municipal code
7  was adopted. I'd have to look at the ordinances.
8  Q. The municipal code, regardless of which
9  year it was adopted, it was adopted and approved by
10 city council, correct?
11 A. Yeah. All ordinances are, yes.
12 Q. And the municipal code sets forth the
13 duties and responsibilities of city manager and
14 other city officials, correct?
15 A. Correct.
16 Q. And those duties and authority for city
17 manager and city officials were all approved and
18 adopted by the city council, correct?
19 A. Correct.
20 Q. The City of Beaumont does not have a
21 separate risk management department; is that
22 correct?
23 A. That's correct.
24 Q. Has the City ever had a separate risk
25 management department?

Page 37

1  A. No.
2  Q. My understanding, pursuant to the municipal
3  code and resolutions passed by the city council, the
4  city manager for Beaumont has a set spending
5  authority. Is that correct?
6  A. That is correct, yes.
7  Q. And in 2011 what was the spending authority
8  limit for the city manager?
9  A. I believe it was $10,000.
10 Q. Any purchase made by the City over $10,000
11 had to be approved by city council, correct?
12 A. Any purchase over $10,000 should have been
13 approved by the city council.
14 Q. If the purchase of insurance for the City
15 was greater than $10,000, that needed approval by
16 the city council, correct?
17 A. It should have been, yes.
18 Q. Do you believe that the city council had no
19 knowledge of the insurance that it purchased from my
20 client, National Union?
21 A. I can't speak to city council's knowledge
22 at the time.
23 Q. And is that true, for the entire time
24 period between 1993 and 2015, you're not able to
25 provide any testimony regarding what city council

Page 38

```
 1  members knew, correct?
 2      A. Correct, unless it was discussed in an open
 3  meeting.
 4      Q. Well, you didn't interview any city council
 5  members to prepare for this deposition, correct?
 6      A. Correct.
 7      Q. And so -- what city council members knew,
 8  at certain times, between 1993 and 2016, as you sit
 9  here today, you're not able to provide any testimony
10  about that, correct?
11      A. Correct.
12      Q. The approval of payments to the City's
13  vendors and contractors, I want to talk about that.
14         It's my understanding that warrant lists
15  are provided to the city council, and those warrant
16  lists need to be approved and passed at city council
17  meetings. Is that correct?
18      A. Yes.
19      Q. And has that been true since at least 1993?
20      A. There was a time frame where payments to
21  contractors and consultants, through the bond
22  trustees, were not presented to city council for
23  approval. Just the general fund check register was
24  presented to counsel for approval.
25         Another --
```

Page 39

```
 1      Q. I'm sorry. Continue.
 2      A. Another check register was payroll, that
 3  was -- to my knowledge, that was not submitted to
 4  counsel. But there were -- there were payments made
 5  to consultants and contractors from one of the
 6  City's bond trustees that were never presented to
 7  city council.
 8      Q. Payments from the bond trustee. The bond
 9  trustee is Union Bank?
10      A. At that time it was, yes.
11      Q. And between 1993 and 2012, Union Bank was
12  the bond trustee?
13      A. I believe so. I don't know if they were
14  the bond trustee in 1993, but they held the position
15  for many years.
16      Q. Payments from the bond trustee are
17  different from payments made by the City of
18  Beaumont, correct?
19      A. Payments from the bond trustee are --
20  are -- were not, at that time, issued through the
21  City's accounts payable program.
22      Q. City -- or strike that.
23         Money that was paid by the City of Beaumont
24  to its contractors and vendors was money paid from
25  the general fund; is that correct?
```

Page 40

```
 1      A. Both. They were paid -- there were
 2  contractors paid through the City's accounts payable
 3  staff and finance director, but there were also
 4  consultants and contractors paid outside the City's
 5  Finance Department, and they were paid directly from
 6  the bond trustee, Union Bank.
 7      Q. Do you know why payments from the bond
 8  trustee were not presented to city council?
 9      A. They didn't want city council to know how
10  much money they were making.
11      Q. Who is "they"?
12      A. Urban Logic, Alan Kapanicas, finance
13  director.
14      Q. And how do you know that?
15      A. Because they should have been presented
16  through city council for approval.
17      Q. How do you know that payments from the bond
18  trustee were never presented to city council?
19      A. Because I attended city council meetings
20  for two decades.
21      Q. And it's your testimony at no time were the
22  payments from the bond trustee presented to city
23  council?
24      A. Correct. The actual physical payments.
25  The cost of issuance, yes, but that's not payment;
```

