# EXHIBIT 2

EXHIBIT 2
PAGE 30

Page 849216

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION


WESTERN RIVERSIDE COUNSEL     )
OF GOVERNMENTS; CITY OF  )
BEAUMONT,                     )
                              )
         Plaintiff,           )
                              )
     vs.                      )        Case No. 5:20-cv-
                              )        02164-GW(KKx)
NATIONAL UNION FIRE           )
INSURANCE COMPANY OF          )
PITTSBURGH, PA,               )
                              )
         Defendants.          )
                              )



DEPOSITION OF DANIEL RAY

IRVINE, CALIFORNIA

MONDAY, JULY 18, 2022




Reported by:
LAURA A. RUTHERFORD, RPR
CSR No. 9266



EXHIBIT 2
PAGE 31

**Page 2**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION

WESTERN RIVERSIDE COUNSEL )
OF GOVERNMENTS; CITY OF )
BEAUMONT, )
)
         Plaintiff, )
)
vs. ) Case No. 5:20-cv-
) 02164-GW(KKx)
NATIONAL UNION FIRE )
INSURANCE COMPANY OF )
PITTSBURGH, PA, )
)
         Defendants. )
)

Deposition of DANIEL RAY, taken on behalf of Defendants, at 5 Park Plaza, Suite 1100, Irvine, California, beginning at 8:57 a.m., and ending at 2:25 p.m., on Monday, July 18, 2022, before LAURA A. RUTHERFORD, RPR, Certified Shorthand Reporter No. 9266.

**Page 3**

APPEARANCES:

For Plaintiff:
    BEST, BEST & KRIEGER
    BY: CHRISTOPHER M. PISANO, ESQ.
    18101 Von Karman Aveue, Suite 1000
    Irvine, CA  92612
    (213) 617-7492
    christopher.pisano@bbklaw.com

For Defendants:
    GORDON REES
    BY: SCOTT L. SCHMOOKLER, ESQ.
    5 Park Plaza, Suite 1100
    Irvine, CA  92614
    (312) 980-6799
    sschmookler@gordonrees.com

Videographer:
    SERGIO ESPARZA, VIDEOGRAPHER

**Page 4**

INDEX

WITNESS:                              PAGE
DANIEL RAY
    BY MR. SCHMOOKLER              7

EXHIBITS
EXHIBIT NO.      DESCRIPTION              PAGE
1     REPORT                            11
2     SUPPLEMENTAL REPORT               11
3     STANDARD                          14
4     9-27-93 CONTRACT                  24
5     1994 ADDENDUM                     24
6     DECLARATION OF EGGER              37
7     2011-2012 CAPITAL IMPROVEMENT PLAN   65
8     RESOLUTIONS TO CAPITAL IMPROVEMENT PLAN   66
9     DEPOSITION OF BERG                86
10    FACTUAL BASIS                     164

INFORMATION REQUESTED
        (None)

INSTRUCTION NOT TO ANSWER
        (None)

**Page 5**

IRVINE, CALIFORNIA; MONDAY, JULY 18, 2022
8:57 A.M. - 2:25 P.M.
---oOo---

THE VIDEOGRAPHER: Good morning, we are on the record. This begins -- excuse me -- video number one in the deposition of Daniel Ray, in the matter the Western Riverside Counsel of Governments, versus National Union Fire Insurance, in the United States District Court for the Central District of California, Eastern Division, case number 5:20-cv-02164.

Today's date is July 18, 2022, and the time is 8:57 a.m. This deposition is being taken at 5 Park Plaza, Suite 1100, in Irvine, California, at the request the Gordon Rees.

I'm Sergio Esparza, the videographer of Magna Legal Services, and the court reporter is Laura Rutherford of Magna Legal Services.

Will counsel and all parties present state their appearances and whom they represent?

MR. SCHMOOKLER: Scott Schmookler on behalf of the defendant.

MR. PISANO: Christopher Pisano, Best, Best & Krieger, on behalf of the plaintiff.

THE VIDEOGRAPHER: Thank you.



EXHIBIT 2
PAGE 32

```
                                                        Page 6
1              Will the court reporter please administer the
2    oath?
3
4                        DANIEL RAY,
5              having been first duly placed under oath,
6              was examined and testified as follows:
7
8                       EXAMINATION
9    BY MR. SCHMOOKLER:
10        Q.  Please state your name and spell your last
11   name for the record?
12        A.  My name is Daniel W. Ray, R-a-y.
13        Q.  How many times have you been deposed?
14        A.  I would estimate 40 to 50.
15        Q.  You make your living as an expert witness;
16   correct?
17        A.  I make my living as a forensic accountant of
18   which I'm a partner of a CPA firm, which the work that I
19   perform sometimes does result in expert testimony, but the
20   vast majority of the times, it does not result in expert
21   testimony.
22        Q.  Okay.
23             Who hired you in this case?
24        A.  The Law Firm of Best, Best & Krieger, on
25   behalf of their client.
```

```
                                                        Page 7
1         Q.  Isn't it true you were hired by the District
2    Attorney first?
3             MR. PISANO:  Objection.  Vague.
4             THE WITNESS:  I was hired by the District
5    Attorney's office in a similar but different matter
6    preceding my retention by Best, Best & Krieger.
7         Q.  BY MR. SCHMOOKLER:  So "this matter" meaning
8    the matter we're here about today first started with a
9    criminal case; correct?
10        A.  No, it's not correct.
11        Q.  Okay.
12             Who is the first entity that hired you?
13        A.  It was through a law firm called Stradling
14   Yocca, on behalf of their client, City of Beaumont.
15        Q.  Have you ever been retained by the City of
16   Beaumont, did you assist with a criminal case?
17        A.  Yes, I did.
18        Q.  What was your role in the criminal case?
19        A.  It was to come to an understanding of the
20   billings -- billings issued by Urban Logic and
21   Mr. Kapanicas through his company, GGMS, and was to
22   understand the payments received and the work performed in
23   connection with those payments.
24        Q.  Isn't it true that that's the same role you
25   performed for the City of Beaumont?
```

```
                                                        Page 8
1         A.  In the initial engagement, you mean?
2         Q.  Yes.
3         A.  No.  The initial engagement with the
4    Stradling firm for the City of Beaumont was similar but
5    different.
6         Q.  Okay.
7             Isn't it true that in connection with the
8    Stradling engagement, you quantified the total billing by
9    Urban Logic?
10        A.  I did.
11        Q.  Isn't it true that that's the same task you
12   did for the government?
13        A.  Yes.  That task was performed on both of
14   those engagements.
15        Q.  Who paid you when you were working for the
16   government?
17        A.  I got paid by -- my firm got paid by City of
18   Beaumont through -- well, through the Riverside District
19   Attorney's Office.
20        Q.  When you say "paid by the City of Beaumont
21   through the Riverside District Attorney's Office," what do
22   you mean?
23        A.  Well, what I was doing was I was correcting
24   myself.  For the engagement which I was retained directly
25   by Riverside District Attorney's Office, I was paid by the
```

```
                                                        Page 9
1    Riverside District Attorney's Office.
2         Q.  Was any of the work that you're currently
3    relying on work that was paid for by the District
4    Attorney?
5             MR. PISANO:  Objection.  Vague.
6         Q.  BY MR. SCHMOOKLER:  I'll ask it again.
7             Is any work product in either of the reports
8    we're going to talk today a product that was generated
9    while you were working for the District Attorney and being
10   paid by the District Attorney?
11            MR. PISANO:  Same objection.
12            THE WITNESS:  I relied upon certain documents
13   that were provided to me by the Riverside District
14   Attorney's Office in connection with this engagement.
15        Q.  BY MR. SCHMOOKLER:  Okay.
16            Did you rely upon any work product that was
17   generated while working for the District Attorney and
18   being paid by the District Attorney in connection with
19   this engagement?
20        A.  I think you said generated by the District
21   Attorney's Office.
22        Q.  No.
23            Is there any work product your firm generated
24   that is relied upon in either of the reports provided in
25   this litigation that was created while you were working
```



3 (Pages 6 to 9)

EXHIBIT 2
PAGE 33

Page 10

1 for the District Attorney and being paid by the District
2 Attorney?
3          MR. PISANO:  Objection.  Vague.
4          THE WITNESS:  Some of the work product
5 included in these reports is similar to some of the work
6 product that was generated while I was doing work for the
7 Riverside District Attorney's Office and for the City of
8 Beaumont.  Not in the same exact form.  I've certainly
9 modified early schedules, reviewed earlier schedules.
10          Q.  BY MR. SCHMOOKLER:  Did the District Attorney
11 provide you permission to use work product that was
12 generated by an engagement which they paid you in this
13 litigation?
14          A.  Yes.
15          Q.  Okay.
16          Who?
17          A.  "Who"?  Meaning the names --
18          Q.  The name of the person who provided you
19 permission to use work product that the District Attorney
20 paid for in support of a civil lawsuit?
21          MR. PISANO:  Object to form.
22          THE WITNESS:  I'm trying to remember their
23 names.  There was two particular ADA, or Assistant
24 District Attorney's, that I worked with.  I can't remember
25 their names off the top of my head.

Page 11

1          Q.  BY MR. SCHMOOKLER:  Was there a specific
2 conversation in which you asked them for permission to use
3 work product generated during an engagement when the
4 District Attorney paid you in support of civil litigation
5 by the City of Beaumont?
6          MR. PISANO:  Object to form.
7          THE WITNESS:  The District Attorney's Office
8 was fully aware that I was working previously on another
9 matter and then subsequently to my engagement with them on
10 a civil matter.
11          I had permission to utilize the documents
12 that I had received from them, and they were fully aware
13 that similar work product that was prepared in connection
14 with my engagement with them would also be used in
15 connection with a civil cases.
16          Q.  BY MR. SCHMOOKLER:  Well, I'm asking a
17 different question.
18          So you have provided us two reports, which
19 are marked as Exhibits 1 and 2, right next to you in
20 binders.
21          (Exhibits 1 and 2 were marked for
22 identification.)
23          Q.  BY MR. SCHMOOKLER:  Do you see that, sir?
24          A.  I do.
25          Q.  Prior to generating Exhibits 1 and 2, did you

Page 12

1 have a conversation with the District Attorney and asked
2 for permission to use work product generated during an
3 engagement the District Attorney paid you for in Exhibits
4 1 and 2?
5          MR. PISANO:  Object to form.
6          THE WITNESS:  Well, you said District
7 Attorney.  I've spoken with two different assistant
8 District Attorney's.  Never had a conversation with the
9 District Attorney.  They were fully aware that this -- I
10 was performing work in connection with the civil
11 litigation.
12          In fact, during one of the conversations with
13 them discussing approval to utilize the documents that
14 were produced and work product, one of the lawyers from
15 Best, Best & Krieger was on that conversation with the
16 attorneys.
17          Q.  BY MR. SCHMOOKLER:  Oh, who was that?
18          A.  It was Chris Deal.
19          Q.  When was that conversation?
20          A.  Perhaps four months ago, plus or minus.
21          Q.  And who was on the conversation for the
22 District Attorney?
23          A.  It was the two women assistant District
24 Attorney's whose name I am drawing a blank on.  On a
25 break, I can come up with the names.

Page 13

1          Q.  That would be excellent.
2          Do you know if either of these assistant
3 District Attorney's that you were talking to are married
4 to lawyers at the Best, Best and Krieger law firm?
5          A.  I have no reason to believe that they are
6 married to a lawyer at the Best, Best & Krieger law firm.
7          Q.  Do you know either way?
8          A.  No, I don't know either way.
9          Q.  Did you rely upon any articles, periodicals,
10 secondary sources in creating the analysis in Exhibits 1
11 and 2?
12          A.  No.
13          Q.  Did you rely on any specific written forensic
14 standards in creating Exhibits 1 and 2?
15          A.  No.
16          Q.  Did you rely upon any secondary sources
17 addressing financial institution bonds or fidelity bonds
18 in creating Exhibits 1 and 2?
19          A.  No.
20          Q.  As you sit here today, are there any specific
21 standards, publications, or other secondary sources that
22 you rely upon to support any of the analysis in Exhibits 1
23 and 2?
24          A.  I include in a footnote to, I believe,
25 Exhibit 2, which talks about my engagement letter



EXHIBIT 2
PAGE 34

Page 14

1 referencing a particular accounting standard that's used
2 for forensic Accounting, and that I mentioned in that, as
3 a footnote, that particular standard, which is set forth
4 in our engagement agreements.
5      Q.  Please mark this as Exhibit 3.
6           (Exhibit Number 3 was marked for
7 identification.)
8      Q.  BY MR. SCHMOOKLER:  I'll hand what has been
9 marked as Exhibit 3.
10          Have you seen this document before, sir?
11     A.  I have.
12     Q.  Okay.
13          Is this the standard you referenced in your
14 report, supplemental report, which is Exhibit 2?
15     A.  Correct.
16     Q.  Is it true that there is nothing in this
17 standard that speaks to how a forensic accountant should
18 compute a loss in connection with an employee dishonesty
19 insurance claim?
20     A.  I agree.  It's not a step-by-step manual on
21 how to perform a forensic accounting assignment.
22     Q.  In fact, in Exhibit 3, there's no explanation
23 whatsoever as to how to perform a forensic accounting
24 engagement?
25     A.  Well, it talks about -- on page -- there's no

Page 15

1 page number.  It's on a section called "Standards for
2 Forensic Accounting," paragraph number six.  It talks
3 about -- there's four different bullet points about how
4 the approach needs to be made in connection with the work.
5           It talks about professional competency, due
6 professional care, planning supervision, sufficient
7 relevant data.  So it sort of sets forth the framework
8 under which forensic accounting is to be performed, but
9 it's certainly not a step-by-step manual on how to build
10 spreadsheets and review invoices and banking records.
11     Q.  Is there any standard that you can cite to
12 that you followed -- strike that.
13          Is there any written standard you can point
14 to that you followed in performing the computations in
15 Exhibits 1 and 2?
16          MR. PISANO:  Object to form.
17          THE WITNESS:  No.  And I'm not aware of a
18 standard that says step one, you do this, step two, you do
19 this.  I've done this for 40 years and certainly rely upon
20 my skills, training, expertise in performing these type of
21 services.
22     Q.  BY MR. SCHMOOKLER:  Okay.  Well, let me ask
23 it again, because I want to be really specific, sir.
24          Is -- in your 40 years of experience, can you
25 point to anything in writing that you followed in

Page 16

1 performing the analysis in Exhibits 1 and 2?
2     A.  No.
3     Q.  There are, however, written standards for how
4 to conduct a sampling in the audit context; correct?
5     A.  Correct.
6     Q.  And you did not follow those standards;
7 correct?
8     A.  Well, this is not an audit.
9     Q.  That's fine.
10          You did not follow the sampling procedures
11 that the AICPA adopts in performing your analysis;
12 correct?
13     A.  I did not perform sampling analysis as called
14 for by the AICPA in connection with audit assignments,
15 because this is not an audit assignment.
16     Q.  I asked a different question.
17     A.  Okay.
18     Q.  You did not follow the sampling procedure
19 adopted by the AICPA; correct?
20          MR. PISANO:  Asked and answered.
21          THE WITNESS:  It's adopted by the AICPA in
22 connection with performance of an audit.  This is not an
23 audit, so I did not follow those procedures.
24     Q.  BY MR. SCHMOOKLER:  Okay.
25          Did you perform any level of recognized

Page 17

1 sampling in performing your analysis in Exhibits 1 and 2?
2          MR. PISANO:  Object to form.
3          THE WITNESS:  I'm not aware of standards
4 beyond what's set forth in the AICPA in connection with an
5 audit assignment.  The work I did I wouldn't describe as
6 sampling.  It's based upon my analysis of documents
7 available.
8     Q.  BY MR. SCHMOOKLER:  Okay.
9          Do you understand what a sampling is?
10     A.  Yes, I do.
11     Q.  Did you take basic statistics in college?
12     A.  Yes, I did.
13     Q.  You understand what a statistically valid
14 extrapolation is; correct?
15     A.  I do.
16     Q.  And you understand how to conduct a
17 statistically valid extrapolation; correct?
18     A.  Yes.  When one is called for, I know how to
19 do that, yes.
20     Q.  Okay.
21          And you did not perform a statistically valid
22 extrapolation in this matter; is that correct?
23     A.  I agree with that.
24     Q.  Okay.
25          You did not conduct, for example, a random



EXHIBIT 2
PAGE 35

Page 18

1  sampling of invoices in this matter; correct?
2      A.  I reviewed invoices -- a sample of the
3  invoices that were available.
4      Q.  I asked a different question.
5          You understand what randomization is?
6      A.  Yes, I do.
7      Q.  Did you conduct a random sampling of the
8  invoices in this matter?
9      A.  I didn't use a random technique to do the
10 analysis that I did.  I focused on particular time frames,
11 and I did 100 percent coverage of particular time frames
12 where invoices were available.
13     Q.  But there were time frames when 100 percent
14 wasn't available; correct?
15     A.  I agree.
16     Q.  And in time frames when 100 percent was not
17 available, rather than conduct a statistically valid
18 extrapolation, what did you do -- or strike that.
19         In the time frame when there was not 100
20 percent of the invoices available, did you conduct a
21 statistically valid extrapolation?
22     A.  No.
23     Q.  In the time frame when 100 percent of the
24 invoices were not available, did you attempt to conduct a
25 statistically valid extrapolation?

Page 19

1      A.  No.
2      Q.  In the time frame when 100 percent of the
3  invoices were not available to you, did you attempt to
4  extrapolate at all?
5      A.  Well, I did extrapolate.  I used estimates.
6  I used interpolations of data, sure.
7      Q.  Well, you used estimates.  Estimate's
8  different than an extrapolation, is it not?
9      A.  I don't know.  I think I'd have to understand
10 the context.  So estimating something and extrapolating
11 because you're missing data, I think it would be very
12 similar.
13     Q.  Well, you understand that an extrapolation
14 using a randomized sample is a way to conduct a
15 statistically valid analysis of a population; correct?
16     A.  Right.  And I told you I didn't do a
17 statistically valid random sampling.
18     Q.  Okay.
19         When -- in the time frame that a hundred
20 percent of the invoices were not available to you --
21     A.  Um-hum.
22     Q.  -- did you use an estimate?
23     A.  Yes.
24     Q.  Okay.
25     A.  I believe so.

Page 20

1      Q.  Define for me what you use the word
2  "estimate" to mean?
3      A.  Well, I think in one connection is with where
4  I was estimating -- I was summarizing the financial
5  benefit by the three owners of Urban Logic Consulting, and
6  there was some missing years for one or more of those
7  individuals.
8          So based upon my review and analysis of
9  documents that were available, I estimated what their
10 compensation was during certain periods based upon my
11 analysis of the documents available.  So I would say that
12 was an estimate.
13     Q.  Okay.
14         Have you ever worked in construction?
15     A.  Have I worked in construction?  No.
16     Q.  Do you have any expertise in construction?
17     A.  Only on a personal basis -- well, two
18 comments.  One is in 40 years, I worked a number of cases
19 involving construction disputes.  Typically, the concern
20 was that there were inflating billings, improper billings
21 in connection with a construction project.
22         And number two, on a personal level, I've
23 done two very large remodel projects on my home.  I had
24 contracts with general contractors, subcontractors.  Very
25 familiar with the budgeting process, with the change order

Page 21

1  process, invoicing for construction charges.  So both on a
2  professional level and a personal level.
3      Q.  Okay.
4          Do you know the difference between
5  engineering and construction management?
6      A.  I think it depends on the project.  I don't
7  know that that's a definitive -- that a construction
8  management might involve some engineering work.  I don't
9  know that there's a particular bright line that always
10 applies to all engagements for construction projects.
11     Q.  Okay.
12         Are you here to offer opinions as to whether
13 engineering, in the context of Urban Logic's work, falls
14 within the definition of construction management?
15         MR. PISANO:  Object to form.
16         THE WITNESS:  That's certainly not a specific
17 opinion that I have expressed or intend to express.
18     Q.  BY MR. SCHMOOKLER:  Do you intend to express
19 any specific opinion as to whether specific functions
20 performed by Urban Logic constitute construction
21 management?
22     A.  Again, I think my answer is the same as the
23 prior one.  That's not a specific opinion that I've
24 expressed, and it's not an opinion that I anticipate
25 specifically expressing the way you've phrased it.



Page 22

1    Q.  Not the way -- you're being too specific,
2  sir, with your word "specific."
3         I'm asking, in this case when you appear
4  before the jury, do you intend to offer any testimony as
5  to whether any specific function performed by Urban Logic
6  qualifies as construction management?
7         MR. PISANO:  Object to form.
8         THE WITNESS:  I don't anticipate making that
9  specific -- rendering that specific testimony or opinion.
10    Q.  BY MR. SCHMOOKLER:  Okay.
11        Do you intend to offer any testimony in front
12  of a jury as to whether or not specific functions billed
13  for by Urban Logic fall within section V.1 of the 1994
14  addendum?
15        MR. PISANO:  Object to form.
16        THE WITNESS:  My opinion will be and is that,
17  based upon my analysis, my review of the documents, that a
18  certain percentage, estimated percentage of the billings
19  by Urban Logic were outside of the 4.5 percent cap, which
20  is mentioned in section V.1 of the amendment.
21        And that the billings that were outside of
22  that, that were subject to the cap, far exceeded the 4.5
23  percent of the total construction costs or bid price.
24    Q.  BY MR. SCHMOOKLER:  Okay.
25        I asked a different question.

Page 23

1    A.  Okay.
2    Q.  My question is this.  You understand that
3  Urban Logic billed for very specific work; correct?
4    A.  Well, I've seen Urban Logic where their
5  invoices simply say, "For professional services rendered."
6  So it isn't always very specific as to specifically what
7  task they performed.  I have two specific examples in my
8  binder where the billing simply says, "For professional
9  services rendered."
10        So for me or for anyone to specifically
11  determine, based upon that invoice, whether it was or was
12  not, for example, subject to the 4.5 percent cap, can't
13  really be accomplished when it simply says, "For
14  professional services rendered."
15    Q.  Let me dig into this, because I asked a
16  different question, but I'm interested in your answer.
17    A.  Okay.
18    Q.  You agree with me that there's not enough
19  information on the invoices to determine if the
20  amount -- if the task billed for falls inside or outside
21  of the cap; correct?
22        MR. PISANO:  Object to form.
23        THE WITNESS:  What I'm saying is that -- yes,
24  that there are certain bills that it's not determinable
25  about exactly, precisely what work was performed when the

Page 24

1  bill simply says, "For professional services rendered."
2    Q.  BY MR. SCHMOOKLER:  So let's just break this
3  down, and maybe we can shortcut lots of my questions
4  today.
5         I'll show you what I'm marking as Exhibit 4
6  and Exhibit 5.
7         MR. PISANO:  Which one is 4 and --
8         MR. SCHMOOKLER:  The 93 is 4, and 94 is 5.
9         (Exhibits 4 and 5 were marked for
10  identification.)
11    Q.  BY MR. SCHMOOKLER:  Okay.
12        Before we get into this, I guess I should
13  have done it.  I've placed before you two binders, one of
14  which is marked Exhibit 1, and one of which is marked
15  Exhibit 2.
16        Do you recognize those documents, sir?
17    A.  I do.
18    Q.  And is Exhibit 1 a true and correct copy, to
19  the best of your knowledge, of the original report issued
20  in this litigation?
21    A.  It appears to be.
22    Q.  And is Exhibit 2 a true and correct copy of
23  the supplemental opinion you've issued in this matter?
24    A.  Yes, it appears to be.
25    Q.  Do Exhibits 1 and 2 fully reflect all of the

Page 25

1  opinions you intend to offer in this case?
2    A.  Yes.
3    Q.  Okay.  Great.
4         I've given to you two contracts, one of which
5  is marked Exhibit 3.  Do you recognize Exhibit 3?
6         MR. PISANO:  3 is the --
7    Q.  BY MR. SCHMOOKLER:  I'm sorry.  I'm sorry.
8  My fault.  Exhibit 4.
9    A.  Yes, I do.
10    Q.  Okay.
11        Tell me what Exhibit 4 is.
12    A.  Exhibit 4 is an agreement dated September 27,
13  1993, between the City of Beaumont and Urban Logic
14  Consultants.
15    Q.  And the terms of this contract form a basis
16  of some of your opinions in this matter?
17    A.  Yes.
18    Q.  Okay.
19        And in particular, if you look at page 7 of
20  the contract, BEAUAIG701, section 5, there's a section 5
21  entitled, "Plan Checking and Construction Inspection."
22        Do you see that?
23    A.  I do.
24    Q.  And section 5 is one of the sections you cite
25  in support of your opinion in this matter; correct?



7 (Pages 22 to 25)

EXHIBIT 2
PAGE 37

Page 26

1    A.  Correct.
2    Q.  And section 5, on page 7, reflects two sets
3  of services, plan checking and construction inspection;
4  correct?
5    A.  Correct.
6    Q.  Was there enough information on any invoice
7  you've seen to determine if the time billed was incurred
8  from plan checking?
9    A.  I'm not sure that any of the invoices
10  specifically stated plan checking.  They may have.
11  There's hundreds of invoices, thousands, probably.  I
12  don't recall off the top of my head whether any of those
13  specifically call out plan checking as a task that was
14  performed.
15    Q.  Did you compute the total amount of time
16  billed for any task that falls under planning checking,
17  section V-A of the contract?
18    A.  No.  That was not the approach that I made to
19  my analysis.
20    Q.  Can you state to a reasonable degree of
21  accounting certainty the exact amount of money billed for
22  any task falling under section V-A, plan checking?
23    A.  No.
24    Q.  Can you state to a reasonable degree of
25  accounting certainty the exact amount of money billed for

Page 27

1  any task following under construction inspection, V-B of
2  the contract?
3    A.  No.
4    Q.  Did you, in fact, compute in any period the
5  total amount billed for tasks falling under plan checking,
6  V-A?
7    A.  No.
8    Q.  Did you compute in any period the total
9  amount billed for construction inspection, V-B of the
10  contract?
11    A.  No.
12    Q.  Now, looking at Exhibit 5, which is the 1994
13  addendum, 1994 addendum has a section V-1.  Do you see
14  that?  It's on page 2, BEAUAIG675.
15    A.  Yes, I see it.
16    Q.  And you see there's a section on construction
17  management.  Do you see that?
18    A.  I do.
19    Q.  Okay.
20    Did you determine the total amount billed by
21  Urban Logic for functions that fall under the construction
22  management, V-1 of the 1994 addendum?
23    A.  Invoices specifically referencing the title
24  construction management services, there may have been some
25  invoices that particularly used this phraseology.  But as

Page 28

1  far as summarizing specifically invoices that include this
2  particular verbiage language, no, I didn't do that.
3    Q.  Okay.
4    Did you -- can you say to a reasonable degree
5  of accounting certainty the total amount billed by Urban
6  Logic for functions that fall under V.1 of the 1994
7  addendum?
8    A.  No.
9    Q.  Do you see on page 2, under "Construction
10  Management Services," there is a 21-point list of
11  functions.
12    Do you see that, sir?
13    A.  I do.
14    Q.  And you were familiar with a 21-point list of
15  functions at the time of your analysis; correct?
16    A.  I was.
17    Q.  Did you compute the amount billed for any one
18  of the 21 functions identified under V.1 of the 1994
19  addendum?
20    A.  No.
21    Q.  Can you state to a reasonable degree of
22  accounting certainty the amount billed for the functions
23  identified in the numbered list 1 through 21, under V.1 of
24  the 1994 addendum?
25    A.  No.

Page 29

1    Q.  Do you know to a reasonable degree of
2  accounting certainty that the precise amount billed for
3  tasks identified expressly in section V.1 exceed 4.5
4  percent of the bid price for capital improvements during
5  the period in which Urban Logic provided services to the
6  City?
7    MR. PISANO:  Object to form.
8    THE WITNESS:  I looked in total to the
9  invoices.  Again, many of the invoices simply said, "For
10  professional services rendered."
11    So, therefore, it's not possible, when they
12  provide billing as generic as "professional services
13  rendered" to tie it to a specific -- a particular -- this
14  has 21 tasks, and then the other -- the original agreement
15  has two specific tasks, so there's 23 tasks.
16    It's not really possible to compute precisely
17  to a particular defined task, given the way that
18  they -- Urban Logic -- or, I'm sorry -- Urban Logic
19  submitted their invoices.
20    Q.  BY MR. SCHMOOKLER:  Okay.
21    Now, let me just make sure I understand the
22  methodology underlying your opinion.  You computed the
23  total amount of capital improvements; correct?
24    A.  We estimated what the total amount of capital
25  improvements were.



EXHIBIT 2
PAGE 38

Page 30

1   Q. Okay.
2       And then you took 4.5 of that amount;
3   correct?
4   A. Correct.
5   Q. And that represented, in your analysis, the
6   maximum amount Urban Logic could charge?
7   A. Correct. For services that fit within the
8   parameters of these two agreements, the agreement and the
9   amendment.
10  Q. Okay.
11      And what you did is that in order to
12  determine if they have charged too much is you have to
13  compare the actual amount billed for the specific services
14  in section 5 and 5.1 to the amount you computed; correct?
15  A. What I did is I compared the amount billed
16  and paid in total. And I estimated how much of those
17  total billings would have been not subject to the cap,
18  with the remaining amount being subject to the cap.
19      And I compared that amount against the
20  estimated capital improvement expenditures and multiplied
21  by 4.5 percent, and that's where I came up with the
22  overbilling.
23  Q. You said you went through some home
24  renovations. Do you remember that?
25  A. I do.

Page 31

1   Q. Did you give them a budget?
2   A. I did.
3   Q. Did you give them a line item budget?
4   A. Generic line item, not, you know, here's how
5   many sprinklers, here's how much PVC pipe, those generic
6   line items to the budget.
7   Q. And did you compare how much they charged you
8   to how much the budget was to see if they had gone over
9   your budget?
10  A. I did.
11  Q. Okay.
12      And so what you do in your personal life is
13  you'd compare the budget for a particular function to the
14  amount spent for that function; correct?
15  A. The amount billed for that particular
16  function -- sure. Certainly, the budget I had is a
17  document that I would consider when the contractor submits
18  the invoice.
19  Q. Sure.
20      But just in terms of, like, day-to-day life,
21  let's just talk in plain old-fashioned day-to-day life.
22  If you want to know if somebody's gone over the budget,
23  you saw how much did you spend, and you compare that to
24  the budget; right?
25  A. Well, when you say "everyday life," not

Page 32

1   everyday life always have budgets to compare things
2   against, but, yeah. I'm familiar with the budgeting
3   process. I'm familiar with the invoicing process. And
4   I'm very aware of the payment process, which is what I
5   looked at in all of these.
6   Q. Can we agree that, in a normal case, you
7   would want -- if you were determining if somebody was over
8   budget, you would want to know what was the budget and
9   what they spend for that task?
10  A. Sure.
11  Q. Okay.
12      And in this case, you were not able to
13  determine the exact amount spent for plan checking, for
14  example?
15  A. Correct, because of the way the billings
16  were.
17  Q. Okay.
18      And you were also not able to determine the
19  exact amount spent for construction inspection; correct?
20  A. Correct, because of the way they were billing
21  and because they were missing invoices.
22  Q. And you were also not aware or able to
23  compute the amount spent for construction management
24  tasks, as explained in section V.1; correct?
25  A. Correct, because of the way the invoices were

Page 33

1   drafted, and the fact they were many missing years' worth
2   of invoices.
3   Q. Now, because you were unable to determine the
4   exact amount spent for plan checking, can you, to a
5   reasonable degree of accounting certainty, say the exact
6   amount spent for plan checking exceeded 4.5 percent of the
7   construction cost?
8   A. No, and that's not my opinion either.
9   Q. Can you based, on the information you have,
10  state to a reasonable degree of accounting certainty that
11  the amount spent for construction inspection exceeds 4.5
12  percent of the confirmed construction costs?
13  A. I agree, and that's not my opinion either.
14  Q. I said it openly, so let me try it again.
15      Can we agree that you cannot state to a
16  reasonable degree of accounting certainty that the amount
17  spent on construction inspection exceeded 4.5 percent of
18  the confirmed construction costs?
19  A. I agree.
20  Q. Can we also agree that you cannot state to a
21  reasonable degree of accounting certainty that the amount
22  spent on construction management, as delineated in V.1 of
23  the 1994 amendment, exceeded 4.5 percent of the bid price
24  awarded by the City for each project?
25  A. I agree, because of the way the invoices were



EXHIBIT 2
PAGE 39

Page 34

1 drafted, and there were hundreds of invoices that were not
2 available.
3      Q.  Okay.
4          So if I understand why you're unable to reach
5 those computations, there's two reasons.  One is missing
6 invoices; correct?
7      A.  Correct.
8      Q.  And the second reason you're unable to reach
9 those opinions is just -- is the detail on the invoices
10 themselves?
11     A.  The lack of detail on the invoices
12 themselves.
13     Q.  You understand from the discovery that I've
14 produced in this matter on behalf of my client that
15 there's additional information about ULC's billing;
16 correct?
17     A.  I don't understand your question.
18     Q.  Sure.
19         Have you ever had the benefit of looking at
20 the discovery that my client has secured in this matter?
21         MR. PISANO:  Object to form.
22         THE WITNESS:  I don't believe I've seen the
23 totality of your discovery.  I've certainly reviewed your
24 expert's report, and I'm familiar with the documents he
25 reviewed and considered in forming his opinions.

Page 35

1      Q.  BY MR. SCHMOOKLER:  Okay.
2          Did you see the declaration of Mr. Egger?
3      A.  Yes.
4      Q.  Okay.
5          And you understand from his declaration how
6 invoices were created within Urban Logic; correct?
7      A.  I haven't memorized his declaration.  I
8 believe he talks about that in his declaration.  I
9 reviewed it.
10     Q.  Isn't it true that within the context of
11 Urban Logic, invoices were created based on time cards?
12     A.  I believe he said that.
13     Q.  And isn't it true that the time cards were
14 then entered into a computer system by an office manager?
15     A.  I haven't memorized his testimony.  I don't
16 know if -- or his declaration.  I don't know if he
17 specifically said that.
18     Q.  Okay.
19         Well, did you do a search for time cards to
20 determine the exact tasks that were performed by Urban
21 Logic's resources?
22     A.  Well, in my original report, I include as
23 exhibits what might be reviewed or viewed as time cards.
24 It's certainly a listing of individuals and staffing
25 positions.

Page 36

1          And it was in connection with that that I
2 rendered the opinion that there were inflated amounts and
3 subconsultants were being included in on these time
4 billings.  And I don't believe that the time cards
5 specifically identified which tasks or what tasks were
6 performed.
7      Q.  You say "time cards," are you talking about
8 the Paycheck records?
9      A.  No.
10     Q.  So you have seen time cards?
11     A.  I've seen documents that I believe may be
12 what he's referring to as time cards.  There are several
13 exhibits in my original report that might fit that
14 definition of time cards.
15     Q.  I have your exhibit -- your report.  Which
16 exhibits are you referring to?
17         Let's make sure we're on the same page.
18     A.  Referring to, for example, 18-2, I'm sorry,
19 18- -- 18-2.
20     Q.  Okay.
21         Bear with me to find where you're at, because
22 mine's not as tabbed as yours.
23         Is Exhibit 18-2 something you created or
24 something Urban Logic created?
25     A.  Urban Logic created.

Page 37

1          The notations with the 1's and the 2's on the
2 documents were ours.  We did that in order to identify
3 which of these various subtotals on these time records
4 were used to prepare the billings that were sent to City
5 of Beaumont by Urban Logic.
6      Q.  Chris, I only have one of this.  I can't find
7 the other two.  If you want, I'll take a break.  It's
8 Egger's declaration.
9          Do you want to make another copy?
10     A.  I brought -- a binder with the exhibits.
11     Q.  I want to mark this separately, sir.
12         Do you want to take a break and copy it, or
13 do you want to just keep going, and I'll get you a copy at
14 the break?
15         MR. PISANO:  That's fine.
16     Q.  BY MR. SCHMOOKLER:  I will mark what I'm
17 marking as Exhibit 6 a declaration of Ernest Egger
18 produced in this matter.
19         (Exhibit Number 6 was marked for
20 identification.)
21     Q.  BY MR. SCHMOOKLER:  Have you seen what
22 identified mark as Exhibit 6 before today, sir?
23     A.  It looks like the declaration I've reviewed
24 before.
25     Q.  In paragraph 5, Mr. Egger specifically



10  (Pages 34 to 37)

EXHIBIT 2
PAGE 40

Page 38

1  delineates and explains the process by which Urban Logic
2  was billing time internally.
3        Do you see that, sir?
4    A.  I do.
5    Q.  And do you see that he says in his
6  declaration that the employees were specifically required
7  to turn in time cards with their -- explaining what they
8  did that week?
9    A.  Okay.
10       Yes, I see that.
11   Q.  Did you see it at the bottom of the page in
12 paragraph 5 that goes onto the second page?
13   A.  Yeah, I saw it.
14   Q.  Did you do a search at any time during any of
15 your engagements for Urban Logic's time cards as explained
16 by Mr. Egger?
17   A.  Well, again, I pointed out to you a document
18 that I included as Exhibit 18-2 to my report that perhaps
19 represents the time cards that he mentions.  I don't know
20 that I've ever seen specifically what Mr. Egger is
21 referring to here.
22   Q.  Do you know if those records exist?
23   A.  I don't.
24   Q.  Do you know if those records would allow you
25 to compute to a reasonable degree of accounting certainty

Page 39

1  the amount of time spent on construction management, as
2  delineated in the 1994 addendum?
3    A.  I don't know, because I don't know that those
4  documents he's referencing exist, what detail is set forth
5  in them, whether he delineates the difference between
6  employees versus subconsultants, as they are -- appear to
7  be blended in with their invoices, as I've opined in my
8  report.
9        So I don't know whether those documents he
10 mentioned in his declaration would have been fruitful to
11 this analysis.
12   Q.  Did you look for them at any time in any
13 portion of your engagement?
14   A.  I've looked at many thousands of documents in
15 connection with this engagement that I've worked since
16 2016.  I don't think I've seen anything, unless what I'm
17 looking at 18.2 would fit the description that
18 Mr. Egger is referring to.
19   Q.  Did you ask -- at any time, have you asked
20 for those records to be provided to you?
21   A.  I've asked.  I've -- as far as I know, all
22 the documents available have been produced to me.  I've
23 reviewed tens of thousands of pages.  Did I specifically
24 ask about this particular document?  No, I did not.
25   Q.  So is it fair to say that based on all the

Page 40

1  records that were available, it is not possible to any
2  degree of certainty to determine if the amount billed by
3  Urban Logic for construction management exceeds 4.5
4  percent of the bid price awarded by the City for each
5  project?
6    A.  My opinion is that, in total, their billings
7  do exceed the 4.5 percent.  That is my opinion.  I don't
8  specifically say that it's for a particular section of one
9  of the agreements.  But that my opinion is clearly that
10 the amount that they received far exceeded the 4.5 percent
11 cap set forth in the agreement and the amendment.
12   Q.  And we'll get to that, but I want to be very
13 specific here.
14       Is it possible to any degree of certainty to
15 say that the specific amounts billed for construction
16 management exceed 4.5 percent of the bid price awarded by
17 the City for each project?
18   A.  I don't believe it is specifically for that
19 particular task, based upon the way they constructed their
20 invoices, billed the City, and the fact that there are
21 hundreds -- hundreds of invoices that are missing.
22   Q.  Okay.
23       Is it possible to any degree of certainty to
24 determine whether the amounts billed for plan checking
25 exceed 4 and a half percent of the confirmed construction

Page 41

1  costs of public improvements?
2    A.  No.  Same answer as before, because of the
3  way that they constructed their invoices, the fact that
4  there are missing hundreds of invoices, just not
5  available.  There's a 19-year period that we're looking at
6  through this analysis.
7        And also, there's all kinds of concerns about
8  the invoices themselves.  That's one of the opinions that
9  I expressed in my original report is that I believe there
10 is hidden within the invoices time provided by or
11 performed by subconsultants that exceed the limitation of
12 50 percent markup.
13       So the invoices themselves, even when they
14 are available, I believe are misleading to the City of
15 Beaumont, because they are including subconsultant's time
16 in the invoices.
17   Q.  Okay.
18       We'll get to that in a minute, but I just
19 want to be clear.
20       You and I can agree that it is not possible
21 to any degree of certainty to determine if the amount
22 incurred for plan checking exceeds 4 and a half percent of
23 the confirmed construction costs of public improvements?
24   A.  I agree.
25   Q.  And it also not possible to any degree of



EXHIBIT 2
PAGE 41

Page 42

1  certainty to determine whether the amount incurred for
2  construction inspection exceeds 4 and a half percent of
3  the confirmed construction costs?
4       A.  I agree.
5       Q.  Okay.
6            Did you compute the amount of confirmed
7  construction costs in any year for the City of Beaumont?
8       A.  I computed and did a great extensive analysis
9  on what we believe the capital improvement projects were
10 during periods -- certain periods of time.  It's one of my
11 exhibits in my report.
12      Q.  And I understand that.
13           But do you know whether the amount of capital
14 improvements represents the confirmed construction costs
15 of public improvements?
16      A.  Well, if they actually expended those funds
17 for the capital improvement project, I would assume that
18 that represented confirmed costs, since they -- since I'm
19 looking at actual costs.
20      Q.  Okay.
21           But I'm asking a different question.  I don't
22 want to ask about assumptions.  I want to know what you
23 actually verified.
24      A.  Okay.
25      Q.  Did you verify that the amount incurred for

Page 43

1  capital improvement in any year represents the confirmed
2  construction costs?
3       A.  I don't know if there's a difference between
4  the actual capital improvement costs expended versus the
5  confirmed construction costs.  I don't know if there's a
6  difference between the two.
7       Q.  All right.  That was my question.
8            Do you know whether the amount of capital
9  improvement costs is the same as the bid price awarded by
10 the City?
11      A.  I don't know if there's a difference between
12 the actual versus the bid price.
13      Q.  Well, do you know whether the capital
14 improvement amount that you computed is the same as the
15 bid price awarded by the City?
16      A.  I do not know that.
17      Q.  Okay.
18           And do you know -- did you, at any time,
19 interview anyone associated with the City to determine
20 whether or not the amount of the capital improvements that
21 you computed represented the same amount as the bid price
22 awarded by the City?
23      A.  In my original engagement with the Stradling
24 firm, I had a number of conversations with employees at
25 the City of Beaumont about capital projects undertaken.

Page 44

1  And that was a primary source for me for the schedule that
2  I prepared summarizing the capital improvement projects
3  undertaken by the city.
4            I don't know that I have a specific
5  spreadsheet or knowledge of any variance, if any, between
6  the actual cost and the bid price.
7       Q.  But did someone at the City tell you that the
8  amount of the capital improvements represents the bid
9  price awarded by the City?
10      A.  I don't recall if they ever said that.
11      Q.  Do you have any source that you can point to
12 today that confirms that the amount of the capital
13 improvements you quantified is the same as the amount of
14 the bid price awarded by the City?
15      A.  Again, I don't know that there's a difference
16 when I'm looking at is the actual expenditure.  If the bid
17 comes in at a million, and they spent a million two, I
18 suspect the original bid was then supplemented by a change
19 order to bring it up to the amount that was authorized to
20 spend to a million two.
21           So I don't know that, for example, there's a
22 bid price that's lower than the actual cost.  There might
23 have an the original bid with certain changes orders that
24 would increase the original bid price.  But I'm focused
25 on my understanding of what the actual capital

Page 45

1  improvements costs were.
2       Q.  Okay.
3            But you understand that in the 1994 agreement
4  addendum, which is Exhibit 5, speaks to the bid price
5  awarded by the City?
6       A.  I understand that's the verbiage, yeah.
7       Q.  Did you identify any document or documents
8  within the City which allowed you to specifically identify
9  the bid price awarded by the City for each project during
10 the time frame of your analysis?
11      A.  No.
12      Q.  And you understand that the 1993 agreement,
13 which is Exhibit 4, speaks to confirmed construction
14 costs?
15      A.  Yes.
16      Q.  Did you identify any documents in your
17 analysis that would allow you to confirm to a reasonable
18 degree of accounting certainty the exact amount of
19 confirmed construction costs?
20      A.  Again, I don't know if there's a difference
21 between confirmed construction costs versus actual
22 construction costs incurred.  I don't know if there's a
23 difference.
24      Q.  So the answer is you don't know either way?
25      A.  You're suggesting that there is a difference.



12  (Pages 42 to 45)

EXHIBIT 2
PAGE 42

Page 46

1 I don't know if there is a difference.  So, no.  I don't
2 know that there's a difference, and I didn't compute a
3 difference between the two.
4       Q.  Buy I'm asking a different question.
5          Do you know whether the amount you used in
6 your analysis represents to a reasonable degree of
7 accounting certainty the amount of confirmed construction
8 costs?
9       A.  And again, my response would be I'm not aware
10 that there's an difference between the actual costs
11 incurred versus the confirmed construction costs.
12       Q.  Did you make any analysis to determine if
13 there's a difference between the confirmed construction
14 cost and the amount of the capital improvements used in
15 your analysis?
16       A.  No.
17       Q.  I should have started -- since you're an
18 expert, I don't actually do the whole "This is how
19 depositions work."  I don't want to waste my client's
20 money?
21       A.  Okay.
22       Q.  But if you want to break at any time, you let
23 me know, and we'll have a break.
24       A.  Okay.
25       Q.  We've been going 40 minutes.  Usually

Page 47

1 around -- 50 minutes.  I usually offer one at an hour.
2 But if you want one, too, you let me know.
3       A.  Thank you.
4       Q.  Okay.
5          According to our expert -- and I'm happy to
6 give you his report, if you want to verify what I'm about
7 to tell you.  He identified one invoice from 1994.
8          Did you identify more than one?
9       A.  Not that I'm aware of.
10       Q.  Did you even compute the amount of invoices
11 that were available for 1994?
12       A.  No.
13       Q.  Did you compute the amount that was
14 billed -- strike that.
15          Do you know if there was enough data to
16 determine the nature of ULC's billing in 1994?
17       A.  If I remember correctly, without looking back
18 at one of my exhibits, I've computed the amount that Urban
19 Logic was paid by the City during a certain period of time
20 and then paid from bond proceeds pursuant to invoices that
21 Urban Logic also sent to the City.
22          I believe with respect to the payments
23 received directly from bond proceeds, I know how much was
24 paid from bond proceeds during 1994.  Therefore, it would
25 logically represent -- would be pretty consistent with

Page 48

1 what they billed if that's how much they received.
2       Q.  Okay.
3          Was there enough data available to you
4 from -- in 1994 only to determine whether the billing in
5 1994 by Urban Logic exceeded the cap for construction
6 management and -- construction management?
7       A.  Again, I know how much Urban Logic was paid
8 in 1994 from bond proceeds.  I didn't do a year-over-year
9 analysis about what were the capital improvement costs in
10 1949, and does the amount received in 1994 from bond
11 proceeds exceed 4.5.  I didn't do a year-over-year
12 analysis over the capital improvement costs.
13          And again, because we don't have any -- I
14 don't have any records from 1993 through -- I think it's
15 2003 about payments received by Urban Logic directly from
16 the City, any estimate I make is going to be an
17 underestimate, because I don't have the amount -- any
18 records dealing with how much they received from the City
19 during that time, and neither did your expert.
20       Q.  I was trying to get to a different point.  I
21 think -- either I've confused the question or confused
22 myself.  So let me try this again.
23          From 1994 through 2007, can we agree that
24 there's a substantial amount of missing invoices?
25       A.  I agree.

Page 49

1       Q.  Okay.
2          And can we agree that due to the substantial
3 amount of missing invoices from 1994 to 2007, it is not
4 possible to determine how much Urban Logic billed for plan
5 checking and construction inspection?
6       A.  Well, I do -- I can tell you how much Urban
7 Logic was paid during that period of time, and they are
8 only going get paid on invoices submitted.  So even if I
9 don't have the invoice, I know how much invoicing they did
10 based upon the amount that they received.  So I know how
11 much the invoices were based upon the amount that they
12 received.
13          And, again, even when I did have invoices,
14 they would generically describe the scope of work.  So
15 even if I had the invoice, it wouldn't give me the ability
16 to say how many hours was for plan checking, how many
17 hours for construction inspection, and how many hours for
18 preparing progress reports.
19          It didn't have that level of detail.  But I
20 can tell you how much they got paid during that period of
21 time based upon deposit records.
22       Q.  And that's my point, and I think you and I
23 are on the same page.  That even if you were to make an
24 analysis of the descriptions of the invoices available to
25 you from 2008 to 2012, you don't even have enough invoices

MAGNA
LEGAL SERVICES

EXHIBIT 2
PAGE 43

Page 50

1  from 1994 to 2007 to do that analysis; correct?
2      A.  I agree.  And in my supplemental report, I
3  talk about your particular expert says what's critical is
4  an invoice-by invoice analysis, and that's the ultimate
5  analysis to be performed.
6          In my supplemental report, I talked about
7  even if you had all the invoices, there's all kinds of
8  assumptions that would have to be made in reviewing those
9  invoices.
10         So, yeah.  Even without the invoices, you
11 have to make certain estimations.  And even with the
12 invoices, you have to make a myriad of assumptions about
13 the accuracy and the integrity of the invoices.
14         Again, one of my opinions in my original
15 report is that there were problems with the invoices.
16 There's padding of the hours with subconsultants to
17 inflate the amount of the invoice.
18         The invoices are being prepared by the owners
19 of Urban Logic who have each pled guilty to federal
20 criminal counts or state criminal charges.
21         They are aware that there's certain things
22 that are outside the scope of the 4.5 percent cap.  So,
23 therefore, there's incentive for them to prepare the
24 invoice in a certain way to make it appear that it's
25 outside of the cap.

Page 51

1          So there's all kinds of problems with just
2  reviewing the invoices themselves.
3      Q.  Okay.
4          So any -- given everything you just said, do
5  you have enough data, as you sit here today, to tell me
6  how much was legitimately charged for plan checking?
7      A.  If you're referring to a specific task, the
8  answer is no.  And that's why I did the analysis in the
9  manner that I did because of the inability of missing
10 records, questionable records, even when they are
11 available.
12         And the fact that they are generically
13 described in the scopes of work, no, I don't think anybody
14 can do exactly what you asked about.
15     Q.  Okay.
16         And do you have enough records available to
17 you, as you sit here today, to offer to compute how much
18 was spent legitimately on construction inspection?
19     A.  Same answer.
20     Q.  Answer is no, then?
21     A.  The answer is there are missing invoices.
22 Even when invoices are produced, there are certain
23 questions about the invoices themselves, the integrity of
24 the invoices.  And the way the invoices are generically
25 drafted, it doesn't provide anyone the ability to do what

Page 52

1  you suggested.
2      Q.  Okay.
3          And the same would be true for construction
4  management.  There's just not enough data to compute the
5  amount billed legitimately for construction management?
6      A.  I agree, which is why I did the analysis in
7  the manner that I did.
8      Q.  Okay.
9          Let's take a few minutes, and I'll gather my
10 thoughts and go off the record.
11         THE VIDEOGRAPHER:  Okay.
12         Off the record.  The time now is 9:58 a.m.
13         (Pause in proceedings.)
14         THE VIDEOGRAPHER:  On the record.  The time
15 is 10:10 a.m.
16     Q.  BY MR. SCHMOOKLER:  In your analysis, as I
17 understand it, you subtracted 25 percent from Urban
18 Logic's billing in order to determine whether or not the
19 amount billed exceeded 4 and a half percent of the capital
20 improvement cost; is that correct?
21     A.  I subtracted 25 percent of the amount of
22 payments Urban Logic received directly from the City in
23 order to do that computation.
24     Q.  Why did you only subtract 25 percent from the
25 City's billing and not subtract 25 percent from amounts

Page 53

1  paid by Beaumont Financing Authority?
2      A.  Because the agreement clearly sets forth, for
3  example, a scope of work that they were to perform as City
4  officials for which they were to be paid $15,000 a month.
5          All of those invoices in which they got paid
6  $15,000 a month, which is clearly outside of the
7  4.5 percent cap, was paid directly by the City of Beaumont,
8  not from bond proceeds.
9          So I didn't see any payments on Urban Logic
10 invoices from bond proceeds that would clearly fit the
11 description as being outside of the 4.5 percent cap.
12 That's why I limited it to a reduction solely to the
13 payments received from the City of Beaumont.
14     Q.  Was the 25 percent assumption you applied
15 your estimation of the amount actually billed for tasks
16 outside the cap?
17     A.  Yes.  It was my estimation of that, and it
18 ends up being effectively at a 25 percent rate, about a $9
19 million adjustment, saying that's how much was
20 outside of the cap.
21     Q.  Why not 26 percent?
22     A.  Okay.
23         I could have use 26 percent.  25 percent I
24 felt was a reasonable estimation of the amount.
25     Q.  Okay.



14  (Pages 50 to 53)

EXHIBIT 2
PAGE 44

Page 54

1       Why not 22 percent?
2       A.  I could have used 22 percent.  I thought 25
3   percent was the right estimation.
4       Q.  Okay.
5       Why not 22.25 percent?
6       A.  We could do this for a long time with you
7   throwing percentages out.  I estimated 25 percent.  Based
8   upon my years of reviewing these documents, skills,
9   training and experience, that seemed like the correct
10  estimation.
11      Q.  Do you have any experience, other than this
12  case, estimating the percentage of billing a contractor
13  will bill a city for construction management?
14      A.  I don't recall.  Again, I've done this for 40
15  years.  There might have been an engagement somewhere in
16  that 40-year time frame that might come close to that
17  description, but I don't have any specific recollection.
18      Q.  Did you perform a comparison of Urban Logic's
19  billing to anybody else in the world in order to determine
20  whether your 25 percent number was reasonable?
21      A.  No.
22      Q.  Did you do any sort of industry study in
23  order to determine whether your 25 percent number was
24  reasonable?
25      A.  No.  I'm not aware of any industry study that

Page 55

1   I could possibly rely upon, but the answer is no.
2       Q.  And that was going to be my question.
3       Is there any secondary source, treatise,
4   standard, objective third-party source that you relied
5   upon in formulating your 25 percent figure?
6       A.  No.
7       Q.  Do you, in fact, know whether or not 25
8   percent fairly and accurately reflects the amount of time
9   spent on functions outside the cap?
10      A.  I believe it's a reasonable estimation.  Do I
11  know exactly whether it's 25 versus 26 versus 21.5, or
12  other numbers you've thrown out?  No, I don't know that.
13  It is, I believe, a reasonable estimation.
14      Q.  Tell me how it is you decided to use an
15  estimation.
16      A.  Well, I don't believe there's any other way
17  that you could do it other than estimating the percentage,
18  given the fact that, as we've talked about a number of
19  times, the fact that there are hundreds of invoices
20  missing, there's questionable integrity to the invoices
21  that we do have, there's generic wording to many of the
22  invoices.
23      Therefore, a precise calculation can't really
24  be determined.  Some of it -- some of the invoices, as I
25  mentioned, was very clear.  For example, when they bill

Page 56

1   for services dealing with City officials, and they were
2   paid $15,000, that was very clear on the invoice.  And I
3   was aware of those.
4       It's very clear that some scope of work is
5   outside the cap.  I estimated that percentage to be 25
6   percent, which I believe is a reasonable estimation.
7       Q.  Is there any sort of mathematical computation
8   underlying your 25 percent number?
9       MR. PISANO:  Object to form.
10      THE WITNESS:  No.
11      Q.  BY MR. SCHMOOKLER:  Is there any objective
12  formula underlying your 25 percent number?
13      MR. PISANO:  Object to form.
14      THE WITNESS:  No.  It's not a precise
15  formula.  It's an estimation based upon my review of the
16  invoices, knowledge of the case.  It's an estimation that
17  I believe is an approximation that is a reasonable
18  estimation.
19      Q.  BY MR. SCHMOOKLER:  How do you define
20  "reasonable"?
21      A.  Reasonable, I would define as not outrageous,
22  not inconsistent with the underlying documents available,
23  that there's consistency to them.  It's not an outrageous
24  number.
25      Q.  Well, is it an accurate number?

Page 57

1       A.  I'm sorry?
2       Q.  Do you know if it's an accurate number?
3       A.  I believe it to be a reasonable estimation.
4       Q.  Yeah.  I asked a different question.
5       Are you willing to say here, under oath, and
6   to a reasonable degree of accounting certainty that your
7   25 percent number is accurate?
8       A.  I never said it's exactly 25 percent.  I said
9   I'm estimating that 25 percent of the billings were not
10  subject to the 4.5 percent cap.
11      I'm not -- saying definitively, opining under
12  oath, that it's 25, and it could not possibly be any other
13  possible number besides 25.  It's not 26; it's not 24.
14  It's an estimation, a reasonable estimation.
15      Q.  Are you willing to say under oath that your
16  25 percent estimation is accurate?
17      A.  What I say in my report and I would say under
18  oath is that I believe it is a reasonable estimation of
19  the amount, period.  That's what my opinion is, and that's
20  what my opinion would be in front of a jury.
21      Q.  I'm asking a different question, though.
22      Did you identify any invoice, any invoice at
23  all, where the amount of time billed for engineering
24  exceeded 25 percent?
25      A.  I don't understand.  So amount -- I don't



EXHIBIT 2
PAGE 45

Page 58

1  understand your question.
2      Q.  You understand that our expert looked at the
3  entries and identified billing for engineers?
4      A.  Well, I understand your expert -- his
5  approach was to identify certain titles of professionals
6  on billings, and said that only those four, if I remember
7  correctly, titled individuals performed work that are
8  subject to the cap.
9          And, therefore, that there are -- I think
10  there was about 14 other professionals, including the
11  principals, that none of their time in 19 years was ever
12  subject to the cap.  I believe that's his analysis, which
13  I believe is completely flawed.
14      Q.  Okay.
15          Did you determine the amount of time billed
16  by engineers?
17      A.  No, I did not.  Again, we don't have invoices
18  for many years.  The invoices are generic in their scope.
19  There's integrity issues with the invoices.
20          So, no.  I didn't go invoice by invoice,
21  identify what Urban Logic unilaterally determined was an
22  engineering person, and not total those up.  That's
23  not the approach I took.  It's not the analysis I
24  performed.
25      Q.  Okay.

Page 59

1          Have you ever done an estimate, as you've
2  done in this case, without any analysis underlying it in
3  any other case?
4      A.  To describe my work as performing no analysis
5  is completely disingenuous and wrong.
6      Q.  I didn't say that --
7      A.  You did.
8      Q.  -- and you misunderstood my question.
9      A.  Okay.
10      Q.  I said no.
11          Have you ever used an estimate without
12  performing any analysis underlying it in any other case?
13          MR. PISANO:  Object to form.
14          THE WITNESS:  And I told you that my estimate
15  of 25 percent is based upon my analysis of invoices, many
16  invoices, and a myriad of other documents in the case.  So
17  my analysis or estimates of 25 percent is supported by the
18  analysis that I did.
19      Q.  BY MR. SCHMOOKLER:  Okay.
20          What document can you point to in your
21  binders -- and I've got them all here for you -- where we
22  could look and see this is how I got to 25 percent, and
23  not 23 percent and not 29 percent?
24      A.  Okay.
25          I described in the narrative of the document

Page 60

1  the reason for the 25 percent.  I describe it as clearly
2  that there was scope of work that was called for pursuant
3  to the agreement that would be outside of the scope.
4          There's particular subparagraphs that talk
5  about services they were going to provide as officials for
6  the City.  They were to spend 28 hours per week, if I
7  remember the agreement right, at offices at the City, and
8  they were to be paid $15,000 a month.
9          I looked through many, many invoices, saw
10  invoices consistent with that agreement amount of $15,000.
11  I saw that those were paid by the City.  They were not
12  paid from bond proceeds.
13          I figured out how many months, roughly, that
14  they were serving as City officials and would be provided
15  that $15,000, and I estimated 25 percent.  There is no
16  Excel spreadsheet with the mathematical formula other than
17  what I've just described.
18      Q.  Did you take $15,000 a month, multiply it by
19  12, and then multiply it by the years to get your 25
20  percent?
21      A.  Yes.  That was one of the things I
22  considered.
23      Q.  So if we took $15,000, and we multiply it by
24  12, you get to $180,000?
25      A.  I agree.

Page 61

1      Q.  And did you then multiply $180,000 times the
2  number of years, which I think is 17, to get to your 25
3  percent?
4      A.  Well, $180,000 times 10 years is $1.8
5  million.  Twenty years would be $3.6 million, and I've
6  given them the benefit of $9 million.
7          So in my 25 percent estimate, I'm saying
8  they're going to get $15,000 a month for a certain number
9  of years.  And there's other scopes of work that they are
10  going to perform in addition to that.
11          And I'm effectively giving them credit for $9
12  million, when I know that 10 years of serving as City
13  officials at $15,000 a month is only $1.8 million.
14          So I'm including in, without any type of
15  additional specifics, that there are other work that they
16  are doing that is outside of the cap of the 4.5 percent.
17      Q.  Well, let's just work your math for a minute.
18  So let's just take -- we'll round the numbers for ease of
19  use.
20          Let's say you gave them credit for $9
21  million.  We know that $1.8 million of that is absolutely,
22  unequivocally outside the cap, because they get paid their
23  monthly fee; right?
24      A.  Well, I don't know that they got paid as City
25  officials for all 17 years.



Page 62

1   Q.  I used 10 years.
2   A.  Okay.
3   Q.  So I'll give you the benefit of this.
4   A.  Okay.
5   Q.  $9 million -- we can agree that $9 million,
6   we take 10 years at $15,000 a month, that's $1.8 million,
7   meaning the net we're going to yield is $6.2 million?
8   A.  7.2.
9   Q.  7.2, sorry.  Doing this in my had.
10       7.2 million; correct?
11   A.  Correct.
12   Q.  And you say, I believe, that the total
13   billing is $75 million; correct?
14   A.  Correct.
15   Q.  So you're giving them less than 10 percent,
16   less than -- one out of every 10 hours billed in your
17   estimate is outside the cap; correct?
18   A.  Well, $9 million is more than 10 percent of
19   $75 million, but --
20   Q.  But within your $9 million is -- is -- is --
21   is the monthly fee --
22   A.  Okay.
23   Q.  -- correct?
24   A.  Yeah.
25   Q.  So if we just focus on work that is not in

Page 63

1   the three paragraphs we've been talking about, it's
2   actually $7.2 million; correct?
3   A.  Yes.
4   Q.  And so, in reality, what you said is less
5   than 10 percent of every hour billed is not within one of
6   those -- not within the contract at all?
7   A.  That would fit what the contract calls as
8   "from time to time, we may authorize you to perform
9   additional tasks," yes.
10       But that 10 percent would fit that
11   description from the sentence, "from time to time, we may
12   authorize you to perform other services"; that is
13   correct.
14   Q.  And isn't it true that the City, every single
15   year, authorized Urban Logic to act as a contractor and
16   provide other services?
17       MR. PISANO:  Object to form.
18       THE WITNESS:  Well, when you say
19   "authorized," what is your -- what is the document you
20   have -- are you asserting that there's a documents that
21   specifically calls out an authorization for them to do
22   these additional services?
23   Q.  BY MR. SCHMOOKLER:  Yes.
24       Are you aware that such documents exist?
25       MR. PISANO:  Object to form.

Page 64

1       THE WITNESS:  I don't know what documents
2   you're referring to.  I might be.
3   Q.  BY MR. SCHMOOKLER:  Okay.
4   A.  If you think there's a specific
5   authorization -- certainly, the invoices were approved by
6   Mr. Kapanicas.  But I don't know that there's a specific
7   task-by-task approval for the services.
8   Q.  Isn't it true that each and every year,
9   capital improvement plans that were provided to the City
10   Council provided a list of qualified contractors?
11       MR. PISANO:  Object to form.
12       THE WITNESS:  I agree.  There's a couple
13   improvement plans year over year.
14   Q.  BY MR. SCHMOOKLER:  No.  I asked you a much
15   more specific question.
16       Isn't it true the capital improvement plans
17   that were provided to the City Council list a set of
18   approved qualified contractors?
19       MR. PISANO:  Same objection.
20       THE WITNESS:  I believe that's true.  I don't
21   know that I've seen every capital improvement plan for
22   every single year, but I've seen some of them.
23   Q.  BY MR. SCHMOOKLER:  Isn't it true that the
24   City Council every year specifically approved the use of
25   qualified contractors identified in the capital

Page 65

1   improvement plans, including Urban Logic?
2       MR. PISANO:  Object to form.
3       THE WITNESS:  Again, you qualified as "every
4   year."  I know that there's capital improvement plans that
5   identify Urban Logic as a approved contractor.
6   Q.  BY MR. SCHMOOKLER:  Well, I asked a different
7   question.
8       Isn't it true that those capital improvement
9   plans were specifically approved, including approval for
10   the use of Urban Logic as a contractor?
11       MR. PISANO:  Same objection.
12       THE WITNESS:  And I think I just said yes.  I
13   haven't seen every single -- 19 years' worth of capital
14   improvement plans.  I've seen some, and I know that Urban
15   Logic is listed as an approved contractor.
16       MR. SCHMOOKLER:  Okay.
17       Let's look at what's going to be marked as
18   Exhibit 7.
19       (Exhibit Number 7 was marked for
20   identification.)
21   Q.  BY MR. SCHMOOKLER:  Okay.
22       Exhibit 7 is the 2011 Capital Improvement
23   Plan, sir.  Do you see that?
24   A.  Yes.  For year 2011-2012.
25   Q.  And you can see at the final page of that



17  (Pages 62 to 65)

EXHIBIT 2
PAGE 47

Page 66

1    capital improvement plan, which is the last page of that
2    document, is a list of contractors.  It should be on the
3    back.  Literally the last page.
4           You know, I don't have my copy.  I only made
5    two, so bear with me one minute.  I thought it was the
6    last page.  Sorry.  It is on BAUAIG4419.
7           MR. PISANO:  That's the last page of the
8    document that I have.
9           MR. SCHMOOKLER:  Oh, you know what?  Then
10   I've done a bad job copying yours.  I owe you a copy of
11   that one, too.
12          THE WITNESS:  Okay.
13          Q.   BY MR. SCHMOOKLER:  Do you see the list of
14   contractors on that particular capital improvement?
15          A.   I do.
16          Q.   And that includes Urban Logic; correct?
17          A.   It does.
18          Q.   Isn't it true that in 2011, for example,
19   Urban Logic was listed as a qualified contractor in the
20   capital improvement plan?
21          A.   Yes.
22          Q.   I'll show you what I'm marking as Exhibit 8.
23          (Exhibit Number 8 was marked for
24   identification.)
25          Q.   BY MR. SCHMOOKLER:  Exhibit 8 is a group

Page 67

1    exhibit that I put together.  It is the resolutions, I
2    will tell you, on the capital improvement plans for each
3    of the years.  If you turn to literally the last two
4    pages, you will find the resolution 2011-18.
5           Do you see that, sir?
6           A.   I do.
7           Q.   And this is a resolution approving the
8    2010-11 capital improvement plan.  Do you see that?
9           A.   Yes.
10          Q.   Okay.
11          And you see a paragraph section 1?
12          A.   Yes.
13          Q.   It says,
14           "The City hereby amends and adopts the
15          capital improvement plan attached as Exhibit
16          A, authorizes the use of funds as shown on
17          attached Exhibit B, and authorizes and
18          districts the City manager, staff, financing
19          team, and qualified professional service
20          contractors identified on attached Exhibit C
21          to implement the plan and take all necessary
22          actions and expend funds as herein directed
23          and authorized as set forth in the project
24          progress reports attached as Exhibit D."
25          Do you see where I've read from, sir?

Page 68

1           A.   I do.
2           Q.   Isn't it true -- and look.  You can look
3    through all of these if you want.  Every year there's a
4    resolution authorizing the contractors identified in the
5    capital improvement plans to implement the capital
6    improvement plan?
7           A.   Well, a couple comments.
8           A capital improvement plan is a forward
9    looking budget.  It's not approving specific invoices.
10          Clearly, Urban Logic was an approved
11   contractor, because they got paid $75 million from 1993
12   through August of 2012.
13          And what we're referring to is the agreement
14   that sets forth a paragraph that says, "from time to time,
15   we may authorize you to perform additional services."
16          So approval -- blanket approval of Urban
17   Logic as a consultant consistent or included in with a
18   capital improvement plan does not, in my mind, authorize
19   or fit that description of "from time to time, we may
20   authorize you to do additional work."
21          "From time to time" certainly suggests to me,
22   a clear reading of the agreement, that it is the
23   exception, not the majority.  That the majority of the
24   work to be done by Urban Logic is set forth and is subject
25   to the 4.5 percent cap.

Page 69

1           Q.   BY MR. SCHMOOKLER:  Okay.
2           I didn't ask any of that.  Moving to strike
3    your answer, because I understand you want to say all
4    those words, because that's the story I've heard.  I'm
5    asking a different question.
6           First of all -- but I'll ask about your
7    answer.
8           You interpret the words "time to time";
9    correct?
10          Those -- you've offered an interpretation of
11   what that means?
12          A.   Well, my report offers an interpretation, and
13   then I actually refer in a footnote what dictionary.com
14   says "from time to time" refers to.  So I don't think it's
15   an outrageous interpretation of what that means.
16          Q.   Whether you think it's outrageous or not, the
17   opinion about whether or not the billing fits within the
18   contract depends on your interpretation of the contract;
19   correct?
20          MR. PISANO:  Object to form.
21          THE WITNESS:  Can you repeat that question?
22          Q.   BY MR. SCHMOOKLER:  Sure.
23          You have offered the opinion about whether or
24   not the amount -- whether or not the amount billed fits
25   within the phrase "from time to time"; correct?



18  (Pages 66 to 69)

EXHIBIT 2
PAGE 48

Page 70

1    A.  No.  What I've offered in the opinion is that
2  25 percent of the time, the invoices paid -- issued --
3  all the invoices were issued by Urban Logic to the City of
4  Beaumont.
5            And those invoices that were paid directly by
6  the City of Beaumont, 25 percent of them were outside of
7  the cap.  Our discussion now about that phrase "from time
8  to time," in my opinion, supports my estimate of 25
9  percent.
10    Q.  You are interpreting the contract when you
11  define what "from time to time" means; correct?
12            MR. PISANO:  Object to form.
13            THE WITNESS:  I don't believe that I'm
14  interpreting the contract.  I'm talking about what common
15  understanding of the phrase "from time to time"
16  represents.
17            And I believe that that phraseology supports
18  my estimation of 25 percent.  25 percent means 75 percent
19  are; 25 percent are not, which is consistent with the
20  "from time to time."
21            If you think -- I don't know that there's a
22  disparate view about what the phrase "from time to time"
23  means.  But my opinion doesn't hinge upon my correct
24  interpretation of that particular phrase.
25    Q.  BY MR. SCHMOOKLER:  Did you, at any time, in

Page 71

1  any of your opinions offer any interpretation of any
2  contract term?
3            MR. PISANO:  Object to form.
4            THE WITNESS:  I don't know how to answer that
5  question.  Of course, I've read the contracts.  I came to
6  an understanding of what the contracts say.  I performed
7  my analysis that I believe is consistent with and uses as
8  its framework the agreement -- the agreements, both the
9  original agreement and the amendment.
10    Q.  BY MR. SCHMOOKLER:  Did you interpret in
11  doing your analysis any of the words in the contract?
12    A.  I read the words in the contract.  I'm not a
13  lawyer.  I don't -- I don't interpret contracts.  I read
14  contracts.  I've done this for 40 years.  I've probably
15  read a million contracts.  The idea of reading a contract
16  and coming to an understanding as a CPA professional, I've
17  done that for 40-plus years.
18            And as an FBI agent, trust me, I've read many
19  contracts as a special agent with the FBI investigating
20  white collar crimes.  I can read contracts.
21    Q.  You were subject to a motion to strike your
22  opinions because you have history of interpreting
23  contracts.
24            Are you aware of that?
25    A.  No.

Page 72

1    Q.  Oh, wait.
2            Are you aware that party -- at least one
3  party has moved to exclude you as an expert for offering
4  legal opinions?
5    A.  No.  I'm not aware of that.
6    Q.  Okay.
7            Isn't it true that you have been the subject
8  of a motion to exclude because you offered interpretation
9  of contracts?
10    A.  You mean in this case or another case?
11    Q.  No, another case.
12    A.  I don't know.
13    Q.  Are you offering the opinion that a fraud
14  occurred?
15    A.  The determination about whether someone did
16  or did not commit fraud rests with the Trier-of-Fact, not
17  me.  What I do say is, based upon my skills, training and
18  experience, there appears to be indicia of a fraud scheme.
19            And, in fact, the defendants were all charged
20  in a criminal fraud case by the Riverside District
21  Attorney's Office and pled guilty.  Each of them pled
22  guilty to criminal fraud counts, felony counts.
23            So I'm not rendering that opinion.  The
24  D.A.'s office believed that there was fraud.  They
25  specifically charged a fraud count, and they all pled

Page 73

1  guilty.
2    Q.  They did not plead guilty to fraud.  Isn't
3  that true?
4    A.  I'm sorry?
5    Q.  Not a single one of the Urban Logic owners
6  pled guilty to fraud.  Is that not true?
7    A.  Two of them pled guilty to -- I have to look
8  back at my report what they specifically pled guilty to.
9    Q.  They pled guilty to a conflict of interest,
10  did they not?
11    A.  Two of them solely to -- pled guilty to a
12  conflict of interest.  One of the others, conflict of
13  interest, plus some misappropriation charge.
14    Q.  And isn't it true, as, apparently, your
15  client believes, the conflict of interest has no support
16  for your opinion; correct?
17            MR. PISANO:  Object to form.
18    Q.  BY MR. SCHMOOKLER:  I'll rephrase.
19            The conflict of interest that was pled to
20  provides no support for a single one of your opinions;
21  correct?
22            MR. PISANO:  Same objection.
23            THE WITNESS:  Well, I would say that
24  they -- each of the individuals pled guilty to
25  federal -- or to felony counts in a criminal case brought



EXHIBIT 2
PAGE 49

1    by the Riverside District Attorney's Office.
2         That is the impact to me, in my analysis, is
3    that they all pled guilty to felony counts in a criminal
4    case brought by the Riverside District Attorney's
5    Office.
6         Q.  BY MR. SCHMOOKLER:  Yeah.  But that has no
7    support for any of the opinions as to whether or not the
8    billing exceeded 4 and a half -- the 4 and a half cap you
9    applied; correct?
10        A.  It's certainly somewhat of a factor.
11   They -- that the facts of the case rose to a level in
12   which the Riverside District Attorney's Office brought a
13   felony criminal case of which the defendants of the case
14   pled guilty to a count, and it's a factor.
15        Q.  So you do rely on the plea agreements then?
16        A.  I don't know how -- it isn't a computation in
17   my -- there's no schedule here that increases the number
18   because of the fact that they pled guilty to a felony
19   count.  It's a factor.
20        Q.  Okay.
21        A.  I view the factors, I mentioned it, is as an
22   admission of wrongdoing by the individuals.
23        Q.  Okay.
24             That is my question.  I want to be really
25   clear about this, because we're in the middle of some

1    briefing where your testimony is critical.
2         Do you, today, as you sit here right now,
3    rely upon the plea agreements as an admission of
4    wrongdoing in support of your expert opinions?
5         MR. PISANO:  Object to form.
6         THE WITNESS:  It's just knowledge that's out
7    there.  I have knowledge that they pled guilty.  Did it
8    impact any of the numbers, any of my opinions?  No,
9    absolutely not.
10        Q.  BY MR. SCHMOOKLER:  Okay.
11             Do you rely upon those plea agreements to
12   support any of the opinions you reached in your reports?
13        A.  No.
14        Q.  Okay.
15             So to the extent that those plea agreements
16   never come into evidence, you don't need them; right?
17        A.  I don't need them, meaning does it throw out
18   my opinions, any of my opinions if the plea agreement
19   doesn't come in?  No.
20        Q.  Okay.
21             You agree with me that $10 million in
22   restitution was paid, correct, by the Urban Logic owners?
23        A.  Agreed.
24        Q.  You purport to compute in your report
25   overcharging based on an analysis of payroll records from

1    Paychex; correct?
2         A.  Yes.
3         Q.  Is the amount you compute of overcharging
4    based on the payroll records from Paychex more or less
5    than $10 million?
6         A.  Well, the payroll records were for a very
7    limited period of time.  I think we've got them for three
8    years.  My calculation of overcharge deals with the period
9    covering 1993 through August of 2012.
10             So the Paychek records only existed for a
11   short period of time and were used by me to help formulate
12   an opinion about whether those invoices include charges by
13   subconsultants in excess of the 15 percent markup.
14        Q.  Okay.
15             I asked a different question.
16             Does the amount of overcharging you computed
17   mathematically, based on the Paychek records you had, is
18   it more or less than $10 million?
19        A.  You're mixing up my analysis.  I
20   didn't -- base my opinion about the overcharging in excess
21   of 4.5 percent based on the Paychek records.  That's not
22   what I did.
23        Q.  I didn't say you did.
24             If you look -- and if you want to look at
25   your own report, you can.  We're on page 14 of your

1    report.
2         You do a computation of implied overbilling
3    based on Paycheck records.  And you say the amount is
4    $3,903,252 in the year 2011.
5         Do you see that, sir?
6         A.  Right.
7         Q.  Then say, "A similar result is obtained when
8    the analysis is performed for the billings and payroll
9    records for the year 2010."
10             Do you see that?
11        A.  I do.
12        Q.  You do not, however, provide a number for
13   2010, a computation.  Do you see that?
14        A.  Yeah.
15        Q.  Did you compute the implied overbilling for
16   2010 based upon Paycheck records?
17        A.  No.
18        Q.  Okay.
19             The only number you computed for implied
20   overbilling is for the year 2011; correct?
21        A.  It's the only year that I did the computation
22   based upon excess hours times average rate.  I did do a
23   calculation for 2010 for the -- I believe I did for the
24   implied overhours for 2010, but I might not have.
25             But, again, there's two different



20  (Pages 74 to 77)

EXHIBIT 2
PAGE 50

Page 78

1  overbillings.  One is this is talking about an overbilling
2  based upon payroll records in connection with the
3  inclusion of subconsultants embedded within the Urban
4  Logic invoices, not the opinion about overbillings as
5  comparison against the 4.5 percent.
6      Q.  Totally agree with you, and I'm separating
7  them out.  I understand what you've done on 4 and a half
8  percent, and now we're talking about implied overbilling
9  at payroll records and subconsultants.
10     A.  Okay.
11     Q.  How much -- what the amount that you compute
12  as overbilling based on the Paychex records?
13     A.  Well, again, I only had a couple years' worth
14  of Paychex records.  So I'm using, as an example, 2011,
15  and how the analysis of the 2011 records shows that
16  subconsultant's times are embedded within the Urban Logic
17  invoices.
18         I'm using 2011 as an example.  And I use, as
19  an example, the annual impact of $3.9 million for 2011.
20  I did not do that same calculation for other years.
21     Q.  So you did a computations of implied
22  overbilling based on whatever records you had available to
23  you; correct?
24     A.  When you say, "applied overbillings" as a
25  result of the inclusion of subcontractors, that would be

Page 79

1  the more accurate --
2      Q.  Well --
3      A.  -- phrase.
4      Q.  You say, in your words -- I'm using your
5  words.  These aren't mine.
6      A.  Okay.
7      Q.  "The result is an implied overbilling."
8      A.  Okay.
9      Q.  So I'm using your words, not mine.  I don't
10 want to use mine.
11     A.  Okay.
12     Q.  You did a computation of implied overbilling
13 and computed the amount as $3,903,252; correct?
14     A.  With respect to 2011 exclusively, and with
15 respect to the inclusion of subcontractors in a stepped up
16 rates outside of 15 percent markup.
17     Q.  Sure.
18         Now, you did not do that same computation for
19 other years; correct?
20     A.  Correct.
21     Q.  Okay.
22         So the total amount of implied overbilling,
23 as computed by you in your report, based on hours and
24 whether or not the billings included subconsultants, is
25 under $4 million; correct?

Page 80

1      A.  Due to the limitation of records that I had,
2  yes.  I limited my analysis to just 2011.
3      Q.  Okay.
4          And the amount you computed, based on the
5  availability of the information you had, is under $4
6  million; correct?
7      A.  Correct.
8      Q.  And the amount you computed, based on alleged
9  overbilling for subconsultants, is under the amount of
10 restitution paid by the Urban Logic owners; correct?
11     A.  Well, I do not believe at all that this
12 inclusion of subcontractors was limited to just 2011.
13 That's the only calculation, based upon the availability
14 of the records.  I have no reason to believe that that
15 practice didn't occur years prior to 2011 and years
16 subsequent to 2011.
17         So it certainly does not represent the
18 totality of what I believe this practice -- the amount of
19 overbilling resulted from this practice.  I'm using this
20 as an example year.
21         And, no, I don't express the opinion that I
22 only saw this in 2011.  It's just, through the
23 availability of the records, that's all I talked about.
24     Q.  I don't want to talk about beliefs.  I want
25 to talk about actual analysis.

Page 81

1          The only analysis you are able to perform,
2  based on applied overbilling for subconsultants, was in
3  2010 and '11 based on the availability of the records; is
4  that correct?
5      A.  Again, overbilling in connection with the
6  inclusion of -- non-disclosure of the inclusion of
7  subconsultants in ULC's billings to the City.  That's
8  correct.
9      Q.  Okay.
10         And the only amount you were able to compute
11 to a reasonable degree of accounting certainty for
12 overbilling based upon the -- based upon subconsultants is
13 reflected on pages -- in your report on pages 14, 15, 16,
14 17, 18, 19, and 20; correct?
15     A.  Right.  Those are the examples that I set
16 forth to demonstrate and support my opinion about
17 overbilling with respect to subconsultants.
18     Q.  And the only amount that you computed for
19 overbilling involving subconsultants is less than $4
20 million; correct?
21     A.  Correct.
22     Q.  Okay.
23         And can we agree that the only amount you
24 computed for overbilling based upon subconsultants is less
25 than the restitution paid?



21 (Pages 78 to 81)

EXHIBIT 2
PAGE 51

Page 82

1    A.  I agree that $4 million less than $10
2  million.
3    Q.  And isn't it true, sir, that you have not
4  performed the computations necessary to compute implied
5  overbilling based on subconsultants for 2010, even though
6  Paychex records are available for that year?
7    A.  Can I look back at my report?
8    Q.  Sure.  So I brought the totality for you.
9        If you want to look at 14-1, I'm not sure if
10  that is intended to be a computation or not.
11    A.  Yes, it is.  14-1 is a computation based upon
12  invoices.  The computation is driven by two things.  One
13  is the invoices that were submitted by Urban Logic to the
14  City of Beaumont in the hours claimed on those invoices,
15  as well as Paychex records.
16        And I did do a computations which is -- for
17  2010, which is under tab 14-1, which is an implied
18  overbilling for 2010 of $2.2 million.
19    Q.  Okay.
20        And so is it fair to say that the
21  computations you did based on Paychex records and implied
22  overbilling based on subconsultants is roughly $6.7
23  million?
24    A.  Yes.  For those two years, right.
25    Q.  And those are the only two years you had

Page 83

1  enough payroll records to do the analysis; correct?
2    A.  Well, it's more than payroll records.  My
3  report talks about a variety of documents I had to review
4  in order to make this analysis.
5        I had to find, for example, those internal
6  prepared worksheets that I referenced before as exhibit
7  tab 18-1.  That was a critical component.
8        I had to find an invoice for that same period
9  of time by a third-party subconsultant.  I had to find
10  invoices during the same period of time.  So it was a
11  matching up of three different source documents as well as
12  the payroll records.
13        So there's four different documents that I'd
14  have to find for that same period of time for the entire
15  year in order to do that calculation.  And I didn't always
16  have those documents available, which is why my analysis
17  was just limited to 2010-2011.
18    Q.  Can we agree that there are not enough
19  records for you to do an analysis of implied overbilling
20  based on the use of subconsultants to a reasonable degree
21  of accounting certainty for any years other than 2010 and
22  '11?
23    A.  Yes.  That's why I didn't do it for other
24  years.  I didn't have the documents available to do that.
25    Q.  Okay.

Page 84

1        And we can agree that the amount of implied
2  overbilling that you computed for the only years that you
3  were able to do the analysis, meaning 2010 and '11, is
4  less than the amount of restitution paid?
5    A.  I agree.
6    Q.  Did you make any effort to conform your
7  analysis to the testimony of the City Council members?
8        MR. PISANO:  Object to form.
9        THE WITNESS:  Well, I don't know that I
10  conformed my analysis to their testimony.  I'm aware of
11  what their testimony was.
12    Q.  BY MR. SCHMOOKLER:  Okay.
13        Did you make any effort to ensure that your
14  analysis was consistent with the testimony offered by the
15  City Council members?
16        MR. PISANO:  Same objection.  Object to
17  form.
18        THE WITNESS:  I think my answer is going to
19  be the same.  I performed my analysis based upon review of
20  banking records, invoices, a myriad of documents.  I did a
21  calculation.
22        I'm aware of what the City Council members
23  said.  I didn't, then, take my result, and say, "Oh, wow.
24  I need to back that number down based on what somebody
25  testified about."  No, I did not do that.  I'm aware of

Page 85

1  what they testified.
2    Q.  BY MR. SCHMOOKLER:  Okay.
3        So let's look at the contract.  I think this
4  is Exhibit -- 4, the 1993 contract.  Okay?
5        And you will see in section 5, page 7, Bates
6  number 701?
7    A.  Okay.
8    Q.  You will see that, in the first line of that
9  section, it says, "The consultant shall provide all
10  necessary plan checking and inspection services for public
11  works projects in the City of Beaumont as follows."
12        Do you see where I've read from?
13    A.  I do.
14    Q.  And you understand what a public works
15  project is, do you not?
16    A.  Generally speaking, sure.
17    Q.  Okay.
18        And then if you look at Exhibit 5, which I
19  think is the '94 addendum -- yes.  In section V-1, you
20  will see that, again, this section applies to services,
21  quote, during all phases of public works construction.
22        Do you see that?
23    A.  Yes.
24    Q.  Okay.
25        Now, you understand from the testimony, do



Page 86

1  you not, that in addition to working on public improvement
2  projects, Urban Logic also provided services in connection
3  with private projects that had to be supervised by the
4  City.
5          Do you not?
6      A.  I believe I read that.
7      Q.  We'll look together, just so we're on the
8  same page.
9          I'll show you what's marked as Exhibit Number
10 9.
11         (Exhibit Number 9 was marked for
12 identification.)
13     Q.  BY MR. SCHMOOKLER:  Exhibit 9 is the full
14 deposition of Mr. Roger Berg.  You're familiar with who he
15 is; correct?
16     A.  City Council member, from my understanding.
17     Q.  Okay.
18         If you look at page 46, line 20, he was asked
19 the following question by my colleague.
20         Before I ask this, you reviewed his
21 deposition; right?
22     A.  I did.
23     Q.  Did you -- did you, for any reason
24 whatsoever, disregard his testimony?
25     A.  Well, first of all, let me back up.

Page 87

1          I believe I read his deposition.  Disregard
2  it?  I'm aware of it.
3      Q.  Okay.
4          Did you factor his testimony into your
5  analysis of whether Urban Logic overcharged based on these
6  4 and a half percent cap?
7      A.  I considered what he was testifying about.
8      Q.  Okay.
9          He wrote -- he's asked this question on page
10 46, line 20.
11             "To the extent that Urban Logic was
12         providing plan checking and construction
13         inspection for private development, that
14         would not be encompassed by this agreement.
15         Do I understand that correctly?"
16             "Answer:  That would be correct."
17         Do you see where I read from?
18     A.  I do.
19     Q.  So you know from both the contracts
20 themselves and from the City Council member, who was there
21 when these contracts were executed, that the caps we've
22 been speaking to speak about public works project, not
23 private development projects; correct?
24     A.  I understand that.
25     Q.  Did you subtract from your computations

Page 88

1  amounts billed on private jobs?
2      A.  Well, I believe that would be encompassed
3  within that 25 percent.  I'm not aware of -- again, based
4  upon the generic billings of Urban Logic for professional
5  services rendered, it doesn't tell me what project they
6  were working on.
7          The fact that there were hundreds the Urban
8  Logic invoices that were missing, there's some concern
9  about the integrity of the Urban Logic invoices.  I'm
10 aware of that, and I would say that they would be
11 encompassed within the 25 percent.
12     Q.  Hold on.  Let me ask a different question,
13 because maybe you and I are missing each other.
14         The bills that Urban Logic provided actually
15 do segregate out the amount billed on a
16 project-and-project basis; correct?
17     A.  Sometimes, not always.  I have two examples
18 in my report that says, "For professional services
19 rendered."
20     Q.  Okay.
21         Two examples out of how many bills?
22     A.  Well, examples are examples.  It doesn't mean
23 this encompasses every single time I've seen that billing.
24 I'm using this as examples.  So this doesn't -- it's
25 beyond two.

Page 89

1      Q.  Where available, did you compute
2  out -- strike that.
3          In the instances where Urban Logic
4  specifically billed specific amounts on a
5  project-by-project basis, did you subtract out billing on
6  private jobs from your computations?
7      A.  No.
8      Q.  Were you able, based on the data you had, to
9  determine how much was billed on private jobs, assuming
10 the invoices were otherwise accurate?
11     A.  No.  It's not -- there's not enough invoices
12 available to do that, and there's not always the
13 sufficient amount of description, and it's also not clear
14 what are private versus public works job.
15         So, no, I did not do that.  That's why I
16 gave, basically, a 25 percent allowance estimate in the
17 way I constructed my analysis.
18     Q.  Well, do you know whether or not, if you went
19 back and computed the instances where specific billing was
20 on specific private jobs, that amount exceeds 25 percent?
21     A.  No, I didn't do that calculation.  I don't
22 have enough invoices.  I don't trust the integrity of the
23 invoices.  And I don't know that I had the specific
24 knowledge to determine the public versus private work
25 projects.



23  (Pages 86 to 89)

EXHIBIT 2
PAGE 53

Page 90

1    Q.  Well, to the extent that you accepted the
2 invoices as true, do you have the expertise necessary to
3 delineate a private project from a public works project?
4         MR. PISANO:  Object to form.
5         THE WITNESS:  It depends upon the description
6 on the invoices.  It might be very clear that it's a
7 private project versus a public works project, or it might
8 not be.  Depends on the narrative on the invoice.
9    Q.  BY MR. SCHMOOKLER:  Let's look at one that is
10 in your report, so we know you looked at it.  So if you
11 look at Exhibit 2, which is your supplemental report,
12 Exhibit 27.
13         And I'm just going pull this one at random.
14    A.  Okay.
15    Q.  Bates number LOC474562?
16    A.  These aren't filed in Bates order.  Is
17 there -- if you go to the top page, there will be a
18 letter.  Starts with AA --
19    Q.  Yeah.  I tabbed it for you.  It's Exhibit 27.
20    A.  Okay.
21    Q.  So that's AA.
22    A.  Okay.
23    Q.  You're right.  They are not in any -- I put
24 them in the order you gave them to me.
25    A.  Okay.

Page 91

1    Q.  So it's LOC4074562.
2    A.  They are not in Bates order.  How many pages
3 in from the first page do I turn?
4    Q.  23.
5    A.  074563?
6    Q.  -62.
7    A.  Okay.
8    Q.  We're going took looking at -63, too.
9    A.  Okay.
10    Q.  So LOC4074562 is one invoice from Urban
11 Logic, dated June 2, 2011.  Do you see that?
12    A.  I do.
13    Q.  And do you see where it says "Shell gas
14 station"?
15    A.  Yes.
16    Q.  Is that a public works job?
17    A.  Well --
18         MR. PISANO:  Object to form.
19         THE WITNESS:  -- the top of the invoice says,
20 "Billing for public work services."
21    Q.  BY MR. SCHMOOKLER:  Okay.
22         Did you do the analysis necessary to
23 determine from the City records whether that's a public
24 works job?
25    A.  No.  The invoice says it's for public works

Page 92

1 services.
2    Q.  I understand.
3         And I wanted to know -- you said the invoices
4 are totally inaccurate and unreliable, as I understand it.
5    A.  That is not what I said.
6    Q.  So you are willing to rely on the invoices
7 where it helps?
8    A.  Well, let me correct what you just said.
9 I never said that, totally inaccurate and
10 unreliable.  I said that part of my analysis was that they
11 embedded within -- they included within the invoices work
12 perform by subconsultants in contradiction to the defined
13 markup.  So I talked about questioning about the integrity
14 of the invoices.  So you're misstating my opinion.
15         As far as here, did I challenge their own
16 phraseology, where it says that the workers performed for
17 public works services?  No, I did not.
18    Q.  Okay.
19         But, importantly, we can agree the contract
20 says that it applies to a public works project and public
21 works construction.  Do you remember that?
22         MR. PISANO:  Object.
23         THE WITNESS:  Yes.
24    Q.  BY MR. SCHMOOKLER:  Okay.
25         Did you do any analysis to determine whether,

Page 93

1 for example, the Shell gas station was a public works
2 construction?
3    A.  No.
4    Q.  Did you do any analysis of whether that was a
5 public works project?
6    A.  No.  Again, the invoice says "public works
7 services."  I did not parse out the word "services,"
8 compare it against construction work projects.  I did not
9 parse out those words and do a specific invoice-by-invoice
10 analysis.  No, I did not do that.
11    Q.  Did you determine whether or not the amount
12 incurred on work other than public works projects and
13 public works construction is more than your 25 percent
14 assumption?
15    A.  No.
16    Q.  And you agree, correct, that public
17 works -- anything that's not a public works project or
18 public works construction should be subtracted from your
19 computations?
20         MR. PISANO:  Object to form.
21         THE WITNESS:  Well, not subtracted, because I
22 gave a generic estimate of 25 percent.  So it would be
23 embedded within that 25 percent.  So it wouldn't be a
24 subtraction.  It would be included within that 25 percent.
25    Q.  BY MR. SCHMOOKLER:  But if you were to go



EXHIBIT 2
PAGE 54

Page 94

1  back and to do this to a mathematical certainty, one of
2  the factors you'd want to know is how much was billed on a
3  public works project, public works construction;
4  correct?
5       MR. PISANO:  Object to form.
6       THE WITNESS:  Well, I'm looking at an invoice
7  that says "public works services."  So it sound like your
8  suggestion is I'm now to look behind this invoice to see
9  whether Urban Logic inaccurately described it as a public
10 work service, when it's really a private work service, and
11 I should have done a calculation to exclude this?
12      I'm trying to understand your question.
13   Q.  BY MR. SCHMOOKLER:  Sure.
14      If you wanted to know to a mathematical
15 certainty did they bill more than the cap, as you've
16 asserted it, you'd want to know how much was billed on a
17 public works job, and how much was billed on a public
18 works job; right?
19      You'd want to know that.
20      MR. PISANO:  Objection to form.
21      THE WITNESS:  Conceptually -- I'm sorry.
22      Conceptually, if I had all the documents, and
23 I could trust the documents as far as reliability, and I
24 had a perfect document production for 19 years' worth of
25 services rendered, maybe an analysis, if it could possibly

Page 95

1  be performed, might have some useful benefit.
2       But no, I did not do that.  And it's a
3  hypothetical that is unattainable, given the documents and
4  all the other reasons that I mentioned.
5    Q.  BY MR. SCHMOOKLER:  I don't want to talk
6  about 19 years.  Let's just talk about one year.  Let's
7  just do one year.  Let's do them one at a time.
8    A.  Okay.
9    Q.  2011?
10   A.  Okay.
11   Q.  If you were to compute whether the billing in
12 2011 exceeded the 4.5 percent cap, one piece of data you'd
13 like to have how much was incurred on private jobs;
14 correct?
15   A.  That's not the approach I took, because I
16 didn't operate in a vacuum in 2011.  I'm doing an analysis
17 for 19 years.  The analysis for one year, if even
18 possible, is not a reasonable approach given that I've got
19 19 years' worth of data that I need to analyze.
20   Q.  Okay.
21      But if you were to -- you did do an analysis
22 in 2011, did you not?
23   A.  I did -- I know how much was paid over to
24 Urban Logic pursuant to their billings to the City and
25 paid by both the City and bond proceeds.  I know exactly

Page 96

1  what they got paid, which would be -- the obvious -- if
2  they got paid X dollars, it would suggest that they
3  invoiced X dollars.
4       So I know how much they got paid.  I'm giving
5  them an allowance of 25 percent as being outside the cap
6  as a reasonable estimation.  And I compared that against
7  4.5 percent of the capital improvement costs.
8    Q.  Can you tell me to the reasonable degree of
9  accounting certainty how much was billed by Urban Logic in
10 connection with private jobs outside the scope of caps?
11   A.  No.
12      And are you suggesting that the invoice is
13 wrong here?  It says it's public works services.
14   Q.  I'm not suggesting anything.  I'm get to ask
15 the questions today.
16   A.  Okay.
17      I'm trying to understand your question.  I'm
18 trying to get clarity of your questions.
19   Q.  We'll talk in terms of my questions.
20      So -- strike that.
21      Sir, can you testify today as to the amount
22 billed by Urban Logic on private jobs outside the scope of
23 the cap to a reasonable degree of accounting certainty?
24   A.  No.
25   Q.  Now, Mr. Berg was also asked about -- on page

Page 97

1  69 of his deposition.  It's at the bottom, line 22.  He
2  was then asked, and I'm reading,
3           "And the plan check/inspection and
4       construction management services that Urban
5       Logic would provide on those projects for the
6       water district, school district, and parks
7       and rec district, were those services subject
8       to a 4 and a half percent fee cap?
9           "No," he says.
10      Do you see that?
11   A.  I do.
12   Q.  Did you compute to a reasonable degree of
13 accounting certainty the total amount billed for the water
14 district by Urban Logic?
15   A.  No.
16   Q.  Did you compute to a reasonable degree of
17 accounting certainty the amount incurred for the school
18 district?
19   A.  No.
20   Q.  Did you compute to a reasonable degree of
21 accounting certainty the amount computed for the parks and
22 recreation district?
23   A.  No.
24   Q.  Did you subtract out from your computation
25 amounts billed from the water district in light of



**EXHIBIT 2**
**PAGE 55**

Page 98

1    Mr. Berg's testimony?
2         A.   No.
3         Q.   Did you subtract out amounts billed for the
4    school district from your computations in light of
5    Mr. Berg's testimony?
6         A.   No.
7         Q.   Did you subtract out the amount that was
8    billed for parks and recreation district from your
9    computation in light of Mr. Berg's testimony?
10        A.   No.
11        MR. SCHMOOKLER:   Let's take a break.
12        THE VIDEOGRAPHER:   Off the record.  The time
13   is 11:11 a.m.
14        (Pause in proceeding.)
15        THE VIDEOGRAPHER:   We're back on the record.
16   The time is 11:23 a.m.
17        Q.   BY MR. SCHMOOKLER:  Sir, as I understand it,
18   you applied a 25 percent assumption in your analysis; is
19   that correct?
20        A.   Correct.
21        Q.   And -- but you only applied that assumption
22   to billing by -- or amounts paid by the City; correct?
23        A.   Directly paid by the City; correct.
24        Q.   And you did not subtract out from your
25   analysis any tasks as being outside the cap if it was paid

Page 99

1    by Beaumont Financing Authority; correct?
2         A.   Correct.
3         Q.   And, therefore, your assumption as it relates
4    to Beaumont Financing Authority is that every single task
5    ever performed by Urban Logic fell within plan checking,
6    construction inspection or construction management?
7         A.   Yes.  For those ULC invoices submitted to the
8    City paid from bond proceeds, I estimated that they were
9    all subject to the 4.5 cap.
10        Q.   So it is your opinion that every single
11   function ever performed by Urban Logic for Beaumont
12   Financing Authority is either construction management,
13   plan checking or construction inspection; correct?
14        A.   Well, you said performed for Beaumont
15   Financing Authority.  Urban Logic submitted its invoices
16   to the City of Beaumont.
17        City of Beaumont apparently were the ones
18   that determined whether that particular invoice would be
19   paid by the City funds or whether it would be paid by bond
20   proceeds.  But all the invoices were submitted to City of
21   Beaumont.
22        Q.   And we're going to get to that, and I'll
23   rephrase my question.
24        Every dollar for every task ever paid by
25   Beaumont Financing Authority was either construction

Page 100

1    management, plan checking or construction inspection;
2    correct?
3         A.   I applied -- yes.  Again, it's paid by bond
4    proceeds.  The invoices were all submitted to the City of
5    Beaumont.
6         Q.   What is the factual basis for you opining
7    that every single work -- piece of work ever done that was
8    paid by Beaumont Financing Authority had to be plan
9    checking, construction inspection or construction
10   management?
11        A.   Again, as I testified earlier, there was
12   certain carve-out of scopes of work that was not subject
13   to the cap.  My understanding of what that was, I saw that
14   those particular invoices were always paid by the City of
15   Beaumont, as I understood what was not subject to the cap.
16        They weren't paid from bond proceeds.  They
17   were paid from -- directly from the City of Beaumont.
18   That's the reason that the cap, the estimation of the 25
19   percent, applied to the payments from the City of
20   Beaumont.
21        Q.   Are you willing to say under oath today to a
22   reasonable degree of professional certainty that Urban
23   Logic ever perform any function ever on any project paid
24   for by Beaumont Financing Authority outside of
25   construction management, plan checking and construction

Page 101

1    inspection?
2         A.   No.  I'm not going to say that.  I haven't
3    said that.
4         Q.   Okay.
5         Isn't it true that you have not computed the
6    amount that was paid by Beaumont Financing Authority for
7    work that was outside of construction management, plan
8    checking and construction inspection?
9         A.   Correct.
10        Q.   And isn't it true that the bond documents
11   themselves identify Urban Logic as the project engineer?
12        A.   I believe sometimes they use that phrase, and
13   sometimes they use other phrases to describe Urban Logic.
14        Q.   And you have not, for example, computed the
15   amount billed by Urban Logic and paid by Beaumont
16   Financing Authority for work Urban Logic did as the
17   project engineer in connection with the bonds; correct?
18        A.   Correct.
19        Q.   And there's nothing in section -- any of the
20   witness testimony that said project engineer work is
21   subject to a 4 and a half percent cap; correct?
22        A.   Can I look back at a document?
23        Q.   Sure.
24        A.   I'm looking at Exhibit 5, section V.1.  The
25   last full sentence says,



Page 102

1       "In the performance of such duties, ULC
2    shall provide construction management for
3    each public works project before, during and
4    after completion of various stages of
5    construction, including the following
6    services related to planning, control,
7    scheduling, estimating and value engineering
8    of public works project."
9       So in here, it talks about value engineering.
10   So they use the word engineering in public works projects
11   as -- into the preamble paragraph, as it precedes the
12   listing of 21 separate scopes of tasks defined under the
13   generic term of construction management services.
14      Q.  Great.
15          You don't know what value engineering is, do
16   you?
17      A.  As used here, I don't know -- I see the word
18   "engineering" in connection with public works projects.
19      Q.  I didn't ask that.
20          Do you have any expertise in what constitute
21   value engineering?
22      A.  No.
23      Q.  Did you do any research on what constitutes
24   value engineering?
25      A.  Value engineering as opposed to engineering,

Page 103

1    no.  I did not do anything with respect to that.
2       Q.  Sorry.  I didn't mean to interrupt you.
3           Did you do any computation of the amount
4    incurred by Urban Logic for value engineering?
5       A.  No.
6       Q.  Did you do any distinction between billing by
7    Urban Logic for engineering and value engineering?
8       A.  No.
9       Q.  Do you even know if there is a distinction
10   between project -- being project engineer for the bond and
11   value engineering as used in section 5?
12      A.  No, I do not.
13          MR. PISANO:  Object to form.
14          THE WITNESS:  I'm sorry.
15          I do not.
16      Q.  BY MR. SCHMOOKLER:  Are you willing to say to
17   a reasonable degree of accounting certainty that 100
18   percent of every dollar ever spent by Urban Logic and paid
19   for by Beaumont Financing Authority is subject to the cap?
20      A.  That's not what my opinion is, and it's not
21   the opinion I'm going render.  The opinion is that I
22   estimated and provided, essentially, an allowance of a
23   certain amount that's outside of the cap.
24          I applied that allowance to payments made
25   directly by the City.  That's the way I constructed it.  I

Page 104

1    could have done 12 and a half percent on one, and 12 and a
2    half to the other, and yielded the same result.  It's a
3    basically an allowance of 25 percent used in the
4    calculation.
5       Q.  Okay.
6           But I asked a different question.
7           Are you willing to say, as you sit here
8    today, that to a reasonable degree of accounting certainty
9    every dollar of paid for by BFA was for a service inside
10   the cap?
11      A.  No.
12          MR. PISANO:  Objection.
13          THE WITNESS:  I didn't say that, and I'm not
14   saying that.
15      Q.  BY MR. SCHMOOKLER:  Okay.
16          Now, you will agree with me that the
17   percentage, in your words, allowance that you used has an
18   impact on the calculation?
19      A.  Of course.
20      Q.  So if you used 30 percent, 40 percent, 50
21   percent, 2 percent, the calculation would change; right?
22      A.  It would.
23          In fact, in my supplemental report, I did
24   four different scenarios about what impact changing the 25
25   percent would be.  And it still yields a result that shows

Page 105

1    an overbilling significantly in excess of the 4.5 percent
2    cap, even if I used 90 percent, as opposed to 25 percent.
3           So it's still yields the same result, that
4    being an apparent overbilling by Urban Logic in excess of
5    the 4.5 percent cap.
6       Q.  Well, your scenarios have more factors built
7    in than just the percentage; right?
8       A.  I'm sorry.  The question again?
9       Q.  Sure.
10          Each of your factors that you've -- I'm
11   sorry.
12          Each of your examples that you've come up
13   with -- 25, 50, 75, 90, I believe, is the four?
14      A.  Correct.
15      Q.  Okay.
16          Let talk about the assumptions underlying
17   each of those.  It assumes no reduction for any
18   outside-the-cap services from Beaumont Financing
19   Authority; correct?
20      A.  That's correct.
21      Q.  It assumes that no reduction for specific
22   work done on private jobs; correct?
23      A.  Correct.
24      Q.  It assumes no reduction for billing to the
25   water district; correct?

MAGNA
LEGAL SERVICES

EXHIBIT 2
PAGE 57

1    A.  I didn't have that carve-out.  I gave it a
2  general allowance; that's correct.
3    Q.  It assumes no reduction for work done for the
4  school district; correct?
5    A.  Correct.
6    Q.  It assumes no work done for parks and
7  recreation; correct?
8    A.  Correct.
9    Q.  So when you say, "various scenarios all yield
10  overbilling," they were all based upon assumptions you
11  applied as to what should be entitled to be included;
12  correct?
13    MR. PISANO:  Object to form.
14    THE WITNESS:  No.  The percentage provides
15  what I can use the word "allowance."
16    For example, at a 90 percent, that's
17  effectively saying that -- I don't have the numbers in
18  front of me, but something like $60 million worth of
19  payments received by Urban Logic were not subject to the
20  cap.  That's what that represents.
21    Whether I took 95 percent and put 45 against
22  this payment from the City, 45 percent against payment
23  from the bond, it's going to yield the same number.  It's
24  creating an allowance.
25    I don't need to specify in my allowance how

1  much of that allowance is related to school district, how
2  much of it is related to public versus private works.
3  It's an allowance.  And I'm saying they can do this amount
4  of work, and it's not subject to the cap.  That's what I'm
5  doing.
6    Q.  But I didn't well -- strike that, sir.
7    Can we agree on the rudimentary basics of
8  multiplication, that in order to multiply, you need to
9  have a number and a percentage for your calculation?
10    A.  Sure.
11    Q.  If you took 90 percent, and you applied it
12  over the total population of billing, there would be no
13  overbilling; correct?
14    A.  Right, in your hypothetical.  That's fine.
15    Q.  No.
16    In your analysis, your analysis, if you took
17  your 90 percent number and applied to all of the billing,
18  there would be no overcharging; correct?
19    A.  Mathematically, yeah.  The number would work
20  out that way.  I wouldn't do that, because I don't think
21  that's correct, but that's fine.
22    Q.  And if you took 75 percent, and you
23  multiplied it across all of the billing, there would be no
24  overcharging; correct?
25    A.  I don't know.  I didn't do that calculation.

1    Q.  Well, we can do the rudimentary math
2  together.  Let's get your schedules.  We have the
3  schedules.
4    A.  Okay.
5    Q.  I believe -- do you know what Exhibit Number
6  it is?
7    A.  Two.
8    Q.  So Exhibit 2 has all four of your scenarios
9  in it; correct?
10    A.  Correct.
11    Q.  And if we took 90 percent, which is the last
12  scenario, and we applied to all of the billing, we can
13  agree there's no overcharging whatsoever; correct?
14    A.  Well, it would be pretty close.  They got
15  paid $75 million.  10 percent of $75 million is $7.5
16  million.  4.5 percent of the cap is $8 million.  So it's
17  very close.  But, I wouldn't apply 90 percent against
18  both, because I don't think that's correct.
19    Q.  Okay.
20    A.  But I agree, mathematically, it would work
21  out that it would just come under $8 million.
22    Q.  Well, under is under; right?
23    A.  Under is under.
24    Q.  So if you apply your 90 percent scenario to
25  all of the billing, we can agree there would be no

1  overcharging?
2    A.  Sure.
3    Q.  And if we take your 75 percent number, there
4  would be some overbilling but less than the restitution
5  paid; correct?
6    A.  I'll do the math quickly in my head here.  It
7  would still be over, even considering the cap, I believe.
8  $75 -- million, 10 percent is $7.5 million.  Fifteen, it
9  would be $30 million.  I don't know.  I don't feel like
10  doing the calculation in my head.
11    Q.  Well, sir, how do we know if 90 percent is
12  right?  25 percent is right?  28 percent might be right?
13  How do we know?
14    A.  Well, the original agreement and the
15  amendment sets forth 23 scopes of work to be performed.
16  And, for example, the language talks about -- I think it's
17  in the amendment that there's an expectation that the
18  principals of Urban Logic would be performing those
19  services.
20    Your expert did a calculation that yields a
21  number that's something like 97 percent of the invoices
22  were outside of the cap, only 3 percent.
23    And your expert made -- essentially renders
24  the opinion that not one single hour for 19 years worked
25  by the principals was ever subject to the cap.



EXHIBIT 2
PAGE 58

Page 110

1    So when you start using numbers such as 90
2  percent or 97 percent, like your expert does, it yields
3  what I believe is a completely unsupportable, unrealistic
4  result that cannot possibly, I believe, be correct.
5    Q.  Okay.
6    But you understand that your client's the
7  plaintiff; right?
8    A.  I understand how litigation works, yeah.
9    Q.  Do you know what it means to be the
10 plaintiff?
11   A.  I've done this for 40 years.  I've got a
12 concept of plaintiff versus defendant.  I do.
13   Q.  And you've been expert for the plaintiff;
14 correct?
15   A.  I've been an expert for defendants and
16 plaintiffs in my 40 years.
17   Q.  Great.  Great.  Excellent.
18   So I want to know, is there, for example, a
19 recognized industry standard that you can point me to
20 about how to compute an estimate of when work is inside or
21 outside of a contractual cap?
22   A.  No.  There's no -- industry standard that
23 says exactly how that computation should be made.  It's
24 each case is unique, unique sets of facts, unique
25 agreements.  There is no such standard that says exactly

Page 111

1  how you should do that.
2    Q.  Have you received any specialized training
3  about how to make an estimate of what percentage of work
4  is inside or outside of a contractual cap?
5    A.  I can read a document.  I can understand what
6  percentages are.  I can do the calculation.  I can do
7  estimations.  This is the type of work I've done for many,
8  many years as an FBI agent and as a forensic accountant.
9    Each case is unique.  But, at the same time,
10 there's similar types of analysis that can be done in the
11 majority of cases, and that's what I'm doing here.
12   Q.  Okay.
13   But I'm being really specific here.  Have you
14 received any specialized training on how to estimate the
15 percentage of work that is inside or outside of a
16 contractual cap?
17   A.  I'm not aware that there's any specialized
18 training that says exactly how to calculate construction
19 billings to this specific contract with the City of
20 Beaumont, no.  I'm not aware of any specific training out
21 there that does that.
22   Q.  Are you aware of any publications that we can
23 look to as to how estimate when -- what percentage of work
24 is inside or outside of a contractual cap?
25   A.  No.

Page 112

1    Q.  Have you spoken to any industry experts in
2  construction about whether there's any data points that
3  they can point you to in terms of estimating what
4  percentage of work would be inside or outside of a
5  contractual cap in the construction world?
6    A.  No.
7    Q.  Is there anything you can point me to that
8  would be authoritative, in your mind, that would provide
9  guidance as to how to estimate the percentage of work that
10 is inside or outside of the cap?
11   A.  Any type of guidance, you said?
12   Q.  No.
13   I said, is there any publication, training,
14 standard, anything in the world that you can dream of that
15 you can point me to today that would provide an
16 authoritative source as to how to estimate what percentage
17 of work is inside or outside of a cap?
18   A.  No.
19   MR. PISANO:  Object to form.
20   THE WITNESS:  I'm sorry.
21   MR. PISANO:  Go ahead.
22   THE WITNESS:  Authoritative source to tell me
23 exactly how to do this calculation?  No.
24   Q.  BY MR. SCHMOOKLER:  Can you point me to a
25 case by name where you have offered an opinion using the

Page 113

1  same methodology to compute -- or strike that.
2    Can you point me to a case by name -- and you
3  can look at your file if you wish -- where you have used
4  the same methodology to provide an estimate of costs
5  inside or outside a contractual provision of any variety?
6    A.  No.  There's not any case that I can recall
7  that has this unique set of facts.  Each case is unique.
8  This is a unique set of facts to this particular case, so
9  no.
10   Q.  So because each case is unique, can we agree
11 that whatever -- strike that.
12   Have you ever been asked in any other case
13 ever to estimate the amount of billing inside and outside
14 of a contractual cap?
15   A.  Well, as I mentioned early on in this
16 deposition, I worked a number of cases involving
17 construction disputes and concerns about accuracy and
18 integrity of billings by contractors.
19   I don't think those particular cases had this
20 unique set of facts, where there's a defined cap, and
21 there's a certain set of work that's subject to a cap, and
22 certain set of work that's not subject to the cap.  I
23 don't think I have a case with that exact similar pattern.
24   But, again, reviewing construction billing,
25 construction costs, comparing them against expected costs



EXHIBIT 2
PAGE 59

Page 114

1   and bases for overage, I've done that a number of times.
2       Q.   And I want to be really more specific about
3   the estimate and your 25 percent estimate. Have you ever
4   offered any opinion in any case where you have used a
5   blanket estimate when determining whether or not there's
6   overbilling?
7           MR. PISANO:  Object to form.
8           THE WITNESS:  Well, when you say "blanket
9   estimate" --
10      Q.  BY MR. SCHMOOKLER:  I'll rephrase.  I'll take
11  it back.
12          Have you ever used an estimate in lieu of
13  sort of an invoice-or-invoice or billing-by-billing
14  analysis in any other case when alleging overcharging?
15      A.   Sure.  We use estimates -- "we," generically,
16  forensic accountants, me, specifically, Dan Ray, use
17  estimates all the time.  It's extremely rare, if ever,
18  that I get a hundred percent of every single document I
19  can could possibly want in a case.
20          So there's holes that need to get filled by
21  use of estimations, interpretations of data.  It happens
22  all the time.  And what you do at the end of that is you
23  look to see whether the estimate yields a result that's
24  reasonable.
25          And now we compare and contrast my estimate

Page 115

1   that I believe yields a reasonable result with the
2   estimate and the calculations used by your expert that I
3   believe yields a completely incorrect result that could
4   not possibly be correct.
5           So the approach to be taken is utilize
6   estimations, and then you take a step back and you say,
7   "Am I yielding a result and analysis that appears to be
8   reasonable?"
9           And my opinion is that your expert's
10  analysis, while I understand it, yields a result that
11  could not possibly be correct.
12      Q.   Let's take a step back.
13          Your estimate occurred before our expert did
14  anything; correct?
15      A.   I know my report was filed before his.  I
16  don't know what work he was doing while I was doing my
17  analysis.
18      Q.   But you did the estimate in 2018; correct?
19      A.   Well, I wrote a report way back then in 2018.
20  It's not the report that was issued in this particular
21  case.
22      Q.   But in 2018 is when you devised the 25
23  percent estimate?
24      A.   Correct.
25      Q.   Okay.

Page 116

1           So in 2018, when you devised the 25 percent
2   estimate, were you applying any sort of industry
3   recognized standard in coming up with 25 percent?
4       A.   There is no standard that I'm aware of that
5   says, "Thou shalt use 25 percent." I'm not aware of a
6   standard that's out there.
7       Q.   Okay.
8           Were you applying any sort of authoritative
9   industry standard in determining whether, in your opinion,
10  your estimate was reasonable?
11      A.   Well, you showed me early on the litigation
12  consulting standards, and I pointed out in there that
13  there are four critical components to the standards that I
14  do follow as a forensic accountant.
15          And that is professional competency, due
16  professional care, adequate planning and supervision and
17  sufficient relevant data.  I believe that the work I did
18  clearly is within the four corners of what my standards
19  are as a forensic accountant.
20      Q.   Yeah.  I asked a different question.
21          You said you did 25 percent, and you took a
22  step back, and you looked at whether it's reasonable;
23  right?
24      A.   I did.
25      Q.   Okay.  Great.

Page 117

1           Is there anything in what I marked as Exhibit
2   2 that speaks to the standard for determining when an
3   estimate is reasonable?
4       A.   No.
5       Q.   Is there anything you can point me to
6   anywhere in the world that you would deem authoritative in
7   your own mind that would guide us in evaluating the
8   reasonableness of your estimate?
9           MR. PISANO:  Object to form.  Also, I believe
10  this is all asked and answered.
11          THE WITNESS:  No.  And I believe that's why
12  there's a Trier-of-Fact to make that ultimate
13  determination.
14      Q.   BY MR. SCHMOOKLER:  Can we agree that your
15  view of what is reasonable is sort of in the eye of the
16  beholder?
17          MR. PISANO:  Object to form.
18          THE WITNESS:  Well, I believe that it's going
19  to be in the eyes of the Trier-of-Fact as to whether my
20  opinion of 25 percent is more accurate than your expert's
21  opinion that only 3 percent of the total invoices was
22  subject to the cap, and that not a single hour ever worked
23  by the professionals, the principals, ever pertained to
24  work subject to the 4.5 percent cap.
25          I think that's going to be up to the



EXHIBIT 2
PAGE 60

Page 118

1  Trier-of-Fact to determine which opinion is more
2  reasonable.
3      Q.  BY MR. SCHMOOKLER:  Well, I want to talk
4  about, like, how you got to 25 percent, so in devising 25
5  percent and not 28 percent -- or strike that.
6          When you first decided to use an estimate,
7  did you go through various scenarios on various
8  percentages in deciding whether other percentages would be
9  equally reasonable?
10     A.  No.  I didn't sit down and have a discussion
11 with myself about whether it should be 26 versus 25.  25
12 seemed like a reasonable estimation, given my knowledge of
13 the case and my review of the documents.
14     Q.  Well, did you at any time consider whether
15 alternative numbers -- strike that.
16         Did you, at any time prior to receiving our
17 expert's report, consider whether there were alternative
18 percentages that would be reasonable?
19     A.  Well, sure.  Again, I didn't plunk 25 percent
20 out of thin air.  I reviewed documents.  I did
21 multiplications like we talked about with $15,000 a month,
22 times 12 months a year, and how many years.  I did those
23 calculations and considerations in my head.
24         I also was aware, even before your expert
25 wrote his report, that even if the number was 50 percent,

Page 119

1  it would still yield a number that would indicate that
2  there is significant overbillings in excess of the 4.5
3  percent cap.
4          I was aware that even if I changed that
5  number, that 25 percent, to something more significant, it
6  would still yield, effectively, the same result.  That
7  there was an overbilling by Urban Logic against the 4.5
8  cap.
9          But I put 25 percent, because I believe that
10 to be the most reasonable percentage.  But I was also
11 aware that 50 percent would yield the same result.  75
12 percent would yield the same result.
13     Q.  Well, not it wouldn't  The numbers would be
14 different.  When you say it would yield the same
15 result -- strike that.
16         It would yield the same result, you mean the
17 product of your computations would be identical?
18     A.  Of course not.
19     Q.  Isn't it true that your choice of 25 percent
20 has a direct impact on the amount of the claimed
21 overbilling?
22     A.  I agree that the number changes.  What I'm
23 talking about is the result being that Urban Logic
24 overbilled and received money far in excess of the 4.5
25 cap.  That's the point I was making.  Of course, if I

Page 120

1  multiply 25 versus 50, it's going to yield a different
2  number.  Of course.
3      Q.  So the amount of money your client demands of
4  my client is directly dependent on the percentage you
5  chose; correct?
6      A.  Of course.
7      Q.  And so your choice of 25 percent has a direct
8  correlation to the amount of money that you can claim;
9  correct?
10     A.  I agree.
11         MR. PISANO:  Object to form.
12         THE WITNESS:  Sorry.
13     Q.  BY MR. SCHMOOKLER:  And as I understand it,
14 are there any records that you kept reflecting your value
15 judgments as to why 25 percent would be reasonable, as
16 opposed to 30 percent or a different percentage?
17     A.  No.
18     Q.  Is there anything you can point to in your
19 file or in your records that we could look to to
20 understand how and why -- strike that.
21         Is there anything we can look at in your
22 records that would show us the mental process that you
23 reached in deciding the 25 percent is reasonable?
24     A.  No.
25     Q.  Did anybody else, other than you, have any

Page 121

1  input as to whether 25 percent would be reasonable?
2      A.  I worked with a couple staff people on the
3  case.  This is something I might have discussed with him
4  about whether 25 percent seems reasonable or not.  I had a
5  particular staff person that worked very closely with me
6  on this case.
7      Q.  Who is that?
8      A.  Bill Lind, L-i-n-d.
9      Q.  Does he have a construction background?
10     A.  I don't know.
11     Q.  Are you aware of any sort of authoritative
12 material that would provide us factors for evaluating
13 whether or not an estimate is reasonable?
14     A.  Estimate -- generically?
15     Q.  No.
16     A.  Whether forensic accountants should be able
17 to use estimates or -- I don't understand your question.
18     Q.  My question is you've used an estimate, 25
19 percent.  I want to know, is there any sort of
20 authoritative source whatsoever that would provide us an
21 identified list of factors to evaluate the reasonableness
22 of your estimate?
23     A.  Not that I'm aware of.
24     Q.  Is there any industry standards that you're
25 aware of at all that would govern the reasonableness of an



Page 122

1   estimate?
2       A.  Industry standard?  No.
3       Q.  Did you apply any sort of recognized
4   methodology from any authoritative source in deciding
5   whether or not 25 percent would be reasonable?
6       A.  We would point back to the litigation
7   consulting standards that the -- person performing the
8   work has to have professional competency, they exhibit due
9   professional care during the course of their engagement,
10  in the exercise of, in this case, determining estimations,
11  and adequately planning and supervision of their work.
12      I plan to work.  I utilized a qualified staff
13  member to assist me.  I exercised due professional care.
14  I relied upon sufficient relevant data in order to come up
15  with my estimate.  So that would be the standard.
16      And then I would supplemental that with 40
17  years' worth of training, various certifications.  I am a
18  certified public accountant.  I'm certified in financial
19  forensic by AICPA.  I'm a certified fraud examiner, former
20  FBI, special agent, with particular training in analyzing
21  financial records.  I have done this for 40 years.
22      So that would be the environment in which I
23  did this work and came up with this estimation.
24      Q.  Do you have any certifications relating to
25  evaluating the reasonableness of an estimate?

Page 123

1       MR. PISANO:  Object to form.
2       THE WITNESS:  Well, every case is unique.
3   Every estimate -- again, when you use estimates, you need
4   to take a step back at the end of that process and say,
5   "Is that estimate yielding what would appear to be a
6   reasonable result?"
7       And my opinion is that my estimate of 25
8   percent yields a reasonable result.  Your estimate, your
9   expert's estimation and opinion yields what I believe is
10  completely incorrect result, a result that could not
11  possibly be correct.
12      Q.  BY MR. SCHMOOKLER:  Well, I didn't ask that.
13  I'll go back to my question.
14      Do you have a certification, any
15  certification, that certifies you as some sort of expert
16  in evaluating the reasonableness of an estimation?
17      A.  I'm not aware of any certification out there
18  that certifies someone in reasonableness estimation.  I
19  have many, many years of experience and training, which
20  includes analyzing financial data, estimating where
21  necessary.
22      And then making determinations as to whether
23  those estimates yield a result that appears to be
24  reasonable.  There is no standard out there that I believe
25  would apply beyond what I've already described.

Page 124

1       Q.  Okay.
2       So I want to go back to my question.  I'll
3   start with a different question and come back to this.
4       Have you received specific training on
5   evaluation of when an estimate is reasonable?
6       A.  Specific training?  I'm not aware of a
7   specific training that says here how you shall determine
8   whether an estimate is reasonable.
9       I'm not aware of a particular course that
10  says that.  There's generic training that I've received
11  for 40 years that allows me to do that.  But, no, I can't
12  think of a specific course that says here's how you do
13  that.
14      Q.  Okay.
15      Did you receive any training at the FBI on
16  evaluating when an estimate in a mathematical -- in a
17  forensic accounting analysis is reasonable?
18      A.  It's certainly something they teach you, is
19  that you make sure that your analysis -- there's a lot of
20  phrases.  You can use, "pass the smell test," "appears
21  reasonable."  I mean, that's really pretty common, basic,
22  fundamental stuff.  "Does it pass the smell test?"  If you
23  want to use that phraseology.
24      So, yeah.  That's absolutely a critical part
25  of what I was doing as an FBI agent, where my work might

Page 125

1   lead to someone being criminally indicted.  So, of course,
2   I'm going to make sure that my analysis and my
3   investigation yields a reasonable result.
4       But is there a particular course?  I can't
5   think of one.
6       Q.  That's what my question is.  Have you ever
7   received any training specifically on how to evaluate
8   whether your estimates are, in fact, reasonable?
9       A.  I think I've answered that three or four
10  times.  I would say no.  I can't think of a specific
11  course that dealt exactly with that topic.
12      Q.  Okay.
13      It is 12:00.  Would you like to take lunch?
14  I'm going to go for a little longer -- a little bit
15  longer, so it's going to be awhile.
16      MR. PISANO:  Okay.
17      THE WITNESS:  Okay.
18      MR. PISANO:  Off the record.
19      THE VIDEOGRAPHER:  Off the record.  The time
20  is 11:58 a.m.
21      (Pause in proceeding.)
22      THE VIDEOGRAPHER:  We're back on the record.
23  The time is 12:32 p.m.
24      Q.  BY MR. SCHMOOKLER:  Okay.
25      Sir, we've taken lunch.  I'd like to go



EXHIBIT 2
PAGE 62

Page 126

1    through your reports.  I have some questions about some
2    specific areas.  And if you want to look at the opening
3    report, we just go through it.  I have very specific
4    questions about it.
5         A.  Okay.
6         Q.  On page 4, under "Summary of Opinions," you
7    write in paragraph three, "The accounting records for ULC
8    as set forth in the general ledger are not accurate."
9              Do you see that?
10        A.  I do.
11        Q.  That is your opinion; correct?
12        A.  It is my opinion.
13        Q.  Okay.
14             And because the records are not accurate, you
15   would agree that they do not provide a reasonable basis
16   for an accounting computation; correct?
17        A.  Depends upon what accounting computation is
18   being done and what alternate documents are available to
19   do the calculation.
20             For example, I do expand on this opinion
21   later on by saying it looks like the revenue side of the
22   general ledger appears accurate.  I can reconcile general
23   ledger revenue entries against bank account records.  So
24   that appears reasonable.  It's the expense side that they
25   didn't -- appears that they didn't accurately record

Page 127

1    expenses.
2         Q.  But for purposes of computing whether the
3    billing exceeded the 4 and a half percent, the accuracy of
4    the general ledger is irrelevant; correct?
5         MR. PISANO:  Object to form.
6         THE WITNESS:  It was -- the relevancy, and
7    the reason I included it as one of my opinions, is that I
8    believe there's an expectation that someone who gets paid
9    $75 million would have accurate accounting records, and
10   they did not.  So that was the pretty much the sole point
11   of making this opinion.
12        Q.  BY MR. SCHMOOKLER:  But for purposes of
13   offering an opinion as to the computations of loss, to
14   what extent is the accuracy of the general ledger
15   impactful of whether or not there's overbilling in this
16   case?
17        A.  Well, again, the overbilling is driven by the
18   revenue side, that is, how much money that they got.  And
19   there's two primary -- three different places that I can
20   pick up the revenue side.
21             One is how much was paid out from the City
22   and BFA bond proceeds, how much was deposited into the
23   bank accounts for Urban Logic, where I have bank records,
24   and then the general ledger records.
25             The general ledger records with respect to

Page 128

1    the revenue side do appear to be accurate.  And it helped
2    me to understand the sources of the money -- about how
3    much is coming from the City, how much is coming from bond
4    proceeds, according to their very own general ledger
5    records.  The problem with their general ledger is the
6    expense side, not the revenue side.
7         Q.  But the inaccuracy of the expenses does not
8    impact whether or not there was overcharging; correct?
9         A.  I agree with that.
10        Q.  And, therefore, that you agree with me that
11   you don't need accurate expense records in a general
12   ledger for purposes of your analysis?
13        A.  Well, again, the reason I included it
14   is -- is that they did $75 million worth of work they got
15   paid for, and they don't have accurate accounting records.
16   So that's pretty much the sole purpose.
17             Although, in my supplemental report, I have
18   specific exhibits which I generated from their general
19   ledger in order to demonstrate how much money came from
20   the City and how much money came from bond proceeds.
21        Q.  But that would be revenue; correct?
22        A.  That would be revenue.
23        Q.  So in terms of you criticizing Urban Logic
24   for inaccurate general ledger, that was not necessary in
25   order for you to compute whether there's overbilling;

Page 129

1    correct?
2         A.  I agree.
3         Q.  You also in this report purport to detail the
4    amount of money that Mr. Dillon and Mr. Moorjani and
5    Mr. Egger earned as owners; correct?
6         A.  Correct.
7         Q.  That also was not a component of determining
8    whether there was overbilling; correct?
9         A.  No.  It provides a framework as to precisely
10   how much they made in the way of profits from this
11   overbilling.  The idea that they are doing work for the
12   City and received compensation totaling probably in excess
13   of $30, $40 million from a contract with the City I think
14   is a data point.
15        Q.  But to the extent that they earned $30
16   million legitimately, they earned $30 million
17   legitimately; correct?
18        A.  Well, if it's legitimate, and it's within the
19   parameters of the contract and the limitations of the
20   contract.
21             But my opinion is that the contract limited
22   the amount they could make to 4.5 percent of confirmed or
23   bid price, depending on which agreement.  And the idea
24   that they personally took home somewhere in the
25   neighborhood of $30 to $40 million is suggestive that

MAGNA ▶
LEGAL SERVICES

EXHIBIT 2
PAGE 63

Page 130

1    maybe there is an overbilling.
2        Q.  Okay.
3            But, fundamentally, sir, you would agree you
4    don't need to know how much Mr. Dillon, Egger, Moorjani
5    earned in order to determine whether there's overbilling?
6        A.  Did I need to know that in order to make the
7    determination?  No.  But it's the determination about how
8    much in excess of 4.5 percent.
9            But my schedule shows that 4.5 percent of the
10   confirmed construction costs is around $8 million, and
11   they paid themselves somewhere around $30 to $40 million.
12           So certainly, that dramatic difference
13   between, what, 4.5 percent of the capital improvement
14   costs are, versus how much they personally took home is a
15   data point.  But I did not have to have that schedule in
16   order to reach the opinion that I did.  It kind of
17   confirms the opinion that I reached.
18       Q.  So other than just saying they are a bunch of
19   rich guys who made a bunch of money, and you should hate
20   them for that, what is the point of those schedules?
21       A.  Well, as I told you, it's a comparison.  It
22   shows that and confirms the opinion, I believe, that
23   there's overbilling.  They couldn't have paid themselves
24   $40 million if they were only entitled to receive $8
25   million in gross proceeds from 4.5 percent of the capital

Page 131

1    improvement costs.  And it shows -- it confirms, I
2    believe, the overbilling.
3        Q.  So you're saying the fact that they made a
4    bunch of money, they couldn't have done that legitimately?
5            MR. PISANO:  Object to form.
6        Q.  BY MR. SCHMOOKLER:  It's impossible -- strike
7    that.
8            In your mind, in your opinion, it's -- in the
9    America we live in, it wasn't possible for these three
10   gentlemen to earn legitimately $40 million; right?
11           MR. PISANO:  Object to form.
12           THE WITNESS:  I don't make any opinion about,
13   as an American, what they're entitled to make, or a slant
14   against people who make $30 to $40 millions.
15           It's a contrast against what 4.5 percent of
16   the capital improvement costs were, contrasted with how
17   much they -- their personal compensation was.
18       Q.  BY MR. SCHMOOKLER:  Why did you need to
19   compare 4 and a half percent of the capital improvement
20   plans to their income in order to -- when -- in order to
21   compute whether there's overbilling, other than just to
22   taint them with the motion that they made a lot of money?
23       A.  Well, that's certainly wasn't the reason I
24   put that in.  The reason I put that in is when I
25   multiplied 4.5 percent times capital improvement cost, it

Page 132

1    comes to about $8 million.
2            The three -- just the three of them alone got
3    paid $40 million.  So it suggested there's overbillings.
4    It confirms that there's overbillings.
5        Q.  So the fact that they made a lot of money, in
6    your mind, means they had to have lied, cheat and steal?
7            MR. PISANO:  Object to form.
8        Q.  BY MR. SCHMOOKLER:  Well, let me ask you
9    again.  In your mind, sir, people can't make a lot of
10   money legitimately; right?
11           MR. PISANO:  Object to form.
12           THE WITNESS:  I didn't even come close to
13   saying that, so --
14       Q.  BY MR. SCHMOOKLER:  So Mr. Dillon, Egger and
15   Moorjani had no legitimate means of making a lot of money
16   in your opinion; right?
17           MR. PISANO:  Object to form.
18           THE WITNESS:  Well, we've talked about this a
19   lot.  I told you why I included that.  That it's a
20   comparison against what 4.5 percent of the confirmed
21   construction costs are, compared against their personal
22   earnings from these contracts with the City.
23       Q.  BY MR. SCHMOOKLER:  And if your opinion is
24   wrong in terms of overbilling, there would be no reason to
25   criticize them for just making a lot of money on a

Page 133

1    successful business; right?
2            MR. PISANO:  Object to form.
3            THE WITNESS:  Well, I don't think in my
4    report I criticize them.  It's a data point.  I don't say
5    in my report anywhere that these are fraudsters, or dirt
6    bags for making $30 to $40 million.  It's a data point.
7    It's a point of contrast against what 4.5 percent of the
8    total construction costs, capital improvement costs
9    were.
10       Q.  BY MR. SCHMOOKLER:  And you don't need that
11   in order to compute what you deem are the damages; right?
12       A.  I included it for the comparison purposes.
13           Again, I mentioned before the break that I
14   talked about taking a step back and analyzing whether the
15   opinion or use of an estimate yields a result that appears
16   reasonable.
17           My opinion is that they overbilled.  And, in
18   part, looking at how much compensation they paid
19   themselves, far in excess of what it appears they should
20   have been paying themselves with respect to the 4.5
21   percent cap or limitation, is the reason I included that.
22       Q.  So you're making a value judgment of what
23   they should charge -- should earn -- strike that.
24           You understand they own a business; right?
25       A.  I'm sorry?

MAGNA
LEGAL SERVICES

EXHIBIT 2
PAGE 64

Page 134

1      Q.  Do you understand that they owned a business?
2      A.  Yes, I do.
3      Q.  As the owners, they get 100 percent of the
4  profit.  That's the way businesses works.  Do you
5  understand that basic concept?
6      A.  I'm a CPA.  I worked in this field for 40
7  years.  I understand business very well.
8      Q.  Okay.
9      A.  And I can tell you that about 80 to 85, 90
10  percent of the money that was received by Urban Logic was
11  a result of the work -- the capital improvement work on
12  behalf of City of Beaumont.
13      Q.  Sure.
14      A.  This isn't that they had a hundred other
15  clients that generated a significant portion of their
16  revenue.  Their revenue came from the City of Beaumont.
17  So the $40 million -- $30 to $40 million was money coming
18  in as a result of the work they did on behalf of the City
19  of Beaumont.
20      Q.  And they did work for the City of Beaumont,
21  didn't they?
22      A.  And they did.
23      Q.  So your criticism, as -- or strike that.
24          The imputed criticism of them are they earned
25  a lot of money through their business, so they must cheat;

Page 135

1  right?
2      A.  No.
3      Q.  So there would be legitimate ways they could
4  have earned that money; correct?
5      A.  Well, again, I'm comparing $30 to $40 million
6  of personal earnings to them, against what 4.5 percent of
7  the capital improvement costs were.  That number is $8
8  million.  They paid themselves about $30 to $40 million.
9  It suggests that there is an overbilling.
10      Q.  Or it suggests they did work outside the cap
11  and lots of it?
12      A.  That's not what I believe is happening.
13      Q.  Okay.
14          Well, whether you believe it or not, there
15  are two conclusions to be reached from what they were
16  paid.  They were either legitimately paid that money or
17  not; correct?
18          MR. PISANO:  Object to form.
19          THE WITNESS:  They were paid the money.  I
20  think I have a question about legitimately paid that
21  money.
22          Because, number one, we just talked about how
23  they included -- appear to include subconsultants on their
24  invoices that they buried.  There was no transparency to
25  that fact.  It exceeded the cap limitation of 15 percent

Page 136

1  on the markup.  So when you say "legitimately earned," I
2  have some concerns about that.
3          And, again, the notion about -- as your
4  expert said, only -- I think his conclusion was only about
5  3.5 percent of the total invoices ever issued should be
6  applied against the cap, with 97 percent being outside of
7  the cap, appears to be a completely -- incorrect opinion.
8      Q.  BY MR. SCHMOOKLER:  I didn't -- did I -- have
9  I asked you to today about my expert's opinion at all?
10          You keep saying it's incorrect.  I know
11  that's your talking point.  But I haven't asked you.  I'm
12  here to talk about your opinions.  My expert will get
13  questioned, and your lawyers can go ahead and ask away.
14          We're here to ask about your opinions and, in
15  particular, why it is in case where you're computing
16  overbilling you want to emphasize the amount of money
17  three gentlemen earned while running a company.
18          And I guess my question is, is there any
19  correlation in your experience between what they earned
20  and your allegation that they committed fraud?
21      A.  Well, you're using the word "fraud."  I
22  didn't use the word "fraud" in here.
23      Q.  You use it twice in your report, but go
24  ahead.
25      A.  I said that it appears to be a fraud scheme,

Page 137

1  but it's left to the Trier-Of-Fact to reach that
2  determination.
3          I told you about three different times the
4  reason why I included that.  And that is it's a contrast
5  between what it appears they should have earned -- Urban
6  Logic should have earned, given that there's a 4.5 percent
7  cap against capital improvement cost, versus how much they
8  personally took home.
9      Q.  But you say, "they should have earned."  You
10  realize that any amounts that they were paid outside the
11  cap are not subject to the cap; correct?
12      A.  Of course.
13      Q.  So in order to determine what they should
14  have been paid, one would have to compute what is the
15  total amount in the cap, and what is the total amount
16  outside the cap; correct?
17      A.  That's right.  And I estimated 25 percent is
18  outside of the cap.
19      Q.  And every dollar that they were paid outside
20  of the cap, they were free to do with as they wished, as
21  owners of the business; right?
22          MR. PISANO:  Object.
23          THE WITNESS:  I don't think I have a problem
24  with that.
25      Q.  BY MR. SCHMOOKLER:  And you don't know,

MAGNA ▶
LEGAL SERVICES

EXHIBIT 2
PAGE 65

Page 138

1  because you couldn't compute it, whether or not the
2  amounts that they were paid were due to work that was, in
3  fact, performed outside the cap; correct?
4          MR. PISANO:  Object to form.
5          THE WITNESS:  I testified numerous times why
6  the methodology I employed was the appropriate methodology
7  given, A, the vast majority of the invoices that were
8  missing, the vagueness of the invoices, the concerns about
9  the integrity of the invoices.  That's why the analysis is
10  the way I performed it.  I gave them an estimate of 25
11  percent.
12      Q.  BY MR. SCHMOOKLER:  You've used the Paychex
13  records, but you understand that not everybody gets paid
14  through Paychex; correct?
15      A.  Well, when you say not everybody --
16      Q.  Do you know what Paychex is?
17      A.  Yes.  It's is payroll processing company.
18      Q.  And you know that they can process as much as
19  or as little of the payroll as you want them to; correct?
20      A.  Depends on what their contract is with
21  Paychex.
22      Q.  Sure.
23          And so to the extent that Urban Logic has
24  people working for them that are not paid through Paychex,
25  it wouldn't be reflected in the Paychex records;

Page 139

1  correct?
2      A.  Well, that's a complete hypothetical on your
3  part.  I don't know that there are employees -- employees
4  of Urban Logic that -- some of its employees get paid
5  through a payroll processing company, and other employees
6  are not paid through the payroll processing.
7          It's your hypothetical.
8      Q.  It's not a hypothetical.
9          Do you know whether every single person who
10  is ever an employee of Urban Logic was, in fact, paid
11  through Paychex?
12      A.  Well, again, I only have Paychex records for
13  three years.  So when you say "ever," I can't attest to
14  that.  I have no reason to believe that there were Urban
15  Logic employees that were not also included on the Paychex
16  records.
17      Q.  Well, you know there was lots of checks
18  written to lots of people, because you have the bank
19  statements; right?
20      A.  Sure.  There are lots of checks written to a
21  lot of people.
22      Q.  And you don't know to what extent that was
23  compensation for people who worked for them; correct?
24      A.  Well, I know that they used the payroll
25  processing company called Paychex.  I can see disbursement

Page 140

1  records from the payroll records, from banking records,
2  from the general ledger, occasionally, that they were
3  making payments to Paychex.
4          Generally, in my experience of doing this for
5  many years, if a company utilizes a payroll processing
6  company, it utilizes it for all of its employees.  They
7  don't want to utilize an outside payroll processing
8  company for just certain employees.
9      Q.  Well, do you know if Urban Logic ever did
10  that?
11      A.  I know that Urban Logic, based upon the
12  review of the Paychex records, utilized Paychex for its
13  principals.  They used Paychex for its salaried employees.
14  They used Paychex for their hourly employees.
15          I see all levels of those employees being
16  included in the Paychex records.  I have no reason to
17  believe that an employee of Urban Logic was paid outside
18  of Paychex.
19      Q.  Was there a term of art called "professional
20  subconsultant" in your world, that term of art?
21      A.  Is it a term of art?  I don't think it's a
22  term of art.
23      Q.  Had you ever heard of that phrase before this
24  case?
25      A.  I've heard phases like "subcontractors,"

Page 141

1  "subconsultants," "professional subconsultants."  I've
2  heard a variety of terms similar to that.
3      Q.  Do you know whether the phrase "professional
4  subconsultants" included 1099 independent contractors?
5      A.  I don't know.
6      Q.  And you do know, though, that the payroll
7  records from Paychex only included W-2 employees; correct?
8          Because you can see on every single one of
9  them with holding.
10      A.  Yeah.
11      Q.  So we know the Paychex records only encompass
12  W-2 employees; correct?
13      A.  I believe so.  Again, we have a limited
14  number of years of Paychex records.
15      Q.  And we don't know whether or not the 1099
16  independent contractors, people just hired periodically,
17  are professional subconsultants; correct?
18      A.  I'm not aware of 1099 people getting paid
19  through Urban Logic.  I'm not aware of any.
20      Q.  It's a different question.
21          Do you know whether, in the context of this
22  agreement from 1993, a 1099 independent contractor hired
23  periodically was deemed a professional subconsultant?
24      A.  I don't know.
25      Q.  Can we agree that there was no Paychex



36 (Pages 138 to 141)

EXHIBIT 2
PAGE 66

Page 142

1  records reflecting payments to 1099 contractors?
2       That's not what they were using Paychex for?
3       A.  Right.  I did not see any 1099 payments.
4       Q.  And so can we agree, then, in computing
5  whether you think there are overbilled hours, your
6  implied overbilling computation, imbedded in that are
7  amounts that -- strike that.
8       In this computing the implied overbilling for
9  subconsultants, you included in your computation every
10  independent contractor as a professional subconsultant;
11  correct?
12      A.  No.  What my report does is I gave five
13  specific examples where professionals were invoicing Urban
14  Logic for services rendered at a particular hourly rate.
15      Those employees, those individuals that were
16  submitting invoices to Urban Logic, were included in on
17  invoices but was never called out -- called out.  There
18  was no transparency that these individuals' hours are
19  included on the Urban Logic invoices.
20      And that they were billed to the City of
21  Beaumont at rates far in excess of what Urban Logic was
22  charged.
23      Q.  I guess I asked a different question.
24      Your computation of implied overbilling
25  assumes that anybody who is not W-2 employee can only be

Page 143

1  billed at cost plus 15 percent; correct?
2       A.  Can you say that one more time?
3       Q.  Your analysis of implied overbilling assumes
4  that everyone who's not a W-2 employee can only be billed
5  at cost plus 15 percent?
6       A.  No.  That's not what my opinion is.
7       My opinion is that when I look at the hours
8  charged on the invoices to the City, compare them against
9  the payroll records, there are extra hours on the billings
10  that are not in the payroll records.
11      And I found in order to address, investigate
12  that extra hours, what I found were five different
13  examples where people who are professionals billing
14  services to Urban Logic, those hours are included in and
15  account for some of those overbilled hours.
16      Q.  Okay.
17      But the examples you're pointing to are
18  distinct.  And let's look at them on page 15 of your
19  report and look through them.
20      So example number one is a company, not an
21  individual; correct?
22      A.  It's a company, an individual as a dba or a
23  business.
24      Q.  It's not a dba.  It's a company.
25      A.  Okay.

Page 144

1       Q.  Well, I want you to agree with me.
2       In your report, the first example is a
3  private business, a corporation?
4       A.  It's an Inc.; correct.
5       Q.  Yes.
6       The second example is also a corporation;
7  correct?
8       A.  Correct.
9       Q.  We'll get to the middle ones.  The
10  third -- the last example is Jeru (phonetic) and
11  Associates; correct?
12      A.  Correct.
13      Q.  Do you know what that is?
14      A.  I'd have to look back at the invoice.  It
15  might tell me what they do.
16      Q.  Okay.
17      There are only three instances you pointed
18  to, three, where individuals, as opposed to some level of
19  a business, were used; correct?
20      A.  Well, you're looking at one chart.  Let me
21  look back at the actual invoices themselves and see if
22  Eric Lewis, for example, billed out as an individual or
23  something else.
24      Q.  Great.
25      A.  I have trouble finding Eric Lewis' invoices.

Page 145

1       Okay.
2       It's under 18-1, and it's -- the invoice from
3  Eric Lewis just says "Eric Lewis, P.E.T.E."
4       Q.  Okay.
5       And what is the factual grounds for you
6  asserting that just an independent contractor employed by
7  Urban Logic is subject to a cost plus 15 percent?
8       A.  Because he is providing consulting services,
9  professional consulting services to Urban Logic.  Urban
10  Logic did have a number of invoices where they appeared to
11  accurately identify the invoice from the third party and
12  markup of 15 percent.
13      It's my understanding, looking at the
14  services provided, that Eric Lewis is a professional, and
15  that he's not an employee of Urban Logic and would be
16  subject to the 15 percent markup.
17      Q.  And that's because you have concluded that
18  the term "professional subconsultant" includes anyone who
19  is not a W-2 employee?
20      A.  Well, there could be a -- 1099 janitor that I
21  wouldn't say was a professional subcontractor.
22      Q.  Why not?
23      A.  Well, first of all, I don't see any janitor
24  bills being marked up.
25      When I look at this, I understand Eric Lewis

37 (Pages 142 to 145)



EXHIBIT 2
PAGE 67

Page 146

1  to be a professional.  I understand him to not be employed
2  by Urban Logic as an employee.  And there's no disclosure
3  in the invoice that's submitted by Urban Logic to the City
4  of Beaumont identifying that a non-employee was providing
5  the service, another professional.
6  Q.  Okay.
7  But my point is, you assume, then, that
8  unless they're a W-2 employee, they must be a professional
9  subcontractor subject to a cost plus 15 percent charge?
10  A.  My opinion is if the five examples I provide
11  in my report are examples of professional subconsultants
12  whose markup was in excess of 15 percent.
13  Q.  But the total amount from that, as I
14  understand it, is $261,243.50?
15  A.  You're reading that number from where?
16  Q.  Page 16.
17  A.  Yeah.  For those -- well, that's one
18  particular vendor called Satory (phonetic) RE Solutions.
19  So it's one professional subconsultant for one year for
20  the invoices that I could find.  This is probably a
21  complete set, since I have 12 months' worth of data.
22  Q.  What is the total amount of instances you
23  computed where you saw an invoice wrongly charged by Urban
24  Logic?
25  What's the amount of that?

Page 147

1  A.  Well, as I mentioned earlier and testified
2  earlier, in order to do that calculation, there's
3  literally four different types of documents that I have to
4  have for the same period of time.  I don't have that for
5  all -- all of the contractors or subcontractors that were
6  utilized for long periods.
7  I did do an analysis for years 2010-2011, and
8  I looked at the apparent overcharged hours, multiplied
9  that by an average billing rate, and came up with two
10  different numbers we talked about earlier that I think
11  totaled around $7 million, $6 million.  I can't remember
12  the number.
13  Q.  Well, that's an implied amount, according to
14  your report; correct?
15  A.  Yes.
16  Q.  Now, I want to ask when you specifically
17  found an invoice that was overbilled, what is the total
18  amount of that?
19  A.  Well, I'm using it -- as an example here,
20  Satory of $261,000, that when you look at how much this
21  particular woman charged -- and I can find her name in a
22  minute.
23  When she charged work -- Lana Gusava
24  (phonetic), Lana Gusava invoiced Urban Logic she billed
25  them at $40 an hour.  When Urban Logic embedded her hours

Page 148

1  in an invoice to the City of Beaumont, they charged City
2  of Beaumont $170 an hour.  That's a markup of 325 percent.
3  So in this particular case, it looked like
4  for 2011, we have a complete set or a significant set of
5  invoices from Satory RE Solutions to make that comparison
6  with.  I didn't have complete sets of data for all of
7  these vendors that I used in examples one through five.
8  Q.  That wasn't my question.
9  I want to know the dollar value where you're
10  able to point to a specific invoice that was, in fact,
11  overcharged?
12  What's the dollar value of all that?
13  A.  Well, I'm using -- that's what I think I just
14  answered.  I just told you.  Because of the incomplete
15  necessary of the records, I can't do that for all of the
16  occasions where they included a professional subcontractor
17  with increased markup rates.
18  I do have a complete set for one particular
19  vendor and a calculated amount to be $261,000 of extra
20  money.  So I don't have the number for all of them,
21  because I don't have the data for all of them.
22  Q.  So the only amount that you can point to
23  where you have a specific invoice, you can show
24  specifically overbill, the total is $261,243.50;
25  correct?

Page 149

1  A.  No.  I have another examples of overbillings.
2  I have one on page 15.  There's a table that talks about
3  overbillings with Dennis Janda (phonetic), Eric
4  Lewis -- others.  So there's others.  I just don't have
5  complete sets of their invoices, so I don't have a grand
6  total number for you.
7  Q.  Okay.
8  But a grand total of everything that you
9  could quantify, what's the number you're giving the jury?
10  A.  I didn't specifically do that calculation.
11  I'm showing examples of how they have this practice of
12  hiding subcontractors within their billings, increasing
13  the hourly rates up to amounts in excess of 15 percent.  I
14  did not do a specific calculation that you're talking
15  about.
16  Q.  Can you testify to a reasonable degree of
17  accounting certainty as to the exact amount of overbilling
18  you can tie to a specific invoice?
19  A.  Yes.
20  Q.  Okay.
21  What is that amount?
22  A.  I would point to my table as one example
23  where I do have more complete records as $261,243, just
24  for year 2011.  I can point to that.
25  If between now and trial you want me to do an

MAGNA
LEGAL SERVICES

EXHIBIT 2
PAGE 68

Page 150

1  additional calculation to quantify that further, I can do
2  that, but --
3       Q.  I can see -- I'll interrupt you.
4            We're here today.  You have what you have.
5  So I want to know, other than the $261,243.50, can you
6  identify to a reasonable degree of accounting certainty
7  any other specific instances where you found an invoice
8  where that was overcharged?
9       A.  Yes, I do.
10      Q.  Okay.
11           What is that?
12      A.  My report describes them.  I found excess
13 billings on five different invoices from Dennis Janda,
14 or -- multiple invoices from Dennis Janda, Eric Lewis.  I
15 did not quantify what the grand total of that was.  I did
16 not do that.
17      Q.  So you did not quantify the alleged
18 overbilling.  You identified -- other than what's in
19 chart -- the chart on page 16; correct?
20      A.  No.  What I'm telling you is that there's
21 five separate examples I have in my narrative that show
22 that there are several different -- five different
23 professional subcontractors, where there was a practice by
24 Urban Logic to increase their billings.
25           For example, Eric Lewis, on the chart on page

Page 151

1  15, he bills Urban Logic at $75 an hour.  Urban Logic does
2  not specifically identify him in their invoice.  And they
3  billed him at $170 hour, which is 126 percent markup.  So
4  I have the percentages.  I did not quantify the dollars.
5       Q.  What percentage of the time did Urban Logic
6  accurately bill its subcontractors?
7       A.  Well, I've seen several occasions where they
8  did.  What percentage, I don't know.
9       Q.  Did you compute what percentages of times you
10 were able to find an incorrect billing, versus what
11 percentages of time it was correctly billed?
12      A.  No.
13      Q.  Did you determine what percentage, on a
14 dollar value basis, the alleged overcharges were versus
15 the correct billing?
16      A.  No.  Because as I indicated, in order to
17 identify this, to call out this practice, I needed to have
18 for the correct period -- the same period of time four
19 different sets of documents, and it was only a limited
20 number of times that I could do that.
21           So, of course, I could not then make a
22 determination how many percentage on 19 years' worth of
23 invoices had subcontractors when I don't have the data.
24           What I'm demonstrating is this pattern and
25 practice of including professional subcontractors and

Page 152

1  showing the percentages.
2       Q.  When you say "pattern and practice," what
3  percentage of time is required for a pattern -- something
4  to be a pattern?
5       A.  Well, I'm showing examples of it.
6       Q.  Okay.
7            I asked a different question.  You said it is
8  a pattern and practice.  Now we're going to delve into
9  what is a pattern?
10           What percentage of time is required, under
11 accounting industry standards, for something to be a
12 pattern?
13      A.  Well, there is no industry standard that
14 talks about defining when something is a pattern.  There's
15 just nothing out there that talks about that.
16           What you can tell you is every time I have
17 the requisite documents to do this comparison, the
18 percentage is a hundred percent of the time.
19           A hundred percent of the time, I saw what I
20 believed to be a professional subcontractor.  I had the
21 requisite records to do the analysis.  A hundred percent
22 of the time, they marked up the rates in excess of 15
23 percent.  So it's a hundred percent.
24      Q.  So there was not a single time, not once, you
25 could ever find that -- you said that there were times

Page 153

1  they did it right.  So, apparently, which is it?
2            There were times they did it right, or never
3  did it right?
4       A.  Well, it doesn't have to be the two extremes.
5  What I have included as exhibits in -- I think it's in my
6  supplemental report are examples where it looks like they
7  did do it correctly for a period of time.
8            That they knew that there needs to be some
9  transparency to their billing.  They knew there was a 15
10 percent markup.  So it looks like they did it correct.
11           So I sort of impute that knowledge to them,
12 that it looks like they know that's what they are supposed
13 to do.  It doesn't have to be a hundred or zero, the way
14 you phrase it.
15      Q.  Well, I want to know.  Were there times you
16 saw instances where their subconsultants were correctly
17 billed?
18      A.  Yes.  And I use those as examples in my
19 report.
20      Q.  Okay.
21           What percentage on a dollar value basis are
22 the instances where it was done correctly, versus the
23 instances where you think it was done incorrectly?
24      A.  I don't have anywhere near the data in order
25 to do a calculation like that.

MAGNA▶
LEGAL SERVICES

EXHIBIT 2
PAGE 69

Page 154

1    Q.  Can we agree that you don't know what
2  percentage the incorrect billings were as it relates to
3  all billings of subconsultants?
4    A.  For the 19 years of the issue, that's
5  correct.  I don't have that data.  I don't have the
6  ability to do that calculation.
7    Q.  You don't have the ability to even determine
8  whether it was the majority of times they were incorrectly
9  billing it or a minority of times they were incorrectly
10  billing it?
11    A.  As I testified earlier, when I have the
12  requisite data to do the analysis, for these particular
13  vendors, because these were the ones that I was able to
14  match up to the right data, a hundred percent of the time,
15  they billed them out -- did not disclose them on the
16  invoice and billed them out far in excess of 15 percent
17  markup.  A hundred percent.
18    Q.  You found four vendors where they overbilled;
19  right?
20    A.  One, two, three, four, five, six -- seven
21  different vendors in my example.
22    Q.  Seven vendors.  Great.
23      What was the total billing for those vendors?
24      What percentage of the $75 million that was
25  billed involved these seven particular vendors?

Page 155

1    A.  Well, that's the point.  They don't identify
2  them in their invoices.  So when I look at the invoices to
3  the City, these vendors are nowhere to be disclosed.
4    Q.  Great.
5    A.  The only way I could determine that is to be
6  able to, on the occasion, be able to actually find the
7  invoices from the vendors submitted to Urban Logic.  So if
8  I look at Urban Logic invoices to the City, they don't
9  talk about these.
10    Q.  You've been working on this since 2016,
11  right?
12    A.  Correct.
13    Q.  Six years; right?
14    A.  Correct.
15    Q.  Did you call Dennis Janda?
16    A.  No.
17    Q.  How about Eric Lewis?
18    A.  No.
19    Q.  Did you bother to call Eric Lewis and ask him
20  how much he had been billed through -- or how many
21  business he did with Urban Logic?
22    A.  No, I did not.
23    Q.  How about any of these seven people?
24    A.  No.
25    Q.  Did you seek out -- as part of any of your

Page 156

1  work, whether on behalf of the District Attorney or the
2  City or Western Riverside, did you seek out these records
3  from these people?
4    A.  I did not.  I believe the Riverside D.A. may
5  have spoken with some of them, but I have not.
6    Q.  And you don't know whether this is a very
7  small fraction of Urban Logic's time or a huge percentage;
8  correct?
9    A.  Well, as I said repeatedly, when I did find
10  the requisite data, a hundred percent of the time, they
11  marked these up far in excess of 15 percent.  When I'm
12  able to do the data, do the analysis, a hundred percent of
13  the time, there was exorbitant markups on their bills.
14    Q.  I didn't ask you that.  I understand you want
15  to say that.  I'm not asking about whether you think it's
16  exorbitant or not.
17      I just want to know, do you have any clue
18  whether the total amount Urban Logic billed for these
19  seven vendors is a significant amount of dollars or not?
20      MR. PISANO:  Object to form.
21      THE WITNESS:  And my answer to that same
22  exact question was I don't have that ability, because,
23  number one, there's hundreds of Urban Logic invoices not
24  available.  And, two, these vendors are not disclosed on
25  the invoices.

Page 157

1      I can't tell.  Nobody can tell.  That's kind
2  of the point is there's no transparency to the fact that
3  the invoices include hours for these vendors.
4    Q.  BY MR. SCHMOOKLER:  You have the records, you
5  said.  I got you the bank records.
6      Did you go through the bank records and see
7  how much money was paid to these vendors?
8      I got them for you.
9    A.  How much was paid -- by Urban --
10    Q.  I went out and got you bank records.  Did you
11  go through the bank records to determine what dollars were
12  paid to these seven vendors in an era where the bank
13  records are available?
14    A.  Paid by Urban Logic?
15    Q.  Yes.
16    A.  No.  I did not do that.
17    Q.  So you do have available to you the exact
18  amount of money that was spent by Urban Logic from
19  basically 2008 to 2012; correct?
20    A.  I have bank records from 2008 to 2012.  I do
21  not have check copies.  So I don't even know that I could
22  determine that, even if I did that analysis, because what
23  I've got are bank statements.
24      Bank statements are very limited in the
25  amount of details that you can glean from them.  So if



EXHIBIT 2
PAGE 70

Page 158

1  they are writing checks to these people, I wouldn't know
2  it, because I don't have the actual copies of checks.
3      Q.  What did you do in 2016 to get them when you
4  started this engagement?
5      A.  What did I do in 2016?
6      Q.  Yeah.
7          What did you do in 2016 to help yourself by
8  securing bank records that you think are necessary to show
9  overcharges?
10         MR. PISANO:  Object -- object to form.
11         THE WITNESS:  I had, in 2016, the same exact
12  bank records that you claim you got and made available,
13  except for two months' worth.  I think May and June I did
14  not have.  So that's the only supplement to the bank
15  records that I've had since 2016.  I've had Urban Logic
16  bank records for years.
17     Q.  BY MR. SCHMOOKLER:  Were they produced to me?
18     A.  I don't know.  They were produced by the
19  District Attorney's Office, I believe, to me.
20     Q.  More importantly, were they produced to me in
21  this litigation?
22     A.  I have no idea if they were -- what was
23  produced to you.
24     Q.  Did you produce to counsel for production to
25  me the records that you relied upon to compute your

Page 159

1  calculation?
2      A.  I checked with counsel, and they confirmed to
3  me that everything that I had was made available to you.
4  I have no reason to believe that you don't have those bank
5  records.
6      Q.  Where is your file produced in this
7  litigation to counsel?
8      A.  I'm sorry?
9      Q.  Was your file produced to counsel at the
10 outset of this litigation in response to my request for
11 production?
12     A.  My counsel has the same documents.  The
13 source of the documents that I reply upon, as I talked
14 about earlier, is the original engagement back with the
15 Stradling firm.  I have some documents from them.
16         I got many, tens of thousands of pages of
17 documents from the Riverside District Attorney's Office.
18 And then if there's other documents, I got them from Best,
19 Best and Krieger.  So my understanding is that they have
20 everything that I've got.
21     Q.  So you relied on -- let me just make sure I
22 have this correct, because I want the record really clear
23 when I go back to look at the Relativity database.
24         You believe that you had the Union Bank bank
25 statements since 2016; is that correct?

Page 160

1      A.  I believe so.
2      Q.  And you relied on them in 2016; correct?
3      A.  Yes.  But not all of them.  Again, there were
4  two months' worth of bank statements that I did not
5  previous have.
6      Q.  Which two months?
7      A.  May and June of -- 2016?  Can't remember.
8      Q.  It wouldn't be 2016.  Okay.
9          Well, I'll look for the records myself,
10 but --
11     A.  Okay.
12     Q.  Is there overcharging by GGMS?
13     A.  I didn't have an opinion about overcharging
14 by GGMS.
15     Q.  Why did you include any computation about
16 GGMS in your report if there was no overcharging?
17     A.  The importance of GGMS in this was that the
18 owner of GGMS, Mr. Kanpanicas, was the one that basically
19 approved all of the invoices issued by Urban Logic, and
20 was also one of the co-defendants to the criminal case
21 brought by the Riverside District Attorney's Office.
22     Q.  I understand who he is.  But his job was to
23 approve invoices was the City manager; is that correct?
24     A.  I believe that was probably one of the his
25 jobs, sure.

Page 161

1      Q.  So the fact that he approved invoices for
2  Urban Logic, that was just part and parcel of his job;
3  correct?
4      A.  Yeah.  I believe than would be part of his
5  job.
6      Q.  So what is -- what is the opinion in section
7  7 of your report, pages 21 through 23, other than Allen
8  Kapanicas is also a guy who made a lot of money?
9          MR. PISANO:  Object to form.
10         THE WITNESS:  The opinion was -- well, there
11 really is not an opinion here.  I'm not expressing an
12 opinion about Mr. Kapanicas.  There's tables and some
13 narrative, but there's no opinion that I'm talking about.
14         I do point out in my supplemental report that
15 there was a practice of Mr. Kapanicas approving the
16 invoices from Urban Logic, and then Urban Logic approving
17 the invoices issued by GGMS, Mr. Kapanicas' business.
18         So, therefore, essentially, the defendants in
19 the criminal case are cross-approving each other's
20 invoices, which certainly would -- from a fraud
21 investigation perspective, would cause concern that
22 there's such cross-approval process by co-defendants in a
23 criminal case.
24     Q.  BY MR. SCHMOOKLER:  Did you identify a single
25 instance in which Mr. Kapanicas, either directly or

MAGNA
LEGAL SERVICES

EXHIBIT 2
PAGE 71

Page 162

1  through his company, GGMS, was paid funds that he was not
2  entitled to?
3      A.  No.
4      Q.  I'll turn to your supplemental report, the
5  narrative, and I'll ask you about that.
6          Turn to page 3.  What does the phrase
7  "improper conduct" mean in the third full paragraph?
8      A.  What does the phrase "improper conduct"?
9      Q.  Yeah.  That's your words.
10     A.  Okay.
11         Well, they were criminally charged in a case
12  brought by the District Attorney's Office.  So I would
13  think if you're criminally charged, there's an allegation
14  that they -- there was improper conduct, and they
15  eventually pled guilty, all of the defendants in the
16  case.
17     Q.  Okay.
18         But you understand the difference between a
19  criminal indictment and a plea agreement; right?
20         You work for the FBI.
21     A.  Sure.  I know all about --
22     Q.  Do you believe in people being innocent until
23  found guilty, or is that --
24     A.  Of course, of course.
25     Q.  Great.

Page 163

1          So the fact that the District Attorney said
2  something in a document doesn't make it true; right?
3      A.  There's sufficient evidence brought -- come
4  to light to the District Attorney's Office for them to
5  have brought a criminal case of which the defendants pled
6  guilty to one or more counts.
7      Q.  Okay.
8          But there was not a single plea to
9  overcharging; correct?
10     A.  No.  There was pleas including things like
11  misappropriation of funds.  My document specifies what
12  they pled guilty to.
13     Q.  Agreed.
14     A.  Conflicts of interest, embezzlement of public
15  funds, embezzlement of public funds, misappropriation of
16  public funds.  I think all of that would fit within the
17  parameter of improper conduct.
18     Q.  Well, isn't it true that -- isn't it true,
19  sir, that -- when it comes to misappropriation of funds,
20  Mr. Egger didn't plead to that.  He pled to a conflict of
21  interest; correct?
22     A.  That's correct.
23     Q.  Isn't it true that when you say
24  misappropriation of funds, the only misappropriation of
25  funds referenced in the plea agreement is the misuse of

Page 164

1  monies that were allegedly owed to Western Riverside?
2      A.  I don't know.  I haven't memorized the plea
3  agreement.
4      Q.  Can you tell me a single person that pled
5  guilty to stealing from Beaumont?
6      A.  Well, my understanding is that Western
7  Riverside is now standing in the shoes of City of Beaumont
8  through this litigation.
9          To answer your question, no.  I
10  wasn't -- privy to when they -- or how they negotiated
11  that plea agreement, what counts they were allowed to
12  plead to versus other counts.
13     Q.  And it is true, is it not, there's not a
14  single instance in which one of the Urban Logic owners
15  pled guilty to overcharging the City, as you've alleged;
16  correct?
17     A.  Mr. Dillon pled guilty to conflict of
18  interest and embezzlement of public funds.  So I would
19  think his felony guilty plea to embezzlement of public
20  funds is certainly pretty consistent to what my findings
21  are.
22     Q.  Ma'am, would you please mark that, and let me
23  know what number it is?
24         (Exhibit Number 10 was marked for
25  identification.)

Page 165

1      Q.  BY MR. SCHMOOKLER:  Please identify the
2  factual basis -- strike that.
3          I'll show you what has been marked as Exhibit
4  10.  Exhibit 10 is the factual pleas of Mr. Dillon.
5          Please show me in that document for the
6  record purposes where it says that he overcharged the City
7  for services provided by Urban Logic?
8      A.  I don't think those exact words are going to
9  be in here.
10     Q.  Isn't it true there's not even a suggestion
11  of overcharging, as you've alleged, in that plea
12  agreement?
13     A.  Well, when the subject of the criminal case
14  pleads guilty to embezzlement of public funds, it
15  suggestive that -- embezzlement of public funds means that
16  they're getting public funds in excess of what they were
17  entitled to.  That's pretty basic stuff about what
18  embezzlement of public funds means.
19     Q.  Those are your words, though.  That's what
20  Mr. Dillon plead to.  He pled to number 10.  Where in that
21  does it say that he embezzled from the City of Beaumont?
22     A.  Well, you're showing me the factual basis.
23  You're not showing me -- are you questioning whether I
24  accurately state that he pled guilty to embezzlement of
25  public funds?



EXHIBIT 2
PAGE 72

**Page 166**

1    Q.  I'm showing you exactly what Mr. Dillon said.
2  I want to know where in Exhibit 10 it says he embezzled
3  public funds?
4    A.  Well, you have to look to the plea agreement
5  that talks about his pleading guilty to embezzlement of
6  public funds.  That's where -- it's not in this document.
7  It's in the plea agreement.
8    Q.  That is the plea agreement, sir.  That is
9  what number 10 is.  You'll see Mr. Dillon's signature.  I
10  want to know where it says he embezzled public funds.
11    A.  There's another document that talks about
12  what he's pleading guilty to.  There's another document
13  you're not showing me in which it talks about his pleading
14  guilty to conflict of interest and embezzlement of public
15  funds.
16    Q.  It's that document.  Certainly, Exhibit 10
17  does talk about conflicts of interest.
18    A.  Because you're not showing me the correct
19  document.  I've got it in my briefcase if you want to see
20  the document --
21    Q.  Great.
22    A.  -- where he pleads guilty to embezzlement of
23  public funds.
24    Q.  Great.
25      Who did he steal from?

**Page 167**

1      I want to know what entity he stole from,
2  because you are not in a criminal courtroom.  You're in an
3  insurance case.
4      Who did he steal from?
5    A.  I believe the victim in this case, of the
6  criminal case that was brought at that time by Riverside
7  District Attorney's Office, identifies W.R. Cogg as the
8  victim.
9    Q.  Okay.
10      So isn't it true that the only plea was to
11  stealing from somebody who is not insured by my client;
12  correct?
13    A.  Well, my investigation is looking at the
14  owners of Urban Logic, of which all three of the owners of
15  Urban Logic have pled guilty to felony criminal counts in
16  a fraud case brought by the U.S. Attorney's Office or by
17  the Riverside District Attorney's Office.
18      The fact that it's a different victim than
19  City of Beaumont, for my purposes -- I'm using this as a
20  data point.  I don't have -- I'm not adding, for example,
21  an extra number to my calculation because of the guilty
22  pleas.
23      It is a framework in which I'm analyzing
24  business records.  The business records that I'm looking
25  at were prepared by three individuals who have pled guilty

**Page 168**

1  to felony criminal counts.  It's a data point that's
2  included in my analysis.  I haven't increased a number or
3  decreased a number because of it.  It's a data point.
4    Q.  So you agree with me that nothing in the
5  section on the guilty pleas has any impact on the
6  quantification of the alleged loss you claim in your
7  reports?
8    A.  As far as the qualification, I agree with
9  that.
10    Q.  Okay.  Great.
11    A.  Sure.
12    Q.  All right.
13      You agree there's no contract between
14  Beaumont Financing Authority and Urban Logic; right?
15    A.  Yeah.
16    Q.  You also agree that the sole reason that any
17  bills were ever sent to the City is because the bank
18  required that to happen?
19    A.  I don't know that to be the case.  I know
20  that every invoice issued by Urban Logic was issued to the
21  City of Beaumont.
22    Q.  Why?
23    A.  Why?
24    Q.  Why did Urban Logic send the bills to the
25  City?

**Page 169**

1    A.  Because they wanted to get paid.
2    Q.  Okay.
3      But why did the bills have to go to the City?
4    A.  Because they are doing work on behalf of the
5  City.
6    Q.  Isn't it true that, contractually, the only
7  way Urban Logic could get paid is because the bank
8  required the CFD to make certain certifications?
9    MR. PISANO:  Object to form.
10    THE WITNESS:  I agree that the cover letter
11  that included Urban Logic invoices, as well as other
12  professional invoices, had a certain certification signed
13  I believe exclusively by Mr. Kapanicas.
14      So, yes.  I believe that the bond trustee is
15  relying upon the certification by Mr. Kapanicas about the
16  accuracy and integrity of the invoices being included for
17  which they are going to get paid from the bond proceeds.
18    Q.  BY MR. SCHMOOKLER:  And you know that the
19  certifications were not made by the City but were,
20  instead, made by a separate entity, the CFD; right?
21    MR. PISANO:  Object to form.
22    THE WITNESS:  Well, I can tell you is the --
23    Q.  BY MR. SCHMOOKLER:  I asked a different
24  question.
25      You personally know the certifications were

MAGNA
LEGAL SERVICES

EXHIBIT 2
PAGE 73

Page 170

1  not signed by the City but were signed by the legislative
2  body of the Community Facilities District 93-1?
3      A.  Well, I know that the bond proceeds were
4  being paid from the CFD 93-1.  We know that a step in the
5  process of getting payment on the invoices was a cover
6  letter that was executed by Mr. Kapanicas and sent to -- I
7  believe it was the bond trustee with, I think, Union Bank,
8  if I remember right.
9          So I saw that same cover letter on, I
10 believe, all of the invoices that were paid from bond
11 proceeds.
12     Q.  And the invoices -- the cover -- the
13 certifications, which you call the cover letter, were
14 executed by specific legal entities; correct?
15     A.  The cover letter, as I'm calling it, was
16 signed by Mr. Kapanicas.
17     Q.  But in a very specific capacity; correct?
18     A.  I don't know if it's very specific capacity.
19     Q.  Well, let's look --
20     A.  You're interrupting my answer here.  You're
21 talking over me.
22         What I'm telling you is whenever I saw an
23 invoice that was issued by Urban Logic paid from bond
24 proceeds, there was a cover letter executed by
25 Mr. Kapanicas.

Page 171

1          Now, whether that was in Mr. Kapanicas -- I
2  got one here in front of me, for example.  It's a cover
3  letter.  I'm looking at Exhibit 26, the very first page.
4          A cover letter signed by Mr. Kapanicas in his
5  capacity as City manager, including invoices to Mr. Steven
6  Boughton, B-o-u-g-h-t-o-n, with Union Bank, in which he is
7  enclosing invoices for payment from bond proceeds.  So it
8  looks to me like he's drafting this letter in his capacity
9  as City manager for the City of Beaumont.
10     Q.  Would you look at page 2?
11     A.  (Complies.)
12     Q.  How does he sign the certification?
13     A.  Okay.
14         Page 2.
15     Q.  What entity signs of certification, sir?
16     A.  Ex-officio Legislative Body of Community
17 Facility District 93-1.  And Mr. Kapanicas is signing as
18 City manager of the City of Beaumont.
19     Q.  I'll go back to my question.
20         What entity makes the certification?
21     A.  I'm reading the document.  Is it City of
22 Beaumont -- I'm trying to figure out what you're looking
23 for here.  It's under the heading, "City of Beaumont's
24 Community Facility District 93-1," signed by Alex
25 Kapanicas, who has the title of City manager for the City

Page 172

1  of Beaumont.
2      Q.  Actually, I will go back to my question, sir.
3          Isn't it true that the plain terms of the
4  documents you saw, the City of Beaumont Community Facility
5  District 93-1 was the entity making the certification?
6          Look at the first paragraph.
7      A.  Okay.
8      Q.  And isn't it true the next one that you
9  pointed to us is the certification by the Beaumont Utility
10 Authority?
11     A.  Okay.  I see that.
12     Q.  So isn't it true that in order to get paid,
13 specific entities, whether it be the Beaumont Utility
14 Authority or the Beaumont CFD, had to make certain
15 certifications.
16     A.  Correct.
17     Q.  Isn't it true?
18     A.  And the certification document being signed
19 by Alex Kapanicas, City manager, City of Beaumont.
20     Q.  And isn't it true that the City was acting
21 as -- acting on behalf of very specific governmental
22 authorities, the CFD, Beaumont Utility Authority, and
23 others?
24     A.  I don't know.  I don't know.  I can read the
25 document.

Page 173

1      Q.  Do you know whether or not the bills had to
2  be sent to the City, not because the work was being done
3  for the City, but because somebody on behalf of other
4  entities had to make a certification?
5          MR. PISANO:  Object to form.
6          THE WITNESS:  Well, I'm not aware that there
7  is any knowledge by Urban Logic as to which of their
8  invoices would be paid from City funds and which of their
9  invoices would be paid from bond proceeds.
10         I see the invoices looking virtually
11 identical.  That's one of the exhibits that I included in
12 my report is the fact that an invoice submitted and paid
13 from City funds looks identical to an invoice that's
14 submitted to the City and paid from bond proceeds.  They
15 look identical.
16         So I'm not even sure Urban Logic knew which
17 invoice was paid through bond proceeds, and whether they
18 had any particular input as to which one -- or knowledge
19 which would be paid from bond proceeds versus City funds.
20     Q.  BY MR. SCHMOOKLER:  Sure.  They do know that.
21         Let's look at LLC 462531.
22     A.  62521?
23     Q.  No, 62531.  It's in your examples.
24     A.  Again, you're not in Bates order number, so
25 do you want to point me further to -- which tab and how



44 (Pages 170 to 173)

EXHIBIT 2
PAGE 74

**Page 174**

1  many pages in?
2       Q.  It's in the same tab that you were in.
3       A.  Okay.
4       Q.  The examples you gave me are very specific as
5  to Mr. Kapanicas.
6       A.  I'm sorry.  Is there a question?
7       Q.  Sure.
8           Go through your examples that you gave me.
9  Tell me how many examples in here are examples where Urban
10 Logic's bill does not identify the specific entity that
11 it's associated with.
12      A.  I'm still trying understand your question.
13 These are -- this is collection -- tab 26, assembled by me
14 or gathered by me, represents invoices submitted by Urban
15 Logic to City of Beaumont in which payment was received
16 from bond proceeds.
17          So I'm trying to understand what your
18 question is now.
19      Q.  Sure.
20          Look at the first invoice.  You said Urban
21 Logic might not even have known who they were looking for.
22 And if you look at page 6, there's a bill from Urban
23 Logic.  You chose this bill.
24          No.  It's back and forth, front and back.
25 Sorry.

**Page 175**

1           Hold on.  Hold on.  I get to ask the
2  questions.
3           Page 6 is a bill you chose, and it's very
4  specific that it's billing for the CFD.  Do you see that?
5       A.  I do.
6       Q.  Now, if you go to the next bill in line that
7  you chose, which is six more pages in, this one is
8  specific to another entity that they are doing work for;
9  correct?
10      A.  It says, "City of Beaumont, Common Sewer
11 Facilities Fund."
12      Q.  And the next one, which is six more pages in,
13 is always specific to which entity they are doing work
14 for.  Do you see that, sir?
15      A.  I do.
16      Q.  How many instances did you find where Urban
17 Logic provided a specific reference for people they were
18 doing work for?
19      A.  How many instances?  I didn't count the
20 number of instances.
21      Q.  How many instances were there where BFA
22 issued payment for a bill for services that were provided
23 to the City itself, not the CFD or the utility, or some
24 other governmental entity?
25      A.  I don't know.

**Page 176**

1           MR. PISANO:  Object to form.
2       Q.  BY MR. SCHMOOKLER:  Can you point me to a
3  single incidence in your examples that you provided where
4  work was done for the City, not the CFD, and not for BFA
5  or the utility, and paid for by the City?
6  I'm sorry.  Paid for by BFA?
7           THE VIDEOGRAPHER:  I'm sorry.
8           MR. SCHMOOKLER:  We'll take a break.  Sorry.
9           THE VIDEOGRAPHER:  Off the record.  The time
10 is 1:37 p.m.
11          (Pause in proceeding.)
12          THE VIDEOGRAPHER:  On the record.  The time
13 is 1:49 p.m.
14      Q.  BY MR. SCHMOOKLER:  Sir, isn't it true that
15 in the examples you provided in your supplemental report,
16 the invoices from Urban Logic identify who exactly the
17 work is being done from and distinguished between the
18 various Beaumont entities?
19          MR. PISANO:  Object to form.
20      Q.  BY MR. SCHMOOKLER:  I will ask it again.
21          Isn't it true that the examples you provided
22 in your supplemental report identify the Beaumont entity
23 associated with Urban Logic's work?
24      A.  You're talking about a specific exhibit
25 number?

**Page 177**

1       Q.  I'm looking, when we last left off, at
2  Exhibit 26 to your supplemental report.  You've provided
3  examples of Urban Logic bills.
4           And my question is, in the examples you've
5  provide in your supplemental report, Exhibit 26, Urban
6  Logic identified the Beaumont entity for which it was
7  doing work; correct?
8       A.  Yes.
9           MR. PISANO:  Object to form.
10      Q.  BY MR. SCHMOOKLER:  And so you were able,
11 using your own documents that you called out, to identify
12 which Beaumont entity Urban Logic was working for;
13 correct?
14          MR. PISANO:  Object to form.
15          THE WITNESS:  This is just a sampling of
16 invoices collected for a particular year.  There's 19
17 years' worth of invoices that we don't have
18 many -- hundreds of them missing.
19          So I can't make a blanket statement that
20 every invoice is going to include this level of
21 information.  In fact, I include as exhibits where it
22 simply says, "For professional services rendered."
23      Q.  BY MR. SCHMOOKLER:  But we weren't talking
24 about the nature of the description of services.  We're
25 talking about which entity the services were provided for.

MAGNA ▶
LEGAL SERVICES

EXHIBIT 2
PAGE 75

Page 178

1  The examples you've given in your
2  supplemental report identify the Beaumont entity for whom
3  services were provided; correct?
4  MR. PISANO: Object to form.
5  THE WITNESS: Correct.
6  Q. BY MR. SCHMOOKLER: And you know from
7  Mr. Berg's testimony that there was specific Beaumont
8  entities that were outside of the contractual agreement;
9  correct?
10  MR. PISANO: Object to form.
11  THE WITNESS: Yes.
12  Q. BY MR. SCHMOOKLER: And you did not subtract
13  from your computation the entities that are outside the
14  contract consistent with Mr. Berg's testimony, even though
15  you could do so by just looking at the invoice?
16  MR. PISANO: Object to form.
17  THE WITNESS: No. I did not, based upon
18  Mr. Berg's testimony, make a subtraction from invoices
19  issued and paid from the community facilities district,
20  which was formed for a variety of districts.
21  In fact, Exhibit 41 to my report is an
22  exhibit that talks about all the different districts that
23  are being paid from bond proceeds, the Community Facility
24  District 93-1.
25  Q. BY MR. SCHMOOKLER: But my question is more

Page 179

1  specific than that. You did not subtract out from your
2  computation billing for work for entities that
3  Mr. Berg acknowledges are outside the contract; correct?
4  A. Correct.
5  Q. And so even though, for example, the City
6  Council understood the water district is outside the scope
7  of any cap, did you subtract out billings for the water
8  district?
9  MR. PISANO: Object to form.
10  THE WITNESS: I did not.
11  Q. BY MR. SCHMOOKLER: And the same would be
12  true for all the other districts that Mr. Berg mentioned
13  that are outside the cap?
14  A. Correct.
15  MR. PISANO: Same.
16  Q. BY MR. SCHMOOKLER: You said in your
17  report -- and I just want to find it. It was interesting.
18  You know, before I ask that, go to page 6 of
19  your supplemental report, please.
20  A. (Witness complies.)
21  Q. On page 6 and 7, you criticize Mr. Tasker's
22  invoice-by-invoice analysis. Do you see that?
23  A. I do.
24  Q. And is it fair to say that you do not believe
25  that an invoice-by-invoice analysis is possible?

Page 180

1  A. Correct, for a variety of reasons.
2  Q. And so, in your mind, it is not possible, by
3  doing the analysis Mr. Tasker suggests -- strike that.
4  It is not, in your mind, possible using
5  Mr. Tasker's methodology to determine whether there's
6  overbilling; correct?
7  A. Correct.
8  Q. Now, do you criticize his methodology?
9  Meaning, if you had perfect records, is there
10  anything wrong with his methodology?
11  A. Yes. And that's really the purpose of what I
12  wrote at page 6 was he asserts that an invoice-by-invoice
13  analysis is not predicated upon assumptions.
14  So what I did was detailed out all of the
15  myriad of assumptions that would have to be made. So,
16  yes. The answer is that I do believe that that's still
17  not the correct methodology.
18  Q. No. You're answering a different question.
19  You understand that Mr. Tasker's methodology
20  is to identify which specific -- how much was billed for
21  each particular type of task. And then compute whether
22  the total amount within the cap is plus or minus 4.5
23  percent.
24  Do you understand that?
25  A. Well, what I believe he did was he identified

Page 181

1  which professional service provider on invoices would fit
2  within the cap.
3  And he extrapolated out from there that he
4  identified four specific titles of professionals and said
5  only work done by those four professionals would be
6  subject to the cap, and the 14 others, including
7  principals, would be outside the cap.
8  So he wasn't focusing on the scope of work.
9  He was focusing on the name of the professional on the
10  invoice.
11  Q. I'm trying to get to a different point.
12  You understand that in a utopian world, you
13  would compute how much was spent on each type of work,
14  compute out the amount of work spent for capped services,
15  and see if it's more or less than 4.5 percent.
16  Do you understand that?
17  A. I do understand that.
18  Q. Okay.
19  A. And my point is, as I say in this report,
20  that it's still predicated upon assumptions. And I detail
21  out all the myriad of assumptions that would have to be
22  made to do that utopian analysis.
23  Q. I'm trying to get to a different point,
24  because you're focused on Mr. Tasker, and I'm just talking
25  about method.



46 (Pages 178 to 181)

EXHIBIT 2
PAGE 76

Page 182

```
 1        A.  Okay.
 2        Q.  Is there anything wrong with, if you had
 3   perfect records and a perfect records of all the work that
 4   was done, of going through and identifying the amount
 5   charged task by task and figuring out how much was billed
 6   for cap services?
 7        MR. PISANO:  Object to form.
 8        THE WITNESS:  Well, again, not specific to
 9   Mr. Tasker.  There's still assumptions that are being
10   made.  A, that the invoice is accurate.  B, that you have
11   the requisite knowledge to make the specific exact
12   determinations to whether something was or was not subject
13   to the cap.  That the math on the invoice is correct.
14        There's still -- irrespective of Mr. Tasker,
15   I'm talking about generically, all of those
16   things -- assumptions are still embedded within an
17   invoice-by-invoice analysis.
18        Q.  BY MR. SCHMOOKLER:  Well, there's not an
19   assumption about if the math is correct.  You can verify
20   if the math is correct; correct?
21        A.  You can verify.
22        Q.  Yeah.  But that's not an assumption.
23        A.  That would be a step you'd have to take then.
24        Q.  Okay.
25        But that can be done; right?
```

Page 183

```
 1        A.  Yeah.
 2        Q.  Somebody with Excel could figure out if the
 3   math on an invoice is correct; right?
 4        A.  Sure.
 5        Q.  So that's actually -- that's actually
 6   something that can be accomplished even today; correct?
 7        A.  Yes.  It's still an assumption that the
 8   invoice has -- is mathematically correct.  That's one
 9   little dot of the list that I gave you.
10        Q.  Did you do that?
11        A.  Did I --
12        Q.  Did you make sure the math on the invoice is
13   correct?
14        A.  No.  I didn't go invoice by invoice, hundreds
15   of invoices, to make sure the math is correct.  I did not
16   do that.
17        Q.  What does the quantity of invoices matter?
18        Like, if you're here to compute whether the
19   invoices are correct, you can do that; right?
20        A.  By running an Excel spreadsheet to make sure
21   the math is correct, and, therefore, if the math is
22   correct, I have to determine that the invoice is correct?
23        Q.  No, I didn't say that.
24        If you wanted to know -- if you want to know
25   whether the invoice are correct in terms of mathematically
```

Page 184

```
 1   correct, you can do that; right?
 2        A.  Sure.  I could spend hours and hours
 3   mathematically adding together invoices and make sure they
 4   total.  I can do that, sure.
 5        Q.  Sure.
 6        So the volume of invoices really just
 7   dictates how long it will take you; right?
 8        A.  Sure.
 9        Q.  Okay.  All right.
10        So we know that that's something that can be
11   done.
12        And in terms of -- in terms of the requisite
13   expertise to know what's in or inside the cap, you don't
14   know what -- you don't know Mr. Tasker, I assume?
15        A.  I did not know him.
16        Q.  You don't know what his level of expertise
17   with construction is, do he?
18        A.  I read his CV.
19        Q.  And he has more construction experience than
20   you do; correct?
21        A.  Yeah.
22        Q.  So -- and the jury can look at his expertise.
23        But assuming we knew exactly how much was
24   spent for each task by Urban Logic, computing that and
25   comparing it to 4 and a half percent would be the most
```

Page 185

```
 1   accurate way of knowing if there was overbilling?
 2        MR. PISANO:  Object to form.
 3        THE WITNESS:  Well, again the assumption
 4   would be that if I'm looking at an invoice prepared by
 5   Urban Logic, that it's going to accurately describe what
 6   work was performed.
 7        There's certainly an incentive by the
 8   preparer of the invoice to describe it in a manner that is
 9   not subject to the 4.5 percent cap.  So there's an
10   incentive there by the drafter of the invoice to describe
11   it in a way that makes it outside of the cap.
12        Q.  BY MR. SCHMOOKLER:  There's an incentive by
13   anybody that bills to bill it in a way most likely to get
14   paid; right?
15        MR. PISANO:  Object to form.
16        THE WITNESS:  I'm detailing that's a critical
17   assumption.  That if they say the work was for X, then
18   really was for X.
19        Q.  BY MR. SCHMOOKLER:  But there's an assumption
20   you make anytime somebody bills you, right, on an hourly
21   basis?
22        A.  Well, it depends.  If I sit there, and I
23   watch them do the work, it's greater comfort than on the
24   accuracy of the invoice.  But, yeah.  That's -- that's an
25   assumption that is -- spreads across any type of analysis
```

MAGNA
LEGAL SERVICES

EXHIBIT 2
PAGE 77

Page 186

1    of invoices.
2        Q.  Including your invoices.  We have to assume
3    that what you put down is accurate and reflects what you
4    did.
5        A.  Sure.
6        Q.  Right?
7        A.  Sure.
8        Q.  That happens every time everybody pays an
9    hourly invoice?
10        A.  Well, I guess the only adage here is
11    that -- and, again, I'm not -- I hesitate to mention this.
12    It's not that big of a deal.
13            But I man cognizant of the fact that these
14    individuals were charged with felony violations and fraud,
15    and pled guilty to a count of felony criminal count.
16        Q.  But they didn't prepare the invoices, and you
17    know that because of the declaration; right?
18        A.  Well, I'm not ready to take that leap that
19    they didn't have some approval authority or verification
20    over the invoices before they submit it to the City.
21            So, no.  I'm not just relying on Mr. Dillon's
22    representation that they didn't have any involvement in
23    the preparation of the invoices.
24        Q.  Did you talk to the office manager?
25        A.  No, I did not talk with the office manager.

Page 187

1        Q.  Did you talk to anybody associated with Urban
2    Logic that didn't plead guilty to a crime to see how the
3    bills were paid?
4        A.  No.
5        Q.  So is it fair to say, then, that in your
6    mind, based on everything you have, it is just simply
7    impossible to compute to a reasonable degree of any
8    certainty how much was spent on cap services, no matter
9    the method?
10        A.  Well, again, given the missing
11    hundreds -- years' worth of documents, yes.  You can't do
12    an invoice-by-invoice analysis when you're missing
13    hundreds or thousands of documents.  So what you're left
14    with is an alternative approach.
15            MR. PISANO:  I didn't mean to interrupt your
16    depo.
17            MR. SCHMOOKLER:  That's okay.  It was my
18    critical moment in time.
19            MR. PISANO:  That was a doozy.  All right.
20            I'm good.
21        Q.  BY MR. SCHMOOKLER:  But I guess, if I'm
22    understanding you correctly, is in terms of using
23    reasonable accounting methods to reach a precise answer,
24    you don't agree with Mr. Tasker's method or think any
25    method can be used?

Page 188

1        A.  Well, I'm not going to say no method can be
2    use, because I did use a method that I think yields a
3    reasonable result.
4            I don't agree with Mr. Tasker's methodology,
5    although, you know, conceptually, I understand it, but it
6    yields what I think is a completely unsupportable
7    result.
8        Q.  And I'm just trying to draw a distinction
9    between a method which yields what you think is a
10    reasonable result and a method that is to a reasonable
11    degree of accounting certainty.
12            Is there any method that you can employ that
13    would go through the invoices and, in your mind, yield to
14    a reasonable degree of accounting certainty a specific
15    calculation of overcharging?
16        A.  Given the missing thousands of invoices, I'm
17    not aware of a calculation that will give you an exact
18    number, which is why I provided an estimate of 25 percent,
19    which I think is a reasonable estimate.
20        Q.  Putting aside the word "exact," I'll ask a
21    different question.
22            Is there any method that you could employ
23    that to a reasonable degree of accounting certainty would
24    compute without estimates the amount of overcharging?
25        A.  Not given the state of the documents, the

Page 189

1    availability of the documents, the 19 years' span in which
2    these services were being rendered by Urban Logic, no.
3        Q.  You understand that there are two different
4    provisions speaking to a 4 and a half cap percent;
5    correct?
6        A.  I know that's what Mr. Tasker advocates.  But
7    my understanding is that there's 4.5 percent mentioned in
8    the original agreement, and then the amendment
9    incorporates a new subparagraph to paragraph roman numeral
10    five that also mentions a 4.5 percent cap.  I did not view
11    those as two separate 4.5 percent caps.
12        Q.  But you understand that there are two
13    different paragraphs speaking to a 4 and a half percent
14    cap?
15        A.  When you say two different paragraphs, within
16    the same document or two different documents you're
17    talking about?
18        Q.  Let's look at the '93 agreement, which is
19    Exhibit 4.
20        A.  Okay.
21        Q.  The 4 and a half cap you cite is in section
22    9-3.  Do you see that?
23        A.  Yes.
24        Q.  And the Exhibit 5, which is the addendum,
25    adds a new paragraph to section 9, paragraph five;

MAGNA ◆
LEGAL SERVICES

EXHIBIT 2
PAGE 78

Page 190

1  correct?
2       A.  Well, it's amended in that the language
3  changed.  It talks about -- the old section 9 talks about
4  4.5 of confirmed construction costs.  The new paragraph 9
5  talks about 4.5 percent of the bid price.
6       Q.  Well, it doesn't say that.  It says, "Section
7  9 is hereby amended to include the following additional
8  subsection."
9            Do you see that?
10      A.  I do.
11      Q.  And you know what "additional" means; right?
12      A.  Sure.
13      Q.  And you know what "subsection" means?
14      A.  Sure.
15      Q.  And you see how it's numbered paragraph five?
16      A.  Yes.
17      Q.  And if you go to then Exhibit 4, the original
18  section 9 only had four subparagraphs?
19      A.  Okay.
20      Q.  So isn't it true the addendum adds a new
21  subparagraph to number 9, subparagraph five?
22           MR. PISANO:  Object to form.
23           THE WITNESS:  Okay.
24           I see that.
25      Q.  BY MR. SCHMOOKLER:  And so even though one

Page 191

1  and a half percent cap is in the new section five, and the
2  other 4 and a half percent cap is in section two, you're
3  giving -- you used a combination of only one cap.
4       A.  Correct.
5       Q.  And that is based on your read of the
6  agreement?
7       A.  Correct.
8       Q.  That is not based on any factual testimony as
9  to the witnesses who actually negotiated the agreement;
10  correct?
11           MR. PISANO:  Object to form.
12           THE WITNESS:  That's correct.
13      Q.  BY MR. SCHMOOKLER:  Did you reconcile your
14  opinion with the testimony in this case as to what was
15  actually agreed amongst the parties in 1994?
16           MR. PISANO:  Object to form.
17           THE WITNESS:  I could be wrong, but I'm not
18  aware of anyone, other than Mr. Tasker, that talks about a
19  9 percent cap.  I could be wrong in that, but I know
20  Mr. Tasker used the phrase "9 percent cap" several times
21  in his report.  I'm not aware of anybody else using that
22  phrase "9 percent."
23      Q.  BY MR. SCHMOOKLER:  Well, 9 percent is the
24  two caps together, 4 and a half and 4 and a half; right?
25      A.  I agree, that's how he comes up with 9.

Page 192

1  But I'm saying I'm not sure that I've ever seen any
2  testimony, documents, letters, agreements that talk about
3  9 percent.
4       Q.  Well, sir, as somebody who's here on behalf
5  of the plaintiff, again -- and you understand is the
6  plaintiff -- you have to make an affirmative showing;
7  right?
8       A.  Okay.
9       Q.  What did you do before your original report
10  to determine if there was, in fact, one cap for 4 and a
11  half percent or two caps totaling 9 percent?
12           MR. PISANO:  Object to form.
13           THE WITNESS:  As I just testified, I did not
14  see -- until I read Mr. Tasker's report, I didn't see
15  anybody referencing two separate 4.5 percent caps for a
16  total cap of 9 percent.  I didn't see anyone other than
17  Mr. Tasker make that conclusion.  My reading of the
18  document did not suggest two 4.5 percent caps.
19      Q.  BY MR. SCHMOOKLER:  Did you look at
20  Mr. Berg's testimony?
21      A.  I did.
22      Q.  Okay.
23           And isn't it true he testifies there being
24  two caps?
25      A.  I can't recall.  I don't know exactly what

Page 193

1  his words were.
2       Q.  Did you ask Mr. DeVorge (phonetic)?
3       A.  Did I ask him?
4       Q.  Yeah.
5           Did you go out and talk to the people who
6  actually know what the cap is?
7       A.  No.
8       Q.  Okay.
9           So in formulating your opinion that there's
10  only one cap, even though there's two subsections, did you
11  reconcile that opinion with anybody who actually worked
12  for the City at the time of the agreement?
13           MR. PISANO:  Object to form.
14           THE WITNESS:  I may have spoken with -- as I
15  indicated before, during my work with the Stradling firm,
16  I had a number of conversations, conference calls with
17  employees of City of Beaumont.  We had fairly regular
18  conference calls.  And I don't know whether the topic of
19  one 4.5 percent or two 4.5 percents ever came up.
20      Q.  BY MR. SCHMOOKLER:  And, of course, you know
21  Mr. Egger says there's only one cap; right?
22           Or, I'm sorry, two caps, excuse me.
23      A.  Well, actually, my exhibit to one of my
24  records is Mr. Dillon's declaration, and he doesn't say
25  anything about two caps at 4.5 percent.  He talks about



EXHIBIT 2
PAGE 79

Page 194

1  one cap at 4.5 percent.
2      Q.  Do you know what Mr. Egger says in his
3  declaration?
4      A.  Contrasted to what Mr. Dillon says, no.  I'm
5  not -- aware.
6      Q.  And, of course, whether there's one cap or
7  two caps would have a direct impact on your analysis;
8  correct?
9      A.  It would change the number.  It would not
10  change the impact, the overall opinion that the amount
11  that they received was far in excess of 4.5 percent, even
12  if the cap was 9 percent.  But it would change the
13  numbers, obviously.
14      Q.  It would also -- that conclusion as to
15  whether there still would be overcharge would all be
16  subject to your 25 percent assumption; correct?
17      A.  Correct.
18      Q.  So the conclusion of overcharging is actually
19  subject to multiple variables, one cap versus two cap, and
20  then percentage of fees within the cap?
21      A.  I agree.
22      Q.  And did you -- were you able to, at any time,
23  prior to your opinion, verify with the City, using its own
24  records, as to whether there is any understanding from
25  1994 as to whether there's one cap or two caps?

Page 195

1      A.  No.  As I mentioned, I've never heard anybody
2  represent to me that there's two 4.5 percent caps prior to
3  my reading Mr. Tasker's report.
4          And I saw that he referenced Mr. Berg's
5  declaration or transcript, and I read that.  And I saw a
6  notion -- for the first time, the notion of two 4.5
7  percent caps.
8          So from 2016 until Mr. Tasker wrote his
9  report, I hadn't heard any representation about there
10  being two 4.5 percent caps.
11      Q.  When you say no representation, did you just
12  talk to Mr. Berg at any time --
13      A.  Did I --
14      Q.  -- before this?
15      A.  I'm sorry.  I cut you off.
16          I did not talk to Mr. Berg.
17      Q.  And you knew he was on the City Council;
18  right?
19      A.  Yes.
20      Q.  And you knew he was on the City Council at
21  the time of the agreements; correct?
22      A.  Yes.
23      Q.  While I find what I'm looking for, sir, you
24  were originally engaged in 2016 but did not produce your
25  original report for purposes of the insurance claim until

Page 196

1  2018, September of 2018 to be precise.
2          Do you recall that?
3      A.  I believe that there was a report in
4  September 2018, yes.
5      Q.  Did it take you from 2016 until 2018 to
6  finish what you were doing?
7      A.  Well, you suggested I was writing a report
8  beginning 2016.  I was gathering tens of thousands of
9  documents.  I was doing analysis.  I didn't put pen to
10  paper to write any type of report until 2018.
11      Q.  That's fair, but that wasn't my question.
12          Did it take you from whenever you were
13  engaged in 2016 until September of 2018 to finish the
14  analysis and prepare your report?
15      A.  I don't always write reports in
16  connection -- probably that's the first time that somebody
17  said, "Would you mind writing a report?" was sometime
18  around that time.
19          I don't always enter into an engagement
20  saying I'm going to write a report at the end of this.
21  Sometimes, I write reports; sometimes, I don't write
22  reports.  The 2018 date was probably because somebody
23  said, "I'd like to have a report of showing what you've
24  found so far."
25      Q.  How long did it take you to do the analysis

Page 197

1  in that report?
2          MR. PISANO:  Object to form.
3          THE WITNESS:  The work that I did originally
4  with the Stradling firm was quite different than this
5  work.  It touched some of the same topics, since it's
6  dealing with monies received by Urban Logic, but it
7  was -- had a different scope to it.  It was a different
8  scope of work than what this encompasses.
9      Q.  BY MR. SCHMOOKLER:  And I understand that.
10  I'm just trying to understand.
11          So you're engaged by Stradling in '16.  A
12  report is generated in September of '18, and is roughly
13  two years.  How much of that two years was comprised of
14  gathering materials, doing analysis, and doing your
15  computations?
16      A.  A significant part of that two years.
17  Obviously, I work on other cases at the same time and
18  other trials and other matters.  But, yes, it was a very
19  complex case with tens of thousands of pages of documents
20  to review.
21          But I certainly was not working full time
22  exclusively on this matter.  I was working many other ones
23  at the same time.
24      Q.  And did you think that, you know, the
25  two-year window between when you were engaged and when you

**MAGNA**
LEGAL SERVICES

EXHIBIT 2
PAGE 80

Page 198

1  prepared your report was a reasonable time frame to do the
2  analysis?
3      A.  Sure.
4      Q.  And you would agree that there's -- just
5  given the sheer volume of records that are in play here
6  and the nature of the computation, it would be reasonable
7  that an analysis of the loss could take more than a year?
8      A.  Sure.
9      Q.  When is it that you first decided to compute
10  the loss based upon the 4 and a half percent caps?
11      A.  Well, as I mentioned a couple times, I never
12  heard any representations by anyone that there's two
13  separate 4.5 percent caps until I read Mr. Tasker's
14  report.
15          So I never considered there being two 4.5
16  percent -- 4.5 percent caps, because no one at the City,
17  none the attorneys I worked with, ever said to me, "By the
18  way there's two 4.5 percent caps."
19          The readers of the report never said, "Oh, by
20  the way, there's two separate 4.5 percent caps.  You need
21  to go back and change it."
22      Q.  I was trying to do it a different way.
23          When the original claim came in, we were just
24  given a total amount billed.  And then in 2018, we have
25  your report for the first time, and the use the cap was in

Page 199

1  play to compute the loss.
2          When were you first asked to compute
3  overcharges based on the 4 and a half percent cap?
4      A.  When was I first asked?
5          Well, that's the parameter.  I think from day
6  one, the question was we have an agreement that says
7  there's -- amounts billed should not exceed 4.5 percent of
8  capital improvement costs.  How does the amount they
9  received, got paid, compare against 4.5 percent?
10          I mean, I think that was the analysis.  The
11  question that was being asked early on in the case.  I
12  don't know what day, what month.
13          Again, as I mentioned, the beginning of this
14  case with the Stradling firm was quite different.  It
15  wasn't doing that calculation.  It was something else.
16      Q.  What was it?
17      A.  I'm not sure if that I'm at liberty to say.
18  I was a consultant for them.  I didn't write a report to
19  them on that.  I wasn't disclosed as their expert.  It had
20  to do with internal accounting with respect to the City of
21  Beaumont.
22      Q.  Okay.
23          Was the engagement to compute overcharging
24  done at the request of the Best, Best & Krieger firm?
25      A.  No.  We were doing that analysis when I was

Page 200

1  doing work for the Riverside District Attorney's Office,
2  which preceded Best, Best & Krieger.
3      Q.  Can we turn to your original report, page 6?
4      A.  (Witness complies.)
5      Q.  Under the chart -- or between the charts,
6  you'll see a paragraph that starts, "In their capacities"?
7      A.  Um-hum.
8      Q.  Do you see that, sir?
9      A.  I do.
10      Q.  You write, "In their capacities as City
11  officials, Dillon, Egger, and Moorjani were instrumental
12  in the formation of a Community Facilities District for
13  the stated purpose of raising funds to finance capital
14  improvement projects in Beaumont."
15          Do you see that?
16      A.  I do.
17      Q.  And then you say, and I quote, "Each time a
18  bond issue was approved by the City, a portion of the bond
19  proceeds was thereafter paid over to ULC for consulting
20  services."
21          Do you see that?
22      A.  I do.
23      Q.  And you know that from the face of the bonds;
24  is that correct?
25      A.  Yeah.  I mean, I would want to clarify.  This

Page 201

1  isn't one of my more artful sentences.
2          What I'm saying is Urban Logic ended up
3  getting a portion of every one of the bonds that were
4  issued.  I don't believe -- I don't believe there was any
5  bonds for which Urban Logic got some portion of the bond.
6          When I read that again this morning, it looks
7  like I was saying, "Immediately upon the formation of the
8  bond, they got 4.5 percent."  That's not what I meant to
9  say here.
10      Q.  No.
11          But their interest in the bonds, from a
12  financial perspective, is something you learned by reading
13  the bonds themselves; correct?
14      A.  Well, I'm talking about bond proceeds paid
15  out.  That when we looked at the disbursement of the
16  records of the utilization of bond proceeds for each of
17  the bonds, I believe for every one of the bonds, some
18  portion of that amount of money was paid out to Urban
19  Logic.
20      Q.  Yeah.
21          And my question is, isn't it true that the
22  bonds themselves specifically say that Urban Logic and
23  project engineer will receive a portion of the proceeds of
24  each bond?
25      A.  I think the face of the narrative for the

MAGNA ▶
LEGAL SERVICES

EXHIBIT 2
PAGE 81

Page 202

1  bonds talked about the different roles that various
2  professional firms would play or would perform in
3  connection with the proceeds being raised.
4        Q.  I guess by question is, it wasn't hidden that
5  Urban Logic would receive fees if the bonds were approved
6  and sold; correct?
7        A.  There was certainly an anticipation that they
8  would, sure.
9        Q.  And that was disclosed, was it not, on the
10 face of the bonds?
11       A.  Yes.  I hesitate to say yes, because I don't
12 know that I read the prospectus or the issuing documents
13 for every single bond.  But those that I did review and
14 can recall, yes, Urban Logic's name was identified.
15       Q.  And the bonds that you did review were all
16 issued prior to 2006; correct?
17       A.  No.  I was looking at bonds that were issued
18 in earlier years.
19       Q.  I said prior to.
20       A.  Oh, prior to?  Okay.
21       Q.  The bonds -- the bonds that disclosed Urban
22 Logic would be paid fees upon issuance were all issued
23 prior to 2006; right?
24       A.  I don't know.  Without looking back, I don't
25 know that to be true.  I know for calendar years 2007 to

Page 203

1  2011, they were getting bond proceeds.  From what issuance
2  it was, I don't know.  But I think they were bonds later
3  than 2006 for which Urban Logic got proceeds.
4        Q.  How much have you been paid for this
5  engagement?
6        A.  I have not tallied up the bills, but I can
7  tell you it's in the -- I would estimate the amount to be
8  $90- to $100,000.
9        Q.  For since 2016?
10       A.  Oh, cumulatively since 2016?  I have no idea.
11 It would be higher than $100,000.  I don't know.  I don't
12 know.
13       Q.  More than $500,000?
14       A.  No, I don't think so.
15       Q.  I have nothing further.
16       A.  Great.
17       Q.  Chris?
18       MR. PISANO:  I'm not going to ask any
19 questions at this time.  Thanks.
20       THE VIDEOGRAPHER:  Off the record.  Time is
21 2:24 p.m.
22       THE REPORTER:  Mr. Pisano, electronic copy or
23 paper?
24       MR. PISANO:  Sure.
25       THE REPORTER:  Both?

Page 204

1        MR. PISANO:  However Chris has been ordering
2  those things, yes.
3        THE REPORTER:  Okay.  That's fine.
4        MR. SCHMOOKLER:  A hundred percent do not
5  send me paper.  If you send me paper, I will throw it
6  away.
7        THE REPORTER:  Okay.
8        (Ending time:  2:25 p.m.)

Page 205

4        I, DANIEL RAY, do hereby declare under penalty of
5  perjury that I have read the foregoing transcript of my
6  deposition; that I have made such corrections as noted
7  herein, in ink, initialed by me, or attached hereto; that
8  my testimony as contained herein, as corrected, is true
9  and correct.
10       EXECUTED this _____ day of _____,
11 at _____, _____.
        (City)            (State)

16                          _____
                            DANIEL RAY

MAGNA
LEGAL SERVICES

EXHIBIT 2
PAGE 82

1
2        I, the undersigned, a Certified Shorthand Reporter
3   for the State of California, do hereby certify:
4        That prior foregoing proceedings were taken
5   completely video before me at the time and place herein
6   set forth; that any witnesses in the foregoing
7   proceedings, prior to testifying, were placed under oath;
8        That a verbatim record of the proceedings was made
9   by me using machine shorthand which was thereafter
10  transcribed under my direction; further, that the
11  foregoing is an accurate transcription thereof.
12       I further certify that I am neither financially
13  interested in the action nor a relative or employee of any
14  attorney of any of the parties.
15       IN WITNESS WHEREOF, I have this date subscribed my
16  name.
17
18  Dated:  July 20, 2022
19
20
21
22
                    _____
23                  Laura A. Rutherford, RPR
                    CSR No. 9266
24
25



EXHIBIT 2
PAGE 83

**A**

**AA**
90:18,21
**ability**
49:15 51:25 154:6,7
  156:22
**able**
32:12,18,22 81:1,10
  84:3 89:8 121:16
  148:10 151:10
  154:13 155:6,6
  156:12 177:10
  194:22
**absolutely**
61:21 75:9 124:24
**accepted**
90:1
**accomplished**
23:13 183:6
**account**
126:23 143:15
**accountant**
6:17 14:17 111:8
  116:14,19 122:18
**accountants**
114:16 121:16
**accounting**
14:1,2,21,23 15:2,8
  26:21,25 28:5,22
  29:2 33:5,10,16,21
  38:25 45:18 46:7
  57:6 81:11 83:21
  96:9,23 97:13,17,21
  103:17 104:8
  124:17 126:7,16,17
  127:9 128:15
  149:17 150:6
  152:11 187:23
  188:11,14,23
  199:20
**accounts**
127:23
**accuracy**
50:13 113:17 127:3
  127:14 169:16

185:24
**accurate**
56:25 57:2,7,16 79:1
  89:10 117:20 126:8
  126:14,22 127:9
  128:1,11,15 182:10
  185:1 186:3 206:11
**accurately**
55:8 126:25 145:11
  151:6 165:24 185:5
**acknowledges**
179:3
**act**
63:15
**acting**
172:20,21
**action**
206:13
**actions**
67:22
**actual**
30:13 42:19 43:4,12
  44:6,16,22,25 45:21
  46:10 80:25 144:21
  158:2
**ADA**
10:23
**adage**
186:10
**addendum**
4:13 22:14 27:13,13
  27:22 28:7,19,24
  39:2 45:4 85:19
  189:24 190:20
**adding**
167:20 184:3
**addition**
61:10 86:1
**additional**
34:15 61:15 63:9,22
  68:15,20 150:1
  190:7,11
**address**
143:11
**addressing**
13:17

**adds**
189:25 190:20
**adequate**
116:16
**adequately**
122:11
**adjustment**
53:19
**administer**
6:1
**admission**
74:22 75:3
**adopted**
16:19,21
**adopts**
16:11 67:14
**advocates**
189:6
**affirmative**
192:6
**agent**
71:18,19 111:8
  122:20 124:25
**ago**
12:20
**agree**
14:20 17:23 18:15
  23:18 32:6 33:13,15
  33:19,20,25 41:20
  41:24 42:4 48:23,25
  49:2 50:2 52:6
  60:25 62:5 64:12
  75:21 78:6 81:23
  82:1 83:18 84:1,5
  92:19 93:16 104:16
  107:7 108:13,20,25
  113:10 117:14
  119:22 120:10
  126:15 128:9,10
  129:2 130:3 141:25
  142:4 144:1 154:1
  168:4,8,13,16
  169:10 187:24
  188:4 191:25
  194:21 198:4
**agreed**

75:23 163:13 191:15
**agreement**
25:12 29:14 30:8
  40:11 45:3,12 53:2
  60:3,7,10 68:13,22
  71:8,9 75:18 87:14
  109:14 129:23
  141:22 162:19
  163:25 164:3,11
  165:12 166:4,7,8
  178:8 189:8,18
  191:6,9 193:12
  199:6
**agreements**
14:4 30:8 40:9 71:8
  74:15 75:3,11,15
  110:25 192:2
  195:21
**ahead**
112:21 136:13,24
**AICPA**
16:11,14,19,21 17:4
  122:19
**air**
118:20
**Alex**
171:24 172:19
**allegation**
136:20 162:13
**alleged**
80:8 150:17 151:14
  164:15 165:11
  168:6
**allegedly**
164:1
**alleging**
114:14
**Allen**
161:7
**allow**
38:24 45:17
**allowance**
89:16 96:5 103:22,24
  104:3,17 106:2,15
  106:24,25 107:1,3
**allowed**



EXHIBIT 2
PAGE 84

45:8 164:11
**allows**
124:11
**alternate**
126:18
**alternative**
118:15,17 187:14
**amended**
190:2,7
**amendment**
22:20 30:9 33:23
40:11 71:9 109:15
109:17 189:8
**amends**
67:14
**America**
131:9
**American**
131:13
**amount**
23:20 26:15,21,25
27:5,9,20 28:5,17
28:22 29:2,23,24
30:2,6,13,14,15,18
30:19 31:14,15
32:13,19,23 33:4,6
33:11,16,21 39:1
40:2,10 41:21 42:1
42:6,13,25 43:8,14
43:20,21 44:8,12,13
44:19 45:18 46:5,7
46:14 47:10,13,18
48:10,17,24 49:3,10
49:11 50:17 52:5,19
52:21 53:15,24 55:8
57:19,23,25 58:15
60:10 69:24,24 76:3
76:16 77:3 78:11
79:13,22 80:4,8,9
80:18 81:10,18,23
84:1,4 88:15 89:13
89:20 93:11 96:21
97:13,17,21 98:7
101:6,15 103:3,23
107:3 113:13
119:20 120:3,8

129:4,22 136:16
137:15,15 146:13
146:22,25 147:13
147:18 148:19,22
149:17,21 156:18
156:19 157:18,25
180:22 181:14
182:4 188:24
194:10 198:24
199:8 201:18 203:7
**amounts**
36:2 40:15,24 52:25
88:1 89:4 97:25
98:3,22 137:10
138:2 142:7 149:13
199:7
**analysis**
13:10,22 16:1,11,13
17:1,6 18:10 19:15
20:8,11 22:17 26:19
28:15 30:5 39:11
41:6 42:8 45:10,17
46:6,12,15 48:9,12
49:24 50:1,4,5 51:8
52:6,16 58:12,23
59:2,4,12,15,17,18
71:7,11 74:2 75:25
76:19 77:8 78:15
80:2,25 81:1 83:1,4
83:16,19 84:3,7,10
84:14,19 87:5 89:17
91:22 92:10,25 93:4
93:10 94:25 95:16
95:17,21 98:18,25
107:16,16 111:10
114:14 115:7,10,17
124:17,19 125:2
128:12 138:9 143:3
147:7 152:21
154:12 156:12
157:22 168:2
179:22,25 180:3,13
181:22 182:17
185:25 187:12
194:7 196:9,14,25
197:14 198:2,7

199:10,25
**analyze**
95:19
**analyzing**
122:20 123:20
133:14 167:23
**annual**
78:19
**answer**
4:24 21:22 23:16
41:2 45:24 51:8,19
51:20,21 55:1 69:3
69:7 71:4 84:18
87:16 156:21 164:9
170:20 180:16
187:23
**answered**
16:20 117:10 125:9
148:14
**answering**
180:18
**anticipate**
21:24 22:8
**anticipation**
202:7
**anybody**
51:13 54:19 120:25
142:25 185:13
187:1 191:21
192:15 193:11
195:1
**anytime**
185:20
**apparent**
105:4 147:8
**apparently**
73:14 99:17 153:1
**appear**
22:3 39:6 50:24
123:5 128:1 135:23
**appearances**
3:1 5:20
**appeared**
145:10
**appears**
24:21,24 72:18 115:7

123:23 124:20
126:22,24,25
133:15,19 136:7,25
137:5
**applied**
53:14 74:9 78:24
81:2 98:18,21 100:3
100:19 103:24
106:11 107:11,17
108:12 136:6
**applies**
21:10 85:20 92:20
**apply**
108:17,24 122:3
123:25
**applying**
116:2,8
**approach**
15:4 26:18 58:5,23
95:15,18 115:5
187:14
**appropriate**
138:6
**approval**
12:13 64:7 65:9
68:16,16 186:19
**approve**
160:23
**approved**
64:5,18,24 65:5,9,15
68:10 160:19 161:1
200:18 202:5
**approving**
67:7 68:9 161:15,16
**approximation**
56:17
**areas**
126:2
**art**
140:19,20,21,22
**artful**
201:1
**articles**
13:9
**aside**
188:20



EXHIBIT 2
PAGE 85

asked
11:2 12:1 16:16,20
18:4 22:25 23:15
39:19,21 51:14 57:4
64:14 65:6 76:15
86:18 87:9 96:25
97:2 104:6 113:12
116:20 117:10
136:9,11 142:23
152:7 169:23 199:2
199:4,11
asking
11:16 22:3 42:21
46:4 57:21 69:5
156:15
assembled
174:13
asserted
94:16
asserting
63:20 145:6
asserts
180:12
assignment
14:21 16:15 17:5
assignments
16:14
assist
7:16 122:13
assistant
10:23 12:7,23 13:2
associated
43:19 174:11 176:23
187:1
Associates
144:11
assume
42:17 146:7 184:14
186:2
assumes
105:17,21,24 106:3,6
142:25 143:3
assuming
89:9 184:23
assumption
53:14 93:14 98:18,21

99:3 182:19,22
183:7 185:3,17,19
185:25 194:16
assumptions
42:22 50:8,12 105:16
106:10 180:13,15
181:20,21 182:9,16
attached
67:15,17,20,24 205:7
attempt
18:24 19:3
attest
139:13
attorney
7:2 9:4,9,10,17,18
10:1,2,10,19 11:4
12:1,3,7,9,22 156:1
163:1 206:14
attorneys
12:16 198:17
Attorney's
7:5 8:19,21,25 9:1,14
9:21 10:7,24 11:7
12:8,24 13:3 72:21
74:1,4,12 158:19
159:17 160:21
162:12 163:4 167:7
167:16,17 200:1
audit
16:4,8,14,15,22,23
17:5
August
68:12 76:9
authoritative
112:8,16,22 116:8
117:6 121:11,20
122:4
authorities
172:22
authority
53:1 99:1,4,12,15,25
100:8,24 101:6,16
103:19 105:19
168:14 172:10,14
172:22 186:19
authorization

63:21 64:5
authorize
63:8,12 68:15,18,20
authorized
44:19 63:15,19 67:23
authorizes
67:16,17
authorizing
68:4
availability
80:5,13,23 81:3
189:1
available
17:7 18:3,12,14,17
18:20,24 19:3,20
20:9,11 34:2 39:22
40:1 41:5,14 47:11
48:3 49:24 51:11,16
56:22 78:22 82:6
83:16,24 89:1,12
126:18 156:24
157:13,17 158:12
159:3
average
77:22 147:9
Aveue
3:5
awarded
33:24 40:4,16 43:9
43:15,22 44:9,14
45:5,9
aware
11:8,12 12:9 15:17
17:3 32:4,22 46:9
47:9 50:21 54:25
56:3 63:24 71:24
72:2,5 84:10,22,25
87:2 88:3,10 111:17
111:20,22 116:4,5
118:24 119:4,11
121:11,23,25
123:17 124:6,9
141:18,19 173:6
188:17 191:18,21
194:5
awhile

125:15
a.m
2:17 5:2,13 52:12,15
98:13,16 125:20

---
**B**
---

B
67:17 182:10
back
47:17 66:3 73:8 82:7
84:24 86:25 89:19
94:1 98:15 101:22
114:11 115:6,12,19
116:22 122:6 123:4
123:13 124:2,3
125:22 133:14
144:14,21 159:14
159:23 171:19
172:2 174:24,24
198:21 202:24
background
121:9
bad
66:10
bags
133:6
bank
126:23 127:23,23
139:18 157:5,6,10
157:11,12,20,23,24
158:8,12,14,16
159:4,24,24 160:4
168:17 169:7 170:7
171:6
banking
15:10 84:20 140:1
base
76:20
based
17:6 20:8,10 22:17
23:11 33:9 35:11
39:25 40:19 49:10
49:11,21 54:7 56:15
59:15 72:17 75:25
76:4,17,21 77:3,16
77:22 78:2,12,22



EXHIBIT 2
PAGE 86

79:23 80:4,8,13
81:2,3,12,12,24
82:5,11,21,22 83:20
84:19,24 87:5 88:3
89:8 106:10 140:11
178:17 187:6 191:5
191:8 198:10 199:3
**bases**
114:1
**basic**
17:11 124:21 134:5
165:17
**basically**
89:16 104:3 157:19
160:18
**basics**
107:7
**basis**
4:18 20:17 25:15
88:16 89:5 100:6
126:15 151:14
153:21 165:2,22
185:21
**Bates**
85:5 90:15,16 91:2
173:24
**BAUAIG4419**
66:6
**bear**
36:21 66:5
**BEAUAIG675**
27:14
**BEAUAIG701**
25:20
**Beaumont**
849216:6 2:6 7:14,16
7:25 8:4,18,20 10:8
11:5 25:13 37:5
41:15 42:7 43:25
53:1,7,13 70:4,6
82:14 85:11 99:1,4
99:11,14,16,17,21
99:25 100:5,8,15,17
100:20,24 101:6,15
103:19 105:18
111:20 134:12,16

134:19,20 142:21
146:4 148:1,2 164:5
164:7 165:21
167:19 168:14,21
171:9,18,22 172:1,4
172:9,13,14,19,22
174:15 175:10
176:18,22 177:6,12
178:2,7 193:17
199:21 200:14
**Beaumont's**
171:23
**beginning**
2:17 196:8 199:13
**begins**
5:6
**behalf**
2:15 5:21,24 6:25
7:14 34:14 134:12
134:18 156:1 169:4
172:21 173:3 192:4
**beholder**
117:16
**beliefs**
80:24
**believe**
13:5,24 19:25 34:22
35:8,12 36:4,11
40:18 41:9,14 42:9
47:22 55:10,13,16
56:6,17 57:3,18
58:12,13 62:12
64:20 70:13,17 71:7
77:23 80:11,14,18
86:6 87:1 88:2
101:12 105:13
108:5 109:7 110:3,4
115:1,3 116:17
117:9,11,18 119:9
123:9,24 127:8
130:22 131:2
135:12,14 139:14
140:17 141:13
156:4 158:19 159:4
159:24 160:1,24
161:4 162:22 167:5

169:13,14 170:7,10
179:24 180:16,25
196:3 201:4,4,17
**believed**
72:24 152:20
**believes**
73:15
**benefit**
20:5 34:19 61:6 62:3
95:1
**Berg**
4:17 86:14 96:25
179:3,12 195:12,16
**Berg's**
98:1,5,9 178:7,14,18
192:20 195:4
**best**
3:4,4 5:23,23 6:24,24
7:6,6 12:15,15 13:4
13:4,6,6 24:19
159:18,19 199:24
199:24 200:2,2
**beyond**
17:4 88:25 123:25
**BFA**
104:9 127:22 175:21
176:4,6
**bid**
22:23 29:4 33:23
40:4,16 43:9,12,15
43:21 44:6,8,14,16
44:18,22,23,24 45:4
45:9 129:23 190:5
**big**
186:12
**bill**
24:1 54:13 55:25
94:15 121:8 151:6
174:10,22,23 175:3
175:6,22 185:13
**billed**
22:12 23:3,20 26:7
26:16,21,25 27:5,9
27:20 28:5,17,22
29:2 30:13,15 31:15
40:2,15,20,24 47:14

48:1 49:4 52:5,19
53:15 57:23 58:15
62:16 63:5 69:24
88:1,15 89:4,9 94:2
94:16,17 96:9,22
97:13,25 98:3,8
101:15 142:20
143:1,4 144:22
147:24 151:3,11
153:17 154:15,16
154:25 155:20
156:18 180:20
182:5 198:24 199:7
**billing**
8:8 23:8 29:12 32:20
34:15 38:2 47:16
48:4 52:18,25 54:12
54:19 58:3 62:13
69:17 74:8 88:23
89:5,19 91:20 95:11
98:22 103:6 105:24
107:12,17,23
108:12,25 113:13
113:24 127:3
143:13 147:9
151:10,15 153:9
154:9,10,23 175:4
179:2
**billings**
7:20,20 20:20,20
22:18,21 30:17
32:15 36:4 37:4
40:6 57:9 58:6 77:8
79:24 81:7 88:4
95:24 111:19
113:18 143:9
149:12 150:13,24
154:2,3 179:7
**billing-by-billing**
114:13
**bills**
23:24 88:14,21
145:24 151:1
156:13 168:17,24
169:3 173:1 177:3
185:13,20 187:3



**EXHIBIT 2**
**PAGE 87**

203:6
**binder**
23:8 37:10
**binders**
11:20 24:13 59:21
**bit**
125:14
**blank**
12:24
**blanket**
68:16 114:5,8 177:19
**blended**
39:7
**body**
170:2 171:16
**bond**
47:20,23,24 48:8,10
53:8,10 60:12 95:25
99:8,19 100:3,16
101:10 103:10
106:23 127:22
128:3,20 169:14,17
170:3,7,10,23 171:7
173:9,14,17,19
174:16 178:23
200:18,18 201:5,8
201:14,16,24
202:13 203:1
**bonds**
13:17,17 101:17
200:23 201:3,5,11
201:13,17,17,22
202:1,5,10,15,17,21
202:21 203:2
**bother**
155:19
**bottom**
38:11 97:1
**Boughton**
171:6
**break**
12:25 24:2 37:7,12
37:14 46:22,23
98:11 133:13 176:8
**briefcase**
166:19

**briefing**
75:1
**bright**
21:9
**bring**
44:19
**brought**
37:10 73:25 74:4,12
82:8 160:21 162:12
163:3,5 167:6,16
**budget**
31:1,3,6,8,9,13,16,22
31:24 32:8,8 68:9
**budgeting**
20:25 32:2
**budgets**
32:1
**build**
15:9
**built**
105:6
**bullet**
15:3
**bunch**
130:18,19 131:4
**buried**
135:24
**business**
133:1,24 134:1,7,25
137:21 143:23
144:3,19 155:21
161:17 167:24,24
**businesses**
134:4
**Buy**
46:4
**B-o-u-g-h-t-o-n**
171:6

_____

**C**

**C**
67:20
**CA**
3:5,10
**calculate**
111:18

**calculated**
148:19
**calculation**
55:23 76:8 77:23
78:20 80:13 83:15
84:21 89:21 94:11
104:4,18,21 107:9
107:25 109:10,20
111:6 112:23
126:19 147:2
149:10,14 150:1
153:25 154:6 159:1
167:21 188:15,17
199:15
**calculations**
115:2 118:23
**calendar**
202:25
**California**
849216:2,16 2:2,17
5:1,10,14 206:3
**call**
26:13 151:17 155:15
155:19 170:13
**called**
7:13 15:1 16:13
17:18 60:2 139:25
140:19 142:17,17
146:18 177:11
**calling**
170:15
**calls**
63:7,21 193:16,18
**cap**
22:19,22 23:12,21
30:17,18 40:11 48:5
50:22,25 53:7,11,16
53:20 55:9 56:5
57:10 58:8,12 61:16
61:22 62:17 68:25
70:7 74:8 87:6
94:15 95:12 96:5,23
97:8 98:25 99:9
100:13,15,18
101:21 103:19,23
104:10 105:2,5

106:20 107:4
108:16 109:7,22,25
110:21 111:4,16,24
112:5,10,17 113:14
113:20,21,22
117:22,24 119:3,8
119:25 133:21
135:10,25 136:6,7
137:7,11,11,15,16
137:18,20 138:3
179:7,13 180:22
181:2,6,7 182:6,13
184:13 185:9,11
187:8 189:4,10,14
189:21 191:1,2,3,19
191:20 192:10,16
193:6,10,21 194:1,6
194:12,19,19,20,25
198:25 199:3
**capacities**
200:6,10
**capacity**
170:17,18 171:5,8
**capital**
4:15,16 29:4,23,24
30:20 42:9,13,17
43:1,4,8,13,20,25
44:2,8,12,25 46:14
48:9,12 52:19 64:9
64:16,21,25 65:4,8
65:13,22 66:1,14,20
67:2,8,15 68:5,5,8
68:18 96:7 130:13
130:25 131:16,19
131:25 133:8
134:11 135:7 137:7
199:8 200:13
**capped**
181:14
**caps**
87:21 96:10 189:11
191:24 192:11,15
192:18,24 193:22
193:25 194:7,25
195:2,7,10 198:10
198:13,16,18,20



**cards**
35:11,13,19,23 36:4
  36:7,10,12,14 38:7
  38:15,19
**care**
15:6 116:16 122:9,13
**carve-out**
100:12 106:1
**case**
849216:8 2:8 5:10
  6:23 7:9,16,18 22:3
  25:1 32:6,12 54:12
  56:16 59:2,3,12,16
  72:10,10,11,20
  73:25 74:4,11,13,13
  110:24 111:9
  112:25 113:2,6,7,8
  113:10,12,23 114:4
  114:14,19 115:21
  118:13 121:3,6
  122:10 123:2
  127:16 136:15
  140:24 148:3
  160:20 161:19,23
  162:11,16 163:5
  165:13 167:3,5,6,16
  168:19 191:14
  197:19 199:11,14
**cases**
11:15 20:18 111:11
  113:16,19 197:17
**cause**
161:21
**Central**
849216:2 2:2 5:10
**certain**
9:12 20:10 22:18
  23:24 42:10 44:23
  47:19 50:11,21,24
  51:22 58:5 61:8
  100:12 103:23
  113:21,22 140:8
  169:8,12 172:14
**certainly**
10:8 15:9,19 21:16
  31:16 34:23 35:24

64:5 68:21 74:10
  80:17 124:18
  130:12 131:23
  161:20 164:20
  166:16 185:7
  197:21 202:7
**certainty**
26:21,25 28:5,22
  29:2 33:5,10,16,21
  38:25 40:2,14,23
  41:21 42:1 45:18
  46:7 57:6 81:11
  83:21 94:1,15 96:9
  96:23 97:13,17,21
  100:22 103:17
  104:8 149:17 150:6
  187:8 188:11,14,23
**certification**
123:14,15,17 169:12
  169:15 171:12,15
  171:20 172:5,9,18
  173:4
**certifications**
122:17,24 169:8,19
  169:25 170:13
  172:15
**certified**
2:19 122:18,18,19
  206:2
**certifies**
123:15,18
**certify**
206:3,12
**CFD**
169:8,20 170:4
  172:14,22 175:4,23
  176:4
**challenge**
92:15
**change**
20:25 44:18 104:21
  194:9,10,12 198:21
**changed**
119:4 190:3
**changes**
44:23 119:22

**changing**
104:24
**charge**
30:6 73:13 133:23
  146:9
**charged**
30:12 31:7 51:6
  72:19,25 142:22
  143:8 146:23
  147:21,23 148:1
  162:11,13 182:5
  186:14
**charges**
21:1 50:20 76:12
**chart**
144:20 150:19,19,25
  200:5
**charts**
200:5
**cheat**
132:6 134:25
**check**
157:21
**checked**
159:2
**checking**
25:21 26:3,8,10,13
  26:16,22 27:5 32:13
  33:4,6 40:24 41:22
  49:5,16 51:6 85:10
  87:12 99:5,13 100:1
  100:9,25 101:8
**checks**
139:17,20 158:1,2
**check/inspection**
97:3
**choice**
119:19 120:7
**chose**
120:5 174:23 175:3,7
**Chris**
12:18 37:6 203:17
  204:1
**Christopher**
3:4 5:23
**christopher.pisano...**

3:6
**cite**
15:11 25:24 189:21
**city**
849216:5 2:5 7:14,15
  7:25 8:4,17,20 10:7
  11:5 25:13 29:6
  33:24 37:4 40:4,17
  40:20 41:14 42:7
  43:10,15,19,22,25
  44:3,7,9,14 45:5,8,9
  47:19,21 48:16,18
  52:22 53:3,7,13
  54:13 56:1 60:6,7
  60:11,14 61:12,24
  63:14 64:9,17,24
  67:14,18 70:3,6
  81:7 82:14 84:7,15
  84:22 85:11 86:4,16
  87:20 91:23 95:24
  95:25 98:22,23 99:8
  99:16,17,19,20
  100:4,14,17,19
  103:25 106:22
  111:19 127:21
  128:3,20 129:12,13
  132:22 134:12,16
  134:18,20 142:20
  143:8 146:3 148:1,1
  155:3,8 156:2
  160:23 164:7,15
  165:6,21 167:19
  168:17,21,25 169:3
  169:5,19 170:1
  171:5,9,9,18,18,21
  171:23,25,25 172:4
  172:19,19,20 173:2
  173:3,8,13,14,19
  174:15 175:10,23
  176:4,5 179:5
  186:20 193:12,17
  194:23 195:17,20
  198:16 199:20
  200:10,18 205:11
**City's**
52:25



**civil**
10:20 11:4,10,15 12:10
**claim**
14:19 120:8 158:12 168:6 195:25 198:23
**claimed**
82:14 119:20
**clarify**
200:25
**clarity**
96:18
**clear**
41:19 55:25 56:2,4 68:22 74:25 89:13 90:6 159:22
**clearly**
40:9 53:2,6,10 60:1 68:10 116:18
**client**
6:25 7:14 34:14,20 73:15 120:3,4 167:11
**clients**
134:15
**client's**
46:19 110:6
**close**
54:16 108:14,17 132:12
**closely**
121:5
**clue**
156:17
**Cogg**
167:7
**cognizant**
186:13
**collar**
71:20
**colleague**
86:19
**collected**
177:16
**collection**
174:13
**college**
17:11
**combination**
191:3
**come**
7:19 12:25 54:16 75:16,19 105:12 108:21 122:14 124:3 132:12 163:3
**comes**
44:17 132:1 163:19 191:25
**comfort**
185:23
**coming**
71:16 116:3 128:3,3 134:17
**comments**
20:18 68:7
**commit**
72:16
**committed**
136:20
**common**
70:14 124:21 175:10
**community**
170:2 171:16,24 172:4 178:19,23 200:12
**company**
849216:9 2:9 7:21 136:17 138:17 139:5,25 140:5,6,8 143:20,22,24 162:1
**compare**
30:13 31:7,13,23 32:1 93:8 114:25 131:19 143:8 199:9
**compared**
30:15,19 96:6 132:21
**comparing**
113:25 135:5 184:25
**comparison**
54:18 78:5 130:21 132:20 133:12 148:5 152:17
**compensation**
20:10 129:12 131:17 133:18 139:23
**competency**
15:5 116:15 122:8
**complete**
139:2 146:21 148:4,6 148:18 149:5,23
**completely**
58:13 59:5 110:3 115:3 123:10 136:7 188:6 206:5
**completion**
102:4
**complex**
197:19
**complies**
171:11 179:20 200:4
**component**
83:7 129:7
**components**
116:13
**comprised**
197:13
**computation**
52:23 56:7 74:16 77:2,13,21 79:12,18 82:10,11,12 97:24 98:9 103:3 110:23 126:16,17 142:6,9 142:24 160:15 178:13 179:2 198:6
**computations**
15:14 34:5 78:21 82:4,16,21 87:25 89:6 93:19 98:4 119:17 127:13 197:15
**compute**
14:18 26:15 27:4,8 28:17 29:16 32:23 38:25 42:6 46:2 47:10,13 51:17 52:4 75:24 76:3 77:15 78:11 81:10 82:4 89:1 95:11 97:12,16 97:20 110:20 113:1 128:25 131:21 133:11 137:14 138:1 151:9 158:25 180:21 181:13,14 183:18 187:7 188:24 198:9 199:1 199:2,23
**computed**
29:22 30:14 42:8 43:14,21 47:18 76:16 77:19 79:13 79:23 80:4,8 81:18 81:24 84:2 89:19 97:21 101:5,14 146:23
**computer**
35:14
**computing**
127:2 136:15 142:4,8 184:24
**concept**
110:12 134:5
**conceptually**
94:21,22 188:5
**concern**
20:19 88:8 161:21
**concerns**
41:7 113:17 136:2 138:8
**concluded**
145:17
**conclusion**
136:4 192:17 194:14 194:18
**conclusions**
135:15
**conduct**
16:4 17:16,25 18:7 18:17,20,24 19:14 162:7,8,14 163:17
**conference**
193:16,18
**confirm**
45:17

confirmed
33:12,18 40:25 41:23
    42:3,6,14,18 43:1,5
    45:13,19,21 46:7,11
    46:13 129:22
    130:10 132:20
    159:2 190:4
confirms
44:12 130:17,22
    131:1 132:4
conflict
73:9,12,12,15,19
    163:20 164:17
    166:14
conflicts
163:14 166:17
conform
84:6
conformed
84:10
confused
48:21,21
connection
7:23 8:7 9:14,18
    11:13,15 12:10
    14:18 15:4 16:14,22
    17:4 20:3,21 36:1
    39:15 78:2 81:5
    86:2 96:10 101:17
    102:18 196:16
    202:3
consider
31:17 118:14,17
considerations
118:23
considered
34:25 60:22 87:7
    198:15
considering
109:7
consistency
56:23
consistent
47:25 60:10 68:17
    70:19 71:7 84:14
    164:20 178:14

constitute
21:20 102:20
constitutes
102:23
constructed
40:19 41:3 89:17
    103:25
construction
20:14,15,16,19,21
    21:1,5,7,10,14,20
    22:6,23 25:21 26:3
    27:1,9,16,21,24
    28:9 32:19,23 33:7
    33:11,12,17,18,22
    39:1 40:3,15,25
    41:23 42:2,3,7,14
    43:2,5 45:13,19,21
    45:22 46:7,11,13
    48:5,6 49:5,17
    51:18 52:3,5 54:13
    85:21 87:12 92:21
    93:2,8,13,18 94:3
    97:4 99:6,6,12,13
    99:25 100:1,9,9,25
    100:25 101:7,8
    102:2,5,13 111:18
    112:2,5 113:17,24
    113:25 121:9
    130:10 132:21
    133:8 184:17,19
    190:4
consultant
68:17 85:9 199:18
Consultants
25:14
consulting
20:5 116:12 122:7
    145:8,9 200:19
contained
205:8
context
16:4 19:10 21:13
    35:10 141:21
contract
4:12 25:15,20 26:17
    27:2,10 63:6,7

69:18,18 70:10,14
    71:2,11,12,15 85:3
    85:4 92:19 111:19
    129:13,19,20,21
    138:20 168:13
    178:14 179:3
contractor
31:17 54:12 63:15
    65:5,10,15 66:19
    68:11 141:22
    142:10 145:6
contractors
20:24 64:10,18,25
    66:2,14 67:20 68:4
    113:18 141:4,16
    142:1 147:5
contracts
20:24 25:4 71:5,6,13
    71:14,15,19,20,23
    72:9 87:19,21
    132:22
contractual
110:21 111:4,16,24
    112:5 113:5,14
    178:8
contractually
169:6
contradiction
92:12
contrast
114:25 131:15 133:7
    137:4
contrasted
131:16 194:4
control
102:6
conversation
11:2 12:1,8,15,19,21
conversations
12:12 43:24 193:16
copies
157:21 158:2
copy
24:18,22 37:9,12,13
    66:4,10 203:22
copying

66:10
corners
116:18
corporation
144:3,6
correct
6:16 7:9,10 14:15
    16:4,5,7,12,19
    17:14,17,22 18:1,14
    19:15 23:3,21 24:18
    24:22 25:25 26:1,4
    26:5 28:15 29:23
    30:3,4,7,14 31:14
    32:15,19,20,24,25
    34:6,7,16 35:6 50:1
    52:20 54:9 62:10,11
    62:13,14,17,23 63:2
    63:13 66:16 69:9,19
    69:25 70:11,23
    73:16,21 74:9 75:22
    76:1 77:20 78:23
    79:13,19,20,25 80:6
    80:7,10 81:4,8,14
    81:20,21 83:1 86:15
    87:16,23 88:16 92:8
    93:16 94:4 95:14
    98:19,20,22,23 99:1
    99:2,13 100:2 101:9
    101:17,18,21
    105:14,19,20,22,23
    105:25 106:2,4,5,7
    106:8,12 107:13,18
    107:21,24 108:9,10
    108:13,18 109:5
    110:4,14 115:4,11
    115:14,18,24 120:5
    120:9 123:11
    126:11,16 127:4
    128:8,21 129:1,5,6
    129:8,17 135:4,17
    137:11,16 138:3,14
    138:19 139:1,23
    141:7,12,17 142:11
    143:1,21 144:4,7,8
    144:11,12,19
    147:14 148:25



EXHIBIT 2
PAGE 91

150:19 151:15,18
153:10 154:5
155:12,14 156:8
157:19 159:22,25
160:2,23 161:3
163:9,21,22 164:16
166:18 167:12
170:14,17 172:16
175:9 177:7,13
178:3,5,9 179:3,4
179:14 180:1,6,7,17
182:13,19,20,20
183:3,6,8,13,15,19
183:21,22,22,25
184:1,20 189:5
190:1 191:4,7,10,12
194:8,16,17 195:21
200:24 201:13
202:6,16 205:9
**corrected**
205:8
**correcting**
8:23
**corrections**
205:6
**correctly**
47:17 58:7 87:15
151:11 153:7,16,22
187:22
**correlation**
120:8 136:19
**cost**
33:7 44:6,22 46:14
52:20 131:25 137:7
143:1,5 145:7 146:9
**costs**
22:23 33:12,18 41:1
41:23 42:3,7,14,18
42:19 43:2,4,5,9
45:1,14,19,21,22
46:8,10,11 48:9,12
96:7 113:4,25,25
130:10,14 131:1,16
132:21 133:8,8
135:7 190:4 199:8
**Council**

64:10,17,24 84:7,15
84:22 86:16 87:20
179:6 195:17,20
**counsel**
849216:5 2:5 5:8,19
158:24 159:2,7,9,12
**count**
72:25 74:14,19
175:19 186:15,15
**counts**
50:20 72:22,22 73:25
74:3 163:6 164:11
164:12 167:15
168:1
**couple**
64:12 68:7 78:13
121:2 198:11
**course**
71:5 104:19 119:18
119:25 120:2,6
122:9 124:9,12
125:1,4,11 137:12
151:21 162:24,24
193:20 194:6
**court**
849216:1 2:1 5:9,17
6:1
**courtroom**
167:2
**cover**
169:10 170:5,9,12,13
170:15,24 171:2,4
**coverage**
18:11
**covering**
76:9
**co-defendants**
160:20 161:22
**CPA**
6:18 71:16 134:6
**created**
9:25 35:6,11 36:23
36:24,25
**creating**
13:10,14,18 106:24
**credit**

61:11,20
**crime**
187:2
**crimes**
71:20
**criminal**
7:9,16,18 50:20,20
72:20,22 73:25 74:3
74:13 160:20
161:19,23 162:19
163:5 165:13 167:2
167:6,15 168:1
186:15
**criminally**
125:1 162:11,13
**critical**
50:3 75:1 83:7
116:13 124:24
185:16 187:18
**criticism**
134:23,24
**criticize**
132:25 133:4 179:21
180:8
**criticizing**
128:23
**cross-approval**
161:22
**cross-approving**
161:19
**CSR**
849216:25 206:23
**cumulatively**
203:10
**currently**
9:2
**cut**
195:15
**CV**
184:18

─── **D** ───

**D**
67:24
**damages**
133:11

**Dan**
114:16
**Daniel**
849216:15 2:15 4:3
5:7 6:4,12 205:4,16
**data**
15:7 19:6,11 47:15
48:3 51:5 52:4 89:8
95:12,19 112:2
114:21 116:17
122:14 123:20
129:14 130:15
133:4,6 146:21
148:6,21 151:23
153:24 154:5,12,14
156:10,12 167:20
168:1,3
**database**
159:23
**date**
5:12 196:22 206:15
**dated**
25:12 91:11 206:18
**day**
199:5,12 205:10
**day-to-day**
31:20,21
**dba**
143:22,24
**deal**
12:18 186:12
**dealing**
48:18 56:1 197:6
**deals**
76:8
**dealt**
125:11
**decided**
55:14 118:6 198:9
**deciding**
118:8 120:23 122:4
**declaration**
4:14 35:2,5,7,8,16
37:8,17,23 38:6
39:10 186:17
193:24 194:3 195:5



**declare**
205:4
**decreased**
168:3
**deem**
117:6 133:11
**deemed**
141:23
**defendant**
5:22 110:12
**defendants**
849216:11 2:11,16
3:8 72:19 74:13
110:15 161:18
162:15 163:5
**define**
20:1 56:19,21 70:11
**defined**
29:17 92:12 102:12
113:20
**defining**
152:14
**definition**
21:14 36:14
**definitive**
21:7
**definitively**
57:11
**degree**
26:20,24 28:4,21
29:1 33:5,10,16,21
38:25 40:2,14,23
41:21,25 45:18 46:6
57:6 81:11 83:20
96:8,23 97:12,16,20
100:22 103:17
104:8 149:16 150:6
187:7 188:11,14,23
**delineate**
90:3
**delineated**
33:22 39:2
**delineates**
38:1 39:5
**delve**
152:8

**demands**
120:3
**demonstrate**
81:16 128:19
**demonstrating**
151:24
**Dennis**
149:3 150:13,14
155:15
**dependent**
120:4
**depending**
129:23
**depends**
21:6 69:18 90:5,8
126:17 138:20
185:22
**depo**
187:16
**deposed**
6:13
**deposit**
49:21
**deposited**
127:22
**deposition**
849216:15 2:15 4:17
5:7,13 86:14,21
87:1 97:1 113:16
205:6
**depositions**
46:19
**describe**
17:5 49:14 59:4 60:1
101:13 185:5,8,10
**described**
51:13 59:25 60:17
94:9 123:25
**describes**
150:12
**description**
4:8 39:17 53:11
54:17 63:11 68:19
89:13 90:5 177:24
**descriptions**
49:24

**detail**
34:9,11 39:4 49:19
129:3 181:20
**detailed**
180:14
**detailing**
185:16
**details**
157:25
**determinable**
23:24
**determination**
72:15 117:13 130:7,7
137:2 151:22
**determinations**
123:22 182:12
**determine**
23:11,19 26:7 27:20
30:12 32:13,18 33:3
35:20 40:2,24 41:21
42:1 43:19 46:12
47:16 48:4 49:4
52:18 54:19,23
58:15 89:9,24 91:23
92:25 93:11 118:1
124:7 130:5 137:13
151:13 154:7 155:5
157:11,22 180:5
183:22 192:10
**determined**
55:24 58:21 99:18
**determining**
32:7 114:5 116:9
117:2 122:10 129:7
**development**
87:13,23
**devised**
115:22 116:1
**devising**
118:4
**DeVorge**
193:2
**dictates**
184:7
**dictionary.com**
69:13

**difference**
21:4 39:5 43:3,6,11
44:15 45:20,23,25
46:1,2,3,10,13
130:12 162:18
**different**
7:5 8:5 11:17 12:7
15:3 16:16 18:4
19:8 22:25 23:16
42:21 46:4 48:20
57:4,21 65:6 69:5
76:15 77:25 83:11
83:13 88:12 104:6
104:24 116:20
119:14 120:1,16
124:3 127:19 137:3
141:20 142:23
143:12 147:3,10
150:13,22,22
151:19 152:7
154:21 167:18
169:23 178:22
180:18 181:11,23
188:21 189:3,13,15
189:16 197:4,7,7
198:22 199:14
202:1
**dig**
23:15
**Dillon**
129:4 130:4 132:14
164:17 165:4,20
166:1 194:4 200:11
**Dillon's**
166:9 186:21 193:24
**direct**
119:20 120:7 194:7
**directed**
67:22
**direction**
206:10
**directly**
8:24 47:23 48:15
52:22 53:7 70:5
98:23 100:17
103:25 120:4



EXHIBIT 2
PAGE 93

161:25
**dirt**
133:5
**disbursement**
139:25 201:15
**disclose**
154:15
**disclosed**
155:3 156:24 199:19
202:9,21
**disclosure**
146:2
**discovery**
34:13,20,23
**discussed**
121:3
**discussing**
12:13
**discussion**
70:7 118:10
**dishonesty**
14:18
**disingenuous**
59:5
**disparate**
70:22
**disputes**
20:19 113:17
**disregard**
86:24 87:1
**distinct**
143:18
**distinction**
103:6,9 188:8
**distinguished**
176:17
**district**
849216:1,2 2:1,2 5:9
5:10 7:1,4 8:18,21
8:25 9:1,3,9,10,13
9:17,18,20 10:1,1,7
10:10,19,24 11:4,7
12:1,3,6,8,9,22,23
13:3 72:20 74:1,4
74:12 97:6,6,7,14
97:18,22,25 98:4,8

105:25 106:4 107:1
156:1 158:19
159:17 160:21
162:12 163:1,4
167:7,17 170:2
171:17,24 172:5
178:19,24 179:6,8
200:1,12
**districts**
67:18 178:20,22
179:12
**Division**
849216:3 2:3 5:10
**document**
14:10 31:17 38:17
39:24 45:7 59:20,25
63:19 66:2,8 94:24
101:22 111:5
114:18 163:2,11
165:5 166:6,11,12
166:16,19,20
171:21 172:18,25
189:16 192:18
**documents**
9:12 11:11 12:13
17:6 20:9,11 22:17
24:16 34:24 36:11
37:2 39:4,9,14,22
45:7,16 54:8 56:22
59:16 63:20,24 64:1
83:3,11,13,16,24
84:20 94:22,23 95:3
101:10 118:13,20
126:18 147:3
151:19 152:17
159:12,13,15,17,18
172:4 177:11
187:11,13 188:25
189:1,16 192:2
196:9 197:19
202:12
**doing**
8:23 10:6 61:16 62:9
71:11 95:16 107:5
109:10 111:11
115:16,16 124:25

129:11 140:4 169:4
175:8,13,18 177:7
180:3 196:6,9
197:14,14 199:15
199:25 200:1
**dollar**
99:24 103:18 104:9
137:19 148:9,12
151:14 153:21
**dollars**
96:2,3 151:4 156:19
157:11
**doozy**
187:19
**dot**
183:9
**drafted**
33:1 34:1 51:25
**drafter**
185:10
**drafting**
171:8
**dramatic**
130:12
**draw**
188:8
**drawing**
12:24
**dream**
112:14
**driven**
82:12 127:17
**due**
15:5 49:2 80:1
116:15 122:8,13
138:2
**duly**
6:5
**duties**
102:1
**D.A**
72:24 156:4

——————— E ———————

**earlier**
10:9 100:11 147:1,2

147:10 154:11
159:14 202:18
**early**
10:9 113:15 116:11
199:11
**earn**
131:10 133:23
**earned**
129:5,15,16 130:5
134:24 135:4 136:1
136:17,19 137:5,6,9
**earnings**
132:22 135:6
**ease**
61:18
**Eastern**
849216:3 2:3 5:10
**effectively**
53:18 61:11 106:17
119:6
**effort**
84:6,13
**Egger**
4:14 35:2 37:17,25
38:16,20 39:18
129:5 130:4 132:14
163:20 193:21
194:2 200:11
**Egger's**
37:8
**either**
9:7,24 13:2,7,8 33:8
33:13 45:24 48:21
99:12,25 135:16
161:25
**electronic**
203:22
**embedded**
78:3,16 92:11 93:23
147:25 182:16
**embezzled**
165:21 166:2,10
**embezzlement**
163:14,15 164:18,19
165:14,15,18,24
166:5,14,22



EXHIBIT 2
PAGE 94

emphasize
136:16
employ
188:12,22
employed
138:6 145:6 146:1
employee
14:18 139:10 140:17
142:25 143:4
145:15,19 146:2,8
206:13
employees
38:6 39:6 43:24
139:3,3,4,5,15
140:6,8,13,14,15
141:7,12 142:15
193:17
enclosing
171:7
encompass
141:11
encompassed
87:14 88:2,11
encompasses
88:23 197:8
ended
201:2
ends
53:18
engaged
195:24 196:13
197:11,25
engagement
8:1,3,8,24 9:14,19
10:12 11:3,9,14
12:3 13:25 14:4,24
39:13,15 43:23
54:15 122:9 158:4
159:14 196:19
199:23 203:5
engagements
8:14 21:10 38:15
engineer
101:11,17,20 103:10
201:23
engineering

21:5,8,13 57:23
58:22 102:7,9,10,15
102:18,21,24,25,25
103:4,7,7,11
engineers
58:3,16
ensure
84:13
enter
196:19
entered
35:14
entire
83:14
entities
170:14 172:13 173:4
176:18 178:8,13
179:2
entitled
25:21 106:11 130:24
131:13 162:2
165:17
entity
7:12 167:1 169:20
171:15,20 172:5
174:10 175:8,13,24
176:22 177:6,12,25
178:2
entries
58:3 126:23
environment
122:22
equally
118:9
era
157:12
Eric
144:22,25 145:3,3,14
145:25 149:3
150:14,25 155:17
155:19
Ernest
37:17
Esparza
3:14 5:16
ESQ

3:4,9
essentially
103:22 109:23
161:18
estimate
6:14 19:22 20:2,12
48:16 59:1,11,14
61:7 62:17 70:8
89:16 93:22 110:20
111:3,14,23 112:9
112:16 113:4,13
114:3,3,5,9,12,23
114:25 115:2,13,18
115:23 116:2,10
117:3,8 118:6
121:13,14,18,22
122:1,15,25 123:3,5
123:7,8 124:5,8,16
133:15 138:10
188:18,19 203:7
estimated
20:9 22:18 29:24
30:16,20 54:7 56:5
60:15 99:8 103:22
137:17
estimates
19:5,7 59:17 114:15
114:17 121:17
123:3,23 125:8
188:24
Estimate's
19:7
estimating
19:10 20:4 54:12
55:17 57:9 102:7
112:3 123:20
estimation
53:15,17,24 54:3,10
55:10,13,15 56:6,15
56:16,18 57:3,14,14
57:16,18 70:18 96:6
100:18 118:12
122:23 123:9,16,18
estimations
50:11 111:7 114:21
115:6 122:10

evaluate
121:21 125:7
evaluating
117:7 121:12 122:25
123:16 124:16
evaluation
124:5
eventually
162:15
everybody
138:13,15 186:8
everyday
31:25 32:1
evidence
75:16 163:3
exact
10:8 26:21,25 32:13
32:19 33:4,5 35:20
45:18 113:23
149:17 156:22
157:17 158:11
165:8 182:11
188:17,20
exactly
23:25 51:14 55:11
57:8 95:25 110:23
110:25 111:18
112:23 125:11
166:1 176:16
184:23 192:25
EXAMINATION
6:8
examined
6:6
examiner
122:19
example
17:25 23:12 32:14
36:18 44:21 53:3
55:25 66:18 78:14
78:18,19 80:20 83:5
93:1 101:14 106:16
109:16 110:18
126:20 143:20
144:2,6,10,22
147:19 149:22



EXHIBIT 2
PAGE 95

150:25 154:21
167:20 171:2 179:5
**examples**
23:7 81:15 88:17,21
88:22,22,24 105:12
142:13 143:13,17
146:10,11 148:7
149:1,11 150:21
152:5 153:6,18
173:23 174:4,8,9,9
176:3,15,21 177:3,4
178:1
**exceed**
29:3 40:7,16,25
41:11 48:11 199:7
**exceeded**
22:22 33:6,17,23
40:10 48:5 52:19
57:24 74:8 95:12
127:3 135:25
**exceeds**
33:11 40:3 41:22
42:2 89:20
**Excel**
60:16 183:2,20
**excellent**
13:1 110:17
**exception**
68:23
**excess**
76:13,20 77:22 105:1
105:4 119:2,24
129:12 130:8
133:19 142:21
146:12 149:13
150:12 152:22
154:16 156:11
165:16 194:11
**exclude**
72:3,8 94:11
**exclusively**
79:14 169:13 197:22
**excuse**
5:6 193:22
**executed**
87:21 170:6,14,24

205:10
**exercise**
122:10
**exercised**
122:13
**exhibit**
4:8 13:25 14:5,6,9,14
14:22 24:5,6,14,15
24:18,22 25:5,5,8
25:11,12 27:12
36:15,23 37:17,19
37:22 38:18 45:4,13
65:18,19,22 66:22
66:23,25 67:1,15,17
67:20,24 83:6 85:4
85:18 86:9,11,13
90:11,12,19 101:24
108:5,8 117:1 122:8
164:24 165:3,4
166:2,16 171:3
176:24 177:2,5
178:21,22 189:19
189:24 190:17
193:23
**exhibits**
4:7 11:19,21,25 12:3
13:10,14,18,22
15:15 16:1 17:1
24:9,25 35:23 36:13
36:16 37:10 42:11
47:18 128:18 153:5
173:11 177:21
**exist**
38:22 39:4 63:24
**existed**
76:10
**exorbitant**
156:13,16
**expand**
126:20
**expectation**
109:17 127:8
**expected**
113:25
**expend**
67:22

**expended**
42:16 43:4
**expenditure**
44:16
**expenditures**
30:20
**expense**
126:24 128:6,11
**expenses**
127:1 128:7
**experience**
15:24 54:9,11 72:18
123:19 136:19
140:4 184:19
**expert**
6:15,19,20 46:18
47:5 48:19 50:3
58:2,4 72:3 75:4
109:20,23 110:2,13
110:15 115:2,13
118:24 123:15
136:4,12 199:19
**expertise**
15:20 20:16 90:2
102:20 184:13,16
184:22
**experts**
112:1
**expert's**
34:24 115:9 117:20
118:17 123:9 136:9
**explained**
32:24 38:15
**explaining**
38:7
**explains**
38:1
**explanation**
14:22
**express**
21:17,18 80:21
**expressed**
21:17,24 41:9
**expressing**
21:25 161:11
**expressly**

29:3
**extensive**
42:8
**extent**
75:15 87:11 90:1
127:14 129:15
138:23 139:22
**extra**
143:9,12 148:19
167:21
**extrapolate**
19:4,5
**extrapolated**
181:3
**extrapolating**
19:10
**extrapolation**
17:14,17,22 18:18,21
18:25 19:8,13
**extremely**
114:17
**extremes**
153:4
**Ex-officio**
171:16
**eye**
117:15
**eyes**
117:19

**F**

**face**
200:23 201:25
202:10
**facilities**
170:2 175:11 178:19
200:12
**Facility**
171:17,24 172:4
178:23
**fact**
12:12 14:22 27:4
33:1 40:20 41:3
51:12 55:7,18,19
72:19 74:18 88:7
104:23 125:8 131:3



**EXHIBIT 2**
**PAGE 96**

132:5 135:25 138:3
139:10 148:10
157:2 161:1 163:1
167:18 173:12
177:21 178:21
186:13 192:10
**factor**
74:10,14,19 87:4
**factors**
74:21 94:2 105:6,10
121:12,21
**facts**
74:11 110:24 113:7,8
113:20
**factual**
4:18 100:6 145:5
165:2,4,22 191:8
**fair**
39:25 82:20 179:24
187:5 196:11
**fairly**
55:8 193:17
**fall**
22:13 27:21 28:6
**falling**
26:22 27:5
**falls**
21:13 23:20 26:16
**familiar**
20:25 28:14 32:2,3
34:24 86:14
**far**
22:22 28:1 39:21
40:10 92:15 94:23
119:24 133:19
142:21 154:16
156:11 168:8
194:11 196:24
**fault**
25:8
**FBI**
71:18,19 111:8
122:20 124:15,25
162:20
**federal**
50:19 73:25

**fee**
61:23 62:21 97:8
**feel**
109:9
**fees**
194:20 202:5,22
**fell**
99:5
**felony**
72:22 73:25 74:3,13
74:18 164:19
167:15 168:1
186:14,15
**felt**
53:24
**fidelity**
13:17
**field**
134:6
**Fifteen**
109:8
**figure**
55:5 171:22 183:2
**figured**
60:13
**figuring**
182:5
**file**
113:3 120:19 159:6,9
**filed**
90:16 115:15
**filled**
114:20
**final**
65:25
**finance**
200:13
**financial**
13:17 20:4 122:18,21
123:20 201:12
**financially**
206:12
**financing**
53:1 67:18 99:1,4,12
99:15,25 100:8,24
101:6,16 103:19

105:18 168:14
**find**
36:21 37:6 67:4 83:5
83:8,9,14 146:20
147:21 151:10
152:25 155:6 156:9
175:16 179:17
195:23
**finding**
144:25
**findings**
164:20
**fine**
16:9 37:15 107:14,21
204:3
**finish**
196:6,13
**Fire**
849216:9 2:9 5:9
**firm**
6:18,24 7:13 8:4,17
9:23 13:4,6 43:24
159:15 193:15
197:4 199:14,24
**firms**
202:2
**first**
6:5 7:2,8,12 69:6
85:8 86:25 91:3
118:6 144:2 145:23
171:3 172:6 174:20
195:6 196:16 198:9
198:25 199:2,4
**fit**
30:7 36:13 39:17
53:10 63:7,10 68:19
163:16 181:1
**fits**
69:17,24
**five**
142:12 143:12
146:10 148:7
150:13,21,22
154:20 189:10,25
190:15,21 191:1
**flawed**

58:13
**focus**
62:25
**focused**
18:10 44:24 181:24
**focusing**
181:8,9
**follow**
16:6,10,18,23 116:14
**followed**
15:12,14,25
**following**
27:1 86:19 102:5
190:7
**follows**
6:6 85:11
**footnote**
13:24 14:3 69:13
**foregoing**
205:5 206:4,6,11
**forensic**
6:17 13:13 14:2,17
14:21,23 15:2,8
111:8 114:16
116:14,19 121:16
122:19 124:17
**form**
10:8,21 11:6 12:5
15:16 17:2 21:15
22:7,15 23:22 25:15
29:7 34:21 56:9,13
59:13 63:17,25
64:11 65:2 69:20
70:12 71:3 73:17
75:5 84:8,17 90:4
91:18 93:20 94:5,20
103:13 106:13
112:19 114:7 117:9
117:17 120:11
123:1 127:5 131:5
131:11 132:7,11,17
133:2 135:18 138:4
156:20 158:10
161:9 169:9,21
173:5 176:1,19
177:9,14 178:4,10



**EXHIBIT 2**
**PAGE 97**

178:16 179:9 182:7
185:2,15 190:22
191:11,16 192:12
193:13 197:2
**formation**
200:12 201:7
**formed**
178:20
**former**
122:19
**forming**
34:25
**formula**
56:12,15 60:16
**formulate**
76:11
**formulating**
55:5 193:9
**forth**
14:3 15:7 17:4 39:4
40:11 53:2 67:23
68:14,24 81:16
109:15 126:8
174:24 206:6
**forward**
68:8
**found**
143:11,12 147:17
150:7,12 154:18
162:23 196:24
**four**
12:20 15:3 58:6
83:13 104:24
105:13 108:8
116:13,18 125:9
147:3 151:18
154:18,20 181:4,5
190:18
**fraction**
156:7
**frame**
18:19,23 19:2,19
45:10 54:16 198:1
**frames**
18:10,11,13,16
**framework**

15:7 71:8 129:9
167:23
**fraud**
72:13,16,18,20,22,24
72:25 73:2,6 122:19
136:20,21,22,25
161:20 167:16
186:14
**fraudsters**
133:5
**free**
137:20
**front**
22:11 57:20 106:18
171:2 174:24
**fruitful**
39:10
**full**
86:13 101:25 162:7
197:21
**fully**
11:8,12 12:9 24:25
**function**
22:5 31:13,14,16
99:11 100:23
**functions**
21:19 22:12 27:21
28:6,11,15,18,22
55:9
**Fund**
175:11
**fundamental**
124:22
**fundamentally**
130:3
**funds**
42:16 67:16,22 99:19
162:1 163:11,15,15
163:16,19,24,25
164:18,20 165:14
165:15,16,18,25
166:3,6,10,15,23
173:8,13,19 200:13
**further**
150:1 173:25 203:15
206:10,12

<hr />

**G**

**gas**
91:13 93:1
**gather**
52:9
**gathered**
174:14
**gathering**
196:8 197:14
**general**
20:24 106:2 126:8,22
126:22 127:4,14,24
127:25 128:4,5,11
128:18,24 140:2
**Generally**
85:16 140:4
**generated**
9:8,17,20,23 10:6,12
11:3 12:2 128:18
134:15 197:12
**generating**
11:25
**generic**
29:12 31:4,5 55:21
58:18 88:4 93:22
102:13 124:10
**generically**
49:14 51:12,24
114:15 121:14
182:15
**gentlemen**
131:10 136:17
**getting**
141:18 165:16 170:5
201:3 203:1
**GGMS**
7:21 160:12,14,16,17
160:18 161:17
162:1
**give**
31:1,3 47:6 49:15
62:3 188:17
**given**
25:4 29:17 51:4
55:18 61:6 95:3,18

118:12 137:6 138:7
178:1 187:10
188:16,25 198:5,24
**giving**
61:11 62:15 96:4
149:9 191:3
**glean**
157:25
**go**
52:10 58:20 90:17
93:25 112:21 118:7
123:13 124:2
125:14,25 126:3
136:13,23 157:6,11
159:23 169:3
171:19 172:2 174:8
175:6 179:18
183:14 188:13
190:17 193:5
198:21
**goes**
38:12
**going**
9:8 37:13 46:25
48:16 49:8 55:2
60:5 61:8,10 62:7
65:17 84:18 90:13
91:8 99:22 101:2
103:21 106:23
117:18,25 120:1
125:2,14,15 152:8
165:8 169:17
177:20 182:4 185:5
188:1 196:20
203:18
**good**
5:5 187:20
**Gordon**
3:9 5:15
**govern**
121:25
**government**
8:12,16
**governmental**
172:21 175:24
**Governments**



**EXHIBIT 2**
**PAGE 98**

849216:5 2:5 5:8

**grand**
149:5,8 150:15

**great**
25:3 42:8 102:14
110:17,17 116:25
144:24 154:22
155:4 162:25
166:21,24 168:10
203:16

**greater**
185:23

**gross**
130:25

**grounds**
145:5

**group**
66:25

**guess**
24:12 136:18 142:23
186:10 187:21
202:4

**guidance**
112:9,11

**guide**
117:7

**guilty**
50:19 72:21,22 73:1
73:2,6,7,8,9,11,24
74:3,14,18 75:7
162:15,23 163:6,12
164:5,15,17,19
165:14,24 166:5,12
166:14,22 167:15
167:21,25 168:5
186:15 187:2

**Gusava**
147:23,24

**guy**
161:8

**guys**
130:19

_____ H _____

**half**
40:25 41:22 42:2

52:19 74:8,8 78:7
87:6 97:8 101:21
104:1,2 127:3
131:19 184:25
189:4,13,21 191:1,2
191:24,24 192:11
198:10 199:3

**hand**
14:8

**happen**
168:18

**happening**
135:12

**happens**
114:21 186:8

**happy**
47:5

**hate**
130:19

**head**
10:25 26:12 109:6,10
118:23

**heading**
171:23

**heard**
69:4 140:23,25 141:2
195:1,9 198:12

**help**
76:11 158:7

**helped**
128:1

**helps**
92:7

**hereto**
205:7

**hesitate**
186:11 202:11

**hidden**
41:10 202:4

**hiding**
149:12

**higher**
203:11

**hinge**
70:23

**hired**

6:23 7:1,4,12 141:16
141:22

**history**
71:22

**Hold**
88:12 175:1,1

**holes**
114:20

**home**
20:23 30:23 129:24
130:14 137:8

**hour**
47:1 63:5 109:24
117:22 147:25
148:2 151:1,3

**hourly**
140:14 142:14
149:13 185:20
186:9

**hours**
49:16,17,17 50:16
60:6 62:16 77:22
79:23 82:14 142:5
142:18 143:7,9,12
143:14,15 147:8,25
157:3 184:2,2

**huge**
156:7

**hundred**
19:19 114:18 134:14
152:18,19,21,23
153:13 154:14,17
156:10,12 204:4

**hundreds**
26:11 34:1 40:21,21
41:4 55:19 88:7
156:23 177:18
183:14 187:11,13

**hypothetical**
95:3 107:14 139:2,7
139:8

_____ I _____

**idea**
71:15 129:11,23
158:22 203:10

**identical**
119:17 173:11,13,15

**identification**
11:22 14:7 24:10
37:20 65:20 66:24
86:12 164:25

**identified**
28:18,23 29:3 36:5
37:22 47:7 58:3
64:25 67:20 68:4
121:21 150:18
177:6 180:25 181:4
202:14

**identifies**
167:7

**identify**
37:2 45:7,8,16 47:8
57:22 58:5,21 65:5
101:11 145:11
150:6 151:2,17
155:1 161:24 165:1
174:10 176:16,22
177:11 178:2
180:20

**identifying**
146:4 182:4

**imbedded**
142:6

**Immediately**
201:7

**impact**
74:2 75:8 78:19
104:18,24 119:20
128:8 168:5 194:7
194:10

**impactful**
127:15

**implement**
67:21 68:5

**implied**
77:2,15,19,24 78:8
78:21 79:7,12,22
82:4,17,21 83:19
84:1 142:6,8,24
143:3 147:13

**importance**



**EXHIBIT 2**
**PAGE 99**

160:17
**importantly**
92:19 158:20
**impossible**
131:6 187:7
**improper**
20:20 162:7,8,14
163:17
**improvement**
4:15,16 30:20 42:9
42:17 43:1,4,9,14
44:2 48:9,12 52:20
64:9,13,16,21 65:1
65:4,8,14,22 66:1
66:14,20 67:2,8,15
68:5,6,8,18 86:1
96:7 130:13 131:1
131:16,19,25 133:8
134:11 135:7 137:7
199:8 200:14
**improvements**
29:4,23,25 41:1,23
42:14,15 43:20 44:8
44:13 45:1 46:14
**impute**
153:11
**imputed**
134:24
**inability**
51:9
**inaccuracy**
128:7
**inaccurate**
92:4,9 128:24
**inaccurately**
94:9
**incentive**
50:23 185:7,10,12
**incidence**
176:3
**include**
13:24 28:1 35:22
76:12 135:23 157:3
160:15 177:20,21
190:7
**included**

10:5 36:3 38:18
68:17 79:24 92:11
93:24 106:11 127:7
128:13 132:19
133:12,21 135:23
137:4 139:15
140:16 141:4,7
142:9,16,19 143:14
148:16 153:5 168:2
169:11,16 173:11
**includes**
66:16 123:20 145:18
**including**
41:15 58:10 61:14
65:1,9 102:5 151:25
163:10 171:5 181:6
186:2
**inclusion**
78:3,25 79:15 80:12
81:6,6
**income**
131:20
**incomplete**
148:14
**inconsistent**
56:22
**incorporates**
189:9
**incorrect**
115:3 123:10 136:7
136:10 151:10
154:2
**incorrectly**
153:23 154:8,9
**increase**
44:24 150:24
**increased**
148:17 168:2
**increases**
74:17
**increasing**
149:12
**incurred**
26:7 41:22 42:1,25
45:22 46:11 93:12
95:13 97:17 103:4

**independent**
141:4,16,22 142:10
145:6
**INDEX**
4:1
**indicate**
119:1
**indicated**
151:16 193:15
**indicia**
72:18
**indicted**
125:1
**indictment**
162:19
**individual**
143:21,22 144:22
**individuals**
20:7 35:24 58:7
73:24 74:22 142:15
142:18 144:18
167:25 186:14
**industry**
54:22,25 110:19,22
112:1 116:2,9
121:24 122:2
152:11,13
**inflate**
50:17
**inflated**
36:2
**inflating**
20:20
**information**
4:20 23:19 26:6 33:9
34:15 80:5 177:21
**initial**
8:1,3
**initialed**
205:7
**ink**
205:7
**innocent**
162:22
**input**
121:1 173:18

**inside**
23:20 104:9 110:20
111:4,15,24 112:4
112:10,17 113:5,13
184:13
**inspection**
25:21 26:3 27:1,9
32:19 33:11,17 42:2
49:5,17 51:18 85:10
87:13 99:6,13 100:1
100:9 101:1,8
**instance**
161:25 164:14
**instances**
89:3,19 144:17
146:22 150:7
153:16,22,23
175:16,19,20,21
**institution**
13:17
**INSTRUCTION**
4:24
**instrumental**
200:11
**insurance**
849216:9 2:9 5:9
14:19 167:3 195:25
**insured**
167:11
**integrity**
50:13 51:23 55:20
58:19 88:9 89:22
92:13 113:18 138:9
169:16
**intend**
21:17,18 22:4,11
25:1
**intended**
82:10
**interest**
73:9,12,13,15,19
163:14,21 164:18
166:14,17 201:11
**interested**
23:16 206:13
**interesting**



**EXHIBIT 2**
**PAGE 100**

179:17
**internal**
83:5 199:20
**internally**
38:2
**interpolations**
19:6
**interpret**
69:8 71:10,13
**interpretation**
69:10,12,15,18 70:24
71:1 72:8
**interpretations**
114:21
**interpreting**
70:10,14 71:22
**interrupt**
103:2 150:3 187:15
**interrupting**
170:20
**interview**
43:19
**investigate**
143:11
**investigating**
71:19
**investigation**
125:3 161:21 167:13
**invoice**
23:11 26:6 31:18
47:7 49:9,15 50:4
50:17,24 56:2 57:22
57:22 58:20,20 83:8
90:8 91:10,19,25
93:6 94:6,8 96:12
99:18 144:14 145:2
145:11 146:3,23
147:17 148:1,10,23
149:18 150:7 151:2
154:16 168:20
170:23 173:12,13
173:17 174:20
177:20 178:15
181:10 182:10,13
183:3,8,12,14,14,22
183:25 185:4,8,10

185:24 186:9
**invoiced**
96:3 147:24
**invoices**
15:10 18:1,2,3,8,12
18:20,24 19:3,20
23:5,19 26:9,11
27:23,25 28:1 29:9
29:9,19 32:21,25
33:2,25 34:1,6,9,11
35:6,11 39:7 40:20
40:21 41:3,4,8,10
41:13,16 47:10,20
48:24 49:3,8,11,13
49:24,25 50:7,9,10
50:12,13,15,18 51:2
51:21,22,23,24,24
53:5,10 55:19,20,22
55:24 56:16 58:17
58:18,19 59:15,16
60:9,10 64:5 68:9
70:2,3,5 76:12 78:4
78:17 82:12,13,14
83:10 84:20 88:8,9
89:10,11,22,23 90:2
90:6 92:3,6,11,14
99:7,15,20 100:4,14
109:21 117:21
135:24 136:5 138:7
138:8,9 142:16,17
142:19 143:8
144:21,25 145:10
146:20 148:5 149:5
150:13,14 151:23
155:2,2,7,8 156:23
156:25 157:3
160:19,23 161:1,16
161:17,20 169:11
169:12,16 170:5,10
170:12 171:5,7
173:8,9,10 174:14
176:16 177:16,17
178:18 181:1
183:15,17,19 184:3
184:6 186:1,2,16,20
186:23 188:13,16

**invoice-by**
50:4
**invoice-by-invoice**
93:9 179:22,25
180:12 182:17
187:12
**invoice-or-invoice**
114:13
**invoicing**
21:1 32:3 49:9
142:13
**involve**
21:8
**involved**
154:25
**involvement**
186:22
**involving**
20:19 81:19 113:16
**irrelevant**
127:4
**irrespective**
182:14
**Irvine**
849216:16 2:16 3:5
3:10 5:1,14
**issuance**
202:22 203:1
**issue**
154:4 200:18
**issued**
7:20 24:19,23 70:2,3
115:20 136:5
160:19 161:17
168:20,20 170:23
175:22 178:19
201:4 202:16,17,22
**issues**
58:19
**issuing**
202:12
**item**
31:3,4
**items**
31:6

**J**

**Janda**
149:3 150:13,14
155:15
**janitor**
145:20,23
**Jeru**
144:10
**job**
66:10 89:14 91:16,24
94:17,18 160:22
161:2,5
**jobs**
88:1 89:6,9,20 95:13
96:10,22 105:22
160:25
**judgment**
133:22
**judgments**
120:15
**July**
849216:17 2:18 5:1
5:12 206:18
**June**
91:11 158:13 160:7
**jury**
22:4,12 57:20 149:9
184:22

**K**

**Kanpanicas**
160:18
**Kapanicas**
7:21 64:6 161:8,12
161:15,17,25
169:13,15 170:6,16
170:25 171:1,4,17
171:25 172:19
174:5
**Karman**
3:5
**keep**
37:13 136:10
**kept**
120:14



**EXHIBIT 2**
**PAGE 101**

kind
130:16 157:1
kinds
41:7 50:7 51:1
knew
153:8,9 173:16
184:23 195:17,20
know
13:2,7,8 17:18 19:9
21:4,7,9 29:1 31:4
31:22 32:8 35:16,16
38:19,22,24 39:3,3
39:9,21 42:13,22
43:3,5,8,11,13,16
43:18 44:4,15,21
45:20,22,24 46:1,2
46:5,23 47:2,15,23
48:7 49:9,10 55:7
55:11,12 57:2 61:12
61:21,24 64:1,6,21
65:4,14 66:4,9
70:21 71:4 72:12
74:16 84:9 87:19
89:18,23 90:10 92:3
94:2,14,16,19 95:23
95:25 96:4 102:15
102:17 103:9
107:25 108:5 109:9
109:11,13 110:9,18
115:15,16 121:10
121:19 130:4,6
136:10 137:25
138:16,18 139:3,9
139:17,22,24 140:9
140:11 141:3,5,6,11
141:15,21,24
144:13 148:9 150:5
151:8 153:12,15
154:1 156:6,17
157:21 158:1,18
162:21 164:2,23
166:2,10 167:1
168:19,19 169:18
169:25 170:3,4,18
172:24,24 173:1,20
175:25 178:6

179:18 183:24,24
184:10,13,14,14,15
184:16 186:17
188:5 189:6 190:11
190:13 191:19
192:25 193:6,18,20
194:2 197:24
199:12 200:23
202:12,24,25,25
203:2,11,12
knowing
185:1
knowledge
24:19 44:5 56:16
75:6,7 89:24 118:12
153:11 173:7,18
182:11
known
174:21
Krieger
3:4 5:24 6:24 7:6
12:15 13:4,6 159:19
199:24 200:2

_____

L

L
3:9
lack
34:11
Lana
147:23,24
language
28:2 109:16 190:2
large
20:23
Laura
849216:24 2:18 5:17
206:23
law
6:24 7:13 13:4,6
lawsuit
10:20
lawyer
13:6 71:13
lawyers
12:14 13:4 136:13

lead
125:1
leap
186:18
learned
201:12
ledger
126:8,22,23 127:4,14
127:24,25 128:4,5
128:12,19,24 140:2
left
137:1 177:1 187:13
legal
5:17,18 72:4 170:14
legislative
170:1 171:16
legitimate
129:18 132:15 135:3
legitimately
51:6,18 52:5 129:16
129:17 131:4,10
132:10 135:16,20
136:1
letter
13:25 90:18 169:10
170:6,9,13,15,24
171:3,4,8
letters
192:2
let's
24:2 31:21 36:17
52:9 61:17,18,20
65:17 85:3 90:9
95:6,6,7 98:11
108:2 115:12
143:18 170:19
173:21 189:18
level
16:25 20:22 21:2,2
49:19 74:11 144:18
177:20 184:16
levels
140:15
Lewis
144:22,25 145:3,3,14
145:25 149:4

150:14,25 155:17
155:19
liberty
199:17
lied
132:6
lieu
114:12
life
31:12,20,21,25 32:1
light
97:25 98:4,9 163:4
limitation
41:11 80:1 133:21
135:25
limitations
129:19
limited
53:12 76:7 80:2,12
83:17 129:21
141:13 151:19
157:24
Lind
121:8
line
21:9 31:3,4,6 85:8
86:18 87:10 97:1
175:6
list
28:10,14,23 64:10,17
66:2,13 121:21
183:9
listed
65:15 66:19
listing
35:24 102:12
literally
66:3 67:3 147:3
litigation
9:25 10:13 11:4
12:11 24:20 110:8
116:11 122:6
158:21 159:7,10
164:8
little
125:14,14 138:19



EXHIBIT 2
PAGE 102

183:9
**live**
131:9
**living**
6:15,17
**LLC**
173:21
**LOC4074562**
91:1,10
**LOC474562**
90:15
**Logic**
7:20 8:9 20:5 21:20
22:5,13,19 23:3,4
25:13 27:21 28:6
29:5,18,18 30:6
35:6,11 36:24,25
37:5 38:1 40:3
47:19,21 48:5,7,15
49:4,7 50:19 52:22
53:9 58:21 63:15
65:1,5,10,15 66:16
66:19 68:10,17,24
70:3 73:5 75:22
78:4,16 80:10 82:13
86:2 87:5,11 88:4,8
88:9,14 89:3 91:11
94:9 95:24 96:9,22
97:5,14 99:5,11,15
100:23 101:11,13
101:15,16 103:4,7
103:18 105:4
106:19 109:18
119:7,23 127:23
128:23 134:10
137:6 138:23 139:4
139:10,15 140:9,11
140:17 141:19
142:14,16,19,21
143:14 145:7,9,10
145:15 146:2,3,24
147:24,25 150:24
151:1,1,5 155:7,8
155:21 156:18,23
157:14,18 158:15
160:19 161:2,16,16

164:14 165:7
167:14,15 168:14
168:20,24 169:7,11
170:23 173:7,16
174:15,21,23
175:17 176:16
177:3,6,12 184:24
185:5 187:2 189:2
197:6 201:2,5,19,22
202:5,22 203:3
**logically**
47:25
**Logic's**
21:13 35:21 38:15
52:18 54:18 156:7
174:10 176:23
202:14
**long**
54:6 147:6 184:7
196:25
**longer**
125:14,15
**look**
25:19 39:12 59:22
65:17 68:2,2 73:7
76:24,24 82:7,9
85:3,18 86:7,18
90:9,11 94:8 101:22
111:23 113:3
114:23 120:19,21
126:2 143:7,18,19
144:14,21 145:25
147:20 155:2,8
159:23 160:9 166:4
170:19 171:10
172:6 173:15,21
174:20,22 184:22
189:18 192:19
**looked**
29:8 32:5 39:14 58:2
60:9 90:10 116:22
147:8 148:3 201:15
**looking**
27:12 34:19 39:17
41:5 42:19 44:16
47:17 68:9 91:8

94:6 101:24 133:18
144:20 145:13
167:13,24 171:3,22
173:10 174:21
177:1 178:15 185:4
195:23 202:17,24
**looks**
37:23 126:21 153:6
153:10,12 171:8
173:13 201:6
**loss**
14:18 127:13 168:6
198:7,10 199:1
**lot**
124:19 131:22 132:5
132:9,15,19,25
134:25 139:21
161:8
**lots**
24:3 135:11 139:17
139:18,20
**lower**
44:22
**lunch**
125:13,25
**L-i-n-d**
121:8

_____

**M**

**M**
3:4
**machine**
206:9
**Magna**
5:16,18
**majority**
6:20 68:23,23 111:11
138:7 154:8
**making**
22:8 119:25 123:22
127:11 132:15,25
133:6,22 140:3
172:5
**man**
186:13
**management**

21:5,8,14,21 22:6
27:17,22,24 28:10
32:23 33:22 39:1
40:3,16 48:6,6 52:4
52:5 54:13 97:4
99:6,12 100:1,10,25
101:7 102:2,13
**manager**
35:14 67:18 160:23
171:5,9,18,25
172:19 186:24,25
**manner**
51:9 52:7 185:8
**manual**
14:20 15:9
**mark**
14:5 37:11,16,22
164:22
**marked**
11:19,21 14:6,9 24:9
24:14,14 25:5 37:19
65:17,19 66:23 86:9
86:11 117:1 145:24
152:22 156:11
164:24 165:3
**marking**
24:5 37:17 66:22
**markup**
41:12 76:13 79:16
92:13 136:1 145:12
145:16 146:12
148:2,17 151:2
153:10 154:17
**markups**
156:13
**married**
13:3,6
**match**
154:14
**matching**
83:11
**material**
121:12
**materials**
197:14
**math**



EXHIBIT 2
PAGE 103

61:17 108:1 109:6
182:13,19,20 183:3
183:12,15,21,21
**mathematical**
56:7 60:16 94:1,14
124:16
**mathematically**
76:17 107:19 108:20
183:8,25 184:3
**matter**
5:7 7:5,7,8 11:9,10
17:22 18:1,8 24:23
25:16,25 34:14,20
37:18 183:17 187:8
197:22
**matters**
197:18
**maximum**
30:6
**Ma'am**
164:22
**mean**
8:1,22 20:2 72:10
88:22 103:2 119:16
124:21 162:7
187:15 199:10
200:25
**meaning**
7:7 10:17 62:7 75:17
84:3 180:9
**means**
69:11,15 70:11,18,23
110:9 132:6,15
165:15,18 190:11
190:13
**meant**
201:8
**member**
86:16 87:20 122:13
**members**
84:7,15,22
**memorized**
35:7,15 164:2
**mental**
120:22
**mention**

186:11
**mentioned**
14:2 22:20 39:10
55:25 74:21 95:4
113:15 133:13
147:1 179:12 189:7
195:1 198:11
199:13
**mentions**
38:19 189:10
**method**
181:25 187:9,24,25
188:1,2,9,10,12,22
**methodology**
29:22 113:1,4 122:4
138:6,6 180:5,8,10
180:17,19 188:4
**methods**
187:23
**middle**
74:25 144:9
**million**
44:17,17,20 53:19
61:5,5,6,12,13,21
61:21 62:5,5,6,7,10
62:13,18,19,20 63:2
68:11 71:15 75:21
76:5,18 78:19 79:25
80:6 81:20 82:1,2
82:18,23 106:18
108:15,15,16,16,21
109:8,8,9 127:9
128:14 129:13,16
129:16,25 130:10
130:11,24,25
131:10 132:1,3
133:6 134:17,17
135:5,8,8 147:11,11
154:24
**millions**
131:14
**mind**
68:18 112:8 117:7
131:8 132:6,9 180:2
180:4 187:6 188:13
196:17

**mine**
79:5,9,10
**mine's**
36:22
**minority**
154:9
**minus**
12:20 180:22
**minute**
41:18 61:17 66:5
147:22
**minutes**
46:25 47:1 52:9
**misappropriation**
73:13 163:11,15,19
163:24,24
**misleading**
41:14
**missing**
19:11 20:6 32:21
33:1 34:5 40:21
41:4 48:24 49:3
51:9,21 55:20 88:8
88:13 138:8 177:18
187:10,12 188:16
**misstating**
92:14
**misunderstood**
59:8
**misuse**
163:25
**mixing**
76:19
**modified**
10:9
**moment**
187:18
**Monday**
849216:17 2:18 5:1
**money**
26:21,25 46:20
119:24 120:3,8
127:18 128:2,19,20
129:4 130:19 131:4
131:22 132:5,10,15
132:25 134:10,17

134:25 135:4,16,19
135:21 136:16
148:20 157:7,18
161:8 201:18
**monies**
164:1 197:6
**month**
53:4,6 60:8,18 61:8
61:13 62:6 118:21
199:12
**monthly**
61:23 62:21
**months**
12:20 60:13 118:22
146:21 158:13
160:4,6
**Moorjani**
129:4 130:4 132:15
200:11
**morning**
5:5 201:6
**motion**
71:21 72:8 131:22
**moved**
72:3
**Moving**
69:2
**multiple**
150:14 194:19
**multiplication**
107:8
**multiplications**
118:21
**multiplied**
30:20 107:23 131:25
147:8
**multiply**
60:18,19,23 61:1
107:8 120:1
**myriad**
50:12 59:16 84:20
180:15 181:21

_____
**N**
_____
**name**
6:10,11,12 10:18



12:24 112:25 113:2
147:21 181:9
202:14 206:16
**names**
10:17,23,25 12:25
**narrative**
59:25 90:8 150:21
161:13 162:5
201:25
**National**
849216:9 2:9 5:8
**nature**
47:16 177:24 198:6
**near**
153:24
**necessary**
67:21 82:4 85:10
90:2 91:22 123:21
128:24 148:15
158:8
**need**
75:16,17 84:24 95:19
106:25 107:8
114:20 123:3
128:11 130:4,6
131:18 133:10
198:20
**needed**
151:17
**needs**
15:4 153:8
**negotiated**
164:10 191:9
**neighborhood**
129:25
**neither**
48:19 206:12
**net**
62:7
**never**
12:8 57:8 75:16 92:9
142:17 153:2 195:1
198:11,15,19
**new**
189:9,25 190:4,20
191:1

**non-disclosure**
81:6
**non-employee**
146:4
**normal**
32:6
**notations**
37:1
**noted**
205:6
**notion**
136:3 195:6,6
**number**
5:6,11 14:6 15:1,2
20:18,22 37:19
43:24 54:20,23
55:18 56:8,12,24,25
57:2,7,13 61:2,8
65:19 66:23 74:17
77:12,19 84:24 85:6
86:9,11 90:15
106:23 107:9,17,19
108:5 109:3,21
113:16 114:1
118:25 119:1,5,22
120:2 135:7,22
141:14 143:20
145:10 146:15
147:12 148:20
149:6,9 151:20
156:23 164:23,24
165:20 166:9
167:21 168:2,3
173:24 175:20
176:25 188:18
190:21 193:16
194:9
**numbered**
28:23 190:15
**numbers**
55:12 61:18 75:8
106:17 110:1
118:15 119:13
147:10 194:13
**numeral**
189:9

**numerous**
138:5

---
**O**
---
**oath**
6:2,5 57:5,12,15,18
100:21 206:7
**object**
10:21 11:6 12:5
15:16 17:2 21:15
22:7,15 23:22 29:7
34:21 56:9,13 59:13
63:17,25 64:11 65:2
69:20 70:12 71:3
73:17 75:5 84:8,16
90:4 91:18 92:22
93:20 94:5 103:13
106:13 112:19
114:7 117:9,17
120:11 123:1 127:5
131:5,11 132:7,11
132:17 133:2
135:18 137:22
138:4 156:20
158:10,10 161:9
169:9,21 173:5
176:1,19 177:9,14
178:4,10,16 179:9
182:7 185:2,15
190:22 191:11,16
192:12 193:13
197:2
**objection**
7:3 9:5,11 10:3 64:19
65:11 73:22 84:16
94:20 104:12
**objective**
55:4 56:11
**obtained**
77:7
**obvious**
96:1
**obviously**
194:13 197:17
**occasion**
155:6

**occasionally**
140:2
**occasions**
148:16 151:7
**occur**
80:15
**occurred**
72:14 115:13
**offer**
21:12 22:4,11 25:1
47:1 51:17 71:1
**offered**
69:10,23 70:1 72:8
84:14 112:25 114:4
**offering**
72:3,13 127:13
**offers**
69:12
**office**
7:5 8:19,21,25 9:1,14
9:21 10:7 11:7
35:14 72:21,24 74:1
74:5,12 158:19
159:17 160:21
162:12 163:4 167:7
167:16,17 186:24
186:25 200:1
**offices**
60:7
**officials**
53:4 56:1 60:5,14
61:13,25 200:11
**Oh**
12:17 66:9 72:1
84:23 198:19
202:20 203:10
**okay**
6:22 7:11 8:6 9:15
10:15 14:12 15:22
16:17,24 17:8,20,24
19:18,24 20:13 21:3
21:11 22:10,24 23:1
23:17 24:11 25:3,10
25:18 27:19 28:3
29:20 30:1,10 31:11
32:11,17 34:3 35:1



**EXHIBIT 2**
**PAGE 105**

35:4,18 36:20 38:9
40:22 41:17 42:5,20
42:24 43:17 45:2
46:21,24 47:4 48:2
49:1 51:3,15 52:2,8
52:11 53:22,25 54:4
58:14,25 59:9,19,24
62:2,4,22 64:3
65:16,21 66:12
67:10 69:1 72:6
74:20,23 75:10,14
75:20 76:14 77:18
78:10 79:6,8,11,21
80:3 81:9,22 82:19
83:25 84:12 85:2,4
85:7,17,24 86:17
87:3,8 88:20 90:14
90:20,22,25 91:7,9
91:21 92:18,24 95:8
95:10,20 96:16
101:4 104:5,15
105:15 108:4,19
110:5 111:12
115:25 116:7,25
124:1,14 125:12,16
125:17,24 126:5,13
130:2 134:8 135:13
143:16,25 144:16
145:1,4 146:6 149:7
149:20 150:10
152:6 153:20 160:8
160:11 162:10,17
163:7 167:9 168:10
169:2 171:13 172:7
172:11 174:3
181:18 182:1,24
184:9 187:17
189:20 190:19,23
192:8,22 193:8
199:22 202:20
204:3,7
**old**
190:3
**old-fashioned**
31:21
**once**

152:24
**ones**
99:17 144:9 154:13
197:22
**oOo**
5:3
**opening**
126:2
**openly**
33:14
**operate**
95:16
**opined**
39:7
**opining**
57:11 100:6
**opinion**
21:17,19,23,24 22:9
22:16 24:23 25:25
29:22 33:8,13 36:2
40:6,7,9 57:19,20
69:17,23 70:1,8,23
72:13,23 73:16
76:12,20 78:4 80:21
81:16 92:14 99:10
103:20,21,21
109:24 112:25
114:4 115:9 116:9
117:20,21 118:1
123:7,9 126:11,12
126:20 127:11,13
129:21 130:16,17
130:22 131:8,12
132:16,23 133:15
133:17 136:7,9
143:6,7 146:10
160:13 161:6,10,11
161:12,13 191:14
193:9,11 194:10,23
**opinions**
21:12 25:1,16 34:9
34:25 41:8 50:14
71:1,22 72:4 73:20
74:7 75:4,8,12,18
75:18 126:6 127:7
136:12,14

**opposed**
102:25 105:2 120:16
144:18
**order**
20:25 30:11 37:2
44:19 52:18,23
54:19,23 83:4,15
90:16,24 91:2 107:8
122:14 128:19,25
130:5,6,16 131:20
131:20 133:11
137:13 143:11
147:2 151:16
153:24 172:12
173:24
**ordering**
204:1
**orders**
44:23
**original**
24:19 29:14 35:22
36:13 41:9 43:23
44:18,23,24 50:14
71:9 109:14 159:14
189:8 190:17 192:9
195:25 198:23
200:3
**originally**
195:24 197:3
**other's**
161:19
**outrageous**
56:21,23 69:15,16
**outset**
159:10
**outside**
22:19,21 23:20 50:22
50:25 53:6,11,16,20
55:9 56:5 60:3
61:16,22 62:17 70:6
79:16 96:5,10,22
98:25 100:24 101:7
103:23 109:22
110:21 111:4,15,24
112:4,10,17 113:5
113:13 135:10

136:6 137:10,16,18
137:19 138:3 140:7
140:17 178:8,13
179:3,6,13 181:7
185:11
**outside-the-cap**
105:18
**overage**
114:1
**overall**
194:10
**overbill**
148:24
**overbilled**
119:24 133:17 142:5
143:15 147:17
154:18
**overbilling**
30:22 77:2,15,20
78:1,8,12,22 79:7
79:12,22 80:9,19
81:2,5,12,17,19,24
82:5,18,22 83:19
84:2 105:1,4 106:10
107:13 109:4 114:6
119:7,21 127:15,17
128:25 129:8,11
130:1,5,23 131:2,21
132:24 135:9
136:16 142:6,8,24
143:3 149:17
150:18 180:6 185:1
**overbillings**
78:1,4,24 119:2
132:3,4 149:1,3
**overcharge**
76:8 194:15
**overcharged**
87:5 147:8 148:11
150:8 165:6
**overcharges**
151:14 158:9 199:3
**overcharging**
75:25 76:3,16,20
107:18,24 108:13
109:1 114:14 128:8



EXHIBIT 2
PAGE 106

160:12,13,16 163:9
164:15 165:11
188:15,24 194:18
199:23
**overhours**
77:24
**owe**
66:10
**owed**
164:1
**owned**
134:1
**owner**
160:18
**owners**
20:5 50:18 73:5
75:22 80:10 129:5
134:3 137:21
164:14 167:14,14

P

**PA**
849216:10 2:10
**padding**
50:16
**page**
4:2,8 14:25 15:1
25:19 26:2 27:14
28:9 36:17 38:11,12
49:23 65:25 66:1,3
66:6,7 76:25 85:5
86:8,18 87:9 90:17
91:3 96:25 126:6
143:18 146:16
149:2 150:19,25
162:6 171:3,10,14
174:22 175:3
179:18,21 180:12
200:3
**pages**
39:23 67:4 81:13,13
91:2 159:16 161:7
174:1 175:7,12
197:19
**paid**
8:15,17,17,20,25 9:3

9:10,18 10:1,12,20
11:4 12:3 30:16
47:19,20,24 48:7
49:7,8,20 53:1,4,5,7
56:2 60:8,11,12
61:22,24 68:11 70:2
70:5 75:22 80:10
81:25 84:4 95:23,25
96:1,2,4 98:22,23
98:25 99:8,19,19,24
100:3,8,14,16,17,23
101:6,15 103:18
104:9 108:15 109:5
127:8,21 128:15
130:11,23 132:3
133:18 135:8,16,16
135:19,20 137:10
137:14,19 138:2,13
138:24 139:4,6,10
140:17 141:18
157:7,9,12,14 162:1
169:1,7,17 170:4,10
170:23 172:12
173:8,9,12,14,17,19
176:5,6 178:19,23
185:14 187:3 199:9
200:19 201:14,18
202:22 203:4
**paper**
196:10 203:23 204:5
204:5
**paragraph**
15:2 37:25 38:12
67:11 68:14 102:11
126:7 162:7 172:6
189:9,25,25 190:4
190:15 200:6
**paragraphs**
63:1 189:13,15
**parameter**
163:17 199:5
**parameters**
30:8 129:19
**parcel**
161:2
**Park**

2:16 3:10 5:13
**parks**
97:6,21 98:8 106:6
**parse**
93:7,9
**part**
92:10 124:24 133:18
139:3 155:25 161:2
161:4 197:16
**particular**
10:23 14:1,3 18:10
18:11 21:9 25:19
28:2 29:13,17 31:13
31:15 39:24 40:8,19
50:3 60:4 66:14
70:24 99:18 100:14
113:8,19 115:20
121:5 122:20 124:9
125:4 136:15
142:14 146:18
147:21 148:3,18
154:12,25 173:18
177:16 180:21
**particularly**
27:25
**parties**
5:19 191:15 206:14
**partner**
6:18
**party**
72:2,3 145:11
**pass**
124:20,22
**pattern**
113:23 151:24 152:2
152:3,4,8,9,12,14
**Pause**
52:13 98:14 125:21
176:11
**Paycheck**
36:8 76:10,17,21
77:3,16
**Paychex**
76:1,4 78:12,14 82:6
82:15,21 138:12,14
138:16,21,24,25

139:11,12,15,25
140:3,12,12,13,14
140:16,18 141:7,11
141:14,25 142:2
**paying**
133:20
**payment**
32:4 106:22,22 170:5
171:7 174:15
175:22
**payments**
7:22,23 47:22 48:15
52:22 53:9,13
100:19 103:24
106:19 140:3 142:1
142:3
**payroll**
75:25 76:4,6 77:8
78:2,9 83:1,2,12
138:17,19 139:5,6
139:24 140:1,5,7
141:6 143:9,10
**pays**
186:8
**pen**
196:9
**penalty**
205:4
**people**
121:2 131:14 132:9
138:24 139:18,21
139:23 141:16,18
143:13 155:23
156:3 158:1 162:22
175:17 193:5
**percent**
18:11,13,16,20,23
19:2,20 22:19,23
23:12 29:4 30:21
33:6,12,17,23 40:4
40:7,10,16,25 41:12
41:22 42:2 50:22
52:17,19,21,24,25
53:7,11,14,18,21,23
53:23 54:1,2,3,5,7
54:20,23 55:5,8



**EXHIBIT 2**
**PAGE 107**

56:6,8,12 57:7,8,9
57:10,16,24 59:15
59:17,22,23,23 60:1
60:15,20 61:3,7,16
62:15,18 63:5,10
68:25 70:2,6,9,18
70:18,18,19 76:13
76:21 78:5,8 79:16
87:6 88:3,11 89:16
89:20 93:13,22,23
93:24 95:12 96:5,7
97:8 98:18 100:19
101:21 103:18
104:1,3,20,20,21,21
104:25 105:1,2,2,5
106:16,21,22
107:11,17,22
108:11,15,16,17,24
109:3,8,11,12,12,21
109:22 110:2,2
114:3,18 115:23
116:1,3,5,21 117:20
117:21,24 118:4,5,5
118:19,25 119:3,5,9
119:11,12,19 120:7
120:15,16,23 121:1
121:4,19 122:5
123:8 127:3 129:22
130:8,9,13,25
131:15,19,25
132:20 133:7,21
134:3,10 135:6,25
136:5,6 137:6,17
138:11 143:1,5
145:7,12,16 146:9
146:12 148:2
149:13 151:3
152:18,19,21,23,23
153:10 154:14,16
154:17 156:10,11
156:12 180:23
181:15 184:25
185:9 188:18 189:4
189:7,10,11,13
190:5 191:1,2,19,20
191:22,23 192:3,11

192:11,15,16,18
193:19,25 194:1,11
194:12,16 195:2,7
195:10 198:10,13
198:16,16,18,20
199:3,7,9 201:8
204:4
**percentage**
22:18,18 54:12 55:17
56:5 104:17 105:7
106:14 107:9 111:3
111:15,23 112:4,9
112:16 119:10
120:4,16 151:5,8,13
151:22 152:3,10,18
153:21 154:2,24
156:7 194:20
**percentages**
54:7 111:6 118:8,8
118:18 151:4,9,11
152:1
**percents**
193:19
**perfect**
94:24 180:9 182:3,3
**perform**
6:19 14:21,23 16:13
16:25 17:21 53:3
54:18 61:10 63:8,12
68:15 81:1 92:12
100:23 202:2
**performance**
16:22 102:1
**performed**
7:22,25 8:13 15:8
21:20 22:5 23:7,25
26:14 35:20 36:6
41:11 50:5 58:7,24
71:6 77:8 82:4
84:19 92:16 95:1
99:5,11,14 109:15
138:3,10 185:6
**performing**
12:10 15:14,20 16:1
16:11 17:1 59:4,12
109:18 122:7

**period**
27:4,8 29:5 41:5
47:19 49:7,20 57:19
76:7,8,11 83:8,10
83:14 147:4 151:18
151:18 153:7
**periodically**
141:16,23
**periodicals**
13:9
**periods**
20:10 42:10,10 147:6
**perjury**
205:5
**permission**
10:11,19 11:2,11
12:2
**person**
10:18 58:22 121:5
122:7 139:9 164:4
**personal**
20:17,22 21:2 31:12
131:17 132:21
135:6
**personally**
129:24 130:14 137:8
169:25
**perspective**
161:21 201:12
**pertained**
117:23
**phases**
85:21 140:25
**phonetic**
144:10 146:18
147:24 149:3 193:2
**phrase**
69:25 70:7,15,22,24
79:3 101:12 140:23
141:3 153:14 162:6
162:8 191:20,22
**phrased**
21:25
**phraseology**
27:25 70:17 92:16
124:23

**phrases**
101:13 124:20
**pick**
127:20
**piece**
95:12 100:7
**pipe**
31:5
**Pisano**
3:4 5:23,23 7:3 9:5
9:11 10:3,21 11:6
12:5 15:16 16:20
17:2 21:15 22:7,15
23:22 24:7 25:6
29:7 34:21 37:15
56:9,13 59:13 63:17
63:25 64:11,19 65:2
65:11 66:7 69:20
70:12 71:3 73:17,22
75:5 84:8,16 90:4
91:18 92:22 93:20
94:5,20 103:13
104:12 106:13
112:19,21 114:7
117:9,17 120:11
123:1 125:16,18
127:5 131:5,11
132:7,11,17 133:2
135:18 137:22
138:4 156:20
158:10 161:9 169:9
169:21 173:5 176:1
176:19 177:9,14
178:4,10,16 179:9
179:15 182:7 185:2
185:15 187:15,19
190:22 191:11,16
192:12 193:13
197:2 203:18,22,24
204:1
**PITTSBURGH**
849216:10 2:10
**place**
206:5
**placed**
6:5 24:13 206:7



EXHIBIT 2
PAGE 108

places
127:19
plain
31:21 172:3
plaintiff
849216:7 2:7 3:3
    5:24 110:7,10,12,13
    192:5,6
plaintiffs
110:16
plan
4:15,16 25:21 26:3,8
    26:10,13,22 27:5
    32:13 33:4,6 40:24
    41:22 49:4,16 51:6
    64:21 65:23 66:1,20
    67:8,15,21 68:6,8
    68:18 85:10 87:12
    97:3 99:5,13 100:1
    100:8,25 101:7
    122:12
planning
15:6 26:16 102:6
    116:16 122:11
plans
64:9,13,16 65:1,4,9
    65:14 67:2 68:5
    131:20
play
198:5 199:1 202:2
Plaza
2:16 3:10 5:14
plea
74:15 75:3,11,15,18
    162:19 163:8,25
    164:2,11,19 165:11
    166:4,7,8 167:10
plead
73:2 163:20 164:12
    165:20 187:2
pleading
166:5,12,13
pleads
165:14 166:22
pleas
163:10 165:4 167:22

168:5
please
6:1,10 14:5 164:22
    165:1,5 179:19
pled
50:19 72:21,21,25
    73:6,7,8,9,11,19,24
    74:3,14,18 75:7
    162:15 163:5,12,20
    164:4,15,17 165:20
    165:24 167:15,25
    186:15
plunk
118:19
plus
12:20 73:13 143:1,5
    145:7 146:9 180:22
point
15:13,25 44:11 48:20
    49:22 59:20 110:19
    112:3,7,15,24 113:2
    117:5 119:25
    120:18 122:6
    127:10 129:14
    130:15,20 133:4,6,7
    136:11 146:7
    148:10,22 149:22
    149:24 155:1 157:2
    161:14 167:20
    168:1,3 173:25
    176:2 181:11,19,23
pointed
38:17 116:12 144:17
    172:9
pointing
143:17
points
15:3 112:2
population
19:15 107:12
portion
39:13 134:15 200:18
    201:3,5,18,23
positions
35:25
possible

29:11,16 40:1,14,23
    41:20,25 49:4 57:13
    95:18 131:9 179:25
    180:2,4
possibly
55:1 57:12 94:25
    110:4 114:19 115:4
    115:11 123:11
practice
80:15,18,19 149:11
    150:23 151:17,25
    152:2,8 161:15
preamble
102:11
preceded
200:2
precedes
102:11
preceding
7:6
precise
29:2 55:23 56:14
    187:23 196:1
precisely
23:25 29:16 129:9
predicated
180:13 181:20
preparation
186:23
prepare
37:4 50:23 186:16
    196:14
prepared
11:13 44:2 50:18
    83:6 167:25 185:4
    198:1
preparer
185:8
preparing
49:18
present
5:19
pretty
47:25 108:14 124:21
    127:10 128:16
    164:20 165:17

previous
160:5
previously
11:8
price
22:23 29:4 33:23
    40:4,16 43:9,12,15
    43:21 44:6,9,14,22
    44:24 45:4,9 129:23
    190:5
primary
44:1 127:19
principals
58:11 109:18,25
    117:23 140:13
    181:7
prior
11:25 21:23 80:15
    118:16 194:23
    195:2 202:16,19,20
    202:23 206:4,7
private
86:3 87:13,23 88:1
    89:6,9,14,20,24
    90:3,7 94:10 95:13
    96:10,22 105:22
    107:2 144:3
privy
164:10
probably
26:11 71:14 129:12
    146:20 160:24
    196:16,22
problem
128:5 137:23
problems
50:15 51:1
procedure
16:18
procedures
16:10,23
proceeding
98:14 125:21 176:11
proceedings
52:13 206:4,7,8
proceeds



EXHIBIT 2
PAGE 109

47:20,23,24 48:8,11
53:8,10 60:12 95:25
99:8,20 100:4,16
127:22 128:4,20
130:25 169:17
170:3,11,24 171:7
173:9,14,17,19
174:16 178:23
200:19 201:14,16
201:23 202:3 203:1
203:3
**process**
20:25 21:1 32:3,3,4
38:1 120:22 123:4
138:18 161:22
170:5
**processing**
138:17 139:5,6,25
140:5,7
**produce**
158:24 195:24
**produced**
12:14 34:14 37:18
39:22 51:22 158:17
158:18,20,23 159:6
159:9
**product**
9:7,8,16,23 10:4,6,11
10:19 11:3,13 12:2
12:14 119:17
**production**
94:24 158:24 159:11
**professional**
15:5,6 21:2 23:5,8,14
24:1 29:10,12 67:19
71:16 88:4,18
100:22 116:15,16
122:8,9,13 140:19
141:1,3,17,23
142:10 145:9,14,18
145:21 146:1,5,8,11
146:19 148:16
150:23 151:25
152:20 169:12
177:22 181:1,9
202:2

**professionals**
58:5,10 117:23
142:13 143:13
181:4,5
**profit**
134:4
**profits**
129:10
**progress**
49:18 67:24
**project**
20:21 21:6 33:24
40:5,17 42:17 45:9
67:23 85:15 87:22
88:5 90:3,3,7,7
92:20 93:5,17 94:3
100:23 101:11,17
101:20 102:3,8
103:10,10 201:23
**projects**
20:23 21:10 42:9
43:25 44:2 85:11
86:2,3 87:23 89:25
93:8,12 97:5 102:10
102:18 200:14
**project-and-project**
88:16
**project-by-project**
89:5
**prospectus**
202:12
**provide**
10:11 29:12 51:25
60:5 63:16 77:12
85:9 97:5 102:2
112:8,15 113:4
121:12,20 126:15
146:10 177:5
**provided**
9:13,24 10:18 11:18
29:5 39:20 41:10
60:14 64:9,10,17
86:2 88:14 103:22
145:14 165:7
175:17,22 176:3,15
176:21 177:2,25

178:3 188:18
**provider**
181:1
**provides**
73:20 106:14 129:9
**providing**
87:12 145:8 146:4
**provision**
113:5
**provisions**
189:4
**public**
41:1,23 42:15 85:10
85:14,21 86:1 87:22
89:14,24 90:3,7
91:16,20,23,25
92:17,20,20 93:1,5
93:6,12,13,16,17,18
94:3,3,7,9,17,17
96:13 102:3,8,10,18
107:2 122:18
163:14,15,16
164:18,19 165:14
165:15,16,18,25
166:3,6,10,14,23
**publication**
112:13
**publications**
13:21 111:22
**pull**
90:13
**purport**
75:24 129:3
**purpose**
128:16 180:11
200:13
**purposes**
127:2,12 128:12
133:12 165:6
167:19 195:25
**pursuant**
47:20 60:2 95:24
**put**
67:1 90:23 106:21
119:9 131:24,24
186:3 196:9

**Putting**
188:20
**PVC**
31:5
**P.E.T.E**
145:3
**p.m**
2:18 5:2 125:23
176:10,13 203:21
204:8

---

**Q**

**qualification**
168:8
**qualified**
64:10,18,25 65:3
66:19 67:19 122:12
**qualifies**
22:6
**quantification**
168:6
**quantified**
8:8 44:13
**quantify**
149:9 150:1,15,17
151:4
**quantity**
183:17
**question**
11:17 16:16 18:4
22:25 23:2,16 34:17
42:21 43:7 46:4
48:21 55:2 57:4,21
58:1 59:8 64:15
65:7 69:5,21 71:5
74:24 76:15 86:19
87:9 88:12 94:12
96:17 99:23 104:6
105:8 116:20
121:17,18 123:13
124:2,3 125:6
135:20 136:18
141:20 142:23
148:8 152:7 156:22
164:9 169:24
171:19 172:2 174:6



EXHIBIT 2
PAGE 110

174:12,18 177:4
178:25 180:18
188:21 196:11
199:6,11 201:21
202:4
**questionable**
51:10 55:20
**questioned**
136:13
**questioning**
92:13 165:23
**questions**
24:3 51:23 96:15,18
96:19 126:1,4 175:2
203:19
**quickly**
109:6
**quite**
197:4 199:14
**quote**
85:21 200:17

**R**

**raised**
202:3
**raising**
200:13
**random**
17:25 18:7,9 19:17
90:13
**randomization**
18:5
**randomized**
19:14
**rare**
114:17
**rate**
53:18 77:22 142:14
147:9
**rates**
79:16 142:21 148:17
149:13 152:22
**Ray**
849216:15 2:15 4:3
5:7 6:4,12 114:16
205:4,16

**reach**
34:4,8 130:16 137:1
187:23
**reached**
75:12 120:23 130:17
135:15
**read**
67:25 71:5,12,13,15
71:18,20 85:12 86:6
87:1,17 111:5
172:24 184:18
191:5 192:14 195:5
198:13 201:6
202:12 205:5
**readers**
198:19
**reading**
68:22 71:15 97:2
146:15 171:21
192:17 195:3
201:12
**ready**
186:18
**reality**
63:4
**realize**
137:10
**really**
15:23 23:13 29:16
55:23 74:24 94:10
111:13 114:2
124:21 159:22
161:11 180:11
184:6 185:18
**reason**
13:5 34:8 60:1 80:14
86:23 100:18 127:7
128:13 131:23,24
132:24 133:21
137:4 139:14
140:16 159:4
168:16
**reasonable**
26:20,24 28:4,21
29:1 33:5,10,16,21
38:25 45:17 46:6

53:24 54:20,24
55:10,13 56:6,17,20
56:21 57:3,6,14,18
81:11 83:20 95:18
96:6,8,23 97:12,16
97:20 100:22
103:17 104:8
114:24 115:1,8
116:10,22 117:3,15
118:2,9,12,18
119:10 120:15,23
121:1,4,13 122:5
123:6,8,24 124:5,8
124:17,21 125:3,8
126:15,24 133:16
149:16 150:6 187:7
187:23 188:3,10,10
188:14,19,23 198:1
198:6
**reasonableness**
117:8 121:21,25
122:25 123:16,18
**reasons**
34:5 95:4 180:1
**rec**
97:7
**recall**
26:12 44:10 54:14
113:6 192:25 196:2
202:14
**receive**
124:15 130:24
201:23 202:5
**received**
7:22 11:12 40:10
47:23 48:1,10,15,18
49:10,12 52:22
53:13 106:19 111:2
111:14 119:24
124:4,10 125:7
129:12 134:10
174:15 194:11
197:6 199:9
**receiving**
118:16
**recognize**

24:16 25:5
**recognized**
16:25 110:19 116:3
122:3
**recollection**
54:17
**reconcile**
126:22 191:13
193:11
**record**
5:6 6:11 52:10,12,14
98:12,15 125:18,19
125:22 126:25
159:22 165:6 176:9
176:12 203:20
206:8
**records**
15:10 36:8 37:3
38:22,24 39:20 40:1
48:14,18 49:21
51:10,10,16 75:25
76:4,6,10,17,21
77:3,9,16 78:2,9,12
78:14,15,22 80:1,14
80:23 81:3 82:6,15
82:21 83:1,2,12,19
84:20 91:23 120:14
120:19,22 122:21
126:7,14,23 127:9
127:23,24,25 128:5
128:11,15 138:13
138:25 139:12,16
140:1,1,1,12,16
141:7,11,14 142:1
143:9,10 148:15
149:23 152:21
156:2 157:4,5,6,10
157:11,13,20 158:8
158:12,15,16,25
159:5 160:9 167:24
167:24 180:9 182:3
182:3 193:24
194:24 198:5
201:16
**recreation**
97:22 98:8 106:7



**EXHIBIT 2**
**PAGE 111**

**reduction**
53:12 105:17,21,24
  106:3
**Rees**
3:9 5:15
**refer**
69:13
**reference**
175:17
**referenced**
14:13 83:6 163:25
  195:4
**referencing**
14:1 27:23 39:4
  192:15
**referring**
36:12,16,18 38:21
  39:18 51:7 64:2
  68:13
**refers**
69:14
**reflect**
24:25
**reflected**
81:13 138:25
**reflecting**
120:14 142:1
**reflects**
26:2 55:8 186:3
**regular**
193:17
**related**
102:6 107:1,2
**relates**
99:3 154:2
**relating**
122:24
**relative**
206:13
**Relativity**
159:23
**relevancy**
127:6
**relevant**
15:7 116:17 122:14
**reliability**

94:23
**relied**
9:12,24 55:4 122:14
  158:25 159:21
  160:2
**rely**
9:16 13:9,13,16,22
  15:19 55:1 74:15
  75:3,11 92:6
**relying**
9:3 169:15 186:21
**remaining**
30:18
**remember**
10:22,24 30:24 47:17
  58:6 60:7 92:21
  147:11 160:7 170:8
**remodel**
20:23
**render**
103:21
**rendered**
23:5,9,14 24:1 29:10
  29:13 36:2 88:5,19
  94:25 142:14
  177:22 189:2
**rendering**
22:9 72:23
**renders**
109:23
**renovations**
30:24
**repeat**
69:21
**repeatedly**
156:9
**rephrase**
73:18 99:23 114:10
**reply**
159:13
**report**
4:9,10 14:14,14
  24:19 34:24 35:22
  36:13,15 38:18 39:8
  41:9 42:11 47:6
  50:2,6,15 57:17

69:12 73:8 75:24
  76:25 77:1 79:23
  81:13 82:7 83:3
  88:18 90:10,11
  104:23 115:15,19
  115:20 118:17,25
  126:3 128:17 129:3
  133:4,5 136:23
  142:12 143:19
  144:2 146:11
  147:14 150:12
  153:6,19 160:16
  161:7,14 162:4
  173:12 176:15,22
  177:2,5 178:2,21
  179:17,19 181:19
  191:21 192:9,14
  195:3,9,25 196:3,7
  196:10,14,17,20,23
  197:1,12 198:1,14
  198:19,25 199:18
  200:3
**Reported**
849216:24
**reporter**
2:19 5:17 6:1 203:22
  203:25 204:3,7
  206:2
**reports**
9:7,24 10:5 11:18
  49:18 67:24 75:12
  126:1 168:7 196:15
  196:21,22
**represent**
5:20 47:25 80:17
  195:2
**representation**
186:22 195:9,11
**representations**
198:12
**represented**
30:5 42:18 43:21
**represents**
38:19 42:14 43:1
  44:8 46:6 70:16
  106:20 174:14

**request**
5:14 159:10 199:24
**REQUESTED**
4:20
**required**
38:6 152:3,10 168:18
  169:8
**requisite**
152:17,21 154:12
  156:10 182:11
  184:12
**research**
102:23
**resolution**
67:4,7 68:4
**resolutions**
4:16 67:1
**resources**
35:21
**respect**
47:22 79:14,15 81:17
  103:1 127:25
  133:20 199:20
**response**
46:9 159:10
**restitution**
75:22 80:10 81:25
  84:4 109:4
**rests**
72:16
**result**
6:19,20 77:7 78:25
  79:7 84:23 104:2,25
  105:3 110:4 114:23
  115:1,3,7,10 119:6
  119:11,12,15,16,23
  123:6,8,10,10,23
  125:3 133:15
  134:11,18 188:3,7
  188:10
**resulted**
80:19
**retained**
7:15 8:24
**retention**
7:6



EXHIBIT 2
PAGE 112

**revenue**
126:21,23 127:18,20
  128:1,6,21,22
  134:16,16
**review**
15:10 20:8 22:17
  56:15 83:3 84:19
  118:13 140:12
  197:20 202:13,15
**reviewed**
10:9 18:2 34:23,25
  35:9,23 37:23 39:23
  86:20 118:20
**reviewing**
50:8 51:2 54:8
  113:24
**rich**
130:19
**right**
11:19 19:16 31:24
  43:7 54:3 60:7
  61:23 75:2,16 77:6
  81:15 82:24 86:21
  90:23 94:18 104:21
  105:7 107:14
  108:22 109:12,12
  109:12 110:7
  116:23 131:10
  132:10,16 133:1,11
  133:24 135:1
  137:17,21 139:19
  142:3 153:1,2,3
  154:14,19 155:11
  155:13 162:19
  163:2 168:12,14
  169:20 170:8
  182:25 183:3,19
  184:1,7,9 185:14,20
  186:6,17 187:19
  190:11 191:24
  192:7 193:21
  195:18 202:23
**Riverside**
849216:5 2:5 5:8
  8:18,21,25 9:1,13
  10:7 72:20 74:1,4

74:12 156:2,4
  159:17 160:21
  164:1,7 167:6,17
  200:1
**Roger**
86:14
**role**
7:18,24
**roles**
202:1
**roman**
189:9
**rose**
74:11
**roughly**
60:13 82:22 197:12
**round**
61:18
**RPR**
849216:24 2:19
  206:23
**rudimentary**
107:7 108:1
**running**
136:17 183:20
**Rutherford**
849216:24 2:19 5:17
  206:23
**R-a-y**
6:12

---
**S**
---

**s**
72:24
**salaried**
140:13
**sample**
18:2 19:14
**sampling**
16:4,10,13,18 17:1,6
  17:9 18:1,7 19:17
  177:15
**Satory**
146:18 147:20 148:5
**saw**
31:23 38:13 60:9,11

80:22 100:13
  146:23 152:19
  153:16 170:9,22
  172:4 195:4,5
**saying**
23:23 53:19 57:11
  61:7 104:14 106:17
  107:3 126:21
  130:18 131:3
  132:13 136:10
  192:1 196:20 201:2
  201:7
**says**
15:18 23:8,13 24:1
  38:5 50:3 67:13
  68:14 69:14 85:9
  88:18 91:13,19,25
  92:16,20 93:6 94:7
  96:13 97:9 101:25
  110:23,25 111:18
  116:5 124:7,10,12
  145:3 165:6 166:2
  166:10 175:10
  177:22 190:6
  193:21 194:2,4
  199:6
**scenario**
108:12,24
**scenarios**
104:24 105:6 106:9
  108:8 118:7
**schedule**
44:1 74:17 130:9,15
**schedules**
10:9,9 108:2,3
  130:20
**scheduling**
102:7
**scheme**
72:18 136:25
**Schmookler**
3:9 4:4 5:21,21 6:9
  7:7 9:6,15 10:10
  11:1,16,23 12:17
  14:8 15:22 16:24
  17:8 21:18 22:10,24

24:2,8,11 25:7
  29:20 35:1 37:16,21
  52:16 56:11,19
  59:19 63:23 64:3,14
  64:23 65:6,16,21
  66:9,13,25 69:1,22
  70:25 71:10 73:18
  74:6 75:10 84:12
  85:2 86:13 90:9
  91:21 92:24 93:25
  94:13 95:5 98:11,17
  103:16 104:15
  112:24 114:10
  117:14 118:3
  120:13 123:12
  125:24 127:12
  131:6,18 132:8,14
  132:23 133:10
  136:8 137:25
  138:12 157:4
  158:17 161:24
  165:1 169:18,23
  173:20 176:2,8,14
  176:20 177:10,23
  178:6,12,25 179:11
  179:16 182:18
  185:12,19 187:17
  187:21 190:25
  191:13,23 192:19
  193:20 197:9 204:4
**school**
97:6,17 98:4 106:4
  107:1
**scope**
49:14 50:22 53:3
  56:4 58:18 60:2,3
  96:10,22 179:6
  181:8 197:7,8
**scopes**
51:13 61:9 100:12
  102:12 109:15
**Scott**
3:9 5:21
**search**
35:19 38:14
**second**



EXHIBIT 2
PAGE 113

34:8 38:12 144:6
**secondary**
13:10,16,21 55:3
**section**
15:1 22:13,20 25:20
25:20,24 26:2,17,22
27:13,16 29:3 30:14
32:24 40:8 67:11
85:5,9,19,20 101:19
101:24 103:11
161:6 168:5 189:21
189:25 190:3,6,18
191:1,2
**sections**
25:24
**secured**
34:20
**securing**
158:8
**see**
11:23 25:22 27:13,15
27:16,17 28:9,12
31:8 35:2 38:3,5,10
38:11 53:9 59:22
65:23,25 66:13 67:5
67:8,11,25 77:5,10
77:13 85:5,8,12,20
85:22 87:17 91:11
91:13 94:8 97:10
102:17 114:23
126:9 139:25
140:15 141:8 142:3
144:21 145:23
150:3 157:6 166:9
166:19 172:11
173:10 175:4,14
179:22 181:15
187:2 189:22 190:9
190:15,24 192:14
192:14,16 200:6,8
200:15,21
**seek**
155:25 156:2
**seen**
14:10 23:4 26:7
34:22 36:10,11

37:21 38:20 39:16
64:21,22 65:13,14
88:23 151:7 192:1
**segregate**
88:15
**send**
168:24 204:5,5
**sent**
37:4 47:21 168:17
170:6 173:2
**sentence**
63:11 101:25
**sentences**
201:1
**separate**
102:12 150:21
169:20 189:11
192:15 198:13,20
**separately**
37:11
**separating**
78:6
**September**
25:12 196:1,4,13
197:12
**Sergio**
3:14 5:16
**service**
67:19 94:10,10 104:9
146:5 181:1
**services**
5:17,18 15:21 23:5,9
23:14 24:1 26:3
27:24 28:10 29:5,10
29:12 30:7,13 56:1
60:5 63:12,16,22
64:7 68:15 85:10,20
86:2 88:5,18 91:20
92:1,17 93:7,7 94:7
94:25 96:13 97:4,7
102:6,13 105:18
109:19 142:14
143:14 145:8,9,14
165:7 175:22
177:22,24,25 178:3
181:14 182:6 187:8

189:2 200:20
**serving**
60:14 61:12
**set**
14:3 17:4 39:4 40:11
64:17 67:23 68:24
81:15 113:7,8,20,21
113:22 126:8
146:21 148:4,4,18
206:6
**sets**
15:7 26:2 53:2 68:14
109:15 110:24
148:6 149:5 151:19
**seven**
154:20,22,25 155:23
156:19 157:12
**Sewer**
175:10
**shalt**
116:5
**sheer**
198:5
**Shell**
91:13 93:1
**shoes**
164:7
**short**
76:11
**shortcut**
24:3
**shorthand**
2:19 206:2,9
**show**
24:5 66:22 86:9
120:22 148:23
150:21 158:8 165:3
165:5
**showed**
116:11
**showing**
149:11 152:1,5
165:22,23 166:1,13
166:18 192:6
196:23
**shown**

67:16
**shows**
78:15 104:25 130:9
130:22 131:1
**side**
126:21,24 127:18,20
128:1,6,6
**sign**
171:12
**signature**
166:9
**signed**
169:12 170:1,1,16
171:4,24 172:18
**significant**
119:2,5 134:15 148:4
156:19 197:16
**significantly**
105:1
**signing**
171:17
**signs**
171:15
**similar**
7:5 8:4 10:5 11:13
19:12 77:7 111:10
113:23 141:2
**simply**
23:5,8,13 24:1 29:9
177:22 187:6
**single**
63:14 64:22 65:13
73:5,20 88:23 99:4
99:10 100:7 109:24
114:18 117:22
139:9 141:8 152:24
161:24 163:8 164:4
164:14 176:3
202:13
**sir**
11:23 14:10 15:23
22:2 24:16 28:12
37:11,22 38:3 65:23
67:5,25 77:5 82:3
96:21 98:17 107:6
109:11 125:25



**EXHIBIT 2
PAGE 114**

130:3 132:9 163:19
166:8 171:15 172:2
175:14 176:14
192:4 195:23 200:8
**sit**
13:20 51:5,17 75:2
104:7 118:10
185:22
**six**
15:2 154:20 155:13
175:7,12
**skills**
15:20 54:8 72:17
**slant**
131:13
**small**
156:7
**smell**
124:20,22
**sold**
202:6
**sole**
127:10 128:16
168:16
**solely**
53:12 73:11
**Solutions**
146:18 148:5
**somebody**
32:7 84:24 167:11
173:3 183:2 185:20
192:4 196:16,22
**somebody's**
31:22
**somewhat**
74:10
**sorry**
25:7,7 29:18 36:18
57:1 62:9 66:6 73:4
94:21 103:2,14
105:8,11 112:20
120:12 133:25
159:8 174:6,25
176:6,7,8 193:22
195:15
**sort**

15:7 54:22 56:7
114:13 116:2,8
117:15 121:11,19
122:3 123:15
153:11
**sound**
94:7
**source**
44:1,11 55:3,4 83:11
112:16,22 121:20
122:4 159:13
**sources**
13:10,16,21 128:2
**span**
189:1
**speak**
87:22
**speaking**
85:16 87:22 189:4,13
**speaks**
14:17 45:4,13 117:2
**special**
71:19 122:20
**specialized**
111:2,14,17
**specific**
11:1 13:13,20 15:23
21:16,19,19,23 22:1
22:2,5,9,9,12 23:3,6
23:7 29:13,15 30:13
40:13,15 44:4 51:7
54:17 64:4,6,15
68:9 89:4,19,20,23
93:9 105:21 111:13
111:19,20 114:2
124:4,6,7,12 125:10
126:2,3 128:18
142:13 148:10,23
149:14,18 150:7
170:14,17,18
172:13,21 174:4,10
175:4,8,13,17
176:24 178:7 179:1
180:20 181:4 182:8
182:11 188:14
**specifically**

21:25 23:6,10 26:10
26:13 27:23 28:1
35:17 36:5 37:25
38:6,20 39:23 40:8
40:18 45:8 63:21
64:24 65:9 72:25
73:8 89:4 114:16
125:7 147:16
148:24 149:10
151:2 201:22
**specifics**
61:15
**specifies**
163:11
**specify**
106:25
**spell**
6:10
**spend**
31:23 32:9 44:20
60:6 184:2
**spent**
31:14 32:13,19,23
33:4,6,11,17,22
39:1 44:17 51:18
55:9 103:18 157:18
181:13,14 184:24
187:8
**spoken**
12:7 112:1 156:5
193:14
**spreads**
185:25
**spreadsheet**
44:5 60:16 183:20
**spreadsheets**
15:10
**sprinklers**
31:5
**sschmookler@gor...**
3:11
**staff**
67:18 121:2,5 122:12
**staffing**
35:24
**stages**

102:4
**standard**
4:11 14:1,3,13,17
15:11,13,18 55:4
110:19,22,25
112:14 116:3,4,6,9
117:2 122:2,15
123:24 152:13
**standards**
13:14,21 15:1 16:3,6
17:3 116:12,13,18
121:24 122:7
152:11
**standing**
164:7
**start**
110:1 124:3
**started**
7:8 46:17 158:4
**starts**
90:18 200:6
**state**
5:19 6:10 26:20,24
28:21 33:10,15,20
50:20 165:24
188:25 205:11
206:3
**stated**
26:10 200:13
**statement**
177:19
**statements**
139:19 157:23,24
159:25 160:4
**States**
849216:1 2:1 5:9
**station**
91:14 93:1
**statistically**
17:13,17,21 18:17,21
18:25 19:15,17
**statistics**
17:11
**steal**
132:6 166:25 167:4
**stealing**



**EXHIBIT 2**
**PAGE 115**

164:5 167:11
**step**
15:18,18 115:6,12
116:22 123:4
133:14 170:4
182:23
**stepped**
79:15
**step-by-step**
14:20 15:9
**Steven**
171:5
**stole**
167:1
**story**
69:4
**Stradling**
7:13 8:4,8 43:23
159:15 193:15
197:4,11 199:14
**strike**
15:12 18:18 47:14
69:2 71:21 89:2
96:20 107:6 113:1
113:11 118:5,15
119:15 120:20
131:6 133:23
134:23 142:7 165:2
180:3
**study**
54:22,25
**stuff**
124:22 165:17
**subconsultant**
83:9 140:20 141:23
142:10 145:18
146:19
**subconsultants**
36:3 39:6 41:11
50:16 76:13 78:3,9
79:24 80:9 81:2,7
81:12,17,19,24 82:5
82:22 83:20 92:12
135:23 141:1,1,4,17
142:9 146:11
153:16 154:3

**subconsultant's**
41:15 78:16
**subcontractor**
145:21 146:9 148:16
152:20
**subcontractors**
20:24 78:25 79:15
80:12 140:25 147:5
149:12 150:23
151:6,23,25
**subject**
22:22 23:12 30:17,18
57:10 58:8,12 68:24
71:21 72:7 97:7
99:9 100:12,15
101:21 103:19
106:19 107:4
109:25 113:21,22
117:22,24 137:11
145:7,16 146:9
165:13 181:6
182:12 185:9
194:16,19
**submit**
186:20
**submits**
31:17
**submitted**
29:19 49:8 82:13
99:7,15,20 100:4
146:3 155:7 173:12
173:14 174:14
**submitting**
142:16
**subparagraph**
189:9 190:21,21
**subparagraphs**
60:4 190:18
**subscribed**
206:15
**subsection**
190:8,13
**subsections**
193:10
**subsequent**
80:16

**subsequently**
11:9
**substantial**
48:24 49:2
**subtotals**
37:3
**subtract**
52:24,25 87:25 89:5
97:24 98:3,7,24
178:12 179:1,7
**subtracted**
52:17,21 93:18,21
**subtraction**
93:24 178:18
**successful**
133:1
**sufficient**
15:6 89:13 116:17
122:14 163:3
**suggest**
96:2 192:18
**suggested**
52:1 132:3 196:7
**suggesting**
45:25 96:12,14
**suggestion**
94:8 165:10
**suggestive**
129:25 165:15
**suggests**
68:21 135:9,10 180:3
**Suite**
2:16 3:5,10 5:14
**summarizing**
20:4 28:1 44:2
**Summary**
126:6
**supervised**
86:3
**supervision**
15:6 116:16 122:11
**supplement**
158:14
**supplemental**
4:10 14:14 24:23
50:2,6 90:11 104:23

122:16 128:17
153:6 161:14 162:4
176:15,22 177:2,5
178:2 179:19
**supplemented**
44:18
**support**
10:20 11:4 13:22
25:25 73:15,20 74:7
75:4,12 81:16
**supported**
59:17
**supports**
70:8,17
**supposed**
153:12
**sure**
19:6 26:9 29:21
31:16,19 32:10
34:18 36:17 69:22
79:17 82:8,9 85:16
94:13 101:23 105:9
107:10 109:2
114:15 118:19
124:19 125:2
134:13 138:22
139:20 159:21
160:25 162:21
168:11 173:16,20
174:7,19 183:4,12
183:15,20 184:2,3,4
184:5,8 186:5,7
190:12,14 192:1
198:3,8 199:17
202:8 203:24
**suspect**
44:18
**system**
35:14

**T**

**tab**
82:17 83:7 173:25
174:2,13
**tabbed**
36:22 90:19



EXHIBIT 2
PAGE 116

**table**
149:2,22
**tables**
161:12
**taint**
131:22
**take**
17:11 37:7,12 52:9
60:18 61:18 62:6
67:21 84:23 98:11
109:3 114:10 115:6
115:12 123:4
125:13 176:8
182:23 184:7
186:18 196:5,12,25
198:7
**taken**
2:15 5:13 115:5
125:25 206:4
**talk**
9:8 31:21 50:3 60:4
80:24,25 95:5,6
96:19 105:16 118:3
136:12 155:9
166:17 186:24,25
187:1 192:2 193:5
195:12,16
**talked**
50:6 55:18 80:23
92:13 118:21
132:18 133:14
135:22 147:10
159:13 202:1
**talking**
13:3 36:7 63:1 70:14
78:1,8 119:23
136:11 149:14
161:13 170:21
176:24 177:23,25
181:24 182:15
189:17 201:14
**talks**
13:25 14:25 15:2,5
35:8 83:3 102:9
109:16 149:2
152:14,15 166:5,11

166:13 178:22
190:3,3,5 191:18
193:25
**tallied**
203:6
**task**
8:11,13 23:7,20
26:13,16,22 27:1
29:17 32:9 40:19
51:7 99:4,24 180:21
182:5,5 184:24
**Tasker**
180:3 181:24 182:9
182:14 184:14
189:6 191:18,20
192:17 195:8
**Tasker's**
179:21 180:5,19
187:24 188:4
192:14 195:3
198:13
**tasks**
27:5 29:3,14,15,15
32:24 35:20 36:5,5
53:15 63:9 98:25
102:12
**task-by-task**
64:7
**teach**
124:18
**team**
67:19
**technique**
18:9
**tell**
25:11 44:7 47:7 49:6
49:20 51:5 55:14
67:2 88:5 96:8
112:22 134:9
144:15 152:16
157:1,1 164:4
169:22 174:9 203:7
**telling**
150:20 170:22
**tens**
39:23 159:16 196:8

197:19
**term**
71:2 102:13 140:19
140:20,21,22
145:18
**terms**
25:15 31:20 96:19
112:3 128:23
132:24 141:2 172:3
183:25 184:12,12
187:22
**test**
124:20,22
**testified**
6:6 84:25 85:1
100:11 138:5 147:1
154:11 192:13
**testifies**
192:23
**testify**
96:21 149:16
**testifying**
87:7 206:7
**testimony**
6:19,21 22:4,9,11
35:15 75:1 84:7,10
84:11,14 85:25
86:24 87:4 98:1,5,9
101:20 178:7,14,18
191:8,14 192:2,20
205:8
**Thank**
5:25 47:3
**Thanks**
203:19
**thereof**
206:11
**thin**
118:20
**things**
32:1 50:21 60:21
82:12 163:10
182:16 204:2
**think**
9:20 19:9,11 20:3
21:6,22 39:16 48:14

48:21 49:22 51:13
58:9 61:2 64:4
65:12 69:14,16
70:21 76:7 84:18
85:3,19 107:20
108:18 109:16
113:19,23 117:25
124:12 125:5,9,10
129:13 133:3
135:20 136:4
137:23 140:21
142:5 147:10
148:13 153:5,23
156:15 158:8,13
162:13 163:16
164:19 165:8 170:7
187:24 188:2,6,9,19
197:24 199:5,10
201:25 203:2,14
**third**
144:10 145:11 162:7
**third-party**
55:4 83:9
**Thou**
116:5
**thought**
54:2 66:5
**thoughts**
52:10
**thousands**
26:11 39:14,23
159:16 187:13
188:16 196:8
197:19
**three**
20:5 63:1 76:7 83:11
125:9 126:7 127:19
131:9 132:2,2
136:17 137:3
139:13 144:17,18
154:20 167:14,25
**throw**
75:17 204:5
**throwing**
54:7
**thrown**



EXHIBIT 2
PAGE 117

55:12
**tie**
29:13 149:18
**time**
5:12 18:10,11,13,16
18:19,23 19:2,19
26:7,15 28:15 35:11
35:13,19,23 36:3,4
36:7,10,12,14 37:3
38:2,7,14,15,19
39:1,12,19 41:10,15
42:10 43:18 45:10
46:22 47:19 48:19
49:7,21 52:12,14
54:6,16 55:8 57:23
58:11,15 63:8,8,11
63:11 68:14,14,19
68:19,21,21 69:8,8
69:14,14,25,25 70:2
70:7,8,11,11,15,15
70:20,20,22,22,25
76:7,11 83:9,10,14
88:23 95:7 98:12,16
111:9 114:17,22
118:14,16 125:19
125:23 143:2 147:4
151:5,11,18 152:3
152:10,16,18,19,22
152:24 153:7
154:14 156:7,10,13
167:6 176:9,12
186:8 187:18
193:12 194:22
195:6,12,21 196:16
196:18 197:17,21
197:23 198:1,25
200:17 203:19,20
204:8 206:5
**times**
6:13,20 55:19 61:1,4
77:22 78:16 114:1
118:22 125:10
131:25 137:3 138:5
151:9,20 152:25
153:2,15 154:8,9
191:20 198:11

**title**
27:23 171:25
**titled**
58:7
**titles**
58:5 181:4
**today**
7:8 9:8 13:20 24:4
37:22 44:12 51:5,17
75:2 96:15,21
100:21 104:8
112:15 136:9 150:4
183:6
**Today's**
5:12
**told**
19:16 59:14 130:21
132:19 137:3
148:14
**top**
10:25 26:12 90:17
91:19
**topic**
125:11 193:18
**topics**
197:5
**total**
8:8 22:23 26:15 27:5
27:8,20 28:5 29:8
29:23,24 30:16,17
40:6 58:22 62:12
79:22 97:13 107:12
117:21 133:8 136:5
137:15,15 146:13
146:22 147:17
148:24 149:6,8
150:15 154:23
156:18 180:22
184:4 192:16
198:24
**totaled**
147:11
**totaling**
129:12 192:11
**totality**
34:23 80:18 82:8

**totally**
78:6 92:4,9
**touched**
197:5
**training**
15:20 54:9 72:17
111:2,14,18,20
112:13 122:17,20
123:19 124:4,6,7,10
124:15 125:7
**transcribed**
206:10
**transcript**
195:5 205:5
**transcription**
206:11
**transparency**
135:24 142:18 153:9
157:2
**treatise**
55:3
**trial**
149:25
**trials**
197:18
**Trier-of-Fact**
72:16 117:12,19
118:1 137:1
**trouble**
144:25
**true**
7:1,24 8:7,11 14:16
24:18,22 35:10,13
52:3 63:14 64:8,16
64:20,23 65:8 66:18
68:2 72:7 73:3,6,14
82:3 90:2 101:5,10
119:19 163:2,18,18
163:23 164:13
165:10 167:10
169:6 172:3,8,12,17
172:20 176:14,21
179:12 190:20
192:23 201:21
202:25 205:8
**trust**

71:18 89:22 94:23
**trustee**
169:14 170:7
**try**
33:14 48:22
**trying**
10:22 48:20 94:12
96:17,18 171:22
174:12,17 181:11
181:23 188:8
197:10 198:22
**turn**
38:7 67:3 91:3 162:4
162:6 200:3
**Twenty**
61:5
**twice**
136:23
**two**
10:23 11:18 12:7,23
15:18 20:17,22,23
23:7 24:13 25:4
26:2 29:15 30:8
34:5 37:7 43:6
44:17,20 46:3 66:5
67:3 73:7,11 77:25
82:12,24,25 88:17
88:21,25 108:7
127:19 135:15
147:9 153:4 154:20
156:24 158:13
160:4,6 189:3,11,12
189:15,16 191:2,24
192:11,15,18,24
193:10,19,22,25
194:7,19,25 195:2,6
195:10 197:13,13
197:16 198:12,15
198:18,20
**two-year**
197:25
**type**
15:20 61:14 111:7
112:11 180:21
181:13 185:25
196:10



types
111:10 147:3
**Typically**
20:19

---
U
---

**ULC**
99:7 102:1 126:7
200:19
**ULC's**
34:15 47:16 81:7
**ultimate**
50:4 117:12
**Um-hum**
19:21 200:7
**unable**
33:3 34:4,8
**unattainable**
95:3
**underestimate**
48:17
**underlying**
29:22 56:8,12,22
59:2,12 105:16
**undersigned**
206:2
**understand**
7:22 17:9,13,16 18:5
19:9,13 23:2 29:21
34:4,13,17 35:5
42:12 45:3,6,12
52:17 57:25 58:1,2
58:4 69:3 78:7
85:14,25 87:15,24
92:2,4 94:12 96:17
98:17 110:6,8 111:5
115:10 120:13,20
121:17 128:2
133:24 134:1,5,7
138:13 145:25
146:1,14 156:14
160:22 162:18
174:12,17 180:19
180:24 181:12,16
181:17 188:5 189:3
189:12 192:5 197:9

197:10
**understanding**
7:19 44:25 70:15
71:6,16 86:16
100:13 145:13
159:19 164:6
187:22 189:7
194:24
**understood**
100:15 179:6
**undertaken**
43:25 44:3
**unequivocally**
61:22
**unilaterally**
58:21
**Union**
849216:9 2:9 5:8
159:24 170:7 171:6
**unique**
110:24,24,24 111:9
113:7,7,8,10,20
123:2
**United**
849216:1 2:1 5:9
**unrealistic**
110:3
**unreliable**
92:4,10
**unsupportable**
110:3 188:6
**Urban**
7:20 8:9 20:5 21:13
21:20 22:5,13,19
23:3,4 25:13 27:21
28:5 29:5,18,18
30:6 35:6,11,20
36:24,25 37:5 38:1
38:15 40:3 47:18,21
48:5,7,15 49:4,6
50:19 52:17,22 53:9
54:18 58:21 63:15
65:1,5,10,14 66:16
66:19 68:10,16,24
70:3 73:5 75:22
78:3,16 80:10 82:13

86:2 87:5,11 88:4,7
88:9,14 89:3 91:10
94:9 95:24 96:9,22
97:4,14 99:5,11,15
100:22 101:11,13
101:15,16 103:4,7
103:18 105:4
106:19 109:18
119:7,23 127:23
128:23 134:10
137:5 138:23 139:4
139:10,14 140:9,11
140:17 141:19
142:13,16,19,21
143:14 145:7,9,9,15
146:2,3,23 147:24
147:25 150:24
151:1,1,5 155:7,8
155:21 156:7,18,23
157:9,14,18 158:15
160:19 161:2,16,16
164:14 165:7
167:14,15 168:14
168:20,24 169:7,11
170:23 173:7,16
174:9,14,20,22
175:16 176:16,23
177:3,5,12 184:24
185:5 187:1 189:2
197:6 201:2,5,18,22
202:5,14,21 203:3
**use**
10:11,19 11:2 12:2
18:9 19:22 20:1
53:23 55:14 61:19
64:24 65:10 67:16
78:18 79:10 83:20
101:12,13 102:10
106:15 114:15,16
114:21 116:5 118:6
121:17 123:3
124:20,23 133:15
136:22,23 153:18
188:2,2 198:25
**useful**
95:1

**uses**
71:7
**usually**
46:25 47:1
**utility**
172:9,13,22 175:23
176:5
**utilization**
201:16
**utilize**
11:11 12:13 115:5
140:7
**utilized**
122:12 140:12 147:6
**utilizes**
140:5,6
**utopian**
181:12,22
**U.S**
167:16

---
V
---

**vacuum**
95:16
**Vague**
7:3 9:5 10:3
**vagueness**
138:8
**valid**
17:13,17,21 18:17,21
18:25 19:15,17
**value**
102:7,9,15,21,24,25
103:4,7,11 120:14
133:22 148:9,12
151:14 153:21
**variables**
194:19
**variance**
44:5
**variety**
83:3 113:5 141:2
178:20 180:1
**various**
37:3 102:4 106:9
118:7,7 122:17



EXHIBIT 2
PAGE 119

176:18 202:1
**vast**
6:20 138:7
**vendor**
146:18 148:19
**vendors**
148:7 154:13,18,21
155:7 156:19,24
157:3,7,12
154:22,23,25 155:3
**verbatim**
206:8
**verbiage**
28:2 45:6
**verification**
186:19
**verified**
42:23
**verify**
42:25 47:6 182:19,21
194:23
**versus**
5:8 39:6 43:4,12
45:21 46:11 55:11
55:11 89:14,24 90:7
107:2 110:12
118:11 120:1
130:14 137:7
151:10,14 153:22
164:12 173:19
194:19
**victim**
167:5,8,18
**video**
5:6 206:5
**videographer**
3:13,14 5:5,16,25
52:11,14 98:12,15
125:19,22 176:7,9
176:12 203:20
**view**
70:22 74:21 117:15
189:10
**viewed**
35:23
**violations**

186:14
**virtually**
173:10
**volume**
184:6 198:5
**Von**
3:5
**vs**
849216:8 2:8
**V-A**
26:17,22 27:6
**V-B**
27:1,9
**V-1**
27:13,22 85:19
**V.1**
22:13,20 28:6,18,23
29:3 32:24 33:22
101:24

---

**W**

**W**
6:12
**wait**
72:1
**want**
15:23 31:22 32:7,8
37:7,9,11,12,13
40:12 41:19 42:22
42:22 46:19,22 47:2
47:6 68:3 69:3
74:24 76:24 79:10
80:24,24 82:9 94:2
94:16,19 95:5
110:18 114:2,19
118:3 121:19 124:2
124:23 126:2
136:16 138:19
140:7 144:1 147:16
148:9 149:25 150:5
153:15 156:14,17
159:22 166:2,10,19
167:1 173:25
179:17 183:24
200:25
**wanted**

92:3 94:14 169:1
183:24
**wasn't**
18:14 131:9,23 148:8
164:10 181:8
196:11 199:15,19
202:4
**waste**
46:19
**watch**
185:23
**water**
97:6,13,25 105:25
179:6,7
**way**
13:7,8 19:14 21:25
22:1 29:17 32:15,20
32:25 33:25 40:19
41:3 45:24 50:24
51:24 55:16 89:17
103:25 107:20
115:19 129:10
134:4 138:10
153:13 155:5 169:7
185:1,11,13 198:18
198:20,22
**ways**
135:3
**week**
38:8 60:6
**went**
30:23 89:18 157:10
**weren't**
100:16 177:23
**Western**
849216:5 2:5 5:7
156:2 164:1,6
**we'll**
40:12 41:18 46:23
61:18 86:7 96:19
144:9 176:8
**we're**
7:8 9:8 36:17 41:5
62:7 68:13 74:25
76:25 78:8 86:7
91:8 98:15 99:22

125:22 136:14
150:4 152:8 177:24
**we've**
46:25 55:18 63:1
76:7 87:21 125:25
132:18
**whatsoever**
14:23 86:24 108:13
121:20
**WHEREOF**
206:15
**white**
71:20
**willing**
57:5,15 92:6 100:21
103:16 104:7
**window**
197:25
**wish**
113:3
**wished**
137:20
**withholding**
141:9
**witness**
4:2 6:15 7:4 9:12
10:4,22 11:7 12:6
15:17 16:21 17:3
21:16 22:8,16 23:23
29:8 34:22 56:10,14
59:14 63:18 64:1,12
64:20 65:3,12 66:12
69:21 70:13 71:4
73:23 75:6 84:9,18
90:5 91:19 92:23
93:21 94:6,21
101:20 103:14
104:13 106:14
112:20,22 114:8
117:11,18 120:12
123:2 125:17 127:6
131:12 132:12,18
133:3 135:19
137:23 138:5
156:21 158:11
161:10 169:10,22



EXHIBIT 2
PAGE 120

173:6 177:15 178:5
178:11,17 179:10
179:20 182:8 185:3
185:16 190:23
191:12,17 192:13
193:14 197:3 200:4
206:15
**witnesses**
191:9 206:6
**woman**
147:21
**women**
12:23
**word**
20:1 22:2 93:7
102:10,17 106:15
136:21,22 188:20
**wording**
55:21
**words**
69:4,8 71:11,12 79:4
79:5,9 93:9 104:17
162:9 165:8,19
193:1
**work**
6:18 7:22 9:2,3,7,16
9:23 10:4,5,6,11,19
11:3,13 12:2,10,14
15:4 17:5 21:8,13
23:3,25 46:19 49:14
51:13 53:3 56:4
58:7 59:4 60:2 61:9
61:15,17 62:25
68:20,24 89:24
91:20 92:11 93:8,12
94:10,10 100:7,7,12
101:7,16,20 105:22
106:3,6 107:4,19
108:20 109:15
110:20 111:3,7,15
111:23 112:4,9,17
113:21,22 115:16
116:17 117:24
122:8,11,12,23
124:25 128:14
129:11 134:11,11

134:18,20 135:10
138:2 147:23 156:1
162:20 169:4 173:2
175:8,13,18 176:4
176:17,23 177:7
179:2 181:5,8,13,14
182:3 185:6,17,23
193:15 197:3,5,8,17
200:1
**worked**
10:24 20:14,15,18
39:15 109:24
113:16 117:22
121:2,5 134:6
139:23 193:11
198:17
**workers**
92:16
**working**
8:15 9:9,17,25 11:8
86:1 88:6 138:24
155:10 177:12
197:21,22
**works**
85:11,14,21 87:22
89:14 90:3,7 91:16
91:24,25 92:17,20
92:21 93:1,5,6,12
93:13,17,17,18 94:3
94:3,7,17,18 96:13
102:3,8,10,18 107:2
110:8 134:4
**worksheets**
83:6
**world**
54:19 112:5,14 117:6
140:20 181:12
**worth**
33:1 65:13 78:13
94:24 95:19 106:18
122:17 128:14
146:21 151:22
158:13 160:4
177:17 187:11
**wouldn't**
17:5 49:15 93:23

107:20 108:17
119:13 138:25
145:21 158:1 160:8
**wow**
84:23
**write**
126:7 196:10,15,20
196:21,21 199:18
200:10
**writing**
15:25 158:1 196:7,17
**written**
13:13 15:13 16:3
139:18,20
**wrong**
59:5 96:13 132:24
180:10 182:2
191:17,19
**wrongdoing**
74:22 75:4
**wrongly**
146:23
**wrote**
87:9 115:19 118:25
180:12 195:8
**W-2**
141:7,12 142:25
143:4 145:19 146:8
**W.R**
167:7

---
**X**

**X**
96:2,3 185:17,18

---
**Y**

**yeah**
32:2 38:13 45:6
50:10 57:4 62:24
74:6 77:14 90:19
107:19 110:8
116:20 124:24
141:10 146:17
158:6 161:4 162:9
168:15 182:22
183:1 184:21

185:24 193:4
200:25 201:20
**year**
42:7 43:1 63:15 64:8
64:13,13,22,24 65:4
65:24 68:3 77:4,9
77:20,21 80:20 82:6
83:15 95:6,7,17
118:22 146:19
149:24 177:16
198:7
**years**
15:19,24 20:6,18
33:1 54:8,15 58:11
58:18 60:19 61:2,4
61:5,9,12,25 62:1,6
65:13 67:3 71:14,17
76:8 78:13,20 79:19
80:15,15 82:24,25
83:21,24 84:2 94:24
95:6,17,19 109:24
110:11,16 111:8
118:22 122:17,21
123:19 124:11
134:7 139:13 140:5
141:14 147:7
151:22 154:4
155:13 158:16
177:17 187:11
189:1 197:13,13,16
202:18,25
**year-over-year**
48:8,11
**yield**
62:7 106:9,23 119:1
119:6,11,12,14,16
120:1 123:23
188:13
**yielded**
104:2
**yielding**
115:7 123:5
**yields**
104:25 105:3 109:20
110:2 114:23 115:1
115:3,10 123:8,9



EXHIBIT 2
PAGE 121

125:3 133:15 188:2
  188:6,9
**Yocca**
7:14

---
**Z**
---

**zero**
153:13

---
**$**
---

**$1.8**
61:4,13,21 62:6
**$10**
75:21 76:5,18 82:1
**$100,000**
203:8,11
**$15,000**
  53:4,6 56:2 60:8,10
  60:15,18,23 61:8,13
  62:6 118:21
**$170**
148:2 151:3
**$180,000**
60:24 61:1,4
**$2.2**
82:18
**$261,000**
147:20 148:19
**$261,243**
149:23
**$261,243.50**
146:14 148:24 150:5
**$3,903,252**
77:4 79:13
**$3.6**
61:5
**$3.9**
78:19
**$30**
109:9 129:13,15,16
  129:25 130:11
  131:14 133:6
  134:17 135:5,8
**$4**
79:25 80:5 81:19
  82:1

**$40**
129:13,25 130:11,24
  131:10,14 132:3
  133:6 134:17,17
  135:5,8 147:25
**$500,000**
203:13
**$6**
147:11
**$6.2**
62:7
**$6.7**
82:22
**$60**
106:18
**$7**
147:11
**$7.2**
63:2
**$7.5**
108:15 109:8
**$75**
62:13,19 68:11
  108:15,15 109:8
  127:9 128:14 151:1
  154:24
**$8**
108:16,21 130:10,24
  132:1 135:7
**$9**
53:18 61:6,11,20
  62:5,5,18,20
**$90**
203:8

---
**0**
---

**02164-GW(KKx)**
849216:8 2:8
**074563**
91:5

---
**1**
---

**1**
4:9 11:19,21,25 12:4
  13:10,14,18,22
  15:15 16:1 17:1

24:14,18,25 28:23
  67:11
**1's**
37:1
**1:37**
176:10
**1:49**
176:13
**10**
4:18 61:4,12 62:1,6
  62:15,16,18 63:5,10
  108:15 109:8
  164:24 165:4,4,20
  166:2,9,16
**10:10**
52:15
**100**
18:11,13,16,19,23
  19:2 103:17 134:3
**1000**
3:5
**1099**
141:4,15,18,22 142:1
  142:3 145:20
**11**
4:9,10 81:3 83:22
  84:3
**11:11**
98:13
**11:23**
98:16
**11:58**
125:20
**1100**
2:16 3:10 5:14
**12**
60:19,24 104:1,1
  118:22 146:21
**12:00**
125:13
**12:32**
125:23
**126**
151:3
**14**
4:11 58:10 76:25

81:13 181:6
**14-1**
82:9,11,17
**15**
76:13 79:16 81:13
  135:25 143:1,5,18
  145:7,12,16 146:9
  146:12 149:2,13
  151:1 152:22 153:9
  154:16 156:11
**16**
81:13 146:16 150:19
  197:11
**164**
4:18
**17**
61:2,25 81:14
**18**
849216:17 2:18 5:1
  5:12 36:19 81:14
  197:12
**18-1**
83:7 145:2
**18-2**
36:18,19,23 38:18
**18.2**
39:17
**18101**
3:5
**19**
58:11 65:13 81:14
  94:24 95:6,17,19
  109:24 151:22
  154:4 177:16 189:1
**19-year**
41:5
**1949**
48:10
**1993**
25:13 45:12 48:14
  68:11 76:9 85:4
  141:22
**1994**
4:13 22:13 27:12,13
  27:22 28:6,18,24
  33:23 39:2 45:3



**EXHIBIT 2**
**PAGE 122**

47:7,11,16,24 48:4
48:5,8,10,23 49:3
50:1 191:15 194:25

**2**

**2**
4:10 11:19,21,25
12:4 13:11,14,18,23
13:25 14:14 15:15
16:1 17:1 24:15,22
24:25 27:14 28:9
90:11 91:11 104:21
108:8 117:2 171:10
171:14
**2's**
37:1
**2:24**
203:21
**2:25**
2:17 5:2 204:8
**20**
81:14 86:18 87:10
206:18
**2003**
48:15
**2006**
202:16,23 203:3
**2007**
48:23 49:3 50:1
202:25
**2008**
49:25 157:19,20
**2010**
77:9,13,16,23,24
81:3 82:5,17,18
83:21 84:3
**2010-11**
67:8
**2010-2011**
83:17 147:7
**2011**
65:22 66:18 77:4,20
78:14,15,18,19
79:14 80:2,12,15,16
80:22 91:11 95:9,12
95:16,22 148:4

149:24 203:1
**2011-18**
67:4
**2011-2012**
4:15 65:24
**2012**
49:25 68:12 76:9
157:19,20
**2016**
39:16 155:10 158:3,5
158:7,11,15 159:25
160:2,7,8 195:8,24
196:5,8,13 203:9,10
**2018**
115:18,19,22 116:1
196:1,1,4,5,10,13
196:22 198:24
**2022**
849216:17 2:18 5:1
5:12 206:18
**21**
28:18,23 29:14
102:12 161:7
**21-point**
28:10,14
**21.5**
55:11
**213**
3:6
**22**
54:1,2 97:1
**22.25**
54:5
**23**
29:15 59:23 91:4
109:15 161:7
**24**
4:12,13 57:13
**25**
52:17,21,24,25 53:14
53:18,23 54:2,7,20
54:23 55:5,7,11
56:5,8,12 57:7,8,9
57:12,13,16,24
59:15,17,22 60:1,15
60:19 61:2,7 70:2,6

70:8,18,18,19 88:3
88:11 89:16,20
93:13,22,23,24 96:5
98:18 100:18 104:3
104:24 105:2,13
109:12 114:3
115:22 116:1,3,5,21
117:20 118:4,4,11
118:11,19 119:5,9
119:19 120:1,7,15
120:23 121:1,4,18
122:5 123:7 137:17
138:10 188:18
194:16
**26**
53:21,23 55:11 57:13
118:11 171:3
174:13 177:2,5
**27**
25:12 90:12,19
**28**
60:6 109:12 118:5
**29**
59:23

**3**

**3**
4:11 14:5,6,9,22 25:5
25:5,6 109:22
117:21 162:6
**3.5**
136:5
**30**
104:20 120:16
**312**
3:11
**325**
148:2
**37**
4:14

**4**

**4**
4:12 24:5,7,8,9 25:8
25:11,12 40:25
41:22 42:2 45:13

52:19 74:8,8 78:7
85:4 87:6 97:8
101:21 126:6 127:3
131:19 184:25
189:4,13,19,21
190:17,25 191:2,24
191:24 192:10
198:10 199:3
**4.5**
22:19,22 23:12 29:3
30:2,21 33:6,11,17
33:23 40:3,7,10,16
48:11 50:22 53:6,11
57:10 61:16 68:25
76:21 78:5 95:12
96:7 99:9 105:1,5
108:16 117:24
119:2,7,24 129:22
130:8,9,13,25
131:15,25 132:20
133:7,20 135:6
137:6 180:22
181:15 185:9 189:7
189:10,11 190:4,5
192:15,18 193:19
193:19,25 194:1,11
195:2,6,10 198:13
198:15,16,18,20
199:7,9 201:8
**40**
6:14 15:19,24 20:18
46:25 54:14 71:14
104:20 110:11,16
122:16,21 124:11
134:6
**40-plus**
71:17
**40-year**
54:16
**41**
178:21
**45**
106:21,22
**46**
86:18 87:10
**462531**



**EXHIBIT 2**
**PAGE 123**

173:21

**5**

**5**
2:16 3:10 4:13 5:13
    24:6,8,9 25:20,20
    25:24 26:2 27:12
    30:14 37:25 38:12
    45:4 85:5,18 101:24
    103:11 189:24
**5.1**
30:14
**5:20-cv**
849216:8 2:8
**5:20-cv-02164**
5:11
**50**
6:14 41:12 47:1
    104:20 105:13
    118:25 119:11
    120:1

**6**

**6**
4:14 37:17,19,22
    174:22 175:3
    179:18,21 180:12
    200:3
**617-7492**
3:6
**62**
91:6
**62521**
173:22
**62531**
173:23
**63**
91:8
**65**
4:15
**66**
4:16
**69**
97:1

**7**

**7**
4:4,15 25:19 26:2
    65:18,19,22 85:5
    161:7 179:21
**7.2**
62:8,9,10
**701**
85:6
**75**
70:18 105:13 107:22
    109:3 119:11

**8**

**8**
4:16 66:22,23,25
**8:57**
2:17 5:2,13
**80**
134:9
**85**
134:9
**86**
4:17

**9**

**9**
4:17 86:10,11,13
    189:25 190:3,4,7,18
    190:21 191:19,20
    191:22,23,25 192:3
    192:11,16 194:12
**9-27-93**
4:12
**9-3**
189:22
**9:58**
52:12
**90**
105:2,13 106:16
    107:11,17 108:11
    108:17,24 109:11
    110:1 134:9
**92612**
3:5
**92614**
3:10

**9266**
849216:25 2:19
    206:23
**93**
24:8 189:18
**93-1**
170:2,4 171:17,24
    172:5 178:24
**94**
24:8 85:19
**95**
106:21
**97**
109:21 110:2 136:6
**980-6799**
3:11

EXHIBIT 2
PAGE 124