# EXHIBIT 3

EXHIBIT 3
PAGE 125



MAY 31, 2022

# EXPERT WITNESS REPORT

**REPORT & OPINION**

Re: Western Riverside Council of Governments, et. al. v. National Union Fire Insurance Company Case 5:20-cv-02164-GW-KK

This report incorporates information received to date through a review of the First Amended Complaint; Defendant's Answer and Affirmative Defenses; Exhibit A - National Union Fire Insurance Company of Pittsburgh, Pa. Primary Crime and Fidelity Policy of Insurance # 01-309-61-64, Effective June 30, 2014 to June 30, 2015 issued to CSAC Excess Insurance Authority (CSAC EIA); Exhibit B - National Union Fire Insurance Company of Pittsburgh, Pa. Primary Crime and Fidelity Policy of Insurance # 01-425-57-41, Policy Effective June 30, 2015 to June 30, 2017 issued to CSAC Excess Insurance Authority (CSAC EIA); April 05, 2016 City of Beaumont Crime Loss Report; November 03, 2016 Claim #: 3409580528US Fidelity Bond Claim Department Proof of Loss and Attachments; April 20, 2018 Fidelity Bond Claim Department Proof of Loss (Supplemental) and attachments; Best Best & Krieger Correspondence; National Union Fire Insurance Company of Pittsburgh, Pa. Production of Documents; Judith Blake Deposition Exhibits #1 thru #33; Barbara Leone Deposition Exhibits #34 thru #71; Jennifer Rocha Deposition Exhibits #72 thru #93; Documents Submitted by Attorney John O. Pinkney, Esq. relating to the termination of Alan Kapanicas.

**INTRODUCTION:**

The City of Beaumont (the "City"), a named insured under the CSAC Excess Insurance Authority (CSAC EIA) Fidelity Policies of Insurance issued by the National Union Fire Insurance Company of Pittsburgh ("National Union") Policy No. 01-309-61-64 (Inception June 14, 2014, thru June 14, 2015, with per occurrence limits of $10,000,000) and Policy No. 01-425-57-41(Inception June 14, 2015, thru June 14, 2017, with per occurrence limits of $15,000,000), became aware of unlawful activities of seven former employees (Alan Charles Kapanicas – City Manager, William Kevin Aylward – Director of Finance and later Assistant City Manager, Dave William Dillon – City Planning Director, Ernest Alois Egger – City Economic Development Director, Deepak Moorjani – City Director of Public Works, Joseph Sandy Aklufi – City Attorney and David Wysocki – Assistant City Attorney) on or about May 17, 2016. The City has continuously held a fidelity crime policy in amounts between $10,000,000 and $15,000,000 for the years 2011 to June 14, 2017.

The City became aware of its potential exposure to wrongdoing by the aforementioned City employees when, in April of 2015, the Federal Bureau of Investigation and various California state authorities executed a search warrant at City Hall. Concurrent raids were also conducted at the residences of the suspected employees. These law enforcement seizures included computers and boxes of documents containing City materials. The criminal investigation constrained the City's own ability to uncover relevant facts and any potential estimation of any financial loss values (for the purpose of ascertaining if, in fact, this illegal activity rose to the level of a compensable loss) based on the fact that relevant City materials and documents were now inaccessible to the City until after the conclusion of the criminal investigation.

On May 17, 2016, the District Attorney for the County of Riverside ("District Attorney") filed a felony complaint against the former City employees. These criminal complaints were for the embezzlement of public funds. Kapanicas and Aylward were also accused of misappropriation of public funds and conspiracy. A Proof of Loss was submitted by the City with a discovery of loss date, May 17, 2016. The Proof of Loss was in the amount of $159,702,461 broken down as follows: TUMF Scheme Judgment and Interest thereafter $57,803,975 (minimum); Urban Logic self-dealing $86,448,488; Kapanicas and Aylward self-dealing $1,364,542; Aylward personal self-dealing $96,508; concealed deficit in the City's General Fund $7,471,429;  and the City's illegally diverted general funds $6,517,519. As detailed below, the City is now claiming that its loss was $58,271,801.36 the amount of the ULC overcharges.

