# EXHIBIT 4

**EXHIBIT 4**
**PAGE 137**

Western Riverside Council of Governments,et al

vs.

National Union Fire Ins. et al


Deposition of

John Lepire

July 19, 2022



Job # 24141

EXHIBIT 4
PAGE 138

1            UNITED STATES DISTRICT COURT

2        FOR THE CENTRAL DISTRICT OF CALIFORNIA

3                  EASTERN DIVISION

4

5   WESTERN RIVERSIDE COUNCIL     )
    OF GOVERNMENTS, a             )
6   California Joint Powers       )
    Authority; CITY OF            )
7   BEAUMONT, a public entity     )
    in the State of               )
8   California,                   )
                                  )
9            Plaintiffs,          ) CASE NO.
                                  ) 5:20-cv-02164 GW (KKx)
10    vs.                         )
                                  )
11  NATIONAL UNION FIRE           )
    INSURANCE COMPANY OF          )
12  PITTSBURGH, PA, and DOES 1    )
    through 50, inclusive,        )
13                                )
             Defendants.          )
14  - - - - - - - - - - - - - - - -

15

16

17     VIDEO RECORDED REMOTE EXPERT DEPOSITION OF

18                  JOHN LEPIRE

19             Tuesday, July 19, 2022

20                  9:02 a.m.

21             via Zoom videoconference

22

23

24  REPORTED BY:

25  CYNTHIA F. DAMMANN, CSR#10610



```
 1

 2

 3

 4

 5

 6

 7

 8               Remote video recorded expert deposition

 9   of JOHN LEPIRE, taken on behalf of Defendants, via

10   Zoom videoconference, with the witness located in

11   San Simeon, California, commencing at 9:02 a.m.,

12   Tuesday, July 19, 2022, before Cynthia F. Dammann,

13   Certified Shorthand Reporter No. 10610, pursuant to

14   Notice.

15

16

17

18

19

20

21

22

23

24

25
```



EXCEEDING YOUR EXPECTATIONS

Combs Reporting, Inc.

DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 140

```
 1                 APPEARANCES OF COUNSEL

 2   FOR PLAINTIFFS:

 3        BEST BEST & KRIEGER, LLP
          BY:  CHRISTOPHER E. DEAL, ATTORNEY AT LAW
 4        18101 Von Karman Avenue
          Suite 1000
 5        Irvine, California 92612
          Telephone:  (949) 263-2600
 6        E-mail: Chris.deal@bbklaw.com

 7   FOR DEFENDANTS:

 8        GORDON REES SCULLY MANSUKHANI, LLP
          BY:  SCOTT L. SCHMOOKLER, ATTORNEY AT LAW
 9        5 Park Plaza
          Suite 1100
10        Irvine, California 92614
          Telephone:  (949) 255-6950
11        E-mail: Sschmookler@grsm.com

12   ALSO PRESENT:

13        DELRON SIMPSON, VIDEOGRAPHER

14

15

16

17

18

19

20

21

22

23

24

25
```



EXHIBIT 4
PAGE 141

```
 1                    INDEX

 2  Tuesday, July 19, 2022

 3  JOHN LEPIRE                                 Page

 4       Examination by MR. SCHMOOKLER          7

 5  P.M. SESSION                                127

 6       Examination Resumed by MR. SCHMOOKLER  127

 7       Examination by MR. DEAL                233

 8       Further Examination by MR. SCHMOOKLER  238

 9       Further Examination by MR. DEAL        240

10

11

12                     -oOo-

13

14

15

16

17

18

19

20

21

22

23

24

25
```



EXCEEDING YOUR EXPECTATIONS

Combs Reporting, Inc.

DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 142

```
 1                 INDEX TO EXHIBITS

 2                   JOHN LEPIRE

 3   Number              Description              Page

 4   Exhibit 1   Expert Witness Report              11

 5   Exhibit 2   Online CV                          13

 6   Exhibit 3   Claim Activity Binder              50

 7   Exhibit 4   Complaint                         175

 8

 9

10

11
                      --oOo--
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



EXCEEDING YOUR EXPECTATIONS

COMBS Reporting, Inc.

DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 143

JOHN LEPIRE on 07/19/2022

Page 6

```
 1                Via Zoom Videoconference

 2              Tuesday, July 19, 2022; 9:02 a.m.

 3

 4          THE VIDEOGRAPHER:  Good morning.  We're

 5   going on the record at 9:02 a.m., on Tuesday,        09:02:21

 6   July 19th, 2022.  This begins media number one in

 7   the deposition of John Lepire, in the matter of

 8   Western Riverside Council of Governments, et al.,

 9   vs. National Union Fire Insurance Company of

10   Pittsburgh, PA, et al., filed in the United States   09:02:43

11   District Court, for the Central District of

12   California, Eastern Division.  This is

13   Case No. 5:20-cv-02164 GW (KKx).

14          This deposition is being taken remotely

15   using virtual technology at the request of Gordon &  09:03:13

16   Rees Scully Mansukhani.

17          Please note that this -- the quality of the

18   recording depends on the quality of camera and

19   Internet connection of participants.  What is seen

20   from the witness and heard on screen is what will be 09:03:29

21   recorded.  Audio and video recording will continue

22   to take place unless all parties agree to go off the

23   record.

24          The court reporter is Cynthia Dammann, of

25   Magna Legal Services.  I am the videographer, Delron  09:03:41
```



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 144

```
 1  Simpson, of Magna Legal Services.  I am not related
 2  to any party in this action nor am I financially
 3  interested in the outcome.
 4       Will counsel and all parties present state
 5  their appearance and whom they represent, beginning    09:03:53
 6  with the noticing attorney?
 7       MR. SCHMOOKLER:  Scott Schmookler on behalf
 8  of the defendant.
 9       MR. DEAL:  And Christopher Deal on behalf of
10  the plaintiffs.                                        09:04:03
11       THE VIDEOGRAPHER:  Thank you for that.
12       Will the court reporter please swear in the
13  witness?
14       (Oath administered.)
15       THE WITNESS:  Yes, I do.                          09:04:17
16                 ---oOo---
17                 JOHN LEPIRE,
18  having been first duly sworn, testified as follows:
19                 EXAMINATION
20  BY MR. SCHMOOKLER:
21    Q.  Good morning, sir.  My name is Scott
22  Schmookler.  I represent the defendant in this
23  matter.  We're here to take your deposition.
24       Can you please state your name and last name
25  for purposes of the record?                            09:04:31
```



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 145

JOHN LEPIRE on 07/19/2022

Page 8

```
 1     A.  Yes.  John Lepire, L-e-p-i-r-e.
 2     Q.  Have you ever had your deposition taken
 3  before?
 4     A.  Yes, I have.
 5     Q.  How many times?                              09:04:38
 6     A.  Oh, I can't really recall.  It's been many
 7  times.
 8     Q.  Okay.  We're going to ask you a series of
 9  questions today.  If at any time you do not
10  understand my question either because you didn't   09:04:49
11  hear it or just don't understand what I'm asking
12  you, please tell me and I will rephrase.  If I -- if
13  you do not say anything and you answer my question,
14  I will assume you've understood it as it was asked.
15  Okay?                                              09:05:05
16     A.  I understand.
17     Q.  I have sent you some documents, and I'm also
18  going to show you some other documents on the screen
19  today.  If I show you a document on the screen and
20  you want to see more or less of the document, want   09:05:13
21  it zoomed in or out, you let me know, and I'm happy
22  to do that.  I want to make sure you're able to
23  answer all of my questions as accurately as
24  possible.
25     A.  I understand.                               09:05:24
```



JOHN LEPIRE on 07/19/2022

Page 9

```
 1      Q.  If -- if it's a document that you have in
 2  front of you, if you could identify the Bates number
 3  of anything you're looking at, that would be
 4  helpful.  Okay?
 5      A.  Yes.                                          09:05:33
 6      Q.  You're an expert witness in this matter,
 7  correct?
 8      A.  That's correct.
 9      Q.  You're being paid to be here, correct?
10      A.  That's correct.                               09:05:42
11      Q.  You're being paid to offer opinions against
12  my client, National Union, correct?
13      A.  That's correct.
14      Q.  You've sued insurance companies personally,
15  correct?                                             09:05:52
16      A.  Yes, I have.
17      Q.  You've sued them for fraud, correct?
18      A.  For fraud?  I don't recall.
19      Q.  And after a number of demurrers, you had to
20  dismiss your action against that insurance company,  09:06:10
21  correct?
22      A.  Are you -- are you -- are you speaking about
23  a brokerage firm Aon?
24      Q.  No.  Did you not sue the Hartford?
25      A.  No.  I don't believe I ever have sued the    09:06:23
```



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 147

 1  Hartford.

 2     Q.  Do you recall what in your action against

 3  Aon, you also sued insurance companies that

 4  ultimately defeated you?

 5     A.  I don't believe that is the case.  I believe          09:06:38

 6  that settlement on the Aon matter was confidential.

 7  There was a confidentiality agreement entered into

 8  on that.

 9     Q.  You understand that you settled with Aon but

10  you lost that action against other insurance               09:06:51

11  companies, including against an insurance company?

12     A.  I -- I don't -- I don't understand what

13  you're -- what you're saying.

14     Q.  Okay.  Sir, --

15     A.  Can I -- can I add one more thing?  I -- I           09:07:05

16  don't believe --

17     Q.  No.

18     A.  -- in the action against Aon --

19     Q.  No.

20     A.  -- there were any other insurance companies.        09:07:11

21  There were no other --

22     Q.  I -- I get to the ask the questions, and you

23  can certainly -- your lawyer can follow up.  Just

24  because of paying you I believe $600 an hour, I want

25  to use the time efficiently.                               09:07:23



```
 1          Sir, you've -- you've provided an expert
 2   report in this matter, have you not?
 3       A.  Yes, I have.
 4       Q.  Okay.  I will put it up on the screen for
 5   you.  This, for purposes of the record, will be      09:07:35
 6   marked as Exhibit No. 1.
 7       A.  M-hm.
 8          (Whereupon Exhibit 1 was marked for
 9          identification.)
10   BY MR. SCHMOOKLER:                                    09:07:49
11       Q.  Is Exhibit -- and I'm happy to flip through
12   it.
13          Is Exhibit No. 1 a true and correct copy of
14   the report that you've issued in this matter?
15       A.  It appears to be, yes.                        09:08:00
16       Q.  Did you write all the words in this report?
17       A.  Yes, I did.
18       Q.  Does this report fully and accurately
19   reflect all of the opinions you intend to give in
20   this matter?                                          09:08:15
21       A.  Subject to any additional material that I
22   may be given in the future.
23       Q.  Well, as of today, meaning as of today, the
24   deposition, do you have any opinions in this matter
25   that are not reflected in the report?                 09:08:27
```



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 149

JOHN LEPIRE on 07/19/2022

Page 12

```
 1     A.  No, I do not.
 2     Q.  You have accused my client of bad faith,
 3  correct?
 4     A.  That's correct.
 5     Q.  Are all of the grounds for accusing my      09:08:36
 6  client of bad faith included in this report?
 7     A.  I believe so, yes.
 8     Q.  You've provided us an Exhibit A, which is a
 9  CV.
10         Do you see that, sir?                       09:08:58
11     A.  Yes, I did.
12     Q.  Okay.  And this CV provides an overview,
13  does it not, of all of your experience that you cite
14  as a basis for being an expert witness.  Is that
15  correct?                                           09:09:16
16     A.  Yes.
17     Q.  Okay.  And do you have any training in
18  insurance that is not reflected in this CV?
19     A.  Yes, I do.
20     Q.  Okay.  So it is fair to say that the CV you 09:09:26
21  provided does not fully and accurately reflect all
22  of your training?
23     A.  That's correct.
24     Q.  Is it true then -- strike that.
25         Sir, do you also publish an online CV for   09:09:45
```



EXCEEDING YOUR EXPECTATIONS

COMBS REPORTING, INC.

DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 150

Page 13

```
 1  yourself?

 2     A.  I believe there's one that's online, but

 3  it's something like 17 years old.  I haven't updated

 4  it.

 5     Q.  Let me ask you -- let's look at your online        09:10:01

 6  CV, and I'm going to mark this as Exhibit 2.

 7        (Whereupon Exhibit 2 was marked for

 8        identification.)

 9  BY MR. SCHMOOKLER:

10     Q.  Do you recognize that picture of -- with a        09:10:19

11  dolphin?

12     A.  Yes.  That's me.

13     Q.  Is that you?

14     A.  Yes, that's correct.

15     Q.  Is this an online -- this is a document I --      09:10:26

16  or this is a PDF -- Exhibit 2 is a PDF of something

17  I found online.

18        Do you see that, sir?

19     A.  Yes, that's correct.

20     Q.  And is this -- is this website information        09:10:37

21  that you at some point had input about yourself?

22     A.  Yes, that's correct.

23     Q.  Okay.  And at the time you input it into the

24  Internet and published it, what was the purpose of

25  this posting?                                            09:10:56
```



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 151

JOHN LEPIRE on 07/19/2022

Page 14

```
 1      A.  I -- I'm trying to recall what it had --
 2  what it relates to.  I -- I don't re -- to be honest
 3  with you, I don't recall.
 4      Q.  Okay.  Well, let's look at it because it
 5  gives some very specific dates, much like LinkedIn      09:11:12
 6  would give, about you and your background.  So let's
 7  see what -- what of this is accurate and inaccurate.
 8          Per this bio, it says that you graduated from
 9  UCLA with a degree in political science and
10  government in 1968.                                     09:11:28
11          Do you see that, sir?
12      A.  Yes, I do.
13      Q.  Is that accurate?
14      A.  Actually, I had enough credits, but I didn't
15  get a degree.                                           09:11:35
16      Q.  So you do not have a bachelor of arts from
17  UCLA?
18      A.  I do not, no.  That's reflected in my CV, I
19  believe.
20      Q.  Okay.  Did you go to Whittier Law School?      09:11:44
21      A.  Yes, I did.
22      Q.  Do you have a law degree?
23      A.  No, I don't.  I went one year.
24      Q.  Okay.  Okay.  So is it fair to say then that
25  you are not an attorney?                                09:12:04
```



EXCEEDING YOUR EXPECTATIONS

COMBS REPORTING, INC.

DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 152

JOHN LEPIRE on 07/19/2022

Page 15

```
 1      A.  That's correct.
 2      Q.  All right.  Is it equally fair to say that
 3  none of the education that you received either at
 4  Whittier Law School or UCLA has anything to do with
 5  crime insurance policies?                          09:12:17
 6      A.  That's correct.
 7      Q.  Have you ever attended any class, seminar,
 8  or specific training unique to crime insurance
 9  claims?
10      A.  Yes, I have.                               09:12:29
11      Q.  Okay.  When was that?
12      A.  That was, I believe, in around 1978.
13      Q.  Okay.  Anything else other than the class
14  you attended in 1978?
15      A.  No.                                        09:12:46
16      Q.  Have you ever provided to anyone else
17  training, seminars, or other classes on crime
18  insurance?
19      A.  I have had meetings with executives of
20  insurance companies relative to their crime        09:13:05
21  insurance policies that they'd issued as a
22  reinsurance auditor.  I have gone over their
23  underwriting criteria.  I have been involved in
24  reviewing their claims analysis, their claims
25  reserving, their actuary comp -- actuarial         09:13:22
```



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 153

1  computations of how they came up with their rating

2  for purposes of the reinsurance underwriters on my

3  side.  Evaluating this, I've done -- I did that for

4  probably six, seven years.

5      Q.  Let's go through that.                           09:13:39

6          First of all, when was that six- to

7  seven-year period?

8      A.  From 1977 till about 1984.

9      Q.  Okay.  Do you understand that employee theft

10  policies did not exist when you were in the          09:14:00

11  reinsurance business?

12      A.  Pardon?

13      Q.  When was the first policy covering employee

14  theft, meaning theft as a defined term, introduced

15  in the market?                                        09:14:12

16      A.  I have no idea.

17      Q.  Do you have any background or training on

18  the origin and terms of a government crime policy?

19      A.  Any training?

20      Q.  Yeah.  I'll start with that.                   09:14:32

21          Do you have any training whatsoever specific

22  to government crime policies?

23      A.  You know, as an underwriter?

24      Q.  Any training whatsoever of government crime

25  policies.                                             09:14:48



EXHIBIT 4
PAGE 154

```
 1     A.  Government crime policies per se, no, I do
 2  not.
 3     Q.  Okay.  You said you worked -- and I believe
 4  this was when you were at some company called
 5  Pacific Reinsurance Management Company is when you      09:15:00
 6  dealt with crime policies in -- in the 1997 to
 7  2000 -- or sorry -- 19 -- strike that.
 8         Where -- what company did you work for
 9  during the six- to seven-year window when you had
10  some insight on the reinsurance of crime policies?     09:15:15
11     A.  Pacific Reinsurance Management Company,
12  which was a subsidiary of Mission Insurance Group.
13     Q.  You said you audited files for purposes of
14  underwriting.
15         Do you recall that?                             09:15:29
16     A.  Yes, sir.  Yes, I do.
17     Q.  And -- and you agree that claims handling
18  and underwriting are two distinct functions in the
19  insurance world?
20     A.  Yes, I do.                                      09:15:40
21     Q.  Underwriting is the evaluation of risk for
22  purposes of writing a policy, correct?
23     A.  That's correct.
24     Q.  And claims is the process of adjudicating
25  whether a claim is covered under the policy,           09:15:51
```



EXHIBIT 4
PAGE 155

1    correct?

2        A.   That's correct.

3        Q.   And you mentioned actuarial analysis.

4        Actuarial analysis is distinct from

5    underwriting and distinct from claims, correct?                      09:16:03

6        A.   That's correct.  I am not an actuary.

7        Q.   Actuarial analysis speaks to the projection

8    of risk by -- or to be covered under an insurance

9    policy, correct?

10       A.   That's correct.  In the reinsurance, it's a            09:16:20

11   little bit different insofar as catastrophe loss

12   projections are a concern for hurricanes and

13   tornadoes.  There's a, you know, standard evaluation

14   technique, wind zone analysis that they utilize that

15   I'm familiar with, and I've used those programs                 09:16:43

16   before in doing that.  But that's -- that relates to

17   property coverage.

18       Q.   Have you done any research in connection

19   with this matter to determine whether any of the

20   experience you had in the 1997 -- strike that.                  09:16:55

21       Have you done any research in this matter to

22   determine whether any of the work you did from 1977

23   to 1985 has any application in the current market?

24            MR. DEAL:  Objection, form, vague.

25   BY MR. SCHMOOKLER:                                              09:17:26



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 156

JOHN LEPIRE on 07/19/2022

Page 19

```
 1      Q.   You can answer, sir.

 2      A.   Okay.   Could you repeat the question?

 3      Q.   Sure.   Have you done any re -- have you done

 4  any research in connection with this engagement?

 5      A.   Out -- outside research, no, I have not.      09:17:38

 6      Q.   Have you spoken or interviewed anyone who

 7  handles or has handled crime insurance claims in the

 8  last 20 years in connection with this engagement?

 9      A.   No, I have not.

10      Q.   Have you ever personally sat at a desk and    09:17:53

11  handled crime insurance claims for a single day?

12      A.   Yes, I have.

13      Q.   Okay.   When was that?

14      A.   That was probably back in both the 19 --

15  1970s and -- yeah, the 1970s.                          09:18:15

16      Q.   How many crime claims did you handle in the

17  1970s?

18      A.   Well, I worked for USF&G, United States

19  Fidelity Insurance Company.  They had a book of

20  savings and loans.  I believe they had Gibralter,      09:18:30

21  they had -- let's see -- Nationwide, they had Home

22  Savings & Loan.  Those are the ones I can remember.

23  We had written crime policies -- or I should say

24  USF&G had written crime policies, and we had a

25  number of claims that I was involved in at that        09:18:52
```



EXCEEDING YOUR EXPECTATIONS

COMBS Reporting, INC.

DEPOSITION REPORTERS • LEGAL VIDEO

**EXHIBIT 4**
**PAGE 157**

JOHN LEPIRE on 07/19/2022

Page 20

```
 1  time.
 2      Q.  How many claims did you handle?
 3      A.  You're asking me to go back almost 50 years.
 4  I can't recall.
 5      Q.  Can you --                                        09:19:03
 6          MR. DEAL:  Can you give him an estimate,
 7  John?
 8          MR. SCHMOOKLER:  Hold on.  I'll ask the
 9  questions, Chris.  I don't want estimates.  I'm not
10  asking for estimates.  You can ask your witness          09:19:09
11  those questions.
12          MR. DEAL:  Okay.
13  BY MR. SCHMOOKLER:
14      Q.  Sir, are you comparing any specific personal
15  experience you had in the 1970s to the handling of       09:19:19
16  this claim in reaching your opinions?
17      A.  I'm trying to think.  I would say yes on the
18  basis of the -- the elements of a -- of a bad faith
19  claim relative to any type of insurance policy
20  that's issued is -- is the same.  I mean, there's no      09:19:41
21  differential relative to good faith and fair dealing
22  when it comes to crime policies or if it's a
23  construction policy or if it's a homeowners policy.
24  It's all the same.
25      Q.  Well, I understand that's your view of the        09:19:58
```



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 158

```
 1   world.  I'm just trying to understand.
 2          You're holding my client to a standard in
 3   terms of --
 4       A.  Yes, I am.
 5       Q.  -- how -- hold on.  I wasn't finished.        09:20:05
 6          You're holding my client to a standard in
 7   how it adjudicated a crime claim, correct?
 8       A.  That's correct.
 9       Q.  This isn't a hurricane claim, is it?
10       A.  That's correct.                               09:20:16
11       Q.  It's not -- it's not a wind storm claim, is
12   it?
13       A.  That's right.
14       Q.  It's also not a car accident?
15       A.  That's right.                                 09:20:22
16       Q.  Correct?
17          It's not a med mal claim, is it?
18       A.  It most certainly is not.
19       Q.  And so I want to know, can you recall any
20   specific practice that was employed by you during     09:20:34
21   the period in which you personally handled crime
22   claims in the '70s?
23       A.  Yes.  Basically working with the -- working
24   with the policyholder in developing information that
25   allowed me and the company to make a decision         09:20:54
```



EXHIBIT 4
PAGE 159

 1  relative to whether that claim was (1) an

 2  appropriate claim, if it was covered under the

 3  policy, and what the values were.  All of this in

 4  the context of what was done in the 1970s, I -- I

 5  know is still done today.                              09:21:17

 6      Q.  Okay.  How do you know what is done today?

 7  How do you personally know that?

 8      A.  I basically am keeping up to date on what's

 9  going on insofar as claims processing and claims

10  handling, research that --                             09:21:32

11      Q.  What research have you done into the

12  processing and handling of fidelity claims?

13      A.  Of fidelity claims?

14      Q.  Yes.

15      A.  I just -- you know, the cases that have come   09:21:42

16  down that I have seen, the larger -- larger ones

17  that have been presented.  I've -- I've reviewed

18  those insofar as how they've been handled to the

19  extent I can, or could.  That's pretty much what

20  I've done.                                             09:22:00

21      Q.  Okay.  Have you -- have you done any

22  research into specifically how crime insurance

23  claims are handled?

24      A.  No, I have not.

25      Q.  Are you aware of the current practices        09:22:07



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 160

JOHN LEPIRE on 07/19/2022

Page 23

```
 1  employed by any carrier as it relates to the
 2  investigation of a crime insurance claim since 2000?
 3      A.  No.
 4      Q.  Have you -- have you spoken with anyone who
 5  has handled a fidelity claim since 2000 about the          09:22:29
 6  current practices and procedures employed when
 7  investigating a fidelity claim?
 8      A.  No, I have not.
 9      Q.  Do you know as you sit here today whether
10  the practices and procedures employed in this matter       09:22:43
11  by my client are consistent with the practices and
12  procedures employed by other similar carriers since
13  2000?
14      A.  Could you repeat that question?
15      Q.  Sure.  Are you able as you sit here today to       09:22:59
16  compare the actions of my client to how other
17  similarly situated carriers investigate claims since
18  2000?
19      A.  In the context of how claims are handled in
20  general -- and I'm talking about property and              09:23:16
21  casualty claims in particular -- the answer is I
22  have not.
23      Q.  Okay.  Well, let's talk about casualty.
24          Can we -- we can agree casualty insurance is
25  totally different than fidelity insurance, right?          09:23:31
```



EXCEEDING YOUR EXPECTATIONS

COMBS REPORTING, INC.

DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 161

JOHN LEPIRE on 07/19/2022

Page 24

1      A.  That's correct, yes.

2      **Q.  And we can agree that the information you**

3  **might need if somebody has some water damage at**

4  **their home is totally different than the information**

5  **you would need to investigate a $150 million alleged**       09:23:43

6  **theft, right?**

7      A.  Not necessarily.  The elements are still the

8  same.

9      **Q.  You mean the information you need to know if**

10 **somebody was damaged by water is the same as the**       09:23:53

11 **information you would need to know if somebody**

12 **stole?**

13     A.  No.  I'm talking about in general, that you

14 need to know what the damages are.  You need to be

15 able to calculate what the potential loss is in       09:24:04

16 relationship to the policy limits that are in place.

17 That's -- it's basic claims handling 101 that

18 relates to all forms of claims handling.

19     **Q.  I'm -- we'll get to basics, but let's just**

20 **talk about fidelity.**       09:24:22

21     A.  Sure.

22     **Q.  Do you know whether or not the process of**

23 **investigating a fidelity claim differs from the**

24 **process of investigating a homeowners water damage**

25 **claim?**       09:24:36



EXHIBIT 4
PAGE 162

JOHN LEPIRE on 07/19/2022

Page 25

```
 1      A.  Well, of course.  If you're talking about

 2  the definitive aspects of the actual handling of the

 3  claim, of course.

 4      Q.  So we can agree that if you have a water

 5  damage claim at your home, the process of evaluating      09:24:48

 6  that claim would be different than the process of

 7  evaluating your claim if you had a $150 million

 8  theft, right?

 9      A.  That's correct.

10      Q.  Okay.  Now, have you done -- have you looked     09:25:01

11  at any secondary sources that would speak to the

12  process that carriers employ to investigate

13  $150 million employee theft claims since 2000?

14      A.  No, I have not.

15      Q.  Have you -- do you know what a claims          09:25:19

16  advocate is?

17      A.  A claims advocate?

18      Q.  Yes.

19      A.  Yes.

20      Q.  Okay.  Have you spoken to a claims advocate    09:25:26

21  about whether or not my client's conduct in this

22  case is consistent with the practices employed by

23  carriers investigating crime insurance claims?

24      A.  No, I have not.

25      Q.  And you understand that the City of Beaumont   09:25:44
```



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 163

 1  was represented by a claims advocate in this matter,

 2  correct?

 3      A.  In the context of -- of an attorney?

 4      Q.  No.  You understand that a claims advocate

 5  within Alliant was assigned to advocate on behalf of          09:26:03

 6  the City of Beaumont, do you not?

 7      A.  I was not aware of that, no.

 8      Q.  Did you speak to the claims advocate who was

 9  supposed to represent Beaumont about whether she

10  agrees with a single word you say in terms of AIG's          09:26:19

11  conduct?

12      A.  No.  I wasn't asked to do that.

13      Q.  Okay.  But in terms of forming your opinion,

14  did you go out into the world and gather information

15  from the people who are actually involved at Alliant        09:26:30

16  to determine whether the opinions you've reached are

17  full and accurate?

18      A.  I was not asked to do that.

19      Q.  Well, did you do that yourself of your own

20  volition?                                                     09:26:43

21      A.  No.  I was asked to review the material that

22  related to the claim that was presented and how it

23  was handled.

24      Q.  And you did that solely based on paper

25  provided to you by -- by -- by counsel, correct?            09:26:54



 1    A.  And in -- in discussions of the material

 2  that was provided with the attorney that was

 3  handling this on behalf of City of Beaumont, yes.

 4    **Q.  Okay.  And, sir, just so you know, unless**

 5  **you relied on something specific counsel said, all**     09:27:13

 6  **of that's privileged.  You should not be disclosing**

 7  **to me what counsel said to you.**

 8    A.  I understand.

 9    **Q.  So unless you're relying on that, don't**

10  **disclose that, please.**                                09:27:23

11          **Can we agree that during the --**

12          MR. DEAL:  I'm not sure -- well, hang on,

13  John.  I'm not sure that's actually the case, but --

14          MR. SCHMOOKLER:  Are you going to let --

15          MR. DEAL:  If there's something you want to     09:27:35

16  talk -- if there's something you want to talk about

17  that followed from a discussion with me, we can go

18  off the record and discuss that, but --

19          MR. SCHMOOKLER:  I want to know anything.

20  So I'll ask the broad question.  Tell me what          09:27:48

21  Mr. Deal said.  Chris, you can tell me what you want

22  to give us, but the rules are very clear --

23          MR. DEAL:  Scott --

24          MR. SCHMOOKLER:  -- that I can't delve into

25  what --                                                 09:27:57



EXCEEDING YOUR EXPECTATIONS
**Combs Reporting, Inc.**
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 165

JOHN LEPIRE on 07/19/2022

Page 28

1          MR. DEAL:  My understanding is once you

2   designate an expert, that nothing is privileged at

3   that point.

4          MR. SCHMOOKLER:  Not under Rule 26.

5          MR. DEAL:  Okay.                              09:28:04

6          MR. SCHMOOKLER:  So if you're asserting the

7   privilege, great.  If you're not, great.  I don't

8   care, frankly.

9          MR. DEAL:  Well, we'll do it on a

10  case-by-case basis, John.  If you --                 09:28:15

11         MR. SCHMOOKLER:  Okay.

12         MR. DEAL:  If you feel like you need to

13  disclose something, we'll -- we'll talk off the

14  record.

15  BY MR. SCHMOOKLER:                                   09:28:23

16     Q.  Sir, did you rely upon anything -- did you

17  rely upon anything provided to you by counsel in

18  forming your opinion -- strike that.

19         Did you rely upon my verbal discussions

20  provide -- with counsel in formulating your opinion? 09:28:33

21     A.  No, I did not.

22     Q.  Are there any facts that you relied upon

23  that were provided to you by counsel that are not in

24  documents?

25     A.  No, I did not.                                09:28:46



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 166

JOHN LEPIRE on 07/19/2022

Page 29

```
 1      Q.  Can we agree that for our purposes my client
 2  first insured the City of Beaumont in 2011?
 3      A.  I don't know for -- I do not know that.  I
 4  do not know that.
 5      Q.  You say that in your report, and I'll show      09:29:05
 6  it to you, sir.  I just wanted to find a time frame.
 7  I'll show you your report.  Okay.  It says here in
 8  your report -- I'll see if I can highlight it for
 9  you -- "The City has continuously held a fidelity
10  crime policy in amounts between 10 million and         09:29:47
11  15 million for the years 2011 to June 14, 2017."
12          Do you see that, sir?
13      A.  That's correct.  That's -- that's the
14  material I was given.  If there was anything that
15  was prior to that, I'm not aware of it.               09:30:02
16      Q.  Okay.  Can we agree that from 2011 to today
17  you have not handled a single insurance claim as a
18  claims adjuster?
19      A.  That's correct.
20      Q.  Can we agree that from 2011 until today you    09:30:18
21  have no experience with crime insurance claim
22  handling personally?
23          MR. DEAL:  Objection as to form.
24          THE WITNESS:  That's correct.
25  BY MR. SCHMOOKLER:                                     09:30:34
```



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 167

1      Q.   Can we agree that from 2011 until today you

2   have no insight into the specific practices employed

3   to investigate fidelity claims?

4      A.   That's correct.

5      Q.   Can we agree that from 2011 until today you      09:30:58

6   have no experience with the scope of coverage

7   afforded by a government crime policy?

8      A.   Well, the -- I would -- I would not agree

9   with that.  I would say that I -- in reviewing

10   the -- the policy itself, it indicates, according to   09:31:20

11   the policy, what is covered and what isn't covered.

12      Q.   Okay.  Other than reading the policy in this

13   case, did you have any prior experience with

14   government crime policies?

15      A.   No, I have not.                                 09:31:36

16      Q.   Do you have any experience whatsoever with

17   designing an investigation into a claim under a

18   government crime policy?

19      A.   A government crime policy, no.

20      Q.   Have you done any research into the common      09:31:53

21   practices employed to investigate claims under

22   government crime policies?

23      A.   I believe I asked for a copy of the AIG

24   claims manual, and I was told that none exist.

25      Q.   You did not receive AIG's claims handling      09:32:16



EXHIBIT 4
PAGE 168

JOHN LEPIRE on 07/19/2022

Page 31

 1  guidelines that were produced in this matter?

 2      A.  I don't believe I did.

 3      Q.  Okay.  So is it fair to say then that you

 4  have no personal experience with the practices

 5  employed to investigate a government crime insurance      09:32:34

 6  claim?

 7      A.  In the specific sense, yes.

 8      Q.  Okay.  Is it fair to say that you have done

 9  no research into how carriers commonly investigate

10  claims under the government crime policy in the 2011      09:32:59

11  to 2022 time frame?

12      A.  Yes, that's correct.

13      Q.  Do you know whether -- when is the last time

14  you personally handled a first-party insurance claim

15  of any variety as a -- as a claims examiner?             09:33:22

16      A.  I would say probably in about 1977.

17      Q.  Okay.  And that was when you were at USF&G?

18      A.  No.  That was when I was at Reserve

19  Insurance.

20      Q.  Okay.  And you were a first-party claims        09:33:43

21  examiner there?

22      A.  I was a claims supervisor there.  I had a

23  number of -- I had three adjusters and two examiners

24  working for me at that time.

25      Q.  And those were reinsurance claims, correct?      09:33:56



EXCEEDING YOUR EXPECTATIONS

COMBS REPORTING, INC.

DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 169

JOHN LEPIRE on 07/19/2022

Page 32

```
 1      A.  No.  These are insurance -- these were
 2  insurance, surplus lines, primarily excess claims.
 3      Q.  Do you have any experience handling, as a
 4  primary carrier, a fidelity claim yourself?
 5      A.  Back when I was at USF&G, yes.              09:34:18
 6      Q.  Okay.  Do you know whether or not the
 7  processes employed to investigate a crime claim when
 8  you were at USF&G are consistent with the processes
 9  employed today?
10      A.  I would believe so.                         09:34:38
11      Q.  Well, did you do any analysis to determine
12  if that is, in fact, true?
13      A.  No, I have not.
14      Q.  So have you done any analysis whatsoever to
15  determine whether or not your personal experiences   09:34:51
16  from more than 40 years ago are consistent with the
17  practices employed in the 2016 to 2022 time frame?
18      A.  No.
19      Q.  Have you done any interviews of anyone that
20  would enable you to determine whether or not your    09:35:12
21  experience from more than 40 years ago is consistent
22  with the practices employed to handle crime claims
23  in the 2016 to 2022 time frame?
24      A.  No.
25      Q.  Are you aware that there are publicly        09:35:31
```



EXHIBIT 4
PAGE 170

```
 1  available materials, like books, on the handling of
 2  crime claims?
 3      A.  Yes, I am.
 4      Q.  And did you read them?
 5      A.  No, I did not.                              09:35:43
 6      Q.  Okay.  When did you first become aware that
 7  there were books on how to handle a crime claim?
 8      A.  Well, I assume there are books out there as
 9  to how to handle a crime claim.  I have never
10  looked.  I have never done any research in that      09:36:01
11  regard.
12          My -- my -- my opinions have to do with the
13  holistic aspect of how first-party claims are
14  handled, whether they're crime or -- or homeowners
15  or commercial construction policies, workers'        09:36:14
16  compensation.  There's a -- you know, there's a
17  basic -- there's a basic aspect of the handling that
18  I don't believe was -- was met by the way that
19  this -- this man -- this claim was handled by -- by
20  the party that handled it.                           09:36:37
21      Q.  Okay.  Sorry.  I don't want you to assume.
22  I'm here to get just what you know.
23      A.  Sure.
24      Q.  Do you, in fact, know that there are books
25  published on how to handle crime claims?             09:36:47
```



EXCEEDING YOUR EXPECTATIONS
Combs Reporting, Inc.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 171

JOHN LEPIRE on 07/19/2022

Page 34

```
 1      A.   No.

 2      Q.   Did you make any effort whatsoever to

 3  determine whether there were books on how to handle

 4  crime insurance claims?

 5      A.   No.                                           09:37:00

 6      Q.   Do you know whether or not the opinions that

 7  you have articulated in this matter are consistent

 8  with treatises on how to handle crime insurance

 9  claims?

10      A.   No, I do not.                                 09:37:15

11      Q.   Have you done any interviewing of anyone to

12  determine whether or not the standards employed in

13  the modern times, meaning since 2000 forward, are

14  consistent with the opinions you've offered in this

15  matter?                                                09:37:33

16      A.   No, I have not.

17      Q.   Okay.  You mentioned that there are lots of

18  different kinds of claims, right, workers' comp,

19  casualty I think you mentioned, right?  Is that

20  correct?                                               09:37:47

21      A.   That's correct.  I believe there's about 19

22  different lines of business that relate to the

23  property casualty aspect of insurance, and there's

24  19 different types of claims.

25      Q.   Okay.  Let's use your 19 examples.            09:38:02
```



EXCEEDING YOUR EXPECTATIONS

COMBS REPORTING, INC.

DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 172

1        Have you done any research into whether or

2   not in the 2000 to 2022 time frame the carriers

3   employed different types of processes to investigate

4   different types of claims?

5       A.   No.                                      09:38:22

6       Q.   Do you know to a reasonable degree of

7   professional certainly that the process employed to

8   investigate a workers' comp claim is the same as the

9   process to employ -- to investigate a crime claim?

10      A.   As I said earlier, there are basic aspects   09:38:40

11  of how claims are handled -- the basics I'm talking

12  about, not the definitive aspects of it -- that

13  relate to how this claim was mishandled.

14      Q.   I'm not asking about that.  Move to strike.

15           Sir, I want to be really specific.         09:39:02

16      A.   M-hm.

17      Q.   Can you say to a reasonable degree of

18  professional certainty that the process employed to

19  investigate a workers' compensation claim is the

20  same as the process employed to investigate a crime   09:39:14

21  claim in the 2000 to 2022 time frame?

22      A.   Specifically, no.

23      Q.   Can you testify that the process employed to

24  investigate a water damage claim at a homeowner's

25  house in the 2000 to 2022 time frame is the same as   09:39:33


EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 173

 1  the process employed to investigate a government

 2  crime claim in --

 3      A.   No.

 4      Q.   -- in that era?

 5           The -- you've -- you've mentioned the general          09:39:48

 6  practices.

 7           What research have you done to determine

 8  whether the general practices that you have applied

 9  in this matter are actually used by any carrier

10  investigating any fidelity claim from 2000 to 2022?          09:40:13

11      A.   Could you repeat that question again?

12      Q.   Sure.  As I understand what you've said, you

13  are applying a general set of claim handling

14  guidelines -- or guidelines is the wrong word.

15           As I understand it, you're applying a              09:40:34

16  general set of claim handling practices.  I want to

17  know what have you done to determine whether your

18  view of what is the proper claim handling method is

19  employed by any carrier anywhere in the world when

20  investigating any fidelity claim since 2000.                09:40:51

21      A.   I have not.

22      Q.   Is it fair to say then that you don't know

23  whether the general practices you have applied in

24  this matter are employed by a single carrier

25  investigating a single employee dishonesty claim            09:41:10



EXHIBIT 4
PAGE 174

```
 1   anywhere in the world since 2000?

 2       A.  I would say that that's -- that's true.

 3       Q.  Do you know even whether the practices that

 4   you have relied on for purposes of your opinion were

 5   employed by you each and every time you had          09:41:46

 6   experience with a government crime claim in the

 7   1970s?

 8       A.  Yes, they were.

 9       Q.  Okay.  When I first started practicing,

10   sir -- and that was in 1998 -- a large claim was      09:42:01

11   about a million bucks.

12          What was the largest crime claim you've ever

13   handled personally?

14       A.  Oh, I believe it was a bank called Penn

15   Square Bank.  That was an Oklahoma-based bank that    09:42:23

16   was funneling business up to the -- I'm trying to

17   think of the bank in Chicago.  I think it was -- I

18   can't recall the name of the bank, but they were

19   the -- the bank employ -- certain bank employees

20   were getting kickbacks.  The claim was made by the    09:42:47

21   bank, and the matter was concluded --

22       Q.  Okay.  About how large --

23       A.  -- under the insurance crime policy.

24       Q.  How large was it, dollar wise?

25       A.  Oh, I think it was something in the vicinity  09:42:59
```

Page 38

1  of about 75 million to 100 million, something like

2  that.

3      Q.  Okay.  How large was the policy?

4      A.  I believe the policy was something in the

5  vicinity of -- the policy was -- there was excess          09:43:14

6  coverage.  I'm having to go back to the 1970s.  I

7  can't give you the details.

8      Q.  Okay.  And were you the person specifically

9  responsible for investigating that claim?

10     A.  I was one of the people handling it.  We        09:43:31

11 had -- we had a team.  Normally on something this

12 size, you have a team, a number of people that are

13 involved.  One is involved in the coverage aspects;

14 another person's involved in the -- you know, the

15 valuation of it; the -- you have number -- numerous    09:43:48

16 people involved all, you know, coordinating to

17 handle something of this magnitude, of that

18 magnitude.  Oh, the bank in the Chicago was the

19 Continental Illinois Bank.  I believe it was the

20 19 -- late 1970s.                                        09:44:06

21     Q.  Sir, do you know if teams are actually used

22 by any carrier currently?

23     A.  Pardon?

24     Q.  You mentioned a team environment.

25     A.  Yes.                                             09:44:15



1      Q.  Do you know whether any domestic carrier

2   currently when investigating any crime claim uses a

3   team approach?

4      A.  Oh, yeah.  They do in the context of outside

5   consultants.  They have someone in the company          09:44:25

6   coordinating all the -- they have, you know,

7   forensic accountants, which in this case there was

8   one.  They have criminal investigators because if

9   there's fraud, then obviously on the part of the

10  policyholder, then there's no coverage.  You have       09:44:42

11  that being investigated.

12       You have potentially a unit in that specific

13  state that handles the claim according to the

14  requirements of the Department of Insurance in that

15  specific state.  In this case, you're talking about     09:44:56

16  California.

17     Q.  Name one carrier, any carrier, currently --

18  when I say "currently" I mean from 20 -- 2000 to

19  2022 -- that has specific people in specific states

20  investigating crime claims.                             09:45:11

21     A.  I can't give you those specifics because I

22  don't know.

23     Q.  Do you know if there's a single carrier in

24  the market currently, meaning from 2000 to 2022, at

25  any time that had state-specific examiners for crime    09:45:23



EXHIBIT 4
PAGE 177

1  claims?

2      A.  I didn't say state-specific examiners.  I

3  said someone in a specific state handling or in

4  charge of making certain that that -- you know, that

5  whatever the requirements in that state, in this          09:45:39

6  case California, are being followed.

7      **Q.  All right.  Name one carrier that does that**

8  **in crime claims.**

9      A.  I would say that -- off the top of my head,

10  I would say probably most.                               09:45:51

11      **Q.  Okay.  No, no.**

12      A.  That they're following the -- you know, the

13  requirements under the insurance code that -- that

14  relate to handling of a claim, whatever it is, if

15  it's a fidelity claim or a property claim or             09:46:04

16  aviation claim for that matter.  Whatever is being

17  done, it has to be done strictly within the

18  strictures of those requirements, and I'm sure that

19  every carrier out there has someone who is making

20  certain during the handling of a claim that whatever     09:46:20

21  is being done is in conformance with what the state

22  requires.

23      **Q.  I want to know the name -- sir, I don't want**

24  **to know what you probably think happened.  I want to**

25  **know what you actually know.**                         09:46:32



EXHIBIT 4
PAGE 178

1          Can you give me the name of any carrier in

2    the market since 2000 that has within its crime unit

3    someone there to evaluate whether each and every

4    claim is being handled consistent with state

5    insurance regulation?                                    09:46:46

6        A.  No, I cannot.

7        Q.  Okay.  Have you done any research to

8    determine if that is, in fact -- that there's any

9    carrier that does that?

10       A.  No, I have not.                                  09:46:55

11       Q.  You said criminal investigators.  I've never

12   used a criminal investigator since 1998.

13          Name one carrier that uses criminal

14   investigators in the context of crime insurance

15   claims.                                                  09:47:12

16       A.  Well, what I meant by criminal

17   investigator -- that's kind of a broad term.  The

18   term I was -- you know, what I was referring to is

19   an adjuster in any kind of adjusting firm or

20   individual that has experience in investigating       09:47:23

21   fidelity claims such as this.

22       Q.  Name one carrier in the market that does

23   that.

24       A.  Well, bringing someone in to look into

25   the -- or ascertain if there was fraud involved on    09:47:38



EXHIBIT 4
PAGE 179

 1  the part of the policyholder, I would imagine if

 2  that were something that the initial investigator or

 3  adjuster thought that was case, they would bring

 4  someone in.  I just -- to me, it would seem to be

 5  common sense.                                           09:47:53

 6      Q.  Okay.  But putting aside common sense, I

 7  want to know what the actual industry standard is.

 8          Name one carrier in the market since 2000

 9  that does that.

10      A.  I cannot.                                       09:48:04

11      Q.  You agree that AI -- or National Union hired

12  a forensic accountant in this matter, correct?

13      A.  That's correct.

14      Q.  And that was consistent with industry

15  practices, was it not?                                  09:48:26

16      A.  That's right.

17      Q.  And you don't know Mr. Fogarty at all,

18  correct?

19      A.  No, I do not.

20      Q.  And -- and you don't know the quality of his  09:48:34

21  work, correct?

22      A.  That's correct.

23      Q.  And you have no criticism of him or his

24  experience, correct?

25      A.  No, I do not.                                   09:48:45



EXCEEDING YOUR EXPECTATIONS

COMBS REPORTING, INC.

DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 180

 1       Q.   And so the decisions to retain someone with

 2  specific forensic accounting experience represents,

 3  you would agree, a good faith effort by AIG to

 4  investigate this claim.

 5       A.   That's correct.                              09:49:02

 6       Q.   And you understand that --

 7       A.   Would -- would you mind if we took a break?

 8  I have to take a --

 9       Q.   Happy to.  Happy to.  Want to take five

10  minutes?                                              09:49:14

11       A.   Could you make it ten?

12       Q.   Sure.  We'll come back at 10:00 o'clock.

13       A.   Thanks a lot.

14            THE VIDEOGRAPHER:  Going off the record, the

15  time is 9:49 a.m.  We're off the record.              09:49:22

16            (Break, 9:49 a.m. to 9:59 a.m.)

17            THE VIDEOGRAPHER:  We're back on the record.

18  The time is 9:59 a.m.

19  BY MR. SCHMOOKLER:

20       Q.   Sir, have you done any research into whether 09:59:29

21  the claim handling guidelines that you applied have

22  changed over time?

23       A.   I didn't think it was necessary.

24       Q.   Did you do any research to determine whether

25  the claim handling guidelines you applied in          09:59:49



1  reaching your opinions have changed over time?

2      A.  I -- as I said, I don't believe it was

3  necessary.

4      Q.  So the answer is you did not do that?

5      A.  Well, I think the -- you asked the question          10:00:06

6  and I answered it.

7      Q.  No.  You've answered a different question.

8  You've answered whether you thought it was

9  necessary.

10         My question is did you, in fact, do any            10:00:16

11  research into whether the claims handling guidelines

12  you applied have changed over time?

13     A.  No, I did not.

14     Q.  Have you ton any research whatsoever as to

15  how carriers, in practice, apply the Fair Claims          10:00:30

16  Settlement Practices regulations in California to

17  crime insurance claims?

18     A.  I wasn't aware there was any differential

19  relative to that, other than the fact that the fraud

20  issue is -- is something that is there in the crime       10:00:51

21  claims side that in many other claims you don't have

22  that issue.

23     Q.  Well, I -- do you know whether or not the

24  claims practices employed by carriers for crime

25  claims are different than the claims practices            10:01:08



```
 1  employed for -- by carriers in other lines of

 2  business?

 3      A.  Not that I can recall.

 4      Q.  Well, did you do anything to determine

 5  whether or not the claim handling practices carriers    10:01:22

 6  employ for crime claims are different than the claim

 7  handling practices that are employed by those

 8  carriers for other types of insurance claims?

 9      A.  No.

10      Q.  Can you testify to a reasonable degree of       10:01:36

11  professional certainty that in the modern era,

12  meaning from 2000 to 2022, the claim handling

13  practices the carriers apply to crime insurance

14  claims are identical to the claim handling practices

15  applied to other forms of insurance claims?            10:01:54

16      A.  In a general sense, yes.

17      Q.  How do you know that the claim handling

18  practices applied by carriers in the 20 (sic) to

19  2022 time frame are the same for crime claims as

20  they are for all types of claims?                      10:02:16

21      A.  Well, I know, you know, insofar as the

22  insurance code is concerned that every -- every

23  insurance carrier, no matter what the claim is, is

24  required to keep the insured up to date as to what's

25  going on.  There's a cooperation clause in all of      10:02:30
```



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 183

 1  these policies, every policy I've ever seen, no

 2  matter if it was back in the '70s, '80s, '90s, or

 3  the current century.  There are very -- there -- the

 4  precepts of the Fair Claims Practices Act apply

 5  across the board, with exceptions for, you know,                    10:02:49

 6  various things such as accident and health and --

 7  and such.

 8      Q.  Well, I don't want to talk about -- I'm not

 9  asking about the act.  We'll get to the act.  I'm

10  talking about practices employed by the carriers.                  10:03:03

11      A.  Yes.

12      Q.  Do you know whether the real life day-to-day

13  claim handling practices of the carriers for crime

14  claims are the same as the real life practices

15  employed by any other carrier for any other kind of                10:03:17

16  claim?

17      A.  My understanding is yes.

18      Q.  Okay.  What -- what -- how do you know what

19  the practices of any carrier as it relates to crime

20  claims are?                                                        10:03:30

21      A.  Well, going back to the -- last time I was

22  involved doing audits was in the 19 -- let's say

23  1984, 1985.  That was pretty much consistent with

24  what was done in the late 1960s when I started in

25  the business.  There wasn't, you know, much of a                   10:03:49



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 184

 1  change in that regard, so I would assume that over

 2  the next 30 years things haven't changed that

 3  drastically.

 4      **Q.  Do you know if they've changed in the last**

 5  **30 years?**                                                    10:04:01

 6      A.  No, I do not.

 7      **Q.  Okay.  Can you testify to a reasonable**

 8  **degree of professional certainty that the practices**

 9  **that you witnessed 37 years ago are the same as the**

10  **practices that were in 2016 to 2020?**                         10:04:15

11      A.  In general, yes.

12      **Q.  So you're -- you're saying that you know**

13  **what practices were employed to investigate crime**

14  **claims in the 2016 to 2020 time frame?**

15      A.  I would say the general -- the general        10:04:34

16  practice of handling these claims relative to

17  reporting, relative to keeping the insured up to

18  date with what's going on, relative to making an

19  offer, all of these areas haven't changed.

20      **Q.  Okay.  You keep saying they haven't changed.**  10:04:54

21  **        Do you, in fact, know that they have not**

22  **changed, or do you assume they have not changed?**

23      A.  I know they haven't changed because the

24  insurance code hasn't changed from the time I was

25  doing this back in the 1980s.                         10:05:08



1     Q.  So the standard you're applying is not your

2  professional experience per se; it is your

3  application of the insurance regulations, correct?

4     A.  No.  My professional -- my professional

5  opinion based upon, you know, common standards of          10:05:23

6  practices and also the -- the applicable insurance

7  code.

8     Q.  Did you compare my client's handling of this

9  claim to your own personal handling of an insurance

10  claim?                                                      10:05:42

11     A.  Yes.  As one of the components of my

12  analysis, yes.

13     Q.  Okay.  Tell me the name of a single claim

14  where you were able to adjudicate the claim within

15  40 days of receiving a proof of claim.                      10:05:54

16     A.  I never said it had to be done.

17     Q.  Okay.  Isn't it true that crime claims are

18  commonly not -- you cannot commonly adjudicate a

19  claim within 40 days?

20     A.  That's correct.  I would agree.                      10:06:07

21     Q.  And isn't it true that the failure to

22  adjudicate a claim within 40 days is not bad faith?

23     A.  With the caveat that -- or what's going --

24  the ongoing and continuous investigation having

25  waived that, there's a requirement, I believe, that         10:06:22



EXCEEDING YOUR EXPECTATIONS

COMBS REPORTING, INC.

DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 186

Page 49

```
 1  a report has to be provided on a monthly basis as to

 2  what the status of that particular claim is.

 3      Q.  Tell me a single carrier anywhere in the

 4  world that handles fidelity claims in California and

 5  every single 30 days provides a written update.  One      10:06:37

 6  carrier.

 7      A.  I cannot.

 8      Q.  Name a carrier that handles any kind of

 9  first-party case where you can say to a reasonable

10  degree of professional certainty that they provide a      10:06:50

11  written update every 30 days.  One carrier.

12      A.  I would say that there's probably numerous

13  ones.  I'm not aware of any.

14      Q.  Okay.  Are you aware of a single carrier

15  that you can say under oath provides a written          10:07:03

16  update every 30 days on a first-party case?

17      A.  I'd have to say -- see their claims manuals.

18  I -- I'm not familiar with other carriers' claims

19  manuals.  No, I'm not.

20      Q.  Can you even say that the way my client         10:07:19

21  communicated about this claim varies from how other

22  carriers handle similar claims in terms of the level

23  of communication?

24      A.  Yes, I believe so.

25      Q.  Okay.  I've sent you a binder which I'm          10:07:34
```



EXCEEDING YOUR EXPECTATIONS

COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 187

1   going to mark as Exhibit 3.  I'll give you the

2   binder.

3           (Whereupon Exhibit 3 was marked for

4           identification.)

5   BY MR. SCHMOOKLER:                                    10:07:44

6       Q.  That is years of communication between my

7   client and the broker and the insured, right?

8       A.  Yes, that's correct.

9       Q.  Would you agree with me that there was

10  persistent communication between the two?            10:07:59

11      A.  I would say that there was definitely

12  communication between the two.  That's how I would

13  put it.

14      Q.  Repeated communication, was there not?

15      A.  In some -- in some cases, it was sporadic,   10:08:12

16  but yes, over the period of time there was

17  communication.

18      Q.  Well, sir, let's talk about the 30 day rule.

19          The notice of claim came in on April 5th,

20  correct?                                             10:08:26

21      A.  That's correct.

22      Q.  And you know that you can't do anything in a

23  first-party case until you get the proof of loss,

24  right?

25      A.  That's right.                                10:08:34



EXHIBIT 4
PAGE 188

 1      Q.  And the proof of loss does not come in until

 2   November 3rd, correct?

 3      A.  That's right.

 4      Q.  And so can we agree that between April and

 5   November there's at least five different months?          10:08:48

 6      A.  That's right.

 7      Q.  And your view of the world is every 30 days

 8   we should send them a letter -- we should have sent

 9   them a letter saying, We can't do anything because

10   we don't have your proof of loss, right?                  10:09:03

11      A.  No.  I'm saying that after the proof of loss

12   has been submitted, that there's a 30-day period in

13   which under normal circumstances there's a

14   requirement that the matter be either denied or

15   accepted.  In this case, obviously, both parties         10:09:18

16   agreed to extend that, which is normal and

17   customary.  There's nothing wrong with that.

18      Q.  Well, no, but we didn't tell them the status

19   every 30 days.  We didn't -- you think we were

20   acting in bad faith by not nagging them every 30         10:09:34

21   days, right?  Let me ask it this way.

22          In your opinion, a reasonable insured would

23   expect its insurer to nag every 30 days over the

24   proof of loss just so that they could comply with

25   some insurance regulation, right?                        10:09:50



Page 52

```
 1     A.  I --
 2         MR. DEAL:  Object to form, argumentative.
 3   You can answer.
 4         THE WITNESS:  I would say that the -- the
 5   communication one way or another, whether there's      10:09:59
 6   something being done or something not being done or
 7   additional information that's required or the status
 8   of what's going on with that claim, should be
 9   provided within -- within 30 days.
10   BY MR. SCHMOOKLER:                                      10:10:13
11     Q.  Every 30 days?
12     A.  Yeah.
13     Q.  Okay.  So in the 30 day -- in the five
14   months while AIG waited for a proof of loss, you're
15   saying every 30 days we should have written to        10:10:22
16   Beaumont and said, You haven't given us a proof of
17   loss, correct?
18     A.  Well, I believe that there was a
19   communication that said it's going to take us a
20   while to get it and they -- they mention that it was   10:10:32
21   going to be submitted once they had an analysis of
22   exactly what the potential exposure was, and in
23   reality, that's what -- that's what ended up
24   happening here.
25     Q.  Yeah, but that's not the question.  We're        10:10:46
```



 1  talking about compliance of guidelines.

 2          Your opinion is every 30 days there has to

 3  be a follow-up, correct?

 4      A.  You're -- you're -- you know, you -- you

 5  brought up the issue of a potential $150 million      10:10:59

 6  claim.  I would say in the context of a claim of

 7  this magnitude, with the policy limits being

 8  somewhere between 10 and $15 million, that that

 9  isn't asking for, you know, something that's --

10  it's -- it's something that's extenuating.  I        10:11:14

11  don't -- I don't think that that's something that is

12  asking too much of a carrier in -- in regards to

13  something that large.

14      Q.  Okay.  I didn't ask that.

15          The size of the claim has nothing to do with  10:11:27

16  the application of the regulation, correct?

17      A.  That's right.  But you asked about should

18  there be communication back and forth.  I'm just

19  saying yeah, over 30 days they should.  In this

20  instance, with this particular matter that I was      10:11:41

21  reviewing, absolutely.

22      Q.  I didn't ask that.  Move to strike.

23          Your opinion is a carrier can't comply with

24  the guidelines unless they communicate every 30 days,

25  correct?                                              10:11:55



EXCEEDING YOUR EXPECTATIONS

COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 191

 1     A.  I would say according to the -- according to

 2  the -- you know, the code, yeah, that's true.

 3     **Q.  And the code draws no distinction between**

 4  **$150 million claims and $1,000 claims, correct?**

 5     A.  Yeah, that's true.                          10:12:20

 6     **Q.  So in your opinion, every carrier on every**

 7  **claim, no matter what the circumstances, has to**

 8  **communicate every 30 days or they're in bad faith,**

 9  **right?**

10     A.  I wouldn't say that they're in bad faith.  I  10:12:31

11  didn't say that.

12     **Q.  Okay.  So you agree with me the mere fact**

13  **that there's a violation of the Claims Practices Act**

14  **doesn't make the carrier in bad faith, correct?**

15     A.  That's correct.                             10:12:45

16     **Q.  Now --**

17        MR. DEAL:  And I'll belatedly object that it

18  calls for a legal conclusion.

19  BY MR. SCHMOOKLER:

20     **Q.  In your opinion, sir, you wouldn't be**      10:12:53

21  **willing to call -- accuse my client of bad faith**

22  **solely because every 30 days they failed to send a**

23  **note, correct?**

24     A.  That's correct.

25     **Q.  All right.  You agree with me -- you've**     10:13:06



EXHIBIT 4
PAGE 192

Page 55

```
 1  mentioned in your report too many times that there's
 2  a six -- six-year window of when this claim has
 3  been -- been opened.
 4          Do you recall that?
 5      A.  Yes, I do.                              10:13:23
 6      Q.  Okay.  You agree that the lawsuit was filed
 7  in 2020, correct?
 8      A.  Yes, that's correct.
 9      Q.  And you agree that the claim was submitted
10  in 2016, correct?                              10:13:39
11      A.  That's right.
12      Q.  And so you understand that the claim, in
13  fact, pre-litigation was only open for less than
14  four years, correct?
15      A.  That's correct.                        10:13:54
16      Q.  You also understand that no accounting of
17  the loss was provided until September of 2018,
18  correct?
19      A.  That I'd have to -- I'd have to research.
20  I'm not sure.                                  10:14:10
21      Q.  Sure.  It's in your binder.  I gave you a
22  whole binder of documents.
23      A.  Yes.
24      Q.  If you want to look, the accounting report
25  is dated September 25th, 2018, and I put the       10:14:18
```



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

**EXHIBIT 4**
**PAGE 193**

 1  documents in chronologic order for you.

 2       MR. DEAL:  Do you have a Bates number?

 3       MR. SCHMOOKLER:  3963.

 4       THE WITNESS:  This is Daniel Ray's reported

 5  findings of investigation.  Yes, I have it here.      10:15:01

 6  BY MR. SCHMOOKLER:

 7    Q.  Okay.  You have the date of

 8  September 25th, 2018?

 9    A.  That's correct.

10    Q.  Can we agree then that between the period of   10:15:07

11  April 5th, 2016, when the notice was made, and

12  September 25th of 2018, i.e. more than two years, my

13  client had not been presented with a quantification

14  of the claimed loss?

15    A.  I -- I would disagree with that.            10:15:29

16    Q.  Okay.  What was the date on which we were

17  provided a quantification of how Beaumont computed

18  its loss?

19    A.  Well, I know that the HSNO forensic

20  accountant, Peter Fogarty, was assigned this I        10:15:44

21  believe on December 1st of 2016.  I would imagine

22  that since he -- he was assigned by AIG, that they

23  would have had findings prior to this period because

24  if you look at the assignment for Hemmings & Morse,

25  it was at least a year, if not more, after -- after   10:16:02



EXHIBIT 4
PAGE 194

1  the initial notification of claim.

2      Q.  I don't want you to assume anything.  When

3  is the first time -- and I've given it to you, sir.

4  You -- strike that.

5          You understand Dan Ray is the accountant for          10:16:16

6  the insured, Beaumont, correct?

7      A.  That's right.

8      Q.  And you understand that the report that I've

9  pointed you to is the quantification provided by

10  Beaumont of Beaumont's loss, correct?          10:16:29

11     A.  That's correct.

12     Q.  You agree with me that Beaumont first

13  quantified its alleged overcharging loss

14  September 25th, 2018, correct?

15     A.  Yes.          10:16:44

16     Q.  So can we agree that between April 5th of

17  2016 and September 25th of 2018, Beaumont had not

18  quantified its loss yet?

19     A.  That's correct.

20     Q.  And you agree with me that there's no          10:17:00

21  carrier anywhere that handles crime claims and

22  issues payment prior to a quantification of the

23  loss?

24     A.  Again, I -- I don't know all the facts and

25  circumstances in regards to what information was          10:17:22



1  provided by AIG relative to values before this was

2  turned in, before this report was available.

3      Q.  Are you aware -- how would AIG quantify

4  Beaumont's loss until Beaumont explained -- strike

5  that.                                                    10:17:43

6          Name me a carrier anywhere that pays a loss

7  before the insured quantifies that loss.

8      A.  You're right about that.

9      Q.  Pardon me?

10     A.  Yes.  I understand what you're saying.  I      10:18:03

11  agree.

12     Q.  Okay.  And you agree with me that it is not

13  bad faith for my client during the window of

14  April 5th, 2016, to September 25th, 2018, to not

15  acknowledge coverage and issue a payment before       10:18:18

16  there's a quantification of the loss?

17     A.  Well, acknowledge coverage is a different

18  issue.

19     Q.  Well, isn't it true, sir, that the policy in

20  play here covers theft, correct?                       10:18:30

21     A.  That's right, correct.

22     Q.  And whether or not there is a theft in this

23  matter, as you understand it, depends upon whether

24  or not there's overcharging, correct?

25     A.  That's correct.                                 10:18:42



JOHN LEPIRE on 07/19/2022

Page 59

1      Q.  And so unless and until Beaumont shows there

2   has been overcharging, there's no theft proven,

3   correct?

4      A.  That's correct.

5      Q.  And so a reasonable carrier employing the      10:18:53

6   best and utmost good faith would first await the

7   insured's presentation of a theft before making a

8   claim under a theft policy, would they not?

9      A.  Insofar as that's concerned, yes.

10     Q.  And so you agree with me it was good faith      10:19:09

11  claim practices for my client between

12  April 5th, 2016, and September 25th, 2018, not to

13  reach a final decision as to whether there had been

14  a theft because there had been no presentation of

15  documentation showing a theft as of that date,       10:19:26

16  correct?

17     A.  I would say that's reasonable, yes.

18     Q.  So we can agree my client acted in good

19  faith at least up until September 25th, 2018, in

20  withholding payment as there had been no             10:19:40

21  presentation showing a theft in this matter,

22  correct?

23     A.  Yes.

24     Q.  Now, you understand that the claim was

25  presented April 5th, 2016, and we got the report     10:19:54



EXHIBIT 4
PAGE 197

Page 60

```
 1  from Mr. Ray September 25th, 2018.
 2          Do you see that, sir?
 3      A.  Yes.
 4      Q.  And I think we can agree that that is more
 5  than 24 months; between April of '16 and September    10:20:10
 6  of '18 is more than 24 months.
 7      A.  That's correct.
 8      Q.  More than two years, correct?
 9      A.  Yeah.  One thing I wanted to mention, I'm --
10  I'm looking at your Appendix A, which is the           10:20:21
11  delineation of --
12      Q.  Our experts, yes.
13      A.  I want to let you know I'm doing that.
14      Q.  That's fine.  That's fine.  Happy to have
15  you do it.  That's why it's provided.                  10:20:31
16      A.  Thank you.
17      Q.  All right.  We can agree, sir, that of the
18  four-year window -- four-year window between the
19  original presentation of the claim and the lawsuit,
20  more than two years of that window was while AIG       10:20:46
21  waited for a quantification of the loss, correct?
22      A.  Yes.
23      Q.  So we can agree that in the four years this
24  claim was pre-suit, more than 50 percent of that
25  time is while AIG waited for a quantification of the   10:21:03
```



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 198

1   loss, right?

2        A.   That's correct.

3        Q.   And it was good faith for my client during

4   that more than two-year window to wait for proof of

5   theft before making a decision on this claim,                10:21:17

6   correct?

7        A.   A final decision, yes, that's true.

8        Q.   In fact, it was impossible for us to make a

9   decision -- strike that.

10          In fact, it was impossible for AIG to make a         10:21:27

11   decision on whether there had been a theft unless

12   and until Beaumont showed overcharging, right?

13        A.   That's correct.

14        Q.   And it was impossible to reach a final

15   coverage decision until Beaumont had presented proof        10:21:40

16   of a fact, correct?

17        A.   That's correct.

18        Q.   And the first presentation of a fact was in

19   September of 2018, correct?   September 25th, if you

20   want to be specific.                                         10:21:58

21        A.   Yes, that's correct.

22        Q.   And so up until September 25th, 2018,

23   withholding judgment of this claim was the utmost

24   good faith because -- correct?

25        A.   I would say so, yes.                               10:22:11



JOHN LEPIRE on 07/19/2022

Page 62

 1      Q.  And you would never accuse a carrier of bad

 2   faith for giving an insured the opportunity to

 3   present its case before making a decision, right?

 4      A.  Yes.

 5      Q.  Every insured should be allowed to make a          10:22:28

 6   presentation of its claim before the carrier makes a

 7   decision, correct?

 8      A.  Under the circumstances, yes.

 9      Q.  And in the context of this case, it would

10   have been bad faith for AIG to decide whether there        10:22:43

11   was a theft before Beaumont had a chance to present

12   proof of that fact, right?

13      A.  I guess you could say that.

14      Q.  So you -- if you were handling this case,

15   you wouldn't have issued a payment up and until            10:22:59

16   Mr. Ray's report, correct?

17      A.  Well, that -- I would say that that may not

18   be the case.  Again, I am looking at it from the

19   standpoint of the analysis that was being done by

20   their own forensic accountant.  If the forensic            10:23:17

21   accountant, who had a one-year lead time on this,

22   came up with some preliminary figures and discussed

23   that with the insured and the insured said that that

24   sounds reasonable, potentially a partial payment

25   could have been made or considered.                        10:23:35



EXCEEDING YOUR EXPECTATIONS

COMBS REPORTING, INC.

DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 200

Page 63

```
 1      Q.  Sure.  And that would have followed
 2  Mr. Ray's report, September 25th, right?
 3      A.  Followed?  It could have been preceding his
 4  report.
 5      Q.  How would -- how would HSNO have computed        10:23:45
 6  the loss before Beaumont did that?
 7      A.  Well, it -- by utilizing the information
 8  that was provided by Beaumont in his forensic
 9  analysis.
10      Q.  Okay.                                            10:24:00
11      A.  I don't know if there -- yeah, go on.
12      Q.  Did Beaumont, in fact, provide Mr. Fogarty
13  enough information to validate the existence of
14  overcharging prior to September 25th, 2018?
15      A.  I believe there was a draft report that was      10:24:17
16  prior to September 25th that was issued by
17  Mr. Fogarty.
18      Q.  It is.  And do you want -- let's look at
19  that report together.
20      A.  Okay.                                            10:24:29
21          MR. DEAL:  Scott, what's the Bates number?
22          MR. SCHMOOKLER:  I'm finding it.  Bear with
23  me a second.
24          MR. DEAL:  Sure.
25          MR. SCHMOOKLER:  August 7 -- it's               10:24:59
```



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 201

1  August 18, 2017.  I'll give you the Bates number

2  now.  That is NUFIC 45526.

3          THE WITNESS:  Yeah, I got it.

4  BY MR. SCHMOOKLER:

5      Q.  And in this report, Mr. Fogarty goes through          10:26:07

6  HSNO's preliminary analysis of the materials

7  provided to date, correct?

8      A.  Yes.

9      Q.  And he says that they reviewed 572,170 pages

10 of records.          10:26:28

11          Do you see that?

12     A.  I'm looking for that.  What --

13     Q.  Page 3, Bates number 45528.

14     A.  Yep, I got it.

15     Q.  Okay.  And do you see that he has said he          10:27:03

16 reviewed 572,170 pages of information?

17          Do you see that there?

18     A.  Yes, yes.

19     Q.  Okay.  And do you understand that the --

20 that Beaumont completed that production to          10:27:17

21 Mr. Fogarty on May 15th, 2017?

22     A.  Yes.

23     Q.  So can we agree that even though the

24 production was completed May 15th, 2017, HSNO was

25 able to complete a review and analysis of the claim,          10:27:44



EXHIBIT 4
PAGE 202

```
 1  including 572,172 pages, within 90 days?

 2      A.  Yes.  That's phenomenal.

 3      Q.  Exactly.  You agree with me that the ability

 4  of our forensic accountant to go through these

 5  materials by August 18th, 2017, demonstrates good       10:28:08

 6  faith expediency?

 7      A.  In regards to the handling of that, yes, I

 8  do.

 9      Q.  Now, in his report -- in his report, he

10  says, on page 15 -- with me?                            10:28:29

11      A.  Yeah.  I'm getting there.  I got it.

12      Q.  Fourth full paragraph, it starts "To date."

13  Mr. Fogarty says, and I read, "To date, the insured

14  has not identified any documentation or support to

15  demonstrate that the invoiced amounts exceeded fair     10:29:09

16  market value for the noted service description."

17          Do you see where I've read from?

18      A.  No, I -- I -- I can't find that.  You said

19  it's on page four -- 5540?

20      Q.  It is.  Third paragraph under "Urban Logic."    10:29:23

21      A.  Oh, got it.

22      Q.  It says, and I read, "To date, the insured

23  has not identified any documentation or support to

24  demonstrate that the invoiced amounts exceeded fair

25  market value for the noted service description."        10:29:41
```



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 203

Page 66

```
 1          Do you see that?

 2     A.   Yes.

 3     Q.   That's never been a theory that was

 4  presented by the City, correct?

 5     A.   The differential in fair market value you're    10:29:56

 6  talking about?

 7     Q.   Yes, yes.

 8     A.   It was never presented as -- by the City

 9  as --

10     Q.   Yeah.  The City has not computed its damages    10:30:09

11  based on fair market value for services, correct?

12     A.   That's correct.

13          MR. DEAL:  Objection, form.

14  BY MR. SCHMOOKLER:

15     Q.   But nonetheless, HSNO went out and looked at    10:30:18

16  alternative ways of looking at this claim to see if

17  there was loss, right?

18     A.   That's correct, they did.

19     Q.   And that's good faith, is it not?

20     A.   In regards to what was done, yes.              10:30:32

21     Q.   So isn't it true that my client hired a

22  forensic accountant to go out and consider other

23  ways of proving the loss?

24     A.   That's correct.

25     Q.   And isn't it true that in doing that, they     10:30:47
```



EXHIBIT 4
PAGE 204

 1  demonstrated the utmost good faith of this insured?

 2      A.  As -- as to that point in time, in August of

 3  2017, I would say that that's -- that's true.

 4      Q.  Now, if you look on page 17 of this report,

 5  in the final paragraph right under -- above "Alan          10:31:07

 6  Kapanicas" --

 7      A.  Yes.

 8      Q.  -- it says, second full paragraph, "In the

 9  event that the insured substantiates that ULC billed

10  the City for services that were not, in fact,             10:31:23

11  provided or overbilled for services, it appears that

12  this would likely represent a contractual issue with

13  the City's vendor and not a theft by the City's

14  employees."

15          Do you see that?                                  10:31:36

16      A.  Yes, I see that.

17      Q.  Now, nonetheless, my client continued to

18  consider this claim, did it not?

19      A.  Yes, they did.  That's true.

20      Q.  And they kept an open mind about whether the      10:31:52

21  insured could demonstrate a covered loss, correct?

22      A.  That's correct.

23      Q.  And in keeping an open mind that an insured

24  might be able to give you more and prove a covered

25  loss is the utmost good faith, is it not?                 10:32:03



EXHIBIT 4
PAGE 205

JOHN LEPIRE on 07/19/2022

Page 68

```
 1      A.  That's true.
 2      Q.  And isn't it true that Beaumont specifically
 3  told AIG an actual opinion that it intended to
 4  provide an accounting report demonstrating the
 5  covered loss?                                      10:32:22
 6      A.  That's right.
 7      Q.  Correct?
 8      A.  Yes.
 9      Q.  And that occurred on September -- I'm sorry.
10          That occurred on December 20th, 2017,       10:32:27
11  correct?
12      A.  I believe so, yes.
13      Q.  And if you look at NUFIC 29693,
14  December 20th, 2017, you will see a letter from the
15  Best Best & Krieger law firm.                      10:32:44
16          Do you see that?
17      A.  March 7th letter?
18      Q.  No.  December 7 -- December 20th.
19      A.  December 20th.  What was -- what was the
20  Bates number again?                                10:33:08
21      Q.  Two -- 29693.
22      A.  I'm going from Bates 29438 to 331184.
23      Q.  What date are you on?  They should be in
24  chronologic order, sir.
25      A.  Okay.  This is December?                    10:33:37
```



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 206

1      Q.  Yep.  I didn't put them in Bates order.  I

2   put them in chronologic order for you.

3      A.  Okay.  Just a second here.  What was the

4   date again?

5      Q.  12/20/2017.                                    10:34:00

6      A.  Okay.  I got October 15th.  12/20.

7      Q.  In 2017?

8      A.  Just a second here.  Yep.  I got it.

9      Q.  Okay.

10      A.  Sorry about that.                             10:34:23

11      Q.  You see -- are you with me now?

12      A.  Yeah.  I got a big binder.  I got it.

13      Q.  Okay.  On December 20th, 2017, Chris Deal,

14   of the Best Best & Krieger law firm, wrote to

15   National Union, correct?                             10:34:39

16      A.  Yes, that's correct.

17      Q.  And he writes in the third full paragraph,

18   "As you are hopefully aware, the City has engaged a

19   forensic accountant to investigate its claimed loss

20   relative to the underlying fraud scheme that is the  10:34:51

21   subject of the claim.  Based upon our recent

22   communications with the forensic accountant, the

23   City anticipates amending the proof of loss to

24   provide additional details regarding the loss."

25      A.  Yes.                                          10:35:05



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 207

```
 1      Q.  Do you see that?

 2      A.  Yes.  I'm aware of that.

 3      Q.  So as of December 20th, 2017, my client was

 4   told that the City anticipated amending its claim

 5   and providing a forensic accounting report, correct?    10:35:19

 6      A.  That's correct.

 7      Q.  And it would have been bad faith to make a

 8   decision on this claim at that point knowing the

 9   City intended to provide more information and amend

10   its claim, correct?                                      10:35:32

11      A.  In that context, yes.

12      Q.  So denying the claim as of December 20th of

13   2017 would be bad faith, correct?

14      A.  Well, it -- it relates to the interpretation

15   of the coverage, which was another issue.  You know,    10:35:49

16   we're looking at right now the valuations and the

17   quantum amount of the claim.  I -- you know, the

18   issue of coverage in and of itself is a different --

19   is a different matter, and that's subject to

20   analysis by the accountants.                             10:36:06

21      Q.  Well, hold on.

22          We agree, I believe, that one of the

23   elements of a covered loss is proof that money was

24   stolen, theft, right?

25      A.  That's correct.                                   10:36:16
```



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 208

JOHN LEPIRE on 07/19/2022

Page 71

```
 1      Q.  And we agreed that Beaumont alleged
 2  overcharging as proof of theft, correct?
 3      A.  That's correct.
 4      Q.  So unless and until Beaumont proved
 5  overcharging, there was no proof of theft, correct?    10:36:27
 6      A.  That's right.
 7      Q.  And so as of December 20th, 2017, it was the
 8  utmost good faith for AIG to keep an open mind and
 9  let the insured present whatever it wanted to
10  present in proof of theft, correct?                    10:36:43
11      A.  That's right.  I agree.
12      Q.  And so as of this date, meaning as of
13  December 20th of 2017, you agree with me that my
14  client exercised the utmost good faith by keeping an
15  open mind about this claim when told that more        10:36:57
16  information was forthcoming.
17      A.  Yeah, I would agree with what.
18      Q.  And, in fact, you would have accused us of
19  bad faith, would you not, had we gone out and denied
20  the claim knowing more information was coming,         10:37:15
21  right?
22      A.  In the context of the individuals that were
23  accused of this insofar as their position with the
24  company?
25      Q.  No.  You would have said National Union       10:37:29
```



 1  acted in bad faith by denying a claim without

 2  letting the insured present the totality of the

 3  information available, correct?

 4      A.  Well, let me just say this, that they were

 5  aware of who were involved, the individuals who were      10:37:41

 6  involved in this alleged crime scheme, whatever you

 7  would like to call it, and their positions relative

 8  to either being employees or independent contractors

 9  was the subject that I believe could have been

10  addressed at some point once AIG was aware, or           10:37:57

11  National Union was aware, of the fact that there was

12  a question relative to the position of these

13  individuals who were the subject of this -- of this

14  matter.

15      Q.  And -- and AIG did, in fact, address that        10:38:14

16  issue, did it not?

17      A.  I don't believe that as of December 17th

18  they had addressed it yet.

19      Q.  No.  They -- but they did address it prior

20  to receipt of the accounting report, correct?           10:38:30

21      A.  They raised the question, yes.

22      Q.  They -- no.  They did more than just raise

23  the question.

24          They wrote an extensive letter detailing

25  their analysis of the employee issue, correct?          10:38:41



EXCEEDING YOUR EXPECTATIONS

Combs REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 210

```
 1              MR. DEAL:  Argumentative.
 2   BY MR. SCHMOOKLER:
 3        Q.  Did my client write a letter detailing its
 4   analysis of the employee issue?
 5        A.  Yes.                                            10:38:50
 6        Q.  And you agree with me that going -- that
 7   providing an interim explanation of an issue that it
 8   identified demonstrates good faith.
 9        A.  Unless -- unless they were intending to deny
10   the claim based upon the information that they had       10:39:09
11   available at that point in time.  If that were the
12   case, they should have obtained a full and complete
13   reservation of rights.
14        Q.  Well, that's the question is what -- how do
15   you define a full and complete reservation of rights     10:39:22
16   in the context of a crime insurance claim?
17        A.  Well, basically it has to do with the
18   policy, policy wording, policy language, the
19   number -- I mean, the individuals who are covered,
20   the context of the language as to being covered, any     10:39:37
21   endorsements that would be, you know, attached to
22   the policy that may give rise to either additional
23   coverage or exclusion of coverage.
24              There are a number of issues that relate to
25   that that could be -- it could have been spelled out     10:39:52
```



 1  definitively with the -- with an indication of what

 2  the end result would be if this were -- if -- if

 3  this were found to be the case at that point.

 4      Q.  And isn't that what exactly occurred

 5  April 26th, 2018, sir?                                10:40:10

 6      A.  It was -- it was mentioned as an aspect of

 7  the claim.  It wasn't definitively outlined as a

 8  potential denial.

 9      Q.  Isn't that -- let's look at the letter.

10  Let's look at the letter, April 26th --              10:40:34

11      A.  Yeah.

12      Q.  -- 2018, NUFIC 31574.

13      A.  April 26th of 2017?

14      Q.  '18.

15      A.  '18.                                         10:41:12

16          MR. DEAL:  I'm sorry, Scott.  What was the

17  date again?

18          MR. SCHMOOKLER:  The date?

19          MR. DEAL:  Yeah.

20          MR. SCHMOOKLER:  April 26th, 2018.           10:41:30

21  BY MR. SCHMOOKLER:

22      Q.  Are you with me, sir?

23      A.  Yeah.  I'm slogging my way through here.

24  April 26th.  I have an April 4th settlement

25  agreement and release, and then the next -- the next 10:42:36



EXHIBIT 4
PAGE 212

 1  document is Michael --

 2      **Q.  Keep going.  These are all attached.  Yeah,**

 3  **keep going.**

 4      A.  Keep going?  There's a straddling letter of

 5  November 3rd, 2016.                                    10:42:59

 6      **Q.  Keep going.  The next document.  It's two**

 7  **more documents.**

 8      A.  Two more documents.  Okay.  April 23rd.

 9  That's an email.

10      **Q.  26th.  One more.  26th.**                    10:43:24

11      A.  There we go.  Found it.  Let's see.  I got

12  it.

13      **Q.  You're familiar with this letter, correct?**

14      A.  Yes.  I'm familiar with this letter.

15      **Q.  And in this letter, my client provides a**    10:43:42

16  **preliminary analysis of the materials provided to**

17  **date, correct?**

18      A.  Preliminary coverage issues, yes.

19      **Q.  And they go -- my client went through each**

20  **component of the claim, correct?**                   10:44:01

21      A.  In asking for additional information.

22      **Q.  Well, they did more than just ask for**

23  **additional information.**

24          **My client provided an analysis of each and**

25  **every component of the claim based on the**          10:44:18



JOHN LEPIRE on 07/19/2022

Page 76

 1  information it had as of that date, correct?

 2      A.  When AIG claims that -- AIG claims to insure

 3  this preliminary identification of issues to the

 4  City and may respond and provide additional

 5  information.  We anticipate that the City's forensic        10:44:53

 6  accountant will report all -- will report -- will

 7  address many of the remaining issues and questions.

 8  Now, how the forensic accountant's report is going

 9  to address the issue of coverage, I'm not quite

10  certain.                                                    10:45:15

11      Q.  But isn't it true -- I asked a different

12  question -- my client, on April 25th, 2018, provided

13  a preliminary analysis of every component of the

14  claim, correct?

15      A.  That's correct.                                    10:45:27

16      Q.  And providing a preliminary analysis of

17  every component of the claim demonstrates good

18  faith, does it not?

19      A.  Yes.  At that point, I would say that's

20  correct.                                                   10:45:39

21      Q.  So we can agree that by April 26th, 2018, my

22  client as acting in good faith by providing a

23  preliminary analysis of the claim, correct?

24      A.  That's correct.

25      Q.  And in the letter, my client offered the           10:45:49



EXCEEDING YOUR EXPECTATIONS

COMBS REPORTING, INC.

DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 214

1  City of Beaumont an opportunity to provide

2  additional information before it rendered a final

3  decision, correct?

4      A.  Yes, that's true.

5      Q.  And offering to provide -- offering Beaumont    10:46:04

6  the chance to provide additional information before

7  National Union made a final decision again

8  demonstrated good faith, did it not?

9      A.  That's correct.

10     Q.  So, so far can we agree that at least by      10:46:16

11 April 26th, 2018, my client had acted in the utmost

12 good faith by going through the materials that were

13 available and providing a preliminary analysis?

14     A.  Yes.

15     Q.  And can we agree that as of                 10:46:31

16 April 26th, 2018, my client had acted in the utmost

17 good faith in giving to Beaumont another opportunity

18 to provide more information in support of its claim,

19 correct?

20     A.  That's correct.                            10:46:47

21     Q.  And specifically asking for additional

22 information in April was good faith because it was

23 identifying the types of information that might help

24 the insured prove a covered loss, correct?

25     A.  Yes.  Under the assumption that this        10:47:02



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 215

JOHN LEPIRE on 07/19/2022

Page 78

 1  information in conjunction with the questions about

 2  coverage, which again -- the questions relative to

 3  coverage, again, if there were some issues -- again,

 4  I believe that there should have been a reservation

 5  of rights issued at that point.                        10:47:24

 6      Q.  Well, sir, this letter reserves AIG's

 7  rights, does it not?

 8      A.  Yeah.  But it doesn't -- it doesn't

 9  explain -- it doesn't go into the detail of why

10  their -- the consequences -- let me put it to you      10:47:43

11  that way -- and the explicit aspects of what a

12  normal reservation of rights letter indicates.

13          In other words, it was -- it was a part of a

14  letter that was issued that dealt with other issues,

15  not just with the issue of coverage.  There should    10:48:01

16  have been a separate letter that was issued dealing

17  with coverage relative to the reservation of rights

18  in my opinion.

19      Q.  This is -- this is -- this letter does

20  specifically go through coverage, does it not?        10:48:14

21      A.  Yes, it does.  But I think there should have

22  been a separate -- a separate letter dealing with

23  the coverage issue to be more definitive is what I'm

24  trying to say.

25      Q.  What do you mean -- what would be more        10:48:24



 1  definitive than going claim by claim by claim and

 2  explaining what more was needed to prove a covered

 3  loss?

 4      A.  Well, going into each one of these employ --

 5  each one of these employees, independent                    10:48:35

 6  contractors, the endorsement that was attached to

 7  the policy relative to adding of -- adding of

 8  independent contractors, all the things that were

 9  raised, in my opinion, were, you know, pretty much

10  answered in the -- in a review -- a detailed review         10:48:53

11  of that policy.  In other words, there were

12  indications here of things that, in reality, were

13  not the case.

14      Q.  Well, putting aside whether you agree with

15  them or not, it is true that my client in the April         10:49:08

16  letter ident -- goes through each and every

17  individual and whether they're an employee, correct?

18      A.  Yes.

19      Q.  And they, in the letter, identify all of the

20  various definitions impacting their analysis of             10:49:20

21  whether the individuals in this case were employee,

22  correct?

23      A.  Yes.

24      Q.  And isn't it true it's the utmost good faith

25  of my client to go individual by individual and            10:49:33



 1  explain its analysis of whether they qualify as an

 2  employee as of the date of this letter?

 3     A.  To some extent, yes.

 4     Q.  And isn't it true that rather than running

 5  off and reaching a decision, it was good faith of my        10:49:49

 6  client to give Beaumont an additional opportunity to

 7  provide more information on that issue to

 8  demonstrate that these people qualified as

 9  employees, correct?

10     A.  Yes.  But the -- the problem I see here is          10:50:01

11  that, in reality, you had an endorsement that

12  eliminated this concern that was raised in this

13  letter.  In other words --

14     Q.  Well --

15     A.  -- they were giving them information or they        10:50:12

16  were telling them they -- they were indicating a

17  potential exclusionary issue that, in reality,

18  wasn't the case.

19     Q.  That's your -- that's your legal opinion,

20  that they qualify as employees, correct?                   10:50:25

21     A.  I -- I don't have a legal opinion.

22     Q.  Okay.  Did you -- have you gone through all

23  of the facts such that you are prepared to offer a

24  coverage opinion on whether these people qualify as

25  employees?                                                 10:50:40



1     A.  Well, no.  I -- I'm not.

2     Q.  Are you willing to stand here under oath and

3  say that these people qualify under the policy as

4  employees?

5     A.  No.  I'm -- I'm most certainly not.          10:50:51

6     Q.  Okay.  So isn't it true that in terms of

7  claim handling process, it was the utmost good faith

8  of my client to go through all the materials that

9  were requested -- that were provided, identify

10  issues, and give the insured one last opportunity to    10:51:07

11  present more information for the claim?

12     A.  In that context, yes.

13     Q.  And isn't it true that by asking for

14  additional information on, for example, the status

15  of these people and whether they qualify as           10:51:22

16  employee, my client again showed an openness to

17  finding a covered loss?

18     A.  Yes.

19     Q.  And isn't it true that the April

20  communication demonstrates that AIG at all times      10:51:36

21  continued to keep an open mind about this claim and

22  that's good faith?

23     A.  Well, that's subject to debate.  I can't --

24  I can't comment on that.

25     Q.  Well, isn't it true, sir, that you agree      10:51:49



 1  with AIG's decision in April of 2018 to give the

 2  insured more -- another chance to provide some more

 3  information before it rendered a final decision?

 4     A.  Yes.

 5     Q.  Now, early on in the claim -- I want to go      10:52:08

 6  back --

 7          MR. DEAL:  Scott.

 8          MR. SCHMOOKLER:  -- in time.  Yeah.

 9          MR. DEAL:  Before we move to another topic,

10  can we take a break?                                   10:52:18

11          MR. SCHMOOKLER:  Sure.  Want to take 10

12  minutes, 15 minutes?

13          MR. DEAL:  Yeah.

14          MR. SCHMOOKLER:  Should we just come back at

15  ten -- let's come back at ten after 11:00.            10:52:25

16          MR. DEAL:  Okay.

17          THE VIDEOGRAPHER:  Going off the record, the

18  time is 10:52 a.m.  We're off the record.

19          (Break, 10:52 a.m. to 11:09 a.m.)

20          THE VIDEOGRAPHER:  We're back on the record.   11:09:26

21  The time is 11:09 a.m.

22  BY MR. SCHMOOKLER:

23     Q.  Sir, I'd like to go back in time to November

24  of 2016.  If you can open your binder to the 2016

25  tab.  It says -- it's NUFIC 11283,                    11:09:52



EXCEEDING YOUR EXPECTATIONS
COMBS Reporting, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 220

```
 1  November 3rd, 2016.  It should be the second
 2  document in your binder.
 3      A.  Second document.
 4          MR. DEAL:  I'm sorry, Scott.  What was the
 5  date again?                                          11:10:20
 6          MR. SCHMOOKLER:  November 3rd.
 7          THE WITNESS:  Yes, I have it.  11285 Bates.
 8  BY MR. SCHMOOKLER:
 9      Q.  Yes, that's fine.
10          And you understand from the proof of loss    11:10:36
11  that I've put in front of you that the City
12  originally pursued claims totaling $159,702,461,
13  correct?
14      A.  That was the original proof of loss, yes.
15      Q.  And you understand that the City no longer  11:10:53
16  has -- is no longer pursuing various aspects of the
17  claim, correct?
18      A.  Yes, I do.
19      Q.  Okay.  But at the time the proof of loss
20  came in, my client was presented with a $150 million 11:11:06
21  claim with various components of loss, correct?
22      A.  Yes, that's true.
23      Q.  And it was reasonable and in good faith of
24  my client, when presented with a claim for
25  150 million, to investigate each and every component 11:11:20
```



EXCEEDING YOUR EXPECTATIONS

Combs Reporting, Inc.

DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 221

JOHN LEPIRE on 07/19/2022

Page 84

 1  of that claim.

 2      A.  Yeah.  I think you're right about that, and

 3  one of the things I, you know, am kind of curious

 4  about is why AIG didn't initiate the -- the

 5  obtaining of all of these documents that were needed          11:11:36

 6  in order to come to a, you know, conclusion as to

 7  the value and for -- and as -- for that matter, as

 8  to the coverage on their own, without having, you

 9  know, the City go through the process of having to

10  obtain all these documents themselves and then              11:11:53

11  submit them on to you.

12      Q.  How would -- how would AIG gather records

13  from the City about the City's business dealings

14  with these people other than through the City?

15      A.  Well, my understanding was there was a lot          11:12:08

16  of documents that were, you know, under the control

17  of the -- you know, the attorney -- the Riverside

18  District Attorney's Office that either party could

19  have gotten copies of, which are pretty much germane

20  to what this claim is all about.                            11:12:25

21      Q.  Isn't it true that my client within a very

22  short window, less than 30 days, asked the City for

23  specific records related to this claim?

24      A.  Yes.  And most of those records, from what I

25  can glean from the documents I've reviewed, indicate        11:12:41

EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 222

 1  that these records were in the possession of the

 2  District Attorney's Office and the FBI.

 3      **Q.  It's your opinion that a crime carrier acts**

 4  **in bad faith by asking its insured to provide**

 5  **records in support of the claim?**                    11:12:59

 6      A.  No.

 7          MR. DEAL:  Misstates testimony.

 8  BY MR. SCHMOOKLER:

 9      **Q.  Hold on.  I'm not -- it is your opinion,**

10  **sir, that National Union acted in bad faith by**      11:13:07

11  **asking Beaumont to provide the records related to**

12  **its proof of loss?**

13      A.  You're misstating what I said.  What I'm

14  saying --

15      **Q.  Okay.**                                        11:13:18

16      A.  -- is there should have been a parallel

17  investigation, one by the insurance carrier and one

18  by the insured, if they deemed it necessary.

19          Now, insofar as any records that the City

20  has, they have a right, you know, to request          11:13:28

21  whatever records they can't get.  What I'm trying to

22  say is that the economic burden of obtaining all of

23  these records in my estimation should have been at

24  least partially assumed by the insurance carrier.

25      **Q.  How much did it cost?**                        11:13:46



EXHIBIT 4
PAGE 223

1    A.   I have no idea.

2    Q.   Okay.  So if it was a dollar worth of

3  effort, are you saying that somehow AIG should have

4  agreed to pay 50 cents?

5    A.   What I'm saying is they have a duty to          11:14:00

6  investigate the claim.  They have a duty to expend

7  whatever -- you know, up to the policy limit,

8  whatever it happens to be, in the -- in the --

9  pursuing that aspect of the loss.

10    Q.   Okay.  So let's talk about what they did.        11:14:16

11        Following the proof of loss, my client

12  prepared a list of documents that it needed to

13  evaluate the claim, correct?

14    A.   That's correct.

15    Q.   And that list is -- was circulated           11:14:25

16  internally on December 1st, and it's in your binder

17  NUFIC 12935.

18        Do you see that, sir?

19    A.   Which one is this?

20    Q.   This is -- there's -- in your binder,          11:14:49

21  December 1st, there's some emails to be -- the third

22  document, about requesting information from the

23  insured, correct?

24    A.   December 1st?

25    Q.   Yes.  It should be the third document in         11:15:17



```
 1   your binder.

 2       A.  I have that here in front of me.

 3       Q.  Okay.  If you turn to page 2 of this

 4   document, NUFIC 12936.

 5       A.  Yes, I have it.                              11:15:30

 6       Q.  You'll see the list of documents my client

 7   prepared.

 8           Do you see that?

 9       A.  Yes, I see that.

10       Q.  Okay.  Will you agree with me that each and  11:15:42

11   every one of these requests is directly correlated

12   to some component of the claim?

13       A.  Well, one aspect of it.  Copies of the crime

14   policies from 2008 to 2011, National Union should

15   have had that in their possession.                  11:16:05

16       Q.  Well, that assumes that National Union wrote

17   those policies, correct?

18       A.  Did this email go to the broker too?

19       Q.  Yes.  Did you receive a copy of that?

20       A.  I would assume that the broker would        11:16:20

21   indicate if there, in fact, was coverage other than

22   through AIG.

23       Q.  Let's look at the letter that ultimately

24   goes to the broker.  If you turn to the next

25   document in line, at the top there should be an     11:16:32
```



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 225

```
 1  email from Jenn Rocha to Peter Fogarty.

 2         Do you see that?

 3     A.  I have Judith Blake to Marion Hutton.  I

 4  have Hutton to Rocha.

 5     Q.  Oh, I'm sorry.  No.  If you turn to the --        11:17:03

 6  there should be the document, it starts -- it's

 7  Bates number 48534.

 8     A.  But they're not in Bates order.  I mean,

 9  what -- what was the date?

10     Q.  No, it's not.                                     11:17:16

11     A.  Pardon?

12         MR. DEAL:  It's -- John, it's like the third

13  document.

14  BY MR. SCHMOOKLER:

15     Q.  December 19th.                                    11:17:22

16     A.  December 19th.

17     Q.  Yes.

18     A.  Oh, yeah.  I got it.

19     Q.  Okay.  Turn to the second page.  You will

20  see an email from Jenn Rocha to Marion Hufton,          11:17:39

21  December 1st, 2016.  It is on NUFIC 48535.

22     A.  Yeah, I have it.  From Rocha to Marion

23  Hufton?

24     Q.  Yes.  You said, as I understood it, that

25  there was no need to burden the insured to ask for      11:18:04
```



 1  insurance policies from 2008 to 2011, correct?

 2     A.  Yeah.  Their broker should have been doing

 3  that.

 4     Q.  Okay.  And isn't it true that my client

 5  removed that request before it went out to          11:18:25

 6  Ms. Hufton?

 7     A.  It looks like it, yes.

 8     Q.  So isn't it true that my client in the

 9  process of going through the requests did, in fact,

10  identify which requests were unnecessary and removed  11:18:39

11  them, correct?

12     A.  Yeah, that's true.  You're right.  You asked

13  me to look at that specific document, and that was

14  what I -- you know, what I saw.  We're -- we're

15  talking about literally tens of thousands of pages   11:18:50

16  of documents here.  So it's kind of difficult to

17  keep the -- the facts of each one in mind when going

18  through this.

19     Q.  But you can agree with me, sir, that in the

20  process of preparing requests, my client exercised  11:19:05

21  good faith in removing the requests that were

22  ultimately unnecessary?

23     A.  In that -- in that -- in respect to that one

24  request, yes.

25     Q.  Well, in -- in respect of the requests that   11:19:16



 1  actually go out December 1st, each and every one of

 2  those requests is tied to a specific component of

 3  the claim, correct?

 4      A.  Do you mind if I review the document?

 5      Q.  Sure.  I absolutely would like you to do          11:19:32

 6  that.

 7      A.  (Witness reviews document.)  Okay.  I've

 8  gone through it.

 9      Q.  Okay.  Can we agree that each and every one

10  of these requests is specifically tied to some           11:20:56

11  component of the proof of loss?

12      A.  As I said before, that the majority of these

13  documents, from my recollection, were in the care,

14  custody and control of either the FBI or the

15  District Attorney's Office or the grand jury.            11:21:13

16  Again, you know, these documents could have been

17  obtained contemporarily -- contemporaneously by, you

18  know, by AIG or National Union at the same time --

19      Q.  I didn't --

20      A.  -- instead of burdening the insured with         11:21:28

21  this -- you know, with this request for documents

22  that they, in fact -- my -- as I recollect, they had

23  to wait for these documents to arrive, you know,

24  from the various legal -- you know, legal entities

25  that were, you know, in -- in the care, custody and     11:21:44



EXHIBIT 4
PAGE 228

 1   control of these documents.

 2        Q.   Move to strike, nonresponsive.

 3             Sir, I asked a different question.  I'll get

 4   to that in a moment.

 5             Isn't it true that each and every one of          11:21:56

 6   these requests is specifically tied to the proof of

 7   loss?

 8        A.   That's correct.

 9        Q.   And isn't it true that it was good faith of

10   my client to ask the -- to ask for information from        11:22:08

11   someone about documenting the allegations in the

12   proof of loss?

13        A.   That's true.

14        Q.   And isn't it true that in the volume of

15   information necessary to evaluate this claim is            11:22:22

16   dependent upon the nature of the allegations,

17   correct?

18        A.   Could you repeat that again?

19        Q.   Sure.  The volume of information an insurer

20   will need is often dictated by the nature of the          11:22:36

21   claim, is it not?

22        A.   Yes, of course.

23        Q.   So, you know, if an insured presents a

24   $10,000 claim based on the forgery of a single

25   check, you probably don't need a whole lot of             11:22:48



EXHIBIT 4
PAGE 229

```
 1  records, right?

 2       A.  That's correct.

 3       Q.  And if the insured presents a $150 million

 4  claim involving alleged overcharging over a 17-year

 5  period, you probably need a lot of records, correct?    11:22:58

 6       A.  That's right.

 7       Q.  And so isn't it true that in this case the

 8  insured presented a very large claim over a very

 9  extended period of time, correct?

10       A.  That's right.                                   11:23:10

11       Q.  And isn't it true that it was in the utmost

12  good faith of my client to ask for the records

13  needed to evaluate that claim as it was presented,

14  correct?

15       A.  Relative to asking for the records, yes.       11:23:22

16       Q.  How did my client know that the records were

17  out -- not possessed by the district -- were

18  possessed by the district attorney on December 1st

19  of 2016?

20       A.  My understanding is that information was        11:23:38

21  provided with the -- the initial proof of loss

22  submission in November, that these records -- that

23  the -- these records were under, you know, the

24  control of the legal authorities.  I believe that

25  they were aware of that right from the beginning.       11:23:53
```



1    Q.  So in your mind, if the legal authorities

2  gather the information, it was bad faith to ask the

3  insured to provide what it had?

4    A.  No.  I -- I didn't say that at all.  What I

5  was saying is why didn't National Union/AIG also          11:24:07

6  contemporaneously request these records that they

7  needed in order to make a determination?

8        Having to wait for the insured to get them

9  and having to go through the process of the insured

10  having to go through and call out -- I would imagine       11:24:27

11  there was quite a bit of, you know, records that

12  were irrelevant.  AIG, you know, who knows this

13  business, who knows what's needed, you know, could

14  have effectively done it on their own.

15    Q.  Well, is that bad faith?  I mean, I           11:24:41

16  understand you -- you might want them to do that,

17  but let's ask it this way.

18        Tell me the name of a carrier, any carrier

19  in the world, that in the 2015 time frame doesn't

20  first ask the insured to provide the records          11:24:56

21  available to the -- that are available to the

22  insured.

23    A.  Yeah.  Normally, under normal conditions,

24  you're absolutely right because the records are in

25  the -- in their possession, but these records were       11:25:07



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 231

 1  not in their possession.  These records were in the

 2  possession of another entity, and as I said, these

 3  records could have just as easily been obtained by,

 4  you know, AIG/National Union as the insured and it

 5  would probably have been more expedient for the          11:25:23

 6  purposes of processing or handling this -- this

 7  matter if they had -- if they had done that, if AIG

 8  or National Union, you know, had implemented that.

 9       Q.  Well, let's -- let's debunk your theory for

10  a moment.  Let's go to the proof of loss.  Turn to     11:25:40

11  the proof of loss, November 3rd.  Let's go through

12  this.  Ready?

13       A.  November 3rd.

14       Q.  Yep.  Let's go to the proof of loss.

15       A.  Okay.                                         11:26:00

16       Q.  Let's look at page 11, NUFIC 11294.

17       A.  Got it.

18       Q.  You with me?

19       A.  Yeah.

20       Q.  Ready?  Read the first paragraph to yourself  11:26:24

21  under B(1).

22       A.  (Witness reviews document.)  I've read it.

23       Q.  Isn't it true that in connection with the

24  claim as it relates to Urban Logic, my client was

25  told in the proof of loss that these records were      11:27:13



EXCEEDING YOUR EXPECTATIONS

Combs Reporting, Inc.

DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 232

JOHN LEPIRE on 07/19/2022

Page 95

 1  available for production at your -- at its request?

 2      A.  That's correct.

 3      Q.  It was perfectly reasonable of my client,

 4  when told the records are available upon request, to

 5  ask for those records, was it not?                          11:27:28

 6      A.  That's -- that's true.

 7      Q.  So as it relates to the only component of

 8  the claim that's subject of this litigation, my

 9  act -- my client acted reasonably and in good faith

10  by asking the insured to provide the records the       11:27:41

11  insured offered to produce?

12      A.  And at the time, no one was aware of the

13  fact that this was the only claim that was being

14  presented.

15      Q.  Okay.  We're going to get to the rest.         11:27:52

16      A.  It was a plethora -- plethora of other --

17  other potential claims here.

18      Q.  I agree.  We're going to go one by one, sir.

19          Isn't it true that in November 2016, it was

20  reasonable and good faith of my client to ask the      11:28:09

21  insured to produce the records relating to the Urban

22  Logic component that the insured offered to produce?

23      A.  As to the Urban Logic component, yes, you're

24  right.

25          MR. DEAL:  Counsel -- sorry.  This is the      11:28:23



EXCEEDING YOUR EXPECTATIONS
Combs Reporting, Inc.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 233

```
 1  videographer.  Can we take a short break just to
 2  change the media?
 3            MR. SCHMOOKLER:  Sure.
 4            THE VIDEOGRAPHER:  Thank you.
 5            MR. SCHMOOKLER:  How long do you need?          11:28:34
 6            THE VIDEOGRAPHER:  Just like 30 seconds.
 7            MR. SCHMOOKLER:  Okay, great.  Let's not
 8  take a break.  I want to keep going so we can finish
 9  early today.
10            THE VIDEOGRAPHER:  Okay.  This marks the end   11:28:41
11  of media unit number one.  The time is 11:28 a.m.
12  We're off the record.
13            This marks the beginning of media unit
14  number two.  The time is 11:29 a.m.  We're back on
15  the record.                                               11:29:23
16  BY MR. SCHMOOKLER:
17       Q.  All right.  Let's go to the next component
18  of the claim.  Ready?
19       A.  Yes.
20       Q.  Component number two, B(2), on page 12,         11:29:32
21  grossly -- the gross overcharging claim, correct?
22            In connection with the alleged overcharging,
23  the City, in its proof of loss, said that it
24  intended to provide an expert report in support of
25  that claim.                                               11:29:56
```



EXCEEDING YOUR EXPECTATIONS

COMBS REPORTING, INC.

DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 234

 1          Do you see that, sir?

 2     A.   This is -- you're talking about B(2)?

 3     Q.   **Yes.**

 4     A.   Yes.  The City is obtaining the retention of

 5     experts to do this.                                    11:30:31

 6     Q.   **So in connection with the alleged**

 7     **overcharging, it was the utmost good faith for my**

 8     **client to wait for the City to provide its proof of**

 9     **overcharging before rendering a coverage decision,**

10     **correct?**                                           11:30:47

11     A.   I would say that the -- the insurance

12     carrier should have been asking if they could have

13     their own expert witness go through the same

14     documentation in a manner that probably could have

15     been more expedient.                                   11:31:06

16     Q.   **And we did that, did we not?  AIG did that**

17     **very thing.**

18     A.   They had their own engineering experts.

19     Q.   **Well, we had our own -- we engaged -- we**

20     **asked for the records necessary to evaluate the**     11:31:17

21     **billing by Urban Logic, correct?**

22     A.   No.  I'm talking about the -- the experts

23     that were retained by the City at their cost, the

24     engineering experts, to go through this.  What I'm

25     saying is in my experience, the insurance carrier     11:31:31



1    should have at least hired a consultant who was an

2    expert in ex -- in engineering and cost construction

3    in order to go through and verify this and, in all

4    probability, do it in a more expedient manner.

5         Q.  And that was done, correct?                    11:31:52

6         A.  They -- I don't believe it was.

7         Q.  Isn't it true that HSNO has construction

8    consultants engage -- that were part of the

9    engagement here?

10        A.  Weren't they the experts on behalf of the     11:32:09

11   City?

12        Q.  No.  HSNO was engaged by my client, not the

13   City.

14        A.  That I wasn't aware of.

15        Q.  So isn't it true that the conduct you would   11:32:26

16   expect, meaning the engagement of somebody who has

17   some construction resources, was, in fact, done?

18        A.  In that context, yes.

19        Q.  So isn't it true that hiring HSNO, given

20   that they had experience in construction and         11:32:45

21   experience in accounting, again represents the

22   utmost good faith by my client?

23        A.  It represents good faith, yes.

24        Q.  And can you -- let's just move to D(3), on

25   page 12, fraudulent billing.                         11:33:06



JOHN LEPIRE on 07/19/2022

Page 99

```
 1           Do you see the allegations of fraudulent

 2    billing by Kapanicas and Aylward?

 3      A.  Yes, I see it.

 4      Q.  And do you see again the City offered to

 5    produce records to my client?                          11:33:18

 6      A.  Well, it's unclear here if these records are

 7    actually in their possession or are they going to be

 8    obtaining them from the -- you know, from the source

 9    that had the records in their possession.  I can't

10    tell from looking at that.                             11:34:04

11      Q.  Okay.  But -- but in light of what the

12    insured provided in November, it was perfectly

13    reasonable and good faith for my client to take the

14    insured up on its offer to produce records, correct?

15      A.  In the context of B(3), yes.                     11:34:19

16      Q.  Tell me what -- where in this letter, what

17    records did my client request that were solely in

18    the possession of the government such that it

19    imposed any burden on Beaumont to provide them.  I

20    want to know what categories.                          11:34:44

21      A.  Just a second here.  If you go to the

22    page -- the first page, the second paragraph, "The

23    proof of loss is based on the City's current

24    understanding of the scope of losses caused by the

25    unlawful activities of the seven former employees.    11:35:21
```



EXCEEDING YOUR EXPECTATIONS

**COMBS REPORTING, INC.**

DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 237

 1  The proof of loss incorporates and relies on the

 2  facts as set forth in the investigator declarations

 3  made under penalty of perjury in connection with the

 4  ongoing criminal investigation and case against

 5  these former employees."                              11:35:37

 6       In other words, there's still documentation

 7  that they don't have access to, from my read of

 8  this, that could have and should have been obtained

 9  contemporaneously by -- by the insurance company.

10       Q.  Yeah, but that's a different point.  Let's  11:35:57

11  turn to the December 1st letter.  You're missing my

12  point.  Turn to the December 1st letter.

13       A.  December 1st.  Got it.

14       Q.  All right.

15       A.  Email, you mean?                             11:36:20

16       Q.  Yes.

17       A.  Okay.

18       Q.  They're requests from Ms. Rocha to

19  Ms. Hufton.

20       Do you see that?                                 11:36:27

21       A.  Is that NUFIC 12936?

22       Q.  35 and 36.

23       A.  Yes, I have it here.  What's the question?

24       Q.  Tell me which category of documents in these

25  requests was solely in the possession of the         11:36:53



```
 1  government as of December 1st, 2016.

 2      A.  I can't tell you because I don't know.

 3      Q.  Isn't it true that ultimately the City, in

 4  fact, provided responses to these requests?

 5      A.  Could you repeat that again?            11:37:12

 6      Q.  Isn't it true the City ultimately provided

 7  some of the documents requested?

 8      A.  That's correct, yes.

 9      Q.  And isn't it true then that the records

10  requested by my client were, in fact, in the       11:37:28

11  possession of the City?

12      A.  Well, that's unclear from this -- this

13  email.  It does not indicate one way or another who,

14  in fact, has these records.

15      Q.  Okay.  What is the factual basis for you to  11:37:40

16  suggest that it was bad faith of my client to ask

17  the City for records in support of the City's claim,

18  December 1st, 2016?

19          MR. DEAL:  I think that misstates his

20  testimony.  You guys are talking past each other.  I  11:37:58

21  don't think we're taking the position that these --

22          MR. SCHMOOKLER:  Chris, Chris, Chris,

23  Chris --

24          MR. DEAL:  Let me --

25          MR. SCHMOOKLER:  I don't -- no, no.      11:38:09
```



EXCEEDING YOUR EXPECTATIONS

COMBS REPORTING, INC.

DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 239

JOHN LEPIRE on 07/19/2022

Page 102

```
 1          MR. DEAL:  John can --
 2          MR. SCHMOOKLER:  I don't need --
 3          MR. DEAL:  -- go off the screen, but we're
 4  not -- you're spending a lot of time on a subject I
 5  don't think we're actually contesting.            11:38:16
 6          MR. SCHMOOKLER:  I don't -- I'm spending
 7  time demonstrating that Mr. -- that I don't agree
 8  with these opinions, and whether you want -- you
 9  want to stipulate we acted in good faith, I'll be
10  happy to have that stipulation.  But if you want to  11:38:29
11  show up and say that my client acted in bad faith,
12  we're going to go granular.
13          MR. DEAL:  But I don't think we're taking
14  the position that these requests don't relate to the
15  proof of loss.  That's a different issue from       11:38:40
16  whether it's overly burdensome and whether they
17  could have been gotten from some other source.
18          MR. SCHMOOKLER:  Chris, Chris, please
19  don't -- don't -- please don't help him.  I don't --
20  he doesn't need help.  He's supposed to be an       11:38:49
21  expert.
22          MR. DEAL:  Whatever.  We're wasting time.
23          MR. SCHMOOKLER:  Sir -- I'm paying for the
24  time.  I'm paying for the time.
25          MR. DEAL:  Well, you give me -- you talk to  11:38:59
```



EXHIBIT 4
PAGE 240

1  my partners and talk about what an idiot I am for

2  asking about Judith Blake's high school education.

3  I think --

4          MR. SCHMOOKLER:  I didn't -- I never

5  suggested that, Chris.  I do think it's a waste of          11:39:08

6  time.  I haven't asked a single witness where they

7  went to high school.

8          MR. DEAL:  Well, I spent very little time on

9  background information of those witnesses.  So the

10  notion that I was somehow wasting your time I find          11:39:19

11  offensive.

12          MR. SCHMOOKLER:  It is a waste of time to

13  ask these people where they went to high school.

14  They're not -- okay.  Let's go back to this.

15  BY MR. SCHMOOKLER:                                          11:39:30

16      Q.  Sir, isn't it true -- strike that.

17          Can you name for me a single carrier in the

18  context of a fidelity claim in 2020, or quite

19  frankly at any time after 2000, that sends requests

20  for documents in connection with a crime claim to          11:39:49

21  the government?

22      A.  Would you repeat that question again?

23      Q.  Can you name for me a single carrier from

24  2020 -- sorry -- 2000 forward that issues requests

25  to the government for documents in connection with a          11:40:10

EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 241

 1  crime claim?  One?

 2      A.  Well, I haven't handled any actual crime

 3  claims in and of themselves.  I can tell you that

 4  the obtaining of documentation by the insurance

 5  company is a criteria of every carrier.                 11:40:27

 6      Q.  Agreed.  But that's a different question.

 7          Can you name for me a single carrier as a

 8  matter of course that issues requests to the

 9  government for records in connection with a crime

10  claim in the 2000s?                                     11:40:44

11      A.  No.

12      Q.  Sir, how much did it cost for the City to

13  provide the records that were ultimately provided?

14      A.  I have no idea, but I'm sure it was quite

15  expensive.                                              11:41:06

16      Q.  Okay.  But when you say no -- when you say

17  you -- either you have an idea of the cost or you do

18  not.

19      A.  I do not.

20      Q.  Do you know how much --                         11:41:14

21      A.  I do not.

22      Q.  Do you know how much -- do you know how much

23  time it took for the City to produce whatever it is

24  it produced?

25      A.  I do not.                                       11:41:27



EXHIBIT 4
PAGE 242

1    Q.  Did you, in determining whether or not it
2  was unduly burdensome to ask the insured for these
3  records, compare the amount of time and energy it
4  actually took to what it would normally take in a
5  normal case?                                          11:41:47
6    A.  Would you repeat that one again?
7    Q.  Sure.  In determining whether or not it was
8  unduly burdensome to ask the insured for these
9  records in lieu of going to the government, did you
10  actually analyze the amount of time it took for the   11:42:00
11  City to provide this information?
12    A.  No, I did not.
13    Q.  Do you have any way of quantifying the
14  burden on the City to provide the records requested
15  by my client at any time?                             11:42:19
16    A.  No, I do not.
17    Q.  You mention in your report -- and if you'd
18  like, I can put it up on the screen for you -- an
19  engagement between Ms. Rocha and the City in
20  December of 2017.                                     11:42:38
21       Do you want me to put it up on the screen so
22  you can see it?
23    A.  That would be helpful, yes.
24    Q.  Great.  Happy to do it.
25       Do you see where I've highlighted?              11:42:57



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 243

JOHN LEPIRE on 07/19/2022

Page 106

```
 1      A.  Yes.
 2      Q.  Okay.  Now, you mention that my -- you
 3  criticize my client for not responding within
 4  30 days of this December 19th, 2017, correspondence.
 5          Do you see that?                              11:43:17
 6      A.  Yeah.  After she had said that she's going
 7  to be responding within 30 days.
 8      Q.  Do you know how many days there are between
 9  December 19th and January 25th?
10      A.  How many -- no.  I don't offhand.             11:43:36
11      Q.  37.  And do you -- are you aware that -- of
12  any holidays that fall between December 19th and
13  January 25th?
14      A.  Yes, I do.
15      Q.  Are there any commonly -- commonly           11:43:47
16  celebrated holidays between December 19th and
17  January 25th?
18      A.  Yes.
19      Q.  Some of which are religious in nature,
20  correct?                                              11:44:00
21      A.  Yes, that's correct.
22      Q.  So during -- and oftentimes some people call
23  them the Christmas holidays, and some people call
24  them the winter holidays, correct?
25      A.  That's right.                                 11:44:14
```



EXCEEDING YOUR EXPECTATIONS

COMBS REPORTING, INC.

DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 244

1    Q.  And so let me make sure I understand you

2  correctly.

3        Your criticism of Ms. Rocha is during a

4  window when we have Christmas and New Year's, it

5  took 37 days instead of 30, correct?                    11:44:23

6    A.  No.  What I was saying was that the response

7  that she provided on January 25th was basically a no

8  response.  It was non-response response.

9    Q.  Correct.  She wasn't done.  She told

10 Mr. Deal that on -- that she was not completed,         11:44:44

11 correct?

12   A.  Yeah.  But she could have gone into the

13 details of what she has completed.  It's not

14 either/or.

15   Q.  But what if she wasn't done?                      11:44:56

16   A.  Well, if she had completed part of it -- I

17 mean, to keep someone advised of what's going on,

18 either -- you don't have to wait until you've

19 completed an investigation before you provide an

20 update.  That's -- that's the point I was trying to     11:45:10

21 make.

22   Q.  Wait.  You're an expert.  Tell me what

23 conclusions you would have reached with the same

24 information as of December 19th, 2017.

25   A.  Well, she could have given --                     11:45:20


EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 245

1          MR. DEAL:  Hang on, hang on.  That's beyond

2    the scope of his --

3          MR. SCHMOOKLER:  No.  I'll ask my questions.

4    BY MR. SCHMOOKLER:

5      **Q.  I want to know if you or Ms. Rocha, on**                    11:45:26

6    **December 19th, 2017 -- tell me what conclusions you**

7    **would have reached at that moment in time based on**

8    **the information you had at that moment in time.**

9          MR. DEAL:  I'll object.

10          THE WITNESS:  I'm not her.                                   11:45:38

11          MR. DEAL:  It's an incomplete hypothetical,

12    overbroad, beyond the scope of his designation, but

13    if you can answer, you can answer.

14          THE WITNESS:  I just -- I just believe I

15    just said that I'm not her.  I don't know.  I don't    11:45:50

16    know what her motivations were or where she is now.

17    BY MR. SCHMOOKLER:

18      **Q.  Okay.  Well, tell me what conclusion a**

19    **reasonable claim handler exercising the utmost good**

20    **faith would have reached as of December 19, 2017,**    11:46:02

21    **based on the information available to them.**

22      A.  Well, she's had, you know, in essence, an --

23    almost an entire year to go through all of this

24    material that was requested and I believe forwarded.

25    There -- there should have been some -- at that         11:46:18



 1  point some indication of where they're at and what's
 2  going on.  Excuse me.
 3      Q.  When you say a year, tell me -- we agreed
 4  earlier that the final production from the City was
 5  on May 5th, correct?  May 15th.  Excuse me.                11:46:35
 6      A.  Yes, that's correct.
 7      Q.  So they hadn't -- Ms. Rocha had not had a
 8  year, correct?
 9      A.  Well, she doesn't say that.  It doesn't
10  indicate where she's at.  I can't tell.                    11:46:54
11      Q.  Well, you -- you said a year.  We're talking
12  about what you say, sir.
13      A.  Yeah.
14      Q.  You said that as of December 19th, she had a
15  year.                                                      11:47:03
16          That is not correct, right?
17      A.  Well, I was being general.  You're right.
18      Q.  Okay.  I want to be specific and accurate.
19  Do you want to accuse my client of misconduct?  Be
20  accurate.                                                  11:47:15
21          My client did not, in fact, have a year as
22  of December 19th because the information hadn't been
23  fully provided until May 15th, 2017, correct?
24      A.  That's true.
25      Q.  So your earlier testimony was inaccurate        11:47:27



EXHIBIT 4
PAGE 247

```
 1  when you said she had a year, correct?

 2      A.  Well, if you're looking at it from the

 3  standpoint of the proof of loss having been

 4  submitted on November 3rd and this is December 19th,

 5  my -- my response was correct in that regard.        11:47:40

 6      Q.  Yeah, but they didn't have all the -- they

 7  didn't have the documents necessary to evaluate the

 8  claim when they got the proof of loss, which is why

 9  they had to ask for more.

10      A.  Well, again, they could have been out there  11:47:51

11  obtaining these documents on their own, as far as I

12  can see, you know, from the government entity that

13  was holding these documents.  I don't know.  I'm

14  just saying that that -- I think your date of -- of

15  the -- you know, of the actual investigation could   11:48:10

16  be a little bit off.  That's all I'm trying to say.

17      Q.  Isn't it true, sir -- can -- you know, I'm

18  going to strike that.

19          I want to talk about good faith since you sit

20  there willing to accuse my client of misconduct.     11:48:25

21          Give me a single instance ever since 2000

22  where a single carrier was able to complete an

23  investigation based on information gleaned solely

24  from the government.

25      A.  You're misstating what I stated.  I didn't   11:48:45
```



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 248

JOHN LEPIRE on 07/19/2022

Page 111

```
 1  say --
 2      Q.  I'm not stating anything you stated.  I'm
 3  asking the questions today.
 4          Give me a single example.  One.  What is --
 5      A.  I can't --                                        11:48:51
 6      Q.  -- a single carrier -- hold on.  I haven't
 7  finished.
 8          Give me an example, a single one, where the
 9  crime carrier completed an investigation based
10  solely on information gleaned from the government.     11:49:09
11      A.  I cannot.
12      Q.  Give me a single example in the last
13  20 years where the government had even been willing
14  to produce the records in its possession to a crime
15  carrier.                                                 11:49:26
16      A.  Well, if the -- if the insured authorizes
17  it, there's nothing that stops the governmental
18  entity from providing that information.  I don't
19  believe there was ever a request for an
20  authorization for that to be done.  I can't find it.   11:49:39
21      Q.  I didn't ask -- I didn't ask for that.
22          I want to you give me a single example, one,
23  where the government provided information to a crime
24  carrier in connection with an insurance claim.
25      A.  I cannot.                                         11:49:55
```



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 249

JOHN LEPIRE on 07/19/2022

Page 112

```
 1     Q.  Have you ever once in the last 20 years
 2  called the government and -- while investigating a
 3  crime claim and asked for information?
 4     A.  Have I personally?
 5     Q.  Yes, personally.                          11:50:09
 6     A.  No, I have not.
 7     Q.  Do you distinguish between your preferences
 8  and bad faith?
 9     A.  I don't understand what your -- the question
10  is.                                              11:50:31
11     Q.  Sure.  You have, obviously, a view of how
12  claims should be adjusted, correct?
13     A.  That's true.
14     Q.  Is -- is every instance in which you would
15  disagree with the claim handling bad faith?       11:50:45
16     A.  I think that's speculative.  I can't give
17  you a specific example.
18     Q.  No.  In your mind, in your mind, is every
19  instance in which you agreed with the conduct of AIG
20  in this case automatically bad faith?             11:51:06
21     A.  No.
22     Q.  And can we agree that claim handling is art,
23  not science?
24     A.  Of course.
25        MR. DEAL:  Objection -- objection to form.  11:51:20
```



EXCEEDING YOUR EXPECTATIONS
COMBS Reporting, Inc.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 250

 1  BY MR. SCHMOOKLER:

 2      Q.  And can we agree that there might be more

 3  than one way of investigating a crime claim such as

 4  the one we're deal with here?

 5      A.  Of course.                                    11:51:31

 6      Q.  And can we agree that your disagreement with

 7  a -- with National Union about how it handled this

 8  claim could just be a disagreement of a difference

 9  of approach?

10      A.  No.                                           11:51:44

11      Q.  So every instance in which you disagree with

12  them, none of that could ever be a difference of

13  approach?

14      A.  You're giving me an either/or example.  I

15  don't think that fits the -- the situation here or   11:51:59

16  the claim or the litigation.

17      Q.  Now, you agree -- let's -- let's go forward

18  a bit into 2018 again.  If you'd turn to

19  March 7th, 2018.  Let me know when you're there.

20      A.  Yes.  I've got it.                            11:53:00

21      Q.  It's NUFIC 29586.

22      A.  Yep.

23      Q.  And if you look on the screen, I've

24  highlighted a different paragraph of your report.

25          Do you see that, sir?                         11:53:15



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 251

```
 1      A.  Yes.
 2      Q.  And it says -- you write, "Having heard
 3  nothing from AIG since Ms. Rocha's
 4  December 19, 2017, correspondence, Mr. Deal forwards
 5  a follow-up letter to Ms. Rocha March 7, 2018."      11:53:29
 6          Do you see where I've read from?
 7      A.  Yes, I see that.
 8      Q.  Okay.  What does the word "nothing" mean in
 9  that sentence?
10      A.  I would assume in writing.                   11:53:41
11      Q.  Okay.  So you believe there was no written
12  correspondence from Ms. Rocha between December 19th
13  of 2017 and March 7th of 2018?
14      A.  Not to Mr. Deal, yes.
15      Q.  Okay.  Now let's go back to                  11:53:56
16  December 26th, 2017, which is the last piece of
17  correspondence I've provided you for 2017,
18  NUFIC 29424.
19          Do you see that?
20      A.  What was the date again?                     11:54:12
21      Q.  29424.  December 26th, 2017.
22      A.  December 26th.  That was
23  December 26th, 2017?
24      Q.  Yes, sir.
25      A.  Yeah, I got it.                              11:54:53
```



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 252

1      Q.  And you agree that there was, in fact,

2  correspondence from Ms. Rocha between December 19th

3  of 2017 and March 7th of 2018, correct?

4      A.  What was the question again?

5      Q.  You agree with me there was, in fact,          11:55:23

6  correspondence from Ms. Rocha to Mr. Deal between

7  December 19th of 2017 and March 7th of 2018,

8  correct?

9      A.  Insofar as this email is concerned, yes.

10     Q.  What do you mean insofar as an email is          11:55:38

11  concerned?

12     A.  Well, it's basically a statement that --

13  thank you for your letter.

14     Q.  And what else does she say?  Read the words

15  into the record for us.                                 11:55:49

16     A.  "Please feel free to contact me if you have

17  any questions or concerns."

18     Q.  Did you delete a sentence that seemingly is

19  in between those two sentences, sir?

20     A.  "We look forward to the receipt of any           11:56:00

21  additional information."

22     Q.  Yes.  Do you know why she said that?

23     A.  No, I do not.

24     Q.  Now let's go back one more letter and to

25  December 20th of 2017.                                  11:56:13



```
 1      A.  Yes, I got it.
 2      Q.  And Mr. Deal says in that letter to my
 3  client that "The Riverside District Attorney," last
 4  paragraph, "is negotiating and has completed plea
 5  agreements with several individuals connected with      11:56:39
 6  the underlying fraud scheme, including Moorjani,
 7  Dillon, Eggers, and Aylward.  This could impact
 8  AIG's analysis of the claim."
 9      A.  Yes.
10      Q.  Do you see where I've read from?              11:56:52
11      A.  Yes, I do.
12      Q.  Read the next sentence:  "If needed, the
13  City can forward information in its possession
14  regarding the contemplated plea agreements."
15      A.  Yes.                                          11:57:08
16      Q.  Do you see that?
17          So isn't it true that after Ms. Rocha's
18  December 19, 2017, correspondence, this ensured --
19  told AIG that it was -- that there could be
20  information that could impact this analysis?          11:57:25
21      A.  That's correct.
22      Q.  And isn't it true the City offered to
23  provide information in its possession following the
24  December 19, 2017, correspondence?
25      A.  That's true.                                  11:57:37
```



EXCEEDING YOUR EXPECTATIONS
Combs Reporting, Inc.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 254

1      Q.  And so isn't it true that there was, in

2   fact, correspondence between these business partners

3   during a period in which you said they've heard

4   nothing?

5      A.  Business partners, could you define that?          11:57:49

6      Q.  Well, don't you think the insured and

7   insurer are business partners?

8      A.  I've never heard the term "business

9   partners," but I guess you could -- you could use it

10  in that context.                                          11:58:02

11     Q.  Well, they're not adversaries.

12     A.  Well, no, that's true.

13     Q.  Their --

14     A.  Well, as a business partner, I would think

15  this doesn't preclude National Union or AIG from        11:58:12

16  obtaining that information themselves.

17     Q.  That's not the point, sir.  You said they

18  had heard nothing, correct?

19     A.  I guess I overstated it.

20     Q.  No.  Isn't it true your report falsely           11:58:28

21  accuses Ms. Rocha of saying nothing in a period in

22  which she actually did do something?

23     A.  In the context of that email, you're right.

24     Q.  So isn't it true your report falsely accuses

25  her of doing nothing when, in fact, she did her job?    11:58:45



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 255

```
 1      A.  Well, if you -- I guess you could say that.
 2      Q.  Isn't it true, sir, that the allegations in
 3  the fourth paragraph on page 5 of your report need
 4  to be retracted because they're just false?
 5      A.  Well, in the context of a complete -- a full      11:59:10
 6  and complete investigation and what is happening on
 7  the side of the AIG or National Union, I would say
 8  that I -- you know, I'm not overstating it.  I mean,
 9  I may have -- I may have unintentionally said
10  "nothing."  I -- I -- I wasn't aware of that email      11:59:30
11  to be honest with you.
12      Q.  Okay.  But, sir, Ms. Rocha did her job in a
13  period in which you accuse her of doing nothing,
14  correct?
15      A.  To the extent of that email, yes.               11:59:43
16      Q.  And isn't it true that Rocha emailed the
17  insured to provide the information it requested the
18  day after Christmas demonstrates good faith?
19      A.  In that instance, yes.
20      Q.  Now, let's look at the next paragraph in        12:00:02
21  turn.  You say, "Once again, having heard nothing
22  from Ms. Rocha or anyone else at AIG, Mr. Deal
23  forwarded additional correspondence to Ms. Rocha on
24  April 20th of 2018."
25          Do you see that?  I'll highlight it for you     12:00:22
```



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 256

 1  in yellow.

 2      A.  Yeah.

 3      Q.  Isn't it true that's also false in that

 4  there was correspondence from my client during that

 5  window?                                              12:00:31

 6      A.  You're referencing that December email?

 7      Q.  No.  Between Mr. Deal's April -- I'm sorry.

 8          Between Mr. Deal's March 7th, 2018,

 9  client -- '18 letter and the April 20 date you

10  reference, isn't it true my client was engaged in an  12:00:54

11  analysis of this claim?

12      A.  Yeah.  She was engaged in an analysis of the

13  claim.  That's what she's -- that's her job.

14      Q.  Yeah.  And isn't it true she corresponded

15  with the City, through its broker, during that        12:01:12

16  window?

17      A.  Well, the correspondence with the broker,

18  I -- I'm not -- I'm not certain if correspondence

19  with the broker is, in reality, correspondence with

20  the policyholder.                                     12:01:32

21      Q.  You don't think the correspondence with the

22  broker's claim advocate is correspondence --

23      A.  Well, the client advocate -- okay.  If

24  you're --

25          (Whereupon the court reporter asked the       12:01:48



EXHIBIT 4
PAGE 257

```
 1          parties to speak one at a time.)

 2  BY MR. SCHMOOKLER:

 3      Q.  I'll ask it differently.

 4          Isn't it clear -- isn't it true that in the

 5  period where you say that the insured heard nothing,    12:01:52

 6  my client held a conference call with the claim

 7  advocate to talk about the coverage issues they had

 8  identified?

 9      A.  Did that include the insured, the attorney

10  representing City of Beaumont?                          12:02:13

11      Q.  I asked a different question.

12          Isn't it true that in a period when you say

13  they have heard nothing, my client spoke with the

14  claim advocate representing the insured about

15  coverage issues?                                        12:02:30

16      A.  Without informing the policyholder, I

17  assume.

18      Q.  Sir, you can answer my question as it's

19  phrased.  I get to ask the questions today,

20  unfortunately.                                          12:02:47

21      A.  Could you repeat it, please?

22      Q.  Sure.  Isn't it true that in the window

23  where you say having heard nothing, my client had

24  specific conversations with the claim advocate for

25  the insured over coverage issues?                       12:03:00
```



EXHIBIT 4
PAGE 258

 1     A.  Well, that's a -- that's a conversation, but
 2  nothing was put in writing, I don't -- I don't
 3  believe.  I haven't seen anything, the results of
 4  that phone conversation.  I haven't had a chance to
 5  review anything in that regard.                          12:03:15
 6     Q.  Well, did you review the information and
 7  communication -- sorry.
 8         Did you review correspondence between my
 9  client and the broker claim advocate to determine
10  whether or not we routinely communicated with the       12:03:30
11  claim advocate?
12     A.  You're talking about communication between
13  Rocha and the claims advocate, right?
14     Q.  My client.
15         Did you review the correspondence with the       12:03:46
16  claim advocate so you could see how routinely we
17  communicated about this claim?
18     A.  I was in the -- I was referring to the
19  context of in writing, not phone conversations.
20     Q.  Either -- sure.                                   12:04:02
21         Did you bother to review the written
22  correspondence between my client and the claim
23  advocate to see how regularly we communicated with
24  the insured's representative about this claim?
25     A.  Did the claim advocate communicate in            12:04:17



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 259

 1  writing with the attorney representing the

 2  policyholder?

 3      Q.  I don't know.  You go ahead and ask, but I'm

 4  asking the questions today.

 5          Did you as an expert in this case bother to        12:04:27

 6  review the correspondence between my client and the

 7  insured's claim advocate to -- in evaluating how

 8  often we provided updates about the -- about this

 9  claim?

10      A.  No, I did not.                                     12:04:40

11      Q.  Do you know whether or not my client, in

12  fact, complied with California regulations in

13  providing 30-day updates by updating the claim

14  advocate of the -- representing the insured every

15  30 days?  Do you know if that happened?                    12:04:57

16      A.  I don't know the extent of the -- of the

17  regulations relative to claim advocates.  That I do

18  not know.

19      Q.  Well, the regulations speak to communicating

20  with the -- with the insured, right?                       12:05:13

21      A.  That's correct.

22      Q.  And in this case, the insured had two

23  representatives.  It had a lawyer, and it had a

24  claim advocate, correct?

25      A.  Well, I'm not -- I'm unsure relative to what       12:05:24



EXCEEDING YOUR EXPECTATIONS

COMBS REPORTING, INC.

DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 260

 1  the position of the claim advocate -- advocate was

 2  legally.  I mean, I'm not an attorney.

 3      **Q.  Okay.  But in the insurance world, you know**

 4  **from a -- in claims, that the brokers have internal**

 5  **claim advocates, people who advocate coverage on**       12:05:42

 6  **behalf of the insureds, correct?**

 7      A.  Yeah, that's true.  But again, you have to

 8  look at it from the standpoint of the broker has an

 9  insurance program through an insurance company and

10  other insurance programs through that particular         12:05:54

11  insurance company where their income is coming from.

12  So, you know, they -- the alliance or the

13  relationship, I think, is more so unfavorable to the

14  insurance relative to the claim advocate than it is

15  to the policyholder in my estimation.                    12:06:15

16      **Q.  You think the claim advocate holds off?**

17      A.  Yeah.  At times, I would think so.

18      **Q.  Oh, really?  Oh, can you -- can you give me**

19  **an example of a single time in the last 20 --**

20      A.  I don't have an example because I don't have    12:06:31

21  an example here, but I'm just saying the broker has

22  a tremendous allegiance to the insurance company

23  that he's representing because of the business he's

24  getting.

25      **Q.  Okay.  But -- okay.  I'm going to ask my**      12:06:40



Page 124

 1  question.  I deal with claim advocates all the time.

 2  I'm anxious to know.

 3        Can you name me one claim advocate who

 4  thinks it's their job to help insurance companies

 5  find ways not to pay claims?                    12:06:54

 6    A.  No.

 7    Q.  Can you give me the name of a single claim

 8  advocate ever who has ever helped an insurance

 9  company deny a claim?

10    A.  No, I cannot.                             12:07:06

11    Q.  And is it, in fact, true that in this case

12  the claim advocate, in fact, advocated a series of

13  coverage on behalf of the insured?

14    A.  In this instance, to an extent, yes.

15    Q.  So isn't it -- did you -- did you, in       12:07:20

16  determining whether or not my client acted in bad

17  faith in -- strike that.

18        Did you, in determining whether or not my

19  client acted in bad faith, review the correspondence

20  with the claim advocate to see how often we updated  12:07:34

21  them and whether those -- I shouldn't ask a compound

22  question.

23        Did you determine whether or not my client

24  complied with California regulation in terms of

25  updating the insured through its communications with  12:07:51


EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 262

 1  the claim advocate at Alliant?

 2      A.  I'm not familiar with the position of a

 3  claim advocate relative to the insurance -- the

 4  insurance regulations.  I -- I really am not.

 5      Q.  Can you state to a reasonable degree of          12:08:09

 6  professional certainty that my client acted in bad

 7  faith -- strike that.

 8          Can you state to a reasonable degree of

 9  professional certainty that my client violated the

10  California insurance regulation -- strike that.        12:08:21

11          Can you state to a reasonable degree of

12  professional certainty whether my client's

13  communications with the claim advocate at Alliant

14  satisfied the California insurance regulation in

15  terms of periodic updates to the insured?             12:08:39

16      A.  I'm uncertain.  I do not know the answer to

17  that.

18      Q.  Can we agree that you do not -- you do not

19  have enough information to reach an opinion as to

20  whether or not my client, through communications     12:08:55

21  with the claim advocate at Alliant, satisfied its

22  obligations to provide periodic updates in

23  compliance with the California insurance regulation?

24      A.  That's correct.

25      Q.  All right.  It's 12:00 o'clock.               12:09:09



JOHN LEPIRE on 07/19/2022

Page 126

 1        Would you like to take like a 20-minute

 2   break for lunch?

 3        MR. DEAL:  How much more do you have?

 4        MR. SCHMOOKLER:  Probably an hour and a half

 5   or so.  I think we'll be done about 2:15, 2:30.        12:09:22

 6        MR. DEAL:  Okay.

 7        MR. SCHMOOKLER:  Should we take -- want to

 8   take a break for lunch, sir?

 9        THE WITNESS:  Yeah.  Let's -- can we make it

10   a half an hour?                                        12:09:35

11        MR. SCHMOOKLER:  Sure.  We'll come back --

12   want to come back at 12:30 or 12:40?

13        THE WITNESS:  12:40.

14        MR. SCHMOOKLER:  Okay.  Sounds great.  Thank

15   you.                                                   12:09:41

16        THE WITNESS:  Okay.

17        THE VIDEOGRAPHER:  Going off the record, the

18   time is 12:09 p.m.

19        (At 12:09 p.m. a lunch recess was taken

20   until 12:41 p.m. of the same day.)                     12:09:45

21      (Nothing omitted nor deleted.  See next page.)

22

23

24

25



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

**EXHIBIT 4**
**PAGE 264**

```
 1            TUESDAY, JULY 19, 2022; P.M. SESSION

 2

 3            THE VIDEOGRAPHER:  We're back on the record.

 4    The time is 12:41 p.m.

 5                      ---oOo---                         12:42:00

 6                 EXAMINATION RESUMED

 7    BY MR. SCHMOOKLER:

 8       Q.  Sir, I'd like to ask you a couple more

 9    questions about the April 26th, 2018, letter from my

10    client if you want to find it in the binder.         12:42:08

11            You with me?

12       A.  I'm trying to find it here.

13       Q.  Find the -- look for August 13, 2018, sir,

14    and go back two.

15       A.  Just a second.  It was April 26th?           12:43:56

16       Q.  Yep.

17       A.  Yeah, I got it.  I have it.

18       Q.  Great.  You write in your report -- and I'll

19    put it up on the screen.  I'm curious about this.

20    I'll highlight it for you.                           12:44:35

21            Do you see the paragraph I've highlighted?

22       A.  Yes.

23       Q.  And you say that there -- that her statement

24    is extraordinary.

25       A.  Yes.                                          12:44:52
```



EXCEEDING YOUR EXPECTATIONS

COMBS Reporting, INC.

DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 265

 1      Q.  Okay.  What -- what makes her statement

 2   extraordinary?

 3      A.  Well, basically she says that, "While this

 4   letter is lengthy, we feel such a length is

 5   necessary in order to comprehensively provide."  In     12:45:03

 6   other words, in my opinion, she had comprehensively

 7   reviewed this claim and come up with a figure in the

 8   vicinity of $57,803,907 and -- $803,975.

 9      Q.  So you took her reference to 57,803,97 (sic)

10   as a valuation?                                          12:45:29

11      A.  Yeah.  She said "comprehensively provide the

12   insured with as much detailed review as possible on

13   this."

14      Q.  Yeah.

15      A.  Emphasis on "this."  $57,803,975 claim          12:45:40

16   involving multiple alleged schemes.

17      Q.  Do you know what that 57,803,975 references?

18      A.  I -- it's -- it's in her letter.  I -- I

19   assume that that's this value she came up with.

20      Q.  Isn't it true, sir, that that's just the        12:46:04

21   judgment that was entered against the insured to the

22   penny?

23      A.  It doesn't say that.

24      Q.  But isn't that fact true?

25      A.  I'm not aware of it.                             12:46:14



1    Q.  Well, you are aware of it because you saw

2  the proof of loss, did you not?

3    A.  Yes.  I saw the proof of loss.

4    Q.  And isn't it true the proof of loss

5  identifies the judgment amount as 800 --            12:46:23

6  $57,803,975?

7    A.  Yeah.  I just assumed that she figured that

8  that was the amount.  Why did she put it in her

9  letter?

10    Q.  Well, that is -- that is the amount -- one   12:46:37

11  component of the claim, is it not?

12    A.  Well, it's -- it's the major component of

13  the claim, yes.

14    Q.  Well, actually it would not even be the

15  majority of the claim, correct?                     12:46:49

16    A.  Well, that's what the revised proof of loss

17  came in at, I believe.

18    Q.  So, sir, I just want to understand.

19       You think it's extraordinary -- you think

20  she was acknowledging coverage?                     12:47:03

21    A.  Well, I mean, you can interpret that in a

22  number of different ways.

23    Q.  Okay.  You interpreted that sentence to be

24  an acknowledgment of coverage --

25    A.  No.  I said --                                12:47:18

1      Q.   -- despite what the letter says?

2      A.   I said, "This is an extraordinary statement,

3   and though it doesn't indicate the actual true value

4   of the loss, it certainly implies it."  To me, it

5   implied it.                                         12:47:31

6      Q.   So you think she valued the claim at

7   57,803,975 in that sentence?

8      A.   Well, why would she put it in here unless

9   she was going to, you know, indicate in her letter

10  that this amount was the amount of the judgment?     12:47:44

11  She doesn't say that.  There's nothing about a

12  judgment anywhere there.

13     Q.   Did you read the rest of the letter?

14     A.   Yes.

15     Q.   And in the rest of the letter does she then   12:47:56

16  go on to quantify each component of the claim as

17  presented?

18     A.   She quantifies it, yes.

19     Q.   And your critique of her is she shouldn't

20  have put that number there because of the value --    12:48:14

21  because of the other components of the claim?

22     A.   I'm just saying that she should have put,

23  "This was the amount of the judgment."  That would

24  have made it clear.  It's unclear to me.

25     Q.   Okay.  You just -- you don't like -- you      12:48:25



 1   think that one sentence in her nine-page letter is

 2   unclear.  Is that fair?

 3       A.  That's fair.

 4       Q.  Okay.  Do you think it -- do you think that

 5   the lack of clarity of that one sentence is bad                12:48:40

 6   faith?

 7       A.  Well, it's an indication of a value that was

 8   placed on this by the adjuster handling it in my

 9   opinion.

10       Q.  Yeah.  That doesn't mean it's covered,             12:48:49

11   right?

12       A.  Well, like I said, you know, this -- from

13   the very beginning, it's been difficult to get a --

14   you know, agreed on on exactly what AIG or National

15   Union thinks is the value of this.  It goes up and         12:49:03

16   down.

17       Q.  Both -- I can tell you the value is zero.

18           You understand that because you saw our

19   answer, did you not?

20       A.  I saw your answer.                                 12:49:12

21       Q.  And what -- did the answer specifically deny

22   coverage?

23       A.  It does deny coverage.

24       Q.  And it asserts a series of affirmative

25   defenses?                                                  12:49:24



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 269

```
 1     A.  Yes.  As of, what was it, about five years
 2 after the initial proof of loss was submitted that
 3 it was finally -- finally provided.
 4     Q.  Do you know why that was?
 5     A.  Pardon?                                        12:49:38
 6     Q.  Do you know why it took so long to do that?
 7     A.  I have no idea.
 8     Q.  Okay.  Let's learn.  Let's educate each
 9 other.  Let's look at the November 4th, 2019, letter
10 from Anderson McPharlin & Conners to Chris Deal.      12:49:54
11 November 4, 2019.
12     A.  Yes.  I got it.  I have it.
13     Q.  You read this letter, right?
14     A.  Yes, I read it.
15     Q.  And in this letter, Mr. Watnick, counsel for  12:51:26
16 National Union, details a dispositive coverage
17 issue, correct?
18     A.  That's correct.
19     Q.  And you know that the identification of when
20 discovery occurs can, in fact, be a dispositive      12:51:48
21 coverage issue in the context of a crime policy,
22 correct?
23     A.  Could you repeat that again?
24     Q.  Sure.  The date on which discovery occurs
25 may ultimately be dispositive in a crime claim,      12:51:59
```



 1  correct?

 2     A.  Yes.

 3     Q.  Now, the letter is predicated upon a notice

 4  of discipline of Mr. Kapanicas.  Is that correct?

 5     A.  Where is the reference to the disciplining          12:52:22

 6  of Kapanicas?  I --

 7     Q.  It starts on page 10 and continues on to

 8  page 11, 12, 13.

 9     A.  Yes.  I have it.

10     Q.  Okay.  Do you see how this letter -- can we         12:53:01

11  agree that the letter written by Anderson McPharlin

12  in November of 2019 identifies a dispositive

13  coverage issue for the insured?

14     A.  That it details it, yes.

15     Q.  And if you turn to -- hold on one second --         12:53:29

16  an email from April 12th, 2019.  So keep open

17  Mr. Watnick's letter, so somehow keep it open, but

18  also look at the same time at an email dated

19  April 12th.

20     A.  2019?                                               12:54:19

21     Q.  2019.

22     A.  This is the email from Daniel Richards to

23  Kenneth Watnick?

24     Q.  Yes, sir.

25     A.  Yes, I have it.                                     12:55:08



EXCEEDING YOUR EXPECTATIONS
Combs Reporting, Inc.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 271

JOHN LEPIRE on 07/19/2022

Page 134

1       Q.  So the April 12th email I've shown you is

2   the first instance in which my client was provided

3   the notice of discipline of Mr. Kapanicas.

4           Do you see that, sir?

5       A.  Yeah, I see it.                                    12:55:25

6       Q.  Is it fair to say that one document

7   potentially giving rise -- strike that -- the notice

8   of discipline potentially giving rise to a

9   dispositive issue was first provided to my client

10  April 12th, 2019?                                          12:56:49

11      A.  In relationship to the Kapanicas matter,

12  yes.

13      Q.  Well, termination -- discovery would be

14  dispositive of the whole case, correct?

15          MR. DEAL:  Calls for a legal conclusion.          12:57:07

16  BY MR. SCHMOOKLER:

17      Q.  Well, in your experience, sir, having

18  handled claims, identifying when discovery occurred

19  can be a dispositive issue, correct?

20      A.  That can be a legal issue.                         12:57:25

21      Q.  Well, it can be an issue that can lead to

22  the denial of a claim, correct?

23      A.  That's correct.

24      Q.  And, in fact, you don't even know what

25  policy terms to apply until you know when discovery    12:57:35



EXCEEDING YOUR EXPECTATIONS

Combs Reporting, Inc.

DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 272

1  occurred, right?

2      A.  In regards to the specific individual in

3  that specific instance, you're right.

4      Q.  So -- and in this case, Kapanicas was

5  accused of conspiring with the owners of ULC, right?    12:57:52

6      A.  Conspiring with the owners of ULC?

7      Q.  Yes.

8      A.  Yes.

9      Q.  Okay.  And so learning when the -- when the

10  City decided if fraud occurred, that would be    12:58:06

11  critical to a coverage analysis in a fidelity

12  context, right?

13      A.  Well, it would depend on the -- you know,

14  the circumstances involved.

15      Q.  But in this case, learning when the City    12:58:18

16  accused Kapanicas of fraud would be critical to an

17  analysis of the claim, right?

18      A.  Yes.

19      Q.  And so until -- up and until

20  April 12th, 2019, my client didn't even have the    12:58:33

21  information to know that this was even an issue,

22  right?

23      A.  Insofar as this specific issue that is the

24  provenance of that lawsuit that was filed, that's

25  true.    12:58:51



EXCEEDING YOUR EXPECTATIONS

COMBS REPORTING, INC.

DEPOSITION REPORTERS • LEGAL VIDEO



```
 1     Q.  So isn't it true, sir, that everything that
 2  led up to all -- strike that.
 3         Isn't it true, sir, that it was in the
 4  utmost good faith of my client, upon receipt of a
 5  notice of discipline, to undertake a thorough        12:59:04
 6  investigation into when discovery occurred?
 7     A.  Well, you know, there's another aspect of
 8  this too.  There was an issue of losses prior to
 9  2004, and I believe that that issue was not
10  addressed by the -- the AIG claim -- claim adjuster  12:59:27
11  on this thing, that the issue of -- of -- of the
12  potential losses prior to 2004 was an open issue
13  also.
14     Q.  Well, I didn't ask that.  Move to strike.
15  Sir, stay with me.  We'll get to that.  I know -- I  12:59:47
16  know you have criticism, and I'll debunk that in a
17  minute.
18         Isn't it true that my client, upon receipt of
19  the notice of discipline in April of 2019, acted in
20  the utmost good faith by conducting an investigation 13:00:04
21  and analysis of when discovery occurred?
22     A.  Insofar as that one aspect of the claim is
23  concerned, yes, you're right.
24     Q.  And isn't it true that having been presented
25  with a notice of discipline in April of 2019, it was 13:00:15
```



1  the utmost good faith for AIG to do that analysis of

2  discovery before reaching a coverage decision?

3      A.  Relative to that one specific incidence

4  involving Kapanicas?

5      Q.  You understand Kapanicas is accused of          13:00:35

6  conspiracy, correct?

7      A.  That's correct.  But he's not the -- the

8  entire aspect of this claim.  He's not the -- this

9  is not limited to nothing but Kapanicas.

10     Q.  But you -- do you even know how discovery      13:00:50

11  works in the context of a fidelity policy?

12     A.  Discovery works?  That's a legal issue.

13     Q.  Do you know what the implications of

14  discovery are in the context of a fidelity policy?

15     A.  Discovery?                                     13:01:07

16     Q.  Yes.

17     A.  Legal discovery you're talking about?

18     Q.  No.  Do you understand what the implications

19  are if discovery of Kapan -- a fraud by Kapanicas

20  occurred in a prior policy?  Do you understand the    13:01:20

21  implications of what that means from a policy

22  standpoint?

23     A.  Yes, I do.

24     Q.  Okay.  And you understand then that to the

25  extent there was discovery of fraud by a             13:01:28



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 275

1   conspirator, that that could have implications for

2   all of the claim?

3       A.   If it were true, yes.

4       Q.   Okay.  So you understand that when being

5   told that there's a notice of discipline of                13:01:42

6   Kapanicas, that notice of discipline could have an

7   overarching application or impact on the entire

8   claim, correct?

9       A.   Well, it would have -- it would -- it would

10  relate to what the discipline was for.                      13:01:54

11      Q.   Correct.  And so my client --

12      A.   You know, because it -- again, it had to --

13  it had to be -- it had to be something involving a

14  value, and if there was no value, then the

15  disciplinary action, you know, didn't give rise to a       13:02:08

16  claim in my opinion.

17      Q.   Okay.  I don't -- okay.

18          My client acted in the utmost good faith by

19  undertaking an analysis of the impact of the notice

20  of discipline following its production in April of         13:02:20

21  2019, correct?

22      A.   Well, again, it all depends on the

23  circumstances behind that disciplinary action.

24      Q.   I didn't ask that.

25          My client, from a claim handling                   13:02:36



EXHIBIT 4
PAGE 276

1  perspective, acted in the utmost good faith by

2  conducting an investigation of discovery upon the

3  first production of the notice of discipline in

4  April of 2019, correct?

5      A.  If that documentation couldn't have been                13:02:51

6  obtained by AIG prior to that date, if that was the

7  first notice relative to that particular issue, and

8  that was something that wasn't discoverable by

9  the -- by the insurance company, possibly.

10     Q.  How in the world is there a scenario in                 13:03:14

11  which we could get a notice of discipline by the

12  City from somebody other than the City?

13     A.  I -- I -- to be honest with you, it could

14  have been in the records that were, you know, sealed

15  by the District Attorney's Office or the FBI.                  13:03:33

16     Q.  Or --

17     A.  They might have had copies of that.  If

18  someone had done the investigation back at the very

19  beginning, it may have been something that would

20  have been discoverable by the adjuster of the                 13:03:46

21  insurance company.

22     Q.  Okay.  Let's break it down.  Let's talk

23  about what is and isn't, not what may be.

24         Was it in the government's records, yes or

25  no?                                                           13:03:59



```
 1      A.  I do not know.
 2      Q.  Before accusing my client of bad faith, did
 3   you bother to determine what was, in fact, available
 4   from the government?
 5      A.  No.  I was -- I'm not -- I wasn't privy to        13:04:12
 6   exactly what was obtained from the government or,
 7   conversely, what the government had insofar as
 8   documentation.  I don't know.
 9      Q.  Okay.  But before accusing my client of bad
10   faith for failing to get records from the               13:04:28
11   government, did you bother to figure out if any of
12   the material information it needed was in the
13   possession of the government?
14      A.  Well, they had five years to find out.
15          MR. DEAL:  Objection.                            13:04:39
16          THE WITNESS:  I mean --
17   BY MR. SCHMOOKLER:
18      Q.  I didn't ask whether we had five years to
19   find out.  I -- I'm asking about what you did.
20          Before filing a report accusing my client of    13:04:46
21   bad faith, did you do the necessary due diligence to
22   determine what records were in possession of the
23   government that could be material to this claim?
24      A.  No, I did not.
25      Q.  So you did not do the due diligence you          13:05:02
```



EXHIBIT 4
PAGE 278

1  expected of my client, correct?

2      A.  I'm not the adjuster on the claim.  I

3  wasn't --

4      Q.  Well, you --

5      A.  I was asked to review the records that were          13:05:13

6  provided to me and the governmental documentation

7  that was, you know, held by the FBI or, you know, by

8  the grand jury or by the District Attorney's Office.

9  I wasn't privy to any of that during my -- my

10 evaluation.                                                   13:05:28

11     Q.  Well, why didn't you ask for that?

12     A.  Pardon?

13     Q.  Are you aware that the City of Beaumont

14 possesses the entire government production?

15     A.  I don't know that for a fact.                         13:05:39

16     Q.  Did you bother to figure out if it was

17 available to you for review?

18     A.  No.  It's not my job to do that.

19     Q.  Well, before sitting down to accuse my

20 client of bad faith, did you undertake even a                 13:05:50

21 minimal amount of due diligence to see if the

22 conduct that you think was required actually would

23 have yielded any positive result?

24     A.  You know, my -- my opinion relative to bad

25 faith is holistic.  It has to do with the entire             13:06:11



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 279

1  claims investigation from the very beginning and the

2  obtaining of records which, in my opinion, was

3  deficient.  I mean, there's a lot of aspects to this

4  we haven't even discussed that, you know, relate to

5  that opinion that I came to.                        13:06:27

6      Q.  Oh, I get to ask the -- you'll -- one day if

7  you can get to a jury on this, you can -- you can

8  testify as counsel suggests, and today I get to ask

9  the questions.  So let's go back to what I want to

10  ask.                                               13:06:40

11          Isn't it true, sir, that in accusing my

12  client of bad faith for failing to gather information

13  from the government, you don't even know whether the

14  information the government possessed would enable it

15  to value the claim?                                13:06:58

16      A.  That's correct.

17      Q.  You also don't know whether any of the

18  information that was possessed by the government

19  would have had any impact on any coverage analysis

20  whatsoever?                                        13:07:14

21      A.  No.  Because it was never obtained by the

22  insurance company.

23      Q.  Well, it is available to you today, is it

24  not?

25      A.  Well, I don't know.  As I said, I didn't    13:07:23



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 280

JOHN LEPIRE on 07/19/2022

Page 143

```
 1  compare the documentation that was there that was in

 2  the possession of these governmental agencies with

 3  the information that was provided to me by the City.

 4  I didn't do that.

 5      Q.  Why does it matter what claim number we          13:07:38

 6  assign to this case?

 7      A.  Could you repeat that question again?

 8      Q.  Why in the world would an insured care if

 9  National Union assigned a new claim number?

10      A.  Well, very simply because it relates to a       13:07:58

11  different policy, and that one policy had a

12  $10 million limit and the other policy had a

13  $15 million limit.  So the differential is

14  $5 million.  That's what the -- that's the reason it

15  makes a difference.                                     13:08:14

16      Q.  Well, it doesn't matter how we categorize

17  it.  It matters what policy applies, correct?

18      A.  Well, it's something that should have been

19  revealed to the policyholder, that you're, you know,

20  reassigning this to a different policy.  I don't       13:08:29

21  believe, from what I can glean, that that

22  information was ever provided.

23      Q.  Isn't that what was in Mr. Watnick's letter?

24  He talks specifically about which policy applies,

25  November 4th, 2019, sir.                                13:08:42
```



EXCEEDING YOUR EXPECTATIONS

COMBS REPORTING, INC.

DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 281

1      A.  I'm talking about the claims -- the claim

2  number assignment and the indication or the -- you

3  know, the transmission of that information relative

4  to claim number being assigned with a different

5  policy, with a different policy limit, and          13:08:57

6  potentially additional coverages that were provided

7  by -- by AIG/National Union.  That information, from

8  what I can glean, was never -- never transferred.

9      **Q.  That is exactly what that --**

10     A.  As I've indicated.                           13:09:12

11     **Q.  November 4th, 2019, sir.  Read the letter.**

12  **Let's -- get to the letter with me.**

13     A.  This is the November 4th letter?

14     **Q.  Yeah.**

15     A.  Okay.  Where are you -- what are you         13:09:29

16  referring to?

17     **Q.  Second full paragraph.**

18     A.  At the beginning?

19     **Q.  Yeah.  Read it to yourself.**

20     A.  (Witness reviews document.)  Well, this      13:09:52

21  letter is dated November 4th, 2019.  There's no --

22     **Q.  Okay.**

23     A.  There's no mention as to when this

24  reassignment was made.  Was it made on --

25     **Q.  We'll get to that.  We'll get to that.  Hold**  13:10:29



EXCEEDING YOUR EXPECTATIONS

COMBS REPORTING, INC.

DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 282

JOHN LEPIRE on 07/19/2022

Page 145

```
 1  on.  You said it was never.  You used the word

 2  "never."

 3          Isn't it true that my client, in fact,

 4  communicated to the City that it had concluded that

 5  the 2015 policy did not apply as of                        13:10:43

 6  November 4th, 2019?

 7      A.  Yes, that's true.

 8      Q.  And isn't it true that my client, following

 9  that communication, offered the City a chance to

10  respond and provide information on that issue?           13:11:00

11      A.  That's true.

12      Q.  And isn't it true providing the City an

13  opportunity to respond to a dispositive coverage

14  issue is a reasonable, good faith claim handling

15  practice?                                                 13:11:18

16      A.  That's true if it -- if it --

17      Q.  Is it -- hold on.

18      A.  If it --

19      Q.  Let me ask the next question.  Isn't it

20  true --                                                   13:11:28

21          MR. DEAL:  He's allowed to continue his

22  answer.

23          MR. SCHMOOKLER:  He's not allowed -- he's

24  not allowed to just pontificate.  I asked --

25          MR. DEAL:  He's allowed to continue his          13:11:33
```



EXCEEDING YOUR EXPECTATIONS

Combs Reporting, Inc.
DEPOSITION REPORTERS · LEGAL VIDEO

EXHIBIT 4
PAGE 283

 1  answer.  He had not finished.  You can do a motion

 2  to strike or whatever, but he's allowed to finish

 3  his answer.

 4  BY MR. SCHMOOKLER:

 5     **Q.  Isn't it true, sir, that on**          13:11:41

 6  **November 4th, 2019, my client identified a critical**

 7  **coverage issue and gave the insured an opportunity**

 8  **to respond?**

 9     A.  And my response is that critical issue

10  should have been surfaced at some point in time     13:11:55

11  during this five-year period of pendency of the

12  claim.

13     **Q.  What five years?**

14     A.  Pardon?

15     **Q.  You said five years.  Give me the dates of**   13:12:04

16  **that five years, because this is 2019.  Five**

17  **years --**

18          MR. DEAL:  Scott, do not scream at the

19  witness.

20          THE WITNESS:  No.  It's actually --       13:12:13

21          MR. SCHMOOKLER:  Stop making stuff up,

22  Chris.

23          MR. DEAL:  No.  Stop screaming at the

24  witness.

25          THE WITNESS:  I miss -- I misstated.  It's  13:12:19



EXHIBIT 4
PAGE 284

1  actually three years.

2  BY MR. SCHMOOKLER:

3      Q.  **And isn't it true, sir, that the factual**

4  **basis of that wasn't provided to us until April of**

5  **'19?**                                                  13:12:31

6      A.  Again, if a proper investigation had been

7  conducted by AIG, this information could have been

8  obtained and the issues of coverage could have been

9  addressed much earlier in the process.

10      Q.  **You asked for it in December of '16, sir.**     13:12:55

11  **How much faster would you -- strike that.**

12          **Isn't it true we asked for this in December**

13  **of '16?**

14      A.  Again, I'm going back to the -- the records

15  that were held by -- again, everybody was a prisoner     13:13:10

16  of the documentation that was held by the -- the

17  police authorities or the FBI or the grand jury or

18  the District Attorney's Office.  Again, these

19  documentation -- this documentation could have

20  conceivably been obtained independently by AIG,          13:13:29

21  which, from what I can glean, it was never done.  It

22  was never requested.

23      Q.  **All right.  I didn't ask that.  Move to**

24  **strike.  You have to answer my questions.**

25          MR. DEAL:  Can we go off the record for a         13:13:43



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

**EXHIBIT 4**
**PAGE 285**

1  second?  I have someone knocking at the door.

2       MR. SCHMOOKLER:  No, no.  I need to finish

3  my line of questioning, Chris.  I need to ask two

4  more questions.  Sorry.

5  BY MR. SCHMOOKLER:                                    13:13:53

6       Q.  On December 1st, 2016, three years earlier,

7  my client asked for the employment records of

8  Mr. Kapanicas, correct?

9       A.  Yeah.  Which weren't in our possession, I

10  don't believe.                                        13:14:05

11       Q.  Okay.  How would my client have known in

12  that three-year period that there's a notice of

13  discipline if it never received the records?

14       A.  Those records, from what I understand, were

15  in the possession of governmental authorities that   13:14:21

16  AIG had the same right to obtain after having

17  obtained an authorization from the policyholder that

18  the policyholder had in obtaining these records.

19       What I'm trying to say is that there could

20  have been a number of issues, that being one of      13:14:39

21  them, that could have been resolved much -- much

22  prior to the -- to the time when this was finally

23  surfaced and -- on November 4th of 2019.

24       Q.  Okay.  So you're willing to state under

25  oath, under penalties of perjury that the notice of  13:14:56



EXHIBIT 4
PAGE 286

 1  discipline was, in fact, in the possession of the

 2  government?

 3       A.  No, I didn't say that.  I said it could have

 4  been.

 5       Q.  Okay.  I don't want to know what could have          13:15:03

 6  happened.  I want to know what, in fact, happened.

 7       A.  I don't know what happened.

 8       Q.  Can you state -- do you know whether there

 9  was any source for the notice of discipline other

10  than the City as a matter of fact?                           13:15:14

11       A.  No, I do not.

12       Q.  So your criticism about what could have been

13  obtained from the government, you don't, in fact,

14  know whether this record was obtained -- was

15  accessible through any source other than the City,          13:15:27

16  correct?

17       A.  That's -- that's correct.

18           MR. SCHMOOKLER:  Okay, Chris.  I'm happy to

19  take a break now.

20           MR. DEAL:  Truck's gone.                            13:15:37

21           MR. SCHMOOKLER:  Take five minutes?  Oh,

22  okay.

23           MR. DEAL:  It was a delivery truck.  My

24  daughter got it.

25           MR. SCHMOOKLER:  Okay, great.                       13:15:43



Page 150

```
 1              MR. DEAL:  I literally needed 15 seconds.

 2              MR. SCHMOOKLER:  Sorry.  I was in the middle

 3   of a thought.

 4   BY MR. SCHMOOKLER:

 5       Q.  Now, you know that there was no response to     13:15:52

 6   Mr. Watnick's November letter, correct?

 7       A.  That I can see here in the documentation you

 8   provided, I don't see it.

 9       Q.  No.  Was there a response to Mr. Watnick's

10   letter?                                                 13:16:21

11       A.  Off the top of my head, I can't -- I can't

12   comment on that.

13       Q.  Isn't it true, sir, that the reason no

14   formal position -- strike that.

15              Isn't the re -- isn't it true, sir, that the  13:16:32

16   reason my client didn't finalize its position is

17   because the City never responded to its letter and

18   the critical coverage issue raised in the letter of

19   November 2019?

20              MR. DEAL:  Calls for speculation.             13:16:48

21              THE WITNESS:  I'm not going to speculate on

22   that.

23   BY MR. SCHMOOKLER:

24       Q.  Well, sir, you emphasize too many times in

25   your report that there's no final decision.            13:16:58
```



1          Do you know why it is AIG was unable to

2    complete its investigation?

3        A.  Well, again, you know, what I've been

4    stating from the very beginning is AIG was relying

5    almost exclusively, with the exception of the -- you          13:17:14

6    know, the forensic accountant and the engineer that

7    went out and did the review of those construction

8    records -- really didn't do much of an

9    investigation.  It was left to the -- the -- the

10   provenance of the -- of the policyholder to go out          13:17:34

11   and -- and do that.

12       Q.  Well, sir, in terms of discovery, do you

13   even know how discovery works, the concept?

14       A.  Legal discovery?

15       Q.  No.  Discovery in the context of a fidelity          13:17:47

16   policy.

17           Do you understand --

18       A.  Yes, I do.

19       Q.  -- how it works?

20       A.  Yes, I do.          13:17:53

21       Q.  Discovery --

22       A.  The insurance company has the right to

23   investigate --

24           (Whereupon the court reporter asked the

25           parties to speak one at a time.)



EXHIBIT 4
PAGE 289

JOHN LEPIRE on 07/19/2022

Page 152

```
 1  BY MR. SCHMOOKLER:
 2      Q.  All right.  Sir, do you know that fidelity
 3  policies are written on a discovery basis?
 4      A.  Yes.  I realize that.
 5      Q.  Okay.  And do you understand that discovery     13:18:11
 6  is evaluated based on the knowledge of the insured?
 7      A.  But that doesn't preclude the insurance
 8  company from going out and developing whatever
 9  information they need on their own in order to make
10  a determination as to coverage.                         13:18:27
11      Q.  Move to strike, nonresponsive.
12          MR. SCHMOOKLER:  Ms. Court Reporter, read my
13  question back, please.
14          (Record read:  And do you understand that
15          discovery is evaluated based on the             13:18:13
16          knowledge of the insured?)
17          THE WITNESS:  Yes.
18  BY MR. SCHMOOKLER:
19      Q.  And you understand that in November of 2019
20  my client wrote a letter with its analysis of what     13:18:54
21  the in -- what the insured knew and the implications
22  of that knowledge, correct?
23      A.  Yes.
24      Q.  And in terms of whether the insured agreed
25  or disagreed with the conclusions AIG reached, only    13:19:10
```



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 290

 1  the insured would know that, correct?

 2     A.  Yes, that's correct.

 3     Q.  So as of November of 2019 when my client

 4  reached a conclusion as to when discovery occurred,

 5  only the insured can speak to whether they agree          13:19:28

 6  with that analysis, correct?

 7     A.  That's true.

 8     Q.  So as of November when my client reads a

 9  critical coverage issue, in terms of closing the

10  loop on that issue, it needed to know from its            13:19:43

11  insured do you agree with us or not, correct?

12     A.  That's a valid assumption.

13     Q.  And isn't it true that asking the insured

14  whether it agrees with National Union's coverage

15  analysis is a good faith claim handling practice?         13:20:04

16     A.  In the context of this one specific aspect

17  of the claim, yes.

18     Q.  And this is the last aspect of the claim

19  prior to the lawsuit being filed, correct?

20     A.  From the information I have, yes, that's            13:20:20

21  correct.

22     Q.  So the reason AIG didn't finalize its

23  analysis of the discovery issue is the insured never

24  responded to that analysis, correct?

25     A.  In -- in regards to this one specific aspect       13:20:36



EXHIBIT 4
PAGE 291

1  of the claim, yes, you're right.

2      Q.  And so waiting for the insured to respond to

3  the November letter was good faith, was it not?

4      A.  Regarding this one aspect of the claim, yes.

5      Q.  Now, do you know what happened after --          13:20:57

6  putting aside settlement for a minute.

7          Other than settlement, do you know what

8  happened following this letter in November of '19?

9      A.  Relative to written communication or verbal

10  communication or --                                       13:21:17

11      Q.  With regard to the claim.

12          When was the next time National Union

13  received anything of substance from its insured

14  following the November 4th, 2019, letter?

15      A.  I believe it was the lawsuit.                     13:21:32

16      Q.  So isn't it true that in the period between

17  November 4th, 2019, and the filing of the lawsuit

18  National Union was waiting to hear from its insured

19  as to whether it agreed with a critical coverage

20  issue, correct?                                           13:21:55

21      A.  One of the coverage issues, yes.

22      Q.  And it's -- it's a critical coverage issue,

23  is it not?

24      A.  I -- I can't, you know, comment on how

25  critical it was.  There are other aspects of it that     13:22:12



1  I'm -- you know, that I'm not certain of.

2      Q.  Now, if -- AIG did offer to settle, did it

3  not?

4      A.  Well, that's a good question.  I didn't see

5  anything in writing relative to a settlement offer.      13:22:25

6      Q.  Okay.  But you wrote in your report that an

7  offer was made, correct?

8      A.  I didn't say settlement offer.  I said

9  offer.

10     Q.  Well, you said, "AIG had offered 1.5 million   13:22:37

11 in full and final settlement of this claim."

12         That's your words, is it not?

13     A.  Yeah.  That's -- well, that was a verbal

14 offer.  It wasn't in writing.

15     Q.  Okay.  Yeah.  That's fine.                      13:22:48

16         You don't like verbal offers; you only like

17 writings?

18     A.  Well, I believe that an offer, according to

19 the -- you know, the insurance code, has to be in

20 writing and it has to be specific.  There has to be    13:23:02

21 some specificity.  There was none.  All -- from what

22 I can glean, there was a comment made, you know,

23 we'll give a hundred -- one and a half million

24 dollars.  That was it.

25     Q.  How do you know?  Were you there?              13:23:15



EXCEEDING YOUR EXPECTATIONS

COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 293

JOHN LEPIRE on 07/19/2022

```
 1      A.  No.

 2      Q.  Did you ask Mr. Deal?  He was there.

 3      A.  That's a question for Mr. Deal.

 4      Q.  No.  Did you ask him?

 5      A.  Did I ask him?                              13:23:28

 6      Q.  Yes.

 7      A.  He said it was a verbal -- it was a verbal

 8  offer.  I didn't go into the specifics of what

 9  exactly it was.  All I know is it was a verbal offer

10  made.                                              13:23:38

11      Q.  Did you -- did you -- did you conduct the

12  investigation necessary to determine whether details

13  were provided as to the basis of that offer?

14      A.  I -- I received no details whatsoever.

15      Q.  You don't know whether -- you don't know    13:23:51

16  then whether or not Mr. Watnick, in conveying the

17  offer, provided all the details necessary to comply

18  with the insurance regulations, correct?

19      A.  I -- I wasn't able to review any of that.

20  Again, it was verbal.                              13:24:08

21      Q.  Okay.  Now, you mentioned in your report

22  that HSNO identified the loss as $8 million roughly.

23          Do you recall that?

24      A.  Yes.

25      Q.  And you know that there was $10 million in   13:24:20
```



EXCEEDING YOUR EXPECTATIONS

COMBS REPORTING, INC.

DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 294

1  restitution, correct?

2      A.  Well, that's another question.  I don't know

3  if it's restitution.  I haven't been able to see the

4  restitution order.  I'm not sure exactly --

5      Q.  Okay.                                          13:24:35

6      A.  -- what this restitution was -- was for or

7  on behalf of, if it, in reality, had to do with the

8  City of Beaumont.

9      Q.  Okay.  Do you know then whether or not the

10 loss or potential loss as computed by HSNO was        13:24:48

11 already reimbursed by criminal restitution?

12     A.  Would you repeat that again?

13     Q.  Do you know whether or not the potential

14 loss as computed by HSNO was already reimbursed by

15 criminal restitution?                                 13:25:09

16     A.  I wasn't aware that there was any

17 restitution to Beaumont, no.

18     Q.  So do you -- do you know as you sit here

19 today whether or not National Union offered

20 $1.5 million in a claim where the computed loss had   13:25:23

21 already been reimbursed by restitution?

22     A.  Would you repeat that again?

23     Q.  Do you know whether AIG offered 1.5 million

24 to settle a claim where its accountants had

25 concluded the maximum loss was less than the         13:25:48



EXHIBIT 4
PAGE 295

JOHN LEPIRE on 07/19/2022

Page 158

```
 1  restitution paid?
 2      A.  Again, you know, the restitution, I don't
 3  know if that was actually paid.  I could find no
 4  evidence that Beaumont actually received
 5  $11 million.                                         13:25:59
 6      Q.  When you say you found no evidence, meaning
 7  you were given no evidence, correct?
 8      A.  No.  I was given no -- no indication that
 9  that amount of money, $11 million, was paid to
10  Beaumont, City of Beaumont.                          13:26:12
11      Q.  Would you agree with me that offering
12  $1.5 million in a case where you could not verify a
13  loss would be good faith?
14      A.  Hypothetically?
15      Q.  In this case, to the extent National Union  13:26:28
16  was unable to quantify a loss because of the
17  restitution, you would agree with me offering
18  1.5 million would be good faith?
19      A.  No.  Because I don't know if that
20  restitution was actually paid to Beaumont or not.    13:26:41
21      Q.  Okay.
22      A.  It's not --
23      Q.  So --
24      A.  That -- that was not determinable by me.
25      Q.  Okay.  Do you need to know whether or not   13:26:50
```



JOHN LEPIRE on 07/19/2022

Page 159

1  the restitution offset the loss computed by HSNO to

2  evaluate the good faith nature of a $1.5 million

3  offer?

4      A.  I need to know what the offset was and if it

5  had actually been paid.                                    13:27:07

6      Q.  Okay.  So in terms of evaluating whether or

7  not National Union made a good faith settlement

8  offer, you would want to know whether the

9  restitution paid offset the insured's loss, correct?

10     A.  That would be one of the components of the    13:27:23

11  analysis insofar as the value, yes.  That would be

12  one.

13     Q.  And is it fair to say that as you sit here

14  today you don't have any information about the

15  restitution payment, correct?                             13:27:35

16     A.  That's correct.

17     Q.  And as you sit here today, you don't know

18  whether or not the potential loss as computed by

19  HSNO was more or less than the restitution paid?

20     A.  Would you repeat that again.                       13:27:53

21     Q.  As you sit here today, you do not know

22  whether or not the loss as computed by HSNO was more

23  or less than the restitution paid to the City of

24  Beaumont?

25     A.  That's correct.                                    13:28:06



EXHIBIT 4
PAGE 297

1      Q.  Is it fair to say then that you do not have

2  enough facts as you sit here today to evaluate

3  whether or not AIG offered $1.5 million because it

4  could not validate a loss in excess of the

5  restitution paid to the City of Beaumont?                13:28:24

6      A.  Well, number one I -- you know, again, I

7  don't know the specifics of an offer having been

8  made because there was nothing in writing that I

9  could review.  The other aspect of it is, again, I

10 don't know if this restitution, in reality, was paid    13:28:38

11 to Beaumont, the City of Beaumont.

12     Q.  Okay.  But -- but the latter point, because

13 you don't know whether Beaumont had already received

14 restitution, you don't know if there was a good

15 faith basis for offering 1.5 million, correct?           13:28:52

16     A.  Again, I don't believe there was an actual

17 offer made.  I mean, from what I can glean from the

18 information I have, from what I've been told, I

19 can't verify or confirm that there was a good faith

20 offer made.                                              13:29:07

21     Q.  Okay.  But putting aside that, assume for

22 sake of argument, as your report reflects, a

23 $1.5 million offer was made.  Okay?  You say that.

24     A.  What was --

25     Q.  You can't -- you cannot evaluate whether        13:29:22

```
 1  1.5 million was a good faith offer because you don't
 2  have before you any information about whether the
 3  restitution paid offset any loss by the insured,
 4  correct?
 5      A.  That's one of the components of the              13:29:39
 6  evaluation, one of the components, yes.
 7      Q.  And because you're missing that component,
 8  you can't evaluate whether the $1.5 million offer
 9  was good faith, correct?
10      A.  Well, again, you know, you have the report      13:29:52
11  that came in from, you know, your own -- AIG's own
12  forensic accountant that indicated the value to be
13  somewhere in the vicinity of over $8 million.
14      Q.  Correct.  And if the restitution that was
15  paid was 10 million, 8 million would be fully        13:30:10
16  reimbursed, correct?
17      A.  Well, again, I don't know if that
18  restitution was, in reality, paid.
19          MR. DEAL:  John, treat it like a
20  hypothetical.  If that restitution was paid to the    13:30:22
21  City of Beaumont?  How about we do that.
22          THE WITNESS:  If it had been paid --
23  BY MR. SCHMOOKLER:
24      Q.  To the extent -- to the extent Beaumont
25  received $10 million in restitution and the loss as   13:30:31
```



1  computed by HSNO was 8 million, $1.5 million would

2  be a good faith offer, correct?

3      A.  Well, you'll have to look at it in

4  conjunction with the forensic accounting report that

5  was provided by the -- by the policyholder, which I          13:30:48

6  believe had a higher figure.  Off -- off the top of

7  my head, I don't recall what it was.

8      Q.  Yes.  And you understand that HSNO didn't

9  validate that number, correct?

10     A.  That's correct.                                       13:31:04

11     Q.  So based on the number as validated by AIG's

12  accountant, if the number was 8 million and Beaumont

13  received 10 million in restitution, a $1.5 million

14  offer would be good faith?

15     A.  That's hypothetical, right?                           13:31:21

16     Q.  Not hypothetical.  I don't want to ask a

17  hypothetical.

18         MR. DEAL:  Well, assumes facts not in

19  evidence.

20  BY MR. SCHMOOKLER:                                           13:31:32

21     Q.  You don't -- hold on.  Do you know -- and

22  I'll show it to you in your report if you want me to

23  show you your own words.  It's not a hypothetical.

24         I'll put your report up, sir.  There's

25  nothing hypothetical about this question.  I refuse         13:31:46



EXCEEDING YOUR EXPECTATIONS

COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 300

 1   to -- I refuse to acknowledge it as a hypothetical.

 2          You wrote, "Based on the fact that as of

 3   October 2, 2019, AIG was informed that ULC

 4   overcharges could be up to 8 million and that the

 5   forensic auditors had not yet considered pre-2004         13:32:07

 6   losses, this offer was unreasonable and totally

 7   inadequate."

 8          Your words, right?

 9   A.  That's correct.

10   Q.  Okay.  So the -- the $8 million number I'm          13:32:17

11   giving you is not hypothetical.  That's your number,

12   right?

13   A.  That's a number that I have there, yes,

14   that's correct.

15   Q.  Now, to the extent Beaumont had received          13:32:28

16   $10 million in restitution and HSNO could only

17   quantify 8 million in loss, offering 1.5 million

18   would not be bad faith, correct?

19   A.  Well, we're still not -- you know, you're --

20          MR. DEAL:  Assumes facts not in evidence.        13:32:46

21          THE WITNESS:  -- taking --

22          MR. DEAL:  Incomplete hypothetical.

23   BY MR. SCHMOOKLER:

24   Q.  Go ahead and answer my question, sir.

25   A.  Well, again, there's no consideration given       13:32:57



 1  to the pre-2004 losses that hadn't -- that haven't

 2  been ascertained at this point in time.  So the loss

 3  could be, you know, 10, 12, 15 million for all --

 4  all we know.

 5      Q.  And do you know why the losses pre-2004 had        13:33:14

 6  not been computed as of that date?

 7      A.  Yeah.  My understanding is that AIG told the

 8  forensic accountant not to take them into

 9  consideration.

10      Q.  When did they do that?  Who said that?  You         13:33:27

11  know what, strike that.

12          Give me the name of the person who said

13  that.

14      A.  It's somewhere in -- in these -- in the --

15  in the material that we have here, there's a --         13:33:40

16  there's -- there was a request to review the losses

17  pre-2004 -- excuse me.  I -- I misstated.  Pre-1994

18  losses, and that was not -- that was not completed.

19  And, again, the pre-2004 losses, they haven't been

20  considered.                                              13:34:07

21      Q.  Well, okay.  Let me -- let me -- I think

22  you're -- go look in your binder.  Let's look at

23  together April 16 -- August 16, 2019.

24          MR. DEAL:  August 26th or September?

25          MR. SCHMOOKLER:  August 16th.                    13:34:46



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 302

1          MR. DEAL:  Thank you.

2          MR. SCHMOOKLER:  NUFIC 46325.

3          THE WITNESS:  August 12th.  August 15th.  Is

4  that the one you're talking about?

5  BY MR. SCHMOOKLER:                                     13:34:56

6     Q.  16.  It's the very next day.

7     A.  Got it.

8     Q.  Now, this is the report you're discussing

9  that references the $8 million figure, correct?

10    A.  Well, I believe there's an email to the       13:35:21

11 effect that was provided during discovery that

12 indicated that there was a request by the forensic

13 accountant to review potential losses -- prior

14 losses and the adjuster told them not to do it.

15    Q.  Move to strike, nonresponsive.  Didn't ask    13:35:41

16 you that.

17         This is the report you got the $8 million

18 figure from, correct?

19    A.  Yeah.

20    Q.  Is that right?                                 13:35:53

21    A.  Based on discussions -- it says, "It is now

22 our understanding that the claim is based on

23 billings in excess of $8 million."

24         MR. DEAL:  John, just go to the last page.

25         THE WITNESS:  The last page.  Oh, yeah.       13:36:37



EXCEEDING YOUR EXPECTATIONS

Combs Reporting, Inc.

DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 303

 1  Here we go.  $8,214,943.

 2  BY MR. SCHMOOKLER:

 3      Q.  Okay.  Now look at the prior page, page 6.

 4      A.  Okay.

 5      Q.  First paragraph, last sentence, "Where          13:37:03

 6  Hemming Morse estimates implied overpayments of

 7  $58,272,802 from 1993 through August of 2012, the

 8  ULC invoices do not provide sufficient description

 9  of tasks performed in order to determine what was or

10  was not subject to any contractual limits."          13:37:28

11         Do you see where I've read from?

12      A.  Yes, I see it.

13      Q.  Isn't it true that the invoices provided did

14  not provide enough detail to determine whether there

15  was overcharging?                                     13:37:43

16         MR. DEAL:  That's way outside the scope of

17  his expert opinion, and that's a question for Dan

18  Ray, not for this witness.

19  BY MR. SCHMOOKLER:

20      Q.  Hold on.  I'll ask it a different way.        13:37:52

21         Isn't it true that AIG was told by its

22  forensic accountant there wasn't enough information

23  in the invoices to determine if the tasks were

24  within the contractual limits?

25      A.  That's true, yes.                             13:38:07



1      Q.  So at the time AIG decided to make an offer,

2    it had been told that the invoices didn't provide

3    enough detail to do -- to determine what was in or

4    outside the contractual limits, correct?

5      A.  Well, that's a decision that the adjusters          13:38:23

6    have to make.  I mean, it's -- the -- the final

7    opinion or the final conclusion is not made by the

8    forensic accountants.  It's made by the claims

9    department.

10     Q.  I'm not asking that.                                 13:38:37

11         In terms of evaluating a settlement

12   proposal, the forensic accountant had told National

13   Union that the invoices didn't have enough detail to

14   determine what was in the contractual limits,

15   correct?                                                   13:38:53

16     A.  That's what it says.

17     Q.  And then the accountants went on to

18   extrapolate a potential loss of 8.2 million,

19   correct?

20     A.  That's correct.                                      13:39:03

21     Q.  Okay.  Now, to the extent that AIG had been

22   told there was not enough detail to identify what's

23   in the contract limits and what's not, that would --

24   that would impact whether a $1.5 million offer was

25   reasonable, correct?                                       13:39:34



EXCEEDING YOUR EXPECTATIONS

COMBS REPORTING, INC.

DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 305

1     A.  I don't see any substantiation on what this

2  $1.5 million, in reality, is based on.  I haven't

3  seen anything in writing to give -- you know, be

4  able to provide any kind of an analysis in that

5  regard other than this -- than this letter.  There's        13:39:49

6  no breakdown or breakout or -- or anything that, you

7  know, addresses that issue that I'm aware of.

8     **Q.  You don't know what the offer was based on**

9  **then, right?**

10    A.  That's correct.                                       13:40:06

11    **Q.  And you don't know whether AIG internally**

12 **had a good faith, reasonable basis for offering**

13 **1.5 million because you just don't know what it was**

14 **based on, right?**

15    A.  Yeah.  I mean, they were carrying a                   13:40:16

16 $5 reserve on this file at this point in time.  I --

17 you know, there's no -- there's no rhyme or reason

18 for this 1.5 million that I can see.

19    **Q.  Well, you don't know what the rhyme or**

20 **reason of the $1.5 million offer was, correct?**          13:40:29

21    A.  Yeah.  I mean, carrying a $5 reserve on the

22 file, how you come up with one and a half million

23 dollars is hard for me to speculate or even

24 ascertain.

25    **Q.  And because you don't know whether or not**        13:40:41



EXCEEDING YOUR EXPECTATIONS
**Combs Reporting, Inc.**
DEPOSITION REPORTERS • LEGAL VIDEO

**EXHIBIT 4
PAGE 306**

 1  AIG had a legitimate, reasonable explanation for its

 2  offer, you don't have enough to evaluate it,

 3  correct?

 4      A.  Well, I -- I wouldn't say that.  I'm -- what

 5  I'm trying to -- what I'm trying to say is that          13:40:59

 6  this -- this figure seems to be woefully inadequate

 7  to me based upon the information I have available.

 8      Q.  Okay.  So you would offer -- you would say a

 9  claim where you could not quantify a loss in excess

10  of restitution, it was woefully inaccurate to offer     13:41:18

11  1.5 million?

12      A.  I don't know what was unquantifiable.  I

13  mean, I -- there's no breakout here as to what it is

14  that they considered to be non-quantifiable.  I

15  don't know.                                             13:41:31

16      Q.  Okay.  But you're here as an expert, so I'm

17  trying to understand your opinion.

18          Sir, based on the information that was

19  available to AIG in its claim file and the expert

20  opinions received from HSNO, you think it was          13:41:44

21  woefully inadequate to offer 1.5 million when the

22  only quantification done by the accountant was

23  8 million --

24          MR. DEAL:  Asked and answered.

25  BY MR. SCHMOOKLER:                                     13:41:58



EXHIBIT 4
PAGE 307

1      Q.   -- and restitution --

2           MR. DEAL:  Misstates prior testimony.

3           MR. SCHMOOKLER:  Ms. Court Reporter, will

4  you please read my question back?

5           (Record read:  Sir, based on the information          13:42:28

6           that was available to AIG in its claim file

7           and the expert opinions received from HSNO,

8           you think it was woefully inadequate to

9           offer 1.5 million when the only

10          quantification done by the accountant was          13:41:53

11          8 million?)

12  BY MR. SCHMOOKLER:

13     Q.   And the restitution paid was 10 million.

14          MR. DEAL:  No, it wasn't.

15          THE WITNESS:  Again, I don't know.          13:42:38

16          MR. DEAL:  Assumes facts not in evidence.

17          THE WITNESS:  Yeah.  It's not in evidence.

18  BY MR. SCHMOOKLER:

19     Q.   Sir, I -- we're not at court yet.  I don't

20  have to put anything in evidence.  That's a concept          13:42:46

21  for trial.

22          MR. DEAL:  So treat it as a hypothetical or

23  we're going --

24          MR. SCHMOOKLER:  There's nothing

25  hypothetical about this.          13:42:56



EXHIBIT 4
PAGE 308

 1        MR. DEAL:  The restitution was paid to

 2  WRCOG.

 3        MR. SCHMOOKLER:  Good luck proving it.  Good

 4  luck proving that, Chris.

 5        MR. DEAL:  Okay.                                13:43:04

 6        MR. SCHMOOKLER:  I encourage you to go prove

 7  it.

 8        MR. DEAL:  Thanks, Scott.

 9        MR. SCHMOOKLER:  Okay, great.

10  BY MR. SCHMOOKLER:                                    13:43:13

11     Q.  Sir, back to my questioning, back to our

12  regularly scheduled programming.

13        Isn't it true that offering 1.5 million, to

14  the extent the loss had been computed as 8 and there

15  was 10 million in restitution paid, would be          13:43:29

16  reasonable?

17        MR. DEAL:  Asked and answered, assumes facts

18  not in evidence.

19        THE WITNESS:  I believe I've already

20  answered that question.                               13:43:41

21  BY MR. SCHMOOKLER:

22     Q.  Can you tell me what your answer is?

23     A.  Could the court reporter go back and find

24  where my answer was?

25     Q.  No.                                            13:43:55



EXHIBIT 4
PAGE 309

 1     A.  Again, I -- in answer to this question one
 2  more time, I don't know the status of this
 3  $10 million restitution or recovery.  I -- I have no
 4  idea if it was actually paid.  There's nothing to
 5  indicate that they received these funds that I'm --          13:44:15
 6  that I'm aware of.
 7     **Q.  Now, why would you need to know whether the**
 8  **restitution was received by Beaumont?**
 9     A.  Because you're using it as an offset.
10     **Q.  I'm not doing anything.**                           13:44:31
11        **Why would you as a claims adjuster want to**
12  **know if $10 million was received in restitution?**
13     A.  Well, if $10 million had been received and
14  the estimate on the actual loss was something
15  approximating $8 million, then obviously they'd         13:44:44
16  been -- you know, they've been made whole.  There's
17  no claim on the -- you know, under the terms and
18  conditions of the policy.  But we don't know that.
19  I don't know that.
20     **Q.  Okay.  Why would you want to know whether**       13:44:58
21  **the insured had been made whole in deciding whether**
22  **to make a settlement offer?**
23     A.  Could you repeat that question again?
24     **Q.  Why would you want to know if the insured**
25  **had been made whole in evaluating the reasonableness**   13:45:12

JOHN LEPIRE on 07/19/2022

Page 173

1  of the settlement offer?

2     A.  Oh, because if they've incurred a loss and,

3  in reality, from what you're saying, they were

4  paid -- they were, you know, recompensed $2 million

5  more than their actual loss, then obviously you          13:45:28

6  don't have a loss.

7     Q.  Okay.  And if you don't have a loss, why

8  would that be important to know in evaluating the

9  reasonableness of a settlement offer?

10    A.  Which settlement offer are we talking about?     13:45:43

11    Q.  It's just in concept.  In -- in deciding the

12 reasonableness of any settlement offer, why would

13 you want to know if the insured had already been

14 reimbursed its loss?

15    A.  Well, this is a hypothetical is what            13:45:58

16 you're --

17    Q.  No.  As a matter of claims handling

18 practice, why would you want to know whether the

19 insured had been reimbursed in deciding a reasonable

20 settlement offer?                                       13:46:11

21    A.  Because if they'd been -- if they've been

22 reimbursed more than the amount of the loss, then

23 obviously there's no claim under the policy.

24    Q.  And if there's no claim under the policy,

25 you would make a smaller offer than if you thought      13:46:26



EXHIBIT 4
PAGE 311

1  there was a covered claim under the policy, correct?

2      A.  That's hypothetical.

3      Q.  Well, in your experience as an expert, you

4  know that to the extent that there's no covered

5  claim, you're going to make a smaller offer,          13:46:40

6  correct?

7      A.  I'd have to know the details of what

8  you're -- what you're detailing here.

9      Q.  Now, you have -- have you seen any claim on

10  any excess policy in the 2014-2015 policy period?     13:46:55

11     A.  I've never seen the excess policy.

12     Q.  Do you know whether the excess policy

13  provides coverage?

14     A.  I have absolutely no idea.

15     Q.  Do you know whether there's been -- the      13:47:09

16  excess -- whether anybody has a suit on the excess

17  policy?

18     A.  I believe that's a part of the lawsuit,

19  isn't it?

20     Q.  Well, here, let's look at the first amended  13:47:23

21  complaint.

22         MR. SCHMOOKLER:  Ms. Court Reporter, what

23  number are we on?

24         COURT REPORTER:  I honestly don't know

25  because you've been marking them and I haven't seen   13:47:28



```
 1  them.

 2       MR. SCHMOOKLER:  We're on 4.  We'll mark the

 3  complaint No. 4.

 4       (Whereupon Exhibit 4 was marked for

 5       identification.)                         13:47:45

 6  BY MR. SCHMOOKLER:

 7   Q.  I'm going to put up on the screen the first

 8  amended complaint filed against my client.

 9       Do you see this, sir?

10   A.  Yes, I see it.                           13:47:48

11   Q.  And in the third complaint, you'll see an

12  allegation about an assignment of claims under two

13  policies:  Policy 01-309-61-64 and 01-425-57-41.

14       Do you see that?

15   A.  Yes, I see it.                           13:48:17

16   Q.  And one of those policies was issued for the

17  2014-2015 policy term, and the other one was issued

18  for the 2015-2017 policy term.

19       Are you aware of that?

20   A.  I'm aware of that, yes.                  13:48:32

21   Q.  Are you aware of any lawsuit on any excess

22  policy whatsoever?

23   A.  There's no indication of it here.

24   Q.  Why -- why would -- why does it matter

25  whether we -- strike that.                    13:48:47
```



EXCEEDING YOUR EXPECTATIONS

Combs Reporting, Inc.

DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 313

1           Why do you care whether National Union

2    disclosed the existence of an excess policy that is

3    not subject of this lawsuit?

4        A.  Well, we're -- we're going back from when

5    the claim was presented.  This information, if it                    13:49:02

6    was known by the insured -- I mean, the insurer --

7    if it was known by the insurer, that information

8    relative to an excess policy, if it applies, should

9    have been -- you know, it should have been disclosed

10   to the -- to the policyholder of the underlying                      13:49:20

11   coverage.

12       Q.  Do you know whether it applied?

13       A.  I have no idea.  All I know is there was an

14   indication of an excess policy, so the assumption is

15   that it must be.                                                     13:49:33

16       Q.  Okay.  But I'm not -- I don't want to make

17   assumptions.

18           Sitting here today, can you testify to a

19   reasonable degree of professional certainty that AIG

20   breached its duties by failing to disclose the                      13:49:46

21   excess policy without knowing its terms?

22       A.  Well, if there was no -- if they were aware

23   of an excess policy, no matter what the -- you know,

24   the terms and conditions of the period, I believe

25   that should have been disclosed with the caveat that                13:50:06



EXHIBIT 4
PAGE 314

1  this doesn't apply or the coverage doesn't apply.  I

2  still think that that should have been disclosed in

3  some way, shape or form.

4      **Q.  Why didn't the insured just know about its**

5  **own coverage?  Why do we have to tell it about its**        13:50:18

6  **policies?**

7      A.  Well, I mean, you know, they're a part of

8  a -- you know, a coverage insurance program that

9  encompasses a number of counties, a number of

10 cities.  They're -- you know, this is not, you know,    13:50:30

11 a simple insurance policy that was issued.  It's --

12 it's a combination of -- of a lot of different

13 entities all, you know, wrapped up into one policy

14 pro -- or policy issuance.

15     **Q.  Well, my question is different.**                13:50:48

16     **Beaumont purchased coverage, right?**

17     A.  That's correct.

18     **Q.  Beaumont knows what Beaumont purchased,**

19 **correct?**

20     A.  Well, again, you had the people that were    13:50:57

21 running the City that are no longer there.  You

22 know, a lot of that -- a lot of that documentation,

23 a lot of that information very well could have been

24 passed on to the -- you know, the legal authorities

25 and they didn't have access to it.                     13:51:14



EXCEEDING YOUR EXPECTATIONS
**COMBS REPORTING, INC.**
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 315

JOHN LEPIRE on 07/19/2022

Page 178

1    Q.  Well --

2    A.  That's --

3    Q.  Do you -- do you know that that's true?

4    A.  I don't know.

5    Q.  Okay.  Do you know whether Beaumont -- you    13:51:23

6 know that Beaumont had a risk manager Jim Gregg,

7 right?

8    A.  That's correct.

9    Q.  Do you know whether Mr. Gregg was equally

10 aware of the excess policy?    13:51:33

11    A.  That I don't know.

12    Q.  So do you know whether or not Beaumont,

13 through its risk manager, was aware of the very

14 excess policy referenced in your report?

15    A.  No.  But I know that an insurance company is    13:51:47

16 required to disclose coverage, if it exists, even

17 though the -- you know, the insured does not have a

18 copy of it.  I mean, if it's something that is known

19 relative to coverage that is the provenance of the

20 insurance company, they're required to disclose    13:52:05

21 that.

22    Q.  Okay.  What about auto?  I mean, if we wrote

23 an auto policy for Beaumont, should we have sent

24 them the auto coverage for review?

25    A.  Could you repeat that question?    13:52:17



EXHIBIT 4
PAGE 316

1    Q.  Sure.  If National Union wrote an auto

2  insurance policy for Beaumont, you would have

3  expected them in the context of this claim to tell

4  them about the auto policy, right?

5    A.  Well, in the context of -- that's a third        13:52:27

6  party -- you know, that's a -- an example of a

7  third-party claim, I think, isn't it, that you're

8  talking about?

9    Q.  Okay, sure.  Let's -- let's -- I'll give you

10  first party.                                          13:52:40

11       If we wrote a fire policy on the firehouse,

12  you would have expected National Union to disclose

13  that to Beaumont too, right?

14    A.  If you -- on a Beaumont firehouse are you

15  talking about?                                        13:52:56

16    Q.  Yeah, yeah.  In the context of this crime

17  claim if National Union knew it also wrote fire

18  insurance on the firehouse, you would have expected

19  National Union --

20    A.  No.  We're -- we're discussing -- we're --      13:53:08

21  we're dealing with a matter -- a fidelity matter

22  here, and I'm -- you know, it -- the assumption that

23  I have is that this excess policy provided excess

24  fidelity coverage, crime coverage.

25    Q.  Well, do you know whether or not the policy,     13:53:24



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 317

 1  in fact, applies?

 2      A.  I've never seen the policy.

 3      Q.  Okay.  So is it fair to say then that you

 4  don't know whether the disclosure of that policy

 5  would have had any impact on Beaumont?          13:53:36

 6      A.  It should have been disclosed.  That's

 7  the --

 8      Q.  I didn't ask that.  I'll ask my question

 9  again.

10          Do you know whether the alleged failure to   13:53:49

11  disclose the excess policy had any impact on

12  Beaumont?

13      A.  I do not know.

14          MR. DEAL:  I think it indirectly calls for a

15  legal conclusion.  You're essentially asking him to   13:54:00

16  conclude whether the excess policy would cover this

17  claim.  He said he doesn't -- hasn't reviewed it.  I

18  think all he's saying is that it should have been

19  disclosed and that's it, period.

20          MR. SCHMOOKLER:  I -- Chris, I don't -- I    13:54:15

21  don't -- you're not an insurance expert witness.  I

22  mean, I get it.  At some point you'll get to ask

23  your questions, but, I mean, you don't get to just

24  speak for him.  I get to ask the questions.

25          MR. DEAL:  Your questions don't make sense.   13:54:30



 1          MR. SCHMOOKLER:  So -- okay, fair.  In your

 2  mind -- I'll begrudge you that, sure.  Have your own

 3  opinion of me.  I don't care.  I'm still going to

 4  ask my questions.

 5  BY MR. SCHMOOKLER:                                   13:54:44

 6     Q.  Now, sir, in your report, page 8 -- oh, I

 7  wanted to ask you about this.  I've been waiting all

 8  day to get to this.  Sorry.  I'm going to change

 9  topics.

10     A.  Could we take a break?                        13:55:11

11     Q.  Sure.  Happy to.  How long would you like?

12     A.  How about ten minutes?

13     Q.  Sure.

14     A.  Great, thank you.

15          THE VIDEOGRAPHER:  This marks the end of      13:55:21

16  media unit number two.  The time is 1:55 p.m.  We're

17  off the record.

18          (Break, 1:55 p.m. to 2:05 p.m.)

19          THE VIDEOGRAPHER:  We're back on the record.

20  The time is 2:05 p.m.                                14:05:46

21  BY MR. SCHMOOKLER:

22     Q.  Okay, sir.  I want to show you your report

23  and ask you about page 2.  So I've put up your

24  report, page 2, and I highlighted two sentences I

25  want to ask you about.  Okay?                        14:05:59



```
 1      A.  Sure.

 2      Q.  Let's start with the top sentence.  You

 3  write, and I read, "The City became aware of its

 4  potential exposure to wrongdoing by the

 5  aforementioned City employees when in April of 2015    14:06:11

 6  the Federal Bureau of Investigation and various

 7  California state authorities executed a search

 8  warrant at City Hall."

 9          Do you see where I've read from?

10      A.  Yes.                                            14:06:24

11      Q.  And I highlighted in yellow that sentence,

12  but the specific segment in what I think is pink is

13  "potential exposure to wrongdoing."

14          Do you see where I've highlighted?

15      A.  Yes, I see it.                                  14:06:37

16      Q.  Why was the City aware of exposure to

17  wrongdoing following the execution of search

18  warrants in April of 2015?

19      A.  My understanding is they weren't aware of

20  what had been transpiring there until the FBI showed   14:06:51

21  up and grabbed all the records.

22      Q.  What is it about the search warrant that

23  alerted the City to its potential exposure to

24  wrongdoing?

25      A.  I -- I'm not on the city council.  I can't      14:07:05
```



```
 1   say.
 2      Q.   Well, you wrote those words.
 3           So when you said, "The City became aware of
 4   its potential exposure to wrongdoing," what led you
 5   to that conclusion?                                      14:07:19
 6      A.   The fact that you had the Federal Bureau of
 7   Investigation grabbing all the employee records and
 8   all of the documentation and financial information
 9   that related to the City.
10      Q.   And do you think --                              14:07:33
11      A.   Somebody was doing something wrong, in other
12   words.  That's --
13      Q.   And --
14      A.   -- what I was trying to get across.
15      Q.   And do you think the execution of a search       14:07:40
16   warrant in April of 2015 would cause anyone at the
17   City to reasonably expect criminality occurred?
18      A.   Criminality?  I would believe so, yes.
19      Q.   And would you expect the execution of a
20   search warrant by the criminal authorities in April     14:08:05
21   of 2015 to reasonably cause the City to conclude
22   that it may have suffered exposure to criminal
23   wrongdoing?
24      A.   Well, exposure and loss are two different
25   things.                                                  14:08:25
```



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 321

1      Q.   Okay.   What's the difference between loss

2    and exposure?

3      A.   Exposure means that something has been done

4    that is inconsistent with the operation of the

5    City's -- you know, the City mechanism or the City      14:08:36

6    government.   The loss is a financial amount, a

7    monetary amount that at that point no one knew if

8    there was actually a financial loss or not.

9      Q.   But you would agree that the execution of

10   the search warrant at least gave the City enough         14:08:55

11   information to know that it might have a loss from

12   employee miss -- malfeasance?

13     A.   Well, it -- relating it to an actual loss,

14   you mean monetary or -- or in what -- in what

15   regard?                                                  14:09:12

16     Q.   Well, you would agree that the execution of

17   the search warrant in April of 2015 gave the City

18   enough information to know that it may have

19   sustained a loss due to employee malfeasance?

20     A.   Well, I don't know the particulars of the         14:09:24

21   search warrant.   I wasn't given that information, so

22   I -- I really can't speculate.

23     Q.   You don't know whether or not the City ever

24   had enough information to determine whether it had

25   an actual loss from employee malfeasance?                14:09:39

1    A.  A loss in the context of monetary?

2    Q.  Yes.

3    A.  That's correct.

4    Q.  And you don't even, as you sit here today,

5  have enough information to know whether or not the          14:09:55

6  City has ever brought forth enough information to

7  prove a covered financial loss, correct?

8    A.  Would you repeat that question again?

9    Q.  Sure.  Even as you sit here today, you don't

10  have enough facts to know to a reasonable degree of         14:10:13

11  professional certainty whether the City has ever

12  come forward with enough information to prove a

13  covered financial loss, correct?

14    A.  They submitted a proof of loss in a

15  specified amount.                                           14:10:28

16    Q.  Yeah.  I'm putting aside the -- you

17  understand the proof of loss is the City's position,

18  correct?

19    A.  That's correct.

20    Q.  And you don't know whether that position is          14:10:36

21  correct or incorrect, right?

22    A.  Well, it's backed up by their forensic

23  accountant's report and also the forensic accountant

24  report of -- engaged by -- by the insurance company,

25  AIG or National Union.                                      14:10:54

 1     Q.  Well, you understand that those -- those two
 2  people dealt with quantification, not coverage,
 3  right?
 4     A.  That's correct.
 5     Q.  Have you read my motion for summary judgment     14:11:03
 6  yet?
 7     A.  No, I have not.
 8     Q.  And do you know whether there are
 9  significant coverage issues?
10     A.  I believe there are, yes.                        14:11:16
11     Q.  And -- and you don't have enough to know
12  whether there's, in fact, a covered loss, correct?
13     A.  Could you repeat that again?
14     Q.  You don't know whether or not there's enough
15  here to prove a covered loss, correct?                  14:11:31
16         MR. DEAL:  Incomplete hypothetical, vague
17  and ambiguous, and it's somewhat outside the scope
18  of his retention in that he's not analyzing
19  coverage, which would I think include the issue of
20  day of discovery.                                       14:11:49
21  BY MR. SCHMOOKLER:
22     Q.  Sir, do you know whether the City actually
23  can prove coverage?
24     A.  I believe it's the job of AIG to disprove
25  coverage.                                               14:12:04


EXCEEDING YOUR EXPECTATIONS
COMBS Reporting, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 324

JOHN LEPIRE on 07/19/2022

Page 187

```
 1     Q.  You think insurance companies have to

 2  disprove coverage?  Hm.

 3     A.  I think they have a responsibility to either

 4  prove or disprove coverage.  That's something that

 5  they -- that they do normally.                      14:12:15

 6     Q.  Okay.  And you -- and you don't know whether

 7  that happened because you didn't read any of the

 8  pleadings in this case, right?

 9     A.  I read some of the pleadings.  I didn't -- I

10  didn't read the motion for summary judgment.  I     14:12:28

11  haven't seen that.

12     Q.  Okay.  Do you know whether there's coverage?

13         MR. DEAL:  Beyond the scope, calls for a

14  legal conclusion.

15  BY MR. SCHMOOKLER:                                  14:12:43

16     Q.  Do you know whether or not the City can

17  establish coverage?

18         MR. DEAL:  Same objection.  You can answer,

19  John.

20         THE WITNESS:  Okay.                          14:12:55

21         MR. DEAL:  It's just for the record.

22         THE WITNESS:  The -- the -- the material

23  I've reviewed and the opinion I've issued indicates

24  that there is coverage.

25  BY MR. SCHMOOKLER:                                  14:13:06
```



EXCEEDING YOUR EXPECTATIONS

COMBS REPORTING, INC.

DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 325

JOHN LEPIRE on 07/19/2022

Page 188

```
 1      Q.  Okay.  So you -- you do think there's -- you
 2  do intend to offer an opinion on coverage.
 3      A.  Well, I'm saying that, you know, from --
 4  from my point of view insofar as the claim is
 5  concerned.  I'm not saying as an underwriter, you      14:13:19
 6  know, the one who wrote the -- the coverage in and
 7  of itself, but yeah, I would say --
 8      Q.  Okay.
 9      A.  -- the coverage does apply.
10      Q.  Okay, great.  Tell me what's wrong with the    14:13:30
11  defenses my client put forth in the summary judgment
12  motion then.
13      A.  I haven't seen the summary judgment motion.
14      Q.  How do you know if there's coverage if you
15  haven't read all of the results of discovery?         14:13:43
16      A.  Well, I'm talking about my -- my review and
17  analysis from the standpoint of when I issued my
18  report, I believe, on May 31st.
19      Q.  Okay.  Did you review all of the discovery
20  taken in this matter?                                  14:13:55
21      A.  All of the discovery?
22      Q.  Yeah.
23      A.  I -- I can't -- you know, I can't speculate
24  on that.
25      Q.  Did you ask for all of the discovery so you    14:14:03
```



EXCEEDING YOUR EXPECTATIONS

COMBS Reporting, Inc.

DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 326

 1  would know whether there's a covered loss?

 2      A.  All of the discovery?

 3      Q.  Yeah, all of it.

 4      A.  I asked for all of the discovery that I --

 5  you know, insofar as the claim is concerned, yeah.        14:14:16

 6      Q.  Okay.  Did you ask for the dec -- did you

 7  get a declarations from witnesses?

 8      A.  Yes, I did.

 9      Q.  Did you get the deposition of Jim Gregg?

10      A.  I believe so, yes.  I did review that.          14:14:31

11      Q.  Okay.  And what did Mr. Gregg say about when

12  he first learned -- do you know who Judge Chaffee

13  is?

14      A.  Who is that again?

15      Q.  You know what, I'll ask in a different way.      14:14:45

16          Let's go -- maybe your report's inaccurate.

17  Here -- let me put your report back up, sir.

18      A.  Sure.

19      Q.  In your report, you identify all of the

20  documents you received.                                 14:15:08

21          Do you see that?

22      A.  Yes.

23      Q.  And nowhere in here do you say you've

24  reviewed the deposition of Jim Gregg or any

25  declarations.                                           14:15:16



EXHIBIT 4
PAGE 327

```
 1          Do you see that?
 2     A.   I -- I reviewed some declarations.  I assume
 3  that was one of the ones that I'd reviewed, but
 4  apparently, it wasn't.
 5     Q.   Well, did you provide me a list of all the      14:15:31
 6  documents you relied on?
 7     A.   I believe so.
 8     Q.   Okay.  Where is the dec -- did you rely on
 9  the -- any of the depositions?
10     A.   Yes, I did.                                      14:15:44
11     Q.   Did you list them here in this paragraph?
12     A.   Well, Barbara Leone, I received -- I guess I
13  should have said deposition and exhibits.  Rocha
14  deposition and exhibits, that was an inadvertent
15  typo.                                                    14:16:16
16     Q.   Are there depositions other than as of
17  Ms. Blake, Ms. Leone, and Ms. Rocha that you relied
18  on?
19     A.   I don't believe so.
20     Q.   Well, you said you did rely on Mr. Gregg's       14:16:31
21  deposition, right?
22     A.   No.  I misstated that.  I said I needed to
23  look at this in order to refresh my memory, and he
24  wasn't one of the ones that -- whose deposition I
25  reviewed.                                                14:16:44
```



EXHIBIT 4
PAGE 328

JOHN LEPIRE on 07/19/2022

1      Q.   So you don't know what he testified to,

2   right?

3      A.   That's -- I believe that's the case.

4      Q.   And you don't know what Mr. Berg testified

5   to, correct?                                          14:16:55

6      A.   If it's not here, then I didn't review it.

7      Q.   Do you have enough information to know

8   whether the witnesses who testified -- strike that.

9           Do you know to what extent the witness

10  testimony impacts your opinion as to whether there's  14:17:12

11  a covered loss?

12     A.   I can't speculate.

13     Q.   I'm not asking you to speculate.

14          Did you perform the very investigation you

15  would expect of my client in determining whether or   14:17:30

16  not there was a covered loss?

17     A.   In my opinion, I think I did.

18     Q.   Okay.  Did you contact the government?  That

19  was one of the things you said you should do.

20     A.   No, I did not.  I'm talking about in the --   14:17:48

21  in regards to reviewing the documents that I was

22  provided.  I didn't do any fieldwork.  I didn't

23  contact any authorities.  I -- I didn't take any --

24  anybody's statements or anything like that.  I just

25  relied on the information that I was provided.         14:18:07



 1     Q.  Okay.  In paragraph 8 of your opinion, you

 2  seem to insult someone, and I just want to know who

 3  you're insulting.

 4         In paragraph 8, who's the insufficiently

 5  competent and experienced claims counsel that you're       14:18:22

 6  insulting?

 7         MR. DEAL:  It's not an insult, but go ahead,

 8  John.

 9         MR. SCHMOOKLER:  It's an insult to my

10  client, and it's going to be an insult to whoever          14:18:35

11  he -- whoever's name he puts out there.

12         THE WITNESS:  Well, I'm talking about --

13  that's --

14  BY MR. SCHMOOKLER:

15     Q.  We take that as an insult.                          14:18:45

16         But, sir, who is the name of the person that

17  you are referring to in paragraph 8 so we know who

18  is not sufficiently competent?

19     A.  Well, I'm saying failure -- "failing to

20  appoint sufficiently competent."  What I'm talking         14:18:56

21  about is -- is at the beginning of this claim --

22  maybe I didn't make it as clear as I should have.

23  At the very beginning, claims counsel, in my

24  opinion, because of the size of this -- of this

25  potential loss, should have been brought in right at       14:19:13



EXCEEDING YOUR EXPECTATIONS

Combs Reporting, Inc.

DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 330

1  the beginning.

2      Q.  When you say "claims counsel," who are

3  you -- what position are you referring to, a lawyer?

4      A.  Yeah.  An attorney who specializes in this

5  sort of investigation.                                    14:19:28

6      Q.  Wasn't Mr. Watnick hired immediately?

7      A.  That -- basically he didn't conduct any

8  investigation that I know of.  That's what I was

9  getting at.

10     Q.  That's not what you said.  You said "failing   14:19:48

11  to appoint."

12         They'd hired Mr. Watnick.

13     A.  Yeah.  What I'm saying is if someone had

14  come in here at the beginning and taken statements

15  under oath, that would have indicated various           14:20:03

16  aspects of this claim that were at this point --

17  well, I should say for a period of three years not

18  known.  That could have been done with the -- you

19  know, with the appointment of someone who

20  specialized in this type of -- this type of             14:20:21

21  investigation.

22     Q.  Is that somebody like you?  Would you hold

23  yourself out as somebody who specializes in this

24  type of investigation?

25     A.  I don't -- I don't do investigations.           14:20:30



JOHN LEPIRE on 07/19/2022

Page 194

```
 1      Q.  Okay.  So -- but do you hold yourself out as
 2  somebody who would be competent to perform this type
 3  of investigation?
 4      A.  No, I do not.
 5      Q.  Do you hold yourself out as somebody who's      14:20:41
 6  experienced enough to handle this type of
 7  investigation?
 8      A.  I've reviewed and I've audited and I've been
 9  involved in the analysis of cases like this over an
10  extended period of time.  I'm not a field adjuster.    14:21:00
11  I'm not a field attorney or investigative body.
12      Q.  Okay.  But I didn't ask that.
13          I said do you hold yourself out as somebody
14  with specialized expertise in the investigation of
15  fidelity claims?                                       14:21:17
16      A.  In the investigation of fidelity claims?
17      Q.  Yes.
18      A.  From my background, I would say I have a
19  pretty good understanding of what needs to be done,
20  yeah.                                                  14:21:28
21      Q.  I didn't ask that.
22          I said do you hold yourself out as somebody
23  with specialized knowledge on the investigation of
24  fidelity claims?
25          MR. DEAL:  He said yeah.                        14:21:38
```



 1          MR. SCHMOOKLER:  I did not hear that.

 2  Chris --

 3          THE WITNESS:  I did say yeah.

 4          MR. SCHMOOKLER:  -- I know you would love to

 5  answer these questions, but I'm going to get to my          14:21:40

 6  point.

 7          MR. DEAL:  He did say it.  You can have the

 8  reporter read it back.

 9          MR. SCHMOOKLER:  Chris, Chris, I'm only

10  asking for the courtesy I would extend to others.          14:21:52

11          MR. DEAL:  Well, you're saying he didn't

12  respond.  He did.

13          MR. SCHMOOKLER:  Hold on.  Hold on.  Time

14  out.  Time out, Counsel.

15          MR. DEAL:  What is the time-out request?          14:22:02

16          MR. SCHMOOKLER:  I'm only -- I'm only --

17          MR. DEAL:  I'm not your child or toddler --

18          MR. SCHMOOKLER:  I'm asking for the courtesy

19  you would expect another lawyer to extend you.

20          MR. DEAL:  If -- if your witness had already          14:22:12

21  answered the question --

22          MR. SCHMOOKLER:  I would not answer it.  And

23  by the way, you've been in many depositions with my

24  team, and that has not happened.  You understand

25  exactly how my team has counseled.          14:22:26



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 333

JOHN LEPIRE on 07/19/2022

```
 1            MR. DEAL:  Why don't you have the reporter

 2   read back what he said.

 3            MR. SCHMOOKLER:  Counsel?  I expect you to

 4   comply with the Rules of Civil Procedure.

 5            MR. DEAL:  I don't expect you to waste our      14:22:38

 6   client's time -- or our expert's time by asking the

 7   same question every time --

 8            MR. SCHMOOKLER:  I'm paying for the time.

 9            MR. DEAL:  -- and then jumping in and saying

10   he didn't respond when, in fact, he did.                14:22:46

11            MR. SCHMOOKLER:  I'm paying for the time.  I

12   get my seven hours, but I don't want to pay $600 an

13   hour to listen to you.  And yes, I'm losing a little

14   bit of patience here because I have extended your

15   firm the exceptional courtesy of not interfering       14:23:05

16   with your witness questioning, no matter what I was

17   thinking in the moment.

18            MR. DEAL:  Why don't you just move on,

19   Scott.

20   BY MR. SCHMOOKLER:                                      14:23:19

21      Q.  So, sir, back to paragraph 8.

22          Do you have any criticism of Mr. Watnick's

23   experience and competence?

24      A.  No, I do not.

25      Q.  And you understand that Mr. Watnick was          14:23:34
```



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 334

1  appointed as claims counsel in this matter, correct?

2     A.  That's correct.

3     Q.  So isn't it true that my client, in fact,

4  appointed a competent, experienced lawyer to assist

5  with this matter?                                    14:23:53

6     A.  It didn't appear to me that he had the

7  complex knowledge to be able to handle an

8  investigation of the type that was required in this

9  matter.

10     Q.  What investigation did you do into          14:24:08

11  Mr. Watnick's capacity to handle this matter?

12     A.  Well, there was no examinations under oath

13  relative to any of the parties that were involved

14  that I could see.  I never got a copy of them.

15  Maybe there were.  But that's something that AIG     14:24:24

16  could have done.  They could have done this way back

17  at the very beginning and eliminated a lot of these

18  issues that cropped up over the years that this

19  thing sat with, you know, in my opinion, not a lot

20  being done.                                          14:24:38

21     Q.  Sir, I'm not asking about what the lawyers

22  could and couldn't do.  You say he -- you say we

23  didn't appoint a competent lawyer.

24        What investigation did you do into the

25  competence of Mr. Watnick?                           14:24:53



EXHIBIT 4
PAGE 335

JOHN LEPIRE on 07/19/2022

Page 198

```
 1      A.  None.
 2      Q.  Are you -- do you have enough information to
 3  state to a reasonable degree of professional
 4  certainty that Mr. Watnick was not a competent
 5  lawyer for this engagement?                        14:25:04
 6      A.  Well, looking at it from the standpoint of
 7  the investigation that was conducted during the
 8  first two and a half, three years, I would question
 9  that.
10      Q.  And, of course, you've never handled a       14:25:17
11  multi-year investigation, correct?
12      A.  I've been involved in multi-year
13  investigations, many of them.
14      Q.  Okay.  Since the year 2000?
15      A.  Not since the year 2000, no.               14:25:29
16      Q.  So in the modern era, have you been involved
17  in a single investigation of a single fidelity
18  claim?
19      A.  No, I have not.
20      Q.  Do you know how many years experience        14:25:40
21  Mr. Watnick's firm has in fidelity claims?
22      A.  I have no idea.
23      Q.  Do you know how many books they have written
24  on fidelity claims?
25      A.  I do not know.                             14:25:54
```



EXCEEDING YOUR EXPECTATIONS

Combs Reporting, Inc.

DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 336

1    Q.  Do you know how many seminars they have

2  given on fidelity claims?

3    A.  I have no idea.

4    Q.  Do you know, as between you and Mr. Watnick,

5  who has more fidelity experience?                    14:26:04

6    A.  Well, I'm not looking at it from the

7  standpoint of experience.  I'm just looking at it

8  from the standpoint of my review and analysis of

9  this particular claim.

10    Q.  I understand.                                  14:26:16

11        Do you know who has more experience in

12  fidelity claims, Mr. Watnick or you?

13    A.  I -- I -- I don't want to speculate.

14    Q.  Okay.  And in terms of deciding what the

15  proper investigatory technique is, given the         14:26:29

16  standards for fidelity claims, who has more

17  knowledge of that, you or Mr. Watnick, somebody

18  who's worked at a firm that's done fidelity for, I

19  don't know, 65 years?

20    A.  Could you repeat the question?                 14:26:42

21    Q.  Sure.  Are you aware that Mr. Watnick's firm

22  has had a department that specializes in fidelity

23  claims for -- for at least 40 years?

24    A.  I wasn't aware of that, no.

25    Q.  Who -- who would have more insight into the    14:26:57



EXHIBIT 4
PAGE 337

 1  proper investigatory techniques of this claim,

 2  somebody who's worked in a group specializing in

 3  fidelity for 40 years or you?

 4      A.  Well, I'm looking at it from the standpoint

 5  of what was done in this particular claim.  I'm not          14:27:11

 6  looking at it from the standpoint of what -- who has

 7  the most experience or knowledge.  I'm just looking

 8  at it from the standpoint of this particular

 9  assignment I was given and what was done and when it

10  was accomplished.                                            14:27:24

11      Q.  How often -- what percentage of fidelity

12  claims involve taking an examination under oath?

13      A.  I have no idea.

14      Q.  How often is that done?

15      A.  Well, I -- I've seen it done in the past a           14:27:37

16  number of times.

17      Q.  When was the last time you saw anyone --

18      A.  In the old -- in the old era.

19      Q.  Well, that's my point.

20          In the modern era, when is the last time you         14:27:48

21  were aware of a fidelity carrier getting an

22  examination under oath in a crime claim?

23      A.  I wasn't aware that they eliminated that

24  ability.  Is that something I should be aware of?

25      Q.  When is the last time a crime carrier was           14:28:07



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 338

```
 1  able to secure an examination under oath of an

 2  insured?

 3      A.  I have absolutely no idea.

 4      Q.  You say in paragraph 5 we asked for

 5  superfluous documents.                                    14:28:28

 6          Tell me the exact request that was

 7  superfluous.

 8      A.  Well, they were documents that related to a

 9  number of issues that -- again, I can't, you know,

10  call them up off the top of my head.  You know,          14:28:45

11  we're talking about having gone over -- in my case

12  over 49,000 pages; in the case of the insurance

13  company, well over half a million pages.

14          All I can tell you is that statement about

15  voluminous documents and continually requesting them     14:29:05

16  related back to the claims adjuster who said we are

17  getting voluminous and -- voluminous documentation

18  that we don't need.  There's a -- there's a quote to

19  that effect.  Again, I don't know exactly where it's

20  at.                                                       14:29:22

21      Q.  I can find it for you because it's in your

22  binder.  I don't believe anybody at AIG said, We're

23  getting documents we do not need.  So let me be

24  clear.

25          Are you testifying under oath that somebody       14:29:33
```



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 339

1  at AIG said, We are getting documents we don't need?

2     A.  Well, you're -- you're -- what I -- let

3  me -- let me restate that again.  Voluminous

4  documentation.

5     Q.  Okay.                                    14:29:43

6     A.  Voluminous documentation means that there

7  are documents that, in reality, they didn't need.

8  And again, you're looking at it from the standpoint

9  of a policyholder that really doesn't know what it

10 is that's needed.  You know, you need guidance from  14:29:55

11 the insurance company to tell them exactly what it

12 is that they need in -- explicitly, and I -- again,

13 I didn't find that to be the case.

14    Q.  Well, you understand that the policyholder

15 was represented by a lawyer, right?               14:30:12

16    A.  I understand that.

17    Q.  And two different law firms which hold

18 themselves out to be experts in this.

19        Are you aware of that?

20    A.  I'm aware of that.                         14:30:23

21    Q.  So you're saying in the context of a claim

22 with an insured represented by a lawyer who holds

23 themselves out as an expert in this, we should go

24 request by request and explain why we want each

25 scrap of paper?                                   14:30:38



EXHIBIT 4
PAGE 340

1      A.  I'm not saying that each scrap of paper

2  should be accounted for.  I'm just saying that

3  the -- the -- the adjuster who's handling this and

4  their supervisor was saying that the documents that

5  were provided were so voluminous it made it                 14:30:52

6  difficult to do a review.  I -- you know, I --

7      Q.  **Who said it was difficult to do a review**

8  **again?**

9      A.  I believe it was Rocha in one of her

10  statements, going back to that letter that had          14:31:05

11  the -- what is it -- I can't scroll on this.  That

12  correspondence that was sent that's referred to in

13  my report.  Scroll up a little bit further.  Just a

14  second.  Hold on.  I think we found it here.  Just a

15  second.  Go up further.  Further.  Further.  The        14:31:34

16  correspondence of April 26th, 2000 -- 2018

17  mentions --

18      Q.  **Yeah.**

19      A.  -- the extraordinary number of records that

20  were being submitted, which to me was indicative of     14:32:09

21  we're getting too much material, we can't handle it

22  all.

23      Q.  **Well, who said they can't handle it all?**

24      A.  Well, that's the impression I'm getting.

25  You know, nobody complains about receiving documents    14:32:24



EXHIBIT 4
PAGE 341

1  if they're -- you know, if -- if they're -- if the

2  documentation is sufficient to satisfy the

3  requirement.  If they're -- if they're mentioning

4  that these are -- you know, they're voluminous,

5  that's an indication that they're, you know, over --  14:32:43

6  more than what -- what normally should be required,

7  which again, you're telling me that their attorneys

8  should -- should be able to -- you know, be able to

9  figure it out without any input from the insurance

10  company, and I don't think that's case -- that's the  14:32:59

11  case.

12      Q.  I didn't say that.

13          Where did anybody at AIG ever complain about

14  the volume of records?

15      A.  Well, let's go to that letter.  14:33:13

16      Q.  Okay.  You've got the binder.

17      A.  April 26th.

18      Q.  Yeah.  I don't think she complains at all.

19  So I'll ask the question just so we have something I

20  can use.  14:33:35

21          Please point me to the letter, to the

22  sentence where Ms. Rocha complained about the volume

23  of records.  If it helps, on page 2 she mentions the

24  volume.

25      A.  Yeah.  600 -- 64,026 documents.  14:35:25



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 342

Page 205

```
 1      Q.  So I'll go back to my question.
 2          Where in this letter does Ms. Rocha complain
 3   about the volume of records?
 4      A.  In this letter, it's not there.
 5      Q.  And, in fact, in that sentence that you just    14:35:34
 6   pointed to, Ms. Rocha writes, and I read, "We also
 7   independently obtained and reviewed filings from the
 8   criminal action and several civil actions, news
 9   reports, and other public information regarding the
10   criminal action and information and documents on the    14:35:48
11   City's website."
12          Do you see that?
13      A.  Yes, I see that.
14      Q.  So isn't it true that National Union, in
15   fact, sought out independently records?                 14:35:59
16      A.  Publicly -- publicly available records.
17   That's what it says, yes.
18      Q.  Well, it also says "information and
19   documents on the City's website."
20          Do you see that?                                 14:36:11
21      A.  Yes.  That's publicly available in my
22   opinion.
23      Q.  Yeah.  So it is true that National Union
24   sought out information outside of what was provided
25   by the insured, correct?                                14:36:23
```



JOHN LEPIRE on 07/19/2022

Page 206

```
 1      A.  To that extent, yes, you're right.
 2      Q.  And that is part of a good -- that is a good
 3  faith claim handling practice, is it not?
 4      A.  To that extent, yes.
 5      Q.  So National Union did not only rely upon      14:36:34
 6  information provided by its insured, correct?
 7      A.  In that regard of publicly available
 8  information, yes.
 9      Q.  Well, are you aware of any way to get
10  non-publicly available information?                   14:36:52
11      A.  Through statements from the -- you know,
12  under oath from the parties involved.
13      Q.  And that was --
14      A.  Something that wasn't done.
15      Q.  Do you know --                                14:37:07
16      A.  If we --
17      Q.  Hold on.
18          Before you say that, do you know -- do you
19  know that there are public statements in those
20  materials from the civil actions?                     14:37:16
21      A.  Public statements?  Yes, I know that.
22      Q.  There are statements from Mr. Egger,
23  Mr. Moorjani, Mr. Dillon in those civil actions, are
24  there not?
25      A.  That's correct, but there were other          14:37:27
```



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 344

1  individuals that I believe had information that had,

2  you know, quite a -- quite an impact on the coverage

3  issues that, in reality, their statements under oath

4  weren't taken.

5      Q.  Oh, okay.  And I'll go back to:  Do you          14:37:43

6  believe that is the normal course, in the modern

7  time, to take statements under oath?

8          MR. DEAL:  Asked and answered.

9          THE WITNESS:  In a matter of this side -- in

10 a matter of this size and magnitude, I don't think     14:38:01

11 it would be asking too much to be doing that right

12 at the beginning of this -- of this -- of this

13 claim.

14 BY MR. SCHMOOKLER:

15     Q.  You mentioned the insurance regulations.        14:38:12

16         Do you remember that?

17     A.  Yes.

18     Q.  Do you know that they were adopted in 1992?

19     A.  Yes.

20     Q.  Have you hand -- did you handle a single         14:38:22

21 fidelity claim in an era where the insurance

22 regulations that you apply have been adopted?

23     A.  In the context of 1992, no.

24     Q.  So in an era where the insurance regulations

25 were in play, have you handled a single claim?          14:38:41



EXHIBIT 4
PAGE 345

```
 1      A.  An individual claim, no, I have not.
 2      Q.  And in the era where the regulations were in
 3 play, have you had any exposure to the handling of
 4 any crime claim by anyone, of any variety?
 5      A.  No.  But I -- you know, again, I could          14:39:00
 6 review the regulations as they exist post-1992 and
 7 apply them to the claim that's been presented.
 8 That's what I've done.
 9      Q.  Okay.  So when you say review them, you just
10 read them?                                               14:39:16
11      A.  Reviewed them?  Yes.
12      Q.  Yeah.  Did you --
13      A.  Yeah.
14      Q.  When you say you've reviewed -- you read
15 them.                                                    14:39:24
16          So what you did, as I understand it, is you
17 read the regulations and you applied them to the
18 claim materials provided to you, correct?
19      A.  In the context of what the regulations are
20 currently, yes, that's true.                             14:39:35
21      Q.  Okay.  And do you have any specific
22 experience, training or expertise in reading the
23 California insurance regulations that a normal
24 layperson wouldn't have?
25      A.  Well, I think based upon my background and      14:39:52
```



EXHIBIT 4
PAGE 346

1  experience and years in the industry, I do.

2      Q.  Do you know how, in practice, the insurance

3  regulations are applied to fidelity claims since

4  1992?

5      A.  In practice?                                          14:40:09

6      Q.  Yes.

7      A.  I can -- I can -- I can read as to what it

8  requires.  In practice, it's a whole different

9  story.  No, I can't address that issue.

10      Q.  Yeah.  So that's what I'm asking you.           14:40:20

11          Do you have any expertise on the in-practice

12  application of insurance regulations that came into

13  play in 1992 to fidelity claims?

14      A.  Other than what's stated in the regulations,

15  no.                                                          14:40:35

16      Q.  And do you have any sort of specific life

17  experience post-1992 when the regulations were

18  adopted as to the handling of fidelity claims in

19  California?

20      A.  Other than what I've referred to, no.           14:40:50

21      Q.  Are there magic words required for a

22  reservation of rights letter?

23      A.  Are there magic words?

24      Q.  Yeah, magic words.

25      A.  I can't think of any magic words.               14:41:24



1       Q.  Is there some specific language a letter

2   must have to be a proper reservation of rights

3   letter in your mind?

4       A.  Yeah.  It must be full and complete, it must

5   be concise, it must relate to the policy terms and          14:41:38

6   conditions itself, what has been violated, what

7   is -- you know, what is being contested.  All of

8   that should be in detail in the reservation of

9   rights letter.

10      Q.  And you agree that on the employee issue, a          14:41:53

11  letter of that variety was issued in April of '18,

12  correct?

13      A.  What was that again?

14      Q.  And my client issued a letter such as that

15  in April of 2018 on the employee issue, correct?           14:42:05

16      A.  You mean -- you're talking about what --

17  what's been referred to as the "soft denial"?

18      Q.  Yes.

19      A.  Well, I've -- you know, again, I don't -- I

20  don't believe that a soft denial is a reservation of        14:42:22

21  rights letter.

22      Q.  Do you -- have you ever heard the word "soft

23  denial" in the context of a fidelity claim?

24      A.  No, I have not.

25      Q.  Do you know what that means in the context          14:42:33



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 348

1  of a fidelity claim?

2      A.  I have -- I have no idea what it means in

3  the context of fidelity claims.  In my -- in -- you

4  know, in my background, you're either, you know,

5  denying the claim or you're accepting the claim.          14:42:45

6  There's no such thing as equivocation.

7      **Q.  Yeah.  You understand that that's not the**

8  **way fidelity claims work though?**

9      A.  I do not -- I -- I'm not aware of that fact

10  that you can have a soft denial.  I'm not aware of     14:42:59

11  that, no.

12      **Q.  And are you aware that the phrase "soft**

13  **denial" is simply a shorthand for issue -- issue**

14  **identification letter?**

15      A.  Well, that -- I've heard of an issue          14:43:13

16  identification letter.  I know what an issue

17  identification letter is, but it's not a reservation

18  of rights.

19      **Q.  Okay.  Well, but an issue identification**

20  **letter can reserve a right, can it not?**            14:43:24

21      A.  Yes.  It can, without equivocation, sure.

22      **Q.  Well, do you understand how fidelity**

23  **claims work in terms of information developing over**

24  **time?**

25      A.  In what context?                               14:43:41



JOHN LEPIRE on 07/19/2022

Page 212

1       Q.  Well, do you understand that in the -- in a
2   normal fidelity case information is developed over a
3   period of time?
4       A.  Of course, like any other claim.
5       Q.  And do you understand that your                    14:43:56
6   understanding of the claim may develop over time?
7       A.  Yes.
8       Q.  And do you understand that in the context
9   of a fidelity claim it is infrequent that the answer
10  is black and white from day one in terms of            14:44:10
11  coverage?
12      A.  Well, that's the case in a lot of -- a lot
13  of claims.  You're right about that.
14      Q.  And do you understand that in the normal
15  course of a fidelity claim investigation it is         14:44:21
16  common for the carrier to provide an understanding
17  of the claim and an interim analysis?
18      A.  An interim analysis?  Well, I don't see that
19  terminology used anywhere in that letter.
20      Q.  Those are my words.                             14:44:40
21          You understand that in fidelity claim
22  handling it is common par for the course for the
23  carrier to provide an analysis in the middle just so
24  the insured knows where they're at at a moment in
25  time?                                                   14:44:56



1    A.  Yeah.  That's normally -- normally part of
2  reporting.
3    Q.  Okay.  And do you understand that the fact
4  that the carrier doesn't have enough information to
5  identify a covered loss at one moment at time might          14:45:05
6  not lead to a denial later?
7    A.  Would you repeat that one again?
8    Q.  Sure.  The fact that the carrier doesn't
9  have enough information to document a covered loss
10  at one point in time doesn't mean the claim may not          14:45:19
11  be accepted in the future if more information is
12  provided.
13    A.  That's true.
14    Q.  And so isn't it reasonable as a carrier to
15  provide an impression of the claim but leave its            14:45:30
16  mind open that more information might ultimately
17  prove a covered loss?
18    A.  Certainly, but you don't refer to it as a
19  reservation of rights.
20    Q.  Sir, isn't it true that in the context of a          14:45:44
21  fidelity claim, providing some language like the
22  phrase "it appears" is common because, of course,
23  the insured may provide you more information in the
24  future which would impact the contents of your
25  letter?                                                      14:46:11



 1      A.  That's true, but it's not a reservation of

 2  rights.

 3      **Q.  So isn't it true that the language you**

 4  **criticize in Ms. Rocha's letter, the equivocation**

 5  **language that you criticize is par for the course in**   14:46:25

 6  **the fidelity world because, of course, more**

 7  **information may be gleaned in the future that would**

 8  **change our understanding of a claim?**

 9      A.  Well, in my estimation, these issues should

10  have been addressed in some manner prior to this         14:46:43

11  letter having been issued.  In other words, if there

12  was a -- an a -- if there was a belief that these

13  were issues that had to be addressed, they should

14  have been addressed earlier.

15      **Q.  I'm putting aside timing.  I just want to**       14:46:56

16  **talk about the tone and content of the letter.  You**

17  **criticize Ms. Rocha's words.**

18      A.  Because she says it's a reservation of

19  rights, and it's not.

20      **Q.  Where does she say that it's a reservation**       14:47:11

21  **of rights?**

22      A.  Well, she sent out a notification earlier, I

23  believe near the beginning of this -- of this

24  process, that they were reserving all their rights.

25  I believe that the statement is in here.  Let me         14:47:26



 1  just take a look real quick.

 2       Yeah.  "AIG claims on behalf of National

 3  Union, reserves any and all rights under the policy

 4  as law or otherwise."  So --

 5       **Q.  And you -- do you know a single carrier,**          14:47:42

 6  **ever, in the last 40 years who hasn't put that exact**

 7  **words on the bottom of every single letter ever**

 8  **written?**

 9       A.  Not with a -- not with a soft denial, not

10  with a denial.  What I'm trying to tell you is there       14:47:57

11  was a denial of coverage here that was cloaked in,

12  quote-unquote, a soft denial.

13       **Q.  What do you mean?  Where does she deny --**

14  **where -- what word does she say in this letter that**

15  **says you're claim is denied?**                            14:48:12

16       A.  Well, it's not a -- well, you're using the

17  term "soft denial."  I mean, that's the term that

18  you came up with.

19       **Q.  No.  I didn't come up with it.  It existed**

20  **before I started practicing.**                            14:48:26

21       A.  Well, I'm just saying that the -- a soft

22  denial is -- it's, by definition, a denial.

23       **Q.  That's not true.  I mean, sir, I understand**

24  **what you're saying, and I just want to understand**

25  **from you:**                                              14:48:39



EXHIBIT 4
PAGE 353

JOHN LEPIRE on 07/19/2022

Page 216

1           Do you have any clue what that means in the

2    fidelity world so that you can understand the

3    context of it?

4        A.  Of a soft denial?

5        Q.  Yeah.  Have you ever asked anyone in the          14:48:50

6    fidelity world what the --

7        A.  I've never encountered -- I've never

8    encountered the term, no, I have not, other than in

9    the medical field.

10       Q.  Do you have any clue what it means in            14:49:01

11   context?

12       A.  No.

13       Q.  Can we agree that this claim -- you mention

14   in your report a number of times six years.  You

15   have the phrase -- the time period six years.         14:49:23

16           Can we agree that the claim prior to the

17   institution of litigation was open for about four

18   and a half years?

19       A.  I think that's a fair assumption, yes.

20       Q.  And can we agree that at least two of those     14:49:40

21   years -- sorry.  Strike that.

22           Can we agree that at least two and a half of

23   the four and a half years the claim was open the

24   City was working on its quantification of loss?

25       A.  The City was working on the quantification      14:49:58



EXHIBIT 4
PAGE 354

1  of loss, yes.

2      Q.  And can we agree that in the nine months

3  immediately preceding the lawsuit, National Union

4  was awaiting a response to its letter on discovery

5  from November?                                          14:50:17

6      A.  I wouldn't want to speculate on that.  I

7  don't know.

8      Q.  Well, we know that a letter went out in

9  November, correct?

10     A.  Yes.                                            14:50:27

11     Q.  And we -- and so if we run the time frame

12  from the original proof of loss in November of 2016

13  to the letter that we've looked at from Mr. Watnick

14  in November 2019, can we agree that that is roughly

15  three years?                                           14:50:48

16     A.  That's about right, yes.

17     Q.  And the time frame, though, from when AIG

18  had a presentation of the quantum of the claimed

19  overcharges to when that letter went out, that was

20  roughly 14 months, correct?                            14:51:04

21     A.  I would say you're probably right about

22  that.

23     Q.  And you know that it took the City over two

24  years to quantify its loss, correct?

25     A.  Yes.  But that was without any assistance or   14:51:19



EXCEEDING YOUR EXPECTATIONS

COMBS REPORTING, INC.

DEPOSITION REPORTERS • LEGAL VIDEO

**EXHIBIT 4**
**PAGE 355**

1    input from AIG insofar as the documentation is
2    concerned.
3         **Q.  Took the City two years to quantify its**
4    **loss, right?**
5         A.  Yes.                                          14:51:32
6         **Q.  And you think it was patently unreasonable**
7    **for National Union to take roughly 14 months to go**
8    **through a loss computation that took two years to**
9    **prepare, correct?**
10        A.  Let me say this, that if the insurance      14:51:49
11   carrier National Union, AIG as their adjusted firm
12   or division, you know, had been involved in
13   ascertaining these issues as to coverage earlier,
14   this matter should -- or could have been -- could
15   have been expedited much -- in a much more rapid    14:52:16
16   manner than it was.  That's the point I'm trying to
17   make.
18        **Q.  I'm not asking that.  I'm asking a different**
19   **question.  I know your point.  I read your report.**
20        **You think it was patently unreasonable and**    14:52:28
21   **in bad faith to take 14 months to review, analyze,**
22   **and process a loss computation that took two years**
23   **to prepare, correct?**
24        A.  In that context, yes.
25        **Q.  How long would it have taken you to do?**    14:52:45



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 356

JOHN LEPIRE on 07/19/2022

Page 219

1    A.   What was that again?

**2    Q.   How long would it have taken you to do it?**

3    A.   Well, number one, I wouldn't have done it

4 because I'm not the adjuster on it.

**5    Q.   No, but you're an expert.**                    14:53:03

**6         So if AIG had come to you and said, Here you**

**7 go, here's your engagement, sir, how long would it**

**8 have taken?**

9    A.   Well, that's speculative.  I -- I -- I can't

10 even give an opinion on that.                           14:53:16

**11   Q.   Well, sir, you're an expert in fidelity**

**12 claims apparently.**

**13        As an expert in fidelity claims, how long**

**14 would it have taken you, following presentation of**

**15 the Ray report, to finish whatever had to be**         14:53:30

**16 finished?**

17   A.   Well, it all depended on the availability of

18 the witnesses, the availability of the

19 documentation.  If I were, you know, working at AIG,

20 I would have been on top of all of that right from     14:53:47

21 the very beginning in trying to acquire and access

22 whatever I could, as best as I could, because of the

23 size of the magnitude of this potential loss.

**24   Q.   Great.  You're the -- you're the boss at**

**25 AIG, got the Ray report.**                             14:54:05


EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 357

1          How long was it going to take you, since

2    you're the expert, to go through this and reach your

3    final decision?

4       A.  That's purely speculative.  I can't comment

5    on that.                                        14:54:20

6       Q.  Well, you're -- you want to criticize Jenn

7    Rocha, hard-working employee of AIG.  Fair.

8          If you were Jenn Rocha, doing her job, her

9    desk, her everything, how long was it going to take

10   you to finish this claim?                       14:54:41

11      A.  I can't respond to that.

12      Q.  Well, you're willing to accuse Ms. Rocha of

13   bad faith.

14          I want to know:  You're Jenn Rocha.  How

15   much faster are you getting to the end?          14:54:55

16      A.  Because of a number of things that should

17   have been done in the very beginning, in my

18   estimation, weren't done.  That's the point I was

19   trying to make in my report.

20      Q.  I understand.  And when you do all those    14:55:09

21   things, because you're the expert, how fast are you

22   getting to an answer?

23      A.  Well, like I say, it would be much -- it

24   would be expedited to a greater extent than three,

25   three and a half years.  I can say that.         14:55:23



EXHIBIT 4
PAGE 358

```
 1      Q.  Okay.  How --

 2      A.  I can't --

 3      Q.  How long?

 4      A.  But I can't tell you exactly how much or how

 5  long, but I can tell you it would have been a much      14:55:28

 6  shorter period of time.

 7      Q.  When you say much shorter -- you

 8  apparently -- you say much shorter.  You must have a

 9  number.

10          How much faster are you able to do Jenn        14:55:38

11  Rocha's job than Jenn Rocha?

12      A.  Well, she didn't do a job.  That's the

13  point.  She was relying on all this information to

14  be provided by the policyholder.  She wasn't doing

15  any independent investigation that I can ascertain,    14:55:52

16  other than the fact that they had, you know, a

17  forensic accountant and an engineering firm out

18  looking at the billings that -- that were submitted.

19      Q.  You're saying Jenn Rocha doesn't -- didn't

20  work on this claim?                                     14:56:07

21      A.  No.  I said there was no -- there was --

22  there was no one authorized to take statements under

23  oath.  There was no one authorized to obtain the

24  records that everybody was waiting for the

25  policyholder to provide, which were in the care,       14:56:21
```



EXCEEDING YOUR EXPECTATIONS

COMBS REPORTING, INC.

DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4

PAGE 359

 1  custody, and control of the -- you know, the

 2  enforcement division the FBI and the District

 3  Attorney's Office and -- and also I believe the

 4  grand jury.

 5       These documents possibly -- again, I can't          14:56:37

 6  say for certain, but they could have been obtained

 7  in a much more rapid manner than having to go

 8  through the bureaucracy of the City of Beaumont to

 9  get them -- you know, get them obtained and sent off

10  and forwarded to AIG.                                    14:56:54

11  **Q.  Well, AIG got the records in March.  So how**

12  **much faster from December 1st to March -- sorry.**

13  **I'll fix my sentence.  AIG had a full production by**

14  **May.**

15       **So how much faster from December 1st to**          14:57:10

16  **May 15th do you think you could do this?**

17       A.  I don't know.

18  **Q.  There's Christmas and New Year's, don't**

19  **forget.**

20       A.  It wasn't -- it wasn't done -- it wasn't        14:57:18

21  done by -- AIG did not -- did not initiate any of

22  that.  They waited for the policyholder to provide

23  all of this information which they didn't have in

24  their possession.  They had to go out and get it

25  themselves, and then they had to take it and they       14:57:33

EXCEEDING YOUR EXPECTATIONS

COMBS REPORTING, INC.

DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 360

```
 1   had to forward it to AIG.

 2          What I'm saying is if AIG had jumped on this

 3   initially and gone out and -- and done that and

 4   taken some statements under oath relative to the

 5   issues having to do with coverage, that this could        14:57:46

 6   have been expedited and could have been handled in a

 7   much more streamlined manner.

 8      Q.  All right.  Give me the names of people you

 9   need statements from.

10      A.  Well, all of the parties that -- the parties      14:58:02

11   that were accused of these various crimes, number

12   one.

13      Q.  Do you think that somebody accused of a

14   crime, pending criminal prosecution is going to give

15   a statement?                                              14:58:15

16      A.  Well, I -- I don't know.  They're paying

17   restitution.  They're -- you know, they're

18   attempting -- they're attempting to satisfy, you

19   know, this -- the criminal complaint against them.

20   They may well have.  I don't know.  They confessed      14:58:26

21   to the crime.

22      Q.  Do you know -- do you know when they pled

23   guilty?

24      A.  I don't -- I don't know that offhand.  No, I

25   do not.                                                  14:58:37
```



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 361

JOHN LEPIRE on 07/19/2022

Page 224

1      Q.   Do you know of any criminal lawyer in the

2  country that was going to let us take a statement

3  under oath of somebody who is subject to criminal

4  indictment?

5      A.   No.                                              14:58:46

6      Q.   Are you aware of any world in which a

7  fidelity carrier has gotten a statement under oath

8  from somebody who's pending criminal investigation?

9      A.   Well, they could have taken, you know,

10 statements from the Western Riverside Council of        14:58:59

11 Governments relative to the issue of the -- of

12 the -- you know, the $11 million that was allegedly

13 paid to the City of Beaumont to ascertain, you know,

14 what the relationship and if, in fact, that --

15 that -- those funds were paid to the City of            14:59:16

16 Beaumont and not to -- you know, to the Western

17 Riverside Council of Government.

18     Q.   Hold on.

19     A.   I don't know.

20     Q.   I didn't ask that.  I didn't ask that.          14:59:26

21 You're not -- you can't change the topic.  You have

22 to answer my questions.

23          I said are you aware of a criminal lawyer in

24 the country that would allow us to take a statement

25 under oath of Mr. Dillon, Egger or Moorjani while        14:59:38



EXCEEDING YOUR EXPECTATIONS

COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 362

```
 1   they were subject of a criminal investigation?
 2      A.   No.
 3      Q.   And isn't it true that there was no
 4   reasonable way for us to take a statement under oath
 5   of three guys who were subject of criminal          14:59:51
 6   investigation in a criminal indictment?
 7      A.   In that regard, yes.
 8      Q.   Now, you said Western Riverside.
 9           Do you know when the restitution was paid?
10      A.   I don't recall.                             15:00:05
11      Q.   So why -- how is it that Ms. Rocha was
12   supposed to take a sworn statement from Western
13   Riverside prior to the payment of any restitution?
14      A.   Because the terms and conditions of the
15   restitution I would assume related back to the      15:00:27
16   relationship between Beaumont and the Western
17   Riverside Council of Governments.  In other words --
18      Q.   No.  I asked a different question.
19           How would she know to take a statement from
20   them before the restitution was paid?               15:00:41
21      A.   Well, they were a party to this, I mean,
22   from way back in the beginning of this -- of this
23   investigation.  They were a -- they were a party in
24   this -- this whole -- you know, this whole claim.
25      Q.   Do you understand that you can only take a  15:01:02
```



EXCEEDING YOUR EXPECTATIONS

COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 363

 1  statement under oath from your insured?

 2      A.  Yes, that's correct, and I believe they

 3  were -- they were under the -- under the AIG policy,

 4  they are -- they are an insured, aren't they?

 5      Q.  You think Western Riverside is an insured?      15:01:16

 6      A.  No.  I mean, the -- the coverage afforded to

 7  Beaumont is separate and distinct, but Western --

 8  the Council has their own coverage in -- in this --

 9  in the same program that Beaumont has, no?

10      Q.  I want to show you something.  I'm      15:01:36

11  fascinated by a statement in your report.  You said,

12  "AIG has recently implied that Beaumont Financing

13  Authority is not an insured."

14          Do you see that?

15      A.  Yes, yes, I see that.      15:01:53

16      Q.  Who implied it?  Give me their name.

17      A.  Off the -- I can't recall off the top of my

18  head.

19      Q.  Well, you say "recently."

20          What year did that occur?      15:02:15

21      A.  Again, I can't recall.

22      Q.  I mean, is Beaumont Financing Authority

23  expressly identified in the policy as an insured?

24      A.  I believe by endorsement.

25      Q.  Do you believe the policy specifically says      15:02:28



EXCEEDING YOUR EXPECTATIONS

COMBS Reporting, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 364

 1   "Beaumont Financing Authority" or that's your read

 2   of it?

 3       A.  Let me go further here.  Yeah.  They're

 4   identified as an additional insured under both

 5   policies.                                              15:02:46

 6       Q.  Okay.

 7       A.  Endorsement 13 on the 2015 to 2017 policy

 8   and in endorsement number 9 on the 2014 to 2015

 9   policy.

10       Q.  You mention the SEC investigation.          15:02:56

11           How much was the loss that Beaumont

12   Financing Authority claimed for the SEC

13   investigation?

14       A.  I don't recall.

15       Q.  Isn't it true that there's no claimed costs  15:03:11

16   associated with the SEC investigation in this

17   matter?

18       A.  My recollection is that SEC investigation

19   was never -- was never investigated by -- you know,

20   by the insurance company.  In other words, they     15:03:27

21   never obtained any information dealing with an SEC

22   investigation.

23       Q.  I asked a different question.

24           Isn't it true that there's no claimed loss

25   associated with the SEC investigation in this        15:03:39



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 365

1  lawsuit?

2     A.  I -- again, I'll have to -- I -- I don't

3  recall.

4     Q.  **Isn't it true that you're nitpicking the**

5  **failure to investigate a subject that is not even**          15:03:50

6  **involved in this lawsuit?**

7     A.  I wouldn't say it's nitpicking.  I'd say

8  it's a comment that I made relative to what, in

9  reality, is the case.

10     Q.  **You understand that Beaumont Financing**          15:04:02

11  **Authority is not a named party in this lawsuit,**

12  **correct?**

13     A.  That's correct, yes.

14     Q.  **So you're talking about the handling of a**

15  **claim for a party that's not even in the lawsuit,**          15:04:11

16  **right?**

17     A.  I was looking at it from the context of

18  prior to the litigation being filed.

19     Q.  **But I'm talking about in this litigation,**

20  **you are offering opinions about the handling of a**          15:04:22

21  **claim for a party that is not in the lawsuit, right?**

22     A.  Yeah.  It says "implied."

23     Q.  **But no.  I'm saying Beaumont Financing**

24  **Authority isn't a plaintiff in this lawsuit,**

25  **correct?**          15:04:39



EXHIBIT 4
PAGE 366

 1     A.  To the best of my knowledge, yes.

 2     **Q.  And you are offering opinions about the**

 3  **handling of a notice of claim for an SEC**

 4  **investigation that -- for a party that is not in the**

 5  **lawsuit, correct?**                              15:04:50

 6     A.  That's correct.

 7     **Q.  And so the SEC notice has nothing to do with**

 8  **whether there was a proper investigation of**

 9  **overcharging by Urban Logic, correct?**

10     A.  To the best of my knowledge, yeah.  Could we   15:05:05

11  take a break?

12     **Q.  Sure.  Happy to.**

13         MR. DEAL:  How close are we?  Scott?

14         MR. SCHMOOKLER:  Yes.  I don't know.  Less

15  than a half hour.                                    15:05:35

16         MR. DEAL:  Okay.

17         THE WITNESS:  A half hour?

18         MR. DEAL:  He has less than a half hour

19  left.

20         THE WITNESS:  Oh, okay.  You want to --        15:05:41

21  five-minute break?

22         MR. DEAL:  Five, ten minutes?

23         MR. SCHMOOKLER:  Five minutes.

24         THE VIDEOGRAPHER:  Going off the record, the

25  time is 3:05 p.m.                                    15:05:50



EXCEEDING YOUR EXPECTATIONS
Combs Reporting, Inc.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 367

JOHN LEPIRE on 07/19/2022

Page 230

```
1              (Break, 3:05 p.m. to 3:12 p.m.)
2         THE VIDEOGRAPHER:  We're back on the record.   
3    The time is 3:12 p.m.
4    BY MR. SCHMOOKLER:
5         Q.  Sir, I'm putting your report back up.  I      15:12:28
6    want to ask a few more questions about numbered
7    paragraph 4.
8              Do you see numbered paragraph 4?
9         A.  Yes.
10        Q.  Okay.  You say we continually changed        15:12:37
11   coverage positions.
12             Do you see that?
13        A.  Yes, I do.
14        Q.  What was the original coverage position?
15        A.  The original coverage position was that it   15:12:49
16   was under investigation.
17        Q.  Okay.  And when did it change?
18        A.  The -- the issue was raised relative to
19   the -- the independent contractor versus an employee
20   issue.  There were -- I'm trying to think of the       15:13:06
21   other ones that were there.  There were a number of
22   different issues that, in my opinion, went -- went
23   back and forth during the -- you know, this three
24   and a half year period this was being handled.
25        Q.  Sure.  And I think, if I understand you      15:13:23
```



EXHIBIT 4
PAGE 368

 1  correctly, AIG raised different -- different issues

 2  as its investigation unfolded, correct?

 3      A.  Yeah, that's right.  And again, you know --

 4  you know, Pinkney, who's -- who has more -- a

 5  tremendous amount of knowledge about what was going          15:13:38

 6  on here, you know, his statement under oath could

 7  have been taken way back at the beginning, and I

 8  think a lot of these issues relative to coverage

 9  could have been dealt with at that point.

10      Q.  Sir, I'm not asking about statements under          15:13:50

11  oath.  I know you think that that's prominent.  It's

12  not.  I'm asking about number four.  You say we

13  changed positions.

14          Isn't it true that what you're really saying

15  is AIG identified issues for its insured over the            15:14:04

16  course of its investigation?

17      A.  They identified potential exposure or

18  identified potential exclusionary issues and then

19  turned around and, you know, withdrew their -- their

20  objections as opposed to issuing a full and complete         15:14:20

21  reservation of rights relative to what they believe

22  the case was.

23      Q.  What's the day on which anything was

24  withdrawn?

25      A.  My understanding was the issue dealing with          15:14:32



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 369

JOHN LEPIRE on 07/19/2022

Page 232

 1  independent contractors was resolved when, you know,

 2  the -- the adjusters became aware of the endorsement

 3  that added independent contractors to the coverage.

 4      Q.  Sir, you're aware that -- I'm sorry.  Hold

 5  on.  I'm going to have to mark a new exhibit now.          15:14:54

 6          You're aware an answer was filed, right?

 7      A.  Yes.

 8      Q.  And you're aware that there was a denial

 9  that the -- that the -- that the wrongdoers were

10  employees, correct?                                        15:15:08

11      A.  Yes, they were.

12      Q.  So it's, in fact, never been withdrawn,

13  correct?

14      A.  Well, my understanding was that at one point

15  it was withdrawn.  I can't, you know, ex -- I can't       15:15:22

16  identify the exact point in time that it was

17  withdrawn as an issue, but I know at one point it

18  was -- it became essentially, for purposes of -- of

19  the claim in and of itself, it was -- it was -- it

20  was not the issue that was -- that was the                 15:15:46

21  predominate issue.

22      Q.  Okay.  Well, putting aside whether it was

23  predominate or not, do you know if, in fact, there

24  was ever an agreement that these individuals were

25  employees?                                                 15:16:03



```
 1     A.  Well, there was never an agreement as to
 2  anything from what I -- from what I can glean.
 3     Q.  Okay.  So isn't it true that my client
 4  identified issues over time?  Is that true?
 5     A.  Yes, they did.                                  15:16:15
 6     Q.  And isn't it true that it provided the
 7  insured an opportunity to respond to those issues as
 8  it identified them?  Isn't that true?
 9     A.  Yes, to an extent that's true.
10     Q.  Isn't it true that identifying issues and   15:16:28
11  offering an opportunity to respond is good faith
12  claim handling practices?
13     A.  Yes, that's true.
14     Q.  I have nothing further.
15                   ---oOo---                            15:16:46
16                   EXAMINATION
17  BY MR. DEAL:
18     Q.  John, let me just clear up a couple things.
19         First of all, you mentioned at one point
20  that you do have criticisms of Evans' report?         15:16:53
21     A.  What was that again?
22     Q.  You understand there's been a rebuttal
23  expert?
24     A.  Yes, that's correct.
25     Q.  Okay.  And you've read his report, right?      15:17:06
```



EXCEEDING YOUR EXPECTATIONS

COMBS REPORTING, INC.

DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 371

```
 1      A.  Yes, I have.
 2      Q.  And you have criticisms of that report,
 3  right?
 4      A.  Yes, I do.
 5      Q.  And so if I was to ask you about those          15:17:14
 6  criticisms, you could answer it, right?
 7      A.  That's correct.
 8      Q.  Okay.  Do you believe that the standard for
 9  handling a fidelity claim materially differs from
10  other first-party claims?                             15:17:40
11      A.  Not in reality, no.  The basics are the
12  same.
13      Q.  The coverage analysis might be different
14  depending on the type of policy and the type of
15  claim, right?                                         15:17:51
16      A.  That's correct.
17          MR. SCHMOOKLER:  Objection to form.  Hold
18  on.  Mr. Lepire, I have to be given the equal
19  opportunity to object because you're being led.
20  Object to form and leading.                           15:18:01
21  BY MR. DEAL:
22      Q.  Okay.  Mr. Schmookler asked you about crime
23  insurers obtaining information from governmental
24  agencies.
25      A.  Yes.                                           15:18:22
```



EXHIBIT 4
PAGE 372

1      Q.  In the adjustment of a fidelity or a

2  crime -- government crime or commercial crime

3  policy, would it be typical to reach out for police

4  reports, investigative reports?

5      A.  Yes, it would.                              15:18:33

6      Q.  He asked you whether you've seen any

7  documents relative to the restitution issue?

8      A.  Yes, that's correct.

9      Q.  Have you reviewed the declaration of Steve

10  Debond?                                            15:18:55

11      A.  Yes, I have.

12      Q.  Do you have an understanding of what

13  Mr. Debond was saying vis-à-vis the restitution?

14      A.  Yes, I do.

15      MR. SCHMOOKLER:  I'm going to object -- hold    15:19:03

16  on.  Hold on.  Mr. Lepire, I'm going to object.

17  We've asserted against Mr. Debond a Rule 26

18  objection.  He's never been disclosed as a witness,

19  and anything he offered is inadmissible.  I'm

20  objecting to any line of questioning about          15:19:17

21  inadmissible evidence.

22      MR. DEAL:  You can object all you like.

23      MR. SCHMOOKLER:  That's fine.  I just want

24  to state my objection.  I'm not --

25  BY MR. DEAL:                                        15:19:29



1     Q.  Did you reach an understanding as to the

2  amount of restitution that was received by Beaumont?

3     A.  Yes.  My -- my understanding is, in reality,

4  the restitution -- the $11 million in restitution

5  was payable to the Western Riverside Council of          15:19:41

6  Government, it wasn't payable to the City of

7  Beaumont, and there was going to be some sort of an

8  apportionment, a small amount of apportionment,

9  which I'm not aware of, to the City of Beaumont out

10 of that restitution agreement.  But the agreement     15:20:00

11 was not with the City of Beaumont.  It -- it was

12 with the -- the ones who were convicted of the crime

13 and the Western Riverside Council of Government.

14    Q.  The issues raised by Mr. Watnick in his

15 November 2019 letter -- well, I'm just going to ask     15:20:30

16 you generally, John.

17    A.  Okay.

18    Q.  I think you've already stated this, but is

19 it your opinion that -- strike that.  Let me try

20 that again.                                            15:21:24

21       In his November 19th letter, Mr. Watnick

22 raised issues about the date of discovery?

23    A.  Yes.

24    Q.  And specifically questions about Pinkney's

25 knowledge and the termination proceeding, right?        15:21:39



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

**EXHIBIT 4**
**PAGE 374**

```
 1      A.  Yes.
 2      Q.  Could that information have been discovered
 3  earlier in your opinion?
 4      A.  Yes.  It could have been discovered within a
 5  few months of the proof of loss submission.          15:21:49
 6      Q.  Should -- if there's a question as to
 7  whether the restitution was payable to AIG or to
 8  WRCOG, should the insurance company have at least
 9  done some investigation on that issue?
10      A.  Yes.  I mean, they have a right of           15:22:14
11  subrogation.  I mean, if this claim had been paid in
12  whatever amount and there was a potential recovery,
13  there's no requirement or need for the policyholder
14  to wait for whatever the restitution agreement is in
15  order to be compensated.                             15:22:29
16      Q.  But what I'm getting at is they have tools
17  to determine whether -- whether Beaumont had been
18  compensated before November 2019?
19      A.  That's correct.
20          MR. SCHMOOKLER:  Object.  Hold on, sir.  You 15:22:47
21  still have to give me the time.  Object to form.
22          MR. DEAL:  Okay.  I have nothing further.
23                     ---oOo---
24      (Nothing omitted nor deleted.  See next page.)
25                                                       15:22:56
```



JOHN LEPIRE on 07/19/2022

Page 238

```
 1                    FURTHER EXAMINATION
 2  BY MR. SCHMOOKLER:
 3     Q.  Sir, when you said they have the tools to
 4  uncover the notice of discipline, you know that in
 5  December of 2016 my client asked for the employment    15:23:08
 6  file for Mr. Kapanicas, right?
 7     A.  Yes.
 8     Q.  So one of the very first things we ever
 9  asked for in this claim was his employment file,
10  correct?                                               15:23:24
11     A.  That's my understanding.
12     Q.  And -- and the notice of discipline was not
13  provided with the employment file, correct?
14     A.  That I'm not aware of.
15     Q.  How is it my client was supposed to know    15:23:35
16  there was a notice of discipline if it asked for the
17  employment file and didn't receive it?
18     A.  Well, again, if they had gone directly to
19  the -- the -- the authority that had these files,
20  they may have been able to obtain that, that notice    15:23:53
21  of discipline.  I -- my --
22     Q.  But --
23     A.  -- understanding is all of these records
24  were picked up in -- you know, under the care,
25  custody and control of the -- you know, the            15:24:04
```



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 376

 1  authorities.

 2      Q.  You say we could have uncovered it earlier.

 3          If it's in the custody of the authorities

 4  and inaccessible, how would they have uncovered

 5  it?                                                    15:24:15

 6      A.  Well, what I'm saying is that they -- you

 7  know, the insurance company may well have been able

 8  to obtain this information if they went about doing

 9  it directly as opposed to going through the conduit

10  of the -- of the insurance -- excuse me -- of the     15:24:28

11  policyholder.

12      Q.  And when you say that, you have no clue

13  whether this -- the notice of discipline was in the

14  possession of the government, right?

15      A.  I -- I do not know that answer, no.           15:24:40

16      Q.  And so when you say they might have gotten

17  it earlier, you don't actually know that that was --

18  is true, right?

19      A.  That's correct.

20      Q.  No further questions.                          15:24:51

21          MR. DEAL:  One question, John.

22                      ---oOo---

23  (Nothing omitted nor deleted.  See next page.)

24

25



```
 1                   FURTHER EXAMINATION
 2  BY MR. DEAL:
 3      Q.  If NUFIC had asked for the Kapanicas
 4  employee file but had not received it, what would
 5  have been -- what would have been the appropriate        15:25:05
 6  step for AIG to do at that time?
 7           MR. SCHMOOKLER:  Object to form.
 8           THE WITNESS:  The -- the next route would
 9  have been, I would imagine, to obtain an
10  authorization from the City of Beaumont and through      15:25:20
11  that authorization obtain it.
12  BY MR. DEAL:
13      Q.  Couldn't they have also just said to, for
14  instance, me or Beaumont's counsel, Hey, you never
15  produced the employment file, where is it?               15:25:33
16      A.  That's true.
17           MR. SCHMOOKLER:  Hold on.  Object to form.
18  I have to be able to object, sir.  For purposes of
19  my job, I have to be able to object.  Object to
20  form.  I'm also objecting to the extent that             15:25:44
21  Mr. Deal is interposing questions about his personal
22  interactions of the case which, obviously, he can't
23  make himself a witness.
24           MR. DEAL:  Okay.  And I think he answered.
25  You got your objections down.  I have nothing            15:25:59
```



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 378

 1  further.

 2       MR. SCHMOOKLER:  Nothing further.  We're

 3  done.

 4       THE VIDEOGRAPHER:  Are we ready to conclude?

 5       MR. SCHMOOKLER:  Yes.                         15:26:12

 6       MR. DEAL:  So how much time do you

 7  calculate, Scott?  I'd say we've gone seven and a

 8  half hours but we took, I think, about probably

 9  50 minutes in breaks.

10       MR. SCHMOOKLER:  Sure.  Whatever you want.    15:26:22

11  That's fine.  I'm not going to nitpick the

12  dollars.

13       MR. DEAL:  So seven and a half minus -- what

14  do you want to call it?  6.7, 6 point --

15       MR. SCHMOOKLER:  Sure.  Whatever you want.    15:26:36

16  It's fine.  I'm not -- I'm not going to worry about

17  it.

18       MR. DEAL:  All right.  John, is 6.7 okay?

19       THE WITNESS:  Yeah.

20       MR. SCHMOOKLER:  All right.  Let's call       15:26:43

21  the -- we can turn off the record.

22       THE VIDEOGRAPHER:  Counsel Chris, would you

23  like a copy of the video and transcript?

24       MR. DEAL:  I would, yes.

25       THE VIDEOGRAPHER:  Okay.  This concludes      15:26:55



Page 242

1  today's proceeding in the deposition of John Lepire.

2  The total number of media units used was three.

3  We're off the record.  The time is 3:27 p.m.  Thank

4  you.

5

6          (Proceedings concluded at 3:27 p.m.)

7

8                          _____

9                          John Lepire

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



EXCEEDING YOUR EXPECTATIONS

COMBS REPORTING, INC.

DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 380

```
 1  STATE OF CALIFORNIA        )

 2  COUNTY OF SAN FRANCISCO    )

 3

 4          I hereby certify that the witness in the

 5  foregoing deposition was by me duly sworn to testify

 6  to the truth, the whole truth and nothing but the

 7  truth, in the within-entitled cause; that said

 8  deposition was taken at the time and place herein

 9  named; that the deposition is a true record of the

10  witness's testimony as reported by me, a duly

11  certified shorthand reporter and a disinterested

12  person, and was thereafter transcribed into

13  typewriting by computer.

14          I further certify that I am not interested

15  in the outcome of the said action, nor connected

16  with, nor related to any of the parties in said

17  action, nor to their respective counsel.

18          IN WITNESS WHEREOF, I have hereunto set my

19  hand this 25th day of July, 2022.

20  Reading and Signing was:

21  _X_ requested  ___ waived  ___ not requested

22

23

24          _____

25                  CYNTHIA F. DAMMANN, CSR No. 10610
```



EXHIBIT 4
PAGE 381

**Exhibits**

**24141 Ex 1** 5:4 11:6,8,13

**24141 Ex 2** 5:5 13:6,7,16

**24141 Ex 4** 5:7 175:4

---

**$**

**$1,000** 54:4

**$1.5** 157:20 158:12 159:2 160:3, 23 161:8 162:1,13 167:24 168:2, 20

**$10** 143:12 156:25 161:25 163:16 172:3,12,13

**$10,000** 91:24

**$11** 158:5,9 224:12 236:4

**$15** 53:8 143:13

**$150** 24:5 25:7,13 53:5 54:4 83:20 92:3

**$159,702,461** 83:12

**$2** 173:4

**$5** 143:14 168:16,21

**$57,803,907** 128:8

**$57,803,975** 128:15 129:6

**$58,272,802** 166:7

**$600** 10:24 196:12

**$8** 156:22 161:13 163:10 165:9, 17,23 172:15

**$8,214,943** 166:1

**$803,975** 128:8

---

**(**

**(1)** 22:1

---

**-**

**---ooo---** 7:16 127:5 233:15 237:23 239:22

---

**0**

**01-309-61-64** 175:13

**01-425-57-41** 175:13

---

**1**

**1** 11:6,8,13

**1.5** 155:10 157:23 158:18 160:15 161:1 163:17 168:13,18 169:11, 21 170:9 171:13

**10** 29:10 53:8 82:11 133:7 161:15 162:13 164:3 170:13 171:15

**100** 38:1

**101** 24:17

**10:00** 43:12

**10:52** 82:18,19

**11** 94:16 133:8

**11283** 82:25

**11285** 83:7

**11294** 94:16

**11:00** 82:15

**11:09** 82:19,21

**11:28** 96:11

**11:29** 96:14

**12** 96:20 98:25 133:8 164:3

**12/20** 69:6

**12/20/2017** 69:5

**12935** 86:17

**12936** 87:4 100:21

**12:00** 125:25

**12:09** 126:18,19

**12:30** 126:12

**12:40** 126:12,13

**12:41** 126:20 127:4

**12th** 133:16,19 134:1,10 135:20 165:3

**13** 127:13 133:8 227:7

**14** 29:11 217:20 218:7,21

---

**15** 29:11 65:10 82:12 150:1 164:3

**150** 83:25

**15th** 64:21,24 69:6 109:5,23 165:3 222:16

**16** 60:5 147:10,13 164:23 165:6

**16th** 164:25

**17** 13:3 67:4

**17-year** 92:4

**17th** 72:17

**18** 60:6 64:1 74:14,15 119:9 210:11

**18th** 65:5

**19** 6:2 17:7 19:14 34:21,24,25 38:20 46:22 108:20 114:4 116:18, 24 127:1 147:5 154:8

**1960s** 46:24

**1968** 14:10

**1970s** 19:15,17 20:15 22:4 37:7 38:6,20

**1977** 16:8 18:22 31:16

**1978** 15:12,14

**1980s** 47:25

**1984** 16:8 46:23

**1985** 18:23 46:23

**1992** 207:18,23 209:4,13

**1993** 166:7

**1997** 17:6 18:20

**1998** 37:10 41:12

**19th** 6:6 88:15,16 106:4,9,12,16 107:24 108:6 109:14,22 110:4 114:12 115:2,7 236:21

**1:55** 181:16,18

**1st** 56:21 86:16,21,24 88:21 90:1 92:18 100:11,12,13 101:1,18 148:6 222:12,15

---

**2**

**2** 13:6,7,16 87:3 163:3 181:23,24 204:23

**20** 19:8 39:18 45:18 111:13 112:1 119:9 123:19



EXCEEDING YOUR EXPECTATIONS

**COMBS REPORTING, INC.**

DEPOSITION REPORTERS • LEGAL VIDEO

**EXHIBIT 4**
**PAGE 382**

**20-minute** 126:1

**2000** 17:7 23:2,5,13,18 25:13 34:13 35:2,21,25 36:10,20 37:1 39:18,24 41:2 42:8 45:12 103:19, 24 110:21 198:14,15 203:16

**2000s** 104:10

**2004** 136:9,12

**2008** 87:14 89:1

**2011** 29:2,11,16,20 30:1,5 31:10 87:14 89:1

**2012** 166:7

**2014** 227:8

**2014-2015** 174:10 175:17

**2015** 93:19 145:5 182:5,18 183:16,21 184:17 227:7,8

**2015-2017** 175:18

**2016** 32:17,23 47:10,14 55:10 56:11,21 57:17 58:14 59:12,25 75:5 82:24 83:1 88:21 92:19 95:19 101:1,18 148:6 217:12 238:5

**2017** 29:11 64:1,21,24 65:5 67:3 68:10,14 69:7,13 70:3,13 71:7,13 74:13 105:20 106:4 107:24 108:6, 20 109:23 114:4,13,16,17,21,23 115:3,7,25 116:18,24 227:7

**2018** 55:17,25 56:8,12 57:14,17 58:14 59:12,19 60:1 61:19,22 63:14 74:5,12,20 76:12,21 77:11, 16 82:1 113:18,19 114:5,13 115:3,7 118:24 119:8 127:9,13 203:16 210:15

**2019** 132:9,11 133:12,16,20,21 134:10 135:20 136:19,25 138:21 139:4 143:25 144:11,21 145:6 146:6,16 148:23 150:19 152:19 153:3 154:14,17 163:3 164:23 217:14 236:15 237:18

**2020** 47:10,14 55:7 103:18,24

**2022** 6:2,6 31:11 32:17,23 35:2, 21,25 36:10 39:19,24 45:12,19 127:1

**20th** 68:10,14,18,19 69:13 70:3, 12 71:7,13 115:25 118:24

**23rd** 75:8

**24** 60:5,6

**25th** 55:25 56:8,12 57:14,17 58:14 59:12,19 60:1 61:19,22 63:2,14,16 76:12 106:9,13,17 107:7

**26** 28:4 235:17

**26th** 74:5,10,13,20,24 75:10 76:21 77:11,16 114:16,21,22,23 127:9,15 164:24 203:16 204:17

**29424** 114:18,21

**29438** 68:22

**29586** 113:21

**29693** 68:13,21

**2:05** 181:18,20

**2:15** 126:5

**2:30** 126:5

---

**3**

**3** 50:1,3 64:13

**30** 47:2,5 49:5,11,16 50:18 51:7, 19,20,23 52:9,11,13,15 53:2,19, 24 54:8,22 84:22 96:6 106:4,7 107:5 122:15

**30-day** 51:12 122:13

**31574** 74:12

**31st** 188:18

**331184** 68:22

**35** 100:22

**36** 100:22

**37** 47:9 106:11 107:5

**3963** 56:3

**3:05** 229:25 230:1

**3:12** 230:1,3

**3rd** 51:2 75:5 83:1,6 94:11,13 110:4

---

**4**

**4** 132:11 175:2,3,4 230:7,8

**40** 32:16,21 48:15,19,22 199:23 200:3 215:6

**45526** 64:2

**45528** 64:13

**46325** 165:2

**48534** 88:7

**48535** 88:21

**49,000** 201:12

**4th** 74:24 132:9 143:25 144:11, 13,21 145:6 146:6 148:23 154:14, 17

---

**5**

**5** 118:3 201:4

**50** 20:3 60:24 86:4 241:9

**5540** 65:19

**57,803,97** 128:9

**57,803,975** 128:17 130:7

**572,170** 64:9,16

**572,172** 65:1

**5:20-cv-02164** 6:13

**5th** 50:19 56:11 57:16 58:14 59:12,25 109:5

---

**6**

**6** 166:3 241:14

**6.7** 241:14,18

**600** 204:25

**64,026** 204:25

**65** 199:19

---

**7**

**7** 63:25 68:18 114:5

**70s** 21:22 46:2

**75** 38:1

**7th** 68:17 113:19 114:13 115:3,7 119:8

---

**8**

**8** 161:15 162:1,12 163:4,17 169:23 170:11 171:14 181:6 192:1,4,17 196:21



EXHIBIT 4
PAGE 383

**8.2** 167:18

**800** 129:5

**80s** 46:2

---

**9**

**9** 227:8

**90** 65:1

**90s** 46:2

**9:02** 6:2,5

**9:49** 43:15,16

**9:59** 43:16,18

---

**A**

**a.m.** 6:2,5 43:15,16,18 82:18,19, 21 96:11,14

**ability** 65:3 200:24

**absolutely** 53:21 90:5 93:24 174:14 201:3

**accepted** 51:15 213:11

**accepting** 211:5

**access** 100:7 177:25 219:21

**accessible** 149:15

**accident** 21:14 46:6

**accomplished** 200:10

**accountant** 42:12 56:20 57:5 62:20,21 65:4 66:22 69:19,22 76:6 151:6 161:12 162:12 164:8 165:13 166:22 167:12 169:22 170:10 185:23 221:17

**accountant's** 76:8 185:23

**accountants** 39:7 70:20 157:24 167:8,17

**accounted** 203:2

**accounting** 43:2 55:16,24 68:4 70:5 72:20 98:21 162:4

**accurate** 14:7,13 26:17 109:18, 20

**accurately** 8:23 11:18 12:21

**accuse** 54:21 62:1 109:19 110:20 118:13 141:19 220:12

**accused** 12:2 71:18,23 135:5,16 137:5 223:11,13

**accuses** 117:21,24

**accusing** 12:5 140:2,9,20 142:11

**acknowledge** 58:15,17 163:1

**acknowledging** 129:20

**acknowledgment** 129:24

**acquire** 219:21

**act** 46:4,9 54:13 95:9

**acted** 59:18 72:1 77:11,16 85:10 95:9 102:9,11 124:16,19 125:6 136:19 138:18 139:1

**acting** 51:20 76:22

**action** 7:2 9:20 10:2,10,18 138:15,23 205:8,10

**actions** 23:16 205:8 206:20,23

**activities** 99:25

**acts** 85:3

**actual** 25:2 42:7 68:3 104:2 110:15 130:3 160:16 172:14 173:5 184:13,25

**actuarial** 15:25 18:3,4,7

**actuary** 15:25 18:6

**add** 10:15

**added** 232:3

**adding** 79:7

**additional** 11:21 52:7 69:24 73:22 75:21,23 76:4 77:2,6,21 80:6 81:14 115:21 118:23 144:6 227:4

**address** 72:15,19 76:7,9 209:9

**addressed** 72:10,18 136:10 147:9 214:10,13,14

**addresses** 168:7

**adjudicate** 48:14,18,22

**adjudicated** 21:7

**adjudicating** 17:24

**adjusted** 112:12 218:11

**adjuster** 29:18 41:19 42:3 131:8 136:10 139:20 141:2 165:14 172:11 194:10 201:16 203:3

**219:4**

**adjusters** 31:23 167:5 232:2

**adjusting** 41:19

**adjustment** 235:1

**administered** 7:14

**adopted** 207:18,22 209:18

**adversaries** 117:11

**advised** 107:17

**advocate** 25:16,17,20 26:1,4,5,8 119:22,23 120:7,14,24 121:9,11, 13,16,23,25 122:7,14,24 123:1,5, 14,16 124:3,8,12,20 125:1,3,13, 21

**advocated** 124:12

**advocates** 122:17 123:5 124:1

**affirmative** 131:24

**afforded** 30:7 226:6

**aforementioned** 182:5

**agencies** 143:2 234:24

**agree** 6:22 17:17 23:24 24:2 25:4 27:11 29:1,16,20 30:1,5,8 42:11 43:3 48:20 50:9 51:4 54:12,25 55:6,9 56:10 57:12,16,20 58:11, 12 59:10,18 60:4,17,23 64:23 65:3 70:22 71:11,13,17 73:6 76:21 77:10,15 79:14 81:25 87:10 89:19 90:9 95:18 102:7 112:22 113:2,6,17 115:1,5 125:18 133:11 153:5,11 158:11,17 184:9,16 210:10 216:13,16,20,22 217:2,14

**agreed** 51:16 71:1 86:4 104:6 109:3 112:19 131:14 152:24 154:19

**agreement** 10:7 74:25 232:24 233:1 236:10 237:14

**agreements** 116:5,14

**agrees** 26:10 153:14

**ahead** 122:3 163:24 192:7

**AI** 42:11

**AIG** 30:23 43:3 52:14 56:22 58:1, 3 60:20,25 61:10 62:10 68:3 71:8 72:10,15 76:2 81:20 84:4,12 86:3 87:22 90:18 93:12 94:7 97:16 112:19 114:3 116:19 117:15



118:7,22 131:14 136:10 137:1
139:6 147:7,20 148:16 151:1,4
152:25 153:22 155:2,10 157:23
160:3 163:3 164:7 166:21 167:1,
21 168:11 169:1,19 170:6 176:19
185:25 186:24 197:15 201:22
202:1 204:13 215:2 217:17 218:1,
11 219:6,19,25 220:7 222:10,11,
13,21 223:1,2 226:3,12 231:1,15
237:7 240:6

**AIG's** 26:10 30:25 78:6 82:1
116:8 161:11 162:11

**AIG/NATIONAL** 94:4 144:7

**Alan** 67:5

**alerted** 182:23

**allegation** 175:12

**allegations** 91:11,16 99:1 118:2

**alleged** 24:5 57:13 71:1 72:6
92:4 96:22 97:6 128:16 180:10

**allegedly** 224:12

**allegiance** 123:22

**alliance** 123:12

**Alliant** 26:5,15 125:1,13,21

**allowed** 21:25 62:5 145:21,23,
24,25 146:2

**alternative** 66:16

**ambiguous** 186:17

**amend** 70:9

**amended** 174:20 175:8

**amending** 69:23 70:4

**amount** 70:17 105:3,10 129:5,8,
10 130:10,23 141:21 158:9
173:22 184:6,7 185:15 231:5
236:2,8 237:12

**amounts** 29:10 65:15,24

**analysis** 15:24 18:3,4,7,14
32:11,14 48:12 52:21 62:19 63:9
64:6,25 70:20 72:25 73:4 75:16,
24 76:13,16,23 77:13 79:20 80:1
116:8,20 119:11,12 135:11,17
136:21 137:1 138:19 142:19
152:20 153:6,15,23,24 159:11
168:4 188:17 194:9 199:8 212:17,
18,23 234:13

**analyze** 105:10 218:21

**analyzing** 186:18

**Anderson** 132:10 133:11

**anticipate** 76:5

**anticipated** 70:4

**anticipates** 69:23

**anxious** 124:2

**anybody's** 191:24

**Aon** 9:23 10:3,6,9,18

**apparently** 190:4 219:12 221:8

**appearance** 7:5

**appears** 11:15 67:11 213:22

**Appendix** 60:10

**applicable** 48:6

**application** 18:23 48:3 53:16
138:7 209:12

**applied** 36:8,23 43:21,25 44:12
45:15,18 176:12 208:17 209:3

**applies** 143:17,24 176:8 180:1

**apply** 44:15 45:13 46:4 134:25
145:5 177:1 188:9 207:22 208:7

**applying** 36:13,15 48:1

**appoint** 192:20 193:11 197:23

**appointed** 197:1,4

**appointment** 193:19

**apportionment** 236:8

**approach** 39:3 113:9,13

**approximating** 172:15

**April** 50:19 51:4 56:11 57:16
58:14 59:12,25 60:5 74:5,10,13,
20,24 75:8 76:12,21 77:11,16,22
79:15 81:19 82:1 118:24 119:7,9
127:9,15 133:16,19 134:1,10
135:20 136:19,25 138:20 139:4
147:4 164:23 182:5,18 183:16,20
184:17 203:16 204:17 210:11,15

**areas** 47:19

**argument** 160:22

**argumentative** 52:2 73:1

**arrive** 90:23

**art** 112:22

**articulated** 34:7

**arts** 14:16

**ascertain** 41:25 168:24 221:15
224:13

**ascertained** 164:2

**ascertaining** 218:13

**aspect** 33:13,17 34:23 74:6 86:9
87:13 136:7,22 137:8 153:16,18,
25 154:4 160:9

**aspects** 25:2 35:10,12 38:13
78:11 83:16 142:3 154:25 193:16

**asserted** 235:17

**asserting** 28:6

**asserts** 131:24

**assign** 143:6

**assigned** 26:5 56:20,22 143:9
144:4

**assignment** 56:24 144:2 175:12
200:9

**assist** 197:4

**assistance** 217:25

**assume** 8:14 33:8,21 47:1,22
57:2 87:20 114:10 120:17 128:19
160:21 190:2 225:15

**assumed** 85:24 129:7

**assumes** 87:16 162:18 163:20
170:16 171:17

**assumption** 77:25 153:12
176:14 179:22 216:19

**assumptions** 176:17

**attached** 73:21 75:2 79:6

**attempting** 223:18

**attended** 15:7,14

**attorney** 7:6 14:25 26:3 27:2
84:17 92:18 116:3 120:9 122:1
123:2 193:4 194:11

**Attorney's** 84:18 85:2 90:15
139:15 141:8 147:18 222:3

**attorneys** 204:7

**Audio** 6:21

**audited** 17:13 194:8



**auditor** 15:22

**auditors** 163:5

**audits** 46:22

**August** 63:25 64:1 65:5 67:2 127:13 164:23,24,25 165:3 166:7

**authorities** 92:24 93:1 147:17 148:15 177:24 182:7 183:20 191:23 239:1,3

**authority** 226:13,22 227:1,12 228:11,24 238:19

**authorization** 111:20 148:17 240:10,11

**authorized** 221:22,23

**authorizes** 111:16

**auto** 178:22,23,24 179:1,4

**automatically** 112:20

**availability** 219:17,18

**aviation** 40:16

**await** 59:6

**awaiting** 217:4

**aware** 22:25 26:7 29:15 32:25 33:6 44:18 49:13,14 58:3 69:18 70:2 72:5,10,11 92:25 95:12 98:14 106:11 118:10 128:25 129:1 141:13 157:16 168:7 172:6 175:19,20,21 176:22 178:10,13 182:3,16,19 183:3 199:21,24 200:21,23,24 202:19,20 206:9 211:9,10,12 224:6,23 232:2,4,6,8 236:9 238:14

**Aylward** 99:2 116:7

---

**B**

**B(1)** 94:21

**B(2)** 96:20 97:2

**B(3)** 99:15

**bachelor** 14:16

**back** 19:14 20:3 32:5 38:6 43:12, 17 46:2,21 47:25 53:18 82:6,14, 15,20,23 96:14 103:14 114:15 115:24 126:11,12 127:3,14 139:18 142:9 147:14 152:13 170:4 171:11,23 176:4 181:19 189:17 195:8 196:2,21 197:16

201:16 203:10 205:1 207:5 225:15,22 230:2,5,23 231:7

**backed** 185:22

**background** 14:6 16:17 103:9 194:18 208:25 211:4

**bad** 12:2,6 20:18 48:22 51:20 54:8,10,14,21 58:13 62:1,10 70:7, 13 71:19 72:1 85:4,10 93:2,15 101:16 102:11 112:8,15,20 124:16,19 125:6 131:5 140:2,9,21 141:20,24 142:12 163:18 218:21 220:13

**bank** 37:14,15,17,18,19,21 38:18, 19

**Barbara** 190:12

**based** 26:24 48:5 66:11 69:21 73:10 75:25 91:24 99:23 108:7,21 110:23 111:9 152:6,15 162:11 163:2 165:21,22 168:2,8,14 169:7,18 170:5 208:25

**basic** 24:17 33:17 35:10

**basically** 21:23 22:8 73:17 107:7 115:12 128:3 193:7

**basics** 24:19 35:11 234:11

**basis** 12:14 20:18 28:10 49:1 101:15 147:4 152:3 156:13 160:15 168:12

**Bates** 9:2 56:2 63:21 64:1,13 68:20,22 69:1 83:7 88:7,8

**Bear** 63:22

**Beaumont** 25:25 26:6,9 27:3 29:2 52:16 56:17 57:6,10,12,17 58:4 59:1 61:12,15 62:11 63:6,8, 12 64:20 68:2 71:1,4 77:1,5,17 80:6 85:11 99:19 120:10 141:13 157:8,17 158:4,10,20 159:24 160:5,11,13 161:21,24 162:12 163:15 172:8 177:16,18 178:5,6, 12,23 179:2,13,14 180:5,12 222:8 224:13,16 225:16 226:7,9,12,22 227:1,11 228:10,23 236:2,7,9,11 237:17 240:10

**Beaumont's** 57:10 58:4 240:14

**beginning** 7:5 92:25 96:13 131:13 139:19 142:1 144:18 151:4 192:21,23 193:1,14 197:17 207:12 214:23 219:21 220:17 225:22 231:7

**begins** 6:6

**begrudge** 181:2

**behalf** 7:7,9 26:5 27:3 98:10 123:6 124:13 157:7 215:2

**belatedly** 54:17

**belief** 214:12

**Berg** 191:4

**big** 69:12

**billed** 67:9

**billing** 97:21 98:25 99:2

**billings** 165:23 221:18

**binder** 49:25 50:2 55:21,22 69:12 82:24 83:2 86:16,20 87:1 127:10 164:22 201:22 204:16

**bio** 14:8

**bit** 18:11 93:11 110:16 113:18 196:14 203:13

**black** 212:10

**Blake** 88:3 190:17

**Blake's** 103:2

**board** 46:5

**body** 194:11

**book** 19:19

**books** 33:1,7,8,24 34:3 198:23

**boss** 219:24

**bother** 121:21 122:5 140:3,11 141:16

**bottom** 215:7

**breached** 176:20

**break** 43:7,16 82:10,19 96:1,8 126:2,8 139:22 149:19 181:10,18 229:11,21 230:1

**breakdown** 168:6

**breakout** 168:6 169:13

**breaks** 241:9

**bring** 42:3

**bringing** 41:24

**broad** 27:20 41:17

**broker** 50:7 87:18,20,24 89:2 119:15,17,19 121:9 123:8,21



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 386

**broker's** 119:22

**brokerage** 9:23

**brokers** 123:4

**brought** 53:5 185:6 192:25

**bucks** 37:11

**burden** 85:22 88:25 99:19 105:14

**burdening** 90:20

**burdensome** 102:16 105:2,8

**Bureau** 182:6 183:6

**bureaucracy** 222:8

**business** 16:11 34:22 37:16 45:2 46:25 84:13 93:13 117:2,5,7,8,14 123:23

**C**

**calculate** 24:15 241:7

**California** 6:12 39:16 40:6 44:16 49:4 122:12 124:24 125:10,14,23 182:7 208:23 209:19

**call** 54:21 72:7 93:10 106:22,23 120:6 201:10 241:14,20

**called** 17:4 37:14 112:2

**calls** 54:18 134:15 150:20 180:14 187:13

**camera** 6:18

**capacity** 197:11

**car** 21:14

**care** 28:8 90:13,25 143:8 176:1 181:3 221:25 238:24

**carrier** 23:1 32:4 36:9,19,24 38:22 39:1,17,23 40:7,19 41:1,9, 13,22 42:8 45:23 46:15,19 49:3,6, 8,11,14 53:12,23 54:6,14 57:21 58:6 59:5 62:1,6 85:3,17,24 93:18 97:12,25 103:17,23 104:5,7 110:22 111:6,9,15,24 200:21,25 212:16,23 213:4,8,14 215:5 218:11 224:7

**carriers** 23:12,17 25:12,23 31:9 35:2 44:15,24 45:1,5,8,13,18 46:10,13 49:22

**carriers'** 49:18

**carrying** 168:15,21

**case** 6:13 10:5 25:22 27:13 30:13 39:7,15 40:6 42:3 49:9,16 50:23 51:15 62:3,9,14,18 73:12 74:3 79:13,21 80:18 92:7 100:4 105:5 112:20 122:5,22 124:11 134:14 135:4,15 143:6 158:12,15 187:8 191:3 201:11,12 202:13 204:10, 11 212:2,12 228:9 231:22 240:22

**case-by-case** 28:10

**cases** 22:15 50:15 194:9

**casualty** 23:21,23,24 34:19,23

**catastrophe** 18:11

**categories** 99:20

**categorize** 143:16

**category** 100:24

**caused** 99:24

**caveat** 48:23 176:25

**celebrated** 106:16

**Central** 6:11

**cents** 86:4

**century** 46:3

**certainty** 35:18 45:11 47:8 49:10 125:6,9,12 176:19 185:11 198:4

**Chaffee** 189:12

**chance** 62:11 77:6 82:2 121:4 145:9

**change** 47:1 96:2 181:8 214:8 224:21 230:17

**changed** 43:22 44:1,12 47:2,4, 19,20,22,23,24 230:10 231:13

**charge** 40:4

**check** 91:25

**Chicago** 37:17 38:18

**child** 195:17

**Chris** 20:9 27:21 69:13 101:22,23 102:18 103:5 132:10 146:22 148:3 149:18 171:4 180:20 195:2, 9 241:22

**Christmas** 106:23 107:4 118:18 222:18

**Christopher** 7:9

**chronologic** 56:1 68:24 69:2

**circulated** 86:15

**circumstances** 51:13 54:7 57:25 62:8 135:14 138:23

**cite** 12:13

**cities** 177:10

**city** 25:25 26:6 27:3 29:2,9 66:4, 8,10 67:10 69:18,23 70:4,9 76:4 77:1 83:11,15 84:9,13,14,22 85:19 96:23 97:4,8,23 98:11,13 99:4 101:3,6,11,17 104:12,23 105:11,14,19 109:4 116:13,22 119:15 120:10 135:10,15 139:12 141:13 143:3 145:4,9,12 149:10, 15 150:17 157:8 158:10 159:23 160:5,11 161:21 177:21 182:3,5, 8,16,23,25 183:3,9,17,21 184:5, 10,17,23 185:6,11 186:22 187:16 216:24,25 217:23 218:3 222:8 224:13,15 236:6,9,11 240:10

**City's** 67:13 76:5 84:13 99:23 101:17 184:5 185:17 205:11,19

**civil** 196:4 205:8 206:20,23

**claim** 17:25 20:16,19 21:7,9,11, 17 22:1,2 23:2,5,7 24:23,25 25:3, 5,6,7 26:22 29:17,21 30:17 31:6, 14 32:4,7 33:7,9,19 35:8,9,13,19, 21,24 36:2,10,13,16,18,20,25 37:6,10,12,20 38:9 39:2,13 40:14, 15,16,20 41:4 43:4,21,25 45:5,6, 12,14,17,23 46:13,16 48:9,10,13, 14,15,19,22 49:2,21 50:19 52:8 53:6,15 54:7 55:2,9,12 57:1 59:8, 11,24 60:19,24 61:5,23 62:6 64:25 66:16 67:18 69:21 70:4,8, 10,12,17 71:15,20 72:1 73:10,16 74:7 75:20,25 76:14,17,23 77:18 79:1 81:7,11,21 82:5 83:17,21,24 84:1,20,23 85:5 86:6,13 87:12 90:3 91:15,21,24 92:4,8,13 94:24 95:8,13 96:18,21,25 101:17 103:18,20 104:1,10 108:19 110:8 111:24 112:3,15,22 113:3,8,16 116:8 119:11,13,22 120:6,14,24 121:9,11,16,17,22,24,25 122:7,9, 13,17,24 123:1,5,14,16 124:1,3,7, 9,12,20 125:1,3,13,21 128:7,15 129:11,13,15 130:6,16,21 132:25 134:22 135:17 136:10,22 137:8 138:2,8,16,25 140:23 141:2 142:15 143:5,9 144:1,4 145:14 146:12 153:15,17,18 154:1,4,11



EXCEEDING YOUR EXPECTATIONS

COMBS REPORTING, INC.

DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 387

155:11 157:20,24 165:22 169:9, 19 170:6 172:17 173:23,24 174:1, 5,9 176:5 179:3,7,17 180:17 188:4 189:5 192:21 193:16 198:18 199:9 200:1,5,22 202:21 206:3 207:13,21,25 208:1,4,7,18 210:23 211:1,5 212:4,6,9,15,17, 21 213:10,15,21 214:8 215:15 216:13,16,23 220:10 221:20 225:24 228:15,21 229:3 232:19 233:12 234:9,15 237:11 238:9

**claimed** 56:14 69:19 217:18 227:12,15,24

**claims** 15:9,24 17:17,24 18:5 19:7,11,16,25 20:2 21:22 22:9,12, 13,23 23:17,19,21 24:17,18 25:13,15,17,20,23 26:1,4,8 29:18 30:3,21,24,25 31:10,15,20,22,25 32:2,22 33:2,13,25 34:4,9,18,24 35:4,11 39:20 40:1,8 41:15,21 44:11,15,17,21,24,25 45:6,8,14, 15,19,20 46:4,14,20 47:14,16 48:17 49:4,17,18,22 54:4,13 57:21 76:2 83:12 95:17 104:3 112:12 121:13 123:4 124:5 134:18 142:1 144:1 167:8 172:11 173:17 175:12 192:5,23 193:2 194:15,16,24 197:1 198:21,24 199:2,12,16,23 200:12 201:16 209:3,13,18 211:3,8,23 212:13 215:2 219:12,13 234:10

**clarity** 131:5

**class** 15:7,13

**classes** 15:17

**clause** 45:25

**clear** 27:22 120:4 130:24 192:22 201:24 233:18

**client** 9:12 12:2,6 21:2,6 23:11,16 29:1 49:20 50:7 54:21 56:13 58:13 59:11,18 61:3 66:21 67:17 70:3 71:14 73:3 75:15,19,24 76:12,22,25 77:11,16 79:15,25 80:6 81:8,16 83:20,24 84:21 86:11 87:6 89:4,8,20 91:10 92:12, 16 94:24 95:3,9,20 97:8 98:12,22 99:5,13,17 101:10,16 102:11 105:15 106:3 109:19,21 110:20 116:3 119:4,9,10,23 120:6,13,23 121:9,14,22 122:6,11 124:16,19, 23 125:6,9,20 127:10 134:2,9 135:20 136:4,18 138:11,18,25 140:2,9,20 141:1,20 142:12

145:3,8 146:6 148:7,11 150:16 152:20 153:3,8 175:8 188:11 191:15 192:10 197:3 210:14 233:3 238:5,15

**client's** 25:21 48:8 125:12 196:6

**cloaked** 215:11

**close** 229:13

**closing** 153:9

**clue** 216:1,10 239:12

**code** 40:13 45:22 47:24 48:7 54:2,3 155:19

**combination** 177:12

**comment** 81:24 150:12 154:24 155:22 220:4 228:8

**commercial** 33:15 235:2

**common** 30:20 42:5,6 48:5 212:16,22 213:22

**commonly** 31:9 48:18 106:15

**communicate** 53:24 54:8 121:25

**communicated** 49:21 121:10, 17,23 145:4

**communicating** 122:19

**communication** 49:23 50:6,10, 12,14,17 52:5,19 53:18 81:20 121:7,12 145:9 154:9,10

**communications** 69:22 124:25 125:13,20

**comp** 15:25 34:18 35:8

**companies** 9:14 10:3,11,20 15:20 124:4 187:1

**company** 6:9 9:20 10:11 17:4,5, 8,11 19:19 21:25 39:5 71:24 100:9 104:5 123:9,11,22 124:9 139:9,21 142:22 151:22 152:8 178:15,20 185:24 201:13 202:11 204:10 227:20 237:8 239:7

**compare** 23:16 48:8 105:3 143:1

**comparing** 20:14

**compensated** 237:15,18

**compensation** 33:16 35:19

**competence** 196:23 197:25

**competent** 192:5,18,20 194:2 197:4,23 198:4

**complain** 204:13 205:2

**complained** 204:22

**complains** 203:25 204:18

**complaint** 174:21 175:3,8,11 223:19

**complete** 64:25 73:12,15 110:22 118:5,6 151:2 210:4 231:20

**completed** 64:20,24 107:10,13, 16,19 111:9 116:4 164:18

**complex** 197:7

**compliance** 53:1 125:23

**complied** 122:12 124:24

**comply** 51:24 53:23 156:17 196:4

**component** 75:20,25 76:13,17 83:25 87:12 90:2,11 95:7,22,23 96:17,20 129:11,12 130:16 161:7

**components** 48:11 83:21 130:21 159:10 161:5,6

**compound** 124:21

**comprehensively** 128:5,6,11

**computation** 218:8,22

**computations** 16:1

**computed** 56:17 63:5 66:10 157:10,14,20 159:1,18,22 162:1 164:6 171:14

**conceivably** 147:20

**concept** 151:13 170:20 173:11

**concern** 18:12 80:12

**concerned** 45:22 59:9 115:9,11 136:23 188:5 189:5 218:2

**concerns** 115:17

**concise** 210:5

**conclude** 180:16 183:21 241:4

**concluded** 37:21 145:4 157:25

**concludes** 241:25

**conclusion** 54:18 84:6 108:18 134:15 153:4 167:7 180:15 183:5 187:14



**EXCEEDING YOUR EXPECTATIONS**

**COMBS REPORTING, INC.**

DEPOSITION REPORTERS • LEGAL VIDEO

**EXHIBIT 4**
**PAGE 388**

**conclusions** 107:23 108:6 152:25

**conditions** 93:23 172:18 176:24 210:6 225:14

**conduct** 25:21 26:11 98:15 112:19 141:22 156:11 193:7

**conducted** 147:7 198:7

**conducting** 136:20 139:2

**conduit** 239:9

**conference** 120:6

**confessed** 223:20

**confidential** 10:6

**confidentiality** 10:7

**confirm** 160:19

**conformance** 40:21

**conjunction** 78:1 162:4

**connected** 116:5

**connection** 6:19 18:18 19:4,8 94:23 96:22 97:6 100:3 103:20,25 104:9 111:24

**Conners** 132:10

**consequences** 78:10

**consideration** 163:25 164:9

**considered** 62:25 163:5 164:20 169:14

**consistent** 23:11 25:22 32:8,16, 21 34:7,14 41:4 42:14 46:23

**conspiracy** 137:6

**conspirator** 138:1

**conspiring** 135:5,6

**construction** 20:23 33:15 98:2, 7,17,20 151:7

**consultant** 98:1

**consultants** 39:5 98:8

**contact** 115:16 191:18,23

**contemplated** 116:14

**contemporaneously** 90:17 93:6 100:9

**contemporarily** 90:17

**content** 214:16

**contents** 213:24

**contested** 210:7

**contesting** 102:5

**context** 22:4 23:19 26:3 39:4 41:14 53:6 62:9 70:11 71:22 73:16,20 81:12 98:18 99:15 103:18 117:10,23 118:5 121:19 132:21 135:12 137:11,14 151:15 153:16 179:3,5,16 185:1 202:21 207:23 208:19 210:23,25 211:3, 25 212:8 213:20 216:3,11 218:24 228:17

**Continental** 38:19

**continually** 201:15 230:10

**continue** 6:21 145:21,25

**continued** 67:17 81:21

**continues** 133:7

**continuous** 48:24

**continuously** 29:9

**contract** 167:23

**contractor** 230:19

**contractors** 72:8 79:6,8 232:1,3

**contractual** 67:12 166:10,24 167:4,14

**control** 84:16 90:14 91:1 92:24 222:1 238:25

**conversation** 121:1,4

**conversations** 120:24 121:19

**conversely** 140:7

**conveying** 156:16

**convicted** 236:12

**cooperation** 45:25

**coordinating** 38:16 39:6

**copies** 84:19 87:13 139:17

**copy** 11:13 30:23 87:19 178:18 197:14 241:23

**correct** 9:7,8,9,10,12,13,15,17, 21 11:13 12:3,4,15,23 13:14,19, 22 15:1,6 17:22,23 18:1,2,5,6,9, 10 21:7,8,10,16 24:1 25:9 26:2,25 29:13,19,24 30:4 31:12,25 34:20, 21 42:12,13,18,21,22,24 43:5 48:3,20 50:8,20,21 51:2 52:17 53:3,16,25 54:4,14,15,23,24 55:7, 8,10,14,15,18 56:9 57:6,10,11,14, 19 58:20,21,24,25 59:3,4,16,22 60:7,8,21 61:2,6,13,16,17,19,21, 24 62:7,16 64:7 66:4,11,12,18,24 67:21,22 68:7,11 69:15,16 70:5,6, 10,13,25 71:2,3,5,10 72:3,20,25 75:13,17,20 76:1,14,15,20,23,24 77:3,9,19,20,24 79:17,22 80:9,20 83:13,17,21 86:13,14,23 87:17 89:1,11 90:3 91:8,17 92:2,5,9,14 95:2 96:21 97:10,21 98:5 99:14 101:8 106:20,21,24 107:5,9,11 109:5,6,8,16,23 110:1,5 112:12 115:3,8 116:21 117:18 118:14 122:21,24 123:6 125:24 129:15 132:17,18,22 133:1,4 134:14,19, 22,23 137:6,7 138:8,11,21 139:4 141:1 142:16 143:17 148:8 149:16,17 150:6 152:22 153:1,2, 6,11,19,21,24 154:20 155:7 156:18 157:1 158:7 159:9,15,16, 25 160:15 161:4,9,14,16 162:2,9, 10 163:9,14,18 165:9,18 167:4, 15,19,20,25 168:10,20 169:3 174:1,6 177:17,19 178:8 185:3,7, 13,18,19,21 186:4,12,15 191:5 197:1,2 198:11 205:25 206:6,25 208:18 210:12,15 217:9,20,24 218:9,23 226:2 228:12,13,25 229:5,6,9 231:2 232:10,13 233:24 234:7,16 235:8 237:19 238:10,13 239:19

**correctly** 107:2 231:1

**correlated** 87:11

**corresponded** 119:14

**correspondence** 106:4 114:4, 12,17 115:2,6 116:18,24 117:2 118:23 119:4,17,18,19,21,22 121:8,15,22 122:6 124:19 203:12, 16

**cost** 85:25 97:23 98:2 104:12,17

**costs** 227:15

**council** 6:8 182:25 224:10,17 225:17 226:8 236:5,13

**counsel** 7:4 26:25 27:5,7 28:17, 20,23 95:25 132:15 142:8 192:5, 23 193:2 195:14 196:3 197:1 240:14 241:22

**counseled** 195:25


EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 389

JOHN LEPIRE on 07/19/2022

**counties** 177:9

**country** 224:2,24

**couple** 127:8 233:18

**court** 6:11,24 7:12 119:25 151:24
152:12 170:3,19 171:23 174:22,
24

**courtesy** 195:10,18 196:15

**cover** 180:16

**coverage** 18:17 30:6 38:6,13
39:10 58:15,17 61:15 70:15,18
73:23 75:18 76:9 78:2,3,15,17,20,
23 80:24 84:8 87:21 97:9 120:7,
15,25 123:5 124:13 129:20,24
131:22,23 132:16,21 133:13
135:11 137:2 142:19 145:13
146:7 147:8 150:18 152:10 153:9,
14 154:19,21,22 174:13 176:11
177:1,5,8,16 178:16,19,24 179:24
186:2,9,19,23,25 187:2,4,12,17,
24 188:2,6,9,14 207:2 212:11
215:11 218:13 223:5 226:6,8
230:11,14,15 231:8 232:3 234:13

**coverages** 144:6

**covered** 17:25 18:8 22:2 30:11
67:21,24 68:5 70:23 73:19,20
77:24 79:2 81:17 131:10 174:1,4
185:7,13 186:12,15 189:1 191:11,
16 213:5,9,17

**covering** 16:13

**covers** 58:20

**credits** 14:14

**crime** 15:5,8,17,20 16:18,22,24
17:1,6,10 19:7,11,16,23,24 20:22
21:7,21 22:22 23:2 25:23 29:10,
21 30:7,14,18,19,22 31:5,10 32:7,
22 33:2,7,9,14,25 34:4,8 35:9,20
36:2 37:6,12,23 39:2,20,25 40:8
41:2,14 44:17,20,24 45:6,13,19
46:13,19 47:13 48:17 57:21 72:6
73:16 85:3 87:13 103:20 104:1,2,
9 111:9,14,23 112:3 113:3
132:21,25 179:16,24 200:22,25
208:4 223:14,21 234:22 235:2
236:12

**crimes** 223:11

**criminal** 39:8 41:11,12,13,16
100:4 157:11,15 183:20,22 205:8,
10 223:14,19 224:1,3,8,23 225:1,
5,6

**criminality** 183:17,18

**criteria** 15:23 104:5

**critical** 135:11,16 146:6,9 150:18
153:9 154:19,22,25

**criticism** 42:23 107:3 136:16
149:12 196:22

**criticisms** 233:20 234:2,6

**criticize** 106:3 214:4,5,17 220:6

**critique** 130:19

**cropped** 197:18

**curious** 84:3 127:19

**current** 18:23 22:25 23:6 46:3
99:23

**custody** 90:14,25 222:1 238:25
239:3

**customary** 51:17

**CV** 12:9,12,18,20,25 13:6 14:18

**Cynthia** 6:24

—

**D**

**D(3)** 98:24

**damage** 24:3,24 25:5 35:24

**damaged** 24:10

**damages** 24:14 66:10

**Dammann** 6:24

**Dan** 57:5 166:17

**Daniel** 56:4 133:22

**date** 22:8 45:24 47:18 56:7,16
59:15 64:7 65:12,13,22 68:23
69:4 71:12 74:17,18 75:17 76:1
80:2 83:5 88:9 110:14 114:20
119:9 132:24 139:6 164:6 236:22

**dated** 55:25 133:18 144:21

**dates** 14:5 146:15

**daughter** 149:24

**day** 19:11 50:18 52:13 118:18
126:20 142:6 165:6 181:8 186:20
212:10 231:23

**day-to-day** 46:12

**days** 48:15,19,22 49:5,11,16
51:7,19,21,23 52:9,11,15 53:2,19,

24 54:8,22 65:1 84:22 106:4,7,8
107:5 122:15

**deal** 7:9 18:24 20:6,12 27:12,15,
21,23 28:1,5,9,12 29:23 52:2
54:17 56:2 63:21,24 66:13 69:13
73:1 74:16,19 82:7,9,13,16 83:4
85:7 88:12 95:25 101:19,24
102:1,3,13,22,25 103:8 107:10
108:1,9,11 112:25 113:4 114:4,14
115:6 116:2 118:22 124:1 126:3,6
132:10 134:15 140:15 145:21,25
146:18,23 147:25 149:20,23
150:1,20 156:2,3 161:19 162:18
163:20,22 164:24 165:1,24
166:16 169:24 170:2,14,16,22
171:1,5,8,17 180:14,25 186:16
187:13,18,21 192:7 194:25 195:7,
11,15,17,20 196:1,5,9,18 207:8
229:13,16,18,22 233:17 234:21
235:22,25 237:22 239:21 240:2,
12,21,24 241:6,13,18,24

**Deal's** 119:7,8

**dealing** 20:21 78:16,22 179:21
227:21 231:25

**dealings** 84:13

**dealt** 17:6 78:14 186:2 231:9

**debate** 81:23

**Debond** 235:10,13,17

**debunk** 94:9 136:16

**dec** 189:6 190:8

**December** 56:21 68:10,14,18,19,
25 69:13 70:3,12 71:7,13 72:17
86:16,21,24 88:15,16,21 90:1
92:18 100:11,12,13 101:1,18
105:20 106:4,9,12,16 107:24
108:6,20 109:14,22 110:4 114:4,
12,16,21,22,23 115:2,7,25
116:18,24 119:6 147:10,12 148:6
222:12,15 238:5

**decide** 62:10

**decided** 135:10 167:1

**deciding** 172:21 173:11,19
199:14

**decision** 21:25 59:13 61:5,7,9,
11,15 62:3,7 70:8 77:3,7 80:5
82:1,3 97:9 137:2 150:25 167:5
220:3

**decisions** 43:1



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

**EXHIBIT 4**
**PAGE 390**

declaration 235:9

declarations 100:2 189:7,25 190:2

deemed 85:18

defeated 10:4

defendant 7:8,22

defenses 131:25 188:11

deficient 142:3

define 73:15 117:5

defined 16:14

definition 215:22

definitions 79:20

definitive 25:2 35:12 78:23 79:1

definitively 74:1,7

degree 14:9,15,22 35:6,17 45:10 47:8 49:10 125:5,8,11 176:19 185:10 198:3

delete 115:18

deleted 126:21 237:24 239:23

delineation 60:11

delivery 149:23

Delron 6:25

delve 27:24

demonstrate 65:15,24 67:21 80:8

demonstrated 67:1 77:8

demonstrates 65:5 73:8 76:17 81:20 118:18

demonstrating 68:4 102:7

demurrers 9:19

denial 74:8 134:22 210:17,20,23 211:10,13 213:6 215:9,10,11,12, 17,22 216:4 232:8

denied 51:14 71:19 215:15

deny 73:9 124:9 131:21,23 215:13

denying 70:12 72:1 211:5

department 39:14 167:9 199:22

depend 135:13

depended 219:17

dependent 91:16

depending 234:14

depends 6:18 58:23 138:22

deposition 6:7,14 7:23 8:2 11:24 189:9,24 190:13,14,21,24

depositions 190:9,16 195:23

description 65:16,25 166:8

designate 28:2

designation 108:12

designing 30:17

desk 19:10 220:9

detail 78:9 166:14 167:3,13,22 210:8

detailed 79:10 128:12

detailing 72:24 73:3 174:8

details 38:7 69:24 107:13 132:16 133:14 156:12,14,17 174:7

determinable 158:24

determination 93:7 152:10

determine 18:19,22 26:16 32:11, 15,20 34:3,12 36:7,17 41:8 43:24 45:4 121:9 124:23 140:3,22 156:12 166:9,14,23 167:3,14 184:24 237:17

determining 105:1,7 124:16,18 191:15

develop 212:6

developed 212:2

developing 21:24 152:8 211:23

dictated 91:20

difference 113:8,12 143:15 184:1

differential 20:21 44:18 66:5 143:13

differently 120:3

differs 24:23 234:9

difficult 89:16 131:13 203:6,7

diligence 140:21,25 141:21

Dillon 116:7 206:23 224:25

directly 87:11 238:18 239:9

disagree 56:15 112:15 113:11

disagreed 152:25

disagreement 113:6,8

disciplinary 138:15,23

discipline 133:4 134:3,8 136:5, 19,25 138:5,6,10,20 139:3,11 148:13 149:1,9 238:4,12,16,21 239:13

disciplining 133:5

disclose 27:10 28:13 176:20 178:16,20 179:12 180:11

disclosed 176:2,9,25 177:2 180:6,19 235:18

disclosing 27:6

disclosure 180:4

discoverable 139:8,20

discovered 237:2,4

discovery 132:20,24 134:13,18, 25 136:6,21 137:2,10,12,14,15, 17,19,25 139:2 151:12,13,14,15, 21 152:3,5,15 153:4,23 165:11 186:20 188:15,19,21,25 189:2,4 217:4 236:22

discuss 27:18

discussed 62:22 142:4

discussing 165:8 179:20

discussion 27:17

discussions 27:1 28:19 165:21

dishonesty 36:25

dismiss 9:20

dispositive 132:16,20,25 133:12 134:9,14,19 145:13

disprove 186:24 187:2,4

distinct 17:18 18:4,5 226:7

distinction 54:3

distinguish 112:7

district 6:11 84:18 85:2 90:15 92:17,18 116:3 139:15 141:8 147:18 222:2

division 6:12 218:12 222:2



**document**  8:19,20 9:1 13:15
75:1,6 83:2,3 86:22,25 87:4,25
88:6,13 89:13 90:4,7 94:22 134:6
144:20 213:9

**documentation**  59:15 65:14,23
97:14 100:6 104:4 139:5 140:8
141:6 143:1 147:16,19 150:7
177:22 183:8 201:17 202:4,6
204:2 218:1 219:19

**documenting**  91:11

**documents**  8:17,18 28:24 55:22
56:1 75:7,8 84:5,10,16,25 86:12
87:6 89:16 90:13,16,21,23 91:1
100:24 101:7 103:20,25 110:7,11,
13 189:20 190:6 191:21 201:5,8,
15,23 202:1,7 203:4,25 204:25
205:10,19 222:5 235:7

**dollar**  37:24 86:2

**dollars**  155:24 168:23 241:12

**dolphin**  13:11

**domestic**  39:1

**door**  148:1

**draft**  63:15

**drastically**  47:3

**draws**  54:3

**due**  140:21,25 141:21 184:19

**duly**  7:18

**duties**  176:20

**duty**  86:5,6

---

**E**

**earlier**  35:10 109:4,25 147:9
148:6 214:14,22 218:13 237:3
239:2,17

**early**  82:5 96:9

**easily**  94:3

**Eastern**  6:12

**economic**  85:22

**educate**  132:8

**education**  15:3 103:2

**effect**  165:11 201:19

**effectively**  93:14

**efficiently**  10:25

**effort**  34:2 43:3 86:3

**Egger**  206:22 224:25

**Eggers**  116:7

**either/or**  107:14 113:14

**elements**  20:18 24:7 70:23

**eliminated**  80:12 197:17 200:23

**email**  75:9 87:18 88:1,20 100:15
101:13 115:9,10 117:23 118:10,
15 119:6 133:16,18,22 134:1
165:10

**emailed**  118:16

**emails**  86:21

**Emphasis**  128:15

**emphasize**  150:24

**employ**  25:12 35:9 37:19 45:6
79:4

**employed**  21:20 23:1,6,10,12
25:22 30:2,21 31:5 32:7,9,17,22
34:12 35:3,7,18,20,23 36:1,19,24
37:5 44:24 45:1,7 46:10,15 47:13

**employee**  16:9,13 25:13 36:25
72:25 73:4 79:17,21 80:2 81:16
183:7 184:12,19,25 210:10,15
220:7 230:19 240:4

**employees**  37:19 67:14 72:8
79:5 80:9,20,25 81:4 99:25 100:5
182:5 232:10,25

**employing**  59:5

**employment**  148:7 238:5,9,13,
17 240:15

**enable**  32:20 142:14

**encompasses**  177:9

**encountered**  216:7,8

**encourage**  171:6

**end**  74:2 96:10 181:15 220:15

**ended**  52:23

**endorsement**  79:6 80:11 226:24
227:7,8 232:2

**endorsements**  73:21

**energy**  105:3

**enforcement**  222:2

**engage**  98:8

**engaged**  69:18 97:19 98:12
119:10,12 185:24

**engagement**  19:4,8 98:9,16
105:19 198:5 219:7

**engineer**  151:6

**engineering**  97:18,24 98:2
221:17

**ensured**  116:18

**entered**  10:7 128:21

**entire**  108:23 137:8 138:7
141:14,25

**entities**  90:24 177:13

**entity**  94:2 110:12 111:18

**environment**  38:24

**equal**  234:18

**equally**  15:2 178:9

**equivocation**  211:6,21 214:4

**era**  36:4 45:11 198:16 200:18,20
207:21,24 208:2

**essence**  108:22

**essentially**  180:15 232:18

**establish**  187:17

**estimate**  20:6 172:14

**estimates**  20:9,10 166:6

**estimation**  85:23 123:15 214:9
220:18

**et al**  6:8,10

**evaluate**  41:3 86:13 91:15 92:13
97:20 110:7 159:2 160:2,25 161:8
169:2

**evaluated**  152:6,15

**evaluating**  16:3 25:5,7 122:7
159:6 167:11 172:25 173:8

**evaluation**  17:21 18:13 141:10
161:6

**Evans'**  233:20

**event**  67:9

**evidence**  158:4,6,7 162:19
163:20 170:16,17,20 171:18



235:21

**exact** 201:6 215:6 232:16

**examination** 7:19 127:6 200:12, 22 201:1 233:16 238:1 240:1

**examinations** 197:12

**examiner** 31:15,21

**examiners** 31:23 39:25 40:2

**examples** 34:25

**exceeded** 65:15,24

**exception** 151:5

**exceptional** 196:15

**exceptions** 46:5

**excess** 32:2 38:5 160:4 165:23 169:9 174:10,11,12,16 175:21 176:2,8,14,21,23 178:10,14 179:23 180:11,16

**exclusion** 73:23

**exclusionary** 80:17 231:18

**exclusively** 151:5

**excuse** 109:2,5 164:17 239:10

**executed** 182:7

**execution** 182:17 183:15,19 184:9,16

**executives** 15:19

**exercised** 71:14 89:20

**exercising** 108:19

**exhibit** 11:6,8,11,13 12:8 13:6,7, 16 50:1,3 175:4 232:5

**exhibits** 190:13,14

**exist** 16:10 30:24 208:6

**existed** 215:19

**existence** 63:13 176:2

**exists** 178:16

**expect** 51:23 98:16 183:17,19 191:19 195:19 196:3,5

**expected** 141:1 179:3,12,18

**expediency** 65:6

**expedient** 94:5 97:15 98:4

**expedited** 218:15 220:24 223:6

**expend** 86:6

**expensive** 104:15

**experience** 12:13 18:20 20:15 29:21 30:6,13,16 31:4 32:3,21 37:6 41:20 42:24 43:2 48:2 97:25 98:20,21 134:17 174:3 196:23 198:20 199:5,7,11 200:7 208:22 209:1,17

**experienced** 192:5 194:6 197:4

**experiences** 32:15

**expert** 9:6 11:1 12:14 28:2 96:24 97:13 98:2 102:21 107:22 122:5 166:17 169:16,19 170:7 174:3 180:21 202:23 219:5,11,13 220:2, 21 233:23

**expert's** 196:6

**expertise** 194:14 208:22 209:11

**experts** 60:12 97:5,18,22,24 98:10 202:18

**explain** 78:9 80:1 202:24

**explained** 58:4

**explaining** 79:2

**explanation** 73:7 169:1

**explicit** 78:11

**explicitly** 202:12

**exposure** 52:22 182:4,13,16,23 183:4,22,24 184:2,3 208:3 231:17

**expressly** 226:23

**extend** 51:16 195:10,19

**extended** 92:9 194:10 196:14

**extensive** 72:24

**extent** 22:19 80:3 118:15 122:16 124:14 137:25 158:15 161:24 163:15 167:21 171:14 174:4 191:9 206:1,4 220:24 233:9 240:20

**extenuating** 53:10

**extraordinary** 127:24 128:2 129:19 130:2 203:19

**extrapolate** 167:18

# F

**fact** 32:12 33:24 41:8 44:10,19 47:21 54:12 55:13 61:8,10,16,18 62:12 63:12 67:10 71:18 72:11,15 87:21 89:9 90:22 95:13 98:17 101:4,10,14 109:21 115:1,5 117:2,25 122:12 124:11,12 128:24 132:20 134:24 140:3 141:15 145:3 149:1,6,10,13 163:2 180:1 183:6 186:12 196:10 197:3 205:5,15 211:9 213:3,8 221:16 224:14 232:12,23

**facts** 28:22 57:24 80:23 89:17 100:2 160:2 162:18 163:20 170:16 171:17 185:10

**factual** 101:15 147:3

**failed** 54:22

**failing** 140:10 142:12 176:20 192:19 193:10

**failure** 48:21 180:10 192:19 228:5

**fair** 12:20 14:24 15:2 20:21 31:3,8 36:22 44:15 46:4 65:15,24 66:5, 11 131:2,3 134:6 159:13 160:1 180:3 181:1 216:19 220:7

**faith** 12:2,6 20:18,21 43:3 48:22 51:20 54:8,10,14,21 58:13 59:6, 10,19 61:3,24 62:2,10 65:6 66:19 67:1,25 70:7,13 71:8,14,19 72:1 73:8 76:18,22 77:8,12,17,22 79:24 80:5 81:7,22 83:23 85:4,10 89:21 91:9 92:12 93:2,15 95:9,20 97:7 98:22,23 99:13 101:16 102:9,11 108:20 110:19 112:8,15, 20 118:18 124:17,19 125:7 131:6 136:4,20 137:1 138:18 139:1 140:2,10,21 141:20,25 142:12 145:14 153:15 154:3 158:13,18 159:2,7 160:15,19 161:1,9 162:2, 14 163:18 168:12 206:3 218:21 220:13 233:11

**fall** 106:12

**false** 118:4 119:3

**falsely** 117:20,24

**familiar** 18:15 49:18 75:13,14 125:2

**fascinated** 226:11



EXCEEDING YOUR EXPECTATIONS

COMBS REPORTING, INC.

DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 393

**fast** 220:21

**faster** 147:11 220:15 221:10 222:12,15

**FBI** 85:2 90:14 139:15 141:7 147:17 182:20 222:2

**Federal** 182:6 183:6

**feel** 28:12 115:16 128:4

**fidelity** 19:19 22:12,13 23:5,7,25 24:20,23 29:9 30:3 32:4 36:10,20 40:15 41:21 49:4 103:18 135:11 137:11,14 151:15 152:2 179:21, 24 194:15,16,24 198:17,21,24 199:2,5,12,16,18,22 200:3,11,21 207:21 209:3,13,18 210:23 211:1, 3,8,22 212:2,9,15,21 213:21 214:6 216:2,6 219:11,13 224:7 234:9 235:1

**field** 194:10,11 216:9

**fieldwork** 191:22

**figure** 128:7 140:11 141:16 162:6 165:9,18 169:6 204:9

**figured** 129:7

**figures** 62:22

**file** 168:16,22 169:19 170:6 238:6,9,13,17 240:4,15

**filed** 6:10 55:6 135:24 153:19 175:8 228:18 232:6

**files** 17:13 238:19

**filing** 140:20 154:17

**filings** 205:7

**final** 59:13 61:7,14 67:5 77:2,7 82:3 109:4 150:25 155:11 167:6,7 220:3

**finalize** 150:16 153:22

**finally** 132:3 148:22

**financial** 183:8 184:6,8 185:7,13

**financially** 7:2

**Financing** 226:12,22 227:1,12 228:10,23

**find** 29:6 65:18 103:10 111:20 124:5 127:10,12,13 140:14,19 158:3 171:23 201:21 202:13

**finding** 63:22 81:17

**findings** 56:5,23

**fine** 60:14 83:9 155:15 235:23 241:11,16

**finish** 96:8 146:2 148:2 219:15 220:10

**finished** 21:5 111:7 146:1 219:16

**fire** 6:9 179:11,17

**firehouse** 179:11,14,18

**firm** 9:23 41:19 68:15 69:14 196:15 198:21 199:18,21 218:11 221:17

**firms** 202:17

**first-party** 31:14,20 33:13 49:9, 16 50:23 234:10

**fits** 113:15

**five-minute** 229:21

**five-year** 146:11

**fix** 222:13

**flip** 11:11

**Fogarty** 42:17 56:20 63:12,17 64:5,21 65:13 88:1

**follow** 10:23

**follow-up** 53:3 114:5

**forensic** 39:7 42:12 43:2 56:19 62:20 63:8 65:4 66:22 69:19,22 70:5 76:5,8 151:6 161:12 162:4 163:5 164:8 165:12 166:22 167:8, 12 185:22,23 221:17

**forgery** 91:24

**forget** 222:19

**form** 18:24 29:23 52:2 66:13 112:25 177:3 234:17,20 237:21 240:7,17,20

**formal** 150:14

**forming** 26:13 28:18

**forms** 24:18 45:15

**formulating** 28:20

**forthcoming** 71:16

**forward** 34:13 103:24 113:17 115:20 116:13 185:12 223:1

**forwarded** 108:24 118:23 222:10

**forwards** 114:4

**found** 13:17 74:3 75:11 158:6 203:14

**four-year** 60:18

**fourth** 65:12 118:3

**frame** 29:6 31:11 32:17,23 35:2, 21,25 45:19 47:14 93:19 217:11, 17

**frankly** 28:8 103:19

**fraud** 9:17,18 39:9 41:25 44:19 69:20 116:6 135:10,16 137:19,25

**fraudulent** 98:25 99:1

**free** 115:16

**front** 9:2 83:11 87:2

**full** 26:17 65:12 67:8 69:17 73:12, 15 118:5 144:17 155:11 210:4 222:13 231:20

**fully** 11:18 12:21 109:23 161:15

**functions** 17:18

**funds** 172:5 224:15

**funneling** 37:16

**future** 11:22 213:11,24 214:7

## G

**gather** 26:14 84:12 93:2 142:12

**gave** 55:21 146:7 184:10,17

**general** 23:20 24:13 36:5,8,13, 16,23 45:16 47:11,15 109:17

**generally** 236:16

**germane** 84:19

**Gibralter** 19:20

**give** 11:19 14:6 20:6 27:22 38:7 39:21 41:1 50:1 64:1 67:24 73:22 80:6 81:10 82:1 102:25 110:21 111:4,8,12,22 112:16 123:18 124:7 138:15 146:15 155:23 164:12 168:3 179:9 219:10 223:8, 14 226:16 237:21

**giving** 62:2 77:17 80:15 113:14 134:7,8 163:11

**glean** 84:25 143:21 144:8 147:21 155:22 160:17 233:2



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 394

**gleaned** 110:23 111:10 214:7

**good** 6:4 7:21 20:21 43:3 59:6, 10,18 61:3,24 65:5 66:19 67:1,25 71:8,14 73:8 76:17,22 77:8,12,17, 22 79:24 80:5 81:7,22 83:23 89:21 91:9 92:12 95:9,20 97:7 98:22,23 99:13 102:9 108:19 110:19 118:18 136:4,20 137:1 138:18 139:1 145:14 153:15 154:3 155:4 158:13,18 159:2,7 160:14,19 161:1,9 162:2,14 168:12 171:3 194:19 206:2 233:11

**Gordon** 6:15

**government** 14:10 16:18,22,24 17:1 30:7,14,18,19,22 31:5,10 36:1 37:6 99:18 101:1 103:21,25 104:9 105:9 110:12,24 111:10,13, 23 112:2 140:4,6,7,11,13,23 141:14 142:13,14,18 149:2,13 184:6 191:18 224:17 235:2 236:6, 13 239:14

**government's** 139:24

**governmental** 111:17 141:6 143:2 148:15 234:23

**Governments** 6:8 224:11 225:17

**grabbed** 182:21

**grabbing** 183:7

**graduated** 14:8

**grand** 90:15 141:8 147:17 222:4

**granular** 102:12

**great** 28:7 96:7 105:24 126:14 127:18 149:25 171:9 181:14 188:10 219:24

**greater** 220:24

**Gregg** 178:6,9 189:9,11,24

**Gregg's** 190:20

**gross** 96:21

**grossly** 96:21

**grounds** 12:5

**group** 17:12 200:2

**guess** 62:13 117:9,19 118:1 190:12

**guidance** 202:10

**guidelines** 31:1 36:14 43:21,25 44:11 53:1,24

**guilty** 223:23

**guys** 101:20 225:5

**GW** 6:13

---

### H

**half** 126:4,10 155:23 168:22 198:8 201:13 216:18,22,23 220:25 229:15,17,18 230:24 241:8,13

**Hall** 182:8

**hand** 207:20

**handle** 19:16 20:2 32:22 33:7,9, 25 34:3,8 38:17 49:22 194:6 197:7,11 203:21,23 207:20

**handled** 19:7,11 21:21 22:18,23 23:5,19 26:23 29:17 31:14 33:14, 19,20 35:11 37:13 41:4 104:2 113:7 134:18 198:10 207:25 223:6 230:24

**handler** 108:19

**handles** 19:7 39:13 49:4,8 57:21

**handling** 17:17 20:15 22:10,12 24:17,18 25:2 27:3 29:22 30:25 32:3 33:1,17 36:13,16,18 38:10 40:3,14,20 43:21,25 44:11 45:5,7, 12,14,17 46:13 47:16 48:8,9 62:14 65:7 81:7 94:6 112:15,22 131:8 138:25 145:14 153:15 173:17 203:3 206:3 208:3 209:18 212:22 228:14,20 229:3 233:12 234:9

**hang** 27:12 108:1

**happened** 40:24 122:15 149:6,7 154:5,8 187:7 195:24

**happening** 52:24 118:6

**happy** 8:21 11:11 43:9 60:14 102:10 105:24 149:18 181:11 229:12

**hard** 168:23

**hard-working** 220:7

**Hartford** 9:24 10:1

**head** 40:9 150:11 162:7 201:10 226:18

---

**health** 46:6

**hear** 8:11 154:18 195:1

**heard** 6:20 114:2 117:3,8,18 118:21 120:5,13,23 210:22 211:15

**held** 29:9 120:6 141:7 147:15,16

**helped** 124:8

**helpful** 9:4 105:23

**helps** 204:23

**Hemming** 166:6

**Hemmings** 56:24

**Hey** 240:14

**high** 103:2,7,13

**higher** 162:6

**highlight** 29:8 118:25 127:20

**highlighted** 105:25 113:24 127:21 181:24 182:11,14

**hired** 42:11 66:21 98:1 193:6,12

**hiring** 98:19

**Hm** 187:2

**hold** 20:8 21:5 70:21 85:9 111:6 133:15 144:25 145:17 162:21 166:20 193:22 194:1,5,13,22 195:13 202:17 203:14 206:17 224:18 232:4 234:17 235:15,16 237:20 240:17

**holding** 21:2,6 110:13

**holds** 123:16 202:22

**holidays** 106:12,16,23,24

**holistic** 33:13 141:25

**home** 19:21 24:4 25:5

**homeowner's** 35:24

**homeowners** 20:23 24:24 33:14

**honest** 14:2 118:11 139:13

**honestly** 174:24

**hour** 10:24 126:4,10 196:13 229:15,17,18

**hours** 196:12 241:8

**house** 35:25

**HSNO** 56:19 63:5 64:24 66:15



98:7,12,19 156:22 157:10,14 159:1,19,22 162:1,8 163:16 169:20 170:7

**HSNO's** 64:6

**Hufton** 88:20,23 89:6 100:19

**hundred** 155:23

**hurricane** 21:9

**hurricanes** 18:12

**Hutton** 88:3,4

**hypothetical** 108:11 161:20 162:15,16,17,23,25 163:1,11,22 170:22,25 173:15 174:2 186:16

**Hypothetically** 158:14

---

**I**

---

**i.e.** 56:12

**idea** 16:16 86:1 104:14,17 132:7 172:4 174:14 176:13 198:22 199:3 200:13 201:3 211:2

**ident** 79:16

**identical** 45:14

**identification** 11:9 13:8 50:4 76:3 132:19 175:5 211:14,16,17, 19

**identified** 65:14,23 73:8 120:8 146:6 156:22 226:23 227:4 231:15,17,18 233:4,8

**identifies** 129:5 133:12

**identify** 9:2 79:19 81:9 89:10 167:22 189:19 213:5 232:16

**identifying** 77:23 134:18 233:10

**idiot** 103:1

**Illinois** 38:19

**imagine** 42:1 56:21 93:10 240:9

**immediately** 193:6 217:3

**impact** 116:7,20 138:7,19 142:19 167:24 180:5,11 207:2 213:24

**impacting** 79:20

**impacts** 191:10

**implemented** 94:8

**implications** 137:13,18,21 138:1

152:21

**implied** 130:5 166:6 226:12,16 228:22

**implies** 130:4

**important** 173:8

**imposed** 99:19

**impossible** 61:8,10,14

**impression** 203:24 213:15

**in-practice** 209:11

**inaccessible** 239:4

**inaccurate** 14:7 109:25 169:10 189:16

**inadequate** 163:7 169:6,21 170:8

**inadmissible** 235:19,21

**inadvertent** 190:14

**incidence** 137:3

**include** 120:9 186:19

**included** 12:6

**including** 10:11 65:1 116:6

**income** 123:11

**incomplete** 108:11 163:22 186:16

**inconsistent** 184:4

**incorporates** 100:1

**incorrect** 185:21

**incurred** 173:2

**independent** 72:8 79:5,8 221:15 230:19 232:1,3

**independently** 147:20 205:7,15

**indicating** 80:16

**indication** 74:1 109:1 131:7 144:2 158:8 175:23 176:14 204:5

**indications** 79:12

**indicative** 203:20

**indictment** 224:4 225:6

**indirectly** 180:14

**individual** 41:20 79:17,25 135:2 208:1

**individuals** 71:22 72:5,13 73:19 79:21 116:5 207:1 232:24

**industry** 42:7,14 209:1

**information** 13:20 21:24 24:2,4, 9,11 26:14 52:7 57:25 63:7,13 64:16 70:9 71:16,20 72:3 73:10 75:21,23 76:1,5 77:2,6,18,22,23 78:1 80:7,15 81:11,14 82:3 86:22 91:10,15,19 92:20 93:2 103:9 105:11 107:24 108:8,21 109:22 110:23 111:10,18,23 112:3 115:21 116:13,20,23 117:16 118:17 121:6 125:19 135:21 140:12 142:12,14,18 143:3,22 144:3,7 145:10 147:7 152:9 153:20 159:14 160:18 161:2 166:22 169:7,18 170:5 176:5,7 177:23 183:8 184:11,18,21,24 185:5,6,12 191:7,25 198:2 205:9, 10,18,24 206:6,8,10 207:1 211:23 212:2 213:4,9,11,16,23 214:7 221:13 222:23 227:21 234:23 237:2 239:8

**informed** 163:3

**informing** 120:16

**infrequent** 212:9

**initial** 42:2 57:1 92:21 132:2

**initially** 223:3

**initiate** 84:4 222:21

**input** 13:21,23 204:9 218:1

**insight** 17:10 30:2 199:25

**instance** 53:20 110:21 112:14,19 113:11 118:19 124:14 134:2 135:3 240:14

**institution** 216:17

**insufficiently** 192:4

**insult** 192:2,7,9,10,15

**insulting** 192:3,6

**insurance** 6:9 9:14,20 10:3,10, 11,20 12:18 15:5,8,18,20,21 17:12,19 18:8 19:7,11,19 20:19 22:22 23:2,24,25 25:23 29:17,21 31:5,14,19 32:1,2 34:4,8,23 37:23 39:14 40:13 41:5,14 44:17 45:8, 13,15,22,23 47:24 48:3,6,9 51:25 73:16 85:17,24 89:1 97:11,25 100:9 104:4 111:24 123:3,9,10, 11,14,22 124:4,8 125:3,4,10,14,



23 139:9,21 142:22 151:22 152:7 155:19 156:18 177:8,11 178:15, 20 179:2,18 180:21 185:24 187:1 201:12 202:11 204:9 207:15,21, 24 208:23 209:2,12 218:10 227:20 237:8 239:7,10

**insure** 76:2

**insured** 29:2 45:24 47:17 50:7 51:22 57:6 58:7 62:2,5,23 65:13, 22 67:1,9,21,23 71:9 72:2 77:24 81:10 82:2 85:4,18 86:23 88:25 90:20 91:23 92:3,8 93:3,8,9,20,22 94:4 95:10,11,21,22 99:12,14 105:2,8 111:16 117:6 118:17 120:5,9,14,25 122:14,20,22 124:13,25 125:15 128:12,21 133:13 143:8 146:7 152:6,16,21, 24 153:1,5,11,13,23 154:2,13,18 161:3 172:21,24 173:13,19 176:6 177:4 178:17 201:2 202:22 205:25 206:6 212:24 213:23 226:1,4,5,13,23 227:4 231:15 233:7

**insured's** 59:7 121:24 122:7 159:9

**insureds** 123:6

**insurer** 51:23 91:19 117:7 176:6, 7

**insurers** 234:23

**intend** 11:19 188:2

**intended** 68:3 70:9 96:24

**intending** 73:9

**interactions** 240:22

**interested** 7:3

**interfering** 196:15

**interim** 73:7 212:17,18

**internal** 123:4

**internally** 86:16 168:11

**Internet** 6:19 13:24

**interposing** 240:21

**interpret** 129:21

**interpretation** 70:14

**interpreted** 129:23

**interviewed** 19:6

**interviewing** 34:11

**interviews** 32:19

**introduced** 16:14

**investigate** 23:17 24:5 25:12 30:3,21 31:5,9 32:7 35:3,8,9,19, 20,24 36:1 43:4 47:13 69:19 83:25 86:6 151:23 228:5

**investigated** 39:11 227:19

**investigating** 23:7 24:23,24 25:23 36:10,20,25 38:9 39:2,20 41:20 112:2 113:3

**investigation** 23:2 30:17 48:24 56:5 85:17 100:4 107:19 110:15, 23 111:9 118:6 136:6,20 139:2,18 142:1 147:6 151:2,9 156:12 182:6 183:7 191:14 193:5,8,21,24 194:3,7,14,16,23 197:8,10,24 198:7,11,17 212:15 221:15 224:8 225:1,6,23 227:10,13,16,18,22,25 229:4,8 230:16 231:2,16 237:9

**investigations** 193:25 198:13

**investigative** 194:11 235:4

**investigator** 41:12,17 42:2 100:2

**investigators** 39:8 41:11,14

**investigatory** 199:15 200:1

**invoiced** 65:15,24

**invoices** 166:8,13,23 167:2,13

**involve** 200:12

**involved** 15:23 19:25 26:15 38:13,14,16 41:25 46:22 72:5,6 135:14 194:9 197:13 198:12,16 206:12 218:12 228:6

**involving** 92:4 128:16 137:4 138:13

**irrelevant** 93:12

**issuance** 177:14

**issue** 44:20,22 53:5 58:15,18 67:12 70:15,18 72:16,25 73:4,7 76:9 78:15,23 80:7,17 102:15 132:17,21 133:13 134:9,19,20,21 135:21,23 136:8,9,11,12 137:12 139:7 145:10,14 146:7,9 150:18 153:9,10,23 154:20,22 168:7 186:19 209:9 210:10,15 211:13, 15,16,19 224:11 230:18,20

231:25 232:17,20,21 235:7 237:9

**issued** 11:14 15:21 20:20 62:15 63:16 78:5,14,16 175:16,17 177:11 187:23 188:17 210:11,14 214:11

**issues** 57:22 73:24 75:18 76:3,7 78:3,14 81:10 103:24 104:8 120:7,15,25 147:8 148:20 154:21 186:9 197:18 201:9 207:3 214:9, 13 218:13 223:5 230:22 231:1,8, 15,18 233:4,7,10 236:14,22

**issuing** 231:20

J

**January** 106:9,13,17 107:7

**Jenn** 88:1,20 220:6,8,14 221:10, 11,19

**Jim** 178:6 189:9,24

**job** 117:25 118:12 119:13 124:4 141:18 186:24 220:8 221:11,12 240:19

**John** 6:7 7:17 8:1 20:7 27:13 28:10 88:12 102:1 161:19 165:24 187:19 192:8 233:18 236:16 239:21 241:18

**Judge** 189:12

**judgment** 61:23 128:21 129:5 130:10,12,23 186:5 187:10 188:11,13

**Judith** 88:3 103:2

**July** 6:2,6 127:1

**jumped** 223:2

**jumping** 196:9

**June** 29:11

**jury** 90:15 141:8 142:7 147:17 222:4

K

**Kapan** 137:19

**Kapanicas** 67:6 99:2 133:4,6 134:3,11 135:4,16 137:4,5,9,19 138:6 148:8 238:6 240:3

**keeping** 22:8 47:17 67:23 71:14

**Kenneth** 133:23

**kickbacks** 37:20

**kind** 41:17,19 46:15 49:8 84:3 89:16 168:4

**kinds** 34:18

**KKX** 6:13

**knew** 152:21 179:17 184:7

**knocking** 148:1

**knowing** 70:8 71:20 176:21

**knowledge** 152:6,16,22 194:23 197:7 199:17 200:7 229:1,10 231:5 236:25

**Krieger** 68:15 69:14

---

**L**

**L-E-P-I-R-E** 8:1

**lack** 131:5

**language** 73:18,20 210:1 213:21 214:3,5

**large** 37:10,22,24 38:3 53:13 92:8

**larger** 22:16

**largest** 37:12

**late** 38:20 46:24

**law** 14:20,22 15:4 68:15 69:14 202:17 215:4

**lawsuit** 55:6 60:19 135:24 153:19 154:15,17 174:18 175:21 176:3 217:3 228:1,6,11,15,21,24 229:5

**lawyer** 10:23 122:23 193:3 195:19 197:4,23 198:5 202:15,22 224:1,23

**lawyers** 197:21

**layperson** 208:24

**lead** 62:21 134:21 213:6

**leading** 234:20

**learn** 132:8

**learned** 189:12

**learning** 135:9,15

**leave** 213:15

**led** 136:2 183:4 234:19

**left** 151:9 229:19

**legal** 6:25 7:1 54:18 80:19,21 90:24 92:24 93:1 134:15,20 137:12,17 151:14 177:24 180:15 187:14

**legally** 123:2

**legitimate** 169:1

**length** 128:4

**lengthy** 128:4

**Leone** 190:12,17

**Lepire** 6:7 7:17 8:1 234:18 235:16

**letter** 51:8,9 68:14,17 72:24 73:3 74:9,10 75:4,13,14,15 76:25 78:6, 12,14,16,19,22 79:16,19 80:2,13 87:23 99:16 100:11,12 114:5 115:13,24 116:2 119:9 127:9 128:4,18 129:9 130:1,9,13,15 131:1 132:9,13,15 133:3,10,11,17 143:23 144:11,12,13,21 150:6,10, 17,18 152:20 154:3,8,14 168:5 203:10 204:15,21 205:2,4 209:22 210:1,3,9,11,14,21 211:14,16,17, 20 212:19 213:25 214:4,11,16 215:7,14 217:4,8,13,19 236:15,21

**letting** 72:2

**level** 49:22

**lieu** 105:9

**life** 46:12,14 209:16

**light** 99:11

**limit** 86:7 143:12,13 144:5

**limited** 137:9

**limits** 24:16 53:7 166:10,24 167:4,14,23

**lines** 32:2 34:22 45:1

**Linkedin** 14:5

**list** 86:12,15 87:6 190:5,11

**listen** 196:13

**literally** 89:15 150:1

**litigation** 95:8 113:16 216:17 228:18,19

**Loan** 19:22

**loans** 19:20

**Logic** 65:20 94:24 95:22,23 97:21 229:9

**long** 96:5 132:6 181:11 218:25 219:2,7,13 220:1,9 221:3,5

**longer** 83:15,16 177:21

**looked** 25:10 33:10 66:15 217:13

**loop** 153:10

**losing** 196:13

**loss** 18:11 24:15 50:23 51:1,10, 11,24 52:14,17 55:17 56:14,18 57:10,13,18,23 58:4,6,7,16 60:21 61:1 63:6 66:17,23 67:21,25 68:5 69:19,23,24 70:23 77:24 79:3 81:17 83:10,14,19,21 85:12 86:9, 11 90:11 91:7,12 92:21 94:10,11, 14,25 96:23 99:23 100:1 102:15 110:3,8 129:2,3,4,16 130:4 132:2 156:22 157:10,14,20,25 158:13, 16 159:1,9,18,22 160:4 161:3,25 163:17 164:2 167:18 169:9 171:14 172:14 173:2,5,6,7,14,22 183:24 184:1,6,8,11,13,19,25 185:1,7,13,14,17 186:12,15 189:1 191:11,16 192:25 213:5,9,17 216:24 217:1,12,24 218:4,8,22 219:23 227:11,24 237:5

**losses** 99:24 136:8,12 163:6 164:1,5,16,18,19 165:13,14

**lost** 10:10

**lot** 43:13 84:15 91:25 92:5 102:4 142:3 177:12,22,23 197:17,19 212:12 231:8

**lots** 34:17

**love** 195:4

**luck** 171:3,4

**lunch** 126:2,8,19

---

**M**

**M-HM** 11:7 35:16

**made** 37:20 56:11 62:25 77:7 100:3 130:24 144:24 155:7,22 156:10 159:7 160:8,17,20,23 167:7,8 172:16,21,25 203:5 228:8



**magic** 209:21,23,24,25

**Magna** 6:25 7:1

**magnitude** 38:17,18 53:7 207:10 219:23

**major** 129:12

**majority** 90:12 129:15

**make** 8:22 21:25 34:2 43:11 54:14 61:8,10 62:5 70:7 93:7 107:1,21 126:9 152:9 167:1,6 172:22 173:25 174:5 176:16 180:25 192:22 218:17 220:19 240:23

**makes** 62:6 128:1 143:15

**making** 40:4,19 47:18 59:7 61:5 62:3 146:21

**mal** 21:17

**malfeasance** 184:12,19,25

**man** 33:19

**Management** 17:5,11

**manager** 178:6,13

**manner** 97:14 98:4 214:10 218:16 222:7 223:7

**Mansukhani** 6:16

**manual** 30:24

**manuals** 49:17,19

**March** 68:17 113:19 114:5,13 115:3,7 119:8 222:11,12

**Marion** 88:3,20,22

**mark** 13:6 50:1 175:2 232:5

**marked** 11:6,8 13:7 50:3 175:4

**market** 16:15 18:23 39:24 41:2, 22 42:8 65:16,25 66:5,11

**marking** 174:25

**marks** 96:10,13 181:15

**material** 11:21 26:21 27:1 29:14 108:24 140:12,23 164:15 187:22 203:21

**materially** 234:9

**materials** 33:1 64:6 65:5 75:16 77:12 81:8 206:20 208:18

**matter** 6:7 7:23 9:6 10:6 11:2,14, 20,24 18:19,21 23:10 26:1 31:1

34:7,15 36:9,24 37:21 40:16 42:12 45:23 46:2 51:14 53:20 54:7 58:23 59:21 70:19 72:14 84:7 94:7 104:8 134:11 143:5,16 149:10 173:17 175:24 176:23 179:21 188:20 196:16 197:1,5,9, 11 207:9,10 218:14 227:17

**matters** 143:17

**maximum** 157:25

**Mcpharlin** 132:10 133:11

**meaning** 11:23 16:14 34:13 39:24 45:12 71:12 98:16 158:6

**means** 137:21 184:3 202:6 210:25 211:2 216:1,10

**meant** 41:16

**mechanism** 184:5

**med** 21:17

**media** 6:6 96:2,11,13 181:16

**medical** 216:9

**meetings** 15:19

**memory** 190:23

**mention** 52:20 60:9 105:17 106:2 144:23 216:13 227:10

**mentioned** 18:3 34:17,19 36:5 38:24 55:1 74:6 156:21 207:15 233:19

**mentioning** 204:3

**mentions** 203:17 204:23

**mere** 54:12

**met** 33:18

**method** 36:18

**Michael** 75:1

**middle** 150:2 212:23

**million** 24:5 25:7,13 29:10,11 37:11 38:1 53:5,8 54:4 83:20,25 92:3 143:12,13,14 155:10,23 156:22,25 157:20,23 158:5,9,12, 18 159:2 160:3,15,23 161:1,8,13, 15,25 162:1,12,13 163:4,10,16,17 164:3 165:9,17,23 167:18,24 168:2,13,18,20,22 169:11,21,23 170:9,11,13 171:13,15 172:3,12, 13,15 173:4 201:13 224:12 236:4

**mind** 43:7 67:20,23 71:8,15 81:21 89:17 90:4 93:1 112:18 181:2 210:3 213:16

**minimal** 141:21

**minus** 241:13

**minute** 136:17 154:6

**minutes** 43:10 82:12 149:21 181:12 229:22,23 241:9

**misconduct** 109:19 110:20

**mishandled** 35:13

**missing** 100:11 161:7

**Mission** 17:12

**misstated** 146:25 164:17 190:22

**misstates** 85:7 101:19 170:2

**misstating** 85:13 110:25

**modern** 34:13 45:11 198:16 200:20 207:6

**moment** 91:4 94:10 108:7,8 196:17 212:24 213:5

**monetary** 184:7,14 185:1

**money** 70:23 158:9

**monthly** 49:1

**months** 51:5 52:14 60:5,6 217:2, 20 218:7,21 237:5

**Moorjani** 116:6 206:23 224:25

**morning** 6:4 7:21

**Morse** 56:24 166:6

**motion** 146:1 186:5 187:10 188:12,13

**motivations** 108:16

**move** 35:14 53:22 82:9 91:2 98:24 136:14 147:23 152:11 165:15 196:18

**multi-year** 198:11,12

**multiple** 128:16

**N**

**nag** 51:23

**nagging** 51:20

**named** 228:11



EXCEEDING YOUR EXPECTATIONS

COMBS REPORTING, INC.

DEPOSITION REPORTERS • LEGAL VIDEO

**EXHIBIT 4**
**PAGE 399**

**names** 223:8

**National** 6:9 9:12 42:11 69:15 71:25 72:11 77:7 85:10 87:14,16 90:18 93:5 94:8 113:7 117:15 118:7 131:14 132:16 143:9 153:14 154:12,18 157:19 158:15 159:7 167:12 176:1 179:1,12,17, 19 185:25 205:14,23 206:5 215:2 217:3 218:7,11

**Nationwide** 19:21

**nature** 91:16,20 106:19 159:2

**necessarily** 24:7

**needed** 79:2 84:5 86:12 92:13 93:7,13 116:12 140:12 150:1 153:10 190:22 202:10

**negotiating** 116:4

**news** 205:8

**nine-page** 131:1

**nitpick** 241:11

**nitpicking** 228:4,7

**non-publicly** 206:10

**non-quantifiable** 169:14

**non-response** 107:8

**nonetheless** 66:15 67:17

**nonresponsive** 91:2 152:11 165:15

**normal** 51:13,16 78:12 93:23 105:5 207:6 208:23 212:2,14

**note** 6:17 54:23

**noted** 65:16,25

**notice** 50:19 56:11 133:3 134:3,7 136:5,19,25 138:5,6,19 139:3,7, 11 148:12,25 149:9 229:3,7 238:4,12,16,20 239:13

**noticing** 7:6

**notification** 57:1 214:22

**notion** 103:10

**November** 51:2,5 75:5 82:23 83:1,6 92:22 94:11,13 95:19 99:12 110:4 132:9,11 133:12 143:25 144:11,13,21 145:6 146:6 148:23 150:6,19 152:19 153:3,8 154:3,8,14,17 217:5,9,12,14 236:15,21 237:18

**NUFIC** 64:2 68:13 74:12 82:25 86:17 87:4 88:21 94:16 100:21 113:21 114:18 165:2 240:3

**number** 6:6 9:2,19 19:25 31:23 38:12,15 56:2 63:21 64:1,13 68:20 73:19,24 88:7 96:11,14,20 129:22 130:20 143:5,9 144:2,4 148:20 160:6 162:9,11,12 163:10, 11,13 174:23 177:9 181:16 200:16 201:9 203:19 216:14 219:3 220:16 221:9 223:11 227:8 230:21 231:12

**numbered** 230:6,8

**numerous** 38:15 49:12

## O

**oath** 7:14 49:15 81:2 148:25 193:15 197:12 200:12,22 201:1, 25 206:12 207:3,7 221:23 223:4 224:3,7,25 225:4 226:1 231:6,11

**object** 52:2 54:17 108:9 234:19, 20 235:15,16,22 237:20,21 240:7, 17,18,19

**objecting** 235:20 240:20

**objection** 18:24 29:23 66:13 112:25 140:15 187:18 234:17 235:18,24

**objections** 231:20 240:25

**obligations** 125:22

**obtain** 84:10 148:16 221:23 238:20 239:8 240:9,11

**obtained** 73:12 90:17 94:3 100:8 139:6 140:6 142:21 147:8,20 148:17 149:13,14 205:7 222:6,9 227:21

**obtaining** 84:5 85:22 97:4 99:8 104:4 110:11 117:16 142:2 148:18 234:23

**occur** 226:20

**occurred** 68:9,10 74:4 134:18 135:1,10 136:6,21 137:20 153:4 183:17

**occurs** 132:20,24

**October** 69:6 163:3

**offensive** 103:11

**offer** 9:11 47:19 80:23 99:14 155:2,5,7,8,9,14,18 156:8,9,13,17 159:3,8 160:7,17,20,23 161:1,8 162:2,14 163:6 167:1,24 168:8,20 169:2,8,10,21 170:9 172:22 173:1,9,10,12,20,25 174:5 188:2

**offered** 34:14 76:25 95:11,22 99:4 116:22 145:9 155:10 157:19, 23 160:3 235:19

**offering** 77:5 158:11,17 160:15 163:17 168:12 171:13 228:20 229:2 233:11

**offers** 155:16

**offhand** 106:10 223:24

**Office** 84:18 85:2 90:15 139:15 141:8 147:18 222:3

**offset** 159:1,4,9 161:3 172:9

**oftentimes** 106:22

**Oklahoma-based** 37:15

**omitted** 126:21 237:24 239:23

**one-year** 62:21

**ongoing** 48:24 100:4

**online** 12:25 13:2,5,15,17

**open** 55:13 67:20,23 71:8,15 81:21 82:24 133:16,17 136:12 213:16 216:17,23

**opened** 55:3

**openness** 81:16

**operation** 184:4

**opinion** 26:13 28:18,20 37:4 48:5 51:22 53:2,23 54:6,20 68:3 78:18 79:9 80:19,21,24 85:3,9 125:19 128:6 131:9 138:16 141:24 142:2, 5 166:17 167:7 169:17 181:3 187:23 188:2 191:10,17 192:1,24 197:19 205:22 219:10 230:22 236:19 237:3

**opinions** 9:11 11:19,24 20:16 26:16 33:12 34:6,14 44:1 102:8 169:20 170:7 228:20 229:2

**opportunity** 62:2 77:1,17 80:6 81:10 145:13 146:7 233:7,11 234:19

**opposed** 231:20 239:9

**order** 56:1 68:24 69:1,2 84:6 88:8



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 400

93:7 98:3 128:5 152:9 157:4 166:9 190:23 237:15

**origin**  16:18

**original**  60:19 83:14 217:12 230:14,15

**originally**  83:12

**outcome**  7:3

**outlined**  74:7

**overarching**  138:7

**overbilled**  67:11

**overbroad**  108:12

**overcharges**  163:4 217:19

**overcharging**  57:13 58:24 59:2 61:12 63:14 71:2,5 92:4 96:21,22 97:7,9 166:15 229:9

**overly**  102:16

**overpayments**  166:6

**overstated**  117:19

**overstating**  118:8

**overview**  12:12

**owners**  135:5,6

---

**P**

**p.m.**  126:18,19,20 127:1,4 181:16,18,20 229:25 230:1,3

**PA**  6:10

**Pacific**  17:5,11

**pages**  64:9,16 65:1 89:15 201:12,13

**paid**  9:9,11 158:1,3,9,20 159:5,9, 19,23 160:5,10 161:3,15,18,20,22 170:13 171:1,15 172:4 173:4 224:13,15 225:9,20 237:11

**paper**  26:24 202:25 203:1

**par**  212:22 214:5

**paragraph**  65:12,20 67:5,8 69:17 94:20 99:22 113:24 116:4 118:3,20 127:21 144:17 166:5 190:11 192:1,4,17 196:21 201:4 230:7,8

**parallel**  85:16

**Pardon**  16:12 38:23 58:9 88:11 132:5 141:12 146:14

**part**  39:9 42:1 78:13 98:8 107:16 174:18 177:7 206:2 213:1

**partial**  62:24

**partially**  85:24

**participants**  6:19

**particulars**  184:20

**parties**  6:22 7:4 51:15 120:1 151:25 197:13 206:12 223:10

**partner**  117:14

**partners**  103:1 117:2,5,7,9

**party**  7:2 33:20 84:18 179:6,10 225:21,23 228:11,15,21 229:4

**passed**  177:24

**past**  101:20 200:15

**patently**  218:6,20

**patience**  196:14

**pay**  86:4 124:5 196:12

**payable**  236:5,6 237:7

**paying**  10:24 102:23,24 196:8,11 223:16

**payment**  57:22 58:15 59:20 62:15,24 159:15 225:13

**pays**  58:6

**PDF**  13:16

**penalties**  148:25

**penalty**  100:3

**pendency**  146:11

**pending**  223:14 224:8

**Penn**  37:14

**penny**  128:22

**people**  26:15 38:10,12,16 39:19 80:8,24 81:3,15 84:14 103:13 106:22,23 123:5 177:20 186:2 223:8

**percent**  60:24

**percentage**  200:11

**perfectly**  95:3 99:12

**perform**  191:14 194:2

**performed**  166:9

**period**  16:7 21:21 50:16 51:12 56:10,23 92:5,9 117:3,21 118:13 120:5,12 146:11 148:12 154:16 174:10 176:24 180:19 193:17 194:10 212:3 216:15 221:6 230:24

**periodic**  125:15,22

**perjury**  100:3 148:25

**persistent**  50:10

**person**  38:8 164:12 192:16

**person's**  38:14

**personal**  20:14 31:4 32:15 48:9 240:21

**personally**  9:14 19:10 21:21 22:7 29:22 31:14 37:13 112:4,5

**perspective**  139:1

**Peter**  56:20 88:1

**phenomenal**  65:2

**phone**  121:4,19

**phrase**  211:12 213:22 216:15

**phrased**  120:19

**picked**  238:24

**picture**  13:10

**piece**  114:16

**pink**  182:12

**Pinkney**  231:4

**Pinkney's**  236:24

**Pittsburgh**  6:10

**place**  6:22 24:16

**plaintiff**  228:24

**plaintiffs**  7:10

**play**  58:20 207:25 208:3 209:13

**plea**  116:4,14

**pleadings**  187:8,9

**pled**  223:22

**plethora**  95:16

**point**  13:21 28:3 67:2 70:8 72:10 73:11 74:3 76:19 78:5 100:10,12 107:20 109:1 117:17 146:10



160:12 164:2 168:16 180:22 184:7 188:4 193:16 195:6 200:19 204:21 213:10 218:16,19 220:18 221:13 231:9 232:14,16,17 233:19 241:14

**pointed** 57:9 205:6

**police** 147:17 235:3

**policies** 15:5,21 16:10,22,25 17:1,6,10 19:23,24 20:22 30:14, 22 33:15 46:1 87:14,17 89:1 152:3 175:13,16 177:6 227:5

**policy** 16:13,18 17:22,25 18:9 20:19,23 22:3 24:16 29:10 30:7, 10,11,12,18,19 31:10 37:23 38:3, 4,5 46:1 53:7 58:19 59:8 73:18,22 79:7,11 81:3 86:7 132:21 134:25 137:11,14,20,21 143:11,12,17,20, 24 144:5 145:5 151:16 172:18 173:23,24 174:1,10,11,12,17 175:13,17,18,22 176:2,8,14,21,23 177:11,13,14 178:10,14,23 179:2, 4,11,23,25 180:2,4,11,16 210:5 215:3 226:3,23,25 227:7,9 234:14 235:3

**policyholder** 21:24 39:10 42:1 119:20 120:16 122:2 123:15 143:19 148:17,18 151:10 162:5 176:10 202:9,14 221:14,25 222:22 237:13 239:11

**political** 14:9

**pontificate** 145:24

**position** 71:23 72:12 101:21 102:14 123:1 125:2 150:14,16 185:17,20 193:3 230:14,15

**positions** 72:7 230:11 231:13

**positive** 141:23

**possessed** 92:17,18 142:14,18

**possesses** 141:14

**possession** 85:1 87:15 93:25 94:1,2 99:7,9,18 100:25 101:11 111:14 116:13,23 140:13,22 143:2 148:9,15 149:1 222:24 239:14

**possibly** 139:9 222:5

**post-1992** 208:6 209:17

**posting** 13:25

**potential** 24:15 52:22 53:5 74:8

80:17 95:17 136:12 157:10,13 159:18 165:13 167:18 182:4,13, 23 183:4 192:25 219:23 231:17, 18 237:12

**potentially** 39:12 62:24 134:7,8 144:6

**practice** 21:20 44:15 47:16 145:15 153:15 173:18 206:3 209:2,5,8

**practices** 22:25 23:6,10,11 25:22 30:2,21 31:4 32:17,22 36:6, 8,16,23 37:3 42:15 44:16,24,25 45:5,7,13,14,18 46:4,10,13,14,19 47:8,10,13 48:6 54:13 59:11 233:12

**practicing** 37:9 215:20

**Pre-1994** 164:17

**pre-2004** 163:5 164:1,5,17,19

**pre-litigation** 55:13

**pre-suit** 60:24

**preceding** 63:3 217:3

**precepts** 46:4

**preclude** 117:15 152:7

**predicated** 133:3

**predominate** 232:21,23

**preferences** 112:7

**preliminary** 62:22 64:6 75:16,18 76:3,13,16,23 77:13

**prepare** 218:9,23

**prepared** 80:23 86:12 87:7

**preparing** 89:20

**present** 7:4 62:3,11 71:9,10 72:2 81:11

**presentation** 59:7,14,21 60:19 61:18 62:6 217:18 219:14

**presented** 22:17 26:22 56:13 59:25 61:15 66:4,8 83:20,24 92:8, 13 95:14 130:17 136:24 176:5 208:7

**presents** 91:23 92:3

**pretty** 22:19 46:23 79:9 84:19 194:19

**primarily** 32:2

**primary** 32:4

**prior** 29:15 30:13 56:23 57:22 63:14,16 72:19 136:8,12 137:20 139:6 148:22 153:19 165:13 166:3 170:2 214:10 216:16 225:13 228:18

**prisoner** 147:15

**privilege** 28:7

**privileged** 27:6 28:2

**privy** 140:5 141:9

**pro** 177:14

**probability** 98:4

**problem** 80:10

**Procedure** 196:4

**procedures** 23:6,10,12

**proceeding** 236:25

**process** 17:24 24:22,24 25:5,6, 12 35:7,9,18,20,23 36:1 81:7 84:9 89:9,20 93:9 147:9 214:24 218:22

**processes** 32:7,8 35:3

**processing** 22:9,12 94:6

**produce** 95:11,21,22 99:5,14 104:23 111:14

**produced** 31:1 104:24 240:15

**production** 64:20,24 95:1 109:4 138:20 139:3 141:14 222:13

**professional** 35:7,18 45:11 47:8 48:2,4 49:10 125:6,9,12 176:19 185:11 198:3

**program** 123:9 177:8 226:9

**programming** 171:12

**programs** 18:15 123:10

**projection** 18:7

**projections** 18:12

**prominent** 231:11

**proof** 48:15 50:23 51:1,10,11,24 52:14,16 61:4,15 62:12 69:23 70:23 71:2,5,10 83:10,14,19 85:12 86:11 90:11 91:6,12 92:21 94:10,11,14,25 96:23 97:8 99:23 100:1 102:15 110:3,8 129:2,3,4, 16 132:2 185:14,17 217:12 237:5



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

**EXHIBIT 4**
**PAGE 402**

**proper** 36:18 147:6 199:15 200:1 210:2 229:8

**property** 18:17 23:20 34:23 40:15

**proposal** 167:12

**prosecution** 223:14

**prove** 67:24 77:24 79:2 171:6 185:7,12 186:15,23 187:4 213:17

**proved** 71:4

**proven** 59:2

**provenance** 135:24 151:10 178:19

**provide** 28:20 49:10 63:12 68:4 69:24 70:9 76:4 77:1,5,6,18 80:7 82:2 85:4,11 93:3,20 95:10 96:24 97:8 99:19 104:13 105:11,14 107:19 116:23 118:17 125:22 128:5,11 145:10 166:8,14 167:2 168:4 190:5 212:16,23 213:15,23 221:25 222:22

**provided** 11:1 12:8,21 15:16 26:25 27:2 28:17,23 49:1 52:9 55:17 56:17 57:9 58:1 60:15 63:8 64:7 67:11 75:16,24 76:12 81:9 92:21 99:12 101:4,6 104:13 107:7 109:23 111:23 114:17 122:8 132:3 134:2,9 141:6 143:3,22 144:6 147:4 150:8 156:13,17 162:5 165:11 166:13 179:23 191:22,25 203:5 205:24 206:6 208:18 213:12 221:14 233:6 238:13

**providing** 70:5 73:7 76:16,22 77:13 111:18 122:13 145:12 213:21

**proving** 66:23 171:3,4

**public** 205:9 206:19,21

**publicly** 32:25 205:16,21 206:7

**publish** 12:25

**published** 13:24 33:25

**purchased** 177:16,18

**purely** 220:4

**purpose** 13:24

**purposes** 7:25 11:5 16:2 17:13, 22 29:1 37:4 94:6 232:18 240:18

**pursued** 83:12

**pursuing** 83:16 86:9

**put** 11:4 50:13 55:25 69:1,2 78:10 83:11 105:18,21 121:2 127:19 129:8 130:8,20,22 162:24 170:20 175:7 181:23 188:11 189:17 215:6

**puts** 192:11

**putting** 42:6 79:14 154:6 160:21 185:16 214:15 230:5 232:22

---

**Q**

**qualified** 80:8

**qualify** 80:1,20,24 81:3,15

**quality** 6:17,18 42:20

**quantification** 56:13,17 57:9,22 58:16 60:21,25 169:22 170:10 186:2 216:24,25

**quantified** 57:13,18

**quantifies** 58:7 130:18

**quantify** 58:3 130:16 158:16 163:17 169:9 217:24 218:3

**quantifying** 105:13

**quantum** 70:17 217:18

**question** 8:10,13 19:2 23:14 27:20 36:11 44:5,7,10 52:25 72:12,21,23 73:14 76:12 91:3 100:23 103:22 104:6 112:9 115:4 120:11,18 124:1,22 143:7 145:19 152:13 155:4 156:3 157:2 162:25 163:24 166:17 170:4 171:20 172:1,23 177:15 178:25 180:8 185:8 195:21 196:7 198:8 199:20 204:19 205:1 218:19 225:18 227:23 237:6 239:21

**questioning** 148:3 171:11 196:16 235:20

**questions** 8:9,23 10:22 20:9,11 76:7 78:1,2 108:3 111:3 115:17 120:19 122:4 127:9 142:9 147:24 148:4 180:23,24,25 181:4 195:5 224:22 230:6 236:24 239:20 240:21

**quick** 215:1

**quote** 201:18

**quote-unquote** 215:12

---

**R**

**raise** 72:22

**raised** 72:21 79:9 80:12 150:18 230:18 231:1 236:14,22

**rapid** 218:15 222:7

**rating** 16:1

**Ray** 57:5 60:1 166:18 219:15,25

**Ray's** 56:4 62:16 63:2

**reach** 59:13 61:14 125:19 220:2 235:3 236:1

**reached** 26:16 107:23 108:7,20 152:25 153:4

**reaching** 20:16 44:1 80:5 137:2

**read** 33:4 65:13,17,22 94:20,22 100:7 114:6 115:14 116:10,12 130:13 132:13,14 144:11,19 152:12,14 166:11 170:4,5 182:3,9 186:5 187:7,9,10 188:15 195:8 196:2 205:6 208:10,14,17 209:7 218:19 227:1 233:25

**reading** 30:12 208:22

**reads** 153:8

**ready** 94:12,20 96:18 241:4

**real** 46:12,14 215:1

**reality** 52:23 79:12 80:11,17 119:19 157:7 160:10 161:18 168:2 173:3 202:7 207:3 228:9 234:11 236:3

**realize** 152:4

**reason** 143:14 150:13,16 153:22 168:17,20

**reasonable** 35:6,17 45:10 47:7 49:9 51:22 59:5,17 62:24 83:23 95:3,20 99:13 108:19 125:5,8,11 145:14 167:25 168:12 169:1 171:16 173:19 176:19 185:10 198:3 213:14 225:4

**reasonableness** 172:25 173:9, 12

**reassigning** 143:20

**reassignment** 144:24



EXHIBIT 4
PAGE 403

**rebuttal** 233:22

**recall** 8:6 9:18 10:2 14:1,3 17:15 20:4 21:19 37:18 45:3 55:4 156:23 162:7 225:10 226:17,21 227:14 228:3

**receipt** 72:20 115:20 136:4,18

**receive** 30:25 87:19 238:17

**received** 15:3 148:13 154:13 156:14 158:4 160:13 161:25 162:13 163:15 169:20 170:7 172:5,8,12,13 189:20 190:12 236:2 240:4

**receiving** 48:15 203:25

**recent** 69:21

**recently** 226:12,19

**recess** 126:19

**recognize** 13:10

**recollect** 90:22

**recollection** 90:13 227:18

**recompensed** 173:4

**record** 6:5,23 7:25 11:5 27:18 28:14 43:14,15,17 82:17,18,20 96:12,15 115:15 126:17 127:3 147:25 149:14 152:14 170:5 181:17,19 187:21 229:24 230:2 241:21

**recorded** 6:21

**recording** 6:18,21

**records** 64:10 84:12,23,24 85:1, 5,11,19,21,23 92:1,5,12,15,16,22, 23 93:6,11,20,24,25 94:1,3,25 95:4,5,10,21 97:20 99:5,6,9,14,17 101:9,14,17 104:9,13 105:3,9,14 111:14 139:14,24 140:10,22 141:5 142:2 147:14 148:7,13,14, 18 151:8 182:21 183:7 203:19 204:14,23 205:3,15,16 221:24 222:11 238:23

**recovery** 172:3 237:12

**Rees** 6:16

**refer** 213:18

**reference** 119:10 128:9 133:5

**referenced** 178:14

**references** 128:17 165:9

**referencing** 119:6

**referred** 203:12 209:20 210:17

**referring** 41:18 121:18 144:16 192:17 193:3

**reflect** 11:19 12:21

**reflected** 11:25 12:18 14:18

**reflects** 160:22

**refresh** 190:23

**refuse** 162:25 163:1

**regard** 33:11 47:1 110:5 121:5 154:11 168:5 184:15 206:7 225:7

**regularly** 121:23 171:12

**regulation** 41:5 51:25 53:16 124:24 125:10,14,23

**regulations** 44:16 48:3 122:12, 17,19 125:4 156:18 207:15,22,24 208:2,6,17,19,23 209:3,12,14,17

**reimbursed** 157:11,14,21 161:16 173:14,19,22

**reinsurance** 15:22 16:2,11 17:5, 10,11 18:10 31:25

**relate** 34:22 35:13 40:14 73:24 102:14 138:10 142:4 210:5

**related** 7:1 26:22 84:23 85:11 183:9 201:8,16 225:15

**relates** 14:2 18:16 23:1 24:18 46:19 70:14 94:24 95:7 143:10

**relating** 95:21 184:13

**relationship** 24:16 123:13 134:11 224:14 225:16

**relative** 15:20 20:19,21 22:1 44:19 47:16,17,18 58:1 69:20 72:7,12 78:2,17 79:7 92:15 122:17,25 123:14 125:3 137:3 139:7 141:24 144:3 154:9 155:5 176:8 178:19 197:13 223:4 224:11 228:8 230:18 231:8,21 235:7

**release** 74:25

**relied** 27:5 28:22 37:4 190:6,17 191:25

**relies** 100:1

**religious** 106:19

**rely** 28:16,17,19 190:8,20 206:5

**relying** 27:9 151:4 221:13

**remaining** 76:7

**remember** 19:22 207:16

**remotely** 6:14

**removed** 89:5,10

**removing** 89:21

**rendered** 77:2 82:3

**rendering** 97:9

**repeat** 19:2 23:14 36:11 91:18 101:5 103:22 105:6 120:21 132:23 143:7 157:12,22 159:20 172:23 178:25 185:8 186:13 199:20 213:7

**Repeated** 50:14

**rephrase** 8:12

**report** 11:2,14,16,18,25 12:6 29:5,7,8 49:1 55:1,24 57:8 58:2 59:25 62:16 63:2,4,15,19 64:5 65:9 67:4 68:4 70:5 72:20 76:6,8 96:24 105:17 113:24 117:20,24 118:3 127:18 140:20 150:25 155:6 156:21 160:22 161:10 162:4,22,24 165:8,17 178:14 181:6,22,24 185:23,24 188:18 189:17,19 203:13 216:14 218:19 219:15,25 220:19 226:11 230:5 233:20,25 234:2

**report's** 189:16

**reported** 56:4

**reporter** 6:24 7:12 119:25 151:24 152:12 170:3 171:23 174:22,24 195:8 196:1

**reporting** 47:17 213:2

**reports** 205:9 235:4

**represent** 7:5,22 26:9 67:12

**representative** 121:24

**representatives** 122:23

**represented** 26:1 202:15,22

**representing** 120:10,14 122:1, 14 123:23

**represents** 43:2 98:21,23

**request** 6:15 85:20 89:5,24 90:21



93:6 95:1,4 99:17 111:19 164:16 165:12 195:15 201:6 202:24

**requested** 81:9 101:7,10 105:14 108:24 118:17 147:22

**requesting** 86:22 201:15

**requests** 87:11 89:9,10,20,21,25 90:2,10 91:6 100:18,25 101:4 102:14 103:19,24 104:8

**required** 45:24 52:7 141:22 178:16,20 197:8 204:6 209:21

**requirement** 48:25 51:14 204:3 237:13

**requirements** 39:14 40:5,13,18

**requires** 40:22 209:8

**research** 18:18,21 19:4,5 22:10, 11,22 30:20 31:9 33:10 35:1 36:7 41:7 43:20,24 44:11,14 55:19

**reservation** 73:13,15 78:4,12,17 209:22 210:2,8,20 211:17 213:19 214:1,18,20 231:21

**reserve** 31:18 168:16,21 211:20

**reserves** 78:6 215:3

**reserving** 15:25 214:24

**resolved** 148:21 232:1

**resources** 98:17

**respect** 89:23,25

**respond** 76:4 145:10,13 146:8 154:2 195:12 196:10 220:11 233:7,11

**responded** 150:17 153:24

**responding** 106:3,7

**response** 107:6,8 110:5 146:9 150:5,9 217:4

**responses** 101:4

**responsibility** 187:3

**responsible** 38:9

**rest** 95:15 130:13,15

**restate** 202:3

**restitution** 157:1,3,4,6,11,15,17, 21 158:1,2,17,20 159:1,9,15,19, 23 160:5,10,14 161:3,14,18,20,25 162:13 163:16 169:10 170:1,13 171:1,15 172:3,8,12 223:17

225:9,13,15,20 235:7,13 236:2,4, 10 237:7,14

**result** 74:2 141:23

**results** 121:3 188:15

**RESUMED** 127:6

**retain** 43:1

**retained** 97:23

**retention** 97:4 186:18

**retracted** 118:4

**revealed** 143:19

**review** 26:21 64:25 79:10 90:4 121:5,6,8,15,21 122:6 124:19 128:12 141:5,17 151:7 156:19 160:9 164:16 165:13 178:24 188:16,19 189:10 191:6 199:8 203:6,7 208:6,9 218:21

**reviewed** 22:17 64:9,16 84:25 128:7 180:17 187:23 189:24 190:2,3,25 194:8 205:7 208:11,14 235:9

**reviewing** 15:24 30:9 53:21 191:21

**reviews** 90:7 94:22 144:20

**revised** 129:16

**rhyme** 168:17,19

**Richards** 133:22

**rights** 73:13,15 78:5,7,12,17 209:22 210:2,9,21 211:18 213:19 214:2,19,21,24 215:3 231:21

**rise** 73:22 134:7,8 138:15

**risk** 17:21 18:8 178:6,13

**Riverside** 6:8 84:17 116:3 224:10,17 225:8,13,17 226:5 236:5,13

**Rocha** 88:1,4,20,22 100:18 105:19 107:3 108:5 109:7 114:5, 12 115:2,6 117:21 118:12,16,22, 23 121:13 190:13,17 203:9 204:22 205:2,6 220:7,8,12,14 221:11,19 225:11

**Rocha's** 114:3 116:17 214:4,17 221:11

**roughly** 156:22 217:14,20 218:7

**route** 240:8

**routinely** 121:10,16

**rule** 28:4 50:18 235:17

**rules** 27:22 196:4

**run** 217:11

**running** 80:4 177:21

---

**S**

**sake** 160:22

**sat** 19:10 197:19

**satisfied** 125:14,21

**satisfy** 204:2 223:18

**savings** 19:20,22

**scenario** 139:10

**scheduled** 171:12

**scheme** 69:20 72:6 116:6

**schemes** 128:16

**Schmookler** 7:7,20,22 11:10 13:9 18:25 20:8,13 27:14,19,24 28:4,6,11,15 29:25 43:19 50:5 52:10 54:19 56:3,6 63:22,25 64:4 66:14 73:2 74:18,20,21 82:8,11, 14,22 83:6,8 85:8 88:14 96:3,5,7, 16 101:22,25 102:2,6,18,23 103:4,12,15 108:3,4,17 113:1 120:2 126:4,7,11,14 127:7 134:16 140:17 145:23 146:4,21 147:2 148:2,5 149:18,21,25 150:2,4,23 152:1,12,18 161:23 162:20 163:23 164:25 165:2,5 166:2,19 169:25 170:3,12,18,24 171:3,6,9, 10,21 174:22 175:2,6 180:20 181:1,5,21 186:21 187:15,25 192:9,14 195:1,4,9,13,16,18,22 196:3,8,11,20 207:14 229:14,23 230:4 234:17,22 235:15,23 237:20 238:2 240:7,17 241:2,5, 10,15,20

**school** 14:20 15:4 103:2,7,13

**science** 14:9 112:23

**scope** 30:6 99:24 108:2,12 166:16 186:17 187:13

**Scott** 7:7,21 27:23 63:21 74:16 82:7 83:4 146:18 171:8 196:19 229:13 241:7



EXCEEDING YOUR EXPECTATIONS

COMBS REPORTING, INC.

DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 405

JOHN LEPIRE on 07/19/2022

**scrap** 202:25 203:1

**scream** 146:18

**screaming** 146:23

**screen** 6:20 8:18,19 11:4 102:3 105:18,21 113:23 127:19 175:7

**scroll** 203:11,13

**Scully** 6:16

**sealed** 139:14

**search** 182:7,17,22 183:15,20 184:10,17,21

**SEC** 227:10,12,16,18,21,25 229:3,7

**secondary** 25:11

**seconds** 96:6 150:1

**secure** 201:1

**seemingly** 115:18

**segment** 182:12

**seminar** 15:7

**seminars** 15:17 199:1

**send** 51:8 54:22

**sends** 103:19

**sense** 31:7 42:5,6 45:16 180:25

**sentence** 114:9 115:18 116:12 129:23 130:7 131:1,5 166:5 182:2,11 204:22 205:5 222:13

**sentences** 115:19 181:24

**separate** 78:16,22 226:7

**September** 55:17,25 56:8,12 57:14,17 58:14 59:12,19 60:1,5 61:19,22 63:2,14,16 68:9 164:24

**series** 8:8 124:12 131:24

**service** 65:16,25

**services** 6:25 7:1 66:11 67:10,11

**SESSION** 127:1

**set** 36:13,16 100:2

**settle** 155:2 157:24

**settled** 10:9

**settlement** 10:6 44:16 74:24 154:6,7 155:5,8,11 159:7 167:11 172:22 173:1,9,10,12,20

**seven-year** 16:7 17:9

**shape** 177:3

**short** 84:22 96:1

**shorter** 221:6,7,8

**shorthand** 211:13

**show** 8:18,19 29:5,7 102:11 162:22,23 181:22 226:10

**showed** 61:12 81:16 182:20

**showing** 59:15,21

**shown** 134:1

**shows** 59:1

**sic** 45:18 128:9

**side** 16:3 44:21 118:7 207:9

**significant** 186:9

**similar** 23:12 49:22

**similarly** 23:17

**simple** 177:11

**simply** 143:10 211:13

**Simpson** 7:1

**single** 19:11 26:10 29:17 36:24, 25 39:23 48:13 49:3,5,14 91:24 103:6,17,23 104:7 110:21,22 111:4,6,8,12,22 123:19 124:7 198:17 207:20,25 215:5,7

**sir** 7:21 10:14 11:1 12:10,25 13:18 14:11 17:16 19:1 20:14 27:4 28:16 29:6,12 35:15 37:10 38:21 40:23 43:20 50:18 54:20 57:3 58:19 60:2,17 68:24 74:5,22 78:6 81:25 82:23 85:10 86:18 89:19 91:3 95:18 97:1 102:23 103:16 104:12 109:12 110:17 113:25 114:24 115:19 117:17 118:2,12 120:18 126:8 127:8,13 128:20 129:18 133:24 134:4,17 136:1,3,15 142:11 143:25 144:11 146:5 147:3,10 150:13,15,24 151:12 152:2 162:24 163:24 169:18 170:5,19 171:11 175:9 181:6,22 186:22 189:17 192:16 196:21 197:21 213:20 215:23 219:7,11 230:5 231:10 232:4 237:20 238:3 240:18

**sit** 23:9,15 110:19 157:18 159:13, 17,21 160:2 185:4,9

**sitting** 141:19 176:18

**situated** 23:17

**situation** 113:15

**six-** 16:6 17:9

**six-year** 55:2

**size** 38:12 53:15 192:24 207:10 219:23

**slogging** 74:23

**small** 236:8

**smaller** 173:25 174:5

**soft** 210:17,20,22 211:10,12 215:9,12,17,21 216:4

**solely** 26:24 54:22 99:17 100:25 110:23 111:10

**sort** 193:5 209:16 236:7

**sought** 205:15,24

**sounds** 62:24 126:14

**source** 99:8 102:17 149:9,15

**sources** 25:11

**speak** 25:11 26:8 120:1 122:19 151:25 153:5 180:24

**speaking** 9:22

**speaks** 18:7

**specialized** 193:20 194:14,23

**specializes** 193:4,23 199:22

**specializing** 200:2

**specific** 14:5 15:8 16:21 20:14 21:20 27:5 30:2 31:7 35:15 39:12, 15,19 40:3 43:2 61:20 84:23 89:13 90:2 109:18 112:17 120:24 135:2,3,23 137:3 153:16,25 155:20 182:12 208:21 209:16 210:1

**specifically** 22:22 35:22 38:8 68:2 77:21 78:20 90:10 91:6 131:21 143:24 226:25 236:24

**specificity** 155:21

**specifics** 39:21 156:8 160:7

**speculate** 150:21 168:23 184:22 188:23 191:12,13 199:13 217:6

**speculation** 150:20



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

**EXHIBIT 4**
**PAGE 406**

speculative 112:16 219:9 220:4

spelled 73:25

spending 102:4,6

spent 103:8

spoke 120:13

spoken 19:6 23:4 25:20

sporadic 50:15

Square 37:15

stand 81:2

standard 18:13 21:2,6 42:7 48:1 234:8

standards 34:12 48:5 199:16

standpoint 62:19 110:3 123:8 137:22 188:17 198:6 199:7,8 200:4,6,8 202:8

start 16:20 182:2

started 37:9 46:24 215:20

starts 65:12 88:6 133:7

state 7:4,24 39:13,15 40:3,5,21 41:4 125:5,8,11 148:24 149:8 182:7 198:3 235:24

state-specific 39:25 40:2

stated 110:25 111:2 209:14 236:18

statement 115:12 127:23 128:1 130:2 201:14 214:25 223:15 224:2,7,24 225:4,12,19 226:1,11 231:6

statements 191:24 193:14 203:10 206:11,19,21,22 207:3,7 221:22 223:4,9 224:10 231:10

states 6:10 19:18 39:19

stating 111:2 151:4

status 49:2 51:18 52:7 81:14 172:2

stay 136:15

step 240:6

Steve 235:9

stipulate 102:9

stipulation 102:10

stole 24:12

stolen 70:24

Stop 146:21,23

stops 111:17

storm 21:11

story 209:9

straddling 75:4

streamlined 223:7

strictly 40:17

strictures 40:18

strike 12:24 17:7 18:20 28:11 35:14 53:22 57:4 58:4 61:9 91:2 103:16 110:18 124:17 125:7,10 134:7 136:2,14 146:2 147:11,24 150:14 152:11 164:11 165:15 175:25 191:8 216:21 236:19

stuff 146:21

subject 11:21 69:21 70:19 72:9, 13 81:23 95:8 102:4 166:10 176:3 224:3 225:1,5 228:5

submission 92:22 237:5

submit 84:11

submitted 51:12 52:21 55:9 110:4 132:2 185:14 203:20 221:18

subrogation 237:11

subsidiary 17:12

substance 154:13

substantiates 67:9

substantiation 168:1

sue 9:24

sued 9:14,17,25 10:3

suffered 183:22

sufficient 166:8 204:2

sufficiently 192:18,20

suggest 101:16

suggested 103:5

suggests 142:8

suit 174:16

summary 186:5 187:10 188:11, 13

superfluous 201:5,7

supervisor 31:22 203:4

support 65:14,23 77:18 85:5 96:24 101:17

supposed 26:9 102:20 225:12 238:15

surfaced 146:10 148:23

surplus 32:2

sustained 184:19

swear 7:12

sworn 7:18 225:12

### T

tab 82:25

taking 101:21 102:13 163:21 200:12

talk 23:23 24:20 27:16 28:13 46:8 50:18 86:10 102:25 103:1 110:19 120:7 139:22 214:16

talking 23:20 24:13 25:1 35:11 39:15 46:10 53:1 66:6 89:15 97:2, 22 101:20 109:11 121:12 137:17 144:1 165:4 173:10 179:8,15 188:16 191:20 192:12,20 201:11 210:16 228:14,19

talks 143:24

tasks 166:9,23

team 38:11,12,24 39:3 195:24,25

teams 38:21

technique 18:14 199:15

techniques 200:1

technology 6:15

telling 80:16 204:7

ten 43:11 82:15 181:12 229:22

tens 89:15

term 16:14 41:17,18 117:8 175:17,18 215:17 216:8

termination 134:13 236:25

terminology 212:19

terms 16:18 21:3 26:10,13 49:22 81:6 124:24 125:15 134:25



151:12 152:24 153:9 159:6 167:11 172:17 176:21,24 199:14 210:5 211:23 212:10 225:14

**testified** 7:18 191:1,4,8

**testify** 35:23 45:10 47:7 142:8 176:18

**testifying** 201:25

**testimony** 85:7 101:20 109:25 170:2 191:10

**theft** 16:9,14 24:6 25:8,13 58:20, 22 59:2,7,8,14,15,21 61:5,11 62:11 67:13 70:24 71:2,5,10

**theory** 66:3 94:9

**thing** 10:15 60:9 97:17 136:11 197:19 211:6

**things** 46:6 47:2 79:8,12 84:3 183:25 191:19 220:16,21 233:18 238:8

**thinking** 196:17

**thinks** 124:4 131:15

**third-party** 179:7

**thought** 42:3 44:8 150:3 173:25

**thousands** 89:15

**three-year** 148:12

**tied** 90:2,10 91:6

**till** 16:8

**time** 8:9 10:25 13:23 20:1 29:6 31:11,13,24 32:17,23 35:2,21,25 37:5 39:25 43:15,18,22 44:1,12 45:19 46:21 47:14,24 50:16 57:3 60:25 62:21 67:2 73:11 82:8,18, 21,23 83:19 90:18 92:9 93:19 95:12 96:11,14 102:4,7,22,24 103:6,8,10,12,19 104:23 105:3, 10,15 108:7,8 120:1 123:19 124:1 126:18 127:4 133:18 146:10 148:22 151:25 154:12 164:2 167:1 168:16 172:2 181:16,20 194:10 195:13,14 196:6,7,8,11 200:17,20,25 207:7 211:24 212:3, 6,25 213:5,10 216:15 217:11,17 221:6 229:25 230:3 232:16 233:4 237:21 240:6 241:6

**time-out** 195:15

**times** 8:5,7 34:13 55:1 81:20 123:17 150:24 200:16 216:14

**timing** 214:15

**today** 8:9,19 11:23 22:5,6 23:9, 15 29:16,20 30:1,5 32:9 96:9 111:3 120:19 122:4 142:8,23 157:19 159:14,17,21 160:2 176:18 185:4,9

**toddler** 195:17

**told** 30:24 68:3 70:4 71:15 94:25 95:4 107:9 116:19 138:5 160:18 164:7 165:14 166:21 167:2,12,22

**ton** 44:14

**tone** 214:16

**tools** 237:16 238:3

**top** 40:9 87:25 150:11 162:6 182:2 201:10 219:20 226:17

**topic** 82:9 224:21

**topics** 181:9

**tornadoes** 18:13

**totaling** 83:12

**totality** 72:2

**totally** 23:25 24:4 163:6

**training** 12:17,22 15:8,17 16:17, 19,21,24 208:22

**transcript** 241:23

**transferred** 144:8

**transmission** 144:3

**transpiring** 182:20

**treat** 161:19 170:22

**treatises** 34:8

**tremendous** 123:22 231:5

**trial** 170:21

**truck** 149:23

**Truck's** 149:20

**true** 11:13 12:24 32:12 37:2 48:17,21 54:2,5 58:19 61:7 66:21, 25 67:3,19 68:1,2 76:11 77:4 79:15,24 80:4 81:6,13,19,25 83:22 84:21 89:4,8,12 91:5,9,13, 14 92:7,11 94:23 95:6,19 98:7,15, 19 101:3,6,9 103:16 109:24 110:17 112:13 116:17,22,25 117:1,12,20,24 118:2,16 119:3, 10,14 120:4,12,22 123:7 124:11

128:20,24 129:4 130:3 135:25 136:1,3,18,24 138:3 142:11 145:3,7,8,11,12,16,20 146:5 147:3,12 150:13,15 153:7,13 154:16 166:13,21,25 171:13 178:3 197:3 205:14,23 208:20 213:13,20 214:1,3 215:23 225:3 227:15,24 228:4 231:14 233:3,4, 6,8,9,10,13 239:18 240:16

**Tuesday** 6:2,5 127:1

**turn** 87:3,24 88:5,19 94:10 100:11,12 113:18 118:21 133:15 241:21

**turned** 58:2 231:19

**two-year** 61:4

**type** 20:19 193:20,24 194:2,6 197:8 234:14

**types** 34:24 35:3,4 45:8,20 77:23

**typical** 235:3

**typo** 190:15

---

**U**

**UCLA** 14:9,17 15:4

**ULC** 67:9 135:5,6 163:3 166:8

**ultimately** 10:4 87:23 89:22 101:3,6 104:13 132:25 213:16

**unable** 151:1 158:16

**uncertain** 125:16

**unclear** 99:6 101:12 130:24 131:2

**uncover** 238:4

**uncovered** 239:2,4

**underlying** 69:20 116:6 176:10

**understand** 8:10,11,16,25 10:9, 12 16:9 20:25 21:1 25:25 26:4 27:8 36:12,15 43:6 55:12,16 57:5, 8 58:10,23 59:24 64:19 83:10,15 93:16 107:1 112:9 129:18 131:18 137:5,18,20,24 138:4 148:14 151:17 152:5,14,19 162:8 169:17 185:17 186:1 195:24 196:25 199:10 202:14,16 208:16 211:7, 22 212:1,5,8,14,21 213:3 215:23, 24 216:2 220:20 225:25 228:10 230:25 233:22



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

EXHIBIT 4
PAGE 408

**understanding** 28:1 46:17 84:15 92:20 99:24 164:7 165:22 182:19 194:19 212:6,16 214:8 231:25 232:14 235:12 236:1,3 238:11,23

**understood** 8:14 88:24

**undertake** 136:5 141:20

**undertaking** 138:19

**underwriter** 16:23 188:5

**underwriters** 16:2

**underwriting** 15:23 17:14,18,21 18:5

**unduly** 105:2,8

**unfavorable** 123:13

**unfolded** 231:2

**unintentionally** 118:9

**Union** 6:9 9:12 42:11 69:15 71:25 72:11 77:7 85:10 87:14,16 90:18 94:4,8 113:7 117:15 118:7 131:15 132:16 143:9 144:7 154:12,18 157:19 158:15 159:7 167:13 176:1 179:1,12,17,19 185:25 205:14,23 206:5 215:3 217:3 218:7,11

**Union's** 153:14

**Union/aig** 93:5

**unique** 15:8

**unit** 39:12 41:2 96:11,13 181:16

**United** 6:10 19:18

**unlawful** 99:25

**unnecessary** 89:10,22

**unquantifiable** 169:12

**unreasonable** 163:6 218:6,20

**unsure** 122:25

**update** 49:5,11,16 107:20

**updated** 13:3 124:20

**updates** 122:8,13 125:15,22

**updating** 122:13 124:25

**Urban** 65:20 94:24 95:21,23 97:21 229:9

**USF&G** 19:18,24 31:17 32:5,8

**utilize** 18:14

**utilizing** 63:7

**utmost** 59:6 61:23 67:1,25 71:8, 14 77:11,16 79:24 81:7 92:11 97:7 98:22 108:19 136:4,20 137:1 138:18 139:1

---

**V**

**vague** 18:24 186:16

**valid** 153:12

**validate** 63:13 160:4 162:9

**validated** 162:11

**valuation** 38:15 128:10

**valuations** 70:16

**valued** 130:6

**values** 22:3 58:1

**varies** 49:21

**variety** 31:15 208:4 210:11

**vendor** 67:13

**verbal** 28:19 154:9 155:13,16 156:7,9,20

**verify** 98:3 158:12 160:19

**versus** 230:19

**vicinity** 37:25 38:5 128:8 161:13

**video** 6:21 241:23

**Videoconference** 6:1

**view** 20:25 36:18 51:7 112:11 188:4

**violated** 125:9 210:6

**violation** 54:13

**virtual** 6:15

**vis-à-vis** 235:13

**volition** 26:20

**volume** 91:14,19 204:14,22,24 205:3

**voluminous** 201:15,17 202:3,6 203:5 204:4

---

**W**

**wait** 61:4 90:23 93:8 97:8 107:18, 22 237:14

**waited** 52:14 60:21,25 222:22

**waiting** 154:2,18 181:7 221:24

**waived** 48:25

**wanted** 29:6 60:9 71:9 181:7

**warrant** 182:8,22 183:16,20 184:10,17,21

**warrants** 182:18

**waste** 103:5,12 196:5

**wasting** 102:22 103:10

**water** 24:3,10,24 25:4 35:24

**Watnick** 132:15 133:23 156:16 193:6,12 196:25 197:25 198:4 199:4,12,17 217:13 236:14,21

**Watnick's** 133:17 143:23 150:6, 9 196:22 197:11 198:21 199:21

**ways** 66:16,23 124:5 129:22

**website** 13:20 205:11,19

**Western** 6:8 224:10,16 225:8,12, 16 226:5,7 236:5,13

**whatsoever** 16:21,24 30:16 32:14 34:2 44:14 142:20 156:14 175:22

**white** 212:10

**Whittier** 14:20 15:4

**whoever's** 192:11

**wind** 18:14 21:11

**window** 17:9 55:2 58:13 60:18, 20 61:4 84:22 107:4 119:5,16 120:22

**winter** 106:24

**wise** 37:24

**withdrawn** 231:24 232:12,15,17

**withdrew** 231:19

**withholding** 59:20 61:23

**witnessed** 47:9

**witnesses** 103:9 189:7 191:8 219:18



EXCEEDING YOUR EXPECTATIONS

COMBS REPORTING, INC.

DEPOSITION REPORTERS • LEGAL VIDEO

**EXHIBIT 4
PAGE 409**

**woefully**  169:6,10,21 170:8

**word**  26:10 36:14 114:8 145:1 210:22 215:14

**wording**  73:18

**words**  11:16 78:13 79:11 80:13 100:6 115:14 128:6 155:12 162:23 163:8 183:2,12 209:21,23, 24,25 212:20 214:11,17 215:7 225:17 227:20

**work**  17:8 18:22 42:21 211:8,23 221:20

**worked**  17:3 19:18 199:18 200:2

**workers'**  33:15 34:18 35:8,19

**working**  21:23 31:24 216:24,25 219:19

**works**  137:11,12 151:13,19

**world**  17:19 21:1 26:14 36:19 37:1 49:4 51:7 93:19 123:3 139:10 143:8 214:6 216:2,6 224:6

**worry**  241:16

**worth**  86:2

**wrapped**  177:13

**WRCOG**  171:2 237:8

**write**  11:16 73:3 114:2 127:18 182:3

**writes**  69:17 205:6

**writing**  17:22 114:10 121:2,19 122:1 155:5,14,20 160:8 168:3

**writings**  155:17

**written**  19:23,24 49:5,11,15 52:15 114:11 121:21 133:11 152:3 154:9 198:23 215:8

**wrong**  36:14 51:17 183:11 188:10

**wrongdoers**  232:9

**wrongdoing**  182:4,13,17,24 183:4,23

**wrote**  69:14 72:24 87:16 152:20 155:6 163:2 178:22 179:1,11,17 183:2 188:6

---

**Y**

---

**year**  14:23 56:25 108:23 109:3,8, 11,15,21 110:1 198:14,15 226:20 230:24

**Year's**  107:4 222:18

**years**  13:3 16:4 19:8 20:3 29:11 32:16,21 47:2,5,9 50:6 55:14 56:12 60:8,20,23 111:13 112:1 132:1 140:14,18 146:13,15,16,17 147:1 148:6 193:17 197:18 198:8, 20 199:19,23 200:3 209:1 215:6 216:14,15,18,21,23 217:15,24 218:3,8,22 220:25

**yellow**  119:1 182:11

**yielded**  141:23

---

**Z**

---

**zone**  18:14

**Zoom**  6:1

**zoomed**  8:21

EXCEEDING YOUR EXPECTATIONS

COMBS REPORTING, INC.

DEPOSITION REPORTERS • LEGAL VIDEO

**EXHIBIT 4**
**PAGE 410**