# EXHIBIT 18

**EXHIBIT 18**
**PAGE 1054**

Page 836380

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

|  |  |  |
|---|---|---|
| WESTERN RIVERSIDE COUNCIL OF GOVERNMENTS, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case No. 5:20-cv-02164-GW(KKx) |
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, and DOES 1 to 50, inclusive, | ) ) ) ) | |
| Defendants. | ) ) ) | |

REMOTE VIDEOGRAPHED

DEPOSITION OF JOHN O. PINKNEY

CALIFORNIA

TUESDAY, MAY 31, 2022

Reported by:
LAURA A. RUTHERFORD, RPR
CSR No. 9266



EXHIBIT 18
PAGE 1055

Page 2

```
 1              UNITED STATES DISTRICT COURT
 2              CENTRAL DISTRICT OF CALIFORNIA
 3                   EASTERN DIVISION
 4
 5    WESTERN RIVERSIDE COUNCIL   )
      OF GOVERNMENTS, et al.,  )
 6                              )
              Plaintiffs,       )
 7                              )
         vs.                    )  Case No. 5:20-cv-02164-
 8                              )  GW(KKx)
      NATIONAL UNION FIRE       )
 9    INSURANCE COMPANY OF       )
      PITTSBURGH, PA, and        )
10    DOES 1 to 50, inclusive,   )
                                )
11            Defendants.       )
                                )
12
13
14
15         Remote videographed deposition of JOHN O.
16    PINKNEY, taken on behalf of Defendants, at California,
17    beginning at 11:00 a.m., and ending at 6:45 p.m., on
18    Tuesday, May 31, 2022, before LAURA A. RUTHERFORD, RPR,
19    Certified Shorthand Reporter No. 9266.
20
21
22
23
24
25
```

Page 3

```
 1    APPEARANCES (VIA ZOOM):
 2
 3    For Plaintiffs:
 4       BEST, BEST, KRIEGER, LLP
         BY:  CHRISTOPHER PISANO, ESQ.
 5          CHRISTOPHER E. DIAL, ESQ.
            DANIEL L. RICHARDS, ESQ.
 6       18101 Von Karman Avenue, Suite 1000
         Irvine, CA  92612
 7       (949) 263-2600
         christopher.pisano@bbklaw.com
 8
 9    For Defendants:
10       GORDON & REES, SCULLY, MANSUKHANI, LLP
         BY:  SCOTT L. SCHMOOKLER, ESQ.
11       1 N. Franklin, Suite 800
         Chicago, IL  60606
12       (312) 980-6779
         sschmookler@gordonrees.com
13
14    For Witness:
15       SLOVAK, BARON, EMPREY, MURPHY & PINKNEY
         BY:  PETER J. NOLAN, ESQ.
16       1800 E. Tahquitz Canyon Way
         Palm Springs, CA  92262
17       (760) 322-2275
         nolan@sbemp.com
18
19    Videographer:
20       JEREMIAH JUAREZ, VIDEOGRAPHER
21
22
23
24
25
```

Page 4

```
 1                    INDEX
 2    WITNESS:                     PAGE
 3    JOHN O. PINKNEY
 4       BY MR. SCHMOOKLER          6
 5
 6
 7                  EXHIBITS
 8    EXHIBIT NO.    DESCRIPTION          PAGE
 9    1    3-19-18 SUBMISSION TO CITY OF BEAUMONT   16
10    2    3-15-16 EMAIL FROM PINKNEY TO GREGG   23
11    4    4-28-15 MINUTES OF SPECIAL MEETING OF
12         COUNCIL                   30
13    5    2-26-16 MEMO FROM PINKNEY TO MAYOR   39
14    6    GOVERNMENT CRIME POLICY          45
15    7    4-5-16 CRIME LOSS REPORT          48
16    8    DECLARATION OF RIVERSIDE COUNTY DISTRICT
17         ATTORNEY SENIOR INVESTIGATOR DOUG DOYLE  52
18    9    PLEA AGREEMENT OF Kapanicas       55
19    10   6-1-15 LETTER FROM PINKNEY TO WEBER   57
20    11   COMPLAINT WRCOG V URBAN LOGIC    71
21    12   11-3-16 NARRATIVE Proof of Loss    81
22    13   5-21-15 NOTICE OF POTENTIAL DISCIPLINE
23         AND/OR DISMISSAL/REMOVAL       103
24
25
```

Page 5

```
 1                INDEX (CONT.)
 2              EXHIBITS (CONT.)
 3    EXHIBIT NO.    DESCRIPTION          PAGE
 4    14   6-1-15 ATTACHMENTS TO LETTER     111
 5    15   COLLAGE OF DOCUMENTS            146
 6    16   5-8-15 EMAIL FROM GREGG TO PINKNEY   180
 7    17   6-2-15 EMAIL FROM SALYER TO GREGG   192
 8    18   10-15-18 LETTER FROM BB&K TO NATIONAL   197
 9    19   4-18-16 EMAIL FROM KIM TO GREGG    200
10    20   12-18-17 LETTER FROM PINKNEY TO EGGER   203
11    21   10-2018 EMAIL BETWEEN BB&K AND D.A.   204
12
13
14           INFORMATION REQUESTED
15              (None)
16
17
18         INSTRUCTION NOT TO ANSWER
19            PAGE    LINE
20            188     24
21            189     11
22
23
24
25
```



Page 6

1   CALIFORNIA; TUESDAY, MAY 31, 2022
2   11:00 A.M. - 6:45 P.M.
3   ---oOo---
4
5        THE VIDEOGRAPHER:  We are on the record at
6   11:00 a.m. on Tuesday, May 31, 2022.  This begins media
7   number one in the deposition of John Pickney, in the
8   matter of Western Riverside Council of Governments, et al.
9   versus National Union Fire Insurance, et al., in the
10  United States District Court for the Central District of
11  California, Eastern Division, case number
12  5:20-cv-02164-GW.
13       This deposition is being taken remotely using
14  virtual technology at the request of Gordon & Rees,
15  Scully, Mansukhani.
16       Please note that the quality of the recording
17  depends on the quality of camera and Internet connection
18  of the participants.  What is seen from the witness and
19  heard on the screen is what will be recorded.  Audio and
20  video recording will continue to take place unless all
21  parties agree to go off the record.
22       The court reporter is Laura Rutherford of
23  Magna Legal Services.  I'm the videographer, Jeremiah
24  Juarez, on behalf of Magna Legal Services.  I'm not
25  related to any party in this action, nor am I financially

Page 7

1   interested in the outcome.
2        Will counsel and all parties present state
3   their appearances and whom they represent, beginning with
4   the noticing attorney?
5        MR. SCHMOOKLER:  Scott Schmookler on behalf
6   of National Union Fire Company of Pittsburgh, P.A.,
7   defendants.
8        MR. PISANO:  Christopher Pisano, Best, Best
9   and Krieger, on behalf of WRCOG and City.
10       MR. NOLAN:  Peter Nolan, SBEMP, on behalf of
11  the witness, John Pinkney.
12       THE VIDEOGRAPHER:  Would the court reporter
13  please swear in the witness, and then counsel may proceed.
14
15            JOHN O. PINKNEY,
16       having been first duly placed under oath,
17         was examined and testified as follows:
18
19            EXAMINATION
20  BY MR. SCHMOOKLER:
21       Q.  Sir, can you state your full name for the
22  record, please?
23       A.  Yes.  It's John, J-o-h-n, Oli, O-l-i, Alvin,
24  A-l-v-i-n, and the last name is Pinkney, P-i-n-k-n-e-y.
25       Q.  Thank you, sir.

Page 8

1        My name is Scott Schmookler.  We met shortly
2   before the deposition on video.  I represent National
3   Union Fire Insurance Company in a coverage action pending
4   in the United States District Court.
5        I assume you're aware of that action; is that
6   correct?
7        A.  Yes.
8        Q.  And I know you're a licensed attorney.  Have
9   you ever had your deposition taken before today?
10       A.  Yes.
11       Q.  How many times have you been deposed?
12       A.  One that I remember many, many years ago.
13       Q.  Okay.
14       And have you personally taken depositions
15  before?
16       A.  I have.
17       Q.  Okay.
18       Even though you've taken depositions, I'm
19  just going to go over a few ground rules that I go over at
20  the beginning of every deposition.
21       You, obviously, know that there's a court
22  reporter here today who will take down everything that is
23  said word for word.  All of your answers must be audible.
24  She can't take down nods of the head, shrugs of the
25  shoulder, gestures, or things of that nature.

Page 9

1        Is that okay?
2        A.  Yes.
3        Q.  There may come a time, I'm 100 percent
4   confident, that the lawyers will want to interpose an
5   objection, which they are entitled to do for the record,
6   and may or may not want to give you directions as
7   privileged.
8        They are entitled to state objections for the
9   record.  And for purposes of the court reporter, it is
10  easiest if we don't talk over each other.  So if, between
11  my question and your answer, you just give the lawyers a
12  chance to object, that way, you'll know if there's an
13  instruction not to answer, and, importantly, the court
14  reporter can take it down accurately.
15       Okay?
16       A.  Okay.
17       Q.  We're taking this deposition over Zoom by
18  remote means.  I'm going to show you documents on the
19  screen.  If there's at any time a technical issue, you
20  can't see the document, see what you want to see on the
21  document, or the audio cuts out, the video cuts out, if in
22  any way your ability to answer my question is impaired,
23  will you let me know?
24       I want to make sure you understood my
25  questions as they have been asked.  But, if you don't say

MAGNA ▶
LEGAL SERVICES

EXHIBIT 18
PAGE 1057

Page 10

1    anything, I'm going to assume that you understood the
2    question as it was asked.
3            Is that fair?
4        A.  I think it's fair.
5        Q.  Finally, I will show you documents on the
6    screen.  I'm happy to show you as much or as little of the
7    documents that you need to see.  I'm happy to zoom it in
8    and zoom it out.  But you let me know if you need me to
9    move the document at all, and I will do that.  I just want
10   to make sure you see whatever it is you need to see.
11           Okay?
12       A.  Thank you.
13       Q.  There has been expressed some concern about
14   privilege prior to this deposition and, in particular,
15   potential for disclosure of information disclosed in
16   closed session.  I am not at any time asking you to
17   discuss the substance of anything that was disclosed in a
18   closed session.
19           So, to the extent that you understand my
20   question asks for that, please let me know, and I will
21   rephrase it.  But I want you to understand that I'm not
22   asking you to disclose anything that was discussed in
23   closed session.
24           Okay?
25       A.  Thank you.

Page 11

1        Q.  Can you give us a brief description of your
2    educational background?
3        A.  I graduated undergrad from Brigham Young
4    University, and then I went onto law school at Brigham
5    Young University.  I graduated there and then went into
6    private practice.
7        Q.  When did you graduate law school?
8        A.  19- -- I believe '92, 1992.
9        Q.  And what firm are you currently associated
10   with?
11       A.  Slovak, Baron, Empey, E-m-p-e-y, Murphy and
12   Pinkney.  SBEMP is usually what we refer it as.
13       Q.  And are you a partner in that firm?
14       A.  I am.
15       Q.  How long have you been a partner in that
16   firm?
17       A.  Since 2010.
18       Q.  Are you currently the City Attorney for the
19   City of Beaumont?
20       A.  I am.
21       Q.  How long have you had that position?
22       A.  I believe we started in -- it was either late
23   April of 2015, early May, 2015.  And my recollection
24   was -- the thing that sticks out in my mind was that the
25   district attorney's office had served -- I think the D.A.

Page 12

1    and the FBI had served search warrants on the City, I
2    think, right before our contract was approved by the
3    Council.  It was right around that time frame.
4        Q.  When you say, "contract with the Council,"
5    does your firm have a contract with -- I'm sorry.  Let me
6    ask this again.
7            Does your firm have a contract with the City
8    of Beaumont?
9        A.  Yes.  We have an engagement agreement.
10       Q.  Does that engagement agreement govern your
11   position as City Attorney?
12       A.  Correct.  That, along with -- I'm sorry.  I
13   was just going to add that the contract sets forth the
14   terms of the representation, and then there's -- I believe
15   there may be a City Code provision that deals with the
16   role of City Attorney as well.  I'm not a hundred percent
17   certain, but there may be.
18       Q.  Whom do you report now as City Attorney?
19       A.  I report to the City Council.
20       Q.  Have you at all times reported to the City
21   Council in your capacity as City Attorney for the City of
22   Beaumont?
23       A.  Yes.  We are retained by the City Council,
24   and I report to the City Council.  I work with City staff
25   and the City Management, you know, day to day.  But,

Page 13

1    ultimately, I report to the City Council.
2        Q.  And let's just break this down.  During the
3    2015 time frame when you were first retained as City
4    Attorney, did you, at that time, report to the City
5    Council?
6        A.  Yes.
7        Q.  Did you, at the time that you were first
8    hired at City Council know of a gentleman named David
9    Dillon?
10       A.  Can you repeat that question?
11       Q.  Sure.
12           When you were first hired at City Council,
13   did you hear of a gentleman named David Dillon?
14       A.  At some point I did.
15       Q.  And how about Ernest Egger?  Did you ever
16   hear that name when you were first appointed as City
17   Attorney?
18       A.  I don't know if it was when we were first
19   appointed, but at some time, I did learn of that name,
20   yes, and since then have heard it many times.
21       Q.  And have you -- did you, at the time you were
22   appointed by City Council, ever learn of a gentleman named
23   Deepak Moorjani?
24       A.  Yes.  I did learn of that name, and those
25   three individuals being City officials of the City, yes,



EXHIBIT 18
PAGE 1058

Page 14

1    at some point.
2         Q.  Were you aware at some point that Mr. Dillon,
3    Egger and Moorjani at one point owned a company called
4    Urban Logic Consultants?
5         A.  Yes.  At some point in time, I became aware
6    of that.
7         Q.  And for purposes of today, can we commonly
8    refer to Urban Logic Consultants as "ULC"?
9         A.  Yes.
10        Q.  And can we commonly or jointly refer to
11   Dillon, Egger and Moorjani as the ULC owners, just so we
12   don't have to say all their names every time?
13        A.  I have no objection to that.  I'm fine with
14   that.
15        Q.  So if I use "ULC owners," you'll know I'm
16   talking about Dillon, Egger and Moorjani; correct?
17        A.  Yes, sir.
18        Q.  Great.
19            At the time you became City Attorney, is it
20   true that the ULC owners had sold their interest in ULC to
21   a third party?
22        A.  I know that they sold their interest to a
23   third party.  And the timing of that, I don't recall as I
24   sit here today.
25        Q.  Were the ULC principals still working for the

Page 15

1    City of Beaumont when you became the City Attorney?
2         A.  I'm not entirely certain.  I have -- sort of
3    a sense that there may have become some work that was done
4    by one or more of them for the City after I was hired, but
5    I -- you know, I'm not certain.
6         Q.  Did you ever hear of a man named James Gregg?
7         A.  Yes.
8         Q.  As I understand it, Mr. Gregg was the risk
9    manager for the City up until June 30th of 2015; is that
10   correct?
11        A.  That's -- it's my understanding that he was
12   referred to as a risk manager for the City.
13        Q.  And is it your understanding that he was
14   worked for the City until June 30th of 2015?
15        A.  You know, that's a more complicated question
16   than it might appear on the surface.  He was -- he ran an
17   organization called ERMAC.  And whether he was an employee
18   of the City I think is disputed.
19        Q.  And I do know that his position and what he
20   calls himself is a disputed point.  I was just trying to
21   get some similar point.  Do you recall that Mr. Gregg
22   retired as of June 30, 2015?
23        A.  No.  I know he retired at some point, but I
24   don't recall that date.
25        Q.  Did anyone replace Mr. Gregg when he retired?

Page 16

1         A.  Well, you know, again, that's a complicated
2    issue, because he was -- he worked for ERMAC.  He ran that
3    organization, which was a risk -- it was a sort of a joint
4    powers insurance entity.  And I understand that he claims
5    that he was an employee of the City.
6             But those are -- I think those issues are
7    being disputed and litigated, and I'm not handling that
8    case, so I can't really speak to that, and I don't really
9    know, you know, when he retired.
10        Q.  Let me put up on the screen what I'm marking
11   as Exhibit 1.
12            (Exhibit Number 1 was marked for
13   identification.)
14        Q.  BY MR. SCHMOOKLER:  Let me see if I can make
15   this work today.  It was a challenge last week.
16            Can you see the retention document, sir?
17        A.  I can, yes.  I can see the stop of the
18   document.
19        Q.  Great.
20            What I'm marking as Exhibit 1 is a submission
21   to the City of Beaumont in 2018 by Brian Ross.  And it's
22   in the form of a claim form submitted by James Gregg.
23            Do you see that, sir?
24        A.  I see -- a document dated March 19, 2018,
25   that says "City of Beaumont, Attention Nichole, City

Page 17

1    Clerk, from Brian P. Ross, Esq."  I don't know who that
2    is.  "Claim form for James Gregg."
3             That's all I can see.
4         Q.  Okay.
5             And I want to show you this for context, and
6    what I'm giving you is a claim form that Mr. Gregg
7    submitted to the City in 2018, and it's a narrative of his
8    claim against the City.
9             But what I want to show you -- and I'm just
10   going to flip in -- if you want me to go back.  I just
11   want to orient you from the time frame perspective.
12            In the narrative, Mr. Gregg writes in the
13   middle of page 5 of the .pdf, "On June 30, 2015, Gregg
14   retired from the City and began receiving retirement
15   benefits from CalPers pursuant -- consistent with
16   representations made by the City and CalPers."
17            Do you see where I read from the middle of
18   the page there?
19        A.  I see what that document says that you just
20   read, yes.
21        Q.  As after June 30, 2015, did the City have
22   anyone in a position of risk manager?
23        A.  Okay.
24            Let me start by saying I don't know what this
25   document is.  I don't know who wrote it.  I don't know if

MAGNA
LEGAL SERVICES

EXHIBIT 18
PAGE 1059

Page 18

1  it's accurate.  I don't -- I can't sit here and tell you
2  that James Gregg did, in fact, retire on June 30, 2015.
3  He may have.  I just -- I don't know if that's accurate or
4  not.
5         I will say that our office was working with
6  James Gregg after that date on matters that the City had,
7  claims that the City had.  So that, you know -- I can't
8  speak to that date and that he, in fact, retired from the
9  City on that date.  He may have.  I just -- I don't know.
10        Q.  Did the City have, in the 2014-15 time frame,
11  a department called the risk management department?
12        A.  I don't know.  I mean, I know that James
13  Gregg claims that he was employed as a risk manager for
14  the City, but, again, that's in dispute in another matter.
15        Q.  Did you at any time, after being appointed
16  City Attorney, have any occasion to report on any
17  insurance-related matters within the City?
18        A.  We did.  And by "we," my office.  So it may
19  have been somebody else in my office that was interacting
20  with Mr. Gregg on individual claims.
21        Q.  Well, I was going to say it this way.
22        Did you, as City Attorney, ever, during the
23  2014-2015 time frame, have discussions with anyone
24  associated with the City about insurance-related matters?
25        A.  I don't -- I don't recall if I did.  At

Page 19

1  first, in 2014, we didn't begin working for the City until
2  sometime around April, May of 2015.  So '14, I would not
3  have really known anything or been doing anything for the
4  City.
5         And then after we were retained, I'm just
6  trying to think, you know, if we submitted any claims or
7  dealt with any insurance coverage, you know, whether a
8  claim that came in was covered, and I just -- off the top
9  of my head, I don't remember any as I sit here right
10  now.
11        I know that, eventually, we did, but -- I
12  know eventually, we did -- we did, but -- and there may
13  have opinion claims that third parties were making, you
14  know, for alleged damages that my office would have
15  interacted with James Gregg on.
16        Q.  In the scope of your retention as City
17  Attorney, were you given full autonomy over handling of
18  insurance matters?
19        MR. PISANO:  Object to form.
20        THE WITNESS:  So, I don't really have -- you
21  know, I report to the Council, and so it's my -- you know,
22  we have to deal with the Brown Act, which I'm sure you're
23  familiar with, which means that the Council can only meet
24  at a properly noticed meeting, public meeting.
25        They can meet in closed session in the

Page 20

1  subject matter falls within one of the exceptions under
2  the Brown Act that allows the Council to meet for several
3  stated reasons in the Brown Act in closed session.
4         And so, you know, I can't pick up the phone
5  and call a majority of the Council and talk to them about
6  a matter.  I have to go through the process provided under
7  California law, so I would meet with them in closed
8  session.
9         I don't have -- you know, you said full
10  autonomy to meet.  That would mean that I have the ability
11  to go out and make decisions.  And, no, I don't have that.
12  As I understand your question, I don't have that type of
13  authority.
14        My job is to serve as legal counsel to the
15  City, to keep the Council apprised.  You know, I represent
16  the City as an entity and its related entities.  And then
17  I work through the legislative body of those entities,
18  which is the Council.
19        So I'm not off doing things on my own, you
20  know, making decisions on my own without, you know,
21  Council -- as I understand the question, without the
22  Council's knowledge and authority.
23        Q.  BY MR. SCHMOOKLER:  Okay.
24        Let's break that down.  You, as City
25  Attorney, at all times have taken direction from the City

Page 21

1  Council; is that correct?
2         A.  So on critical issues, you know, like, for
3  example, if we were going to decide a file a lawsuit, that
4  would be something that any City Attorney would meet with
5  their Council and get approval to file a lawsuit.  And if
6  we were settle a lawsuit, we would get the approval of the
7  City Council to settle the lawsuit.
8         If we received a claim from a third party,
9  and if that claim would go to the Council, and the Council
10  is the one that actually decides whether to approve the
11  claim and pay it, or reject the claim.
12        The City Attorney -- it would be unusual for
13  a City Attorney to have autonomy to make those decisions
14  without Council's approval.
15        Q.  And would insurance-related matters fall
16  within the scope of items that you, as City Attorney,
17  report to the City Council on?
18        MR. PISANO:  Object to form.
19        THE WITNESS:  So could you give me an example
20  of what --
21        Q.  BY MR. SCHMOOKLER:  Let's go through the
22  process.  The City of Beaumont maintains something called
23  crime insurance.  Are you aware of that?
24        A.  Of course, yes.
25        Q.  Does the City Council have final authority



6 (Pages 18 to 21)

EXHIBIT 18
PAGE 1060

Page 22

1  over whether to buy such insurance?
2      A.  I believe so, yes.  I believe so.
3      Q.  And does the City Council have final
4  authority over whether to make a first party insurance
5  claim under a crime insurance policy, or did you have that
6  authority to act alone?
7      A.  You know, I'm trying to remember.  I mean, at
8  some point, we did submit a claim.  I just don't remember
9  specifically meeting with the Council.  I may have.  I may
10 not have.  I just -- I don't recall.
11     But at some point, I did submit a claim.  My
12 office did, I should say.  We did submit a claim.  When we
13 became aware of something that we thought we should tender
14 the carrier, we did.
15     Whether I talked about the Council about that
16 or not ahead of time, I just -- I'm sure that I would have
17 made them aware of that.  I just can't specifically
18 remember a meeting and discussing that with them.
19     Q.  Do you keep any sort of records of the
20 matters in which you meet with the City Council?
21     A.  I do not, not normally.  There are some
22 exceptions to that.  So, sometimes, I might prepare an
23 attorney/client privileged memorandum on a legal issue
24 that I share with the Council in closed session, and that
25 would be a privileged document laying out what the issue

Page 23

1  is, what the decision is that we need them to make, and
2  providing the analysis.
3      But do I, for example, keep minutes of closed
4  sessions?  No.  We don't do that.  And that would be
5  unusual for a City to do that.
6      Q.  Give me one moment.
7      Let me show you what I'm going to mark as
8  Exhibit 2 to your deposition.
9      (Exhibit Number 2 was marked for
10 identification.)
11     Q.  BY MR. SCHMOOKLER:  I'm going show you -- put
12 up on the screen what I'm marking as Exhibit 2.  For
13 purposes of the record, this is an email from John Pinkney
14 to James Gregg, amongst others, dated March 15, 2016.
15     I will ask first if you've seen this email
16 before?
17     A.  I don't specifically remember the email, but
18 I can see that it's an email that was sent from me on
19 March 15, 2016, to James Gregg, and I read the email
20 that's up on the screen, the portion that's on the screen.
21     Q.  Okay.
22     I don't believe there's anything else of
23 substance in the email, so I gave you what I gave you.
24     A.  Okay.
25     And I see that it's copied to Elizabeth

Page 24

1  Gibbs-Urtiaga, and -- well, and then Brent Clemmer, who is
2  as attorney at my office, and Robert Patterson, who is an
3  attorney at my office.
4      So I was inquiring about whether there was a
5  fidelity bond or the type of insurance that's in dispute,
6  I think, in this case.
7      Q.  And in the email, first sentence you write,
8  and I read, "James, as you may know, the City Council is
9  investigating past use of CFD bond proceeds and City
10 funds."
11     Do you say where I read from?
12     A.  That's what it says.
13     Q.  Was the City Council conducting an
14 investigation in the March, 2016 time frame?
15     A.  We -- I believe, if I said that, that it was
16 accurate.  That we were working with a company by the name
17 of Urban Futures, not to be confused with Urban Logic, but
18 Urban Futures, that was assisting us on proceeds and
19 monies that had been spent.
20     So, I mean, there was a lot of things that we
21 were looking at, but that may -- that may -- probably was
22 something that we were looking at.
23     Q.  Ultimately, was the City Council responsible
24 for the investigation referenced in your email into the
25 use of CFG bond proceeds and the City funds?

Page 25

1      MR. PISANO:  Object to form.
2      THE WITNESS:  So I think the -- I mean,
3  ultimately, the Council, as the legislative body of the
4  entity, you know, would be overseeing that.  But the work
5  would have been done by the people that had been hired,
6  retained consultants and lawyers, to look into those
7  issues, and then we would report back.
8      Q.  BY MR. SCHMOOKLER:  And did the City
9  Council -- strike that.
10     Was the City Council the entity that had
11 final decision making authority over the scope of that
12 investigation?
13     MR. PISANO:  Object to form.
14     THE WITNESS:  I would -- I would think that
15 they would have final authority, yes.  I would think that
16 they would.  But let me just qualify that, you know.
17     If somebody in my office was working on
18 investigating the issue, and there were things that we had
19 investigated, and/or if somebody -- some other consultant
20 were working on an investigation, and they found
21 something, I mean, they would, I presume, look into it and
22 look further.  And then, really, the roll would be to
23 return a report back to the Council on the progress of the
24 investigation.
25     Q.  BY MR. SCHMOOKLER:  Did the City Council have



7  (Pages 22 to 25)

EXHIBIT 18
PAGE 1061

Page 26

1  final authority over whether to take any action as a
2  result of this investigation?
3       A.  When you say, "take any action," do you mean
4  submit an insurance claim?
5       Is that what you're referring?
6       Q.  Let's start with litigation.  Did the City
7  Council have final --
8       A.  Yes.
9       Q.  -- decision making over whether to institute
10 litigation as a result of the investigation mentioned in
11 your email?
12      A.  Yes.  And my view, yes.
13      Q.  To the extent that the City Council did not
14 wish to proceed with an insurance claim, did the City
15 Council have final authority to make that decision?
16      A.  I believe so, yes.
17      Q.  And so at some point, did you report to the
18 City Council on the making of this claim?
19      I don't want to -- I'll caution you.  I'll
20 restate my question.  I do not want to know the substance
21 of any communication.  I just want to know if a
22 communication exists.
23      At some point, did you report on this
24 insurance claim to the City Council?
25      MR. PISANO:  Object to form.

Page 27

1       MR. DIAL:  Object as to potential privilege,
2  and instruct the client not to answer -- instruct the
3  witness not to answer.
4       MR. SCHMOOKLER:  Chris, Peter, since you both
5  are here for the City, I'm just going to ask that one of
6  you objects.  I don't think so we need repetitive
7  objections.  So if one of you can just object, it will
8  make life a lot easier --
9       MR. PISANO:  That's fine.
10      MR. SCHMOOKLER:  -- for the court reporter
11 and will speed this up.
12      Q.  BY MR. SCHMOOKLER:  Sir, did you understand
13 my question as it was asked?
14      A.  Could you -- could you have the court
15 reporter read it back, please?
16      MR. SCHMOOKLER:  Sure.
17      THE REPORTER:  "And so at some point, did you
18      report to the City Council on the making of
19      this decision -- I'll just restate it.  I do
20      not want to know the substance of any
21      communication.  I just want to know if a
22      communication exists.
23      "At some point, did you report on this
24      insurance claim to the City Council?"
25      THE WITNESS:  So, let me see if I can answer

Page 28

1  that in a way that doesn't violate my obligation to
2  protect the attorney/client privilege.
3       The City Council's aware that there is a
4  claim that's been submitted, and that this case is
5  pending.  They are aware of it.
6       Q.  BY MR. SCHMOOKLER:  Did the City Council
7  approve the making of this insurance claim?
8       A.  I -- my answer to that would be I believe so.
9  They're certainly aware that this claim is pending.  When
10 that process occurred, I couldn't give you a specific date
11 or a specific instance, but they are very aware of it.
12      Q.  No, and I understand that, sir.  And I'm just
13 trying to pin down, sort of, the decision making as to the
14 insurance claim.
15      A.  And I couldn't tell you the exact date.
16      Q.  Totally fair.  It's 2022, and that was 2016.
17 I can barely remember last week, so I don't want to get
18 into the actual date.
19      But you did not, as City Attorney -- strike
20 that.
21      You were never delegated as City Attorney
22 full authority to make insurance claims whenever you
23 decided to do so; correct?
24      A.  I believe that's within the purview of the
25 City Council.

Page 29

1       Q.  Now, I'm going to show you another document.
2  Bear with me a second.
3       A.  You know, just to add to that, it's possible
4  that, you know, there were times where we learned of
5  things, and the Council might have learned of them later
6  on after we learned of them.  And, you know, if we have to
7  do something to protect the City's interests, we'll do it.
8  But, you know, we would bring the Council up to speed.
9       Q.  And when you say, "bring the Council up to
10 speed" in the context of an insurance claim, you would
11 seek their agreement to proceed with that claim?
12      A.  Yes, we would.  That would be the normal
13 approach.
14      Q.  So whether they approved literally at the
15 time of the notice or approved shortly thereafter, the
16 City Council's approval was required to go forward at
17 least with an insurance claim?
18      A.  That's how we would proceed, yes.  And, in
19 fact, they are aware that this claim is pending.
20      Q.  And was that always -- was that process
21 always the same throughout your tenure as City Attorney?
22      A.  My practice is to make sure that Council is
23 informed of something of that nature, yes.
24      Q.  When you say, "something of that nature,"
25 we're talking about the making of an insurance claim;



8  (Pages 26 to 29)

EXHIBIT 18
PAGE 1062

Page 30

1   correct?
2        A.   Yes, sir.  Yes, sir.  And the filing of the
3   subsequent lawsuit, yes, sir.
4        Q.   And I'm trying to be awfully careful today.
5   I'm not going to ask you about, like, what's happening in
6   the lawsuit, anything you've learned in that capacity,
7   anything in closed session, substance of advice, please
8   don't take any of my questions as seeking to infringe on
9   that.  I'm really not.  I'm trying to be as specific as I
10  can.
11            Is that fair?
12       A.   Yes.
13       Q.   I want to show you what I'm now marking as
14  Exhibit 4.
15            (Exhibit Number 4 was marked for
16  identification.)
17       Q.   BY MR. SCHMOOKLER:  Exhibit 4 -- I'll put up
18  on the screen -- are minutes of a special meeting held
19  April 28, 2015.
20            Do you see that at the top, sir?
21       A.   Yes.
22       Q.   And action item number one on the list is the
23  approval of a contract with Interim City Attorney, Slovak,
24  Baron, Empey, Murphy and Pinkney, LLP.
25            Do you see that, sir?

Page 31

1        A.   Yes.
2        Q.   And if you look down -- and I'll just scroll
3   down slowly.  At this April 28, 2015, meeting, the
4   contract between the City and your firm was approved;
5   correct?
6        A.   It may have been.  I thought that there were
7   two meetings where we met with the Council, and I just
8   don't have the specific dates in mind, but it was right
9   around that time frame.
10            So the final contract may not have been
11  approved until early May.  I just -- my recollection was
12  that we had two meetings with Council.  I don't know if
13  this was the second meeting or the first meeting, but it
14  was right around that time frame that we were retained by
15  the City.
16       Q.   Okay.
17            And I will represent to you, sir, that this
18  is, in fact, the second meeting.
19       A.   Okay.
20       Q.   If you'd like to see the minutes for the
21  first meeting, I can show it to you.
22       A.   No, I'll take your word for it.
23       Q.   It's an earlier meeting in April to consider
24  the contract and then pushed it to a special meeting?
25       A.   Okay.  All right.

Page 32

1        Q.   All right.
2            Now, at the bottom of this agenda -- again, I
3   want to orient you, for date purposes, April 28, 2015,
4   you'll see under the closed session agenda, items D,
5   letter David, "Personnel matters, evaluation of City
6   Manager, Government Code 54957(B)."
7            Do you see that, sir?
8        A.   Yes, sir.
9        Q.   And per the agenda, personnel matters, namely
10  the evaluation of the City Manager, was discussed on April
11  28, 2015, in closed session; is that correct?
12            MR. PISANO:  Objection.  Privileged as to
13  what was discussed in closed session.
14            THE WITNESS:  It was agendized for discussion
15  in closed session, according to this document.
16       Q.   BY MR. SCHMOOKLER:  Is it true, sir, that
17  immediately following your appointment, one of the tasks
18  that your firm performed was an investigation into the
19  City Manager?
20       A.   We evaluated -- you know, there was some
21  concerns -- there was some concerns about -- or questions,
22  maybe is a better way to do it, about Mr. Kapanicas, and
23  whether he was somebody that the City should stay with or
24  not stay with, not keep as City Manager.
25            And so we were involved early on in reviewing

Page 33

1   some of the practices at City Hall under his tenure as
2   City Manager.
3        Q.   And when you say "we," you're talking about
4   lawyers at your firm; correct?
5        A.   Yes, sir.
6        Q.   And so is it true that between April 28,
7   2015, and June 30th of 2015, your firm, in fact, evaluated
8   Mr. Kapanicas' performance as City Manager?
9        A.   I think that's fair.
10       Q.   And your firm spent a considerable amount of
11  time on that effort, did it not?
12       A.   We spent a fair amount of time on that
13  effort, we did.  And it was --
14       Q.   Ultimately --
15       A.   I was just going to add that, it was -- it
16  was a complicated process, because in, I believe, April of
17  2015, the D.A. and the FBI had raided City Hall, and I
18  think also the homes of some employees and maybe offices,
19  and they had removed a lot of documents, my understanding
20  was computers.  And so it was -- it was a challenging
21  thing to do without that information available.
22       Q.   Was Mr. Kapanicas still acting as City
23  Manager during your evaluation of his performance?
24       A.   Yes.
25       Q.   Did Mr. Kapanicas actively inhibit in any way

MAGNA
LEGAL SERVICES

EXHIBIT 18
PAGE 1063

Page 34

1  your evaluation of his performance?
2       MR. PISANO:  Object to form.
3       THE WITNESS:  I don't believe that we would
4  have allowed that.  It was the bigger -- I apologize, sir.
5       The bigger issue for us was the fact that so
6  much information, computers, et cetera, had been removed
7  from City Hall.  And I'm not faulting the FBI or the D.A.
8  I don't mean to suggest that I am.  But it just made our
9  evaluation process very complicated.
10      Q.  BY MR. SCHMOOKLER:  Can you recall a single
11 instance in which Mr. Kapanicas actively impeded your
12 evaluation of his conduct?
13      A.  You know, I don't know if he was doing
14 something, but I'm not aware of it.  And had I been aware
15 of it, we would have -- you know, we would have worked to
16 work around that.  We wouldn't have allowed him to do it.
17 So we -- so I'm not aware of anything that he did.
18      I will say this, though.  I was
19 concerned -- I was concerned that while he was
20 there -- but it was just a concern.  I had no evidence to
21 back it up, you know, as long as he was there as City
22 Manager, that, you know, he had the ability to remove
23 documents from the server, you know, there was always that
24 risk.
25      It wasn't -- so much a concern that he would

Page 35

1  create something or directly run interference, as opposed
2  to, you know, being the chief executive officer over an
3  organization while it's being -- while we're looking at
4  his performance and activities that occurred under his
5  watch, that, you know, he could remove things, he could
6  hide things, and it was a real challenge finding
7  materials.
8       Q.  Was it a challenge because he hid things?
9       A.  I always believed it was because the D.A. and
10 the FBI had removed so much from the City.  I always
11 believed it was that.  I'm not aware -- I'm not aware, as
12 I sit here today, of things that he deleted or removed,
13 but, you know, I wouldn't know if he had.  That was
14 what --
15      Q.  Was it --
16      A.  I'm sorry.
17      Q.  Was it impossible to conduct an evaluation of
18 Mr. Kapanicas in the April/May time frame because of his
19 ongoing position with the City?
20      A.  It made it awkward.  I wouldn't say it was
21 impossible.  It made it awkward, and there were certainly
22 significant challenges for us.
23      Q.  Were you ultimately able to reach some
24 conclusions about his performance in the April/May/June
25 2015 time frame?

Page 36

1       A.  I had concerns about practices that had
2  occurred at the City under his watch.
3       Q.  And you were able to reach some conclusions
4  in order to determine if you even had any concerns;
5  correct?
6       A.  You know, when you say the word "conclusion,"
7  and I'm not trying to mince words with you, but one of the
8  challenges that we had when we were looking at practices
9  that had occurred during the time period that
10 Mr. Kapanicas was the City Manager, I remember we were
11 looking back years, as well as then, at the present time.
12      One of the challenges was we were doing a lot
13 of issue spotting, and identifying issues, and things that
14 didn't look right.
15      But my recollection is that in most
16 instances, we didn't have conclusory evidence, and that
17 was a real concern on my part was that we had identified
18 issues, concerns, but we it didn't necessarily have, you
19 know, solid evidence to support a conclusion, as you say,
20 that there was, in fact, wrongdoing.
21      So we did our best in identifying what the
22 concerns were, and, you know, that's how we proceeded.
23 Some were stronger than others.  In some instances, we had
24 documentation, you know, that backed up -- that things had
25 not been handled the right way.  In other cases, it was

Page 37

1  more -- you know, it wasn't as solid as that.
2       Q.  Do you recall specific instances in which you
3  had documentation that, in your mind, verified the
4  existence of certain conduct that you ultimately cited as
5  a grounds in his notice of discipline?
6       A.  Well, some of it was in speaking with people,
7  and some of it, you know, we were able to find documents.
8  I remember one particular issue that comes to mind was
9  related to Bill Aylward, who had been the finance director
10 for the City for a period of time under Kapanicas'
11 administration.
12      And one of the concerns that we had was that
13 Mr. Kapanicas was partners with a gentleman by the name of
14 Don Kiker, I believe was his name.  And I think that's
15 spelled K-i-k-e-r.
16      And they had a -- they had a business or an
17 entity, I believe it was an entity, together that owned
18 some real estate, and it wasn't far from City Hall,
19 because I remember driving over there to see the facility.
20      And so here, you've got the finance director
21 who owns a piece of property with this Kiker individual,
22 and then Kiker, I believe, if my recollection is correct,
23 Kiker operated two businesses on that property.  One was
24 Beaumont Tire, and the other one was Cherry Valley
25 Automotive or Beaumont Cherry Valley Automotive.



EXHIBIT 18
PAGE 1064

Page 38

1    And what we were concerned about was that it
2  appeared -- and I believe we did find documentation that
3  the -- that the City had been using these businesses to
4  service City vehicles.  And we were concerned that that
5  could result or could constitute a conflict of interest on
6  Mr. Aylward's part.
7    And I believe -- sorry.  Go ahead.
8  Q.  No.  Go ahead.
9  A.  I believe that in his Form 700 -- a Form 700
10  is a document that's City officials -- public officials in
11  California have to file disclosing any conflict of
12  interest, or -- actually, disclosing any financial
13  interest that they have.
14    And I believe that he, Mr. Aylward, had
15  disclosed that he had an interest in this incident with
16  Don Kiker.
17  Q.  And we'll get to this in a moment in your
18  letter.  I just want to be kind of understand the events
19  to your process.
20    Are you aware that the City has the ability
21  to issue legislative subpoenas?
22  A.  Yes.  Yes, they do under certain
23  circumstances.
24  Q.  I'll put up on the screen Exhibit 5.
25    (Exhibit Number 5 was marked for

Page 39

1  identification.)
2    THE WITNESS:  Under certain circumstances
3  they do.
4  Q.  BY MR. SCHMOOKLER:  I'll put up on Exhibit 5
5  a memo from you to the Mayor and City Council, dated
6  February 26, 2016, addressing the City Council issuance of
7  legislative subpoenas.
8    Do you see that?
9  A.  Yes, sir.
10  Q.  Are you familiar with this memo?
11  A.  I remember the event.  Yeah, I haven't looked
12  at this memo in many, many years, but -- since probably
13  when it was written.  But I remember the issue.  I
14  remember the event.
15  Q.  As I understand it, the City Council
16  authorized the issuance of subpoenas to MUFG Union Bank to
17  gather records in connection with its investigation of the
18  use of bonds proceeds; is that correct?
19  A.  Yes.
20  Q.  And this memo was a memo from you to the City
21  Council explaining how the City Council had the authority
22  to adopt a resolution authorizing the issuance of those
23  subpoenas in order to facilitate its investigation into
24  the use of bond proceeds; is that correct?
25  A.  I believe that's what the memo addresses,

Page 40

1  yes.
2  Q.  The ability to issue legislative subpoenas
3  were not new in 2016; correct?
4  A.  No, it was not.  It's available in specific
5  circumstances.  And I believe that it applied that case
6  where Union Bank was not cooperating.
7  Q.  And one of the specific circumstances, as
8  addressed in the memo, is the facilitation of an
9  investigation into the use of City funds by the City
10  Council; correct?
11  A.  Correct.
12  Q.  The remedy of using subpoenas to gather
13  information to facilitate a City Council investigation
14  into the use of City Council funds existed at all times
15  during your tenure as a City Attorney; is that correct?
16  A.  Yes, sir.
17  Q.  And that would have included during the
18  May/June 2015 time frame; is that correct, sir?
19  A.  Yes.
20  Q.  And Mr. Kapanicas, while serving as City
21  Manager, could not impede the City Council's ability to
22  issue subpoenas, could he?
23    Or strike that.  I'll ask it a different way.
24    Mr. Kapanicas, as City Manager, could not
25  prevent the City Council from issuing subpoenas in

Page 41

1  furtherance of an investigation, could he?
2  A.  He did not have authority to do that.  The
3  City Council would have had authority to issue the
4  subpoenas, provided that the circumstances fit within the
5  law that allows for them.
6  Q.  So to the extent that the City Council was
7  investigating Mr. Kapanicas and his performance, the City
8  Council had the authority to issue subpoenas to gather
9  information necessary to conduct that investigation;
10  correct?
11  A.  I'm not sure that's accurate the way you
12  stated the question.  I mean, we'd have to -- we'd have to
13  look at specifically what the circumstances were and
14  whether legislative subpoenas were a tool that was
15  available during that time.
16    They may have.  I'd have to look at the
17  specific issue.  And I haven't looked at this issue in a
18  number of years.  It's a power that sometimes people
19  aren't aware that councils have.  But, you know, I just
20  don't know -- I don't think it's as broad sweeping as
21  perhaps your question may have implied.
22  Q.  During the April -- strike that.
23    During the May/June 2015 time frame, did
24  Mr. Dillon's conduct at all make it impossible for you to
25  investigate Mr. Kapanicas and his performance?



EXHIBIT 18
PAGE 1065

Page 42

1     A.  He quit.  I mean, he literally just got up
2  and walked out is what I heard.  So he was not -- you
3  know, he was not -- it was challenging -- that was one of
4  the challenging issues was -- and I don't know the exact
5  time frame.
6          But he -- he ended up quitting shortly after
7  we arrived.  The former head of economic development was
8  gone.  The former head of public works was gone.  And the
9  former head of planning was gone.  Alan was somebody that
10  we had concerns about.
11          There was -- you know, there was a lot of
12  people that were not there, and there were a lot of
13  documents that were gone that had been taken off by the
14  FBI and the D.A., and computers.  And so it was -- it was
15  difficult.
16     Q.  And I understand that, sir, and I want to
17  separate, you know, the challenges of an investigation
18  from what makes it impossible.
19          I'm just wondering, was there any conduct by
20  Mr. Dillon that rendered it impossible for you to conduct
21  an investigation into Mr. Kapanicas and his performance in
22  the April/May/June time frame of 2015?
23     MR. PISANO:  Object to form.
24     THE WITNESS:  By Mr. Dillon?
25     Q.  BY MR. SCHMOOKLER:  Yes.

Page 43

1     A.  Okay.  I'm not aware of anything.
2          He may have been -- you know, he may have hid
3  things or carted things off, but I'm not aware of that.
4  And I'm not aware -- I'm not aware that he interfered with
5  or impeded our work.
6     Q.  How about Mr. Moorjani?  Are you aware of
7  anything that he did that impeded or prevented the
8  investigation into Mr. Kapanicas and his performance?
9     A.  I'm not aware of anything.  They -- you know,
10  Moorjani was, I believe, the head of public works.  Dillon
11  was the head of economic development.  And Egger -- those
12  are the three individuals that were affiliated with Urban
13  Logic -- Egger was the head of planning.  And they were
14  all gone at or about or shortly after the time that we
15  came on.
16          And then Aylward, the former finance
17  director, left.  So other than they weren't around, they
18  weren't available, you know, to speak with.
19     Q.  And I'm asking a slightly different question.
20  I'm trying to be more specific, sir.
21          I'm just wondering if Mr. Moorjani, if you
22  can identify any conduct that he engaged in that rendered
23  it impossible for you to do an investigation into
24  Mr. Kapanicas' conduct?
25     A.  Not that I'm aware of.

Page 44

1     Q.  Did Mr. Egger engage in any conduct that made
2  it impossible for you to investigate Mr. Kapanicas'
3  conduct?
4     A.  Not that I'm aware of.  And we did
5  investigate Kapanicas' -- the activities at the City under
6  his administration.
7          But it was challenging with the individuals
8  that were running the City gone and documents and
9  computers gone, as you can imagine.
10     Q.  Are you aware that the City renewed -- strike
11  that.
12          Are you aware that the City purchased a crime
13  insurance policy effective June 30, 2015, from my client?
14     A.  I know that there is such a policy.  When it
15  was purchased, I don't -- I'm not familiar with that.
16     Q.  Are you aware that the policy's effective
17  June 30, 2015?
18     A.  I'm not.  I just -- it's something I haven't
19  looked at.  I know that there is a policy.  I know that we
20  submitted a claim.  I always refer to it as AIG.  The
21  specifics of whether your client is different than who
22  previously insured the City, you know, I can't speak to
23  that.
24     Q.  I will show you what I'm now marking as
25  Exhibit 6 for your deposition.

Page 45

1          (Exhibit Number 6 was marked for
2  identification.)
3     Q.  BY MR. SCHMOOKLER:  Just to orient you for
4  time frame purposes.  What I'll mark as Exhibit 6, Exhibit
5  6 is a Government Crime Policy.
6          And I'll show you down -- if you look at the
7  policy period, the policy period is June 30, 2015, to June
8  30, 2017.
9          Do you see that?
10     A.  Yes, sir.  I see it.
11     Q.  Did anyone at the City disclose to my client
12  its investigation into Mr. Kapanicas before purchasing the
13  2015-2017 policy marked as Exhibit 6?
14     MR. PISANO:  Object to form.
15     THE WITNESS:  I apologize.  I had a little
16  hard time hearing you.  Can you repeat it -- rephrase it?
17     Q.  BY MR. SCHMOOKLER:  Sure.
18          Did anyone on behalf of the City disclose the
19  investigation into Mr. Kapanicas before purchasing the
20  2015-2017 policy marked as Exhibit 6?
21     MR. PISANO:  Object to form.
22     THE WITNESS:  Yeah.  So I don't know the
23  answer to that question.  You referred to it as an
24  investigation, and that is a word that could be used.
25          But, you know, when we were brought on, the



EXHIBIT 18
PAGE 1066

Page 46

1  City was considering staying with Kapanicas and keeping
2  him on as City Manager. But they wanted us to look at
3  practices that occurred during his tenure, and so we did
4  that.
5        And I don't recall the date that we concluded
6  our evaluation of practices that had occurred during his
7  tenure. And I'm not sure that that's something they would
8  disclose.
9        Q. BY MR. SCHMOOKLER: Whether they would or
10 wouldn't, I just want to understand what was told to my
11 client, and, more importantly --
12       A. I don't think there was anything to tell your
13 client at that point, candidly.
14       Q. Okay.
15          Well, we'll get to that in a moment. But I
16 just want to show you this time frame. Can you please
17 recall that the policy was effective June 30, 2015?
18          That was the point of showing you this
19 document. Okay?
20       A. I see it, yes. I see that language there.
21       Q. Okay.
22          Sir, we've been going an hour. Would you
23 like to take a break? I should tell you I offer breaks
24 every hour. If you like a break, that would be fine.
25       A. If we're going to go another hour, that would

Page 47

1  be great.
2        Q. Okay.
3        A. Five minutes or 10 minutes?
4        Q. Why don't we take 10. We'll come
5  back -- let's come back at 2:15, because then it won't be
6  on an odd number. It will be easy to remember. Your time
7  will be 12:15.
8        A. Okay. Thank you.
9        Q. Okay.
10       A. So we just stay on, Laura?
11       Q. You just put your video and your audio on
12 mute. We can week go off the record.
13          THE VIDEOGRAPHER: This marks the end of
14 media number one. The time is 12:03 a.m. We're off the
15 record.
16          (Pause in proceeding.)
17          THE VIDEOGRAPHER: This marks the beginning
18 of media two in the deposition of John Pinkney. The time
19 is 12:17 p.m. We are back on the record.
20       Q. BY MR. SCHMOOKLER: Sir, at some point are
21 you aware that there was a criminal proceeding against
22 Mr. Kapanicas, amongst others?
23       A. Yes.
24       Q. And I assume that prior to today, you had an
25 opportunity to review a declaration filed with the

Page 48

1  Riverside District Attorney's senior investigator,
2  Mr. Doug Doyle; is that correct?
3        A. At some point, many years ago, I would have
4  looked at it, but I have not looked at in this preparation
5  for today.
6        Q. Have you done anything to prepare for
7  today?
8           What was that?
9        A. I don't know.
10       Q. Okay.
11          Let's try again.
12          Have you done anything to prepare for today?
13       A. So I very briefly reviewed -- and it
14 was -- very briefly reviewed a crime loss report that was
15 prepared -- let's see here.
16          That was prepared by my office, and that was
17 on -- it's hard to tell exactly when it was submitted, but
18 I believe it was -- looks like -- I'm looking at the
19 document now. It's this document.
20          And it was dated -- it looks like the date of
21 report of loss is April 5, 2016, and there's an exhibit to
22 that. And I looked at -- so that was on April 5, 2016.
23 We submitted that claim of loss.
24          And then on June 30, 2016, I looked at three
25 documents -- three letters to AIG from John Cannon at the

Page 49

1  Stradling Yocca firm. And they were working with us on a
2  number of issues, including responding to an SEC,
3  Securities and Exchange Commission, subpoena, an
4  investigation that was being commenced by the SEC.
5           And there were three letters, one on behalf
6  of the Beaumont Community Facilities District, one on
7  behalf of the City of Beaumont, and one on behalf of the
8  Beaumont Financing Authority. And I was just making
9  insurance company aware that the SEC was investigating.
10          And then I looked at a letter dated November
11 3, 2016, to AIG, where Mr. Cannon, on the City's behalf,
12 notified -- notified AIG of what, you know, we were
13 learning after the D.A. filed their charges on or
14 about -- in or about May of 2016.
15          So -- and there may have been other
16 communications with your company -- your client, but those
17 are the ones I looked at.
18       Q. Let's, just for record purposes, mark a few
19 things here, and then we'll come back to them as needed.
20          I'll show you what I'm marking as Exhibit 7,
21 which, I believe, is the crime loss report that you were
22 just mentioned that your firm prepared, dated on April 5,
23 2016; is that correct?
24          (Exhibit Number 7 was marked for
25 identification.)

MAGNA
LEGAL SERVICES

EXHIBIT 18
PAGE 1067

Page 50

1    THE WITNESS:  Yes, sir.
2    Q.  BY MR. SCHMOOKLER:  Is Exhibit 7 a true and
3    correct copy of the crime loss report originally provided
4    to my client?
5    A.  It was prepared by attorney Robert Patterson
6    of my office, but I believe it is.  I believe it is.
7    Q.  The original -- the original crime loss
8    report provided to my client only reference the conduct of
9    Mr. Aylward and Mr. Kapanicas; is that correct?
10   A.  I believe that's right.  And that's all I saw
11   in it when I reviewed today was -- and I didn't review it
12   in great detail, but I saw that it -- advised the
13   insurance company that we had concerns about activities by
14   Mr. Kapanicas and Mr. Aylward.
15        That's when we knew of and were concerned
16   about and felt that we had a basis to submit a claim at
17   that time.
18   Q.  Isn't it true that no claim was submitted to
19   my client in connection to any conduct relating to Urban
20   Logic until later when the Proof of Loss was submitted in
21   November of 2016?
22   A.  So to answer that question, on April -- in
23   April, when we submitted the -- I think you referred to it
24   it as Exhibit 7, the crime loss report that my office
25   worked on, you know, our objective there was to notify the

Page 51

1    City's carrier of what, you know, we had concerns about
2    that might constitute criminal activity and put the
3    insurance company on notice of these issues.
4        We did not -- you know, there are a lot
5    of -- there were a lot of conspiracy theories and a lot
6    of, you know, things that were being said that were not
7    true and that didn't make sense and that we were able to
8    conclude, you know, were not legitimate allegations, you
9    know, a lot of people saying a lot of things.
10        So what we tried to do was operate based on
11   facts and evidence.  And so when we had something that we
12   felt warranted notifying the carrier, we did that.
13        And had we known or felt that we had a
14   strong -- strong evidence to support something beyond this
15   that we felt would be covered, we would have notified the
16   carrier when we submitted this April 5, 2016, crime loss
17   report.
18        We had no reason not to include anything.  We
19   wanted you all -- your client to be aware of what we knew.
20   And then when the SEC investigation started, we put your
21   company -- your client on notice of that.
22        And then after the D.A. filed their charges,
23   you know, they were the ones that had all the documents
24   and computers.  And we felt confident that they were
25   qualified to do a proper investigation, and they did, and

Page 52

1    they filed charges, and so we made sure to make your
2    client aware of that as well.
3    Q.  Let's look at the Indictment, which I'm now
4    going to mark as Exhibit 8, and see what your client was
5    aware of at length.
6        I'm going to mark as Exhibit 8 the
7    declaration of Riverside District -- try this again.
8        I'm going to mark as Exhibit 8 the
9    Declaration of Riverside County District Attorney Senior
10   Investigator Doug Doyle.
11        (Exhibit Number 8 was marked for
12   identification.)
13   Q.  BY MR. SCHMOOKLER:  Do you see that, sir?
14   A.  I see the document on the screen, yes.
15   Q.  And this is a document filed May 17, 2016,
16   per the Court stamp in the upper right-hand corner.
17        Do you see that, sir?
18   A.  I do.  I see it.
19   Q.  And is this one of the documents that you
20   would have reviewed in the May of 2016 time frame in
21   connection with your work on behalf of the City of
22   Beaumont?
23   A.  Either myself or somebody in my office,
24   likely.  But at some point, I did review this.  I just
25   don't remember the exact time frame.  I do remember the

Page 53

1    charges being announced.  I do remember it being on
2    television when Hestrin announced the charges.
3        And I think that was right around this time
4    frame.  And I remember being really surprised that the
5    charges were way above and beyond anything that we had,
6    you know, looked at.  It was -- the charges were -- were
7    focused on issues that went beyond what we had been
8    looking at.
9    Q.  Let's look together.  I want to ask you about
10   a particular component of Mr. Doyle's declaration.
11        So the bottom of page 11, number page 11,
12   there are three consecutive paragraphs discussing a loan,
13   interest-free loan to Francis Coe, Jr.
14        Do you see that, sir?
15   A.  Yes.
16   Q.  And in this declaration, Mr. Doyle details a
17   series of interest-free loans to Mr. Coe in the amount of
18   $20,000.
19        Do you see that, sir?
20   A.  I do.
21   Q.  And then on page 12, Mr. Doyle says, and I
22   quote, "Other than Chief Coe, nine other individuals
23   received 'sick loan' between January, 2011 and
24   August, 2013."
25        Do you see where I've read from, sir?



14  (Pages 50 to 53)

EXHIBIT 18
PAGE 1068

Page 54

1    A.  I see it.
2    Q.  Isn't it true that in 2016, one prong of the
3  criminal proceeding against Mr. Kapanicas, among others,
4  were a series of loans to Chief Coe and other City
5  employees commonly referred to as sick loans?
6    A.  So I see that in the declaration.  Can you
7  scroll back up to the top, the first page, the caption
8  page of the document?
9    Q.  (Complies.)
10    A.  So I see that was in a declaration from an
11  investigator, Doug Doyle.  I don't recall if that language
12  that you read a moment ago ultimately ended up in the
13  charges that were made.  I just don't --
14    Q.  That's fine.
15    A.  I'm not a criminal lawyer, so I don't -- you
16  know, I'm not really familiar with that world.
17    Q.  Okay.
18      Sir, you are familiar with what was commonly
19  referred to as the sick loans; correct?
20    A.  I don't think I ever referred to them as
21  that.  I recall that there was a loan that the City made
22  to the chief of police that was concerning.
23    Q.  Well, isn't it true that you were aware of
24  interest-free loans that were granted to former City
25  officials in June of 2015?

Page 55

1    A.  I don't remember the time.  I may have been.
2  I believe that's one of the issues that we looked at was
3  that Mr. Coe had been loaned money by the City to make
4  some repairs, I think, into his home.
5      And I think the way it was structured -- and
6  maybe this is why they call is a sick loan -- was that
7  they had accruals, and that they borrowed against their
8  accrual.
9      So an employee had accrued, let's say,
10  vacation and sick leave time, and instead of cashing that
11  out and using that money for whatever expense they had,
12  that the City would loan them money against their
13  accruals, and that was a concern the way that was
14  structured, whether it was properly documented.  There
15  were other concerns about how was it done.
16      So, yes.  We were aware of that.
17    Q.  Okay.
18      And now let's look for a moment -- bear with
19  me a minute.  I'm going to look at what I've marked as
20  Exhibit 9.
21      (Exhibit Number 9 was marked for
22  identification.)
23    Q.  BY MR. SCHMOOKLER:  Exhibit 9, and I'll Zoom
24  out for a moment, is a factual basis for a plea agreement
25  Mr. Kapanicas has entered into for the State of

Page 56

1  California.
2      Do you see that, sir?
3    A.  Yes.
4    Q.  And you are familiar with the factual basis
5  that Mr. Kapanicas has signed in connection with criminal
6  matters against him; correct?
7    A.  I've seen this document before.  It's been
8  awhile, but I saw it at or about the time this was entered
9  into.
10    Q.  And at the bottom of page 1, top of page 2,
11  Mr. Kapanicas attests that,
12      "Between 2010 and 2013, myself and City
13      Finance Director William Aylward give out
14      $113,773 in interest-free loans to City
15      employees, including $45,000 to then-Beaumont
16      Chief of Police Frank Coe.  These
17      interest-free loans were not authorized by
18      the City Council or any City program."
19      Do you see where I've read from, sir?
20    A.  I see that language.
21      And we were -- you know, we were concerned
22  about how those loans were handled.  My recollection is
23  that the loans were employees borrowing money against time
24  that they had accrued on the books.
25      And my recollection is that the loans were

Page 57

1  paid back, but we were concerned about how those loans
2  were structured, documented and handled.  We did not know
3  that it was a criminal -- you know, that it would result
4  in criminal charges when we were looking at it.
5    Q.  And let me just orient you, sir.  And I don't
6  want to know what you know about whether it's criminal or
7  not.  I'm just trying to understand your knowledge at this
8  specific point in time.
9      So can we agree that in the criminal matter
10  against Mr. Kapanicas, one prong of his plea involved a
11  series of interest-free loans to City employees,
12  including, among others, City of Police Frank Coe?
13      MR. PISANO:  Object to form.
14      THE WITNESS:  That's what the document says.
15    Q.  BY MR. SCHMOOKLER:  Right.
16      Now, I will show you what I'm going to mark
17  as exhibit -- I think we're on number 10?
18      Is that right, Laura?
19      (Exhibit Number 10 was marked for
20  identification.)
21    Q.  BY MR. SCHMOOKLER:  I want to show you, sir,
22  what I'm marking as Exhibit 10.
23      Exhibit 10 is a June 1, 2015, letter from you
24  to a Mr. Stephen Weber, a lawyer on behalf Mr. Kapanicas;
25  is that correct?



EXHIBIT 18
PAGE 1069

Page 58

1    A.  Yes, sir.
2    Q.  And you wrote this June 1, 2015, letter to
3  Mr. Weber; correct?
4    A.  I believe I did, yes.  And there might have
5  been somebody in my office that might have worked on it
6  with me, but I believe I signed this document, and I
7  remember -- I remember these events.
8    Q.  The letter that you sent on June 1, 2015, was
9  in response to Mr. Kapanicas asking you for additional
10  information and documentation supporting a notice of
11  possible discipline that had been delivered to
12  Mr. Kapanicas on May 21, 2015; correct?
13    A.  That sounds -- that sounds right.
14    Q.  And at Mr. Kapanicas' request, your June 1,
15  2015, letter details why the City of Beaumont
16  put -- provided Mr. Kapanicas notice of possible
17  discipline; correct?
18    A.  Yes.  It was a -- this -- I believe that this
19  was pursuant to the Brown Act.  I don't know if anyone's
20  explained it that way.
21    But under the Brown Act, if you're going to
22  have a closed session to consider termination of a public
23  employee, you are required, if there's going to be a
24  closed session discussion regarding specific complaints or
25  charges against that employee that could result in their

Page 59

1  termination, you have to give that employee written notice
2  24 hours of the specific complaints and charges that are
3  going to be discussed in closed session.
4    And then the employee has the option, under
5  the Brown Act, to choose to have that discussion occur in
6  open session.  And so this is a notice, generally, that is
7  required as part of the due process rights of the
8  employee.
9    That, you know, they get the opportunity to
10  have, sort of, a name clearing hearing in public if they
11  want to have it, and they get notice of what's going to be
12  discussed in closed session.
13    Q.  This letter details the specific event that
14  we're going to be discussed in connection with potential
15  discipline against Mr. Kapanicas; correct?
16    A.  It was to give him notice of what was going
17  to be discussed in closed session is my recollection.
18    Q.  And this letter --
19    A.  This could be -- if you give me a second, and
20  just let me look at the first paragraph of the letter?
21    Yeah.  So that's what this would have been.
22  It would have been to give him notice of what was going be
23  to be discussed in closed session to give him the option
24  if he wanted to have it discussed in open session.
25    Q.  And in the event of an open session, you were

Page 60

1  prepared on behalf of the City to detail the specific acts
2  that are set forth in your June 1, 2015, letter; correct?
3    A.  We would have had to do that.  And we haven't
4  gone through the letter yet, but I remember specifically
5  that one of my concerns -- I mean, this was very, very
6  early on.  No documents.  You know, we had a lack of
7  documents, lack of computers.
8    People were no longer at the City to
9  interview.  You know, management was pretty much gone.
10  And so I had concerns about our ability to really prove
11  all of the things that we had concerns about.
12    We had concerns, but whether we would be able
13  to prove them at that early stage was a serious concern of
14  mine, a very serious concern.
15    And, I mean, we haven't looked through the
16  letter yet, and I haven't looked at this letter in some
17  time, so I don't know what is included in it.
18    But what we had an obligation in law to do,
19  as part of his due process rights, was to notify him of
20  what was going to be discussed in closed session.
21    And I didn't think that he would ask that it
22  be considered in open session.  But I want to make sure
23  his due process rights were protected.  Even though I
24  didn't represent him, I wanted to make sure that due
25  process was afforded, and that he knew what was going to

Page 61

1  be discussed in closed session.
2    Q.  So this letter -- and I'll show you in a few
3  minutes -- has a series of attachments.  Do you recall
4  that there was attachments to the letter?
5    A.  I don't, but, you know, I haven't looked at
6  this letter in a long time, but there may be attachments.
7    Q.  Query.  Did your office produce the
8  attachments to this letter to us in this litigation?
9    A.  I really don't know.  I don't know.
10    Q.  Do you know if anyone in your office did a
11  search for the attachments to this letter in response to
12  my client's request for production?
13    A.  We wouldn't hide them from you.  I mean, we
14  wouldn't have any reason to hide them from you.  So I just
15  don't know what was -- what was done.  You know, sitting
16  here today, I couldn't tell you.  I don't know when it was
17  even produced.
18    Q.  Well, I'm just going to state for the record
19  that we have not received the attachments to this letter.
20  We pointed this out at the Best, Best and Krieger firm
21  prior to the deposition when we uncovered it over the
22  weekend, and could not locate the exhibits -- the
23  attachments.
24    A.  Maybe we can go through the letter, and
25  if -- you know, that might refresh my recollection.



16  (Pages 58 to 61)

EXHIBIT 18
PAGE 1070

Page 62

1    Q.  No, no.  We're going to go forward.  We're
2  definitely going forward.  So I'm just stating where we're
3  at on this particular point.  Let's go through the letter
4  together.
5         Earlier, I asked you about the interest-free
6  loans that were cited by Mr. Kapanicas in his plea
7  agreement.  Do you recall that?
8    A.  Yes.
9    Q.  And now I'll turn to page 16 of the letter.
10  And you'll see that in your letter on page 16, there is a
11  section called "Loans and Potential Gifts of Public
12  Funds."
13         Do you see that, sir?
14    A.  I do.
15    Q.  And the first sentence of that section says,
16  and I quote,
17         "The City has loaned money to
18         Councilmember Fox and a number of employees
19         (see attachment 11.1 and loan documents as
20         attachment 11.2).  It does not appear that
21         these loans were disclosed on the applicable
22         2014 Form 700, which may likely be a
23         violation of the Political Reform Act."
24    Do you see where I've read from?
25    A.  Yes, sir.

Page 63

1    Q.  So it is true that by June 1, 2015, you were
2  aware that loans had been made to Councilmember Fox and a
3  number of employees; correct?
4    A.  Yes, that's correct.  We were aware of that,
5  and -- yeah.
6    Q.  And later in the paragraph that you write,
7  second to last sentence, "The loans were unsecured,
8  interest free, and do not appear to serve a legitimate
9  public purpose."
10         Do you see where I read from?
11    A.  That was our concern, and we were careful to
12  use words like "do not appear," because we knew we didn't
13  have -- you know, we didn't have everything fully put
14  together at that point.
15    Q.  But certainly by June 1, you knew there was
16  unsecured, interest-free loans to at least Councilmember
17  Fox and a number of employees; correct?
18    A.  Yeah.  Our concern was -- our concern was the
19  way the loans were handled.  Because from the employee's
20  perspective, they were borrowing their own money.  They
21  had accruals, where they had accrued vacations, sick
22  leave, theoretically, and that they were -- instead of
23  cashing that money out, they were borrowing it from
24  themselves is the way they look at it.
25         The problem from my perspective was that if

Page 64

1  that employee left, the City wouldn't be able to deduct
2  the amount that had been a borrowed from their final
3  paycheck, and that was not a good way to do things.  And
4  so that was a concern on my part in terms of, from a
5  management perspective, that Mr. Kapanicas had handled
6  these loans that way.
7         In my view, what he should have done was have
8  the employees take the money out of their accruals and
9  cash out their accruals rather than borrow against it.
10  Because if the employee left, we wouldn't be able to
11  deduct it from their final paycheck.  So I was concerned
12  from a process standpoint that it was a bad management
13  process on his part.
14    Q.  But in any event, the loans that were
15  ultimately cited in the indictment against Mr. Kapanicas
16  and his plea were, in fact, disclosed to you, amongst
17  others, by June 1, 2015; correct?
18    A.  Well, we reference in the letter, so, yes, we
19  would have been aware of it.  But, again, you have to look
20  at the language.  You're careful in the language, that,
21  for example, a loan from the City to an individual
22  presents a potential problem under the California
23  Prohibition against Gift of Public Funds.
24         We were really -- as I spoke to earlier, we
25  were identifying issues that we had concerns about.  We

Page 65

1  certainly weren't at the point where we could prove that
2  there was any kind of criminal conduct, or theft, or
3  anything like that.
4         We had concerns, and we had an obligation
5  under the law to give Mr. Kapanicas notice that those
6  issues were going to be discussed in closed session.
7    Q.  And I understand that, sir.  And I just want
8  to pin down what you knew factually, not what your
9  concerns may or may not have been.
10    A.  Well --
11    Q.  As a matter of fact, you were aware of the
12  interest-free loans that were granted to Beaumont
13  employees in 2015 that are ultimately identified in
14  Mr. Kapanicas' plea agreement; is that correct?
15         MR. PISANO:  Object to form.
16         THE WITNESS:  We were aware, as I spoke to,
17  as I just testified to, that there was a process used in
18  connection with these loans that we didn't agree with.
19         I think there was an argument that could have
20  been made on the other side, and we knew that, you know,
21  that employees could argue that they were just borrowing
22  from their own accruals.  We just did not believe that it
23  was handled properly.
24    Q.  BY MR. SCHMOOKLER:  Okay.
25         So it is fair to say that in June of 2015,



EXHIBIT 18
PAGE 1071

Page 66

1  you were aware of loans that you didn't think were handled
2  properly and that were ultimately identified in the
3  criminal action against Mr. Kapanicas; correct?
4       A.   That's -- that's correct.  They were
5  ultimately identified in a criminal action, but we
6  certainly, when we wrote this letter, had no idea that
7  that was going to result in a criminal action.
8            And we were more concerned that the process
9  was one that we didn't agree with in terms of how these
10  loans had been handled.  We thought that they should have
11  just had the employees cash out from their accruals
12  instead of borrow against them, for the reasons I
13  explained.
14       Q.   Yeah, no.  I understand how you wanted them
15  handled.  Again, I'm just trying to articulate what you
16  were and were not aware of and try to isolate them.
17            So we agree, though, that by June 1, 2015,
18  you had been able to identify interest-free loans provided
19  to Beaumont City -- to Beaumont employees?
20       A.   By June of 2015, when this letter was
21  written, as it expresses, we were aware that there had
22  been loans made to employees against their accruals, and
23  we didn't agree with the process that had been followed.
24            We certainly did not believe at that time
25  that it rose to the level of -- and by the way, the

Page 67

1  loans -- my recollection is they were all paid back.  So
2  there was no, to my knowledge, any loss to the City.
3  There may have been some interest lost, but I don't
4  think -- I think they were all paid back.
5       Q.   Was the loan approved by the City Council?
6       A.   I don't know.  That was before our time.  All
7  this happened before our time, but we had concerns.  We
8  didn't like it.  It was you unusual.  We thought the way
9  it had been handled and -- and we wanted the Council to be
10  able to discuss that.
11            We didn't know what they knew or what they
12  didn't know.  And in order for them to be able to discuss
13  it in closed session, I had an obligation under the law to
14  give Mr. Kapanicas notice that it was going to be
15  discussed in closed session.
16       Q.   You were aware by June 1 of the finding of
17  fraud against Mr. Kapanicas; correct?
18       A.   June 1 of --
19       Q.   2015?
20       A.   Was I aware in June 1, 2015, of a finding of
21  fraud --
22       Q.   Yes.
23       A.   -- against Mr. Kapanicas?
24       Q.   Yes.
25       A.   What was the --

Page 68

1            MR. PISANO:  Object to form.
2            THE WITNESS:  I'm not sure.  Maybe you can
3  refresh my recollection.
4       Q.   BY MR. SCHMOOKLER:  Sure.
5            Look in your letter, turn to page 22 of the
6  letter, a section called "City of Beaumont versus WRCOG."
7            Do you see that, sir?
8       A.   Yes.
9       Q.   Do you know that "WRCOG" stands for Western
10  Riverside Council of Governments; is that correct?
11       A.   Yes, sir.
12       Q.   And you are aware that Western Riverside
13  filed a lawsuit against the City of Beaumont; correct?
14       A.   Yes, sir.
15       Q.   You were aware --
16       A.   I became aware of that.  I'm sorry.
17       Q.   You aware that Orange County Superior Court
18  Judge David Chaffee wrote an opinion that the City had
19  misdirected funds intended for a Western Riverside program
20  called TUMF; correct?
21       A.   Yes.
22       Q.   And in his findings, as quoted in your June 1
23  letter, Judge Chaffee wrote, and I quote, "The evidence
24  and testimony revealed that City Management and staff
25  engaged in a pattern and practice of deception that

Page 69

1  transcends the typical give and take of dispute
2  negotiations."
3            Do you see where I read from, sir?
4       A.   Yes, sir.  I see it.
5       Q.   And you were aware that the Court had
6  specifically found a pattern and practice of deception by
7  City Management and staff that transcended the typical
8  give and take of dispute negotiation on or before June 1,
9  2015; correct?
10       A.   I was aware of what was written in the
11  Court's opinion.  I read it.
12       Q.   And you read that the Court specifically
13  said, and I quote, "I would have found fraud by clear and
14  convincing evidence against the City."  Correct?
15       A.   And that's what the Court said.  And I was
16  aware of that when we wrote this letter.
17       Q.   After that one quote, you write, and I quote,
18  "Judge Chaffee suggests that, quote, City officials, end
19  quote, have a systemic problem with following the law."
20            Do you see that?
21       A.   Yes, sir.
22       Q.   Who are the City officials in that sentence?
23       A.   I think it was intended to be a broad
24  statement, because I think it involved more than one
25  individual.  And, you know, as we found, when we were



MAGNA
LEGAL SERVICES

EXHIBIT 18
PAGE 1072

Page 70

1  looking at how things were done under the Kapanicas
2  administration, that it wasn't just one issue, you know.
3  There were a number of issues.
4          We had the situation with the finance
5  director that I explained earlier in my testimony.  We had
6  Mr. Kapanicas' issues with a company called GGMS that he
7  owned.
8          We had, you know, this judgment that had been
9  issued, a judgment -- a sizeable judgment issued by the
10  trial court in this case.  And to me, that pointed to poor
11  management on the part of Mr. Kapanicas.
12          And so the intent of this was to make him
13  aware that that was one of the issues that the Council
14  would be considering in closed session was his -- under
15  his tenure, his manager, that the City ended up having a
16  judgment with the wording that you went over issued.
17          And I will tell you that the City believed it
18  was going to prevail in the civil case on appeal.  At some
19  point, that changed, but they did believe, certainly at
20  that time --
21      Q.  You have to be careful here that you not
22  disclose what the City Council -- what you conveyed to
23  them or their --
24      A.  Okay.
25      Q.  -- legal advice that was provided.  I've been

Page 71

1  told that that's privileged.
2      A.  It would be.
3      Q.  I'll go back to my question.
4          As it relates to your letter, what are the
5  names of the City officials that you reference on page 23
6  of your June 1 letter?
7      A.  I think it was intended to be a broad
8  statement, so that it wasn't -- it was intentionally not
9  specific in nature, because this was very early on, and we
10  were still looking at things.  And so it was, by design,
11  intended to be a broad statement as opposed to specific.
12      Q.  Okay.
13          Who was included in that broad statement?
14      A.  It would be anybody that was engaged in any
15  form of wrongdoing, or specifically their mishandling of
16  the TUMF fees that were spoke to in the Court's ruling.
17      Q.  And isn't it true that -- strike that.
18          Let me show you another document.  I will
19  show you what I'm marking as Exhibit 11.
20          (Exhibit Number 11 was marked for
21  identification.)
22      Q.  BY MR. SCHMOOKLER:  Exhibit 11 is a Complaint
23  Western Riverside Council of Governments filed against
24  Urban Logic in Superior Court for the State of California,
25  Riverside County.

Page 72

1          Do you see that, sir?
2      A.  Yes.
3      Q.  And were you aware that Western Riverside had
4  filed a lawsuit against Urban Logic?
5      A.  Yes.
6      Q.  And isn't it true that this action was
7  dismissed as part of the agreement to plead guilty to
8  criminal charges by the Urban Logic owners?
9      A.  I'm not aware of that.  I don't think -- I'm
10  not sure that's accurate.
11      Q.  Are you aware -- and I'll just flip down
12  while I flip down it.
13          You are aware that City of Beaumont dismissed
14  several claims in order to facilitate criminal plea
15  agreements; correct?
16      A.  That we dismissed pending civil claims as
17  part of a plea agreement?
18      Q.  No.  In order to facilitate or -- strike
19  that.
20          As part of the plea agreement process, isn't
21  it true that the City of Beaumont agreed to dismiss civil
22  claims against, amongst others, the Urban Logic owners?
23          MR. PISANO:  Object to form.
24          THE WITNESS:  So in the plea agreements that
25  were entered into by Dillon, Moorjani, Aylward -- perhaps

Page 73

1  Aylward as well, but Dillon Moorjani and Egger, they paid
2  restitution, and the City chose not to pursue them, given
3  that they had paid restitution individually, individually.
4          Because, you know, for example, I recall one
5  of those defendants had to sell his house in order to pay
6  restitution, so there really wasn't anything there to go
7  after.
8      Q.  BY MR. SCHMOOKLER:  Well, isn't it true, sir,
9  that prior to a single plea or agreement to pay
10  restitution, you communicated to the Riverside District
11  Attorney an agreement to dismiss the civil claims upon
12  payment of restitution?
13      A.  It could be true.  It could be true.  I just
14  don't remember if we had -- you know, it wouldn't have
15  been against ULC.  We wouldn't have dismissed a claim
16  against UCL, and I don't think we did.  I think we pursued
17  that claim.
18          But the individual claim against Dillon,
19  Moorjani and Egger, I don't know if we had it pending -- a
20  lawsuit pending at the time that those pleas were entered
21  into.  I just don't remember sitting here right now.
22          But I do recall, to do my best to try to get
23  to the issue that you're raising, that we were not going
24  to pursue them individually if they paid the restitution,
25  which was sizeable, as part of their plea agreement.

MAGNA ➤
LEGAL SERVICES

EXHIBIT 18
PAGE 1073

Page 74

1   And whether that meant that we weren't going
2   to file a lawsuit or whether we were going dismiss them, I
3   can't really recall.
4       Q.   Okay.
5           We'll get to those.  We'll get to that
6   correspondence with the District Attorney shortly.
7           Paragraph 45 of the Complaint, I put up on
8   the screen.  I've blown it up so we can all read it
9   together.  Western Riverside writes, and I quote in the
10  last sentence -- strike that.
11          The last sentence, paragraph 45 -- shoot.
12      A.   Okay.
13          I see that language.
14      Q.   Hold on.  My computer just shut down.
15      A.   Okay.
16      Q.   I apologize.  Can we go off the record for
17  just a second?
18      A.   Sure.
19      Q.   It literally just -- literally turned off.
20          THE VIDEOGRAPHER:  This is the end of media
21  number two.  The time is 12:56 p.m.  We are off the
22  record.
23          (Pause in proceeding.)
24          THE VIDEOGRAPHER:  This marks the beginning
25  of media number three in the deposition of John Pinkney.

Page 75

1   The time is 12:58 p.m.  We are back on the record.
2       Q.   BY MR. SCHMOOKLER:  I apologize for that,
3   Mr. Pinkney, for that technical difficulty.
4           Where we left off, we were looking at
5   paragraph 45.  The last sentence of that paragraph quotes
6   some of the language we earlier looked at in the Notice of
7   Discipline from Judge Chaffee's decision.
8           Do you see that, sir?
9       A.   I see the same language in the last part of
10  paragraph 45 that was quoted in the notice that we gave to
11  Alan Kapanicas before the closed session.
12      Q.   And in this language, you will see that
13  Western Riverside had inserted three names, Dillon, Egger
14  and Moorjani; correct?
15      A.   Yes.  I see that.
16      Q.   And so right after the word "Staff," it says,
17  "i.e., Dillon, Egger and Moorjani."
18          Do you see that?
19      A.   I see that in the pleading, yes.
20      Q.   My question is this.  Were Misters Dillon,
21  Egger and Moorjani included in the reference to City
22  officials in your June 1, 2015, letter?
23      A.   I don't think that that early on -- can we go
24  back to that letter?
25      Q.   Sure.  Let me go off screen for a second.

Page 76

1       A.   And that was June 30, 2015; right?
2       Q.   It was June 1.
3       A.   June 1, 2015.
4           So we had been working for the City for a
5   little over a month -- you know, really a month,
6   basically.  So, you know, I don't know -- it was a lot of
7   information to digest in a short period of time.
8           So I don't know that we would have known, you
9   know, all the details, and that's probably why we didn't
10  list names at that time, why we used the language.
11          If you scroll down further, where we say,
12  right there, Judge Chaffee -- and I'm -- paraphrasing what
13  he's suggesting by his opinion, that City officials -- we
14  hadn't reviewed the whole court proceeding.  There's no
15  time to do that.  We read the ruling.
16          And so I think we were intentionally wording
17  that broadly, because we didn't know, you know, who all
18  was -- that was -- that would refer to, you know, that had
19  been involved with the systemic problem with following the
20  law.
21      Q.   Well, it's your testimony, sir, that as of
22  June 1, 2015, you are unaware that Mr. Kapanicas had
23  anything to do with the TUMF program?
24      A.   That I'm not aware -- by June 1, 2015, I was
25  not aware that Kapanicas had anything to do with the TUMF

Page 77

1   program?
2       Q.   It's a different question.
3       A.   My answer was be no, no.  We were.  We
4   were.  He was the City Manager.  So by necessity, as the
5   Chief Executive Officer or City Manager of the City, you
6   know -- again, you've got to recognize that the point of
7   this letter was to allow the Council to have a
8   conversation in closed session.
9           We had a duty to put him on notice of what
10  was going to be discussed in closed session.  It wasn't to
11  convict him.  It wasn't to say that he had committed a
12  theft, dishonesty or criminal conduct.
13          It was to give him his due process rights,
14  that, hey, the Council's going to be talking about this in
15  closed session.  They could ultimately and may have,
16  hypothetically speaking, disagreed with the Judge's
17  opinion in that closed session.  I'm speaking
18  hypothetically.
19          But I had a duty to give him notice that this
20  topic was going to be discussed in closed session, the
21  ruling by the Court under his watch as City Manager, and
22  that was the purpose.
23          It was not a conclusory, final conclusion, as
24  much as meeting the requirement to give him notice that
25  he's entitled to under the law.



EXHIBIT 18
PAGE 1074

Page 78

1    Q.   Did you give my client notice of this finding
2 before you purchased the 2015-2017 policy of $15 million
3 in coverage?
4         MR. PISANO:  Object to form.
5         THE WITNESS:  Yeah.  I think that's
6 conflating two completely different issues.  This was a
7 requirement --
8    Q.   BY MR. SCHMOOKLER:  No, I'm not conflating
9 the issue, sir.  And I'll ask my question again.  I'm not
10 conflating the issues.
11        As a matter of fact, did the City the
12 Beaumont disclose Judge Chaffee's decision to my client
13 before purchasing $15 million in crime insurance?
14        MR. PISANO:  Object to form.
15        THE WITNESS:  So what was the date of the
16 ruling?  Can we scroll up to see the date of the ruling by
17 the Court?
18    Q.   BY MR. SCHMOOKLER:  It's not in here.  If you
19 want, I can look at the Complaint.
20    A.   Okay.
21        In or about May -- April or May of 2014,
22 mid-2014, the Court issued a decision, so mid 2014.  I
23 don't know, because I wasn't there, if -- I don't know
24 that James Gregg, or somebody at the City -- you know, the
25 City was one of the members of ERMAC.

Page 79

1         And I suspect, I believe, that they should
2 have been aware of -- they may have been aware of the
3 pending lawsuit.  So I don't -- I can't speak to what
4 happened before my time and whether notice was given to
5 your client specifically or to ERMAC or -- I just don't
6 know.
7         I know that we gave notice of what, you know,
8 we felt we had a basis to give notice to the insurance
9 company when we -- you know, we had no reason to hide
10 anything.
11        We wanted the insurance company to know what
12 we knew, that we felt was more than just speculation, and
13 so that's why we sent that letter on April 5, 2016,
14 followed up by, you know, the letters that Stradling sent.
15 We had no reason not to tell your client.  We wanted them
16 to know.
17    Q.   Okay.
18        Did you want them to know that there was a
19 finding against City Management and staff for providing
20 for $15 millions in insurance coverage?
21        MR. PISANO:  Objection.  Objection to form.
22        THE WITNESS:  That, I don't think that's an
23 accurate statement.  I think that -- I think what the
24 Court was saying in dicta in that case was that had fraud
25 been an issue, that the Court would have found that it

Page 80

1 existed in that case.
2         That was a Writ -- my recollection, that was
3 a writ of mandamus action that the Court ruled in.  It was
4 not a fraud case, and so the Court put that there in
5 dicta.
6         And there's a lot of reasons that judges will
7 put dicta into a court ruling.  It could be to try to
8 convince the parties to settle, you know.  You just don't
9 know why the Court wrote that.
10        They could be the signaling to the parties to
11 the litigation to try to encourage them to settle or, you
12 know -- who knows why the Judge put that dicta in the
13 ruling.
14    Q.   BY MR. SCHMOOKLER:  Well, that ruling was, in
15 fact, cited by your office -- strike that.
16        That ruling was, in fact, cited, was it not,
17 in your client's Proof of Loss submitted to my client;
18 correct?
19    A.   In the original Proof of Loss that my office
20 submitted, it was not.  I don't believe it was.  It was
21 subsequently, after the D.A. filed the criminal charges,
22 and we became aware that there was -- you know, there was
23 something serious to report related to the TUMF issue,
24 then it was -- you know, at that point.
25        You know, we knew the D.A. was leading the

Page 81

1 charge on the investigation in those issues.  So when they
2 filed their charges, we made the insurance company aware
3 when we had that information.
4    Q.   No. --
5    A.   We had no reason not to -- we had every
6 reason to let the insurance company know, and, you know,
7 we -- what little we knew in April of 2016, we -- that we
8 felt we could substantiate, and I believe I attached
9 documents to my proof of claim, we submitted it.
10        And then when the SEC started their
11 investigation, we submitted that.  And then when the
12 criminal case was filed, when we had something put
13 together, we submitted that to the insurance carrier.
14    Q.   I asked a different question, sir.
15    A.   I'm sorry.
16    Q.   So let me go back.  And I think you're
17 conflating two documents.
18        What exhibit number are we on, Laura?
19        THE REPORTER:  12.
20        MR. SCHMOOKLER:  Thank you.
21        (Exhibit Number 12 was marked for
22 identification.)
23    Q.   BY MR. SCHMOOKLER:  I'll show you what's been
24 marked as Exhibit 12.  Earlier, we looked at a notice of
25 claim.  On November 3, 2016, a Proof of Loss, Narrative



Page 82

1   Proof of Loss was submitted to my client.
2        Do you see that, sir?
3        A.  Yes.  I have a copy of that.  It's one of the
4   documents I looked at briefly.
5        Q.  And this Narrative Proof of Loss is the City
6   of Beaumont's explanation of its claims; is that correct?
7        A.  So, you know, what we were doing was
8   submitting what we knew that we felt confident submit to
9   go the carrier.  I just need to look at this to see what
10  it's about.
11       So, yes.  This would have been after the D.A.
12  had filed their charges after they did their year-long
13  investigation.
14       Q.  And page 10 of your client's Proof of Loss
15  specifically references the TUMF judgment; correct?
16       A.  That's page 10, you said?
17       Yes.  So it starts off with the heading, "The
18  District Attorney alleges the Kapanicas administration
19  embezzled millions of dollars in manipulating City permits
20  and fines to benefit themselves," et cetera, at the
21  beginning of that page.
22       Q.  And I just want to be very specific.  I
23  understand your reference to the District Attorney.  I
24  really don't want to ask you about the District Attorney.
25  I can ask the District Attorney about the District

Page 83

1   Attorney.
2        Those City's Proof of Loss referenced a $42
3   million judgment entered again the City of Beaumont prior
4   to the purchase of the 2015 policy; correct?
5        A.  It says what it says.  What it says is,
6            "The relevant facts set forth in the
7            investigator," meaning the District Attorney
8            investigator declarations, "attached hereto
9            as Exhibit A and B are referenced and
10           incorporated herein.  The City is at least
11           $42-some-odd dollar million, plus interest in
12           losses related to the former employees'
13           scheme to evade the City's obligation to pay
14           fees to the WRCOG as part of the TUMF
15           program.  The former employees misused
16           Beaumont's resale permit," yadda, yadda, and
17  it goes on.
18       Q.  I didn't ask that.  Move to strike.
19       A.  It says what it says.
20       Q.  I'm being very specific about what this
21  document references and what the City was aware of.  The
22  City of Beaumont submitted, as part of its claim in
23  November of 2015, a judgment that had been entered prior
24  to the purchase of the 2015 policy; correct?
25       MR. PISANO:  Object to form.

Page 84

1        THE WITNESS:  Yeah.  The document says what
2   it says on page 10.  I don't want to read the whole thing
3   for the record.
4        But it does reference the judgment that was
5   entered in the WRCOG case that I included back in June of
6   2015 in my notice to Mr. Kapanicas, because we were
7   obligated to notify him that the Council was going to be
8   discussing that in closed session.  So it does reference
9   the same lawsuit and judgment.
10       But it was put in the notice 2015 because we
11  had an obligation to give him notice, under the law, that
12  it was going to be discussed in closed session.
13       And as I mentioned before, the Council may
14  have decided, hypothetically, that it was going to win
15  that case on appeal.  They could have decided that they
16  loved Alan Kapanicas and wanted to keep him,
17  hypothetically.
18       I don't believe -- well, but it was just
19  meeting our due process requirement to give him notice
20  that this is what Council's going to be discussing.  Do
21  you want to have the meeting in open session or closed
22  session.
23       Q.  BY MR. SCHMOOKLER:  Move to strike as
24  non-responsive.
25       Sir, I'm asking a different question, a very

Page 85

1   tailored question.  Back at June 1 hearing.
2        Isn't it true that a judgment entered against
3   City of Beaumont, prior to the purchase of the 2015
4   policy, was cited as a component of the City's claimed
5   loss in November of 2015?
6        MR. PISANO:  Objection.  Calls for
7   speculation.  He has advised his testimony as he doesn't
8   know when the insurance was purchased.  So you're asking
9   him about a date that he doesn't know.
10       MR. SCHMOOKLER:  Peter, Peter, we went
11  through this last time.  This is Federal Court, not State
12  Court.  Federal Court says object to form is the totality
13  of words that you are allowed to utter.
14       Everything after that today is, once again,
15  coaching.  I'm happy to call the magistrate to get a
16  lesson in what the appropriate protocols are in
17  California, and I'm hoping that's not going to be
18  necessary.
19       MR. PISANO:  Counsel, don't threaten to call
20  a magistrate.  If you have cause -- if you have cause to
21  make a phone call and stop the deposition, do so.  But to
22  make those kinds of remarks on the --
23       MR. SCHMOOKLER:  Great.  Let's stop the
24  deposition.
25       MR. PISANO:  -- record are inappropriate.

MAGNA
LEGAL SERVICES

EXHIBIT 18
PAGE 1076

Page 86

1      MR. SCHMOOKLER:  Either you're going to
2  behave today or not behave today.  But I don't have to
3  have you testify for this witness.  I'm sure Mr. Pinkney
4  is capable of handling my question.
5      THE WITNESS:  Can you repeat the question,
6  please?
7      Q.  BY MR. SCHMOOKLER:  Sure.
8      Sir, do you recall earlier today I showed you
9  the policy which specifically shows that the 2015 policy
10  was effective June 30, 2015?
11      A.  I saw the document, yes.
12      Q.  Prior to the effective date of the 2015-2017
13  policy, a judgment was entered against the City of
14  Beaumont; correct?
15      A.  I believe that's correct, yes.
16      Q.  And you, as City Attorney, were aware of that
17  judgment prior to the effective date of the 2015-2017
18  policy; correct?
19      MR. PISANO:  Object to form.
20      THE WITNESS:  The policy was renewed on June
21  30, 2015?
22      Q.  BY MR. SCHMOOKLER:  It was effective that
23  date, sir.
24      A.  Okay.
25      So my letter to Alan was dated June 1, I

Page 87

1  believe?
2      Q.  It was.
3      A.  So we reference that judgment in his letter
4  on June 1.  So, yes, we would have been aware of that
5  judgment, and we would have given him notice that that
6  topic was going to be discussed in closed session as
7  required by the law.
8      Q.  And the judgment that was entered against the
9  City prior to the effective date of the 2015-2017 policy
10  was one component of the claims presented to my client in
11  2016; correct?
12      MR. PISANO:  Object to form.
13      THE WITNESS:  Yeah.  The document prepared by
14  Stradling Yocca, the law firm of Stradling Yocca included
15  that.  Based on what we reviewed today, I looked at that
16  briefly before today's deposition, and it is in there.
17      Q.  BY MR. SCHMOOKLER:  One of the pieces of
18  evidence cited by Stradling on behalf of the City in
19  support of its claim is Judge Chaffee's decision that we
20  looked at earlier; correct?
21      A.  Yes, that's correct.
22      Q.  So the decision cited by you in your June 1
23  letter related to a judgment entered against the City
24  ultimately formed a portion of the claim made against my
25  client in 2016; correct?

Page 88

1      MR. PISANO:  Object to form.
2      THE WITNESS:  The documents served completely
3  different purposes.  One was to give notice, due process
4  notice to Mr. Kapanicas, and one was a claim form.  And we
5  included it in the claim form when we believed that we had
6  something to tender to the carrier on that, and it was the
7  same.
8      Q.  BY MR. SCHMOOKLER:  I understand it was a
9  different purpose.
10      A.  Yeah.
11      Q.  I just want to get down to what was known,
12  not the purpose.  We can agree that regardless of the
13  purpose of the June 1 letter, the judgment and decision
14  ultimately decided in the Court of the City of Beaumont's
15  claim to National Union was, in fact, known to the City of
16  Beaumont prior to June 1, 2015; correct?
17      MR. PISANO:  Object to form.
18      THE WITNESS:  It would have been known to the
19  City before June 1, 2015.  The judgment by the Court would
20  have been known.  They would have known of that.  Whether
21  they tendered it or made your company -- your client aware
22  of it, I don't know, because it predated me.
23      And I doubt that, at that point in time, we
24  had any reason to believe -- certainly when I was involved
25  at that early stage, in that first 30 days, that we had

Page 89

1  any basis to submit that as a claim with the insurance
2  company.
3      Q.  BY MR. SCHMOOKLER:  Putting aside whether you
4  thought you had a basis, that was your decision whether to
5  submit this judgment and decision at the time you first
6  learned about it; correct?
7      A.  No.  I apologize.  Can you repeat the
8  question?
9      Q.  Sure.
10      Putting aside why you did what you did, the
11  decision as to whether to provide National Union notice of
12  a known judgment and ruling was a decision by the City of
13  Beaumont; correct?
14      MR. PISANO:  Object to form.
15      THE WITNESS:  Whether to notify the carrier
16  that that judgment had been rendered would have been a
17  decision by the City of Beaumont.  Whether they did so
18  before me, I don't know.  But it was a civil dispute that
19  they believed they were going to win on appeal.  So there
20  may not have been anything to submit at that point.
21      Q.  BY MR. SCHMOOKLER:  Well, you agree with me,
22  sir, that a judgment accruing interest was, in fact,
23  awarded; correct?
24      A.  Yes, that's correct.
25      Q.  And the City was aware of the judgment and



Page 90

1  the Judge's basis for that judgment before the inception
2  of the 2015-2017 policy; correct?
3       MR. PISANO:  Object to form.
4       THE WITNESS:  I'm going to clarify something
5  here.  It was aware, certainly by June of 2015, of the
6  judgment in a writ of mandate lawsuit.  And my
7  understanding is -- well, anyway.
8       So it was a writ of mandate lawsuit.  It was
9  not a fraud case.  It was a writ of mandate case.
10      Q.  BY MR. SCHMOOKLER:  Okay.
11          But putting aside what the nature of the
12  claim was, the existence of the judgment and the Judge's
13  ruling, as highlighted in the Proof of Loss, Exhibit 12,
14  were, in fact, known to the City prior to the effective
15  date of the 2015-2017 policy; correct?
16      MR. PISANO:  Object to form.
17      THE WITNESS:  The City was -- I believe,
18  would have been aware, as evidenced by my letter dated
19  June 1, 2015, that there had been this ruling issued in
20  the writ of mandate case between the City and WRCOG.  It
21  was a writ of mandate.
22      Q.  BY MR. SCHMOOKLER:  And the language you
23  ultimately highlight in your June 1 letter was ultimately
24  highlighted again for my client in the Proof of Loss
25  submitted in 2015; correct?

Page 91

1       A.  It was the dicta.  The dicta that I referred
2  to from the Court's opinion and that I included in the
3  June 1, 2015, letter, was referred to again on the
4  June -- in the November 3, 2016, Proof of Loss, yes, in
5  the writ of mandate.
6       Q.  The language that you referred to as "dicta"
7  was cited by the City to my client in support of the
8  insurance claim in 2016; correct?
9       A.  Yes, sir.
10      Q.  And that same language that you referred to
11  as "dicta" was, in fact, known to the City June 1, 2015,
12  prior to the effective date of the 2015-2017 policy; is
13  that correct?
14      MR. PISANO:  Object to form.
15      MR. NOLAN:  Counsel, you've asked that
16  question 10 times now.  Are you just intending to harass
17  and not listen to my witness' answers?
18      He's answered --
19      MR. SCHMOOKLER:  The actual --
20      MR. NOLAN:  -- in the affirmative multiple
21  times.
22      MR. SCHMOOKLER:  You, sir, have grounds to
23  cease the deposition for harassment.  You obviously know
24  your work around these.
25      Ms. Court Reporter, will you please have my

Page 92

1  question read back?
2       THE REPORTER:  "And that same language that
3  you referred to as "dicta" was, in fact, known to the City
4  June 1, 2015, prior to the effective date of the 2015-2017
5  policy; is that correct?"
6       THE WITNESS:  That language would have been
7  known to the City certainly on or before June 1, 2015,
8  when I wrote may letter to Mr. Kapanicas and came out of
9  the writ of mandamus action.
10      Q.  BY MR. SCHMOOKLER:  Thank you very much.
11          Are you aware that in June of 2015, the City
12  increased the amount of coverage it purchased from my
13  client?
14      A.  I was not aware -- I don't believe I was
15  aware until this litigation began.  I mean, it's possible
16  somebody told me that, but I just don't remember that
17  sitting here today.  But at some point, I did become aware
18  of it.
19      Q.  Is it true, sir, that on June 1, 2015, you
20  found that the City Manager failed to fulfill his duties
21  as it relates to the competitive bidding requirements in
22  the Municipal Code?
23      A.  I don't know, when you say that I found, that
24  it's really my role to make findings.  So, for example,
25  you referenced June 1, 2015.

Page 93

1       We would have been -- our role would have
2  been to give notice to Mr. Kapanicas of what was going to
3  be discussed by the Council in closed session.  And we
4  would have had an obligation to give him notice of any
5  specific complaints or charges as part of his due process
6  right before the Council meets in closed session.
7       So I don't know that I would have found
8  anything that would be done by the Council or a hearing
9  officer.
10      Q.  Well, who makes the charges as to what is in
11  your June 1, 2015, letter?
12      A.  I couldn't hear you, sir.
13      Q.  Who made the charges as levied in the June 1,
14  2015, letter?
15      MR. PISANO:  Object to form.
16      THE WITNESS:  Yeah, they are not -- I don't
17  think they are really charges as much as, under the Brown
18  Act and under due process, we are required before we go in
19  and meet outside of the public realm with Council in
20  closed session, the Council's going to have a conversation
21  about this individual and specific complaints or charges
22  against him.
23      And so the law is very clear that we have an
24  obligation to give him written notice a minimum of 24
25  hours before that closed session of what is going to be



Page 94

1  discussed, not necessarily what is going to be found,
2  because we don't know yet.
3        But we have an obligation to give him notice
4  of what's going to be discussed, and that's the purpose of
5  that June 1, 2015, letter from my office would have been.
6        Q.  BY MR. SCHMOOKLER:  Let's look a different
7  section of your letter as it relates -- do you know
8  Beaumont Electric?
9        A.  I do.
10       Q.  Do you remember that the City also granted
11  unsecured loans to Beaumont Electric?
12       A.  I do.  We concluded they were all repaid, so
13  we didn't really have a loss.  And we thought it was a bad
14  practice that possibly could be a gift of public funds,
15  and we were concerned about it.  It was a concern we had.
16       But at the time, I'm not sure -- I'm not
17  sure, as of June of 2015, how much documentation we had
18  to, you know, address that issue.  But it was a concern
19  from --
20       THE REPORTER:  I'm sorry.
21       THE WITNESS:  Sorry, ma'am.
22       Q.  BY MR. SCHMOOKLER:  I apologize for
23  interrupting you.
24       A.  From a management perspective, we had
25  concerns that those loans had been made to Beaumont

Page 95

1  Electric.  We wanted to make the Council aware of them.
2        And we had an obligation to make
3  Mr. Kapanicas aware that the Council would be discussing
4  that, and it could potentially constitute a gift of public
5  funds is my recollection.
6        Q.  Let me show you what I'm marking -- or let me
7  show you your June 1 letter, which we earlier marked.  On
8  page 14 through 16, there's a discussion of Beaumont
9  Electric.
10       Do you see that, sir?
11       A.  Yeah.  I'm looking at it.
12       Q.  I can zoom it out or zoom it in.
13       A.  Yes.  I think I've got the gist of it.
14       Q.  Specifically, on page 15, in the first full
15  paragraph, you say, at the first sentence,
16       "City Manager and Mastone of MGO have
17       confirmed that the City has been purchasing
18       electrical supplies and equipment from
19       Electric Supply Wholesalers for Beaumont
20       Electric to whom it then sells the equipment.
21       The City Manager has admitted to this
22       practice under his tenure."
23       Do you see that?
24       A.  Yes.
25       Q.  You then write, and I quote, "This practice

Page 96

1  does not comply with the City's procurement, code
2  provisions, and may have resulted in Beaumont Electric
3  being favored over other City -- other contractors on City
4  work."
5        Do you see where I read from?
6        A.  I see that, yes.
7        Q.  So by June 1, you, in fact, knew the City had
8  been purchasing electrical supplies and equipment from
9  Beaumont Electric; correct?
10       A.  Yes.  That's correct.
11       Q.  By June 1, Mr. Kapanicas, the City Manager,
12  had admitted to that practice; is that correct?
13       A.  I don't remember it specifically, but if I
14  said it in a letter, then it must be correct.
15       Q.  And then later down, you write,
16       "Finally, this arrangement improperly put
17       the City in the position of a lender or
18       financier to Beaumont Electric, where the
19       City has been providing Beaumont Electric
20       with interest-free loans.  This lending
21       practice involving a single, locally owned
22       company is confirmed in the City ledgers in
23       Attachment 10.3."
24       Do you see where I read that?
25       A.  I see the language.

Page 97

1        Q.  So by June 1, you had, in fact, documented
2  interest-free loans to Beaumont Electric, approved, as a
3  practice, by the City Manager, Mr. Kapanicas; correct?
4        A.  Yes.
5        Q.  Later on in this --
6        A.  I didn't agree with that.  I didn't
7  agree -- I didn't think they should have done that, and so
8  I put that in the letter.
9        And my concern was, as City Attorney, is they
10  weren't charging any interest, and so that could have
11  constituted a gift of public funds potentially.
12       Now, if the public funds, as long as there's
13  a public purpose for the arrangement, then even though an
14  expenditure or an arrangement benefits a private party,
15  that doesn't necessarily mean it's a gift of public funds,
16  but there's that potential there.
17       So that's something that I had concerns
18  about, and I knew I was going to be talking to the Council
19  in closed session about it, and so I had an obligation to
20  give Mr. Kapanicas notice of that.
21       But, ultimately, I believe we concluded that
22  the loans had been paid back by Beaumont Electric.  I'm
23  pretty sure we did.
24       Q.  Okay.
25       We'll get to that in a minute.

MAGNA ▶
LEGAL SERVICES

**EXHIBIT 18**
**PAGE 1079**

Page 98

1    A.  So there wasn't a loss.
2    Q.  At the end of that section, you say, and I
3  quote, "It is the City Manager's responsibility to ensure
4  that the Municipal Code Competitive Bidding Requirements
5  are followed, and that the City maintains an arm's length
6  relationship with third party contractors."
7        Do you see where I've read from, sir?
8    A.  Yes, sir.  I see it.
9    Q.  And you wrote that sentence; correct?
10   A.  Probably.  Probably.
11   Q.  But that was your conclusion --
12   A.  And I believed I signed the letter.
13   Q.  That was your conclusion of Mr. Kapanicas's
14  responsibility as of June 1, 2015; correct?
15   A.  Yes, sir.
16   Q.  The next sentence says, and I quote, "The
17  City Manager failed to fulfill this duty."
18        Do you see that, sir?
19   A.  Yes, sir.  I see it.
20   Q.  And isn't it true that by June 1, you had
21  conclude that Mr. Kapanicas, the City Manager, failed to
22  fulfill his duties faithfully; correct?
23   A.  I concluded -- it was my -- it was my concern
24  and my view that he had not done a good job as City
25  Manager, and -- for the reasons listed in this letter.

Page 99

1        And that's why I put it in the letter,
2  because we were going to meet with the Council in closed
3  session. Ultimately, they would decide whether they
4  wanted to keep him or not keep him.
5    Q.  But, ultimately, it was your conclusion not
6  only that he didn't do a good job, he failed to faithfully
7  fulfill his duties; right?
8        That's what you wrote.
9        MR. PISANO:  Object to form.
10        THE WITNESS:  That's what's written in the
11  letter, and that's what is in the letter. And I -- by the
12  way, today, knowing what I know today, I think that he
13  failed to fulfill his duties as City Manager.
14   Q.  BY MR. SCHMOOKLER:  But I don't want to know
15  what you know today, because what you know today may very
16  well be tainted by what you know through litigation.  And
17  I have to be cautious here, sir, that we don't disclose
18  anything that you learned in the litigation.
19        Hold on.  So I want to say as of June 1,
20  2015, you had concluded that Mr. Kapanicas, as City
21  Manager, failed to faithfully fulfill his duties, at least
22  as connected to Beaumont Electric; correct?
23        MR. PISANO:  Object to form.
24        THE WITNESS:  So that was the argument that I
25  would have been giving him notice that I would be making

Page 100

1  to the City Council in closed session, and that he had a
2  right to respond to that, and he had a right to have that
3  meeting take place in open session if he wanted.
4        But I am not -- I was not and am not his
5  judge and jury.  The issue that precipitated that letter
6  was whether the City Council wanted to keep him on as City
7  Manager, and we were going to have a closed session to
8  discuss that.
9        And I had an obligation to let him know what
10  was going to be discussed in that closed session, and that
11  was the reason this was written.
12   Q.  BY MR. SCHMOOKLER:  Yeah, no.  I understand
13  that.
14   A.  I'm not his judge. I'm not his judge. It's
15  not my role to make findings of fact. That's not the City
16  Attorney's role in this particular situation.
17   Q.  The City Attorney's role in this situation a
18  prosecutor; correct?
19   A.  No.
20   Q.  Was it your job to present the facts --
21   A.  Not correct, not correct.
22   Q.  -- was that your job to present the facts to
23  the City Council?
24   A.  My job with respect to this letter was to
25  give notice to Mr. Kapanicas of what was going to be

Page 101

1  discussed in closed session, as required by the Brown Act
2  and required by due process, and that's what I was
3  doing.
4    Q.  No.  In the context of the upcoming closed
5  session, it was your job to make a presentation to the
6  City Council; correct?
7        MR. PISANO:  Objection.  Privileged
8  communications.
9    Q.  BY MR. SCHMOOKLER:  I don't want to know the
10  substance of the communication, sir.  I want to know what
11  your role was in the context of making a presentation to
12  the City Council and Mr. Kapanicas's performance?
13        MR. PISANO:  And as phrased, I believe you
14  are getting into the substance of the conversation.
15   Q.  BY MR. SCHMOOKLER:  Sir, do you understand my
16  question as it was asked?
17   A.  I do.
18   Q.  Are you going to answer my question as it was
19  asked?
20   A.  Yeah.  I want to, you know, help you get the
21  information that you need, but, at the same time, I have
22  to be careful -- we're all lawyers here -- in not
23  violating the attorney/client privilege, for obvious
24  reasons.
25        But generally speaking, I can just tell you

MAGNA
LEGAL SERVICES

EXHIBIT 18
PAGE 1080

Page 102

1 that the way this would work, just generally speaking in a
2 situation like this, is the lawyer -- the City Attorney's
3 obligation is to prepare the notice.
4        It's mandated by the Brown Act and it is
5 required by due process to give Mr. -- to give the
6 employee who is being discussed in closed session notice
7 of the specific complaints and charges that are going to
8 be discussed in closed session.
9        And so, normally, the way that would work
10 would be that the City Attorney would then relay the
11 information to the City Council.  If there was an
12 investigator, then the investigator might relay that
13 information to the City Council.  So that's generally
14 speaking how that works.
15        But the person relaying the information is
16 not the judge, jury or even prosecutor.  They are just
17 providing information.
18        And then, you know, a council can decide,
19 well, we just don't think there's enough here, and -- to
20 terminate an employee, and so we're going to keep them.
21 Or we really like them, and they have apologized.  Or,
22 yeah, we think there's enough here, and we don't -- you
23 know, we feel it's a breach of trust, and we don't want to
24 keep him anymore.
25        Q.  Do you want to take a break?  I know we've

Page 103

1 been going quite awhile before we look at the next
2 document?
3        A.  Sure.
4        Q.  Okay.  Ten minutes?
5        A.  Sure.
6        THE VIDEOGRAPHER:  The time is 1:35 p.m.  We
7 were going off the record.
8        (Pause in proceeding.)
9        THE VIDEOGRAPHER:  This marks the beginning
10 of media number four in the deposition is John Pinkney.
11 The time is 1:45 p.m.  We are back on the record.
12        Q.  BY MR. SCHMOOKLER:  Sir, when we last left
13 off, we were talking about your June 1 letter.  It was
14 preceded by another communication to Mr. Pinkney.
15        Do you recall that, sir -- or I'm sorry,
16 Mr. Pinkney.  Mr. Kapanicas.
17        Do you recall that, sir?
18        A.  I haven't see it in quite a long time, so --
19        Q.  And I'll mark what I'm now marking as Exhibit
20 13, and I'll show on the screen, is a May 21, 2015, memo
21 from you to Mr. Kapanicas, entitled "Notice of Potential
22 Discipline and/or Dismissal/Removal."
23        (Exhibit Number 13 was marked for
24 identification.)
25        Q.  BY MR. SCHMOOKLER:  Do you see that, sir?

Page 104

1        A.  Yes.
2        Q.  And is Exhibit 13 a copy of a notice of
3 potential discipline that you, as City Attorney, issued to
4 Mr. Kapanicas May 21, 2015?
5        A.  It appears to be, yes.
6        Q.  And were the contents of this memo truthful
7 at the time you issued it to Mr. Kapanicas?
8        A.  Well, I wouldn't have lied, but I -- you
9 know, at that time, one of my concerns was that we lacked
10 documents, because the D.A. had taken documents,
11 computers, and management -- you know, all the management
12 in the City was mostly gone.
13        So I know we were still continuing to look
14 into issues, and we had identified concerns, issue
15 spotting, but I would not have lied in the document.
16        Q.  Okay.
17        Bottom -- on page 2, you wrote above the
18 bullet points, and I quote, "Evidence may also be
19 submitted that you took the following actions in violation
20 of your duties, the Beaumont Municipal Code, and/or state
21 and/or applicable federal laws," and then there's a colon.
22        Do you see where I read from, sir?
23        A.  Which bullet point is it?
24        Q.  There's bullets and there's numbers.  Do you
25 see right above the bullet points?

Page 105

1        A.  Yes.  "Evidence may also be submitted," got
2 it.  And then which bullet point?
3        Q.  No.  I'm just asking if you see where I read
4 from?
5        A.  I see that, yes.
6        Q.  So is it fair to say that in your May 21,
7 2015, notice to Mr. Kapanicas, you identified a series of
8 instances in which evidence may be submitted that he
9 violated his duties, the Beaumont Municipal Code, and/or
10 federal and state law?
11        MR. PISANO:  Object to form.
12        THE WITNESS:  So, the purpose of this
13 document was to comply with the requirements of the Brown
14 Act and due process to give notice to Mr. Kapanicas as an
15 employee of the City.
16        But the Council was going hold a closed
17 session, and, as indicated here, you know, I'm advising
18 him that evidence may also be submitted that you took the
19 following actions.
20        And so you don't know what's going to happen
21 in that closed session.  You don't know what's going to
22 come up in that closed session.  And so you want to be as
23 broad as possible.  At least what I was trying to do there
24 was be as broad, as encompassing as possible.
25        So that if those issues came up, that the

MAGNA ▶
LEGAL SERVICES

EXHIBIT 18
PAGE 1081

Page 106

1  Council would be allowed to talk about them.  Because if
2  you exclude something from the notice required by the
3  Brown Act, then you can't talk about it in closed session.
4          Because that would be, arguably, a violation
5  of the Brown Act and his due process rights.  And so you'd
6  having to go back and redo the notice and redo the
7  hearing.
8          And so, you know, as -- no doubt what I was
9  attempting to do here was to be as broad as possible by
10  saying, look, these are things that might be discussed in
11  a closed session to give him notice.
12         And then he can decide whether he wants to
13  have that discussion occur in closed session or, as is his
14  right, he could choose to have that discussion in open
15  session in front of the public.
16     Q.   BY MR. SCHMOOKLER:  But, sir, going back to
17  my question, you identified specific topics on which
18  evidence may be submitted against Mr. Kapanicas; is that
19  correct?
20     A.   Correct.
21     Q.   One topic -- and it's the first bullet
22  point -- are zero-interest loans issued without proper
23  City Council notice and approval; correct?
24     A.   That was one of the topics that might have
25  been discussed in closed session, and I was giving him

Page 107

1  notice; correct.
2     Q.   And because you were giving Mr. Kapanicas
3  notice, you, obviously, were aware, as of this memo, May
4  21, 2015, that there were, in fact, zero-interest loans
5  granted without City Council notice and approval;
6  correct?
7          MR. PISANO:  Object to form.
8          THE WITNESS:  I had concerns about how loans
9  to employees were handled.  The employees were borrowing
10  money against -- as I recall, against their accrued
11  vacation and sick leave.
12         And my view was that that was mishandled;
13  that it should have been -- that the employees should have
14  just cashed that out instead of borrowing against their
15  accruals, and I didn't agree with the way it was handled.
16         Because if the City terminated that employee,
17  my belief is that they would not be able to deduct any
18  amount owed from their final paycheck.  So from a
19  management perspective, I felt he mishandled that.  And so
20  I was giving him notice that that was something that might
21  be discussed in closed session.
22     Q.   BY MR. SCHMOOKLER:  And I was asking a
23  slightly different question.  I'm just trying to zero
24  in -- on is what transactions you were actually aware of
25  and what was continuing to be investigated.

Page 108

1          The existence of zero-interest loan without
2  proper City Council notice and approval was known as of
3  the May 21, 2015, notice; correct?
4     A.   I don't know if that's true.  I don't know
5  that's true, because it may have been -- I just -- I
6  haven't looked at this document in a long time.
7          It may have been something that I was told
8  verbally and hadn't found any corroborating evidence.  It
9  may -- you know, so it may have just been a concern based
10  on discussions with people.  It may have been I saw some
11  documents that gave me concerns regarding how these loans
12  were handled.
13         On May -- you said May 15, I was, I'm sure,
14  still, you know, looking into this issue and evaluating
15  this issue.  And so to say it the way you said it, I don't
16  necessarily agree with that.
17     Q.   Well, certainly by your June 1 letter, you
18  were aware of the loan, because you provided documentation
19  of those loans; correct?
20     A.   I believe -- I don't know that we found
21  everything ever, but we put together what we were able to
22  cobble them together, given that the D.A. and FBI had
23  taken, you know, truckloads of documents and computers
24  away.  So we put together what we were able to put
25  together.

Page 109

1          I had real concerns about whether we would be
2  able to prove these things, particularly since the
3  employees had paid off -- my understanding is the
4  employees had paid back the money or were in the process
5  of doing it, you know.
6          So is that enough to terminate an employee?
7  That was the issue I was concerned about.
8     Q.   Yeah.  I understand what you're concerned
9  about, and I don't want to get into whether or not it's
10  sufficient to terminate an employee.  I just want to
11  understand the facts you were aware.
12         I'll put back up on the screen the June 1
13  notice, and the section on "Loans to Employees," and you
14  will see, in the June 1 letter, you specifically attach
15  loan documents to your letter.
16         Do you see that, sir?
17     A.   Yes.
18     Q.   So certainly by June 1, you had documentation
19  of the interest-free loan loans; correct?
20     A.   I don't have it in front of me, but I
21  attached something.  I don't know that it was complete.
22  You know, I don't know, without looking at it, what those
23  documents indicate.
24     Q.   Okay.
25         Then, sir, I'm going to stop this deposition.



EXHIBIT 18
PAGE 1082

Page 110

1    Chris, I want the documents.  We have now
2    reached the spot where you guys either have the documents
3    and are going to produce them or you're not.
4          So let's go off the record, Mr. Pinkney.  I
5    apologize for wasting your time, but I don't have these
6    documents.  So let's go off the record.
7          THE VIDEOGRAPHER:  Before we go off the
8    record -- because this is the end of the deposition, did
9    Mr. Nolan --
10         MR. SCHMOOKLER:  No, it's not the end of the
11   deposition.
12         THE VIDEOGRAPHER:  Oh, okay.
13         MR. SCHMOOKLER:  We are going on a break
14   until I get the documents.
15         THE WITNESS:  And, Scott, can we finish the
16   remainder of the deposition if there's a remaining issue
17   that you need to work out with Chris?
18         MR. SCHMOOKLER:  No, no.
19         I mean, today's it.  Look, the reason I
20   emailed this, for purposes of the record, is this is it.
21   Today the day of discovery.
22         MR. PISANO:  Well, and I -- you got an email
23   from Juan Orneles with a Hightail link.
24         MR. SCHMOOKLER:  I don't know.  I'm in the
25   middle of a deposition.  So if -- if this is these

Page 111

1    documents -- let's go off the record.  These documents
2    aren't Bates stamped, which exactly is my query.
3          THE VIDEOGRAPHER:  The time is 1:55 p.m.  We
4    are going off the record.
5          (Pause in proceeding.)
6          THE VIDEOGRAPHER:  We are back on the record.
7    The time is 3:19 p.m.
8          Q.  BY MR. SCHMOOKLER:  Okay.
9          Mr. Pinkney, when we last left off, I was
10   asking you about your June 1 letter and the attachments.
11   We've had a discussion off the record.
12         And, Laura, I don't remember what number
13   we're on, but whatever I'm on, can you remind me?
14         THE REPORTER:  14.
15         MR. SCHMOOKLER:  I am going to show you what
16   is going to be marked as Exhibit 14.
17         (Exhibit Number 14 was marked for
18   identification.)
19         MR. SCHMOOKLER:  Hold on.  My computer is
20   failing me.
21         Let's off the record.  These are not in
22   order.
23         THE VIDEOGRAPHER:  The time is 3:21 p.m.  We
24   are off the record.
25         (Pause in proceeding.)

Page 112

1          THE VIDEOGRAPHER:  The time is 3:24 p.m., we
2    are back on the record.
3          Q.  BY MR. SCHMOOKLER:  I put up on the screen,
4    sir, what I'm marking as Exhibit 14.  This is a collection
5    of documents that were provided to me today and that I
6    understand represent, with the exception of Attachment
7    3.4, the exhibits to your June 1 letter.
8          Just for purposes of the record.  The
9    attachment does not include Attachments 1, Attachments 1.1
10   through 1.5, because they weren't included in what I
11   received today.
12         Do you recall -- and I'll ask my questions
13   now.
14         Do you recall that your June 1, 2015, letter
15   included attachments?
16         A.  I don't have any reason to believe that they
17   didn't.  I just -- you know, I don't remember sitting
18   here.
19         Q.  But, ultimately, the attachments to your
20   letter, if you want to flip through it, are all documents
21   that you gathered as part of your investigation to support
22   your conclusions or support the content of your June 1
23   letter, are they not?
24         A.  Yeah.  We -- you know, we were identifying
25   the issues that we had become aware of and giving notice

Page 113

1    to Mr. Kapanicas, and anything that we would have attached
2    would have been in furtherance of identifying those
3    issues.
4          Q.  But importantly, you were able to identify
5    specific points, specific records to support the
6    conclusions you were making in your letter dated June 1;
7    correct?
8          MR. PISANO:  Object to form.
9          THE WITNESS:  Yeah.  I don't think I was the
10   one to make the conclusions.  I think my role in the
11   process was to give him notice of what the issues were.
12         Q.  BY MR. SCHMOOKLER:  Okay.  I'll ask it a
13   different way.
14         You identified specific documents to support
15   the narrative contained in your June 1, 2015, letter;
16   correct?
17         A.  I would word it the way I worded it, which is
18   that, you know, we were identifying -- as I've testified
19   earlier, that we were identifying issues that we became
20   aware of, and we were giving him notice of those issues
21   and providing him whatever documents we had to support
22   them.
23         And, you know, it was an ongoing evolution,
24   the process, that culminated later.  And we were
25   identifying issues, because a lot of the time, we didn't

29 (Pages 110 to 113)

MAGNA
LEGAL SERVICES

EXHIBIT 18
PAGE 1083

## Page 114

1  know, you know, whether we'd be able to prove certain
2  things, but we had what we had, and we were giving him
3  notice of the issues we identified --
4        Q.  Well, hold on.
5        A.  -- with supporting documents.
6        Q.  Your letter does identify issues.  I agree
7  with you.  It also identifies facts, dates and events,
8  does it not?
9              MR. PISANO:  Object to form.
10       Q.  BY MR. SCHMOOKLER:  All right.  Let's take it
11 in turn.
12             Your letter identifies dates, does it not?
13       A.  Identified what?
14       Q.  Dates.
15       A.  I'm sorry.  I can't hear you.
16       Q.  Your letter identifies dates?
17       A.  I believe, yeah, there are dates in there.
18       Q.  Your letter identifies correspondence;
19 correct?
20       A.  If that's what's attached to the letter.  I
21 haven't looked at it.  I haven't looked at that letter.  I
22 don't think -- other than during the break when we were
23 trying to locate the exhibits, I haven't really looked at
24 the letter.
25       Q.  But your letter, importantly, identifies

## Page 115

1  specific conduct by specific people within the City, does
2  it not?
3        A.  Whatever's in there is what it identifies.
4        Q.  Well, I want to know.  Do you agree with me
5  that your letter of June 1 identifies specific conducts
6  that occurred within the City during Mr. Kapanicas'
7  tenure?
8              MR. PISANO:  Object to form.
9              THE WITNESS:  I mean, the document says what
10 it says.  And, you know, our role at that time -- this is
11 very early on.  We had only been there for about a
12 month -- was we went through contracts, relationships.
13             We reviewed things in very, very short order,
14 despite the fact that the D.A. and FBI had carted off
15 documents, as part of their investigation that was
16 ongoing, and taking computers.
17             And we put together what we could.  And we
18 were identifying the issues to put Mr. Kapanicas on
19 notice.  And then later, as he got a lawyer, put his
20 lawyer on notice on what these issues were, and what
21 evidence that we had in connection with those issues.
22             I haven't read the letter -- I haven't read
23 the letter in the while from cover to cover, so I can't
24 really -- I mean, it says what it says.
25       Q.  BY MR. SCHMOOKLER:  That's what important

## Page 116

1  thing.  By June 1, 2015, you had identified some evidence
2  against Mr. Kapanicas; correct?
3        A.  Whatever we attached to the letter is what we
4  had at that time.
5        Q.  So the answer to my question is yes.  You had
6  evidence to support the notice of discipline against
7  Mr. Kapanicas as of June 1; correct?
8              MR. PISANO:  Object to form.
9              THE WITNESS:  We attached what we had at that
10 early stage, which was -- you know, it progressed as time
11 went.  We gathered more and more information.  But we gave
12 him notice of what we had at that point that related to
13 the issues we had identified in the notice.
14       Q.  BY MR. SCHMOOKLER:  One of the things that
15 you knew about was that is Mr. Dillon, through the Steiner
16 Group, was -- continued to provide services to the City of
17 Beaumont; correct?
18       A.  I believe that to be the case, yes.
19       Q.  And one of the issues that you did know
20 about, as of June 1, was that the owners of Urban Logic
21 were permitted to occupy City offices while continuing to
22 benefit from numerous contracts with the City; correct?
23       A.  I believe that Urban Logic had been sold at
24 that time to a new company, to a new company and owner by
25 the name of Torcal and Kieran McKiernan.

## Page 117

1        Q.  No.  I asked a different question, and I'll
2  show you your June 1 letter again, sir.  And I forgot what
3  exhibit number this is, so I apologize.
4              But for the record, I'm showing you again
5  your June 1 letter that we've been looking at all day.
6  And on page 10 of that letter, you wrote, second full
7  paragraph,
8              "It was also under the City Manager's
9              tenure that the owners of Urban Logic were
10             permitted to occupy City offices, were issued
11             City business cards, all the while continuing
12             to benefit from numerous contracts with the
13             City."
14             Do you see where I've read from, sir?
15       A.  Yes.
16       Q.  And you had uncovered that fact as of June 1,
17 2015; correct?
18       A.  Yeah.  If it's in the letter, then I would
19 have been aware of it at that time.
20       Q.  Well, as to that very fact, you were aware of
21 it; correct?
22       A.  That they occupied City offices?  I believe
23 that was prior to my coming to work for the City that they
24 had occupied City offices.
25       Q.  Sure.

MAGNA
LEGAL SERVICES

EXHIBIT 18
PAGE 1084

Page 118

1    But whether it was -- whether that conduct
2 predated your tenure or not, by June 1, 2015, you had
3 uncovered that Mr. Kapanicas allowed the owners of Urban
4 Logic to occupy City offices while continuing to benefit
5 from their numerous contracts with the City; correct?
6    MR. PISANO:  Object to form.
7    THE WITNESS:  So, I became aware probably
8 from just speaking to people at City Hall that those
9 individuals that were -- I think you referred to them as
10 the principals of Urban Logic earlier, had offices at the
11 City, and that they were doing work for the City.
12    And I was pointing out that that was -- you
13 know, just didn't give the appearance of an arm's length
14 relationship.
15    Q.  BY MR. SCHMOOKLER:  No.  It gave the
16 appearance of a conflict of interest; right?
17    A.  Yeah.  It says here, "The City Manager
18 permitted an environment that did not appear to require
19 arm's length competitive procedures and negotiations with
20 Urban Logic and its owner."
21    And then I go onto say that, "Failure to
22 procure engineering services through a competitive process
23 violated the requirements of the City Code and Government
24 Code Section 4529.12."
25    Q.  So is it fair to say that at least as to the

Page 119

1 failure to procure engineering services through a
2 competitive process, you were aware that Mr. Kapanicas has
3 failed to faithfully perform his duties as of June 1,
4 2015?
5    MR. PISANO:  Objection.  Object to form.
6    THE WITNESS:  I don't know that I would word
7 it maybe the way that you worded it.  It was an issue that
8 was a concern, and it was an issue that -- the purpose of
9 the letter was to identify the issues on which a hearing
10 was going to be held.
11    And so I was putting them on notice that this
12 was an issue that might be -- that might come up during
13 the hearing.
14    Q.  BY MR. SCHMOOKLER:  Why was the fact that the
15 owners of Urban Logic maintained offices at the City while
16 continuing the fact that from their numerous contracts
17 with the City an issue that you were concerned with?
18    A.  I think what I state in the letter, that it
19 just gave the appearance, that it wasn't an arm's length
20 competitive process.
21    Q.  And you don't think the failure to maintain
22 an arm's length -- well, strike that.
23    Let's turn to page 7 for a second.  I think
24 it's further than that.  Maybe I can refresh your memory.
25    At the top of page 7, you write about

Page 120

1 Mr. Dillon and a violation of a section 1090.
2    Do you see that, sir?
3    A.  Let me just read it here.
4    MR. PISANO:  Object to form.
5    MR. SCHMOOKLER:  I haven't asked a question
6 yet.
7    MR. PISANO:  I think you did.  Your question
8 was, do you see that, sir?  And I think the way you
9 phrased the question is objectionable.
10    MR. SCHMOOKLER:  I don't need an explanation,
11 Chris.  I'm okay.
12    MR. PISANO:  Okay.  Then you're the one --
13    MR. SCHMOOKLER:  I'll let you know when I
14 need an objection.
15    MR. PISANO:  Okay.  You engaged.
16    THE WITNESS:  Can I see the rest of that
17 paragraph, please?
18    Q.  BY MR. SCHMOOKLER:  (Complies.)
19    A.  So -- I'm sorry.  Okay.
20    So I see the language, yes.
21    Q.  So by June 1, 2015, you knew that Mr. Dillon
22 provided engineering and other services to the City for
23 decades without a competitive process; correct?
24    A.  That's what the letter says.
25    Q.  So the answer is "yes"?

Page 121

1    A.  Well, I didn't know it, because I hadn't been
2 around for decades.  But I was providing notice to
3 Mr. Kapanicas and his lawyer of what the issues were that
4 we had identified.  I had no personal percipient knowledge
5 of this.
6    Q.  But as a result of your work as the City
7 Attorney, one of the facts you had uncovered is
8 that -- and had uncovered by June 1, 2015, is that
9 Mr. Dillon provided engineering and other services to the
10 City without a competitive process; correct?
11    A.  One of the issues I had identified was as you
12 described, and I was giving notice to Mr. Kapanicas and
13 his lawyer that there was going to be a hearing where that
14 issue would come up.
15    Q.  And why was Mr. Dillon providing engineering
16 and other services without a competitive process an issue
17 that might warrant discipline against Mr. Kapanicas?
18    A.  I don't know, because it predated me.
19    Q.  Well, in your June 1 letter, you provide
20 Mr. Kapanicas notice that Mr. Dillon's provision of
21 engineering and other services without a competitive
22 process might be discussed at his disciplinary proceeding;
23 correct?
24    A.  Yes.
25    Q.  Why did you give him notice of that?



EXHIBIT 18
PAGE 1085

Page 122

1    A.  Because it was an issue of concern that I
2  knew might come up at the hearing, and so my obligation
3  was to give him notice.  Because if we leave anything out,
4  then we might have to go back and start the process over.
5    And so I was -- it was an issue, and I was
6  giving him notice of it, because it may come up at the
7  hearing.
8    Q.  But importantly, you write in this letter,
9  the reason it's an issue is because he violated the
10  Municipal Code; correct?
11    MR. PISANO:  Object to form.
12    THE WITNESS:  I'm just looking at the letter
13  here.
14    I don't remember.
15    Q.  BY MR. SCHMOOKLER:  Well, it would be the
16  sentence right after, that we just read, said, "This
17  violated the Municipal Code as well as state law."
18    Do you see that?
19    A.  Yes.  Let me just look at the paragraph
20  again.
21    So the -- one of the reasons I don't
22  remember, and I don't want to misstate anything, is we've
23  changed the Municipal Code since I've been there to
24  mandate a more competitive process on awarding contracts.
25    And so I just don't remember what the

Page 123

1  said before we modified it.  And we've had it modified for
2  years now, and that's what I've been operating under, and
3  that's what I'm familiar with, but I don't remember what
4  it required before.
5    Q.  Well, in your June 1 letter, you specifically
6  found that Mr. Dillon providing engineering services
7  without a competitive process "violated the Municipal
8  Code"; correct?
9    A.  Well, that's what the letter states.  Again,
10  the letter was to identify issues that were going to be
11  addressed in a hearing.  Mr. Kapanicas and his lawyer had
12  a right to notice of what those issues were, and that's
13  what the purpose of the letter was.
14    Q.  And one of the issues that you wanted to
15  discuss -- or strike that.
16    One of the issues that you wanted to provide
17  notice of is that Mr. Kapanicas violated the Municipal
18  Code when it came to allowing Mr. Dillon to provide
19  engineering services without a competitive process;
20  correct?
21    A.  Yeah --
22    MR. PISANO:  Object to form.
23    THE WITNESS:  I don't recall what I wanted at
24  that time.  I know what's in the letter, and it is what it
25  says.

Page 124

1    Q.  BY MR. SCHMOOKLER:  So, all right.  I'll
2  rephrase.
3    You provided Mr. Kapanicas notice that, in
4  the context of a disciplinary hearing, that one of the
5  issues that might be raised is his violation of the
6  Municipal Code by allowing Dillon to provide services
7  without a competitive process; correct?
8    MR. PISANO:  Object to form.
9    THE WITNESS:  Whatever the letter says is the
10  notice that I gave him of the issue that had been
11  identified that might come up at the hearing.
12    Q.  BY MR. SCHMOOKLER:  Well, do you know?
13    Sir, look.  I'm entitled -- you know, as a
14  lawyer, I want to know what you're going to say at trial.
15  You're not going to be able to come to trial and say, "The
16  letter says what the letter says."
17    So were you aware that Mr. Dillon provided
18  engineering and other services for decades without a
19  competitive process in violation of the Municipal Code as
20  of June 1, 2015?
21    MR. PISANO:  Object to form.
22    THE WITNESS:  Yeah.  I think that was an
23  issue we had identified in a very, very short period of
24  time, with lack of documents, because the D.A. and FBI had
25  removed documents and computers from City Hall, and it was

Page 125

1  an issue that we were -- we were able to put this thing
2  together, cobble it together in 30 days.
3    And so it was one of a number of issues that
4  we identified.  We were going to have a hearing.  The
5  focus of that hearing was to terminate Mr. Kapanicas,
6  potentially, potentially, not for sure, but potentially.
7    And I had a duty to give him notice of what
8  the issues were that might come up or be discussed, and
9  that's what I was doing.  I was not --
10    Q.  BY MR. SCHMOOKLER:  You can't make stuff up
11  for the letter; right?
12    A.  I was not his judge or jury.  My obligation
13  was to give notice of the issues we had identified in a
14  really short period of time with not ideal circumstances
15  regarding the availability of documents and witnesses.
16    Because management had -- was -- management
17  was, essentially, not available.  They had left or were on
18  leave.  And computers had been taken.  And we put together
19  what we could in a relatively short period of time.
20    And I had real concerns at that time about
21  what, you know, could be proven.  I mean, we knew there
22  was issues.  We had identified them, what the issues were,
23  what the questions were.  But we -- you know, we -- there
24  were concerns, that early on, that early on.
25    Later, as time went on and more information

MAGNA
LEGAL SERVICES

EXHIBIT 18
PAGE 1086

Page 126

1    was gathered, I think we felt more confident.  And we put
2    your client on notice.
3           Well, certainly after the D.A. filed charges,
4    we were relying on the D.A. to do their investigation of
5    any criminal wrongdoing.  And as soon as we had that
6    information and the D.A.'s charges, we passed that
7    information onto your client.
8           MR. SCHMOOKLER:  Move to strike.
9    Non-responsive.
10          Laura, please read my question back.
11          THE REPORTER:  "Well, do you know, sir?  And,
12          look, I'm entitled to know what you're going
13          to say at trial and not -- going to say at
14          trial that the letter says what the letter
15          says.
16            "So were you aware that Mr. Dillon
17          provided engineering and other services for
18          decades without a competitive process in
19          violation of the Municipal Code as of
20    June 1, 2015?"
21          Q.  BY MR. SCHMOOKLER:  Are you aware of that
22    fact?
23          MR. PISANO:  Object to form.
24          THE WITNESS:  My answer is what I would say,
25    if called as a witness at trial, the answer is that I just

Page 127

1    gave.
2           Q.  BY MR. SCHMOOKLER:  I'm going to ask my
3    question again, and I'll keep asking it until I have a
4    answer what you said, with all due respect.
5           MR. PISANO:  I'm going to object, Scott.  If
6    that's what you're going to do, then that would be
7    harassment.
8           MR. SCHMOOKLER:  Go for it.  Go for it.
9           I'm happy to read that transcript back.  I've
10    been very patient.  I just want to know what he was aware
11    of as of a very specific date.
12          MR. PISANO:  I believe he's answered that,
13    multiple times.
14          MR. SCHMOOKLER:  He has not.
15          MR. PISANO:  I believe he has.
16          MR. SCHMOOKLER:  Okay.
17          Well, the transcript will reveal one way or
18    the other.  All right.
19          Q.  BY MR. SCHMOOKLER:  Sir, were you aware, as
20    of June 1, 2015, that Mr. Dillon provided engineering
21    services without a competitive process?  "Yes" or "no"?
22          MR. PISANO:  Objection to the form of the
23    question.
24          MR. NOLAN:  Join.
25          THE WITNESS:  Because I was not a percipient

Page 128

1    witness of that, I would not have personally known that.
2    I was giving notice of what the issue was that we had
3    identified, that we were obligated to give to
4    Mr. Kapanicas and his lawyer in advance of the hearing
5    that was going to be taking place.
6           He had a right to that notice, and we
7    gave him that notice.  But did I have personal knowledge?
8    Did I know?  No, because I wasn't there during that time
9    period.  That all predated me, so I had no percipient
10    knowledge of that.
11          Q.  BY MR. SCHMOOKLER:  Sir, you conducted an
12    investigation prior to this June 1 letter, did you not?
13          A.  We were asked to review relationships that
14    existed, contracts, you know, how Mr. Kapanicas, as the
15    City Manager, had handled certain things.  And at the
16    time, the City was trying to decide whether it wanted to
17    stay with Mr. Kapanicas, which was an option, or not.
18          And so our role was to go through, review
19    contracts, relationships that had existed and identify
20    issues that were of concern.  And, ultimately, we gave a
21    notice of a hearing.
22          And the purpose of this notice was to give
23    notice of what the issues were, not conclusions by me
24    based on -- you know, I was not a percipient witness of
25    those events.

Page 129

1           Q.  Sir, you were not allowed to make stuff up in
2    this June 1 letter; right?
3           Strike that.
4           You had to have an actual basis for each of
5    the issues you raised in the June 1 letter; correct?
6           A.  The purpose of the -- I think there's a
7    misunderstanding.  The purpose of the letter is to give
8    Mr. Kapanicas and his lawyer notice of what the issues are
9    that are likely to be addressed -- and any documents that
10    we had to support those issues, that are likely to be
11    addressed at the hearing.
12          He was entitled to that notice, and that's
13    what it was.  I was not -- not a percipient witness of
14    those events that predated me.  I'm not the Trier-of-Fact.
15    I'm not the judge.  I'm not the jury.
16          I'm going through the process, the due
17    process requirement of giving him notice of what the
18    issues are that are going to be addressed at the hearing.
19    That's what I was doing.
20          Q.  Are the contents of the June 1 letter
21    accurate?
22          MR. PISANO:  Object to form.
23          THE WITNESS:  They were accurate in the sense
24    that those were the issues that we had identified that
25    might be addressed at the hearing.

MAGNA◆
LEGAL SERVICES

EXHIBIT 18
PAGE 1087

Page 130

1      Q.   BY MR. SCHMOOKLER:  But you have no clue, as
2  you sit here today, if Mr. Kapanicas is, in fact, engaged
3  in any wrongdoing whatsoever as a percipient witness; is
4  that correct?
5      A.   Well, you know, as I sit here today --
6           MR. PISANO:  Object to form.
7           THE WITNESS:  -- there's a lot that -- you
8  know, we're talking about the June 1, 2015, letter.  But
9  there's a lot that's transpired since then, including Mr.
10 Kapanicas pleading guilty to a felony.
11     Q.   BY MR. SCHMOOKLER:  Mr. Kapanicas pled guilty
12 to conduct that resulted in no loss of funds to the City;
13 right?
14     A.   I'm just --
15     Q.   Hold on.  I want my question answered.
16          Mr. Kapanicas pled guilty to no conduct that
17 resulted in any loss to the City; correct?
18          MR. PISANO:  Object to form.
19          THE WITNESS:  I'd have to look at what he --
20     Q.   BY MR. SCHMOOKLER:  Okay.  Let's look
21 together.
22          Put up on the screen.  I'll just -- I forgot
23 what exhibit we marked this.  Earlier, we looked at
24 Mr. Kapanicas' factual basis -- the factual basis for his
25 plea.  So let's just go paragraph by paragraph.

Page 131

1          First, the first full paragraph, talks about
2  Mr. Kapanicas' business called General Government
3  Management Services, do you see that, otherwise known at
4  GGMS?
5      A.   Yes.
6      Q.   And Mr. Kapanicas, as principal of GGMS, in
7  fact, provided services to the City of Beaumont; correct?
8      A.   Yes.
9      Q.   And City of Beaumont paid Mr. Kapanicas for
10 the services that GGMS provided to the City; correct?
11     A.   I believe that to be the case, yes, but I'm
12 not the one that conducted the D.A.'s investigation.  I
13 believe that to be the case.  I wasn't around when those
14 things happened.
15     Q.   Okay.
16          Now, the second paragraph talks about
17 millions of dollars from TUMF funds.  Do you see that?
18     A.   "From July, 2003 and June, 2009, the City of
19 Beaumont collected millions of dollars from developers and
20 the City as TUMF, and that these TUMF funds should
21 have" --- and I'm skipping -- "should have been remitted
22 to WRCOG."
23     Q.   So the second paragraph talks about money not
24 owed to the City, money that was owed to Western Riverside
25 Council of Governments; correct?

Page 132

1      A.   Correct.
2      Q.   So the second prong of Mr. Kapanicas' plea
3  doesn't involve the taking of money from the City, but,
4  instead, the failure to remit funds to somebody else,
5  meaning Western Riverside Council of Governments; correct?
6      A.   Well -- so that that statement is complete
7  and accurate, the City was sued and ended up having what
8  amounted to, in the end, somewhere north of $60 million
9  judgment that the City did have to pay a portion of
10 pursuant to a settlement agreement.  So the City did
11 suffer losses as a result of that conduct.
12     Q.   Well, the City had a liability as a result of
13 the failure to remit those funds; is that correct?
14     A.   It ended up having a judgment issued against
15 it, and then they entered into -- the City and WRCOB
16 entered into a settlement.
17     Q.   And then that judgment is the same judgment
18 we talked about earlier that was disclosed before the
19 purchase of the '15-'17 policy; correct?
20          MR. PISANO:  Object to form.
21          THE WITNESS:  Can you restate that question?
22     Q.   BY MR. SCHMOOKLER:  Sure.
23          The judgment, as referenced in paragraph two
24 of Mr. Kapanicas' factual plea, is the judgment that was
25 entered and disclosed prior to the effective date of the

Page 133

1  2015-2017 policy; correct?
2           MR. PISANO:  Object to form.
3           THE WITNESS:  It was -- it was referenced in
4  my June 1, 2015, letter.  Whether it was -- that judgment
5  was disclosed by Alan Kapanicas to the Council before my
6  tenure, I have no idea.
7           I have no idea whether he told the Council of
8  that language that was quoted in my June 1, 2015, notice,
9  whether he relayed that language to the Council, and
10 I -- I just don't know.  But I wouldn't be surprised if he
11 didn't.
12     Q.   BY MR. SCHMOOKLER:  Okay.
13          And either way, the judgment referenced in
14 Mr. Kapanicas' factual plea was disclosed by you to the
15 Council no later than June 1, meaning before the inception
16 of the 2015-2017 policy; correct?
17          MR. PISANO:  Object to form.
18          THE WITNESS:  Well, I think you're
19 asking -- are you asking me to disclose privileged
20 communications with my client?
21     Q.   BY MR. SCHMOOKLER:  No.
22          You had public discussions of that judgment
23 outside of privileged discussions, namely your June 1,
24 2015, letter, did you not?
25     A.   That was -- the June 1, 2015, letter that I

**MAGNA** ◆
**LEGAL SERVICES**

EXHIBIT 18
PAGE 1088

Page 134

1  signed was a notice to Alan Kapanicas and his lawyer of
2  issues that would be addressed at a hearing. I don't know
3  if the Council -- I don't know when the Council would have
4  seen that letter or if they saw it. I just -- I don't
5  recall that one way or the other.
6      Q.  Okay.
7          Third, the interest-free loans are discussed
8  at the bottom of page 1, top of page 2. Do you see that?
9      A.  Okay.
10         So we're looking at Kapanicas' plea
11 agreement; right?
12         Okay. I see it.
13     Q.  And those loans were repaid, you said
14 earlier. Do you remember that?
15     A.  I believe they were either repaid or almost
16 all repaid is my recollection.
17     Q.  But in either event, the plea as to the
18 repayment of these loans was -- did not resolve in a
19 financial loss to the City, did it?
20     MR. PISANO:  Object to form.
21     THE WITNESS:  The money would have been
22 loaned out interest free. So if the City was loaning out
23 money interest free, and if -- if -- if it was a gift of
24 public funds, then, you know, there would have been some
25 loss to the City in the form of lost interest.

Page 135

1          But the principle, my recollection, was paid
2  back, and I don't remember when we discovered that, but it
3  was paid back or mostly paid back.
4      Q.  BY MR. SCHMOOKLER:  But in any event, you
5  knew that there was interest-free loans as of June 1,
6  2015, because it's in your letter; correct?
7      A.  Well, we gathered the information together as
8  best we could. We, I believe, had some spreadsheets
9  showing -- that indicated that there had been these loans
10 that were on the books.
11         And, you know, I think there were actually
12 some written agreements for those loans, if I recall
13 correctly, that some of them had written agreements.
14         But just the way that they had been handled,
15 I had concerned about it. And I didn't think they were
16 properly handled, for the reasons I've already testified
17 to. And when I became aware of that, I ended up putting
18 that in my notice to Mr. Kapanicas and his lawyer.
19     Q.  Who's in charge of what's proper, you
20 or -- strike that. I'll ask it differently.
21         You mentioned a couple times today you didn't
22 think things were properly handled. What was the -- what
23 was the comparison you were making in determining whether
24 something was proper?
25     A.  So, for example, in that particular instance

Page 136

1  with the interest free loans, the concern, as I explained
2  before, was that they would have been interest free.
3          And had the City terminated an employee that
4  had a balance owed, that the City wouldn't have been
5  protected, because the City wouldn't have been able to
6  withhold the balance owed from the final paycheck of the
7  employee. And so the City wasn't protected in that
8  situation.
9          And I couldn't find any record that the
10 Council had approved these loans, which is -- in my view,
11 something like that should be approved by the Council, if
12 they are going to do it at all.
13     Q.  So is it fair to say, then, that these loans,
14 you learned, were not authorized?
15     A.  Based on --
16     MR. PISANO:  Object to form.
17     THE WITNESS:  Based on the information I had
18 at the time, they did not appear to have been approved by
19 the Council.
20     Q.  BY MR. SCHMOOKLER:  Did the City Manager have
21 unilateral authority for approve loans without City
22 Council's approval?
23     A.  No.
24     Q.  So is it fair to say, then, that you learned
25 that Mr. Kapanicas made loans in excess of his authority

Page 137

1  without City Council approval?
2      MR. PISANO:  Object to form.
3      THE WITNESS:  That was the concern, and that
4  was the issue that we were raising.
5      Q.  BY MR. SCHMOOKLER:  And the reason it was an
6  issue because he exceeded his authority in that
7  instance?
8      A.  That was the concern, yeah. And so we knew
9  there was going to be a hearing, and that's why -- that
10 might address that issue. And for that reason, I included
11 that in the notice to him and his lawyer, so that he would
12 have due process and notice of that hearing and the
13 subject that was going to be covered.
14     Q.  And maybe there's a way to short-cut some of
15 this. In your letter -- and I'm putting your June 1
16 letter up again, sir. On page 2, you go through a
17 recitation of the powers and duties of the City Manager.
18         Do you see that, sir?
19     A.  Yes. I believe that comes out of the city
20 Code.
21     Q.  And it continues onto page 5?
22     A.  I believe -- I believe it does. I believe it
23 comes out of the City Municipal Code.
24     Q.  Were all of the issues raised in your June 1
25 letter raised because Mr. Kapanicas either exceeded his

**MAGNA** ▶
**LEGAL SERVICES**

EXHIBIT 18
PAGE 1089

Page 138

1  powers or failed to properly -- failed to properly perform
2  his duties?
3          MR. PISANO:  Object to form.
4          THE WITNESS:  They were raised because my
5  role was to make sure that he had notice of the issues
6  that were could potentially be addressed at the hearing
7  and result in his termination.
8          And the reason they were raised was because
9  my focus, my concern was that I wanted to make sure that
10 they wouldn't be able to come back and argue that he
11 didn't have notice, a meaningful notice and an opportunity
12 to be heard, that his due process rights were respected.
13 And so we were identifying the issues that might be
14 addressed at that hearing.
15     Q.  BY MR. SCHMOOKLER:  And all of the issues you
16 were addressing were instances where you found that either
17 he failed to fulfill his duties or exceeded his powers;
18 correct?
19         MR. PISANO:  Object to form.
20         THE WITNESS:  I don't know that I can agree
21 with that statement.
22     Q.  BY MR. SCHMOOKLER:  Were there examples in
23 your June 1 letter where you found that he exceeded his
24 power as City Manager?
25         MR. PISANO:  Object to form.

Page 139

1          THE WITNESS:  I don't think that he should
2  have authorized loans to City employees without the
3  Council's approval.
4      Q.  BY MR. SCHMOOKLER:  So that would be at least
5  one example where he acted in excess of his power;
6  correct?
7          MR. PISANO:  Object to form.
8          THE WITNESS:  I just think that a policy
9  decision like that, to give loans to City employees,
10 should have been approved by the Council, or at least
11 addressed with the Council, and I'm not aware that that
12 ever occurred.
13     Q.  BY MR. SCHMOOKLER:  And you thought that
14 because none of the powers and duties, as stated in your
15 June 1 letter, include granting loans to employees without
16 City Council approval; correct?
17     A.  I say that because I think it's a policy
18 decision for the Council whether to adopt a program like
19 that.  And to my knowledge, they were not given the
20 opportunity to evaluate that policy and make a decision.
21     Q.  And, apparently, by making policy decisions
22 without City Council approval, Mr. Kapanicas did not have
23 that authority?
24     A.  I just -- what I said is my answer.  And that
25 is I think, under those circumstances -- those specific

Page 140

1  circumstances, that a decision to adopt a program to make
2  loans to employees should have gone to the Council.
3      Q.  Well, Mr. Kapanicas, as the City Manager, had
4  no authority to spend funds without City Council approval;
5  correct?
6          MR. PISANO:  Object to form.
7          THE WITNESS:  I'm not sure I can answer that
8  question the way it was asked.  Because normally what
9  happens is there's a budget there's adopted for -- for
10 example, there would be a budget for utility authority for
11 the City, for the finance authority, if they have a
12 budget.
13         And then once that budget is adopted,
14 normally, budgeted items can be -- the City can move
15 forward with budgeted items, and he doesn't have to come
16 back to the -- in any city, just generically, you don't
17 have to come back to the city for approval of every dollar
18 that they spend.
19         It would be impossible to run a government
20 like that.  So they adopt a budget.  And expenses that are
21 approved within that budget, the City Manager would go
22 forward and incur those expenses.
23         The exceptions -- there are some exceptions
24 to that rule, though.  There are some thing that should
25 come back to the City Council.

Page 141

1      Q.  BY MR. SCHMOOKLER:  On page 3 of your letter,
2  you talk about the Cherry Valley Automotive and Mr.
3  Aylward.
4          Do you see that, sir?
5      A.  Yes, I do.
6      Q.  You investigated Mr. Aylward's interest in
7  the Beaumont tire and Beaumont Auto Center; correct?
8      A.  We looked at relationships that existed.
9  That was one of the relationships that we looked at that
10 gave us concern.
11     Q.  That gave you concern because Aylward had a
12 direct or indirect financial interest in his tenants and
13 his partner Kiker's business, Beaumont Tire and Cherry
14 Valley Automotive; correct?
15     A.  We couldn't prove it at the time.  We
16 couldn't prove it.  But we had identified that issue, and
17 what -- I had an obligation -- I knew that that was
18 something that might come up at the hearing, and so I had
19 an obligation to put Mr. Kapanicas and his lawyer on
20 notice that that was an issue that could come up.
21         But, you know, could we prove that Aylward
22 financially benefited from that relationship?  I -- you
23 know, I don't know that we could have, certainly not on
24 June 1, 2015.  But we identified the issue that was
25 required -- as we are required to do.



EXHIBIT 18
PAGE 1090

Page 142

1    Q.  Is it fair to say, then, that you wanted to
2  provide Mr. Kapanicas notice of events that may have
3  constituted a breach of his duties in order to make sure
4  that he had an opportunity prepare for the hearing?
5    A.  I wouldn't agree with that phrasing.  I would
6  say that I was meeting my obligation to give Mr. Kapanicas
7  notice of issues that might be considered at the hearing
8  at which his employment might be affected.
9  And we're required to give that notice, and I was making
10  sure that he had meaningful notice of the issues that
11  might be addressed.
12    Q.  But you couldn't just talk about any issues
13  in the context of dismissing Mr. Kapanicas; correct?
14    A.  You could.
15    Q.  So, for example, if you didn't like that he
16  wore blue suits, that would be a grounds for discussing
17  his termination?
18    A.  It's a bad analogy or hypothetical.  But
19  there are sometimes issues that come up that can be
20  included that may not, alone, constitute grounds for
21  termination but that would be one of the factors that the
22  Council or the hearing officer might want to consider.
23        And because that's going to be considered, we
24  had an obligation to give him notice of the specific
25  complaints or charges that are going to be -- that might

Page 143

1  be addressed at that hearing.
2    Q.  But you haven't asked my question.
3        So if it was something trivial, like the City
4  Council doesn't like blue suits, you're saying that would
5  be something you'd give him notice on, just because they
6  don't like blue suits; right?
7        MR. PISANO:  Object to form.
8        THE WITNESS:  I don't think it's a good
9  example.  I don't think it's a compelling reason to
10  terminate somebody.  Obviously, you know, if there was a
11  reason that was unlawful or against public policy, you
12  wouldn't include that.
13        But if he would shout at employees,
14  hypothetically speaking, you know, that's something that
15  may not be illegal, but it's something that you would
16  include in the notice, because he has a right to know that
17  that might be considered at the hearing at which his
18  employment status is being considered.
19    Q.  BY MR. SCHMOOKLER:  Sure.
20        But you didn't find any instances where he
21  ran an unprofessional environment at the City, correct,
22  like shadowing employees, did you?
23    A.  I was just giving that as an example.
24    Q.  Understood.
25        You didn't find that, though.  That's not

Page 144

1  what happened in this case?
2    A.  Yeah.  It was just an example.
3    Q.  In each and every instance in this case, you
4  were tying the items you were providing notice of to some
5  potential or actual violation of Mr. Kapanicas' duty as
6  City Manager; correct?
7    A.  I was giving him notice of the issues that we
8  had identified that were likely or might be addressed at
9  the hearing at which is employment status could be
10  impacted, Because we were obligated to give him that
11  notice.
12    Q.  Were any of the issues that you were
13  providing notice of not tied to some duty as City
14  Manager?
15        MR. PISANO:  Object to form.
16        THE WITNESS:  I don't -- I don't -- I can't
17  say for sure one way or the other.
18    Q.  BY MR. SCHMOOKLER:  Now, sir, earlier, we
19  talked about you providing notice to my client -- you
20  provided notice to prior there being a criminal
21  indictment; correct?
22    A.  We -- I believe that we did, yes, in April of
23  2016, that we -- and my office was involved in that,
24  identifying the things.
25        You know, we didn't want to include things in

Page 145

1  there that were just hearsay or water cooler talk, or
2  there was a lot of wild speculation going on.  We didn't
3  throw things in that we didn't feel that we had, you know,
4  some -- something more concrete than that.
5        And we identified the things that we had at
6  that time, and as other things became known, we made those
7  known to the carrier.
8    Q.  Isn't it true that you concluded that Mr.
9  Kapanicas violated Section 1090 of the California
10  Government Code more than six months before you provided
11  any notice to my client?
12        MR. PISANO:  Object to form.
13        THE WITNESS:  I don't -- can you give me a
14  specific of what you're --
15    Q.  BY MR. SCHMOOKLER:  Isn't true that on
16  October 1, 2020 -- strike that.
17        Isn't true that by October 1, 2015, you
18  concluded with documentary evidence that Mr. Kapanicas
19  violated California Government Code 1090 but didn't
20  provide any notice to my client for more than six months?
21        MR. PISANO:  Object to form.
22        THE WITNESS:  Can you show me specifically
23  what you're referring to?
24        MR. SCHMOOKLER:  Sure.  Let's go off the
25  record, and I'll get the documents that were just produced

MAGNA ◆
LEGAL SERVICES

EXHIBIT 18
PAGE 1091

Page 146

1  to me today.
2          THE WITNESS:  Can I take a quick break?
3          MR. SCHMOOKLER:  Yeah.
4          THE VIDEOGRAPHER:  This marks the end of
5  media four.  The time is 4:09 p.m.  We are off the
6  record.
7          (Pause in proceeding.)
8          THE VIDEOGRAPHER:  This marks the beginning
9  of media number five in the deposition of John Pinkney.
10  The time is 4:15 p.m.  We are back on the record.
11      Q.  BY MR. SCHMOOKLER:  Mr. Pinkney, I'm putting
12  up on the screen what I've marked as Exhibit 15, which is
13  was collage of documents I received earlier today from the
14  Best, Best and Krieger firm.
15          (Exhibit Number 15 was marked for
16  identification.)
17      Q.  BY MR. SCHMOOKLER:  I won't ask you to try to
18  authenticate the package, but I do want to show you a
19  letter that starts on page 595 of the .pdf.
20          On page 595 of the .pdf is a letter dated
21  October 1, 2015, on your firm's letterhead; correct?
22      A.  Yes, to Steve Weber and Lisa Conn, yes.
23      Q.  Is this is a six-page letter, sir.  You'll
24  see -- I'm going to show you specific language.  But
25  importantly, on page 6, there's a signature.

Page 147

1          Do you see that?
2      A.  I do.  That looks like may signature.
3      Q.  And I was going to say, is that your
4  signature?
5      A.  Yeah, I believe so.
6      Q.  And so you authored a letter to Mr. Weber
7  October 1, 2015; correct?
8      A.  There may have been others in my office that
9  worked on it with me, but I signed it, and I probably
10  worked on it as well.  I just don't recall, you know, who
11  work on it with me.
12      Q.  And, importantly, this was, again, Mr. Weber
13  representing Mr. Kapanicas; correct?
14      A.  That's correct is my recollection.
15      Q.  And this letter, much like the June 1 letter
16  we looked at earlier, is a supplementation as to the
17  potential disciplinary hearing for Mr. Kapanicas.
18          Do you see that?
19      A.  Yeah.  It was further notice in connection
20  with the predisciplinary hearing.
21      Q.  Now, second paragraph, first paragraph, says,
22          "Specifically, attached hereto
23          collectively as Attachment 21 our
24          requisitions that were made by Mr. Kapanicas
25          to Union Bank of California for various --

Page 148

1          for payment of various payment certificates,
2          contractor certificates, and invoices."
3          Do you see where I've read from, sir?
4      A.  Yes, I see it.
5      Q.  Next sentence -- and I read the whole
6  sentence into the record.
7          "As evident in Attachment 21,
8          Mr. Kapanicas approved invoices for his own
9          company, General Government Management
10          Services ("GGMS"), on behalf of the City, and
11          then requisitioned the trustee to pay his
12          company, GGMS, for these invoices under the
13          CFD bonds."
14          Do you see where I've read from?
15      A.  I see where you read.
16      Q.  So by October 1, 2015, you, in fact, had
17  documentary proof that Mr. Kapanicas was approving
18  requisitions to pay his own company GGMS; correct?
19          MR. PISANO:  Object to form.
20          THE WITNESS:  Can we look at Attachment 21?
21      Q.  BY MR. SCHMOOKLER:  Sure.  Love to.  I was
22  going to anyway.
23          So you'll see at the top of each page, the
24  attachments are labeled at the top.
25      A.  Okay.

Page 149

1      Q.  Okay?  All right?
2          So let's look at Attachment 21-02.  So well
3  look at Attachment 21-01, I apologize.
4          Attachment 21.01 is a letter from
5  Mr. Kapanicas to Union Bank of California.  Do you see
6  that, sir?
7      A.  Yes.
8      Q.  And Mr. Kapanicas, on January 9, 2006, writes
9  to Mr. Ball, and I quote,
10          "Please find enclosed the above-referenced
11          requisitions related to the City of Beaumont
12          Community Facilities District 93-1 Series
13          2000 A.  Attached to the requisitions are
14          payment certificates, contractor
15          certificates, and invoices."
16          Do you see where I've read from, sir?
17      A.  Yes.
18      Q.  So by October 1, 2015, you had a letter from
19  Mr. Kapanicas to Union Bank enclosing requisitions for
20  payment; correct?
21      A.  Yes.
22      Q.  The attachment to this letter is marked as
23  Attachment 21-02.  Do you see that, sir?
24      A.  Yes, I see it.
25      Q.  And I will blow it up.  You'll see this is a

MAGNA
LEGAL SERVICES

EXHIBIT 18
PAGE 1092

Page 150

1    requisition signed by Mr. Kapanicas; correct?
2        A.   It appears to be.
3        Q.   And in paragraph one, Mr. Kapanicas writes,
4    "Payment shall be made to the persons or entities
5    identified on Exhibit A hereto."
6            Do you see where I read from?
7        A.   Yes.  I see it.
8        Q.   So by October 1, you not only had a letter
9    from Mr. Kapanicas to Union Bank, but you had a
10   requisition signed by Mr. Kapanicas; correct?
11       A.   Yes.
12       Q.   Attachment A, Exhibit A to this resolution
13   13, is Attachment 21-003.  Do you see that?
14       A.   I see it.
15       Q.   And the final two payments on this
16   requisition were to General Government Management
17   Services.
18           Do you see that, sir?
19       A.   I see it.
20       Q.   And who signed as City approval for this
21   payment certificate?
22       A.   It looks like Deepak Moorjani and Alan
23   Kapanicas in 2006.
24       Q.   So isn't it true by October 1, 2015, you had
25   a specific example where Mr. Kapanicas was signing and

Page 151

1    submitting requisitions requesting payment for his own
2    company GGMS?
3        A.   I had this document, and I -- I included that
4    in the notice in October.
5        Q.   You included this as documentation that
6    Mr. Kapanicas was signing requisitions on behalf his own
7    company -- strike that.
8            You submitted this letter and attachment as
9    documentation that Mr. Kapanicas was submitting and
10   signing requisitions requesting payment for his own
11   company; correct?
12           MR. PISANO:  Object to form.
13           THE WITNESS:  I submitted it, because I knew
14   or believed that that issue that's identified in the
15   October notice and the documents that are attached might
16   be considered by a hearing officer that would potentially
17   impact his employment status.
18           And my role was to give notice to the lawyer
19   and it appears now, in this letter, the October, 2015
20   letter, to the hearing officer, of the issues and
21   documents that might be addressed at that hearing.  It was
22   part of our due process requirement to Mr. Kapanicas and
23   his lawyer.  That's what it was.
24           It wasn't an indictment.  It wasn't a -- you
25   know, a ruling from a court.  You know, that's not my

Page 152

1    role.  My role is to give him notice of the issues and the
2    documents in this case that were going to be considered at
3    the hearing.
4        Q.   BY MR. SCHMOOKLER:  I asked a different
5    question.
6            You identified by October 1, 2015, at least
7    one example where Mr. Kapanicas signed and submitted a
8    requisition requesting payment for his own company;
9    correct?
10       A.   I believe that's correct in this document
11   that you've got up on the screen right now.
12       Q.   And you also note that Mr. Moorjani signs
13   requesting payment as well; correct?
14           MR. PISANO:  Object to form.
15           THE WITNESS:  I don't remember if I noted
16   that in the letter, but it appears to be his signature.
17   I'm not familiar with his signature.  I can just make out,
18   you know, that this looks like Alan Kapanicas and Moorjani
19   signed it.
20       Q.   BY MR. SCHMOOKLER:  Okay.
21           Let's look at the letter.  Oops.  Sorry.  Too
22   many fingers.
23           In the letter, in the second -- on page 3,
24   second full paragraph, you write, and I read, "In
25   addition, although it is the City Manager's duty under the

Page 153

1    Municipal Code Section 2.12.060(a), to ensure that the
2    City's Municipal Code" --
3        A.   I'm sorry.  You lost me.  Where are you?
4        Q.   Page 3, second full paragraph.
5        A.   Right.
6            You started out with the word "although"?
7        Q.   I'm sorry.  I said, "In addition."
8        A.   Okay.  I apologize.
9        Q.   Do you see the paragraph that starts, "In
10   addition"?
11       A.   Yes, I do.
12       Q.   Okay.
13           Let's read -- I'll read it into the record.
14           "In addition, although it is the City
15   Manager's duty under Municipal Code Section
16   2.12.060(a) to ensure that the City's
17   Municipal Code, including the conflict of
18   interest provisions, are enforced,
19   Mr. Kapanicas also allowed the City's Public
20   Works Manager, Deepak Moorjani, to approve
21   the invoices for his own company, Urban Logic
22   Consultants, Inc.  Mr. Moorjani was an owner
23   of Urban Logic Consultants, Inc., but
24   improperly approved invoices to his own
25   company.  As City Manager" --

MAGNA
LEGAL SERVICES

EXHIBIT 18
PAGE 1093

Page 154

1    (Internet failure.)
2    (Pause in proceeding.)
3    THE VIDEOGRAPHER:  The time is 4:36 p.m., and
4  we are back on the record.
5    MR. SCHMOOKLER:  Laura, do you remember what
6  exhibit number this is?  I didn't write it down.  15, I
7  think?  All right.
8    Q.  BY MR. SCHMOOKLER:  Mr. Pinkney, I'll go back
9  to showing you what was marked as Exhibit 15, which is a
10  October 1, 2015, letter you signed.
11    Second full paragraph on page 3, you write in
12  the second full sentence,
13    "Mr. Moorjani was an owner of Urban Logic
14    Consultants, Inc., but improperly approved
15    invoices to his own company.  As City
16    Manager, Mr. Kapanicas should never have
17    permitted a city consultant to approve or be
18    involved in a requisition for payment of his
19    own invoice."
20    Do you see where I've read from?
21    A.  Yes.  I see that in the document.
22    Q.  So isn't it true that at least by October 1,
23  2015, you were aware of -- that Mr. Moorjani, despite
24  being an owner of Urban Logic, improperly approved
25  invoices for his own company?

Page 155

1    MR. PISANO:  Object to form.
2    THE WITNESS:  That's what the document says.
3  And I know that I became aware at some point that there
4  was -- there were invoices or -- I don't know if it was
5  invoices or requisitions, but I became aware of this
6  issue.  And, of course, I wasn't there when these things
7  happened.  I saw documents that gave me concern.
8    And so, again, this was notice to
9  Mr. Kapanicas' lawyer and, apparently, the hearing officer
10  of issues that might arise during the hearing affecting
11  Kapanicas' employment.
12    And we were required to give notice that
13  these issues could be addressed at that hearing, and that
14  was the purpose of this.  It was not an indictment or a
15  conviction or anything like that.
16    Q.  BY MR. SCHMOOKLER:  And I'm not asking you.
17  I already asked about convictions.
18    A.  But my role isn't to be the Trier-of-Fact.
19  It was just to -- the purpose of this was to give notice
20  that these issues and these documents could be addressed
21  at his hearing as part of his due process rights.
22    Q.  But as a matter of fact, you possessed
23  documents on October 1, 2015, showing Mr. Moorjani
24  approving request for payments to his own company;
25  correct?

Page 156

1    A.  Whatever --
2    MR. PISANO:  Object to form.
3    THE WITNESS:  Whatever I attached to the
4  document is what I would have had.
5    Q.  BY MR. SCHMOOKLER:  Well, let's look at the
6  documents.
7    A.  And we --
8    Q.  Here is one of the attachments, it's
9  Attachment 21-0062.  And you see there it's a payment
10  certificate from March 1 -- March 2, 2005.
11    Do you see that, sir?
12    A.  Right.
13    Q.  And the payee of this payment certificate is
14  Urban Logic Consultants; correct?
15    A.  According to this document, that's what the
16  document says.
17    Q.  So the answer is "yes"?
18    A.  It appears, based on the document -- I mean,
19  I don't know any of the underlying facts.  That was one of
20  my concerns is I didn't know, you know, as I mentioned
21  before, the D.A. had taken documents, truckloads of
22  documents away, computers, and the management was gone.
23    I couldn't ask Mr. Deepak Moorjani about it.
24  I couldn't ask Aylward.  I couldn't ask Kapanicas.  We had
25  this document.  That's what we had.

Page 157

1    I wasn't a percipient -- I had no percipient
2  knowledge of what actually occurred, whether there was an
3  excuse for this or reason for it, or whether there were
4  some justification for it.
5    I just had the document, and I was giving
6  notice to Kapanicas that this document and the issue could
7  arise at the hearing that could affect his employment.
8    Q.  Okay.
9    But, sir, you had a document requesting
10  payment to Urban Logic Consultants; correct?
11    A.  Yes.  That appears correct.
12    Q.  And as a lawyer, you're not often a
13  percipient witness but somebody who gathers facts after
14  the fact; right?
15    MR. PISANO:  Object to form.
16    THE WITNESS:  In this case, I think that we
17  were gathering -- we were identifying issues, and we were
18  gathering documents that we had in connection with those
19  issues, and the documents says what it says.
20    But beyond that, you know -- so my duty is to
21  put Kapanicas and his lawyer on notice.  These are the
22  issues.  Here are the documents.  We're going to have a
23  hearing that could affect your employment status.
24    But I was not the one reaching conclusions.
25  It wasn't my role, I should say.  It wasn't my role to

MAGNA
LEGAL SERVICES

EXHIBIT 18
PAGE 1094

Page 158

1  reach final conclusions.  I knew the D.A. was conducting
2  an investigation.  I trusted the D.A., that they would
3  thoroughly conduct their investigation.
4          You know, we ultimately had other agencies
5  that were conducting investigations, but I trusted that
6  they would -- if there was any unlawful conduct, that they
7  would uncover it.
8      Q.  BY MR. SCHMOOKLER:  I don't want to go about
9  the D.A.  I want to ask about what you knew.  And on
10  October 1, 2015, you, as City Attorney, possessed a
11  payment certificate requesting payment to Urban Logic
12  Consultants; correct?
13      A.  I possessed that document that you've got up
14  on the screen, and I included it in the notice.
15      Q.  And by October 1, 2015 -- strike that.
16          This particular payment certificate that's on
17  the screen that's identified as Attachment 21-0062, is
18  signed by the Public Works Director, Deepak Moorjani;
19  correct?
20      A.  It -- it is what it is.  It appears to be, if
21  you can make out that signature.  That was the argument
22  that I was making and the notice that I was giving.  But I
23  had no information about the history, the background,
24  whether there was justification, or rational explanation.
25  I had none of that.

Page 159

1          I just had this document and very little time
2  to put all this together, you know, with a lack of
3  documents, a lack of management, they were all gone.  So I
4  put together what I had.  I worked with what I had.
5          And I had to give notice to Mr. Kapanicas and
6  his lawyer that this is what we've got, and it may be used
7  in a hearing to affect your employment status.
8      Q.  So you had a document that purports to be
9  signed by Mr. Moorjani approving payments to his own
10  company, Urban Logic Consultants, by October 1, 2015;
11  correct?
12      A.  I ha this document, and I attached it to the
13  notice.
14      Q.  Well, do you disagree that the document you
15  possessed as of October 1, 2015, purports to show
16  Mr. Moorjani approving payment for his own company, Urban
17  Logic Consultants?
18          MR. PISANO:  Object to form.
19          THE WITNESS:  Yeah.  I think I've answered
20  that question, sir.
21      Q.  BY MR. SCHMOOKLER:  Okay.
22          Is it a "yes"?
23          MR. PISANO:  Same objection.
24          THE WITNESS:  My answer is that I had the
25  document that's up on the screen.  And can I testify that

Page 160

1  that was Deepak Moorjani's signature?  No.  I can't even
2  tell you for sure that was Alan Kapanicas' signature.
3          The document says what it said.  It's all I
4  had on that topic, I believe, to -- you know, to submit at
5  this hearing that might impact Alan Kapanicas' employment
6  status.
7          And I didn't have any of the background
8  regarding whether there was a reason or a rational
9  explanation or justification.  All I had was the document.
10  And on its surface, it says what it says.
11          And I included it with my notice, because I
12  had an obligation to give Mr. Kapanicas and his lawyer
13  notice of what might be raised at the hearing that could
14  affect his employment status.
15      Q.  BY MR. SCHMOOKLER:  In this time frame that
16  you were providing Mr. Kapanicas' lawyer notice of these
17  requisitions on behalf of Urban Logic Consultants, did you
18  tell my client?
19          MR. PISANO:  Objection to form.
20          THE WITNESS:  We did at some point, you know,
21  again -- and can you go to the top of the letter, the top
22  of the letter, please, that is dated October, 2015?
23      Q.  BY MR. SCHMOOKLER:  (Complies.)
24      A.  So one of the concerns I had -- one of the
25  concerns I had during this time period was committing or

Page 161

1  having any exposure for the City, or for those that were
2  involved in this process, for being -- for libel or
3  slander.
4          And that was a serious consider, because we
5  were operating with a lack of documents, due to the D.A.,
6  you know, taking documents and computers, and the
7  management staff being gone, really not much in the way of
8  people to interview.
9          And we had identified issues that we knew
10  were going to be considered at this hearing, and so we
11  were giving notice.  But one of the concerns I had was I
12  didn't want my client, or those involved, to be sued for
13  defamation, slander, or libel.
14          And so I included in on this document that it
15  was a public official communication, pursuant to Civil
16  Code Section 47(A), which provides some protection.
17          If -- you know, until we knew -- until we
18  felt really confident and knew that there was something
19  more concrete to the issues that we had identified, there
20  could have been a risk to the City, and to others
21  involved, including myself, for making these types of
22  allegations to third parties.
23          And so I think the prudent, responsible thing
24  to do -- because, you know, again, Mr. Kapanicas had not
25  had his day in court, and I don't think any criminal



41 (Pages 158 to 161)

EXHIBIT 18
PAGE 1095

Page 162

1  charges were pending against him at this time -- was to
2  give him notice and an opportunity to be heard and address
3  these issues, allow the District Attorney to conduct their
4  investigation, and conclude that investigation.  They are
5  much more equipped to do it.
6         And then if they determined that there was
7  wrongdoing, then to disclose that -- the outcome of that
8  investigation, a properly conducted investigation, to
9  third parties, such as your client.
10     Q.  Move to strike.  Non-responsive.
11         Sir --
12     A.  Well, can you repeat the question?
13     Q.  -- did you provide my client notice in
14  October of 2015, at the time you had identified instances
15  where Deepak Moorjani approved invoices for his own
16  company, Urban Logic Consultants?
17         MR. PISANO:  Object to form.
18         THE WITNESS:  Can the court reporter reread
19  the question, please?
20         THE REPORTER:  "did you provide my client
21  notice in October of 2015, at the time you had identified
22  instances where Deepak Moorjani approved invoices for his
23  own company, Urban Logic Consultants?"
24         THE WITNESS:  So my answer that I just gave
25  to you was explaining why this language was at the top of

Page 163

1  the October 1, 2015, communication.
2         That I had concerns that the City, myself,
3  others involved, could be sued for defamation by
4  disclosing unproven, unknown, uncertain things to third
5  parties in making allegations that could ultimately be
6  proven not to be true.
7         And so I relied on the District Attorney to
8  complete their investigation, which they ultimately did,
9  and then we disclosed what we learned from that
10  investigation to your client.
11     Q.  BY MR. SCHMOOKLER:  Okay.
12         I didn't ask you why you put a notice on the
13  letter.  And isn't it true -- and I will go back, just to
14  get to your point.
15         You gave us notice before there was any
16  indictment by the District Attorney; correct?
17     A.  We gave notice of those things that we felt
18  comfortable and confident and felt we could responsibly
19  report to your client, to the carrier.  There was a lot of
20  speculation going on at the time.  There were a lot of
21  conspiracy theories.  There was a lot of stuff out there,
22  and we had to cipher through all of that.
23         And so those things that I felt comfortable
24  with, we gave notice to your client in April of 2015.  And
25  when the SEC investigation was commenced, we gave notice

Page 164

1  of that.  And then in November of 2015, we gave them
2  notice after the D.A. had concluded their investigation
3  and filed charges.
4      Q.  Sir, the decision not to provide notice once
5  you learned of instances where Mr. Kapanicas approved
6  requisitions requesting payment on behalf of his own
7  company, that was your decision; correct?
8          MR. PISANO:  Object to form.
9          THE WITNESS:  It assumes that there was a
10  decision made.
11     Q.  BY MR. SCHMOOKLER:  Was a decision made to --
12         MR. PISANO:  Objection.
13         MR. SCHMOOKLER:  Hold on.  I didn't finish.
14     Q.  BY MR. SCHMOOKLER:  Isn't it true, sir, that
15  the very conduct that you were aware of in October of 2015
16  is the allegations that were ultimately contained in the
17  notice provided to my client in April?
18         MR. PISANO:  Object to form.
19         THE WITNESS:  The October 1, 2015, letter was
20  a notice of issues that we had identified and documents
21  that might be considered at a disciplinary hearing that
22  could affect Mr. Kapanicas' employment status.
23         They weren't -- it wasn't a conclusory
24  document.  And I'm telling you -- I'm telling you that I
25  had concerns of whether we could substantiate what we were

Page 165

1  identifying as issues in that letter at that time.
2      Q.  BY MR. SCHMOOKLER:  Let's look at your
3  notice, because I'm confused by your testimony.
4          Let's look at the Crime Loss Report, which
5  was earlier marked today.  I'll put it back on the screen
6  for you.
7          Do you recall the Crime Loss Report earlier
8  today, sir?
9      A.  Yes.
10     Q.  Isn't it true that at the time of the Crime
11  Loss Report, you hadn't concluded your investigation into
12  Mr. Kapanicas?
13     A.  Well, when you say that I -- I hadn't
14  concluded my investigation, that assumes that what I was
15  doing could be considered to be an investigation; whereas,
16  my understanding of my role was to review contracts,
17  documents, relationships, and identify issues that were of
18  concern.  That was my role in those notices that went to
19  Mr. Kapanicas.
20     Q.  Let's look what you told my client in April.
21     A.  And this is later -- this is later in April
22  of 20- --
23     Q.  We're going to find -- yes, it is later.  But
24  it's the same information, so let's read together.
25         You see the section entitled "Alan



42 (Pages 162 to 165)

EXHIBIT 18
PAGE 1096

Page 166

1  Kapanicas"?
2      A.  Yes.
3      Q.  It says,
4          "During the time Mr. Kapanicas served as
5      City Manager, he authorized payments by the
6      City to his company, GBMS, possibly in
7      violation of Government Code Section 1090,
8      and California Conflict of Interest Laws.
9      The investigation regarding the extent of
10     Mr. Kapanicas' acts authorizing payments and
11     benefits for himself and GGMS is ongoing."
12     Do you see where I've read from?
13     A.  Yes, sir.
14     Q.  At the time you gave notice of the
15  investigation regarding Mr. Kapanicas' acts authorizing
16  payments for himself and GGMS was ongoing, was it not?
17     A.  (No audible response.)
18     Q.  I'll ask it differently.
19         You told my client in April the investigation
20  into Mr. Kapanicas' acts authorizing payments for himself
21  and GGMS was ongoing; correct?
22     A.  The D.A., to our understanding, was
23  conducting an investigation.  Urban Futures, not Urban
24  Logic, UFI, Urban Futures was investigating certain
25  issues.

Page 167

1          And my office was -- my office was, you know,
2  reviewing contracts, relationships, and identifying -- or
3  had -- by that point, in April of 2016, had -- I believe
4  we had concluded the process with Mr. Kapanicas that
5  resulted in his separation from the City.
6          And I did not know on April 5, 2016, that the
7  D.A. was about to file charges, but we were putting your
8  client on notice of what we knew, that we felt at that
9  time that we could -- that we had evidence to support,
10  that I felt comfortable, you know, had been vetted.
11         So we were putting them on notice.  But, you
12  know, you also knew that there were investigations that
13  were ongoing, and, you know, ultimately, that resulted in
14  charges be filed by the D.A. I think later that month.
15     Q.  Move to strike.
16         Laura, please reread my question.
17         Sir, I know it's been a long day, but I'm
18  asking very specific questions.  And I get your
19  explanation of why you chose to do what you did.  But I'm
20  not asking anything about that.  I'm asking about
21  specifically what you told my client.  So I'll rephrase my
22  question and just try to be really specific.
23         You told my client in April the investigation
24  regarding the extent of Mr. Kapanicas' acts was still an
25  ongoing matter; correct?

Page 168

1      A.  There was a pending D.A. investigation.
2  Urban Futures was investigating some issues.  I felt, at
3  that point, that I had some information to provide your
4  client, and I provided it.  But I also wanted them to be
5  aware that things were still developing.
6      Q.  You also had information in October.  You
7  didn't provide it at that time; right?
8          MR. PISANO:  Object to form.
9          THE WITNESS:  So in October -- I already
10  explained what my concerns were in October.
11     Q.  BY MR. SCHMOOKLER:  Putting aside your
12  particular concerns, the reality is you concluded that
13  Mr. Kapanicas violated the City's conflict of interest
14  code by October 1, 2015, but didn't tell my client
15  anything until April, did you?
16         MR. NOLAN:  Mr. Nolan.  Objection as to
17  form.
18         THE WITNESS:  That Mr. Kapanicas violated the
19  City's conflict of interest?
20     Q.  BY MR. SCHMOOKLER:  Right.
21         MR. NOLAN:  Same objection.
22         THE WITNESS:  So whatever I put in the letter
23  in October is what's in the letter.  But as I explained,
24  that was a privileged document.  And I know -- I knew the
25  D.A. was doing their investigation as to whether there was

Page 169

1  any criminal wrongdoing by Mr. Kapanicas.
2      Q.  BY MR. SCHMOOKLER:  There's a letter on page
3  3.  It specifically says, "Mr. Kapanicas has, therefore,
4  violated the City's conflict of interest code, the act
5  and likely Government Code Section 1090"; correct?
6      A.  Can we go to the beginning the letter?
7      Q.  Sure.
8      A.  So this was a supplement to a September 18th
9  letter for -- in preparation for Mr. Kapanicas'
10  disciplinary hearing.
11         And then what is your question again?
12     Q.  By October 1, 2015, you had specifically
13  concluded that Mr. Kapanicas, and I quote, "violated the
14  City's conflict of interest code, the act, and likely
15  Government Code Section 1090"; correct?
16     A.  That was an argument, and it was -- it was
17  part of the notice that I was required to give to
18  Mr. Kapanicas and his lawyer in furtherance of
19  Mr. Kapanicas' due process rights prior to a hearing where
20  he -- his employment status could be affected.
21     Q.  So the answer to my question is "yes"?
22     A.  But I was not -- I was not in the role of
23  ultimately serving as the Trier-of-Fact.  I was making an
24  argument on an issue and presenting documents on an issue
25  that I was obligated to give him notice could be

MAGNA ▶
LEGAL SERVICES

EXHIBIT 18
PAGE 1097

Page 170

1  considered at this disciplinary hearing.
2      Q.  So one of your arguments was that
3  Mr. Kapanicas violated the City's conflict of interest
4  code as of October 1, 2015; correct?
5      A.  That was what's in the letter.
6      Q.  So the answer is "yes"?
7      MR. PISANO:  Object to form.
8      THE WITNESS:  That's the argument that was
9  being made in the letter on October 1st.
10     Q.  BY MR. SCHMOOKLER:  And yet, you didn't
11 provide my client notice that that was the argument you
12 intended to make against Mr. Kapanicas until April, nearly
13 six months later; correct?
14     MR. PISANO:  Object to form.
15     THE WITNESS:  We had not -- you know, we
16 hadn't heard back from the D.A. regarding their
17 investigation.  We had UFI doing their work.
18     I was concerned about -- you know, we had a
19 lot of allegations that were being made, conspiracy
20 theories that were floating around.  We were trying to
21 cipher through them and vet them.
22     And in an environment where we -- you know,
23 the D.A. and FBI had taken large volumes of documents, and
24 computers, and the management of the City was pretty much
25 gone, and we were trying to put together what we had.  And

Page 171

1  what we had as of October, 2015 is in that letter.
2      And then when I felt -- and I labeled it as a
3  public official communication to protect the City from a
4  defamation claim, and myself as well, because I want to be
5  very careful about not defaming somebody on issues that
6  hadn't been proven.
7      Mr. Kapanicas hadn't had his day in court.
8  He hadn't even had his disciplinary hearing.  And things
9  were different in April of 2016, and -- they were
10 different.  And I provided the information that I felt
11 comfortable and had some level of confidence providing to
12 your client.
13     I had no reason whatsoever to withhold
14 information from your client.  Zero.  I gave them what we
15 had when we had it.  And then we supplemented that with
16 the SEC information when we had that.
17     And then after the D.A. concluded their
18 investigation, we gave them that information as well.  We
19 had no -- you know, we wanted to put your client on notice
20 as we -- as we got to the point that it was appropriate to
21 do so, that we had, you know, a basis for what we were
22 saying.
23     Q.  BY MR. SCHMOOKLER:  Move to strike.
24     Sir, with all due respect to whatever the
25 analysis was at the time, the reality is you never once

Page 172

1  told my client that you were engaging in a process of
2  potentially disciplining Mr. Kapanicas for basically 11
3  months; correct?
4      MR. PISANO:  Object to form.
5      THE WITNESS:  I think that would be unusual
6  to do that.  And I don't think that we had an obligation
7  to do that, nor do I think it was appropriate at that time
8  to do it.
9      Q.  BY MR. SCHMOOKLER:  Well, regardless, with
10 all due respect, to whether you think it's appropriate,
11 usual, or whatever, the fact is that you spent from May of
12 2015 to April, sending voluminous correspondence to
13 Mr. Kapanicas threatening discipline, but never bothered
14 to once let my client know what was going on; correct?
15     MR. PISANO:  Object to form.
16     THE WITNESS:  The letters that we sent to
17 Kapanicas I've already explained in detail were required
18 as part of due process.  I've already explained that it
19 was a void of documentation City Hall because things had
20 been carted off by the D.A. and the FBI.  Computers had
21 been taken.  Management was gone.
22     And so we hobbled together what we were able
23 to put together.  We gave notice, under the protection of
24 Civil Code Section 47(A), to Mr. Kapanicas and his
25 attorney, so the City wouldn't be sued for deformation.

Page 173

1      We gave him notice of the issues that were
2  going to be potentially considered at the hearing at which
3  his employment status could be affected.
4      That's a completely different issue than
5  getting to point where we felt comfortable communicating
6  with an outside party that there might be something
7  covered under the policy.  And we did not know -- we
8  didn't know what we learned with the D.A. charges until
9  those charges were filed.
10     Q.  BY MR. SCHMOOKLER:  Well, sir, you did know.
11 You did know quite a bit.  You keep saying that.  So let's
12 compare the D.A.'s indictment to what you had.
13     I'll open up the indictment again.
14     A.  We were issue spotting.
15     Q.  Hold on.  Let's see what the indictment says.
16     Before we look at this, I have one question,
17 and I want to go back to the document, so I don't lose my
18 train of thought.
19     In Appendix -- in the documents that were
20 marked as Exhibit 15, Attachment 21, you keep saying you
21 were issue spotting.  You, in fact, possessed documents
22 where Kapanicas signed requisitions for his own company;
23 correct?
24     That wasn't -- that wasn't -- hold on.
25     That wasn't wild speculation.  You had actual



44 (Pages 170 to 173)

EXHIBIT 18
PAGE 1098

Page 174

1  documents there; right?
2      A.  We had a document.  And as I've testified, we
3  didn't know the back story.  We didn't have anybody
4  willing to provide the back story, whether there was some
5  justification or rational explanation.  We didn't have the
6  context.
7          We had a document, and we had an obligation
8  to put Kapanicas on notice, and we did that in connection
9  with his disciplinary hearing.  But we lacked a lot, and I
10  had real concerns about whether we'd be able to prove
11  these things at that time -- at that time.
12      Q.  You had real concerns about whether you'd be
13  able to show up with a document you possessed with
14  Kapanicas' requested authority to pay a bill for his own
15  company, given you possessed the document?
16      A.  No.
17          MR. PISANO:  Object to form.
18      Q.  BY MR. SCHMOOKLER:  Okay.  I'm going to ask
19  it again.
20          You had real questions about whether you
21  could show that Kapanicas had approved requisitions
22  requesting payment for his own company, even though you
23  possessed a document where he did that very thing; right?
24      A.  I had concerns about whether we would be able
25  to prove that he -- or whether it could be proven that he

Page 175

1  had, for example, committed a 1090 violation.
2          I had concerns about that, because we were
3  still early in the process.  Information was being
4  gathered.  The D.A. was conducting their investigation.
5  UFI was doing their investigation.
6          But we had this situation with Kapanicas that
7  we had to deal with.  So I gave the notice that I could,
8  given the circumstances that I had, and we put together
9  what we could.
10          And I had a document, but I didn't have any
11  of the context.  I didn't know whether Kapanicas was going
12  to come in with other documents and say, "Well, there's an
13  explanation for that.  Let me show you what it is."  We
14  had no idea.
15      Q.  Why didn't you just ask him?  You had 10
16  months.
17          MR. PISANO:  Object to form.
18      Q.  BY MR. SCHMOOKLER:  Did you ever just pick up
19  the phone, say, "Steve, what's the answer for this?"
20          Do you have an answer?
21      A.  I had a lot of conversations with Steve, the
22  attorney.
23      Q.  Did he in a single time offer you a single
24  explanation for a single instance in which Kapanicas
25  signed requisitions requesting payment for his own

Page 176

1  company?
2          MR. PISANO:  Object to form.
3          THE WITNESS:  I think Steve is a
4  capable -- Mr. Weber is a capable lawyer, and he wasn't
5  going to show his hand.
6          And so it's my suspicion.  But there was no,
7  you know, indication, that I recall -- or there wasn't
8  information to put in context, or, you know -- we knew we
9  had a document, and we provided that in the notice.
10          But what we didn't know is the rest of story.
11  We didn't know the rest of the story.  We didn't know how
12  was it going play out, but we had it.  We had the
13  document.
14          And so we gave the notice that was required
15  to be given to Mr. Kapanicas of issues and documents that
16  would be or could be considered at the hearing that could
17  affect his employment status, and that's what we did.
18      Q.  BY MR. SCHMOOKLER:  Are you aware of the
19  terms of the policy your client maintained with my client
20  has a specific provision addressing when notice must be
21  provided?
22          MR. PISANO:  Object to form.
23          THE WITNESS:  I'm sure it does, but I'm not
24  familiar with it.
25      Q.  BY MR. SCHMOOKLER:  Did anyone at the City

Page 177

1  conduct an analysis as to whether or not the City was
2  obligated to provide notice, even though its investigation
3  continued?
4      A.  I can't -- I can't speak for everybody at the
5  City.  I know that we brought in attorney John Cannon at
6  Stradling to put together -- once the D.A. filed their
7  charges and that investigation was complete, and we were
8  further along with other things that were being worked on.
9          That we had Mr. Cannon write up a notice of
10  claim that supplemented what I submitted back in April
11  with the information that I felt comfortable I could
12  support at that time.
13          And we --
14      Q.  You mentioned concerns you had.  Did you
15  do -- strike that.
16          Did the City's Risk Management department do
17  an analysis of whether the decision not to provide notice
18  earlier complied with the policy my client sold?
19          MR. PISANO:  Object to form.
20          THE WITNESS:  You're saying there was a
21  decision to not to provide notice earlier.  And I'm not
22  sure -- I'm assuming what you mean by that is earlier than
23  April of 2015.
24      Q.  BY MR. SCHMOOKLER:  Wasn't there an
25  affirmative decision not to provide notice prior to



MAGNA
LEGAL SERVICES

EXHIBIT 18
PAGE 1099

Page 178

1   April, 2016?
2        A.  I don't believe so.
3        Q.  Was there any consideration of providing my
4   client notice at any time between May, 2015 and December
5   20 -- or December, 2015?
6             MR. PISANO:  Object to form.
7             THE WITNESS:  I don't recall sitting here
8   right now.  I don't recall.
9             But I do recall that I was concerned that a
10  lot of these issues that we identified and documents that
11  we attached, you know, had not been fully and completely
12  vetted, that we were working with what we had at the time,
13  and we were kind of on a time crunch.
14       Q.  BY MR. SCHMOOKLER:  Did you talk with your
15  broker with whether there was ways to provide notice while
16  addressing the concerns that you've articulated today?
17       A.  At some point, I don't know if it was the
18  broker we talked to, or if it was Gregg -- James Gregg,
19  or -- you know, I don't remember exactly.
20            But I know, ultimately, we gave notice when
21  we felt that we had something to -- that we were
22  comfortable giving notice of, that we had some basis to
23  submit, and we submitted it.
24            And then as things developed, and we had more
25  information, we submitted it.  We had no reason to

Page 179

1   withhold anything from your client.  We wanted them to be
2   on notice.  That's why we sent the notices.
3        Q.  Sir, isn't it true that by taking the
4   position that you can make a claim in the '15-'17 policy,
5   your seeking the benefit of $15 million policy, not a $10
6   million policy?
7        A.  I don't know.
8        Q.  There's a $5 million justification for
9   seeking coverage under the latter policy; is there not?
10            MR. PISANO:  Object to form.
11            THE WITNESS:  You'd have to talk to one of
12  the other attorneys working on this.
13       Q.  BY MR. SCHMOOKLER:  Well, sir, I'll show you
14  what has been marked previously in other deposition, but
15  I'll mark it for today's purposes.
16       A.  You're assigning a motive that didn't exist.
17  You are.  And it's just inaccurate.  It's inaccurate.
18  It's misleading, and it's not true.
19       Q.  Isn't it true during the period where my
20  client sold you $10 million in coverage, you were aware of
21  a judgment and fraud finding, but you didn't tell us about
22  it.  And then used the very same facts during a period
23  where you had a $15 million policy?
24            MR. PISANO:  Object to form.
25            THE WITNESS:  I don't.  I don't know that's

Page 180

1   true, because I don't know when the application was
2   submitted for that policy, and I don't even know who
3   submitted that application.
4             I mean, perhaps you could provide that
5   information when that application was submitted, because I
6   don't have that information.
7        Q.  BY MR. SCHMOOKLER:  Sure.
8             Oh, one other thing while we look here.  Sir,
9   you were actually asking about the coverage that was
10  available during the window you were conducting this
11  analysis of Mr. Kapanicas' conduct; right?
12       A.  I may have.  I just don't remember sitting
13  here right now.  I don't remember.
14       Q.  Let know show you what I'm marking as Exhibit
15  16.
16            (Exhibit Number 16 was marked for
17  identification.)
18       Q.  BY MR. SCHMOOKLER:  Exhibit 16 is a
19  letter -- an email, excuse me, from Jim Gregg, to, amongst
20  others, you, dated May 8, 2015.
21            Do you see that?
22       A.  The City Clerk and Treasurer?  So this is
23  from James Gregg to Alan Kapanicas, and the former
24  assistance city clerk, and Elizabeth Gibbs.  Bonds for
25  city clerk and treasurer.

Page 181

1        Q.  Do you want me to scroll down to give you
2   context?
3        A.  I just don't remember.  I just don't remember
4   the email.
5        Q.  So bottom of page, page 3 of this exhibit, or
6   page 2, you wrote to Ms. Gibbs, amongst others, "Have the
7   city clerk and treasurer been bonded per Government Code
8   Section 36518?"
9             Do you see where I've read from?
10       A.  I see that in the email.  Can I -- since I
11  don't remember this, can I read the document?
12       Q.  Sure.
13       A.  Scroll up a little.
14       Q.  (Complies.)
15       A.  Okay.
16            So --
17       Q.  Let me ask my question.
18       A.  Yeah.
19       Q.  Isn't it true that in May of 2015, Mr. Gregg,
20  in fact, provided you specific information about the crime
21  policy the City purchased, including the limit of
22  liability for that coverage?
23       A.  The document says what is it says.  I mean,
24  that's what he did.  But my inquiry was part of our
25  looking into issues, relationships, contracts.

MAGNA
LEGAL SERVICES

EXHIBIT 18
PAGE 1100

Page 182

1     And one of the issues that I was looking into
2 was making sure that we were complying with certain
3 requirements.  And one of them was for the clerk and
4 assistant or treasurer were supposed to be bonded, and so
5 I was just making an inquiry.  I wasn't focused on this
6 other issue.  I was focused on that.
7     Q.  Mr. Gregg says, I quote, "Attached is the
8 policy that covers all employees and public officials in
9 fulfillment of the GC."
10    Do you see that?
11    A.  I see it.  But you can see from my inquiry,
12 that what I was looking at was, are we complying with the
13 requirements of the Government Code to have the City clerk
14 and the treasurer bonded?
15    And it was part of my due diligence that I
16 was doing after being retained by the City.  And then he
17 broadened that the information that he provided.  But I
18 still didn't know what the application was submitted
19 for -- with your client for the $15 million.
20    Q.  We're going to get there in a second.  We're
21 going to get there.
22    But it is true, then, that at the very time
23 you were doing an analysis of Mr. Kapanicas' performance,
24 you were aware of the existence of the policy under which
25 the City now seeks coverage; correct?

Page 183

1     MR. PISANO:  Object to form.
2     THE WITNESS:  The email was sent.  I don't
3 specifically, you know, remember seeing these listed
4 coverages.  My inquiry was about the City clerk and the
5 City treasurer and whether we were complying with the
6 Government Code is one of many things that I was doing due
7 diligence on after we were retained.
8     But do I recall that or was I looking for how
9 much coverage there was for these other items?  No, I
10 don't recall that.  It's not what the purpose of my
11 inquiry was.
12    Q.  BY MR. SCHMOOKLER:  Well, putting aside from
13 the purpose of your inquiry, the reality is you had the
14 facts about the coverage long before you sent
15 Mr. Kapanicas any notice of discipline; correct?
16    MR. PISANO:  Object to form.
17    THE WITNESS:  The email says what it says.
18    Q.  BY MR. SCHMOOKLER:  And it says exactly that;
19 that you were aware of the coverage that's at issue in
20 this case well before you provided Mr. Kapanicas any
21 notice of discipline; correct?
22    MR. PISANO:  Object to form.
23    THE WITNESS:  You know, I think you're making
24 an argument.  Do I agree with your argument?  No, I do
25 not.

Page 184

1     Q.  BY MR. SCHMOOKLER:  You do not agree that you
2 were aware of the coverage prior to providing
3 Mr. Kapanicas notice of discipline, that fact?
4     A.  I was conducting my due diligence to ensure
5 that the City was complying with the provision the
6 Government Code that required the City clerk and the
7 treasurer to the bonded.  That was the purpose of my
8 inquiry.  Your argument, which goes beyond that, I don't
9 agree with.
10    Q.  I haven't made any argument, sir.  I'm just
11 trying to understand whether you will acknowledge that you
12 were aware of the policy my client issued before you
13 issued a notice of discipline to Mr. Kapanicas?
14    Will you acknowledge that now that you knew
15 that?
16    MR. PISANO:  Object to form.
17    THE WITNESS:  The email says what it says.
18 He put in it what he put in it.  I don't recall.  I don't
19 recall that, because that's not what I was focused on.  My
20 focus was to make sure that the City was complying with
21 the Government Code as part of my due diligence.
22    Q.  BY MR. SCHMOOKLER:  At what point did you do
23 an analysis of your client's obligation to provide notice
24 under the 2014 or 2015 policy?
25    A.  I think -- are you asking for my work

Page 185

1 product?
2     Q.  I don't know.  You've talked about your
3 concerns, and why you've done what you've done, which, by
4 the way, I absolutely think is your work product, and I
5 absolutely think is a disclosure of privileged
6 information, but you volunteered that.  I never asked.
7     So I believe you've waded into that.  So I
8 will go ahead and ask.  When is it that you did any
9 analysis of your obligation to provide notice to my
10 client?
11    MR. PISANO:  Object to form.
12    MR. SCHMOOKLER:  And if anybody wants to
13 object, I think you guys have waived it.
14    THE WITNESS:  So we submitted the
15 claim -- the initial claim on April 5, 2016, because, at
16 time, we felt that we had something that was credible
17 and that warranted submission to the insurance company,
18 and so we tendered it to the insurance company.
19    We had no reason to not provide those things
20 that we felt that we had something more concrete to
21 provide them, other than, you know, as I said before,
22 there was a lot of speculation, a lot of conspiracy
23 theories, a lot of things being said.
24    And we had to sort out -- instead of just,
25 you know, destroying every rumor or speculative claim that

MAGNA
LEGAL SERVICES

EXHIBIT 18
PAGE 1101

Page 186

1    was being made at the insurance company, we tried to sort
2    out what seemed credible.
3           And in the meantime, we knew the D.A. was
4    doing an investigation, that they were better equipped,
5    and they had all the documents, and they had access to the
6    witnesses, and they had the computers, and we had Urban
7    Futures doing their work.
8           And we submitted what we had on April 5th.
9    We then supplemented that on -- June 30th, when the SEC
10   filed -- started its investigation.  And then on November
11   3rd, we provided the information that we had after the
12   D.A. had filed their charges, and we had no reason to not
13   tell your client.
14          MR. SCHMOOKLER:  I'm going to move to strike.
15   Can you please have my question read back?  I
16   didn't ask any of that, with all due respect.
17          THE REPORTER:  "When is it that you had any
18   signals of your obligation to provide notice to my
19   client?"
20          THE WITNESS:  I apologize, but you kind of
21   broke up there for a second.  Can you read it again,
22   please?
23          THE REPORTER:  "When is it that you had any
24   signals of your obligation" --
25          MR. SCHMOOKLER:  I'll rephrase the question.

Page 187

1    That's not what I asked, sir.
2           Q.  BY MR. SCHMOOKLER:  Sir, my question is this.
3           When is the time that the City of Beaumont
4    first considered whether it was obligated to provide
5    notice to my client?
6           MR. PISANO:  Object to form.
7           THE WITNESS:  I'm not sure.  I just know that
8    when we felt we had something, we notified your client.
9           Q.  BY MR. SCHMOOKLER:  Was any consideration
10   given prior to the effective date of the 2015 policy as to
11   your client's obligation to provide notice in connection
12   to the policy?
13          MR. PISANO:  Same objection.  Object to form.
14          THE WITNESS:  The effective date was June
15   30th of 2015?
16          Q.  BY MR. SCHMOOKLER:  Yes.
17          Was any consideration given prior to June 30,
18   2015, as to whether the City was obligated to provide
19   notice in light of what it had uncovered as of that date?
20          MR. PISANO:  Object to form.
21          THE WITNESS:  Well, as I've explained before,
22   from my perspective, we had identified -- we had reviewed
23   contracts, relationships.  We had identified issues.
24          And all we really had done is identified
25   those issues to give notice to Mr. Kapanicas in connection

Page 188

1    with his -- the hearing where his employment status might
2    be affected, and we were meeting our due process
3    requirement.
4           We were not in a position, in my view at that
5    time, to give notice to your client of anything.
6           Q.  BY MR. SCHMOOKLER:  Was any consideration
7    given as to whether your client was obligated under the
8    policy to provide notice of what it uncovered prior to
9    June 30, 2015?
10          MR. PISANO:  Object to form.
11          THE WITNESS:  So are you -- I'm asking.  Are
12   you asking for my work product, or are you asking for --
13          Q.  BY MR. SCHMOOKLER:  You have articulated in
14   various ways today what can only be described as work
15   product, mental impressions and work product.
16          So I want to know whether or not the City
17   gave any consideration to its obligation to provide
18   notice, prior to June 30, 2015, of what it had uncovered
19   as of that date?
20          MR. PISANO:  Object to form.  He's not
21   being --
22          MR. NOLAN:  Mr. Nolan.  I would object as to
23   potentially discloses privilege information.  And to the
24   extent it might, I would instruct Mr. Pinkney not to
25   answer.

Page 189

1           Q.  BY MR. SCHMOOKLER:  Okay.
2           Sir, do you understand my question?
3           A.  I do.
4           Q.  Are you going answer my question?
5           A.  Based on the instruction given, I won't.
6           Q.  Did you, in fact, provide legal advice as to
7    the City's obligation to provide notice prior to June 30,
8    2015, based upon the information that it had gleaned as of
9    that date?
10          MR. NOLAN:  This is Mr. Nolan.
11          Objection.  Privilege.  To the extent it
12   discloses confidential communications, I'll instruct the
13   witness not to answer.
14          THE WITNESS:  I think you're asking me to
15   breach the attorney/client privilege, and I have a duty to
16   assert of the privilege on behalf of my client.
17          I don't have the right to waive that
18   privilege, even if you argue that I have.  I have no right
19   to waive that privilege.  It's only my client.
20          MR. SCHMOOKLER:  Mr. Pisano, you are here on
21   behalf of the City.  Are you asserting the privilege?
22          MR. PISANO:  Oh, yeah.  I join in that
23   objection --
24          MR. SCHMOOKLER:  Great.
25          MR. PISANO:  -- the way that was phrased.



EXHIBIT 18
PAGE 1102

Page 190

1  MR. SCHMOOKLER:  Sure.
2  Q.  BY MR. SCHMOOKLER:  So, Mr. Pinkney, do you
3  understand my question as it was asked?
4  A.  Can you read it back?
5  Q.  Sure.
6  Ms. Court Reporter, can you please read it
7  back?
8  THE REPORTER:  "Did you, in fact,
9  advise" -- I'm sorry.
10  "Did you, in fact, advise to the City
11  obligation to provide notice prior to June 30, 2015, based
12  upon the information that it had gleaned as of that date?"
13  THE WITNESS:  I believe that calls for
14  privileged information that I do not have the authority to
15  waive.  Only the City can waive the privilege.
16  Q.  BY MR. SCHMOOKLER:  Did you seek input from
17  the broker, Alliant, as to the City's obligation to
18  provide notice prior to June 30, 2015, based upon the
19  information it had gleaned as of that date?
20  MR. PISANO:  Object to form.
21  THE WITNESS:  I don't recall.
22  Q.  BY MR. SCHMOOKLER:  Did you seek guidance
23  from Mr. Gregg as to the City's obligation to provide
24  notice to my client prior to June 30, 2015, based upon the
25  information it had gleaned as of that date?

Page 191

1  MR. PISANO:  Object to form.
2  THE WITNESS:  I can't say one way or the
3  other.  Sitting here today, I just don't know one way or
4  the other.
5  And, you know, if something like that
6  occurred, it could have been with somebody else in my
7  office, Mr. Gregg.  I just don't know sitting here today.
8  MR. PISANO:  You said prior to June 30th.
9  When was the application submitted to that policy?
10  MR. SCHMOOKLER:  I'll have to pull it at the
11  next break.  I didn't have that available today at call,
12  but I'll get it for you.
13  You know what?  Let's take a break, and I'll
14  get it for you right this minute.
15  THE WITNESS:  Thanks.
16  MR. SCHMOOKLER:  The time is 5:29 p.m.  We
17  are off the record.
18  (Pause in proceeding.)
19  THE VIDEOGRAPHER:  This marks the beginning
20  of media number six in the deposition of John Pinkney.
21  The time is 5:39 p.m.  We are back on the record.
22  MR. SCHMOOKLER:  I will show you what I'm
23  marking as Exhibit 17, which is an email from June 2,
24  2015, to Jim Gregg, from Mariana Salyer, who I will
25  represent to you as reflected in the email is the City's

Page 192

1  insurance broker.
2  (Exhibit Number 17 was marked for
3  identification.)
4  Q.  BY MR. SCHMOOKLER:  Okay.
5  A.  So they were offering the increase to all the
6  cities that were a member of ERMAC; is that right?
7  Q.  Sir, I will just --
8  MR. PISANO:  Let's let Scott ask a question.
9  MR. SCHMOOKLER:  Yeah, exactly.  Let me ask a
10  question.
11  Q.  BY MR. SCHMOOKLER:  So this proposal comes
12  in, you'll see, per the email, literally the day after you
13  have now provided your supplemental explanation of the
14  notice of discipline to Mr. Kapanicas.
15  Do you see that, sir?
16  A.  Just give me one second, please.  I want to
17  look at this document.
18  Okay.
19  Q.  And if you look down the document, there's
20  one proposal for everyone, each of the cities.  And you
21  see that there's a specific proposal for a two-year policy
22  to your client.
23  Do you see that, sir?
24  A.  The name insured is ERMAC, the City of
25  Beaumont.  And AIG is the carrier.  And coverage term

Page 193

1  would be June 30, 2015, through June 30, 2017.  And each
2  occurrence would be $15 million.
3  But your questions earlier were misleading,
4  because --
5  Q.  Sir, I didn't ask a question yet.  Now is not
6  the time for you to argue your case.  Your client -- your
7  lawyers will argue your case at a point in time in the
8  future.
9  A.  I just wanted to make sure that my testimony
10  is --
11  Q.  I haven't asked yet.  I get to ask the
12  questions.  So my question is this.
13  At the time that my client was proposing a
14  renewal of the coverage for $15 million, did the City
15  consider its obligation to provide notice of the facts
16  gleaned as of that date in terms of Mr. Kapanicas'
17  conduct?
18  MR. PISANO:  Object to form.
19  THE WITNESS:  Was this document provided to
20  my client?
21  Q.  BY MR. SCHMOOKLER:  Since the City didn't
22  produce anything, you'll have to ask your lawyers.
23  A.  Well, if you scroll back up to the top of the
24  document, it looks like it is between -- I don't know who
25  Mariana Salyer -- is she with your client?

MAGNA
LEGAL SERVICES
EXHIBIT 18
PAGE 1103

Page 194

1    Q.  No.
2    A.  And then Tom Corbett?
3    Q.  Yeah.  He's -- both Mr. Corbett and
4  Ms. Salyer are with Alliance Insurance Services, who is
5  your insurance broker.
6    A.  Okay.
7    Q.  This is a communication from your insurance
8  broker to your risk manager.
9    A.  And James Gregg -- I'm sorry.  It's to James
10 Gregg Law, @aol.com, and James Gregg is a lawyer.  I don't
11 know that the City -- to go back to your question, I don't
12 know that the City saw this or had it or knew it was
13 occurring.  I just don't know.
14         I don't believe that I've seen this before or
15 had it in mind at the time that we were giving
16 Mr. Kapanicas his notice on June 1, 2015, related to his
17 disciplinary hearing, nor did I have it in mind.
18    Q.  So is it fair to say, then, at the time the
19 City was providing supplementation for its notice of
20 discipline, no consideration was given by the City as to
21 its obligation to provide notice to National Union?
22         MR. PISANO:  Objection to form.
23         MR. NOLAN:  Mr. Nolan.  I would object as to
24 potentially calls for privileged information.  And to the
25 extent it does, I would instruct the witness not to

Page 195

1  answer.
2         THE WITNESS:  I don't know that we had this
3  document.
4    Q.  BY MR. SCHMOOKLER:  So, sir, I'm not asking
5  for the substance of any communications.  But did the City
6  Council in public session consider its obligations to
7  provide notice to my client in light of the ongoing notice
8  of discipline to Mr. Kapanicas?
9         MR. PISANO:  Object to form.
10        THE WITNESS:  I don't know that my client
11 ever had this document.  And I don't recall this document
12 or this issue of AIG increasing the coverage limits for
13 all the ERMAC entities being discussed in open session.
14    Q.  BY MR. SCHMOOKLER:  I asked a different
15 question.
16        Did the City in open session consider whether
17 it was obligated to provide notice to my client under the
18 2014-2015 policy in light of its ongoing evaluation of
19 Mr. Kapanicas' conduct, as detailed in your June 1, 2015,
20 letter?
21        MR. PISANO:  Object to form.
22        THE WITNESS:  I don't believe that that
23 was -- I don't recall that -- since my tenure, that that
24 was addressed in open session.  I don't know that the City
25 was ever asked any of that information by your client --

Page 196

1    Q.  BY MR. SCHMOOKLER:  I didn't ask --
2    A.  -- nor, as part of their due diligence in the
3  increasing the policy limits, I don't know that they were
4  asked that or made any inquiry.
5    Q.  So my question is different, sir.  We don't
6  know, because your client didn't produce any of the
7  documents that we needed.
8    A.  I don't know that that's true.
9    Q.  Well, okay.  We'll go figure that out at the
10 end of the case.
11        My question is this.  Forget what due
12 diligence was done.  Did your client consider its
13 obligations under the 2014-2015 policy in open session in
14 light of the notice of discipline and content of your June
15 1, 2015, letter?
16        MR. PISANO:  Object to form.
17        THE WITNESS:  Can she read the question back,
18 please?  I want to make sure I answer your question.
19        THE REPORTER:  "My question is this.  Forget
20        what was -- due diligence was done.  Did your
21        client consider its obligations under the
22        2014-2015 policy in open session in light of
23        the notice of discipline and content of your
24        June 1, 2015, letter?"
25        THE WITNESS:  At some point they may have.

Page 197

1  There have been a lot of -- they may have at some point
2  done that in open session, but I don't recall.  As I sit
3  here, I just don't remember.
4    Q.  BY MR. SCHMOOKLER:  Let me show you an
5  October 15th letter that I'll mark as Exhibit 18.
6        (Exhibit Number 18 was marked for
7  identification.)
8    Q.  BY MR. SCHMOOKLER:  This is an -- I'm sorry.
9  I've got the wrong letter up.  Bear with me a minute.
10        So what I'm marking as Exhibit 18 is an
11 October 15, 2018, letter that was written by the Best,
12 Best and Krieger firm to my client.
13        Do you recall if you saw a letter on October
14 15, 20118, authored by the Best, Best and Krieger firm?
15    A.  I may have.  I don't have any -- just by
16 booking at the first paragraph, I don't -- I don't recall.
17    Q.  Page 3 of this letter, I want to show
18 you -- ask you a question about what Best, Best and
19 Krieger wrote.  Page 3, second full paragraph, it says,
20        "In May, 2016, City Attorney John Pinkney,
21        following an investigation, reported to the
22        sitting risk management that they may have
23        claims against the members of Kapanicas
24        administration and should request holding
25        agreements these individuals.  Mr. Pinkney

MAGNA ◆
LEGAL SERVICES

EXHIBIT 18
PAGE 1104

Page 198

1       would provide an affidavit to this effect."
2           Do you see where I've read from, sir?
3       A.  I see where it says that.
4       Q.  And you never received an affidavit?
5       A.  Can you let me -- I want to just read it real
6    quick.
7           Okay.
8           We did ask for tolling agreements from
9    certain individuals.
10      Q.  That's not my question.
11          Who did you report to in May of 2016?
12      A.  I don't recall.
13      Q.  Was there somebody with the title City Risk
14   Management in May of 2016?
15      A.  At one point in time, James Gregg was
16   allegedly an employee of the City -- it's a disputed
17   issue -- with the title Risk Manager for the City.  And,
18   again, that's a heavily disputed, currently being
19   litigated, issue.
20          And I don't know in May of 2016 whether we
21   would have communicated with him or somebody at ERMAC, or
22   somebody -- somebody else.  I just -- I don't -- I don't
23   remember today as I sit here today.
24      Q.  Do you have any notes or any other documents
25   that would refresh your recollection as to whom you

Page 199

1    reported to in May of 2016 as reflected in this letter?
2       A.  Well, if there were -- you had shown me an
3    email earlier to James Gregg, where we were asking -- we
4    were making an inquiry about submitting a claim, and that
5    seeing that letter might help refresh my recollection.
6       Q.  Okay.
7           I'm happy to show it to you, but that was
8    from April, not May.
9       A.  Okay.  Okay.
10          So May would have been after the D.A. filed
11   their charges, most likely, yes.
12      Q.  I guess I'm curious as to whom -- to whom you
13   reported in May of 2016 as reflected in this letter?
14      A.  I'm not sure.
15      Q.  Is there any -- was there any report in May
16   of 2016 about potential claims against the members of the
17   Kapanicas administration?
18      A.  Well, you know, can we look at that email
19   with James Gregg?
20      Q.  Sure.  Bear with me a second.  I'll find it.
21          All right.  I'm going to mark this as Exhibit
22   19, because it's a more fulsome copy of the correspondence
23   from April.  So I'll put up on the screen what's been
24   marked as Exhibit 19.
25          (Exhibit Number 19 was marked for

Page 200

1    identification.)
2       Q.  BY MR. SCHMOOKLER:  It starts with an email
3    dated April 18, 2016.
4           Do you see that, sir?
5       A.  I see an email from Elaine Kim -- I'm not
6    sure who that is -- to James Gregg at ERMAC, Tom Corbett,
7    who you said was with our broker.  Brent Clemmer is with
8    my office, and I don't know who Robert Frey is.
9       Q.  And if you look at the bottom of the email,
10   which we'll go to, is the email we looked at earlier,
11   dated March 15, 2016, where you inquire about providing
12   notice.
13          Do you see that, sir?
14      A.  Yes, sir.  Yes.
15      Q.  So was there, in fact, any report made in May
16   of 2016 about claims made against members -- strike that.
17          Was there any report made in May of 2016 that
18   the City may have claims against members of the Kapanicas
19   administration?
20      A.  In May of 2015 or '16?
21      Q.  '16, '16?
22      A.  Okay.
23          I don't -- I don't know if we communicated
24   with James Gregg or somebody else in his organization, or
25   one of these folks that's on this email.  I just -- I

Page 201

1    don't know.
2       Q.  Isn't it true, sir, that when you're dealing
3    with potential claims the City may have, you report to the
4    City Council?
5       A.  Ultimately, we did, yes.
6       Q.  So isn't it true that in May of 2016, when
7    talking about potential claims against the Kapanicas
8    administration, you were reporting to the City Council;
9    correct?
10      A.  The timing -- the timing of that, I don't
11   know, but, generally speaking, I report to the Council.
12   And so anything that is -- you know, my obligation as City
13   Attorney is to bring things to the City Council's
14   attention that warrant their attention.  That's my role as
15   City Attorney.
16      Q.  Isn't it true the City didn't have a risk
17   management personnel in May of 2016, because Mr. Gregg had
18   retired?
19      A.  I don't know that that's true.  I'm
20   not -- I'm not -- I'm not sure that that's an accurate
21   statement.
22          There could have been a City employee that
23   stepped into that role.  I just -- or it could have been
24   somebody else, and Mr. Gregg -- at ERMAC.  I just don't
25   know sitting here today.  Or it could have been James

Page 202

1    Gregg.
2        Q.   You don't know either way?
3        A.   I don't.
4        Q.   And you have no notes to refresh your
5    recollection; correct?
6        A.   No.
7        Q.   Do you have any correspondence to refresh
8    your recollection as to who you might have reported -- or
9    strike that.
10       Do you have any notes, memos, documents,
11   anything that would refresh your recollection as to any
12   reports made about claims against the Kapanicas
13   administration in May of 2016?
14       A.   Well, I have the -- I have the claim that we
15   submitted to your client on April 5, 2016, with the
16   information that we felt warranted submission to your
17   client at that time.  I have that.
18       Q.   Yeah.  I didn't ask about that.  I have that
19   too.
20       I want to know if you have anything that
21   would refresh your recollection as to the report that
22   Best, Best and Krieger represented to my client occurred
23   in May of 2016?
24       MR. PISANO:  Object to form.
25       THE WITNESS:  I don't have anything with me

Page 203

1    sitting here right now.  I mean, there may be something
2    out there that I just haven't seen, but I can't -- I can't
3    tell you.  I can only speculate as to who that might have
4    been I was reporting to.
5        Like I said, it may have been James Gregg or
6    somebody else at ERMAC.  It could have been somebody on
7    that email list.  It could have been a City employee that
8    stepped into that role.
9        Q.   BY MR. SCHMOOKLER:  Isn't it true, sir -- I'm
10   going show you a document in a minute -- that you
11   expressly conditioned dismissal of the civil action
12   against Mr. Egger on the payment of restitution in the
13   amount of $3 million?
14       MR. PISANO:  Object to form.
15       THE WITNESS:  I'd like to see the document to
16   refresh my recollection.
17       MR. SCHMOOKLER:  Laura, are we on Number 20?
18       Let me show you what has been marked as
19   Exhibit 20.
20       (Exhibit Number 20 was marked for
21   identification.)
22       Q.   BY MR. SCHMOOKLER:  Exhibit 20 is a December
23   18, 2017, letter that you signed; correct?
24       A.   Yes.  This helps refresh my memory, if I can
25   just read it.

Page 204

1        Okay.  I recall.
2        Q.   Isn't it true that the City of Beaumont
3    expressly conditioned dismissal of the civil action
4    against Mr. Egger on him pleading guilty and paying
5    restitution?
6        A.   I believe that's correct.
7        Q.   Isn't it also true that Western Riverside did
8    the same thing?
9        A.   I can't say -- that sounds right, but I can't
10   speak for them.  And I do remember the letter, and I do
11   remember the conversations with -- I think it was Amy
12   Barajas, the D.A.'s office.
13       Q.   Isn't it true -- I'll put up on the screen
14   what's been marked as Exhibit 21 -- Laura, or 20 -- 21.
15       (Exhibit Number 21 was marked for
16   identification.)
17       Q.   BY MR. SCHMOOKLER:  I'll show you at the
18   bottom, an email between the Best, Best and Krieger firm,
19   and the District Attorney from October 2018.
20       Are you familiar with this correspondence?
21       MR. PISANO:  Object to form.
22       THE WITNESS:  I don't know if I saw this.  I
23   mean, this seems consistent with my recollection of what
24   occurred, now that you've shown me the documents.  But i
25   just can't say for sure that I've seen that email.  I just

Page 205

1    don't recall.
2        Q.   BY MR. SCHMOOKLER:  Were you aware that the
3    District Attorney was sharing with Best, Best & Krieger
4    drafts of the agreements before they were actually
5    executed?
6        A.   They may have been.  That wouldn't surprise
7    me.
8        Q.   Did they share them with you, too?
9        A.   They may have.  Wouldn't surprise me.
10       Q.   Did you have input into the terms of the plea
11   agreement?
12       A.   I don't -- I don't recall one way or the
13   other, but it wouldn't surprise me that they shared it,
14   given that the City was a victim, and WRCOG was a victim
15   of criminal conduct.
16       Q.   Well, my question was different.  Did you
17   have input into the terms of the plea agreement that you
18   are now citing as proof against my client?
19       MR. PISANO:  Object to form.
20       THE WITNESS:  I thought I answered that.
21       Yeah.  I just -- I can't tell you one way or
22   the other for sure.
23       Q.   BY MR. SCHMOOKLER:  Were you aware that the
24   lawyers representing you and Western Riverside were having
25   discussions over the draft plea agreements that are cited

MAGNA
LEGAL SERVICES

EXHIBIT 18
PAGE 1106

Page 206

1    against my client before they were actually executed?
2         MR. PISANO:  Object to form.
3         THE WITNESS:  Yeah.  I mean, if you have a
4    document that you want me to look at that was between me
5    and the D.A.'s office, that might refresh my recollection
6    one way or the other on whether -- you know, if it was
7    just shown to us or -- I don't think it's unusual that the
8    victim of a crime, you know, have communications with the
9    D.A.'s office.
10        Q.  BY MR. SCHMOOKLER:  I've been doing this 20
11   years.  I've never seen it before.
12        A.  Well, I don't think it's --
13        Q.  Apparently, it's a Riverside issue.
14            Were you aware that there were members of the
15   Riverside District Attorney's Office that were married to
16   members of the Best, Best and Krieger firm?
17        A.  When you say was I aware, when I think I --
18        Q.  At the time of the prosecution of the former
19   City officials -- strike that.
20            At the time of the prosecution of the ULC
21   owners, were you aware that members of the District
22   Attorney's Office were married to the law firm that was
23   seeking restitution?
24        MR. PISANO:  Object to form.
25        THE WITNESS:  I think I've heard something

Page 207

1    like that very recently, and it may be in connection with
2    this case.  I just -- but back then, I wouldn't have known
3    anything like that.  I don't think I would have.  It's,
4    you know -- it's just -- it's probably on this case that I
5    might have heard it.
6         Q.  BY MR. SCHMOOKLER:  Bear with me a second.
7             Earlier, you mentioned an inquiry by the SEC.
8    Do you recall that?
9         A.  Yes, I do.
10        Q.  Did the City of Beaumont pay any money to
11   resolve that SEC investigation?
12        A.  We incurred significant expenses to resolve
13   that matter, yes.
14        Q.  When you say "expenses," meaning lawyer's
15   fees?
16        A.  I'm sorry?
17        Q.  When you say "expenses," do you mean
18   attorney's fees?
19        A.  There were attorney fees that were spent -- I
20   think over $2 million that were spent in responding to the
21   investigation, which is a pretty intense experience when
22   the SEC shows up and commences an investigation.
23            There was -- I think we had some expenses
24   with UFI, Urban Futures.  I think there was minimal
25   attorney fees from my office, nominal attorney fees.  It

Page 208

1    was mostly with the Stradling firm.
2             There was -- there was probably a
3    considerable -- in fact, I know there was considerable
4    staff time spent on it.  And there may have been other
5    expenses associated with responding to that investigation,
6    ultimately resolving it.
7         Q.  Were those expenses ever submitted to my
8    client for payment?
9         A.  I can't say for sure.  We'd have to look at
10   the claims forms that had been submitted to confirm
11   that.
12        Q.  Because if they are not in the Proof of Loss
13   that we received earlier, they have not been submitted to
14   my client; correct?
15        A.  I don't know.  We'd have to look at the Proof
16   of Loss.
17        Q.  Okay.
18            Let's see that.
19        A.  I'm not saying they should be or shouldn't
20   be.  I just don't know.
21        Q.  I want to know, because it's been an issue
22   for the last week and a half.
23        A.  It's been an issue for the last week and a
24   half?
25        Q.  It has.

Page 209

1         A.  Okay.  I'm sorry.
2         Q.  There's been intensive questioning about that
3    issue for a week and a half.
4         A.  Okay.
5             I apologize.  I have a tinnitus problem, and
6    so sometimes it's hard for me to --
7         Q.  No worries.  I wasn't speaking clearly.
8             I put up on the screen the Proof of Loss
9    dated November 3, 2016.  And in the Proof of Loss, there's
10   an itemization of the losses claimed by the City under the
11   Proof of Loss totaling $159 million and change.
12            Do you see that?
13        A.  I see the estimated total $159,000 and
14   change.
15        Q.  And nowhere in here -- and I'm happy to show
16   you page by page -- is there any discussion of fees and
17   expenses related to the SEC investigation.
18            So my question is, did the City ever submit
19   for reimbursement of any expenses related to the SEC
20   investigation?
21        A.  We --
22        MR. PISANO:  Object to form, but go ahead.
23        THE WITNESS:  On June 30th of 2016, the
24   Beaumont Finance Authority, the City of Beaumont, and the
25   City of Beaumont CFD submitted a notice of claim listing



Page 210

1 the single policy number related -- related to the SEC
2 investigation.
3         Q.  BY MR. SCHMOOKLER:  I understand that.  I
4 didn't ask that question.  I understand there was notice
5 of the SEC investigation.
6         My question is, did the City ever submit any
7 expenses associated with that investigation for
8 reimbursement?
9         MR. PISANO:  Object to form.
10        THE WITNESS:  The reason I answered it that
11 way is because I viewed that -- those three documents from
12 those three agencies from the Stradling firm as tendering
13 a claim related to the SEC investigation to -- it says,
14 "Notice of Claim, Government Crime Policy," you know.
15        Q.  BY MR. SCHMOOKLER:  I understand what it
16 says, sir.  I don't need you to read it.
17        My question is this.  I'm drawing a
18 distinction between the notice and the expenses.  Did you
19 ever provide us any bills and ask for reimbursement of
20 those bills?
21        MR. PISANO:  Object to form.
22        THE WITNESS:  I don't recall what the City
23 received in response from AIG in response to these three
24 notices of claim that were sent out on behalf of the three
25 agencies.

Page 211

1         I don't recall if they were required, did any
2 kind of due diligence into the claims that were tendered,
3 asked for any information related to what the losses were
4 in connection with the SEC investigation.
5         And I don't recall -- I haven't read this
6 entire document that you've got up on the screen.  I'll
7 take your word for it that there's nothing in there, but I
8 can't -- I just don't know if the SEC ever followed up on
9 that claim that was submitted or not.
10        I'm sorry.  Maybe I misstated that.  I don't
11 know if AIG ever followed up on that claim that was
12 submitted or not.
13        Q.  BY MR. SCHMOOKLER:  You had absolutely no
14 clue what AIG was doing with the City's claim; right?
15        MR. PISANO:  Object to form.
16        THE WITNESS:  At some point, I did.  And at
17 some point, I learned that AIG never made a coverage
18 decision, despite the claims that were submitted, and
19 never tendered -- never covered the claim, never paid the
20 losses.  And to my understanding, they still have never
21 made a coverage decision, despite this going back to 2016.
22        Q.  BY MR. SCHMOOKLER:  All right.
23        Who told you that?
24        A.  That's my understanding.
25        Q.  Where did you come to that understanding

Page 212

1 from, because I believe you just disclosed something
2 privileged?
3         A.  Oh, no.  It may have been -- it may have been
4 the communications with -- from AIG.
5         Q.  So what communications have you had in
6 connection with the Answer we filed in this Complaint in
7 this action?
8         I'll ask it this way.  Have you looked at the
9 Answer my firm filed in this case?
10        A.  Probably at some point.
11        Q.  Do you understand than that letter
12 specifically denies that this claim is covered?
13        A.  What letter?
14        Q.  I'm sorry.  Do you understand that the Answer
15 that we filed in this matter specifically denies that the
16 claim is covered?
17        A.  Well, what I was referring to was prior to
18 the City and the other -- the City having filed a lawsuit
19 to collect under the policy, my understanding is that AIG
20 never made a coverage decision and never paid the claim.
21        If they paid something or made a coverage
22 decision prior to this litigation, you know, maybe you can
23 show me that document to refresh my recollection.
24        Q.  Sir, what due diligence have you done as to
25 what my client did or didn't do, other than talk to

Page 213

1 lawyers who want to sue my client?
2         A.  Well, I believe that I saw the document that
3 was submitted -- well, first, the April 2016 claim that we
4 submitted, the SEC claim submitted to your client on June
5 30, 2016, and the November 30, 2016, claim.  And at some
6 point, I saw, I believe, some correspondence between AIG
7 and the City, or between their lawyers.
8         And I think, you know, that the conclusion
9 that I reached was -- or my observation was and my belief
10 is, prior to filing of this lawsuit, that your client
11 never made a coverage decision.  And I'm pretty confident
12 that they've never paid any money under the claim.
13        Q.  It's because they denied the claim; right?
14        A.  I'm sorry?
15        Q.  It's because we deny that there's any money
16 owed?
17        A.  I just know you never, before the litigation,
18 your client ever just telling us --
19        Q.  Let's look together.  Let's look together.
20 Maybe they haven't educated you to the letters that we
21 sent.
22        A.  Hold on one second.
23        Q.  I'll stop.
24        A.  Sorry.  Someone walked in my office.
25        Q.  Okay.  Bear with me for a moment.



54 (Pages 210 to 213)

EXHIBIT 18
PAGE 1108

Page 214

1          I will ask my questions while I look through
2  the document, sir.
3          Are you aware that in 20 -- I don't want to
4  misstate.  I don't want to misstate the date for you.
5          Were you aware that on August 16 -- no.  I'm
6  sorry.  I'll retract that.  Let me get the exact date for
7  you.
8          Are you aware that on November 4, 2019, the
9  attorneys representing National Union issued a 15-page
10  letter detailing their analysis of the claim based upon
11  the information provided as of that date?
12     A.  That sounds familiar.  I don't recall they
13  made a coverage decision in that letter.
14     Q.  And isn't it true in that letter that my
15  client specifically asked for further information that was
16  never provided by the City?
17     A.  My recollection is that rather than make a
18  coverage decision or pay the claim, that the insurance
19  company continued to just go on and on asking for more and
20  more information, and that's my recollection.
21     Q.  Well, my question is different.  That's an
22  argument, as you allege in your parlance.
23     A.  That's my recollection of what happened.
24     Q.  Is it true that in November 4, 2019, my
25  client identified very specific coverage issues and

Page 215

1  provided the city an opportunity to address those
2  issues?
3          MR. PISANO:  Object to form.
4          THE WITNESS:  I disagree with that
5  characterization.  I think that your client breached their
6  duty to their insured, and that they didn't cover the
7  claim.  If ever there was a theft and dishonesty coverage
8  situation, this would have been it.
9          And why they never told us what their
10  coverage decision was, after communicating with the City's
11  attorneys for a lengthy period of time, and exchanging
12  voluminous documents, I don't know why they didn't do
13  that.  And to not pay the claim or make a coverage
14  decision, given the facts of this case, is beyond me.
15     Q.  BY MR. SCHMOOKLER:  Well, I suspect you will
16  have some lighting views of our motion practices set
17  forth, but back to your deposition.
18          Isn't it true that the City, in fact, never
19  responded substantively to my client's November 4, 2019,
20  letter?
21     A.  I wouldn't agree with that statement.
22     Q.  What was the date on which the City responded
23  substantive to my client's November 4, 2019, letter?
24     A.  I believe that was being handled by Best,
25  Best & Krieger.  You'd have to show me the document.  I

Page 216

1  can't --
2     Q.  You said you disagreed that there was no
3  response.  I want to know.  You obviously -- you disagree.
4  When I say there's no response, you obviously know there
5  was a response.
6          What was the date?
7     A.  It doesn't mean that I recall the specific
8  dates, sir.
9     Q.  Isn't it true the City didn't mail the claim
10  in 2019?
11          MR. PISANO:  Object to form.
12          THE WITNESS:  I'm not sure -- I'm not sure
13  how to answer that, because there are certain claims that
14  I believe the City does own against the carrier, and then
15  there are certain claims that may be owned by WRCOG, but
16  I'm not the right person to real address that.
17          MR. SCHMOOKLER:  Let's go off the record a
18  minute.  I want to gather my thoughts and figure out what
19  else I have today.
20          THE VIDEOGRAPHER:  The time is 6:17 p.m.  We
21  are off the record.
22          (Pause in proceeding.)
23          THE VIDEOGRAPHER:  The time is 6:25 p.m.  We
24  are back on the record.
25     Q.  BY MR. SCHMOOKLER:  Sir, during the course of

Page 217

1  the insurance claim, did you review each and every piece
2  of correspondence from may client about this
3  investigation?
4          MR. PISANO:  Objection to form.
5          THE WITNESS:  Well, I don't know.  Because if
6  there was something they sent that I didn't see, then I
7  wouldn't know that I didn't see it.  But I know there were
8  things I reviewed at some point, but I can't give you more
9  specifics than that.
10     Q.  BY MR. SCHMOOKLER:  Okay.
11          And as you sit here today are you familiar
12  with all the correspondence from my client about its
13  investigation?
14     A.  I don't know.
15          MR. PISANO:  Objection.
16          THE WITNESS:  I'd have to see it.  I'd be
17  speculating.
18     Q.  BY MR. SCHMOOKLER:  Well, prior to coming
19  here today and offering the testimony you just offered,
20  did you review correspondence from my client to determine
21  what questions it had asked during the course of that
22  investigation?
23     A.  I did not review correspondence from your
24  client -- from your client, AIG, in preparation for my
25  deposition today.

MAGNA
LEGAL SERVICES

EXHIBIT 18
PAGE 1109

Page 218

1    Q.  And the only updates you received in terms of
2  the investigation were from lawyers; correct?
3    A.  No.  That's not true.
4    Q.  Okay.
5      Who else did you receive reports from?
6    A.  I saw copies of correspondence related to the
7  claim as they occurred, but I don't know that I saw
8  everything.  Because if there was something I didn't see,
9  I wouldn't know that I didn't see it.  But I saw some
10 correspondence exchanged by the two sides.
11   Q.  When was the first time the City provided my
12 client a quantification of the alleged overcharging?
13   A.  I can't recall that.
14   Q.  Are you familiar -- are you aware that the
15 accounting report that the City provided wasn't provided
16 until 2018?
17     MR. PISANO:  Object to form.
18     THE WITNESS:  The accounting report was not
19 provided until 2018?
20   Q.  BY MR. SCHMOOKLER:  Yes.
21     Are you aware of that?
22   A.  And when you say "accounting report," I'm not
23 sure what you're referring to.
24   Q.  That you were aware that there was a report
25 by Mr. Ray, the accountant?

Page 219

1    A.  Dan Ray?
2    Q.  Yes.
3    A.  Yes.  I'm aware of that.
4    Q.  Were you aware that that report was not
5  provided until the middle of 2018?
6    A.  I can't --
7      MR. PISANO:  Object to form.
8      THE WITNESS:  I can't speak to the date, but
9  I am aware of the report.
10   Q.  BY MR. SCHMOOKLER:  Were you aware that
11 between April, 2016 and Mr. Ray's report -- let me give
12 you the exact date -- dated September 25, 2018, had
13 been no accounting of any alleged overcharging by Urban
14 Logic?
15     MR. PISANO:  Object to form.
16     THE WITNESS:  I don't -- I don't know that we
17 had -- I couldn't say when we had the accounting.  I know
18 that it wasn't discovered -- you know, it wasn't
19 discovered back in April of 2015.  It was discovered as
20 the process went forward.
21   Q.  BY MR. SCHMOOKLER:  And I asked a different
22 question.  Isn't it true --
23   A.  Well, you asked me between --
24   Q.  -- April of 2016, and September 25, 2018, my
25 client did not receive a report detailing any alleged

Page 220

1  overcharging by Urban Logic?
2      MR. PISANO:  Object to form.
3      THE WITNESS:  I don't know that.
4    Q.  BY MR. SCHMOOKLER:  And isn't it true, sir,
5  that my client specifically asked for documentation to
6  support the alleged overcharges following receipt of that
7  report?
8      MR. PISANO:  Object to form.
9      THE WITNESS:  I can't speak to that.
10   Q.  BY MR. SCHMOOKLER:  Isn't it true that my
11 client met with Mr. Ray to understand his accounting
12 report?
13   A.  I wasn't a part of that meeting, so I can't
14 really speak to it.
15   Q.  And isn't it true, sir, that the
16 documentation my client asked about, even on the
17 quantification of the loss, wasn't provided until the
18 middle of 2019?
19   A.  I don't know that that's true one way or the
20 other.
21     Going back on my last question, I don't
22 recall that I was part of a meeting between your client
23 and Dan Ray.  I don't know if it was an in-person meeting.
24 I'm not sure what meeting you're talking about, or whether
25 it was by Zoom or phone call.  And so I just don't recall

Page 221

1  it -- being part of it.  At the moment, I don't.
2    Q.  Isn't it true, sir, that -- documents -- my
3  client specifically asked in a June, 2019 meeting for
4  support of the City's loss computations?
5    A.  Loss computations?
6    Q.  Yes.  The computation of the claimed loss?
7    A.  I can't speak to that date.  I just can't off
8  the top of my head.
9    Q.  Isn't it true that my client didn't receive
10 the documentation supporting the City's computations of
11 its loss until the end of 2019?
12   A.  You'd have to refresh my recollection with
13 the documents.  I just -- I mean, these dates that you're
14 throwing out, off the top of my head, I didn't review.
15     I did not, in preparation for this
16 deposition, review correspondence between your client and
17 the City, or anyone else on behalf of the City.  So I
18 can't -- I just don't have those dates or any of that off
19 the top of my head.
20   Q.  Do you know whether or not my client, in
21 fact, timely and promptly requested information supporting
22 the City's loss computations after meeting with the City's
23 forensic accountant, Mr. Ray?
24     MR. PISANO:  Object to form.
25     THE WITNESS:  I doubt it.  I don't think your

56 (Pages 218 to 221)

Page 222

1   client has done anything timely, other than ask
2   continuously questions without making a coverage decision,
3   so I would doubt it.
4        Q.  BY MR. SCHMOOKLER:  So nothing?  We've done
5   nothing timely?  Nothing?  Not one thing?
6        A.  Well, we're still -- you know, we waited all
7   those years for a coverage decision, which you would
8   expect, at a minimum, they would have made a coverage
9   decision or paid the claim, one of the two, and they
10  didn't do that.
11       Q.  That's not what you said, sir.  You said my
12  client has done nothing timely.  So I want to make sure
13  it's clear.
14            You, under oath, are saying there's not a
15  single thing my client did during the course of this
16  investigation that was timely?
17            Right?  Not a single thing?
18       A.  Can the court reporter read the question
19  back, please?  The original question?
20            THE REPORTER:  "Do you know whether or not my
21  client, in fact, timely and promptly requested information
22  supporting the City's loss computations after meeting with
23  the City's forensic accounting, Mr. Ray?"
24            THE WITNESS:  I don't know if they did, as
25  you described it, timely and promptly request that

Page 223

1   information, whatever timely and promptly means.
2            But my experience has been that we've
3   been -- we waited a long time for a coverage decision that
4   didn't seem to be forthcoming or coverage and payment of
5   the claim.  My client always paid its premiums timely.
6        Q.  BY MR. SCHMOOKLER:  Did you timely tell us
7   about the notice of discipline for Mr. Kapanicas?
8            MR. PISANO:  Object to form.
9        Q.  BY MR. SCHMOOKLER:  I'll ask it a different
10  way.
11            Do you think telling us about the notice of
12  discipline in 2019, when it occurred in 2016, is timely?
13            MR. PISANO:  Object to form.
14       Q.  BY MR. SCHMOOKLER:  I'll ask it a different
15  way.
16            Are you aware that we were never told about
17  the notice of discipline until 2019, more than three years
18  after this claim had been pending?
19            MR. PISANO:  Object to form.
20       Q.  BY MR. SCHMOOKLER:  Were you aware of that
21  fact, sir?
22            MR. PISANO:  Object to form.
23            THE WITNESS:  The April, 2016 claim that we
24  submitted included some items that were in the notice that
25  went out to Mr. Kapanicas.

Page 224

1            As I testified to earlier, we had concerns
2   about putting things out there that hadn't been fully
3   vetted, where investigation were pending, including by the
4   D.A.  UFI was do its analysis, its work.  Our office was
5   still doing its work.
6            And, you know, putting something out there
7   before those investigations were complete before
8   Mr. Kapanicas had been -- even had his hearing on his
9   employment status I think was premature.
10       Q.  BY MR. SCHMOOKLER:  I asked a different
11  question.
12            Are you aware that your lawyers did not
13  provide my client the notice of discipline we discussed
14  today until late in 2019?
15            MR. PISANO:  Object to form.
16       Q.  BY MR. SCHMOOKLER:  Are you aware of that
17  fact?
18       A.  I couldn't respond to that.  I mean, I can't
19  tell you when they did what they did.
20            We -- you know, we notified your client when
21  we felt that we had something that was substantial or
22  substantive in nature that we could back up in April of
23  2015, and then again when the SEC investigation was
24  commenced.  And then once the D.A. concluded their
25  investigation, we made your client aware of that.

Page 225

1        Q.  I'm asking a different question.
2        A.  We waited --
3        Q.  I want to know how it was that my client
4   could timely respond to your claim when you didn't provide
5   us the notice of discipline for nearly three years?
6            Do you know?
7            MR. PISANO:  Object to form.
8            THE WITNESS:  I think the information that
9   was provided, to answer your question, that was provided
10  in the November 3, 2016, claim, gave pretty -- gave a
11  pretty good detailed description of the information in
12  support of the claim.
13            And at that time -- at that time,
14  estimated -- and this is November of 2016, estimated the
15  total at $159,732,461.  And that was in November of 2016.
16       Q.  BY MR. SCHMOOKLER:  Yeah, no.
17            Were you aware, in accusing my client of not
18  timely -- of not timely responding, that they were never
19  apprised of the notice of discipline against Mr. Kapanicas
20  until 2019, nearly three years after you submitted the
21  claim?
22            MR. NOLAN:  Counsel, that's now the fourth
23  time you asked that question.  You are -- you are
24  borderline harassing.
25            MR. SCHMOOKLER:  I agree I've asked it, and

MAGNA
LEGAL SERVICES

EXHIBIT 18
PAGE 1111

Page 226

1  I'm still waiting for an answer.
2        MR. NOLAN:  He has answered you four times.
3  Just because you don't like the answer doesn't mean he
4  hasn't answered.
5        MR. SCHMOOKLER:  He has not.
6        MR. NOLAN:  He has.
7        Q.  BY MR. SCHMOOKLER:  Sir, isn't it true that
8  for the very first time in your knowledge of
9  Mr. Kapanicas' conduct was disclosed to my client in 2019,
10  three years after you submitted the claim?
11       A.  No.
12       MR. PISANO:  Object to form.
13       MR. SCHMOOKLER:  Now we have an answer.
14       Q.  BY MR. SCHMOOKLER:  Isn't it true, sir, that
15  the content of your notice of discipline -- your June 1
16  letter was not communicated to my client until 2019, three
17  years in the claim process?
18       A.  On April 5, 2016, we submitted a claim to
19  your client that says what it says.
20        On November -- well, and then on June 30,
21  2016, three claims were submitted.
22        And then on November 3, 2016, another claim
23  was submitted under the employee dishonestly policy.  And
24  that claim lists the basis for the claim.  It totals the
25  estimated total of the claim at $159 million and some

Page 227

1  change.  It provides a description that's attached as
2  Addendum A to the November 3, 2016, claim.
3        And if I can just refresh my memory, to
4  answer your question.
5        Q.  Do you recall my question?  Because none of
6  what you said addresses my point.
7        A.  But I think it does, but I do recall my
8  question.
9        Q.  When was your findings in the June -- I'm
10  sorry.
11        When was the -- when were the issues raised
12  in your June 1, 2015, letter first advised to my client?
13        A.  I believe on April 5, 2016, and on November
14  3, 2016.
15        Q.  Is it your testimony, then, that your April
16  and November submissions track the information contained
17  in your June 1 letter?
18        MR. PISANO:  Object to form.
19        THE WITNESS:  That wasn't in the last
20  question, but the documents say what they say.  And I
21  believe that -- I'd have to review the whole document, but
22  it discloses what ended up happening with the D.A.'s
23  investigation.
24        And then that there's coverage under the
25  government crime policies, and so that document says what

Page 228

1  is it says, but --
2        Q.  BY MR. SCHMOOKLER:  Let me show you what we
3  previously looked at, which are the exhibits I received
4  today, and I'll put it up on the screen.
5        I want to look at the Court's finding again,
6  the dicta, as you called it.  I think you called Judge
7  Chaffee's language dicta?
8        A.  It was a writ.
9        Q.  Okay.
10        Well, Judge Chaffee made specific findings
11  allowed in court, or transcribed into the record.  You
12  called his words "dicta" earlier.  We're referring to
13  Attachment 16.0-009, your submission.  And highlighted in
14  this document are specific references to Misters Dillon,
15  Hughes and Moorjani.
16        Do you see that in the middle of the page at
17  line 15?
18        A.  I see that on the -- and I think this is
19  actually a transcript of a hearing with the Judge as
20  opposed to a written ruling.
21        Q.  Sure.
22        And in the Court's oral discussion, he wrote,
23  "Respondent's witnesses, particularly Misters Dillon,
24  Hughes and Moorjani, either lacked specific knowledge or
25  were not credible in their testimony regarding compliance

Page 229

1  with the TUMF contribution requirements."
2        Do you see that?
3        A.  I see the language in the transcript.
4        Q.  Were you aware in 2015 that the Court had
5  found Mr. Dillon and Moorjani, that they lacked
6  credibility?
7        MR. PISANO:  Object to form.
8        THE WITNESS:  On my June 1, 2015, notice to
9  Kapanicas, I believe I quoted some of the transcript from
10  the Court's hearing, but I think it was more the other
11  section that we went over earlier.  I don't know that I
12  quoted this.
13        Q.  BY MR. SCHMOOKLER:  Did you ever find that
14  Mr. Kapanicas was not forthcoming?
15        MR. PISANO:  Object to form.
16        THE WITNESS:  I had concerns about that.
17        Q.  BY MR. SCHMOOKLER:  Pardon me?
18        A.  I had concerns about that.
19        Q.  When was that?
20        A.  At some point, I can't tell you specifically,
21  but at some point, I had concerns about that.
22        Q.  Did you ever find that Mr. Kapanicas was
23  lying?
24        MR. PISANO:  Object to form.
25        THE WITNESS:  I don't know.  I don't know.  I

MAGNA
LEGAL SERVICES

EXHIBIT 18
PAGE 1112

Page 230

1  can't say right now in this moment. I'd have to think
2  about that and go back over everything to really be able
3  to respond to that.
4       You know, I take calling somebody a liar
5  serious. And right now, I just -- I can't think of
6  anything off the top of my head. But I had concerns about
7  his forthrightness I think was the word that you used.
8       MR. SCHMOOKLER: I have no further questions
9  today. Thank you for your time, sir.
10      THE WITNESS: Thank you.
11      MR. SCHMOOKLER: Madam Court Reporter --
12  let's go off the record.
13      THE VIDEOGRAPHER: And before we go off the
14  record, Mr. Nolan, Mr. Pisano, did you want a copy of
15  these videos?
16      MR. PISANO: Not at this time, but do we have
17  your info, Jeremiah?
18      THE VIDEOGRAPHER: No. I can leave my email
19  in the chat for you if you want.
20      MR. PISANO: That would be great.
21      THE VIDEOGRAPHER: All right.
22      And everybody's ready to go off the record?
23      MR. SCHMOOKLER: Yes, sir.
24      THE VIDEOGRAPHER: Okay.
25      This concludes today's proceeding in the

Page 231

1  deposition of John Pinkney. The number of media used was
2  six. The time is 6:45 p.m. We are off the record.
3       THE REPORTER: Mr. Nolan, did you want copy?
4       MR. NOLAN: No, not at this time. Thanks.
5       THE REPORTER: Mr. Pisano, a copy?
6       MR. PISANO: I want a copy.
7       THE REPORTER: Thank you.
8       (Ending time: 6:45 p.m.)

1
2
3
4
5       I, JOHN PINKNEY, do hereby declare under penalty
6  of perjury that I have read the foregoing transcript of my
7  deposition; that I have made such corrections as noted
8  herein, in ink, initialed by me, or attached hereto; that
9  my testimony as contained herein, as corrected, is true
10  and correct.
11      EXECUTED this _____ day of _____,
12  at _____, _____.
            (City)         (State)
13
14
15
16

17        _____
          JOHN PINKNEY
18
19
20
21
22
23
24
25

1
2       I, the undersigned, a Certified Shorthand Reporter
3  for the State of California, do hereby certify:
4       That prior foregoing proceedings were taken
5  completely video before me at the time and place herein
6  set forth; that any witnesses in the foregoing
7  proceedings, prior to testifying, were placed under oath;
8       That a verbatim record of the proceedings was made
9  by me using machine shorthand which was thereafter
10  transcribed under my direction; further, that the
11  foregoing is an accurate transcription thereof.
12      I further certify that I am neither financially
13  interested in the action nor a relative or employee of any
14  attorney of any of the parties.
15      IN WITNESS WHEREOF, I have this date subscribed my
16  name.
17
18  Dated: June 5, 2022
19
20
21
22
23      _____
        Laura A. Rutherford, RPR
        CSR No. 9266
24
25

MAGNA
LEGAL SERVICES

EXHIBIT 18
PAGE 1113

Page 1

**A**

**ability**
9:22 20:10 34:22
38:20 40:2,21 60:10

**able**
35:23 36:3 37:7 51:7
60:12 64:1,10 66:18
67:10,12 107:17
108:21,24 109:2
113:4 114:1 124:15
125:1 136:5 138:10
172:22 174:10,13
174:24 230:2

**above-referenced**
149:10

**absolutely**
185:4,5 211:13

**access**
186:5

**accountant**
218:25 221:23

**accounting**
218:15,18,22 219:13
219:17 220:11
222:23

**accrual**
55:8

**accruals**
55:7,13 63:21 64:8,9
65:22 66:11,22
107:15

**accrued**
55:9 56:24 63:21
107:10

**accruing**
89:22

**accurate**
18:1,3 24:16 41:11
72:10 79:23 129:21
129:23 132:7
201:20 233:11

**accurately**
9:14

**accusing**
225:17

**acknowledge**
184:11,14

**act**
19:22 20:2,3 22:6
58:19,21 59:5 62:23
93:18 101:1 102:4
105:14 106:3,5
169:4,14

**acted**
139:5

**acting**
33:22

**action**
6:25 8:3,5 26:1,3
30:22 66:3,5,7 72:6
80:3 92:9 203:11
204:3 212:7 233:13

**actions**
104:19 105:19

**actively**
33:25 34:11

**activities**
35:4 44:5 50:13

**activity**
51:2

**acts**
60:1 166:10,15,20
167:24

**actual**
28:18 91:19 129:4
144:5 173:25

**add**
12:13 29:3 33:15

**Addendum**
227:2

**addition**
152:25 153:7,10,14

**additional**
58:9

**address**
94:18 137:10 162:2
215:1 216:16

**addressed**
40:8 123:11 129:9,11
129:18,25 134:2
138:6,14 139:11

**142:11 143:1 144:8**
151:21 155:13,20
195:24

**addresses**
39:25 227:6

**addressing**
39:6 138:16 176:20
178:16

**administration**
37:11 44:6 70:2
82:18 197:24
199:17 200:19
201:8 202:13

**admitted**
95:21 96:12

**adopt**
39:22 139:18 140:1
140:20

**adopted**
140:9,13

**advance**
128:4

**advice**
30:7 70:25 189:6

**advise**
190:9,10

**advised**
50:12 85:7 227:12

**advising**
105:17

**affect**
157:7,23 159:7
160:14 164:22
176:17

**affidavit**
198:1,4

**affiliated**
43:12

**affirmative**
91:20 177:25

**afforded**
60:25

**agencies**
158:4 210:12,25

**agenda**
32:2,4,9

**agendized**
32:14

**ago**
8:12 48:3 54:12

**agree**
6:21 57:9 65:18 66:9
66:17,23 88:12
89:21 97:6,7 107:15
108:16 114:6 115:4
138:20 142:5
183:24 184:1,9
215:21 225:25

**agreed**
72:21

**agreement**
4:18 12:9,10 29:11
55:24 62:7 65:14
72:7,17,20 73:9,11
73:25 132:10
134:11 205:11,17

**agreements**
72:15,24 135:12,13
197:25 198:8 205:4
205:25

**ahead**
22:16 38:7,8 185:8
209:22

**AIG**
44:20 48:25 49:11,12
192:25 195:12
210:23 211:11,14
211:17 212:4,19
213:6 217:24

**al**
836380:5 2:5 6:8,9

**Alan**
42:9 75:11 84:16
86:25 133:5 134:1
150:22 152:18
160:2,5 165:25
180:23

**allegations**
51:8 161:22 163:5
164:16 170:19

**allege**
214:22



EXHIBIT 18
PAGE 1114

alleged
19:14 218:12 219:13
219:25 220:6
allegedly
198:16
alleges
82:18
Alliance
194:4
Alliant
190:17
allow
77:7 162:3
allowed
34:4,16 85:13 106:1
118:3 129:1 153:19
228:11
allowing
123:18 124:6
allows
20:2 41:5
Alvin
7:23
amount
33:10,12 53:17 64:2
92:12 107:18
203:13
amounted
132:8
Amy
204:11
analogy
142:18
analysis
23:2 171:25 177:1,17
180:11 182:23
184:23 185:9
214:10 224:4
and/or
4:23 25:19 103:22
104:20,21 105:9
announced
53:1,2
answer
5:18 9:11,13,22 27:2
27:3,25 28:8 45:23

50:22 77:3 101:18
116:5 120:25
126:24,25 127:4
139:24 140:7
156:17 159:24
162:24 169:21
170:6 175:19,20
188:25 189:4,13
195:1 196:18 212:6
212:9,14 216:13
225:9 226:1,3,13
227:4
answered
91:18 127:12 130:15
159:19 205:20
210:10 226:2,4
answers
8:23 91:17
anybody
71:14 174:3 185:12
anymore
102:24
anyone's
58:19
anyway
90:7 148:22
aol.com
194:10
apologize
34:4 45:15 74:16
75:2 89:7 94:22
110:5 117:3 149:3
153:8 186:20 209:5
apologized
102:21
apparently
139:21 155:9 206:13
appeal
70:18 84:15 89:19
appear
15:16 62:20 63:8,12
118:18 136:18
appearance
118:13,16 119:19
appearances
3:1 7:3

appeared
38:2
appears
104:5 150:2 151:19
152:16 156:18
157:11 158:20
Appendix
173:19
applicable
62:21 104:21
application
180:1,3,5 182:18
191:9
applied
40:5
appointed
13:16,19,22 18:15
appointment
32:17
apprised
20:15 225:19
approach
29:13
appropriate
85:16 171:20 172:7
172:10
approval
21:5,6,14 29:16
30:23 106:23 107:5
108:2 136:22 137:1
139:3,16,22 140:4
140:17 150:20
approve
21:10 28:7 136:21
153:20 154:17
approved
12:2 29:14,15 31:4
31:11 67:5 97:2
136:10,11,18
139:10 140:21
148:8 153:24
154:14,24 162:15
162:22 164:5
174:21
approving
148:17 155:24 159:9

159:16
April
11:23 19:2 30:19
31:3,23 32:3,10
33:6,16 41:22 48:21
48:22 49:22 50:22
50:23 51:16 78:21
79:13 81:7 144:22
163:24 164:17
165:20,21 166:19
167:3,6,23 168:15
170:12 171:9
172:12 177:10,23
178:1 185:15 186:8
199:8,23 200:3
202:15 213:3
219:11,19,24
223:23 224:22
226:18 227:13,15
April/May
35:18
April/May/June
35:24 42:22
arguably
106:4
argue
65:21 138:10 189:18
193:6,7
argument
65:19 99:24 158:21
169:16,24 170:8,11
183:24,24 184:8,10
214:22
arguments
170:2
arm's
98:5 118:13,19
119:19,22
arrangement
96:16 97:13,14
arrived
42:7
articulate
66:15
articulated
178:16 188:13



EXHIBIT 18
PAGE 1115

aside
89:3,10 90:11 168:11
183:12
asked
9:25 10:2 27:13 62:5
81:14 91:15 101:16
101:19 117:1 120:5
128:13 140:8 143:2
152:4 155:17 185:6
187:1 190:3 193:11
195:14,25 196:4
211:3 214:15
217:21 219:21,23
220:5,16 221:3
224:10 225:23,25
asking
10:16,22 43:19 58:9
84:25 85:8 105:3
107:22 111:10
127:3 133:19,19
155:16 167:18,20
167:20 180:9
184:25 188:11,12
188:12 189:14
195:4 199:3 214:19
225:1
asks
10:20
assert
189:16
asserting
189:21
assigning
179:16
assistance
180:24
assistant
182:4
assisting
24:18
associated
11:9 18:24 208:5
210:7
assume
8:5 10:1 47:24
assumes

164:9 165:14
assuming
177:22
attach
109:14
attached
81:8 83:8 109:21
113:1 114:20 116:3
116:9 147:22
149:13 151:15
156:3 159:12
178:11 182:7 227:1
232:8
attachment
62:19,20 96:23 112:6
112:9 147:23 148:7
148:20 149:2,3,4,22
149:23 150:12,13
151:8 156:9 158:17
173:20 228:13
attachments
5:4 61:3,4,6,8,11,19
61:23 111:10 112:9
112:9,15,19 148:24
156:8
attempting
106:9
attention
16:25 201:14,14
attests
56:11
attorney
4:17 7:4 8:8 11:18
12:11,16,18,21 13:4
13:17 14:19 15:1
18:16,22 19:17
20:25 21:4,12,13,16
24:2,3 28:19,21
29:21 30:23 40:15
50:5 52:9 73:11
74:6 82:18,23,24,25
83:1,7 86:16 97:9
102:10 104:3 121:7
158:10 162:3 163:7
163:16 172:25
175:22 177:5

197:20 201:13,15
204:19 205:3
207:19,25,25
233:14
attorneys
179:12 214:9 215:11
attorney's
11:25 48:1 100:16,17
102:2 206:15,22
207:18
attorney/client
22:23 28:2 101:23
189:15
audible
8:23 166:17
audio
6:19 9:21 47:11
August
53:24 214:5
authenticate
146:18
authored
147:6 197:14
authority
20:13,22 21:25 22:4
22:6 25:11,15 26:1
26:15 28:22 39:21
41:2,3,8 49:8
136:21,25 137:6
139:23 140:4,10,11
174:14 190:14
209:24
authorized
39:16 56:17 136:14
139:2 166:5
authorizing
39:22 166:10,15,20
Auto
141:7
Automotive
37:25,25 141:2,14
autonomy
19:17 20:10 21:13
availability
125:15
available

33:21 40:4 41:15
43:18 125:17
180:10 191:11
Avenue
3:6
awarded
89:23
awarding
122:24
aware
8:5 14:2,5 21:23
22:13,17 28:3,5,9
28:11 29:19 34:14
34:14,17 35:11,11
38:20 41:19 43:1,3
43:4,4,6,9,25 44:4
44:10,12,16 47:21
49:9 51:19 52:2,5
54:23 55:16 63:2,4
64:19 65:11,16 66:1
66:16,21 67:16,20
68:12,15,16,17 69:5
69:10,16 70:13 72:3
72:9,11,13 76:24,25
79:2,2 80:22 81:2
83:21 86:16 87:4
88:21 89:25 90:5,18
92:11,14,15,17 95:1
95:3 107:3,24
108:18 109:11
112:25 113:20
117:19,20 118:7
119:2 124:17
126:16,21 127:10
127:19 135:17
139:11 154:23
155:3,5 164:15
168:5 176:18
179:20 182:24
183:19 184:2,12
205:2,23 206:14,17
206:21 214:3,5,8
218:14,21,24 219:3
219:4,9,10 223:16
223:20 224:12,16
224:25 225:17



EXHIBIT 18
PAGE 1116

229:4
**awfully**
30:4
**awhile**
56:8 103:1
**awkward**
35:20,21
**Aylward**
37:9 38:14 43:16
50:9,14 56:13 72:25
73:1 141:3,11,21
156:24
**Aylward's**
38:6 141:6
**A-l-v-i-n**
7:24
**a.m**
2:17 6:2,6 47:14

**B**

**B**
83:9
**back**
17:10 25:7,23 27:15
34:21 36:11 47:5,5
47:19 49:19 54:7
57:1 67:1,4 71:3
75:1,24 81:16 84:5
85:1 92:1 97:22
103:11 106:6,16
109:4,12 111:6
112:2 122:4 126:10
127:9 135:2,3,3
138:10 140:16,17
140:25 146:10
154:4,8 163:13
165:5 170:16
173:17 174:3,4
177:10 186:15
190:4,7 191:21
193:23 194:11
196:17 207:2
211:21 215:17
216:24 219:19
220:21 222:19
224:22 230:2

**backed**
36:24
**background**
11:2 158:23 160:7
**bad**
64:12 94:13 142:18
**balance**
136:4,6
**Ball**
149:9
**Bank**
39:16 40:6 147:25
149:5,19 150:9
**Barajas**
204:12
**barely**
28:17
**Baron**
3:14 11:11 30:24
**based**
51:10 87:15 108:9
128:24 136:15,17
156:18 189:5,8
190:11,18,24
214:10
**basically**
76:6 172:2
**basis**
50:16 55:24 56:4
79:8 89:1,4 90:1
129:4 130:24,24
171:21 178:22
226:24
**Bates**
111:2
**BB&K**
5:8,11
**bear**
29:2 55:18 197:9
199:20 207:6
213:25
**Beaumont**
4:9 11:19 12:8,22
15:1 16:21,25 21:22
37:24,25 49:6,7,8
52:22 58:15 65:12

66:19,19 68:6,13
72:13,21 78:12 83:3
83:22 85:3 86:14
88:16 89:13,17 94:8
94:11,25 95:8,19
96:2,9,18,19 97:2
97:22 99:22 104:20
105:9 116:17 131:7
131:9,19 141:7,7,13
149:11 187:3
192:25 204:2
207:10 209:24,24
209:25
**Beaumont's**
82:6 83:16 88:14
**began**
17:14 92:15
**beginning**
2:17 7:3 8:20 47:17
74:24 82:21 103:9
146:8 169:6 191:19
**begins**
6:6
**behalf**
2:16 6:24 7:5,9,10
45:18 49:5,7,7,11
52:21 57:24 60:1
87:18 148:10 151:6
160:17 164:6
189:16,21 210:24
221:17
**behave**
86:2,2
**belief**
107:17 213:9
**believe**
11:8,22 12:14 22:2,2
23:22 24:15 26:16
28:8,24 33:16 34:3
37:14,17,22 38:2,7
38:9,14 39:25 40:5
43:10 48:18 49:21
50:6,6,10 55:2 58:4
58:6,18 65:22 66:24
70:19 79:1 80:20
81:8 84:18 86:15

87:1 88:24 90:17
92:14 97:21 101:13
108:20 112:16
114:17 116:18,23
117:22 127:12,15
131:11,13 134:15
135:8 137:19,22,22
137:22 144:22
147:5 152:10 160:4
167:3 178:2 185:7
190:13 194:14
195:22 204:6 212:1
213:2,6 215:24
216:14 227:13,21
229:9
**believed**
35:9,11 70:17 88:5
89:19 98:12 151:14
**benefit**
82:20 116:22 117:12
118:4 179:5
**benefited**
141:22
**benefits**
17:15 97:14 166:11
**best**
3:4,4 7:8,8 36:21
61:20,20 73:22
135:8 146:14,14
197:11,12,14,14,18
197:18 202:22,22
204:18,18 205:3,3
206:16,16 215:24
215:25
**better**
32:22 186:4
**beyond**
51:14 53:5,7 157:20
184:8 215:14
**bidding**
92:21 98:4
**bigger**
34:4,5
**bill**
37:9 174:14
**bills**



EXHIBIT 18
PAGE 1117

210:19,20
**bit**
173:11
**blow**
149:25
**blown**
74:8
**blue**
142:16 143:4,6
**body**
20:17 25:3
**bond**
24:5,9,25 39:24
**bonded**
181:7 182:4,14 184:7
**bonds**
39:18 148:13 180:24
**booking**
197:16
**books**
56:24 135:10
**borderline**
225:24
**borrow**
64:9 66:12
**borrowed**
55:7 64:2
**borrowing**
56:23 63:20,23 65:21
107:9,14
**bothered**
172:13
**bottom**
32:2 53:11 56:10
104:17 134:8 181:5
200:9 204:18
**breach**
102:23 142:3 189:15
**breached**
215:5
**break**
13:2 20:24 46:23,24
102:25 110:13
114:22 146:2
191:11,13
**breaks**

46:23
**Brent**
24:1 200:7
**Brian**
16:21 17:1
**brief**
11:1
**briefly**
48:13,14 82:4 87:16
**Brigham**
11:3,4
**bring**
29:8,9 201:13
**broad**
41:20 69:23 71:7,11
71:13 105:23,24
106:9
**broadened**
182:17
**broadly**
76:17
**broke**
186:21
**broker**
178:15,18 190:17
192:1 194:5,8 200:7
**brought**
45:25 177:5
**Brown**
19:22 20:2,3 58:19
58:21 59:5 93:17
101:1 102:4 105:13
106:3,5
**budget**
140:9,10,12,13,20,21
**budgeted**
140:14,15
**bullet**
104:18,23,25 105:2
106:21
**bullets**
104:24
**business**
37:16 117:11 131:2
141:13
**businesses**

37:23 38:3
**buy**
22:1

---

**C**

**CA**
3:6,16
**California**
836380:2,17 2:2,16
6:1,11 20:7 38:11
56:1 64:22 71:24
85:17 145:9,19
147:25 149:5 166:8
233:3
**call**
20:5 55:6 85:15,19
85:21 191:11
220:25
**called**
14:3 15:17 18:11
21:22 62:11 68:6,20
70:6 126:25 131:2
228:6,6,12
**calling**
230:4
**calls**
15:20 85:6 190:13
194:24
**CalPers**
17:15,16
**camera**
6:17
**candidly**
46:13
**Cannon**
48:25 49:11 177:5,9
**Canyon**
3:15
**capable**
86:4 176:4,4
**capacity**
12:21 30:6
**caption**
54:7
**cards**
117:11

**careful**
30:4 63:11 64:20
70:21 101:22 171:5
**carrier**
22:14 51:1,12,16
81:13 82:9 88:6
89:15 145:7 163:19
192:25 216:14
**carted**
43:3 115:14 172:20
**case**
836380:7 2:7 6:11
16:8 24:6 28:4 40:5
70:10,18 79:24 80:1
80:4 81:12 84:5,15
90:9,9,20 116:18
131:11,13 144:1,3
152:2 157:16
183:20 193:6,7
196:10 207:2,4
212:9 215:14
**cases**
36:25
**cash**
64:9 66:11
**cashed**
107:14
**cashing**
55:10 63:23
**cause**
85:20,20
**caution**
26:19
**cautious**
99:17
**cease**
91:23
**Center**
141:7
**Central**
836380:2 2:2 6:10
**certain**
12:17 15:2,5 37:4
38:22 39:2 114:1
128:15 166:24
182:2 198:9 216:13



EXHIBIT 18
PAGE 1118

216:15
**certainly**
28:9 35:21 63:15
65:1 66:6,24 70:19
88:24 90:5 92:7
108:17 109:18
126:3 141:23
**certificate**
150:21 156:10,13
158:11,16
**certificates**
148:1,2 149:14,15
**Certified**
2:19 233:2
**certify**
233:3,12
**cetera**
34:6 82:20
**CFD**
24:9 148:13 209:25
**CFG**
24:25
**Chaffee**
68:18,23 69:18 76:12
228:10
**Chaffee's**
75:7 78:12 87:19
228:7
**challenge**
16:15 35:6,8
**challenges**
35:22 36:8,12 42:17
**challenging**
33:20 42:3,4 44:7
**chance**
9:12
**change**
209:11,14 227:1
**changed**
70:19 122:23
**characterization**
215:5
**charge**
81:1 135:19
**charges**
49:13 51:22 52:1

53:1,2,5,6 54:13
57:4 58:25 59:2
72:8 80:21 81:2
82:12 93:5,10,13,17
93:21 102:7 126:3,6
142:25 162:1 164:3
167:7,14 173:8,9
177:7 186:12
199:11
**charging**
97:10
**chat**
230:19
**Cherry**
37:24,25 141:2,13
**Chicago**
3:11
**chief**
35:2 53:22 54:4,22
56:16 77:5
**choose**
59:5 106:14
**chose**
73:2 167:19
**Chris**
27:4 110:1,17 120:11
**Christopher**
3:4,5 7:8
**christopher.pisano...**
3:7
**cipher**
163:22 170:21
**circumstances**
38:23 39:2 40:5,7
41:4,13 125:14
139:25 140:1 175:8
**cited**
37:4 62:6 64:15
80:15,16 85:4 87:18
87:22 91:7 205:25
**cities**
192:6,20
**citing**
205:18
**city**
4:9 7:9 11:18,19 12:1

12:7,11,15,16,18,19
12:20,21,21,23,24
12:24,25 13:1,3,4,8
13:12,16,22,25,25
14:19 15:1,1,4,9,12
15:14,18 16:5,21,25
16:25 17:7,8,14,16
17:21 18:6,7,9,10
18:14,16,17,22,24
19:1,4,16 20:15,16
20:24,25 21:4,7,12
21:13,16,17,22,25
22:3,20 23:5 24:8,9
24:13,23,25 25:8,10
25:25 26:6,13,14,18
26:24 27:5,18,24
28:3,6,19,21,25
29:16,21 30:23 31:4
31:15 32:5,10,19,23
32:24 33:1,2,8,17
33:22 34:7,21 35:10
35:19 36:2,10 37:10
37:18 38:3,4,10,20
39:5,6,15,20,21
40:9,9,13,14,15,20
40:21,24,25 41:3,6
41:7 44:5,8,10,12
44:22 45:11,18 46:1
46:2 49:7 52:21
54:4,21,24 55:3,12
56:12,14,18,18
57:11,12 58:15 60:1
60:8 62:17 64:1,21
66:19 67:2,5 68:6
68:13,18,24 69:7,14
69:18,22 70:15,17
70:22 71:5 72:13,21
73:2 75:21 76:4,13
77:4,5,5,21 78:11
78:24,25 79:19 82:5
82:19 83:3,10,21,22
85:3 86:13,16 87:9
87:18,23 88:14,15
88:19 89:12,17,25
90:14,17,20 91:7,11
92:3,7,11,20 94:10

95:16,17,21 96:3,3
96:7,11,17,19,22
97:3,9 98:3,5,17,21
98:24 99:13,20
100:1,6,6,15,17,23
101:6,12 102:2,10
102:11,13 104:3,12
105:15 106:23
107:5,16 108:2
115:1,6 116:16,21
116:22 117:8,10,11
117:13,22,23,24
118:4,5,8,11,11,17
118:23 119:15,17
120:22 121:6,10
124:25 128:15,16
130:12,17 131:7,9
131:10,18,20,24
132:3,7,9,10,12,15
134:19,22,25 136:3
136:4,5,7,20,21
137:1,17,19,23
138:24 139:2,9,16
139:22 140:3,4,11
140:14,16,17,21,25
143:3,21 144:6,13
148:10 149:11
150:20 152:25
153:14,25 154:15
154:17 158:10
161:1,20 163:2
166:5,6 167:5
170:24 171:3
172:19,25 176:25
177:1,5 180:22,24
180:25 181:7,21
182:13,16,25 183:4
183:5 184:5,6,20
187:3,18 188:16
189:21 190:10,15
192:24 193:14,21
194:11,12,19,20
195:5,16,24 197:20
198:13,16,17
200:18 201:3,4,8,12
201:13,15,16,22



EXHIBIT 18
PAGE 1119

203:7 204:2 205:14
206:19 207:10
209:10,18,24,25
210:6,22 212:18,18
213:7 214:16 215:1
215:18,22 216:9,14
218:11,15 221:17
221:17 232:12
**City's**
29:7 49:11 51:1 83:2
83:13 85:4 96:1
153:2,16,19 168:13
168:19 169:4,14
170:3 177:16 189:7
190:17,23 191:25
211:14 215:10
221:4,10,22,22
222:22,23
**civil**
70:18 72:16,21 73:11
89:18 161:15
172:24 203:11
204:3
**claim**
16:22 17:2,6,8 19:8
21:8,9,11,11 22:5,8
22:11,12 26:4,14,18
26:24 27:24 28:4,7
28:9,14 29:10,11,17
29:19,25 44:20
48:23 50:16,18
73:15,17,18 81:9,25
83:22 87:19,24 88:4
88:5,15 89:1 90:12
91:8 171:4 177:10
179:4 185:15,15,25
199:4 202:14
209:25 210:13,14
210:24 211:9,11,14
211:19 212:12,16
212:20 213:3,4,5,12
213:13 214:10,18
215:7,13 216:9
217:1 218:7 222:9
223:5,18,23 225:4
225:10,12,21

226:10,17,18,22,24
226:24,25 227:2
**claimed**
85:4 209:10 221:6
**claims**
16:4 18:7,13,20 19:6
19:13 28:22 72:14
72:16,22 73:11 82:6
87:10 197:23
199:16 200:16,18
201:3,7 202:12
208:10 211:2,18
216:13,15 226:21
**clarify**
90:4
**clear**
69:13 93:23 222:13
**clearing**
59:10
**clearly**
209:7
**Clemmer**
24:1 200:7
**clerk**
17:1 180:22,24,25
181:7 182:3,13
183:4 184:6
**client**
27:2 44:13,21 45:11
46:11,13 49:16 50:4
50:8,19 51:19,21
52:2,4 78:1,12 79:5
79:15 80:17 82:1
87:10,25 88:21
90:24 91:7 92:13
126:2,7 133:20
144:19 145:11,20
160:18 161:12
162:9,13,20 163:10
163:19,24 164:17
165:20 166:19
167:8,21,23 168:4
168:14 170:11
171:12,14,19 172:1
172:14 176:19,19
177:18 178:4 179:1

179:20 182:19
184:12 185:10
186:13,19 187:5,8
188:5,7 189:16,19
190:24 192:22
193:6,13,20,25
195:7,10,17,25
196:6,12,21 197:12
202:15,17,22
205:18 206:1 208:8
208:14 212:25
213:1,4,10,18
214:15,25 215:5
217:2,12,20,24,24
218:12 219:25
220:5,11,16,22
221:3,9,16,20 222:1
222:12,15,21 223:5
224:13,20,25 225:3
225:17 226:9,16,19
227:12
**client's**
61:12 80:17 82:14
184:23 187:11
215:19,23
**closed**
10:16,18,23 19:25
20:3,7 22:24 23:3
30:7 32:4,11,13,15
58:22,24 59:3,12,17
59:23 60:20 61:1
65:6 67:13,15 70:14
75:11 77:8,10,15,17
77:20 84:8,12,21
87:6 93:3,6,20,25
97:19 99:2 100:1,7
100:10 101:1,4
102:6,8 105:16,21
105:22 106:3,11,13
106:25 107:21
**clue**
130:1 211:14
**coaching**
85:15
**cobble**
108:22 125:2

**code**
12:15 32:6 92:22
96:1 98:4 104:20
105:9 118:23,24
122:10,17,23,25
123:8,18 124:6,19
126:19 137:20,23
145:10,19 153:1,2
153:15,17 161:16
166:7 168:14 169:4
169:5,14,15 170:4
172:24 181:7
182:13 183:6 184:6
184:21
**Coe**
53:13,17,22 54:4
55:3 56:16 57:12
**collage**
5:5 146:13
**collect**
212:19
**collected**
131:19
**collection**
112:4
**collectively**
147:23
**colon**
104:21
**come**
9:3 47:4,5 49:19
105:22 119:12
121:14 122:2,6
124:11,15 125:8
138:10 140:15,17
140:25 141:18,20
142:19 175:12
211:25
**comes**
37:8 137:19,23
192:11
**comfortable**
163:18,23 167:10
171:11 173:5
177:11 178:22
**coming**



EXHIBIT 18
PAGE 1120

117:23 217:18
**commenced**
49:4 163:25 224:24
**commences**
207:22
**Commission**
49:3
**committed**
77:11 175:1
**committing**
160:25
**commonly**
14:7,10 54:5,18
**communicated**
73:10 198:21 200:23
226:16
**communicating**
173:5 215:10
**communication**
26:21,22 27:21,22
101:10 103:14
161:15 163:1 171:3
194:7
**communications**
49:16 101:8 133:20
189:12 195:5 206:8
212:4,5
**Community**
49:6 149:12
**company**
836380:9 2:9 7:6 8:3
14:3 24:16 49:9,16
50:13 51:3,21 70:6
79:9,11 81:2,6
88:21 89:2 96:22
116:24,24 148:9,12
148:18 151:2,7,11
152:8 153:21,25
154:15,25 155:24
159:10,16 162:16
162:23 164:7 166:6
173:22 174:15,22
176:1 185:17,18
186:1 214:19
**compare**
173:12

**comparison**
135:23
**compelling**
143:9
**competitive**
92:21 98:4 118:19,22
119:2,20 120:23
121:10,16,21
122:24 123:7,19
124:7,19 126:18
127:21
**Complaint**
4:20 71:22 74:7
78:19 212:6
**complaints**
58:24 59:2 93:5,21
102:7 142:25
**complete**
109:21 132:6 163:8
177:7 224:7
**completely**
78:6 88:2 173:4
178:11 233:5
**compliance**
228:25
**complicated**
15:15 16:1 33:16
34:9
**complied**
177:18
**Complies**
54:9 120:18 160:23
181:14
**comply**
96:1 105:13
**complying**
182:2,12 183:5 184:5
184:20
**component**
53:10 85:4 87:10
**computation**
221:6
**computations**
221:4,5,10,22 222:22
**computer**
74:14 111:19

**computers**
33:20 34:6 42:14
44:9 51:24 60:7
104:11 108:23
115:16 124:25
125:18 156:22
161:6 170:24
172:20 186:6
**concern**
10:13 34:20,25 36:17
55:13 60:13,14
63:11,18,18 64:4
94:15,18 97:9 98:23
108:9 119:8 122:1
128:20 136:1 137:3
137:8 138:9 141:10
141:11 155:7
165:18
**concerned**
34:19,19 38:1,4
50:15 56:21 57:1
64:11 66:8 94:15
109:7,8 119:17
135:15 170:18
178:9
**concerning**
54:22
**concerns**
32:21,21 36:1,4,18
36:22 37:12 42:10
50:13 51:1 55:15
60:5,10,11,12 64:25
65:4,9 67:7 94:25
97:17 104:9,14
107:8 108:11 109:1
125:20,24 156:20
160:24,25 161:11
163:2 164:25
168:10,12 174:10
174:12,24 175:2
177:14 178:16
185:3 224:1 229:16
229:18,21 230:6
**conclude**
51:8 98:21 162:4
**concluded**

46:5 94:12 97:21
98:23 99:20 145:8
145:18 164:2
165:11,14 167:4
168:12 169:13
171:17 224:24
**concludes**
230:25
**conclusion**
36:6,19 77:23 98:11
98:13 99:5 213:8
**conclusions**
35:24 36:3 112:22
113:6,10 128:23
157:24 158:1
**conclusory**
36:16 77:23 164:23
**concrete**
145:4 161:19 185:20
**conditioned**
203:11 204:3
**conduct**
34:12 35:17 37:4
41:9,24 42:19,20
43:22,24 44:1,3
50:8,19 65:2 77:12
115:1 118:1 130:12
130:16 132:11
158:3,6 162:3
164:15 177:1
180:11 193:17
195:19 205:15
226:9
**conducted**
128:11 131:12 162:8
**conducting**
24:13 158:1,5 166:23
175:4 180:10 184:4
**conducts**
115:5
**confidence**
171:11
**confident**
9:4 51:24 82:8 126:1
161:18 163:18
213:11



EXHIBIT 18
PAGE 1121

confidential
189:12
confirm
208:10
confirmed
95:17 96:22
conflating
78:6,8,10 81:17
conflict
38:5,11 118:16
153:17 166:8
168:13,19 169:4,14
170:3
confused
24:17 165:3
Conn
146:22
connected
99:22
connection
6:17 39:17 50:19
52:21 56:5 59:14
65:18 115:21
147:19 157:18
174:8 187:11,25
207:1 211:4 212:6
consecutive
53:12
consider
31:23 58:22 142:22
161:4 193:15 195:6
195:16 196:12,21
considerable
33:10 208:3,3
consideration
178:3 187:9,17 188:6
188:17 194:20
considered
60:22 142:7,23
143:17,18 151:16
152:2 161:10
164:21 165:15
170:1 173:2 176:16
187:4
considering
46:1 70:14

consistent
17:15 204:23
conspiracy
51:5 163:21 170:19
185:22
constitute
38:5 51:2 95:4
142:20
constituted
97:11 142:3
consultant
25:19 154:17
consultants
14:4,8 25:6 153:22
153:23 154:14
156:14 157:10
158:12 159:10,17
160:17 162:16,23
CONT
5:1,2
contained
113:15 164:16
227:16 232:9
content
112:22 196:14,23
226:15
contents
104:6 129:20
context
17:5 29:10 101:4,11
124:4 142:13 174:6
175:11 176:8 181:2
continue
6:20
continued
116:16 177:3 214:19
continues
137:21
continuing
104:13 107:25
116:21 117:11
118:4 119:16
continuously
222:2
contract
12:2,4,5,7,13 30:23

31:4,10,24
contractor
148:2 149:14
contractors
96:3 98:6
contracts
115:12 116:22
117:12 118:5
119:16 122:24
128:14,19 165:16
167:2 181:25
187:23
contribution
229:1
conversation
77:8 93:20 101:14
conversations
175:21 204:11
conveyed
70:22
convict
77:11
conviction
155:15
convictions
155:17
convince
80:8
convincing
69:14
cooler
145:1
cooperating
40:6
copied
23:25
copies
218:6
copy
50:3 82:3 104:2
199:22 230:14
231:3,5,6
Corbett
194:2,3 200:6
corner
52:16

correct
8:6 12:12 14:16
15:10 21:1 28:23
30:1 31:5 32:11
33:4 36:5 37:22
39:18,24 40:3,10,11
40:15,18 41:10 48:2
49:23 50:3,9 54:19
56:6 57:25 58:3,12
58:17 59:15 60:2
63:3,4,17 64:17
65:14 66:3,4 67:17
68:10,13,20 69:9,14
72:15 75:14 80:18
82:6,15 83:4,24
86:14,15,18 87:11
87:20,21,25 88:16
89:6,13,23,24 90:2
90:15,25 91:8,13
92:5 96:9,10,12,14
97:3 98:9,14,22
99:22 100:18,21,21
101:6 106:19,20,23
107:1,6 108:3,19
109:19 113:7,16
114:19 116:2,7,17
116:22 117:17,21
118:5 120:23
121:10,23 122:10
123:8,20 124:7
129:5 130:4,17
131:7,10,25 132:1,5
132:13,19 133:1,16
135:6 138:18 139:6
139:16 140:5 141:7
141:14 142:13
143:21 144:6,21
146:21 147:7,13,14
148:18 149:20
150:1,10 151:11
152:9,10,13 155:25
156:14 157:10,11
158:12,19 159:11
163:16 164:7
166:21 167:25
169:5,15 170:4,13



172:3,14 173:23
182:25 183:15,21
201:9 202:5 203:23
204:6 208:14 218:2
232:10
**corrected**
232:9
**corrections**
232:7
**correctly**
135:13
**correspondence**
74:6 114:18 172:12
199:22 202:7
204:20 213:6 217:2
217:12,20,23 218:6
218:10 221:16
**corroborating**
108:8
**council**
836380:5 2:5 4:12
6:8 12:3,4,19,21,23
12:24 13:1,5,8,12
13:22 19:21,23 20:2
20:5,15,18,21 21:1
21:5,7,9,9,17,25
22:3,9,15,20,24
24:8,13,23 25:3,9
25:10,23,25 26:7,13
26:15,18,24 27:18
27:24 28:6,25 29:5
29:8,9,22 31:7,12
39:5,6,15,21,21
40:10,13,14,25 41:3
41:6,8 56:18 67:5,9
68:10 70:13,22
71:23 77:7 84:7,13
93:3,6,8,19 95:1,3
97:18 99:2 100:1,6
100:23 101:6,12
102:11,13,18
105:16 106:1,23
107:5 108:2 131:25
132:5 133:5,7,9,15
134:3,3 136:10,11
136:19 137:1

139:10,11,16,18,22
140:2,4,25 142:22
143:4 195:6 201:4,8
201:11
**Councilmember**
62:18 63:2,16
**councils**
41:19
**Council's**
20:22 21:14 28:3
29:16 40:21 77:14
84:20 93:20 136:22
139:3 201:13
**counsel**
7:2,13 20:14 85:19
91:15 225:22
**County**
4:16 52:9 68:17
71:25
**couple**
135:21
**course**
21:24 155:6 216:25
217:21 222:15
**court**
836380:1 2:1 6:10,22
7:12 8:4,21 9:9,13
27:10,14 52:16
68:17 69:5,12,15
70:10 71:24 76:14
77:21 78:17,22
79:24,25 80:3,4,7,9
85:11,12,12 88:14
88:19 91:25 151:25
161:25 162:18
171:7 190:6 222:18
228:11 229:4
230:11
**Court's**
69:11 71:16 91:2
228:5,22 229:10
**cover**
115:23,23 215:6
**coverage**
8:3 19:7 78:3 79:20
92:12 179:9,20

180:9 181:22
182:25 183:9,14,19
184:2 192:25
193:14 195:12
211:17,21 212:20
212:21 213:11
214:13,18,25 215:7
215:10,13 222:2,7,8
223:3,4 227:24
**coverages**
183:4
**covered**
19:8 51:15 137:13
173:7 211:19
212:12,16
**covers**
182:8
**create**
35:1
**credibility**
229:6
**credible**
185:16 186:2 228:25
**crime**
4:14,15 21:23 22:5
44:12 45:5 48:14
49:21 50:3,7,24
51:16 78:13 165:4,7
165:10 181:20
206:8 210:14
227:25
**criminal**
47:21 51:2 54:3,15
56:5 57:3,4,6,9 65:2
66:3,5,7 72:8,14
77:12 80:21 81:12
126:5 144:20
161:25 169:1
205:15
**critical**
21:2
**crunch**
178:13
**CSR**
836380:25 233:23
**culminated**

113:24
**curious**
199:12
**currently**
11:9,18 198:18
**cuts**
9:21,21

---

**D**

**D**
32:4
**damages**
19:14
**Dan**
219:1 220:23
**DANIEL**
3:5
**date**
15:24 18:6,8,9 28:10
28:15,18 32:3 46:5
48:20 78:15,16 85:9
86:12,17,23 87:9
90:15 91:12 92:4
127:11 132:25
187:10,14,19
188:19 189:9
190:12,19,25
193:16 214:4,6,11
215:22 216:6 219:8
219:12 221:7
233:15
**dated**
16:24 23:14 39:5
48:20 49:10,22
86:25 90:18 113:6
146:20 160:22
180:20 200:3,11
209:9 219:12
233:18
**dates**
31:8 114:7,12,14,16
114:17 216:8
221:13,18
**David**
13:8,13 32:5 68:18
**day**



EXHIBIT 18
PAGE 1123

12:25,25 110:21
117:5 161:25
167:17 171:7
192:12 232:11
**days**
88:25 125:2
**deal**
19:22 175:7
**dealing**
201:2
**deals**
12:15
**dealt**
19:7
**decades**
120:23 121:2 124:18
126:18
**December**
178:4,5 203:22
**deception**
68:25 69:6
**decide**
21:3 99:3 102:18
106:12 128:16
**decided**
28:23 84:14,15 88:14
**decides**
21:10
**decision**
23:1 25:11 26:9,15
27:19 28:13 75:7
78:12,22 87:19,22
88:13 89:4,5,11,12
89:17 139:9,18,20
140:1 164:4,7,10,11
177:17,21,25
211:18,21 212:20
212:22 213:11
214:13,18 215:10
215:14 222:2,7,9
223:3
**decisions**
20:11,20 21:13
139:21
**declaration**
4:16 47:25 52:7,9

53:10,16 54:6,10
**declarations**
83:8
**declare**
232:5
**deduct**
64:1,11 107:17
**Deepak**
13:23 150:22 153:20
156:23 158:18
160:1 162:15,22
**defamation**
161:13 163:3 171:4
**defaming**
171:5
**defendants**
836380:11 2:11,16
3:9 7:7 73:5
**definitely**
62:2
**deformation**
172:25
**delegated**
28:21
**deleted**
35:12
**delivered**
58:11
**denied**
213:13
**denies**
212:12,15
**deny**
213:15
**department**
18:11,11 177:16
**depends**
6:17
**deposed**
8:11
**deposition**
836380:16 2:15 6:7
6:13 8:2,9,20 9:17
10:14 23:8 44:25
47:18 61:21 74:25
85:21,24 87:16

91:23 103:10
109:25 110:8,11,16
110:25 146:9
179:14 191:20
215:17 217:25
221:16 231:1 232:7
**depositions**
8:14,18
**described**
121:12 188:14
222:25
**description**
4:8 5:3 11:1 225:11
227:1
**design**
71:10
**despite**
115:14 154:23
211:18,21
**destroying**
185:25
**detail**
50:12 60:1 172:17
**detailed**
195:19 225:11
**detailing**
214:10 219:25
**details**
53:16 58:15 59:13
76:9
**determine**
36:4 217:20
**determined**
162:6
**determining**
135:23
**developed**
178:24
**developers**
131:19
**developing**
168:5
**development**
42:7 43:11
**DIAL**
3:5 27:1

**dicta**
79:24 80:5,7,12 91:1
91:1,6,11 92:3
228:6,7,12
**different**
40:23 43:19 44:21
77:2 78:6 81:14
84:25 88:3,9 94:6
107:23 113:13
117:1 152:4 171:9
171:10 173:4
195:14 196:5
205:16 214:21
219:21 223:9,14
224:10 225:1
**differently**
135:20 166:18
**difficult**
42:15
**difficulty**
75:3
**digest**
76:7
**diligence**
182:15 183:7 184:4
184:21 196:2,12,20
211:2 212:24
**Dillon**
13:9,13 14:2,11,16
42:20,24 43:10
72:25 73:1,18 75:13
75:17,20 116:15
120:1,21 121:9,15
123:6,18 124:6,17
126:16 127:20
228:14,23 229:5
**Dillon's**
41:24 121:20
**direct**
141:12
**direction**
20:25 233:10
**directions**
9:6
**directly**
35:1



**EXHIBIT 18**
**PAGE 1124**

**director**
37:9,20 43:17 56:13
70:5 158:18
**disagree**
159:14 215:4 216:3
**disagreed**
77:16 216:2
**disciplinary**
121:22 124:4 147:17
164:21 169:10
170:1 171:8 174:9
194:17
**discipline**
4:22 37:5 58:11,17
59:15 75:7 103:22
104:3 116:6 121:17
172:13 183:15,21
184:3,13 192:14
194:20 195:8
196:14,23 223:7,12
223:17 224:13
225:5,19 226:15
**disciplining**
172:2
**disclose**
10:22 45:11,18 46:8
70:22 78:12 99:17
133:19 162:7
**disclosed**
10:15,17 38:15 62:21
64:16 132:18,25
133:5,14 163:9
212:1 226:9
**discloses**
188:23 189:12
227:22
**disclosing**
38:11,12 163:4
**disclosure**
10:15 185:5
**discovered**
135:2 219:18,19,19
**discovery**
110:21
**discuss**
10:17 67:10,12 100:8

123:15
**discussed**
10:22 32:10,13 59:3
59:12,14,17,23,24
60:20 61:1 65:6
67:15 77:10,20
84:12 87:6 93:3
94:1,4 100:10 101:1
102:6,8 106:10,25
107:21 121:22
125:8 134:7 195:13
224:13
**discussing**
22:18 53:12 84:8,20
95:3 142:16
**discussion**
32:14 58:24 59:5
95:8 106:13,14
111:11 209:16
228:22
**discussions**
18:23 108:10 133:22
133:23 205:25
**dishonestly**
226:23
**dishonesty**
77:12 215:7
**dismiss**
72:21 73:11 74:2
**dismissal**
203:11 204:3
**Dismissal/Removal**
4:23 103:22
**dismissed**
72:7,13,16 73:15
**dismissing**
142:13
**dispute**
18:14 24:5 69:1,8
89:18
**disputed**
15:18,20 16:7 198:16
198:18
**distinction**
210:18
**district**

836380:1,2 2:1,2
4:16 6:10,10 8:4
11:25 48:1 49:6
52:7,9 73:10 74:6
82:18,23,24,25,25
83:7 149:12 162:3
163:7,16 204:19
205:3 206:15,21
**Division**
836380:3 2:3 6:11
**document**
9:20,21 10:9 16:16
16:18,24 17:19,25
22:25 29:1 32:15
38:10 46:19 48:19
48:19 52:14,15 54:8
56:7 57:14 58:6
71:18 83:21 84:1
86:11 87:13 103:2
104:15 105:13
108:6 115:9 151:3
152:10 154:21
155:2 156:4,15,16
156:18,25 157:5,6,9
158:13 159:1,8,12
159:14,25 160:3,9
161:14 164:24
168:24 173:17
174:2,7,13,15,23
175:10 176:9,13
181:11,23 192:17
192:19 193:19,24
195:3,11,11 203:10
203:15 206:4 211:6
212:23 213:2 214:2
215:25 227:21,25
228:14
**documentary**
145:18 148:17
**documentation**
36:24 37:3 38:2
58:10 94:17 108:18
109:18 151:5,9
172:19 220:5,16
221:10
**documented**

55:14 57:2 97:1
**documents**
5:5 9:18 10:5,7 33:19
34:23 37:7 42:13
44:8 48:25 51:23
52:19 60:6,7 62:19
81:9,17 82:4 88:2
104:10,10 108:11
108:23 109:15,23
110:1,2,6,14 111:1
111:1 112:5,20
113:14,21 114:5
115:15 124:24,25
125:15 129:9
145:25 146:13
151:15,21 152:2
155:7,20,23 156:6
156:21,22 157:18
157:19,22 159:3
161:5,6 164:20
165:17 169:24
170:23 173:19,21
174:1 175:12
176:15 178:10
186:5 196:7 198:24
202:10 204:24
210:11 215:12
221:2,13 227:20
**doing**
19:3 20:19 34:13
36:12 82:7 101:3
109:5 118:11 125:9
129:19 165:15
168:25 170:17
175:5 182:16,23
183:6 186:4,7
206:10 211:14
224:5
**dollar**
83:11 140:17
**dollars**
82:19 131:17,19
**Don**
37:14 38:16
**doubt**
88:23 106:8 221:25



222:3
**Doug**
4:17 48:2 52:10
    54:11
**Doyle**
4:17 48:2 52:10
    53:16,21 54:11
**Doyle's**
53:10
**draft**
205:25
**drafts**
205:4
**drawing**
210:17
**driving**
37:19
**due**
59:7 60:19,23,24
    77:13 84:19 88:3
    93:5,18 101:2 102:5
    105:14 106:5 127:4
    129:16 137:12
    138:12 151:22
    155:21 161:5
    169:19 171:24
    172:10,18 182:15
    183:6 184:4,21
    186:16 188:2 196:2
    196:11,20 211:2
    212:24
**duly**
7:16
**duties**
92:20 98:22 99:7,13
    99:21 104:20 105:9
    119:3 137:17 138:2
    138:17 139:14
    142:3
**duty**
77:9,19 98:17 125:7
    144:5,13 152:25
    153:15 157:20
    189:15 215:6
**D.A**
5:11 11:25 33:17

34:7 35:9 42:14
49:13 51:22 80:21
80:25 82:11 104:10
108:22 115:14
124:24 126:3,4,6
131:12 156:21
158:1,2,9 161:5
164:2 166:22 167:7
167:14 168:1,25
170:16,23 171:17
172:20 173:8,12
175:4 177:6 186:3
186:12 199:10
204:12 206:5,9
224:4,24 227:22

---

**E**

**E**
3:5,15
**earlier**
31:23 62:5 64:24
    70:5 75:6 81:24
    86:8 87:20 95:7
    113:19 118:10
    130:23 132:18
    134:14 144:18
    146:13 147:16
    165:5,7 177:18,21
    177:22 193:3 199:3
    200:10 207:7
    208:13 224:1
    228:12 229:11
**early**
11:23 31:11 32:25
    60:6,13 71:9 75:23
    88:25 115:11
    116:10 125:24,24
    175:3
**easier**
27:8
**easiest**
9:10
**Eastern**
836380:3 2:3 6:11
**easy**
47:6

**economic**
42:7 43:11
**educated**
213:20
**educational**
11:2
**effect**
198:1
**effective**
44:13,16 46:17 86:10
    86:12,17,22 87:9
    90:14 91:12 92:4
    132:25 187:10,14
**effort**
33:11,13
**Egger**
5:10 13:15 14:3,11
    14:16 43:11,13 44:1
    73:1,19 75:13,17,21
    203:12 204:4
**either**
11:22 52:23 86:1
    110:2 133:13
    134:15,17 137:25
    138:16 202:2
    228:24
**Elaine**
200:5
**Electric**
94:8,11 95:1,9,19,20
    96:2,9,18,19 97:2
    97:22 99:22
**electrical**
95:18 96:8
**Elizabeth**
23:25 180:24
**email**
4:10 5:6,7,9,11 23:13
    23:15,17,18,19,23
    24:7,24 26:11
    110:22 180:19
    181:4,10 183:2,17
    184:17 191:23,25
    192:12 199:3,18
    200:2,5,9,10,25
    203:7 204:18,25

230:18
**emailed**
110:20
**embezzled**
82:19
**Empey**
11:11 30:24
**employed**
18:13
**employee**
15:17 16:5 55:9
    58:23,25 59:1,4,8
    64:1,10 102:6,20
    105:15 107:16
    109:6,10 136:3,7
    198:16 201:22
    203:7 226:23
    233:13
**employees**
33:18 54:5 56:15,23
    57:11 62:18 63:3,17
    64:8 65:13,21 66:11
    66:19,22 83:12,15
    107:9,9,13 109:3,4
    109:13 139:2,9,15
    140:2 143:13,22
    182:8
**employee's**
63:19
**employment**
142:8 143:18 144:9
    151:17 155:11
    157:7,23 159:7
    160:5,14 164:22
    169:20 173:3
    176:17 188:1 224:9
**EMPREY**
3:14
**enclosed**
149:10
**enclosing**
149:19
**encompassing**
105:24
**encourage**
80:11



EXHIBIT 18
PAGE 1126

ended
42:6 54:12 70:15
132:7,14 135:17
227:22
enforced
153:18
engage
44:1
engaged
43:22 68:25 71:14
120:15 130:2
engagement
12:9,10
engaging
172:1
engineering
118:22 119:1 120:22
121:9,15,21 123:6
123:19 124:18
126:17 127:20
ensure
98:3 153:1,16 184:4
entered
55:25 56:8 72:25
73:20 83:3,23 84:5
85:2 86:13 87:8,23
132:15,16,25
entire
211:6
entirely
15:2
entities
20:16,17 150:4
195:13
entitled
9:5,8 77:25 103:21
124:13 126:12
129:12 165:25
entity
16:4 20:16 25:4,10
37:17,17
environment
118:18 143:21
170:22
equipment
95:18,20 96:8

equipped
162:5 186:4
ERMAC
15:17 16:2 78:25
79:5 192:6,24
195:13 198:21
200:6 201:24 203:6
Ernest
13:15
Esq
3:4,5,5,10,15 17:1
essentially
125:17
estate
37:18
estimated
209:13 225:14,14
226:25
et
836380:5 2:5 6:8,9
34:6 82:20
evade
83:13
evaluate
139:20
evaluated
32:20 33:7
evaluating
108:14
evaluation
32:5,10 33:23 34:1,9
34:12 35:17 46:6
195:18
event
39:11,14 59:13,25
64:14 134:17 135:4
events
38:18 58:7 114:7
128:25 129:14
142:2
eventually
19:11,12
everybody
177:4
everybody's
230:22

evidence
34:20 36:16,19 51:11
51:14 68:23 69:14
87:18 104:18 105:1
105:8,18 106:18
108:8 115:21 116:1
116:6 145:18 167:9
evidenced
90:18
evident
148:7
evolution
113:23
exact
28:15 42:4 52:25
214:6 219:12
exactly
48:17 111:2 178:19
183:18 192:9
EXAMINATION
7:19
examined
7:17
example
21:3,19 23:3 64:21
73:4 92:24 135:25
139:5 140:10
142:15 143:9,23
144:2 150:25 152:7
175:1
examples
138:22
exceeded
137:6,25 138:17,23
exception
112:6
exceptions
20:1 22:22 140:23,23
excess
136:25 139:5
Exchange
49:3
exchanged
218:10
exchanging
215:11

exclude
106:2
excuse
157:3 180:19
executed
205:5 206:1 232:11
executive
35:2 77:5
exhibit
4:8 5:3 16:11,12,20
23:8,9,12 30:14,15
30:17 38:24,25 39:4
44:25 45:1,4,4,13
45:20 48:21 49:20
49:24 50:2,24 52:4
52:6,8,11 55:20,21
55:23 57:17,19,22
57:23 71:19,20,22
81:18,21,24 83:9
90:13 103:19,23
104:2 111:16,17
112:4 117:3 130:23
146:12,15 150:5,12
154:6,9 173:20
180:14,16,18 181:5
191:23 192:2 197:5
197:6,10 199:21,24
199:25 203:19,20
203:22 204:14,15
exhibits
4:7 5:2 61:22 112:7
114:23 228:3
exist
179:16
existed
40:14 80:1 128:14,19
141:8
existence
37:4 90:12 108:1
182:24
exists
26:22 27:22
expect
222:8
expenditure
97:14



**expense**
55:11
**expenses**
140:20,22 207:12,14
207:17,23 208:5,7
209:17,19 210:7,18
**experience**
207:21 223:2
**explained**
58:20 66:13 70:5
136:1 168:10,23
172:17,18 187:21
**explaining**
39:21 162:25
**explanation**
82:6 120:10 158:24
160:9 167:19 174:5
175:13,24 192:13
**exposure**
161:1
**expressed**
10:13
**expresses**
66:21
**expressly**
203:11 204:3
**extent**
10:19 26:13 41:6
166:9 167:24
188:24 189:11
194:25
**E-m-p-e-y**
11:11

———————————
**F**
**facilitate**
39:23 40:13 72:14,18
**facilitation**
40:8
**Facilities**
49:6 149:12
**facility**
37:19
**fact**
18:2,8 29:19 31:18
33:7 34:5 36:20

64:16 65:11 78:11
80:15,16 88:15
89:22 90:14 91:11
92:3 96:7 97:1
100:15 107:4
115:14 117:16,20
119:14,16 126:22
130:2 131:7 148:16
155:22 157:14
172:11 173:21
181:20 184:3 189:6
190:8,10 200:15
208:3 215:18
221:21 222:21
223:21 224:17
**factors**
142:21
**facts**
51:11 83:6 100:20,22
109:11 114:7 121:7
156:19 157:13
179:22 183:14
193:15 215:14
**factual**
55:24 56:4 130:24,24
132:24 133:14
**factually**
65:8
**failed**
92:20 98:17,21 99:6
99:13,21 119:3
138:1,1,17
**failing**
111:20
**failure**
118:21 119:1,21
132:4,13 154:1
**fair**
10:3,4 28:16 30:11
33:9,12 65:25 105:6
118:25 136:13,24
142:1 194:18
**faithfully**
98:22 99:6,21 119:3
**fall**
21:15

**falls**
20:1
**familiar**
19:23 39:10 44:15
54:16,18 56:4 123:3
152:17 176:24
204:20 214:12
217:11 218:14
**far**
37:18
**faulting**
34:7
**favored**
96:3
**FBI**
12:1 33:17 34:7
35:10 42:14 108:22
115:14 124:24
170:23 172:20
**February**
39:6
**federal**
85:11,12 104:21
105:10
**feel**
102:23 145:3
**fees**
71:16 83:14 207:15
207:18,19,25,25
209:16
**felony**
130:10
**felt**
50:16 51:12,13,15,24
79:8,12 81:8 82:8
107:19 126:1
161:18 163:17,18
163:23 167:8,10
168:2 171:2,10
173:5 177:11
178:21 185:16,20
187:8 202:16
224:21
**fidelity**
24:5
**figure**

196:9 216:18
**file**
21:3,5 38:11 74:2
167:7
**filed**
47:25 49:13 51:22
52:1,15 68:13 71:23
72:4 80:21 81:2,12
82:12 126:3 164:3
167:14 173:9 177:6
186:10,12 199:10
212:6,9,15,18
**filing**
30:2 213:10
**final**
21:25 22:3 25:11,15
26:1,7,15 31:10
64:2,11 77:23
107:18 136:6
150:15 158:1
**Finally**
10:5 96:16
**finance**
37:9,20 43:16 56:13
70:4 140:11 209:24
**financial**
38:12 134:19 141:12
**financially**
6:25 141:22 233:12
**financier**
96:18
**Financing**
49:8
**find**
37:7 38:2 136:9
143:20,25 149:10
165:23 199:20
229:13,22
**finding**
35:6 67:16,20 78:1
79:19 179:21 228:5
**findings**
68:22 92:24 100:15
227:9 228:10
**fine**
14:13 27:9 46:24



**EXHIBIT 18**
**PAGE 1128**

54:14
**fines**
82:20
**fingers**
152:22
**finish**
110:15 164:13
**Fire**
836380:8 2:8 6:9 7:6
8:3
**firm**
11:9,13,16 12:5,7
31:4 32:18 33:4,7
33:10 49:1,22 61:20
87:14 146:14
197:12,14 204:18
206:16,22 208:1
210:12 212:9
**firm's**
146:21
**first**
7:16 13:3,7,12,16,18
19:1 22:4 23:15
24:7 31:13,21 54:7
59:20 62:15 88:25
89:5 95:14,15
106:21 131:1,1
147:21 187:4
197:16 213:3
218:11 226:8
227:12
**fit**
41:4
**five**
47:3 146:9
**flip**
17:10 72:11,12
112:20
**floating**
170:20
**focus**
125:5 138:9 184:20
**focused**
53:7 182:5,6 184:19
**folks**
200:25

**followed**
66:23 79:14 98:5
211:8,11
**following**
32:17 69:19 76:19
104:19 105:19
197:21 220:6
**follows**
7:17
**foregoing**
232:6 233:4,6,11
**forensic**
221:23 222:23
**Forget**
196:11,19
**forgot**
117:2 130:22
**form**
16:22,22 17:2,6
19:19 21:18 25:1,13
26:25 34:2 38:9,9
42:23 45:14,21
57:13 62:22 65:15
68:1 71:15 72:23
78:4,14 79:21 83:25
85:12 86:19 87:12
88:1,4,5,17 89:14
90:3,16 91:14 93:15
99:9,23 105:11
107:7 113:8 114:9
115:8 116:8 118:6
119:5 120:4 122:11
123:22 124:8,21
126:23 127:22
129:22 130:6,18
132:20 133:2,17
134:20,25 136:16
137:2 138:3,19,25
139:7 140:6 143:7
144:15 145:12,21
148:19 151:12
152:14 155:1 156:2
157:15 159:18
160:19 162:17
164:8,18 168:8,17
170:7,14 172:4,15

174:17 175:17
176:2,22 177:19
178:6 179:10,24
183:1,16,22 184:16
185:11 187:6,13,20
188:10,20 190:20
191:1 193:18
194:22 195:9,21
196:16 202:24
203:14 204:21
205:19 206:2,24
209:22 210:9,21
211:15 215:3
216:11 217:4
218:17 219:7,15
220:2,8 221:24
223:8,13,19,22
224:15 225:7
226:12 227:18
229:7,15,24
**formed**
87:24
**former**
42:7,8,9 43:16 54:24
83:12,15 180:23
206:18
**forms**
208:10
**forth**
12:13 60:2 83:6
215:17 233:6
**forthcoming**
223:4 229:14
**forthrightness**
230:7
**forward**
29:16 62:1,2 140:15
140:22 219:20
**found**
25:20 69:6,13,25
79:25 92:20,23 93:7
94:1 108:8,20 123:6
138:16,23 229:5
**four**
103:10 146:5 226:2
**fourth**

225:22
**Fox**
62:18 63:2,17
**frame**
12:3 13:3 17:11
18:10,23 24:14 31:9
31:14 35:18,25
40:18 41:23 42:5,22
45:4 46:16 52:20,25
53:4 160:15
**Francis**
53:13
**Frank**
56:16 57:12
**Franklin**
3:11
**fraud**
67:17,21 69:13 79:24
80:4 90:9 179:21
**free**
63:8 134:22,23 136:1
136:2
**Frey**
200:8
**front**
106:15 109:20
**fulfill**
92:20 98:17,22 99:7
99:13,21 138:17
**fulfillment**
182:9
**full**
7:21 19:17 20:9
28:22 95:14 117:6
131:1 152:24 153:4
154:11,12 197:19
**fully**
63:13 178:11 224:2
**fulsome**
199:22
**funds**
24:10,25 40:9,14
62:12 64:23 68:19
94:14 95:5 97:11,12
97:15 130:12
131:17,20 132:4,13



EXHIBIT 18
PAGE 1129

**further**
25:22 76:11 119:24
147:19 177:8
214:15 230:8
233:10,12
**furtherance**
41:1 113:2 169:18
**future**
193:8
**Futures**
24:17,18 166:23,24
168:2 186:7 207:24

---

**G**

**gather**
39:17 40:12 41:8
216:18
**gathered**
112:21 116:11 126:1
135:7 175:4
**gathering**
157:17,18
**gathers**
157:13
**GBMS**
166:6
**GC**
182:9
**General**
131:2 148:9 150:16
**generally**
59:6 101:25 102:1,13
201:11
**generically**
140:16
**gentleman**
13:8,13,22 37:13
**gestures**
8:25
**getting**
101:14 173:5
**GGMS**
70:6 131:4,6,10
148:10,12,18 151:2
166:11,16,21

**Gibbs**
180:24 181:6
**Gibbs-Urtiaga**
24:1
**gift**
64:23 94:14 95:4
97:11,15 134:23
**Gifts**
62:11
**gist**
95:13
**give**
9:6,11 11:1 21:19
23:6 28:10 56:13
59:1,16,19,22,23
65:5 67:14 69:1,8
77:13,19,24 78:1
79:8 84:11,19 88:3
93:2,4,24 94:3
97:20 100:25 102:5
102:5 105:14
106:11 113:11
118:13 121:25
122:3 125:7,13
128:3,22 129:7
139:9 142:6,9,24
143:5 144:10
145:13 151:18
152:1 155:12,19
159:5 160:12 162:2
169:17,25 181:1
187:25 188:5
192:16 217:8
219:11
**given**
19:17 73:2 79:4 87:5
108:22 139:19
174:15 175:8
176:15 187:10,17
188:7 189:5 194:20
205:14 215:14
**giving**
17:6 99:25 106:25
107:2,20 112:25
113:20 114:2
121:12 122:6 128:2

129:17 143:23
144:7 157:5 158:22
161:11 178:22
194:15
**gleaned**
189:8 190:12,19,25
193:16
**go**
6:21 8:19,19 17:10
20:6,11 21:9,21
29:16 38:7,8 46:25
47:12 61:24 62:1,3
71:3 73:6 74:16
75:23,25 81:16 82:9
93:18 106:6 110:4,6
110:7 111:1 118:21
122:4 127:8,8
128:18 130:25
137:16 140:21
145:24 154:8 158:8
160:21 163:13
169:6 173:17 185:8
194:11 196:9
200:10 209:22
214:19 216:17
230:2,12,13,22
**goes**
83:17 184:8
**going**
8:19 9:18 10:1 12:13
17:10 18:21 21:3
23:7,11 27:5 29:1
30:5 33:15 46:22,25
52:4,6,8 55:19
57:16 58:21,23 59:3
59:11,14,16,22
60:20,25 61:18 62:1
62:2 65:6 66:7
67:14 70:18 73:23
74:1,2 77:10,14,20
84:7,12,14,20 85:17
86:1 87:6 89:19
90:4 93:2,20,25
94:1,4 97:18 99:2
100:7,10,25 101:18
102:7,20 103:1,7

105:16,20,21
106:16 109:25
110:3,13 111:4,15
111:16 119:10
121:13 123:10
124:14,15 125:4
126:12,13 127:2,5,6
128:5 129:16,18
136:12 137:9,13
142:23,25 145:2
146:24 147:3
148:22 152:2
157:22 161:10
163:20 165:23
172:14 173:2
174:18 175:11
176:5,12 182:20,21
186:14 189:4
199:21 203:10
211:21 220:21
**good**
64:3 98:24 99:6
143:8 225:11
**Gordon**
3:10 6:14
**govern**
12:10
**government**
4:14 32:6 45:5
118:23 131:2
140:19 145:10,19
148:9 150:16 166:7
169:5,15 181:7
182:13 183:6 184:6
184:21 210:14
227:25
**Governments**
836380:5 2:5 6:8
68:10 71:23 131:25
132:5
**graduate**
11:7
**graduated**
11:3,5
**granted**
54:24 65:12 94:10



EXHIBIT 18
PAGE 1130

107:5
**granting**
139:15
**great**
14:18 16:19 47:1
50:12 85:23 189:24
230:20
**Gregg**
4:10 5:6,7,9 15:6,8
15:21,25 16:22 17:2
17:6,12,13 18:2,6
18:13,20 19:15
23:14,19 78:24
178:18,18 180:19
180:23 181:19
182:7 190:23 191:7
191:24 194:9,10,10
198:15 199:3,19
200:6,24 201:17,24
202:1 203:5
**ground**
8:19
**grounds**
37:5 91:22 142:16,20
**Group**
116:16
**guess**
199:12
**guidance**
190:22
**guilty**
72:7 130:10,11,16
204:4
**guys**
110:2 185:13
**GW(KKx)**
836380:8 2:8

**H**

**ha**
159:12
**half**
208:22,24 209:3
**Hall**
33:1,17 34:7 37:18
118:8 124:25

172:19
**hand**
176:5
**handled**
36:25 56:22 57:2
63:19 64:5 65:23
66:1,10,15 67:9
107:9,15 108:12
128:15 135:14,16
135:22 215:24
**handling**
16:7 19:17 86:4
**happen**
105:20
**happened**
67:7 79:4 131:14
144:1 155:7 214:23
**happening**
30:5 227:22
**happens**
140:9
**happy**
10:6,7 85:15 127:9
199:7 209:15
**harass**
91:16
**harassing**
225:24
**harassment**
91:23 127:7
**hard**
45:16 48:17 209:6
**head**
8:24 19:9 42:7,8,9
43:10,11,13 221:8
221:14,19 230:6
**heading**
82:17
**hear**
13:13,16 15:6 93:12
114:15
**heard**
6:19 13:20 42:2
138:12 162:2
170:16 206:25
207:5

**hearing**
45:16 59:10 85:1
93:8 106:7 119:9,13
121:13 122:2,7
123:11 124:4,11
125:4,5 128:4,21
129:11,18,25 134:2
137:9,12 138:6,14
141:18 142:4,7,22
143:1,17 144:9
147:17,20 151:16
151:20,21 152:3
155:9,10,13,21
157:7,23 159:7
160:5,13 161:10
164:21 169:10,19
170:1 171:8 173:2
174:9 176:16 188:1
194:17 224:8
228:19 229:10
**hearsay**
145:1
**heavily**
198:18
**held**
30:18 119:10
**help**
101:20 199:5
**helps**
203:24
**hereto**
83:8 147:22 150:5
232:8
**Hestrin**
53:2
**hey**
77:14
**hid**
35:8 43:2
**hide**
35:6 61:13,14 79:9
**highlight**
90:23
**highlighted**
90:13,24 228:13
**Hightail**

110:23
**hired**
13:8,12 15:4 25:5
**history**
158:23
**hobbled**
172:22
**hold**
74:14 99:19 105:16
111:19 114:4
130:15 164:13
173:15,24 213:22
**holding**
197:24
**home**
55:4
**homes**
33:18
**hoping**
85:17
**hour**
46:22,24,25
**hours**
59:2 93:25
**house**
73:5
**Hughes**
228:15,24
**hundred**
12:16
**hypothetical**
142:18
**hypothetically**
77:16,18 84:14,17
143:14

**I**

**idea**
66:6 133:6,7 175:14
**ideal**
125:14
**identification**
16:13 23:10 30:16
39:1 45:2 49:25
52:12 55:22 57:20
71:21 81:22 103:24



EXHIBIT 18
PAGE 1131

111:18 146:16
180:17 192:3 197:7
200:1 203:21
204:16
**identified**
36:17 65:13 66:2,5
104:14 105:7
106:17 113:14
114:3,13 116:1,13
121:4,11 124:11,23
125:4,13,22 128:3
129:24 141:16,24
144:8 145:5 150:5
151:14 152:6
158:17 161:9,19
162:14,21 164:20
178:10 187:22,23
187:24 214:25
**identifies**
114:7,12,16,18,25
115:3,5
**identify**
43:22 66:18 113:4
114:6 119:9 123:10
128:19 165:17
**identifying**
36:13,21 64:25
112:24 113:2,18,19
113:25 115:18
138:13 144:24
157:17 165:1 167:2
**IL**
3:11
**illegal**
143:15
**imagine**
44:9
**immediately**
32:17
**impact**
151:17 160:5
**impacted**
144:10
**impaired**
9:22
**impede**

40:21
**impeded**
34:11 43:5,7
**implied**
41:21
**important**
115:25
**importantly**
9:13 46:11 113:4
114:25 122:8
146:25 147:12
**impossible**
35:17,21 41:24 42:18
42:20 43:23 44:2
140:19
**impressions**
188:15
**improperly**
96:16 153:24 154:14
154:24
**inaccurate**
179:17,17
**inappropriate**
85:25
**inception**
90:1 133:15
**incident**
38:15
**include**
51:18 112:9 139:15
143:12,16 144:25
**included**
40:17 60:17 71:13
75:21 84:5 87:14
88:5 91:2 112:10,15
137:10 142:20
151:3,5 158:14
160:11 161:14
223:24
**including**
49:2 56:15 57:12
130:9 153:17
161:21 181:21
224:3
**inclusive**
836380:10 2:10

**incorporated**
83:10
**increase**
192:5
**increased**
92:12
**increasing**
195:12 196:3
**incur**
140:22
**incurred**
207:12
**INDEX**
4:1 5:1
**indicate**
109:23
**indicated**
105:17 135:9
**indication**
176:7
**indictment**
52:3 64:15 144:21
151:24 155:14
163:16 173:12,13
173:15
**indirect**
141:12
**individual**
18:20 37:21 64:21
69:25 73:18 93:21
**individually**
73:3,3,24
**individuals**
13:25 43:12 44:7
53:22 118:9 197:25
198:9
**info**
230:17
**information**
5:14 10:15 33:21
34:6 40:13 41:9
58:10 76:7 81:3
101:21 102:11,13
102:15,17 116:11
125:25 126:6,7
135:7 136:17

158:23 165:24
168:3,6 171:10,14
171:16,18 175:3
176:8 177:11
178:25 180:5,6
181:20 182:17
185:6 186:11
188:23 189:8
190:12,14,19,25
194:24 195:25
202:16 211:3
214:11,15,20
221:21 222:21
223:1 225:8,11
227:16
**informed**
29:23
**infringe**
30:8
**inhibit**
33:25
**initial**
185:15
**initialed**
232:8
**ink**
232:8
**input**
190:16 205:10,17
**inquire**
200:11
**inquiring**
24:4
**inquiry**
181:24 182:5,11
183:4,11,13 184:8
196:4 199:4 207:7
**inserted**
75:13
**instance**
28:11 34:11 135:25
137:7 144:3 175:24
**instances**
36:16,23 37:2 105:8
138:16 143:20
162:14,22 164:5



EXHIBIT 18
PAGE 1132

**institute**
26:9
**instruct**
27:2,2 188:24 189:12
194:25
**instruction**
5:18 9:13 189:5
**insurance**
836380:9 2:9 6:9 8:3
16:4 19:7,18 21:23
22:1,4,5 24:5 26:4
26:14,24 27:24 28:7
28:14,22 29:10,17
29:25 44:13 49:9
50:13 51:3 78:13
79:8,11,20 81:2,6
81:13 85:8 89:1
91:8 185:17,18
186:1 192:1 194:4,5
194:7 214:18 217:1
**insurance-related**
18:17,24 21:15
**insured**
44:22 192:24 215:6
**intended**
68:19 69:23 71:7,11
170:12
**intending**
91:16
**intense**
207:21
**intensive**
209:2
**intent**
70:12
**intentionally**
71:8 76:16
**interacted**
19:15
**interacting**
18:19
**interest**
14:20,22 38:5,12,13
38:15 63:8 67:3
83:11 89:22 97:10
118:16 134:22,23

134:25 136:1,2
141:6,12 153:18
166:8 168:13,19
169:4,14 170:3
**interested**
7:1 233:13
**interests**
29:7
**interest-free**
53:13,17 54:24 56:14
56:17 57:11 62:5
63:16 65:12 66:18
96:20 97:2 109:19
134:7 135:5
**interfered**
43:4
**interference**
35:1
**Interim**
30:23
**Internet**
6:17 154:1
**interpose**
9:4
**interrupting**
94:23
**interview**
60:9 161:8
**investigate**
41:25 44:2,5
**investigated**
25:19 107:25 141:6
**investigating**
24:9 25:18 41:7 49:9
166:24 168:2
**investigation**
24:14,24 25:12,20,24
26:2,10 32:18 39:17
39:23 40:9,13 41:1
41:9 42:17,21 43:8
43:23 45:12,19,24
49:4 51:20,25 81:1
81:11 82:13 112:21
115:15 126:4
128:12 131:12
158:2,3 162:4,4,8,8

163:8,10,25 164:2
165:11,14,15 166:9
166:15,19,23
167:23 168:1,25
170:17 171:18
175:4,5 177:2,7
186:4,10 197:21
207:11,21,22 208:5
209:17,20 210:2,5,7
210:13 211:4 217:3
217:13,22 218:2
222:16 224:3,23,25
227:23
**investigations**
158:5 167:12 224:7
**investigator**
4:17 48:1 52:10
54:11 83:7,8 102:12
102:12
**invoice**
154:19
**invoices**
148:2,8,12 149:15
153:21,24 154:15
154:25 155:4,5
162:15,22
**involve**
132:3
**involved**
32:25 57:10 69:24
76:19 88:24 144:23
154:18 161:2,12,21
163:3
**involving**
96:21
**in-person**
220:23
**Irvine**
3:6
**isolate**
66:16
**issuance**
39:6,16,22
**issue**
9:19 16:2 22:23,25
25:18 34:5 36:13

37:8 38:21 39:13
40:2,22 41:3,8,17
41:17 70:2 73:23
78:9 79:25 80:23
94:18 100:5 104:14
108:14,15 109:7
110:16 119:7,8,12
119:17 121:14,16
122:1,5,9 124:10,23
125:1 128:2 137:4,6
137:10 141:16,20
141:24 151:14
155:6 157:6 169:24
169:24 173:4,14,21
182:6 183:19
195:12 198:17,19
206:13 208:21,23
209:3
**issued**
70:9,9,16 78:22
90:19 104:3,7
106:22 117:10
132:14 184:12,13
214:9
**issues**
16:6 21:2 25:7 36:13
36:18 42:4 49:2
51:3 53:7 55:2
64:25 65:6 70:3,6
70:13 78:6,10 81:1
104:14 105:25
112:25 113:3,11,19
113:20,25 114:3,6
115:18,20,21
116:13,19 119:9
121:3,11 123:10,12
123:14,16 124:5
125:3,8,13,22,22
128:20,23 129:5,8
129:10,18,24 134:2
137:24 138:5,13,15
142:7,10,12,19
144:7,12 151:20
152:1 155:10,13,20
157:17,19,22 161:9
161:19 162:3



EXHIBIT 18
PAGE 1133

164:20 165:1,17
166:25 168:2 171:5
173:1 176:15
178:10 181:25
182:1 187:23,25
214:25 215:2
227:11
**issuing**
40:25
**item**
30:22
**itemization**
209:10
**items**
21:16 32:4 140:14,15
144:4 183:9 223:24
**i.e**
75:17

_____

**J**

**J**
3:15
**James**
15:6 16:22 17:2 18:2
18:6,12 19:15 23:14
23:19 24:8 78:24
178:18 180:23
194:9,9,10 198:15
199:3,19 200:6,24
201:25 203:5
**January**
53:23 149:8
**Jeremiah**
3:19 6:23 230:17
**Jim**
180:19 191:24
**job**
20:14 98:24 99:6
100:20,22,24 101:5
**John**
836380:16 2:15 4:3
6:7 7:11,15,23
23:13 47:18 48:25
74:25 103:10 146:9
177:5 191:20
197:20 231:1 232:5

232:17
**join**
127:24 189:22
**joint**
16:3
**jointly**
14:10
**Jr**
53:13
**Juan**
110:23
**Juarez**
3:19 6:24
**judge**
68:18,23 69:18 75:7
76:12 78:12 80:12
87:19 100:5,14,14
102:16 125:12
129:15 228:6,10,19
**judges**
80:6
**Judge's**
77:16 90:1,12
**judgment**
70:8,9,9,16 82:15
83:3,23 84:4,9 85:2
86:13,17 87:3,5,8
87:23 88:13,19 89:5
89:12,16,22,25 90:1
90:6,12 132:9,14,17
132:17,23,24 133:4
133:13,22 179:21
**July**
131:18
**June**
15:9,14,22 17:13,21
18:2 33:7 44:13,17
45:7,7 46:17 48:24
54:25 57:23 58:2,8
58:14 60:2 63:1,15
64:17 65:25 66:17
66:20 67:16,18,20
68:22 69:8 71:6
75:22 76:1,2,3,22
76:24 84:5 85:1
86:10,20,25 87:4,22

88:13,16,19 90:5,19
90:23 91:3,4,11
92:4,7,11,19,25
93:11,13 94:5,17
95:7 96:7,11 97:1
98:14,20 99:19
103:13 108:17
109:12,14,18
111:10 112:7,14,22
113:6,15 115:5
116:1,7,20 117:2,5
117:16 118:2 119:3
120:21 121:8,19
123:5 124:20
126:20 127:20
128:12 129:2,5,20
130:8 131:18 133:4
133:8,15,23,25
135:5 137:15,24
138:23 139:15
141:24 147:15
186:9 187:14,17
188:9,18 189:7
190:11,18,24 191:8
191:23 193:1,1
194:16 195:19
196:14,24 209:23
213:4 221:3 226:15
226:20 227:9,12,17
229:8 233:18
**jury**
100:5 102:16 125:12
129:15
**justification**
157:4 158:24 160:9
174:5 179:8
**J-o-h-n**
7:23

_____

**K**

**Kapanicas**
4:18 32:22 33:8,22
33:25 34:11 35:18
36:10 37:10,13
40:20,24 41:7,25
42:21 43:8,24 44:2

44:5 45:12,19 46:1
47:22 50:9,14 54:3
55:25 56:5,11 57:10
57:24 58:9,12,14,16
59:15 62:6 64:5,15
65:5,14 66:3 67:14
67:17,23 70:1,6,11
75:11 76:22,25
82:18 84:6,16 88:4
92:8 93:2 95:3
96:11 97:3,20 98:21
99:20 100:25
103:16,21 104:4,7
105:7,14 106:18
107:2 113:1 115:6
115:18 116:2,7
118:3 119:2 121:3
121:12,17,20
123:11,17 124:3
125:5 128:4,14,17
129:8 130:2,10,11
130:16,24 131:2,6,9
132:2,24 133:5,14
134:1,10 135:18
136:25 137:25
139:22 140:3
141:19 142:2,6,13
144:5 145:9,18
147:13,17,24 148:8
148:17 149:5,8,19
150:1,3,9,10,23,25
151:6,9,22 152:7,18
153:19 154:16
155:9,11 156:24
157:6,21 159:5
160:2,5,12,16
161:24 164:5,22
165:12,19 166:1,4
166:10,15,20 167:4
167:24 168:13,18
169:1,3,9,13,18,19
170:3,12 171:7
172:2,13,17,24
173:22 174:8,14,21
175:6,11,24 176:15
180:11,23 182:23



183:15,20 184:3,13
187:25 192:14
193:16 194:16
195:8,19 197:23
199:17 200:18
201:7 202:12 223:7
223:25 224:8
225:19 226:9 229:9
229:14,22
**Kapanicas's**
98:13 101:12
**Karman**
3:6
**keep**
20:15 22:19 23:3
32:24 84:16 99:4,4
100:6 102:20,24
127:3 173:11,20
**keeping**
46:1
**Kieran**
116:25
**Kiker**
37:14,21,22,23 38:16
**Kiker's**
141:13
**Kim**
5:9 200:5
**kind**
38:18 65:2 178:13
186:20 211:2
**kinds**
85:22
**knew**
50:15 51:19 60:25
63:12,15 65:8,20
67:11 79:12 80:25
81:7 82:8 96:7
97:18 116:15
120:21 122:2
125:21 135:5 137:8
141:17 151:13
158:1,9 161:9,17,18
167:8,12 168:24
176:8 184:14 186:3
194:12

**know**
8:8,21 9:12,23 10:8
10:20 12:25 13:8,18
14:15,22 15:5,15,19
15:23 16:1,9,9 17:1
17:24,25,25 18:3,7
18:9,12,12 19:6,7
19:11,12,14,21,21
20:4,9,15,20,20
21:2 22:7 24:8 25:4
25:16 26:20,21
27:20,21 29:3,4,6,8
31:12 32:20 34:13
34:13,15,21,22,23
35:2,5,13,13 36:6
36:19,22,24 37:1,7
41:19,20 42:3,4,11
42:17 43:2,9,18
44:14,19,19,22
45:22,25 48:9 49:12
50:25 51:1,4,6,8,9
51:23 53:6 54:16
56:21 57:2,3,6,6
58:19 59:9 60:6,9
60:17 61:5,9,9,10
61:15,15,16,25
63:13 65:20 67:6,11
67:12 68:9 69:25
70:2,8 73:4,14,19
76:5,6,6,8,9,17,17
76:18 77:6 78:23,23
78:24 79:6,7,7,9,11
79:14,16,18 80:8,9
80:12,22,24,25 81:6
81:6 82:7 85:8,9
88:22 89:18 91:23
92:23 93:7 94:2,7
94:18 99:12,14,15
99:15,16 100:9
101:9,10,20 102:18
102:23,25 104:9,11
104:13 105:17,20
105:21 106:8 108:4
108:4,9,14,20,23
109:5,21,22,22
110:24 112:17,24

113:18,23 114:1,1
115:4,10 116:10,19
118:13 119:6
120:13 121:1,18
123:24 124:12,13
124:14 125:21,23
126:11,12 127:10
128:8,14,24 130:5,8
133:10 134:2,3,24
135:11 138:20
141:21,23,23
143:10,14,16
144:25 145:3
147:10 151:25,25
152:18 155:3,4
156:19,20,20
157:20 158:4 159:2
160:4,20 161:6,17
161:24 167:1,6,10
167:12,13,17
168:24 170:15,18
170:22 171:19,21
172:14 173:7,8,10
173:11 174:3
175:11 176:7,8,10
176:11,11 177:5
178:11,17,19,20
179:7,25 180:1,2,14
182:18 183:3,23
185:2,21,25 187:7
188:16 191:3,5,7,13
193:24 194:11,12
194:13 195:2,10,24
196:3,6,8 198:20
199:18 200:8,23
201:1,11,12,19,25
202:2,20 204:22
206:6,8 207:4 208:3
208:15,20,21
210:14 211:8,11
212:22 213:8,17
215:12 216:3,4
217:5,7,7,14 218:7
218:9 219:16,17,18
220:3,19,23 221:20
222:6,20,24 224:6

224:20 225:3,6
229:11,25,25 230:4
**knowing**
99:12
**knowledge**
20:22 57:7 67:2
121:4 128:7,10
139:19 157:2 226:8
228:24
**known**
19:3 51:13 76:8
88:11,15,18,20,20
89:12 90:14 91:11
92:3,7 108:2 128:1
131:3 145:6,7 207:2
**knows**
80:12
**Krieger**
3:4 7:9 61:20 146:14
197:12,14,19
202:22 204:18
205:3 206:16
215:25
**K-i-k-e-r**
37:15

**L**

**L**
3:5,10
**labeled**
148:24 171:2
**lack**
60:6,7 124:24 159:2
159:3 161:5
**lacked**
104:9 174:9 228:24
229:5
**language**
46:20 54:11 56:20
64:20,20 74:13 75:6
75:9,12 76:10 90:22
91:6,10 92:2,6
96:25 120:20 133:8
133:9 146:24
162:25 228:7 229:3
**large**



EXHIBIT 18
PAGE 1135

170:23
**late**
11:22 224:14
**Laura**
836380:24 2:18 6:22
47:10 57:18 81:18
111:12 126:10
154:5 167:16
203:17 204:14
233:23
**law**
11:4,7 20:7 41:5
60:18 65:5 67:13
69:19 76:20 77:25
84:11 87:7,14 93:23
105:10 122:17
194:10 206:22
**laws**
104:21 166:8
**lawsuit**
21:3,5,6,7 30:3,6
68:13 72:4 73:20
74:2 79:3 84:9 90:6
90:8 212:18 213:10
**lawyer**
54:15 57:24 102:2
115:19,20 121:3,13
123:11 124:14
128:4 129:8 134:1
135:18 137:11
141:19 151:18,23
155:9 157:12,21
159:6 160:12,16
169:18 176:4
194:10
**lawyers**
9:4,11 25:6 33:4
101:22 193:7,22
205:24 213:1,7
218:2 224:12
**lawyer's**
207:14
**laying**
22:25
**leading**
80:25

**learn**
13:19,22,24
**learned**
29:4,5,6 30:6 89:6
99:18 136:14,24
163:9 164:5 173:8
211:17
**learning**
49:13
**leave**
55:10 63:22 107:11
122:3 125:18
230:18
**ledgers**
96:22
**left**
43:17 64:1,10 75:4
103:12 111:9
125:17
**legal**
6:23,24 20:14 22:23
70:25 189:6
**legislative**
20:17 25:3 38:21
39:7 40:2 41:14
**legitimate**
51:8 63:8
**lender**
96:17
**lending**
96:20
**length**
52:5 98:5 118:13,19
119:19,22
**lengthy**
215:11
**lesson**
85:16
**letter**
4:19 5:4,8,10 32:5
38:18 49:10 57:23
58:2,8,15 59:13,18
59:20 60:2,4,16,16
61:2,4,6,8,11,19,24
62:3,9,10 64:18
66:6,20 68:5,6,23

69:16 71:4,6 75:22
75:24 77:7 79:13
86:25 87:3,23 88:13
90:18,23 91:3 92:8
93:11,14 94:5,7
95:7 96:14 97:8
98:12,25 99:1,11,11
100:5,24 103:13
108:17 109:14,15
111:10 112:7,14,20
112:23 113:6,15
114:6,12,16,18,20
114:21,24,25 115:5
115:22,23 116:3
117:2,5,6,18 119:9
119:18 120:24
121:19 122:8,12
123:5,9,10,13,24
124:9,16,16 125:11
126:14,14 128:12
129:2,5,7,20 130:8
133:4,24,25 134:4
135:6 137:15,16,25
138:23 139:15
141:1 146:19,20,23
147:6,15,15 149:4
149:18,22 150:8
151:8,19,20 152:16
152:21,23 154:10
160:21,22 163:13
164:19 165:1
168:22,23 169:2,6,9
170:5,9 171:1
180:19 195:20
196:15,24 197:5,9
197:11,13,17 199:1
199:5,13 203:23
204:10 212:11,13
214:10,13,14
215:20,23 226:16
227:12,17
**letterhead**
146:21
**letters**
48:25 49:5 79:14
172:16 213:20

**let's**
13:2 20:24 21:21
26:6 47:5 48:11,15
49:18 52:3 53:9
55:9,18 62:3 85:23
94:6 110:4,6 111:1
111:21 114:10
119:23 130:20,25
145:24 149:2
152:21 153:13
156:5 165:2,4,20,24
173:11,15 191:13
192:8 208:18
213:19,19 216:17
230:12
**level**
66:25 171:11
**levied**
93:13
**liability**
132:12 181:22
**liar**
230:4
**libel**
161:2,13
**licensed**
8:8
**lied**
104:8,15
**life**
27:8
**light**
187:19 195:7,18
196:14,22
**lighting**
215:16
**limit**
181:21
**limits**
195:12 196:3
**line**
5:19 228:17
**link**
110:23
**Lisa**
146:22



EXHIBIT 18
PAGE 1136

list
30:22 76:10 203:7
listed
98:25 183:3
listen
91:17
listing
209:25
lists
226:24
literally
29:14 42:1 74:19,19
192:12
litigated
16:7 198:19
litigation
26:6,10 61:8 80:11
92:15 99:16,18
212:22 213:17
little
10:6 45:15 76:5 81:7
159:1 181:13
LLP
3:4,10 30:24
loan
53:12,13,23 54:21
55:6,12 62:19 64:21
67:5 108:1,18
109:15,19
loaned
55:3 62:17 134:22
loaning
134:22
loans
53:17 54:4,5,19,24
56:14,17,22,23,25
57:1,11 62:6,11,21
63:2,7,16,19 64:6
64:14 65:12,18 66:1
66:10,18,22 67:1
94:11,25 96:20 97:2
97:22 106:22 107:4
107:8 108:11,19
109:13,19 134:7,13
134:18 135:5,9,12
136:1,10,13,21,25

139:2,9,15 140:2
locally
96:21
locate
61:22 114:23
Logic
4:20 14:4,8 24:17
43:13 50:20 71:24
72:4,8,22 116:20,23
117:9 118:4,10,20
119:15 153:21,23
154:13,24 156:14
157:10 158:11
159:10,17 160:17
162:16,23 166:24
219:14 220:1
long
11:15,21 34:21 61:6
97:12 103:18 108:6
167:17 183:14
223:3
longer
60:8
look
25:6,21,22 31:2
36:14 41:13,16 45:6
46:2 52:3 53:9
55:18,19 59:20
63:24 64:19 68:5
78:19 82:9 94:6
103:1 104:13
106:10 110:19
122:19 124:13
126:12 130:19,20
148:20 149:2,3
152:21 156:5 165:2
165:4,20 173:16
180:8 192:17,19
199:18 200:9 206:4
208:9,15 213:19,19
214:1 228:5
looked
39:11 41:17 44:19
48:4,4,22,24 49:10
49:17 53:6 55:2
60:15,16 61:5 75:6

81:24 82:4 87:15,20
108:6 114:21,21,23
130:23 141:8,9
147:16 200:10
212:8 228:3
looking
24:21,22 35:3 36:8
36:11 48:18 53:8
57:4 70:1 71:10
75:4 95:11 108:14
109:22 117:5
122:12 134:10
181:25 182:1,12
183:8
looks
48:18,20 147:2
150:22 152:18
193:24
lose
173:17
loss
4:15,21 48:14,21,23
49:21 50:3,7,20,24
51:16 67:2 80:17,19
81:25 82:1,5,14
83:2 85:5 90:13,24
91:4 94:13 98:1
130:12,17 134:19
134:25 165:4,7,11
208:12,16 209:8,9
209:11 220:17
221:4,5,6,11,22
222:22
losses
83:12 132:11 209:10
211:3,20
lost
67:3 134:25 153:3
lot
24:20 27:8 33:19
36:12 42:11,12 51:4
51:5,5,9,9 76:6 80:6
113:25 130:7,9
145:2 163:19,20,21
170:19 174:9
175:21 178:10

185:22,22,23 197:1
Love
148:21
loved
84:16
lying
229:23

M

machine
233:9
Madam
230:11
magistrate
85:15,20
Magna
6:23,24
mail
216:9
maintain
119:21
maintained
119:15 176:19
maintains
21:22 98:5
majority
20:5
making
19:13 20:20 25:11
26:9,18 27:18 28:7
28:13 29:25 49:8
99:25 101:11 113:6
135:23 139:21
142:9 158:22
161:21 163:5
169:23 182:2,5
183:23 199:4 222:2
man
15:6
management
12:25 18:11 60:9
64:5,12 68:24 69:7
70:11 79:19 94:24
104:11,11 107:19
125:16,16 131:3
148:9 150:16



156:22 159:3 161:7
170:24 172:21
177:16 197:22
198:14 201:17
**manager**
15:9,12 17:22 18:13
32:6,10,19,24 33:2
33:8,23 34:22 36:10
40:21,24 46:2 70:15
77:4,5,21 92:20
95:16,21 96:11 97:3
98:17,21,25 99:13
99:21 100:7 118:17
128:15 136:20
137:17 138:24
140:3,21 144:6,14
153:20,25 154:16
166:5 194:8 198:17
**Manager's**
98:3 117:8 152:25
153:15
**mandamus**
80:3 92:9
**mandate**
90:6,8,9,20,21 91:5
122:24
**mandated**
102:4
**manipulating**
82:19
**Mansukhani**
3:10 6:15
**March**
16:24 23:14,19 24:14
156:10,10 200:11
**Mariana**
191:24 193:25
**mark**
23:7 45:4 49:18 52:4
52:6,8 57:16 103:19
179:15 197:5
199:21
**marked**
16:12 23:9 30:15
38:25 45:1,13,20
49:24 52:11 55:19

55:21 57:19 71:20
81:21,24 95:7
103:23 111:16,17
130:23 146:12,15
149:22 154:9 165:5
173:20 179:14
180:16 192:2 197:6
199:24,25 203:18
203:20 204:14,15
**marking**
16:10,20 23:12 30:13
44:24 49:20 57:22
71:19 95:6 103:19
112:4 180:14
191:23 197:10
**marks**
47:13,17 74:24 103:9
146:4,8 191:19
**married**
206:15,22
**Mastone**
95:16
**materials**
35:7
**matter**
6:8 18:14 20:1,6 57:9
65:11 78:11 155:22
167:25 207:13
212:15
**matters**
18:6,17,24 19:18
21:15 22:20 32:5,9
56:6
**Mayor**
4:13 39:5
**May/June**
40:18 41:23
**ma'am**
94:21
**McKiernan**
116:25
**mean**
18:12 20:10 22:7
24:20 25:2,21 26:3
34:8 41:12 42:1
60:5,15 61:13 92:15

97:15 110:19 115:9
115:24 125:21
156:18 177:22
180:4 181:23 203:1
204:23 206:3
207:17 216:7
221:13 224:18
226:3
**meaning**
83:7 132:5 133:15
207:14
**meaningful**
138:11 142:10
**means**
9:18 19:23 223:1
**meant**
74:1
**media**
6:6 47:14,18 74:20
74:25 103:10 146:5
146:9 191:20 231:1
**meet**
19:23,25 20:2,7,10
21:4 22:20 93:19
99:2
**meeting**
4:11 19:24,24 22:9
22:18 30:18 31:3,13
31:13,18,21,23,24
77:24 84:19,21
100:3 142:6 188:2
220:13,22,23,24
221:3,22 222:22
**meetings**
31:7,12
**meets**
93:6
**member**
192:6
**members**
78:25 197:23 199:16
200:16,18 206:14
206:16,21
**memo**
4:13 39:5,10,12,20
39:20,25 40:8

103:20 104:6 107:3
**memorandum**
22:23
**memory**
119:24 203:24 227:3
**memos**
202:10
**mental**
188:15
**mentioned**
26:10 49:22 84:13
135:21 156:20
177:14 207:7
**met**
8:1 31:7 220:11
**MGO**
95:16
**mid**
78:22
**middle**
17:13,17 110:25
219:5 220:18
228:16
**mid-2014**
78:22
**million**
78:2,13 83:3,11
132:8 179:5,6,8,20
179:23 182:19
193:2,14 203:13
207:20 209:11
226:25
**millions**
79:20 82:19 131:17
131:19
**mince**
36:7
**mind**
11:24 31:8 37:3,8
194:15,17
**mine**
60:14
**minimal**
207:24
**minimum**
93:24 222:8



minute
55:19 97:25 191:14
  197:9 203:10
  216:18
minutes
4:11 23:3 30:18
  31:20 47:3,3 61:3
  103:4
misdirected
68:19
mishandled
107:12,19
mishandling
71:15
misleading
179:18 193:3
misstate
122:22 214:4,4
misstated
211:10
Misters
75:20 228:14,23
misunderstanding
129:7
misused
83:15
modified
123:1,1
moment
23:6 38:17 46:15
  54:12 55:18,24
  213:25 221:1 230:1
money
55:3,11,12 56:23
  62:17 63:20,23 64:8
  107:10 109:4
  131:23,24 132:3
  134:21,23 207:10
  213:12,15
monies
24:19
month
76:5,5 115:12 167:14
months
145:10,20 170:13
  172:3 175:16

Moorjani
13:23 14:3,11,16
  43:6,10,21 72:25
  73:1,19 75:14,17,21
  150:22 152:12,18
  153:20,22 154:13
  154:23 155:23
  156:23 158:18
  159:9,16 162:15,22
  228:15,24 229:5
Moorjani's
160:1
motion
215:16
motive
179:16
move
10:9 83:18 84:23
  126:8 140:14
  162:10 167:15
  171:23 186:14
MUFG
39:16
multiple
91:20 127:13
Municipal
92:22 98:4 104:20
  105:9 122:10,17,23
  123:7,17 124:6,19
  126:19 137:23
  153:1,2,15,17
Murphy
3:14 11:11 30:24
mute
47:12

---

## N

N
3:11
name
7:21,24 8:1 13:16,19
  13:24 24:16 37:13
  37:14 59:10 116:25
  192:24 233:16
named
13:8,13,22 15:6

names
14:12 71:5 75:13
  76:10
narrative
4:21 17:7,12 81:25
  82:5 113:15
National
836380:8 2:8 5:8 6:9
  7:6 8:2 88:15 89:11
  194:21 214:9
nature
8:25 29:23,24 71:9
  90:11 224:22
nearly
170:12 225:5,20
necessarily
36:18 94:1 97:15
  108:16
necessary
41:9 85:18
necessity
77:4
need
10:7,8,10 23:1 27:6
  82:9 101:21 110:17
  120:10,14 210:16
needed
49:19 196:7
negotiation
69:8
negotiations
69:2 118:19
neither
233:12
never
28:21 154:16 171:25
  172:13 185:6 198:4
  206:11 211:17,19
  211:19,19,20
  212:20,20 213:11
  213:12,17 214:16
  215:9,18 223:16
  225:18
new
40:3 116:24,24
Nichole

16:25
nine
53:22
nods
8:24
Nolan
3:15 7:10,10 91:15
  91:20 110:9 127:24
  168:16,16,21
  188:22,22 189:10
  189:10 194:23,23
  225:22 226:2,6
  230:14 231:3,4
nolan@sbemp.com
3:17
nominal
207:25
non-responsive
84:24 126:9 162:10
normal
29:12
normally
22:21 102:9 140:8,14
north
132:8
note
6:16 152:12
noted
152:15 232:7
notes
198:24 202:4,10
notice
4:22 29:15 37:5 51:3
  51:21 58:10,16 59:1
  59:6,11,16,22 65:5
  67:14 75:6,10 77:9
  77:19,24 78:1 79:4
  79:7,8 81:24 84:6
  84:10,11,19 87:5
  88:3,4 89:11 93:2,4
  93:24 94:3 97:20
  99:25 100:25 102:3
  102:6 103:21 104:2
  105:7,14 106:2,6,11
  106:23 107:1,3,5,20
  108:2,3 109:13



112:25 113:11,20
114:3 115:19,20
116:6,12,13 119:11
121:2,12,20,25
122:3,6 123:12,17
124:3,10 125:7,13
126:2 128:2,6,7,21
128:22,23 129:8,12
129:17 133:8 134:1
135:18 137:11,12
138:5,11,11 141:20
142:2,7,9,10,24
143:5,16 144:4,7,11
144:13,19,20
145:11,20 147:19
151:4,15,18 152:1
155:8,12,19 157:6
157:21 158:14,22
159:5,13 160:11,13
160:16 161:11
162:2,13,21 163:12
163:15,17,24,25
164:2,4,17,20 165:3
166:14 167:8,11
169:17,25 170:11
171:19 172:23
173:1 174:8 175:7
176:9,14,20 177:2,9
177:17,21,25 178:4
178:15,20,22 179:2
183:15,21 184:3,13
184:23 185:9
186:18 187:5,11,19
187:25 188:5,8,18
189:7 190:11,18,24
192:14 193:15
194:16,19,21 195:7
195:7,17 196:14,23
200:12 209:25
210:4,14,18 223:7
223:11,17,24
224:13 225:5,19
226:15 229:8
**noticed**
19:24
**notices**

165:18 179:2 210:24
**noticing**
7:4
**notified**
49:12,12 51:15 187:8
224:20
**notify**
50:25 60:19 84:7
89:15
**notifying**
51:12
**November**
49:10 50:21 81:25
83:23 85:5 91:4
164:1 186:10 209:9
213:5 214:8,24
215:19,23 225:10
225:14,15 226:20
226:22 227:2,13,16
**number**
6:7,11 16:12 23:9
30:15,22 38:25
41:18 45:1 47:6,14
49:2,24 52:11 53:11
55:21 57:17,19
62:18 63:3,17 70:3
71:20 74:21,25
81:18,21 103:10,23
111:12,17 117:3
125:3 146:9,15
154:6 180:16
191:20 192:2 197:6
199:25 203:17,20
204:15 210:1 231:1
**numbers**
104:24
**numerous**
116:22 117:12 118:5
119:16

—————————————
**O**

**O**
836380:16 2:15 4:3
7:15
**oath**
7:16 222:14 233:7

**object**
9:12 19:19 21:18
25:1,13 26:25 27:1
27:7 34:2 42:23
45:14,21 57:13
65:15 68:1 72:23
78:4,14 83:25 85:12
86:19 87:12 88:1,17
89:14 90:3,16 91:14
93:15 99:9,23
105:11 107:7 113:8
114:9 115:8 116:8
118:6 119:5 120:4
122:11 123:22
124:8,21 126:23
127:5 129:22 130:6
130:18 132:20
133:2,17 134:20
136:16 137:2 138:3
138:19,25 139:7
140:6 143:7 144:15
145:12,21 148:19
151:12 152:14
155:1 156:2 157:15
159:18 162:17
164:8,18 168:8
170:7,14 172:4,15
174:17 175:17
176:2,22 177:19
178:6 179:10,24
183:1,16,22 184:16
185:11,13 187:6,13
187:20 188:10,20
188:22 190:20
191:1 193:18
194:23 195:9,21
196:16 202:24
203:14 204:21
205:19 206:2,24
209:22 210:9,21
211:15 215:3
216:11 218:17
219:7,15 220:2,8
221:24 223:8,13,19
223:22 224:15
225:7 226:12

227:18 229:7,15,24
**objection**
9:5 14:13 32:12
79:21,21 85:6 101:7
119:5 120:14
127:22 159:23
160:19 164:12
168:16,21 187:13
189:11,23 194:22
217:4,15
**objectionable**
120:9
**objections**
9:8 27:7
**objective**
50:25
**objects**
27:6
**obligated**
84:7 128:3 144:10
169:25 177:2 187:4
187:18 188:7
195:17
**obligation**
28:1 60:18 65:4
67:13 83:13 84:11
93:4,24 94:3 95:2
97:19 100:9 102:3
122:2 125:12
141:17,19 142:6,24
160:12 172:6 174:7
184:23 185:9
186:18,24 187:11
188:17 189:7
190:11,17,23
193:15 194:21
201:12
**obligations**
195:6 196:13,21
**observation**
213:9
**obvious**
101:23
**obviously**
8:21 91:23 107:3
143:10 216:3,4



EXHIBIT 18
PAGE 1140

**occasion**
18:16
**occupied**
117:22,24
**occupy**
116:21 117:10 118:4
**occur**
59:5 106:13
**occurred**
28:10 35:4 36:2,9
    46:3,6 115:6 139:12
    157:2 191:6 202:22
    204:24 218:7
    223:12
**occurrence**
193:2
**occurring**
194:13
**October**
145:16,17 146:21
    147:7 148:16
    149:18 150:8,24
    151:4,15,19 152:6
    154:10,22 155:23
    158:10,15 159:10
    159:15 160:22
    162:14,21 163:1
    164:15,19 168:6,9
    168:10,14,23
    169:12 170:4,9
    171:1 197:5,11,13
    204:19
**odd**
47:6
**offer**
46:23 175:23
**offered**
217:19
**offering**
192:5 217:19
**office**
11:25 18:5,18,19
    19:14 22:12 24:2,3
    25:17 48:16 50:6,24
    52:23 58:5 61:7,10
    80:15,19 94:5

144:23 147:8 167:1
167:1 191:7 200:8
204:12 206:5,9,15
206:22 207:25
213:24 224:4
**officer**
35:2 77:5 93:9
    142:22 151:16,20
    155:9
**offices**
33:18 116:21 117:10
    117:22,24 118:4,10
    119:15
**official**
161:15 171:3
**officials**
13:25 38:10,10 54:25
    69:18,22 71:5 75:22
    76:13 182:8 206:19
**Oh**
110:12 180:8 189:22
    212:3
**okay**
8:13,17 9:1,15,16
    10:11,24 17:4,23
    20:23 23:21,24
    31:16,19,25 43:1
    46:14,19,21 47:2,8
    47:9 48:10 54:17
    55:17 65:24 70:24
    71:12 74:4,12,15
    78:20 79:17 86:24
    90:10 97:24 103:4
    104:16 109:24
    110:12 111:8
    113:12 120:11,12
    120:15,19 127:16
    130:20 131:15
    133:12 134:6,9,12
    148:25 149:1
    152:20 153:8,12
    157:8 159:21
    163:11 174:18
    181:15 189:1 192:4
    192:18 194:6 196:9
    198:7 199:6,9,9

200:22 204:1
208:17 209:1,4
213:25 217:10
218:4 228:9 230:24
**Oli**
7:23
**once**
85:14 140:13 164:4
    171:25 172:14
    177:6 224:24
**ones**
49:17 51:23
**ongoing**
35:19 113:23 115:16
    166:11,16,21
    167:13,25 195:7,18
**oOo**
6:3
**Oops**
152:21
**open**
59:6,24,25 60:22
    84:21 100:3 106:14
    173:13 195:13,16
    195:24 196:13,22
    197:2
**operate**
51:10
**operated**
37:23
**operating**
123:2 161:5
**opinion**
19:13 68:18 69:11
    76:13 77:17 91:2
**opportunity**
47:25 59:9 138:11
    139:20 142:4 162:2
    215:1
**opposed**
35:1 71:11 228:20
**option**
59:4,23 128:17
**oral**
228:22
**Orange**

68:17
**order**
36:4 39:23 67:12
    72:14,18 73:5
    111:22 115:13
    142:3
**organization**
15:17 16:3 35:3
    200:24
**orient**
17:11 32:3 45:3 57:5
**original**
50:7,7 80:19 222:19
**originally**
50:3
**Orneles**
110:23
**outcome**
7:1 162:7
**outside**
93:19 133:23 173:6
**overcharges**
220:6
**overcharging**
218:12 219:13 220:1
**overseeing**
25:4
**owed**
107:18 131:24,24
    136:4,6 213:16
**owned**
14:3 37:17 70:7
    96:21 216:15
**owner**
116:24 118:20
    153:22 154:13,24
**owners**
14:11,15,20 72:8,22
    116:20 117:9 118:3
    119:15 206:21
**owns**
37:21
**O-l-i**
7:23

_____
P
_____



**P**
17:1
**PA**
836380:9 2:9
**package**
146:18
**page**
4:2,8 5:3,19 17:13,18
53:11,11,21 54:7,8
56:10,10 62:9,10
68:5 71:5 82:14,16
82:21 84:2 95:8,14
104:17 117:6
119:23,25 134:8,8
137:16,21 141:1
146:19,20,25
148:23 152:23
153:4 154:11 169:2
181:5,5,6 197:17,19
209:16,16 228:16
**paid**
57:1 67:1,4 73:1,3,24
97:22 109:3,4 131:9
135:1,3,3 211:19
212:20,21 213:12
222:9 223:5
**Palm**
3:16
**paragraph**
59:20 63:6 74:7,11
75:5,5,10 95:15
117:7 120:17
122:19 130:25,25
131:1,16,23 132:23
147:21,21 150:3
152:24 153:4,9
154:11 197:16,19
**paragraphs**
53:12
**paraphrasing**
76:12
**Pardon**
229:17
**parlance**
214:22
**part**

36:17 38:6 59:7
60:19 64:4,13 70:11
72:7,17,20 73:25
75:9 83:14,22 93:5
112:21 115:15
151:22 155:21
169:17 172:18
181:24 182:15
184:21 196:2
220:13,22 221:1
**participants**
6:18
**particular**
10:14 37:8 53:10
62:3 100:16 135:25
158:16 168:12
**particularly**
109:2 228:23
**parties**
6:21 7:2 19:13 80:8
80:10 161:22 162:9
163:5 233:14
**partner**
11:13,15 141:13
**partners**
37:13
**party**
6:25 14:21,23 21:8
22:4 97:14 98:6
173:6
**passed**
126:6
**patient**
127:10
**pattern**
68:25 69:6
**Patterson**
24:2 50:5
**Pause**
47:16 74:23 103:8
111:5,25 146:7
154:2 191:18
216:22
**pay**
21:11 73:5,9 83:13
132:9 148:11,18

174:14 207:10
214:18 215:13
**paycheck**
64:3,11 107:18 136:6
**payee**
156:13
**paying**
204:4
**payment**
73:12 148:1,1 149:14
149:20 150:4,21
151:1,10 152:8,13
154:18 156:9,13
157:10 158:11,11
158:16 159:16
164:6 174:22
175:25 203:12
208:8 223:4
**payments**
150:15 155:24 159:9
166:5,10,16,20
**pdf**
17:13 146:19,20
**penalty**
232:5
**pending**
8:3 28:5,9 29:19
72:16 73:19,20 79:3
162:1 168:1 223:18
224:3
**people**
25:5 37:6 41:18
42:12 51:9 60:8
108:10 115:1 118:8
161:8
**percent**
9:3 12:16
**percipient**
121:4 127:25 128:9
128:24 129:13
130:3 157:1,1,13
**perform**
119:3 138:1
**performance**
33:8,23 34:1 35:4,24
41:7,25 42:21 43:8

101:12 182:23
**performed**
32:18
**period**
36:9 37:10 45:7,7
76:7 124:23 125:14
125:19 128:9
160:25 179:19,22
215:11
**perjury**
232:6
**permit**
83:16
**permits**
82:19
**permitted**
116:21 117:10
118:18 154:17
**person**
102:15 216:16
**personal**
121:4 128:7
**personally**
8:14 128:1
**personnel**
32:5,9 201:17
**persons**
150:4
**perspective**
17:11 63:20,25 64:5
94:24 107:19
187:22
**Peter**
3:15 7:10 27:4 85:10
85:10
**phone**
20:4 85:21 175:19
220:25
**phrased**
101:13 120:9 189:25
**phrasing**
142:5
**pick**
20:4 175:18
**Pickney**
6:7



EXHIBIT 18
PAGE 1142

**piece**
37:21 217:1
**pieces**
87:17
**pin**
28:13 65:8
**Pinkney**
836380:16 2:16 3:14
  4:3,10,13,19 5:6,10
  7:11,15,24 11:12
  23:13 30:24 47:18
  74:25 75:3 86:3
  103:10,14,16 110:4
  111:9 146:9,11
  154:8 188:24 190:2
  191:20 197:20,25
  231:1 232:5,17
**Pisano**
3:4 7:8,8 19:19 21:18
  25:1,13 26:25 27:9
  32:12 34:2 42:23
  45:14,21 57:13
  65:15 68:1 72:23
  78:4,14 79:21 83:25
  85:6,19,25 86:19
  87:12 88:1,17 89:14
  90:3,16 91:14 93:15
  99:9,23 101:7,13
  105:11 107:7
  110:22 113:8 114:9
  115:8 116:8 118:6
  119:5 120:4,7,12,15
  122:11 123:22
  124:8,21 126:23
  127:5,12,15,22
  129:22 130:6,18
  132:20 133:2,17
  134:20 136:16
  137:2 138:3,19,25
  139:7 140:6 143:7
  144:15 145:12,21
  148:19 151:12
  152:14 155:1 156:2
  157:15 159:18,23
  160:19 162:17
  164:8,12,18 168:8

170:7,14 172:4,15
  174:17 175:17
  176:2,22 177:19
  178:6 179:10,24
  183:1,16,22 184:16
  185:11 187:6,13,20
  188:10,20 189:20
  189:22,25 190:20
  191:1,8 192:8
  193:18 194:22
  195:9,21 196:16
  202:24 203:14
  204:21 205:19
  206:2,24 209:22
  210:9,21 211:15
  215:3 216:11 217:4
  217:15 218:17
  219:7,15 220:2,8
  221:24 223:8,13,19
  223:22 224:15
  225:7 226:12
  227:18 229:7,15,24
  230:14,16,20 231:5
  231:6
**Pittsburgh**
836380:9 2:9 7:6
**place**
6:20 100:3 128:5
  233:5
**placed**
7:16 233:7
**Plaintiffs**
836380:6 2:6 3:3
**planning**
42:9 43:13
**play**
176:12
**plea**
4:18 55:24 57:10
  62:6 64:16 65:14
  72:14,17,20,24 73:9
  73:25 130:25 132:2
  132:24 133:14
  134:10,17 205:10
  205:17,25
**plead**

72:7
**pleading**
75:19 130:10 204:4
**pleas**
73:20
**please**
6:16 7:13,22 10:20
  27:15 30:7 46:16
  86:6 91:25 120:17
  126:10 149:10
  160:22 162:19
  167:16 186:15,22
  190:6 192:16
  196:18 222:19
**pled**
130:11,16
**plus**
83:11
**point**
13:14 14:1,2,3,5
  15:20,21,23 22:8,11
  26:17,23 27:17,23
  46:13,18 47:20 48:3
  52:24 57:8 62:3
  63:14 65:1 70:19
  77:6 80:24 88:23
  89:20 92:17 104:23
  105:2 106:22
  116:12 155:3
  160:20 163:14
  167:3 168:3 171:20
  173:5 178:17
  184:22 193:7
  196:25 197:1
  198:15 211:16,17
  212:10 213:6 217:8
  227:6 229:20,21
**pointed**
61:20 70:10
**pointing**
118:12
**points**
104:18,25 113:5
**police**
54:22 56:16 57:12
**policies**

227:25
**policy**
4:14 22:5 44:13,14
  44:19 45:5,7,7,13
  45:20 46:17 78:2
  83:4,24 85:4 86:9,9
  86:13,18,20 87:9
  90:2,15 91:12 92:5
  132:19 133:1,16
  139:8,17,20,21
  143:11 173:7
  176:19 177:18
  179:4,5,6,9,23
  180:2 181:21 182:8
  182:24 184:12,24
  187:10,12 188:8
  191:9 192:21
  195:18 196:3,13,22
  210:1,14 212:19
  226:23
**policy's**
44:16
**Political**
62:23
**poor**
70:10
**portion**
23:20 87:24 132:9
**position**
11:21 12:11 15:19
  17:22 35:19 96:17
  179:4 188:4
**possessed**
155:22 158:10,13
  159:15 173:21
  174:13,15,23
**possible**
29:3 58:11,16 92:15
  105:23,24 106:9
**possibly**
94:14 166:6
**potential**
4:22 10:15 27:1
  59:14 62:11 64:22
  97:16 103:21 104:3
  144:5 147:17



EXHIBIT 18
PAGE 1143

199:16 201:3,7
**potentially**
95:4 97:11 125:6,6,6
138:6 151:16 172:2
173:2 188:23
194:24
**power**
41:18 138:24 139:5
**powers**
16:4 137:17 138:1,17
139:14
**practice**
11:6 29:22 68:25
69:6 94:14 95:22,25
96:12,21 97:3
**practices**
33:1 36:1,8 46:3,6
215:16
**preceded**
103:14
**precipitated**
100:5
**predated**
88:22 118:2 121:18
128:9 129:14
**predisciplinary**
147:20
**premature**
224:9
**premiums**
223:5
**preparation**
48:4 169:9 217:24
221:15
**prepare**
22:22 48:6,12 102:3
142:4
**prepared**
48:15,16 49:22 50:5
60:1 87:13
**present**
7:2 36:11 100:20,22
**presentation**
101:5,11
**presented**
87:10

**presenting**
169:24
**presents**
64:22
**presume**
25:21
**pretty**
60:9 97:23 170:24
207:21 213:11
225:10,11
**prevail**
70:18
**prevent**
40:25
**prevented**
43:7
**previously**
44:22 179:14 228:3
**principal**
131:6
**principals**
14:25 118:10
**principle**
135:1
**prior**
10:14 47:24 61:21
73:9 83:3,23 85:3
86:12,17 87:9 88:16
90:14 91:12 92:4
117:23 128:12
132:25 144:20
169:19 177:25
184:2 187:10,17
188:8,18 189:7
190:11,18,24 191:8
212:17,22 213:10
217:18 233:4,7
**private**
11:6 97:14
**privilege**
10:14 27:1 28:2
101:23 188:23
189:11,15,16,18,19
189:21 190:15
**privileged**
9:7 22:23,25 32:12

71:1 101:7 133:19
133:23 168:24
185:5 190:14
194:24 212:2
**probably**
24:21 39:12 76:9
98:10,10 118:7
147:9 207:4 208:2
212:10
**problem**
63:25 64:22 69:19
76:19 209:5
**procedures**
118:19
**proceed**
7:13 26:14 29:11,18
**proceeded**
36:22
**proceeding**
47:16,21 54:3 74:23
76:14 103:8 111:5
111:25 121:22
146:7 154:2 191:18
216:22 230:25
**proceedings**
233:4,7,8
**proceeds**
24:9,18,25 39:18,24
**process**
20:6 21:22 28:10
29:20 33:16 34:9
38:19 59:7 60:19,23
60:25 64:12,13
65:17 66:8,23 72:20
77:13 84:19 88:3
93:5,18 101:2 102:5
105:14 106:5 109:4
113:11,24 118:22
119:2,20 120:23
121:10,16,22 122:4
122:24 123:7,19
124:7,19 126:18
127:21 129:16,17
137:12 138:12
151:22 155:21
161:2 167:4 169:19

172:1,18 175:3
188:2 219:20
226:17
**procure**
118:22 119:1
**procurement**
96:1
**produce**
61:7 110:3 193:22
196:6
**produced**
61:17 145:25
**product**
185:1,4 188:12,15,15
**production**
61:12
**program**
56:18 68:19 76:23
77:1 83:15 139:18
140:1
**progress**
25:23
**progressed**
116:10
**Prohibition**
64:23
**promptly**
221:21 222:21,25
223:1
**prong**
54:2 57:10 132:2
**proof**
4:21 50:20 80:17,19
81:9,25 82:1,5,14
83:2 90:13,24 91:4
148:17 205:18
208:12,15 209:8,9
209:11
**proper**
51:25 106:22 108:2
135:19,24
**properly**
19:24 55:14 65:23
66:2 135:16,22
138:1,1 162:8
**property**



37:21,23
**proposal**
192:11,20,21
**proposing**
193:13
**prosecution**
206:18,20
**prosecutor**
100:18 102:16
**protect**
28:2 29:7 171:3
**protected**
60:23 136:5,7
**protection**
161:16 172:23
**protocols**
85:16
**prove**
60:10,13 65:1 109:2
114:1 141:15,16,21
174:10,25
**proven**
125:21 163:6 171:6
174:25
**provide**
89:11 116:16 121:19
123:16,18 124:6
142:2 145:20
162:13,20 164:4
168:3,7 170:11
174:4 177:2,17,21
177:25 178:15
180:4 184:23 185:9
185:19,21 186:18
187:4,11,18 188:8
188:17 189:6,7
190:11,18,23
193:15 194:21
195:7,17 198:1
210:19 224:13
225:4
**provided**
20:6 41:4 50:3,8
58:16 66:18 70:25
108:18 112:5
120:22 121:9 124:3

124:17 126:17
127:20 131:7,10
144:20 145:10
164:17 168:4
171:10 176:9,21
181:20 182:17
183:20 186:11
192:13 193:19
214:11,16 215:1
218:11,15,15,19
219:5 220:17 225:9
225:9
**provides**
161:16 227:1
**providing**
23:2 79:19 96:19
102:17 113:21
121:2,15 123:6
144:4,13,19 160:16
171:11 178:3 184:2
194:19 200:11
**provision**
12:15 121:20 176:20
184:5
**provisions**
96:2 153:18
**prudent**
161:23
**public**
19:24 38:10 42:8
43:10 58:22 59:10
62:11 63:9 64:23
93:19 94:14 95:4
97:11,12,13,15
106:15 133:22
134:24 143:11
153:19 158:18
161:15 171:3 182:8
195:6
**pull**
191:10
**purchase**
83:4,24 85:3 132:19
**purchased**
44:12,15 78:2 85:8
92:12 181:21

**purchasing**
45:12,19 78:13 95:17
96:8
**purports**
159:8,15
**purpose**
63:9 77:22 88:9,12
88:13 94:4 97:13
105:12 119:8
123:13 128:22
129:6,7 155:14,19
183:10,13 184:7
**purposes**
9:9 14:7 23:13 32:3
45:4 49:18 88:3
110:20 112:8
179:15
**pursuant**
17:15 58:19 132:10
161:15
**pursue**
73:2,24
**pursued**
73:16
**purview**
28:24
**pushed**
31:24
**put**
16:10 23:11 30:17
38:24 39:4 47:11
51:2,20 58:16 63:13
74:7 77:9 80:4,7,12
81:12 84:10 96:16
97:8 99:1 108:21,24
108:24 109:12
112:3 115:17,18,19
125:1,18 126:1
130:22 141:19
157:21 159:2,4
163:12 165:5
168:22 170:25
171:19 172:23
174:8 175:8 176:8
177:6 184:18,18
199:23 204:13

209:8 228:4
**putting**
89:3,10 90:11 119:11
135:17 137:15
146:11 167:7,11
168:11 183:12
224:2,6
**P-i-n-k-n-e-y**
7:24
**P.A**
7:6
**p.m**
2:17 6:2 47:19 74:21
75:1 103:6,11 111:3
111:7,23 112:1
146:5,10 154:3
191:16,21 216:20
216:23 231:2,8

**Q**

**qualified**
51:25
**qualify**
25:16
**quality**
6:16,17
**quantification**
218:12 220:17
**query**
61:7 111:2
**question**
9:11,22 10:2,20
13:10 15:15 20:12
20:21 26:20 27:13
41:12,21 43:19
45:23 50:22 71:3
75:20 77:2 78:9
81:14 84:25 85:1
86:4,5 89:8 91:16
92:1 101:16,18
106:17 107:23
116:5 117:1 120:5,7
120:9 126:10 127:3
127:23 130:15
132:21 140:8 143:2
152:5 159:20



EXHIBIT 18
PAGE 1145

162:12,19 167:16
167:22 169:11,21
173:16 181:17
186:15,25 187:2
189:2,4 190:3 192:8
192:10 193:5,12
194:11 195:15
196:5,11,17,18,19
197:18 198:10
205:16 209:18
210:4,6,17 214:21
219:22 220:21
222:18,19 224:11
225:1,9,23 227:4,5
227:8,20
**questioning**
209:2
**questions**
9:25 30:8 32:21
112:12 125:23
167:18 174:20
193:3,12 214:1
217:21 222:2 230:8
**quick**
146:2 198:6
**quit**
42:1
**quite**
103:1,18 173:11
**quitting**
42:6
**quote**
53:22 62:16 68:23
69:13,17,17,18,19
74:9 95:25 98:3,16
104:18 149:9
169:13 182:7
**quoted**
68:22 75:10 133:8
229:9,12
**quotes**
75:5

———————
R
———————
**raided**
33:17

**raised**
124:5 129:5 137:24
137:25 138:4,8
160:13 227:11
**raising**
73:23 137:4
**ran**
15:16 16:2 143:21
**rational**
158:24 160:8 174:5
**Ray**
218:25 219:1 220:11
220:23 221:23
222:23
**Ray's**
219:11
**reach**
35:23 36:3 158:1
**reached**
110:2 213:9
**reaching**
157:24
**read**
17:17,20 23:19 24:8
24:11 27:15 53:25
54:12 56:19 62:24
63:10 69:3,11,12
74:8 76:15 84:2
92:1 96:5,24 98:7
104:22 105:3
115:22,22 117:14
120:3 122:16
126:10 127:9 148:3
148:5,14,15 149:16
150:6 152:24
153:13,13 154:20
165:24 166:12
181:9,11 186:15,21
190:4,6 196:17
198:2,5 203:25
210:16 211:5
222:18 232:6
**ready**
230:22
**real**
35:6 36:17 37:18

109:1 125:20
174:10,12,20 198:5
216:16
**reality**
168:12 171:25
183:13
**really**
16:8,8 19:3,20 25:22
30:9 53:4 54:16
60:10 61:9 64:24
73:6 74:3 76:5
82:24 92:24 93:17
94:13 102:21
114:23 115:24
125:14 161:7,18
167:22 187:24
220:14 230:2
**realm**
93:19
**reason**
51:18 61:14 79:9,15
81:5,6 88:24 100:11
110:19 112:16
122:9 137:5,10
138:8 143:9,11
157:3 160:8 171:13
178:25 185:19
186:12 210:10
**reasons**
20:3 66:12 80:6
98:25 101:24
122:21 135:16
**recall**
14:23 15:21,24 18:25
22:10 34:10 37:2
46:5,17 54:11,21
61:3 62:7 73:4,22
74:3 86:8 103:15,17
107:10 112:12,14
123:23 134:5
135:12 147:10
165:7 176:7 178:7,8
178:9 183:8,10
184:18,19 190:21
195:11,23 197:2,13
197:16 198:12

204:1 205:1,12
207:8 210:22 211:1
211:5 214:12 216:7
218:13 220:22,25
227:5,7
**receipt**
220:6
**receive**
218:5 219:25 221:9
**received**
21:8 53:23 61:19
112:11 146:13
198:4 208:13
210:23 218:1 228:3
**receiving**
17:14
**recitation**
137:17
**recognize**
77:6
**recollection**
11:23 31:11 36:15
37:22 56:22,25
59:17 61:25 67:1
68:3 80:2 95:5
134:16 135:1
147:14 198:25
199:5 202:5,8,11,21
203:16 204:23
206:5 212:23
214:17,20,23
221:12
**record**
6:5,21 7:22 9:5,9
23:13 47:12,15,19
49:18 61:18 74:16
74:22 75:1 84:3
85:25 103:7,11
110:4,6,8,20 111:1
111:4,6,11,21,24
112:2,8 117:4 136:9
145:25 146:6,10
148:6 153:13 154:4
191:17,21 216:17
216:21,24 228:11
230:12,14,22 231:2



EXHIBIT 18
PAGE 1146

233:8
**recorded**
6:19
**recording**
6:16,20
**records**
22:19 39:17 113:5
**redo**
106:6,6
**Rees**
3:10 6:14
**refer**
11:12 14:8,10 44:20
76:18
**reference**
50:8 64:18 71:5
75:21 82:23 84:4,8
87:3
**referenced**
24:24 83:2,9 92:25
132:23 133:3,13
**references**
82:15 83:21 228:14
**referred**
15:12 45:23 50:23
54:5,19,20 91:1,3,6
91:10 92:3 118:9
**referring**
26:5 145:23 212:17
218:23 228:12
**reflected**
191:25 199:1,13
**Reform**
62:23
**refresh**
61:25 68:3 119:24
198:25 199:5 202:4
202:7,11,21 203:16
203:24 206:5
212:23 221:12
227:3
**regarding**
58:24 108:11 125:15
160:8 166:9,15
167:24 170:16
228:25

**regardless**
88:12 172:9
**reimbursement**
209:19 210:8,19
**reject**
21:11
**related**
6:25 20:16 37:9
80:23 83:12 87:23
116:12 149:11
194:16 209:17,19
210:1,1,13 211:3
218:6
**relates**
71:4 92:21 94:7
**relating**
50:19
**relationship**
98:6 118:14 141:22
**relationships**
115:12 128:13,19
141:8,9 165:17
167:2 181:25
187:23
**relative**
233:13
**relatively**
125:19
**relay**
102:10,12
**relayed**
133:9
**relaying**
102:15
**relevant**
83:6
**relied**
163:7
**relying**
126:4
**remainder**
110:16
**remaining**
110:16
**remarks**
85:22

**remedy**
40:12
**remember**
8:12 19:9 22:7,8,18
23:17 28:17 36:10
37:8,19 39:11,13,14
47:6 52:25,25 53:1
53:4 55:1 58:7,7
60:4 73:14,21 92:16
94:10 96:13 111:12
112:17 122:14,22
122:25 123:3
134:14 135:2
152:15 154:5
178:19 180:12,13
181:3,3,11 183:3
197:3 198:23
204:10,11
**remind**
111:13
**remit**
132:4,13
**remitted**
131:21
**remote**
836380:15 2:15 9:18
**remotely**
6:13
**remove**
34:22 35:5
**removed**
33:19 34:6 35:10,12
124:25
**rendered**
42:20 43:22 89:16
**renewal**
193:14
**renewed**
44:10 86:20
**repaid**
94:12 134:13,15,16
**repairs**
55:4
**repayment**
134:18
**repeat**

13:10 45:16 86:5
89:7 162:12
**repetitive**
27:6
**rephrase**
10:21 45:16 124:2
167:21 186:25
**replace**
15:25
**report**
4:15 12:18,19,24
13:1,4 18:16 19:21
21:17 25:7,23 26:17
26:23 27:18,23
48:14,21 49:21 50:3
50:8,24 51:17 80:23
163:19 165:4,7,11
198:11 199:15
200:15,17 201:3,11
202:21 218:15,18
218:22,24 219:4,9
219:11,25 220:7,12
**reported**
836380:24 12:20
197:21 199:1,13
202:8
**reporter**
2:19 6:22 7:12 8:22
9:9,14 27:10,15,17
81:19 91:25 92:2
94:20 111:14
126:11 162:18,20
186:17,23 190:6,8
196:19 222:18,20
230:11 231:3,5,7
233:2
**reporting**
201:8 203:4
**reports**
202:12 218:5
**represent**
7:3 8:2 20:15 31:17
60:24 112:6 191:25
**representation**
12:14
**representations**



EXHIBIT 18
PAGE 1147

17:16
**represented**
202:22
**representing**
147:13 205:24 214:9
**request**
6:14 58:14 61:12
155:24 197:24
222:25
**requested**
5:14 174:14 221:21
222:21
**requesting**
151:1,10 152:8,13
157:9 158:11 164:6
174:22 175:25
**require**
118:18
**required**
29:16 58:23 59:7
87:7 93:18 101:1,2
102:5 106:2 123:4
141:25,25 142:9
155:12 169:17
172:17 176:14
184:6 211:1
**requirement**
77:24 78:7 84:19
129:17 151:22
188:3
**requirements**
92:21 98:4 105:13
118:23 182:3,13
229:1
**requisition**
150:1,10,16 152:8
154:18
**requisitioned**
148:11
**requisitions**
147:24 148:18
149:11,13,19 151:1
151:6,10 155:5
160:17 164:6
173:22 174:21
175:25

**reread**
162:18 167:16
**resale**
83:16
**resolution**
39:22 150:12
**resolve**
134:18 207:11,12
**resolving**
208:6
**respect**
100:24 127:4 171:24
172:10 186:16
**respected**
138:12
**respond**
100:2 224:18 225:4
230:3
**responded**
215:19,22
**Respondent's**
228:23
**responding**
49:2 207:20 208:5
225:18
**response**
58:9 61:11 166:17
210:23,23 216:3,4,5
**responsibility**
98:3,14
**responsible**
24:23 161:23
**responsibly**
163:18
**rest**
120:16 176:10,11
**restate**
26:20 27:19 132:21
**restitution**
73:2,3,6,10,12,24
203:12 204:5
206:23
**result**
26:2,10 38:5 57:3
58:25 66:7 121:6
132:11,12 138:7

**resulted**
96:2 130:12,17 167:5
167:13
**retained**
12:23 13:3 19:5 25:6
31:14 182:16 183:7
**retention**
16:16 19:16
**retire**
18:2
**retired**
15:22,23,25 16:9
17:14 18:8 201:18
**retirement**
17:14
**retract**
214:6
**return**
25:23
**reveal**
127:17
**revealed**
68:24
**review**
47:25 50:11 52:24
128:13,18 165:16
217:1,20,23 221:14
221:16 227:21
**reviewed**
48:13,14 50:11 52:20
76:14 87:15 115:13
187:22 217:8
**reviewing**
32:25 167:2
**RICHARDS**
3:5
**right**
12:2,3 19:9 31:8,14
31:25 32:1 36:14,25
50:10 53:3 57:15,18
58:13 73:21 75:16
76:1,12 93:6 99:7
100:2,2 104:25
106:14 114:10
118:16 122:16
123:12 124:1

125:11 127:18
128:6 129:2 130:13
134:11 143:6,16
149:1 152:11 153:5
154:7 156:12
157:14 168:7,20
174:1,23 178:8
180:11,13 189:17
189:18 191:14
192:6 199:21 203:1
204:9 211:14,22
213:13 216:16
222:17 230:1,5,21
**rights**
59:7 60:19,23 77:13
106:5 138:12
155:21 169:19
**right-hand**
52:16
**risk**
15:8,12 16:3 17:22
18:11,13 34:24
161:20 177:16
194:8 197:22
198:13,17 201:16
**Riverside**
836380:5 2:5 4:16
6:8 48:1 52:7,9
68:10,12,19 71:23
71:25 72:3 73:10
74:9 75:13 131:24
132:5 204:7 205:24
206:13,15
**Robert**
24:2 50:5 200:8
**role**
12:16 92:24 93:1
100:15,16,17
101:11 113:10
115:10 128:18
138:5 151:18 152:1
152:1 155:18
157:25,25 165:16
165:18 169:22
201:14,23 203:8
**roll**



25:22
**rose**
66:25
**Ross**
16:21 17:1
**RPR**
836380:24 2:18
233:23
**rule**
140:24
**ruled**
80:3
**rules**
8:19
**ruling**
71:16 76:15 77:21
78:16,16 80:7,13,14
80:16 89:12 90:13
90:19 151:25
228:20
**rumor**
185:25
**run**
35:1 140:19
**running**
44:8
**Rutherford**
836380:24 2:18 6:22
233:23

---
**S**
---
**s**
126:6 131:12 173:12
204:12 206:5,9
227:22
**Salyer**
5:7 191:24 193:25
194:4
**saw**
50:10,12 56:8 86:11
108:10 134:4 155:7
194:12 197:13
204:22 213:2,6
218:6,7,9
**saying**
17:24 51:9 79:24

106:10 143:4
171:22 173:11,20
177:20 208:19
222:14
**says**
16:25 17:19 24:12
53:21 57:14 62:15
75:16 83:5,5,5,19
83:19 84:1,2 85:12
98:16 115:9,10,24
115:24 118:17
120:24 123:25
124:9,16,16 126:14
126:15 147:21
155:2 156:16
157:19,19 160:3,10
160:10 166:3 169:3
173:15 181:23,23
182:7 183:17,17,18
184:17,17 197:19
198:3 210:13,16
226:19,19 227:25
228:1
**SBEMP**
7:10 11:12
**scheme**
83:13
**Schmookler**
3:10 4:4 7:5,5,20 8:1
16:14 20:23 21:21
23:11 25:8,25 27:4
27:10,12,16 28:6
30:17 32:16 34:10
39:4 42:25 45:3,17
46:9 47:20 50:2
52:13 55:23 57:15
57:21 65:24 68:4
71:22 73:8 75:2
78:8,18 80:14 81:20
81:23 84:23 85:10
85:23 86:1,7,22
87:17 88:8 89:3,21
90:10,22 91:19,22
92:10 94:6,22 99:14
100:12 101:9,15
103:12,25 106:16

107:22 110:10,13
110:18,24 111:8,15
111:19 112:3
113:12 114:10
115:25 116:14
118:15 119:14
120:5,10,13,18
122:15 124:1,12
125:10 126:8,21
127:2,8,14,16,19
128:11 130:1,11,20
132:22 133:12,21
135:4 136:20 137:5
138:15,22 139:4,13
141:1 143:19
144:18 145:15,24
146:3,11,17 148:21
152:4,20 154:5,8
155:16 156:5 158:8
159:21 160:15,23
163:11 164:11,13
164:14 165:2
168:11,20 169:2
170:10 171:23
172:9 173:10
174:18 175:18
176:18,25 177:24
178:14 179:13
180:7,18 183:12,18
184:1,22 185:12
186:14,25 187:2,9
187:16 188:6,15
189:1,20,24 190:1,2
190:16,22 191:10
191:22 192:4,9,11
193:21 195:4,14
196:1 197:4,8 200:2
203:9,17,22 204:17
205:2,23 206:10
207:6 210:3,15
211:13,22 215:15
216:17,25 217:10
217:18 218:20
219:10,21 220:4,10
222:4 223:6,9,14,20
224:10,16 225:16

225:25 226:5,7,13
226:14 228:2
229:13,17 230:8,11
230:23
**school**
11:4,7
**scope**
19:16 21:16 25:11
**Scott**
3:10 7:5 8:1 110:15
127:5 192:8
**screen**
6:19 9:19 10:6 16:10
23:12,20,20 30:18
38:24 52:14 74:8
75:25 103:20
109:12 112:3
130:22 146:12
152:11 158:14,17
159:25 165:5
199:23 204:13
209:8 211:6 228:4
**scroll**
31:2 54:7 76:11
78:16 181:1,13
193:23
**Scully**
3:10 6:15
**search**
12:1 61:11
**SEC**
49:2,4,9 51:20 81:10
163:25 171:16
186:9 207:7,11,22
209:17,19 210:1,5
210:13 211:4,8
213:4 224:23
**second**
29:2 31:13,18 59:19
63:7 74:17 75:25
117:6 119:23
131:16,23 132:2
147:21 152:23,24
153:4 154:11,12
182:20 186:21
192:16 197:19



EXHIBIT 18
PAGE 1149

199:20 207:6
213:22
**section**
62:11,15 68:6 94:7
98:2 109:13 118:24
120:1 145:9 153:1
153:15 161:16
165:25 166:7 169:5
169:15 172:24
181:8 229:11
**Securities**
49:3
**see**
9:20,20,20 10:7,10
10:10 16:14,16,17
16:23,24 17:3,17,19
23:18,25 27:25
30:20,25 31:20 32:4
32:7 37:19 39:8
45:9,10 46:20,20
48:15 52:4,13,14,17
52:18 53:14,19,25
54:1,6,10 56:2,19
56:20 62:10,13,19
62:24 63:10 68:7
69:3,4,20 72:1
74:13 75:8,9,12,15
75:18,19 78:16 82:2
82:9 95:10,23 96:5
96:6,24,25 98:7,8
98:18,19 103:18,25
104:22,25 105:3,5
109:14,16 117:14
120:2,8,16,20
122:18 131:3,17
134:8,12 137:18
141:4 146:24 147:1
147:18 148:3,4,14
148:15,23 149:5,16
149:23,24,25 150:6
150:7,13,14,18,19
153:9 154:20,21
156:9,11 165:25
166:12 173:15
180:21 181:9,10
182:10,11,11

192:12,15,21,23
198:2,3 200:4,5,13
203:15 208:18
209:12,13 217:6,7
217:16 218:8,9
228:16,18 229:2,3
**seeing**
183:3 199:5
**seek**
29:11 190:16,22
**seeking**
30:8 179:5,9 206:23
**seeks**
182:25
**seen**
6:18 23:15 56:7
134:4 194:14 203:2
204:25 206:11
**sell**
73:5
**sells**
95:20
**sending**
172:12
**senior**
4:17 48:1 52:9
**sense**
15:3 51:7 129:23
**sent**
23:18 58:8 79:13,14
172:16 179:2 183:2
183:14 210:24
213:21 217:6
**sentence**
24:7 62:15 63:7
69:22 74:10,11 75:5
95:15 98:9,16
122:16 148:5,6
154:12
**separate**
42:17
**separation**
167:5
**September**
169:8 219:12,24
**series**

53:17 54:4 57:11
61:3 105:7 149:12
**serious**
60:13,14 80:23 161:4
230:5
**serve**
20:14 63:8
**served**
11:25 12:1 88:2
166:4
**server**
34:23
**service**
38:4
**services**
6:23,24 116:16
118:22 119:1
120:22 121:9,16,21
123:6,19 124:6,18
126:17 127:21
131:3,7,10 148:10
150:17 194:4
**serving**
40:20 169:23
**session**
10:16,18,23 19:25
20:3,8 22:24 30:7
32:4,11,13,15 58:22
58:24 59:3,6,12,17
59:23,24,25 60:20
60:22 61:1 65:6
67:13,15 70:14
75:11 77:8,10,15,17
77:20 84:8,12,21,22
87:6 93:3,6,20,25
97:19 99:3 100:1,3
100:7,10 101:1,5
102:6,8 105:17,21
105:22 106:3,11,13
106:15,25 107:21
195:6,13,16,24
196:13,22 197:2
**sessions**
23:4
**set**
60:2 83:6 215:16

233:6
**sets**
12:13
**settle**
21:6,7 80:8,11
**settlement**
132:10,16
**shadowing**
143:22
**share**
22:24 205:8
**shared**
205:13
**sharing**
205:3
**shoot**
74:11
**short**
76:7 115:13 124:23
125:14,19
**shorthand**
2:19 233:2,9
**shortly**
8:1 29:15 42:6 43:14
74:6
**short-cut**
137:14
**shoulder**
8:25
**shout**
143:13
**show**
9:18 10:5,6 17:5,9
23:7,11 29:1 30:13
31:21 44:24 45:6
46:16 49:20 57:16
57:21 61:2 71:18,19
81:23 95:6,7 103:20
111:15 117:2
145:22 146:18,24
159:15 174:13,21
175:13 176:5
179:13 180:14
191:22 197:4,17
199:7 203:10,18
204:17 209:15



**EXHIBIT 18**
**PAGE 1150**

212:23 215:25
228:2
**showed**
86:8
**showing**
46:18 117:4 135:9
154:9 155:23
**shown**
199:2 204:24 206:7
**shows**
86:9 207:22
**shrugs**
8:24
**shut**
74:14
**sick**
53:23 54:5,19 55:6
55:10 63:21 107:11
**side**
65:20
**sides**
218:10
**signaling**
80:10
**signals**
186:18,24
**signature**
146:25 147:2,4
152:16,17 158:21
160:1,2
**signed**
56:5 58:6 98:12
134:1 147:9 150:1
150:10,20 152:7,19
154:10 158:18
159:9 173:22
175:25 203:23
**significant**
35:22 207:12
**signing**
150:25 151:6,10
**signs**
152:12
**similar**
15:21
**single**

34:10 73:9 96:21
175:23,23,24 210:1
222:15,17
**sir**
7:21,25 14:17 16:16
16:23 27:12 28:12
30:2,2,3,20,25
31:17 32:7,8,16
33:5 34:4 39:9
40:16,18 42:16
43:20 45:10 46:22
47:20 50:1 52:13,17
53:14,19,25 54:18
56:2,19 57:5,21
58:1 62:13,25 65:7
68:7,11,14 69:3,4
69:21 72:1 73:8
75:8 76:21 78:9
81:14 82:2 84:25
86:8,23 89:22 91:9
91:22 92:19 93:12
95:10 98:7,8,15,18
98:19 99:17 101:10
101:15 103:12,15
103:17,25 104:22
106:16 109:16,25
112:4 117:2,14
120:2,8 124:13
126:11 127:19
128:11 129:1
137:16,18 141:4
144:18 146:23
148:3 149:6,16,23
150:18 156:11
157:9 159:20
162:11 164:4,14
165:8 166:13
167:17 171:24
173:10 179:3,13
180:8 184:10 187:1
187:2 189:2 192:7
192:15,23 193:5
195:4 196:5 198:2
200:4,13,14 201:2
203:9 210:16
212:24 214:2 216:8

216:25 220:4,15
221:2 222:11
223:21 226:7,14
230:9,23
**sit**
14:24 18:1 19:9
35:12 130:2,5 197:2
198:23 217:11
**sitting**
61:15 73:21 92:17
112:17 178:7
180:12 191:3,7
197:22 201:25
203:1
**situation**
70:4 100:16,17 102:2
136:8 175:6 215:8
**six**
145:10,20 170:13
191:20 231:2
**six-page**
146:23
**sizeable**
70:9 73:25
**skipping**
131:21
**slander**
161:3,13
**slightly**
43:19 107:23
**Slovak**
3:14 11:11 30:23
**slowly**
31:3
**sold**
14:20,22 116:23
177:18 179:20
**solid**
36:19 37:1
**somebody**
18:19 25:17,19 32:23
42:9 52:23 58:5
78:24 92:16 132:4
143:10 157:13
171:5 191:6 198:13
198:21,22,22

200:24 201:24
203:6,6 230:4
**soon**
126:5
**sorry**
12:5,12 35:16 38:7
68:16 81:15 94:20
94:21 103:15
114:15 120:19
152:21 153:3,7
190:9 194:9 197:8
207:16 209:1
211:10 212:14
213:14,24 214:6
227:10
**sort**
15:2 16:3 22:19
28:13 59:10 185:24
186:1
**sounds**
58:13,13 204:9
214:12
**speak**
16:8 18:8 43:18
44:22 79:3 177:4
204:10 219:8 220:9
220:14 221:7
**speaking**
37:6 77:16,17 101:25
102:1,14 118:8
143:14 201:11
209:7
**special**
4:11 30:18 31:24
**specific**
28:10,11 30:9 31:8
37:2 40:4,7 41:17
43:20 57:8 58:24
59:2,13 60:1 71:9
71:11 82:22 83:20
93:5,21 102:7
106:17 113:5,5,14
115:1,1,5 127:11
139:25 142:24
145:14 146:24
150:25 167:18,22



EXHIBIT 18
PAGE 1151

176:20 181:20
192:21 214:25
216:7 228:10,14,24
**specifically**
22:9,17 23:17 41:13
60:4 69:6,12 71:15
79:5 82:15 86:9
95:14 96:13 109:14
123:5 145:22
147:22 167:21
169:3,12 183:3
212:12,15 214:15
220:5 221:3 229:20
**specifics**
44:21 217:9
**speculate**
203:3
**speculating**
217:17
**speculation**
79:12 85:7 145:2
163:20 173:25
185:22
**speculative**
185:25
**speed**
27:11 29:8,10
**spelled**
37:15
**spend**
140:4,18
**spent**
24:19 33:10,12
172:11 207:19,20
208:4
**spoke**
64:24 65:16 71:16
**spot**
110:2
**spotting**
36:13 104:15 173:14
173:21
**spreadsheets**
135:8
**Springs**
3:16

**sschmookler@gor...**
3:12
**staff**
12:24 68:24 69:7
75:16 79:19 161:7
208:4
**stage**
60:13 88:25 116:10
**stamp**
52:16
**stamped**
111:2
**standpoint**
64:12
**stands**
68:9
**start**
17:24 26:6 122:4
**started**
11:22 51:20 81:10
153:6 186:10
**starts**
82:17 146:19 153:9
200:2
**state**
7:2,21 9:8 55:25
61:18 71:24 85:11
104:20 105:10
119:18 122:17
232:12 233:3
**stated**
20:3 41:12 139:14
**statement**
69:24 71:8,11,13
79:23 132:6 138:21
201:21 215:21
**states**
836380:1 2:1 6:10
8:4 123:9
**stating**
62:2
**status**
143:18 144:9 151:17
157:23 159:7 160:6
160:14 164:22
169:20 173:3

176:17 188:1 224:9
**stay**
32:23,24 47:10
128:17
**staying**
46:1
**Steiner**
116:15
**Stephen**
57:24
**stepped**
201:23 203:8
**Steve**
146:22 175:19,21
176:3
**sticks**
11:24
**stop**
16:17 85:21,23
109:25 213:23
**story**
174:3,4 176:10,11
**Stradling**
49:1 79:14 87:14,14
87:18 177:6 208:1
210:12
**strike**
25:9 28:19 40:23
41:22 44:10 71:17
72:18 74:10 80:15
83:18 84:23 119:22
123:15 126:8 129:3
135:20 145:16
151:7 158:15
162:10 167:15
171:23 177:15
186:14 200:16
202:9 206:19
**strong**
51:14,14
**stronger**
36:23
**structured**
55:5,14 57:2
**stuff**
125:10 129:1 163:21

**subject**
20:1 137:13
**submission**
4:9 16:20 185:17
202:16 228:13
**submissions**
227:16
**submit**
22:8,11,12 26:4
50:16 82:8 89:1,5
89:20 160:4 178:23
209:18 210:6
**submitted**
16:22 17:7 19:6 28:4
44:20 48:17,23
50:18,20,23 51:16
80:17,20 81:9,11,13
82:1 83:22 90:25
104:19 105:1,8,18
106:18 151:8,13
152:7 177:10
178:23,25 180:2,3,5
182:18 185:14
186:8 191:9 202:15
208:7,10,13 209:25
211:9,12,18 213:3,4
213:4 223:24
225:20 226:10,18
226:21,23
**submitting**
82:8 151:1,9 199:4
**subpoena**
49:3
**subpoenas**
38:21 39:7,16,23
40:2,12,22,25 41:4
41:8,14
**subscribed**
233:15
**subsequent**
30:3
**subsequently**
80:21
**substance**
10:17 23:23 26:20
27:20 30:7 101:10



EXHIBIT 18
PAGE 1152

101:14 195:5
**substantial**
224:21
**substantiate**
81:8 164:25
**substantive**
215:23 224:22
**substantively**
215:19
**sue**
213:1
**sued**
132:7 161:12 163:3
172:25
**suffer**
132:11
**sufficient**
109:10
**suggest**
34:8
**suggesting**
76:13
**suggests**
69:18
**Suite**
3:6,11
**suits**
142:16 143:4,6
**Superior**
68:17 71:24
**supplement**
169:8
**supplemental**
192:13
**supplementation**
147:16 194:19
**supplemented**
171:15 177:10 186:9
**supplies**
95:18 96:8
**Supply**
95:19
**support**
36:19 51:14 87:19
91:7 112:21,22
113:5,14,21 116:6

129:10 167:9
177:12 220:6 221:4
225:12
**supporting**
58:10 114:5 221:10
221:21 222:22
**supposed**
182:4
**sure**
9:24 10:10 13:11
19:22 22:16 27:16
29:22 41:11 45:17
46:7 52:1 60:22,24
68:2,4 72:10 74:18
75:25 86:3,7 89:9
94:16,17 97:23
103:3,5 108:13
117:25 125:6
132:22 138:5,9
140:7 142:3,10
143:19 144:17
145:24 148:21
160:2 169:7 176:23
177:22 180:7
181:12 182:2
184:20 187:7 190:1
190:5 193:9 196:18
199:14,20 200:6
201:20 204:25
205:22 208:9
216:12,12 218:23
220:24 222:12
228:21
**surface**
15:16 160:10
**surprise**
205:6,9,13
**surprised**
53:4 133:10
**suspect**
79:1 215:15
**suspicion**
176:6
**swear**
7:13
**sweeping**

41:20
**systemic**
69:19 76:19

---

**T**

**Tahquitz**
3:15
**tailored**
85:1
**tainted**
99:16
**take**
6:20 8:22,24 9:14
26:1,3 30:8 31:22
46:23 47:4 64:8
69:1,8 100:3 102:25
114:10 146:2
191:13 211:7 230:4
**taken**
2:16 6:13 8:9,14,18
20:25 42:13 104:10
108:23 125:18
156:21 170:23
172:21 233:4
**talk**
9:10 20:5 106:1,3
141:2 142:12 145:1
178:14 179:11
212:25
**talked**
22:15 132:18 144:19
178:18 185:2
**talking**
14:16 29:25 33:3
77:14 97:18 103:13
130:8 201:7 220:24
**talks**
131:1,16,23
**tasks**
32:17
**technical**
9:19 75:3
**technology**
6:14
**television**
53:2

**tell**
18:1 28:15 46:12,23
48:17 61:16 70:17
79:15 101:25 160:2
160:18 168:14
179:21 186:13
203:3 205:21 223:6
224:19 229:20
**telling**
164:24,24 213:18
223:11
**Ten**
103:4
**tenants**
141:12
**tender**
22:13 88:6
**tendered**
88:21 185:18 211:2
211:19
**tendering**
210:12
**tenure**
29:21 33:1 40:15
46:3,7 70:15 95:22
115:7 117:9 118:2
133:6 195:23
**term**
192:25
**terminate**
102:20 109:6,10
125:5 143:10
**terminated**
107:16 136:3
**termination**
58:22 59:1 138:7
142:17,21
**terms**
12:14 64:4 66:9
176:19 193:16
205:10,17 218:1
**testified**
7:17 65:17 113:18
135:16 174:2 224:1
**testify**
86:3 159:25



**testifying**
233:7
**testimony**
68:24 70:5 76:21
  85:7 165:3 193:9
  217:19 227:15
  228:25 232:9
**Thank**
7:25 10:12,25 47:8
  81:20 92:10 230:9
  230:10 231:7
**Thanks**
191:15 231:4
**theft**
65:2 77:12 215:7
**then-Beaumont**
56:15
**theoretically**
63:22
**theories**
51:5 163:21 170:20
  185:23
**thereof**
233:11
**thing**
11:24 33:21 84:2
  116:1 125:1 140:24
  161:23 174:23
  180:8 204:8 222:5
  222:15,17
**things**
8:25 20:19 24:20
  25:18 29:5 35:5,6,8
  35:12 36:13,24 43:3
  43:3 49:19 51:6,9
  60:11 64:3 70:1
  71:10 106:10 109:2
  114:2 115:13
  116:14 128:15
  131:14 135:22
  144:24,25 145:3,5,6
  155:6 163:4,17,23
  168:5 171:8 172:19
  174:11 177:8
  178:24 183:6
  185:19,23 201:13

217:8 224:2
**think**
10:4 11:25 12:2
  15:18 16:6 19:6
  24:6 25:2,14,15
  27:6 33:9,18 37:14
  41:20 46:12 50:23
  53:3 54:20 55:4,5
  57:17 60:21 65:19
  66:1 67:4,4 69:23
  69:24 71:7 72:9
  73:16,16 75:23
  76:16 78:5 79:22,23
  79:23 81:16 93:17
  95:13 97:7 99:12
  102:19,22 113:9,10
  114:22 118:9
  119:18,21,23 120:7
  120:8 124:22 126:1
  129:6 133:18
  135:11,15,22 139:1
  139:8,17,25 143:8,9
  154:7 157:16
  159:19 161:23,25
  167:14 172:5,6,7,10
  176:3 183:23
  184:25 185:4,5,13
  189:14 204:11
  206:7,12,17,25
  207:3,20,23,24
  213:8 215:5 221:25
  223:11 224:9 225:8
  227:7 228:6,18
  229:10 230:1,5,7
**third**
14:21,23 19:13 21:8
  98:6 134:7 161:22
  162:9 163:4
**thoroughly**
158:3
**thought**
22:13 31:6 66:10
  67:8 89:4 94:13
  139:13 173:18
  205:20
**thoughts**

216:18
**threaten**
85:19
**threatening**
172:13
**three**
13:25 43:12 48:24,25
  49:5 53:12 74:25
  75:13 210:11,12,23
  210:24 223:17
  225:5,20 226:10,16
  226:21
**throw**
145:3
**throwing**
221:14
**tied**
144:13
**time**
9:3,19 10:16 12:3
  13:3,4,7,19,21 14:5
  14:12,19 17:11
  18:10,15,23 22:16
  24:14 29:15 31:9,14
  33:11,12 35:18,25
  36:9,11 37:10 40:18
  41:15,23 42:5,22
  43:14 45:4,16 46:16
  47:6,14,18 50:17
  52:20,25 53:3 55:1
  55:10 56:8,23 57:8
  60:17 61:6 66:24
  67:6,7 70:20 73:20
  74:21 75:1 76:7,10
  76:15 79:4 85:11
  88:23 89:5 94:16
  101:21 103:6,11,18
  104:7,9 108:6 110:5
  111:3,7,23 112:1
  113:25 115:10
  116:4,10,24 117:19
  123:24 124:24
  125:14,19,20,25
  128:8,16 136:18
  141:15 145:6 146:5
  146:10 154:3 159:1

160:15,25 162:1,14
  162:21 163:20
  165:1,10 166:4,14
  167:9 168:7 171:25
  172:7 174:11,11
  175:23 177:12
  178:4,12,13 182:22
  185:16 187:3 188:5
  191:16,21 193:6,7
  193:13 194:15,18
  198:15 202:17
  206:18,20 208:4
  215:11 216:20,23
  218:11 223:3
  225:13,13,23 226:8
  230:9,16 231:2,4,8
  233:5
**timely**
221:21 222:1,5,12,16
  222:21,25 223:1,5,6
  223:12 225:4,18,18
**times**
8:11 12:20 13:20
  20:25 29:4 40:14
  91:16,21 127:13
  135:21 226:2
**timing**
14:23 201:10,10
**tinnitus**
209:5
**tire**
37:24 141:7,13
**title**
198:13,17
**today**
8:9,22 14:7,24 16:15
  30:4 35:12 47:24
  48:5,7,12 50:11
  61:16 85:14 86:2,2
  86:8 87:15 92:17
  99:12,12,15,15
  110:21 112:5,11
  130:2,5 135:21
  146:1,13 165:5,8
  178:16 188:14
  191:3,7,11 198:23



EXHIBIT 18
PAGE 1154

198:23 201:25
216:19 217:11,19
217:25 224:14
228:4 230:9
**today's**
87:16 110:19 179:15
230:25
**told**
46:10 71:1 92:16
108:7 133:7 165:20
166:19 167:21,23
172:1 211:23 215:9
223:16
**tolling**
198:8
**Tom**
194:2 200:6
**tool**
41:14
**top**
19:8 30:20 54:7
56:10 119:25 134:8
148:23,24 160:21
160:21 162:25
193:23 221:8,14,19
230:6
**topic**
77:20 87:6 106:21
160:4
**topics**
106:17,24
**Torcal**
116:25
**total**
209:13 225:15
226:25
**totaling**
209:11
**totality**
85:12
**Totally**
28:16
**totals**
226:24
**track**
227:16

**train**
173:18
**transactions**
107:24
**transcended**
69:7
**transcends**
69:1
**transcribed**
228:11 233:10
**transcript**
127:9,17 228:19
229:3,9 232:6
**transcription**
233:11
**transpired**
130:9
**treasurer**
180:22,25 181:7
182:4,14 183:5
184:7
**trial**
70:10 124:14,15
126:13,14,25
**tried**
51:10 186:1
**Trier-of-Fact**
129:14 155:18
169:23
**trivial**
143:3
**truckloads**
108:23 156:21
**true**
14:20 32:16 33:6
50:2,18 51:7 54:2
54:23 63:1 71:17
72:6,21 73:8,13,13
85:2 92:19 98:20
108:4,5 145:8,15,17
150:24 154:22
163:6,13 164:14
165:10 179:3,18,19
180:1 181:19
182:22 196:8 201:2
201:6,16,19 203:9

204:2,7,13 214:14
214:24 215:18
216:9 218:3 219:22
220:4,10,15,19
221:2,9 226:7,14
232:9
**trust**
102:23
**trusted**
158:2,5
**trustee**
148:11
**truthful**
104:6
**try**
48:11 52:7 66:16
73:22 80:7,11
146:17 167:22
**trying**
15:20 19:6 22:7
28:13 30:4,9 36:7
43:20 57:7 66:15
105:23 107:23
114:23 128:16
170:20,25 184:11
**Tuesday**
836380:18 2:18 6:1,6
**TUMF**
68:20 71:16 76:23,25
80:23 82:15 83:14
131:17,20,20 229:1
**turn**
62:9 68:5 114:11
119:23
**turned**
74:19
**two**
31:7,12 37:23 47:18
74:21 78:6 81:17
132:23 150:15
218:10 222:9
**two-year**
192:21
**tying**
144:4
**type**

20:12 24:5
**types**
161:21
**typical**
69:1,7

_____
**U**
_____
**UCL**
73:16
**UFI**
166:24 170:17 175:5
207:24 224:4
**ULC**
14:8,11,15,20,20,25
73:15 206:20
**ultimately**
13:1 24:23 25:3
33:14 35:23 37:4
54:12 64:15 65:13
66:2,5 77:15 87:24
88:14 90:23,23
97:21 99:3,5 112:19
128:20 158:4 163:5
163:8 164:16
167:13 169:23
178:20 201:5 208:6
**unaware**
76:22
**uncertain**
163:4
**uncover**
158:7
**uncovered**
61:21 117:16 118:3
121:7,8 187:19
188:8,18
**undergrad**
11:3
**underlying**
156:19
**undersigned**
233:2
**understand**
10:19,21 15:8 16:4
20:12,21 27:12
28:12 38:18 39:15



EXHIBIT 18
PAGE 1155

42:16 46:10 57:7
65:7 66:14 82:23
88:8 100:12 101:15
109:8,11 112:6
184:11 189:2 190:3
210:3,4,15 212:11
212:14 220:11
**understanding**
15:11,13 33:19 90:7
109:3 165:16
166:22 211:20,24
211:25 212:19
**understood**
9:24 10:1 143:24
**unilateral**
136:21
**Union**
836380:8 2:8 6:9 7:6
8:3 39:16 40:6
88:15 89:11 147:25
149:5,19 150:9
194:21 214:9
**United**
836380:1 2:1 6:10
8:4
**University**
11:4,5
**unknown**
163:4
**unlawful**
143:11 158:6
**unprofessional**
143:21
**unproven**
163:4
**unsecured**
63:7,16 94:11
**unusual**
21:12 23:5 67:8
172:5 206:7
**upcoming**
101:4
**updates**
218:1
**upper**
52:16

**Urban**
4:20 14:4,8 24:17,17
24:18 43:12 50:19
71:24 72:4,8,22
116:20,23 117:9
118:3,10,20 119:15
153:21,23 154:13
154:24 156:14
157:10 158:11
159:10,16 160:17
162:16,23 166:23
166:23,24 168:2
186:6 207:24
219:13 220:1
**use**
14:15 24:9,25 39:18
39:24 40:9,14 63:12
**usual**
172:11
**usually**
11:12
**utility**
140:10
**utter**
85:13

---

**V**

**V**
4:20
**vacation**
55:10 107:11
**vacations**
63:21
**Valley**
37:24,25 141:2,14
**various**
147:25 148:1 188:14
**vehicles**
38:4
**verbally**
108:8
**verbatim**
233:8
**verified**
37:3
**versus**

6:9 68:6
**vet**
170:21
**vetted**
167:10 178:12 224:3
**victim**
205:14,14 206:8
**video**
6:20 8:2 9:21 47:11
233:5
**videographed**
836380:15 2:15
**videographer**
3:18,19 6:5,23 7:12
47:13,17 74:20,24
103:6,9 110:7,12
111:3,6,23 112:1
146:4,8 154:3
191:16,19 216:20
216:23 230:13,18
230:21,24
**videos**
230:15
**view**
26:12 64:7 98:24
107:12 136:10
188:4
**viewed**
210:11
**views**
215:16
**violate**
28:1
**violated**
105:9 118:23 122:9
122:17 123:7,17
145:9,19 168:13,18
169:4,13 170:3
**violating**
101:23
**violation**
62:23 104:19 106:4
120:1 124:5,19
126:19 144:5 166:7
175:1
**virtual**

6:14
**void**
172:19
**volumes**
170:23
**voluminous**
172:12 215:12
**volunteered**
185:6
**Von**
3:6
**vs**
836380:7 2:7

---

**W**

**waded**
185:7
**waited**
222:6 223:3 225:2
**waiting**
226:1
**waive**
189:17,19 190:15,15
**waived**
185:13
**walked**
42:2 213:24
**want**
9:4,6,20,24 10:9,21
17:5,9,10,11 26:19
26:20,21 27:20,21
28:17 30:13 32:3
38:18 42:16 46:10
46:16 53:9 57:6,21
59:11 60:22 65:7
78:19 79:18 82:22
82:24 84:2,21 88:11
99:14,19 101:9,10
101:20 102:23,25
105:22 109:9,10
110:1 112:20 115:4
122:22 124:14
127:10 130:15
142:22 144:25
146:18 158:8,9
161:12 171:4



173:17 181:1
188:16 192:16
196:18 197:17
198:5 202:20 206:4
208:21 213:1 214:3
214:4 216:3,18
222:12 225:3 228:5
230:14,19 231:3,6
**wanted**
46:2 51:19 59:24
60:24 66:14 67:9
79:11,15 84:16 95:1
99:4 100:3,6 123:14
123:16,23 128:16
138:9 142:1 168:4
171:19 179:1 193:9
**wants**
106:12 185:12
**warrant**
121:17 201:14
**warranted**
51:12 185:17 202:16
**warrants**
12:1
**wasn't**
34:25 37:1,18 70:2
71:8 73:6 77:10,11
78:23 98:1 119:19
128:8 131:13 136:7
151:24,24 155:6
157:1,25,25 164:23
173:24,24,25 176:4
176:7 177:24 182:5
209:7 218:15
219:18,18 220:13
220:17 227:19
**wasting**
110:5
**watch**
35:5 36:2 77:21
**water**
145:1
**way**
3:15 9:12,22 18:21
28:1 32:22 33:25
36:25 40:23 41:11

53:5 55:5,13 58:20
63:19,24 64:3,6
66:25 67:8 99:12
102:1,9 107:15
108:15 113:13,17
119:7 120:8 127:17
133:13 134:5
135:14 137:14
140:8 144:17 161:7
185:4 189:25 191:2
191:3 202:2 205:12
205:21 206:6
210:11 212:8
220:19 223:10,15
**ways**
178:15 188:14
**Weber**
4:19 57:24 58:3
146:22 147:6,12
176:4
**week**
16:15 28:17 47:12
208:22,23 209:3
**weekend**
61:22
**went**
11:4,5 53:7 70:16
85:10 115:12
116:11 125:25
165:18 219:20
223:25 229:11
**weren't**
43:17,18 65:1 74:1
97:10 112:10
164:23
**Western**
836380:5 2:5 6:8
68:9,12,19 71:23
72:3 74:9 75:13
131:24 132:5 204:7
205:24
**we'll**
29:7 38:17 46:15
47:4 49:19 74:5,5
97:25 196:9 200:10
**we're**

9:17 29:25 35:3
46:25 47:14 57:17
59:14 62:1,1,2
101:22 102:20
111:13 130:8
134:10 142:9
157:22 165:23
182:20,20 222:6
228:12
**we've**
46:22 102:25 111:11
117:5 122:22 123:1
159:6 222:4 223:2
**Whatever's**
115:3
**whatsoever**
130:3 171:13
**WHEREOF**
233:15
**Wholesalers**
95:19
**wild**
145:2 173:25
**William**
56:13
**willing**
174:4
**win**
84:14 89:19
**window**
180:10
**wish**
26:14
**withhold**
136:6 171:13 179:1
**witness**
3:13 4:2 6:18 7:11,13
19:20 21:19 25:2,14
27:3,25 32:14 34:3
39:2 42:24 45:15,22
50:1 57:14 65:16
68:2 72:24 78:5,15
79:22 84:1 86:3,5
86:20 87:13 88:2,18
89:15 90:4,17 91:17
92:6 93:16 94:21

99:10,24 105:12
107:8 110:15 113:9
115:9 116:9 118:7
119:6 120:16
122:12 123:23
124:9,22 126:24,25
127:25 128:1,24
129:13,23 130:3,7
130:19 132:21
133:3,18 134:21
136:17 137:3 138:4
138:20 139:1,8
140:7 143:8 144:16
145:13,22 146:2
148:20 151:13
152:15 155:2 156:3
157:13,16 159:19
159:24 160:20
162:18,24 164:9,19
168:9,18,22 170:8
170:15 172:5,16
176:3,23 177:20
178:7 179:11,25
183:2,17,23 184:17
185:14 186:20
187:7,14,21 188:11
189:13,14 190:13
190:21 191:2,15
193:19 194:25
195:2,10,22 196:17
196:25 202:25
203:15 204:22
205:20 206:3,25
209:23 210:10,22
211:16 215:4
216:12 217:5,16
218:18 219:8,16
220:3,9 221:25
222:24 223:23
225:8 227:19 229:8
229:16,25 230:10
233:15
**witnesses**
125:15 186:6 228:23
233:6
**wondering**



42:19 43:21
**word**
8:23,23 31:22 36:6
  45:24 75:16 113:17
  119:6 153:6 211:7
  230:7
**worded**
113:17 119:7
**wording**
70:16 76:16
**words**
36:7 63:12 85:13
  228:12
**wore**
142:16
**work**
12:24 15:3 16:15
  20:17 25:4 34:16
  43:5 52:21 91:24
  96:4 102:1,9 110:17
  117:23 118:11
  121:6 147:11
  170:17 184:25
  185:4 186:7 188:12
  188:14,15 224:4,5
**worked**
15:14 16:2 34:15
  50:25 58:5 147:9,10
  159:4 177:8
**working**
14:25 18:5 19:1
  24:16 25:17,20 49:1
  76:4 178:12 179:12
**works**
42:8 43:10 102:14
  153:20 158:18
**world**
54:16
**worries**
209:7
**wouldn't**
34:16 35:13,20 46:10
  61:13,14 64:1,10
  73:14,15 104:8
  133:10 136:4,5
  138:10 142:5

143:12 172:25
  205:6,9,13 207:2
  215:21 217:7 218:9
**WRCOB**
132:15
**WRCOG**
4:20 7:9 68:6,9 83:14
  84:5 90:20 131:22
  205:14 216:15
**writ**
80:2,3 90:6,8,9,20,21
  91:5 92:9 228:8
**write**
24:7 63:6 69:17
  95:25 96:15 119:25
  122:8 152:24 154:6
  154:11 177:9
**writes**
17:12 74:9 149:8
  150:3
**written**
39:13 59:1 66:21
  69:10 93:24 99:10
  100:11 135:12,13
  197:11 228:20
**wrong**
197:9
**wrongdoing**
36:20 71:15 126:5
  130:3 162:7 169:1
**wrote**
17:25 58:2 66:6
  68:18,23 69:16 80:9
  92:8 98:9 99:8
  104:17 117:6 181:6
  197:19 228:22

---

**Y**

**yadda**
83:16,16
**yeah**
39:11 45:22 59:21
  63:5,18 66:14 78:5
  84:1 87:13 88:10
  93:16 95:11 100:12
  101:20 102:22

109:8 112:24 113:9
  114:17 117:18
  118:17 123:21
  124:22 137:8 144:2
  146:3 147:5,19
  159:19 181:18
  189:22 192:9 194:3
  202:18 205:21
  206:3 225:16
**years**
8:12 36:11 39:12
  41:18 48:3 123:2
  206:11 222:7
  223:17 225:5,20
  226:10,17
**year-long**
82:12
**Yocca**
49:1 87:14,14
**Young**
11:3,5

---

**Z**

**zero**
107:23 171:14
**zero-interest**
106:22 107:4 108:1
**zoom**
3:1 9:17 10:7,8 55:23
  95:12,12 220:25

---

**$**

**$10**
179:5,20
**$113,773**
56:14
**$15**
78:2,13 79:20 179:5
  179:23 182:19
  193:2,14
**$159**
209:11 226:25
**$159,000**
209:13
**$159,732,461**
225:15

**$2**
207:20
**$20,000**
53:18
**$3**
203:13
**$42**
83:2
**$42-some-odd**
83:11
**$45,000**
56:15
**$5**
179:8
**$60**
132:8

---

**1**

**1**
836380:10 2:10 3:11
  4:9 16:11,12,20
  56:10 57:23 58:2,8
  58:14 60:2 63:1,15
  64:17 66:17 67:16
  67:18,20 68:22 69:8
  71:6 75:22 76:2,3
  76:22,24 85:1 86:25
  87:4,22 88:13,16,19
  90:19,23 91:3,11
  92:4,7,19,25 93:11
  93:13 94:5 95:7
  96:7,11 97:1 98:14
  98:20 99:19 103:13
  108:17 109:12,14
  109:18 111:10
  112:7,9,14,22 113:6
  113:15 115:5 116:1
  116:7,20 117:2,5,16
  118:2 119:3 120:21
  121:8,19 123:5
  124:20 126:20
  127:20 128:12
  129:2,5,20 130:8
  133:4,8,15,23,25
  134:8 135:5 137:15
  137:24 138:23



139:15 141:24
145:16,17 146:21
147:7,15 148:16
149:18 150:8,24
152:6 154:10,22
155:23 156:10
158:10,15 159:10
159:15 163:1
164:19 168:14
169:12 170:4
194:16 195:19
196:15,24 226:15
227:12,17 229:8
**1st**
170:9
**1.1**
112:9
**1.5**
112:10
**1:35**
103:6
**1:45**
103:11
**1:55**
111:3
**10**
4:19 47:3,4 57:17,19
57:22,23 82:14,16
84:2 91:16 117:6
175:15
**10-15-18**
5:8
**10-2018**
5:11
**10.3**
96:23
**100**
9:3
**1000**
3:6
**103**
4:23
**1090**
120:1 145:9,19 166:7
169:5,15 175:1
**11**

4:20 5:21 53:11,11
71:19,20,22 172:2
**11-3-16**
4:21
**11.1**
62:19
**11.2**
62:20
**11:00**
2:17 6:2,6
**111**
5:4
**12**
4:21 53:21 81:19,21
81:24 90:13
**12-18-17**
5:10
**12:03**
47:14
**12:15**
47:7
**12:17**
47:19
**12:56**
74:21
**12:58**
75:1
**13**
4:22 103:20,23 104:2
150:13
**14**
5:4 19:2 95:8 111:14
111:16,17 112:4
**146**
5:5
**15**
5:5 23:14,19 95:14
108:13 132:19
146:12,15 154:6,9
173:20 179:4
197:11,14 200:11
228:17
**15th**
197:5
**15-page**
214:9

**16**
4:9 5:6 62:9,10 95:8
180:15,16,18
200:20,21,21 214:5
**16.0-009**
228:13
**17**
5:7 52:15 132:19
179:4 191:23 192:2
**18**
5:8 197:5,6,10 200:3
203:23
**18th**
169:8
**180**
5:6
**1800**
3:15
**18101**
3:6
**188**
5:20
**189**
5:21
**19**
5:9 11:8 16:24
199:22,24,25
**192**
5:7
**197**
5:8
**1992**
11:8

——————
**2**
——————
**2**
4:10 23:8,9,12 56:10
104:17 134:8
137:16 156:10
181:6 191:23
**2-26-16**
4:13
**2.12.060(a)**
153:1,16
**2:15**
47:5

**20**
5:10 165:22 178:5
203:17,19,20,22
204:14 206:10
214:3
**200**
5:9
**2000**
149:13
**2003**
131:18
**2005**
156:10
**2006**
149:8 150:23
**2009**
131:18
**2010**
11:17 56:12
**2011**
53:23
**20118**
197:14
**2013**
53:24 56:12
**2014**
19:1 62:22 78:21,22
184:24
**2014-15**
18:10
**2014-2015**
18:23 195:18 196:13
196:22
**2015**
11:23,23 13:3 15:9
15:14,22 17:13,21
18:2 19:2 30:19
31:3 32:3,11 33:7,7
33:17 35:25 40:18
41:23 42:22 44:13
44:17 45:7 46:17
54:25 57:23 58:2,8
58:12,15 60:2 63:1
64:17 65:13,25
66:17,20 67:19,20
69:9 75:22 76:1,3



EXHIBIT 18
PAGE 1159

76:22,24 83:4,23,24
84:6,10 85:3,5 86:9
86:10,21 88:16,19
90:5,19,25 91:3,11
92:4,7,11,19,25
93:11,14 94:5,17
98:14 99:20 103:20
104:4 105:7 107:4
108:3 112:14
113:15 116:1
117:17 118:2 119:4
120:21 121:8
124:20 126:20
127:20 130:8 133:4
133:8,24,25 135:6
141:24 145:17
146:21 147:7
148:16 149:18
150:24 151:19
152:6 154:10,23
155:23 158:10,15
159:10,15 160:22
162:14,21 163:1,24
164:1,15,19 168:14
169:12 170:4 171:1
172:12 177:23
178:4,5 180:20
181:19 184:24
187:10,15,18 188:9
188:18 189:8
190:11,18,24
191:24 193:1
194:16 195:19
196:15,24 200:20
219:19 224:23
227:12 229:4,8
**2015-2017**
45:13,20 78:2 86:12
86:17 87:9 90:2,15
91:12 92:4 133:1,16
**2016**
23:14,19 24:14 28:16
39:6 40:3 48:21,22
48:24 49:11,14,23
50:21 51:16 52:15
52:20 54:2 79:13

81:7,25 87:11,25
91:4,8 144:23 167:3
167:6 171:9 178:1
185:15 197:20
198:11,14,20 199:1
199:13,16 200:3,11
200:16,17 201:6,17
202:13,15,23 209:9
209:23 211:21
213:3,5,5 219:11,24
223:12,23 225:10
225:14,15 226:18
226:21,22 227:2,13
227:14
**2017**
45:8 193:1 203:23
**2018**
16:21,24 17:7 197:11
204:19 218:16,19
219:5,12,24
**2019**
214:8,24 215:19,23
216:10 220:18
221:3,11 223:12,17
224:14 225:20
226:9,16
**2020**
145:16
**2022**
836380:18 2:18 6:1,6
28:16 233:18
**203**
5:10
**204**
5:11
**21**
5:11 58:12 103:20
104:4 105:6 107:4
108:3 147:23 148:7
148:20 173:20
204:14,14,15
**21-003**
150:13
**21-0062**
156:9 158:17
**21-01**

149:3
**21-02**
149:2,23
**21.01**
149:4
**22**
68:5
**23**
4:10 71:5
**24**
5:20 59:2 93:24
**25**
219:12,24
**26**
39:6
**263-2600**
3:7
**28**
30:19 31:3 32:3,11
33:6

─────────
**3**
─────────
**3**
49:11 81:25 91:4
141:1 152:23 153:4
154:11 169:3 181:5
197:17,19 209:9
225:10 226:22
227:2,14
**3rd**
186:11
**3-15-16**
4:10
**3-19-18**
4:9
**3.4**
112:7
**3:19**
111:7
**3:21**
111:23
**3:24**
112:1
**30**
4:12 15:22 17:13,21
18:2 44:13,17 45:7

45:8 46:17 48:24
76:1 86:10,21 88:25
125:2 187:17 188:9
188:18 189:7
190:11,18,24 193:1
193:1 213:5,5
226:20
**30th**
15:9,14 33:7 186:9
187:15 191:8
209:23
**31**
836380:18 2:18 6:1,6
**312**
3:12
**322-2275**
3:16
**36518**
181:8
**39**
4:13

─────────
**4**
─────────
**4**
4:11 30:14,15,17
214:8,24 215:19,23
**4-18-16**
5:9
**4-28-15**
4:11
**4-5-16**
4:15
**4:09**
146:5
**4:15**
146:10
**4:36**
154:3
**45**
4:14 74:7,11 75:5,10
**4529.12**
118:24
**47(A)**
161:16 172:24
**49**
4:15



EXHIBIT 18
PAGE 1160

**5**

**5**
4:13 17:13 38:24,25
39:4 48:21,22 49:22
51:16 79:13 137:21
167:6 185:15
202:15 226:18
227:13 233:18
**5th**
186:8
**5-21-15**
4:22
**5-8-15**
5:6
**5:20-cv-02164**
836380:7 2:7
**5:20-cv-02164-GW**
6:12
**5:29**
191:16
**5:39**
191:21
**50**
836380:10 2:10
**52**
4:17
**54957(B)**
32:6
**55**
4:18
**57**
4:19
**595**
146:19,20

**6**

**6**
4:4,14 44:25 45:1,4,5
45:13,20 146:25
**6-1-15**
4:19 5:4
**6-2-15**
5:7
**6:17**
216:20

**6:25**
216:23
**6:45**
2:17 6:2 231:2,8
**60606**
3:11

**7**

**7**
4:15 49:20,24 50:2
50:24 119:23,25
**700**
38:9,9 62:22
**71**
4:20
**760**
3:16

**8**

**8**
4:16 52:4,6,8,11
180:20
**800**
3:11
**81**
4:21

**9**

**9**
4:18 55:20,21,23
149:8
**92**
11:8
**92262**
3:16
**92612**
3:6
**9266**
836380:25 2:19
233:23
**93-1**
149:12
**949**
3:7
**980-6779**
3:12



EXHIBIT 18
PAGE 1161