# EXHIBIT 19

**EXHIBIT 19**
**PAGE 1162**

Page 1

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

WESTERN RIVERSIDE COUNCIL OF ) Case No.:
GOVERNMENTS, a California    ) 5:20-cv-02164 GW (KKx)
Joint Powers Authority; CITY )
OF BEAUMONT, a public entity )
in the State of California,  )
                             )
            Plaintiffs,      )
                             )
     vs.                     )
                             )
NATIONAL UNION FIRE          )
INSURANCE COMPANY OF         )
PITTSBURGH, PA and DOES 1    )
through 50, inclusive,       )
                             )
            Defendants.      )
_____ )

VIRTUAL REMOTE DEPOSITION OF

ELIZABETH GIBBS-URTIAGA

Monday, May 23, 2022; 9:10 a.m.

Beaumont, California

Magna Legal Services

866-624-6221   www.MagnaLS.com

Reported by Mimi Murray, CSR No. 13985



EXHIBIT 19
PAGE 1163

Page 2

```
 1              UNITED STATES DISTRICT COURT
 2         FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3                    EASTERN DIVISION
 4
 5   WESTERN RIVERSIDE COUNCIL OF )  Case No.:
     GOVERNMENTS, a California     )  5:20-cv-02164 GW (KKx)
 6   Joint Powers Authority; CITY  )
     OF BEAUMONT, a public entity  )
 7   in the State of California,   )
 8        Plaintiffs,              )
                                   )
 9   vs.                          )
                                   )
10   NATIONAL UNION FIRE          )
     INSURANCE COMPANY OF          )
11   PITTSBURGH, PA and DOES 1     )
     through 50, inclusive,        )
12                                 )
          Defendants.              )
13   _____ )
14
15
16
17
18
19        VIDEOTAPED VIRTUAL REMOTE DEPOSITION OF
20   ELIZABETH GIBBS-URTIAGA, taken on behalf of Defendant,
21   at Beaumont, California, commencing at 9:10 a.m., on
22   Monday, May 23, 2022, before Mimi Murray, a Certified
23   Shorthand Reporter, CSR No. 13985, with principal office
24   in the County of Los Angeles, within and for the State
25   of California.
```

Page 3

```
 1   A P P E A R A N C E S:
 2   ON BEHALF OF DEFENDANT NATIONAL UNION FIRE INSURANCE
     COMPANY OF PITTSBURGH, PA:
 3
          GORDON REES SCULLY MANSUKHANI, LLP
 4        BY:  MEAGAN P. VANDERWEELE, ESQ.
               HANNA E. MONSON, ESQ.
 5        5 PARK PLAZA
          SUITE 1100
 6        IRVINE, CALIFORNIA 92614
          312-980-6779
 7        MVANDERWEELE@GRSM.COM
          (VIA VIDEOCONFERENCE)
 8
 9   ON BEHALF OF PLAINTIFF WESTERN RIVERSIDE COUNCIL
     OF GOVERNMENTS:
10
          BEST BEST & KRIEGER LLP
11        BY:  JEFFREY DUNN, ESQ.
          18101 VON KARMAN AVENUE
12        SUITE 1000
          IRVINE, CALIFORNIA 92612
13        949-263-2600  949-260-0972 FAX
          JVDUNN@BBKLAW.COM
14        (VIA VIDEOCONFERENCE)
15
16   ON BEHALF OF DEPONENT ELIZABETH GIBBS-URTIAGA:
17        SLOVAK BARON EMPEY MURPHY & PINKNEY
          BY:  PETER J. NOLAN, ESQ.
18        1800 EAST TAHQUITZ CANYON WAY
          PALM SPRINGS, CALIFORNIA  92262
19        760-322-2275  760-322-2107 FAX
          NOLAN@SBEMP.COM
20        (VIA VIDEOCONFERENCE)
21
22   THE VIDEOGRAPHER:
          JEREMIAH JUAREZ
23
24
25
```

Page 4

```
 1              INDEX OF EXAMINATION
 2
 3   WITNESS:
     ELIZABETH GIBBS-URTIAGA
 4
 5
 6   EXAMINATION:                  PAGE
     BY MS. VANDERWEELE              9
 7
 8
 9
10        INFORMATION REQUESTED
11             NONE
12
13
14     INSTRUCTION NOT TO ANSWER
15
          PAGE   LINE
16
           19     3
17         19     24
          115     12
18        165     16
          166     9
19
20
          INDEXED QUESTIONS
21
             NONE
22
23
24
25
```

Page 5

```
 1              INDEX OF EXHIBITS
 2
 3   DESCRIPTION                    PAGE
 4   EXHIBIT 1   Interim City Manager Employment   41
                 Agreement, 4/11/22
 5
     EXHIBIT 2   Acting City Manager Employment    42
 6               Agreement, 8/4/15
 7   EXHIBIT 3   Portion of Beaumont, California,   50
                 Code of Ordinances, Bates
 8               3240-3255
 9   EXHIBIT 4   E-mail, 1/28/15, Bates            69
                 49174-49176
10
     EXHIBIT 5   E-mail, 4/2/15, Bates 49135       82
11
     EXHIBIT 6   E-mail, 5/8/15, Bates             84
12               49136-49144
13   EXHIBIT 7   Document, 7 pages,                99
                 BEAUMONTAIG0407453-0407460
14
     EXHIBIT 8   E-mails, Bates 0073870-73873     101
15
     EXHIBIT 9   BeaumontGate.org Website,        148
16               LOC5-001262-1281
17   EXHIBIT 10  Notice of Potential Discipline   164
                 and/or Dismissal/Removal,
18               5/21/15, Bates NUFIC7918-7921
19   EXHIBIT 11  City Council Meeting Minutes,    174
                 6/2/15
20
     EXHIBIT 12  Master Crime Program 2015/2017   182
21               Proposal to the City of Beaumont
                 from National Union Fire
22               Insurance Company, Bates
                 ERMAC_992-995
23
     EXHIBIT 13  Insurance Policy No.             183
24               01-425-57-41
25
```



EXHIBIT 19
PAGE 1164

Page 6

1   EXHIBIT 14   Document, 8/26/15, Bates        178
            BEAUMONTAIG0250996-251096
2
    EXHIBIT 15   E-mail, 9/18/15, Bates        187
3           BEAUMONTAIG0416851
4   EXHIBIT 16   E-mail, Bates ERMAC002168-2206    194
5   EXHIBIT 17   Letter, 11/3/16            197
6   EXHIBIT 21   Amended Notice of Deposition     27
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1        MONDAY, MAY 23, 2022; 9:10 A.M.
2            BEAUMONT, CALIFORNIA
3
4        THE VIDEOGRAPHER:  Good morning.  We are on
5   the record at 9:10 a.m. on Monday, May 23rd, 2022.
6        This begins Media No. 1 in the deposition of
7   Elizabeth Gibbs-Urtiaga in the matter of Western
8   Riverside Council of Governments, et al., versus
9   National Union Fire Insurance Company of Pittsburgh,
10  Pennsylvania, in the United States District Court
11  for the Central District of California, Eastern
12  Division, Case No. 5:20-cv-02164 GW.
13       This deposition is being taken remotely,
14  using virtual technology, at the request of Gordon
15  and Rees Scully Mansukhani, LLP.
16       Please note that the quality of the
17  recording depends on the quality of camera and
18  Internet connection of participants.  What is seen
19  from the witness and heard on screen is what will be
20  recorded.  Audio and video recording will continue
21  to take place unless all parties agree to go off the
22  record.
23       The court reporter is Mimi Murray of Magna
24  Legal Services.  I am the videographer, Jeremiah
25  Juarez, of Magna Legal Services.  I am not related

Page 8

1   to any party in this case, nor am I financially
2   interested in the outcome.
3        Will counsel and all parties present state
4   their appearances and whom they represent, beginning
5   with the noticing attorney.
6        MS. VANDERWEELE:  Meagan VanderWeele on
7   behalf of the defendant National Union Fire
8   Insurance Company of Pittsburgh, PA.
9        MS. MONSON:  Hanna Monson on behalf of the
10  defendant National Union Fire Insurance Company of
11  Pittsburgh, PA.
12       THE WITNESS:  Elizabeth Gibbs, City of
13  Beaumont.
14       MR. NOLAN:  Peter Nolan.  I'm appearing on
15  behalf of -- specially for WRCOG, plaintiff in this,
16  and I'm also appearing on behalf of the City of
17  Beaumont for Ms. Gibbs.
18       THE VIDEOGRAPHER:  Will the court reporter
19  please swear in the witness, and then counsel may
20  proceed.
21
22       ELIZABETH GIBBS-URTIAGA,
23  having first declared under penalty of perjury to
24  tell the truth, was examined and testified as
25  follows:

Page 9

1            EXAMINATION
2   BY MS. VANDERWEELE:
3        Q.  Good morning, Ms. Gibbs.  My name is
4   Meagan VanderWeele.
5        Before we get started, I do just want to make
6   a couple statements on the record.
7        Before the deposition started, I learned that
8   the attorneys of record for Western Riverside Council
9   of Governments and the City of Beaumont would not be
10  attending, at least the beginning portion of this
11  deposition.
12       And as I understand it -- stand it,
13  Mr. Nolan is here appearing on behalf of you,
14  Ms. Gibbs; correct?
15       A.  Correct.
16       Q.  And it's also my understanding that the
17  lawyers of record for the City and WRCOG have
18  consented to starting this deposition without the
19  attorneys of record for the plaintiffs being present.
20  And based on that understanding, I'm ready to
21  proceed, pursuant to the notice that's been issued.
22       And, Ms. Gibbs, are you ready to proceed with
23  that understanding as well?
24       A.  I am.
25       Q.  Could you please state your full name for the

3  (Pages 6 to 9)



EXHIBIT 19
PAGE 1165

Page 10

1  record?
2      A.  Elizabeth Marie Gibbs.
3      Q.  And what is your date of birth?
4      A.  December 3rd, 1967.
5      Q.  Have you ever given a deposition before?
6      A.  Yes.
7      Q.  How many times?
8      A.  Two.
9      Q.  And do you -- when was the first time that
10  you gave a deposition?
11     A.  Roughly, 2018.
12     Q.  And I apologize.  Were you done with your
13  answer?
14     A.  Yes.
15     Q.  And in what context did you give a deposition
16  in approximately 2018?
17     A.  I was subpoenaed in a case between a former
18  employee and CalPERS.
19     Q.  And was that a lawsuit involving James Gregg?
20     A.  Yes.
21     Q.  And you gave a deposition in that lawsuit?
22     A.  Yes.
23     Q.  Did you testify at trial in that lawsuit?
24     A.  No.
25     Q.  You had mentioned a second deposition.  When

Page 11

1  is the second time that you've given a deposition?
2      A.  Around 2021.
3      Q.  And what was the context of that second
4  deposition?
5      A.  It was the same case.
6      Q.  So you've given two depositions in a lawsuit
7  involving Mr. Gregg?
8      A.  Yes.
9      Q.  And were you represented by counsel for those
10  depositions?
11     A.  Yes.
12     Q.  Who represented you in the first deposition?
13     A.  S-b-e-m-p.
14     Q.  And what does that acronym stand for?
15     A.  Slovak Baron Empey Murphy & Pinkney.
16     Q.  That law firm is -- or strike that.
17         Mr. Pinkney is the City Attorney for
18  Beaumont; correct?
19     A.  Yes.
20     Q.  Did Mr. Pinkney represent you in the second
21  deposition?
22     A.  Yes -- no.  Mr. Pinkney did not, his firm
23  did.
24     Q.  Just want to go over a few things before we
25  get underway here at this deposition.  I know you've

Page 12

1  been deposed twice before, but I'll just go over a
2  few things that will hopefully make the deposition go
3  a little bit more smoothly, and we'll get you out of
4  here a little bit sooner.
5          Mimi is our court reporter today.  She's
6  taking down everything that we say, and so it's
7  important that we do our best not to speak over each
8  other.
9          In the beginning, especially when I'm asking
10  you really easy questions about your background,
11  you'll probably anticipate where I'm going and want
12  to jump in and give me the answer.  But if you could
13  just let me finish asking my full answer -- or my
14  full question before you answer, that will make the
15  court reporter's job a lot easier; okay?
16     A.  Okay.
17     Q.  And I certainly will do my best, though, to
18  not interrupt you.  I want to make sure that you're
19  able to give your full answer.
20         If at any time I accidently cut you off or
21  you're not done completing your answer and there's
22  more that you would like to say, would you please let
23  me know?
24     A.  Yes.
25     Q.  If at any time I ask you a question that you

Page 13

1  don't understand, would you please let me know?
2      A.  Yes.
3      Q.  If you need me to repeat or rephrase a
4  question, please let me know; okay?
5      A.  Okay.
6      Q.  If you answer one of my questions, it will be
7  presumed that you understood what was being asked; is
8  that fair?
9      A.  Yes.
10     Q.  If you don't know an answer or don't recall
11  something that I ask you about, please let me know.
12  I don't want you to guess or speculate; okay?
13     A.  Okay.
14     Q.  We will take breaks throughout the
15  deposition.  If at any time you would like a break
16  and I have not asked you if you'd like one, please
17  let me know.  We can take as many breaks as you would
18  like.  You don't need to let me know a reason.  You
19  just let me know you want to take a break and I'm
20  happy to do that, so long as we're not in the middle
21  of a question and an answer; okay?
22     A.  Okay.
23     Q.  I'm going to be showing documents as exhibits
24  to the deposition.  I understand you don't have a
25  hard copy in front of you.  Please take your time



EXHIBIT 19
PAGE 1166

Page 14

```
 1    reviewing any documents.  And if you need me to zoom
 2    in or go to a different page, please let me know;
 3    okay?
 4        A.  Okay.
 5        Q.  And so you are being represented by counsel
 6    today; correct?
 7        A.  Yes.
 8        Q.  And who is representing you today?
 9        A.  Peter Nolan.
10        Q.  And Mr. Nolan is from the SBEMP law firm?
11        A.  S-b-e-m-p.
12        Q.  And that law firm is the law firm that
13    Mr. Pinkney is employed by; correct?
14        A.  Yes.
15        Q.  And Mr. Pinkney is the City Attorney for
16    Beaumont; correct?
17        A.  Yes.
18        Q.  You and I have spoken before today; correct?
19        A.  Yes.
20        Q.  You were initially subpoenaed, I believe it
21    was, in March of 2022, to give testimony in this
22    lawsuit; do you recall that?
23        A.  I do.
24        Q.  And you and I spoke on the phone and
25    exchanged e-mails about scheduling that deposition;
```

Page 15

```
 1    do you recall that?
 2        A.  Yes.
 3        Q.  And your deposition -- or strike that.
 4            At the time that we scheduled your
 5    deposition, you were not employed by Beaumont; is
 6    that correct?
 7        A.  Correct.
 8        Q.  You are now currently employed by the City of
 9    Beaumont; correct?
10        A.  Yes.
11        Q.  When did you begin your current employment
12    with Beaumont?
13        A.  April 11, 2022.
14        Q.  And when did you inform the City that you had
15    been subpoenaed in this lawsuit?
16        A.  After I was employed.
17        Q.  What date did you inform the City of the
18    subpoena?
19        A.  April 11th.
20        Q.  And who did you inform in the City that you
21    had been subpoenaed?
22        A.  Tom Pinkney, the City Attorney.
23        Q.  Your deposition was originally scheduled to
24    proceed on April 21, 2022; correct?
25        A.  Correct.
```

Page 16

```
 1        Q.  It did not proceed on that day; correct?
 2        A.  Correct.
 3        Q.  And why not?
 4        A.  I don't remember.
 5        Q.  Have you ever -- or strike that.
 6            Prior to April 21, 2022, did you ever speak
 7    to any of the lawyers from the Best Best and Krieger
 8    law firm?
 9        A.  Can you repeat that?
10        Q.  Sure.
11            And I guess I should preface this.
12            I do not want to know the substance of any
13    conversations that you've had with any of the City's
14    lawyers.  That's privileged; okay?
15            And so if I ever ask you a question that
16    would require you to divulge information or the
17    substance of conversations with the City's lawyers, I
18    don't -- just say, Hey, that's something I learned
19    from the attorneys.
20            And I certainly do not intend to elicit any
21    privileged communications or information.
22            But I do want to know:  When is the first
23    time that you spoke from any lawyer from the Best
24    Best and Krieger law firm?
25        A.  The first time I ever spoke to Best Best and
```

Page 17

```
 1    Krieger was back in 2015.  Not about this case.
 2        Q.  Okay.  In 2015, who did you speak to from the
 3    Best Best and Krieger law firm?
 4            MR. NOLAN:  Object as to any relevance at
 5    this time as to communications she may have had with
 6    BB&K unrelated to this case.
 7    BY MS. VANDERWEELE:
 8        Q.  Okay.  I still need an answer to the
 9    question.
10        A.  It was Steve DeBaun.
11        Q.  And in 2015, Steve DeBaun was not
12    representing the City of Beaumont; correct?
13        A.  Correct.
14        Q.  Steve DeBaun represented Western Riverside
15    Council of Governments; correct?
16        A.  Correct.
17        Q.  And what did you and Mr. DeBaun talk about in
18    2015?
19            MR. NOLAN:  Objection.  Privileged.
20            MS. VANDERWEELE:  Well, the witness just
21    testified that Mr. DeBaun was not representing the
22    City, so there's no privilege.
23            MR. NOLAN:  She may not be aware of all of
24    the agreements between counsels as to who was
25    serving as co-counsels on various cases.
```



EXHIBIT 19
PAGE 1167

Page 18

1    So we do have agreements with BB&K to assist
2  on various cases.  So lack of foundation as to
3  whether it's privileged or not.
4    MS. VANDERWEELE:  Can I -- Mimi, can you
5  repeat my -- repeat the question that I asked?
6    (The record was read by the court reporter.)
7  BY MS. VANDERWEELE:
8    Q.  Let me -- let me back up and see if I can --
9  can get there a different way.
10    And it's Steve -- is it DeBaun,
11  D-e-b-a-u-n-n?
12    A.  I -- I'm not sure how to spell his last
13  name.
14    Q.  When you and Mr. DeBaun spoke in 2015, you
15  told me earlier that he represented WRCOG at that
16  time?
17    A.  Yes.
18    Q.  And in 2015, do you recall the month?
19    A.  No.
20    Q.  Were you serving as the City Manager for
21  Beaumont at the time that you spoke with Mr. DeBaun?
22    A.  I was the Interim City Manager.
23    Q.  And what did you and Mr. DeBaun discuss when
24  you spoke with him in 2015?
25    MR. NOLAN:  Same objection.  It's

Page 19

1  privileged.  And I'll instruct the witness not to
2  answer.
3    (Instruction not to answer.)
4    MS. VANDERWEELE:  So you're instructing the
5  witness, as the witness' lawyer, not to answer my
6  question?
7    MR. NOLAN:  And as counsel for plaintiffs in
8  this case.
9    MS. VANDERWEELE:  You don't have an
10  appearance on record, so any evidentiary objection
11  on behalf of the plaintiffs is not valid.
12    MR. NOLAN:  We're asserting attorney-client
13  privilege.  She's already testified that she had a
14  conversation about another matter, not this matter,
15  and those communications are privileged.
16    MS. VANDERWEELE:  But Mr. DeBaun was not
17  working -- was not representing the City in 2015.
18  There had never been an assignment or a settlement
19  agreement in 2015, so there could not possibly be
20  any privilege.
21    MR. NOLAN:  We are asserting privilege.  And
22  I'm instructing the client not to answer that
23  question.
24    (Instruction not to answer.)
25

Page 20

1  BY MS. VANDERWEELE:
2    Q.  All right.  Ms. Gibbs, Mr. Nolan has
3  instructed you not answer my question about the
4  substance of your discussion with WRCOG's lawyer in
5  2015.
6    Are you going to follow your attorney's
7  advice and refuse to answer my question?
8    A.  Yes.
9    Q.  When is the first time that you spoke with a
10  lawyer from Best Best and Krieger regarding the
11  lawsuits between WRCOG, the City, and my client,
12  National Union?
13    A.  Can you repeat that?
14    Q.  Sure.
15    Do you understand that you're here to testify
16  in a lawsuit that's been filed by WRCOG and the City
17  of Beaumont against my client, National Union Fire
18  Insurance Company?
19    A.  Yes.
20    Q.  And do you understand that the lawyers from
21  the law firm Best Best and Krieger are the lawyers
22  representing the City and WRCOG in this lawsuit?
23    A.  Yes.
24    Q.  And when is the first time that you spoke
25  with anyone from the Best Best and Krieger law firm

Page 21

1  regarding this lawsuit?
2    A.  Around the week of April 18th.
3    Q.  Now, your earlier communications with the
4  Best Best and Krieger law firm -- I think you told me
5  that those conversations took place in 2015?
6    A.  Say that again.
7    Q.  Sure.
8    You told me earlier that you recall speaking
9  with Steve DeBaun from the Best Best and Krieger law
10  firm in 2015; is that correct?
11    A.  Correct.
12    Q.  How many times did you speak with Mr. DeBaun?
13    A.  Just one time.
14    Q.  And was that a conversation in person or over
15  the telephone?
16    A.  In person.
17    Q.  Where did that conversation take place?
18    A.  His office.
19    Q.  Who else was present for that conversation?
20    A.  I don't recall, other than Mr. Pinkney was
21  with me.
22    Q.  And Mr. Pinkney was the City's lawyer at that
23  time?
24    A.  Yes.
25    Q.  And Mr. DeBaun represented Western Riverside

6  (Pages 18 to 21)



EXHIBIT 19
PAGE 1168

Page 22

```
1    Council of Governments at that time?
2       A.  Yes.
3       Q.  And were you present as the Interim City
4    Manager for Beaumont?
5       A.  Yes.
6       Q.  At the time that you had this conversation
7    with Mr. DeBaun in 2015, had a settlement agreement
8    been reached between Western Riverside Council of
9    Governments and the City of Beaumont?
10      A.  No.
11      Q.  Had any assignment been entered into between
12   Western Riverside Council of Governments and the City
13   of Beaumont at the time that you participated in this
14   conversation with Mr. DeBaun in 2015?
15      A.  I don't know.
16      Q.  But you do know that there was no settlement
17   agreement reached at the time that you participated
18   in a discussion with Mr. DeBaun in 2015; true?
19      A.  True.
20      Q.  And then the next time that you had any
21   contact from any lawyer from Best Best and Krieger
22   would have been some time the week of April 18, 2022,
23   in relation to this lawsuit; is that correct?
24      A.  Correct.
25      Q.  When is the first time that you learned that
```

Page 23

```
1    the City and Western Riverside Council of Governments
2    had filed a lawsuit against National Union Fire
3    Insurance Company?
4       A.  April 12th of this year.
5       Q.  You had been served with a subpoena prior to
6    that; correct?
7       A.  Correct.  Actually, that -- you're right,
8    that's when I found out.
9       Q.  Am I correct, then, that the first time you
10   learned of a lawsuit that had been filed by the City
11   and Western Riverside against National Union would
12   have been when you were served with a subpoena that
13   was issued by my law firm?
14      A.  No, that's not correct.  It was actually
15   your phone call to me, your voicemail to me.
16      Q.  And the voicemail, do you recall when it was
17   that I had called you?
18      A.  No.  I'd have to look in my phone.
19      Q.  The first time that you and I spoke, you were
20   not employed by the City; correct?
21      A.  Correct.
22      Q.  After you were employed by the City in April
23   of 2022, you and I have not spoken since today, for
24   this deposition; correct?
25      A.  Correct.
```

Page 24

```
1       Q.  And during our discussions leading up to the
2    initial date of your deposition, at any time did you
3    ever tell me that you were employed by the City?
4       A.  No.
5       Q.  Because you weren't employed; right?
6       A.  Say that again.
7       Q.  Every time that we spoke leading up to the
8    initial date for your deposition, at that time you
9    had not been employed by the City; correct?
10      A.  Correct.
11      Q.  Did you meet with any attorneys to prepare
12   for your deposition today?
13      A.  Yes.
14      Q.  Who did you meet with?
15      A.  The City Attorney, Peter Nolan, and
16   attorneys from BB&K.
17      Q.  And when you say "City Attorney," you're
18   referring to John Pinkney?
19      A.  No.  Peter Nolan.
20      Q.  So to prepare for the deposition, you met
21   with Mr. Nolan; correct?
22      A.  Correct.
23      Q.  And then you had also mentioned meeting with
24   lawyers from the Best Best and Krieger law firm?
25      A.  Yes.
```

Page 25

```
1       Q.  And which lawyers did you meet with from the
2    BBK firm?
3       A.  Chris Deal and Jeff Dunn.  And there was one
4    other gentleman, but I don't remember his name.
5       Q.  And when did you meet with the lawyers to
6    prepare for your deposition today?
7       A.  We scheduled some meetings.  I recall they
8    were on Thursdays, two or three different times.
9    But I don't have those dates without looking at my
10   calendar.
11      Q.  Other than the -- other than Mr. Nolan and
12   the lawyers from the BBK law firm, have you spoken
13   with anyone else to prepare for your deposition
14   today?
15      A.  No.
16      Q.  Have you reviewed any documents to prepare
17   for this deposition?
18      A.  Yes.
19      Q.  Were those documents -- or strike that.
20      What documents did you review to prepare for
21   this deposition?
22      A.  Court -- court documents that had been
23   submitted between the two parties, some agreements
24   from the past.
25      THE WITNESS:  Can I -- can I ask a question?
```

7 (Pages 22 to 25)



EXHIBIT 19
PAGE 1169

Page 26

1  Am I allowed to ask a question?
2      MS. VANDERWEELE:  I'll just need you to
3  finish the answer.  And then if you have a question
4  for me, I'm happy to answer it.
5      THE WITNESS:  So court documents that had
6  been filed, correspondence between the two parties,
7  some past settlement agreements, past contracts.
8  BY MS. VANDERWEELE:
9      Q.  Anything else?
10     A.  No, that's it.
11     Q.  And then is there a question for me, or is
12 it -- if it's for your lawyer, then we can go off the
13 record.  If it's for me, I'm happy to answer it.
14     A.  No, it's for my lawyer.
15     MS. VANDERWEELE:  Then we will go off the
16 record.
17     THE WITNESS:  Okay.
18     THE VIDEOGRAPHER:  Going off the record.
19 The time is 9:31 a.m.
20     (A discussion was held off the record.)
21     THE VIDEOGRAPHER:  The time is 9:33 a.m.  We
22 are back on the record.
23 BY MS. VANDERWEELE:
24     Q.  Ms. Gibbs, do you understand that you are
25 here today to testify as -- in your individual

Page 27

1  capacity as a witness to certain events that occurred
2  during your previous employment with the City of
3  Beaumont as resources director and later on as
4  Interim and Acting City Manager?
5      A.  Yes.
6      Q.  And did you ever receive -- actually, one
7  second.  One second.  I'm just going to pull up an
8  exhibit here.
9      MR. NOLAN:  And just for -- for the record,
10 she would be changing her answer to your last
11 question regarding any preparation.
12     MS. VANDERWEELE:  Okay.  One moment.
13 I'm going to show you what I'm going to mark
14 as Exhibit 21.
15     (Deposition Exhibit 21 was marked for
16     identification by the court reporter.)
17 BY MS. VANDERWEELE:
18     Q.  For the record, Exhibit 21 is an Amended
19 Notice of Deposition.
20     Are you able to see this document, ma'am?
21     A.  Yes.
22     Q.  And I'll scroll through to the next page.
23     This Amended Notice of Deposition states that
24 (as read):
25     Pursuant to rules 30 and 45 of the Federal

Page 28

1  Rules of Civil Procedure, defendant National Union
2  Fire Insurance Company of Pittsburgh, PA, through its
3  attorneys of record, will take the deposition of
4  Elizabeth Gibbs-Urtiaga on May 23, 2022, beginning at
5  9:00 a.m. PT.
6      Do you see that?
7      A.  Yes.
8      Q.  Have you seen this document before?
9      A.  No.
10     Q.  You've never seen -- okay.
11     But you do understand that today you are
12 testifying in your individual capacity as a
13 percipient witness; correct?
14     A.  Correct, I understand that now.
15     Q.  Okay.  Before the deposition started, did you
16 believe that you were testifying in a different
17 capacity?
18     A.  Yes.
19     Q.  And what did you believe today's deposition
20 was for?
21     A.  For the PMQ.
22     Q.  Are you prepared to testify today in your
23 individual capacity as a fact witness to certain
24 events that occurred when you worked for the City of
25 Beaumont as resources director, Interim City Manager

Page 29

1  and Acting City Manager?
2      A.  Yes.
3      Q.  Okay.  And I previously asked you questions
4  about documents that you had reviewed to prepare, and
5  you had listed some court documents and other
6  materials.
7      Those documents that you reviewed, did you
8  review them to prepare for your deposition in your
9  individual capacity?
10     A.  No.
11     Q.  All right.  And so all the documents that you
12 previously identified for me are documents that you
13 reviewed to testify as the person most knowledgeable
14 on behalf of the City of Beaumont; is that correct?
15     A.  Yes.
16     Q.  Okay.  You had also told me earlier today in
17 the deposition that you met with Mr. Nolan and
18 lawyers from the BBK firm to prepare for your
19 deposition.
20     Were those preparation meetings, that you had
21 previously told me about, meetings to prepare for
22 your deposition as a fact witness in this lawsuit?
23     A.  Those meetings were in my role as PMQ.
24     Q.  And when you say "PMQ," what do you mean by
25 that?

8  (Pages 26 to 29)



EXHIBIT 19
PAGE 1170

Page 30

1    A. Person most qualified.
2    Q. Do you understand that you've -- you've been
3  designated by the City of Beaumont to testify as the
4  person most knowledgeable on behalf of the City of
5  Beaumont?
6    A. PMK, yes.
7    Q. Okay. I want to know about what you did to
8  prepare for your deposition as a fact witness, and so
9  for your deposition in your individual capacity.
10    And did you review any documents to prepare
11  for your deposition as a fact witness in this
12  lawsuit?
13    A. No.
14    Q. Have you spoken with any of the witnesses who
15  have given depositions in this lawsuit?
16    A. Yes.
17    Q. Who have you spoken to?
18    A. As a fact witness?
19    Q. Correct.
20    A. No.
21    Q. Okay. And I guess I should make that clear.
22    Any of my -- all of my questions today are
23  going to be questions that I'm asking to you in your
24  individual capacity as a fact witness.
25    A. Okay. Understood.

Page 31

1    Q. And I'm -- I apologize. I should have made
2  that more clear at the outset.
3    All of my questions today are questions that
4  I'm asking you as a fact witness since you were
5  employed by the City, I believe, since 1993, up
6  until -- I think it was sometime in -- in 2022 of
7  this year, before there was a period of time that you
8  were unemployed.
9    And so those are -- when I'm asking you
10  questions today, it is as a fact witness in this
11  lawsuit; okay?
12    A. Okay. My employment started in '95,
13  actually.
14    Q. Okay. We will get through all of that.
15    So you did not review any documents and you
16  did not speak with any witnesses to prepare for your
17  deposition as a fact witness; correct?
18    THE COURT REPORTER: I'm sorry. I didn't
19  hear the answer.
20    THE WITNESS: Correct.
21    THE COURT REPORTER: Thank you.
22  BY MS. VANDERWEELE:
23    Q. Okay. What is your highest level of
24  education?
25    A. I have a master's of public administration.

Page 32

1    Q. And is that from California Baptist
2  University?
3    A. Yes.
4    Q. And you obtained that degree in 2018?
5    A. Yes.
6    Q. Your master's degree in public
7  administration, did you obtain that degree after your
8  initial appointment as Interim City Manager for
9  Beaumont?
10    A. Yes.
11    Q. You also have a bachelor of arts degree from
12  California Baptist University; is that correct?
13    A. Yes.
14    Q. And in what year did you obtain your bachelor
15  of arts?
16    A. 2010.
17    Q. Do you currently hold any professional
18  licenses or certifications?
19    A. Yes.
20    Q. So let's start with professional licenses.
21    Do you have any professional licenses
22  currently?
23    A. I hold a certified parks and rec
24  professional certification with the National
25  Recreation and Parks administration.

Page 33

1    Q. And was that issued in September of 2020?
2    A. Roughly, yes.
3    Q. Other than your certification as a park and
4  recreation professional, do you hold any other
5  certifications?
6    A. I have a risk management practitioner
7  certification.
8    Q. And when did you obtain your certification as
9  a risk management practitioner?
10    A. Sometime around '17 or '18. I don't recall.
11  2017 or '18.
12    Q. When you served as the resources director for
13  the City of Beaumont, did you have any professional
14  licenses or certifications during that time period?
15    A. Not that I recall, no.
16    Q. Your certification in risk management
17  practice, you obtained that following your service as
18  the Interim and Acting City Manager in 2015 and 2016;
19  correct?
20    A. Correct.
21    Can you hear me?
22    Q. I don't believe we got an answer.
23    A. Oh, I said, Correct.
24    Q. Other than your certification as a risk
25  management practitioner and your certification as a



EXHIBIT 19
PAGE 1171

Page 34

1    park and recreational professional, do you have any
2    other professional certifications?
3       A.  Yes.
4       Q.  Okay.  Which other certifications do you
5    currently hold?
6       A.  Transit operations planning certificate.
7       Q.  And when did you obtain that certificate?
8       A.  That was in 2013 or '14.
9       Q.  And did you obtain that certificate when you
10   served as the resources director for Beaumont?
11      A.  Yes, yes.
12      Q.  Do you hold any other professional
13   certifications that we have not already talked about?
14      A.  Not that I recall, no.
15      Q.  Are you a certified public accountant?
16      A.  No.
17      Q.  Are you a certified risk manager, a CRM?
18      A.  No.
19      Q.  Do you have any training or education in
20   construction management?
21      A.  No.
22      Q.  And you're currently employed as the Interim
23   City Manager for Beaumont; correct?
24      A.  Yes.
25      Q.  And when did you first learn that the City

Page 35

1    was appointing you to become the Interim City
2    Manager?
3       A.  About 5:30 on April 11th, 2022.
4       Q.  And was that following a City Council
5    meeting?
6       A.  That was during a City Council meeting.
7       Q.  Were you present for that meeting?
8       A.  Yes.
9       Q.  And why were you present for that meeting?
10      A.  To see if I was going to be appointed.
11      Q.  And prior to being appointed, did someone
12   from the City advise you that they intended to
13   appoint you as the Interim City Manager?
14      THE COURT REPORTER:  I didn't get an answer.
15      THE WITNESS:  No.  I -- can you -- can you
16   ask that question again?
17   BY MS. VANDERWEELE:
18      Q.  Sure.
19      So you've told me that you learned, during a
20   City Council meeting on April 11, that you were being
21   appointed the Interim City Manager.  And I'm trying
22   to figure out if you had learned prior to that time
23   that the City intended you -- intended to appoint you
24   as the Interim City Manager?
25      A.  I was asked to be at the meeting, and that's

Page 36

1    it.
2       Q.  It's my understanding the previous City
3   Manager, Todd Parton, is no longer employed by the
4   City.
5      A.  Correct.
6      Q.  Why did Mr. Parton step down as City Manager?
7      A.  I don't know.
8      Q.  I want to go through the chronology of your
9   employment with Beaumont because I understand you've
10   worked for the City of Beaumont for several years.
11      When did you first start working for the City
12   of Beaumont?
13      A.  It was -- let's see.  It was '90- -- October
14   of '96; however, prior to that, I was a temporary
15   employee from a temp agency.
16      Q.  How long did you work as a temporary employee
17   for Beaumont before becoming a full-time employee?
18      A.  I worked for the temp agency for ten months,
19   and then I was hired as a part-time City employee in
20   October of '96.
21      Q.  And what was your position when you were
22   initially hired by Beaumont in '96?
23      A.  Customer service coordinator.
24      Q.  And what were your duties and
25   responsibilities as a customer service coordinator

Page 37

1    for Beaumont?
2       A.  Take payments, answer phones, do data entry,
3   general information to the public; that was it.
4      Q.  How long did you serve as a customer service
5   coordinator for Beaumont?
6      A.  I'd have to look at my resume.  I want to
7   guess and say it was somewhere, let's see, around
8   2004, 2005; somewhere in there.
9      Q.  I've reviewed many documents in this case,
10   and it's my understanding that you became the
11   resources director in January of 2003; does that
12   sound about right to you?
13      A.  I was a resources manager first, before
14   resources director.
15      Q.  During what time period did you serve as
16   resources manager for Beaumont?
17      A.  For two or three years after my promotion
18   from the customer service coordinator.
19      Q.  So you started out as a customer services
20   coordinator.
21      What was your next position for the City of
22   Beaumont?
23      A.  Resources manager.
24      Q.  And then after, you were promoted from
25   resources manager to resources director?



EXHIBIT 19
PAGE 1172

Page 38

1    A. Yes.
2    Q. Do you recall when you were promoted from
3  resources manager to resources director?
4    A. I don't.
5    Q. Do you recall when you were promoted from a
6  customer service coordinator to a resources manager
7  for Beaumont?
8    A. It was, roughly, seven years after I
9  started, so some -- somewhere around 2003, '04.
10   Q. And how long did you work as the resources
11  manager before being promoted to the resources
12  director?
13   A. I want to say it was about two or
14  three years.
15   Q. In 2010, what was your position with
16  Beaumont?
17   A. At that time, it should have been resources
18  director.
19   Q. As best as you can recall, from 2010 up until
20  your appointment as the Acting City Manager, you were
21  the resources director for Beaumont?
22   A. Yes.
23   Q. And in June of 2015, it's my understanding
24  you were appointed the Acting City Manager for
25  Beaumont?

Page 39

1    A. Yes.
2    Q. And that was after the City Manager,
3  Alan Kapanicas, was placed on leave; is that correct?
4    A. Yes.
5    Q. My understanding, you served as the Acting
6  City Manager from June of 2015 to November of 2015;
7  is that correct?
8    A. Yes.
9    Q. And then from November 2015 to May of 2016,
10  you served as the Interim City Manager for Beaumont;
11  correct?
12   A. Yes.
13   Q. From May of 2016 to July of 2018, you were
14  the transit director for Beaumont; correct?
15   A. Yes.
16   Q. And then from July 2018 to January 2022, you
17  served as the director of community services for
18  Beaumont; correct?
19   A. Yes.
20   Q. Between January 2022 and up until the time
21  that you were appointed as the current Interim City
22  Manager, were you employed?
23   A. Yes.
24   Q. Where were you employed?
25   A. Beaumont Unified School District.

Page 40

1    Q. Are you currently employed by the Beaumont
2  Unified School District?
3    A. No.
4    Q. I've also read somewhere that you are the
5  president and owner of a landscaping company; is that
6  correct?
7    A. Yes.
8    Q. And what's the name of the landscaping
9  company?
10   A. Pro Care Landscape Services, Incorporated.
11   Q. And has Pro Care Landscape Services ever had
12  any contracts with the City of Beaumont?
13   A. Yes.
14   Q. During what time period?
15   A. Prior to my involvement with the company.
16   Q. From January 2016 to April 2022, did Pro Care
17  Landscape Services have any contracts with Beaumont?
18   A. No.
19   Q. As the transit director from -- for Beaumont,
20  what were your duties and responsibilities?
21   A. To manage the public transportation
22  operation of the City.
23   Q. And as director of community services for
24  Beaumont, what were your duties and responsibilities?
25   A. In addition to the public transportation

Page 41

1  operations, I managed the parks and recreation
2  program and grounds maintenance operation and
3  building maintenance operation.
4    Q. When you were the Interim City Manager and
5  the Acting City Manager in 2015 and 2016, did you
6  have any involvement in the City's submission of an
7  insurance claim to my client, National Union Fire
8  Insurance Company?
9    A. No.
10   Q. As the transit director and later as the
11  director of community services, did you have any
12  involvement in the insurance claim that had been
13  filed by the City to my client, National Union Fire
14  Insurance Company?
15   A. No.
16    (Deposition Exhibit 1 was marked for
17    identification by the court reporter.)
18  BY MS. VANDERWEELE:
19   Q. Going to show you what I've marked as
20  Exhibit 1.
21    And are you able to see my screen, ma'am?
22   A. Yes.
23   Q. And for the record, Exhibit 1 is Interim City
24  Manager Employment Agreement. It's dated April 11,
25  2022, and it's an agreement between City of Beaumont



EXHIBIT 19
PAGE 1173

Page 42

```
 1   and Elizabeth Gibbs.
 2       Can you read that, ma'am?
 3       A. Yes.
 4       Q. And this is -- in all fairness to you, it's
 5   an 11-page document. And I'll scroll through this,
 6   and please let me know if I'm going too quickly.
 7       But my question is going to be if this is the
 8   employment agreement that you signed relative to your
 9   current employment with the City of Beaumont?
10       A. Correct.
11       Q. And if we look at page 9 of this exhibit, is
12   that your signature?
13       A. Yes.
14       Q. And this is the employment agreement that you
15   signed relative to your current employment with
16   Beaumont as Interim City Manager?
17       A. Yes.
18       MS. VANDERWEELE: I'll show you what I will
19   mark as Exhibit 2 to the deposition.
20       For the record, Exhibit 2 is an Acting City
21   Manager Employment Agreement. It's dated August 4,
22   2015.
23       (Deposition Exhibit 2 was marked for
24       identification by the court reporter.)
25
```

Page 43

```
 1   BY MS. VANDERWEELE:
 2       Q. Is this the employment agreement, ma'am, that
 3   you signed relative to your role as the Acting City
 4   Manager for Beaumont in 2015?
 5       A. I'd have to see the signature page. Yes.
 6       Q. And I'm showing you page 4 of Exhibit 2.
 7       This is your signature; correct?
 8       A. Yes.
 9       Q. And it looks like this was signed on
10   August 5, 2015; correct?
11       A. Correct.
12       Q. And it's signed by you, as well as the City
13   of Beaumont; correct?
14       A. Correct.
15       Q. And if we go up -- focus on the first page.
16   And I'll zoom in so you're able to see this.
17       The -- Section 1, with the heading "Term"
18   states that (as read):
19       The City has employed and hereby employs the
20   employee as Acting City Manager on an acting
21   day-to-day basis for a period commencing June 2,
22   2015. Notwithstanding anything herein to the
23   contrary, this agreement shall terminate no later
24   than December 31, 2015.
25       Do you see that, ma'am?
```

Page 44

```
 1       A. Yes.
 2       Q. And am I correct that you began your role as
 3   the Acting City Manager starting on June 2, 2015?
 4       A. Yes.
 5       Q. And did your employment as City Manager
 6   continue up until May of 2016?
 7       A. Yes.
 8       Q. And I believe May 17, 2016, was that the last
 9   date of your employment as City Manager for Beaumont?
10       A. I -- it was May 16th, 2016.
11       Q. All right. And so you were the City Manager
12   for Beaumont between June 2, 2015, through May 16 of
13   2016; correct?
14       A. Correct.
15       Q. And who was the City Manager starting on
16   May 17, 2016?
17       A. Richard Warne.
18       Q. And do you know how long Richard Warne served
19   as City Manager for City of Beaumont?
20       A. Until October 31st, 2016.
21       Q. And did Mr. Warne step down as City Manager
22   in October of 2016?
23       A. I don't know. He was Interim City Manager.
24       Q. Was Mr. Parton, Todd Parton, appointed City
25   Manager, following Mr. Warne's tenure as Interim City
```

Page 45

```
 1   Manager?
 2       A. Yes.
 3       Q. Turning back to Exhibit 2, do you see
 4   Section 3 that talks about the duties of a City -- of
 5   you, as City Manager?
 6       A. Yes.
 7       Q. And Section 3 states that (as read):
 8       The Acting City Manager shall perform the
 9   duties of the City Manager as prescribed by the
10   municipal code, City policy and the California
11   Government Code.
12       Correct?
13       A. Correct.
14       Q. Section 3 also states that (as read):
15       In addition to the powers and duties set
16   forth in the municipal code, City policy, the
17   California Government Code, the Acting City Manager
18   shall have such powers and duties that are delegated
19   to her from time to time by the City Council.
20       Correct?
21       A. Correct.
22       Q. The section also states that (as read):
23       The Acting City Manager shall execute all
24   powers and duties in accordance with the policies
25   adopted by the City Council and the State of
```



EXHIBIT 19
PAGE 1174

Page 46

1  California Government Code.
2      Correct?
3      A. Correct.
4      Q. There's a reference to the "City policy" in
5  this section; do you see that?
6      A. Yes.
7      Q. In 2015, at the time that this agreement was
8  entered into, did the City have a set of policies and
9  procedures that applied to the City Manager?
10     A. Not that I'm aware of.
11     Q. What is referred to here in this agreement,
12 when it says "City policy"?
13         What is that referencing?
14     A. Personnel handbook.
15     Q. So in 2015, the City had a personnel
16 handbook?
17     A. Yes.
18     Q. Did the -- is the personnel handbook the same
19 thing as an employee handbook?
20     A. It can be the same thing. We call it a
21 personnel handbook.
22     Q. All right. And did the City have a personnel
23 handbook in 2014?
24     A. Yes.
25     Q. Do you know when it is that the City first

Page 47

1  instituted or maintained a personnel handbook?
2      A. 2009.
3      Q. All right. And how do you know -- how do you
4  know that?
5      A. Because I presented it to City Council for
6  adoption.
7      Q. And that's when you were serving as resources
8  director?
9      A. Yes.
10     Q. The -- am I correct, then, that the City of
11 Beaumont maintained a personnel handbook from 2009 up
12 until the present?
13     A. Yes.
14     Q. Has that handbook been amended or revised
15 over the years?
16     A. I -- I don't know.
17     Q. The personnel handbook, does that apply to
18 all City of Beaumont employees?
19     A. Yes.
20     Q. And when you presented the personnel handbook
21 in 2009 to City Council, did the City Council have to
22 vote on and approve the adoption of that handbook?
23     A. Yes.
24     Q. And it sounds like the City Council did, in
25 fact, approve and adopt the personnel handbook in

Page 48

1  2009?
2      A. Yes.
3      Q. And what is contained in that personnel
4  handbook?
5      A. It -- there's different paragraphs having to
6  do with day-to-day operations. I haven't looked at
7  it in years, I'll be honest. Dress code, general
8  work hours; things like that.
9      Q. Does the personnel handbook set forth
10 different City employees' duties and
11 responsibilities?
12     A. Not that I recall, no.
13     Q. Is the personnel handbook a document that's
14 maintained by the City of Beaumont?
15     A. Yes.
16     Q. Is there a physical copy somewhere?
17     A. Yes.
18     Q. Is there an electronic copy that staff had
19 access to?
20     A. There is currently. I don't know about back
21 then.
22     Q. According to Exhibit 2, which is the Acting
23 City Manager Employment Agreement that you had
24 entered into, your duties as City Manager were set
25 forth in the municipal code, City policy, California

Page 49

1  Government Code, and as delegated to you from the
2  City Council; correct?
3      A. Correct.
4      Q. Have you reviewed the municipal code?
5      A. Not in its entirety. Particular sections.
6  This -- the section having to do with City Manager,
7  yes.
8      Q. And did you review the municipal code related
9  to the City Manager position, at the time that you
10 were appointed as the Acting City Manager?
11     A. Yes.
12     Q. When you served as the resources director for
13 Beaumont, had you ever reviewed the municipal code?
14     A. Certain sections, as it pertained to my job.
15     Q. In Section 4 of Exhibit 2, there's a section
16 that states (as read):
17         Acting City Manager and Council
18 Responsibilities.
19         Do you see that?
20     A. Yes.
21     Q. And the second sentence of this section
22 states that (as read):
23         The Acting City Manager shall serve at the
24 pleasure of the City Council.
25         Correct?

13 (Pages 46 to 49)



EXHIBIT 19
PAGE 1175

Page 50

1     A. Correct.
2     Q. And when you served as City Manager, did you
3  report to the City Council?
4     A. Yes.
5     Q. And that's pursuant to this agreement, as
6  well as the municipal code; correct?
7     A. Correct.
8     Q. When you served as the resources director for
9  Beaumont, I take it the City Manager at that time
10 also reported to City Council; is that correct?
11    A. Correct.
12       MS. VANDERWEELE: I want to show you what I
13 will mark as Exhibit 3. I'll zoom out here. And,
14 for the record, Exhibit 3 is Bates-stamped
15 B-e-a-u-a-i-g 3240 through 3255. And I'll represent
16 to you -- ma'am, I'll zoom out so you can see
17 this -- that this is a portion of the Beaumont,
18 California, Code of Ordinances.
19       (Deposition Exhibit 3 was marked for
20       identification by the court reporter.)
21 BY MS. VANDERWEELE:
22    Q. And I want to direct your attention to the
23 section here at the bottom, and I'll zoom in. It's
24 Section 2.12.010, and it talks about the City
25 Manager.

Page 51

1     Do you see that?
2     A. Yes.
3     Is this the Beaumont municipal code?
4     Q. Correct.
5     A. Okay. Okay.
6     Q. And we can actually go back -- I don't want
7  to confuse you, but I want to just go back. And
8  you'll see in -- actually, it's in Exhibit 1.
9  There's a reference to the Beaumont municipal code
10 and a reference to Section 2.12.060.
11    Do you see that?
12    A. Yes.
13    Q. And according to Exhibit 1, which is your
14 current employment agreement, your duties and
15 responsibilities are set forth in Section 2.12.060 of
16 the municipal code; correct?
17    A. Correct.
18    Q. And I'm going to go back now to Exhibit 3,
19 which is the municipal code. And if we look here,
20 I'm showing you Section 2.12.060, Powers and Duties.
21    Is this the section that's referenced in your
22 current employment agreement?
23    A. Yes.
24    Q. And this is a municipal code that you
25 reviewed before; correct?

Page 52

1     A. Yes.
2     Q. I'm going to go back up to the
3  Section 2.12.010. This section states that (as
4  read):
5       The office of City Manager for the City is
6  created and established. The City Manager shall be
7  appointed by the City Council.
8       Do you see that?
9     A. Yes.
10    Q. According to the municipal code, the City
11 Manager holds office at and during the pleasure of
12 the City Council; correct?
13    A. Correct.
14    Q. The City Manager at all times has reported to
15 Beaumont City Council; correct?
16    A. Correct.
17    Q. And that was true when you served as
18 resources director?
19    A. Yes.
20    Q. The powers and duties of the City Manager are
21 set forth in Section 2.12.060; correct?
22    A. Yes.
23    Q. And this section of the municipal code states
24 that (as read):
25       The City Manager shall be the administrative

Page 53

1  head of the City government under the direction and
2  control of the City Council, except as otherwise
3  provided in this chapter.
4     Correct?
5     A. Correct.
6     Q. And then there's several paragraphs that are
7  identified here in this section that set forth the
8  City Manager's duties; correct?
9     A. Yes.
10    Q. And the City Manager has all these duties
11 under the direction and control of the City Council;
12 correct?
13    A. Correct.
14    Q. Subparagraph H, and I'll zoom in, talks about
15 the annual budget; do you see that?
16    A. Yes.
17    Q. And according to Subparagraph H of this
18 section, (as read):
19       The City Manager must obtain approval from
20 City Council for purchase of any item exceeding the
21 cost of $1,000.
22       Correct?
23    A. Correct.
24    Q. And that threshold amount of $1,000 may be
25 amended from time to time by resolution; correct?

14  (Pages 50 to 53)



EXHIBIT 19
PAGE 1176

Page 54

1   A. Yes.
2   Q. But whatever that threshold dollar amount is,
3   anything above that amount, the City Manager must
4   obtain approval from the City Council for purchases
5   above that amount; correct?
6   A. Correct.
7   Q. When you served as resources director, do you
8   have any information or knowledge as to whether the
9   $1,000 threshold amount in Subparagraph H was ever
10   amended by City Council?
11   A. I don't know.
12   Q. I'll zoom out, and I'm happy to show you each
13   page.
14       But my question is:  Based on your review of
15   the municipal code, are you aware of anything in the
16   municipal code that provides that the City Manager is
17   responsible for submitting insurance claims on behalf
18   of the City?
19   A. I'm -- I'm not aware.
20   Q. Is there anything in the municipal code that
21   delegates power or authority to the City Manager,
22   over matters concerning the City's insurance?
23   A. Can you repeat that?
24   Q. Sure.
25       Is there anywhere -- anything in the

Page 55

1   municipal code that delegates authority or power to
2   the City Manager, over the City's insurance?
3   A. Not that I'm aware.
4   Q. Am I correct that, when you served as the
5   resources director for the City, that the City
6   Council had final authority over matters concerning
7   the City's insurance?
8   A. I -- I don't know.
9   Q. Has the City Council ever passed a resolution
10   delegating authority to the City Manager to submit
11   insurance claims, without obtaining the City
12   Council's approval?
13   A. I don't know.
14   Q. Am I correct that the City Council must vote
15   on and approve the submission of insurance claims on
16   behalf of the City?
17   A. No.
18   Q. So that is not a correct statement?
19   A. That -- yeah, that is not a correct
20   statement.  The City Manager has the authority to,
21   in certain cases, submit the claim without Council
22   action.
23   Q. And can you identify where in the municipal
24   code, in the City's policies, or any other document,
25   that establishes that the City Manager has authority,

Page 56

1   in certain cases, to submit claims without City
2   Council approval or authority?
3   A. I'd have to review the municipal code.
4   Q. Well, I'm going to show you Exhibit 3 that we
5   have on the screen.  And if you could review the
6   section related to the City Manager's powers and
7   duties, and let me know if there is anything in this
8   section that allows the City Manager to submit an
9   insurance claim on behalf of the City without City
10   Council approval.
11   A. Can you zoom in, please?
12   Q. Sure.
13       And let me know when you want me to scroll
14   down.  I'm happy to do that.
15   A. Can you scroll down, please?  And can you
16   confirm the question again?
17   Q. Sure.
18       I'm asking for the identification of anything
19   in this municipal code that allows the City Manager
20   to submit an insurance claim on behalf of the City
21   without approval of City Council.
22   A. So if you go back up, I'm basing this on
23   operations prior to this year and what was happening
24   in the org at the time.
25       If you look at number -- at letter B (as

Page 57

1   read):
2       To control, order and give directions to all
3   head of departments, subordinate officers and
4   employees of the City, except the City Clerk, City
5   employees from one department to another, and to
6   consolidate or combine offices, positions,
7   departments or units under his direction.
8       That is where I would say the City Manager
9   has the authority to file an insurance claim.
10   Q. And where in Subparagraph B does it discuss
11   insurance claims?
12   A. It doesn't.
13   Q. Is there any discussion anywhere in this
14   Section 2.12.060 that discusses the City Manager's
15   authority over submitting insurance claims?
16   A. No.
17   Q. Is there anything in the personnel handbook,
18   that the City of Beaumont maintains, that allows the
19   City Manager to submit insurance claims on behalf of
20   the City without City approval?
21   A. No.
22   Q. Am I correct that the City Council has to
23   approve the purchase of insurance for Beaumont?
24   A. Depending on the dollar amount, yes.
25   Q. And if that dollar amount for an insurance



EXHIBIT 19
PAGE 1177

Page 58

1    purchase is above the $1,000 threshold amount, that
2    would require approval of the City Council; correct?
3        A.  It's actually 25,000 now.  So, yes, anything
4    above 25,000 requires City Council approval.
5        Q.  So, currently, any purchase over $25,000 by
6    the City must have City Council approval?
7        A.  Yes.
8        Q.  In 2010, what was the threshold amount for
9    purchases by the City that required City Council
10   approval?
11       A.  Ten thousand.
12       Q.  In 2011, what was the threshold amount that
13   required City Council approval for purchases on
14   behalf of the City?
15       A.  Ten thousand.
16       Q.  Was the same true in 2012?
17       A.  Yes.
18       Q.  Was the same true in 2013?
19       A.  Yes.
20       Q.  Was the same true in 2014?
21       A.  Yes.
22       Q.  Was the same true in 2015?
23       A.  Yes.
24       Q.  Was the same true in 2016?
25       A.  Yes.

Page 59

1        Q.  Was the same true in 2017?
2        A.  At some point in '17 or '18, Mr. Parton --
3    signing authority changed to 25,000, but I don't
4    recall exactly when.
5        Q.  So between 2010 and approximately 2017 or
6    2018, any purchases by the City, over $10,000,
7    required City Council approval; correct?
8        A.  Correct.
9        Q.  Okay.  Stop this.
10           I want to talk about your role as the City's
11   resources director.  And I believe you testified
12   earlier that you were the resources director sometime
13   in the early 2000s up until June of 2015; is that
14   correct?
15       A.  Resources manager and resources director
16   during that time.
17       Q.  And did you have an employment agreement with
18   Beaumont when you worked as the resources manager or
19   the resources director?
20       A.  The executives at that time were under a
21   memorandum of understanding and negotiated as
22   individuals.  I did not have a sole executive
23   contract.
24       Q.  As the resources -- I want to focus on your
25   role as resources manager, and then we'll go to

Page 60

1    resources director.
2            So as resources manager, who did you report
3    to?
4        A.  Alan Kapanicas, the City Manager.
5        Q.  And Mr. Kapanicas served as the City Manager
6    during what time period?
7        A.  I don't know when it started.  He was here
8    when I came in '95.
9        Q.  Between 1995 and June -- end of May 2015,
10   Mr. Kapanicas was the City Manager for Beaumont?
11       A.  Yes.
12       Q.  Mr. Kapanicas was also the owner and
13   president of a company named GGMS; correct?
14       A.  Correct.
15       Q.  And when you served as the resources manager
16   and the resources director for Beaumont, did you know
17   and understand that Mr. Kapanicas was the owner and
18   president of GGMS?
19       A.  I knew he was the owner, but I didn't know
20   what position he held with the company.
21       Q.  While you served as resources manager and
22   resources director for Beaumont, you knew that
23   Mr. Kapanicas owned GGMS; correct?
24       A.  Correct.
25       Q.  And when you were resources director, you

Page 61

1    reported to Mr. Kapanicas?
2        A.  Yes.
3        Q.  Did any employees report to you when you were
4    resources manager?
5        A.  I had two or three customer service
6    coordinators that reported to me.
7        Q.  When you were resources director, who
8    reported to you?
9        A.  Customer service -- all the customer service
10   coordinators, and then eventually transit operations
11   reported to me.
12       Q.  When you worked as resources director for
13   Beaumont, did you work with James Gregg?
14       A.  I did.
15       Q.  Mr. Gregg was hired by the City of Beaumont
16   in July of 2006; correct?
17       A.  Correct.
18       Q.  And he was hired as the risk manager?
19       A.  Yes.
20       Q.  Prior to July 2006, the City of Beaumont did
21   not have a risk manager; correct?
22       A.  Correct.
23       Q.  Prior to 2006, the City Council handled risk
24   management for Beaumont; correct?
25       A.  The City -- say that again.



EXHIBIT 19
PAGE 1178

Page 62

1    Q.  Prior to 2006, so before Mr. Gregg came on as
2  risk manager, am I correct that the City Council
3  handled risk management for Beaumont?
4    A.  No, that's not correct.
5    Q.  Who handled risk management for Beaumont
6  prior to July 2006?
7    A.  Alan, and he delegated some duties to me.
8    Q.  What risk management functions were delegated
9  to you when you worked as the resources director?
10   A.  I would process government tort claims.  I
11  would, at times, act as the City representative in
12  negotiating minor settlements.  I kept the files,
13  updated Alan on progress for those settlements.
14   Q.  When you served as the resources director for
15  Beaumont, did you have any duties and
16  responsibilities regarding the submission of
17  insurance claims on behalf of the City?
18   A.  Only at Alan's direction.  I would not
19  initiate them.
20   Q.  When you served as resources director, did
21  Mr. Kapanicas ever direct you to submit a claim to
22  any of the City's insurance companies?
23   A.  Yes.
24   Q.  How many times?
25   A.  I can think of one.

Page 63

1    Q.  Okay.  What's that one time that you -- that
2  you can recall?
3    A.  Property damage.  We -- we had some building
4  damage from a storm.
5    Q.  And what year was it that Mr. Kapanicas
6  directed you to submit an insurance claim to the
7  City's property insurer?
8    A.  I -- I don't recall.  It was the early
9  2000s.
10   Q.  Whenever an insurance claim -- or strike
11  that.
12       Am I correct that the City Council had to
13  approve any settlements that the City entered into?
14   A.  Not all of them, no.
15   Q.  When you would negotiate settlements on
16  behalf of the City, did you advise the City Council
17  of those settlement negotiations and any agreements
18  that were reached?
19   A.  No.
20   Q.  Did you understand that, as resources
21  director, you had a duty to report those settlements
22  to City Council?
23   A.  No, that was the City Manager's duty.
24   Q.  Did you have any reporting -- or strike that.
25       Was it your understanding that you had no

Page 64

1  reporting duties to the City Council when you served
2  as resources director?
3    A.  Yes.  My -- my reporting duties were to the
4  City Manager.
5    Q.  When you worked as the resources director,
6  did the City of Beaumont have a separate risk
7  management department?
8    A.  No.
9    Q.  When you were the resources director for
10  Beaumont, it's my understanding you also served as
11  the secretary to ERMAC, E-r-m-a-c; is that correct?
12   A.  That -- that wasn't until I became Interim
13  City Manager -- or Acting City Manager, in June.
14   Q.  ERMAC stands for Exclusive Risk Management
15  Authority of California?
16   A.  Yes.
17   Q.  During what time period did you serve as
18  secretary to ERMAC?
19   A.  I believe it was June of '15 to May of '16.
20   Q.  And was your position as secretary to ERMAC
21  by virtue of the fact that you were the Acting and
22  then later the Interim City Manager for Beaumont?
23   A.  Yes.
24   Q.  And what were your duties and
25  responsibilities as the secretary to ERMAC on behalf

Page 65

1  of Beaumont?
2    A.  To attend the board meetings and act as a
3  representative for Beaumont.
4    Q.  You mentioned earlier that certain risk
5  management functions were delegated to you when you
6  served as the resources director; do you recall that?
7    A.  Yes.
8    Q.  Were you responsible for reviewing the
9  insurance policies that the City purchased?
10   A.  No.
11   Q.  At any time that you served as resources
12  director, did you ever review the insurance policies
13  that the City purchased?
14   A.  No.
15   Q.  Did you ever, at any time as resources
16  director for Beaumont, review the insurance policies
17  issued by National Union Fire Insurance Company of
18  Pittsburgh, PA, to the City of Beaumont?
19   A.  No.
20   Q.  As resources director for Beaumont, were you
21  responsible for preparing insurance applications on
22  behalf of Beaumont?
23   A.  As delegated by Alan.  I would collect the
24  data, and Jim -- James Gregg ultimately would submit
25  the application.  But I was responsible for

17  (Pages 62 to 65)



EXHIBIT 19
PAGE 1179

Page 66

1    collecting data such as building square footage,
2    types of roofs; things like that.
3        Q. Did you ever physically fill out any
4    insurance applications on behalf of Beaumont when you
5    served as resources director?
6        A. I would enter the data that I collected,
7    yes.
8        Q. And were you responsible for ensuring that
9    the data in the insurance application, submitted on
10   behalf of Beaumont, was accurate?
11       A. That was not my responsibility, no.
12       Q. Whose responsibility was that?
13       A. I don't know if Alan delegated that to
14   James Gregg.
15       Q. It's my understanding that Mr. Gregg, in his
16   role as risk manager, advised the City regarding
17   purchase of insurance; is that correct?
18       A. I -- I heard conversations.
19       Q. Do you have any understanding as to
20   Mr. Gregg's role as risk manager for Beaumont?
21       A. I didn't read his job description.  He was
22   in an advisory capacity.
23       Q. And would Mr. Gregg give advice and
24   recommendations to City Council?
25       A. No.

Page 67

1        Q. Isn't it true that Mr. Gregg would make
2    recommendations to City Council regarding the
3    purchase of insurance?
4        A. I don't know that Mr. Gregg ever attended a
5    City Council meeting while he was employed here.
6        Q. As the resources director for Beaumont, did
7    you assist Mr. Gregg in presenting insurance packages
8    to the City Council?
9        A. No.
10       Q. Did you ever prepare staff reports, making
11   recommendations to City Council regarding the
12   purchase of insurance?
13       A. No.
14       Q. Were you responsible, as the resources
15   director, for selecting the types of insurance that
16   the City would purchase?
17       A. No.
18       Q. What is ERMAC?
19       A. It's a joint powers authority made up of
20   four or five cities, shared resources in an
21   insurance pool.
22       Q. Am I correct that ERMAC would secure an
23   annual insurance proposal for its member agencies,
24   including Beaumont?
25       A. Yes.

Page 68

1        Q. And then ultimately the City Council would
2    have to approve budgets authorizing the purchase of
3    insurance for the City; correct?
4        A. City Council approved budgets.  I don't know
5    if insurance premiums were included in those.  I'd
6    have to review them.
7        Q. Have you ever reviewed the City's budgets
8    when you worked as the resources director for
9    Beaumont?
10       A. No.
11       Q. The risk management functions that were
12   delegated to you, did they include responsibility for
13   determining whether and when the City should pursue a
14   claim under any of its insurance policies?
15       A. No.
16       Q. The City of Beaumont, in this lawsuit, has
17   identified you as a witness who was involved in
18   assessing and coordinating insurance matters for the
19   City.
20           Are you aware of that?
21       A. No.
22       Q. As resources director and resources manager
23   for the City, what were your duties and
24   responsibilities with respect to the assessment and
25   coordination of insurance matters for the City?

Page 69

1        A. It was -- as I stated previously, it was
2    really the self-insurance portion, in that I would
3    settle minor claims for people that had filed
4    government tort claims with the City.
5        Q. And I think you told me earlier that as
6    resources manager and resources director, you had no
7    responsibility regarding determining whether and when
8    the City should pursue an insurance claim under any
9    of its insurance policies; is that correct?
10       A. Correct.
11           MS. VANDERWEELE:  We've been going a little
12   over an hour.  Are you good to keep going, or would
13   you like to take a break?
14           THE WITNESS:  I'm okay.  I'm okay.
15           MS. VANDERWEELE:  Okay.  We can keep going.
16       I want to show you -- I think we'll mark
17   this Exhibit 4.
18           (Deposition Exhibit 4 was marked for
19           identification by the court reporter.)
20           MS. VANDERWEELE:  So I'm showing you what
21   I've marked Exhibit 4, which, for the record, is
22   Bates-stamped B-e-a-u-a-i-g 49174 through 49176.
23   BY MS. VANDERWEELE:
24       Q. And this is a January 28, 2015, e-mail from
25   Elizabeth Gibbs-Urtiaga, to Alan Kapanicas, Jim

18  (Pages 66 to 69)



EXHIBIT 19
PAGE 1180

Page 70

```
 1    Gregg, Bill Aylward, Akufli and Wysocki, with the
 2    subject line:  Insurance Decision Package.
 3         Do you see this?
 4         A.  Yes.
 5         Q.  This is an e-mail that you sent to
 6    Mr. Kapanicas, Mr. Gregg, Mr. Aylward, Aklufi and
 7    Wysocki; correct?
 8         A.  Yes.
 9         Q.  And it's regarding an insurance decision
10    package; correct?
11         A.  Yes.
12         Q.  Do you recall sending this e-mail?
13         A.  No.
14         Q.  This e-mail states (as read):
15         See attached, dot, dot, dot, I plagiarized
16    Jim's analysis to present to Council.
17         Correct?
18         A.  Correct.
19         Q.  And what did you mean when you wrote that
20    sentence in this e-mail?
21         A.  I'd have to see the attachment.
22         Q.  I'm going to show you the attachment.  It
23    starts on page 2 of Exhibit 4.  And I'm happy -- we
24    can go through the -- it's a -- I believe, a two-page
25    document.
```

Page 71

```
 1         The attachment, for the record, is -- looks
 2    like a memo or a report from City Manager to City
 3    Council, dated January 27, 2015, with the subject of:
 4    General liability insurance increase.
 5         And I'll let you take a moment to read that.
 6    And let me know when you're done.
 7         A.  (Witness complied.)
 8         Q.  Would you like me to go to the next page?
 9         A.  Sure.
10         Okay.  I vaguely remember this.
11         Q.  Okay.  So the document that's at page 2 and
12    goes on to page 3 of Exhibit 4, did you prepare this
13    document?
14         A.  I don't know.
15         Q.  You sent the -- this document, which is on
16    pages 2 and 3 of Exhibit 4, to Mr. Kapanicas,
17    Mr. Gregg, Mr. Aylward, Aklufi and Wysocki, on
18    January 28, 2015; correct?
19         A.  Correct.
20         Q.  Mr. Gregg, we've already discussed, was the
21    risk manager; right?
22         A.  At that time, yes.
23         Q.  Mr. Aylward, was he the director of finance
24    for Beaumont?
25         A.  Was the finance director and assistant City
```

Page 72

```
 1    Manager.
 2         Q.  Aklufi and Wysocki was -- that's the City
 3    Attorneys at that time?
 4         A.  Yes.
 5         Q.  After having reviewed Exhibit 4, are you able
 6    to say whether or not you prepared the document
 7    that's contained on pages 2 and 3 of Exhibit 4?
 8         A.  I don't know if I did.  If I did, I
 9    formatted it for Alan.  I -- when I put in the
10    e-mail that I plagiarized Jim's analysis, more than
11    likely I took his narrative and I dropped it into a
12    City Council staff report for Alan.
13         That's not my -- that's definitely not my
14    writing.  I don't -- that's above me.
15         Q.  And when you say "That's definitely not my
16    writing," are you referring to the writing on pages 2
17    and 3 of Exhibit 4?
18         A.  Correct.
19         Q.  Certainly the writing on page 1, this e-mail,
20    is your writing; correct?
21         A.  Oh, yeah.  That's mine.
22         Q.  And the document on pages 2 and 3 of this
23    exhibit is a staff report; is that correct?
24         A.  I'm sorry.  Say that again.
25         Q.  I'm just trying to get an idea of what this
```

Page 73

```
 1    document is that starts on page 2.
 2         Is this a staff report?
 3         A.  It seems to be a staff report, from Alan to
 4    City Council, discussing general liability insurance
 5    and the market analysis.  And on page 3, it looks
 6    like a recommendation.
 7         Q.  So on page 3, there's a recommendation to the
 8    City Council to increase the budget by 15 percent for
 9    the City's insurance; correct?
10         A.  Correct.
11         Q.  And so the City Council would receive a staff
12    report making recommendations, and then the City
13    Council, just generally speaking, has to vote on any
14    staff recommendation; correct?
15         A.  Say that again.
16         Q.  Sure.
17         And I'm just asking generally:  Staff reports
18    that are presented to City Council that include
19    recommendations must be voted on by the City Council;
20    correct?
21         A.  Not always, no.
22         Q.  If there is a request by -- in a staff report
23    to City Council, that request needs to be voted on;
24    true?
25         A.  No.  City Council has the authority to table
```



EXHIBIT 19
PAGE 1181

items if they so choose.
Q. Sure.
And a request such as the request in Exhibit 4, regarding increasing the budget by 15 percent, it looks like there's four options here that the City Council can take.
Do you see that?
A. Yes.
Q. And the options are: To approve the 15 percent increase; modify the 15 percent increase; deny the 15 percent increase; or continue the 15 percent increase.
Correct?
A. Correct.
Q. And so continuing the 15 percent increase would be tabling the item, which is what you had just mentioned; right?
A. Right.
Q. So when a staff recommendation is made to City Council, they can do one of these four things: Approve, modify, deny, or continue.
Correct?
A. Yes. And let me clarify.
A continuation is not always the same as a table.

A "table" means indefinite.
"Continue" is generally to a date certain.
Q. Increases in the budget need to be approved by City Council; correct?
A. They're supposed to be, yes.
Q. And when you served as the resources director for City Council in January of 2015, an increase in the City's budget for insurance needed to be approved by the City Council; correct?
A. Can you restate that? I think you said that I was the resources director for City Council.
That's not correct.
Q. Sure. When you were the resources director for the City of Beaumont in January of 2015, as reflected in this exhibit, an increase in the City's budget for the purchase of insurance required approval by the City Council; correct?
A. Generally speaking, yes.
Q. And that's what's reflected in this document; true?
A. Yes.
I can't say if this document ever made it to City Council, though.
Q. Do you have any reason to believe that this document did not make it to City Council?

A. Staff reports didn't always go to City Council.
Q. And what do you mean by that?
A. Alan operated under the policy that he determined what went to City Council and what did not, regardless of the municipal code.
Q. When you served as the resources director, you knew that Mr. Kapanicas was not providing certain staff reports to City Council?
A. I can't be specific. But I reported to Alan, and it was Alan's job to take things to City Council.
Q. And it sounds like your -- you -- you believe that certain staff reports -- you just told me that certain staff reports didn't always go to City Council; right?
A. There were times when we would draft staff reports, and Alan would make the decision to not take them to City Council. Yes.
Q. And you knew that, when you served as resources director, that there were times when Mr. Kapanicas was not providing staff reports to City Council; correct?
A. Correct. The direction would change -- correct.

Q. Did you ever report to City Councilmembers that the City Manager was not providing all staff reports to the Council?
A. No.
Q. Why not?
A. Because Alan determined -- I don't know of conversations between Alan and Council. I wasn't privy to those.
I took my direction from him, and if he said, Something's changed, we're moving in a different direction, or, We don't need to take that to Council, I have the authority -- I mean, there's -- there's any number of reasons.
Q. Were there -- you told me that sometimes staff reports were not provided to City Council by the City Manager.
Was there other information that you were aware of that Mr. Kapanicas was not providing to City Council?
A. That -- it's very broad.
Q. Sure. Well, what I'm trying to get at is you've told me that you were aware, as resources director, that staff reports didn't always go to City Council; right?
A. Right.

Page 78

1    Q.  In addition to staff reports, was -- were
2  there any other documents that the City Manager
3  withheld from City Council when you served as the
4  resources director?
5    A.  Not -- not that I recall, no.
6    Q.  When you were resources director -- and I can
7  take this down.
8      When you were the resources director for the
9  City Council --
10  (Mr. Dunn joined the deposition proceedings.)
11    MS. VANDERWEELE:  Oh, hi, Jeff.
12    MR. DUNN:  Hi.  I apologize, Meagan, to
13  interrupt the deposition, just to make it known that
14  I'm -- I'm now appeared.  So thank you.
15    MS. VANDERWEELE:  And I just want to make
16  sure it's clear on the record, Jeff, that we started
17  the deposition with the understanding that you, as
18  the City's lawyer, was consenting to the start of
19  the deposition without you being present; correct?
20    MR. DUNN:  Yes.  And, Meagan, I apologize to
21  you for not letting you know in advance.  I had
22  fully expected to be on video this morning.  Had a
23  medical appointment that I had to do this morning.
24  So I apologize for not letting you know.  But, yes,
25  you -- you are correct.

Page 79

1    MS. VANDERWEELE:  Okay.
2  BY MS. VANDERWEELE:
3    Q.  Ms. Gibbs, we were talking about staff
4  reports not being provided to City Council.
5      When you were the resources director for
6  Beaumont, audits were performed, on an annual basis,
7  of the City; is that correct?
8    A.  Yes.
9    Q.  And those audits were performed by Moss, Levy
10  and Hartzheim?
11    A.  Yes.
12    Q.  And when you served as the resources
13  director, were you aware that every year Moss, Levy
14  and Hartzheim performed an audit of the City?
15    A.  Yes.
16    Q.  And as the resources director, were you
17  responsible for reviewing those audit reports on an
18  annual basis?
19    A.  No.
20    Q.  Those audit reports that were done by Moss,
21  Levy and Hartzheim, did you ever review them?
22    A.  No.
23    Q.  But you're aware that they -- strike that.
24      Although you did not review any of the Moss,
25  Levy and Hartzheim audit reports when you were

Page 80

1  resources director, you were aware that those audits
2  were being done; correct?
3    A.  Yes.
4    Q.  The audit reports were provided to City
5  Council; correct?
6    A.  I don't know.
7    Q.  Do you have any knowledge or information
8  regarding whether the audit reports from Moss, Levy
9  and Hartzheim were provided to City Council?
10    A.  I'd have to review City Council minutes.
11    Q.  But as you sit here today, you don't have any
12  knowledge or information regarding whether the City
13  was provided those audits; is that correct?
14    A.  Correct.
15    MS. VANDERWEELE:  I'm going to show you
16  Exhibit 5.
17    THE WITNESS:  After this exhibit can we take
18  a break?
19    MS. VANDERWEELE:  Sure.  I'm happy to take a
20  break now, if you'd like, before we get going on
21  this exhibit.
22    THE WITNESS:  Can we do that?
23    MS. VANDERWEELE:  Yeah, not a problem.
24    THE WITNESS:  Okay.  Thank you.
25    THE VIDEOGRAPHER:  This marks the end of

Page 81

1  Media No. 1.  The time is 10:42 a.m.  We are off the
2  record.
3      (A brief recess was taken.)
4    THE VIDEOGRAPHER:  This marks the beginning
5  of Media No. 2 in the deposition of
6  Elizabeth Gibbs-Urtiaga.  The time is 10:56 a.m.  We
7  are on the record.
8  BY MS. VANDERWEELE:
9    Q.  Shortly before we took a break, you had
10  testified that when you were the resources director
11  that you were aware that Mr. Kapanicas -- or at least
12  there were times when Mr. Kapanicas would not provide
13  staff reports to City Council.
14      Do you recall that?
15    A.  Yes.
16    Q.  And were there times when you were aware,
17  during your role as resources director for the City,
18  that Mr. Kapanicas was withholding staff reports from
19  the City Council that you felt should have been
20  provided to City Council?
21    A.  Let me clarify.
22      So that is common to draft staff reports
23  that don't make it to City Council.  If they're on
24  the agenda, then City Council is provided with staff
25  reports, if it's an agendized item.



EXHIBIT 19
PAGE 1183

Page 82

1      However, there are times when staff will
2  create staff reports on a plethora of items, and
3  before the course of the posting, 75 hours in
4  advance, it could be that the matter was resolved or
5  that it didn't need Council action, or it was
6  postponed for a month or two.
7      That's not uncommon to have a staff report
8  drafted that does not go to City Council in a City
9  Council meeting.  They're draft staff reports.
10     Q.  Were there ever times when you served as
11 resources director for Beaumont that you believed
12 Mr. Kapanicas was withholding information from the
13 City Council?
14     A.  No.
15     MS. VANDERWEELE:  I'm going to show you what
16 I'll mark as Exhibit 5.
17     And Exhibit 5, for the record, is
18 Bates-stamped B-e-a-u-a-i-g 49135.
19     (Deposition Exhibit 5 was marked for
20     identification by the court reporter.)
21 BY MS. VANDERWEELE:
22     Q.  And this is an April 2, 2015, e-mail from
23 Jim Gregg to Mr. Kapanicas, and it's copying you,
24 Elizabeth Gibbs; correct?
25     A.  Correct.

Page 83

1      Q.  And do you recall receiving this e-mail?
2      A.  No.
3      Q.  Do you have any reason to dispute that this
4  is an e-mail that you received on April 2, 2015?
5      A.  No.
6      Q.  The subject of this e-mail is regarding:
7  Increase ERMAC Fees.
8      Correct?
9      A.  Yes.
10     Q.  And in this e-mail, Mr. Gregg is providing an
11 estimate for insurance costs, to you and
12 Mr. Kapanicas; correct?
13     A.  Correct.
14     Q.  And the total estimated insurance cost is
15 $394,500; correct?
16     A.  Correct.
17     Q.  And this -- the estimated insurance costs for
18 the following year exceeds that $10,000 purchasing
19 limit for the City Manager; correct?
20     A.  Correct.
21     Q.  And so am I correct that the City Council
22 would need to vote on and approve the purchase of
23 insurance as set forth in this e-mail?
24     A.  They should have, yes.
25     Q.  And City Council did approve of the purchase

Page 84

1  of insurance, as set forth in this e-mail; correct?
2      A.  Can you say that again?  Did you say "did"
3  or "didn't"?
4      Q.  "Did."
5      A.  "Did"?  I don't know.  If it was included in
6  the budget and Council adopted the budget, then --
7  I'd have to look at the minutes.
8      Q.  We've talked about how purchases over $10,000
9  required City Council approval; right?  Correct?
10     A.  They were supposed to.
11     Q.  If an insurance claim was valued over
12 $10,000, was the submission a claim that was valued
13 over $10,000 -- did that require City Council
14 approval?
15     A.  I don't know.
16     MS. VANDERWEELE:  I'm going to show you
17 Exhibit 6.
18     I'll zoom out here.  Exhibit 6, for the
19 record, is Bates-stamped B-e-a-u-a-i-g 49136 through
20 49144.
21     (Deposition Exhibit 6 was marked for
22     identification by the court reporter.)
23 BY MS. VANDERWEELE:
24     Q.  And this is a May 8, 2015, e-mail from
25 James Gregg to Alan Kapanicas, John Pinkney,

Page 85

1  Shelby Hanvey and Elizabeth Gibbs-Urtiaga; correct?
2      A.  Correct.
3      Q.  Mr. Pinkney was the City Attorney as of
4  May 8, 2015?
5      A.  Yes.  I don't know what day he was appointed
6  specifically.
7      Q.  Do you recall that Aklufi -- Mr. Aklufi, the
8  prior City Manager, resigned as of May 1, 2015?
9      A.  I don't recall when Joe Aklufi resigned.
10     Q.  Shelby Hanvey, who is that?
11     A.  She held the title of Deputy City Clerk.
12     Q.  And what were Ms. Hanvey's duties and
13 responsibilities as Deputy City Clerk?
14     A.  Mainly filing, putting the agenda together
15 for Alan.  She was also the spouse of Bill Aylward.
16 She would help at the counter in customer service at
17 times.
18     Q.  So the --
19     A.  Her --
20     Q.  Oh, I'm sorry.  Please continue.
21     A.  Her title and her duties did not correlate.
22     Q.  And what do you mean by that?
23     A.  She was not qualified to be a Deputy City
24 Clerk.
25     Q.  And did you feel that way when you served as



EXHIBIT 19
PAGE 1184

Page 86

1  resources director?
2      A.  Yes.
3      Q.  And did you ever report that to anyone?
4      A.  I don't know that it was reported.  It was
5  discussed with Alan.
6      Q.  And what did you tell Alan regarding your
7  concerns about Ms. Hanvey being unqualified to serve
8  in her position?
9      A.  That she wasn't qualified.
10     Q.  And when you say not qualified, can you
11 explain that, please?
12     A.  She did not understand the Brown Act.  She
13 did not understand records retention.
14     Q.  During the time that Shelby Hanvey served as
15 the Deputy City Clerk, she was married to Bill
16 Aylward?
17     A.  They cohabitated.  And at some point they
18 got married, but I don't know when.
19     Q.  I take it the relationship between Ms. Hanvey
20 and Mr. Aylward was known by City Council?
21     A.  Yes.  They had a child together.
22     MR. NOLAN:  I'm going to object as to
23 speculation as to whether City Council knew.
24     THE WITNESS:  Oh.
25     MR. NOLAN:  We -- you knew; correct.  I'm

Page 87

1  not sure if -- how we would know if City Council
2  knew.  Lack of foundation of that aspect.
3      BY MS. VANDERWEELE:
4      Q.  Ma'am, do you have any reason to believe that
5  the City Council did not know that its director of
6  finance was married to Shelby Hanvey?
7      A.  No.
8      Q.  Based on your day-to-day interaction with
9  members of City Council and other staff at the City,
10 do you believe, based on that, that everyone at City
11 Hall knew that Mr. Aylward was either cohabitating
12 with or married to Shelby Hanvey, who was the Deputy
13 City Clerk?
14     MR. NOLAN:  I'm going to object.  Same
15 thing.  Lack of foundation.  Calls for speculation.
16 Relies on hearsay.
17     MS. VANDERWEELE:  She can still answer.
18     MR. NOLAN:  If she knows, of her personal
19 knowledge.
20     THE WITNESS:  Can you repeat the question?
21     BY MS. VANDERWEELE:
22     Q.  Sure.
23         You worked at City Hall for decades; correct?
24     A.  Yes.
25     Q.  You interacted with staff on a daily basis;

Page 88

1  true?
2      A.  Yes.
3      Q.  Did you also interact with City Council from
4  time to time?
5      A.  Occasionally.
6      Q.  Would you be present at City Council
7  meetings?
8      A.  Yes.
9      Q.  Would you provide staff reports to City
10 Council?
11     A.  Yes.
12     Q.  Based on your interactions with the City
13 staff and the City Council, do you believe, in your
14 individual capacity, that City staff and City Council
15 understood and knew that its director of finance was
16 married to the Deputy City Clerk?
17     MR. NOLAN:  Objection.  Calls for
18 speculation.  Lack of foundation.  Possibly relies
19 on hearsay.
20     BY MS. VANDERWEELE:
21     Q.  You can still answer, if you know, if you're
22 able to.
23     A.  Yes.
24     Q.  And so I want to turn -- or, actually, let me
25 back up.

Page 89

1          You reported to Mr. Kapanicas that you felt
2  Ms. Hanvey was not qualified for her position;
3  correct?
4      A.  Correct.
5      Q.  Did you report those concerns to anyone else?
6      A.  No.
7      Q.  Why not?
8      A.  Because I reported to Alan.
9      Q.  How long did Ms. Hanvey serve as the Deputy
10 City Clerk for Beaumont?
11     A.  I'm going to guess and say more than
12 15 years, around 15 years.
13     Q.  So as best as you can recall, Ms. Hanvey
14 served as the Deputy City Clerk for Beaumont; is that
15 correct?
16     A.  Yes.
17     Q.  During those approximately 15 years that
18 Ms. Hanvey served as Deputy City Clerk, did you ever
19 report concerns regarding her lack of qualification,
20 to anyone other than Mr. Kapanicas?
21     A.  No.
22     Q.  And did you feel that Ms. Hanvey was
23 unqualified to serve as Deputy City Clerk during the
24 entire 15 years that Ms. Hanvey was in that position?
25     A.  Yes.

23  (Pages 86 to 89)



EXHIBIT 19
PAGE 1185

Page 90

1    Q.  Other than Ms. Hanvey, are there other
2  employees or staff of Beaumont that you felt were
3  unqualified for their positions?
4    A.  No, not that I recall.
5    Q.  Did you ever have concerns regarding
6  Mr. Aylward's qualifications to serve as director of
7  finance?
8    A.  No.
9    Q.  Did you ever have concerns regarding
10  Mr. Aklufi or Mr. Wysocki's qualifications to serve
11  as City Attorney?
12    A.  No.
13    Q.  Turning back to Exhibit 5, do you recall
14  receiving this e-mail?
15    A.  No.
16    Q.  Do you have any reason to dispute that this
17  is an e-mail that you received on or about May 8,
18  2015?
19    A.  No, I don't dispute that.
20    Q.  And this is an e-mail regarding a
21  government -- or a crime coverage policy; do you
22  understand that?
23    A.  Yes.
24    Q.  And I'm going to show you -- I hope I can get
25  to the right page.  I'm going to show you -- it's

Page 91

1  page 3 of Exhibit 6.  And, I apologize, I think I had
2  referred to it as Exhibit 5, but we're on Exhibit 6.
3    And page 3 of this exhibit is a June 25,
4  2014, letter from AIG and National Union Fire
5  Insurance Company of Pittsburgh, PA.
6    Do you see that?
7    A.  Yes.
8    Q.  And this is regarding a government crime
9  policy; correct?
10    A.  That's what it says.
11    Q.  Do you recall receiving and reviewing this
12  letter?
13    A.  No.
14    Q.  Have you ever reviewed the government crime
15  insurance policy No. 01-309-61-64?
16    A.  No.
17    Q.  As the resources director, were you
18  responsible for reviewing and understanding the terms
19  of the policy that's referenced in Exhibit 6?
20    A.  No.
21    Q.  As of May 8, 2015, when you received the
22  e-mail that's contained in Exhibit 6, I take it you
23  were at least aware that -- of the City's government
24  crime policy; correct?
25    A.  No.  Oftentimes if it didn't pertain to me

Page 92

1  directly I wouldn't open any attachments.  I
2  wouldn't read what was in it.  I'd just delete the
3  e-mail.
4    Q.  When you served as the resources director for
5  Beaumont, did you have any understanding at all
6  regarding the terms of the government crime insurance
7  policy that the City had purchased from my client,
8  National Union Fire Insurance Company?
9    A.  No.
10    Q.  And it's your testimony that, as resources
11  director, you did not have any duties to review or
12  understand the terms of this policy; is that correct?
13    A.  That's correct.
14    Q.  Is it also your testimony that, as resources
15  director, you did not have any duty to review or
16  understand the reporting requirements for submitting
17  an insurance claim pursuant to this policy; is that
18  true?
19    A.  That's true.
20    Q.  I want to go back up -- and focusing your
21  attention now on page 2 of Exhibit 6, there's an
22  e-mail from Mr. Pinkney to you and Shelby Hanvey,
23  copying Mr. Kapanicas, dated May 7, 2015.
24    Do you see that?
25    A.  Yes.

Page 93

1    Q.  And Mr. Pinkney asks, quote (as read):
2    Have the City Clerk and treasurer been bonded
3  per Government Code Section 36518, question mark,
4  closed quote.
5    Do you see that?
6    A.  Yes.
7    Q.  Do you have any understanding as to why
8  Mr. Pinkney was asking you and Ms. Hanvey whether the
9  City Clerk and treasurer were bonded, on May 7, 2015?
10    A.  I -- I recall that we were the only ones
11  that had been introduced to Mr. Pinkney when he
12  first came on board because we helped coordinate
13  interviews with his firm.  And it may be that he
14  sent it to us because he didn't know anybody else in
15  City Hall.
16    Q.  Do you know why Mr. Pinkney was asking
17  whether the City Clerk and treasurer had been bonded?
18    A.  I think he was doing -- I can't speak to his
19  thought process, but I would imagine he was doing
20  due diligence as the new City Attorney.
21    Q.  Actually, I'm going to go back to page 3 of
22  Exhibit 6.  You see here that the -- the policy
23  number is identified in the -- in the subject line,
24  correct, of this letter?
25    A.  Yes.

24  (Pages 90 to 93)



MAGNA ▸
LEGAL SERVICES

EXHIBIT 19
PAGE 1186

Page 94

1    Q.  And the policy period effective date is
2  June 30, 2014, to June 30, 2015; correct?
3    A.  Correct.
4    Q.  In -- on June 2 of 2015, that's when you were
5  appointed Interim City Manager; correct?
6    A.  Correct.
7    Q.  So as of June 2, 2015, Mr. Kapanicas was
8  placed on administrative leave; true?
9    A.  It was a few days before I was appointed,
10  yes.
11    Q.  As of June 2, 2015, when you were appointed
12  Interim City Manager, Mr. Aklufi had resigned by that
13  time; correct?
14    A.  Yes.
15    Q.  By the time that you were appointed Interim
16  City Manager on June 2, 2015, Bill Aylward had
17  resigned; correct?
18    A.  Correct.
19    Q.  When you worked as the resources director for
20  Beaumont, were you responsible for ensuring that City
21  employees and officials completed a Form 700 on an
22  annual basis?
23    A.  Can you repeat that?
24    Q.  Sure.
25        Do you know what a Form 700 is?

Page 95

1    A.  Yes.
2    Q.  And what is a Form 700?
3    A.  It's the Fair Political Practices Commission
4  form that certain positions within government are
5  required to complete every year.
6    Q.  While you worked as resources director for
7  Beaumont, did you understand that the Fair Political
8  Practices Commission required City officials and
9  employees, who make or influence governmental
10  decisions, to submit a Statement of Economic
11  Interest, otherwise known as a Form 700?
12    A.  Yes.
13    Q.  And did you file Statements of Economic
14  Interest with the City as required by the FPPC?
15    A.  Yes.
16    Q.  As resources director, were you responsible
17  for reviewing other City employees' and officials'
18  Form 700 on an annual basis?
19    A.  No.
20    Q.  As resources director for Beaumont, were you
21  responsible for keeping track of employees' and City
22  officials' submission of Form 700?
23    A.  No.
24    Q.  Who was responsible for that?
25    A.  The Deputy City Clerk.

Page 96

1    Q.  And that was Shelby Hanvey?
2    A.  Yes.
3    Q.  Who you feel was unqualified for her
4  position?
5    A.  Yes.
6    Q.  When you were resources director for
7  Beaumont, did you understand that California law
8  prohibited City employees and officers from
9  participating in decisions in which they had a
10  financial interest?
11    A.  No.
12    Q.  When you began your employment with City of
13  Beaumont, did the City require that you undergo any
14  training with respect to the Fair Political Practices
15  Commission?
16    A.  No.
17    Q.  At any time during your employment with the
18  City of Beaumont, as the resources director, did you
19  ever undergo any training or education related to the
20  Fair Political Practices Commission?
21    A.  No.
22    Q.  When you were appointed Interim City Manager,
23  did you have any understanding as to the requirements
24  under the fair political practices act?
25    A.  No.

Page 97

1    Q.  On an annual basis, you completed a Form 700;
2  true?
3    A.  True.
4    Q.  But you had no understanding as to what was
5  required by the FPPC; is that your testimony?
6    A.  Other than submitting the form.
7    Q.  Did you understand, during your employment
8  with the City of Beaumont, that California law
9  prohibited City employees and officers from being
10  financially interested in a contract in which they
11  were involved or participated in forming?
12    A.  I learned that after I was appointed in '15.
13  I didn't know that before.
14    Q.  Prior to 2015, the City never required you to
15  undergo any training related to the FPPC; is that
16  correct?
17    A.  Not that I recall, no.
18    Q.  When you completed the Form 700 on an annual
19  basis, did you ever ask anyone about why you were
20  being required to submit a Statement of Economic
21  Interest?
22    A.  No.
23    Q.  Why not?
24    A.  I read the instructions that came with the
25  form.



EXHIBIT 19
PAGE 1187

Page 98

```
1        Q.  When is the first time that you learned that
2   California law prohibited City employees and officers
3   from participating in decisions in which they had a
4   financial interest?
5        A.  After I was appointed the Acting City
6   Manager in '15.
7        Q.  So that would have been in June 2015?
8        A.  June, July 2015; somewhere in there.
9        Q.  And how did you learn that California law
10  prohibited employees and officers of the City from
11  participating in decisions in which they had a
12  financial interest?
13       A.  My husband's company had a contract for weed
14  abatement.  And when I was appointed Acting City
15  Manager, that contract was terminated.
16       Q.  And who told you that that contract needed to
17  be terminated?
18       A.  The City Attorney.
19           MS. VANDERWEELE:  I want to show you
20  Exhibit 7.
21           I'm showing you what I've marked as Exhibit
22  7, which, for the record, is Bates-stamped
23  BEAUMONTAIG0407453 through 0407460.  And I'll zoom
24  out so that you're able to see this.  It's a
25  seven-page document.
```

Page 99

```
1   you can see the whole thing, and then I'll zoom in
2   you can see the whole thing, and then I'll zoom in
3   onto specific portions that I have questions about.
4           (Deposition Exhibit 7 was marked for
5            identification by the court reporter.)
6   BY MS. VANDERWEELE:
7        Q.  My first question is:  Do you recognize this
8   document?
9        A.  No.
10       Q.  Did you have any involvement in the drafting
11  or preparation of this document?
12       A.  No.
13       Q.  Do you have any knowledge or information as
14  to what this document shows?
15       A.  It lists employees and others, elected
16  officials, their position, and some sort of a
17  description.
18       Q.  And is your knowledge about what the document
19  contains just based on simply reading the document?
20       A.  Say that again.
21       Q.  I'm just trying to see if you have any
22  knowledge or information regarding how this document
23  was prepared or who prepared it.  And it sounds like,
24  given the fact that you've never seen this before,
25  you're not able to provide any testimony about it.
```

Page 100

```
1           Is that fair?
2        A.  That's fair.
3        Q.  We talked a little bit earlier about audits
4   that were done by Moss, Levy and Hartzheim on an
5   annual basis; do you recall that questioning?
6        A.  Yes.
7        Q.  And you told me that, when you were the
8   resources director, you understood that the Moss,
9   Levy and Hartzheim firm performed annual audits of
10  the City; correct?
11       A.  Correct.
12       Q.  And I believe you told me earlier you never
13  reviewed those audit reports; correct?
14       A.  Correct.
15       Q.  Why not?
16       A.  That was the finance director's job.
17       Q.  Is it your testimony that the resources
18  director for the City had no duty or responsibility
19  to review the annual audit reports that were
20  performed by Moss, Levy and Hartzheim?
21       A.  It was not in my job description.
22       Q.  I want to show you Exhibit 8 -- let me back
23  up.
24           Do you recall in 2015 that the State
25  Controller's Office performed an audit of Beaumont?
```

Page 101

```
1        A.  Yes.
2           MS. VANDERWEELE:  And I'm going to show you
3   now Exhibit 8.  Exhibit 8, for the record, is
4   Bates-stamped B-e-a-u-a-i-g 0073870 through 73873.
5           (Deposition Exhibit 8 was marked for
6            identification by the court reporter.)
7   BY MS. VANDERWEELE:
8        Q.  And the first page is an e-mail dated May 19,
9   2015, from Mike Spalj, S-p-a-l-j, from the State
10  Controller's Office, to Alan Kapanicas, and copying
11  Elizabeth Gibbs-Urtiaga and John Pinkney; correct?
12       A.  Correct.
13       Q.  Do you recall receiving this e-mail?
14       A.  No.  But I know -- I recognize the name from
15  the SCO's office.
16       Q.  Do you recall learning in May of 2015 that
17  the State Controller's Office was going to be
18  performing an audit of the City's administrative and
19  internal accounting controls?
20       A.  I learned -- I don't remember what day it
21  was, but I learned that they were going to do an
22  internal control audit.
23           When they arrived at City Hall, I was the
24  senior-most person in the office, everybody else had
25  left.  And I -- I met with them because there was
```



MAGNA
LEGAL SERVICES

EXHIBIT 19
PAGE 1188

Page 102

```
 1    nobody else there to meet with them.
 2        Q.  And when you say there was no one else there,
 3    is that because they came at a certain time of day
 4    when no one was there, or was that because everyone
 5    who was in a senior position had stepped down?
 6        A.  Alan was still there.  Everybody else had
 7    stepped down.  And he was walking out the door to go
 8    meet with his attorney, and he said, Good luck.
 9        Q.  In May of 2015, that's when Mr. Aklufi
10    resigned; correct?
11        A.  I don't recall when Mr. Aklufi left.
12        Q.  At the -- do you recall the date that the
13    State Controller showed up to City -- City Hall?
14        A.  No, I don't.
15        Q.  Was it before you were appointed Interim City
16    Manager?
17        A.  Yes.
18        Q.  The day of this e-mail in Exhibit 8 is
19    May 19, 2015.  Would it be fair to say that you met
20    with the State Controller at City Hall sometime
21    between May 19 of 2015 and when you were appointed
22    Interim City Manager on June 2 of 2015?
23        A.  Yes.
24        Q.  And, actually, I think we might have a date,
25    if I -- it looks like -- so page 2 of Exhibit 8 is a
```

Page 103

```
 1    letter from the California State Controller to
 2    Mr. Kapanicas, City Manager of City of Beaumont;
 3    correct?
 4        A.  Correct.
 5        Q.  And this was the -- this letter that's
 6    contained on page 2 of Exhibit 8 was the letter
 7    attached to the e-mail that you received on May 19,
 8    2015, regarding this audit; correct?
 9        A.  Say that again.
10        Q.  Sure.
11            So the first page of Exhibit 8 is an e-mail,
12    and there's an attachment to this e-mail; right?
13        A.  Right.
14        Q.  And you received this e-mail on May 19, 2015;
15    correct?
16        A.  Correct.
17        Q.  And the e-mail attached a letter that starts
18    on page 2 of Exhibit 8; right?
19        A.  Correct.
20        Q.  So you would have received this letter on
21    May 19, 2015; true?
22        A.  Correct.
23            I don't know when we met, and I want to say
24    this -- this was a follow-up to that meeting,
25    because I was not aware that the State Controller's
```

Page 104

```
 1    Office was coming.
 2        Q.  The last paragraph on the letter, on page 2,
 3    talks about entrance conference; do you see that?
 4        A.  Yes.
 5        Q.  And this letter states that (as read):
 6            The entrance conference will be held at
 7    550 East 6th Street, Beaumont, California, at
 8    1:30 p.m., on May 26, 2014.
 9            Correct?
10        A.  Correct.
11        Q.  Were you present for this conference with the
12    State Controller's Office on May 26, 2014?
13        A.  No.  That was the year before.
14        Q.  Oh, good point.
15            Were -- and you testified that you recall,
16    sometime in May of 2015, a meeting with the State
17    Controller?
18        A.  Yes.
19        Q.  At the time that you met with the State
20    Controller in May of 2015, Mr. Aklufi had stepped
21    down or resigned; is that correct?
22        A.  I -- I -- again, I don't know when he left.
23    I don't recall what day it was.
24        Q.  Tell me what happened when you met with the
25    State Controller in May of 2015.
```

Page 105

```
 1        A.  There were a lot of people.  There were
 2    two -- two different teams.  They were doing two
 3    different audits.
 4            I had never heard of this before.  And I
 5    explained that on behalf of the City, I would do
 6    everything we could to help them; however, I was the
 7    senior-most person at the time in City Hall and
 8    finance was not my area of expertise.
 9        Q.  How long did you meet with the two teams from
10    the State Controller's Office in May of 2015?
11        A.  On that particular day, I want to say the
12    meeting lasted anywhere from 30 to 45 minutes, I'm
13    guessing.
14        Q.  And did anyone from the State Controller's
15    Office advise you as to why they were doing an audit
16    of the City?
17        A.  Not that I recall.
18        Q.  Did you understand that an audit was being
19    done over the City's internal accounting controls?
20        A.  I -- I don't remember what the conversation
21    was.  I -- I imagine they explained that.
22        Q.  Do you see in this letter, in the first
23    paragraph -- I'm looking at page 2 of Exhibit 8.  The
24    letter states that (as read):
25            The State Controller's Office will review the
```

27 (Pages 102 to 105)



EXHIBIT 19
PAGE 1189

Page 106

1  City of Beaumont's administrative and internal
2  accounting controls.
3       Do you see that?
4       A.  Yes.
5       Q.  And do you also see in the third paragraph in
6  this letter, the State Controller states that it
7  believes that (as read):
8           The City's ability to provide reliable and
9  accurate information regarding required financial
10 reports submitted by the City is questionable?
11      A.  I see it says that, yes.
12      Q.  And this was information provided to you on
13 May 19th of 2015; correct?
14      A.  Correct.
15      Q.  The state --
16      A.  I don't recall that, though.
17      Q.  The State Controller -- it sounds like there
18 was an initial meeting where they came to City Hall
19 and you met with the team from the State Controller's
20 Office for 30 to 45 minutes; correct?
21      A.  Correct.
22      Q.  Did you have any understanding, during that
23 meeting, as to why the audit was being performed?
24      A.  No.
25      Q.  Following that meeting, did you have

Page 107

1  subsequent discussions or meetings with the State
2  Controller's Office?
3       A.  They occupied a couple offices here in City
4  Hall.  And I would occasionally, as the Acting City
5  Manager, have to meet with them.
6       Q.  During what time period did the State
7  Controller occupy offices at City Hall?
8       A.  I want to say they were here anywhere from
9  four to six months.
10      Q.  And that was starting in May of 2015?
11      A.  I don't know if it started right away or --
12 I don't know when they actually came.  I know -- I
13 remember the meeting very briefly, but I don't -- I
14 don't recall when their auditors showed up.
15      Q.  When you were appointed Interim City Manager
16 on June 2 of 2010, by that time had the State
17 Controller auditors been occupying offices at City
18 Hall?
19      A.  I don't recall.
20      Q.  The four to six months that the State
21 Controller occupied offices at City Hall that -- in
22 any event, began in 2015; correct?
23      A.  Correct.
24      Q.  And during that time period as City Manager
25 or Interim or Acting City Manager, did you meet with

Page 108

1  the team from the State Controller's Office to
2  discuss what they were doing?
3       A.  There was a formal meeting set up weeks,
4  months after they arrived.  Other than that, it was
5  just chatter in the hallway, or if they needed a
6  document that nobody could find, they would ask me
7  if I knew where it was.
8           But the formal meeting was significantly
9  longer after they originally came.  It was like a
10 briefing on where they were at in the process.
11      Q.  When did the formal meeting occur with the
12 State Controller's Office?
13      A.  I don't -- I don't remember.
14      Q.  Was it in 2015?
15      A.  Possibly, yes.
16      Q.  Did you prepare any notes regarding the
17 formal meeting that you participated in with the
18 State Controller's Office?
19      A.  Say that again.
20      Q.  Sure.
21           You told me that you -- you attended this
22 meeting; correct?
23      A.  Correct.
24      Q.  Did you prepare any notes regarding that
25 meeting?

Page 109

1       A.  I don't remember.
2       Q.  Who attending the meeting with -- the formal
3  meeting with the State Controller's Office that
4  you've mentioned?
5       A.  I -- I imagine it would have been me, the
6  interim finance director at the time -- which we had
7  a turnover, so I don't know if it was -- I can't
8  remember the gentleman's name.  Onyx Jones
9  eventually joined us as interim financial director.
10 And I don't remember anybody else.
11      Q.  Where did the meeting take place?
12      A.  It would have been in our conference room
13 here at City Hall.
14      Q.  And tell me what you learned during that
15 meeting.
16      A.  I learned that they were close to providing
17 a -- a report, and that was about it.
18      Q.  During this meeting, did the State Controller
19 advise you of any of their findings?
20      A.  I don't recall.  They may have summarized
21 some of them or hit some high points, verbally.  I
22 don't remember getting any documents.
23      Q.  Do you recall that the State Controller
24 issued its audit report in November of 2015?
25      A.  The formal report?



EXHIBIT 19
PAGE 1190

Page 110

1     Q.  Correct.
2     A.  That -- that might be.
3     Q.  I take it the formal meeting that you
4  participated in with the State Controller's Office
5  occurred prior to the issuance of the State
6  Controller's final audit report; correct?
7     A.  Correct.
8     Q.  And so if the audit report was issued in
9  November of 2015, the formal meeting that you
10 participated in had to have occurred some time before
11 then; correct?
12    A.  Correct.
13    Q.  Did -- prior to receiving the final audit
14 report, did you ever learn of any of the auditors'
15 findings?
16    A.  I don't recall.
17    Q.  Do you recall receiving the final audit
18 report?
19    A.  Vaguely.
20    Q.  The auditor found significant weaknesses in
21 the City's accounting and administrative control
22 system; correct?
23    A.  Correct.  There was, I don't know, 60 or 70
24 findings I think.
25    Q.  And were any of those findings reported to

Page 111

1  you during the formal meeting that you attended with
2  the State Controller?
3     A.  I -- I don't remember.  Like I said, I think
4  they hit some of the high points as a courtesy
5  because it was going to hit the press.
6     Q.  When you attended this formal meeting with
7  the State Controller's, did you come away thinking
8  everything was fine?
9     A.  I walked out of that meeting thinking that
10 there was a lot of misunderstandings.
11    Q.  And what do you mean by that?
12    A.  Some of the things -- I remember thinking
13 that some of the things that they were telling us
14 were not the entire picture and that they were --
15 we -- we had recently lost the hard drive where some
16 of our records retention were kept, and it was
17 corrupt, it crashed.
18        And so some of the documents that they
19 wanted -- I recall some of the findings were because
20 of that, but they -- it didn't matter.
21    Q.  Did you provide -- all of -- so the auditor
22 requested documents from the City as part of --
23 strike that.
24        The State Controller requested documents from
25 the City as part of its audit; correct?

Page 112

1     A.  Correct.
2     Q.  And were you involved in ensuring that the
3  City produced all documents requested by the State
4  Controller's Office?
5     A.  I directed staff to comply.
6     Q.  And did City of Beaumont staff comply with
7  all requests made by the State Controller's Office?
8     A.  I believe so, yes.
9     Q.  In -- does the City of Beaumont -- or strike
10 that.
11        In 2015, did the City of Beaumont have a
12 records retention policy?
13    A.  Not a formal policy that I remember.
14    Q.  At any time that you served as resources
15 director for the City, did the City have a record
16 retention policy?
17    A.  Thinking back, I think we adopted a -- a
18 City Council resolution with a records retention
19 policy, but it wasn't a comprehensive policy, it was
20 just a very general one.
21        But there -- it seems like there was a City
22 Council resolution that was adopted.
23    Q.  And when did the City Council adopt a
24 resolution enacting a formal record retention policy?
25    A.  I don't remember the date.

Page 113

1     Q.  Was it when you served as the resources
2  director for the City?
3     A.  It could have been, yes.
4     Q.  Turning back to Exhibit 8.  I've shown you a
5  couple portions of this letter.  And -- and the
6  letter expresses concern about the City's ability to
7  provide reliable and accurate information; correct?
8     A.  Correct.
9     Q.  And did you ever inform City Council of the
10 letter that you received on or about May 19, 2015,
11 from the State Controller's Office?
12    A.  I'd have to go back to minutes.
13    Q.  Do you have an independent recollection of
14 ever speaking with anyone from City Council about the
15 State Controller's letter that's contained in
16 Exhibit 8?
17    A.  Can I have just a minute?
18    Q.  Sure.
19    MS. VANDERWEELE:  Oh, wait.  Hold on.  Ma'am,
20 you can't -- you have to answer the question.  You
21 can take as much time as you want to answer, but you
22 can't consult with your attorney about the answer.
23    THE WITNESS:  Okay.  Can you hear me?
24 BY MS. VANDERWEELE:
25    Q.  Yep.

29 (Pages 110 to 113)



EXHIBIT 19
PAGE 1191

Page 114

1    A. Okay.
2    Q. Do you want me to restate the question?
3    A. Please. Please.
4    Q. Do you have an independent recollection or
5    memory of ever speaking with anyone on City Council
6    about the letter that you received from the State
7    Controller's Office on or about May 19, 2015?
8        MR. NOLAN: I'm going to object twofold.
9        No. 1, I'll be asserting privilege to any
10   conversations that may have taken place in a closed
11   session.
12       And, secondly, well, it's just lack of
13   foundation and -- and hearsay to those conversations.
14       MS. VANDERWEELE: Well, she hasn't testified
15   that she ever discussed this in closed session, so
16   she can answer the question.
17       MR. NOLAN: I believe your question is broad
18   enough that it would potentially cover that. So I'm
19   objecting so that there is no response as to any
20   conversations that may have occurred in closed
21   session.
22       MS. VANDERWEELE: Okay. Let me do it this
23   way.
24   BY MS. VANDERWEELE:
25   Q. Ma'am, have you ever spoken with City

Page 115

1    Council, during a closed session, regarding the
2    letter that's contained in Exhibit 8?
3        MR. NOLAN: Objection.
4        MS. VANDERWEELE: She can testify whether
5    she had the discussion, without divulging the
6    substance of that discussion.
7        MR. NOLAN: And my objection stands.
8        MS. VANDERWEELE: Okay. She can still
9    answer.
10       MR. NOLAN: I'm instructing her not to
11   answer.
12       (Instruction not to answer.)
13       MS. VANDERWEELE: I'm not asking her about
14   what was discussed in closed session. I'm asking
15   whether she did discuss this letter in closed
16   session. There is a difference.
17       MR. NOLAN: And the substance is not the
18   only part that is privileged. You're asking her
19   about what took place in closed session, and that is
20   privileged.
21       You're asking her if she had conversations
22   in closed sessions; that is privileged.
23   BY MS. VANDERWEELE:
24   Q. Ma'am, did you ever discuss this letter,
25   that's contained in Exhibit 8, with City Council,

Page 116

1    outside of a closed-session meeting?
2    A. I don't recall.
3    Q. Did you ever speak with anyone on City
4    Council, at any time, outside of a closed-session
5    meeting, regarding the State Controller's audit?
6    A. Can you -- sorry. Can you repeat that? Did
7    you say "anyone"?
8    Q. So this -- what I'm trying to figure out is
9    if you've ever spoken with anyone from City Council
10   regarding the audit that was performed, outside of a
11   closed-session meeting?
12   A. I don't remember. I'd have to look at City
13   Council minutes.
14   Q. So without the benefit of looking at a
15   meeting minute, as you sit here today, you don't
16   recall ever speaking with anyone on City Council
17   about the State Controller's audit, outside of a
18   closed-session meeting; is that correct?
19   A. Correct.
20   Q. Are you familiar with Urban Logic consulting?
21   A. Yes.
22   Q. While you were employed by the City of
23   Beaumont as resources director, I take it you
24   understood that the City contracted with Urban Logic
25   Consultants; correct?

Page 117

1    A. I knew they worked for us. I didn't know
2    the nature or the terms.
3    Q. Did you know that the City had a contract
4    with Urban Logic Consultants when you served as
5    resources director?
6    A. I never reviewed a contract, no.
7    Q. That's not my question.
8        And I -- I -- I understand you might not know
9    the terms of the contract, but did you understand,
10   when you worked as the resources director, that the
11   City did have a contract what Urban Logic
12   Consultants?
13   A. I understood that they were consultants,
14   yes.
15   Q. But you understood that Urban Logic
16   Consultants did business with the City when you
17   worked as resources director; correct?
18   A. Yes.
19   Q. When you were employed by the City as
20   resources director, did you know who the owners of
21   Urban Logic Consultants were?
22   A. No.
23   Q. Do you know a gentleman by the name of
24   Deepak Moorjani?
25   A. Yes.

30  (Pages 114 to 117)



EXHIBIT 19
PAGE 1192

Page 118

1    Q.  Mr. Moorjani served as the City's public
2  works director; correct?
3    A.  Correct.
4    Q.  And Mr. Moorjani served at the City's public
5  works director from 1993 to 2009; correct?
6    A.  Yeah.  I thought it was longer than that.
7    Q.  When you served as the resources director for
8  Beaumont, during that time period, did you know and
9  understand that Mr. Moorjani was the City's public
10  works director?
11    A.  Yes.
12    Q.  When you were the resources director, did you
13  know and understand that a gentleman by the name of
14  David -- David Dillon served as the City's economic
15  development director?
16    A.  Yes.
17    Q.  When you served as the resources director for
18  Beaumont, did you know and understand that Ernest
19  Egger served as the City's planning director?
20    A.  Yes.
21    Q.  When you served as the resources director,
22  did you know and understand that Mr. Moorjani,
23  Mr. Dillon and Mr. Egger owned Urban Logic
24  Consultants?
25    A.  That's what I heard.

Page 119

1    Q.  And who did you hear that from?
2    A.  I believe it was Alan.
3    Q.  Based on Mr. Kapanicas -- and when you say
4  "Alan," you're referring to Alan Kapanicas?
5    A.  Correct, yes.
6    Q.  Based on what Mr. Kapanicas told you, did you
7  understand that Mr. Moorjani, Mr. Dillon and
8  Mr. Egger owned Urban Logic during the time that they
9  served as officials for the City?
10    A.  Yes.
11    Q.  And while you were employed as the resources
12  director, I take it you understood that Mr. Dillon,
13  Mr. Egger and Mr. Moorjani simultaneously owned Urban
14  Logic while serving as City officials; true?
15    A.  Yes.
16    Q.  And you told me earlier you understood that
17  Urban Logic did business with the City as a -- a
18  consultant; correct?
19    A.  Correct.
20    Q.  Was Urban Logic Consultants the contractor
21  for the City on various construction and other public
22  works projects while you served as resources
23  director?
24    A.  They -- they were the City officials holding
25  those three titles, and they had employees that

Page 120

1  worked for them.  But I don't know -- I don't know
2  about construction projects.
3    Q.  When you were the resources director for the
4  City, did you have any oversight over the services
5  that were performed by Urban Logic Consultants on
6  behalf of the City?
7    A.  No.
8    Q.  Did you, as resources director, ever review
9  the contracts that were entered into between Beaumont
10  and Urban Logic Consultants?
11    A.  No.
12    Q.  Did you have any understanding as to the
13  professional services that Urban Logic Consultants
14  provided for the City with respect to the City's
15  public works projects?
16    A.  No.
17    Q.  Given the fact that you never -- or strike
18  that.
19      Have you reviewed the Urban Logic and
20  Beaumont contracts when you served as the City
21  Manager in 2015 and 2016?
22    A.  No.
23    Q.  Is it fair to say that you're not able to
24  offer any testimony or opinions in your individual
25  capacity as to the contracts entered into between

Page 121

1  Beaumont and Urban Logic?
2    A.  Correct.
3    Q.  When you served as the resources director for
4  Beaumont, did you understand that the City awarded
5  projects to Urban Logic Consultants?
6    A.  No.  My -- my knowledge was strictly of
7  their positions as directors.
8    Q.  In terms of the work and services that
9  Urban Logic provided as a contractor for the City,
10  you -- sounds like you don't have any knowledge or
11  information about that; is that correct?
12    A.  Correct.
13    Q.  As the resources director for Beaumont, did
14  you have any duties and responsibilities for
15  reviewing invoices submitted by Urban Logic?
16    A.  No.
17    Q.  When you served as the Interim City Manager
18  and the Acting City Manager for Beaumont in 2015 and
19  2016, did you ever review any of the invoices
20  submitted by Urban Logic?
21    A.  Yes.
22    Q.  And in what context did you review the
23  invoices?
24    A.  I was the approving authority.
25    Q.  So as City Manager, you reviewed and approved

31  (Pages 118 to 121)



EXHIBIT 19
PAGE 1193

Page 122

```
1    invoices submitted by Urban Logic, as City Manager?
2       A.  Yes.
3       Q.  And are the invoices that you reviewed
4    invoices that were submitted to the City during your
5    time as City Manager in 2015 and 2016?
6       A.  Yes.  And there were some that were
7    presented to me as Interim and Acting City Manager,
8    from prior to my appointment.
9       Q.  And what invoices did you review that had
10   been submitted by ULC prior to the appointment as
11   Interim City Manager in 2015?
12      A.  I don't recall the specifics of the
13   invoices.  I just know that they were old invoices
14   that hadn't been approved or paid prior to my
15   appointment.
16      Q.  And was the purpose of you reviewing these
17   old or prior invoices to review and approve them for
18   payment?
19      A.  The purpose was Urban Logic wanted to be
20   paid.
21      Q.  Have you ever reviewed the entirety of the
22   invoices that have been submitted by Urban Logic
23   between 1993 and 2012?
24      A.  No.
25      Q.  Have you ever -- in your individual capacity,
```

Page 123

```
1    ever done an analysis of each of the invoices
2    submitted by Urban Logic between 1993 and 2012?
3       A.  No.
4       Q.  Are you aware that Urban Logic provided plan
5    checking, inspection and construction management
6    services for public works projects for the City of
7    Beaumont?
8       A.  I learned that when I became -- when I was
9    appointed in June of 2015.
10      Q.  So in June of 2015, you understood that
11   Urban Logic was providing the plan checking,
12   inspection and construction management services for
13   public works projects for the City; correct?
14         THE COURT REPORTER:  Is that correct?
15         THE WITNESS:  Yes.
16   BY MS. VANDERWEELE:
17      Q.  And before being appointed Interim City
18   Manager, when you were the resources director, you
19   had no knowledge or understanding as to whether Urban
20   Logic was providing plan checking, inspection and
21   construction management services for the City; is
22   that correct?
23      A.  Correct.
24      Q.  When you were the resources director for the
25   City of Beaumont, did you understand that Urban Logic
```

Page 124

```
1    provided engineering, design and surveying services
2    for the City?
3       A.  I knew they had subcontracted with a
4    surveyor.
5       Q.  And when you say "they," do you mean the City
6    contract -- contracted --
7       A.  No.  Urban Logic.
8          I -- I had conversations with the surveyor,
9    and I knew that he had sub -- he was a subcontractor
10   for Urban Logic.
11      Q.  Did you understand that Urban Logic was a
12   contractor for the City on certain public works
13   projects when you were the resources director?
14      A.  Can you repeat that, please?
15      Q.  When you were the resources director for the
16   City, did you ever come to learn or understand that
17   Urban Logic served as the contractor for certain
18   public works projects for the City?
19      A.  No.
20      Q.  When you served as resources director for the
21   City, did you ever review the Form 700 submitted by
22   each of the Urban Logic owners?
23      A.  I remember I saw Deepak's once, but I
24   didn't -- I didn't pursue them.  I wanted to say it
25   was on Shelby's desk and I saw it.
```

Page 125

```
1       Q.  And did you understand that Mr. Moorjani had
2    disclosed his interests in Urban Logic Consultants on
3    that Form 700?
4       A.  I seem to recall that, yes.
5       Q.  So you understood that Mr. Moorjani was a
6    City official and also owned or had an ownership
7    interest in Urban Logic, which was an entry that did
8    business with the City; correct?
9       A.  Correct.
10         MR. NOLAN:  I'm going to object at this
11   time.  Vague as to time as to when she knew that and
12   when Moorjani was an official and an owner.
13   BY MS. VANDERWEELE:
14      Q.  The time that you reviewed this Form 700 from
15   Mr. Moorjani, when was that?
16      A.  It was as resources director.
17      Q.  So at some point when you were the resources
18   director, you knew and understood that Mr. Moorjani
19   was a City official who had an financial interest in
20   Urban Logic as an owner and that Urban Logic did
21   business with the City; correct?
22      A.  Correct.
23      Q.  And did you also understand that the same was
24   true for Mr. Dillon and Mr. Egger?
25      A.  I did not see those 700 forms, so I don't
```



EXHIBIT 19
PAGE 1194

Page 126

```
 1    know.
 2        Q.  Putting aside the forms -- the 700 forms.
 3        When you were the resources director, you
 4    obviously knew who Mr. Dillon and Mr. Egger were;
 5    correct?
 6        A.  Correct.
 7        Q.  And you knew that they were department heads
 8    for Beaumont; correct?
 9        A.  Correct.
10        Q.  You also knew that they owned Urban Logic;
11    correct?
12        A.  I understood that from Alan, yes.
13        Q.  Right.  And did you ever come to learn that
14    Alan was wrong, that Dillon, Egger and Moorjani did
15    not actually own Urban Logic?
16        A.  I don't know.
17        Q.  When Mr. Dillon, Mr. Egger and Mr. Moorjani
18    served as City officials, did you, as resources
19    director, have any day-to-day interaction with those
20    individuals?
21        A.  Yes.
22        Q.  Who?
23        A.  All three of them.
24        Q.  Let's start with Mr. Moorjani.
25            What type of interaction did you have with
```

Page 127

```
 1    Mr. Moorjani, as resources director?
 2        A.  Day-to-day discussions on workflow,
 3    performance of my staff in assisting the Public
 4    Works Department.  That's about it, other than --
 5    other than personal discussions.
 6        Q.  When you were the resources director for the
 7    City, did you understand that the Public Works
 8    Department prepared capital improvement plans for the
 9    City?
10        A.  I don't recall that specifically.  I --
11    although I understand that that is a role, I don't
12    remember the City even having a CIP program at the
13    time.
14        Q.  As resources director, did you have any
15    involvement in the preparation of capital improvement
16    plans for Beaumont?
17        A.  Not that I can recall.
18        Q.  When you were resources director, did you
19    ever review any of the capital improvement plans that
20    were approved by the City Council?
21        A.  No.
22        Q.  When you were the resources director for the
23    City of Beaumont, did you review the budgets that
24    were passed and approved by the City Council?
25        A.  No.
```

Page 128

```
 1        Q.  Why not?
 2        A.  They were very, very -- the documentation
 3    was very minimal.  They were on Excel spreadsheets
 4    that only the finance director had access to.  And
 5    other than listening to discussions at a City
 6    Council meeting, that was the extent of my
 7    knowledge.
 8        Q.  Are you aware that the capital improvement
 9    plans that were provided to, passed and approved by
10    the City Council contained detailed budget summaries
11    for each of the public works projects that were
12    approved by the City Council?
13        A.  In what capacity?
14        Q.  I guess I don't understand your question.  Do
15    you need me to rephrase the question?
16        A.  Please.
17        Q.  Sure.
18            The capital improvement plans that were
19    passed and approved by City Council, when you served
20    as resources director, contained budget summaries;
21    correct?
22        A.  I -- I don't remember.  I don't remember
23    seeing those documents.
24        Q.  What was your -- when you were the resources
25    director for Beaumont, what was your day-to-day
```

Page 129

```
 1    interaction like with Mr. Egger?
 2        A.  It was very minimal.  I didn't have a lot to
 3    do with planning.  And other than the counter staff,
 4    the customer service coordinators that worked with
 5    the public on things such as business licensing and
 6    reroof permits and things like that, my interactions
 7    with Mr. Egger was minimal.
 8        Q.  Can you describe for me your interaction with
 9    Mr. Dillon, when you served as resources director for
10    Beaumont?
11        A.  Mr. Dillon was the -- my interactions with
12    Mr. Dillon were the least of all three of them.
13        Q.  So it sounds like you interacted with -- of
14    the three -- of the three owners of Urban Logic, you
15    interacted the most with Mr. Moorjani?
16        A.  Yes, but it was more on a personal level.
17        Q.  When you were the resources director for
18    Beaumont, did you consider Mr. Moorjani a social
19    friend?
20        A.  Not outside the office, no.  We would have
21    lunch occasionally, but that was it.
22        Q.  Did you have any social relationship with
23    Mr. Egger or Mr. Dillon, outside of City Hall?
24        A.  No.
25        Q.  Have you spoken with Mr. Moorjani, Mr. Dillon
```



MAGNA
LEGAL SERVICES

EXHIBIT 19
PAGE 1195

Page 130

1  or Mr. Egger with respect to this lawsuit?
2       A.  No.
3       Q.  When you served as the resources director for
4  Beaumont, did you understand that Urban Logic was
5  paid fees to manage certain projects that were
6  approved by the City Council?
7       A.  No.
8       Q.  When you were the resources director for the
9  City, did you have any involvement in the bonds that
10  were issued by Beaumont Financing Authority?
11      A.  No.
12      Q.  After you were appointed Interim City
13  Manager, were you involved in the issuance of bonds
14  by Beaumont Financing Authority?
15      A.  I recall that we -- I think we issued one
16  bond or refinanced one bond, but I don't recall the
17  specifics.
18      Q.  Have you ever reviewed the bonds that were
19  issued by Beaumont Financing Authority during the
20  time that you served as resources director?
21      A.  No.
22      Q.  Do you understand -- or strike that.
23          Are you aware that the owners of Urban Logic,
24  Mr. Dillon, Mr. Moorjani and Mr. Egger, participated
25  in the issuance of bonds by Beaumont Financing

Page 131

1  Authority?
2       A.  No.
3       Q.  And you were never involved in the issuance
4  of bonds by BFA when you served as resources
5  director; correct?
6       A.  Correct.
7       Q.  Do you recall that Mr. Dillon, Mr. Egger and
8  Mr. Moorjani stepped down from their role as
9  department heads in August of 2009?
10      A.  I don't -- I don't recall when it happened.
11  They just stopped coming to City Hall.
12      Q.  And as best as you can recall, when did
13  Mr. Moorjani, Mr. Dillon and Mr. Egger stop coming to
14  City Hall?
15      A.  I don't remember.
16      Q.  Was it while you served as resources director
17  for the City?
18      A.  Yes.
19      Q.  When you served as resources director for the
20  City, did you come to learn that Mr. Moorjani,
21  Mr. Dillon, Mr. Egger sold Urban Logic in 2012?
22      A.  I found out quite a ways after it happened.
23      Q.  When did you learn that?
24      A.  I don't remember when I learned it.  But
25  there was a gentleman that kept coming to City Hall

Page 132

1  and I didn't know who he was.  Nobody introduced
2  him.  And -- and then one day, I think Alan told me
3  that he was the new owner.
4       Q.  And do you recall when it was that
5  Alan Kapanicas told you that Urban Logic had a new
6  owner?
7       A.  I don't recall.
8       Q.  When you served as the resources director for
9  Beaumont, did you have any understanding as to how
10  Urban Logic and Mr. Moorjani, Mr. Dillon, Mr. Egger
11  were compensated?
12      A.  No.
13      Q.  When you served as the resources director,
14  did you have any knowledge or understanding regarding
15  any fee caps that applied to the services provided by
16  Urban Logic?
17      A.  No.
18      Q.  When you served as the Interim and Acting
19  City Manager in 2015 and 2016, did you come to learn
20  of anything related to how Urban Logic was
21  compensated by the City of Beaumont?
22      A.  As for plan checking, yes.  I -- I learned
23  of that after I was appointed because I was asked to
24  sign invoices, and -- and so I asked a staff member
25  what their responsibilities were, what services they

Page 133

1  provided to the City.
2       Q.  So it sounds like sometime after you were
3  appointed Interim City Manager, you learned that
4  Urban Logic provided plan-checking services for
5  Beaumont?
6       A.  Yes.  And some other treatment plant
7  services.
8       Q.  And who told you that information?
9       A.  I believe it was Kyle Warsinski.
10      Q.  And Mr. Warsinski worked for Urban Logic;
11  correct?
12      A.  No, he was a City employee.
13      Q.  Do you know whether Mr. Warsinski has ever
14  worked for Urban Logic Consultants?
15      A.  I don't know.
16      Q.  When did Mr. Warsinski become employed by
17  Beaumont?
18      A.  I don't know.  When I was appointed Interim
19  City Manager, he was development services director.
20      Q.  And at that time, did you have any knowledge
21  or understanding as to Mr. Warsinski's relationship
22  with Urban Logic Consultants?
23      A.  No.
24      Q.  When you were Interim City Manager, did you
25  ever review the Form 700 filed by Mr. Warsinski?

34  (Pages 130 to 133)



EXHIBIT 19
PAGE 1196

Page 134

```
 1        A. No.
 2        Q. So it sounds like after you were appointed
 3   Interim City Manager, Mr. Warsinski told you about
 4   the plan checking and some other services that Urban
 5   Logic provided for the City?
 6        A. Yes.
 7        Q. At that time, did you learn anything about
 8   the compensation that Urban Logic received for
 9   plan-checking services?
10        A. I saw invoices.  I -- I -- like I said, I
11   was the signing authority.  And so before I put my
12   signature approving an invoice, I would ask
13   questions.
14        Q. And did you confirm that the payments that
15   were made to Urban Logic conformed with the contracts
16   that were entered into by Beaumont and Urban Logic?
17        A. I didn't.  I delegated that to Kyle.
18        Q. And before delegating that to Kyle, did you
19   ever have any conversation with him about whether he
20   had any involvement or relationship with Urban Logic
21   Consultants?
22        A. No.
23        Q. Have -- when you were the Interim City
24   Manager, did you ever come to learn of any fee caps
25   that applied to services provided by Urban Logic?
```

Page 135

```
 1        A. I understood from Kyle that there -- there
 2   was a cap in the plan checking, based on the deposit
 3   structure that we had with the developers.
 4        Q. And can you explain that to me?
 5        A. So developers would submit plans with a
 6   deposit check, and it was my understanding from Kyle
 7   that they were -- Urban Logic would plan check up to
 8   a certain percentage, and I don't recall what that
 9   percentage was.  I think it was 80/20.
10        Q. As you sit here today, are you able to recall
11   the fee cap that applied to Urban Logic's
12   plan-checking services that they provided on behalf
13   of the City?
14        A. I know there was, but I don't recall what
15   the number was.  I want to say it was 80 percent.
16   So the City would retain 20, and Urban Logic would
17   receive 80 percent of the plan checking, up to the
18   deposit amount.
19        Q. Are you aware, during your time as resources
20   director, that Urban Logic Consultants provided
21   certain services to the City on an hourly basis?
22        A. No.  They -- my only understanding was -- is
23   that they were department heads.
24        Q. Are you aware that the City of Beaumont is
25   claiming that Urban Logic overcharged them for
```

Page 136

```
 1   certain services?
 2        A. I realized that there was some issues with
 3   the invoices when I became Interim City Manager.  I
 4   had questions of Urban Logic that they can't answer,
 5   and I felt -- I felt like there was some unnecessary
 6   charges.
 7        Q. And can you explain that, please?
 8        A. The accounting system of Urban Logic in
 9   2015, after I was appointed, was, in my opinion,
10   convoluted, and it seemed that they -- they were
11   trying to -- they were trying to be paid.  And I
12   couldn't confirm the services.  There was nobody in
13   City Hall who could confirm what they were doing.
14        Q. Did you ever determine that Urban Logic was
15   submitting invoices that contained charges for
16   services that were not provided?
17        A. I couldn't confirm or deny that.
18        Q. And in your individual capacity, you've never
19   gone back and reviewed all of the Urban Logic
20   invoices to determine whether any of the invoices
21   contained inflated or false charges; correct?
22        A. Not in my individual capacity, no.
23        Q. And have you gone and reviewed those invoices
24   of Urban Logic, as the current employee of the City
25   of Beaumont?
```

Page 137

```
 1        A. No.
 2        Q. So when have you gone back and looked through
 3   all the invoices to determine which invoices
 4   contained inflated or false charges?
 5        A. Can you clarify?  I'm -- are we --
 6        Q. Sure.
 7        A. Are we still talking as the resources
 8   director or --
 9        Q. As the resources -- as an employee of the
10   City of Beaumont at any time, have you ever gone
11   through all of Urban Logic's invoices from 1993 to
12   2012, to determine which invoices contained inflated
13   or false billing charges?
14        A. Not in my individual capacity, no.
15        Q. As a corporate representative of Beaumont,
16   have you done that?
17        A. As the PMK?  I don't understand "corporate
18   representative."
19        Q. And I'm not here today to ask you questions
20   in your corporate representative capacity.
21           Do you understand that tomorrow you will give
22   a deposition as the designated corporate
23   representative of the City of Beaumont?
24        A. Yes.
25        Q. And to the extent you've gone back and
```



EXHIBIT 19
PAGE 1197

Page 138

1    reviewed any invoices of Urban Logic to determine any
2    inflated or false billing, that was done in your
3    capacity as a corporate representative or a person
4    most knowledgeable for Beaumont; is that correct?
5        A.  Correct.
6        Q.  Okay.  Are you aware that the City Council
7    approved capital improvement plans that contained
8    budgets that authorized Urban Logics Consultants to
9    charge fees in excess of their contractual fee cap?
10       A.  No.
11       Q.  Are you aware that City Council approved
12   progress reports that authorized Urban Logic
13   Consultants to charge fees in excess of their
14   contractual fee cap?
15       A.  No.
16       Q.  When Mr. Dillon, Mr. Moorjani and Mr. Egger
17   worked as department heads for the City, when you
18   were the resources director, did you understand that
19   they were providing advice to the City Council
20   regarding various engineering and public works
21   projects?
22       A.  They provided recommendations to Alan, and
23   then either -- Alan would present those in an open
24   meeting.  There were times when Ernie would attend
25   the meetings.  I don't recall Dave or Dee ever

Page 139

1    attending those meetings.
2        Q.  Have you ever reviewed staff reports
3    submitted by David Dillon to City Council regarding
4    his recommendation to the Council regarding public
5    works projects?
6        A.  No.
7        Q.  Mr. Moorjani, do you have any understanding
8    or knowledge of his involvement in preparing the
9    capital improvement plans that were presented to City
10   Council?
11       A.  No.
12       MR. DUNN:  Counsel, this is Mr. Dunn.  Are
13   we going to go through the lunch hour?  It's been --
14       MS. VANDERWEELE:  Oh, I'm sorry.
15       MR. DUNN:  No, that's okay.  I'm just
16   inquiring because it's been about an hour and a half
17   since the last break, and it's 12:15.  I'm just
18   inquiring what the --
19       MS. VANDERWEELE:  No.
20       MR. DUNN:  -- plan is.
21       MS. VANDERWEELE:  I appreciate that.
22       You know, I'm happy to take a break now.  We
23   can take a break as long as you would like,
24   Ms. Gibbs, and then we can reconvene and finish up
25   the afternoon.

Page 140

1        MR. DUNN:  Whatever you all want to do,
2    Ms. Gibbs and the others want to do is fine with me.
3        MS. VANDERWEELE:  That works for me.  So
4    it's 2 -- 12:15 Pacific Time.  Do we want to
5    reconvene in 45 minutes, or do you need longer than
6    that?  I'm happy to give you as much time as you
7    need.
8        THE WITNESS:  I think 45 minutes is fine.
9        MS. VANDERWEELE:  Okay.  So we'll come back
10   at -- if I'm doing my math correctly -- 3:00 p.m. my
11   time, 1:00 p.m. Pacific Time.  Great.
12       MR. DUNN:  Thank you.
13       MS. VANDERWEELE:  Yep.
14       THE VIDEOGRAPHER:  This marks the end of
15   Media No. 1.  The time is 12:15 p.m.  We are off the
16   record.
17            (Lunch recess.)
18       (Mr. Dunn left the deposition proceedings.)
19       THE VIDEOGRAPHER:  This marks the beginning
20   of Media No. 2 in the deposition of
21   Elizabeth Gibbs-Urtiaga.  The time is 1:01 p.m.  We
22   are back on the record.
23   BY MS. VANDERWEELE:
24       Q.  Okay.  Ms. Gibbs, when you were working as
25   the resources director for the City of Beaumont, did

Page 141

1    you have occasion to attend City Council meetings?
2        A.  Yes.
3        Q.  Was the resources director required to attend
4    every City Council meeting?
5        A.  No.  Alan asked me to, though.
6        Q.  Okay.  And so during the time that you served
7    as the resources director for Beaumont, did you
8    attend almost every City Council meeting?
9        A.  Yes, unless I was on vacation.
10       Q.  And when you were the resources director,
11   were there times that you gave staff reports on
12   various matters during City Council meetings?
13       A.  Yes.
14       Q.  When you would attend a City Council meeting
15   as the resources director for Beaumont, would you
16   attend the entire meeting from start to finish?
17       A.  Generally, yes.
18       Q.  When you attended City Council meetings as
19   the resources director, would you observe the public
20   comment period?
21       A.  Yes.
22       Q.  And the public comment period during City
23   Council meetings for Beaumont was an opportunity for
24   members of the public to speak to the Council;
25   correct?

36  (Pages 138 to 141)



EXHIBIT 19
PAGE 1198

Page 142

1    A.  Correct, on matters not on the agenda.
2    Q.  Could the members of the public also speak
3  regarding matters that were on the agenda?
4    A.  Yes, under the item.
5    Q.  And did you have any role in preparing the
6  agendas for the City Council meetings when you served
7  as resources director?
8    A.  No.  Other than if I had something that
9  needed to be on the agenda.
10    Q.  And when you served as the resources
11  director, was it your understanding that the City
12  Council meeting agendas were provided to Council in
13  advance of each meeting?
14    A.  That was my understanding, yes.
15    Q.  And was it also your understanding, when you
16  served as the resources director for Beaumont, that
17  City Council was provided staff reports that
18  corresponded with agendized items on the agenda?
19    A.  I -- I imagine, yes.  I don't -- I can't
20  confirm what they physically received.
21    Q.  Did the resources director have any role in
22  providing materials to City Council prior to the City
23  Council meetings?
24    A.  No.
25    Q.  When you served as resources director and

Page 143

1  attended City Council meetings, did you observe and
2  listen to public comments regarding Urban Logic
3  Consultants?
4    A.  If I was paying attention.
5    Q.  Well, as you sit here today, do you recall,
6  when you served as resources director, that members
7  of the public spoke about Urban Logic during the
8  public comment period of City Council meetings?
9    A.  Yes.
10    Q.  And when you served as resources director,
11  did you observe members of the public raising
12  concerns regarding Urban Logic having a conflict of
13  interest?
14    A.  What I recall, it was more personal in
15  nature.  I know the word "cronyism" was used, but I
16  didn't think anything of it.
17    Q.  When you were the resources director for
18  Beaumont, were you aware that members of the public
19  were raising concerns to the City about Urban Logic
20  having a conflict of interest?
21    A.  I know they spoke at Council meetings, yes.
22    Q.  And when you say "they spoke at Council
23  meetings," you're referring to members of the public?
24    A.  Yes.
25    Q.  And members of the public raised concerns

Page 144

1  regarding Urban Logic having a conflict of interest;
2  correct?
3    A.  I don't know if "conflict of interest" was
4  used in those public comments.
5    Q.  Did -- when you were resources director,
6  although members of the public may not have used the
7  phrase "conflict of interest," did you understand
8  that the public was raising concerns regarding Urban
9  Logic engaging in unlawful activity?
10    A.  No, I didn't understand that.  It was --
11  what I recall, when they spoke about Urban Logic, it
12  was personal in nature, and it seemed to me to be
13  retaliatory.
14    Q.  What personal -- or strike that.
15        What do you mean when you say "personal in
16  nature"?
17    A.  It seemed to be retaliatory for a project
18  that the City was working on that they disagreed
19  with.
20    Q.  And who's "they"?
21    A.  Specifically Judy Bingham.
22    Q.  Do you recall Judy Bingham telling City
23  Council during the public comment period of City
24  Council meetings that she felt Urban Logic was
25  violating conflict of interest law?

Page 145

1    A.  I don't recall that specifically.  I know
2  she used the word "cronyism."
3    Q.  And you understand -- strike that.
4        You understand, when you were the resources
5  director, that cronyism was illegal under California
6  law; correct?
7    A.  I did not understand that it was illegal,
8  no.  I -- I -- I understood that cronyism could be
9  unethical.
10    Q.  Did you have any understanding, when you were
11  resources director, whether cronyism was lawful
12  conduct in the State of California when you were
13  resources director?
14    A.  No.  I didn't understand that, no.
15    Q.  Judy Bingham is one individual that you
16  mentioned.  You also recall Nancy Hall speaking at
17  City Council meetings when you were the resources
18  director?
19    A.  Yes.
20    Q.  And Nancy Hall also raised concerns regarding
21  Urban Logic; correct?
22    A.  I'm not sure.  Hers was more about projects,
23  like the hillside ordinance and things like that.
24    Q.  Have you ever heard of the organization
25  Beaumont Citizens for Responsible Growth?

37 (Pages 142 to 145)


MAGNA
LEGAL SERVICES

EXHIBIT 19
PAGE 1199

Page 146

1    A.  Yes.
2    Q.  Are you familiar with that organization?
3    A.  I recognize the name.
4    Q.  Beaumont Citizens for Responsible Growth,
5   that was a group formed by Judy Bingham; correct?
6    A.  I don't know who formed it, but I know the
7   name.
8    Q.  Do you know -- strike that.
9        When you were the resources director for
10  Beaumont, is that when you came to learn of the group
11  called Beaumont Citizens for Responsible Growth?
12   A.  While I was the resources director, yes.
13   Q.  And that was a group that was formed in or
14  about 2004; do you recall that?
15   A.  I don't know when they were formed.
16   Q.  Have you ever heard of the website
17  BeaumontGate.org?
18   A.  I -- I've heard of it, yes.
19   Q.  And did you learn of the BeaumontGate.org
20  website when you worked for Beaumont as its resources
21  director?
22   A.  Yes.
23   Q.  Do you recall the -- or strike that.
24       Did you ever go and visit the
25  BeaumontGate.org website when you served as resources

Page 147

1   director for Beaumont?
2    A.  Yes.
3    Q.  Do you recall that the BeaumontGate website
4   was formed in 2010?
5    A.  I don't know when it was formed.
6    Q.  Did you have occasion to visit the
7   BeaumontGate.org website in 2010?
8    A.  When I looked at it, I think I only looked
9   at it once or twice, it wasn't something that I
10  actively pulled up on my screen.
11   Q.  The BeaumontGate.org website raised concerns
12  regarding Mr. Kapanicas and Urban Logic; correct?
13   A.  I believe so.  It seemed to be that the
14  website was bashing City government as a whole.
15   Q.  And do you recall that in 2010 Mr. Moorjani,
16  Mr. Dillon and Mr. Egger filed a lawsuit against
17  Ms. Bingham, Ms. Hall and the Beaumont Citizens for
18  Responsible Growth organization?
19   A.  I had heard that in discussions at the
20  office, but I didn't know details about it.
21   Q.  And did you learn about the Urban Logic
22  versus Beaumont Citizens for Responsible Growth
23  lawsuit when you were the resources director?
24   A.  Yes.
25   Q.  And did you understand that the lawsuit that

Page 148

1   was filed against Beaumont Citizens for Responsible
2   Growth was a defamation lawsuit?
3    A.  That's what I heard, but I didn't see the
4   documents.
5    Q.  Are you aware that in 2010 the
6   BeaumontGate.org website raised concerns about Urban
7   Logic having a conflict of interest?
8    A.  I don't remember that detail.  I remember
9   they -- they were -- it seemed to me to be personal
10  attacks.
11       MS. VANDERWEELE:  I'm going to show you what
12  I will mark as Exhibit 9.  And Exhibit 9, for the
13  record, is Bates-stamped LOC5-001262 -- 1262 through
14  1281.
15       (Deposition Exhibit 9 was marked for
16       identification by the court reporter.)
17  BY MS. VANDERWEELE:
18   Q.  This is -- are you able to see this document,
19  ma'am?
20   A.  I am.
21   Q.  And this is a printout of the
22  BeaumontGate.org website.  There's a date at the
23  bottom of September 10, 2010; do you see that?
24   A.  Yes.
25   Q.  And I'll scroll through this briefly, then

Page 149

1   I'll focus on certain portions of this document.  And
2   my question is -- is:  What is contained here in
3   Exhibit 9, does this look like the BeaumontGate.org
4   website that you viewed when you were the resources
5   director for Beaumont?
6    A.  I -- I don't remember.  I know I looked at
7   it, just out of curiosity, but I don't remember what
8   was on there.
9    Q.  Do you see here on page 1 of Exhibit 9 where
10  it states, quote (as read):
11       A clear conflict of interest, closed quote?
12   A.  Yes.
13   Q.  Do you have any reason to dispute that this
14  information that's shown on page 1 of Exhibit 9 was
15  the information that was on the BeaumontGate.org
16  website in September of 2010?
17   A.  I can't confirm or deny that.
18   Q.  Do you see on this document where it states,
19  quote (as read):
20       The City of Beaumont's contract with Urban
21  Logic presents a significant conflict of interest
22  and, therefore, must be terminated, closed quote?
23   A.  I see that.
24   Q.  When you were the resources director for
25  Beaumont and attended the City Council meetings, was

38  (Pages 146 to 149)



EXHIBIT 19
PAGE 1200

Page 150

1   the BeaumontGate.org website discussed?
2       A. I don't know.
3       Q. You did come to learn of a lawsuit that was
4   filed related to this website; correct?
5       A. I knew of a lawsuit, but I didn't know --
6   again, I didn't know what was -- what were the terms
7   of that lawsuit.
8       Q. Did you ever come to learn that the judge
9   dismissed the lawsuit that had been filed against
10  Beaumont Citizens for Responsible Growth?
11      A. I had heard that, yes.
12      Q. And is it your understanding that the judge
13  dismissed the lawsuit because the judge determined
14  that the statements on this website were true?
15      A. I can't speak to what the judge said or did
16  or ruled.
17      Q. There is -- I'm going to show you page 3 of
18  Exhibit 9. And do you see the section that talks
19  about favoritism and cronyism?
20      A. Yes.
21      Q. And the website, at least as documented on
22  page 3 of Exhibit 9, states that (as read):
23          The City of Beaumont under Urban Logic and
24  City Manager Alan Kapanicas has consistently
25  demonstrated favoritism and cronyism in the awarding

Page 151

1   of public contracts.
2       Did I read that correctly?
3       A. Yes.
4       Q. And although it might not be verbatim what
5   you saw when you viewed the website, but when you
6   viewed the BeaumontGate.org website as resources
7   director, did the website contain information
8   regarding alleged favoritism and cronyism as shown
9   here on page 3 of this exhibit?
10      A. I don't remember what was on the website
11  when I looked at it, or when I looked at it.
12      Q. Concerns regarding cronyism were raised
13  during City Council meetings that you attended;
14  correct?
15      A. Yes, I remember that word being used.
16      Q. And as the resources director and employee
17  of the City, were you concerned that citizens were
18  raising -- or making allegations about cronyism?
19      A. No. I thought it was a witch hunt.
20      Q. Isn't it true that the conflict of interest
21  that is raised -- or strike that.
22          Isn't it true that the conflict of interest
23  that Ms. Bingham and others raised with City Council
24  is the same law that the ULC owners eventually pled
25  guilty to violating?

Page 152

1       A. Can you repeat that, please?
2       Q. Sure. And let me back up because that was
3   actually a horribly phrased question.
4           Do you understand that the owners of
5   Urban Logic, Mr. Egger, Mr. Dillon and Mr. Moorjani,
6   ultimately pled guilty to violating conflict of
7   interest law?
8       A. I don't know -- I know they pled guilty. I
9   know the charges were felonies, but I don't know
10  what those charges were.
11      Q. Do you have any understanding as to the
12  factual basis for the plea agreements that Mr. Egger,
13  Mr. Dillon and Mr. Moorjani entered into?
14      A. No.
15      Q. Is the Record Gazette a newspaper that's
16  published in Beaumont?
17      A. Yeah, in the San Gorgonio Pass area.
18      Q. And do you recall, when you were the
19  resources director, that articles were published by
20  the Record Gazette raising concerns about
21  Mr. Kapanicas and Urban Logic?
22      A. I don't -- I don't often read that
23  newspaper.
24      Q. So is the answer to my question no?
25      A. No.

Page 153

1       Q. When you served as the resources director for
2   Beaumont, did you come to learn that the Western
3   Riverside Council of Governments sued the City of
4   Beaumont over alleged unremitted fees?
5       A. As resources director, I understood that
6   WRCOG sued the City in relation to the TUMF program,
7   but I didn't know the specifics of the lawsuit.
8       Q. And TUMF is the Transportation Uniform
9   Mitigation Fee program; correct?
10      A. I believe so, yes.
11      Q. As resources director, did you have any
12  involvement in Western Riverside Council of
13  Governments?
14      A. No, not in relation to the TUMF.
15          I did coordinate a grant program with them
16  early on in my career, and that was the extent of my
17  dealings with them.
18      Q. So as the resources director, you had no
19  involvement in the TUMF program; correct?
20      THE COURT REPORTER: I didn't get an answer.
21      THE WITNESS: Correct.
22      MS. VANDERWEELE: And, Mimi, just so -- TUMF
23  is T-u-m-f. I just want to make sure you're getting
24  that.
25      THE COURT REPORTER: Thank you.



EXHIBIT 19
PAGE 1201

Page 154

```
1    BY MS. VANDERWEELE:
2       Q.  Although you had no involvement in the TUMF
3    program, you did come to learn, when you served as
4    resources director, about the lawsuit that WRCOG
5    filed against Beaumont; correct?
6       A.  I understood that they filed a lawsuit, but
7    I didn't know the specifics.
8       Q.  As resources director of Beaumont, did you
9    know that in 2008 WRCOG was demanding that the City
10   pay WRCOG more than $50 million in unremitted TUMF
11   fees?
12      A.  No.
13      Q.  Did you ever disclose the fact that WRCOG was
14   seeking millions of dollars from Beaumont, on any of
15   the insurance applications that you completed on
16   behalf of Beaumont?
17      A.  Could you repeat that, please?
18      Q.  Sure.
19         You told me earlier that as resources
20   director you assisted in providing data for insurance
21   applications for the City; right?
22      A.  For -- limited to property insurance
23   applications.
24      Q.  Did you have any involvement in completing
25   insurance applications for the City's government
```

Page 155

```
1    crime insurance policies?
2       A.  No, not that I recall.
3       Q.  Is it your testimony that the only insurance
4    applications that you assisted in preparing or
5    gathering information for were property damage
6    insurance applications?
7       A.  Yes, property coverage, to secure insurance
8    in case of damage to any of our properties.
9       Q.  In terms of any employee fidelity or
10   government crime policies, did you have any
11   involvement in preparing those applications on behalf
12   of the City of Beaumont?
13      A.  No, not that I recall.
14      Q.  Did you ever tell my client, National Union,
15   that WRCOG was seeking millions of dollars from the
16   City of Beaumont?
17      A.  I don't recall ever talking to National
18   Union ever.
19      Q.  As I mentioned earlier, the City disclosed
20   you as a witness who assessed and coordinated
21   insurance matters, and it sounds like you had no
22   involvement in the assessment and coordination of
23   insurance matters with respect to National Union; is
24   that fair to say?
25      A.  Yes, that's fair.
```

Page 156

```
1       Q.  In terms of any of the policies that the City
2    purchased from my client, National Union, you had no
3    involvement in that; is that your testimony?
4       A.  Yes.
5       Q.  Do you recall that WRCOG sued Beaumont in
6    2009?
7       A.  I know they sued us, but I don't remember
8    when.  I don't know when it was filed.
9       Q.  As the resources director, did you have any
10   involvement in the litigation that ensued between
11   WRCOG and Beaumont?
12      A.  No.
13      Q.  The lawsuit eventually went to trial;
14   correct?
15      A.  Yes.  And the only reason I know that is
16   because Mr. Kapanicas was out of the office for
17   multiple days, and we understood that he was in
18   Orange County testifying.
19         Let me clarify something.
20         I was asked to find certain documents for --
21   and I don't know -- I'm assuming it was for our
22   attorney.  But I remember Mr. Kapanicas, because I
23   was over IT at the time, asking that we do -- that I
24   do a search with certain key words to see what I
25   could find in the City's documents.
```

Page 157

```
1       Q.  And what were the key words that
2    Mr. Kapanicas had you search?
3       A.  I -- I don't recall.
4       Q.  You understood that Mr. Kapanicas testified
5    at that trial for the -- for the lawsuit that had
6    been filed by WRCOG; correct?
7       A.  Yes, only because he told me about the trial
8    proceedings.
9       Q.  Did you testify in that trial?
10      A.  No.
11      Q.  Did you understand that Mr. Dillon,
12   Mr. Moorjani and Mr. Egger were asked to testify at
13   that trial?
14      A.  I didn't know that.  I thought Alan was the
15   only one.
16      Q.  You understand that a judgment was entered in
17   favor of WRCOG against Beaumont; correct?
18      A.  I understood that because Mr. Kapanicas told
19   me that.
20      Q.  And did Mr. Kapanicas tell you that the judge
21   awarded WRCOG approximately $43 million plus
22   interest?
23      A.  I had heard that, but I don't remember who
24   told me that.  I know that Mr. Kapanicas sent the
25   judgment out to some of the executive staff, but I
```





EXHIBIT 19
PAGE 1202

Page 158

1  never read it.
2     Q. Did you ever read the statement of --
3  statement on decision that was issued by the judge in
4  that lawsuit?
5     A. No.
6     Q. Did you ever read the transcript of the
7  May 22, 2014, oral ruling that was issued by the
8  judge in that lawsuit?
9     A. No.
10    Q. I take it you had discussions with fellow
11 City employees about that judgment; is that correct?
12    A. Yes. During department head meetings, it
13 was talked -- it was discussed.
14    Q. And through those discussions, did you come
15 to learn and understand that the judgment was entered
16 against Beaumont in excess of $40 million?
17    A. I understood that we lost. And I -- I think
18 there was a dollar amount tied to it, but I don't
19 remember what the dollar -- at the time, I didn't
20 pay attention to the dollar amount.
21    Q. Were there discussions among City staff that
22 the judge had found that City management and staff
23 engaged in a pattern and practice of deception?
24    A. I think I heard that -- I don't think Alan
25 relayed. I think I heard that from a family

Page 159

1  member that had read an article.
2     Q. And so you came to learn, when you served as
3  resources director, that a judge had found that City
4  management and staff engaged in a pattern and
5  practice of deception; correct?
6     A. Yes, through the media.
7     Q. And did you also learn that the judge had
8  found fraud by clear and convincing evidence?
9     A. I learned that at some point, and I don't
10 know who or when I heard that.
11    Q. And would you have learned this information
12 about the judge's findings and rulings shortly after
13 that judgment was entered?
14    A. I don't know the time frame of when I heard
15 it after -- after the court case was over.
16    Q. The decision was -- the oral decision was --
17 was entered in May of 2014, with the final decision
18 in June of 2014.
19       Would it be fair to say that as of June 2014
20 is -- that's when you learned about the judge's
21 findings in this case?
22    A. I don't -- I don't know when I learned. I
23 didn't read the documents.
24    Q. I understand you didn't read the documents,
25 but you certainly participated in conversations with

Page 160

1  your co-workers about the judge's findings and the
2  judgment that had been entered; correct?
3     A. Yes, there were discussions, but I don't
4  remember when.
5     Q. And at no time did you ever disclose the fact
6  that the judge had found evidence of a pattern and
7  practice of deception, to my client, National Union;
8  correct?
9     A. Correct.
10    Q. Did you ever disclose to any of the City's
11 insurers of the judge's finding of a pattern and
12 practice of deception that had been perpetrated by
13 City staff and management?
14    A. No.
15    Q. And why not?
16    A. We were appealing the decision. It was
17 explained to department heads that the judge was
18 wrong and that our attorney didn't do a very good
19 job of representing us and that we would surely win
20 under appeal.
21    Q. The lawyers that represented WRCOG in the
22 lawsuit that was filed against Beaumont, that was the
23 Best, Best and Krieger law firm?
24    A. Can you repeat that?
25    Q. Correct?

Page 161

1     A. Can you repeat that?
2     Q. The lawyers, the law firm that represented
3  Western Riverside Council of Governments in the
4  lawsuit against Beaumont, was the Best, Best and
5  Krieger law firm; correct?
6     A. I don't know at the time. I -- I know that
7  now, but at the time, I didn't know who the opposing
8  counsel was.
9     Q. Do you understand now that the Best, Best and
10 Krieger law firm, the law firm that represented
11 WRCOG, is now representing Beaumont in the lawsuit
12 filed against National Union?
13    A. Yes.
14    Q. As the resources director for the City, I
15 understand you never made any disclosure to National
16 Union about the judge's findings and the judgment.
17       But are you aware if anyone from the City
18 ever disclosed the judge's findings and the judgment
19 to my client, National Union, prior to November 2016?
20    A. I don't know.
21    Q. Following the judge's decision in the WRCOG
22 versus Beaumont litigation, it's my understanding,
23 based on my review of meeting minutes, that the City
24 Council began an evaluation of the City Manager.
25       Do you recall that?



EXHIBIT 19
PAGE 1203

Page 162

```
 1      A. At some point, there was an evaluation of
 2  the City Manager, and I believe it was after the
 3  November election in 2014.
 4      Q. And why did the City Council begin evaluating
 5  the manager after the November 2014 election?
 6          MR. NOLAN:  Objection. Clearly calls for
 7  speculation.
 8  BY MS. VANDERWEELE:
 9      Q. You can answer.
10      A. I don't know.
11      Q. As the resources director, did you have any
12  involvement in the City's evaluation of Mr. Kapanicas
13  following the November 2014 election?
14      A. No.  I reported to him.
15      Q. Did you continue to report to Mr. Kapanicas
16  even after the City began its evaluation of
17  Mr. Kapanicas?
18      A. I reported to Mr. Kapanicas until his last
19  day here.
20      Q. And so it's true that even after the City
21  Council began evaluating Mr. Kapanicas, you continued
22  to report to him?
23      A. Yes.
24      Q. Did you find that odd?
25      A. No.  He was the City Manager and I was a
```

Page 163

```
 1  department head.
 2      Q. Even though the City Council was evaluating
 3  Mr. Kapanicas, you still reported to him?
 4      A. Yes.
 5      Q. Mr. Kapanicas was ultimately placed on
 6  administrative leave; correct?
 7      A. Correct.
 8      Q. And that was following the City Council's
 9  investigation into Mr. Kapanicas; correct?
10      A. I'm not aware of any investigation.
11      Q. The evaluation -- or strike that.
12          When the City Council began its evaluation of
13  Mr. Kapanicas following the November 2014 election,
14  did you have any knowledge or information regarding
15  what the City Council did to evaluate Mr. Kapanicas?
16      A. No.  And the only reason I know about the
17  evaluation is because it was on a public City
18  Council agenda, as required under the Brown Act.
19      Q. Correct.  And there were repetitive City
20  Council meeting minutes that disclosed that the City
21  Council was evaluating Mr. Kapanicas at the end of
22  2014 and into 2015; correct?
23      A. According to the agendas, yes.
24      Q. And following the City's evaluation of
25  Mr. Kapanicas, they placed Mr. Kapanicas on
```

Page 164

```
 1  administrative leave; correct?
 2      A. In -- well, in June they placed him on
 3  administrative leave, yes.
 4      Q. And do you recall receiving the notice of
 5  discipline that was -- or strike that.
 6          Did you ever receive a notice of discipline
 7  that was issued to Mr. Kapanicas?
 8      A. I don't recall seeing it, but I -- I may
 9  have.  As resources director, I dealt mostly with
10  the rank and file.  It was the City Attorney's job
11  to deal with the City Manager.  Those are the only
12  two employees that report to City Council.
13          MS. VANDERWEELE:  I'm going to show you
14  Exhibit 10.
15          Exhibit 10, for the record, is Bates-stamped
16  NUFIC, N-u-f-i-c, 7918 through 7921.  And this is a
17  Notice of Potential Discipline and/or
18  Dismissal/Removal, dated May 21, 2015.  It's from
19  John Pinkney, City Attorney, to Alan Kapanicas,
20  Beaumont City Manager.
21      (Deposition Exhibit 10 was marked for
22      identification by the court reporter.)
23  BY MS. VANDERWEELE:
24      Q. Have you seen this document before?
25      A. No.
```

Page 165

```
 1      Q. There was a May 29 closed-session City
 2  Council meeting to evaluate Mr. Kapanicas; correct?
 3          MR. NOLAN:  Object to any discussion of
 4  anything taking place in closed session.
 5  BY MS. VANDERWEELE:
 6      Q. And I'm not asking what was discussed in
 7  closed session, but there is, documented here in this
 8  document, the fact that the City Council would be
 9  meeting on May 29, 2015; correct?
10          MR. NOLAN:  Your object -- my objection is
11  you're asking about a specific document and whether
12  that was discussed in closed session, so you are
13  asking substantive questions of what was discussed
14  in closed session, which is privileged.  I would
15  instruct my client not to answer.
16          (Instruction not to answer.)
17          MS. VANDERWEELE:  All I want to know is
18  whether there was a May 29, 2015, closed-session
19  meeting, the fact of the meeting.  You're objecting
20  to the witness answering that question?
21          MR. NOLAN:  That wasn't the question you
22  asked.
23          MS. VANDERWEELE:  It was, and I'm happy to
24  rephrase it if there was any confusion.
25
```

42 (Pages 162 to 165)



MAGNA
LEGAL SERVICES

EXHIBIT 19
PAGE 1204

Page 166

```
1    BY MS. VANDERWEELE:
2      Q.  Ms. Gibbs, are you aware that on May 29,
3    2015, there was a closed-session meeting to discuss
4    dismissal or removal of Mr. Kapanicas?
5          MR. NOLAN:  Objection as phrased.
6          MS. VANDERWEELE:  Can she still answer or
7    are you instructing her not to answer?
8          MR. NOLAN:  No.  I'm instructing her not to.
9          (Instruction not to answer.)
10         MS. VANDERWEELE:  So you're not going to let
11   the witness answer my question, which was whether
12   she knew that there was a May 29, 2015,
13   closed-session meeting?
14         MR. NOLAN:  That's not what you asked.  You
15   said, Was there a May 29th closed-session meeting to
16   discuss discipline and Al Kapanicas, so --
17         MS. VANDERWEELE:  I mean, you didn't --
18         MR. NOLAN:  You're asking a substantive
19   question.  You're not asking:  Was there a
20   closed-session meeting on that day?
21   BY MS. VANDERWEELE:
22     Q.  Ma'am, was there a closed-session meeting on
23   May 29th, 2015, that you're aware of?
24     A.  Yes.
25     Q.  Did you participate in that meeting?
```

Page 167

```
1          MR. NOLAN:  Objection.  Privileged as to who
2    was present.
3          MS. VANDERWEELE:  Is it -- is it correct,
4    Counsel, that you're going to be objecting to any
5    question that I ask this witness about the May 29,
6    2015, City Council closed-session meeting?
7          MR. NOLAN:  Absolutely.  It's privileged.
8          MS. VANDERWEELE:  And you'll be instructing
9    her not to answer those questions?
10         MR. NOLAN:  Yes, ma'am.
11         MS. VANDERWEELE:  And I take it the City did
12   not intend to admit any evidence regarding that
13   meeting, at trial; is that correct?
14         MR. NOLAN:  I'm not trial counsel.  I'm here
15   for this deposition.  And that's privileged
16   information, and we're asserting privilege.
17         MS. VANDERWEELE:  Jeff, I'm going to need
18   you to state on the record whether you're going to
19   be admitting any evidence.
20         Oh, is Jeff not here?
21         All right.  So just so the record is clear,
22   we currently do not have an attorney of record for
23   City of Beaumont or Western Riverside Council of
24   Governments present for this deposition.
25         Counsel Jeff Dunn has apparently left the
```

Page 168

```
1    deposition, and there is no attorney of record here
2    for either of the plaintiffs in this lawsuit.
3          But based on representations that have been
4    made to me by Mr. Nolan and Mr. Dunn, I have the
5    City and WRCOG's consent to move forward with this
6    deposition.
7          MR. NOLAN:  And if I could just clarify, I
8    am here on behalf of Ms. Gibbs, but I am also here
9    on behalf of the City, as I represented when we
10   began.
11         So it's not completely accurate when you say
12   there's nobody here on behalf of WRCOG or on behalf
13   of the City.  I am here on behalf of the City.
14         MS. VANDERWEELE:  Have you filed an
15   appearance in this lawsuit?
16         MR. NOLAN:  I have not.
17         MS. VANDERWEELE:  All right.
18         MR. NOLAN:  As I also disclosed when we
19   began.
20         MS. VANDERWEELE:  Well, you understand that
21   any evidentiary objection you make is not applicable
22   to the City or Western Riverside in this lawsuit,
23   since you're not an attorney of record; correct?
24         MR. NOLAN:  Well, I understand that that's
25   what you're asserting.  And if that's the position
```

Page 169

```
1    you're taking, then I'm not sure why we're
2    proceeding with the deposition then.
3          MS. VANDERWEELE:  I don't know -- understand
4    why there's not an attorney of record for both of
5    the plaintiffs in this lawsuit, but you guys have
6    both agreed to move forward.
7          MR. NOLAN:  With me present acting in that
8    capacity.
9          MS. VANDERWEELE:  I have not agreed at any
10   time to let you represent the City or Western
11   Riverside Council of Governments as an attorney of
12   record for two of the plaintiffs in this lawsuit;
13   that was never an agreement.
14         MR. NOLAN:  Well, then I think at this point
15   probably the best thing we do is we need to stop the
16   deposition and clarify that issue.  There's no sense
17   going forward and then fighting this out afterwards.
18         I believe if you contact Jeff Dunn, he's
19   going to say it's his understanding that I am here
20   on plaintiff's behalf.
21         If you're saying that's not what you're
22   agreeing to, then -- then there's not much sense in
23   going forward.
24         MS. VANDERWEELE:  Well, what's -- what's
25   disappointing is that a Notice of Deposition has
```

43 (Pages 166 to 169)



EXHIBIT 19
PAGE 1205

Page 170

```
1    been issued weeks ago, and I'm now learning that the
2    attorney of record for both of the plaintiffs in
3    this lawsuit doesn't intend to be present for the
4    entire deposition.  No appearance has been filed by
5    you.  No appearance has been filed by your law firm,
6    and yet you want to continue with this deposition.
7         Is that -- do I understand that correctly?
8         MR. NOLAN:  You -- I -- I've made my
9    statement clear.  And you clarified that with
10   Mr. Dunn, when he was present, and now you are
11   asserting a different position than you did
12   previously.
13        MS. VANDERWEELE:  That is not true at all.
14   I made it very clear that I was happy to proceed
15   with you being present on behalf of the witness, and
16   that Mr. Dunn, as the attorney of record for the
17   City and Western Riverside, consented to proceeding
18   without him being present as the attorney for the
19   plaintiffs in this lawsuit.
20        MR. NOLAN:  And Mr. Dunn represented to you
21   that I was attorney for the City.
22        MS. VANDERWEELE:  All right.  We're going to
23   have to take a break.  We'll come back in ten
24   minutes.
25        THE VIDEOGRAPHER:  The time is 1:39 p.m.  We
```

Page 171

```
1    are off the record.
2         (A brief recess was taken.)
3         THE VIDEOGRAPHER:  The time is 1:51 p.m.  We
4    are back on the record.
5         MS. VANDERWEELE:  All right.  I am ready to
6    proceed with the deposition, and given the timing of
7    the discovery deadlines, given the fact that we
8    don't have much time to complete the deposition, I
9    would like to move forward, even though an attorney
10   of record from the Best, Best and Krieger law firm
11   is no longer present for the City or Western
12   Riverside Council of Governments.
13        Mr. Nolan, I understand that you're here
14   representing Ms. Gibbs, and it's also your position
15   that you're representing the City and WRCOG; is that
16   correct?
17        MR. NOLAN:  I'm here on their behalf.  Yes,
18   absolutely.
19        MS. VANDERWEELE:  Okay.  You know, I
20   certainly -- I stated my position, but given -- in
21   the interest of time and to get this deposition
22   done, I'm prepared to move forward.
23        MR. NOLAN:  Okay.  Well, given your -- your
24   statement before we broke, I'm concerned, short an
25   agreement and a stipulation on the record, that
```

Page 172

```
1    you're agreeing to allow me to appear in capacity
2    for the plaintiffs, that we move forward.
3         You're stating that while there's time
4    constraints and discovery deadlines, yes, all those
5    are true, but you've also expressed a very strong
6    position in my representation here.
7         So I think we need to clear that up at this
8    time.
9         MS. VANDERWEELE:  Sure.  Is it going to be
10   your position that you now represent the City and
11   WRCOG in this lawsuit?
12        MR. NOLAN:  I'm saying that for purposes of
13   this deposition, that was the agreement that Jeff
14   Dunn made with yourself, and that was my
15   understanding.
16        MS. VANDERWEELE:  Well, that was an
17   agreement he made with you.
18        MR. NOLAN:  And you clearly said --
19        MS. VANDERWEELE:  Let's be clear --
20        MR. NOLAN:  And you clearly said that.
21        MS. VANDERWEELE:  That was an agreement he
22   made with you, not me.
23        MR. NOLAN:  Okay.  And my position remains.
24   I'm asking now:  Am I making that agreement with
25   you?
```

Page 173

```
1         Are you willing to stipulate that on the
2    record, or do we need to cancel this deposition?
3         MS. VANDERWEELE:  I will stipulate to that
4    in the interest of Ms. Gibbs' time.  I know she's
5    prepared, she's here, she's been very patient with
6    me, and I'm happy to move forward with that
7    understanding.
8         MR. NOLAN:  Okay.
9    BY MS. VANDERWEELE:
10        Q.  Ms. Gibbs, I'd shown you, before we took a
11   break, the notice of discipline that was issued with
12   respect to Mr. Kapanicas.  And I apologize, I don't
13   think I recall what your answer was, but I believe
14   you told me that you had not seen that document
15   before; is that correct?
16        A.  Correct.
17        Q.  All right.  Do you understand that
18   Mr. Kapanicas was ultimately terminated from his
19   position as City Manager for engaging in unlawful
20   activity?
21        A.  I understand that Mr. Kapanicas left the
22   City and -- on mutual terms, is what I understand.
23   There was a settlement agreement between the two
24   parties.
25        Q.  As the resources director and as the later
```



MAGNA
LEGAL SERVICES

EXHIBIT 19
PAGE 1206

Page 174

```
1    Interim City Manager for the City of Beaumont, did
2    you come to learn that Mr. Kapanicas -- or strike
3    that.
4          As resources director and later as the
5    Interim City Manager, did you ever come to learn that
6    the City believed Mr. Kapanicas had engaged in
7    unlawful activity?
8       A.  No, even after he was arrested.
9          MS. VANDERWEELE:  I'm going to show you
10   Exhibit 11.
11         (Deposition Exhibit 11 was marked for
12         identification by the court reporter.)
13         (Mr. Dunn rejoined the deposition.)
14   BY MS. VANDERWEELE:
15      Q.  Exhibit 11, these are City Council meeting
16   minutes from June 2 of 2015; correct?
17      A.  Correct.
18      Q.  And these meeting minutes reflect the fact
19   that you were acquainted the -- strike that.
20         These meeting minutes reflect the fact that
21   you were appointed Acting City Manager by the City
22   Council on June 2, 2015; correct?
23      A.  Correct.
24      Q.  And after the City Council appointed you
25   Acting City Manager, you began that position with the
```

Page 175

```
1    City of Beaumont through May 16 of 2016; correct?
2       A.  Correct.
3       Q.  I take it you were present for this meeting?
4       A.  Yes.
5       Q.  On page 2 -- and I'll zoom in.  Agenda
6    Item 8.i -- sorry.  I'll get there.  There we go.
7          Agenda 8.i on Exhibit 11 states (as read):
8          Release of a request for proposal for
9    financial advisor services.
10         Do you see that?
11      A.  Yes.
12      Q.  And it looks like you gave a staff report on
13   this item; correct?
14      A.  I gave a verbal staff report.  I did not
15   write the staff report that was included in the
16   packet.
17      Q.  What was the verbal staff report that you
18   gave the City Council during the June 2, 2015, City
19   Council meeting?
20      A.  I -- basically, if I recall, I read the
21   staff report that was in the packet.
22      Q.  And do you recall what that staff report
23   said?
24      A.  Based on the minutes, it was to allow staff
25   to issue a request for proposal for financial
```

Page 176

```
1    advisor services.
2       Q.  And do you recall that a request for proposal
3    was issued?
4       A.  I -- I believe so.
5       Q.  And was Urban Futures ultimately retained by
6    the City pursuant to this request for proposal that
7    was issued?
8       A.  Yes, I believe that's correct.
9       Q.  What is Urban Futures?
10      A.  A consulting firm.
11      Q.  Is there any relationship between Urban Logic
12   and Urban Futures?
13      A.  Not that I'm aware of, no.
14      Q.  In June of 2015, the City retained Urban
15   Futures to look into the City's finances; is that
16   correct?
17      A.  I don't know when, but I do know that we
18   ultimately did hire Urban Futures.  I just don't
19   know when.
20      Q.  And why was Urban Futures hired by the City?
21      A.  To advise on financial services.
22      Q.  Did Urban Futures also assist the City in
23   reconciling the use of bond proceeds?
24      A.  I think that was added sometime down the
25   road, way down the road.
```

Page 177

```
1       Q.  It's my understanding that initially Urban
2    Futures was retained to assist the City in its
3    finances and also to assist you in preparing a
4    budget; is that correct?
5       A.  Yes.  Yeah.
6       Q.  And then, as you had just mentioned, later on
7    the scope of Urban Futures' work for the City
8    expanded to include reconciliation of the use of bond
9    proceeds; is that correct?
10      A.  That is correct, but I don't know if the
11   City -- I don't know how that portion or that
12   service was retained.  I don't recall how that came
13   about.
14      Q.  Were you the Interim City Manager for
15   Beaumont when the scope of Urban Futures' work for
16   the City expanded to include reconciliation of the
17   bond proceeds?
18      A.  Yes.
19      Q.  When you were appointed City Manager in June
20   of 2015, you had to prepare a general operating
21   budget; correct?
22      A.  A general fund and restricted fund budget,
23   yes.  There's multiple funds.
24      Q.  Did you come to learn that the City's general
25   fund was insolvent during that process?
```



EXHIBIT 19
PAGE 1207

Page 178

```
1        A.  Yes.  That we -- we were several million
2   dollars short and couldn't afford the workforce that
3   we had employed.
4        MS. VANDERWEELE:  I'm going to show you --
5   I'm jumping ahead a few exhibits, but I'm going to
6   show you Exhibit 14, if I can get this to work here.
7        (Deposition Exhibit 14 was marked for
8        identification by the court reporter.)
9   BY MS. VANDERWEELE:
10       Q.  So I'm showing you what I've marked as
11  Exhibit 14, which, for the record, is
12  BEAUMONTAIG0250996 through 251096.
13       This is a document dated August 26, 2015.
14  It's from Elizabeth Gibbs-Urtiaga, Acting City
15  Manager, to Mayor and Members of the Beaumont City
16  Council.  And this is regarding (as read):
17       Submission of the fiscal year 2015-2016
18  proposed general operating budget.
19       Do you recognize this document, ma'am?
20       A.  Yes.
21       Q.  Did you prepare this document?
22       A.  It was a group effort between me, the
23  finance director and the consultant, Urban Futures.
24       Q.  Who was the finance director at the time that
25  this document was prepared?
```

Page 179

```
1        A.  We had an interim finance director and her
2   name was Onyx -- or is Onyx Jones.
3        Q.  When was Ms. Jones hired as the interim
4   director of finance?
5        A.  I don't recall, but it was shortly before
6   this document was drafted.  It was within weeks.
7        Q.  And so you drafted the document that is in
8   Exhibit 14, with input from Ms. Jones and Urban
9   Futures?
10       A.  Yes.
11       Q.  And this memo discusses the fact that the
12  general fund for Beaumont was insolvent; correct?
13       A.  Correct.
14       Q.  And on the second page of this document,
15  you -- and in the pages that follow, you discuss how
16  it is that the City's general fund became insolvent;
17  correct?
18       A.  I'm sorry.  Can you repeat that?
19       Q.  Sure.  Sorry.  And that was a bad question.
20       The -- this document discusses kind of how it
21  is that Beaumont's general fund became insolvent; is
22  that fair to say?
23       A.  I'd have to read through it again.  I -- we
24  were basically painting the picture for City Council
25  that we were in trouble.
```

Page 180

```
1        Q.  You state here on page 3 of Exhibit 14 that
2   (as read):
3        In reviewing our audited financial statements
4   that go back to fiscal year 2007-2008, it appears the
5   City's general fund had been in a negative cash and
6   working capital position since that time.
7        Correct?
8        A.  Correct.
9        Q.  And right before that sentence, there's a
10  heading in this report that says, quote (as read):
11       It has been a long time in the making, closed
12  quote.
13       Correct?
14       A.  Correct.
15       Q.  And on page 2 of this document, you write in
16  this report, quote (as read):
17       This did not happen overnight.  The City has
18  been budget insolvent for years, closed quote.
19       Correct?
20       A.  Correct.
21       Q.  I want to show you page 7.  On page 7 of this
22  document, you discuss your rationale for the budget
23  that's proposed in this document; correct?
24       A.  Correct.
25       Q.  And I want to direct your attention to the
```

Page 181

```
1   second-to-bottom paragraph.  There's a sentence --
2   the second sentence reads (as read):
3        Despite growth in some revenue items, it was
4   offset by reductions in overhead charges to special
5   funds and what we might recover from insurance
6   claims, closed quote.
7        Do you see that?
8        A.  Yes.
9        Q.  And what did you mean when you referenced
10  recovery from insurance claims, in this document?
11       A.  Honestly, I don't recall.
12       Q.  So as you sit here today, you don't recall
13  what it is you meant when you mentioned recovery of
14  insurance claims on page 7 of Exhibit 14; is that
15  correct?
16       A.  That's correct.
17       Like I said, this was a group effort, and
18  I -- there were portions of this that were written
19  by the interim finance director and the consultants.
20  We each took a portion of it.
21       For example, the bankruptcy section was
22  written by Urban Future because I had never been
23  involved with a government bankruptcy.
24       You know, if I read -- if I read the whole
25  document, if I had time to read the whole document,
```



MAGNA
LEGAL SERVICES

EXHIBIT 19
PAGE 1208

Page 182

1    I -- I don't even know then if I would remember what
2    we were writing about.
3        Q.  You were the City Manager in 2015 when the
4    City purchased a government crime insurance policy
5    from my client; do you recall that?
6        A.  No.  I was the City Manager, but I don't
7    remember purchasing the insurance at the time.
8        MS. VANDERWEELE:  I'm going to show you --
9    this is Exhibit 12.  Showing you Exhibit 12.
10       And, for the record, Exhibit 12 is
11   Bates-stamped ERMAC, E-r-m-a-c, underscore, 992
12   through 995.  And this is a Master Crime Program
13   2015/2017 Proposal to the City of Beaumont from
14   National Union Fire Insurance Company.
15       (Deposition Exhibit 12 was marked for
16       identification by the court reporter.)
17   BY MS. VANDERWEELE:
18       Q.  Have you ever seen this document before?
19       A.  Not that I recall, no.
20       Q.  This document is dated on page 3.  It has a
21   proposal date of June 1, 2015; do you see that?
22       A.  Yes.
23       Q.  You were appointed City Manager on June 2,
24   2015?
25       A.  Yes.

Page 183

1        Q.  Mr. Kapanicas had been -- or strike that.
2        Mr. Kapanicas had been placed on leave as of
3    June 2, 2015; correct?
4        A.  I don't know the date he was placed on
5    leave, but it was sometime prior to my appointment.
6        Q.  Do you recall any discussions that you had
7    with -- with anyone in the City regarding this Master
8    Crime Program Proposal contained in Exhibit 12?
9        A.  No.
10       MS. VANDERWEELE:  I will show you
11   Exhibit 13.  Exhibit 13 is an insurance policy, No.
12   01-425-57-41.
13       (Deposition Exhibit 13 was marked for
14       identification by the court reporter.)
15   BY MS. VANDERWEELE:
16       Q.  Have you ever seen this document before,
17   ma'am?
18       A.  No.
19       Q.  The effective date of this policy -- well,
20   strike that.
21       Let me back up.
22       I'm going to show you page 103, I think it
23   is.  Yeah, page 103 of Exhibit 13.  It's Endorsement
24   3-39, and it identifies named insureds under this
25   policy.

Page 184

1        And do you see that the City of Beaumont is
2    identified as a named insured under this policy?
3        A.  Yes.
4        Q.  Beaumont Utility Authority, Beaumont
5    Charitable Foundation and Beaumont Conservation
6    Authority are also identified on this policy as named
7    insureds; correct?
8        A.  Correct.
9        Q.  Beaumont Financing Authority is not
10   identified as a named insured under this policy;
11   correct?
12       A.  Correct.
13       Q.  Do you have any knowledge as to whether the
14   City ever requested that Beaumont Financing Authority
15   be a named insured under this policy?
16       A.  I have no knowledge of that.
17       Q.  And going back to page 1 of this Exhibit 13,
18   do you see that the policy has an effective date of
19   June 30, 2015?
20       A.  Yes.
21       Q.  And prior to June 30 of 2015, Mr. Kapanicas
22   no longer served in the City Manager role; correct?
23       A.  Correct.
24       Q.  Mr. Aklufi, Mr. Aylward and Mr. Wysocki were
25   no longer working for the City in June of 2015;

Page 185

1    correct?
2        A.  Correct.
3        Q.  The Urban Logic principals, Mr. Moorjani,
4    Mr. Egger and Mr. Dillon, no longer worked for the
5    City of Beaumont prior to June 30, 2015; correct?
6        A.  They weren't around.  They never -- they
7    never worked for the City of Beaumont.  They
8    consulted.
9        Q.  When you were appointed Interim City Manager
10   on June 2 of 2015, was there anything preventing you
11   from investigating any wrongdoing that Mr. Kapanicas
12   may have committed?
13       A.  Can you repeat that?
14       Q.  Sure.
15       By the time that you were appointed City
16   Manager on June 2 of 2015, was there anything
17   stopping you from launching an investigation as to
18   whether Mr. Kapanicas had violated any laws?
19       A.  I understood and I believed that
20   Mr. Kapanicas would be back, that he would at some
21   point come back, and that my role was temporary
22   until he returned.
23       Q.  That wasn't the answer to my question.
24       My question was:  Was there anything
25   preventing you from conducting an investigation as to

47 (Pages 182 to 185)



EXHIBIT 19
PAGE 1209

Page 186

```
1    whether Mr. Kapanicas had engaged in any unlawful
2    activity?
3         A. I wouldn't -- there was nothing preventing
4    me, but I wouldn't do an investigation because I
5    didn't believe he did anything wrong.
6         Q. Well, you're aware that Mr. Kapanicas was
7    places on leave due to concerns about him engaging in
8    unlawful activity; correct?
9         A. No. I understood that he was placed on
10   leave, and that's all I knew.
11        Q. Do you have any understanding as to why
12   Mr. Kapanicas was placed on leave?
13        A. I thought maybe there was personality
14   conflicts between him and a couple of the
15   Councilmembers.
16        Q. When you were appointed Interim City Manager
17   on June 2 of 2015, was there anything preventing you
18   from conducting an investigation into whether
19   Urban Logic Consultants and the owners had engaged in
20   unlawful activity?
21        A. No. But, again, I didn't think there was
22   any wrongdoing, so I wouldn't entertain an
23   investigation.
24        MS. VANDERWEELE: I'm going to show you what
25   I've marked as Exhibit -- I think this is 15.
```

Page 187

```
1         Exhibit 15, for the record, is Bates-stamped
2    BEAUMONTAIG0416851. And this is a September 18,
3    2015, e-mail from Libi Uremovic to Onyx Jones and
4    Elizabeth Gibbs-Urtiaga.
5         (Deposition Exhibit 15 was marked for
6         identification by the court reporter.)
7    BY MS. VANDERWEELE:
8         Q. Ma'am, is this an e-mail that you received on
9    September 18, 2015, when you worked as the City
10   Manager for Beaumont?
11        A. It -- it appears so. I don't recall this
12   particular e-mail.
13        Q. Do you have any reason to dispute that this
14   was an e-mail that you received on or about
15   September 18, 2015?
16        A. No.
17        Q. Do you know who Libi Uremovic is?
18        A. Yes.
19        Q. And who is that?
20        A. She's just a person.
21        Q. Okay. Why was Ms. Uremovic sending you an
22   e-mail on September 18, 2015?
23        MR. NOLAN: Objection. Calls for
24   speculation.
25
```

Page 188

```
1    BY MS. VANDERWEELE:
2         Q. You can answer.
3         A. I don't know. She made herself known and
4    would frequently contact us.
5         Q. Did Ms. Uremovic attend City Council
6    meetings?
7         A. I recall one, but she generally did not.
8    She preferred to communicate through e-mail and
9    through social media.
10        Q. Did Ms. Uremovic raise concerns to you about
11   Urban Logic?
12        A. Libi raised concerns on a number of issues,
13   including whether or not I was qualified. She was
14   just anti-government.
15        Q. Did the concerns that Ms. Uremovic raised to
16   you include concerns related to Urban Logic?
17        A. It looks like, based on this e-mail.
18        Q. My question is: Do you recall, as you sit
19   here today, concerns raised by Ms. Uremovic related
20   to Urban Logic?
21        A. Yes, what I read on her blog.
22        Q. And what did -- did some of the concerns that
23   Ms. Uremovic post on the blog include concerns
24   related to Urban Logic engaging in unlawful conduct?
25        A. She was accusing them of a number of things,
```

Page 189

```
1    including breaking the law, if I recall.
2         Q. And was the law that Ms. Uremovic was
3    accusing Urban Logic of violating include conflict of
4    interest law?
5         A. I don't recall.
6         Q. When did Ms. Uremovic first raise concerns to
7    you regarding Urban Logic engaging in unlawful
8    activity?
9         A. It had to have been after I was appointed
10   because she didn't communicate with me directly
11   before that.
12        Q. In this e-mail that's contained in
13   Exhibit 15, Ms. Uremovic writes, quote (as read):
14        I listed to your comments regarding the
15   Urban Logic invoices Exhibit C.
16        Do you see that?
17        A. Yes.
18        Q. And do you know what she is saying when she's
19   referring to "your comments regarding the Urban Logic
20   invoices"?
21        A. If I recall, there was a staff report that I
22   gave regarding some Urban Logic invoices that were
23   presented to the City for payment that were over my
24   signing authority, and, therefore, they were
25   presented to Council.
```

48  (Pages 186 to 189)



EXHIBIT 19
PAGE 1210

Page 190

1   Q.  And were those invoices, Urban Logic
2   invoices, invoices that remained outstanding?
3      A.  I'm sorry.  Can you say that again?
4   Q.  The -- the invoice -- you mentioned a staff
5   report where you discussed Urban Logic invoices.
6      Did I understand that correctly?
7      A.  Yes.
8   Q.  And did -- those Urban Logic invoices, were
9   those invoices that were unpaid at that time?
10     A.  Yes.
11  Q.  And was the purpose of the staff report to
12  apprise the City Council of these outstanding
13  invoices from Urban Logic?
14     A.  Yes.
15  Q.  And we talked earlier on in the deposition
16  that you recall when you were Interim City Manager
17  that you had to review invoices from Urban Logic that
18  had not yet been paid; correct?
19     A.  Correct.
20  Q.  And is that what the staff report discussed,
21  what we had talked about earlier, with the unpaid
22  Urban Logic invoices?
23     A.  I would have to see the staff report.
24  Q.  Do you know if the City has produced that
25  staff report in this lawsuit?

Page 191

1      A.  I don't know.
2   Q.  In this e-mail that's on Exhibit 15,
3   Ms. Uremovic writes, quote (as read):
4      It's written in the bonds that payment for
5   services regarding the bonds is contingent upon the
6   sale of the bonds.  And, yes, former City Manager,
7   Alan Kapanicas, owned a company that directly
8   profited from every bond, as did the former City
9   Attorney, former finance director, former public
10  works director, former economic development director,
11  former planning director, and former risk manager,
12  closed quote.
13     Do you see that?
14     A.  Yes.
15  Q.  Did you understand that the bonds that were
16  issued by Beaumont Financing Authority -- that the
17  payment of proceeds under the -- or strike that.
18     You told me earlier you never reviewed any of
19  the bonds issued by BFA; correct?
20     A.  Correct.
21  Q.  As to -- do you know who the project engineer
22  was that's identified on the bonds issued by Beaumont
23  Financing Authority?
24     A.  No.
25  Q.  When you received this e-mail from

Page 192

1   Ms. Uremovic, did you take any action?
2      A.  No.
3   Q.  Why not?
4      A.  Because she is what we call a gadfly.  She
5   claimed to be a forensic auditor, but had no
6   credentials.  And she -- she -- I mean, some of the
7   things that she would say were so far-fetched that
8   it was hard to believe anything she said.
9   Q.  You understand that Ms. Uremovic was raising
10  concerns about the Urban Logic principals violating
11  conflict of interest law?
12     You understand that; correct?
13     A.  Based on this e-mail, yes.
14  Q.  And you understand that the Urban Logic
15  principals pled guilty to violating conflict of
16  interest law; correct?
17     A.  I understand that they are convicted felons,
18  but I don't know what they pled guilty to.
19  Q.  In March of 2016, you were still the City
20  Manager for Beaumont; is that correct?
21     A.  Correct.
22  Q.  Do you recall the City issuing -- or strike
23  that.
24     Do you recall City Council approving the
25  issuance of legislative subpoenas to Union Bank?

Page 193

1      A.  I recall -- I recall -- I don't know when,
2   but I recall that we had to forcibly get documents
3   from Union Bank because they refused to release
4   them.
5      And that was part of the DA investigation.
6   The DA was asking the City to go to the trustee to
7   get those documents.  And after multiple
8   conversations with Union Bank myself, I had to get
9   our City Attorney involved.
10  Q.  And did the City issue a subpoena to
11  Union Bank?
12     A.  I don't recall.  It seems like we talked
13  about a subpoena, but I would have to see the
14  document.
15  Q.  Have you ever -- in your capacity as the
16  Interim City Manager for Beaumont in 2015 and 2016,
17  did you ever review documents produced by Union Bank?
18     A.  No.  We couldn't find anything, and that's
19  why we were asking Union Bank for the documents.
20  And they kept deflecting for weeks on end.
21  Q.  I think you told me earlier, and I want to
22  make sure it's clear because I think we can
23  short-circuit a lot of my remaining questions.
24     Did you have any involvement in the City's
25  submission of a notice of claim to National Union





EXHIBIT 19
PAGE 1211

Page 194

```
1    Fire Insurance Company of Pittsburgh, PA?
2        A. No, not that I recall.
3        MS. VANDERWEELE: I'm going to show you what
4    I've marked as Exhibit 16.
5        Exhibit 16, for the record, is Bates-stamped
6    ERMAC002168 through 2206.
7        (Deposition Exhibit 16 was marked for
8        identification by the court reporter.)
9    BY MS. VANDERWEELE:
10       Q. And I'm actually going to draw your attention
11   to page 4, the bottom half. The bottom half of
12   page 4 of Exhibit 16 is an e-mail from John Pinkney
13   to James Gregg, copying you, Elizabeth Gibbs-Urtiaga,
14   Brent Clemmer and Robert L. Patterson, with a subject
15   line of, Fidelity Bonds; correct?
16       A. Correct.
17       Q. Do you recall receiving this e-mail?
18       A. No.
19       Q. Any reason to dispute that this is an e-mail
20   that you received on March 15, 2016?
21       A. No reason.
22       Q. And the first sentence of this e-mail reads,
23   quote (as read):
24       James, as you know, the City Council is
25   investigating past use of CFD bond proceeds and City
```

Page 195

```
1    funds, closed quote.
2        Do you see that?
3        A. Yes.
4        Q. And prior to this date, was City Council
5    investigating the past use of CFD bond proceeds and
6    City funds?
7        A. City Council? No, not that I'm aware.
8        But John Pinkney also reported directly to
9    City Council, and so conversations that he had with
10   City Council very well could have taken place
11   outside of me.
12       Q. Okay. So did you have any involvement in the
13   City's investigation into the past use of CFD bond
14   proceeds and City funds?
15       A. Other than the request from the DA to get
16   copies.
17       Q. Did you take any action after receiving this
18   e-mail?
19       A. In -- in what way? In what --
20       Q. Well, you received an e-mail on March 15,
21   2016, related to the City's fidelity bonds; correct?
22       A. Correct.
23       Q. And I'm just wondering if you, as a City
24   Manager, took any action with respect to the contents
25   of this e-mail?
```

Page 196

```
1        A. No, not that I recall. I probably read it
2    and deleted it.
3        Q. There's a -- starting on page 5 of
4    Exhibit 16, there's a Crime Loss Report.
5        Have you ever seen this document before?
6        A. It looks familiar, but I don't know if I've
7    ever seen that one.
8        Q. And this is a Crime Loss Report, it starts on
9    page 5. And then on page 6 and page 7 of this
10   document, the report continues.
11       Have you seen either of these pages?
12       A. I don't recall.
13       Q. Did you have any preparation in the Crime
14   Loss Report that's contained in Exhibit 16?
15       A. No.
16       Q. And this -- okay.
17       Did you have any involvement in the
18   preparation of a proof of loss that was submitted to
19   my client on behalf of the City of Beaumont in
20   November of 2016?
21       A. No, I wasn't City Manager then.
22       Q. You were the transit director as of May 17,
23   2016; correct?
24       A. Correct.
25       MS. VANDERWEELE: Going to show you
```

Page 197

```
1    Exhibit 17 quickly.
2        Showing you what I've marked as Exhibit 17.
3    This is a November 3, 2016, letter from Stradling
4    law firm to Judith Blake at AIG. And I'll zoom out.
5        (Deposition Exhibit 17 was marked for
6        identification by the court reporter.)
7    BY MS. VANDERWEELE:
8        Q. Have you ever seen this document before?
9        A. No.
10       Q. I'm going to show you page 3 of Exhibit 17.
11   This is a Fidelity Bond Claim Department Proof of
12   Loss form.
13       Have you ever seen this document before?
14       A. No.
15       Q. Did you have any involvement in preparing the
16   proof of loss that's shown here on page 3 of
17   Exhibit 17?
18       A. No.
19       Q. In your role as City Manager in 2015 and
20   2016, did you have any role or involvement in
21   computing the City's alleged loss that it's claiming
22   in this lawsuit?
23       A. No.
24       Q. Have you ever completed an analysis of the
25   Urban Logic invoices, in your role as the Interim
```

50  (Pages 194 to 197)


MAGNA
LEGAL SERVICES

EXHIBIT 19
PAGE 1212

Page 198

1    City Manager for Beaumont, to determine the amount
2    that Urban Logic allegedly overcharged the City?
3        A. No, I -- not directly.
4        Q. Indirectly have you done that?
5        A. I -- at some point, Urban Futures was
6    retained to do reconciliation because Urban Logic
7    was threatening litigation.
8        Q. And all I'm trying to get at is if in your
9    role as the Interim City Manager in 2015 and 2016 --
10   ever made a determination as to the exact amount that
11   Urban Logic overcharged the City?
12       A. No.
13       Q. You mentioned that you were involved in
14   assisting the DA with its investigation; do you
15   recall that?
16       A. Yes.
17       Q. Is that referring to the Riverside District
18   Attorney's office?
19       A. Yes.
20       Q. The Riverside DA conducted an investigation
21   in 2015 and 2016; correct?
22       A. It started -- City Hall was raided on
23   April 22nd, 2015, so I assumed that their
24   investigation started.
25           We were not given updates, so we kept, you

Page 199

1    know, business as usual.
2        Q. Were you involved in the DA's investigation?
3        A. I was interviewed once.
4        Q. When were you interviewed?
5        A. December 2nd, 2015.
6        Q. And who interviewed you?
7        A. I -- there were five or six represent- -- DA
8    representatives in the room, and Mr. Pinkney was
9    with me.
10           I can't remember the lead investigator -- or
11   the lead attorney's name, she was a female.  But
12   there were multiple people in that room.  It was at
13   their office in Riverside.
14       Q. Do you recall that one of the DAs present was
15   Emily Hanks?
16       A. I don't recognize that name, but that could
17   have been her name.
18       Q. How long was -- did the interview take?
19       A. It was five hours.  It was a long time.  I
20   remember that because that was the day that the
21   San Bernardino public social services building was
22   bombed.
23       Q. When you were interviewed by the DA, did you
24   provide them with any documents?
25       A. No, it was strictly an oral interview.

Page 200

1        Q. And what were the types of things that the DA
2    was asking you about in this interview?
3        A. I -- I don't know.  They wanted to know a
4    lot about the department heads and the culture of
5    the organization and how things were done.  I don't
6    remember specific questions.
7        Q. Did the DA advise you during this interview
8    of why it was conducting an investigation?
9        A. No.
10       Q. Are you aware that the City of Beaumont is
11   claiming in this lawsuit that Urban Logic overcharged
12   the City millions of dollars?
13       A. As the employee, no.
14       Q. And I -- thank you for pointing that out.  I
15   should have clarified.
16           As the resources director and then as the
17   Interim City Manager and the transit director and the
18   community services director, did you ever come to
19   learn, with respect to those roles that you had at
20   the City, that the City is claiming that Urban Logic
21   overcharged them millions of dollars?
22       A. I believe I learned that from you, with our
23   initial conversation.  I don't think it was specific
24   to Urban Logic.
25       Q. And what do you mean by -- by it not being

Page 201

1    "specific to Urban Logic"?
2        A. I -- I think when you and I talked, it was
3    multiple people, not just Urban Logic -- or I got
4    the -- I can't remember, but I got the impression
5    that it was many people.
6        Q. So prior to you and I speaking, back when you
7    were initially subpoenaed in this lawsuit, you had no
8    knowledge or information about Urban Logic
9    overcharging the City; correct?
10       A. Well -- okay.  Let me back up.
11           So I heard through conversations with
12   Mr. Parton, as City Manager, that ultimately -- and
13   this was just a couple years ago.  Ultimately, the
14   City believed that they were overcharged.
15           Some of this is attorney-client privilege,
16   so I can't get into detail.
17       Q. Yeah.  Okay.  Thank you.  And I don't want to
18   know anything that you've learned from the City's
19   lawyers.
20           The conversation that you had with Mr. Parton
21   about Urban Logic overcharging, when did that occur?
22       A. I want to say, like, '18, '19.  It was just
23   a couple years ago.
24       Q. And prior to that conversation with
25   Mr. Parton, you did not have any information or

51  (Pages 198 to 201)



EXHIBIT 19
PAGE 1213

Page 202

1    knowledge about any alleged overcharging by
2    Urban Logic; correct?
3        A.  Correct.
4        Q.  Would you agree that violating a conflict of
5    interest law constitutes dishonest conduct?
6        A.  Violating a conflict of interest is
7    dishonest and unethical, yes.
8        Q.  Do you agree that violating a conflict of
9    interest law amounts to theft?
10       A.  No, not necessarily.
11       Q.  If the violation of conflict of interest law
12   involves the payment of money, do you believe that
13   that amounts to theft?
14       A.  Involves a payment of money.  So an exchange
15   of money?
16       Q.  Correct.  An exchange of money in violation
17   of conflict of interest law, do you believe that
18   amounts to theft?
19       A.  No, it could be bribe.
20       Q.  And bribery, that would be dishonest conduct;
21   correct?
22       A.  Correct.
23         It could be theft.  It could be bribe.  It
24   could be unethical.
25       Q.  The conversation that you had with Mr. Parton

Page 203

1    in 2018 or 2019, that's the first time that you, in
2    your individual capacity, learned that Urban Logic
3    had allegedly overcharged the City; correct?
4        A.  Around that time, yeah.
5        Q.  And --
6        A.  It was just a conversation in passing.
7        Q.  Do you know, in your individual capacity as a
8    fact witness in this lawsuit, when it is that the
9    City first learned that Urban Logic had overcharged
10   the City?
11       A.  I don't know.
12       MS. VANDERWEELE:  I'm going to just need a
13   quick break, five-minute break or so, and then I
14   think I'm about done.
15       THE VIDEOGRAPHER:  Okay.  This marks the end
16   of Media No. 3.  The time is 2:34 p.m.  We are off
17   the record.
18       (A brief recess was taken.)
19       THE VIDEOGRAPHER:  This marks the beginning
20   of -- oh, wait.  Stand by.
21       This marks the beginning of Media No. 4 in
22   the deposition of Elizabeth Gibbs-Urtiaga.  The time
23   is 2:39 p.m.  We are on the record.
24       MS. VANDERWEELE:  Jeff, did you have an
25   opportunity to determine whether the City's going to

Page 204

1    be asserting the privilege over the 2015
2    conversation that Ms. Gibbs had with Steve DeBaun?
3        MR. DUNN:  I didn't get a chance to talk to
4    Mr. Nolan.  I'm prepared to do that now, if he's --
5    if he's available.  I can talk to him offline and
6    get back to you while you wait.
7        MS. VANDERWEELE:  Yeah, that would be great.
8    Or, if you want, I can -- if you guys want to talk,
9    we can end the deposition and then I can -- to the
10   extent you're not going to be asserting the
11   privilege, I can ask her that tomorrow.
12       MR. DUNN:  Tomorrow, yeah.  Okay.
13       MS. VANDERWEELE:  Thank you.
14       MR. DUNN:  That will work, if that's okay
15   with Mr. Nolan too.
16       MR. NOLAN:  Absolutely, yes.
17       MS. VANDERWEELE:  Okay.  Then we're back on
18   the record.
19       And I don't have any further questions of
20   you at this time, Ms. Gibbs.  I appreciate your
21   patience with me today and your time.
22       THE WITNESS:  Thank you.
23       THE VIDEOGRAPHER:  And before we go off the
24   record, Mr. Nolan and Mr. Dunn, did you want a copy
25   of this video?

Page 205

1        MR. DUNN:  This is Mr. Dunn.  I'll order a
2    copy, yes.
3        THE VIDEOGRAPHER:  Mr. Nolan, you're good?
4        MR. NOLAN:  Yes.  Thank you.
5        THE VIDEOGRAPHER:  And, Ms. Monson, did you
6    want a copy as well?
7        MS. VANDERWEELE:  She's from my office.
8        THE VIDEOGRAPHER:  Are we all ready to go
9    off the record?
10       THE COURT REPORTER:  Hold on one second.
11       So, Mr. Dunn, you want a copy of the
12   transcript?
13       MR. DUNN:  Yes, I do, please.
14       THE COURT REPORTER:  Okay.  Thank you.
15       THE VIDEOGRAPHER:  Okay.  This concludes
16   today's proceedings in the deposition of
17   Elizabeth Gibbs-Urtiaga.  The total number of media
18   used was four.
19       We are off the record.  The time is
20   2:41 p.m.
21       (Deposition proceedings concluded at 2:41 p.m.)
22
23
24
25





MAGNA
LEGAL SERVICES

EXHIBIT 19
PAGE 1214

Page 206

1    I, Mimi Murray, a licensed Certified Shorthand
2    Reporter, duly qualified and certified as such by the
3    State of California, do hereby certify:
4        That prior to being examined, the witness
5    named in the foregoing proceedings was, by me, duly
6    sworn to testify to the truth, the whole truth, and
7    nothing but the truth;
8        That the said proceedings were, by me,
9    recorded stenographically at the time and place first
10   therein mentioned; and the foregoing pages constitute a
11   full, true, complete and correct record of the
12   testimony given by the said witness;
13       That I am a disinterested person, not being in
14   any way interested in the outcome of said action, not
15   connected with, nor related to any of the parties in
16   said action, or to their respective counsel, in any
17   manner whatsoever.
18       IN WITNESS WHEREOF, I have subscribed my name
19   this 2nd day of June, 2022.
20
21   _____
22       Mimi Murray, CSR No. 13985
23
24
25

Page 207

1                DEPOSITION ERRATA SHEET
2
3    Assignment No. 831793
     Case Caption:  WESTERN RIVERSIDE COUNCIL OF
4    GOVERNMENTS, a California Joint Powers Authority; CITY
     OF BEAUMONT, a public entity in the State of California
5    vs. NATIONAL UNION FIRE INSURANCE COMPANY OF
     PITTSBURGH, PA and DOES 1 through 50, inclusive
6
7            DECLARATION UNDER PENALTY OF PERJURY
8
9        I declare under penalty of perjury that I have read
10   the entire transcript of my Deposition taken in the
11   captioned matter, or the same has been read to me, and
12   the same is true and accurate, save and except for
13   changes and/or corrections, if any, as indicated by me
14   on the DEPOSITION ERRATA SHEET hereof, with the
15   understanding that I offer these changes as if still
16   under oath.
17
18       Signed on the _____ day of _____, 20___.
19
20   _____
21       ELIZABETH GIBBS-URTIAGA
22
23
24
25

Page 208

1                DEPOSITION ERRATA SHEET
2
3    Page No._____ Line No._____ Change to:_____
4    _____
5    Reason for change:_____
6    Page No._____ Line No._____ Change to:_____
7    _____
8    Reason for change:_____
9    Page No._____ Line No._____ Change to:_____
10   _____
11   Reason for change:_____
12   Page No._____ Line No._____ Change to:_____
13   _____
14   Reason for change:_____
15   Page No._____ Line No._____ Change to:_____
16   _____
17   Reason for change:_____
18   Page No._____ Line No._____ Change to:_____
19   _____
20   Reason for change:_____
21   Page No._____ Line No._____ Change to:_____
22   _____
23   Reason for change:_____
24   SIGNATURE:_____DATE:_____
25       ELIZABETH GIBBS-URTIAGA

Page 209

1                DEPOSITION ERRATA SHEET
2
3    Page No._____ Line No._____ Change to:_____
4    _____
5    Reason for change:_____
6    Page No._____ Line No._____ Change to:_____
7    _____
8    Reason for change:_____
9    Page No._____ Line No._____ Change to:_____
10   _____
11   Reason for change:_____
12   Page No._____ Line No._____ Change to:_____
13   _____
14   Reason for change:_____
15   Page No._____ Line No._____ Change to:_____
16   _____
17   Reason for change:_____
18   Page No._____ Line No._____ Change to:_____
19   _____
20   Reason for change:_____
21   Page No._____ Line No._____ Change to:_____
22   _____
23   Reason for change:_____
24   SIGNATURE:_____DATE:_____
25       ELIZABETH GIBBS-URTIAGA

53 (Pages 206 to 209)



EXHIBIT 19
PAGE 1215

## A

**a.m**
1:19 2:21 7:1,5 26:19
26:21 28:5 81:1,6
**abatement**
98:14
**ability**
106:8 113:6
**able**
12:19 27:20 41:21
43:16 72:5 88:22
98:24 99:25 120:23
135:10 148:18
**absolutely**
167:7 171:18 204:16
**access**
48:19 128:4
**accidently**
12:20
**accountant**
34:15
**accounting**
101:19 105:19 106:2
110:21 136:8
**accurate**
66:10 106:9 113:7
168:11 207:12
**accusing**
188:25 189:3
**acquainted**
174:19
**acronym**
11:14
**act**
62:11 65:2 86:12
96:24 163:18
**acting**
5:5 27:4 29:1 33:18
38:20,24 39:5 41:5
42:20 43:3,20,20
44:3 45:8,17,23
48:22 49:10,17,23
64:13,21 98:5,14
107:4,25 121:18
122:7 132:18 169:7

174:21,25 178:14
**action**
55:22 82:5 192:1
195:17,24 206:14
206:16
**actively**
147:10
**activity**
144:9 173:20 174:7
186:2,8,20 189:8
**added**
176:24
**addition**
40:25 45:15 78:1
**administration**
31:25 32:7,25
**administrative**
52:25 94:8 101:18
106:1 110:21 163:6
164:1,3
**admit**
167:12
**admitting**
167:19
**adopt**
47:25 112:23
**adopted**
45:25 84:6 112:17,22
**adoption**
47:6,22
**advance**
78:21 82:4 142:13
**advice**
20:7 66:23 138:19
**advise**
35:12 63:16 105:15
109:19 176:21
200:7
**advised**
66:16
**advisor**
175:9 176:1
**advisory**
66:22
**afford**
178:2

**afternoon**
139:25
**agencies**
67:23
**agency**
36:15,18
**agenda**
81:24 85:14 142:1,3
142:9,18 163:18
175:5,7
**agendas**
142:6,12 163:23
**agendized**
81:25 142:18
**ago**
170:1 201:13,23
**agree**
7:21 202:4,8
**agreed**
169:6,9
**agreeing**
169:22 172:1
**agreement**
5:4,6 19:19 22:7,17
41:24,25 42:8,14,21
43:2,23 46:7,11
48:23 50:5 51:14,22
59:17 169:13
171:25 172:13,17
172:21,24 173:23
**agreements**
17:24 18:1 25:23
26:7 63:17 152:12
**ahead**
178:5
**AIG**
91:4 197:4
**Aklufi**
70:6 71:17 72:2 85:7
85:7,9 90:10 94:12
102:9,11 104:20
184:24
**Akufli**
70:1
**al**
7:8 166:16

**Alan**
39:3 60:4 62:7,13
65:23 66:13 69:25
72:9,12 73:3 76:4
76:11,18 77:6,7
84:25 85:15 86:5,6
89:8 101:10 102:6
119:2,4,4 126:12,14
132:2,5 138:22,23
141:5 150:24
157:14 158:24
164:19 191:7
**Alan's**
62:18 76:11
**allegations**
151:18
**alleged**
151:8 153:4 197:21
202:1
**allegedly**
198:2 203:3
**allow**
172:1 175:24
**allowed**
26:1
**allows**
56:8,19 57:18
**amended**
6:6 27:18,23 47:14
53:25 54:10
**amount**
53:24 54:2,3,5,9
57:24,25 58:1,8,12
135:18 158:18,20
198:1,10
**amounts**
202:9,13,18
**analysis**
70:16 72:10 73:5
123:1 197:24
**and/or**
5:17 164:17 207:13
**Angeles**
2:24
**annual**
53:15 67:23 79:6,18



EXHIBIT 19
PAGE 1216

94:22 95:18 97:1,18
100:5,9,19
**answer**
4:14 10:13 12:12,13
12:14,19,21 13:6,10
13:21 17:8 19:2,3,5
19:22,24 20:3,7
26:3,4,13 27:10
31:19 33:22 35:14
37:2 87:17 88:21
113:20,21,22
114:16 115:9,11,12
136:4 152:24
153:20 162:9
165:15,16 166:6,7,9
166:11 167:9
173:13 185:23
188:2
**answering**
165:20
**anti-government**
188:14
**anticipate**
12:11
**anybody**
93:14 109:10
**apologize**
10:12 31:1 78:12,20
78:24 91:1 173:12
**apparently**
167:25
**appeal**
160:20
**appealing**
160:16
**appear**
172:1
**appearance**
19:10 168:15 170:4,5
**appearances**
8:4
**appeared**
78:14
**appearing**
8:14,16 9:13
**appears**

180:4 187:11
**applicable**
168:21
**application**
65:25 66:9
**applications**
65:21 66:4 154:15,21
154:23,25 155:4,6
155:11
**applied**
46:9 132:15 134:25
135:11
**apply**
47:17
**appoint**
35:13,23
**appointed**
35:10,11,21 38:24
39:21 44:24 49:10
52:7 85:5 94:5,9,11
94:15 96:22 97:12
98:5,14 102:15,21
107:15 123:9,17
130:12 132:23
133:3,18 134:2
136:9 174:21,24
177:19 182:23
185:9,15 186:16
189:9
**appointing**
35:1
**appointment**
32:8 38:20 78:23
122:8,10,15 183:5
**appreciate**
139:21 204:20
**apprise**
190:12
**approval**
53:19 54:4 55:12
56:2,10,21 57:20
58:2,4,6,10,13 59:7
75:17 84:9,14
**approve**
47:22,25 55:15 57:23
63:13 68:2 74:9,21

83:22,25 122:17
**approved**
68:4 75:3,8 121:25
122:14 127:20,24
128:9,12,19 130:6
138:7,11
**approving**
121:24 134:12
192:24
**approximately**
10:16 59:5 89:17
157:21
**April**
15:13,19,24 16:6
21:2 22:22 23:4,22
35:3,20 40:16 41:24
82:22 83:4 198:23
**area**
105:8 152:17
**arrested**
174:8
**arrived**
101:23 108:4
**article**
159:1
**articles**
152:19
**arts**
32:11,15
**aside**
126:2
**asked**
13:7,16 18:5 29:3
35:25 132:23,24
141:5 156:20
157:12 165:22
166:14
**asking**
12:9,13 30:23 31:4,9
56:18 73:17 93:8,16
115:13,14,18,21
156:23 165:6,11,13
166:18,19 172:24
193:6,19 200:2
**asks**
93:1

**aspect**
87:2
**asserting**
19:12,21 114:9
167:16 168:25
170:11 204:1,10
**assessed**
155:20
**assessing**
68:18
**assessment**
68:24 155:22
**assignment**
19:18 22:11 207:3
**assist**
18:1 67:7 176:22
177:2,3
**assistant**
71:25
**assisted**
154:20 155:4
**assisting**
127:3 198:14
**assumed**
198:23
**assuming**
156:21
**attached**
70:15 103:7,17
**attachment**
70:21,22 71:1 103:12
**attachments**
92:1
**attacks**
148:10
**attend**
65:2 138:24 141:1,3
141:8,14,16 188:5
**attended**
67:4 108:21 111:1,6
141:18 143:1
149:25 151:13
**attending**
9:10 109:2 139:1
**attention**
50:22 92:21 143:4



158:20 180:25 194:10

**attorney**
8:5 11:17 14:15 15:22 24:15,17 85:3 90:11 93:20 98:18 102:8 113:22 156:22 160:18 164:19 167:22 168:1,23 169:4,11 170:2,16,18,21 171:9 191:9 193:9

**attorney's**
20:6 164:10 198:18 199:11

**attorney-client**
19:12 201:15

**attorneys**
9:8,19 16:19 24:11 24:16 28:3 72:3

**Audio**
7:20

**audit**
79:14,17,20,25 80:4 80:8 100:13,19,25 101:18,22 103:8 105:15,18 106:23 109:24 110:6,8,13 110:17 111:25 116:5,10,17

**audited**
180:3

**auditor**
110:20 111:21 192:5

**auditors**
107:14,17

**auditors'**
110:14

**audits**
79:6,9 80:1,13 100:3 100:9 105:3

**August**
42:21 43:10 131:9 178:13

**authority**
1:6 2:6 54:21 55:1,6

55:10,20,25 56:2 57:9,15 59:3 64:15 67:19 73:25 77:12 121:24 130:10,14 130:19 131:1 134:11 184:4,6,9,14 189:24 191:16,23 207:4

**authorized**
138:8,12

**authorizing**
68:2

**available**
204:5

**AVENUE**
3:11

**awarded**
121:4 157:21

**awarding**
150:25

**aware**
17:23 46:10 54:15,19 55:3 68:20 77:18,22 79:13,23 80:1 81:11 81:16 91:23 103:25 123:4 128:8 130:23 135:19,24 138:6,11 143:18 148:5 161:17 163:10 166:2,23 176:13 186:6 195:7 200:10

**Aylward**
70:1,6 71:17,23 85:15 86:16,20 87:11 94:16 184:24

**Aylward's**
90:6

_____

**B**

**B**
56:25 57:10

**B-e-a-u-a-i-g**
50:15 69:22 82:18 84:19 101:4

**bachelor**
32:11,14

**back**
17:1 18:8 26:22 45:3 48:20 51:6,7,18 52:2 56:22 88:25 90:13 92:20 93:21 100:22 112:17 113:4,12 136:19 137:2,25 140:9,22 152:2 170:23 171:4 180:4 183:21 184:17 185:20,21 201:6,10 204:6,17

**background**
12:10

**bad**
179:19

**Bank**
192:25 193:3,8,11,17 193:19

**bankruptcy**
181:21,23

**Baptist**
32:1,12

**Baron**
3:17 11:15

**based**
9:20 54:14 87:8,10 88:12 99:19 119:3,6 135:2 161:23 168:3 175:24 188:17 192:13

**bashing**
147:14

**basically**
175:20 179:24

**basing**
56:22

**basis**
43:21 79:6,18 87:25 94:22 95:19 97:1,19 100:5 135:21 152:12

**Bates**
5:7,9,10,11,14,18,22 6:1,2,4

**Bates-stamped**

50:14 69:22 82:18 84:19 98:22 101:4 148:13 164:15 182:11 187:1 194:5

**BB&K**
17:6 18:1 24:16

**BBK**
25:2,12 29:18

**Beaumont**
1:6,20 2:6,21 5:7,21 7:2 8:13,17 9:9 11:18 14:16 15:5,9 15:12 17:12 18:21 20:17 22:4,9,13 27:3 28:25 29:14 30:3,5 32:9 33:13 34:10,23 36:9,10,12 36:17,22 37:1,5,16 37:22 38:7,16,21,25 39:10,14,18,25 40:1 40:12,17,19,24 41:25 42:9,16 43:4 43:13 44:9,12,19 47:11,18 48:14 49:13 50:9,17 51:3 51:9 52:15 57:18,23 59:18 60:10,16,22 61:13,15,20,24 62:3 62:5,15 64:6,10,22 65:1,3,16,18,20,22 66:4,10,20 67:6,24 68:9,16 71:24 75:14 79:6 82:11 89:10,14 90:2 92:5 94:20 95:7,20 96:7,13,18 97:8 100:25 103:2 104:7 112:6,9,11 116:23 118:8,18 120:9,20 121:1,4,13 121:18 123:7,25 126:8 127:16,23 128:25 129:10,18 130:4,10,14,19,25 132:9,21 133:5,17 134:16 135:24 136:25 137:10,15



137:23 138:4
140:25 141:7,15,23
142:16 143:18
145:25 146:4,10,11
146:20 147:1,17,22
148:1 149:5,25
150:10,23 152:16
153:2,4 154:5,8,14
154:16 155:12,16
156:5,11 157:17
158:16 160:22
161:4,11,22 164:20
167:23 174:1 175:1
177:15 178:15
179:12 182:13
184:1,4,4,5,9,14
185:5,7 187:10
191:16,22 192:20
193:16 196:19
198:1 200:10 207:4
**Beaumont's**
106:1 149:20 179:21
**BEAUMONTAIG...**
178:12
**BEAUMONTAIG...**
6:1
**BEAUMONTAIG...**
98:23
**BEAUMONTAIG...**
5:13
**BEAUMONTAIG...**
6:3 187:2
**BeaumontGate**
147:3
**BeaumontGate.org**
5:15 146:17,19,25
147:7,11 148:6,22
149:3,15 150:1
151:6
**becoming**
36:17
**began**
44:2 96:12 107:22
161:24 162:16,21
163:12 168:10,19
174:25

**beginning**
8:4 9:10 12:9 28:4
81:4 140:19 203:19
203:21
**begins**
7:6
**behalf**
2:20 3:2,9,16 8:7,9
8:15,16 9:13 19:11
29:14 30:4 54:17
55:16 56:9,20 57:19
58:14 62:17 63:16
64:25 65:22 66:4,10
105:5 120:6 135:12
154:16 155:11
168:8,9,12,12,13
169:20 170:15
171:17 196:19
**believe**
14:20 28:16,19 31:5
33:22 44:8 59:11
64:19 70:24 75:24
76:13 87:4,10 88:13
100:12 112:8
114:17 119:2 133:9
147:13 153:10
162:2 169:18
173:13 176:4,8
186:5 192:8 200:22
202:12,17
**believed**
82:11 174:6 185:19
201:14
**believes**
106:7
**benefit**
116:14
**Bernardino**
199:21
**best**
3:10,10 12:7,17 16:7
16:7,23,24,25,25
17:3,3 20:10,10,21
20:21,25,25 21:4,4
21:9,9 22:21,21
24:24,24 38:19

89:13 131:12
160:23,23 161:4,4,9
161:9 169:15
171:10,10
**BFA**
131:4 191:19
**Bill**
70:1 85:15 86:15
94:16
**billing**
137:13 138:2
**Bingham**
144:21,22 145:15
146:5 147:17
151:23
**birth**
10:3
**bit**
12:3,4 100:3
**Blake**
197:4
**blog**
188:21,23
**board**
65:2 93:12
**bombed**
199:22
**bond**
130:16,16 176:23
177:8,17 191:8
194:25 195:5,13
197:11
**bonded**
93:2,9,17
**bonds**
130:9,13,18,25 131:4
191:4,5,6,15,19,22
194:15 195:21
**bottom**
50:23 148:23 194:11
194:11
**break**
13:15,19 69:13 80:18
80:20 81:9 139:17
139:22,23 170:23
173:11 203:13,13

**breaking**
189:1
**breaks**
13:14,17
**Brent**
194:14
**bribe**
202:19,23
**bribery**
202:20
**brief**
81:3 171:2 203:18
**briefing**
108:10
**briefly**
99:1 107:13 148:25
**broad**
77:20 114:17
**broke**
171:24
**Brown**
86:12 163:18
**budget**
53:15 73:8 74:4 75:3
75:8,16 84:6,6
128:10,20 177:4,21
177:22 178:18
180:18,22
**budgets**
68:2,4,7 127:23
138:8
**building**
41:3 63:3 66:1
199:21
**business**
117:16 119:17 125:8
125:21 129:5 199:1

---
**C**
---
**C**
3:1 189:15
**calendar**
25:10
**California**
1:2,5,7,20 2:2,5,7,21
2:25 3:6,12,18 5:7



EXHIBIT 19
PAGE 1219

7:2,11 32:1,12
45:10,17 46:1 48:25
50:18 64:15 96:7
97:8 98:2,9 103:1
104:7 145:5,12
206:3 207:4,4
**call**
23:15 46:20 192:4
**called**
23:17 146:11
**calls**
87:15 88:17 162:6
187:23
**CalPERS**
10:18
**camera**
7:17
**cancel**
173:2
**CANYON**
3:18
**cap**
135:2,11 138:9,14
**capacity**
27:1 28:12,17,23
29:9 30:9,24 66:22
88:14 120:25
122:25 128:13
136:18,22 137:14
137:20 138:3 169:8
172:1 193:15 203:2
203:7
**capital**
127:8,15,19 128:8,18
138:7 139:9 180:6
**caps**
132:15 134:24
**Caption**
207:3
**captioned**
207:11
**Care**
40:10,11,16
**career**
153:16
**case**

1:5 2:5 7:12 8:1
10:17 11:5 17:1,6
19:8 37:9 155:8
159:15,21 207:3
**cases**
17:25 18:2 55:21
56:1
**cash**
180:5
**Central**
1:2 2:2 7:11
**certain**
27:1 28:23 49:14
55:21 56:1 65:4
75:2 76:8,14,15
95:4 102:3 124:12
124:17 130:5 135:8
135:21 136:1 149:1
156:20,24
**certainly**
12:17 16:20 72:19
159:25 171:20
**certificate**
34:6,7,9
**certification**
32:24 33:3,7,8,16,24
33:25
**certifications**
32:18 33:5,14 34:2,4
34:13
**certified**
2:22 32:23 34:15,17
206:1,2
**certify**
206:3
**CFD**
194:25 195:5,13
**chance**
204:3
**change**
76:24 208:3,5,6,8,9
208:11,12,14,15,17
208:18,20,21,23
209:3,5,6,8,9,11,12
209:14,15,17,18,20
209:21,23

**changed**
59:3 77:10
**changes**
207:13,15
**changing**
27:10
**chapter**
53:3
**charge**
138:9,13
**charges**
136:6,15,21 137:4,13
152:9,10 181:4
**Charitable**
184:5
**chatter**
108:5
**check**
135:6,7
**checking**
123:5,11,20 132:22
134:4 135:2,17
**child**
86:21
**choose**
74:1
**Chris**
25:3
**chronology**
36:8
**CIP**
127:12
**cities**
67:20
**citizens**
145:25 146:4,11
147:17,22 148:1
150:10 151:17
**City**
1:6 2:6 5:4,5,19,21
8:12,16 9:9,17
11:17 14:15 15:8,14
15:17,20,22 17:12
17:22 18:20,22
19:17 20:11,16,22
22:3,9,12 23:1,10

23:20,22 24:3,9,15
24:17 27:2,4 28:24
28:25 29:1,14 30:3
30:4 31:5 32:8
33:13,18 34:23,25
35:1,4,6,12,13,20
35:21,23,24 36:2,4
36:6,10,11,19 37:21
38:20,24 39:2,6,10
39:21 40:12,22 41:4
41:5,13,23,25 42:9
42:16,20 43:3,12,19
43:20 44:3,5,9,11
44:15,19,19,21,23
44:24,25 45:4,5,8,9
45:10,16,17,19,23
45:25 46:4,8,9,12
46:15,22,25 47:5,10
47:18,21,21,24
48:10,14,23,24,25
49:2,6,9,10,17,23
49:24 50:2,3,9,10
50:24 52:5,5,6,7,10
52:12,14,15,20,25
53:1,2,8,10,11,19
53:20 54:3,4,10,16
54:18,21 55:2,5,5,9
55:10,11,14,16,20
55:25 56:1,6,8,9,9
56:19,20,21 57:4,4
57:4,8,14,18,19,20
57:20,22 58:2,4,6,6
58:9,9,13,14 59:6,7
60:4,5,10 61:15,20
61:23,25 62:2,11,17
63:12,13,16,16,22
63:23 64:1,4,6,13
64:13,22 65:9,13,18
66:16,24 67:2,5,8
67:11,16 68:1,3,4
68:13,16,19,23,25
69:4,8 71:2,2,25
72:2,12 73:4,8,11
73:12,18,19,23,25
74:5,20 75:4,7,9,11
75:14,17,23,25 76:1



EXHIBIT 19
PAGE 1220

76:5,9,11,15,19,22
77:1,2,15,16,18,23
78:2,3,9 79:4,7,14
80:4,9,10,12 81:13
81:17,19,20,23,24
82:8,8,13 83:19,21
83:25 84:9,13 85:3
85:8,11,13,23 86:15
86:20,23 87:1,5,9,9
87:10,13,23 88:3,6
88:9,12,13,14,14,16
89:10,14,18,23
90:11 92:7 93:2,9
93:15,17,20 94:5,12
94:16,20 95:8,14,17
95:21,25 96:8,12,13
96:18,22 97:8,9,14
98:2,5,10,14,18
100:10,18 101:23
102:13,13,15,20,22
103:2,2 105:5,7,16
106:1,10,18 107:3,4
107:7,15,17,21,24
107:25 109:13
111:22,25 112:3,6,9
112:11,15,15,18,21
112:23 113:2,9,14
114:5,25 115:25
116:3,9,12,16,22,24
117:3,11,16,19
119:9,14,17,21,24
120:4,6,14,20 121:4
121:9,17,18,25
122:1,4,5,7,11
123:6,13,17,21,25
124:2,5,12,16,18,21
125:6,8,19,21
126:18 127:7,9,12
127:20,23,24 128:5
128:10,12,19
129:23 130:6,9,12
131:11,14,17,20,25
132:19,21 133:1,3
133:12,19,24 134:3
134:5,23 135:13,16
135:21,24 136:3,13

136:24 137:10,23
138:6,11,17,19
139:3,9 140:25
141:1,4,8,12,14,18
141:22 142:6,11,17
142:22,22 143:1,8
143:19 144:18,22
144:23 145:17
147:14 149:20,25
150:23,24 151:13
151:17,23 153:3,6
154:9,21 155:12,16
155:19 156:1
158:11,21,22 159:3
160:13 161:14,17
161:23,24 162:2,4
162:16,20,25 163:2
163:8,12,15,17,19
163:20 164:10,11
164:12,19,20 165:1
165:8 167:6,11,23
168:5,9,13,13,22
169:10 170:17,21
171:11,15 172:10
173:19,22 174:1,1,5
174:6,15,21,21,24
174:25 175:1,18,18
176:6,14,20,22
177:2,7,11,14,16,19
178:14,15 179:24
180:17 182:3,4,6,13
182:23 183:7 184:1
184:14,22,25 185:5
185:7,9,15 186:16
187:9 188:5 189:23
190:12,16,24 191:6
191:8 192:19,22,24
193:6,9,10,16
194:24,25 195:4,6,7
195:9,10,14,23
196:19,21 197:19
198:1,2,9,11,22
200:10,12,17,20,20
201:9,12,14 203:3,9
203:10 207:4
**City's**

16:13,17 21:22 41:6
54:22 55:2,7,24
59:10 62:22 63:7
68:7 73:9 75:8,15
78:18 91:23 101:18
105:19 106:8
110:21 113:6 118:1
118:4,9,14,19
120:14 154:25
156:25 160:10
162:12 163:24
176:15 177:24
179:16 180:5
193:24 195:13,21
197:21 201:18
203:25
**Civil**
28:1
**claim**
41:7,12 55:21 56:9
56:20 57:9 62:21
63:6,10 68:14 69:8
84:11,12 92:17
93:25 197:11
**claimed**
192:5
**claiming**
135:25 197:21
200:11,20
**claims**
54:17 55:11,15 56:1
57:11,15,19 62:10
62:17 69:3,4 181:6
181:10,14
**clarified**
170:9 200:15
**clarify**
74:23 81:21 137:5
156:19 168:7
169:16
**clear**
30:21 31:2 78:16
149:11 159:8
167:21 170:9,14
172:7,19 193:22
**clearly**

162:6 172:18,20
**Clemmer**
194:14
**Clerk**
57:4 85:11,13,24
86:15 87:13 88:16
89:10,14,18,23 93:2
93:9,17 95:25
**client**
19:22 20:11,17 41:7
41:13 92:7 155:14
156:2 160:7 161:19
165:15 182:5
196:19
**close**
109:16
**closed**
93:4 114:10,15,20
115:1,14,15,19,22
149:11,22 165:4,7
165:12,14 180:11
180:18 181:6
191:12 195:1
**closed-session**
116:1,4,11,18 165:1
165:18 166:3,13,15
166:20,22 167:6
**co-counsels**
17:25
**co-workers**
160:1
**code**
5:7 45:10,11,16,17
46:1 48:7,25 49:1,4
49:8,13 50:6,18
51:3,9,16,19,24
52:10,23 54:15,16
54:20 55:1,24 56:3
56:19 76:6 93:3
**cohabitated**
86:17
**cohabitating**
87:11
**collect**
65:23
**collected**



EXHIBIT 19
PAGE 1221

66:6
**collecting**
66:1
**combine**
57:6
**come**
111:7 124:16 126:13
131:20 132:19
134:24 140:9 150:3
150:8 153:2 154:3
158:14 170:23
174:2,5 177:24
185:21 200:18
**coming**
104:1 131:11,13,25
**commencing**
2:21 43:21
**comment**
141:20,22 143:8
144:23
**comments**
143:2 144:4 189:14
189:19
**Commission**
95:3,8 96:15,20
**committed**
185:12
**common**
81:22
**communicate**
188:8 189:10
**communications**
16:21 17:5 19:15
21:3
**community**
39:17 40:23 41:11
200:18
**companies**
62:22
**company**
1:10 2:10 3:2 5:22
7:9 8:8,10 20:18
23:3 28:2 40:5,9,15
41:8,14 60:13,20
65:17 91:5 92:8
98:13 182:14 191:7

194:1 207:5
**compensated**
132:11,21
**compensation**
134:8
**complete**
95:5 171:8 206:11
**completed**
94:21 97:1,18 154:15
197:24
**completely**
168:11
**completing**
12:21 154:24
**complied**
71:7
**comply**
112:5,6
**comprehensive**
112:19
**computing**
197:21
**concern**
113:6
**concerned**
151:17 171:24
**concerning**
54:22 55:6
**concerns**
86:7 89:5,19 90:5,9
143:12,19,25 144:8
145:20 147:11
148:6 151:12
152:20 186:7
188:10,12,15,16,19
188:22,23 189:6
192:10
**concluded**
205:21
**concludes**
205:15
**conduct**
145:12 188:24 202:5
202:20
**conducted**
198:20

**conducting**
185:25 186:18 200:8
**conference**
104:3,6,11 109:12
**confirm**
56:16 134:14 136:12
136:13,17 142:20
149:17
**conflict**
143:12,20 144:1,3,7
144:25 148:7
149:11,21 151:20
151:22 152:6 189:3
192:11,15 202:4,6,8
202:11,17
**conflicts**
186:14
**conformed**
134:15
**confuse**
51:7
**confusion**
165:24
**connected**
206:15
**connection**
7:18
**consent**
168:5
**consented**
9:18 170:17
**consenting**
78:18
**Conservation**
184:5
**consider**
129:18
**consistently**
150:24
**consolidate**
57:6
**constitute**
206:10
**constitutes**
202:5
**constraints**

172:4
**construction**
34:20 119:21 120:2
123:5,12,21
**consult**
113:22
**consultant**
119:18 178:23
**consultants**
116:25 117:4,12,13
117:16,21 118:24
119:20 120:5,10,13
121:5 125:2 133:14
133:22 134:21
135:20 138:8,13
143:3 181:19
186:19
**consulted**
185:8
**consulting**
116:20 176:10
**contact**
22:21 169:18 188:4
**contain**
151:7
**contained**
48:3 72:7 91:22
103:6 113:15 115:2
115:25 128:10,20
136:15,21 137:4,12
138:7 149:2 183:8
189:12 196:14
**contains**
99:19
**contents**
195:24
**context**
10:15 11:3 121:22
**contingent**
191:5
**continuation**
74:24
**continue**
7:20 44:6 74:11,21
75:2 85:20 162:15
170:6



**continued**
162:21
**continues**
196:10
**continuing**
74:15
**contract**
59:23 97:10 98:13,15
98:16 117:3,6,9,11
124:6 149:20
**contracted**
116:24 124:6
**contractor**
119:20 121:9 124:12
124:17
**contracts**
26:7 40:12,17 120:9
120:20,25 134:15
151:1
**contractual**
138:9,14
**contrary**
43:23
**control**
53:2,11 57:2 101:22
110:21
**Controller**
102:13,20 103:1
104:17,20,25 106:6
106:17 107:7,17,21
109:18,23 111:2,24
**Controller's**
100:25 101:10,17
103:25 104:12
105:10,14,25
106:19 107:2 108:1
108:12,18 109:3
110:4,6 111:7 112:4
112:7 113:11,15
114:7 116:5,17
**controls**
101:19 105:19 106:2
**conversation**
19:14 21:14,17,19
22:6,14 105:20
134:19 200:23

201:20,24 202:25
203:6 204:2
**conversations**
16:13,17 21:5 66:18
77:7 114:10,13,20
115:21 124:8
159:25 193:8 195:9
201:11
**convicted**
192:17
**convincing**
159:8
**convoluted**
136:10
**coordinate**
93:12 153:15
**coordinated**
155:20
**coordinating**
68:18
**coordination**
68:25 155:22
**coordinator**
36:23,25 37:5,18,20
38:6
**coordinators**
61:6,10 129:4
**copies**
195:16
**copy**
13:25 48:16,18
204:24 205:2,6,11
**copying**
82:23 92:23 101:10
194:13
**corporate**
137:15,17,20,22
138:3
**correct**
9:14,15 11:18 14:6
14:13,16,18 15:6,7
15:9,24,25 16:1,2
17:12,13,15,16
21:10,11 22:23,24
23:6,7,9,14,20,21
23:24,25 24:9,10,21

24:22 28:13,14
29:14 30:19 31:17
31:20 32:12 33:19
33:20,23 34:23 36:5
39:3,7,11,14,18
40:6 42:10 43:7,10
43:11,13,14 44:2,13
44:14 45:12,13,20
45:21 46:2,3 47:10
49:2,3,25 50:1,6,7
50:10,11 51:4,16,17
51:25 52:12,13,15
52:16,21 53:4,5,8
53:12,13,22,23,25
54:5,6 55:4,14,18
55:19 57:22 58:2
59:7,8,14 60:13,14
60:23,24 61:16,17
61:21,22,24 62:2,4
63:12 64:11 66:17
67:22 68:3 69:9,10
70:7,10,17,18 71:18
71:19 72:18,20,23
73:9,10,14,20 74:13
74:14,22 75:4,9,12
75:17 76:23,24,25
78:19,25 79:7 80:2
80:5,13,14 82:24,25
83:8,12,13,15,16,19
83:20,21 84:1,9
85:1,2 86:25 87:23
89:3,4,15 91:9,24
92:12,13 93:24 94:2
94:3,5,6,13,17,18
97:16 100:10,11,13
100:14 101:11,12
102:10 103:3,4,8,15
103:16,19,22 104:9
104:10,21 106:13
106:14,20,21
107:22,23 108:22
108:23 110:1,6,7,11
110:12,22,23
111:25 112:1 113:7
113:8 116:18,19,25
117:17 118:2,3,5

119:5,18,19 121:2
121:11,12 123:13
123:14,22,23 125:8
125:9,21,22 126:5,6
126:8,9,11 128:21
131:5,6 133:11
136:21 138:4,5
141:25 142:1 144:2
145:6,21 146:5
147:12 150:4
151:14 153:9,19,21
154:5 156:14 157:6
157:17 158:11
159:5 160:2,8,9,25
161:5 163:6,7,9,19
163:22 164:1 165:2
165:9 167:3,13
168:23 171:16
173:15,16 174:16
174:17,22,23 175:1
175:2,13 176:8,16
177:4,9,10,21
179:12,13,17 180:7
180:8,13,14,19,20
180:23,24 181:15
181:16 183:3 184:7
184:8,11,12,22,23
185:1,2,5 186:8
190:18,19 191:19
191:20 192:12,16
192:20,21 194:15
194:16 195:21,22
196:23,24 198:21
201:9 202:2,3,16,21
202:22 203:3
206:11
**corrections**
207:13
**correctly**
140:10 151:2 170:7
190:6
**correlate**
85:21
**corresponded**
142:18
**correspondence**



26:6
**corrupt**
111:17
**cost**
53:21 83:14
**costs**
83:11,17
**Council**
1:5 2:5 3:9 5:19 7:8
9:8 17:15 22:1,8,12
23:1 35:4,6,20
45:19,25 47:5,21,21
47:24 49:2,17,24
50:3,10 52:7,12,15
53:2,11,20 54:4,10
55:6,9,14,21 56:2
56:10,21 57:22 58:2
58:4,6,9,13 59:7
61:23 62:2 63:12,16
63:22 64:1 66:24
67:2,5,8,11 68:1,4
70:16 71:3 72:12
73:4,8,11,13,18,19
73:23,25 74:6,20
75:4,7,9,11,17,23
75:25 76:2,5,9,12
76:16,19,23 77:3,7
77:12,15,19,24 78:3
78:9 79:4 80:5,9,10
81:13,19,20,23,24
82:5,8,9,13 83:21
83:25 84:6,9,13
86:20,23 87:1,5,9
88:3,6,10,13,14
112:18,22,23 113:9
113:14 114:5 115:1
115:25 116:4,9,13
116:16 127:20,24
128:6,10,12,19
130:6 138:6,11,19
139:3,4,10 141:1,4
141:8,12,14,18,23
141:24 142:6,12,12
142:17,22,23 143:1
143:8,21,22 144:23
144:24 145:17

149:25 151:13,23
153:3,12 161:3,24
162:4,21 163:2,12
163:15,18,20,21
164:12 165:2,8
167:6,23 169:11
171:12 174:15,22
174:24 175:18,19
178:16 179:24
188:5 189:25
190:12 192:24
194:24 195:4,7,9,10
207:3
**Council's**
55:12 163:8
**Councilmembers**
77:1 186:15
**counsel**
8:3,19 11:9 14:5 19:7
139:12 161:8 167:4
167:14,25 206:16
**counsels**
17:24
**counter**
85:16 129:3
**County**
2:24 156:18
**couple**
9:6 107:3 113:5
186:14 201:13,23
**course**
82:3
**court**
1:1 2:1 7:10,23 8:18
12:5,15 18:6 25:22
25:22 26:5 27:16
29:5 31:18,21 35:14
41:17 42:24 50:20
69:19 82:20 84:22
99:5 101:6 123:14
148:16 153:20,25
159:15 164:22
174:12 178:8
182:16 183:14
187:6 194:8 197:6
205:10,14

**courtesy**
111:4
**cover**
114:18
**coverage**
90:21 155:7
**crashed**
111:17
**create**
82:2
**created**
52:6
**credentials**
192:6
**crime**
5:20 90:21 91:8,14
91:24 92:6 155:1,10
182:4,12 183:8
196:4,8,13
**CRM**
34:17
**cronyism**
143:15 145:2,5,8,11
150:19,25 151:8,12
151:18
**CSR**
1:25 2:23 206:21
**culture**
200:4
**curiosity**
149:7
**current**
15:11 39:21 42:9,15
51:14,22 136:24
**currently**
15:8 32:17,22 34:5
34:22 40:1 48:20
58:5 167:22
**customer**
36:23,25 37:4,18,19
38:6 61:5,9,9 85:16
129:4
**cut**
12:20

——————— **D** ———————

**D-e-b-a-u-n-n**
18:11
**DA**
193:5,6 195:15
198:14,20 199:7,23
200:1,7
**DA's**
199:2
**daily**
87:25
**damage**
63:3,4 155:5,8
**DAs**
199:14
**data**
37:2 65:24 66:1,6,9
154:20
**date**
10:3 15:17 24:2,8
44:9 75:2 94:1
102:12,24 112:25
148:22 182:21
183:4,19 184:18
195:4 208:24
209:24
**dated**
41:24 42:21 71:3
92:23 101:8 164:18
178:13 182:20
**dates**
25:9
**Dave**
138:25
**David**
118:14,14 139:3
**day**
16:1 85:5 101:20
102:3,18 104:23
105:11 132:2
162:19 166:20
199:20 206:19
207:18
**day-to-day**
43:21 48:6 87:8
126:19 127:2
128:25



EXHIBIT 19
PAGE 1224

days
94:9 156:17
deadlines
171:7 172:4
deal
25:3 164:11
dealings
153:17
dealt
164:9
DeBaun
17:10,11,14,17,21
18:10,14,21,23
19:16 21:9,12,25
22:7,14,18 204:2
decades
87:23
December
10:4 43:24 199:5
deception
158:23 159:5 160:7
160:12
decision
70:2,9 76:18 158:3
159:16,16,17
160:16 161:21
decisions
95:10 96:9 98:3,11
DECLARATION
207:7
declare
207:9
declared
8:23
Dee
138:25
Deepak
117:24
Deepak's
124:23
defamation
148:2
defendant
2:20 3:2 8:7,10 28:1
Defendants
1:12 2:12

definitely
72:13,15
deflecting
193:20
degree
32:4,6,7,11
delegated
45:18 49:1 62:7,8
65:5,23 66:13 68:12
134:17
delegates
54:21 55:1
delegating
55:10 134:18
delete
92:2
deleted
196:2
demanding
154:9
demonstrated
150:25
deny
74:11,21 136:17
149:17
department
57:5 64:7 126:7
127:4,8 131:9
135:23 138:17
158:12 160:17
163:1 197:11 200:4
departments
57:3,7
Depending
57:24
depends
7:17
DEPONENT
3:16
deposed
12:1
deposit
135:2,6,18
deposition
1:16 2:19 6:6 7:6,13
9:7,11,18 10:5,10

10:15,21,25 11:1,4
11:12,21,25 12:2
13:15,24 14:25 15:3
15:5,23 23:24 24:2
24:8,12,20 25:6,13
25:17,21 27:15,19
27:23 28:3,15,19
29:8,17,19,22 30:8
30:9,11 31:17 41:16
42:19,23 50:19
69:18 78:10,13,17
78:19 81:5 82:19
84:21 99:4 101:5
137:22 140:18,20
148:15 164:21
167:15,24 168:1,6
169:2,16,25 170:4,6
171:6,8,21 172:13
173:2 174:11,13
178:7 182:15
183:13 187:5
190:15 194:7 197:5
203:22 204:9
205:16,21 207:1,10
207:14 208:1 209:1
depositions
11:6,10 30:15
Deputy
85:11,13,23 86:15
87:12 88:16 89:9,14
89:18,23 95:25
describe
129:8
description
5:3 66:21 99:17
100:21
design
124:1
designated
30:3 137:22
desk
124:25
Despite
181:3
detail
148:8 201:16

detailed
128:10
details
147:20
determination
198:10
determine
136:14,20 137:3,12
138:1 198:1 203:25
determined
76:5 77:6 150:13
determining
68:13 69:7
developers
135:3,5
development
118:15 133:19
191:10
difference
115:16
different
14:2 18:9 25:8 28:16
48:5,10 77:11 105:2
105:3 170:11
diligence
93:20
Dillon
118:14,23 119:7,12
125:24 126:4,14,17
129:9,11,12,23,25
130:24 131:7,13,21
132:10 138:16
139:3 147:16 152:5
152:13 157:11
185:4
direct
50:22 62:21 180:25
directed
63:6 112:5
direction
53:1,11 57:7 62:18
76:24 77:9,11
directions
57:2
directly
92:1 189:10 191:7



EXHIBIT 19
PAGE 1225

195:8 198:3
**director**
27:3 28:25 33:12
34:10 37:11,14,25
38:3,12,18,21 39:14
39:17 40:19,23
41:10,11 47:8 49:12
50:8 52:18 54:7
55:5 59:11,12,15,19
60:1,16,22,25 61:7
61:12 62:9,14,20
63:21 64:2,5,9 65:6
65:12,16,20 66:5
67:6,15 68:8,22
69:6 71:23,25 75:6
75:11,13 76:7,21
77:23 78:4,6,8 79:5
79:13,16 80:1 81:10
81:17 82:11 86:1
87:5 88:15 90:6
91:17 92:4,11,15
94:19 95:6,16,20
96:6,18 100:8,18
109:6,9 112:15
113:2 116:23 117:5
117:10,17,20 118:2
118:5,7,10,12,15,17
118:19,21 119:12
119:23 120:3,8
121:3,13 123:18,24
124:13,15,20
125:16,18 126:3,19
127:1,6,14,18,22
128:4,20,25 129:9
129:17 130:3,8,20
131:5,16,19 132:8
132:13 133:19
135:20 137:8
138:18 140:25
141:3,7,10,15,19
142:7,11,16,21,25
143:6,10,17 144:5
145:5,11,13,18
146:9,12,21 147:1
147:23 149:5,24
151:7,16 152:19

153:1,5,11,18 154:4
154:8,20 156:9
159:3 161:14
162:11 164:9
173:25 174:4
178:23,24 179:1,4
181:19 191:9,10,10
191:11 196:22
200:16,17,18
**director's**
100:16
**directors**
121:7
**disagreed**
144:18
**disappointing**
169:25
**discipline**
5:17 164:5,6,17
166:16 173:11
**disclose**
154:13 160:5,10
**disclosed**
125:2 155:19 161:18
163:20 168:18
**disclosure**
161:15
**discovery**
171:7 172:4
**discuss**
18:23 57:10 108:2
115:15,24 166:3,16
179:15 180:22
**discussed**
71:20 86:5 114:15
115:14 150:1
158:13 165:6,12,13
190:5,20
**discusses**
57:14 179:11,20
**discussing**
73:4
**discussion**
20:4 22:18 26:20
57:13 115:5,6 165:3
**discussions**

24:1 107:1 127:2,5
128:5 147:19
158:10,14,21 160:3
183:6
**dishonest**
202:5,7,20
**disinterested**
206:13
**dismissal**
166:4
**Dismissal/Removal**
5:17 164:18
**dismissed**
150:9,13
**dispute**
83:3 90:16,19 149:13
187:13 194:19
**District**
1:1,2 2:1,2 7:10,11
39:25 40:2 198:17
**Division**
1:3 2:3 7:12
**divulge**
16:16
**divulging**
115:5
**document**
5:13 6:1 27:20 28:8
42:5 48:13 55:24
70:25 71:11,13,15
72:6,22 73:1 75:19
75:22,25 98:25 99:8
99:11,14,18,19,22
108:6 148:18 149:1
149:18 164:24
165:8,11 173:14
178:13,19,21,25
179:6,7,14,20
180:15,22,23
181:10,25,25
182:18,20 183:16
193:14 196:5,10
197:8,13
**documentation**
128:2
**documented**

150:21 165:7
**documents**
13:23 14:1 25:16,19
25:20,22 26:5 29:4
29:5,7,11,12 30:10
31:15 37:9 78:2
109:22 111:18,22
111:24 112:3
128:23 148:4
156:20,25 159:23
159:24 193:2,7,17
193:19 199:24
**doing**
93:18,19 105:2,15
108:2 136:13
140:10
**dollar**
54:2 57:24,25 158:18
158:19,20
**dollars**
154:14 155:15 178:2
200:12,21
**door**
102:7
**dot**
70:15,15,15
**draft**
76:17 81:22 82:9
**drafted**
82:8 179:6,7
**drafting**
99:10
**draw**
194:10
**Dress**
48:7
**drive**
111:15
**dropped**
72:11
**due**
93:20 186:7
**duly**
206:2,5
**Dunn**
3:11 25:3 78:10,12



EXHIBIT 19
PAGE 1226

78:20 139:12,12,15
139:20 140:1,12,18
167:25 168:4
169:18 170:10,16
170:20 172:14
174:13 204:3,12,14
204:24 205:1,1,11
205:13
**duties**
36:24 40:20,24 45:4
45:9,15,18,24 48:10
48:24 51:14,20
52:20 53:8,10 56:7
62:7,15 64:1,3,24
68:23 85:12,21
92:11 121:14
**duty**
63:21,23 92:15
100:18

————————
**E**
————————
**E**
3:1,1,4
**e-mail**
5:9,10,11 6:2,4 69:24
70:5,12,14,20 72:10
72:19 82:22 83:1,4
83:6,10,23 84:1,24
90:14,17,20 91:22
92:3,22 101:8,13
102:18 103:7,11,12
103:14,17 187:3,8
187:12,14,22 188:8
188:17 189:12
191:2,25 192:13
194:12,17,19,22
195:18,20,25
**e-mails**
5:14 14:25
**E-r-m-a-c**
64:11 182:11
**earlier**
18:15 21:3,8 29:16
59:12 65:4 69:5
100:3,12 119:16
154:19 155:19

190:15,21 191:18
193:21
**early**
59:13 63:8 153:16
**easier**
12:15
**East**
3:18 104:7
**Eastern**
1:3 2:3 7:11
**easy**
12:10
**economic**
95:10,13 97:20
118:14 191:10
**education**
31:24 34:19 96:19
**effective**
94:1 183:19 184:18
**effort**
178:22 181:17
**Egger**
118:19,23 119:8,13
125:24 126:4,14,17
129:1,7,23 130:1,24
131:7,13,21 132:10
138:16 147:16
152:5,12 157:12
185:4
**either**
87:11 138:23 168:2
196:11
**elected**
99:15
**election**
162:3,5,13 163:13
**electronic**
48:18
**elicit**
16:20
**Elizabeth**
1:17 2:20 3:16 4:3
7:7 8:12,22 10:2
28:4 42:1 69:25
81:6 82:24 85:1
101:11 140:21

178:14 187:4
194:13 203:22
205:17 207:21
208:25 209:25
**Emily**
199:15
**Empey**
3:17 11:15
**employed**
14:13 15:5,8,16
23:20,22 24:3,5,9
31:5 34:22 36:3
39:22,24 40:1 43:19
67:5 116:22 117:19
119:11 133:16
178:3
**employee**
10:18 36:15,16,17,19
43:20 46:19 133:12
136:24 137:9
151:16 155:9
200:13
**employees**
47:18 57:4,5 61:3
90:2 94:21 95:9
96:8 97:9 98:2,10
99:15 119:25
158:11 164:12
**employees'**
48:10 95:17,21
**employment**
5:4,5 15:11 27:2
31:12 36:9 41:24
42:8,9,14,15,21
43:2 44:5,9 48:23
51:14,22 59:17
96:12,17 97:7
**employs**
43:19
**enacting**
112:24
**Endorsement**
183:23
**engaged**
158:23 159:4 174:6
186:1,19

**engaging**
144:9 173:19 186:7
188:24 189:7
**engineer**
191:21
**engineering**
124:1 138:20
**ensued**
156:10
**ensuring**
66:8 94:20 112:2
**enter**
66:6
**entered**
22:11 46:8 48:24
63:13 120:9,25
134:16 152:13
157:16 158:15
159:13,17 160:2
**entertain**
186:22
**entire**
89:24 111:14 141:16
170:4 207:10
**entirety**
49:5 122:21
**entity**
1:6 2:6 207:4
**entrance**
104:3,6
**entry**
37:2 125:7
**ERMAC**
64:11,14,18,20,25
67:18,22 83:7
182:11
**ERMAC_992-995**
5:22
**ERMAC002168**
194:6
**ERMAC002168-22...**
6:4
**Ernest**
118:18
**Ernie**
138:24



EXHIBIT 19
PAGE 1227

**ERRATA**
207:1,14 208:1 209:1
**especially**
12:9
**ESQ**
3:4,4,11,17
**established**
52:6
**establishes**
55:25
**estimate**
83:11
**estimated**
83:14,17
**et**
7:8
**evaluate**
163:15 165:2
**evaluating**
162:4,21 163:2,21
**evaluation**
161:24 162:1,12,16
  163:11,12,17,24
**event**
107:22
**events**
27:1 28:24
**eventually**
61:10 109:9 151:24
  156:13
**everybody**
101:24 102:6
**evidence**
159:8 160:6 167:12
  167:19
**evidentiary**
19:10 168:21
**exact**
198:10
**exactly**
59:4
**EXAMINATION**
4:1,6 9:1
**examined**
8:24 206:4
**example**

181:21
**exceeding**
53:20
**exceeds**
83:18
**Excel**
128:3
**excess**
138:9,13 158:16
**exchange**
202:14,16
**exchanged**
14:25
**Exclusive**
64:14
**execute**
45:23
**executive**
59:22 157:25
**executives**
59:20
**exhibit**
5:4,5,7,9,10,11,13,14
  5:15,17,19,20,23
  6:1,2,4,5,6 27:8,14
  27:15,18 41:16,20
  41:23 42:11,19,20
  42:23 43:6 45:3
  48:22 49:15 50:13
  50:14,19 51:8,13,18
  56:4 69:17,18,21
  70:23 71:12,16 72:5
  72:7,17,23 74:3
  75:15 80:16,17,21
  82:16,17,19 84:17
  84:18,21 90:13 91:1
  91:2,2,3,19,22
  92:21 93:22 98:20
  98:21 99:4 100:22
  101:3,3,5 102:18,25
  103:6,11,18 105:23
  113:4,16 115:2,25
  148:12,12,15 149:3
  149:9,14 150:18,22
  151:9 164:14,15,21
  174:10,11,15 175:7

178:6,7,11 179:8
  180:1 181:14 182:9
  182:9,10,15 183:8
  183:11,11,13,23
  184:17 186:25
  187:1,5 189:13,15
  191:2 194:4,5,7,12
  196:4,14 197:1,2,5
  197:10,17
**exhibits**
5:1 13:23 178:5
**expanded**
177:8,16
**expected**
78:22
**expertise**
105:8
**explain**
86:11 135:4 136:7
**explained**
105:5,21 160:17
**expressed**
172:5
**expresses**
113:6
**extent**
128:6 137:25 153:16
  204:10

---

**F**

**fact**
28:23 29:22 30:8,11
  30:18,24 31:4,10,17
  47:25 64:21 99:24
  120:17 154:13
  160:5 165:8,19
  171:7 174:18,20
  179:11 203:8
**factual**
152:12
**fair**
13:8 95:3,7 96:14,20
  96:24 100:1,2
  102:19 120:23
  155:24,25 159:19
  179:22

**fairness**
42:4
**false**
136:21 137:4,13
  138:2
**familiar**
116:20 146:2 196:6
**family**
158:25
**far-fetched**
192:7
**favor**
157:17
**favoritism**
150:19,25 151:8
**FAX**
3:13,19
**Federal**
27:25
**fee**
132:15 134:24
  135:11 138:9,14
  153:9
**feel**
85:25 89:22 96:3
**fees**
83:7 130:5 138:9,13
  153:4 154:11
**fellow**
158:10
**felonies**
152:9
**felons**
192:17
**felt**
81:19 89:1 90:2
  136:5,5 144:24
**female**
199:11
**fidelity**
155:9 194:15 195:21
  197:11
**fighting**
169:17
**figure**
35:22 116:8



EXHIBIT 19
PAGE 1228

**file**
57:9 95:13 164:10
**filed**
20:16 23:2,10 26:6
 41:13 69:3 133:25
 147:16 148:1 150:4
 150:9 154:5,6 156:8
 157:6 160:22
 161:12 168:14
 170:4,5
**files**
62:12
**filing**
85:14
**fill**
66:3
**final**
55:6 110:6,13,17
 159:17
**finance**
71:23,25 87:6 88:15
 90:7 100:16 105:8
 109:6 128:4 178:23
 178:24 179:1,4
 181:19 191:9
**finances**
176:15 177:3
**financial**
96:10 98:4,12 106:9
 109:9 125:19 175:9
 175:25 176:21
 180:3
**financially**
8:1 97:10
**Financing**
130:10,14,19,25
 184:9,14 191:16,23
**find**
108:6 156:20,25
 162:24 193:18
**finding**
160:11
**findings**
109:19 110:15,24,25
 111:19 159:12,21
 160:1 161:16,18

**fine**
111:8 140:2,8
**finish**
12:13 26:3 139:24
 141:16
**Fire**
1:10 2:10 3:2 5:21
 7:9 8:7,10 20:17
 23:2 28:2 41:7,13
 65:17 91:4 92:8
 182:14 194:1 207:5
**firm**
11:16,22 14:10,12,12
 16:8,24 17:3 20:21
 20:25 21:4,10 23:13
 24:24 25:2,12 29:18
 93:13 100:9 160:23
 161:2,5,10,10 170:5
 171:10 176:10
 197:4
**first**
8:23 10:9 11:12
 16:22,25 20:9,24
 22:25 23:9,19 34:25
 36:11 37:13 43:15
 46:25 93:12 98:1
 99:7 101:8 103:11
 105:22 189:6
 194:22 203:1,9
 206:9
**fiscal**
178:17 180:4
**five**
67:20 199:7,19
**five-minute**
203:13
**focus**
43:15 59:24 149:1
**focusing**
92:20
**follow**
20:6 179:15
**follow-up**
103:24
**following**
33:17 35:4 44:25

83:18 106:25
 161:21 162:13
 163:8,13,24
**follows**
8:25
**footage**
66:1
**forcibly**
193:2
**foregoing**
206:5,10
**forensic**
192:5
**form**
94:21,25 95:2,4,11
 95:18,22 97:1,6,18
 97:25 124:21 125:3
 125:14 133:25
 197:12
**formal**
108:3,8,11,17 109:2
 109:25 110:3,9
 111:1,6 112:13,24
**formatted**
72:9
**formed**
146:5,6,13,15 147:4
 147:5
**former**
10:17 191:6,8,9,9,10
 191:11,11
**forming**
97:11
**forms**
125:25 126:2,2
**forth**
45:16 48:9,25 51:15
 52:21 53:7 83:23
 84:1
**forward**
168:5 169:6,17,23
 171:9,22 172:2
 173:6
**found**
23:8 110:20 131:22
 158:22 159:3,8

160:6
**foundation**
18:2 87:2,15 88:18
 114:13 184:5
**four**
67:20 74:5,20 107:9
 107:20 205:18
**FPPC**
95:14 97:5,15
**frame**
159:14
**fraud**
159:8
**frequently**
188:4
**friend**
129:19
**front**
13:25
**full**
9:25 12:13,14,19
 206:11
**full-time**
36:17
**fully**
78:22
**functions**
62:8 65:5 68:11
**fund**
177:22,22,25 179:12
 179:16,21 180:5
**funds**
177:23 181:5 195:1,6
 195:14
**further**
204:19
**Future**
181:22
**Futures**
176:5,9,12,15,18,20
 176:22 177:2
 178:23 179:9 198:5
**Futures'**
177:7,15
———————————
———————————
**G**



EXHIBIT 19
PAGE 1229

gadfly
192:4
gathering
155:5
Gazette
152:15,20
general
37:3 48:7 71:4 73:4
112:20 177:20,22
177:24 178:18
179:12,16,21 180:5
generally
73:13,17 75:2,18
141:17 188:7
gentleman
25:4 117:23 118:13
131:25
gentleman's
109:8
getting
109:22 153:23
GGMS
60:13,18,23
Gibbs
8:12,17 9:3,14,22
10:2 20:2 26:24
42:1 79:3 82:24
139:24 140:2,24
166:2 168:8 171:14
173:10 204:2,20
Gibbs'
173:4
Gibbs-Urtiaga
1:17 2:20 3:16 4:3
7:7 8:22 28:4 69:25
81:6 85:1 101:11
140:21 178:14
187:4 194:13
203:22 205:17
207:21 208:25
209:25
give
10:15 12:12,19 14:21
57:2 66:23 137:21
140:6
given

10:5 11:1,6 30:15
99:24 120:17 171:6
171:7,20,23 198:25
206:12
go
7:21 11:24 12:1,2
14:2 26:12,15 36:8
43:15 51:6,7,18
52:2 56:22 59:25
70:24 71:8 76:1,15
77:23 82:8 92:20
93:21 102:7 113:12
139:13 146:24
175:6 180:4 193:6
204:23 205:8
goes
71:12
going
12:11 13:23 20:6
26:18 27:7,13,13
30:23 35:10 41:19
42:6,7 51:18 52:2
56:4 69:11,12,15
70:22 80:15,20
82:15 84:16 86:22
87:14 89:11 90:24
90:25 93:21 101:2
101:17,21 111:5
114:8 125:10
139:13 148:11
150:17 164:13
166:10 167:4,17,18
169:17,19,23
170:22 172:9 174:9
178:4,5 182:8
183:22 184:17
186:24 194:3,10
196:25 197:10
203:12,25 204:10
good
7:4 9:3 69:12 102:8
104:14 160:18
205:3
Gordon
3:3 7:14
Gorgonio

152:17
government
45:11,17 46:1 49:1
53:1 62:10 69:4
90:21 91:8,14,23
92:6 93:3 95:4
147:14 154:25
155:10 181:23
182:4
governmental
95:9
Governments
1:5 2:5 3:9 7:8 9:9
17:15 22:1,9,12
23:1 153:3,13 161:3
167:24 169:11
171:12 207:4
grant
153:15
great
140:11 204:7
Gregg
10:19 11:7 61:13,15
62:1 65:24 66:14,15
66:23 67:1,4,7 70:1
70:6 71:17,20 82:23
83:10 84:25 194:13
Gregg's
66:20
grounds
41:2
group
146:5,10,13 178:22
181:17
growth
145:25 146:4,11
147:18,22 148:2
150:10 181:3
guess
13:12 16:11 30:21
37:7 89:11 128:14
guessing
105:13
guilty
151:25 152:6,8
192:15,18

guys
169:5 204:8
GW
1:5 2:5 7:12

H

H
53:14,17 54:9
half
139:16 194:11,11
Hall
87:11,23 93:15
101:23 102:13,20
105:7 106:18 107:4
107:7,18,21 109:13
129:23 131:11,14
131:25 136:13
145:16,20 147:17
198:22
hallway
108:5
handbook
46:14,16,18,19,21,23
47:1,11,14,17,20,22
47:25 48:4,9,13
57:17
handled
61:23 62:3,5
Hanks
199:15
Hanna
3:4 8:9
Hanvey
85:1,10 86:7,14,19
87:6,12 89:2,9,13
89:18,22,24 90:1
92:22 93:8 96:1
Hanvey's
85:12
happen
180:17
happened
104:24 131:10,22
happening
56:23
happy



13:20 26:4,13 54:12
56:14 70:23 80:19
139:22 140:6
165:23 170:14
173:6
**hard**
13:25 111:15 192:8
**Hartzheim**
79:10,14,21,25 80:9
100:4,9,20
**head**
53:1 57:3 158:12
163:1
**heading**
43:17 180:10
**heads**
126:7 131:9 135:23
138:17 160:17
200:4
**hear**
31:19 33:21 113:23
119:1
**heard**
7:19 66:18 105:4
118:25 145:24
146:16,18 147:19
148:3 150:11
157:23 158:24,25
159:10,14 201:11
**hearsay**
87:16 88:19 114:13
**held**
26:20 60:20 85:11
104:6
**help**
85:16 105:6
**helped**
93:12
**hereof**
207:14
**Hey**
16:18
**hi**
78:11,12
**high**
109:21 111:4

**highest**
31:23
**hillside**
145:23
**hire**
176:18
**hired**
36:19,22 61:15,18
176:20 179:3
**hit**
109:21 111:4,5
**hold**
32:17,23 33:4 34:5
34:12 113:19
205:10
**holding**
119:24
**holds**
52:11
**honest**
48:7
**Honestly**
181:11
**hope**
90:24
**hopefully**
12:2
**horribly**
152:3
**hour**
69:12 139:13,16
**hourly**
135:21
**hours**
48:8 82:3 199:19
**hunt**
151:19
**husband's**
98:13

**I**

**idea**
72:25
**identification**
27:16 41:17 42:24
50:20 56:18 69:19

82:20 84:22 99:5
101:6 148:16
164:22 174:12
178:8 182:16
183:14 187:6 194:8
197:6
**identified**
29:12 53:7 68:17
93:23 184:2,6,10
191:22
**identifies**
183:24
**identify**
55:23
**illegal**
145:5,7
**imagine**
93:19 105:21 109:5
142:19
**important**
12:7
**impression**
201:4
**improvement**
127:8,15,19 128:8,18
138:7 139:9
**include**
68:12 73:18 177:8,16
188:16,23 189:3
**included**
68:5 84:5 175:15
**including**
67:24 188:13 189:1
**inclusive**
1:11 2:11 207:5
**Incorporated**
40:10
**increase**
71:4 73:8 74:10,10
74:11,12,15 75:7,15
83:7
**Increases**
75:3
**increasing**
74:4
**indefinite**

75:1
**independent**
113:13 114:4
**INDEX**
4:1 5:1
**INDEXED**
4:20
**indicated**
207:13
**Indirectly**
198:4
**individual**
26:25 28:12,23 29:9
30:9,24 88:14
120:24 122:25
136:18,22 137:14
145:15 203:2,7
**individuals**
59:22 126:20
**inflated**
136:21 137:4,12
138:2
**influence**
95:9
**inform**
15:14,17,20 113:9
**information**
4:10 16:16,21 37:3
54:8 77:17 80:7,12
82:12 99:13,22
106:9,12 113:7
121:11 133:8
149:14,15 151:7
155:5 159:11
163:14 167:16
201:8,25
**initial**
24:2,8 32:8 106:18
200:23
**initially**
14:20 36:22 177:1
201:7
**initiate**
62:19
**input**
179:8



EXHIBIT 19
PAGE 1231

**inquiring**
139:16,18
**insolvent**
177:25 179:12,16,21
  180:18
**inspection**
123:5,12,20
**instituted**
47:1
**instruct**
19:1 165:15
**instructed**
20:3
**instructing**
19:4,22 115:10 166:7
  166:8 167:8
**Instruction**
4:14 19:3,24 115:12
  165:16 166:9
**instructions**
97:24
**insurance**
1:10 2:10 3:2 5:22,23
  7:9 8:8,10 20:18
  23:3 28:2 41:7,8,12
  41:14 54:17,22 55:2
  55:7,11,15 56:9,20
  57:9,11,15,19,23,25
  62:17,22 63:6,10
  65:9,12,16,17,21
  66:4,9,17 67:3,7,12
  67:15,21,23 68:3,5
  68:14,18,25 69:8,9
  70:2,9 71:4 73:4,9
  75:8,16 83:11,14,17
  83:23 84:1,11 91:5
  91:15 92:6,8,17
  154:15,20,22,25
  155:1,3,6,7,21,23
  181:5,10,14 182:4,7
  182:14 183:11
  194:1 207:5
**insured**
184:2,10,15
**insureds**
183:24 184:7

**insurer**
63:7
**insurers**
160:11
**intend**
16:20 167:12 170:3
**intended**
35:12,23,23
**interact**
88:3
**interacted**
87:25 129:13,15
**interaction**
87:8 126:19,25 129:1
  129:8
**interactions**
88:12 129:6,11
**interest**
95:11,14 96:10 97:21
  98:4,12 125:7,19
  143:13,20 144:1,3,7
  144:25 148:7
  149:11,21 151:20
  151:22 152:7
  157:22 171:21
  173:4 189:4 192:11
  192:16 202:5,6,9,11
  202:17
**interested**
8:2 97:10 206:14
**interests**
125:2
**interim**
5:4 18:22 22:3 27:4
  28:25 32:8 33:18
  34:22 35:1,13,21,24
  39:10,21 41:4,23
  42:16 44:23,25
  64:12,22 94:5,12,15
  96:22 102:15,22
  107:15,25 109:6,9
  121:17 122:7,11
  123:17 130:12
  132:18 133:3,18,24
  134:3,23 136:3
  174:1,5 177:14

179:1,3 181:19
  185:9 186:16
  190:16 193:16
  197:25 198:9
  200:17
**internal**
101:19,22 105:19
  106:1
**Internet**
7:18
**interrupt**
12:18 78:13
**interview**
199:18,25 200:2,7
**interviewed**
199:3,4,6,23
**interviews**
93:13
**introduced**
93:11 132:1
**investigating**
185:11 194:25 195:5
**investigation**
163:9,10 185:17,25
  186:4,18,23 193:5
  195:13 198:14,20
  198:24 199:2 200:8
**investigator**
199:10
**invoice**
134:12 190:4
**invoices**
121:15,19,23 122:1,3
  122:4,9,13,13,17,22
  123:1 132:24
  134:10 136:3,15,20
  136:20,23 137:3,3
  137:11,12 138:1
  189:15,20,22 190:1
  190:2,2,5,8,9,13,17
  190:22 197:25
**involved**
68:17 97:11 112:2
  130:13 131:3
  181:23 193:9
  198:13 199:2

**involvement**
40:15 41:6,12 99:10
  127:15 130:9
  134:20 139:8
  153:12,19 154:2,24
  155:11,22 156:3,10
  162:12 193:24
  195:12 196:17
  197:15,20
**involves**
202:12,14
**involving**
10:19 11:7
**IRVINE**
3:6,12
**issuance**
110:5 130:13,25
  131:3 192:25
**issue**
169:16 175:25
  193:10
**issued**
9:21 23:13 33:1
  65:17 109:24 110:8
  130:10,15,19 158:3
  158:7 164:7 170:1
  173:11 176:3,7
  191:16,19,22
**issues**
136:2 188:12
**issuing**
192:22
**item**
53:20 74:16 81:25
  142:4 175:6,13
**items**
74:1 82:2 142:18
  181:3

_____
**J**
_____
**J**
3:17
**James**
10:19 61:13 65:24
  66:14 84:25 194:13
  194:24



EXHIBIT 19
PAGE 1232

**January**
37:11 39:16,20 40:16
  69:24 71:3,18 75:7
  75:14
**Jeff**
25:3 78:11,16 167:17
  167:20,25 169:18
  172:13 203:24
**JEFFREY**
3:11
**Jeremiah**
3:23 7:24
**Jim**
65:24 69:25 82:23
**Jim's**
70:16 72:10
**job**
12:15 49:14 66:21
  76:11 100:16,21
  160:19 164:10
**Joe**
85:9
**John**
24:18 84:25 101:11
  164:19 194:12
  195:8
**joined**
78:10 109:9
**joint**
1:6 2:6 67:19 207:4
**Jones**
109:8 179:2,3,8
  187:3
**Juarez**
3:23 7:25
**judge**
150:8,12,13,15
  157:20 158:3,8,22
  159:3,7 160:6,17
**judge's**
159:12,20 160:1,11
  161:16,18,21
**judgment**
157:16,25 158:11,15
  159:13 160:2
  161:16,18

**Judith**
197:4
**Judy**
144:21,22 145:15
  146:5
**July**
39:13,16 61:16,20
  62:6 98:8
**jump**
12:12
**jumping**
178:5
**June**
38:23 39:6 43:21
  44:3,12 59:13 60:9
  64:13,19 91:3 94:2
  94:2,4,7,11,16 98:7
  98:8 102:22 107:16
  123:9,10 159:18,19
  164:2 174:16,22
  175:18 176:14
  177:19 182:21,23
  183:3 184:19,21,25
  185:5,10,16 186:17
  206:19
**JVDUNN@BBKL...**
3:13

——————————————
### K
**Kapanicas**
39:3 60:4,5,10,12,17
  60:23 61:1 62:21
  63:5 69:25 70:6
  71:16 76:8,22 77:18
  81:11,12,18 82:12
  82:23 83:12 84:25
  89:1,20 92:23 94:7
  101:10 103:2 119:3
  119:4,6 132:5
  147:12 150:24
  152:21 156:16,22
  157:2,4,18,20,24
  162:12,15,17,18,21
  163:3,5,9,13,15,21
  163:25,25 164:7,19
  165:2 166:4,16

173:12,18,21 174:2
  174:6 183:1,2
  184:21 185:11,18
  185:20 186:1,6,12
  191:7
**KARMAN**
3:11
**keep**
69:12,15
**keeping**
95:21
**kept**
62:12 111:16 131:25
  193:20 198:25
**key**
156:24 157:1
**kind**
179:20
**KKx**
1:5 2:5
**knew**
60:19,22 76:8,20
  86:23,25 87:2,11
  88:15 108:7 117:1
  124:3,9 125:11,18
  126:4,7,10 150:5
  166:12 186:10
**know**
11:25 12:23 13:1,4
  13:10,11,17,18,19
  14:2 16:12,22 22:15
  22:16 30:7 36:7
  42:6 44:18,23 46:25
  47:3,4,16 48:20
  54:11 55:8,13 56:7
  56:13 60:7,16,19
  66:13 67:4 68:4
  71:6,14 72:8 77:6
  78:21,24 80:6 84:5
  84:15 85:5 86:4,18
  87:1,5 88:21 93:14
  93:16 94:25 97:13
  101:14 103:23
  104:22 107:11,12
  107:12 109:7
  110:23 117:1,3,8,20

117:23 118:8,13,18
  118:22 120:1,1
  122:13 126:1,16
  132:1 133:13,15,18
  135:14 139:22
  143:15,21 144:3
  145:1 146:6,6,8,15
  147:5,20 149:6
  150:2,5,6 152:8,8,9
  152:9 153:7 154:7,9
  156:7,8,15,21
  157:14,24 159:10
  159:14,22 161:6,6,7
  161:20 162:10
  163:16 165:17
  169:3 171:19 173:4
  176:17,17,19
  177:10,11 181:24
  182:1 183:4 187:17
  188:3 189:18
  190:24 191:1,21
  192:18 193:1
  194:24 196:6 199:1
  200:3,3 201:18
  203:7,11
**knowledge**
54:8 80:7,12 87:19
  99:13,18,22 121:6
  121:10 123:19
  128:7 132:14
  133:20 139:8
  163:14 184:13,16
  201:8 202:1
**knowledgeable**
29:13 30:4 138:4
**known**
78:13 86:20 95:11
  188:3
**knows**
87:18
**Krieger**
3:10 16:7,24 17:1,3
  20:10,21,25 21:4,9
  22:21 24:24 160:23
  161:5,10 171:10
**Kyle**



**MAGNA**
**LEGAL SERVICES**

**EXHIBIT 19**
**PAGE 1233**

133:9 134:17,18
135:1,6

**L**

**L**
194:14
**lack**
18:2 87:2,15 88:18
89:19 114:12
**Landscape**
40:10,11,17
**landscaping**
40:5,8
**lasted**
105:12
**launching**
185:17
**law**
11:16 14:10,12,12
16:8,24 17:3 20:21
20:25 21:4,9 23:13
24:24 25:12 96:7
97:8 98:2,9 144:25
145:6 151:24 152:7
160:23 161:2,5,10
161:10 170:5
171:10 189:1,2,4
192:11,16 197:4
202:5,9,11,17
**lawful**
145:11
**laws**
185:18
**lawsuit**
10:19,21,23 11:6
14:22 15:15 20:16
20:22 21:1 22:23
23:2,10 29:22 30:12
30:15 31:11 68:16
130:1 147:16,23,25
148:2 150:3,5,7,9
150:13 153:7 154:4
154:6 156:13 157:5
158:4,8 160:22
161:4,11 168:2,15
168:22 169:5,12

170:3,19 172:11
190:25 197:22
200:11 201:7 203:8
**lawsuits**
20:11
**lawyer**
16:23 19:5 20:4,10
21:22 22:21 26:12
26:14 78:18
**lawyers**
9:17 16:7,14,17
20:20,21 24:24 25:1
25:5,12 29:18
160:21 161:2
201:19
**lead**
199:10,11
**leading**
24:1,7
**learn**
34:25 98:9 110:14
124:16 126:13
131:20,23 132:19
134:7,24 146:10,19
147:21 150:3,8
153:2 154:3 158:15
159:2,7 174:2,5
177:24 200:19
**learned**
9:7 16:18 22:25
23:10 35:19,22
97:12 98:1 101:20
101:21 109:14,16
123:8 131:24
132:22 133:3 159:9
159:11,20,22
200:22 201:18
203:2,9
**learning**
101:16 170:1
**leave**
39:3 94:8 163:6
164:1,3 183:2,5
186:7,10,12
**left**
101:25 102:11

104:22 140:18
167:25 173:21
**Legal**
1:22 7:24,25
**legislative**
192:25
**let's**
32:20 36:13 37:7
126:24 172:19
**letter**
6:5 56:25 91:4,12
93:24 103:1,5,6,17
103:20 104:2,5
105:22,24 106:6
113:5,6,10,15 114:6
115:2,15,24 197:3
**letting**
78:21,24
**level**
31:23 129:16
**Levy**
79:9,13,21,25 80:8
100:4,9,20
**liability**
71:4 73:4
**Libi**
187:3,17 188:12
**licensed**
206:1
**licenses**
32:18,20,21 33:14
**licensing**
129:5
**limit**
83:19
**limited**
154:22
**line**
4:15 70:2 93:23
194:15 208:3,6,9,12
208:15,18,21 209:3
209:6,9,12,15,18,21
**listed**
29:5 189:14
**listen**
143:2

**listening**
128:5
**lists**
99:15
**litigation**
156:10 161:22 198:7
**little**
12:3,4 69:11 100:3
**LLP**
3:3,10 7:15
**LOC5-001262**
148:13
**LOC5-001262-1281**
5:16
**Logic**
116:20,24 117:4,11
117:15,21 118:23
119:8,14,17,20
120:5,10,13,19
121:1,5,9,15,20
122:1,19,22 123:2,4
123:11,20,25 124:7
124:10,11,17,22
125:2,7,20,20
126:10,15 129:14
130:4,23 131:21
132:5,10,16,20
133:4,10,14,22
134:5,8,15,16,20,25
135:7,16,20,25
136:4,8,14,19,24
138:1,12 143:2,7,12
143:19 144:1,9,11
144:24 145:21
147:12,21 148:7
149:21 150:23
152:5,21 176:11
185:3 186:19
188:11,16,20,24
189:3,7,15,19,22
190:1,5,8,13,17,22
192:10,14 197:25
198:2,6,11 200:11
200:20,24 201:1,3,8
201:21 202:2 203:2
203:9



**Logic's**
135:11 137:11
**Logics**
138:8
**long**
13:20 36:16 37:4
38:10 44:18 89:9
105:9 139:23
180:11 199:18,19
**longer**
36:3 108:9 118:6
140:5 171:11
184:22,25 185:4
**look**
23:18 37:6 42:11
51:19 56:25 84:7
116:12 149:3
176:15
**looked**
48:6 137:2 147:8,8
149:6 151:11,11
**looking**
25:9 105:23 116:14
**looks**
43:9 71:1 73:5 74:5
102:25 175:12
188:17 196:6
**Los**
2:24
**loss**
196:4,8,14,18 197:12
197:16,21
**lost**
111:15 158:17
**lot**
12:15 105:1 111:10
129:2 193:23 200:4
**luck**
102:8
**lunch**
129:21 139:13
140:17

**M**

**ma'am**
27:20 41:21 42:2

43:2,25 50:16 87:4
113:19 114:25
115:24 148:19
166:22 167:10
178:19 183:17
187:8
**Magna**
1:22 7:23,25
**maintained**
47:1,11 48:14
**maintains**
57:18
**maintenance**
41:2,3
**making**
67:10 73:12 151:18
172:24 180:11
**manage**
40:21 130:5
**managed**
41:1
**management**
33:6,9,16,25 34:20
61:24 62:3,5,8 64:7
64:14 65:5 68:11
123:5,12,21 158:22
159:4 160:13
**manager**
5:4,5 18:20,22 22:4
27:4 28:25 29:1
32:8 33:18 34:17,23
35:2,13,21,24 36:3
36:6 37:13,16,23,25
38:3,6,11,20,24
39:2,6,10,22 41:4,5
41:24 42:16,21 43:4
43:20 44:3,5,9,11
44:15,19,21,23,25
45:1,5,8,9,17,23
46:9 48:23,24 49:6
49:9,10,17,23 50:2
50:9,25 52:5,6,11
52:14,20,25 53:10
53:19 54:3,16,21
55:2,10,20,25 56:8
56:19 57:8,19 59:15

59:18,25 60:2,4,5
60:10,15,21 61:4,18
61:21 62:2 64:4,13
64:13,22 66:16,20
68:22 69:6 71:2,21
72:1 77:2,16 78:2
83:19 85:8 94:5,12
94:16 96:22 98:6,15
102:16,22 103:2
107:5,15,24,25
120:21 121:17,18
121:25 122:1,5,7,11
123:18 130:13
132:19 133:3,19,24
134:3,24 136:3
150:24 161:24
162:2,5,25 164:11
164:20 173:19
174:1,5,21,25
177:14,19 178:15
182:3,6,23 184:22
185:9,16 186:16
187:10 190:16
191:6,11 192:20
193:16 195:24
196:21 197:19
198:1,9 200:17
201:12
**Manager's**
53:8 56:6 57:14
63:23
**manner**
206:17
**Mansukhani**
3:3 7:15
**March**
14:21 192:19 194:20
195:20
**Marie**
10:2
**mark**
27:13 42:19 50:13
69:16 82:16 93:3
148:12
**marked**
27:15 41:16,19 42:23

50:19 69:18,21
82:19 84:21 98:21
99:4 101:5 148:15
164:21 174:11
178:7,10 182:15
183:13 186:25
187:5 194:4,7 197:2
197:5
**market**
73:5
**marks**
80:25 81:4 140:14,19
203:15,19,21
**married**
86:15,18 87:6,12
88:16
**Master**
5:20 182:12 183:7
**master's**
31:25 32:6
**materials**
29:6 142:22
**math**
140:10
**matter**
7:7 19:14,14 82:4
111:20 207:11
**matters**
54:22 55:6 68:18,25
141:12 142:1,3
155:21,23
**Mayor**
178:15
**Meagan**
3:4 8:6 9:4 78:12,20
**mean**
29:24 70:19 76:3
77:12 85:22 111:11
124:5 144:15
166:17 181:9 192:6
200:25
**means**
75:1
**meant**
181:13
**media**



EXHIBIT 19
PAGE 1235

7:6 81:1,5 140:15
140:20 159:6 188:9
203:16,21 205:17
**medical**
78:23
**meet**
24:11,14 25:1,5
102:1,8 105:9 107:5
107:25
**meeting**
5:19 24:23 35:5,6,7,9
35:20,25 67:5 82:9
103:24 104:16
105:12 106:18,23
106:25 107:13
108:3,8,11,17,22,25
109:2,3,11,15,18
110:3,9 111:1,6,9
116:1,5,11,15,18
128:6 138:24 141:4
141:8,14,16 142:12
142:13 161:23
163:20 165:2,9,19
165:19 166:3,13,15
166:20,22,25 167:6
167:13 174:15,18
174:20 175:3,19
**meetings**
25:7 29:20,21,23
65:2 88:7 107:1
138:25 139:1 141:1
141:12,18,23 142:6
142:23 143:1,8,21
143:23 144:24
145:17 149:25
151:13 158:12
188:6
**member**
67:23 132:24 159:1
**members**
87:9 141:24 142:2
143:6,11,18,23,25
144:6 178:15
**memo**
71:2 179:11
**memorandum**

59:21
**memory**
114:5
**mentioned**
10:25 24:23 65:4
74:17 109:4 145:16
155:19 177:6
181:13 190:4
198:13 206:10
**met**
24:20 29:17 101:25
102:19 103:23
104:19,24 106:19
**middle**
13:20
**Mike**
101:9
**million**
154:10 157:21
158:16 178:1
**millions**
154:14 155:15
200:12,21
**Mimi**
1:25 2:22 7:23 12:5
18:4 153:22 206:1
206:21
**mine**
72:21
**minimal**
128:3 129:2,7
**minor**
62:12 69:3
**minute**
113:17 116:15
**minutes**
5:19 80:10 84:7
105:12 106:20
113:12 116:13
140:5,8 161:23
163:20 170:24
174:16,18,20
175:24
**misunderstandings**
111:10
**Mitigation**

153:9
**modify**
74:10,21
**moment**
27:12 71:5
**Monday**
1:19 2:22 7:1,5
**money**
202:12,14,15,16
**Monson**
3:4 8:9,9 205:5
**month**
18:18 82:6
**months**
36:18 107:9,20 108:4
**Moorjani**
117:24 118:1,4,9,22
119:7,13 125:1,5,12
125:15,18 126:14
126:17,24 127:1
129:15,18,25
130:24 131:8,13,20
132:10 138:16
139:7 147:15 152:5
152:13 157:12
185:3
**morning**
7:4 9:3 78:22,23
**Moss**
79:9,13,20,24 80:8
100:4,8,20
**move**
168:5 169:6 171:9,22
172:2 173:6
**moving**
77:10
**multiple**
156:17 177:23 193:7
199:12 201:3
**municipal**
45:10,16 48:25 49:4
49:8,13 50:6 51:3,9
51:16,19,24 52:10
52:23 54:15,16,20
55:1,23 56:3,19
76:6

**Murphy**
3:17 11:15
**Murray**
1:25 2:22 7:23 206:1
206:21
**mutual**
173:22
**MVANDERWEE...**
3:7

---

**N**

**N**
3:1
**N-u-f-i-c**
164:16
**name**
9:3,25 18:13 25:4
40:8 101:14 109:8
117:23 118:13
146:3,7 179:2
199:11,16,17
206:18
**named**
60:13 183:24 184:2,6
184:10,15 206:5
**Nancy**
145:16,20
**narrative**
72:11
**National**
1:10 2:10 3:2 5:21
7:9 8:7,10 20:12,17
23:2,11 28:1 32:24
41:7,13 65:17 91:4
92:8 155:14,17,23
156:2 160:7 161:12
161:15,19 182:14
193:25 207:5
**nature**
117:2 143:15 144:12
144:16
**necessarily**
202:10
**need**
13:3,18 14:1 17:8
26:2 75:3 77:11



**EXHIBIT 19**
**PAGE 1236**

82:5 83:22 128:15
140:5,7 167:17
169:15 172:7 173:2
203:12
**needed**
75:8 98:16 108:5
142:9
**needs**
73:23
**negative**
180:5
**negotiate**
63:15
**negotiated**
59:21
**negotiating**
62:12
**negotiations**
63:17
**never**
19:18 28:10 97:14
99:24 100:12 105:4
117:6 120:17 131:3
136:18 158:1
161:15 169:13
181:22 185:6,7
191:18
**new**
93:20 132:3,5
**newspaper**
152:15,23
**Nolan**
3:17 8:14,14 9:13
14:9,10 17:4,19,23
18:25 19:7,12,21
20:2 24:15,19,21
25:11 27:9 29:17
86:22,25 87:14,18
88:17 114:8,17
115:3,7,10,17
125:10 162:6 165:3
165:10,21 166:5,8
166:14,18 167:1,7
167:10,14 168:4,7
168:16,18,24 169:7
169:14 170:8,20

171:13,17,23
172:12,18,20,23
173:8 187:23 204:4
204:15,16,24 205:3
205:4
**NOLAN@SBEMP...**
3:19
**note**
7:16
**notes**
108:16,24
**notice**
5:17 6:6 9:21 27:19
27:23 164:4,6,17
169:25 173:11
193:25
**noticing**
8:5
**Notwithstanding**
43:22
**November**
39:6,9 109:24 110:9
161:19 162:3,5,13
163:13 196:20
197:3
**NUFIC**
164:16
**NUFIC7918-7921**
5:18
**number**
56:25 77:13 93:23
135:15 188:12,25
205:17

---

**O**

**oath**
207:16
**object**
17:4 86:22 87:14
114:8 125:10 165:3
165:10
**objecting**
114:19 165:19 167:4
**objection**
17:19 18:25 19:10
88:17 115:3,7 162:6

165:10 166:5 167:1
168:21 187:23
**observe**
141:19 143:1,11
**obtain**
32:7,14 33:8 34:7,9
53:19 54:4
**obtained**
32:4 33:17
**obtaining**
55:11
**obviously**
126:4
**occasion**
141:1 147:6
**occasionally**
88:5 107:4 129:21
**occupied**
107:3,21
**occupy**
107:7
**occupying**
107:17
**occur**
108:11 201:21
**occurred**
27:1 28:24 110:5,10
114:20
**October**
36:13,20 44:20,22
**odd**
162:24
**offer**
120:24 207:15
**office**
2:23 21:18 52:5,11
100:25 101:10,15
101:17,24 104:1,12
105:10,15,25
106:20 107:2 108:1
108:12,18 109:3
110:4 112:4,7
113:11 114:7
129:20 147:20
156:16 198:18
199:13 205:7

**officers**
57:3 96:8 97:9 98:2
98:10
**offices**
57:6 107:3,7,17,21
**official**
125:6,12,19
**officials**
94:21 95:8 99:16
119:9,14,24 126:18
**officials'**
95:17,22
**offline**
204:5
**offset**
181:4
**Oftentimes**
91:25
**oh**
33:23 72:21 78:11
85:20 86:24 104:14
113:19 139:14
167:20 203:20
**okay**
12:15,16 13:4,5,12
13:13,21,22 14:3,4
16:14 17:2,8 26:17
27:12 28:10,15 29:3
29:16 30:7,21,25
31:11,12,14,23 34:4
51:5,5 59:9 63:1
69:14,14,15 71:10
71:11 79:1 80:24
113:23 114:1,22
115:8 138:6 139:15
140:9,24 141:6
171:19,23 172:23
173:8 187:21
195:12 196:16
201:10,17 203:15
204:12,14,17
205:14,15
**old**
122:13,17
**once**
124:23 147:9 199:3



EXHIBIT 19
PAGE 1237

ones
93:10
**Onyx**
109:8 179:2,2 187:3
**open**
92:1 138:23
**operated**
76:4
**operating**
177:20 178:18
**operation**
40:22 41:2,3
**operations**
34:6 41:1 48:6 56:23
  61:10
**opinion**
136:9
**opinions**
120:24
**opportunity**
141:23 203:25
**opposing**
161:7
**options**
74:5,9
**oral**
158:7 159:16 199:25
**Orange**
156:18
**order**
57:2 205:1
**ordinance**
145:23
**Ordinances**
5:7 50:18
**org**
56:24
**organization**
145:24 146:2 147:18
  200:5
**originally**
15:23 108:9
**outcome**
8:2 206:14
**outset**
31:2

**outside**
116:1,4,10,17 129:20
  129:23 195:11
**outstanding**
190:2,12
**overcharged**
135:25 198:2,11
  200:11,21 201:14
  203:3,9
**overcharging**
201:9,21 202:1
**overhead**
181:4
**overnight**
180:17
**oversight**
120:4
**owned**
60:23 118:23 119:8
  119:13 125:6
  126:10 191:7
**owner**
40:5 60:12,17,19
  125:12,20 132:3,6
**owners**
117:20 124:22
  129:14 130:23
  151:24 152:4
  186:19
**ownership**
125:6

— **P** —

**P**
3:1,1,4
**p.m**
104:8 140:10,11,15
  140:21 170:25
  171:3 203:16,23
  205:20,21
**PA**
1:11 2:11 3:2 8:8,11
  28:2 65:18 91:5
  194:1 207:5
**Pacific**
140:4,11

**package**
70:2,10
**packages**
67:7
**packet**
175:16,21
**page**
4:6,15 5:3 14:2 27:22
  42:11 43:5,6,15
  54:13 70:23 71:8,11
  71:12 72:19 73:1,5
  73:7 90:25 91:1,3
  92:21 93:21 101:8
  102:25 103:6,11,18
  104:2 105:23 149:9
  149:14 150:17,22
  151:9 175:5 179:14
  180:1,15,21,21
  181:14 182:20
  183:22,23 184:17
  194:11,12 196:3,9,9
  196:9 197:10,16
  208:3,6,9,12,15,18
  208:21 209:3,6,9,12
  209:15,18,21
**pages**
5:13 71:16 72:7,16
  72:22 179:15
  196:11 206:10
**paid**
122:14,20 130:5
  136:11 190:18
**painting**
179:24
**PALM**
3:18
**paragraph**
104:2 105:23 106:5
  181:1
**paragraphs**
48:5 53:6
**park**
3:5 33:3 34:1
**parks**
32:23,25 41:1
**part**

111:22,25 115:18
  193:5
**part-time**
36:19
**participants**
7:18
**participate**
166:25
**participated**
22:13,17 97:11
  108:17 110:4,10
  130:24 159:25
**participating**
96:9 98:3,11
**particular**
49:5 105:11 187:12
**parties**
7:21 8:3 25:23 26:6
  173:24 206:15
**Parton**
36:3,6 44:24,24 59:2
  201:12,20,25
  202:25
**party**
8:1
**Pass**
152:17
**passed**
55:9 127:24 128:9,19
**passing**
203:6
**patience**
204:21
**patient**
173:5
**pattern**
158:23 159:4 160:6
  160:11
**Patterson**
194:14
**pay**
154:10 158:20
**paying**
143:4
**payment**
122:18 189:23 191:4



**EXHIBIT 19**
**PAGE 1238**

191:17 202:12,14
**payments**
37:2 134:14
**penalty**
8:23 207:7,9
**Pennsylvania**
7:10
**people**
69:3 105:1 199:12
201:3,5
**percent**
73:8 74:4,10,10,11
74:12,15 135:15,17
**percentage**
135:8,9
**percipient**
28:13
**perform**
45:8
**performance**
127:3
**performed**
79:6,9,14 100:9,20
100:25 106:23
116:10 120:5
**performing**
101:18
**period**
31:7 33:14 37:15
40:14 43:21 60:6
64:17 94:1 107:6,24
118:8 141:20,22
143:8 144:23
**perjury**
8:23 207:7,9
**permits**
129:6
**perpetrated**
160:12
**person**
21:14,16 29:13 30:1
30:4 101:24 105:7
138:3 187:20
206:13
**personal**
87:18 127:5 129:16

143:14 144:12,14
144:15 148:9
**personality**
186:13
**personnel**
46:14,15,18,21,22
47:1,11,17,20,25
48:3,9,13 57:17
**pertain**
91:25
**pertained**
49:14
**Peter**
3:17 8:14 14:9 24:15
24:19
**phone**
14:24 23:15,18
**phones**
37:2
**phrase**
144:7
**phrased**
152:3 166:5
**physical**
48:16
**physically**
66:3 142:20
**picture**
111:14 179:24
**Pinkney**
3:17 11:15,17,20,22
14:13,15 15:22
21:20,22 24:18
84:25 85:3 92:22
93:1,8,11,16 101:11
164:19 194:12
195:8 199:8
**Pittsburgh**
1:11 2:11 3:2 7:9 8:8
8:11 28:2 65:18
91:5 194:1 207:5
**place**
7:21 21:5,17 109:11
114:10 115:19
165:4 195:10 206:9
**placed**

39:3 94:8 163:5,25
164:2 183:2,4 186:9
186:12
**places**
186:7
**plagiarized**
70:15 72:10
**plaintiff**
3:9 8:15
**plaintiff's**
169:20
**plaintiffs**
1:8 2:8 9:19 19:7,11
168:2 169:5,12
170:2,19 172:2
**plan**
123:4,11,20 132:22
134:4 135:2,7,17
139:20
**plan-checking**
133:4 134:9 135:12
**planning**
34:6 118:19 129:3
191:11
**plans**
127:8,16,19 128:9,18
135:5 138:7 139:9
**plant**
133:6
**PLAZA**
3:5
**plea**
152:12
**please**
7:16 8:19 9:25 12:22
13:1,4,11,16,25
14:2 42:6 56:11,15
85:20 86:11 114:3,3
124:14 128:16
136:7 152:1 154:17
205:13
**pleasure**
49:24 52:11
**pled**
151:24 152:6,8
192:15,18

**plethora**
82:2
**plus**
157:21
**PMK**
30:6 137:17
**PMQ**
28:21 29:23,24
**point**
59:2 86:17 104:14
125:17 159:9 162:1
169:14 185:21
198:5
**pointing**
200:14
**points**
109:21 111:4
**policies**
45:24 46:8 55:24
65:9,12,16 68:14
69:9 155:1,10 156:1
**policy**
5:23 45:10,16 46:4
46:12 48:25 76:4
90:21 91:9,15,19,24
92:7,12,17 93:22
94:1 112:12,13,16
112:19,19,24 182:4
183:11,19,25 184:2
184:6,10,15,18
**political**
95:3,7 96:14,20,24
**pool**
67:21
**portion**
5:7 9:10 50:17 69:2
177:11 181:20
**portions**
99:3 113:5 149:1
181:18
**position**
36:21 37:21 38:15
49:9 60:20 64:20
86:8 89:2,24 96:4
99:16 102:5 168:25
170:11 171:14,20



EXHIBIT 19
PAGE 1239

172:6,10,23 173:19
174:25 180:6
**positions**
57:6 90:3 95:4 121:7
**possibly**
19:19 88:18 108:15
**post**
188:23
**posting**
82:3
**postponed**
82:6
**Potential**
5:17 164:17
**potentially**
114:18
**power**
54:21 55:1
**powers**
1:6 2:6 45:15,18,24
51:20 52:20 56:6
67:19 207:4
**practice**
33:17 158:23 159:5
160:7,12
**practices**
95:3,8 96:14,20,24
**practitioner**
33:6,9,25
**preface**
16:11
**preferred**
188:8
**premiums**
68:5
**preparation**
27:11 29:20 99:11
127:15 196:13,18
**prepare**
24:11,20 25:6,13,16
25:20 29:4,8,18,21
30:8,10 31:16 67:10
71:12 108:16,24
177:20 178:21
**prepared**
28:22 72:6 99:23,23

127:8 171:22 173:5
178:25 204:4
**preparing**
65:21 139:8 142:5
155:4,11 177:3
197:15
**prescribed**
45:9
**present**
8:3 9:19 21:19 22:3
35:7,9 47:12 70:16
78:19 88:6 104:11
138:23 167:2,24
169:7 170:3,10,15
170:18 171:11
175:3 199:14
**presented**
47:5,20 73:18 122:7
139:9 189:23,25
**presenting**
67:7
**presents**
149:21
**president**
40:5 60:13,18
**press**
111:5
**presumed**
13:7
**preventing**
185:10,25 186:3,17
**previous**
27:2 36:2
**previously**
29:3,12,21 69:1
170:12
**principal**
2:23
**principals**
185:3 192:10,15
**printout**
148:21
**prior**
16:6 23:5 35:11,22
36:14 40:15 56:23
61:20,23 62:1,6

85:8 97:14 110:5,13
122:8,10,14,17
142:22 161:19
183:5 184:21 185:5
195:4 201:6,24
206:4
**privilege**
17:22 19:13,20,21
114:9 167:16
201:15 204:1,11
**privileged**
16:14,21 17:19 18:3
19:1,15 115:18,20
115:22 165:14
167:1,7,15
**privy**
77:8
**Pro**
40:10,11,16
**probably**
12:11 169:15 196:1
**problem**
80:23
**Procedure**
28:1
**procedures**
46:9
**proceed**
8:20 9:21,22 15:24
16:1 170:14 171:6
**proceeding**
169:2 170:17
**proceedings**
78:10 140:18 157:8
205:16,21 206:5,8
**proceeds**
176:23 177:9,17
191:17 194:25
195:5,14
**process**
62:10 93:19 108:10
177:25
**produced**
112:3 190:24 193:17
**professional**
32:17,20,21,24 33:4

33:13 34:1,2,12
120:13
**profited**
191:8
**program**
5:20 41:2 127:12
153:6,9,15,19 154:3
182:12 183:8
**progress**
62:13 138:12
**prohibited**
96:8 97:9 98:2,10
**project**
144:17 191:21
**projects**
119:22 120:2,15
121:5 123:6,13
124:13,18 128:11
130:5 138:21 139:5
145:22
**promoted**
37:24 38:2,5,11
**promotion**
37:17
**proof**
196:18 197:11,16
**properties**
155:8
**property**
63:3,7 154:22 155:5
155:7
**proposal**
5:21 67:23 175:8,25
176:2,6 182:13,21
183:8
**proposed**
178:18 180:23
**provide**
81:12 88:9 99:25
106:8 111:21 113:7
199:24
**provided**
53:3 77:15 79:4 80:4
80:9,13 81:20,24
106:12 120:14
121:9 123:4 124:1



EXHIBIT 19
PAGE 1240

128:9 132:15 133:1
133:4 134:5,25
135:12,20 136:16
138:22 142:12,17
**provides**
54:16
**providing**
76:8,22 77:2,18
83:10 109:16
123:11,20 138:19
142:22 154:20
**PT**
28:5
**public**
1:6 2:6 31:25 32:6
34:15 37:3 40:21,25
118:1,4,9 119:21
120:15 123:6,13
124:12,18 127:3,7
128:11 129:5
138:20 139:4
141:19,22,24 142:2
143:2,7,8,11,18,23
143:25 144:4,6,8,23
151:1 163:17 191:9
199:21 207:4
**published**
152:16,19
**pull**
27:7
**pulled**
147:10
**purchase**
53:20 57:23 58:1,5
66:17 67:3,12,16
68:2 75:16 83:22,25
**purchased**
65:9,13 92:7 156:2
182:4
**purchases**
54:4 58:9,13 59:6
84:8
**purchasing**
83:18 182:7
**purpose**
122:16,19 190:11

**purposes**
172:12
**pursuant**
9:21 27:25 50:5
92:17 176:6
**pursue**
68:13 69:8 124:24
**put**
72:9 134:11
**putting**
85:14 126:2

---
## Q

**qualification**
89:19
**qualifications**
90:6,10
**qualified**
30:1 85:23 86:9,10
89:2 188:13 206:2
**quality**
7:16,17
**question**
12:14,25 13:4,21
16:15 17:9 18:5
19:6,23 20:3,7
25:25 26:1,3,11
27:11 35:16 42:7
54:14 56:16 87:20
93:3 99:7 113:20
114:2,16,17 117:7
128:14,15 149:2
152:3,24 165:20,21
166:11,19 167:5
179:19 185:23,24
188:18
**questionable**
106:10
**questioning**
100:5
**questions**
4:20 12:10 13:6 29:3
30:22,23 31:3,3,10
99:3 134:13 136:4
137:19 165:13
167:9 193:23 200:6

204:19
**quick**
203:13
**quickly**
42:6 197:1
**quite**
131:22
**quote**
93:1,4 149:10,11,19
149:22 180:10,12
180:16,18 181:6
189:13 191:3,12
194:23 195:1

---
## R

**R**
3:1
**raided**
198:22
**raise**
188:10 189:6
**raised**
143:25 145:20
147:11 148:6
151:12,21,23
188:12,15,19
**raising**
143:11,19 144:8
151:18 152:20
192:9
**rank**
164:10
**rationale**
180:22
**reached**
22:8,17 63:18
**read**
18:6 27:24 40:4 42:2
43:18 45:7,14,22
49:16,22 52:4,24
53:18 57:1 66:21
70:14 71:5 92:2
93:1 97:24 104:5
105:24 106:7
149:10,19 150:22
151:2 152:22 158:1

158:2,6 159:1,23,24
175:7,20 178:16
179:23 180:2,10,16
181:2,24,24,25
188:21 189:13
191:3 194:23 196:1
207:9,11
**reading**
99:19
**reads**
181:2 194:22
**ready**
9:20,22 171:5 205:8
**realized**
136:2
**really**
12:10 69:2
**reason**
13:18 75:24 83:3
87:4 90:16 149:13
156:15 163:16
187:13 194:19,21
208:5,8,11,14,17,20
208:23 209:5,8,11
209:14,17,20,23
**reasons**
77:13
**rec**
32:23
**recall**
13:10 14:22 15:1
18:18 21:8,20 23:16
25:7 33:10,15 34:14
38:2,5,19 48:12
59:4 63:2,8 65:6
70:12 78:5 81:14
83:1 85:7,9 89:13
90:4,13 91:11 93:10
97:17 100:5,24
101:13,16 102:11
102:12 104:15,23
105:17 106:16
107:14,19 109:20
109:23 110:16,17
111:19 116:2,16
122:12 125:4



EXHIBIT 19
PAGE 1241

127:10,17 130:15
130:16 131:7,10,12
132:4,7 135:8,10,14
138:25 143:5,14
144:11,22 145:1,16
146:14,23 147:3,15
152:18 155:2,13,17
156:5 157:3 161:25
164:4,8 173:13
175:20,22 176:2
177:12 179:5
181:11,12 182:5,19
183:6 187:11 188:7
188:18 189:1,5,21
190:16 192:22,24
193:1,1,2,12 194:2
194:17 196:1,12
198:15 199:14
**receive**
27:6 73:11 135:17
164:6
**received**
83:4 90:17 91:21
103:7,14,20 113:10
114:6 134:8 142:20
187:8,14 191:25
194:20 195:20
**receiving**
83:1 90:14 91:11
101:13 110:13,17
164:4 194:17
195:17
**recess**
81:3 140:17 171:2
203:18
**recognize**
99:7 101:14 146:3
178:19 199:16
**recollection**
113:13 114:4
**recommendation**
73:6,7,14 74:19
139:4
**recommendations**
66:24 67:2,11 73:12
73:19 138:22

**reconciliation**
177:8,16 198:6
**reconciling**
176:23
**reconvene**
139:24 140:5
**record**
7:5,22 9:6,8,17,19
10:1 18:6 19:10
26:13,16,18,20,22
27:9,18 28:3 41:23
42:20 50:14 69:21
71:1 78:16 81:2,7
82:17 84:19 98:22
101:3 112:15,24
140:16,22 148:13
152:15,20 164:15
167:18,21,22 168:1
168:23 169:4,12
170:2,16 171:1,4,10
171:25 173:2
178:11 182:10
187:1 194:5 203:17
203:23 204:18,24
205:9,19 206:11
**recorded**
7:20 206:9
**recording**
7:17,20
**records**
86:13 111:16 112:12
112:18
**recover**
181:5
**recovery**
181:10,13
**recreation**
32:25 33:4 41:1
**recreational**
34:1
**reductions**
181:4
**Rees**
3:3 7:15
**reference**
46:4 51:9,10

**referenced**
51:21 91:19 181:9
**referencing**
46:13
**referred**
46:11 91:2
**referring**
24:18 72:16 119:4
143:23 189:19
198:17
**refinanced**
130:16
**reflect**
174:18,20
**reflected**
75:15,19
**refuse**
20:7
**refused**
193:3
**regarding**
20:10 21:1 27:11
62:16 66:16 67:2,11
69:7 70:9 74:4 80:8
80:12 83:6 86:6
89:19 90:5,9,20
91:8 92:6 99:22
103:8 106:9 108:16
108:24 115:1 116:5
116:10 132:14
138:20 139:3,4
142:3 143:2,12
144:1,8 145:20
147:12 151:8,12
163:14 167:12
178:16 183:7 189:7
189:14,19,22 191:5
**regardless**
76:6
**rejoined**
174:13
**related**
7:25 49:8 56:6 96:19
97:15 132:20 150:4
188:16,19,24
195:21 206:15

**relation**
22:23 153:6,14
**relationship**
86:19 129:22 133:21
134:20 176:11
**relative**
42:8,15 43:3
**relayed**
158:25
**release**
175:8 193:3
**relevance**
17:4
**reliable**
106:8 113:7
**relies**
87:16 88:18
**remained**
190:2
**remaining**
193:23
**remains**
172:23
**remember**
16:4 25:4 71:10
101:20 105:20
107:13 108:13
109:1,8,10,22 111:3
111:12 112:13,25
116:12 124:23
127:12 128:22,22
131:15,24 148:8,8
149:6,7 151:10,15
156:7,22 157:23
158:19 160:4 182:1
182:7 199:10,20
200:6 201:4
**REMOTE**
1:16 2:19
**remotely**
7:13
**removal**
166:4
**repeat**
13:3 16:9 18:5,5
20:13 54:23 87:20



94:23 116:6 124:14
152:1 154:17
160:24 161:1
179:18 185:13
**repetitive**
163:19
**rephrase**
13:3 128:15 165:24
**report**
50:3 60:2 61:3 63:21
71:2 72:12,23 73:2
73:3,12,22 77:1
82:7 86:3 89:5,19
109:17,24,25 110:6
110:8,14,18 162:15
162:22 164:12
175:12,14,15,17,21
175:22 180:10,16
189:21 190:5,11,20
190:23,25 196:4,8
196:10,14
**reported**
1:25 50:10 52:14
61:1,6,8,11 76:10
86:4 89:1,8 110:25
162:14,18 163:3
195:8
**reporter**
2:23 7:23 8:18 12:5
18:6 27:16 31:18,21
35:14 41:17 42:24
50:20 69:19 82:20
84:22 99:5 101:6
123:14 148:16
153:20,25 164:22
174:12 178:8
182:16 183:14
187:6 194:8 197:6
205:10,14 206:2
**reporter's**
12:15
**reporting**
63:24 64:1,3 92:16
**reports**
67:10 73:17 76:1,9
76:14,15,18,22 77:3

77:15,23 78:1 79:4
79:17,20,25 80:4,8
81:13,18,22,25 82:2
82:9 88:9 100:13,19
106:10 138:12
139:2 141:11
142:17
**represent**
8:4 11:20 50:15
169:10 172:10
**represent-**
199:7
**representation**
172:6
**representations**
168:3
**representative**
62:11 65:3 137:15,18
137:20,23 138:3
**representatives**
199:8
**represented**
11:9,12 14:5 17:14
18:15 21:25 160:21
161:2,10 168:9
170:20
**representing**
14:8 17:12,21 19:17
20:22 160:19
161:11 171:14,15
**request**
7:14 73:22,23 74:3,3
175:8,25 176:2,6
195:15
**requested**
4:10 111:22,24 112:3
184:14
**requests**
112:7
**require**
16:16 58:2 84:13
96:13
**required**
58:9,13 59:7 75:16
84:9 95:5,8,14 97:5
97:14,20 106:9

141:3 163:18
**requirements**
92:16 96:23
**requires**
58:4
**reroof**
129:6
**resigned**
85:8,9 94:12,17
102:10 104:21
**resolution**
53:25 55:9 112:18,22
112:24
**resolved**
82:4
**resources**
27:3 28:25 33:12
34:10 37:11,13,14
37:16,23,25,25 38:3
38:3,6,10,11,17,21
47:7 49:12 50:8
52:18 54:7 55:5
59:11,12,15,15,18
59:19,24,25 60:1,2
60:15,16,21,22,25
61:4,7,12 62:9,14
62:20 63:20 64:2,5
64:9 65:6,11,15,20
66:5 67:6,14,20
68:8,22,22 69:6,6
75:6,11,13 76:7,21
77:22 78:4,6,8 79:5
79:12,16 80:1 81:10
81:17 82:11 86:1
91:17 92:4,10,14
94:19 95:6,16,20
96:6,18 100:8,17
112:14 113:1
116:23 117:5,10,17
117:20 118:7,12,17
118:21 119:11,22
120:3,8 121:3,13
123:18,24 124:13
124:15,20 125:16
125:17 126:3,18
127:1,6,14,18,22

128:20,24 129:9,17
130:3,8,20 131:4,16
131:19 132:8,13
135:19 137:7,9
138:18 140:25
141:3,7,10,15,19
142:7,10,16,21,25
143:6,10,17 144:5
145:4,11,13,17
146:9,12,20,25
147:23 149:4,24
151:6,16 152:19
153:1,5,11,18 154:4
154:8,19 156:9
159:3 161:14
162:11 164:9
173:25 174:4
200:16
**respect**
68:24 96:14 120:14
130:1 155:23
173:12 195:24
200:19
**respective**
206:16
**response**
114:19
**responsibilities**
36:25 40:20,24 48:11
49:18 51:15 62:16
64:25 68:24 85:13
121:14 132:25
**responsibility**
66:11,12 68:12 69:7
100:18
**responsible**
54:17 65:8,21,25
66:8 67:14 79:17
91:18 94:20 95:16
95:21,24 145:25
146:4,11 147:18,22
148:1 150:10
**restate**
75:10 114:2
**restricted**
177:22



EXHIBIT 19
PAGE 1243

**resume**
37:6
**retain**
135:16
**retained**
176:5,14 177:2,12
198:6
**retaliatory**
144:13,17
**retention**
86:13 111:16 112:12
112:16,18,24
**returned**
185:22
**revenue**
181:3
**review**
25:20 29:8 30:10
31:15 49:8 54:14
56:3,5 65:12,16
68:6 79:21,24 80:10
92:11,15 100:19
105:25 120:8
121:19,22 122:9,17
124:21 127:19,23
133:25 161:23
190:17 193:17
**reviewed**
25:16 29:4,7,13 37:9
49:4,13 51:25 68:7
72:5 91:14 100:13
117:6 120:19
121:25 122:3,21
125:14 130:18
136:19,23 138:1
139:2 191:18
**reviewing**
14:1 65:8 79:17
91:11,18 95:17
121:15 122:16
180:3
**revised**
47:14
**Richard**
44:17,18
**right**

20:2 23:7 24:5 29:11
37:12 44:11 46:22
47:3 71:21 74:17,18
76:16 77:24,25 84:9
90:25 103:12,13,18
107:11 126:13
154:21 167:21
168:17 170:22
171:5 173:17 180:9
**risk**
33:6,9,16,24 34:17
61:18,21,23 62:2,3
62:5,8 64:6,14 65:4
66:16,20 68:11
71:21 191:11
**Riverside**
1:5 2:5 3:9 7:8 9:8
17:14 21:25 22:8,12
23:1,11 153:3,12
161:3 167:23
168:22 169:11
170:17 171:12
198:17,20 199:13
207:3
**road**
176:25,25
**Robert**
194:14
**role**
29:23 43:3 44:2
59:10,25 66:16,20
81:17 127:11 131:8
142:5,21 184:22
185:21 197:19,20
197:25 198:9
**roles**
200:19
**roofs**
66:2
**room**
109:12 199:8,12
**roughly**
10:11 33:2 38:8
**ruled**
150:16
**rules**

27:25 28:1
**ruling**
158:7
**rulings**
159:12

---

**S**

**S**
3:1
**S-b-e-m-p**
11:13 14:11
**S-p-a-l-j**
101:9
**sale**
191:6
**San**
152:17 199:21
**save**
207:12
**saw**
124:23,25 134:10
151:5
**saying**
169:21 172:12
189:18
**says**
46:12 91:10 106:11
180:10
**SBEMP**
14:10
**scheduled**
15:4,23 25:7
**scheduling**
14:25
**School**
39:25 40:2
**SCO's**
101:15
**scope**
177:7,15
**screen**
7:19 41:21 56:5
147:10
**scroll**
27:22 42:5 56:13,15
99:1 148:25

**Scully**
3:3 7:15
**search**
156:24 157:2
**second**
10:25 11:1,3,20 27:7
27:7 49:21 179:14
181:2 205:10
**second-to-bottom**
181:1
**secondly**
114:12
**secretary**
64:11,18,20,25
**section**
43:17 45:4,7,14,22
46:5 49:6,15,15,21
50:23,24 51:10,15
51:20,21 52:3,3,21
52:23 53:7,18 56:6
56:8 57:14 93:3
150:18 181:21
**sections**
49:5,14
**secure**
67:22 155:7
**see**
18:8 27:20 28:6
35:10 36:13 37:7
41:21 43:5,16,25
45:3 46:5 49:19
50:16 51:1,8,11
52:8 53:15 70:3,15
70:21 74:7 91:6
92:24 93:5,22 98:24
99:2,21 104:3
105:22 106:3,5,11
125:25 148:3,18,23
149:9,18,23 150:18
156:24 175:10
181:7 182:21 184:1
184:18 189:16
190:23 191:13
193:13 195:2
**seeing**
128:23 164:8



**EXHIBIT 19**
**PAGE 1244**

seeking
154:14 155:15
seen
7:18 28:8,10 99:24
164:24 173:14
182:18 183:16
196:5,7,11 197:8,13
selecting
67:15
self-insurance
69:2
sending
70:12 187:21
senior
102:5
senior-most
101:24 105:7
sense
169:16,22
sent
70:5 71:15 93:14
157:24
sentence
49:21 70:20 180:9
181:1,2 194:22
separate
64:6
September
33:1 148:23 149:16
187:2,9,15,22
serve
37:4,15 49:23 64:17
86:7 89:9,23 90:6
90:10
served
23:5,12 33:12 34:10
39:5,10,17 44:18
49:12 50:2,8 52:17
54:7 55:4 60:5,15
60:21 62:14,20 64:1
64:10 65:6,11 66:5
75:6 76:7,20 78:3
79:12 82:10 85:25
86:14 89:14,18 92:4
112:14 113:1 117:4
118:1,4,7,14,17,19

118:21 119:9,22
120:20 121:3,17
124:17,20 126:18
128:19 129:9 130:3
130:20 131:4,16,19
132:8,13,18 141:6
142:6,10,16,25
143:6,10 146:25
153:1 154:3 159:2
184:22
service
33:17 36:23,25 37:4
37:18 38:6 61:5,9,9
85:16 129:4 177:12
services
1:22 7:24,25 37:19
39:17 40:10,11,17
40:23 41:11 120:4
120:13 121:8 123:6
123:12,21 124:1
132:15,25 133:4,7
133:19 134:4,9,25
135:12,21 136:1,12
136:16 175:9 176:1
176:21 191:5
199:21 200:18
serving
17:25 18:20 47:7
119:14
session
114:11,15,21 115:1
115:14,16,19 165:4
165:7,12,14
sessions
115:22
set
45:15 46:8 48:9,24
51:15 52:21 53:7
83:23 84:1 108:3
settle
69:3
settlement
19:18 22:7,16 26:7
63:17 173:23
settlements
62:12,13 63:13,15,21

seven
38:8
seven-page
98:25
shared
67:20
SHEET
207:1,14 208:1 209:1
Shelby
85:1,10 86:14 87:6
87:12 92:22 96:1
Shelby's
124:25
short
171:24 178:2
short-circuit
193:23
Shorthand
2:23 206:1
shortly
81:9 159:12 179:5
show
27:13 41:19 42:18
50:12 54:12 56:4
69:16 70:22 80:15
82:15 84:16 90:24
90:25 98:19 100:22
101:2 148:11
150:17 164:13
174:9 178:4,6
180:21 182:8
183:10,22 186:24
194:3 196:25
197:10
showed
102:13 107:14
showing
13:23 43:6 51:20
69:20 98:21 178:10
182:9 197:2
shown
113:4 149:14 151:8
173:10 197:16
shows
99:14
sign

132:24
signature
42:12 43:5,7 134:12
208:24 209:24
signed
42:8,15 43:3,9,12
207:18
significant
110:20 149:21
significantly
108:8
signing
59:3 134:11 189:24
simply
99:19
simultaneously
119:13
sit
80:11 116:15 135:10
143:5 181:12
188:18
six
107:9,20 199:7
Slovak
3:17 11:15
smoothly
12:3
social
129:18,22 188:9
199:21
sold
131:21
sole
59:22
Something's
77:10
sooner
12:4
sorry
31:18 72:24 85:20
116:6 139:14 175:6
179:18,19 190:3
sort
99:16
sound
37:12



EXHIBIT 19
PAGE 1245

sounds
47:24 76:13 99:23
  106:17 121:10
  129:13 133:2 134:2
  155:21
**Spalj**
101:9
speak
12:7 16:6 17:2 21:12
  31:16 93:18 116:3
  141:24 142:2
  150:15
speaking
21:8 73:13 75:18
  113:14 114:5
  116:16 145:16
  201:6
special
181:4
specially
8:15
specific
76:10 99:3 165:11
  200:6,23 201:1
specifically
85:6 127:10 144:21
  145:1
specifics
122:12 130:17 153:7
  154:7
speculate
13:12
speculation
86:23 87:15 88:18
  162:7 187:24
spell
18:12
spoke
14:24 16:23,25 18:14
  18:21,24 20:9,24
  23:19 24:7 143:7,21
  143:22 144:11
spoken
14:18 23:23 25:12
  30:14,17 114:25
  116:9 129:25

spouse
85:15
spreadsheets
128:3
**SPRINGS**
3:18
square
66:1
staff
48:18 67:10 72:12,23
  73:2,3,11,14,17,22
  74:19 76:1,9,14,15
  76:17,22 77:2,15,23
  78:1 79:3 81:13,18
  81:22,24 82:1,2,7,9
  87:9,25 88:9,13,14
  90:2 112:5,6 127:3
  129:3 132:24 139:2
  141:11 142:17
  157:25 158:21,22
  159:4 160:13
  175:12,14,15,17,21
  175:22,24 189:21
  190:4,11,20,23,25
stand
9:12 11:14 203:20
stands
64:14 115:7
start
32:20 36:11 78:18
  126:24 141:16
started
9:5,7 28:15 31:12
  37:19 38:9 60:7
  78:16 107:11
  198:22,24
starting
9:18 44:3,15 107:10
  196:3
starts
70:23 73:1 103:17
  196:8
state
1:7 2:7,24 8:3 9:25
  45:25 100:24 101:9
  101:17 102:13,20

103:1,25 104:12,16
  104:19,25 105:10
  105:14,25 106:6,15
  106:17,19 107:1,6
  107:16,20 108:1,12
  108:18 109:3,18,23
  110:4,5 111:2,7,24
  112:3,7 113:11,15
  114:6 116:5,17
  145:12 167:18
  180:1 206:3 207:4
stated
69:1 171:20
statement
55:18,20 95:10 97:20
  158:2,3 170:9
  171:24
statements
9:6 95:13 150:14
  180:3
states
1:1 2:1 7:10 27:23
  43:18 45:7,14,22
  49:16,22 52:3,23
  70:14 104:5 105:24
  106:6 149:10,18
  150:22 175:7
stating
172:3
stenographically
206:9
step
36:6 44:21
stepped
102:5,7 104:20 131:8
**Steve**
17:10,11,14 18:10
  21:9 204:2
stipulate
173:1,3
stipulation
171:25
stop
59:9 131:13 169:15
stopped
131:11

stopping
185:17
storm
63:4
**Stradling**
197:3
**Street**
104:7
strictly
121:6 199:25
strike
11:15 15:3 16:5
  25:19 63:10,24
  79:23 111:23 112:9
  120:17 130:22
  144:14 145:3 146:8
  146:23 151:21
  163:11 164:5 174:2
  174:19 183:1,20
  191:17 192:22
strong
172:5
structure
135:3
sub
124:9
subcontracted
124:3
subcontractor
124:9
subject
70:2 71:3 83:6 93:23
  194:14
submission
41:6 55:15 62:16
  84:12 95:22 178:17
  193:25
submit
55:10,21 56:1,8,20
  57:19 62:21 63:6
  65:24 95:10 97:20
  135:5
submitted
25:23 66:9 106:10
  121:15,20 122:1,4
  122:10,22 123:2



124:21 139:3
196:18
**submitting**
54:17 57:15 92:16
97:6 136:15
**subordinate**
57:3
**Subparagraph**
53:14,17 54:9 57:10
**subpoena**
15:18 23:5,12 193:10
193:13
**subpoenaed**
10:17 14:20 15:15,21
201:7
**subpoenas**
192:25
**subscribed**
206:18
**subsequent**
107:1
**substance**
16:12,17 20:4 115:6
115:17
**substantive**
165:13 166:18
**sued**
153:3,6 156:5,7
**SUITE**
3:5,12
**summaries**
128:10,20
**summarized**
109:20
**supposed**
75:5 84:10
**sure**
12:18 16:10 18:12
20:14 21:7 35:18
54:24 56:12,17 71:9
73:16 74:2 75:13
77:21 78:16 80:19
87:1,22 94:24
103:10 108:20
113:18 128:17
137:6 145:22 152:2

153:23 154:18
169:1 172:9 179:19
185:14 193:22
**surely**
160:19
**surveying**
124:1
**surveyor**
124:4,8
**swear**
8:19
**sworn**
206:6
**system**
110:22 136:8

---

**T**

**T-u-m-f**
153:23
**table**
73:25 74:25 75:1
**tabling**
74:16
**TAHQUITZ**
3:18
**take**
7:21 13:14,17,19,25
21:17 28:3 37:2
50:9 69:13 71:5
74:6 76:11,19 77:11
78:7 80:17,19 86:19
91:22 109:11 110:3
113:21 116:23
119:12 139:22,23
158:10 167:11
170:23 175:3 192:1
195:17 199:18
**taken**
2:20 7:13 81:3
114:10 171:2
195:10 203:18
207:10
**talk**
17:17 59:10 204:3,5
204:8
**talked**

34:13 84:8 100:3
158:13 190:15,21
193:12 201:2
**talking**
79:3 137:7 155:17
**talks**
45:4 50:24 53:14
104:3 150:18
**team**
106:19 108:1
**teams**
105:2,9
**technology**
7:14
**telephone**
21:15
**tell**
8:24 24:3 86:6
104:24 109:14
155:14 157:20
**telling**
111:13 144:22
**temp**
36:15,18
**temporary**
36:14,16 185:21
**ten**
36:18 58:11,15
170:23
**tenure**
44:25
**Term**
43:17
**terminate**
43:23
**terminated**
98:15,17 149:22
173:18
**terms**
91:18 92:6,12 117:2
117:9 121:8 150:6
155:9 156:1 173:22
**testified**
8:24 17:21 19:13
59:11 81:10 104:15
114:14 157:4

**testify**
10:23 20:15 26:25
28:22 29:13 30:3
115:4 157:9,12
206:6
**testifying**
28:12,16 156:18
**testimony**
14:21 92:10,14 97:5
99:25 100:17
120:24 155:3 156:3
206:12
**thank**
31:21 78:14 80:24
140:12 153:25
200:14 201:17
204:13,22 205:4,14
**theft**
202:9,13,18,23
**thing**
46:19,20 87:15 99:2
169:15
**things**
11:24 12:2 48:8 66:2
74:20 76:11 111:12
111:13 129:5,6
145:23 188:25
192:7 200:1,5
**think**
21:4 31:6 62:25 69:5
69:16 75:10 91:1
93:18 102:24
110:24 111:3
112:17 130:15
132:2 135:9 140:8
143:16 147:8
158:17,24,24,25
169:14 172:7
173:13 176:24
183:22 186:21,25
193:21,22 200:23
201:2 203:14
**thinking**
111:7,9,12 112:17
**third**
106:5



**EXHIBIT 19**
**PAGE 1247**

**thought**
93:19 118:6 151:19
    157:14 186:13
**thousand**
58:11,15
**threatening**
198:7
**three**
25:8 37:17 38:14
    61:5 119:25 126:23
    129:12,14,14
**threshold**
53:24 54:2,9 58:1,8
    58:12
**Thursdays**
25:8
**tied**
158:18
**time**
10:9 11:1 12:20,25
    13:15,25 15:4 16:23
    16:25 17:5 18:16,21
    20:9,24 21:13,23
    22:1,6,13,17,20,22
    22:25 23:9,19 24:2
    24:7,8 26:19,21
    31:7 33:14 35:22
    37:15 38:17 39:20
    40:14 45:19,19 46:7
    49:9 50:9 53:25,25
    56:24 59:16,20 60:6
    63:1 64:17 65:11,15
    71:22 72:3 81:1,6
    86:14 88:4,4 94:13
    94:15 96:17 98:1
    102:3 104:19 105:7
    107:6,16,24 109:6
    110:10 112:14
    113:21 116:4 118:8
    119:8 122:5 125:11
    125:11,14 127:13
    130:20 133:20
    134:7 135:19
    137:10 140:4,6,11
    140:11,15,21 141:6
    156:23 158:19

159:14 160:5 161:6
    161:7 169:10
    170:25 171:3,8,21
    172:3,8 173:4
    178:24 180:6,11
    181:25 182:7
    185:15 190:9
    199:19 203:1,4,16
    203:22 204:20,21
    205:19 206:9
**times**
10:7 21:12 25:8
    52:14 62:11,24
    76:17,21 81:12,16
    82:1,10 85:17
    138:24 141:11
**timing**
171:6
**title**
85:11,21
**titles**
119:25
**today**
12:5 14:6,8,18 23:23
    24:12 25:6,14 26:25
    28:11,22 29:16
    30:22 31:3,10 80:11
    116:15 135:10
    137:19 143:5
    181:12 188:19
    204:21
**today's**
28:19 205:16
**Todd**
36:3 44:24
**told**
18:15 21:4,8 29:16
    29:21 35:19 69:5
    76:14 77:14,22
    98:16 100:7,12
    108:21 119:6,16
    132:2,5 133:8 134:3
    154:19 157:7,18,24
    173:14 191:18
    193:21
**Tom**

15:22
**tomorrow**
137:21 204:11,12
**tort**
62:10 69:4
**total**
83:14 205:17
**track**
95:21
**training**
34:19 96:14,19 97:15
**transcript**
158:6 205:12 207:10
**transit**
34:6 39:14 40:19
    41:10 61:10 196:22
    200:17
**transportation**
40:21,25 153:8
**treasurer**
93:2,9,17
**treatment**
133:6
**trial**
10:23 156:13 157:5,7
    157:9,13 167:13,14
**trouble**
179:25
**true**
22:18,19 52:17 58:16
    58:18,20,22,24 59:1
    67:1 73:24 75:20
    88:1 92:18,19 94:8
    97:2,3 103:21
    119:14 125:24
    150:14 151:20,22
    162:20 170:13
    172:5 206:11
    207:12
**trustee**
193:6
**truth**
8:24 206:6,6,7
**trying**
35:21 72:25 77:21
    99:21 116:8 136:11

136:11 198:8
**TUMF**
153:6,8,14,19,22
    154:2,10
**turn**
88:24
**Turning**
45:3 90:13 113:4
**turnover**
109:7
**twice**
12:1 147:9
**two**
10:8 11:6 25:8,23
    26:6 37:17 38:13
    61:5 82:6 105:2,2,2
    105:9 164:12
    169:12 173:23
**two-page**
70:24
**twofold**
114:8
**type**
126:25
**types**
66:2 67:15 200:1

──────────
**U**
──────────
**ULC**
122:10 151:24
**ultimately**
65:24 68:1 152:6
    163:5 173:18 176:5
    176:18 201:12,13
**uncommon**
82:7
**undergo**
96:13,19 97:15
**underscore**
182:11
**understand**
9:12 13:1,24 20:15
    20:20 26:24 28:11
    28:14 30:2 36:9
    60:17 63:20 86:12
    86:13 90:22 92:12



**EXHIBIT 19**
**PAGE 1248**

92:16 95:7 96:7
97:7 105:18 117:8,9
118:9,13,18,22
119:7 121:4 123:25
124:11,16 125:1,23
127:7,11 128:14
130:4,22 137:17,21
138:18 144:7,10
145:3,7,14 147:25
152:4 157:11,16
158:15 159:24
161:9,15 168:20,24
169:3 170:7 171:13
173:17,21,22 190:6
191:15 192:9,12,14
192:17
**understanding**
9:16,20,23 36:2
37:10 38:23 39:5
59:21 63:25 64:10
66:15,19 78:17
91:18 92:5 93:7
96:23 97:4 106:22
120:12 123:19
132:9,14 133:21
135:6,22 139:7
142:11,14,15
145:10 150:12
152:11 161:22
169:19 172:15
173:7 177:1 186:11
207:15
**understood**
13:7 30:25 88:15
100:8 116:24
117:13,15 119:12
119:16 123:10
125:5,18 126:12
135:1 145:4,8 153:5
154:6 156:17 157:4
157:18 158:17
185:19 186:9
**underway**
11:25
**unemployed**
31:8

**unethical**
145:9 202:7,24
**Unified**
39:25 40:2
**Uniform**
153:8
**Union**
1:10 2:10 3:2 5:21
7:9 8:7,10 20:12,17
23:2,11 28:1 41:7
41:13 65:17 91:4
92:8 155:14,18,23
156:2 160:7 161:12
161:16,19 182:14
192:25 193:3,8,11
193:17,19,25 207:5
**United**
1:1 2:1 7:10
**units**
57:7
**University**
32:2,12
**unlawful**
144:9 173:19 174:7
186:1,8,20 188:24
189:7
**unnecessary**
136:5
**unpaid**
190:9,21
**unqualified**
86:7 89:23 90:3 96:3
**unrelated**
17:6
**unremitted**
153:4 154:10
**updated**
62:13
**updates**
198:25
**Urban**
116:20,24 117:4,11
117:15,21 118:23
119:8,13,17,20
120:5,10,13,19
121:1,5,9,15,20

122:1,19,22 123:2,4
123:11,19,25 124:7
124:10,11,17,22
125:2,7,20,20
126:10,15 129:14
130:4,23 131:21
132:5,10,16,20
133:4,10,14,22
134:4,8,15,16,20,25
135:7,11,16,20,25
136:4,8,14,19,24
137:11 138:1,8,12
143:2,7,12,19 144:1
144:8,11,24 145:21
147:12,21 148:6
149:20 150:23
152:5,21 176:5,9,11
176:12,14,18,20,22
177:1,7,15 178:23
179:8 181:22 185:3
186:19 188:11,16
188:20,24 189:3,7
189:15,19,22 190:1
190:5,8,13,17,22
192:10,14 197:25
198:2,5,6,11 200:11
200:20,24 201:1,3,8
201:21 202:2 203:2
203:9
**Uremovic**
187:3,17,21 188:5,10
188:15,19,23 189:2
189:6,13 191:3
192:1,9
**use**
176:23 177:8 194:25
195:5,13
**usual**
199:1
**Utility**
184:4

———————————————
                  V
———————————————
**vacation**
141:9
**Vague**

125:11
**vaguely**
71:10 110:19
**valid**
19:11
**valued**
84:11,12
**VanderWeele**
3:4 4:6 8:6,6 9:2,4
17:7,20 18:4,7 19:4
19:9,16 20:1 26:2,8
26:15,23 27:12,17
31:22 35:17 41:18
42:18 43:1 50:12,21
69:11,15,20,23
78:11,15 79:1,2
80:15,19,23 81:8
82:15,21 84:16,23
87:3,17,21 88:20
98:19 99:6 101:2,7
113:19,24 114:14
114:22,24 115:4,8
115:13,23 123:16
125:13 139:14,19
139:21 140:3,9,13
140:23 148:11,17
153:22 154:1 162:8
164:13,23 165:5,17
165:23 166:1,6,10
166:17,21 167:3,8
167:11,17 168:14
168:17,20 169:3,9
169:24 170:13,22
171:5,19 172:9,16
172:19,21 173:3,9
174:9,14 178:4,9
182:8,17 183:10,15
186:24 187:7 188:1
194:3,9 196:25
197:7 203:12,24
204:7,13,17 205:7
**various**
17:25 18:2 119:21
138:20 141:12
**verbal**
175:14,17



EXHIBIT 19
PAGE 1249

**verbally**
109:21
**verbatim**
151:4
**versus**
7:8 147:22 161:22
**video**
7:20 78:22 204:25
**VIDEOCONFER...**
3:7,14,20
**videographer**
3:22 7:4,24 8:18
26:18,21 80:25 81:4
140:14,19 170:25
171:3 203:15,19
204:23 205:3,5,8,15
**VIDEOTAPED**
2:19
**viewed**
149:4 151:5,6
**violated**
185:18
**violating**
144:25 151:25 152:6
189:3 192:10,15
202:4,6,8
**violation**
202:11,16
**virtual**
1:16 2:19 7:14
**virtue**
64:21
**visit**
146:24 147:6
**voicemail**
23:15,16
**VON**
3:11
**vote**
47:22 55:14 73:13
83:22
**voted**
73:19,23
**vs**
1:9 2:9 207:5

---

**W**

**wait**
113:19 203:20 204:6
**walked**
111:9
**walking**
102:7
**want**
9:5 11:24 12:11,18
13:12,19 16:12,22
30:7 36:8 37:6
38:13 50:12,22 51:6
51:7 56:13 59:10,24
69:16 78:15 88:24
92:20 98:19 100:22
103:23 105:11
107:8 113:21 114:2
135:15 140:1,2,4
153:23 165:17
170:6 180:21,25
193:21 201:17,22
204:8,8,24 205:6,11
**wanted**
111:19 122:19
124:24 200:3
**Warne**
44:17,18,21
**Warne's**
44:25
**Warsinski**
133:9,10,13,16,25
134:3
**Warsinski's**
133:21
**wasn't**
64:12 77:7 86:9
112:19 147:9
165:21 185:23
196:21
**way**
3:18 18:9 85:25
114:23 176:25
195:19 206:14
**ways**
131:22

**we'll**
12:3 59:25 69:16
140:9 170:23
**we're**
13:20 19:12 77:10
91:2 167:16 169:1
170:22 204:17
**we've**
69:11 71:20 84:8
**weaknesses**
110:20
**website**
5:15 146:16,20,25
147:3,7,11,14 148:6
148:22 149:4,16
150:1,4,14,21 151:5
151:6,7,10
**weed**
98:13
**week**
21:2 22:22
**weeks**
108:3 170:1 179:6
193:20
**went**
76:5 156:13
**weren't**
24:5 185:6
**Western**
1:5 2:5 3:9 7:7 9:8
17:14 21:25 22:8,12
23:1,11 153:2,12
161:3 167:23
168:22 169:10
170:17 171:11
207:3
**whatsoever**
206:17
**WHEREOF**
206:18
**willing**
173:1
**win**
160:19
**witch**
151:19

**withheld**
78:3
**withholding**
81:18 82:12
**witness**
4:3 7:19 8:12,19
17:20 19:1,5 25:25
26:5,17 27:1 28:13
28:23 29:22 30:8,11
30:18,24 31:4,10,17
31:20 35:15 68:17
69:14 71:7 80:17,22
80:24 86:24 87:20
113:23 123:15
140:8 153:21
155:20 165:20
166:11 167:5
170:15 203:8
204:22 206:4,12,18
**witness'**
19:5
**witnesses**
30:14 31:16
**wondering**
195:23
**word**
143:15 145:2 151:15
**words**
156:24 157:1
**work**
36:16 38:10 48:8
61:13 121:8 177:7
177:15 178:6
204:14
**worked**
28:24 36:10,18 59:18
61:12 62:9 64:5
68:8 87:23 94:19
95:6 117:1,10,17
120:1 129:4 133:10
133:14 138:17
146:20 185:4,7
187:9
**workflow**
127:2
**workforce**



EXHIBIT 19
PAGE 1250

178:2
**working**
19:17 36:11 140:24
144:18 180:6
184:25
**works**
118:2,5,10 119:22
120:15 123:6,13
124:12,18 127:4,7
128:11 138:20
139:5 140:3 191:10
**wouldn't**
92:1,2 186:3,4,22
**WRCOG**
8:15 9:17 18:15
20:11,16,22 153:6
154:4,9,10,13
155:15 156:5,11
157:6,17,21 160:21
161:11,21 168:12
171:15 172:11
**WRCOG's**
20:4 168:5
**write**
175:15 180:15
**writes**
189:13 191:3
**writing**
72:14,16,16,19,20
182:2
**written**
181:18,22 191:4
**wrong**
126:14 160:18 186:5
**wrongdoing**
185:11 186:22
**wrote**
70:19
**www.MagnaLS.com**
1:23
**Wysocki**
70:1,7 71:17 72:2
184:24
**Wysocki's**
90:10

**X**

**Y**

**yeah**
55:19 72:21 80:23
118:6 152:17 177:5
183:23 201:17
203:4 204:7,12
**year**
23:4 31:7 32:14
56:23 63:5 79:13
83:18 95:5 104:13
178:17 180:4
**years**
36:10 37:17 38:8,14
47:15 48:7 89:12,12
89:17,24 180:18
201:13,23
**Yep**
113:25 140:13

**Z**

**zoom**
14:1 43:16 50:13,16
50:23 53:14 54:12
56:11 84:18 98:23
99:2 175:5 197:4

**0**

**0073870**
101:4
**0073870-73873**
5:14
**01-309-61-64**
91:15
**01-425-57-41**
5:24 183:12
**04**
38:9
**0407460**
98:23

**1**

**1**
1:11 2:11 5:4 7:6
41:16,20,23 43:17

51:8,13 72:19 81:1
85:8 114:9 140:15
149:9,14 182:21
184:17 207:5
**1,000**
53:21,24 54:9 58:1
**1/28/15**
5:9
**1:00**
140:11
**1:01**
140:21
**1:30**
104:8
**1:39**
170:25
**1:51**
171:3
**10**
5:17 148:23 164:14
164:15,21
**10,000**
59:6 83:18 84:8,12
84:13
**10:42**
81:1
**10:56**
81:6
**1000**
3:12
**101**
5:14
**103**
183:22,23
**11**
5:19 15:13 35:20
41:24 174:10,11,15
175:7
**11-page**
42:5
**11/3/16**
6:5
**1100**
3:5
**115**
4:17

**11th**
15:19 35:3
**12**
4:17 5:20 182:9,9,10
182:15 183:8
**12:15**
139:17 140:4,15
**1262**
148:13
**1281**
148:14
**12th**
23:4
**13**
5:23 183:11,11,13,23
184:17
**13985**
1:25 2:23 206:21
**14**
6:1 34:8 178:6,7,11
179:8 180:1 181:14
**148**
5:15
**15**
6:2 64:19 73:8 74:4
74:10,10,11,11,15
89:12,12,17,24
97:12 98:6 186:25
187:1,5 189:13
191:2 194:20
195:20
**16**
4:18 6:4 44:12 64:19
175:1 194:4,5,7,12
196:4,14
**164**
5:17
**165**
4:18
**166**
4:18
**16th**
44:10
**17**
6:5 33:10 44:8,16
59:2 196:22 197:1,2



**EXHIBIT 19**
**PAGE 1251**

197:5,10,17
**174**
5:19
**178**
6:1
**18**
22:22 33:10,11 59:2
187:2,9,15,22
201:22
**1800**
3:18
**18101**
3:11
**182**
5:20
**183**
5:23
**187**
6:2
**18th**
21:2
**19**
4:16,17 101:8 102:19
102:21 103:7,14,21
113:10 114:7
201:22
**194**
6:4
**1967**
10:4
**197**
6:5
**1993**
31:5 118:5 122:23
123:2 137:11
**1995**
60:9
**19th**
106:13

———————————
**2**
———————————
**2**
5:5 42:19,20,23 43:6
43:21 44:3,12 45:3
48:22 49:15 70:23
71:11,16 72:7,16,22

73:1 81:5 82:22
83:4 92:21 94:4,7
94:11,16 102:22,25
103:6,18 104:2
105:23 107:16
140:4,20 174:16,22
175:5,18 180:15
182:23 183:3
185:10,16 186:17
**2.12.010**
50:24 52:3
**2.12.060**
51:10,15,20 52:21
57:14
**2:34**
203:16
**2:39**
203:23
**2:41**
205:20,21
**20**
135:16 207:18
**2000s**
59:13 63:9
**2003**
37:11 38:9
**2004**
37:8 146:14
**2005**
37:8
**2006**
61:16,20,23 62:1,6
**2007-2008**
180:4
**2008**
154:9
**2009**
47:2,11,21 48:1
118:5 131:9 156:6
**2010**
32:16 38:15,19 58:8
59:5 107:16 147:4,7
147:15 148:5,23
149:16
**2011**
58:12

**2012**
58:16 122:23 123:2
131:21 137:12
**2013**
34:8 58:18
**2014**
46:23 58:20 91:4
94:2 104:8,12 158:7
159:17,18,19 162:3
162:5,13 163:13,22
**2015**
17:1,2,11,18 18:14
18:18,24 19:17,19
20:5 21:5,10 22:7
22:14,18 33:18
38:23 39:6,6,9 41:5
42:22 43:4,10,22,24
44:3,12 46:7,15
58:22 59:13 60:9
69:24 71:3,18 75:7
75:14 82:22 83:4
84:24 85:4,8 90:18
91:21 92:23 93:9
94:2,4,7,11,16
97:14 98:7,8 100:24
101:9,16 102:9,19
102:21,22 103:8,14
103:21 104:16,20
104:25 105:10
106:13 107:10,22
108:14 109:24
110:9 112:11
113:10 114:7
120:21 121:18
122:5,11 123:9,10
132:19 136:9
163:22 164:18
165:9,18 166:3,12
166:23 167:6
174:16,22 175:18
176:14 177:20
178:13 182:3,21,24
183:3 184:19,21,25
185:5,10,16 186:17
187:3,9,15,22
193:16 197:19

198:9,21,23 199:5
204:1
**2015-2016**
178:17
**2015/2017**
5:20 182:13
**2016**
33:18 39:9,13 40:16
41:5 44:6,8,10,13
44:16,20,22 58:24
120:21 121:19
122:5 132:19
161:19 175:1
192:19 193:16
194:20 195:21
196:20,23 197:3,20
198:9,21
**2017**
33:11 59:1,5
**2018**
10:11,16 32:4 39:13
39:16 59:6 203:1
**2019**
203:1
**2020**
33:1
**2021**
11:2
**2022**
1:19 2:22 7:1,5 14:21
15:13,24 16:6 22:22
23:23 28:4 31:6
35:3 39:16,20 40:16
41:25 206:19
**21**
6:6 15:24 16:6 27:14
27:15,18 164:18
**22**
158:7
**2206**
194:6
**22nd**
198:23
**23**
1:19 2:22 7:1 28:4
**23rd**



**EXHIBIT 19**
**PAGE 1252**

7:5
**24**
4:17
**25**
91:3
**25,000**
58:3,4,5 59:3
**251096**
178:12
**26**
104:8,12 178:13
**27**
6:6 71:3
**28**
69:24 71:18
**29**
165:1,9,18 166:2,12
167:5
**29th**
166:15,23
**2nd**
199:5 206:19

---

**3**

**3**
4:16 5:7 45:4,7,14
50:13,14,19 51:18
56:4 71:12,16 72:7
72:17,22 73:5,7
91:1,3 93:21 150:17
150:22 151:9 180:1
182:20 197:3,10,16
203:16
**3-39**
183:24
**3:00**
140:10
**30**
27:25 94:2,2 105:12
106:20 184:19,21
185:5
**31**
43:24
**312-980-6779**
3:6
**31st**

44:20
**3240**
50:15
**3240-3255**
5:8
**3255**
50:15
**36518**
93:3
**394,500**
83:15
**3rd**
10:4

---

**4**

**4**
5:9 42:21 43:6 49:15
69:17,18,21 70:23
71:12,16 72:5,7,17
74:4 194:11,12
203:21
**4/11/22**
5:4
**4/2/15**
5:10
**40**
158:16
**41**
5:4
**42**
5:5
**43**
157:21
**45**
27:25 105:12 106:20
140:5,8
**49135**
5:10 82:18
**49136**
84:19
**49136-49144**
5:12
**49144**
84:20
**49174**
69:22

**49174-49176**
5:9
**49176**
69:22

---

**5**

**5**
3:5 5:10 43:10 80:16
82:16,17,19 90:13
91:2 196:3,9
**5/21/15**
5:18
**5/8/15**
5:11
**5:20-cv-02164**
1:5 2:5 7:12
**5:30**
35:3
**50**
1:11 2:11 5:7 154:10
207:5
**550**
104:7

---

**6**

**6**
5:11 84:17,18,21
91:1,2,19,22 92:21
93:22 196:9
**6/2/15**
5:19
**60**
110:23
**69**
5:9
**6th**
104:7

---

**7**

**7**
5:13,13 92:23 93:9
98:20,22 99:4
180:21,21 181:14
196:9
**70**
110:23

**700**
94:21,25 95:2,11,18
95:22 97:1,18
124:21 125:3,14,25
126:2 133:25
**73873**
101:4
**75**
82:3
**760-322-2107**
3:19
**760-322-2275**
3:19
**7918**
164:16
**7921**
164:16

---

**8**

**8**
5:14 84:24 85:4
90:17 91:21 100:22
101:3,3,5 102:18,25
103:6,11,18 105:23
113:4,16 115:2,25
**8.i**
175:6,7
**8/26/15**
6:1
**8/4/15**
5:6
**80**
135:15,17
**80/20**
135:9
**82**
5:10
**831793**
207:3
**84**
5:11
**866-624-6221**
1:23

---

**9**

**9**



EXHIBIT 19
PAGE 1253

4:6,18 5:15 42:11
148:12,12,15 149:3
149:9,14 150:18,22
**9/18/15**
6:2
**9:00**
28:5
**9:10**
1:19 2:21 7:1,5
**9:31**
26:19
**9:33**
26:21
**90-**
36:13
**92262**
3:18
**92612**
3:12
**92614**
3:6
**949-260-0972**
3:13
**949-263-2600**
3:13
**95**
31:12 60:8
**96**
36:14,20,22
**99**
5:13
**992**
182:11
**995**
182:12

