# EXHIBIT 21

EXHIBIT 21
PAGE 1262

1  JEFFREY V. DUNN, Bar No. 131926
   jeffrey.dunn@bbklaw.com
2  CHRISTOPHER E. DEAL, Bar No. 186754
   chris.deal@bbklaw.com
3  DANIEL L. RICHARDS, Bar No. 315552
   daniel.richards@bbklaw.com
4  BEST BEST & KRIEGER LLP
   18101 Von Karman Avenue
5  Suite 1000
   Irvine, California  92612
6  Telephone:  (949) 263-2600
   Facsimile:   (949) 260-0972
7
   Attorneys for Plaintiff
8  Western Riverside Council of Governments

9                UNITED STATES DISTRICT COURT

10             CENTRAL DISTRICT OF CALIFORNIA

11

12

13 WESTERN RIVERSIDE COUNCIL OF          Case No. 5:20-cv-02164- GW (KKx)
   GOVERNMENTS, a California Joint
14 Powers Authority; CITY OF             **PLAINTIFFS WESTERN**
   BEAUMONT, a public entity in the      **RIVERSIDE COUNCIL OF**
15 State of California,                   **GOVERNMENTS AND CITY OF**
                                          **BEAUMONT'S SUPPLEMENTAL**
16              Plaintiff,                **RESPONSE TO FIRST SET OF**
                                          **INTERROGATORIES**
17          v.

18 NATIONAL UNION FIRE
   INSURANCE COMPANY OF
19 PITTSBURGH, PA, and DOES 1
   through 50, inclusive,
20
                Defendants.
21

22

23

24

25

26

27

28

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

                              - 1 -                    5:20-CV-02164- GW (KKX)
                                                                    [TITLE]

**EXHIBIT 21**
**PAGE 1263**

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

| | |
|---|---|
| PROPOUNDING PARTY: | Defendant National Union Fire Insurance Company of Pittsburgh |
| RESPONDING PARTY: | Plaintiffs City of Beaumont and Western Riverside Council of Governments |
| SET NUMBER: | One (1) |

Pursuant to Federal Rule of Civil Procedure 33 Plaintiffs Western Riverside Council of Government and the City of Beaumont (together, the "City") respond to the First Set of Interrogatories propounded by Defendant National Union Fire Insurance Company of Pittsburgh ("Propounding Party") as follows:

Discovery is ongoing at this time and responding party reserves the right to supplement its responses as provided under Federal Rule of Civil Procedure 26 (e). The responses contained herein are made in good faith and are based only upon such information and documents which are presently available to and specifically known to the responding party.  It is anticipated that further discovery and independent investigation may lead to additions to, changes in, and/or variations from the responses set forth below.

The responses here may include hearsay and other forms of information that are neither reliable nor admissible as evidence.

## **RESPONSES**

## **INTERROGATORY NO. 1:**

To the extent supporting the Complaint, please identify the name of each individual (including any or all of the Principals) that committed any act or omission that constitutes:

(a)   Dishonesty; and/or

(b)   Faithless Performance.

For each individual, please state (on an individual-by-individual basis) the factual basis for your contention; and describe any loss the City suffered as a result thereof (including the amount of such loss and how you computed that loss).

5:20-CV-02164- GW (KKX)
[TITLE]

**EXHIBIT 21**
**PAGE 1264**

1    **RESPONSE TO INTERROGATORY NO. 1:**

2        The City objects to this interrogatory as compound, consisting of at least

3    eight discrete subparts that are not logically or factually subsumed within or

4    necessarily related to the primary question.

5        The City recognizes the difficulty in determining whether a single

6    interrogatory encompasses multiple interrogatories, and has attempted to

7    conservatively determine the discrete primary questions posed in each

8    interrogatory, while also avoiding waiving its objections to Defendant serving in

9    excess of 25 interrogatories. The City notes that it has primarily relied upon the line

10   of cases discussing (1) whether two subparts "are logically or factually subsumed

11   within and necessarily related to the primary question" and (2) whether the first

12   "question" can be answered fully and completely without answering the second.

13   *See generally MCC Controls v. Hal Hays Construction*, 2020 WL 6034321, at *4

14   (C.D. Cal., July 23, 2020) (Kato, Mag.J.) (concluding that most courts have adopted

15   the "logically or factually subsumed" test and discussing and applying same); *see*

16   *also id*. (approvingly citing *Withers v. eHarmony, Inc*., No. CV 09-2266-GHK

17   (RCx), 2010 WL 11520197, at *3 (C.D. Cal. Apr. 1, 2010) and noting that court

18   had sustained compound objection as to interrogator seeking information

19   concerning 25 separate individuals). By way of an example of how the City has

20   applied these lines of cases, the City concludes that the question: "Did Kapanicas

21   engage in dishonesty when he [___]?" can be answered fully and completed

22   without answering "Did Kapanicas engage in faithless performance when he [__]."

23   Moreover, these questions may have different answers depending upon the omitted

24   bracketed material. The City further notes whether an individual engaged in

25   "dishonesty" is not logically and factually subsumed in the inquiry of whether an

26   individual failed to perform duties prescribed by law. *See* Definition No. 19. The

27   common understanding of "dishonesty" is very distinct from the scope of duties

28   imposed by the law.

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

The City interprets this interrogatory as posing the following eight primary questions:

(1) Does the City contend that Alan Kapanicas committed any act or omission that constitutes "Dishonesty," and if so, state the factual basis for this contention and describe any loss suffered by the City as a result of this Dishonesty, including the amount of such loss and how the loss was computed;

(2) Does the City contend that Ernest Egger committed any act or omission that constitutes "Dishonesty," and if so, state the factual basis for this contention and describe any loss suffered by the City as a result of this Dishonesty, including the amount of such loss and how the loss was computed;

(3) Does the City contend that David Dillon committed any act or omission that constitutes "Dishonesty," and if so, state the factual basis for this contention and describe any loss suffered by the City as a result of this Dishonesty, including the amount of such loss and how the loss was computed;

(4) Does the City contend that Deepak Moorjani committed any act or omission that constitutes "Dishonesty," and if so, state the factual basis for this contention and describe any loss suffered by the City as a result of this Dishonesty, including the amount of such loss and how the loss was computed;

(5) Does the City contend that Alan Kapanicas committed any act or omission that constitutes "Faithless Performance," and if so, state the factual basis for this contention and describe any loss suffered by the City as a result of this Faithless Performance, including the amount of such loss and how the loss was computed;

(6) Does the City contend that Ernest Egger committed any act or omission that constitutes "Faithless Performance," and if so, state the factual basis for this contention and describe any loss suffered by the City as a result of this Faithless Performance, including the amount of such loss and how the loss was computed;

Best Best & Krieger LLP
Attorneys at Law
18101 Von Karman Avenue, Suite 1000
Irvine, California 92612

- 4 -

5:20-CV-02164- GW (KKX)

**EXHIBIT 21**
**PAGE 1266**

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

(7) Does the City contend that David Dillon committed any act or omission that constitutes "Faithless Performance," and if so, state the factual basis for this contention and describe any loss suffered by the City as a result of this Faithless Performance, including the amount of such loss and how the loss was computed;

(8) Does the City contend that Deepak Moorjani committed any act or omission that constitutes "Faithless Performance," and if so, state the factual basis for this contention and describe any loss suffered by the City as a result of this Faithless Performance, including the amount of such loss and how the loss was computed.

The City counts this interrogatory as eight separate interrogatories. The City responds to these eight questions as follows:

**(1) Does the City contend that Alan Kapanicas committed any act or omission that constitutes "Dishonesty," and if so, state the factual basis for this contention and describe any loss suffered by the City as a result of this Dishonesty, including the amount of such loss and how the loss was computed;**

This interrogatory by its plain terms seems to be unlimited in time and scope, and inquires as to whether the City contends that this individual has *ever* engaged in any conduct that constitutes dishonesty. However, the City interprets the qualifier "to the extent supporting the Complaint" to cabin this interrogatory to inquiring as to whether the City contends that any of the conduct the Complaint alleges that this individual engaged in constitutes "dishonesty." The City will answer this interrogatory based on its understanding that this was the intended scope of the interrogatory.

To the extent Defendant in fact intended to inquire whether the City believes that Alan Kapanicas has *ever* engaged in conduct that constitutes "dishonesty," the City objects on the grounds that a broad ranging and temporally unlimited inquiry into whether Kapanicas has ever engaged in conduct that constitutes "dishonesty" has no or extremely limited relevance to any party's claims or defenses, and would

- 5 -

5:20-CV-02164- GW (KKX)

**EXHIBIT 21**
**PAGE 1267**

be grossly disproportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Based on this objection, the City will only respond to this interrogatory to the extent it inquires as to whether the City contends that any of the conduct the Complaint alleges that Kapanicas engaged in constitutes "dishonesty."

The City objects on the basis that this request seeks the premature disclosure of expert witness information which is not discoverable at this time. The City does not object to stating facts that may form the basis for an expert opinion and will state such facts to the extent responsive to this interrogatory.

Alan Kapanicas held a number of positions with the City, including City Manager, Executive Director of Beaumont Financing Authority, CFD, Disclosure Consultant, and Special Tax Consultant. During the time frame that Alan Kapanicas exercised pervasive control over the City of Beaumont, he, along with a cabal of other individual including the principals of ULC, worked together to deprive the City of a substantial amount of money.

ULC was formed initially by Egger and Dillon in late 1993, and Moorjani was subsequently added as a principal later that year. As will be further detailed below, ULC entered into a series of contracts with Beaumont to provide consulting services in connection with a large number of capital improvement projects being undertaken by the City and funded by the sale of bonds.

Commencing in 1993, various bond issues were sold with a total face value of approximately $367,240,000. Of this amount, approximately $267,004,166 was expended for a variety of purpose.

These include the following:

| Bond Proceeds Usage | Amount |
|---|---|

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

- 6 -

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1268

| | |
|---|---|
| Construction – Design / Planning / Engineering / Mgmnt | $ 50,649,268 |
| Construction – 3rd Parties / Developers / Beaumont / Etc. | $193,948,343 |
| Cost of Issuance | $   5,134,984 |
| Underwriters Discount – Cost of Issuance | $   6,846,890 |
| Administration Expenses | $   3,567,143 |
| BFA Expenses | $   6,857,538 |
| | |
| **Total** | **$267,004,166** |

In their capacities as City officials, Dillon, Egger and Moorjani were instrumental in the formation of a Community Facilities District ("CFD") for the stated purpose of raising funds to finance capital improvement projects in Beaumont. Each time a bond issue was approved by the City, a portion of the bond proceeds were thereafter paid over to ULC for consulting services. The identified purposes and amounts of bond funds paid to ULC included the following:

| | Total Expenditure | Total Amt. to ULC | Percentage |
|---|---|---|---|
| Construction Design, Etc. | $50,649,268 | $45,391,831 | 90% |
| Cost of Issuance | $ 5,134,984 | $ | 15% |
| Administration Expenses | $ 3,567,143 | $ | 13% |
| Other Expenses | $ 6,857,538 | $ | 6% |
| **Totals** | **$66,208,933** | **$47,020,440** | |

ULC received more than $45 million of the bond proceeds which were allocated for Construction purposes. This equates to approximately 18.5% of the total funds allocated for Construction and 90% of the constructions costs associated with design, planning, engineering and management.

In addition to the receipt of approximately $47 million of bond proceeds, additional funds were paid to ULC directly by Beaumont for a variety of purposes including for service as city officials; for the management of the Wastewater Treatment Plant; and for services rendered for various capital improvement projects. The total amount of funds paid by Beaumont to ULC was approximately $42.3 million. In summary, the total amount received by ULC from both bond proceeds and payments directly by Beaumont totals approximately $89.3 million

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

1   ULC and its principals were initially hired by the City pursuant to an

2   Agreement for Planning and Economic Development Services dated March 22,

3   1993. This agreement specified several broad categories of services for which ULC

4   would be compensated. For Planning Services (Category I) and Economic

5   Development Services (Category II), ULC was to be paid a lump sum monthly fee

6   of $10,000. The agreement specified that the ULC principals maintain an office

7   presence at City Hall for 28 hours per week. The agreement further identified an

8   additional category called "Additional Services" for which ULC was to be

9   compensated in accordance with the hourly rate schedule included as Exhibit A to

10  the agreement. The Exhibit A states that ULC would be entitled to reimbursements

11  of Professional Sub-Consultant Services at "Actual Cost plus 15%"

12  Shortly following the above agreement, another agreement was entered into

13  between Beaumont and ULC. This agreement dated September 27, 1993, was titled

14  Agreement for Planning, Economic Development and Public Works Services. This

15  agreement was very similar to the initial agreement in that it sets forth the scope of

16  the duties of the principals of ULC in their capacities as officials for the City,

17  including the requirement to spend 28 hours per week working at City Hall. For

18  their services as public officials, ULC was paid $15,000 per month (an increase of

19  $5,000 per month from the prior agreement.) In addition, ULC was to provide

20  Public Works and Engineering Services as detailed in the agreement. For these

21  services, ULC was to be paid "on a time and materials basis not exceeding four and

22  one half percent (4.5%) of the confirmed construction cost of the public

23  improvements to be constructed." The agreement also has an additional scope of

24  work section called Additional Services. For these services, ULC was to be

25  compensated in accordance with the hourly rate schedule included as Exhibit A to

26  the agreement. The Exhibit A states that ULC would be entitled to reimbursements

27  of Professional Sub-Consultant Services at "Actual Cost plus 15%"

28

- 8 -

1    There was an amendment to the above-agreement with ULC in a document

2    dated April 11, 1994. In this amendment the language relating to the compensation

3    to be paid to ULC for Public Works Construction Management was modified

4    slightly. The language in this agreement states, "...compensation shall be on a time

5    and materials basis <u>not exceeding four and one half percent</u> (4.5%) of the bid price

6    awarded by the City for each project."

7    As noted above, ULC was paid from both bond funds and directly by the

8    City. To obtain these funds, ULC issued separate invoices on a monthly basis to

9    both the bond trustee and to Beaumont. In these invoices, ULC would list out

10   various categories of professionals who provided services that month, along with

11   the number of hours expended by each professional category. Examples of the

12   professional categories include:

13   ·     Principal

14   ·     Construction Manager

15   ·     Surveyor

16   ·     One Man Crew

17   ·     Two Man Crew

18   ·     Office Manager

19   ·     Executive Secretary

20   The agreement between ULC and the City states that ULC shall be paid on a

21   time and materials basis, and the invoices submitted by ULC purport to identify the

22   hours expended by various professionals during the period covered by the invoice.

23   ULC, by and through Egger, Dillon, and Moorjani, falsified these invoices

24   and overbilled the City by approximately 26,647 hours that were not actually

25   worked in a single calendar year. This represents an overbilling of approximately

26   $4,000,000 in a single calendar year. Similar overbillings occurred in other years.

27   Additionally, hours worked by third party vendors were included in the time

28   and billing records of ULC, and then included in the invoices issued by ULC. The

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

**EXHIBIT 21**
**PAGE 1271**

1  ULC principals applied extraordinary markups to these third party invoices. These
2  markups on occasion exceeded 300%.

3        The agreement between Beaumont and ULC previously discussed in this
4  response anticipated the submission and repayment of invoices paid by ULC, and
5  allows for a markup of 15%.

6        The profits achieved by ULC as a result of the extraordinary markups on the
7  third party invoices has resulted in millions of illicit dollars in profits to ULC,
8  Egger, Dillon, and Moorjani, at the expense of the City.

9        Without information solely in the possession of the Egger, Dillon, Moorjani,
10  and Kapanicas (and a detailed and complicated analysis of the same), no third party
11  or "outsider" to the cabal of the Kapanicas administration could have reconciled
12  these issues and discovered this illicit profit. This is all the more true in that these
13  parties were able to use their positions with the City to approve the aforementioned
14  invoices.

15        While not exhaustive, several examples of the markup and inflated charges
16  follows:

17        In June 2011, Satori R.E. Solutions, Inc. sent invoice number 5, dated June 1,
18  20111, to ULC for services rendered during the month of May 2011. This invoice
19  was for 185.42 hours of work at $40 per hour, for a total invoice amount of
20  $7,416.80.

21        On its May 2011 time and billing worksheet submitted to the City, ULC
22  listed under the Sundance Project 185.50 hours for Lana Guseva (the CEO and
23  Secretary of Satori Real Estate Solutions, Inc.) for a total of $31,535, which equates
24  to an hourly rate of $170, or $130 greater than what was charged to ULC.

25        In March 2011, Giroux & Associates sent invoice number 10-049-URB05,
26  dated March 24, 2011, to ULC for services rendered during the month of March
27  2011. This invoice was for 10, 20, and 14 hours for the work of a Senior Scientist,

28

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

**EXHIBIT 21**
**PAGE 1272**

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
1810 IOWA KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

Associate Planner, and Technician, respectively. The services were billed at rates of $120, $75, and $40 per hour, for total charges excluding travel of $3,260

On its March 2011 time and billing worksheet ULC listed under the Waste Water Treatment Plant Expansion Project 20 hours for an Associate Engineer, which agrees to the 20 hours for the Associate Planner noted above. ULC listed 14 hours for a CADD Technician, which agrees to the 14 hours for a Technician noted above. Lastly, ULC listed 42 hours for a Project Manager / Sr. Engineer, which reconciles with the 10 hours for the Senior Scientist noted above after adding in 32 hours of the Director of Environmental Services charged to ULC in the same period by EARSI. For these various services, ULC charged the City of Beaumont a total of $10,900. The total charges incurred by ULC for these services amounted to just $6,620, which indicates the services were marked up by $4,280, or an increase of 65% when examined in the aggregate.

In July 2011, Eric Lewis sent invoice number 84, dated July 24, 2011, to ULC for services rendered during the months of June and July 2011. This invoice was for 19 hours of professional traffic engineering services. The services were billed at a rate of $75 per hour, for total charges of $1,425.

On its July 2011 time and billing worksheet, ULC listed under City Wide Traffic Surveys 19 hours for Eric Lewis, which agreed to the invoice noted in the previous paragraph. For these various services, ULC charged the City of Beaumont a total of $3,230 or $170 per hour. The total charges incurred by ULC for these services was just $1,425, which indicates the services were marked up by $1,805, or an increase of 126.67%.

Many additional examples exist, an exhaustive analysis of which would constitute an expert opinion.

As previously discussed in this response, the agreement between Beaumont and ULC put a cap on the amount of fees that ULC could receive for work performed on public works construction projects. The amount of funds received by

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

1   ULC, Egger, Dillon, and Moorjani from the bond proceeds and the City related to

2   capital improvement projects far exceed this 4.5% cap.

3       Overall, ULC, Egger, Dillon, and Moorjani overbilled the City for tens of

4   millions of dollars, the precise amount of which has not yet been fully calculated

5   (and additional third party discovery may be necessary to complete this analysis),

6   but which far exceeds any applicable policy limit(s).

7       This overbilling was only able to be accomplished because of the positions at

8   the City held by Egger, Kapanicas, Dillon, and Moorjani.

9       The City initially hired Alan Kapanicas in July 1993 through his Company

10  BSI Consultants, Inc. ("BSI"), and later through his company General Government

11  Management Services, Inc. ("GGMS") to perform the role of City Manager. In his

12  role as City Manager, Kapanicas authorized payments by the City to a variety of

13  vendors and third parties.

14      Alan Kapanicas, as City Manager and in his other capacities with the City,

15  had enormous and pervasive power over the day to day functioning of the City of

16  Beaumont.  Kapanicas was the "administrative head of the City Government" and

17  had broad power to appoint, demote, or remove any city employee or officer

18  besides the City Clerk, City Treasurer, City Attorney, and members of the Planning

19  Commission. He had "Control over all departments of the City government." This

20  control was exclusive – under the Beaumont Municipal Code, the City Council

21  could not directly give orders to or "deal with" any subordinate of the City

22  Manager. Kapanicas appointed officials on behalf of the City, entered into contracts

23  the name of the City, and directly controlled numerous departments and division

24  within the City. *See* Beaumont Municipal Code section 2.12 *et seq.* In additional to

25  his role as City Manager, Kapanicas was the designated labor negotiator, Personnel

26  Director, Financial Officer for City Investments, and provided services related to

27  bond issuances.

28

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

1   Kapanicas, in conjunction with the other members of the Kapanicas

2   administration, were able to exercise these and other powers to prevent any party

3   not a part of their cabal from discovering, among other things, the above described

4   gross overbilling.

5   The City contends that the course of conduct described above and other acts

6   and omissions of Kapanicas constitutes "dishonesty," as the term is commonly

7   understood.

8   The City notes that this response is only based on information currently

9   available to it, and may not be exhaustive. This lawsuit is in its earliest stages, and

10  the City had not yet taken any depositions or conducted any thirty party discovery,

11  nor has it completed its analysis of the documents and information it presently

12  possesses.

13  The City further notes that it tendered this claim to National Union years ago,

14  and National Union thereafter had a duty to investigate this claim and seek evidence

15  *supporting* coverage.  CACI 2332; *Egan v. Mut. of Omaha Ins. Co.* 24 Cal.3d 809,

16  819 (1979); *Wilson v. 21st Century Ins. Co.*, 42 Cal.4th 713, 720-21 (2007);

17  *Mariscal v. Old Republic Life Ins. Co.*, 42 Cal.App.4th 1617, 1620 (1996). To the

18  City's knowledge, National Union has conducted no investigation whatsoever

19  seeking information that could support the City's claim (e.g., by contacting or

20  seeking information from any party besides the City), and has instead sought only

21  information from the City that would tend to establish that any losses the City has

22  suffered do not fall within the scope of an insuring provision, or fall within an

23  exclusion. The City therefore further responds to interrogatory that additional

24  responsive information may be in the possession, custody, or control of third parties

25  including Egger, Dillon, Kapanicas, ULC, the Federal Bureau of Investigation, the

26  Riverside County District Attorney's office, and former employees and officials of

27  the City of Beaumont, to the extent such information has not been lost, destroyed,

28

- 13 -

5:20-CV-02164- GW (KKX)

**EXHIBIT 21**
**PAGE 1275**

or forgotten during the years in which National Union has declined to investigate possible grounds for coverage

**(2) Does the City contend that Ernest Egger committed any act or omission that constitutes "Dishonesty," and if so, state the factual basis for this contention and describe any loss suffered by the City as a result of this Dishonesty, including the amount of such loss and how the loss was computed;**

This interrogatory by its plain terms seems to be unlimited in time and scope, and inquires as to whether the City contends that this individual has *ever* engaged in any conduct that constitutes dishonesty. However, the City interprets the qualifier "to the extent supporting the Complaint" to cabin this interrogatory to inquiring as to whether the City contends that any of the conduct the Complaint alleges that this individual engaged in constitutes "dishonesty." The City will answer this interrogatory based on its understanding that this was the intended scope of the interrogatory.

To the extent Defendant in fact intended to inquire whether the City believes that Ernest Egger has *ever* engaged in conduct that constitutes "dishonesty," the City objects on the grounds that a broad ranging and temporally unlimited inquiry into whether Egger has ever engaged in conduct that constitutes "dishonesty" has no or extremely limited relevance to any party's claims or defenses, and would be grossly disproportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Based on this objection, the City will only respond to this interrogatory to the extent it inquires as to whether the City contends that any of the conduct the Complaint alleges that Egger engaged in constitutes "dishonesty."

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

The City objects on the basis that this request seeks the premature disclosure of expert witness information which is not discoverable at this time. The City does not object to stating facts that may form the basis for an expert opinion and will state such facts to the extent responsive to this interrogatory.

Ernest Egger, in his role as a City Official and as a principle in ULC, engaged in a variety of dishonest acts with caused substantial losses to the City.

ULC was formed initially by Egger and Dillon in late 1993, and Moorjani was subsequently added as a principal later that year. As will be further detailed below, ULC entered into a series of contracts with Beaumont to provide consulting services in connection with a large number of capital improvement projects being undertaken by the City and funded by the sale of bonds.

Commencing in 1993, various bond issues were sold with a total face value of approximately $367,240,000. Of this amount, approximately $267,004,166 was expended for a variety of purpose.

These include the following:

| Bond Proceeds Usage | Amount |
|---|---|
| Construction – Design / Planning / Engineering / Mgmnt | $ 50,649,268 |
| Construction – 3rd Parties / Developers / Beaumont / Etc. | $193,948,343 |
| Cost of Issuance | $   5,134,984 |
| Underwriters Discount – Cost of Issuance | $   6,846,890 |
| Administration Expenses | $   3,567,143 |
| BFA Expenses | $   6,857,538 |
|  |  |
| **Total** | **$267,004,166** |

In their capacities as City officials, Dillon, Egger and Moorjani were instrumental in the formation of a Community Facilities District ("CFD") for the stated purpose of raising funds to finance capital improvement projects in Beaumont. Each time a bond issue was approved by the City, a portion of the bond proceeds were thereafter paid over to ULC for consulting services. The identified purposes and amounts of bond funds paid to ULC included the following:

|  | Total Expenditure | Total Amt. to ULC | Percentage |
|---|---|---|---|

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1277

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

| Construction Design, Etc. | $50,649,268 | $45,391,831 | 90% |
| Cost of Issuance | $ 5,134,984 | $ | 15% |
| Administration Expenses | $ 3,567,143 | $ | 13% |
| Other Expenses | $ 6,857,538 | $ | 6% |
| **Totals** | **$66,208,933** | **$47,020,440** | |

ULC received more than $45 million of the bond proceeds which were allocated for Construction purposes. This equates to approximately 18.5% of the total funds allocated for Construction and 90% of the constructions costs associated with design, planning, engineering and management.

In addition to the receipt of approximately $47 million of bond proceeds, additional funds were paid to ULC directly by Beaumont for a variety of purposes including for service as city officials; for the management of the Wastewater Treatment Plant; and for services rendered for various capital improvement projects. The total amount of funds paid by Beaumont to ULC was approximately $42.3 million. In summary, the total amount received by ULC from both bond proceeds and payments directly by Beaumont totals approximately $89.3 million

ULC and its principals were initially hired by the City pursuant to an Agreement for Planning and Economic Development Services dated March 22, 1993. This agreement specified several broad categories of services for which ULC would be compensated. For Planning Services (Category I) and Economic Development Services (Category II), ULC was to be paid a lump sum monthly fee of $10,000. The agreement specified that the ULC principals maintain an office presence at City Hall for 28 hours per week. The agreement further identified an additional category called "Additional Services" for which ULC was to be compensated in accordance with the hourly rate schedule included as Exhibit A to the agreement. The Exhibit A states that ULC would be entitled to reimbursements of Professional Sub-Consultant Services at "Actual Cost plus 15%"

Shortly following the above agreement, another agreement was entered into between Beaumont and ULC. This agreement dated September 27, 1993, was titled

Best Best & Krieger LLP
Attorneys at Law
1800 Von Karman Avenue, Suite 1000
Irvine, California 92612

- 16 -

**EXHIBIT 21**
**PAGE 1278**

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

1  Agreement for Planning, Economic Development and Public Works Services. This

2  agreement was very similar to the initial agreement in that it sets forth the scope of

3  the duties of the principals of ULC in their capacities as officials for the City,

4  including the requirement to spend 28 hours per week working at City Hall. For

5  their services as public officials, ULC was paid $15,000 per month (an increase of

6  $5,000 per month from the prior agreement.) In addition, ULC was to provide

7  Public Works and Engineering Services as detailed in the agreement. For these

8  services, ULC was to be paid "on a time and materials basis <u>not exceeding four and</u>

9  <u>one half percent</u> (4.5%) of the confirmed construction cost of the public

10 improvements to be constructed." The agreement also has an additional scope of

11 work section called Additional Services. For these services, ULC was to be

12 compensated in accordance with the hourly rate schedule included as Exhibit A to

13 the agreement. The Exhibit A states that ULC would be entitled to reimbursements

14 of Professional Sub-Consultant Services at "Actual Cost plus 15%"

15         There was an amendment to the above-agreement with ULC in a document

16 dated April 11, 1994. In this amendment the language relating to the compensation

17 to be paid to ULC for Public Works Construction Management was modified

18 slightly. The language in this agreement states, "...compensation shall be on a time

19 and materials basis <u>not exceeding four and one half percent</u> (4.5%) of the bid price

20 awarded by the City for each project."

21         As noted above, ULC was paid from both bond funds and directly by the

22 City. To obtain these funds, ULC issued separate invoices on a monthly basis to

23 both the bond trustee and to Beaumont. In these invoices, ULC would list out

24 various categories of professionals who provided services that month, along with

25 the number of hours expended by each professional category. Examples of the

26 professional categories include:

27         ·        Principal

28         ·        Construction Manager

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1279

1 ·  Surveyor

2 ·  One Man Crew

3 ·  Two Man Crew

4 ·  Office Manager

5 ·  Executive Secretary

6 The agreement between ULC and the City states that ULC shall be paid on a

7 time and materials basis, and the invoices submitted by ULC purport to identify the

8 hours expended by various professionals during the period covered by the invoice.

9 ULC, by and through Egger, Dillon, and Moorjani, falsified these invoices

10 and overbilled the City by approximately 26,647 hours that were not actually

11 worked in a single calendar year. This represents an overbilling of approximately

12 $4,000,000 in a single calendar year. Similar overbillings occurred in other years.

13 Additionally, hours worked by third party vendors were included in the time

14 and billing records of ULC, and then included in the invoices issued by ULC. The

15 ULC principals applied extraordinary markups to these third party invoices. These

16 markups on occasion exceeded 300%.

17 The agreement between Beaumont and ULC previously discussed in this

18 response anticipated the submission and repayment of invoices paid by ULC, and

19 allows for a markup of 15%.

20 The profits achieved by ULC as a result of the extraordinary markups on the

21 third party invoices has resulted in millions of illicit dollars in profits to ULC,

22 Egger, Dillon, and Moorjani, at the expense of the City.

23 Without information solely in the possession of the Egger, Dillon, Moorjani,

24 and Kapanicas (and a detailed and complicated analysis of the same), no third party

25 or "outsider" to the cabal of Kapanicas, Egger, Dillon, and Moorjani could have

26 reconciled these issues and discovered this illicit profit. This is all the more true in

27 that these parties were able to use their positions with the City to approve the

28 aforementioned invoices.

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

- 18 -

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1280

1   While not exhaustive, several examples of the markup and inflated charges

2   follows:

3   In June 2011, Satori R.E. Solutions, Inc. sent invoice number 5, dated June 1,

4   20111, to ULC for services rendered during the month of May 2011. This invoice

5   was for 185.42 hours of work at $40 per hour, for a total invoice amount of

6   $7,416.80.

7   On its May 2011 time and billing worksheet submitted to the City, ULC

8   listed under the Sundance Project 185.50 hours for Lana Guseva (the CEO and

9   Secretary of Satori Real Estate Solutions, Inc.) for a total of $31,535, which equates

10  to an hourly rate of $170, or $130 greater than what was charged to ULC.

11  In March 2011, Giroux & Associates sent invoice number 10-049-URB05,

12  dated March 24, 2011, to ULC for services rendered during the month of March

13  2011. This invoice was for 10, 20, and 14 hours for the work of a Senior Scientist,

14  Associate Planner, and Technician, respectively. The services were billed at rates of

15  $120, $75, and $40 per hour, for total charges excluding travel of $3,260

16  On its March 2011 time and billing worksheet ULC listed under the Waste

17  Water Treatment Plant Expansion Project 20 hours for an Associate Engineer,

18  which agrees to the 20 hours for the Associate Planner noted above. ULC listed 14

19  hours for a CADD Technician, which agrees to the 14 hours for a Technician noted

20  above. Lastly, ULC listed 42 hours for a Project Manager / Sr. Engineer, which

21  reconciles with the 10 hours for the Senior Scientist noted above after adding in 32

22  hours of the Director of Environmental Services charged to ULC in the same period

23  by EARSI. For these various services, ULC charged the City of Beaumont a total of

24  $10,900. The total charges incurred by ULC for these services amounted to just

25  $6,620, which indicates the services were marked up by $4,280, or an increase of

26  65% when examined in the aggregate.

27  In July 2011, Eric Lewis sent invoice number 84, dated July 24, 2011, to

28  ULC for services rendered during the months of June and July 2011. This invoice

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

was for 19 hours of professional traffic engineering services. The services were billed at a rate of $75 per hour, for total charges of $1,425.

On its July 2011 time and billing worksheet, ULC listed under City Wide Traffic Surveys 19 hours for Eric Lewis, which agreed to the invoice noted in the previous paragraph. For these various services, ULC charged the City of Beaumont a total of $3,230 or $170 per hour. The total charges incurred by ULC for these services was just $1,425, which indicates the services were marked up by $1,805, or an increase of 126.67%.

Many additional examples exist, an exhaustive analysis of which would constitute an expert opinion.

As previously discussed in this report, the agreement between Beaumont and ULC put a cap on the amount of fees that ULC could receive for work performed on public works construction projects. The amount of funds received by ULC, Egger, Dillon, and Moorjani from the bond proceeds and the City related to capital improvement projects far exceed this 4.5% cap.

Overall, ULC, Egger, Dillon, and Moorjani overbilled the City for tens of millions of dollars, the precise amount of which has not yet been fully calculated (and additional third party discovery may be necessary to complete this analysis), but which far exceeds any applicable policy limit(s).

This overbilling was only able to be accomplished because of the positions at the City held by Egger, Kapanicas, Dillon, and Moorjani.

In the early 1990s, the City hired Ernest Egger – an owner and principal of ULC – to manage the planning of the City. Egger served as Planning Director of Beaumont. He had day to day control of department, overseeing staff and reporting directly to the City Manager Kapanicas.

Together, Kapanicas, Dillon, Egger, and Moorjani had almost total control over the City of Beaumont. Dillon was the Planning Director of the City, Egger was the Community and Economic Development Director, and Moorjani was the

Best Best & Krieger LLP
ATTORNEYS AT LAW
18101 Von Karman Avenue, Suite 1000
Irvine, California 92612

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1282

Director of Public Works. These individuals were all members of the Kapanicas

Administration, and exercised substantial control over their respective departments.

As Department head officials and directors, these individuals were empowered with

broad authority under the Code. The Director of Public Works was empowered to

"administer, implement and enforce" the provisions of various ordinances and

Chapters of the Code and grant or deny development permits. The Director of

Planning was similarly empowered to administer various ordinances, including the

City zoning ordinance, and was empowered to "interpret the intent" of provisions

within the code. Critically, as Department Heads, these individuals were able to

sign off on bond requisition forms, _including_ _bond requisition forms for payment to_

_ULC._  Ernest Egger, in particular, had a broad range of powers and responsibilities

as Planning Director, including:

• Establish working relationships and coordination with City Staff,

public agencies, County departments, utilities and service purveyors involved in

matters affecting the City.

• Analyze and recommend planning programs consistent with the

economic capabilities of the City. When directed, prepare and administer identified

programs.

• Direct and supervise the day to day functions and activities of the

Planning and Economic Development Department including all planning and

building functions and associate personnel

• Attend necessary meetings with City Council members, Planning

Commissioners, City staff, public agencies, community groups, developers,

contractors and the general public

• Provide recommendations regarding regulations and ordinances

pertaining to planning matters and coordinate with the City Attorney in preparation

of routine ordinances or amendment

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

**EXHIBIT 21**

**PAGE 1283**

• Provide zoning and planning related information to citizens and prospective applicants, conduct pre-submittal reviews, and assist individual in coping with City processes.

• Upgrade and maintain the City's base mapping and routine graphic needs

• Review, and as necessary adjust, the Planning Department's forms, processes and operational procedures to improve its efficiency, function and professional image, and bring the City's operations into the state-of-the-art, comparable with similarly sized communities

• Monitor and report on changes in State law, regional programs and changes in environmental regulations and adjust City processes to conform to statutory requirements

• Maintain an office presence at City Hall for 28 hours weekly, with the precise schedule of office hours determined through mutual agreement, with one of ULC's professional planning principals in attendance during office hours.

• Review proposed land development project, occupancies and business licenses with planning implications and notify applicants relative to zoning ordinance and General Plan compliance

• Coordinate and correspond with applicants and process applications in accordance with City codes and policy

• Review and process routine projects in compliance with the requirements of the California Environmental Quality Act (CEQA) and the City's guidelines for its implementations. Prepare initial studies and negative declarations for routines projects.

• Develop conditions of approval for routines projects consistent with State law and good planning practices; City police and financing requirements; health, safety and welfare considerations; and with respect to protecting and maintaining neighborhood stability and quality of life in Beaumont.

