# EXHIBIT 23

**EXHIBIT 23**
**PAGE 1535**

Scott L. Schmookler, *Pro Hac Vice*
sschmookler@grsm.com
(312) 980-6779
Gordon Rees Scully Mansukhani, LLP
5 Park Plaza Suite 1100
Irvine, CA 92614
Attorneys for Defendant,
NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION

| | |
|---|---|
| WESTERN RIVERSIDE COUNCIL OF GOVERNMENTS, a California Joint Powers Authority; CITY OF BEAUMONT, a public entity in the State of California,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, and DOES 1 through 50, inclusive,<br><br>Defendants. | Case No. 5:20-cv-02164- GW (KKx)<br><br>**Declaration of Lawrence Dressel** |

I, LAWRENCE DRESSEL, declare as follows:

1.     I have personal knowledge of the matters and facts set forth below and am competent to testify to such matters and facts.

2.     I am a resident of the Mentone, California and served on the Beaumont City Council from 2001 to 2010. Based upon my tenure on the Beaumont City Council, I had knowledge of and was aware prior to 2011 of the following facts set forth in paragraph 3 through paragraph 23.

3.     On an annual basis, the City Council reviewed and approved Capital Improvement Plans. Capital Improvement Plans were a component of the

-1-

EXHIBIT 23
PAGE 1536

NUFIC_049369

Gordon Rees Scully Mansukhani, LLP
5 Park Plaza, Suite 1100
Irvine, CA 92614

1    budgeting process and identified the capital improvement projects that the City

2    (either itself or through the Beaumont Utility Authority) would undertake. Capital

3    Improvement Plans were prepared by the Public Works Department in conjunction

4    with input from other agencies as needed for various projects. The Capital

5    Improvement Plans included a preliminary engineer's estimate of the cost for each

6    project, an allocation of funds and a budget summary that categorized the costs

7    associated with each project. The Capital Improvement Plans also included a list

8    of professional services contractors that were approved to perform the work for

9    the projects identified in the plans.

10          4.    While I was on City Council from 2001 through 2010, the City

11   Council reviewed and approved the Capital Improvement Plans. As a member of

12   the City Council, I personally reviewed the Capital Improvement Plans for fiscal

13   year 2001 through fiscal year 2010.  Those Capital Improvement Plans included a

14   budget summary that categorized the costs associated with each project, and the

15   cost for the services associated with each project identified in the Capital

16   Improvement Plans.

17          5.    The Capital Improvement Plans were treated as the governing

18   agreement for each project. The City Council could amend and adopt the Capital

19   Improvement Plans through a Resolution. After reviewing the Capital

20   Improvement Plans for fiscal years 2001 through 2010, the City Council voted to

21   approve each plan.   Through that approval, the City Council authorized the City

22   Manager, staff, financing team, and qualified professional services contractors

23   identified in the plans to take all necessary actions and expend funds as directed

24   and authorized to complete the projects as set forth in the Capital Improvement

25   Plans.

26          6.    While I served on the City Council, the City of Beaumont contracted

27   with Urban Logic Consultants ("ULC") and paid ULC to provide planning,

28

-2-

EXHIBIT 23
PAGE 1537

NUFIC_049370

Gordon Rees Scully Mansukhani, LLP
5 Park Plaza, Suite 1100
Irvine, CA 92614

1  economic development, construction management and engineering services.

2  While I served on the City Council, Ernest Egger, David Dillon, and Deepak

3  Moorjani ("ULC Principals") owned ULC. ULC was a qualified professional

4  services contractor approved by the City Council during my tenure on the council.

5       7.    Throughout my time on the City Council, I understood that: Mr. Dillon

6  served as the City of Beaumont's Economic Development Director during the time

7  he held an ownership interest in ULC and while ULC contracted with City of

8  Beaumont; Mr. Moorjani served as the City of Beaumont's Public Works Director

9  during the time he held an ownership interest in ULC and while ULC contracted

10  with City of Beaumont; and Mr. Egger served as the City of Beaumont's Planning

11  Director during the time he held an ownership interest in ULC and while ULC

12  contracted with City of Beaumont.

13       8.    The City of Beaumont and ULC entered into an agreement in

14  September 1993. (See Agreement for Planning, Economic Development and

15  Public Works Services, dated September 27, 1993, attached here as <u>Exhibit A</u>.)

16  Pursuant to Section V of the agreement ("Plan Checking and Construction

17  Inspection"), ULC contracted with the City to provide all necessary plan checking

18  and inspection services for public works projects in the City of Beaumont.

19  (<u>Exhibit A</u>, Section V.)  Pursuant to Section IX of the agreement ("Compensation

20  to Consultant"), ULC's fees for services set forth in Section V were subject to a

21  4.5% cap of the confirmed construction cost of the public improvements to be

22  constructed. (<u>Exhibit A</u>, Section IX, par. 2.)

23       9.    In 1994, the agreement between the City of Beaumont and ULC was

24  amended. (See Agreement Amending the Agreement for Planning, Economic

25  Development and Public Works Services, dated April 11, 1994, attached here as

26  <u>Exhibit B</u>.) Pursuant to the 1994 amendment, ULC contracted with the City to

27  provide construction management services during all phases of public works

28

-3-

EXHIBIT 23
PAGE 1538

NUFIC_049371

Gordon Rees Scully Mansukhani, LLP
5 Park Plaza, Suite 1100
Irvine, CA  92614

1   construction for each public works project, as set forth in Section V.1 ("Public

2   Works Construction Management"). (See Exhibit B, pg. 2.) Pursuant to the 1994

3   amendment, ULC's fees for services set forth in Section V.1 were subject to a

4   4.5% cap of the bid price awarded by the City of Beaumont for each public works

5   project.  (See Exhibit B, pg. 3.)

6       10.   The 4.5% cap on fees for services set forth in Section V and V.1

7   generally applied to day-to-day services that ULC provided on public works

8   projects relating to plan checking; construction inspection; and construction

9   management ("Section V and Section V.1 services").

10      11.   ULC performed or outsourced engineering; surveying; and/or other

11  contractor services that were billed on an hourly rate schedule and not subject to

12  the 4.5% fee cap.

13      12.   ULC also performed services for private development projects that

14  were outside of its agreement with the City. Services for private development

15  projects were billed on an hourly rate schedule and not subject to a 4.5% fee cap.

16      13.   The Capital Improvement Plans provided a budget for services ULC

17  performed on a yearly, as-needed basis, including a budget for Section V and

18  Section V.1 services. The budget summary incorporated into each Capital

19  Improvement Plan set forth the estimated cost for the services associated with each

20  project identified in the Capital Improvement Plan, including the Section V and

21  Section V.1 services that ULC provided.

22      14.   As reflected in the Capital Improvement Plans and as approved by the

23  City Council, the fees that ULC charged for Section V and Section V.1 services

24  exceeded 4.5% of the total project budget/bid price/cost. The fees that ULC

25  charged for Section V and Section V.1 services exceeded the 4.5% fee cap because

26  of the nature and scope of the City's public works projects as the City expanded

27  and grew.

28

-4-

EXHIBIT 23
PAGE 1539

NUFIC_049372

15. As a member of City Council, I knew that the fees ULC charged for Section V and Section V.1 services exceeded 4.5% of the total project budget/bid price/cost. The amount of ULC's fees for Section V and V.1 services, and the fact that those fees exceeded the 4.5% fee cap, were disclosed to and approved by the City Council.

16. During my time on the City Council, the City Council received reports on and discussed construction projects within the City of Beaumont. Those reports included presentations by and discussions with Mr. Egger, Mr. Dillon and Mr. Moorjani, in their role as city officials, about work performed by ULC and/or funding and approval of projects on which ULC was an approved contractor.

17. While serving in an official capacity for the City and acting on behalf of the City, Mr. Egger, Mr. Dillon and Mr. Moorjani:

    a. Recommended that the City adopt resolutions approving Capital Improvement Plans that provided funding for projects on which ULC was listed among the qualified contractors;

    b. Participated in the discussions about, negotiations over and solicitation of bids in connection with construction projects in which ULC would provide planning, engineering, inspection and construction management services for a fee;

    c. Participated in the discussions about bids submitted by ULC;

    d. Participated in discussions about bids submitted by other contractors in which ULC would provide planning, engineering, inspection and construction management services for a fee;

    e. Recommended that the City award contracts to other contractors on projects in which ULC was paid a fee to provide planning, inspection and construction management services for those projects; and

Gordon Rees Scully Mansukhani, LLP
5 Park Plaza, Suite 1100
Irvine, CA 92614

-5-

EXHIBIT 23
PAGE 1540

NUFIC_049373

f. Supervised work performed by ULC that was valued in excess of $25,000

18. I understood that Mr. Egger, Mr. Dillon and Mr. Moorjani, as owners of ULC, received a financial benefit from the construction projects and work awarded by the City of Beaumont to ULC and from the contracts and work awarded to other contractors in which ULC provided planning, engineering, inspection and construction management services for a fee. The total work awarded to ULC during my time on the City Council exceeded $25,000. I therefore understood that Mr. Dillon, Mr. Egger and Mr. Moorjani received a financial benefit from the construction projects and work awarded by the City of Beaumont to ULC in excess of $25,000.

19. At the time that Mr. Egger, Mr. Dillon and Mr. Moorjani were owners and principals of ULC and in their official capacities as Department Heads for the City of Beaumont, they participated in the preliminary discussion, planning, negotiation and/or solicitation of bids in connection with the making of bonds issued by the Beaumont Financing Authority.

20. At the time that Mr. Egger, Mr. Dillon and Mr. Moorjani were owners and principals of ULC and were engaged as Department Heads for the City of Beaumont, the Beaumont Financing Authority issued bonds that listed ULC as the project engineer.

21. Due to their ownership interest in ULC, Mr. Egger, Mr. Dillon and Mr. Moorjani financially benefitted from ULC's work as a project engineer on bonds issued by the Beaumont Financing Authority in an amount in excess of $25,000.

