Christina R. Spiezia, State Bar No. 315145
cspiezia@grsm.com
(949) 255-6968
Scott L. Schmookler, IL
sschmookler@grsm.com, Pro Hac Vice
(312) 980-6779
Gordon Rees Scully Mansukhani, LLP
5 Park Plaza Suite 1100
Irvine, CA 92614

Attorneys for Defendant,
NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION

| | |
|---|---|
| WESTERN RIVERSIDE COUNCIL OF GOVERNMENTS, a California Joint Powers Authority; CITY OF BEAUMONT, a public entity in the State of California,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, and DOES 1 through 50, inclusive,<br><br>Defendants. | Case No. 5:20-cv-02164- GW (KKx)<br><br>**NOTICE OF MOTION AND MOTION IN LIMINE #1 OF NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA TO EXCLUDE DANIEL RAY FROM TESTIFYING AT TRIAL**<br><br>Judge:   Hon. George H. Wu<br>Date:    9/1/2022<br>Time:    8:30 a.m.<br>Room:   9D |

Gordon Rees Scully Mansukhani, LLP
5 Park Plaza, Suite 1100
Irvine, CA 92614

TO PLAINTIFF WESTERN RIVERSIDE COUNCIL OF GOVERNMENTS AND CITY OF BEAUMONT AND ITS COUNSEL OF RECORD:

**NOTICE IS HEREBY GIVEN** that on September 1, 2022, at 8:30 a.m., or as soon thereafter as counsel may be heard, in the courtroom of the Hon. George H. Wu, located at the U.S. Courthouse, 411 West Fourth Street, Santa Ana, CA 92701, National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union") will and hereby does move this Court to EXCLUDE DANIEL RAY FROM TESTIFYING AT TRIAL pursuant to Federal Rule of Evidence 702.

This motion is based on this notice, motion, Declaration of Scott Schmookler and Appendix of Exhibits. These materials are filed concurrently herewith, along with all the pleadings, files, and records in this proceeding, all other matters of which the Court may take judicial notice, and any argument or evidence that may be presented to or considered by the Court prior to its ruling.

This Motion follows the meeting of counsel, pursuant to L-R 7-3, which occurred on August 4, 2022.

Dated: August 11, 2022

GORDON REES SCULLY MANSUKHANI LLP

By: */s/ Scott L. Schmookler*
Scott L. Schmookler (PHV)
sschmookler@grsm.com
(312) 980-6779
Christina R. Spiezia (SBN: 315145)
cspiezia@grsm.com
(949) 255-6968
5 Park Plaza, Suite 1100
Irvine, CA 92614
*Attorneys for Defendant*
*National Union Fire Insurance*
*Company of Pittsburgh, Pa.*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Gordon Rees Scully Mansukhani, LLP**
5 Park Plaza, Suite 1100
Irvine, CA 92614

**TABLE OF CONTENTS**

I.   INTRODUCTION ....................................................................................1

II.  SUMMARY OF MR. RAY'S PROPOSED TESTIMONY ............................4

   **A.**   Plaintiffs' Contractual Cap Theory of Overbilling ......................................4

   **B.**   Plaintiffs' Subcontractor Theory of Overbilling..........................................8

III. OVERVIEW OF GOVERNING *DAUBERT* STANDARD ...........................10

IV. LEGAL ARGUMENT ...........................................................................11

   **A.**   Mr. Ray's Overbilling Computation of Capped Services Based Upon Unsubstantiated Estimates Is not Admissible. ....................................................11

   **B.**   Mr. Ray's Admitted Failure to Conform His Overbilling Computation of Capped Services to The ULC Contract Further Renders His Opinion Inadmissible....................................................................................14

   **C.**   Mr. Ray's Unsupported Assumption on "Professional Sub-Consultant" Renders His Other Overbilling Opinion Inadmissible. ........................................16

V.  CONCLUSION ...................................................................................19

MOTION IN LIMINE #1 TO EXCLUDE DANIEL RAY FROM TESTIFYING AT TRIAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Gordon Rees Scully Mansukhani, LLP**
5 Park Plaza, Suite 1100
Irvine, CA  92614

# TABLE OF AUTHORITIES

**Cases**

*Advanced Drainage v. Quality Culvert*,
  2015 WL 1299368 (S.D. Ohio 2015) ....................................................12

*Advanced Microthem v. Norman Wright Mech.*,
  2010 WL 11575000 (N.D. Cal. 2010)....................................................12

*Aerojet Rocketdyne, Inc. v. Global Aerospace, Inc.*,
  2021 WL 1839695 (E.D. Cal. May 7, 2021) .........................................17

*Aguilera v. Pirelli Armstrong Tire*,
  223 F.3d 1010 (9th Cir. 2000) ...............................................................14

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993) ...............................................................................18

*Cabrera v. Cordis*,
  134 F.3d 1418 (9th Cir. 1998) ...............................................................11

*Claar v. Burlington N.R.R.*,
  29 F.3d 499 (9th Cir. 1994) ...................................................................10

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) .................................................................................15

*Daubert v. Merrell Dow Pharmaceuticals*,
  43 F.3d 1311 (9th Cir. 1995) ...........................................................2, 11

*Daubert v. Merrell Dow Pharms.*,
  509 U.S. 579 (1993) ...............................................................................10

*DSU Med. v. JMS Co.*,
  296 F.Supp.2d 1140 (N.D. Cal. 2003)...................................................12

*Emerald Investments Ltd. P'ship v. Allmerica Fin. Life Ins. & Annuity Co.*,
  516 F.3d 612 (7th Cir. 2008) .................................................................15

*General Elec. Co. v. Joiner*,
  522 U.S. 136 (1997) .........................................................................10, 18

-iii-

*GPNE v. Apple, Inc.*,
  2014 WL 149247 (N.D. Cal. 2014)........................................................................2

*Guidroz-Brault v. Missouri Pac. R. Co.*,
  254 F.3d 825 (9th Cir. 2001) ...............................................................................19

*Haddad v. Rev Bahamas*,
  589 F. Supp. 2d 1302 (S.D. Fla. 2008)...........................................................15, 16

