# EXHIBIT B

1      A.   No.

2      Q.   Have you been retained by Gordon & Rees to

3   testify at the trial of this matter?

4           MR. SCHMOOKLER:  Object to form.

5           Do not disclose the substance of any

6   communication with counsel.  You can disclose if you

7   haven't (unintelligible) --

8           THE REPORTER:  You keep cutting off at the

9   end of your statement.

10          "You can disclose...," what?

11          MR. SCHMOOKLER:  ... the substance of

12  communications with counsel, but you can disclose if

13  there's an engagement.

14          THE WITNESS:  Yeah.  I -- I do not have a

15  formal Engagement Letter with Gordon & Rees.

16  BY MR. PISANO:

17     Q.   How about an informal oral engagement with

18  Gordon & Rees, do you have one of those to testify at

19  the trial?

20          MR. SCHMOOKLER:  Object to form.

21          You're asking for communications with

22  counsel under Rule 26, privilege.

23          MR. PISANO:  So you're instructing him not

24  to answer?

25          MR. SCHMOOKLER:  I'm instructing him not to



1    disclose the privileged communication with counsel

2    under Rule 26.

3            MR. PISANO:  So you're instructing him not

4    to --

5            MR. SCHMOOKLER:  Yes.

6            MR. PISANO:  -- answer?

7            MR. SCHMOOKLER:  Yes.

8            MR. PISANO:  Great.

9        Q.  Mr. Fogarty, you're going to follow that

10   instruction?

11       A.  Yes.

12       Q.  Are you being paid for your time today,

13   Mr. Fogarty?

14       A.  My firm is being paid for my time, Counsel.

15   Yes.

16       Q.  By whom?

17           MR. SCHMOOKLER:  You.

18           MR. PISANO:  Me?

19           MR. SCHMOOKLER:  You wanted his deposition.

20   BY MR. PISANO:

21       Q.  Okay.  So we paid you a witness fee; right?

22       A.  (No audible response.)

23       Q.  You -- we paid your company a witness fee,

24   Mr. Fogarty?  Is that right?

25       A.  My time today, Counselor, hasn't been billed



1    BY MR. PISANO:

2         Q.   And so, Mr. Fogarty, when the expert

3    disclosure talks about your reports dated August 18,

4    2017, May 15, 2019, and August 16, 2019, are those

5    the reports that we've marked as Exhibits 6, 7 and

6    14, respectively?

7         A.   Yes.

8         Q.   Great.

9              Sticking on page 3 of Exhibit 2.

10             After the disclosure talks about your three

11   reports, it goes on to say:

12             "The subjects and bases for this witness's

13   testimony are disclosed in his reports,

14   communications and notes produced in this litigation.

15   Defendant reserves the right to elicit testimony and

16   opinions on any subjects disclosed in this witness's

17   documents produced in this litigation."

18             You see those two sentences?

19        A.   Yes.

20        Q.   All right.  So, Mr. Fogarty, do you have any

21   opinions that you know you're going to testify to at

22   the trial of this matter?

23             MR. SCHMOOKLER:  Object to form.

24             Mr. Fogarty, please do not disclose any

25   substance of any communications with counsel that are



Page 42

1  privileged.

2       If you have anything to say other than what

3  you learned through me, you can say it.  But if you

4  learned it through me, please do not disclose

5  communications with counsel.

6       THE WITNESS:  Advice of counsel, I don't

7  have an answer for that question.

8  BY MR. PISANO:

9   Q.  Right.

10      Well, Mr. Fogarty, as I read those reports,

11  my understanding of your involvement in all of this,

12  is that you were retained by AIG to analyze

13  Beaumont's claim of loss after it was submitted.

14      Is that fair?

15  A.  Yes.

16  Q.  Is that what you were retained by AIG to do?

17  A.  Yes.

18  Q.  In the course of -- and -- and did you do an

19  analysis of Beaumont's claim of loss?

20  A.  Yes.

21  Q.  And is your analysis of Beaumont's claim of

22  loss discussed in those three reports that we looked

23  at, Exhibits 6, 7 and 14?

24  A.  Yes.

25  Q.  In the course of performing that analysis,



1   did you formulate any opinions regarding the claim of

2   loss?

3        A.  I would say yes.

4        Q.  What opinions did you formulate regarding

5   Beaumont's claim of loss?

6        A.  Well, as we just discussed, Counsel, there's

7   three separate reports.  They are 50 pages long and

8   probably 700 pages of analysis that went along with

9   them.

10            There are quite a few observations, I guess

11   you could say opinions, that are noted in each of the

12   reports.

13       Q.  I know there are.  And I tried to do this

14   the easy way by just asking what opinions you're

15   going to testify to at trial, but I'm getting nowhere

16   with the easy button.

17            So I'm trying to figure out what to do here,

18   Mr. Fogarty, 'cause I don't want this depo to take

19   all day.

20            MR. SCHMOOKLER:  Chris, I'll try to make

21   your life (unintelligible).

22            MR. PISANO:  Scott, you're gonna just -- I

23   know the court reporter has said this a couple of

24   times.  You've got a little bit of a choppy

25   connection.



1            MR. SCHMOOKLER:  Hold on.  I will try to

2     make your life easier today, Chris.  I'll offer you

3     this stipulation.

4            Mr. Fogarty will not be appearing at trial

5     to offer any conclusions or analysis that are not

6     reflected in the three reports.  And then there's a

7     few e-mails that you have where he did some

8     supplemental analysis in 2019.

9            We're limiting ourselves within those

10    reports.  And the e-mails that are referenced in our

11    disclosure are because there's two or three e-mails

12    at the end of 2019's supplemental analysis.

13           Other than that, we're not using him for any

14    other analysis. If that makes today easier, I'm

15    happy to offer that.

16           MR. PISANO:  Well, I appreciate that, Scott.

17    It doesn't make my life any easier.  And, in fact,

18    what you just said complicates things, because in the

19    documents that I looked through, I only saw one

20    e-mail, which was in July of 2019.

21           MR. SCHMOOKLER:  What do you mean you only

22    saw one e-mail?

23           MR. PISANO:  I only saw one e-mail.

24           MR. SCHMOOKLER:  You don't --

25           MR. PISANO:  I don't know what --



Page 45

1          MR. SCHMOOKLER:  -- have 34348?

2          MR. PISANO:  Say the Bates -- say the Bates

3    number again.

4          MR. SCHMOOKLER:  34348.

5          MR. PISANO:  34348.

6          MR. SCHMOOKLER:  That's an e-mail.

7          MR. PISANO:  Uh, I don't know.

8          MR. SCHMOOKLER:  47892 is an e-mail.

9          MR. PISANO:  47892.

10          MR. SCHMOOKLER:  That was in the production,

11    all of which are Bates stamped.

12          MR. PISANO:  So 34348 --

13          MR. SCHMOOKLER:  Yeah.

14          MR. PISANO:  -- and 47892?

15          MR. SCHMOOKLER:  47892.

16          Just two e-mails from December of 2016.

17          MR. PISANO:  All right.  Well, I'll -- I'll

18    try to track those down on a break.  I -- I

19    appreciate the stipulation.  It really doesn't make

20    my life any easier.  But -- okay.

21          MR. SCHMOOKLER:  Okay.

22          MR. PISANO:  It doesn't say anything that's

23    not in the disclosure.

24          I guess...

25          So let's go back to Exhibit 6.  Exhibit 6 is



Page 48

1    A.  I'm not sure I reviewed all of them, but I

2    certainly reviewed some of them.

3    Q.  What's your best estimate as to the total

4    amount HSNO and its successor, J.S. Held, billed on

5    the analysis of Beaumont's claim of loss for -- to

6    AIG?

7    A.  It's in the hundreds of thousands of

8    dollars.

9    Q.  All right.  So sticking with Exhibit 6,

10   Mr. Fogarty.  And this is your August 18, 2017

11   report.

12       By the way, do you have a hard copy of that

13   with you today at the deposition?

14   A.  No, sir.

15       MR. SCHMOOKLER:  An e-copy, Chris, he can

16   move.

17       MR. PISANO:  I didn't catch that, Scott.

18       MR. SCHMOOKLER:  He has an electronic copy

19   he can move.

20       MR. PISANO:  Oh, okay.

21       (Off-record discussion.)

22       MR. PISANO:  Well, I'd rather he show me

23   what he wants to show me.

24       Let's go to the second -- let's go to page

25   26 of 28, if we could, please, Robert.



1          And let's just go to our summary section.

2     Q.   See that?

3     A.   Yes.

4     Q.   Are all of the opinions that you proffer in

5     the August 18, '27 [sic] report contained within the

6     summary that starts on page 26?

7          And please, if you want to scroll through

8     the whole three pages of the summary, feel free.

9     A.   Yeah, I -- I mean, I'd be happy to do that,

10    Counsel.  But unless I went back through the entire

11    report, looked at everything that I discussed and

12    then compared it against this summary section, I -- I

13    couldn't give you an answer.

14         Do I think every single thing that we noted

15    within the report is contained in the summary

16    section?  I doubt it.

17         But this certainly would be some of the more

18    significant findings that we had up to this point in

19    time with the understanding that the analysis was

20    ongoing.

21    Q.   So, Mr. Fogarty, if I were to ask you to

22    identify all of the opinions you and your staff

23    formulated as of August 18, 2017, that are contained

24    within the report, could you do that for me?

25    A.   How much time do we have?



Page 50

1        Q.  Well, I guess under the rules, we have seven

2    hours.

3        A.  Okay.

4        Q.  Is that an exercise that you could do?

5    Before I ask you to do it.

6        A.  Well, I guess it would hinge somewhat on --

7    on the word "opinion."

8            I mean, there's -- there's observations,

9    there's commentary, there's findings, and I don't

10   want to get hung up on a word.

11           I think the report speaks for itself in that

12   in a -- in a very top level, we at that point had not

13   found any support for the various components that

14   were contained in the proof of loss for a number of

15   reasons that are articulated within the 28 pages of

16   this report.

17       Q.  Well, Mr. Fogarty, you know what an

18   "opinion" is; right?

19       A.  Well, again -- um, I know what an "opinion"

20   is, but if I have a sentence in this report that

21   someone may construe to be an "opinion," maybe

22   somebody doesn't.  So...

23       Q.  Okay.  Well, that's fair.

24           But what I asked you, Mr. Fogarty, if you

25   would be able to go through the August 18, '27 report



Page 51

1    and identify all of the opinions that are formulated

2    within that report, is that something you would be

3    able to do, just based upon your understanding of

4    what are the opinions?

5        A.   Same answer as I just gave you, Counsel.  I

6    mean, I may read a sentence.  Whether that would rise

7    to a level of an "opinion," I've always felt that's

8    more of a legal conclusion.

9        Q.   But you could go through this report and

10   identify what you consider to be the opinions, could

11   you not?

12       A.   I certainly -- let's look at the summary

13   paragraph here, second sentence, "Based" --

14       Q.   No.  Hold -- hold on, Mr. Fogarty.

15       A.   Sure.

16       Q.   My question is much higher level.  We're

17   still at 10,000 feet.

18            You could -- if we had all the time in the

19   world, and money was no object, you could go through

20   this report page by page, line by line and tell me

21   everything within that report that you consider to be

22   an "opinion," could you not?

23       A.   Same answer, again, Counsel.  If I read the

24   particular sentence, is it an opinion?  Is it a

25   statement of fact?  Is it a summary of our analysis



Page 52

1  to date?  It can be -- potentially three people would

2  think it falls into any one of those categories.

3      So...

4  Q.  And, Mr. Fogarty --

5  A.  That's my -- my difficulty in -- in

6  answering your question.

7  Q.  Okay.  And I think we're having a

8  disconnect, because I think I'm asking something

9  different.

10     And so let me try to rephrase and, perhaps,

11 be more articulate in what I'm asking for.

12     I don't want you to concern yourself as to

13 how others may interpret what is written in the

14 August 18, 2017.

15     For purposes of this question, I only want

16 you to think about and consider what you believe to

17 be opinions.

18     And my question is:  Could you, as an

19 exercise, go through the August 18, 2017 report and

20 identify for me everything in that report that you

21 consider to be opinions of yours?

22 A.  Again, hinging on the word "opinion," I can

23 read sentences within this report.  There may be a

24 component that may be an opinion.  It may be a

25 summation of an analysis or a fact that could be an



Page 53

1   opinion.

2          So it's -- it's difficult, again, for me to

3   answer your question in, I believe, the way you want

4   me to, which is to define "opinion" in my mind and

5   then apply it to this report.

6          Again, "opinion" to me can take many forms.

7   Different forms.

8       Q.  Okay.

9       A.  So --

10      Q.  Okay.  I -- I didn't mean to cut you off.

11         But is it fair to say, then, that that's an

12   analysis you cannot do?  You cannot go through this

13   document and tell me all of your opinions that are

14   stated within?

15         MR. SCHMOOKLER:  Object to form.

16         THE WITNESS:  I can go through the report

17   line by line, and I can say to you, well, this could

18   be construed to be an opinion.  It could be construed

19   to be a fact.

20         Again, it's how is the word "opinion" being

21   defined?  And by whom?

22         And I know you just said it's defined by me.

23   BY MR. PISANO:

24      Q.  Yes.  You're the --

25      A.  That's -- that's my best answer to you,



Page 54

1    Counselor, is --

2         Q.  Okay.

3         A.  -- it's -- it's -- I can read a sentence and

4    say, well, yeah, that -- that -- that could be an

5    opinion, or you construe it as opinion, or I may

6    consider it to be an opinion.

7         Q.  So would the same answer, then, hold true if

8    I asked that question regarding the May 15, 2019

9    report that's Exhibit 7?

10        A.  Yes.

11        Q.  And would the same answer hold true if I

12   asked it as to the August 16, 2019 report that is

13   Exhibit 14?

14        A.  Yes.

15             MR. PISANO:  All right.

16             And, Scott, I want to make sure I have these

17   Bates numbers correct again, because I did just get

18   them e-mailed to me.

19             You said NUFIC 34348; is that right?

20             (Transmission glitch.)

21             THE WITNESS:  Chris, do you mind if I go to

22   the bathroom while you guys are doing this?

23             MR. PISANO:  Yeah.  Let's go off the record.

24   And we can handle this off the record.

25             THE WITNESS:  All right.  I'm going to go on



Page 148

1          Or actually, before we go there, are there
2     any other opinions within Exhibit 14 that we haven't
3     talked about today?
4     A.   Again, you know, there are references to
5     some of the caveats, ULC being consultants, things of
6     that nature that are in here, so whether or not you
7     feel we've talked about them, certainly leave to you.
8          But like the other reports, there are things
9     in here that I would expect counsel may or may not
10    ask me about at trial.
11    Q.   And if I were to ask you, Mr. Fogarty, what
12    opinions counsel intends to elicit from you at trial,
13    you would not answer that question based upon
14    privilege; correct?
15         MR. SCHMOOKLER:  I would object based on
16    privilege.  So...
17    BY MR. PISANO:
18    Q.   I'd be beating my head against the wall if I
19    asked you what opinions you intend to testify to at
20    trial; is that fair, Mr. Fogarty?
21         MR. SCHMOOKLER:  He's not going to disclose,
22    cannot disclose -- the privilege -- any
23    communications we've had about our trial strategy,
24    what we may or may not do at trial.
25    ///



Page 149

1    BY MR. PISANO:

2        Q.  And so, Mr. Fogarty, you're not going to

3    answer that question based on counsel's instruction;

4    right?

5        A.  That's correct.

6            MR. PISANO:  Okay.  So, Robert, did you get

7    Exhibits 17 and 18 from my office, or do I need to

8    send those to you?

9            THE TECHNICIAN:  I need 17 and 18.  I do not

10   have them yet.

11           MR. PISANO:  Okay.  Why don't we take a

12   break.

13           I'm going to send these last two exhibits,

14   and then we'll be done.

15           MR. SCHMOOKLER:  How long do you think you

16   have, so I know about my plans?

17           MR. PISANO:  Not much.  Because they are the

18   e-mails that you referenced earlier today, Scott.

19           MR. SCHMOOKLER:  I think not, 'cause you

20   just want to put -- have him look at his paper.

21           MR. PISANO:  Why don't we just go off the

22   record, 'cause that'll also let me look at my notes.

23           We're -- we're pretty close to being done.

24           MR. SCHMOOKLER:  So don't worry about it.

25   Fine.



EXHIBIT

6

**HSNO**
**THE FORENSICS FIRM**
Accounting | Economics | Consulting

August 18, 2017


**VIA EMAIL**
Ms. Jennifer Rocha
Complex Claims Director
AIG Property Casualty
175 Water Street
New York, NY 10038
Jennifer.Rocha@aig.com


Re:    Insured - City of Beaumont, California
       Employee Theft Claim
       Date of Discovery – May 17, 2016
       AIG Claim Number – 3409580528US
       HSNO File Number – 10022193
       **Status Report – Preliminary & Tentative**


Dear Ms. Rocha:

This correspondence will serve to provide you with the status of our evaluation to date regarding the claims made by the City of Beaumont, California, for employee dishonesty, other fraud, and corruption.  We are in receipt of a sworn proof of loss prepared and submitted by the insured's representative, Stradling, Yocca, Carlson, & Rauth, P.C. ("Stradling"), totaling $159,702,461, summarized in Table 1, below:

| Description | Amount |
|---|---|
| TUMF Scheme Judgment and Interest Thereafter | $    57,803,795 |
| Urban Logic Self-Dealing | 86,448,488 |
| Kapanicas and Aylward Self-Dealing | 1,364,542 |
| Additional Aylward Self-Dealing | 96,508 |
| Concealed Deficit in General Fund | 7,471,429 |
| Wrongly Diverted General Funds | 6,517,519 |
| Total | $   159,702,461 |

*Table 1*

Based on our review of the Stradling proof of loss, the exhibits thereto, and documents produced to date, each claim component is based on different facts and circumstances. However, it is unclear whether the insured is claiming each component as a separate occurrence, or the aggregate of all components as a single occurrence.

