# EXHIBIT F

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CASE NO. 5:20-CV-02164-GW(KKx)

WESTERN RIVERSIDE COUNCIL OF GOVERNMENTS, a California Joint Powers Authority,

Plaintiff,

vs.

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, and DOES 1 through 50, inclusive,

Defendants.

Videotaped Deposition of

JAMES GREGG

(Conducted Remotely)

Tuesday, April 26, 2022

10:01 a.m. PDT

Magna Legal Services
(866) 624-6221
www.MagnaLS.com

Job No.: 822124

Reported by: BRENDA MATZOV, CSR NO. 9243



Videotaped deposition of JAMES GREGG, taken remotely in the above-entitled cause pending in the United States District Court, Central District of California, before BRENDA MATZOV, CSR NO. 9243, and simultaneously in the participants' remote locations, on Tuesday, the 26th day of April, 2022, at 10:01 a.m. PDT.

APPEARANCES:

FOR PLAINTIFF:

BEST BEST & KRIEGER, LLP
By: CHRISTOPHER E. DEAL, ESQ.
18101 Von Karman Avenue
Suite 1000
Irvine, California 92612
(949) 263-2600
chris.deal@bbklaw.com

FOR DEFENDANT:

GORDON REES SCULLY MANSUKHANI, LLP
By: SCOTT L. SCHMOOKLER, ESQ.
5 Park Plaza
Suite 1100
Irvine, California 92614
(949) 255-6950
sschmookler@grsm.com



APPEARANCES (Continued):

FOR THE WITNESS:

RAINS LUCIA STERN ST. PHALLE & SILVER, PC
By: BRIAN P. ROSS, ESQ.
1428 Second Street
Suite 200
Santa Monica, California 90401-2367
(310) 393-1486
bross@rlslawyers.com

ALSO PRESENT:

NICHOLAS HEMPHILL, Videographer



I N D E X

WITNESS
James Gregg
(Witness Location: Los Alamitos, California)


| EXAMINATION | PAGE |
|---|---|
| By Mr. Deal | 13, 209 |
| By Mr. Schmookler | 142 |


E X H I B I T S


| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit 1 | Document Entitled "March 1993 - Community and Economic Development Services Agreement," and Related Documents (BEAUAIG0000584 to 0000623) | 24 |
| Exhibit 2 | Document Entitled "September 1993 - Amendment No. 1 to March 1993 Agreement," and Related Documents (BEAUAIG0000638 to 0000660) | 42 |
| Exhibit 3 | Document Entitled "1995 Additional Services Provided by Urban Logic Consultants at No Additional Cost to the City of Beaumont" (BEAUAIG0000672 to 0000673) | 43 |




E X H I B I T S


| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit 4 | Document Entitled "Agreement for Planning, Economic Development and Public Works Services," Dated September 27, 1993, and Related Documents (BEAUAIG0000695 to 0000725) | 44 |
| Exhibit 5 | Document Entitled "Staff Report," Dated March 15, 2011 (BEAUAIG0000816 to 0000818) | 46 |
| Exhibit 6 | (Exhibit 6 was not marked.) | -- |
| Exhibit 7 | Document Entitled "Staff Report," Dated December 17, 2013 (BEAUAIG0000991 to 0000992) | 49 |
| Exhibit 8 | E-mail from James J. Gregg to Alan Kapanicas and Bill Aylward, Dated November 11, 2014, Subject: "RE: Treasurer Bond" and Related E-mail Chain (BEAUAIG0001569 to 0001570) | 50 |
| Exhibit 9 | (Exhibit 9 was not marked.) | -- |
| Exhibit 10 | E-mail from James J. Gregg to Bill Aylward, Dated November 11, 2014, Subject: "RE: Beaumont - Change in City Treasurer" and Related E-mail Chain (BEAUAIG0002682 to 0002684) | 53 |
| Exhibit 11 | E-mail from Pass Area to Albert Chatigny and Others, Dated May 28, 2015, Subject: "Alan Kapanicas" (BEAUAIG0002686 to 0002688) | 57 |







