# EXHIBIT 1

EXHIBIT 1
PAGE 5

Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


WESTERN RIVERSIDE COUNCIL OF  )
OF GOVERNMENTS, a California  )
Joint Powers Authority,       )
                              )
            Plaintiff,        )
                              )
       v.                     ) Case No. 5:20-cv-02164-
                              )            GW (KKx)
NATIONAL UNION FIRE INSURANCE )
COMPANY OF PITTSBURGH, PA,    )
and DOES 1 through 50,        )
inclusive,                    )
                              )
            Defendants.       )
_____)



VIRTUAL VIDEOTAPED DEPOSITION OF PETER FOGARTY, CPA, CFE,
CFF, taken on behalf of Plaintiffs Western Riverside
Council of Governments and City of Beaumont, via Zoom
Videoconferencing, beginning at 8:03 a.m., and ending
at 1:52 p.m., on Thursday, July 28, 2022, before
Marceline F. Noble, RPR, CRR, Certified Shorthand
Reporter No. 3024.




Magna Legal Services
866-624-6221
www.MagnaLS.com


Reported by:
Marceline F. Noble
CSR No. 3024

Job No. 854511



EXHIBIT 1
PAGE 6

Page 2

```
1    APPEARANCES:
2    For Plaintiffs WESTERN RIVERSIDE COUNCIL OF GOVERNMENTS
     and CITY OF BEAUMONT:
3
         BEST BEST & KRIEGER LLP
4        BY:  CHRISTOPHER PISANO, ESQ.
         18101 Von Karman Avenue, Suite 1000
5        Irvine, California 92612
         (949) 263-2600
6        (949) 260-0972  Fax
         christopher.pisano@bbklaw.com
7
8    For Defendant NATIONAL UNION FIRE INSURANCE COMPANY:
9        GORDON REES SCULLY MANSUKHANI, LLP
         BY:  SCOTT L. SCHMOOKLER, ESQ.
10       5 Park Plaza, Suite 1100
         Irvine, California 92614
11       (312) 980-6779
         sschmookler@grsm.com
12
13
14   Also Present:
15       JESSE NAVARRO, Videographer
16       ROBERT MORRISON, Technician
17
18
19
20
21
22
23
24
25
```

Page 3

```
1                  INDEX
2    WITNESS                    EXAMINATION
3    PETER FOGARTY, CPA, CFE, CFF
4        By Mr. Pisano           6
5
6
7                 EXHIBITS
8    NUMBER   DESCRIPTION                PAGE
9     1    Subpoena to Testify at a Deposition   7
           in a Civil Action, and attachments
10
      2    Defendant's Rule 26(a)(2) Disclosures   9
11
      6    E-mail, 8/18/17, to Jennifer Rocha   33
12         from Peter Fogarty
13    7    Letter, 5/15/19, to Jennifer Rocha   37
           from Peter Fogarty
14
      14   Letter, 8/16/19, to Jennifer Rocha   39
15         and Kenneth Watnick from Peter Fogarty
16    8    Extrapolation of Subcontractor   72
           Invoices
17
      5    Letter, 12/14/16, to Peter Fogarty   113
18         from Jennifer Rocha
19    17   E-mails between Mr. Fogarty and   152
           Fred Dairman
20
      18   Preliminary Research Summary,   153
21         11 pages
22
23           INSTRUCTION NOT TO ANSWER:
24               Page 15, Line 17
                 Page 19, Line 16
25
```

Page 4

```
1             (Via Zoom Videoconferencing)
2               THURSDAY, JULY 28, 2022
3                8:03 a.m. - 1:52 p.m.
4
5          THE VIDEOGRAPHER:  All right.  Stand by.
6       Good morning.  We're on the record at
7    8:03 a.m., on Thursday, July 28th, 2022.
8          This begins media No. 1 in the deposition of
9    Peter Fogarty, in the matter of Western Riverside
10   Council of Governments versus National Union Fire
11   Insurance Company of Pittsburgh, Philadelphia [sic],
12   et al., filed in the United States District Court,
13   Central District of California.
14         Case No. 5:20-cv-02164-GW (KKx).
15         This deposition is being taken remotely,
16   using virtual technology at the request of Best
17   Best & Krieger, LLP.
18         Please note that the quality of the
19   recording depends on the quality of camera and
20   Internet connection of participants.  What is seen
21   from the witness and heard on screen is what will be
22   recorded.
23         Audio and video recording will continue to
24   take place unless all parties agree to go off the
25   record.
```

Page 5

```
1          The court reporter is Marceline Noble of
2    Magna Legal Services.
3          I am the videographer, Jesse Navarro, of
4    Magna Legal Services.
5          I am not related to any party in this
6    action, nor am I financially interested in the
7    outcome.
8          Would counsel and all parties present state
9    their appearances and whom they represent, beginning
10   with the noticing attorney.
11         MR. PISANO:  Christopher Pisano, Best
12   Best & Krieger, representing the plaintiffs.
13         MR. SCHMOOKLER:  Scott Schmookler on behalf
14   of defendants.
15         THE VIDEOGRAPHER:  Okay.  Would the court
16   reporter please swear in the witness.
17
18         PETER FOGARTY, CPA, CFE, CFF,
19   having been first duly sworn, was examined and testified
20   as follows:
21
22         THE REPORTER:  Thank you.
23         THE WITNESS:  You're welcome.
24   ///
25   ///
```



2  (Pages 2 to 5)

EXHIBIT 1
PAGE 7

Page 6

```
 1              EXAMINATION
 2  BY MR. PISANO:
 3     Q. Good morning, Mr. Fogarty.
 4     A. Morning, Mr. Pisano.  How are you?
 5     Q. I'm well.  And yourself?
 6     A. Doing fine.  Thank you.
 7     Q. Good.
 8        We briefly exchanged pleasantries off the
 9  record, but my name is Christopher Pisano, and I'm
10  representing the plaintiffs in this matter.  And I'm
11  going to be taking your deposition this morning,
12  although it's probably getting close to the afternoon
13  where you are.
14        Have you ever had your deposition taken
15  before?
16     A. Yes.
17     Q. On how many occasions?
18     A. 30, 35.
19     Q. Do you feel pretty comfortable in the
20  general admonitions, or what the lawyers like to call
21  "ground rules" of a deposition, or do you want me to
22  go over them with you?  Happy either way.
23     A. I -- I'm fine.  The verbal "uh-hmms" and
24  things of that nature, yes.  Correct.
25     Q. Anytime you want to take a break, let me
```

Page 7

```
 1  know.  Happy to go off the record.
 2     A. I take frequent bathroom breaks, just so you
 3  know.
 4     Q. Fair enough.
 5        Any -- any time you need to do that, you let
 6  me know and we'll go off the record.
 7     A. Thank you.
 8     Q. Is there any reason we can't go forward with
 9  your deposition today?
10     A. Not that I'm aware of.
11     Q. All right.  Have you taken any medication or
12  substances within the last 24 hours that might impact
13  your ability to recall things?
14     A. No.
15     Q. Can we get Exhibit 1 up, please, Robert.
16        And I'd like to mark Exhibit 1 for the
17  record.
18        (Deposition Exhibit 1 was marked for
19        identification by the court reporter.)
20  BY MR. PISANO:
21     Q. Mr. Fogarty, can you see the screen?  The
22  exhibit -- can you see the exhibit on the screen?
23     A. Yes.  If you don't mind, I'll put my cheats
24  on.  That's another age issue.
25        Yes, sir, I do.
```

Page 8

```
 1     Q. This is just a -- this is a Subpoena that
 2  was issued by my office.  Although Mr. Schmookler of
 3  Gordon & Rees, was gracious enough to accept service.
 4        But have you seen this Subpoena to testify
 5  at a deposition?
 6     A. I believe I have.
 7     Q. All right.  And attached to it --
 8        If you scroll down a little bit, Robert.
 9        -- is a Notice of Deposition.
10        Have you seen this document before?
11     A. Is -- there's more to this, isn't there?
12     Q. There is.
13        If we could scroll down.
14     A. Yes, I believe I have.
15     Q. All right.  You understand that you're here
16  to give a deposition pursuant to a federal Subpoena?
17  You --
18     A. Yes.
19     Q. -- understand that?
20     A. Yes.
21     Q. And you -- as I understand it, you work and
22  reside in the Boston area; is that right?
23     A. No.  I -- I actually work and reside in the
24  state of Florida, and I summer in the state of
25  Rhode Island.
```

Page 9

```
 1        And so I work out of those two states.
 2  Predominantly.
 3     Q. Right now, are you in -- or where are you
 4  right now?  Just the city.
 5     A. Yeah.  I'm in the JSL office in Providence,
 6  Rhode Island.
 7     Q. I haven't been to Providence in a long time.
 8  Nice town now.
 9     A. It's changed quite a bit.
10        MR. PISANO:  Okay.  We can take Exhibit 1
11  down.
12        Can we get Exhibit 2 up on the screen,
13  please, Robert.
14        (Deposition Exhibit 2 was marked for
15        identification by the court reporter.)
16  BY MR. PISANO:
17     Q. And, Mr. Fogarty, I don't know if you've
18  seen this document before.  But this Defendant's
19  Rule 26 A-2, expert disclosures for this litigation,
20  and I'm -- we're just going to put the caption page
21  up on the screen right now.
22        Have you ever seen this before?
23     A. Again, there's more to this, I believe,
24  and -- and my -- I believe I'm further down, but I'm
25  not a hundred percent sure.
```

**MAGNA**
LEGAL SERVICES

EXHIBIT 1
PAGE 8

1      Could you scroll down on this?
2      Q. Sure. Why don't we go to the next page,
3  please.
4      And you are on this document. Do you see
5  that, on page 2?
6      A. Yes. I have seen this.
7      Q. All right. When did you first see Exhibit
8  2, Mr. Fogarty?
9      A. I'm sorry.
10     Q. When did you first see this document?
11     A. Recently. Last couple of days.
12     Q. So the last couple of days was the first
13 time you saw this document?
14     A. I believe so, yes.
15     Q. Prior to the first time you saw this
16 document within the last couple days, did you have an
17 understanding that you were -- had been identified as
18 a potential expert witness in this case?
19     MR. SCHMOOKLER: Object to form.
20     Peter, do not disclose communications with
21 my office. Do you have it?
22     (Unintelligible.)
23     (Reporter clarification.)
24     MR. SCHMOOKLER: Object to form.
25     Peter, do not disclose communications with

1  my office. They're privileged under Rule 26.
2      But if you had an understanding, other than
3  through my office, you can answer.
4      THE WITNESS: Counsel, would you repeat the
5  question, please.
6  BY MR. PISANO:
7      Q. Sure.
8      Prior to the first time you saw this
9  document, which was within the last couple of days,
10 did you have an understanding one way or the other as
11 to whether you had been designated as an expert in
12 this case?
13     MR. SCHMOOKLER: Same objection.
14     THE WITNESS: Based upon counsel's
15 objection, I don't believe I can answer.
16 BY MR. PISANO:
17     Q. All right. So then, is it fair to say,
18 Mr. Fogarty, that prior to the first time you saw
19 this document, which happened within the last couple
20 of days, you did not know that you had been
21 identified as a potential expert witness in this
22 case?
23     MR. SCHMOOKLER: Object to form. Calls for
24 privilege, anything he learned about what has been --
25 what's been disclosed by counsel.

1      Under what --
2      MR. PISANO: What he -- what understanding
3  he has in his mind is not privileged.
4      MR. SCHMOOKLER: He -- he's told you that he
5  has no understanding other than what he learned
6  through counsel.
7  BY MR. PISANO:
8      Q. It's a yes or no. You either knew or you
9  didn't know.
10     Go ahead, Mr. Fogarty.
11     A. I'm sorry, Counselor. Could you repeat?
12     Q. Sure.
13     Prior to the time when you first saw this
14 document, within the last couple of days, yes or no,
15 did you know that you had been designated as an
16 expert in this case?
17     MR. SCHMOOKLER: Peter, do not disclose
18 anything that you learned from counsel. If the
19 information came through counsel, even a yes or no.
20     THE WITNESS: Right.
21     MR. SCHMOOKLER: But if you learned any
22 information through counsel, it is privileged. Do
23 not answer.
24     If you had an understanding other than
25 through counsel, you can answer.

1      THE WITNESS: On the advice of counsel, I
2  cannot answer that question.
3  BY MR. PISANO:
4      Q. Interesting. Okay.
5      Other than through -- what you learned
6  through counsel, Mr. Fogarty, did you know prior to
7  any time within the last couple of days, that you had
8  been designated as an expert in this case?
9      In other words, did you hear that you had
10 been designated as an expert in this case from any
11 source, other than counsel, within the last couple of
12 days?
13     A. Other -- no. I had no discussions with
14 anyone other than counsel.
15     Q. All right. Fair enough.
16     So I want to walk through with you some of
17 what is written in Exhibit 2.
18     And we'll start with the first sentence
19 under the header, "Peter Fogarty."
20     It says:
21     "Peter Fogarty, CPA, CFE, CFF, of J.S. Held,
22 previously known as Hagen Streiff Newton & Oshiro,
23 Accountants, PC, was retained by National Union prior
24 to this lawsuit to provide an analysis of City of
25 Beaumont's claimed loss."

MAGNA ◆
LEGAL SERVICES

EXHIBIT 1
PAGE 9

Page 14

1     Is that a true statement?
2   A.  Yes.
3   Q.  When were you retained by National Union to
4 provide an analysis in the City of Beaumont's claimed
5 loss?
6   A.  I believe it was December of 2016.
7   Q.  And who from National Union retained you?
8   A.  I'm not sure specifically who retained me.
9     I spoke to Fred Dairman initially, I believe
10 Jen Rocha, and Judith Blake.
11   Q.  Did those individuals contact you in around
12 the December 2016 time frame?
13   A.  Yes.
14   Q.  What did they say?
15   A.  I recall Fred Dairman calling me, giving me
16 an overview of the case.  I believe he referred me to
17 some public documents regarding the case so I could
18 get some kind of a background on it.
19     And that was my -- my initial engagement.
20   Q.  Did you sign an Engagement Agreement?
21   A.  No.
22   Q.  Have you ever signed an Engagement Agreement
23 with either AIG, National Union, or Gordon & Rees, to
24 provide an analysis of the City of Beaumont's claimed
25 loss?

Page 15

1   A.  No.
2   Q.  Have you been retained by Gordon & Rees to
3 testify at the trial of this matter?
4     MR. SCHMOOKLER:  Object to form.
5     Do not disclose the substance of any
6 communication with counsel.  You can disclose if you
7 haven't (unintelligible) --
8     THE REPORTER:  You keep cutting off at the
9 end of your statement.
10     "You can disclose...," what?
11     MR. SCHMOOKLER:  ... the substance of
12 communications with counsel, but you can disclose if
13 there's an engagement.
14     THE WITNESS:  Yeah.  I -- I do not have a
15 formal Engagement Letter with Gordon & Rees.
16 BY MR. PISANO:
17   Q.  How about an informal oral engagement with
18 Gordon & Rees, do you have one of those to testify at
19 the trial?
20     MR. SCHMOOKLER:  Object to form.
21     You're asking for communications with
22 counsel under Rule 26, privilege.
23     MR. PISANO:  So you're instructing him not
24 to answer?
25     MR. SCHMOOKLER:  I'm instructing him not to

Page 16

1 disclose the privileged communication with counsel
2 under Rule 26.
3     MR. PISANO:  So you're instructing him not
4 to --
5     MR. SCHMOOKLER:  Yes.
6     MR. PISANO:  -- answer?
7     MR. SCHMOOKLER:  Yes.
8     MR. PISANO:  Great.
9   Q.  Mr. Fogarty, you're going to follow that
10 instruction?
11   A.  Yes.
12   Q.  Are you being paid for your time today,
13 Mr. Fogarty?
14   A.  My firm is being paid for my time, Counsel.
15 Yes.
16   Q.  By whom?
17     MR. SCHMOOKLER:  You.
18     MR. PISANO:  Me?
19     MR. SCHMOOKLER:  You wanted his deposition.
20 BY MR. PISANO:
21   Q.  Okay.  So we paid you a witness fee; right?
22   A.  (No audible response.)
23   Q.  You -- we paid your company a witness fee,
24 Mr. Fogarty?  Is that right?
25   A.  My time today, Counselor, hasn't been billed

Page 17

1 yet.  So...
2   Q.  Do you plan on billing your time today,
3 Mr. Fogarty?
4   A.  I do.
5   Q.  And are you going to put that into an
6 invoice?
7   A.  It will be put into an invoice, yes.  I
8 won't do it, but yes.
9   Q.  And do you have an expectation that you will
10 be paid for your time?
11   A.  Yes.
12   Q.  By whom?
13   A.  Oh.  My understanding is BBK will be paying
14 for this.
15   Q.  Oh.  Okay.  That's interesting.
16     What's your hourly rate, since I have no
17 idea what it is, since it's not on the disclosure?
18   A.  I believe it's 375 an hour.
19   Q.  Hmm.
20     Did you do any work to prepare for today's
21 deposition, Mr. Fogarty?
22   A.  Yes.
23   Q.  What did you do to prepare for today's
24 deposition?
25   A.  I read through various file documents,

MAGNA
LEGAL SERVICES

EXHIBIT 1
PAGE 10

Page 18

1  correspondence, reports, and the like.
2      Q.  How much time did you spend preparing for
3  today's deposition?
4      A.  I don't know the exact amount of time.
5      Q.  Can you give me an estimate?
6      A.  Between 10 and 40 hours, I would say.
7      Q.  Have you billed your time for that 10 and
8  40 hours of prep work, sir?
9      A.  No.
10     Q.  Are you going to bill your time for that
11 prep work?
12     A.  Yes.
13     Q.  Do you have an expectation that you will be
14 paid for that prep work?
15     A.  Yes.
16     Q.  Who do you expect to pay you for that prep
17 work?
18     A.  Whoever the responsible party is under the
19 rules.
20     Q.  Do you have an understanding as to who that
21 is?
22     A.  It's either BBK or AIG.
23     Q.  Do you have some kind of contractual
24 arrangement with AIG to pay you for your time for
25 preparing for the deposition?

Page 19

1      A.  No.
2      Q.  On what basis do you believe if BBK does not
3  pay for your time for preparing for your deposition,
4  that AIG will?
5      A.  That I am providing services as it relates
6  to the claim that was filed against AIG or
7  National Union.
8      Q.  What services do you understand you are
9  providing in preparing for your deposition?
10     A.  Whatever services counsel requires of me.
11     Q.  What counsel?
12     A.  Gordon Rees.
13     Q.  So you understand that you're providing
14 services to Gordon & Rees?
15     A.  Yes.
16     Q.  And do those services include testifying at
17 the trial in this matter?
18         MR. SCHMOOKLER:  Object to form.
19     Do not disclose the substance of any
20 communications with counsel, including whether we
21 told you you were going to testify here.
22     Instruct you not to answer.
23 BY MR. PISANO:
24     Q.  How is it, Mr. Fogarty, that you have an
25 understanding that you're providing services to

Page 20

1  Gordon & Rees?
2      A.  Through communications with counsel.
3      Q.  And by "counsel," you mean Gordon & Rees.
4      A.  Correct.
5      Q.  When you say that you spent 10 to 40 hours
6  preparing for today's deposition -- and I believe you
7  said you looked at reports and things in the file,
8  et cetera.
9      Is that right?
10     A.  Yes.
11     Q.  Did you look at any reports that were
12 prepared by any other experts in this case as part of
13 that prep work?
14     A.  You'd have to tell me who those experts are,
15 for me to answer that question.
16     Q.  All right.  Dan Ray, did you look at any of
17 his work in the 40 hours of prep work -- 10 to 40
18 hours of prep work that you did?
19     A.  Yes.
20     Q.  How about Richard Tasker, did you look at
21 any of the materials that Richard Tasker prepared?
22     A.  No.
23     Q.  How about Anthony Hayter?  H-a-y-t-e-r.
24 Have you seen any materials that Mr. Hayter has
25 prepared?

Page 21

1      A.  No.
2      Q.  How about Peter Evans, have you seen any
3  materials that Mr. Evans has prepared?
4      A.  No.
5      Q.  How about Doug Barnhart, have you seen any
6  materials that Mr. Barnhart prepared?
7      A.  No.
8      Q.  All right.  So looking back on our first
9  sentence, Peter Fogarty.  Then you've got some
10 letters after your name.  CPA.  I think I know what
11 that means.  Certified Public Accountant?
12     A.  Correct.
13     Q.  What's CFE?
14     A.  Certified Fraud Examiner.
15     Q.  And what about CFF?
16     A.  Certified in Financial Forensics.
17     Q.  So, Mr. Fogarty, I -- I did not see in any
18 of the materials that I reviewed regarding you, any
19 kind of CV or resumé.
20     Did -- did you provide one to AIG or the
21 Gordon Rees firm in connection with this Beaumont
22 matter?
23     A.  I don't recall.
24     Q.  Oh.  Okay.  So -- I mean, I don't know.
25     Give me your elevator speech, Mr. Fogarty.

MAGNA ◆
LEGAL SERVICES

EXHIBIT 1
PAGE 11

Page 22

1  Was it -- what is it that you do for a living?
2     A.  Well, you want me to start at the beginning
3  or start going backwards?
4        What's -- what's your preference,
5  Mr. Pisano?
6     Q.  Why don't you start by telling me what you
7  consider yourself an expert in.
8        Well, let me -- maybe that's being
9  presumptuous.
10       Do you consider yourself to be an expert?
11    A.  Yes.  I -- I'm -- I consider myself an
12  expert in -- in financial matters, in many types of
13  insurance claims, fraud investigations, financial
14  investigations, things of that manner.
15       I testified as such on multiple occasions.
16    Q.  So an expert in -- in financial matters;
17  right?
18    A.  Well, I -- I use that particular phrase.
19  I -- I don't want to limit myself to a word, but I
20  have testified as an expert witness in multiple cases
21  involving financial matters, financial damages,
22  fraud, and the like.
23    Q.  I've heard the term "forensic accountant."
24       Do you consider yourself a forensic
25  accountant?

Page 23

1     A.  Yes.
2     Q.  And do you consider yourself to have
3  expertise in forensic accounting?
4     A.  Yes.
5     Q.  What about construction, do you consider
6  yourself an expert in construction?
7     A.  No.
8     Q.  You ever testified in a construction dispute
9  before?
10    A.  I -- I believe I have.  Believe I have.
11    Q.  But in your capacity as a financial expert?
12    A.  As a forensic accountant, yes.
13    Q.  So in other words, on the finance side of a
14  construction dispute.
15    A.  Yes.
16    Q.  All right.
17    A.  The books and records, let's say, associated
18  with a construction situation.
19    Q.  Okay.  What about public works construction,
20  are you an expert in public works construction?
21    A.  It would be the same answer I just gave you
22  about construction, sir.
23    Q.  So not necessarily on the construction
24  aspects itself, but perhaps in the financial side;
25  fair?

Page 24

1     A.  Depending upon the individual case, yes.
2  That's a fair -- fair assessment.
3     Q.  All right.  So let's get a little bit
4  granular in -- in construction world -- in -- in the
5  world of construction.
6        Are you an expert in construction
7  management?
8     A.  No.
9     Q.  Are you an expert in construction
10  inspections?
11    A.  No.
12    Q.  Are you an expert in plan checking?
13    A.  No.
14    Q.  Are you an expert in engineering?
15    A.  No.
16    Q.  When did this -- or strike that.
17       Let -- let's -- sticking [sic] back on our
18  first sentence here.
19       You are with J.S. Held; right?
20    A.  Correct.
21    Q.  And they used to be HSNO?
22    A.  J.S. Held acquired HSNO.
23    Q.  When did that happen?
24    A.  I believe it was May of 2019 approximately.
25    Q.  Was it after you had done your analysis in

Page 25

1  this case?
2     A.  I think -- well, when you say the
3  "analysis," my analysis was ongoing through certainly
4  the end of 2019, I believe, maybe even into the
5  beginning of 2020.  And by "analysis," I mean, I was
6  involved in the case.
7        So the majority, I think, of what we did was
8  while at HSNO, and then I believe there's some work
9  that was done also at J.S. Held.
10    Q.  Okay.  Other than the 10 to 40 hours of prep
11  work that you did for today's deposition, when was
12  the last time you billed any time in connection with
13  this analysis of -- of the City of Beaumont and its
14  claimed loss that's at issue in this litigation?
15    A.  Probably a couple of months ago.
16    Q.  What did you do then?
17       MR. SCHMOOKLER:  Object to form.
18       Calls for privileged work product of a
19  consulting expert that we're not relying on.
20       You shall not disclose anything you've done
21  as a consultant.
22       (Reporter clarification.)
23       MR. SCHMOOKLER:  As a litigation consultant.
24  BY MR. PISANO:
25    Q.  The work that you did a couple of months



1  ago, Mr. Fogarty --
2      Oh, and -- and, well -- and -- and so,
3  Mr. Fogarty, are you going to follow counsel's
4  instruction and not answer?
5      A.  Correct.
6      Q.  All right.  And so the work that you did a
7  couple of months ago, which apparently was -- well,
8  let me lay some foundation.
9      The work that you did a couple of months
10  ago, was that as a litigation consultant?
11      A.  Yes.
12      Q.  And were you providing litigation consulting
13  services for Gordon & Rees?
14      A.  Yes.
15      Q.  So the work that you did a couple of months
16  ago for Gordon & Rees, how much time did you spend?
17      A.  Couple of months ago, not much time.
18      Q.  Can you give me an estimate?
19      A.  Maybe five hours, ten hours.
20      Q.  Did you bill your time?
21      A.  Yes.
22      Q.  Did you submit your time to Gordon & Rees?
23      A.  I'm not sure who the bills were submitted
24  to.
25      Q.  Do you know if you were paid for that time?

1      A.  I don't know for sure.  I don't deal with
2  the billings and the accounts receivable,
3  collections.
4      Q.  You submit your -- your time -- generally
5  speaking, you submit your time.  And somebody in the
6  company then sends out the bills?
7      A.  That's correct.
8      Q.  Do you get notifications when your time
9  hasn't been paid, so you can go chase down your
10  clients?
11      A.  Pretty much every day.
12      Q.  Me, too.
13      Did you ever get a notification from
14  J.S. Held that you were not paid for that five to ten
15  hours' worth of work you did for Gordon & Rees a
16  couple of months ago?
17      A.  If I did, I just delete those notices.  So
18  not maybe the best practice, but I just generally
19  ignore them and delete them and -- and don't even
20  look at what I'm being notified of.
21      Q.  Okay.  Prior to the work that you did a
22  couple of months ago in your capacity as a litigation
23  consultant, when was the last time you did any work
24  in analyzing City of Beaumont's claimed loss that's
25  at issue in this case?

1      A.  In the months prior to a few months ago.
2      Q.  So what?  Maybe like half a year ago?
3      A.  Yeah.
4      Q.  And was that work also done in your capacity
5  as a litigation consultant for Gordon & Rees?
6      A.  Yes.
7      Q.  And that work that you did about a half year
8  ago, how much time did you spend?
9      A.  I don't -- I don't know precisely how much.
10      Q.  Can you give me an estimate?
11      A.  Not in -- not in hours, no.
12      Q.  Can you give me an estimate using some other
13  type of benchmark?
14      A.  $50,000 worth of work maybe.  Maybe more.
15      Q.  And was that work done all at that billing
16  rate that you identified for me earlier in this
17  deposition as your rate?
18      A.  Yes.  And -- and I'd like to just clarify.
19  That -- it's not just all my time.  It would be staff
20  time as well.
21      Q.  Fair enough.
22      So prior to the $50,000 or so worth of work
23  that you and your staff did a half year ago for
24  Gordon & Rees, when was the previous time that you
25  did work providing analysis of City of Beaumont's

1  claimed loss that's at issue in this case?
2      A.  I'm sorry.  Would you repeat that.
3      Q.  Sure.
4      So the -- strike that.
5      When was the next time -- working our way
6  back in time -- that you did work analyzing the City
7  of Beaumont's claimed loss at issue in this case,
8  prior to the work that you did about a half year ago?
9      A.  I believe it was probably sometime in early
10  2020.  And then subsequent to that would be work for
11  Gordon & Rees that we -- we did.
12      Q.  So early 2020?
13      A.  Yeah, I -- yeah.  I'm -- I don't like to
14  guess.  I know my reports were issued at the end of
15  2019 or thereabouts.  I believe there may have been
16  some additional minor correspondence, maybe a little
17  bit of work, but then it -- it came to an end.
18      Q.  Right.
19      And the last report I've seen with your name
20  on it, Mr. Fogarty, is dated August 16, 2019.
21      Do you recall that report?
22      A.  Yes, sir.
23      Q.  All right.  And so I have that one.
24      And this line of questioning I'm -- I'm
25  doing with you right now, I'm just trying to get an

MAGNA ▶
LEGAL SERVICES

EXHIBIT 1
PAGE 13

Page 30

1   understanding of what you did.
2       And I understand Mr. Schmookler is asserting
3   privilege, and, fair enough, he can do that, and you
4   don't have to answer specifics.
5       But I'm just trying to get an understanding
6   of when it is, at least, that you worked on this case
7   in any capacity.
8       And so after you finished your reports in
9   the later part of 2019, is it fair to say that the
10  next time you provided services in connection with
11  the City of Beaumont's claimed loss, was early 2020?
12      A.  Again, Counselor, I -- I would -- my
13  recollection is, we provided some service, we had
14  some discussions, some with counsel that I don't
15  believe I can speak to.  And then our engagement at
16  that point sort of was on hold, if you will, until
17  such time as -- as we were contacted by Gordon Rees.
18      Q.  When was the first time you were contacted
19  by Gordon Rees?
20      A.  I'm not sure.
21      Q.  Can you give me an estimate?
22      A.  I want to say, in 2021 at some point.
23      And, Counsel, just for purposes of this, I'm
24  going to need a bathroom break sooner than later.
25      So if you're going to launch into something,

Page 31

1   we might want to take a break before we launch.
2       Q.  All right.  Are you trying to get me to
3   change the subject, Mr. Fogarty?
4       A.  No, sir.  I -- it's just nature's calling.
5   So...
6       Q.  Why don't we take a break.  I -- I
7   absolutely respect that.
8       A.  Thank you, sir.
9       THE VIDEOGRAPHER:  Going off the record.
10      The time is 8:44 a.m.
11      (Short recess.)
12      THE VIDEOGRAPHER:  Stand by.
13      The time is 8:53 a.m.
14      We're back on the record.
15  BY MR. PISANO:
16      Q.  Mr. Tasker -- or strike that.
17      Mr. Fogarty, since you were first engaged by
18  Gordon & Rees as a litigation consultant -- in I
19  believe early 2021, you said -- how much time total
20  have you and your staff performed in providing those
21  litigation consulting services?
22      A.  I would say -- again, I don't know for
23  sure -- but probably somewhere between 75- and
24  $100,000.
25      MR. PISANO:  All right.  So let's go back

Page 32

1   and put Exhibit 2 back up on the screen, if we could,
2   please, Robert.
3       Q.  So we read -- we talked about the first
4   sentence in the Peter Fogarty paragraph.  The second
5   sentence says:
6       "The scope and substance of Mr. Fogarty's
7   work, knowledge and analysis is reflected in e-mails
8   to/from Mr. Fogarty and reports dated August 18,
9   2017, May 15, 2019, and August 16, 2019."
10      You see that?
11      A.  Yeah.  The -- the second page is cut off.
12  That's where all of our smiling faces are.
13      Is there any way to move that second page
14  over so I can see it?
15      Q.  Yes.
16      (Off-record comments.)
17      THE WITNESS:  We disappeared actually.
18      Yes -- yes, Counsel, I see that.
19  BY MR. PISANO:
20      Q.  All right.  And then it goes on to say --
21  again, we're -- we're on Exhibit 2, but now we're on
22  the third page.
23      "The subjects and bases for this witness's
24  testimony are disclosed in his reports,
25  communications and notes produced in this

Page 33

1   litigation."
2       You see that sentence?
3       A.  Yes.
4       Q.  All right.  So the prior sentence identifies
5   three reports in August 8 -- August 18, 2017 report,
6   a May 15, 2019 report, and an August 16, 2019 report.
7       Are those three reports that you prepared?
8       A.  My firm prepared, yes, under my direction.
9   Yes.
10      Q.  Now, just in connection with your analysis
11  of the City of Beaumont's claimed loss -- so, in
12  other words, leave aside the litigation consulting
13  work you've done for Gordon & Rees -- have you or
14  staff under your direction, written any other reports
15  analyzing the claim of loss?
16      A.  No.
17      MR. PISANO:  Can we put Exhibit 6 up on the
18  screen, Robert.
19      And I'd like to mark Exhibit 6 for
20  identification.
21      (Deposition Exhibit 6 was marked for
22  identification by the court reporter.)
23      THE TECHNICIAN:  Apologies.  Not responding.
24  Just give me two seconds.  I'll get it up.
25  ///



EXHIBIT 1
PAGE 14

Page 34

```
1    BY MR. PISANO:
2        Q. So, Mr. Fogarty, what I've put on the screen
3    is what I have marked as Exhibit 6, which is an
4    e-mail -- well, it's from you.  And we -- we can
5    scroll through it, if you want.  But it's to Jennifer
6    Rocha, dated August 18, 2017.
7        The first Bates page is NUFIC 001221.
8        You see that?
9        A. Yes.
10        There any way to make that larger?
11       MR. PISANO:  Probably.
12       Robert, can we enlarge it?
13       THE WITNESS:  Ah.  Much better.
14       Thank you, Robert.
15       THE TECHNICIAN:  My pleasure.
16       THE WITNESS:  Yes, Counsel.
17    BY MR. PISANO:
18        Q. Is this the first page of your August 18,
19    '27 [sic] report?
20       THE WITNESS:  You scroll down, please?
21    (Reporter clarification.)
22       MR. PISANO:  August 18, 2017 report.
23       THE REPORTER:  Thank you.
24       THE WITNESS:  It appears to be, yes.
25       MR. PISANO:  And, Robert, can we go to the
```

Page 35

```
1    last page, please.
2        Q. And you see at the bottom, it says, "Very
3    truly yours, Hagen, Streiff, Newton & Oshiro,
4    Accountants," and then by "Peter Fogarty and David
5    Gardiner"?
6        A. Yes.  Hagen Streiff, including partner,
7    David Streiff.  So...
8        And my correction, but...
9        David Streiff -- so Hagen Streiff Newton &
10    Oshiro, yes.
11        Q. All right.  And does this appear to be the
12    last page of your August 18, 2017 report?
13        A. It does.
14        Q. Would you like to -- us -- or strike that.
15        Would you like Robert to scroll through the
16    document in order to have you confirm that Exhibit 6
17    is your August 18, '27 report?
18        A. Would he mind just going to, you know, the
19    top of each?  So I'd like to see each page, 27 and
20    28, 26, 28 and the like, if you don't mind.
21        Q. Sure.
22        A. Okay.  Okay.  Mm-hmm.  Okay.
23        Thank you.
24        Q. So now that our tech, Robert, has gone
25    through all the pages, is Exhibit 6 the August 18,
```

Page 36

```
1    2017 report that you and your staff authored,
2    Mr. Fogarty?
3        A. Appears to be, yes.
4        Q. Each page of the report has a draft
5    watermark.
6        You see that?
7        A. Yes.
8        Q. Did you send this report to Ms. Rocha?
9        A. I believe I did, yes.
10        Q. Did you remove the draft watermark before
11    you sent it to her, or did you send it to her with
12    this watermark on it?
13        A. I believe it was sent the way it appears
14    right here.
15        Q. Did you ever update the August 18, 2017
16    report in any way?
17        A. We issued subsequent reports.
18        But if you're asking if we made a change to
19    this report, the answer is no.
20        Q. Okay.  That was the -- the gist of the
21    question.  So I appreciate the clarification.
22        A. My pleasure.
23        MR. PISANO:  All right.
24        Robert, we can take that down for now.
25        And I'd like to put up on the screen and
```

Page 37

```
1    mark Exhibit 7.
2        (Deposition Exhibit 7 was marked for
3    identification by the court reporter.)
4    BY MR. PISANO:
5        Q. Do you see that up -- do you see that up on
6    the screen, Mr. Fogarty?
7        A. I do.
8        Q. And this is a document, another e-mail that
9    you sent to Ms. Rocha on May 15, 2019; is that right?
10        A. Yes.
11        MR. PISANO:  And the first Bates page of
12    this document is NUFIC 003038.
13        Q. Do you see that down at the bottom?
14        A. I -- I can't see that from what you have.
15        MR. PISANO:  Can you maybe blow that up,
16    Robert, in the bottom right?
17        THE WITNESS:  I see that.
18        MR. PISANO:  All right.
19        And now can we go to the last page of the
20    document, Robert.
21        THE WITNESS:  And, Counsel, if we could do
22    the same exercise.  If you wouldn't mind having
23    Robert just scroll through each page.
24        MR. PISANO:  Sure.
25        Robert, can we go do that?  Can we go back
```

MAGNA ▶
LEGAL SERVICES

EXHIBIT 1
PAGE 15

Page 38

1  to page 1 and scroll through each page at -- at a
2  pace Mr. Fogarty is comfortable with, so he can
3  confirm the report.
4       THE TECHNICIAN:  Perfect.
5       THE WITNESS:  Thank you.
6  BY MR. PISANO:
7       Q.  Mr. Fogarty, is Exhibit 7, the May 15, 2019
8  report that you and your staff prepared?
9       A.  It appears to be, yes.
10      Q.  And did you send this report to Ms. Rocha at
11 AIG?
12      A.  Yes.
13      Q.  Incidentally, for this report --
14      A.  Counsel, when I -- when I say "I," it may
15 not have been me.  It may have been a staff person.
16      But yes, we -- we sent it to Ms. Rocha.
17      Q.  Okay.  And did you send it to her or on
18 around May 15, 2019?
19      A.  Yes.  I believe -- yes.
20      Q.  For Exhibit 6, did you send her the report
21 on or about August 18, 2017?
22      A.  Yes.
23      Q.  And this document, Exhibit 7, also has the
24 draft watermark.
25      Did you send the report to Ms. Rocha with

Page 39

1  the draft watermark on each page?
2       A.  I believe we did, yes.
3       Q.  Okay.  And then other than, perhaps -- or
4  writing a supplement or a further report, did you in
5  any way update or modify Exhibit 7 after it was sent
6  to Ms. Rocha on or about May 15, 2019?
7       A.  I -- I -- not that I -- no, I don't think we
8  did.  No.
9       MR. PISANO:  Okay.  And so we can take that
10 down, Robert.
11      And I'd like to put up on the screen and
12 mark for identification Exhibit 14.
13      (Deposition Exhibit 14 was marked for
14      identification by the court reporter.)
15 BY MR. PISANO:
16      Q.  And do you see page 1 of Exhibit 14 up on
17 the screen, Mr. Fogarty?
18      A.  I do.
19      Q.  And this is a communication dated August 16,
20 2019, to Jennifer Rocha and Ken Watnick.
21      You see that?
22      A.  I do.
23      Q.  And who's Ken Watnick?
24      A.  Ken Watnick was counsel with Anderson
25 McPharlin & Conners.

