# EXHIBIT 4

EXHIBIT 4
PAGE 154

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CASE NO. 5:20-CV-02164-GW(KKx)

WESTERN RIVERSIDE COUNCIL OF GOVERNMENTS, a California Joint Powers Authority,

Plaintiff,

vs.

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, and DOES 1 through 50, inclusive,

Defendants.

Videotaped Deposition of

JAMES GREGG

(Conducted Remotely)

Tuesday, April 26, 2022

10:01 a.m. PDT

Magna Legal Services
(866) 624-6221
www.MagnaLS.com

Job No.: 822124

Reported by: BRENDA MATZOV, CSR NO. 9243

"In 2005, the board of directors of ERMAC discussed a member hiring me as an employee in order to avoid the costs and bureaucracy of creating a personnel system for ERMAC."

Do you recall that?

A. I do.

Q. Okay. And what was the purpose of doing it this way?

A. Well, I was going to -- I -- I -- as I had mentioned earlier, I was looking at becoming a -- a -- a employee -- municipal employee again. And I was exploring different options. And I let the board know.

And they said: Come back to me with ideas.

And I said: Well, you could hire me and -- and ERMAC could join CalPERS and so on and ...

And I believe it was the president or -- of the -- ERMAC, Don White, who suggested, you know, under the JPA agreement law, that cities can provide employees to JPAs and other resources, whatever it -- it might be under this particular form of JPA. And as such,

it would be cheaper -- rather than creating a new personnel system within ERMAC for Work Comp and employee manuals and training and so on, it would be easier for a city to hire -- hire me and thereafter appoint me back to -- to handle the general manager duties.

Q. Was one of the reasons for this is that you could obtain CalPERS benefits?

A. Absolutely.

Q. Turning to page 2, paragraph 5, it says:

"Following the May 11, 2006, resolution, the city of Beaumont hired me as a risk manager."

Is that an accurate statement?

A. That's true.

Q. And you were hired on July 1, 2006?

A. That's correct.

Q. And you reported to Alan Kapanicas?

A. I did.

Q. It says -- I asked you this earlier:

"The city of Beaumont did not, during my tenure, have a" risk -- "separate insurance risk management department." (As read.)

Is that true?

A. That's true.

Q. To the extent there was one, it was you; right?

A. That's correct. There was a budget item for it. But I don't believe it -- there was no department.

Q. The next sentence says:

"The city council had final budget authority for the allocation of funds for the purchase of insurance" projects. (As read.)

In other words, the city council sets the budget. But they don't actually -- they're not involved in the selection of policies; correct?

A. That is correct.

Q. That -- they leave it to you or ERMAC; right?

A. It was left to the --

MR. SCHMOOKLER: Object to form.

THE WITNESS: Yeah, I'm sorry.

Was there an objection?

THE COURT REPORTER: Was -- was --

MR. SCHMOOKLER: Yes.

THE COURT REPORTER: -- that an objection?

MR. SCHMOOKLER: Yes, sir. Yes, ma'am.

BY MR. DEAL:

Q. You can answer.

A. Okay. Okay. The decision on types and limits was -- was a decision made by Mr. Kapanicas and Mr. Aylward, the -- the finance director.

Q. But that wasn't your decision. You would consult with them. But they would make the ultimate decision?

MR. SCHMOOKLER: Object to form.

THE WITNESS: I would -- I would offer alternatives. They would basically get the same alternatives that every other ERMAC agency would get. There was a variety of different types of coverage that we offered.

In some years, folks would accept one and not another. For instance, they would come into the property program maybe two years after we created it. I believe even on the crime policy it was -- there may have been a year or so before Beaumont entered.

But I would offer these programs that ERMAC had and had access to to all the

MR. DEAL: Why don't I go -- go ahead and let you get started.
MR. SCHMOOKLER: Okay.

