# EXHIBIT 7

EXHIBIT 7
PAGE 212

Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


WESTERN RIVERSIDE COUNCIL OF    )
GOVERNMENTS, a California       )
Joint Powers Authority; CITY    )
OF BEAUMONT, a public entity    )
in the State of California,     )
                                )
                 Plaintiff,     )   No.
                                )   5:20-cv-02164-GW
        vs.                     )   (KKx)
                                )
NATIONAL UNION FIRE INSURANCE   )
COMPANY OF PITTSBURGH, PA, and  )
DOES 1 through 50, inclusive,   )
                                )
                 Defendants.    )
_____)




ZOOM DEPOSITION OF PETER EVANS

(All parties appearing remotely)

JULY 26, 2022


MAGNA LEGAL SERVICES
866-624-6221
www.MagnaLS.com

REPORTED BY:  CHRISTINA M. LOPEZ, CSR NO. 13048

FILE NO.:  852312



EXHIBIT 7
PAGE 213

Page 2

```
 1   APPEARANCES:
 2   For the Plaintiffs:
 3      BEST, BEST & KRIEGER LLP
        BY:  CHRISTOPHER E. DEAL, ESQ.
 4      18101 Von Karman Avenue
        Suite 1000
 5      Irvine, California  92612
        (949) 263-2600
 6      (949) 260-0972 (Fax)
        chris.deal@bbklaw.com
 7
     For the Defendant:
 8
        GORDON REES SCULLY MANSUKHANI, LLP
 9      BY:  MEAGAN VANDERWEELE, ESQ.
        5 Park Plaza
10      Suite 1100
        Irvine, California  92614
11      (312) 980-6779
        mvanderweele@grsm.com
12
     Also Present:
13
        Louwhan Welch, Videographer
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1             I N D E X
 2
 3   WITNESS      EXAMINATION        PAGE
 4   Peter Evans     By Mr. Deal       6
 5   Afternoon Session            80
 6
 7
 8   E X H I B I T S
 8   PLAINTIFFS'              PAGE
 9   1 - Report and Curriculum Vitae      8
10   2 - August 18, 2017 draft report from HSNO Peter
         Fogarty           30
11
12   3 - December 19, 2017 letter from Jennifer Rocha  40
13   4 - December 20, 2017 letter from Mr. Deal     43
14   5 - December 26, 2017 from Jennifer Rocha     43
15   6 - January 25, 2000 letter from Jennifer Rocha  45
16   7 - March 7, 2018 letter to Ms. Rocha      47
17   8 - E-mail chain from Judith Blake to Jennifer
         Rocha           49
18   9 - April 26, 2018 letter from Jennifer Rocha   52
19   10 - (No exhibit marked)          54
20   11 - October 15, 2018 letter to Jennifer Rocha   59
21   12 - E-mail dated 11/28/18 from Mr. Watnick,
         copying Jennifer Rocha        76
22
23   13 - August 15, 2019 letter from HSNO draft to
         Jennifer Rocha           80
24   14 - November 4, 2019 status letter from
         Mr. Watnick           84
25
```

Page 4

```
 1           I N D E X
             (Continued)
 2
 3         E X H I B I T S
 4
     PLAINTIFFS'              PAGE
 5
 6   15 - Deponent's file documents      98
 7
 8
 9
10     QUESTIONS INSTRUCTED NOT TO ANSWER
11           None.
12
13
14
15
16     INFORMATION REQUESTED
17           None.
18
19
20
21
22
23
24
25
```

Page 5

```
 1              TUESDAY, JULY 26, 2022
 2                 10:00 A.M.
 3
 4        THE VIDEOGRAPHER:  Good morning.  We are now
 5   on the record.  This begins Media Number 1 in the     10:00:54AM
 6   deposition of Peter Evans, in the matter of Western
 7   Riverside Council of the Governments, et al., versus
 8   National Union Fire Insurance Company of Pittsburgh, PA,
 9   et al., in the United States District Court, Central
10   District of California, Case Number 520CV02164GWKKX.    10:01:17AM
11        Today is Tuesday, July 26th, 2022, and the
12   time is 10:01 a.m.  This deposition is being taken
13   remotely via web conferencing at the request of Best
14   Best & Krieger LLP.  The videographer is Louwhan Welch
15   of Magna Legal Services.  The court reporter is        10:01:49AM
16   Christina Lopez of Magna Legal Services.
17        Will counsel and all parties present state
18   their appearance and whom they represent, after which
19   the court reporter will swear in the witness.
20        MR. DEAL:  This is Christopher Deal for the       10:02:02AM
21   plaintiffs.
22        MS. VANDERWEELE:  Meagan VanderWeele for
23   defendant, National Union Insurance Company of
24   Pittsburgh, PA.
25
```



2  (Pages 2 to 5)

EXHIBIT 7
PAGE 214

Page 6

1        PETER EVANS,
2    called as a witness by and on behalf
3    of the Plaintiffs, being first duly
4    sworn, was examined and testified
5    as follows:
6
7         EXAMINATION
8    BY MR. DEAL:
9    Q.   Good morning, Mr. Evans.  My name is
10   Christopher Deal.  I represent the plaintiffs in this    10:02:25AM
11   case.
12   A.   Good morning.
13   Q.   Thank you for appearing.
14        Have you had your deposition taken before?
15   A.   Yes.                              10:02:34AM
16   Q.   Can you give me a general estimate of how many
17   times?
18   A.   Well, I've been saying more than 50 for a
19   while.  I don't know.
20   Q.   Would -- would you be -- are you comfortable    10:02:43AM
21   with me dispensing with the typical deposition
22   admonitions?
23   A.   Yes, I am.
24   Q.   You understand this is -- you're testifying
25   under penalty of perjury; correct?            10:02:54AM

Page 7

1    A.   Of course.
2    Q.   Have you had any drugs or alcohol, anything in
3    the last 24 hours which would impact your ability to
4    give your best testimony?
5    A.   No.                              10:03:04AM
6    Q.   Is there any other reason why you can't give
7    your best testimony today?
8    A.   Not that I'm aware.
9    Q.   All right.  I -- I am not very technically
10   proficient, but I'm going to try to share with you your    10:03:14AM
11   report.
12   A.   All right.  Well, I want to say that that
13   makes two of us.  And I -- I have a copy of my report in
14   front of me.
15   Q.   I am just terrible at this, so just bear with    10:03:30AM
16   me.  Almost there.  I am so sorry, Mr. Evans, I am truly
17   terrible at this.
18   A.   It's okay.  It was there for a moment.
19        MS. VANDERWEELE:  Yeah, you had it up there
20   and you -- I think he has the hard copy of -- of the    10:04:30AM
21   report in front of him, Chris, if that makes your job a
22   little easier.
23   BY MR. DEAL:
24   Q.   Is it up there, Mr. Evans?
25   A.   It is.                             10:04:39AM

Page 8

1    Q.   I think I'm able to give you control, but I'll
2    try to point you to the stuff I'm interested in.
3    A.   All right.
4    Q.   And we'll introduce -- we'll mark this as
5    Exhibit 1 to your deposition.            10:05:00AM
6        (Plaintiffs' Exhibit 1 was marked
7         for identification by the court
8         reporter and is attached hereto.)
9    BY MR. DEAL:
10   Q.   So I'm looking now at the CV that was attached 10:05:08AM
11   to your report.  Is -- does this appear to be a copy of
12   your CV?
13   A.   It does.
14   Q.   And it states from 2003 to the present, you've
15   worked for Evans Adjusters?            10:05:19AM
16   A.   Correct.
17   Q.   And what is Evans Adjusters?
18   A.   It's a sole proprietorship.  Until recently, I
19   was adjusting first-party property insurance claims; and
20   am now effectively retired from that as of six months or 10:05:35AM
21   so ago, maybe a year ago.  And presently I'm doing some
22   Insurance Code appraisals, effectively arbitrations.
23   Also --
24        THE REPORTER:  I'm sorry, excuse me, I didn't
25   get that.  "And presently I'm doing some insurance"?    10:05:44AM

Page 9

1        THE WITNESS:  Some insurance appraisals,
2    effectively arbitrations.  And also doing consulting and
3    expert witness work.
4    BY MR. DEAL:
5    Q.   While at Evans Adjusting -- Evans Adjusters,    10:06:08AM
6    are you able to give me a percentage of the claims that
7    you handle that were crime or fidelity or surety claims?
8    A.   I would say it was a fairly small proportion,
9    but there were a few.
10   Q.   Can you -- like, can you estimate a number for 10:06:28AM
11   me?
12   A.   I think probably between 5 and 10.  I don't
13   remember.
14   Q.   So from 2003 to the present, your best
15   estimate is that you've adjusted 5 to 10 crime insurance 10:06:47AM
16   surety bond claims during that time period?
17   A.   I think so.
18   Q.   When you say you think so, is there anything
19   that's causing you to hesitate?
20   A.   Not really.  Only that I don't really remember 10:07:07AM
21   lost claims -- the suggest matter very well.
22   Q.   What other types of claims do you handle at
23   Evans Adjusters?  And let's limit ourselves to
24   first-party claims.
25   A.   Well, I would say that 90 -- 99 percent of the 10:07:27AM



EXHIBIT 7
PAGE 215

Page 10

1    claims I've handled for 40 years have been property
2    first party related, one way or another. So I think
3    that was -- that's the answer to your question.
4        Q.   So 99 percent of your claims have been
5    property and casual claim, from 2003 to the present?    10:07:51AM
6        A.   Have been first party related claims.
7        Q.   Are you able to break down what type of
8    first-party claims? For instance, CGL versus crime
9    versus pollution?
10       A.   Sure. And I think you're not stating    10:08:11AM
11   correctly, at least my definition of first-party claims.
12   Those are property related or claims made by the insured
13   in respect of issues other than CGL. For example, those
14   are liability claims made against the insured. So
15   almost all of -- almost all of my work has been first    10:08:40AM
16   party, that is claims made by the insured.
17       Q.   Okay. I think I understand. So property
18   policies, casualty policies?
19       A.   Not casualty policies.
20       Q.   Property policies?    10:08:53AM
21       A.   Correct. Property related policies, put it
22   that way.
23       Q.   Thank you.
24            Do you handle title insurance claims?
25       A.   No.    10:09:03AM

Page 11

1        Q.   So for the period at Evans Adjusters, can you
2    give me an estimate of the percentage of claims that you
3    handled that were crime or fidelity rated -- related
4    versus the entire body of first-party claims that you
5    were handling?    10:09:28AM
6        A.   I would say it's a very small percentage, but
7    I can't give you a percentage.
8        Q.   Do you think it's less than 5 percent?
9        A.   Probably, yes. Yeah. Most of my claims in
10   the last probably 30 years have been large loss    10:09:41AM
11   property, often for excess insurers, around the U.S. and
12   some outside the U.S.
13       Q.   Do you believe that there's a difference in
14   customs and practice in terms of the handling of a crime
15   or fidelity claim versus another typical property claim?    10:10:03AM
16       A.   I think that some of the obligations are
17   different. Some of the investigation is different from
18   ordinary property claims. I would make an -- an analogy
19   as to the investigation of quantum as -- as somewhat
20   similar to business interruption lawsuits where they are    10:10:30AM
21   document driven complete -- almost.
22       Q.   Are you familiar with the California insurance
23   regulations governing claims handling?
24       A.   Yes.
25       Q.   Is -- are claims handled under crime,    10:10:53AM

Page 12

1    fidelity, surety policies subject to the Insurance Code
2    regulations?
3        A.   I believe so, but I'm not a lawyer.
4        Q.   Okay. I'll come back to that.
5            In terms of the claims that you've handled,    10:11:24AM
6    can you give me an estimate of the number where you've
7    represented the insured -- insured versus the insurer,
8    or insurer?
9        A.   Absolutely minimal on behalf of the insured,
10   because in California, at least, I'm not licensed to    10:11:41AM
11   handled claims on behalf of the insureds. That would be
12   a public adjuster's license as opposed to an independent
13   adjuster's license. And you can't have both.
14       Q.   Have you handled claims for insurers for
15   claims made in California?    10:12:17AM
16       A.   Sorry, for insurers?
17       Q.   Yes.
18       A.   Lots, yes. That's part of the adjusting
19   business.
20       Q.   So you've adjusted a lot of California claims,    10:12:32AM
21   but never on the behalf of the policyholder?
22       A.   Correct. Again, because I'm not licensed to
23   do that.
24       Q.   I'm skipping to, in your report, Page 2 of
25   your CV -- Page 3, actually, "Recent deposition    10:13:00AM

Page 13

1    testimony."
2            Can you see that?
3        A.   Yes.
4        Q.   This goes on for about -- it's like five
5    pages. In any of these cases, did you -- were you    10:13:17AM
6    providing expert opinions for the policyholder?
7        A.   No. I merely testified at deposition and
8    trial once on behalf of an insured, and that was, I
9    think, probably before 2016.
10       Q.   Is there a reason you focused on representing    10:13:40AM
11   or providing expert testimony to insureds versus
12   policyholders?
13       A.   Generally, I'm not called by insured
14   representatives. I don't advertise and I don't belong
15   to any groups of experts.    10:14:03AM
16       Q.   What would you need to be qualified to testify
17   on behalf of the policyholder in California in a
18   first-party dispute?
19       A.   I would need to be able to have no conflicts,
20   to have it to be a matter which I have experience, and    10:14:37AM
21   an overview of documents where I (Audio issue) --
22            THE REPORTER: I'm sorry, "and an overview of
23   documents"?
24            THE WITNESS: Review of documents -- can
25   you -- can you go back a bit further so I can know what    10:14:59AM

MAGNA
LEGAL SERVICES

EXHIBIT 7
PAGE 216

Page 14

1  I said?
2      (The previous answer was read back by
3  the court reporter as follows:
4        "I would need to be able to have
5  no conflicts, to have it to be a        10:14:35AM
6  matter which I have experience,
7  and". . .)
8      THE WITNESS:  Or to be a matter where I agreed
9  with the plaintiff's position.
10 BY MR. DEAL:                           10:15:24AM
11     Q.   And so how long have you been providing expert
12 witness consulting services?
13     A.   To a greater or lesser extent, for probably 30
14 years.
15     Q.   Okay.  So in 30 years, you said you've   10:15:37AM
16 testified for one insured policyholder at a trial and a
17 deposition?
18     A.   I believe that's correct.
19     Q.   So in 30 years, only one policyholder has
20 presented you with a matter where you were comfortable 10:15:54AM
21 giving expert testimony based on the fact that you did
22 not have conflicts and could support the position the
23 policyholder was advancing?
24     A.   That's not quite correct, because there have
25 been some cases where I've been retained and the matter 10:16:12AM

Page 15

1  settled before my deposition or trial.
2      Q.   Can you give me an estimate of how many such
3  cases there were?
4      A.   Probably less than a dozen or -- or around a
5  dozen.  I don't know.                   10:16:25AM
6      Q.   Did any -- were any of those crime claims?
7      A.   I don't think so.
8      Q.   If I -- I -- if I grouped together surety,
9  fidelity, crime, do you generally understand what I'm
10 talking about?                          10:16:50AM
11     A.   Yes.
12     Q.   Have you handled any first-party claims in the
13 past 10 years where the claim had not been resolved
14 after 5 years?
15     A.   Yes.                          10:17:12AM
16     Q.   Can you give me an estimate of the percentage
17 of the number of claims which are not resolved after
18 five years?
19     A.   It would be a small percentage, but certainly,
20 I -- I had one that wasn't resolve for 17 years.   10:17:22AM
21     Q.   I'm sorry, I didn't hear that last one.
22     A.   I had one that was involved -- that wasn't
23 resolved for, I think it was 17 years.
24     Q.   Okay.  But what percentage of first-party
25 claims, best estimate, have not resolved after five   10:17:39AM

Page 16

1  years?
2      A.   It's a small percentage.  Probably, I don't
3  know, a dozen or -- I don't know.
4      Q.   A dozen.  Do you mean -- how about 5 percent?
5      A.   No, it's a smaller percentage than that.   10:18:00AM
6      Q.   2 percent?
7      A.   I just don't know.
8      Q.   Okay.  Less than 5 percent, is that a fair
9  estimate?
10     A.   I think it probably is.  Depends on the   10:18:10AM
11 complexity of -- of the method.
12     Q.   Did you -- do you have an understanding that
13 there was an excess policy issued for the 2014/'15 time
14 period?
15     MS. VANDERWEELE:  Objection --   10:18:41AM
16     THE WITNESS:  That's --
17     (Speaking simultaneously.)
18     THE REPORTER:  I'm sorry, Counsel, I didn't
19 hear you.
20     MS. VANDERWEELE:  Form objection.   10:18:50AM
21 BY MR. DEAL:
22     Q.   You can answer, Mr. Evans.
23     A.   It's my understanding that there was a policy
24 that provided some specific additional limits subject to
25 specific terms and conditions, yes.   10:19:04AM

Page 17

1      Q.   But did you actually look at that policy in
2  performing your analysis?
3      A.   I did not.
4      Q.   Have you reached any conclusions as to whether
5  that policy might provide coverage in this case?   10:19:16AM
6      A.   I don't know.
7      Q.   Do you have any understanding as to who
8  underwrote the excess policy?
9      A.   I think it was one of the AIG companies.
10     Q.   Do you believe that during the course of this 10:19:36AM
11 claim, AIG had a responsibility to review the excess
12 policy and determine if coverage might exist under that
13 policy?
14     A.   I don't think that it ever got to that.
15     Q.   How -- how do you know that?   10:20:02AM
16     A.   And -- well, I don't -- so far as I understand
17 the numbers involved, at least on the adjusting side,
18 I'm not sure that an adjustment, even assuming coverage,
19 would have exceeded $10 million in that policy period.
20     Q.   Well, Mr. Evans, let's assume there was   10:20:27AM
21 coverage.  Are you aware that plaintiffs are making a
22 claim for approximately $60 million in overbillings?
23     A.   I'm aware of a high number, yes.
24     Q.   And so is it your opinion that that couldn't
25 possibly reach the excess policy from the 2014/'15 time 10:20:46AM



5  (Pages 14 to 17)

EXHIBIT 7
PAGE 217

Page 18

1    period?
2        A.   Well, have not reviewed the terms and
3    conditions of that policy, I don't know.
4        Q.   Having received a claim under the primary
5    policy, is AIG under any responsibility to adjust a     10:21:00AM
6    claim under the excess policy?
7        A.   It appears to me, again, not knowing enough
8    about that policy, excess or otherwise, that I would
9    expect a claim to have been nullified by the insured
10   through its broker.                    10:21:22AM
11       Q.   Okay.  And do you know if that happened?
12       A.   I'm not -- I don't think it did.
13       Q.   And what do you base that opinion on?
14       A.   My review.  I'm unsure that that's my --
15   that's what I've seen.                 10:21:37AM
16       Q.   You've been in the insurance industries over
17   40 years; correct?
18       A.   Seeming like forever, yes.
19       Q.   Yeah.  And you've been adjusting claims on
20   behalf of insurance companies for -- for over 40 years;  10:22:12AM
21   correct?
22       A.   In the U.S., and longer in Europe, yes.
23       Q.   In your experience, when a policyholder
24   tenders under a policy and you determine that there
25   might be other policies to provide coverage, is it your  10:22:26AM

Page 19

1    custom and practice to notify the insured that there
2    might be other policies that provide coverage?
3        A.   If there's an assumption -- if -- if the
4    claims people are aware of it and it is relevant to the
5    adjustment, then possibly.  But again, I would -- I     10:22:48AM
6    would expect, certainly in the days since 9-11 and --
7    and Hurricane Katrina, that the brokers would notify
8    claims on any policy that even they might apply.
9        Q.   And I understand your point, Mr. Evans, and I
10   understand we -- we can talk about the brokers, but what  10:23:15AM
11   I'm focusing is on -- is on the insured.
12            In your -- based on your experience in the
13   industry, if you determined the insured is tendered
14   under one policy, but other policies underwritten by the
15   same policy might apply, is it your custom and program   10:23:30AM
16   to notify the insured of the existence of those other
17   policies?
18       A.   Potentially.  If I'm fully aware of what any
19   other policies might be and if they're relevant to the
20   adjustment.                           10:23:46AM
21       Q.   Are you aware whether AIG in this case was
22   aware of the existence of the excess policy?
23       A.   I'm not a -- I'm not aware that the people
24   directly involved -- involved in the claim were aware of
25   it.  Whether AIG is aware of it or not is a different    10:24:03AM

Page 20

1    matter.
2        Q.   If the people handling the claim were aware of
3    the excess policy, should they have notified the insured
4    regarding the existence of the excess policy?
5        A.   Well, I don't think it ever got to that      10:24:21AM
6    because there wasn't an adjusted loss in excess of an
7    applicable limit.
8        Q.   So I'm going to put a hypothetical to you.
9    Assume that the insured is claiming a $60 million loss.
10   Assume that the adjuster is aware of the excess policy,   10:24:38AM
11   and assume that there's coverage.  Under that scenario,
12   should the insurance company make the policyholder aware
13   that there's an excess policy which might provide
14   coverage?
15            MS. VANDERWEELE:  Objection; form, incomplete  10:24:54AM
16   hypothetical.
17            You can still answer.
18            THE WITNESS:  In the event that the
19   potentially adjusted loss would exceed a primary limit
20   for which there was a valid excess policy, then the     10:25:07AM
21   investigation would -- I would expect, since it's in the
22   same group of companies, and perhaps even in the same
23   company -- insurance company, then the adjustment and
24   investigation would merely roll over.
25   ///

Page 21

1    BY MR. DEAL:
2        Q.   Thank you.
3            When were you first contacted regarding this
4    assignment?
5        A.   Sometime after Mr. Lapeen -- is it Lapeen or   10:25:42AM
6    Lapine?
7        Q.   Lepire?
8        A.   Sorry?
9        Q.   Lepire; right?
10       A.   Sorry, Lepire.  Thank you.  Sorry.  Sometime   10:25:56AM
11   after his report.
12       Q.   And who contacted you?
13       A.   I think Ms. VanderWeele.
14       Q.   And what were you told about the nature of the
15   assignment?                           10:26:13AM
16            MS. VANDERWEELE:  Object.  Chris, under
17   Rule 26, you're not entitled to those communications.
18            MR. DEAL:  You know, Meagan, you're -- that's
19   fair enough.  I think I'd be entitled to learn if you --
20   if you were told to make any assumptions --            10:26:29AM
21            MS. VANDERWEELE:  Sure.  Any facts that I told
22   him, assumptions that I told him to assume, but in terms
23   of, you know, what we discussed about the assignment, I
24   just think you just need to be a little bit more
25   specific in the question.              10:26:43AM

1    MR. DEAL:  Fair enough.  I'll -- I'll withdraw
2  the question, Meagan.
3        MS. VANDERWEELE:  Okay.
4        MR. DEAL:  And we'll kind of cover that more
5  in little more detail later.          10:26:49AM
6        MS. VANDERWEELE:  Okay.
7  BY MR. DEAL:
8    Q.  Have you worked for Gordon Rees in the past?
9  Have you done expert -- strike that.
10       Have you done expert witness consulting   10:26:57AM
11 assignments for Gordon Rees in the past?
12   A.  I can only say possibly.  If I have, it's been
13 very rare.  And it's not being told recent, as in not in
14 the last seven to -- or more years.
15   Q.  Have you ever worked with Scott Schmookler?   10:27:16AM
16   A.  I have not.
17   Q.  Meagan?
18   A.  No.
19   Q.  Sorry to jump around, Mr. Evans.  I'm looking
20 at Page 16 of your report.          10:28:15AM
21   A.  Okay.
22   Q.  Okay.  And the first full paragraph, it
23 starts, "Mr. Lepire also apparently criticizes"?
24   A.  Yes.
25   Q.  Okay.  Do you have an understanding who   10:28:36AM

1  Beaumont Financing Authority was?
2    A.  I understand it was a financing authority
3  separate from the City of Beaumont.
4    Q.  Do you have any understanding as to whether
5  they were an additional insured under the policy?   10:28:52AM
6    A.  I'm uncertain.  I don't remember.
7    Q.  Are you aware whether BFA submitted a claim
8  under the 1517 crime policy in June 2016?
9    A.  I don't recall the -- they did.  And I don't
10 recall that BFA is the plaintiff in this matter.   10:29:17AM
11   Q.  Okay.  Have you read Judith Blake's testimony?
12   A.  I did read -- I saw it, yes.
13   Q.  Okay.  Are -- do you recall the discussion --
14 her testimony about BFA?
15   A.  I don't.          10:29:38AM
16   Q.  Ms. Blake indicated that they received the
17 claim under -- by BFA and essentially collapsed it into
18 the master claim.  Do you recall seeing testimony to
19 that effect by Mr. -- Ms. Blake?
20       MS. VANDERWEELE:  Objection; form, misstates   10:29:58AM
21 evidence.
22       THE WITNESS:  I don't remember.
23 BY MR. DEAL:
24   Q.  Okay.  I'd like you to assume that was her
25 testimony.  Assume that Ms. Blake said in response to   10:30:06AM

1  the June 2016 tender by BFA, she treated that as being
2  part of the master claim.  Do you believe that's proper?
3    A.  It was -- it would have been the same
4  investigation, so I don't think it's improper.
5    Q.  Okay.  Do you have an understanding that, in   10:30:32AM
6  June 2016, both BFA and the city submitted claims under
7  the crime policy relating to an SEC investigation?
8    A.  I recall something related to the SEC, yes.
9    Q.  Do you know if AIG or National Union ever
10 responded to that claim?          10:31:05AM
11   A.  I'm not sure that it was a claim as -- as
12 opposed to information.
13   Q.  And so are you aware --
14   A.  Well --
15       (Speaking simultaneously.)          10:31:19AM
16       MS. VANDERWEELE:  You have to let him finish
17 his answer Chris.
18       THE WITNESS:  And certainly, this policy, as
19 far as I've seen, doesn't provide coverage for defense.
20 BY MR. DEAL:          10:31:25AM
21   Q.  Okay.  And if -- if that's the case should a
22 letter of consent indicating that there was no coverage
23 for the SEC investigation?
24   A.  Well, the investigation of the claim was by
25 the named insured of the plaintiffs.  Any other kind of   10:31:48AM

