# EXHIBIT 10

**EXHIBIT 10**
**PAGE 276**

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES ACT OF 1933
Release No. 10406 / August 23, 2017

ADMINISTRATIVE PROCEEDING
File No. 3-18132

| | |
|---|---|
| In the Matter of<br><br>BEAUMONT FINANCING AUTHORITY,<br><br>Respondent. | ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS AND A CEASE-AND-DESIST ORDER |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act"), against the Beaumont Financing Authority ("BFA" or "Respondent").

**II.**

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over it and the subject matter of these proceedings, Respondent consents to the entry of this Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order ("Order"), as set forth below.

**III.**

On the basis of this Order and Respondent's Offer, the Commission finds[1] that:

---

[1] The findings herein are made pursuant to Respondent's Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

EXHIBIT 10
PAGE 277
BMTGJ0001437

## Summary

1.      This matter involves material misstatements and omissions by the BFA in the sale of municipal securities.  Between 2003 and 2013, the BFA issued approximately $260 million in municipal bonds in 24 separate offerings.  In connection with each of those offerings, a community facilities district established by the City of Beaumont, California ("the District"), in its capacity as an obligated person with respect to the bonds, entered into a continuing disclosure agreement ("CDA") for the benefit of investors in the BFA's municipal securities, including annual reports containing financial information and operating data relating to the bonds being offered.  From the period of at least 2004 through April 2013, the District regularly failed to comply with its CDAs.

2.      In 2012 and 2013, the BFA issued approximately $32.26 million of revenue bonds in five separate offerings.  In each of those offerings, the BFA falsely stated in its official statements that, except in one instance several years earlier, the District had complied with its CDAs.

3.      As a result of the conduct described herein, the BFA violated Sections 17(a)(2) and (a)(3) of the Securities Act.

## Respondent

4.      **Beaumont Financing Authority** is a joint exercise of powers authority formed by the City of Beaumont, California ("Beaumont") under the California Joint Exercise of Powers Act.  Among other things, the BFA issues bonds to public investors to provide funds for the acquisition of local obligations issued by the District.  The District receives the proceeds from the BFA bond sales for the acquisition and construction of public facilities permitted under state law.  The BFA bonds that are sold to public investors are secured by the revenues from the repayment of the District local obligations and certain other specified sources of repayment.  The Mayor of Beaumont serves, *ex officio,* as Chairperson of the BFA and the City Manager of Beaumont also is the BFA's Executive Director.  Beaumont performs general administrative and support functions for the BFA.

## Other Relevant Entities

5.      **Beaumont** is a city in Riverside County, California.  It has a population of approximately 40,000 residents and is managed by an elected five-member City Council.  The City Council also serves as the governing board ("Board") of the BFA.  Beaumont governs and administers the District.

6.      **Beaumont Community Facilities District 93-1** is a community facilities district formed by Beaumont for the purpose of financing and refinancing the acquisition or construction of public facilities, which includes the public infrastructure of real estate developments.  The District issues local obligations secured and paid by special taxes levied on homes within the boundaries of the district.  From approximately 1995 to 2015, the Beaumont City Manager

managed the operations of the District. Among other things, this involved reviewing, signing, and filing documents on behalf of the District, including CDAs and continuing disclosure reports.

7. **Alan Charles Kapanicas**, age 65, is a resident of Palm Desert, California. From approximately 1995 to 2015, Kapanicas was both the Executive Director of the BFA and City Manager of Beaumont. As such, Kapanicas was involved in nearly every aspect of the management of the BFA and the District.

