JEFFREY V. DUNN, Bar No. 131926
jeffrey.dunn@bbklaw.com
CHRISTOPHER E. DEAL, Bar No. 186754
chris.deal@bbklaw.com
DANIEL L. RICHARDS, Bar No. 315552
daniel.richards@bbklaw.com
BEST BEST & KRIEGER LLP
18101 Von Karman Avenue
Suite 1000
Irvine, California 92612
Telephone: (949) 263-2600
Facsimile: (949) 260-0972

Attorneys for Plaintiffs
Western Riverside Council of Governments
and City of Beaumont

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

WESTERN RIVERSIDE COUNCIL OF GOVERNMENTS, a California Joint Powers Authority,

Plaintiff,

v.

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, and DOES 1 through 50, inclusive,

Defendants.

Case No. 5:20-cv-02164- GW (KKx)

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION IN LIMINE NO. 1 TO EXCLUDE DANIEL RAY FROM TESTIFYING AT TRIAL**

Trial Date: September 1, 2022
Time: 8:30 a.m.
Courtroom: 9D

# TABLE OF CONTENTS

Page


I. INTRODUCTION .......... 7
II. FACTUAL BACKGROUND .......... 8
III. LEGAL ARGUMENT .......... 9
A. Legal Standard .......... 9
B. Ray's Opinion that ULC Exceeded the 4.5% Cap is Admissible .......... 10
1. Ray Applied an Appropriate Methodology .......... 14
2. Ray's Opinion is Subject to Cross-Examination .......... 17
3. Ray's Opinions Conformed to the Contract .......... 18
4. The Decisions Relied upon by National Union are Inapposite .......... 19
C. Ray's Opinion Concerning Inappropriate Markup of Sub-consultants Bills is Admissible. .......... 21
D. National Union's Challenge goes to Weight .......... 25
E. Difficulty in Proving the Amount of Damages is not a Bar to Admissibility .......... 27
F. Plaintiffs Motion in Limine is a Disfavored Disguised Motion for Summary Judgment .......... 29
G. Ray Will Offer Percipient Testimony .......... 31
IV. CONCLUSION .......... 31


BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

**TABLE OF AUTHORITIES**

**Page**

**Federal Cases**

*Advanced Microtherm, Inc. v. Norman Wright Mech. Equip. Corp.* 2010 WL 11575000 (N.D. Cal. Aug. 30, 2010) .......... 20, 21

*Aerojet Rocketdune, Inc. v. Global Aerospace, Inc.* 2021 WL 1839695 (E.D. Cal. May 7, 2021) .......... 24

*Alaska Airlines, Inc. v. Endurance Am. Ins. Co.* 2022 WL 2982800 (W.D. Wash. July 28, 2022) .......... 16

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.* 738 F.3d 960 (9th Cir. 2013) .......... 9, 17, 25

*City of Pomona v. SQM N. Am. Corp.* 750 F.3d 1036 (9th Cir. 2014) .......... 10

*Colon v. Presbyterian Cmty. Hosp., Inc.* (D.P.R. Oct. 8, 2021) .......... 26

*Corbrus, LLC v. 8th Bridge Cap., Inc.* 2021 WL 4439220 .......... 30

*Daubert v. Merrell Dow Pharmaceuticals, Inc.* 509 U.S. 579 (1993) .......... *passim*

*Edu-Sci. (USA) Inc. v. IntuBrite LLC* 2015 WL 3998980 (S.D. Cal. July 1, 2015) .......... 20

*Elosu v. Middlefork Ranch Inc.* 26 F.4th 1017 (9th Cir. 2022) .......... 15, 16

*FC Online Mktg., Inc. v. Champions Fund, Inc.* 2014 WL 12629760 (M.D. Fla. Nov. 14, 2014) .......... 23

*GPNE Corp. v. Apple, Inc.* 2014 WL 1494247 (N.D. Cal. Apr. 16, 2014) .......... 21

*Howson v. Pac. Lady F/V* 124 F.3d 211 (9th Cir. 1997) .......... 29

**TABLE OF AUTHORITIES**
(continued)

**Page**

*JH Kelly, LLC v. AECOM Tech. Servs., Inc.*
2022 WL 1817415 (N.D. Cal. June 2, 2022) ............................................. 24, 26

*Kumho Tire Co. v. Carmichael*
526 U.S. 137 (1999) ............................................................................. 16

*Leader Clothing Co. v. Fid. & Cas. Co. of N. Y.*
237 F.2d 7 (10th Cir. 1956) ..................................................................... 28

*McGlinchy v. Shell Chem. Co.*
845 F.2d 802 (9th Cir. 1988) ................................................................ 19, 20, 21

*Messick v. Novartis Pharmaceuticals Corp.*
747 F.3d 1193 (9th Cir. 2014) .................................................................. 10

*Mighty Enterprises, Inc. v. She Hong Indus. Co.*
745 F. App'x 706 (9th Cir. 2018) ........................................................ 13, 25

*Nazario Sanchez v. Hospicio La Paz* (D.P.R. Sept. 30, 2016) ............................... 26

*Nebraska Plastics, Inc. v. Holland Colors Americas, Inc.*
408 F.3d 410 (8th Cir. 2005) .................................................................... 25

*Pac. Fuel Co., LLC v. Shell Oil Co.*
2008 WL 11336467 (C.D. Cal. Jan. 24, 2008) ............................................. 22

*Pac. Shores Props., LLC v. City of Newport Beach*
730 F.3d 1142 (9th Cir.2013) ..................................................................... 29

*Primiano v. Cook*
598 F.3d 558 (9th Cir. 2010) ........................................................................ 9

*Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*
752 F.3d 807 (9th Cir. 2014) ...................................................................... 25

*Raishevich v. Foster*
247 F.3d 337 (2d Cir. 2001) ....................................................................... 27

*In re Roundup Prod. Liab. Litig.*
2018 WL 3368534 (N.D. Cal. July 10, 2018) ................................................ 10

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

# TABLE OF AUTHORITIES
(continued)

**Page**

*Space Systems/Loral, Inc. v. Lockheed Martin Corp.*
2006 WL 279331 (N. D. Cal. Feb. 6, 2006)........................................10

*Spears v. Cooper*
2008 WL 5552336 (E.D. Tenn. Nov. 17, 2018)........................................26

*Story Parchment Co. v. Paterson Parchment Paper Co.*
282 U.S. 555 (1931) ........................................28

*Sutton v. Earles*
26 F.3d 903 (9th Cir. 1994)........................................29

*Sys. Dev. Integration, LLC v. Computer Scis. Corp.*
886 F. Supp. 2d 873 (N.D. Ill. 2012)........................................22

*Trevino v. Gates*
99 F.3d 911 (9th Cir. 1996)........................................24

*United Energy Trading, LLC v. Pac. Gas & Elec. Co.*
2018 WL 5013580 (N.D. Cal. Oct. 16, 2018)........................................23

