JEFFREY V. DUNN, Bar No. 131926
jeffrey.dunn@bbklaw.com
CHRISTOPHER E. DEAL, Bar No. 186754
chris.deal@bbklaw.com
DANIEL L. RICHARDS, Bar No. 315552
daniel.richards@bbklaw.com
BEST BEST & KRIEGER LLP
18101 Von Karman Avenue
Suite 1000
Irvine, California 92612
Telephone:  (949) 263-2600
Facsimile:   (949) 260-0972

Attorneys for Plaintiffs
Western Riverside Council of Governments
and City of Beaumont

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WESTERN RIVERSIDE COUNCIL OF GOVERNMENTS, a California Joint Powers Authority,<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, and DOES 1 through 50, inclusive,<br><br>Defendants. | Case No. 5:20-cv-02164- GW (KKx)<br><br>**DECLARATION OF DANIEL W. RAY IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION IN LIMINE NO. 1 TO EXCLUDE DANIEL RAY FROM TESTIFYING AT TRIAL**<br><br>Trial Date:   September 13, 2022<br>Time:           8:30 a.m.<br>Courtroom:  9D |

BEST BEST & KRIEGER LLP

# DECLARATION OF DANIEL W. RAY

I, Daniel W. Ray, declare:

1. I am a Certified Public Accountant ("CPA") and partner in the Walnut Creek office of Hemming Morse, LLP. I am also a Certified Fraud Examiner ("CFE"), and I am Certified in Financial Forensics ("CFF"). I am submitting this declaration in support of Western Riverside Council of Governments' ("WRCOG") and City of Beaumont's ("City") opposition to National Union Fire Insurance Company of Pittsburgh's ("Defendant") motion *in limine* to exclude my expert testimony at trial. If called as a witness, I could and would competently testify to the facts stated herein.

**Background**

2. I have been retained by Best Best & Krieger LLP, counsel of record for WRCOG and the City in the above-entitled action. I have been retained to provide expert forensic accounting consulting services, as well as to provide expert testimony at the trial of this matter. I have provided forensic accounting and litigation services for a variety of clients since 1990. As stated above, I am currently a partner with Hemming Morse, LLP, which is a nationally recognized forensic and financial consulting firm. My practice concentrates in providing forensic accounting and fraud investigations, as well as damages analyses, which I have done now for approximately 40 years. During this time, I have conducted several hundred forensic matters involving the analysis of accounting records in a wide variety of industries. Prior to going into private practice, I served as a Special Agent with the Federal Bureau of Investigations ("FBI") from 1982 –1990, where I investigated complex white collar crimes.

3. I am a member of the California Society of Certified Public Accountants ("CalCPA"), and I am the past chair of its statewide Litigation Services Steering Committee. This committee provides guidance to CalCPA members who provide litigation consulting services. I am also a member of the Association of Certified Fraud Examiners, the Northern California Fraud Investigators Association, the Society of Former Special Agents of the FBI, and the American Institute of Certified Public Accountants ("AICPA"). My expert qualifications,

including my testimony in the last four years and publications I have authored in the last ten years, are described in my CV, which is attached as Exhibit "A" hereto.

### The Forensic Accounting Process

4. As stated above, I concentrate my practice in providing forensic accounting and fraud investigations. Forensic accounting is a specialty area of the broader accounting discipline. One of the purposes of a forensic accounting engagement is to help to determine whether there is evidence that a company may have engaged in financial reporting misconduct. This a different kind of analysis from financial statement audits, which focuses on whether a company or other entity has followed and met a set of defined, generally accepted standards and principles in the reporting of its financial performance. These standards and principles for financial statement audits follow strict regulations and/or industry practices, which act as a roadmap for how an auditor must conduct his/her investigation. These auditing standards (GAAS) and accounting principles (GAAP) are well-marked and structured.

5. Forensic accounting, by contrast, is a much broader, and less structurally defined discipline. Forensic accountants are often charged with determining whether financial wrongdoing has been committed which might give rise to a criminal charge or civil claim. This requires a deeper and more exhaustive historical analysis of financial information than what would be done for a financial statement audit. Forensic accountants must be able to gather and review available financial records from the target company or entity under investigation that are sometimes years or even decades old, either from the company or entity itself, or from disinterested third party sources such as banks, accounting firms and law firms. Forensic accountants must be able to interpret historical financial records to the greatest extent possible to determine whether there is evidence of financial wrongdoing within the investigated entity. To the extent there are gaps in the records of the entity under investigation, and there often are, a forensic accountant must try to fill those gaps through third-party document subpoenas, interviews with witnesses, or through the review of testimony, if it is available. If any gaps remain after these avenues have been exhausted, a forensic accountant can also rely upon extrapolation and deductive or analytical reasoning to complete his/her analysis.

