# EXHIBIT D



1390 Willow Pass Road
Suite 410
Concord, CA 94520

# Western Riverside Counsel of Governments City of Beaumont

## v.

# National Union Fire Insurance Company of Pittsburgh

Expert Report of

Daniel W. Ray CPA / CFF, CFE

Partner – Hemming Morse, LLP

May 27, 2022

## I.      Introduction

The purpose of this report, and accompanying exhibits, is to provide a summary of the results of the investigation of the financial activities of Urban Logic Consultants ("ULC") and its principals David Dillon, Ernst Egger, and Deepak Moorjani.[1]  In addition, this report will also address, to a lesser extent, the financial activities of Alan Kapanicas and his entity General Government Management Services or GGMS, Inc.

In delivering or rendering this report, I am not assuming or usurping the role of the trier of fact (judge or jury).  With that caveat in mind, based upon my skills, training, and experience as detailed below, along with a careful analysis of financial and banking records, I am expressing my opinions regarding what appears to be a fraud scheme.

The analysis performed and conclusions expressed are as of the date of this report.  It is anticipated that additional documents may be received, and additional analyses may be performed following the date of this report.  If so, a supplemental report may be issued.

On or about May 17, 2016, the Riverside County District Attorney's Office ("DA's Office") filed a Felony Complaint against seven former public officials in the City of Beaumont ("City" or "Beaumont").  **(Exhibit 1)** The charges alleged that the named defendants carried out various schemes which cost taxpayers nearly $43 million due to their improper conduct.  The Felony Complaint included a "Special Allegation – Aggravated White Collar Crime Enhancement" relating to multiple felonies of fraud or embezzlement.  Those charged included the principals of ULC who also served in various high-level positions with the City of Beaumont, as well as the owner of GGMS.[2]  **(Exhibit 1A)** Summarized below is a table of the individuals and entities that will be the subject of this report:

|                  | ULC       | GGMS, Inc. | City of Beaumont                  |
| ---------------- | --------- | ---------- | --------------------------------- |
| David Dillon     | Principal |            | Economic Development Director     |
| Ernst Egger      | Principal |            | Planning Director                 |
| Deepak Moorjani  | Principal |            | City Engineer / Public Works Dir. |
| Alan Kapanicas   |           | Owner      | City Manager                      |

As of the date of this report, all of the above individuals have pled guilty to criminal charges files.  On or about October 20, 2017, Mr. Moorjani plead guilty and was ordered to pay restitution of $3 million and serve 3 years' probation.  On or about December 19, 2017, Mr. Dillon, Mr. Egger, and Mr. Kapanicas also pled guilty to criminal charges.  As part of their guilty plea, Mr. Dillon was ordered to pay restitution of $4 million; Mr. Egger was ordered

---

[1]  In mid-August of 2012, ULC was sold to an individual named Kieran McKiernan. This report for the most part focuses on the period in which ULC was owned and controlled by Dillon, Egger, and Moorjani.

[2]  In a letter dated August 27, 2009, the three principals of ULC informed the City that they were terminating their positions as City officials effective that date.  Despite this "termination," the three ULC principals continued to operate in their same capacities with the exception that they were now executing documents as "consultants."

to pay restitution of $3 million; and Mr. Kapanicas was ordered to pay restitution of $1 million.

In this matter Hemming Morse, LLP ("Hemming") was initially retained in June 2016 by the law firm of Stradling Yocca Carlson & Rauth, P.C. ("Stradling") who served as outside counsel for the City. Hemming was thereafter retained by the DA's Office in approximately December 2016, to assist with the criminal investigation. I was responsible for performing the analysis detailed in this report.

## II.     Summary of Expert Qualifications

I am a Certified Public Accountant ("CPA") and a partner in the Concord office of Hemming. I am also a Certified Fraud Examiner ("CFE"), and I am Certified in Financial Forensics ("CFF"). I have provided forensic accounting and litigation services since 1990. Prior to that time, I served as a Special Agent with the FBI from 1982 – 1990. My expert qualifications, including my testimony in the last four years and the publications I have authored in the last ten years, are described in **Exhibit A** hereto.

I am a member of the California Society of Certified Public Accountants ("CalCPA"). I am the past Chair of the Steering Committee of its statewide Forensic Services Section. This Steering Committee provides guidance to approximately 1,100 members of its Operating Sections: (1) Fraud and Financial Investigations, (2) Economic Damages, (3) Business Valuation and (4) Family Law. I previously served as the Chair of the CalCPA's statewide Fraud and Financial Investigations Section.

I am also a member of the Association of Certified Fraud Examiners ("ACFE"), the Northern California Fraud Investigators Association ("NCFIA"), the Society of Former Special Agents of the FBI, and American Institute of Certified Public Accountants ("AICPA"). I lecture frequently on a variety of topics including fraud and forensic accounting.

## III.    Documents Reviewed and Considered

During the course of this investigation, Hemming received a large volume of documents from several sources including the Stradling law firm and the DA's Office. The Stradling law firm served as outside counsel for Beaumont. The items received from Stradling include various documents relating to the issuance of bonds and requests for funds under the control of the Bond Trustee, as well as payroll and banking records, along with general ledger records for ULC. The records also include the general ledgers for Beaumont for fiscal years 2004 – 2015. Hemming was also provided work product previously prepared by a consulting firm called Urban Futures, Inc.

The documents received from the DA's Office are from two primary sources: (1) work-papers supporting the analysis performed by a predecessor forensic accounting firm on numerous business and personal bank accounts; and (2) documents obtained by the DA's Office via the execution of search warrants. The types of documents reviewed and considered include banking records, tax filings, QuickBooks, general ledgers, payroll

records, invoices, construction project files, declarations, etc.  Included as **Exhibit B** is a detailed listing of documents reviewed and considered.

In addition to the documents reviewed and considered, I have also relied upon my own professional judgment and expertise gathered during my approximate 40 years in which I have conducted financial investigations.

## IV.   Summary of Opinions

As will be discussed in much greater detail in this report, my opinions include:

1.  The owners of ULC appear to have undertaken a scheme to materially inflate the profits achieved as a result of adding additional and improper markup to the services rendered by Professional Sub-Consultant's beyond the 15% markup limitation set forth in the various contracts with the City of Beaumont.

2.  The amount of total compensation received by ULC far exceeds the 4.5% limitation on confirmed construction costs of the public improvements as set forth in the various agreements with the City of Beaumont.

3.  The accounting records for ULC as set forth in their general ledger are not accurate.

## V.   Executive Summary of Facts and Findings

1.  While serving and being compensated as city officials, Mr. Dillon, Mr. Egger, and Mr. Moorjani materially participated in the approval process regarding capital improvement projects funded by bonds sold to investors.  In addition, their company ULC was retained by City of Beaumont to serve as consultants in connection with the approved capital improvement projects.

2.  In connection with the ULC consulting services, ULC entered into agreements with the City of Beaumont that limited the amount of fees ULC could receive for their consulting services.

3.  An agreement between the City of Beaumont and ULC dated September 27, 1993, stated that for the capital improvement consulting services ULC was to be paid "on a time and materials basis not exceeding four and one-half percent (4.5%) of the confirmed construction cost of the public improvements to be constructed."  An amended version of this agreement dated April 11, 1994, states "...compensation shall be on a time and materials basis not exceeding four and one-half percent (4.5%) of the bid price awarded by the City for each project."

4.  During the period 1993 through August 2012, ULC submitted invoices and received payments from both the City of Beaumont as well as the Bond Trustee.[3]  These combined

---

[3]  This analysis of payments to ULC stops in August 2012, because ULC was sold to a third party.

payments totaled approximately $75 million.  The breakdown is approximately $35 million from the City of Beaumont and approximately $40 million from the Bond Trustee.

5.  It is noted that ULC and its owners were compensated for certain services that were not limited to the 4.5% cap described above for the capital improvement work.  For purposes of a damage calculation, Hemming is estimating that approximately 25% of the funds paid to ULC from the City of Beaumont were not subject to the 4.5% cap.

