# EXHIBIT E



1390 Willow Pass Road
Suite 410
Concord, CA 94520

# Western Riverside Counsel of Governments City of Beaumont

## v.

# National Union Fire Insurance Company of Pittsburgh

Supplemental / Rebuttal Expert Report of

Daniel W. Ray CPA / CFF, CFE

Partner – Hemming Morse, LLP

June 30, 2022

www.hemming.com

San Francisco I San Mateo I Los Angeles I Concord I Santa Rosa I Fresno I Chico

## I.      Introduction

The purpose of this Supplemental / Rebuttal Expert Report ("Supplemental Report") and accompanying exhibits is to respond to the Expert Report of Richard E. Tasker dated May 31, 2022.  This Supplemental Report sets forth opinions that will (1) address various inaccurate statements made by Mr. Tasker; (2) comment on his overall approach to his analysis; (3) and provide additional exhibits and supporting documents to further support the analysis and opinions set forth in my original Expert Report dated May 27, 2022.  This supplemental report will include both modified versions of exhibits previously included in my original report along with new exhibits.[1]

As previously stated in my original report, I am not assuming or usurping the role of the trier of fact (judge or jury).  With that caveat in mind, based upon my skills, training, and experience as detailed below, along with a careful analysis of financial and banking records, I am expressing my opinions regarding what appears to be a fraud scheme.

As noted in my original report, I have more 40 years-experience in conducting financial investigations.  Many of the matters in which I have been engaged include concerns of fraud being conducted by one or more individuals or entities.  Some of these matters include construction related transactions.  During my eight years as a Special Agent with the FBI, I specialized in the investigation of complex white-collar crimes.  Since leaving the FBI in 1990 and became a CPA, my practice has solely been on forensic accounting matters.  In addition to being a CPA, I am also a Certified Fraud Examiner, and I am Certified in Financial Forensics.  I lecture frequently on the topic of fraud and financial investigations. See also my Curriculum Vitae **(Exhibit A-1)** which has now been updated to reflect a recent deposition testimony.

## II.      Additional Documents Reviewed and Considered

In addition to the documents previously identified in my original report, I have now reviewed and considered additional documents.  The additional documents reviewed and considered in connection with this Supplemental Report are summarized in **Exhibit B-1**.

## III.      Opinions Regarding the Report by Mr. Tasker

In his report, Mr. Tasker makes certain assumptions that appear incorrect, he performs certain analyses that appear to be flawed, he makes factual errors, and he misstates my analysis and opinions that I expressed in my report dated May 27, 2022.  These will be addressed in this Supplemental Report.

---

[1]  The modified exhibits will maintain their original exhibit number but will be identified as being modified. New exhibits will commence with exhibit number 26 since the last exhibit number on the original report was exhibit number 25.

***In my Opinion Mr. Tasker Minimizes the Felony Guilty Pleas of the ULC Owners and Mr. Kapanicas.***

While Mr. Tasker does acknowledge that the former owners of Urban Logic Consulting ("ULC") Mr. Moorjani, Mr. Egger, and Mr. Dillon, along with Mr. Kapanicas pled guilty to the criminal charges filed by the Riverside District Attorney's Office (DA's Office) on or about May 17, 2016, he appears to be minimizing the fact that the four individuals (along with others) each plead guilty to felony criminal counts.  Mr. Moorjani and Mr. Egger each pled guilty to one count of Conflict of Interest.  Mr. Dillon pled guilty to Conflict of Interest and Embezzlement of Public Funds.  Mr. Kapanicas pled guilty to Embezzlement of Public Funds and Misappropriation of Public Funds.  As will be further discussed, Mr. Kapanicas approved virtually all if not all of the invoices submitted by ULC.  When Mr. Kapanicas issued invoices on behalf of his company GGMS, they were approved by one of the ULC owners.  Thus, the defendants in the criminal matter cross-approved each other's invoices.

Mr. Tasker focuses on the fact that the ULC owners were required to repay the victim (City of Beaumont) combined restitution of $10 million, and that this sum results in a reduction to the "damage" amount suffered by the plaintiff.  He does not appear to consider these felony guilty pleas and restitution payments as acknowledgments or admissions of wrongdoing by the ULC Principals.

As previously noted, the criminal complaint filed by the DA's Office alleged that the named defendants carried out various schemes which cost taxpayers nearly $43 million due to their improper conduct.  The Felony Complaint included a "Special Allegation – Aggravated White Collar Crime Enhancement" relating to multiple felonies of fraud or embezzlement.

***In my Opinion Mr. Tasker Inappropriately Excludes Approximately $40 Million Received by ULC from Bond Proceeds***

While he asserts that he is not making a legal opinion about the contract between ULC and the City of Beaumont ("City"), Mr. Tasker throughout his report excludes approximately $40 million received by ULC from bond proceeds based on his premise that there was no agreement between ULC and the Beaumont Financing Authority ("BFA").  He asserts that because there is no agreement between ULC and BFA, then the restrictions of a 4.5% cap set forth in the agreements between ULC and the City would not apply to any of the approximate $40 million received by ULC from bond proceeds.  While I would agree with Mr. Tasker that there does not appear to be an agreement between ULC and the BFA, this observation does not exclude the $40 million of bond proceeds from the 4.5% cap.

What Mr. Tasker fails to mention is that all of the invoices issued by ULC were addressed to the City of Beaumont with whom ULC has a contract.  On some occasions these invoices were paid directly by the City, and on other occasions Mr. Kapanicas included the ULC invoice in a payment request to the bond trustee.  To my knowledge there are no invoices from ULC to the BFA.  Thus, it would appear that all of the ULC invoices were issued to the party (the City) with whom ULC had contractual obligations including a cap of 4.5% for certain scopes of work.

