# EXHIBIT 1

**EXHIBIT 7**



May 15, 2019

**VIA EMAIL**
Ms. Jennifer Rocha
Complex Claims Director
AIG Property Casualty
175 Water Street
New York, NY 10038
Jennifer.Rocha@aig.com

Re:   Insured - City of Beaumont, California
      Employee Theft Claim
      Date of Discovery – May 17, 2016
      AIG Claim Number – 3409580528US
      HSNO File Number – 10022193
      **Supplemental Report**

Dear Ms. Rocha:

This correspondence will serve to provide you with the status of our evaluation to date regarding the claims made by the City of Beaumont, California, for employee dishonesty, other fraud, and corruption. Previously, it was our understanding that the insured claimed losses totaling $159,702,461 based on a sworn proof of loss prepared and submitted by the insured's representative, Stradling, Yocca, Carlson, & Rauth, P.C. ("Stradling"). Subsequent to our August 18, 2017 status report, we received a report prepared by the insured's forensic accountants, Hemming Morse, LLP ("Hemming Morse/HM") along with additional documentation submitted by the insured's representative, Best, Best & Krieger LLP ("BBK").

Based on our analysis of the noted Hemming Morse report, it appears that the insured has abandoned many aspects of the original claim of $159,702,461, including the $57,803,795 related to the TUMF judgment, $96,508 in Additional Aylward Self-Dealing, $7,471,429 in the Concealed General Fund Deficit, and $6,517,519 in Wrongly Diverted General Funds. The Hemming Morse report appears to focus on the $86,448,488 in Urban Logic Self-Dealing and the $1,364,542 in Kapanicas and Aylward Self-Dealing, with no mention of Mr. Aylward and only a brief summary of disbursements from the City to Mr. Kapanicas.

The analysis performed by Hemming Morse appears to focus on Urban Logic Consultants (ULC) billing the City for professional subcontractor services in excess of the alleged limits imposed by the 1993 and 1994 service contracts and related amendments. This allegation of overbilling was not asserted as part of the Stradling proof of loss.

Atlanta | Boston | Chicago | Dallas | Houston | Jersey City | London | Los Angeles | Mexico City | New York City
Newport Beach | Oakland | Philadelphia | Providence | Sacramento | Salt Lake City | San Francisco | Seattle | Stamford
647 Putnam Pike | Greenville, Rhode Island 02828 | Phone: (401) 949-8001 | www.HSNO.com

NUFIC_003038

Ms. Jennifer Rocha
May 15, 2019
Page 2 of 12

### Analysis of Hemming Morse Report

As part of our assignment, counsel asked us to review the September 25, 2018 report of Daniel Ray, Partner - Hemming Morse, LLP. The report conclusions were as follows:
- ULC received at least $75 million dollars from the bond trustee and the City
- The amount received appears to be driven in significant part by the extraordinary markup on the third-party invoices which were included in the ULC invoices
- The markup percentages appear to be completely inconsistent with the 1993 original contract between ULC and the City which allowed only a 15% markup
- The analysis performed to date strongly indicates that the amount of funds received by ULC far exceeds the allowed cap of 4.5% of incurred construction costs.

The report covers the periods between 1993 and August 2012. It was noted that ULC was sold in mid-August 2012 and therefore very little analysis was done of the ULC invoicing to the City subsequent to that date. The HM report relies to a great extent on their interpretation of the 1993 vendor contract between ULC and the City as the basis for their conclusion that ULC overcharged the City on third-party invoices. We were not provided with ULC billing information subsequent to August 2012 necessary to ascertain whether the new owners of ULC (Torcal, LLC, Kieran McKiernan) continued to bill the City in the same fashion as their prior owners (Dillon, Egger and Moorjani) but see our additional analysis below.

Hemming Morse asserts that based on a billing cap of 4.5% of approximately $177,809,377 in capital improvement expenditures, ULC should not have billed the City more than approximately $8,000,000. However, based on our analysis of the service agreements between ULC and the City, it appears that Hemming Morse has incorrectly applied the noted 4.5% limit.

Hemming Morse goes on to state that " ... ULC and its owners were compensated for certain services that were not limited to the 4.5% cap... for capital improvement work". In addition, they "estimate" that 25% of the funds paid to ULC were not subject to the 4.5% cap. They did not provide any basis for the 25% "estimate," nor have they provided any support as to exactly what constituted the Time and Material services that were to be supplied by ULC that may have fallen within the 4.5% cap.

