# EXHIBIT 3

Page 849216

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| WESTERN RIVERSIDE COUNSEL OF GOVERNMENTS; CITY OF BEAUMONT, ) ) ) | |
| Plaintiff, ) | |
| vs. ) | Case No. 5:20-cv-02164-GW(KKx) |
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, ) ) ) | |
| Defendants. ) ) | |

DEPOSITION OF DANIEL RAY

IRVINE, CALIFORNIA

MONDAY, JULY 18, 2022

Reported by:
LAURA A. RUTHERFORD, RPR
CSR No. 9266



Page 5

1           IRVINE, CALIFORNIA; MONDAY, JULY 18, 2022

2                   8:57 A.M. - 2:25 P.M.

3                       ---oOo---

4

5           THE VIDEOGRAPHER:  Good morning, we are on

6    the record.  This begins -- excuse me -- video number one

7    in the deposition of Daniel Ray, in the matter the Western

8    Riverside Counsel of Governments, versus National Union

9    Fire Insurance, in the United States District Court for

10   the Central District of California, Eastern Division, case

11   number 5:20-cv-02164.

12           Today's date is July 18, 2022, and the time

13   is 8:57 a.m.  This deposition is being taken at 5 Park

14   Plaza, Suite 1100, in Irvine, California, at the request

15   the Gordon Rees.

16           I'm Sergio Esparza, the videographer of Magna

17   Legal Services, and the court reporter is Laura Rutherford

18   of Magna Legal Services.

19           Will counsel and all parties present state

20   their appearances and whom they represent?

21           MR. SCHMOOKLER:  Scott Schmookler on behalf

22   of the defendant.

23           MR. PISANO:  Christopher Pisano, Best, Best &

24   Krieger, on behalf of the plaintiff.

25           THE VIDEOGRAPHER:  Thank you.



Page 6

1               Will the court reporter please administer the

2    oath?

3

4                         DANIEL RAY,

5          having been first duly placed under oath,

6               was examined and testified as follows:

7

8                         EXAMINATION

9    BY MR. SCHMOOKLER:

10        Q.   Please state your name and spell your last

11   name for the record?

12        A.   My name is Daniel W. Ray, R-a-y.

13        Q.   How many times have you been deposed?

14        A.   I would estimate 40 to 50.

15        Q.   You make your living as an expert witness;

16   correct?

17        A.   I make my living as a forensic accountant of

18   which I'm a partner of a CPA firm, which the work that I

19   perform sometimes does result in expert testimony, but the

20   vast majority of the times, it does not result in expert

21   testimony.

22        Q.   Okay.

23             Who hired you in this case?

24        A.   The Law Firm of Best, Best & Krieger, on

25   behalf of their client.



Page 13

1          Q.    That would be excellent.

2                Do you know if either of these assistant

3    District Attorney's that you were talking to are married

4    to lawyers at the Best, Best and Krieger law firm?

5          A.    I have no reason to believe that they are

6    married to a lawyer at the Best, Best & Krieger law firm.

7          Q.    Do you know either way?

8          A.    No, I don't know either way.

9          Q.    Did you rely upon any articles, periodicals,

10   secondary sources in creating the analysis in Exhibits 1

11   and 2?

12         A.    No.

13         Q.    Did you rely on any specific written forensic

14   standards in creating Exhibits 1 and 2?

15         A.    No.

16         Q.    Did you rely upon any secondary sources

17   addressing financial institution bonds or fidelity bonds

18   in creating Exhibits 1 and 2?

19         A.    No.

20         Q.    As you sit here today, are there any specific

21   standards, publications, or other secondary sources that

22   you rely upon to support any of the analysis in Exhibits 1

23   and 2?

24         A.    I include in a footnote to, I believe,

25   Exhibit 2, which talks about my engagement letter



Page 14

1    referencing a particular accounting standard that's used

2    for forensic accounting, and that I mentioned in that, as

3    a footnote, that particular standard, which is set forth

4    in our engagement agreements.

5              Q.   Please mark this as Exhibit 3.

6              (Exhibit Number 3 was marked for

7    identification.)

8              Q.   BY MR. SCHMOOKLER:  I'll hand what has been

9    marked as Exhibit 3.

10             Have you seen this document before, sir?

11             A.   I have.

12             Q.   Okay.

13             Is this the standard you referenced in your

14   report, supplemental report, which is Exhibit 2?

