# EXHIBIT 5



**Expert Report of Richard E. Tasker**

**in the matter of**

*Western Riverside Council of Governments and City of Beaumont v.*
*National Union Fire Insurance Company of Pittsburgh, PA, et al.*

**United States District Court, Central District of California, Eastern Division**

**Case No. 5:20-cv-02164- GW (KKx)**

<u>**PREPARED BY**</u>

Richard E. Tasker
Sage Associates, Inc.
2361 Campus Drive, Suite 111
Irvine, California 92612
(949) 724-9600  |  rtasker@sage-associates.com

May 31, 2022

Sage #2526

Tasker
Exhibit
002

# TABLE OF CONTENTS

I.      Scope ................................................................................................................1

II.     Assignment and Qualifications........................................................................2

III.    Materials Reviewed .........................................................................................3

IV.     Background Facts .............................................................................................5

      A.      Beaumont and WRCOG's Claims against NUFIC ...............................6

      B.      Beaumont's Retention of Urban Logic Consultants ............................7

      C.      The Urban Logic Contracts .................................................................8

            1.      September 27, 1993 Agreement................................................8

            2.      April 11, 1994 Amendment ......................................................9

      D.      Services Provided by and Payment to ULC .........................................10

      E.      Hemming Morse Report........................................................................14

      F.      HSNO Reports .....................................................................................17

V.      Methodology ...................................................................................................19

VI.     Opinions...........................................................................................................21

      A.      Opinion 1:  Industry Practices Allowed ULC to Request Contract Deviations and Upon Approval of the City Council, the Invoice Amounts in Excess of any 4.5% Cap..............................................................................................................22

      B.      Opinion 2:  Even Absent City Council Approval, the City was Already Reimbursed for any Alleged Overcharges........................................................................28

            1.      Step 1:  Identify Amounts Paid by City of Beaumont........................29

            2.      Step 2:  Compute the Contractual Caps .................................30

            3.      Step 3:  Analysis of ULC Invoices.........................................33

            4.      Step 4:  Comparison of Billing to Contractual Caps Computation ...................38

            5.

VII.    Conclusion........................................................................................................41

**EXHIBITS**

    A.      Curriculum Vitae of Richard E. Tasker

    B.      List Depositions and Testimony of Richard E. Tasker during the Last Four Years and All Publications Authored by Richard E. Tasker in the Previous 10 Years

    C.      Union Bank Statements against Invoices

    D.      ULC Invoice Spreadsheet

    E./E.1 Contractual Caps/Calculations for 2008

    F.      Summary of Billing Codes by Sage Analysis


**APPENDICES**

    1.      Materials Reviewed – Invoices from Urban Logic Consultants, 2008-2012

    2.      Materials Reviewed – City of Beaumont Capital Improvement Plans, 1994-2012

    3.      Materials Reviewed – City of Beaumont Council Resolutions, 1993-2011

The following report provides my opinions based upon my review of the facts and materials of this case to date, along with my education, training, experience and credentials. I reserve the right to enhance, expand or limit these opinions based upon yet unseen materials and information.[1] All opinions expressed in this report are expressed to a reasonable degree of professional certainty, and are based upon my personal experience on construction consulting, industry standards, and customarily accepted construction practices.

## I.    SCOPE

Sage Associates, Inc. ("Sage") was retained to evaluate damages claimed by Western Riverside Council of Governments ("WRCOG") and City of Beaumont ("the City" or "Beaumont") against National Union Fire Insurance Company of Pittsburgh, PA ("NUFIC") in this litigation. I understand based on my review of the materials in this case that NUFIC insured Beaumont, and that Beaumont and WRCOG, as assignee of Beaumont's claim, seek to recover loss from NUFIC on the theory that Ernest Egger, David Dillon and Deepak Moorjani ("ULC Principals") stole from Beaumont through their consulting company, Urban Logic Consultants ("ULC").[2] Although Beaumont contracted with and received services from ULC for more than two decades,[3] I understand that Beaumont alleges that ULC and the ULC Principals fraudulently inflated their invoices, resulting in overcharges to the City.[4]

Beaumont, through Daniel Ray of Hemming Morse, offered a damage calculation predicated on the theory that ULC's contract with Beaumont capped charges for some services at a singular cap of 4.5% of the project cost.[5] Mr. Ray assumed that 25% of the total invoiced services fell outside of the singular cap and then evaluated whether the remaining 75% exceeded 4.5% of the project costs.[6] During my career, I have been asked to evaluate design and construction costs and billing, and to compare design and construction costs and billing to budgets and construction contracts. In my experience, this analysis requires an analysis of the invoices and billing entries. I am not aware of any reasonable or customary practice to support Mr. Ray's assumption that 25% of ULC's fees were excluded from any contractual billing cap. Typically, municipalities operate on an annual budget based on the needs for individual projects to be undertaken that year. A proper analysis of potential overcharging

---

[1]   I understand the depositions of Elizabeth Gibbs, City of Beaumont's corporate representative and Beaumont Financing Authority's corporate representative were recently completed. Because those transcripts are not available in final form, I reserve the right to update and amend this report upon review of the transcripts from those depositions.

[2]   First Amended Complaint, ¶ 28 (Dkt. 20) and "Report of Findings on the Investigation of: Urban Logic Consulting [sic], David Dillon, Ernst [sic] Egger, Deepak Moorjani, GGMS, Inc., Alan Kapanicas," by Daniel W. Ray and Hemming Morse, LLP, dated September 25, 2018 ("Ray Report") (BEAUAIG0003964).

[3]   First Amended Complaint, ¶ 19. I have not reviewed any of the insurance policies issued by NUFIC to Beaumont and do not offer any opinions on the policies and whether the policies provide coverage in this matter.

[4]   First Amended Complaint, ¶ 28; Ray Report (BEAUAIG0003964).

[5]   Ray Report, Exhibit B (BEAUAIG0003994).

[6]   Ray Report, Exhibit B (BEAUAIG0003994).

Expert Report of Richard E. Tasker
*Western Riverside Council of Governments/City of Beaumont v. National Union Fire Insurance Company of Pittsburgh, PA, et al.* | United States District Court, Central District of California, Eastern Division, Case No. 5:20-cv-02164- GW (KKx)
May 31, 2022
Page 2

for design or construction invoices necessitates a detailed analysis of the work being billed on each individual invoice.

Consistent with my experience, I have been asked by NUFIC to express opinions on the following: First, as explained below, I understand that the Beaumont City Council received budget projections (in the form of Capital Improvement Plans) and that those budget projections reflected that ULC's costs for certain specified services would, in some cases, exceed the 4.5% caps in its contract.[7]  I understand that City Council approved the budgets, with the understanding that ULC's costs for those specified services would, in some cases, exceed the 4.5% caps in its contract.[8]  I was first asked to opine on whether reasonable and customary practices allowed ULC to rely upon City Council approval of budgets (including approval to exceed contractual billing caps). Second, I was asked to analyze ULC's invoices and in the alternative, evaluate whether those invoices reflected charges in excess of the 4.5% caps on the specified services.

## II.   ASSIGNMENT AND QUALIFICATIONS

My Curriculum Vitae is attached here as **EXHIBIT A** and sets forth my education, training, experience and credentials. I am the Owner and President of Sage and have worked as a construction consultant since 1975. Sage is a 36-year old construction consulting firm, headquartered in Irvine, California.  The business of Sage involves the investigation and analysis of construction claims and disputes.  We are a group of Construction Managers, Contractors, Engineers and Architects providing consulting services.  Our clients include Federal and State Agencies, International and local private developers, manufacturers, commercial interests, contractors, subcontractors, lenders, Surety companies and various types of design and construction insurers.  Additional information on Sage can be obtained from our website www.Sage-Associates.com.

I am also the majority owner of S&W Investments, Inc. d/b/a Sage Contractor Services ("S&W").  S&W is a California, "A" and "B" licensed general contractor. S&W has performed tens of millions of dollars' worth of construction projects, most involving public works, including work for the United States Army Corp of Engineers, various municipalities and multiple school districts.

I was trained at the internationally recognized Straus Institute for Dispute Resolution at Pepperdine University School of Law and perform a limited amount of mediations annually, via Sage Mediation Services.  For more than five years I have also functioned as the

---

7    Declaration of Lawrence Dressel, ¶ 14; Deposition of Roger Berg, 129:15-21.
8    Declaration of Lawrence Dressel, ¶ 14; Deposition of Roger Berg, 129:15-21.

Expert Report of Richard E. Tasker
*Western Riverside Council of Governments/City of Beaumont v. National Union Fire Insurance Company of*
*Pittsburgh, PA, et al.* | United States District Court, Central District of California, Eastern Division, Case No.
5:20-cv-02164- GW (KKx)
May 31, 2022
Page 3

embedded Third Party Neutral for almost a billion dollars' worth of fast track construction for a major international technology manufacturer. I have been involved in dozens of construction mediations in my career as a retained expert and have qualified and testified as an expert in both Federal and multiple State proceedings on myriad subjects, including but not limited to project delivery systems, construction scheduling and delays, construction budgeting and job cost accounting, labor productivity, change order entitlement and change order management, quality, jobsite safety and construction management services.

A list of all other cases in which I've testified as an expert at trial or by deposition during the last four years as well as all publications I have authored in the previous 10 years is attached as **EXHIBIT B**.

I am being compensated at a rate of $275 per hour for my time related to my investigation, review of materials, and all other preparatory activities, including preparation of my report; at a rate of $395 for deposition and trial testimony. I have delegated certain data entry, administrative and clerical tasks to employees of Sage, which are compensated at a lower hourly rate as reflected on the invoices submitted by Sage. Consistent with industry standards, I reviewed that work and incorporate it into my analysis. All analysis, calculations and opinions are my own. My compensation and the compensation of Sage in this case is not dependent on the results of this case.

## III.   **MATERIALS REVIEWED**

In preparation of my opinions in this case, I reviewed the following materials:

- First Amended Complaint (Dkt. 20);

- Response of Plaintiffs WRCOG and City to Defendant NUFIC's Requests for Admission;

- Contracts entered into between the City and Urban Logic Consultants, Inc., including the following:

   o   Agreement for Technical and Professional Services Comprehensive Public Facilities Financing Program for the City of Beaumont ("CPFFP Agreement"), dated March 22, 1993 (LOC4-032105);

Expert Report of Richard E. Tasker
*Western Riverside Council of Governments/City of Beaumont v. National Union Fire Insurance Company of Pittsburgh, PA, et al.* | United States District Court, Central District of California, Eastern Division, Case No. 5:20-cv-02164- GW (KKx)
May 31, 2022
Page 4

- o   Agreement for Planning, Economic Development and Public Works Services, dated September 27, 1993 (BEAUAIG0000695 – BEAUAIG0000725);

- o   Agreement Amending the Agreement for Planning, Economic Development and Public Works Services, dated April 11, 1994 (BEAUAIG0000674 - BEAUAIG0000676);

- Invoices from Urban Logic Consultants, Inc. from 2008 through 2012, as identified in Appendix A, attached here;

- City of Beaumont Capital Improvement Plans for fiscal years 1994 through 2012, as identified in Appendix B, attached here;

- City of Beaumont Council Resolutions from 1993 through 2011, as identified in Appendix C, attached here;

- "Report of Findings on the Investigation of: Urban Logic Consulting [sic], David Dillon, Ernst [sic] Egger, Deepak Moorjani, GGMS, Inc., Alan Kapanicas," by Daniel W. Ray and Hemming Morse, LLP, dated September 25, 2018, including attachments (BEAUAIG 0003963 – BEAUAIG0004174);

- "Status Report – Preliminary & Tentative," dated August 18, 2017; "Supplemental Report," dated May 15, 2019; and "Supplemental Report," dated August 16, 2019 by Hagen, Streiff, Newton & Oshiro, Accountants, P.C, including attachments;

- Deposition transcripts, including exhibits, of Roger Berg, David Castaldo, and Brian DeForge;

- Declarations of Brian DeForge; Lawrence Dressel; and Ernest Egger;

- Urban Logic Consultants Hourly Rate Schedule, Effective April 2, 2011 (BEAUAIG0004124);

- Payments by the City of Beaumont to Urban Logic Consultants and Urban Logic Services (NUFIC_011043-011059);

- Subpoenaed records from Union Bank;

Expert Report of Richard E. Tasker
*Western Riverside Council of Governments/City of Beaumont v. National Union Fire Insurance Company of Pittsburgh, PA, et al.* | United States District Court, Central District of California, Eastern Division, Case No. 5:20-cv-02164- GW (KKx)
May 31, 2022
Page 5

- City of Beaumont Report on Municipal Services Privatization, October 1, 2010, updated February 2011 (ULCAIG0003410 – ULCAIG0003419);

- Felony Plea Forms of:

  - Deepak Moorjani, filed October 20, 2017 (BEAUAIG0003959-60);

  - David William Dillon, filed December 19, 2017 (BEAUAIG0003911-12);

  - Ernest Alois Egger, filed December 19, 2017 (BEAUAIG0003388-89); and

  - Alan Charles Kapanicas, filed December 19, 2017 (BMTGJ0000018-19);

- Settlement and Release Agreement between:

  - WRCOG and Deepak Moorjani, dated October 20, 2017 (ULCAIG0059062-66);

  - WRCOG and David Dillon, dated December 18, 2017 (ULCAIG0068976-82); and

  - WRCOG and Ernest Egger, dated December 18, 2017 (ULCAIG0068983-89);

- Western Riverside Council of Governments General Ledger Report (BEAUAIG0049067-119).