Page 41

```
 1  that's not wire money, cut checks, things like that.
 2      Q. Are you aware that city council members
 3  knew of payments from the bond trustee to Urban
 4  Logic?
 5      A. We've done an extensive records search, and
 6  we have found no such communications.
 7      Q. Did you speak with any former city council
 8  members to determine whether they knew that the bond
 9  trustee was making payments in millions of dollars
10  to Urban Logic?
11      A. No, I have not spoken to any former or
12  current city council members.
13      Q. So you're not able to say whether any
14  former city council members did, in fact, know that
15  millions of dollars from the bond trustee were being
16  paid to Urban Logic, correct?
17      A. It was not discussed at a public meeting.
18      Q. That wasn't my question.
19         My question is: You -- aren't able to say,
20  one way or another today, whether members of city
21  council knew that the bond trustee was paying
22  millions of dollars to Urban Logic, correct?
23      A. I can't speak to what city council knew.
24      Q. And you haven't reviewed any testimony or
25  declaration from any city council members to
```



Page 42

```
 1   determine what it is they knew, correct?
 2       A. Correct.
 3       Q. When did the City of Beaumont first
 4   participate in the Exclusive Risk Management
 5   Authority of California?
 6       A. I don't recall the year, but it was when
 7   that particular JPA was formed.
 8       Q. JPA is "Joint Powers Authority"?
 9       A. Yes.
10       Q. And if I use the term "ERMAC," E-R-M-A-C,
11   will you understand that I'm referring to the
12   "Exclusive Risk Management Authority of California"?
13       A. Yes.
14       Q. It's my understanding that Mr. James Gregg,
15   he was -- served as the City's risk manager between
16   July 2006 and 2015.  Correct?
17       A. Yes.
18       Q. What were Mr. Gregg's duties and
19   responsibilities as risk manager for Beaumont?
20       A. To make recommendations to the city manager
21   on insurance purchases, levels of self-insurance
22   retention, review claims files, make recommendations
23   on settlements, and negotiate the larger litigation
24   cases where the City was a defendant.
25       Q. Was Mr. Gregg involved in making
```

Page 43

```
 1   determinations as to whether the City should pursue
 2   any claims under the policies that were issued to
 3   Beaumont?
 4       A. He would make recommendations to the city
 5   manager.  But ultimately, the city manager was the
 6   final authority.
 7       Q. And the city manager reported to city
 8   council, correct?
 9       A. Correct.
10       Q. And would the city manager make
11   recommendations to city council regarding the
12   purchase of insurance?
13       A. He should have, yes.
14       Q. The city manager between, I believe, 1996
15   and 2015 was Alan Kapanicas?
16       A. Yes.
17       Q. Did Mr. Kapanicas provide recommendations
18   to city council regarding the purchase of insurance?
19       A. If he did, it would be in the minutes.
20       Q. As you sit here today, are you able to
21   provide any testimony regarding the recommendations
22   that Mr. Kapanicas made to city council regarding
23   the purchase of insurance?
24       A. I'm unable to -- to confirm or deny any
25   conversations that Mr. Kapanicas had with city
```

Page 44

```
 1   council, individually.
 2       Q. Did you review any of the City's
 3   applications for insurance that were submitted to my
 4   client, National Union?
 5       A. No, I haven't.
 6       Q. When is the first date that Beaumont
 7   purchased insurance from my client, National Union?
 8       A. I don't recall the year.  It was several
 9   years ago.  I think -- I believe there were two
10   separate policies.
11       Q. And are you able to say when the first date
12   is that Beaumont purchased insurance from National
13   Union?
14       A. No.  I don't recall, but it was -- I -- I
15   want to say it was about ten years ago.
16       Q. Who was involved in preparing the
17   application for insurance on behalf of Beaumont?
18       A. Mr. Gregg.
19       Q. And did city council have to vote on and
20   approve the purchase of insurance from National
21   Union?
22       A. They should have, but I can't say that they
23   did.
24       Q. Are you aware of the first day that the
25   City of Beaumont participated in a government crime
```

Page 45

```
 1   coverage program?
 2       A. No, I don't recall it.  I -- like I said, I
 3   think it was about ten years ago.
 4       Q. Prior to July 2006, which is the date the
 5   City hired Mr. Gregg, the City did not have a risk
 6   manager, correct?
 7       A. Correct.
 8       Q. Prior to July 2006, did the city council
 9   handle risk management issues for Beaumont?
10       A. No.  Mr. Kapanicas did.
11       Q. And Mr. Kapanicas reported to city council,
12   correct?
13       A. Yes.
14       Q. City council provided direction to
15   Mr. Kapanicas, correct?
16       A. On -- on which area?
17       Q. Well, pursuant to the municipal code, the
18   city council provided legislative direction to
19   Mr. Kapanicas, correct?
20       A. That's what the municipal code says, yes.
21       Q. Does Beaumont have a human resources
22   department?
23       A. It does now.  It's -- it's titled
24   "Administrative Services."
25       Q. In 2011 did Beaumont have a human resources
```