Under an agreement entered into between the City and National Union, the Proof of Loss with accompanying addendum was submitted on November 03, 2016. As of the date of this Report, the claim filed under the aforementioned Proof of Loss and the subsequent supplemental Proof of Loss dated April 20, 2018 remains unresolved and unpaid.

**QUALIFICATIONS:**

My qualifications are as described in my curriculum vitae attached as Exhibit "A". To summarize, I began my 54-year career in the insurance and reinsurance industry as a property and casualty claims specialist, eventually holding senior management and executive positions at The Travelers, The Hartford, and The United States Fidelity & Guaranty Insurance Company.

During 1977 I entered the treaty reinsurance industry as a claims and underwriting auditor (including surety, fidelity, and comprehensive general liability coverage applications and claim processing policies and procedures) for various underwriting pools that represented the interests of INA, The London Institute of Underwriters, Sun Alliance, SCOR, Eisen Un Stahl and Assicurazioni Generali, to name a few of the more prominent. In 1982 I became a treaty reinsurance broker specializing in the design and marketing of quota share, excess, catastrophe, and retrocessional reinsurance programs (including surety, fidelity, professional liability, and commercial/personal lines insurance) as a Senior Vice President with RFC Intermediaries, a wholly owned subsidiary of The St. Paul Companies.

In 1985 I was one of the founders and Board Member of American Intermediaries, a treaty reinsurance brokerage firm responsible for the placement of all forms of property and casualty treaty reinsurance. More recently I designed, structured, and implemented AssureLease™, Healthcare Providers Compliance Assurance Program™, MedDefense™ and successfully designed, implemented, and was a Board member of the International Ironworkers Union workers compensation and construction wrap up captive insurance program, ICIP; the American Medical Association's MD/JD Branch captive insurer United Physicians Insurance and the American Academy of Cosmetic Surgery's captive, North American Physicians Insurance Company.

**LISTING OF OTHER CASES I HAVE TESTIFIED IN (PAST 4 YEARS)**

October 22, 2021, *Mark Rosenstein v Montefiore Medical Center, et al,* Supreme Court of the State of New York, County of West Chester, 50213/2016. On behalf of the defendant.

January 31, 2022, *Certain Underwriters at Lloyds of London v Anchor Insurance Holdings, Inc., Nick W. Griffin, Daniel S. Bowmen, Anchor Property & Casualty Insurance Company*, United States District Court Middle District of Florida Tampa Division, 8:21-cv-00370-TPB-AEP. On behalf of the plaintiff.

**TASKS TO BE PERFORMED:**

I was retained as an expert witness to review case material as previously described and render a professional opinion, as a property, casualty, and fidelity insurance coverage and claims dispute expert, regarding whether the actions of Defendant in this matter violated applicable insurance regulations or conflicted with industry customs, standards and practices.

**Materials Reviewed:**

- Summons and Complaint filed in the United States District Court Central District of California, Case No. 5:20-cv-02164 GW (KKx)
- Defendant's Answer and Affirmative Defenses
- Exhibit A - National Union Fire Insurance Company of Pittsburgh, Pa. Primary Crime and Fidelity Policy of Insurance # 01-309-61-64, Effective June 30, 2014, to June 30, 2015, issued to CSAC Excess Insurance Authority
- Exhibit B - National Union Fire Insurance Company of Pittsburgh, Pa. Primary Crime and Fidelity Policy of Insurance # 01-425-57-41, Policy Effective June 30, 2015, to June 30, 2017, issued to CSAC Excess Insurance Authority
- April 05, 2016, City of Beaumont Crime Loss Report
- November 03, 2016, Claim #: 3409580528US Fidelity Bond Claim Department Proof of Loss and Attachments

- April 20, 2018, Fidelity Bond Claim Department Proof of Loss (Supplemental) and attachments
- Best Best & Krieger Correspondence
- National Union Fire Insurance Company of Pittsburgh, Pa. Production of Documents
- James Gregg Deposition Transcript
- Judith Blake Deposition Exhibits #1 thru #33
- Barbara Leone Deposition Exhibits #34 thru #71
- Jennifer Rocha Deposition Transcript (rough draft)
- Jennifer Rocha Deposition Exhibits #72 thru #93
- Documents Submitted by Attorney John O. Pinkney, Esq.