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

5:20-CV-02164- GW (KKX)

**EXHIBIT 21**
**PAGE 1284**

1          •     Provide complete staffing to the Planning Commission and act in the

2   capacity of Planning Director/Secretary in the conduct of regularly scheduled

3   meetings

4          •     Provide professional presentations and recommendations to the

5   Planning Commission to guide appropriately informed decision making on

6   discretionary actions

7          •     Prepare clear, professional quality graphics and other presentation

8   materials to clarify planning issues and to convey a professional image to the public

9          •     Prepare staff reports, regulations and meeting minutes, with the use of

10  present City clerical support, for all Planning Commission meetings

11         •     Utilizing City clerical support, prepare all required notices, agenda

12  packets and other pertinent materials for Commission meetings

13         •     Prepare and maintain a Planning Commissioner's Handbook to

14  provide members with a useful reference guide on subjects including legal

15  requirements, conducting of meetings, findings, conflict of interest and

16  requirements of the Brown Act

17         Egger, in conjunction with the other members of the Kapanicas

18  administration, was able to exercise these and other powers to prevent any party not

19  a part of their cabal from discovering, among other things, their own gross

20  overbilling.

21         The City contends that the course of conduct described above constitutes

22  "dishonesty," as the term is commonly understood. The submission of invoices for

23  payment which Egger was not entitled to represents a false assertion of fact – e.g.,

24  that ULC had performed the work indicated on the invoices and was in fact entitled

25  to payment for the same under the terms of his agreement with the City. The

26  approval of these invoices would also constitutes dishonesty, in that one of the

27  principal's approval of these invoices would represent a false statement of fact –

28  that ULC was entitled to the payment represented on the invoice.

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1285

1    The City notes that this response is only based on information currently

2    available to it, and may not be exhaustive. This lawsuit is in its earliest stages, and

3    the City had not yet taken any depositions or conducted any thirty party discovery,

4    nor has it completed its analysis of the documents and information it presently

5    possesses.

6          The City further notes that it tendered this claim to National Union years ago,

7    and National Union thereafter had a duty to investigate this claim and seek evidence

8    *supporting* coverage.  CACI 2332; *Egan v. Mut. of Omaha Ins. Co.* 24 Cal.3d 809,

9    819 (1979); *Wilson v. 21st Century Ins. Co.*, 42 Cal.4th 713, 720-21 (2007);

10   *Mariscal v. Old Republic Life Ins. Co.*, 42 Cal.App.4th 1617, 1620 (1996). To the

11   City's knowledge, National Union has conducted no investigation whatsoever

12   seeking information that could support the City's claim (e.g., by contacting or

13   seeking information from any party besides the City), and has instead sought only

14   information from the City that would tend to establish that any losses the City has

15   suffered do not fall within the scope of an insuring provision, or fall within an

16   exclusion. The City therefore further responds to interrogatory that additional

17   responsive information may be in the possession, custody, or control of third parties

18   including Egger, Dillon, Kapanicas, ULC, the Federal Bureau of Investigation, the

19   Riverside County District Attorney's office, and former employees and officials of

20   the City of Beaumont, to the extent such information has not been lost, destroyed,

21   or forgotten during the years in which National Union has declined to investigate

22   possible grounds for coverage.

23        **(3) Does the City contend that David Dillon committed any act or**

24   **omission that constitutes "Dishonesty," and if so, state the factual basis for this**

25   **contention and describe any loss suffered by the City as a result of this**

26   **Dishonesty, including the amount of such loss and how the loss was computed;**

27        This interrogatory by its plain terms seems to be unlimited in time and scope,

28   and inquires as to whether the City contends that this individual has *ever* engaged in

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

- 24 -

5:20-CV-02164- GW (KKX)

**EXHIBIT 21**
**PAGE 1286**

1   any conduct that constitutes dishonesty. However, the City interprets the qualifier

2   "to the extent supporting the Complaint" to cabin this interrogatory to inquiring as

3   to whether the City contends that any of the conduct the Complaint alleges that this

4   individual engaged in constitutes "dishonesty." The City will answer this

5   interrogatory based on its understanding that this was the intended scope of the

6   interrogatory.

7       To the extent Defendant in fact intended to inquire whether the City believes

8   that Ernest Egger has *ever* engaged in conduct that constitutes "dishonesty," the

9   City objects on the grounds that a broad ranging and temporally unlimited inquiry

10  into whether Egger has ever engaged in conduct that constitutes "dishonesty" has

11  no or extremely limited relevance to any party's claims or defenses, and would be

12  grossly disproportional to the needs of the case, considering the importance of the

13  issues at stake in the action, the amount in controversy, the parties' relative access

14  to relevant information, the parties' resources, the importance of the discovery in

15  resolving the issues, and whether the burden or expense of the proposed discovery

16  outweighs its likely benefit. Based on this objection, the City will only respond to

17  this interrogatory to the extent it inquires as to whether the City contends that any

18  of the conduct the Complaint alleges that Egger engaged in constitutes

19  "dishonesty."

20      The City objects on the basis that this request seeks the premature disclosure

21  of expert witness information which is not discoverable at this time. The City does

22  not object to stating facts that may form the basis for an expert opinion and will

23  state such facts to the extent responsive to this interrogatory.

24      Ernest Egger, in his role as a City Official and as a principle in ULC,

25  engaged in a variety of dishonest acts with caused substantial losses to the City.

26      ULC was formed initially by Egger and Dillon in late 1993, and Moorjani

27  was subsequently added as a principal later that year. As will be further detailed

28  below, ULC entered into a series of contracts with Beaumont to provide consulting

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

- 25 -                                    5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1287

services in connection with a large number of capital improvement projects being undertaken by the City and funded by the sale of bonds.

Commencing in 1993, various bond issues were sold with a total face value of approximately $367,240,000. Of this amount, approximately $267,004,166 was expended for a variety of purpose.

These include the following:

| Bond Proceeds Usage | Amount |
|---|---|
| Construction – Design / Planning / Engineering / Mgmnt | $ 50,649,268 |
| Construction – 3rd Parties / Developers / Beaumont / Etc. | $193,948,343 |
| Cost of Issuance | $ 5,134,984 |
| Underwriters Discount – Cost of Issuance | $ 6,846,890 |
| Administration Expenses | $ 3,567,143 |
| BFA Expenses | $ 6,857,538 |
| | |
| **Total** | **$267,004,166** |

In their capacities as City officials, Dillon, Egger and Moorjani were instrumental in the formation of a Community Facilities District ("CFD") for the stated purpose of raising funds to finance capital improvement projects in Beaumont. Each time a bond issue was approved by the City, a portion of the bond proceeds were thereafter paid over to ULC for consulting services. The identified purposes and amounts of bond funds paid to ULC included the following:

| | Total Expenditure | Total Amt. to ULC | Percentage |
|---|---|---|---|
| Construction Design, Etc. | $50,649,268 | $45,391,831 | 90% |
| Cost of Issuance | $ 5,134,984 | $ | 15% |
| Administration Expenses | $ 3,567,143 | $ | 13% |
| Other Expenses | $ 6,857,538 | $ | 6% |
| **Totals** | **$66,208,933** | **$47,020,440** | |

ULC received more than $45 million of the bond proceeds which were allocated for Construction purposes. This equates to approximately 18.5% of the total funds allocated for Construction and 90% of the constructions costs associated with design, planning, engineering and management.

In addition to the receipt of approximately $47 million of bond proceeds, additional funds were paid to ULC directly by Beaumont for a variety of purposes

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

**EXHIBIT 21**

**PAGE 1288**

1   including for service as city officials; for the management of the Wastewater

2   Treatment Plant; and for services rendered for various capital improvement

3   projects. The total amount of funds paid by Beaumont to ULC was approximately

4   $42.3 million. In summary, the total amount received by ULC from both bond

5   proceeds and payments directly by Beaumont totals approximately $89.3 million

6       ULC and its principals were initially hired by the City pursuant to an

7   Agreement for Planning and Economic Development Services dated March 22,

8   1993. This agreement specified several broad categories of services for which ULC

9   would be compensated. For Planning Services (Category I) and Economic

10  Development Services (Category II), ULC was to be paid a lump sum monthly fee

11  of $10,000. The agreement specified that the ULC principals maintain an office

12  presence at City Hall for 28 hours per week. The agreement further identified an

13  additional category called "Additional Services" for which ULC was to be

14  compensated in accordance with the hourly rate schedule included as Exhibit A to

15  the agreement. The Exhibit A states that ULC would be entitled to reimbursements

16  of Professional Sub-Consultant Services at "Actual Cost plus 15%"

17      Shortly following the above agreement, another agreement was entered into

18  between Beaumont and ULC. This agreement dated September 27, 1993, was titled

19  Agreement for Planning, Economic Development and Public Works Services. This

20  agreement was very similar to the initial agreement in that it sets forth the scope of

21  the duties of the principals of ULC in their capacities as officials for the City,

22  including the requirement to spend 28 hours per week working at City Hall. For

23  their services as public officials, ULC was paid $15,000 per month (an increase of

24  $5,000 per month from the prior agreement.) In addition, ULC was to provide

25  Public Works and Engineering Services as detailed in the agreement. For these

26  services, ULC was to be paid "on a time and materials basis not exceeding four and

27  one half percent (4.5%) of the confirmed construction cost of the public

28  improvements to be constructed." The agreement also has an additional scope of

EXHIBIT 21
PAGE 1289

1   work section called Additional Services. For these services, ULC was to be

2   compensated in accordance with the hourly rate schedule included as Exhibit A to

3   the agreement. The Exhibit A states that ULC would be entitled to reimbursements

4   of Professional Sub-Consultant Services at "Actual Cost plus 15%"

5       There was an amendment to the above-agreement with ULC in a document

6   dated April 11, 1994. In this amendment the language relating to the compensation

7   to be paid to ULC for Public Works Construction Management was modified

8   slightly. The language in this agreement states, "...compensation shall be on a time

9   and materials basis not exceeding four and one half percent (4.5%) of the bid price

10   awarded by the City for each project."

11       As noted above, ULC was paid from both bond funds and directly by the

12   City. To obtain these funds, ULC issued separate invoices on a monthly basis to

13   both the bond trustee and to Beaumont. In these invoices, ULC would list out

14   various categories of professionals who provided services that month, along with

15   the number of hours expended by each professional category. Examples of the

16   professional categories include:

17   ·      Principal

18   ·      Construction Manager

19   ·      Surveyor

20   ·      One Man Crew

21   ·      Two Man Crew

22   ·      Office Manager

23   ·      Executive Secretary

24       The agreement between ULC and the City states that ULC shall be paid on a

25   time and materials basis, and the invoices submitted by ULC purport to identify the

26   hours expended by various professionals during the period covered by the invoice.

27       ULC, by and through Egger, Dillon, and Moorjani, falsified these invoices

28   and overbilled the City by approximately 26,647 hours that were not actually

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
1810 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

5:20-CV-02164- GW (KKX)

**EXHIBIT 21**
**PAGE 1290**

1   worked in a single calendar year. This represents an overbilling of approximately

2   $4,000,000 in a single calendar year. Similar overbillings occurred in other years.

3       Additionally, hours worked by third party vendors were included in the time

4   and billing records of ULC, and then included in the invoices issued by ULC. The

5   ULC principals applied extraordinary markups to these third party invoices. These

6   markups on occasion exceeded 300%.

7       The agreement between Beaumont and ULC previously discussed in this

8   response anticipated the submission and repayment of invoices paid by ULC, and

9   allows for a markup of 15%.

10      The profits achieved by ULC as a result of the extraordinary markups on the

11  third party invoices has resulted in millions of illicit dollars in profits to ULC,

12  Egger, Dillon, and Moorjani, at the expense of the City.

13      Without information solely in the possession of the Egger, Dillon, Moorjani,

14  and Kapanicas (and a detailed and complicated analysis of the same), no third party

15  or "outsider" to the cabal of Kapanicas, Egger, Dillon, and Moorjani could have

16  reconciled these issues and discovered this illicit profit. This is all the more true in

17  that these parties were able to use their positions with the City to approve the

18  aforementioned invoices.

19      While not exhaustive, several examples of the markup and inflated charges

20  follows:

21      In June 2011, Satori R.E. Solutions, Inc. sent invoice number 5, dated June 1,

22  20111, to ULC for services rendered during the month of May 2011. This invoice

23  was for 185.42 hours of work at $40 per hour, for a total invoice amount of

24  $7,416.80.

25      On its May 2011 time and billing worksheet submitted to the City, ULC

26  listed under the Sundance Project 185.50 hours for Lana Guseva (the CEO and

27  Secretary of Satori Real Estate Solutions, Inc.) for a total of $31,535, which equates

28  to an hourly rate of $170, or $130 greater than what was charged to ULC.

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

**EXHIBIT 21**
**PAGE 1291**

1      In March 2011, Giroux & Associates sent invoice number 10-049-URB05,

2 dated March 24, 2011, to ULC for services rendered during the month of March

3 2011. This invoice was for 10, 20, and 14 hours for the work of a Senior Scientist,

4 Associate Planner, and Technician, respectively. The services were billed at rates of

5 $120, $75, and $40 per hour, for total charges excluding travel of $3,260

6      On its March 2011 time and billing worksheet ULC listed under the Waste

7 Water Treatment Plant Expansion Project 20 hours for an Associate Engineer,

8 which agrees to the 20 hours for the Associate Planner noted above. ULC listed 14

9 hours for a CADD Technician, which agrees to the 14 hours for a Technician noted

10 above. Lastly, ULC listed 42 hours for a Project Manager / Sr. Engineer, which

11 reconciles with the 10 hours for the Senior Scientist noted above after adding in 32

12 hours of the Director of Environmental Services charged to ULC in the same period

13 by EARSI. For these various services, ULC charged the City of Beaumont a total of

14 $10,900. The total charges incurred by ULC for these services amounted to just

15 $6,620, which indicates the services were marked up by $4,280, or an increase of

16 65% when examined in the aggregate.

17      In July 2011, Eric Lewis sent invoice number 84, dated July 24, 2011, to

18 ULC for services rendered during the months of June and July 2011. This invoice

19 was for 19 hours of professional traffic engineering services. The services were

20 billed at a rate of $75 per hour, for total charges of $1,425.

21      On its July 2011 time and billing worksheet, ULC listed under City Wide

22 Traffic Surveys 19 hours for Eric Lewis, which agreed to the invoice noted in the

23 previous paragraph. For these various services, ULC charged the City of Beaumont

24 a total of $3,230 or $170 per hour. The total charges incurred by ULC for these

25 services was just $1,425, which indicates the services were marked up by $1,805, or

26 an increase of 126.67%.

27      Many additional examples exist, an exhaustive analysis of which would

28 constitute an expert opinion.

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

1   As previously discussed in this report, the agreement between Beaumont and

2   ULC put a cap on the amount of fees that ULC could receive for work performed

3   on public works construction projects. The amount of funds received by ULC,

4   Egger, Dillon, and Moorjani from the bond proceeds and the City related to capital

5   improvement projects far exceed this 4.5% cap.

6   Overall, ULC, Egger, Dillon, and Moorjani overbilled the City for tens of

7   millions of dollars, the precise amount of which has not yet been fully calculated

8   (and additional third party discovery may be necessary to complete this analysis),

9   but which far exceeds any applicable policy limit(s).

10   This overbilling was only able to be accomplished because of the positions at

11   the City held by Egger, Kapanicas, Dillon, and Moorjani.

12   In the early 1990s, the City hired Ernest Egger – an owner and principal of

13   ULC – to manage the planning of the City. Egger served as Planning Director of

14   Beaumont. He had day to day control of department, overseeing staff and reporting

15   directly to the City Manager Kapanicas.

16   Together, Kapanicas, Dillon, Egger, and Moorjani had almost total control

17   over the City of Beaumont. Dillon was the Planning Director of the City, Egger was

18   the Community and Economic Development Director, and Moorjani was the

19   Director of Public Works. These individuals were all members of the Kapanicas

20   Administration, and exercised substantial control over their respective departments.

21   As Department head officials and directors, these individuals were empowered with

22   broad authority under the Code. The Director of Public Works was empowered to

23   "administer, implement and enforce" the provisions of various ordinances and

24   Chapters of the Code and grant or deny development permits. The Director of

25   Planning was similarly empowered to administer various ordinances, including the

26   City zoning ordinance, and was empowered to "interpret the intent" of provisions

27   within the code. Critically, as Department Heads, these individuals were able to

28   sign off on bond requisition forms, _including_ bond requisition forms for payment to

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1293

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

<u>ULC</u>.  David Dillon, in particular, had a broad range of powers and responsibilities as Director of Economic Development, including:

• Monitor and report on on-going efforts involving public infrastructure financing programs and coordinate these efforts with other City functions, including planning, engineering, building and safety, finance, redevelopment and other City programs

• Advise landowners and providing preliminary technical aid in the establishment of new financing programs, or in the annexation of properties to existing financing districts

• Advise the City on the sale of public infrastructure bonds for the incremental expansion and upgrading of the wastewater treatment plant and other public facilities

• Assist the City in the planning for annexation of strategic projects into the City

• Establish a program for priority processing for projects of exceptional merit, such as industrial and commercial developments with substantial revenue and job creation benefits

• Coordinate the administrative process of enacting development agreements for major development projects in the City

• Assist the City Manager in establishing financing programs which can augment the City's budget (e.g. redevelopment, 308 districts, Marks-Roos, mitigation fees)

• Assist the City Manager in outreach functions to enhance the process of attracting business, industry and quality development to Beaumont

• Assist the City manager in public relations matters to promote a positive image for Beaumont and City programs, ad provide assistance in managing the press on relevant matters

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1294

•     Assist the City in the procurement of grants and other for local projects from federal and State sources

•     Provide Graphic Artist services for up to forty-three hours per month

Dillon, in conjunction with the other members of the Kapanicas administration, was able to exercise these and other powers to prevent any party not a part of their cabal from discovering, among other things, their own gross overbilling.

The City contends that the course of conduct described above constitutes "dishonesty," as the term is commonly understood. The submission of invoices for payment which Dillon was not entitled to represents a false assertion of fact – e.g., that ULC had performed the work indicated on the invoices and was in fact entitled to payment for the same under the terms of his agreement with the City. The approval of these invoices would also constitutes dishonesty, in that one of the principal's approval of these invoices would represent a false statement of fact – that ULC was entitled to the payment represented on the invoice.

The City notes that this response is only based on information currently available to it, and may not be exhaustive. This lawsuit is in its earliest stages, and the City had not yet taken any depositions or conducted any thirty party discovery, nor has it completed its analysis of the documents and information it presently possesses.

The City further notes that it tendered this claim to National Union years ago, and National Union thereafter had a duty to investigate this claim and seek evidence *supporting* coverage.  CACI 2332; *Egan v. Mut. of Omaha Ins. Co.* 24 Cal.3d 809, 819 (1979); *Wilson v. 21st Century Ins. Co.*, 42 Cal.4th 713, 720-21 (2007); *Mariscal v. Old Republic Life Ins. Co.*, 42 Cal.App.4th 1617, 1620 (1996). To the City's knowledge, National Union has conducted no investigation whatsoever seeking information that could support the City's claim (e.g., by contacting or seeking information from any party besides the City), and has instead sought only

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

- 33 -

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1295

1  information from the City that would tend to establish that any losses the City has

2  suffered do not fall within the scope of an insuring provision, or fall within an

3  exclusion. The City therefore further responds to interrogatory that additional

4  responsive information may be in the possession, custody, or control of third parties

5  including Egger, Dillon, Kapanicas, ULC, the Federal Bureau of Investigation, the

6  Riverside County District Attorney's office, and former employees and officials of

7  the City of Beaumont, to the extent such information has not been lost, destroyed,

8  or forgotten during the years in which National Union has declined to investigate

9  possible grounds for coverage.

10  **(4) Does the City contend that Deepak Moorjani committed any act or**

11  **omission that constitutes "Dishonesty," and if so, state the factual basis for this**

12  **contention and describe any loss suffered by the City as a result of this**

13  **Dishonesty, including the amount of such loss and how the loss was computed;**

14  This interrogatory by its plain terms seems to be unlimited in time and scope,

15  and inquires as to whether the City contends that this individual has *ever* engaged in

16  any conduct that constitutes dishonesty. However, the City interprets the qualifier

17  "to the extent supporting the Complaint" to cabin this interrogatory to inquiring as

18  to whether the City contends that any of the conduct the Complaint alleges that this

19  individual engaged in constitutes "dishonesty." The City will answer this

20  interrogatory based on its understanding that this was the intended scope of the

21  interrogatory.

22  To the extent Defendant in fact intended to inquire whether the City believes

23  that Ernest Egger has *ever* engaged in conduct that constitutes "dishonesty," the

24  City objects on the grounds that a broad ranging and temporally unlimited inquiry

25  into whether Egger has ever engaged in conduct that constitutes "dishonesty" has

26  no or extremely limited relevance to any party's claims or defenses, and would be

27  grossly disproportional to the needs of the case, considering the importance of the

28  issues at stake in the action, the amount in controversy, the parties' relative access

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

**EXHIBIT 21**
**PAGE 1296**

to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Based on this objection, the City will only respond to this interrogatory to the extent it inquires as to whether the City contends that any of the conduct the Complaint alleges that Egger engaged in constitutes "dishonesty."

The City objects on the basis that this request seeks the premature disclosure of expert witness information which is not discoverable at this time. The City does not object to stating facts that may form the basis for an expert opinion and will state such facts to the extent responsive to this interrogatory.

Ernest Egger, in his role as a City Official and as a principle in ULC, engaged in a variety of dishonest acts with caused substantial losses to the City.

ULC was formed initially by Egger and Dillon in late 1993, and Moorjani was subsequently added as a principal later that year. As will be further detailed below, ULC entered into a series of contracts with Beaumont to provide consulting services in connection with a large number of capital improvement projects being undertaken by the City and funded by the sale of bonds.

Commencing in 1993, various bond issues were sold with a total face value of approximately $367,240,000. Of this amount, approximately $267,004,166 was expended for a variety of purpose.

These include the following:

| Bond Proceeds Usage | Amount |
|---|---|
| Construction – Design / Planning / Engineering / Mgmnt | $ 50,649,268 |
| Construction – 3rd Parties / Developers / Beaumont / Etc. | $193,948,343 |
| Cost of Issuance | $    5,134,984 |
| Underwriters Discount – Cost of Issuance | $    6,846,890 |
| Administration Expenses | $    3,567,143 |
| BFA Expenses | $    6,857,538 |
|  |  |
| **Total** | **$267,004,166** |

Best Best & Krieger LLP
Attorneys at Law
1800 Von Karman Avenue, Suite 1000
Irvine, California 92612

5:20-CV-02164- GW (KKX)

**EXHIBIT 21**
**PAGE 1297**

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

In their capacities as City officials, Dillon, Egger and Moorjani were instrumental in the formation of a Community Facilities District ("CFD") for the stated purpose of raising funds to finance capital improvement projects in Beaumont. Each time a bond issue was approved by the City, a portion of the bond proceeds were thereafter paid over to ULC for consulting services. The identified purposes and amounts of bond funds paid to ULC included the following:

|                          | Total Expenditure | Total Amt. to ULC | Percentage |
|--------------------------|-------------------|-------------------|------------|
| Construction Design, Etc. | $50,649,268       | $45,391,831       | 90%        |
| Cost of Issuance         | $ 5,134,984       | $                 | 15%        |
| Administration Expenses  | $ 3,567,143       | $                 | 13%        |
| Other Expenses           | $ 6,857,538       | $                 | 6%         |
| **Totals**               | **$66,208,933**   | **$47,020,440**   |            |

ULC received more than $45 million of the bond proceeds which were allocated for Construction purposes. This equates to approximately 18.5% of the total funds allocated for Construction and 90% of the constructions costs associated with design, planning, engineering and management.

In addition to the receipt of approximately $47 million of bond proceeds, additional funds were paid to ULC directly by Beaumont for a variety of purposes including for service as city officials; for the management of the Wastewater Treatment Plant; and for services rendered for various capital improvement projects. The total amount of funds paid by Beaumont to ULC was approximately $42.3 million. In summary, the total amount received by ULC from both bond proceeds and payments directly by Beaumont totals approximately $89.3 million

ULC and its principals were initially hired by the City pursuant to an Agreement for Planning and Economic Development Services dated March 22, 1993. This agreement specified several broad categories of services for which ULC would be compensated. For Planning Services (Category I) and Economic Development Services (Category II), ULC was to be paid a lump sum monthly fee of $10,000. The agreement specified that the ULC principals maintain an office

5:20-CV-02164- GW (KKX)

**EXHIBIT 21**
**PAGE 1298**

1   presence at City Hall for 28 hours per week. The agreement further identified an

2   additional category called "Additional Services" for which ULC was to be

3   compensated in accordance with the hourly rate schedule included as Exhibit A to

4   the agreement. The Exhibit A states that ULC would be entitled to reimbursements

5   of Professional Sub-Consultant Services at "Actual Cost plus 15%"

6       Shortly following the above agreement, another agreement was entered into

7   between Beaumont and ULC. This agreement dated September 27, 1993, was titled

8   Agreement for Planning, Economic Development and Public Works Services. This

9   agreement was very similar to the initial agreement in that it sets forth the scope of

10   the duties of the principals of ULC in their capacities as officials for the City,

11   including the requirement to spend 28 hours per week working at City Hall. For

12   their services as public officials, ULC was paid $15,000 per month (an increase of

13   $5,000 per month from the prior agreement.) In addition, ULC was to provide

14   Public Works and Engineering Services as detailed in the agreement. For these

15   services, ULC was to be paid "on a time and materials basis <u>not exceeding four and</u>

16   <u>one half percent</u> (4.5%) of the confirmed construction cost of the public

17   improvements to be constructed." The agreement also has an additional scope of

18   work section called Additional Services. For these services, ULC was to be

19   compensated in accordance with the hourly rate schedule included as Exhibit A to

20   the agreement. The Exhibit A states that ULC would be entitled to reimbursements

21   of Professional Sub-Consultant Services at "Actual Cost plus 15%"

22       There was an amendment to the above-agreement with ULC in a document

23   dated April 11, 1994. In this amendment the language relating to the compensation

24   to be paid to ULC for Public Works Construction Management was modified

25   slightly. The language in this agreement states, "...compensation shall be on a time

26   and materials basis <u>not exceeding four and one half percent</u> (4.5%) of the bid price

27   awarded by the City for each project."

28

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

**EXHIBIT 21**
**PAGE 1299**

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

As noted above, ULC was paid from both bond funds and directly by the City. To obtain these funds, ULC issued separate invoices on a monthly basis to both the bond trustee and to Beaumont. In these invoices, ULC would list out various categories of professionals who provided services that month, along with the number of hours expended by each professional category. Examples of the professional categories include:

· Principal

· Construction Manager

· Surveyor

· One Man Crew

· Two Man Crew

· Office Manager

· Executive Secretary

The agreement between ULC and the City states that ULC shall be paid on a time and materials basis, and the invoices submitted by ULC purport to identify the hours expended by various professionals during the period covered by the invoice.

ULC, by and through Egger, Dillon, and Moorjani, falsified these invoices and overbilled the City by approximately 26,647 hours that were not actually worked in a single calendar year. This represents an overbilling of approximately $4,000,000 in a single calendar year. Similar overbillings occurred in other years.

Additionally, hours worked by third party vendors were included in the time and billing records of ULC, and then included in the invoices issued by ULC. The ULC principals applied extraordinary markups to these third party invoices. These markups on occasion exceeded 300%.

The agreement between Beaumont and ULC previously discussed in this response anticipated the submission and repayment of invoices paid by ULC, and allows for a markup of 15%.

5:20-CV-02164- GW (KKX)

**EXHIBIT 21**
**PAGE 1300**

1    The profits achieved by ULC as a result of the extraordinary markups on the

2    third party invoices has resulted in millions of illicit dollars in profits to ULC,

3    Egger, Dillon, and Moorjani, at the expense of the City.

4    Without information solely in the possession of the Egger, Dillon, Moorjani,

5    and Kapanicas (and a detailed and complicated analysis of the same), no third party

6    or "outsider" to the cabal of Kapanicas, Egger, Dillon, and Moorjani could have

7    reconciled these issues and discovered this illicit profit. This is all the more true in

8    that these parties were able to use their positions with the City to approve the

9    aforementioned invoices.

10    While not exhaustive, several examples of the markup and inflated charges

11    follows:

12    In June 2011, Satori R.E. Solutions, Inc. sent invoice number 5, dated June 1,

13    20111, to ULC for services rendered during the month of May 2011. This invoice

14    was for 185.42 hours of work at $40 per hour, for a total invoice amount of

15    $7,416.80.

16    On its May 2011 time and billing worksheet submitted to the City, ULC

17    listed under the Sundance Project 185.50 hours for Lana Guseva (the CEO and

18    Secretary of Satori Real Estate Solutions, Inc.) for a total of $31,535, which equates

19    to an hourly rate of $170, or $130 greater than what was charged to ULC.

20    In March 2011, Giroux & Associates sent invoice number 10-049-URB05,

21    dated March 24, 2011, to ULC for services rendered during the month of March

22    2011. This invoice was for 10, 20, and 14 hours for the work of a Senior Scientist,

23    Associate Planner, and Technician, respectively. The services were billed at rates of

24    $120, $75, and $40 per hour, for total charges excluding travel of $3,260

25    On its March 2011 time and billing worksheet ULC listed under the Waste

26    Water Treatment Plant Expansion Project 20 hours for an Associate Engineer,

27    which agrees to the 20 hours for the Associate Planner noted above. ULC listed 14

28    hours for a CADD Technician, which agrees to the 14 hours for a Technician noted

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

above. Lastly, ULC listed 42 hours for a Project Manager / Sr. Engineer, which reconciles with the 10 hours for the Senior Scientist noted above after adding in 32 hours of the Director of Environmental Services charged to ULC in the same period by EARSI. For these various services, ULC charged the City of Beaumont a total of $10,900. The total charges incurred by ULC for these services amounted to just $6,620, which indicates the services were marked up by $4,280, or an increase of 65% when examined in the aggregate.

In July 2011, Eric Lewis sent invoice number 84, dated July 24, 2011, to ULC for services rendered during the months of June and July 2011. This invoice was for 19 hours of professional traffic engineering services. The services were billed at a rate of $75 per hour, for total charges of $1,425.

On its July 2011 time and billing worksheet, ULC listed under City Wide Traffic Surveys 19 hours for Eric Lewis, which agreed to the invoice noted in the previous paragraph. For these various services, ULC charged the City of Beaumont a total of $3,230 or $170 per hour. The total charges incurred by ULC for these services was just $1,425, which indicates the services were marked up by $1,805, or an increase of 126.67%.

Many additional examples exist, an exhaustive analysis of which would constitute an expert opinion.

As previously discussed in this report, the agreement between Beaumont and ULC put a cap on the amount of fees that ULC could receive for work performed on public works construction projects. The amount of funds received by ULC, Egger, Dillon, and Moorjani from the bond proceeds and the City related to capital improvement projects far exceed this 4.5% cap. Overall, ULC, Egger, Dillon, and Moorjani overbilled the City for tens of millions of dollars, the precise amount of which has not yet been fully calculated (and additional third party discovery may be necessary to complete this analysis), but which far exceeds any applicable policy limit(s).

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1302

1   This overbilling was only able to be accomplished because of the positions at

2   the City held by Egger, Kapanicas, Dillon, and Moorjani.

3   In the early 1990s, the City hired Ernest Egger – an owner and principal of

4   ULC – to manage the planning of the City. Egger served as Planning Director of

5   Beaumont. He had day to day control of department, overseeing staff and reporting

6   directly to the City Manager Kapanicas.

7   Together, Kapanicas, Dillon, Egger, and Moorjani had almost total control

8   over the City of Beaumont. Dillon was the Planning Director of the City, Egger was

9   the Community and Economic Development Director, and Moorjani was the

10   Director of Public Works. These individuals were all members of the Kapanicas

11   Administration, and exercised substantial control over their respective departments.

12   As Department head officials and directors, these individuals were empowered with

13   broad authority under the Code. The Director of Public Works was empowered to

14   "administer, implement and enforce" the provisions of various ordinances and

15   Chapters of the Code and grant or deny development permits. The Director of

16   Planning was similarly empowered to administer various ordinances, including the

17   City zoning ordinance, and was empowered to "interpret the intent" of provisions

18   within the code. Critically, as Department Heads, these individuals were able to

19   sign off on bond requisition forms, _including bond requisition forms for payment to_

20   _ULC_.  Deepak Moorjani, in particular, had a broad range of powers and

21   responsibilities as Director of Public Works, including:

22   •   Maintain a presence at City hall for 24 hours weekly

23   •   Administer public works and engineering services including

24   supervision of Public Works Department personnel and day to day operations of the

25   Public Works Department as directed by the City Manager

26   •   Direct maintenance and operation activities of the City's Public Works

27   Department including those related to streets, public utilities, water, wastewater,

28

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

**EXHIBIT 21**
**PAGE 1303**

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

1  reclaimed water and storm drain systems; motorized and non-motorized equipment;
2  and routine contract administration

3  • Direct the Public Works Department design engineering, capital
4  improvement projects (CIP), traffic engineering, construction inspection and
5  material testing, surveying, construction management services and plan checking
6  services

7  • Attend public meeting; assist the City Manager in preparation and
8  maintenance of budgets; and provide leadership and motivation to all employees of
9  the Public Works Department

10  • Review the plans prepared by civil engineers and other appropriate
11  professionals on behalf of the City or private development interests for compliance
12  with the ordinances of the City. Arrange reviews by other appropriate agencies
13  having jurisdiction in such matters relative to the enforcement of relevant codes and
14  compliance with UBC (Uniform Building Code, 1991) and Caltrans. Only when
15  satisfied that all conditions of approval and the appropriate requirements of the
16  City's codes and other relevant codes and standards have been met, the Public
17  Works Director shall approve or recommend approval of plans as relevant.

18  • Provide inspection services during all phases of construction to enforce
19  compliance with codes and conditions of approval, provisions of the City
20  ordinances, Uniform Building Code (1991) and other requirements set forth on the
21  plans for which permits were issued for construction. In the performance of such
22  duties, ULC shall provide inspection for each project during and after completion of
23  various stages of construction to confirm compliance with approved plans.

24  • Provide construction  management services during all phases of public
25  works construction to enforce compliance with codes and conditions of approval,
26  provisions of the City ordinances, Uniform Building code (1991) and other
27  requirements set forth on the plan and specification for which permits are issued for
28  construction. In the performance of such duties, ULC shall provide construction

1  management for each public works project before, during and after completion of

2  various stages of construction.

3      Moorjani, in conjunction with the other members of the Kapanicas

4  administration, was able to exercise these and other powers to prevent any party not

5  a part of their cabal from discovering, among other things, their own gross

6  overbilling.

7      The City contends that the course of conduct described above constitutes

8  "dishonesty," as the term is commonly understood. The submission of invoices for

9  payment which Moorjani was not entitled to represents a false assertion of fact –

10  e.g., that ULC had performed the work indicated on the invoices and was in fact

11  entitled to payment for the same under the terms of his agreement with the City.

12  The approval of these invoices would also constitutes dishonesty, in that one of the

13  principal's approval of these invoices would represent a false statement of fact –

14  that ULC was entitled to the payment represented on the invoice.

15      The City notes that this response is only based on information currently

16  available to it, and may not be exhaustive. This lawsuit is in its earliest stages, and

17  the City had not yet taken any depositions or conducted any thirty party discovery,

18  nor has it completed its analysis of the documents and information it presently

19  possesses.

20      The City further notes that it tendered this claim to National Union years ago,

21  and National Union thereafter had a duty to investigate this claim and seek evidence

22  *supporting* coverage.  CACI 2332; *Egan v. Mut. of Omaha Ins. Co.* 24 Cal.3d 809,

23  819 (1979); *Wilson v. 21st Century Ins. Co.*, 42 Cal.4th 713, 720-21 (2007);

24  *Mariscal v. Old Republic Life Ins. Co.*, 42 Cal.App.4th 1617, 1620 (1996). To the

25  City's knowledge, National Union has conducted no investigation whatsoever

26  seeking information that could support the City's claim (e.g., by contacting or

27  seeking information from any party besides the City), and has instead sought only

28  information from the City that would tend to establish that any losses the City has

Best Best & Krieger LLP
Attorneys at Law
1800 Von Karman Avenue, Suite 1000
Irvine, California 92612

- 43 -

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1305

suffered do not fall within the scope of an insuring provision, or fall within an exclusion. The City therefore further responds to interrogatory that additional responsive information may be in the possession, custody, or control of third parties including Egger, Dillon, Kapanicas, ULC, the Federal Bureau of Investigation, the Riverside County District Attorney's office, and former employees and officials of the City of Beaumont, to the extent such information has not been lost, destroyed, or forgotten during the years in which National Union has declined to investigate possible grounds for coverage.