22. Prior to 2011, members of the public, including Judith Bingham and Nancy Hall, appeared during city council meetings and publicly stated that in their opinion the retention of ULC created a conflict of interest that violated California

Gordon Rees Scully Mansukhani, LLP
5 Park Plaza, Suite 1100
Irvine, CA 92614

-6-

EXHIBIT 23
PAGE 1541

NUFIC_049374

Gordon Rees Scully Mansukhani, LLP
5 Park Plaza, Suite 1100
Irvine, CA 92614

1   law. Members of the public advised City Council that the ULC Principals'
2   participation, as city officials, in planning, negotiating, recommending and
3   awarding work to ULC; the ULC Principals' supervision, as city officials, of the
4   work ULC performed; and the ULC Principals' financial interest in the
5   construction projects and work awarded to ULC was a conflict of interest that
6   violated California law.

7       23.    The City Council considered whether to continue retaining Mr. Egger,
8   Mr. Moorjani and Mr. Dillon in an official capacity. The City Council knew that
9   Mr. Egger, Mr. Moorjani and Mr. Dillon had a financial interest in construction
10  projects and work awarded by the City to ULC, participated (as city officers) in
11  planning, negotiating, recommending and awarding projects and work to ULC,
12  and supervised (as city officers) the work performed by ULC. The City Council
13  decided to continue retaining ULC and did not remove Mr. Egger, Mr. Moorjani
14  and Mr. Dillon from their official positions with the City of Beaumont.

15

16      Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the
17  foregoing is true and correct.

18

19

20      Executed this  5  th day of ~~March,~~ *APRIL* 2022.

21

22                                      *Lawrence W. Dressel*
23                                      Lawrence Dressel

24

25

26

27

28

-7-

EXHIBIT 23
PAGE 1542

NUFIC_049375



ORIGINAL

# A G R E E M E N T

## AGREEMENT FOR PLANNING, ECONOMIC DEVELOPMENT AND PUBLIC WORKS SERVICES

This AGREEMENT, made and entered into this 27th day of September, 1993, by and between the City of Beaumont, a municipal corporation located in the County of Riverside, State of California, hereinafter referred to as "CITY" and Urban Logic Consultants, a General Partnership under the laws of the State of California with mailing address of 27463 Enterprise Circle West, Temecula, California, 92590, hereinafter referred to as "CONSULTANT."

## W I T N E S S E T H

WHEREAS, CITY has the need for city planning, economic development and public works services; and

WHEREAS, CITY desires to contract for such services with a private consulting firm; and

WHEREAS, CONSULTANT is experienced in providing such services for municipal corporations and is able to provide personnel with the proper experience and background to carry out the duties involved; and

WHEREAS, CITY wishes to retain CONSULTANT for the performance of said services;

NOW, THEREFORE, in consideration of the mutual covenants, benefits and premises herein stated, the CITY and CONSULTANT agree as follows:

CITY does hereby appoint CONSULTANT in a contractual capacity to perform the following services in accordance with the terms and conditions hereinafter set forth:

## I.     Planning Services

### I-A.  General Administrative Functions:

1.     Establish working relationships and coordination with City staff, public agencies, County departments, utilities and service purveyors involved in matters affecting the City.

2.     Analyze and recommend planning programs consistent with the economic capabilities of the City.  When directed, prepare and administer identified programs.


NUFIC_049376
BEAUAIG0000695

ORIGINAL

3.     Direct and supervise the day to day functions and activities of the Planning and Economic Development Department including all planning and building functions and associated personnel.

4.     Attend necessary meetings with City Council members, Planning Commissioners, City staff, public agencies, community groups, developers, contractors and the general public.

5.     Provide recommendations regarding regulations and ordinances pertaining to planning matters and coordinate with the City Attorney in preparation of routine ordinances or amendments.

6.     Provide zoning and planning related information to citizens and prospective applicants, conduct pre-submittal reviews, and assist individuals in coping with City processes.

7.     Upgrade and maintain the City's base mapping and routine graphic needs.

8.     Review, and as necessary adjust, the Planning Department's forms, processes and operational procedures to improve its efficiency, function and professional image, and bring the City's operations into the state-of-the-art, comparable with similarly sized communities.

9.     Monitor and report on changes in State law, regional programs and changes in environmental regulations and adjust City processes to conform to statutory requirements.

10.     Maintain an office presence at City Hall for 28 hours weekly, with the precise schedule of office hours determined through mutual agreement, with one of CONSULTANT's professional planning principals in attendance during office hours.

I-B.  Development Review:

1.     Review proposed land development projects, occupancies and business licenses with planning implications and notify applicants relative to zoning ordinance and General Plan compliance.

2.     Coordinate and correspond with applicants and process applications in accordance with City codes and policy.

3.     Review and process routine projects in compliance with the requirements of the California Environmental Quality Act (CEQA) and the City's guidelines for its implementation.  Prepare initial studies and negative declarations for routine projects.

**EXHIBIT A**

**PAGE 1544**

NUFIC_049377
BEAUAIG0000696

ORIGINAL

4.     Develop conditions of approval for routine projects consistent with State law and
good planing practices; City policy and financing requirements; health, safety and
welfare considerations; and with respect to protecting and maintaining
neighborhood stability and quality of life in Beaumont.

<u>I-C  Planning Commission Staffing:</u>

1.     Provide complete staffing to the Planning Commission and act in the capacity of
Planning Director/Secretary in the conduct of regularly scheduled meetings.

2.     Provide professional presentations and recommendations to the Planning
Commission to guide appropriately informed decision making on discretionary
actions.

3.     Prepare clear, professional quality graphics and other presentation materials to
clarify planning issues and to convey a professional image to the public.

4.     Prepare staff reports, regulations and meeting minutes, with the use of present
City clerical support, for all Planning Commission meetings.

5.     Utilizing City clerical support, prepare all required notices, agenda packets and
other pertinent materials for Commission meetings.

6.     Prepare and maintain a Planning Commissioner's Handbook to provide members
with a useful reference guide on subjects including legal requirements, conducting
of meetings, findings, conflict of interest and requirements of the Brown Act.

<u>I-D  City Council Staffing:</u>

1.     Utilizing City clerical staff, prepare planning notices and agenda items for
meetings, including reports and resolutions.

2.     Provide presentations and recommendations on planning issues and projects at
regular Council meetings and hearings.

3.     Provide graphic presentation materials of an appropriate quality to convey a
professional image to the public at City Council meetings.

4.     Attend City Council meetings on an as-need basis to provide counsel on planning
issues and pertinent public comments.


NUFIC 049378
BEAUAIG0000687

ORIGINAL

## II.  Economic Development Services

II-A.  Public Infrastructure Financing Programs:

1.  Monitor and report on on-going efforts involving public infrastructure financing programs and coordinate these efforts with other City functions, including planning, engineering, building and safety, finance, redevelopment and other City programs.

2.  Advise landowners and provide preliminary technical aid in the establishment of new financing programs, or in the annexation of properties to existing financing districts.

3.  Advise the City on the sale of public infrastructure bonds for the incremental expansion and upgrading of the wastewater treatment plant and other public facilities.

II-B.  Special Projects:

1.  Assist the City in the planning for annexation of strategic projects into the City.

2.  Establish a program for priority processing for projects of exceptional merit, such as industrial and commercial developments with substantial revenue and job creation benefits.

3.  Coordinate the administrative process of enacting development agreements for major development projects in the City.

4.  Assist the City Manager in establishing financing programs which can augment the City's budget (e.g. redevelopment, 308 Districts, Marks-Roos, mitigation fees).

II-C.  Marketing of the City:

1.  Assist the City Manager in outreach functions to enhance the process of attracting business, industry and quality development to Beaumont.

2.  Assist the City manager in public relations matters to promote a positive image for Beaumont and City programs, and provide assistance in managing the press n relevant matters.

3.  Assist the City in the procurement of grants and other funding for local projects from federal and State sources.

4.  Provide Graphic Artist services for up to forty-three hours per month.



**EXHIBIT A**

**PAGE 1546**

NUFIC_049379
BEAUAIG0000698

ORIGINAL

## III. Review of Development Services Functions

CONSULTANT will prepare an independent operational analysis of the City's development services functions, processes, record keeping and communications.

### III-A.  Planning Department:

1. Interview current City staff, Planning Commissioners and City Council members to determine attitudes, priorities,, and preferences relative to the planning function and operations, and the adequacy of coordination with other City functions.

2. Interview selected current and past project applicants to solicit comments and potential suggestions for improvements in departmental operations.

3. Review files and records to ascertain public satisfaction or complaint history with current operations.

4. Review forms and public information materials to a) ensure ready availability, b) ensure that materials are complete and provide proper instructions to applicants, and c) verify that the City is retrieving reasonable printing and production costs for materials furnished to the public.

5. Make appropriate recommendations for modifications or improvements to planning services.

### II-B.  Building and Safety:

1. Interview existing staff and other departments to ascertain any potential issues and problems relative to building and safety services.

2. Review records and files to ascertain public satisfaction with services an complaint history, if any.

3. Evaluate turn-around time for building plan checking and response to requests for inspection.

4. Review forms and public information materials as described relative to the Planning Department evaluation above.

5. Make recommendations relative to potential modifications or improvements to Building and Safety services.

### III-C.  City Engineering:

1. Interview existing staff to identify any prevailing issues, problems, resources needs and other operational considerations.

Exhibit A
PAGE 1547

NUFIC_049380
BEAUAIG0000699

ORIGINAL

2. Review files and records to ascertain any past problems and public satisfaction with services.

3. Review public works standards and other public information materials to ensure adequacy, clarity an completeness.

4. With the assistance of the existing staff, develop recommendations for improvements, where necessary.

III-D. Development Monitoring and Record Keeping:

1. Evaluate the City's record keeping system and capabilities, reporting process and information retrieval system for development related services.

2. Provide recommendations for improvement of data management systems, recognizing City budget limitations.

III-E. Report Preparation:

1. Prepare a preliminary report detailing findings and recommendations, for the review of the City Manager, in conjunction with reorganization of the City's development services staff and commencement of all services set forth herein.

2. Provide a final report inclusive of the City Manager's comments for presentation to the City Council as a discussion or "receive and file" item.

## IV. Public Works and Engineering Services

The designated Director of Public Works will maintain a presence at City hall for 24 hours weekly, will report directly to the City Manager and will provide the following services.

1. Administer public works and engineering services including supervision of Public Works Department personnel and day to day operations of the Public Works Department as directed by the City Manager.

2. Direct maintenance and operation activities of the City's Public Works Department including those related to streets, public utilities, water, wastewater, reclaimed water and storm drain systems; motorized and non-motorized equipment; and routine contract administration.