*JH Kelly, LLC v. AECOM Technical Servs., Inc.*,
  2022 WL 1817415 (N.D. Cal. June 2, 2022) .......................................................17

*Kumho Tire Co., Ltd. v. Carmichael*,
  526 U.S. 137 (1999). ............................................................................................10

*Lindy Pen Co. v. Bic Pen*,
  982 F.2d 1400 (9th Cir. 1993) ..............................................................................15

*Lock Realty v. U.S. Health*,
  707 F.3d 764 (7th Cir. 2013) ................................................................................15

*LuMetta v. U.S. Robotics, Inc.*,
  824 F.2d 768 (9th Cir.1987) .................................................................................18

*McGlinchy v. Shell Chemical Co.*,
  845 F.2d 802 (9th Cir. 1988)....................................................................2, 12, 13

*Messick v. Novartis Pharm. Corp.*,
  747 F.3d 1193 (9th Cir. 2014) ..............................................................................15

*Navarro v. Block*,
   250 F.3d 729 (9th Cir. 2001) ...............................................................................19

*People v. Wright*,
  4 Cal. App. 5th 537 (2016) ...................................................................................19

*Snyder v. Bank of America*,
  202 WL 6462400 (N.D. Cal. 2020).......................................................................12

*Trevino v. Gates*,
  99 F.3d 911 (9th Cir. 1996) ............................................................................3, 19

Gordon Rees Scully Mansukhani, LLP
5 Park Plaza, Suite 1100
Irvine, CA  92614

-iv-

*United States Postal Serv. v. Jamke*,
  2017 WL 131991 (E.D. Cal. Jan. 12, 2017)..........................................................17
*Waskowski v. State Farm Mut. Auto. Ins.*,
  970 F. Supp. 2d 714 (E.D. Mich. 2013) ...............................................................12
*Winn-Dixie v. Dolgencorp,*
  746 F.3d 1008 (11th Cir. 2014)......................................................................15, 16
*Wyatt Technology Corp. v. Malvern Instruments, Inc.*,
  2010 WL 11505684 (C.D. Cal. Jan. 25, 2011)....................................................15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Gordon Rees Scully Mansukhani, LLP**
5 Park Plaza, Suite 1100
Irvine, CA 92614

MOTION IN LIMINE #1 TO EXCLUDE DANIEL RAY FROM TESTIFYING AT TRIAL

1

**I.      INTRODUCTION**

2        Western Riverside Council of Governments ("WRCOG") and the City of

3   Beaumont (collectively "Plaintiffs") seek insurance coverage on the theory that

4   David Dillon, Ernest Egger, and Deepak Moorjani ("Former Officials") committed

5   a theft through their company, Urban Logic Consultants, Inc. ("ULC"). (Dkt. 20, ¶¶

6   18, 46). Because the Former Officials deny any overbilling, Plaintiffs disclosed

7   Daniel Ray, an accountant, to quantify its claimed loss.  (Dkt. 65-1, Expert Report

8   of Daniel W. Ray ("Ray Report")). Despite characterizing the Former Officials as

9   corrupt, Plaintiffs do not claim that they surreptitiously embezzled funds under the

10  cover of darkness. Instead, they allege that ULC breached its fee agreement by (1)

11  exceeding a contractual cap limiting fees incurred for construction management,

12  plan checking and construction inspection ("Capped Services") and (2) billing work

13  performed by ULC's vendors at the wrong rate.  (Dkt. 65-1, Ray Report, p. 4).

14        While marketing himself as a forensic accountant with substantial

15  experience, Mr. Ray admitted in his deposition that he did not (and could not) verify

16  Plaintiffs' theory of overbilling. (Dkt. 65-2, Deposition of Daniel W. Ray ("Ray

17  Dep."), 33:15-25, 141:03-05). Instead, he seeks to offer speculation unsupported by

18  any recognized methodology or substantiated assumptions.  (Dkt. 65-2, Ray Dep.,

19  55:03-13, 57:05-14, 116:01-122:04). Such testimony is inadmissible under Federal

20  Rule of Evidence 702 because Mr. Ray admits he (1) did not apply a recognized

21  methodology and (2) did not validate the assumptions underlying his alleged

22  opinions.  (Dkt. 65-2, Ray Dep., 55:03-13, 57:05-14, 116:01-122:04).

23        Mr. Ray's report is comprised of two opinions that must be excluded.  First,

24  while Plaintiffs claim that ULC billings for Capped Services exceeded a contractual

25  cap (defined as 4.5% of confirmed construction cost), Mr. Ray could not verify any

26  such overbilling. He conclusively admitted that he could not quantify the amount

27  billed for Capped Service or that billing exceeded the contractual cap:

28        Q.      Can we agree that you cannot state to a reasonable degree of

MOTION IN LIMINE #1 TO EXCLUDE DANIEL RAY FROM TESTIFYING AT TRIAL

Gordon Rees Scully Mansukhani, LLP
5 Park Plaza, Suite 1100
Irvine, CA  92614

Gordon Rees Scully Mansukhani, LLP
5 Park Plaza, Suite 1100
Irvine, CA 92614

accounting certainty that the amount spent on construction inspection exceeded 4.5 percent of the confirmed construction costs?

A.   I agree.

Q.   Can we also agree that you cannot state to a reasonable degree of accounting certainty that the amount spent on construction management, as delineated in V.1 of the 1994 amendment, exceeded 4.5 percent of the bid price awarded by the City for each project?

A.   I agree…

(Dkt. 65-2, Ray Dep., 33:15-25).

Unable to validate Plaintiffs' theory, Mr. Ray manufactured a damage analysis unsupported by any recognized methodology. He randomly estimated that 75% of ULC's billing applied to Capped Services and quantified whether his self-created estimate exceeded the contractual cap. (Dkt. 65-2, Ray Dep., 116:01-122:04). That estimate, Mr. Ray admitted, is not based upon any recognized methodology:

Q:   Is there any secondary source, treatise, standard, objective third-party source that you relied upon in formulating your 25 percent figure?

A.   No.

(Dkt. 65-2, Ray Dep., 55:03-06). Mr. Ray seeks to offer a damage computation not supported by any industry standard, objective computation or recognized source. (Dkt. 65-2, Ray Dep., 117:05-13; 121:24-122:02).