NUFIC_001221

Ms. Jennifer Rocha
August 18, 2017
Page 2 of 28

### Summary of the Claims

*TUMF Fees*
It is our understanding that the TUMF (Transportation Uniform Mitigation Fees) claim of $57,803,795 is based on the July 17, 2014 civil judgment against the City of Beaumont arising from a dispute with the Western Riverside Council of Governments ("WRCOG"). According to court documents [HSNO Exhibit 1], the City was ordered to remit $42,994,879 in TUMF fees, plus statutory interest from October 2009 to May 2014, claimed at $14,808,906 as of the proof of loss filing. The civil judgment was subsequently appealed and settled at a reduced rate, as discussed later in this report.

Although the TUMF judgment was the result of a civil action between two government entities, the insured's claims follow the May 17, 2016 arrests of the seven individuals noted on the November 3, 2016 proof of loss (See Table 2). According to the Riverside County District Attorney arrest warrants and declarations [HSNO Exhibit 2], the prosecution alleges that failing to remit the TUMF fees disputed in the civil matter amounts to embezzlement on the part of the seven named individuals. As such, the insured claims the entire judgment as employee dishonesty.

*Urban Logic Self-Dealing*
Based on the proof of loss, the Urban Logic Self-Dealing claim of $86,448,488 is based on disbursements to Urban Logic Consultants from two sources; $45,391,831 in bond proceeds from bond trustee accounts, and $41,056,657 from City bank accounts per the general ledger. It is our understanding that the self-dealing claim amounts are based on the reconciliation of disbursements from bond trustee accounts prepared by the insured's consultant, Urban Futures, Inc. (not related to Urban Logic Consultants). The consultant's presentation of findings is included as "**Exhibit S**" to the insured's proof of loss, and notes that the "Reconciliation work did not include forensic or investigative analysis." As such, it appears that the amounts claimed by the insured represent all identified funds disbursed to ULC, regardless of the reason or basis for the disbursements.

*Kapanicas and Aylward Self-Dealing*
The Kapanicas and Aylward Self-Dealing claim of $1,364,542 is based on disbursements from the bond trustee accounts, and does not appear to include general ledger disbursements from the City's bank accounts. It is our understanding that the self-dealing claim amounts are based on the same consultant's reconciliations as the Urban Logic claim. Again, the consultant's presentation notes that the "Reconciliation work did not include forensic or investigative analysis." As such, it appears that the amounts claimed by the insured represent all identified funds disbursed to Mr. Kapanicas and Mr. Aylward, regardless of the reason or basis for the disbursements.

*Aylward Additional Self-Dealing*
Based on the proof of loss, the insured claims $95,508 relating to additional self-dealing related to ownership interests of Mr. William K. Aylward. According to the proof of loss, Mr. Aylward, while acting as the City's Finance Director, maintained an ownership interest in property leased by two businesses, Cherry Valley Automotive and Beaumont Tire. On occasion, the City paid

NUFIC_001222

Ms. Jennifer Rocha
August 18, 2017
Page 3 of 28

for services rendered from these two businesses. The insured contends that this relationship represents a conflict of interest.

_Concealed Deficit in General Fund and Wrongly Diverted General Funds_
The insured also claims $7,471,429 characterized as a "fraudulently concealed deficit in the general fund," and $6,517,519 characterized as "unallowable transfers" from the Beaumont Redevelopment Agency to the City. With regard to the claimed $7,471,429, the proof of loss states, "This deficit, which violates the California Constitution's requirement of a balanced budget, appears to have been concealed by Kapanicas, Aylward and Aklufi…" According to "**Exhibit V**" of the insured's proof of loss, the $7,471,429 was an estimate as of June 17, 2016. The $6,517,519 is based on a March 2015 Asset Transfer Review conducted by the California State Auditor, included with the insured's proof of loss as "**Exhibit X**".

**Preliminary Document Review**

In addition to the proof of loss, Stradling has provided six submissions of voluminous documentation. As of this report we have been provided with 64,046 document files, including Excel and PDF files, consisting of more than 572,170 pages of information. All of the documentation provided has been uploaded to a Relativity document management site and rendered into searchable formats. In order to narrow the population of documents to those most relevant to the insured's claims, we have so far performed searches of 75 preliminary keywords/search terms, including all reasonable variations and permutations. Searches are added and revised as new information is discovered.

We have focused the scope of our searches in an attempt to return those results most relevant to claimed loss categories/schemes and the known persons named in the November 3, 2016 proof of loss, such as home addresses, business addresses, email addresses, financial statement titles, trustee account numbers, vendor invoice numbers, and any other unique identifier.

We have now reviewed and tagged 254 document files consisting of 223 PDF files and 32 Excel files. These 223 PDF files account for 57,012 out of the 572,170 Bates numbers pages, or approximately 10% of the total production. Because the Stradling document production assigned a single Bates number to each Excel file, the 32 Excel files account for only 32 out of the 572,170 bates numbered pages. However, this does not accurately represent the file size or volume of information contained in each file. Each of the 32 Excel files includes multiple tabs and varying amounts of data, making it difficult to determine the equivalent number of printed pages. We estimate that these 32 Excel files account for approximately 20,000 additional pages that have been reviewed and tagged.

Within the approximately 77,000 pages reviewed and tagged thus far, we have identified and analyzed the following types of documents:

- Urban Logic Consultants invoices
- Urban Logic Consultants contracts
- General Government Management Services contracts

NUFIC_001223

Ms. Jennifer Rocha
August 18, 2017
Page 4 of 28

- Union Bank bond trustee account statements
- Bond disbursement requisitions
- Bond issuance statements and closing documents
- Audit reports and work papers
- Email correspondence
- Bank reconciliations
- General ledger detail and summary reports

In addition to documents provided by Stradling, we retrieved annual reports, court filings, and news articles from available internet sources, which we have included in our ongoing evaluation.

**Analysis of Employment History and Status – Preliminary and Tentative**

Based on our review of the November 3, 2016 proof of loss and discussions with Stradling, it is our understanding that the insured has categorized their claims as losses resulting from **employee dishonesty**. However, based on the documentation reviewed to date, it appears that several of the individuals named in the proof of loss were in fact employees of private firms contracted by the City of Beaumont, and not employees of the City of Beaumont per se.

| Employer | Period | Employment Status |
|---|---|---|
| **Alan Kapanicas** | | |
| BSI Consultants, Inc. | 07/12/93 to 02/26/96 | Contract City Manager |
| GGMS, Inc. | 02/26/96 to 06/21/11 | Contract City Manager |
| City of Beaumont | 06/21/11 to 05/17/15 | City Employee - City Manager |
| **William Aylward** | | |
| William K. Aylward, CPA | 09/27/96 to 07/16/08 | Independent CPA |
| City of Beaumont | 07/16/08 to 05/17/15 | City Employee - Finance Director |
| **David Dillon** | | |
| Urban Logic Consultants | 03/22/93 to 05/17/15 | Contract Economic Development Director |
| **Deepak Moorjani** | | |
| Urban Logic Consultants | 03/22/93 to 05/17/15 | Contract Public Works Director |
| **Ernest Egger** | | |
| Urban Logic Consultants | 03/22/93 to 05/17/15 | Contract Planning Director |
| **Joseph Aklufi** | | |
| Law Firm of Aklufi & Wysocki | 03/01/92 to 05/17/15 | Independent Attorney |
| **Francis Coe** | | |
| City of Beaumont | 12/12/05 to 05/17/15 | City Employee - Chief of Police |
| **Notes:** | | |
| Assessment of employment dates and status are preliminary and tentative based on the documentation reviewed to date. Information is subject to update and revision. Period utilized is based on the earliest reviewed dates found on contracts, personnel records, or verified payments, and the date of discovery. | | |

*Table 2*

NUFIC_001224

Ms. Jennifer Rocha
August 18, 2017
Page 5 of 28

We have identified service agreements, personnel records, employment agreements, bond trustee account statements, correspondence, and references in court documents that appear to indicate the periods that the individual defendants were or were not employees of the City of Beaumont, as summarized above on Table 2. This information is preliminary and tentative, and subject to update and revision as additional documents are reviewed. The periods noted are based on the earliest dates found on contracts, personnel records, or verified payments, and the date of discovery.

*Alan Kapanicas and General Government Management Services, Inc.*
Based on documentation reviewed to date, Alan Kapanicas is the principal of General Government Management Services, incorporated in the State of California as GGMS, Inc. According to an Agreement for Services between GGMS and the City of Beaumont [HSNO Exhibit 3], Mr. Kapanicas was contracted by the City of Beaumont to provide "professional management, financial, personnel, special district, and consulting services." This agreement was executed on February 26, 1996 by the Mayor of the City of Beaumont, Janice C. Leja, and Mr. Kapanicas. GGMS's contract with the City was renewed and amended in 1998 and in 2005, each time executed by the sitting Mayor; Janice Leja in 1998, and Larry Dressel in 2005.

Prior to the 1996 contract with GGMS, it appears that the City contracted Mr. Kapanicas through another vendor, BSI Consultants. According to an agreement dated July 12, 1993 [HSNO Exhibit 4], Mr. Kapanicas was the BSI Consultants' representative. The 1993 agreement with BSI Consultants was executed by the sitting Mayor, Dayle Kelleher.

As an independent contractor, from 1993 to 2011 Mr. Kapanicas held several titled positions for the City of Beaumont, including City Manager, Deputy Clerk, Administrative Services Director, Special Tax Consultant, and Director of the Beaumont Financing Authority. It is our understanding that GGMS submitted invoices for services rendered, and was paid from the City's bank account or from bond trustee accounts, depending on the type of service provided. We continue to search the documents provided by Stradling for all GGMS invoices. Thus far we have located and reviewed only a small sample.

According to an Employment Agreement [HSNO Exhibit 5], Alan Kapanicas was officially hired by the City of Beaumont as the City Manager on June 21, 2011. A memorandum dated June 21, 2011 from City Attorney, Joseph Aklufi, to the Beaumont Mayor and City Council indicates that Mr. Kapanicas had not been a city employee prior to the execution of the June 2011 employment agreement. The employment agreement was signed by the Mayor of the City of Beaumont, Brian DeForge, and Deputy City Clerk, Shelby Hanvey.

Mr. Kapanicas was terminated from the City on October 8, 2015, pursuant to a Separation and Settlement Agreement with the City of Beaumont [HSNO Exhibit 6]. As such, it appears that Alan Kapanicas was an independent contractor from July 1993 through June 2011, and an employee from June 2011 through October 2015. Because the City participated in the TUMF program between 2004 and 2009, it appears that any alleged wrongdoing by Mr. Kapanicas would have been prior to becoming a City employee in 2011, and during his time as an independent contractor. Likewise, the claimed Kapanicas self-dealing includes bond proceed

NUFIC_001225

Ms. Jennifer Rocha
August 18, 2017
Page 6 of 28

distributions occurring between February 1996 and June 2009. As such, these transactions would have taken place during the time that Mr. Kapanicas was an independent contractor. At this time, we have not discovered any documentation that would indicate that Mr. Kapanicas or GGMS was at any time an employee of Urban Logic Consultants, William K. Aylward, CPA, or the Law Firm of Aklufi & Wysocki. As such, it does not appear that transactions between GGMS and the other parties, including authorization of payments, would represent a conflict of interest.

*William K. Aylward, CPA*
Based on the documentation reviewed to date, it appears that William K. Aylward, CPA was officially hired by the City of Beaumont as the Finance Director on July 16, 2008. An employee profile notes William Aylward's date of hire as July 16, 2008 [HSNO Exhibit 7]. In a July 13, 2009 email from William Aylward to Shaina Harwood and Nicole Wheelwright (believed to be personnel or human resources), Mr. Aylward states, "Effective 6/29 I am working full time." As such, although Mr. Aylward's employee profile notes a date of hire of July 16, 2008, it appears that he may have been a part time employee until June 29, 2009.

The exact date that Mr. Aylward began providing services to the City is unclear. We have not discovered any contracts or correspondence officially engaging Mr. Aylward for accounting services. However, it appears that prior to the July 16, 2008 date of hire, Mr. Aylward was an independent Certified Public Accountant. Although documents indicate that he held the position of Finance Director as far back as 2003. It appears that Mr. Aylward submitted invoices to the City under William K. Aylward, CPA. We have identified $277,170 in disbursements from the City's general ledger between July 2003 and June 2015. We continue to search the documents provided by Stradling for all invoices from William K. Aylward, CPA. Thus far we have located and reviewed only a small sample.

The insured's claim for $165,300 characterized as Aylward Self-Dealing includes bond proceed distributions occurring between September 27, 1996 and July 17, 2008. Although the disbursement is dated July 17, 2008, the service period is noted as June 30, 2008. As such, these transactions would have taken place prior to the City's hiring of Mr. Aylward in July of 2008.

At this time, we have not discovered any documentation that would indicate that Mr. Aylward was at any time an employee of Urban Logic Consultants, GGMS, Inc., or the Law Firm of Aklufi & Wysocki. As such, it does not appear that transactions between William K. Aylward, CPA and the other parties, including authorization of payments, would represent a conflict of interest.

*Deepak Moorjani, David Dillon, Ernest A. Egger, and Urban Logic Consultants*
Based on documentation reviewed to date, Urban Logic Consultants ("ULC") is a General Partnership under the laws of the State of California. Deepak Moorjani, David Dillon, and Ernest Egger are described as the "Principals" of ULC. According to an Agreement for Services between ULC and the City of Beaumont [HSNO Exhibit 8], ULC was contracted by the City of Beaumont to provide engineering and planning services. This agreement was executed on March 22, 1993 by the Mayor of the City of Beaumont, Janice C. Leja, David W. Dillon, and Ernest A. Egger. ULC's contract with the City was renewed and amended in April of 1993

Ms. Jennifer Rocha
August 18, 2017
Page 7 of 28

executed by City Manager Dayle Kelleher and Mayor Janice Leja, in April of 1994 executed by Mayor Janice Leja, and December 17, 2013 by Mayor Roger Berg. There is also a September 27, 1993 contract. However, the copy that we reviewed was not executed.

As a contract service provider from 1993 to 2015, ULC provided the City of Beaumont with planning, engineering, and development services. Over the contract period, Moorjani, Dillon, and Egger served as the City's Public Works Director, Economic Development Director, and Planning Director, respectively. Although the three principals were named in the proof of loss, based on our review of correspondence, it appears that additional ULC employees were providing services to the City of Beaumont. The actual number of people employed by ULC is unclear. However, we have identified correspondence from three ULC email addresses in addition to the principals, and note the following employee descriptions from the ULC invoices reviewed to date:

- 1-3 Man Survey Crew
- Administrative
- Associate Eng
- CADD/ Tech
- Const. Manager
- Designer II
- Draftsperson for exhibits
- Eng. Geologist
- Engineer
- Exec Secretary
- Inspector
- Inspector-Prev Wage
- Office Mgr

- Plan Checker
- Planner
- Principal Planner/ Principal
- Principal/ Engineer
- Principal/ Project Engineer
- Project Development Planner
- Project Engineer
- Project Manager/ Engineer
- Project Mgr./ Sr. Engineer
- Public Works Dept.
- Soils Inspector
- Soils Tech
- Sr. Asso/Eng.

- Sr. City Engineer
- Sr. City Engineer/ Principal
- Sr. City Manager
- Sr. City Planner
- Sr. City Planner/ Principal
- Sr. Designer II
- Sr. Engineer
- Sr. Inspector
- Sr. Planner
- Sr. Project Engineer/ Principal
- Staff Engineer
- Surveyor
- Web- Services/ Surveyor

At this time, we have not discovered any documentation that would indicate that any of the named ULC principals, or any employee of ULC, was at any time an employee of the City of Beaumont, GGMS, Inc., William K. Aylward, CPA, or the Law Firm of Aklufi & Wysocki. As such, it does not appear that transactions between ULC and other parties, including authorization of payments, would represent a conflict of interest.

*Joseph S. Aklufi and Aklufi & Wysocki*
Based on documentation reviewed to date, Joseph Aklufi is an attorney and a partner at the law firm of Aklufi & Wysocki. It is our understanding that Aklufi & Wysocki represented the City as general counsel dating back to 1992. The exact date that Mr. Aklufi began providing services to the City is unclear. We have not discovered any contracts or correspondence officially engaging Mr. Aklufi or his firm for legal services.

We have identified one disbursement from the bond trustee accounts on January 8, 1997 for an invoice dated December 30, 1996 in the amount of $368. Based on the general ledger, it appears that Aklufi & Wysocki received cash disbursements totaling $2,045,495 between August 2003 and June 2015. To date, we have not discovered general ledger data prior to 2003.

NUFIC_001227

Ms. Jennifer Rocha
August 18, 2017
Page 8 of 28

Based on the November 3, 2016 proof of loss, the insured has not alleged self-dealing or the submission of fraudulent invoices by Aklufi and Wysocki.  However, Mr. Aklufi is one of the seven former "employees" named in the proof of loss.

On June 3, 2017 the City of Beaumont and the Beaumont Utility Authority (described as a "public agency blended component unit of the City of Beaumont), filed suit against Aklufi & Wysocki, alleging Legal Malpractice, Breach of Fiduciary Duty, and Breach of Written Contract.  According to the civil complaint [HSNO Exhibit 9], "Aklufi, as a partner of Aklufi & Wysocki ("A& W"), was the City Attorney for the City and City-related entity for a continuous period beginning on or about March 1, 1992, and ending in or about 2014."

Although the civil complaint indicates that the City's relationship with Mr. Aklufi ended in 2014, it appears that Mr. Aklufi's partner, Mr. David Wysocki, continued to represent the City until 2015.  According to the complaint, "Wysocki, as partner of A&W, acted as Deputy City Attorney for the City and City-related entity during the continuous period beginning on or about March 1, 1992, and ending in about 2014. From 2014 until about May 2015, Wysocki served as City Attorney until in or about May 2015, when Plaintiffs terminated their relationship with Defendants."  Mr. Wysocki is not one of the seven individuals named as a "former employee" in the November 3, 2016 proof of loss.