EXHIBITS

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit 12 | Press Release Entitled "Beaumont City Council Unanimously Approves Agreement Ending Relationship with City Manager," Dated October 9, 2015 (BEAUAIG0002693) | 73 |
| Exhibit 13 | E-mail from "ulcdave@aol.com" to "ggms@earthlink.net" and Others, Dated November 27, 2009, No Subject (BEAUAIG0002782) | 81 |
| Exhibit 14 | (Exhibit 14 was not marked.) | -- |
| Exhibit 15 | Letter from Judith Bingham to Julio Martinez, Dated August 14, 2015, and Related Documents (BEAUAIG0003256 to 0003259) | 83 |
| Exhibit 16 | Letter from Stradling Yocca Carlson & Rauth, P.C., to Allied World Assurance Company (U.S.) Inc., Dated June 30, 2016, and Related Documents (BEAUAIG0003394 to 0003484) | 86 |
| Exhibit 17 | Letter from Stradling Yocca Carlson & Rauth, P.C., to CSAC Excess Insurance Authority, Dated June 30, 2016, and Related Documents (BEAUAIG0003485 to 0003577) | 89 |
| Exhibit 18 | Letter from Stradling Yocca Carlson & Rauth, P.C., to AIG Financial Lines Claims, Dated June 30, 2016, and Related Documents (BEAUAIG0003578 to 0003611) | 90 |



EXHIBITS

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit 19 | (Exhibit 19 was not marked.) | -- |
| Exhibit 20 | (Exhibit 20 was not marked.) | -- |
| Exhibit 21 | Letter from Stradling Yocca Carlson & Rauth, P.C., to Alliant Insurance Services, Inc., Dated June 30, 2016, and Related Documents (BEAUAIG0003680 to 0003736) | 91 |
| Exhibit 22 | Letter from Stradling Yocca Carlson & Rauth, P.C., to Judith D. Blake, Assistant Vice President, Financial Lines, AIG Property Casualty, Dated November 3, 2016, and Related Documents (BEAUAIG0003737 to 0003751) | 92 |
| Exhibit 23 | (Exhibit 23 was not marked.) | -- |
| Exhibit 24 | (Exhibit 24 was not marked.) | -- |
| Exhibit 25 | Document Entitled "Grand Jury Request for Documents," Dated August 24, 2006, and Related Documents (BEAUAIG0008089 to 0008098) | 93 |
| Exhibit 26 | Document Entitled "City of Beaumont Management Report and Auditor's Communication Letter," Dated June 30, 2014 (BEAUAIG0010225 to 0010238) | 94 |
| Exhibit 27 | Letter from Dave to Alan, Undated (BEAUAIG0010497 to 0010498) | 97 |



EXHIBITS

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit 28 | E-mail from "de4gecon1" to Alan Kapanicas, Dated June 17, 2014, Subject: "[BULK] Fwd: WRCOG Verdict" and Related E-mail Chain (BEAUAIG0010499) | 101 |
| Exhibit 29 | (Exhibit 29 was not marked.) | -- |
| Exhibit 30 | (Exhibit 30 was not marked.) | -- |
| Exhibit 31 | (Exhibit 31 was not marked.) | -- |
| Exhibit 32 | (Exhibit 32 was not marked.) | -- |
| Exhibit 33 | Letter from National Union Fire Insurance Company of Pittsburgh, Pa., to Alliant Insurance Services, Inc., Dated June 25, 2014, and Related Documents (BEAUAIG00049126 to 00049132) | 102 |
| Exhibit 34 | E-mail from James J. Gregg to Alan Kapanicas and Others, Dated June May 8, 2015, Subject: "RE: Bonds for City Clerk and Treasurer" and Related E-mail Chain (BEAUAIG00049136 to 00049137) | 104 |
| Exhibit 35 | E-mail from Alan Kapanicas to Elizabeth Gibbs-Urtiaga and "mdrown@ci.beaumont.ca.us," Dated May 19, 2015, Subject: "RE: Online Form Submittal: Proposed Fiscal Year 2015-16 Budget Questions" and Related E-mail Chain (BEAUAIG00049148) | 105 |
| Exhibit 36 | (Exhibit 36 was not marked.) | -- |