Page 40

1       Q.  Why were you sending this document to him?
2       A.  Because we were told to and because --
3  well -- yeah.
4       Q.  Okay.  And Ms. Rocha --
5       A.  He was involved with the file at that point.
6       Q.  Okay.  Ms. Rocha, what did you understand
7  her role to be?
8       A.  I -- I believe she was the primary claims
9  examiner or handler of this file.
10      Q.  All right.  And down on the bottom of the
11 first page, it's Bates-labeled NUFIC 002291.
12      You see that?
13      A.  I do.
14      Q.  All right.  I'd like to go through the same
15 exercise where Robert scrolls through the document
16 at -- at a pace you're comfortable with, Mr. Fogarty,
17 and then at the end, ask you if you could confirm
18 that this is the August 16, 2019 report that you and
19 your staff prepared.
20      A.  Fine.
21      Appears to be, yes.
22      Q.  Great.
23      So can we go back to Exhibit 2, please,
24 Robert.  And go to -- put the bottom of page 2 and
25 the top of page 3 up on the screen.

Page 41

1  BY MR. PISANO:
2       Q.  And so, Mr. Fogarty, when the expert
3  disclosure talks about your reports dated August 18,
4  2017, May 15, 2019, and August 16, 2019, are those
5  the reports that we've marked as Exhibits 6, 7 and
6  14, respectively?
7       A.  Yes.
8       Q.  Great.
9       Sticking on page 3 of Exhibit 2.
10      After the disclosure talks about your three
11 reports, it goes on to say:
12      "The subjects and bases for this witness's
13 testimony are disclosed in his reports,
14 communications and notes produced in this litigation.
15 Defendant reserves the right to elicit testimony and
16 opinions on any subjects disclosed in this witness's
17 documents produced in this litigation."
18      You see those two sentences?
19      A.  Yes.
20      Q.  All right.  So, Mr. Fogarty, do you have any
21 opinions that you know you're going to testify to at
22 the trial of this matter?
23      MR. SCHMOOKLER:  Object to form.
24      Mr. Fogarty, please do not disclose any
25 substance of any communications with counsel that are

**MAGNA**
LEGAL SERVICES

EXHIBIT 1
PAGE 16

Page 42

1  privileged.
2      If you have anything to say other than what
3  you learned through me, you can say it.  But if you
4  learned it through me, please do not disclose
5  communications with counsel.
6      THE WITNESS:  Advice of counsel, I don't
7  have an answer for that question.
8  BY MR. PISANO:
9      Q.  Right.
10      Well, Mr. Fogarty, as I read those reports,
11  my understanding of your involvement in all of this,
12  is that you were retained by AIG to analyze
13  Beaumont's claim of loss after it was submitted.
14      Is that fair?
15      A.  Yes.
16      Q.  Is that what you were retained by AIG to do?
17      A.  Yes.
18      Q.  In the course of -- and -- and did you do an
19  analysis of Beaumont's claim of loss?
20      A.  Yes.
21      Q.  And is your analysis of Beaumont's claim of
22  loss discussed in those three reports that we looked
23  at, Exhibits 6, 7 and 14?
24      A.  Yes.
25      Q.  In the course of performing that analysis,

Page 43

1  did you formulate any opinions regarding the claim of
2  loss?
3      A.  I would say yes.
4      Q.  What opinions did you formulate regarding
5  Beaumont's claim of loss?
6      A.  Well, as we just discussed, Counsel, there's
7  three separate reports.  They are 50 pages long and
8  probably 700 pages of analysis that went along with
9  them.
10      There are quite a few observations, I guess
11  you could say opinions, that are noted in each of the
12  reports.
13      Q.  I know there are.  And I tried to do this
14  the easy way by just asking what opinions you're
15  going to testify to at trial, but I'm getting nowhere
16  with the easy button.
17      So I'm trying to figure out what to do here,
18  Mr. Fogarty, 'cause I don't want this depo to take
19  all day.
20      MR. SCHMOOKLER:  Chris, I'll try to make
21  your life (unintelligible).
22      MR. PISANO:  Scott, you're gonna just -- I
23  know the court reporter has said this a couple of
24  times.  You've got a little bit of a choppy
25  connection.

Page 44

1      MR. SCHMOOKLER:  Hold on.  I will try to
2  make your life easier today, Chris.  I'll offer you
3  this stipulation.
4      Mr. Fogarty will not be appearing at trial
5  to offer any conclusions or analysis that are not
6  reflected in the three reports.  And then there's a
7  few e-mails that you have where he did some
8  supplemental analysis in 2019.
9      We're limiting ourselves within those
10  reports.  And the e-mails that are referenced in our
11  disclosure are because there's two or three e-mails
12  at the end of 2019's supplemental analysis.
13      Other than that, we're not using him for any
14  other analysis.  If that makes today easier, I'm
15  happy to offer that.
16      MR. PISANO:  Well, I appreciate that, Scott.
17  It doesn't make my life any easier.  And, in fact,
18  what you just said complicates things, because in the
19  documents that I looked through, I only saw one
20  e-mail, which was in July of 2019.
21      MR. SCHMOOKLER:  What do you mean you only
22  saw one e-mail?
23      MR. PISANO:  I only saw one e-mail.
24      MR. SCHMOOKLER:  You don't --
25      MR. PISANO:  I don't know what --

Page 45

1      MR. SCHMOOKLER:  -- have 34348?
2      MR. PISANO:  Say the Bates -- say the Bates
3  number again.
4      MR. SCHMOOKLER:  34348.
5      MR. PISANO:  34348.
6      MR. SCHMOOKLER:  That's an e-mail.
7      MR. PISANO:  Uh, I don't know.
8      MR. SCHMOOKLER:  47892 is an e-mail.
9      MR. PISANO:  47892.
10      MR. SCHMOOKLER:  That was in the production,
11  all of which are Bates stamped.
12      MR. PISANO:  So 34348 --
13      MR. SCHMOOKLER:  Yeah.
14      MR. PISANO:  -- and 47892?
15      MR. SCHMOOKLER:  47892.
16  Just two e-mails from December of 2016.
17      MR. PISANO:  All right.  Well, I'll -- I'll
18  try to track those down on a break.  I -- I
19  appreciate the stipulation.  It really doesn't make
20  my life any easier.  But -- okay.
21      MR. SCHMOOKLER:  Okay.
22      MR. PISANO:  It doesn't say anything that's
23  not in the disclosure.
24      I guess...
25      So let's go back to Exhibit 6.  Exhibit 6 is



1  our first report, August 18, 2017; correct?
2  A. Yes.
3  Q. And in the re line, you say, "Status Report,
4  Preliminary and Tentative."
5  You see that?
6  A. Yes.
7  Q. At the time you wrote this report, how long
8  had you been analyzing Beaumont's claim of loss?
9  A. At some level since our initial engagement
10  in December of 2016.
11  Q. Had you reviewed all the documents you'd
12  been provided, at this time in August of 2017?
13  A. No. The production from Straddling was in
14  a -- on a rolling basis. And I don't believe we got
15  their final production of their initial production
16  until maybe sometime in May of '17. That totaled
17  almost 600,000 documents. And that number may
18  actually be larger.
19  So, no, we definitely were not done looking
20  through the information at that point.
21  Q. Mr. Fogarty, I -- I don't believe I've asked
22  you this one yet, and it's important.
23  How much time total did you and your staff
24  spend analyzing the City of Beaumont's claim of loss
25  as part of your engagement with AIG?

1  So again, we can completely leave aside what
2  you've done as a litigation consultant in the -- in
3  the subsequent period.
4  A. I don't know. I know it was a substantial
5  amount of time over an extended period of time.
6  And as a point of clarification, once
7  Mr. Warnick [sic] was involved, we were taking
8  direction from him. So from a legal standpoint, I
9  don't know the significance of that.
10  Q. And that's fair enough. And I don't expect
11  you to understand or know the legal significance of
12  that.
13  But if you could give me an estimate, just
14  your best estimate, as to how much time -- and you
15  can either do it in hours or dollars -- you and your
16  staff spent analyzing Beaumont's claim of loss on
17  behalf of AIG either directly or through Mr. Watnick?
18  A. I'd -- I mean -- it's thousands and
19  thousands of hours.
20  Q. So if you could picture in your head -- or
21  strike that.
22  Do you review -- strike that.
23  Did you review all of the bills that HSNO
24  generated in connection with the assignment from AIG
25  to analyze Beaumont's claim of loss?

1  A. I'm not sure I reviewed all of them, but I
2  certainly reviewed some of them.
3  Q. What's your best estimate as to the total
4  amount HSNO and its successor, J.S. Held, billed on
5  the analysis of Beaumont's claim of loss for -- to
6  AIG?
7  A. It's in the hundreds of thousands of
8  dollars.
9  Q. All right. So sticking with Exhibit 6,
10  Mr. Fogarty. And this is your August 18, 2017
11  report.
12  By the way, do you have a hard copy of that
13  with you today at the deposition?
14  A. No, sir.
15  MR. SCHMOOKLER: An e-copy, Chris, he can
16  move.
17  MR. PISANO: I didn't catch that, Scott.
18  MR. SCHMOOKLER: He has an electronic copy
19  he can move.
20  MR. PISANO: Oh, okay.
21  (Off-record discussion.)
22  MR. PISANO: Well, I'd rather he show me
23  what he wants to show me.
24  Let's go to the second -- let's go to page
25  26 of 28, if we could, please, Robert.

1  And let's just go to our summary section.
2  Q. See that?
3  A. Yes.
4  Q. Are all of the opinions that you proffer in
5  the August 18, '27 [sic] report contained within the
6  summary that starts on page 26?
7  And please, if you want to scroll through
8  the whole three pages of the summary, feel free.
9  A. Yeah, I -- I mean, I'd be happy to do that,
10  Counsel. But unless I went back through the entire
11  report, looked at everything that I discussed and
12  then compared it against this summary section, I -- I
13  couldn't give you an answer.
14  Do I think every single thing that we noted
15  within the report is contained in the summary
16  section? I doubt it.
17  But this certainly would be some of the more
18  significant findings that we had up to this point in
19  time with the understanding that the analysis was
20  ongoing.
21  Q. So, Mr. Fogarty, if I were to ask you to
22  identify all of the opinions you and your staff
23  formulated as of August 18, 2017, that are contained
24  within the report, could you do that for me?
25  A. How much time do we have?



Page 50

```
 1       Q.  Well, I guess under the rules, we have seven
 2   hours.
 3       A.  Okay.
 4       Q.  Is that an exercise that you could do?
 5   Before I ask you to do it.
 6       A.  Well, I guess it would hinge somewhat on --
 7   on the word "opinion."
 8           I mean, there's -- there's observations,
 9   there's commentary, there's findings, and I don't
10   want to get hung up on a word.
11           I think the report speaks for itself in that
12   in a -- in a very top level, we at that point had not
13   found any support for the various components that
14   were contained in the proof of loss for a number of
15   reasons that are articulated within the 28 pages of
16   this report.
17       Q.  Well, Mr. Fogarty, you know what an
18   "opinion" is; right?
19       A.  Well, again -- um, I know what an "opinion"
20   is, but if I have a sentence in this report that
21   someone may construe to be an "opinion," maybe
22   somebody doesn't.  So...
23       Q.  Okay.  Well, that's fair.
24           But what I asked you, Mr. Fogarty, if you
25   would be able to go through the August 18, '27 report
```

Page 51

```
 1   and identify all of the opinions that are formulated
 2   within that report, is that something you would be
 3   able to do, just based upon your understanding of
 4   what are the opinions?
 5       A.  Same answer as I just gave you, Counsel.  I
 6   mean, I may read a sentence.  Whether that would rise
 7   to a level of an "opinion," I've always felt that's
 8   more of a legal conclusion.
 9       Q.  But you could go through this report and
10   identify what you consider to be the opinions, could
11   you not?
12       A.  I certainly -- let's look at the summary
13   paragraph here, second sentence, "Based" --
14       Q.  No.  Hold -- hold on, Mr. Fogarty.
15       A.  Sure.
16       Q.  My question is much higher level.  We're
17   still at 10,000 feet.
18           You could -- if we had all the time in the
19   world, and money was no object, you could go through
20   this report page by page, line by line and tell me
21   everything within that report that you consider to be
22   an "opinion," could you not?
23       A.  Same answer, again, Counsel.  If I read the
24   particular sentence, is it an opinion?  Is it a
25   statement of fact?  Is it a summary of our analysis
```

Page 52

```
 1   to date?  It can be -- potentially three people would
 2   think it falls into any one of those categories.
 3           So...
 4       Q.  And, Mr. Fogarty --
 5       A.  That's my -- my difficulty in -- in
 6   answering your question.
 7       Q.  Okay.  And I think we're having a
 8   disconnect, because I think I'm asking something
 9   different.
10           And so let me try to rephrase and, perhaps,
11   be more articulate in what I'm asking for.
12           I don't want you to concern yourself as to
13   how others may interpret what is written in the
14   August 18, 2017.
15           For purposes of this question, I only want
16   you to think about and consider what you believe to
17   be opinions.
18           And my question is:  Could you, as an
19   exercise, go through the August 18, 2017 report and
20   identify for me everything in that report that you
21   consider to be opinions of yours?
22       A.  Again, hinging on the word "opinion," I can
23   read sentences within this report.  There may be a
24   component that may be an opinion.  It may be a
25   summation of an analysis or a fact that could be an
```

Page 53

```
 1   opinion.
 2           So it's -- it's difficult, again, for me to
 3   answer your question in I believe, the way you want
 4   me to, which is to define "opinion" in my mind and
 5   then apply it to this report.
 6           Again, "opinion" to me can take many forms.
 7   Different forms.
 8       Q.  Okay.
 9       A.  So --
10       Q.  Okay.  I -- I didn't mean to cut you off.
11           But is it fair to say, then, that that's an
12   analysis you cannot do?  You cannot go through this
13   document and tell me all of your opinions that are
14   stated within?
15           MR. SCHMOOKLER:  Object to form.
16           THE WITNESS:  I can go through the report
17   line by line, and I can say to you, well, this could
18   be construed to be an opinion.  It could be construed
19   to be a fact.
20           Again, it's how is the word "opinion" being
21   defined?  And by whom?
22           And I know you just said it's defined by me.
23   BY MR. PISANO:
24       Q.  Yes.  You're the --
25       A.  That's -- that's my best answer to you,
```



MAGNA
LEGAL SERVICES

EXHIBIT 1
PAGE 19

Page 54

1  Counselor, is --
2     Q.  Okay.
3     A.  -- it's -- it's -- I can read a sentence and
4  say, well, yeah, that -- that -- that could be an
5  opinion, or you construe it as opinion, or I may
6  consider it to be an opinion.
7     Q.  So would the same answer, then, hold true if
8  I asked that question regarding the May 15, 2019
9  report that's Exhibit 7?
10    A.  Yes.
11    Q.  And would the same answer hold true if I
12 asked it as to the August 16, 2019 report that is
13 Exhibit 14?
14    A.  Yes.
15    MR. PISANO:  All right.
16    And, Scott, I want to make sure I have these
17 Bates numbers correct again, because I did just get
18 them e-mailed to me.
19    You said NUFIC 34348; is that right?
20    (Transmission glitch.)
21    THE WITNESS:  Chris, do you mind if I go to
22 the bathroom while you guys are doing this?
23    MR. PISANO:  Yeah.  Let's go off the record.
24 And we can handle this off the record.
25    THE WITNESS:  All right.  I'm going to go on

Page 55

1  mute and then -- I apologize.  It's just...
2  BY MR. PISANO:
3     Q.  You don't have to apologize, Mr. Fogarty.
4  Jeez.
5     THE VIDEOGRAPHER:  This marks the end of
6  media No. 1.
7     The time is 9:34 a.m.
8     We're off the record.
9     (Short recess.)
10    MR. SCHMOOKLER:  Let's go on the record.  Go
11 back on the record.
12    THE VIDEOGRAPHER:  Stand by.
13    This marks the beginning of media No. 2.
14    The time's 9:47 a.m.
15    We're back on the record.
16    MR. SCHMOOKLER:  After consulting off the
17 record, National Union will offer the following
18 stipulation:  That Mr. Fogarty, if called to testify
19 at trial, will offer the opinion that as of
20 August 18th, 2017, based upon the documents reviewed
21 as reflected in his report, Exhibit 6, reached the
22 opinion that the insured, City of Beaumont, had not
23 substantiated the employee theft in the amount
24 claimed in the proof of loss, and that the
25 explanation in the 28-page report is the basis for

Page 56

1  that opinion.
2     MR. PISANO:  And I'll accept that
3  stipulation.  I appreciate that, Mr. Schmookler.
4     Q.  And, Mr. Fogarty, that is the overarching
5  opinion that's within the August 18, 2017 report; is
6  that right?
7     A.  That -- that is correct, Counselor.  It's
8  basically the -- the summary paragraph sentence, "The
9  insured has not substantiated any of the claimed
10 159,702 [sic] dollars and -- well, let's see --
11 $702,461.
12    Q.  All right.  At the time you had written the
13 August 18 -- or strike that.
14    In the course of your work in analyzing the
15 claim of loss, you reviewed invoices from
16 Urban Logic; correct?
17    A.  Yes.
18    Q.  At the time you prepared the August 18, 2017
19 report, had you at that point in time, had an
20 opportunity to review any of the Urban Logic
21 invoices?
22    A.  I don't know.  I don't recall.
23    MR. PISANO:  Why don't we go to page -- if
24 we could get Exhibit 6 back up on the screen, Robert.
25    And if we could go, please, to page 3.  And

Page 57

1  if we could go to the bottom and maybe blow up that
2  bottom paragraph and the three bullet points, last
3  paragraph.
4     Q.  Okay.  And do you see the paragraph there at
5  the very end, "Within the approximately 77,000 pages
6  reviewed and tagged thus far, we have identified and
7  analyzed the following types of documents"?
8     A.  Yes.
9     Q.  And the first bullet point is "Urban Logic
10 Consultants Invoices."
11    Do you see that?
12    A.  Yes.
13    Q.  Does that refresh your recollection that as
14 of this point in time, August 18, 2017, you had
15 reviewed any of the Urban Logic invoices?
16    A.  Sure.  But, you know, to what level they had
17 been reviewed, what type of analysis had been
18 performed, is very different at this stage compared
19 to the analysis that we did subsequently.
20    So this is just identifying the kinds of
21 documents that we were able to try to hone in on and,
22 you know, look at as a first pass to see whether or
23 not it was in any way obvious that any aspect of the
24 proof of loss was -- was supported and documented.
25    Q.  Is it fair to say that as of this point in

MAGNA
LEGAL SERVICES

EXHIBIT 1
PAGE 20

Page 58

1  time, August 18, 2017, you had received at least some
2  portion of the Urban Logic consultant invoices, but
3  you had not yet done a thorough analysis of them?
4      A.  Yeah.  You know, how many did we have at
5  that point?  I don't know.  The level of analysis
6  that we did at that point -- again I -- I can't speak
7  to at this point, but we clearly had seen some
8  invoices as well as some of the other things that are
9  noted on page 4 and 5 of the August 18th, 2017
10  report.
11      Q.  So let's fast-forward, then, and let's talk
12  about the May 15, 2019 report.
13      And maybe what we can do is put Exhibit 7
14  back up on the screen.
15      And I want to walk through some of the --
16  some of what's written in this report that's entitled
17  the "Supplemental Report."
18      Do you see that?  In the re line.
19      A.  Oh.  I got -- yeah, okay.
20      Yes.  I'm with you.
21      Q.  All right.  Let me ask you some questions
22  about the second paragraph of the first page of
23  Exhibit 7.
24      "Based on our analysis of the noted Hemming
25  Morse report, it appears that the insured has

Page 59

1  abandoned many aspects of the original claim of 159
2  million, including the 57 million related to the
3  TUMF judgment."
4      T-U-M-F judgment.
5      And I'm going to stop right there.
6      Do you see that?
7      A.  Yes.
8      Q.  What was your understanding of the TUMF
9  judgment, what that was?
10      A.  My understanding was that there was a
11  dispute between Western Riverside Council of
12  Governments, City of Governments, and Beaumont,
13  regarding whether the City of Beaumont was properly
14  remitting TUMF fees to WRCOG.
15      And they had a -- an extended legal battle
16  over many years that culminated in a judge ruling
17  against the City of Beaumont, to the tune of 47
18  [sic] -- 42 million or so, plus interest, which I
19  think was around 14 million.  That's my understanding
20  at that point of what that is.
21      Q.  Do you know what "TUMF" stands for?
22      A.  I believe it's Transportation Uniform
23  Mitigation Fees, or something along those lines.
24      Q.  So the next sentence in that paragraph on
25  Exhibit 7 -- the first page of Exhibit 7 says:

Page 60

1      "The Hemming Morse report appears to focus
2  on the 86 million in Urban Logic self-dealing and 1.3
3  in Kapanicas and Aylward self-dealing," and goes on
4  from there.
5      Did you understand at this time in May of
6  2019, Mr. Fogarty, that the City's claim of loss
7  related to the TUMF fee issue, was separate and
8  distinct from their claim of loss having to do with
9  Urban Logic's billings?
10      A.  Would you rephrase that, please?  I -- I --
11  repeat it.
12      Q.  Sure.
13      Well, maybe we could have the court reporter
14  read it back, because I don't think I could possibly
15  repeat what I just said.
16      (Record read.)
17      MR. SCHMOOKLER:  Object to form.
18      THE WITNESS:  I -- I did not have a clear
19  understanding, which is why the first sentence of
20  this paragraph stated that:
21      "Based on of our analysis of the noted
22  Hemming Morse report, it appears that the insured has
23  abandoned many aspects of the original claim."
24      So we went from the proof of loss from
25  Straddling having multiple sections, including the

Page 61

1  TUMF judgment claim, to then getting this
2  Hemming Morse report that only dealt with
3  Urban Logic, Kapanicas and Aylward self-dealing.
4  Although Aylward was never mentioned in the Kapanicas
5  report -- I'm sorry -- in the Hemming Morse report.
6  And it was a very, very brief section dealing with
7  Mr. Kapanicas.
8      So hopefully that answers your question.
9      No, I didn't -- you know, we weren't sure
10  at -- at that point exactly what the City was putting
11  forth.
12  BY MR. PISANO:
13      Q.  Okay.  After you wrote the May 15, 2019
14  report, but before you finished your analysis of the
15  claim of loss for AIG --
16      So, in other words, I want you to exclude
17  what you have been doing as a litigation consultant
18  for Gordon Rees.
19      With me so far?
20      A.  No.  Say that again.  What -- what are the
21  time frames again?
22      Q.  After you wrote the May 15, 2019 report --
23      A.  Yes.
24      Q.  -- but before you finished the analysis for
25  AIG.  So, in other words, I want you to leave out



16  (Pages 58 to 61)

EXHIBIT 1
PAGE 21

Page 62

1   what you did for Gordon Rees.
2       A. Okay.
3       Q. You're with me so far?
4       A. Yes.
5       Q. While you were analyzing the claim of loss
6   for AIG, did you ever come to an understanding that
7   the City of Beaumont's claim of loss related to the
8   TUMF fee issue, was separate and distinct from its
9   claim of loss related to the overbilling by
10  Urban Logic?
11          MR. SCHMOOKLER:  Object to form.
12          THE WITNESS:  I would say no.  Our analysis
13  from the Hemming Morse report date forward, really
14  concentrated on the claim for potential overbilling
15  by Urban Logic and the 4-1/2 percent cap fee
16  question.  And we did not really do much of anything
17  with the TUMF judgment beyond that point, other than
18  to understand it.  Then there was a settlement and
19  the amounts changed and we understood that to be the
20  case.
21  BY MR. PISANO:
22      Q. Well, let's -- let's explore that.  You
23  understood there was a settlement; right?
24      A. Yes.
25      Q. What did you understand that settlement to

Page 63

1   entail?
2       A. My recollection is there were multiple
3   facets to it.  There were some payments that the City
4   was supposed to make.  They were supposed to finish
5   several projects.  And I believe they were supposed
6   to, in conjunction with WRCOG, seek monies from third
7   parties, share those funds to some extent and
8   associated legal groups.
9       Q. Okay.  So in the first paragraph of
10  Exhibit 7, you write in the last sentence:
11          "Subsequent to our August 18, 2017 status
12  report, we received a report prepared by the
13  insurance forensics accountants, Hemming Morse, along
14  with additional documentation submitted by the
15  insured's representative Best Best & Krieger."
16          You see that?
17      A. Yes.
18      Q. All right.  And so you reviewed a report
19  from Hemming Morse.  Is that Dan Ray?
20      A. He was the author of it, yes.
21      Q. And you also reviewed documentation provided
22  by Best Best & Krieger?
23      A. Yes.  I believe there was additional
24  100,000-plus documents that were produced.
25      Q. And jumping down to the third paragraph on

Page 64

1   the first page, you write:
2           "The analysis performed by Hemming Morse
3   appears to focus on Urban Logic Consultants, ULC,
4   billing the City for professional subcontractor
5   services in excess of the alleged limits imposed by
6   the 1993 and 1994 service contracts and related
7   amendments."
8           You see that?
9       A. I do.
10      Q. All right.  And then your May 15, 2019
11  report goes on to analyze that issue of Urban Logic
12  billing the City for subcontractor services in excess
13  of the above limits -- or the -- in excess of the
14  allowable limits in the contracts; correct?
15      A. Well, we -- yeah.  We went out -- we went on
16  to analyze the subcontractor or people that billed
17  ULC, and ULC billing -- subsequently billing the City
18  of Beaumont associated with the bills that they were
19  receiving from the vendors that were working for
20  them.  Yes.
21      Q. All right.  So let's go to page 3 of
22  Exhibit 7 then.  And look at the first sentence of
23  paragraph 2.
24          "We note that Hemming Morse" -- strike that.
25          "We note that the Hemming Morse report also

Page 65

1   mentions that ULC was subject to a limitation of
2   billing the City no more than 15 percent above the
3   actual costs of any subcontractor costs."
4           Do you see that?
5       A. Yes.
6       Q. And is that something that you also observe
7   within the contracts themselves, that there was this
8   limit --
9           (Reporter clarification.)
10          MR. PISANO:  Or strike that.
11      Q. Is that something that you observed in your
12  analysis of the contracts themselves; namely, that
13  Urban Logic was required to bill subcontractors at
14  cost plus 15 percent?
15          MR. SCHMOOKLER:  Object to form.
16          THE WITNESS:  We -- we looked at the
17  contracts, and we noted that the wording regarding
18  that 15 percent potential cap on the charge was -- it
19  seemed to be very specific and -- but yet, the
20  specificity of it, we did not find to be defined
21  anywhere.
22          So I take your attention to page 8 of 12.
23  And I'll just read this.  This is the last -- the
24  paragraph right before "Analysis and Findings."  And
25  it says:



EXHIBIT 1
PAGE 22

Page 66

1   "However, we leave any and all legal
2   interpretation to counsel as to how the ULC billings
3   associated with professional services that were
4   performed by both ULC employees and subcontractors
5   under their direction as opposed to direct services,
6   slash -- or hyphen -- "professional subconsultant
7   services were supposed to be billed by ULC per the
8   terms of the various consultant agreements."
9       So our reading of it was that, you know,
10  professional services, they were able to bill at
11  their rack rate.  But direct services, hyphen,
12  professional subconsultant services, that section
13  where there was a limitation of 15 percent.
14      So whether or not the vendors that did work
15  for ULC fell under that specific provision, we left
16  that up to others to interpret.
17      But we did an analysis in following the
18  Hemming Morse approach, with the assumption that
19  anybody who worked for ULC as a sub- -- or who billed
20  ULC, was a vendor to ULC, potentially could fall
21  under that section; ergo, being limited to no more
22  than 15 percent of what they billed to ULC.
23      So we were following the Hemming Morse
24  approach to see what we could find in looking into
25  the detailed information where we were able to do the

Page 67

1   analysis.
2   BY MR. PISANO:
3       Q.  Well, let's stick with page 8, then, since
4   you had us turn to it.
5       A.  Okay.
6       Q.  Let's talk about the analysis and findings.
7   Okay?
8       A.  Sure.
9       (Reporter clarification.)
10      MR. PISANO:  The analysis and findings.
11      THE REPORTER:  Oh, thank you.
12      MR. PISANO:  Okay.  Don't scroll any
13  further, please.
14      Q.  You write in the second paragraph,
15  "Subsequent to our August 18, 2018" --
16      That should be 2017; right?
17      A.  Let me see.  Yes, I believe it is.
18      Q.  All right.
19      A.  You know, there's always a mistake in every
20  report.  So I'm glad you found it for me.
21      Q.  My pleasure.
22      "Subsequent to our August 18" -- you write
23  2018, but you mean 2017 -- "preliminary status
24  report, we received approximately 123,631 pages of
25  additional documentation, including ULC internal

Page 68

1   accounting and billing records and invoices
2   from UL-" -- or "to ULC from -- from subcontractors
3   that they utilized."
4       You see that?
5       A.  Yes.
6       Q.  Okay.  So after you wrote the initial
7   report, you received some invoices that the
8   subcontractors had sent to Urban Logic; correct?
9       A.  Yes.
10      Q.  And you go on to write:
11      "Due to the volume of documentation
12  provided, we focused on a three-year sample of
13  billing records from 2008 to 2010, and compared three
14  sets of documents to identify what services were
15  billed to the City by ULC employees and
16  subcontractors that ULC utilized on City projects."
17      I read that right?
18      A.  Yes.
19      Q.  Why did you focus on a three-year sample of
20  billing records from 2008 through 2010?
21      A.  The approach that Hemming Morse took, which
22  is the same approach that we took, really requires
23  what I call a "three-legged stool."  And without one
24  of those components, you couldn't really do this
25  analysis.