EXAMINATION
BY MR. SCHMOOKLER:
Q. Mr. Gregg, how are you today? Would you like a break before I start?
A. I think I'm good for right now.
Q. Okay. Great.
Just want to just harken back to a little bit about your background and work at the city. Starting in 2006, I understand that you had the title "risk manager."
Is that correct?
A. That's correct.
Q. And -- and within the city, there was no department called risk management department, was there?
A. I don't know what was in the budget. But there was no department, like, with -- you know, here are the offices for risk management and all the assistants and so on. No. I was --
Q. And --

A. I was the risk management department or division.
Q. But within the terms of risk management, what -- lots of what the risk manager does is deal with insurance?
Is that fair?
A. That's correct.
Q. And within the city, people who were involved in insurance were -- were technically housed, from an organizational perspective, in various departments; correct?
MR. DEAL: Objection.
THE WITNESS: [Audio fades].
MR. DEAL: Form.
BY MR. SCHMOOKLER:
Q. Sure. Isn't it true, sir --
THE COURT REPORTER: Wait. Wait.
BY MR. SCHMOOKLER:
Q. -- that there were --
THE COURT REPORTER: Wait. Wait. I don't -- wait. I didn't get his answer. There was an objection --
MR. SCHMOOKLER: I didn't -- I'm rephrasing. I'm rephrasing.
THE COURT REPORTER: I know. But

he said something. The witness said something while the objection was going on.
I didn't get what you said, sir.
THE WITNESS: I didn't understand your question.
BY MR. SCHMOOKLER:
Q. Okay. Great.
Earlier you were asked about people who had involvement with insurance.
Do you remember that at the beginning of your deposition?
A. I do.
Q. And one of the people you mentioned is a woman named Roxann Sherwood.
Do you recall her?
A. Yes.
Q. And she had some involvement in terms of insurance; correct?
A. Well, in terms of supporting the risk management functions in the city, yes.
Q. And -- and Ms. Gibbs, do you remember her?
A. I do.
Q. Okay. Did she have involvement supporting the risk management function of

the city?
A. She did.
Q. And was Ms. Gibbs employed in a department called the risk management department?
A. No.
Q. Was she employed in a department called the human resources department?
A. I believe that's what it was called. Yes.
Q. What was -- where was Ms. Sherwood employed?
A. In the human resources department. Or it might have been administrative services. I -- I -- I don't recall.
Q. Can we agree that Ms. Sherwood and Ms. Gibbs assisted with the risk management function of the city even though they weren't technically employed in a department called the risk management department?
A. That's true, because I don't think there was a risk management department. But -- uh-huh.
Q. You also mentioned there were times you talked about insurance with the city --

city's attorney.
Do you recall that?
A. Yes.
Q. Okay. And -- and the city's attorney would have discussions about insurance even though he too was not involved -- employed in a department called the risk management department; correct?
MR. DEAL: I'll object to the extent it may invade the attorney-client privilege.
BY MR. SCHMOOKLER:
Q. And -- and, sir, I don't want to ask you at all about the substance of any conversations -- what you said to the lawyer or what the lawyer said to you. I just want to understand if there were ever any discussions with the city attorney that at all involved insurance.
MR. DEAL: But that necessarily implicates the attorney-client privilege, because to answer that --
MR. SCHMOOKLER: If you want to instruct him --
MR. DEAL: -- he would have to

reveal --
MR. SCHMOOKLER: I'm not asking him to reveal the substance. I want to know -- it's a foundational question as to whether such conversations existed. All I'm asking is a foundational question.
MR. DEAL: About a certain subject which I think implicates the attorney-client privilege. But I'll let Mr. Ross deal with any instruction.
MR. SCHMOOKLER: Well, you're the city's lawyer, Chris. So if you're instructing him not to answer on behalf of the city, that's fine. But you have asked him about conversations with the lawyer throughout the day.
MR. DEAL: I -- I have made pains to try to -- when -- to admonish him that, when giving answers, I did not want a -- a -- information that was presented with Aklufi present or in a closed-session setting.
MR. SCHMOOKLER: I'll ask --
MR. DEAL: So I think I've been --
MR. SCHMOOKLER: I -- I don't agree. But I'm going to ask it a different way, and I'll get to my answer.