1  investigation -- again, I'm no lawyer -- would seem to
2  me to be a liability issue as opposed to a first-party
3  property issue.
4    Q.  Okay.  But my question was, should AIG, in
5  response to that claim, notify the insured, Hey, this   10:32:09AM
6  doesn't appear to be a proper claim under this policy?
7    A.  Well, since I don't recall the -- the detail,
8  I don't know.
9    Q.  Okay.  In response to a claim letter, what is
10 the typical custom and practice in California in terms   10:32:36AM
11 of sending the acknowledgment letter?
12   A.  If there's new -- if there's a claim, as here,
13 there was an acknowledgment sent.  And that's what you
14 do, and then you begin your investigation when you have
15 sufficient information to do so.          10:32:52AM
16   Q.  And if BFA submitted a claim, should there
17 have been a separate note or acknowledgment for BFA?
18   A.  Well, they would -- apparently, as you have
19 told me, an -- an additional insured under the same
20 policy, so it would be the same claim.          10:33:14AM
21   Q.  So then it's your opinion that you do not need
22 to send a separate acknowledgment for BFA?
23   A.  The answer is, it depends on the
24 circumstances.  In this case, it was any claim was --
25 involving -- so far as I'm aware, would have involved   10:33:33AM

Page 26

1  the same facts and information.
2      Q.   I thought your testimony was that if it
3  relates to an SEC investigation, it's almost kind of a
4  quasi third-party claim.  Was -- is my understanding of
5  your testimony correct?                    10:33:53AM
6      A.   That's -- from what little I know about it,
7  yes, that's correct.
8      Q.   Okay.  And if that is, in fact, the case,
9  shouldn't AIG have notified the policyholder, This is a
10  first-party policy, we don't cover third-party claims,  10:34:05AM
11  your claim is denied?
12      A.   Well, I don't think there was a claim
13  presented.
14      Q.   Okay.
15      A.   And certainly, there was (Audio issue) --   10:34:16AM
16          THE REPORTER:  I'm sorry, could you repeat
17  that, Mr. Evans?
18          THE WITNESS:  Sure.  And certainly, there was
19  no separate proof of loss presented.
20  BY MR. DEAL:                              10:34:27AM
21      Q.   Do you know if a separate proof of loss was
22  ever requested from BFA?
23      A.   I don't know.
24      Q.   Are you aware at some point during the course
25  of this investigation the policy number was changed?   10:34:45AM

Page 27

1      A.   There was a change in either policy number or
2  claim number, I don't remember which.
3      Q.   Do you know why the policy number or -- I'm
4  sorry, I may have misstated that.
5          Do you know why the claim number was changed  10:35:05AM
6  sometime during the adjustment of this claim?
7      A.   I don't know.  I don't see it's relevant to
8  the investigation.  I don't know why.
9      Q.   I'll represent to you that there are
10  communications where Ms. Blake essentially asked that  10:35:21AM
11  this claim be reclassified under the '14/'15 policy and
12  given a new claim number.  Are you aware of those facts?
13      A.   I think that that may have well been the
14  reason.  But again, I don't think it's relevant to the
15  investigation.  It may be relevant to coverage.        10:35:47AM
16      Q.   Doesn't that -- if Ms. Blake had made the
17  decision to reclassify the claim under the '14/'15
18  policy, doesn't that mean she's denying coverage or
19  effectively denying coverage under the '15 to '17
20  policy?                                    10:36:04AM
21      A.   No.
22      Q.   Why not?
23      A.   Because -- because it wasn't -- that wasn't
24  done, as far as I'm aware.  I don't think she was
25  denying it.  She was feeling that the best policy -- the  10:36:12AM

Page 28

1  '14/'15 policy was where discovery may have claimed,
2  given what they knew at the time.
3      Q.   If AIG had come to the conclusion that there
4  was no possibility of coverage under the '15/'17 policy,
5  should it have notified the insured?          10:36:37AM
6      A.   I don't know that it had come to that
7  conclusion.  I think that it had come to a view that it
8  might be under another policy.  But since the general
9  policy wording, so far as I'm aware, was technically
10  similar, it made no difference.  The policy -- as the   10:36:58AM
11  investigation was complete, the claim would fall
12  wherever it was found to fall.
13      Q.   So my hypothetical is sometime during the
14  course of the administration of this claim, Ms. Blake
15  reaches a conclusion that, based on the facts presented, 10:37:22AM
16  she doesn't believe that there's any possibility of
17  coverage under the '15 to '17 policy.  And instead,
18  although believes there might be possibility for
19  coverage under the '14/'15 policy.
20          Do you understand my hypothetical?        10:37:38AM
21      A.   I understand it.  I don't think I agree that
22  it's -- it's the facts, but go ahead.
23      Q.   Okay.  In that hypothetical, should AIG inform
24  the insured that it's made a decision that there is no
25  coverage under the '15/'17 policy?            10:37:56AM

Page 29

1      A.   Well, since its investigation was not
2  complete, I don't think that's -- that's right.  I don't
3  think that they had made that conclusion.  They had made
4  a supposition or a view, but they were intending to
5  investigate under the earlier policy in the same way as  10:38:20AM
6  it was -- as they were carrying out the overall
7  investigation.
8      Q.   Are you aware of who HSNO is?
9      A.   Yes, well aware.
10      Q.   Can you give me a minute here, I'm having a   10:39:40AM
11  technological issue?
12      A.   Sure.
13          MS. VANDERWEELE:  Do you want to take a break?
14          MR. DEAL:  Yeah, let's go off the record, like
15  two minutes.                              10:39:50AM
16          THE VIDEOGRAPHER:  We are going off the record
17  at 10:39 a.m.
18          (Recess.)
19          THE VIDEOGRAPHER:  We are back on video record
20  at 10:43 a.m.                             10:43:30AM
21  BY MR. DEAL:
22      Q.   Thank you, Mr. Evans.  I am going to share an
23  August 18, 2017 draft report from HSNO Peter Fogarty.
24  And we'll mark this as Exhibit -- Exhibit 2.
25  ///

8  (Pages 26 to 29)

EXHIBIT 7
PAGE 220

Page 30

```
 1        (Plaintiffs' Exhibit 2 was marked
 2        for identification by the court
 3        reporter and is attached hereto.)
 4   BY MR. DEAL:
 5        Q.   Before we talk about the -- this letter,   10:43:57AM
 6   Mr. Evans.  When I looked at your resume, it looked like
 7   back in the '70s and '80s, you handled a -- I don't know
 8   about fair amount, but more crime and fidelity claims
 9   than you are presently handling?
10        A.   I'm sure that's correct, yes.          10:44:15AM
11        Q.   In the '70s and '80s, can you estimate for me
12   the percentage of the claims you were handling that were
13   crime or fidelity related?
14        A.   Fidelity related, I think was fairly small,
15   but I certainly dealt with them.  Crime may have been a  10:44:30AM
16   bit more.  But I really don't remember the --
17        Q.   Can you give me an estimate as to the total
18   number of crime, fidelity, surety claims you've handled
19   during your career?
20        A.   Hundreds.                            10:44:53AM
21        Q.   Can you estimate for me in the last 10 years,
22   how many claims you've handled involving crime, fidelity
23   or surety?
24        A.   Well, I think we've been through this, but I
25   think it's a very small number because I've been -- the  10:45:06AM
```

Page 31

```
 1   last 10 years, I was traveling handling large loss
 2   excess claims.  So I would say it would be very few.
 3        Q.   Okay.  Do you believe that the experience you
 4   gathered while adjusting crime, fidelity, surety claims
 5   in the '70s and '80s gave you a sufficient basis to   10:45:32AM
 6   testify as to claims handling in 2022 for a crime,
 7   fidelity or surety claim?
 8        A.   Yes.  And the other claims that I've handled
 9   since, sure it does.  And -- and also my general
10   experience in adjusting and -- investigating and      10:45:50AM
11   adjusting business interruption claims, things like
12   jewelers block claims and those kinds of things, maybe
13   builder's risk delay in opening claims.  Those are
14   extremely document driven and relate to same kinds of
15   investigations.                                10:46:17AM
16        Q.   Okay.  Essentially -- strike that.
17             All right.  So I'm going to turn us back to
18   Exhibit 2, which is the HSNO report.  And I'm looking at
19   page 4 of the report now.  It should be on the screen
20   with the highlighting.                         10:47:04AM
21        A.   I see it.
22        Q.   Under the heading "Analysis of Employment
23   History and Status, Preliminary and Tentative," there's
24   a sentence that states, "However, based on the
25   documentation reviewed to date, it appears that several  10:47:18AM
```

Page 32

```
 1   of the individuals named in the proof of loss were, in
 2   fact, employees of private firms contracted by the City
 3   of Beaumont, not employment" -- "not employees of the
 4   City of Beaumont, per se."
 5             See that?                           10:47:33AM
 6        A.   Yes.
 7        Q.   Do you understand why Mr. Fogarty is
 8   discussing the employee status of these individuals in
 9   this report?
10        A.   Because at that stage, at least, it appeared  10:47:43AM
11   to be relevant, to the investigation.
12        Q.   Why -- sorry.  Didn't mean to cut you off.
13             At that stage, why did it appear relevant?
14        A.   Because I believe that Mr. Fogarty, at least,
15   was unaware of the endorsement (Audio issue) --      10:47:59AM
16        THE REPORTER:  I'm sorry, "unaware of the
17   endorsement"?
18        THE WITNESS:  Consultants.
19   BY MR. DEAL:
20        Q.   So this is August 18, 2017.  There's an --   10:48:09AM
21   you're talking about the endorsement that adds public --
22   appointed public officials as named insureds; correct?
23        A.   I think that's right.  Again, assuming that
24   that -- and again, I'm not a lawyer, but that's correct.
25        Q.   As of August 2017, should AIG have been aware  10:48:35AM
```

Page 33

```
 1   of that endorsement?
 2        A.   If they had believed it to be relevant,
 3   perhaps, but again, the investigation was going on to
 4   see just what the status of these people was.
 5        Q.   In your mind, in August 2017, was there any   10:49:00AM
 6   question as -- that Alan Kapanicas was the city manager
 7   of the City of Beaumont -- well, let me rephrase that.
 8             Based on the information that AIG had in
 9   August 2017, did AIG have any reason to question the
10   city's contention that Alan Kapanicas was an employee of  10:49:25AM
11   the city?
12        A.   Well, it appears from the information
13   immediately below the sentence that you read, that he
14   was shown as being an employee of the city between
15   2011 -- between 2011 and 2015, if I'm reading this   10:49:47AM
16   properly.
17        And underneath David Gill, it says, "Contract
18   economic development director."  Do you see that?
19        A.   Yes.
20        Q.   Mr. Moorjani is the public works director?   10:50:04AM
21        A.   Yes.
22        Q.   Ernest Egger is the contract planning
23   director?
24        A.   Yes.
25        Q.   And then Mr. Aklufi is an independent   10:50:12AM
```

**MAGNA** ▶
LEGAL SERVICES

Page 34

1  attorney?
2  A.  Apparently.
3  Q.  All right.  Would these individuals qualify as
4  insureds under the endorsement, adding public officials
5  as insureds?                        10:50:31AM
6  A.  I would leave that to the lawyers.
7  Q.  You've been adjusting claims for over 40
8  years; correct?
9  A.  That I have.
10  Q.  If you'd been adjusting this claim, you're now 10:50:48AM
11  over a year into the claim, would you be aware that
12  there was an endorsement naming city officials as
13  additional endorsement -- additional insureds under the
14  policy?
15  A.  I don't know.  I don't think they were really  10:51:10AM
16  a year into the claim because the claim wasn't presented
17  until -- well, the proof of loss wasn't presented until
18  November 2016.
19  Q.  The original claim was submitted in April --
20  June 2016; correct?  June or April?          10:51:27AM
21  A.  No, the -- no, the claim wasn't presented.
22  No, the claim was -- a claim was notified.
23  Q.  A claim was tendered in April 2016; right?
24  A.  Without a proof of loss and without
25  quantification, yes.                 10:51:45AM

Page 35

1  Q.  In August of 2017, under customary industry
2  practices, should AIG have been aware that there was an
3  endorsement naming appointed city officials as
4  additional insureds under the policy?
5  A.  Possibly.  I don't know.  I mean it was --  10:52:10AM
6  there was a dd an overall investigation into the claim,
7  and this was part of the investigation.
8  Q.  Would it -- would you assume that by virtue of
9  the language we're looking at in Table 2, the HSNO
10  report, that at this point Mr. Fogarty has not been made 10:52:34AM
11  aware that there's an endorsement adding appointed
12  public -- appointed city officials as additional
13  insureds?
14  A.  I can't make assumptions.  I don't know.
15  Q.  Okay.  If you could look at the last paragraph 10:52:49AM
16  at the page I have on the screen?  It's Page 5 of your
17  report.
18  A.  Yes.
19  Q.  It's talking about the termination of
20  Mr. Kapanicus?                       10:53:42AM
21  A.  Yes.
22  Q.  The second sentence states that he was an
23  independent contractor from July 1993 through June 2011.
24  Do you see that?
25  A.  I do.                         10:53:53AM

Page 36

1  Q.  Why is that relevant?
2  A.  He's telling a story.
3  Q.  Does his status as an independent contractor
4  or employee impact the coverage analysis?
5  A.  I think it's part of the overall information  10:54:07AM
6  obtained by the insurer or through its consultant, so
7  sure it's relevant.
8  Q.  Okay.  I'm now looking at Page 7 of the
9  letter, the HSNO report.  And if you see my --
10  A.  I'm sorry, can I just make a comment?     10:54:50AM
11  Q.  Yeah.
12  A.  I think -- I think a couple -- or several
13  questions ago, you talked about my report.  And this is
14  not my report.
15  Q.  True.  I apologize.  This is the HSNO report. 10:55:02AM
16  A.  Right.
17  MS. VANDERWEELE:  Just so the record is clear,
18  this is Exhibit 2.  The question is about Page 5 of the
19  report.  You were referring to Exhibit 2; correct,
20  Chris?                          10:55:15AM
21  MR. DEAL:  Correct.
22  MS. VANDERWEELE:  Okay.
23  BY MR. DEAL:
24  Q.  Right before the section on Joseph Aklufi, it
25  states, "At this time, we have not discovered any  10:55:25AM

Page 37

1  documentation that would indicate that any of the named
2  ULC principals or any employee of ULC was at any time an
3  employee of the City of Beaumont, GGMS
4  (Indiscernible) --
5  THE REPORTER:  I'm sorry, just a little bit  10:55:34AM
6  slower when you're reading.  You -- you read all fast.
7  BY MR. DEAL:
8  Q.  I'll tell you what, read the paragraph to
9  yourself, Mr. Evan [sic].
10  A.  Okay.  (Witness complies.)        10:55:53AM
11  Q.  And the first sentence --
12  A.  Hold on a second.
13  Yes, I read it.
14  Q.  Okay.  Was their status as employees of the
15  city important to the analysis that AIG was going to  10:56:39AM
16  render?
17  A.  It was important in the -- telling the story,
18  as it were, explaining the facts, explaining what was
19  going on.  And that's what you do as an adjuster or an
20  investigator or a forensic accountant.       10:56:59AM
21  Q.  Now, I'll scroll down to Page 16 of the
22  letter -- the report by HSNO.  I don't think you've done
23  any analysis of this, Mr. Evans, but I'm going to ask.
24  Mr. Fogarty makes the statement that "the insured claims
25  that the approval of payments to ULC by Deepak Moorjani 10:58:04AM



EXHIBIT 7
PAGE 222

Page 38

1  represents a conflict of interest as Moorjani" --
2      A.   I'm sorry, I see it now.  Got it.
3          MS. VANDERWEELE:  What paragraph are you
4  referring to, Chris?
5          MR. DEAL:  It's the first full paragraph on    10:58:16AM
6  Page 16 on the screen.
7          MS. VANDERWEELE:  Okay.  Thank you.
8  BY MR. DEAL:
9      Q.   Did you do any type of analysis to see who
10 approved what requisition or invoices, Mr. Evans?    10:58:28AM
11     A.   No.
12     Q.   Okay.  I'm now on Page 17, the first full
13 paragraph, which starts "Additionally"?
14     A.   Yes.
15     Q.   And then the second -- second two sentences.   10:59:26AM
16 "Although we have located these documents within the six
17 production submissions, we have not yet analyzed them in
18 detail.  However, based on our preliminary review, these
19 documents appear to reflect the type of tasks noted in
20 the service agreements."                             10:59:39AM
21      Can you tell me what you mean by that?
22          MS. VANDERWEELE:  Objection --
23          THE WITNESS:  I don't mean -- I don't mean
24 anything by it.  It's not my report.
25          MR. DEAL:  Strike that.                    10:59:51AM

Page 39

1  BY MR. DEAL:
2      Q.   Do you have any understanding as to what
3  Mr. Fogarty's is referring to?
4      A.   I'm not sure that I do.
5      Q.   Mr. Evans, do you have any opinion as to       11:00:29AM
6  whether AIG should have shared this report with the
7  insureds?
8      A.   I think it was so preliminary, that probably
9  not.  But some do, some don't.
10     Q.   Is it customary to share forensic analysis -- 11:01:11AM
11 strike that.
12      In the handling of a crime claim, if the
13 insurer has retained an independent forensic accountant
14 to analyze a loss, would it be typical for the insurance
15 company to share the results of that investigation with  11:01:30AM
16 the insured?
17     A.   If it's a final report, either by -- either
18 directly or by explanation of meeting, that's what one
19 would expect, that this was preliminary and there was
20 lots more investigation to do.  And I think much more    11:01:49AM
21 documentation still to come from the insured.
22     Q.   Going back to my original question, do you
23 believe AIG should have shared this HSNO report with the
24 insureds in August 2017?
25          MS. VANDERWEELE:  Objection; asked and        11:02:12AM

Page 40

1  answered.
2          THE WITNESS:  Again, I think I have answered
3  the question, and the answer -- the answer is this was a
4  very preliminary report and the investigation was still
5  firmly underway and there was still a lot more           11:02:30AM
6  documentation to come, so I don't think it was any kind
7  of final anything.  I think it was just an information
8  provided to the insured based on Mr. Fogarty's firm's
9  investigation to date.
10 BY MR. DEAL:                                           11:02:48AM
11     Q.   So the answer is no, you don't believe it
12 needed to be shared with the insured?
13     A.   I don't think that AIG was obliged to share
14 it, an adjusting decision, I assume.
15          THE REPORTER:  I'm sorry, "an adjusting"?     11:02:58AM
16          THE WITNESS:  Decision, I assume.
17          MR. DEAL:  Okay.  I'm going to mark as
18 Exhibit 3 a December 19, 2017 letter from Jennifer Rocha
19 to me, Christopher Deal.
20      (Plaintiffs' Exhibit 3 was marked for             11:03:29AM
21      identification by the court reporter
22      and is attached hereto.)
23 BY MR. DEAL:
24     Q.   Have you seen this before?
25     A.   I have.                                       11:03:39AM

Page 41

1      Q.   Okay.  I'll circle with my mouse, "AIG Claims
2  expects to provide me with feedback within the next 30
3  days."
4      Do you see that?
5      A.   Yes.                               11:03:52AM
6      Q.   Do you know if that happened?
7      A.   I think there was additional contact following
8  this letter.
9      Q.   Would you characterize that additional contact
10 as feedback regarding the claim?                     11:04:05AM
11     A.   I would need to double-check.
12      So can you turn back, please --
13     Q.   Yeah.
14     A.   -- to the exhibit.
15     Q.   This one?                          11:04:28AM
16     A.   Yeah.  Yes, I see that it was followed by
17 additional information from you, I assume, or from the
18 city anyway, the following day.
19     Q.   So the following day, I acknowledge her
20 letter; right?                               11:04:50AM
21     A.   Right.
22          MS. VANDERWEELE:  I'm just going to have to
23 object, Chris.  You're now inserting yourself as like a
24 witness in the case by asking the witness questions
25 about a letter you sent.  And I know this has come up in 11:04:57AM

MAGNA
LEGAL SERVICES

EXHIBIT 7
PAGE 223

Page 42

```
 1   other depositions, but just for the record, I'll just
 2   make a standing objection so that we can get through
 3   this quickly.  I'm objecting to you asking the witness
 4   questions about a letter that you wrote.
 5        THE REPORTER:  I'm sorry, Counsel, I didn't   11:05:18AM
 6   hear the last part.  "I object"?
 7        MS. VANDERWEELE:  I'm objecting to Mr. Deal
 8   asking the witness questions about a letter that he
 9   wrote -- a letter that Mr. Deal wrote.
10   BY MR. DEAL:                        11:05:25AM
11        Q.  Okay.  Mr. Evans, the second paragraph, it --
12   it states, "We understand that you intend to provide the
13   city with feedback regarding the claim within
14   approximately 30 days."
15        Do you see that?                11:05:41AM
16        A.  Yes.
17        Q.  And it's your opinion that that happened?
18        A.  No, I don't think it was done within 30 days,
19   given the information that was coming and the fact that
20   the letter said that the insured had retained their own  11:05:54AM
21   consultant.  So that was a continuation of the process.
22        MR. DEAL:  So let's mark the -- the prior one
23   I had put up on the screen as Exhibit 4.  I can put it
24   back if it's helpful.  The December 20, 2017 letter from
25   me will be Exhibit 4.                11:06:16AM
```

Page 43

```
 1        (Plaintiffs' Exhibit 4 was marked for
 2         identification by the court reporter
 3         and is attached hereto.)
 4        MR. DEAL:  Exhibit 5 will be an e-mail dated
 5   December 26th, 2017 from Jennifer Rocha to myself.   11:06:38AM
 6        (Plaintiffs' Exhibit 5 was marked
 7         for identification by the court
 8         reporter and is attached hereto.)
 9   BY MR. DEAL:
10        Q.  It says -- Mr. Evans, can you see it?   11:06:47AM
11        A.  I can.
12        Q.  "Thank you for your letter.  We look forward
13   to receiving any additional information.  Please feel
14   free to contact me if you have any questions or
15   concerns."                          11:07:00AM
16        Would you characterize that as feedback
17   regarding the claim?
18        A.  I think it was feedback following the prior
19   exhibit where you said that the insured was planning to
20   update or enhance its statement of loss.  And I can't   11:07:18AM
21   see -- I don't see the exact words, but it effectually
22   rendered the -- being carried out incomplete, it seems
23   to me.
24        Q.  So based on the fact that I had indicated you
25   were retaining a forensic accountant, did that nullify   11:07:43AM
```

Page 44

```
 1   Ms. Rocha's promise to send feedback within 30 days?
 2        A.  Well, it wasn't promised.  It was a statement,
 3   to start with.  And your letter speaks for itself in
 4   that it says more than an amendment to the proof of
 5   loss.  It's the retention --            11:08:06AM
 6        Q.  Okay.
 7        MS. VANDERWEELE:  Counsel, let him finish,
 8   Chris.
 9        THE WITNESS:  Let's go back to that --
10        MR. DEAL:  That's 5; right?        11:08:15AM
11        THE REPORTER:  That would be 5, yes.  I don't
12   think you marked it, but --
13        MR. DEAL:  Let's mark that as 5.
14        MS. VANDERWEELE:  Hold on.
15        Mr. Evans, were you finished with answering   11:08:27AM
16   Mr. Deal's question?
17        THE WITNESS:  Well, I'd like him to see the
18   letter and then I can finish answering.
19   BY MR. DEAL:
20        Q.  Sure.  You're talking about the HSNO letter or   11:08:37AM
21   my letter?
22        A.  Your letter.
23        Q.  Okay.
24        A.  In that letter, you say that "the city
25   anticipates amending the proof of loss and provided" --   11:08:48AM
```

Page 45

```
 1   or "to provide additional details regarding the loss."
 2   And also, you say that the insured -- insured is
 3   providing -- I'm sorry, has retained a consultant.  And
 4   further below, that the Riverside D.A. is dealing with
 5   plea agreements.  And I knew that that would render   11:09:17AM
 6   the -- any opinions by the insurer or potential issues
 7   to be incomplete.
 8        MR. DEAL:  We'll mark as Exhibit 6 January 25,
 9   2000 e-mail -- or I'm sorry, letter from Jennifer Rocha
10   to me.                              11:09:55AM
11        (Plaintiffs' Exhibit 6 was marked
12         for identification by the court
13         reporter and is attached hereto.)
14   BY MR. DEAL:
15        Q.  Have you seen Exhibit 6 before, Mr. Evan?   11:10:01AM
16        A.  I believe so, yes.
17        Q.  The last sentence of the first full paragraph,
18   "AIG Claims expects to provide you with a preliminary
19   evaluation letter within the next 30 days."
20        What is a preliminary evaluation letter?   11:10:17AM
21        A.  It is -- well, I assume it's what it says.
22   They were -- they were expecting to provide a
23   preliminary evaluation within the next 30 days.
24        Q.  Is that a term of art?  What is a preliminary
25   evaluation letter?                   11:10:38AM
```

MAGNA ▶
LEGAL SERVICES

EXHIBIT 7
PAGE 224

Page 46

1    A.  I think it can mean different things to
2  different people, but it was followed up in, I think,
3  April by a preliminary evaluation letter.
4    Q.  Do you know if AIG Claim -- did it provide a
5  preliminary evaluation letter within 30 days of this    11:11:09AM
6  letter?
7    A.  I think -- I -- I'm not aware that it did.
8  I'm aware that there was additional information still
9  that came from the insured in March.
10    Q.  Do you know what additional information came    11:11:29AM
11  from the insured in this time period, such that AIG was
12  not able to provide a permanent -- preliminary
13  evaluation within 30 days?
14    A.  I would need to look at the -- all
15  communication to be sure of the details.    11:11:43AM
16    Q.  Do you need to look at your file in order to
17  determine why there was no preliminary evaluation letter
18  within 30 days of this letter?
19    A.  Well, I think that there was something that
20  came from Beaumont or its representatives early in    11:12:12AM
21  March.
22    THE REPORTER:  I'm sorry, "Well, I think that
23  there was something that came from"?
24    THE WITNESS:  Beaumont or its representatives
25  early in March.    11:12:24AM

Page 47

1    MR. DEAL:  So Exhibit 7 will be a March 7,
2  2018 letter from me to Ms. Rocha.
3    (Plaintiffs' Exhibit 7 was marked
4    for identification by the court
5    reporter and is attached hereto.)    11:12:44AM
6  BY MR. DEAL:
7    Q.  Have you seen this before?
8    A.  I believe that I have.
9    Q.  Is this what you were referring to, that
10  additional information was provided?    11:12:52AM
11    A.  Yes, keep going.  Scroll down.
12    Yes, you -- you say that -- understand that
13  they may be nearing a coverage evaluation.
14    Q.  If -- if AIG had substantive information to
15  report within 30 days of January 2018, shouldn't they    11:13:18AM
16  have provided that information regardless of what the
17  insured was going to submit?
18    A.  Well, except that in providing a preliminary
19  view of the investigation, we wanted to be as complete
20  as possible.  While you were expecting, for example, a    11:13:44AM
21  report from the insured's accountant, then it's better
22  to wait for that.  Or -- or at least to be aware of it
23  before you make -- you -- you present views that are --
24  that may be supercede.
25    Q.  Okay.  In this case, the expert, the Dan Ray    11:14:09AM