### The District Agreements to Provide Annual Disclosures in Connection with BFA Municipal Bond Offerings

8. Between 2003 and 2013, the BFA issued approximately $260 million in municipal bonds in 24 separate offerings. In connection with each of those offerings, the District, in its capacity as an obligated person with respect to the bonds, executed a CDA pursuant to Rule 15c2-12 under the Securities Exchange Act of 1934 ("Exchange Act"), in which it agreed to publicly file annual reports containing specified financial information and operating data, as well as notices of certain enumerated events pertaining to the bonds at issue. Among other things, the CDAs required that such annual reports contain special tax delinquency data, the status of facilities being constructed with bond proceeds, the balances of various funds that could be drawn upon to pay bondholders in the event of insufficient special tax collections, and Beaumont's audited financial statements. The CDAs also identified the filing deadlines for the annual reports and notices, as well as the repositories where the required information was required to be posted.

9. In his capacity as City Manager, Kapanicas approved and signed all 24 CDAs on behalf of the District. He also was responsible for drafting, signing off on, and filing the District's annual reports and notices that were required by the CDAs.

10. In December of 2011, while reviewing a preliminary official statement for a 2011 bond offering by the BFA, a credit analyst at a large institutional investor requested that the District revise the terms of a draft CDA for those bonds. The revisions included changing the due date for the District's required annual reports and including information about various fund balances in the District's annual reports that served as sources of potential repayment of, and security for, the BFA's bonds. Kapanicas and the BFA knew about and approved the specific changes. The District also included the revised due date and additional fund balances in the CDAs that it entered into in connection with the BFA's 2012 and 2013 offerings.

### The District Repeatedly Failed to Comply with its Continuing Disclosure Agreements

11. From the period of at least 2004 through April 2013, the District regularly failed to comply with its CDAs. It filed its annual reports late virtually every year during this period, including by as many as 117 days. Moreover, the annual reports that it filed consistently omitted information required by its CDAs. Two required components of the annual reports were a description of the status of facilities being constructed with bond proceeds and Beaumont's audited financial statements. The District, however, never included these items in its annual reports. It also failed to include complete special tax delinquency data and reserve fund balances for several

3

EXHIBIT 10
PAGE 279

BMTGJ0001439

years. Other required disclosures missing in certain annual reports included cash flow management fund balances, rate stabilization fund balances, residual fund balances, and special escrow fund balances. The cash flow management, rate stabilization, and residual funds served as additional sources of repayment and security for the BFA's bonds.

### The BFA Falsely Stated in Five Official Statements that the District had Complied with its Prior Continuing Disclosure Agreements

12. In 2012 and 2013, the BFA issued approximately $32.26 million of revenue bonds in five separate offerings. The official statements for each of these five offerings included a section titled "Continuing Disclosure," which represented that an annual report due November 1, 2002 was filed on December 21, 2002, but the District had not otherwise failed to meet its continuing disclosure requirement under Rule 15c2-12. These representations were false. As noted above, the District repeatedly failed to comply with its prior CDAs. It regularly filed annual reports late, and those reports did not contain several pieces of financial information and operating data required by those prior CDAs.

13. For each of these five offerings, the BFA delegated to its Executive Director responsibility for carrying out the bond issuances, and for reviewing and approving the content of all draft and final official statements. Kapanicas also signed the final official statements on behalf of the BFA after the BFA's Board approved the documents for dissemination to the investing public.

14. The reality of the District's history of compliance with its prior CDAs was very different from this representation to investors. Reasonable investors would have wanted to know about the District's many disclosure failures from 2004 through 2013 and would have viewed the omitted information as significantly altering the total mix of information made available in making a trading decision. The BFA's failure to disclose the District's true record of compliance with its past CDAs made the BFA's bonds appear more attractive to investors than they actually were. The BFA also misled these investors regarding the likelihood that the District would timely comply with its CDAs in the future.

15. The BFA failed to exercise reasonable care. Its Executive Director repeatedly reviewed, approved, and signed materially misleading official statements. As City Manager, Kapanicas had previously reviewed and signed all of the District's prior CDAs and he also subsequently prepared and filed the deficient and late annual reports. He repeatedly either failed to read and understand the District's CDAs or disregarded their requirements. He also repeatedly failed to read and confirm that the statements in the BFA's 2012 and 2013 official statements concerning the District's compliance with past CDAs were accurate and complete, or ignored the fact that the statements were false.