*United States for Use & Benefit of Bergelectric Corp. v. Sauer, Inc*.
2020 WL 470273 (N.D. Cal. Jan. 29, 2020) ........................................26

*United States Postal Serv. v. Jamke*
2017 WL 131991 (E.D. Cal. Jan. 12, 2017)........................................24

*United States v. Frazier*
387 F.3d 1244 (11th Cir. 2004)........................................16

*United States v. Hirokawa*
342 F. App'x 242 (9th Cir. 2009) ........................................15

*United States v. Howard*
2017 WL 2662469 (S.D. Cal. June 19, 2017)........................................17

*Universal Elecs., Inc. v. Universal Remote Control, Inc.*
2014 WL 8096334 (C.D. Cal. Apr. 21, 2014)........................................29

*Wells Fargo Bank, N.A. v. Stewart Title Guar. Co.*
2020 WL 6451963 (D. Utah Nov. 3, 2020)........................................30

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Westberry v. Gislavaed Gummi AB*
178 F.3d 257 (4th Cir. 1999) .......... 10

**State Cases**

*Cnty. of Orange v. Rosales*
99 Cal.App.4th 1214 (2002) .......... 14

*Green Valley Landowners Assn. v. City of Vallejo*
241 Cal.App.4th 425 (2015) .......... 13

*Miller v. McKinnon*
20 Cal.2d 83 (1942) .......... 12

*P&D Consultants, Inc. v. City of Carlsbad*
190 Cal.App.4th 1332 (2010) .......... 13

**Rules**

Federal Rule of Evidence Rule 702 .......... 9, 16, 30

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

## I. INTRODUCTION

National Union Fire Insurance Company of Pittsburgh, Pa's ("National Union") motion in limine should be denied in its entirely. Daniel W. Ray ("Ray") is an undeniably qualified expert – he is a certified public accountant and fraud examiner, certified in financial forensics, and has approximately 40 years of experience in forensic accounting and dealing with fraud-related issues. Ray was a special agent for the Federal Bureau of Investigation, and has specialized training and experience in white collar crimes and financial crimes. Declaration of Daniel W. Ray ("Ray Decl.") at ¶ 3.

The opinions Ray intends to offer are admissible, as they are reliable and relevant. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993). Ray's opinion that the ULC principles exceed the 4.5% cap is based on an exhaustive review of thousands of pages of invoices, contracts, banking records, and more. National Union's argument against Ray's conclusion that no more than 25% of UCL billing fell outside of the "cap" is meritless. The contract between the City and ULC provides that essentially *all* work performed by ULC fell within the cap, with the exception of a $15,000 monthly retainer and additional "ad-hoc" work needed from "time to time" that required separate authorization. Ray accounted for the separately invoiced $15,000 payments, and could only locate a very small number of authorizations for additional "as-needed work." Ray's estimation of up to 25% of billings not subject to the cap was supported by Ray's exhaustive review of all available records. His opinion more than satisfied *Daubert*.

National Union's attack on Ray's opinion that ULC improperly "marked up" work performed by sub-consultants is nonsensical. The gravamen of National Union's attack is that Ray failed to apply the correct "bespoke" meaning of the phrase "professional sub-consultant." Tellingly, National Union fails to proffer any competing definition to the common sense, plain reading used by Ray – a sub-consultant not directly employed by ULC that provided professional services. Ray

needs no special expertise to apply the plain meaning of contractual language, and Ray offers no opinion concerning the meaning of any legal term of art or any legal opinions whatsoever. In any event, experts may properly make assumptions (e.g., that a contract was breached, or a contractual term has some specific meaning) in rendering their opinions that a trier of fact is free to accept or reject.

More broadly, National Union's arguments either go to the weight of Ray's testimony, or are pure legal issues suitable for determination by a motion for summary judgment or at trial (e.g., the argument that "professional sub-consultant" has some "bespoke" specialized legal significance that renders Ray's opinion unreliable.) National Union's motion should be denied.

## II. <u>FACTUAL BACKGROUND</u>

Daniel W. Ray is a certified public accountant, a certified fraud examiner, and certified in financial forensics, among other things. He was a special agent in the Federal Bureau of Investigation for 8 years, focusing on white collar and financial investigations and on bank fraud in particular during his last several years. For four decades he has worked in fields which lend expertise to his work in this case. Ray Decl. at ¶¶ 2–3 & Ex. A.

Ray was originally retained in 2016 by the Riverside County District Attorney's Office to assist in its investigation of criminal wrongdoing on the part of former City officials, including ULC principles Dillon, Egger and Moorjani (the "ULC Principles"). During this work, Ray analyzed thousands of pages of documents from the District Attorney and other sources. *Id.* at ¶ 8.

In 2018, Ray was retained by Best Best & Krieger to assist in its investigation of theft on the part of the ULC principles in connection with an insurance claim made to Defendant National Union. Ray ultimately concluded that the ULC principles had stolen millions of dollars from the City, through several distinct overbilling schemes identified in his original report. (Ray Dec. Ex. C.)

After this action was filed, Ray was again retained by Plaintiffs, and prepared

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

and issued an expert report dated May 27, 2022. (Ray Dec. Ex. D.) On June 30, 2022, Ray issued a supplemental / rebuttal report. (Ray Decl. Ex. E.).

At trial, Ray will offer two primary opinions: First, that ULC and the ULC principles overbilled the City by approximately $58,000,000 by exceeding a contractual "cap" of 4.5% of the cost of certain public works projects. Ray Decl. at ¶ 11. Second, that the ULC principles stole approximately $3,900,000 from the City by submitting fraudulent invoices seeking higher rates than permitted for work performed by professional sub-consultants. Ray Decl. at ¶12.

## III. LEGAL ARGUMENT

### A. Legal Standard

The testimony of Daniel Ray is admissible because Ray's knowledge and experience qualifies him as an expert in the field of forensic accounting; his testimony concerns specialized knowledge, and his testimony will help the trier of fact in understanding the facts in this case. *See, e.g.*, Ray Decl. at ¶¶ 2–3, 20–44.

Federal Rule of Evidence Rule 702 reflects an attempt to liberalize rules governing the admission of expert testimony and is clearly one of admissibility rather than exclusion. *See Daubert,* 509 U.S. at 589. Under *Daubert* and its progeny, a district court's inquiry into admissibility is a flexible one. *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 960 (9th Cir. 2013). In evaluating proffered expert testimony, the trial court is "a gatekeeper, not a fact finder." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010).

"[T]he trial court must assure that the expert testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" *Id*. at 564 (quoting *Daubert*, 509 U.S. at 597). "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Id.* at 565 (citation and internal quotation marks omitted).

National Union does not challenge the qualification of Ray or the relevance



BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

of his testimony, instead challenging only the reliability and validity of his conclusions. Courts "ha[ve] broad latitude to consider whatever factors bearing on validity that the court finds to be useful; the particular factors will depend upon the unique circumstances of the expert testimony involved." *Westberry v. Gislavaed Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999). "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *City of Pomona v. SQM N. Am. Corp*., 750 F.3d 1036, 1044 (9th Cir. 2014).