6. Every case and investigation is different in terms of the available documents and evidence that the review and investigation is able to uncover. Unlike financial statement auditing, there is no set roadmap, or defined set of standards, for how the analysis must proceed. Instead, the process for conducting the analysis is primarily dictated by the evidence that the forensic accountant is able to uncover through the available documents. However, there is a set of rules governing forensic accountants known as the "Statement on Standards for Forensic Services," which is issued by the Forensic and Valuation Services Executive Committee of the AICPA. These standards, which are attached hereto as Exhibit "B," provide guidance for how forensics accountants must perform their analyses. As this standard indicates, the forensic accountant must conduct his/her analysis using professional competence, due professional care, adequate planning and supervision, and the use of sufficient relevant data to afford a reasonable basis for his/her conclusions. However, other than those somewhat "high level" general guidelines, there is nothing more specific that dictates how a forensic account must do his/her analysis. This is so simply because the evidence and available documentation that can be obtained in any investigation varies so greatly. At the end of the day, the forensic accountant must utilize his/her experience and expertise to gather as much financial information as possible, and then he/she must analyze that information in order to determine whether there may be evidence of financial wrongdoing.

7. As I discuss in greater detail herein, in this matter, I fully complied with the Statement on Standards for Forensic Services, and relied upon my skills, training and experience in gathering and analyzing as much financial information regarding the investigated entity, Urban Logic Consultants ("ULC"), and its former principals, Messrs. Dillon, Egger and Moorjani. This was a difficult task as much of the ULC financial information was missing, and the financial information that was available did not provide a clear record of what work was actually performed. Furthermore, the period covered by this analysis included approximately 19 years, from 1993 through August 2012. However, I did have enough information, both from ULC itself and from subpoenaed bank record and the City's former legal counsel's records, that I was able to

1  arrive at conclusions regarding apparent financial wrongdoing that was committed against the
2  City by ULC and its former principals. Again, this is all explained in greater detail herein.

### History of Working on the Fraudulent Overbilling in the City by ULC Principles

4  8. Prior to being retained to provide expert consulting services in this matter, I was
5  initially retained by the counsel for the City of Beaumont in connection with a related but
6  somewhat different matter. Shortly thereafter I was retained by the Riverside District Attorney's
7  Office (Riverside DA's Office) following the FBI's raid of Beaumont City Hall in 2015. I was
8  retained by the Riverside DA's Office in or about 2016 to assist in its investigation of criminal
9  wrongdoing on the part of numerous former City officials, including Messrs. Dillon, Egger and
10 Moorjani, who I understood were the former principals of ULC. During this work, I received tens
11 of thousands of pages of documents from the Riverside DA's Office, and from Stradling Yocca, a
12 law firm that served as outside counsel for the City, as well as from other sources. I reviewed and
13 analyzed those documents, and I assisted the Riverside DA's Office in determining whether
14 financial crimes may have been committed by Messrs. Dillon, Egger and Moorjani. I understand
15 that the Riverside DA's Office filed a Criminal Complaint against Messrs. Dillon, Egger and
16 Moorjani, among others, in 2016 alleging numerous crimes, including theft of public money, and
17 that these individuals ultimately pled guilty to lesser offenses, and were ordered to pay restitution.
18 In February 2018 I issued a report of my findings, which is attached hereto as Exhibit "C." As
19 this report indicates, I reached a conclusion that it appears that Messrs. Dillon, Egger and
20 Moorjani committed financial wrongdoing, and that they overbilled the City in terms of what they
21 were allowed to bill under their agreements by tens of millions of dollars since 1993.[1]

22 9. On or about January 25, 2018, Hemming Morse was retained by Best Best &
23 Krieger, LLP ("BBK"), counsel for WRCOG and the City, to provide expert consulting services
24 in connection with the claim against Defendant National Union. At the time, WRCOG and the
25 City had not filed a lawsuit, but I understood that they had submitted a claim for loss under the
26 City's policy with Defendant, and that Defendant was demanding a proof of loss analysis.

---

[1] I understand that the determination of whether someone has committed fraud rests with the trier of fact. My opinions are limited to stating that there may be an indicia or appearance of fraud.

Building off the work I had done for the Riverside DA's Office, from January-September 2018, I worked on a report to submit to National Union documenting theft and overcharging by ULC. In September 2018, I submitted my report regarding the overcharging to BBK, and I understand it was subsequently forwarded to National Union. In or around June 2019, I met with National Union's forensic accountants, HSNO, including Peter Fogarty, at BBK's offices in Walnut Creek. During the meeting, HSNO extensively questioned me regarding my report and the factual and documentary basis for the report. Interestingly, although I know now that HSNO had itself conducted an investigation into overcharging, HSNO did not share the results of its own research during the meeting. It was largely a one-sided exchange of information.