6.  Therefore, we are estimating the amount received by ULC that relate to capital improvement projects, and thus subject to the 4.5% cap, as being $66,273,223.  This is after reducing the amount received from the City of Beaumont by 25%.  ($35,000,000 reduced to $26,000,000).

7.  Our analysis reveals that the adjusted amount received by ULC of $66,273,223 far exceeds 4.5% of the cost of the capital improvement projects undertaken by the City of Beaumont.

8.  Our analysis reveals that during the relevant period, the City of Beaumont expended approximately $177,809,377 on capital improvements.  A calculation of 4.5% of this amount indicates that ULC should have received approximately $8,000,000.  This suggests that ULC was overcompensated by approximately $58 million.[4]

9.  This report provides details regarding what appears to be a fraud scheme perpetrated by the ULC officials which enabled them to receive such a massive overpayment.

10. To quantify this overpayment by year, HM prepared a schedule that does the does the following:

   a.  Tracks payments received each year from the City of Beaumont for years 1998 – Aug 2012
   b.  Reduces the payments received by 25% for the reason cited above
   c.  Tracks payments received from the Bond Trustee for years 1993 – Aug 2012
   d.  Totals the payments received
   e.  Tracks estimated capital improvement expenditures made by the City of Beaumont
   f.  Calculates 4.5% of each years' total capital improvement expenditures
   g.  Calculates the implied overpayments

11. The summary chart reflecting the estimated year-by-year overpayments received by ULC is included as **Exhibit 2**.

---

[4]  It should be noted that HM was unable to locate records relating to payments made by the City of Beaumont to ULC for years 1993 – 1997.  Therefore, our calculation of the amounts paid to ULC is lower than the amount actually received.

San Francisco I San Mateo I Los Angeles I Concord I Santa Rosa I Fresno I Chico

## VI.     Detailed Summary of the Financial Activities of Urban Logic and its Principals

ULC was formed initially by Egger and Dillon in late 1993, with Moorjani subsequently added as a principal later that year.  As will be further detailed below, ULC entered into a series of contracts with Beaumont to provide consulting services in connection with a large number of capital improvement projects being undertaken by the City and funded by the sale of bonds.

Commencing in 1993, various bond issues were sold with a total face value of approximately $367,240,000.  Of this amount, approximately $267,004,166 was expended for a variety of purposes.[5]  **(Exhibit 3)**

These include the following:

| Bond Proceeds Usage | Amount |
|---|---|
| Construction – Design / Planning / Engineering / Mgmnt | $ 50,649,268 |
| Construction – 3rd Parties / Developers / Beaumont / Etc. | $193,948,343 |
| Cost of Issuance | $  5,134,984 |
| Underwriters Discount – Cost of Issuance | $  6,846,890 |
| Administration Expenses | $  3,567,143 |
| BFA Expenses | $  6,857,538 |
|  |  |
| **Total** | **$267,004,166** |

In their capacities as City officials, Dillon, Egger, and Moorjani were instrumental in the formation of a Community Facilities District ("CFD") for the stated purpose of raising funds to finance capital improvement projects in Beaumont.  Each time a bond issue was approved by the City, a portion of the bond proceeds were thereafter paid over to ULC for consulting services.  The identified purposes and amounts of bond funds paid to ULC included the following:

|  | Total Expenditure | Total Amt. to ULC | Percentage |
|---|---|---|---|
| Construction Design, Etc. | $50,649,268 | $45,391,831 | 90% |
| Cost of Issuance | $  5,134,984 | $    777,500 | 15% |
| Administration Expenses | $  3,567,143 | $    466,109 | 13% |
| Other Expenses | $  6,857,538 | $    385,000 | 6% |
| **Totals** | **$66,208,933** | **$47,020,440** |  |

---

[5]  In significant part Hemming is relying upon the work performed by Urban Futures for the details regarding the face amounts of the bonds, the net proceeds received, the categories of the disbursements, and bond expenses.  Urban Futures prepared a PowerPoint presentation dated June 7, 2016, which summarizes the uses of the bond proceeds. (Bates BMTSEC0081824 - 81872)

As calculated by Urban Futures during the scope of work performed by them for the City, but substantially verified by the work performed by Hemming, ULC received more than $45 million of the bond proceeds which were allocated for Construction purposes.  This equates to approximately 18.5% of the total funds allocated for Construction and 90% of the construction costs associated with design, planning, engineering, and management.

In addition to the receipt of approximately $47 million of bond proceeds, additional funds were paid to ULC directly by Beaumont for a variety of purposes including for service as city officials; for the management of the Wastewater Treatment Plant; and for services rendered for various capital improvement projects.[6]  Based upon the analysis of the ULC general ledger and banking records, the total amount of funds paid by Beaumont to ULC was approximately $42.3 million[7].

With respect to the determination of the payment amount of $42.3 million to ULC by Beaumont, it is important to consider the following:

- For the period January 1998 – June 2003, Hemming is relying on the general ledger ("GL") for ULC for this amount.  The total for this period was approximately $2.4 million.  No records for the period prior to January 1998 are available, and it is likely that a significant amount of funds was paid to ULC by Beaumont during the period from 1993 through the end of 1997.

- For the period July 2003 – August 2012, Hemming had access to the GL's for both ULC as well as the City.  In addition, Hemming had access to the banking records of ULC.  During this period, the total amount paid by the City to ULC was approximately $32.2 million.

- On or about mid-August 2012, ULC was sold by the three principals to an individual named Kieran McKiernan.  Following the sale, McKiernan maintained the same bank account as previously used by ULC, but the GL for ULC as maintained by the original principals was no longer utilized.  The funds paid by the City to ULC during the period September 2012 – June 2015 totals approximately $7.7 million.

In summary, the total amount received by ULC from both bond proceeds and payments directly by Beaumont totals approximately $89.3 million.  This broken down as follows:

|  | Bond Funds | Beaumont Funds | Total |
|---|---|---|---|
| Original Principals | $42,500,000 | $34,600,000 | **$77,100,000** |
| Kieran McKiernan | $ 4,500,000 | $ 7,700,000 | **$12,200,000** |
| **Total** | **$47,000,000** | **$42,300,000** | **$89,300,000** |

---

[6]  It should be noted that the City of Beaumont received approximately $55 million of the bond proceeds.  It is believed that a significant portion of the funds paid by the City of Beaumont to ULC for consulting services for capital improvement projects originated from the bond proceeds received by the City.

[7]  In addition to ULC, the principals created and operated an entity called Urban Logic Services ("ULS").  This entity received payments from Beaumont for its work on the Wastewater Treatment Plant.  Funds received by ULS were deposited into the ULC bank account.  Of the approximate $42.3 million received from the City, approximately $645,000 was paid to ULS.