This can be demonstrated by a review of **Modified Exhibit 13** and **Modified Exhibit 14**. Modified Exhibit 13 summarizes invoices issued by ULC to the City for which payments were received during calendar year 2011. The summary chart shows payments made from bond proceeds totaling $4,212,212 and payments made by the City totaling $4,506,491. It is emphasized that all the invoices, irrespective of the source of payment, were issued by ULC to the City of Beaumont. Modified Exhibit 14 summarizes invoices issued by ULC to the City for which payments were received during calendar year 2010. The summary chart shows payments made from bond proceeds totaling $5,296,309 and payments made by the City totaling $2,503,882.[2] As with the schedule for 2011 all the invoices, irrespective of the source of payment, were issued by ULC to the City of Beaumont.[3]

The modifications made to these prior exhibits include additional language to make it clear that all invoices were issued by ULC to the City irrespective of the payment source. The schedules now include references to all the supporting documents. These new exhibits are as follows[4]:

| Exhibit # | Support for | Paid By | # of ULC Invoices | Invoice Totals | Year |
|---|---|---|---|---|---|
| 26 | Modified Ex. 13 | Bond Proceeds | 26 | $ 4,212,212.17 | 2011 |
| 27 | Modified Ex. 13 | City of Beaumont | 70 | $ 4,506,491.27 | 2011 |
| 28 | Modified Ex. 14 | Bond Proceeds | 33 | $ 5,296,308.88 | 2010 |
| 29 | Modified Ex. 14 | City of Beaumont | 16 | $ 2,503,882.04 | 2010 |
| | | | 145 | $16,518,894.36 | |
| | | | | | |

These four exhibits include 145 invoices issued by ULC to the City of Beaumont totaling $16,518,894. Some of the invoices were paid by the City and others were paid from bond proceeds. Some of the ULC invoices paid directly by the City had a cover letter addressed to Alan Kapanicas and signed by a ULC official. It appears that all of the ULC invoices issued to the City that were paid from bond proceeds had a cover letter addressed to the bond trustee signed by Alan Kapanicas. The language in these cover letters, irrespective of payment source (City vs. Bond proceeds) was identical. **(Exhibit 30)** The cover letters state:

---

[2] In Exhibit 14, the ULC invoices paid by the city for the period 01/01/10 – 06/30/10 could not be located. Therefore, the total payments received from the City in this schedule is lower than the actual amount received. The General Ledger for ULC reflects the Consulting Revenue received from the City of Beaumont of $489,080 during the period 02/01/10 – 06/01/10.

[3] Exhibits 13 & 14 focused on years 2010 and 2011 because we had payroll records for those periods. These exhibits include details regarding the number of hours claimed on these invoices issued to the City.

[4] Some of the ULC invoices paid from bond proceeds identify broad categories of work performed such as "Sewer Facilities" (Ex. 28 pdf pg. 34) and "Critical and Joint Facilities" (Ex. 28 pdf pg. 81) A documents titled "CFD Funding Summary" identifies the various facilities financed from bond proceeds. (See **Exhibit 41**.)

> *Please find enclosed the above referenced requisition related to the City of Beaumont Community Facilities District 93-1 Funds.  Attached to the requisition(s) are payment certificates, contractor certificates and invoices.*
>
> *Thank you very much for your assistance with this matter.*

The cover letter to both the City and the Bond Trustee both indicate that the invoices issued by ULC are "...related to the City of Beaumont Community Facilities District 93-1 Funds."

In my opinion it is inappropriate of Mr. Tasker to remove from consideration the approximately $40 million received by ULC that had as the source of payment bond proceeds.  His opinion that none of the work performed by ULC which was paid via bond proceeds was subject to the 4.5% cap set forth in the agreements between the City and ULC appears false.

### *In My Opinion Mr. Tasker Misstates My Analysis of the 4.5% Cap per the Contracts*

Mr. Tasker contradicts himself in his report regarding how I addressed the 4.5% cap limitation on the total billings by ULC.  On the one hand he is critical of my estimation that 25% of the ULC invoices paid directly the City were outside of the 4.5% cap limitation.

On page 1 of his report, Mr. Tasker states that he is "...not aware of any reasonable or customary practice to support Mr. Ray's assumption that 25% of ULC's fees were excluded from any contractual billing cap."  Then on page 14 he states that I assumed that 25% of the ULC invoices paid by the City were not subject to the 4.5% cap.

Following his criticism of my using an estimate of 25%, Mr. Tasker then asserts on page 15 of his report that my analysis assumed that any amount in excess of the 4.5% cap constituted an overcharge.  He states, "Mr. Ray assumes that all services charged by ULC were subject to the contractual caps, including services charged by the BFA."  This statement makes no sense for several reasons.  He has already acknowledged that I allocated 25% as being not subject to the 4.5% cap.  In addition, his phrase "...including services **charged by the BFA**" (emphasis added) makes no sense.  As previously stated, all ULC invoices were issued to the City of Beaumont.  On some occasions, the City forwarded the ULC invoices to the bond trustee to be paid via bond proceeds.

Mr. Tasker stated that my use of an estimate "was not reasonable" and that it violated "customary practice."  He states the analysis I performed, and my use of an estimate "...does not follow commonly accepted practices and does not comply with industry standards used to evaluate construction costs."[5]  The procedures I used in this matter are consistent with my 40 years of practice and are consistent with the standards I follow as a CPA providing forensic accounting services.[6]

---

[5]  It is noted that Mr. Tasker does not cite what "industry standard" I failed to follow.

[6]  My engagement agreement with WRCOG states that the work that I will perform is subject to the American Institute of Certified Public Accountants ("AICPA") Statement on Standards for Forensic Services SSFS No.1.

Mr. Tasker states that in his experience the appropriate practice would be to perform an invoice-by-invoice analysis to identify those invoices that are subject to the 4.5% cap. He states, "In my experience, this analysis requires an invoice-by-invoice analysis and **is not predicated upon assumptions.**" (Emphasis added. Tasker Report pg. 15). These statements by Mr. Tasker have a myriad of problems including:

1. The period covered by this analysis is from September 1993 through August 2012. This is a total of 19 years. The entire population of ULC invoices are not available for analysis.
2. Mr. Tasker states on page 20 that he reviewed ULC invoices from 2008 – 2012. This is a 5-year period, and there is no assurance that he reviewed every invoice issued during that period.
3. Mr. Tasker asserts in his footnote #113 that because the ULC invoices for the entire period are not available then the plaintiffs cannot assert that ULC overcharged the City.
4. Despite the fact that his touted invoice-by-invoice analysis "…is not predicated upon assumptions", this type of analysis clearly requires numerous assumptions to be made. For example, it assumes:

   a. That the services being billed on the invoice was actually performed.
   b. That the invoice accurately describes the services performed given that ULC would have the incentive to describe a scope of work not subject to the 4.5% cap.
   c. That the math on the invoice is accurate.
   d. That the invoice does not inappropriately include hours worked by non-employees or professional sub-consultants (a specific finding in my report that they do).
   e. That Mr. Tasker will have the requisite expertise to definitively determine whether a particular scope of work is or is not subject to the 4.5% cap., particularly when ULC invoices often simply state they are billing for professional services rendered for a particular project or location. **(see Exhibit 31 and Exhibit 32)**
      i. Exhibit 31 was submitted to the City and paid by the City.
      ii. There are a significant number of similar ULC invoices paid by the City in which the description of the services rendered simply states "Billing for Professional Services."
      iii. Exhibit 32 was submitted to the City and paid from bond funds.
      iv. There are a significant number of similar ULC invoices issued to the City but paid via bond proceeds in which the description of services rendered simply states "Billing for Professional Services."
      v. Invoices paid by the City and invoices paid from bond proceeds both often indicate that the work related to the City of Beaumont Community Facilities District 93-1 Funds.

    f.    It assumes no concern about the integrity of the invoices despite the fact that the owners of ULC and the approver of the ULC invoices (Mr. Kapanicas) all pled guilty to felony counts in the criminal action brought by the DA's Office.[7]

In my experience performing an invoice-by-invoice analysis given the great number of assumptions that would have to be made, and the fact that the invoices were prepared and approved by the defendants of the criminal case, would not be the appropriate method.