On page 6 of the Hemming Morse report they note that ULC, under the ownership of Kieran McKiernan, was paid $12.2 million dollars between September 2012 and June 2015. The following table summarizing the payments to the original three ULC principals and the new owner, Mr. Kieran McKiernan, is excerpted from the Hemming Morse report.

Payments to ULC

|  | Bond Funds | Beaumont Funds | Total |
|---|---|---|---|
| Original Principals | $42,500,000 | $34,600,000 | $77,100,000 |
| Kieran McKiernan | 4,500,000 | 7,700,000 | 12,200,000 |
| Total | $47,000,000 | $42,300,000 | $89,300,000 |

Ms. Jennifer Rocha
May 15, 2019
Page 3 of 12

Applying Heming Morse's contention that all ULC payments are limited to 4.5% of all City of Beaumont project costs, the payments to ULC during Mr. McKiernan's ownership would equate to over $271 million dollars of incurred capital costs ($12.2 million divided by 4.5% = $271 million dollars). Therefore, it appears that ULC continued to bill the City at rates far in excess of 4.5% of incurred construction project costs. If the City was in fact billed by ULC at their standard rates for work done by Subcontractors subsequent to August 2012, we would question how accurate HM's interpretation of the terms of the 1993 contract really are?

We note that the Hemming Morse report also mentions that ULC was subject to a limitation of billing the City no more than 15% above the actual costs of any subcontractor costs. It seems inconsistent that there would be a cap on the billing of subcontractor's fees and that those same subcontractor costs would also be subject to an overall 4.5% cap on any capital improvement work. The Hemming Morse analysis fails to separate out what portion of the ULC bills were from subcontractors, verses from Time and Materials performed solely by ULC employees.

This appears to be a contract dispute between the City and ULC regarding their respective interpretations regarding which projects were subject to the 4.5% billing cap and whether or not contractors who provided services to the City under the direction of ULC could be billed out at the approved ULC rates or were limited to 115% of their billed costs to ULC.

The Hemming Morse report (page 2) notes that " ... ULC was retained by the City of Beaumont to serve as consultants in connection with the approved capital improvement projects". The Hemming Morse report goes on to refer to ULC as "consultants" on a number of occasions within their report. The agreements referred to by Hemming Morse repeatedly refer to ULC as "CONSULTANTS". We raise this issue to point out that if the City's forensic accounting expert has concluded that ULC were "consultants" to the City, it's unclear how they could also have been employees of the City as maintained in other sections of the Hemming Morse report.

We reviewed service agreements and amendments dated March 22, 1993 (LOC5-000635 to 000643), September 27, 1993, April 11, 1994 (LOC5-001296 to 001311), and April 2, 1994 (LOC5-000013). The September agreement appears to be the contract, with its various amendments, referenced by Hemming Morse as the basis for their analysis of the purported overbilling. The March 1993 agreement was signed, but the September 1993 version reviewed by HSNO is noted as "Original" and was not executed. However, the amendment dated April 11, 1994, which references the September 1993 agreement, was executed. As such, it appears that the September 1993 agreement was in force. Both the September 1993 Agreement and April 1994 amendment were included as Exhibit 8 to our August 18, 2018 preliminary status report.

Although Hemming Morse estimates that approximately 25% of capital expenditures would not be subject to the 4.5% cap, it is unclear how they arrived at this estimate. Based on our review of the various Agreements, it appears that the 4.5% cap relates only to "Plan Checking and Construction Inspection" and "Public Works Construction Management" (Section V). However, the services to be performed for the City by ULC ranged from five to eight different categories of services that included over 90 different functions that often changed from one agreement to the next, as summarized in the following table:

Ms. Jennifer Rocha
May 15, 2019
Page 4 of 12

| Agreement Section | | Noted Compensation | No. of Functions |
|---|---|---|---|
| I. | Planning Services | Included in $15,000 per month lump sum | 24 Functions |
| II. | Economic Development Services | Included in $15,000 per month lump sum | 11 Functions |
| III. | Review of Development Services Functions | Included in $15,000 per month lump sum | 18 Functions |
| IV. | Public Works and Engineering Services (1) | Included in $15,000 per month lump sum | 4 Functions |
| V. | (A & B) Plan Checking and Construction Inspection (1) | T&M subject to limit of 4.5% of confirmed construction cost of the public improvements to be constructed | 2 Functions |
| V. | (V-1) Public Works (1) Construction Management | T&M subject to limit of 4.5% of bid price awarded by the City for each project | 21 Functions |
| VI. | Facilities, Records and Support Personnel | Silent as to compensation | 1 Function |
| VII. | Additional Services | Hourly rate per Rate Schedule or negotiated fixed fee - Not subject to any limits | 11 listed, but not limited to list |
| VIII. | Fee Collection (1) | Silent as to compensation | 1 Function |

Note:
   (1)  Not part of the March 1993 Agreement.

Compensation for the noted service categories appears to be governed by Section IX of the 1993 agreement. Both Section V and Section IX were updated by the April 1994 amendment as well as subsequent amendments. The following are excerpts from the September 1993 agreement and April 1994 regarding Section V and Section V.1, as amended:

> *V. Plan Checking and Construction Inspection* (**Original September 1993 Agreement**)
>
> *The CONSULTANT shall provide all necessary plan checking and inspection services for public works projects in the City of Beaumont as follows:*
>
> <u>*V-A. Plan Checking*</u>
>
> *On behalf of the City, ULC, under the direction of the Director of Public Works, shall review the plans prepared by civil engineers and other appropriate professionals on behalf of the City or private development interests for compliance with the ordinances of the City. The Director of Public Works shall arrange reviews by other appropriate agencies having jurisdiction in such matters relative to the enforcement of relevant codes and compliance with UBC (Uniform Building Code, 1991) and Caltrans. Only when satisfied that all conditions of approval and the appropriate requirements of the City's codes and other relevant codes and standards have been met, the Public Works Director shall approve or recommend approval of plans as relevant.*

### V-B. Construction Inspection

*On behalf of the City, ULC, under the supervision of the Director of Public Works, shall provide inspection services during all phases of construction to enforce compliance with codes and conditions of approval, provisions of the City ordinances, Uniform Building Code (1991) and other requirements set forth on the plans for which permits were issued for construction. In the performance of such duties, ULC shall provide inspection for each project during and after completion of various stages of construction to confirm compliance with approved plans.*

### V.1 Public Works Construction Management (Added per April 1994 Amendment)

*On behalf of the City, ULC, under the supervision of the Director of Public Works, shall provide construction management services during all phases of public works construction to enforce compliance with codes and conditions of approval, provisions of the City ordinances, Uniform Building code (1991) and other requirements set forth on the plans and specifications for which permits are issued for construction. In the performance of such duties, ULC shall provide construction management for each public works project before, during and after completion of various stages of construction including the following services related to the planning, control, scheduling, estimating and value engineering of public works projects:*

#### A. Construction Management Services

1. Coordinate, receive, review and evaluate bids
2. Award bids, make appropriate recommendations, and prepare contracts
3. Manage, coordinate and inspect all work
4. Provide contract and subcontract coordination
5. Prepare and monitor construction schedules
6. Make adjustments to accommodate changing and unforeseen conditions
7. Prepare progress reports
8. Review and recommend progress payments
9. Obtain, review and evaluate shop drawings
10. Provide laboratory testing of materials as required and monitor test results
11. Evaluate quality and workmanship of construction
12. Maintain daily logs and records and such other services as are required to manage the work in accordance with City objectives
13. Schedule project meetings
14. Liaison with controlling agencies and design and construction engineers
15. Monitor and record correspondence between City contractors, subcontractors and design professionals
16. Prepare transmittals and labor reports
17. Provide labor and payroll compliance
18. Provide change order management and coordination
19. Provide plan interpretation as required
20. Administer extensions of time (force majeure delay) reports
21. Administer release and waivers of lien

Ms. Jennifer Rocha
May 15, 2019
Page 6 of 12

According to Section IX of the September 1993 Agreement and April 1994 amendment, only those services listed in Section V were subject to a cap of 4.5% of capital expenditures. The following excerpts are from the September 1993 agreement and April 1994 regarding Section IX compensation, as amended:

> IX. Compensation to CONSULTANT
>
> The fees in full compensation to CONSULTANT for the services rendered for the services as set forth in this Agreement shall be as follows:
>
> 1. For the services set forth in Sections I, II and IV, compensation shall be a monthly lump sum of $15,000.00, to be renegotiated annually.
>
> 2. For the services set forth in Section V, compensation shall be on a ==time and materials basis not exceeding four and one-half percent (4.5%) of the== confirmed construction cost ==of the public improvements to be constructed==.
>
> 3. For the services set forth in Section III, there shall be no compensation. These services shall be provided in connection with the services set forth in Sections II and IV.
>
> 4. For ==Additional Services== as set forth in Section VII, compensation shall be in accordance with the ==Hourly Rate Schedule== attached to this Agreement as Exhibit A", or based upon a negotiated fixed fee rate.
>
> 5. **(Added per April 1994 Amendment)** For the services set forth in SECTION V-1, compensation shall be on a ==time and materials basis not exceeding four and one-half percent (4.5%) of the== bid price ==awarded by the City for each project==.

As such, it appears that billings for services performed pursuant to Section V-A and Section V-B were subject to a cap of 4.5% of ==confirmed construction costs of the public improvements to be constructed==, while services performed pursuant to Section V-1 were subject to a cap of 4.5% of the ==bid price awarded by the City for each project==. While Hemming Morse notes approximately $177,809,377 in capital expenditures, their report makes no mention of the bid, nor does it attempt to segregate bid price from the associated confirmed construction costs. As such, a comparison of total ULC billings to only confirmed costs for capital expenditures is not an accurate or representative analysis.

Additionally, Hemming Morse makes no mention of compensation for services performed pursuant to Section VII of the 1993 Agreement. As noted above in subsection 4 of Section IX, compensation for "Additional Services" set forth in Section VII "shall be in accordance with the Hourly Rate Schedule attached to this Agreement as Exhibit A, or based upon a negotiated fixed fee rate." We note that subsection 4 makes no reference to the 4.5% cap, or any such limit. As such, the approximate billings of $75,000,000 noted in the Hemming Morse report likely include many services that were not subject to any limit and may far exceed the 25% estimated by Hemming Morse.

In fact, the on-going billings from ULC to the City may be related for the most part to the "additional services" covered by section VII of the agreements, which as noted above, are not subject to any billing cap. It should be noted that the Hourly Rate Schedules that accompany the various service agreements make a distinction between "Professional Services" – for which ULC was allowed to charge an hourly rate, and "Direct Services – Professional Sub-Consultant Services" for which ULC was allowed to bill for actual cost incurred plus 15%. The list of "Professional Services" was an ever-increasing list as each agreement was updated/amended.

We noted that most of the noted "Professional Services" categories included the classification of services that were being performed by various subcontractors working at ULC's direction. Many of the noted services were also being performed by ULC employees. Hemming Morse did not breakout the ULC invoices in such a manner that would allow them to determine what portion of the ULC bills may have been subject to the 4.5% cap.

The following excerpt is from the September 1993 agreement and April 1994 regarding Section VII services:

> *VII. Additional Services*
>
> *CITY may from time-to-time have the need for other services not specifically listed in this Agreement for which CONSULTANT has the necessary experience and capabilities to provide. CITY may authorize CONSULTANT to perform such additional services on an as needed basis. Additional services which may be required include, but are not necessarily limited to:*
>
> > *A. Major ordinance or General Plan revisions.*
> > *B. Specific Plan and Environmental Impact Report processing.*
> > *C. Direct costs for printing and reproduction of City materials*
> > *D. Preparation of Environmental Impact Reports and other major planning documents.*
> > *E. Major overhauling of City mapping systems.*
> > *F. Clerical services beyond those available from City staff.*
> > *G. Development Agreement Processing.*
> > *H. Major Annexations.*
> > *I. Economic Development assistance beyond tasks specified in this Agreement (e.g. marketing brochures).*
> > *I. Specification Writing.*
> > *K. Bid Document Preparation.*

Based on the descriptions noted in Section V-A, Section V-B, Section V-1, and Section VII of the Agreement, it is unclear how much of the time billed by ULC was attributed to those tasks subject to the 4.5% limits and those not subject to any limit.

It's our belief that Hemming Morse's own interpretation of which ULC costs were subject to an overall 4.5% capital improvement bids or confirmed costs, and which subcontractor costs were limited to a 15% markup, as well as whether these two limitations were inclusive or exclusive of one another goes to the very heart of the HM findings. The fact they did not identify which

NUFIC_003044

Capital improvement projects may have been subject to the 4.5% cap also calls their overall conclusions into question.