15             A.   Correct.

16             Q.   Is it true that there is nothing in this

17   standard that speaks to how a forensic accountant should

18   compute a loss in connection with an employee dishonesty

19   insurance claim?

20             A.   I agree.  It's not a step-by-step manual on

21   how to perform a forensic accounting assignment.

22             Q.   In fact, in Exhibit 3, there's no explanation

23   whatsoever as to how to perform a forensic accounting

24   engagement?

25             A.   Well, it talks about -- on page -- there's no



Page 18

1   sampling of invoices in this matter; correct?

2          A.   I reviewed invoices -- a sample of the

3   invoices that were available.

4          Q.   I asked a different question.

5               You understand what randomization is?

6          A.   Yes, I do.

7          Q.   Did you conduct a random sampling of the

8   invoices in this matter?

9          A.   I didn't use a random technique to do the

10  analysis that I did.  I focused on particular time frames,

11  and I did 100 percent coverage of particular time frames

12  where invoices were available.

13         Q.   But there were time frames when 100 percent

14  wasn't available; correct?

15         A.   I agree.

16         Q.   And in time frames when 100 percent was not

17  available, rather than conduct a statistically valid

18  extrapolation, what did you do -- or strike that.

19              In the time frame when there was not 100

20  percent of the invoices available, did you conduct a

21  statistically valid extrapolation?

22         A.   No.

23         Q.   In the time frame when 100 percent of the

24  invoices were not available, did you attempt to conduct a

25  statistically valid extrapolation?



Page 23

```
 1          A.   Okay.
 2          Q.   My question is this.  You understand that
 3    Urban Logic billed for very specific work; correct?
 4          A.   Well, I've seen Urban Logic where their
 5    invoices simply say, "For professional services rendered."
 6    So it isn't always very specific as to specifically what
 7    task they performed.  I have two specific examples in my
 8    binder where the billing simply says, "For professional
 9    services rendered."
10               So for me or for anyone to specifically
11    determine, based upon that invoice, whether it was or was
12    not, for example, subject to the 4.5 percent cap, can't
13    really be accomplished when it simply says, "For
14    professional services rendered."
15          Q.   Let me dig into this, because I asked a
16    different question, but I'm interested in your answer.
17          A.   Okay.
18          Q.   You agree with me that there's not enough
19    information on the invoices to determine if the
20    amount -- if the task billed for falls inside or outside
21    of the cap; correct?
22               MR. PISANO:  Object to form.
23               THE WITNESS:  What I'm saying is that -- yes,
24    that there are certain bills that it's not determinable
25    about exactly, precisely what work was performed when the
```



Page 29

1          Q.   Do you know to a reasonable degree of

2    accounting certainty that the precise amount billed for

3    tasks identified expressly in section V.1 exceed 4.5

4    percent of the bid price for capital improvements during

5    the period in which Urban Logic provided services to the

6    City?

7               MR. PISANO:  Object to form.

8               THE WITNESS:  I looked in total to the

9    invoices.  Again, many of the invoices simply said, "For

10   professional services rendered."

11              So, therefore, it's not possible, when they

12   provide billing as generic as "professional services

13   rendered" to tie it to a specific -- a particular -- this

14   has 21 tasks, and then the other -- the original agreement

15   has two specific tasks, so there's 23 tasks.

16              It's not really possible to compute precisely

17   to a particular defined task, given the way that

18   they -- Urban Logic -- or, I'm sorry -- Urban Logic

19   submitted their invoices.

20          Q.   BY MR. SCHMOOKLER:  Okay.

21              Now, let me just make sure I understand the

22   methodology underlying your opinion.  You computed the

23   total amount of capital improvements; correct?

24          A.   We estimated what the total amount of capital

25   improvements were.



Page 51

1          So there's all kinds of problems with just

2     reviewing the invoices themselves.

3          Q.   Okay.

4          So any -- given everything you just said, do

5     you have enough data, as you sit here today, to tell me

6     how much was legitimately charged for plan checking?

7          A.   If you're referring to a specific task, the

8     answer is no.  And that's why I did the analysis in the

9     manner that I did because of the inability of missing

10    records, questionable records, even when they are

11    available.

12         And the fact that they are generically

13    described in the scopes of work, no, I don't think anybody

14    can do exactly what you asked about.

15         Q.   Okay.

16         And do you have enough records available to

17    you, as you sit here today, to offer to compute how much

18    was spent legitimately on construction inspection?