## IV.   **BACKGROUND FACTS**

Before explaining my analysis and opinions in this case, I will describe my understanding of the facts underlying the lawsuit filed by WRCOG and Beaumont against NUFIC based on my review of the above materials. I do not intend to testify as a fact witness, but instead summarize my understanding of the facts to provide context for my opinions and to highlight the underlying basis for my opinions.

Expert Report of Richard E. Tasker
*Western Riverside Council of Governments/City of Beaumont v. National Union Fire Insurance Company of Pittsburgh, PA, et al.* | United States District Court, Central District of California, Eastern Division, Case No. 5:20-cv-02164- GW (KKx)
May 31, 2022
Page 6

A.      **Beaumont and WRCOG's Claims against NUFIC**

Based upon my review of the First Amended Complaint, I understand that WRCOG and Beaumont allege[9] as follows:

> WRCOG is a California Joint Powers Authority operating in Riverside County in the State of California.[10]  Beaumont is a municipal corporation in the County of Riverside in the State of California.[11]  Beaumont assigned to WRCOG any assignable claims the City has against NUFIC under two government crime insurance policies.[12]  The insurance policies were issued by NUFIC to CSAC Excess Insurance Authority and named Beaumont as an additional insured.[13]  Beaumont and WRCOG (as assignee) bring this action against NUFIC to recover alleged loss the City incurred, as more fully described below.[14]
>
> In the early 1990s, the City hired David Dillon, Ernest Egger and Deepak Moorjani – owners and Principals of Urban Logic Consultants ("ULC") – to manage the planning, engineering, and economic development of the City.[15] Dillon served as Economic Development Director of Beaumont; Egger served as Planning Director of Beaumont; and Moorjani served as City Engineer/Director of Public Works for Beaumont.[16]  While the ULC Principals served as city officials for Beaumont, the City contracted with ULC to assist with projects and capital improvements.[17]
>
> In April 2015, the FBI and California state authorities executed a search warrant at City Hall and the ULC offices.[18]  Thereafter the County of Riverside District Attorney's Office filed a felony complaint against Dillon, Egger, Moorjani and others.[19]  I understand that Dillon, Egger, and Moorjani

---

[9]     I do not offer any opinion on the veracity of WRCOG and Beaumont's allegations, but include this overview to provide context for my opinions.
[10]    First Amended Complaint, ¶ 1.
[11]    First Amended Complaint, ¶ 2.
[12]    First Amended Complaint, ¶¶ 3, 29.
[13]    First Amended Complaint, ¶ 29.
[14]    First Amended Complaint, ¶¶ 63-68.
[15]    First Amended Complaint, ¶ 18.
[16]    First Amended Complaint, ¶ 18.
[17]    First Amended Complaint, ¶ 19.
[18]    First Amended Complaint, ¶ 24.
[19]    First Amended Complaint, ¶ 26.

ultimately pled guilty to violating conflict of interest law and that they, along with others, paid over $11,000,000 in restitution.[20]

The City sought to recover alleged loss it incurred with regard to the conduct of Dillon, Egger, Moorjani and others from NUFIC under the policies.[21] The City hired Dan Ray to review and analyze the City's financial records to investigate its alleged loss.[22] Mr. Ray concluded that ULC overbilled the City in excess of $58 million by allegedly falsifying invoices.[23]

**B.    Beaumont's Retention of Urban Logic Consultants**

Prior to 1993, Beaumont relied on internal staff supported by outside contractors to provide public planning, economic development and public works services.[24] After facing fiscal and service delivery challenges, Beaumont began to transition from internal staff to contract services.[25] Beaumont issued a request for proposals to develop a program to finance and develop infrastructure to facilitate community development.[26] As a result of the competitive bidding, Beaumont retained ULC.[27] ULC assumed responsibility for developing a comprehensive finance and community infrastructure development plan.[28]

According to Beaumont's City Manager, ULC was instrumental in "(1) Execution of Cooperative Agreements with BUSD [Beaumont Unified School District], BCVWD [Beaumont-Cherry Valley Water District] and the San Gorgonio Pass Water Agency to usher in a new era of cooperation among local service providers; (2) the design, financing and construction of a new wastewater reclamation facility; and (3) the

---

[20]   First Amended Complaint, ¶ 26; Felony Plea forms of Deepak Moorjani, filed October 20, 2017 (BEAUAIG0003959-60); David William Dillon, filed December 19, 2017 (BEAUAIG0003911-12); Ernest Alois Egger, filed December 19, 2017 (BEAUAIG0003388-89); and Alan Charles Kapanicas, filed December 19, 2017 (BMTGJ0000018-19). Settlement and Release Agreement between: WRCOG and Deepak Moorjani, dated October 20, 2017 (ULCAIG0059062-66); WRCOG and David Dillon, dated December 18, 2017 (ULCAIG0068976-82); and WRCOG and Ernest Egger, dated December 18, 2017 (ULCAIG0068983-89); Western Riverside Council of Governments General Ledger Report (BEAUAIG0049067-119).

[21]   First Amended Complaint, ¶ 37.

[22]   First Amended Complaint, ¶ 45.

[23]   First Amended Complaint, ¶ 46.

[24]   City of Beaumont Report on Municipal Services Privatization, October 1, 2010, updated February 2011, ("Report on Municipal Privatization") p. 2 (ULCAIG0003413); Deposition of Roger Berg, 31:21-32:8.

[25]   Report on Municipal Privatization, p. 1 (ULCAIG0003412).

[26]   Report on Municipal Privatization, p. 2 (ULCAIG0003413); Deposition of Roger Berg, 33:20-25.

[27]   Report on Municipal Privatization, p. 2 (ULCAIG0003413); Deposition of Roger Berg, 34:1-7; Agreement for Technical and Professional Services Comprehensive Public Facilities Financing Program for the City of Beaumont ("CPFFP Agreement"), dated March 22, 1993 (BEAUAIG0000577).

[28]   Report on Municipal Privatization, p. 2 (ULCAIG0003413); CPFFP Agreement; Deposition of Roger Berg, 34:8-11.

Expert Report of Richard E. Tasker
*Western Riverside Council of Governments/City of Beaumont v. National Union Fire Insurance Company of*
*Pittsburgh, PA, et al.* | United States District Court, Central District of California, Eastern Division, Case No.
5:20-cv-02164- GW (KKx)
May 31, 2022
Page 8

establishment of Community Facilities District 93-1 (CFD 93-1) to form the basis
for effective and efficient financing of infrastructure in the City."[29] As a result of
these efforts, ULC showed it had "the capability to integrate creative solutions to a
complex series of issues and problems and forged a vision for how the City can
effectively manage development and growth for the future."[30] Based upon ULC's
successful performance, the Beaumont City Council requested that Urban Logic
expand its services to assume the City's Planning, Economic Development and
Public Works services.[31]

## C.   The Urban Logic Contracts

Based upon my review of the materials provided in support of the City's claim, I
understand that the City and ULC entered into two contracts with respect to
planning, economic development and public works services, one dated September
27, 1993[32] and an amendment dated April 11, 1994[33].  I do not intend to offer any
interpretation of these contracts, but in order to provide context to my opinions, I
will briefly summarize the provisions of these agreements.

### 1.   September 27, 1993 Agreement

On September 27, 1993, Beaumont entered into an Agreement for Planning,
Economic Development and Public Works Services with ULC (the
"Agreement").[34]  Pursuant to the Agreement, Beaumont retained ULC as a
consultant to provide planning, economic development and public works
services.[35] As explained below, the Agreement contains three provisions
affecting my analysis.

First, pursuant to Section V of the Agreement, titled "Plan Checking and
Construction Inspection," ULC was to provide "all necessary plan checking
and inspection services for public works projects" in Beaumont.[36]

---

[29]   Report on Municipal Privatization, p. 2 (ULCAIG0003413).
[30]   Report on Municipal Privatization, p. 2 (ULCAIG0003413).
[31]   Report on Municipal Privatization, p. 2 (ULCAIG0003413).
[32]   Agreement for Planning, Economic Development and Public Works Services ("Agreement"), dated September 27,
1993 (BEAUAIG0000695 – BEAUAIG0000725).
[33]   Agreement Amending the Agreement for Planning, Economic Development and Public Works Services, dated
April 11, 1994 ("Amendment") (BEAUAIG0000674 - BEAUAIG0000676).
[34]   Agreement (BEAUAIG0000695 – BEAUAIG0000725).
[35]   Agreement, Sections I, II, III and IV, pgs. 1-7.
[36]   Agreement, Section V, pg. 7.

Expert Report of Richard E. Tasker
*Western Riverside Council of Governments/City of Beaumont v. National Union Fire Insurance Company of*
*Pittsburgh, PA, et al.* | United States District Court, Central District of California, Eastern Division, Case No.
5:20-cv-02164- GW (KKx)
May 31, 2022
Page 9

Second, Section VII of the Agreement, titled "Additional Services," provided
that Beaumont may authorize ULC "to perform additional services on an as-
needed basis."[37]  The Agreement identifies a non-comprehensive list of
"Additional Services," which includes major ordinance or general plan
revisions, preparation of environmental impact reports and other major
planning documents, major overhauling of City mapping systems, clerical
services beyond those available from City staff, and bid document
preparation.[38]

Third, Section IX of the Agreement, titled "Compensation to
CONSULTANT," sets forth the fees paid to ULC for each of the services
identified in the Agreement.[39] Sub-paragraph 2 of Section IX provides that
for Plan Checking and Construction Inspection services, "compensation shall
be on a time and materials basis not exceeding four and one-half percent of
the confirmed construction costs of the public improvements to be
constructed."[40] Section IX further provides in sub-paragraph 4, that the
"Additional Services" set forth in section VII of the Agreement are to be
paid on an hourly rate basis in accordance with the Hourly Rate Schedule
attached as Exhibit A to the Agreement.[41] The hourly rate schedule changed
over time, as approved by the Beaumont City Council.[42]

2.   **April 11, 1994 Amendment**

On April 11, 1994, Beaumont and ULC entered into an Agreement
Amending the Agreement for Planning, Economic Development and Public
Works Services (the "Amendment").[43] The Amendment modifies Section V
of the Agreement to include a subsection, "Section V.1" related to Public
Works Construction Management services.[44]  Pursuant to Section V.1 of the
Amendment, "ULC, under the supervision of the Director of Public Works,
shall provide construction management services during all phases of public
works construction …."[45]  Section V.1 of the Amendment further provides

---

37   Agreement, Section VII, pg. 7.
38   Agreement, Section VII, pgs. 7-8.
39   Agreement, Section IX, pg. 8.
40   Agreement, Section IX, pg. 8.
41   Agreement, Section IX, pg. 8; see also Exhibit A to Agreement.
42   Deposition of Roger Berg, 48:22-49:5.
43   Amendment (BEAUAIG0000674 - BEAUAIG0000676).
44   Amendment, pg. 1-2.
45   Amendment, pg. 2.