**EXPERT OPINION WITH RELEVANT COMMENTS:**

Based on my review of the above-referenced materials and my training, education, experience, and professional qualifications in property, casualty, and fidelity insurance coverage and claims dispute practices, and procedures, I offer the following opinions within a reasonable degree of professional certainty.

In addressing the gravamen of the City's litigation pending against National Union I will be relying on certain elements of the California Fair Claims Settlement Practices Regulations that I believe National Union violated in contravention of National Union's implied covenant of good faith and fair dealing in the issuance of the policies of insurance that are the subject of this litigation.

The pertinent elements of the California Fair Claims Settlement Practices Regulations relating to this litigation are:

- Accepting or denying claims within 40 days of receiving proof of claim, unless written notice is provided for additional time
- Providing a clear and concise written explanation of the factual and legal bases for rejection or denial of first-party claims
- Thoroughly, fairly, and objectively investigate claims, and not seek information that is not reasonably required in order to resolve claim disputes
- Not making unreasonably low settlement offers

These are only some of the requirements established by the regulations, and the regulations themselves are not exhaustive in terms of defining what constitutes a fair settlement of claims. In addition to California laws and regulations mentioned, National Union is also required to adhere to standard insurance industry standards, customs, and practices which include broadly interpreting coverage, avoiding overly burdensome requests for documentation, and issuing a full and complete Reservation of Rights notification if warranted.

**Accepting or denying claims within 40 days of receiving proof of claim, unless written notice is provided for additional time**

In April 2016 immediately after the District Attorney filed a felony complaint against former City employees previously mentioned, on or about May 17, 2016, the City's Risk Manager, James Gregg submitted the initial notice of loss. These criminal complaints were for the embezzlement of public funds. Kapanicas and Aylward were also accused of misappropriation of public funds and conspiracy. On behalf of National Union, AIG[1] Assistant Vice President – Fidelity Bond, Financial Lines Claims, Judith Blake – acknowledged receipt of the Notice of Loss and assignment of Claim # 3409580528US by way of correspondence dated April 20, 2016, and assigned to Claims Director, Jennifer Rocha for further handling.

A Proof of Loss was submitted by the City with a discovery of loss date, May 17, 2016. The Proof of Loss was in the amount of $159,702,461 broken down as follows: TUMF Scheme Judgment and Interest thereafter $57,803,975 (minimum); Urban Logic self-dealing $86,448,488; Kapanicas and Aylward self-dealing $1,364,542; Aylward personal self-dealing $ $96,508; concealed deficit in the City's General Fund $7,471,429; and the City's illegally diverted general funds $6,517,519.

On December 19, 2017, Ms. Rocha acknowledges the assignment of the City's financial crimes claim by way of correspondence to the City's counsel, Christopher Deal, and states *"AIG Claims expects to provide you with feedback within the next 30 days"*. Contrary to Ms. Rocha's December 19, 2017 letter nothing further is heard from AIG until Ms. Rocha's follow-up correspondence dated January 25, 2018, which provides no feedback or status update information other than another statement from Ms. Rocha that *"AIG Claim expects to provide you with a preliminary evaluation letter within the next 30 days"*. No such "preliminary evaluation letter" was forthcoming within the indicated 30-day time frame.

Having heard nothing further from AIG since Ms. Rocha's December 19, 2017 correspondence, Mr. Deal forwards a follow-up letter to Ms. Rocha on March 07, 2018, indicating that the City had recently subpoenaed documents from the District Attorney in connection with the criminal proceedings and *that "While the City has previously provided voluminous records in response to your previous requests, if AIG believes the subpoenaed documents are necessary to formulate the preliminary coverage evaluation, please let us know so that we can work with you on production of these documents"*. No response to this offer was forthcoming from Ms. Rocha or anyone else at AIG.