**(5) Does the City contend that Alan Kapanicas committed any act or omission that constitutes "Faithless Performance," and if so, state the factual basis for this contention and describe any loss suffered by the City as a result of this Faithless Performance, including the amount of such loss and how the loss was computed.**

This interrogatory by its plain terms seems to be unlimited in time and scope, and inquires as to whether the City contends that this individual has *ever* engaged in any conduct that constitutes "faithless performance." However, the City interprets the qualifier "to the extent supporting the Complaint" to cabin this interrogatory to inquiring as to whether the City contends that any of the conduct the Complaint alleges that this individual engaged in constitutes "faithless performance." The City will answer this interrogatory based on its understanding that this was the intended scope of the interrogatory.

To the extent Defendant in fact intended to inquire whether the City believes that Alan Kapanicas has *ever* engaged in conduct that constitutes "faithless performance," the City objects on the grounds that a broad ranging and temporally unlimited inquiry into whether Kapanicas has ever engaged in conduct that constitutes "faithless performance" has no or extremely limited relevance to any party's claims or defenses, and would be grossly disproportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1306

controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Based on this objection, the City will only respond to this interrogatory to the extent it inquires as to whether the City contends that any of the conduct the Complaint alleges that Kapanicas engaged in constitutes "faithless performance."

Definition No. 19 of this set of interrogatories defined "Faithless Performance" to mean "failure to faithfully perform duties prescribed by law." The City notes that this definition is meaningfully different than the definition of the conduct described in Endorsement No. 4 ("Faithful Performance of Duty Coverage") to the 2014 Policy and the 2015 Policy, but the City will respond to the interrogatory based on the definitions provided.

The City objects on the basis that this request seeks the premature disclosure of expert witness information which is not discoverable at this time. The City does not object to stating facts that may form the basis for an expert opinion and will state such facts to the extent responsive to this interrogatory.

Alan Kapanicas held a number of positions with the City, including City Manager, Executive Director of Beaumont Financing Authority, CFD, Disclosure Consultant, and Special Tax Consultant. During the time frame that Alan Kapanicas exercised pervasive control over the City of Beaumont, he, along with a cabal of other individual including the principals of ULC, worked together to deprive the City of a substantial amount of money.

ULC was formed initially by Egger and Dillon in late 1993, and Moorjani was subsequently added as a principal later that year. As will be further detailed below, ULC entered into a series of contracts with Beaumont to provide consulting services in connection with a large number of capital improvement projects being undertaken by the City and funded by the sale of bonds.

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1307

Commencing in 1993, various bond issues were sold with a total face value of approximately $367,240,000. Of this amount, approximately $267,004,166 was expended for a variety of purpose.

These include the following:

| Bond Proceeds Usage | Amount |
|---|---|
| Construction – Design / Planning / Engineering / Mgmnt | $ 50,649,268 |
| Construction – 3rd Parties / Developers / Beaumont / Etc. | $193,948,343 |
| Cost of Issuance | $     5,134,984 |
| Underwriters Discount – Cost of Issuance | $     6,846,890 |
| Administration Expenses | $     3,567,143 |
| BFA Expenses | $     6,857,538 |
|  |  |
| **Total** | **$267,004,166** |

In their capacities as City officials, Dillon, Egger and Moorjani were instrumental in the formation of a Community Facilities District ("CFD") for the stated purpose of raising funds to finance capital improvement projects in Beaumont. Each time a bond issue was approved by the City, a portion of the bond proceeds were thereafter paid over to ULC for consulting services. The identified purposes and amounts of bond funds paid to ULC included the following:

|  | Total Expenditure | Total Amt. to ULC | Percentage |
|---|---|---|---|
| Construction Design, Etc. | $50,649,268 | $45,391,831 | 90% |
| Cost of Issuance | $ 5,134,984 | $ | 15% |
| Administration Expenses | $ 3,567,143 | $ | 13% |
| Other Expenses | $ 6,857,538 | $ | 6% |
| **Totals** | **$66,208,933** | **$47,020,440** |  |

ULC received more than $45 million of the bond proceeds which were allocated for Construction purposes. This equates to approximately 18.5% of the total funds allocated for Construction and 90% of the constructions costs associated with design, planning, engineering and management.

In addition to the receipt of approximately $47 million of bond proceeds, additional funds were paid to ULC directly by Beaumont for a variety of purposes including for service as city officials; for the management of the Wastewater Treatment Plant; and for services rendered for various capital improvement

- 46 -

5:20-CV-02164- GW (KKX)

**EXHIBIT 21**

**PAGE 1308**

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

1  projects. The total amount of funds paid by Beaumont to ULC was approximately

2  $42.3 million. In summary, the total amount received by ULC from both bond

3  proceeds and payments directly by Beaumont totals approximately $89.3 million

4      ULC and its principals were initially hired by the City pursuant to an

5  Agreement for Planning and Economic Development Services dated March 22,

6  1993. This agreement specified several broad categories of services for which ULC

7  would be compensated. For Planning Services (Category I) and Economic

8  Development Services (Category II), ULC was to be paid a lump sum monthly fee

9  of $10,000. The agreement specified that the ULC principals maintain an office

10 presence at City Hall for 28 hours per week. The agreement further identified an

11 additional category called "Additional Services" for which ULC was to be

12 compensated in accordance with the hourly rate schedule included as Exhibit A to

13 the agreement. The Exhibit A states that ULC would be entitled to reimbursements

14 of Professional Sub-Consultant Services at "Actual Cost plus 15%"

15     Shortly following the above agreement, another agreement was entered into

16 between Beaumont and ULC. This agreement dated September 27, 1993, was titled

17 Agreement for Planning, Economic Development and Public Works Services. This

18 agreement was very similar to the initial agreement in that it sets forth the scope of

19 the duties of the principals of ULC in their capacities as officials for the City,

20 including the requirement to spend 28 hours per week working at City Hall. For

21 their services as public officials, ULC was paid $15,000 per month (an increase of

22 $5,000 per month from the prior agreement.) In addition, ULC was to provide

23 Public Works and Engineering Services as detailed in the agreement. For these

24 services, ULC was to be paid "on a time and materials basis <u>not exceeding four and</u>

25 <u>one half percent</u> (4.5%) of the confirmed construction cost of the public

26 improvements to be constructed." The agreement also has an additional scope of

27 work section called Additional Services. For these services, ULC was to be

28 compensated in accordance with the hourly rate schedule included as Exhibit A to

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1309

the agreement. The Exhibit A states that ULC would be entitled to reimbursements of Professional Sub-Consultant Services at "Actual Cost plus 15%"

There was an amendment to the above-agreement with ULC in a document dated April 11, 1994. In this amendment the language relating to the compensation to be paid to ULC for Public Works Construction Management was modified slightly. The language in this agreement states, "...compensation shall be on a time and materials basis <u>not exceeding four and one half percent</u> (4.5%) of the bid price awarded by the City for each project."

As noted above, ULC was paid from both bond funds and directly by the City. To obtain these funds, ULC issued separate invoices on a monthly basis to both the bond trustee and to Beaumont. In these invoices, ULC would list out various categories of professionals who provided services that month, along with the number of hours expended by each professional category. Examples of the professional categories include:

- · Principal
- · Construction Manager
- · Surveyor
- · One Man Crew
- · Two Man Crew
- · Office Manager
- · Executive Secretary

The agreement between ULC and the City states that ULC shall be paid on a time and materials basis, and the invoices submitted by ULC purport to identify the hours expended by various professionals during the period covered by the invoice.

ULC, by and through Egger, Dillon, and Moorjani, falsified these invoices and overbilled the City by approximately 26,647 hours that were not actually worked in a single calendar year. This represents an overbilling of approximately $4,000,000 in a single calendar year. Similar overbillings occurred in other years.

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1310

1   Additionally, hours worked by third party vendors were included in the time

2   and billing records of ULC, and then included in the invoices issued by ULC. The

3   ULC principals applied extraordinary markups to these third party invoices. These

4   markups on occasion exceeded 300%.

5   The agreement between Beaumont and ULC previously discussed in this

6   response anticipated the submission and repayment of invoices paid by ULC, and

7   allows for a markup of 15%.

8   The profits achieved by ULC as a result of the extraordinary markups on the

9   third party invoices has resulted in millions of illicit dollars in profits to ULC,

10  Egger, Dillon, and Moorjani, at the expense of the City.

11  Without information solely in the possession of the Egger, Dillon, Moorjani,

12  and Kapanicas (and a detailed and complicated analysis of the same), no third party

13  or "outsider" to the cabal of the Kapanicas administration could have reconciled

14  these issues and discovered this illicit profit. This is all the more true in that these

15  parties were able to use their positions with the City to approve the aforementioned

16  invoices.

17  While not exhaustive, several examples of the markup and inflated charges

18  follows:

19  In June 2011, Satori R.E. Solutions, Inc. sent invoice number 5, dated June 1,

20  20111, to ULC for services rendered during the month of May 2011. This invoice

21  was for 185.42 hours of work at $40 per hour, for a total invoice amount of

22  $7,416.80.

23  On its May 2011 time and billing worksheet submitted to the City, ULC

24  listed under the Sundance Project 185.50 hours for Lana Guseva (the CEO and

25  Secretary of Satori Real Estate Solutions, Inc.) for a total of $31,535, which equates

26  to an hourly rate of $170, or $130 greater than what was charged to ULC.

27  In March 2011, Giroux & Associates sent invoice number 10-049-URB05,

28  dated March 24, 2011, to ULC for services rendered during the month of March

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

**EXHIBIT 21**
**PAGE 1311**

2011. This invoice was for 10, 20, and 14 hours for the work of a Senior Scientist, Associate Planner, and Technician, respectively. The services were billed at rates of $120, $75, and $40 per hour, for total charges excluding travel of $3,260

On its March 2011 time and billing worksheet ULC listed under the Waste Water Treatment Plant Expansion Project 20 hours for an Associate Engineer, which agrees to the 20 hours for the Associate Planner noted above. ULC listed 14 hours for a CADD Technician, which agrees to the 14 hours for a Technician noted above. Lastly, ULC listed 42 hours for a Project Manager / Sr. Engineer, which reconciles with the 10 hours for the Senior Scientist noted above after adding in 32 hours of the Director of Environmental Services charged to ULC in the same period by EARSI. For these various services, ULC charged the City of Beaumont a total of $10,900. The total charges incurred by ULC for these services amounted to just $6,620, which indicates the services were marked up by $4,280, or an increase of 65% when examined in the aggregate.

In July 2011, Eric Lewis sent invoice number 84, dated July 24, 2011, to ULC for services rendered during the months of June and July 2011. This invoice was for 19 hours of professional traffic engineering services. The services were billed at a rate of $75 per hour, for total charges of $1,425.

On its July 2011 time and billing worksheet, ULC listed under City Wide Traffic Surveys 19 hours for Eric Lewis, which agreed to the invoice noted in the previous paragraph. For these various services, ULC charged the City of Beaumont a total of $3,230 or $170 per hour. The total charges incurred by ULC for these services was just $1,425, which indicates the services were marked up by $1,805, or an increase of 126.67%.

Many additional examples exist, an exhaustive analysis of which would constitute an expert opinion.

As previously discussed in this response, the agreement between Beaumont and ULC put a cap on the amount of fees that ULC could receive for work

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

1   performed on public works construction projects. The amount of funds received by

2   ULC, Egger, Dillon, and Moorjani from the bond proceeds and the City related to

3   capital improvement projects far exceed this 4.5% cap. Overall, ULC, Egger,

4   Dillon, and Moorjani overbilled the City for tens of millions of dollars, the precise

5   amount of which has not yet been fully calculated (and additional third party

6   discovery may be necessary to complete this analysis), but which far exceeds any

7   applicable policy limit(s).

8        This overbilling was only able to be accomplished because of the positions at

9   the City held by Egger, Kapanicas, Dillon, and Moorjani.

10       The City initially hired Alan Kapanicas in July 1993 through his Company

11   BSI Consultants, Inc. ("BSI"), and later through his company General Government

12   Management Services, Inc. ("GGMS") to perform the role of City Manager. In his

13   role as City Manager, Kapanicas authorized payments by the City to a variety of

14   vendors and third parties.

15       Alan Kapanicas, as City Manager and in his other capacities with the City,

16   had enormous and pervasive power over the day to day functioning of the City of

17   Beaumont.  Kapanicas was the "administrative head of the City Government" and

18   had broad power to appoint, demote, or remove any city employee or officer

19   besides the City Clerk, City Treasurer, City Attorney, and members of the Planning

20   Commission. He had "Control over all departments of the City government." This

21   control was exclusive – under the Beaumont Municipal Code, the City Council

22   could not directly give orders to or "deal with" any subordinate of the City

23   Manager. Kapanicas appointed officials on behalf of the City, entered into contracts

24   the name of the City, and directly controlled numerous departments and division

25   within the City. *See* Beaumont Municipal Code section 2.12 *et seq*. In additional to

26   his role as City Manager, Kapanicas was the designated labor negotiator, Personnel

27   Director, Financial Officer for City Investments, and provided services related to

28   bond issuances.

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
1810 IOWA KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

- 51 -

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1313

1    Kapanicas, in conjunction with the other members of the Kapanicas

2    administration, were able to exercise these and other powers to prevent any party

3    not a part of their cabal from discovering, among other things, the above described

4    gross overbilling.

5    The City contends that the course of conduct described above and other acts

6    and omissions of Kapanicas constitutes "faithless performance," in that state law

7    and the City of Beaumont municipal code imposed on all City officials and

8    employees, and Alan Kapanicas in particular as City Manager, a duty to prevent

9    and not participate in the course of conduct described above.

10    The City notes that this response is only based on information currently

11    available to it, and may not be exhaustive. This lawsuit is in its earliest stages, and

12    the City had not yet taken any depositions or conducted any thirty party discovery,

13    nor has it completed its analysis of the documents and information it presently

14    possesses.

15    The City further notes that it tendered this claim to National Union years ago,

16    and National Union thereafter had a duty to investigate this claim and seek evidence

17    *supporting* coverage.  CACI 2332; *Egan v. Mut. of Omaha Ins. Co.* 24 Cal.3d 809,

18    819 (1979); *Wilson v. 21st Century Ins. Co.*, 42 Cal.4th 713, 720-21 (2007);

19    *Mariscal v. Old Republic Life Ins. Co.*, 42 Cal.App.4th 1617, 1620 (1996). To the

20    City's knowledge, National Union has conducted no investigation whatsoever

21    seeking information that could support the City's claim (e.g., by contacting or

22    seeking information from any party besides the City), and has instead sought only

23    information from the City that would tend to establish that any losses the City has

24    suffered do not fall within the scope of an insuring provision, or fall within an

25    exclusion. The City therefore further responds to interrogatory that additional

26    responsive information may be in the possession, custody, or control of third parties

27    including Egger, Dillon, Kapanicas, ULC, the Federal Bureau of Investigation, the

28    Riverside County District Attorney's office, and former employees and officials of

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

the City of Beaumont, to the extent such information has not been lost, destroyed, or forgotten during the years in which National Union has declined to investigate possible grounds for coverage

**(6) Does the City contend that Ernest Egger committed any act or omission that constitutes "Faithless Performance," and if so, state the factual basis for this contention and describe any loss suffered by the City as a result of this Faithless Performance, including the amount of such loss and how the loss was computed;**

This interrogatory by its plain terms seems to be unlimited in time and scope, and inquires as to whether the City contends that this individual has ever engaged in any conduct that constitutes "faithless performance." However, the City interprets the qualifier "to the extent supporting the Complaint" to cabin this interrogatory to inquiring as to whether the City contends that any of the conduct the Complaint alleges that this individual engaged in constitutes "faithless performance." The City will answer this interrogatory based on its understanding that this was the intended scope of the interrogatory.

To the extent Defendant in fact intended to inquire whether the City believes that Ernest Egger has ever engaged in conduct that constitutes "faithless performance," the City objects on the grounds that a broad ranging and temporally unlimited inquiry into whether Egger has ever engaged in conduct that constitutes "faithless performance" has no or extremely limited relevance to any party's claims or defenses, and would be grossly disproportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Based on this objection, the City will only respond to this interrogatory to the extent it inquires as to whether the City contends that any of the conduct the Complaint

5:20-CV-02164- GW (KKX)

**EXHIBIT 21**
**PAGE 1315**

alleges that Egger engaged in constitutes "faithless performance."

Definition No. 19 of this set of interrogatories defined "Faithless Performance" to mean "failure to faithfully perform duties prescribed by law." The City notes that this definition is meaningfully different than the definition of the conduct described in Endorsement No. 4 ("Faithful Performance of Duty Coverage") to the 2014 Policy and the 2015 Policy, but the City will respond to the interrogatory based on the definitions provided.

The City objects on the basis that this request seeks the premature disclosure of expert witness information which is not discoverable at this time. The City does not object to stating facts that may form the basis for an expert opinion and will state such facts to the extent responsive to this interrogatory

Ernest Egger, in his role as a City Official and as a principle in ULC, engaged in a variety of dishonest acts with caused substantial losses to the City.

ULC was formed initially by Egger and Dillon in late 1993, and Moorjani was subsequently added as a principal later that year. As will be further detailed below, ULC entered into a series of contracts with Beaumont to provide consulting services in connection with a large number of capital improvement projects being undertaken by the City and funded by the sale of bonds.

Commencing in 1993, various bond issues were sold with a total face value of approximately $367,240,000. Of this amount, approximately $267,004,166 was expended for a variety of purpose.

These include the following:

| Bond Proceeds Usage | Amount |
|---|---|
| Construction – Design / Planning / Engineering / Mgmnt | $ 50,649,268 |
| Construction – 3rd Parties / Developers / Beaumont / Etc. | $193,948,343 |
| Cost of Issuance | $    5,134,984 |
| Underwriters Discount – Cost of Issuance | $    6,846,890 |
| Administration Expenses | $    3,567,143 |
| BFA Expenses | $    6,857,538 |
|  |  |
| **Total** | **$267,004,166** |

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

- 54 -

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1316

In their capacities as City officials, Dillon, Egger and Moorjani were instrumental in the formation of a Community Facilities District ("CFD") for the stated purpose of raising funds to finance capital improvement projects in Beaumont. Each time a bond issue was approved by the City, a portion of the bond proceeds were thereafter paid over to ULC for consulting services. The identified purposes and amounts of bond funds paid to ULC included the following:

|  | Total Expenditure | Total Amt. to ULC | Percentage |
|---|---|---|---|
| Construction Design, Etc. | $50,649,268 | $45,391,831 | 90% |
| Cost of Issuance | $ 5,134,984 | $ | 15% |
| Administration Expenses | $ 3,567,143 | $ | 13% |
| Other Expenses | $ 6,857,538 | $ | 6% |
| **Totals** | **$66,208,933** | **$47,020,440** |  |

ULC received more than $45 million of the bond proceeds which were allocated for Construction purposes. This equates to approximately 18.5% of the total funds allocated for Construction and 90% of the constructions costs associated with design, planning, engineering and management.

In addition to the receipt of approximately $47 million of bond proceeds, additional funds were paid to ULC directly by Beaumont for a variety of purposes including for service as city officials; for the management of the Wastewater Treatment Plant; and for services rendered for various capital improvement projects. The total amount of funds paid by Beaumont to ULC was approximately $42.3 million. In summary, the total amount received by ULC from both bond proceeds and payments directly by Beaumont totals approximately $89.3 million

ULC and its principals were initially hired by the City pursuant to an Agreement for Planning and Economic Development Services dated March 22, 1993. This agreement specified several broad categories of services for which ULC would be compensated. For Planning Services (Category I) and Economic Development Services (Category II), ULC was to be paid a lump sum monthly fee of $10,000. The agreement specified that the ULC principals maintain an office

Best Best & Krieger LLP
Attorneys at Law
18101 Von Karman Avenue, Suite 1000
Irvine, California 92612

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1317

presence at City Hall for 28 hours per week. The agreement further identified an additional category called "Additional Services" for which ULC was to be compensated in accordance with the hourly rate schedule included as Exhibit A to the agreement. The Exhibit A states that ULC would be entitled to reimbursements of Professional Sub-Consultant Services at "Actual Cost plus 15%"

Shortly following the above agreement, another agreement was entered into between Beaumont and ULC. This agreement dated September 27, 1993, was titled Agreement for Planning, Economic Development and Public Works Services. This agreement was very similar to the initial agreement in that it sets forth the scope of the duties of the principals of ULC in their capacities as officials for the City, including the requirement to spend 28 hours per week working at City Hall. For their services as public officials, ULC was paid $15,000 per month (an increase of $5,000 per month from the prior agreement.) In addition, ULC was to provide Public Works and Engineering Services as detailed in the agreement. For these services, ULC was to be paid "on a time and materials basis not exceeding four and one half percent (4.5%) of the confirmed construction cost of the public improvements to be constructed." The agreement also has an additional scope of work section called Additional Services. For these services, ULC was to be compensated in accordance with the hourly rate schedule included as Exhibit A to the agreement. The Exhibit A states that ULC would be entitled to reimbursements of Professional Sub-Consultant Services at "Actual Cost plus 15%"

There was an amendment to the above-agreement with ULC in a document dated April 11, 1994. In this amendment the language relating to the compensation to be paid to ULC for Public Works Construction Management was modified slightly. The language in this agreement states, "...compensation shall be on a time and materials basis not exceeding four and one half percent (4.5%) of the bid price awarded by the City for each project."

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1318

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

1  As noted above, ULC was paid from both bond funds and directly by the
2  City. To obtain these funds, ULC issued separate invoices on a monthly basis to
3  both the bond trustee and to Beaumont. In these invoices, ULC would list out
4  various categories of professionals who provided services that month, along with
5  the number of hours expended by each professional category. Examples of the
6  professional categories include:

7  · Principal

8  · Construction Manager

9  · Surveyor

10  · One Man Crew

11  · Two Man Crew

12  · Office Manager

13  · Executive Secretary

14  The agreement between ULC and the City states that ULC shall be paid on a
15  time and materials basis, and the invoices submitted by ULC purport to identify the
16  hours expended by various professionals during the period covered by the invoice.

17  ULC, by and through Egger, Dillon, and Moorjani, falsified these invoices
18  and overbilled the City by approximately 26,647 hours that were not actually
19  worked in a single calendar year. This represents an overbilling of approximately
20  $4,000,000 in a single calendar year. Similar overbillings occurred in other years.

21  Additionally, hours worked by third party vendors were included in the time
22  and billing records of ULC, and then included in the invoices issued by ULC. The
23  ULC principals applied extraordinary markups to these third party invoices. These
24  markups on occasion exceeded 300%.

25  The agreement between Beaumont and ULC previously discussed in this
26  response anticipated the submission and repayment of invoices paid by ULC, and
27  allows for a markup of 15%.

28

- 57 -

5:20-CV-02164- GW (KKX)

**EXHIBIT 21**
**PAGE 1319**

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

1   The profits achieved by ULC as a result of the extraordinary markups on the
2   third party invoices has resulted in millions of illicit dollars in profits to ULC,
3   Egger, Dillon, and Moorjani, at the expense of the City.

4   Without information solely in the possession of the Egger, Dillon, Moorjani,
5   and Kapanicas (and a detailed and complicated analysis of the same), no third party
6   or "outsider" to the cabal of Kapanicas, Egger, Dillon, and Moorjani could have
7   reconciled these issues and discovered this illicit profit. This is all the more true in
8   that these parties were able to use their positions with the City to approve the
9   aforementioned invoices.

10   While not exhaustive, several examples of the markup and inflated charges
11   follows:

12   In June 2011, Satori R.E. Solutions, Inc. sent invoice number 5, dated June 1,
13   20111, to ULC for services rendered during the month of May 2011. This invoice
14   was for 185.42 hours of work at $40 per hour, for a total invoice amount of
15   $7,416.80.

16   On its May 2011 time and billing worksheet submitted to the City, ULC
17   listed under the Sundance Project 185.50 hours for Lana Guseva (the CEO and
18   Secretary of Satori Real Estate Solutions, Inc.) for a total of $31,535, which equates
19   to an hourly rate of $170, or $130 greater than what was charged to ULC.

20   In March 2011, Giroux & Associates sent invoice number 10-049-URB05,
21   dated March 24, 2011, to ULC for services rendered during the month of March
22   2011. This invoice was for 10, 20, and 14 hours for the work of a Senior Scientist,
23   Associate Planner, and Technician, respectively. The services were billed at rates of
24   $120, $75, and $40 per hour, for total charges excluding travel of $3,260

25   On its March 2011 time and billing worksheet ULC listed under the Waste
26   Water Treatment Plant Expansion Project 20 hours for an Associate Engineer,
27   which agrees to the 20 hours for the Associate Planner noted above. ULC listed 14
28   hours for a CADD Technician, which agrees to the 14 hours for a Technician noted

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1320

above. Lastly, ULC listed 42 hours for a Project Manager / Sr. Engineer, which reconciles with the 10 hours for the Senior Scientist noted above after adding in 32 hours of the Director of Environmental Services charged to ULC in the same period by EARSI. For these various services, ULC charged the City of Beaumont a total of $10,900. The total charges incurred by ULC for these services amounted to just $6,620, which indicates the services were marked up by $4,280, or an increase of 65% when examined in the aggregate.

In July 2011, Eric Lewis sent invoice number 84, dated July 24, 2011, to ULC for services rendered during the months of June and July 2011. This invoice was for 19 hours of professional traffic engineering services. The services were billed at a rate of $75 per hour, for total charges of $1,425.

On its July 2011 time and billing worksheet, ULC listed under City Wide Traffic Surveys 19 hours for Eric Lewis, which agreed to the invoice noted in the previous paragraph. For these various services, ULC charged the City of Beaumont a total of $3,230 or $170 per hour. The total charges incurred by ULC for these services was just $1,425, which indicates the services were marked up by $1,805, or an increase of 126.67%.

Many additional examples exist, an exhaustive analysis of which would constitute an expert opinion.

As previously discussed in this report, the agreement between Beaumont and ULC put a cap on the amount of fees that ULC could receive for work performed on public works construction projects. The amount of funds received by ULC, Egger, Dillon, and Moorjani from the bond proceeds and the City related to capital improvement projects far exceed this 4.5% capOverall, ULC, Egger, Dillon, and Moorjani overbilled the City for tens of millions of dollars, the precise amount of which has not yet been fully calculated (and additional third party discovery may be necessary to complete this analysis), but which far exceeds any applicable policy limit(s).

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
1810 IOWA KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

1    This overbilling was only able to be accomplished because of the positions at

2    the City held by Egger, Kapanicas, Dillon, and Moorjani.

3    In the early 1990s, the City hired Ernest Egger – an owner and principal of

4    ULC – to manage the planning of the City. Egger served as Planning Director of

5    Beaumont. He had day to day control of department, overseeing staff and reporting

6    directly to the City Manager Kapanicas.

7    Together, Kapanicas, Dillon, Egger, and Moorjani had almost total control

8    over the City of Beaumont. Dillon was the Planning Director of the City, Egger was

9    the Community and Economic Development Director, and Moorjani was the

10   Director of Public Works. These individuals were all members of the Kapanicas

11   Administration, and exercised substantial control over their respective departments.

12   As Department head officials and directors, these individuals were empowered with

13   broad authority under the Code. The Director of Public Works was empowered to

14   "administer, implement and enforce" the provisions of various ordinances and

15   Chapters of the Code and grant or deny development permits. The Director of

16   Planning was similarly empowered to administer various ordinances, including the

17   City zoning ordinance, and was empowered to "interpret the intent" of provisions

18   within the code. Critically, as Department Heads, these individuals were able to

19   sign off on bond requisition forms, *including* bond requisition forms for payment to

20   ULC.  Ernest Egger, in particular, had a broad range of powers and responsibilities

21   as Planning Director, including:

22   •    Establish working relationships and coordination with City Staff,

23   public agencies, County departments, utilities and service purveyors involved in

24   matters affecting the City.

25   •    Analyze and recommend planning programs consistent with the

26   economic capabilities of the City. When directed, prepare and administer identified

27   programs.

28

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

- 60 -

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1322

1      •     Direct and supervise the day to day functions and activities of the

2  Planning and Economic Development Department including all planning and

3  building functions and associate personnel

4      •     Attend necessary meetings with City Council members, Planning

5  Commissioners, City staff, public agencies, community groups, developers,

6  contractors and the general public

7      •     Provide recommendations regarding regulations and ordinances

8  pertaining to planning matters and coordinate with the City Attorney in preparation

9  of routine ordinances or amendment

10      •     Provide zoning and planning related information to citizens and

11  prospective applicants, conduct pre-submittal reviews, and assist individual in

12  coping with City processes.

13      •     Upgrade and maintain the City's base mapping and routine graphic

14  needs

15      •     Review, and as necessary adjust, the Planning Department's forms,

16  processes and operational procedures to improve its efficiency, function and

17  professional image, and bring the City's operations into the state-of-the-art,

18  comparable with similarly sized communities

19      •     Monitor and report on changes in State law, regional programs and

20  changes in environmental regulations and adjust City processes to conform to

21  statutory requirements

22      •     Maintain an office presence at City Hall for 28 hours weekly, with the

23  precise schedule of office hours determined through mutual agreement, with one of

24  ULC's professional planning principals in attendance during office hours.

25      •     Review proposed land development project, occupancies and business

26  licenses with planning implications and notify applicants relative to zoning

27  ordinance and General Plan compliance

28

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

1      •     Coordinate and correspond with applicants and process applications in

2 accordance with City codes and policy

3      •     Review and process routine projects in compliance with the

4 requirements of the California Environmental Quality  Act (CEQA) and the City's

5 guidelines for its implementations. Prepare initial studies and negative declarations

6 for routines projects.

7      •     Develop conditions of approval for routines projects consistent with

8 State law and good planning practices; City police and financing requirements;

9 health, safety and welfare considerations; and with respect to protecting and

10 maintaining neighborhood stability and quality of life in Beaumont.

11      •     Provide complete staffing to the Planning Commission and act in the

12 capacity of Planning Director/Secretary in the conduct of regularly scheduled

13 meetings

14      •     Provide professional presentations and recommendations to the

15 Planning Commission to guide appropriately informed decision making on

16 discretionary actions

17      •     Prepare clear, professional quality graphics and other presentation

18 materials to clarify planning issues and to convey a professional image to the public

19      •     Prepare staff reports, regulations and meeting minutes, with the use of

20 present City clerical support, for all Planning Commission meetings

21      •     Utilizing City clerical support, prepare all required notices, agenda

22 packets and other pertinent materials for Commission meetings

23      •     Prepare and maintain a Planning Commissioner's Handbook to

24 provide members with a useful reference guide on subjects including legal

25 requirements, conducting of meetings, findings, conflict of interest and

26 requirements of the Brown Act

27      Egger, in conjunction with the other members of the Kapanicas

28 administration, was able to exercise these and other powers to prevent any party not

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

**EXHIBIT 21**
**PAGE 1324**

1  a part of their cabal from discovering, among other things, their own gross

2  overbilling.

3  The City contends that the course of conduct described above and other acts

4  and omissions of Egger, constitutes "faithless performance," in that state law and

5  the City of Beaumont municipal code imposed on all City officials and employees,

6  and Egger in particular as Planning Director, a duty to prevent and not participate in

7  the course of conduct described above.

8  The City notes that this response is only based on information currently

9  available to it, and may not be exhaustive. This lawsuit is in its earliest stages, and

10  the City had not yet taken any depositions or conducted any thirty party discovery,

11  nor has it completed its analysis of the documents and information it presently

12  possesses.

13  The City further notes that it tendered this claim to National Union years ago,

14  and National Union thereafter had a duty to investigate this claim and seek evidence

15  *supporting* coverage.  CACI 2332; *Egan v. Mut. of Omaha Ins. Co.* 24 Cal.3d 809,

16  819 (1979); *Wilson v. 21st Century Ins. Co.*, 42 Cal.4th 713, 720-21 (2007);

17  *Mariscal v. Old Republic Life Ins. Co.*, 42 Cal.App.4th 1617, 1620 (1996). To the

18  City's knowledge, National Union has conducted no investigation whatsoever

19  seeking information that could support the City's claim (e.g., by contacting or

20  seeking information from any party besides the City), and has instead sought only

21  information from the City that would tend to establish that any losses the City has

22  suffered do not fall within the scope of an insuring provision, or fall within an

23  exclusion. The City therefore further responds to interrogatory that additional

24  responsive information may be in the possession, custody, or control of third parties

25  including Egger, Dillon, Kapanicas, ULC, the Federal Bureau of Investigation, the

26  Riverside County District Attorney's office, and former employees and officials of

27  the City of Beaumont, to the extent such information has not been lost, destroyed,

28

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

5:20-CV-02164- GW (KKX)

**EXHIBIT 21**
**PAGE 1325**

or forgotten during the years in which National Union has declined to investigate possible grounds for coverage.

**(7) Does the City contend that David Dillon committed any act or omission that constitutes "Faithless Performance," and if so, state the factual basis for this contention and describe any loss suffered by the City as a result of this Faithless Performance, including the amount of such loss and how the loss was computed**;

This interrogatory by its plain terms seems to be unlimited in time and scope, and inquires as to whether the City contends that this individual has ever engaged in any conduct that constitutes "faithless performance." However, the City interprets the qualifier "to the extent supporting the Complaint" to cabin this interrogatory to inquiring as to whether the City contends that any of the conduct the Complaint alleges that this individual engaged in constitutes "faithless performance." The City will answer this interrogatory based on its understanding that this was the intended scope of the interrogatory.

To the extent Defendant in fact intended to inquire whether the City believes that David Dillon has ever engaged in conduct that constitutes "faithless performance," the City objects on the grounds that a broad ranging and temporally unlimited inquiry into whether Dillon has ever engaged in conduct that constitutes "faithless performance" has no or extremely limited relevance to any party's claims or defenses, and would be grossly disproportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Based on this objection, the City will only respond to this interrogatory to the extent it inquires as to whether the City contends that any of the conduct the Complaint alleges that Dillon engaged in constitutes "faithless performance."

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

Definition No. 19 of this set of interrogatories defined "Faithless Performance" to mean "failure to faithfully perform duties prescribed by law." The City notes that this definition is meaningfully different than the definition of the conduct described in Endorsement No. 4 ("Faithful Performance of Duty Coverage") to the 2014 Policy and the 2015 Policy, but the City will respond to the interrogatory based on the definitions provided.

The City objects on the basis that this request seeks the premature disclosure of expert witness information which is not discoverable at this time. The City does not object to stating facts that may form the basis for an expert opinion and will state such facts to the extent responsive to this interrogatory

David Dillon, in his role as a City Official and as a principle in ULC, engaged in a variety of acts of faithless performance that caused substantial losses to the City.

ULC was formed initially by Egger and Dillon in late 1993, and Moorjani was subsequently added as a principal later that year. As will be further detailed below, ULC entered into a series of contracts with Beaumont to provide consulting services in connection with a large number of capital improvement projects being undertaken by the City and funded by the sale of bonds.

Commencing in 1993, various bond issues were sold with a total face value of approximately \$367,240,000. Of this amount, approximately \$267,004,166 was expended for a variety of purpose.

These include the following:

| Bond Proceeds Usage | Amount |
|---|---|
| Construction – Design / Planning / Engineering / Mgmnt | \$ 50,649,268 |
| Construction – 3rd Parties / Developers / Beaumont / Etc. | \$193,948,343 |
| Cost of Issuance | \$ 5,134,984 |
| Underwriters Discount – Cost of Issuance | \$ 6,846,890 |
| Administration Expenses | \$ 3,567,143 |
| BFA Expenses | \$ 6,857,538 |
| | |
| **Total** | **\$267,004,166** |

5:20-CV-02164- GW (KKX)

**EXHIBIT 21**

**PAGE 1327**

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

In their capacities as City officials, Dillon, Egger and Moorjani were instrumental in the formation of a Community Facilities District ("CFD") for the stated purpose of raising funds to finance capital improvement projects in Beaumont. Each time a bond issue was approved by the City, a portion of the bond proceeds were thereafter paid over to ULC for consulting services. The identified purposes and amounts of bond funds paid to ULC included the following:

|  | Total Expenditure | Total Amt. to ULC | Percentage |
|---|---|---|---|
| Construction Design, Etc. | $50,649,268 | $45,391,831 | 90% |
| Cost of Issuance | $ 5,134,984 | $ | 15% |
| Administration Expenses | $ 3,567,143 | $ | 13% |
| Other Expenses | $ 6,857,538 | $ | 6% |
| **Totals** | **$66,208,933** | **$47,020,440** | |

ULC received more than $45 million of the bond proceeds which were allocated for Construction purposes. This equates to approximately 18.5% of the total funds allocated for Construction and 90% of the constructions costs associated with design, planning, engineering and management.