3. Direct the Public Works Department design engineering, capital improvement projects (CIP), traffic engineering, construction inspection and material testing, surveying, construction management services and plan checking services.

EXHIBIT 28

PAGE 1548

NUFIC_049381

BEAUAIG0000700

ORIGINAL

4.  Attend public meetings; assist the City Manager in preparation and maintenance of budgets; and provide leadership and motivation to all employees of the Public Works Department.

## V. Plan Checking and Construction Inspection

The CONSULTANT shall provide all necessary plan checking and inspection services for public works projects in the City of Beaumont as follows:

### V-A.  Plan Checking

On behalf of the City, ULC, under the direction of the Director of Public Works, shall review the plans prepared by civil engineers and other appropriate professionals on behalf of the City or private development interests for compliance with the ordinances of the City. The Director of Public Works shall arrange reviews by other appropriate agencies having jurisdiction in such matters relative to the enforcement of relevant codes and compliance with UBC (Uniform Building Code, 1991) and Caltrans. Only when satisfied that all conditions of approval and the appropriate requirements of the City's codes and other relevant codes and standards have been met, the Public Works Director shall approve or recommend approval of plans as relevant.

### V-B.  Construction Inspection

On behalf of the City, ULC, under the supervision of the Director of Public Works, shall provide inspection services during all phases of construction to enforce compliance with codes and conditions of approval, provisions of the City ordinances, Uniform Building Code (1991) and other requirements set forth on the plans for which permits were issued for construction. In the performance of such duties, ULC shall provide inspection for each project during and after completion of various stages of construction to confirm compliance with approved plans.

## VI. Facilities, Records and Support Personnel

The CITY shall provide an office for conducting the duties as set forth in this Agreement. Within this office, CONSULTANT shall assemble and maintain such records customarily maintained by a City Planning, Economic Development and Public Works Department. Such records shall at all times be the property of the CITY. The CITY shall also assign its Planning Department secretary to provide assistance in all of the required clerical support services directly related to the execution of the professional services set forth in this Agreement.

## VII. Additional Services

CITY may from time-to-time have the need for other services not specifically listed in this Agreement for which CONSULTANT has the necessary experience and capabilities to provide. CITY may authorize CONSULTANT to perform such additional services on an as-needed basis. Additional services which may be required include, but are not necessarily limited to:

NUFIC_049382
BEAUAIG0000701

ORIGINAL

A.  Major ordinance or General Plan revisions.
B.  Specific Plan and Environmental Impact Report processing.
C.  Direct costs for printing and reproduction of City materials.
D.  Preparation of Environmental Impact Reports and other major planning documents.
E.  Major overhauling of City mapping systems.
F.  Clerical services beyond those available from City staff.
G.  Development Agreement Processing.
H.  Major Annexations.
I.  Economic Development assistance beyond tasks specified in this Agreement (e.g. marketing brochures).
J.  Specification Writing.
K.  Bid Document Preparation.

## VIII.  Fee Collection

All fees to be collected from any private developer, engineer, architect, applicant or representative in connection with carrying out the functions on behalf of the City as set forth in this Agreement, if collected by CONSULTANT, shall be collected in the name of the CITY. CONSULTANT shall employ record keeping measures acceptable to the CITY.

## IX.  Compensation to CONSULTANT

The fees in full compensation to CONSULTANT for the services rendered for the services as set forth in this Agreement shall be as follows:

1.  For the services set forth in Sections I, II and IV, compensation shall be a monthly lump sum of $15,000.00, to be renegotiated annually.

2.  For the services set forth in Section V, compensation shall be on a time and materials basis not exceeding four and one-half percent (4.5%) of the confirmed construction cost of the public improvements to be constructed.

3.  For the services set forth in Section III, there shall be no compensation. These services shall be provided in connection with the services set forth in Sections II and IV.

4.  For Additional Services as set forth in Section VII, compensation shall be in accordance with the Hourly Rate Schedule attached to this Agreement as Exhibit "A", or based upon a negotiated fixed fee rate.

## X.  Termination

This Agreement may be terminated by CITY or CONSULTANT with or without cause, with minimum written notice of 60 days. In the event of such termination, CONSULTANT shall be compensated for such services up to the point of the effective date of the determination.

EXHIBIT 28

NUEIC_049383
BEAUAIG0000702

ORIGINAL

## XI. General Provisions

1. CONSULTANT shall provide no services for any private entitlement project within the corporate boundaries or sphere of influence of the CITY or to any other city within the boundary of the San Gorgonio Pass Water Agency during the period that this Agreement is in effect, without the written approval of the City Manager.

2. CITY shall not be called upon to assume any liability for the direct payment of any salary, wage or other compensation to any person employed by CONSULTANT performing services hereunder for CITY.

3. CONSULTANT shall not assign this contract without the prior written consent of the CITY.

## XII. Responsible Individuals

The individuals directly responsible for the execution of the services as set forth herein shall be Ernest A. Egger, David W. Dillon and Deepak Moorjani, principals for Urban Logic Consultants. Changes in responsible personnel are subject to mutual agreement with the CITY.

## XIII. Commencement of Services, Duration and Effect of Agreement

Services as set forth in this Agreement shall be commenced on September 28, 1993. The duration of this Agreement shall be until such time as the Agreement is terminated by either party, or both. Upon Execution of this Agreement, any prior Agreement for the services provided for herein shall be superseded by this Agreement.

EXHIBIT 28

PAGE 1551

NUFIC_049384
BEAUAIG0000703

ORIGINAL

IN WITNESS HEREOF, CITY and CONSULTANT have caused this Agreement to be executed by the duly authorized officers the day and year first above written in this Agreement.

CITY OF BEAUMONT                    URBAN LOGIC CONSULTANTS

_____            _____
Jan Leja, Mayor                    Ernest A. Egger, Principal

_____            _____
City Clerk                         David W. Dillon, Principal

                                   _____
                                   Deepak Moorjani, Principal

NUFIC_049385
BEAUAIG0000704

# EXHIBIT "A"

# URBAN LOGIC CONSULTANTS

### HOURLY RATE SCHEDULE

Professional Services:

| Classification | Hourly Rate |
|---|---|
| Principal | $100.00 |
| Senior Associate (Planner/Engineer) | 80.00 |
| Associate (Planner/Engineer) | 70.00 |
| Public Works Plan Checker | 60.00 |
| Administrative Assistant | 55.00 |
| Public Works Construction Inspector | 55.00 |
| Executive Secretary | 35.00 |
| Secretary | 30.00 |

Direct Services and Reimbursement Costs:

Professional Sub-Consultant Services - Actual cost plus 15%

Document Reproduction and Copying - Actual cost plus 15%

Blue Prints - $2.50 per sheet

Vehicle Mileage - $0.32 per mile

Consultation in connection with litigation and court testimony will be quoted separately on an individual basis.

The above rates remain in effect through December 31, 1994.

**EXHIBIT 25**

**PAGE 1553**

NUFIC_049386
BEAUAIG0000705

TO:        Mayor and Members of the City Council

FROM:      City Manager

DATE:      September 27, 1993

SUBJECT:   Proposed Amended Agreement with Urban Logic Consultants
           for Planning, Economic Development and Public Works
           Services.
=================================================================

**BACKGROUND**

On March 22, 1993 the City Council approved an agreement for
Community and Economic Development Services with Urban Logic
Consultants (ULC).  The agreement provided for day-to-day planning
and economic development services with staffing coverage at City
Hall of twenty-eight hours per week for a flat fee of $10,000 per
month.

It also provided for up to forty-three hours per month of graphic
artists services.  Since that date, Dave Dillon and Ernie Egger
have been providing the agreed upon services to the City.  Although
the agreement calls for coverage of twenty-eight hours per week,
the actual coverage has averaged well over forty hours a week since
March.  The services provided have been excellent.  Mr. Dillon and
Mr. Egger have coordinated well with City staff and have exceeded my
expectations in terms of productivity and effectiveness.  One of the
most important benefits for the City has been the additional
coordination provided between planning and development related
services and the City's program for financing and construction of
public facilities.

**PROPOSED AMENDMENT**

As discussed informally with the Council recently, there is a need
for more comprehensive day-to-day public works services.  This need
involves the direct supervision of public works personnel,
overseeing the operations of the public works superintendent, the
wastewater treatment plant superintendent, and the vehicle
maintenance and transit superintendent. This need is anticipated to
grow as the City pursues construction of the wastewater treatment
plant as well as other major public facilities planned as part of
the community facilities district.  Moreover, capital improvement
planning involving existing sources of funding for capital
improvements, such as gas tax and CDBG funds, needs to take place.

The proposed amended agreement is identical to the agreement adopted
by the Council in March, with the exception of the following:

1.  It provides for direction and supervision of personnel in
    the planning and building functions.

2.  It provides for public works and engineering services,
    including direction and supervision of staff as outlined
    above, with presence at City Hall for twenty-four hours
    weekly.

3.  It provides for plan checking and construction inspection
    services on the basis of time and materials, not exceeding
    4.5% of the confirmed construction costs of public
    improvements.   (This item has been budgeted in the
    comprehensive public facilities financing program).

4.  Increases the monthly flat rate for services from $10,000
    per month to $15,000 per month. This incremental increase
    amounts to the addition of public works services at a rate

EXHIBIT A

NUFIC_049387
BEAUAIG0000706

TO:    Mayor and City Council Members        September 27, 1993
FROM:   City Manager                         Page 2

SUBJ:   Amended Agreement with Urban Logic Consultants.

of approximately $48.00 per hour. The approximate hourly rate for planning, economic development, and graphic services repeated in this amendment is approximately $57.00 per hour.

The Public Works and Engineering Services will be provided by Deepak Moorjani, a principal for ULC. Attached for your information is a copy of Mr. Moorjani's resume.

## FISCAL IMPACT

All of the funds for the incremental increase of $5,000 per month are currently budgeted within the General Fund, Sewer Enterprise Fund, Street Lighting Fund, Gas Tax Fund, and other transportation related grant funds. City Engineering services currently being provided by Almgren & Koptionak, have averaged approximately $7,100 per month from February, 1993 through June, 1993, at an hourly rate for the Principal City Engineer of $90.00. It is anticipated that through the attached amendment the City will experience a savings of approximately $24,000 per year and at the same time substantially increase the availability of public works and engineering services.