Federal Rule of Evidence ("FRE") 702 does not allow Plaintiffs to admit subjective speculation under the guise of expert opinion. Plaintiffs "must show that [their] expert's findings are based on sound science" – a test that "require[s] some objective, independent validation of the expert's methodology." *Daubert v. Merrell Dow Pharms.*, 43 F.3d 1311, 1316 (9th Cir. 1995). To that end, the Ninth Circuit has conclusively held that damage computations based upon unsupported estimates are inadmissible speculation and conjecture. *McGlinchy v. Shell Chemical Co.*, 845 F.2d 802, 807 (9th Cir. 1988); *GPNE v. Apple, Inc.*, 2014 WL 149247 (N.D. Cal. 2014).

MOTION IN LIMINE #1 TO EXCLUDE DANIEL RAY FROM TESTIFYING AT TRIAL

Gordon Rees Scully Mansukhani, LLP
5 Park Plaza, Suite 1100
Irvine, CA 92614

Because Mr. Ray admits he did not apply any recognized methodology in computing the Capped Services, his testimony is inadmissible under FRE 702.

Second, Plaintiffs claim that ULC overbilled because the Beaumont-ULC contract required ULC to bill a "Professional Sub-Consultant" at the cost incurred by ULC plus 15%. (Dkt. 65-1, Ray Report, pp. 4, 14-18). This theory depends upon three independent elements: (1) the definition of a Professional Sub-Consultant; (2) a determination of whether ULC's vendors fell within the definition; and (3) a determination of whether ULC properly billed vendors within that definition. Mr. Ray could not perform the required analysis because he did not know whether the definition of Professional Sub-Consultant encompassed independent contractors:

> Q.   Do you know whether the phrase "professional subconsultants" included 1099 independent contractors?
> A.   I don't know.

(Dkt. 65-2, Ray Dep., 41:03-05). Because he lacked a factual basis to confirm Plaintiffs' theory, Mr. Ray simply assumed – without any basis -- that every independent contractor qualified as a Professional Sub-Consultant. (Dkt. 65-1, Ray Report, pp. 14-18). Because Mr. Ray did not identify who qualified as a Professional Sub-Consultant, determine whether ULC's vendors fell within the definition, and whether the vendors within that definition were properly billed, he has no basis to opine on overcharging and any such opinion is inadmissible speculation. *Trevino v. Gates*, 99 F.3d 911, 922-23 (9th Cir. 1996) (expert opinion based upon unsubstantiated assumption is inadmissible).

Plaintiffs volley an undocumented damage theory that their own accountant could not validate. They therefore seek to use Mr. Ray to volley speculation – in hopes that unsubstantiated testimony of an accountant will confuse the jury and distract from its inability to prove damages. Such prejudice cannot be overcome through cross-examination because the admission of his unsupported theory implies merit and invites the jury to speculate. Because Mr. Ray admits that he did not

MOTION IN LIMINE #1 TO EXCLUDE DANIEL RAY FROM TESTIFYING AT TRIAL

1  employ a recognized methodology and did not verify dispositive assumptions, his
2  two main opinions are not admissible and he should be excluded from testifying as
3  trial.

4  **II.      SUMMARY OF MR. RAY'S PROPOSED TESTIMONY**

5          Citing his background in forensic accounting, Plaintiffs proffer Mr. Ray to
6  quantify its alleged damages.  (Dkt. 65-1, Ray Report, p. 3). Per Mr. Ray's Report,
7  he was asked to evaluate two specific theories of overbilling. First, whether ULC's
8  fees for the Capped Services exceeded 4.5% of confirmed construction costs.
9  Second, whether ULC wrongly overbilled for services for Professional Sub-
10 Consultants. (Dkt. 65-1, Ray Report, p. 4). Mr. Ray admitted in his deposition that
11 he could not substantiate either theory of overcharging and instead offers
12 inadmissible estimates based upon unsupported assumptions. (Dkt. 65-2, Ray Dep.,
13 33:15-25, 55:03-13, 57:05-14, 116:01-122:04, 141:03-05).

14         **A.      PLAINTIFFS' CONTRACTUAL CAP THEORY OF OVERBILLING**

15         In 1993, Beaumont entered into Agreement for Planning, Economic
16 Development and Public Works Services ("1993 Contract") with ULC. (Dkt. 65-25,
17 1993 Contract). Pursuant to Section V of that 1993 Contract, ULC agreed to provide
18 "plan checking" and "construction inspection" services, and to bill Beaumont for
19 those services "on a time and materials basis not exceeding four and one half percent
20 (4.5%) of the confirmed construction cost of the public improvements to be
21 constructed." (Dkt. 65-25, 1993 Contract, pp. 7-8).  Thereafter, Beaumont hired
22 ULC to provide construction management services and to pay ULC for those
23 services "...on a time and materials basis not exceeding four and one half percent
24 (4.5%) of the bid price awarded by the City for each project." (Dkt. 65-26, 1994
25 Addendum, pp. 2-3).

26         Citing these provisions, Plaintiffs theorize that ULC overbilled Beaumont for
27 its services because its fees for Capped Services exceeded the alleged 4.5%
28

Gordon Rees Scully Mansukhani, LLP
5 Park Plaza, Suite 1100
Irvine, CA  92614

-4-

contractual cap.[1] (Dkt. 65-1, Ray Report, p. 4). This theory should – conceptually – involve a simplistic comparison of the total billed for Capped Services to 4.5% of the confirmed construction costs. However, Mr. Ray admitted that he lacked the data necessary to compute the amount ULC billed for Capped Services because Beaumont did not maintain a full set of ULC's invoices and ULC's invoices did not contain enough detail on its services. (Dkt. 65-2, Ray Dep., 40:14-42:04). Due to the absence of complete and reliable records, Mr. Ray admitted he did not and could not compute the amount ULC billed for Capped Services:

> Q.   Can you state to a reasonable degree of accounting certainty the exact amount of money billed for any task falling under section V-A, plan checking?
>
> A.   No.
>
> Q.   Can you state to a reasonable degree of accounting certainty the exact amount of money billed for any task following under construction inspection, V-B of the contract?
>
> A.   No.