The City's civil suit against Aklufi & Wysocki alleges that Joseph Aklufi, David Wysocki, and their firm negligently failed to provide appropriate legal advice and adequate oversight over the administration of the TUMF program, the hiring of supervision of contractors, financial reporting, and control over financial functions.  The City seeks compensatory, exemplary and punitive damages of an undetermined amount.

<u>Francis Dennis Coe, Jr. – Chief of Police</u>
Based on documentation reviewed to date, Francis Coe was the Chief of the Beaumont Police Department from December 12, 2005 until he retired in May of 2015.  It appears that Mr. Coe was an employee of the City of Beaumont for his entire employment period.

Of the seven individuals named as "former employees" in the November 3, 2016 proof of loss, it appears that Mr. Coe was the only bona fide employee of the City.  However, the insured has not asserted any involvement by Mr. Coe in the alleged TUMF scheme or alleged self-dealing schemes.  Mr. Coe's involvement relates to receiving interest free loans backed by his sick and vacation time.  The criminal charges allege that between May 2010 and August 2013, Mr. Coe received "sick loans" without the knowledge or permission of the City Council, and those sick loans were approved by Alan Kapanicas and William Aylward.  The insured has not claimed an amount relating to the interest free employee loans.  According to the District Attorney's declarations, all sick loan money was paid back.

Based on the dates noted in the District Attorney's declaration, the alleged sick loan scheme would have begun after the City's hiring of Mr. Aylward in July 2008, and continued after the June 2011 hiring of Alan Kapanicas.  Again, to date, the insured has neither claimed nor substantiated a loss resulting from the loans in question.

NUFIC_001228

Ms. Jennifer Rocha
August 18, 2017
Page 9 of 28

**Indemnification**

Based on our review of the vendor agreements, it appears that both the GGMS and ULC contracts require the contractors to indemnify the insured, and possibly maintain errors and omissions insurance policies.  According to the February 26, 1996 and November 10, 1998 GGMS agreements:

> *"GGMS hereby covenants and agrees to:*

> a.  *Obtain a comprehensive general liability policy in an amount of not less than $1,000,000 per occurrence naming CITY as an additional insured;*

> b.  *Obtain a policy of errors and omissions insurance in a minimum amount of $1,000,000 per occurrence to cover any negligent acts or omissions committed by GGMS, its employees and/or agents in the perfonnance of any services for CITY;"*

> *"GGMS acknowledges and agrees that all such insurance is in addition to GGMS obligation to indemnify and hold City harmless from and against any and all claims arising out of any loss, injury or damage to property or persons caused by the intentional and negligent acts or omissions of GGMS committed outside the course and scope of GGMS authority."*

Additionally, the January 5, 2005 GGMS Amendment to Agreement for Services states:

> *"The CONSULTANT hereby agrees to comply with federal and state law, rules and regulations governing the subject matter of this AMENDMENT to the AGREEMENT. In the event the CONSULTANT violates any such law, rule or regulation, the CONSULTANT shall indemnify and hold the OWNER free and harmless from any liability of any kind or nature that may result from such violation, including claims and actions brought by third parties."*

The insured's relationship with Urban Logic Consultants stems from a November 1992 contract with Trans-Pacific Consultants [HSNO Exhibit 10], of which Ernest Egger was the Engineering Contract Manager.  The February 1993 contract with ULC [HSNO Exhibit 8] retains the Trans-Pacific employees, David Dillon and Ernest Egger, now Principals of ULC, in order to maintain continuity of the personnel involved in the CFD programs.

Under the Trans-Pacific contract, the city was indemnified under Section F-Paragraph 5, which stated:

> *"Engineer and Consultant Team agree to and shall to the extent of insurance required under the terms of the Agreement and hold City, its officers and employees free and harmless from claims, actions, damages and liabilities arising from death, personal injury, property damage or other cause asserted or, based upon any respective negligent act or omission of Engineer and Consultant Team, or employees of Engineer and Consultant Team relating to the accomplishment of the work or performance of services under this agreement."*

NUFIC_001229

Ms. Jennifer Rocha
August 18, 2017
Page 10 of 28

Additionally, under the Trans-Pacific Consultants contract, the contractor was required to maintain insurance coverage described in Section M-Paragraph 2 as:

> "Comprehensive General Liability Insurance, including contractual coverage and excluding automobile, with a combined single limit of not less than $500,000 each occurrence and $1,000,000 annual aggregate."

Article IV (Conditions) of the Urban Logic Consultants February 1993 contract draws in Section F (Liability and Indemnification) and Section M (Insurance) from the November 1992 Trans-Pacific Consultants contract. As such, it appears that the insured was contractually indemnified by ULC.

Although the contract provisions indicate insurance is required, we have not identified any insurance policies within the documentation reviewed to date.

**Analysis and Findings – Preliminary and Tentative**

*TUMF Scheme Judgment and Interest: $57,803,975*

The insured claims $57,803,975 relating to a civil judgment for Transportation Uniform Mitigation Fee ("TUMF") funds that were not remitted to the Western Riverside Counsel of Governments ("WRCOG"). According to a 1991 Joint Powers Agreement [HSNO Exhibit 11], the WRCOG is a public entity established by several member municipalities within Riverside County, California, including the City of Beaumont. The agreement states that, "Among other functions, WRCOG shall serve as a forum for consideration, study and recommendation on area-wide and regional problems."

It is our understanding that between 2004 and 2009 the City of Beaumont participated in the WRCOG TUMF program, officially adopted as Ordinance No. 839 on March 18, 2003, and renewed as Ordinance No. 894 on May 2, 2006 [HSNO Exhibit 12]. According to these Ordinances, the TUMF program was a means of funding projects to "enlarge the capacity of the Regional System of Highways and Arterials in Western Riverside County." It is our understanding that under the TUMF program, participating cities agreed to collect fees from developers, and remit those fees to the WRCOG to be used to fund regional transportation projects.

Based on our review of a brief[1] filed by the insured in the civil proceedings [HSNO Exhibit 13], it appears that the matter in dispute relates to whether or not certain projects within the City of Beaumont were exempt from the collection of TUMF fees, and whether or not certain projects within the City qualified for TUMF credit under an existing financing plan. Resolution No. 839 and Resolution No. 894 both include provisions for exemptions from the collection of TUMF, and credit for TUMF facilities within a "Recognized Financing District."

---

[1] Case No. 30-2010-00357976 in Superior Court of the State of California, County of Orange, Defendants Opening Brief Re Plaintiff's Failure to Comply With The Government Claims Act; Stradling Bates No. BEAUMONTAIG00000370.

NUFIC_001230

Ms. Jennifer Rocha
August 18, 2017
Page 11 of 28

The City argued that because they established a Community Facilities District ("CFD")[2] prior to the adoption of the TUMF ordinance, the City was not obligated to collect and remit TUMF, and that facilities constructed within the CFD, and financed through CFD and special tax bonds, were eligible for TUMF credit.

Based on our review of correspondence between the City and WRCOG, it appears that this civil dispute was ongoing throughout the period that the insured was a participant in the TUMF program.  On September 9, 2009 the WRCOG filed suit in California Superior Court[3], and on October 5, 2009 WRCOG passed Resolution 03-10 [HSNO Exhibit 14], removing the City of Beaumont as a participant in the TUMF program.  The insured officially withdrew from the TUMF program on October 20, 2009 with the adoption of Ordinance No. 962 [HSNO Exhibit 15], signed by then Mayor Jeff Fox.

According to the court's July 17, 2014 Statement of Decision [HSNO Exhibit 1], the City was ordered to remit $42,994,879 in TUMF fees, plus statutory interest from October 2009 to May 2014, claimed at $14,808,906 as of the proof of loss filing.  Based on a 47 page document entitled "WRCOG v. City of Beaumont Calculation of TUMF Obligation" [HSNO Exhibit 16], it appears that the $42,994,879 figure was calculated by WRCOG's expert accounting witness in the civil trial, RSM McGladrey[4].

The McGladrey calculation accounts for $2,777,510 in payments from the City to WRCOG, $21,774 in credit agreements, and $840,800 in CFD 93-1 bonds.  However, the general ledger includes net disbursements to WRCOG in the amount of $3,453,116 between 2003 and 2009.  The general ledger does not indicate which, if any, of these funds relate to TUMF.  To date, we have not performed a detailed analysis of the RSM McGladrey calculation.

On May 12, 2015 the insured filed with the California Court of Appeal to have the decision reversed [HSNO Exhibit 17].  However, on April 4, 2017, prior to final determination by the appellate court, the City and WRCOG negotiated a settlement agreement [HSNO Exhibit 18].  Based on our review of the settlement agreement, it appears that the insured's obligations to WRCOG have been reduced significantly from the original $57,803,975 claim amount, and are now based on a number of conditions and contingencies to be implemented over many years, to terminate on June 30, 2039 regardless of whether the stipulated obligations have been met.  Based on our review of the settlement agreement, the terms are as follows:

---

[2] Resolution No. 1993-13 was passed on June 29, 1993, establishing CFD 93-1 pursuant to the "Mello-Roos Community Facilities Act of 1982."  Refer to Stradling Bates numbers BEAUMONTAIG0000008 through BEAUMONTAIG0000019, included as HSNO Exhibit 19.

[3] Case No. RIC 536164 in Superior Court of the State of California, County of Riverside, Petition For Writ of Mandate and Complaint For Declaratory and Injunctive Relief; Stradling Bates No. BEAUMONTAIG0000057.

[4] Document number BEAUMONTAIG0001811, provided by Stradling and included as HSNO Exhibit 16, shows the calculation of $42,994,879 and references "McGladrey Calculated TUMF Obligation." It is our understanding that the insured's counsel engaged the accounting firm of RSM McGladrey for expert witness services, as shown on bates number BEAUMONTAIG0002648.

NUFIC_001231

Ms. Jennifer Rocha
August 18, 2017
Page 12 of 28

- Forfeit a percentage of yearly "Measure A Revenues" over the course of 20 years, not to exceed $9,400,000, reduced by any potential recovery from third parties

- Pay $2,000,000 to WRCOG no later than October 1, 2017

- Complete three improvement projects within the City no later than January 1, 2022, at an estimated cost of $1,191,660

- Remit $2,100,000 to WRCOG for Cherry Valley Boulevard Project

- Fund a designated account in the amount of $3,000,000, no later than October 1, 2017, for the purpose of funding improvements to Pennsylvania Avenue

- On a prorated basis, share in recovery from third-party claims, with a guaranteed recovery of $7,000,000 to WRCOG

- The lesser of 50% of legal fees incurred pursuing third-party claims or $1,000,000

Based on our review of the settlement agreement, it appears that the City and the WRCOG have agreed to jointly pursue civil actions against the various accused parties. Although it appears that the original judgment has been superseded by the settlement agreement, the insured has not, to date, provided a revised claim.

Although the insured's financial obligations to WRCOG are the result of a civil judgment and subsequent settlement agreement, the insured's claim asserts that the original TUMF dispute was the product of widespread corruption and self-dealing perpetrated by the seven individuals, described as "former employees," named in the November 3, 2016 proof of loss. The claim is based on declarations made by the Riverside County District Attorney in the criminal complaint and affidavits [HSNO Exhibit 2], which allege that the defendants intentionally deprived WRCOG of TUMF proceeds, which they then directed to their own companies for personal enrichment. According to news reports, each of the defendants has pleaded NOT GUILTY to the alleged crimes[5], and waived their rights to a speedy trial[6].

The insured claims that the TUMF judgment losses are the result of employee dishonesty; specifically, the insured claims that GGMS principal, Alan Kapanicas, ULC principals David Dillon, Deepak Moorjani, and Ernest Eggers, City Attorney Joseph S. Aklufi, and Certified Public Accountant William K. Aylward acted in a criminal manner to the detriment of the City. However, based on our review of the documentation provided by Stradling, each of these named individuals was an independent contractor at the time the City joined the TUMF program in 2004, and only William Aylward had become an employee prior to the 2009 withdrawal from the program. Although it appears that each of these individuals held

---

[5] Danelski, David and Wesson, Gail. "All Seven Former Beaumont Officials Plead Not Guilty in Corruption Case." The Press Enterprise August 19, 2016. www.pe.com. Web. Dec. 6, 2016. Refer to HSNO Exhibit 20.

[6] Danelski, David. "Beaumont Corruption Defendants Waive Speedy Trial Rights." The Press Enterprise May 26, 2017. www.pe.com. Web. May 30, 2017. Refer to HSNO Exhibit 20.

NUFIC_001232

Ms. Jennifer Rocha
August 18, 2017
Page 13 of 28

positions within the City, those positions were filled through contracted private vendors, and not held by bona fide city employees.

While it does appear that certain positions within the city were held by independent contractors, those contractors were hired by elected city officials. It is our understanding that the City had contracts in place with GGMS and ULC, which were executed by elected officials. The vendor contracts that we reviewed, as well as TUMF Resolutions 839 and 894, appear to have been signed by the sitting mayor at the date of execution. Additionally, we have reviewed minutes to city council meetings where TUMF projects and the ongoing TUMF dispute were discussed.

Within the documentation submitted to date, we have discovered and reviewed documents which indicate that the City's elected officials were aware of, and involved with, the City's administration of the TUMF program, and the ongoing civil dispute with WRCOG. Certain correspondence between the named "former employees" and WRCOG [HSNO Exhibit 21], and minutes to City Council meetings [HSNO Exhibit 22], include the names of the Mayor and City Council members.

The following select examples, included with [HSNO Exhibit 21], appear to demonstrate that the TUMF matter included elected Beaumont officials beyond the "former employees" named in the proof of loss:

- A June 9, 2005 letter from the WRCOG Deputy Executive Director, Ruthanne Taylor Berger, regarding TUMF credit agreements for construction of TUMF facilities directly benefiting the City, was addressed to Alan Kapanicas and carbon copied to then Mayor Larry Dressel (BEAUMONTAIG0020070).

- A May 24, 2006 letter from Alan Kapanicas to WRCOG Executive Director, Rick Bishop, was also carbon copied to the City Council. This letter states, "As we have discussed in the past, the City of Beaumont will rely upon the pending and approved two party agreements in combination of community facilities district proceeds, retained fees and other funding to construct TUMF facilities in accordance with project conditions of approval and the City's Comprehensive Public Facilities Financing Program which was initiated in 1993," and, "The City wants to be very clear how we are building TUMF Non-Program Facilities and have assurance from WRCOG that the process is fully compliant with the TUMF program and Administrative Policies," (BEAUMONTAIG0020046).

- A March 7, 2008 letter from WRCOG Executive Director, Rick Bishop, to Alan Kapanicas was also carbon copied to then Council Member Larry Dressel (formerly the Mayor). This letter states, "For the past several years the City has used that CFD to retain TUMF dollars to construct facilities on the TUMF network but are not specifically listed in the CFD. With this revision the City will no longer be allowed to retain TUMF dollars to construct TUMF facilities when the bonds are issued after February 4, 2008, unless the City follows the prescribed criteria for new funding districts."

NUFIC_001233

Ms. Jennifer Rocha
August 18, 2017
Page 14 of 28

Additionally, based on minutes Beaumont City Council Meetings [HSNO Exhibit 21], it appears that TUMF credit agreements for several construction projects were approved by the Mayor, Mayor Pro Tem, and three Council Members on July 18, 2006 (BEAUMONTAIG0020055), and November 6, 2007. We continue to search the voluminous documentation provided for additional correspondence and minutes to City Council meetings.

As such, it appears that Beaumont elected officials were well aware of the way the TUMF program was being administered by the City. The insured has not alleged that the mayor, mayor pro tem, members of the city council, or any other elected officials were involved with the claimed thefts, but the record is clear that they were both aware and complicit with the City's interpretation and administration of the TUMF program.

Based on the documentation reviewed to date, it appears that the TUMF dispute amounts to a civil matter between two government agencies who disagreed over the administration of a regional program. While the City has agreed to settle the judgment, it appears that the disputed TUMF funds were utilized on construction projects within the City, for the benefit of the City. Any allegations of illegal activity have yet to be supported by the information provided to date. In the event that the insured substantiates losses resulting from illicit activity, it does not appear that the alleged TUMF activity was perpetrated by employees of the City of Beaumont. At this time, we have not reviewed any documentation that would indicate that any of the three ULC principals, or the GGMS principal, were employees of the City of Beaumont at any time during the TUMF program period (2004 through 2009).

The insured also named the City's attorney, Joseph S. Aklufi, as one of the seven "employees" that was party to the claimed employee dishonesty. However, it appears that Mr. Aklufi's law firm, Aklufi & Wysocki, represented the City as general counsel. We have reviewed several correspondence from Mr. Aklufi whereby he provided legal opinions as to the City's position and administration of the TUMF program. On June 30, 2017, the insured filed suit against Aklufi & Wysocki alleging malpractice for failing to appropriately supervise and protect the city with regard to the claimed losses. At this time, we have not discovered any documentation that would indicate that Mr. Joseph S. Aklufi was at any time an employee of the City of Beaumont.

The alleged TUMF scheme assumes cooperation and collusion between Alan Kapanicas, the three ULC principals, William Aylward, and Joseph Aklufi, with no oversight or mechanism of checks and balances. However, the documentation provided indicates that these individuals represent four distinct legal entities. This suggests that the insured is asserting that all parties conspired to provide a disproportionate financial benefit for one party, with no apparent benefit for the others. To date, nothing in the documentation provided substantiates any tacit agreements for mutual benefit between any of the named parties.