EXHIBITS

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit 37 | (Exhibit 37 was not marked.) | -- |
| Exhibit 38 | (Exhibit 38 was not marked.) | -- |
| Exhibit 39 | Document Entitled "Agreement for Services by Independent Contractor," Dated December 17, 2013, and Related Documents (BEAUAIG0073927 to 0073941) | 107 |
| Exhibit 40 | (Exhibit 40 was not marked.) | -- |
| Exhibit 41 | Document Entitled "Declaration of James Gregg," Dated February 7, 2022 (NUFIC_049202 to 049206) | 108 |
| Exhibit 42 | (Exhibit 42 was not marked.) | -- |
| Exhibit 43 | (Exhibit 43 was not marked.) | -- |
| Exhibit 44 | E-mail from Tom E. Corbett to James Gregg, Dated August 11, 2011, Subject: "RE: Crime Coverage - Beaumont" and Related E-mail Chain (ERMAC_002045 to 002047) | 153 |
| Exhibit 45 | E-mail from Robert Frey to James Gregg and Tom Corbett, Dated March 16, 2016, Subject: "Re: Crime Policy Claim" and Related E-mail Chain (ERMAC_002126 to 002131) | 156 |
| Exhibit 46 | E-mail from Elaine Kim to James Gregg and Others, Dated April 18, 2016, Subject. "RE: Possible Crime Coverage Claim - City of Beaumont" and Related E-mail Chain and Attachments (ERMAC_002168 to 002252) | 159 |






EXHIBITS

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit 47 | Document Entitled "Declaration of Nancy E. Hall," Dated February 9, 2022, and Related Documents (NUFIC_049321 to 049347) | 165 |
| Exhibit 48 | E-mail from Elaine Kim to James Gregg and Others, Dated April 18, 2016, Subject: "RE: Possible Crime Coverage Claim - City of Beaumont" and Related E-mail Chain and Attachments (ERMAC_002168 to 002252) | 170 |
| Exhibit 49 | Document Entitled "Superior Court of California Felony Plea Form," People v. Ernest Alois Egger, Case Number RIF1602262, Dated December 19, 2017 (BEAUAIG0003388 to 0003389) | 181 |
| Exhibit 50 | Document Entitled "Superior Court of California Felony Plea Form," People v. Deepak Moorjani, Case Number RIF1602262, Dated October 20, 2017 (BEAUAIG0003959 to 0003960) | 184 |
| Exhibit 51 | Document Entitled "Superior Court of California Felony Plea Form," People v. David William Dillon, Case Number RIF1602262, Dated December 19, 2017 (BEAUAIG0003911 to 0003912) | 185 |



EXHIBITS

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit 52A | Letter from Christopher E. Deal, Best Best & Krieger, LLP, to Jennifer Rocha, Director Financial Lines Claims, AIG Claims, Inc., Dated October 15, 2018 (NUFIC_012790 to 012811) | 187 |
| Exhibit 52B | E-mail from Elizabeth Gibbs-Urtiaga to Alan Kapanicas and Others, Dated January 28, 2015, Subject: "Insurance Decision Package" and Related Attachment (BEAUAIG0049174 to 0049176) | 195 |
| Exhibit 53 | E-mail from Jim Gregg to Tom E. Corbett, Dated August 1, 2011, Subject: "Crime Coverage - Beaumont" and Related Attachments (ERMAC_000030 to 000117) | 201 |
| Exhibit 54 | Letter from National Union Fire Insurance Company of Pittsburgh, Pa., to Alliant Insurance Services, Inc., Dated October 2, 2014, and Related Documents (NUFIC_001707 to 001990) | 204 |



TUESDAY, APRIL 26, 2022
10:01 A.M. PDT

THE VIDEOGRAPHER: Good morning. We are now on the record. This begins the deposition of James Gregg, in the matter of Western Riverside Council of Governments, et al., versus National Union Fire Insurance, et al., in the United States District Court, Central District of California.

Today's date is Tuesday, April 26, 2022. And the time is 10:01. This deposition is being taken virtually at the request of Best Best & Krieger, LLP.

The videographer is Nicholas Hemphill, of Magna Legal Services. And the court reporter is Brenda Matzov, of Magna Legal Services.