Page 69

1       You -- we started off, as Hemming Morse did,
2   trying to identify who were employees of ULC.
3   Employees of ULC are allowed to charge for their
4   services at their rack rate.  And we didn't have
5   payroll records for many years.  But we had, I think,
6   2011 and 2010.
7       In terms of the next component of doing the
8   analysis, you need the -- the -- the billing records,
9   which Hemming Morse referred to as "time and
10  billing."  And that's where they kind of had a sheet
11  that showed who worked on a project, the number of
12  hours that the person worked on the project.  And
13  with that, we were able to then, in some instances,
14  tie those hours to the vendors -- vendor invoices
15  that were sent to ULC.
16      And then from there, you could take the time
17  and billing report and carry that forward to the ULC
18  invoice to either the City or to the -- to bonds --
19  to the bond funds.
20      So you -- you needed those three or four
21  things in order to do the analysis.  So we confined
22  it to 2008 through '10, because that's where we had a
23  substantial amount of information in order to do the
24  analysis.
25      Q.  All right.  So let's break this down a



EXHIBIT 1
PAGE 23

Page 70

1    little bit.  You mentioned that the analysis is a
2    "three-legged stool"; right?
3        A.  Yes.
4        Q.  And one leg of the stool is getting an
5    understanding of who the employees of ULC were versus
6    subcontractors; right?
7        A.  That -- that's sort of the fourth leg, but
8    yes.  That's correct.
9        Q.  Okay.  And then is another leg doing an
10   analysis of the billing records of ULC?  In other
11   words, who worked on a project and the number of
12   hours.
13       A.  Yes, the time and billing record.
14       Q.  Time and billing records.
15       A.  Yeah.
16       Q.  And then another leg of the stool is the ULC
17   invoices to the City?
18       A.  Correct.
19       Q.  And what was the fourth leg?
20       A.  The vendor invoices to ULC.
21       Q.  Okay.
22       A.  The work they did related to the projects
23   that ended up on the ULC bills to the City.
24       Q.  Okay.  So we're really talking about a
25   four-legged stool; right?

Page 71

1        A.  The analysis to try to determine whether
2    there was potential overbilling, really was the
3    vendor invoices to ULC to the time and billing
4    reports to the ULC invoicing to the City.
5        The -- you -- you also needed the payroll
6    just to try to identify, where we could, who within
7    the time and billing reports were employees of ULC.
8    Because they obviously wouldn't even -- they wouldn't
9    fall under any potential definition of "subcontract."
10       Q.  Okay.  So when you're looking at the leg of
11   the stool for vendor invoices to ULC, you analyzed
12   invoices from 22 vendors; is that right?
13       A.  I believe that's what we showed in our
14   report.  That's correct.
15       MR. PISANO:  Let's go to the next page of
16   the report, page 9, and look at the second-to-last
17   paragraph.
18       Q.  And so we're talking about invoices from
19   22 vendors; correct?
20       A.  Yes.
21       Q.  And your analysis showed a total of
22   3.7 million from January '08 through December of 2010
23   for those 22 vendors; is that right?
24       A.  Yeah.  I believe that's shown in detail on
25   either schedule 4 B or 4 C.

Page 72

1        MR. PISANO:  All right.
2        Why don't we mark and put up on the screen
3    Exhibit 8, please.
4        (Deposition Exhibit 8 was marked for
5        identification by the court reporter.)
6        MR. PISANO:  And this is a document that
7    starts with NUFIC 001137.
8        Q.  Do you see that, Mr. Fogarty?
9        A.  Yes.  Oh...
10       MR. PISANO:  And if we could go to page
11   NUFIC 001163, please.
12       Q.  Do you see schedule 4 B, Mr. Fogarty?
13       A.  Yes.
14       Q.  Is this the schedule 4 B that's referenced
15   in the May 15, 2019 report?
16       A.  It is.  There's the 3,780,989.
17       MR. PISANO:  And if we can go to the next
18   page, please.
19       Q.  Is this the first page of schedule 4 C?
20       A.  It appears to be, yes.
21       Q.  So these schedules then, 4 B and 4 C,
22   summarize how you arrived at the 3.7 million; is that
23   right?
24       A.  I'm sorry.  Say that again.
25       Q.  Are [sic] schedules 4 B and 4 C summarize

Page 73

1    how you arrived at a total of 3.7 million in terms of
2    vendor invoicing to Urban Logic from '08 through
3    2010?
4        A.  I believe so, yes.
5        MR. PISANO:  Can we go back to Exhibit 7,
6    and go to page 10 of the report.
7        Q.  And in the second paragraph, you write:
8        "As shown on schedule 4 A, out of the noted
9    3.7 billed by subcontractors between '08 and '10, the
10   amount attributable to vendors that appeared on
11   the ULC time and billing reports totaled only
12   2.1 million."
13       You see that?
14       A.  Yes.
15       Q.  What's the significance of that?  What --
16   what is that meant to discuss?
17       A.  Basically just that we could not see all of
18   the billings to -- from the sub- -- well, from the
19   vendors to ULC, appearing on a ULC time and billing
20   report.
21       Q.  All right.  So there were, what, about
22   1.6 million in vendor invoices to ULC that you did
23   not see on ULC bills to the City?
24       A.  Well, attributable, then, that appeared on
25   ULC time and billing reports.

MAGNA
LEGAL SERVICES

EXHIBIT 1
PAGE 24

Page 74

1    Q.  Yeah.
2    A.  Now, the time and billing reports form the
3    basis for the ULC invoices to the City and to the --
4    the bonds, bond authority.
5    Q.  All right.  Now, in the next paragraph, you
6    talk specifically about Dennis Janda.
7        Why did you focus on Dennis Janda, in
8    particular, as one of the vendors?
9    A.  Two reasons:  One, his billings were --
10   were, you know, relatively significant; two, we noted
11   that ULC performed surveying services.  Their
12   employees performed surveying services.  And -- and
13   Dennis Janda's company did the same thing.
14       So it was unclear to us whether all of the
15   survey hours that we noted on the ULC billing to the
16   City and to the financing authority, were due to
17   vendor bills, or whether a portion of it was just
18   their own employees doing surveying work.
19       So we -- we knew we had Dennis Janda as a
20   surveyor.  So we isolated Dennis Janda and said, all
21   right, is there a potential overbilling, should he
22   fall under that category that we discussed earlier.
23   And, if so, that was part of our calculation of
24   potential overbilling.
25       And then we made the further assumption that

Page 75

1    while we'll take all of the dollars that were billed
2    for surveying, and make the same assumption that this
3    was all due to sub- -- vendors to ULC.  Even though
4    we didn't necessarily have other vendor invoices to
5    U- -- to ULC related to surveying.
6        That make sense?  It's a little convoluted.
7    Q.  I -- I think I've got it.
8    A.  Okay.
9        MR. PISANO:  Let's go down, if we could --
10   scroll down on that page 10, please, Robert.
11       Yeah, to that paragraph right there, "As
12   shown on schedule 3 A."
13   Q.  You see that paragraph, Mr. Fogarty?
14   A.  I do.
15   Q.  So you identified vendor invoices to ULC,
16   totaling 3.4 million from '08 to '10, which we would
17   expect to be billed to the City.
18       And you indicate that it's shown on schedule
19   3 A and summarized on schedule 3.
20       You see that?
21   A.  Yes.
22       MR. PISANO:  So now, can we go back to
23   Exhibit 8.  And I want to go -- turn your attention
24   to schedules 3 and 3 A, which start on Bates
25   NUFIC 1145.

Page 76

1        Can we go there?
2    Q.  Is this schedule 3, Mr. Fogarty?
3    A.  Yes.
4        MR. PISANO:  And can you go to the next
5    page, please.
6    Q.  Is this the first page of schedule 3 A?
7    A.  It appears to be, yes.
8    Q.  Can you walk me through, Mr. Fogarty, how it
9    is that you identified vendor invoices totaling
10   3.4 million that you would expect to be billed to the
11   City?
12       And if you want to go back -- do you want to
13   go back to schedule 3 to answer that question?
14   A.  I'd have to basically look at all of the
15   schedules to answer that question.  But let's --
16   let's start at schedule 3, if we could.
17       MR. SCHMOOKLER:  Chris, maybe you want to
18   ask it again.  I think you guys are missing each
19   other.
20       If I can help you, I think you're asking a
21   more basic question than -- than he does.
22       But go ahead.
23       THE WITNESS:  Maybe.
24   BY MR. PISANO:
25   Q.  Well, what I'm trying to get a sense of,

Page 77

1    Mr. Fogarty, is, how it is that you arrived at the
2    number 3.4 million of vendor invoices to ULC that you
3    would expect to be billed to the City.
4    A.  Yeah.  So it says, "As shown on ..."
5        So I'd have to look to schedule 3 A and
6    schedule 3 to give you that answer and tie it back to
7    the 3 --
8        So if you go to schedule probably 3 A, to
9    the end of the schedule, so 42 pages down.
10   Q.  Well, it's not -- it's not all those pages.
11   It ends at NUFIC 1152.
12   A.  Well, I -- I believe that that's where that
13   3.4 million comes from.  And that if we were able to
14   scroll down on this schedule -- okay?
15   Q.  Well, I have up on the screen NUFIC 1152.
16       Do you see that?
17   A.  Yeah.  That's -- see the 3 million 414?
18   Q.  Yes.
19   A.  Isn't that -- yeah.
20       So that's where it's coming from.
21   Q.  How did you come to that calculation,
22   though?  How did you figure that out?
23   A.  By looking at all of the invoicing of the
24   ULC time and billing reports for subcontractors that
25   is detailed in the 42 pages above it.



EXHIBIT 1
PAGE 25

Page 78

1    So this is, again, where we separated out
2 the surveyors from the nonsurveyors so that we could
3 carry that forward to schedule 1 and make the
4 analysis between just Dennis Janda, as the surveyor,
5 and potentially others with the -- the assumption
6 that everybody else that was a surveyor, was
7 potentially a subcontractor and not a ULC employee.
8    And this is the individual calculation of
9 the hours that were being billed for the work done by
10 the vendors to ULC, multiplied by the rate that ULC
11 charged, and then comparing that against the rate
12 noted by the sub for the work that they billed ULC.
13    With the delta being shown in the far
14 right-hand column.
15    So that's your 2,104,405 that I believe
16 flows forward to schedule 1 or 1 A.
17    Q. Which are your potential overbillings;
18 right?
19    A. Well -- yeah. I -- I mean, potential in a
20 sense that, again, we -- we followed the
21 Hemming Morse approach. And for purposes of this
22 analysis, we made the assumption that all of these
23 vendors to ULC would fall under that specific
24 definition that we talked about earlier.
25    But again, not seeing that particular

Page 79

1 wording defined anywhere else in the contract, and
2 not being lawyers, it's not our -- our -- you know,
3 not for us to do that.
4    It was -- it was more of a, you know, this
5 is a potentially outside number, if you will, with
6 other assumptions being that it would be a consistent
7 number of subcontract costs to the ULC billing to the
8 City on an annual basis. And we know that's not the
9 case.
10    We know that in the earlier years, there was
11 much less billing or payments being made to ULC. We
12 know that certain subcontractors don't appear to have
13 worked for them every single year.
14    So, let's say, someone like LG Consulting --
15 which was one of the vendors that Hemming Morse noted
16 in their report as -- as potentially being a rather
17 large overbilling, we don't see LG in 2009 or 2008.
18    So, you know, that would have a potential
19 impact on the percentage, potential overbilling,
20 being compared to the ULC payments on a yearly basis.
21    MR. PISANO: Okay. Can we go back to
22 Exhibit 7, please, Robert.
23    And go to page 10. And I want to focus on
24 the second-to-the-last paragraph.
25    Now, as I understand that

Page 80

1 second-to-last-paragraph, you have a potential
2 overbilling of 901,724 for nonsurvey-approved
3 invoices and a potential overbilling --
4    MR. SCHMOOKLER: We're not --
5    THE WITNESS: Which -- which paragraph are
6 you on?
7    MR. PISANO: Second-to-last-paragraph.
8    THE WITNESS: Assuming that's the
9 15 percent?
10    MR. PISANO: Yes.
11    THE WITNESS: Okay. Go ahead. I'm sorry.
12 BY MR. PISANO:
13    Q. Okay. Now, as I understand that paragraph,
14 you identify a potential overbilling of 901,000 for
15 nonsurvey-approved invoices and a potential
16 overbilling of 1.2 million for survey crew invoices,
17 for a total potential billing of 2.1 million.
18    Is that understanding correct?
19    A. Yes. With the caveats that I just
20 discussed, yes. There are, obviously, assumptions
21 built into that in terms of following the same
22 Hemming Morse methodology, and that all of the
23 vendors that we were able to analyze and trace
24 through to the ULC invoicing to the City and bond
25 trustee, would have fallen under that 15 percent cap.

Page 81

1    Q. All right. And so, then, as I understand,
2 in your analysis at arriving at a potential
3 overbilling for these subcontractors of 2.1 million,
4 you essentially mirrored the Hemming Morse approach;
5 is that fair?
6    A. It -- it -- it's -- it's -- yeah, it's fair
7 in that we followed the same approach.
8    Q. Sure.
9    A. Upon their report and my face-to-face
10 meeting with Dan Ray, it's my understanding they
11 didn't do the kind of analysis that we did to look at
12 as many of these vendor invoices, time and billing
13 records, and ULC invoices that -- that we did.
14    He -- he did really more of a -- a sample, I
15 guess, of four or five.
16    Q. Okay. Whereas, you looked at 22.
17    A. Well, no, 'cause I -- I -- I -- we -- we
18 looked at 22 different vendors to ULC, but we did it
19 over a three-year period of time. Hemming Morse
20 looked at, I think, four or five, and it was limited
21 to 2011.
22    And I'm not -- I don't believe he looked at
23 all of them for 2011. The only one I remember where
24 it looked like he had a complete analysis, or
25 somewhat complete analysis for 2011, was

MAGNA
LEGAL SERVICES

EXHIBIT 1
PAGE 26

1    LG Consulting.  Lana, I think it's Uvia.
2        Q.  Okay.  But leaving aside differences in --
3    in -- in time periods and -- and the subcontractors
4    that were the focus of the analysis, is it generally
5    fair that you mirrored the four-legged-stool approach
6    of Hemming in the analysis?
7        A.  The approach, yes.
8        But, you know, one of my concerns with --
9    with the Hemming Morse report was, did he look at
10   sufficient relevant data.  And -- and that's why one
11   of the questions when we met was, you know, did you
12   do more than just look at these four or five
13   examples?  And, if so, you know, can you show that to
14   us.  We'd like to take a look at it.
15       You know, we -- we felt -- try to come to a
16   potential figure like we did, that you should look at
17   a larger body of information.
18       And I will readily acknowledge, as -- as Dan
19   has said, you know, the records were not always
20   complete.
21       But from 2008 to 2010, that -- that seemed
22   to be a -- you know, a meatier -- and I mean that as
23   in m-e-a-t -- a meatier group of documents for us to
24   analyze.
25       Q.  All right.  "Meatier," as in the sense of

1    more meat on the bone.
2        A.  Exactly.  As opposed to "meteor," 'cause
3    that's how it sounded with my accent.  So...
4        Q.  Okay.  So you did an analysis that mirrored,
5    so to speak, the Hemming Morse four-legged
6    approach -- or four-legged-stool approach.
7        Did you tackle this question of whether
8    Urban Logic had overbilled for subconsultant work in
9    any other way?
10       A.  I -- I -- I'm not really sure what you're
11   asking me.
12       I -- I mean, you know, we took the results,
13   we extrapolated it to the total payments.  We -- as I
14   said earlier, we did look at the disbursements made
15   to ULC, and we -- we observed that the total
16   disbursements was less in earlier years, number one.
17       And -- and I think importantly -- and I -- I
18   want to see where I noted this in the report, if I
19   could.  Bear -- oh.
20       If you could go to page 12 of 12 of this
21   exhibit, the bullet point at the top of the report,
22   we noted that the amount that was invoiced by the
23   subcontractors in 2010, was 228 percent of the amount
24   billed in 2009 and more than 280 percent of the
25   amount billed in 2008.

1        So the significance of that to me, is that
2    it seemed there were less sub- -- potential
3    subcontracting dollars that were being billed to ULC
4    in earlier years.
5        And it -- which logically makes sense to me
6    if there were less projects going on.  If ULC was
7    billing less to the City, it would make sense that
8    they would be paying themselves, using their own
9    people, and they wouldn't necessarily be using
10   subcontractors.
11       So therefore, that potential number, which
12   extrapolated, I -- I think, is on the high side,
13   quite frankly, because of these -- this additional
14   kind of analysis that we did.
15       Q.  Okay.  So now, Mr. Fogarty, let's go to page
16   11 your -- of your report, please.
17       A.  Okay.
18       Q.  And the paragraph in the middle bottom of
19   the page that starts with, "As shown on schedule
20   1 A."  I want to focus on that one paragraph.
21       A.  Okay.  Got it.
22       Q.  So another aspect of the analysis -- and I
23   just want to make sure I have this right -- is that
24   after you calculated a potential overbilling from
25   2008 to 2010, you then performed an extrapolation to

1    come up with a potential overbilling of 2004 through
2    2012.
3        Is that what's going on here?
4        A.  Yes.
5        Q.  What's an extrapolation?
6        A.  Well, extrapolation is taking a finding
7    of -- of an analysis that you do, and you -- you
8    expand it to the entire population.
9        So in this case -- and I'm doing this off
10   the top of my head -- but I -- I think we -- there
11   was like $21 million of ULC invoicing.  In that year
12   they billed the City 23 million.  And so the
13   potential overbilling with the caveats that we've
14   discussed, came out to be 7 to 10 percent of those
15   bills.
16       So we then said, well, if we -- if we take
17   the 7 to the 10 percent of potential overbilling,
18   assuming they all fell within that parameter of the
19   contract, and we extrapolated to the total dollars
20   that were paid to ULC, that's how we arrived at the
21   2 million 104 figure that's noted in this particular
22   paragraph that you just pointed me to.
23       Um -- I'm sorry.  The extrapolation results
24   in the potential overbilling of the 5,857,762.
25       Q.  Right.  My question --

**MAGNA** ◢
**LEGAL SERVICES**

EXHIBIT 1
PAGE 27

1    A. Yeah.
2    Q. -- is, again, much more high level.
3        MR. SCHMOOKLER: So your -- your --
4        Just answer his literal question. You
5    don't -- if he wants to ask you about your specific
6    analysis, let him ask you about your specific
7    analysis. He asked a general question, you can give
8    him now.
9    BY MR. PISANO:
10    Q. So let me see if I can even try short- --
11    shortcut this a little bit.
12        What is an extrapolation, and why does
13    someone in your line of work do an extrapolation?
14        MR. SCHMOOKLER: Everything.
15        THE WITNESS: I think I just explained what
16    an extrapolation is. And someone in my line of work
17    does that.
18        In this particular instance, we were asked
19    by AIG and/or counsel to take the results that we
20    came up with from 2008 to 2010, and apply it or
21    extrapolate it to -- to all the payments that were
22    made to ULC to -- to come up with a potential
23    over- -- overbilling figure.
24    BY MR. PISANO:
25    Q. So the extrapolation was at the request of

1    the client; correct? Or was it your idea?
2    A. I -- I -- I think it was -- I know we
3    were -- we were -- we certainly thought about doing
4    it; we did it. I believe we had discussions with AIG
5    about it. But whether or not --
6    I -- I'm pretty sure we initiated that, but
7    I'm not a hundred percent sure.
8    Q. Why did you use an extrapolation to
9    determine potential overbilling for the other years,
10    as opposed to looking at actual invoices and other
11    documentation for those years?
12    A. 'Cause we didn't have that information for
13    the other years.
14    Q. And because you didn't have that information
15    for the other years, is that why you had to do an
16    extrapolation?
17        MR. SCHMOOKLER: Object to form.
18        THE WITNESS: Yeah. Again, we didn't have
19    to do an extrapolation, but that's -- that -- that's
20    why, yes.
21    BY MR. PISANO:
22    Q. All things being equal, Mr. Fogarty, would
23    you agree with me that it's better to conduct the
24    analysis with the actual documentation for those
25    years, as opposed to performing an extrapolation?

1    A. Yes. Sure.
2    Q. But you -- but in your line of work, you
3    perform an extrapolation when you have insufficient
4    data to analyze the subset; correct?
5        MR. SCHMOOKLER: Object to form.
6        THE WITNESS: In this specific case,
7    that's -- that's what we did. I mean, it's -- it's
8    not that we do extrapolations on every file that we
9    work on. No.
10    BY MR. PISANO:
11    Q. Understood.
12    A. Yep.
13    Q. But when you have insufficient data to
14    analyze a subset, is the use of an extrapolation a
15    reasonable methodology in forensic accounting?
16        MR. SCHMOOKLER: Object to form.
17        THE WITNESS: In this particular instance,
18    again, with all the caveats that I've noted in my
19    report that I've testified to today, as a methodology
20    to try to come up with this potential -- I'll call it
21    "outside number" -- extrapolations are sometimes
22    used.
23    BY MR. PISANO:
24    Q. And you used it here; correct?
25    A. I did.

1    Q. Is your use of an extrapolation here
2    reasonable?
3        MR. SCHMOOKLER: Object to form.
4        THE WITNESS: Well, I'm not sure by -- what
5    you mean by, is it "reasonable?"
6    BY MR. PISANO:
7    Q. Hmm. You don't know what "reasonable"
8    means?
9        MR. SCHMOOKLER: Object to form.
10        THE WITNESS: I think I know what
11    "reasonable" means.
12        But in this instance, I -- you know, I'm not
13    really sure what you're asking me.
14        Was it --
15    BY MR. PISANO:
16    Q. What --
17    A. -- was it -- was it re- --
18        Go ahead. I'm sorry.
19    Q. What I'm asking you is: Do you think that
20    your use of an extrapolation to determine a potential
21    overbilling for the entirety of 2004 and 2012,
22    reasonable, in your opinion?
23        MR. SCHMOOKLER: Object to form.
24        THE WITNESS: I feel that, as I noted in my
25    report, there are a number of factors that may



Page 90

1  materially impact this extrapolation. And I
2  explained some of those in my prior testimony.
3      So when you say "is it reasonable," for
4  purposes of trying to come up with this outside
5  number, it's a methodology. But you would need to
6  take into consideration all of these other factors
7  that I've mentioned, which I think would reduce the
8  amount of the calculated, extrapolated figure that I
9  came up with.
10  BY MR. PISANO:
11      Q. So is the answer to my question then, no,
12  your use of an extrapolation here was not reasonable?
13  Is that what your opinion is?
14      MR. SCHMOOKLER: Object to form.
15      THE WITNESS: It's -- it's -- Counselor, I
16  don't think it's a black-and-white answer. It's not
17  is it reasonable, is it unreasonable?
18      It's -- you have to look at all of the
19  things that we noted in the report. It was a method
20  to try to apply to a much larger set than the subset
21  that we were able to analyze.
22      But you have to keep in mind all of the
23  other things that could significantly impact that
24  extrapolation.
25      And as I've testified already, I think that

Page 91

1  the extrapolation is on the high side because of the
2  things I've already discussed.
3      So is it -- is it reasonable? It -- it's --
4  it's a method that we used in this particular case,
5  based upon the facts and circumstances of this
6  particular case.
7  BY MR. PISANO:
8      Q. Well, Mr. Fogarty, if an extrapolation here,
9  as you've done it, is not necessarily reasonable,
10  why'd you do it?
11      A. I didn't say it's not reasonable, Counselor.
12  That's -- those are your words. I said --
13      Q. So it is reasonable.
14      A. No. I -- what I said is that -- you -- I'm
15  not going to be hung up on the word "reasonable."
16  I'm going to explain to you how we did our
17  extrapolation with all of the caveats that we noted
18  in the report.
19      Q. All right.
20      A. So doing the extrapolation with all the
21  caveats that we noted in the report, do I feel that's
22  reasonable? Yes.
23      But you've got to take all of that into
24  consideration.
25      Q. Fair enough.

Page 92

1      Taking all of it into consideration, all the
2  caveats you mentioned --
3      A. Yes.
4      Q. -- I got a very simple question: Is your
5  approach reasonable?
6      MR. SCHMOOKLER: Objection.
7      Object to form.
8      I don't know if you heard me, Court
9  Reporter.
10  BY MR. PISANO:
11      Q. And the answer?
12      MR. SCHMOOKLER: Object to form.
13      THE WITNESS: The -- the answer is the
14  answer I've given you. It's -- it's reasonable with
15  all the caveats that we've discussed.
16  BY MR. PISANO:
17      Q. All right. Very good.
18      So I got a few more questions on this, and
19  then we can move on to another topic.
20      You want to take a break now, or you want to
21  try to power through?
22      A. Well, I'm -- I'm doing all right on the --
23  the thing that's been disrupting us.
24      It is almost 2 o'clock my time. Haven't had
25  lunch yet.

Page 93

1      Were you planning on breaking, at all or...
2      Q. Sure.
3      I can break at any time you want,
4  Mr. Fogarty.
5      A. All right. What's a good time for you,
6  Counselor?
7      Q. Well, do you want to try to get through this
8  segment in maybe the next ten minutes or so and then
9  take a break?
10      A. That'd be great.
11      Q. All right. Very good.
12      So let's keep going.
13      So as I understand it -- and we can go to
14  the last page of your report, after -- and -- and
15  let's focus on the third-to-last paragraph.
16      After you performed an extrapolation, you
17  determined a potential overbilling -- and again, I'm
18  not saying an actual overbilling -- but a potential
19  overbilling of between 4.4 million to 5.5 [sic]
20  million for the period of '04 to 2012 for the
21  subcontractor work; is that right?
22      A. I believe you're reading the paragraph that
23  says, "potential overbilling ranging from 4.469
24  million to 5.857 million."
25      I think you said 575.

MAGNA ▶
LEGAL SERVICES

EXHIBIT 1
PAGE 29

1    Q.  No.  I meant 5.8, if I said 5.5.
2    A.  All right.
3    Q.  But that's what's happening in this
4  paragraph; right?
5    A.  That's correct.
6    Q.  And that's the conclusion you're reaching?
7    A.  With all of the caveats that we've been
8  discussing up to this point in time, yes.
9    Q.  And that's based on the analysis that you
10  did that sort of mirrors the Hemming Morse approach;
11  right?
12    MR. SCHMOOKLER:  Object to form.
13    THE WITNESS:  Again, our analysis was much
14  more detailed than theirs.  But we used the same
15  approach that they used to look at a few examples of
16  potential overbilling.
17  BY MR. PISANO:
18    Q.  Correct.  You used the four -- the
19  four-legged-stool approach; right?
20    MR. SCHMOOKLER:  Object to form.
21    THE WITNESS:  Yes.
22  BY MR. PISANO:
23    Q.  Okay.  Did you consider using an approach to
24  determine potential overbilling of the subcontractor
25  work, using a methodology other than the four-stool

1  [sic] approach that you had also seen in the Hemming
2  report?
3    A.  I'm not sure whether we did or not, 'cause
4  it was a while ago.  But we chose to do this method,
5  in part, to mirror what Hemming Morse did, since
6  that's the way they were coming to their conclusions
7  and their findings.
8    Q.  All right.  Why didn't you do your own
9  thing, your own approach?
10    A.  Well, we did do our own approach.  Our
11  approach was not theirs.  We did significantly more
12  work than they did.
13    Q.  My -- my -- my question was very inartful.
14  That's not -- that's not what I was going for.
15    A.  Yep.
16    Q.  But my question is more along the lines,
17  Mr. Fogarty, of, why did you choose to do an approach
18  that was somewhat similar or analogous in methodology
19  to Hemming Morse, as opposed to just doing something
20  completely different?
21    MR. SCHMOOKLER:  Object to form.
22    THE WITNESS:  We felt that the approach --
23  we could work with the approach.
24  BY MR. PISANO:
25    Q.  Okay.

1    A.  We felt we could work with that approach.
2    Q.  All right.  Good.  Good enough.
3    Did you think there was a better way to
4  tackle the assignment after you had seen the
5  documents that were available to you?
6    MR. SCHMOOKLER:  Object to form.
7    THE WITNESS:  Nothing came to mind, no.
8  BY MR. PISANO:
9    Q.  All right.  So to, then, try to put a bow on
10  Exhibit 7, is it your opinion that if all the caveats
11  and all the assumptions were correct, that there
12  would be a potential overbilling of up to 5.8 million
13  for the subconsultants?
14    MR. SCHMOOKLER:  Object to form.
15    THE WITNESS:  No.  I -- my opinion is I
16  think it's -- it's less than that --
17  BY MR. PISANO:
18    Q.  What do you think it is --
19    A.  -- as I stated.
20    Q.  What -- what do you think the potential
21  overbilling is for the Urban Logic invoicing of
22  subconsultants?
23    MR. SCHMOOKLER:  Object to form.
24    THE WITNESS:  Less than 5.8 million to
25  4.4 million.

1  BY MR. PISANO:
2    Q.  Do you know -- or strike that.
3    Do you have a number that you are
4  comfortable saying is the potential overbilling in
5  terms of what Urban Logic billed to the City for its
6  subconsultants?
7    A.  A specific number, no.
8    Q.  Do you have a range?
9    MR. SCHMOOKLER:  Object to form.
10    THE WITNESS:  Yes.
11  BY MR. PISANO:
12    Q.  What's the range?
13    A.  The range is less than 5.87 on the high side
14  and less than 4.4 million on the low side.
15    Q.  What's the floor?
16    A.  The floor is less than 4.469 million.
17    Q.  So somewhere between zero and 4.469 million?
18    A.  Yes.
19    Q.  Can you put any finer of a point on your
20  opinion of the potential overbilling for the
21  subcontractor work in terms of the range being
22  between zero and 4.469 million?
23    MR. SCHMOOKLER:  Object to form.
24    THE WITNESS:  Without any other caveats
25  attached to that, no.  Or answers to the other

MAGNA
LEGAL SERVICES

EXHIBIT 1
PAGE 30

Page 98

1  caveats attached to that, no.
2  BY MR. PISANO:
3      Q. Can you say, Mr. Fogarty, with any degree of
4  professional certainty, that the overbilling of
5  Urban Logic to the City for its subconsultants, is
6  greater than zero?
7      MR. SCHMOOKLER: Could I have that read
8  back, please.
9      (Record read.)
10     MR. SCHMOOKLER: Thank you.
11     THE WITNESS: Again, Counselor, without
12 having answers to the caveats that I described,
13 whether it be subcontractors or vendors, would fall
14 under this cap. Without knowing that, it might be --
15 if none of them fall under that cap, then it would be
16 zero. Okay.
17     If -- if the answer is they all fall under
18 the cap, then my answer would be it would be above
19 zero, but it would be less than $4,470,000.
20     MR. PISANO: Let's say they -- they did
21 all --
22     Or -- or --
23     I'm sorry.
24     I'm now going to need the answer back,
25 unfortunately.

Page 99

1      (Record read.)
2  BY MR. PISANO:
3      Q. Okay. Mr. Fogarty, if the trier of fact
4  were to find that all of them were under the cap, do
5  you have an opinion as to the overbilling for the
6  subcontractors?
7      MR. SCHMOOKLER: Object to form.
8      THE WITNESS: Again, Counselor, I -- you
9  know, I mentioned one caveat. I mean, there's --
10 there's other issues. There's date of discovery;
11 there's whether they're employees or not employees.
12 So lots of other things that are in play here.
13     So each of these things would have to be --
14 a trier of fact would have to, I guess, come to a
15 decision on, and at that point, I could refine this
16 calculation further. I may be able to refine it
17 further.
18 BY MR. PISANO:
19     Q. Mr. Fogarty --
20     A. Another -- another caveat, you know, are --
21 are the billings to -- to the -- to the bond, you
22 know. Did they fall under this particular potential
23 cap?
24     So -- because our calculation is total
25 disbursements to ULC.

Page 100

1      So I'm not trying to be evasive, Counselor.
2  I'm just saying there are other factors at play here.
3      Q. Would you agree with me that the caveats
4  that you're giving me, Mr. Fogarty, are legal
5  questions?
6      MR. SCHMOOKLER: Object to form.
7      THE WITNESS: I would think most of them
8  are, yeah.
9  BY MR. PISANO:
10     Q. All right. So, Mr. Fogarty, Exhibit 7 --
11     And again, I'm really trying to wrap up this
12 exhibit so we can break for lunch.
13     Are there any opinions in this exhibit of
14 yours other than a potential overbilling for
15 subconsultants that I understand you say is --
16 contains lots of caveats?
17     A. I -- much like the discussion we had about
18 the previous report, Counselor, I'm sure there are
19 things in here, comments that I've made, you know,
20 that may rise to a level of an opinion.
21     I don't know if you and Scott want to chat
22 about that.
23     Q. Well, I tell you what, Mr. Fogarty. We're
24 going to take a little break for lunch. And when we
25 come back from lunch, I'll just ask you if there are

Page 101

1  any other opinions in this -- in this report,
2  Exhibit 7, that you care to share.
3      And then we'll move on.
4      Okay? So why don't we take a lunch break.
5      A. Oh, good. Thank you very much.
6      THE VIDEOGRAPHER: This marks the end of
7  media No. 2.
8      The time is 11:03 a.m.
9      We're off the record.
10     (Lunch recess.)
11     THE VIDEOGRAPHER: Stand by.
12     This marks the beginning of media No. 3.
13     The time is 11:54 a.m.
14     We're back on the record.
15 BY MR. PISANO:
16     Q. Good morning still, Mr. Fogarty. Although
17 where you are, it is the afternoon.
18     A. That is correct.
19     Q. You understand that you're still under oath?
20     A. I do.
21     MR. PISANO: All right. Can we have
22 Exhibit 7 up on the screen, please, Robert.
23     And I would like to go to the last page of
24 Exhibit 7. And I would like to blow up the
25 third-to-last paragraph.