BY MR. SCHMOOKLER:
Q. Sir, is it true that there were administrative staff in the city that had some -- that provided some support for the risk management function of the city?
A. Yes.
Q. And were any of those administrative staff employed in a department called the risk management department?
A. No.
Q. Isn't it true that there were times during your tenure that reports were made to the city council about insurance?
MR. DEAL: Reports by who? Objection. Vague.
BY MR. SCHMOOKLER:
Q. Isn't it true, sir, that there were reports made by Ms. Gibbs to the city council about insurance?
A. I don't recall any from Ms. Gibbs. The -- the correspondence about insurance generally that I'm aware of were included in the -- the budget.
Q. Okay. And -- and I'll show you a document in a moment. We will -- we will --

we'll look at some page -- we'll look at some paper -- electronic paper that is.
You mentioned -- and I think it was right at the end here -- that the ultimate authority resides with the city council.
Do you remember saying something of that nature?
A. Yes.
Q. And -- and isn't it true that the ultimate authority on everything within the city of Beaumont resided with the Beaumont city council?
MR. DEAL: Objection. Form. Calls for a legal conclusion.
THE WITNESS: That -- that I'm not sure of in a council manager form of government.
In a council city administrator form of government, that would be true. But there's certain -- I think in the municipal codes, certain things are delegated to the city manager that he had ultimate authority for. I -- I don't recall the exact particulars of that. But I suppose ultimately, at the end of the day, whether it's by terminating the city manager or doing whatever needs to

be done, the city council has the authority to make its will be known and done.

MR. DEAL: Move to strike on the basis that it's a legal conclusion.

And this is just for the record, Mr. Gregg.

BY MR. SCHMOOKLER:

Q. Mr. Gregg, is it fair to say, then, that because the city did not have a department entitled "risk management department," people involved with insurance were housed in various departments within the city?

A. Yes.

Q. And so it wasn't you alone, as risk manager, that had complete responsibility for every aspect of everything that ever had to do with insurance; correct?

MR. DEAL: Objection.

THE WITNESS: I need more particulars to understand that question.

BY MR. SCHMOOKLER:

Q. In terms of insurance, during your time as risk manager, it wasn't you acting alone as a one-man shop when it came to

insurance. You -- you needed help from others and received help from others.

Correct?

MR. DEAL: Objection. Misstates testimony.

THE WITNESS: I needed clerical assistance. That's correct. And I needed assistance with gathering data. That's correct. But ultimate decisions regarding, you know, insurance-related matters rested with the -- the city manager. But I would put those together as a department head role.

BY MR. SCHMOOKLER:

Q. Okay. Now, you were asked about the decision to pursue insurance claims.

Do you recall those questions, sir, early on in the day?

A. I remember some questions. Yes.

Q. Isn't it true that, in connection with the claim that we're here to talk about, the employee dishonesty claim, you had -- you were not the risk manager when the decision was made to make the claim?

Is that correct?

A. That's correct.

Q. Who filled your role when you left?

A. I don't know.

Q. Did they -- did the city of Beaumont ever hire somebody with the title risk -- "risk manager"?

A. I don't know.

Q. I just want to see if I can find one thing.

Now, we've been talking about crime coverage all day. And I just want to refresh your recollection.

Is it correct that the city of Beaumont first participated in the crime policy coverage on -- that we're here about in August of 2011?

A. I -- I don't have any independent memory of when they entered the program. I would have to look at the ERMAC documents back in the --

Q. Okay.

A. -- [audio fades] --

Q. And let me see if I can show you something to refresh your recollection on that point. Just bear with me one moment.

MR. ROSS: Mr. Schmookler, if you could please try to let Mr. Gregg finish his responses. Thanks.

MR. SCHMOOKLER: Sure.

Madam Court Reporter, can you tell me what exhibit number we're on?

THE COURT REPORTER: No, I can't. You'll have to ask Mr. Deal.