Page 48

1  report was provided to AIG.  Do you know when?
2    A.  I think much later in 2018.
3    Q.  Around September 2018?
4    A.  I think that's about it.
5    Q.  And do you believe that AIG -- that the    11:14:22AM
6  standard of care required to wait for that report
7  before issuing any type of preliminary coverage
8  analysis?
9    A.  Well, it did not because it was time to
10  provide what it had as a preliminary coverage analysis,    11:14:38AM
11  waiting for additional information.
12    Q.  So kind of going back to my original
13  questions, the January 2018 letter indicated that there
14  would be some type of preliminary evaluation within 30
15  days.  But you indicated that was delayed, there was    11:15:00AM
16  additional information provided and that it would be
17  appropriate to wait for the final accounting report from
18  the insured; correct?
19    A.  Assuming it came in reasonable time, yes.
20    Q.  But in this case, it did not now; right?    11:15:14AM
21    A.  Unless the insured went ahead and wrote its
22  letter in April.
23    Q.  Well, let's look at the April letter.
24    MR. DEAL:  Are we on Exhibit 8?
25    THE REPORTER:  Yes.    11:15:42AM

Page 49

1    MR. DEAL:  We'll mark as Exhibit 8 an e-mail
2  chain from Judith Blake to Jennifer Rocha.
3    (Plaintiffs' Exhibit 8 was marked
4    for identification by the court
5    reporter and is attached hereto.)    11:15:46AM
6  BY MR. DEAL:
7    Q.  Have you seen this before, Mr. Evan?
8    A.  I don't know.  You're scrolling up and down, I
9  don't see the meat, as it were, of the chain.
10    Q.  All right.  I'm -- I'm focusing here on an    11:16:14AM
11  e-mail from Elaine Than at Alliant dated April 2nd, 2018
12  to Jennifer Rocha and CC'ed to Judith Blake.
13    Do you see that?
14    A.  I do.
15    Q.  And if we go to the next page, looks there's    11:16:28AM
16  attachments, JPEGs.  Do you see that?
17    A.  Yes.
18    MS. VANDERWEELE:  Only (Audio issue) --
19    MR. DEAL:  I'm sorry, Meagan?
20    MS. VANDERWEELE:  Are you talking about --    11:16:44AM
21  when you say "next page," are you talking about -- okay.
22  Thank you.
23  BY MR. DEAL:
24    Q.  Image 4, Image 5 JPEGs.  Do you see that?
25    A.  I do.    11:16:53AM

MAGNA
LEGAL SERVICES

EXHIBIT 7
PAGE 225

Page 50

1   Q.   Do you know what those were?
2   A.   I don't recall, but they followed a message
3   from Ms. Rocha, asking for a conference call to discuss
4   the claim.
5   Q.   In your review of the file, did you come        11:17:09AM
6   across communications where Alliant is sending
7   endorsements to AIG and alerting them to the existence
8   of these endorsements?
9   A.   I don't remember.
10  Q.   Do you know if anyone at AIG was aware of the   11:17:25AM
11  endorsement naming appointed city officials as the
12  additional endorse -- insureds in April 2018?
13  A.   I don't know.
14  Q.   If they did not know, if they were not aware
15  of those endorsements, would that fall within the custom 11:17:46AM
16  and practice of the industry?
17  A.   You would hope that they knew all the
18  endorsements on this group policy that covered multiple
19  municipalities.  But they may not have.  They may not
20  have realized they were there, so the brokers were       11:18:11AM
21  (Audio issue) --
22       THE REPORTER:  I'm sorry, I didn't hear the
23  last part.  "So the brokers were"?
24       THE WITNESS:  Doing what they do for their
25  clients, the insured.                                    11:18:26AM

Page 51

1   BY MR. DEAL:
2   Q.   We're almost two years into the claim at this
3   point; correct?
4   A.   Well, by your calculation, not -- not by mine.
5   Q.   We're almost two years since the initial claim 11:18:36AM
6   was submitted to AIG; correct?
7   A.   Was notified to AIG, yes.
8   Q.   Should AIG be aware of the endorsements it's
9   issued in its own policy at this point in time?
10  A.   I would say that they should have -- should    11:18:58AM
11  have known, but that's why brokers are there and that's
12  why people double-check.  If it was an error, it was an
13  error.
14  Q.   What do you mean by "if it was an error, it's
15  an error"?                                               11:19:25AM
16  A.   Well, it means that they're reminded and now
17  they know.
18  Q.   If AIG's investigation for merely two years
19  focused on the issue of whether the wrongdoers were
20  employees or not, wouldn't that be effectively a waste   11:19:46AM
21  of time considering the endorsement?
22  A.   No, not at all because the investigation was a
23  much larger one than that, covering hundreds of
24  thousands of documents, and viewed by the forensic
25  accounting account -- accounting consultant.  That       11:20:09AM

Page 52

1   wasn't a waste of time.  It is something to add into the
2   evaluation of the investigation.
3        MR. DEAL:  Okay.  We've been going about an
4   hour, 20 minutes.  Can we take a few minute break?
5        THE WITNESS:  That would be great.             11:20:42AM
6   Five-minute break.
7        THE VIDEOGRAPHER:  Okay.  We are going off the
8   record at 11:20 a.m.
9        (Recess.)
10       THE VIDEOGRAPHER:  We are back on video record 11:31:47AM
11  at 11:31 a.m.
12       MR. DEAL:  What exhibit are we on, Madam
13  Reporter?
14       THE REPORTER:  Was it 8 that you were on
15  last -- oh; 9.                    11:31:58AM
16       (A discussion was held off the record.)
17       MR. DEAL:  Okay.  I'll mark as Exhibit 9
18  April 26, 2018 letter from Jennifer Rocha to me.
19       (Plaintiffs' Exhibit 9 was marked for
20       identification by the court reporter    11:32:36AM
21       and is attached hereto.)
22  BY MR. DEAL:
23  Q.   Mr. Evans, have you seen this letter before?
24  A.   I don't see it now.
25       MS. VANDERWEELE:  It's not on the screen.    11:32:54AM

Page 53

1        MR. DEAL:  Sorry.
2   BY MR. DEAL:
3   Q.   Is that better?
4   A.   Yes, I have seen this letter before.
5   Q.   I've heard this referred to as a soft denial. 11:33:16AM
6   Do you know what that means?
7   A.   I've heard the term.
8   Q.   Is it a term you use?
9   A.   I don't think I do.  I've certainly heard it.
10  Q.   Why don't you use the term?            11:33:34AM
11  A.   I'd rather call it what AIG Claims called it
12  at the end, a preliminary issues letter or something.
13  Same thing.
14  Q.   Looking at the third paragraph of Page 1, it
15  states, "Based on the information we have to date, the  11:34:15AM
16  issues identified pertain primarily to whether the
17  alleged wrongdoers fall within one or more definition of
18  employee under the policy."
19       Do you see that?
20  A.   I do.                          11:34:30AM
21  Q.   In your mind, in April of 2018, should there
22  have been any question about whether the wrongdoers
23  qualified as employees under the policy?
24  A.   I don't recall exactly how much detail the
25  insurer had regarding the individual, or the            11:34:53AM

MAGNA
LEGAL SERVICES

EXHIBIT 7
PAGE 226

Page 54

1  individuals, but it was part of the investigation.
2  Q.  Eventually, it was determined that they were
3  appointed -- that the wrongdoers were either appointed
4  city officials or employees; correct?
5  A.  I think that's right.          11:35:16AM
6  Q.  Is there any reason as of April 2018 why AIG
7  couldn't have obtained the information sufficient to
8  reach that conclusion in April 2018?
9  A.  I don't know the detail of the employees that
10 they had at that time.          11:35:37AM
11 Q.  They could have sought information regarding
12 the employee or status of the wrongdoers with the city;
13 right?
14 A.  As a part of their investigation, sure.
15 Q.  Sorry, bear with me, I'm eliminating a bunch  11:35:57AM
16 of questions here, so. . .
17 Okay.  I'm going to jump around here, if you
18 can bear with me, Mr. Evans.
19 I'm going to mark the next, which I think is
20 Exhibit 10.          11:38:04AM
21 (Plaintiffs' Exhibit 10 was marked
22 for identification by the court
23 reporter and is attached hereto.)
24 BY MR. DEAL:
25 Q.  So I'm on Page 4 of the letter?          11:39:36AM

Page 55

1  MS. VANDERWEELE:  Are we still on Exhibit 9,
2  Chris?
3  MR. DEAL:  Yeah.
4  MS. VANDERWEELE:  Okay.
5  MR. DEAL:  This is the April 26, 2018 letter. 11:39:44AM
6  MS. VANDERWEELE:  All right.  I thought you
7  were marking a new exhibit.
8  BY MR. DEAL:
9  Q.  Okay.  The last paragraph on the section on
10 Mr. Kapanicus, "Based on the information described at  11:39:59AM
11 the bottom, it appears that Kapanicus was an independent
12 contractor at the time of events."
13 Is that statement true?
14 A.  I think it may have been in part, but -- at
15 one time.          11:40:17AM
16 Q.  We know at some point he was also an employee
17 of the city; right?
18 A.  Well, we may know, I believe -- I think I
19 recall that, yes.
20 Q.  So the statement is incorrect; correct?  Is  11:40:31AM
21 that true?
22 A.  It may have ended up being incorrect, but I'm
23 not sure that it had been fully investigated by that
24 state.
25 And do you -- do you have an understanding  11:40:43AM

Page 56

1  that Mr. Kapanicus was the city manager of the City of
2  Beaumont?
3  A.  At some stage, yes.
4  Q.  Is there any question in your mind that he was
5  actually the city manager for -- until he was  11:40:56AM
6  terminated?
7  A.  I think he was.
8  Q.  Prior to that termination, is -- is it -- in
9  your mind, is there any question that he was the city
10 manager for the City of Beaumont?          11:41:08AM
11 A.  Based on what I know now, I think he was the
12 city manager at some stage.
13 Q.  And that's based on the documents you
14 reviewed; right?
15 A.  Including those after this event, after this  11:41:22AM
16 letter, yes.
17 Q.  And then Mr. Dillon, Moorjani and Mr. Egger,
18 in your mind now, is there any question that they were
19 appointed city officials for City of Beaumont?
20 A.  I think they were, but again, I'm not a lawyer 11:41:43AM
21 so I -- but I think they were.
22 Q.  It's not -- seemingly, that wouldn't be a very
23 difficult issue to resolve; right?  If AIG had a
24 question as to whether someone was a city official,
25 presumably that information could be obtained by  11:42:00AM

Page 57

1  (Inaudible) right?
2  A.  Yes, it could.  And certainly following this,
3  it could be.
4  Q.  Would you expect that two years into the
5  claim, AIG would have already obtained that information? 11:42:12AM
6  A.  Well, we can quibble into the past as to dates
7  again.  But again, it was a big investigation going as
8  to document review, mainly, and this was a preliminary
9  issue letter that needed a response.  So it was part of
10 the investigation.          11:42:34AM
11 Q.  The last paragraph on Page 4, the Keeler memo
12 appears to show these individuals were not employees as
13 defined in the policy.  Is that relevant?
14 A.  Probably is.
15 Q.  You say "probably."  How?          11:43:09AM
16 A.  Well, it's -- it's part of the investigation.
17 At the end of this letter, they ask for response and
18 comment.  So it's -- it's their understanding at the
19 time, whether right or wrong.
20 Q.  As of April 2018, should AIG have requested or 11:43:28AM
21 obtained information regarding the status of Dillon,
22 Edgar -- Egger and Moorjani, specifically their status
23 as independent contractors?
24 A.  I already answered that question at least
25 twice.          11:43:54AM

MAGNA
LEGAL SERVICES

EXHIBIT 7
PAGE 227

---

Page 58

1    Q.   Let's try a third time.
2    A.   All right. Well, then this is a question in
3  this letter that needed response. That was their
4  understanding at around this time. And the response was
5  received and, ultimately, I believe the issue was        11:44:08AM
6  resolved.
7    Q.   Looking at this paragraph right before
8  Mr. Aklufi, "While there's information suggesting that
9  Moorjani, Dillon and Egger are not employees as defined
10  in the policy, please provide support for the assertion  11:44:29AM
11  that they were city officials."
12       What type of information was AIG -- what's
13  your understanding as to what type of information they
14  were seeking?
15    A.   They were seeking exactly what they said,     11:44:48AM
16  please provide support for the assertion that they were.
17    Q.   What type of support would you expect AIG --
18  or the insured to provide in response to this?
19    A.   The city's best shot at answering the
20  question.                          11:45:08AM
21    Q.   Do you have any understanding or opinion as to
22  whether Egger, Moorjani, Dillon and Kapanicus were
23  appointed city officials and/or employees during all
24  relevant time frames for this claim?
25    A.   I don't recall.              11:45:34AM

---

Page 59

1    MR. DEAL:  Are we on 11?
2    THE REPORTER:  Yes.
3    MR. DEAL:  I'm going to share. Exhibit 11
4  will be my October 15, 2018 letter to Jennifer Rocha.
5    (Plaintiffs' Exhibit 11 was marked       11:46:55AM
6    for identification by the court
7    reporter and is attached hereto.)
8    MS. VANDERWEELE:  I have the same standing
9  objecting to the use of correspondence by counsel and it
10  having -- or objecting to Mr. Deal asking the witness    11:47:10AM
11  questions in the first person about letters that
12  Mr. Deal wrote pre-suit.
13  BY MR. DEAL:
14    Q.   On Page 2, the first paragraph, it states, "As
15  you acknowledge, Endorsement Number 8 modified the       11:47:24AM
16  policies so the discovery means only discovery by the
17  risk management department designated to handle
18  insurance matters for the city."
19       Do you agree with that statement?
20    A.   I would need to look again at the endorsement. 11:47:40AM
21  I don't recall seeing the so-called acknowledgment, but
22  I need to look at that (Audio issue) --
23    THE REPORTER:  I'm sorry, "but"? I didn't
24  hear the last part.
25    THE WITNESS:  I would need to look at that    11:47:55AM

---

Page 60

1  acknowledgment, too.
2  BY MR. DEAL:
3    Q.   Have you looked at Endorsement Number 8?
4    A.   I think I did at one stage, but I'm not -- I
5  don't have it in mind at the moment.        11:48:06AM
6    Q.   Do you -- do you have an understanding as to
7  that impacts the definition of discovery under the two
8  policies?
9    A.   Well, I think it did, but I'd like to look at
10  that time again.                     11:48:20AM
11    Q.   You can, if you -- do you need to look at it
12  in order to answer my question?
13    A.   Well, why don't -- why don't you show it to
14  me?
15    Q.   Let me see if I can find it.       11:49:02AM
16    MS. VANDERWEELE:  Do you want to go off the
17  record, Chris?
18    MR. DEAL:  Yeah, let's take a two-minute
19  break.
20    THE VIDEOGRAPHER:  We are going off record at 11:49:10AM
21  11:49 a.m.
22    (Recess.)
23    THE VIDEOGRAPHER:  We are back on video record
24  at 11:56 a.m.
25    MR. DEAL:  Could you read back my last    11:56:08AM

---

Page 61

1  question and answer.
2    (The previous question and answer
3    were read back by the court reporter
4    as follows:
5    "QUESTION:  Do you have an
6    understanding as to that impacts the
7    definition of discovery under two
8    policies -- the two policies?"
9    "ANSWER:  Well, I think it did,
10    but I'd like to look at that time
11    again.")
12  BY MR. DEAL:
13    Q.   So I have on the screen the '15/'17 policy,
14  which was Exhibit 8 to Ms. Blake's deposition.
15       Is there somewhere you'd like to look on   11:56:46AM
16  there?
17    A.   I'd like to look at the relevant enforcement,
18  which I think is Number 8.
19    Q.   This endorsement?
20    MS. VANDERWEELE:  Just for the record, you're 11:57:15AM
21  on Page 246 of Exhibit 8 of Blake's deposition?
22    MR. DEAL:  Yeah, it's Endorsement Number 8.
23    THE WITNESS:  Well, that's the discovery. I
24  was thinking of the one that deals with definition of
25  employee or other.                  11:57:39AM

MAGNA
LEGAL SERVICES

EXHIBIT 7
PAGE 228

Page 62

1  BY MR. DEAL:
2      Q.   Are you able to point me in -- in the policy
3  to what you'd like me to look at?
4      A.   Well, the endorsement about which you've been
5  asking me questions.                    11:57:57AM
6      Q.   This is Endorsement 13, which is on Page 252?
7      A.   That's what it looks like.
8      Q.   But we were talking about discovery, I think,
9  so that's why I was asking you to look at the earlier
10  endorsement.  And specifically, I believe I was asking  11:58:40AM
11  with respect to Endorsement Number 9.
12          Would you agree that discovery under the
13  subject policy is limited to the risk management
14  department pursuant to Endorsement Number 8?
15      A.   Well, first, I don't think that was the    11:59:12AM
16  question you were asking, but never mind.
17          It says, "risk management department or other
18  department designated to handle insurance matters for
19  named insured" -- "named insured learns of the theft or
20  other dishonest act committed by the employee."    11:59:34AM
21  So, it says what it says.
22      Q.   Do you know when AIG first asked the city or
23  WRCOG for any information as to the information
24  possessed by its risk -- risk management department?
25      A.   I don't recall that.                 11:59:59AM

Page 63

1      Q.   Do you have an understanding that the City of
2  Beaumont did have a risk management department?
3      A.   It had a risk manager, certainly.
4      Q.   Okay.  Do you have any understanding that
5  Mr. Gregg was the risk manager?            12:00:13PM
6      A.   That's my understanding.
7      Q.   Would you agree that a central focus of the
8  claim should have been what Mr. Gregg did or didn't know
9  about the subject claim?
10      A.   As a part of the investigation, sure.    12:00:28PM
11      Q.   Do you know --
12      A.   Well, I -- or -- or the risk management
13  department or any other department designated.
14      Q.   So going back to my question, which was on --
15  so this is my October 15, 2018 letter that we were    12:01:26PM
16  looking at earlier?
17          MS. VANDERWEELE:  Exhibit 11?
18          MR. DEAL:  Yes.
19  BY MR. DEAL:
20      Q.   So my original question was the first    12:01:43PM
21  paragraph.  "As you acknowledge, Endorsement Number 8
22  modified the policy so that discovery means only
23  discovery by the risk management department designated
24  to handle insurance matters through the city."
25          Would you agree with that statement?    12:01:59PM

Page 64

1      A.   Well, that doesn't quite quote the
2  endorsement.
3      Q.   So you don't agree?
4      A.   Well, I don't think it's a full statement, and
5  I'm not a lawyer, so -- I don't agree with it.    12:02:14PM
6      Q.   What investigation had AIG done as of October
7  2018 into the information possessed by the City of
8  Beaumont's risk manager?
9      A.   I don't know.
10      Q.   Should it have done some investigation into    12:02:36PM
11  what information the risk manager possessed at the time
12  of the subject claim and after?
13      A.   In the end, that it was investigating the
14  overall facts as presented and the claim as presented,
15  which was its obligation.  So a part of the overall  12:02:57PM
16  investigation, but only a part.
17      Q.   Is there anything that AIG could have done
18  prior to October 15, 2018 to determine what knowledge
19  the risk management department had or didn't have?
20      A.   I don't have the detail information and    12:03:25PM
21  document requests, so I don't recall.
22      Q.   Could it have taken an examination under oath
23  of Mr. Gregg?
24      A.   In my experience, it's very unusual for
25  examinations under oath to be taken without full detail  12:03:53PM

Page 65

1  of the claim.  It's possible, but in my experience, it's
2  unlikely.
3      Q.   I don't understand without full knowledge of
4  the claim, I'm not sure I understand the qualification
5  there.                                   12:04:12PM
6      A.   Sure.  You need to have all the detail
7  available before you take an examination under oath.
8  Otherwise, you're just shooting in the dark.
9      Q.   Well, here, the -- there's a fairly finite,
10  discrete issue of what the risk manager knew; right?    12:04:31PM
11  And it's a central issue to the coverage analysis;
12  correct?
13      A.   It is central, and I think that the insurer
14  had requested employee documentation.  And I don't
15  recall that it had been -- see, I don't remember when it  12:04:47PM
16  was received.
17      Q.   Did AIG have the right to take an examination
18  under oath of the risk manager in 2018?
19      A.   Potentially.  But again, having been involved
20  in examinations under oath and having taken a couple    12:05:09PM
21  myself, there's little point before the investigation is
22  all but complete.  Because otherwise you are unable to
23  take -- or unable to obtain all the information that you
24  might need.  And while policies say that -- I don't
25  remember what this one says, but policies generally say  12:05:34PM

17  (Pages 62 to 65)

EXHIBIT 7
PAGE 229

Page 66

1  that you can take them as often as you like.  That in
2  itself leads to accusations of overreaching, if you take
3  one and then you need to go back and get more
4  information.
5      Q.   Mr. Evans, it's a yes/no question.  In October  12:05:59PM
6  2018, did AIG have the right to seek an examination
7  under oath of the risk manager?
8      A.   Yes, they did.  But again, I refer you to my
9  prior answer.
10     Q.   Thank you.                        12:06:17PM
11         Okay.  Still on Exhibit 11 and I'm focusing on
12  Section 4, the city's losses.  In Section A 1, talks
13  about ULC.  Have you seen this before?
14     A.   I believe so.
15     Q.   Do you understand that at one point, at least  12:07:01PM
16  in this letter, the insured was claiming losses for
17  conflict of interest statutes?
18         MS. VANDERWEELE:  Objection; form.
19         THE WITNESS:  There were all sorts of claims.
20  BY MR. DEAL:                            12:07:26PM
21     Q.   I'm sorry, I didn't hear that, Mr. Evan.
22     A.   There were all sorts of claims, but this one
23  deals with California Code section 1090.
24     Q.   Okay.  In your experience as an adjuster over
25  40 years, is it common for an insured to itemize or seek  12:07:46PM

Page 67

1  damages and approve a loss or other document that are
2  ultimately not covered by the policy?
3      A.   At times, sure.
4      Q.   And part of the insurer's job is to explain to
5  the insured these losses are covered, these are not, you  12:08:03PM
6  know, that this is the type of loss that would be
7  covered by the policy; right?
8      A.   And that's what was done back in April of
9  2017, or '18.  I forget which.
10     Q.   And ultimately it was AIG's position that    12:08:21PM
11  losses from 1090 violations on -- in and of themselves,
12  would not be grounds for a covered loss; is that true?
13     A.   I don't think that was the only reason.
14  Again, I'd need to look at the documentation to be sure
15  and answer that question properly.            12:08:41PM
16     Q.   Do you believe that because the insured was
17  seeking damages for 1090 violations, that it's estopped
18  from seeking damages under any other theory?
19     A.   You're asking me a legal question and I'm not
20  a lawyer, I can't answer that.              12:08:59PM
21     Q.   Let me ask you, in the insurance industry,
22  have you ever taken the position that since an insured
23  was asserting an uncovered loss, it was also then barred
24  from seeking any covered losses?
25     A.   That wouldn't be for me to do.  You're back to  12:09:15PM

Page 68

1  asking me a legal question.  The answer is I don't know,
2  but that -- that would be something for the lawyers.
3      Q.   Okay.  You personally have never taken that
4  position in a coverage opinion?
5          MS. VANDERWEELE:  Objection; form.        12:09:34PM
6          THE WITNESS:  Well, I don't like coverage
7  opinions, first.  I'm not a lawyer, and I'm certainly
8  not prepared to espouse any opinion as to waiver an
9  estoppel.  That's not my job.
10  BY MR. DEAL:                            12:09:54PM
11     Q.   Are you -- when you did your review of the
12  file, did you see that the submission of this letter
13  changed AIG's handling of the claim?
14     A.   I don't know.
15     Q.   What I'm trying to get at is part of an      12:10:10PM
16  estoppel would involve some type of prejudice.  Are you
17  aware that this assertion made by the insured in
18  October 15, 2018 letter somehow prejudiced AIG or
19  impacted the way it handled the claim?
20         MS. VANDERWEELE:  Objection; form.  It seeks a  12:10:34PM
21  legal opinion or conclusion.  It's improper for this
22  witness.
23         THE WITNESS:  Again, I'm not a lawyer.  I
24  don't deal with labor and estoppel.  It's a legal
25  concept that is not for the adjuster.         12:10:45PM

Page 69

1  BY MR. DEAL:
2      Q.   Does an adjuster -- are you saying an adjuster
3  can never make a determination as to whether there's
4  been a waiver for damages or losses?
5      A.   Well, this adjuster, for sure.  You're      12:11:07PM
6  asking -- again, it's a legal concept and it's not for
7  me to say, and not for the general -- generally for an
8  adjuster to make that determination.
9      Q.   Okay.  I'm going to -- I'm showing you now
10  Page 16 of the October 15, 2018 letter.  Have you seen  12:11:46PM
11  this?
12     A.   I don't recall.
13     Q.   Okay.  This points out six other policies that
14  might provide coverage for the claim.
15         Do you see that?                    12:12:00PM
16     A.   I do.
17     Q.   Do you know if AIG ever examined whether there
18  was coverage of these other six policies?
19     A.   I don't recall.
20     Q.   Should, at some point during the handling of  12:12:13PM
21  this claim, AIG have notified the insured that there
22  either was or was not coverage under the six policies
23  identified there?
24     A.   I know that counsel for the insured responded
25  in detail a coverage position letter, and I don't recall  12:12:31PM

MAGNA
LEGAL SERVICES

EXHIBIT 7
PAGE 230

Page 70

1   what response in there, or anywhere else, dealt with
2   that specific request.
3       Q.   Do you believe that coverage letter you were
4   just referring to addressed any of these six policies?
5       A.   I just said that I don't know.        12:12:53PM
6       Q.   Let's assume that they did not, isn't AIG --
7   as part of the claims handling process, isn't it the
8   custom -- custom and practice in the industry for the
9   insurer to at least respond to a policyholder asking
10  about coverage under a specific policy?        12:13:19PM
11      A.   I would expect so.
12      Q.   So you would have expected at some point AIG
13  would address the requests being made in Section 6 of
14  the October 15, 2018 letter?
15      A.   Well, again, I assume that AIG did respond to  12:13:33PM
16  that letter, but I don't recall it.
17      Q.   I think my question, though, is should they
18  have responded to this specific contention regarding the
19  other six policies?
20      A.   I would expect that they -- they would have  12:13:50PM
21  and that they did, and the question asked probably
22  deserved an answer.
23      Q.   Okay.  So now I'm looking at Page 19 and 20 of
24  my letter, and it's dealing with Request Number 10.
25  I'll represent to you these were information requests  12:14:26PM