16. Despite seeking and receiving hundreds of millions of dollars in financing from municipal securities investors between 2003 and 2013, the BFA and the District did not have any formal written policies or procedures for the preparation of accurate, complete and timely official statements or post-issuance continuing disclosures. The BFA and the District also did not clearly delineate the responsibilities of officers, staff, professional services providers, and contractors.

Instead, each relied almost exclusively on Kapanicas to manage their bond issuances and to make post-issuance disclosures without any significant governance, oversight or supervision. The BFA and the District also failed to properly account for the spending of bond proceeds and to maintain appropriate records of bond transactions, which hindered the BFA's and the District's ability to make and ensure timely, accurate and complete pre- and post-issuance disclosures.

### Legal Discussion

17. Section 17(a)(2) of the Securities Act makes it unlawful "in the offer or sale of any securities … directly or indirectly … to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77q(a)(2). Section 17(a)(3) of the Securities Act makes it unlawful "in the offer or sale of any securities … directly or indirectly … to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a)(3). Negligence is sufficient to establish violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act. *See Aaron v. SEC*, 446 U.S. 680, 696-97 (1980). A misrepresentation or omission is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision. *See Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).

18. Exchange Act Rule 15c2-12 was adopted in an effort to improve the quality and timeliness of disclosures to investors in municipal securities. In recognition of the fact that the disclosure of sound financial information is critical to the integrity of not just the primary market, but also the secondary markets for municipal securities, Rule 15c2-12 requires an underwriter to obtain a written agreement, for the benefit of the holders of the securities, in which the issuer or obligated person undertakes, among other things, to annually provide certain financial information and event notices to the Municipal Securities Rulemaking Board. *See* 17 C.F.R. § 240.15c2-12(b)(5)(i); Municipal Securities Disclosure, Exchange Act Release No. 34961, 59 Fed. Reg. 59590, 59592 (Nov. 17, 1994) ("1994 Amendments Adopting Release"); and Amendment to Municipal Securities Disclosure, Exchange Act Release No. 59062, 73 Fed. Reg. 76103 (Dec. 15, 2008).

19. In addition, it is important for investors and the market to know the scope of any ongoing disclosure undertakings, and the type of information provided. *See* 1994 Amendments Adopting Release, at 59594. Rule 15c2-12 therefore requires that undertakings provided pursuant to Rule 15c2-12 be described in the final official statement. Moreover, critical to any evaluation of an undertaking to make disclosures is the likelihood that the issuer or obligated person will abide by the undertaking. *See id.* Therefore, Rule 15c2-12(f)(3) requires that a final official statement set forth any instances in the previous five years in which an issuer of municipal securities, or obligated person, failed to comply in all material respects with any previous continuing disclosure undertakings. The requirements of Rule 15c2-12 allow underwriters, investors, and others to assess the reliability of the disclosure representations. *See id.* at 59595.

20. As a result of the conduct described above, the BFA violated Sections 17(a)(2) and (3) of the Securities Act.

BMTGJ0001441

**Undertakings**

Respondent undertakes to:

21. Within 180 days of this Order, establish appropriate and comprehensive written policies and procedures and periodic training regarding all aspects of the BFA's municipal securities disclosures, including formal policies and procedures to be followed for the preparation, review and approval of official statements and continuing disclosures, and the designation of an individual officer of Respondent responsible for ensuring compliance by Respondent with such policies and procedures and responsible for implementing and maintaining a record (including attendance) of such training.

22. Within 180 days of this Order, establish appropriate and comprehensive written policies and procedures and periodic training regarding the accounting of bond proceeds and recordkeeping, and the designation of an individual officer of Respondent responsible for ensuring compliance by Respondent with such policies and procedures and responsible for implementing and maintaining a record (including attendance) of such training.

23. Within 180 days of this Order, ensure that the District complies with all existing continuing disclosure undertakings, including updating past delinquent filings if the District is not currently in compliance with its CDAs.