Courts, including the Ninth Circuit in particular, have found that under *Daubert* there is a presumption of admissibility. *See, e.g., In re Roundup Prod. Liab. Litig.,* 2018 WL 3368534, at *5 (N.D. Cal. July 10, 2018) ("The Ninth Circuit has placed great emphasis on *Daubert'*s admonition that a district court should conduct this analysis 'with a 'liberal thrust' favoring admission.' . . . This emphasis has resulted in slightly more room for deference to experts in close cases than might be appropriate in some other Circuits.") (*quoting Messick v. Novartis Pharmaceuticals Corp*., 747 F.3d 1193, 1196 (9th Cir. 2014)). Further, Courts "must rely on expert witnesses to sift through the [voluminous materials] and determine what information is relevant to the case at hand." *Space Systems/Loral, Inc. v. Lockheed Martin Corp*., 2006 WL 279331 at n. 8 (N. D. Cal. Feb. 6, 2006)

**B. Ray's Opinion that ULC Exceeded the 4.5% Cap is Admissible**

ULC and the City of Beaumont entered into a contract in 1993 and amended that contract in 1994. Ray Exs. F, G. Among other terms, these contracts describe the compensation that will be received by ULC for performing various functions for the City. *Id.* Together, the contracts lay out three general categories of services to be performed by ULC, and their compensation for these services. First, day-to-day services as department heads, for which the ULC official will be paid a flat monthly fee of $15,000. Ray Dep. Ex. F at p. 8.

Second, the contracts provide that ULC will be compensated for other



BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

services on a time and materials basis not exceeding four and one-half percent (4.5%) of the confirmed construction costs or bid price of the public improvement to be constructed (Ray Dec. Ex. F at p. 8, Ex. G at p. 2.) The *extremely* broad categories of tasks subject to the 4.5% cap encompassed all work that would generally be performed by the ULC principles outside of their separately compensated roles as department heads, and included the following:

> <u>V-A. Plan Checking</u>
>
> . . . ULC . . . shall review the plans prepared by civil engineers and other appropriate professional . . . .
>
> <u>V-B Construction Inspection</u>
>
> . . . ULC . . . shall provide inspection services during all phases of construction . . . In the performance of such Duties, ULC shall provide inspection for each project during and after completion of various stages of construction. . . .
>
> <u>V-1 Public Works Construction Management</u>
>
> . . . ULC, under the supervision of the Director of Public Works, shall provide construction management services during all phases of public works construction . . . . ULC shall provide construction management for each public work project before, during, and after completion of the various stages of construction **including** the following services related to the planning, control, scheduling, estimating and value engineering of public works projects:
>
> <u>A. Construction Management Services</u>
>
> 1. Coordinate, receive, review, and evaluation bids 2. Award bids, make appropriate recommendations, and prepare contracts. 3. Manage, coordinate, and inspect all work. 4. Provide contract and subcontract coordination 5. Prepare and monitor construction schedules. 6. Make adjustments to accommodate changing and unforeseen conditions 7. Prepare progress reports 8. Review and recommend progress payments 9. Obtain, review and evaluate shop drawing 10. Provide laboratory testing of materials as required and monitor test results 11. Evaluate quality and workmanship of construction 12. Maintain daily logs and records and such other services as are required to manage the work in accordance with City objectives. 13. Schedule project meetings 14. Liaison with controlling agencies and design and construction engineers 15. Monitor and record correspondence between City



BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

contractors, subcontractors, and design professionals 16. Prepare transmittals and labor reports 17. Provide labor and payroll compliance 18. provide change order management and coordination 19. provide plan interpretation as required 20. Administer extension of time (force majeure) delay reports 21. Administer release and waiver of liens.

Ray Dec. Ex. F at pp. 7–8, Ex G at pp. 2–3. Finally, the contracts provided that the City "may from **time-to-time** have the need for additional services not specifically listed in this agreement," and that the City "may authorize CONSULTANT to perform such additional services on an as-needed basis." Ray Dec. Ex. F at p. 7 (emphasis added). For these ad-hoc services that could be needed "from time-to-time," the ULC principles would either be paid in accordance with an hourly rate schedule or on a "negotiated fixed fee rate." Ray Dec. Ex. F at pp. 7–8.

Helpfully, for purposes of determining which portions of the payment received by ULC were subject to the 4.5% cap, the flat monthly fee of $15,000 was separately broken out on invoices issued by ULC. Ray Dec. at ¶ 22.

As described in the report of another expert, Doug Barnhart, any additional services that the City authorized ULC to perform would necessarily have been supported by a written authorization or change order. As Barnhart opines, ULC had an obligation to "receive specific City direction to perform additional work. . . . Construction contracts do contain clauses that allow owners to order additional services when the need arises. . . . In the Construction Industry events requiring Additional Services **is documented through the issuance of a change order or notice to proceed from the owner**." Declaration of Christopher E. Deal ("Deal Decl.") Ex. 4 at p. 3. This opinion is consistent with California law, which provides that all contracts with cities must be in writing, must be executed in compliance with city ordinances or other legal requirements, that oral contracts with cities are unenforceable, and that a city cannot be liable in quasi-contract. *See, e.g., Miller v. McKinnon,* 20 Cal.2d 83, 88 (1942) (A city cannot be bound by contracts that do not strictly comply with the statutory or charter requirements for entering into

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

municipal contracts); *Green Valley Landowners Assn. v. City of Vallejo,* 241 Cal.App.4th 425, 437–38 (2015) ("[I]t is settled that a private party cannot sue a public entity on an implied-in-law or quasi-contract theory . . ."); *P&D Consultants, Inc. v. City of Carlsbad*, 190 Cal.App.4th 1332, 1341 (2010) ("Whether a claimed modification is oral or through conduct, the party contracting with a public agency is charged with the knowledge of public contracting law. Perhaps there is even a greater reason for not allowing modification through conduct, as that is a more nebulous concept potentially subject to abuse than an oral modification. . . ."). In short, as a matter of law, any additional contractual services provided by ULC would have been required to be authorized in writing to be effective.

In his review of thousands and thousands of pages of invoices, work records, and ULC files, Ray located only a small number of written authorizations for additional work. *See* Ray Decl. at ¶¶ 25 & Ex. J. In light of the breadth of the articulated services to which the 4.5% cap applied and the few examples of written authorization for additional ad-hoc work, nearly all services which the ULC principles invoiced the City for were subject to the 4.5% cap.

However, in an effort to be reasonable and fair, and in light of the incomplete records kept by ULC, Ray gave a generous "allowance" of 25% to reflect the $15,000 per month flat fees and to reflect that authorizations for additional work may exist and to reflect, e.g., the possibility that written authorizations may have been misplaced or destroyed by the ULC principles, or that other work may have for some reason not been subject to the 4.5%. *See* Deal Decl. Ex. 3 (Ray Deposition Transcript) at pp. 59:19–61:16; *see also id.* at p. 63:10–13 (describing unspecific tasks that may be authorized "from time to time").