**Expert Witness Opinions**

10. After the lawsuit in this action was filed, my engagement was expanded by BBK to prepare an expert witness report and provide expert opinions for trial. On May 27, 2022, I submitted an expert witness report, which is attached hereto (without its accompanying exhibits, except for exhibit 2 to the report, which is included) as Exhibit "D." On June 30, 2022, I submitted a supplemental/rebuttal expert report, which is attached hereto (again without its accompanying exhibits) as Exhibit "E." While these reports contain all of my opinions and the bases for my opinions, I will summarize my opinions, or at least those opinions that are not offered strictly for rebuttal, herein.

11. I have two primary opinions that I intend to offer at trial. First, it is my opinion that there is evidence of financial wrongdoing on the part of ULC and its former principals against the City based on compensation to ULC far in excess of the 4.5% contractual cap on construction costs of public improvements in the City. Based on my review and analysis, it is my estimate that the overpayments in excess of this 4.5% cap total approximately $58 million.

12. Second it is my opinion that there is evidence of financial wrongdoing on the part of ULC and its former principals against the City based on compensation to ULC for an improper markup of sub-consultant work far in excess of the 15% that is allowed under the contract between the parties. Based on my review and analysis of the one year where I had sufficient

1    records of the improper markups, 2011, I was able to uncover examples of excessive markups
2    which would yield approximately $3.9 million in excessive markup compensation.
3        13.    These are my two primary opinions, although, again, I have several other opinions
4    that are stated in my reports.

**Work Performed/Analyses to Arrive at Opinions**

14. In order to arrive at these opinions, I reviewed the September 27, 1993 Agreement between the City and ULC (the "Agreement"), and the April 11, 1994 Amendment to the Agreement ("Amendment"). I understand that the Agreement and Amendment, which are attached hereto as Exhibit "F" and "G" respectively, provided for the scope of services ULC was to provide to the City.

15. The Agreement included as the services to be provided by ULC, "Section I - Planning Services", "Section II - Economic Development Services", "Section III - Review of Development Services", "Section IV - Public Works and Engineering Services", and "Section V - Plan Checking and Construction Inspection." The Agreement also included "Section VII – Additional Services", which provided that the City may, from "time-to-time" have the need for other services that were not specifically identified in the Agreement, and in such cases the City "may authorize" ULC to perform such additional services on an as-needed basis. (Ex. "F, p. 7.) The Agreement also includes "Section XII Responsible Individuals" which states, "The individuals directly responsible for the execution of the services set forth herein shall be Ernest A. Egger, David W. Dillon and Deepak Moorjani, principals of Urban Logic Consultants."[2] The Amendment added a new subsection to "Section V" of the Agreement, "Plan Checking and Construction Inspection," which subsection was entitled "Public Works Construction Management." This Amendment added additional tasks related to Construction Management that would be included with the Section V scope of work. (Ex. "G," p. 2.)

16. The Agreement and Amendment included sections on the compensation to be paid to ULC for these different services. The Agreement provided in "Section IX" that for services

---

[2] It should be noted that an expert for the Defendant, Mr. Tasker, concludes in his analysis that not one single hour worked by the ULC principals in 19 years was ever limited by the 4.5% cap.

1  performed under Sections I, II and IV (i.e. Planning, Economic Development and Public Works
2  and Engineering), compensation would paid based on a $15,000 per month retainer, to be
3  negotiated annually.[3]  For services set forth in Section III (i.e. Review of Development), the
4  Agreement provided that such work was to be done at no charge, and that those services were to
5  be provided in connection with the monthly retainer work.  The Agreement further provided that
6  for services in Section V (i.e. Plan Checking and Construction Inspection) compensation to ULC
7  was to be based on a time and material basis, not to exceed 4.5% of the confirmed construction
8  costs of the public improvements to be constructed.  The Amendment, which again added a new
9  subsection to Section V entitled "Public Works Construction Management", provided that for the
10 services under that new subsection, compensation was to be based on a time and material basis,
11 not to exceed 4.5% of the bid price awarded by the City for each project.

12      17.    Finally, the Agreement provided that for Section VII work (i.e. any Additional
13 Services), ULC's work would be compensated based on the attached Hourly Rate Schedule, or
14 any other negotiated fee rate.  The attached Hourly Rate Schedule identified classifications of
15 ULC employees and their corresponding hourly rate, and it also included a provision for the
16 reimbursement of ULC's costs.  This included a provision that "Professional Sub-Consultant"
17 services would be reimbursed at actual cost plus 15%.  In other words, the Agreement provides
18 that ULC could only bill the City for professional sub-consultants that ULC hired at the sub-
19 consultants' actual rates, plus a 15% markup.