***Urban Logic Contracts with Beaumont***

It appears that ULC and its principals were initially hired by the City pursuant to an Agreement for Planning and Economic Development Services dated March 22, 1993.  This agreement specified several broad categories of services for which ULC would be compensated.  For Planning Services (Category I) and Economic Development Services (Category II), ULC was to be paid a lump sum monthly fee of $10,000.  The agreement specified that the ULC principals maintain an office presence at City Hall for 28 hours per week.  The agreement further identified an additional category called "Additional Services" for which ULC was to be compensated in accordance with the hourly rate schedule included as Exhibit A to the agreement.  The Exhibit A states that ULC would be entitled to reimbursements of Professional Sub-Consultant Services at ***"Actual Cost plus 15%"*** (emphases added) **(Exhibit 4)**

Shortly following the above agreement, another agreement was entered into between Beaumont and ULC.  This agreement dated September 27, 1993, was titled *Agreement for Planning, Economic Development and Public Works Services*.  This agreement was very similar to the initial agreement in that it sets forth the scope of the duties of the principals of ULC in their capacities as officials for the City, including the requirement to spend 28 hours per week working at City Hall.  For their services as public officials, ULC was paid $15,000 per month (an increase of $5,000 per month from the prior agreement.)  In addition, ULC was to provide Public Works and Engineering Services as detailed in the agreement.  For these services, ULC was to be paid "on a time and materials basis not exceeding four and one half percent (4.5%) of the confirmed construction cost of the public improvements to be constructed."  The agreement also has an additional scope of work section called Additional Services.  For these services, ULC was to be compensated in accordance with the hourly rate schedule included as Exhibit A to the agreement.  The Exhibit A states that ULC would be entitled to reimbursements of Professional Sub-Consultant Services at ***"Actual Cost plus 15%"*** (emphases added) **(Exhibit 5)**

There was an amendment to the above agreement with ULC in a document dated April 11, 1994.  In this amendment the language relating to the compensation to be paid to ULC for Public Works Construction Management was modified slightly.  The language in this agreement states, "…compensation shall be on a time and materials basis not exceeding four and one half percent (4.5%) of the bid price awarded by the City for each project." **(Exhibit 6)**

***The Accounting Records Maintained by Urban Logic Are Not Accurate***

As noted above, Hemming had access to and reviewed the GL maintained by ULC for the period January 1996 – August 15, 2012.[8]  The accounting records for ULC were maintained by an accounting software program called QuickBooks.  From the ULC QuickBooks file, Hemming generated financial statement including an income statement and balance sheet.

---

[8] There are only a small number of transactions recorded in the GL for years 1996 and 1997.

The income statement generated from ULC's accounting records (QuickBooks) indicates the following: (**Exhibit 7**)

| Summary of ULC Income Statement | | |
|---|---|---|
| | | |
| Consulting Income | $ | 79,341,336 |
| Other Regular Income | $ | 5,648,547 |
| Reimbursed Expenses | $ | 5,529 |
| Retention | $ | (50,503) |
| **Total Income** | **$** | **84,944,909** |
| | | |
| Total Outside Services | $ | 3,515,671 |
| Total Professional Fees | $ | 51,590 |
| Total Payroll Expense | $ | 32,486 |
| Other Expenses | $ | 763,189 |
| **Total Expenses** | **$** | **4,362,936** |
| | | |
| **Net Income** | **$** | **80,581,973** |
| | | |

Based upon a detailed analysis of banking, payroll, and other records, it is clear that the Net Income amount as recorded in the accounting records of ULC is not correct. A detailed analysis of the recorded revenue items appears correct, but the expense amount appears to be materially understated.

The balance sheet generated from ULC's accounting records (QuickBooks) indicates the following: (**Exhibit 8**)

| Summary of ULC Balance Sheet | | |
|---|---|---|
| | | |
| Checking / Savings Balance | $ | (4,644,905) |
| Accounts Receivable | $ | 55,655 |
| Employee Advances | $ | 700 |
| Undeposited Funds | $ | 85,190,475 |
| **Total Assets** | **$** | **80,601,925** |
| | | |
| Accounts Payable | $ | 19,952 |
| **Total Liabilities** | **$** | **19,952** |
| | | |
| **Total Equity** | **$** | **80,581,973** |
| | | |
| **Total Liabilities & Equity** | **$** | **80,601,925** |
| | | |

Based upon a detailed analysis of banking, payroll, and other records, it is clear that the reported equity is materially incorrect. Equity in a balance sheet generally consists of

retained earnings generated from net income.  This balance sheet reflects net income for the period ended August 31, 2012, of $4 million and Retained Earnings (cumulative prior years' net income) of $76.5 million.  These amounts cannot be correct due to the unrecorded expenses identified from the analysis of banking and payroll records.

### *The Compensation Received by the Principals of Urban Logic*

The work performed by Hemming included an analysis of the money received personally by each of the principals of ULC.  The source of this information includes payroll records for ULC, federal tax returns where available, and W-2's.

Hemming has analyzed the payroll records produced by Paychex in response to a search warrant executed by the DA's office.  The salary and bonus payments made to the ULC principals for years 2010 – 2012 are as follows: **(Exhibits 9, 10, 11)**

| | Year | | | Salary | | Bonus | | Total |
|---|---|---|---|---|---|---|---|---|
| Dillon | 2010 | Exhibit 3 | $ | 227,999.98 | $ | 999,000.00 | $ | 1,226,999.98 |
| Dillon | 2011 | Exhibit 4 | $ | 227,999.98 | $ | 1,013,500.00 | $ | 1,241,499.98 |
| Dillon | 2012 | Exhibit 5 | $ | 166,615.37 | $ | 837,550.00 | $ | 1,004,165.37 |
| | **Totals** | | **$** | **622,615.33** | **$** | **2,850,050.00** | **$** | **3,472,665.33** |
| | | | | | | | | |
| | Year | | | Salary | | Bonus | | Total |
| Egger | 2010 | Exhibit 3 | $ | 227,999.98 | $ | 999,000.00 | $ | 1,226,999.98 |
| Egger | 2011 | Exhibit 4 | $ | 227,999.98 | $ | 986,500.00 | $ | 1,214,499.98 |
| Egger | 2012 | Exhibit 5 | $ | 166,615.37 | $ | 806,200.00 | $ | 972,815.37 |
| | **Totals** | | **$** | **622,615.33** | **$** | **2,791,700.00** | **$** | **3,414,315.33** |
| | Year | | | Salary | | Bonus | | Total |
| Moorjani | 2010 | Exhibit 3 | $ | 227,999.98 | $ | 999,000.00 | $ | 1,226,999.98 |
| Moorjani | 2011 | Exhibit 4 | $ | 227,999.98 | $ | 983,450.00 | $ | 1,211,449.98 |
| Moorjani | 2012 | Exhibit 5 | $ | 166,615.37 | $ | 830,450.00 | $ | 997,065.37 |
| | **Totals** | | **$** | **622,615.33** | **$** | **2,812,900.00** | **$** | **3,435,515.33** |
| | | | | | | | | |
| | **Grand Totals for 2010** | | $ | 683,999.94 | $ | 2,997,000.00 | $ | 3,680,999.94 |
| | **Grand Totals for 2011** | | $ | 683,999.94 | $ | 2,983,450.00 | $ | 3,667,449.94 |
| | **Grand Totals for 2012** | | $ | 499,846.11 | $ | 2,474,200.00 | $ | 2,974,046.11 |
| | | | **$** | **1,867,845.99** | **$** | **8,454,650.00** | **$** | **10,322,495.99** |

The analysis of payroll records was limited to years 2010 – 2012 due to the availability of the records produced by Paychex.

An analysis of available tax returns reveals reported wages for additional years not included in the above table.  It should be noted that the personal tax returns for Egger were

not available.   In addition, tax returns for certain years were not available for Dillon and Moorjani.  The reported wages on the available tax returns are as follows:

| Reported Wages on Federal Return | | | |
|---|---|---|---|
| Year | Dillon | Moorjani | Totals |
| 2003 | | $ 565,631 | $ 565,631.00 |
| 2004 | | $ 623,769 | $ 623,769.00 |
| 2005 | | $ 792,115 | $ 792,115.00 |
| 2006 | $ 1,113,180 | $ 1,113,180 | $ 2,226,360.00 |
| 2007 | $ 1,513,180 | | $ 1,513,180.00 |
| 2008 | $ 1,385,500 | $ 1,385,500 | $ 2,771,000.00 |
| 2009 | | $ 1,172,300 | $ 1,172,300.00 |
| 2010 | | $ 1,205,000 | $ 1,205,000.00 |
| 2011 | $ 1,220,980 | $ 1,190,930 | $ 2,411,910.00 |
| 2012 | $ 1,004,170 | $ 982,070 | $ 1,986,240.00 |
| 2013 | $ 72,500 | | $ 72,500.00 |
| 2014 | $ 37,900 | | $ 37,900.00 |
| Totals | $ 6,347,410 | $ 9,030,495 | $ 15,377,905 |