### *In My Opinion Mr. Tasker Incorrectly Concludes that less than 4% of all the ULC Invoices Paid are Subject to the 4.5% cap.*

As noted above, Mr. Tasker was critical of my use of a 25% estimate of ULC invoices paid by the City as being not subject to the 4.5% cap.[8] Despite this, he does not specifically state what he believes the correct percentage is if not 25%. Only through a careful reading of his findings that are set out towards the end of his report can one get an understanding that he believes that less than 4% of the ULC invoices during the period 2008 – 2012 were subject to the 4.5% cap.

Mr. Tasker focuses his analysis on two agreements between ULC and the City. One agreement is dated September 27, 1993, and the other is an amendment to that contract dated April 11, 1994. The initial 1993 agreement ("Agreement") identified two specific services to be rendered by ULC that were subject to a 4.5% cap of "...the confirmed construction cost of the public improvements to be constructed." The two scopes of work subject to this cap were identified as Plan Checking and Construction Inspection. There were other scopes of work to be performed by ULC for which was to be paid a flat monthly fee of $15,000. Included in this flat monthly fee was work described as "Planning Services", "Economic Development Services", and "Public Works and Engineering Services." (See prior Exhibit 5).[9]

This Agreement states that it is anticipated that ***"...from time-to-time"*** the City may have need for other services not specifically listed in the agreement.[10]  (Emphasis added) The agreement further states in paragraph XII, "The individuals directly responsible for the execution of the services as set forth herein shall be Ernest A. Egger, David W. Dillon and Deepak Moorjani, ***principals*** for Urban Logic.[11] (emphasis added)

The amendment dated April 11, 1994 ("Amendment"), expands the scope of work to be performed by ULC. This expanded scope of work is under the broad heading of "Construction Management Services." Within the category "Construction Management Services" the Amendment identifies 21 separate tasks. Once again, the compensation to ULC for this work was limited to "...4.5% of the bid price awarded by the City for each project." (see prior Exhibit 6)

---

[7]  A review of the Curriculum Vitae for Mr. Tasker does not indicate that he has any particular training in fraud detection or has any experience in matters that involve allegations of fraud.

[8]  As previously noted, he also asserted that I was of the opinion that all of the invoices were subject to the 4.5% cap.

[9]  This agreement also included an Exhibit A that limits the markup on "Professional Sub-Consultant Services" to 15%.  This will be discussed later in this report.

[10]  See page 7 of the Agreement (Exhibit 5)

[11]  As will be discussed in greater detail, it appears Mr. Tasker does not consider any of the work performed by the Principals of ULC as be limited by the 4.5% cap.

Despite the "…from time-to-time" catchall language in the 1993 Agreement, and the fact that there are now 23 separate tasks identified as being subject to the 4.5% cap, Mr. Tasker concludes "…most of the services provided by ULC are overwhelmingly "additional costs" under the terms of the Agreement and Amendment."[12]   The common understanding of the phrase "…from time-to-time" is that it is the exception and not the "overwhelming majority" as Mr. Tasker concludes.[13]

Neither the initial 1993 Agreement nor the 1994 Amendment indicate that this 4.5% cap does not apply when invoices issued by ULC to the City are forwarded by the City to the Bond Trustee for payment.  There is simply no carve-out exception.  As previously stated, all ULC invoices were issued to the City of Beaumont – the other party to the Agreement and Amendment that include the 4.5% cap language.

My analysis of hundreds of invoices issued by ULC to the City reveals that ULC included a variety of titles on their invoices with various hourly rates assigned to each.  While not every invoice includes all such professionals, there are certain professional titles that appear on most all invoices.  These include Principal, Sr. Assoc / Engineer, Construction Manager, Inspector, Etc.  Below is a table that compiles the professional titles found on ULC invoices.

| Summary of Titles on ULC Invoices | |
|---|---|
| **Title** | **Rate** |
| Principal | $   195.00 |
| Project Manager / Engineer | $   170.00 |
| Sr. Associate / Engineer | $   170.00 |
| Surveyor | $   150.00 |
| ***Const. Manager*** | ***$   150.00*** |
| Sr. Planner | $   150.00 |
| 1-Man Survey Crew | $   160.00 |
| 2-Man Survey Crew | $   210.00 |
| 3-Man Crew | $   260.00 |
| ***Inspector (Prev. Wage)*** | ***$   136.50*** |
| ***Inspector*** | ***$   100.00*** |
| Soils Tech (Prev. Wage) | $   136.50 |
| Sr. Designer II | $   130.00 |
| Staff Engineer | $   110.00 |
| ***Plan Checker*** | ***$   100.00*** |
| Office Manager | $    90.00 |
| CADD Tech | $    80.00 |
| Exec. Secretary | $    60.00 |

---

[12] Tasker report page 36.  See also Tasker report page 22 where he states, "…the vast majority of ULC's services were outside the caps."
[13] Dictionary.com defines "from time to time" as "Occasionally, once in a while."

According to Mr. Tasker, he has concluded that the only professionals whose billed hours are subject to the 4.5% cap are Const. Manager, Plan Checker, Inspector, and Inspector (Prev. Wage).  Therefore, of the 18 different titled professional that are included on hundreds of invoices to the City, Mr. Tasker believes that only four professional categories are limited to the 4.5% cap.  Most significantly he has concluded than **none** of the work performed by the Principals of ULC (Moorjani, Dillon, and Egger) was subject to or limited by the 4.5% cap.  This conclusion by Mr. Tasker is despite the fact, as noted above, paragraph XII of the Agreement states that the ULC principals were to be directly responsible for the work to be performed.