In addition to their analysis of total ULC billings as compared to the noted contractual limit of 4.5% of capital improvements, Hemming Morse also attempted to prove overbilling through an analysis of ULC payroll records. For the year 2011, Hemming Morse compared the total hours paid to employees per ULC payroll records versus hours billed to the City on ULC invoices. Hemming Morse concluded that the hours billed to the City by ULC did in fact exceed those worked by ULC employees per the ULC payroll records, indicating, "that invoices include either 'phantom hours' (hours not actually worked by anyone) or hours incurred by non-employees of ULC."

HSNO agrees with Hemming Morse that more hours were billed by ULC during 2011 than worked by ULC employees, and that the excess results from the use of subcontractors that were included on ULC's bills to the City and charged at ULC's rates. As such, our analysis focuses on ULC's use of subcontractors and rates billed to ULC by their vendors and the rates billed to the City by ULC for those same vendors. However, we leave any and all legal interpretation to counsel as to how the ULC billings associated with "Professional Services" that were performed by both ULC employees and subcontractors under their direction, as opposed to "Direct Services – Professional Sub-Consultants Services" were supposed to be billed by ULC per the terms of the various CONSULTANT agreements between the City and ULC.

### Analysis and Findings – Preliminary and Tentative

Based on our review of the Hemming Morse report, it is our understanding that the insured now claims losses resulting from overbilling whereby ULC utilized subcontractors to perform services for the City, who were then included on the ULC invoices to the City at the rates charged by ULC for the same or similar services performed by their own employees. The Hemming Morse report notes that ULC was subject to a limitation of billing the City no more than 15% above the actual costs for any subcontractor. We note that the rate sheet, included with the Agreement as "Exhibit A" of the September 1993 Agreement, does state, "Direct Services and Reimbursement Costs: Professional Sub-Consultant Services - Actual cost plus 15 %".

Subsequent to our August 18, 2018 preliminary status report we received approximately 123,361 pages of additional documentation, including ULC internal accounting and billing records and invoices to ULC from subcontractors that they utilized. Due to the volume of documentation provided, we focused on a 3-year sample of billing records from 2008 through 2010 and compared three sets of documents to identify what services were billed to the City by ULC employees and subcontractors that ULC utilized on City projects.

We are in receipt of what appear to be ULC internal billing reports, noted by Hemming Morse as "time and billing records." Based on our analysis, it appears that the time and billing records were prepared by ULC and included the hours worked by both ULC employees and subcontractors, as well as the amounts that would ultimately be billed on ULC's invoice to the

City. Our analysis consisted of tracing the time and billing records forward to the ULC invoices and back to the subcontractor invoices billed to ULC for work on City projects.

From 2008 through 2010, we identified invoices addressed to ULC from 22 separate vendors for work performed on projects within the City of Beaumont. We attempted to identify if and how the hours billed by subcontractors of ULC were then billed by ULC to the City. However, in many cases the ULC time and billing records noted only the description of the task, rather than the name of an individual or company that performed the noted task. In some cases, we were able to directly tie the hours from a subcontractor invoices to the ULC time and billing records, and then through to the ULC invoice to the City. We note the following billing descriptions which appear on the ULC invoice and the time and billing records:

- 1-3 Man Survey Crew
- Administrative
- Associate Eng
- CADD/ Tech
- Const. Manager
- Designer II
- Draftsperson for exhibits
- Eng. Geologist
- Engineer
- Exec Secretary
- Inspector
- Inspector-Prev Wage
- Office Mgr
- Plan Checker
- Planner
- Principal Planner/ Principal
- Principal/ Engineer
- Principal/ Project Engineer
- Project Development Planner
- Project Engineer
- Project Manager/ Engineer
- Project Mgr./ Sr. Engineer
- Public Works Dept.
- Soils Inspector
- Soils Tech
- Sr. Asso/Eng.
- Sr. City Engineer
- Sr. City Engineer/ Principal
- Sr. City Manager
- Sr. City Planner
- Sr. City Planner/ Principal
- Sr. Designer II
- Sr. Engineer
- Sr. Inspector
- Sr. Planner
- Sr. Project Engineer/ Principal
- Staff Engineer
- Surveyor
- Web- Services/ Surveyor

Although the hourly rate schedule "Professional Services" classifications changed with each amendment to the CONSULTANTS agreement, the items noted above were for the most part listed as "Professional Services" categories or a variation of same for which ULC was allowed to charge the agreed upon hourly rate. We found no indication that ULC was charging for additional hours or rates that were not in accordance with the type of "Professional Service" being provided.