19         A.   Same answer.

20         Q.   Answer is no, then?

21         A.   The answer is there are missing invoices.

22    Even when invoices are produced, there are certain

23    questions about the invoices themselves, the integrity of

24    the invoices.  And the way the invoices are generically

25    drafted, it doesn't provide anyone the ability to do what



Page 52

1    you suggested.

2              Q.    Okay.

3                    And the same would be true for construction

4    management.  There's just not enough data to compute the

5    amount billed legitimately for construction management?

6              A.    I agree, which is why I did the analysis in

7    the manner that I did.

8              Q.    Okay.

9                    Let's take a few minutes, and I'll gather my

10   thoughts and go off the record.

11                   THE VIDEOGRAPHER:  Okay.

12                   Off the record.  The time now is 9:58 a.m.

13                   (Pause in proceedings.)

14                   THE VIDEOGRAPHER:  On the record.  The time

15   is 10:10 a.m.

16              Q.    BY MR. SCHMOOKLER:  In your analysis, as I

17   understand it, you subtracted 25 percent from Urban

18   Logic's billing in order to determine whether or not the

19   amount billed exceeded 4 and a half percent of the capital

20   improvement cost; is that correct?

21              A.    I subtracted 25 percent of the amount of

22   payments Urban Logic received directly from the City in

23   order to do that computation.

24              Q.    Why did you only subtract 25 percent from the

25   City's billing and not subtract 25 percent from amounts



Page 59

1                    Have you ever done an estimate, as you've

2    done in this case, without any analysis underlying it in

3    any other case?

4            A.    To describe my work as performing no analysis

5    is completely disingenuous and wrong.

6            Q.    I didn't say that --

7            A.    You did.

8            Q.    -- and you misunderstood my question.

9            A.    Okay.

10           Q.    I said no.

11                   Have you ever used an estimate without

12    performing any analysis underlying it in any other case?

13                   MR. PISANO:  Object to form.

14                   THE WITNESS:  And I told you that my estimate

15    of 25 percent is based upon my analysis of invoices, many

16    invoices, and a myriad of other documents in the case.  So

17    my analysis or estimates of 25 percent is supported by the

18    analysis that I did.

19           Q.    BY MR. SCHMOOKLER:  Okay.

20                   What document can you point to in your

21    binders -- and I've got them all here for you -- where we

22    could look and see this is how I got to 25 percent, and

23    not 23 percent and not 29 percent?

24           A.    Okay.

25                   I described in the narrative of the document



Page  60

1    the reason for the 25 percent.  I describe it as clearly

2    that there was scope of work that was called for pursuant

3    to the agreement that would be outside of the scope.

4                There's particular subparagraphs that talk

5    about services they were going to provide as officials for

6    the City.  They were to spend 28 hours per week, if I

7    remember the agreement right, at offices at the City, and

8    they were to be paid $15,000 a month.

9                I looked through many, many invoices, saw

10   invoices consistent with that agreement amount of $15,000.

11   I saw that those were paid by the City.  They were not

12   paid from bond proceeds.

13               I figured out how many months, roughly, that

14   they were serving as City officials and would be provided

15   that $15,000, and I estimated 25 percent.  There is no

16   Excel spreadsheet with the mathematical formula other than

17   what I've just described.

18          Q.    Did you take $15,000 a month, multiply it by

19   12, and then multiply it by the years to get your 25

20   percent?

21          A.    Yes.  That was one of the things I

22   considered.

23          Q.    So if we took $15,000, and we multiply it by

24   12, you get to $180,000?

25          A.    I agree.



Page 61

1          Q.   And did you then multiply $180,000 times the

2    number of years, which I think is 17, to get to your 25

3    percent?

4          A.   Well, $180,000 times 10 years is $1.8

5    million.  Twenty years would be $3.6 million, and I've

6    given them the benefit of $9 million.

7               So in my 25 percent estimate, I'm saying

8    they're going to get $15,000 a month for a certain number

9    of years.  And there's other scopes of work that they are

10   going to perform in addition to that.

11              And I'm effectively giving them credit for $9

12   million, when I know that 10 years of serving as City

13   officials at $15,000 a month is only $1.8 million.

14              So I'm including in, without any type of

15   additional specifics, that there are other work that they

16   are doing that is outside of the cap of the 4.5 percent.

17         Q.   Well, let's just work your math for a minute.

18   So let's just take -- we'll round the numbers for ease of

19   use.