Expert Report of Richard E. Tasker
*Western Riverside Council of Governments/City of Beaumont v. National Union Fire Insurance Company of*
*Pittsburgh, PA, et al.* | United States District Court, Central District of California, Eastern Division, Case No.
5:20-cv-02164- GW (KKx)
May 31, 2022
Page 10

that "ULC shall provide construction management for each public works
project before, during and after completion of various stages of construction
including the following services related to the planning, control, scheduling,
estimating and value engineering of public works projects …."[46] Section V.1
of the Amendment identifies a list of twenty-one "Construction Management
Services."[47]

The Amendment also amends Section IX of the September 27, 1993
Agreement to include an additional subsection setting forth the
compensation to ULC for construction management services.[48] The
Amendment provides that "[f]or services set forth in SECTION V.1,
compensation shall be on a time and materials basis not exceeding four and
one-half percent (4.5%) of the bid price awarded by the City for each
project."[49]

### D.    Services Provided by and Payment to ULC

ULC, under the ownership of the ULC Principals, provided planning, economic
development, public works, construction management, contractor, engineering,
design, surveying and other professional services to Beaumont from 1993 through
August 2012.[50] Based on the plain wording of the Agreement and Amendment, the
Declaration of Mr. Egger, and upon testimony from members of the City Council, I
understand that the 4.5% cap on services set forth in Section V applied to plan
checking and construction inspection services; and a separate 4.5% cap applied to
construction management services as set forth in Section V.1.[51] ULC performed or
outsourced engineering, surveying and/or contractor services that were billed on an
hourly rate and not subject to the fee caps.[52] ULC's contracts with Beaumont were
reviewed and approved by City Council on an annual basis.[53]

While Beaumont grew dramatically in the 1993 -2012 period, doubling in population
multiple times, the needs and demands for the various levels of public support

[46]    Amendment, pg. 2.
[47]    Amendment, pg. 2.
[48]    Amendment, pg. 3.
[49]    Amendment, pg. 3.
[50]    Report on Municipal Services, pgs. 5-6; Ray Report, pg. 3; Deposition of Roger Berg, 35:17-36:13.
[51]    Agreement; Amendment; Declaration of Lawrence Dressel, ¶ 10; Deposition of Roger Berg, 58:21-59:1; Declaration
of Ernest Egger, ¶ 11.
[52]    Declaration of Lawrence Dressel, ¶ 11; Deposition of Roger Berg, 61:7-13.
[53]    Deposition of Roger Berg, 39:12-24; 55:11-56:1.

Expert Report of Richard E. Tasker
*Western Riverside Council of Governments/City of Beaumont v. National Union Fire Insurance Company of*
*Pittsburgh, PA, et al.* **| United States District Court, Central District of California, Eastern Division, Case No.**
**5:20-cv-02164- GW (KKx)**
**May 31, 2022**
**Page 11**

services varied (i.e., Growth and corresponding needs for City services was
inconsistent.)[54] ULC responded to the somewhat unpredictable demands by adopting
a "demand-responsive" approach (i.e., as "additional services" were required by the
City) via the City Council, ULC added or reduced the volume of its staff and
particularly of its numerous independent contractors.[55]

Beaumont's City Council was responsible for approving all public works projects for
the City and the funding for those projects.[56] The City Council approved public
works projects and funding through its approval of annual Capital Improvement
Plans ("CIPs").[57]  ULC was a professional contractor identified in the CIPs and was
involved in the preparation and approval of Beaumont's CIPs.[58] The CIPs included a
budget summary that categorized the costs associated with each project, and the
costs for services associated with each project identified in the CIP.[59] Budgets for
services ULC performed on public works projects were disclosed to and approved
by the City Council.[60] Changes to budgets or scopes of work had to be approved by
the City Council.[61] Through its approval of CIPs, the City Council authorized city
staff and the qualified professional contractors identified in the plans, including
ULC, to take all necessary actions to complete the projects as set forth in the CIP.[62]

As reflected in the CIPs and confirmed by former City Councilmen Roger Berg and
Lawrence Dressel, the fees that ULC charged for Section V (plan checking and
construction inspection) and Section V.1 (construction management) services, in
some instances, exceeded the fee caps set forth in the Agreement and Amendment.[63]
As explained by Mr. Egger, "[t]he City Council had the authority to approve
proposals and work that may have exceeded the 4.5% 'caps.'"[64] The fees that ULC
charged for plan checking, construction inspection and construction management
services, in some instances, exceeded the fee caps because of the nature and scope of
the City's public works projects as the City expanded and grew (i.e., required more

---

[54]    Report on Municipal Services, pgs. 1-3.
[55]    Report on Municipal Services, pgs. 1-3.
[56]    Deposition of Roger Berg, 22:22-23:6
[57]    Declaration of Lawrence Dressel, ¶¶ 3-5, Deposition of Roger Berg, 119:14-23, 122:1-10.
[58]    Deposition of Roger Berg, 130:4-131:9; Declaration of Ernest Egger, ¶ 11.
[59]    Declaration of Lawrence Dressel, ¶ 4; Berg Deposition, 126:15-128:2.
[60]    Deposition of Roger Berg, 134:18-136:1.
[61]    Deposition of Roger Berg, 136:20-137:3.
[62]    Declaration of Lawrence Dressel, ¶ 5.
[63]    Declaration of Lawrence Dressel, ¶ 14; Deposition of Roger Berg, 129:15-21.
[64]    Declaration of Ernest Egger, ¶ 11.

Expert Report of Richard E. Tasker
*Western Riverside Council of Governments/City of Beaumont v. National Union Fire Insurance Company of*
*Pittsburgh, PA, et al.* | United States District Court, Central District of California, Eastern Division, Case No.
5:20-cv-02164- GW (KKx)
May 31, 2022
Page 12

ULC provided services).[65] Mr. Berg testified that the substantial amount of work
ULC performed outside of the 4.5% caps was not reflected in Mr. Ray's analysis.[66]
Mr. Berg so testified because (1) services pertaining to PE and PM [project engineer
and project management]; engineering; survey/GIS [global information services];
design and construction contractor services were not subject to a 4.5% caps;[67] and
(2) services billed for private projects and agency services such as the water, school,
and parks and recreation districts, were not subject to a 4.5% caps.[68]

According to Mr. Egger, "[a]ll ULC employees and contractor employees providing
services to the City were required internally at ULC to submit weekly time sheets
specifying in detail the quantity of time devoted to a specific task and project, and a
description of the tasks undertaken. The time cards were collected by ULC's Office
Manager and they were then reviewed by the relevant supervisor of the particular
service(s) that were being provided. Following that review, invoices were prepared by
ULC's Office Manager. The invoices were then reviewed and approved by a
principal/owner of ULC and then submitted to the City."[69] The City Council (with
members who had construction, construction management, and finance
backgrounds), was responsible for approving invoices from and payment to the
City's contractors, including ULC.[70] The City Council had final authority for
payment of contractors' invoices, including ULC, following recommendations from
the finance department.[71]

Former City Councilman Berg testified that during his tenure on City Council from
1993 through 2014, he reviewed invoices submitted by ULC.[72] Mr. Berg believes that
ULC appropriately billed for services that it performed on behalf of the City.[73]
Former City Councilmen Brian DeForge similarly testified that he reviewed ULC's
invoices and never believed that ULC submitted inflated invoices or invoices for
work that had not actually been done.[74] Mr. Egger declared that "[t]hroughout its
over 20 years of services" to Beaumont, "ULC never overbilled the City, fabricated

65   Declaration of Lawrence Dressel, ¶ 14; Deposition of Roger Berg, 137:17-138:14; 138:17-139:1; 139:5-10; 144:11
     145:9.
66   Deposition of Roger Berg, 190:14-18; 190:20; 190:25-191:5.
67   Deposition of Roger Berg, 54:22-55:4; 175:6-176:8.
68   Deposition of Roger Berg, 61:2-13; 69:16-70:3.
69   Declaration of Ernest A. Egger, ¶ 5.
70   Deposition of Roger Berg, 23:7-23, 61:18-62:5; Deposition of Brian DeForge, 97:18-98:10; Declaration of Ernest A.
     Egger, ¶ 4.
71   Deposition of Roger Berg, 23:17-19; 67:6-14.
72   Deposition of Roger Berg, 76:5-78:18.
73   Deposition of Roger Berg, 76:5-78:18.
74   Deposition of Brian DeForge, 101:9-102:4.

Expert Report of Richard E. Tasker
*Western Riverside Council of Governments/City of Beaumont v. National Union Fire Insurance Company of Pittsburgh, PA, et al.* | United States District Court, Central District of California, Eastern Division, Case No. 5:20-cv-02164- GW (KKx)
May 31, 2022
Page 13

or misstated invoices, or exceeded the 4.5% 'cap' on plan checking and inspection services or the 4.5% 'cap' on the enumerated construction management services without prior disclosure and approval from City Council."[75] Mr. Berg testified that the City Council also reviewed and approved any hourly rate changes for ULC's services.[76]

During the period of 1993 through August 2012, ULC received payments from the City of Beaumont and Beaumont Financing Authority ("BFA").[77] BFA paid ULC through Union Bank, which served as the bond trustee.[78] Beaumont paid ULC from the general fund.[79]  Based on the testimony of Roger Berg, and admissions by Beaumont, I understand that BFA is a separate legal entity.[80] In particular, Beaumont admitted that BFA was a separate entity and was not a signatory to any of the 1993 agreement with ULC[81]:

| | |
|---|---|
| 1 | **REQUEST FOR ADMISSION NO. 34:** |
| 2 | On March 22, 1993, the City and ULC entered into the 1993 Agreement. |
| 3 | **RESPONSE TO REQUEST FOR ADMISSION NO. 34:** |
| 4 | Responding Parties respond as follows: Admit that the City and ULC entered |
| 5 | into an Agreement for Planning and Economic Development Services on March 22, |
| 6 | 1993. |
| 7 | **REQUEST FOR ADMISSION NO. 35:** |
| 8 | BFA is not a signatory to the 1993 Agreement. |
| 9 | **RESPONSE TO REQUEST FOR ADMISSION NO. 35:** |
| 10 | Admit. |

I am unaware of any written executed by BFA with ULC.

---

[75]   Declaration of Ernest Egger, ¶ 13.
[76]   Deposition of Roger Berg, 48:22-49:5.
[77]   *See* Union Bank Records; Deposition of Roger Berg, 185:2-186:2; 208:11-209:2.
[78]   *See* Union Bank Records.
[79]   Deposition of Roger Berg, 208:11-209:2.
[80]   Deposition of Roger Berg, 185:14-17; Response of Plaintiffs WRCOG and City to Defendant NUFIC's Requests for Admission Nos. 34 & 35.
[81]   Response of Plaintiffs WRCOG and City to Defendant NUFIC's Requests for Admission Nos. 34 & 35.

Expert Report of Richard E. Tasker
*Western Riverside Council of Governments/City of Beaumont v. National Union Fire Insurance Company of Pittsburgh, PA, et al.* | United States District Court, Central District of California, Eastern Division, Case No. 5:20-cv-02164- GW (KKx)
May 31, 2022
Page 14

    E.    **Hemming Morse Report**

I have reviewed the report of Daniel W. Ray of Hemming Morse, LLP ("Ray Report") and understand that Hemming Morse was retained by legal counsel for Beaumont.[82] Mr. Ray offered a damage calculation, focused on the fact that ULC's contract capped charges for some services to 4.5% of the project cost.[83] Mr. Ray acknowledged that not all services were subject to the 4.5% caps, but did not then identify which services were subject to the caps and the amount charged for these services.[84] Instead, Mr. Ray provided a damage calculation based on the assumption that "approximately 25% of the funds paid to ULC from the City of Beaumont were not subject to the 4.5% cap."[85] Thus, Mr. Ray's calculation assumes that 75% of the funds paid to ULC were subject to a single 4.5% fee cap.[86] Mr. Ray then took the total amount of services charged by ULC, subtracted 25% of the billings, and then compared whether the remaining costs exceeded 4.5% of the estimated capital expenditures.[87] In doing so, Mr. Ray determined that ULC overcharged by $58,271,801.36.[88]

Mr. Ray's methodology does not follow commonly accepted practices and does not comply with industry standards used to evaluate construction costs. I disagree with Mr. Ray's methodology for the following reasons.

First, Mr. Ray does not address the testimony of former City Council members, Declaration of Mr. Egger and Beaumont's Capital Improvement Plans. These materials indicate that City Council approved ULC's budgets and approved ULC charging, in some cases, fees in excess of the 4.5% caps.  Mr. Berg confirmed the approvals in his deposition:

    Q:    The fact that the budget for plan check/inspection, and construction management, the fact that those services would necessarily have to exceed the four and a half percent fee cap, was that something that was fully disclosed to the City Council?

    …

---

[82]   Ray Report, pg. 2.
[83]   Ray Report, Exhibit B (BEAUAIG0003994).
[84]   Ray Report, Exhibit B (BEAUAIG0003994).
[85]   Ray Report, pg. 3.
[86]   Ray Report, Exhibit B (BEAUAIG0003994).
[87]   Ray Report, Exhibit B (BEAUAIG0003994).
[88]   Ray Report, pg. 3, Exhibit B (BEAUAIG0003994).

Expert Report of Richard E. Tasker
*Western Riverside Council of Governments/City of Beaumont v. National Union Fire Insurance Company of Pittsburgh, PA, et al.* | United States District Court, Central District of California, Eastern Division, Case No. 5:20-cv-02164- GW (KKx)
May 31, 2022
Page 15

> A:    The amount was always recommended and the actual cost was always provided to the City Council.
>
> Q:    I take it the City Council understood that given the nature and scope of the work that Urban Logic was providing for these projects necessarily had to exceed four and a half percent of the total project costs?
>
> A:    Yes.[89]

Mr. Ray, therefore, incorrectly assumes that any amounts charged in excess of the 4.5% caps constitute overcharging.