Once again, having heard nothing further from either Ms. Rocha or anyone else at AIG, Mr. Deal forwarded additional correspondence to Ms. Rocha on April 20, 2018, stating *"The purpose of*

---

[1] AIG Claims Inc. is the authorized claims agent for National Union

*this letter is to request an update regarding the status of the City of Beaumont's insurance claim and to confirm that AIG has the information that it requires to complete its investigation of the claim. Since the original proof of loss was submitted in November 2016 (the "Proof of Loss"), we request that AIG substantively respond to the claim by no later than May 2, 2018".*

On behalf of AIG, Ms. Rocha responds by way of correspondence dated April 26, 2018. This correspondence was referred to by Ms. Rocha in her deposition as a "soft denial" letter (the only context that I've ever heard the term "soft denial" used in relates exclusively to the review of medical insurance claims wherein there is some minor issue [usually a more detailed diagnosis from a treating physician] which requires resolution prior to payment authorization). Furthermore, this is not a proper Reservation of Rights notice according to insurance industry standards, customs, or procedures.

In Ms. Rocha's 10-page letter, she routinely prefixes her declination wording with *"may impact"*, *"whether"*, *"does not appear"*, *"appear to have been"*, *"Our preliminary conclusion"*, *"the available information appears to show"*, *"seems consistent"*, *"appear to reflect"*, etc. This is contrary to industry standards and customs, as well as applicable insurance code regulations, which require an insurer to provide a clear, concise, and timely coverage determination. Further, and for these same reasons, this is not a proper or effective Reservation of Rights.

After two years from the insured City's initial report of loss to the issuance of this correspondence, Ms. Rocha states over and over again throughout her correspondence *" We also are requesting additional information…"*.

Additional information? The original Proof of Loss submitted on November 06, 2016, declared that the loss sustained by the City totaled $159,702,461. Ms. Rocha states, comprehensively, in her April 26, 2018 correspondence *"While this letter is lengthy, we feel such length is necessary in order to comprehensively provide the Insured with as much detailed review as possible on this $57,803,975 claim involving multiple alleged schemes, multiple alleged wrongdoers and over five hundred thousand pages of documents".* This is an extraordinary statement and though it doesn't indicate the actual true value of the loss, it certainly implies it.

Applying the appropriate California insurance law and statutes as well as considering industry practices and procedures to the details indicated in Mr. Deal's subsequent October 15, 2018 correspondence to Ms. Rocha, resolution of this claim should have been accomplished by the respective AIG claims and legal departments within a timeframe of far less than six years after the original Proof of Loss was submitted to AIG.

**Providing a clear and concise written explanation of the factual and legal bases for rejection or denial of first-party claims**

During the six-plus years[i] this claim has been pending, at no time has there been any definitive explanation of a factual or legal basis for denial or acceptance of this first-party financial crime

loss. Additionally, AIG did not follow property industry standards and procedures regarding the issuance of a formal Reservation of Rights notification.

In the course of AIG's investigation, AIG has requested literally hundreds of thousands of pages of documents, at great expense to the City. These requests were grossly overly burdensome; the overly "voluminous" nature of AIG's documents request was even noted by one of its own employees (Exhibit 22 to Blake deposition).

Further, it is inexplicable how AIG could at one point conclude that the various wrongdoers whose acts are the subject of this claim could have been classified as *"independent contractors"* even though they were acknowledged City officials, covered by Endorsement 5 to the City's financial crimes policy of coverage. At various points in the investigation, AIG continued to ask for unnecessary documentation on this subject.

Finally, AIG initially issued one claim file number and then, years after the claim had been initially reported, at the direction of senior management, issued a new claim number for the apparent express purpose of reducing the City's policy limits by $5,000,000. It also neglected to inform The City of the existence of a $5,000,000 excess policy that was underwritten by an AIG affiliate.