In addition to the receipt of approximately $47 million of bond proceeds, additional funds were paid to ULC directly by Beaumont for a variety of purposes including for service as city officials; for the management of the Wastewater Treatment Plant; and for services rendered for various capital improvement projects. The total amount of funds paid by Beaumont to ULC was approximately $42.3 million. In summary, the total amount received by ULC from both bond proceeds and payments directly by Beaumont totals approximately $89.3 million

ULC and its principals were initially hired by the City pursuant to an Agreement for Planning and Economic Development Services dated March 22, 1993. This agreement specified several broad categories of services for which ULC would be compensated. For Planning Services (Category I) and Economic Development Services (Category II), ULC was to be paid a lump sum monthly fee of $10,000. The agreement specified that the ULC principals maintain an office

- 66 -

**EXHIBIT 21**
**PAGE 1328**

presence at City Hall for 28 hours per week. The agreement further identified an additional category called "Additional Services" for which ULC was to be compensated in accordance with the hourly rate schedule included as Exhibit A to the agreement. The Exhibit A states that ULC would be entitled to reimbursements of Professional Sub-Consultant Services at "Actual Cost plus 15%"

Shortly following the above agreement, another agreement was entered into between Beaumont and ULC. This agreement dated September 27, 1993, was titled Agreement for Planning, Economic Development and Public Works Services. This agreement was very similar to the initial agreement in that it sets forth the scope of the duties of the principals of ULC in their capacities as officials for the City, including the requirement to spend 28 hours per week working at City Hall. For their services as public officials, ULC was paid $15,000 per month (an increase of $5,000 per month from the prior agreement.) In addition, ULC was to provide Public Works and Engineering Services as detailed in the agreement. For these services, ULC was to be paid "on a time and materials basis not exceeding four and one half percent (4.5%) of the confirmed construction cost of the public improvements to be constructed." The agreement also has an additional scope of work section called Additional Services. For these services, ULC was to be compensated in accordance with the hourly rate schedule included as Exhibit A to the agreement. The Exhibit A states that ULC would be entitled to reimbursements of Professional Sub-Consultant Services at "Actual Cost plus 15%"

There was an amendment to the above-agreement with ULC in a document dated April 11, 1994. In this amendment the language relating to the compensation to be paid to ULC for Public Works Construction Management was modified slightly. The language in this agreement states, "...compensation shall be on a time and materials basis not exceeding four and one half percent (4.5%) of the bid price awarded by the City for each project."

5:20-CV-02164- GW (KKX)

**EXHIBIT 21**
**PAGE 1329**

As noted above, ULC was paid from both bond funds and directly by the City. To obtain these funds, ULC issued separate invoices on a monthly basis to both the bond trustee and to Beaumont. In these invoices, ULC would list out various categories of professionals who provided services that month, along with the number of hours expended by each professional category. Examples of the professional categories include:

- · Principal
- · Construction Manager
- · Surveyor
- · One Man Crew
- · Two Man Crew
- · Office Manager
- · Executive Secretary

The agreement between ULC and the City states that ULC shall be paid on a time and materials basis, and the invoices submitted by ULC purport to identify the hours expended by various professionals during the period covered by the invoice.

ULC, by and through Egger, Dillon, and Moorjani, falsified these invoices and overbilled the City by approximately 26,647 hours that were not actually worked in a single calendar year. This represents an overbilling of approximately $4,000,000 in a single calendar year. Similar overbillings occurred in other years.

Additionally, hours worked by third party vendors were included in the time and billing records of ULC, and then included in the invoices issued by ULC. The ULC principals applied extraordinary markups to these third party invoices. These markups on occasion exceeded 300%.

The agreement between Beaumont and ULC previously discussed in this response anticipated the submission and repayment of invoices paid by ULC, and allows for a markup of 15%.

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

- 68 -

**EXHIBIT 21**
**PAGE 1330**

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

1    The profits achieved by ULC as a result of the extraordinary markups on the

2    third party invoices has resulted in millions of illicit dollars in profits to ULC,

3    Egger, Dillon, and Moorjani, at the expense of the City.

4    Without information solely in the possession of the Egger, Dillon, Moorjani,

5    and Kapanicas (and a detailed and complicated analysis of the same), no third party

6    or "outsider" to the cabal of Kapanicas, Egger, Dillon, and Moorjani could have

7    reconciled these issues and discovered this illicit profit. This is all the more true in

8    that these parties were able to use their positions with the City to approve the

9    aforementioned invoices.

10    While not exhaustive, several examples of the markup and inflated charges

11    follows:

12    In June 2011, Satori R.E. Solutions, Inc. sent invoice number 5, dated June 1,

13    20111, to ULC for services rendered during the month of May 2011. This invoice

14    was for 185.42 hours of work at $40 per hour, for a total invoice amount of

15    $7,416.80.

16    On its May 2011 time and billing worksheet submitted to the City, ULC

17    listed under the Sundance Project 185.50 hours for Lana Guseva (the CEO and

18    Secretary of Satori Real Estate Solutions, Inc.) for a total of $31,535, which equates

19    to an hourly rate of $170, or $130 greater than what was charged to ULC.

20    In March 2011, Giroux & Associates sent invoice number 10-049-URB05,

21    dated March 24, 2011, to ULC for services rendered during the month of March

22    2011. This invoice was for 10, 20, and 14 hours for the work of a Senior Scientist,

23    Associate Planner, and Technician, respectively. The services were billed at rates of

24    $120, $75, and $40 per hour, for total charges excluding travel of $3,260

25    On its March 2011 time and billing worksheet ULC listed under the Waste

26    Water Treatment Plant Expansion Project 20 hours for an Associate Engineer,

27    which agrees to the 20 hours for the Associate Planner noted above. ULC listed 14

28    hours for a CADD Technician, which agrees to the 14 hours for a Technician noted

**EXHIBIT 21**
**PAGE 1331**

above. Lastly, ULC listed 42 hours for a Project Manager / Sr. Engineer, which reconciles with the 10 hours for the Senior Scientist noted above after adding in 32 hours of the Director of Environmental Services charged to ULC in the same period by EARSI. For these various services, ULC charged the City of Beaumont a total of $10,900. The total charges incurred by ULC for these services amounted to just $6,620, which indicates the services were marked up by $4,280, or an increase of 65% when examined in the aggregate.

In July 2011, Eric Lewis sent invoice number 84, dated July 24, 2011, to ULC for services rendered during the months of June and July 2011. This invoice was for 19 hours of professional traffic engineering services. The services were billed at a rate of $75 per hour, for total charges of $1,425.

On its July 2011 time and billing worksheet, ULC listed under City Wide Traffic Surveys 19 hours for Eric Lewis, which agreed to the invoice noted in the previous paragraph. For these various services, ULC charged the City of Beaumont a total of $3,230 or $170 per hour. The total charges incurred by ULC for these services was just $1,425, which indicates the services were marked up by $1,805, or an increase of 126.67%.

Many additional examples exist, an exhaustive analysis of which would constitute an expert opinion.

As previously discussed in this report, the agreement between Beaumont and ULC put a cap on the amount of fees that ULC could receive for work performed on public works construction projects. The amount of funds received by ULC, Egger, Dillon, and Moorjani from the bond proceeds and the City related to capital improvement projects far exceed this 4.5% cap. Overall, ULC, Egger, Dillon, and Moorjani overbilled the City for tens of millions of dollars, the precise amount of which has not yet been fully calculated (and additional third party discovery may be necessary to complete this analysis), but which far exceeds any applicable policy limit(s).

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1332

1   This overbilling was only able to be accomplished because of the positions at
2   the City held by Egger, Kapanicas, Dillon, and Moorjani.

3   Together, Kapanicas, Dillon, Egger, and Moorjani had almost total control
4   over the City of Beaumont. Dillon was the Planning Director of the City, Egger was
5   the Community and Economic Development Director, and Moorjani was the
6   Director of Public Works. These individuals were all members of the Kapanicas
7   Administration, and exercised substantial control over their respective departments.
8   As Department head officials and directors, these individuals were empowered with
9   broad authority under the Code. The Director of Public Works was empowered to
10  "administer, implement and enforce" the provisions of various ordinances and
11  Chapters of the Code and grant or deny development permits. The Director of
12  Planning was similarly empowered to administer various ordinances, including the
13  City zoning ordinance, and was empowered to "interpret the intent" of provisions
14  within the code. Critically, as Department Heads, these individuals were able to
15  sign off on bond requisition forms, _including_ bond requisition forms for payment to
16  ULC.  David Dillon, in particular, had a broad range of powers and responsibilities
17  as Director of Economic Development, including:

18      •      Monitor and report on on-going efforts involving public infrastructure
19  financing programs and coordinate these efforts with other City functions,
20  including planning, engineering, building and safety, finance, redevelopment and
21  other City programs

22      •      Advise landowners and providing preliminary technical aid in the
23  establishment of new financing programs, or in the annexation of properties to
24  existing financing districts

25      •      Advise the City on the sale of public infrastructure bonds for the
26  incremental expansion and upgrading of the wastewater treatment plant and other
27  public facilities

28

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

1   •   Assist the City in the planning for annexation of strategic projects into

2   the City

3   •   Establish a program for priority processing for projects of exceptional

4   merit, such as industrial and commercial developments with substantial revenue and

5   job creation benefits

6   •   Coordinate the administrative process of enacting development

7   agreements for major development projects in the City

8   •   Assist the City Manager in establishing financing programs which can

9   augment the City's budget (e.g. redevelopment, 308 districts, Marks-Roos,

10   mitigation fees)

11   •   Assist the City Manager in outreach functions to enhance the process

12   of attracting business, industry and quality development to Beaumont

13   •   Assist the City manager in public relations matters to promote a

14   positive image for Beaumont and City programs, ad provide assistance in managing

15   the press on relevant matters

16   •   Assist the City in the procurement of grants and other for local projects

17   from federal and State sources

18   •   Provide Graphic Artist services for up to forty-three hours per month

19   Dillon, in conjunction with the other members of the Kapanicas

20   administration, was able to exercise these and other powers to prevent any party not

21   a part of their cabal from discovering, among other things, their own gross

22   overbilling.

23   The City contends that the course of conduct described above constitutes

24   "dishonesty," as the term is commonly understood. The submission of invoices for

25   payment which Dillon was not entitled to represents a false assertion of fact – e.g.,

26   that ULC had performed the work indicated on the invoices and was in fact entitled

27   to payment for the same under the terms of his agreement with the City. The

28   approval of these invoices would also constitutes dishonesty, in that one of the

1    principal's approval of these invoices would represent a false statement of fact –

2    that ULC was entitled to the payment represented on the invoice.

3         The City notes that this response is only based on information currently

4    available to it, and may not be exhaustive. This lawsuit is in its earliest stages, and

5    the City had not yet taken any depositions or conducted any thirty party discovery,

6    nor has it completed its analysis of the documents and information it presently

7    possesses.

8         The City further notes that it tendered this claim to National Union years ago,

9    and National Union thereafter had a duty to investigate this claim and seek evidence

10   *supporting* coverage.  CACI 2332; *Egan v. Mut. of Omaha Ins. Co.* 24 Cal.3d 809,

11   819 (1979); *Wilson v. 21st Century Ins. Co.*, 42 Cal.4th 713, 720-21 (2007);

12   *Mariscal v. Old Republic Life Ins. Co.*, 42 Cal.App.4th 1617, 1620 (1996). To the

13   City's knowledge, National Union has conducted no investigation whatsoever

14   seeking information that could support the City's claim (e.g., by contacting or

15   seeking information from any party besides the City), and has instead sought only

16   information from the City that would tend to establish that any losses the City has

17   suffered do not fall within the scope of an insuring provision, or fall within an

18   exclusion. The City therefore further responds to interrogatory that additional

19   responsive information may be in the possession, custody, or control of third parties

20   including Egger, Dillon, Kapanicas, ULC, the Federal Bureau of Investigation, the

21   Riverside County District Attorney's office, and former employees and officials of

22   the City of Beaumont, to the extent such information has not been lost, destroyed,

23   or forgotten during the years in which National Union has declined to investigate

24   possible grounds for coverage

25        **(8) Does the City contend that Deepak Moorjani committed any act or**

26   **omission that constitutes "Faithless Performance," and if so, state the factual**

27   **basis for this contention and describe any loss suffered by the City as a result**

28

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

- 73 -

5:20-CV-02164- GW (KKX)

**EXHIBIT 21**
**PAGE 1335**

**of this Faithless Performance, including the amount of such loss and how the loss was computed.**

This interrogatory by its plain terms seems to be unlimited in time and scope, and inquires as to whether the City contends that this individual has ever engaged in any conduct that constitutes "faithless performance." However, the City interprets the qualifier "to the extent supporting the Complaint" to cabin this interrogatory to inquiring as to whether the City contends that any of the conduct the Complaint alleges that this individual engaged in constitutes "faithless performance." The City will answer this interrogatory based on its understanding that this was the intended scope of the interrogatory.

To the extent Defendant in fact intended to inquire whether the City believes that Moorjani has ever engaged in conduct that constitutes "faithless performance," the City objects on the grounds that a broad ranging and temporally unlimited inquiry into whether Moorjani has ever engaged in conduct that constitutes "faithless performance" has no or extremely limited relevance to any party's claims or defenses, and would be grossly disproportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Based on this objection, the City will only respond to this interrogatory to the extent it inquires as to whether the City contends that any of the conduct the Complaint alleges that Kapanicas engaged in constitutes "faithless performance."

Definition No. 19 of this set of interrogatories defined "Faithless Performance" to mean "failure to faithfully perform duties prescribed by law." The City notes that this definition is meaningfully different than the definition of the conduct described in Endorsement No. 4 ("Faithful Performance of Duty

Best Best & Krieger LLP
Attorneys at Law
18101 Von Karman Avenue, Suite 1000
Irvine, California 92612

Coverage") to the 2014 Policy and the 2015 Policy, but the City will respond to the interrogatory based on the definitions provided.

The City objects on the basis that this request seeks the premature disclosure of expert witness information which is not discoverable at this time. The City does not object to stating facts that may form the basis for an expert opinion and will state such facts to the extent responsive to this interrogatory.

Moorjani, in his role as a City Official and as a principle in ULC, engaged in a variety of dishonest acts with caused substantial losses to the City.

ULC was formed initially by Egger and Dillon in late 1993, and Moorjani was subsequently added as a principal later that year. As will be further detailed below, ULC entered into a series of contracts with Beaumont to provide consulting services in connection with a large number of capital improvement projects being undertaken by the City and funded by the sale of bonds.

Commencing in 1993, various bond issues were sold with a total face value of approximately $367,240,000. Of this amount, approximately $267,004,166 was expended for a variety of purpose.

These include the following:

| Bond Proceeds Usage | Amount |
|---|---|
| Construction – Design / Planning / Engineering / Mgmnt | $ 50,649,268 |
| Construction – 3rd Parties / Developers / Beaumont / Etc. | $193,948,343 |
| Cost of Issuance | $    5,134,984 |
| Underwriters Discount – Cost of Issuance | $    6,846,890 |
| Administration Expenses | $    3,567,143 |
| BFA Expenses | $    6,857,538 |
|  |  |
| **Total** | **$267,004,166** |

In their capacities as City officials, Dillon, Egger and Moorjani were instrumental in the formation of a Community Facilities District ("CFD") for the stated purpose of raising funds to finance capital improvement projects in Beaumont. Each time a bond issue was approved by the City, a portion of the bond proceeds were thereafter paid over to ULC for consulting services. The

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

identified purposes and amounts of bond funds paid to ULC included the following:

| | Total Expenditure | Total Amt. to ULC | Percentage |
|---|---|---|---|
| Construction Design, Etc. | $50,649,268 | $45,391,831 | 90% |
| Cost of Issuance | $ 5,134,984 | $ | 15% |
| Administration Expenses | $ 3,567,143 | $ | 13% |
| Other Expenses | $ 6,857,538 | $ | 6% |
| **Totals** | **$66,208,933** | **$47,020,440** | |

ULC received more than $45 million of the bond proceeds which were allocated for Construction purposes. This equates to approximately 18.5% of the total funds allocated for Construction and 90% of the constructions costs associated with design, planning, engineering and management.

In addition to the receipt of approximately $47 million of bond proceeds, additional funds were paid to ULC directly by Beaumont for a variety of purposes including for service as city officials; for the management of the Wastewater Treatment Plant; and for services rendered for various capital improvement projects. The total amount of funds paid by Beaumont to ULC was approximately $42.3 million. In summary, the total amount received by ULC from both bond proceeds and payments directly by Beaumont totals approximately $89.3 million

ULC and its principals were initially hired by the City pursuant to an Agreement for Planning and Economic Development Services dated March 22, 1993. This agreement specified several broad categories of services for which ULC would be compensated. For Planning Services (Category I) and Economic Development Services (Category II), ULC was to be paid a lump sum monthly fee of $10,000. The agreement specified that the ULC principals maintain an office presence at City Hall for 28 hours per week. The agreement further identified an additional category called "Additional Services" for which ULC was to be compensated in accordance with the hourly rate schedule included as Exhibit A to the agreement. The Exhibit A states that ULC would be entitled to reimbursements of Professional Sub-Consultant Services at "Actual Cost plus 15%"

Best Best & Krieger LLP
Attorneys at Law
1800 Von Karman Avenue, Suite 1000
Irvine, California 92612

- 76 -

5:20-CV-02164- GW (KKX)

**EXHIBIT 21**
**PAGE 1338**

1    Shortly following the above agreement, another agreement was entered into
2    between Beaumont and ULC. This agreement dated September 27, 1993, was titled
3    Agreement for Planning, Economic Development and Public Works Services. This
4    agreement was very similar to the initial agreement in that it sets forth the scope of
5    the duties of the principals of ULC in their capacities as officials for the City,
6    including the requirement to spend 28 hours per week working at City Hall. For
7    their services as public officials, ULC was paid $15,000 per month (an increase of
8    $5,000 per month from the prior agreement.) In addition, ULC was to provide
9    Public Works and Engineering Services as detailed in the agreement. For these
10   services, ULC was to be paid "on a time and materials basis <u>not exceeding four and</u>
11   <u>one half percent</u> (4.5%) of the confirmed construction cost of the public
12   improvements to be constructed." The agreement also has an additional scope of
13   work section called Additional Services. For these services, ULC was to be
14   compensated in accordance with the hourly rate schedule included as Exhibit A to
15   the agreement. The Exhibit A states that ULC would be entitled to reimbursements
16   of Professional Sub-Consultant Services at "Actual Cost plus 15%"

17   There was an amendment to the above-agreement with ULC in a document
18   dated April 11, 1994. In this amendment the language relating to the compensation
19   to be paid to ULC for Public Works Construction Management was modified
20   slightly. The language in this agreement states, "...compensation shall be on a time
21   and materials basis <u>not exceeding four and one half percent</u> (4.5%) of the bid price
22   awarded by the City for each project."

23   As noted above, ULC was paid from both bond funds and directly by the
24   City. To obtain these funds, ULC issued separate invoices on a monthly basis to
25   both the bond trustee and to Beaumont. In these invoices, ULC would list out
26   various categories of professionals who provided services that month, along with
27   the number of hours expended by each professional category. Examples of the
28   professional categories include:

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

**EXHIBIT 21**
**PAGE 1339**

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

1  ·     Principal

2  ·     Construction Manager

3  ·     Surveyor

4  ·     One Man Crew

5  ·     Two Man Crew

6  ·     Office Manager

7  ·     Executive Secretary

8      The agreement between ULC and the City states that ULC shall be paid on a

9 time and materials basis, and the invoices submitted by ULC purport to identify the

10 hours expended by various professionals during the period covered by the invoice.

11      ULC, by and through Egger, Dillon, and Moorjani, falsified these invoices

12 and overbilled the City by approximately 26,647 hours that were not actually

13 worked in a single calendar year. This represents an overbilling of approximately

14 $4,000,000 in a single calendar year. Similar overbillings occurred in other years.

15      Additionally, hours worked by third party vendors were included in the time

16 and billing records of ULC, and then included in the invoices issued by ULC. The

17 ULC principals applied extraordinary markups to these third party invoices. These

18 markups on occasion exceeded 300%.

19      The agreement between Beaumont and ULC previously discussed in this

20 response anticipated the submission and repayment of invoices paid by ULC, and

21 allows for a markup of 15%.

22      The profits achieved by ULC as a result of the extraordinary markups on the

23 third party invoices has resulted in millions of illicit dollars in profits to ULC,

24 Egger, Dillon, and Moorjani, at the expense of the City.

25      Without information solely in the possession of the Egger, Dillon, Moorjani,

26 and Kapanicas (and a detailed and complicated analysis of the same), no third party

27 or "outsider" to the cabal of Kapanicas, Egger, Dillon, and Moorjani could have

28 reconciled these issues and discovered this illicit profit. This is all the more true in

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1340

1    that these parties were able to use their positions with the City to approve the

2    aforementioned invoices.

3        While not exhaustive, several examples of the markup and inflated charges

4    follows:

5        In June 2011, Satori R.E. Solutions, Inc. sent invoice number 5, dated June 1,

6    20111, to ULC for services rendered during the month of May 2011. This invoice

7    was for 185.42 hours of work at $40 per hour, for a total invoice amount of

8    $7,416.80.

9        On its May 2011 time and billing worksheet submitted to the City, ULC

10   listed under the Sundance Project 185.50 hours for Lana Guseva (the CEO and

11   Secretary of Satori Real Estate Solutions, Inc.) for a total of $31,535, which equates

12   to an hourly rate of $170, or $130 greater than what was charged to ULC.

13       In March 2011, Giroux & Associates sent invoice number 10-049-URB05,

14   dated March 24, 2011, to ULC for services rendered during the month of March

15   2011. This invoice was for 10, 20, and 14 hours for the work of a Senior Scientist,

16   Associate Planner, and Technician, respectively. The services were billed at rates of

17   $120, $75, and $40 per hour, for total charges excluding travel of $3,260

18       On its March 2011 time and billing worksheet ULC listed under the Waste

19   Water Treatment Plant Expansion Project 20 hours for an Associate Engineer,

20   which agrees to the 20 hours for the Associate Planner noted above. ULC listed 14

21   hours for a CADD Technician, which agrees to the 14 hours for a Technician noted

22   above. Lastly, ULC listed 42 hours for a Project Manager / Sr. Engineer, which

23   reconciles with the 10 hours for the Senior Scientist noted above after adding in 32

24   hours of the Director of Environmental Services charged to ULC in the same period

25   by EARSI. For these various services, ULC charged the City of Beaumont a total of

26   $10,900. The total charges incurred by ULC for these services amounted to just

27   $6,620, which indicates the services were marked up by $4,280, or an increase of

28   65% when examined in the aggregate.

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

**EXHIBIT 21**
**PAGE 1341**

1       In July 2011, Eric Lewis sent invoice number 84, dated July 24, 2011, to

2   ULC for services rendered during the months of June and July 2011. This invoice

3   was for 19 hours of professional traffic engineering services. The services were

4   billed at a rate of $75 per hour, for total charges of $1,425.

5       On its July 2011 time and billing worksheet, ULC listed under City Wide

6   Traffic Surveys 19 hours for Eric Lewis, which agreed to the invoice noted in the

7   previous paragraph. For these various services, ULC charged the City of Beaumont

8   a total of $3,230 or $170 per hour. The total charges incurred by ULC for these

9   services was just $1,425, which indicates the services were marked up by $1,805, or

10   an increase of 126.67%.

11       Many additional examples exist, an exhaustive analysis of which would

12   constitute an expert opinion.

13       As previously discussed in this report, the agreement between Beaumont and

14   ULC put a cap on the amount of fees that ULC could receive for work performed

15   on public works construction projects. The amount of funds received by ULC,

16   Egger, Dillon, and Moorjani from the bond proceeds and the City related to capital

17   improvement projects far exceed this 4.5% cap.

18       Overall, ULC, Egger, Dillon, and Moorjani overbilled the City for tens of

19   millions of dollars, the precise amount of which has not yet been fully calculated

20   (and additional third party discovery may be necessary to complete this analysis),

21   but which far exceeds any applicable policy limit(s).

22       This overbilling was only able to be accomplished because of the positions at

23   the City held by Egger, Kapanicas, Dillon, and Moorjani.

24       Together, Kapanicas, Dillon, Egger, and Moorjani had almost total control

25   over the City of Beaumont. Dillon was the Planning Director of the City, Egger was

26   the Community and Economic Development Director, and Moorjani was the

27   Director of Public Works. These individuals were all members of the Kapanicas

28   Administration, and exercised substantial control over their respective departments.

5:20-CV-02164- GW (KKX)

EXHIBIT 21

PAGE 1342

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

As Department head officials and directors, these individuals were empowered with broad authority under the Code. The Director of Public Works was empowered to "administer, implement and enforce" the provisions of various ordinances and Chapters of the Code and grant or deny development permits. The Director of Planning was similarly empowered to administer various ordinances, including the City zoning ordinance, and was empowered to "interpret the intent" of provisions within the code. Critically, as Department Heads, these individuals were able to sign off on bond requisition forms, _including_ bond requisition forms for payment to ULC. Deepak Moorjani, in particular, had a broad range of powers and responsibilities as Director of Public Works, including:

- Maintain a presence at City hall for 24 hours weekly

- Administer public works and engineering services including supervision of Public Works Department personnel and day to day operations of the Public Works Department as directed by the City Manager

- Direct maintenance and operation activities of the City's Public Works Department including those related to streets, public utilities, water, wastewater, reclaimed water and storm drain systems; motorized and non-motorized equipment; and routine contract administration

- Direct the Public Works Department design engineering, capital improvement projects (CIP), traffic engineering, construction inspection and material testing, surveying, construction management services and plan checking services

- Attend public meeting; assist the City Manager in preparation and maintenance of budgets; and provide leadership and motivation to all employees of the Public Works Department

- Review the plans prepared by civil engineers and other appropriate professionals on behalf of the City or private development interests for compliance with the ordinances of the City. Arrange reviews by other appropriate agencies

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1343

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

1   having jurisdiction in such matters relative to the enforcement of relevant codes and

2   compliance with UBC (Uniform Building Code, 1991) and Caltrans. Only when

3   satisfied that all conditions of approval and the appropriate requirements of the

4   City's codes and other relevant codes and standards have been met, the Public

5   Works Director shall approve or recommend approval of plans as relevant.

6        •       Provide inspection services during all phases of construction to enforce

7   compliance with codes and conditions of approval, provisions of the City

8   ordinances, Uniform Building Code (1991) and other requirements set forth on the

9   plans for which permits were issued for construction. In the performance of such

10  duties, ULC shall provide inspection for each project during and after completion of

11  various stages of construction to confirm compliance with approved plans.

12       •       Provide construction  management services during all phases of public

13  works construction to enforce compliance with codes and conditions of approval,

14  provisions of the City ordinances, Uniform Building code (1991) and other

15  requirements set forth on the plan and specification for which permits are issued for

16  construction. In the performance of such duties, ULC shall provide construction

17  management for each public works project before, during and after completion of

18  various stages of construction.

19       Moorjani, in conjunction with the other members of the Kapanicas

20  administration, was able to exercise these and other powers to prevent any party not

21  a part of their cabal from discovering, among other things, their own gross

22  overbilling.

23       The City contends that the course of conduct described above constitutes

24  "dishonesty," as the term is commonly understood. The submission of invoices for

25  payment which Moorjani was not entitled to represents a false assertion of fact –

26  e.g., that ULC had performed the work indicated on the invoices and was in fact

27  entitled to payment for the same under the terms of his agreement with the City.

28  The approval of these invoices would also constitutes dishonesty, in that one of the

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1344

1   principal's approval of these invoices would represent a false statement of fact –

2   that ULC was entitled to the payment represented on the invoice.

3       The City notes that this response is only based on information currently

4   available to it, and may not be exhaustive. This lawsuit is in its earliest stages, and

5   the City had not yet taken any depositions or conducted any thirty party discovery,

6   nor has it completed its analysis of the documents and information it presently

7   possesses.

8       The City further notes that it tendered this claim to National Union years ago,

9   and National Union thereafter had a duty to investigate this claim and seek evidence

10  *supporting* coverage.  CACI 2332; *Egan v. Mut. of Omaha Ins. Co.* 24 Cal.3d 809,

11  819 (1979); *Wilson v. 21st Century Ins. Co.*, 42 Cal.4th 713, 720-21 (2007);

12  *Mariscal v. Old Republic Life Ins. Co.*, 42 Cal.App.4th 1617, 1620 (1996). To the

13  City's knowledge, National Union has conducted no investigation whatsoever

14  seeking information that could support the City's claim (e.g., by contacting or

15  seeking information from any party besides the City), and has instead sought only

16  information from the City that would tend to establish that any losses the City has

17  suffered do not fall within the scope of an insuring provision, or fall within an

18  exclusion. The City therefore further responds to interrogatory that additional

19  responsive information may be in the possession, custody, or control of third parties

20  including Egger, Dillon, Kapanicas, ULC, the Federal Bureau of Investigation, the

21  Riverside County District Attorney's office, and former employees and officials of

22  the City of Beaumont, to the extent such information has not been lost, destroyed,

23  or forgotten during the years in which National Union has declined to investigate

24  possible grounds for coverage

25  **<u>INTERROGATORY NO. 2:</u>**

26      For each of the Principals, please state whether he committed a Theft. If so,

27  please state the factual basis for your contention and describe any loss suffered by

28

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

- 83 -

5:20-CV-02164- GW (KKX)

**EXHIBIT 21**
**PAGE 1345**

1  the City as a result thereof (including the amount of such loss and how you

2  computed that loss).

3  **RESPONSE TO INTERROGATORY NO. 2:**

4      The City objects to this interrogatory as compound, consisting of at least four

5  discrete subparts that are not logically or factually subsumed within or necessarily

6  related to the primary question.

7      The City recognizes the difficulty in determining whether a single

8  interrogatory encompasses multiple interrogatories, and has attempted to

9  conservatively determine the discrete primary questions posed in each

10 interrogatory, while also avoiding waiving its objections to Defendant serving in

11 excess of 25 interrogatories. The City notes that it has primarily relied upon the line

12 of cases discussing (1) whether two subparts "are logically or factually subsumed

13 within and necessarily related to the primary question" and (2) whether the first

14 "question" can be answered fully and completely without answering the second.

15 *See generally MCC Controls v. Hal Hays Construction*, 2020 WL 6034321, at *4

16 (C.D. Cal., July 23, 2020) (Kato, Mag.J.) (concluding that most courts have adopted

17 the "logically or factually subsumed" test and discussing and applying same); *see*

18 *also id*. (approvingly citing *Withers v. eHarmony, Inc*., No. CV 09-2266-GHK

19 (RCx), 2010 WL 11520197, at *3 (C.D. Cal. Apr. 1, 2010) and noting that court

20 had sustained compound objection as to interrogator seeking information

21 concerning 25 separate individuals). By way of an example of how the City has

22 applied these lines of cases, the City concludes that the question: "Did Kapanicas

23 engage in dishonesty when he [___]?" can be answered fully and completed

24 without answering "Did Kapanicas engage in faithless performance when he [__]."

25 Moreover, these questions may have different answers depending upon the omitted

26 bracketed material. The City further notes whether an individual engaged in

27 "dishonesty" is not logically and factually subsumed in the inquiry of whether an

28 individual failed to perform duties prescribed by law. *See* Definition No. 19. The

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

**EXHIBIT 21**
**PAGE 1346**

common understanding of "dishonesty" is very distinct from the scope of duties imposed by the law.

The City interprets this interrogatory as posing the following four primary questions:

(1) Does the City contend that Alan Kapanicas committed any act that constitutes "Theft," and if so, state the factual basis for this contention and describe any loss suffered by the City as a result of this Theft, including the amount of such loss and how the loss was computed;

(2) Does the City contend that Ernest Egger committed any act that constitutes "Theft," and if so, state the factual basis for this contention and describe any loss suffered by the City as a result of this Theft, including the amount of such loss and how the loss was computed;

(3) Does the City contend that David Dillon committed any act that constitutes "Theft," and if so, state the factual basis for this contention and describe any loss suffered by the City as a result of this Theft, including the amount of such loss and how the loss was computed;

(4) Does the City contend that Deepak Moorjani committed any act that constitutes "Theft," and if so, state the factual basis for this contention and describe any loss suffered by the City as a result of this Theft, including the amount of such loss and how the loss was computed;

The City counts this interrogatory as four separate interrogatories.

**(1) Does the City contend that Alan Kapanicas committed any act that constitutes "Theft," and if so, state the factual basis for this contention and describe any loss suffered by the City as a result of this Theft, including the amount of such loss and how the loss was computed**

The City objects to this interrogatory on the grounds that it is unlimited in time and scope, and is therefore grossly overbroad. Whether Alan Kapanicas has ever committed a "theft" outside the scope of conduct alleged in the Complaint has

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1347

no relevance to any party's claims or defenses, and would be grossly disproportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Based on this objection, the City will only respond to this interrogatory to the extent it inquires as to whether Kapanicas committed a "Theft" in connection with the conduct alleged in the Complaint.

The term "Theft" is defined in these interrogatories by reference to the 2014 and 2015 Policies, which define "theft" to mean "the unlawful taking of property to the deprivation of the Insurance."

The City objects on the basis that this request seeks the premature disclosure of expert witness information which is not discoverable at this time. The City does not object to stating facts that may form the basis for an expert opinion and will state such facts to the extent responsive to this interrogatory

Alan Kapanicas held a number of positions with the City, including City Manager, Executive Director of Beaumont Financing Authority, CFD, Disclosure Consultant, and Special Tax Consultant. During the time frame that Alan Kapanicas exercised pervasive control over the City of Beaumont, he, along with a cabal of other individual including the principals of ULC, worked together to deprive the City of a substantial amount of money.

ULC was formed initially by Egger and Dillon in late 1993, and Moorjani was subsequently added as a principal later that year. As will be further detailed below, ULC entered into a series of contracts with Beaumont to provide consulting services in connection with a large number of capital improvement projects being undertaken by the City and funded by the sale of bonds.

Commencing in 1993, various bond issues were sold with a total face value of approximately $367,240,000. Of this amount, approximately $267,004,166 was expended for a variety of purpose.

These include the following:

| Bond Proceeds Usage | Amount |
|---|---|
| Construction – Design / Planning / Engineering / Mgmnt | $ 50,649,268 |
| Construction – 3rd Parties / Developers / Beaumont / Etc. | $193,948,343 |
| Cost of Issuance | $    5,134,984 |
| Underwriters Discount – Cost of Issuance | $    6,846,890 |
| Administration Expenses | $    3,567,143 |
| BFA Expenses | $    6,857,538 |
|  |  |
| **Total** | **$267,004,166** |

In their capacities as City officials, Dillon, Egger and Moorjani were instrumental in the formation of a Community Facilities District ("CFD") for the stated purpose of raising funds to finance capital improvement projects in Beaumont. Each time a bond issue was approved by the City, a portion of the bond proceeds were thereafter paid over to ULC for consulting services. The identified purposes and amounts of bond funds paid to ULC included the following:

|  | Total Expenditure | Total Amt. to ULC | Percentage |
|---|---|---|---|
| Construction Design, Etc. | $50,649,268 | $45,391,831 | 90% |
| Cost of Issuance | $ 5,134,984 | $ | 15% |
| Administration Expenses | $ 3,567,143 | $ | 13% |
| Other Expenses | $ 6,857,538 | $ | 6% |
| **Totals** | **$66,208,933** | **$47,020,440** | |

ULC received more than $45 million of the bond proceeds which were allocated for Construction purposes. This equates to approximately 18.5% of the total funds allocated for Construction and 90% of the constructions costs associated with design, planning, engineering and management.