On the planning and economic development services, previously at a flat monthly rate of $10,000, the City is saving approximately $27,000 per year, as compared to the costs of full time staffing in the planning department previously. That full time staffing and related operational costs previously ran the City $146,721 per year versus the current flat rate of $120,000 per year. In total, the amended agreement with ULC should result in a total savings to the City of in excess of $50,000 per year.

## RECOMMENDATION:

It is recommended that the City Council approve the attached Agreement for Planning, Economic Development and Public Works Services, and authorize the Mayor to execute same.

Respectfully submitted,

Dayle Keller
City Manager

DK:jw

EXHIBIT 28
PAGE 1555

Exhibit A

NUFIC_049388
BEAUAIG0000707

BEAUMONT CITY COUNCIL

MINUTES OF

SEPTEMBER 27, 1993

The Beaumont City Council met in a regular meeting on Monday,
September 27, 1993, at 6:08 p.m., in the City Council Chambers with
Mayor Leja presiding.

On roll call the following Council Members were present:  Brey,
McLaughlin, Parrott, Russo and Mayor Leja.

PROCLAMATION - PROCLAIMING NO TIES.

Mayor Leja read a proclamation in its entirety proclaiming that no
ties will be allowed at this meeting.  After reading the
proclamation, Mayor Leja then announced that those found in
violation of the proclamation will have the tie immediately clipped.

The meeting was adjourned at 6:10 p.m. to allow all those in
attendance to remove their ties and place them on the rack provided
for that purpose, with the meeting reconvening at 6:11 p.m.

The invocation was given by Council Member Russo, who then led the
Pledge of Allegiance to the Flag.

1.  Clerk's Affidavit of Posting.

    Motion by Council Member McLaughlin, second by Council Member
    Brey, to dispense with the reading of the affidavit of
    posting.  With no opposition, the motion carried 5-0.

2.  Adjustments to Agenda.

    The City Manager requested that Agenda Items No. 15 and 20.a be
    removed from the agenda as those items were not ready to be
    considered.

    There being no objections, these items were removed from the
    agenda.

3.  **ORAL COMMUNICATION:**

    Battalion Chief Chris Wurzell had requested to address the
    Council, however, due to a number of brush fires in the area,
    was unable to attend the meeting.

    PUBLIC HEARING:

4.  DEVELOPMENT AGREEMENT 93-DA-1 and NEGATIVE DECLARATION 93-ND-11.
    **Applicant:**  ICI, Inc. and Orangewood.  **Location:**  CFD 93-1
    Improvement Areas No. 9 and 10.  **Project Description:**  Request
    for approval of a Development Agreement for Tentative Tract No.
    23646, located north of Cougar Way and east of Beaumont Avenue
    and Tentative Tract Map No. 25272, located adjacent to the west
    side of Tract No. 23646.

    The adoption of a Negative Declaration pursuant to the
    California Environmental Quality Act (CEQA) is also proposed
    including findings consistent with Section 15153 of the CEQA
    Guidelines.
    **Staff Recommendation:**  Adopt Negative Declaration 93-ND-11;
    Approve Development Agreement DA-1; and Approve Ordinance No.
    723 at its first reading.

    The staff report on Development Agreements 93-DA-1 through 93-
    DA-6 was presented by David Dillon as one report.  This lengthy
    report is a matter of record in the Clerk's file.

Page 1


NUFIC_049389
BEAUAIG00000708

Beaumont City Council
September 2, 1993

The public hearing was re-opened at 6:24 p.m., and there being
no one requesting to speak, the hearing was closed at 6:24:30
p.m.

There were no comments or questions from the Council.

a.  Adopting Negative Declaration 93-ND-11 based on the
    findings the proposed agreement will not have an adverse
    affect on the environment.

Motion by Council Member Parrott, second by Council Member
McLaughlin, to adopt Negative Declaration 93-ND-11 based on the
finding the proposed agreement will not have an adverse affect
on the environment.

AYES:    Council Member Brey, McLaughlin, Parrott, Russo and
         Mayor Leja.
NOES:    None.
ABSTAIN: None.
ABSENT:  None.

b.  <u>ORDINANCE NO. 723</u> - FIRST READING - Approving Development
    Agreement 93-DA-1 for Tentative Tract Nos. 23646 and 25272.
    Applicant:  ICI, Inc. and Orangewood. Location: CFD 93-1
    Improvement Areas 9 and 10.

Motion to read Ordinance No. 723 by title only.

Motion by Council Member McLaughlin, second by Council Member
Parrott, to read Ordinance No. 723 by title only.

AYES:    Council Member Brey, McLaughlin, Parrott, Russo and
         Mayor Leja.
NOES:    None.
ABSTAIN: None.
ABSENT:  None.

The ordinance was read by title only by the Deputy City Clerk.

Motion to Approve Ordinance No. 723 at its first reading.

Motion by Council Member McLaughlin, second by Council Member
Parrott, to approve Ordinance No. 723 at its first reading.

AYES:    Council Member Brey, McLaughlin, Parrott, Russo and
         Mayor Leja.
NOES:    None.
ABSTAIN: None.
ABSENT:  None.

5.  DEVELOPMENT AGREEMENT 93-DA-2 and NEGATIVE DECLARATION
    93-ND-12. Applicant:  Hovchild, Inc.  Location: CFD 93-1
    Improvement Area No. 7.  Project Description:  Request for
    approval of a Development Agreement for Specific Plan No.
    SP-88-3, located south of Interstate 10 and west of Highland
    Springs Avenue.

    The adoption of a Negative Declaration pursuant to the
    California Environmental Quality Act (CEQA) is also proposed
    including findings consistent with Section 15153 of the CEQA
    Guidelines.
    Staff Recommendation:  Adopt Negative Declaration 93-ND-12;
    Approve Development Agreement DA-2; and Approve Ordinance No.
    724 at its first reading.

The Staff report was presented with Agenda Item No. 4.

The public hearing was re-opened at 6:40 p.m.

Mr. Jeff Lodder, representing Hovchild, Inc., stating he wanted

Page 2


EXHIBIT 28
PAGE 1557

NUFIC_049390
BEAUAIG0000709

Beaumont City Council
September 2, 1993

to express their appreciation specifically to the staff, City Manager Dayle Keller, Dave Dillon, Ernie Egger and George McFarlin, for their efforts and their willingness to work with all of the developers, and to thank each of them for the time allotted. He continued that it is his understanding that the City Council has a recommendation from David Dillon that the Council would give the City Manager and the staff the authority to fine tune the development agreement because there are some minor changes and alterations needed. He then requested that the Council authorize the City Manager and the staff to do this.

There being no other requests to speak, the hearing was closed at 6:45 p.m.

a. Adopting Negative Declaration 93-ND-12 based on the findings the proposed agreement will not have an adverse affect on the environment.

Motion by Council Member McLaughlin, second by Council member Parrott to adopt Negative Declaration 93-ND-12 based on the finding the proposed agreement will not have a significant impact on the environment.

AYES: Council Member Brey, McLaughlin, Parrott, Russo and Mayor Leja.
NOES: None.
ABSTAIN: None.
ABSENT: None.

b. **ORDINANCE NO. 724** – **FIRST READING** – Approving Development Agreement 93-DA-2 for Specific Plan SP-88-3. Applicant: Hovchild, Inc. Location: CFD 93-1 Improvement Area 7.

Motion to read Ordinance No. 724 by title only.

Motion by Council Member Brey, second by Council Member McLaughlin, to read Ordinance No. 724 by title only.

There being no opposition, the motion carried 5-0.

The ordinance was read by title only by the Deputy City Clerk.

Motion to Approve Ordinance No. 724 at its first reading.

Motion by Council Member Parrott, second by Council Member McLaughlin, to approve Ordinance No. 724 at its first reading.

AYES: Council Member Brey, McLaughlin, Parrott, Russo and Mayor Leja.
NOES: None.
ABSTAIN: None.
ABSENT: None.

6. **DEVELOPMENT AGREEMENT 93-DA-3 and NEGATIVE DECLARATION 93-ND-13. Applicant:** Loma Linda University. **Location:** CFD 93-1 Improvement Areas No. 6A and 6B. **Project Description:** Request for approval of a Development Agreement for Specific Plan No. SP-93-3, located south of Interstate 10 and west of Highland Springs Avenue.

The adoption of a Negative Declaration pursuant to the California Environmental Quality Act (CEQA) is also proposed including findings consistent with Section 15153 of the CEQA Guidelines.

Staff Recommendation: Adopt Negative Declaration 93-ND-13; Approve Development Agreement DA-3; and Approve Ordinance No. 725 at its first reading.

The staff report was presented with Agenda Item No. 4.

Page 3


NUFIC_049391
BEAUAIG0000710

Beaumont City Council
September 27, 1993

The public hearing was re-opened at 6:55 p.m. and there being
no requests to speak, the hearing was closed at 6:55:30 p.m.

   a.  Adopting Negative Declaration 93-ND-13 based on the
      finding the proposed agreement will not have an adverse
      affect on the environment.

Motion by Council Member McLaughlin, second by Council Member
Parrott, to adopt Negative Declaration 93-ND-13 based on the
finding the proposed agreement will not have an adverse affect
on the environment.

AYES:     Council Member Brey, McLaughlin, Parrott, Russo and
         Mayor Leja.
NOES:     None.
ABSTAIN: None.
ABSENT:  None.

   b.  **ORDINANCE NO. 725 – FIRST READING** – Approving Development
      Agreement 93-DA-3 for Specific Plan SP-93-3.   Applicant:
      Loma Linda University.   Location: CFD 93-1 Improvement
      Areas 6A and 6B.

Motion to read Ordinance No. 725 by title only.

Motion by Council Member Brey, second by Council Member
McLaughlin to read Ordinance No. 725 by title only.

There being no opposition, the motion carried 5-0.

The ordinance was read by title only by the Deputy City Clerk.

Motion to Approve Ordinance No. 725 at its first reading.

Motion by Council Member Parrott, second by Council Member
Brey, to approve Ordinance No. 725 at its first reading.

AYES:     Council Member Brey, McLaughlin, Parrott, Russo and
         Mayor Leja.
NOES:     None.
ABSTAIN: None.
ABSENT:  None.