(Dkt. 65-2, Ray Dep., 26:20-27:03).

Because Plaintiffs' theory depends upon a comparison of the amount billed for Capped Services to the alleged contractual cap, Mr. Ray admitted that he could not opine to a reasonable degree of accounting certainty that the amount ULC billed for Capped Services exceeded 4.5% of the confirmed construction costs:

> Q:   You and I can agree that it is not possible to any degree of certainty to determine if the amount incurred for plan checking exceeds 4 and a half percent of the confirmed construction costs of public improvements?
>
> A.   I agree.
>
> Q.   And it also not possible to any degree of certainty to determine

---

[1] Plaintiffs maintain that ULC could only bill 4.5% of the confirmed construction cost for all Capped Services.  While National Union disputes that conclusion, National Union assumes Plaintiffs' theory as correct for purposes of this motion because even if correct, Mr. Ray did not document Plaintiffs' theory of overbilling.

Gordon Rees Scully Mansukhani, LLP
5 Park Plaza, Suite 1100
Irvine, CA  92614

whether the amount incurred for construction inspection exceeds 4
and a half percent of the confirmed construction costs?

A.    I agree.

(Dkt. 65-2, Ray Dep., 41:20-42:04). Mr. Ray admitted that he could not employ any

method to compute overcharging to a reasonable degree of professional certainty:

Q:    Is there any method that you could employ that to a reasonable
degree of accounting certainty would compute without estimates the
amount of overcharging?

A.    Not given the state of the documents, the availability of the
documents, the 19 years' span in which these services were being
rendered by Urban Logic, no.

(Dkt. 65-2, Ray Dep., 188:22-189:02).

Because he could not compute the amount billed for Capped Services, Mr.

Ray randomly estimated that 25% of ULC's billings were for services outside the

cap and that 75% of its billings were within the cap.  (Exh. 1, Ray Report, p. 5).  That

estimate has a direct impact on Mr. Ray's computations and the amount of Plaintiffs'

alleged damages:

Q.    So the amount of money your client demands of my client is directly
dependent on the percentage you chose; correct?

A.    Of course.

Q.    And so your choice of 25 percent has a direct correlation to the
amount of money that you can claim; correct?

A.    I agree.

(Dkt. 65-2, Ray Dep., 120:03-10). Yet, despite the impact of his estimate, Mr. Ray

did not compute this estimate based upon any analytical methodology, industry

standard, or authoritative source:

Q:    I said, is there any publication, training, standard, anything in the
world that you can dream of that  you can point me to today that
would provide an authoritative source as to how to estimate what
percentage of work is inside or outside of a cap?

A.    No.

(Dkt. 65-2, Ray Dep., 112:13-18). Nor did Mr. Ray have any specialized training on

-6-

estimating billing within a contractual cap or prior experience applying the same methodology to compute whether a vendor complied with a contractual fee cap. (Dkt. 65-2, Ray Dep., 113:2-9).

While claiming that this case presented a unique circumstance, Mr. Ray did not even attempt to reconcile his estimate with percipient testimony.  For example, even though a former city council member testified that the alleged cap did not apply to projects associated with the water and school districts, Mr. Ray made no attempt to subtract such projects from his analysis:

> Q.    And so even though, for example, the City Council understood the water district is outside the scope of any cap, did you subtract out billings for the water district?....
>
> A:    I did not.
>
> Q:    And the same would be true for all the other districts that Mr. Berg mentioned that are outside the cap?
>
> A.    Correct.

(Dkt. 65-2, Ray Dep., 179:05-08, 10-14).

Mr. Ray identified a singular criteria for his subjective estimate – his personal view of reasonableness; that subjective view of reasonableness was not based upon any recognized criteria or specialized industry standard. (Dkt. 65-2, Ray Dep., 110:18-111:01, 121:24-122:02). He could not identify any authoritative source or industry standard to addressing the reasonableness of an estimate:

> Q:    My question is you've used an estimate, 25 percent.  I want to know, is there any sort of authoritative source whatsoever that would provide us an identified list of factors to evaluate the reasonableness of your estimate?
>
> A.    Not that I'm aware of.
>
> Q.    Is there any industry standards that you're aware of at all that would govern the reasonableness of an estimate?
>
> A.    Industry standard?  No.

(Dkt. 65-2, Ray Dep., 121:18-122:02). In short, Mr. Ray seeks to offer a damage

-7-

computation based upon a subjectively manufactured estimate unsupported by an industry standard solely because he, in his subjective perspective, deemed the estimate reasonable.

## B.   PLAINTIFFS' SUBCONTRACTOR THEORY OF OVERBILLING

Unable to compute the amount billed for Capped Services and to verify that ULC's billing for such services exceeded any contractual cap, Plaintiffs offered an alternative theory of overbilling based on sub-consultant markups. (Dkt. 65-1, Ray Report, at p. 4). The 1993 Contract referenced "Professional Sub-Consultant Services" and allowed that ULC to bill "Professional Sub-Consultant Services" at "Actual Cost plus 15%." (Dkt. 65-25, 1993 Contract, Exhibit A, p. 11). This theory depends upon three steps:

Step 1:     Prove the definition of Professional Sub-Consultant;

Step 2:     Prove identity of and services provided by the alleged vendors;

Step 3:     Prove services provided by the vendors fall within the definition of Professional Sub-Consultant;

Step 4:     Prove ULC overbilled Beaumont.

Plaintiffs asked Mr. Ray to investigate whether ULC complied with this rate agreement. (Dkt. 65-1, Ray Report, p. 4).  Mr. Ray had no prior familiarity with the term Professional Sub-Consultant Services – acknowledging that it was not a term of art. (Dkt. 65-2, Ray Dep., 140:19-22). Nonetheless, he identified seven instances where ULC retained an independent contractor, but did not bill their time at cost plus 15%. (Dkt. 65-2, Ray Dep., 154:18-21). Nor did he purport to fully compute the total amount of alleged overcharging, but instead identified a few examples:

> I didn't specifically do that calculation.  I'm showing examples of how they have this practice of hiding subcontractors within their billings, increasing the hourly rates up to amounts in excess of 15 percent.  I did not do a specific calculation that you're talking about.