Based on our review of the documentation provided to date, the insured has not substantiated a theft of TUMF funds by any city employee. All indications are that in 1993, elected officials of the City of Beaumont chose to contract private firms to manage the City's financial, planning, city development, and public works functions. It appears that these contracts were approved and renewed by different mayors over the course of 10 years, prior to the implementation of the

NUFIC_001234

Ms. Jennifer Rocha
August 18, 2017
Page 15 of 28

WRCOG TUMF program in 2004, and the elected officials were aware of the apparent conflicts between the TUMF program and the City's CFD 93-1. Although the court ruled in favor of WRCOG in the civil matter, documentation reviewed to date does not substantiate a loss resulting from employee dishonesty. We leave all policy coverage for your determination.

*Urban Logic Self-Dealing:  $86,448,488*

According to the November 3, 2016 proof of loss, the insured claims $86,448,488 characterized as payments that, "were grossly inflated and made pursuant to a fraudulent embezzlement scheme beyond the TUMF scheme outlined above, including whereby Urban Logic routinely submitted false invoices that were approved by the Kapanicas Administration." It is our understanding that the claim amount is based on the reconciliation of disbursements from bond trustee accounts and the City's general ledger, prepared by the insured's consultant, Urban Futures, Inc.

As previously discussed, the Urban Futures presentation notes that the "Reconciliation work did not include forensic or investigative analysis." As such, it appears that the amounts claimed by the insured just represent all identified funds disbursed to ULC, regardless of the reason or basis for the disbursements.

To date, we have reviewed service agreements, invoices, bond requisitions, and general ledger details, all of which indicate that the insured had active and ongoing contracts for service with ULC, and that ULC invoiced the City and was paid for services rendered. To date, the insured has not identified any documentation or support to demonstrate that the invoice amounts exceeded fair market value for the noted service descriptions.

The claim amount includes $45,391,831 in bond proceeds from bond trustee accounts, and $41,056,657 from City bank accounts per the general ledger. We have analyzed the general ledger and identified the entries that make up the claim amount, as shown on Schedule 3. As shown on Schedules 3B and 3C, we have identified invoices totaling $19,014,021, dated between July 2010 and May 2015, which accounts for approximately 46.5% of the $41,056,657 disbursed by the City per the general ledger. We have not located any invoices within the documents provided that were dated prior to July 2010.

We have located what we believe to be the Urban Futures spreadsheets used as the basis for the $45,391,831 claim for bond proceeds. However, the source documents used by Urban Futures in assembling the claim schedules was not immediately apparent or easily located. We have now identified thousands of pages of bond trustee account statements and requisition packets that we believe are the basis of the claimed payments. We are in the process of analyzing the bond trustee account statements and requisitions.

As shown on Schedule 6, based on the documentation provided, disbursements to ULC out of the bond trustee accounts totals $46,420,335. However, of only $44,789,275 appears to have come from the Construction accounts, which is $602,556 less than the $45,391,831 claimed. The reason for the discrepancy is unclear at this time.

NUFIC_001235

Ms. Jennifer Rocha
August 18, 2017
Page 16 of 28

To date, we have reviewed and verified bond requisitions for 169 separate ULC invoices. Of the 169 requisitions reviewed, 56 were approved by Alan Kapanicas and Deepak Moorjani. The insured claims that approval of payments to ULC by Deepak Moorjani represents a conflict of interest, as Moorjani is a principal of ULC. However, none of the 169 requisitions were approved by a ULC principal alone. Additionally, 93 were approved solely by Alan Kapanicas, and 20 were approved by Alan Kapanicas and William Aylward. We compared the ULC invoices included with the bond requisitions to the invoices provided and did not find any duplications.

Based on the bond requisition documents that we have reviewed thus far, it appears that disbursements were made based on invoices, certifications from the vendor, and approval by Alan Kapanicas, or Alan Kapanicas and a second party. While it is our understanding that the insured contends that approval by Mr. Kapanicas represents "Self-Dealing," as previously discussed, it does not appear that Alan Kapanicas or Bill Aylward were at any time employees of ULC. Although some requisitions for payment of bond proceeds did include the signature of ULC principal, Deepak Moorjani, to date we have not located any instance where a ULC principal was the sole approver of requisitions for payment. We have not seen any indications from the insured, nor have we observed within any of the documentation reviewed to date, that Mr. Kapanicas received any type of financial benefit from ULC or its principals.

Within the voluminous documentation provided by Stradling, we identified what appear to be the original documents [HSNO Exhibit 23] relating to the issuance and sale of the district bonds in question, including the official disclosure statements and closing documents. These documents appear to explicitly disclose the use of Urban Logic Consultants as the "Project Manager" under the "Concluding Information" section, which states:

> *"The City's Public Works Director, as a principal of Urban Logic Consultants, Inc., is serving as the City's Project Engineer with respect to the District. The Project Engineer will be responsible, among other things, for engineering estimates with respect to the Project. The fees paid to the Project Engineer are contingent upon the sale and delivery of the Bonds."*
> (BEAUMONTAIG0047014)

These documents also include a "Certificate of the Project Manager," signed by a representative of Urban Logic Consultants (BEAUMONTAIG0048091).

The bond issue and closing documents include certifications by various city officials, including the Mayor, the City Clerk, and Alan Kapanicas as the City Manager. These documents also include letters of reliance and letters of opinion from bond counsel, disclosure counsel, and authority counsel. As such, it appears that the City, the trustee, bond purchasers, bond counsel, and disclosure counsel were aware and approved of the services performed by ULC with regard to the issuance of district bonds.

Based on the documentation reviewed to date, the insured has not substantiated that the invoices submitted by ULC are inflated or otherwise fraudulent. It is our understanding that ULC provided services to the City of Beaumont pursuant to a legal contract, and the City paid for those services based on invoices submitted by ULC. Based on our review of the ULC service

NUFIC_001236

Ms. Jennifer Rocha
August 18, 2017
Page 17 of 28

agreements, the City contracted UCL to provide engineering, development, public works, and project management functions. The descriptions of service noted on the invoices reviewed to date appear consistent with their contracted duties.

Additionally, we have identified documents within the Stradling production that appear to relate to the management of construction and engineering projects within the City, such as project bids, building permits, inspection forms, engineering reports, and correspondence between ULC representatives and contractors. Although we have located these documents within the six production submissions, we have not yet analyzed them in detail. However, based on a preliminary review, these documents appear to reflect the types of tasks noted in the service agreements.

As noted above, to date we have not located and analyzed all of the Urban Logic invoices and payment requisitions noted in the claim. In the event that the insured substantiates that ULC billed the City for services that were not in fact provided, or over-billed for services, it appears that this would more likely represent a contractual issue with the City's vendor, and not a theft by City employees.

*Alan Kapanicas Self-Dealing: $1,119,242*

According to the November 3, 2016 proof of loss, the insured claims $1,119,242 characterized as "false invoices" submitted through the City's vendor, General Government Management Services, of which Mr. Alan Kapanicas was the principal. It is our understanding that the claim amount is based on the reconciliation of disbursements from bond trustee accounts prepared by the insured's consultant, Urban Futures, Inc. As previously discussed, the Urban Futures presentation notes that the "Reconciliation work did not include forensic or investigative analysis." As such, it appears that the amounts claimed by the insured just represent all identified bond funds disbursed to GGMS, regardless of the reason or basis for the disbursements.

Although the claim appears to include only disbursements from the bond trustee accounts, the general ledger shows disbursements from the City totaling $1,452,503 between July 2003 and July 2011, as shown on Schedule 4. The $1,452,503 in general ledger disbursements does not appear to be claimed by the insured. As noted above, we have not as of yet located general ledger data prior to 2003.

Based on the documentation reviewed to date, it appears that GGMS was contracted to provide a multitude of concurrent tasks, some of which were paid from City funds, and some of which were paid from bond proceeds. The various GGMS Agreements for Services [HSNO Exhibit 3], indicate that GGMS was to be paid based on individual "task orders" [HSNO Exhibit 24], which would specify the specific services to be performed, and the compensation for those services.

It appears that each version of the GGMS Agreement includes the same three task orders, designated Task Order No. 1, No. 2, and No. 3, with a single instance of Task Order 1A, which appears to represent a change in Task Order No. 1 compensation. Task Order No. 1 and Task Order No. 2 appear to specify duties related to City operations, for which GGMS was to provide

NUFIC_001237

Ms. Jennifer Rocha
August 18, 2017
Page 18 of 28

a monthly or semi-monthly invoice.  Task Order No. 3 appears to relate to duties specifically associated with the CFD's and bond financing, for which GGMS would be paid out of "special funds," which may relate to the district bond proceeds.

The 1996 Agreement included Task Order No. 1, No. 2, and No. 3.  The first two task orders are dated February 27, 1996, the same date the Agreement was executed, and were signed by Janice Leja as Mayor.  The third task order was signed July 16, 1996 by Roger Berg as Mayor Pro Tem.

As with the 1996 Agreement, the 1998 agreement included three task orders, again numbered No. 1, No. 2, and No 3.  All three are dated November 11, 1998, the same date the Agreement was executed, and all three were signed by Janice Leja as Mayor.

Also pursuant to the November 1998 Agreement, Task Order No. 1A was signed on June 19, 2003, this time by Brian DeForge as Mayor.

The December 2005 Agreement also included Task Orders No. 1, No. 2, and No. 3.  All three task orders are dated December 22, 2005, the same date the Agreement was executed, and signed by Larry Dressel as Mayor.

Task Order No. 1 named Alan Kapanicas as the City Manager and Deputy Clerk of the City of Beaumont, effective April 3, 1996, compensated at $3,250 per month, billed monthly or semi-monthly, plus expenses.  The 1996 and 1998 versions appear to be identical.  Task Order No. 1A, signed in 2003, increases compensation from $3,250 per month to $5,650 per month.  Under the December 2005 Agreement, compensation for Task Order No. 1 remains at $5,650 per month.  However, in addition to City Manager and Deputy Clerk, the 2005 version of Task Order No. 1 names Alan Kapanicas as the Executive Director and Secretary of the Beaumont Redevelopment Agency, Beaumont Financing Authority, and Beaumont Utility Authority.

Task Order No. 2 named Alan Kapanicas as the Administrative Services Directory, effective April 3, 1996, compensated at $4,350 per month, billed either monthly or semi-monthly, plus expenses.  The task order states that services to be performed include personnel, purchasing, finance, and workers' compensation services.  The 1996, 1998, and 2005 versions of the task order appear to be identical, with the exception of a 2005 increase in compensation from $4,350 per month to $4,950 per month.

To date, we have not discovered any Agreements subsequent to the one executed in December 2005.[7]  As such, it appears that the terms of the 2005 Agreement remained in effect until Alan Kapanicas was hired as City Manager by the City in June of 2011.

Based on our review of Task Order No. 1 and No. 2, it appears that from 1996 through 2005, Alan Kapanicas and GGMS were contracted to perform the functions of City Manager, Deputy

---

[7] We identified one Amendment to the 2005 contract, which was executed on January 5, 2005.  However, it appears that this amendment only adds requirements for a drug and alcohol testing, background checks, training requirements, compliance, and indemnification, and does not substantively change the terms of service of the Agreement.  Please refer to **HSNO Exhibit 3**.

NUFIC_001238

Ms. Jennifer Rocha
August 18, 2017
Page 19 of 28

Clerk, and Administrative Services Director, and from late 2005 through June 2011, to perform the functions of City Manager, Deputy Clerk, Administrative Services Director, and Executive Director and Secretary of three City agencies.

To date, we have not located any of the invoices that GGMS billed for the services noted on Task Order No. 1 or Task Order No. 2. However, invoices may be included in the voluminous Stradling documents yet to be reviewed. Based on a preliminary analysis of the limited general ledger data (identified to date), the City made semi-monthly disbursements to GGMS, which appear to be in line with the amounts noted on the task orders. Our analysis of disbursements to GGMS is ongoing.

Where Task Order No. 1 and No. 2 appear to relate to the operations of the City, it appears that Task Order No. 3 relates to the special districts and bond financing. Task Order No. 3 states that the following tasks are to be performed:

> *"GGMS shall provide professional services in support of the special district, as approved. Services include, but are not limited to, assisting with CFD 93-1, AD 83-1, sewer studies, special financing, and other special assignments. These services are in addition to services provided under prior Task Orders."*

The task order also states that compensation for services pursuant to Task Order No. 3 is to be based on approved work orders, and that funding is "from special purpose funds, and will have no impact on the general fund of the City." Based on this language, it appears that the noted disbursements from the bond trustee accounts may relate to the Task Order No. 3.

We have performed a preliminary analysis of the bond trustee disbursements noted in the proof of loss exhibits and work papers, as shown on Schedule 4A. Where the insured claims disbursements in the amount of $1,119,242, based on our preliminary analysis, the consultant's work papers actually show disbursements to GGMS totaling $1,119,742. The difference of $500 is unclear at this time.

To date, we have identified several bond requisitions for payment to GGMS. However, we have not yet located requisitions for all of the noted disbursements. Based on the requisitions reviewed to date, it appears that each requisition packet submitted to the bond trustee includes a letter from Alan Kapanicas, a signed requisition certificate, a signed payment certificate, a signed contractor certificate, schedule summarizing payment activity, and an invoice from GGMS. Please refer to [HSNO Exhibit 25] for an example.

Within the voluminous documentation provided by Stradling, we identified what appear to be the original documents [HSNO Exhibit 23] relating to the issuance and sale of the district bonds in question, including the official disclosure statements and closing documents. These documents appear to explicitly disclose the use of General Government Management Services as Special Tax Consultant under the "Professional Services" section, and the "Concluding Information" section, which state:

NUFIC_001239

Ms. Jennifer Rocha
August 18, 2017
Page 20 of 28

> *"A certificate from General Government Management Services to the effect that (i) the Special Tax if applied in accordance with the terms as set forth in each of the Rates and Methods of Apportionment of Special Tax for Improvement Area No. 9, Improvement Area No. IOA, Improvement Area No. 12A and Improvement Area No. 14A, respectively, will annually yield sufficient revenue to make timely payments of debt service…"* (BEAUMONTAIG0046876)

> *"The City Manager, as the principal of General Government Management Services, is serving as the District's Special Tax Consultant with respect to the Improvement Areas. The Special Tax Consultant, among other things, will be responsible for preparing a cash flow certificate showing that sufficient Special Taxes will be available to pay debt service on all District Bonds. Fees paid to the Special Tax Consultant are contingent upon the sale and delivery of the Bonds."* (BEAUMONTAIG0047014)

These documents also include several certifications signed by Alan Kapanicas in his various capacities in the City. For example, documents relating to the issue of 2003 Series A bonds include the following documents signed by Alan Kapanicas:

- **Certificate of Secretary of the Governing Board Beaumont Financing Authority**, signed as Secretary of the Beaumont Financing Authority (BEAUMONTAIG0047970)

- **Tax Certificate**, signed on behalf of the Beaumont Financing Authority as Executive Director of the Beaumont Financing Authority, on behalf of CFD 93-1 as City Manager, and on behalf of the City of Beaumont as City Manager (BEAUMONTAIG0047997)

- **Cash Flow Certificate**, signed on behalf of General Government Management Services as President (BEAUMONTAIG0048007)

- **Certificate of the District**, on behalf of CFD 93-1 as City Manager (BEAUMONTAIG0048018)

- **Certificate of Special Tax Consultant**, signed on behalf of General Government Management Services as President (BEAUMONTAIG0048)

The bond issue and closing documents also include certifications by various city officials, including the Mayor and the City Clerk, as well as letters of reliance and opinion from bond counsel, disclosure counsel, and authority counsel. As such, it appears that the documents relating to the issuance and sale of district bonds, which clearly disclosed the various roles of GGMS and Alan Kapanicas, were reviewed by and approved by the Mayor, Bond Counsel, and Disclosure Counsel. Based on the documentation reviewed to date, there is no indication that any issues or objections were raised with regard to a conflict of interest.

Based on the documentation reviewed to date, the insured has not substantiated that the invoices submitted by GGMS are inflated or otherwise fraudulent, nor has the insured substantiated that disbursements to GGMS from bond proceeds were not earned or represent a conflict of interest. It appears that Alan Kapanicas, operating as GGMS, provided a multitude of services to the City of Beaumont, pursuant to a legal contract and associated task orders. It also appears that the City paid for those services based on invoices submitted by GGMS, either from the general fund or from bond trustee accounts.

NUFIC_001240

Ms. Jennifer Rocha
August 18, 2017
Page 21 of 28

Additionally, within the documentation reviewed to date, we have observed documents that appear to support that Alan Kapanicas was performing the tasks noted on the various task orders, including the preparation of reports as special tax consultant, and the preparation and issuance of special tax liens, which appear to relate to Task Order No. 3. Although we have located these documents within the six production submissions, we have not yet analyzed them in detail.

Although it appears that Alan Kapanicas did sign requisitions for payment to GGMS, this could be viewed as consistent with his duties as Administrative Services Director, as per Task Order No. 2. As such, the City would be well aware of this activity. As noted above, the claim includes only the funds disbursed to GGMS from the bond trustee accounts. According to the consultant's schedules, the latest disbursement of bond proceeds to GGMS was on June 18, 2009, two years prior to Alan Kapanicas becoming an employee of the City. As such, it appears that all of the claimed disbursements occurred during the timeframe that Alan Kapanicas was contracted to the City through GGMS, and not while he was a City employee.

In an August 18, 2016 article in the Press Enterprise[8], Mr. Kapanicas's attorney notes that Mr. Kapanicas was not an employee of the City, stating:

> "Gregory H. Kassel, an attorney for Kapanicas, contends in a filing that Kapanicas cannot be charged with embezzlement because he was "neither an officer for city of Beaumont nor a person of heightened fiduciary duties during the time of the alleged crimes." Instead, he was an "independent consultant'' for the city through his business, General Government Management Services."

As noted above, to date, we have not located and analyzed all of the GGMS invoices and payment requisitions noted in the claim. In the event that the insured substantiates that GGMS billed the City for services that were not in fact provided, or over-billed for services, it appears that this would more likely represent a contractual issue with the City's vendor, and not a theft by City employees.