Will counsel and all parties present state their appearance and whom they represent, after which will the court reporter please swear in the witness.

MR. DEAL: This is Christopher Deal, for the plaintiff -- plaintiffs.

MR. SCHMOOKLER: Scott Schmookler, for the defendant.



MR. ROSS: This is Brian Ross, from Rains Lucia Stern St. Phalle & Silver, representing the deponent James Gregg.

JAMES GREGG,
called as a witness, being duly sworn remotely, was examined and testified as hereinafter set forth.

EXAMINATION
BY MR. DEAL:
Q. Good morning, Mr. Gregg.
A. Good morning.
Q. My name is Chris Deal. I represent WRCOG.
You're familiar with WRCOG; correct?
A. Yeah. Uh-huh.
Q. What's -- have you ever had your deposition taken before?
A. No.
Q. Are you a lawyer?
A. I am.
Q. Despite that fact, I'm going to go over some of the basic rules of deposition with you.





First, it's important that you let me finish my questions and then give your answer so the reporter has a clear record. It's important not to give "huh-uhs," shakes of the head, non-verbal communication. Since this is a deposition, it needs to be transcribed in a booklet.
At the conclusion of the deposition, you're going to get a chance to review your testimony and possibly make changes to that testimony. But if you make significant changes --
MR. DEAL: I'm hearing an echo.
THE COURT REPORTER: It -- it might be my speakers. Let me mute myself and see if that helps. Try that again. Sorry.
BY MR. DEAL:
Q. Okay. So, essentially, Mr. Gregg, there'll be a booklet with my questions, your answers. You'll be given a chance to review it. But if you make significant material changes to those answers, I or anyone else trying this case could comment on that fact at trial. So it's important you give me your best testimony today.



Do you understand that?
A. I do.
Q. Okay. If, during the course of the deposition, you need to take a break or you need to talk with your attorney, just let us know. I'd just appreciate, if a question's pending, that you answer the question before going off the record.
During the course of the deposition, I may ask you for estimates. I'm entitled to your estimate but not a guess.
The classic example is if I ask -- asked you to -- to estimate the length of my coffee table, which is right next to me, you couldn't do that because you don't see it.
Right?
A. Correct.
Q. But if I asked you to estimate the length of your home dining room table, you could do that because you've seen it.
Correct?
A. Correct.
Q. Have you had any drugs or alcohol in the last 24 hours which might affect your



ability to give your best testimony?
A. No.
Q. Okay. Is there any other reason why we can't proceed with your deposition?
A. None that I'm aware of.
Q. Where are you currently employed?
A. I am -- I'm of counsel to the Fischer Law Office.
Q. And what is the Fischer Law Office?
A. It's a law firm in Long Beach, California.
Q. Are you an -- are you admitted to practice law in California?
A. I am.
Q. Okay. Where did you go to law school?
A. Southwestern University School of Law.
Q. When did you obtain your degree?
A. 1995.
Q. And did you take the Bar exam?
A. I did.
Actually, I think I graduated in December of 1994 but walked in May of '95.
Q. All right. So I'm going to go over your work history a little.
How long have you been at Fischer



law firm -- Fischer Law Office?
A. I believe 2017 on.
Q. And where were you prior to Fischer Law Office?
A. In -- I was the general manager of ERMAC from 20 -- 2006 through December 31st, 2017, I believe. And from 2 -- oh, excuse me. 2004 to 2017. And from 2016 -- July 2016 or -- excuse me -- July '20 -- 2006 through June 30th, 2015, I worked for the city of -- of Beaumont.
Q. You -- you've been involved in some litigation with -- is it with CalPERS? -- regarding your retirement benefits?
A. That's correct.
Q. Okay. And does that have to do with whether you were an employee of ERMAC or an employee of Beaumont?
A. It had to do with whether or not I was an employee of the city of Beaumont.
Q. Okay. And has an adjudication been made in that matter?
A. There was an arbitration decision, a 53-page decision, that indicated that I was an employee. There was a subsequent hearing





afterwards in which there's been no finding. But the arbiter had indicated to all parties that he was not inclined to change the initial finding that I was --
Q. Do you know if that's --
A. -- employee of Beaumont.
Q. Has that been converted into a judgment? Or do you know if steps have been taken --
A. No.
Q. -- to confirm the award?
MR. SCHMOOKLER: I'm just going to object -- object. It calls for a legal conclusion.
BY MR. DEAL:
Q. So you first started working with the city of Beaumont in 2006?
A. Yes.
Q. And what were you brought on as? What was --
A. Risk --
Q. -- your --
A. -- manager.
Q. -- job?
THE COURT REPORTER: I'm sorry?