MAGNA
LEGAL SERVICES

EXHIBIT 1
PAGE 31

Page 102

1     Q.  And before we broke for lunch, we were
2  talking about that estimated potential overbilling
3  range of 4.4 to 5.8 million.
4     Do you recall that?
5     A.  Yes.
6     Q.  All right.  Now, Mr. Fogarty, this report,
7  Exhibit 7, and all of its attached schedules, was the
8  purpose of that entire analysis to arrive at this
9  estimate of a potential overbilling range?
10    A.  I would say, for the most part, yes, it was.
11    Q.  Are there other purposes?
12    A.  I'd have to go back and reread the entire
13  report.  But I believe there's other commentary.  I'm
14  just sort of scrolling up, to see whether that's, in
15  fact, the case.
16    I mean, there is definitely discussion about
17  the 4-1/2 percent cap issue, construction costs, the
18  bid price.
19    So it wasn't just to do that.  It was
20  basically to address the totality -- excuse me -- the
21  totality of the Hemming Morse report.
22    Q.  Is it your opinion -- excuse me.  Let me
23  start over.
24    Is it your opinion, Mr. Fogarty, that there
25  is potential overbilling by Urban Logic for its

Page 103

1  subcontractor's work that ranges between 4.4 and
2  5.8 million?
3     MR. SCHMOOKLER:  Form.
4     THE WITNESS:  I'm sorry, Counsel.  Would you
5  just repeat that again.  I zoned out a little bit.
6  BY MR. PISANO:
7     Q.  Sure.
8     Is it your opinion, Mr. Fogarty, that there
9  is a potential overbilling that Urban Logic did to
10  the City for the work of its subcontractors that
11  ranges between 4.4 and 5.8 million?
12    MR. SCHMOOKLER:  Object to form.
13    THE WITNESS:  As discussed before the break,
14  Counselor, I think the number is less than that.  And
15  if there are -- there are a lot of caveats that
16  potentially would -- would impact that potential
17  overbilling number.
18  BY MR. PISANO:
19    Q.  Okay.  Could the overbilling be as high as a
20  range of 4.4 to 5.8 million for the subcontractor
21  work, in your opinion?
22    MR. SCHMOOKLER:  Object to form.  Calls for
23  speculation.
24    THE WITNESS:  I do not believe so, no.
25  ///

Page 104

1  BY MR. PISANO:
2     Q.  What is the highest amount of overbilling
3  for subcontractors...
4     Let me -- let me start that over.
5     What is the maximum amount of overbilling
6  that Urban Logic did to the City for the work of its
7  subcontractors?  The maximum potential amount in your
8  opinion.
9     In other words how high could it possibly
10  go, Mr. Fogarty?
11    MR. SCHMOOKLER:  Object to form.
12    THE WITNESS:  Again, based upon all the
13  things that we've discussed, I believe that the
14  highest it could be is less than the 4.4 to
15  $5.8 million noted in the paragraph that you have on
16  the screen right now.
17  BY MR. PISANO:
18    Q.  Can you provide me with a maximum potential
19  number, Mr. Fogarty?
20    A.  Not without understanding all the -- the
21  outcome of all the caveats that we've been
22  discussing.  No, I can't.
23    Q.  If every single caveat that you provided
24  broke in favor of overbilling, what's the maximum
25  potential overbilling that could've occurred for the

Page 105

1  subconsulting work?
2     MR. SCHMOOKLER:  Objection.  Object to form.
3     THE WITNESS:  I -- I do.  And -- and,
4  Counsel, you said the caveats that we've discussed.
5  I -- I don't believe that's necessarily all of the
6  caveats.
7     But to give you an answer, if all the
8  caveats that are out there right now, fell in favor
9  of the plaintiff, the maximum potential overbilling,
10  I think, could be less than the 5 million 857 noted
11  here.
12  BY MR. PISANO:
13    Q.  What would the number be, Mr. Fogarty?  Do
14  you know?
15    A.  A specific dollar number, no.  Not without,
16  again, understanding the outcome of all the caveats.
17    Q.  Mr. Fogarty, we're talking about a
18  hypothetical where all of the caveats break in favor
19  of overbilling.  Every single, solitary caveat that
20  forms the basis of your analysis breaks in favor of
21  overbilling.
22    You're with me so far?
23    A.  Yes, sir.
24    MR. SCHMOOKLER:  Object to form.
25  ///



27 (Pages 102 to 105)

EXHIBIT 1
PAGE 32

Page 106

```
 1   BY MR. PISANO:
 2       Q.  If every one of those caveats broke in favor
 3   of overbilling, what is the maximum potential number
 4   of overbilling?
 5       A.  As discussed previously, Counselor, given
 6   the fact that a contractor invoicing appeared to be
 7   heavier in 2010, compared to -- to previous ones that
 8   we analyzed.  And given the fact that the total
 9   billings by -- for ULC to the City, was declining, as
10   you move backwards from 2008, I feel the likelihood
11   that any potential subcontractor overbilling would be
12   less than the 7 to 10 percent that we came up with.
13       So I can't give you a specific number.  I
14   can only tell you what I just told you.
15       Q.  If every caveat -- so, in other words, you
16   can't give me a number of potential overbilling;
17   fair?
18       A.  An exact number, that's correct.  Yes.
19       Q.  Okay.
20       A.  That's fair.
21       Q.  Can you at least give me a potential minimum
22   amount of overbilling for the subcontractor work in
23   the hypothetical world where every one of your
24   caveats breaks in favor of overbilling?
25       MR. SCHMOOKLER:  Object to form.  Outside
```

Page 107

```
 1   the scope of his designation.
 2       THE WITNESS:  Basically same answer that I
 3   just gave.
 4   BY MR. PISANO:
 5       Q.  Which is?
 6       A.  That the analysis we did from 2008 to 2010
 7   may not be representative of the subcontractor
 8   billing to ULC compared to the ULC billing to the
 9   City in -- in other years.
10       So therefore, I can't give you a floor
11   either, a minimum floor.
12       Q.  So in other words, then, Mr. Fogarty, you
13   cannot get any more precise in terms of a
14   determination of the overbilling due to the
15   subcontractor work than a range that is between zero
16   and 4.4 to 5.87 million; fair?
17       A.  Yes.  I think that's fair.
18       Q.  All right.  So other than that range, are
19   there any other overarching opinions in Exhibit 7?
20       A.  Again, you know, I'm on page 2 of 12.  We
21   had discussions about the Hemming Morse 4-1/2 percent
22   cap analysis and their estimate of 25 percent
23   reduction to those payments who account for items
24   that may be outside of that cap, you know, we took
25   exception to that.
```

Page 108

```
 1       I'd have to, again, go through and read each
 2   of my paragraphs.  But there may very well be
 3   opinions associated with that aspect of their report
 4   that are contained within Exhibit 7.
 5       Q.  Well, I do want to talk about that analysis
 6   of the billing, and the cap.
 7       Aside from that analysis -- and you can
 8   leave that entire issue aside for now -- are there
 9   any other opinions in Exhibit 7 that you can share
10   with us?
11       A.  Well, again, Counselor, I mean, there's --
12   there's a lot contained in the -- there's questions
13   regarding, you know, what constitutes a consultant,
14   what might fall under any potential cap, and the
15   like.
16       So may I be asked to express opinions on
17   those topics?  I don't know.
18       If it's in my report and I'm asked to give
19   an opinion about it, then I'm able to do that.
20       Q.  That wasn't exactly my question,
21   Mr. Fogarty.
22       My question is broader and more [sic] higher
23   level.
24       A.  Okay.
25       Q.  Other than the analysis and opinion that you
```

Page 109

```
 1   arrived at for the potential overbilling, or at least
 2   the range for the subconsultant work, and other than
 3   any opinions you formulated with regards to potential
 4   overpayments related to work within and outside the
 5   4-1/2 percent cap -- recognizing I want to talk about
 6   that issue next -- are there any other opinions in
 7   Exhibit 7 that you have formulated that you could
 8   potentially testify to at trial?
 9       MR. SCHMOOKLER:  Do not disclose anything I
10   said about trial strategy.  It's privileged.
11   (Unintelligible.)
12       THE REPORTER:  Can't hear you.
13       MR. SCHMOOKLER:  Do not disclose anything I
14   said about trial strategy.  It's privileged.
15       Other than that, he can answer.
16       THE WITNESS:  And again, Counselor, I don't
17   want to limit myself to saying that there aren't
18   other topics that counsel may want to ask me about
19   that are contained within this report.
20   BY MR. PISANO:
21       Q.  All right.
22       A.  I -- I -- I will say to you I feel the
23   majority of this report deals with the potential
24   subcontractor overbilling issue and the 4-1/2 percent
25   cap issue.
```

MAGNA ◆
LEGAL SERVICES

EXHIBIT 1
PAGE 33

Page 110

1     Q.  Are there other issues where there might be
2  opinions lurking that may pop out at trial?
3         MR. SCHMOOKLER:  Object to form.
4         THE WITNESS:  As an example, we brought up
5  the issue with Kiernan McKiernan.  His --
6         THE REPORTER:  I'm sorry.  With who?
7         THE WITNESS:  Kiernan McKiernan.
8         I don't know if there'd be any questions
9  regarding that from counsel at trial.
10  BY MR. PISANO:
11     Q.  What opinions, if any, have you formulated
12  regarding Kiernan McKiernan, as you testify here
13  today?
14     A.  That it appears he continued to bill the
15  same way that ULC did when they were owned by Dillon
16  Egger and Moorjani.
17     Q.  So is it your opinion, then, that there is
18  potential overbilling of the City of Beaumont that
19  extends beyond 2012 by Urban Logic?
20     A.  Yeah.  That McKiernan appears, at least very
21  top level, continued to bill in a similar fashion to
22  the way ULC was billing prior to his ownership.
23     Q.  Have you formulated a range of potential
24  overbilling that Urban Logic did to the City
25  post-2012, similar to the range that you formulated

Page 111

1  for '04 to '12?
2     A.  No.
3     Q.  After you wrote the May 15, 2019 report
4  that's marked as Exhibit 7, and that we have been
5  discussing, did you do anything to refine or provide
6  further precision to the range of potential
7  overbilling based on the subcontractor work?
8     A.  I don't believe so --
9        Yes.  I think we extended the calculation
10  further back than 2004.
11     Q.  When did you do that?
12     A.  I believe later on in 2019.
13     Q.  Was that the subject of the August 16, 2019
14  report?
15     A.  No.  I believe that report related more to
16  the 4-1/2 percent cap issue.
17     Q.  Did you determine -- or strike that.
18        So you did an analysis of the potential
19  overbilling for the subcontractor work for periods of
20  time that predate 2004?
21     A.  Yes.
22     Q.  What were the results of that analysis?
23     A.  I don't have the numbers in front of me, but
24  we did the same extrapolation carried back to what we
25  saw to be the ULC payments from the City, dating back

Page 112

1  to 1993.
2     Q.  I'm sorry.  1993?
3     A.  Correct.
4     Q.  And can you give me an estimate, or at least
5  ballpark of the range of potential overbilling going
6  back to 1993?
7     A.  I don't have that in front of me, Counselor.
8  It certainly went up from the numbers that we've been
9  discussing.
10     Q.  But you don't know how high, sitting here
11  today?
12     A.  I know how high our calculation was, yes.
13  But I don't have that in front of me.  I don't -- I
14  don't know what the number is.
15     Q.  Can you give me a ballpark estimate?
16        MR. SCHMOOKLER:  Object to form.
17        THE WITNESS:  High side, 6 millionish.
18        Low side, probably high fours, low five.
19  Somewhere in that range.
20  BY MR. PISANO:
21     Q.  Low fours, meaning low 4 million?
22     A.  No.  I mean, we're already on the low --
23  talking about this at 4 million 469.  So...
24     Q.  So you said high side, 6 millionish.
25        What does that mean?

Page 113

1        MR. SCHMOOKLER:  Object to form.
2        Peter, do you understand his question?
3        THE WITNESS:  I'd like it read back, if you
4  would.
5        (Record read.)
6        THE WITNESS:  It means I believe the
7  calculation was over 6 million on the high side.
8  BY MR. PISANO:
9     Q.  And that's potential overbilling -- that's
10  potential overbilling based upon the subcontractor
11  work; correct?
12        MR. SCHMOOKLER:  Object to form.
13        THE WITNESS:  Based upon the analysis we did
14  in our May 15th, '19 report, yes.
15        MR. PISANO:  Okay.  Good.
16        So I would like to change topics on us.
17        And if we could, please, Robert, put on the
18  screen, and mark for identification Exhibit 5.
19        (Deposition Exhibit 5 was marked for
20        identification by the court reporter.)
21  BY MR. PISANO:
22     Q.  Now, this is a December 14, 2016 e-mail,
23  from Ms. Rocha at AIG, to you; correct?
24     A.  It appears to be, yes.
25        MR. PISANO:  And this is a three-page

MAGNA
LEGAL SERVICES

EXHIBIT 1
PAGE 34

Page 114

1  document.  So can we scroll through to the second
2  page.  And then let's scroll through to the last
3  page.
4      Q.  Mr. Fogarty, this appears to me to be an
5  Engagement Agreement.  Is that what this document is?
6      A.  I believe it is.
7      Q.  Did you sign this document?
8      A.  I believe I did.
9      And I believe my earlier testimony was I
10 didn't think I had an Engagement Letter.
11     Q.  Okay.  So you -- it is -- is it your
12 testimony now that you did have an Engagement
13 Agreement with AIG?
14     A.  Yes.  I believe I did.
15     Q.  Okay.  Is this the only one, or was there
16 more than one Engagement Agreements that you had with
17 AIG for your work in analyzing the Beaumont claims?
18     A.  I believe this would be it.
19     Q.  And so, then, your assignment in this case,
20 if we are sticking on page 1, it says:
21     "Please conduct a forensic accounting
22 examination of the pertinent records and other
23 supporting data in connection with the claim, and
24 provide in writing a work plan for the following
25 objectives."

Page 115

1      And then there's bullet points that go from
2  there.
3      Do you see that?
4      A.  Yes.
5      Q.  And so was that the assignment that you were
6  given by AIG?
7      A.  This was the, yeah, written engagement
8  portion of it.  Yes.
9      Q.  Did you prepare the written work plan that
10 is called for in the scope of the assignment?
11     A.  I believe I did.
12     Q.  Did you provide that work plan to AIG?
13     A.  I believe I did.  I don't have a full
14 recollection, as I sit here.
15     Q.  Now, one of the objectives --
16     If we can go to the next page.
17     One of the objectives -- and I'm looking at
18 the second-to-last bullet point -- says:
19     "In your opinion and based on your
20 procedures in this investigation, attempt to
21 determine an out-of-pocket loss that may have been
22 sustained due to the claimed dishonesty and the
23 possible amount of loss."
24     Do you see that?
25     A.  Yes.

Page 116

1      Q.  Is that topic discussed in your written work
2  plan?
3      A.  I'm not sure I understand your question.
4      Q.  Well, let me try to ask it a different way.
5      Did you -- did -- did you determine if an
6  out-of-pocket loss was sustained due to the claimed
7  dishonesty?
8      A.  My reports in this matter address this
9  bullet point right here.  So whether there may have
10 been sustained a loss due to claimed dishonesty,
11 that's what we just went over in Exhibit 7 and
12 previously in Exhibit 14 -- I'm sorry -- Exhibit 6.
13     Q.  6 and 7?
14     A.  6 and 7, yes.
15     Q.  All right.  And then we're going to get to
16 14 in a second.
17     But the last bullet point in Exhibit 5 is,
18 "issue a report of your findings."
19     The report of your findings are the three
20 reports: the August 18, 2017 report, the May 15, 2019
21 report, and the August 16, 2019 report; correct?
22     A.  Correct.  Those are my three reports.
23     MR. PISANO:  So let's look at Exhibit 14
24 which we previously marked which is the August 16,
25 2019 report.

Page 117

1      Q.  This is the third report; right?
2      A.  That is correct.
3      Q.  Now, turning your attention to the first
4  paragraph of the first page, you write in the second
5  sentence that:
6      "This correspondence supplements our
7  previous status report dated May 15, 2019, based on
8  our meeting with the insured's forensic accountants,
9  Hemming Morse, the insured's counsel, Best Best
10 & Krieger, on July 11, 2019 in Walnut Creek,
11 California, as well as additional discussions with
12 AIG counsel."
13     You see that?
14     A.  Yes.
15     Q.  Before we get into the meeting between
16 Hemming Morse and BB&K and yourself, what additional
17 discussions with AIG counsel are you referring to in
18 this sentence?
19     MR. SCHMOOKLER:  Do you have a recollection,
20 Peter?  Because if so, I'm going to talk about
21 whether or not you did (unintelligible).
22     If you don't have any recollection, say
23 that.
24     THE WITNESS:  I don't have a recollection of
25 any specifics related to any discussions I've had

MAGNA
LEGAL SERVICES

EXHIBIT 1
PAGE 35

Page 118

1    with AIG counsel.
2    BY MR. PISANO:
3        Q.  Do you remember, Mr. Fogarty, how additional
4    discussions you had with AIG counsel, which are
5    referenced in your report in Exhibit 14, contributed
6    to any of the supplements that are set out in the
7    August 16, 2019 report?
8        A.  Can you repeat that?
9            MR. PISANO:  Madam Reporter, could you read
10   it back, please.
11           (Record read.)
12           MR. PISANO:  All right.  I'm going to
13   rephrase that 'cause I don't think that's what I
14   said.  And it may be what I said, but it's not what I
15   meant to say.
16           So I'm going to start over.
17       Q.  Mr. Fogarty, do you recall how the
18   additional discussions with AIG counsel that are
19   referenced in that first paragraph of Exhibit 14
20   contributed to any of the supplemental text you
21   provide in this report?
22       A.  I don't have a recollection of my
23   discussions with the AIG counsel, so my answer would
24   be no.
25       Q.  All right.  So let me ask you some questions

Page 119

1    about -- or strike that.
2        Do you recall how many discussions you had
3    with AIG counsel in advance of you preparing this
4    August 16, 2019 Supplemental Report?
5        A.  I don't remember how many.  I do not believe
6    it was "many."
7        Q.  Do you remember anything AIG counsel told
8    you in any of those discussions?
9        A.  No.
10       Q.  Who is the AIG counsel you're referring to
11   in that sentence?
12       A.  Mr. Watnick.
13       Q.  Anyone else?
14       A.  No.
15       Q.  So let me ask you some questions, then,
16   about the July 11, 2019 meeting.
17           Who was at that meeting?
18       A.  Mr. Ray.
19           I believe Chris Deal from your office; not a
20   hundred percent sure on that.
21           I believe it was Mr. Watnick, or some other
22   attorney from his office, myself, and Phil Segerson
23   from my office.
24       Q.  Can you describe for us generally what
25   happened at that meeting?

Page 120

1        A.  I believe we had an agenda that we shared
2    with them ahead of time.  And for the most part, we
3    went through the agenda.  They explained sections of
4    the report.  "They," being Dan Ray.
5            I had a series of questions related to
6    certain aspects of his report.  And we discussed
7    what, if any, support they had for certain key
8    elements of their report.
9        Q.  What were the questions that you had?
10       A.  I don't remember every question.  But we
11   certainly asked for the basis for the 25 percent
12   estimate of the payments to ULC that would not be
13   subject to the 4-1/2 percent cap.
14           I remember asking if they had any more
15   payroll records.
16           I recall asking if they had any more vendor
17   in- -- vendor invoices to ULC, any more time and
18   billing reports, any more ULC invoices, any other
19   analysis that Hemming Morse may have done that we
20   hadn't seen yet, anything that they felt we should
21   consider.
22       Q.  At the time of this meeting -- or strike
23   that.
24           And the meeting took place on July 11, 2019;
25   is that right?

Page 121

1        A.  I believe so, yes.
2        Q.  Okay.  At the time of this meeting that you
3    had with Hemming Morse and Best Best & Krieger and
4    the AIG counsel, you had already sent AIG your
5    May 15, 2019 report that's marked as Exhibit 7;
6    correct?
7        A.  Yes.
8        Q.  And likewise, you prepared the August 18,
9    '27 report that's marked as Exhibit 6; correct?
10       A.  Yes.
11       Q.  Did you provide either of those reports to
12   Mr. Ray, or Best Best & Krieger?
13       A.  I did not, no.
14       Q.  Why not?
15       A.  The reporting chain, if you will, was
16   from -- from me to AIG or from me to AIG's counsel.
17       Q.  Meaning that would've been up to AIG or its
18   counsel whether or not to give you reports to Mr. Ray
19   or BB&K?
20       A.  Correct.  It's not for me to do that.
21       Q.  During the July 11, 2019 meeting, did you
22   explain to Mr. Ray or Mr. Deal, or anyone else there
23   on behalf of BB&K, what your findings were from the
24   May 15, 2019 or August 18, 2017 reports?
25       A.  I -- I have a recollection that we asked

31 (Pages 118 to 121)

MAGNA ▶
LEGAL SERVICES

EXHIBIT 1
PAGE 36

Page 122

1    questions that were relevant to the analysis that we
2    had done up to that point in time, to see if there
3    was any additional information that we should
4    consider, that could -- we could consider.
5        Q.  Okay.  That was not quite my question,
6    Mr. Fogarty.
7        A.  That's my answer.  You know, I did -- I --
8    that's my answer.
9            So there were discussions about things that
10   may have been in the report.  We didn't sit there and
11   talk about our report, if that's what you're asking.
12       Q.  Okay.  Well, that is what I'm asking.  So I
13   appreciate that.
14           So is it fair to say you did not share the
15   finding from your May 15, 2019 report of the
16   potential overbilling -- or at least the range of
17   potential overbilling related to the subcontractor
18   work?
19       A.  I do not recall discussing them --
20   discussing that with them at that meeting, no.
21       Q.  And again, while you were in that meeting,
22   was it your understanding that if that information
23   was going to be provided to Mr. Ray and BBK, that
24   would have been AIG's and its counsel's decision to
25   do so, not yours?

Page 123

1        A.  Yes.
2        Q.  Do you think, as you're sitting here now, it
3    might've been helpful to Mr. Ray if he had the
4    benefit of your analysis in the May 15, 2019 report
5    in that January 2019 time frame?
6            MR. SCHMOOKLER:  Object to form.  Calls for
7    speculation.
8            THE WITNESS:  I mean, I -- I think you'd
9    have to ask Mr. Ray that.
10   BY MR. PISANO:
11       Q.  You don't have any view on that one way or
12   the other?
13           MR. SCHMOOKLER:  Objection.  Asked and
14   answered.
15           THE WITNESS:  No, I don't.
16   BY MR. PISANO:
17       Q.  All right.  At the time of the January -- or
18   strike that.
19           At the time of the July 11, 2019 meeting in
20   Walnut Creek, had you performed the analysis of the
21   potential overbilling based on the 4-1/2 percent cap
22   that you ultimately articulated in the August 16,
23   2019 report?
24       A.  I don't know.  I doubt it.
25       Q.  Why do you say that you doubt it?

Page 124

1        A.  Because we issued the report in the middle
2    of August.  So we usually, you know, do work leading
3    up to the report.  So my guess would be we may have
4    been working on it, but it certainly wasn't completed
5    yet.
6        Q.  Did your analysis of the potential
7    overbilling, based on the subcontractor work, change
8    in any way after the meeting with Mr. Ray and BBK?
9        A.  As I said earlier, we updated our figures to
10   include going back to 1993.
11           But other than that, I don't believe so.
12       Q.  Did the meeting that you had with Mr. Ray
13   and BB&K, inform your analysis of the potential
14   overbilling based on the 4-1/2 percent cap that you
15   ultimately performed in your August 16, 2019 report?
16       A.  I -- I don't recall specifically what
17   Mr. Ray may have said related to the 4-1/2 percent
18   issue, other than I think they felt everything
19   related to it.
20       Q.  And you disagreed with that; right?
21       A.  It wasn't really for me to agree or
22   disagree.  I felt that's more of a legal issue.
23       Q.  Well, Mr. Fogarty, let's talk about that.
24           Sticking on Exhibit 14, can we go to page 3,
25   please.

Page 125

1            And I would like to ask you some questions
2    about the very last sentence on this page, which
3    continues onto page 4, where you wrote in your
4    report, that:
5            "Although Hemming Morse contends that
6    approximately 25 percent of the amounts billed by ULC
7    would not be subject to the 4-1/2 percent cap,
8    billings for the noted construction-management-type
9    timekeepers totaled only 13.82 percent of all
10   billings from 2008 to 2012, indicating that as much
11   as 86.18 percent of ULC billings may not have been
12   subject to the 4-1/2 percent cap."
13           You see that?
14       A.  Yes.
15       Q.  So you did arrive at a determination as to
16   what ULC work should be within and without of the
17   cap; true?
18           MR. SCHMOOKLER:  Object to form.
19           THE WITNESS:  No.  No, Counsel.
20   BY MR. PISANO:
21       Q.  Well, what's the 86.18 percent?
22       A.  It is billings for noted construction-
23   management-type timekeepers looking at the ULC
24   invoices from 2008 through 2012, identifying those
25   charges for those construction-management-type

MAGNA
LEGAL SERVICES

EXHIBIT 1
PAGE 37

Page 126

1    timekeepers yielded only 13.82 percent.
2        Q.  And as I understand the calculation that you
3    did following that analysis, the calculation is
4    premised upon 13 percent of the work being within the
5    cap and 86 percent being outside of the cap; true?
6        MR. SCHMOOKLER:  Object to form.
7        THE WITNESS:  Would you repeat the question,
8    please.
9        MR. PISANO:  Madam Reporter, can you read it
10   back.
11       THE WITNESS:  I will need a break in a
12   little while here.
13       MR. PISANO:  All right.  Why don't we take
14   care of this, and then we'll take a break.
15       THE WITNESS:  Sounds good.  Thank you.
16       (Record read.)
17       THE WITNESS:  Based upon the time records
18   that we looked at, potentially that's what we saw.
19   Yes.
20       MR. PISANO:  Okay.  Why don't we take a
21   break.
22       THE WITNESS:  Thank you.
23       THE VIDEOGRAPHER:  Going off the record.
24   The time is 12:46 p.m.
25       (Short recess.)

Page 127

1        THE VIDEOGRAPHER:  Stand by.
2    The time is 12:56 p.m.
3        We're back on the record.
4    BY MR. PISANO:
5        Q.  So, Mr. Fogarty, before we took a break, we
6    were looking at page 3 of your August 16, 2019
7    report, which is Exhibit 14.
8        Can we get back -- get that back up on the
9    screen, please, Robert.
10       Thank you.
11       Yeah, that's good.  Pages 3 and 4.
12       So, Mr. Fogarty, who made the determination
13   of 13.82 percent of billings being within the cap and
14   86.18 of billings being outside of the cap?
15       A.  We did a calculation, Counselor.
16       Q.  I understand the calculation.  My question
17   is who.
18       A.  I know.  But -- but --
19       MR. SCHMOOKLER:  Let him ask the question.
20       THE WITNESS:  Go ahead.
21   BY MR. PISANO:
22       Q.  Okay.  The -- the question is who.  Who was
23   involved in the process of coming up with the
24   numbers?
25       A.  My -- my -- my firm was.  But I don't think

Page 128

1    the question is fair in a sense, that if you look at
2    the previous paragraph, we specifically say:
3        "Based on our analysis of the ULC invoices,
4    the descriptions of the tasks are vague and do not
5    provide detailed explanations of the tasks performed.
6    We identified three billing titles which appear
7    consistent with the construction-management-related
8    duties noted above."
9        Based upon that, we came up with the 13.82
10   percent.
11       Q.  I completely understand what you did.  My
12   question is:  Who's the "we"?  Who is involved?
13       MR. SCHMOOKLER:  Who's the people?
14       THE WITNESS:  I -- myself and Phil Segerson
15   and maybe other staff.  I don't know.  I'd have to
16   refer back to things.
17   BY MR. PISANO:
18       Q.  You were involved in that process; right?
19       A.  Yeah.  Yes.
20       Q.  And Phil Segerson was involved.
21       A.  I believe so, yes.
22       Q.  What's Mr. Segerson's background?
23       A.  He's an accountant.
24       Q.  Is he an expert in construction?
25       A.  You'd have to ask him that question.  I'm

Page 129

1    not aware that he is, but maybe he had some
2    experience before he joined us.
3        Q.  You just don't know one way or the other as
4    you're sitting here right now; fair?
5        A.  Fair.
6        Q.  And can you name, as you sit here right now,
7    anyone else on your team who was involved in that
8    process of coming up with the 13.82 percent and the
9    86.18 percent?
10       A.  No, not as I sit here today.
11       Q.  All right.  Now, you did read the above
12   paragraph on page 3, which is a paragraph that
13   intrigues me, and so I wanted to ask you some
14   questions about it.
15       And you -- you read the sentence that I find
16   the most interesting, which is that:
17       "Based on our analysis of the ULC invoices,
18   the description of tasks are vague and do not provide
19   a detailed explanation -- or do not provide
20   explanations of the tasks performed."
21       You wrote that; right?
22       A.  Yes.
23       Q.  And do you agree with that?
24       A.  Yes.
25       Q.  "Tasks" are vague?

MAGNA
LEGAL SERVICES

EXHIBIT 1
PAGE 38

Page 130

1    A. Yes.
2    Q. The ULC invoices are -- are vague; true,
3  sir?
4    A. The "tasks" descriptions are vague, yes.
5    Q. Do those invoices provide any explanation of
6  what work was performed?
7    A. No. Doesn't -- it doesn't provide a
8  detailed explanation, no.
9    Q. So as I understand it, then, what you and
10  Mr. Segerson did, was you looked for titles of the
11  billing professional.
12    A. Correct.
13    Q. And if you found someone with a title of
14  construction manager, that would be within cap;
15  right?
16    MR. SCHMOOKLER: Object to form.
17    THE WITNESS: (No audible response.)
18    MR. SCHMOOKLER: Do you understand his
19  question?
20    THE WITNESS: I do.
21    And to answer your question, section --
22  schedule 1 of my report, this particular report, the
23  descriptions that we identified as potentially
24  falling under the cap, are construction manager,
25  inspector, inspector pre-wage, inspector over time,

Page 131

1  and plan checker.
2  BY MR. PISANO:
3    Q. Right.
4    But my question was: To the extent you saw
5  that professional title, those ones you just
6  identified, you put them in the within-cap bucket;
7  correct?
8    A. Potential, yes. Yes, we did.
9    Q. And then the other professional titles that
10  you saw in those invoices, you put in the other
11  bucket as being outside the cap; correct?
12    A. That's correct.
13    Q. And that's how you came up with the 13.82
14  percent potentially being within cap and 86.18
15  potentially being outside of cap.
16    A. Correct.
17    Q. All right. So who made the determination
18  that you would divide up potential within cap versus
19  potential outside of cap, based on the title of the
20  professional?
21    A. We did.
22    Q. Who's the "we"? You and Mr. Segerson?
23    A. Yes.
24    Q. Did anyone else participate in that
25  determination?