MR. SCHMOOKLER: Chris, did you end on exhibit -- I think you've ended on Exhibit 40 --

MR. DEAL: I think -- 43, I think, might have been the declaration.

MR. SCHMOOKLER: Okay. Well, I'll just start at 44.

And do -- do -- Chris, do you and -- and Brian want me to upload these to the Chat? I'm going to show them to Mr. Gregg over the screen share. But if you want copies, I'm happy to upload them as I use them.

MR. DEAL: Screen share is fine.

MR. SCHMOOKLER: Great.

(Exhibit 44 marked.)

BY MR. SCHMOOKLER:

Q. All right. Sir, let me show you

MR. DEAL: Calls for speculation.
THE WITNESS: I don't know that.
BY MR. SCHMOOKLER:
Q. And isn't it true, sir, that the violation of 1090 cited in the plea forms for Mr. Egger, Moorjani, and Dillon are the same section cited by the concerned citizens on their public website?
A. Well, based upon the documents you've shown me, that's correct.
Q. And isn't it true, sir, that the decision on whether to permit Mr. Moorjani, Egger, and Dillon to continue, despite the alleged violation of Section 1090, was a decision that rested solely with the city council?
MR. DEAL: Calls for speculation.
THE WITNESS: Did you say "rested solely with the city council"?
BY MR. SCHMOOKLER:
Q. I'll rephrase.
Isn't it true, sir, that following the reports of a violation of Government Code Section 1090, the city council has, in your words, the ultimate authority within the city

of Beaumont, they were the ones who decided whether to let you all [audio fades] and continue; correct?
MR. DEAL: Calls for speculation.
THE WITNESS: I -- I -- I don't believe that's true. No.
BY MR. SCHMOOKLER:
Q. Who within the city had the authority to override the city council and let ULC continue despite the allegations of a conflict of interest?
MR. DEAL: Objection as to form. Incomplete hypothetical.
THE WITNESS: No one.
BY MR. SCHMOOKLER:
Q. Now, you mentioned -- strike that.
Have you seen -- and I'll stop sharing for a moment.
(Exhibit 52A marked.)
BY MR. SCHMOOKLER:
Q. What I'm now going to mark as Exhibit 52 -- bear with me. Let's see if I can make that happen for you.
This is a letter that Chris Deal wrote August [sic] 15th, 2018.

Do you see the top letterhead, sir?
A. (Examining.) I do.
Q. And this is a letter -- just so you can see where it was oriented -- is a letter from Mr. Deal to Ms. Rocha at AIG claims, Inc.
Do you see that, sir?
A. I do.
Q. And you were not involved at this point in the prosecution of the insurance claim by the City of Beaumont; correct?
A. Correct.
Q. Once the lawyers became involved, your -- you dropped out of the -- of -- dropped out of the claim handling process; is that correct?
MR. DEAL: I think that misstates testimony. I don't think he testified that he had any involvement in the claim handling for this, except as the recipient at ERMAC.
MR. SCHMOOKLER: Chris, Chris, Chris. I don't need you to testify for him. If -- if he wants to fix it, he will.
BY MR. SCHMOOKLER:
Q. Sir, isn't it true that one of the roles you performed as general manager of ERMAC

was to act as a go-between for the lawyer and Alliant in the presentation of the original notice of claim?
A. In the original notice back in -- I think you showed me a -- a document -- 2016 maybe. I can't remember if it's March or August, something like that.
Q. And at that time, you told Alliant to work with the lawyers on behalf of the city; is that correct?
A. I did give some direction. I don't recall. It's in that e-mail, I believe.
Q. But by 2018, you were not directly involved in the presentation of this claim, were you?
A. I -- I left ERMAC on December 31st, 2016.
Q. Okay. So by 2018, since you were no longer related -- you had nothing to do with the city and nothing to do with ERMAC, you had nothing to do with this claim?
A. Right.
Q. Great.
And are you aware -- and I'll turn now to page 13 of this letter. You'll see