Page 71

1   from AIG.
2       Have you seen this provision before, this part
3   of the letter?
4       A.   Probably.  I'm not certain.
5       Q.   Do you have an understanding in this case that  12:14:43PM
6   Mr. Kapanicus was ordered to pay restitution as part of
7   the criminal proceedings?
8       A.   Yes, it's my understanding that several were
9   required to pay restitution, and I understand that they
10  did so.                                        12:14:59PM
11      Q.   Do you have an understanding as to who they
12  were required to pay restitution to?
13      A.   Well, this letter says WRCOG.
14      Q.   And is that consistent with your
15  understanding?                                 12:15:17PM
16      A.   Well, I'm -- I don't know.  I assume so.
17      Q.   Would you agree with me that as -- as of
18  October 2018, AIG knew that the restitution payments
19  made by the wrongdoers were paid to WRCOG, not the city?
20      A.   I assume so.  And, again, it's my        12:15:49PM
21  understanding that that entity had an assignment of
22  claim from the city.
23      Q.   Do you have any understanding as to what those
24  restitution payments were supposed to represent?
25      A.   Restitution, based on the criminal complaint.  12:16:11PM

Page 72

1       Q.   Restitution for what?
2       A.   For the malfeasance of those people.
3       THE REPORTER:  I'm sorry, "for the"?
4       THE WITNESS:  Malfeasance of those people.
5   BY MR. DEAL:                                   12:16:29PM
6       Q.   And that was malfeasance in relation to WRCOG;
7   correct?
8       MS. VANDERWEELE:  Objection to form.
9       THE WITNESS:  I don't know that.  I'm -- my
10  understanding, it was for their activities in connection 12:16:43PM
11  with Beaumont.
12  BY MR. DEAL:
13      Q.   Do you have any understanding --
14      THE WITNESS:  I'm sorry --
15      THE REPORTER:  I'm sorry, "in connection     12:16:48PM
16  with"?
17      THE WITNESS:  With Beaumont --
18      MS. VANDERWEELE:  Beaumont.
19      THE WITNESS:  -- that had assigned its rights
20  under the -- any rights under the claim to the other  12:17:01PM
21  entity.
22  BY MR. DEAL:
23      Q.   Have you looked at the settlement agreement
24  between WRCOG and Beaumont?
25      A.   I don't recall.                        12:17:17PM

Page 73

1       Q.   Do you have an understanding as to what the
2   underlying TUMF suit between the city and WRCOG related
3   to?
4       A.   Not enough to -- no, is the answer.
5       Q.   Do you have an understanding that WRCOG     12:17:38PM
6   obtained a judgment over of $40 million against the
7   city?
8       A.   That's what I -- I understand that there was a
9   large judgment.
10      THE REPORTER:  I'm sorry, I didn't hear you,  12:17:49PM
11  "that there was a"?
12      THE WITNESS:  Large judgment.
13  BY MR. DEAL:
14      Q.   And that was a contractual liability; is that
15  correct?                                       12:18:05PM
16      A.   I don't --
17      MS. VANDERWEELE:  Objection.  You're seeking a
18  legal opinion from this witness, and that's improper.
19      THE WITNESS:  The answer is, I don't know.
20  BY MR. DEAL:                                   12:18:14PM
21      Q.   Do you have any understanding that the
22  restitution that was paid to WRCOG was supposed to cover
23  its loss -- strike that.
24      Do you have an understanding that the
25  restitution talked about here in relation to Request  12:18:39PM

MAGNA
LEGAL SERVICES

EXHIBIT 7
PAGE 231

Page 74

1   Number 10 was paid to WRCOG for its contractual judgment
2   against the city and not for any overbilling or theft?
3       MS. VANDERWEELE:  Objection; form, foundation,
4   seeking improper opinion testimony regarding illegal
5   conclusion from this witness.           12:19:07PM
6       THE WITNESS:  And I do not have that
7   understanding because I do not know.
8   BY MR. DEAL:
9       Q.  Would it be fair to say --
10      A.  And -- and -- sorry.  And it would be beyond  12:19:13PM
11  my nonlegal capability.
12      Q.  Okay.  If -- if AIG actually believed that
13  this restitution actually represented consideration to
14  the city, should it have -- should it have communicated
15  this to the insured?                    12:19:35PM
16      MS. VANDERWEELE:  Objection; form, foundation,
17  improperly seeking a legal opinion from this.
18      THE WITNESS:  Why don't you repeat that
19  question, please?
20  BY MR. DEAL:                            12:19:49PM
21      Q.  Under standard industry practices, if there
22  was any question in AIG's mind as to what these
23  restitution payments represented and whether they
24  represented consideration being paid to W -- to
25  Beaumont, should it have alerted the policyholder to its  12:20:07PM

Page 75

1   questions or concerns?
2       MS. VANDERWEELE:  Same objection.
3       THE WITNESS:  Should it have -- should it have
4   what?
5   BY MR. DEAL:                            12:20:16PM
6       Q.  Essentially, alerted the policyholder in this
7   case to the fact that it believed the restitution
8   payments being paid by Kapanicus, Dillon, Eggers,
9   Moorjani and Aylward represented consideration being
10  paid to Beaumont or to WRCOG?            12:20:36PM
11      MS. VANDERWEELE:  Objection; form.
12      THE WITNESS:  Well, again, it was my
13  understanding that the City of Beaumont assigned its
14  claim to the other entity and that these -- the
15  restitution was paid because of those people's  12:20:48PM
16  malfeasance or claimed malfeasance towards the City of
17  Beaumont.  So that's the best I can tell you.  I'm not a
18  lawyer, yet again, and it's not for me to answer legal
19  questions.
20  BY MR. DEAL:                            12:21:10PM
21      Q.  Do you know when AIG subsequently responded to
22  this letter?
23      A.  I don't remember.
24      Q.  Was it over a year?
25      A.  Well, most certainly discussions following  12:21:30PM

Page 76

1   this letter and responses, I can't tell you.
2       Q.  Should there have been a substantive response
3   to this letter within a year of it being sent --
4       A.  My --
5       Q.  Let me qualify that, applying standard customs  12:21:52PM
6   and practices in the insurance industry for first-party
7   claims?
8       A.  Well, again, it depends.  My understanding is
9   that there were multiple contacts, continuing contacts,
10  and I don't recall what detailed responses were given in  12:22:09PM
11  those contacts.
12      Q.  What is your understanding as to why it took
13  over a year to respond to this letter?
14      A.  I don't know that it did.
15      MR. DEAL:  What exhibit we on?  Is it 12?  12:22:52PM
16      THE REPORTER:  Yes.
17      MR. DEAL:  So I'm going to mark this as 12.
18  It's an e-mail from Mr. Watnick to me, copying Jennifer
19  Rocha, dated 11-- 11/28/18.
20      (Plaintiffs' Exhibit 12 was marked    12:23:07PM
21      for identification by the court
22      reporter and is attached hereto.)
23  BY MR. DEAL:
24      Q.  Okay.  And I'd like you to focus on
25  Paragraph 4 in this e-mail.  It kind of straddles -- it  12:23:36PM

Page 77

1   straddles Pages 4 and 5.
2       And on -- starting on Page 5, there's a
3   sentence that says "Was the city council aware?"
4       Do you see that?
5       A.  Yes.                            12:23:59PM
6       Q.  Okay.  It says, "Was the city council aware of
7   the dual capacities of the principals ULC, GGMS and BSI
8   when they approved the agreements, the bond issuance or
9   payments to the companies?"
10      What does it matter what the city council knew  12:24:17PM
11  or when it was aware?
12      A.  Well, you would have had to ask Mr. Watnick
13  or -- or AIG about that, but it appears to me that it
14  was -- it related, in part, at least, to -- to discovery
15  as defined under the terms of policy, but I don't know.  12:24:36PM
16      Q.  When we looked at the policy, it was my
17  understanding that the relevant inquiry for purposes of
18  discovery was what the risk manager knew or did not know
19  during the relevant time period.  Is my understanding
20  incorrect?                              12:24:58PM
21      MS. VANDERWEELE:  Objection.  You're asking
22  him to give now like a coverage opinion, Chris, which is
23  improper for this witness.  I understand what you're
24  doing, but -- so objection; form.
25      MR. DEAL:  Just -- yeah, just object and he  12:25:08PM

**MAGNA**
LEGAL SERVICES

EXHIBIT 7
PAGE 232

Page 78

1  can answer the best he can.
2        THE WITNESS:  I think the answer is not for
3  me.  It's -- the policy says what it says.  The city
4  council is a department that is involved, among other
5  things, in management and insurance so I can't answer   12:25:27PM
6  your question.  It's a legal question.
7  BY MR. DEAL:
8     Q.   All right.  Kind of jumping up to the top of
9  the e-mail.  Second paragraph, "During our call,
10  Jennifer Rocha of AIG Claims explained that HSNO was   12:26:24PM
11  analyzing several years of information, including
12  invoices and payment stubs, because of the detailed
13  nature of the analysis, HSNO expects to complete its
14  analysis in January."
15        Do you know if HSNO completed its analysis in   12:26:39PM
16  January?
17     A.   I'm not sure that it did because I think
18  addition -- well, there was information obtained --
19  provided in September 15, and it was working on that so
20  that's -- January is what they expected and I'm not sure   12:26:59PM
21  that it happened by January.
22     Q.   The first paragraph states, "It has retained a
23  forensic accountant, HSNO, to assist in the damage
24  analysis" (Audio issue) --
25        THE REPORTER:  I'm sorry, Counsel, excuse

Page 79

1  me --
2        MS. VANDERWEELE:  Chris, your audio -- Chris,
3  your audio is all fuzzy.
4        MR. DEAL:  Let me try again.
5  BY MR. DEAL:
6     Q.   During our call, Jennifer Rocha --
7        THE REPORTER:  No.
8        THE WITNESS:  It's just as bad.
9        MS. VANDERWEELE:  It's your audio, it's all
10  out of whack, Chris.                   12:27:38PM
11        MR. DEAL:  Do you want to try to log on again?
12        MS. VANDERWEELE:  Yeah, I don't know what's
13  happening at this part.
14        THE VIDEOGRAPHER:  Let's go off the record,
15  yes, and we can try to fix it?          12:27:42PM
16        MS. VANDERWEELE:  Yeah, why don't we do that?
17        THE WITNESS:  Sure.  And a question.  I'm
18  assuming I'm not nearly finished, so why don't we
19  take a lunch break?
20        MS. VANDERWEELE:  Yeah, why don't we go off   12:27:51PM
21  the record and we can talk about a lunch break?
22        MR. DEAL:  I've only have about 20 more
23  minutes, but let's go off the record.
24        THE VIDEOGRAPHER:  We are going off the record
25  at 12:28 p.m.                          12:28:03PM

Page 80

1        (Lunch recess.)
2        THE VIDEOGRAPHER:  We are back on video record
3  at 1 o'clock p.m.
4        MR. DEAL:  What's the next exhibit in order?
5        THE REPORTER:  Is it 12?  I don't know if I   01:01:21PM
6  didn't get to write it down.
7        MS. VANDERWEELE:  I think we're up to 13.  The
8  last exhibit was 12.
9        MR. DEAL:  I thought we had a 12.  So I'm
10  going to mark as 13 the August 15, 2019 letter from   01:01:22PM
11  HSNO, draft to Jennifer Rocha.
12        (Plaintiffs' Exhibit 13 was marked
13        for identification by the court
14        reporter and is attached hereto.)
15  BY MR. DEAL:                           01:01:29PM
16     Q.   Mr. Evans, have you seen this document before?
17        MS. VANDERWEELE:  I think you'll need to share
18  your screen, Chris.
19        MR. DEAL:  Oh.
20  BY MR. DEAL:                           01:01:42PM
21     Q.   And I can scroll through it, just --
22     A.   I have seen it before.
23     Q.   So I'm looking at Page 6.  The third
24  paragraph, Mr. Fogarty states, "If it is determined that
25  ULC should have billed the City of Beaumont the actual   01:02:29PM

Page 81

1  cost of subcontractors plus a 15 percent markup, then we
2  estimate potential overbilling ranging from $4,469,678
3  to $5,857,672" -- excuse my grammar -- "for the period
4  of 2004 through 2012."
5        You've seen this conclusion before; correct?   01:02:54PM
6     A.   Well, as qualified conclusion, yes.
7     Q.   And then the next paragraph talks about other
8  potential overbilling ranging from -- I'm sorry, I
9  misstated that.
10        In a separate section of the report, it talks   01:03:15PM
11  about another set of overbillings in the range of
12  $2 million; correct?
13     A.   Again, qualified.
14     Q.   Correct.  So there's a paragraph, "Pending
15  direction from counsel regarding the correct          01:03:31PM
16  interpretation and application of the contract
17  provisions, we tentatively estimate potential
18  overbilling ranging from 2.3 million to 8.2," and
19  there's additional numbers there.
20        Do you see that?                   01:03:46PM
21     A.   Correct.
22     Q.   Should this information have been reported to
23  the insured?
24     A.   I think that it was followed by a meeting.
25     Q.   Do you know if the report was ever provided to   01:03:57PM



EXHIBIT 7
PAGE 233

Page 82

1  the policyholder?
2      A.  I don't.
3      Q.  Should it have been?
4      A.  It seems to me that it could have been, but
5  there was, in fact, a meeting or meetings to discuss it. 01:04:10PM
6  So --
7      Q.  By the way, what is your understanding as to
8  what occurred during that meeting?
9      A.  What meeting?
10     Q.  You're talking about there was a meeting        01:04:26PM
11 between the forensic accountants; right?
12     A.  I believe there was.
13     Q.  Okay.  Do you have an --
14     A.  And maybe with others.
15     Q.  Do you have an understanding as to what         01:04:35PM
16 happened?
17     A.  I'm not sure that I do.  I don't think
18 Mr. Fogarty has been deposed yet, but I don't know that.
19     Q.  Do you know if Mr. Ray was given any
20 opportunity to look at the analysis of Mr. Fogarty?      01:04:52PM
21     A.  I don't know whether he looked at it or
22 discussed it.
23     Q.  Do you know if he discussed it?
24     A.  I'm not sure.  I don't think I do.  I don't
25 recall.                                                  01:05:09PM

Page 83

1      Q.  Do you have an understanding that HSNO was
2  allowed to ask questions of Mr. Ray and his report?
3      A.  Again, I don't recall the detail of the
4  meeting.
5      Q.  If AIG had already had in possession a draft   01:05:22PM
6  report and the policyholder is given the opportunity to
7  question its forensic accountant, under a standard
8  industry customs and practices, should AIG have shared
9  the results of its own forensic accountants' --
10     A.  Not necessarily.                                01:05:44PM
11     Q.  -- analysis?
12     A.  Not necessarily because it was -- these were
13 not conclusions.  They were qualified by questions as to
14 direction from counsel, and also, in the other
15 paragraph, if it is determined paragraph.  So I know     01:06:05PM
16 that.  But then again, there was -- there was at least
17 one meeting and there were discussions.
18     Q.  Would you agree it would have been a more
19 productive meeting if both reports were discussed, both
20 reports were shared?  And by both, I mean Mr. Ray's and  01:06:19PM
21 Mr. Fogarty's report.
22     A.  Since I don't know the detail of the report, I
23 just can't answer that question.  Detail of the meeting,
24 I mean.
25     MR. DEAL:  All right.  I think we're on 14          01:07:07PM

Page 84

1  now; right?
2      THE REPORTER:  Yes.
3      MR. DEAL:  This is on November 4, 2019 letter
4  from Mr. Watnick to my firm, and it's identified as a
5  status letter.                                          01:07:29PM
6      (Plaintiffs' Exhibit 14 was marked
7      for identification by the court
8      reporter and is attached hereto.)
9  BY MR. DEAL:
10     Q.  Have you seen this document before?             01:07:31PM
11     A.  Show it to me.
12     Q.  (Complies.)
13     A.  I think I have.
14     Q.  Are you aware of any -- between October 2018
15 and November 2019, are you aware of any letters from AIG 01:07:55PM
16 where they substantively addressed any coverage defenses
17 that they were asserting in this action?
18     A.  Well, there's a long, detailed e-mail from
19 Mr. Watnick.  And I think there was also a meeting and
20 other things.                                           01:08:15PM
21     Q.  Okay.  So there was the meeting between the
22 forensic accountants; right?
23     A.  Yes.  I don't remember -- I don't know who
24 else was attending that.
25     Q.  Could you have found out?                       01:08:28PM

Page 85

1      A.  Possibly.
2      Q.  And then we looked at Mr. Watnick's -- I think
3  it's an e-mail with a number of information requests.
4  Is that what you're referring to?  It's a document we
5  looked at earlier.                                      01:08:48PM
6      A.  The -- the long e-mail, detailed e-mail?
7      Q.  Yes.
8      A.  Yes.
9      Q.  So you consider that a substantive response to
10 the October 2018 letter?                                01:08:59PM
11     A.  I think it was certainly a response, and it
12 went into detail of issues.
13     Q.  In Paragraph 3, "In preparing this letter," do
14 you see that?
15     A.  I do.                                           01:09:17PM
16     Q.  If we jump forward, "However, this analysis
17 raised questions about whether the city discovered the
18 facts relating to its claimed loss between 1993 and
19 2011, including the city council's knowledge and
20 approval of void agreements with Urban Logic Consulting 01:09:34PM
21 and GGMS."
22     Do you see that?
23     A.  I do.
24     Q.  Are you aware of AIG or National Union raising
25 this specific argument prior to November 2019?          01:09:45PM

MAGNA
LEGAL SERVICES

EXHIBIT 7
PAGE 234

Page 86

1    A.   I don't know.  I don't recall.
2    Q.   Is it unusual for a new coverage defense to be
3  inserted into a coverage dispute over three-and-a-half
4  years the inception of the claim?
5    A.   Well, again, we can talk about the timing, but  01:10:03PM
6  certainly, as investigation continues, additional
7  information becomes available.
8    Q.   Is it unusual to be requesting additional
9  documents three-and-a-half years into the claim?
10    A.   Not necessarily, given the development of the  01:10:25PM
11  claim and all the other issues.
12    Q.   Now, I understand that there was a delay in
13  obtaining the forensic accountant work; right?  So the
14  quantum of the claim was still a matter of
15  back-and-forth going through 2019; correct?         01:10:45PM
16    A.   It was.
17    Q.   In terms of the defense that's being
18  identified here in the third paragraph, continuing on to
19  Page 2, could this defense have been asserted earlier?
20    A.   I have no idea.                          01:11:05PM
21    Q.   Do you have any understanding as to whether
22  the facts underlying that coverage defense were
23  available to AIG prior to November 2019?
24    A.   I don't.  The -- this letter says "we further
25  analyze available information" (Audio issue) --

Page 87

1    THE REPORTER:  I'm sorry --
2  BY MR. DEAL:
3    Q.   Further analyze?
4    THE REPORTER:  I didn't hear that.  Could you
5  repeat your answer, please?
6    THE WITNESS:  Sure.
7    It says, "In preparing this letter, we further
8  analyzed the available information about discovery and
9  the claims that the city has permitted" -- "submitted."
10  BY MR. DEAL:                                       01:11:43PM
11    Q.   The use of the term "further analysis"
12  suggests that there were some prior analysis in this
13  issue; right?
14    A.   One would think.
15    Q.   What was the prior analysis of this issue?   01:11:51PM
16    A.   I don't know.  You'd have to ask Mr. Watnick.
17    Q.   Okay.  Home stretch.  I have just a few random
18  questions.
19    A.   That's what they all say, isn't it?
20    Q.   Right.                                    01:12:55PM
21    MS. VANDERWEELE:  Famous last words.
22    THE WITNESS:  I apologize.  Go ahead.
23  BY MR. DEAL:
24    Q.   All right.  I've put your report back on the
25  screen, Mr. Evans.  Can you see it?               01:13:22PM

Page 88

1    A.   I do.
2    Q.   All right.  On Page 7, "Meeting between the
3  parties took place in early" -- "in July 2019 summarized
4  in e-mail" -- "e-mail by Mr. Fogarty of HSNO."
5    That's what we were just talking about; is    01:14:13PM
6  that correct, Mr. Evans?
7    A.   Well, one of the things we were talking about,
8  yes.
9    Q.   But that's the meeting that took place between
10  the forensic accountants?                         01:14:22PM
11    A.   And potentially others, subject to whatever
12  that e-mail says.
13    Q.   Okay.  And going to the bottom paragraph here.
14  "Restitution orders against four of the criminal
15  defendants related to Beaumont's claim total         01:14:44PM
16  $11 million."
17    Do you see that?
18    A.   I do.
19    Q.   Next sentence, "As set forth in H" -- "As set
20  forth in HSNO's draft report date dated August 15, 2019, 01:14:58PM
21  potential loss was tentatively estimated as between
22  2.3 million to 8.2," and I'm summarizing that, "subject
23  to continued coverage questions and ongoing
24  investigation."
25    Do you see that?                            01:15:15PM

Page 89

1    A.   I do.
2    Q.   "Thus, it appeared at the time of the offer
3  that Beaumont's net loss was subsumed within the
4  restitution payments that had been received that absent
5  additional information or computations, the City of    01:15:27PM
6  Beaumont had no unreimbursed loss."
7    Do you see that?
8    A.   I do.
9    Q.   Do you agree with that conclusion?
10    A.   Well, I wrote it.  I do agree with it.      01:15:36PM
11    Q.   All right.  We looked at the restitution, the
12  fact that the restitution payments were made to WRCOG,
13  not the city.  Does that change your conclusion at all?
14    A.   No.  If my understanding remains the same.
15  Again, I think you -- as I've testified, in asking me   01:15:56PM
16  legal opinions, and it's not for me to do that.
17    Q.   Okay.  Have you asked for or looked at any of
18  the restitution orders?
19    A.   I think I saw some documents that showed some
20  information, but I don't recall the detail of them.    01:16:30PM
21    Q.   You're assuming that all the restitution was
22  paid to Beaumont; is that correct?
23    A.   No.  As I testified, I've assumed, or I
24  understand that Beaumont assigned its claim, or any
25  benefits from its claim, to the other entity.  And so   01:17:07PM

MAGNA ▶
LEGAL SERVICES

EXHIBIT 7
PAGE 235

Page 90

1  then we can go directly to Beaumont because Beaumont had
2  assigned its -- any recovery.
3      Q.   Do you know if the original restitution orders
4  directed that restitution be paid to the city or
5  Beaumont -- to the city or WRCOG?          01:17:28PM
6      A.   Well, from the information that you've shown
7  in your letter, one of the earlier exhibits, you showed
8  that the restitution would be paid to the other entity.
9      Q.   To the what?
10     A.   To the other entity.          01:17:53PM
11     Q.   But that doesn't change your analysis?
12     A.   It doesn't because there wasn't an assignment
13 of the claim.  And again, I'm not a lawyer, and so I'm
14 unable to give you a full answer to your question.
15     Q.   If, hypothetically, WRCOG received all the   01:18:16PM
16 restitution payments and the restitution orders provided
17 for direct payment to WRCOG, would that change your
18 analysis?
19     A.   Again, you're asking me a legal question, and
20 I don't know.          01:18:31PM
21     Q.   Well, you have conclude that had the
22 $11 million is a setoff against any overpay; right?
23         MS. VANDERWEELE:  Objection; that misstates
24 his testimony and to form.
25         THE WITNESS:  I don't think that's what I   01:18:45PM

Page 91

1  said.
2  BY MR. DEAL:
3      Q.   "Thus, it appeared at the time of the offer
4  that Beaumont's net loss was subsumed within the
5  restitution payments that had been received and that   01:18:49PM
6  absent additional information or computations, the City
7  of Beaumont had no reimbursed -- unreimbursed loss."
8          Isn't it your conclusion that the restitution
9  that was paid to WRCOG offset any overbilling by ULC?
10     A.   Well, read that sentence again and there you   01:19:11PM
11 have my answer.
12     Q.   That, perhaps you can explain it to me.  I --
13     A.   This is a --
14     Q.   -- I may be slow, but I'm not picking up on
15 your --          01:19:23PM
16     A.   Well --
17     Q.   -- point.
18     A.   -- sure.  My point is that this is not my
19 opinion.  This is my statement or -- or reporting of the
20 facts.  And as I say in this -- this sentence, "Thus, it   01:19:32PM
21 appeared at the time of the offer, that Beaumont's net
22 loss was subsumed within the restoration [sic] payments
23 that had been received, and that absent additional
24 information or computations, the City of Beaumont had no
25 unreimbursed loss."          01:15:30PM

Page 92

1      Q.   And I asked you to hypothetically assume that
2  the restitution payments were made to WRCOG and were --
3  strike that.
4          I'm asking you to assume, hypothetically, that
5  the restitution payments were made to WRCOG and that the   01:20:11PM
6  restitution orders provided for direct compensation to
7  WRCOG.  Would that impact your analysis?
8          MS. VANDERWEELE:  Objection; asked and
9  answered.
10         THE WITNESS:  Well, I have answered that.  And   01:20:24PM
11 my answer was that you're asking me for a legal opinion
12 or conclusion, and I can't do that because, apart from
13 anything else, I don't have enough information even to
14 review all that, I don't think.
15 BY MR. DEAL:          01:20:38PM
16     Q.   Do the California insurance regulations talk
17 about a soft denial?
18     A.   They don't mention, as far as -- I've never
19 seen those words in the regulations.
20     Q.   Now, in your report, you mention there's no   01:21:32PM
21 magic language required for a reservation of rights?
22     A.   Well, that's exactly right.  The reservation
23 of rights needs to set out the areas of coverage that
24 are understood to be at issue.  And they, in my
25 experience, almost always allows the insured to -- to   01:22:05PM

Page 93

1  respond, request response.  That's different from a
2  letter of denial, which, for example, denies the claim
3  and also has, in California, required statutory
4  language.  That statutory language was not included
5  within any of the reservations of rights in this matter. 01:22:30PM
6      Q.   Okay.  I'm on Page 13 of your report on the
7  section, "Clear and concise written explanation of
8  denial."
9      A.   Yes.
10     Q.   The second sentence, "National Union   01:23:08PM
11 ultimately did deny coverage in its answer to
12 plaintiffs' complaint."
13         Do you see that sentence?
14     A.   Yes.
15     Q.   Do you consider that a proper way to deny a   01:23:19PM
16 claim?
17     A.   In litigation, it probably is.  Again, that's
18 a legal question.  And it's somewhat different from the
19 description I just gave because things change in
20 litigation, I think.          01:23:35PM
21     Q.   Have you ever, in your own personal practice,
22 treated an answer to a complaint as a coverage denial?
23         THE REPORTER:  "As a coverage"?
24         MR. DEAL:  Denial.
25         THE WITNESS:  I have never been asked to   01:23:52PM