24. Retain an independent consultant (the "Independent Consultant"), not unacceptable to the Commission staff, to conduct a review of BFA's policies and procedures as they relate to all aspects of the BFA's municipal securities disclosures, the accounting of bond proceeds and recordkeeping. The Independent Consultant shall not have provided consulting, legal, auditing or other professional services to, nor had any affiliation with, the BFA during the two years prior to the institution of these proceedings.

25. Require the Independent Consultant to enter into an agreement that provides that for the period of engagement and for a period of two years from completion of the engagement, the Independent Consultant shall not enter into any employment, consultant, attorney-client, auditing or other professional relationship with the BFA, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity. The agreement will also provide that the Independent Consultant will require that any firm with which he/she is affiliated or of which he/she is a member, and any person engaged to assist the Independent Consultant in performance of his/her duties under this Order shall not, without prior written consent of the Division of Enforcement, enter into any employment, consultant, attorney-client, auditing or other professional relationship with the BFA, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such for the period of the engagement and for a period of two years after the engagement. The agreement will also provide that, within 180 days of the institution of these proceedings, the Independent Consultant shall submit a written report of its findings to the BFA, which shall include the Independent Consultant's recommendations for changes in or improvements to the BFA's policies and procedures.

EXHIBIT 10
PAGE 282                                                                                BMTGJ0001442

26. Adopt all recommendations contained in the Independent Consultant's report within 90 days of the date of that report, provided, however, that within 30 days of the report, the BFA shall advise in writing the Independent Consultant and the Commission staff of any recommendations that the BFA considers to be unduly burdensome, impractical or inappropriate. With respect to any such recommendation, the BFA need not adopt that recommendation at that time but shall propose in writing an alternative policy, procedures or system designed to achieve the same objective or purpose. As to any recommendation on which the BFA and the Independent Consultant do not agree, the BFA and the Independent Consultant shall attempt in good faith to reach an agreement within 60 days after the date of the Report. Within 15 days after the conclusion of the discussion and evaluation by the BFA and the Independent Consultant, the BFA shall require the Independent Consultant inform the BFA and the Commission staff in writing of the Independent Consultant's final determination concerning any recommendation that the BFA considers to be unduly burdensome, impractical, or inappropriate. Within 10 days of this written communication from the Independent Consultant, the BFA may seek approval from the Commission staff to not adopt recommendations that the BFA can demonstrate to be unduly burdensome, impractical, or inappropriate. Should the Commission staff agree that any proposed recommendations are unduly burdensome, impractical, or inappropriate, the BFA shall not be required to abide by, adopt, or implement those recommendations.

27. Disclose in a clear and conspicuous fashion the terms of this settlement in any final official statement for an offering by Respondent within five years of the institution of these proceedings.

28. Certify, in writing, compliance with the undertakings set forth above in paragraphs 21-27. The certification shall identify the undertakings, provide written evidence of compliance in the form of a narrative, and be supported by exhibits sufficient to demonstrate compliance. The Commission staff may make reasonable requests for further evidence of compliance, and the BFA agrees to provide such evidence. The certification and supporting material shall be submitted to LeeAnn G. Gaunt, Chief, Public Finance Abuse Unit, with a copy to the Office of Chief Counsel of the Division of Enforcement, no later than sixty (60) days from the date of the completion of the undertakings.

29. For good cause shown, the Commission staff may extend any of the procedural dates relating to these undertakings. Deadlines for procedural dates shall be counted in calendar days, except that if the last day falls on a weekend or federal holiday, the next business day shall be considered the last day.

## IV.

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in Respondent BFA's Offer.

Accordingly, it is hereby ORDERED that:

     A.     Pursuant to Section 8A of the Securities Act, Respondent BFA cease and desist from committing or causing any violations and any future violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act.

     B.     Respondent BFA shall comply with the undertakings enumerated in paragraphs 21 – 29 of Section III, above.

     By the Commission.

     Brent J. Fields
     Secretary