Indeed, even if the 25% estimation was a pure assumption, which it was not, this would not render the overall opinion inadmissible; the use of assumptions does not render an opinion inadmissible. *Mighty Enterprises, Inc. v. She Hong Indus. Co.*, 745 F. App'x 706, 709 (9th Cir. 2018) ("She Hong's second argument, that the

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

expert's use of a ten-year period for lost future profits rendered his testimony inadmissible, also fails. An expert can use assumptions, inferences, and comparisons. Such assumptions are admissible; their reliability is impeachable.")

1. **Ray Applied an Appropriate Methodology**

National Union's argument that Ray failed to apply a recognized forensic accountant methodology to calculate the amount of services that fell outside of the 4.5% cap is without merit, and ignores the realities of the fields in which Ray is an expert – forensic accounting and fraud examination. As Ray testified at length, he applied and complied with the relevant Standards for Forensic Services ("Standards"). *See* Deal Dec. Ex 3 at pp. 122:3–23; 13:24–14:4.

Just as "every unhappy family is unhappy in its own way,"[1] the Standards, and the practice of forensic accounting more broadly, recognize that every fraud scheme and criminal enterprise is wrongful in its own way. Rather than provide a step by step "checklist" to analyze a specific fraud scheme, the Standards give forensic accountants like Ray the tools, combined with their own experience and training, to uncover and quantify fraud and criminality in whatever unique form it may take. See Ray Decl. at ¶ 4–7. As Ray repeatedly noted in his deposition, and in his report, he applied the relevant Standards. Deal Decl. Ex. 3 at p. 122:3–23; *see also id.* at pp. 13:24–14:4, Ray Decl. at ¶ 6 & Ex. B.

National Union's argument that Ray's opinion does not apply a specific methodology to determine the amount of billing that fell outside of the 4.5% cap is also misplaced. No specific methodology *exists* for unique factual scenarios such as determining what amount of (nondescript) billing fell outside of a specific 4.5% contractual cap. Rather, Ray applied the methodological principles of forensic accounting and fraud examination, in conjunction with his 40 years of experience in analyzing and uncovering various fraud schemes:

A. . . . . This is the type of work I've done for many, many years as

[1] *Cnty. of Orange v. Rosales*, 99 Cal.App.4th 1214, 1216 (2002) (*quoting* Tolstoy).



BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

> an FBI agent and as a forensic accountant. Each case is unique. But, at the same time, there's similar types of analysis that can be done in the majority of cases, and that's what I'm doing here.

Deal Decl. Ex. 3 at p. 111:5–11; *see also id.* at pp. 113:23–114:1 ("I don't think I have a case with that exact similar pattern. But, again, reviewing construction billing, construction costs, comparing them against expected costs, and bases for overage, I've done that a number of times."); Ray Decl. at ¶¶ 4–7; *compare with Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) ("[S]pecialized knowledge and experience can serve as the requisite 'facts or data' . . . .").

As Ray further testified, the type of estimation that was performed in his analysis is consistent with the general practice of forensic accounting:

> A. Sure. We use estimate – "we," generically, forensic accountants, me, specifically, Dan Ray, use estimates all the time. It's extremely rare, if ever, that I get every single document that I can could possibly want in a case. So there's holes that need to get filled by use of estimations, interpretations of data. It happens all the time. And what you do at the end of that is you look to see whether the estimate yields a result that's reasonable.

Deal Decl. Ex. 3 at pp. 114:12–115:11.

Indeed, Ray notes in his supplemental report that he has substantial expertise *specifically* in circumstances where an incomplete universe of documents exists and gaps in data must be filled in through the application of training and experience and close review of the data and documents available:

> In my approximately 40-years of performing forensic accounting services and criminal fraud investigations as an FBI Special Agent in matters similar to this, it is extremely rare that I receive 100% of the relevant transaction documents. In this matter I have received and have incorporated into my analysis: [numerous documents] . . . . In my training and experience, these documents are sufficient for me to perform my analysis and render the opinions that I have. The work of forensic accounting experts often includes the use of estimates and imputed amounts where complete documentation is not available.

Ray Decl. Ex. E at p. 14; *compare with United States v. Hirokawa*, 342 F. App'x

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

242, 246 (9th Cir. 2009) (Appellants' criticisms of those estimations—e.g., his assumptions for labor, overhead and profit, and his failure to account for other costs and contingencies—go to the probative weight, rather than the admissibility, of the evidence . . . .") (internal citations omitted) *and Elosu*, 26 F.4th at 1026 ("Experts working in specialized, scientific, and uncertain fields regularly extrapolate from existing data and generate novel hypotheses about complex issues.").

National Union's insistence that Ray should have, somehow, applied some specific generally accepted methodology for determining the amount of fees outside the contractual cap is also contrary to what is required by Rule 702. *Daubert* and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) recognize that admissible expert opinion comes in many forms, and Rule 702 no longer requires rigid adherence to concepts such as whether a particular methodology is generally accepted. The test of reliability is a "flexible" one and the *Daubert* factors do not constitute a "definitive checklist or test" but must be tailored to the facts of the particular case. *Kumho Tire*, 526 U.S. 137, 150 (*quoting Daubert,* 509 U.S. at 593); *see also United States v. Frazier*, 387 F.3d 1244, 1297 (11th Cir. 2004). The particular factors will depend upon the unique circumstances of the expert testimony involved. *See Kumho Tire*, 526 U.S. at 151–52. The goal is to ensure that the expert, "whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152; *see also Alaska Airlines, Inc. v. Endurance Am. Ins. Co*., 2022 WL 2982800, at *11 (W.D. Wash. July 28, 2022) ("Beyer does not dispute that he has never seen any underwriter, agent, or broker use his methodology to quantify a specific claim's purported effect on an insurance premium. . . . Similarly, Beyer does not dispute that his methodology is not peer-reviewed. . . The Court concludes that Endurance's challenges go to the weight, not the admissibility, of Beyer's testimony.")

It is noteworthy that National Union does not offer any opinion of a qualified

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

forensic accountant and fraud examiner that Ray's analysis is outside the commonly accepted industry approach. What is clear is that Ray will employ in the courtroom that same level of intellectual rigor that characterizes the practice of a forensic accountant and fraud examiner in the relevant field. Indeed, a similar analysis performed for the Riverside County District Attorney's office was used in the course of charging the ULC principles. Ray Decl. at ¶ 8; *see also Alaska Rent-A-Car, Inc.*, 738 F.3d at 969; *United States v. Howard*, 2017 WL 2662469, *2 (S.D. Cal. June 19, 2017) ("The reliability requirement is ultimately aimed at excluding 'junk science' [citation], not expert opinions that fall within 'the range where experts might reasonably differ, and where the jury must decide among the conflicting views of different experts, even though the evidence is shaky.")