20      18.    In addition to reviewing the Agreement and Amendment, I also reviewed City
21 records which indicated that in 1993 the City established a Community Facilities District
22 ("CFD"), known as CFD No. 93-1. The CFD allowed for the issuance of bonds that were sold on
23 the bond market to pay for the financing of public infrastructure, i.e. roads, storm drains, sewer
24 facilities, water facilities,, public safety and civic facilities, "critical and joint facilities
25 engineering", etc., which the City believed would allow it to keep up with the rapid pace of new
26 development within the City.[4]  I understand that CFDs typically cover a discrete area, and that

---

[3] For a short period of time (April 1993 – October 1993) the retainer amount was $10,000.  It was increased to $15,000 in November 1993.

[4] A detailed listing can be found in Exhibit 41 to my Supplemental Expert Report.

property owners within the district are ultimately responsible for paying off the bonds through taxes. However, the City's CFD 93-1 encompassed the entire boundary of the City. From the records I received it appeared that Messrs. Dillon, Egger and Moorjani were materially involved in setting up CFD 93-1.

19. In connection with this assignment, I reviewed a large volume of invoices ULC submitted to the City. It is important to note that all ULC invoices were issued to the City. Payments on these City-issued invoices came from both the City and from the bond trustee that oversaw the sale and distribution of the bond proceeds for CFD 93-1. I analyzed and summarized the payments that were received and deposited by ULC, both from the City and from the bond funds utilizing monthly bank statements for the account maintained by ULC at Union Bank. In addition to my analysis of the ULC bank statements, I also analyzed ULC's general ledger, documents produced by the Bond Trustee, as well as detailed analysis performed by an unrelated entity called Urban Futures.[5] I also reviewed a variety of other business records including ULC payroll records that were available. One purpose for reviewing ULC's general ledger, payments and invoices was to determine whether ULC and its former principals billed the City appropriately given the 4.5% cap for Section V services under the Agreement and Amendment discussed above. In other words, one issue that I specifically analyzed was whether there was evidence that ULC and its former principles improperly billed the City and received payments in excess of the 4.5% cap for Section V work. Another purpose of reviewing the invoices and payroll records was to determine whether ULC and its former principals improperly marked up sub-consultant work in excess of the 15% allowed under the Agreement. As stated, it is my opinion that there is evidence that ULC and its former principals overbilled the City on both issues, and that overbilling resulted in improper payments to ULC of tens of millions of dollars.

**Analysis for First Opinion**

20. Again, my first opinion is that there is evidence of overbilling above the 4.5% cap allowed for Section V services under the Agreement and Amendment, and that this overbilling is

---

[5] It is my understanding that Urban Futures (no relation to ULC) was retained by the City to analyze the disbursements of bond proceeds.

in the approximate amount of $58 million.  This opinion is based on the analyses that are stated in my report and supplemental report, which is summarized as follows.

21.     First, I was able to determine through multiple different analyses of both City and Union Bank records, as well as ULC records, that during the time that ULC was owned by the former principals, Messrs. Dillon, Egger and Moorjani, i.e. 1993 to August 2012, ULC was paid a total of approximately $75 million from both the City directly and from bond proceeds associated with CFD 93-1.  Of this amount, about $40.3 million was paid out of bond proceeds, while about $34.6 million was paid out of City funds.  These payments are summarized by year from 1993 to 2012 in exhibit 2 to my initial report, which is attached hereto as Exhibit "D."  It should be noted that there was insufficient evidence in the City's or ULC's files to determine the amounts that ULC was paid directly from the City, as opposed to bond proceeds, for 1993 through 1997.  Thus, the payments to ULC, and undoubtedly the overbilling, were greater that what I have reported.  However, I only used years where there was sufficient evidence in the files to determine the amounts paid by the City to ULC.

22.     From here, I made an initial logical assumption that all the $40.3 million worth of work paid out of bond proceeds was for Section V work under the Agreement and Amendment, and thus subject to the 4.5% cap.  This is so for several reasons based on my review of the file.  First, I know that the bonds proceeds were not used to pay any of the retainer work called out in Sections I, II and IV of the Agreement because the ULC bank records, general ledger and invoices show that such work was always paid by the City and not from bond proceeds.  I reviewed invoices for payment that ULC submitted to the City, where I saw that the $15,000 retainer work under Sections I, II and IV of the Agreement were always separately line items to the City, with no reference to CDF 93-1.  The ULC general ledger shows that the $15,000 per month retainer work was always billed to and paid by the City, and was never paid by the bond trustee[6].  There was no record that I saw that the retainer work was ever billed for CFD 93-1

---

[6] As previously noted, all ULC invoices were issued to the City, irrespective of whether paid by the City or from bond proceeds.