From a detailed analysis of both the payroll records and tax returns, it appears that each year the principals received about the same level of compensation.  Therefore, the table below attempts to fill in the missing information by imputing the likely amount of wages received based upon the information for other principals.  The imputed amounts are highlighted in red.

| Reported Wages on Federal Return (Imputed amounts in RED) | | | | |
|---|---|---|---|---|
| Year | Dillon | Egger | Moorjani | Totals |
| 2003 | $ 565,631 | $ 565,631 | $ 565,631 | $ 1,696,893 |
| 2004 | $ 623,769 | $ 623,769 | $ 623,769 | $ 1,871,307 |
| 2005 | $ 792,115 | $ 792,115 | $ 792,115 | $ 2,376,345 |
| 2006 | $ 1,113,180 | $ 1,113,180 | $ 1,113,180 | $ 3,339,540 |
| 2007 | $ 1,513,180 | $ 1,513,180 | $ 1,513,180 | $ 4,539,540 |
| 2008 | $ 1,385,500 | $ 1,385,500 | $ 1,385,500 | $ 4,156,500 |
| 2009 | $ 1,172,300 | $ 1,172,300 | $ 1,172,300 | $ 3,516,900 |
| 2010 | $ 1,205,000 | $ 1,205,000 | $ 1,205,000 | $ 3,615,000 |
| 2011 | $ 1,220,980 | $ 1,200,000 | $ 1,190,930 | $ 3,611,910 |
| 2012 | $ 1,004,170 | $ 1,000,000 | $ 982,070 | $ 2,986,240 |
| 2013 | $ 72,500 | $ 72,500 | $ 72,500 | $ 217,500 |
| 2014 | $ 37,900 | $ 37,900 | $ 37,900 | $ 113,700 |
| Totals | $ 10,706,225 | $10,681,075 | $10,654,075 | $ 32,041,375 |

It should be noted that the earliest period in which wages from ULC is available is 2003.  Both the bond sales and ULC services to Beaumont commenced in 1993.  Therefore, information relating to the compensation paid to the ULC principals is missing for a 10-year period.

In addition to the wages received by the three principals, there were two significant transactions that netted the principals additional money.

In addition to owning ULC, the three principals also owned an entity called Urban Logic Services ("ULS") as previously mentioned.  This entity received funds from Beaumont for work performed on the Wastewater Treatment Plant.  On or about October 8, 2003, ULS was sold to an entity called Aquarion Operating Services for $1.8 million.  It is believed that these proceeds were shared equally by the three principals.

As previously noted, ULC was acquired by Kieran McKiernan in August of 2012 through an entity owned by him called Torcal, LLC.  The purchase price paid by Torcal / McKiernan was $5,600,000.  The purchase price was in the form of cash to be paid in equal amounts to the three principals, with the remainder to be in the form of a note.  **(Exhibit 12 – Select Pages Only)**

### *Material Inconsistencies Between the Billing Records and Payroll Records*

As noted above, ULC was paid from both bond funds and directly by the City.  During the time that ULC was owned by the original principals, these payments totaled a minimum of $75 million.[9]

To obtain these funds, ULC issued separate invoices on a monthly basis to both the bond trustee and to Beaumont.  In these invoices, ULC would list out various categories of professionals who provided services that month, along with the number of hours expended by each professional category.  Examples of the professional categories include:

- Principal
- Construction Manager
- Surveyor
- One Man Crew
- Two Man Crew
- Office Manager
- Executive Secretary

The agreement between ULC and the City states that ULC shall be paid on a time and materials basis, and the invoices submitted by ULC were required to identify the hours expended by various professionals during the period covered by the invoice.  An analysis was performed by Hemming to determine whether hours claimed on the monthly invoices reconciled or agreed with the hours on the payroll records that were produced. This analysis was performed for calendar years 2010 and 2011.  Because of the limitation on the available documents, particularly the payroll records, this analysis was limited to just these two years.  The results of these analyses for 2011 are included as **Exhibits 13, 13-1**, and the analysis 2010 are included as **Exhibits 14, and 14-1**.

---

[9] This $75 million figure is described as a minimum because, as previously stated, the earliest records available for analysis is the ULC general ledger which commences in January 1996.  The bond program and ULC contracts with the City commenced in late 1993.

The initial step to this analysis was to locate the invoices submitted by ULC to both the bond trustee and Beaumont, and group them together by the month during which the services were performed.[10] The Hemming schedules identify the invoices submitted to the bond trustee on the left side (Blue color across the columns) and the invoices to Beaumont on the right side of the schedule (Green color across the columns).  As can be seen, there were typically multiple invoices submitted by ULC during each month.  The invoices were then totaled for each month.  The schedule also summarizes the hours claimed to have been worked by "Principals" and also tracks total hours claimed (this includes the principal hours).

The schedule starts with the invoice totals.  However, there are a number of items included on each invoice that do not represent time spent by professionals such as mileage reimbursements, a 15% markup on third party invoices paid by ULC, and other expense type items.  Once these items are subtracted from the invoice amount, it results in the determination of the professional fees being claimed.  An analysis is then made on the reported number of hours expended for those professional fees.  According to the analysis for 2011 (Exhibit 13 & 13-1), the total invoice amounts, total professional fees, and total hours appearing on the invoices were as follows:

| Year 2011 | To Bond Trustee | To Beaumont | Total |
|---|---|---|---|
| Total Invoices | $4,212,212 | $4,506,491 | $8,718,703 |
| Total Professional Fees | $4,144,909 | $4,365,400 | $8,510,309 |
| Total Hours | 28,940 | 29,159 | 58,099 |

In order to ensure that the ULC invoices included in the spreadsheet were actually issued and paid, a comparison was performed utilizing the banking records of ULC.  This comparison determined that the amounts deposited into the account of ULC equals the amount of the invoices included in the analysis.

A comparison was then made to assess the representations made in the invoices that 58,099 hours were expended by ULC during 2011.  In order to perform this analysis, we reviewed the payroll records produced by Paychex.  The payroll records identify 21 people on the payroll during calendar year 2011 (Exhibit 10).  Of these 21 employees, 12 are hourly employees and 9 are salaried employees.  For the hourly employees, the total number of hours worked are identified in the Paychex records.  For the salaried employees, the total gross earnings and hourly rates are provided.  By dividing the gross earnings by the hourly rate, the implied number of hours worked by the salaried employees can be determined.

As shown on the analysis included as **Exhibit 15**, the payroll records indicate that the hourly employees worked a total of 13,274 hours.  The payroll records in this exhibit also reflect wages paid to six salaried or non-hourly employees.  This exhibit assumes that they worked a minimum of 1,040 hours.  This estimate of 1,040 hours was calculating dividing

---

[10]   The analysis performed for calendar year 2011 will be detailed in the report narrative.  The records for 2011 are more complete than those for 2010.  The analysis for 2010 will be included as an exhibit.

San Francisco | San Mateo | Los Angeles | Concord | Santa Rosa | Fresno | Chico

the total wages paid as set forth in Exhibit 10 by the hourly rates for each salaried employee as set forth in payroll records for 2010. **(Exhibit 15-1)** Through the process described above, the implied number of hours incurred by the salaried employees (non-principals) was 6,240 (1,040 hours x 6 employees).  Because the calculation of the implied hours worked by salaried employees calculated to be only 1,040 hours, for purposes of the analysis we doubled the implied hours to 12,480. The billing records indicate that the total hours expended by Principals was 5,698.

The results of the analysis of the purported hours worked for 2011 is as follows:

|  |  |
|---|---|
| Total Reported Hours per Paychex | 13,274 |
| Actual Hours Claimed by Principals per invoices | 5,698 |
| Implied Hours for Salaried Employees | 6,240 |
| Double Implied Hours for Reasonableness | 6,240 |
| **Total Hours** | **31,452** |
| **Total Hours Claimed on Invoices** | **58,099** |
| **Implied Overbilled Hours** | **26,647** |

By dividing the total professional fees of $8,510,309 by the total hours claimed of 58,099, it is determined that the average hourly rate is $146.48.  If this hourly rate is multiplied by the implied overbilled hours of 26,647, the result is an implied overbilling of $3,903,252.