The 1993 Agreement included Plan Checking and Construction Inspection as being subject to the 4.5% cap.  The April 1994 Amendment listed 21 scopes of work under the category "Construction Management Services" as being subject to the 4.5% cap.  The preamble prior to the listing of the 21 scopes of worked covered by the 4.5% cap states:

> "In the performance of such duties, ULC shall provide construction management for each public works project before, during and after completion of various stages of construction including the following services related to the planning, control, scheduling, estimating and value engineering of public works projects:"

The listing of 21 scopes of work related to Construction Management Services included but are not limited to tasks such as:

1. Coordinate, receive, review, and evaluate bids
2. Award bids, make appropriate recommendations, and prepare contracts
3. Manage, coordinate, and inspect all work
4. Prepare progress reports
5. Evaluate quality and workmanship of construction
6. Provide change order management and coordination
7. Liaison with controlling agencies and design and construction engineers.

Mr. Tasker has concluded that none of the ULC Principals (nor any of the other 14 titled professionals) ever performed **any** of these services which would be subject to the 4.5% cap.  The modified Exhibits 13 & 14 reveal that from July 1, 2010 – December 31, 2011, the ULC Principals billed the City for 11,345 hours of work.  The opinion of Mr. Tasker is than none of those 11,345 hours by the Principals were for services that were limited by the 4.5% cap.

Due to Mr. Taskers extraordinary limitation of the 4.5% cap to only 4 of the 18 professionals on these invoices, he concludes that the "overwhelming majority" of the work performed by ULC was outside of the limitation of the 4.5% cap.

His analysis focused on the available invoices issued by ULC during the period 2008 – 2012.  An imbedded chart on page 38 of Mr. Tasker's report suggests during the 5-year period there were "City Invoices" totaling $1,522,397 and "BFA Invoices" totaling $4,166,628 for a total of $5,689,026.  There are numerous flaws with Mr. Taskers chart.  His identification of

San Francisco I San Mateo I Los Angeles I Concord I Santa Rosa I Fresno I Chico

"BFA Invoices" is not correct because there are no "BFA Invoices." ULC did not issue any invoices to the BFA. All invoices from ULC were issued to the City of Beaumont. Some of these invoices were paid directly by the City and some of the ULC invoices were included by the City (along with other professional invoices) in a requisition requesting that they be paid from bond proceeds. On page 29 of his report Mr. Tasker states, "…ULC never entered into an agreement with BFA and did not appear to agree to 4.5% caps on its services to BFA…" As repeatedly stated in this report all ULC invoices were issued to the City. Mr. Tasker makes no showing whatsoever to support his comment that ULC "did not appear to agree to 4.5% caps on is services to BFA."

Mr. Tasker also makes no showing that ULC was aware of which invoices they issued to the City would be paid directly by the City and which would be paid via bond proceeds.[14] As stated earlier, many of these ULC invoices looked identical whether paid by the City or from bond proceeds. (See Exhibit 31 – ULC Invoice paid by the City and Exhibit 32 – ULC invoice paid from bond funds)

In addition, the calculation of the total invoice amounts includes only hours claimed for four of the 18 titled professionals. This unilateral exclusion of 14 titled professionals, including 100% of the hours worked by the ULC Principals significantly reduced the total billings by ULC to the City for this 5-year period. An analysis of Modified Exhibits 13 & 14 reveals that just during the 18 months from July 1, 2010 to December 31, 2011, ULC issued invoices to the City of Beaumont totaling $16,518,893.

From his already materially reduced ULC billing amount of $5,689,026 for the five years 2008 – 2012, Mr. Tasker then concludes that any ULC invoice that was paid via bond proceeds should be excluded. He refers to these as being "BFA Invoices." He therefore concludes that during this 5-year period only $1,522,397 of ULC invoices were subject to the 4.5% cap. As will be demonstrated below, his conclusion that only $1,522,397 of the ULC invoices issued during the entire 2008 – 2012 period are subject to the 4.5% cap results in an extremely small percentage being subject to the cap.

Mr. Tasker then compares his $1,522,397 against the total payments received by ULC during 2008–2012.[15] He states that ULC received payments totaling $41,188,467. He further states that his analysis of the bank account records for ULC for the period May 2008 – 2012[16] reflects deposits from the City of $7,311,776 and bond payments of $31,792,089. Mr. Tasker states that my report showing bond payments of $19,343,622 (and not his $31,792,089) is in error. He is incorrect.

---

[14] Mr. Tasker makes no showing that ULC cared from what source of funds their invoices were paid. Like virtually all contractors, what is most important is that the invoices get paid.

[15] My analysis stops at the end of August 2012 due to the change of ownership of ULC. Mr. Tasker simply states that his analysis runs through 2012.

[16] Mr. Tasker said that he did not have ULC bank statements prior to May 2008, but that the deposit total from January 2008 – April 2008 was $2,084,602. Without having the ULC bank statements it is unclear how he determined this amount. It may be based on his review of the invoices issued to the City.

I verified my analysis of the funds received by ULC for the period May 1, 2008 – August 31, 2012.[17]  The total payments received from the City was $18,141,812 and the total payments received from bond proceeds was $18,548,472.  The total deposits into ULC's bank account for this time period was $40,456,145.  Therefore, the deposits from the City and bond proceeds account for 90.7% of the total funds received and are about equally split between City and bond proceeds.  To supplement the analysis to include the first four months of 2008, I utilized ULC's General Ledger ("GL") for transactions identified as Consulting Income.  This analysis shows total Consulting Income deposits from the City and bond proceeds as being $3,049,370.  The payments received from the City were $1,477,179 (48%) and the payments from bond proceeds were $1,572,191 (52%).  This analysis is supported by the following:

Schedule of Identified Deposits and Disbursement **(Exhibit 33)**
Summary of Monthly Bank Statements for ULC **(Exhibit 34)**
Copies of the ULC Bank Statements **(Exhibit 35)**
ULC GL Showing Consulting Income for 01/01/08 – 04/30/08 **(Exhibit 36)**

According to the referenced exhibits, the total payments received by ULC for the period 01/01/08 – 08/31/12 is as follows:

| Payments Received By ULC | | | | |
|---|---|---|---|---|
| **January 1, 2008 - August 31, 2012** | | | | |
| | | | | |
| **Per Hemming Cash Deposit Analysis** | | | | |
| | | | | |
| **Source** | **Period** | **From City** | **From Bonds** | **Total** |
| General Ledger | 01/01/08 - 04/30/08 | $   1,477,179 | $   1,572,191 | $   3,049,370 |
| Union Bank | 05/01/08 - 08/31/12 | $ 18,141,812 | $ 18,548,472 | $ 36,690,285 |
| | **Totals** | **$19,618,992** | **$ 20,120,663** | **$ 39,739,655** |
| | | | | |