As shown on Schedules 4B and 4C, we analyzed invoices from 22 vendors totaling $3,780,989 from January 2008 through December 2010. However, it is our understanding that although ULC employed subcontractors to assist in City of Beaumont projects, actual ULC employees also performed the same types of tasks, including surveying, engineering, and project management. As such, it was not always possible to identify the hours and amounts on the time and billing reports that exclusively subcontractor hours versus a blend of subcontractors and ULC employees.

Included as exhibits to the Hemming Morse report were ULC payroll records for 2010 and 2011. We compared the ULC time and billing records to the payroll records to identify the individuals who were in fact employees of ULC and eliminate any possible duplication with subcontractors. However, because we could only locate payroll records for 2010 and 2011, the actual individuals employed by ULC over the entire period is unclear.

Ms. Jennifer Rocha
May 15, 2019
Page 10 of 12

Certain vendors were identified by name on the time and billing reports, allowing us to perform a direct comparison to the vendors' invoices. For those identified vendors that were included on the ULC time and billing reports, we analyzed the hours and amounts billed to ULC and calculated the amount that would have been billed to the City at ULC's rates versus what the bill would have been based on a 15% markup.

As shown on Schedule 4A, out of the noted $3,780,989 billed by subcontractors between 2008 and 2010, the amount attributable to vendors that appeared on the ULC time and billing reports totaled only $2,128,255. For purposes of this analysis, we assumed that costs incurred by ULC for subcontractors working for the City were passed on to the City through the ULC invoices.

We note that one vendor, Dennis Janda, Inc., provided surveying services, which appear to be listed on the ULC time and billing reports simply as "Surveyor," "1-Man Survey Crew," "2-Man Survey Crew," etc. However, it is also our understanding that ULC employees also performed surveying services. As shown on Schedule 4, we performed a separate analysis on Dennis Janda, Inc. invoices and found that they totaled approximately $1,434,781 over the three-year period analyzed, representing the largest portion of subcontractors utilized by ULC. As such, we did not want to exclude this vendor from the analysis.

Due to the difficulty in identifying the surveyor services performed exclusively by subcontractors, we segregated all survey related billing descriptions and performed two calculations; one based on the ULC time and billing reports and one based solely on Dennis Janda, Inc. invoices.

As shown on Schedule 3A and summarized on Schedule 3, we identified vendor invoices to ULC totaling $3,414,320 from 2008 through 2010, which we would expect to be billed to the City. Of the $3,414,320, $2,722,598 relates only to survey crews, where the difference of $691,723 excludes survey crews. Based on the rates shown on the ULC time and billing records for the noted vendors, we calculated billings to the City of $1,697,205 for non-survey crew subcontractors, and $4,333,668 for survey crews. Once again, the survey crew total may include ULC employees.

Assuming that the 15% markup over actual cost incurred represents the amount that should have been billed to the City, total billings for non-survey crew invoices would have been $795,481, resulting in a potential overbilling of $901,724. Likewise, total billings for survey crew invoices should have been $3,130,987, resulting in potential overbilling of $1,202,680, for a total potential overbilling of $2,104,405.

As noted above, we segregated survey crew invoices submitted by Dennis Janda, Inc., as these were the only survey crew services that we could verify as subcontractors. As shown on Schedule 4, Dennis Janda, Inc. billed ULC $1,434,781 from 2008 through 2010. Based on the rates billed to ULC at a 115% markup, the amount billed to the City for survey crew services performed by Dennis Janda, Inc. should have been $1,649,998 for the same three-year period. However, the amount calculated to have been billed to the City at ULC rates for survey crew services was $2,354,009, resulting in potential overbilling of $704,011.

NUFIC_003047

Based on our findings relative to the noted three-year period, we attempted to extrapolate what potential overbillings may have been from 2004 through 2012. General ledger detail prior to 2004 was not provided. As such, we could not determine total disbursements to ULC prior to 2004.