20              Let's say you gave them credit for $9

21   million.  We know that $1.8 million of that is absolutely,

22   unequivocally outside the cap, because they get paid their

23   monthly fee; right?

24         A.   Well, I don't know that they got paid as City

25   officials for all 17 years.



Page 63

1    the three paragraphs we've been talking about, it's

2    actually $7.2 million; correct?

3              A.   Yes.

4              Q.   And so, in reality, what you said is less

5    than 10 percent of every hour billed is not within one of

6    those -- not within the contract at all?

7              A.   That would fit what the contract calls as

8    "from time to time, we may authorize you to perform

9    additional tasks," yes.

10             But that 10 percent would fit that

11   description from the sentence, "from time to time, we may

12   authorize you to perform other services"; that is

13   correct.

14             Q.   And isn't it true that the City, every single

15   year, authorized Urban Logic to act as a contractor and

16   provide other services?

17             MR. PISANO:  Object to form.

18             THE WITNESS:  Well, when you say

19   "authorized," what is your -- what is the document you

20   have -- are you asserting that there's a documents that

21   specifically calls out an authorization for them to do

22   these additional services?

23             Q.   BY MR. SCHMOOKLER:  Yes.

24             Are you aware that such documents exist?

25             MR. PISANO:  Object to form.



Page 87

1            I believe I read his deposition.  Disregard

2    it?  I'm aware of it.

3            Q.   Okay.

4            Did you factor his testimony into your

5    analysis of whether Urban Logic overcharged based on these

6    4 and a half percent cap?

7            A.   I considered what he was testifying about.

8            Q.   Okay.

9            He wrote -- he's asked this question on page

10   46, line 20.

11               "To the extent that Urban Logic was

12               providing plan checking and construction

13               inspection for private development, that

14               would not be encompassed by this agreement.

15               Do I understand that correctly?"

16               "Answer:  That would be correct."

17               Do you see where I read from?

18           A.   I do.

19           Q.   So you know from both the contracts

20   themselves and from the City Council member, who was there

21   when these contracts were executed, that the caps we've

22   been speaking to speak about public works project, not

23   private development projects; correct?

24           A.   I understand that.

25           Q.   Did you subtract from your computations



Page 96

1    what they got paid, which would be -- the obvious -- if

2    they got paid X dollars, it would suggest that they

3    invoiced X dollars.

4              So I know how much they got paid.  I'm giving

5    them an allowance of 25 percent as being outside the cap

6    as a reasonable estimation.  And I compared that against

7    4.5 percent of the capital improvement costs.

8         Q.   Can you tell me to the reasonable degree of

9    accounting certainty how much was billed by Urban Logic in

10   connection with private jobs outside the scope of caps?

11        A.   No.

12             And are you suggesting that the invoice is

13   wrong here?  It says it's public works services.

14        Q.   I'm not suggesting anything.  I'm get to ask

15   the questions today.

16        A.   Okay.

17             I'm trying to understand your question.  I'm

18   trying to get clarity of your questions.

19        Q.   We'll talk in terms of my questions.

20             So -- strike that.

21             Sir, can you testify today as to the amount

22   billed by Urban Logic on private jobs outside the scope of

23   the cap to a reasonable degree of accounting certainty?

24        A.   No.

25        Q.   Now, Mr. Berg was also asked about -- on page



Page 97

1    69 of his deposition.  It's at the bottom, line 22.  He

2    was then asked, and I'm reading,

3                    "And the plan check/inspection and

4                    construction management services that Urban

5                    Logic would provide on those projects for the

6                    water district, school district, and parks

7                    and rec district, were those services subject

8                    to a 4 and a half percent fee cap?

9                    "No," he says.

10                   Do you see that?

11            A.    I do.

12            Q.    Did you compute to a reasonable degree of

13    accounting certainty the total amount billed for the water

14    district by Urban Logic?

15            A.    No.

16            Q.    Did you compute to a reasonable degree of

17    accounting certainty the amount incurred for the school

18    district?

19            A.    No.

20            Q.    Did you compute to a reasonable degree of

21    accounting certainty the amount computed for the parks and

22    recreation district?

23            A.    No.

24            Q.    Did you subtract out from your computation

25    amounts billed from the water district in light of



Page 111

1    how you should do that.

2           Q.   Have you received any specialized training

3    about how to make an estimate of what percentage of work

4    is inside or outside of a contractual cap?