Second, Mr. Ray assumes that all services charged by ULC were subject to the contractual caps, including services charged by BFA.[90]   However, as explained above, the City admits that BFA was not a signatory to the 1993 agreement.[91]

Third, Mr. Ray assumes that all services charged by ULC were subject to a single 4.5% cap.[92]   However, the Agreement and Amendment detail two distinct fee caps that apply to different sets of services.  Based upon testimony from members of the City Council, and the declaration of Mr. Egger, I understand that the 4.5% cap on services set forth in Section V applied to "plan checking and construction inspection"; and a separate 4.5% cap on services set forth in Section V.1 applied to "construction management services."[93]

Fourth, Mr. Ray did not conduct an invoice-by-invoice analysis to determine the amount charged for services subject to any contractual caps.[94]  Mr. Ray did not identify the amount charged for these services, but instead assumed that 25% of ULC's services fell outside the caps.[95]   He provided no explanation or factual support for that assumption and did not support that assumption with any detailed analysis.  In my experience, this analysis requires an invoice-by-invoice analysis, and is not predicated upon assumptions.

---

[89]   Berg Deposition, pg. 137:17-138:14; 138:17-139:1; 139:5-10.
[90]   Ray Report, Exhibit B (BEAUAIG0003994).
[91]   Response of Plaintiffs WRCOG and City to Defendant NUFIC's Requests for Admission Nos. 34 & 35.
[92]   Ray Report, Exhibit B (BEAUAIG0003994).
[93]   Declaration of Larry Dressel, ¶ 10; Deposition of Roger Berg, 58:21-59:1; 60:22-61:1; Declaration of Ernest A. Egger, ¶ 10.
[94]   Ray Report, Exhibit B (BEAUAIG0003994).
[95]   Ray Report, Exhibit B (BEAUAIG0003994).

Expert Report of Richard E. Tasker
*Western Riverside Council of Governments/City of Beaumont v. National Union Fire Insurance Company of*
*Pittsburgh, PA, et al.* | United States District Court, Central District of California, Eastern Division, Case No.
5:20-cv-02164- GW (KKx)
May 31, 2022
Page 16

Fifth, Mr. Ray did not account for any restitution paid by the ULC Principals, and
others, and did not subtract the restitution paid to Beaumont and WRCOG from his
computation of damages.

Mr. Ray provides additional opinions regarding ULC's alleged fraud in overstating
employee hours and excessive markups on independent contracts. These opinions
are also based on faulty assumptions due to the lack of documentation to support
them. First, Mr. Ray relies upon inaccurate financing, accounting and payroll records
in his conclusion that there was fraud by the ULC Principals.[96] I concur that the
ULC balance sheets and income statements included in Mr. Ray's report are
inaccurate. I believe the Paychex reporting of its actions and financial payments are
likely accurate, but could be incomplete in that they do not include additional
payrolls. Further, ULC could have paid contractors in cash, such that their earnings
would not be reported on Paychex.

Mr. Ray also imputed wages where there is no supportive data.[97] For example, in
2012, Dillon reported wages of $1,004,170 on his federal return and Moorjani
reported $982,070.[98] While the report asserts that "the principals received the same
level of compensation," it imputes $1,000,000 to Egger.[99]

Finally, Mr. Ray does not differentiate or seek to differentiate between the alleged
overbillings charged to Beaumont as opposed to BFA. The sources of funds for
payment to ULC by Beaumont and BFA, as well as the projects to which those
funds relate, are different.

Mr. Ray concludes that ULC provided invoices to the City (and BFA) which were
"phantom hours (hours not actually worked by anyone) or hours incurred by non-
employees of ULC."[100] The support Mr. Ray uses for this conclusion are hours in
ULC's invoiced hours for 2010 and 2011 and payroll records produced by Paychex
for the same period.[101] Mr. Ray states that a total of 58,099 hours are claimed in
2011, and 13,274 hours are included in the Paychex totals.[102] Mr. Ray concludes "It
appears clear that the total hours claimed on the ULC invoices submitted to the
bond trustee and to Beaumont exceed the hours that were worked by employees of

---

[96]   Ray Report, pgs. 7-12.
[97]   Ray Report, pg. 9.
[98]   Ray Report, pg. 9.
[99]   Ray Report, pg. 9.
[100]  Ray Report, pg. 12.
[101]  Ray Report, pgs. 10-12.
[102]  Ray Report, pg. 12.

Expert Report of Richard E. Tasker
*Western Riverside Council of Governments/City of Beaumont v. National Union Fire Insurance Company of Pittsburgh, PA, et al.* | United States District Court, Central District of California, Eastern Division, Case No. 5:20-cv-02164- GW (KKx)
May 31, 2022
Page 17

ULC."[103] This is not fact, rather it is an opinion based on incomplete data. What *is* clear is one or more of the following:

1.   All of the hours that ULC worked are likely not captured in the Paychex accounting records upon which Mr. Ray relies. Mr. Ray acknowledges that this is likely true in that he identifies nine salaried employees in Exhibit 4 to his report.[104] The total number of hours Mr. Ray calculated for these individuals is 6,240 hours, for an average of 693 annual hours a year.[105] Mr. Ray imputed an addition 6,240 hours for "reasonableness."[106] Said differently, he doubles certain hours without supporting evidence because he believes his original calculation is "unreasonable."

2.   Contract labor is not included in the Paychex "Compensation Report" but was included in the ULC invoices. I concur with Mr. Ray's conclusion that hours worked by others were included in the time and material billings to Beaumont and BFA.[107]

Mr. Ray further concludes "ULC principals applied extraordinary markups to third party invoices."[108] Mr. Ray provides an analysis of one vendor for one calendar year to show these alleged markups. Mr. Ray provides an additional five examples of individual third-party invoices with alleged markups. This analysis is incomplete as it provides a year's worth of alleged markups for one vendor and provides random examples of additional markups. I have not identified any additional records to supplement these analyses and do not believe Mr. Ray's assumptions and methodology used to calculate damages in this way are reliable and customary in practice.

**F.   HSNO Reports**

I have also reviewed the August 18, 2017; May 15, 2019; and August 16, 2019 reports prepared by Hagen, Streiff, Newton & Oshiro, Accountants, P.C. ("HSNO"). HSNO was retained by NUFIC to provide an analysis of Beaumont's claimed loss.

---

[103]   Ray Report, pg. 12.
[104]   Ray Report, Exhibit 4 (BEAUAIG0004010-4015).
[105]   Ray Report, pg. 12.
[106]   Ray Report, pg. 12.
[107]   Ray Report, pg. 12.
[108]   Ray Report, pg. 12.

Expert Report of Richard E. Tasker

*Western Riverside Council of Governments/City of Beaumont v. National Union Fire Insurance Company of Pittsburgh, PA, et al.* | United States District Court, Central District of California, Eastern Division, Case No. 5:20-cv-02164- GW (KKx)

May 31, 2022

Page 18

In its August 16, 2019 report, HSNO determined that the maximum overbilling by ULC was $8,214,943[109], as opposed to the $58,271,801.36 proposed by Mr. Ray:

| Description | Amount |
|---|---|
| Potential Overbilling Base on 4.5% of Cap. Ex. Applied to Total ULC Billings | $2,357,181.00 |
| Potential Overbilling Based on 15% Vendor Markup | $4,469,678.00 to $5,857,762.00 |
| Maximum Combined Overbilling - $2,357,181 + $5,857,762 | $8,214,943.00 |

HSNO calculated the potential billing based on the assumptions applied by Mr. Ray – namely one 4.5% cap that applied to all projects (whether for the City of BFA). Based upon these assumptions, HSNO than determined this category comprised of $2,357,181 of possible overbillings.[110] HSNO performed this by analyzing timekeeper descriptions and found that approximately 13.82% of ULC billings from 2008 through 2012 may have potentially been subject to a 4.5% limit under Section V of the 1994 Agreement.[111]

HSNO prepared its analysis based on the information available at that time and based upon Mr. Ray's assumptions (i.e., one 4.5% cap and the cap applies to BFA). While I agree with HSNO's analysis of ULC billings on an invoice-by-invoice basis, documents later developed allowed me to refine HSNO's analysis and reduce the maximum claimable loss.  In particular, new information obtained in discovery revealed that: 1) any invoices paid by BFA are not subject to any 4.5% caps because it is not a party to the Agreement or the Amendment, and the City admits that it is a separate legal entity; and 2) the Agreement and Amendment provide for two separate 4.5% caps—one cap for inspection and plan checking services; and another cap for construction management services.

HSNO calculated the potential overbilling based on 15% vendor markup by analyzing DJI invoices and survey crew billings from 2004 through 2012. HSNO acknowledges the following underlying assumptions in this analysis:

- This analysis is based on the documents that we identified as ULC subcontractor invoices within the voluminous document production. It is

---

[109]   August 16, 2017 HSNO Report, pg. 7.
[110]   August 16, 2017 HSNO Report, pgs. 6-7.
[111]   August 16, 2017 HSNO Report, pg. 4.

Expert Report of Richard E. Tasker
*Western Riverside Council of Governments/City of Beaumont v. National Union Fire Insurance Company of*
*Pittsburgh, PA, et al.* | United States District Court, Central District of California, Eastern Division, Case No.
5:20-cv-02164- GW (KKx)
May 31, 2022
Page 19

possible that other ULC vendors and their invoices were not provided or
identified.

- Vendors such as LG Consulting, CHJ, Darrel L. Connerton, and Greg Russel
  did not begin billing until 2010, while others billed only prior to 2010.

- The percentage of markup from the subcontractor invoice rate to the ULC
  invoice rate varies drastically from vendor to vendor.

- The total amount invoices by subcontractors in 2010 was more than 228% of
  2009 total billings, and more than 280% of 2008 total billings. As such, 2010
  may not accurately represent what was billed prior to 2008.

- Because limited ULC payroll records for 2010 and 2011 were available for
  review by both HSNO and Hemming Morse, neither of them were able to
  confirm the actual ULC employees as opposed to subcontractors over the
  period tested. Counsel has represented to Sage that Hemming Morse
  provided all available payroll records.[112] "All available" and all are not
  necessarily the same thing.  As a consequence, Sage is unable to advance the
  payroll analysis further than HSNO or Hemming Morse.

In my opinion, Beaumont cannot reasonably or reliably compute overcharging due
to incomplete records. Therefore, I focused on the Agreement, Amendment, Capital
Improvement Plans, testimony and declarations, ULC invoices and the amounts
actually paid by Beaumont and by BFA to ULC.

## V.    <u>METHODOLOGY</u>

Before detailing my analysis, I provide an overview of my methodology and the foundational
steps underlying my analysis.

Beaumont's claim suggests that ULC overcharged for its services to the extent that it
exceeded the 4.5% caps in the Agreement and Amendment.  As stated above, Beaumont's
claim errs in not accounting for both 4.5% caps: one cap for plan checking and inspection
services, and a separate cap for construction management services.  Further, in my
experience, contractors can and often reasonably request deviations from fixed fee
percentage agreement when situations warrant.  When justified, owners often agree to

---

[112]   August 16, 2017 HSNO Report, pgs. 5-6.

Expert Report of Richard E. Tasker
*Western Riverside Council of Governments/City of Beaumont v. National Union Fire Insurance Company of*
*Pittsburgh, PA, et al.* | United States District Court, Central District of California, Eastern Division, Case No.
5:20-cv-02164- GW (KKx)
May 31, 2022
Page 20

reasonable deviations.  In the construction industry, it is customary to review Public Services
contracts annually and to submit change orders to amend the scope of work for a contract
pursuant to the specifications of any project. It is also customary for a city to analyze
budgets annually for projects the city will undertake in that given year. Accordingly, I
analyzed Beaumont's Capital Improvement Plans and compared them to the types of
services ULC provided pursuant to the Agreement and Amendment in order to determine
whether ULC budgeted amounts in excess of the 4.5% caps, and whether the City Council
approved charges in excess of those caps.  I also analyzed deposition testimony, declarations
of former Beaumont City Council members, and the declaration of former ULC Principal,
Ernest A. Egger, to determine whether any deviations were submitted for review, and were
approved.

Although customary construction practices allow a client and contractor to amend scopes of
work in contracts, I was asked to calculate the total amount of possible overcharging (on the
assumption that no deviations were approved). To conduct that analysis, I conducted an
invoice-by-invoice analysis to detail how much ULC billed for categories of services subject
to the 4.5% caps, and categories of services that fell outside of the 4.5% caps. I was only able
to perform this analysis from 2008-2012 based on the records available.[113]  I conducted this
analysis as follows:

First, I compared the ULC invoices to ULC's bank statements in order to determine which
invoices were paid by Beaumont and which were paid by BFA. Since BFA is not a signatory
to the Agreement or the Amendment (and is a separate legal entity from Beaumont), the trier
of fact could conclude that services provided to BFA are not subject to any 4.5% caps. To
the extent that the trier of fact so concludes and excludes money paid by BFA to ULC in
determining any overcharging of damage, I subtracted the total amount paid by BFA to ULC
from the total amount billed by ULC. This figure represents the total (at most) amount that
Beaumont paid to ULC.