**Thoroughly, fairly, and objectively investigate claims, and not seek information that is not reasonably required in order to resolve claim disputes**

Under normal and customary first-party claims handling procedures relating to financial crime exposure, a potential policy limits loss such as what the City incurred represents nothing short of a four-alarm fire. Immediate utilization of in-house field claims adjustors, outside independent adjusters with expertise in financial crimes investigations, private investigators along with forensic accountants with expertise in municipal government are standard procedures implemented to protect the interests of the insured and, more importantly, provide swift compensation under the terms and conditions of the policy or policies in question. My review found no such urgency on the part of AIG.

Again, AIG's overly burdensome demand for what was deemed by their own employees as overly burdensome documentation falls squarely into this category.

AIG has recently implied that the Beaumont Financing Authority (the "BFA"), is not an insured under the policies at issue even though the BFA is identified as an additional insured under both polices (Endorsement 13 to the 2015-2017 Policy and Endorsement 9 to the 2014-2015 Policy). AIG was notified in June of 2016 of the applicability of coverage to BFA with no rejection of coverage for BFA or issuance by AIG of a full and complete Reservation of Rights. Notably, both the City and the BFA submitted June 30, 2016 claims relating to an SEC investigation and a subpoena issued to the City. Ms. Blake testified that these claims were collapsed into the master claim and were not assigned new claim numbers. Notably, AIG has never responded in any fashion to the SEC tenders.

As a central part of the investigative process the claims supervisor, Judith Blake, at one point became aware of the existence of an excess financial crimes coverage policy issued by another division of AIG (as mentioned previously, the primary financial crimes coverage policy was issued by AIG's subsidiary, National Union). By normal and customary first-party claims handling policies and procedures, this information should have been immediately communicated to the insured. . The records I reviewed indicated that it was not.

As a part of the AIG claims investigation the City's general ledger and bond account documentation from 2004 through 2012 was audited for potential loss by AIG's forensic accountants. The City's policies being underwritten on a claims-made basis losses discovered prior to 2004 would be potentially covered under the financial crimes policy. It appears, however, that AIG never actually investigated these pre-2004 losses despite specific inquiries from its own auditor as to whether they should do so.

**Not making unreasonably low settlement offer**

My understanding is, over the aforementioned six-plus-year period of claim pendency, AIG had offered $1.5 million in full and final settlement of this claim. Based on the fact that, as of October 2, 2019, AIG was informed that ULC overcharges could be up to $8,000,000 (see Exhibit 2 to Blake deposition) and that the forensic auditors had not yet considered pre-2004 losses, this offer was unreasonable and totally inadequate. In addition, it is inexplicable why AIG's findings were not shred with the City, as is required for a first-party policy holder.

**Failure to give equal consideration to the interests of the insured and failing to investigate potential grounds for application of coverage**

It is a well-established principle in insurance law that an insurer cannot favor its own interests over its insured. In addition, it is well-established that when an insurer is conducting a coverage investigation it must look for facts tending to establish coverage, as well as facts that may preclude coverage. In my review of this file, there are many instances in which AIG failed to comply with these well-established rules. Examples include:

(1) Reclassifying the claim under the 2014-2015 Policy, despite there being an active dispute as to the applicable policy;

(2) Failing to inform the insured regarding the existence of an excess policy underwritten by an AIG affiliate;

(3) Failing to instruct auditors to investigate pre-2004 losses;

(4) Continually changing its coverage positions to raise new potential grounds for denial;

(5) Continually seeking voluminous documents, including superfluous and unnecessary documents, to support new potential grounds for denial;

(6) Never issuing a formal coverage opinion letter or proper Reservation of Rights;

(7) Failing to issue a good-faith settlement offer and instead issuing a "low-ball" settlement offer, and failing to make any payment whatsoever under the policy despite evidence that covered losses exist;

(8) Failing to appoint sufficiently competent and experienced claims counsel despite the complexity of the claim and amount at issue;

(9) Failing to communicate in a timely manner and failing to timely respond to inquiries from the insured; and

(10) Failure to acknowledge additional insured and failing to respond to BFA's and the City's tenders regarding the SEC investigations.