In addition to the receipt of approximately $47 million of bond proceeds, additional funds were paid to ULC directly by Beaumont for a variety of purposes including for service as city officials; for the management of the Wastewater Treatment Plant; and for services rendered for various capital improvement

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

1   projects. The total amount of funds paid by Beaumont to ULC was approximately

2   $42.3 million. In summary, the total amount received by ULC from both bond

3   proceeds and payments directly by Beaumont totals approximately $89.3 million

4       ULC and its principals were initially hired by the City pursuant to an

5   Agreement for Planning and Economic Development Services dated March 22,

6   1993. This agreement specified several broad categories of services for which ULC

7   would be compensated. For Planning Services (Category I) and Economic

8   Development Services (Category II), ULC was to be paid a lump sum monthly fee

9   of $10,000. The agreement specified that the ULC principals maintain an office

10  presence at City Hall for 28 hours per week. The agreement further identified an

11  additional category called "Additional Services" for which ULC was to be

12  compensated in accordance with the hourly rate schedule included as Exhibit A to

13  the agreement. The Exhibit A states that ULC would be entitled to reimbursements

14  of Professional Sub-Consultant Services at "Actual Cost plus 15%"

15      Shortly following the above agreement, another agreement was entered into

16  between Beaumont and ULC. This agreement dated September 27, 1993, was titled

17  Agreement for Planning, Economic Development and Public Works Services. This

18  agreement was very similar to the initial agreement in that it sets forth the scope of

19  the duties of the principals of ULC in their capacities as officials for the City,

20  including the requirement to spend 28 hours per week working at City Hall. For

21  their services as public officials, ULC was paid $15,000 per month (an increase of

22  $5,000 per month from the prior agreement.) In addition, ULC was to provide

23  Public Works and Engineering Services as detailed in the agreement. For these

24  services, ULC was to be paid "on a time and materials basis <u>not exceeding four and</u>

25  <u>one half percent</u> (4.5%) of the confirmed construction cost of the public

26  improvements to be constructed." The agreement also has an additional scope of

27  work section called Additional Services. For these services, ULC was to be

28  compensated in accordance with the hourly rate schedule included as Exhibit A to

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

5:20-CV-02164- GW (KKX)

**EXHIBIT 21**
**PAGE 1350**

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

1  the agreement. The Exhibit A states that ULC would be entitled to reimbursements

2  of Professional Sub-Consultant Services at "Actual Cost plus 15%"

3      There was an amendment to the above-agreement with ULC in a document

4  dated April 11, 1994. In this amendment the language relating to the compensation

5  to be paid to ULC for Public Works Construction Management was modified

6  slightly. The language in this agreement states, "...compensation shall be on a time

7  and materials basis not exceeding four and one half percent (4.5%) of the bid price

8  awarded by the City for each project."

9      As noted above, ULC was paid from both bond funds and directly by

10  the City. To obtain these funds, ULC issued separate invoices on a monthly basis to

11  both the bond trustee and to Beaumont. In these invoices, ULC would list out

12  various categories of professionals who provided services that month, along with

13  the number of hours expended by each professional category. Examples of the

14  professional categories include:

15  ·      Principal

16  ·      Construction Manager

17  ·      Surveyor

18  ·      One Man Crew

19  ·      Two Man Crew

20  ·      Office Manager

21  ·      Executive Secretary

22      The agreement between ULC and the City states that ULC shall be paid on a

23  time and materials basis, and the invoices submitted by ULC purport to identify the

24  hours expended by various professionals during the period covered by the invoice.

25      ULC, by and through Egger, Dillon, and Moorjani, falsified these invoices

26  and overbilled the City by approximately 26,647 hours that were not actually

27  worked in a single calendar year. This represents an overbilling of approximately

28  $4,000,000 in a single calendar year. Similar overbillings occurred in other years.

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

1    Additionally, hours worked by third party vendors were included in the time

2    and billing records of ULC, and then included in the invoices issued by ULC. The

3    ULC principals applied extraordinary markups to these third party invoices. These

4    markups on occasion exceeded 300%.

5    The agreement between Beaumont and ULC previously discussed in this

6    response anticipated the submission and repayment of invoices paid by ULC, and

7    allows for a markup of 15%.

8    The profits achieved by ULC as a result of the extraordinary markups on the

9    third party invoices has resulted in millions of illicit dollars in profits to ULC,

10   Egger, Dillon, and Moorjani, at the expense of the City.

11   Without information solely in the possession of the Egger, Dillon, Moorjani,

12   and Kapanicas (and a detailed and complicated analysis of the same), no third party

13   or "outsider" to the cabal of the Kapanicas administration could have reconciled

14   these issues and discovered this illicit profit. This is all the more true in that these

15   parties were able to use their positions with the City to approve the aforementioned

16   invoices.

17   While not exhaustive, several examples of the markup and inflated charges

18   follows:

19   In June 2011, Satori R.E. Solutions, Inc. sent invoice number 5, dated June 1,

20   20111, to ULC for services rendered during the month of May 2011. This invoice

21   was for 185.42 hours of work at $40 per hour, for a total invoice amount of

22   $7,416.80.

23   On its May 2011 time and billing worksheet submitted to the City, ULC

24   listed under the Sundance Project 185.50 hours for Lana Guseva (the CEO and

25   Secretary of Satori Real Estate Solutions, Inc.) for a total of $31,535, which equates

26   to an hourly rate of $170, or $130 greater than what was charged to ULC.

27   In March 2011, Giroux & Associates sent invoice number 10-049-URB05,

28   dated March 24, 2011, to ULC for services rendered during the month of March

**EXHIBIT 21**
**PAGE 1352**

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

2011. This invoice was for 10, 20, and 14 hours for the work of a Senior Scientist, Associate Planner, and Technician, respectively. The services were billed at rates of $120, $75, and $40 per hour, for total charges excluding travel of $3,260

On its March 2011 time and billing worksheet ULC listed under the Waste Water Treatment Plant Expansion Project 20 hours for an Associate Engineer, which agrees to the 20 hours for the Associate Planner noted above. ULC listed 14 hours for a CADD Technician, which agrees to the 14 hours for a Technician noted above. Lastly, ULC listed 42 hours for a Project Manager / Sr. Engineer, which reconciles with the 10 hours for the Senior Scientist noted above after adding in 32 hours of the Director of Environmental Services charged to ULC in the same period by EARSI. For these various services, ULC charged the City of Beaumont a total of $10,900. The total charges incurred by ULC for these services amounted to just $6,620, which indicates the services were marked up by $4,280, or an increase of 65% when examined in the aggregate.

In July 2011, Eric Lewis sent invoice number 84, dated July 24, 2011, to ULC for services rendered during the months of June and July 2011. This invoice was for 19 hours of professional traffic engineering services. The services were billed at a rate of $75 per hour, for total charges of $1,425.

On its July 2011 time and billing worksheet, ULC listed under City Wide Traffic Surveys 19 hours for Eric Lewis, which agreed to the invoice noted in the previous paragraph. For these various services, ULC charged the City of Beaumont a total of $3,230 or $170 per hour. The total charges incurred by ULC for these services was just $1,425, which indicates the services were marked up by $1,805, or an increase of 126.67%.

Many additional examples exist, an exhaustive analysis of which would constitute an expert opinion.

As previously discussed in this response, the agreement between Beaumont and ULC put a cap on the amount of fees that ULC could receive for work

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1353

1   performed on public works construction projects. The amount of funds received by

2   ULC, Egger, Dillon, and Moorjani from the bond proceeds and the City related to

3   capital improvement projects far exceed this 4.5% cap. Overall, ULC, Egger,

4   Dillon, and Moorjani overbilled the City for tens of millions of dollars, the precise

5   amount of which has not yet been fully calculated (and additional third party

6   discovery may be necessary to complete this analysis), but which far exceeds any

7   applicable policy limit(s).

8       This overbilling was only able to be accomplished because of the positions at

9   the City held by Egger, Kapanicas, Dillon, and Moorjani.

10      The City initially hired Alan Kapanicas in July 1993 through his Company

11  BSI Consultants, Inc. ("BSI"), and later through his company General Government

12  Management Services, Inc. ("GGMS") to perform the role of City Manager. In his

13  role as City Manager, Kapanicas authorized payments by the City to a variety of

14  vendors and third parties.

15      Alan Kapanicas, as City Manager and in his other capacities with the City,

16  had enormous and pervasive power over the day to day functioning of the City of

17  Beaumont.  Kapanicas was the "administrative head of the City Government" and

18  had broad power to appoint, demote, or remove any city employee or officer

19  besides the City Clerk, City Treasurer, City Attorney, and members of the Planning

20  Commission. He had "Control over all departments of the City government." This

21  control was exclusive – under the Beaumont Municipal Code, the City Council

22  could not directly give orders to or "deal with" any subordinate of the City

23  Manager. Kapanicas appointed officials on behalf of the City, entered into contracts

24  the name of the City, and directly controlled numerous departments and division

25  within the City. *See* Beaumont Municipal Code section 2.12 *et seq*. In additional to

26  his role as City Manager, Kapanicas was the designated labor negotiator, Personnel

27  Director, Financial Officer for City Investments, and provided services related to

28  bond issuances.

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

1   Kapanicas, in conjunction with the other members of the Kapanicas
2   administration, were able to exercise these and other powers to prevent any party
3   not a part of their cabal from discovering, among other things, the above described
4   gross overbilling.

5   The City contends that the course of conduct described above and other acts
6   and omissions of Kapanicas constitutes "Theft," in that this conduct resulted in the
7   City's money being unlawfully taken to its deprivation.

8   The City notes that this response is only based on information currently
9   available to it, and may not be exhaustive. This lawsuit is in its earliest stages, and
10   the City had not yet taken any depositions or conducted any thirty party discovery,
11   nor has it completed its analysis of the documents and information it presently
12   possesses.

13   The City further notes that it tendered this claim to National Union years ago,
14   and National Union thereafter had a duty to investigate this claim and seek evidence
15   *supporting* coverage.  CACI 2332; *Egan v. Mut. of Omaha Ins. Co.* 24 Cal.3d 809,
16   819 (1979); *Wilson v. 21st Century Ins. Co.*, 42 Cal.4th 713, 720-21 (2007);
17   *Mariscal v. Old Republic Life Ins. Co.*, 42 Cal.App.4th 1617, 1620 (1996). To the
18   City's knowledge, National Union has conducted no investigation whatsoever
19   seeking information that could support the City's claim (e.g., by contacting or
20   seeking information from any party besides the City), and has instead sought only
21   information from the City that would tend to establish that any losses the City has
22   suffered do not fall within the scope of an insuring provision, or fall within an
23   exclusion. The City therefore further responds to interrogatory that additional
24   responsive information may be in the possession, custody, or control of third parties
25   including Egger, Dillon, Kapanicas, ULC, the Federal Bureau of Investigation, the
26   Riverside County District Attorney's office, and former employees and officials of
27   the City of Beaumont, to the extent such information has not been lost, destroyed,
28

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1355

1   or forgotten during the years in which National Union has declined to investigate

2   possible grounds for coverage

3   **(2) Does the City contend that Ernest Egger committed any act or**

4   **omission that constitutes "theft," and if so, state the factual basis for this**

5   **contention and describe any loss suffered by the City as a result of this theft,**

6   **including the amount of such loss and how the loss was computed;**

7   The City objects to this interrogatory on the grounds that it is unlimited in

8   time and scope, and is therefore grossly overbroad. Whether Egger has ever

9   committed a "theft" outside the scope of conduct alleged in the Complaint has no

10  relevance to any party's claims or defenses, and would be grossly disproportional to

11  the needs of the case, considering the importance of the issues at stake in the action,

12  the amount in controversy, the parties' relative access to relevant information, the

13  parties' resources, the importance of the discovery in resolving the issues, and

14  whether the burden or expense of the proposed discovery outweighs its likely

15  benefit. Based on this objection, the City will only respond to this interrogatory to

16  the extent it inquires as to whether Egger committed a "Theft" in connection with

17  the conduct alleged in the Complaint.

18  The term "theft" is defined in these interrogatories by reference to the 2014

19  and 2015 Policies, which define "theft" to mean "the unlawful taking of property to

20  the deprivation of the Insurance."

21  The City objects on the basis that this request seeks the premature disclosure

22  of expert witness information which is not discoverable at this time. The City does

23  not object to stating facts that may form the basis for an expert opinion and will

24  state such facts to the extent responsive to this interrogatory.

25  Ernest Egger, in his role as a City Official and as a principle in ULC,

26  engaged in a variety of dishonest acts with caused substantial losses to the City.

27  ULC was formed initially by Egger and Dillon in late 1993, and Moorjani

28  was subsequently added as a principal later that year. As will be further detailed

5:20-CV-02164- GW (KKX)

**EXHIBIT 21**
**PAGE 1356**

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
1800 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

below, ULC entered into a series of contracts with Beaumont to provide consulting services in connection with a large number of capital improvement projects being undertaken by the City and funded by the sale of bonds.

Commencing in 1993, various bond issues were sold with a total face value of approximately $367,240,000. Of this amount, approximately $267,004,166 was expended for a variety of purpose.

These include the following:

| Bond Proceeds Usage | Amount |
|---|---|
| Construction – Design / Planning / Engineering / Mgmnt | $ 50,649,268 |
| Construction – 3rd Parties / Developers / Beaumont / Etc. | $193,948,343 |
| Cost of Issuance | $   5,134,984 |
| Underwriters Discount – Cost of Issuance | $   6,846,890 |
| Administration Expenses | $   3,567,143 |
| BFA Expenses | $   6,857,538 |
|  |  |
| **Total** | **$267,004,166** |

In their capacities as City officials, Dillon, Egger and Moorjani were instrumental in the formation of a Community Facilities District ("CFD") for the stated purpose of raising funds to finance capital improvement projects in Beaumont. Each time a bond issue was approved by the City, a portion of the bond proceeds were thereafter paid over to ULC for consulting services. The identified purposes and amounts of bond funds paid to ULC included the following:

|  | Total Expenditure | Total Amt. to ULC | Percentage |
|---|---|---|---|
| Construction Design, Etc. | $50,649,268 | $45,391,831 | 90% |
| Cost of Issuance | $ 5,134,984 | $ | 15% |
| Administration Expenses | $ 3,567,143 | $ | 13% |
| Other Expenses | $ 6,857,538 | $ | 6% |
| **Totals** | **$66,208,933** | **$47,020,440** |  |

ULC received more than $45 million of the bond proceeds which were allocated for Construction purposes. This equates to approximately 18.5% of the total funds allocated for Construction and 90% of the constructions costs associated with design, planning, engineering and management.

5:20-CV-02164- GW (KKX)

**EXHIBIT 21**
**PAGE 1357**

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

1       In addition to the receipt of approximately $47 million of bond proceeds,

2   additional funds were paid to ULC directly by Beaumont for a variety of purposes

3   including for service as city officials; for the management of the Wastewater

4   Treatment Plant; and for services rendered for various capital improvement

5   projects. The total amount of funds paid by Beaumont to ULC was approximately

6   $42.3 million. In summary, the total amount received by ULC from both bond

7   proceeds and payments directly by Beaumont totals approximately $89.3 million

8       ULC and its principals were initially hired by the City pursuant to an

9   Agreement for Planning and Economic Development Services dated March 22,

10   1993. This agreement specified several broad categories of services for which ULC

11   would be compensated. For Planning Services (Category I) and Economic

12   Development Services (Category II), ULC was to be paid a lump sum monthly fee

13   of $10,000. The agreement specified that the ULC principals maintain an office

14   presence at City Hall for 28 hours per week. The agreement further identified an

15   additional category called "Additional Services" for which ULC was to be

16   compensated in accordance with the hourly rate schedule included as Exhibit A to

17   the agreement. The Exhibit A states that ULC would be entitled to reimbursements

18   of Professional Sub-Consultant Services at "Actual Cost plus 15%"

19       Shortly following the above agreement, another agreement was entered into

20   between Beaumont and ULC. This agreement dated September 27, 1993, was titled

21   Agreement for Planning, Economic Development and Public Works Services. This

22   agreement was very similar to the initial agreement in that it sets forth the scope of

23   the duties of the principals of ULC in their capacities as officials for the City,

24   including the requirement to spend 28 hours per week working at City Hall. For

25   their services as public officials, ULC was paid $15,000 per month (an increase of

26   $5,000 per month from the prior agreement.) In addition, ULC was to provide

27   Public Works and Engineering Services as detailed in the agreement. For these

28   services, ULC was to be paid "on a time and materials basis <u>not exceeding four and</u>

5:20-CV-02164- GW (KKX)

**EXHIBIT 21**
**PAGE 1358**

one half percent (4.5%) of the confirmed construction cost of the public improvements to be constructed." The agreement also has an additional scope of work section called Additional Services. For these services, ULC was to be compensated in accordance with the hourly rate schedule included as Exhibit A to the agreement. The Exhibit A states that ULC would be entitled to reimbursements of Professional Sub-Consultant Services at "Actual Cost plus 15%"

There was an amendment to the above-agreement with ULC in a document dated April 11, 1994. In this amendment the language relating to the compensation to be paid to ULC for Public Works Construction Management was modified slightly. The language in this agreement states, "...compensation shall be on a time and materials basis not exceeding four and one half percent (4.5%) of the bid price awarded by the City for each project."

As noted above, ULC was paid from both bond funds and directly by the City. To obtain these funds, ULC issued separate invoices on a monthly basis to both the bond trustee and to Beaumont. In these invoices, ULC would list out various categories of professionals who provided services that month, along with the number of hours expended by each professional category. Examples of the professional categories include:

- Principal
- Construction Manager
- Surveyor
- One Man Crew
- Two Man Crew
- Office Manager
- Executive Secretary

The agreement between ULC and the City states that ULC shall be paid on a time and materials basis, and the invoices submitted by ULC purport to identify the hours expended by various professionals during the period covered by the invoice.

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1359

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

ULC, by and through Egger, Dillon, and Moorjani, falsified these invoices and overbilled the City by approximately 26,647 hours that were not actually worked in a single calendar year. This represents an overbilling of approximately $4,000,000 in a single calendar year. Similar overbillings occurred in other years.

Additionally, hours worked by third party vendors were included in the time and billing records of ULC, and then included in the invoices issued by ULC. The ULC principals applied extraordinary markups to these third party invoices. These markups on occasion exceeded 300%.

The agreement between Beaumont and ULC previously discussed in this response anticipated the submission and repayment of invoices paid by ULC, and allows for a markup of 15%.

The profits achieved by ULC as a result of the extraordinary markups on the third party invoices has resulted in millions of illicit dollars in profits to ULC, Egger, Dillon, and Moorjani, at the expense of the City.

Without information solely in the possession of the Egger, Dillon, Moorjani, and Kapanicas (and a detailed and complicated analysis of the same), no third party or "outsider" to the cabal of Kapanicas, Egger, Dillon, and Moorjani could have reconciled these issues and discovered this illicit profit. This is all the more true in that these parties were able to use their positions with the City to approve the aforementioned invoices.

While not exhaustive, several examples of the markup and inflated charges follows:

In June 2011, Satori R.E. Solutions, Inc. sent invoice number 5, dated June 1, 20111, to ULC for services rendered during the month of May 2011. This invoice was for 185.42 hours of work at $40 per hour, for a total invoice amount of $7,416.80.

On its May 2011 time and billing worksheet submitted to the City, ULC listed under the Sundance Project 185.50 hours for Lana Guseva (the CEO and

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1360

Secretary of Satori Real Estate Solutions, Inc.) for a total of $31,535, which equates to an hourly rate of $170, or $130 greater than what was charged to ULC.

In March 2011, Giroux & Associates sent invoice number 10-049-URB05, dated March 24, 2011, to ULC for services rendered during the month of March 2011. This invoice was for 10, 20, and 14 hours for the work of a Senior Scientist, Associate Planner, and Technician, respectively. The services were billed at rates of $120, $75, and $40 per hour, for total charges excluding travel of $3,260

On its March 2011 time and billing worksheet ULC listed under the Waste Water Treatment Plant Expansion Project 20 hours for an Associate Engineer, which agrees to the 20 hours for the Associate Planner noted above. ULC listed 14 hours for a CADD Technician, which agrees to the 14 hours for a Technician noted above. Lastly, ULC listed 42 hours for a Project Manager / Sr. Engineer, which reconciles with the 10 hours for the Senior Scientist noted above after adding in 32 hours of the Director of Environmental Services charged to ULC in the same period by EARSI. For these various services, ULC charged the City of Beaumont a total of $10,900. The total charges incurred by ULC for these services amounted to just $6,620, which indicates the services were marked up by $4,280, or an increase of 65% when examined in the aggregate.

In July 2011, Eric Lewis sent invoice number 84, dated July 24, 2011, to ULC for services rendered during the months of June and July 2011. This invoice was for 19 hours of professional traffic engineering services. The services were billed at a rate of $75 per hour, for total charges of $1,425.

On its July 2011 time and billing worksheet, ULC listed under City Wide Traffic Surveys 19 hours for Eric Lewis, which agreed to the invoice noted in the previous paragraph. For these various services, ULC charged the City of Beaumont a total of $3,230 or $170 per hour. The total charges incurred by ULC for these services was just $1,425, which indicates the services were marked up by $1,805, or an increase of 126.67%.

5:20-CV-02164- GW (KKX)

EXHIBIT 21

PAGE 1361

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
1810 I VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

1   Many additional examples exist, an exhaustive analysis of which would
2   constitute an expert opinion.

3   As previously discussed in this report, the agreement between Beaumont and
4   ULC put a cap on the amount of fees that ULC could receive for work performed
5   on public works construction projects. The amount of funds received by ULC,
6   Egger, Dillon, and Moorjani from the bond proceeds and the City related to capital
7   improvement projects far exceed this 4.5% cap. Overall, ULC, Egger, Dillon, and
8   Moorjani overbilled the City for tens of millions of dollars, the precise amount of
9   which has not yet been fully calculated (and additional third party discovery may be
10  necessary to complete this analysis), but which far exceeds any applicable policy
11  limit(s).

12  This overbilling was only able to be accomplished because of the positions at
13  the City held by Egger, Kapanicas, Dillon, and Moorjani.

14  In the early 1990s, the City hired Ernest Egger – an owner and principal of
15  ULC – to manage the planning of the City. Egger served as Planning Director of
16  Beaumont. He had day to day control of department, overseeing staff and reporting
17  directly to the City Manager Kapanicas.

18  Together, Kapanicas, Dillon, Egger, and Moorjani had almost total control
19  over the City of Beaumont. Dillon was the Planning Director of the City, Egger was
20  the Community and Economic Development Director, and Moorjani was the
21  Director of Public Works. These individuals were all members of the Kapanicas
22  Administration, and exercised substantial control over their respective departments.
23  As Department head officials and directors, these individuals were empowered with
24  broad authority under the Code. The Director of Public Works was empowered to
25  "administer, implement and enforce" the provisions of various ordinances and
26  Chapters of the Code and grant or deny development permits. The Director of
27  Planning was similarly empowered to administer various ordinances, including the
28  City zoning ordinance, and was empowered to "interpret the intent" of provisions

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1362

1   within the code. Critically, as Department Heads, these individuals were able to

2   sign off on bond requisition forms, *including* bond requisition forms for payment to

3   ULC.  Ernest Egger, in particular, had a broad range of powers and responsibilities

4   as Planning Director, including:

5          •      Establish working relationships and coordination with City Staff,

6   public agencies, County departments, utilities and service purveyors involved in

7   matters affecting the City.

8          •      Analyze and recommend planning programs consistent with the

9   economic capabilities of the City. When directed, prepare and administer identified

10  programs.

11         •      Direct and supervise the day to day functions and activities of the

12  Planning and Economic Development Department including all planning and

13  building functions and associate personnel

14         •      Attend necessary meetings with City Council members, Planning

15  Commissioners, City staff, public agencies, community groups, developers,

16  contractors and the general public

17         •      Provide recommendations regarding regulations and ordinances

18  pertaining to planning matters and coordinate with the City Attorney in preparation

19  of routine ordinances or amendment

20         •      Provide zoning and planning related information to citizens and

21  prospective applicants, conduct pre-submittal reviews, and assist individual in

22  coping with City processes.

23         •      Upgrade and maintain the City's base mapping and routine graphic

24  needs

25         •      Review, and as necessary adjust, the Planning Department's forms,

26  processes and operational procedures to improve its efficiency, function and

27  professional image, and bring the City's operations into the state-of-the-art,

28  comparable with similarly sized communities

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1363

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

•      Monitor and report on changes in State law, regional programs and changes in environmental regulations and adjust City processes to conform to statutory requirements

•      Maintain an office presence at City Hall for 28 hours weekly, with the precise schedule of office hours determined through mutual agreement, with one of ULC's professional planning principals in attendance during office hours.

•      Review proposed land development project, occupancies and business licenses with planning implications and notify applicants relative to zoning ordinance and General Plan compliance

•      Coordinate and correspond with applicants and process applications in accordance with City codes and policy

•      Review and process routine projects in compliance with the requirements of the California Environmental Quality  Act (CEQA) and the City's guidelines for its implementations. Prepare initial studies and negative declarations for routines projects.

•      Develop conditions of approval for routines projects consistent with State law and good planning practices; City police and financing requirements; health, safety and welfare considerations; and with respect to protecting and maintaining neighborhood stability and quality of life in Beaumont.

•      Provide complete staffing to the Planning Commission and act in the capacity of Planning Director/Secretary in the conduct of regularly scheduled meetings

•      Provide professional presentations and recommendations to the Planning Commission to guide appropriately informed decision making on discretionary actions

•      Prepare clear, professional quality graphics and other presentation materials to clarify planning issues and to convey a professional image to the public

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1364

• Prepare staff reports, regulations and meeting minutes, with the use of present City clerical support, for all Planning Commission meetings

• Utilizing City clerical support, prepare all required notices, agenda packets and other pertinent materials for Commission meetings

• Prepare and maintain a Planning Commissioner's Handbook to provide members with a useful reference guide on subjects including legal requirements, conducting of meetings, findings, conflict of interest and requirements of the Brown Act

Egger, in conjunction with the other members of the Kapanicas administration, was able to exercise these and other powers to prevent any party not a part of their cabal from discovering, among other things, their own gross overbilling.

The City contends that the course of conduct described above and other acts and omissions of Egger constitutes "Theft," in that this conduct resulted in the City's money being unlawfully taken to its deprivation

The City notes that this response is only based on information currently available to it, and may not be exhaustive. This lawsuit is in its earliest stages, and the City had not yet taken any depositions or conducted any thirty party discovery, nor has it completed its analysis of the documents and information it presently possesses.

The City further notes that it tendered this claim to National Union years ago, and National Union thereafter had a duty to investigate this claim and seek evidence *supporting* coverage. CACI 2332; *Egan v. Mut. of Omaha Ins. Co.* 24 Cal.3d 809, 819 (1979); *Wilson v. 21st Century Ins. Co.*, 42 Cal.4th 713, 720-21 (2007); *Mariscal v. Old Republic Life Ins. Co.*, 42 Cal.App.4th 1617, 1620 (1996). To the City's knowledge, National Union has conducted no investigation whatsoever seeking information that could support the City's claim (e.g., by contacting or seeking information from any party besides the City), and has instead sought only

- 103 -

1   information from the City that would tend to establish that any losses the City has

2   suffered do not fall within the scope of an insuring provision, or fall within an

3   exclusion. The City therefore further responds to interrogatory that additional

4   responsive information may be in the possession, custody, or control of third parties

5   including Egger, Dillon, Kapanicas, ULC, the Federal Bureau of Investigation, the

6   Riverside County District Attorney's office, and former employees and officials of

7   the City of Beaumont, to the extent such information has not been lost, destroyed,

8   or forgotten during the years in which National Union has declined to investigate

9   possible grounds for coverage.

10      **(3) Does the City contend that David Dillon committed any act or**

11  **omission that constitutes "theft," and if so, state the factual basis for this**

12  **contention and describe any loss suffered by the City as a result of this theft,**

13  **including the amount of such loss and how the loss was computed;**

14      The City objects to this interrogatory on the grounds that it is unlimited in

15  time and scope, and is therefore grossly overbroad. Whether Dillon has ever

16  committed a "theft" outside the scope of conduct alleged in the Complaint has no

17  relevance to any party's claims or defenses, and would be grossly disproportional to

18  the needs of the case, considering the importance of the issues at stake in the action,

19  the amount in controversy, the parties' relative access to relevant information, the

20  parties' resources, the importance of the discovery in resolving the issues, and

21  whether the burden or expense of the proposed discovery outweighs its likely

22  benefit. Based on this objection, the City will only respond to this interrogatory to

23  the extent it inquires as to whether Dillon committed a "Theft" in connection with

24  the conduct alleged in the Complaint.

25      The term "theft" is defined in these interrogatories by reference to the 2014

26  and 2015 Policies, which define "theft" to mean "the unlawful taking of property to

27  the deprivation of the Insurance."

28

5:20-CV-02164- GW (KKX)

**EXHIBIT 21**
**PAGE 1366**

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
3800 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

The City objects on the basis that this request seeks the premature disclosure of expert witness information which is not discoverable at this time. The City does not object to stating facts that may form the basis for an expert opinion and will state such facts to the extent responsive to this interrogatory.

Dillon, in his role as a City Official and as a principle in ULC, engaged in a variety of dishonest acts with caused substantial losses to the City.

ULC was formed initially by Egger and Dillon in late 1993, and Moorjani was subsequently added as a principal later that year. As will be further detailed below, ULC entered into a series of contracts with Beaumont to provide consulting services in connection with a large number of capital improvement projects being undertaken by the City and funded by the sale of bonds.

Commencing in 1993, various bond issues were sold with a total face value of approximately $367,240,000. Of this amount, approximately $267,004,166 was expended for a variety of purpose.

These include the following:

| Bond Proceeds Usage | Amount |
|---|---|
| Construction – Design / Planning / Engineering / Mgmnt | $ 50,649,268 |
| Construction – 3rd Parties / Developers / Beaumont / Etc. | $193,948,343 |
| Cost of Issuance | $    5,134,984 |
| Underwriters Discount – Cost of Issuance | $    6,846,890 |
| Administration Expenses | $    3,567,143 |
| BFA Expenses | $    6,857,538 |
|  |  |
| **Total** | **$267,004,166** |

In their capacities as City officials, Dillon, Egger and Moorjani were instrumental in the formation of a Community Facilities District ("CFD") for the stated purpose of raising funds to finance capital improvement projects in Beaumont. Each time a bond issue was approved by the City, a portion of the bond proceeds were thereafter paid over to ULC for consulting services. The identified purposes and amounts of bond funds paid to ULC included the following:

| | Total Expenditure | Total Amt. to ULC | Percentage |
|---|---|---|---|

5:20-CV-02164- GW (KKX)

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
1810 I VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

**EXHIBIT 21**

**PAGE 1367**

| Construction Design, Etc. | $50,649,268 | $45,391,831 | 90% |
|---|---|---|---|
| Cost of Issuance | $ 5,134,984 | $ | 15% |
| Administration Expenses | $ 3,567,143 | $ | 13% |
| Other Expenses | $ 6,857,538 | $ | 6% |
| **Totals** | **$66,208,933** | **$47,020,440** | |

ULC received more than $45 million of the bond proceeds which were allocated for Construction purposes. This equates to approximately 18.5% of the total funds allocated for Construction and 90% of the constructions costs associated with design, planning, engineering and management.

In addition to the receipt of approximately $47 million of bond proceeds, additional funds were paid to ULC directly by Beaumont for a variety of purposes including for service as city officials; for the management of the Wastewater Treatment Plant; and for services rendered for various capital improvement projects. The total amount of funds paid by Beaumont to ULC was approximately $42.3 million. In summary, the total amount received by ULC from both bond proceeds and payments directly by Beaumont totals approximately $89.3 million

ULC and its principals were initially hired by the City pursuant to an Agreement for Planning and Economic Development Services dated March 22, 1993. This agreement specified several broad categories of services for which ULC would be compensated. For Planning Services (Category I) and Economic Development Services (Category II), ULC was to be paid a lump sum monthly fee of $10,000. The agreement specified that the ULC principals maintain an office presence at City Hall for 28 hours per week. The agreement further identified an additional category called "Additional Services" for which ULC was to be compensated in accordance with the hourly rate schedule included as Exhibit A to the agreement. The Exhibit A states that ULC would be entitled to reimbursements of Professional Sub-Consultant Services at "Actual Cost plus 15%"

Shortly following the above agreement, another agreement was entered into between Beaumont and ULC. This agreement dated September 27, 1993, was titled

1    Agreement for Planning, Economic Development and Public Works Services. This

2    agreement was very similar to the initial agreement in that it sets forth the scope of

3    the duties of the principals of ULC in their capacities as officials for the City,

4    including the requirement to spend 28 hours per week working at City Hall. For

5    their services as public officials, ULC was paid $15,000 per month (an increase of

6    $5,000 per month from the prior agreement.) In addition, ULC was to provide

7    Public Works and Engineering Services as detailed in the agreement. For these

8    services, ULC was to be paid "on a time and materials basis <u>not exceeding four and</u>

9    <u>one half percent</u> (4.5%) of the confirmed construction cost of the public

10   improvements to be constructed." The agreement also has an additional scope of

11   work section called Additional Services. For these services, ULC was to be

12   compensated in accordance with the hourly rate schedule included as Exhibit A to

13   the agreement. The Exhibit A states that ULC would be entitled to reimbursements

14   of Professional Sub-Consultant Services at "Actual Cost plus 15%"

15       There was an amendment to the above-agreement with ULC in a document

16   dated April 11, 1994. In this amendment the language relating to the compensation

17   to be paid to ULC for Public Works Construction Management was modified

18   slightly. The language in this agreement states, "...compensation shall be on a time

19   and materials basis <u>not exceeding four and one half percent</u> (4.5%) of the bid price

20   awarded by the City for each project."

21       As noted above, ULC was paid from both bond funds and directly by the

22   City. To obtain these funds, ULC issued separate invoices on a monthly basis to

23   both the bond trustee and to Beaumont. In these invoices, ULC would list out

24   various categories of professionals who provided services that month, along with

25   the number of hours expended by each professional category. Examples of the

26   professional categories include:

27       ·      Principal

28       ·      Construction Manager

Best Best & Krieger LLP
Attorneys at Law
1800 Von Karman Avenue, Suite 1000
Irvine, California 92612

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1369

1      ·      Surveyor

2      ·      One Man Crew

3      ·      Two Man Crew

4      ·      Office Manager

5      ·      Executive Secretary

6      The agreement between ULC and the City states that ULC shall be paid on a

7 time and materials basis, and the invoices submitted by ULC purport to identify the

8 hours expended by various professionals during the period covered by the invoice.

9      ULC, by and through Egger, Dillon, and Moorjani, falsified these invoices

10 and overbilled the City by approximately 26,647 hours that were not actually

11 worked in a single calendar year. This represents an overbilling of approximately

12 $4,000,000 in a single calendar year. Similar overbillings occurred in other years.

13      Additionally, hours worked by third party vendors were included in the time

14 and billing records of ULC, and then included in the invoices issued by ULC. The

15 ULC principals applied extraordinary markups to these third party invoices. These

16 markups on occasion exceeded 300%.

17      The agreement between Beaumont and ULC previously discussed in this

18 response anticipated the submission and repayment of invoices paid by ULC, and

19 allows for a markup of 15%.

20      The profits achieved by ULC as a result of the extraordinary markups on the

21 third party invoices has resulted in millions of illicit dollars in profits to ULC,

22 Egger, Dillon, and Moorjani, at the expense of the City.

23      Without information solely in the possession of the Egger, Dillon, Moorjani,

24 and Kapanicas (and a detailed and complicated analysis of the same), no third party

25 or "outsider" to the cabal of Kapanicas, Egger, Dillon, and Moorjani could have

26 reconciled these issues and discovered this illicit profit. This is all the more true in

27 that these parties were able to use their positions with the City to approve the

28 aforementioned invoices.

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

1    While not exhaustive, several examples of the markup and inflated charges

2 follows:

3    In June 2011, Satori R.E. Solutions, Inc. sent invoice number 5, dated June 1,

4 20111, to ULC for services rendered during the month of May 2011. This invoice

5 was for 185.42 hours of work at $40 per hour, for a total invoice amount of

6 $7,416.80.

7    On its May 2011 time and billing worksheet submitted to the City, ULC

8 listed under the Sundance Project 185.50 hours for Lana Guseva (the CEO and

9 Secretary of Satori Real Estate Solutions, Inc.) for a total of $31,535, which equates

10 to an hourly rate of $170, or $130 greater than what was charged to ULC.

11    In March 2011, Giroux & Associates sent invoice number 10-049-URB05,

12 dated March 24, 2011, to ULC for services rendered during the month of March

13 2011. This invoice was for 10, 20, and 14 hours for the work of a Senior Scientist,

14 Associate Planner, and Technician, respectively. The services were billed at rates of

15 $120, $75, and $40 per hour, for total charges excluding travel of $3,260

16    On its March 2011 time and billing worksheet ULC listed under the Waste

17 Water Treatment Plant Expansion Project 20 hours for an Associate Engineer,

18 which agrees to the 20 hours for the Associate Planner noted above. ULC listed 14

19 hours for a CADD Technician, which agrees to the 14 hours for a Technician noted

20 above. Lastly, ULC listed 42 hours for a Project Manager / Sr. Engineer, which

21 reconciles with the 10 hours for the Senior Scientist noted above after adding in 32

22 hours of the Director of Environmental Services charged to ULC in the same period

23 by EARSI. For these various services, ULC charged the City of Beaumont a total of

24 $10,900. The total charges incurred by ULC for these services amounted to just

25 $6,620, which indicates the services were marked up by $4,280, or an increase of

26 65% when examined in the aggregate.

27    In July 2011, Eric Lewis sent invoice number 84, dated July 24, 2011, to

28 ULC for services rendered during the months of June and July 2011. This invoice

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1371

1  was for 19 hours of professional traffic engineering services. The services were

2  billed at a rate of $75 per hour, for total charges of $1,425.