7.    DEVELOPMENT AGREEMENT 93-DA-4 and NEGATIVE DECLARATION
    93-ND-14.   Applicant:   Heartland California Beaumont LTD.
    **Location:**    CFD  93-1  Improvement  Area  No.  5.   **Project
    Description:**   Request  for  approval  of  a  Development  Agreement
    for General Plan Entitlements to formalize applicant and City
    obligations which relate to General Plan Entitlements and CFD
    93-1, located north of Highway 60 and south of San Timoteo
    Canyon Road.

The adoption of a Negative Declaration pursuant to the
California Environmental Quality Act (CEQA) is also proposed
including findings consistent with Section 15153 of the CEQA
CEQA Guidelines.
**Staff Recommendation:**   Adopt Negative Declaration 93-ND-14;
Approve Development Agreement DA-4; and Approve Ordinance No.
726 at its first reading.

The staff report was presented with Agenda Item No. 4.

The public hearing was re-opened at 7:00 p.m., and there being
no requests to speak, the hearing was closed at 7:00:30 p.m.

   a.  Adopting Negative Declaration 93-ND-14 based on the
      findings the proposed agreement will not have an adverse
      affect on the environment.

Page 4

**EXHIBIT 28**
**PAGE 1559**

EXHIBIT A

NUFIC_049392
BEAUAIG0000071

Beaumont City Council
September   , 1993

Motion by Council Member Brey, second by Council Member
Parrott, to adopt Negative Declaration 93-ND-14 based on the
finding the proposed agreement will not have an adverse affect
on the environment.

AYES:    Council Member Brey, McLaughlin, Parrott, Russo and
         Mayor Leja.
NOES:    None.
ABSTAIN: None.
ABSENT:  None.

   b.  **ORDINANCE NO. 726 – FIRST READING** – Approving Development
       Agreement 93-DA-4 for General Plan Entitlements.  Applicant:
       Heartland California Beaumont LTD.  Location: CFD 93-1
       Improvement Area 5.

Motion to read Ordinance No. 726 by title only.

Motion by Council Member McLaughlin, second by Council Member
Brey, to read Ordinance No. 726 by title only.

There being no opposition, the motion carried 5-0.

Motion to Approve Ordinance No. 726 at its first reading.

Motion by Council Member Parrott, second by Council Member
McLaughlin, to approve Ordinance No. 726 at its first reading.

AYES:    Council Member Brey, McLaughlin, Parrott, Russo and
         Mayor Leja.
NOES:    None.
ABSTAIN: None.
ABSENT:  None.

8.  **DEVELOPMENT AGREEMENT 93-DA-5 and NEGATIVE DECLARATION
    93-ND-15.  Applicant:**  High 60 Associates (Rolling Hills
    Ranch).  **Location:** CFD 93-1 Improvement Area No. 4.  **Project
    Description:**  Request for approval of a Development Agreement
    for Specific Plan No.  SP-92-2, located south of State Highway
    60 and north of Fourth Street.

The adoption of a Negative Declaration pursuant to the
California Environmental Quality Act (CEQA) is also proposed
including findings consistent with Section 15153 of the CEQA
CEQA Guidelines.
**Staff Recommendation:**  Adopt Negative Declaration 93-ND-15;
Approve Development Agreement DA-5; and Approve Ordinance No.
727 at its first reading.

The staff report was presented with Agenda Item No. 4.

The public hearing was re-opened at 7:05 p.m.

Mr. Joe DiChristina, representing Robertson Homes, addressed
the Council, expressing the gratitude he and his partner
have towards the City staff, including Dayle Keller, Mr.
Aklufi, Dave Dillon, Ernie Egger and Mr.  McFarlin, as they
have all been a tremendous asset in the last year working on
the project.  He continued they feel they have pulled together
a strong group of developers and some very difficult and
complicated issues in a very brief period of time, which is
something they have not seen in this City for the four years
they have owned the property.

He went on to state they believe everything in the development
agreement has been agreed to, with just a few minor
clarifications which are being worked out, including a small
provision on the tentative map, but all the language should be
worked through in the next day or two, and everything will be
taken care of.

EXHIBIT A
PAGE 1560

NUFIC_049393
BEAUAIG0000712

Beaumont City Council
September 27, 1993

There being no other requests to speak, the hearing was closed
at 7:10 p.m.

a.  Adopting  Negative  Declaration  93-ND-15  based  on  the
    findings the proposed agreement will not have an adverse
    affect on the environment.

Motion by Council Member McLaughlin, second by Council Member
Russo to adopt Negative Declaration 93-ND-15 based on the
finding the proposed agreement will not have an adverse affect
on the environment.

AYES:    Council Member Brey, McLaughlin, Parrott, Russo and
         Mayor Leja.
NOES:    None.
ABSTAIN: None.
ABSENT:  None.

b.  <u>ORDINANCE NO. 727 - FIRST READING</u> - Approving Development
    Agreement 93-DA-5 for Specific Plan SP-92-2.  Applicant:
    High 60 Associates (Rolling Hills Ranch).  Location:
    CFD 93-1 Improvement Area No. 4.

Motion to read Ordinance No. 727 by title only.

Motion  by  Council  Member  Brey,  second  by  Council  Member
McLaughlin, to read Ordinance No. 727 by title only.

There being no opposition, the motion carried 5-0.

Motion to Approve Ordinance No. 727 at its first reading.

Motion  by  Council  Member  Russo,  second  by  Council  Member
McLaughlin, to approve Ordinance No. 727 at its first reading.

AYES:    Council Member Brey, McLaughlin, Parrott, Russo and
         Mayor Leja.
NOES:    None.
ABSTAIN: None.
ABSENT:  None.

9.  DEVELOPMENT  AGREEMENT  93-DA-6  and  NEGATIVE  DECLARATION
    93-ND-16.  **Applicant:** Coscan/Stewart Partnership.  **Location:**
    CFD 93-1 Improvement Area No. 3.  **Project Description:** Request
    for approval of a Development Agreement for Specific Plan No.
    SP-88-2 (Three Rings Ranch), located east of Interstate 10 and
    south of Fourteenth Street.

    The adoption  of  a  Negative  Declaration  pursuant  to  the
    California Environmental Quality Act (CEQA) is also proposed
    including findings consistent  with Section 15153 of the CEQA
    Guidelines.
    Staff Recommendation:  Adopt Negative Declaration 93-ND-16;
    Approve Development Agreement DA-6; and Approve Ordinance No.
    728 at its first reading.

    The staff  report  was  presented  with  Agenda  Item  No. 4.

    The public hearing was re-opened at 7:16 p.m., and there being
    no requests to speak, the hearing was closed at 7:16:30 p.m.

a.  Adopting  Negative  Declaration  93-ND-16  based  on  the
    findings the proposed agreement will not have an adverse
    affect on the environment.

Motion by Council Member Russo, second by Council Member Brey,
to adopt Negative Declaration 93-ND-16 based on the finding
the proposed agreement will not have an adverse affect on the
environment.

Page 6


EXHIBIT A
PAGE 1561

Beaumont City Council
September   , 1993

There being no opposition, the motion carried 5-0.

b. __ORDINANCE NO. 728__ - __FIRST READING__ - Approving Development
   Agreement 93-DA-6 for Specific Plan SP-88-2.  Applicant:
   Coscan/Stewart Partnership.  Location: CFD 93-1 Improvement
   Area No. 3.

Motion to read Ordinance No. 728 by title only.

Motion by Council Member Russo, second by Council Member
Parrott, to read Ordinance No. 728 by title only.

There being no opposition, the motion carried 5-0.

The ordinance was read by title only by the Deputy City Clerk.

Motion to Approve Ordinance No. 728 at its first reading.

Motion by Council Member McLaughlin, second by Council Member
Russo, to approve Ordinance No. 728 at its first reading.

AYES:    Council Member Brey, McLaughlin, Parrott, Russo and
         Mayor Leja.
NOES:    None.
ABSTAIN: None.
ABSENT:  None.

10. PROPOSED PRE-ANNEXATION  CHANGE OF ZONE 92-RZ-2, SPECIFIC PLAN
    SP-92-1, ENVIRONMENTAL IMPACT REPORT EIR-92-2, ANNEXATION 92-
    ANX-2-53 and DEVELOPMENT AGREEMENT 93-DA-7.

    **Applicant:** Lockheed Corporation.  **Location:**   South of the
    existing City Limits, with the site's northerly periphery
    consisting of the southerly terminus of Highland Springs
    Avenue, and the westerly boundary being Highway 79 (Lambs
    Canyon Road).

    A proposed  pre-annexation  zone change  on 9,117 acres from
    Riverside   County   M-M   (Manufacturing-Medium),   M-H
    (Manufacturing-Heavy), M-RA (Mineral Resources and Related
    Manufacturing), W-2 (Controlled Development) and W-2-160
    (Controlled Development, 160 acres minimum lot size) to City
    of Beaumont SPA (Specific Plan Area) (92-RZ-2); proposed
    annexation of the property into the City of Beaumont (92-
    ANX-2-53); the proposed adoption of the Potrero Creek Specific
    Plan for a master planned community with 11,870 dwelling units
    and ancillary commercial and recreational uses on 9,117 acres
    (SP-92-1); certification that the final environmental impact
    report has been completed in compliance with the California
    Environmental Quality Act (CEQA) (EIR-92-2); and adoption of a
    Development Agreement (93-DA-7).
    __Staff Recommendation:__   Adopt Resolution No. 1993-48; Approve
    Ordinance No. 730 at its first reading; Approve Ordinance No.
    731 at its first reading; and Adopt Resolution No. 1993-49.

    The staff report was presented by Ernie Egger, a copy of which
    is a matter of record in the Clerk's file.

    Representatives of the applicant, Lockheed Corporation, gave an
    in-depth  presentation  concerning  the  project,  answering
    numerous questions from the Council.  This presentation and the
    questions from the Council are a matter of record on the
    recording of this meeting, and are available upon request.

    At the conclusion of the Lockheed presentation, Mr. Egger
    submitted the remainder of his staff report relating to the
    conditions of approval, the development agreement and the
    annexation proceedings.  Mr. Egger also stated for the record
    that comments from the Sierra Club and the Audubon Club were
    received this evening, and briefly addressed those comments for
    the benefit of the Council.