(Dkt. 65-2, Ray Dep., 149:10-15).

Instead of validating Plaintiffs' theory, Mr. Ray assumed that ULC could only

Gordon Rees Scully Mansukhani, LLP
5 Park Plaza, Suite 1100
Irvine, CA  92614

-8-

Gordon Rees Scully Mansukhani, LLP
5 Park Plaza, Suite 1100
Irvine, CA 92614

bill independent contractors at cost plus 15%.  He admits that he never verified his assumption:

> Q.    Do you know whether the phrase "professional subconsultants" included 1099 independent contractors?
> A.    I don't know.
>
> ***
>
> Q    Do you know whether, in the context of this agreement from 1993, a 1099 independent contractor hired periodically was deemed a professional subconsultant?
> A.    I don't know.

(Dkt. 65-2, Ray Dep., 141:3-5, 21-24).

Mr. Ray did not determine whether these examples were common or random errors.  He did not, for example, quantify the number of times ULC properly billed independent contractors (under his theory):

> Q.    What percentage of the time did Urban Logic accurately bill its subcontractors?
> A.    Well, I've seen several occasions where they did.  What percentage, I don't know.
>
> Q.    Did you compute what percentages of times you were able to find an incorrect billing, versus what percentages of time it was correctly billed?
> A.    No.

(Dkt. 65-2, Ray Dep., 151:04-12). Nor did he conduct a statistical extrapolation based upon a randomized sample to determine whether his examples were outliers (or the norm):

> Q.    In the time frame when there was not 100 percent of the invoices available, did you conduct a statistically valid extrapolation?
> A.    No.

(Dkt. 65-2, Ray Dep., 17:23-18:01). Mr. Ray understood that an extrapolation is a recognized method to conduct an analysis, but chose not to employ a recognized method:

> Q.    Well, you understand that an extrapolation using a randomized

sample is a way to conduct a statistically valid analysis of a
population; correct?

A.   Right.   And I told you I didn't do a statistically valid random
sampling.

(Dkt. 65-2, Ray Dep., 18:13-17).

## III.   OVERVIEW OF GOVERNING *DAUBERT* STANDARD

While Federal Rule of Evidence 702 allows expert testimony, an expert can only testify where: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 597 (1993). *Daubert* requires the court to act as a "reliability gatekeeper" to keep unreliable testimony away from the jury. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149-50 (1999). Accordingly, before expert testimony can be presented, a court should first consider: (1) whether the expert's technique or theory can be or has been tested; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community. *Id.* at 149-50; *Daubert*, 509 U.S. at 593-94.

The court's purpose is to determine the reliability of a particular expert opinion through a preliminary assessment of the methodologies underlying the opinion. *Id.* at 592–593. "Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *General Elec. v. Joiner*, 522 U.S. 136, 147 (1997). An expert's opinions are not reliable where the expert bases her conclusions on "mere subjective beliefs or unsupported speculation." *Claar v. Burlington N.R.R.*, 29 F.3d 499, 502 (9th Cir. 1994). "An opinion based on ... unsubstantiated and

Gordon Rees Scully Mansukhani, LLP
5 Park Plaza, Suite 1100
Irvine, CA 92614

-10-

undocumented information is the antithesis of the scientifically reliable expert opinion admissible under *Daubert* and Rule 702." *Cabrera v. Cordis*, 134 F.3d 1418, 1423 (9th Cir. 1998).  Accordingly, the proponent of expert testimony must "explain the methodology the experts followed to reach their conclusions [and] point to any external source to validate that methodology." *Daubert II*, 43 F.3d at 1319.

## IV.   LEGAL ARGUMENT

While marketing himself as an accountant, Mr. Ray acknowledged that he did not and could not verify Plaintiffs' damage theories. (Dkt. 65-2, Ray Dep., 33:15-25; 141:03-05).  He therefore manufactured damage computations based upon unsupported estimates and unsupported assumptions. (Dkt. 65-2, Ray Dep., 55:03-13; 57:05-14; 116:01-122:04). Mr. Ray did not and cannot cite a single authoritative source that permits such estimates and assumptions.  Because Mr. Ray did not follow any recognized method and relied upon unsubstantiated estimates and assumptions, his two proffered opinions regarding overbilling are inadmissible speculation and should be excluded.

### A.   MR. RAY'S OVERBILLING COMPUTATION OF CAPPED SERVICES BASED UPON UNSUBSTANTIATED ESTIMATES IS NOT ADMISSIBLE.

Plaintiffs articulated a simplistic theory of overbilling – ULC's billing for Capped Services exceeded 4.5% of the confirmed construction cost. (Dkt. 65-1, Ray Report, pp. 4-5). However, due to the absence of complete records, Mr. Ray could not verify any overbilling.   (Dkt. 65-2, Ray Dep., 32:12-34:12). Rather than acknowledge that Plaintiffs cannot prove damages, Mr. Ray manufactured a damage computation based upon a self-created estimate devoid of any analytical support. (Dkt. 65-1, Ray Report, pp. 4-5). Mr. Ray admitted that his "estimate" was not based upon any

- construction experience;
- industry standards;
- specialized training;

Gordon Rees Scully Mansukhani, LLP
5 Park Plaza, Suite 1100
Irvine, CA  92614

1       • authoritative publications;

2       • prior experience with an analogous case; or

3       • any other recognized standard.

(Dkt. 65-2, Ray Dep., 20:14-20, 54:11-17; 110:18-111:01, 111:13-25, 113:02-09, 121:24-122:02). Mr. Ray randomly estimated that 75% of all billings applied to Capped Services – solely because he subjectively viewed that estimate as reasonable. (Dkt. 65-2, Ray Dep., 53:14-56:18).

Such an opinion is not susceptible to any meaningful cross-examination. Because Mr. Ray admits that he did not apply any authoritative source or recognized methodology, National Union cannot meaningfully question Mr. Ray about his application of industry standards, application of recognized methodologies, decision to use an estimate, or the reasonableness of the estimate. Mr. Ray seeks free reign to volley a damage amount he created – in apparent hope that a jury will overlook the absence of evidence of overbilling and speculate on damages.