*William K. Aylward, CPA Self-Dealing: $165,300*

According to the November 3, 2016 proof of loss, the insured claims $165,300 characterized as "false invoices" submitted through the City's vendor, William K. Aylward, CPA. It is our understanding that the claim amount is based on the reconciliation of disbursements from bond trustee accounts prepared by the insured's consultant, Urban Futures, Inc. As previously discussed, the Urban Futures presentation notes that the "Reconciliation work did not include forensic or investigative analysis." As such, it appears that the amounts claimed by the insured just represent all identified bond funds disbursed to William K. Aylward, CPA, regardless of the reason or basis for the disbursements.

---

[8] Danelski, David and Wesson, Gail. "Here's How to Make Sense of Beaumont's Corruption Case." The Press Enterprise August 18, 2016. www.pe.com. Web. Jul. 11, 2017. Refer to HSNO Exhibit 20.

NUFIC_001241

Ms. Jennifer Rocha
August 18, 2017
Page 22 of 28

Although the claim appears to include only disbursements from the bond trustee accounts, the general ledger shows disbursements from the City totaling $277,170 between July 2003 and July 2011, as shown on Schedule 5. The $277,170 in general ledger disbursements does not appear to be claimed by the insured. As noted above, we have not as of yet located general ledger data prior to 2003.

We have performed a preliminary analysis of the bond trustee disbursements noted in the proof of loss exhibits and work papers. Where the insured claims disbursements in the amount of $165,300, based on our preliminary analysis, the consultant's work papers actually show disbursements to William K. Aylward, CPA totaling $166,950, as shown on Schedule 5A. The difference of $1,650 appears to relate to Bond Expense disbursements, which were not claimed.

Based on the documentation reviewed to date, it appears that William K. Aylward, CPA was an independent Certified Public Accountant providing accounting and finance services to the City. Thus far, we have not discovered any contracts or correspondence officially engaging Mr. Aylward for accounting services. However, according to the consultant's schedules, the earliest disbursement of bond proceeds was on September 26, 1996.

As noted above, documentation reviewed to date [HSNO Exhibit 7] indicates that William Aylward was hired by the City as Finance Director and Bond Finance Accountant on July 16, 2008. The last disbursement of bond proceeds was July 17, 2008 for an invoice dated July 9, 2008, prior to William Aylward becoming a City employee.

With regard to the disbursements from the general ledger, we have reviewed only a small sample of invoices which note a description of "For Professional Services Rendered." To date, we have not located detailed billing backup, which we would expect from a CPA firm. We found that the disbursements from the general ledger appear to be consistent and repetitive, totaling approximately $3,329 per month broken out into separate $1,800 and $1,519 disbursements, which may represent an agreed upon amount.

Within the Stradling production reviewed to date, we have observed documents that appear to indicate the types of tasks performed by Mr. Aylward, including preparation of financial statements, bank reconciliations, and communication with auditors, payroll, and the like. We also note that William Aylward, along with Alan Kapanicas, signed bond requisition payment certificates for payments to ULC. Although we have located these documents within the six production submissions, we have not yet analyzed them in detail.

To date, we have identified only three bond requisitions for payment to William K. Aylward, CPA. The requisitions packets reviewed to date include a letter from Alan Kapanicas, a requisition certificate signed by Alan Kapanicas, a payment certificate signed by Alan Kapanicas and Deepak Moorjani, a contractor certificate signed by David Dillon, a certificate summary, and an invoice from William K. Aylward, CPA. None of the three requisitions were signed by William Aylward himself. Please refer to [HSNO Exhibit 26] for an example.

Unlike the invoices for payment from the general fund, the invoices included with the bond requisitions provide slightly more detail; for example, "Reviewing, summarizing and recording

NUFIC_001242

Ms. Jennifer Rocha
August 18, 2017
Page 23 of 28

of 2005B bond transactions for the five months ended October 31, 2005." The noted invoice is for a lump sum of $1,000, and does not include the number of hours spend performing the described tasks.

Based on the documentation reviewed to date, the insured has not substantiated that the invoices submitted by William K. Aylward, CPA are inflated or otherwise fraudulent, nor has the insured substantiated that disbursements to William K. Aylward, CPA from bond proceeds were not earned or represent a conflict of interest. Disbursements appear to have been based on an invoice, and authorized by Alan Kapanicas and Deepak Moorjani, not William Aylward.

However, as noted above, to date, we have not located and analyzed all of the invoices and payment requisitions noted in the claim, which may have yet to be located within the Stradling production. According to the consultant's schedules, the last disbursement of bond proceeds to William K. Aylward, CPA was for services rendered prior to Mr. Aylward becoming an employee of the City. In the event that the insured substantiates that Mr. Aylward billed the City for services that were not in fact provided, or over-billed for services, it appears that this would more likely represent a contractual issue with the City's vendor, and not a theft by City employees.

### William K. Aylward, CPA Additional Self-Dealing:  $96,508

Based on the proof of loss, the insured claims $96,508 characterized as additional self-dealing related to ownership interests of Mr. William K. Aylward. According to the proof of loss, Mr. Aylward, while acting as the City's Finance Director, maintained an ownership interest in property leased by two businesses, Cherry Valley Automotive and Beaumont Tire. On occasion, the City paid for services rendered from these two businesses. The insured contends that this relationship represents a conflict of interest.

According to the general ledger, disbursements to Beaumont Tire and Cherry Valley Automotive began in May 2006, and continued through June 2015. During this timeframe, disbursements to Cherry Valley Auto totaled $447,860, and disbursements to Beaumont Tire totaled $84,370. The proof of loss states that the claim amount is based on payments to the two vendors from March 1, 2014 through February 28, 2016. According to the general ledger, payments during this timeframe totaled $97,988. The basis for the claim of $96,508 is unclear.

The insured's exhibits to the November 3, 2016 proof of loss include a sample of 21 invoices from Cherry Valley Automotive, which are mostly illegible. However, it appears that the invoices were for routine service on police vehicles. The insured has not asserted that the City was overcharged for these services, only that a conflict of interest may exist because William Aylward owns 40% of the building that leases space to these companies.

Based on the insured's explanation in the proof of loss, Cherry Valley Automotive and Beaumont Tire are owned 100% by Mr. Don Kiker. However, the building that leases to the two companies is owned by a general partnership, with Don Kiker owning 60% and William Aylward owning 40%. The insured has not asserted that payments were made by the City to the general partnership.

NUFIC_001243

Ms. Jennifer Rocha
August 18, 2017
Page 24 of 28

Based on the documentation reviewed to date, it appears that Mr. Aylward disclosed his
ownership interest in the property that houses Beaumont Tire and Cherry Valley Automotive.
According to the City's conflict of interest policy, employees and contractors are required to file
statements disclosing economic interest in the following:

- Investments and interests in real property situated within the City (except your
  principal residence)

- Business positions in business entities situated within the City, doing business in the
  City, and/or doing business with the City

- Investments and interests in business entities situated in the City, doing business in the
  City, and/or doing business with the City

We have identified what appear to be audit work papers prepared by the City's independent
auditor, Moss, Levy, & Hartzheim LLP ("MLH"), from 2010, 2011, 2012, 2013, and 2014, and a
California Form 700 dated January 26, 2015, which indicate that Mr. Aylward filed the
appropriate disclosure forms in accordance with the City's conflict of interest policy [HSNO
Exhibit 27].

Footnotes to the 2013 MLH audit papers state, "Examined Form 700 to ensure all members
within the City who were required to file Form 700 did file it for FY 11-12. MLH obtained
vendor list as of 2/21/13 and compared it to Form 700, for any business or rental property
appears on the Form 700. Noted the real property owned by the Finance Director (655 E. 5th St,
Beaumont) was listed on vendor list for a business (Beaumont Tire). Annual amount expensed
by the City for Beaumont Tire in FY 11-12 was immaterial (around $10k, see TF-14 for details)."

Based on our preliminary review of these documents, it is unclear how the relationship between
Mr. Aylward's tenants and the City represents a conflict of interest. As noted above, the
insured has neither asserted, nor provided documentation indicting that they were overcharged
for services, or charged for services that were not necessary.

_Concealed Deficit in General Fund and Wrongly Diverted General Funds_

The insured also claims $7,471,429 characterized as a "fraudulently concealed deficit in the
general fund," and $6,517,519 characterized as "unallowable transfers" from the Beaumont
Redevelopment Agency to the City. With regard to the claimed $7,471,429, the proof of loss
states, "This deficit, which violates the California Constitution's requirement of a balanced
budget, appears to have been concealed by Kapanicas, Aylward and Aklufi…" Exhibits to the
proof of loss indicate that the claimed $7,471,429 was an estimate as of June 17, 2016. To date,
we have not located financial statements for the fiscal year ended June 30, 2016. As such, this
may not represent any actual deficit as of the date of the proof of loss.

We have reviewed the City of Beaumont Audited Financial Statements for fiscal years 2008
through 2014. For each year from 2011 through 2014, the opinion of the independent auditor,
MLH, includes commentary addressing the deficit in the general fund [HNSO Exhibit 28]. The

NUFIC_001244

Ms. Jennifer Rocha
August 18, 2017
Page 25 of 28

deficit also appears in the notes to the financial statements. In the 2013 and 2014 audit report, the deficit was included as an emphasis matter, which stated, "These conditions raise substantial doubt about its ability to continue as a going concern."

According to the 2011 through 2014 MLH audit reports, the City did not provide Management's Discussion and Analysis. The following paragraph was included in the MLH audit report for each of the noted years:

> "Management has omitted the Management's Discussion and Analysis that accounting principles generally accepted in the United States of America require to be presented to supplement the basic financial statements. Such missing information, although not part of the basic financial statements, is required by the Governmental Accounting Standards Board, who considers it to be an essential part of financial reporting for placing the basic financial statements in an appropriate operational, economic, or historical context."

As part of the notes to the 2013 and 2014 audited financial statements, the City provided a response to the notes regarding the financial condition of the City and the general fund deficit. The response states that, "The City is aware of the deficit unassigned fund balance and has implemented a hiring freeze over the last year along with analyzing all expenditures with department heads." The response does not reference any conflict of interest or ongoing fraud. The independent auditor's reports were addressed to the Members of the City Council of the City of Beaumont. As such, it does not appear that the deficit was concealed by Alan Kapanicas, or any other contractor or employee.

The $6,517,519 is based on a March 2015 Asset Transfer Review conducted by the California State Controller, included with the insured's proof of loss [HNSO Exhibit 29]. Based on our review of the State Controller's report, it appears that in 2011, the State of California passed a law ordering all Redevelopment Agencies ("RDA") to be dissolved, and the assets of the Agency transferred to a Successor Agency. According to the State Controller's report, between January 1, 2011 and January 31, 2012, assets totaling $6,517,519 were transferred from the Beaumont Redevelopment Agency to the City of Beaumont.

According to the new law, transfers of assets from the RDA were only permitted if they were contractually committed to a third party prior to June 28, 2011. The State Controller determined that the City of Beaumont was not a third party, and that the transfers were in violation of the 2011 law. The State Controller ordered that the funds be turned over to the Successor Agency.

The City argued that the City of Beaumont is a third party as defined by the law, and that it has been treated as a third party since the inception of the RDA in 1993. The City also argued that the payments were not "asset transfers" but interest payments on pre-existing loans and advances made pursuant to a Master Loan Agreement, and an impairment of the Master Loan Agreement would constitute an unlawful taking of the City's lawful receipt of loan repayments.

The State Controller did not accept the City's argument, and ordered the $6,517,519 to be turned over to the Successor Agency. However, according to an October 18, 2016 review by the State

NUFIC_001245

Ms. Jennifer Rocha
August 18, 2017
Page 26 of 28

Controller, the Successor Agency entered into a repayment plan for $2,281,846, leaving only $4,235,674 to be turned over. This was not accounted for in the claim.

To date, we have not located or reviewed account statements or records of the transfers from the Redevelopment Agency to the City, or to the Successor Agency. However, based on the City's response to the State Controller's report, it appears that these types of transfers were normal and ordinary dating back to 1993. It is our understanding that the City, the Redevelopment Agency, and the Successor Agency are related parties, and the transfers represent the moving of assets from one City fund to another.

Based on the documentation provided to date, it appears that the deficit in the general fund was an ongoing issue that was reported to the City Council over several years by the independent auditors, and the transfer of assets from the RDA to the City is still under the control of the City. As such, the insured has not substantiated that general fund deficit or the RDA transfers constitute a theft of funds by a City employee.

**Summary**

Our analysis of the claim and documentation provided to date is ongoing. Based on our preliminary analysis of the focused sample of the documentation provided (approximately 10%), the insured has not substantiated any of the claimed $159,702,461. Our comments in this matter are preliminary and tentative, based on our understanding of facts and circumstances presented in the documentation reviewed to date. We defer to AIG regarding all policy interpretation and application of coverage.

According to the November 3, 2016 proof of loss, the $159,702,461 represents a financial loss resulting from "Employee Dishonesty," "Other Fraud," "Dishonesty," or "Other Corruption." The insured has attempted to paint a picture of collusion and corruption among a group of City officials, characterized repeatedly in the proof of loss as the "Kapanicas Administration."

In stark contrast, the documentation reviewed to date indicates that Alan Kapanicas was an independent consultant contracted by the elected City officials to perform a multitude of administrative duties. The City also contracted an engineering consulting firm, Urban Logic Consultants, to perform engineering, public works, development, and project management duties. In fact, there was never a "Kapanicas Administration." Rather, the City engaged a team of several independent consultants tasked with establishing a financing and development program to expand the City's infrastructure and tax base.

This program would become the 1993 Comprehensive Public Facilities Financing Program, and Community Facilities District 93-1. Under the CFD program, the construction of public facilities would be financed through the sale of bonds, the interest on which would be paid through the collection of special taxes. However, in 2004 the City's officials passed a resolution to join the regional TUMF program administered by WRCOG. It appears that the conflict between the City's CFD program and TUMF was a known problem from the onset. A December 2004 news

NUFIC_001246

Ms. Jennifer Rocha
August 18, 2017
Page 27 of 28

article[9] reported on cities, including Beaumont, Banning, and Calimesa, waiving TUMF fees for contractors with existing development agreements.

The TUMF Ordinance passed by the City include an exception for "Development Projects which are the subject of a Public Facilities Development Agreement," and credits for TUMF facilities constructed by the City in a "recognized benefit district." The City's administration of the TUMF program, in accordance with the Ordinance passed by the elected officials, ultimately resulted in civil judgment for $57,803,795, which the City now claims represents embezzlement by the consultants that the City hired to administer the program.

However, the documents reviewed to date, including news articles, City Ordinances, City Council meeting minutes, and correspondence indicate that the elected City officials were well aware of the ongoing dispute with WRCOG, and participated in the administration of the TUMF program in Beaumont. The former Mayor of Beaumont, Roger Berg, explained the City's use of the consultants in a May 18, 2016 Press Enterprise article[10], which states:

> The men, Berg said, simply followed a debt-financing plan approved by the City Council that was needed to accommodate explosive growth and modernized what had been the city's crumbling roads, and water-delivery and sewage systems.
>
> And the plan worked, he said. Beaumont grew responsibility and now has a larger tax base.
>
> Berg acknowledged that Kapanicas and Urban Logic officials advised the City Council about when to issue bonds and how much should be borrowed, knowing that their companies would later earn fees from the bond proceeds.
>
> Berg compared the situation to getting advice from an attorney about whether to pursue a lawsuit, knowing that the lawyer stood to make more money later by litigating the lawsuit.
>
> "They made money," Berg said of the bond work. "But they worked hard for it. They earned it."
>
> He said using consultants as Beaumont city administrators was part of a larger effort to run the city like a business, which cut the city's personnel costs and prevented employee layoffs during hard economic times.

With regard to the payments to ULC, GGMS, and William Aylward, it appears that the insured is claiming any payment made to the vendors as a financial loss to the City. The proof of loss includes terms such as "self-dealing" and "conflict of interest," and states, "the payment of over $86 million to Urban Logic Consultants ("Urban Logic"), which obtained contracts without a required competitive bidding process." However, the contracts that we reviewed were signed

---

[9] Moore, Steve and Marriott, Karin. "Road Fees: Beaumont, Banning, and Calimesa Officials Say the Funds Were Not Waived." *The Press Enterprise* Dec. 8, 2004. www.pe.com. Stradling Bates Number BEAUMONTAIG0020158. Refer to HSNO Exhibit 20.
[10] Danelski, David. "Beaumont: How City Officials Allegedly Tapped Millions in Bond Funds." The Press Enterprise May 18, 2016. www.pe.com. Web. Dec. 6, 2016. Refer to HSNO Exhibit 20.

NUFIC_001247

Ms. Jennifer Rocha
August 18, 2017
Page 28 of 28

by elected City officials.  If in fact the required competitive bidding process was bypassed, the failure was on the part of the City officials who hired the contractors, not the contractors.

As these claims stem from the criminal charges against the seven individuals named in the proof of loss, it appears that the insured equates the allegations of wrongdoing with a financial loss to the City.  While the State may ultimately prove that the actions of the seven defendants satisfy the elements of California criminal statutes, those actions do not necessarily represent a covered financial loss to the City of Beaumont.

It is unclear, based on this preliminary analysis, whether or not any of the claimed vendor billings were fraudulent or inflated, as asserted in the proof of loss.  However, it does not appear that the insured has made any attempt to differentiate legitimate payment for services rendered from the alleged fraudulent billings.

In addition to the claim areas noted above, the proof of loss notes an undetermined amount for "Interest Losses Related to Misdealing Identified by the District Attorney," which we understand relates to charges for "Misuse of a Resale Permit."  Although, Alan Kapanicas and William Aylward were charged with misusing the permit, the application for the resale permit was signed by City Council Member W.M. Killough and Mayor Brian DeForge, as well as Alan Kapanicas (BEAUMONTAIG0281270-0281271).