THE WITNESS: Risk manager.
THE COURT REPORTER: One second, you guys. You're talking at the end. I didn't -- yeah, if you can just try not to. Thank you.
BY MR. DEAL:
Q. And who -- how did the hiring process go? Who did you interview with?
A. I interviewed with the city manager, Alan Kapanicas. Yeah.
Q. Anyone else?
A. I was trying to think. I may have spoken with the city attorney. But I believe it was just the city manager.
Q. And did you have a prior relationship with Mr. Kapanicas?
A. He -- the city of Beaumont sat on the ERMAC board of directors.
Q. Prior to 2006, did you have any type of personal relationship with Mr. Kapanicas? For example, you would go to dinner? Share -- go to drinks? Anything like that?
A. We had done that on occasion. But it wasn't frequent.
Q. Would you consider him your -- your



friend in 2006?
A. A collegial friend. Yes.
Q. Did you ever have an ownership interest in a company called GGMS?
A. No.
Q. Did you ever have any involvement or any role with a company called GGMS?
A. I was agent for service of process. He had asked me to do that out of the Long Beach office because he didn't want to put his home address up for public consumption.
Q. So you were the agent for service of process for Mr. Kapanicas?
A. No. For GGMS, I thought was your question.
Q. I'm sorry. Yeah. Thank you.
Did you understand what GGMS is?
A. It was a consulting firm owned by Mr. Kapanis -- Kapanicas, as I understood it.
Q. And do you know what type of consulting they did?
A. He performed city manager and some financial -- I -- I'm not sure what the exact financial, you know, consulting was. And he did this for multiple cities. It may have



been other municipalities as well or other government agencies. I -- I -- I'm not sure.
Q. Prior to 2006, had you ever worked as a risk manager?
A. Yes.
Q. Where?
A. City of Gardena.
Q. And when was that?
A. I began work for the city in 1977. I moved to the city manager's office in 1981. And that's when I began performing risk management type work.
Q. And can you generally describe for me what a risk manager does?
A. Generally, a risk manager is involved in trying to deal with risk issues facing a -- their client or their employer, whether you'd be transferring risk or assuming risk, and establishing some of the financial criteria by which to determine whether to transfer risk either through risk retention pools or through insurance and maintaining self-insurance reserves within a -- a program, identifying those claims, maybe possibly setting up loss runs, developing loss runs that identify each of the individual





claims that are -- the city is facing, establishing reserves, reporting to excess carriers if -- you know, for claims, coordinating those types of things.
Sometimes it involves some cursory levels of safety or reporting with OSHA and those types of things. It -- it could --
Q. Is the risk --
A. -- include more. But that -- that's -- yeah, that's generally --
Q. Is the --
A. -- what -- that's generally what an -- a risk manager would be handling.
Q. Thank you, Mr. Gregg.
Is one of the jobs to actually submit claims on behalf --
A. Yes.
Q. -- of the city?
A. Oh, excuse me. I thought you were finished with your question.
Yes.
Q. And do you submit those claims? Or would the city manager submit the claim?
A. Oftentimes the city attorney would do that.