Page 132

1    A. No.
2    (Off-record comments.)
3    MR. PISANO: Okay. Let's go to the prior
4  page, page 2, please.
5    And let's look down at the bottom.
6    Q. And I want to focus on the last sentence.
7    And -- and, by the way, this -- this
8  paragraph, you -- you quoted paragraph 51, Public
9  Works Construction Management.
10    This is in the 1994 addendum; correct?
11    A. I believe so, yes.
12    Q. And as part of your work in this case, you
13  reviewed both the September 27, 1993 agreement, as
14  well as the April 11, 1994 amendment to the
15  agreement; correct?
16    A. Yes.
17    Q. All right. And so this Roman numeral V.1,
18  this is in the 1994 addendum. And this is a quote
19  from the contract; correct?
20    A. I believe so, yes.
21    Q. And the last sentence -- and we're just
22  going to pick it up -- yeah, we'll -- we'll look at
23  the last sentence:
24    "In the performance of such duties, ULC
25  shall provide construction management for each public

Page 133

1  works project before, during and after completion of
2  various stages of construction, including the
3  following services related to planning, control,
4  scheduling, estimating and value engineering of
5  public works projects."
6    You see that?
7    A. I do.
8    Q. Do you know what planning services are
9  typically provided in connection with public works
10  construction projects?
11    A. No.
12    Q. Do you know what control services are
13  typically provided in connection with public works
14  construction projects?
15    A. No.
16    Q. Do you know what scheduling services are
17  typically provided in connection with public works
18  projects?
19    A. No.
20    Q. Do you know what estimating services are
21  typically provided in connection with public works
22  construction projects?
23    A. No.
24    Q. Do you know what value engineering services
25  are typically provided in connection with public



34 (Pages 130 to 133)

EXHIBIT 1
PAGE 39

Page 134

1  works construction projects?
2      A.  No.
3      Q.  Do you know what kinds of construction
4  professionals typically perform the services that are
5  identified in that last sentence on Exhibit 2 of your
6  report?
7      A.  No.
8      Q.  All right.  Let's go to the next page of
9  your report, please.
10     Again, the top of page 3 of your report is a
11 continuation of the quote of the 1994 amendment;
12 correct?
13     A.  I believe so, yes.
14     Q.  And that amendment provides this listing of
15 21 services, does it not?
16     A.  Yes.
17     Q.  Do you know what any of these 21 services
18 entail in connection with public works construction?
19     A.  No.
20     Q.  Do you know what kind of professional
21 provides laboratory testing of materials as
22 identified in No. 10?
23     A.  I would -- a material testing lab.  But
24 beyond that, no.  No, I don't.
25     Q.  Do you know what kind of professional

Page 135

1  evaluates the quality and workmanship of
2  construction, which is identified in No. 11?
3      A.  Specifically no, I don't.
4      Q.  How about No. 19, do you know what kind of
5  professional typically provides plan interpretation?
6      A.  No.
7      Q.  Do you know what role, if any, engineers
8  play in the management of construction works -- or
9  con- -- strike that.
10     Do you know what role, if any, engineers
11 play in providing construction management services in
12 public works construction?
13     A.  Specifically, no.
14     MR. PISANO:  All right.  Let's go to page 4
15 of Exhibit 14, if we could.
16     Q.  Can you walk me through it, please,
17 Mr. Fogarty, the calculation that's performed in the
18 first box on page 4 of your report.
19     A.  I believe we took this from the
20 Hemming Morse report.  If they took total billings or
21 payments to ULC.  They backed out an estimated
22 25 percent figure to come up with what they felt was
23 the payments to ULC, subject to the 4-1/2 percent
24 limit.
25     They then compared that against their

Page 136

1  estimate of total capital expenditures times
2  4-1/2 percent, to come up with what they feel is an
3  implied overpayment ULC.
4      Q.  All right.  The next box, down below, let's
5  look at that.
6      And rather than me try to summarize it, why
7  don't you tell me what's going on in this box.
8      A.  Sure.
9      We just replicated what Hemming Morse did as
10 a comparison to -- to their figure.  So we did the
11 same calculation, you know, excepting, if you will,
12 their assumption there -- that there's a -- one
13 4-1/2 percent cap, and that that cap is applied
14 against capital expenditures and the like, so we
15 could come up with a number to basically compare
16 against their analysis.
17     Q.  So you used what Hemming Morse found to be
18 the total billings of 74.9 million; correct?
19     A.  We -- we -- again, we just took their
20 numbers to do a comparison.
21     Q.  Right.  You used their numbers.
22     A.  Yes.
23     Q.  Right.
24     And then you came up with the 64.57 million
25 based on the 86.18 percent of that total billing;

Page 137

1  correct?
2      A.  Yes.  Mathematically correct, yes, that's
3  what we did.
4      Q.  And so that gave you the potential -- what
5  was potentially subject to the 4-1/2 percent cap at
6  10 million -- 10.3 million; right?
7      A.  And again, you -- following Hemming Morse's.
8  This was for comparison purposes.  It's a
9  mathematical calculation.  But yes, that's what we
10 came up with.
11     Q.  And then again, you took Hemming Morse's
12 estimate of CapEx at 177.8 million; right?
13     A.  Yes.
14     Q.  And then, just pure math.  4.5 percent of
15 CapEx would be 8 million.
16     Which is the Hemming Morse number; right?
17     A.  Correct.
18     Q.  And the delta between the 10.3 million and
19 the 8 million, is 2.3 million potentially implied
20 overpayment; correct?
21     A.  Yeah.  Again, I -- I don't consider this to
22 be the implied overpayment because of other issues
23 that are in existence here.
24     But if the amount not subject was at
25 86 percent versus 25 percent, that's what the



EXHIBIT 1
PAGE 40

Page 138

1  difference in the calculations would show.
2      Q.  All right.  So, Mr. Fogarty, did you do a
3  separate and independent analysis of the total ULC
4  billings?
5      MR. SCHMOOKLER:  Move to --
6          Object to form.  Sorry.
7      THE WITNESS:  I'm not sure whether we did or
8  not.  I'm not sure.
9  BY MR. PISANO:
10     Q.  But if you did one, it's not reflected in
11 any of your reports; true?
12     A.  Not that I'm aware of, as I sit here right
13 now.
14     Q.  All right.  Did you do an independent
15 analysis of total capital expenditures?
16     A.  I know we looked at capital expenditures.
17 We looked at several schedules that had been put
18 together.  I believe Urban Futures did an analysis,
19 which was a company hired prior to Hemming Morse.
20         But again, for purposes of what we're
21 looking at, we would just try to do a comparison
22 against Hemming Morse's calculation.
23     Q.  To the extent you did an independent
24 analysis of total capital expenditures in the City of
25 Beaumont, that is not reflected in any of these three

Page 139

1  reports we have been looking at today; true?
2      A.  I believe that's correct.
3      Q.  Did you do an analysis of potential
4  overpayments -- or strike that.
5          Did you do an analysis of potential
6  overbilling by Urban Logic, other than the analysis
7  that's reflected in the calculations on page 4 of
8  your August 16, 2019 report?
9      A.  Just so I can confirm.  You're -- you're
10 saying the schedule that we're looking at right now?
11     Q.  Yes.  And -- and the -- yeah.  Okay.
12     A.  If -- if I understood your question, it's
13 overbilling, we -- we also did the analysis
14 associated with potential overbilling from the use of
15 vendors.
16     Q.  Okay.  We're -- right now, I want to limit
17 our discussion to this issue of overbilling based
18 upon the 4-1/2 percent cap.
19     A.  Okay.  I missed that in your question, but
20 if I did, I'm sorry.
21     Q.  It wasn't in my question, so you're fair to
22 seek clarification.
23     A.  Okay.  This -- this was the analysis that we
24 did.
25     Q.  Is this the only analysis that you did?

Page 140

1      A.  Related to the 4-1/2 percent cap, correct.
2      Q.  One of the charges AIG gave you when they
3  hired you, was to determine whether or not there was
4  potential overbilling; true?
5      A.  I'd have to look at the exact wording.
6  It's -- it's really more of an engagement to analyze
7  the claim presented by the insured and -- and this
8  quote that they provide behind each of those claims.
9      MR. PISANO:  Now, let's go back to
10 Exhibit 5, page 2.  And let's go to that
11 second-to-last bullet point.
12     Q.  Mr. Fogarty, one of your charges was to try
13 to determine if an out-of-pocket loss may have been
14 sustained due to the claimed dishonesty and the
15 possible amount of loss; true?
16     A.  Yes.
17     MR. PISANO:  All right.  We can take that
18 down.
19         And let's go back to Exhibit 14.  And let's
20 go back to page 4.
21     Q.  And is it fair say that the only analysis of
22 potential overbilling that you did as it relates to
23 the 4-1/2 cap that is reflected in any of your
24 reports, is what's shown on page 4 of Exhibit 14?
25     MR. SCHMOOKLER:  Object to form.

Page 141

1      THE WITNESS:  I'm not sure I would agree
2  with the way you phrased it.
3          We certainly looked at many aspects of this
4  particular assertion made by your client, and this is
5  what was presented as the loss.  This was the basis
6  for the loss.
7          And so we tested that basis.  We looked at
8  the information behind it, based on documentation,
9  our review of the contract language, the billing
10 information, and this is what we were able to come up
11 with using the same assumption that there was one
12 4-1/2 percent limit; and using the descriptions from
13 the billing records, knowing that we didn't have the
14 actual tasks that were being performed.
15 BY MR. PISANO:
16     Q.  Let's go to page 5 of your report,
17 Mr. Fogarty.
18     A.  Okay.
19     Q.  I'm going to ask you about the second
20 paragraph -- or the first full paragraph on the page.
21         "It is our opinion that Hemming Morse has
22 not substantiated what amounts billed by ULC were
23 subject to a limit of 4-1/2 percent of capital
24 expenditures, nor what services were limited to time
25 and materials plus 15 percent."

Page 142

1    See that?
2    A. I do.
3    Q. And then you go on to indicate that legal
4  interpretations have to be made by the lawyers;
5  right?
6    A. Yes.
7    Q. All right. So let me ask you this,
8  Mr. Fogarty: If Hemming Morse didn't substantiate
9  what amounts were billed by Urban Logic that were
10  subject to 4-1/2 percent of CapEx, what could you
11  have done differently to substantiate that amount,
12  given the Urban Logic invoices as you found them?
13    A. Would you repeat the question? I'm not sure
14  I understand it.
15    Q. Sure.
16    You are of the opinion that Hemming Morse
17  did not substantiate what amounts were billed by
18  Urban Logic that were within the cap; right?
19    A. Yes.
20    Q. What could you have done differently? Where
21  could you have succeeded that Hemming failed?
22    MR. SCHMOOKLER: Object to form.
23    THE WITNESS: We did what we did -- what we
24  could with the information that was provided. We
25  looked at the support that the City provided through

Page 143

1  Hemming Morse, how they came up with their loss
2  calculations, and we were not able to substantiate
3  the amounts that they were claiming that were lost.
4  BY MR. PISANO:
5    Q. So is it fair to say that while
6  Hemming Morse did not substantiate what amounts
7  billed by Urban Logic were within the cap, you,
8  likewise, did not substantiate what amounts were
9  billed by Urban Logic that were within the cap.
10    A. Yes.
11    Q. And didn't --
12    A. It was -- it was not substantiated. It
13  wasn't --
14    Q. And given.
15    I'm sorry. I didn't mean to cut you off.
16    Go ahead.
17    A. I said what I said.
18    Q. Okay. Given what you saw in those
19  Urban Logic invoices, and the fact that they really
20  don't describe the work that was performed, is it
21  even possible, in your opinion, to substantiate what
22  amounts billed by Urban Logic, were subject to the
23  cap?
24    A. You weren't able to specifically do that
25  based upon looking at the -- on the descriptions. We

Page 144

1  weren't able to do that as forensic accountant.
2    Q. Based on the information that was provided
3  to you, do you think you could have substantiated the
4  amounts, with more time and resources?
5    A. I think it would be more of a -- having more
6  information --
7    Q. All right. And let's make sure --
8    A. -- would have been helpful.
9    Q. Sure.
10    And let's make sure we're -- we're on the
11  same page here.
12    When I use the word "time and resources,"
13  "resources" was not the right word. So I'm going to
14  rephrase.
15    Given the materials that you have -- so
16  given the information that you have -- the
17  information doesn't change -- could you have
18  substantiated what amounts ULC billed that were
19  within the cap, given any amount of time and money
20  that you had available to do the analysis?
21    In other words, if time and money were no
22  object, given the information that you had, is it
23  possible for you to have substantiated what amounts
24  billed by ULC, were subject to the cap?
25    A. Is it possible for me to do that? That's

Page 145

1  what you're asking?
2    Q. All I can ask you is what you can do.
3    A. We did what we could with the information
4  that we had.
5    Q. So it's not possible; right?
6    A. I'm not saying that it's not possible. I'm
7  saying we did what we could do with the information
8  that we had.
9    Q. And the effort -- or strike that.
10    And what you were able to do does not
11  substantiate the amount that's within the cap;
12  correct?
13    A. Yes. We were unable to substantiate that
14  there was, in fact, monies paid above the cap.
15    Q. Is -- is there more --
16    A. We did --
17    Q. -- you had wanted -- I'm sorry.
18    Is there more you had wanted to do with your
19  analysis that you were unable to do due to budgetary
20  constraints?
21    A. No.
22    Q. Same question with regards to the potential
23  overbilling related to the subcontractors.
24    Were you able to substantiate the amount of
25  overbilling, if any, due to the work of the

MAGNA ◆
LEGAL SERVICES

EXHIBIT 1
PAGE 42

Page 146

1  subcontractors?
2      A.  You'll have to repeat that one.  I'm sorry.
3      Q.  Sure.
4          Were you able to substantiate the amount of
5  the overbilling related to the subcontractors?
6      A.  As I said, there are lots of caveats
7  associated with our analysis that would need to be
8  further defined in order to come up with a final
9  number.
10         So the figure we have, I -- I would not call
11 that "substantiated."  I would not say that's a
12 substantiated overbilling amount.
13         But we've discussed that at length, I
14 believe, earlier in this deposition.
15     Q.  Yeah.  All right.  I would agree with that.
16         So let's go to page 7 of your report.
17         So we're still on Exhibit 14.  We're going
18 to page 7.
19     A.  Okay.
20     Q.  And tell me, please, Mr. Fogarty, what's
21 going on in -- in this calculation in the box.
22     A.  Okay.  So right above it, pending direction
23 from counsel, (transmission glitch) and application
24 of various things, we're estimating potentially
25 overbilled -- overbilling ranging from 2.3 to

Page 147

1  8.2 million dollars.
2          So this is taking this -- the vendor bills,
3  the ULC, the range that we discussed in Exhibit 7.
4  And now adding to that, this potential 4-1/2 percent
5  cap, again with caveats following the methodology of
6  Hemming Morse, and the 2.3, and adding those numbers
7  together to come up with a maximum combined potential
8  overbilling of 8.2 million.
9      Q.  So you just took the high-side number of the
10 potential overbilling related to the subcontractors
11 and added it to that overbilling calculation for work
12 within the cap.  And those two numbers added together
13 yielded 8.2 million; right?
14     A.  With maximum potential, yes, with all the
15 caveats that haven't been fully explored yet.  Yes.
16     Q.  And when you say the caveats haven't been
17 fully explored, fully explored by whom?
18     A.  I wouldn't -- AIG counsel -- AIG's counsel.
19 Others outside of HSNO, JSL.
20     Q.  And is it fair to say that you did not
21 explore the caveats because they are outside of your
22 area of expertise?
23     A.  Yes.
24     Q.  All right.  Now, earlier in the
25 deposition --

Page 148

1          Or actually, before we go there, are there
2  any other opinions within Exhibit 14 that we haven't
3  talked about today?
4      A.  Again, you know, there are references to
5  some of the caveats, ULC being consultants, things of
6  that nature that are in here, so whether or not you
7  feel we've talked about them, certainly leave to you.
8          But like the other reports, there are things
9  in here that I would expect counsel may or may not
10 ask me about at trial.
11     Q.  And if I were to ask you, Mr. Fogarty, what
12 opinions counsel intends to elicit from you at trial,
13 you would not answer that question based upon
14 privilege; correct?
15         MR. SCHMOOKLER:  I would object based on
16 privilege.  So...
17 BY MR. PISANO:
18     Q.  I'd be beating my head against the wall if I
19 asked you what opinions you intend to testify to at
20 trial; is that fair, Mr. Fogarty?
21         MR. SCHMOOKLER:  He's not going to disclose,
22 cannot disclose -- the privilege -- any
23 communications we've had about our trial strategy,
24 what we may or may not do at trial.
25 ///

Page 149

1  BY MR. PISANO:
2      Q.  And so, Mr. Fogarty, you're not going to
3  answer that question based on counsel's instruction;
4  right?
5      A.  That's correct.
6          MR. PISANO:  Okay.  So, Robert, did you get
7  Exhibits 17 and 18 from my office, or do I need to
8  send those to you?
9          THE TECHNICIAN:  I need 17 and 18.  I do not
10 have them yet.
11         MR. PISANO:  Okay.  Why don't we take a
12 break.
13         I'm going to send these last two exhibits,
14 and then we'll be done.
15         MR. SCHMOOKLER:  How long do you think you
16 have, so I know about my plans?
17         MR. PISANO:  Not much.  Because they are the
18 e-mails that you referenced earlier today, Scott.
19         MR. SCHMOOKLER:  I think not, 'cause you
20 just want to put -- have him look at his paper.
21         MR. PISANO:  Why don't we just go off the
22 record, 'cause that'll also let me look at my notes.
23         We're -- we're pretty close to being done.
24         MR. SCHMOOKLER:  So don't worry about it.
25 Fine.

**MAGNA**
**LEGAL SERVICES**

EXHIBIT 1
PAGE 43

Page 150

1      THE WITNESS: You guys need to talk or no?
2      MR. SCHMOOKLER: No. No.
3      THE VIDEOGRAPHER: Going off the record.
4  The time is 1:35 p.m.
5      (Short recess.)
6      MR. SCHMOOKLER: Okay. We're ready to go.
7      THE VIDEOGRAPHER: All right. Stand by.
8  The time is 1:43 p.m.
9  We're back on the record.
10      MR. PISANO: All right. We're going to -- I
11  just want to go back briefly to Exhibit 2.
12      And put up page 3, please, Robert.
13      Q. This is the expert designation. And I just
14  want to turn your attention to the last sentence of
15  the section involving you before we get to Mr. Berg.
16      Berg, B-e-r-g.
17      So, Mr. Fogarty, do you see there's a
18  reference to the restitution paid by Egger, Dillon
19  and Moorjani?
20      A. Yes.
21      Q. Do you know how much in restitution they
22  paid?
23      A. Yes.
24      Q. How much?
25      A. Ten million.

Page 151

1      Q. Do you know who the restitution was paid to?
2      A. I believe it was paid to the City of
3  Beaumont.
4      Q. Do you know what the restitution was
5  intended for?
6      Or let me -- let me rephrase.
7      Do you know why those individuals were
8  making restitution?
9      A. I mean, are you referring to their -- their
10  plea agreement?
11      Q. Sure.
12      A. Okay.
13      Q. Is it your understanding --
14      Let -- let me rephrase.
15      Is it your understanding, Mr. Fogarty, that
16  Egger Dillon and Moorjani made ten million in
17  restitution to the City of Beaumont to cover the --
18  the claimed overbillings that we've been talking
19  about today?
20      A. That's not my understanding, no.
21      Q. Then what is your understanding?
22      A. Well, I think the question would be better
23  posed to Mr. Egger, Dillon and Moorjani.
24      But my understanding is they paid
25  restitution based upon some conflict of interest

Page 152

1  issues and potential public works issues related to
2  the TUMF fee issue -- or, in particular,
3  Western Riverside. And that's, you know, vague in
4  terms of my recollection.
5      MR. PISANO: Okay. So let's put on the
6  screen and mark as Exhibit -- mark Exhibit 17 if we
7  could, please.
8      (Deposition Exhibit 17 was marked for
9      identification by the court reporter.)
10  BY MR. PISANO:
11      Q. Now, Exhibit 17 is an e-mail from you to
12  Fred Dairman; is that right?
13      A. Yes.
14      Well, it's -- it's him to me and me to him.
15      Q. Right. Okay.
16      And it starts with Bates number NUFIC 34348,
17  and it ends at 34350.
18      Do you see that?
19      A. I -- I can't see the Bates numbers on the
20  screen, but I'll --
21      MR. PISANO: The last page, and blow up the
22  Bates number.
23      THE WITNESS: Ah. Okay. I see something
24  highlighted.
25  ///

Page 153

1  BY MR. PISANO:
2      Q. Okay. Now, I look at this e-mail or this --
3  this compilation of documents. I -- I.
4      Are there any opinions in here?
5      A. In -- in this e-mail stream?
6      Q. Yeah.
7      A. I'd -- I'd have to read the whole thing, but
8  I don't think so. I think this was just Fred's
9  initial contact with me and sending me a link to some
10  articles associated with what was going on.
11      MR. PISANO: All right. Let's -- let's look
12  at Exhibit 18, which starts with the Bates number
13  NUFIC 47892.
14      (Deposition Exhibit 18 was marked for
15      identification by the court reporter.)
16      MR. PISANO: And this is an 11-page
17  document. If you go to the second page.
18      Q. It looks like a Preliminary Research
19  Summary.
20      Did you prepare this?
21      A. Yes.
22      Q. What is this document meant to depict?
23      A. Preliminary research summary. So we were
24  asked to look at different articles, sort of
25  familiarize ourselves with the case. And so we

MAGNA
LEGAL SERVICES

EXHIBIT 1
PAGE 44

Page 154

1   looked through that information.
2        And based upon what we looked at, we
3   prepared this Preliminary Research Summary, who the
4   parties were, what the accusations were, and the
5   like.
6   Q.  Are there any opinions in this document?
7   A.  I -- I doubt it.  I don't believe so.  But
8   I'd have had to scan through the whole thing to
9   say -- let you know.
10       MR. PISANO:  All right.  And, Scott, are
11  these the two documents?  Did I re- -- did I write
12  down the Bates numbers you read me correctly?
13       MR. SCHMOOKLER:  These are the -- these are
14  two of the documents.  I mean, there are many e-mails
15  and correspondence and memos -- not memos, but
16  e-mails, correspondence, things of that nature.
17  Those are just two of the first ones.
18       MR. PISANO:  All right.  So I'm just going
19  to have to read them all.
20       MR. SCHMOOKLER:  (Unintelligible) e-mail.
21  That kind of shocked me a little bit because I know
22  there's more, and these were the, literally, two on
23  top of my binder --
24       MR. PISANO:  Well, all right.
25       MR. SCHMOOKLER:  -- prepared for me.

Page 155

1        MR. PISANO:  So, in other words, to glean
2   all the potential opinions, I've got to go read all
3   the e-mails.
4        MR. SCHMOOKLER:  No.  I don't think that's
5   true.  We've said the work he did is reflected in the
6   e-mail.  There's lots of things he did over time that
7   are reflected in the e-mail.
8        MR. PISANO:  Um, okay.
9        MR. SCHMOOKLER:  I mean, I'm supposed to
10  tell you the subject of his testimony.  He did
11  lots -- had lots of communications with, for example,
12  your firm and others, that lead up to those reports.
13  That's what we communicated.
14       MR. PISANO:  Well, I think you're supposed
15  to tell me what his opinions are, but it is what it
16  is.
17       MR. SCHMOOKLER:  Okay.  Save that for
18  another day.
19       MR. PISANO:  Yeah, I guess we will.
20  Q.  And, Mr. Fogarty, I don't have any more
21  questions for you, other than thank you; to say
22  thanks for coming in.  Appreciate it.
23       I'm not going to root your sport -- I'm not
24  going to root any luck, or wish you any luck on your
25  sports teams.

Page 156

1        But other than that, good luck on everything
2   else.
3   A.  I -- I appreciate it.
4        Thanks very much for the way you conducted
5   the -- the deposition, and have a good rest of your
6   day while I start the beginning of my night.
7   Q.  Very good.
8   A.  Take care.  Thank you.
9        THE VIDEOGRAPHER:  Mr. Schmookler, did you
10  need a copy of the video?
11       MR. SCHMOOKLER:  Not yet, no.
12       THE VIDEOGRAPHER:  Okay.  I'll conclude us.
13       This concludes -- this concludes today's
14  proceeding in the deposition of Peter Fogarty.
15       The total number of media used was three.
16       We're off the record.
17       The time is 1:52 p.m.
18       THE REPORTER:  Did you want a copy of the
19  transcript, Mr. --
20       MR. PISANO:  He's gone.
21       THE REPORTER:  So we have used Exhibits 1,
22  2, 5, 6, 7, 14, 8, 17 and 18.
23
24
25

Page 157

1
2            REPORTER'S CERTIFICATION
3
4        I, MARCELINE F. NOBLE, a Certified Shorthand
5   Reporter in and for the State of California, do hereby
6   certify:
7
8        That the foregoing witness was by me duly sworn;
9   that the deposition was then taken before me at the time
10  and place herein set forth; that the testimony and
11  proceedings were reported stenographically by me and
12  later transcribed into typewriting under my direction;
13  that the foregoing is a true record of the testimony and
14  proceedings taken at that time.
15
16       IN WITNESS WHEREOF, I have subscribed my name this
17  9th day of August, 2022.
18
19
20       _____
21       MARCELINE F. NOBLE, CSR No. 3024
22
23
24
25

MAGNA ▶
LEGAL SERVICES

EXHIBIT 1
PAGE 45

Page 158

1
2   DECLARATION UNDER PENALTY OF PERJURY
3
4       I declare under penalty of perjury that I have
5   read the entire transcript of my Deposition taken in the
6   above-captioned matter, or the same has been read to me,
7   and the same is true and accurate, save and except for
8   changes and/or corrections, if any, as indicated by me on
9   the DEPOSITION ERRATA SHEET hereof, with the
10  understanding that I offer these changes as if still
11  under oath.
12      Signed on the ___ day of _____, 20____.
13
14
        _____
15
    PETER FOGARTY, CPA, CFE, CFF
16
17
18
19
20
21
22
23
24
25

Page 159

1           DEPOSITION ERRATA SHEET
2   Page No._____Line No._____Change to:_____
3   _____
4   Reason for change: _____
5   Page No._____Line No._____Change to:_____
6   _____
7   Reason for change: _____
8   Page No._____Line No._____Change to:_____
9   _____
10  Reason for change: _____
11  Page No._____Line No._____Change to:_____
12  _____
13  Reason for change: _____
14  Page No._____Line No._____Change to:_____
15  _____
16  Reason for change: _____
17  Page No._____Line No._____Change to:_____
18  _____
19  Reason for change: _____
20  Page No._____Line No._____Change to:_____
21  _____
22  Reason for change: _____
23
24  SIGNATURE:_____DATE_____
25      PETER FOGARTY, CPA, CFE, CFF

Page 160

1           DEPOSITION ERRATA SHEET
2   Page No._____Line No._____Change to:_____
3   _____
4   Reason for change: _____
5   Page No._____Line No._____Change to:_____
6   _____
7   Reason for change: _____
8   Page No._____Line No._____Change to:_____
9   _____
10  Reason for change: _____
11  Page No._____Line No._____Change to:_____
12  _____
13  Reason for change: _____
14  Page No._____Line No._____Change to:_____
15  _____
16  Reason for change: _____
17  Page No._____Line No._____Change to:_____
18  _____
19  Reason for change: _____
20  Page No._____Line No._____Change to:_____
21  _____
22  Reason for change: _____
23
24  SIGNATURE:_____DATE_____
25      PETER FOGARTY, CPA, CFE, CFF



41 (Pages 158 to 160)

EXHIBIT 1
PAGE 46

## A

**abandoned**
59:1 60:23
**ability**
7:13
**able**
50:25 51:3 57:21
66:10,25 69:13
77:13 80:23 90:21
99:16 108:19
141:10 143:2,24
144:1 145:10,24
146:4
**above-captioned**
158:6
**absolutely**
31:7
**accent**
83:3
**accept**
8:3 56:2
**account**
107:23
**accountant**
21:11 22:23,25 23:12
128:23 144:1
**accountants**
13:23 35:4 63:13
117:8
**accounting**
23:3 68:1 88:15
114:21
**accounts**
27:2
**accurate**
158:7
**accusations**
154:4
**acknowledge**
82:18
**acquired**
24:22
**action**
3:9 5:6
**actual**

65:3 87:10,24 93:18
141:14
**added**
147:11,12
**addendum**
132:10,18
**adding**
147:4,6
**additional**
29:16 63:14,23 67:25
84:13 117:11,16
118:3,18 122:3
**address**
102:20 116:8
**admonitions**
6:20
**advance**
119:3
**advice**
13:1 42:6
**afternoon**
6:12 101:17
**age**
7:24
**agenda**
120:1,3
**ago**
25:15 26:1,7,10,16
26:17 27:16,22 28:1
28:2,8,23 29:8 95:4
**agree**
4:24 87:23 100:3
124:21 129:23
141:1 146:15
**agreement**
14:20,22 114:5,13
132:13,15 151:10
**agreements**
66:8 114:16
**Ah**
34:13 152:23
**ahead**
12:10 76:22 80:11
89:18 120:2 127:20
143:16
**AIG**

14:23 18:22,24 19:4
19:6 21:20 38:11
42:12,16 46:25
47:17,24 48:6 61:15
61:25 62:6 86:19
87:4 113:23 114:13
114:17 115:6,12
117:12,17 118:1,4
118:18,23 119:3,7
119:10 121:4,4,16
121:17 140:2
147:18
**AIG's**
121:16 122:24
147:18
**al**
4:12
**alleged**
64:5
**allowable**
64:14
**allowed**
69:3
**amendment**
132:14 134:11,14
**amendments**
64:7
**amount**
18:4 47:5 48:4 55:23
69:23 73:10 83:22
83:23,25 90:8 104:2
104:5,7 106:22
115:23 137:24
140:15 142:11
144:19 145:11,24
146:4,12
**amounts**
62:19 125:6 141:22
142:9,17 143:3,6,8
143:22 144:4,18,23
**analogous**
95:18
**analysis**
13:24 14:4,24 24:25
25:3,3,5,13 28:25
32:7 33:10 42:19,21

42:25 43:8 44:5,8
44:12,14 48:5 49:19
51:25 52:25 53:12
57:17,19 58:3,5,24
60:21 61:14,24
62:12 64:2 65:12,24
66:17 67:1,6,10
68:25 69:8,21,24
70:1,10 71:1,21
78:4,22 81:2,11,24
81:25 82:4,6 83:4
84:14,22 85:7 86:6
86:7 87:24 94:9,13
102:8 105:20 107:6
107:22 108:5,7,25
111:18,22 113:13
120:19 122:1 123:4
123:20 124:6,13
126:3 128:3 129:17
136:16 138:3,15,18
138:24 139:3,5,6,13
139:23,25 140:21
144:20 145:19
146:7
**analyze**
42:12 47:25 64:11,16
80:23 82:24 88:4,14
90:21 140:6
**analyzed**
57:7 71:11 106:8
**analyzing**
27:24 29:6 33:15
46:8,24 47:16 56:14
62:5 114:17
**Anderson**
39:24
**and/or**
86:19 158:8
**annual**
79:8
**answer**
3:23 11:3,15 12:23
12:25 13:2 15:24
16:6 19:22 20:15
23:21 26:4 30:4
36:19 42:7 49:13



EXHIBIT 1
PAGE 47

51:5,23 53:3,25
54:7,11 76:13,15
77:6 86:4 90:11,16
92:11,13,14 98:17
98:18,24 105:7
107:2 109:15
118:23 122:7,8
130:21 148:13
149:3
**answered**
123:14
**answering**
52:6
**answers**
61:8 97:25 98:12
**Anthony**
20:23
**anybody**
66:19
**Anytime**
6:25
**Apologies**
33:23
**apologize**
55:1,3
**apparently**
26:7
**appear**
35:11 79:12 128:6
**appearances**
2:1 5:9
**appeared**
73:10,24 106:6
**appearing**
44:4 73:19
**appears**
34:24 36:3,13 38:9
40:21 58:25 60:1,22
64:3 72:20 76:7
110:14,20 113:24
114:4
**application**
146:23
**applied**
136:13
**apply**

53:5 86:20 90:20
**appreciate**
36:21 44:16 45:19
56:3 122:13 155:22
156:3
**approach**
66:18,24 68:21,22
78:21 81:4,7 82:5,7
83:6,6 92:5 94:10
94:15,19,23 95:1,9
95:10,11,17,22,23
96:1
**approximately**
24:24 57:5 67:24
125:6
**April**
132:14
**area**
8:22 147:22
**arrangement**
18:24
**arrive**
102:8 125:15
**arrived**
72:22 73:1 77:1
85:20 109:1
**arriving**
81:2
**articles**
153:10,24
**articulate**
52:11
**articulated**
50:15 123:22
**aside**
33:12 47:1 82:2
108:7,8
**asked**
46:21 50:24 54:8,12
86:7,18 108:16,18
120:11 121:25
123:13 148:19
153:24
**asking**
15:21 36:18 43:14
52:8,11 76:20 83:11

89:13,19 120:14,16
122:11,12 145:1
**aspect**
57:23 84:22 108:3
**aspects**
23:24 59:1 60:23
120:6 141:3
**asserting**
30:2
**assertion**
141:4
**assessment**
24:2
**assignment**
47:24 96:4 114:19
115:5,10
**associated**
23:17 63:8 64:18
66:3 108:3 139:14
146:7 153:10
**assuming**
80:8 85:18
**assumption**
66:18 74:25 75:2
78:5,22 136:12
141:11
**assumptions**
79:6 80:20 96:11
**attached**
8:7 97:25 98:1 102:7
**attachments**
3:9
**attempt**
115:20
**attention**
65:22 75:23 117:3
150:14
**attorney**
5:10 119:22
**attributable**
73:10,24
**audible**
16:22 130:17
**Audio**
4:23
**August**

29:20 32:8,9 33:5,5,6
34:6,18,22 35:12,17
35:25 36:15 38:21
39:19 40:18 41:3,4
46:1,12 48:10 49:5
49:23 50:25 52:14
52:19 54:12 55:20
56:5,13,18 57:14
58:1,9 63:11 67:15
67:22 111:13
116:20,21,24 118:7
119:4 121:8,24
123:22 124:2,15
127:6 139:8 157:17
**author**
63:20
**authored**
36:1
**authority**
1:5 74:4,16
**available**
96:5 144:20
**Avenue**
2:4
**aware**
7:10 129:1 138:12
**Aylward**
60:3 61:3,4
**A-2**
9:19
**a.m**
1:15 4:3,7 31:10,13
55:7,14 101:8,13

---

**B**

**B**
71:25 72:12,14,21,25
**back**
21:8 24:17 29:6
31:14,25 32:1 37:25
40:23 45:25 49:10
55:11,15 56:24
58:14 60:14 73:5
75:22 76:12,13 77:6
79:21 98:8,24
100:25 101:14



**EXHIBIT 1**
**PAGE 48**

102:12 111:10,24
111:25 112:6 113:3
118:10 124:10
126:10 127:3,8,8
128:16 140:9,19,20
150:9,11
**backed**
135:21
**background**
14:18 128:22
**backwards**
22:3 106:10
**ballpark**
112:5,15
**Barnhart**
21:5,6
**based**
11:14 51:3,13 55:20
58:24 60:21 91:5
94:9 104:12 111:7
113:10,13 115:19
117:7 123:21 124:7
124:14 126:17
128:3,9 129:17
131:19 136:25
139:17 141:8
143:25 144:2
148:13,15 149:3
151:25 154:2
**bases**
32:23 41:12
**basic**
76:21
**basically**
56:8 73:17 76:14
102:20 107:2
136:15
**basis**
19:2 46:14 55:25
74:3 79:8,20 105:20
120:11 141:5,7
**Bates**
34:7 37:11 45:2,2,11
54:17 75:24 152:16
152:19,22 153:12
154:12

**Bates-labeled**
40:11
**bathroom**
7:2 30:24 54:22
**battle**
59:15
**BBK**
17:13 18:22 19:2
122:23 124:8
**BB&K**
117:16 121:19,23
124:13
**Bear**
83:19
**beating**
148:18
**Beaumont**
1:14 2:2 21:21 25:13
55:22 59:12,13,17
64:18 110:18
114:17 138:25
151:3,17
**Beaumont's**
13:25 14:4,24 27:24
28:25 29:7 30:11
33:11 42:13,19,21
43:5 46:8,24 47:16
47:25 48:5 62:7
**beginning**
1:15 5:9 22:2 25:5
55:13 101:12 156:6
**begins**
4:8
**behalf**
1:14 5:13 47:17
121:23
**believe**
8:6,14 9:23,24 10:14
11:15 14:6,9,16
17:18 19:2 20:6
23:10,10 24:24 25:4
25:8 29:9,15 30:15
31:19 36:9,13 38:19
39:2 40:8 46:14,21
52:16 53:3 59:22
63:5,23 67:17 71:13

71:24 73:4 77:12
78:15 81:22 87:4
93:22 102:13
103:24 104:13
105:5 111:8,12,15
113:6 114:6,8,9,14
114:18 115:11,13
119:5,19,21 120:1
121:1 124:11
128:21 132:11,20
134:13 135:19
138:18 139:2
146:14 151:2 154:7
**benchmark**
28:13
**benefit**
123:4
**Berg**
150:15,16
**best**
2:3,3 4:16,17 5:11,12
27:18 47:14 48:3
53:25 63:15,15,22
63:22 117:9,9 121:3
121:3,12,12
**better**
34:13 87:23 96:3
151:22
**beyond**
62:17 110:19 134:24
**bid**
102:18
**bill**
18:10 26:20 65:13
66:10 110:14,21
**billed**
16:25 18:7 25:12
48:4 64:16 66:7,19
66:22 68:15 73:9
75:1,17 76:10 77:3
78:9,12 83:24,25
84:3 85:12 97:5
125:6 141:22 142:9
142:17 143:7,9,22
144:18,24
**billing**