MAGNA
LEGAL SERVICES

EXHIBIT 7
PAGE 236

Page 94

1    consider that.
2    BY MR. DEAL:
3        Q.   Have you ever seen that?  Have you ever seen
4    an insurer taking the position that its answer to the
5    complaint constitutes a denial letter, or the equivalent 01:24:03PM
6    of a proper denial of coverage?
7        A.   Given everything else here, I've never seen --
8    well, no, I -- I'm sure I have seen somewhere in the
9    past denial being made in response to -- in answer to a
10   complaint.                              01:24:27PM
11       Q.   Can you give me an example?
12       A.   No.
13       Q.   In 40-plus years, can you recall one specific
14   example where an insurer treated its answer to the
15   complaint as the equivalent of a denial?      01:24:41PM
16       A.   I don't know that I can, but it certainly
17   happened.  That's about --
18       Q.   You talk -- you talked about the reservation
19   of rights doesn't have magic language, but when you
20   issue a denial in California, there is certain magic   01:25:01PM
21   language you have to include; is that correct?
22       A.   Allowing the insured to contact the Department
23   of Insurance is what it means.
24       Q.   Yeah, there's a handout that generally
25   accompanies the denial showing how you contact the    01:25:20PM

Page 95

1    Department of Insurance --
2        A.   No.
3        Q.   -- and the process; correct?
4        A.   No.  It's usually just a sentence.  If you
5    disagree, you can contact the Department of Insurance -- 01:25:30PM
6    of Insurance at whatever address it is in Los Angeles
7    and telephone number.
8        Q.   Based on your experience in the industry, is
9    it mandatory in California to include that language when
10   you're issuing a denial?                 01:25:48PM
11       A.   During the normal conduct of the claim, yes.
12   Things change, I understand, in litigation.
13       Q.   Would it have been better practice if National
14   Union was going to treat the answers to denial, to
15   accompany that with a formal denial letter explaining   01:26:05PM
16   the basis for coverage, and including the magic
17   language?
18       A.   Well, it's not exactly magic language.  It's
19   statutory language, but they had explained in great
20   detail coverage issues, the meetings, the discussions   01:26:21PM
21   and correspondence (Audio issue) --
22       THE REPORTER:  I'm sorry, I can't make out
23   what you're saying, Mr. Evans.
24       THE WITNESS:  How far back do I go?
25       THE REPORTER:  "Well, it's not exactly magic  01:26:13PM

Page 96

1    language.  It's"?
2        THE WITNESS:  Statutory language.  And as best
3    I can recall, I said that litigation practice is not
4    something that I -- is for me or a lawyer, but I think
5    the rules are different.  Things change.      01:26:56PM
6    BY MR. DEAL:
7        Q.   Okay.  On Page 15, we talked about this
8    somewhat.  I'm looking at the second paragraph.
9    "However, there's no evidence that the excess policy
10   provided coverage for Beaumont's claimed loss."   01:27:23PM
11       What is the basis for that statement?
12       A.   Because I have not seen that it did provide
13   coverage for Beaumont's claimed loss.  And my
14   understanding is that it provided some excess carrier --
15   sorry, some excess coverage that brought the applicable 01:27:47PM
16   potential limit up to $15 million, but it was subject to
17   a retroactive date of June 30, 2012.
18       Q.   Okay.  Can you explain what that means?
19       A.   Well, again, I think you're asking me for a
20   legal opinion, but it means that, as with my errors and  01:28:14PM
21   omissions coverage, it has a retroactive date as the day
22   I started my own business, which would mean that
23   anything that happened before that would not be covered.
24   But again, I'm not a lawyer and I'm not prepared to give
25   (Audio issue) --                          01:28:48PM

Page 97

1        Q.   I'm on Page 16.  My mouse is on "Beaumont
2    never asked National Union to acknowledge BFA as an
3    additional insured."
4        Do you see that sentence?
5        A.   Yes.                            01:29:38PM
6        Q.   If the City of Beaumont submitted a claim by
7    BFA in June 2016, would that change your opinion, at
8    least the opinion reflected in this sentence?
9        A.   Not necessarily.  I -- I don't believe there
10   was ever proof of loss (Audio issue) --       01:30:04PM
11       THE REPORTER:  I'm sorry, Mr. Evans, I'm
12   having a hard time understanding what you're saying.
13       THE WITNESS:  I'm saying that there was no
14   proof of loss submitted.  And then I don't remember the
15   rest of my answer.                        01:30:25PM
16   BY MR. DEAL:
17       Q.   Did AIG ever ask BFA to submit a proof of
18   loss?
19       A.   I don't know that they did, but BFA -- that
20   the City of Beaumont is something of a sophisticated    01:30:38PM
21   insured with its own risk management department and with
22   its own national or multinational broker that has its
23   own claims consultants.  So they would do it.  It's
24   prerequisite under the policy.
25       MR. DEAL:  There were a series of -- Scott   01:31:58PM

MAGNA
LEGAL SERVICES

EXHIBIT 7
PAGE 237

Page 98

1  sent me some communications, invoices last minute. I'm
2  just going to attach those to the deposition transcript,
3  if that's okay --
4        MS. VANDERWEELE: I don't think --
5        MR. DEAL: -- collectively?            01:32:10PM
6        MS. VANDERWEELE: That's fine. I don't think
7  there were any invoices -- or there might have been one,
8  but if you want to just attach it as an exhibit, that's
9  fine.
10        MR. DEAL: Okay. I'm not going to ask him    01:32:25PM
11  specific questions. I just kind of want it there so we
12  have his files or what he was able to --
13        MS. VANDERWEELE: So that would be 15?
14        MR. DEAL: Yeah.
15        (Plaintiffs' Exhibit 15 was marked          01:32:31PM
16        for identification by the court
17        reporter and is attached hereto.)
18        MR. DEAL: And I'll supply the court reporter
19  with that. With that, I have no further questions.
20        MS. VANDERWEELE: Okay. I do not have any    01:32:43PM
21  questions.
22        While we're still on the record, I know --
23        Mr. Evans, do you want to review and sign the
24  transcript?
25        THE WITNESS: I do.                          01:32:52PM

Page 99

1        MS. VANDERWEELE: And, Chris, it was been
2  what, three-and-a-half hours?
3        So, Mr. Evans, are you okay with him
4  submitting the invoice to me and then I'll forward that
5  on to you, Chris?                                01:33:09PM
6        MR. DEAL: Yeah, I think we took a half-hour
7  lunch. We did that to Lepire, so I think it should be
8  three hours.
9        MS. VANDERWEELE: Well, it's for his entire
10  time spent at the deposition, which is three and a half. 01:33:14PM
11        MR. DEAL: He did the same -- Scott did the
12  same thing to John, so --
13        MS. VANDERWEELE: I looked at the transcript.
14  Scott said he wasn't going to quibble over the numbers.
15  If you're going to, then I won't compensate Mr. Evans   01:33:21PM
16  for his lunch break.
17        MR. DEAL: You can send me the invoice for
18  three and a half.
19        MS. VANDERWEELE: Thank you.
20        THE VIDEOGRAPHER: We're going off the record. 01:33:32PM
21  Counsel, would you like a copy of your video
22  synced, sir?
23        MR. DEAL: Yes.
24        THE VIDEOGRAPHER: Okay. And, ma'am, would
25  you like a copy of the video?                    01:33:42PM

Page 100

1        MS. VANDERWEELE: Yes, please. Thank you.
2        THE VIDEOGRAPHER: And would you like it
3  synced as well?
4        MS. VANDERWEELE: Yes, please.
5        THE VIDEOGRAPHER: And your transcript orders? 01:33:49PM
6        MS. VANDERWEELE: I will take a copy, please.
7        MR. DEAL: Yes, we'll take a copy as well.
8        THE VIDEOGRAPHER: Okay. Thank you.
9  We are going off the record at 1:34 p.m.
10        (Whereupon the deposition was
11        concluded at 1:33 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 101

1
2
3
4  STATE OF CALIFORNIA        )
                              )  ss.
5  COUNTY OF LOS ANGELES      )
6
7        I, PETER EVANS, having appeared for my
8  deposition on Tuesday, July 26, 2022, do this date
9  declare under penalty of perjury that I have read the
10  foregoing deposition, I have made any corrections,
11  additions or deletions that I was desirous of making in
12  order to render the within transcript true and correct.
13        IN WITNESS WHEREOF, I have hereunto subscribed
14  my name this _____ day of_____, 2022.
15
16
17
18
19
20        _____
                  PETER EVANS
21
22
23
24
25



EXHIBIT 7
PAGE 238

Page 102

1          REPORTER'S CERTIFICATE
2
3          I, CHRISTINA M. LOPEZ, CSR No. 13048,
4   Certified Shorthand Reporter, certify:
5          That the foregoing proceedings were taken
6   before me at the time and place therein set forth, at
7   which time the witness was put under oath by me;
8          That the testimony of the witness, the
9   questions propounded, and all objections and statements
10  made at the time of the examination were recorded
11  stenographically by me and were thereafter transcribed;
12         That the foregoing is a true and correct
13  transcript of my shorthand notes so taken.
14          I further certify that I am not a relative or
15  employee of any attorney of the parties, nor financially
16  interested in the actions.
17          I declare under penalty of perjury under the
18  laws of California that the foregoing is true and
19  correct.
20          Dated this 6th day of August, 2022.
21
22
23
            CHRISTINA M. LOPEZ, CSR. No. 13048
24
25



## A

**ability**
7:3
**able**
8:1 9:6 10:7 13:19
14:4 46:12 62:2
98:12
**absent**
89:4 91:6,23
**Absolutely**
12:9
**accompanies**
94:25
**accompany**
95:15
**account**
51:25
**accountant**
37:20 39:13 43:25
47:21 78:23 83:7
86:13
**accountants**
82:11 83:9 84:22
88:10
**accounting**
48:17 51:25,25
**accusations**
66:2
**acknowledge**
41:19 59:15 63:21
97:2
**acknowledgment**
25:11,13,17,22 59:21
60:1
**act**
62:20
**action**
84:17
**actions**
102:16
**activities**
72:10
**actual**
80:25
**add**

52:1
**adding**
34:4 35:11
**addition**
78:18
**additional**
16:24 23:5 25:19
34:13,13 35:4,12
41:7,9,17 43:13
45:1 46:8,10 47:10
48:11,16 50:12
81:19 86:6,8 89:5
91:6,23 97:3
**Additionally**
38:13
**additions**
101:11
**address**
70:13 95:6
**addressed**
70:4 84:16
**adds**
32:21
**adjust**
18:5
**adjusted**
9:15 12:20 20:6,19
**adjuster**
20:10 37:19 66:24
68:25 69:2,2,5,8
**Adjusters**
8:15,17 9:5,23 11:1
**adjuster's**
12:12,13
**adjusting**
8:19 9:5 12:18 17:17
18:19 31:4,10,11
34:7,10 40:14,15
**adjustment**
17:18 19:5,20 20:23
27:6
**administration**
28:14
**admonitions**
6:22
**advancing**

14:23
**advertise**
13:14
**Afternoon**
3:5
**ago**
8:21,21 36:13
**agree**
28:21 59:19 62:12
63:7,25 64:3,5
71:17 83:18 89:9,10
**agreed**
14:8
**agreement**
72:23
**agreements**
38:20 45:5 77:8
85:20
**ahead**
28:22 48:21 87:22
**AIG**
17:9,11 18:5 19:21
19:25 24:9 25:4
26:9 28:3,23 32:25
33:8,9 35:2 37:15
39:6,23 40:13 41:1
45:18 46:4,11 47:14
48:1,5 50:7,10 51:6
51:7,8 53:11 54:6
56:23 57:5,20 58:12
58:17 62:22 64:6,17
65:17 66:6 68:18
69:17,21 70:6,12,15
71:1,18 74:12 75:21
77:13 78:10 83:5,8
84:15 85:24 86:23
97:17
**AIG's**
51:18 67:10 68:13
74:22
**Aklufi**
33:25 36:24 58:8
**al**
5:7,9
**Alan**
33:6,10

alcohol
7:2
**alerted**
74:25 75:6
**alerting**
50:7
**alleged**
53:17
**Alliant**
49:11 50:6
**allowed**
83:2
**Allowing**
94:22
**allows**
92:25
**amending**
44:25
**amendment**
44:4
**amount**
30:8
**analogy**
11:18
**analysis**
17:2 31:22 36:4
37:15,23 38:9 39:10
48:8,10 65:11 78:13
78:14,15,24 82:20
83:11 85:16 87:11
87:12,15 90:11,18
92:7
**analyze**
39:14 86:25 87:3
**analyzed**
38:17 87:8
**analyzing**
78:11
**and/or**
58:23
**Angeles**
95:6 101:5
**answer**
4:10 10:3 14:2 16:22
20:17 24:17 25:23
40:3,3,11 60:12



**EXHIBIT 7**
**PAGE 240**

61:1,2,9 66:9 67:15
67:20 68:1 70:22
73:4,19 75:18 78:1
78:2,5 83:23 87:5
90:14 91:11 92:11
93:11,22 94:4,9,14
97:15
**answered**
40:1,2 57:24 92:9,10
**answering**
44:15,18 58:19
**answers**
95:14
**anticipates**
44:25
**anyway**
41:18
**apart**
92:12
**apologize**
36:15 87:22
**apparently**
22:23 25:18 34:2
**appear**
8:11 25:6 32:13
38:19
**appearance**
5:18
**APPEARANCES**
2:1
**appeared**
32:10 89:2 91:3,21
101:7
**appearing**
1:16 6:13
**appears**
18:7 31:25 33:12
55:11 57:12 77:13
**applicable**
20:7 96:15
**application**
81:16
**apply**
19:8,15
**applying**
76:5

**appointed**
32:22 35:3,11,12
50:11 54:3,3 56:19
58:23
**appraisals**
8:22 9:1
**appropriate**
48:17
**approval**
37:25 85:20
**approve**
67:1
**approved**
38:10 77:8
**approximately**
17:22 42:14
**April**
3:18 34:19,20,23
46:3 48:22,23 49:11
50:12 52:18 53:21
54:6,8 55:5 57:20
67:8
**arbitrations**
8:22 9:2
**areas**
92:23
**argument**
85:25
**art**
45:24
**asked**
27:10 39:25 62:22
70:21 89:17 92:1,8
93:25 97:2
**asking**
41:24 42:3,8 50:3
59:10 62:5,9,10,16
67:19 68:1 69:6
70:9 77:21 89:15
90:19 92:4,11 96:19
**asserted**
86:19
**asserting**
67:23 84:17
**assertion**
58:10,16 68:17

**assigned**
72:19 75:13 89:24
90:2
**assignment**
21:4,15,23 71:21
90:12
**assignments**
22:11
**assist**
78:23
**assume**
17:20 20:9,10,11
21:22 23:24,25 35:8
40:14,16 41:17
45:21 70:6,15 71:16
71:20 92:1,4
**assumed**
89:23
**assuming**
17:18 32:23 48:19
79:18 89:21
**assumption**
19:3
**assumptions**
21:20,22 35:14
**attach**
98:2,8
**attached**
8:8,10 30:3 40:22
43:3,8 45:13 47:5
49:5 52:21 54:23
59:7 76:22 80:14
84:8 98:17
**attachments**
49:16
**attending**
84:24
**attorney**
34:1 102:15
**audio**
13:21 26:15 32:15
49:18 50:21 59:22
78:24 79:2,3,9
86:25 95:21 96:25
97:10
**August**

3:10,22 29:23 32:20
32:25 33:5,9 35:1
39:24 80:10 88:20
102:20
**authority**
1:5 23:1,2
**available**
65:7 86:7,23,25 87:8
**Avenue**
2:4
**aware**
7:8 17:21,23 19:4,18
19:21,22,23,24,25
20:2,10,12 23:7
24:13 25:25 26:24
27:12,24 28:9 29:8
29:9 32:25 34:11
35:2,11 46:7,8
47:22 50:10,14 51:8
68:17 77:3,6,11
84:14,15 85:24
**Aylward**
75:9
**a.m**
5:2,12 29:17,20 52:8
52:11 60:21,24

---
**B**
---

**B**
3:6 4:3
**back**
12:4 13:25 14:2
29:19 30:7 31:17
39:22 41:12 42:24
44:9 48:12 52:10
60:23,25 61:3 63:14
66:3 67:8,25 80:2
87:24 95:24
**back-and-forth**
86:15
**bad**
79:8
**barred**
67:23
**base**
18:13



**based**
14:21 19:12 28:15
31:24 33:8 38:18
40:8 43:24 53:15
55:10 56:11,13
71:25 95:8
**basis**
31:5 95:16 96:11
**bear**
7:15 54:15,18
**Beaumont**
1:5 23:1,3 32:3,4
33:7 37:3 46:20,24
56:2,10,19 63:2
72:11,17,18,24
74:25 75:10,13,17
80:25 89:6,22,24
90:1,1,5 91:7,24
97:1,6,20
**Beaumont's**
64:8 88:15 89:3 91:4
91:21 96:10,13
**begins**
5:5
**behalf**
6:2 12:9,11,21 13:8
13:17 18:20
**believe**
11:13 12:3 14:18
17:10 24:2 28:16
31:3 32:14 39:23
40:11 45:16 47:8
48:5 55:18 58:5
62:10 66:14 67:16
70:3 82:12 97:9
**believed**
33:2 74:12 75:7
**believes**
28:18
**belong**
13:14
**benefits**
89:25
**best**
2:3,3 5:13,14 7:4,7
9:14 15:25 27:25

58:19 75:17 78:1
96:2
**better**
47:21 53:3 95:13
**beyond**
74:10
**BFA**
23:7,10,14,17 24:1,6
25:16,17 26:22 97:2
97:7,17,19
**big**
57:7
**billed**
80:25
**bit**
13:25 21:24 30:16
37:5
**Blake**
3:16 23:16,19,25
27:10,16 28:14 49:2
49:12
**Blake's**
23:11 61:14,21
**block**
31:12
**body**
11:4
**bond**
9:16 77:8
**bottom**
55:11 88:13
**break**
10:7 29:13 52:4,6
60:19 79:19,21
99:16
**broker**
18:10 97:22
**brokers**
19:7,10 50:20,23
51:11
**brought**
96:15
**BSI**
77:7
**builder's**
31:13

**bunch**
54:15
**business**
11:20 12:19 31:11
96:22

—————————
**C**
—————————
**calculation**
51:4
**California**
1:2,4,6 2:5,10 5:10
11:22 12:10,15,20
13:17 25:10 66:23
92:16 93:3 94:20
95:9 101:4 102:18
**call**
50:3 53:11 78:9 79:6
**called**
6:2 13:13 53:11
**capability**
74:11
**capacities**
77:7
**care**
48:6
**career**
30:19
**carried**
43:22
**carrier**
96:14
**carrying**
29:6
**case**
5:10 6:11 17:5 19:21
24:21 25:24 26:8
41:24 47:25 48:20
71:5 75:7
**cases**
13:5 14:25 15:3
**casual**
10:5
**casualty**
10:18,19
**causing**
9:19

**CC'ed**
49:12
**central**
1:2 5:9 63:7 65:11,13
**certain**
71:4 94:20
**certainly**
15:19 19:6 24:18
26:15,18 30:15 53:9
57:2 63:3 68:7
75:25 85:11 86:6
94:16
**CERTIFICATE**
102:1
**Certified**
102:4
**certify**
102:4,14
**CGL**
10:8,13
**chain**
3:16 49:2,9
**change**
27:1 89:13 90:11,17
93:19 95:12 96:5
97:7
**changed**
26:25 27:5 68:13
**characterize**
41:9 43:16
**Chris**
7:21 21:16 24:17
36:20 38:4 41:23
44:8 55:2 60:17
77:22 79:2,2,10
80:18 99:1,5
**Christina**
1:21 5:16 102:3,23
**Christopher**
2:3 5:20 6:10 40:19
**chris.deal@bbkla...**
2:6
**circle**
41:1
**circumstances**
25:24



EXHIBIT 7
PAGE 242

**city**
  1:5 23:3 24:6 32:2,4
  33:6,7,11,14 34:12
  35:3,12 37:3,15
  41:18 42:13 44:24
  50:11 54:4,12 55:17
  56:1,1,5,9,10,12,19
  56:19,24 58:11,23
  59:18 62:22 63:1,24
  64:7 71:19,22 73:2
  73:7 74:2,14 75:13
  75:16 77:3,6,10
  78:3 80:25 85:17,19
  87:9 89:5,13 90:4,5
  91:6,24 97:6,20
**city's**
  33:10 58:19 66:12
**claim**
  10:5 11:15,15 15:13
  17:11,22 18:4,6,9
  19:24 20:2 23:7,17
  23:18 24:2,10,11,24
  25:5,6,9,12,16,20
  25:24 26:4,11,12
  27:2,5,6,11,12,17
  28:11,14 31:7 34:10
  34:11,16,16,19,21
  34:22,22,23 35:6
  39:12 41:10 42:13
  43:17 46:4 50:4
  51:2,5 57:5 58:24
  63:8,9 64:12,14
  65:1,4 68:13,19
  69:14,21 71:22
  72:20 75:14 86:4,9
  86:11,14 88:15
  89:24,25 90:13 93:2
  93:16 95:11 97:6
**claimed**
  28:1 75:16 85:18
  96:10,13
**claiming**
  20:9 66:16
**claims**
  8:19 9:6,7,16,21,22
  9:24 10:1,4,6,8,11

  10:12,14,16,24 11:2
  11:4,9,18,23,25
  12:5,11,14,15,20
  15:6,12,17,25 18:19
  19:4,8 24:6 26:10
  30:8,12,18,22 31:2
  31:4,6,8,11,12,13
  34:7 37:24 41:1
  45:18 53:11 66:19
  66:22 70:7 76:7
  78:10 87:9 97:23
**clear**
  36:17 93:7
**clients**
  50:25
**Code**
  8:22 12:1 66:23
**collapsed**
  23:17
**collectively**
  98:5
**come**
  12:4 28:3,6,7 39:21
  40:6 41:25 50:5
**comfortable**
  6:20 14:20
**coming**
  42:19
**comment**
  36:10 57:18
**committed**
  62:20
**common**
  66:25
**communicated**
  74:14
**communication**
  46:15
**communications**
  21:17 27:10 50:6
  98:1
**companies**
  17:9 18:20 20:22
  77:9
**company**
  1:9 5:8,23 20:12,23

  20:23 39:15
**compensate**
  99:15
**compensation**
  92:6
**complaint**
  71:25 93:12,22 94:5
  94:10,15
**complete**
  11:21 28:11 29:2
  47:19 65:22 78:13
**completed**
  78:15
**complexity**
  16:11
**complies**
  37:10 84:12
**computations**
  89:5 91:6,24
**concept**
  68:25 69:6
**concerns**
  43:15 75:1
**concise**
  93:7
**conclude**
  90:21
**concluded**
  100:11
**conclusion**
  28:3,7,15 29:3 54:8
  68:21 74:5 81:5,6
  89:9,13 91:8 92:12
**conclusions**
  17:4 83:13
**conditions**
  16:25 18:3
**conduct**
  95:11
**conference**
  50:3
**conferencing**
  5:13
**conflict**
  38:1 66:17
**conflicts**
  549

  13:19 14:5,22
**connection**
  72:10,15
**consent**
  24:22
**consider**
  85:9 93:15 94:1
**consideration**
  74:13,24 75:9
**considering**
  51:21
**consistent**
  71:14
**constitutes**
  94:5
**consultant**
  36:6 42:21 45:3
  51:25
**consultants**
  32:18 97:23
**consulting**
  9:2 14:12 22:10
  85:20
**contact**
  41:7,9 43:14 94:22
  94:25 95:5
**contacted**
  21:3,12
**contacts**
  76:9,9,11
**contention**
  33:10 70:18
**continuation**
  42:21
**continued**
  4:1 88:23
**continues**
  86:6
**continuing**
  76:9 86:18
**contract**
  33:17,22 81:16
**contracted**
  32:2
**contractor**
  35:23 36:3 55:12



**EXHIBIT 7**
**PAGE 243**

**contractors**
57:23
**contractual**
73:14 74:1
**control**
8:1
**copy**
7:13,20 8:11 99:21
99:25 100:6,7
**copying**
3:21 76:18
**correct**
6:25 8:16 10:21
12:22 14:18,24
18:17,21 26:5,7
30:10 32:22,24 34:8
34:20 36:19,21
48:18 51:3,6 54:4
55:20 65:12 72:7
73:15 81:5,12,14,15
81:21 86:15 88:6
89:22 94:21 95:3
101:12 102:12,19
**corrections**
101:10
**correctly**
10:11
**correspondence**
59:9 95:21
**cost**
81:1
**council**
1:4 5:7 77:3,6,10
78:4
**council's**
85:19
**counsel**
5:17 16:18 42:5 44:7
59:9 69:24 78:25
81:15 83:14 99:21
**COUNTY**
101:5
**couple**
36:12 65:20
**course**
7:1 17:10 26:24

28:14
**court**
1:1 5:9,15,19 8:7
14:3 30:2 40:21
43:2,7 45:12 47:4
49:4 52:20 54:22
59:6 61:3 76:21
80:13 84:7 98:16,18
**cover**
22:4 26:10 73:22
**coverage**
17:5,12,18,21 18:25
19:2 20:11,14 24:19
24:22 27:15,18,19
28:4,17,19,25 36:4
47:13 48:7,10 65:11
68:4,6 69:14,18,22
69:25 70:3,10 77:22
84:16 86:2,3,22
88:23 92:23 93:11
93:22,23 94:6 95:16
95:20 96:10,13,15
96:21
**covered**
50:18 67:2,5,7,12,24
96:23
**covering**
51:23
**crime**
9:7,15 10:8 11:3,14
11:25 15:6,9 23:8
24:7 30:8,13,15,18
30:22 31:4,6 39:12
**criminal**
71:7,25 88:14
**criticizes**
22:23
**CSR**
1:21 102:3,23
**Curriculum**
3:9
**custom**
19:1,15 25:10 50:15
70:8,8
**customary**
35:1 39:10

**customs**
11:14 76:5 83:8
**cut**
32:12
**CV**
8:10,12 12:25

---

### D

**D**
3:1 4:1
**damage**
78:23
**damages**
67:1,17,18 69:4
**Dan**
47:25
**dark**
65:8
**date**
31:25 40:9 53:15
88:20 96:17,21
101:8
**dated**
3:21 43:4 49:11
76:19 88:20 102:20
**dates**
57:6
**David**
33:17
**day**
41:18,19 96:21
101:14 102:20
**days**
19:6 41:3 42:14,18
44:1 45:19,23 46:5
46:13,18 47:15
48:15
**dd**
35:6
**deal**
2:3 3:4,12 5:20,20
6:8,10 7:23 8:9 9:4
14:10 16:21 21:1,18
22:1,4,7 23:23
24:20 26:20 29:14
29:21 30:4 32:19