**2. Ray's Opinion is Subject to Cross-Examination**

National Union's argument that it is impossible to effectively cross examine the opinion of Ray is also meritless. First, National Union may (as it did during Mr. Ray's deposition) cross-examine Ray as to the basis for his 25% estimate, and argue that it is unsupported and some other figure is appropriate. Moreover, this argument is negated by the fact that *two* experts hired by National Union were able to independently reach their own estimations, which may be presented to the trier of fact for competition and consideration. National Union's expert Tasker opines that only approximately 4% of ULC invoices were subject to the cap, based on his assumption that only work performed by ULC employees with specific job titles were subject to the cap and that only invoices directly paid by the City were subject to the cap. See Ray Decl. Ex. E at pp. 7–13.

National Union's other expert, Fogerty, was similarly able to reach a conclusion that approximately 86.18% of entries were not subject to the 4.5% cap:

> "[U]sing our calculation of 86.18% based on timekeeper titles, . . . The result is a potential implied overbilling of $2,357,818, . . . ."

Deal Decl. Ex. 2 at p. 4. In other words, National Union may cross-examine Ray's

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

calculations by both examining the data and any assumptions made by Ray, *and* by offering the competing calculations made by its experts.

### 3. Ray's Opinions Conformed to the Contract

National Union's argument that Ray made "no attempt to tailor his opinions" to ULC contracts is based on a misrepresentation of the facts. Ray's opinion was based upon his close review of the contracts and precisely conformed with the contracts. See Ray Decl. at ¶¶ 14–17; see also Ray Decl. Ex D at p. 8, E at p. 9,

The gravamen of National Union's argument seems to not be that Ray made no attempt to analyze the contracts, but rather that Ray failed to "subtract excluded work." Specifically, National Union seems to argue that Ray failed to exclude costs associated with "projects for specific agencies" and purely private projects. The assumption concerning allegedly "excluded" work is based entirely on former Councilmember's Berg's subjective understanding (an understanding that counsel for National Union imputed to "the City") of the legal import of the City's contracts with ULC:

> Q. Okay. He [councilmember Berg] wrote – he's asked this question on page 46, line 20. "To the extent that Urban logic was providing plan checking and construction inspection for private development, that would not be encompassed by this agreement. Do I understand that correctly. Answer: that would be correct." Do you see where I read that?
>
> A. I do. . . .
>
> Q. And you know from Mr. Berg's testimony that there was specific Beaumont entities that were outside of the contractual cap . . . And you did not subtract from your calculations the entities that are outside the contract consistent with Mr. Berg's testimony, even though you could do so just by looking at the invoice? . . .
>
> A. No, I did not, based on Mr. Berg's testimony, make a subtraction from invoices issued and paid by the community facilities district, which was formed for a variety of districts.

Deal Decl. Ex. 3 at pp. 87:3–18; 96:25–97, 178:6–179:4. Tellingly, National Union fails to cite any portion of any contract between the City and ULC in support of this

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

"private development" and "specific agency" theory, instead relying solely on the testimony of a single former councilmember concerning his understanding of the legal import of a contract. National Union's theory is meritless, for many reasons.

Berg's lay understanding of the scope of the 4.5% cap was incorrect. There is no provision in the contracts that somehow excludes costs associated with "projects for specific agencies" and "private development," and allowed ULC to bill whatever they please for such work. The 4.5% cap applies broadly to work associated with all "public works project in the City of Beaumont," which is the work ULC was retained to perform. Ray Decl. Ex. F at p. 7, Ex. G at p. 2.[2]

More fundamentally, National Union's theory is based on a nonsensical premise, divorced from the contracts – that ULC would bill the City pursuant to its contract for "public works services" for work performed on entirely private jobs or for other "specific agencies." ULC contracted with the City to perform "Public Works Services," not to perform work for private development paid out of the public fisc and subject to no contractual price controls. Ray Decl. Exs. F, G.

In any event, even if National Union's adoption of Berg's subjective understanding of the contract's application to "projects for specific agencies" and "private projects" was not demonstrably nonsensical, this is a legal issue of contract interpretation unsuitable for resolution through a motion in limine. See Section III.F, *infra*. National Union's theory boils down to an argument that this Court *must* accept Berg's legal conclusion regarding the scope of the contract as correct, and that this conclusion renders Ray's opinions entirely inadmissible. This is meritless.

**4. The Decisions Relied upon by National Union are Inapposite**

None of the decisions relied upon by National Union compel or support the exclusion of Ray's testimony. In *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802 (9th Cir. 1988), an expert was retained to opine concerning the damages caused by the

---

[2] National Union has not identified a single invoice that would allegedly be excluded from the 4.5% cap but erroneously included in Ray's calculations.

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

allegedly improper loss of a contract for resin sales. *Id.* at 808. To determine these damages, the expert would "forecast polybutylene resin sales, apply a given commission rate, and subtract out expenses to arrive at the net profits appellants would have earned but for the loss of their contract. The study's value depends heavily on the accuracy of the sales forecast. To forecast sales through 1987, William McGlinchy said that he 'took the 838,000 pounds for 1982 actual sales and applied the 41 percent [compound annual] growth figure.'" *Id.*

In fact, the expert did not look at sales in 1982 and forecast through 1987. Rather, he "divined" a total sales figure for 1987, then invented a compound growth rate that, applied in reverse, would work out to "the 1982 actual sales figure." *Id.* As the Ninth Circuit noted, these entirely invented figures would "mislead a jury into believing that damages had grown exponentially over the relevant period." *Id.* The expert also, inexplicably, concluded that while sales would grow exponentially, "expenses would stay at $60,000 per year for nine years through 1991." *Id.* In light of the fact that the entirety of the opinion rested on "divined" figures, the Ninth Circuit affirmed exclusion of the opinion. *Id.; see also Edu-Sci. (USA) Inc. v. IntuBrite LLC*, 2015 WL 3998980, at *3 (S.D. Cal. July 1, 2015) ("The expert in *McGlinchy* relied on demonstrably false assumptions to arrive at speculative lost profits calculations resulting from Shell Oil's breach of contract. For example, he claimed to account for 'experience plus inflation' to arrive at the expenses to subtract from his expected gross profits calculation, but mystifyingly assumed no increase in expenses over a nine year period.").