1  projects. Examples of invoices for the separately billed $15,000 per motion retainer work from
2  my file are attached hereto as Exhibit "H."
3      23. Also, from my review of the files, the City would always send ULC invoices to the
4  bond trustee that were to be paid out of CFD 93-1 funds, and the bills for the retainer work was
5  never included in those transmittals. An example of transmittal letters are attached hereto as
6  Exhibit "I.". Finally, it is also my general understanding that CFD bond proceeds have to be used
7  for the purpose of the CFD, which in this case was to build backbone City infrastructure through
8  public works construction projects, and bond proceeds would not be used to pay for general
9  retainer work. Based on these factors that I observed in my review of the file and my experience
10 and expertise, I concluded that all payments from bond proceeds were for Section V work, and
11 thus subject to the 4.5% cap, and not general retainer work and not any potential additional work
12 that may have been authorized by the City.
13     24. From here I made a second logical assumption that for the $34.6 million worth of
14 work that was paid out of City proceeds, an estimated 25% was for work that was outside the cap
15 work under Section V of the Agreement. My choice of 25% as the estimated percentage of work
16 that was outside the cap was based on multiple facts which I also observed in the file. First, the
17 total amount of monthly retainer work over this cumulative period that would be covered under
18 Sections I, II and IV of the Agreement is a relatively small number in comparison to the overall
19 amounts paid by City proceeds. The retainer amount of $15,000 per month yields only $180,000
20 per year. Thus, for the years where I have evidence of ULC retainer invoices and or retainer
21 payments of City funds to ULC (April 1993 through September 2009[7]), the total retainer work is
22 only $2.93 million. This retainer work amount would only be approximately 8.5% of the total
23 amount paid by the City.
24     25. Furthermore, in my review of the City's and ULC's files, I was only able to find
25 two occasions where the City authorized ULC to perform additional work under Section VII of
26 the Agreement. One such instance was an authorization for $11,280 of additional work. The

---

[7] The source of this information includes ULC invoices to the City and entries made in the general ledger of ULC. The final retainer payment to ULC was for month end August 2009.

1  other authorization for "Additional Services" was for "time and materials not to exceed $650."
2  These documents are attached hereto as Exhibit "J." Other than these referenced documents, I
3  was unable to find any additional documents specifically authorizing ULC to perform additional
4  work under Section VII of the Agreement. I view this is as being consistent with the plain
5  language of Section VII of the Agreement, which provides that additional services may be
6  requested and authorized by the City from "time to time". Yet while I found a small handful of
7  instances of evidence of Section VII Additional Services work being authorized, I still applied at
8  25% share to work being outside the cap, which I believe under the circumstances, is
9  conservative. Applying that 25% reduction, I estimate that the total amount of payments to ULC
10 for work inside the cap was $25.9 million (75% of $34.6 million = $25.9 million). Conversely,
11 my 25% reduction created an "allowance" of approximately $8.6 million to cover the monthly
12 consulting / retainer payments and any additional work that may fit the Additional Services to be
13 authorized "from time to time" category.
14      26.    Once I determined the total amount that was paid to ULC, both from bond
15 proceeds and the City directly, and applied the 25% reduction to the City payments for ULC work
16 outside the cap, I concluded that the total amount of work within the Section V cap that was paid
17 to ULC was $66.2 million ($25.9 million + $40.3 million = $66.2 million). From here, the next
18 step in my analysis was to determine to the total amount of construction capital expenditures the
19 City spent on public works projects during this time period. I was able to determine this based on
20 my review of City project files, bond issuance documents, public records research, and
21 discussions with City officials. I was unable to find evidence of capital expenditures for the
22 period of 1998 through 2000, but I did have capital expenditures for the other years. As reflected
23 in exhibit 2 to my report (Ex. "D"), I was able to find evidence of capital expenditures by the City
24 from 1993 to 2012 totaling $177.8 million. I then multiplied the total capital expenditures times
25 the 4.5% cap, which yielded a number of $8 million ($177.8 million x 4.5% = $8 million). This
26 was approximately $58.2 million less than the $66.2 million that was paid to ULC. Accordingly,
27 it is my opinion, based on my forensic analysis, that there was overbilling by ULC, and
28 overpayments to ULC, by approximately $58.2 million.

**Analysis for Second Opinion**

27.  As stated above, my second opinion is that there is evidence of financial wrongdoing on the part of ULC and its former principals based on compensation to ULC for an improper markup of professional sub-consultant work that is far in excess of the 15% that is allowed under the Agreement, which I calculated for one year (2011) to be $3.9 million in excessive markup compensation.