A similar result is obtained when this analysis is performed for the billings and payroll records for year 2010.

It appears clear that the total hours claimed on the ULC invoices submitted to the bond trustee and to Beaumont exceed the hours that were worked by employees of ULC.  This suggests that invoices include either "phantom hours" (hours not actually worked by anyone) or hours incurred by non-employees of ULC.

### *Extraordinary Markup on Hours Worked by Non-ULC Employees*

Included in the documents produced by the DA's Office were time and billing records used by ULC to assist with the preparation of invoices to the bond trustee and Beaumont.  Also included in the documents produced were copies of invoices submitted to ULC by various third-party vendors.

A detailed analysis of the third-party invoices to ULC, the time and billing records, and the invoices by ULC to the bond trustee and Beaumont reveals that the hours worked by third party vendors were included in the time and billing records of ULC, and then included in the invoices issued by ULC.  The detailed analysis also reveals that the ULC principals applied extraordinary markups to these third-party invoices.  These markups on occasion exceeded 300%.

It should be noted that the agreements between Beaumont and ULC previously discussed in this report anticipated the submission and repayment of invoices paid by ULC and allows for a markup of 15%.

There were a number of vendors that submitted invoices to ULC each month during 2011 and prior years whose hours appear to have been included on the ULC invoices.  Below is a table that identifies some of these vendors and summarizes the markup applied and charged by ULC.

| Per Invoice to Urban Logic | | Per ULC Invoice to Beaumont | | Markup Calculation | |
|---|---|---|---|---|---|
| Vendor | Rate to ULC | Position / Name | Hrly Rate | Markup $ / Hr. | Markup % |
| Satori R.E. Solutions, Inc. | $ 40.00 | Lana Guseva | $ 170.00 | $ 130.00 | 325.00% |
| Dennis Janda, Inc. - 1 Man Survey Crew | $ 110.00 | One Man Survey Crew | $ 160.00 | $ 50.00 | 45.45% |
| Dennis Janda, Inc. - 2 Man Survey Crew | $ 145.00 | Two Man Survey Crew | $ 210.00 | $ 65.00 | 44.83% |
| Dennis Janda, Inc. - Assistant Surveyor | $ 65.00 | Surveyor | $ 150.00 | $ 85.00 | 130.77% |
| Dennis Janda, Inc. - Principal Surveyor | $ 85.00 | Surveyor | $ 150.00 | $ 65.00 | 76.47% |
| Eric Lewis | $ 75.00 | Eric Lewis | $ 170.00 | $ 95.00 | 126.67% |
| Rich Soltysiak | $ 75.00 | Rich Soltysiak | $ 170.00 | $ 95.00 | 126.67% |
| Hisam Baqal | $ 70.00 | Hisam Baqal | $ 170.00 | $ 100.00 | 142.86% |
| EARSI - Director | $ 105.00 | Project Mgr/Sr Engineer | $ 170.00 | $ 65.00 | 61.90% |
| Giroux & Assoc. - Senior Scientist | $ 120.00 | Project Mgr/Sr Engineer | $ 170.00 | $ 50.00 | 41.67% |
| Giroux & Assoc. - Associate Planner | $ 75.00 | Associate Engineer | $ 125.00 | $ 50.00 | 66.67% |
| Giroux & Assoc. - Technican | $ 40.00 | CADD Technician | $ 90.00 | $ 50.00 | 125.00% |

The profits achieved by ULC as a result of the extraordinary markups on the third-party invoices has resulted in millions of dollars in profits to ULC.  Without a very detailed analysis of the documents obtained via search warrant by the DA's Office, which were also produced to the Stradling law firm as counsel to Beaumont, it appears likely that neither Beaumont or its citizens would have any knowledge of, or transparency into these profits. Using just one vendor, Satori R.E. Solutions, Inc. / Lana Guseva for just calendar year 2011 as an example, the summary table below demonstrates the undisclosed and non-transparent profit achieved by ULC.

| Summary of Invoices by Satori R.E. Solutions, Inc. to ULC | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Per Invoice to Urban Logic | | | | Per ULC Invoice to Beaumont | | | Hemming Markup Calculation | | |
| Invoice Date | Hrs | Invoice Amt. | Rate to ULC | Hrs | Billed | Rate to Beaumont | Profit to ULC | Markup $ / Hr. | Markup % |
| 01/31/11 | 102.46 | $ 4,098.20 | $ 40.00 | 102.50 | $ 17,425.00 | $ 170.00 | $ 13,326.80 | $ 130.00 | 325.02% |
| 03/01/11 | 163.17 | $ 6,526.80 | $ 40.00 | 164.00 | $ 27,880.00 | $ 170.00 | $ 21,353.20 | $ 130.00 | 325.00% |
| 04/01/11 | 182.42 | $ 7,296.80 | $ 40.00 | 182.50 | $ 31,025.00 | $ 170.00 | $ 23,728.20 | $ 130.00 | 325.00% |
| 05/01/11 | 175.25 | $ 7,010.00 | $ 40.00 | 175.25 | $ 29,792.50 | $ 170.00 | $ 22,782.50 | $ 130.00 | 325.00% |
| 06/01/11 | 185.42 | $ 7,416.80 | $ 40.00 | 185.50 | $ 31,535.00 | $ 170.00 | $ 24,118.20 | $ 130.00 | 325.00% |
| 07/01/11 | 186.00 | $ 7,440.00 | $ 40.00 | 186.00 | $ 31,620.00 | $ 170.00 | $ 24,180.00 | $ 130.00 | 325.00% |
| 08/01/11 | 171.00 | $ 6,840.00 | $ 40.00 | 171.00 | $ 29,070.00 | $ 170.00 | $ 22,230.00 | $ 130.00 | 325.00% |
| 09/01/11 | 192.67 | $ 7,706.80 | $ 40.00 | 193.00 | $ 32,810.00 | $ 170.00 | $ 25,103.20 | $ 130.00 | 325.00% |
| 09/30/11 | 169.50 | $ 6,780.00 | $ 40.00 | 169.50 | $ 28,815.00 | $ 170.00 | $ 22,035.00 | $ 130.00 | 325.00% |
| 11/01/11 | 198.17 | $ 7,926.80 | $ 40.00 | 198.00 | $ 33,660.00 | $ 170.00 | $ 25,733.20 | $ 130.00 | 325.00% |
| 12/05/11 | 161.17 | $ 6,446.80 | $ 40.00 | 161.00 | $ 27,370.00 | $ 170.00 | $ 20,923.20 | $ 130.00 | 325.00% |
| 12/31/11 | 121.00 | $ 4,840.00 | $ 40.00 | 121.00 | $ 20,570.00 | $ 170.00 | $ 15,730.00 | $ 130.00 | 325.00% |
| | 2,008.23 | $ 80,329.00 | | 2,009.25 | $341,572.50 | | $261,243.50 | | |

Included with this report are several examples of the markup and resulting profits to ULC as summarized in the tables above.

**Example 1**

In June 2011, Satori R.E. Solutions, Inc. sent invoice number 5, dated June 1, 20111, to ULC for services rendered during the month of May 2011.  This invoice was for 185.42 hours of work at $40 per hour, for a total invoice amount of $7,416.80. Hemming noted the services related to the Sundance Project. **(Exhibit 16-1 Subcontractor Invoice)**

On its May 2011 time and billing worksheet **(Exhibit 16-2 Time and Billing)**, ULC listed under the Sundance Project 185.50 hours for Lana Guseva[11] for a total of $31,535, which equates to an hourly rate of $170, or $130 greater than what was charged to ULC.