The analysis by Hemming Morse, LLP ("Hemming") is fully supported by Exhibits 33-36 and reflects similar total deposits received by ULC as determined by Mr. Tasker during the period ($39.7M v. $41.1M).[18]  However, Mr. Tasker asserts that only $8.4 million was received from the City as opposed to the $19.6M as reflected in the bank records and GL for ULC.  He is incorrect.  To further verify the accuracy of the deposit sources, I had a staff person at Hemming verify my original analysis and I also reviewed the GL for ULC for the period 01/01/08 – 08/31/12 to determine the sources of the Consulting Income received per ULC.  The GL reflects deposits from the City of $19,19,148,287 (48.17% of total) and

---

[17]  My analysis of the ULC bank records commences May 1, 2008, because I do not have bank statement for earlier periods.
[18]  The analysis by Hemming stops at 08/31/12 due to the change of ownership.  Mr. Tasker's analysis appears to have continued through the end of 2012 which may account for his higher total deposits.

deposits from bond proceeds of $19,343,622 (48.66% of total) for a total of $39,755,588.[19] As can be seen, this total per the GL is very close to the deposit total of $39,739,655 as determined by the analysis of bank records.

The below summary tables demonstrate the conclusions reached by Mr. Tasker when you incorporate the opinions he advocates:

Using the **incorrect** deposit amounts set forth in Mr. Taskers report, his calculations are as follows:

| | Per Tasker (Using His INCORRECT Deposit Source Amounts) | | |
|---|---|---|---|
| | **City Payments** | **Bond Payments** | **Total** |
| Funds Received | $ 8,441,630.00 | $ 32,746,837.00 | $ 41,188,467.00 |
| Invoices Limited to the Cap | $ (1,522,397.00) | $ - | $ (1,522,397.00) |
| **Work Performed Outside of Cap** | **$ 6,919,233.00** | **$ 32,746,837.00** | **$ 39,666,070.00** |
| | | | |
| % Subject to the Cap (Note 1) | **18.03%** | 0.00% | **3.70%** |
| % Not Subject to the Cap | 81.97% | 100.00% | **96.30%** |
| | | | |
| Note 1.  Calculated as $1,522,397 / $8,441,630 = 18.03%.  $1,522,397 / $41,188,467 = 3.70%. | | | |

As shown above, using incorrect deposit source amounts, Mr. Tasker concludes that ULC performed nearly $7 million of services for approximately 82% of the time directly for the City which was not subject to the 4.5% cap.  For this work there does not appear to be any written agreements, pre-authorizations, or pre-approvals.  In addition, he advocates that only $1,522,397 out of the total payments received of $41,118,467 is limited by the 4.5% cap.  He therefore is concluding that ULC performed services totaling $39,666,070 for the City and the BFA that was not subject to the cap.[20]  For this nearly $40 million worth of work, I do not see any agreements, change orders, contracts, or any type of pre-approvals authorizing the work.  In total he concludes that during the period 2008 – 2012, only 3.7% of the ULC invoices *are* subject to the 4.5% cap and 96.3% are *not* subject to the cap.

Using the **correct** deposit amounts and opinions set forth in Mr. Taskers report, the calculations are as follows:

---

[19]  The deposit amounts determined from the bank statements vs. general ledger are off slightly due to the timing as to when transactions are recorded in the GL versus when they are posted to bank statements.
[20] All ULC invoices were issued to the City.  There are no ULC invoices issued to the BFA.

| | City Payments | Bond Payments | Total |
|---|---|---|---|
| **Per Tasker (Using The CORRECT Deposit Source Amounts)** | | | |
| Funds Received | $ 19,618,992.00 | $ 20,120,663.00 | $ 39,739,655.00 |
| Invoices Limited to the Cap | $ (1,522,397.00) | $ - | $ (1,522,397.00) |
| **Work Performed Outside of Cap** | **$18,096,595.00** | **$ 20,120,663.00** | **$ 38,217,258.00** |
| | | | |
| % Subject to the Cap (Note 2) | **7.76%** | 0.00% | **3.83%** |
| % Not Subject to the Cap | 92.24% | 100.00% | **96.17%** |
| | | | |

Note 2.  Calculated as $1,522,397 / $19,618,992 = 7.76%.  $1,522,397 / $39,739,655 = 3.83%.

As shown above using correct deposit source amounts, Mr. Tasker apparently concludes that ULC performed more than $18 million of services for approximately 92% of the time directly for the City that was not limited by the 4.5% cap.  For this approximate $18 million of work there does not appear to be any written agreements, pre-authorizations, or pre-approvals.  If you incorporate the payments received from bond proceeds, Mr. Tasker would opine that $38.2 million of work by ULC was not subject to the 4.5% cap.

Mr. Tasker is of the opinion that this $7 million (using incorrect deposit sources) or $18 million (using correct deposit sources) received directly from the City was all considered "Additional Services" as described in the Agreement at Section VII., the first sentence of which includes the "…from time-to-time" language.[21]  Also included in this paragraph the agreement states, "City *may authorize* CONSULTANT to perform such additional services on an as needed basis." (Emphasis added) (See Exhibit 5)  I have not seen such authorizations and Mr. Tasker has not identified any such authorizations.  The ULC invoices that were approved by Mr. Kapanicas and paid from City funds do not represent pre-authorizations or pre-approvals.

Throughout his report Mr. Tasker states, "…ULC never entered into an agreement with BFA and did not appear to agree to 4.5% caps on its services to BFA…"[22]  This consistent premise sets forth the basis for Mr. Tasker to exclude approximately $40 million received by ULC.  Following that premise, it would then mean that ULC performed nearly $33 million of work (using his incorrect deposit amounts) or $20 million of work (using the correct deposit amounts) for the BFA without any type of contract or agreement.  If Mr. Tasker wants to completely separate out the ULC invoices that were issued to the City but paid from bond proceeds from the 4.5% cap set forth in the Agreement and Amendment, then it would mean that $20 - $33 million of work was performed "for the BFA" without any type of written contract.  He cannot rely upon or point to Section VII of the Agreement which discusses "Additional Services" because he says BFA was not a party to the Agreement.

It should be noted that the amounts received by ULC in the above charts are simply for the 5-year period 2008 – 2012.  The Agreement with ULC commenced in 1993 and the analysis

---

[21] As previously noted, Mr. Tasker is of the opinion that not a single hour worked by the ULC Principals would be subject to the Cap.

[22] Tasker report page 29.

continues through August 2012 – a period of 19 years.  According to Exhibit 2 to my report, ULC received approximately $35 million from the City for the period 1998 – August 2012 and received approximately $40 million from bond proceeds during the period 1993 – August 2012.[23]  Thus the combined grand total received by ULC was approximately $75 million.