As shown on Schedule 2A and summarized on Schedule 2, we analyzed ULC invoices to the City of Beaumont totaling $21,846,497 from 2008 through 2010. For this same timeframe, we identified disbursements to ULC from the City's general fund and bond trustee accounts totaling $23,853,936, as shown on Schedules 1 and 1A. As such, actual invoices analyzed represent approximately 92% of total disbursements to ULC.

As shown on Schedule 1, we utilized the potential overbillings of $901,724 for non-survey crews (Schedule 3) and $704,011 for Dennis Janda, Inc. survey crews (Schedule 4), for a total of $1,605,735 in potential overbillings from 2008 through 2010. Compared to the actual ULC invoices analyzed of $21,846,497, the potential overbillings of $1,605,735 represent approximately 7% of ULC billings to the City.

Based on our analysis of disbursements to ULC from the City's general ledger and the bond trustee accounts, ULC received approximately $66,407,503 from 2004 through 2012. At the estimated 7% percent potential overbilling from 2008 to 2010, we calculate potential overbilling from 2004 through 2012 of $4,469,678, or $66,407,503 times the 7% potential overbilling rate, times the 92% sample size.

As shown on Schedule 1A, we performed the same analysis utilizing potential overbillings of $1,202,680 for all survey crews (Schedule 3) and the potential overbillings of $901,724 for non-survey crews (Schedule 3) for a total of $2,104,405 in potential overbillings from 2008 through 2010. Compared to the actual ULC invoices analyzed of $21,846,497, the potential overbillings of $2,104,405 represent approximately 10% of ULC billings to the City. Extrapolating this result over the 2004 through 2012 period results in potential overbillings of $5,857,762, or $66,407,503 times the 10% potential overbilling rate, times the 92% sample size.

Although we are able to extrapolate the potential overbilling based on our analysis of the noted 3-year period, we have identified several factors that may have a material impact on the application of the percentage potentially overbilled as it applies to other years:

- This analysis is based on the documents that we identified as ULC subcontractor invoices within the voluminous document production. It is possible that other ULC vendors and their invoices were not provided or identified.

- Vendors such as LG Consulting, CHJ, Darrell L. Connerton, and Greg Russell did not begin billing until 2010, while others billed only prior to 2010

- The percentage of markup from the subcontractor invoice rate to the ULC invoice rate varies drastically from vendor to vendor

Ms. Jennifer Rocha
May 15, 2019
Page 12 of 12

- The total amount invoiced by subcontractors in 2010 was more than 228% of 2009 total billings, and more than 280% of 2008 total billings. As such, 2010 may not accurately represent what was billed prior to 2008.

Based on the above, an extrapolation of the total period based solely on the 3 years analyzed may be inaccurate. In order to provide a more accurate calculation of the remaining years, it would be necessary to perform a detailed analysis of vendor invoices billed to ULC and the relationship of those invoices to the ULC invoices billed to the City of Beaumont.

**Summary**

Based on our preliminary analysis of the Hemming Morse report and approximately 123,360 additional pages of documentation provided by BBK, it appears that ULC was utilizing subcontractors to perform professional services for the City of Beaumont, and those services were being billed to the City at rates charged by ULC for the same or similar professional services performed by their own employees. It also appears that reimbursement for "Direct Services -professional sub-consultants" was to be billed by ULC at "actual cost plus 15%," per the service agreement with the City. However, as noted above, we leave the interpretation of the noted service agreement and the appropriateness of ULC's billing practices to counsel.

If it is determined that ULC should have billed the City of Beaumont the actual cost of subcontractors plus a 15% markup, then we estimate potential overbilling ranging from $4,469,678 to $5,857,762 for the period of 2004 through 2012.

Whether these findings constitute a covered cause of loss under any area of coverage we leave for your determination. As previously stated, our analysis is preliminary, tentative, and ongoing, and as such subject to revision as new information becomes available.

We have enjoyed being of service to you and hope the enclosed accounting information will be of assistance to you in the adjustment of this claim. If you have any questions or require any additional information, please do not hesitate to contact us.

Very truly yours,

**HAGEN, STREIFF, NEWTON & OSHIRO, ACCOUNTANTS, P.C.**
By: Peter Fogarty, CPA, CFE, CFF
Philip J. Segerson, CFE