5           A.   I can read a document.  I can understand what

6    percentages are.  I can do the calculation.  I can do

7    estimations.  This is the type of work I've done for many,

8    many years as an FBI agent and as a forensic accountant.

9                Each case is unique.  But, at the same time,

10   there's similar types of analysis that can be done in the

11   majority of cases, and that's what I'm doing here.

12          Q.   Okay.

13               But I'm being really specific here.  Have you

14   received any specialized training on how to estimate the

15   percentage of work that is inside or outside of a

16   contractual cap?

17          A.   I'm not aware that there's any specialized

18   training that says exactly how to calculate construction

19   billings to this specific contract with the City of

20   Beaumont, no.  I'm not aware of any specific training out

21   there that does that.

22          Q.   Are you aware of any publications that we can

23   look to as to how estimate when -- what percentage of work

24   is inside or outside of a contractual cap?

25          A.   No.



Page 113

1    same methodology to compute -- or strike that.

2            Can you point me to a case by name -- and you

3    can look at your file if you wish -- where you have used

4    the same methodology to provide an estimate of costs

5    inside or outside a contractual provision of any variety?

6            A.    No.   There's not any case that I can recall

7    that has this unique set of facts.   Each case is unique.

8    This is a unique set of facts to this particular case, so

9    no.

10           Q.    So because each case is unique, can we agree

11   that whatever -- strike that.

12           Have you ever been asked in any other case

13   ever to estimate the amount of billing inside and outside

14   of a contractual cap?

15           A.    Well, as I mentioned early on in this

16   deposition, I worked a number of cases involving

17   construction disputes and concerns about accuracy and

18   integrity of billings by contractors.

19           I don't think those particular cases had this

20   unique set of facts, where there's a defined cap, and

21   there's a certain set of work that's subject to a cap, and

22   certain set of work that's not subject to the cap.   I

23   don't think I have a case with that exact similar pattern.

24           But, again, reviewing construction billing,

25   construction costs, comparing them against expected costs



Page 114

1   and bases for overage, I've done that a number of times.

2          Q.   And I want to be really more specific about

3   the estimate and your 25 percent estimate.  Have you ever

4   offered any opinion in any case where you have used a

5   blanket estimate when determining whether or not there's

6   overbilling?

7                MR. PISANO:  Object to form.

8                THE WITNESS:  Well, when you say "blanket

9   estimate" --

10         Q.   BY MR. SCHMOOKLER:  I'll rephrase.  I'll take

11   it back.

12               Have you ever used an estimate in lieu of

13   sort of an invoice-or-invoice or billing-by-billing

14   analysis in any other case when alleging overcharging?

15         A.   Sure.  We use estimates -- "we," generically,

16   forensic accountants, me, specifically, Dan Ray, use

17   estimates all the time.  It's extremely rare, if ever,

18   that I get a hundred percent of every single document I

19   can could possibly want in a case.

20               So there's holes that need to get filled by

21   use of estimations, interpretations of data.  It happens

22   all the time.  And what you do at the end of that is you

23   look to see whether the estimate yields a result that's

24   reasonable.

25               And now we compare and contrast my estimate



Page 115

1    that I believe yields a reasonable result with the

2    estimate and the calculations used by your expert that I

3    believe yields a completely incorrect result that could

4    not possibly be correct.

5              So the approach to be taken is utilize

6    estimations, and then you take a step back and you say,

7    "Am I yielding a result and analysis that appears to be

8    reasonable?"

9              And my opinion is that your expert's

10   analysis, while I understand it, yields a result that

11   could not possibly be correct.

12        Q.   Let's take a step back.

13             Your estimate occurred before our expert did

14   anything; correct?

15        A.   I know my report was filed before his.  I

16   don't know what work he was doing while I was doing my

17   analysis.

18        Q.   But you did the estimate in 2018; correct?

19        A.   Well, I wrote a report way back then in 2018.

20   It's not the report that was issued in this particular

21   case.

22        Q.   But in 2018 is when you devised the 25

23   percent estimate?

24        A.   Correct.

25        Q.   Okay.



Page 122

1    estimate?

2              A.    Industry standard?  No.

3              Q.    Did you apply any sort of recognized

4    methodology from any authoritative source in deciding

5    whether or not 25 percent would be reasonable?

6              A.    We would point back to the litigation

7    consulting standards that the -- person performing the

8    work has to have professional competency, they exhibit due

9    professional care during the course of their engagement,

10   in the exercise of, in this case, determining estimations,

11   and adequately planning and supervision of their work.