Second, I analyzed the services billed on the invoices paid by Beaumont to ULC to assess
which services were categorized as "inspection" and plan check" services (subject to the
4.5% cap detailed in 1993 Agreement) and which services were categorized as "construction

---

[113]   I was not able to complete this analysis for years prior to 2008 due to the absence of a complete set of invoices. For
years 1993-2007, there are only 839 invoices available for analysis:  1 invoice from 1994; 7 invoices from 1995; 14
invoices from 1996; 15 invoices from 1997; 79 invoices from 1998; 61 invoices from 1999; 62 invoices from 2000;
75 invoices from 2001; 115 invoices from 2002; 100 invoices from 2003; 57 invoices from 2004; 81 invoices from
2005; 45 invoices from 2006; and 23 invoices from 2007.  Based on the numbering of the invoices, it appears that
ULC issued 2,360 invoices – meaning that the City produced 35.5% of the total invoices.  In my opinion, it is not
possible to determine whether ULC overcharged the City from 1993 to 2007 because the City has not produced
more than 64% of ULC invoices.

Expert Report of Richard E. Tasker
*Western Riverside Council of Governments/City of Beaumont v. National Union Fire Insurance Company of
Pittsburgh, PA, et al.* | United States District Court, Central District of California, Eastern Division, Case No.
5:20-cv-02164- GW (KKx)
May 31, 2022
Page 21

management" services (subject to the 4.5% cap detailed in the 1994 Amendment). This
analysis allowed me to determine the total amount charged for services subject to the 4.5%
caps.

Third, after determining the amount of invoiced services subject to the caps, I compared this
amount to the estimated capital expenditures computed in the Hemming Morse report,
multiplied by 4.5% for inspection and planning services, and another 4.5% for construction
management services to determine the total amount of potential overcharging. I did so to
compute the maximum amount ULC was allowed to charge for these services and how
much over that amount ULC charged.[114]

Finally, I took the total amount of potential overcharging and compared the sum to the total
amount of restitution that the ULC principals paid in order to determine whether Beaumont
was already reimbursed for its potential damages.

## VI.   OPINIONS

As detailed below, I intend to offer the following opinions in this case.

First, Beaumont's Capital Improvement Plans, former City Council Member's declarations
and testimony, and declaration of a former ULC Principal show that Beaumont approved
changes in scope of services ULC and agreed to allow ULC to charge amounts in excess of
the 4.5% caps.[115]  Industry standards and commonly accepted practices allow a reasonable
construction consultant to rely upon such approvals and thus, Beaumont has not established
any overcharging by ULC.

Second, even if Beaumont had not approved ULC's requests to deviate from the contractual
caps, the amount Beaumont received in restitution exceeds any alleged overcharging by
ULC.  Beaumont's computation of alleged overcharging overstates Beaumont's damages
because Beaumont:

(1)      assumes invoices paid by BFA are subject to the 4.5% caps, even though BFA is not
a party to the Agreement or the Amendment, and is separate legal entity from
Beaumont;

---

[114]  I also performed this analysis without subtracting payments made by BFA and based on the assumption that all
invoices were subject to the Agreement and Amendment to illustrate the overstatement of Beaumont's damages.

[115]  Declaration of Lawrence Dressel, ¶ 14; Deposition of Roger Berg, 129:15-21; Declaration of Ernest Egger, ¶ 11.

Expert Report of Richard E. Tasker
*Western Riverside Council of Governments/City of Beaumont v. National Union Fire Insurance Company of
Pittsburgh, PA, et al.* | United States District Court, Central District of California, Eastern Division, Case No.
5:20-cv-02164- GW (KKx)
May 31, 2022
Page 22

(2)     imposes a single 4.5% cap, even though the Agreement and Amendment provide for
        two separate 4.5% caps; and

(3)     wrongly assumes 25% of all services were outside the caps, even though an invoice-
        by-invoice analysis shows that the vast majority of ULC's services were outside the
        caps.

A.      *Opinion 1:* **Industry Practices Allowed ULC to Request Contract Deviations
        and Upon Approval of the City Council, the Invoice Amounts in Excess of
        Any 4.5% Cap**

        In my experience, it is reasonable and customary for an engineering and construction
        consulting firm to request deviations to fee capped service contracts and to request
        compensation for the overages if reasonably supported by additional facts or
        services.  It is very common in engineering and construction projects for a client and
        contractor to agree to changes in scope and cost for a project. In such instances, the
        owner reviews the request and decides whether to approve the contractor's request.
        If the owner approves, the contractor can rely upon that approval and submit
        requests for payment of the overage.  Such submissions are not a form of
        overcharging, but instead reflects request for payment of approved expenses.

        Beaumont routinely performs construction budgeting through CIPs.[116]  The review,
        discussion and approval of CIPs is a core function of the City Council, as has been
        confirmed by the deposition testimony of former City Council Members.[117] ULC was
        significantly involved in the development of CIPs, including in preparation of
        budgets.[118] However, ULC had no authority to determine which potential projects
        would proceed, and which would not; the Beaumont City Council had such
        authority.[119]

        Each of the CIPs followed a similar format.  The CIPs provided an executive
        summary; a description of the Beaumont Redevelopment Agency's capital
        improvement plan (including a description of capital projects); a description of the
        Beaumont Utility Authority's projects (including a description of the projects); a
        description of the City of Beaumont's transportation projects (including a
        description of transportation system projects); and  a description of the Beaumont

---

[116]   Declaration of Lawrence Dressel, ¶¶ 3-5; Deposition of Roger Berg, 119:14-23, 122:1-10.
[117]   Declaration of Lawrence Dressel, ¶¶ 3-5; Deposition of Roger Berg, 119:14-23, 122:1-10.
[118]   Deposition of Roger Berg, 130:18-131:9; Declaration of Ernest Egger, ¶ 11.
[119]   Declaration of Lawrence Dressel, ¶5.

Expert Report of Richard E. Tasker

*Western Riverside Council of Governments/City of Beaumont v. National Union Fire Insurance Company of Pittsburgh, PA, et al.* | United States District Court, Central District of California, Eastern Division, Case No. 5:20-cv-02164- GW (KKx)

May 31, 2022

Page 23

Utility Authority's projects (including a description of the projects).[120]   At the conclusion, the CIPs then provided a proposed/estimated budget for each project – with a breakdown of the proposed/estimated costs.[121]  The following is an example of the budget provided for the 2010-211 CIP[122]:

**Exhibit B-4**

**City of Beaumont**
**Capital Improvement Plan 2010 - 2011**
**Budget Summary**

| RDA and Public Works Projects | PE & PM Services | Engineering Services | Plan Check/ Inspection | Survey/GIS Services | Construction Management | Construction Contractor | Total Project |
|---|---|---|---|---|---|---|---|
| Brookside Avenue Crossing of Noble Creek | $29,794 | $63,844 | $38,306 | $34,050 | $42,563 | $1,101,250 | $1,309,807 |
| Old Town Street Lighting | $0 | $0 | $0 | $0 | $0 | $950,000 | $950,000 |
| Woman's Club Renovation | $700 | $1,500 | $900 | $800 | $1,000 | $20,000 | $24,900 |
| Civic and Community Center Expansion | $35,000 | $75,000 | $45,000 | $40,000 | $50,000 | $1,000,000 | $1,245,000 |
| Noble Creek Regional Park Facilities | $6,300 | $13,500 | $8,100 | $7,200 | $9,000 | $180,000 | $224,100 |
| Rule 20A Downtown Underground Utility Project | $4,356 | $9,334 | $5,600 | $4,978 | $6,223 | $784,450 | $814,941 |
| Sidewalk Improvement Project | $0 | $107,149 | $0 | $0 | $0 | $1,428,654 | $1,535,803 |
| **Subtotal** | **$76,150** | **$270,327** | **$97,906** | **$87,028** | **$108,786** | **$5,464,354** | **$6,104,551** |

Because the CIPs included a breakdown of the proposed budget, the City Council could evaluate the budget for "construction management" costs and "plan check/inspection" as well as other discrete cost elements and services of each project.  The City Council could, therefore, determine whether ULC proposed fees in excess of the 4.5% caps.

Analysis of the budgeted costs reveals that ULC disclosed instances where its services would exceed the 4.5% cap for plan checking services.  The following is an example comparing ULC's budgeted costs for seven projects identified in the 2010 CIP[123]:

---

[120]  See Capital Improvement Plans in Appendix B.
[121]  See Capital Improvement Plans in Appendix B.
[122]  City of Beaumont Amendment to the Capital Improvement Plan Comprehensive Public Facilities Financing Program Fiscal Year 2010-2011, March 16, 2010 (BEAUAIG0004383-4407), Exhibit B-4 (BEAUAIG0004405).
[123]  City of Beaumont Amendment to the Capital Improvement Plan Comprehensive Public Facilities Financing Program Fiscal Year 2010-2011, March 16, 2010 (BEAUAIG0004383-4407), Exhibit B-4 (BEAUAIG0004405).

Expert Report of Richard E. Tasker
*Western Riverside Council of Governments/City of Beaumont v. National Union Fire Insurance Company of Pittsburgh, PA, et al.* | United States District Court, Central District of California, Eastern Division, Case No. 5:20-cv-02164- GW (KKx)
May 31, 2022
Page 24

| Proposed Budget | 4.5% of Budget | Plan Check Budget | Difference |
|---|---|---|---|
| $1,395,023.00 | $62,776.04 | $50,423.00 | $12,353.04 |
| 236,283.00 | 10,632.74 | 54,527.00 | (43,894.26) |
| 776,880.00 | 34,959.60 | 28,080.00 | 6,879.60 |
| 7,968,000.00 | 358,560.00 | 288,000.00 | 70,560,00 |
| 1,245,000.00 | 56,025.00 | 45,000.00 | 11,025.00 |
| 7,000,000.00 | 315,000.00 | - | 315,000.00 |
| 200,000.00 | 9,000.00 | - | 9,000.00 |

Some, but by no means all, of the projects had plan checks budgets within one of the 4.5% caps. As a result, ULC did not conceal instances where its fees would exceed the 4.5% caps, but instead identified those instances in the budget. Such overages can be common in design and construction projects and seeking a variance from the contractual agreements are common too.

In 2010, the City Council approved the CIP – even though ULC expressly disclosed an instance where its fees would exceed fees would exceed one of the 4.5% caps.[124] That resolution expressly included authority to expend funds pursuant to the budget[125]:

> **NOW, THEREFORE, BE IT RESOLVED BY THE BEAUMONT CITY COUNCIL AS FOLLOWS:**
>
> <u>Section 1</u>. The City hereby amends and approves the Capital Improvement Plan attached as Exhibit "A," authorizes the use of funds as shown on attached Exhibit "B," authorizes and directs the City Manager, staff, financing team and qualified professional services contractors identified on attached Exhibit "C" to implement the Plan and to take all necessary actions and expend funds as herein directed and authorized as set forth in the Project Progress Report attached as Exhibit "D."

In light of these approvals, it would be reasonable, and consistent in design and construction industry practices, for ULC to invoice the City consistent with the budget – even if its fees exceeded the 4.5% cap.

---

[124] Resolution No. 2010-04, Resolution of the City Council of the City of Beaumont Amending and Approving the Capital Improvement Plan for the 2010-2011 Fiscal Year (BEAUIG0004380-4407), pg. 1.

[125] Resolution No. 2010-04, Resolution of the City Council of the City of Beaumont Amending and Approving the Capital Improvement Plan for the 2010-2011 Fiscal Year (BEAUIG0004380-4407), pg. 1.