Respectfully Submitted,

*John Lepire*
John Lepire

EXHIBIT A

**Curriculum Vitae – John Lepire**

John Lepire is the founder and CEO of Ludger Limited, an independent financial services consulting firm formed in 1995 to provide insurance/reinsurance program structuring, insurance program design options, and expert opinion and testimony to organizations in a wide variety of industries. Ludger also provides industry-specific analytical services to public/private investment firms with financial interests in property, casualty, surety, fidelity, life /accident/health, and all forms of quota share/excess/catastrophe/retrocessional reinsurance matters. Mr. Lepire's prior experience includes over 52 years in both managerial and executive roles with the Travelers, The Hartford, The Continental Corporation, St. Paul Fire & Marine, USF&G, AON, and JH Minet.

Mr. Lepire is also an insurance entity formation expert and developer of regional/national MGU/MGA operations, a treaty reinsurance claims and underwriting auditor, a treaty reinsurance consultant, and a property/ casualty insurance program development and design specialist through the utilization of both onshore or offshore captive insurer structuring.

Mr. Lepire began his 52-year career in the insurance and reinsurance industry as a property and casualty claims specialist, eventually holding senior management positions at The Travelers, The Hartford, and St Paul Fire & Marine. During 1977 Mr. Lepire entered the treaty reinsurance industry as a claims and underwriting auditor for various underwriting pools that represented the interests of INA, The London Institute of Underwriters, Sun Alliance, SCOR, Eisen Un Stahl, and Assicurazioni Generali, to name a few of the more prominent.

In 1982 Mr. Lepire became a treaty reinsurance broker specializing in the design and marketing of specialized commercial casualty and professional liability reinsurance programs as a Senior Vice President with RFC Intermediaries, a wholly owned subsidiary of The St. Paul Companies. During 1985 Mr. Lepire was one of the founders and eventually a Board Member of American Intermediaries, a reinsurance brokerage firm responsible for the placement of treaty reinsurance on behalf of primarily doctor and attorney owned professional liability firms such as Physicians Insurance of Ohio, Physicians Insurance of Michigan, Physicians Insurance of Florida and the California Attorneys Mutual Insurance Company.

More recently Mr. Lepire designed, structured, and implemented AssureLease™, underwritten by Torus Insurance; the Healthcare Providers Compliance Assurance Program™, underwritten through Genstar Insurance; MedDefense™ underwritten through certain underwriters at Lloyds of London, and successfully designed, implemented, and was a Board member of the International Ironworkers Union contractors wrap-up and workers compensation captive program, ICIP™, underwritten by Travelers; the American Medical Association's MD/JD Branch

captive insurer United Physicians Insurance™ and the American Academy of Cosmetic Surgery's captive, North American Physicians Insurance Company™.

**Publications**

November 21, 2015, *The Insurance Advocate*, *"Finite Reinsurance: Use and Misuse"* by John Lepire and Andrew Barile

January 20, 2016, *The Royal Gazette*, *"With Increased Scrutiny, Specialists Services Offer Companies Peace of Mind"* by John Lepire

June 15, 2017, *Gerson Lehrman Group Webcast*, *"The Boeing Company: 737/MAX8/9 Carrier Subrogation Rights Acquisition/Profitability Issues"*

January 28, 2019, *Gerson Lehrman Group Webcast*, *"PG&E: Insurance Subrogation Recovery*

May 22, 2019, *Gerson Lehrman Group Webcast*, *"Uber and Lyft: Operator Liability Insurance Issues"*

October 24, 2019, *Gerson Lehrman Group Webcast*, *"Uber & James River Insurance: Mid-Term Coverage Cancellation & Impact on Ridesharing Industry"*

**Statement of Compensation to be Paid**

- $300 per hour (all preparatory work)
- $600 per hour (deposition/testimony)
- $200 per hour (travel)

---

[i] During my entire career in the property and casualty insurance industry, I cannot think of any other first-party claim that had remained unresolved for over six years.