3      On its July 2011 time and billing worksheet, ULC listed under City Wide

4  Traffic Surveys 19 hours for Eric Lewis, which agreed to the invoice noted in the

5  previous paragraph. For these various services, ULC charged the City of Beaumont

6  a total of $3,230 or $170 per hour. The total charges incurred by ULC for these

7  services was just $1,425, which indicates the services were marked up by $1,805, or

8  an increase of 126.67%.

9      Many additional examples exist, an exhaustive analysis of which would

10  constitute an expert opinion.

11      As previously discussed in this report, the agreement between Beaumont and

12  ULC put a cap on the amount of fees that ULC could receive for work performed

13  on public works construction projects. The amount of funds received by ULC,

14  Egger, Dillon, and Moorjani from the bond proceeds and the City related to capital

15  improvement projects far exceed this 4.5% cap. Overall, ULC, Egger, Dillon, and

16  Moorjani overbilled the City for tens of millions of dollars, the precise amount of

17  which has not yet been fully calculated (and additional third party discovery may be

18  necessary to complete this analysis), but which far exceeds any applicable policy

19  limit(s).

20      This overbilling was only able to be accomplished because of the positions at

21  the City held by Egger, Kapanicas, Dillon, and Moorjani.

22      Together, Kapanicas, Dillon, Egger, and Moorjani had almost total control

23  over the City of Beaumont. Dillon was the Planning Director of the City, Egger was

24  the Community and Economic Development Director, and Moorjani was the

25  Director of Public Works. These individuals were all members of the Kapanicas

26  Administration, and exercised substantial control over their respective departments.

27  As Department head officials and directors, these individuals were empowered with

28  broad authority under the Code. The Director of Public Works was empowered to

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1372

"administer, implement and enforce" the provisions of various ordinances and Chapters of the Code and grant or deny development permits. The Director of Planning was similarly empowered to administer various ordinances, including the City zoning ordinance, and was empowered to "interpret the intent" of provisions within the code. Critically, as Department Heads, these individuals were able to sign off on bond requisition forms, _including bond requisition forms for payment to ULC_.  David Dillon, in particular, had a broad range of powers and responsibilities as Director of Economic Development, including:

• Monitor and report on on-going efforts involving public infrastructure financing programs and coordinate these efforts with other City functions, including planning, engineering, building and safety, finance, redevelopment and other City programs

• Advise landowners and providing preliminary technical aid in the establishment of new financing programs, or in the annexation of properties to existing financing districts

• Advise the City on the sale of public infrastructure bonds for the incremental expansion and upgrading of the wastewater treatment plant and other public facilities

• Assist the City in the planning for annexation of strategic projects into the City

• Establish a program for priority processing for projects of exceptional merit, such as industrial and commercial developments with substantial revenue and job creation benefits

• Coordinate the administrative process of enacting development agreements for major development projects in the City

• Assist the City Manager in establishing financing programs which can augment the City's budget (e.g. redevelopment, 308 districts, Marks-Roos, mitigation fees)

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1373

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

•     Assist the City Manager in outreach functions to enhance the process of attracting business, industry and quality development to Beaumont

•     Assist the City manager in public relations matters to promote a positive image for Beaumont and City programs, ad provide assistance in managing the press on relevant matters

•     Assist the City in the procurement of grants and other for local projects from federal and State sources

•     Provide Graphic Artist services for up to forty-three hours per month

Dillon, in conjunction with the other members of the Kapanicas administration, was able to exercise these and other powers to prevent any party not a part of their cabal from discovering, among other things, their own gross overbilling.

The City contends that the course of conduct described above and other acts and omissions of Dillon constitutes "Theft," in that this conduct resulted in the City's money being unlawfully taken to its deprivation

The City notes that this response is only based on information currently available to it, and may not be exhaustive. This lawsuit is in its earliest stages, and the City had not yet taken any depositions or conducted any thirty party discovery, nor has it completed its analysis of the documents and information it presently possesses.

The City further notes that it tendered this claim to National Union years ago, and National Union thereafter had a duty to investigate this claim and seek evidence *supporting* coverage. CACI 2332; *Egan v. Mut. of Omaha Ins. Co.* 24 Cal.3d 809, 819 (1979); *Wilson v. 21st Century Ins. Co.*, 42 Cal.4th 713, 720-21 (2007); *Mariscal v. Old Republic Life Ins. Co.*, 42 Cal.App.4th 1617, 1620 (1996). To the City's knowledge, National Union has conducted no investigation whatsoever seeking information that could support the City's claim (e.g., by contacting or seeking information from any party besides the City), and has instead sought only

5:20-CV-02164- GW (KKX)

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

EXHIBIT 21
PAGE 1374

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

information from the City that would tend to establish that any losses the City has suffered do not fall within the scope of an insuring provision, or fall within an exclusion. The City therefore further responds to interrogatory that additional responsive information may be in the possession, custody, or control of third parties including Egger, Dillon, Kapanicas, ULC, the Federal Bureau of Investigation, the Riverside County District Attorney's office, and former employees and officials of the City of Beaumont, to the extent such information has not been lost, destroyed, or forgotten during the years in which National Union has declined to investigate possible grounds for coverage.

**(4) Does the City contend that Deepak Moorjani committed any act or omission that constitutes "theft," and if so, state the factual basis for this contention and describe any loss suffered by the City as a result of this Dishonesty, including the amount of such loss and how the loss was computed;**

The City objects to this interrogatory on the grounds that it is unlimited in time and scope, and is therefore grossly overbroad. Whether Moorjani has ever committed a "theft" outside the scope of conduct alleged in the Complaint has no relevance to any party's claims or defenses, and would be grossly disproportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Based on this objection, the City will only respond to this interrogatory to the extent it inquires as to whether Moorjani committed a "Theft" in connection with the conduct alleged in the Complaint.

The term "theft" is defined in these interrogatories by reference to the 2014 and 2015 Policies, which define "theft" to mean "the unlawful taking of property to the deprivation of the Insured."

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1375

1   The City objects on the basis that this request seeks the premature disclosure

2   of expert witness information which is not discoverable at this time. The City does

3   not object to stating facts that may form the basis for an expert opinion and will

4   state such facts to the extent responsive to this interrogatory.

5   Deepak Moorjani, in his role as a City Official and as a principle in ULC,

6   engaged in a variety of dishonest acts with caused substantial losses to the City.

7   ULC was formed initially by Egger and Dillon in late 1993, and Moorjani

8   was subsequently added as a principal later that year. As will be further detailed

9   below, ULC entered into a series of contracts with Beaumont to provide consulting

10  services in connection with a large number of capital improvement projects being

11  undertaken by the City and funded by the sale of bonds.

12  Commencing in 1993, various bond issues were sold with a total face value

13  of approximately $367,240,000. Of this amount, approximately $267,004,166 was

14  expended for a variety of purpose.

15  These include the following:

| Bond Proceeds Usage | Amount |
|---|---|
| Construction – Design / Planning / Engineering / Mgmnt | $ 50,649,268 |
| Construction – 3rd Parties / Developers / Beaumont / Etc. | $193,948,343 |
| Cost of Issuance | $   5,134,984 |
| Underwriters Discount – Cost of Issuance | $   6,846,890 |
| Administration Expenses | $   3,567,143 |
| BFA Expenses | $   6,857,538 |
|  |  |
| **Total** | **$267,004,166** |

21  In their capacities as City officials, Dillon, Egger and Moorjani were

22  instrumental in the formation of a Community Facilities District ("CFD") for the

23  stated purpose of raising funds to finance capital improvement projects in

24  Beaumont. Each time a bond issue was approved by the City, a portion of the

25  bond proceeds were thereafter paid over to ULC for consulting services. The

26  identified purposes and amounts of bond funds paid to ULC included the

27  following:

| | Total Expenditure | Total Amt. to ULC | Percentage |
|---|---|---|---|

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1376

| Construction Design, Etc. | $50,649,268 | $45,391,831 | 90% |
| Cost of Issuance | $ 5,134,984 | $ | 15% |
| Administration Expenses | $ 3,567,143 | $ | 13% |
| Other Expenses | $ 6,857,538 | $ | 6% |
| **Totals** | **$66,208,933** | **$47,020,440** | |

ULC received more than $45 million of the bond proceeds which were allocated for Construction purposes. This equates to approximately 18.5% of the total funds allocated for Construction and 90% of the constructions costs associated with design, planning, engineering and management.

In addition to the receipt of approximately $47 million of bond proceeds, additional funds were paid to ULC directly by Beaumont for a variety of purposes including for service as city officials; for the management of the Wastewater Treatment Plant; and for services rendered for various capital improvement projects. The total amount of funds paid by Beaumont to ULC was approximately $42.3 million. In summary, the total amount received by ULC from both bond proceeds and payments directly by Beaumont totals approximately $89.3 million

ULC and its principals were initially hired by the City pursuant to an Agreement for Planning and Economic Development Services dated March 22, 1993. This agreement specified several broad categories of services for which ULC would be compensated. For Planning Services (Category I) and Economic Development Services (Category II), ULC was to be paid a lump sum monthly fee of $10,000. The agreement specified that the ULC principals maintain an office presence at City Hall for 28 hours per week. The agreement further identified an additional category called "Additional Services" for which ULC was to be compensated in accordance with the hourly rate schedule included as Exhibit A to the agreement. The Exhibit A states that ULC would be entitled to reimbursements of Professional Sub-Consultant Services at "Actual Cost plus 15%"

Shortly following the above agreement, another agreement was entered into between Beaumont and ULC. This agreement dated September 27, 1993, was titled

5:20-CV-02164- GW (KKX)

**EXHIBIT 21**
**PAGE 1377**

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

1  Agreement for Planning, Economic Development and Public Works Services. This
2  agreement was very similar to the initial agreement in that it sets forth the scope of
3  the duties of the principals of ULC in their capacities as officials for the City,
4  including the requirement to spend 28 hours per week working at City Hall. For
5  their services as public officials, ULC was paid $15,000 per month (an increase of
6  $5,000 per month from the prior agreement.) In addition, ULC was to provide
7  Public Works and Engineering Services as detailed in the agreement. For these
8  services, ULC was to be paid "on a time and materials basis <u>not exceeding four and</u>
9  <u>one half percent</u> (4.5%) of the confirmed construction cost of the public
10 improvements to be constructed." The agreement also has an additional scope of
11 work section called Additional Services. For these services, ULC was to be
12 compensated in accordance with the hourly rate schedule included as Exhibit A to
13 the agreement. The Exhibit A states that ULC would be entitled to reimbursements
14 of Professional Sub-Consultant Services at "Actual Cost plus 15%"

15      There was an amendment to the above-agreement with ULC in a document
16 dated April 11, 1994. In this amendment the language relating to the compensation
17 to be paid to ULC for Public Works Construction Management was modified
18 slightly. The language in this agreement states, "...compensation shall be on a time
19 and materials basis <u>not exceeding four and one half percent</u> (4.5%) of the bid price
20 awarded by the City for each project."

21      As noted above, ULC was paid from both bond funds and directly by the
22 City. To obtain these funds, ULC issued separate invoices on a monthly basis to
23 both the bond trustee and to Beaumont. In these invoices, ULC would list out
24 various categories of professionals who provided services that month, along with
25 the number of hours expended by each professional category. Examples of the
26 professional categories include:

27      ·      Principal

28      ·      Construction Manager

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1378

1 · Surveyor

2 · One Man Crew

3 · Two Man Crew

4 · Office Manager

5 · Executive Secretary

6     The agreement between ULC and the City states that ULC shall be paid on a

7 time and materials basis, and the invoices submitted by ULC purport to identify the

8 hours expended by various professionals during the period covered by the invoice.

9     ULC, by and through Egger, Dillon, and Moorjani, falsified these invoices

10 and overbilled the City by approximately 26,647 hours that were not actually

11 worked in a single calendar year. This represents an overbilling of approximately

12 $4,000,000 in a single calendar year. Similar overbillings occurred in other years.

13     Additionally, hours worked by third party vendors were included in the time

14 and billing records of ULC, and then included in the invoices issued by ULC. The

15 ULC principals applied extraordinary markups to these third party invoices. These

16 markups on occasion exceeded 300%.

17     The agreement between Beaumont and ULC previously discussed in this

18 response anticipated the submission and repayment of invoices paid by ULC, and

19 allows for a markup of <u>15%</u>.

20     The profits achieved by ULC as a result of the extraordinary markups on the

21 third party invoices has resulted in millions of illicit dollars in profits to ULC,

22 Egger, Dillon, and Moorjani, at the expense of the City.

23     Without information solely in the possession of the Egger, Dillon, Moorjani,

24 and Kapanicas (and a detailed and complicated analysis of the same), no third party

25 or "outsider" to the cabal of Kapanicas, Egger, Dillon, and Moorjani could have

26 reconciled these issues and discovered this illicit profit. This is all the more true in

27 that these parties were able to use their positions with the City to approve the

28 aforementioned invoices.

Best Best & Krieger LLP
Attorneys at Law
18101 Von Karman Avenue, Suite 1000
Irvine, California 92612

- 117 -

5:20-CV-02164- GW (KKX)

**EXHIBIT 21**
**PAGE 1379**

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

While not exhaustive, several examples of the markup and inflated charges follows:

In June 2011, Satori R.E. Solutions, Inc. sent invoice number 5, dated June 1, 20111, to ULC for services rendered during the month of May 2011. This invoice was for 185.42 hours of work at $40 per hour, for a total invoice amount of $7,416.80.

On its May 2011 time and billing worksheet submitted to the City, ULC listed under the Sundance Project 185.50 hours for Lana Guseva (the CEO and Secretary of Satori Real Estate Solutions, Inc.) for a total of $31,535, which equates to an hourly rate of $170, or $130 greater than what was charged to ULC.

In March 2011, Giroux & Associates sent invoice number 10-049-URB05, dated March 24, 2011, to ULC for services rendered during the month of March 2011. This invoice was for 10, 20, and 14 hours for the work of a Senior Scientist, Associate Planner, and Technician, respectively. The services were billed at rates of $120, $75, and $40 per hour, for total charges excluding travel of $3,260

On its March 2011 time and billing worksheet ULC listed under the Waste Water Treatment Plant Expansion Project 20 hours for an Associate Engineer, which agrees to the 20 hours for the Associate Planner noted above. ULC listed 14 hours for a CADD Technician, which agrees to the 14 hours for a Technician noted above. Lastly, ULC listed 42 hours for a Project Manager / Sr. Engineer, which reconciles with the 10 hours for the Senior Scientist noted above after adding in 32 hours of the Director of Environmental Services charged to ULC in the same period by EARSI. For these various services, ULC charged the City of Beaumont a total of $10,900. The total charges incurred by ULC for these services amounted to just $6,620, which indicates the services were marked up by $4,280, or an increase of 65% when examined in the aggregate.

In July 2011, Eric Lewis sent invoice number 84, dated July 24, 2011, to ULC for services rendered during the months of June and July 2011. This invoice

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1380

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

1   was for 19 hours of professional traffic engineering services. The services were

2   billed at a rate of $75 per hour, for total charges of $1,425.

3          On its July 2011 time and billing worksheet, ULC listed under City Wide

4   Traffic Surveys 19 hours for Eric Lewis, which agreed to the invoice noted in the

5   previous paragraph. For these various services, ULC charged the City of Beaumont

6   a total of $3,230 or $170 per hour. The total charges incurred by ULC for these

7   services was just $1,425, which indicates the services were marked up by $1,805, or

8   an increase of 126.67%.

9          Many additional examples exist, an exhaustive analysis of which would

10  constitute an expert opinion.

11         As previously discussed in this report, the agreement between Beaumont and

12  ULC put a cap on the amount of fees that ULC could receive for work performed

13  on public works construction projects. The amount of funds received by ULC,

14  Egger, Dillon, and Moorjani from the bond proceeds and the City related to capital

15  improvement projects far exceed this 4.5% cap. Overall, ULC, Egger, Dillon, and

16  Moorjani overbilled the City for tens of millions of dollars, the precise amount of

17  which has not yet been fully calculated (and additional third party discovery may be

18  necessary to complete this analysis), but which far exceeds any applicable policy

19  limit(s).

20         This overbilling was only able to be accomplished because of the positions at

21  the City held by Egger, Kapanicas, Dillon, and Moorjani.

22         Together, Kapanicas, Dillon, Egger, and Moorjani had almost total control

23  over the City of Beaumont. Dillon was the Planning Director of the City, Egger was

24  the Community and Economic Development Director, and Moorjani was the

25  Director of Public Works. These individuals were all members of the Kapanicas

26  Administration, and exercised substantial control over their respective departments.

27  As Department head officials and directors, these individuals were empowered with

28  broad authority under the Code. The Director of Public Works was empowered to

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1381

"administer, implement and enforce" the provisions of various ordinances and Chapters of the Code and grant or deny development permits. The Director of Planning was similarly empowered to administer various ordinances, including the City zoning ordinance, and was empowered to "interpret the intent" of provisions within the code. Critically, as Department Heads, these individuals were able to sign off on bond requisition forms, _including_ bond requisition forms for payment to ULC.  Deepak Moorjani, in particular, had a broad range of powers and responsibilities as Director of Public Works, including:

• Maintain a presence at City hall for 24 hours weekly

• Administer public works and engineering services including supervision of Public Works Department personnel and day to day operations of the Public Works Department as directed by the City Manager

• Direct maintenance and operation activities of the City's Public Works Department including those related to streets, public utilities, water, wastewater, reclaimed water and storm drain systems; motorized and non-motorized equipment; and routine contract administration

• Direct the Public Works Department design engineering, capital improvement projects (CIP), traffic engineering, construction inspection and material testing, surveying, construction management services and plan checking services

• Attend public meeting; assist the City Manager in preparation and maintenance of budgets; and provide leadership and motivation to all employees of the Public Works Department

• Review the plans prepared by civil engineers and other appropriate professionals on behalf of the City or private development interests for compliance with the ordinances of the City. Arrange reviews by other appropriate agencies having jurisdiction in such matters relative to the enforcement of relevant codes and compliance with UBC (Uniform Building Code, 1991) and Caltrans. Only when

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1382

1   satisfied that all conditions of approval and the appropriate requirements of the

2   City's codes and other relevant codes and standards have been met, the Public

3   Works Director shall approve or recommend approval of plans as relevant.

4       •   Provide inspection services during all phases of construction to enforce

5   compliance with codes and conditions of approval, provisions of the City

6   ordinances, Uniform Building Code (1991) and other requirements set forth on the

7   plans for which permits were issued for construction. In the performance of such

8   duties, ULC shall provide inspection for each project during and after completion of

9   various stages of construction to confirm compliance with approved plans.

10      •   Provide construction  management services during all phases of public

11  works construction to enforce compliance with codes and conditions of approval,

12  provisions of the City ordinances, Uniform Building code (1991) and other

13  requirements set forth on the plan and specification for which permits are issued for

14  construction. In the performance of such duties, ULC shall provide construction

15  management for each public works project before, during and after completion of

16  various stages of construction.

17      Moorjani, in conjunction with the other members of the Kapanicas

18  administration, was able to exercise these and other powers to prevent any party not

19  a part of their cabal from discovering, among other things, their own gross

20  overbilling.

21      The City contends that the course of conduct described above and other acts

22  and omissions of Moorjani constitutes "Theft," in that this conduct resulted in the

23  City's money being unlawfully taken to its deprivation

24      The City notes that this response is only based on information currently

25  available to it, and may not be exhaustive. This lawsuit is in its earliest stages, and

26  the City had not yet taken any depositions or conducted any thirty party discovery,

27  nor has it completed its analysis of the documents and information it presently

28  possesses.

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

- 121 -

5:20-CV-02164- GW (KKX)

**EXHIBIT 21**
**PAGE 1383**

1    The City further notes that it tendered this claim to National Union years ago,

2   and National Union thereafter had a duty to investigate this claim and seek evidence

3   *supporting* coverage.  CACI 2332; *Egan v. Mut. of Omaha Ins. Co.* 24 Cal.3d 809,

4   819 (1979); *Wilson v. 21st Century Ins. Co.*, 42 Cal.4th 713, 720-21 (2007);

5   *Mariscal v. Old Republic Life Ins. Co.*, 42 Cal.App.4th 1617, 1620 (1996). To the

6   City's knowledge, National Union has conducted no investigation whatsoever

7   seeking information that could support the City's claim (e.g., by contacting or

8   seeking information from any party besides the City), and has instead sought only

9   information from the City that would tend to establish that any losses the City has

10  suffered do not fall within the scope of an insuring provision, or fall within an

11  exclusion. The City therefore further responds to interrogatory that additional

12  responsive information may be in the possession, custody, or control of third parties

13  including Egger, Dillon, Kapanicas, ULC, the Federal Bureau of Investigation, the

14  Riverside County District Attorney's office, and former employees and officials of

15  the City of Beaumont, to the extent such information has not been lost, destroyed,

16  or forgotten during the years in which National Union has declined to investigate

17  possible grounds for coverage.

18  **INTERROGATORY NO. 3:**

19    In Paragraph 26 of the Complaint, you allege "On May 17, 2016, the County

20  of Riverside District Attorney's Office filed a felony complaint against the

21  Kapanicas administration members for criminal conflict of interest...." For each of

22  the Principals, please

23    (a)    state whether you contend he acted with or despite a conflict of interest

24  and if so, the factual basis for your contention;

25    (b)    state whether you contend that acting with or despite a conflict of

26  interest constitutes Theft;

27    (c)    state whether you contend that acting with or despite a conflict of

28    interest constitutes Dishonesty;

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1384

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

(d)   state whether you contend that acting with or despite a conflict of interest constitutes Faithless Performance;

(e)   describe any loss suffered by the City as a result of the alleged conflict of interest (including the amount of such loss and how you computed that loss); and

(f)   state the factual basis for your contentions.

**RESPONSE TO INTERROGATORY NO. 3:**

The City objects to this interrogatory as compound, consisting of at least seven discrete subparts that are not logically or factually subsumed within or necessarily related to the primary question.

The City recognizes the difficulty in determining whether a single interrogatory encompasses multiple interrogatories, and has attempted to conservatively determine the discrete primary questions posed in each interrogatory, while also avoiding waiving its objections to Defendant serving in excess of 25 interrogatories. The City notes that it has primarily relied upon the line of cases discussing (1) whether two subparts "are logically or factually subsumed within and necessarily related to the primary question" and (2) whether the first "question" can be answered fully and completely without answering the second. *See generally MCC Controls v. Hal Hays Construction*, 2020 WL 6034321, at *4 (C.D. Cal., July 23, 2020) (Kato, Mag.J.) (concluding that most courts have adopted the "logically or factually subsumed" test and discussing and applying same); *see also id.* (approvingly citing *Withers v. eHarmony, Inc*., No. CV 09-2266-GHK (RCx), 2010 WL 11520197, at *3 (C.D. Cal. Apr. 1, 2010) and noting that court had sustained compound objection as to interrogator seeking information concerning 25 separate individuals). By way of an example of how the City has applied these lines of cases, the City concludes that the question: "Did Kapanicas engage in dishonesty when he [___]?" can be answered fully and completed without answering "Did Kapanicas engage in faithless performance when he [__]."

B**EST** B**EST** & K**RIEGER** LLP
A**TTORNEYS AT** L**AW**
18101 V**ON** K**ARMAN** A**VENUE**, S**UITE** 1000
I**RVINE**, C**ALIFORNIA** 92612

5:20-CV-02164- GW (KKX)

**EXHIBIT 21**
**PAGE 1385**

Moreover, these questions may have different answers depending upon the omitted bracketed material. The City further notes whether an individual engaged in "dishonesty" is not logically and factually subsumed in the inquiry of whether an individual failed to perform duties prescribed by law. *See* Definition No. 19. The common understanding of "dishonesty" is very distinct from the scope of duties imposed by the law.

The City interprets this interrogatory as posing the following seven primary questions:

(1) Whether the City contends that acting with or despite a conflict of interest constitutes "dishonesty," and, if so, the factual basis for this contention (subparagraphs (b) and (f));

(2) Whether the City contends that acting with or despite a conflict of interest constitutes "Theft," and, if so, the factual basis for this contention (subparagraphs (c) and (f));

(3) Whether the City contends that acting with or despite a conflict of interest constitutes "Faithless Performance," and, if so, the factual basis for this contention (subparagraphs (c) and (f));

(4) Whether the City contends that Alan Kapanicas acted with or despite a conflict of interest, and if so, the factual basis for this contention, as well as an explanation of any "loss" caused by this conflict of interest (including the amount of such loss, and an explanation for the computation of this loss) (subparagraphs (a), (e) and (f));

(5) Whether the City contends that Ernest Egger acted with or despite a conflict of interest, and if so, the factual basis for this contention, as well as an explanation of any "loss" caused by this conflict of interest (including the amount of such loss, and an explanation for the computation of this loss) (subparagraphs (a), (e), and (f));

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1386

(6) Whether the City contends that David Dillon acted with or despite a conflict of interest, and if so, the factual basis for this contention, as well as an explanation of any "loss" caused by this conflict of interest (including the amount of such loss, and an explanation for the computation of this loss) (subparagraphs (a), (e), and (f));

(7) Whether the City contends that David Dillon acted with or despite a conflict of interest, and if so, the factual basis for this contention, as well as an explanation of any "loss" caused by this conflict of interest (including the amount of such loss, and an explanation for the computation of this loss) (subparagraphs (a), (e), and (f))[1]

The City counts this interrogatory as seven interrogatories. The City responds to these interrogatories, as the City understands them, as follows:

**(1) Whether the City contends that acting with or despite a conflict of interest constitutes "dishonesty," and, if so, the factual basis for this contention (subparagraphs (b) and (f));**

The term "conflict of interest" is not defined in this interrogatory or in the definition section of this set of interrogatories. Based on this interrogatory's reference to the felony complaint filed against the Principals for "felony conflict of interest," the City interprets this request as inquiring whether the City contends that a violation of California Government Code section 1090 constitutes "dishonesty."

Government Code section 1090 provides in relevant part:

"(a) Members of the Legislature, state, county, district, judicial district, and city officers or employees shall not be financially interested in any contract made by them in their official capacity, or by any body or board of which they are

_____

[1] Discrete questions 4, 5, 6, and 7 arguably constitute at least two interrogatories each (one primary question as to whether a certain individual acted with or despite a conflict of interest, and a separate interrogatory concerning whether such actions caused the city a "loss", and an explanation of the amount, calculation, and factual basis for such "loss") but the City will treat them as one interrogatory each at this time and in an abundance of caution.

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1387

1  members. Nor shall state, county, district, judicial district, and city officers or

2  employees be purchasers at any sale or vendors at any purchase made by them in

3  their official capacity."

4    Based on this definition, the City responds that a violation of California

5  Government Codes section 1090 may or may not involve dishonesty, depending on

6  the particular factual circumstances involved. Stated differently, the City does not

7  contend that a violation of Government Code Section 1090 always and necessarily

8  involves an affirmative act of "dishonesty" as the term is commonly understood.

9    Regardless, at the present time, and based on the facts now available to the

10  City and the City's understanding of the relevant insuring provisions and applicable

11  authority, the City does not currently contend that it suffered a "loss" covered by

12  any insuring provision in the 2014 Policy and the 2015 Policy resulting from a

13  violation of Government Code section 1090.

14    The City further responds that even assuming *arguendo* that the purported

15  loss was within an insuring provision of the 2014 or 2015 Policy, the City could not

16  have discovered such a loss because of the pervasive control of the Kapanicas

17  administration. The member of the Kapanicas administration exercised an

18  extraordinary level of power and control over the functioning of the City. The City

19  Manager and cabal of high ranking officials, logically and as a matter of fact,

20  controlled the City to such an extent as to preclude discovery of their own

21  wrongdoing while they remained in power.  The doctrine of adverse domination

22  therefore applies.

23

24    **(2) Whether the City contends that acting with or despite a conflict of**

25  **interest constitutes "Theft," and, if so, the factual basis for this contention**

26  **(subparagraphs (c) and (f))**;

27    The term "conflict of interest" is not defined in this interrogatory or in the

28  definition section of this set of interrogatories. Based on this interrogatory's

B EST B EST & K RIEGER LLP
A TTORNEYS AT L AW
18101 V ON K ARMAN A VENUE, S UITE 1000
I RVINE, C ALIFORNIA 92612

**EXHIBIT 21**
**PAGE 1388**

reference to the felony complaint filed against the Principals for "felony conflict of interest," the City interprets this request as inquiring whether the City contends that a violation of California Government Code section 1090 constitutes "theft."

Government Code section 1090 provides in relevant part:

"(a) Members of the Legislature, state, county, district, judicial district, and city officers or employees shall not be financially interested in any contract made by them in their official capacity, or by any body or board of which they are members. Nor shall state, county, district, judicial district, and city officers or employees be purchasers at any sale or vendors at any purchase made by them in their official capacity."

The term "theft" is defined in these interrogatories by reference to the 2014 and 2015 Policies, which define "theft" to mean "the unlawful taking of property to the deprivation of the Insured."

Based on these definition, the City responds that a violation of California Government Codes section 1090 may or may not involve "Theft", depending on the particular factual circumstances involved, and in particular based on whether or not the violation of California Government Code section 1090 results in "the unlawful taking of property to the deprivation" of a particular insured. Stated differently, the City does not contend that a violation of Government Code section 1090 necessarily constitutes "Theft."

Regardless, at the present time, and based on the facts now available to the City and the City's understanding of the relevant insuring provisions and applicable authority, the City does not currently contend that it suffered a "loss" covered by any insuring provision in the 2014 Policy and the 2015 Policy resulting from a violation of Government Code section 1090.

The City further responds that even assuming *arguendo* that the purported loss was within an insuring provision of the 2014 or 2015 Policy, the City could not have discovered such a loss because of the pervasive control of the Kapanicas

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1389

1   administration. The member of the Kapanicas administration exercised an

2   extraordinary level of power and control over the functioning of the City. The City

3   Manager and cabal of high ranking officials, logically and as a matter of fact,

4   controlled the City to such an extent as to preclude discovery of their own

5   wrongdoing while they remained in power.  The doctrine of adverse domination

6   therefore applies.

7

8       **(3) Whether the City contends that acting with or despite a conflict of**

9   **interest constitutes "Faithless Performance," and, if so, the factual basis for**

10  **this contention (subparagraphs (c) and (f));**

11      The term "conflict of interest" is not defined in this interrogatory or in the

12  definition section of this set of interrogatories. Based on this interrogatory's

13  reference to the felony complaint filed against the Principals for "felony conflict of

14  interest," the City interprets this request as inquiring whether the City contends that

15  a violation of California Government Code section 1090 constitutes "faithless

16  performance."

17      Government Code section 1090 provides in relevant part:

18      "(a) Members of the Legislature, state, county, district, judicial district, and

19  city officers or employees shall not be financially interested in any contract made

20  by them in their official capacity, or by any body or board of which they are

21  members. Nor shall state, county, district, judicial district, and city officers or

22  employees be purchasers at any sale or vendors at any purchase made by them in

23  their official capacity."

24      Definition No. 19 of this set of interrogatories defined "Faithless

25  Performance" to mean "failure to faithfully perform duties prescribed by law." The

26  City notes that this definition is meaningfully different than the definition of the

27  conduct described in Endorsement No. 4 ("Faithful Performance of Duty

28

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

5:20-CV-02164- GW (KKX)

**EXHIBIT 21**
**PAGE 1390**

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

Coverage") to the 2014 Policy and the 2015 Policy, but the City will respond to the interrogatory based on the definitions provided.

Based on these definitions, the City responds that the plain language of California Government Code Section 1090 appears to prescribe certain duties – in particular, to refrain from engaging in conduct proscribed by this section. Therefore, engaging in conduct proscribed by California Government Code section 1090 could arguably constitute "Faithless Performance" as defined in this interrogatory (which, as noted, is meaningfully different than the definition of the conduct described in Endorsement No. 4 to the 2014 Policy and the 2015 Policy) in that such conduct could constitute a "failure to faithfully perform duties prescribed by law." However, the City does not affirmatively contend that acting with or despite a conflict of interest necessarily constitutes faithless performance.

Regardless, at the present time, and based on the facts now available to the City and the City's understanding of the relevant insuring provisions and applicable authority, the City does not currently contend that it suffered a "loss" covered by any insuring provision in the 2014 Policy and the 2015 Policy resulting from a violation of Government Code section 1090.

The City further responds that even assuming *arguendo* that the purported loss was within an insuring provision of the 2014 or 2015 Policy, the City could not have discovered such a loss because of the pervasive control of the Kapanicas administration. The member of the Kapanicas administration exercised an extraordinary level of power and control over the functioning of the City. The City Manager and cabal of high ranking officials, logically and as a matter of fact, controlled the City to such an extent as to preclude discovery of their own wrongdoing while they remained in power.  The doctrine of adverse domination therefore applies.

**(4) Whether the City contends that Alan Kapanicas acted with or despite a conflict of interest, and if so, the factual basis for this contention, as well as**

**EXHIBIT 21**
**PAGE 1391**

**an explanation of any "loss" caused by this conflict of interest (including the amount of such loss, and an explanation for the computation of this loss);**

The term "conflict of interest" is not defined in this interrogatory or in the definition section of this set of interrogatories. Based on this interrogatory's reference to the felony complaint filed against the Principals for "felony conflict of interest," the City interprets this request as inquiring whether the City contends that Alan Kapanicas violated California Government Code section 1090, and whether any such violation caused the City a "loss." While the term "loss" is not defined, in the context of this lawsuit the City interprets the term "loss" as being used consistently with how it is used in the relevant provisions in the 2014 Policy and 2015 Policy (e.g., as the term is used in Section A.2 of the 2014 Policy: "we will pay for loss of or damage to money, securities, and other property resulting directly from theft committed by each employee . . . .")

The City does not, based on the information currently available to it, affirmatively contend that Alan Kapanicas criminally violated Government Code section 1090. For the sake of clarity, the City does not expressly contend that Alan Kapanicas did *not* violate Government Code section 1090, only that based on the information now possessed by the City it does *contend* that Kapanicas violated Government Code section 1090.

However, based on the criminal charges brought against Alan Kapanicas by the Riverside County District Attorney's Office and the investigation conducted by this department, the City believes it is likely that Kapanicas may have violated California Government Code section 1090.

At the present time, and based on the facts now available to the City and the City's understanding of the relevant insuring provisions and applicable authority, the City does not currently contend that it suffered a "loss" covered by any insuring provision in the 2014 Policy and the 2015 Policy resulting directly from a violation of Government Code section 1090 by Alan Kapanicas.

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1392

1   The City further responds that even assuming *arguendo* that Alan Kapanicas

2   acted with a "conflict of interest" in such a manner as to cause the City a "loss"

3   falling within an insuring provision of the 2014 or 2015 Policy, the City could not

4   have discovered such a loss because of the pervasive control of the Kapanicas

5   administration. The member of the Kapanicas administration exercised an

6   extraordinary level of power and control over the functioning of the City. The City

7   Manager and cabal of high ranking officials, logically and as a matter of fact,

8   controlled the City to such an extent as to preclude discovery of their own

9   wrongdoing while they remained in power.  The doctrine of adverse domination

10  therefore applies.

11  **(5) Whether the City contends that Ernest Egger acted with or despite a**

12  **conflict of interest, and if so, the factual basis for this contention, as well as an**

13  **explanation of any "loss" caused by this conflict of interest (including the**

14  **amount of such loss, and an explanation for the computation of this loss).**

15  The term "conflict of interest" is not defined in this interrogatory or in the

16  definition section of this set of interrogatories. Based on this interrogatory's

17  reference to the felony complaint filed against the Principals for "felony conflict of

18  interest," the City interprets this request as inquiring whether the City contends that

19  Ernest Egger violated California Government Code section 1090, and whether any

20  such violation caused the City a "loss." While the term "loss" is not defined, in the

21  context of this lawsuit the City interprets the term "loss" as being used consistently

22  with how it is used in the relevant provisions in the 2014 Policy and 2015 Policy

23  (e.g., as the term is used in Section A.2 of the 2014 Policy: "we will pay for loss of

24  or damage to money, securities, and other property resulting directly from theft

25  committed by each employee . . . .")

26  The City does not, based on the information currently available to it,

27  affirmatively contend that Egger criminally violated Government Code section

28  1090. For the sake of clarity, the City does not expressly contend that Egger did *not*

Best Best & Krieger LLP
Attorneys at Law
18101 Von Karman Avenue, Suite 1000
Irvine, California 92612

5:20-CV-02164- GW (KKX)

**EXHIBIT 21**
**PAGE 1393**

1  violate Government Code section 1090, only that based on the information now

2  possessed by the City it does *contend* that Egger violated Government Code section

3  1090.