EXHIBIT 28
PAGE 1562

NUFIC_049395
BEAUAIG00000714

Beaumont C    y Council
September 21, 1993

The public hearing was opened at 7:40 p.m.

Ann Dennis, conservation coordinator for the Sierra Club, 568
N. Mountain View, Suite 130, San Bernardino, 92401: The reason
I am here really is not to belabor the comments you already
have because, although I am a staff person for the Sierra Club
which represents both Riverside and San Bernardino counties,
one of my other hats, as the gentlemen behind me know, I have
been acting for the past couple of years as the chair for the
advisory committee for the Riverside County Habitat Agency, so
they know that I like to try to really move to the close and
hold the meetings under five or six or ten hours if I can, and
I sure don't want to do any different here since I am locked in
just like the rest of you.

But what I do want to say is that we do feel very strongly
about the comments that you have received.  We have also
presented you with comments prior to this.  We would be glad to
meet with you at any time to discuss those comments.  I do
apologize for the lateness of these comments.  I did not
hand carry them, they were brought in by someone else.
Unfortunately for us we are a grassroots organization.  We have
a very large membership, but our EIR reading group that
comments on these very important EIRs and the people that
attend these hearings by and large are volunteers and hold
down, as I am sure most of you do, a full time job and then
also serve their communities.  So we find that these
developments, even though they may be many years as they are
moving along, seem to come to fruition in cycles, and I think
you guys can speak to that too.  You go along and there is kind
of not much happening, and then it is all happening.  And so I
do apologize that you did not get this later set sooner, but we
are kind of in that situation now, and our conservation chair,
Joan Taylor, who prepared these comments, is at this moment in
another meeting out in the Coachella Valley, which was prior
set to this one and she could not come in.

So I am just here to echo her comments and also to really,
seriously say to you that speaking as the acting chair, as I
have been for quite some time for that agency, it is not a
given that Potrero will not be a study area.  It is a study
area now, and that is something you really, really want to
think about.  It has not been taken out of that designation.
And economics does not say that it will be because I think in
the endangered species act economics is not considered.  So you
want to think about that.

Mayor Leja: Can I ask you a couple of questions.

Ms. Dennis:  You bet.  I am not Joan, but I will do my best.

Mayor Leja: That's fine.  I think you will do just fine.  The
study area that you are talking about that Potrero is in, is
that the study area for the habitat conservation for Riverside
County.

Ms. Dennis:  Stephens Kangaroo Rat at this time.  It is moving
into a multi-species but . . .

Mayor Leja:  It is the study area that the Riverside County. .
.

Ms. Dennis:  Habitat Conservation Agency.

Mayor Leja:  They have identified it as their study area.

Ms. Dennis:  Yes.

Mayor Leja:  Could you cover for me real quick the requirements
of the study area or the participation in the RC whatever it
is.



EXHIBIT A
PAGE 1563

NUFIC_049396
BEAUAIG0000715

Beaumont City Council
September 27, 1993

Ms. Dennis:  RCACA.

Mayor Leja:  Because I know some cities participate in that, and I am not sure how you relate your study areas to certain areas outside of the cities that are participating.

Ms. Dennis:  Well the study areas pretty much cover the same cities and County of Riverside area that there are found Stephens Kangaroo Rat, or has been found, and as he alluded earlier there have been found some new Stephens Kangaroo Rat populations recently.  But the fact remains that they are working with what is, because we are coming very close to the long term plan in getting it drawn, which would last for, hopefully, twenty or thirty years or more.  But right now, we are in the short term plan, and so we have not finalized those areas, and Potrero is one of them.

And kind of what they looked at when people started four or five years ago to look at these areas in the County they went out and literally did biological studies and tried to see where was the rat.  And within that area tried to encompass a large enough area so that as they began to cut it down they would still be relatively certain, or as certain as they could be, that this species could on go.

Mayor Leja:  So what you are saying is this group of, I believe, is a collection of some cities and the County, designated what they thought the study areas would be for other areas without a public hearing?

Ms. Dennis:  No, no, no.  There has been a lot of public hearings, and it wasn't the joint powers authority to begin with, it started out as a task force.

Mayor Leja:  Who identified different areas as study areas.

Ms. Dennis:  There was a consulting firm that was hired early on, four or five - I think about five years ago actually.

Mayor Leja:  And they identified the study areas, and then. . .

Ms. Dennis:  I think you were even, weren't you at that time still involved, I mean before. . .

Unidentified speaker:  I never designated my client a study area.

Ms. Dennis:  No, but I mean, way back when it all first started, you know when Paul Seltzer was starting to work on it, were you not involved at that time.

Mayor Leja:  I have just been trying to find this answer out for the longest time of who gave them the authority to designate it, as well as - without the benefit of a public hearing of lands that would be designated as a study area. Also, I have one other question - I guess there is no clear answer . . .

Ms. Dennis:  No, that I can answer you.  When it very first started, Fish and Wildlife, United States Fish and Wildlife as the deciding agency, because of it being under the endangered species act, was willing to give a permit to the County of Riverside, and the cities involved, if they would put together a plan that would be satisfactory.  And that is when they began to do the studies, and they did have hearings at that time.

Mayor Leja:  So they put a plan together for a city that was not participating.  For our area.

Ms. Dennis:  Well, it was not, at that time, my understanding

Page 9



NUFIC_049397
BEAUAIG0000716

Beaumont C   Council
September 27, 1993

Mayor Leja:  How many acre feet will be in the lake, and where
will the water come from.

Mr. Snyder:  The water is coming from the treatment plant,
which is right here.  And the total treatment plants, Phase 1-
A and this will be later on, is going to be tributary to the
treatment plant, which is about a 22 acre treatment plant,
which will produce 3.8 million gallons a day, between the two.
Excluding the estate areas, which these are going to be under
their own septic tank system.  They won't be tributary to these
systems.  We are tentatively looking at a ten acre lake,
43,560 feet and it is going to be about fourteen feet deep
approximately.  And that is how much the storage capacity will
be, and what that does is you have the overflow, the constant
overflow that will water the golf course - the golf courses and
the landscaped area.  And depending on how this progresses as
far as the needs of landscaping and parks, this treatment plant
will either have a pump station and pump it back up to the
lake, or water this, or discharge into the creek, if allowed.

Mayor Leja:  And there is a requirement to have so much water
in that lake at all times.

Mr. Snyder:  Correct.  You don't want a dry lake.  And that is
yes, and the key on that is that before you build the golf
courses, or finish them and irrigate them, is to build up a
static water surface and have it that you can fluctuate based
on the amount of water affluent treated raising it up, and also
during the rainy season.  That you can't have it too high and
you have a overflow system to bring it down.   Also,
additionally, we have been talking to the City, there is
potentially, that there may be - we have asked for the City to
bring some affluent from the north down to the south on a early
basis to have that treated, that will help speed along the golf
courses and the lake.  But that is still under discussion.

Mayor Leja:  Did that answer your question.

Ms. Vrzal:  I didn't get what he said the depth of it was.

Mr. Egger:  14 feet.  140 acre feet.

Mayor Leja:  Are there any other questions or comments from the
public.  Any questions or comments in favor or opposition or
neutral.  Okay we will close the public hearing.

The public hearing was closed at 7:53 p.m.

Following the close of the public hearing, Mayor Leja had one
specific question to the effect that won't the wildlife and
rats and birds and everything else, won't they thrive more
under the condition that provides water and those types of
things.

Mr. Egger responded that was absolutely correct, and that in
fact the golf courses will contain water features and actually
will provide a fairly hospitable interface from that primary
wildlife corridor, which is Potrero Creek and some of its
tributaries.   He pointed out the project has been nicely
designed by virtue of the fact that in most cases the
interfaces between that wildlife corridor and urban development
areas does consist of a golf course, and while a golf course is
not a 100% natural environment and 100% support for wildlife,
it does provide a much better transition to the urban
development than other types of things.

The meeting was recessed at 7:55 p.m., reconvening at 8:12 p.m.

After reconvening, a number of questions were asked by members
of the Council concerning the proposed project.   These



EXHIBIT 28
PAGE 1565

NUFIC_049398
BEAUAIG0000717

it was not in your City.  The area.

Mayor Leja:  So the areas were just generally put in there.

Ms. Dennis:  If the County designated that area, which I assume it did, then the thought was there was a very large population there at that time.

Mayor Leja:  Can I ask another question.  When you have your study areas for your short term or for your long term, and I know all the laws and all the — I think, what is it, four biologist in the State are only authorized to touch the rats, and if you touch the rat or its habitat you are nailed with a $10,000 fine.  Is that roughly it.

Ms. Dennis:  It is pretty steep.

Mayor Leja:  Yeah, but I think it is about $10,000.  Can I ask a question.  Let's say we set up all these nice little study areas, and that little rat decides to go outside that study area, are they open game then, can we smash the little suckers, or what.

Ms. Dennis:  Well there is a hope that you wouldn't smash them, but if you accidentally smashed them you wouldn't have that same fine.

Mayor Leja:  Is there a lobbying effort on by your organization so that once the study areas are set up, then the rest of the population is rid of all the unnecessary fines and everything if they happen to walk in our backyard and our cat decides to eat one.

Ms. Dennis:  Once the study areas are final.  Once the long term is in effect, everything else out of there is out of there.  If it is not in that study area, it is out of there.

Mayor Leja:  It is open game.

Ms. Dennis:  I really don't like that phrase, but yes.  The study area is the study area.  But it is not the study area until it final.  You see.  So there is the rub.  Right now it has not been finalized, but shortly it will be.

Mayor Leja:  Okay.  Did the Sierra Club sell their office building in San Francisco, because I believe they used to have a really nice place in San Francisco, downtown.

Ms. Dennis:  As far as I know, I have never been there, but I believe they have been in the same place for a long, long time. It is on Pope Street, that is all I know.  I have never been in it.

Mayor Leja:  All right.  Thank you very much.  Mrs. Vrzal, did you have a comment.

Alma Vrzal, 720 California Avenue, Beaumont:  I want to know what the size of the lake is going to be, and what the water capacity is, and where the water is coming from.

Mr. Egger:  It is ten acres in size.  The water capacity, I think Doug Snyder can probably tell us a little bit about.  The water would be reclaimed water from the project sewage treatment plant.  Partially anyway.

Mayor Leja:  This is the guy who can — tell him what the question is.