Such testimony is inadmissible under Ninth Circuit precedent. Regardless of Mr. Ray's accounting experience, a witness cannot offer opinions on damages unsupported by industry standards, authoritative sources or other recognized methodology. To that end, the Ninth Circuit has conclusively held that the creation of an unsupported estimate divorced from any analytical computation or methodology is inadmissible speculation. *McGlinchy*, 845 F.2d at 807; *Snyder v. Bank of America*, 202 WL 6462400 (N.D. Cal. 2020); *GPNE*, 2014 WL 149247 at *3; *Advanced Microthem v. Norman Wright Mech.*, 2010 WL 11575000 (N.D. Cal. 2010); *DSU Med. v. JMS Co.*, 296 F.Supp.2d 1140, 1158 (N.D. Cal. 2003).[2]

_____

[2] Courts have excluded accountants from testifying where, as here, they base their analysis upon unsupported estimates. *Advanced Drainage v. Quality Culvert*, 2015 WL 1299368, at *20 (S.D. Ohio 2015) (accountant's opinion regarding lost profits excluded because expert's relied upon unsupported assumption); *Waskowski v. State Farm Mut. Auto. Ins.*, 970 F. Supp. 2d 714, 722 (E.D. Mich. 2013) (excluding opinions because estimate not supported by an independent computation).

Gordon Rees Scully Mansukhani, LLP
5 Park Plaza, Suite 1100
Irvine, CA 92614

-12-

*McGlinchy* affirmed the exclusion of an analogous opinion. In that case, the plaintiff sought to offer an expert on damages, even though the expert predicated his analysis on estimated sales that he "did not otherwise document." 845 F.2d at 807. The district court excluded the opinion on the basis that it was speculative and unsupported. *Id.* Affirming that decision, the Ninth Circuit held that the expert was rightly excluded since his opinions rested on "unsupported assumptions and unsound extrapolation." *Id.* Because the analysis lacked "any sound foundation, the Ninth Circuit held that it "would mislead a jury. . . ." *Id.*

*Advanced Microthem* reached the same conclusion. In that case, the expert purported to compute damages based upon his estimate of the plaintiff's market share. 2010 WL 11575000 at *3. However, the expert's estimate was "wholly unsupported by any study or set of calculations. Rather, [his] figure appears to be based solely on his generalized industry 'experience.'" *Id.* The district court excluded that expert from testifying because, like Mr. Ray, he could not cite any authoritative sources to support his analysis:

> Mr. Burns does not disclose the methodology that he employed to determine his 50% figure, nor provide any sort of empirical testing showing that his theory or technique is falsifiable, refutable, or testable. There is no error rate linked to Mr. Burns' figure, and there is no mention of any sort of standards or controls used, let alone peer review or any indication that what he did would be accepted to the relevant scientific community.

*Id.*

Mr. Ray purports to be an experienced forensic account, but his experience does not grant him *carte blanche* to offer unsupported theories. *GPNE* addressed the admissibility of an equally experienced expert who sought to opine on damages based upon a subjectively selected estimate. 2014 WL 1494247 at *5. Despite thirty years of documented experience, the district court nonetheless excluded an expert because he offered a damage computation without any "methodology other than his '30 years of experience.'" *Id.* Because the expert offered no analytical basis for his

MOTION IN LIMINE #1 TO EXCLUDE DANIEL RAY FROM TESTIFYING AT TRIAL

Gordon Rees Scully Mansukhani, LLP
5 Park Plaza, Suite 1100
Irvine, CA 92614

opinion, the district court excluded him from testifying:

> While the Court does not doubt that Mr. Dansky is an experienced professional, Mr. Dansky's "30 years of experience" does not constitute "sufficient facts or data," or "reliable principles and methods." Fed.R.Evid. 702. "30 years of experience" cannot be tested or "subjected to peer review and publication," nor is there a "known or potential rate of error." …. Mr. Dansky's derivation of the $1 per unit royalty from Apple's average net incremental profit "is classic *ipse dixit*" reasoning, "[p]icking th[e] million dollar number."

*Id.*

As Mr. Ray admits, Plaintiffs cannot prove their theory of overcharging because he was unable to compute the amount billed for Capped Services and thus, could not determine whether the amount billed for Capped Services exceeded the contractual cap.  (Ex. 2, Ray Dep., 41:20-42:04, 188:22-189:02). Plaintiffs cannot now circumvent the fatal flaw with a subjective estimate unsupported by any analytical computation, industry source, peer-tested methodology or other recognized approach.  Because Mr. Ray did not apply any recognized industry standard or other recognized methodology, his opinion on overbilling of Capped Services is inadmissible and he may not testify. (Ex. 2, Ray Dep., 121:18-122:02); *Aguilera v. Pirelli Armstrong Tire*, 223 F.3d 1010, 1015 (9th Cir. 2000) (Plaintiffs cannot pursue claim based upon unsupported theory of damages).

### B.  MR. RAY'S ADMITTED FAILURE TO CONFORM HIS OVERBILLING COMPUTATION OF CAPPED SERVICES TO THE ULC CONTRACT FURTHER RENDERS HIS OPINION INADMISSIBLE.

Although Plaintiffs predicate their damage theory on Beaumont's contract with ULC, Mr. Ray made no attempt to tailor his opinions to that contract.  For example, he admitted that Beaumont's contract with ULC applied only to public improvement projects and did not encompass projects for specific agencies (such as the water and school districts). (Ex. 1, 87:19-24). Nonetheless, he made no effort to conform his analysis to the Beaumont-ULC contract and did not subtract excluded

-14-

Gordon Rees Scully Mansukhani, LLP
5 Park Plaza, Suite 1100
Irvine, CA  92614

work from his computation. (Ex. 1, 97:12-98:10; 179:05-10). He therefore seeks to offer a knowingly incorrect computation – apparently in hopes that volleying an enormous damage amount will mislead the jury into wrongly assuming damages.