Based on the documentation reviewed to date, all indications are that six of the seven individuals named as "former employees" were in fact independent contractors, and not employees of the City of Beaumont during the time that the City participated in the TUMF program.  Of the seven "former employees" named in the proof of loss, it appears that only Chief of Police Francis Coe was an actual employee, and Mr. Coe was not implicated in the alleged TUMF scheme, self-dealing/conflict of interest schemes, or general fund deficit scheme.

Whether these preliminary findings constitute a covered cause of loss under another area of coverage we leave for your determination.  As previously stated, our analysis is preliminary, tentative, and ongoing, and as such subject to revision as new information becomes available. We have updated our document request lists, which is included for your review.

We have enjoyed being of service to you and hope the enclosed accounting information will be of assistance to you in the adjustment of this claim. If you have any questions or require any additional information, please do not hesitate to contact us.

Very truly yours,

**HAGEN, STREIFF, NEWTON & OSHIRO, ACCOUNTANTS, P.C.**
By:    Peter Fogarty, CPA, CFE, CFF
         David Gardiner, CPA

NUFIC_001248





May 15, 2019

**VIA EMAIL**
Ms. Jennifer Rocha
Complex Claims Director
AIG Property Casualty
175 Water Street
New York, NY 10038
Jennifer.Rocha@aig.com

Re:     Insured - City of Beaumont, California
        Employee Theft Claim
        Date of Discovery – May 17, 2016
        AIG Claim Number – 3409580528US
        HSNO File Number – 10022193
        **Supplemental Report**

Dear Ms. Rocha:

This correspondence will serve to provide you with the status of our evaluation to date regarding the claims made by the City of Beaumont, California, for employee dishonesty, other fraud, and corruption. Previously, it was our understanding that the insured claimed losses totaling $159,702,461 based on a sworn proof of loss prepared and submitted by the insured's representative, Stradling, Yocca, Carlson, & Rauth, P.C. ("Stradling"). Subsequent to our August 18, 2017 status report, we received a report prepared by the insured's forensic accountants, Hemming Morse, LLP ("Hemming Morse/HM") along with additional documentation submitted by the insured's representative, Best, Best & Krieger LLP ("BBK").

Based on our analysis of the noted Hemming Morse report, it appears that the insured has abandoned many aspects of the original claim of $159,702,461, including the $57,803,795 related to the TUMF judgment, $96,508 in Additional Aylward Self-Dealing, $7,471,429 in the Concealed General Fund Deficit, and $6,517,519 in Wrongly Diverted General Funds. The Hemming Morse report appears to focus on the $86,448,488 in Urban Logic Self-Dealing and the $1,364,542 in Kapanicas and Aylward Self-Dealing, with no mention of Mr. Aylward and only a brief summary of disbursements from the City to Mr. Kapanicas.

The analysis performed by Hemming Morse appears to focus on Urban Logic Consultants (ULC) billing the City for professional subcontractor services in excess of the alleged limits imposed by the 1993 and 1994 service contracts and related amendments. This allegation of overbilling was not asserted as part of the Stradling proof of loss.

Atlanta | Boston | Chicago | Dallas | Houston | Jersey City | London | Los Angeles | Mexico City | New York City
Newport Beach | Oakland | Philadelphia | Providence | Sacramento | Salt Lake City | San Francisco | Seattle | Stamford

647 Putnam Pike | Greenville, Rhode Island 02828 | Phone: (401) 949-8001 | www.HSNO.com

NUFIC_003038

Ms. Jennifer Rocha
May 15, 2019
Page 2 of 12

## Analysis of Hemming Morse Report

As part of our assignment, counsel asked us to review the September 25, 2018 report of Daniel Ray, Partner - Hemming Morse, LLP.  The report conclusions were as follows:
- ULC received at least $75 million dollars from the bond trustee and the City
- The amount received appears to be driven in significant part by the extraordinary markup on the third-party invoices which were included in the ULC invoices
- The markup percentages appear to be completely inconsistent with the 1993 original contract between ULC and the City which allowed only a 15% markup
- The analysis performed to date strongly indicates that the amount of funds received by ULC far exceeds the allowed cap of 4.5% of incurred construction costs.

The report covers the periods between 1993 and August 2012.  It was noted that ULC was sold in mid-August 2012 and therefore very little analysis was done of the ULC invoicing to the City subsequent to that date.  The HM report relies to a great extent on their interpretation of the 1993 vendor contract between ULC and the City as the basis for their conclusion that ULC overcharged the City on third-party invoices.  We were not provided with ULC billing information subsequent to August 2012 necessary to ascertain whether the new owners of ULC (Torcal, LLC, Kieran McKiernan) continued to bill the City in the same fashion as their prior owners (Dillon, Egger and Moorjani) but see our additional analysis below.

Hemming Morse asserts that based on a billing cap of 4.5% of approximately $177,809,377 in capital improvement expenditures, ULC should not have billed the City more than approximately $8,000,000.  However, based on our analysis of the service agreements between ULC and the City, it appears that Hemming Morse has incorrectly applied the noted 4.5% limit.

Hemming Morse goes on to state that " ... ULC and its owners were compensated for certain services that were not limited to the 4.5% cap... for capital improvement work".  In addition, they "estimate" that 25% of the funds paid to ULC were not subject to the 4.5% cap.  They did not provide any basis for the 25% "estimate," nor have they provided any support as to exactly what constituted the Time and Material services that were to be supplied by ULC that may have fallen within the 4.5% cap.

On page 6 of the Hemming Morse report they note that ULC, under the ownership of Kieran McKiernan, was paid $12.2 million dollars between September 2012 and June 2015.  The following table summarizing the payments to the original three ULC principals and the new owner, Mr. Kieran McKiernan, is excerpted from the Hemming Morse report.

Payments to ULC

|  | Bond Funds | Beaumont Funds | Total |
|---|---|---|---|
| Original Principals | $42,500,000 | $34,600,000 | $77,100,000 |
| Kieran McKiernan | 4,500,000 | 7,700,000 | 12,200,000 |
| Total | $47,000,000 | $42,300,000 | $89,300,000 |

NUFIC_003039

Ms. Jennifer Rocha
May 15, 2019
Page 3 of 12

Applying Heming Morse's contention that all ULC payments are limited to 4.5% of all City of Beaumont project costs, the payments to ULC during Mr. McKiernan's ownership would equate to over $271 million dollars of incurred capital costs ($12.2 million divided by 4.5% = $271 million dollars). Therefore, it appears that ULC continued to bill the City at rates far in excess of 4.5% of incurred construction project costs. If the City was in fact billed by ULC at their standard rates for work done by Subcontractors subsequent to August 2012, we would question how accurate HM's interpretation of the terms of the 1993 contract really are?

We note that the Hemming Morse report also mentions that ULC was subject to a limitation of billing the City no more than 15% above the actual costs of any subcontractor costs. It seems inconsistent that there would be a cap on the billing of subcontractor's fees and that those same subcontractor costs would also be subject to an overall 4.5% cap on any capital improvement work. The Hemming Morse analysis fails to separate out what portion of the ULC bills were from subcontractors, verses from Time and Materials performed solely by ULC employees.

This appears to be a contract dispute between the City and ULC regarding their respective interpretations regarding which projects were subject to the 4.5% billing cap and whether or not contractors who provided services to the City under the direction of ULC could be billed out at the approved ULC rates or were limited to 115% of their billed costs to ULC.

The Hemming Morse report (page 2) notes that " ... ULC was retained by the City of Beaumont to serve as consultants in connection with the approved capital improvement projects". The Hemming Morse report goes on to refer to ULC as "consultants" on a number of occasions within their report. The agreements referred to by Hemming Morse repeatedly refer to ULC as "CONSULTANTS". We raise this issue to point out that if the City's forensic accounting expert has concluded that ULC were "consultants" to the City, it's unclear how they could also have been employees of the City as maintained in other sections of the Hemming Morse report.

We reviewed service agreements and amendments dated March 22, 1993 (LOC5-000635 to 000643), September 27, 1993, April 11, 1994 (LOC5-001296 to 001311), and April 2, 1994 (LOC5-000013). The September agreement appears to be the contract, with its various amendments, referenced by Hemming Morse as the basis for their analysis of the purported overbilling. The March 1993 agreement was signed, but the September 1993 version reviewed by HSNO is noted as "Original" and was not executed. However, the amendment dated April 11, 1994, which references the September 1993 agreement, was executed. As such, it appears that the September 1993 agreement was in force. Both the September 1993 Agreement and April 1994 amendment were included as Exhibit 8 to our August 18, 2018 preliminary status report.

Although Hemming Morse estimates that approximately 25% of capital expenditures would not be subject to the 4.5% cap, it is unclear how they arrived at this estimate. Based on our review of the various Agreements, it appears that the 4.5% cap relates only to "Plan Checking and Construction Inspection" and "Public Works Construction Management" (Section V). However, the services to be performed for the City by ULC ranged from five to eight different categories of services that included over 90 different functions that often changed from one agreement to the next, as summarized in the following table:

NUFIC_003040

Ms. Jennifer Rocha
May 15, 2019
Page 4 of 12

| Agreement Section | | Noted Compensation | No. of Functions |
|---|---|---|---|
| I. | Planning Services | Included in $15,000 per month lump sum | 24 Functions |
| II. | Economic Development Services | Included in $15,000 per month lump sum | 11 Functions |
| III. | Review of Development Services Functions | Included in $15,000 per month lump sum | 18 Functions |
| IV. | Public Works and Engineering Services (1) | Included in $15,000 per month lump sum | 4 Functions |
| V. | (A & B) Plan Checking and Construction Inspection (1) | T&M subject to limit of 4.5% of confirmed construction cost of the public improvements to be constructed | 2 Functions |
| V. | (V-1) Public Works  (1) Construction Management | T&M subject to limit of 4.5% of bid price awarded by the City for each project | 21 Functions |
| VI. | Facilities, Records and Support Personnel | Silent as to compensation | 1 Function |
| VII. | Additional Services | Hourly rate per Rate Schedule or negotiated fixed fee - Not subject to any limits | 11 listed, but not limited to list |
| VIII. | Fee Collection (1) | Silent as to compensation | 1 Function |

Note:
  (1)  Not part of the March 1993 Agreement.

Compensation for the noted service categories appears to be governed by Section IX of the 1993 agreement. Both Section V and Section IX were updated by the April 1994 amendment as well as subsequent amendments. The following are excerpts from the September 1993 agreement and April 1994 regarding Section V and Section V.1, as amended:

*V. Plan Checking and Construction Inspection* (**Original September 1993 Agreement**)

*The CONSULTANT shall provide all necessary plan checking and inspection services for public works projects in the City of Beaumont as follows:*

*V-A. Plan Checking*

*On behalf of the City, ULC, under the direction of the Director of Public Works, shall review the plans prepared by civil engineers and other appropriate professionals on behalf of the City or private development interests for compliance with the ordinances of the City. The Director of Public Works shall arrange reviews by other appropriate agencies having jurisdiction in such matters relative to the enforcement of relevant codes and compliance with UBC (Uniform Building Code, 1991) and Caltrans. Only when satisfied that all conditions of approval and the appropriate requirements of the City's codes and other relevant codes and standards have been met, the Public Works Director shall approve or recommend approval of plans as relevant.*

NUFIC_003041

Ms. Jennifer Rocha
May 15, 2019
Page 5 of 12

### V-B. Construction Inspection

On behalf of the City, ULC, under the supervision of the Director of Public Works, shall provide inspection services during all phases of construction to enforce compliance with codes and conditions of approval, provisions of the City ordinances, Uniform Building Code (l 991) and other requirements set forth on the plans for which permits were issued for construction. In the performance of such duties, ULC shall provide inspection for each project during and after completion of various stages of construction to confirm compliance with approved plans.

### V.1 Public Works Construction Management (**Added per April 1994 Amendment**)

On behalf of the City, ULC, under the supervision of the Director of Public Works, shall provide construction management services during all phases of public works construction to enforce compliance with codes and conditions of approval, provisions of the City ordinances, Uniform Building code (1991) and other requirements set forth on the plans and specifications for which permits are issued for construction. In the performance of such duties, ULC shall provide construction management for each public works project before, during and after completion of various stages of construction including the following services related to the planning, control, scheduling, estimating and value engineering of public works projects:

    A. Construction Management Services

        1. Coordinate, receive, review and evaluate bids
        2. Award bids, make appropriate recommendations, and prepare contracts
        3. Manage, coordinate and inspect all work
        4. Provide contract and subcontract coordination
        5. Prepare and monitor construction schedules
        6. Make adjustments to accommodate changing and unforeseen conditions
        7. Prepare progress reports
        8. Review and recommend progress payments
        9. Obtain, review and evaluate shop drawings
        10. Provide laboratory testing of materials as required and monitor test results
        11. Evaluate quality and workmanship of construction
        12. Maintain daily logs and records and such other services as are required to manage the work in accordance with City objectives
        13. Schedule project meetings
        14. Liaison with controlling agencies and design and construction engineers
        15. Monitor and record correspondence between City contractors, subcontractors and design professionals
        16. Prepare transmittals and labor reports
        17. Provide labor and payroll compliance
        18. Provide change order management and coordination
        19. Provide plan interpretation as required
        20. Administer extensions of time (force majeure delay) reports
        21. Administer release and waivers of lien

NUFIC_003042

Ms. Jennifer Rocha
May 15, 2019
Page 6 of 12

According to Section IX of the September 1993 Agreement and April 1994 amendment, only those services listed in Section V were subject to a cap of 4.5% of capital expenditures. The following excerpts are from the September 1993 agreement and April 1994 regarding Section IX compensation, as amended:

> *IX. Compensation to CONSULTANT*
>
> *The fees in full compensation to CONSULTANT for the services rendered for the services as set forth in this Agreement shall be as follows:*
>
> 1. *For the services set forth in Sections I, II and IV, compensation shall be a monthly lump sum of $15,000.00, to be renegotiated annually.*
>
> 2. *For the services set forth in Section V, compensation shall be on a ==time and materials basis not exceeding four and one-half percent (4.5%) of the== ==confirmed construction cost== of the ==public improvements to be constructed==.*
>
> 3. *For the services set forth in Section III, there shall be no compensation. These services shall be provided in connection with the services set forth in Sections II and IV.*
>
> 4. *For ==Additional Services== as set forth in Section VII, compensation shall be in accordance with the ==Hourly Rate Schedule== attached to this Agreement as Exhibit A", or based upon a negotiated fixed fee rate.*
>
> 5. **(Added per April 1994 Amendment)** *For the services set forth in SECTION V-1, compensation shall be on a ==time and materials basis not exceeding four and one-half percent (4.5%) of the== ==bid price== awarded by the City for each project.*

As such, it appears that billings for services performed pursuant to Section V-A and Section V-B were subject to a cap of 4.5% of ==confirmed construction costs of the public improvements to be constructed==, while services performed pursuant to Section V-1 were subject to a cap of 4.5% of the ==bid price awarded by the City for each project==. While Hemming Morse notes approximately $177,809,377 in capital expenditures, their report makes no mention of the bid, nor does it attempt to segregate bid price from the associated confirmed construction costs. As such, a comparison of total ULC billings to only confirmed costs for capital expenditures is not an accurate or representative analysis.

Additionally, Hemming Morse makes no mention of compensation for services performed pursuant to Section VII of the 1993 Agreement. As noted above in subsection 4 of Section IX, compensation for "Additional Services" set forth in Section VII "shall be in accordance with the Hourly Rate Schedule attached to this Agreement as Exhibit A, or based upon a negotiated fixed fee rate." We note that subsection 4 makes no reference to the 4.5% cap, or any such limit. As such, the approximate billings of $75,000,000 noted in the Hemming Morse report likely include many services that were not subject to any limit and may far exceed the 25% estimated by Hemming Morse.

NUFIC_003043

Ms. Jennifer Rocha
May 15, 2019
Page 7 of 12

In fact, the on-going billings from ULC to the City may be related for the most part to the "additional services" covered by section VII of the agreements, which as noted above, are not subject to any billing cap.  It should be noted that the Hourly Rate Schedules that accompany the various service agreements make a distinction between "Professional Services" – for which ULC was allowed to charge an hourly rate, and "Direct Services – Professional Sub-Consultant Services" for which ULC was allowed to bill for actual cost incurred plus 15%.  The list of "Professional Services" was an ever-increasing list as each agreement was updated/amended.

We noted that most of the noted "Professional Services" categories included the classification of services that were being performed by various subcontractors working at ULC's direction. Many of the noted services were also being performed by ULC employees. Hemming Morse did not breakout the ULC invoices in such a manner that would allow them to determine what portion of the ULC bills may have been subject to the 4.5% cap.

The following excerpt is from the September 1993 agreement and April 1994 regarding Section VII services:

> *VII. Additional Services*
>
> *CITY may from time-to-time have the need for other services not specifically listed in this Agreement for which CONSULTANT has the necessary experience and capabilities to provide. CITY may authorize CONSULTANT to perform such additional services on an as needed basis. Additional services which may be required include, but are not necessarily limited to:*
>
> > *A. Major ordinance or General Plan revisions.*
> > *B. Specific Plan and Environmental Impact Report processing.*
> > *C. Direct costs for printing and reproduction of City materials*
> > *D. Preparation of Environmental Impact Reports and other major planning documents.*
> > *E. Major overhauling of City mapping systems.*
> > *F. Clerical services beyond those available from City staff.*
> > *G. Development Agreement Processing.*
> > *H. Major Annexations.*
> > *I. Economic Development assistance beyond tasks specified in this Agreement (e.g. marketing brochures).*
> > *I. Specification Writing.*
> > *K. Bid Document Preparation.*

Based on the descriptions noted in Section V-A, Section V-B, Section V-1, and Section VII of the Agreement, it is unclear how much of the time billed by ULC was attributed to those tasks subject to the 4.5% limits and those not subject to any limit.