Q. Would you have input into the decision as to whether to submit a claim or not?
A. Oh, yes.
Q. Okay. If you could turn to --
MR. DEAL: Well, actually, before we go on, Scott, are we sequentially numbering exhibits?
MR. SCHMOOKLER: No. I just asked Meagan. Apparently, it's sequential only in each deposition.
MR. DEAL: Okay.
BY MR. DEAL:
Q. I'm going to ask you to turn to -- see if I can get this right. I think it's going to be the document, the last three digits 584 and 585. It's the first -- first exhibit.
A. Sorry. My computer just closed down. I have to --
Q. Sure. Take your time.
A. Okay. You'll have to give me those numbers again.
Q. It's 584 and 585.
A. Okay. I found 584.
Q. 585 is probably the -- the real



substantive document.
A. Of course. Let me try to find that one.
Q. I think what we tried to send you is -- is thumb PDFs.
A. Yeah. That's what I'm looking at. There's just a lot of them.
Five, eight -- you -- you're looking for 585; correct?
Q. Yeah. It should be pretty much part of the first tab, the first document.
A. I'm on -- I'm just on a big screen with all of them -- like all 30 of them. So sorry. I'm not seeing that. Sorry.
MR. ROSS: Can we go off the record until we figure out what's going on with Mr. Gregg's exhibits?
MR. DEAL: Yeah.
THE VIDEOGRAPHER: The time is 10:18 a.m. And we are off the record.
(Recess from 10:18 a.m. to 10:19 a.m. PDT.)
(Exhibit 1 marked.)
THE VIDEOGRAPHER: The time is 10:19 a.m. And we are back on the record.



BY MR. DEAL:
Q. Okay. And do you see, Mr. Gregg, that there's a document before you:
"March 1993 - Community and Economic Development Services Agreement."
A. (Examining.) I do. Uh-huh.
Q. Are --
A. I have that --
Q. Are you --
A. -- document. Excuse me. I have that document up. Uh-huh.
Q. Are you familiar with that document?
A. No.
Q. Okay. Have you ever read through the March 1993 Community and Economic Development Services Agreement?
A. No.
Q. Okay. Is ERMAC a self-insure? Or is it a insure -- pooled insurance entity?
A. It's both.
Q. Okay. My understanding -- and maybe this -- maybe this is the easiest way is I'll tell you what my understanding of what -- of what it is and you can correct me if I'm wrong -- is that ERMAC arranges first for some -- some





layer of coverage under pooled coverage and that it contracts out for excess insurance and specialized policies such as crime and pollution. That's my understanding.
A. That's correct, with the exception of not all the policies had some self-insured retention. Some were just strictly pass-throughs.
So, for instance, the crime policy was a crime policy that ERMAC took no share of risk in. Mostly their risk was taking in the general liability area.
Q. Okay. Thank you.
So kind of jumping around. With Mr. Kapanicas, how did you first find out about the opportunity at the city of Beaumont to work as a risk manager?
A. I had presented to the ERMAC board that I was planning on looking for work in a -- in a municipality to return back into city or municipal employment. And the board of directors at that point of ERMAC wanted to retain me. And they indicated that -- that they would desire to -- to have one of the cities hire me in order to -- and I would do -- I could do my ERMAC general



manager program through them.
The city had a need for a risk manager. So they hired me to perform not only the ERMAC duties but as well as act as the risk manager for the city, handling their claims and risk management issues with the city.
Q. And so who approached you about possibly working for the city of Beaumont?
A. Mr. Kapanicas.
Q. Okay. And how did -- how did that come -- how did he do that?
A. I think it was in a telephone call. But I -- I don't exactly remember.
Q. And then you had -- did you have a formal interview with Mr. Kapanicas? Or --
A. There was a --
Q. -- was it -- go ahead.
A. There was a -- I did -- I did sit down and talk to him about what the duties and responsibilities of the job would be. He indicated that I'd be hired on a tentative basis and then the city would go through a recruitment process, posting of the job spec and so on.



There was the filling out of the necessary applications and so on. And after the -- the postings and so on, there were no applications -- other applications made. And at that point I was hired on permanently.
Q. Okay. And sorry to skip around.
You were appointed the agent for service of process for GGMS; right?
A. Yes, I was.
Q. GGMS is an Alan Kapanicas company; right?
A. It was owned by Alan Kapanicas. Yes.
Q. Okay. So you -- you had some prior business relationship with Mr. Kapanicas prior -- prior to joining the city; correct?
A. Prior to 2006, I had assisted him with the dissolution of one company and the incorporation of another and the preparation of some minutes. But as soon as I became an employee of the city, I advised him I could not do any other work.
Q. So the nature of your prior relationship with Mr. Kapanicas was that you had performed legal -- legal functions for him?
A. Not for Mr. Kapanicas. No.