17:2 28:15 64:4,12
64:17,17 65:2 68:1
68:13,20 69:8,10,17
70:10,13,14 71:3,7
73:11,19,25 74:2,15
77:24 79:7,11 80:17
81:12 84:7 107:8,8
108:6 110:22
120:18 128:6
130:11 136:25
141:9,13
**billings**
27:2 60:9 66:2 73:18
74:9 99:21 106:9
125:8,10,11,22
127:13,14 135:20
136:18 138:4
**bills**
26:23 27:6 47:23
64:18 70:23 73:23
74:17 85:15 147:2
**binder**
154:23
**bit**
8:8 9:9 24:3 29:17
43:24 70:1 86:11
103:5 154:21
**black-and-white**
90:16
**Blake**
14:10
**blow**
37:15 57:1 101:24
152:21
**body**
82:17
**bond**
69:19 74:4 80:24
99:21
**bonds**
69:18 74:4
**bone**
83:1
**books**
23:17
**Boston**



8:22

**bottom**
35:2 37:13,16 40:10
40:24 57:1,2 84:18
132:5

**bow**
96:9

**box**
135:18 136:4,7
146:21

**break**
6:25 30:24 31:1,6
45:18 69:25 92:20
93:3,9 100:12,24
101:4 103:13
105:18 126:11,14
126:21 127:5
149:12

**breaking**
93:1

**breaks**
7:2 105:20 106:24

**brief**
61:6

**briefly**
6:8 150:11

**broader**
108:22

**broke**
102:1 104:24 106:2

**brought**
110:4

**bucket**
131:6,11

**budgetary**
145:19

**built**
80:21

**bullet**
57:2,9 83:21 115:1
115:18 116:9,17
140:11

**button**
43:16

**B-e-r-g**
150:16

---

**C**

**C**
71:25 72:19,21,25

**calculated**
84:24 90:8

**calculation**
74:23 77:21 78:8
99:16,24 111:9
112:12 113:7 126:2
126:3 127:15,16
135:17 136:11
137:9 138:22
146:21 147:11

**calculations**
138:1 139:7 143:2

**California**
1:2,4 2:5,10 4:13
117:11 157:5

**call**
6:20 68:23 88:20
146:10

**called**
55:18 115:10

**calling**
14:15 31:4

**Calls**
11:23 25:18 103:22
123:6

**camera**
4:19

**cap**
62:15 65:18 80:25
98:14,15,18 99:4,23
102:17 107:22,24
108:6,14 109:5,25
111:16 120:13
123:21 124:14
125:7,12,17 126:5,5
127:13,14 130:14
130:24 131:11,14
131:15,18,19
136:13,13 137:5
139:18 140:1,23
142:18 143:7,9,23
144:19,24 145:11

---

145:14 147:5,12

**capacity**
23:11 27:22 28:4
30:7

**CapEx**
137:12,15 142:10

**capital**
136:1,14 138:15,16
138:24 141:23

**caption**
9:20

**care**
101:2 126:14 156:8

**carried**
111:24

**carry**
69:17 78:3

**case**
1:7 4:14 10:18 11:12
11:22 12:16 13:8,10
14:16,17 20:12 24:1
25:1,6 27:25 29:1,7
30:6 62:20 79:9
85:9 88:6 91:4,6
102:15 114:19
132:12 153:25

**cases**
22:20

**catch**
48:17

**categories**
52:2

**category**
74:22

**cause**
43:18 81:17 83:2
87:12 95:3 118:13
149:19,22

**caveat**
99:9,20 104:23
105:19 106:15

**caveats**
80:19 85:13 88:18
91:17,21 92:2,15
94:7 96:10 97:24
98:1,12 100:3,16

---

103:15 104:21
105:4,6,8,16,18
106:2,24 146:6
147:5,15,16,21
148:5

**Central**
1:2 4:13

**certain**
79:12 120:6,7

**certainly**
25:3 48:2 49:17
51:12 87:3 112:8
120:11 124:4 141:3
148:7

**certainty**
98:4

**CERTIFICATION**
157:2

**Certified**
1:16 21:11,14,16
157:4

**certify**
157:6

**cetera**
20:8

**CFE**
1:13 3:3 5:18 13:21
21:13 158:15
159:25 160:25

**CFF**
1:14 3:3 5:18 13:21
21:15 158:15
159:25 160:25

**chain**
121:15

**change**
31:3 36:18 113:16
124:7 144:17 159:2
159:4,5,7,8,10,11
159:13,14,16,17,19
159:20,22 160:2,4,5
160:7,8,10,11,13,14
160:16,17,19,20,22

**changed**
9:9 62:19

**changes**



158:8,10
**charge**
65:18 69:3
**charged**
78:11
**charges**
125:25 140:2,12
**chase**
27:9
**chat**
100:21
**cheats**
7:23
**checker**
131:1
**checking**
24:12
**choose**
95:17
**choppy**
43:24
**chose**
95:4
**Chris**
43:20 44:2 48:15
54:21 76:17 119:19
**Christopher**
2:4 5:11 6:9
**christopher.pisano...**
2:6
**circumstances**
91:5
**city**
1:14 2:2 9:4 13:24
14:4,24 25:13 27:24
28:25 29:6 30:11
33:11 46:24 55:22
59:12,13,17 61:10
62:7 63:3 64:4,12
64:17 65:2 68:15,16
69:18 70:17,23 71:4
73:23 74:3,16 75:17
76:11 77:3 79:8
80:24 84:7 85:12
97:5 98:5 103:10
104:6 106:9 107:9

110:18,24 111:25
138:24 142:25
151:2,17
**City's**
60:6
**Civil**
3:9
**claim**
19:6 33:15 42:13,19
42:21 43:1,5 46:8
46:24 47:16,25 48:5
56:15 59:1 60:6,8
60:23 61:1,15 62:5
62:7,9,14 114:23
140:7
**claimed**
13:25 14:4,24 25:14
27:24 29:1,7 30:11
33:11 55:24 56:9
115:22 116:6,10
140:14 151:18
**claiming**
143:3
**claims**
22:13 40:8 114:17
140:8
**clarification**
10:23 25:22 34:21
36:21 47:6 65:9
67:9 139:22
**clarify**
28:18
**clear**
60:18
**clearly**
58:7
**client**
87:1 141:4
**clients**
27:10
**close**
6:12 149:23
**collections**
27:3
**column**
78:14

**combined**
147:7
**come**
62:6 77:21 82:15
85:1 86:22 88:20
90:4 99:14 100:25
135:22 136:2,15
141:10 146:8 147:7
**comes**
77:13
**comfortable**
6:19 38:2 40:16 97:4
**coming**
77:20 95:6 127:23
129:8 155:22
**commentary**
50:9 102:13
**comments**
32:16 100:19 132:2
**communicated**
155:13
**communication**
15:6 16:1 39:19
**communications**
10:20,25 15:12,21
19:20 20:2 32:25
41:14,25 42:5
148:23 155:11
**company**
1:8 2:8 4:11 16:23
27:6 74:13 138:19
**compare**
136:15
**compared**
49:12 57:18 68:13
79:20 106:7 107:8
135:25
**comparing**
78:11
**comparison**
136:10,20 137:8
138:21
**compilation**
153:3
**complete**
81:24,25 82:20

**completed**
124:4
**completely**
47:1 95:20 128:11
**completion**
133:1
**complicates**
44:18
**component**
52:24 69:7
**components**
50:13 68:24
**con**
135:9
**concentrated**
62:14
**concern**
52:12
**concerns**
82:8
**conclude**
156:12
**concludes**
156:13,13
**conclusion**
51:8 94:6
**conclusions**
44:5 95:6
**conduct**
87:23 114:21
**conducted**
156:4
**confined**
69:21
**confirm**
35:16 38:3 40:17
139:9
**conflict**
151:25
**conjunction**
63:6
**connection**
4:20 21:21 25:12
30:10 33:10 43:25
47:24 114:23 133:9
133:13,17,21,25



**EXHIBIT 1**
**PAGE 51**

134:18
**Conners**
39:25
**consider**
22:7,10,11,24 23:2,5
  51:10,21 52:16,21
  54:6 94:23 120:21
  122:4,4 137:21
**consideration**
90:6 91:24 92:1
**consistent**
79:6 128:7
**constitutes**
108:13
**constraints**
145:20
**construction**
23:5,6,8,14,18,19,20
  23:22,23 24:4,5,6,9
  102:17 125:22
  128:24 130:14,24
  132:9,25 133:2,10
  133:14,22 134:1,3
  134:18 135:2,8,11
  135:12
**construction-mana...**
128:7
**construction-mana...**
125:8,25
**construe**
50:21 54:5
**construed**
53:18,18
**consultant**
25:21,23 26:10 27:23
  28:5 31:18 47:2
  58:2 61:17 66:8
  108:13
**consultants**
57:10 64:3 148:5
**consulting**
25:19 26:12 31:21
  33:12 55:16 79:14
  82:1
**contact**
14:11 153:9

**contacted**
30:17,18
**contained**
49:5,15,23 50:14
  108:4,12 109:19
**contains**
100:16
**contends**
125:5
**continuation**
134:11
**continue**
4:23
**continued**
110:14,21
**continues**
125:3
**contract**
79:1 85:19 132:19
  141:9
**contractor**
106:6
**contracts**
64:6,14 65:7,12,17
**contractual**
18:23
**contributed**
118:5,20
**control**
133:3,12
**convoluted**
75:6
**copy**
48:12,18 156:10,18
**correct**
6:24 20:4 21:12
  24:20 26:5 27:7
  46:1 54:17 56:7,16
  64:14 68:8 70:8,18
  71:14,19 80:18 87:1
  88:4,24 94:5,18
  96:11 101:18
  106:18 112:3
  113:11,23 116:21
  116:22 117:2 121:6
  121:9,20 130:12

131:7,11,12,16
132:10,15,19
134:12 136:18
137:1,2,17,20 139:2
140:1 145:12
148:14 149:5
**correction**
35:8
**corrections**
158:8
**correctly**
154:12
**correspondence**
18:1 29:16 117:6
  154:15,16
**cost**
65:14
**costs**
65:3,3 79:7 102:17
**could've**
104:25
**Council**
1:4,14 2:2 4:10 59:11
**counsel**
5:8 11:4,25 12:6,18
  12:19,22,25 13:1,6
  13:11,14 15:6,12,22
  16:1,14 19:10,11,20
  20:2,3 30:14,23
  32:18 34:16 37:21
  38:14 39:24 41:25
  42:5,6 43:6 49:10
  51:5,23 66:2 86:19
  103:4 105:4 109:18
  110:9 117:9,12,17
  118:1,4,18,23 119:3
  119:7,10 121:4,16
  121:18 125:19
  146:23 147:18,18
  148:9,12
**Counselor**
12:11 16:25 30:12
  54:1 56:7 90:15
  91:11 93:6 98:11
  99:8 100:1,18
  103:14 106:5

108:11 109:16
112:7 127:15
**counsel's**
11:14 26:3 122:24
149:3
**couple**
10:11,12,16 11:9,19
  12:14 13:7,11 25:15
  25:25 26:7,9,15,17
  27:16,22 43:23
**course**
42:18,25 56:14
**court**
1:1 4:12 5:1,15 7:19
  9:15 33:22 37:3
  39:14 43:23 60:13
  72:5 92:8 113:20
  152:9 153:15
**cover**
151:17
**CPA**
1:13 3:3 5:18 13:21
  21:10 158:15
  159:25 160:25
**Creek**
117:10 123:20
**crew**
80:16
**CRR**
1:16
**CSR**
1:24 157:21
**culminated**
59:16
**cut**
32:11 53:10 143:15
**cutting**
15:8
**CV**
21:19

---
**D**
---
**Dairman**
3:19 14:9,15 152:12
**damages**
22:21



**EXHIBIT 1**
**PAGE 52**

**Dan**
20:16 63:19 81:10
    82:18 120:4
**data**
82:10 88:4,13 114:23
**date**
52:1 62:13 99:10
    159:24 160:24
**dated**
29:20 32:8 34:6
    39:19 41:3 117:7
**dating**
111:25
**David**
35:4,7,9
**day**
27:11 43:19 155:18
    156:6 157:17
    158:12
**days**
10:11,12,16 11:9,20
    12:14 13:7,12
**deal**
27:1 119:19 121:22
**dealing**
61:6
**deals**
109:23
**dealt**
61:2
**December**
14:6,12 45:16 46:10
    71:22 113:22
**decision**
99:15 122:24
**DECLARATION**
158:2
**declare**
158:4
**declining**
106:9
**Defendant**
2:8 41:15
**defendants**
1:10 5:14
**Defendant's**

3:10 9:18
**define**
53:4
**defined**
53:21,22 65:20 79:1
    146:8
**definitely**
46:19 102:16
**definition**
71:9 78:24
**degree**
98:3
**delete**
27:17,19
**delta**
78:13 137:18
**Dennis**
74:6,7,13,19,20 78:4
**Depending**
24:1
**depends**
4:19
**depict**
153:22
**depo**
43:18
**deposition**
1:13 3:9 4:8,15 6:11
    6:14,21 7:9,18 8:5,9
    8:16 9:14 16:19
    17:21,24 18:3,25
    19:3,9 20:6 25:11
    28:17 33:21 37:2
    39:13 48:13 72:4
    113:19 146:14
    147:25 152:8
    153:14 156:5,14
    157:9 158:5,9 159:1
    160:1
**describe**
119:24 143:20
**described**
98:12
**description**
3:8 129:18
**descriptions**

128:4 130:4,23
    141:12 143:25
**designated**
11:11 12:15 13:8,10
**designation**
107:1 150:13
**detail**
71:24
**detailed**
66:25 77:25 94:14
    128:5 129:19 130:8
**determination**
107:14 125:15
    127:12 131:17,25
**determine**
71:1 87:9 89:20
    94:24 111:17
    115:21 116:5 140:3
    140:13
**determined**
93:17
**difference**
138:1
**differences**
82:2
**different**
52:9 53:7 57:18
    81:18 95:20 116:4
    153:24
**differently**
142:11,20
**difficult**
53:2
**difficulty**
52:5
**Dillon**
110:15 150:18
    151:16,23
**direct**
66:5,11
**direction**
33:8,14 47:8 66:5
    146:22 157:12
**directly**
47:17
**disagree**

124:22
**disagreed**
124:20
**disappeared**
32:17
**disbursements**
83:14,16 99:25
**disclose**
10:20,25 12:17 15:5
    15:6,10,12 16:1
    19:19 25:20 41:24
    42:4 109:9,13
    148:21,22
**disclosed**
11:25 32:24 41:13,16
**disclosure**
17:17 41:3,10 44:11
    45:23
**disclosures**
3:10 9:19
**disconnect**
52:8
**discovery**
99:10
**discuss**
73:16
**discussed**
42:22 43:6 49:11
    74:22 80:20 85:14
    91:2 92:15 103:13
    104:13 105:4 106:5
    116:1 120:6 146:13
    147:3
**discussing**
94:8 104:22 111:5
    112:9 122:19,20
**discussion**
48:21 100:17 102:16
    139:17
**discussions**
13:13 30:14 87:4
    107:21 117:11,17
    117:25 118:4,18,23
    119:2,8 122:9
**dishonesty**
115:22 116:7,10



140:14
**dispute**
23:8,14 59:11
**disrupting**
92:23
**distinct**
60:8 62:8
**District**
1:1,2 4:12,13
**divide**
131:18
**document**
8:10 9:18 10:4,10,13
10:16 11:9,19 12:14
35:16 37:8,12,20
38:23 40:1,15 53:13
72:6 114:1,5,7
153:17,22 154:6
**documentation**
63:14,21 67:25 68:11
87:11,24 141:8
**documented**
57:24
**documents**
14:17 17:25 41:17
44:19 46:11,17
55:20 57:7,21 63:24
68:14 82:23 96:5
153:3 154:11,14
**doing**
6:6 29:25 54:22
61:17 69:7 70:9
74:18 85:9 87:3
91:20 92:22 95:19
**dollar**
105:15
**dollars**
47:15 48:8 56:10
75:1 84:3 85:19
147:1
**doubt**
49:16 123:24,25
154:7
**Doug**
21:5
**draft**

36:4,10 38:24 39:1
**due**
68:11 74:16 75:3
107:14 115:22
116:6,10 140:14
145:19,25
**duly**
5:19 157:8
**duties**
128:8 132:24

_____
**E**
_____
**earlier**
28:16 74:22 78:24
79:10 83:14,16 84:4
114:9 124:9 146:14
147:24 149:18
**early**
29:9,12 30:11 31:19
**easier**
44:2,14,17 45:20
**easy**
43:14,16
**effort**
145:9
**Egger**
110:16 150:18
151:16,23
**either**
6:22 12:8 14:23
18:22 47:15,17
69:18 71:25 107:11
121:11
**electronic**
48:18
**elements**
120:8
**elevator**
21:25
**elicit**
41:15 148:12
**employee**
55:23 78:7
**employees**
66:4 68:15 69:2,3
70:5 71:7 74:12,18

99:11,11
**ended**
70:23
**ends**
77:11 152:17
**engaged**
31:17
**engagement**
14:19,20,22 15:13,15
15:17 30:15 46:9,25
114:5,10,12,16
115:7 140:6
**engineering**
24:14 133:4,24
**engineers**
135:7,10
**enlarge**
34:12
**entail**
63:1 134:18
**entire**
49:10 85:8 102:8,12
108:8 158:5
**entirety**
89:21
**entitled**
58:16
**equal**
87:22
**ergo**
66:21
**ERRATA**
158:9 159:1 160:1
**ESQ**
2:4,9
**essentially**
81:4
**estimate**
18:5 26:18 28:10,12
30:21 47:13,14 48:3
102:9 107:22 112:4
112:15 120:12
136:1 137:12
**estimated**
102:2 135:21
**estimating**

133:4,20 146:24
**et**
4:12 20:8
**evaluates**
135:1
**Evans**
21:2,3
**evasive**
100:1
**everybody**
78:6
**exact**
18:4 106:18 140:5
**exactly**
61:10 83:2 108:20
**examination**
3:2 6:1 114:22
**examined**
5:19
**examiner**
21:14 40:9
**example**
110:4 155:11
**examples**
82:13 94:15
**excepting**
136:11
**exception**
107:25
**excess**
64:5,12,13
**exchanged**
6:8
**exclude**
61:16
**excuse**
102:20,22
**exercise**
37:22 40:15 50:4
52:19
**exhibit**
7:15,16,18,22,22
9:10,12,14 10:7
13:17 32:1,21 33:17
33:19,21 34:3 35:16
35:25 37:1,2 38:7



**EXHIBIT 1**
**PAGE 54**

38:20,23 39:5,12,13
39:16 40:23 41:9
45:25,25 48:9 54:9
54:13 55:21 56:24
58:13,23 59:25,25
63:10 64:22 72:3,4
73:5 75:23 79:22
83:21 96:10 100:10
100:12,13 101:2,22
101:24 102:7
107:19 108:4,9
109:7 111:4 113:18
113:19 116:11,12
116:12,17,23 118:5
118:19 121:5,9
124:24 127:7 134:5
135:15 140:10,19
140:24 146:17
147:3 148:2 150:11
152:6,6,8,11 153:12
153:14
**exhibits**
3:7 41:5 42:23 149:7
149:13 156:21
**existence**
137:23
**expand**
85:8
**expect**
18:16 47:10 75:17
76:10 77:3 148:9
**expectation**
17:9 18:13
**expenditures**
136:1,14 138:15,16
138:24 141:24
**experience**
129:2
**expert**
9:19 10:18 11:11,21
12:16 13:8,10 22:7
22:10,12,16,20 23:6
23:11,20 24:6,9,12
24:14 25:19 41:2
128:24 150:13
**expertise**

23:3 147:22
**experts**
20:12,14
**explain**
91:16 121:22
**explained**
86:15 90:2 120:3
**explanation**
55:25 129:19 130:5,8
**explanations**
128:5 129:20
**explore**
62:22 147:21
**explored**
147:15,17,17
**express**
108:16
**extended**
47:5 59:15 111:9
**extends**
110:19
**extent**
63:7 131:4 138:23
**extrapolate**
86:21
**extrapolated**
83:13 84:12 85:19
90:8
**extrapolation**
3:16 84:25 85:5,6,23
86:12,13,16,25 87:8
87:16,19,25 88:3,14
89:1,20 90:1,12,24
91:1,8,17,20 93:16
111:24
**extrapolations**
88:8,21
**e-copy**
48:15
**e-mail**
3:11 34:4 37:8 44:20
44:22,23 45:6,8
113:22 152:11
153:2,5 154:20
155:6,7
**e-mailed**

54:18
**e-mails**
3:19 32:7 44:7,10,11
45:16 149:18
154:14,16 155:3

———— **F** ————

**F**
1:16,23 157:4,21
**faces**
32:12
**facets**
63:3
**face-to-face**
81:9
**fact**
44:17 51:25 52:25
53:19 99:3,14
102:15 106:6,8
143:19 145:14
**factors**
89:25 90:6 100:2
**facts**
91:5
**failed**
142:21
**fair**
7:4 11:17 13:15
23:25 24:2,2 28:21
30:3,9 42:14 47:10
50:23 53:11 57:25
81:5,6 82:5 91:25
106:17,20 107:16
107:17 122:14
128:1 129:4,5
139:21 140:21
143:5 147:20
148:20
**fall**
66:20 71:9 74:22
78:23 98:13,15,17
99:22 108:14
**fallen**
80:25
**falling**
130:24

**falls**
52:2
**familiarize**
153:25
**far**
57:6 61:19 62:3
78:13 105:22
**fashion**
110:21
**fast-forward**
58:11
**favor**
104:24 105:8,18,20
106:2,24
**Fax**
2:6
**federal**
8:16
**fee**
16:21,23 60:7 62:8
62:15 152:2
**feel**
6:19 49:8 89:24
91:21 106:10
109:22 136:2 148:7
**fees**
59:14,23
**feet**
51:17
**fell**
66:15 85:18 105:8
**felt**
51:7 82:15 95:22
96:1 120:20 124:18
124:22 135:22
**figure**
43:17 77:22 82:16
85:21 86:23 90:8
135:22 136:10
146:10
**figures**
124:9
**file**
17:25 20:7 40:5,9
88:8
**filed**



4:12 19:6
**final**
46:15 146:8
**finance**
23:13
**financial**
21:16 22:12,13,16,21
22:21 23:11,24
**financially**
5:6
**financing**
74:16
**find**
65:20 66:24 99:4
129:15
**finding**
85:6 122:15
**findings**
49:18 50:9 65:24
67:6,10 95:7 116:18
116:19 121:23
**fine**
6:6,23 40:20 149:25
**finer**
97:19
**finish**
63:4
**finished**
30:8 61:14,24
**Fire**
1:8 2:8 4:10
**firm**
16:14 21:21 33:8
127:25 155:12
**first**
5:19 10:7,10,12,15
11:8,18 12:13 13:18
21:8 24:18 30:18
31:17 32:3 34:7,18
37:11 40:11 46:1
57:9,22 58:22 59:25
60:19 63:9 64:1,22
72:19 76:6 117:3,4
118:19 135:18
141:20 154:17
**five**

26:19 27:14 81:15,20
82:12 112:18
**floor**
97:15,16 107:10,11
**Florida**
8:24
**flows**
78:16
**focus**
60:1 64:3 68:19 74:7
79:23 82:4 84:20
93:15 132:6
**focused**
68:12
**Fogarty**
1:13 3:3,12,13,15,17
3:19 4:9 5:18 6:3
7:21 9:17 10:8
11:18 12:10 13:6,19
13:21 16:9,13,24
17:3,21 19:24 21:9
21:17,25 26:1,3
29:20 31:3,17 32:4
32:8 34:2 35:4 36:2
37:6 38:2,7 39:17
40:16 41:2,20,24
42:10 43:18 44:4
46:21 48:10 49:21
50:17,24 51:14 52:4
55:3,18 56:4 60:6
72:8,12 75:13 76:2
76:8 77:1 84:15
87:22 91:8 93:4
95:17 98:3 99:3,19
100:4,10,23 101:16
102:6,24 103:8
104:10,19 105:13
105:17 107:12
108:21 114:4 118:3
118:17 122:6
124:23 127:5,12
135:17 138:2
140:12 141:17
142:8 146:20
148:11,20 149:2
150:17 151:15

155:20 156:14
158:15 159:25
160:25
**Fogarty's**
32:6
**follow**
16:9 26:3
**followed**
78:20 81:7
**following**
55:17 57:7 66:17,23
80:21 114:24 126:3
133:3 137:7 147:5
**follows**
5:20
**foregoing**
157:8,13
**forensic**
22:23,24 23:3,12
88:15 114:21 117:8
144:1
**forensics**
21:16 63:13
**form**
10:19,24 11:23 15:4
15:20 19:18 25:17
41:23 53:15 60:17
62:11 65:15 74:2
87:17 88:5,16 89:3
89:9,23 90:14 92:7
92:12 94:12,20
95:21 96:6,14,23
97:9,23 99:7 100:6
103:3,12,22 104:11
105:2,24 106:25
110:3 112:16 113:1
113:12 123:6
125:18 126:6
130:16 138:6
140:25 142:22
**formal**
15:15
**forms**
53:6,7 105:20
**formulate**
43:1,4

**formulated**
49:23 51:1 109:3,7
110:11,23,25
**forth**
61:11 157:10
**forward**
7:8 62:13 69:17 78:3
78:16
**found**
50:13 67:20 130:13
136:17 142:12
**foundation**
26:8
**four**
69:20 81:15,20 82:12
94:18
**fours**
112:18,21
**fourth**
70:7,19
**four-legged**
70:25 83:5
**four-legged-stool**
82:5 83:6 94:19
**four-stool**
94:25
**frame**
14:12 123:5
**frames**
61:21
**frankly**
84:13
**fraud**
21:14 22:13,22
**Fred**
3:19 14:9,15 152:12
**Fred's**
153:8
**free**
49:8
**frequent**
7:2
**front**
111:23 112:7,13
**full**
115:13 141:20



EXHIBIT 1
PAGE 56

**fully**
147:15,17,17
**funds**
63:7 69:19
**further**
9:24 39:4 67:13
  74:25 99:16,17
  111:6,10 146:8
**Futures**
138:18

---
**G**
---

**Gardiner**
35:5
**general**
6:20 86:7
**generally**
27:4,18 82:4 119:24
**generated**
47:24
**getting**
6:12 43:15 61:1 70:4
**gist**
36:20
**give**
8:16 18:5 21:25
  26:18 28:10,12
  30:21 33:24 47:13
  49:13 77:6 86:7
  105:7 106:13,16,21
  107:10 108:18
  112:4,15 121:18
**given**
92:14 106:5,8 115:6
  142:12 143:14,18
  144:15,16,19,22
**giving**
14:15 100:4
**glad**
67:20
**glean**
155:1
**glitch**
54:20 146:23
**go**
4:24 6:22 7:1,6,8

10:2 12:10 27:9
31:25 34:25 37:19
37:25,25 40:14,23
40:24 45:25 48:24
48:24 49:1 50:25
51:9,19 52:19 53:12
53:16 54:21,23,25
55:10,10 56:23,25
57:1 64:21 68:10
71:15 72:10,17 73:5
73:6 75:9,22,23
76:1,4,12,13,22
77:8 79:21,23 80:11
83:20 84:15 89:18
93:13 101:23
102:12 104:10
108:1 115:1,16
124:24 127:20
132:3 134:8 135:14
140:9,10,19,20
141:16 142:3
143:16 146:16
148:1 149:21 150:6
150:11 153:17
155:2
**goes**
32:20 41:11 60:3
  64:11
**going**
6:11 9:20 16:9 17:5
  18:10 19:21 22:3
  26:3 30:24,25 31:9
  35:18 41:21 43:15
  54:25 59:5 84:6
  85:3 91:15,16 93:12
  95:14 98:24 100:24
  112:5 116:15
  117:20 118:12,16
  122:23 124:10
  126:23 132:22
  136:7 141:19
  144:13 146:17,21
  148:21 149:2,13
  150:3,10 153:10
  154:18 155:23,24
**gonna**

43:22
**good**
4:6 6:3,7 92:17 93:5
  93:11 96:2,2 101:5
  101:16 113:15
  126:15 127:11
  156:1,5,7
**Gordon**
2:9 8:3 14:23 15:2,15
  15:18 19:12,14 20:1
  20:3 21:21 26:13,16
  26:22 27:15 28:5,24
  29:11 30:17,19
  31:18 33:13 61:18
  62:1
**Governments**
1:4,14 2:2 4:10 59:12
  59:12
**gracious**
8:3
**granular**
24:4
**great**
16:8 40:22 41:8
  93:10
**greater**
98:6
**ground**
6:21
**group**
82:23
**groups**
63:8
**guess**
29:14 43:10 45:24
  50:1,6 81:15 99:14
  124:3 155:19
**guys**
54:22 76:18 150:1
**GW**
1:7

---
**H**
---

**Hagen**
13:22 35:3,6,9
**half**

28:2,7,23 29:8
**handle**
54:24
**handler**
40:9
**happen**
24:23
**happened**
11:19 119:25
**happening**
94:3
**happy**
6:22 7:1 44:15 49:9
**hard**
48:12
**Hayter**
20:23,24
**head**
47:20 85:10 148:18
**header**
13:19
**hear**
13:9 109:12
**heard**
4:21 22:23 92:8
**heavier**
106:7
**Held**
13:21 24:19,22 25:9
  27:14 48:4
**help**
76:20
**helpful**
123:3 144:8
**Hemming**
58:24 60:1,22 61:2,5
  62:13 63:13,19 64:2
  64:24,25 66:18,23
  68:21 69:1,9 78:21
  79:15 80:22 81:4,19
  82:6,9 83:5 94:10
  95:1,5,19 102:21
  107:21 117:9,16
  120:19 121:3 125:5
  135:20 136:9,17
  137:7,11,16 138:19



138:22 141:21
142:8,16,21 143:1,6
147:6
**hereof**
158:9
**high**
84:12 86:2 91:1
97:13 103:19 104:9
112:10,12,17,18,24
113:7
**higher**
51:16 108:22
**highest**
104:2,14
**highlighted**
152:24
**high-side**
147:9
**hinge**
50:6
**hinging**
52:22
**hired**
138:19 140:3
**Hmm**
17:19 89:7
**hold**
30:16 44:1 51:14,14
54:7,11
**hone**
57:21
**hopefully**
61:8
**hour**
17:18
**hourly**
17:16
**hours**
7:12 18:6,8 20:5,17
20:18 25:10 26:19
26:19 27:15 28:11
47:15,19 50:2 69:12
69:14 70:12 74:15
78:9
**HSNO**
24:21,22 25:8 47:23

48:4 147:19
**hundred**
9:25 87:7 119:20
**hundreds**
48:7
**hung**
50:10 91:15
**hyphen**
66:6,11
**hypothetical**
105:18 106:23
**H-a-y-t-e-r**
20:23

———————————

**I**

**idea**
17:17 87:1
**identification**
7:19 9:15 33:20,22
37:3 39:12,14 72:5
113:18,20 152:9
153:15
**identified**
10:17 11:21 28:16
57:6 75:15 76:9
128:6 130:23 131:6
134:5,22 135:2
**identifies**
33:4
**identify**
49:22 51:1,10 52:20
68:14 69:2 71:6
80:14
**identifying**
57:20 125:24
**ignore**
27:19
**impact**
7:12 79:19 90:1,23
103:16
**implied**
136:3 137:19,22
**important**
46:2
**importantly**
83:17

**imposed**
64:5
**inartful**
95:13
**Incidentally**
38:13
**include**
19:16 124:10
**including**
19:20 35:6 59:2
60:25 67:25 133:2
**inclusive**
1:9
**independent**
138:3,14,23
**INDEX**
3:1
**indicate**
75:18 142:3
**indicated**
158:8
**indicating**
125:10
**individual**
24:1 78:8
**individuals**
14:11 151:7
**inform**
124:13
**informal**
15:17
**information**
12:19,22 46:20 66:25
69:23 82:17 87:12
87:14 122:3,22
141:8,10 142:24
144:2,6,16,17,22
145:3,7 154:1
**initial**
14:19 46:9,15 68:6
153:9
**initially**
14:9
**initiated**
87:6
**inspections**

24:10
**inspector**
130:25,25,25
**instance**
86:18 88:17 89:12
**instances**
69:13
**Instruct**
19:22
**instructing**
15:23,25 16:3
**instruction**
3:23 16:10 26:4
149:3
**insufficient**
88:3,13
**insurance**
1:8 2:8 4:11 22:13
63:13
**insured**
55:22 56:9 58:25
60:22 140:7
**insured's**
63:15 117:8,9
**intend**
148:19
**intended**
151:5
**intends**
148:12
**interest**
59:18 151:25
**interested**
5:6
**interesting**
13:4 17:15 129:16
**internal**
67:25
**Internet**
4:20
**interpret**
52:13 66:16
**interpretation**
66:2 135:5
**interpretations**
142:4



**EXHIBIT 1**
**PAGE 58**

**intrigues**
129:13
**investigation**
115:20
**investigations**
22:13,14
**invoice**
17:6,7 69:18
**invoiced**
83:22
**invoices**
3:16 56:15,21 57:10
57:15 58:2,8 68:1,7
69:14 70:17,20 71:3
71:11,12,18 73:22
74:3 75:4,15 76:9
77:2 80:3,15,16
81:12,13 87:10
120:17,18 125:24
128:3 129:17 130:2
130:5 131:10
142:12 143:19
**invoicing**
71:4 73:2 77:23
80:24 85:11 96:21
106:6
**involved**
25:6 40:5 47:7
127:23 128:12,18
128:20 129:7
**involvement**
42:11
**involving**
22:21 150:15
**Irvine**
2:5,10
**Island**
8:25 9:6
**isolated**
74:20
**issue**
7:24 25:14 27:25
29:1,7 60:7 62:8
64:11 102:17 108:8
109:6,24,25 110:5
111:16 116:18

**J**

124:18,22 139:17
152:2
**issued**
8:2 29:14 36:17
124:1
**issues**
99:10 110:1 137:22
152:1,1
**items**
107:23