36:21,23 37:7 38:5
38:8,25 39:1 40:10
40:17,19,23 42:7,9
42:10,22 43:4,9
44:10,13,19 45:8,14
47:1,6 48:24 49:1,6
49:19,23 51:1 52:3
52:12,17,22 53:1,2
54:24 55:3,5,8 59:1
59:3,10,12,13 60:2
60:18,25 61:12,22
62:1 63:18,19 66:20
68:10,24 69:1 72:5
72:12,22 73:13,20
74:8,20 75:5,20
76:15,17,23 77:25
78:7 79:4,5,11,22
80:4,9,15,19,20
83:25 84:3,9 87:2
87:10,23 91:2 92:15
93:24 94:2 96:6
97:16,25 98:5,10,14
98:18 99:6,11,17,23
100:7
**dealing**
45:4 70:24
**deals**
61:24 66:23
**dealt**
30:15 70:1
**Deal's**
44:16
**December**
3:11,12,13 40:18
42:24 43:5
**decision**
27:17 28:24 40:14,16
**declare**
101:9 102:17
**Deepak**
37:25
**defendant**
2:7 5:23
**defendants**
1:11 88:15
**defense**



24:19 86:2,17,19,22
**defenses**
84:16
**defined**
57:13 58:9 77:15
**definition**
10:11 53:17 60:7
61:7,24
**delay**
31:13 86:12
**delayed**
48:15
**deletions**
101:11
**denial**
53:5 92:17 93:2,8,22
93:24 94:5,6,9,15
94:20,25 95:10,14
95:15
**denied**
26:11
**denies**
93:2
**deny**
93:11,15
**denying**
27:18,19,25
**department**
59:17 62:14,17,18,24
63:2,13,13,23 64:19
78:4 94:22 95:1,5
97:21
**depends**
16:10 25:23 76:8
**Deponent's**
4:6
**deposed**
82:18
**deposition**
1:15 5:6,12 6:14,21
8:5 12:25 13:7
14:17 15:1 61:14,21
98:2 99:10 100:10
101:8,10
**depositions**
42:1

**described**
55:10
**description**
93:19
**deserved**
70:22
**designated**
59:17 62:18 63:13,23
**desirous**
101:11
**detail**
22:5 25:7 38:18
53:24 54:9 64:20,25
65:6 69:25 83:3,22
83:23 85:12 89:20
95:20
**detailed**
76:10 78:12 84:18
85:6
**details**
45:1 46:15
**determination**
69:3,8
**determine**
17:12 18:24 46:17
64:18
**determined**
19:13 54:2 80:24
83:15
**development**
33:18 86:10
**difference**
11:13 28:10
**different**
11:17,17 19:25 46:1
46:2 93:1,18 96:5
**difficult**
56:23
**Dillon**
56:17 57:21 58:9,22
75:8
**direct**
90:17 92:6
**directed**
90:4
**direction**

81:15 83:14
**directly**
19:24 39:18 90:1
**director**
33:18,20,23
**disagree**
95:5
**discovered**
36:25 85:17
**discovery**
28:1 59:16,16 60:7
61:7,23 62:8,12
63:22,23 77:14,18
87:8
**discrete**
65:10
**discuss**
50:3 82:5
**discussed**
21:23 82:22,23 83:19
**discussing**
32:8
**discussion**
23:13 52:16
**discussions**
75:25 83:17 95:20
**dishonest**
62:20
**dispensing**
6:21
**dispute**
13:18 86:3
**District**
1:1,2 5:9,10
**document**
11:21 31:14 57:8
64:21 67:1 80:16
84:10 85:4
**documentation**
31:25 37:1 39:21
40:6 65:14 67:14
**documents**
4:6 13:21,23,24
38:16,19 51:24
56:13 86:9 89:19
**doing**

8:21,25 9:2 50:24
77:24
**double-check**
41:11 51:12
**dozen**
15:4,5 16:3,4
**draft**
3:10,22 29:23 80:11
83:5 88:20
**driven**
11:21 31:14
**drugs**
7:2
**dual**
77:7
**duly**
6:3
**D.A**
45:4

**E**

**E**
2:3 3:1,6 4:1,3
**earlier**
29:5 62:9 63:16 85:5
86:19 90:7
**early**
46:20,25 88:3
**easier**
7:22
**economic**
33:18
**Edgar**
57:22
**effect**
23:19
**effectively**
8:20,22 9:2 27:19
51:20
**effectually**
43:21
**Egger**
33:22 56:17 57:22
58:9,22
**Eggers**
75:8



EXHIBIT 7
PAGE 245

either
27:1 39:17,17 54:3
    69:22
Elaine
49:11
eliminating
54:15
employee
32:8 33:10,14 36:4
    37:2,3 53:18 54:12
    55:16 61:25 62:20
    65:14 102:15
employees
32:2,3 37:14 51:20
    53:23 54:4,9 57:12
    58:9,23
employment
31:22 32:3
ended
55:22
endorse
50:12
endorsement
32:15,17,21 33:1
    34:4,12,13 35:3,11
    50:11 51:21 59:15
    59:20 60:3 61:19,22
    62:4,6,10,11,14
    63:21 64:2
endorsements
50:7,8,15,18 51:8
enforcement
61:17
enhance
43:20
entire
11:4 99:9
entitled
21:17,19
entity
1:5 71:21 72:21
    75:14 89:25 90:8,10
equivalent
94:5,15
Ernest
33:22

error
51:12,13,14,15
errors
96:20
espouse
68:8
ESQ
2:3,9
essentially
23:17 27:10 31:16
    75:6
estimate
6:16 9:10,15 11:2
    12:6 15:2,16,25
    16:9 30:11,17,21
    81:2,17
estimated
88:21
estopped
67:17
estoppel
68:9,16,24
et
5:7,9
Europe
18:22
evaluation
45:19,20,23,25 46:3
    46:5,13,17 47:13
    48:14 52:2
Evan
37:9 45:15 49:7
    66:21
Evans
1:15 3:4 5:6 6:1,9
    7:16,24 8:15,17 9:5
    9:5,23 11:1 16:22
    17:20 19:9 22:19
    26:17 29:22 30:6
    37:23 38:10 39:5
    42:11 43:10 44:15
    52:23 54:18 66:5
    80:16 87:25 88:6
    95:23 97:11 98:23
    99:3,15 101:7,20
event

20:18 56:15
events
55:12
Eventually
54:2
evidence
23:21 96:9
exact
43:21
exactly
53:24 58:15 92:22
    95:18,25
examination
3:3 6:7 64:22 65:7,17
    66:6 102:10
examinations
64:25 65:20
examined
6:4 69:17
example
10:13 47:20 93:2
    94:11,14
exceed
20:19
exceeded
17:19
excess
11:11 16:13 17:8,11
    17:25 18:6,8 19:22
    20:3,4,6,10,13,20
    31:2 96:9,14,15
excuse
8:24 78:25 81:3
exhibit
3:19 8:5,6 29:24,24
    30:1 31:18 36:18,19
    40:18,20 41:14
    42:23,25 43:1,4,6
    43:19 45:8,11,15
    47:1,3 48:24 49:1,3
    52:12,17,19 54:20
    54:21 55:1,7 59:3,5
    61:14,21 63:17
    66:11 76:15,20 80:4
    80:8,12 84:6 98:8
    98:15

exhibits
90:7
exist
17:12
existence
19:16,22 20:4 50:7
expect
18:9 19:6 20:21
    39:19 57:4 58:17
    70:11,20
expected
70:12 78:20
expecting
45:22 47:20
expects
41:2 45:18 78:13
experience
13:20 14:6 18:23
    19:12 31:3,10 64:24
    65:1 66:24 92:25
    95:8
expert
9:3 13:6,11 14:11,21
    22:9,10 47:25
experts
13:15
explain
67:4 91:12 96:18
explained
78:10 95:19
explaining
37:18,18 95:15
explanation
39:18 93:7
extent
14:13
extremely
31:14
e-mail
3:16,21 43:4 45:9
    49:1,11 76:18,25
    78:9 84:18 85:3,6,6
    88:4,4,12

_____
F
_____
fact



14:21 26:8 32:2
42:19 43:24 75:7
82:5 89:12
**facts**
21:21 26:1 27:12
28:15,22 37:18
64:14 85:18 86:22
91:20
**fair**
16:8 21:19 22:1 30:8
74:9
**fairly**
9:8 30:14 65:9
**fall**
28:11,12 50:15 53:17
**familiar**
11:22
**Famous**
87:21
**far**
17:16 24:19 25:25
27:24 28:9 92:18
95:24
**fast**
37:6
**Fax**
2:6
**feedback**
41:2,10 42:13 43:16
43:18 44:1
**feel**
43:13
**feeling**
27:25
**fidelity**
9:7 11:3,15 12:1 15:9
30:8,13,14,18,22
31:4,7
**file**
1:22 4:6 46:16 50:5
68:12
**files**
98:12
**final**
39:17 40:7 48:17
**financially**

102:15
**financing**
23:1,2
**find**
60:15
**fine**
98:6,9
**finish**
24:16 44:7,18
**finished**
44:15 79:18
**finite**
65:9
**Fire**
1:9 5:8
**firm**
84:4
**firmly**
40:5
**firms**
32:2
**firm's**
40:8
**first**
6:3 10:2,6,15 21:3
22:22 37:11 38:5,12
45:17 59:11,14
62:15,22 63:20 68:7
78:22
**first-party**
8:19 9:24 10:8,11
11:4 13:18 15:12,24
25:2 26:10 76:6
**five**
13:4 15:18,25
**Five-minute**
52:6
**fix**
79:15
**focus**
63:7 76:24
**focused**
13:10 51:19
**focusing**
19:11 49:10 66:11
**Fogarty**

3:10 29:23 32:7,14
35:10 37:24 80:24
82:18,20 88:4
**Fogarty's**
39:3 40:8 83:21
**followed**
41:16 46:2 50:2
81:24
**following**
41:7,18,19 43:18
57:2 75:25
**follows**
6:5 14:3 61:4
**foregoing**
101:10 102:5,12,18
**forensic**
37:20 39:10,13 43:25
51:24 78:23 82:11
83:7,9 84:22 86:13
88:10
**forever**
18:18
**forget**
67:9
**form**
16:20 20:15 23:20
66:18 68:5,20 72:8
74:3,16 75:11 77:24
90:24
**formal**
95:15
**forth**
88:19,20 102:6
**forward**
43:12 85:16 99:4
**found**
28:12 84:25
**foundation**
74:3,16
**four**
88:14
**frames**
58:24
**free**
43:14
**front**

7:14,21
**full**
22:22 38:5,12 45:17
64:4,25 65:3 90:14
**fully**
19:18 55:23
**further**
13:25 45:4 86:24
87:3,7,11 98:19
102:14
**fuzzy**
79:3

---

**G**

**gathered**
31:4
**general**
6:16 28:8 31:9 69:7
**generally**
13:13 15:9 65:25
69:7 94:24
**GGMS**
37:3 77:7 85:21
**Gill**
33:17
**give**
6:16 7:4,6 8:1 9:6
11:2,7 12:6 15:2,16
29:10 30:17 77:22
90:14 94:11 96:24
**given**
27:12 28:2 42:19
76:10 82:19 83:6
86:10 94:7
**giving**
14:21
**go**
13:25 28:22 29:14
44:9 49:15 60:16
66:3 79:14,20,23
87:22 90:1 95:24
**goes**
13:4
**going**
7:10 20:8 29:16,22
31:17 33:3 37:15,19



MAGNA
LEGAL SERVICES

EXHIBIT 7
PAGE 247

37:23 39:22 40:17
41:22 47:11,17
48:12 52:3,7 54:17
54:19 57:7 59:3
60:20 63:14 69:9
76:17 79:24 80:10
86:15 88:13 95:14
98:2,10 99:14,15,20
100:9
**Good**
5:4 6:9,12
**Gordon**
2:8 22:8,11
**governing**
11:23
**Governments**
1:4 5:7
**grammar**
81:3
**great**
52:5 95:19
**greater**
14:13
**Gregg**
63:5,8 64:23
**grounds**
67:12
**group**
20:22 50:18
**grouped**
15:8
**groups**
13:15

---

**H**

**H**
3:6 4:3 88:19
**half**
99:10,18
**half-hour**
99:6
**handle**
9:7,22 10:24 59:17
62:18 63:24
**handled**
10:1 11:3,25 12:5,11

12:14 15:12 30:7,18
30:22 31:8 68:19
**handling**
11:5,14,23 20:2 30:9
30:12 31:1,6 39:12
68:13 69:20 70:7
**handout**
94:24
**happened**
18:11 41:6 42:17
78:21 82:16 94:17
96:23
**happening**
79:13
**hard**
7:20 97:12
**heading**
31:22
**hear**
15:21 16:19 42:6
50:22 59:24 66:21
73:10 87:4
**heard**
53:5,7,9
**held**
52:16
**helpful**
42:24
**hereto**
8:8 30:3 40:22 43:3,8
45:13 47:5 49:5
52:21 54:23 59:7
76:22 80:14 84:8
98:17
**hereunto**
101:13
**hesitate**
9:19
**Hey**
25:5
**high**
17:23
**highlighting**
31:20
**History**
31:23

**Hold**
37:12 44:14
**Home**
87:17
**hope**
50:17
**hour**
52:4
**hours**
7:3 99:2,8
**HSNO**
3:10,22 29:8,23
31:18 35:9 36:9,15
37:22 39:23 44:20
78:10,13,15,23
80:11 83:1 88:4
**HSNO's**
88:20
**hundreds**
30:20 51:23
**Hurricane**
19:7
**hypothetical**
20:8,16 28:13,20,23
**hypothetically**
90:15 92:1,4

---

**I**

**idea**
86:20
**identification**
8:7 30:2 40:21 43:2,7
45:12 47:4 49:4
52:20 54:22 59:6
76:21 80:13 84:7
98:16
**identified**
53:16 69:23 84:4
86:18
**illegal**
74:4
**Image**
49:24,24
**immediately**
33:13
**impact**

7:3 36:4 92:7
**impacted**
68:19
**impacts**
60:7 61:6
**important**
37:15,17
**improper**
24:4 68:21 73:18
74:4 77:23
**improperly**
74:17
**Inaudible**
57:1
**inception**
86:4
**include**
94:21 95:9
**included**
93:4
**including**
56:15 78:11 85:19
95:16
**inclusive**
1:10
**incomplete**
20:15 43:22 45:7
**incorrect**
55:20,22 77:20
**independent**
12:12 33:25 35:23
36:3 39:13 55:11
57:23
**indicate**
37:1
**indicated**
23:16 43:24 48:13,15
**indicating**
24:22
**Indiscernible**
37:4
**individual**
53:25
**individuals**
32:1,8 34:3 54:1
57:12



**EXHIBIT 7**
**PAGE 248**

**industries**
18:16
**industry**
19:13 35:1 50:16
67:21 70:8 74:21
76:6 83:8 95:8
**inform**
28:23
**information**
4:16 24:12 25:15
26:1 33:8,12 36:5
40:7 41:17 42:19
43:13 46:8,10 47:10
47:14,16 48:11,16
53:15 54:7,11 55:10
56:25 57:5,21 58:8
58:12,13 62:23,23
64:7,11,20 65:23
66:4 70:25 78:11,18
81:22 85:3 86:7,25
87:8 89:5,20 90:6
91:6,24 92:13
**initial**
51:5
**inquiry**
77:17
**inserted**
86:3
**inserting**
41:23
**instance**
10:8
**INSTRUCTED**
4:10
**insurance**
1:9 5:8,23 8:19,22,25
9:1,15 10:24 11:22
12:1 18:16,20 20:12
20:23 39:14 59:18
62:18 63:24 67:21
76:6 78:5 92:16
94:23 95:1,5,6
**insured**
10:12,14,16 12:7,7,9
13:8,13 14:16 18:9
19:1,11,13,16 20:3

20:9 23:5 24:25
25:5,19 28:5,24
37:24 39:16,21 40:8
40:12 42:20 43:19
45:2,2 46:9,11
47:17 48:18,21
50:25 58:18 62:19
62:19 66:16,25 67:5
67:16,22 68:17
69:21,24 74:15
81:23 92:25 94:22
97:3,21
**insureds**
12:11 13:11 32:22
34:4,5,13 35:4,13
39:7,24 50:12
**insured's**
47:21
**insurer**
12:7,8 36:6 39:13
45:6 53:25 65:13
70:9 94:4,14
**insurers**
11:11 12:14,16
**insurer's**
67:4
**intend**
42:12
**intending**
29:4
**interest**
38:1 66:17
**interested**
8:2 102:16
**interpretation**
81:16
**interruption**
11:20 31:11
**introduce**
8:4
**investigate**
29:5
**investigated**
55:23
**investigating**
31:10 64:13

**investigation**
11:17,19 20:21,24
24:4,7,23,24 25:1
25:14 26:3,25 27:8
27:15 28:11 29:1,7
32:11 33:3 35:6,7
39:15,20 40:4,9
47:19 51:18,22 52:2
54:1,14 57:7,10,16
63:10 64:6,10,16
65:21 86:6 88:24
**investigations**
31:15
**investigator**
37:20
**invoice**
99:4,17
**invoices**
38:10 78:12 98:1,7
**involve**
68:16
**involved**
15:22 17:17 19:24,24
25:25 65:19 78:4
**involving**
25:25 30:22
**Irvine**
2:5,10
**issuance**
77:8
**issue**
13:21 25:2,3 26:15
29:11 32:15 49:18
50:21 51:19 56:23
57:9 58:5 59:22
65:10,11 78:24
86:25 87:13,15
92:24 94:20 95:21
96:25 97:10
**issued**
16:13 51:9
**issues**
10:13 45:6 53:12,16
85:12 86:11 95:20
**issuing**
48:7 95:10

**itemize**
66:25

<hr>

**J**

**January**
3:14 45:8 47:15
48:13 78:14,16,20
78:21
**Jennifer**
3:11,13,14,16,18,20
3:21,23 40:18 43:5
45:9 49:2,12 52:18
59:4 76:18 78:10
79:6 80:11
**jewelers**
31:12
**job**
7:21 67:4 68:9
**John**
99:12
**Joint**
1:5
**Joseph**
36:24
**JPEGs**
49:16,24
**judgment**
73:6,9,12 74:1
**Judith**
3:16 23:11 49:2,12
**July**
1:17 5:1,11 35:23
88:3 101:8
**jump**
22:19 54:17 85:16
**jumping**
78:8
**June**
23:8 24:1,6 34:20,20
35:23 96:17 97:7

<hr>

**K**

**Kapanicas**
33:6,10
**Kapanicus**
35:20 55:10,11 56:1



**EXHIBIT 7**
**PAGE 249**

58:22 71:6 75:8
**Karman**
2:4
**Katrina**
19:7
**Keeler**
57:11
**keep**
47:11
**kind**
22:4 24:25 26:3 40:6
48:12 76:25 78:8
98:11
**kinds**
31:12,14
**KKx**
1:8
**knew**
28:2 45:5 50:17
65:10 71:18 77:10
77:18
**know**
6:19 13:25 15:5 16:3
16:3,7 17:6,15 18:3
18:11 21:18,23 24:9
25:8 26:6,21,23
27:3,5,7,8 28:6 30:7
34:15 35:5,14 41:6
41:25 46:4,10 48:1
49:8 50:1,10,13,14
51:17 53:6 54:9
55:16,18 56:11
62:22 63:8,11 64:9
67:6 68:1,14 69:17
69:24 70:5 71:16
72:9 73:19 74:7
75:21 76:14 77:15
77:18 78:15 79:12
80:5 81:25 82:18,19
82:21,23 83:15,22
84:23 86:1 87:16
90:3,20 94:16 97:19
98:22
**knowing**
18:7
**knowledge**

64:18 65:3 85:19
**known**
51:11
**Krieger**
2:3 5:14

_____
**L**
_____
**labor**
68:24
**language**
35:9 92:21 93:4,4
94:19,21 95:9,17,18
95:19 96:1,2
**Lapeen**
21:5,5
**Lapine**
21:6
**large**
11:10 31:1 73:9,12
**larger**
51:23
**laws**
102:18
**lawsuits**
11:20
**lawyer**
12:3 25:1 32:24
56:20 64:5 67:20
68:7,23 75:18 90:13
96:4,24
**lawyers**
34:6 68:2
**leads**
66:2
**learn**
21:19
**learns**
62:19
**leave**
34:6
**legal**
1:19 5:15,16 67:19
68:1,21,24 69:6
73:18 74:17 75:18
78:6 89:16 90:19
92:11 93:18 96:20

**Lepire**
21:7,9,10 22:23 99:7
**lesser**
14:13
**letter**
3:11,12,14,15,18,20
3:22,24 24:22 25:9
25:11,22 30:5 36:9
37:22 40:18 41:8,20
41:25 42:4,8,9,20
42:24 43:12 44:3,18
44:20,21,22,24 45:9
45:19,20,25 46:3,5
46:6,17,18 47:2
48:13,22,23 52:18
52:23 53:4,12 54:25
55:5 56:16 57:9,17
58:3 59:4 63:15
66:16 68:12,18
69:10,25 70:3,14,16
70:24 71:3,13 75:22
76:1,3,13 80:10
84:3,5 85:10,13
86:24 87:7 90:7
93:2 94:5 95:15
**letters**
59:11 84:15
**let's**
9:23 17:20 29:14
42:22 44:9,13 48:23
58:1 60:18 70:6
79:14,23
**liability**
10:14 25:2 73:14
**license**
12:12,13
**licensed**
12:10,22
**limit**
9:23 20:7,19 96:16
**limited**
62:13
**limits**
16:24
**litigation**
93:17,20 95:12 96:3

**little**
7:22 21:24 22:5 26:6
37:5 65:21
**LLP**
2:3,8 5:14
**located**
38:16
**log**
79:11
**Logic**
85:20
**long**
14:11 84:18 85:6
**longer**
18:22
**look**
17:1 35:15 43:12
46:14,16 48:23
59:20,22,25 60:9,11
61:10,15,17 62:3,9
67:14 82:20
**looked**
30:6,6 60:3 72:23
77:16 82:21 85:2,5
89:11,17 99:13
**looking**
8:10 22:19 31:18
35:9 36:8 53:14
58:7 63:16 70:23
80:23 96:8
**looks**
49:15 62:7
**Lopez**
1:21 5:16 102:3,23
**Los**
95:6 101:5
**loss**
11:10 20:6,9,19
26:19,21 31:1 32:1
34:17,24 39:14
43:20 44:5,25 45:1
67:1,6,12,23 73:23
85:18 88:21 89:3,6
91:4,7,22,25 96:10
96:13 97:10,14,18
**losses**



**EXHIBIT 7**
**PAGE 250**

66:12,16 67:5,11,24
69:4
**lost**
9:21
**lot**
12:20 40:5
**lots**
12:18 39:20
**Louwhan**
2:13 5:14
**lunch**
79:19,21 80:1 99:7
99:16

### M

**M**
1:21 102:3,23
**Madam**
52:12
**magic**
92:21 94:19,20 95:16
95:18,25
**Magna**
1:19 5:15,16
**making**
17:21 101:11
**malfeasance**
72:2,4,6 75:16,16
**management**
59:17 62:13,17,24
63:2,12,23 64:19
78:5 97:21
**manager**
33:6 56:1,5,10,12
63:3,5 64:8,11
65:10,18 66:7 77:18
**mandatory**
95:9
**MANSUKHANI**
2:8
**March**
3:15 46:9,21,25 47:1
**mark**
8:4 29:24 40:17
42:22 44:13 45:8
49:1 52:17 54:19

76:17 80:10
**marked**
3:19 8:6 30:1 40:20
43:1,6 44:12 45:11
47:3 49:3 52:19
54:21 59:5 76:20
80:12 84:6 98:15
**marking**
55:7
**markup**
81:1
**master**
23:18 24:2
**matter**
5:6 9:21 13:20 14:6,8
14:20,25 20:1 23:10
77:10 86:14 93:5
**matters**
59:18 62:18 63:24
**ma'am**
99:24
**Meagan**
2:9 5:22 21:18 22:2
22:17 49:19
**mean**
16:4 27:18 32:12
35:5 38:21,23,23
46:1 51:14 83:20,24
96:22
**means**
51:16 53:6 59:16
63:22 94:23 96:18
96:20
**meat**
49:9
**Media**
5:5
**meeting**
39:18 81:24 82:5,8,9
82:10 83:4,17,19,23
84:19,21 88:2,9
**meetings**
82:5 95:20
**memo**
57:11
**mention**

92:18,20
**merely**
13:7 20:24 51:18
**message**
50:2
**method**
16:11
**million**
17:19,22 20:9 73:6
81:12,18 88:16,22
90:22 96:16
**mind**
33:5 53:21 56:4,9,18
60:5 62:16 74:22
**mine**
51:4
**minimal**
12:9
**minute**
29:10 52:4 98:1
**minutes**
29:15 52:4 79:23
**misstated**
27:4 81:9
**misstates**
23:20 90:23
**modified**
59:15 63:22
**moment**
7:18 60:5
**months**
8:20
**Moorjani**
33:20 37:25 38:1
56:17 57:22 58:9,22
75:9
**morning**
5:4 6:9,12
**mouse**
41:1 97:1
**multinational**
97:22
**multiple**
50:18 76:9
**municipalities**
50:19

mvanderweele@gr...
2:11

### N

**N**
3:1 4:1
**name**
6:9 101:14
**named**
24:25 32:1,22 37:1
62:19,19
**naming**
34:12 35:3 50:11
**national**
1:9 5:8,23 24:9 85:24
93:10 95:13 97:2,22
**nature**
21:14 78:13
**nearing**
47:13
**nearly**
79:18
**necessarily**
83:10,12 86:10 97:9
**need**
13:16,19 14:4 21:24
25:21 41:11 46:14
46:16 59:20,22,25
60:11 65:6,24 66:3
67:14 80:17
**needed**
40:12 57:9 58:3
**needs**
92:23
**net**
89:3 91:4,21
**never**
12:21 62:16 68:3
69:3 92:18 93:25
94:7 97:2
**new**
25:12 27:12 55:7
86:2
**nonlegal**
74:11
**normal**



**EXHIBIT 7**
**PAGE 251**

95:11
**note**
25:17
**noted**
38:19
**notes**
102:13
**notified**
20:3 26:9 28:5 34:22
    51:7 69:21
**notify**
19:1,7,16 25:5
**November**
3:24 34:18 84:3,15
    85:25 86:23
**nullified**
18:9
**nullify**
43:25
**number**
5:5,10 9:10 12:6
    15:17 17:23 26:25
    27:1,2,3,5,12 30:18
    30:25 59:15 60:3
    61:18,22 62:11,14
    63:21 70:24 74:1
    85:3 95:7
**numbers**
17:17 81:19 99:14

---
**O**
---
**oath**
64:22,25 65:7,18,20
    66:7 102:7
**object**
21:16 41:23 42:6
    77:25
**objecting**
42:3,7 59:9,10
**objection**
16:15,20 20:15 23:20
    38:22 39:25 42:2
    66:18 68:5,20 72:8
    73:17 74:3,16 75:2
    75:11 77:21,24
    90:23 92:8