National Unions' reliance on *Advanced Microtherm, Inc. v. Norman Wright Mech. Equip. Corp*., 2010 WL 11575000, at *3 (N.D. Cal. Aug. 30, 2010) is similarly misplaced. In *Advanced Microtherm,* after an adverse *Daubert* motion as to their prior damages expert, the plaintiff submitted a "supplemental report" from previously disclosed engineering expert Mr. Burns regarding the damages caused by anti-completive behavior. Based on no facts or relevant experience, Mr. Burns

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

opined that but-for certain anti-competitive behavior, the Plaintiffs would have achieved an equal market share with the defendants. *Id.* at *3. As the court noted, as an engineer, Mr. Burns had no expertise or experience that could possibly enable him to opine as to the market share ratio that would have resulted in the absence of anti-competitive behavior: "[W]hile Mr. Burns experience in the industry and his Masters in engineering may qualify him as an expert as to the engineering industry, he lacks the requisite expertise relevant to forecasting competitive markets, commonly reached through economic or statistic based models." *Id*. As the court concluded, "Mr. Burns' report appears to have even less foundation than the excluded expert testimony involved in *McGlinchy*." *Id.*

In *GPNE Corp. v. Apple, Inc*., 2014 WL 1494247, at *2 (N.D. Cal. Apr. 16, 2014), the Plaintiff's expert's entire damages calculation turned on his determination of a reasonable royalty. However, rather than applying any factors or data, the expert seemingly picked the number "$1" per unit from thin air: "Mr. Dansky's analysis is an impermissible black box . . . Mr. Dansky's derivation of the $1 per unit royalty from Apple's average net incremental profit is classic *ipse dixit* reasoning, picking the million dollar number." *Id.* at *5 (internal citations omitted).

As described above, Ray's opinions are informed by his decades of experience in the precise task put to him here – forensic accounting and fraud examination – and based on exacting review of the contracts at issue, thousands of invoices, ledgers, and other records, and are not analogous to the entirely invented damages figure in *McGlinchy* or the other decisions relied upon by National Union.

**C. <u>Ray's Opinion Concerning Inappropriate Markup of Sub-consultants Bills is Admissible.</u>**

The 1993 contract provides that, for certain tasks, ULC would be paid on an hourly rate. The "Exhibit A" provides a detailed list of hourly rates that could be charged by ULC staff, and articulated rates for, among others, Principles, Senior Associates, Secretaries, and Administrative Assistants. The Exhibit further provides



BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

that for work performed by professional sub-consultants, ULC could charge only "actual cost plus 15%." Ray Decl. Ex. F at p. 11.

Ray reviewed thousands of pages of invoices from the sub-consultants to ULC, invoices from ULC to the City, payments by the City, and ULC's payroll to its employees, and determined that ULC defrauded the City in violation of the contract by passing off work performed by sub-consultants as work performed by ULC staff and charging dramatically higher staff rates. Ray Decl. at ¶¶ 28–29.

National Union's challenge to Ray's opinion concerning markups by subcontractors is meritless. National Union does not challenge Ray's expertise, his methodology, or even whether Ray relied upon sufficient facts and data. Rather, the sole challenge to Ray's opinion is that Ray purportedly made an unsupported assumption that the various sub-consultants relied upon by ULC qualified as "Professional Sub-consultants." This challenge fails for numerous reasons.

First, it is entirely appropriate for an expert to make assumptions in reaching their opinions, including legal assumptions regarding, e.g., contractual matters. *See, e.g., Sys. Dev. Integration, LLC v. Computer Scis. Corp.*, 886 F. Supp. 2d 873, 882 (N.D. Ill. 2012) ("CSC's argument that Mr. Mayer inappropriately assumed the existence of an enforceable contract and that CSC's breach was the sole cause of SDI's damages is unpersuasive. . . . It is entirely appropriate for a damages expert to assume liability for the purposes of his or her opinion. To hold otherwise would be illogical."); *Pac. Fuel Co., LLC v. Shell Oil Co.*, 2008 WL 11336467, at *5 (C.D. Cal. Jan. 24, 2008) ("Kamin's report does not primarily seek to give meaning to the Agreement. Instead, Kamin's report adopts Plaintiff's interpretation of the Agreement as requiring Defendants to make expense allowance payment based on historical operating expenses . . . .")

The term "professional sub consultant" is not a term of art. It has no specialized legal meaning, and is not defined by the contracts or California statutes. Ray offers no legal opinion concerning the meaning of this phrase, and instead

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

applies its common sense, plain meaning – a sub consultant hired to provide professional services that is not directly employed by ULC. In any event, even if Ray had given an opinion concerning his understanding of the phrase, this would not render his opinion inadmissible. *United Energy Trading, LLC v. Pac. Gas & Elec. Co.*, 2018 WL 5013580, at *3 (N.D. Cal. Oct. 16, 2018) ("UET further argues that Ray's opinions in both his report and deposition are 'riddled' with legal opinions and conclusions such that they are wholly inadmissible as a matter of law. . . . [T]he [Ninth Circuit] has also held that if the terms used by an expert witness do not have a specialized meaning in law and do not represent an attempt to instruct the jury on the law, or how to apply the law to the facts of the case, the testimony is not an impermissible legal conclusion. . . . Ray did not substitute his judgment for the jury's, but instead provides his professional opinion about whether PG&E's conduct acted in conformance with its understanding of the Gas Rules.").

National Union contends that the phrase "professional sub-consultant" has some specialized, "bespoke" meaning that renders Ray's opinion wrong. While National Union will be free to explain this alternative proposed meaning to the trier of fact,[3] such a competing interpretation does not render Ray's opinions unreliable or inadmissible. To the extent there is any ambiguity in this phrase, the trier of fact will be free to consider National Union's alternative interpretation of the phrase (whatever that interpretation may be). Ray's opinion gives the trier of fact the admissible tools to calculate damages if it concludes that the common-sense plain meaning of the phrase "professional sub-consultant" is correct. *FC Online Mktg., Inc. v. Champions Fund, Inc.*, 2014 WL 12629760, at *2 (M.D. Fla. Nov. 14, 2014) ("FCOM's argument that Katz is making legal conclusion about the existence of a third year of the contract misses the mark, because Katz is simply providing the fact finder with the tools to calculate appropriate damages if the fact finder determines a third year of the contract existed.")

[3] Although it offers no competing explanation in its motion in limine.

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

National Union's insinuation that Ray performed some sort of statistically invalid random sampling, as opposed to a "statistically valid extrapolation," is a misrepresentation. As Ray testified, he did not perform a "statistically valid random sampling," or any random sampling *at all.* Rather, Ray analyzed in detail every invoice in the timeframes for which invoices were available:

> A. I didn't use a random technique to do the analysis that I did. I focused on particular time frames, and I did 100 perfect coverage of particular time frames when invoices were available.

Deal Decl. Ex. 3 at p. 18:7–12. Finally, the decisions relied upon by National Union for this argument are also inapplicable. *JH Kelly, LLC v. AECOM Tech. Servs., Inc.*, 2022 WL 1817415, at *12 (N.D. Cal. June 2, 2022), *Aerojet Rocketdune, Inc. v. Global Aerospace, Inc.*, 2021 WL 1839695 (E.D. Cal. May 7, 2021) and *United States Postal Serv. v. Jamke*, 2017 WL 131991, at *5 (E.D. Cal. Jan. 12, 2017) are unpublished district court opinions that stand for the unremarkable proposition that an expert may not usurp the role of the trier of fact by offering opinions that amount to no more than how the jury should decide ultimate legal issues. *See, e.g., Aerojet Rocketdyne, Inc.*, 2021 WL at *3 (excluding opinion that "Since the parties did not agree to the applicability of federal law to their claims, this could have left state law as the law in effect under the contract"). Ray offers no such opinions.