28.  I note at the outset that there were constraints in performing this analysis due to the limitations on the available documents required to determine whether there were excessive markups.  In order to perform the analysis related to potential excessive markups for sub-consultant work under the Agreement, I needed five categories of documents: (1) invoices from the sub-consultants to ULC, (2) ULC internal time and billing worksheets, (3) invoices from ULC to the City, (4) payments made by the City to ULC, and (5) ULC's payroll records related to its employees.  There was only one year in which I had sufficient documents for all five categories, and that was 2011.  As such, this analysis and opinion is limited to 2011, although the apparent overbilling explained herein likely occurred in other years as well.

29.  Once I had gathered the documents, the first step was to look at the invoices that ULC submitted to the City, both for the work to be paid by the City and for CFD 93-1 work that was to be paid by the bond trustee.  These invoices did not identify any ULC employees by name or even initial, rather they are only identified by the title of the professional.  Also, while the numbers of hours and hourly rate for each professional is stated, there is no description as to what work was performed by the various professionals.  There was an indication on each invoice as to what project was being worked on, and whether it was a was a CFD 93-1 project, but there was nothing indicating what work was actually performed by each professional during that time period.  Some invoices did clearly identify costs that were associated with third party vendors and reflect a 15% markup. In addition, such invoices include mileage reimbursement or some other recoverable cost on the rate schedule attached to the Agreement.  A sample of some of the invoices ULC submitted to the City in 2011 are attached hereto as Exhibit "K."

30. Once I had gathered all the ULC invoices to the City for 2011, the next step was to subtract out all of the costs from each invoice, so that the only charge I would be analyzing were the professional services fees that were contained within each invoice, as well as the total number of hours the ULC professionals billed to each invoice. As my report indicates, the invoices that were submitted to the City in 2011 for payment from both the City and bond trustee totaled $8.7 million, and after costs were subtracted out, the professional fees that were submitted in the 2011 invoices totaled $8.5 million, which was based on 58,099 total hours billed. (Ex. "D," p. 13.)

31. I next determined whether the City and bond trustee paid these amounts that were invoiced by ULC. To do this I reviewed the bank records for ULC during this time period, and it appears that ULC payments received during 2011 matched what it had submitted on the invoices.

32. The next step in my analysis was to look at ULC's payroll records for 2011, which had been obtained from a third-party payroll provider called Paychex, in order to determine the total number of payroll hours for all ULC employees for 2011. I had received Paychex payroll records for ULC for 2011, and these records identified a total of 21 people on the ULC payroll that year, with 12 being hourly employees and 9 being salaried employees. The 9 salaried employees included the three principals, Messrs. Dillon, Egger and Moorjani.

33. For the 12 hourly employees, the total number of hours worked for those individuals were stated on the payroll records. These hours totaled 13,274. For the 6 salaried employees other than the principals, the payroll records identified the total gross earnings and the hourly rates for these employees. I divided the total gross earnings by the hourly rate to determine a total number of implied hours worked for each such salaried employee during that year, and in each case it yielded total number of implied hours of 1,040. I added those implied hours for the 6 non-principal salaried employees, which yielded a total of 6,240 hours. For the 3 principals, the Paychex payroll records identified the same total number of implied hours of 1,040 when I divided the principals' salaries by their hourly rates in the payroll records. However, for the three principals, I had the actual number of hours billed directly from the invoices, and when I added those together for all of the 2011 invoices, the three principals billed a combined 5,698 hours. Finally, because the total number of implied hours for the 6 non-principal salaried

employees totaled only 1,040 hours per employee, I doubled that number to make it more consistent with a full time job that would warrant the hiring of a salaried employee. This added another 6,240 hours to the total. I then added all the hours for the 12 non-salaried employees, the 6 salaried employees and the 3 principals, and it totaled 31,452 hours.

34. When I compared the total number of hours billed to the City on the ULC invoices for 2011 with the total number of hours attributable to the ULC employees through the Paychex records and the principals' invoiced hours, the ULC invoices to the City (paid by both the City and bond proceeds) appear to have included 26,647 hours in 2011 not worked by ULC employees. This is a significant number of hours that ULC billed to the City that cannot be accounted for in the ULC payroll records. The possible explanations for this is that ULC either padded its hours on its invoices, i.e. it made up phantom hours for work that was never performed, or it billed the City for work that its sub-consultants actually did, but it included their time as part of the ULC services, rather than as a cost plus a 15% markup. For the documents gathered for 2011, I utilized the ULC internal time and billing worksheets to see whether the hours billed to ULC by its sub-consultants appear on the worksheet which was used to construct the invoice that was ultimately sent to the City. An example of such match is explained below.

35. This resulted in a substantial overbilling to the City. I determined the amount of the overbilling by dividing the $8.5 million in total professional fees invoiced by ULC in 2011 by the total number of invoiced hours, and that yielded an average hourly rate of $146.48 per hour. I then multiplied this average hourly rate by the total number of apparent overbilled hours of 26,646, which resulted in a total implied overbilling of $3.9 million. (See Ex. "D," p. 14.) Thus, it is my opinion that in 2011 alone, ULC appears to have overbilled the City by at least $3.9 million based on including sub-consultant work as part of the ULC professional services, or simply making up hours.