We noted that the May 2011 time and billing worksheet showed professional fees totaling $307,215.75, which reconciled to the professional fees of ULC invoice number 2011-141, dated 6/1/2011, for $311,987.92. **(Exhibit 16-3 ULC Invoice)** We noted the difference of $4,772.17 is attributed to reimbursable expenses, mileage, and other miscellaneous charges on the ULC invoice.

**Example 2**

In March 2011, Giroux & Associates sent invoice number 10-049-URB05, dated March 24, 2011, to ULC for services rendered during the month of March 2011.  This invoice was for

---

[11] Lana Guseva was the CEO and Secretary of Satori Real Estate Solutions, Inc. according to the business search results from the California Secretary of State website. https://businesssearch.sos.ca.gov/.

10, 20, and 14 hours for the work of a Senior Scientist, Associate Planner, and Technician, respectively. We noted that the services were billed to ULC at rates of $120, $75, and $40 per hour, for total charges excluding travel of $3,260. Hemming noted the services related to the Beaumont Wastewater Treatment Plant Expansion. (**Exhibit 17-1 Subcontractor Invoice**)

On its March 2011 time and billing worksheet (**Exhibit 17-2 Time and Billing**), ULC listed under the Wastewater Treatment Plant Expansion Project 20 hours for an Associate Engineer, which agrees to the 20 hours for the Associate Planner noted above. We also noted that ULC listed 14 hours for a CADD Technician, which agrees to the 14 hours for a Technician noted above. Lastly, we noted that ULC listed 42 hours for a Project Manager / Sr. Engineer, which reconciles with the 10 hours for the Senior Scientist noted above after adding in 32 hours of the Director of Environmental Services charged to ULC in the same period by EARSI (**Exhibit 17-3 Subcontractor Invoice**). We noted that for these various services, ULC charged the City of Beaumont a total of $10,900. The total charges incurred by ULC for these services amounted to just $6,620, which indicates the services were marked up by $4,280, or an increase of 65% when examined in the aggregate.

We noted that the March 2011 time and billing worksheet had professional fees totaling $95,667.50, which reconciled to the professional fees of ULC invoice number 2011-125, dated 4/6/2011, for $95,667.50. (**Exhibit 17-4 ULC Invoice**)

**Example 3**

In July 2011, Eric Lewis sent invoice number 84, dated July 24, 2011, to ULC for services rendered during the months of June and July 2011.  This invoice was for 19 hours of professional traffic engineering services. We noted that the services were billed to ULC at a rate of $75 per hour, for total charges of $1,425. (**Exhibit 18-1 Subcontractor Invoice**)

On its July 2011 time and billing worksheet (**Exhibit 18-2 Time and Billing**), ULC listed under City Wide Traffic Surveys 19 hours for Eric Lewis, which agreed to the invoice noted in the previous paragraph. We noted that for these various services, ULC charged the City of Beaumont a total of $3,230 or $170 per hour. The total charges incurred by ULC for these services was just $1,425, which indicates the services were marked up by $1,805, or an increase of 126.67%.

We noted that the July 2011 time and billing worksheet had professional fees totaling $220,494, which reconciled to the professional fees of ULC invoice number 2011-158, dated 8/5/2011, for $223,090.47. (**Exhibit 18-3 ULC Invoice**) We noted the difference of $2,596.47 is attributed to reimbursable expenses and mileage.

**Example 4**

In October 2011, J. Andrew Schlange sent invoice number 11-09, dated October 31, 2011, to ULC for services rendered during October 2011.  This invoice was for 28.5 hours of consulting services related to the San Timoteo Project. We noted that the services were billed to ULC at a rate of $120 per hour, for total charges excluding mileage of $3,420. We

San Francisco I San Mateo I Los Angeles I Concord I Santa Rosa I Fresno I Chico

noted that 29.5 hours was written on the invoice, and that it is likely the $119.35 of mileage charges were billed as an hour of service by ULC. **(Exhibit 19-1 Subcontractor Invoice)**

On its October 2011 time and billing worksheet **(Exhibit 19-2 Time and Billing)**, ULC listed under San Timoteo Monitoring Wells Project 29.5 hours for a Project Manager / Sr. Engineer, which agreed to the hours written on invoice noted in the previous paragraph. We noted that for these various services, ULC charged the City of Beaumont a total of $5,015 or $170 per hour. The total charges incurred by ULC for these services was just $3,539.35, which indicates the services were marked up by $1,475.65, or an increase of 42%.

We noted that the time and billing worksheet had professional fees totaling $88,266, which reconciled to the professional fees of ULC invoice number 2011-185, dated 11/7/2011, for $88,463.25. **(Exhibit 19-3 ULC Invoice)** We noted the difference of $197.25 was due to reimbursable expenses.

**Example 5**

In December 2011, Dennis Janda, Inc. sent invoice number 8643, dated December 28, 2011, to ULC for services rendered during the months of November and December 2011.  This invoice was for 13 hours of a two-man survey crew, 5 hours of a one-man survey crew, and 412.50 hours of principal and assistant surveyors. We noted that for those services, the hourly rates charged to ULC were $145, $110, $85 (for principal surveyor), and $65 (for assistant surveyor) **(Exhibit 20-1 Subcontractor Invoice)**

On its December 2011 time and billing worksheet **(Exhibit 20-2 Time and Billing)**, ULC listed under various projects 13 hours for a two-man survey crew, 5 hours for a one- man survey crew, and 412.50 hours for principal and assistant surveyors, all of which agreed to the hours previously noted. We noted that according to the December 2011 time and billing worksheet, ULC charged the City of Beaumont a total of $65,405. The total charges incurred by ULC for these services was just $31,297.50, which indicates the services were marked up by $34,107.50, or an increase of 109% when examined in the aggregate.

We noted that the December 2011 time and billing worksheet had professional fees totaling $144,385, which reconciled to the professional fees of ULC invoice number 2012-101, dated January 9, 2012, for $148,335.25. **(Exhibit 20-3 ULC Invoice)** We noted the difference of $3,950.25 was due to reimbursable expenses.

***Amount Received by ULC Far Exceeds the Required 4.5% Cap***

As previously discussed in this report, the agreement between Beaumont and ULC put a cap on the amount of fees that ULC could receive for work performed on public works construction projects.

In connection with a civil suit brought by the Beaumont Citizens for Responsible Growth, several declarations were executed under penalty of perjury by Dillon in which he addresses the issue regarding the 4.5% cap.  In a declaration executed by Dillon on February 2, 2011, he states:

"According to its contracts with the City, Urban Logic bills the City for its services on an hourly "time and materials" basis.  Urban Logic has *never* received a cut, commission, or percentage of the overall cost of a development project.  Instead, the City budgets 4.5% of the estimated cost of capital improvements for payment to Urban Logic for construction management services." **(Exhibit 21)**

The analysis performed to date reveals that the amount of funds received from the bond proceeds and the City related to capital improvement projects appears to far exceed this 4.5% cap.  This can be demonstrated in a variety of ways.

As stated earlier in this report, the work performed by Urban Futures (and verified in significant part by Hemming) reveals that of the total bond expenditures of $267,004,166, ULC received payments totaling $47,020,440.  This equates to 18% of the total bond proceeds.[12]  If this analysis was performed on the bond fund expenditures that directly relate to construction costs the result would be similar.  The total construction related costs total $244,597,611, and from this amount ULC received $45,391,831.  This equates to 19% of the total construction related expenditures.  This analysis does not take into consideration the approximate $34.6 million that ULC received directly from Beaumont.