The table below incorporates the same percentages advocated by Mr. Tasker for his analysis of years 2008 – 2012.  This now includes all funds received.

| Per Tasker's Methodology For ALL Payments Received (per Ex. 2) | | | |
|---|---|---|---|
| | **City Payments** | **Bond Payments** | **Total** |
| Funds Received (Hemming Ex. 2) | $ 34,660,057.00 | $  40,278,181.00 | $  74,938,238.00 |
| Invoices Limited to the Cap (Note 3) | **7.76%** | 0.00% | **3.59%** |
| Imputed Invoices Limited to Cap | $   2,689,620.42 | $               - | $   2,689,620.42 |
| **Work Performed Outside of Cap** | **$31,970,436.58** | **$ 40,278,181.00** | **$ 72,248,617.58** |
| | | | |
| Note 3. Calculated as $34,660,057 x 7.76% = $2,689,620.  $2,689,620 / $74,938,238 = 3.59% | | | |

Using the same percentages that Mr. Tasker advocates (using the correct deposit details) and applying that methodology to the entire $75 million received by ULC, it indicates that Mr. Tasker is of the opinion that ULC was paid $72.2 million which was not subject to the 4.5% cap.  For this $72.2 million of work performed by ULC, there does not appear to be any specific authorizations by the City in advance of the ULC invoice being issued, and most significantly "…ULC never entered into an agreement with BFA…" (quoting Mr. Tasker).  Therefore, according to Mr. Tasker, ULC performed $40 million of work "for the BFA" without any written agreement.

### In My Opinion Mr. Tasker Makes Incorrect and Broad Sweeping Conclusions Regarding Insufficient Documents

This matter involves transactions between the City of Beaumont and ULC that date back to 1993 and continued through August 2012, at which time ULC was sold by its former owners.  During this 19-year period, I would estimate than more than a thousand invoices were issued by ULC to the City of Beaumont.[24]  On numerous occasions in his report, Mr. Tasker takes the position that unless **all** documents were available for his review than it is not possible to reach a conclusion that ULC overbilled the City.  He makes this statement with respect to invoices, payroll records, banking records, tax return, etc.  Below are some examples of such conclusions by Mr. Tasker:

1.  "In my opinion, Beaumont cannot reasonably or reliably compute overcharging due to incomplete records."[25]

---

[23] We do not have any records reflecting how much ULC received directly from the City from 1993 – 1997.
[24] No ULC invoices were issued to the BFA.
[25] Tasker report page 19

2. "In my opinion, it is not possible to determine whether ULC overcharged the City from 1993 to 2007 because the City has not produced more than 64% of ULC invoices."[26]
3. The inability to trace the payments to specific invoices and tasks prevents the City from proving overcharging."[27]
4. "...in my opinion, it is impossible to reach a conclusion on whether there was overcharging for years 1993 to 2007 because the City did not maintain and produce ULC's invoices during that period."[28]

In my approximate 40-years of performing forensic accounting services and criminal fraud investigations as an FBI Special Agent in matters similar to this, it is extremely rare that I receive 100% of the relevant transaction documents.  In this matter I have received and have incorporated into my analysis:

1. Hundreds of invoices issued by ULC to the City
2. Banking records for ULC for the period commencing May 2008
3. The general ledger for ULC showing "consulting income" beginning 1998
4. Bond payment details
5. Several years of payroll records
6. Tax returns and W-2's
7. Invoices from Professional Sub-Consultants
8. Agreement and Amendment with the City of Beaumont
9. Documents related to capital improvement projects
10. Numerous other documents

In my training and experience, these documents are sufficient for me to perform my analysis and render the opinions that I have.  The work of forensic accounting experts often includes the use of estimates and imputed amounts where complete documentation is not available.

It is noted that a similar portfolio of documents was sufficient for the DA's office to file criminal charges against the ULC owners and Mr. Kapanicas.  In addition, the CPA firm of HSNO also worked with similar documents and concluded that ULC overbilled.

***In My Opinion Mr. Tasker Incorrectly Criticizes My 25% Reduction Estimate on Invoices Paid by the City***

As previously stated, Mr. Tasker appears to contradict himself in his criticism of my estimation that 25% of the ULC invoices paid directly by the City were outside of the 4.5% cap limitation.  On the one had he says I am simply guessing without any basis.  On the other had he says incorrectly that I assumed all invoices were subject to the 4.5% cap.

---

[26] Tasker report page 20, footnote 113
[27] Tasker report page 37
[28] Tasker report page 39

In my report I estimated that 25% of the ULC invoices paid directly by the City were **not** subject to the 4.5% cap, and that all of the ULC invoices paid from bond proceeds were subject to the 4.5% cap. The rational for this estimate is that clearly ULC was obligated to perform certain services for the City to be paid directly by the City via a monthly lump sum of $15,000, and "...from time-to-time..." provide other services for the City to be paid by the City.  Based upon a careful reading of Mr. Taskers report, he appears to conclude that 96.3% of the ULC invoices paid by the City were **not** subject to the 4.5% cap. and that none of the ULC invoices issued to the City paid from bond proceeds were subject to the 4.5% cap.  This conclusion by Mr. Tasker essentially makes the 4.5% cap completely meaningless if on a combined basis (paid by City and bond proceeds) about 97% of the invoices are not subject to the cap.  He therefore concludes that if you take into consideration the $10 million of restitution paid by the ULC principals, the City has incurred no damage.

The Defendant in this litigation previously retained the accounting firm of Hagen, Streiff, Newton & Oshiro ("HSNO") to perform an analysis of possible overbillings by ULC. According to Mr. Tasker, HSNO incorrectly concluded that the maximum combined overbilling by ULC was $8.2 million.  Mr. Tasker stated that he agrees with "...HSNO's analysis of ULC billings on an invoice by invoice bases..."[29] While he states that he agrees with the approach of HSNO, he states that, "...documents later developed allowed me to refine HSNO's analysis and reduce the maximum claimable loss."[30]  He is therefore rejecting the conclusion of the prior CPA firm retained by the Defendant based upon his "refined" and "later developed" analysis.