12              I plan to work.  I utilized a qualified staff

13   member to assist me.  I exercised due professional care.

14   I relied upon sufficient relevant data in order to come up

15   with my estimate.  So that would be the standard.

16              And then I would supplemental that with 40

17   years' worth of training, various certifications.  I am a

18   certified public accountant.  I'm certified in financial

19   forensic by AICPA.  I'm a certified fraud examiner, former

20   FBI, special agent, with particular training in analyzing

21   financial records.  I have done this for 40 years.

22              So that would be the environment in which I

23   did this work and came up with this estimation.

24              Q.    Do you have any certifications relating to

25   evaluating the reasonableness of an estimate?



Page 178

1           The examples you've given in your

2    supplemental report identify the Beaumont entity for whom

3    services were provided; correct?

4               MR. PISANO:  Object to form.

5               THE WITNESS:  Correct.

6           Q.   BY MR. SCHMOOKLER:  And you know from

7    Mr. Berg's testimony that there was specific Beaumont

8    entities that were outside of the contractual agreement;

9    correct?

10              MR. PISANO:  Object to form.

11              THE WITNESS:  Yes.

12          Q.   BY MR. SCHMOOKLER:  And you did not subtract

13   from your computation the entities that are outside the

14   contract consistent with Mr. Berg's testimony, even though

15   you could do so by just looking at the invoice?

16              MR. PISANO:  Object to form.

17              THE WITNESS:  No.  I did not, based upon

18   Mr. Berg's testimony, make a subtraction from invoices

19   issued and paid from the community facilities district,

20   which was formed for a variety of districts.

21              In fact, Exhibit 41 to my report is an

22   exhibit that talks about all the different districts that

23   are being paid from bond proceeds, the Community Facility

24   District 93-1.

25          Q.   BY MR. SCHMOOKLER:  But my question is more



Page 179

1    specific than that.  You did not subtract out from your

2    computation billing for work for entities that

3    Mr. Berg acknowledges are outside the contract; correct?

4              A.   Correct.

5              Q.   And so even though, for example, the City

6    Council understood the water district is outside the scope

7    of any cap, did you subtract out billings for the water

8    district?

9              MR. PISANO:  Object to form.

10             THE WITNESS:  I did not.

11             Q.   BY MR. SCHMOOKLER:  And the same would be

12   true for all the other districts that Mr. Berg mentioned

13   that are outside the cap?

14             A.   Correct.

15             MR. PISANO:  Same.

16             Q.   BY MR. SCHMOOKLER:  You said in your

17   report -- and I just want to find it.  It was interesting.

18             You know, before I ask that, go to page 6 of

19   your supplemental report, please.

20             A.   (Witness complies.)

21             Q.   On page 6 and 7, you criticize Mr. Tasker's

22   invoice-by-invoice analysis.  Do you see that?

23             A.   I do.

24             Q.   And is it fair to say that you do not believe

25   that an invoice-by-invoice analysis is possible?



Page 205

```
1

2

3

4          I, DANIEL RAY, do hereby declare under penalty of

5    perjury that I have read the foregoing transcript of my

6    deposition; that I have made such corrections as noted

7    herein, in ink, initialed by me, or attached hereto; that

8    my testimony as contained herein, as corrected, is true

9    and correct.

10         EXECUTED this 9th day of August 2022

11   at _____Alamo_____, ____CA____.
                (City)              (State)

12

13

14

15

16         DANIEL RAY

17

18

19

20

21

22

23

24

25
```



MAGNA
LEGAL SERVICES

1

2          I, the undersigned, a Certified Shorthand Reporter

3    for the State of California, do hereby certify:

4          That prior foregoing proceedings were taken

5    completely video before me at the time and place herein

6    set forth; that any witnesses in the foregoing

7    proceedings, prior to testifying, were placed under oath;

8          That a verbatim record of the proceedings was made

9    by me using machine shorthand which was thereafter

10   transcribed under my direction; further, that the

11   foregoing is an accurate transcription thereof.

12         I further certify that I am neither financially

13   interested in the action nor a relative or employee of any

14   attorney of any of the parties.

15         IN WITNESS WHEREOF, I have this date subscribed my

16   name.

17

18   Dated:  July 20, 2022

19

20

21

22                        _Laura A. Rutherford_

23                        _____
                         Laura A. Rutherford, RPR
                         CSR No. 9266

24

25