Expert Report of Richard E. Tasker

*Western Riverside Council of Governments/City of Beaumont v. National Union Fire Insurance Company of Pittsburgh, PA, et al.* | United States District Court, Central District of California, Eastern Division, Case No. 5:20-cv-02164- GW (KKx)

May 31, 2022

Page 25

This is one example.  If, as the City contends, all ULC services were subject to one 4.5% cap, the CIPs disclosed that ULC's services exceeded that amount in 2011.[126] The following is an image of the proposed budget from the 2011-20112 CIP[127]:



Exhibit B-2
City of Beaumont
Capital Improvement Plan 2011 - 2012
Budget Summary

| Redevelopment Agency Projects | PE & PM Services | Engineering Services | Plan Check/ Inspection | Survey/GIS Services | Construction Management | Construction Contractor | Total Project |
|---|---|---|---|---|---|---|---|
| Old Town Street and Sewer Repair Project | $24,500 | $52,500 | $31,500 | $28,000 | $35,000 | $700,000 | $871,500 |
| Palm Avenue at Sixth Street Storm Drain | $6,048 | $12,960 | $7,776 | $6,912 | $8,640 | $172,800 | $215,136 |
| Civic and Community Center Expansion | $28,175 | $60,375 | $36,225 | $32,200 | $40,250 | $805,000 | $1,002,225 |
| Regional Park Facilities | $0 | $0 | $0 | $0 | $0 | $724,055 | $724,055 |
| Downtown Underground Utility Project | $27,456 | $58,834 | $35,300 | $31,378 | $39,223 | $784,450 | $976,640 |
| Sidewalk Improvement Project | $37,450 | $80,250 | $48,150 | $42,800 | $53,500 | $1,070,000 | $1,332,150 |
| **Subtotal** | **$123,629** | **$264,919** | **$158,951** | **$141,290** | **$176,613** | **$4,256,305** | **$5,121,706** |

Comparing the amount budgeted for plan check services and construction management services reveals that ULC's proposed fees that exceeded 4.5% of the budgeted cost:

| | Proposed Budget | 4.5% of Budget | Plan Check Budget | CM Budget | Total ULC Cost | Difference |
|---|---|---|---|---|---|---|
| **Old Town Street** | $ 871,500.00 | $39,217.50 | $31,500.00 | $35,000.00 | $66,500.00 | ($27,282.50) |
| **Palm Avenue at Sixth Street** | 215,136.00 | 9,681.12 | 7,776.00 | 7,640.00 | 15,416.00 | (5,734.88) |
| **Civil and Community Center** | 1,002,225.00 | 45,100.13 | 36,225.00 | 40,250.00 | 76,475.00 | (31,374.87) |
| **Regional Park Facilities** | 724,055.00 | 32,582.48 | - | - | - | 32,582.48 |
| **Downtown Underground Utility** | 976,640.00 | 43,948.80 | 45,000.00 | 39,223.00 | 84,223.00 | (40,274.20) |
| **Sidewalk Improvement Project** | 1,332,150.00 | 59,946.75 | - | 53,500.00 | 53,500.00 | 6,446.75 |

Yet, even though the CIP budgets an amount in excess of how Beaumont views the caps, the City approved the CIP and budgeted expenditures[128]:

---

[126]  I do not agree with this conclusion, but offer this analysis to illustrate the disclosure to the City Council.

[127]  See City of Beaumont Amendment to the Capital Improvement Plan Comprehensive Public Facilities Financing Program Fiscal Year 2011-2012, June 21, 2011 (BEAUAIG0004408-4419), Exhibit B-2 (BEAUAIG0004417).

[128]  Resolution No. 2011-184, Resolution of the City Council of the City of Beaumont Amending and Approving the Capital Improvement Plan for the 2011-2012 Fiscal Year (ULCAIG0060835-49), pg. 1.

Expert Report of Richard E. Tasker
*Western Riverside Council of Governments/City of Beaumont v. National Union Fire Insurance Company of
Pittsburgh, PA, et al.* | United States District Court, Central District of California, Eastern Division, Case No.
5:20-cv-02164- GW (KKx)
May 31, 2022
Page 26

> **NOW, THEREFORE, BE IT RESOLVED BY THE BEAUMONT CITY
> COUNCIL AS FOLLOWS:**
>
> Section 1. The City hereby amends and adopts the Capital Improvement Plan
> attached as Exhibit "A," authorizes the use of funds as shown on attached Exhibit "B," authorizes
> and directs the City Manager, staff, financing team and qualified professional services
> contractors identified on attached Exhibit "C" to implement the Plan and to take all necessary
> actions and expend funds as herein directed and authorized as set forth in the Project Progress
> Report attached as Exhibit "D."

Testimony from the City Council supports this conclusion. According to former
City Council Member Roger Berg, any time plan check, inspection and construction
management services necessarily had to exceed 4.5% for a given project, the budget
was always submitted to the City Council for review and approval.[129] Mr. Berg
acknowledged that this typically occurred because some projects ended up being
more difficult than anticipated and required specialized services.[130] According to Mr.
Egger, "UCL proceeded based upon and in reliance upon the City Council's
approval of the budgets."[131] This recommendation by ULC, followed by review,
discussion and approval of CIPs functions as an updated agreement to the scope and
cost for a certain project.

Furthermore, Beaumont experienced significant growth from 1993-2012.[132] The City
essentially doubled its population multiple times and it made logical sense for the
needs and demands to vary project by project.[133] It is patent that neither Beaumont,
nor ULC could have foreseen the magnitude of public works projects it would
undertake in 1993, and through 2012. These needs instead would be assessed
annually, as illustrated in the Capital Improvement Plans.

It is important to recognize that the 4.5% plan check/inspection cap and 4.5%
construction management cap were established in 1993 and 1994. The scope of
those professional services and related costs of providing those services underwent
significant changes in the more than 18 years of service. Design standards and
construction codes were significantly changed, energy and seismic requirements

---

[129]   Declaration of Lawrence Dressel, ¶ 14; Deposition of Roger Berg, 129:15-21.
[130]   Deposition of Roger Berg, 137:12-137:23.
[131]   Declaration of Ernest Egger, ¶ 11.
[132]   Report on Municipal Services, pgs. 1-3.
[133]   Report on Municipal Services, pgs. 1-3.

Expert Report of Richard E. Tasker
*Western Riverside Council of Governments/City of Beaumont v. National Union Fire Insurance Company of*
*Pittsburgh, PA, et al.* | United States District Court, Central District of California, Eastern Division, Case No.
5:20-cv-02164- GW (KKx)
May 31, 2022
Page 27

changed and significant technology changes required the inspectors and construction
managers to upgrade training and equipment.  As a consequence, it is not surprising
that the fee caps established many years early might not apply to some of the project
which ULC was requested to administer.

It is also custom and practice in the design and construction industry that hourly rate
agreements are reviewed and updated on a regular, often annual basis. This aligns
with Mr. Berg's testimony that ULC's rate changed over time and was approved by
the City Council.[134] The only written evidence I was able to analyze of an hourly rate
reviewed is a fee update "effective April 2, 2011."[135] As additional evidence of
expanding technological and professional services over the years, in addition to
higher hourly rates, the number of professional service categories expands
significantly in the 2011 fee update, from eleven (11) to twenty-five (25).[136] The
expansion includes many categories of services not contemplated in the Agreement
and Amendment, including survey crews, senior designers I and II, engineering
geologist, CADD specialist, soil technician, staff engineer, project manager, and
senior engineer.[137] This fee update is entirely consistent with the "demand-
responsive" nature of ULC services to Beaumont.

Based on the Agreement and Amendment; Capital Improvement Plans; and hourly
rate agreements, I conclude Beaumont City Council members reviewed and
approved ULC's actual invoices for payment. Former Beaumont City Council
members testified that they never suspected any fraudulent overcharging by ULC.[138]
The City Council's consistent review and approval of work scope and related
invoices for the scope that ULC undertook suggests that the City approved ULC's
expense and that ULC did not overcharge the City.  It is customary in the design and
construction industry for a contractor to rely on its client's approval to perform
services beyond the scope of its contract. Here, the approval came in multiple forms:

- Annual review and approval of the Agreement and Amendment;
- Annual review and approval of hourly rate agreements;
- Annual review and approval of CIP budgets;
- Review and approval of change orders, as needed; and

---

[134]   Deposition of Roger Berg, 48:22-49:5.
[135]   Urban Logic Consultants Hourly Rate Schedule, Effective April 2, 2011 (BEAUAIG0004124).
[136]   Urban Logic Consultants Hourly Rate Schedule, Effective April 2, 2011 (BEAUAIG0004124).
[137]   Urban Logic Consultants Hourly Rate Schedule, Effective April 2, 2011 (BEAUAIG0004124).
[138]   Deposition of Brian DeForge, 101:9-102:4; Deposition of Roger Berg, 190:14-191:6; 211:19-212:6.

Expert Report of Richard E. Tasker
*Western Riverside Council of Governments/City of Beaumont v. National Union Fire Insurance Company of Pittsburgh, PA, et al.* | United States District Court, Central District of California, Eastern Division, Case No. 5:20-cv-02164- GW (KKx)
May 31, 2022
Page 28

- Review, approval and payment of all ULC invoices.

**B.** *Opinion 2*: **Even Absent City Council Approval, the City was Already Reimbursed for any Alleged Overcharges**

In my opinion, industry practices and customs allowed ULC to request that the City approve fees in excess of any contractual fee caps and upon receipt of the City's approval, to invoice the City for amounts in excess of any contractual caps. However, even if the City Council had not approved any such deviations, the City has already been reimbursed for any alleged overcharges because it received $10 million in restitution from the ULC Principals.[139] While the City's expert suggested that the City incurred loss in excess of $10 million, that analysis is based upon a series of flawed assumptions and is inconsistent with testimony.[140] I was, therefore, asked to perform an alternative analysis and determine whether the City can establish a loss in excess of the $10 million paid in restitution by the ULC Principals

I conducted two versions of this analysis. First, I analyzed whether the City can establish a loss in excess of the $10 million paid in restitution by the ULC Principals if the trier of fact concludes that BFA was not a party to the ULC agreements and ULC's services for BFA are not subject to any contractual caps. Second, I analyzed whether the City can establish a loss in excess of the $10 million paid in restitution by the ULC Principals if the trier of fact concludes that ULC's services for BFA are subject to the contractual caps.

This analysis involves four steps. First, I computed the amount paid by BFA. I did so in order to identify the invoices paid by the City (i.e., deduct the BFA payments which are confirmed by bank records from total payments to ULC in the applicable period). Second, I computed the amount of the contractual caps based upon the data provided by Hemming Morse. Third, I conducted an analysis of the ULC invoices to identify the total amount subject to the contractual caps. Fourth, I compared the amount charged and subject to the caps to the contractual caps, in order to identify any potential overcharging. Fifth, I compared any potential overcharging to the

---

[139] First Amended Complaint, ¶ 26; Felony Plea forms of Deepak Moorjani, filed October 20, 2017 (BEAUAIG0003959-60); David William Dillon, filed December 19, 2017 (BEAUAIG0003911-12); Ernest Alois Egger, filed December 19, 2017 (BEAUAIG0003388-89); and Alan Charles Kapanicas, filed December 19, 2017 (BMTGJ0000018-19). Settlement and Release Agreement between: WRCOG and Deepak Moorjani, dated October 20, 2017 (ULCAIG0059062-66); WRCOG and David Dillon, dated December 18, 2017 (ULCAIG0068976-82); and WRCOG and Ernest Egger, dated December 18, 2017 (ULCAIG0068983-89); Western Riverside Council of Governments General Ledger Report (BEAUAIG0049067-119).

[140] Ray Report, pg. 3, Exhibit B (BEAUAIG0003994).

Expert Report of Richard E. Tasker
*Western Riverside Council of Governments/City of Beaumont v. National Union Fire Insurance Company of Pittsburgh, PA, et al.* | United States District Court, Central District of California, Eastern Division, Case No. 5:20-cv-02164- GW (KKx)
May 31, 2022
Page 29

amount paid in restitution. I will explain each step in the analysis and then provide my computations.

1.    *Step 1: Identify Amounts Paid by City of Beaumont*

Beaumont assumed all invoices were subject to the 4.5% caps, regardless of whether they were paid by BFA or Beaumont.[141] As detailed above, Beaumont admits that BFA is not a signatory to the Agreement or Amendment.[142] Because ULC never entered into an agreement with BFA and did not appear to agree to 4.5% caps on its services to BFA, the trier of fact may conclude that ULC's services were not subject to the 4.5% caps. In order to assist the trier of fact, I computed the amount paid by BFA in the event that the trier of fact concludes that any caps on ULC's contracts with the City do not apply to services provided to BFA.

In order to compute this amount, I totaled the number of services invoiced by ULC and subtracted any invoices that were paid by BFA. The total amount of services invoiced by ULC for 2008-2012 was $41,188,467. In order to determine whether BFA paid these invoices, I analyzed ULC's bank statements from May 2008-2012.[143] Those bank statements distinguish between payments by BFA and payments by the City. BFA's payments are reflected on the statements as "UNION BANK TRUST UNION BANK CCD" on the bank statements and payments from Beaumont are reflected on the statements as "CITYBEAU PAYABLES PPD."[144]

Mr. Ray calculated the payments made by BFA to total $19,343,622.40 from 2008 to 2012.[145] This calculation is inaccurate based upon ULC's bank statements. To verify the amounts in this report, I compared the amounts reflected as payments from BFA on the bank statements to ULC's invoices. Attached as **EXHIBIT C** is a spreadsheet reflecting this analysis and tying BFA's payments to specific statements. This analysis reveals that BFA paid a total of $31,792,089 (out of the $41,188,467 billed) to ULC from 2008 to 2012:

---

[141]   Ray Report, Exhibit B (BEAUAIG0003994).
[142]   Response of Plaintiffs WRCOG and City to Defendant NUFIC's Requests for Admission Nos. 34 & 35.
[143]   See Subpoenaed Records from Union Bank.
[144]   See Subpoenaed Records from Union Bank.
[145]   Ray Report, Exhibit B (BEAUAIG0003994).