4       Based on the criminal charges brought against Egger by the Riverside

5  County District Attorney's Office and the investigation conducted by this

6  department, the City believes it is likely that Egger may have violated California

7  Government Code section 1090.

8       At the present time, and based on the facts now available to the City and the

9  City's understanding of the relevant insuring provisions and applicable authority,

10  the City does not currently contend that it suffered a "loss" covered by any insuring

11  provision in the 2014 Policy and the 2015 Policy resulting directly from a violation

12  of Government Code section 1090 by Egger.

13       The City further responds that even assuming *arguendo* that Ernest Egger

14  acted with a "conflict of interest" in such a manner as to cause the City a "loss"

15  falling within an insuring provision of the 2014 or 2015 Policy, the City could not

16  have discovered such a loss because of the pervasive control of the Kapanicas

17  administration. The member of the Kapanicas administration exercised an

18  extraordinary level of power and control over the functioning of the City. The City

19  Manager and cabal of high ranking officials, logically and as a matter of fact,

20  controlled the City to such an extent as to preclude discovery of their own

21  wrongdoing while they remained in power.  The doctrine of adverse domination

22  therefore applies.

23       **(6) Whether the City contends that David Dillon acted with or despite a**

24  **conflict of interest, and if so, the factual basis for this contention, as well as an**

25  **explanation of any "loss" caused by this conflict of interest (including the**

26  **amount of such loss, and an explanation for the computation of this loss)**

27       The term "conflict of interest" is not defined in this interrogatory or in the

28  definition section of this set of interrogatories. Based on this interrogatory's

Best Best & Krieger LLP
Attorneys at Law
1810 Von Karman Avenue, Suite 1000
Irvine, California 92612

- 132 -

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1394

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

1   reference to the felony complaint filed against the Principals for "felony conflict of

2   interest," the City interprets this request as inquiring whether the City contends that

3   David Dillon violated California Government Code section 1090, and whether any

4   such violation caused the City a "loss." While the term "loss" is not defined, in the

5   context of this lawsuit the City interprets the term "loss" as being used consistently

6   with how it is used in the relevant provisions in the 2014 Policy and 2015 Policy

7   (e.g., as the term is used in Section A.2 of the 2014 Policy: "we will pay for loss of

8   or damage to money, securities, and other property resulting directly from theft

9   committed by each employee . . . .")

10      The City does not, based on the information currently available to it,

11   affirmatively contend that David Dillon criminally violated Government Code

12   section 1090. For the sake of clarity, the City does not expressly contend that Alan

13   Kapanicas did *not* violate Government Code section 1090, only that based on the

14   information now possessed by the City it does *contend* that David Dillon violated

15   Government Code section 1090.

16      Based on the criminal charges brought against David Dillon by the Riverside

17   County District Attorney's Office and the investigation conducted by this

18   department, the City believes it is likely that Dillon may have violated California

19   Government Code section 1090.

20      At the present time, and based on the facts now available to the City and the

21   City's understanding of the relevant insuring provisions and applicable authority,

22   the City does not currently contend that it suffered a "loss" covered by any insuring

23   provision in the 2014 Policy and the 2015 Policy resulting directly from a violation

24   of Government Code section 1090 by David Dillon.

25      The City further responds that even assuming *arguendo* that David Dillon

26   acted with a "conflict of interest" in such a manner as to cause the City a "loss"

27   falling within an insuring provision of the 2014 or 2015 Policy, the City could not

28   have discovered such a loss because of the pervasive control of the Kapanicas

1  administration. The member of the Kapanicas administration exercised an

2  extraordinary level of power and control over the functioning of the City. The City

3  Manager and cabal of high ranking officials, logically and as a matter of fact,

4  controlled the City to such an extent as to preclude discovery of their own

5  wrongdoing while they remained in power. The doctrine of adverse domination

6  therefore applies.

7      **(7) Whether the City contends that Deepak Moorjani acted with or**

8  **despite a conflict of interest, and if so, the factual basis for this contention, as**

9  **well as an explanation of any "loss" caused by this conflict of interest**

10  **(including the amount of such loss, and an explanation for the computation of**

11  **this loss)**

12      The term "conflict of interest" is not defined in this interrogatory or in the

13  definition section of this set of interrogatories. Based on this interrogatory's

14  reference to the felony complaint filed against the Principals for "felony conflict of

15  interest," the City interprets this request as inquiring whether the City contends that

16  Moorjani violated California Government Code section 1090, and whether any such

17  violation caused the City a "loss." While the term "loss" is not defined, in the

18  context of this lawsuit the City interprets the term "loss" as being used consistently

19  with how it is used in the relevant provisions in the 2014 Policy and 2015 Policy

20  (e.g., as the term is used in Section A.2 of the 2014 Policy: "we will pay for loss of

21  or damage to money, securities, and other property resulting directly from theft

22  committed by each employee . . . .")

23      The City does not, based on the information currently available to it,

24  affirmatively contend that Moorjani criminally violated Government Code section

25  1090. For the sake of clarity, the City does not expressly contend that Moorjani did

26  *not* violate Government Code section 1090, only that based on the information now

27  possessed by the City it does *contend* that Moorjani violated Government Code

28  section 1090.

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

5:20-CV-02164- GW (KKX)

**EXHIBIT 21**
**PAGE 1396**

1    Based on the criminal charges brought against Moorjani by the Riverside

2   County District Attorney's Office and the investigation conducted by this

3   department, the City believes it is likely that Moorjani may have violated California

4   Government Code section 1090.

5    At the present time, and based on the facts now available to the City and the

6   City's understanding of the relevant insuring provisions and applicable authority,

7   the City does not currently contend that it suffered a "loss" covered by any insuring

8   provision in the 2014 Policy and the 2015 Policy resulting directly from a violation

9   of Government Code section 1090 by Moorjani.

10    The City further responds that even assuming *arguendo* that Deepak

11   Moorjani acted with a "conflict of interest" in such a manner as to cause the City a

12   "loss" falling within an insuring provision of the 2014 or 2015 Policy, the City

13   could not have discovered such a loss because of the pervasive control of the

14   Kapanicas administration. The member of the Kapanicas administration exercised

15   an extraordinary level of power and control over the functioning of the City. The

16   City Manager and cabal of high ranking officials, logically and as a matter of fact,

17   controlled the City to such an extent as to preclude discovery of their own

18   wrongdoing while they remained in power.  The doctrine of adverse domination

19   therefore applies.

20   **<u>INTERROGATORY NO. 4:</u>**

21    In Paragraph 17 of the Complaint, you allege that "Kapanicas authorized

22   payments by the City to his company GGMS." Please state whether you contend

23   that such conduct constitutes:

24    (a) Theft;

25

26    (b) Dishonesty; and/or

27    (c) Faithless Performance.

28

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
1800 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

5:20-CV-02164- GW (KKX)

**EXHIBIT 21**
**PAGE 1397**

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

1       If so, please explain the factual basis for your contention and describe loss

2   the City suffered resulting directly therefrom.

3   **RESPONSE TO INTERROGATORY NO. 4:**

4       The City objects to this interrogatory as compound, consisting of at least

5   three discrete subparts that are not logically or factually subsumed within or

6   necessarily related to the primary question.

7       The City recognizes the difficulty in determining whether a single

8   interrogatory encompasses multiple interrogatories, and has attempted to

9   conservatively determine the discrete primary questions posed in each

10   interrogatory, while also avoiding waiving its objections to Defendant serving in

11   excess of 25 interrogatories. The City notes that it has primarily relied upon the line

12   of cases discussing (1) whether two subparts "are logically or factually subsumed

13   within and necessarily related to the primary question" and (2) whether the first

14   "question" can be answered fully and completely without answering the second.

15   *See generally MCC Controls v. Hal Hays Construction*, 2020 WL 6034321, at *4

16   (C.D. Cal., July 23, 2020) (Kato, Mag.J.) (concluding that most courts have adopted

17   the "logically or factually subsumed" test and discussing and applying same); *see*

18   *also id*. (approvingly citing *Withers v. eHarmony, Inc*., No. CV 09-2266-GHK

19   (RCx), 2010 WL 11520197, at *3 (C.D. Cal. Apr. 1, 2010) and noting that court

20   had sustained compound objection as to interrogator seeking information

21   concerning 25 separate individuals). By way of an example of how the City has

22   applied these lines of cases, the City concludes that the question: "Did Kapanicas

23   engage in dishonesty when he [___]?" can be answered fully and completed

24   without answering "Did Kapanicas engage in faithless performance when he [__]."

25   Moreover, these questions may have different answers depending upon the omitted

26   bracketed material. The City further notes whether an individual engaged in

27   "dishonesty" is not logically and factually subsumed in the inquiry of whether an

28   individual failed to perform duties prescribed by law. *See* Definition No. 19. The

- 136 -

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

common understanding of "dishonesty" is very distinct from the scope of duties imposed by the law.

The City interprets this interrogatory as posing the following three primary questions:

(1) Does the City contend that Alan Kapanicas' acts of authorizing payment by the City to his company GGMS constitutes "Theft," and if so explain (i) the factual basis for this contention; and (ii) describe [any] loss the City suffered resulting therefrom.

(2) Does the City contend that Alan Kapanicas' acts of authorizing payment by the City to his company GGMS constitutes "Dishonesty," and if so explain (i) the factual basis for this contention; and (ii) describe [any] loss the City suffered resulting therefrom.

(3) Does the City contend that Alan Kapanicas' acts of authorizing payment by the City to his company GGMS constitutes "Faithless Performance," and if so explain (i) the factual basis for this contention; and (ii) describe [any] loss the City suffered resulting therefrom.

The City will count this interrogatory as three interrogatories. Based on the City's understanding of these interrogatories, the City responds as follows:

**(1) Does the City contend that Alan Kapanicas' acts of authorizing payment by the City to his company GGMS constitutes "Theft," and if so explain (i) the factual basis for this contention; and (ii) describe [any] loss the City suffered resulting therefrom.**

The term "theft" is defined in these interrogatories by reference to the 2014 and 2015 Policies, which define "theft" to mean "the unlawful taking of property to the deprivation of the Insurance."

The City does not at this time contend that the act of authorizing payment by the City to GGMS necessarily constitutes "the unlawful taking of property to the deprivation of the Insurance." To the extent later acquired information establishes

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1399

1  that GGMS did not provide the City the services it billed the City for or that GGMS

2  otherwise overbilled the City, the City would contend that the act of authorizing

3  such payment could constitute theft.

4      The City further responds that it believes GGMS may in fact have overbilled

5  the City, but the City is not yet aware of the specifics of this overbilling and the

6  City's investigation continues.

7  **(2) Does the City contend that Alan Kapanicas' acts of authorizing**

8  **payment by the City to his company GGMS constitutes "Dishonesty," and if so**

9  **explain (i) the factual basis for this contention; and (ii) describe [any] loss the**

10  **City suffered resulting therefrom.**

11      The City does not at this time contend that the act of authorizing payment by

12  the City to GGMS constitutes dishonesty. To the extent later acquired information

13  establishes that GGMS did not provide the City the services it billed the City for or

14  that GGMS otherwise overbilled the City, the City would contend that the act of

15  authorizing such payment could constitute dishonesty.

16      The City further responds that it believes GGMS may in fact have overbilled

17  the City, but the City is not yet aware of the specifics of this overbilling and the

18  City's investigation continues.

19  **(3) Does the City contend that Alan Kapanicas' acts of authorizing**

20  **payment by the City to his company GGMS constitutes "Faithless**

21  **Performance," and if so explain (i) the factual basis for this contention; and (ii)**

22  **describe [any] loss the City suffered resulting therefrom.**

23      The City does not at this time contend that the act of authorizing payment by

24  the City to GGMS constitutes faithless performance. To the extent later acquired

25  information establishes that GGMS did not provide the City the services it billed

26  the City for or that GGMS otherwise overbilled the City, the City would contend

27  that the act of authorizing such payment could constitute faithless performance.

28

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

5:20-CV-02164- GW (KKX)

**EXHIBIT 21**
**PAGE 1400**

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

1   The City further responds that it believes GGMS may in fact have overbilled

2   the City, but the City is not yet aware of the specifics of this overbilling and the

3   City's investigation continues.

4   **INTERROGATORY NO. 5:**

5   In Paragraph 24 of the Complaint, you allege that "Kapanicas allowed the

6   ULC principles to enter into self-dealing contracts with the City without adequate

7   competitive bidding." Please state whether you contend that such conduct

8   constitutes:

9   (a) Theft;

10  (b) Dishonesty; and/or

11

12  (c) Faithless performance.

13  If so, please explain the factual basis for your contention and describe loss

14  the City suffered resulting directly therefrom.

15  **RESPONSE TO INTERROGATORY NO. 5:**

16  The City objects to this interrogatory as compound, consisting of at least

17  three discrete subparts that are not logically or factually subsumed within or

18  necessarily related to the primary question.

19  The City recognizes the difficulty in determining whether a single

20  interrogatory encompasses multiple interrogatories, and has attempted to

21  conservatively determine the discrete primary questions posed in each

22  interrogatory, while also avoiding waiving its objections to Defendant serving in

23  excess of 25 interrogatories. The City notes that it has primarily relied upon the line

24  of cases discussing (1) whether two subparts "are logically or factually subsumed

25  within and necessarily related to the primary question" and (2) whether the first

26  "question" can be answered fully and completely without answering the second.

27  *See generally MCC Controls v. Hal Hays Construction*, 2020 WL 6034321, at *4

28  (C.D. Cal., July 23, 2020) (Kato, Mag.J.) (concluding that most courts have adopted

5:20-CV-02164- GW (KKX)

**EXHIBIT 21**
**PAGE 1401**

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

1   the "logically or factually subsumed" test and discussing and applying same); *see
2   also id*. (approvingly citing *Withers v. eHarmony, Inc*., No. CV 09-2266-GHK
3   (RCx), 2010 WL 11520197, at *3 (C.D. Cal. Apr. 1, 2010) and noting that court
4   had sustained compound objection as to interrogator seeking information
5   concerning 25 separate individuals). By way of an example of how the City has
6   applied these lines of cases, the City concludes that the question: "Did Kapanicas
7   engage in dishonesty when he [____]?" can be answered fully and completed
8   without answering "Did Kapanicas engage in faithless performance when he [__]."
9   Moreover, these questions may have different answers depending upon the omitted
10  bracketed material. The City further notes whether an individual engaged in
11  "dishonesty" is not logically and factually subsumed in the inquiry of whether an
12  individual failed to perform duties prescribed by law. *See* Definition No. 19. The
13  common understanding of "dishonesty" is very distinct from the scope of duties
14  imposed by the law.

15      The City interprets this interrogatory as posing the following three primary
16  questions:

17      (1) Does the City contend that Kapanicas' act of allowing the ULC principles
18  to enter into self-dealing contracts with the City without adequate competitive
19  bidding constitute theft? If so, explain the factual basis for this contention, and
20  describe [any] loss the City suffered resulting directly therefrom.

21      (2) Does the City contend that Kapanicas' act of allowing the ULC principles
22  to enter into self-dealing contracts with the City without adequate competitive
23  bidding constitute Dishonesty? If so, explain the factual basis for this contention,
24  and describe [any] loss the City suffered resulting directly therefrom.

25      (3) Does the City contend that Kapanicas' act of allowing the ULC principles
26  to enter into self-dealing contracts with the City without adequate competitive
27  bidding constitute Dishonesty? If so, explain the factual basis for this contention,
28  and describe [any] loss the City suffered resulting directly therefrom.

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1402

1    The City counts this interrogatory as three interrogatories.

2    Based on the City's understanding of these interrogatories, the City responds

3    as follows:

4    **(1) Does the City contend that Kapanicas' act of allowing the ULC**

5    **principles to enter into self-dealing contracts with the City without adequate**

6    **competitive bidding constitute theft? If so, explain the factual basis for this**

7    **contention, and describe [any] loss the City suffered resulting directly**

8    **therefrom:**

9    The term "theft" is defined in these interrogatories by reference to the 2014

10   and 2015 Policies, which define "theft" to mean "the unlawful taking of property to

11   the deprivation of the Insured."

12   The City does not contend that the act of allowing the ULC principles to

13   enter into self-dealing contracts with the City without adequate competitive bidding

14   itself constitutes "the unlawful taking of property to the deprivation of the

15   Insurance."

16   **(2) Does the City contend that Kapanicas' act of allowing the ULC**

17   **principles to enter into self-dealing contracts with the City without adequate**

18   **competitive bidding constitute Dishonesty? If so, explain the factual basis for**

19   **this contention, and describe [any] loss the City suffered resulting directly**

20   **therefrom.**

21   The City is without sufficient information at this time to make a contention

22   regarding the mental state of Kapanicas, and in particular whether his act of

23   allowing the ULC principles to enter into self-dealing contracts with the City

24   without adequate competitive bidding involved "dishonesty." The City does not

25   contend that in all circumstances an act of allowing a contract to be entered into

26   without adequate competitive bidding constitutes "dishonesty."

27   **(3) Does the City contend that Kapanicas' act of allowing the ULC**

28   **principles to enter into self-dealing contracts with the City without adequate**

Best Best & Krieger LLP
Attorneys at Law
18101 Von Karman Avenue, Suite 1000
Irvine, California 92612

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1403

**competitive bidding constitute Faithless Performance? If so, explain the**

**factual basis for this contention, and describe [any] loss the City suffered**

**resulting directly therefrom.**

Rule 33 of the Federal Rules of Civil Procedure provides that "[u]nless
otherwise stipulated or ordered by the court, a party may serve on any other party
no more than 25 written interrogatories, including all discrete subparts." Fed. R.
Civ. Proc. 33(a)(1). Defendant has not requested and Plaintiffs have not agreed to a
stipulation that would allow the parties to serve on one another more than 25
written interrogatories, including all discrete subparts. Moreover, the Court has not
entered an order that would allow the parties to serve on one another more than 25
written interrogatories, including all discrete subparts. As such, and pursuant to
Rule 33 of the Federal Rules of Civil Procedure, the City objects to this
interrogatory as beyond the 25 written interrogatories, including all discrete
subparts, that a party may serve without stipulation or order of the court. Based
thereon, the City will not respond to this interrogatory.

[Definition No. 19 of this set of interrogatories defined "Faithless
Performance" to mean "failure to faithfully perform duties prescribed by law." The
City notes that this definition is meaningfully different than the definition of the
conduct described in Endorsement No. 4 ("Faithful Performance of Duty
Coverage") to the 2014 Policy and the 2015 Policy, but the City will respond to the
interrogatory based on the definitions provided

Government Code section 4529.12 provides that, commencing in 2000,
engineering and architectural contracts must be awarded on the basis of a
competitive process. Similar requirements are found in Beaumont Municipal Code
section 3.00.010, 3.00.040, and 3.00.050. By allowing the creation of contracts that
did not comply with the duties imposed by these sources of law, Kapanicas failed to
perform duties prescribed by law.

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

5:20-CV-02164- GW (KKX)

**EXHIBIT 21**
**PAGE 1404**

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
1800 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

1      At the present time, and based on the facts now available to the City and the

2  City's understanding of the relevant insuring provisions and applicable authority,

3  the City does not currently contend that suffered a "loss" covered by any insuring

4  provision in the 2014 Policy and the 2015 Policy directly from the act itself of

5  Kapanicas allowing ULC Principles to enter into contracts with the City without

6  adequate competitive bidding. The City notes, however, that this act made easier

7  later acts of theft and other conduct covered by the 2014 Policy and 2015 Policy

8  that led to a "loss" on the part of the City in excess ]

9  **INTERROGATORY NO. 6:**

10      In Paragraph 24 of the Complaint, you allege that "Kapanicas allowed the

11  ULC principles to enter into self-dealing contracts with the City without adequate

12  competitive bidding." Please state whether you contend entering into contracts

13  with ULC without competitive bidding constitutes:

14      (a) Theft;

15

16      (b) Dishonesty; and/or

17      (c) Faithless Performance.

18      If so, please explain the factual basis for your contention and describe loss

19  the City suffered resulting directly therefrom.

20  **RESPONSE TO INTERROGATORY NO. 6:**

21      Rule 33 of the Federal Rules of Civil Procedure provides that "[u]nless

22  otherwise stipulated or ordered by the court, a party may serve on any other party

23  no more than 25 written interrogatories, including all discrete subparts." Fed. R.

24  Civ. Proc. 33(a)(1). Defendant has not requested and Plaintiffs have not agreed to a

25  stipulation that would allow the parties to serve on one another more than 25

26  written interrogatories, including all discrete subparts. Moreover, the Court has not

27  entered an order that would allow the parties to serve on one another more than 25

28  written interrogatories, including all discrete subparts. As such, and pursuant to

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1405

1  Rule 33 of the Federal Rules of Civil Procedure, the City objects to this

2  interrogatory as beyond the 25 written interrogatories, including all discrete

3  subparts, that a party may serve without stipulation or order of the court.  Based

4  thereon, the City will not respond to these interrogatories.

5  **INTERROGATORY NO. 7:**

6      In Paragraph 19 of the Complaint, you allege "While these ULC principals

7  were named to these posts within the City, the City contracted with ULC for more

8  than $80 million in City projects and capital improvements." Please identify each

9  payment to ULC that constitutes:

10     (a) Theft;

12     (b) Dishonesty; and/or

13     (c) Faithless Performance.

14     For each such payment, please explain the factual basis for your contention;

15  and describe any loss the City suffered as a result thereof (including the amount of

16  such loss and how you computed that loss).

17  **RESPONSE TO INTERROGATORY NO. 7:**

18     Rule 33 of the Federal Rules of Civil Procedure provides that "[u]nless

19  otherwise stipulated or ordered by the court, a party may serve on any other party

20  no more than 25 written interrogatories, including all discrete subparts."  Fed. R.

21  Civ. Proc. 33(a)(1).  Defendant has not requested and Plaintiffs have not agreed to a

22  stipulation that would allow the parties to serve on one another more than 25

23  written interrogatories, including all discrete subparts.  Moreover, the Court has not

24  entered an order that would allow the parties to serve on one another more than 25

25  written interrogatories, including all discrete subparts.  As such, and pursuant to

26  Rule 33 of the Federal Rules of Civil Procedure, the City objects to this

27  interrogatory as beyond the 25 written interrogatories, including all discrete

28

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

5:20-CV-02164- GW (KKX)

**EXHIBIT 21**
**PAGE 1406**

subparts, that a party may serve without stipulation or order of the court. Based thereon, the City will not respond to these interrogatories.

**INTERROGATORY NO. 8:**

In Paragraph 46 of the Complaint, you allege that "ULC principles (Egger, Dillon, and Moorjani) overbilled the City or otherwise stole or embezzled in excess of $58,000,000 through a number of schemes, including falsifying invoices, and fraudulently seeking payment for work performed by third parties by submitting invoices indicating the work had been performed by ULC staff." Please state the factual basis for that allegation, including (but not limited to):

(a)    who performed the work identified in the paragraph

(b)    a description of why the City suffered a loss as a result of ULC seeking payment for work performed by third-parties;

(c)    a description of why you contend that billing for work performed by third-parties constitutes embezzlement;

(d)    the date and amount of each "falsified invoice";

(e)    whether anyone performed the work reflected on the allegedly "falsified invoices"; and

(f)    a description of why the city suffered a loss as a result of the alleged "falsified invoices."

**RESPONSE TO INTERROGATORY NO. 8:**

Rule 33 of the Federal Rules of Civil Procedure provides that "[u]nless otherwise stipulated or ordered by the court, a party may serve on any other party no more than 25 written interrogatories, including all discrete subparts." Fed. R. Civ. Proc. 33(a)(1). Defendant has not requested and Plaintiffs have not agreed to a stipulation that would allow the parties to serve on one another more than 25 written interrogatories, including all discrete subparts. Moreover, the Court has not entered an order that would allow the parties to serve on one another more than 25

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
1810 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

5:20-CV-02164- GW (KKX)

**EXHIBIT 21**
**PAGE 1407**

written interrogatories, including all discrete subparts.  As such, and pursuant to Rule 33 of the Federal Rules of Civil Procedure, the City objects to this interrogatory as beyond the 25 written interrogatories, including all discrete subparts, that a party may serve without stipulation or order of the court.  Based thereon, the City will not respond to these interrogatories.

## SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 9:

Based on an agreement with counsel for National Union pursuant to Federal Rule of Civil Procedure 33(a)(1), and without otherwise waiving Plaintiff's objection to National Union serving in excess of 25 written interrogatories, Plaintiff further responds as follows:

The City objects on the basis that this request seeks the premature disclosure of expert witness information which is not discoverable at this time. The City does not object to stating facts that may form the basis for an expert opinion and will state such facts to the extent responsive to this interrogatory.

Pursuant to Federal Rule of Civil Procedure 33(d), Plaintiff shall answer this interrogatory, in part, by providing records from which the answer to subsections (a) and (d) of this interrogatory may be determined. The City's investigation is continuing, and to the extent additional responsive invoices are located, they will be produced.

ULC and its principals were initially hired by the City pursuant to an Agreement for Planning and Economic Development Services dated March 22, 1993. This agreement specified several broad categories of services for which ULC would be compensated. For Planning Services (Category I) and Economic Development Services (Category II), ULC was to be paid a lump sum monthly fee of $10,000. The agreement specified that the ULC principals maintain an office presence at City Hall for 28 hours per week. The agreement further identified an additional category called "Additional Services" for which ULC was to be compensated in accordance with the hourly rate schedule included as Exhibit A to

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

**EXHIBIT 21**
**PAGE 1408**

1  the agreement. The Exhibit A states that ULC would be entitled to reimbursements

2  of Professional Sub-Consultant Services at "Actual Cost plus 15%"

3      Shortly following the above agreement, another agreement was entered into

4  between Beaumont and ULC. This agreement dated September 27, 1993, was titled

5  Agreement for Planning, Economic Development and Public Works Services. This

6  agreement was very similar to the initial agreement in that it sets forth the scope of

7  the duties of the principals of ULC in their capacities as officials for the City,

8  including the requirement to spend 28 hours per week working at City Hall. For

9  their services as public officials, ULC was paid $15,000 per month (an increase of

10  $5,000 per month from the prior agreement.) In addition, ULC was to provide

11  Public Works and Engineering Services as detailed in the agreement. For these

12  services, ULC was to be paid "on a time and materials basis not exceeding four and

13  one half percent (4.5%) of the confirmed construction cost of the public

14  improvements to be constructed." The agreement also has an additional scope of

15  work section called Additional Services. For these services, ULC was to be

16  compensated in accordance with the hourly rate schedule included as Exhibit A to

17  the agreement. The Exhibit A states that ULC would be entitled to reimbursements

18  of Professional Sub-Consultant Services at "Actual Cost plus 15%."

19      There was an amendment to the above-agreement with ULC in a document

20  dated April 11, 1994. In this amendment the language relating to the compensation

21  to be paid to ULC for Public Works Construction Management was modified

22  slightly. The language in this agreement states, "...compensation shall be on a time

23  and materials basis not exceeding four and one half percent (4.5%) of the bid price

24  awarded by the City for each project."

25      As noted above, ULC was paid from both bond funds and directly by the

26  City. To obtain these funds, ULC issued separate invoices on a monthly basis to

27  both the bond trustee and to Beaumont. In these invoices, ULC would list out

28  various categories of professionals who provided services that month, along with

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1409

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

the number of hours expended by each professional category. Examples of the professional categories include:

- ·    Principal
- ·    Construction Manager
- ·    Surveyor
- ·    One Man Crew
- ·    Two Man Crew
- ·    Office Manager
- ·    Executive Secretary

The agreement between ULC and the City states that ULC shall be paid on a time and materials basis, and the invoices submitted by ULC purport to identify the hours expended by various professionals during the period covered by the invoice.

ULC, by and through Egger, Dillon, and Moorjani, falsified these invoices and overbilled the City by approximately 26,647 hours that were not actually worked in a single calendar year. This represents an overbilling of approximately $4,000,000 in a single calendar year. Similar overbillings occurred in other years.

Additionally, hours worked by third party vendors were included in the time and billing records of ULC, and then included in the invoices issued by ULC. The ULC principals applied extraordinary markups to these third party invoices. These markups on occasion exceeded 300%.

The agreement between Beaumont and ULC previously discussed in this response anticipated the submission and repayment of invoices paid by ULC, and allows for a markup of 15%.

The profits achieved by ULC as a result of the extraordinary markups on the third party invoices has resulted in millions of illicit dollars in profits to ULC, Egger, Dillon, and Moorjani, at the expense of the City.

Without information solely in the possession of the Egger, Dillon, Moorjani, and Kapanicas (and a detailed and complicated analysis of the same), no third party

EXHIBIT 21
PAGE 1410

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

1  or "outsider" to the cabal of the Kapanicas administration could have reconciled

2  these issues and discovered this illicit profit. This is all the more true in that these

3  parties were able to use their positions with the City to approve the aforementioned

4  invoices.

5       While not exhaustive, several examples of the markup and inflated charges

6  follows:

7       In June 2011, Satori R.E. Solutions, Inc. sent invoice number 5, dated June 1,

8  2011, to ULC for services rendered during the month of May 2011. This invoice

9  was for 185.42 hours of work at $40 per hour, for a total invoice amount of

10  $7,416.80.

11       On its May 2011 time and billing worksheet submitted to the City, ULC

12  listed under the Sundance Project 185.50 hours for Lana Guseva (the CEO and

13  Secretary of Satori Real Estate Solutions, Inc.) for a total of $31,535, which equates

14  to an hourly rate of $170, or $130 greater than what was charged to ULC, and far in

15  excess of 15%.

16       In March 2011, Giroux & Associates sent invoice number 10-049-URB05,

17  dated March 24, 2011, to ULC for services rendered during the month of March

18  2011. This invoice was for 10, 20, and 14 hours for the work of a Senior Scientist,

19  Associate Planner, and Technician, respectively. The services were billed at rates of

20  $120, $75, and $40 per hour, for total charges excluding travel of $3,260.

21       On its March 2011 time and billing worksheet ULC listed under the Waste

22  Water Treatment Plant Expansion Project 20 hours for an Associate Engineer,

23  which agrees to the 20 hours for the Associate Planner noted above. ULC listed 14

24  hours for a CADD Technician, which agrees to the 14 hours for a Technician noted

25  above. Lastly, ULC listed 42 hours for a Project Manager / Sr. Engineer, which

26  reconciles with the 10 hours for the Senior Scientist noted above after adding in 32

27  hours of the Director of Environmental Services charged to ULC in the same period

28  by EARSI. For these various services, ULC charged the City of Beaumont a total of

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1411

1   $10,900. The total charges incurred by ULC for these services amounted to just

2   $6,620, which indicates the services were marked up by $4,280, or an increase of

3   65% when examined in the aggregate.

4        In July 2011, Eric Lewis sent invoice number 84, dated July 24, 2011, to

5   ULC for services rendered during the months of June and July 2011. This invoice

6   was for 19 hours of professional traffic engineering services. The services were

7   billed at a rate of $75 per hour, for total charges of $1,425.

8        On its July 2011 time and billing worksheet, ULC listed under City Wide

9   Traffic Surveys 19 hours for Eric Lewis, which agreed to the invoice noted in the

10  previous paragraph. For these various services, ULC charged the City of Beaumont

11  a total of $3,230 or $170 per hour. The total charges incurred by ULC for these

12  services was just $1,425, which indicates the services were marked up by $1,805, or

13  an increase of 126.67%.

14       Many additional examples exist, an exhaustive analysis of which would

15  constitute an expert opinion.

16       As previously discussed in this response, the agreement between Beaumont

17  and ULC put a cap on the amount of fees that ULC could receive for work

18  performed on public works construction projects. The amount of funds received by

19  ULC, Egger, Dillon, and Moorjani from the bond proceeds and the City related to

20  capital improvement projects far exceed this 4.5% cap.

21       Overall, ULC, Egger, Dillon, and Moorjani overbilled the City for tens of

22  millions of dollars, the precise amount of which has not yet been fully calculated

23  (and additional third party discovery may be necessary to complete this analysis),

24  but which far exceeds any applicable policy limit(s).

25       This overbilling was only able to be accomplished because of the positions at

26  the City held by Egger, Kapanicas, Dillon, and Moorjani.

27       Through this court of conduct, ULC, Egger, Dillon, and Moorjani made false

28  representations to the City (*e.g.*, that work was performed by employees of ULC

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

- 150 -

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1412

rather than by third party subcontractors) in order to obtain funds to which they were not entitled, and utilized their positions with the City in order to ensure that these funds were obtained (in violation of duties owed to the City).

The Policies define "theft" to mean "the unlawful taking of property to the deprivation of the Insurance." The Policies also insure for loss of money caused by the failure of any employee to faithfully perform his or her duties as prescribed by law.

Whether denominated theft, embezzlement, breach of contract, fraud, or otherwise, the course of misconduct described above resulted in the City losing money as a result of "theft" as the term is defined in the Policies.

Further, whether denominated theft, embezzlement, breach of contract, fraud, or otherwise, the course of misconduct described above resulted in the City losing money as a result of Egger, Moorjani, Dillon, Kapanicas, and/or other members of the Kapanicas administrations' failure to faithfully perform their duties.

Because the City lost money as a result of conduct covered by multiple insuring provisions, it suffered a "loss."

**INTERROGATORY NO. 9:**

Please identify (by amount, source and date) any amounts the City and/or WRCOG has recovered or received as reimbursement relating to the conduct, transactions, actions and/or loss alleged in the Complaint, including any restitution paid in connection with Criminal Action or amounts recovered (whether by settlement or judgment) from any civil action against any party allegedly responsible for the loss alleged in the Complaint.

**RESPONSE TO INTERROGATORY NO. 10:**

Rule 33 of the Federal Rules of Civil Procedure provides that "[u]nless otherwise stipulated or ordered by the court, a party may serve on any other party no more than 25 written interrogatories, including all discrete subparts."  Fed. R. Civ. Proc. 33(a)(1).  Defendant has not requested and Plaintiffs have not agreed to a

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1413

1   stipulation that would allow the parties to serve on one another more than 25

2   written interrogatories, including all discrete subparts.  Moreover, the Court has not

3   entered an order that would allow the parties to serve on one another more than 25

4   written interrogatories, including all discrete subparts.  As such, and pursuant to

5   Rule 33 of the Federal Rules of Civil Procedure, the City objects to this

6   interrogatory as beyond the 25 written interrogatories, including all discrete

7   subparts, that a party may serve without stipulation or order of the court.  Based

8   thereon, the City will not respond to these interrogatories.

9   **INTERROGATORY NO. 10:**

10   Identify each and every person who has knowledge or may have knowledge

11   pertaining to any facts relevant to the claims and/or affirmative defenses, including

12   any facts set forth in the responses to these Interrogatories, and describe generally

13   the relevant facts that such person knows or may know.

14   **RESPONSE TO INTERROGATORY NO. 11:**

15   Rule 33 of the Federal Rules of Civil Procedure provides that "[u]nless

16   otherwise stipulated or ordered by the court, a party may serve on any other party

17   no more than 25 written interrogatories, <u>including all discrete subparts</u>."  Fed. R.

18   Civ. Proc. 33(a)(1).  Defendant has not requested and Plaintiffs have not agreed to a

19   stipulation that would allow the parties to serve on one another more than 25

20   written interrogatories, including all discrete subparts.  Moreover, the Court has not

21   entered an order that would allow the parties to serve on one another more than 25

22   written interrogatories, including all discrete subparts.  As such, and pursuant to

23   Rule 33 of the Federal Rules of Civil Procedure, the City objects to this

24   interrogatory as beyond the 25 written interrogatories, including all discrete

25   subparts, that a party may serve without stipulation or order of the court.  Based

26   thereon, the City will not respond to these interrogatories.

27

28

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

5:20-CV-02164- GW (KKX)

**EXHIBIT 21**
**PAGE 1414**

**INTERROGATORY NO. 11:**

Identify all experts that you expect to call at the trial of this case, and for each such expert, state each opinion of the expert and all facts relied upon by the expert in reaching each opinion.

**RESPONSE TO INTERROGATORY NO. 12:**

Rule 33 of the Federal Rules of Civil Procedure provides that "[u]nless otherwise stipulated or ordered by the court, a party may serve on any other party no more than 25 written interrogatories, including all discrete subparts." Fed. R. Civ. Proc. 33(a)(1). Defendant has not requested and Plaintiffs have not agreed to a stipulation that would allow the parties to serve on one another more than 25 written interrogatories, including all discrete subparts. Moreover, the Court has not entered an order that would allow the parties to serve on one another more than 25 written interrogatories, including all discrete subparts. As such, and pursuant to Rule 33 of the Federal Rules of Civil Procedure, the City objects to this interrogatory as beyond the 25 written interrogatories, including all discrete subparts, that a party may serve without stipulation or order of the court. Based thereon, the City will not respond to these interrogatories.

**INTERROGATORY NO. 12:**

identify all witnesses that you expect to call at the trial of this case and all documents you expect to attempt to introduce into evidence at the trial of this case.