Mr. Egger:  We need to know how many gallons of water will be in the ten acre recreation lake.

Page 10

NUFIC_049399
BEAUAIG0000718

Beaumont City Council
September   , 1993

questions are a matter of record on the recording of the meeting.

Mayor Leja called attention to the fact that either in the specific plan or the EIR it stated that as far as current parks and recreation in this area, that Stewart Park and Rangel Park were owned and operated by the Beaumont-Cherry Valley Recreation and Parks District, which needs to be amended because it only listed the County of Riverside and the Beaumont-Cherry Valley Recreation and Parks District as being park owners and operators, and the City of Beaumont is as well.

Mr. Egger indicated that the conditions of approval provides that the applicant is to do any fine tuning and editing necessary with regard to the specific plan, with the final version then being delivered to the City, and this document will be gone through with a fine tooth comb and all of the mis-references will be caught.

Mr. Egger then stated for the record that, with respect to the golf course, a condition can be added as follows:

"Prior to the issuance of building permits for the golf course, a plot plan shall be filed and potential municipal use and ownership of the golf course shall be proposed or could be evaluated by the City Council."

a. <u>RESOLUTION NO. 1993-48</u> - Certifying Environmental Impact Report No. 92-2 and Approving Specific Plan No. 92-1.

Motion by Council Member McLaughlin, second by Council Member Russo, to adopt Resolution No. 1993-48 with the conditions of approval amended as discussed.

AYES:     Council Member Brey, McLaughlin, Parrott, Russo and
          Mayor Leja.
NOES:     None.
ABSTAIN: None.
ABSENT:  None.

b. <u>ORDINANCE NO. 730</u> - FIRST READING - Prezoning 9,117 acres from Riverside County M-M (Manufacturing-Medium), M-H (Manufacturing-Heavy), M-RA (Mineral Resources and Related Manufacturing), W-2 (Controlled Development) and W-2-160 (Controlled Development, 160 acres minimum lot size) to City of Beaumont SPA (Specific Plan Area) (92-RZ-2). Applicant: Lockheed Corporation.  Location:    At the southerly terminus of Highland Springs Avenue, southeasterly of the existing Beaumont Corporate Limits (92-ANX-2-53).

Motion to read Ordinance No. 730 by title only.

Motion by Council Member Parrott, second by Council Member Brey, to read Ordinance No. 730 by title only.

AYES:     Council Member Brey, McLaughlin, Parrott, Russo and
          Mayor Leja.
NOES:     None.
ABSTAIN: None.
ABSENT:  None.

The ordinance was read by title only by the Deputy City Clerk.

Motion to approve Ordinance No. 730 at its first reading.

Motion by Council Member Parrott, second by Council Member Brey, to approve Ordinance No. 730 at its first reading.

AYES:     Council Member Brey, McLaughlin, Parrott, Russo and
          Mayor Leja.
NOES:     None.
ABSTAIN: None.
ABSENT:  None.



EXHIBIT A
PAGE 1567

NUFIC_049409
BEAUAIG0000719

c.  <u>ORDINANCE NO. 731</u> - FIRST READING   Adopting Development
Agreement No. DA-7 Between the City of Beaumont and the
Lockheed Corporation (Pursuant to Government Code Sections
65864 - 65869.5).

Motion to read Ordinance No. 731 by title only.

Motion by Council Member McLaughlin, second by Council Member
Parrott, to read Ordinance No. 731 by title only.

AYES:     Council Member Brey, McLaughlin, Parrott, Russo and
          Mayor Leja.
NOES:     None.
ABSTAIN:  None.
ABSENT:   None.

The  ordinance was read by title only by the Deputy City Clerk.

Motion to approve Ordinance No. 731 at its first reading.

Motion by Council Member McLaughlin, second by Council Member
Parrott, to approve Ordinance No. 731 at its first reading.

AYES:     Council Member Brey, McLaughlin, Parrott, Russo and
          Mayor Leja.
NOES:     None.
ABSTAIN:  None.
ABSENT:   None.


d.  <u>RESOLUTION NO. 1993-49</u> - Requesting the Local Agency
Formation Commission to Initiate Proceedings for the
Annexation of Uninhabited Territory Pursuant to the
Local   Government   Reorganization   Act   of   1985.
(92-ANX-2-53).

Motion by Council Member McLaughlin, second by Council Member
Brey, to adopt Resolution No. 1993-49.

AYES:     Council Member Brey, McLaughlin, Parrott, Russo and
          Mayor Leja.
NOES:     None.
ABSTAIN:  None.
ABSENT:   None.

END PUBLIC HEARINGS.

11.  Report on Alternative Method of Distribution of Tax Levies and
Collections.  (Teeter Plan).
<u>Staff recommendation:</u>  Adopt Resolution No. 1993-54.

The staff report was presented by the City Manager, a copy of
which is a matter of record in the Clerk's file.

Discussion followed with questions asked by the Council, and
the advantages of joining this plan explained by the City
Manager and Interim Administrative Services Director.

a.  <u>RESOLUTION NO. 1993-54</u> - Pursuant to Section 4715 of the
Revenue and Taxation Code of the State of California
Agreeing to Participate in the Alternative Method for
Distribution of Tax Levies and Collections and of Tax Sale
Proceeds Adopted by the County of Riverside.

Motion by Council Member Parrott, second by Council Member
McLaughlin, to adopt Resolution No. 1993-54.

AYES:     Council Member Brey, McLaughlin, Parrott, Russo and
          Mayor Leja.
NOES:     None.
ABSTAIN:  None.
ABSENT:   None.

Page 13



EXHIBIT 28
PAGE 1568

NUFIC_049401
BEAUAIG0000720

Beaumont City Council
September   , 1993



12. Consider Request from Chief of Police for City Council Support
of Extension of the Half-Cent Sales Tax for Public Safety.
Staff Recommendation: Adopt Resolution No. 1993-50.

The Chief of Police presented the staff report, a copy of which
is a matter of record in the Clerk's file.

Council Member Brey commented this is a prime example of the
fact that everyone knew once the sales tax went up it would
never come down again.  This makes you wonder how the State
government is run - not the local government and the County
government, but the State government.  Everything was funded
before, but now the City gets less money and the County gets
less money, but the citizens have to pay more taxes.  He then
indicated that he would not support this for that fact - not
that he didn't want the City to have more money for public
safety protection, but the State should look for another way of
funding it.

Mayor Leja said she agreed with everything that Mr. Brey has
said, and in addition she feels this is just another way for
the State not to have to do their job.  Basically, what they do
is take what they think the public will be the most upset about
or most concerned about, so if the tax is supposed to be for
public safety that is a major issue for residents.  She
continued that she thought the State should have to take the
action on their own, and not come to local governments for
support when all they do is continually take money away from
local government that was originally designed to help support
local services such as police and fire.  This is another
example of the unfair and cowardly way the State government is
being run and she would recommend that no formal vote be taken
on this resolution.

Council Member McLaughlin disagreed, saying whether or not they
voted for or against this resolution, it will still be on the
November ballot.

Mayor Leja said the voters should be allowed to make up their
minds themselves, and she saw no need to take an action on it.

Discussion continued concerning whether or not this resolution
should be considered, with Council Member Russo stating he
agreed with both Mrs. Leja and Mr. Brey, but he also agreed
with Mr. McLaughlin.  Basically, the City is caught in the
middle.

The City Attorney suggested the resolution be re-written as
follows:

WHEREAS, indicating the City Council supports adequate public
safety;

WHEREAS, all local services are at risk due to the fiscal
crisis created by the lack of leadership in the State
government;

WHEREAS, that the City supports the help of the County in order
to insure local government;

WHEREAS, the State has not provided leadership and has
essentially dumped this issue on the local agencies to avoid
criticism and the political problems that creates;

WHEREAS, urgent action needs to be taken to reform State
government and State financing;

NOW, THEREFORE, the City Council supports local public safety
and commits to provide the necessary leadership to bring about
long term fiscal and government reform at the State level; and
the City Council demands that the State provide leadership on
this issue and to take all necessary action to reform itself

EXHIBIT 28
PAGE 1569

NUFIC  049402

BEAUAIG0000721

and its financing.

Mayor Leja requested that it also include the statement that the State reform at the State level and not the State reforming government by reforming local government.

a. **RESOLUTION NO. 1993-50** - In Support of Public Safety and Reform of State Government.

Motion by Council Member Brey, second by Council Member McLaughlin, to adopt revised Resolution No. 1993-50.

AYES:      Council Member Brey, McLaughlin, Parrott, Russo and Mayor Leja.
NOES:      None.
ABSTAIN:   None.
ABSENT:    None.

The Clerk was directed to send a copy of the revised resolution to all cities in the State, as well as the League of California Cities.

13. Consider Request from Chief of Police to Contract for Supplemental Law Enforcement Services for Special Events. **Staff Recommendation:** Adopt Resolution No. 1993-52.

The staff report was presented by the Chief of Police, a copy of which is a matter of record in the Clerk's file.

There were no questions or comments from the Council.

a. **RESOLUTION NO. 1993-52** - Authorizing the City to Provide Supplemental Law Enforcement Service to Private Individuals or Private Entities to Preserve the Peace at Special Events or Occurrences.

Motion by Council Member Parrott, second by Council Member Russo, to adopt Resolution No. 1993-52.

AYES:      Council Member Brey, McLaughlin, Parrott, Russo and Mayor Leja.
NOES:      None.
ABSTAIN:   None.
ABSENT:    None.

14. Consider Request from Chief of Police to Establish a Compensation Schedule for Police Department Reserve Officers. **Staff Recommendation:** Adopt Resolution No. 1993-53.

The Chief of Police submitted the staff report, a copy of which is a matter of record in the Clerk's file.

There no were questions or comments from the Council.

a. **RESOLUTION NO. 1993-53** - Establishing a Compensation Schedule Paid To Beaumont Police Department Police Reserve Officers.

Motion by Council Member Russo, second by Council Member of Parrott, to adopt Resolution No. 1993-53.

AYES:      Council Member Brey, McLaughlin, Parrott, Russo and Mayor Leja.
NOES:      None.
ABSTAIN:   None.
ABSENT:    None.

15. Consider Award of Bid for Police Department Radio Equipment.

This agenda item was removed from the agenda under adjustments to the agenda.