Expert testimony must have "a valid connection to the pertinent inquiry." *Messick v. Novartis Pharm. Corp.*, 747 F.3d 1193, 1196–97 (9th Cir. 2014). Courts reject or exclude expert testimony that fails to connect damage calculations to the theory of liability. For instance, in *Comcast Corp. v. Behrend*, the Supreme Court rejected a regression model that accounted for damages beyond the alleged theory of anticompetitive impact at issue in the antitrust case. 569 U.S. 27, 35–38 (2013). Similarly, in *Wyatt Technology Corp. v. Malvern Instruments, Inc.*, the district court excluded an expert's damages calculations in a trademark case where the expert did not limit the plaintiff's claimed lost sales to the relevant market in which the plaintiff alleged that the entirety of the defendant's wrongdoing took place. 2010 WL 11505684, at *2–5 (C.D. Cal. Jan. 25, 2011); *see also Lindy Pen Co. v. Bic Pen*, 982 F.2d 1400, 1407–08 (9th Cir. 1993) (finding lost profit calculations to be irreparably flawed when they relied on data of total sales, rather than products at issue).

Where, as here, a party predicates its claim on a written contract, its damage expert must adhere to that contract and compute the damages permitted under that contract. Courts refuse to allow damage computations that fail to adhere to the contract because allowing such testimony encourages the jury to ignore the governing contract. *Winn-Dixie v. Dolgencorp,* 746 F.3d 1008, 1028 (11th Cir. 2014); *Lock Realty v. U.S. Health,* 707 F.3d 764, 771 (7th Cir. 2013); *Emerald Investments Ltd. P'ship v. Allmerica Fin. Life Ins. & Annuity Co.,* 516 F.3d 612, 617 (7th Cir. 2008); *Meterlogic, Inc. v. KLT*, 368 F.3d 1017, 1019 (8th Cir. 2004); *Haddad v. Rev Bahamas*, 589 F. Supp. 2d 1302, 1308 (S.D. Fla. 2008).

The Eleventh Circuit has confirmed that an expert's opinion on the wrong damages methodology is inadmissible. In *Winn-Dixie Stores*, the proposed expert calculated damages for harm caused by competing stores within Winn-Dixie's

Gordon Rees Scully Mansukhani, LLP
5 Park Plaza, Suite 1100
Irvine, CA 92614

-15-

market area.  The Eleventh Circuit rejected the expert opinion as both unreliable and unhelpful to the trier of fact because it was not based on the contract underlying the dispute. 746 F.3d at 1027-30. Because the expert did not opine on the specific damages that were recoverable based on the parties' contract, the Eleventh Circuit upheld the district court's exclusion of her opinion. *Id.*

*Haddad* reached the same conclusion. There, the expert calculated damages as of August 2008, despite the fact that the alleged breach occurred during a different period. 589 F. Supp. 2d at 1307-08. The district court refused to admit his testimony, finding his opinion about the loss during an irrelevant timeframe inadmissible: "[t]he August 2008 premise used in Mr. Mukamal's report is irrelevant and therefore unhelpful to the jury's task of determining Plaintiff's damages." *Id.* at 1308. Finding that the expert's analysis was based on an assumption that was "legally irrelevant to the measure of damages," the district court excluded his entire report and testimony. *Id.*

Plaintiffs claim that ULC failed to adhere to its contract with Beaumont, but Mr. Ray did not compute whether ULC adhered to the contract and made no attempt to focus his analysis on the contract.  Instead, he offered a strawman (*i.e.*, an irrelevant and overstated damage computation) in an apparent hope that the jury will presume damages.  Because Mr. Ray does not offer an opinion on the potential overbilling under that actual terms of the Beaumont-ULC contract, his testimony is irrelevant, will not assist the jury and is inadmissible.

### C.   MR. RAY'S UNSUPPORTED ASSUMPTION ON "PROFESSIONAL SUB-CONSULTANT" RENDERS HIS OTHER OVERBILLING OPINION INADMISSIBLE.

Plaintiffs claim that ULC overbilled Beaumont because ULC's contract required ULC to bill services provided by a "Professional Sub-Consultant" at the cost incurred by ULC plus 15%. (Dkt. 65-1, Ray Report, p. 4).  The 1993 Contract does not, however, define the term Professional Sub-Consultant.  Given the absence

MOTION IN LIMINE #1 TO EXCLUDE DANIEL RAY FROM TESTIFYING AT TRIAL

Gordon Rees Scully Mansukhani, LLP
5 Park Plaza, Suite 1100
Irvine, CA  92614

of a definition, Plaintiffs' theory depends upon four independent steps:

Step 1:    Prove the definition of Professional Sub-Consultant;

Step 2:    Prove identity of and services provided by the alleged vendors;

Step 3:    Prove services provided by the vendors fall within the definition of Professional Sub-Consultant;

Step 4:    Prove ULC overbilled Beaumont.

Plaintiffs' theory of overbilling for services provided by Professional Sub-Consultants necessarily requires Mr. Ray to offer inadmissible legal opinions regarding the definition and interpretation of "Professional Sub-Consultant" as used in the 1993 Contract. His report cites no testimony or other evidence establishing the meaning of "Professional Sub-Consultant" as used in the governing contract. Thus, Mr. Ray's opinion that ULC overbilled for "Professional Sub-Consultant" services is based entirely on his own interpretation of the term without any factual support or evidentiary basis. Such "straightforward contract interpretation" is inadmissible at trial. *JH Kelly, LLC v. AECOM Technical Servs., Inc.*, No. 20-CV-05381-HSG, 2022 WL 1817415, at *12 (N.D. Cal. June 2, 2022) (barring expert from offering opinions "purportedly based on [the expert's] reading of the Subcontract" because "they are at bottom attorney argument dressed up as expert opinion"); *see also United States Postal Serv. v. Jamke*, No. 115-CV-01806-LJO-EPG, 2017 WL 131991, at *5 (E.D. Cal. Jan. 12, 2017) ("Generally, contract interpretation is not an appropriate subject for expert testimony, because it requires an expert to make conclusions of law."); *Aerojet Rocketdyne, Inc. v. Global Aerospace, Inc.*, No. 2:17-cv-1515 KJM-AC, 2021 WL 1839695, at *3 (E.D. Cal. May 7, 2021) (excluding portions of expert's proposed testimony that reflected contract interpretation because they were "inadmissible as treading on ultimate issues of law").