It's our belief that Hemming Morse's own interpretation of which ULC costs were subject to an overall 4.5% capital improvement bids or confirmed costs, and which subcontractor costs were limited to a 15% markup, as well as whether these two limitations were inclusive or exclusive of one another goes to the very heart of the HM findings.  The fact they did not identify which

NUFIC_003044

Ms. Jennifer Rocha
May 15, 2019
Page 8 of 12

Capital improvement projects may have been subject to the 4.5% cap also calls their overall conclusions into question.

In addition to their analysis of total ULC billings as compared to the noted contractual limit of 4.5% of capital improvements, Hemming Morse also attempted to prove overbilling through an analysis of ULC payroll records. For the year 2011, Hemming Morse compared the total hours paid to employees per ULC payroll records versus hours billed to the City on ULC invoices. Hemming Morse concluded that the hours billed to the City by ULC did in fact exceed those worked by ULC employees per the ULC payroll records, indicating, "that invoices include either 'phantom hours' (hours not actually worked by anyone) or hours incurred by non-employees of ULC."

HSNO agrees with Hemming Morse that more hours were billed by ULC during 2011 than worked by ULC employees, and that the excess results from the use of subcontractors that were included on ULC's bills to the City and charged at ULC's rates. As such, our analysis focuses on ULC's use of subcontractors and rates billed to ULC by their vendors and the rates billed to the City by ULC for those same vendors. However, we leave any and all legal interpretation to counsel as to how the ULC billings associated with "Professional Services" that were performed by both ULC employees and subcontractors under their direction, as opposed to "Direct Services – Professional Sub-Consultants Services" were supposed to be billed by ULC per the terms of the various CONSULTANT agreements between the City and ULC.

### Analysis and Findings – Preliminary and Tentative

Based on our review of the Hemming Morse report, it is our understanding that the insured now claims losses resulting from overbilling whereby ULC utilized subcontractors to perform services for the City, who were then included on the ULC invoices to the City at the rates charged by ULC for the same or similar services performed by their own employees. The Hemming Morse report notes that ULC was subject to a limitation of billing the City no more than 15% above the actual costs for any subcontractor. We note that the rate sheet, included with the Agreement as "Exhibit A" of the September 1993 Agreement, does state, "Direct Services and Reimbursement Costs: Professional Sub-Consultant Services - Actual cost plus 15 %".

Subsequent to our August 18, 2018 preliminary status report we received approximately 123,361 pages of additional documentation, including ULC internal accounting and billing records and invoices to ULC from subcontractors that they utilized. Due to the volume of documentation provided, we focused on a 3-year sample of billing records from 2008 through 2010 and compared three sets of documents to identify what services were billed to the City by ULC employees and subcontractors that ULC utilized on City projects.

We are in receipt of what appear to be ULC internal billing reports, noted by Hemming Morse as "time and billing records." Based on our analysis, it appears that the time and billing records were prepared by ULC and included the hours worked by both ULC employees and subcontractors, as well as the amounts that would ultimately be billed on ULC's invoice to the

NUFIC_003045

Ms. Jennifer Rocha
May 15, 2019
Page 9 of 12

City.  Our analysis consisted of tracing the time and billing records forward to the ULC invoices and back to the subcontractor invoices billed to ULC for work on City projects.

From 2008 through 2010, we identified invoices addressed to ULC from 22 separate vendors for work performed on projects within the City of Beaumont.  We attempted to identify if and how the hours billed by subcontractors of ULC were then billed by ULC to the City.  However, in many cases the ULC time and billing records noted only the description of the task, rather than the name of an individual or company that performed the noted task.  In some cases, we were able to directly tie the hours from a subcontractor invoices to the ULC time and billing records, and then through to the ULC invoice to the City.  We note the following billing descriptions which appear on the ULC invoice and the time and billing records:

- 1-3 Man Survey Crew
- Administrative
- Associate Eng
- CADD/ Tech
- Const. Manager
- Designer II
- Draftsperson for exhibits
- Eng. Geologist
- Engineer
- Exec Secretary
- Inspector
- Inspector-Prev Wage
- Office Mgr
- Plan Checker
- Planner
- Principal Planner/ Principal
- Principal/ Engineer
- Principal/ Project Engineer
- Project Development Planner
- Project Engineer
- Project Manager/ Engineer
- Project Mgr./ Sr. Engineer
- Public Works Dept.
- Soils Inspector
- Soils Tech
- Sr. Asso/Eng.
- Sr. City Engineer
- Sr. City Engineer/ Principal
- Sr. City Manager
- Sr. City Planner
- Sr. City Planner/ Principal
- Sr. Designer II
- Sr. Engineer
- Sr. Inspector
- Sr. Planner
- Sr. Project Engineer/ Principal
- Staff Engineer
- Surveyor
- Web- Services/ Surveyor

Although the hourly rate schedule "Professional Services" classifications changed with each amendment to the CONSULTANTS agreement, the items noted above were for the most part listed as "Professional Services" categories or a variation of same for which ULC was allowed to charge the agreed upon hourly rate.  We found no indication that ULC was charging for additional hours or rates that were not in accordance with the type of "Professional Service" being provided.

As shown on Schedules 4B and 4C, we analyzed invoices from 22 vendors totaling $3,780,989 from January 2008 through December 2010.  However, it is our understanding that although ULC employed subcontractors to assist in City of Beaumont projects, actual ULC employees also performed the same types of tasks, including surveying, engineering, and project management.  As such, it was not always possible to identify the hours and amounts on the time and billing reports that exclusively subcontractor hours versus a blend of subcontractors and ULC employees.

Included as exhibits to the Hemming Morse report were ULC payroll records for 2010 and 2011. We compared the ULC time and billing records to the payroll records to identify the individuals who were in fact employees of ULC and eliminate any possible duplication with subcontractors. However, because we could only locate payroll records for 2010 and 2011, the actual individuals employed by ULC over the entire period is unclear.

NUFIC_003046

Ms. Jennifer Rocha
May 15, 2019
Page 10 of 12

Certain vendors were identified by name on the time and billing reports, allowing us to perform a direct comparison to the vendors' invoices. For those identified vendors that were included on the ULC time and billing reports, we analyzed the hours and amounts billed to ULC and calculated the amount that would have been billed to the City at ULC's rates versus what the bill would have been based on a 15% markup.

As shown on Schedule 4A, out of the noted $3,780,989 billed by subcontractors between 2008 and 2010, the amount attributable to vendors that appeared on the ULC time and billing reports totaled only $2,128,255. For purposes of this analysis, we assumed that costs incurred by ULC for subcontractors working for the City were passed on to the City through the ULC invoices.

We note that one vendor, Dennis Janda, Inc., provided surveying services, which appear to be listed on the ULC time and billing reports simply as "Surveyor," "1-Man Survey Crew," "2-Man Survey Crew," etc. However, it is also our understanding that ULC employees also performed surveying services. As shown on Schedule 4, we performed a separate analysis on Dennis Janda, Inc. invoices and found that they totaled approximately $1,434,781 over the three-year period analyzed, representing the largest portion of subcontractors utilized by ULC. As such, we did not want to exclude this vendor from the analysis.

Due to the difficulty in identifying the surveyor services performed exclusively by subcontractors, we segregated all survey related billing descriptions and performed two calculations; one based on the ULC time and billing reports and one based solely on Dennis Janda, Inc. invoices.

As shown on Schedule 3A and summarized on Schedule 3, we identified vendor invoices to ULC totaling $3,414,320 from 2008 through 2010, which we would expect to be billed to the City. Of the $3,414,320, $2,722,598 relates only to survey crews, where the difference of $691,723 excludes survey crews. Based on the rates shown on the ULC time and billing records for the noted vendors, we calculated billings to the City of $1,697,205 for non-survey crew subcontractors, and $4,333,668 for survey crews. Once again, the survey crew total may include ULC employees.

Assuming that the 15% markup over actual cost incurred represents the amount that should have been billed to the City, total billings for non-survey crew invoices would have been $795,481, resulting in a potential overbilling of $901,724. Likewise, total billings for survey crew invoices should have been $3,130,987, resulting in potential overbilling of $1,202,680, for a total potential overbilling of $2,104,405.

As noted above, we segregated survey crew invoices submitted by Dennis Janda, Inc., as these were the only survey crew services that we could verify as subcontractors. As shown on Schedule 4, Dennis Janda, Inc. billed ULC $1,434,781 from 2008 through 2010. Based on the rates billed to ULC at a 115% markup, the amount billed to the City for survey crew services performed by Dennis Janda, Inc. should have been $1,649,998 for the same three-year period. However, the amount calculated to have been billed to the City at ULC rates for survey crew services was $2,354,009, resulting in potential overbilling of $704,011.

NUFIC_003047

Ms. Jennifer Rocha
May 15, 2019
Page 11 of 12

Based on our findings relative to the noted three-year period, we attempted to extrapolate what potential overbillings may have been from 2004 through 2012. General ledger detail prior to 2004 was not provided. As such, we could not determine total disbursements to ULC prior to 2004.

As shown on Schedule 2A and summarized on Schedule 2, we analyzed ULC invoices to the City of Beaumont totaling $21,846,497 from 2008 through 2010. For this same timeframe, we identified disbursements to ULC from the City's general fund and bond trustee accounts totaling $23,853,936, as shown on Schedules 1 and 1A. As such, actual invoices analyzed represent approximately 92% of total disbursements to ULC.

As shown on Schedule 1, we utilized the potential overbillings of $901,724 for non-survey crews (Schedule 3) and $704,011 for Dennis Janda, Inc. survey crews (Schedule 4), for a total of $1,605,735 in potential overbillings from 2008 through 2010. Compared to the actual ULC invoices analyzed of $21,846,497, the potential overbillings of $1,605,735 represent approximately 7% of ULC billings to the City.

Based on our analysis of disbursements to ULC from the City's general ledger and the bond trustee accounts, ULC received approximately $66,407,503 from 2004 through 2012. At the estimated 7% percent potential overbilling from 2008 to 2010, we calculate potential overbilling from 2004 through 2012 of $4,469,678, or $66,407,503 times the 7% potential overbilling rate, times the 92% sample size.

As shown on Schedule 1A, we performed the same analysis utilizing potential overbillings of $1,202,680 for all survey crews (Schedule 3) and the potential overbillings of $901,724 for non-survey crews (Schedule 3) for a total of $2,104,405 in potential overbillings from 2008 through 2010. Compared to the actual ULC invoices analyzed of $21,846,497, the potential overbillings of $2,104,405 represent approximately 10% of ULC billings to the City. Extrapolating this result over the 2004 through 2012 period results in potential overbillings of $5,857,762, or $66,407,503 times the 10% potential overbilling rate, times the 92% sample size.

Although we are able to extrapolate the potential overbilling based on our analysis of the noted 3-year period, we have identified several factors that may have a material impact on the application of the percentage potentially overbilled as it applies to other years:

- This analysis is based on the documents that we identified as ULC subcontractor invoices within the voluminous document production. It is possible that other ULC vendors and their invoices were not provided or identified.

- Vendors such as LG Consulting, CHJ, Darrell L. Connerton, and Greg Russell did not begin billing until 2010, while others billed only prior to 2010

- The percentage of markup from the subcontractor invoice rate to the ULC invoice rate varies drastically from vendor to vendor

NUFIC_003048

Ms. Jennifer Rocha
May 15, 2019
Page 12 of 12

- The total amount invoiced by subcontractors in 2010 was more than 228% of 2009 total billings, and more than 280% of 2008 total billings. As such, 2010 may not accurately represent what was billed prior to 2008.

Based on the above, an extrapolation of the total period based solely on the 3 years analyzed may be inaccurate. In order to provide a more accurate calculation of the remaining years, it would be necessary to perform a detailed analysis of vendor invoices billed to ULC and the relationship of those invoices to the ULC invoices billed to the City of Beaumont.

**Summary**

Based on our preliminary analysis of the Hemming Morse report and approximately 123,360 additional pages of documentation provided by BBK, it appears that ULC was utilizing subcontractors to perform professional services for the City of Beaumont, and those services were being billed to the City at rates charged by ULC for the same or similar professional services performed by their own employees. It also appears that reimbursement for "Direct Services -professional sub-consultants" was to be billed by ULC at "actual cost plus 15%," per the service agreement with the City. However, as noted above, we leave the interpretation of the noted service agreement and the appropriateness of ULC's billing practices to counsel.

If it is determined that ULC should have billed the City of Beaumont the actual cost of subcontractors plus a 15% markup, then we estimate potential overbilling ranging from $4,469,678 to $5,857,762 for the period of 2004 through 2012.

Whether these findings constitute a covered cause of loss under any area of coverage we leave for your determination. As previously stated, our analysis is preliminary, tentative, and ongoing, and as such subject to revision as new information becomes available.

We have enjoyed being of service to you and hope the enclosed accounting information will be of assistance to you in the adjustment of this claim. If you have any questions or require any additional information, please do not hesitate to contact us.

Very truly yours,

**HAGEN, STREIFF, NEWTON & OSHIRO, ACCOUNTANTS, P.C.**
By:     Peter Fogarty, CPA, CFE, CFF
          Philip J. Segerson, CFE

NUFIC_003049



**EXHIBIT**

**14**



HSNO
THE FORENSICS FIRM
Accounting | Economics | Consulting

August 16, 2019

**VIA EMAIL**
Ms. Jennifer Rocha
Complex Claims Director, Fidelity Bonds
Financial Lines Claims
AIG Property Casualty
175 Water Street, 5th Floor
New York, NY  10038
Jennifer.Rocha@aig.com

**VIA EMAIL**
Mr. Kenneth Watnick
Anderson McPharlin & Conners
707 Wilshire Blvd
Suite 4000
Los Angeles, CA 90017-3623
kdw@amclaw.com

Re:     Insured - City of Beaumont, California
        Employee Theft Claim
        Date of Discovery – May 17, 2016
        AIG Claim Number – 3409580528US
        HSNO File Number – 10022193
        **Supplemental Report**

Dear Ms. Rocha and Mr. Watnick:

This correspondence will serve to provide you with an updated status of our evaluation to date regarding the claims made by the City of Beaumont, California, for employee dishonesty, other fraud, and corruption.  This correspondence supplements our previous status report dated May 15, 2019 based on our meeting with the insured's forensic accountants, Hemming Morse, LLP ("Hemming Morse/HM") the insured's counsel, Best, Best & Krieger LLP ("BBK"), on July 11, 2019 in Walnut Creek, California, as well as additional discussions with AIG counsel.

The analysis performed by Hemming Morse appears to focus on Urban Logic Consultants (ULC) billing the City for professional subcontractor services in excess of the alleged limits imposed by the 1993 and 1994 service contracts and related amendments.  This allegation of overbilling was not asserted as part of the Stradling proof of loss.

As noted in our status report dated May 15, 2019, it was our understanding that the analysis performed by Hemming Morse asserted that billings by ULC to the City were limited to 4.5% of the costs incurred for the City's capital improvement projects, and that the amount of funds received by ULC far exceeds the allowed cap of 4.5%.  According to the Hemming Morse report, based on a billing cap of 4.5% of approximately $177,809,377 in capital improvement expenditures, ULC should not have billed the City more than approximately $8,000,000 over the period of 1993 through August of 2012.  Based on our discussions with Hemming Morse and BKK on July 11, 2019, it is now our understanding that the claim is based on billings in excess of $8,000,000.

Atlanta | Boston | Chicago | Dallas | Houston | Jersey City | London | Los Angeles | Mexico City | New York City
Newport Beach | Oakland | Philadelphia | Providence | Sacramento | Salt Lake City | San Francisco | Seattle | Stamford

647 Putnam Pike | Greenville, Rhode Island 02828 | Phone: (401) 949-8001 | www.HSNO.com

NUFIC_002291

Ms. Jennifer Rocha and Mr. Kenneth Watnick
August 16, 2019
Page 2 of 7

The Hemming Morse report does "estimate" that 25% of the funds paid to ULC were not subject to the 4.5% cap. However, they did not provide any basis for the 25% "estimate," nor have they provided any support as to exactly what constituted the Time and Material services that were to be supplied by ULC that may have fallen within the 4.5% cap.