Q. For GGMS?
A. I did some limited minutes preparation for corporate compliance work. Yes.
Q. So you were the general manager of ERMAC from 2004 to 2017?
A. That's correct.
Q. And then you were with the city from 2006 to 2015; is that correct?
A. Correct. Uh-huh.
Q. Prior to 2004, did you --
A. I believe -- excuse me. I'm sorry.
I think I -- my term ended December 31st, 2016. So --
Q. Thank you.
A. -- some of the dates run together now. It's getting to be a long time ago. But I believe that's correct.
Q. What are you currently doing at the Fischer Law Office?
A. Mostly trust administration, probate work. That's the majority of my work.
Q. You -- you mentioned that the city did not have a risk management department -- is that correct? -- when you joined?
A. That's true.





Q. Did it ever, during your tenure, develop a risk management department?
A. It was a small city. I was basically the department. I was -- there were certain staff assigned to assist me.
Q. And who were those staff?
A. Roxann Sherwood. And Elizabeth Gibbs I would work with quite a bit. And then she had her own staff that she may assign on particular projects.
Q. And in 2006 when you started, what was Elizabeth Gibbs' title?
A. I believe it was human resources director.
Q. And how would she help with the risk management services you would perform?
A. So when we would collect application data for excess, to apply for insurance, she would assist in that. She would assist with forwarding claims from the city. So she -- she maintained, like, the camera. She also kept the files -- the risk management or claim files within her office in a locked file cabinet.
We would discuss risk management



issues, you know, how to pursue -- well, you know, whether it was -- you know, how to value or obtain information for property applications or general liability applications and so on.
Q. Did Ms. Gibbs have any involvement in the selection of the types of insurance that the city would -- would purchase?
A. Prior to me coming on, that was one of her roles. And we would discuss that. Yes.
Q. Can you generally describe for me how the process worked of submitting a claim?
That's pretty broad.
But what I'm trying to figure out is -- is: How is the claim received initially? Who does it go to first? And then: What is the process by which it eventually gets reported to ERMAC?
MR. SCHMOOKLER: Object to form.
THE WITNESS: What was that last part? Did somebody say something?
MR. SCHMOOKLER: I can state my objections for purposes of the record, Mr. Gibbs [sic].
So unless -- if you understood



the question, you can answer it. I just have to state my objections for purposes of the record.
THE WITNESS: Yeah. I just didn't hear what you said. And it's Mr. Gregg, not --
MR. SCHMOOKLER: Oh, sorry.
THE WITNESS: -- Gibbs.
MR. SCHMOOKLER: Sorry. I apologize.
THE WITNESS: That's okay.
MR. SCHMOOKLER: We were just talking about Ms. Gibbs.
THE WITNESS: Yeah, I -- I know.
So a claim would normally come in through the city clerk's office. And then it would be distributed amongst -- I -- I suppose amongst the city attorney and maybe the city manager. I don't know. But, eventually, I would get that and I would evaluate that. But not all claims are made as municipal claims.
So we had a police department. If there was a federal lawsuit, they don't have to file a claim under the Tort Claims Act. So, you know, when those lawsuits would come in, they'd get to the city attorney. Eventually



they'd get to me. You know, I would -- I would evaluate those in terms of, you know, are -- do they have coverage?
And not all lawsuits necessarily had -- were general liability claims. So we had -- as I recall, there was a claim for a medical marijuana dispensary where they had fines over a period of time and -- and the city had collected these fines. And it wasn't, you know, under a general liability -- you know, it wasn't an insurable matter. We called them uninsurable.
So those would be not be -- even if they were significant numbers, if the -- the type of lawsuit was not an insurable amount, then it wouldn't be reported.
But if it was, for instance, a -- let's just use a -- a civil rights case in which we have a death which requires reporting, then, you know, we -- we -- I would advise the city attorney and we would report that up to -- to ERMAC.
BY MR. DEAL:
Q. So as the risk manager, your -- with respect to the process of submitting





MAGNA LEGAL SERVICES