**J**

**Janda**
74:6,7,19,20 78:4
**Janda's**
74:13
**January**
71:22 123:5,17
**Jeez**
55:4
**Jen**
14:10
**Jennifer**
3:11,13,14,18 34:5
39:20
**Jesse**
2:15 5:3
**Job**
1:25
**joined**
129:2
**Joint**
1:5
**JSL**
9:5 147:19
**judge**
59:16
**judgment**
59:3,4,9 61:1 62:17
**Judith**
14:10
**July**
1:15 4:2,7 44:20
117:10 119:16
120:24 121:21
123:19

**K**

**jumping**
63:25
**J.S**
13:21 24:19,22 25:9
27:14 48:4

**K**

**Kapanicas**
60:3 61:3,4,7
**Karman**
2:4
**keep**
15:8 90:22 93:12
**Ken**
39:20,23,24
**Kenneth**
3:15
**key**
120:7
**Kiernan**
110:5,7,12
**kind**
14:18 18:23 21:19
69:10 81:11 84:14
134:20,25 135:4
154:21
**kinds**
57:20 134:3
**KKx**
1:7 4:14
**knew**
12:8 74:19
**know**
7:1,3,6 9:17 11:20
12:9,15 13:6 18:4
21:10,24 26:25 27:1
28:9 29:14 31:22
35:18 41:21 43:13
43:23 44:25 45:7
47:4,4,9,11 50:17
50:19 53:22 56:22
57:16,22 58:4,5
59:21 61:9 66:9
67:19 74:10 79:2,4
79:8,10,12,18 82:8
82:11,13,15,19,22

83:12 87:2 89:7,10
89:12 92:8 97:2
99:9,20,22 100:19
100:21 105:14
107:20,24 108:13
108:17 110:8
112:10,12,14 122:7
123:24 124:2
127:18 128:15
129:3 133:8,12,16
133:20,24 134:3,17
134:20,25 135:4,7
135:10 136:11
138:16 148:4
149:16 150:21
151:1,4,7 152:3
154:9,21
**knowing**
98:14 141:13
**knowledge**
32:7
**known**
13:22
**Krieger**
2:3 4:17 5:12 63:15
63:22 117:10 121:3
121:12

**L**

**L**
2:9
**lab**
134:23
**laboratory**
134:21
**Lana**
82:1
**language**
141:9
**large**
79:17
**larger**
34:10 46:18 82:17
90:20
**launch**
30:25 31:1



EXHIBIT 1
PAGE 59

**lawsuit**
13:24
**lawyers**
6:20 79:2 142:4
**lay**
26:8
**lead**
155:12
**leading**
124:2
**learned**
11:24 12:5,18,21
13:5 42:3,4
**leave**
33:12 47:1 61:25
66:1 108:8 148:7
**leaving**
82:2
**left**
66:15
**leg**
70:4,7,9,16,19 71:10
**legal**
1:20 5:2,4 47:8,11
51:8 59:15 63:8
66:1 100:4 124:22
142:3
**length**
146:13
**Letter**
3:13,14,17 15:15
114:10
**letters**
21:10
**let's**
23:17 24:3,17 31:25
45:25 48:24,24 49:1
51:12 54:23 55:10
56:10 58:11,11
62:22,22 64:21 67:3
67:6 69:25 71:15
75:9 76:15,16 79:14
84:15 93:12,15
98:20 114:2 116:23
124:23 132:3,5
134:8 135:14 136:4

140:9,10,19,19
141:16 144:7,10
146:16 152:5
153:11,11
**level**
46:9 50:12 51:7,16
57:16 58:5 86:2
100:20 108:23
110:21
**LG**
79:14,17 82:1
**life**
43:21 44:2,17 45:20
**likelihood**
106:10
**likewise**
121:8 143:8
**limit**
22:19 65:8 109:17
135:24 139:16
141:12,23
**limitation**
65:1 66:13
**limited**
66:21 81:20 141:24
**limiting**
44:9
**limits**
64:5,13,14
**line**
3:24,24 29:24 46:3
51:20,20 53:17,17
58:18 86:13,16 88:2
159:2,5,8,11,14,17
159:20 160:2,5,8,11
160:14,17,20
**lines**
59:23 95:16
**link**
153:9
**listing**
134:14
**literal**
86:4
**literally**
154:22

**litigation**
9:19 25:14,23 26:10
26:12 27:22 28:5
31:18,21 33:1,12
41:14,17 47:2 61:17
**little**
8:8 24:3 29:16 43:24
70:1 75:6 86:11
100:24 103:5
126:12 154:21
**living**
22:1
**LLP**
2:3,9 4:17
**Logic**
56:16,20 57:9,15
58:2 60:2 61:3
62:10,15 64:3,11
65:13 68:8 73:2
83:8 96:21 97:5
98:5 102:25 103:9
104:6 110:19,24
139:6 142:9,12,18
143:7,9,19,22
**logically**
84:5
**Logic's**
60:9
**long**
9:7 43:7 46:7 149:15
**look**
20:11,16,20 27:20
51:12 57:22 64:22
71:16 76:14 77:5
81:11 82:9,12,14,16
83:14 90:18 94:15
116:23 128:1 132:5
132:22 136:5 140:5
149:20,22 153:2,11
153:24
**looked**
20:7 42:22 44:19
49:11 65:16 81:16
81:18,20,22,24
126:18 130:10
138:16,17 141:3,7

142:25 154:1,2
**looking**
21:8 46:19 66:24
71:10 77:23 87:10
115:17 125:23
127:6 138:21 139:1
139:10 143:25
**looks**
153:18
**loss**
13:25 14:5,25 25:14
27:24 29:1,7 30:11
33:11,15 42:13,19
42:22 43:2,5 46:8
46:24 47:16,25 48:5
50:14 55:24 56:15
57:24 60:6,8,24
61:15 62:5,7,9
115:21,23 116:6,10
140:13,15 141:5,6
143:1
**lost**
143:3
**lot**
103:15 108:12
**lots**
99:12 100:16 146:6
155:6,11,11
**low**
97:14 112:18,18,21
112:21,22
**luck**
155:24,24 156:1
**lunch**
92:25 100:12,24,25
101:4,10 102:1
**lurking**
110:2

**M**

**Madam**
118:9 126:9
**Magna**
1:20 5:2,4
**majority**
25:7 109:23



**EXHIBIT 1**
**PAGE 60**

making
151:8
management
24:7 132:9,25 135:8
  135:11
management-type
125:23
manager
130:14,24
manner
22:14
MANSUKHANI
2:9
Marceline
1:16,23 5:1 157:4,21
mark
7:16 33:19 37:1
  39:12 72:2 113:18
  152:6,6
marked
7:18 9:14 33:21 34:3
  37:2 39:13 41:5
  72:4 111:4 113:19
  116:24 121:5,9
  152:8 153:14
marks
55:5,13 101:6,12
material
134:23
materially
90:1
materials
20:21,24 21:3,6,18
  134:21 141:25
  144:15
math
137:14
mathematical
137:9
Mathematically
137:2
matter
4:9 6:10 15:3 19:17
  21:24 41:22 116:8
  158:6
matters

22:12,16,21
maximum
104:5,7,18,24 105:9
  106:3 147:7,14
McKiernan
110:5,7,12,20
McPharlin
39:25
mean
20:3 21:24 25:5
  44:21 47:18 49:9
  50:8 51:6 53:10
  67:23 78:19 82:22
  83:12 88:7 89:5
  99:9 102:16 108:11
  112:22,25 123:8
  143:15 151:9
  154:14 155:9
meaning
112:21 121:17
means
21:11 89:8,11 113:6
meant
73:16 94:1 118:15
  153:22
meat
83:1
meatier
82:22,23,25
media
4:8 55:6,13 101:7,12
  156:15
medication
7:11
meeting
81:10 117:8,15
  119:16,17,25
  120:22,24 121:2,21
  122:20,21 123:19
  124:8,12
memos
154:15,15
mentioned
61:4 70:1 90:7 92:2
  99:9
mentions

65:1
met
82:11
meteor
83:2
method
90:19 91:4 95:4
methodology
80:22 88:15,19 90:5
  94:25 95:18 147:5
middle
84:18 124:1
might've
123:3
million
59:2,2,18,19 60:2
  71:22 72:22 73:1,12
  73:22 75:16 76:10
  77:2,13,17 80:16,17
  81:3 85:11,12,21
  93:19,20,24,24
  96:12,24,25 97:14
  97:16,17,22 102:3
  103:2,11,20 104:15
  105:10 107:16
  112:21,23 113:7
  136:18,24 137:6,6
  137:12,15,18,19,19
  147:1,8,13 150:25
  151:16
millionish
112:17,24
mind
7:23 12:3 35:18,20
  37:22 53:4 54:21
  90:22 96:7
minimum
106:21 107:11
minor
29:16
minutes
93:8
mirror
95:5
mirrored
81:4 82:5 83:4

mirrors
94:10
missed
139:19
missing
76:18
mistake
67:19
Mitigation
59:23
Mm-hmm
35:22
modify
39:5
money
51:19 144:19,21
monies
63:6 145:14
months
25:15,25 26:7,9,15
  26:17 27:16,22 28:1
  28:1
Moorjani
110:16 150:19
  151:16,23
morning
4:6 6:3,4,11 101:16
MORRISON
2:16
Morse
58:25 60:1,22 61:2,5
  62:13 63:13,19 64:2
  64:24,25 66:18,23
  68:21 69:1,9 78:21
  79:15 80:22 81:4,19
  82:9 83:5 94:10
  95:5,19 102:21
  107:21 117:9,16
  120:19 121:3 125:5
  135:20 136:9,17
  137:16 138:19
  141:21 142:8,16
  143:1,6 147:6
Morse's
137:7,11 138:22
move

32:13 48:16,19
92:19 101:3 106:10
138:5
**multiple**
22:15,20 60:25 63:2
**multiplied**
78:10
**mute**
55:1
**m-e-a-t**
82:23

## N

**name**
6:9 21:10 29:19
129:6 157:16
**National**
1:8 2:8 4:10 13:23
14:3,7,23 19:7
55:17
**nature**
6:24 148:6 154:16
**nature's**
31:4
**Navarro**
2:15 5:3
**necessarily**
23:23 75:4 84:9 91:9
105:5
**need**
7:5 30:24 69:8 90:5
98:24 126:11 146:7
149:7,9 150:1
156:10
**needed**
69:20 71:5
**never**
61:4
**Newton**
13:22 35:3,9
**Nice**
9:8
**night**
156:6
**Noble**
1:16,23 5:1 157:4,21

**nonsurveyors**
78:2
**nonsurvey-approved**
80:2,15
**note**
4:18 64:24,25
**noted**
43:11 49:14 58:9,24
60:21 65:17 73:8
74:10,15 78:12
79:15 83:18,22
85:21 88:18 89:24
90:19 91:17,21
104:15 105:10
125:8,22 128:8
**notes**
32:25 41:14 149:22
**Notice**
8:9
**notices**
27:17
**noticing**
5:10
**notification**
27:13
**notifications**
27:8
**notified**
27:20
**NUFIC**
34:7 37:12 40:11
54:19 72:7,11 75:25
77:11,15 152:16
153:13
**number**
3:8 45:3 46:17 50:14
69:11 70:11 77:2
79:5,7 83:16 84:11
88:21 89:25 90:5
97:3,7 103:14,17
104:19 105:13,15
106:3,13,16,18
112:14 136:15
137:16 146:9 147:9
152:16,22 153:12
156:15

**numbers**
54:17 111:23 112:8
127:24 136:20,21
147:6,12 152:19
154:12
**numeral**
132:17

## O

**oath**
101:19 158:11
**object**
10:19,24 11:23 15:4
15:20 19:18 25:17
41:23 51:19 53:15
60:17 62:11 65:15
87:17 88:5,16 89:3
89:9,23 90:14 92:7
92:12 94:12,20
95:21 96:6,14,23
97:9,23 99:7 100:6
103:12,22 104:11
105:2,24 106:25
110:3 112:16 113:1
113:12 123:6
125:18 126:6
130:16 138:6
140:25 142:22
144:22 148:15
**objection**
11:13,15 92:6 105:2
123:13
**objectives**
114:25 115:15,17
**observations**
43:10 50:8
**observe**
65:6
**observed**
65:11 83:15
**obvious**
57:23
**obviously**
71:8 80:20
**occasions**
6:17 22:15

**occurred**
104:25
**offer**
44:2,5,15 55:17,19
158:10
**office**
8:2 9:5 10:21 11:1,3
119:19,22,23 149:7
**Off-record**
32:16 48:21 132:2
**oh**
17:13,15 21:24 26:2
48:20 58:19 67:11
72:9 83:19 101:5
**okay**
5:15 9:10 13:4 16:21
17:15 21:24 23:19
25:10 27:21 35:22
35:22,22 36:20
38:17 39:3,9 40:4,6
45:20,21 48:20 50:3
50:23 52:7 53:8,10
54:2 57:4 58:19
61:13 62:2 63:9
67:5,7,12 68:6 70:9
70:21,24 71:10 75:8
77:14 79:21 80:11
80:13 81:16 82:2
83:4 84:15,17,21
94:23 95:25 98:16
99:3 101:4 103:19
106:19 108:24
113:15 114:11,15
121:2 122:5,12
126:20 127:22
132:3 139:11,16,19
139:23 141:18
143:18 146:19,22
149:6,11 150:6
151:12 152:5,15,23
153:2 155:8,17
156:12
**once**
47:6
**ones**
106:7 131:5 154:17



**EXHIBIT 1**
**PAGE 62**

25:3 49:20
**opinion**
50:7,18,19,21 51:7
51:22,24 52:22,24
53:1,4,6,18,20 54:5
54:5,6 55:19,22
56:1,5 89:22 90:13
96:10,15 97:20 99:5
100:20 102:22,24
103:8,21 104:8
108:19,25 110:17
115:19 141:21
142:16 143:21
**opinions**
41:16,21 43:1,4,11
43:14 49:4,22 51:1
51:4,10 52:17,21
53:13 100:13 101:1
107:19 108:3,9,16
109:3,6 110:2,11
148:2,12,19 153:4
154:6 155:2,15
**opportunity**
56:20
**opposed**
66:5 83:2 87:10,25
95:19
**oral**
15:17
**order**
35:16 69:21,23 146:8
**original**
59:1 60:23
**Oshiro**
13:22 35:3,10
**outcome**
5:7 104:21 105:16
**outside**
79:5 88:21 90:4
106:25 107:24
109:4 126:5 127:14
131:11,15,19
147:19,21
**out-of-pocket**
115:21 116:6 140:13
**overarching**

56:4 107:19
**overbilled**
83:8 146:25
**overbilling**
62:9,14 71:2 74:21
74:24 79:17,19 80:2
80:3,14,16 81:3
84:24 85:1,13,17,24
86:23 87:9 89:21
93:17,18,19,23
94:16,24 96:12,21
97:4,20 98:4 99:5
100:14 102:2,9,25
103:9,17,19 104:2,5
104:24,25 105:9,19
105:21 106:3,4,11
106:16,22,24
107:14 109:1,24
110:18,24 111:7,19
112:5 113:9,10
122:16,17 123:21
124:7,14 139:6,13
139:14,17 140:4,22
145:23,25 146:5,12
146:25 147:8,10,11
**overbillings**
78:17 151:18
**overpayment**
136:3 137:20,22
**overpayments**
109:4 139:4
**overview**
14:16
**owned**
110:15
**ownership**
110:22
**o'clock**
92:24

_____
**P**
**PA**
1:8
**pace**
38:2 40:16
**page**

3:8,24,24 9:20 10:2,5
32:11,13,22 34:7,18
35:1,12,19 36:4
37:11,19,23 38:1,1
39:1,16 40:11,24,25
41:9 48:24 49:6
51:20,20 56:23,25
58:9,22 59:25 64:1
64:21 65:22 67:3
71:15,16 72:10,18
72:19 73:6 75:10
76:5,6 79:23 83:20
84:15,19 93:14
101:23 107:20
114:2,3,20 115:16
117:4 124:24 125:2
125:3 127:6 129:12
132:4,4 134:8,10
135:14,18 139:7
140:10,20,24
141:16,20 144:11
146:16,18 150:12
152:21 153:17
159:2,5,8,11,14,17
159:20 160:2,5,8,11
160:14,17,20
**pages**
3:21 35:25 43:7,8
49:8 50:15 57:5
67:24 77:9,10,25
127:11
**paid**
16:12,14,21,23 17:10
18:14 26:25 27:9,14
85:20 145:14
150:18,22 151:1,2
151:24
**paper**
149:20
**paragraph**
32:4 51:13 56:8 57:2
57:3,4 58:22 59:24
60:20 63:9,25 64:23
65:24 67:14 71:17
73:7 74:5 75:11,13
79:24 80:5,13 84:18

84:20 85:22 93:15
93:22 94:4 101:25
104:15 117:4
118:19 128:2
129:12,12 132:8,8
141:20,20
**paragraphs**
108:2
**parameter**
85:18
**Park**
2:10
**part**
20:12 30:9 46:25
74:23 95:5 102:10
120:2 132:12
**participants**
4:20
**participate**
131:24
**particular**
22:18 51:24 74:8
78:25 85:21 86:18
88:17 91:4,6 99:22
130:22 141:4 152:2
**parties**
4:24 5:8 63:7 154:4
**partner**
35:6
**party**
5:5 18:18
**pass**
57:22
**pay**
18:16,24 19:3
**paying**
17:13 84:8
**payments**
63:3 79:11,20 83:13
86:21 107:23
111:25 120:12
135:21,23
**payroll**
69:5 71:5 120:15
**PC**
13:23



**EXHIBIT 1**
**PAGE 63**

**penalty**
158:2,4
**pending**
146:22
**people**
52:1 64:16 84:9
    128:13
**percent**
9:25 62:15 65:2,14
    65:18 66:13,22 80:9
    80:25 83:23,24
    85:14,17 87:7
    102:17 106:12
    107:21,22 109:5,24
    111:16 119:20
    120:11,13 123:21
    124:14,17 125:6,7,9
    125:11,12,21 126:1
    126:4,5 127:13
    128:10 129:8,9
    131:14 135:22,23
    136:2,13,25 137:5
    137:14,25,25
    139:18 140:1
    141:12,23,25
    142:10 147:4
**percentage**
79:19
**Perfect**
38:4
**perform**
88:3 134:4
**performance**
132:24
**performed**
31:20 57:18 64:2
    66:4 74:11,12 84:25
    93:16 123:20
    124:15 128:5
    129:20 130:6
    135:17 141:14
    143:20
**performing**
42:25 87:25
**period**
47:3,5 81:19 93:20

**periods**
82:3 111:19
**perjury**
158:2,4
**person**
38:15 69:12
**pertinent**
114:22
**Peter**
1:13 3:3,12,13,15,17
    4:9 5:18 10:20,25
    12:17 13:19,21 21:2
    21:9 32:4 35:4
    113:2 117:20
    156:14 158:15
    159:25 160:25
**Phil**
119:22 128:14,20
**Philadelphia**
4:11
**phrase**
22:18
**phrased**
141:2
**pick**
132:22
**picture**
47:20
**Pisano**
2:4 3:4 5:11,11 6:2,4
    6:9 7:20 9:10,16
    11:6,16 12:2,7 13:3
    15:16,23 16:3,6,8
    16:18,20 19:23 22:5
    25:24 31:15,25
    32:19 33:17 34:1,11
    34:17,22,25 36:23
    37:4,11,15,18,24
    38:6 39:9,15 41:1
    42:8 43:22 44:16,23
    44:25 45:2,5,7,9,12
    45:14,17,22 48:17
    48:20,22 53:23
    54:15,23 55:2 56:2
    56:23 61:12 62:21
    65:10 67:2,10,12

71:15 72:1,6,10,17
73:5 75:9,22 76:4
76:24 79:21 80:7,10
80:12 86:9,24 87:21
88:10,23 89:6,15
90:10 91:7 92:10,16
94:17,22 95:24 96:8
96:17 97:1,11 98:2
98:20 99:2,18 100:9
101:15,21 103:6,18
104:1,17 105:12
106:1 107:4 109:20
110:10 112:20
113:8,15,21,25
116:23 118:2,9,12
123:10,16 125:20
126:9,13,20 127:4
127:21 128:17
131:2 132:3 135:14
138:9 140:9,17
141:15 143:4
148:17 149:1,6,11
149:17,21 150:10
152:5,10,21 153:1
153:11,16 154:10
154:18,24 155:1,8
155:14,19 156:20
**Pittsburgh**
1:8 4:11
**place**
4:24 120:24 157:10
**plaintiff**
1:6 105:9
**plaintiffs**
1:14 2:2 5:12 6:10
**plan**
17:2 24:12 114:24
    115:9,12 116:2
    131:1 135:5
**planning**
93:1 133:3,8
**plans**
149:16
**play**
99:12 100:2 135:8,11
**Plaza**

2:10
**plea**
151:10
**pleasantries**
6:8
**please**
4:18 5:16 7:15 9:13
    10:3 11:5 32:2
    34:20 35:1 40:23
    41:24 42:4 48:25
    49:7 56:25 60:10
    67:13 72:3,11,18
    75:10 76:5 79:22
    84:16 98:8 101:22
    113:17 114:21
    118:10 124:25
    126:8 127:9 132:4
    134:9 135:16
    146:20 150:12
    152:7
**pleasure**
34:15 36:22 67:21
**plus**
59:18 65:14 141:25
**point**
30:16,22 40:5 46:20
    47:6 49:18 50:12
    56:19 57:9,14,25
    58:5,6,7 59:20
    61:10 62:17 83:21
    94:8 97:19 99:15
    115:18 116:9,17
    122:2 140:11
**pointed**
85:22
**points**
57:2 115:1
**pop**
110:2
**population**
85:8
**portion**
58:2 74:17 115:8
**posed**
151:23
**possible**



MAGNA
LEGAL SERVICES

EXHIBIT 1
PAGE 64

115:23 140:15
143:21 144:23,25
145:5,6
**possibly**
60:14 104:9
**post-2012**
110:25
**potential**
10:18 11:21 62:14
65:18 71:2,9 74:21
74:24 78:17,19
79:18,19 80:1,3,14
80:15,17 81:2 82:16
84:2,11,24 85:1,13
85:17,24 86:22 87:9
88:20 89:20 93:17
93:18,23 94:16,24
96:12,20 97:4,20
99:22 100:14 102:2
102:9,25 103:9,16
104:7,18,25 105:9
106:3,11,16,21
108:14 109:1,3,23
110:18,23 111:6,18
112:5 113:9,10
122:16,17 123:21
124:6,13 131:8,18
131:19 137:4 139:3
139:5,14 140:4,22
145:22 147:4,7,10
147:14 152:1 155:2
**potentially**
52:1 66:20 78:5,7
79:5,16 103:16
109:8 126:18
130:23 131:14,15
137:5,19 146:24
**power**
92:21
**Powers**
1:5
**practice**
27:18
**precise**
107:13
**precisely**

28:9
**precision**
111:6
**predate**
111:20
**Predominantly**
9:2
**preference**
22:4
**preliminary**
3:20 46:4 67:23
153:18,23 154:3
**premised**
126:4
**prep**
18:8,11,14,16 20:13
20:17,18 25:10
**prepare**
17:20,23 115:9
153:20
**prepared**
20:12,21,25 21:3,6
33:7,8 38:8 40:19
56:18 63:12 121:8
154:3,25
**preparing**
18:2,25 19:3,9 20:6
119:3
**present**
2:14 5:8
**presented**
140:7 141:5
**presumptuous**
22:9
**pretty**
6:19 27:11 87:6
149:23
**previous**
28:24 100:18 106:7
117:7 128:2
**previously**
13:22 106:5 116:12
116:24
**pre-wage**
130:25
**price**

102:18
**primary**
40:8
**prior**
10:15 11:8,18 12:13
13:6,23 27:21 28:1
28:22 29:8 33:4
90:2 110:22 132:3
138:19
**privilege**
11:24 15:22 30:3
148:14,16,22
**privileged**
11:1 12:3,22 16:1
25:18 42:1 109:10
109:14
**probably**
6:12 25:15 29:9
31:23 34:11 43:8
77:8 112:18
**procedures**
115:20
**proceeding**
156:14
**proceedings**
157:11,14
**process**
127:23 128:18 129:8
**produced**
32:25 41:14,17 63:24
**product**
25:18
**production**
45:10 46:13,15,15
**professional**
64:4 66:3,6,10,12
98:4 130:11 131:5,9
131:20 134:20,25
135:5
**professionals**
134:4
**proffer**
49:4
**project**
69:11,12 70:11 133:1
**projects**

63:5 68:16 70:22
84:6 133:5,10,14,18
133:22 134:1
**proof**
50:14 55:24 57:24
60:24
**properly**
59:13
**provide**
13:24 14:4,24 21:20
104:18 111:5
114:24 115:12
118:21 121:11
128:5 129:18,19
130:5,7 132:25
140:8
**provided**
30:10,13 46:12 63:21
68:12 104:23
122:23 133:9,13,17
133:21,25 142:24
142:25 144:2
**Providence**
9:5,7
**provides**
134:14,21 135:5
**providing**
19:5,9,13,25 26:12
28:25 31:20 135:11
**provision**
66:15
**public**
14:17 21:11 23:19,20
132:8,25 133:5,9,13
133:17,21,25
134:18 135:12
152:1
**pure**
137:14
**purpose**
102:8
**purposes**
30:23 52:15 78:21
90:4 102:11 137:8
138:20
**pursuant**



EXHIBIT 1
PAGE 65

8:16
**put**
7:23 9:20 17:5,7 32:1
33:17 34:2 36:25
39:11 40:24 58:13
72:2 96:9 97:19
113:17 131:6,10
138:17 149:20
150:12 152:5
**putting**
61:10
**p.m**
1:15 4:3 126:24
127:2 150:4,8
156:17

**Q**

**quality**
4:18,19 135:1
**question**
11:5 13:2 20:15
36:21 42:7 51:16
52:6,15,18 53:3
54:8 61:8 62:16
76:13,15,21 83:7
85:25 86:4,7 90:11
92:4 95:13,16
108:20,22 113:2
116:3 120:10 122:5
126:7 127:16,19,22
128:1,12,25 130:19
130:21 131:4
139:12,19,21
142:13 145:22
148:13 149:3
151:22
**questioning**
29:24
**questions**
58:21 82:11 92:18
100:5 108:12 110:8
118:25 119:15
120:5,9 122:1 125:1
129:14 155:21
**quite**
9:9 43:10 84:13

122:5
**quote**
132:18 134:11 140:8
**quoted**
132:8

**R**

**rack**
66:11 69:4
**range**
97:8,12,13,21 102:3
102:9 103:20
107:15,18 109:2
110:23,25 111:6
112:5,19 122:16
147:3
**ranges**
103:1,11
**ranging**
93:23 146:25
**rate**
17:16 28:16,17 66:11
69:4 78:10,11
**Ray**
20:16 63:19 81:10
119:18 120:4
121:12,18,22
122:23 123:3,9
124:8,12,17
**reached**
55:21
**reaching**
94:6
**read**
17:25 32:3 42:10
51:6,23 52:23 54:3
60:14,16 65:23
68:17 98:7,9 99:1
108:1 113:3,5 118:9
118:11 126:9,16
129:11,15 153:7
154:12,19 155:2
158:5,6
**readily**
82:18
**reading**

66:9 93:22
**ready**
150:6
**really**
45:19 62:13,16 68:22
68:24 70:24 71:2
81:14 83:10 89:13
100:11 124:21
140:6 143:19
**reason**
7:8 159:4,7,10,13,16
159:19,22 160:4,7
160:10,13,16,19,22
**reasonable**
88:15 89:2,5,7,11,22
90:3,12,17 91:3,9
91:11,13,15,22 92:5
92:14
**reasons**
50:15 74:9
**recall**
7:13 14:15 21:23
29:21 56:22 102:4
118:17 119:2
120:16 122:19
124:16
**receivable**
27:2
**received**
58:1 63:12 67:24
68:7
**receiving**
64:19
**recess**
31:11 55:9 101:10
126:25 150:5
**recognizing**
109:5
**recollection**
30:13 57:13 63:2
115:14 117:19,22
117:24 118:22
121:25 152:4
**record**
4:6,25 6:9 7:1,6,17
31:9,14 54:23,24

55:8,10,11,15,17
60:16 70:13 98:9
99:1 101:9,14 113:5
118:11 126:16,23
127:3 149:22 150:3
150:9 156:16
157:13
**recorded**
4:22
**recording**
4:19,23
**records**
23:17 68:1,13,20
69:5,8 70:10,14
81:13 82:19 114:22
120:15 126:17
141:13
**reduce**
90:7
**reduction**
107:23
**Rees**
2:9 8:3 14:23 15:2,15
15:18 19:12,14 20:1
20:3 21:21 26:13,16
26:22 27:15 28:5,24
29:11 30:17,19
31:18 33:13 61:18
62:1
**refer**
128:16
**reference**
150:18
**referenced**
44:10 72:14 118:5,19
149:18
**references**
148:4
**referred**
14:16 69:9
**referring**
117:17 119:10 151:9
**refine**
99:15,16 111:5
**reflected**
32:7 44:6 55:21



32:7 44:6 55:21
138:10,25 139:7
140:23 155:5,7
**refresh**
57:13
**regarding**
14:17 21:18 43:1,4
54:8 59:13 65:17
108:13 110:9,12
**regards**
109:3 145:22
**related**
5:5 59:2 60:7 62:7,9
64:6 70:22 75:5
109:4 111:15
117:25 120:5
122:17 124:17,19
133:3 140:1 145:23
146:5 147:10 152:1
**relates**
19:5 140:22
**relatively**
74:10
**relevant**
82:10 122:1
**relying**
25:19
**remember**
81:23 118:3 119:5,7
120:10,14
**remitting**
59:14
**remotely**
4:15
**remove**
36:10
**repeat**
11:4 12:11 29:2
60:11,15 103:5
118:8 126:7 142:13
146:2
**rephrase**
52:10 60:10 118:13
144:14 151:6,14
**replicated**
136:9

**report**
29:19,21 33:5,6,6
34:19,22 35:12,17
36:1,4,8,16,19 38:3
38:8,10,13,20,25
39:4 40:18 46:1,3,7
48:11 49:5,11,15,24
50:11,16,20,25 51:2
51:9,20,21 52:19,20
52:23 53:5,16 54:9
54:12 55:21,25 56:5
56:19 58:10,12,16
58:17,25 60:1,22
61:2,5,5,14,22
62:13 63:12,12,18
64:11,25 67:20,24
68:7 69:17 71:14,16
72:15 73:6,20 79:16
81:9 82:9 83:18,21
84:16 88:19 89:25
90:19 91:18,21
93:14 95:2 100:18
101:1 102:6,13,21
108:3,18 109:19,23
111:3,14,15 113:14
116:18,19,20,21,21
116:25 117:1,7
118:5,7,21 119:4
120:4,6,8 121:5,9
122:10,11,15 123:4
123:23 124:1,3,15
125:4 127:7 130:22
130:22 134:6,9,10
135:18,20 139:8
141:16 146:16
**reported**
1:23 157:11
**reporter**
1:16 5:1,16,22 7:19
9:15 10:23 15:8
25:22 33:22 34:21
34:23 37:3 39:14
43:23 60:13 65:9
67:9,11 72:5 92:9
109:12 110:6
113:20 118:9 126:9

152:9 153:15
156:18,21 157:5
**REPORTER'S**
157:2
**reporting**
121:15
**reports**
18:1 20:7,11 29:14
30:8 32:8,24 33:5,7
33:14 36:17 41:3,5
41:11,13 42:10,22
43:7,12 44:6,10
71:4,7 73:11,25
74:2 77:24 116:8,20
116:22 120:18
121:11,18,24
138:11 139:1
140:24 148:8
155:12
**represent**
5:9
**representative**
63:15 107:7
**representing**
5:12 6:10
**request**
4:16 86:25
**required**
65:13
**requires**
19:10 68:22
**reread**
102:12
**research**
3:20 153:18,23 154:3
**reserves**
41:15
**reside**
8:22,23
**resources**
144:4,12,13
**respect**
31:7
**respectively**
41:6
**responding**

33:23
**response**
16:22 130:17
**responsible**
18:18
**rest**
156:5
**restitution**
150:18,21 151:1,4,8
151:17,25
**results**
83:12 85:23 86:19
111:22
**resumé**
21:19
**retained**
13:23 14:3,7,8 15:2
42:12,16
**review**
47:22,23 56:20 141:9
**reviewed**
21:18 46:11 48:1,2
55:20 56:15 57:6,15
57:17 63:18,21
132:13
**Rhode**
8:25 9:6
**Richard**
20:20,21
**right**
4:5 7:11 8:7,15,22
9:3,4,21 10:7 11:17
12:20 13:15 16:21
16:24 20:9,16 21:8
22:17 23:16 24:3,19
26:6 29:18,23,25
31:2,25 32:20 33:4
35:11 36:14,23 37:9
37:16,18 40:10,14
41:15,20 42:9 45:17
48:9 50:18 54:15,19
54:25 56:6,12 58:21
59:5 62:23 63:18
64:10,21 65:24
67:16,18 68:17
69:25 70:2,6,25



71:12,23 72:1,23
73:21 74:5,21 75:11
78:18 81:1 82:25
84:23 85:25 91:19
92:17,22 93:5,11,21
94:2,4,11,19 95:8
96:2,9 100:10
101:21 102:6
104:16 105:8
107:18 109:21
116:9,15 117:1
118:12,25 120:25
123:17 124:20
126:13 128:18
129:4,6,11,21
130:15 131:3,17
132:17 134:8
135:14 136:4,21,23
137:6,12,16 138:2
138:12,14 139:10
139:16 140:17
142:5,7,18 144:7,13
145:5 146:15,22
147:13,24 149:4
150:7,10 152:12,15
153:11 154:10,18
154:24
**right-hand**
78:14
**rise**
51:6 100:20
**Riverside**
1:4,14 2:2 4:9 59:11
152:3
**Robert**
2:16 7:15 8:8 9:13
32:2 33:18 34:12,14
34:25 35:15,24
36:24 37:16,20,23
37:25 39:10 40:15
40:24 48:25 56:24
75:10 79:22 101:22
113:17 127:9 149:6
150:12
**Rocha**
3:11,13,14,18 14:10