**objections**
102:9
**obligation**
64:15
**obligations**
11:16
**obliged**
40:13
**obtain**
65:23
**obtained**
36:6 54:7 56:25 57:5
    57:21 73:6 78:18
**obtaining**
86:13
**occurred**
82:8
**October**
3:20 59:4 63:15 64:6
    64:18 66:5 68:18
    69:10 70:14 71:18
    84:14 85:10
**offer**
89:2 91:3,21
**official**
56:24
**officials**
32:22 34:4,12 35:3
    35:12 50:11 54:4
    56:19 58:11,23
**offset**
91:9
**oh**
52:15 80:19
**okay**
7:18 10:17 12:4
    14:15 15:24 16:8
    18:11 22:3,6,21,22
    22:25 23:11,13,24
    24:5,21 25:4,9 26:8
    26:14 28:23 31:3,16
    35:15 36:8,22 37:10
    37:14 38:7,12 40:17
    41:1 42:11 44:6,23
    47:25 49:21 52:3,7
    52:17 54:17 55:4,9

63:4 66:11,24 68:3
69:9,13 70:23 74:12
76:24 77:6 82:13
84:21 87:17 88:13
89:17 93:6 96:7,18
98:3,10,20 99:3,24
100:8
**omissions**
96:21
**once**
13:8
**ongoing**
88:23
**opening**
31:13
**opinion**
17:24 18:13 25:21
    39:5 42:17 58:21
    68:4,8,21 73:18
    74:4,17 77:22 91:19
    92:11 96:20 97:7,8
**opinions**
13:6 45:6 68:7 89:16
**opportunity**
82:20 83:6
**opposed**
12:12 24:12 25:2
**order**
46:16 60:12 80:4
    101:12
**ordered**
71:6
**orders**
88:14 89:18 90:3,16
    92:6 100:5
**ordinary**
11:18
**original**
34:19 39:22 48:12
    63:20 90:3
**outside**
11:12
**overall**
29:6 35:6 36:5 64:14
    64:15
**overbilling**

74:2 81:2,8,18 91:9
**overbillings**
17:22 81:11
**overpay**
90:22
**overreaching**
66:2
**overview**
13:21,22
**o'clock**
80:3

---
**P**
---
**PA**
1:9 5:8,24
**page**
3:3,8 4:4 12:24,25
    22:20 31:19 35:16
    35:16 36:8,18 37:21
    38:6,12 49:15,21
    53:14 54:25 57:11
    59:14 61:21 62:6
    69:10 70:23 77:2
    80:23 86:19 88:2
    93:6 96:7 97:1
**pages**
13:5 77:1
**paid**
71:19 73:22 74:1,24
    75:8,10,15 89:22
    90:4,8 91:9
**paragraph**
22:22 35:15 37:8
    38:3,5,13 42:11
    45:17 53:14 55:9
    57:11 58:7 59:14
    63:21 76:25 78:9,22
    80:24 81:7,14 83:15
    83:15 85:13 86:18
    88:13 96:8
**Park**
2:9
**part**
12:18 24:2 35:7 36:5
    42:6 50:23 54:1,14
    55:14 57:9,16 59:24



63:10 64:15,16 67:4
68:15 70:7 71:2,6
77:14 79:13
**parties**
1:16 5:17 88:3
102:15
**party**
10:2,6,16
**pay**
71:6,9,12
**payment**
78:12 90:17
**payments**
37:25 71:18,24 74:23
75:8 77:9 89:4,12
90:16 91:5,22 92:2
92:5
**penalty**
6:25 101:9 102:17
**Pending**
81:14
**people**
19:4,23 20:2 33:4
46:2 51:12 72:2,4
**people's**
75:15
**percent**
9:25 10:4 11:8 16:4,6
16:8 81:1
**percentage**
9:6 11:2,6,7 15:16,19
15:24 16:2,5 30:12
**performing**
17:2
**period**
9:16 11:1 16:14
17:19 18:1 46:11
77:19 81:3
**perjury**
6:25 101:9 102:17
**permanent**
46:12
**permitted**
87:9
**person**
59:11

**personal**
93:21
**personally**
68:3
**pertain**
53:16
**Peter**
1:15 3:4,10 5:6 6:1
29:23 101:7,20
**picking**
91:14
**Pittsburgh**
1:9 5:8,24
**place**
88:3,9 102:6
**plaintiff**
1:7 23:10
**plaintiffs**
2:2 3:8 4:4 5:21 6:3
6:10 8:6 17:21
24:25 30:1 40:20
43:1,6 45:11 47:3
49:3 52:19 54:21
59:5 76:20 80:12
84:6 93:12 98:15
**plaintiff's**
14:9
**planning**
33:22 43:19
**Plaza**
2:9
**plea**
45:5
**please**
41:12 43:13 58:10,16
74:19 87:5 100:1,4
100:6
**plus**
81:1
**point**
8:2 19:9 26:24 35:10
51:3,9 55:16 62:2
65:21 66:15 69:20
70:12 91:17,18
**points**
69:13

**policies**
10:18,18,19,20,21
12:1 18:25 19:2,14
19:17,19 59:16 60:8
61:8,8 65:24,25
69:13,18,22 70:4,19
**policy**
16:13,23 17:1,5,8,12
17:13,19,25 18:3,5
18:6,8,24 19:8,14
19:15,22 20:3,4,10
20:13,20 23:5,8
24:7,18 25:6,20
26:10,25 27:1,3,11
27:18,20,25 28:1,4
28:8,9,10,17,19,25
29:5 34:14 35:4
50:18 51:9 53:18,23
57:13 58:10 61:13
62:2,13 63:22 67:2
67:7 70:10 77:15,16
78:3 96:9 97:24
**policyholder**
12:21 13:6,17 14:16
14:19,23 18:23
20:12 26:9 70:9
74:25 75:6 82:1
83:6
**policyholders**
13:12
**pollution**
10:9
**position**
14:9,22 67:10,22
68:4 69:25 94:4
**possessed**
62:24 64:7,11
**possession**
83:5
**possibility**
28:4,16,18
**possible**
47:20 65:1
**possibly**
17:25 19:5 22:12
35:5 85:1

**potential**
45:6 81:2,8,17 88:21
96:16
**potentially**
19:18 20:19 65:19
88:11
**Powers**
1:5
**practice**
11:14 19:1 25:10
50:16 70:8 93:21
95:13 96:3
**practices**
35:2 74:21 76:6 83:8
**prejudice**
68:16
**prejudiced**
68:18
**preliminary**
31:23 38:18 39:8,19
40:4 45:18,20,23,24
46:3,5,12,17 47:18
48:7,10,14 53:12
57:8
**prepared**
68:8 96:24
**preparing**
85:13 87:7
**prerequisite**
97:24
**present**
2:12 5:17 8:14 9:14
10:5 47:23
**presented**
14:20 26:13,19 28:15
34:16,17,21 64:14
64:14
**presently**
8:21,25 30:9
**presumably**
56:25
**previous**
14:2 61:2
**pre-suit**
59:12
**primarily**



53:16
**primary**
18:4 20:19
**principals**
37:2 77:7
**prior**
42:22 43:18 56:8
64:18 66:9 85:25
86:23 87:12,15
**private**
32:2
**probably**
9:12 11:9,10 13:9
14:13 15:4 16:2,10
39:8 57:14,15 70:21
71:4 93:17
**proceedings**
71:7 102:5
**process**
42:21 70:7 95:3
**production**
38:17
**productive**
83:19
**proficient**
7:10
**program**
19:15
**promise**
44:1
**promised**
44:2
**proof**
26:19,21 32:1 34:17
34:24 44:4,25 97:10
97:14,17
**proper**
24:2 25:6 93:15 94:6
**properly**
33:16 67:15
**property**
8:19 10:1,5,12,17,20
10:21 11:11,15,18
25:3
**proportion**
9:8

**propounded**
102:9
**proprietorship**
8:18
**provide**
17:5 18:25 19:2
20:13 24:19 41:2
42:12 45:1,18,22
46:4,12 48:10 58:10
58:16,18 69:14
96:12
**provided**
16:24 40:8 44:25
47:10,16 48:1,16
78:19 81:25 90:16
92:6 96:10,14
**providing**
13:6,11 14:11 45:3
47:18
**provision**
71:2
**provisions**
81:17
**public**
1:5 12:12 32:21,22
33:20 34:4 35:12
**purposes**
77:17
**pursuant**
62:14
**put**
10:21 20:8 42:23,23
87:24 102:7
**p.m**
79:25 80:3 100:9,11

———————
**Q**
**qualification**
65:4
**qualified**
13:16 53:23 81:6,13
83:13
**qualify**
34:3 76:5
**quantification**
34:25

**quantum**
11:19 86:14
**quasi**
26:4
**question**
10:3 21:25 22:2 25:4
33:6,9 36:18 39:22
40:3 44:16 53:22
56:4,9,18,24 57:24
58:2,20 60:12 61:1
61:2,5 62:16 63:14
63:20 66:5 67:15,19
68:1 70:17,21 74:19
74:22 78:6,6 79:17
83:7,23 90:14,19
93:18
**questions**
4:10 36:13 41:24
42:4,8 43:14 48:13
54:16 59:11 62:5
75:1,19 83:2,13
85:17 87:18 88:23
98:11,19,21 102:9
**quibble**
57:6 99:14
**quickly**
42:3
**quite**
14:24 64:1
**quote**
64:1

———————
**R**
**raised**
85:17
**raising**
85:24
**random**
87:17
**range**
81:11
**ranging**
81:2,8,18
**rare**
22:13
**rated**

11:3
**Ray**
47:25 82:19 83:2
**Ray's**
83:20
**reach**
17:25 54:8
**reached**
17:4
**reaches**
28:15
**read**
14:2 23:11,12 33:13
37:6,8,13 60:25
61:3 91:10 101:9
**reading**
33:15 37:6
**realized**
50:20
**really**
9:20,20 30:16 34:15
**reason**
7:6 13:10 27:14 33:9
54:6 67:13
**reasonable**
48:19
**recall**
23:9,10,13,18 24:8
25:7 50:2 53:24
55:19 58:25 59:21
62:25 64:21 65:15
69:12,19,25 70:16
72:25 76:10 82:25
83:3 86:1 89:20
94:13 96:3
**received**
18:4 23:16 58:5
65:16 89:4 90:15
91:5,23
**receiving**
43:13
**recess**
29:18 52:9 60:22
80:1
**reclassified**
27:11



**EXHIBIT 7**
**PAGE 254**

reclassify
27:17
record
5:5 29:14,16,19
36:17 42:1 52:8,10
52:16 60:17,20,23
61:20 79:14,21,23
79:24 80:2 98:22
99:20 100:9
recorded
102:10
recovery
90:2
Rees
2:8 22:8,11
refer
66:8
referred
53:5
referring
36:19 38:4 39:3 47:9
70:4 85:4
reflect
38:19
reflected
97:8
regarding
20:4 21:3 41:10
42:13 43:17 45:1
53:25 54:11 57:21
70:18 74:4 81:15
regardless
47:16
regulations
11:23 12:2 92:16,19
reimbursed
91:7
relate
31:14
related
10:2,6,12,21 11:3
24:8 30:13,14 73:2
77:14 88:15
relates
26:3
relating

24:7 85:18
relation
72:6 73:25
relative
102:14
relevant
19:4,19 27:7,14,15
32:11,13 33:2 36:1
36:7 57:13 58:24
61:17 77:17,19
remains
89:14
remember
9:13,20 23:6,22 27:2
30:16 50:9 65:15,25
75:23 84:23 97:14
reminded
51:16
remotely
1:16 5:13
render
37:16 45:5 101:12
rendered
43:22
repeat
26:16 74:18 87:5
rephrase
33:7
report
3:9,10 7:11,13,21
8:11 12:24 21:11
22:20 29:23 31:18
31:19 32:9 35:10,17
36:9,13,14,15,19
37:22 38:24 39:6,17
39:23 40:4 47:15,21
48:1,6,17 81:10,25
83:2,6,21,22 87:24
88:20 92:20 93:6
reported
1:21 81:22
reporter
5:15,19 8:8,24 13:22
14:3 16:18 26:16
30:3 32:16 37:5
40:15,21 42:5 43:2

43:8 44:11 45:13
46:22 47:5 48:25
49:5 50:22 52:13,14
52:20 54:23 59:2,7
59:23 61:3 72:3,15
73:10 76:16,22
78:25 79:7 80:5,14
84:2,8 87:1,4 93:23
95:22,25 97:11
98:17,18 102:4
REPORTER'S
102:1
reporting
91:19
reports
83:19,20
represent
5:18 6:10 27:9 70:25
71:24
representatives
13:14 46:20,24
represented
12:7 74:13,23,24
75:9
representing
13:10
represents
38:1
request
5:13 70:2,24 73:25
93:1
requested
4:16 26:22 57:20
65:14
requesting
86:8
requests
64:21 70:13,25 85:3
required
48:6 71:9,12 92:21
93:3
requisition
38:10
reservation
92:21,22 94:18
reservations

93:5
resolve
15:20 56:23
resolved
15:13,17,23,25 58:6
respect
10:13 62:11
respond
70:9,15 76:13 93:1
responded
24:10 69:24 70:18
75:21
response
23:25 25:5,9 57:9,17
58:3,4,18 70:1 76:2
85:9,11 93:1 94:9
responses
76:1,10
responsibility
17:11 18:5
rest
97:15
restitution
71:6,9,12,18,24,25
72:1 73:22,25 74:13
74:23 75:7,15 88:14
89:4,11,12,18,21
90:3,4,8,16,16 91:5
91:8 92:2,5,6
restoration
91:22
results
39:15 83:9
resume
30:6
retained
14:25 39:13 42:20
45:3 78:22
retaining
43:25
retention
44:5
retired
8:20
retroactive
96:17,21



EXHIBIT 7
PAGE 255

review
13:24 17:11 18:14
38:18 50:5 57:8
68:11 92:14 98:23
reviewed
18:2 31:25 56:14
right
7:9,12 8:3 21:9 29:2
31:17 32:23 34:3,23
36:16,24 41:20,21
44:10 48:20 49:10
54:5,13 55:6,17
56:14,23 57:1,19
58:2,7 65:10,17
66:6 67:7 78:8
82:11 83:25 84:1,22
86:13 87:13,20,24
88:2 89:11 90:22
92:22
rights
72:19,20 92:21,23
93:5 94:19
risk
31:13 59:17 62:13,17
62:24,24 63:2,3,5
63:12,23 64:8,11,19
65:10,18 66:7 77:18
97:21
Riverside
1:4 5:7 45:4
Rocha
3:11,13,14,15,17,18
3:20,21,23 40:18
43:5 45:9 47:2 49:2
49:12 50:3 52:18
59:4 76:19 78:10
79:6 80:11
Rocha's
44:1
roll
20:24
Rule
21:17
rules
96:5

**S**

S
3:6 4:3
saw
23:12 89:19
saying
6:18 69:2 95:23
97:12,13
says
33:17 43:10 44:4
45:21 62:17,21,21
65:25 71:13 77:3,6
78:3,3 86:24 87:7
88:12
scenario
20:11
Schmookler
22:15
Scott
22:15 97:25 99:11,14
screen
31:19 35:16 38:6
42:23 52:25 61:13
80:18 87:25
scroll
37:21 47:11 80:21
scrolling
49:8
SCULLY
2:8
se
32:4
SEC
24:7,8,23 26:3
second
35:22 37:12 38:15,15
42:11 78:9 93:10
96:8
section
36:24 55:9 66:12,12
66:23 70:13 81:10
93:7
see
13:2 27:7 31:21 32:5
33:4,18 35:24 36:9

38:2,9 41:4,16
42:15 43:10,21,21
44:17 49:9,13,16,24
52:24 53:19 60:15
65:15 68:12 69:15
77:4 81:20 85:14,22
87:25 88:17,25 89:7
93:13 97:4
seeing
23:18 59:21
seek
66:6,25
seeking
58:14,15 67:17,18,24
73:17 74:4,17
seeks
68:20
seemingly
56:22
seen
18:15 24:19 40:24
45:15 47:7 49:7
52:23 53:4 66:13
69:10 71:2 80:16,22
81:5 84:10 92:19
94:3,3,7,8 96:12
send
25:22 44:1 99:17
sending
25:11 50:6
sent
25:13 41:25 76:3
98:1
sentence
31:24 33:13 35:22
37:11 45:17 77:3
88:19 91:10,20
93:10,13 95:4 97:4
97:8
sentences
38:15
separate
23:3 25:17,22 26:19
26:21 81:10
September
48:3 78:19

series
97:25
service
38:20
services
1:19 5:15,16 14:12
Session
3:5
set
81:11 88:19,19 92:23
102:6
setoff
90:22
settled
15:1
settlement
72:23
seven
22:14
share
7:10 29:22 39:10,15
40:13 59:3 80:17
shared
39:6,23 40:12 83:8
83:20
shooting
65:8
shorthand
102:4,13
shot
58:19
show
57:12 60:13 84:11
showed
89:19 90:7
showing
69:9 94:25
shown
33:14 90:6
sic
37:9 91:22
side
17:17
sign
98:23
similar



EXHIBIT 7
PAGE 256

11:20 28:10
**simultaneously**
16:17 24:15
**sir**
99:22
**six**
8:20 38:16 69:13,18
69:22 70:4,19
**skipping**
12:24
**slow**
91:14
**slower**
37:6
**small**
9:8 11:6 15:19 16:2
30:14,25
**smaller**
16:5
**soft**
53:5 92:17
**sole**
8:18
**somewhat**
11:19 93:18 96:8
**sophisticated**
97:20
**sorry**
7:16 8:24 12:16
13:22 15:21 16:18
21:8,10,10 22:19
26:16 27:4 32:12,16
36:10 37:5 38:2
40:15 42:5 45:3,9
46:22 49:19 50:22
53:1 54:15 59:23
66:21 72:3,14,15
73:10 74:10 78:25
81:8 87:1 95:22
96:15 97:11
**sorts**
66:19,22
**sought**
54:11
**so-called**
59:21

**Speaking**
16:17 24:15
**speaks**
44:3
**specific**
16:24,25 21:25 70:2
70:10,18 85:25
94:13 98:11
**specifically**
57:22 62:10
**spent**
99:10
**ss**
101:4
**stage**
32:10,13 56:3,12
60:4
**standard**
48:6 74:21 76:5 83:7
**standing**
42:2 59:8
**start**
44:3
**started**
96:22
**starting**
77:2
**starts**
22:23 38:13
**state**
1:6 5:17 55:24 101:4
**statement**
37:24 43:20 44:2
55:13,20 59:19
63:25 64:4 91:19
96:11
**statements**
102:9
**states**
1:1 5:9 8:14 31:24
35:22 36:25 42:12
53:15 59:14 78:22
80:24
**stating**
10:10
**status**

3:24 31:23 32:8 33:4
36:3 37:14 54:12
57:21,22 84:5
**statutes**
66:17
**statutory**
93:3,4 95:19 96:2
**stenographically**
102:11
**story**
36:2 37:17
**straddles**
76:25 77:1
**stretch**
87:17
**strike**
22:9 31:16 38:25
39:11 73:23 92:3
**stubs**
78:12
**stuff**
8:2
**subcontractors**
81:1
**subject**
12:1 16:24 62:13
63:9 64:12 88:11,22
96:16
**submission**
68:12
**submissions**
38:17
**submit**
47:17 97:17
**submitted**
23:7 24:6 25:16
34:19 51:6 87:9
97:6,14
**submitting**
99:4
**subscribed**
101:13
**subsequently**
75:21
**substantive**
47:14 76:2 85:9

**substantively**
84:16
**subsumed**
89:3 91:4,22
**sufficient**
25:15 31:5 54:7
**suggest**
9:21
**suggesting**
58:8
**suggests**
87:12
**suit**
73:2
**Suite**
2:4,10
**summarized**
88:3
**summarizing**
88:22
**supercede**
47:24
**supply**
98:18
**support**
14:22 58:10,16,17
**supposed**
71:24 73:22
**supposition**
29:4
**sure**
10:10 17:18 21:21
24:11 26:18 29:12
30:10 31:9 36:7
39:4 44:20 46:15
54:14 55:23 63:10
65:4,6 67:3,14 69:5
78:17,20 79:17
82:17,24 87:6 91:18
94:8
**surety**
9:7,16 12:1 15:8
30:18,23 31:4,7
**swear**
5:19
**sworn**



6:4
**synced**
99:22 100:3

---

**T**

**T**
3:6 4:3
**Table**
35:9
**take**
29:13 52:4 60:18
65:7,17,23 66:1,2
79:19 100:6,7
**taken**
5:12 6:14 64:22,25
65:20 67:22 68:3
102:5,13
**talk**
19:10 30:5 79:21
86:5 92:16 94:18
**talked**
36:13 73:25 94:18
96:7
**talking**
15:10 32:21 35:19
44:20 49:20,21 62:8
82:10 88:5,7
**talks**
66:12 81:7,10
**tasks**
38:19
**technically**
7:9 28:9
**technological**
29:11
**telephone**
95:7
**tell**
37:8 38:21 75:17
76:1
**telling**
36:2 37:17
**tender**
24:1
**tendered**
19:13 34:23

**tenders**
18:24
**Tentative**
31:23
**tentatively**
81:17 88:21
**term**
45:24 53:7,8,10
87:11
**terminated**
56:6
**termination**
35:19 56:8
**terms**
11:14 12:5 16:25
18:2 21:22 25:10
77:15 86:17
**terrible**
7:15,17
**testified**
6:4 13:7 14:16 89:15
89:23
**testify**
13:16 31:6
**testifying**
6:24
**testimony**
7:4,7 13:1,11 14:21
23:11,14,18,25 26:2
26:5 74:4 90:24
102:8
**Thank**
6:13 10:23 21:2,10
29:22 38:7 43:12
49:22 66:10 99:19
100:1,8
**theft**
62:19 74:2
**theory**
67:18
**thing**
53:13 99:12
**things**
31:11,12 46:1 78:5
84:20 88:7 93:19
95:12 96:5

**think**
7:20 8:1 9:12,17,18
10:2,10,17 11:8,16
13:9 15:7,23 16:10
17:9,14 18:12 20:5
21:13,19,24 24:4
26:12 27:13,14,24
28:7,21 29:2,3
30:14,24,25 32:23
34:15 36:5,12,12
37:22 39:8,20 40:2
40:6,7,13 41:7
42:18 43:18 44:12
46:1,2,7,19,22 48:2
48:4 53:9 54:5,19
55:14,18 56:7,11,20
56:21 60:4,9 61:9
61:18 62:8,15 64:4
65:13 67:13 70:17
78:2,17 80:7,17
81:24 82:17,24
83:25 84:13,19 85:2
85:11 87:14 89:15
89:19 90:25 92:14
93:20 96:4,19 98:4
98:6 99:6,7
**thinking**
61:24
**third**
53:14 58:1 80:23
86:18
**third-party**
26:4,10
**thought**
26:2 55:6 80:9
**thousands**
51:24
**three**
99:8,10,18
**three-and-a-half**
86:3,9 99:2
**time**
5:12 9:16 16:13
17:25 28:2 36:25
37:2 46:11 48:9,19
51:9,21 52:1 54:10

55:12,15 57:19 58:1
58:4,24 60:10 61:10
64:11 77:19 89:2
91:3,21 97:12 99:10
102:6,7,10
**times**
6:17 67:3
**timing**
86:5
**title**
10:24
**today**
5:11 7:7
**told**
21:14,20,21,22 22:13
25:19
**top**
78:8
**total**
30:17 88:15
**transcribed**
102:11
**transcript**
98:2,24 99:13 100:5
101:12 102:13
**traveling**
31:1
**treat**
95:14
**treated**
24:1 93:22 94:14
**trial**
13:8 14:16 15:1
**true**
36:15 55:13,21 67:12
101:12 102:12,18
**truly**
7:16
**try**
7:10 8:2 58:1 79:4,11
79:15
**trying**
68:15
**Tuesday**
5:1,11 101:8
**TUMF**



EXHIBIT 7
PAGE 258

73:2
**turn**
31:17 41:12
**twice**
57:25
**two**
7:13 29:15 38:15
51:2,5,18 57:4 60:7
61:7,8
**two-minute**
60:18
**type**
10:7 38:9,19 48:7,14
58:12,13,17 67:6
68:16
**types**
9:22
**typical**
6:21 11:15 25:10
39:14

---

**U**

**ULC**
37:2,2,25 66:13 77:7
80:25 91:9
**ultimately**
58:5 67:2,10 93:11
**unable**
65:22,23 90:14
**unaware**
32:15,16
**uncertain**
23:6
**uncovered**
67:23
**underlying**
73:2 86:22
**underneath**
33:17
**understand**
6:24 10:17 15:9
17:16 19:9,10 23:2
28:20,21 32:7 42:12
47:12 65:3,4 66:15
71:9 73:8 77:23
86:12 89:24 95:12

**understanding**
16:12,23 17:7 22:25
23:4 24:5 26:4 39:2
55:25 57:18 58:4,13
58:21 60:6 61:6
63:1,4,6 71:5,8,11
71:15,21,23 72:10
72:13 73:1,5,21,24
74:7 75:13 76:8,12
77:17,19 82:7,15
83:1 86:21 89:14
96:14 97:12
**understood**
92:24
**underway**
40:5
**underwritten**
19:14
**underwrote**
17:8
**Union**
1:9 5:8,23 24:9 85:24
93:10 95:14 97:2
**United**
1:1 5:9
**unreimbursed**
89:6 91:7,25
**unsure**
18:14
**unusual**
64:24 86:2,8
**update**
43:20
**Urban**
85:20
**use**
53:8,10 59:9 87:11
**usually**
95:4
**U.S**
11:11,12 18:22

---

**V**

**valid**
20:20
**VanderWeele**

2:9 5:22,22 7:19
16:15,20 20:15
21:13,16,21 22:3,6
23:20 24:16 29:13
36:17,22 38:3,7,22
39:25 41:22 42:7
44:7,14 49:18,20
52:25 55:1,4,6 59:8
60:16 61:20 63:17
66:18 68:5,20 72:8
72:18 73:17 74:3,16
75:2,11 77:21 79:2
79:9,12,16,20 80:7
80:17 87:21 90:23
92:8 98:4,6,13,20
99:1,9,13,19 100:1
100:4,6
**versus**
5:7 10:8,9 11:4,15
12:7 13:11
**video**
29:19 52:10 60:23
80:2 99:21,25
**videographer**
2:13 5:4,14 29:16,19
52:7,10 60:20,23
79:14,24 80:2 99:20
99:24 100:2,5,8
**view**
28:7 29:4 47:19
**viewed**
51:24
**views**
47:23
**violations**
67:11,17
**virtue**
35:8
**Vitae**
3:9
**void**
85:20
**Von**
2:4
**vs**
1:8