The remaining decisions stand for the proposition that an expert's opinion must be based on sufficient facts and data. *See, e.g.*, *Trevino v. Gates*, 99 F.3d 911, 922 (9th Cir. 1996) ("Both opinions were predicated on the assumption that Bahena was employed as a full time mechanic . . . . The only foundation laid for this assumption was testimony that (1) Bahena left in the morning and returned in the evening; (2) he gave Trevino's mother money at fairly regular intervals and (3) he was observed on a few occasions working on cars. There were no pay stubs, no W–2s, no tax returns, no cancelled checks, and no employer testimony offered as foundational evidence.") Ray's opinion is based on an exhaustive review of

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

invoices, banking records, payroll records, and the City's contract with ULC.

**D. National Union's Challenge goes to Weight**

The general rule is that the "factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Mighty Enterprises, Inc.*, 745 F. App'x at 709. Expert testimony should be excluded only if it reaches the extreme level of being "so fundamentally unsupported that it can offer no assistance to the jury." *Nebraska Plastics, Inc. v. Holland Colors Americas, Inc.*, 408 F.3d 410, 416 (8th Cir. 2005).

In *Alaska Rent-A-Car, Inc.*, 738 F.3d 960, the Ninth Circuit considered a laundry list of challenges to an expert's opinion, but concluded that such challenges amount to areas of cross-examination, not a basis for exclusion. *Id.* at 968–69. As the Ninth Circuit summarized, "[b]asically, the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Id.* at 969; *see also Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 815 (9th Cir. 2014) ("In short, Spiegel's . . . report is not one of the 'unreliable nonsense opinions' that should be screened from use.").

The alleged flaw in Ray's opinion concerning the 4.5% cap is not a result of any alleged lack of methodological rigor on the part of Ray, but rather a result of the fact that ULC kept an incomplete universe of records, and seemingly purposely obfuscated billing entries with task descriptions as incomplete as "for professional services rendered:"

> Q. My question is this. You understand that Urban Logic billed for very specific work, correct?
>
> A. Well, I've seen Urban logic where their invoices simply say "for professional services rendered." So it isn't always very specific as to specifically what tasks they performed. . . . So for me or anyone to specifically determine, based on that invoices, whether it was or was not, for example, subject to the 4.5% cap can't really be accomplished because it simply says, "for professional services rendered."



BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

Deal Decl. Ex. 3 at p. 23:2–14, *see also id.* at pp. 29:1–19, 51:3–14. Indeed, as Ray noted, the vagueness in the invoices was likely not accidental, but a calculated effort by the ULC principles to obfuscate their overbilling. *Id.* at p. 52:2–25. The argument that an expert's opinion is based on incomplete records or data goes to the weight of the experts testimony, and is grounds for cross-examination, not exclusion. *Nazario Sanchez v. Hospicio La Paz* (D.P.R. Sept. 30, 2016) ("Taking this standard into account, an expert basing his findings on incomplete records, goes to the weight of the testimony and not to the Daubert exclusion of the same.") (internal citations and alterations omitted); *Colon v. Presbyterian Cmty. Hosp., Inc.* (D.P.R. Oct. 8, 2021) (same); *Spears v. Cooper*, 2008 WL 5552336, at *5 (E.D. Tenn. Nov. 17, 2018) ("[C]redibility attacks, such as the use of incorrect or incomplete data in formulating an opinion, are intended for cross-examination.").

National Union's challenge to 25% figure goes to weight as well. Based on the evidence at trial, the trier of fact could conclude that 15%, or 35%, or some other percentage of the work performed by ULC was not subject to the cap. *See* Ray Decl. Ex. E at p. 16; *see also, e.g., JH Kelly, LLC v. AECOM Tech. Servs., Inc.*, 2022 WL 1817415, at *7 (N.D. Cal. June 2, 2022) ("Dr. Ibbs's explanation for assuming that AECOM was responsible for 99.72% of JH Kelly's staff and subcontractor cost overruns appears weak. His argument is essentially that he did so because he had no choice. But in the end, the Court finds that AECOM's assertion that Dr. Ibbs made an unsupported assumption and therefore reached faulty conclusions bears on the weight of his testimony, not its admissibility. . . . Dr. Ibbs says that his decision to impute JH Kelly's craft labor's self-inflicted loss figure to its subcontractors still provides for a 'reasonable estimate,' . . . . To the extent AECOM fears the jury will assign undue weight to Dr. Ibbs's opinion, it will have every opportunity to undermine the testimony through vigorous cross-examination."); *United States for Use & Benefit of Bergelectric Corp. v. Sauer, Inc.*, 2020 WL 470273, at *2 (N.D. Cal. Jan. 29, 2020) ("District courts within and

outside this district have often concluded that experts' decisions about what data to use in their analysis bear on the weight, not the admissibility, of expert testimony. . . The alleged flaws in [expert]'s measured mile analysis . . . may be tested during trial through competing evidence and incisive cross-examination.").

**E. <u>Difficulty in Proving the Amount of Damages is not a Bar to Admissibility</u>**

There is no reasonable dispute that the City of Beaumont suffered a loss covered by the policies. National Union's expert concede the *existence* of damages. Tasker opined that "ULC – at most – charged $1,931,818.40 more than permitted under the Agreement and Amendment." Deal Decl. Ex. 5 at p. 39. Tasker further reached a legal conclusion that the City suffered no cognizable damages, because "[t]his amount, is, however substantially less than the total restitution received by the City." *Id.* However, Tasker ignores that all restitution was paid directly to WRCOG to compensate it for the ULC's principles separate fraudulent acts towards ULC. Declaration of John Pinkney (ECF No. 60-1) at ¶ 3. In other words, setting aside Tasker's erroneous conclusion that $10,000,000 was already paid to the City to compensate it for its losses, Tasker himself concluded that the City suffered nearly $2,000,000 in compensable losses. National Union's other expert, Fogerty, concluded that overbilling of ULC subcontractors alone resulted in overbilling "ranging from $4,469,678 to $5,857,762 for the period of 2004 through 2012." (Fogerty Ex. 7 at p. 12.) In short, there is unanimity among the experts in this matter as to the *existence* of damages; their opinions differ only as to the quantum of the damages.

Undeniably, it is difficult to prove the precise dollar figure of harm caused by a decades long fraud scheme perpetuated by a cabal of wrongdoers who occupied some of the highest official positions at the City. However, when the difficulty in proving damages is attributable to the misconduct of the entity that caused the damages, less exacting proof is required. *See, e.g., Raishevich v. Foster*, 247 F.3d

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

337, 343 (2d Cir. 2001) ("If the plaintiff's inability to prove an exact amount of damages arises from actions of the defendant, a factfinder has some latitude to make a just and reasonable estimate of damages based on relevant data.") (internal quotation marks omitted); *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 565 (1931) (when uncertainty in proving damages is caused by the defendant's own wrongful act, "justice and sound public policy alike require that he should bear the risk of the uncertainty thus produced").