36. Finally, as a component of the analysis of $3.9 million in overbilling discussed in the prior paragraphs, my analysis of the relevant records from 2011 demonstrates that ULC appears to have improperly marked up sub-consultant work and charge the City for that work at rates that were higher than what the sub-consultants had billed to ULC. For example, I reviewed

1  a sub-consultant invoice that was submitted to ULC on June 1, 2011 from a sub-consultant called
2  Satori R.E. Solutions, Inc. ("Satori"), for work that had been performed in May 2011. This
3  invoice was for 185.42 hours of work at $40 per hour, for a total amount invoiced to ULC of
4  $7,416.80. Based on the invoice, it appears that this work was related to the "Sundance Project".
5  However, ULC's May 2011 invoice to the City included 185.5 hours for Lana Guseva, who I
6  identified through a search of the Secretary of State records as the CEO and Secretary of Satori,
7  but ULC billed the City $31,535 for her work, which equates to an hourly rate of $170 per hour.[8]
8  This is $130 per hour more than what Satori billed to ULC. This is far more of an increase than
9  the 15% markup allowed by the contract. For this one transaction alone ULC made a profit of
10 $24,388.20 ($31,535 - $7,416.80). This is documented in exhibit 16 to my report, which I am also
11 attaching hereto as Exhibit "L." This is but one example of the overbilling for sub-consultants.
12 I found four other similar examples, which are discussed on pages 16 through 18 of my report.
13 (Ex. "D," pp. 16-18.)

**Response to Defendant's Motion *in Limine***

15  37.  I have reviewed the motion *in limine* Defendant filed to exclude my testimony. I
16 offer the following analyses in response. First, Defendant argues that I did not and could not
17 verify the overbilling, and that instead I am offering "speculation unsupported by any recognized
18 methodology or substantiated assumptions." (Motion, p. 1.) This is not so, and Defendant is
19 reading my deposition testimony out of context, and it is misconstruing the bases for my
20 opinions. In particular, Defendant criticizes my application of a 25% estimate of the ULC work
21 that was paid by the City as being outside of the 4.5% billing cap in the in Section V of the
22 Agreement, and argues that the 25% determination is not supported by any authoritative source.
23 (Motion, p. 11.) But as I discussed earlier, this determination of 25% of work being outside the
24 cap was based on a sound and well-reasoned analysis of the particular facts of this case, and the
25 actual contractual relationship that existed between ULC and the City. In my 40 years of
26 experience, I have found that for some matters precise calculations can be made. On other

---

[8] As previously stated, the invoices issued to the City did not include the names of individuals. The name "Lana Guseva" however does appear on internally prepared and maintained time and billing worksheets of ULC. I have seen no evidence that the City ever saw or had access to these ULC internally prepared time and billing records.

1  matters, such as this, estimates need to be made due to limitations on the available documents
2  and/or the lack of necessary details on the documents that are available. In this matter we have
3  both missing and poorly detailed records (e.g., ULC invoices).

4  38. It is important to note here that the invoices that ULC submitted to the City did not
5  identify the work that the purported ULC professionals performed on the various projects. The
6  invoices attached hereto as Exhibit "K" illustrate the problem. They identify various projects that
7  ULC was working on at the time in 2011, and they identify the title of the ULC professionals who
8  worked on those projects, as well as how many hours they billed to those projects, and their
9  hourly rates. But these invoices do not provide any descriptions of the work these purported ULC
10 professionals actually performed. Without such information, one cannot rely upon the invoices
11 themselves as being determinative to whether the work that was being performed was within the
12 Agreement's Section V scope of work that is subject to the 4.5% cap, or subject to another section
13 of the Agreement where there is no cap.

14 39. Because the invoices themselves do not provide guidance on whether the work is
15 within or outside the cap, I had to use another approach to make such a determination. As I
16 stated, my determination of 25% as a reasonable estimate is based upon the circumstances of the
17 engagement between ULC and the City. The Agreement plainly provides that there are only two
18 other potential avenues of compensation to ULC other than the Section V work; (1) the $15,000
19 per month retainer work, which compensated ULC for all work in Sections I, II and IV of the
20 Agreement, and (2) any "Additional Services", that would be authorized by the City from "time
21 to time".