Among the ULC documents obtained via the search warrant were budget related documents called Construction Fund Vendor Control ("Vendor Control").  It appears that these documents were created on a monthly basis and maintained by ULC.  Our analysis has identified Vendor Control documents for 20 different bond issues.  Each of these Vendor Control documents identifies different categories of programs or uses of the bond proceeds, and also identifies the vendor responsible for carrying out the work.  **(Exhibit 22)**

One such example of a Vendor Control document is for bond 2004 Series B. **(Exhibit 23)** This particular example identifies four different projects under the category called Critical and Joint Facilities.  It also identified one project under the category called Individual Facilities.  Each of the projects has a budget amount, with the grand total budget being $4,637,323.[13]  Of this total amount, ULC was budgeted to perform work totaling $480,686.  The amount budgeted to ULC is therefore approximately 10% of the total budget amount.  The Vendor Control document also indicates that the entire amount of the $480,686 budgeted to ULC was paid out to ULC.

In the example above, ULC was budgeting for itself 10% of the construction expenditures for bond 2004 Series B.  The fact that ULC received 10% of this

---

[12]  It should be noted that of the $47,020,440 of bond proceeds received by ULC, $4,500,000 was paid out to ULC after the period in which ULC was sold to McKiernan.  Taking this into consideration, ULC would have received 16% of the bond proceeds during the time it was owned by the original principals.

[13]  The analysis performed by Urban Futures indicates that for bond 2004 Series B, the total construction-related expenditures were $5,017,770.

bond issue appears inconsistent with the agreement with the City and the declaration of Dillon in which he asserts that ULC was capped at 4.5%.

The analysis described above was performed on 20 different bond issues.  The results are summarized as follows:

| Summary of Construction Fund Vendor Control Documents | | | |
|---|---|---|---|
| Bond Issue | Project Budget | ULC Budget | Budgeted % to ULC |
| 1994A | $ 1,336,042 | $ 168,252 | 13% |
| 2000A | $ 17,167,621 | $ 2,569,037 | 15% |
| 2001A | $ 22,778,231 | $ 7,685,809 | 34% |
| 2002A | $ 8,667,559 | $ 1,911,749 | 22% |
| 2003A | $ 15,377,484 | $ 2,167,624 | 14% |
| 2003B | $ 8,580,215 | $ 583,273 | 7% |
| 2004A | $ 3,713,922 | $ 546,234 | 15% |
| 2004B | $ 4,637,323 | $ 480,686 | 10% |
| 2004C | $ 7,151,066 | $ 1,110,699 | 16% |
| 2004D | $ 19,012,683 | $ 1,101,102 | 6% |
| 2005A | $ 14,745,685 | $ 1,318,953 | 9% |
| 2005B | $ 9,931,147 | $ 1,252,508 | 13% |
| 2005C | $ 15,824,569 | $ 1,464,322 | 9% |
| 2006A | $ 11,983,501 | $ 1,114,059 | 9% |
| 2006B | $ 6,156,294 | $ 994,914 | 16% |
| 2007A | $ 4,505,884 | $ 4,500,384 | 100% |
| 2007E | $ 5,061,673 | $ 595,705 | 12% |
| 2008A | $ 2,879,684 | $ 1,211,614 | 42% |
| 2009A | $ 2,548,959 | $ 499,915 | 15% |
| 2009B | $ 1,890,857 | $ 439,250 | 15% |
| | $ 183,950,399 | $ 31,716,089 | 17% |

Another analysis performed to assess the reasonableness of the assertions made by Dillon that the amounts paid to ULC for capital improvement projects did not exceed 4.5% is to divide the amount of money ULC received by 4.5% to see whether the resulting number is consistent with the total amount spent by Beaumont on capital improvements.

During the period that ULC was owned by the original three principals, ULC received at least $75 million.  It is understood that some portion of this amount represents payments received for services other than capital improvement projects.  These other items include payments for service as City officials, management of the wastewater treatment plant, reimbursements of expenses, etc.  For conservative purposes, this analysis assumes that $25 million of the

funds were for other purposes leaving $50 million as payments received for capital improvement related services. If the assertions made by Dillion that ULC only received 4.5% of the capital improvement costs are correct, then $50 million of payments calculate to be total capital improvement costs of approximately $1.1 billion. The City did not spend anywhere near that amount of money on capital improvements.

One additional analysis performed to assess whether ULC received funds equal to or less that 4.5% of the total project costs is to estimate how much the City spent on capital improvement projects, then multiply that amount by 4.5% to determine how much money ULC should have received, and then compare that with the amount of money ULC actually received.

In his above referenced declaration executed on February 2, 2011 (Exhibit 21), Dillon stated that during the period 1993 – 2009, there were 64 major public works projects undertaken by the City. His declaration listed these projects. Hemming took this identified list and attempted to determine the total construction costs for each project. Hemming then searched the public database for Beaumont and identified a number of additional capital improvement project not included on the listing in the Dillon declaration. Included with this report is a schedule prepared by Hemming of the identified capital improvement projects and their estimated total costs.[14] **(Exhibit 24)**

This schedule identifies approximately 192 capital improvement projects with a total contract amount of $181,327,811. If it is assumed that this total contract amount is accurate, then 4.5% of this total calculates to be $8,159,752. This is obviously dramatically less than the approximate $75 million received by ULC.

## VII.    Summary of Financial Activities of GGMS, Inc. and Kapanicas

Additional analysis was performed on the funds received by Alan Kapanicas and his company GGMS. Kapanicas served as the City Manager. During the pendency as city Manager, he also owned or controlled GGMS.

The work performed by Urban Futures, which was significantly substantiated by Hemming, reveals that more than $1 million of bond proceeds were paid out to GGMS as detailed in the chart below.[15]

---

[14] The projects identified with the letter A were projects listed in the Dillon declaration. The projects identified with the letter B were determined from a search of the public database of the City.
[15] The source of this information is the PowerPoint presentation prepared by Urban Futures dated June 7, 2016. (Bates BMTSEC0081824 – 0081872)

|  | Total Expenditure | Total to GGMS | Percentage |
|---|---|---|---|
| Cost of Issuance | $ 5,134,984 | $   451,222 | 9% |
| Administration Expenses | $ 3,567,143 | $   512,042 | 14% |
| Other Expenses | $ 6,857,538 | $   129,000 | 2% |
| **Totals** | $15,559,665 | $ 1,029,264 |  |

In an effort to determine how much money was received by Kapanicas as City Manager and owner of GGMS, an analysis was made utilizing the available tax returns and related documents.

The earliest tax return available for Kapanicas was for year 2007.  The tax return for year 2008 was not located.  The table below summarizes the information on the tax returns.

| | Alan Kapanicas Federal Tax Return Summary | | | |
|---|---|---|---|---|
| | **Wages** | **Real Estate / Partnerships** | **Other Items** | **Totals** |
| 2007 | $    155,000 | $    187,536 | $    18,671 | $    361,207 |
| 2008 | | | | $    - |
| 2009 | $    172,000 | $    253,422 | $    19,646 | $    445,068 |
| 2010 | $    216,000 | $    (64,389) | $    7,705 | $    159,316 |
| 2011 | $    259,118 | $    29,035 | $    36,162 | $    324,315 |
| 2012 | $    250,420 | $    35,992 | $    29,705 | $    316,117 |
| 2013 | $    252,630 | $    16,632 | $    25,196 | $    294,458 |
| 2014 | $    237,007 | $    12,442 | $    39,489 | $    288,938 |
| Totals | $ 1,542,175 | $    470,670 | $    176,574 | $ 2,189,419 |

In addition to his personal tax return, Kapanicas also filed a return for GGMS, Inc. A review of these tax returns, for the years available, reveals gross receipts of nearly $2 million.  It also reveals that GGMS, Inc. was making rent payments to Kapanicas, and that Diana Kapanicas was also receiving a salary from GGMS, Inc.