In order to add some perspective to the conclusion reached by Mr. Tasker that no damage was incurred by the City, I have made modifications to a previous exhibit that reflected the estimated 25% exclusion from the cap. (See **Modified Exhibit 2)** Rather than limiting my initial assumption on Exhibit 2 to simply 25% of the payments from the City being excluded from the 4.5% cap, the Modified Exhibit 2 now shows four separate scenarios.  All of these scenarios show that there were overpayments to ULC.  These calculated overpayments occurred even after the repayment of $10 million to the City pursuant to the felony guilty pleas was applied.  These various scenarios are summarized as follows:

| Scenario | Reduction Assumption | Applied To Payments From | Pmts From City 1998-2012 | Pmts from Bonds 1993-2012 | Total From City and Bonds | 4.5% of Est. Cap Exp. | Overage | Restitution Paid | Net Overage |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 25% | City Only | $25,995,043 | $ 40,278,181 | $ 66,273,224 | $ 8,001,422 | $ 58,271,802 | $ 10,000,000 | $ 48,271,802 |
| 2 | 50% | City Only | $17,330,028 | $ 40,278,181 | $ 57,608,209 | $ 8,001,422 | $ 49,606,787 | $ 10,000,000 | $ 39,606,787 |
| 3 | 75% | City Only | $ 8,665,014 | $ 40,278,181 | $ 48,943,195 | $ 8,001,422 | $ 40,941,773 | $ 10,000,000 | $ 30,941,773 |
| 4 | 90% | City Only | $ 3,446,006 | $ 40,278,181 | $ 43,724,187 | $ 8,001,422 | $ 35,722,765 | $ 10,000,000 | $ 25,722,765 |

---

[29]  See prior discussion in this Supplemental Report regarding the incompleteness of the available ULC invoices and the extraordinary amounts of assumptions that have to be made and relied upon in order to reach conclusions based on the wording on the invoices.
[30]  Tasker report page 18.

San Francisco I San Mateo I Los Angeles I Concord I Santa Rosa I Fresno I Chico

Important notes to the above table include the following:

1.  We do not have any details regarding the amounts of payments made to ULC by the City of Beaumont prior to 1998.  If these payments amounts were known and included, it would further increase the calculated amount of overage. The initial agreement between ULC and the City commenced in 1993.  Therefore, this analysis excludes nearly 5 years of payments to ULC.

2.  The total amount of payments received by ULC directly from the City from 01/01/98 - 08/31/12 was $34,660,057.  The total amount received by ULC from City funds and Bond funds combined is approximately $75 million.

3.  Scenarios 1-4 assumes that a portion of the ULC invoices paid directly by the City are not subject to the 4.5% cap, but all of the payments received from bond proceeds are subject to the 4.5% cap.

It is important to note that the 4.5% is a Cap and not a floor.  My estimates in the table above which summarize the Modified Exhibit 3 are therefore conservative because it essentially assumes that ULC did work up to the cap on all occasions.  If some work was accomplished below the cap, then it indicates that the other work exceeded the cap to a greater extent.

### *In My Opinion Mr. Tasker is Not Correct that the 1994 Amendment Created a Separate 4.5% Cap for Construction Management Services Thus Raising the Cap to 9%*

On page 31 of his report Mr. Tasker states, "Applying that testimony, the total aggregate cap on plan check, inspection, and construction management services is 9%."[31]

On page 34 of his report Mr. Tasker states that the Amendment to include Construction Management Services created a "...second cap of 4.5%..."  He then adds the purported two cap's together to create a 9% cap.

While contract interpretation maybe a question for lawyers to debate, it is noted that the 1993 Agreement was amended approximately 6 months later.  The April 1994 document is an Amendment and not a new contract or agreement.[32]  The Agreement identifies the scope of work covered by the 4.5% cap in "Section V. Plan Checking and Construction Inspection." The 1994 Amendment states, "Section V is hereby amended to include the following subsection."  It then adds "Section V.1 Public Works Construction Management Services."  It appears that the Amendment simply expanded the universe of the original scope of work.

I believe the plain reading of this document is that is adds an additional scope of work to the original scope of work, which in total is capped at 4.5% of construction costs or the "bid price awarded" per the Amendment.

---

[31]  Tasker is referring to the deposition testimony of Berg.
[32]  Therefore, the Agreement with a narrower scope of work lasted approximately 6 months before the scope of work was expanded by virtue of the Amendment.  The expanded scope of work was in effect for approximately 18 ½ years.

San Francisco I San Mateo I Los Angeles I Concord I Santa Rosa I Fresno I Chico

***In My Opinion Mr. Tasker Provides No Detailed Analysis to Refute the Opinion in my Expert Report Dated May 27, 2022, that ULC Invoices Included Hours Worked by Professional Sub-Consultants Resulting in Excess Profits to ULC***

One of the opinions detailed in my Expert Report dated May 27, 2022, was that ULC appears to have perpetrated a scheme by which they include on invoices issued to the City (paid by both the City and bond proceeds) hours worked by Professional Sub-Consultants. There was no disclosure in the invoices that they included hours worked by consultants and that the rates being charged on the ULC invoices to the City far exceeded the 15% markup allowed in the Attachment A to the Agreements between ULC and the City.  The Attachment A states, "Direct Services and Reimbursement Costs: Professional Sub-Consultant Services – Actual cost plus 15%." (See Exhibits 4, 5, & 25)

My Expert Report dated May 27, 2022, sets forth my detailed analysis of this apparent scheme beginning on page 12 and continuing through page 21.  To support my analysis included a number of exhibits including Exhibits 9 – 24.

In his rebuttal, Mr. Tasker states on page 17, "Contract labor is not included in the Paychex "Compensation Report" but was included in the ULC invoices.  I concur with Mr. Ray's conclusion that hours worked by others were included in the time and material billings to Beaumont and BFA."[33]  In my opinion this is a significant acknowledgement by Mr. Tasker in his stating he agrees that contract labor hours, which I and the Exhibit A to the Agreement refer to as Professional Sub-Consultants, are included in the ULC invoices.

Mr. Tasker further states on page 16 of his report, "I believe that the Paychex reporting of its actions and financial payments are likely accurate, but could be incomplete in that they do not include additional payrolls.  Further, ***ULC could have paid contractors in cash, such that their earnings would not be reported on Paychex***." (Emphasis added).  There are a number of problems with this statement by Mr. Tasker.  These include:

1. He appears to be suggesting what could be viewed as tax fraud by his speculation that ULC may have paid contractors in cash so that their earnings would not be reported.
2. Whether ULC paid contractors by cash or in a manner that they appear on the records of Paychex does not alleviate my opinion that Professional Sub-Consultants hours are hidden (or not disclosed) on the ULC invoices and the rates were in excess of the 15% markup limitation.
3. The Professional Sub-Consultants have their own firms and would have their own payrolls.  They would not be on the payrolls of ULC.
4. He assumes that the Paychex records are accurate but incomplete.