Expert Report of Richard E. Tasker
*Western Riverside Council of Governments/City of Beaumont v. National Union Fire Insurance Company of Pittsburgh, PA, et al.* | United States District Court, Central District of California, Eastern Division, Case No. 5:20-cv-02164- GW (KKx)
May 31, 2022
Page 30

| Row Labels | Sum of Total |
|---|---|
| ⊞ No Union Bank Statement Available For This Date Range | $ 2,084,602 |
| ⊞ Payments Made by BFA | $ 31,792,089 |
| ⊞ Payments Made by Other | $ 7,311,776 |
| Grand Total | $ 41,188,467 |

I was unable to identify the source of $2,084,602 in payments because Union Bank was unable to produce statements during the period of those statements, and I address those payments below.

**2.**   *Step 2: Compute the Contractual Caps*

Hemming Morse computed a single contractual cap as 4.5% of the total capital expenditure.[146]  As confirmed by the City Council, ULC and Beaumont agreed to a 4.5% cap for "plan checking" and "construction inspection" services, and Beaumont thereafter amended that Agreement to add a second cap of 4.5% for "construction management" services.[147] This conclusion is illustrated in the following provisions of the Agreement and Amendment.  Section IX of the Agreement[148] provides:

> 2.   For the services set forth in Section V, compensation shall be on a time and materials basis not exceeding four and one-half percent (4.5%) of the confirmed construction cost of the public improvements to be constructed.

The Amendment thereafter adds a new provision[149], which provides as follows:

---

[146]   Ray Report, Exhibit B (BEAUAIG0003994).
[147]   Deposition of Roger Berg, 58:21-59:1.
[148]   Agreement, pg. 8.
[149]   Amendment, pg. 3.

Expert Report of Richard E. Tasker
*Western Riverside Council of Governments/City of Beaumont v. National Union Fire Insurance Company of Pittsburgh, PA, et al.* | United States District Court, Central District of California, Eastern Division, Case No. 5:20-cv-02164- GW (KKx)
May 31, 2022
Page 31

> SECTION IX is hereby amended to include the following additional subsection:
>
> 5.    For the services set forth in SECTION V-1, compensation shall be on a time and materials basis not exceeding four and one-half percent (4.5%) of the bid price awarded by the City for each project.

While both provisions include a 4.5% cap, the language in both differs. The Agreement provides for a 4.5% cap "of the confirmed construction cost of the public improvements to be constructed[150]," whereas the Amendment provides for a 4.5% cap "of the bid price awarded by the City for each project [151]." Mr. Egger declared that "ULC did not agree to 'cap' fees for all services provided to the City. As described in the 1993 agreement, ULC agreed to a 4.5% 'cap' on certain plan checking and inspection services. That cap applied solely to plan checking and inspection services as described in the 1993 agreement. As described in 1994 amendment, ULC agreed to a separate 4.5% 'cap' on construction management services. That cap applied solely to construction management services as described in 1994 amendment. Each of these caps applied to separate and distinct services and each set of services were charged separately."[152] Former City Council member Roger Berg confirmed this when he testified that the Agreement and Amendment comprised of two separate caps.[153] Applying that testimony, the total aggregate cap on plan check, inspection, and construction management services is 9%.

In my opinion and experience, it would be illogical, as well as financially unfeasible, for ULC to agree to perform plan checking, construction inspection services, and construction management services for 4.5% of the project costs.  The Amendment reflected an agreement for ULC to provide additional services.  At that time, ULC already provided plan checking and construction inspection services and was paid 4.5% of the project costs for those services.  In my experience, engineers and construction contractors do not agree to provide additional services, services that require high levels of

---

[150]   Agreement, pg. 8.
[151]   Amendment, pg. 3.
[152]   Declaration of Ernest Egger, ¶ 11.
[153]   Deposition of Roger Berg, 58:21-59:1.

Expert Report of Richard E. Tasker
*Western Riverside Council of Governments/City of Beaumont v. National Union Fire Insurance Company of*
*Pittsburgh, PA, et al.* | United States District Court, Central District of California, Eastern Division, Case No.
5:20-cv-02164- GW (KKx)
May 31, 2022
Page 32

experience, necessitate costly insurance and create additional administrative
and management and add risk without additional compensation – especially
construction management services because such services can be substantial.

To the extent that the trier of fact agrees that Beaumont agreed to a 4.5%
cap for "plan checking" and "construction inspection" services and
Beaumont agreed to a second cap of 4.5% for "construction management"
services, an analysis of overcharging requires a computation of the maximum
amount ULC could charge Beaumont (i.e., it assumes no Beaumont
approvals of costs/invoicing beyond the 9% aggregate cap.)  To compute
that amount, I relied upon and accepted Mr. Ray's computation of the total
capital improvements.  From 2008 through 2012, he identifies $41,946,751 in
capital expenditures:

| CAPITAL EXPENDITURES | |
|---|---|
| **2008** | 15,535,070.00 |
| **2009** | 21,089,167.00 |
| **2010** | 2,532,543.00 |
| **2011** | 2,232,652.00 |
| **2012** | 557,319.00 |
| Total | **$41,946,751.00** |

I then computed 4.5% of that amount (as compensation for plan checking
and construction inspection services) and a separate 4.5% (for "construction
management" services). That computation is reflected in the following table:

| | Percentage Cap | Expenditure | Total Cap |
|---|---|---|---|
| **Plan Checking and Inspection Services** | 4.5% | $41,946,751.00 | $1,887,603.80 |
| **Construction Management Services** | 4.5% | $41,946,751.00 | 1,887,603.80 |
| **Total** | | | **$3,775,207.60** |

Accordingly, accepting Mr. Ray's data and assuming no approval of invoicing
in excess of the 1993/1994 fee caps, ULC's charges for plan checking,
construction inspection and construction management services should not
have exceeded $3,775,207.59 from 2008 through 2012.

Expert Report of Richard E. Tasker
*Western Riverside Council of Governments/City of Beaumont v. National Union Fire Insurance Company of*
*Pittsburgh, PA, et al.* | United States District Court, Central District of California, Eastern Division, Case No.
5:20-cv-02164- GW (KKx)
May 31, 2022
Page 33

3. *Step 3: Analysis of ULC Invoices*

Mr. Ray did not conduct an invoice-by-invoice analysis to identify how much
ULC charged for the services subject to the caps.[154]  Such an analysis is
necessary because the specific services subject to the caps involve distinct
tasks. Instead, Mr. Ray assumes that only 25% of the total amount billed falls
outside the 4.5% caps.[155] Without any analysis, the 25% is simply a guess.
Because the Agreement and Amendment provide 4.5% caps on specific
services (plan checking, construction inspection and construction
management)[156], it is my opinion based upon experience that it is necessary to
conduct an invoice-by-invoice analysis to determine charges for these specific
services.

To conduct this analysis, I first identified the services subject to the
Agreement.  As explained above, the 4.5% cap applies to services identified
in Section V.  Section V provides as follows[157]:

> **V.  Plan Checking and Construction Inspection**
>
> The CONSULTANT shall provide all necessary plan checking and inspection services
> for public works projects in the City of Beaumont as follows:
>
> **V-A.  Plan Checking**
>
> On behalf of the City, ULC, under the direction of the Director of Public Works, shall
> review the plans prepared by civil engineers and other appropriate professionals on behalf
> of the City or private development interests for compliance with the ordinances of the
> City.  The Director of Public Works shall arrange reviews by other appropriate agencies
> having jurisdiction in such matters relative to the enforcement of relevant codes and
> compliance with UBC (Uniform Building Code, 1991) and Caltrans. Only when satisfied
> that all conditions of approval and the appropriate requirements of the City's codes and
> other relevant codes and standards have been met, the Public Works Director shall
> approve or recommend approval of plans as relevant.
>
> **V-B.  Construction Inspection**
>
> On behalf of the City, ULC, under the supervision of the Director of Public Works, shall
> provide inspection services during all phases of construction to enforce compliance with
> codes and conditions of approval, provisions of the City ordinances, Uniform Building
> Code (1991) and other requirements set forth on the plans for which permits were issued
> for construction.  In the performance of such duties, ULC shall provide inspection for
> each project during and after completion of various stages of construction to confirm
> compliance with approved plans.

---

[154]   Ray Report, Exhibit B (BEAUAIG0003994).
[155]   Ray Report, Exhibit B (BEAUAIG0003994).
[156]   Agreement, pg. 8; Amendment, pg. 3.
[157]   Agreement, pg. 7.

Expert Report of Richard E. Tasker
*Western Riverside Council of Governments/City of Beaumont v. National Union Fire Insurance Company of*
*Pittsburgh, PA, et al.* | United States District Court, Central District of California, Eastern Division, Case No.
5:20-cv-02164- GW (KKx)
May 31, 2022
Page 34

In my experience, plan checking is considered to be a desk job and involves
confirming a design in a report that can be easily verified. Typically an
engineer or architect is the designer of a report and is primarily liable for
conformance to applicable codes and the safety of the design, hence the
"plan check" is largely confirmation that the plan submission is complete,
that all applicable elements of the proposed construction have been
addressed, that the applicable codes were followed and the designers of
record have certified (i.e., "stamped" the plans with their professional seals).
It is important work and in the public interest but reasonably straight-
forward. My review of the 2008 to 2012 invoices show only one billing code
related to plan checking services:

- PLAN CHECKER

  In my experience, inspection services on private work are very often
  invoiced on a time and materials basis. In public work, where the
  inspector cost is a function of the public improvements, a public
  agency/department will budget inspection costs based on the
  assumed Capital Improvement Plan and then supplement with
  outside, third-party inspectors if the magnitude of work is too large
  for in-house staff. My review of the 2008 to 1012 invoices show the
  following billing codes related to inspection services:

- (OVERTIME) INSPECTOR;
- INSPECTOR;
- INSPECTOR (PREV. WAGE); and
- PREV. WAGE – INSPECTOR.

To further this analysis, I identified the services subject to the Amendment.
As explained above, the 4.5% cap applies to services identified in Section
V.1.  Section V.1 provides as follows[158]:

---

[158]   Amendment, pg. 2.

Expert Report of Richard E. Tasker
*Western Riverside Council of Governments/City of Beaumont v. National Union Fire Insurance Company of*
*Pittsburgh, PA, et al.* | United States District Court, Central District of California, Eastern Division, Case No.
5:20-cv-02164- GW (KKx)
May 31, 2022
Page 35

> **V.1 Public Works Construction Management**
>
> On behalf of the City, ULC, under the supervision of the Director of Public Works, shall provide construction management services during all phases of public works construction to enforce compliance with codes and conditions of approval, provisions of the City ordinances, Uniform Building code (1991) and other requirements set forth on the plans and specifications for which permits are issued for construction. In the performance of such duties, ULC shall provide construction management for each public works project before, during and after completion of various stages of construction including the following services related to the planning, control, scheduling, estimating and value engineering of public works projects:
>
> A.   **Construction Management Services**
>
> 1.  Coordinate, receive, review and evaluate bids
> 2.  Award bids, make appropriate recommendations, and prepare contracts
> 3.  Manage, coordinate and inspect all work
> 4.  Provide contract and subcontract coordination
> 5.  Prepare and monitor construction schedules
> 6.  Make adjustments to accommodate changing and unforeseen conditions
> 7.  Prepare progress reports
> 8.  Review and recommend progress payments
> 9.  Obtain, review and evaluate shop drawings
> 10. Provide laboratory testing of materials as required and monitor test results
> 11. Evaluate quality and workmanship of construction
> 12. Maintain daily logs and records and such other services as are required to manage the work in accordance with City objectives
> 13. Schedule project meetings
> 14. Liaison with controlling agencies and design and construction engineers
> 15. Monitor and record correspondence between City contractors, subcontractors and design professionals
> 16. Prepare transmittals and labor reports
> 17. Provide labor and payroll compliance
> 18. Provide change order management and coordination
> 19. Provide plan interpretation as required
> 20. Administer extensions of time (force majeure delay) reports
> 21. Administer release and waivers of lien

In my experience, construction management services involve overseeing the construction of a project from its inception to completion. These services can vary significantly based on the complexity and needs of the project. My review of the 2008 to 2012 invoices show the following codes related to construction management services:

- CONST. MANAGER;
- CAL 216 - RELATIVE COMPACTION;
- CAL 216 - RELATIVE COMPACTION (TESTS RUN NOT HOURS);
- CAL 231 - USE OF Nuclear Gauges;

Expert Report of Richard E. Tasker
*Western Riverside Council of Governments/City of Beaumont v. National Union Fire Insurance Company of*
*Pittsburgh, PA, et al.* | United States District Court, Central District of California, Eastern Division, Case No.
5:20-cv-02164- GW (KKx)
May 31, 2022
Page 36

- CAL 231 - USE OF NUCLEAR GAUGES (TESTS RUN NOT HOURS);
- CAL 521 - CONCRETE CYLINDER COMPRESSION (TESTS RUN NOT HOURS);
- CAL 521 - Concrete Cylinder Stren; and
- CAL 521 - Concrete Cylinders.