**RESPONSE TO INTERROGATORY NO. 13:**

Rule 33 of the Federal Rules of Civil Procedure provides that "[u]nless otherwise stipulated or ordered by the court, a party may serve on any other party no more than 25 written interrogatories, including all discrete subparts." Fed. R. Civ. Proc. 33(a)(1). Defendant has not requested and Plaintiffs have not agreed to a stipulation that would allow the parties to serve on one another more than 25 written interrogatories, including all discrete subparts. Moreover, the Court has not entered an order that would allow the parties to serve on one another more than 25

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

5:20-CV-02164- GW (KKX)

**EXHIBIT 21**
**PAGE 1415**

1  written interrogatories, including all discrete subparts.  As such, and pursuant to

2  Rule 33 of the Federal Rules of Civil Procedure, the City objects to this

3  interrogatory as beyond the 25 written interrogatories, including all discrete

4  subparts, that a party may serve without stipulation or order of the court.  Based

5  thereon, the City will not respond to these interrogatories.

6  **INTERROGATORY NO. 13:**

7     Please quantify any alleged damages sought in this action and state all facts

8  supporting your computation of damages.

9  **RESPONSE TO INTERROGATORY NO. 14:**

10    Rule 33 of the Federal Rules of Civil Procedure provides that "[u]nless

11  otherwise stipulated or ordered by the court, a party may serve on any other party

12  no more than 25 written interrogatories, including all discrete subparts."  Fed. R.

13  Civ. Proc. 33(a)(1).  Defendant has not requested and Plaintiffs have not agreed to a

14  stipulation that would allow the parties to serve on one another more than 25

15  written interrogatories, including all discrete subparts.  Moreover, the Court has not

16  entered an order that would allow the parties to serve on one another more than 25

17  written interrogatories, including all discrete subparts.  As such, and pursuant to

18  Rule 33 of the Federal Rules of Civil Procedure, the City objects to this

19  interrogatory as beyond the 25 written interrogatories, including all discrete

20  subparts, that a party may serve without stipulation or order of the court.  Based

21  thereon, the City will not respond to these interrogatories.

22  **INTERROGATORY NO. 14:**

23    In his plea agreement, Egger stated he "advised the City on and participated

24  in making of City contracts that financially benefited [his] company ULC...." please

25  state whether you contend that such conduct constitutes:

26    (a) Theft;

27    (b) Dishonesty; and/or

28    (c) Faithless Performance.

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

5:20-CV-02164- GW (KKX)

**EXHIBIT 21**
**PAGE 1416**

If so, please explain the factual basis for your contention and describe loss the City suffered resulting directly therefrom.

## RESPONSE TO INTERROGATORY NO. 15:

Rule 33 of the Federal Rules of Civil Procedure provides that "[u]nless otherwise stipulated or ordered by the court, a party may serve on any other party no more than 25 written interrogatories, including all discrete subparts."  Fed. R. Civ. Proc. 33(a)(1).  Defendant has not requested and Plaintiffs have not agreed to a stipulation that would allow the parties to serve on one another more than 25 written interrogatories, including all discrete subparts.  Moreover, the Court has not entered an order that would allow the parties to serve on one another more than 25 written interrogatories, including all discrete subparts.  As such, and pursuant to Rule 33 of the Federal Rules of Civil Procedure, the City objects to this interrogatory as beyond the 25 written interrogatories, including all discrete subparts, that a party may serve without stipulation or order of the court.  Based thereon, the City will not respond to these interrogatories.

## INTERROGATORY NO. 15:

In his plea agreement, Dillon stated he "advised the city on and participated in making of city contracts that financially benefited [his] company ULC because ULC was paid for providing planning, economic development and engineering services for the city, which were provided." please state whether you contend that such conduct constitutes

(a) Theft;

(b) Dishonesty; and/or

(c) Faithless Performance.

If so, please explain the factual basis for your contention and describe loss the City suffered resulting directly therefrom.

Best Best & Krieger LLP
Attorneys at Law
18101 Von Karman Avenue, Suite 1000
Irvine, California 92612

- 155 -

5:20-CV-02164- GW (KKX)

**EXHIBIT 21**
**PAGE 1417**

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

**RESPONSE TO INTERROGATORY NO. 16:**

Rule 33 of the Federal Rules of Civil Procedure provides that "[u]nless otherwise stipulated or ordered by the court, a party may serve on any other party no more than 25 written interrogatories, including all discrete subparts." Fed. R. Civ. Proc. 33(a)(1). Defendant has not requested and Plaintiffs have not agreed to a stipulation that would allow the parties to serve on one another more than 25 written interrogatories, including all discrete subparts. Moreover, the Court has not entered an order that would allow the parties to serve on one another more than 25 written interrogatories, including all discrete subparts. As such, and pursuant to Rule 33 of the Federal Rules of Civil Procedure, the City objects to this interrogatory as beyond the 25 written interrogatories, including all discrete subparts, that a party may serve without stipulation or order of the court. Based thereon, the City will not respond to these interrogatories.

**INTERROGATORY NO. 16:**

Please state the factual basis for paragraph 21 of the complaint, including (but not limited to):

(a)     Whether (and if so, how) the City spent the $13,426,563 in "fair share fees" it collected from developers;

(b)     Whether (and if so, how) the City spent the $23,179,627 in bond requisitions referenced in paragraph 21;

(c)     The alleged excuses referenced in paragraph 21;

(d)     A description of the financial benefit the Kapanicas administration received from "TUMF money" (including the amount of any such benefit); and

(e)     A description of any loss the City suffered as a result of the retention of "TUMF money" (including the amount of such loss and how you computed that loss).

5:20-CV-02164- GW (KKX)

**EXHIBIT 21**
**PAGE 1418**

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

**RESPONSE TO INTERROGATORY NO. 17:**

Rule 33 of the Federal Rules of Civil Procedure provides that "[u]nless otherwise stipulated or ordered by the court, a party may serve on any other party no more than 25 written interrogatories, including all discrete subparts." Fed. R. Civ. Proc. 33(a)(1). Defendant has not requested and Plaintiffs have not agreed to a stipulation that would allow the parties to serve on one another more than 25 written interrogatories, including all discrete subparts. Moreover, the Court has not entered an order that would allow the parties to serve on one another more than 25 written interrogatories, including all discrete subparts. As such, and pursuant to Rule 33 of the Federal Rules of Civil Procedure, the City objects to this interrogatory as beyond the 25 written interrogatories, including all discrete subparts, that a party may serve without stipulation or order of the court. Based thereon, the City will not respond to these interrogatories.

**INTERROGATORY NO. 17:**

From 2003 through 2011, please identify (a) each officer of the City; (b) whether the City maintained a risk management department and if so, the members of that department; and (c) each individual and/or department responsible for insurance matters.

**RESPONSE TO INTERROGATORY NO. 18:**

Rule 33 of the Federal Rules of Civil Procedure provides that "[u]nless otherwise stipulated or ordered by the court, a party may serve on any other party no more than 25 written interrogatories, including all discrete subparts." Fed. R. Civ. Proc. 33(a)(1). Defendant has not requested and Plaintiffs have not agreed to a stipulation that would allow the parties to serve on one another more than 25 written interrogatories, including all discrete subparts. Moreover, the Court has not entered an order that would allow the parties to serve on one another more than 25 written interrogatories, including all discrete subparts. As such, and pursuant to Rule 33 of the Federal Rules of Civil Procedure, the City objects to this

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1419

1  interrogatory as beyond the 25 written interrogatories, including all discrete

2  subparts, that a party may serve without stipulation or order of the court.  Based

3  thereon, the City will not respond to these interrogatories.

4  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 17:**

5  Based on an agreement with counsel for National Union pursuant to Federal

6  Rule of Civil Procedure 33(a)(1), and without otherwise waiving Plaintiff's

7  objection to National Union serving in excess of 25 written interrogatories, Plaintiff

8  further responds as follows:

9  The term "officer" is defined in these interrogatories to mean "the members

10  of the City Council, City Clerk, City Treasurer, Chief of Police, recorder, City

11  Attorney, street superintendent, health officer, pound master, and any other offices

12  the City Council deemed necessary or expedient."

13  Plaintiff objects to this interrogatory on the grounds that it is vague,

14  ambiguous, and unintelligible, in particular because the definition of "Officer"

15  includes the phrase "any other officers the City Council deemed necessary or

16  expedient." This portion of the definition is vague, ambiguous, and unintelligible,

17  in part because the definition uses the term being defined as part of the definition

18  ("officer"). In other words, "officer" is defined in part to mean "officer."

19  The City notes that this interrogatory uses the term "officer," while the

20  pertinent provision of the Policies use the undefined term "official," which is a

21  meaningfully distinct (and broader) term, which, because the term is undefined,

22  would be interpreted based on the reasonable expectation of the insured. The City

23  therefore objects to the extent National Union attempts to use this interrogatory and

24  the City's response to conflate the terms "official" and "officer."

25  The City also objects to this request on the grounds that identification of a

26  number of individuals defined as "officers" would be of no relevance to any party's

27  claims or defense and would have no importance to resolving the issues in this

28  litigation. For example, the identity of the City's pound master, health officer, and

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

5:20-CV-02164- GW (KKX)

**EXHIBIT 21**
**PAGE 1420**

street superintendent over the course of nearly a decade is wholly irrelevant to any
issue in this litigation. Therefore, a response to this interrogatory taking into
account the expansive scope of the defined term "officer" would not be
proportional to the needs of the case, considering the importance of the issues at
stake in the action, the amount in controversy, the parties' relative access to
relevant information, the parties' resources, the importance of the discovery in
resolving the issues, and whether the burden or expense of the proposed discovery
outweighs its likely benefit.

The City will identify the following individuals from 2003 through 2011: the
members of the City Council, City Clerk, City Treasurer, Chief of Police, City
Attorney, and members of the Kapanicas administration who were officials in this
time frame:

**City Council:**

Mr. Brian DeForge served on the City Council from 2003 to 2011; Mr.
Lawrence Dressel served on the City Council from 2003 to 2010; Mr. Roger Berg
served on the City Council from 2003 to 2011; Mr. Jeffrey Fox, Sr. served on the
City Council from 2003 to 2011; Ms. Placentia Valdivia served on the City Council
from 2003 to 2004; Ms. Martha Killough served on the City Council from 2005 to
2008; Ms. Nancy Gall served on the City Council from 2009 to 2011; Mr. David
Castaldo served on the City Council starting in 2011.

**City Clerk:**

Ms. Karen Thompson served as the City Clerk from the relevant period of
2003 to 2011.

**City Treasurer:**

Ms. Jennifer Kiyasu served as City Treasurer from 2003 until 2005, and Mr.
Robert Deming served as City Treasurer from 2006 to 2011.**Chief of Police:**

Mr. Patrick Smith served as Chief of Police from 2003 to 2006, and Mr.
Frank Coe served as Chief of Police from 2006 to 2011.

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

5:20-CV-02164- GW (KKX)

**EXHIBIT 21**
**PAGE 1421**

**City Attorney:**

Mr. Aklufi was appointed as the City Attorney and Mr. Wysocki was appointed as the Deputy City Attorney on March 9, 1992, and remained in these positions until 2015. As the March 9, 1992 minutes of the Beaumont City Council state:

> "Motion by Council Member Russo, second by Council Member Brey, to appoint Aklufi and Wysocki as Attorney for the City of Beaumont, with Mr. Aklufi **appointed** as City Attorney and Mr. Wysocki as Deputy City Attorney, at the rate of $105.00 per hour.
>
> AYES: [all]."

The Code explicitly defines "City Attorney" as a designated employee. Further, it is well established that even contract city attorneys are "public officers" under California law. *People ex rel Clancy v. Sup. Ct.*, 39 Cal.3d 740, 747 (1985)

As officials explicitly appointed by the City Council, Aklufi and Wysocki were both covered "Employees" under Paragraph 5 and Endorsement 13.

**Alan Kapanicas:**

Prior to 1996, Alan Kapanicas provided a variety of services to the City through his company, GGMS, and in particular provided services as a "Transition Team Leader for the Position of Interim Administrative Services Director."

On February 26, 1996, through a contract and task order, Alan Kapanicas was appointed as City Manager. Per the task order, Kapanicas was appointed as "City Manager for the City of Beaumont, as designated by the attached CITY Ordinance No. 363 (as amended) and related resolutions." As a City Manager, Alan Kapanicas took an Oath of Office, pursuant to Government Code Section 3102.

Kapanicas was also directly appointed as City Manager by act of the City Council as required by the Beaumont City Code. He held the position of City

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

**EXHIBIT 21**
**PAGE 1422**

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

Manager from February 26, 1996 to December 9, 2015. This Contract was amended a number of times, but without changing Mr. Kapanicas' role as City Manager.

Under the Code, Kapanicas was the "administrative head of the City government," and had broad powers to appoint, demote or remove any city employee or officer besides the City Clerk, City Treasurer, City Attorney, and members of the Planning Commission. He had "control over all departments of the City government." Indeed, Kapanicas' control over the administration of the City was exclusive, and the City Council could not directly give orders to or "deal with" any subordinate of the City Manager. Kapanicas appointed officials on behalf of the City, entered into contracts in the name of the City, and directly controlled numerous department and divisions with the City.

Further, the Code explicitly defines "City Manager" as a "designated employee" who has been determined to "make or participate in the making of decisions which may foreseeably have a material effect on financial interest.

Kapanicas served in a variety of other roles with the City, including designated labor negotiator, Personnel Director, Financial Officer for City investments, and provided services related to bond issuances.

On November 16, 2015, pursuant to a separation agreement, Kapanicas was formally terminated as City Manager

As the appointed City Manager, Kapanicas was an "appointed official" per Endorsement No. 13 and was, therefore, a covered "Employee" under Paragraph 5a of the Policy.

**Dillon, Egger, Moorjani**

The City's relationship with Dillon, Moorjani and Egger dates back to the early 1990s, and the creation of ULC. Prior to February of 1993, the City utilized Trans-Pacific Consultants to provide various professional and technical services related to the Comprehensive Public Facilities Financing Program. In February of 1993, the City entered into a contract with ULC principals Egger and Moorjani to

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1423

1   provide technical and professional services.

2          In March 1993, the City appointed Dillon and Egger as the Planning Director

3   and Community and Economic Development Director respectively. The

4   appointment of Dillon and Egger was effectuated by an order of the City Council

5   and a contract. In September 1993, the City appointed Moorjani as the Director of

6   Public Works.

7          As Department head officials and directors, these individuals were

8   empowered with broad authority under the Code. The Director of Public Works was

9   empowered to "administer, implement and enforce" the provisions of various

10  ordinances and Chapters of the Code and grant or deny development permits. The

11  Director of Planning was similarly empowered to administer various ordinances,

12  including the City zoning ordinance, and was empowered to "interpret the intent" of

13  provisions within the code.

14         Like the City Manager post held by Kapanicas, the Code explicitly defined

15  "Planning Director," Director of Public Works," and "Director of Economic

16  Development" as "designated employees" who have been determined to "make or

17  participate in the making of decisions which may foreseeably have a material effect

18  on financial interest."

19         As department heads, these individuals were able to sign off on bond

20  requisition forms, including bond requisition forms for payment to ULC.

21         In a letter dated August 27, 2009, Egger, Moorjani and Dillon resigned their

22  positions as City Officials, but remained as "consultants" to the City, and continued

23  to perform the same functions and continued to operate in the same effective

24  capacities.  On October 14, 2010, Egger, Moorjani and Dillon wrote to the City

25  declining an offer of reinstatement as Department heads. As the three wrote:

26              "This letter is in reference to the City's offer to reinstate
                the three principals of Urban Logic Consultants as City
27              department heads (Directors of Planning, Economic
                Development, and Public Works). . . . We believe we can
28

- 162 -                          5:20-CV-02164- GW (KKX)

**EXHIBIT 21**
**PAGE 1424**

Best Best & Krieger LLP
ATTORNEYS AT LAW
18101 Von Karman Avenue, Suite 1000
Irvine, California 92612

> be equally effective as technical consultants and advisors
> to City staff, in the same manner that we have over the
> past one plus year."

During their tenure as department heads and later as former-officials/consultants, Egger, Moorjani and Dillon were each "appointed officials" and qualified as "Employees" under Paragraph 5.a of the Policy. Each was appointed to their respective posts through contracts with the City.

**Aylward**

Beginning in 1994, Aylward provided financial services for the City of Beaumont. Aylward was originally the Director of Finance as a contract employee, and starting in 2008 was directly paid by the City as the Director of Finance. Aylward was later appointed to the role of Assistant City Manager as well. Aylward resigned as Finance Director on May 1, 2015.

As Finance Director, Aylward was empowered by the Code to execute the financial and accounting duties previously executed by the City Clerk under the California Government Code. Aylward's responsibilities included maintaining all records reflecting the financial condition of the City and its departments, and issue various licenses within the City, supervise payroll, and collect taxes and revenues on behalf of the City. Aylward also directly approved city expenditures and warrants for payment.

Like the City Manager and other positions, the Code explicitly defined "Finance Director" as a "designated employee" who has been determined to "make or participate in the making of decisions which may foreseeably have a material effect on financial interest."

As Finance Director, Aylward was a covered "Employee" under Paragraph 5 and/or Endorsement No. 13.

**Risk Management:**

The City does maintain a separate risk management department. The phrase

Best Best & Krieger LLP
Attorneys at Law
18101 Von Karman Avenue, Suite 1000
Irvine, California 92612

- 163 -

1  "responsible for insurance matters" is vague and ambiguous and could be

2  interpreted in multiple ways, but, based on the City's understanding of the intent of

3  this interrogatory, the City responds as follows:

4        Mr. James Gregg was employed by the City during the period of 2010 to

5  2014, and was hired through the Exclusive Risk Management Authority of

6  California joint powers authority.  Mr. Gregg worked in conjunction with, among

7  others, then-City Manager Alan Kapanicas and Resources Manager Elizabeth Gibbs

8  to assess and coordinate insurance matters for the City during the course of his

9  employment.

10

11  **INTERROGATORY NO. 18:**

12        Please state the factual basis for paragraph 20 of the Complaint, including

13  (but not limited to): (a) whether it was impossible to learn of the conduct alleged in

14  the Complaint prior to the termination of the Principals; and (b) each and every act

15  the Principals took to prevent an investigation into their conduct; or (c) each and

16  every act the principals took to render it impossible to learn of the conduct alleged

17  in the Complaint prior to their termination.

18  **RESPONSE TO INTERROGATORY NO. 19:**

19        Rule 33 of the Federal Rules of Civil Procedure provides that "[u]nless

20  otherwise stipulated or ordered by the court, a party may serve on any other party

21  no more than 25 written interrogatories, including all discrete subparts."  Fed. R.

22  Civ. Proc. 33(a)(1).  Defendant has not requested and Plaintiffs have not agreed to a

23  stipulation that would allow the parties to serve on one another more than 25

24  written interrogatories, including all discrete subparts.  Moreover, the Court has not

25  entered an order that would allow the parties to serve on one another more than 25

26  written interrogatories, including all discrete subparts.  As such, and pursuant to

27  Rule 33 of the Federal Rules of Civil Procedure, the City objects to this

28  interrogatory as beyond the 25 written interrogatories, including all discrete

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

5:20-CV-02164- GW (KKX)

**EXHIBIT 21**
**PAGE 1426**

subparts, that a party may serve without stipulation or order of the court.  Based

thereon, the City will not respond to these interrogatories.

## SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 18:

Based on an agreement with counsel for National Union pursuant to Federal

Rule of Civil Procedure 33(a)(1), and without otherwise waiving Plaintiff's

objection to National Union serving in excess of 25 written interrogatories, Plaintiff

further responds as follows:

The City objects to this interrogatory to the extent it attempts to incorporate a

standard of discovery that differs from California law. Under California law, the

standard for discovering theft or dishonesty is strict and mere suspicion of

wrongdoing is not "discovery" for purpose of denying coverage. *Fidelity Nat.*

*Financial, Inc. v. National Union Fire Ins. Co. of Pittsburg, PA*, No. 09-CV-140-

GPC-KSC, 2014 WL 4909103 (S.D. Cal. 2014). Notably, the relevant Policy

language before the *Fidelity* court (involving discovery by the risk management

department) was nearly identical to the language in the Policy and Endorsement No.

8. Interpreting this language, the *Fidelity* Court explained that California has

adopted a combined subjective/objective approach to discovery. Accordingly, a loss

is not discovered until the insured has "knowledge—not simply suspicion—of the

existence of such facts as would justify a careful and prudent man in charging

another with fraud or dishonesty. *Id.* at *20 (citing *Gulf USA Corp. v. Federal Ins.*

*Co*., 259 F.3d 1049, 1058 (9th Cir. 2001)). In other words, "discovery of loss does

not occur until the insured discovers facts showing that dishonest acts occurred and

appreciates the significance.

In response to subsection (a) the City responds "yes," it would have been

impossible to learn of the material conduct alleged in the complaint prior to the

termination of the Principals.

In response to subsections (b) and (c), the City respond as follows:

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

The City is unaware at this time of all specific acts or omissions of the Principals (e.g., on what date a Principal learned of a pertinent fact, and made the decision to withhold that information), as this information is uniquely in the possession of these individuals, but discovery is just beginning, and the City reserves the right to supplement this response after further discovery.

The City notes, however, that it would have been impossible for any party not a member of the cabal to discover the loss, in that discovery required knowledge possessed only by members of the cabal, and thus simple non-disclosure would suffice to render discovery impossible. Similarly non-disclosure of the material facts (e.g., that ULC work was performed by third-party sub-contractors but billed to the City as work performed by ULC employees) would prevent an investigation into the conduct, in that absent knowledge of the scheme there would have been no reason to investigate. The City has no reason to suspect, much less *know*, of the scheme.

Finally, the ULC principles and other members of the Kapanicas administrative prevented an investigation by virtue of the positions they held with the City (E.g., City Manager, City Attorney, department heads) and by virtue of the fact that they (or individuals they controlled in their departments or elsewhere in the City) were the individuals who could have instigated such an investigation.

For years, the City remained unaware of the Kapanicas administration's wrongful conduct because ULC, its principles, and Kapanicas had insulated themselves from independent oversight, and had maintained total control over (among other things) the bidding and payment processes for the City's planning services, economic development services, and public works and engineering services. Not surprisingly, these individuals did not report the fraudulent and inflated invoices they had caused ULC to submit to the City.

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1428

**INTERROGATORY NO. 19:**

In paragraph 28 of the Complaint, you allege that "[t]he City did not discover the bad acts of the Kapanicas administration involving theft and dishonesty until it had conducted its own investigation in May 2016." Please identify the factual basis for this allegation and paragraph 36 of the Complaint, including

(a)    a description of the "bad acts ... involving theft and dishonesty";

(b)    the identity of who first learned of those alleged "bad acts ... involving theft and dishonesty" in May 2016;

(c)    the identity of anyone who participated in the investigation identified in this allegation; and

(d)    each step take in furtherance of the investigation identified in this allegation.

**RESPONSE TO INTERROGATORY NO. 20:**

Rule 33 of the Federal Rules of Civil Procedure provides that "[u]nless otherwise stipulated or ordered by the court, a party may serve on any other party no more than 25 written interrogatories, including all discrete subparts." Fed. R. Civ. Proc. 33(a)(1). Defendant has not requested and Plaintiffs have not agreed to a stipulation that would allow the parties to serve on one another more than 25 written interrogatories, including all discrete subparts. Moreover, the Court has not entered an order that would allow the parties to serve on one another more than 25 written interrogatories, including all discrete subparts. As such, and pursuant to Rule 33 of the Federal Rules of Civil Procedure, the City objects to this interrogatory as beyond the 25 written interrogatories, including all discrete subparts, that a party may serve without stipulation or order of the court. Based thereon, the City will not respond to these interrogatories.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 19:**

Based on an agreement with counsel for National Union pursuant to Federal Rule of Civil Procedure 33(a)(1), and without otherwise waiving Plaintiff's

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

- 167 -

objection to National Union serving in excess of 25 written interrogatories, Plaintiff further responds as follows.

The City objects on the basis that this request seeks the premature disclosure of expert witness information which is not discoverable at this time. The City does not object to stating facts that may form the basis for an expert opinion and will state such facts to the extent responsive to this interrogatory.

On May 17, 2016, the District Attorney filed a felony complaint against Dillon, Egger and Moorjani, along with Kapanicas, Aylward and Aklufi. Dillon, Egger and Moorjani were each charged with one count of criminal conflict of interest, and six counts of embezzlement, relating to their work for the City.

Prior to the District Attorney filing a felony complaint against Dillon, Egger and Moorjani, the City was unaware of the embezzlement and other wrongdoing of these individuals. Because these individuals held many of the top City management positions, including City Manager and City Attorney, they controlled all of the information presented to the City Council.

Indeed, as of mid-2015, the City's management team consisted of City Manager (Alan Kapanicas), City Attorney (Joseph Aklufi), City Finance Director (William Aylward), City Economic Development Director (Dillon), City Director of Planning (Egger) and City Director of Public Works (Moorjani). All of whom, would later plead guilty of wrongdoing.

In 2016, following the criminal charges, the City commenced an investigation into the wrongdoing of its former City officials. Recognizing that it may have claims against these individuals, the City requested a tolling agreement from these individuals.

Shortly after beginning this investigation, the City tendered a claim to Defendants. Despite National Union's duty to investigate any possible basis for coverage, the City continued to investigate as well.

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

5:20-CV-02164- GW (KKX)

**EXHIBIT 21**
**PAGE 1430**

1      In June of 2016, the City retained a forensic accountant to assist in the

2 investigation of the various acts and omissions of the ULC Principals and other

3 members of the Kapanicas Administration. In the course of this investigation, and

4 based on a review of documents ultimately obtained from the District Attorney's

5 office, the forensic accountant was, for the first time, able to identify the overbilling

6 scheme perpetrated by the Principals and members of the Kapanicas administration.

7 This scheme was described to National Union shortly thereafter, and voluminous

8 documents related to this investigation were provided to National Union as well.

9 **INTERROGATORY NO. 20:**

10      Please identify the factual basis for the allegations in Paragraph 36 of the

11 Complaint, including legal advice (as alleged in Paragraph 36(d) of the Complaint)

12 the City's legal department provided that impacted or inhibited knowledge of and

13 disclosure of the conduct alleged in the Complaint or supporting your claims

14 against National Union.

15 **RESPONSE TO INTERROGATORY NO. 21:**

16      Rule 33 of the Federal Rules of Civil Procedure provides that "[u]nless

17 otherwise stipulated or ordered by the court, a party may serve on any other party

18 no more than 25 written interrogatories, including all discrete subparts."  Fed. R.

19 Civ. Proc. 33(a)(1).  Defendant has not requested and Plaintiffs have not agreed to a

20 stipulation that would allow the parties to serve on one another more than 25

21 written interrogatories, including all discrete subparts.  Moreover, the Court has not

22 entered an order that would allow the parties to serve on one another more than 25

23 written interrogatories, including all discrete subparts.  As such, and pursuant to

24 Rule 33 of the Federal Rules of Civil Procedure, the City objects to this

25 interrogatory as beyond the 25 written interrogatories, including all discrete

26 subparts, that a party may serve without stipulation or order of the court.  Based

27 thereon, the City will not respond to these interrogatories.

28

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

- 169 -

5:20-CV-02164- GW (KKX)

**EXHIBIT 21**
**PAGE 1431**

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 20:**

Based on an agreement with counsel for National Union pursuant to Federal Rule of Civil Procedure 33(a)(1), and without otherwise waiving Plaintiff's objection to National Union serving in excess of 25 written interrogatories, Plaintiff further responds as follows.

The City objects to this interrogatory on the grounds that it is vague, ambiguous and unintelligible such that the City cannot respond to the interrogatory, in particular because this interrogatory misrepresents the allegations in paragraph 36(d) of the First Amended Complaint.

The sentence referenced by this interrogatory provides in full: "As City Attorney and Deputy City Attorney, these individuals had substantial control over the City's legal affairs, and gave legal advice to the City and had substantial control over whether and what legal information was relayed to the City Council." This allegation describes the duties and roles of a City Attorney and Deputy City Attorney, and it is unclear what further factual basis National Union Seeks. As City Attorney and Deputy City Attorney, these individuals in fact had substantial control over the City's legal affairs, and in fact regularly gave legal advice to the City and in fact had substantial control over whether and what legal information was relayed to the City Council.

This paragraph does not allege that the City Attorney gave a discrete piece of legal advice that prevented discovery of the fraudulent billing scheme or related misconduct, but rather alleges that members of the Kapanicas Administration – including the City Attorney – exercised pervasive control over the City such that the City could not (and did not) discover the wrongdoing of these individuals while they remained in power.

**INTERROGATORY NO. 21:**

For each of the principals, please

Best Best & Krieger LLP
Attorneys at Law
18101 Von Karman Avenue, Suite 1000
Irvine, California 92612

5:20-CV-02164- GW (KKX)

**EXHIBIT 21
PAGE 1432**

1    (a)    state the date on which they first became employed by or associated

2  with the City;

3    (b)    the identity of each position held with the City and the dates on which

4  he held that position;

5    (c)    state whether the City compensated said person by salary and wages

6  and if so, the timeframe during which the City compensated him by salary and

7  wages;

8    (d)    state whether he was appointed an officer and if so, the date on which

9  he was elected as an officer or appointed an officer by the City Council, and the

10  timeframe during which he served as an officer; and

11    (e)    whether he served as a member or chairperson on any committees and

12  if so, the name of any such committees and the dates on which he served as a

13  member or chairperson of such committees.

14  **RESPONSE TO INTERROGATORY NO. 22:**

15      Rule 33 of the Federal Rules of Civil Procedure provides that "[u]nless

16  otherwise stipulated or ordered by the court, a party may serve on any other party

17  no more than 25 written interrogatories, including all discrete subparts."  Fed. R.

18  Civ. Proc. 33(a)(1).  Defendant has not requested and Plaintiffs have not agreed to a

19  stipulation that would allow the parties to serve on one another more than 25

20  written interrogatories, including all discrete subparts.  Moreover, the Court has not

21  entered an order that would allow the parties to serve on one another more than 25

22  written interrogatories, including all discrete subparts.  As such, and pursuant to

23  Rule 33 of the Federal Rules of Civil Procedure, the City objects to this

24  interrogatory as beyond the 25 written interrogatories, including all discrete

25  subparts, that a party may serve without stipulation or order of the court.  Based

26  thereon, the City will not respond to these interrogatories.

27

28

5:20-CV-02164- GW (KKX)

**EXHIBIT 21**

**PAGE 1433**

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

1   **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 21:**

2   Based on an agreement with counsel for National Union pursuant to Federal

3   Rule of Civil Procedure 33(a)(1), and without otherwise waiving Plaintiff's

4   objection to National Union serving in excess of 25 written interrogatories, Plaintiff

5   further responds as follows:

6   The City objects that this interrogatory is vague, ambiguous, unintelligible

7   and lacks foundation, in that subsection (d) includes the incorrect assumption that

8   any officer must be either elected or "appointed an officer by the City Council."

9   This is not so. Section 2.12.060 of the Beaumont Municipal Codes provides that

10  "The City Manager shall . . . have the power: . . . (C) To **appoint**, promote, demote

11  and remove **any officers** and employees **of the City except the City Clerk, City**

12  **Treasurer, City Attorney, and members of the planning commission**."

13  The City notes that this interrogatory uses the term "officer," while the

14  pertinent provision of the Policies use the undefined term "official," which is a

15  meaningfully distinct (and broader) term, which, because the term is undefined,

16  would be interpreted based on the reasonable expectation of the insured. The City

17  therefore objects to the extent National Union attempts to use this interrogatory and

18  the City's' response to conflate the terms "official" and "officer."

19  **Kapanicas:**

20  Prior to 1996, Alan Kapanicas provide a variety of services to the City

21  through his company, GGMS, and in particular provided services as a "Transition

22  Team Leader for the Position of Interim Administrative Services Director."

23  On February 26, 1996, through a contract and task order, Alan Kapanicas

24  was appointed as City Manager. Per the task order, Kapanicas was appointed as

25  "City Manager for the City of Beaumont, as designated by the attached CITY

26  Ordinance No. 363 (as amended) and related resolutions." As a City Manager, Alan

27  Kapanicas took an Oath of Office, pursuant to Government Code Section 3102.

28

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

5:20-CV-02164- GW (KKX)

**EXHIBIT 21**
**PAGE 1434**

1       Kapanicas was also directly appointed as City Manager by act of the City

2   Council as required by the Beaumont City Code. He held the position of City

3   Manager from February 26, 1996 to December 9, 2015. This Contract was amended

4   a number of times, but without changing Mr. Kapanicas' role as City Manager.

5       Under the Code, Kapanicas was the "administrative head of the City

6   government," and had broad powers to appoint, demote or remove any city

7   employee or officer beside the City Clerk, City Treasurer, City Attorney, and

8   members of the Planning Commission. He had "control over all departments of the

9   City government." Indeed, Kapanicas' control over the administration of the City

10  was exclusive, and the City Council could not directly give orders to or "deal with"

11  any subordinate of the City Manager. Kapanicas appointed officials on behalf of the

12  City, entered into contracts in the name of the City, and directly controlled

13  numerous department and divisions with the City.

14      Further, the Code explicitly defines "City Manager" as a "designated

15  employee" who has been determined to "make or participate in the making of

16  decisions which may foreseeably have a material effect on financial interest.

17      Kapanicas served in a variety of other roles with the City, including

18  designated labor negotiator, Personnel Director, Financial Officer for City

19  investments, and provided services related to bond issuances.

20      On November 16, 2015, pursuant to a separation agreement, Kapanicas was

21  formally terminated as City Manager.

22      As the appointed City Manager, Kapanicas was an "appointed official" per

23  Endorsement No. 13 and was, therefore, a covered "Employee" under Paragraph 5a

24  of the Policy

25  **Dillon, Egger, Moorjani**

26      The City's relationship with Dillon, Moorjani and Egger dates back to the

27  early 1990s, and the creation of ULC.  Prior to February of 1993, the City utilized

28  Trans-Pacific Consultants to provide various professional and technical services

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

5:20-CV-02164- GW (KKX)

**EXHIBIT 21**
**PAGE 1435**

related to the Comprehensive Public Facilities Financing Program. In February of 1993, the City entered into a contract with ULC principals Egger and Moorjani to provide technical and professional services.

In March 1993, the City appointed Dillon and Egger as the Planning Director and Community and Economic Development Director respectively. The appointment of Dillon and Egger was effectuated by an order of the City Council and a contract. In September 1993, the City appointed Moorjani as the Director of Public Works.

As Department head officials and directors, these individuals were empowered with broad authority under the Code. The Director of Public Works was empowered to "administer, implement and enforce" the provisions of various ordinances and Chapters of the Code and grant or deny development permits. The Director of Planning was similarly empowered to administer various ordinances, including the City zoning ordinance, and was empowered to "interpret the intent" of provisions within the code.

Like the City Manager post held by Kapanicas, the Code explicitly defined "Planning Director," Director of Public Works," and "Director of Economic Development" as "designated employees" who have been determined to "make or participate in the making of decisions which may foreseeably have a material effect on financial interest."

As department heads, these individuals were able to sign off on bond requisition forms, including bond requisition forms for payment to ULC.

In a letter dated August 27, 2009, Egger, Moorjani and Dillon resigned their positions as City Officials, but remained as "consultants" to the City, and continued to perform the same functions and continued to operate in the same effective capacities. On October 14, 2010, Egger, Moorjani and Dillon wrote to the City declining an offer of reinstatement as Department heads. As the three wrote:
"This letter is in reference to the City's offer to reinstate

5:20-CV-02164- GW (KKX)

EXHIBIT 21
PAGE 1436

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

1  the three principals of Urban Logic Consultants as City
2  department heads (Directors of Planning, Economic
3  Development, and Public Works). . . . We believe we can
   be equally effective as technical consultants and advisors
4  to City staff, in the same manner that we have over the
   past one plus year."
5
6  During their tenure as department heads and later as former-
7  officials/consultants, Egger, Moorjani and Dillon were each "appointed officials"
   and qualified as "Employees" under Paragraph 5.a of the Policy. Each was
8  appointed to their respective posts through contracts with the City.
9
10
   Dated:  March 8, 2021                    BEST BEST & KRIEGER LLP
11
12
13                                          By: _____
14                                          JEFFREY V. DUNN
                                            CHRISTOPHER E. DEAL
15                                          DANIEL L. RICHARDS

16                                          Attorneys for Plaintiff
                                            Western Riverside Council of
17                                          Governments

18  20323.00057\33758000.1

19

20

21

22

23

24

25

26

27

28

- 175 -

5:20-CV-02164- GW (KKX)

**EXHIBIT 21**
**PAGE 1437**