**Exhibit A**
**PAGE 1570**

NUFIC_049403
BEAUAIG0000722

Beaumont City Council
September   , 1993

16. Consider Proposed Amended Agreement Between the City of
Beaumont and Urban Logic Consultants for Planning, Economic
Development and Public Works Services.
Staff Recommendation: Approval of amended agreement and
authorization for Mayor to execute same.

The staff report was received from the City Manager, a copy of
which is a matter of record in the Clerk's file.

There were no questions or comments from the Council other than
one statement by Mayor Leja that it appears by approving this
amendment the City would be saving money and getting more work.

Motion by Council Member Russo, second by Council Member Brey,
to approve the amended agreement for Planning, Economic
Development and Public Works Services, and authorize the Mayor
to execute same.

    AYES:    Council Member Brey, McLaughlin, Parrott, Russo and
             Mayor Leja.
    NOES:    None.
    ABSTAIN: None.
    ABSENT:  None.

17. RESOLUTION NO. 1993-51 - Relating to the Issuance of Bonds with
Respect to Certain Improvement Areas Within Community
Facilities District No. 93-1 and the Sale Thereof to the
Beaumont Financing Authority.
Staff Recommendation: Adopt Resolution No. 1993-51.

The staff report was presented by David Dillon, a copy of which
is a matter of record in the Clerk's file.

There were no comments or questions from the Council.

Motion by Council Member Russo, second by Council Member
Parrott, to adopt Resolution No. 1993-51.

    AYES:    Council Member Brey, McLaughlin, Parrott, Russo and
             Mayor Leja.
    NOES:    None.
    ABSTAIN: None.
    ABSENT:  None.

18. ORDINANCE NO. 732 - FIRST READING - Authorizing the Execution
and Delivery of an Installment Sale Agreement and Authorizing
and Directing Certain Other Actions with Respect Thereto.
Staff Recommendation: Approve Ordinance No. 732 at its first
Reading.

David Dillon presented the staff report, a copy of which is a
matter of record in the Clerk's file.

There were no comments or questions from the Council.

Motion to read Ordinance No. 732 by title only.

Motion by Council Member McLaughlin, second by Council Member
Brey, to read Ordinance No. 732 by title only.

There being no opposition, the motion carried 5-0.

The ordinance was read by title only.

Motion to approve Ordinance No. 732 at its first reading.

Motion by Council Member McLaughlin, second by Council Member
Parrott, to approve Ordinance No. 732 at its first reading.

    AYES:    Council Member Brey, McLaughlin, Parrott, Russo and
             Mayor Leja.
    NOES:    None.
    ABSTAIN: None.
    ABSENT:  None.

Page 16



EXHIBIT 28
PAGE 1571

NUFIC_049404
BEAUAIG0000723

Beaumont C  y Council
September 2/, 1993

19.   Reports and Appointments.

   a.   Request from Mayor Leja for Appointment of an Ad Hoc
        Committee to Review the Business License Ordinance.

   Mayor Leja said she would not expect this committee to become
   active until after the sign committee recommendations have been
   completed and the revised sign ordinance has been presented to
   the Council.

   She then requested the Council to submit suggested appointments
   to this committee at the next meeting.

   There were no objections from the Council for the formation of
   this committee.

   The City Manager reported there were numerous inter-related
   items on the last LAFCO agenda specifically involving the City
   of Beaumont as well as the cities of Calimesa, Banning and to
   some degree the City of San Jacinto since our application for
   amendment of our sphere of influence impacted those three
   cities.

   The final result was that with regard to the western boundary
   meeting the City of Calimesa, the Commission voted to place
   the Storm property in the City of Calimesa.  The Golden
   Triangle property at the freeway, which both Beaumont and
   Calimesa were requesting be placed in their sphere, was placed
   in neither sphere at this time.  With regard to the City of
   Banning, the Commission split their request on an east/west
   basis, leaving within the City of Beaumont's sphere the western
   portion of the Black Bench as well as Highland Springs Resort
   and related residential development around the resort.  They
   also voted to place all of Cherry Valley in Beaumont's sphere,
   on a tentative basis.  All of these issues will be brought back
   to LAFCO to be ratified at the next meeting.

   Also, there needs to be additional discussion with the various
   Cherry Valley groups, and staff plans to sit down with them and
   work with them on some of the concepts which have been
   previously discussed, such as a joint planning area between
   Brookside and Cherry Valley Boulevard.

   On the southern side, the portion of the City's application
   that was below the ridge on the San Jacinto side was removed on
   the recommendation of the LAFCO Director.

   In addition, the Eighth Street annexation and the Saab
   annexation were approved by LAFCO.

   Mayor Leja said the only thing she could add to the City
   Manager's report was that all the actions pertaining to the
   Pass area were unanimous.

   There were no other reports.

20.   <u>CONSENT CALENDAR</u> - All Items Listed Under the Consent Calendar
      are considered to be routine by the City Council and will be
      approved on one motion.  There will be no separate discussion
      of these items unless a Council Member or Citizen so requests,
      in which case the item will be removed from the Consent
      Calendar and considered separately.

   a.   Approval of Minutes of Regular City Council Meeting of
        September 13, 1993.

   b.   Acceptance of Minutes of Regular Planning Commission
        Meeting of August 17, 1993.

   c.   Approval of Warrants and Payroll.

Page 17



NUFIC  049405
BEAUAIG0000724

Beaumont City Council
September 27, 1993

d. Report of Planning Commission Action at Regular Meeting of September 21, 1993.

Motion by Council Member McLaughlin, second by Council Member Parrott, to adopt the consent calendar with Item a. removed.

AYES:     Council Member Brey, McLaughlin, Parrott, Russo and Mayor Leja.
NOES:     None.
ABSTAIN: None.
ABSENT:  None.

21. Closed Session at Discretion of Council.

There was no need for a closed session.

Date set for next regular City Council Meeting Monday, October 11, 1993, at 6:00 p.m., in the City Council Chambers.

There being no further business to come before the Council, the meeting was adjourned at 9:23 p.m.


Respectfully submitted,

*Julie White*

Deputy City Clerk

EXHIBIT 28
PAGE 1573

NUFIC_049406
BEAUAIG0000725

Contract No. 94-15

ORIGINAL

## AGREEMENT

AGREEMENT AMENDING THE
AGREEMENT FOR PLANNING, ECONOMIC DEVELOPMENT
AND PUBLIC WORKS SERVICES

This AGREEMENT, made and entered into this 11th day of ___April___, 1994, by and between the City of Beaumont, a municipal corporation located in the County of Riverside, State of California, hereinafter referred to as "CITY" and Urban Logic Consultants, Inc., a corporation under the laws of the State of California with mailing address of 27463 Enterprise Circle West, Temecula, California 92590, hereinafter referred to as "CONSULTANT."

### WITNESSETH

WHEREAS, CITY has the need for city planning, economic development and public works services; and

WHEREAS, CITY wishes to retain CONSULTANT for the performance of Construction Management services necessitating modification of the agreement with CONSULTANT, executed by the Mayor of the City of Beaumont on the 23rd day of September, 1993, hereinafter referred to as "AMENDED AGREEMENT."

WHEREAS, CITY desires to contract for such services with a private consulting firm; and

WHEREAS, CONSULTANT is experienced in providing such services for municipal corporations and is able to provide personnel with the proper experience and background to carry out the duties involved; and

WHEREAS, CITY wishes to retain CONSULTANT for the performance of said services;

NOW, THEREFORE, in consideration of the mutual covenants, benefits and premises herein stated, the CITY and CONSULTANT agree as follows:

CITY does hereby cause the AMENDED AGREEMENT to be amended to facilitate appointment of CONSULTANT in a contractual capacity in accordance with the amendments to the AMENDED AGREEMENT and terms and conditions hereinafter set forth:

1

NUFIC_049407
BEAUAIG0000674

I.     AMENDMENTS TO AMENDED AGREEMENT

SECTION V.
Plan Checking and Construction Inspection

SECTION V is hereby amended to include the following subsection:

V.1 Public Works Construction Management

On behalf of the City, ULC, under the supervision of the Director of Public Works, shall provide construction management services during all phases of public works construction to enforce compliance with codes and conditions of approval, provisions of the City ordinances, Uniform Building code (1991) and other requirements set forth on the plans and specifications for which permits are issued for construction.  In the performance of such duties, ULC shall provide construction management for each public works project before, during and after completion of various stages of construction including the following services related to the planning, control, scheduling, estimating and value engineering of public works projects:

A.    Construction Management Services

1. Coordinate, receive, review and evaluate bids
2. Award bids, make appropriate recommendations, and prepare contracts
3. Manage, coordinate and inspect all work
4. Provide contract and subcontract coordination
5. Prepare and monitor construction schedules
6. Make adjustments to accommodate changing and unforeseen conditions
7. Prepare progress reports
8. Review and recommend progress payments
9. Obtain, review and evaluate shop drawings
10. Provide laboratory testing of materials as required and monitor test results
11. Evaluate quality and workmanship of construction
12. Maintain daily logs and records and such other services as are required to manage the work in accordance with City objectives
13. Schedule project meetings
14. Liaison with controlling agencies and design and construction engineers
15. Monitor and record correspondence between City contractors, subcontractors and design professionals
16. Prepare transmittals and labor reports
17. Provide labor and payroll compliance
18. Provide change order management and coordination
19. Provide plan interpretation as required
20. Administer extensions of time (force majeure delay) reports
21. Administer release and waivers of lien

2

NUFIC_049408
BEAUAIG0000675

## SECTION IX
### Compensation to CONSULTANT

SECTION IX is hereby amended to include the following additional subsection:

5.      For the services set forth in SECTION V-1, compensation shall be on a time and materials basis not exceeding four and one-half percent (4.5%) of the bid price awarded by the City for each project.

IN WITNESS HEREOF, CITY and CONSULTANT have caused this Agreement to be executed by the duly authorized officers the day and year first above written in this Agreement.

CITY OF BEAUMONT                          URBAN LOGIC CONSULTANTS, INC.


_____          _____
Jan Leja, Mayor                          Deepak Moorjani, P.E., Principal


_____          _____
City Clerk                               Ernest A. Egger, AICP, REA, Principal


                                         _____
                                         David W. Dillon, Principal


3

NUFIC_049409
BEAUAIG0000676