Mr. Ray also cites no factual basis to determine whether ULC properly billed Beaumont for services provided by a "Professional Sub-Consultant." Noticeably absent from Mr. Ray's report is any mention, let alone discussion, of the services

provided by ULC's alleged vendors.  Mr. Ray does not identify or detail the nature of the services provided by ULC's vendors, does not detail whether or how those vendors qualify as Professional Sub-Consultants and does not explain whether or how ULC properly (or improperly) billed vendors who qualified as Professional Sub-Consultants.

Forced to apply his own impermissible interpretation of the contract and faced with a bald record devoid of factual support, Mr. Ray assumed that ULC could only bill W-2 employees at its hourly rate and that any independent contractor providing any service whatsoever qualified as a "Professional Sub-Consultant."  (Dkt. 65-1, Ray Report, pp. 14-18).   Mr. Ray admitted that he lacked any basis for that assumption – conceding that he did not know whether independent contractors qualified as Professional Sub-Consultant:

> Q.    Do you know whether the phrase "professional subconsultants" included 1099 independent contractors?
> A.    I don't know.

(Dkt. 65-2, at 141:03-05).

Opinions based upon an unsubstantiated assumption are inadmissible because they constitute conjecture and speculation and will only serve to confuse the jury. "When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law ... it cannot support a jury's verdict." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993); *see also LuMetta v. U.S. Robotics, Inc.*, 824 F.2d 768, 771 (9th Cir.1987) (discounting expert testimony with an insufficient factual basis). Accordingly, expert testimony that is not sufficiently tied to the specific facts of the case should not be admitted. *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("Conclusions and methodology are not entirely distinct from one another. . . . A court may conclude that there is simply too great an analytic gap between the data and the opinion proffered.").

Prior to offering an expert, the proffering party must establish a factual basis

-18-

for the opinions. Where, as here, a proposed expert offers opinions based upon unsubstantiated assumptions and unsupported theories, courts commonly exclude such experts. *Trevino v. Gates*, 99 F.3d 911, 922-23 (9th Cir. 1996), *holding modified by Navarro v. Block*, 250 F.3d 729 (9th Cir. 2001) (excluding expert for lack of foundation when there was insufficient factual evidence in the record to support the expert's assumption); *People v. Wright*, 4 Cal. App. 5th 537, 545 (2016) ("California courts have been particularly chary of expert testimony based on assumptions that are not supported by the evidentiary record…."); *Guidroz-Brault v. Missouri Pac. R. Co.*, 254 F.3d 825, 831-32 (9th Cir. 2001) ("The factual basis for the expert's opinion must be stated in the expert's affidavit and although the underlying factual details need not be disclosed in the affidavit, the underlying facts must exist.").

In this case, Plaintiffs' theory depends upon the application of the term Professional Sub-Consultant - a bespoke term not defined in the 1993 Contract. Mr. Ray did not have a supported basis to identify who qualified as a Professional Sub-Consultant and then determine whether ULC properly billed costs incurred by anyone who qualifies as a Professional Sub-Consultant. Nonetheless, he purports to offer an opinion on this subject. Any such opinion is inadmissible because either Mr. Ray relies upon his impermissible legal interpretation of the term "Professional Sub-Consultant," or he relies upon an unsupported assumption that the term encompasses any independent contractor. In either event, his opinion on whether the sub-consultants overcharged is inadmissible and should be excluded.

## V.    CONCLUSION

Plaintiffs cannot document that ULC ever overbilled Beaumont – either by exceeding a cap for fees associated with Capped Services or by overbilling time incurred by Professional Sub-Consultants. Plaintiffs therefore seek to confuse the jury and distract from their inability to prove overbilling with alleged opinions that rely entirely upon unsupported assumptions and estimates. Mr. Ray openly admits

Gordon Rees Scully Mansukhani, LLP
5 Park Plaza, Suite 1100
Irvine, CA 92614

-19-

1 the absence of support for his intended testimony – conceding that he did not apply

2 industry standards, verified facts or a recognized methodology. Those admissions

3 render his opinions inadmissible and accordingly, National Union asks this Court to

4 exclude Mr. Ray from testifying at trial.

5 Dated:  August 11, 2022                           GORDON REES SCULLY
                                                                    MANSUKHANI LLP
6

7                                                            By:    */s/ Scott L. Schmookler*
                                                                    Scott L. Schmookler (PHV)
8                                                                    sschmookler@grsm.com
                                                                    (312) 980-6779
9                                                                    Christina R. Spiezia (SBN: 315145)
10                                                                   cspiezia@grsm.com
                                                                    (949) 255-6968
11                                                                   5 Park Plaza, Suite 1100
                                                                    Irvine, CA 92614
12                                                                   *Attorneys for Defendant*
13                                                                   *National Union Fire Insurance*
                                                                    *Company of Pittsburgh, Pa.*
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Gordon Rees Scully Mansukhani, LLP**
5 Park Plaza, Suite 1100
Irvine, CA  92614

1

**CERTIFICATE OF SERVICE**

2

The undersigned hereby certifies that on August 11, 2022, a true and correct

3

copy of the foregoing was electronically filed with the Clerk of Court using the

4

CM/ECF system, which will automatically send email notification of such filing to

5

all counsel of record, as follows:

6

7

Jeffrey V. Dunn, State Bar No. 131926
jeffrey.dunn@bbklaw.com

8

Christopher E. Deal, State Bar No. 186754
chris.deal@bbklaw.com

9

Daniel L. Richards, State Bar No. 315552

10

daniel.richards@bbklaw.com
BEST BEST & KRIEGER LLP

11

18101 Von Karman Avenue, Suite 1000

12

Irvine, California 92612
Telephone: 949-263-2600

13

Facsimile: 949-260-0972

14

15

*Attorneys for Plaintiffs*

16

17

GORDON REES SCULLY
MANSUKHANI LLP

18

19

By:   */s/ Scott L. Schmookler*
Scott L. Schmookler

20

21

22

23

24

25

26

27

28

Gordon Rees Scully Mansukhani, LLP
5 Park Plaza, Suite 1100
Irvine, CA 92614

-21-