Although Hemming Morse estimates that approximately 25% of capital expenditures would not be subject to the 4.5% cap, it is unclear how they arrived at this estimate. Based on our review of the various Agreements, it appears that the 4.5% cap relates only to "Plan Checking and Construction Inspection" and "Public Works Construction Management" (Section V), excerpted as follows:

*V. Plan Checking and Construction Inspection* (**Original September 1993 Agreement**)

*The CONSULTANT shall provide all necessary plan checking and inspection services for public works projects in the City of Beaumont as follows:*

*V-A. Plan Checking*

*On behalf of the City, ULC, under the direction of the Director of Public Works, shall review the plans prepared by civil engineers and other appropriate professionals on behalf of the City or private development interests for compliance with the ordinances of the City. The Director of Public Works shall arrange reviews by other appropriate agencies having jurisdiction in such matters relative to the enforcement of relevant codes and compliance with UBC (Uniform Building Code, 1991) and Caltrans. Only when satisfied that all conditions of approval and the appropriate requirements of the City's codes and other relevant codes and standards have been met, the Public Works Director shall approve or recommend approval of plans as relevant.*

*V-B. Construction Inspection*

*On behalf of the City, ULC, under the supervision of the Director of Public Works, shall provide inspection services during all phases of construction to enforce compliance with codes and conditions of approval, provisions of the City ordinances, Uniform Building Code (l 991) and other requirements set forth on the plans for which permits were issued for construction. In the performance of such duties, ULC shall provide inspection for each project during and after completion of various stages of construction to confirm compliance with approved plans.*

*V.1 Public Works Construction Management* (**Added per April 1994 Amendment**)

*On behalf of the City, ULC, under the supervision of the Director of Public Works, shall provide construction management services during all phases of public works construction to enforce compliance with codes and conditions of approval, provisions of the City ordinances, Uniform Building code (1991) and other requirements set forth on the plans and specifications for which permits are issued for construction. In the performance of such duties, ULC shall provide construction management for each public works project before, during and after completion of various stages of construction including the following services related to the planning, control, scheduling, estimating and value engineering of public works projects:*

NUFIC_002292

Ms. Jennifer Rocha and Mr. Kenneth Watnick
August 16, 2019
Page 3 of 7

A. *Construction Management Services*

1. *Coordinate, receive, review and evaluate bids*
2. *Award bids, make appropriate recommendations, and prepare contracts*
3. *Manage, coordinate and inspect all work*
4. *Provide contract and subcontract coordination*
5. *Prepare and monitor construction schedules*
6. *Make adjustments to accommodate changing and unforeseen conditions*
7. *Prepare progress reports*
8. *Review and recommend progress payments*
9. *Obtain, review and evaluate shop drawings*
10. *Provide laboratory testing of materials as required and monitor test results*
11. *Evaluate quality and workmanship of construction*
12. *Maintain daily logs and records and such other services as are required to manage the work in accordance with City objectives*
13. *Schedule project meetings*
14. *Liaison with controlling agencies and design and construction engineers*
15. *Monitor and record correspondence between City contractors, subcontractors and design professionals*
16. *Prepare transmittals and labor reports*
17. *Provide labor and payroll compliance*
18. *Provide change order management and coordination*
19. *Provide plan interpretation as required*
20. *Administer extensions of time (force majeure delay) reports*
21. *Administer release and waivers of lien*

As discussed in our May 15, 2019 report, Subsection 4 of Section IX of the Agreement states that compensation for "Additional Services" set forth in Section VII "shall be in accordance with the Hourly Rate Schedule attached to this Agreement as Exhibit A, or based upon a negotiated fixed fee rate." We note that subsection 4 makes no reference to the 4.5% cap, or any such limit. However, Hemming Morse does not consider compensation for services performed pursuant to Section VII of the 1993 Agreement.

At the request of Counsel, we analyzed the ULC invoices in an attempt to identify the billings that may potentially relate to the Section V Construction Management tasks, and extrapolate the percentage of total ULC billings that may have been subject to the noted 4.5% cap. Based on our analysis of the ULC invoices, the descriptions of tasks are vague, and do not provide detailed explanations of the tasks performed. However, we only identified three billing titles which appear consistent with the construction management related duties noted above under Section V.; Construction Manager, Inspector, and Plan Checker.

As shown on Schedule 1, we analyzed ULC invoices from 2008 through 2012 and segregated the amounts billed for the noted timekeepers. Although Hemming Morse contends that approximately 25% of the amounts billed by ULC would not be subject to the 4.5% cap, billings for the noted construction management type timekeepers totaled only 13.82% of all billings

NUFIC_002293

Ms. Jennifer Rocha and Mr. Kenneth Watnick
August 16, 2019
Page 4 of 7

from 2008 through 2012, indicating that as much as 86.18% of ULC billings may not have been subject to the 4.5% cap.

According to Exhibit B of the Hemming Morse report, the Hemming Morse compares ULC billings of $66,273,223, net of the estimated 25% not subject to the 4.5% limit, to $8,001,422 to calculate "Implied Overpayment" of $58,271,801.  The limit of $8,001,422 represents $177,809,377 in capital improvement expenditures multiplied by the noted 4.5% limit, as summarized below:

| Description | Amount | Comments |
|---|---|---|
| Total Billings | $74,938,238 | |
| Not Subject to 4.5% Limit | 8,665,014 | Based on estimated 25% (A) |
| Claimed Subject to 4.5% Limit | $66,273,224 | |
| | | |
| Est. Cap. Ex. | $177,809,377 | |
| 4.5% of Cap. Ex. | 8,001,422 | |
| Claimed Implied Overpayment | $58,271,802 | |
| Note (A): Hemming Morse only applied 25% estimate to payments from the City, not from bond proceeds. | | |

Although Hemming Morse estimates that 25% of payments received by ULC from City of Beaumont funds would not be subject to the noted 4.5% cap, based on our analysis the actual amount that may or may not be subject to any such limit cannot reasonably be determined by Hemming Morse from the UCL invoices provided.  However, using our calculation of 86.18% based on timekeeper titles that mirrored the Section V construction management related duties, the potential amount that may not be subject to the noted 4.5% cap increases significantly.  The result is a potential implied overbilling of $2,357,181, as summarized below:

| Description | Amount | Comments |
|---|---|---|
| Total Billings | $74,938,238 | |
| Not Subject to 4.5% Limit | 64,579,635 | Based on 86.18% (Schedule 1) |
| Potentially Subject to 4.5% Limit | 10,358,603 | |
| | | |
| Est. Cap. Ex. | 177,809,377 | |
| 4.5% of Cap. Ex. | 8,001,422 | |
| Potential Implied Overpayment | $2,357,181 | |

As discussed in our May 15, 2019 status report, Hemming Morse also contends that ULC was subject to a limitation of billing the City no more than 15% above the actual costs of any subcontractor costs.  However, based on our discussions with Hemming Morse and BBK on

NUFIC_002294

Ms. Jennifer Rocha and Mr. Kenneth Watnick
August 16, 2019
Page 5 of 7

July 11, 2019, it is now our understanding that the Hemming Morse and BBK contend that ALL billings, regardless of the timekeeper status, are limited to the 4.5% cap. However, it seems inconsistent that there would be a cap on the billing of subcontractor's fees and that those same subcontractor costs would also be subject to an overall 4.5% cap on any capital improvement work.

It is our opinion that Hemming Morse has not substantiated what amounts billed by ULC were subject to a limit of 4.5% of capital expenditures, nor what services were limited to time and materials plus 15%. We leave any and all legal interpretation of the agreements between the City and ULC to counsel, including what, if any, services were subject to the noted limits.

Because the ULC invoices provided to the City do not explicitly state the work descriptions noted in Section V-A, Section V-B, Section V-1, and Section VII of the Agreement, it remains unclear how much of the time billed by ULC was attributed to those tasks subject to the 4.5% limits and those not subject to any limit. In fact, it is possible that the on-going billings from ULC to the City may relate more to the "additional services" covered by section VII of the agreements, which as noted above, are not subject to any billing cap.

As discussed in our May 15, 2019 status report, we previously identified and analyzed vendor invoices to ULC totaling $3,414,320 from 2008 through 2010. Due to the difficulty in identifying the surveyor services performed exclusively by subcontractors, we segregated all survey related billing descriptions and performed two calculations; one based on the ULC time and billing reports and one based solely on Dennis Janda, Inc. invoices.

Assuming that the 15% markup over actual cost incurred represents the amount that should have been billed to the City, total billings based on Dennis Janda, Inc. segregated invoices resulted in a potential overbilling of $1,605,735, and total billings including all survey crew invoices resulted in potential overbilling of $2,104,405. Compared to the actual ULC invoices analyzed of $21,846,497 for the comparable period, the potential overbillings of $1,605,735 represent approximately 7% of ULC billings to the City, and the potential overbillings of $2,104,405 represent approximately 10% of ULC billings to the City.

We then extrapolated these percentages over the 2004 through 2012 period, resulting in potential overbillings ranging from $4,469,678 to $5,857,762. However, these figures could be impacted by multiple factors, as noted below:

As previously explained, any extrapolation based on our analysis of the noted ULC invoices to the City and vendor invoices to ULC may be impacted by the following factors:

- This analysis is based on the documents that we identified as ULC subcontractor invoices within the voluminous document production. It is possible that other ULC vendors and their invoices were not provided or identified.

- Vendors such as LG Consulting, CHJ, Darrell L. Connerton, and Greg Russell did not begin billing until 2010, while others billed only prior to 2010

NUFIC_002295

Ms. Jennifer Rocha and Mr. Kenneth Watnick
August 16, 2019
Page 6 of 7

- The percentage of markup from the subcontractor invoice rate to the ULC invoice rate varies drastically from vendor to vendor

- The total amount invoiced by subcontractors in 2010 was more than 228% of 2009 total billings, and more than 280% of 2008 total billings.  As such, 2010 may not accurately represent what was billed prior to 2008.

- Because limited ULC payroll records for 2010 and 2011 were available for review by both HSNO and Hemming Morse, neither of us were able to confirm the actual ULC employees as opposed to subcontractors over the period tested.  We confirmed with Hemming Morse that we have been provided with all available payroll records.

**Summary**

Based on our preliminary analysis of the Hemming Morse report and the documentation provided, to date, by BBK and Stradling, it appears that approximately 86.18% of ULC billings to the City of Beaumont may not have been subject to any limit as asserted by Hemming Morse and BBK.  Where Hemming Morse estimates implied overpayments of $58,271,802 from 1993 through August of 2012, the ULC invoices do not provide sufficient descriptions of tasks performed in order to determine what was or was not subject to any contractual limits.

Based on our analysis of timekeeper descriptions, it appears that approximately 13.82% of billings ULC billings from 2008 through 2012 may have potentially been subject to a 4.5% limit under Section V of the 1994 Agreement.  If in fact the 1994 Agreement was the governing document from 1993 through 2012, and it is determined that the timekeeper descriptions noted on Schedule 1 are consistent with the duties outlined in Section V, we would calculate a potential overbilling of $2,357,181.

As previously noted in our May 15, 2019 status report, it appears that ULC was utilizing subcontractors to perform certain professional services for the City of Beaumont, and those services were being billed to the City at rates charged by ULC for the same or similar professional services performed by their own employees.  Hemming Morse has maintained that reimbursement for "Direct Services -professional sub-consultants" was to be billed by ULC at "actual cost plus 15%," per the service agreement with the City.

If it is determined that ULC should have billed the City of Beaumont the actual cost of subcontractors plus a 15% markup, then we estimate potential overbilling ranging from $4,469,678 to $5,857,762 for the period of 2004 through 2012.  It remains unclear whether amounts billed for subcontractors at actual cost plus 15% markup would then also be potentially subject to the 4.5% limit.  Please note that ALL asserted damages ULC billings to the City in their capacity as CONSULTANTS to the City, not as employees of the City.

NUFIC_002296

Ms. Jennifer Rocha and Mr. Kenneth Watnick
August 16, 2019
Page 7 of 7

Please note that although Hemming Morse has relied exclusively on the 1993 and 1994
Agreements between the City and ULC, the contracts have not been fully vetted to determine
what, if any, changes or side agreements were made with ULC between 1994 and 2012, and how
this impacts who determined the claimed "overbilling," and at what point they came to that
realization.

Pending direction from Counsel regarding the correct interpretation and application of the
contract provisions, we tentatively estimate potential overbilling ranging from $2,357,181 to
$8,214,943.

| Description | Amount |
|---|---|
| Potential Overbilling Based on 4.5% of Cap. Ex. Applied to Total ULC Billings | $2,357,181 |
| Potential Overbilling Based on 15% Vendor Markup - DJI Actual Invoices | $4,469,678 |
| Potential Overbilling Based on 15% Vendor Markup - Survey Crew Billings | $5,857,762 |
| | |
| Maximum Combined Overbilling - $2,357,181 + $5,857,762 | $8,214,943 |

As noted above, we leave the interpretation of the noted service agreement and the
appropriateness of ULC's billing practices to counsel. Whether these findings constitute a
covered cause of loss under any area of coverage we leave for your determination. As
previously stated, our analysis is preliminary, tentative, and ongoing, and as such subject to
revision as new information becomes available.

We have enjoyed being of service to you and hope the enclosed accounting information will be
of assistance to you in the adjustment of this claim. If you have any questions or require any
additional information, please do not hesitate to contact us.

Very truly yours,

**HAGEN, STREIFF, NEWTON & OSHIRO, ACCOUNTANTS, P.C.**
By:    Peter Fogarty, CPA, CFE, CFF
       Philip J. Segerson, CFE

NUFIC_002297

Prepared for AIG and Counsel
Re: City of Beaumont, California
Date of Discovery: May 17, 2016

Schedule 1
Page 1 of 2

## Analysis of "Section V" Potential Construction Management Billing Descriptions (A)

| Description | Invoice Amount | | | | | | % of Total |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | 2008 | 2009 | 2010 | 2011 | 2012 | Total | |
| **Billing Descriptions Potentially Subject to the "Section V" 4.5% Cap:** | | | | | | | |
| Const Manager | $489,323 | $257,985 | $283,260 | $185,100 | $249,825 | $1,465,493 | 4.42% |
| Inspector | 1,240,335 | 613,170 | 364,500 | 21,600 | 248,400 | 2,488,005 | 7.51% |
| Inspector - Prev Wage | | | 172,250 | 182,031 | 152,880 | 507,161 | 1.53% |
| Inspector (Overtime) | | | 7,553 | | | 7,553 | 0.02% |
| Plan Checker | 52,560 | | | 6,750 | 52,950 | 112,260 | 0.34% |
| Subtotal | 1,782,218 | 871,155 | 827,563 | 395,481 | 704,055 | 4,580,471 | **13.82%** |
| **Other Billing Descriptions Potentially Not Subject to "Section V" 4.5% Cap:** | | | | | | | |
| 1-Man Survey Crew | 187,320 | 56,440 | 97,200 | 5,040 | 6,080 | 352,080 | 1.06% |
| 1-Man Survey Crew - Prev Wage | | | 26,475 | 4,125 | 1,890 | 32,490 | 0.10% |
| 2-Man Survey Crew | 505,733 | 628,215 | 190,995 | 39,270 | 41,055 | 1,405,268 | 4.24% |
| 2-Man Survey Crew - Prev Wage | | | 298,165 | 58,358 | 68,557 | 425,080 | 1.28% |
| 3-Man Survey Crew | 7,020 | 251,550 | 24,180 | | | 282,750 | 0.85% |
| Associate Engineer | | | 1,028 | 45,313 | | 46,340 | 0.14% |
| CADD Technician | 9,200 | 16,960 | 50,318 | 60 | | 76,538 | 0.23% |
| CAL 216 - Relative Compaction | | | | 1,080 | | 1,080 | 0.00% |
| CAL 231 - Use of Nuclear Gauges | | | | 448 | | 448 | 0.00% |
| Exec Secretary | 191,763 | 122,925 | 224,135 | 15,660 | 73,350 | 627,833 | 1.89% |
| Engineering Geologist | 6,785 | 14,548 | 17,969 | | 10,695 | 49,996 | 0.15% |
| Soils Technician | 422,145 | 312,525 | 103,605 | 3,500 | 125,700 | 967,475 | 2.92% |
| Soils Technician - Prev Wage | | | 81,835 | 66,021 | 41,223 | 189,079 | 0.57% |
| Office Manager | 125,220 | 107,160 | 127,375 | 40,485 | 92,205 | 492,445 | 1.49% |
| One 24x36 color photo print | | | | | 29 | 29 | 0.00% |
| Planner | 7,300 | 5,000 | | 220 | 130 | 12,650 | 0.04% |
| Principal | 857,894 | 779,888 | 1,085,849 | 408,755 | 803,498 | 3,935,883 | 11.88% |
| Project Engineer | | | 233,475 | | | 233,475 | 0.70% |
| Project Manager | 4,500 | 5,850 | | | | 10,350 | 0.03% |



Prepared for AIG and Counsel
Re: City of Beaumont, California
Date of Discovery: May 17, 2016

Schedule 1
Page 2 of 2

## Analysis of "Section V" Potential Construction Management Billing Descriptions (A)

| Description | Invoice Amount | | | | | | % of Total |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | 2008 | 2009 | 2010 | 2011 | 2012 | Total | |
| Project Manager/Engineer | 359,213 | 43,950 | 604,630 | | 1,458,388 | 2,466,180 | 7.44% |
| Project Mgr./ Sr. Engineer | | | | | $1,700 | $1,700 | 0.01% |
| Public Works Dept. | | | | | 1,920 | 1,920 | 0.01% |
| Sr Assoc/Eng | $1,662,525 | $1,372,463 | $1,479,353 | | | 4,514,340 | 13.62% |
| Sr. Designer II | 47,580 | 12,240 | 7,035 | $1,238,738 | 925,503 | 2,231,095 | 6.73% |
| Sr. Asso/Eng. | | | | 1,762,145 | 1,127,610 | 2,889,755 | 8.72% |
| Sr. Planner | 238,350 | 235,500 | 289,678 | 52,955 | 177,970 | 994,453 | 3.00% |
| Staff Engineer | 689,819 | 510,103 | 449,425 | 61,600 | 369,408 | 2,080,354 | 6.28% |
| Staff Engineer - Prev Wage | | | 130,260 | | | 130,260 | 0.39% |
| Surveyor | 958,238 | 809,513 | 842,888 | 196,286 | 737,663 | 3,544,586 | 10.70% |
| GIS/CADD Technician | 80,200 | 74,780 | | | | 154,980 | 0.47% |
| Tech/CADD Specialist | | | 32,310 | | | 32,310 | 0.10% |
| Technician | 8,200 | | | | | 8,200 | 0.02% |
| Technician/Drafter | 34,560 | | | | | 34,560 | 0.10% |
| (blank) | 8,409 | 7,803 | 188,000 | 121,906 | 4,375 | 330,493 | 1.00% |
| Subtotal | 6,411,971 | 5,367,411 | 6,586,180 | 4,121,964 | 6,068,946 | 28,556,472 | 86.18% |
| Total | $8,194,189 | $6,238,566 | $7,413,742 | $4,517,445 | $6,773,001 | $33,136,943 | 100.00% |

Notes:
(A) Because the ULC invoices provided to the City do not explicitly state the work descriptions noted in Section V-A, Section V-B,
    Section V-1, and Section VII of the Agreement, this analysis is based solely on the timekeeper descriptions that appear
    consistent with the duties listed in Section V.  We leave any and all legal interpretation of the agreements between the City and
    ULC to counsel.

PRELIMINARY:
FOR DISCUSSION PURPOSES ONLY



NUFIC_002299