34:6 36:8 37:9
38:10,16,25 39:6,20
40:4,6 113:23
**role**
40:7 135:7,10
**rolling**
46:14
**Roman**
132:17
**root**
155:23,24
**RPR**
1:16
**Rule**
3:10 9:19 11:1 15:22
16:2
**rules**
6:21 18:19 50:1
**ruling**
59:16

———————— S ————————
**sample**
68:12,19 81:14
**save**
155:17 158:7
**saw**
10:13,15 11:8,18
12:13 44:19,22,23
111:25 126:18
131:4,10 143:18
**saying**
93:18 97:4 100:2
109:17 139:10
145:6,7
**says**
13:20 32:5 35:2
59:25 65:25 77:4
93:23 114:20
115:18
**scan**
154:8
**schedule**
71:25 72:12,14,19
73:8 75:12,18,19
76:2,6,13,16 77:5,6

77:8,9,14 78:3,16
84:19 130:22
139:10
**schedules**
72:21,25 75:24 76:15
102:7 138:17
**scheduling**
133:4,16
**Schmookler**
2:9 5:13,13 8:2 10:19
10:24 11:13,23 12:4
12:17,21 15:4,11,20
15:25 16:5,7,17,19
19:18 25:17,23 30:2
41:23 43:20 44:1,21
44:24 45:1,4,6,8,10
45:13,15,21 48:15
48:18 53:15 55:10
55:16 56:3 60:17
62:11 65:15 76:17
80:4 86:3,14 87:17
88:5,16 89:3,9,23
90:14 92:6,12 94:12
94:20 95:21 96:6,14
96:23 97:9,23 98:7
98:10 99:7 100:6
103:3,12,22 104:11
105:2,24 106:25
109:9,13 110:3
112:16 113:1,12
117:19 123:6,13
125:18 126:6
127:19 128:13
130:16,18 138:5
140:25 142:22
148:15,21 149:15
149:19,24 150:2,6
154:13,20,25 155:4
155:9,17 156:9,11
**scope**
32:6 107:1 115:10
**Scott**
2:9 5:13 43:22 44:16
48:17 54:16 100:21
149:18 154:10
**screen**

4:21 7:21,22 9:12,21
32:1 33:18 34:2
36:25 37:6 39:11,17
40:25 56:24 58:14
72:2 77:15 101:22
104:16 113:18
127:9 152:6,20
**scroll**
8:8,13 10:1 34:5,20
35:15 37:23 38:1
49:7 67:12 75:10
77:14 114:1,2
**scrolling**
102:14
**scrolls**
40:15
**SCULLY**
2:9
**second**
32:4,11,13 48:24
51:13 58:22 67:14
73:7 114:1 116:16
117:4 141:19
153:17
**seconds**
33:24
**second-to-last**
71:16 115:18 140:11
**second-to-last-par...**
80:1,7
**second-to-the-last**
79:24
**section**
49:1,12,16 61:6
66:12,21 130:21
150:15
**sections**
60:25 120:3
**see**
7:21,22 10:4,7,10
21:17 32:10,14,18
33:2 34:8 35:2,19
36:6 37:5,5,13,14
37:17 39:16,21
40:12 41:18 46:5
49:2 56:10 57:4,11



**EXHIBIT 1**
**PAGE 68**

57:22 58:18 59:6
63:16 64:8 65:4
66:24 67:17 68:4
72:8,12 73:13,17,23
75:13,20 77:16,17
79:17 83:18 86:10
102:14 115:3,24
117:13 122:2
125:13 133:6 142:1
150:17 152:18,19
152:23
**seeing**
78:25
**seek**
63:6 139:22
**seen**
4:20 8:4,10 9:18,22
10:6 20:24 21:2,5
29:19 58:7 95:1
96:4 120:20
**Segerson**
119:22 128:14,20
130:10 131:22
**Segerson's**
128:22
**segment**
93:8
**self-dealing**
60:2,3 61:3
**send**
36:8,11 38:10,17,20
38:25 149:8,13
**sending**
40:1 153:9
**sends**
27:6
**sense**
75:6 76:25 78:20
82:25 84:5,7 128:1
**sent**
36:11,13 37:9 38:16
39:5 68:8 69:15
121:4
**sentence**
13:18 21:9 24:18
32:4,5 33:2,4 50:20

51:6,13,24 54:3
56:8 59:24 60:19
63:10 64:22 117:5
117:18 119:11
125:2 129:15 132:6
132:21,23 134:5
150:14
**sentences**
41:18 52:23
**separate**
43:7 60:7 62:8 138:3
**separated**
78:1
**September**
132:13
**series**
120:5
**service**
8:3 30:13 64:6
**services**
1:20 5:2,4 19:5,8,10
19:14,16,25 26:13
30:10 31:21 64:5,12
66:3,5,7,10,11,12
68:14 69:4 74:11,12
133:3,8,12,16,20,24
134:4,15,17 135:11
141:24
**set**
90:20 118:6 157:10
**sets**
68:14
**settlement**
62:18,23,25
**seven**
50:1
**share**
63:7 101:2 108:9
122:14
**shared**
120:1
**sheet**
69:10 158:9 159:1
160:1
**shocked**
154:21

**short**
31:11 55:9 86:10
126:25 150:5
**shortcut**
86:11
**Shorthand**
1:16 157:4
**show**
48:22,23 82:13 138:1
**showed**
69:11 71:13,21
**shown**
71:24 73:8 75:12,18
77:4 78:13 84:19
140:24
**sic**
4:11 24:17 34:19
47:7 49:5 56:10
59:18 72:25 93:19
95:1 108:22
**side**
23:13,24 84:12 91:1
97:13,14 112:17,18
112:24 113:7
**sign**
14:20 114:7
**SIGNATURE**
159:24 160:24
**signed**
14:22 158:12
**significance**
47:9,11 73:15 84:1
**significant**
49:18 74:10
**significantly**
90:23 95:11
**similar**
95:18 110:21,25
**simple**
92:4
**single**
49:14 79:13 104:23
105:19
**sir**
7:25 18:8 23:22
29:22 31:4,8 48:14

105:23 130:3
**sit**
115:14 122:10 129:6
129:10 138:12
**sitting**
112:10 123:2 129:4
**situation**
23:18
**slash**
66:6
**smiling**
32:12
**solitary**
105:19
**somebody**
27:5 50:22
**somewhat**
50:6 81:25 95:18
**sooner**
30:24
**sorry**
10:9 12:11 29:2 61:5
72:24 80:11 85:23
89:18 98:23 103:4
110:6 112:2 116:12
138:6 139:20
143:15 145:17
146:2
**sort**
30:16 70:7 94:10
102:14 153:24
**sounded**
83:3
**Sounds**
126:15
**source**
13:11
**speak**
30:15 58:6 83:5
**speaking**
27:5
**speaks**
50:11
**specific**
65:19 66:15 78:23
86:5,6 88:6 97:7



**EXHIBIT 1**
**PAGE 69**

    105:15 106:13
**specifically**
  14:8 74:6 124:16
    128:2 135:3,13
    143:24
**specificity**
  65:20
**specifics**
  30:4 117:25
**speculation**
  103:23 123:7
**speech**
  21:25
**spend**
  18:2 26:16 28:8
    46:24
**spent**
  20:5 47:16
**spoke**
  14:9
**sport**
  155:23
**sports**
  155:25
**sschmookler@grs...**
  2:11
**staff**
  28:19,23 31:20 33:14
    36:1 38:8,15 40:19
    46:23 47:16 49:22
    128:15
**stage**
  57:18
**stages**
  133:2
**stamped**
  45:11
**Stand**
  4:5 31:12 55:12
    101:11 127:1 150:7
**standpoint**
  47:8
**stands**
  59:21
**start**
  13:18 22:2,3,6 75:24

  76:16 102:23 104:4
    118:16 156:6
**started**
  69:1
**starts**
  49:6 72:7 84:19
    152:16 153:12
**state**
  5:8 8:24,24 157:5
**stated**
  53:14 60:20 96:19
**statement**
  14:1 15:9 51:25
**states**
  1:1 4:12 9:1
**status**
  46:3 63:11 67:23
    117:7
**stenographically**
  157:11
**stick**
  67:3
**sticking**
  24:17 41:9 48:9
    114:20 124:24
**stipulation**
  44:3 45:19 55:18
    56:3
**stool**
  68:23 70:2,4,16,25
    71:11
**stop**
  59:5
**Straddling**
  46:13 60:25
**strategy**
  109:10,14 148:23
**stream**
  153:5
**Streiff**
  13:22 35:3,6,7,9,9
**strike**
  24:16 29:4 31:16
    35:14 47:21,22
    56:13 64:24 65:10
    97:2 111:17 119:1

  120:22 123:18
    135:9 139:4 145:9
**sub**
  66:19 73:18 75:3
    78:12 84:2
**subconsultant**
  66:6,12 83:8 109:2
**subconsultants**
  96:13,22 97:6 98:5
    100:15
**subconsulting**
  105:1
**subcontract**
  71:9 79:7
**subcontracting**
  84:3
**subcontractor**
  3:16 64:4,12,16 65:3
    78:7 93:21 94:24
    97:21 103:20
    106:11,22 107:7,15
    109:24 111:7,19
    113:10 122:17
    124:7
**subcontractors**
  65:13 66:4 68:2,8,16
    70:6 73:9 77:24
    79:12 81:3 82:3
    83:23 84:10 98:13
    99:6 103:10 104:3,7
    145:23 146:1,5
    147:10
**subcontractor's**
  103:1
**subject**
  31:3 65:1 111:13
    120:13 125:7,12
    135:23 137:5,24
    141:23 142:10
    143:22 144:24
    155:10
**subjects**
  32:23 41:12,16
**submit**
  26:22 27:4,5
**submitted**

  26:23 42:13 63:14
**Subpoena**
  3:9 8:1,4,16
**subscribed**
  157:16
**subsequent**
  29:10 36:17 47:3
    63:11 67:15,22
**subsequently**
  57:19 64:17
**subset**
  88:4,14 90:20
**substance**
  15:5,11 19:19 32:6
    41:25
**substances**
  7:12
**substantial**
  47:4 69:23
**substantiate**
  142:8,11,17 143:2,6
    143:8,21 145:11,13
    145:24 146:4
**substantiated**
  55:23 56:9 141:22
    143:12 144:3,18,23
    146:11,12
**succeeded**
  142:21
**successor**
  48:4
**sufficient**
  82:10
**Suite**
  2:4,10
**summarize**
  72:22,25 136:6
**summarized**
  75:19
**summary**
  3:20 49:1,6,8,12,15
    51:12,25 56:8
    153:19,23 154:3
**summation**
  52:25
**summer**



**EXHIBIT 1**
**PAGE 70**

8:24
**supplement**
39:4
**supplemental**
44:8,12 58:17 118:20
119:4
**supplements**
117:6 118:6
**support**
50:13 120:7 142:25
**supported**
57:24
**supporting**
114:23
**supposed**
63:4,4,5 66:7 155:9
155:14
**sure**
9:25 10:2 11:7 12:12
14:8 26:23 27:1
29:3 30:20 31:23
35:21 37:24 48:1
51:15 54:16 57:16
60:12 61:9 67:8
81:8 83:10 84:23
87:6,7 88:1 89:4,13
93:2 95:3 100:18
103:7 116:3 119:20
136:8 138:7,8 141:1
142:13,15 144:7,9
144:10 146:3
151:11
**survey**
74:15 80:16
**surveying**
74:11,12,18 75:2,5
**surveyor**
74:20 78:4,6
**surveyors**
78:2
**sustained**
115:22 116:6,10
140:14
**swear**
5:16
**sworn**

5:19 157:8

―――――――――
**T**
―――――――――
**tackle**
83:7 96:4
**tagged**
57:6
**take**
4:24 6:25 7:2 9:10
31:1,6 36:24 39:9
43:18 53:6 65:22
69:16 75:1 82:14
85:16 86:19 90:6
91:23 92:20 93:9
100:24 101:4
126:13,14,20
140:17 149:11
156:8
**taken**
1:14 4:15 6:14 7:11
157:9,14 158:5
**talk**
58:11 67:6 74:6
108:5 109:5 117:20
122:11 124:23
150:1
**talked**
32:3 78:24 148:3,7
**talking**
70:24 71:18 102:2
105:17 112:23
151:18
**talks**
41:3,10
**Tasker**
20:20,21 31:16
**tasks**
128:4,5 129:18,20,25
130:4 141:14
**team**
129:7
**teams**
155:25
**tech**
35:24
**Technician**

2:16 33:23 34:15
38:4 149:9
**technology**
4:16
**tell**
20:14 51:20 53:13
100:23 106:14
136:7 146:20
155:10,15
**telling**
22:6
**ten**
26:19 27:14 93:8
150:25 151:16
**Tentative**
46:4
**term**
22:23
**terms**
66:8 69:7 73:1 80:21
97:5,21 107:13
152:4
**tested**
141:7
**testified**
5:19 22:15,20 23:8
88:19 90:25
**testify**
3:9 8:4 15:3,18 19:21
41:21 43:15 55:18
109:8 110:12
148:19
**testifying**
19:16
**testimony**
32:24 41:13,15 90:2
114:9,12 155:10
157:10,13
**testing**
134:21,23
**text**
118:20
**thank**
5:22 6:6 7:7 31:8
34:14,23 35:23 38:5
67:11 98:10 101:5

126:15,22 127:10
155:21 156:8
**thanks**
155:22 156:4
**That'd**
93:10
**theft**
55:23
**theirs**
94:14 95:11
**thereabouts**
29:15
**thing**
49:14 74:13 92:23
95:9 153:7 154:8
**things**
6:24 7:13 20:7 22:14
44:18 58:8 69:21
87:22 90:19,23 91:2
99:12,13 100:19
104:13 122:9
128:16 146:24
148:5,8 154:16
155:6
**think**
21:10 25:2,7 39:7
49:14 50:11 52:2,7
52:8,16 59:19 60:14
69:5 75:7 76:18,20
81:20 82:1 83:17
84:12 85:10 86:15
87:2 89:10,19 90:7
90:16,25 93:25 96:3
96:16,18,20 100:7
103:14 105:10
107:17 111:9
114:10 118:13
123:2,8 124:18
127:25 144:3,5
149:15,19 151:22
153:8,8 155:4,14
**third**
32:22 63:6,25 117:1
**third-to-last**
93:15 101:25
**thorough**



58:3
**thought**
87:3
**thousands**
47:18,19 48:7
**three**
33:5,7 41:10 42:22
43:7 44:6,11 49:8
52:1 57:2 68:13
69:20 116:19,22
128:6 138:25
156:15
**three-legged**
68:23 70:2
**three-page**
113:25
**three-year**
68:12,19 81:19
**Thursday**
1:15 4:2,7
**tie**
69:14 77:6
**time**
7:5 9:7 10:13,15 11:8
11:18 12:13 13:7
14:12 16:12,14,25
17:2,10 18:2,4,7,10
18:24 19:3 25:12,12
26:16,17,20,22,25
27:4,5,8,23 28:8,19
28:20,24 29:5,6
30:10,17,18 31:10
31:13,19 46:7,12,23
47:5,5,14 49:19,25
51:18 55:7 56:12,18
56:19 57:14 58:1
60:5 61:21 69:9,16
70:13,14 71:3,7
73:11,19,25 74:2
77:24 81:12,19 82:3
92:24 93:3,5 94:8
101:8,13 111:20
120:2,17,22 121:2
122:2 123:5,17,19
126:17,24 127:2
130:25 141:24

144:4,12,19,21
150:4,8 155:6
156:17 157:9,14
**timekeepers**
125:9,23 126:1
**times**
43:24 136:1
**time's**
55:14
**title**
130:13 131:5,19
**titles**
128:6 130:10 131:9
**today**
7:9 16:12,25 17:2
44:2,14 48:13 88:19
110:13 112:11
129:10 139:1 148:3
149:18 151:19
**today's**
17:20,23 18:3 20:6
25:11 156:13
**told**
12:4 19:21 40:2
106:14 119:7
**top**
35:19 40:25 50:12
83:21 85:10 110:21
134:10 154:23
**topic**
92:19 116:1
**topics**
108:17 109:18
113:16
**total**
31:19 46:23 48:3
71:21 73:1 80:17
83:13,15 85:19
99:24 106:8 135:20
136:1,18,25 138:3
138:15,24 156:15
**totaled**
46:16 73:11 125:9
**totaling**
75:16 76:9
**totality**

102:20,21
**town**
9:8
**to/from**
32:8
**trace**
80:23
**track**
45:18
**transcribed**
157:12
**transcript**
156:19 158:5
**transmission**
54:20 146:23
**Transportation**
59:22
**trial**
15:3,19 19:17 41:22
43:15 44:4 55:19
109:8,10,14 110:2,9
148:10,12,20,23,24
**tried**
43:13
**trier**
99:3,14
**true**
14:1 54:7,11 125:17
126:5 130:2 138:11
139:1 140:4,15
155:5 157:13 158:7
**truly**
35:3
**trustee**
80:25
**try**
43:20 44:1 45:18
52:10 57:21 71:1,6
82:15 86:10 88:20
90:20 92:21 93:7
96:9 116:4 136:6
138:21 140:12
**trying**
29:25 30:5 31:2
43:17 69:2 76:25
90:4 100:1,11

**TUMF**
59:3,8,14,21 60:7
61:1 62:8,17 152:2
**tune**
59:17
**turn**
67:4 75:23 150:14
**turning**
117:3
**two**
9:1 33:24 41:18
44:11 45:16 74:9,10
147:12 149:13
154:11,14,17,22
**type**
28:13 57:17
**types**
22:12 57:7
**typewriting**
157:12
**typically**
133:9,13,17,21,25
134:4 135:5
**T-U-M-F**
59:4

---

## U

**U**
75:5
**Uh**
45:7
**uh-hmms**
6:23
**UL**
68:2
**ULC**
64:3,17,17 65:1 66:2
66:4,7,15,19,20,20
66:22 67:25 68:2,15
68:16 69:2,3,15,17
70:5,10,16,20,23
71:3,4,7,11 73:11
73:19,19,22,23,25
74:3,11,15 75:3,5
75:15 77:2,4 78:7
78:10,10,12,23 79:7



**EXHIBIT 1**
**PAGE 72**

79:11,20 80:24
81:13,18 83:15 84:3
84:6 85:11,20 86:22
99:25 106:9 107:8,8
110:15,22 111:25
120:12,17,18 125:6
125:11,16,23 128:3
129:17 130:2
132:24 135:21,23
136:3 138:3 141:22
144:18,24 147:3
148:5
**ultimately**
123:22 124:15
**um**
50:19 85:23 155:8
**unable**
145:13,19
**unclear**
74:14
**understand**
8:15,19,21 19:8,13
30:2 40:6 47:11
60:5 62:18,25 79:25
80:13 81:1 93:13
100:15 101:19
113:2 116:3 126:2
127:16 128:11
130:9,18 142:14
**understanding**
10:17 11:2,10 12:2,5
12:24 17:13 18:20
19:25 30:1,5 42:11
49:19 51:3 59:8,10
59:19 60:19 62:6
70:5 80:18 81:10
104:20 105:16
122:22 151:13,15
151:20,21,24
158:10
**understood**
62:19,23 88:11
139:12
**unfortunately**
98:25
**Uniform**

59:22
**unintelligible**
10:22 15:7 43:21
109:11 117:21
154:20
**Union**
1:8 2:8 4:10 13:23
14:3,7,23 19:7
55:17
**United**
1:1 4:12
**unreasonable**
90:17
**update**
36:15 39:5
**updated**
124:9
**Urban**
56:16,20 57:9,15
58:2 60:2,9 61:3
62:10,15 64:3,11
65:13 68:8 73:2
83:8 96:21 97:5
98:5 102:25 103:9
104:6 110:19,24
138:18 139:6 142:9
142:12,18 143:7,9
143:19,22
**use**
22:18 87:8 88:14
89:1,20 90:12
139:14 144:12
**usually**
124:2
**utilized**
68:3,16
**Uvia**
82:1

_____
**V**

**v**
1:7
**vague**
128:4 129:18,25
130:2,4 152:3
**value**

133:4,24
**various**
17:25 50:13 66:8
133:2 146:24
**vendor**
66:20 69:14 70:20
71:3,11 73:2,22
74:17 75:4,15 76:9
77:2 81:12 120:16
120:17 147:2
**vendors**
64:19 66:14 69:14
71:12,19,23 73:10
73:19 74:8 75:3
78:10,23 79:15
80:23 81:18 98:13
139:15
**verbal**
6:23
**versus**
4:10 70:5 131:18
137:25
**video**
4:23 156:10
**Videoconferencing**
1:15 4:1
**videographer**
2:15 4:5 5:3,15 31:9
31:12 55:5,12 101:6
101:11 126:23
127:1 150:3,7 156:9
156:12
**VIDEOTAPED**
1:13
**view**
123:11
**virtual**
1:13 4:16
**volume**
68:11
**Von**
2:4
**V.1**
132:17

_____
**W**

**walk**
13:16 58:15 76:8
135:16
**wall**
148:18
**Walnut**
117:10 123:20
**want**
6:21,25 13:16 22:2
22:19 30:22 31:1
34:5 43:18 49:7
50:10 52:12,15 53:3
54:16 58:15 61:16
61:25 75:23 76:12
76:12,17 79:23
83:18 84:20,23
92:20,20 93:3,7
100:21 108:5 109:5
109:17,18 132:6
139:16 149:20
150:11,14 156:18
**wanted**
16:19 129:13 145:17
145:18
**wants**
48:23 86:5
**Warnick**
47:7
**wasn't**
102:19 108:20 124:4
124:21 139:21
143:13
**watermark**
36:5,10,12 38:24
39:1
**Watnick**
3:15 39:20,23,24
47:17 119:12,21
**way**
6:22 11:10 29:5
32:13 34:10 36:13
36:16 39:5 43:14
48:12 53:3 57:23
83:9 95:6 96:3
110:15,22 116:4
123:11 124:8 129:3



132:7 141:2 156:4
welcome
5:23
went
43:8 49:10 60:24
64:15,15 112:8
116:11 120:3
weren't
61:9 143:24 144:1
Western
1:4,14 2:2 4:9 59:11
152:3
we'll
7:6 13:18 75:1 101:3
126:14 132:22,22
149:14
we're
4:6 9:20 25:19 31:14
32:21,21,21 44:9,13
51:16 52:7 55:8,15
70:24 71:18 80:4
100:23 101:9,14
105:17 112:22
116:15 127:3
132:21 138:20
139:10,16 144:10
144:10 146:17,17
146:24 149:23,23
150:6,9,10 156:16
we've
41:5 85:13 92:15
94:7 104:13,21
105:4 112:8 146:13
148:7,23 151:18
155:5
WHEREOF
157:16
why'd
91:10
wish
155:24
within-cap
131:6
witness
3:2 4:21 5:16,23
10:18 11:4,14,21

12:20 13:1 15:14
16:21,23 22:20
32:17 34:13,16,20
34:24 37:17,21 38:5
42:6 53:16 54:21,25
60:18 62:12 65:16
76:23 80:5,8,11
86:15 87:18 88:6,17
89:4,10,24 90:15
92:13 94:13,21
95:22 96:7,15,24
97:10,24 98:11 99:8
100:7 103:4,13,24
104:12 105:3 107:2
109:16 110:4,7
112:17 113:3,6,13
117:24 123:8,15
125:19 126:7,11,15
126:17,22 127:20
128:14 130:17,20
138:7 141:1 142:23
150:1 152:23 157:8
157:16
witness's
32:23 41:12,16
word
22:19 50:7,10 52:22
53:20 91:15 144:12
144:13
wording
65:17 79:1 140:5
words
13:9 23:13 33:12
61:16,25 70:11
91:12 104:9 106:15
107:12 144:21
155:1
work
8:21,23 9:1 17:20
18:8,11,14,17 20:13
20:17,17,18 25:8,11
25:18,25 26:6,9,15
27:15,21,23 28:4,7
28:14,15,22,25 29:6
29:8,10,17 32:7
33:13 56:14 66:14

70:22 74:18 78:9,12
83:8 86:13,16 88:2
88:9 93:21 94:25
95:12,23 96:1 97:21
103:1,10,21 104:6
105:1 106:22
107:15 109:2,4
111:7,19 113:11
114:17,24 115:9,12
116:1 122:18 124:2
124:7 125:16 126:4
130:6 132:12
143:20 145:25
147:11 155:5
worked
30:6 66:19 69:11,12
70:11 79:13
working
29:5 64:19 124:4
workmanship
135:1
works
23:19,20 132:9 133:1
133:5,9,13,17,21
134:1,18 135:8,12
152:1
world
24:4,5 51:19 106:23
worry
149:24
worth
27:15 28:14,22
wouldn't
37:22 71:8,8 84:9
147:18
would've
121:17
wrap
100:11
WRCOG
59:14 63:6
write
63:10 64:1 67:14,22
68:10 73:7 117:4
154:11
writing

39:4 114:24
written
13:17 33:14 52:13
56:12 58:16 115:7,9
116:1
wrote
46:7 61:13,22 68:6
111:3 125:3 129:21
www.MagnaLS.com
1:21

Y
yeah
9:5 15:14 28:3 29:13
29:13 32:11 40:3
45:13 49:9 54:4,23
58:4,19 64:15 70:15
71:24 74:1 75:11
77:4,17,19 78:19
81:6 86:1 87:18
100:8 110:20 115:7
127:11 128:19
132:22 137:21
139:11 146:15
153:6 155:19
year
28:2,7,23 29:8 79:13
85:11
yearly
79:20
years
59:16 69:5 79:10
83:16 84:4 87:9,11
87:13,15,25 107:9
Yep
88:12 95:15
yielded
126:1 147:13

Z
zero
97:17,22 98:6,16,19
107:15
zoned
103:5
Zoom



EXHIBIT 1
PAGE 74

1:14 4:1

**$**

**$100,000**
31:24
**$21**
85:11
**$4,470,000**
98:19
**$5.8**
104:15
**$50,000**
28:14,22
**$702,461**
56:11

**0**

**001137**
72:7
**001163**
72:11
**001221**
34:7
**002291**
40:11
**003038**
37:12
**04**
93:20 111:1
**08**
71:22 73:2,9 75:16

**1**

**1**
1:9 3:9 4:8 7:15,16
  7:18 9:10 38:1
  39:16 55:6 78:3,16
  78:16 84:20 114:20
  130:22 156:21
**1.2**
80:16
**1.3**
60:2
**1.6**
73:22
**1:35**

150:4
**1:43**
150:8
**1:52**
1:15 4:3 156:17
**10**
18:6,7 20:5,17 25:10
  69:22 73:6,9 75:10
  75:16 79:23 85:14
  85:17 106:12
  134:22 137:6
**10,000**
51:17
**10.3**
137:6,18
**100,000-plus**
63:24
**1000**
2:4
**104**
85:21
**11**
3:21 84:16 117:10
  119:16 120:24
  121:21 123:19
  132:14 135:2
**11-page**
153:16
**11:03**
101:8
**11:54**
101:13
**1100**
2:10
**113**
3:17
**1145**
75:25
**1152**
77:11,15
**12**
65:22 83:20,20
  107:20 111:1
**12/14/16**
3:17
**12:46**

126:24
**12:56**
127:2
**123,631**
67:24
**13**
126:4
**13.82**
125:9 126:1 127:13
  128:9 129:8 131:13
**14**
3:14 39:12,13,16
  41:6 42:23 54:13
  59:19 113:22
  116:12,16,23 118:5
  118:19 124:24
  127:7 135:15
  140:19,24 146:17
  148:2 156:22
**15**
3:24 32:9 33:6 37:9
  38:7,18 39:6 41:4
  54:8 58:12 61:13,22
  64:10 65:2,14,18
  66:13,22 72:15 80:9
  80:25 111:3 116:20
  117:7 121:5,24
  122:15 123:4
  141:25
**15th**
113:14
**152**
3:19
**153**
3:20
**159**
59:1
**159,702**
56:10
**16**
3:24 29:20 32:9 33:6
  39:19 40:18 41:4
  54:12 111:13
  116:21,24 118:7
  119:4 123:22
  124:15 127:6 139:8

**17**
3:19,24 46:16 149:7
  149:9 152:6,8,11
  156:22
**177.8**
137:12
**18**
3:20 32:8 33:5 34:6
  34:18,22 35:12,17
  35:25 36:15 38:21
  41:3 46:1 48:10
  49:5,23 50:25 52:14
  52:19 56:5,13,18
  57:14 58:1 63:11
  67:15,22 116:20
  121:8,24 149:7,9
  153:12,14 156:22
**18th**
55:20 58:9
**18101**
2:4
**19**
3:24 113:14 135:4
**1993**
64:6 112:1,2,6
  124:10 132:13
**1994**
64:6 132:10,14,18
  134:11

**2**

**2**
3:10 9:12,14 10:5,8
  13:17 32:1,21 40:23
  40:24 41:9 55:13
  64:23 85:21 92:24
  101:7 107:20 132:4
  134:5 140:10
  150:11 156:22
**2,104,405**
78:15
**2.1**
73:12 80:17 81:3
**2.3**
137:19 146:25 147:6
**20**



**EXHIBIT 1**
**PAGE 75**

158:12
**2004**
85:1 89:21 111:10,20
**2008**
68:13,20 69:22 79:17
82:21 83:25 84:25
86:20 106:10 107:6
125:10,24
**2009**
79:17 83:24
**2010**
68:13,20 69:6 71:22
73:3 82:21 83:23
84:25 86:20 106:7
107:6
**2011**
69:6 81:21,23,25
**2012**
85:2 89:21 93:20
110:19 125:10,24
**2016**
14:6,12 45:16 46:10
113:22
**2017**
32:9 33:5 34:6,22
35:12 36:1,15 38:21
41:4 46:1,12 48:10
49:23 52:14,19
55:20 56:5,18 57:14
58:1,9 63:11 67:16
67:23 116:20
121:24
**2018**
67:15,23
**2019**
24:24 25:4 29:15,20
30:9 32:9,9 33:6,6
37:9 38:7,18 39:6
39:20 40:18 41:4,4
44:8,20 54:8,12
58:12 60:6 61:13,22
64:10 72:15 111:3
111:12,13 116:20
116:21,25 117:7,10
118:7 119:4,16
120:24 121:5,21,24

122:15 123:4,5,19
123:23 124:15
127:6 139:8
**2019's**
44:12
**2020**
25:5 29:10,12 30:11
**2021**
30:22 31:19
**2022**
1:15 4:2,7 157:17
**21**
134:15,17
**22**
71:12,19,23 81:16,18
**228**
83:23
**23**
85:12
**24**
7:12
**25**
107:22 120:11 125:6
135:22 137:25
**26**
9:19 11:1 15:22 16:2
35:20 48:25 49:6
**26(a)(2)**
3:10
**260-0972**
2:6
**263-2600**
2:5
**27**
34:19 35:17,19 49:5
50:25 121:9 132:13
**28**
1:15 4:2 35:20,20
48:25 50:15
**28th**
4:7
**28-page**
55:25
**280**
83:24

**3**

**3**
40:25 41:9 56:25
64:21 75:12,19,19
75:24,24 76:2,6,13
76:16 77:5,6,7,8,17
101:12 124:24
127:6,11 129:12
134:10 150:12
**3,780,989**
72:16
**3.4**
75:16 76:10 77:2,13
**3.7**
71:22 72:22 73:1,9
**30**
6:18
**3024**
1:16,24 157:21
**312**
2:11
**33**
3:11
**34348**
45:1,4,5,12 54:19
152:16
**34350**
152:17
**35**
6:18
**37**
3:13
**375**
17:18
**39**
3:14

**4**

**4**
58:9 71:25,25 72:12
72:14,19,21,21,25
72:25 73:8 112:21
112:23 125:3
127:11 135:14,18
139:7 140:20,24

**4-1/2**
62:15 102:17 107:21
109:5,24 111:16
120:13 123:21
124:14,17 125:7,12
135:23 136:2,13
137:5 139:18 140:1
140:23 141:12,23
142:10 147:4
**4.4**
93:19 96:25 97:14
102:3 103:1,11,20
104:14 107:16
**4.469**
93:23 97:16,17,22
**4.5**
137:14
**40**
18:6,8 20:5,17,17
25:10
**414**
77:17
**42**
59:18 77:9,25
**469**
112:23
**47**
59:17
**47892**
45:8,9,14,15 153:13

**5**

**5**
2:10 3:17 58:9
105:10 113:18,19
116:17 140:10
141:16 156:22
**5,857,762**
85:24
**5.5**
93:19 94:1
**5.8**
94:1 96:12,24 102:3
103:2,11,20
**5.857**
93:24



**EXHIBIT 1**
**PAGE 76**

**5.87**
97:13 107:16
**5/15/19**
3:13
**5:20-cv-02164**
1:7
**5:20-cv-02164-GW**
4:14
**50**
1:9 43:7
**51**
132:8
**57**
59:2
**575**
93:25

_____
**6**
3:4,11 33:17,19,21
   34:3 35:16,25 38:20
   41:5 42:23 45:25,25
   48:9 55:21 56:24
   112:17,24 113:7
   116:12,13,14 121:9
   156:22
**600,000**
46:17
**64.57**
136:24

_____
**7**
3:9,13 37:1,2 38:7,23
   39:5 41:5 42:23
   54:9 58:13,23 59:25
   59:25 63:10 64:22
   73:5 79:22 85:14,17
   96:10 100:10 101:2
   101:22,24 102:7
   106:12 107:19
   108:4,9 109:7 111:4
   116:11,13,14 121:5
   146:16,18 147:3
   156:22
**700**

43:8
**72**
3:16
**74.9**
136:18
**75**
31:23
**77,000**
57:5

_____
**8**
3:16 33:5 65:22 67:3
   72:3,4 75:23 137:15
   137:19 156:22
**8.2**
147:1,8,13
**8/16/19**
3:14
**8/18/17**
3:11
**8:03**
1:15 4:3,7
**8:44**
31:10
**8:53**
31:13
**854511**
1:25
**857**
105:10
**86**
60:2 126:5 137:25
**86.18**
125:11,21 127:14
   129:9 131:14
   136:25
**866-624-6221**
1:20

_____
**9**
3:10 71:16
**9th**
157:17
**9:34**

55:7
**9:47**
55:14
**901,000**
80:14
**901,724**
80:2
**92612**
2:5
**92614**
2:10
**949**
2:5,6
**980-6779**
2:11

EXHIBIT 1
PAGE 77