---

**W**

**W**
74:24
**wait**
47:22 48:6,17
**waiting**
48:11
**waiver**
68:8 69:4
**want**
7:12 29:13 60:16
79:11 98:8,11,23
**wanted**
47:19
**wasn't**
15:20,22 20:6 27:23
27:23 34:16,17,21
44:2 52:1 90:12
99:14
**waste**
51:20 52:1
**Watnick**
3:21,24 76:18 77:12
84:4,19 87:16
**Watnick's**
85:2
**way**
10:2,22 29:5 68:19
82:7 93:15
**web**
5:13
**Welch**
2:13 5:14
**went**
48:21 85:12
**Western**
1:4 5:6
**we'll**
8:4,4 22:4 29:24 45:8
49:1 100:7
**we're**
35:9 51:2,5 80:7
83:25 98:22 99:20
**we've**
30:24 52:3



**EXHIBIT 7**
**PAGE 259**

**whack**
79:10
**WHEREOF**
101:13
**withdraw**
22:1
**witness**
3:3 5:19 6:2 9:1,3
    13:24 14:8,12 16:16
    20:18 22:10 23:22
    24:18 26:18 32:18
    37:10 38:23 40:2,16
    41:24,24 42:3,8
    44:9,17 46:24 50:24
    52:5 59:10,25 61:23
    66:19 68:6,22,23
    72:4,9,14,17,19
    73:12,18,19 74:5,6
    74:18 75:3,12 77:23
    78:2 79:8,17 87:6
    87:22 90:25 92:10
    93:25 95:24 96:2
    97:13 98:25 101:13
    102:7,8
**wording**
28:9
**words**
43:21 87:21 92:19
**work**
9:3 10:15 86:13
**worked**
8:15 22:8,15
**working**
78:19
**works**
33:20
**wouldn't**
51:20 56:22 67:25
**WRCOG**
62:23 71:13,19 72:6
    72:24 73:2,5,22
    74:1 75:10 89:12
    90:5,15,17 91:9
    92:2,5,7
**write**
80:6

**written**
93:7
**wrong**
57:19
**wrongdoers**
51:19 53:17,22 54:3
    54:12 71:19
**wrote**
42:4,9,9 48:21 59:12
    89:10
**www.MagnaLS.com**
1:20

———————
**X**
———————
**X**
3:1,6 4:1,3

———————
**Y**
———————
**yeah**
7:19 11:9 18:19
    29:14 36:11 41:13
    41:16 55:3 60:18
    61:22 77:25 79:12
    79:16,20 94:24
    98:14 99:6
**year**
8:21 34:11,16 75:24
    76:3,13
**years**
10:1 11:10 14:14,15
    14:19 15:13,14,18
    15:20,23 16:1 18:17
    18:20 22:14 30:21
    31:1 34:8 51:2,5,18
    57:4 66:25 78:11
    86:4,9 94:13
**yes/no**
66:5

———————
**Z**
———————
**ZOOM**
1:15

———————
**$**
———————
**$10**
17:19

**$11**
88:16 90:22
**$15**
96:16
**$2**
81:12
**$4,469,678**
81:2
**$40**
73:6
**$5,857,672**
81:3
**$60**
17:22 20:9

———————
**0**
———————
**01:01:21PM**
80:5
**01:01:22PM**
80:10
**01:01:29PM**
80:15
**01:01:42PM**
80:20
**01:02:29PM**
80:25
**01:02:54PM**
81:5
**01:03:15PM**
81:10
**01:03:31PM**
81:15
**01:03:46PM**
81:20
**01:03:57PM**
81:25
**01:04:10PM**
82:5
**01:04:26PM**
82:10
**01:04:35PM**
82:15
**01:04:52PM**
82:20
**01:05:09PM**
82:25

**01:05:22PM**
83:5
**01:05:44PM**
83:10
**01:06:05PM**
83:15
**01:06:19PM**
83:20
**01:07:07PM**
83:25
**01:07:29PM**
84:5
**01:07:31PM**
84:10
**01:07:55PM**
84:15
**01:08:15PM**
84:20
**01:08:28PM**
84:25
**01:08:48PM**
85:5
**01:08:59PM**
85:10
**01:09:17PM**
85:15
**01:09:34PM**
85:20
**01:09:45PM**
85:25
**01:10:03PM**
86:5
**01:10:25PM**
86:10
**01:10:45PM**
86:15
**01:11:05PM**
86:20
**01:11:43PM**
87:10
**01:11:51PM**
87:15
**01:12:55PM**
87:20
**01:13:22PM**
87:25



**EXHIBIT 7**
**PAGE 260**

| | | | |
|---|---|---|---|
| **01:14:13PM** | **01:21:32PM** | **01:30:04PM** | 5:5 |
| 88:5 | 92:20 | 97:10 | **10:01** |
| **01:14:22PM** | **01:22:05PM** | **01:30:25PM** | 5:12 |
| 88:10 | 92:25 | 97:15 | **10:01:17AM** |
| **01:14:44PM** | **01:22:30PM** | **01:30:38PM** | 5:10 |
| 88:15 | 93:5 | 97:20 | **10:01:49AM** |
| **01:14:58PM** | **01:23:08PM** | **01:31:58PM** | 5:15 |
| 88:20 | 93:10 | 97:25 | **10:02:02AM** |
| **01:15:15PM** | **01:23:19PM** | **01:32:10PM** | 5:20 |
| 88:25 | 93:15 | 98:5 | **10:02:25AM** |
| **01:15:27PM** | **01:23:35PM** | **01:32:25PM** | 6:10 |
| 89:5 | 93:20 | 98:10 | **10:02:34AM** |
| **01:15:30PM** | **01:23:52PM** | **01:32:31PM** | 6:15 |
| 91:25 | 93:25 | 98:15 | **10:02:43AM** |
| **01:15:36PM** | **01:24:03PM** | **01:32:43PM** | 6:20 |
| 89:10 | 94:5 | 98:20 | **10:02:54AM** |
| **01:15:56PM** | **01:24:27PM** | **01:32:52PM** | 6:25 |
| 89:15 | 94:10 | 98:25 | **10:03:04AM** |
| **01:16:30PM** | **01:24:41PM** | **01:33:09PM** | 7:5 |
| 89:20 | 94:15 | 99:5 | **10:03:14AM** |
| **01:17:07PM** | **01:25:01PM** | **01:33:14PM** | 7:10 |
| 89:25 | 94:20 | 99:10 | **10:03:30AM** |
| **01:17:28PM** | **01:25:20PM** | **01:33:21PM** | 7:15 |
| 90:5 | 94:25 | 99:15 | **10:04:30AM** |
| **01:17:53PM** | **01:25:30PM** | **01:33:32PM** | 7:20 |
| 90:10 | 95:5 | 99:20 | **10:04:39AM** |
| **01:18:16PM** | **01:25:48PM** | **01:33:42PM** | 7:25 |
| 90:15 | 95:10 | 99:25 | **10:05:00AM** |
| **01:18:31PM** | **01:26:05PM** | **01:33:49PM** | 8:5 |
| 90:20 | 95:15 | 100:5 | **10:05:08AM** |
| **01:18:45PM** | **01:26:13PM** | | 8:10 |
| 90:25 | 95:25 | _____ **1** _____ | **10:05:19AM** |
| **01:18:49PM** | **01:26:21PM** | | 8:15 |
| 91:5 | 95:20 | **1** | **10:05:35AM** |
| **01:19:11PM** | **01:26:56PM** | 1:10 3:9 5:5 8:5,6 | 8:20 |
| 91:10 | 96:5 | 53:14 66:12 80:3 | **10:05:44AM** |
| **01:19:23PM** | **01:27:23PM** | **1:33** | 8:25 |
| 91:15 | 96:10 | 100:11 | **10:06:08AM** |
| **01:19:32PM** | **01:27:47PM** | **1:34** | 9:5 |
| 91:20 | 96:15 | 100:9 | **10:06:28AM** |
| **01:20:11PM** | **01:28:14PM** | **10** | 9:10 |
| 92:5 | 96:20 | 3:19 9:12,15 15:13 | **10:06:47AM** |
| **01:20:24PM** | **01:28:48PM** | 30:21 31:1 54:20,21 | 9:15 |
| 92:10 | 96:25 | 70:24 74:1 | **10:07:07AM** |
| **01:20:38PM** | **01:29:38PM** | **10:00** | 9:20 |
| 92:15 | 97:5 | 5:2 | **10:07:27AM** |
| | | **10:00:54AM** | |



EXHIBIT 7
PAGE 261

| | | | |
|---|---|---|---|
| 9:25 | 14:15 | 19:5 | 23:25 |
| **10:07:51AM** | **10:15:54AM** | **10:23:15AM** | **10:30:32AM** |
| 10:5 | 14:20 | 19:10 | 24:5 |
| **10:08:11AM** | **10:16:12AM** | **10:23:30AM** | **10:31:05AM** |
| 10:10 | 14:25 | 19:15 | 24:10 |
| **10:08:40AM** | **10:16:25AM** | **10:23:46AM** | **10:31:19AM** |
| 10:15 | 15:5 | 19:20 | 24:15 |
| **10:08:53AM** | **10:16:50AM** | **10:24:03AM** | **10:31:25AM** |
| 10:20 | 15:10 | 19:25 | 24:20 |
| **10:09:03AM** | **10:17:12AM** | **10:24:21AM** | **10:31:48AM** |
| 10:25 | 15:15 | 20:5 | 24:25 |
| **10:09:28AM** | **10:17:22AM** | **10:24:38AM** | **10:32:09AM** |
| 11:5 | 15:20 | 20:10 | 25:5 |
| **10:09:41AM** | **10:17:39AM** | **10:24:54AM** | **10:32:36AM** |
| 11:10 | 15:25 | 20:15 | 25:10 |
| **10:10:03AM** | **10:18:00AM** | **10:25:07AM** | **10:32:52AM** |
| 11:15 | 16:5 | 20:20 | 25:15 |
| **10:10:30AM** | **10:18:10AM** | **10:25:42AM** | **10:33:14AM** |
| 11:20 | 16:10 | 21:5 | 25:20 |
| **10:10:53AM** | **10:18:41AM** | **10:25:56AM** | **10:33:33AM** |
| 11:25 | 16:15 | 21:10 | 25:25 |
| **10:11:24AM** | **10:18:50AM** | **10:26:13AM** | **10:33:53AM** |
| 12:5 | 16:20 | 21:15 | 26:5 |
| **10:11:41AM** | **10:19:04AM** | **10:26:29AM** | **10:34:05AM** |
| 12:10 | 16:25 | 21:20 | 26:10 |
| **10:12:17AM** | **10:19:16AM** | **10:26:43AM** | **10:34:16AM** |
| 12:15 | 17:5 | 21:25 | 26:15 |
| **10:12:32AM** | **10:19:36AM** | **10:26:49AM** | **10:34:27AM** |
| 12:20 | 17:10 | 22:5 | 26:20 |
| **10:13:00AM** | **10:20:02AM** | **10:26:57AM** | **10:34:45AM** |
| 12:25 | 17:15 | 22:10 | 26:25 |
| **10:13:17AM** | **10:20:27AM** | **10:27:16AM** | **10:35:05AM** |
| 13:5 | 17:20 | 22:15 | 27:5 |
| **10:13:40AM** | **10:20:46AM** | **10:28:15AM** | **10:35:21AM** |
| 13:10 | 17:25 | 22:20 | 27:10 |
| **10:14:03AM** | **10:21:00AM** | **10:28:36AM** | **10:35:47AM** |
| 13:15 | 18:5 | 22:25 | 27:15 |
| **10:14:35AM** | **10:21:22AM** | **10:28:52AM** | **10:36:04AM** |
| 14:5 | 18:10 | 23:5 | 27:20 |
| **10:14:37AM** | **10:21:37AM** | **10:29:17AM** | **10:36:12AM** |
| 13:20 | 18:15 | 23:10 | 27:25 |
| **10:14:59AM** | **10:22:12AM** | **10:29:38AM** | **10:36:37AM** |
| 13:25 | 18:20 | 23:15 | 28:5 |
| **10:15:24AM** | **10:22:26AM** | **10:29:58AM** | **10:36:58AM** |
| 14:10 | 18:25 | 23:20 | 28:10 |
| **10:15:37AM** | **10:22:48AM** | **10:30:06AM** | **10:37:22AM** |



EXHIBIT 7
PAGE 262

28:15
**10:37:38AM**
28:20
**10:37:56AM**
28:25
**10:38:20AM**
29:5
**10:39**
29:17
**10:39:40AM**
29:10
**10:39:50AM**
29:15
**10:43**
29:20
**10:43:30AM**
29:20
**10:43:57AM**
30:5
**10:44:15AM**
30:10
**10:44:30AM**
30:15
**10:44:53AM**
30:20
**10:45:06AM**
30:25
**10:45:32AM**
31:5
**10:45:50AM**
31:10
**10:46:17AM**
31:15
**10:47:04AM**
31:20
**10:47:18AM**
31:25
**10:47:33AM**
32:5
**10:47:43AM**
32:10
**10:47:59AM**
32:15
**10:48:09AM**
32:20
**10:48:35AM**

32:25
**10:49:00AM**
33:5
**10:49:25AM**
33:10
**10:49:47AM**
33:15
**10:50:04AM**
33:20
**10:50:12AM**
33:25
**10:50:31AM**
34:5
**10:50:48AM**
34:10
**10:51:10AM**
34:15
**10:51:27AM**
34:20
**10:51:45AM**
34:25
**10:52:10AM**
35:5
**10:52:34AM**
35:10
**10:52:49AM**
35:15
**10:53:42AM**
35:20
**10:53:53AM**
35:25
**10:54:07AM**
36:5
**10:54:50AM**
36:10
**10:55:02AM**
36:15
**10:55:15AM**
36:20
**10:55:25AM**
36:25
**10:55:34AM**
37:5
**10:55:53AM**
37:10
**10:56:39AM**

37:15
**10:56:59AM**
37:20
**10:58:04AM**
37:25
**10:58:16AM**
38:5
**10:58:28AM**
38:10
**10:59:26AM**
38:15
**10:59:39AM**
38:20
**10:59:51AM**
38:25
**1000**
2:4
**1090**
66:23 67:11,17
**11**
3:20 59:1,3,5 63:17
   66:11 76:19
**11/28/18**
3:21 76:19
**11:00:29AM**
39:5
**11:01:11AM**
39:10
**11:01:30AM**
39:15
**11:01:49AM**
39:20
**11:02:12AM**
39:25
**11:02:30AM**
40:5
**11:02:48AM**
40:10
**11:02:58AM**
40:15
**11:03:29AM**
40:20
**11:03:39AM**
40:25
**11:03:52AM**
41:5

**11:04:05AM**
41:10
**11:04:28AM**
41:15
**11:04:50AM**
41:20
**11:04:57AM**
41:25
**11:05:18AM**
42:5
**11:05:25AM**
42:10
**11:05:41AM**
42:15
**11:05:54AM**
42:20
**11:06:16AM**
42:25
**11:06:38AM**
43:5
**11:06:47AM**
43:10
**11:07:00AM**
43:15
**11:07:18AM**
43:20
**11:07:43AM**
43:25
**11:08:06AM**
44:5
**11:08:15AM**
44:10
**11:08:27AM**
44:15
**11:08:37AM**
44:20
**11:08:48AM**
44:25
**11:09:17AM**
45:5
**11:09:55AM**
45:10
**11:10:01AM**
45:15
**11:10:17AM**
45:20



EXHIBIT 7
PAGE 263

| | | | |
|---|---|---|---|
| **11:10:38AM** | **11:17:46AM** | **11:38:04AM** | **11:47:10AM** |
| 45:25 | 50:15 | 54:20 | 59:10 |
| **11:11:09AM** | **11:18:11AM** | **11:39:36AM** | **11:47:24AM** |
| 46:5 | 50:20 | 54:25 | 59:15 |
| **11:11:29AM** | **11:18:26AM** | **11:39:44AM** | **11:47:40AM** |
| 46:10 | 50:25 | 55:5 | 59:20 |
| **11:11:43AM** | **11:18:36AM** | **11:39:59AM** | **11:47:55AM** |
| 46:15 | 51:5 | 55:10 | 59:25 |
| **11:12:12AM** | **11:18:58AM** | **11:40:17AM** | **11:48:06AM** |
| 46:20 | 51:10 | 55:15 | 60:5 |
| **11:12:24AM** | **11:19:25AM** | **11:40:31AM** | **11:48:20AM** |
| 46:25 | 51:15 | 55:20 | 60:10 |
| **11:12:44AM** | **11:19:46AM** | **11:40:43AM** | **11:49** |
| 47:5 | 51:20 | 55:25 | 60:21 |
| **11:12:52AM** | **11:20** | **11:40:56AM** | **11:49:02AM** |
| 47:10 | 52:8 | 56:5 | 60:15 |
| **11:13:18AM** | **11:20:09AM** | **11:41:08AM** | **11:49:10AM** |
| 47:15 | 51:25 | 56:10 | 60:20 |
| **11:13:44AM** | **11:20:42AM** | **11:41:22AM** | **11:56** |
| 47:20 | 52:5 | 56:15 | 60:24 |
| **11:14:09AM** | **11:31** | **11:41:43AM** | **11:56:08AM** |
| 47:25 | 52:11 | 56:20 | 60:25 |
| **11:14:22AM** | **11:31:47AM** | **11:42:00AM** | **11:56:46AM** |
| 48:5 | 52:10 | 56:25 | 61:15 |
| **11:14:38AM** | **11:31:58AM** | **11:42:12AM** | **11:57:15AM** |
| 48:10 | 52:15 | 57:5 | 61:20 |
| **11:15:00AM** | **11:32:36AM** | **11:42:34AM** | **11:57:39AM** |
| 48:15 | 52:20 | 57:10 | 61:25 |
| **11:15:14AM** | **11:32:54AM** | **11:43:09AM** | **11:57:57AM** |
| 48:20 | 52:25 | 57:15 | 62:5 |
| **11:15:42AM** | **11:33:16AM** | **11:43:28AM** | **11:58:40AM** |
| 48:25 | 53:5 | 57:20 | 62:10 |
| **11:15:46AM** | **11:33:34AM** | **11:43:54AM** | **11:59:12AM** |
| 49:5 | 53:10 | 57:25 | 62:15 |
| **11:16:14AM** | **11:34:15AM** | **11:44:08AM** | **11:59:34AM** |
| 49:10 | 53:15 | 58:5 | 62:20 |
| **11:16:28AM** | **11:34:30AM** | **11:44:29AM** | **11:59:59AM** |
| 49:15 | 53:20 | 58:10 | 62:25 |
| **11:16:44AM** | **11:34:53AM** | **11:44:48AM** | **1100** |
| 49:20 | 53:25 | 58:15 | 2:10 |
| **11:16:53AM** | **11:35:16AM** | **11:45:08AM** | **12** |
| 49:25 | 54:5 | 58:20 | 3:21 76:15,17,20 |
| **11:17:09AM** | **11:35:37AM** | **11:45:34AM** | 80:5,8,9 |
| 50:5 | 54:10 | 58:25 | **12:00:13PM** |
| **11:17:25AM** | **11:35:57AM** | **11:46:55AM** | 63:5 |
| 50:10 | 54:15 | 59:5 | **12:00:28PM** |



**EXHIBIT 7**
**PAGE 264**

| | | | |
|---|---|---|---|
| 63:10 | 67:25 | 72:15 | 77:5 |
| **12:01:26PM** | **12:09:34PM** | **12:17:01PM** | **12:24:17PM** |
| 63:15 | 68:5 | 72:20 | 77:10 |
| **12:01:43PM** | **12:09:54PM** | **12:17:17PM** | **12:24:36PM** |
| 63:20 | 68:10 | 72:25 | 77:15 |
| **12:01:59PM** | **12:10:10PM** | **12:17:38PM** | **12:24:58PM** |
| 63:25 | 68:15 | 73:5 | 77:20 |
| **12:02:14PM** | **12:10:34PM** | **12:17:49PM** | **12:25:08PM** |
| 64:5 | 68:20 | 73:10 | 77:25 |
| **12:02:36PM** | **12:10:45PM** | **12:18:05PM** | **12:25:27PM** |
| 64:10 | 68:25 | 73:15 | 78:5 |
| **12:02:57PM** | **12:11:07PM** | **12:18:14PM** | **12:26:24PM** |
| 64:15 | 69:5 | 73:20 | 78:10 |
| **12:03:25PM** | **12:11:46PM** | **12:18:39PM** | **12:26:39PM** |
| 64:20 | 69:10 | 73:25 | 78:15 |
| **12:03:53PM** | **12:12:00PM** | **12:19:07PM** | **12:26:59PM** |
| 64:25 | 69:15 | 74:5 | 78:20 |
| **12:04:12PM** | **12:12:13PM** | **12:19:13PM** | **12:27:38PM** |
| 65:5 | 69:20 | 74:10 | 79:10 |
| **12:04:31PM** | **12:12:31PM** | **12:19:35PM** | **12:27:42PM** |
| 65:10 | 69:25 | 74:15 | 79:15 |
| **12:04:47PM** | **12:12:53PM** | **12:19:49PM** | **12:27:51PM** |
| 65:15 | 70:5 | 74:20 | 79:20 |
| **12:05:09PM** | **12:13:19PM** | **12:20:07PM** | **12:28** |
| 65:20 | 70:10 | 74:25 | 79:25 |
| **12:05:34PM** | **12:13:33PM** | **12:20:16PM** | **12:28:03PM** |
| 65:25 | 70:15 | 75:5 | 79:25 |
| **12:05:59PM** | **12:13:50PM** | **12:20:36PM** | **13** |
| 66:5 | 70:20 | 75:10 | 3:22 62:6 80:7,10,12 |
| **12:06:17PM** | **12:14:26PM** | **12:20:48PM** | 93:6 |
| 66:10 | 70:25 | 75:15 | **13048** |
| **12:07:01PM** | **12:14:43PM** | **12:21:10PM** | 1:21 102:3,23 |
| 66:15 | 71:5 | 75:20 | **14** |
| **12:07:26PM** | **12:14:59PM** | **12:21:30PM** | 3:24 27:11,17 28:1 |
| 66:20 | 71:10 | 75:25 | 28:19 83:25 84:6 |
| **12:07:46PM** | **12:15:17PM** | **12:21:52PM** | **15** |
| 66:25 | 71:15 | 76:5 | 3:20,22 4:6 16:13 |
| **12:08:03PM** | **12:15:49PM** | **12:22:09PM** | 17:25 27:11,17,19 |
| 67:5 | 71:20 | 76:10 | 28:1,4,17,19,25 |
| **12:08:21PM** | **12:16:11PM** | **12:22:52PM** | 59:4 61:13 63:15 |
| 67:10 | 71:25 | 76:15 | 64:18 68:18 69:10 |
| **12:08:41PM** | **12:16:29PM** | **12:23:07PM** | 70:14 78:19 80:10 |
| 67:15 | 72:5 | 76:20 | 81:1 88:20 96:7 |
| **12:08:59PM** | **12:16:43PM** | **12:23:36PM** | 98:13,15 |
| 67:20 | 72:10 | 76:25 | **1517** |
| **12:09:15PM** | **12:16:48PM** | **12:23:59PM** | 23:8 |



**16**
22:20 37:21 38:6
69:10 97:1
**17**
15:20,23 27:19 28:4
28:17,25 38:12
61:13
**18**
3:10 29:23 32:20
67:9
**18101**
2:4
**19**
3:11 40:18 70:23
**1993**
35:23 85:18

---
**2**
**2**
3:10 12:24 16:6
29:24 30:1 31:18
35:9 36:18,19 59:14
86:19
**2nd**
49:11
**2.3**
81:18 88:22
**20**
3:12 42:24 52:4
70:23 79:22
**2000**
3:14 45:9
**2003**
8:14 9:14 10:5
**2004**
81:4
**2011**
33:15,15 35:23 85:19
**2012**
81:4 96:17
**2014**
16:13 17:25
**2015**
33:15
**2016**
13:9 23:8 24:1,6

34:18,20,23 97:7
**2017**
3:10,11,12,13 29:23
32:20,25 33:5,9
35:1 39:24 40:18
42:24 43:5 67:9
**2018**
3:15,18,20 47:2,15
48:2,3,13 49:11
50:12 52:18 53:21
54:6,8 55:5 57:20
59:4 63:15 64:7,18
65:18 66:6 68:18
69:10 70:14 71:18
84:14 85:10
**2019**
3:22,24 80:10 84:3
84:15 85:25 86:15
86:23 88:3,20
**2022**
1:17 5:1,11 31:6
101:8,14 102:20
**24**
7:3
**246**
61:21
**25**
3:14 45:8
**252**
62:6
**26**
1:17 3:13,18 5:1
21:17 52:18 55:5
101:8
**26th**
5:11 43:5
**260-0972**
2:6
**263-2600**
2:5

---
**3**
**3**
3:11 12:25 40:18,20
85:13
**30**

3:10 11:10 14:13,15
14:19 41:2 42:14,18
44:1 45:19,23 46:5
46:13,18 47:15
48:14 96:17
**312**
2:11

---
**4**
**4**
3:12,24 31:19 42:23
42:25 43:1 49:24
54:25 57:11 66:12
76:25 77:1 84:3
**40**
3:11 10:1 18:17,20
34:7 66:25
**40-plus**
94:13
**43**
3:12,13
**45**
3:14
**47**
3:15
**49**
3:17

---
**5**
**5**
2:9 3:13 9:12,15 11:8
15:14 16:4,8 35:16
36:18 43:4,6 44:10
44:11,13 49:24 77:1
77:2
**5:20-cv-02164-GW**
1:7
**50**
1:10 6:18
**52**
3:18
**520CV02164GWK...**
5:10
**54**
3:19
**59**

3:20

---
**6**
**6**
3:4,14 45:8,11,15
70:13 80:23
**6th**
102:20

---
**7**
**7**
3:15,15 36:8 47:1,1,3
88:2
**70s**
30:7,11 31:5
**76**
3:21

---
**8**
**8**
3:9,16 48:24 49:1,3
52:14 59:15 60:3
61:14,18,21,22
62:14 63:21
**8.2**
81:18 88:22
**80**
3:5,23
**80s**
30:7,11 31:5
**84**
3:24
**852312**
1:22
**866-624-6221**
1:19

---
**9**
**9**
3:18 52:15,17,19
55:1 62:11
**9-11**
19:6
**90**
9:25
**92612**



EXHIBIT 7
PAGE 266

2:5
**92614**
2:10
**949**
2:5,6
**98**
4:6
**980-6779**
2:11
**99**
9:25 10:4



**EXHIBIT 7**
**PAGE 267**