True, the difficulty in proving damages is not directly attributable to wrongdoing of National Union. However, this difficulty is due to the wrongdoing of the individuals who caused the loss to the City – the ULC principles. The risk of damages caused by the wrongdoing of government employees is the *precise* peril that National Union offered and sold insurance for. It is inherent in the risk being insured against – government crime – that the malefactors will take steps to hide their wrongdoing. Sound public policy dictates that the risk of sophisticated and successful criminal conduct be borne by the entity which sells government crime insurance, rather than the governmental entity which is the victim of the crime and the purchaser of the insurance policy which covers government crime.

If a government crime insurer can escape its indemnity obligation *because of* the success of the very criminal conduct which it insures, the policy would be rendered illusory in the circumstances in which it is most desperately needed – when criminal wrongdoers are sophisticated, most thoroughly control the levers of governmental power, and have the greatest opportunity to obfuscate and hide their own misdeeds. National Union should not gain a windfall from the fact that the ULC principles covered their tracks.

Even setting aside that the difficulty in proving damages was caused by the wrongful conduct of the ULC principles, when the existence of damages is certain, the amount of damages need not be proven with exact certainty. *Leader Clothing Co. v. Fid. & Cas. Co. of N. Y.*, 237 F.2d 7, 10–11 (10th Cir. 1956) ("When it is

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

once established with certainty that a loss covered by the [fidelity] policy has occurred, it is not necessary to a recovery that the amount must be proved with mathematical accuracy, where that is impossible. Where, as here, the amount of damages is difficult of ascertainment, as said by the Supreme Court, it would be a perversion of justice to deny all relief to the injured person under such circumstances. It is enough if there is a basis for a reasonable inference as to the extent of the damages"); *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1170–71 (9th Cir.2013) ("Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty . . . it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate."); *Howson v. Pac. Lady F/V*, 124 F.3d 211 (9th Cir. 1997) ("Although the district court did not specify the method by which it calculated damages, the $47,000 lost future earnings award here is supported by the evidence, represents a reasonable approximation of damages."); *Sutton v. Earles*, 26 F.3d 903, 918 (9th Cir. 1994) ("The government contends that the district court's use of identical annual amounts for each of the five survivors alone establish that the awards were clearly erroneous. . . . This assertion very well may be true and probably would require reversal of the damage awards if we required damage awards to be made with mathematical certainty. We do not.").

### F. <u>Plaintiffs Motion in Limine is a Disfavored Disguised Motion for Summary Judgment</u>

The substantive defects in National Union's motion aside, the motion in limine should also be denied because it is an untimely motion for summary judgment masquerading as a motion in limine. ECF No. 7 at fn. 5 ("["M]otions in line are not a substitute for a timely made motion for summary judgment or adjudication."); *see also Universal Elecs., Inc. v. Universal Remote Control, Inc.*, 2014 WL 8096334, at *7 (C.D. Cal. Apr. 21, 2014) ("[M]otions in limine are not substitutes for motions for summary judgment . . .").

National Union's challenge to Ray's opinion on subconsultant overbilling is entirely based on a legal argument concerning interpretation of phrase "Professional Sub-Consultant." The argument that "professional sub-consultant" has some specialized legal meaning outside of the common meaning of the phrase, and that Ray's opinion is inadmissible because it fails to conform with the "correct" legal interpretation of the phrase, is a quintessential improper motion for summary judgment argument disguised as a motion in limine argument. *See, e.g.*, *Corbrus, LLC v. 8th Bridge Cap., Inc.*, 2021 WL 4439220, at *4 (C.D. Cal. Aug. 9, 2021 ("Corbrus' argument that Tenzer should be excluded presents a disputed question of law as to contract ambiguity, that is, in effect, an untimely motion for summary judgement disguised as a Daubert motion."); *Wells Fargo Bank, N.A. v. Stewart Title Guar. Co.*, 2020 WL 6451963, at *3 (D. Utah Nov. 3, 2020) ("STGC contends that Mr. Hansen's appraisal of the Property is unreliable because the methodology he used for calculating Loss is not permitted under Section 7(a)(iii) the Policy. . . . The correct interpretation of the Title Policy, however, presents a question of law, which is best resolved on summary judgment not in a motion under Rule 702. Stated differently, the court will not entertain summary judgment-esque arguments disguised as Daubert objections"). To the extent there is any ambiguity in the phrase "professional subconsultant," that is an issue for trial.

National Union's argument concerning the 4.5% cap are similarly a disguised motion for summary judgment. National Union's argument relies on the legal accuracy of National Union's position concerning the scope of the 4.5% cap. That is, if National Union and its expert Tasker's position is correct, this is because National Union's narrow interpretation of the twenty-six tasks subject to the cap and broad interpretation of the tasks that may be authorized from "time to time" is correct, and Plaintiffs' interpretation of these provisions is wrong. This is an argument for trial, not for a motion in limine. *Corbrus, LLC*, 2021 WL at *4.

Finally, National Union's motion in limine is effectively a motion for

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

summary judgment in that it seeks to preclude Plaintiffs from introducing expert testimony that is critical to establishing Plaintiffs' damages. If National Union believed Plaintiffs had no admissible means to establish the existence of damages, or that the contractual interpretation underlying Plaintiffs' damages theory failed as a matter of law, the proper remedy would have been a motion for summary judgment. Having failed to obtain summary judgment through reliance on a theory of discovery, National Union should not now be permitted a second attempt.

### G. Ray Will Offer Percipient Testimony

National Union seeks to preclude Ray from testifying entirely on the basis of National Union's *Daubert* based challenge to Ray's opinions. However, National Union ignores that Ray will also testify in a percipient capacity in this matter.

Prior to being retained by Plaintiffs, Ray was hired by the Riverside County District Attorney's Office to assist in its investigation of the ULC Principles, Kapanicas, and other former City Officials. Ray can and will offer important testimony concerning the investigation and ultimate indictment and conviction of these individuals. Ray Decl. at ¶ 8.

Further, prior to this litigation, Ray was retained by Plaintiffs to conduct an initial investigation into the ULC principles. It was through the investigation and analysis of Ray that Plaintiffs initially discovered the overbilling scheme of the ULC principles. Ray Decl. at ¶ 9. Ray's testimony concerning the investigation he undertook, and the difficulty in discovering the overbilling scheme, will be relevant, indeed critical, in rebutting National Union's defense that the City did discover or should have discovered the overbilling scheme earlier than it did. National Union ignores the important and relevant percipient testimony Ray can and will offer at trial.

## IV. CONCLUSION

For all of the aforementioned reasons, the motion should be denied.

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

Dated: August 22, 2022

BEST BEST & KRIEGER LLP

By: */s/ Jeffrey V. Dunn*
JEFFREY V. DUNN
CHRISTOPHER E. DEAL
DANIEL L. RICHARDS

Attorneys for Plaintiffs
Western Riverside Council of
Governments and City of Beaumont

20323.00057\40614606.4

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612