22 40. As I state above, my estimate of the 25% of work billed to the City and paid by the
23 City as being outside the cap was based on the following facts: (1) CFD 93-1 projects were
24 separately invoiced to the City, and then forwarded by the City to the bond trustee for payment,
25 and these projects were all public works construction projects given the nature of the CFD, (2) the
26 $15,000 per month work was separately accounted for in the general ledger and separately billed
27 to the City, and it accounted for only $2.9 million, or about 8.5% of the total amount that paid to
28 ULC from 1993 to August 2012, (3) there was only two written authorization that I was able to

1 find anywhere in the City's files indicting an authorization for ULC to perform additional
2 services work under Section VII, one was for $11,280 and the other was for $650 worth of work,
3 and (4) Section VII of the Agreement itself provides that additional services would be authorized
4 "from time to time," which suggests that the parties contemplated that such additional payments
5 would be occasional and infrequent.  Under the circumstances of this contractual relationship, and
6 based on what I was able to uncover in the file on this case, I applied a 25% reduction for work
7 outside the cap, which in my opinion is a reasonable estimate.  This methodology is in line with
8 the way forensic accounting is done, which again requires a gathering of all the evidence, and a
9 determination of whether there has been apparent wrongdoing based on an analysis of the
10 evidence that is uncovered.  As I said in my deposition, there is no treatise or standard that says
11 "thou shalt use X Percentage" for the determination of work that is within or outside of a limiting
12 cap in a construction contract.  This determination was based on my forensic analysis of this
13 particular case, and it is consistent with the way I have been performing forensic accounting for
14 40 years.

15   41.   I also note here that in my Supplemental Report, I ran my calculations under
16 different hypothetical situations of reductions for payments outside of the Section V cap.  I ran
17 my calculations using scenarios of (1) 50% of the City payments are outside the Section V cap,
18 (2) 75% of the City payments are outside the Section V cap, and (3) 90% of the City payments
19 are outside the Section V cap.  It should be noted that in each scenario, there is a net overpayment
20 to ULC (See Ex. "E," pp. 16-17.)  In other words, even if the trier of fact were to find that 90% of
21 the City payments to ULC should be outside of the Section V cap work, my opinion would be
22 that there is still evidence of overpayments to ULC.  Defendant asserts that my opinion of a 25%
23 reduction is unsupported and speculative.  As I have discussed, that is not the case at all.  But the
24 analysis I performed for the Supplemental Report shows that even if the trier of fact disagrees
25 with me and finds that more work should be attributable to a section in the Agreement other than
26 Section V, there is still evidence of overpayments for which Defendant should be liable.

27   42.   Second, Defendant also criticize my opinions because I did not subtract from the
28 analysis payments made for specific agencies, such as water and school districts.  (See Motion ,p.

BEST BEST & KRIEGER LLP

14.) This argument makes no sense to me. My analysis focused on the total amount of funds received by ULC and bond proceeds pursuant to the invoices that were submitted to the City. I did see some ULC invoices that were submitted to entities other than the City, but the small revenue received by ULC from these other municipalities are not included in my analysis. My analysis of the funds received into the bank account of ULC during the period May 1, 2008 through August 15, 2012 show that 95.8% of the net deposits came from the City or bond proceeds. The only contract at use here is the Agreement and its Amendment, which are between the City and ULC, and all of the invoices were submitted to the City. Defendant's argument does not make sense.

43. Third, Defendant criticizes my opinions because I apparently interpreted the term "Professional Sub-Consultant" in determining the overbilling beyond the allowable 15% markup. (Motion, p. 17.) This argument likewise makes no sense to me. The term "Professional Sub-Consultant" is a term that does not require any specialized education or training or experience to understand. To me, the word "Professional" means one who is paid for his/her work, which I believe is a fairly common understanding. Also, given that the Agreement defines ULC as the "Consultant", seems fairly reasonable to me that "Sub-Consultant" would mean anyone who does not own or otherwise work for ULC, but who ULC hires a consultant to assist it in performing services for the City. I believe that this is a fairly common-sense understanding, and I do not consider this understanding to be based on any specialized education or training. In addition, I would add that my firm occasionally utilizes professional sub-consultants for select engagements.

44. Also, this argument of Defendant ignores that my analysis focused on and relied upon ULC's own payroll records, which were obtained from Paychex. As I state above, these payroll records show that for 2011, ULC's entire workforce worked at most 31,452 hours, and yet ULC billed the City for 58,099 hours of work. That is a staggering difference in hours for one year of work, and it shows that sub-consultants hours were included in the invoices to the City. There was no disclosure or transparency to the City that such hours or their billing rates were included in the invoices. Defendant may believe that it takes specialized education and skill to understand the meaning of the phrase "Professional Sub-Consultant." I disagree with that

1 position, but it does not change the fact that there appears to be substantial evidence of
2 overbilling.
3     I declare under penalty of perjury under the laws of the State of California that the
4 foregoing is true and correct.
5     Executed on August 22, 2022, at Alamo, California.

                                              */s/ Daniel W. Ray*
                                              Daniel W. Ray

BEST BEST & KRIEGER LLP