| Analysis of GGMS, Inc. Federal Tax Returns and W-2's | | | | |
| --- | --- | --- | --- | --- |
| Year | Gross Receipts | Rent Pmts to Kapanicas | Wages to Alan Kapanicas | Wages to Diana Kapanicas |
| 2003 | | | $      102,000 | $      81,500 |
| 2004 | | | | |
| 2005 | | | | |
| 2006 | | | | |
| 2007 | $   556,644 | $   24,000 | $       98,000 | $      98,000 |
| 2008 | | | $      102,000 | $     102,000 |
| 2009 | $   631,948 | $   24,000 | $      108,000 | $     108,000 |
| 2010 | $   362,485 | $   24,000 | $      130,000 | $     130,000 |
| 2011 | $   337,709 | $   24,000 | $       28,000 | $     162,500 |
| 2012 | | $   12,000 | $       54,000 | |
| 2013 | | $   36,000 | $       51,450 | |
| 2014 | $     70,574 | $   24,000 | $       30,000 | |
| | $ 1,959,360 | $ 168,000 | $     703,450 | $     682,000 |

## VIII   Summary of Conclusions

Based upon the analysis performed to date, ULC (while owned by the original principals Dillon, Egger, and Moorjani) received at least $75 million dollars from the bond trustee and the City.  The amount received appears to be driven in significant part by the extraordinary markup on the third-party invoices which were included in the ULC invoices.  There was no transparency in the manner in which these additional hours worked by third parties were included in the invoice.  Without the ULC documents obtained via search warrant, followed by a laborious tracing of the hours and rates, this extraordinary markup up would never have come to light.  The markup percentages, which ranged between 42% to 325% appear to be completely inconsistent with the contract with the City which allowed only a 15% markup.  As previously stated, the 1993 original agreement between the City and ULC allowed for a 15% markup on third-party billings.  This same limitation of a 15% markup was also identified in the ULC Hourly Rate Schedule with an effective date of April 2, 2011. **(Exhibit 25)**

The analysis performed to date by Hemming strongly indicates that the amount of funds received by ULC far exceeds the required cap of 4.5%.

With respect to Kapanicas and his company GGMS, the analysis of the tax return reveals that he made millions of dollars through GGMS, while at the same time he served as the City Manager for Beaumont.

## IX.    Hourly Rate

The hourly billing rate established by HM for my services, which is the rate charged for services rendered in connection with this engagement is $660.


Dated: May 27, 2022                    By: _____

                                           Daniel W. Ray, CPA/CFF, CFE

**EXHIBIT 2**

**Summary of Payments to Urban Logic by Year**
**Sources: Years 1993-1996 - Urban Futures Work Product; 1998-2012 ULC General Ledger**

| A | B | C | D | E = C + D | F | G = F x 4.5% | H = G - E |
|---|---|---|---|---|---|---|---|
| Year | From Beaumont | Est. 25% Reduction | Bond Proceeds | Total | Est. Capital Exp. | 4.5% of Cap. Exp. | Implied Overpmt |
| 1993 | | | $ 24,900.00 | $ 24,900.00 | $ 1,086,542.00 | $ 48,894.39 | $ 23,994.39 |
| 1994 | | | $ 520,327.48 | $ 520,327.48 | $ 7,772,750.00 | $ 349,773.75 | $ (170,553.73) |
| 1995 | | | $ 375,506.20 | $ 375,506.20 | $ 4,455,857.00 | $ 200,513.57 | $ (174,992.64) |
| 1996 | | | $ 362,392.86 | $ 362,392.86 | $ 2,407.00 | $ 108.32 | $ (362,284.55) |
| 1997 | | | $ 266,135.72 | $ 266,135.72 | $ 20,050.00 | $ 902.25 | $ (265,233.47) |
| 1998 | $ 115,721.78 | $ 86,791.34 | $ 170,988.21 | $ 257,779.55 | | $ - | $ (257,779.55) |
| 1999 | $ 216,246.55 | $ 162,184.91 | $ 538,052.81 | $ 700,237.72 | | $ - | $ (700,237.72) |
| 2000 | $ 315,857.25 | $ 236,892.94 | $ 1,112,243.29 | $ 1,349,136.23 | | $ - | $ (1,349,136.23) |
| 2001 | $ 453,032.75 | $ 339,774.56 | $ 1,171,873.63 | $ 1,511,648.19 | $ 2,037,900.00 | $ 91,705.50 | $ (1,419,942.69) |
| 2002 | $ 743,261.58 | $ 557,446.19 | $ 1,464,684.33 | $ 2,022,130.52 | $ 6,602,191.00 | $ 297,098.60 | $ (1,725,031.92) |
| 2003 | $ 1,001,253.24 | $ 750,939.93 | $ 1,929,334.19 | $ 2,680,274.12 | $ 30,690,742.00 | $ 1,381,083.39 | $ (1,299,190.73) |
| 2004 | $ 1,752,217.55 | $ 1,314,163.16 | $ 2,235,986.87 | $ 3,550,150.03 | $ 5,932,767.00 | $ 266,974.52 | $ (3,283,175.52) |
| 2005 | $ 2,621,764.46 | $ 1,966,323.35 | $ 2,785,812.23 | $ 4,752,135.58 | $ 35,021,730.00 | $ 1,575,977.85 | $ (3,176,157.73) |
| 2006 | $ 4,035,333.75 | $ 3,026,500.31 | $ 3,312,485.18 | $ 6,338,985.49 | $ 17,684,274.00 | $ 795,792.33 | $ (5,543,193.16) |
| 2007 | $ 4,256,080.81 | $ 3,192,060.61 | $ 4,663,835.34 | $ 7,855,895.95 | $ 24,555,416.00 | $ 1,104,993.72 | $ (6,750,902.23) |
| 2008 | $ 4,679,565.41 | $ 3,509,674.06 | $ 4,207,733.01 | $ 7,717,407.07 | $ 15,535,070.00 | $ 699,078.15 | $ (7,018,328.92) |
| 2009 | $ 2,865,383.92 | $ 2,149,037.94 | $ 4,638,016.57 | $ 6,787,054.51 | $ 21,089,167.00 | $ 949,012.52 | $ (5,838,042.00) |
| 2010 | $ 2,759,599.80 | $ 2,069,699.85 | $ 5,081,310.88 | $ 7,151,010.73 | $ 2,532,543.00 | $ 113,964.44 | $ (7,037,046.30) |
| 2011 | $ 4,078,469.78 | $ 3,058,852.34 | $ 4,098,876.92 | $ 7,157,729.26 | $ 2,232,652.00 | $ 100,469.34 | $ (7,057,259.92) |
| 12-Aug | $ 4,766,268.18 | $ 3,574,701.14 | $ 1,317,685.00 | $ 4,892,386.14 | $ 557,319.00 | $ 25,079.36 | $ (4,867,306.78) |
| | $ 34,660,056.81 | $ 25,995,042.61 | $ 40,278,180.72 | $ 66,273,223.33 | $ 177,809,377.00 | $ 8,001,421.97 | $ (58,271,801.36) |

**Notes:**

**Column A** - The is the calendar year to determine the implied overpayment received.

**Column B** - This is a summary of payments received by Urban Logic Consulting ("ULC") from the City of Beaumont.

**Column C** - A significant portion, but not all of the money received by ULC from Beaumont was subject to a limit of 4.5% of the total construction costs. For purposes of this analysis, I am estimating that 25% of the funds received from Beaumont were for services which were not subject to this cap.

**Column D** - This summarizes the bond funds received by ULC. For years 1993 - 1997, the data comes from the work performed by Urban Futures. The remaining years, the data comes from the general ledger of ULC, which commenced in 1998.

**EXHIBIT 2**

**Column E** - This is the sum of the bond proceeds received plus the funds received from Beaumont which were reduced by 25%.

**Column F** - This is the estimated amount of capital expenditure spent by City of Beaumont each year.

**Column G** - This calculates the amount that ULC should have received if the 4.5% cap was followed.

**Column H** - This calculates the implied overpayment received by ULC.  The calculation is to subtract Column G by Column E.  A negative number implies ULC received an overpayment or excess funds.

**The analysis above shows ULC received 37% of the total Capital Expenditures ($66,273,223 / 177,809,377).  This percentage should have equaled 4.5%**