While stating that the Paychex records are accurate, he states, "Mr. Ray relies upon inaccurate financing, accounting and payroll records in his conclusion that there was fraud by the ULC Principals."[34] I am not aware of what "financing" or "accounting" records he

---

[33] Once again, there are no "billings to BFA."  All invoices were issued to the City.
[34] Tasker report page 16.

San Francisco I San Mateo I Los Angeles I Concord I Santa Rosa I Fresno I Chico

asserts I relied upon.  I did make a very detailed analysis of ULC invoices issued to the City for the period July 1, 2010 - December 31, 2011, to identify the hours claimed on 145 invoices. (See Modified Exhibits 13 & 14 and Exhibits 26 – 29).  I then compared the hours appearing on those invoices with the Paychex records for the same period. (See Exhibits 9, 10, 13-1, 14-1, 15, and 15-1)  I then compared them with invoices issued by the Professional Sub-Consultants to ULC (See Exhibits 16-1, 17-1, 17-3, 18-1, 19-1, and 20-1).  And I then identified those Professional Sub-Consultants hours of the various Time and Billing records used by ULC to create invoices issued to the City (See Exhibits 16-2, 17-2, 18-2, 19-2, and 20-2)

While stating that my opinion is based on incomplete data, Mr. Tasker performs no specific rebuttal analysis on the comprehensive data I utilized to reach my opinion.  In fact, he concurs that consultant hours are included on the ULC invoices.

Mr. Tasker concludes his comments on this particular issue by stating, "I have not identified any additional records to supplement these analyses and do not believe Mr. Ray's assumptions and methodology used to calculate damages in this way are reliable and customary in practice."  Mr. Tasker does not state what he believes the customary practice would be to find undisclosed hidden hours for work performed by Professional Sub-Consultants in invoices.

It is noted that on some ULC invoices they do follow the methodology and markup limitation called for in the Exhibit A to the Agreement.  Examples of this are included as **Exhibits 38-1 through 38-4**.  These exhibits suggest that ULC was fully aware of the limitation of the 15% markup and understood the need to be transparent in their billings by including a copy of the Professional Sub-Consultant invoices.

### *In My Opinion, Mr. Tasker Inappropriately Relies Upon CIP Approvals by Council Members to Conclude that ULC Could Not Have Overbilled*

In his report Mr. Tasker spends a significant amount of time demonstrating that the Capital Improvement Plans ("CIP") were approved by Council members and that the CIP's reflected services to be performed by ULC that "…in some instances, exceeded the fee caps set forth in the agreement."[35] While CIPs are an important forwarding looking budgeting document, they are simply budgets and plans.  They are not approvals of actual invoices.

While the City Council Members may have approved annual forward looking CIPs for multiple years on which some line items included amounts budgeted to ULC that exceeded 4.5%, Mr. Kapanicas approved virtually all if not all of the actual invoices submitted by ULC.  Some of the ULC Payment Summary documents that have been located make it clear that the budgets were approved by the CIP, and that other charges were approved by the contract and/or the City Manager's (Mr. Kapanicas) approval.  **Examples include Exhibits 39-1 through 39-3.**

Conversely, when Mr. Kapanicas issued invoices on behalf of his company GGMS which were paid from bond proceeds, they were approved by one of the ULC owners.  Examples

---

[35]  Tasker Report page 11

include **Exhibits 40-1 through 40-4**. Thus, the ULC principals and Mr. Kapanicas, who all plead guilty to the criminal case brought by the DA's Office, would cross-approve each other's invoices.

## IV.    Conclusions

My Expert Report dated May 27, 2022 identified three primary opinions as follows:

1.  The owners of ULC appear to have undertaken a scheme to materially inflate the profits achieved as a result of adding additional and improper markup to the services rendered by Professional Sub-Consultant's beyond the 15% markup limitation set forth in the various contracts with the City of Beaumont.

2.  The amount of total compensation received by ULC far exceeds the 4.5% limitation on confirmed construction costs of the public improvements as set forth in the various agreements with the City of Beaumont.

3.  The accounting records for ULC as set forth in their general ledger are not accurate.

My Expert Report went into great detail as to the documents considered, analysis performed, and assumptions made to formulate the opinions expressed. The report also identified the skills, training, and experience I relied upon to perform the analysis and reach the opinions expresses. The analysis was further supported by 25 exhibits.

Following the detailed analysis of the Expert Report of Mr. Tasker dated May 31, 2022, I stand by and make no modifications to the opinions I previously expressed. The modifications I have made to the original exhibits in my Expert Report dated May 27, 2022, and the newly created exhibits referenced in this Supplemental Report further supports the prior opinions expressed.

This report does, however, express a variety of new opinions which address the flaws and inaccuracies in the report of Mr. Tasker. These new opinions which focus on my analysis of the work performed by Mr. Tasker include the following:

| Page # | Rebuttal Opinions |
|--------|-------------------|
| 3 | Mr. Tasker Minimizes the Felony Guilty Pleas of the ULC Owners and Mr. Kapanicas. |
| 3 | Mr. Tasker Inappropriately Excludes Approximately $40 Million Received by ULC from Bond Proceeds. |
| 5 | Mr. Tasker Misstates My Analysis of the 4.5% Cap per the Contracts. |
| 7 | Mr. Tasker Incorrectly Concludes that less than 4% of all the ULC Invoices Paid are Subject to the 4.5% cap. |
| 14 | Mr. Tasker Makes Incorrect and Broad Sweeping Conclusions Regarding Insufficient Documents. |

| 15 | Mr. Tasker Incorrectly Criticizes My 25% Reduction Estimate on Invoices Paid by the City. |
| 17 | Mr. Tasker is Not Correct that the 1994 Amendment Created a Separate 4.5% Cap for Construction Management Services Thus Raising the Cap to 9%. |
| 18 | Mr. Tasker Provides No Detailed Analysis to Refute the Opinion in my Expert Report Dated May 27, 2022, that ULC Invoices Included Hours Worked by Professional Sub-Consultants Resulting in Excess Profits to ULC. |
| 19 | Mr. Tasker Inappropriately Relies Upon CIP Approvals by Council Members to Conclude that ULC Could Not Have Overbilled |

## V.     Hourly Rate

The hourly billing rate for this Supplemental Report is the same as the rate identified in my Expert Report dated May 27, 2022.  The hourly rate established by Hemming for my services is $660.

Dated: June 30, 2022               By: _____

                                          Daniel W. Ray, CPA/CFF, CFE

San Francisco I San Mateo I Los Angeles I Concord I Santa Rosa I Fresno I Chico