My review of the invoices from 2008 to 2012 reveals that most of the services provided by ULC are overwhelmingly "additional costs" under the terms of the Agreement and Amendment[159]. Work within the definition of "Additional Services" includes:

| Engineering | $18,704,589 |
|---|---|
| Surveying | $ 7,294,943 |
| Soil Analysis | $ 1,366,759 |

This aligns with Mr. Egger's declaration that "ULC did not agree to 'cap' fees for all services to the City," and provided an authorized range of broad services that included planning, project management, civil engineering, plan check inspection, surveying, and staff services.[160] This further aligns with former City Council Member Roger Berg's testimony that additional services such as engineering, surveying, and contractor services fall outside of the 4.5% caps.[161] Mr. Ray failed to acknowledge the significant amount of work ULC did beyond the 4.5% capped services. There were also additional costs related to items such as aerial mapping, reprographics, and photographs that fall under "Additional Costs."

After identifying the relevant billing codes, I then conducted an invoice-by-invoice analysis to determine the amount ULC billed from 2008 through 2012 for these services. I performed this analysis on all of the available invoices issued from 2008 through 2012 – whether paid by BFA or the City. I did so in order to compute the total amount charged to the City for these services. **EXHIBIT F** details the specific amount charged for each billing code and **EXHIBIT D** provides itemized support for the totals reflected in **EXHIBIT C** and **EXHIBIT F**.

---

[159]  Agreement, pg. 7.
[160]  Declaration of Ernest A. Egger, ¶ 9.
[161]  Deposition of Roger Berg, 175:6-176:8.

Expert Report of Richard E. Tasker
*Western Riverside Council of Governments/City of Beaumont v. National Union Fire Insurance Company of
Pittsburgh, PA, et al.* | United States District Court, Central District of California, Eastern Division, Case No.
5:20-cv-02164- GW (KKx)
May 31, 2022
Page 37

Union Bank was unable to produce bank statements for the first three
months of 2008.  I could not, therefore, determine if the payments (totaling
$2,084,602) to ULC during that period were issued by Beaumont or BFA.
Therefore, I allocated these payments between Beaumont and BFA on a
percentage basis based upon the remaining payments issued in 2008 ([Jan–
Mar] $2,084,602 – [Apr–Dec] $8,612,710 = $6,528,107).  In the remainder of
2008, Beaumont issued 54.2% of the payments to ULC ($2,987,586 of
$6,528,107)) and BFA issued 45.8% of the payments to ULC ($3,540,521 of
$6,528,107) Therefore, I allocated 54.2% of $2,084,602 to the City and 45.8%
of $2,084,602 to BFA.

| Invoice 2008 Frame | Amount | Percentage |
|---|---|---|
| BFA (Apr-Dec) | $2,987,586 | 45.8% |
| City (Apr-Dec) | $3,540,521 | 54.2% |
| Total (Apr-Dec) | $6,528,107 | 100% |

Because I could not trace these payments to specific invoices, I could not
determine whether these payments reflected compensation of services within
the caps or outside the caps.  The inability to trace the payments to specific
invoices and tasks prevents the City from proving overcharging.  However,
in the event the trier of fact elects to allocate these payments based upon
ULC's subsequent services in 2008, I prepared an alternative computation.
That computation calculated the percentage of ULC's 2008 services that were
subject to the caps – both for projects on behalf of the City and on behalf of
BFA.  I then applied those percentages to the payments for which I do not
have bank statements.  This analysis is reflected in **EXHIBIT E.1**.  Doing so
increased the total amounts charged for services subject to the caps, as are
reflected in **EXHIBIT E**.

Including the above-described allocation, the total amount ULC charged
from 2008 to 2012 for services subject to the contractual caps are detailed in
**EXHIBIT E** and reflected in the following chart:

Expert Report of Richard E. Tasker
*Western Riverside Council of Governments/City of Beaumont v. National Union Fire Insurance Company of*
*Pittsburgh, PA, et al.* | United States District Court, Central District of California, Eastern Division, Case No.
5:20-cv-02164- GW (KKx)
May 31, 2022
Page 38

| Description | City Invoices | BFA Invoices | All Invoices |
|---|---|---|---|
| **V.1-A Construction Management Services** | 483,117.84 | 1,442,716.66 | 1,925,834.50 |
| **V-A. Plan Checker** | 54,220.00 | 72,850.00 | 127,070.00 |
| **V-B. Construction Inspection** | 985,059.44 | 2,651,062.06 | 3,636,121.50 |
| Total | **$1,522,397.28** | **$4,166,628.72** | **$5,689,026.00** |

**4.**     *Step 4: Comparison of Billing to Contractual Caps Computation*

After identifying the total amount charged for plan checking, construction
inspection and construction management, I compared the amounts invoiced
to the contractual caps (as calculated above). I performed two alternative
computations.  First, I analyzed whether the amount paid by the City for
services subject to the caps exceeded the amount permitted under the
Agreement and Amendment.  That analysis revealed that ULC charged less
than the amount permitted under the Agreement and Amendment.  That
computation is reflected in the following chart:

| ANALYSIS OF CITY PAYMENTS | | | |
|---|---|---|---|
| | **Total Allowed** | **Total Charged** | **Difference** |
| **Plan Checking and Inspection Services** | 1,887,603.80 | (1,039,279.44) | 848,324.36 |
| **Construction Management Services** | 1,887,603.80 | (483,117.84) | 1,404,485.96 |
| Total | **$3,775,207.60** | **($1,522,397.28)** | **$2,252,810.32** |

Therefore, to the extent that the trier of fact concludes that the 4.5% caps do
not apply to services ULC provided to BFA, it is my opinion that ULC did
not in fact overcharge the City from 2008 to 2012, and the City has not
demonstrated any overcharging during that period.

In the event that the trier of fact concludes that the 4.5% caps applies to
services ULC provided to BFA as well as to Beaumont, I compared the total
amount ULC for services subject to the contractual caps. That computation
is reflected in the following chart:

Expert Report of Richard E. Tasker
*Western Riverside Council of Governments/City of Beaumont v. National Union Fire Insurance Company of*
*Pittsburgh, PA, et al.* | United States District Court, Central District of California, Eastern Division, Case No.
5:20-cv-02164- GW (KKx)
May 31, 2022
Page 39

| ANALYSIS OF ALL PAYMENTS | | | |
|---|---|---|---|
| | Total Allowed | Total Charged | Difference |
| **Plan Checking and Inspection Services** | 1,887,603.80 | (3,763,191.50) | (1,875,587.70) |
| **Construction Management Services** | 1,887,603.80 | (1,925,834.50) | (38,230.70) |
| **Subtotal** | **$3,775,207.60** | **$ (5,689,026.00)** | **$ (1,913,818.40)** |

This computation reflects that ULC – at most – charged $1,931,818.40 more
than permitted under the Agreement and Amendment (assuming that the
caps apply to services provided to BFA and the overages were not approved
by the City Council). This amount is, however, substantially less than the
total restitution received by the City:

| ANALYSIS OF ALL PAYMENTS | | | |
|---|---|---|---|
| | Total Allowed | Total Charged | Difference |
| **Plan Checking and Inspection Services** | 1,887,603.80 | (3,763,191.50) | (1,875,587.70) |
| **Construction Management Services** | 1,887,603.80 | (1,925,834.50) | (38,230.70) |
| **Subtotal** | $3,775,207.60 | $(5,689,026.00) | $(1,931,818.40) |
| **Restitution** | | | 10,000,000.00 |
| **(Loss)/Gain** | | | **$ 8,068,181.60** |

Accordingly, even if the trier of fact concludes that the 4.5% caps applies to
services ULC provided to BFA and the overages were not approved by the
City Council), the City has not established a loss in excess of the restitution
received.

This analysis does not include an analysis of invoicing prior to 2008 because,
in my opinion, it is impossible to reach a conclusion on whether there was
overcharging for years 1993 to 2007 because the City did not maintain and
produce ULC's invoices during that period. Given the unique nature of
ULC's services, I do not believe that it is possible to perform a statistically
valid extrapolation as the nature of the services ULC provided may differ
from year to year and the amount charged for specific services may differ
from project to project. It is, therefore, my opinion that the City cannot
demonstrate overcharging from 1993 to 2007, regardless of whether the BFA
work is included or excluded.

Expert Report of Richard E. Tasker
*Western Riverside Council of Governments/City of Beaumont v. National Union Fire Insurance Company of Pittsburgh, PA, et al.* | United States District Court, Central District of California, Eastern Division, Case No. 5:20-cv-02164- GW (KKx)
May 31, 2022
Page 40

However, if the trier of fact applies my analysis to the 1993 to 2007 timeframe, using an extrapolation of percentages in the 2008 – 2012 period, the trier of fact would not find overcharging.  As reflected above, Plan Checking/Inspection and Construction Management was a small percentage of the total amount paid to ULC, whether measured on a dollar basis or a percentage basis.  The following chart illustrates the amount charged from 2008 to 2012 for Plan Checking/Inspection and Construction Management services:

|  | Total Billed | Capped Services Billed | % |
|---|---|---|---|
| **Plan Checking and Inspection Services** | $ 41,188,467.07 | $3,763,192.00 | 9.14% |
| **Construction Management Services** | 41,188,467.07 | 1,925,835.00 | 4.68% |
| **Total** | | 5,689,027.00 | 13.81% |

Because I do not have a complete set of ULC's invoices for 1993 to 2007, I do not know the amount charged for Plan Checking/Inspection and Construction Management, but if I assume that ULC's billings for these services were consistent their billing from 2008 to 2012, the total amount charged for these services would be as follows:

|  | 2008-2012 Percentage | 1993-2007 Billing | Projected Cost |
|---|---|---|---|
| **Plan Checking and Inspection Services** | 9.14% | 33,749,770.47 | 3,083,553.68 |
| **Construction Management Services** | 4.68% | 33,749,770.47 | 1,578,026.01 |
| **Total** | 13.81% | | $ 4,661,579.69 |

Prior to 2008, the total capital improvements (as computed by Hemming Morse) were $135,862,626.00.[162]  Accordingly, if BFA projects apply to ULC fee cap percentages, ULC was entitled to charge 4.5% of that amount for plan checking and inspection services, and 4.5% of that amount for construction management.  That amount totals $12,227,636.34.

---

[162] This amount is computed by subtracting the total capital expenditures from 2008 to 2012 ($41,946,751) from the total capital expenditures identified by Hemming Morse ($177,809,377).

Expert Report of Richard E. Tasker
*Western Riverside Council of Governments/City of Beaumont v. National Union Fire Insurance Company of Pittsburgh, PA, et al.* | United States District Court, Central District of California, Eastern Division, Case No. 5:20-cv-02164- GW (KKx)
May 31, 2022
Page 41

| | Capital Expenditures | Section V. % | Total |
|---|---|---|---|
| Plan Checking and Inspection | $135,862,626.00 | 4.50% | $6,113,818.17 |
| Construction Management Services | 135,862,626.00 | 4.50% | 6,113,818.17 |
| Total | | | $12,227,636.34 |

Comparing this computation to the projection above reveals that if the trier of fact applies my analysis of ULC's invoices to the 1993 to 2007 timeframe using extrapolated percentages, the City was not overcharged:

| | Total Allowed | Projected Charges | Difference |
|---|---|---|---|
| Plan Checking and Inspection Services | 6,113,818.17 | (3,083,553.68) | 3,030,264.49 |
| Construction Management Services | 6,113,818.17 | (1,578,026.01) | 4,535,792.16 |
| Total | $12,227,636.34 | ($4,661,579.69) | $7,566,056.65 |

Accordingly, applying my analysis of the 2008-2012 invoices to the pre-2008 invoicing reveals no overcharging occurred under this projection because the City's capital expenditures were higher prior to 2008 and thus, the amount ULC was allowed to charge more for the capped services during that period.

## VII.    CONCLUSION

In my opinion, the City of Beaumont and WRCOG rely upon a faulty analysis to compute alleged overcharging.  A detailed analysis of the record and invoicing reveals in my opinion that consistent with industry practices, ULC sought and obtained approval to exceed the 4.5% contractual caps from the City Council.  However, even absent such approval, the City and WRCOG cannot demonstrate overcharging in excess of the restitution paid and thus have not shown any damages.

Respectfully submitted,
*SAGE ASSOCIATES, INC.*

Richard E. Tasker, President

May 31, 2022