# EXHIBIT 5

Page 1

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

```
WESTERN RIVERSIDE COUNCIL OF )  Case No.:
GOVERNMENTS, a California    )  5:20-cv-02164 GW (KKx)
Joint Powers Authority; CITY )
OF BEAUMONT, a public entity )
in the State of California,  )
                             )
          Plaintiffs,        )
                             )
     vs.                     )
                             )
NATIONAL UNION FIRE          )
INSURANCE COMPANY OF         )
PITTSBURGH, PA and DOES 1    )
through 50, inclusive,       )
                             )
          Defendants.        )
_____)
```

VIRTUAL REMOTE DEPOSITION OF

ELIZABETH GIBBS-URTIAGA

Monday, May 23, 2022; 9:10 a.m.

Beaumont, California

Magna Legal Services

866-624-6221   www.MagnaLS.com

Reported by Mimi Murray, CSR No. 13985



```
                                                              Page 2
 1              UNITED STATES DISTRICT COURT
 2          FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3                     EASTERN DIVISION
 4
 5   WESTERN RIVERSIDE COUNCIL OF ) Case No.:
     GOVERNMENTS, a California    ) 5:20-cv-02164 GW (KKx)
 6   Joint Powers Authority; CITY )
     OF BEAUMONT, a public entity )
 7   in the State of California,  )
                                  )
 8         Plaintiffs,            )
                                  )
 9      vs.                       )
                                  )
10   NATIONAL UNION FIRE          )
     INSURANCE COMPANY OF         )
11   PITTSBURGH, PA and DOES 1    )
     through 50, inclusive,       )
12                                )
           Defendants.            )
13   _____)
14
15
16
17
18
19         VIDEOTAPED VIRTUAL REMOTE DEPOSITION OF
20   ELIZABETH GIBBS-URTIAGA, taken on behalf of Defendant,
21   at Beaumont, California, commencing at 9:10 a.m., on
22   Monday, May 23, 2022, before Mimi Murray, a Certified
23   Shorthand Reporter, CSR No. 13985, with principal office
24   in the County of Los Angeles, within and for the State
25   of California.
```



```
                                                          Page 3
 1   A P P E A R A N C E S:
 2      ON BEHALF OF DEFENDANT NATIONAL UNION FIRE INSURANCE
        COMPANY OF PITTSBURGH, PA:
 3
             GORDON REES SCULLY MANSUKHANI, LLP
 4           BY:  MEAGAN P. VANDERWEELE, ESQ.
                  HANNA E. MONSON, ESQ.
 5           5 PARK PLAZA
             SUITE 1100
 6           IRVINE, CALIFORNIA 92614
             312-980-6779
 7           MVANDERWEELE@GRSM.COM
             (VIA VIDEOCONFERENCE)
 8
 9      ON BEHALF OF PLAINTIFF WESTERN RIVERSIDE COUNCIL
        OF GOVERNMENTS:
10
             BEST BEST & KRIEGER LLP
11           BY:  JEFFREY DUNN, ESQ.
             18101 VON KARMAN AVENUE
12           SUITE 1000
             IRVINE, CALIFORNIA 92612
13           949-263-2600   949-260-0972 FAX
             JVDUNN@BBKLAW.COM
14           (VIA VIDEOCONFERENCE)
15
16      ON BEHALF OF DEPONENT ELIZABETH GIBBS-URTIAGA:
17           SLOVAK BARON EMPEY MURPHY & PINKNEY
             BY:  PETER J. NOLAN, ESQ.
18           1800 EAST TAHQUITZ CANYON WAY
             PALM SPRINGS, CALIFORNIA  92262
19           760-322-2275   760-322-2107 FAX
             NOLAN@SBEMP.COM
20           (VIA VIDEOCONFERENCE)
21
22      THE VIDEOGRAPHER:
23           JEREMIAH JUAREZ
24
25
```



Page 7

1          MONDAY, MAY 23, 2022; 9:10 A.M.
2               BEAUMONT, CALIFORNIA
3
4          THE VIDEOGRAPHER:  Good morning.  We are on
5   the record at 9:10 a.m. on Monday, May 23rd, 2022.
6          This begins Media No. 1 in the deposition of
7   Elizabeth Gibbs-Urtiaga in the matter of Western
8   Riverside Council of Governments, et al., versus
9   National Union Fire Insurance Company of Pittsburgh,
10  Pennsylvania, in the United States District Court
11  for the Central District of California, Eastern
12  Division, Case No. 5:20-cv-02164 GW.
13         This deposition is being taken remotely,
14  using virtual technology, at the request of Gordon
15  and Rees Scully Mansukhani, LLP.
16         Please note that the quality of the
17  recording depends on the quality of camera and
18  Internet connection of participants.  What is seen
19  from the witness and heard on screen is what will be
20  recorded.  Audio and video recording will continue
21  to take place unless all parties agree to go off the
22  record.
23         The court reporter is Mimi Murray of Magna
24  Legal Services.  I am the videographer, Jeremiah
25  Juarez, of Magna Legal Services.  I am not related



Page 8

```
 1   to any party in this case, nor am I financially
 2   interested in the outcome.
 3          Will counsel and all parties present state
 4   their appearances and whom they represent, beginning
 5   with the noticing attorney.
 6          MS. VANDERWEELE:  Meagan VanderWeele on
 7   behalf of the defendant National Union Fire
 8   Insurance Company of Pittsburgh, PA.
 9          MS. MONSON:  Hanna Monson on behalf of the
10   defendant National Union Fire Insurance Company of
11   Pittsburgh, PA.
12          THE WITNESS:  Elizabeth Gibbs, City of
13   Beaumont.
14          MR. NOLAN:  Peter Nolan.  I'm appearing on
15   behalf of -- specially for WRCOG, plaintiff in this,
16   and I'm also appearing on behalf of the City of
17   Beaumont for Ms. Gibbs.
18          THE VIDEOGRAPHER:  Will the court reporter
19   please swear in the witness, and then counsel may
20   proceed.
21
22              ELIZABETH GIBBS-URTIAGA,
23   having first declared under penalty of perjury to
24   tell the truth, was examined and testified as
25   follows:
```



A "table" means indefinite.
"Continue" is generally to a date certain.
Q. Increases in the budget need to be approved by City Council; correct?
A. They're supposed to be, yes.
Q. And when you served as the resources director for City Council in January of 2015, an increase in the City's budget for insurance needed to be approved by the City Council; correct?
A. Can you restate that? I think you said that I was the resources director for City Council.
That's not correct.
Q. Sure. When you were the resources director for the City of Beaumont in January of 2015, as reflected in this exhibit, an increase in the City's budget for the purchase of insurance required approval by the City Council; correct?
A. Generally speaking, yes.
Q. And that's what's reflected in this document; true?
A. Yes.
I can't say if this document ever made it to City Council, though.
Q. Do you have any reason to believe that this document did not make it to City Council?



Page 76

1      A.   Staff reports didn't always go to City
2    Council.
3      Q.   And what do you mean by that?
4      A.   Alan operated under the policy that he
5    determined what went to City Council and what did
6    not, regardless of the municipal code.
7      Q.   When you served as the resources director,
8    you knew that Mr. Kapanicas was not providing certain
9    staff reports to City Council?
10     A.   I can't be specific.  But I reported to
11   Alan, and it was Alan's job to take things to City
12   Council.
13     Q.   And it sounds like your -- you -- you believe
14   that certain staff reports -- you just told me that
15   certain staff reports didn't always go to City
16   Council; right?
17     A.   There were times when we would draft staff
18   reports, and Alan would make the decision to not
19   take them to City Council.  Yes.
20     Q.   And you knew that, when you served as
21   resources director, that there were times when
22   Mr. Kapanicas was not providing staff reports to City
23   Council; correct?
24     A.   Correct.  The direction would change --
25   correct.



Page 174

```
 1   Interim City Manager for the City of Beaumont, did
 2   you come to learn that Mr. Kapanicas -- or strike
 3   that.
 4           As resources director and later as the
 5   Interim City Manager, did you ever come to learn that
 6   the City believed Mr. Kapanicas had engaged in
 7   unlawful activity?
 8      A.   No, even after he was arrested.
 9           MS. VANDERWEELE:  I'm going to show you
10   Exhibit 11.
11           (Deposition Exhibit 11 was marked for
12           identification by the court reporter.)
13           (Mr. Dunn rejoined the deposition.)
14   BY MS. VANDERWEELE:
15      Q.   Exhibit 11, these are City Council meeting
16   minutes from June 2 of 2015; correct?
17      A.   Correct.
18      Q.   And these meeting minutes reflect the fact
19   that you were acquainted the -- strike that.
20           These meeting minutes reflect the fact that
21   you were appointed Acting City Manager by the City
22   Council on June 2, 2015; correct?
23      A.   Correct.
24      Q.   And after the City Council appointed you
25   Acting City Manager, you began that position with the
```



Page 185

```
 1   correct?
 2       A.   Correct.
 3       Q.   The Urban Logic principals, Mr. Moorjani,
 4   Mr. Egger and Mr. Dillon, no longer worked for the
 5   City of Beaumont prior to June 30, 2015; correct?
 6       A.   They weren't around.  They never -- they
 7   never worked for the City of Beaumont.  They
 8   consulted.
 9       Q.   When you were appointed Interim City Manager
10   on June 2 of 2015, was there anything preventing you
11   from investigating any wrongdoing that Mr. Kapanicas
12   may have committed?
13       A.   Can you repeat that?
14       Q.   Sure.
15            By the time that you were appointed City
16   Manager on June 2 of 2015, was there anything
17   stopping you from launching an investigation as to
18   whether Mr. Kapanicas had violated any laws?
19       A.   I understood and I believed that
20   Mr. Kapanicas would be back, that he would at some
21   point come back, and that my role was temporary
22   until he returned.
23       Q.   That wasn't the answer to my question.
24            My question was:  Was there anything
25   preventing you from conducting an investigation as to
```



Page 186

```
 1   whether Mr. Kapanicas had engaged in any unlawful
 2   activity?
 3       A.   I wouldn't -- there was nothing preventing
 4   me, but I wouldn't do an investigation because I
 5   didn't believe he did anything wrong.
 6       Q.   Well, you're aware that Mr. Kapanicas was
 7   places on leave due to concerns about him engaging in
 8   unlawful activity; correct?
 9       A.   No.  I understood that he was placed on
10   leave, and that's all I knew.
11       Q.   Do you have any understanding as to why
12   Mr. Kapanicas was placed on leave?
13       A.   I thought maybe there was personality
14   conflicts between him and a couple of the
15   Councilmembers.
16       Q.   When you were appointed Interim City Manager
17   on June 2 of 2015, was there anything preventing you
18   from conducting an investigation into whether
19   Urban Logic Consultants and the owners had engaged in
20   unlawful activity?
21       A.   No.  But, again, I didn't think there was
22   any wrongdoing, so I wouldn't entertain an
23   investigation.
24            MS. VANDERWEELE:  I'm going to show you what
25   I've marked as Exhibit -- I think this is 15.
```



Page 198

1  City Manager for Beaumont, to determine the amount
2  that Urban Logic allegedly overcharged the City?
3      A.  No, I -- not directly.
4      Q.  Indirectly have you done that?
5      A.  I -- at some point, Urban Futures was
6  retained to do reconciliation because Urban Logic
7  was threatening litigation.
8      Q.  And all I'm trying to get at is if in your
9  role as the Interim City Manager in 2015 and 2016 --
10 ever made a determination as to the exact amount that
11 Urban Logic overcharged the City?
12     A.  No.
13     Q.  You mentioned that you were involved in
14 assisting the DA with its investigation; do you
15 recall that?
16     A.  Yes.
17     Q.  Is that referring to the Riverside District
18 Attorney's office?
19     A.  Yes.
20     Q.  The Riverside DA conducted an investigation
21 in 2015 and 2016; correct?
22     A.  It started -- City Hall was raided on
23 April 22nd, 2015, so I assumed that their
24 investigation started.
25         We were not given updates, so we kept, you



Page 199

```
 1   know, business as usual.
 2        Q.   Were you involved in the DA's investigation?
 3        A.   I was interviewed once.
 4        Q.   When were you interviewed?
 5        A.   December 2nd, 2015.
 6        Q.   And who interviewed you?
 7        A.   I -- there were five or six represent- -- DA
 8   representatives in the room, and Mr. Pinkney was
 9   with me.
10             I can't remember the lead investigator -- or
11   the lead attorney's name, she was a female.  But
12   there were multiple people in that room.  It was at
13   their office in Riverside.
14        Q.   Do you recall that one of the DAs present was
15   Emily Hanks?
16        A.   I don't recognize that name, but that could
17   have been her name.
18        Q.   How long was -- did the interview take?
19        A.   It was five hours.  It was a long time.  I
20   remember that because that was the day that the
21   San Bernardino public social services building was
22   bombed.
23        Q.   When you were interviewed by the DA, did you
24   provide them with any documents?
25        A.   No, it was strictly an oral interview.
```



Page 200

1    Q.   And what were the types of things that the DA
2    was asking you about in this interview?
3    A.   I -- I don't know.  They wanted to know a
4    lot about the department heads and the culture of
5    the organization and how things were done.  I don't
6    remember specific questions.
7    Q.   Did the DA advise you during this interview
8    of why it was conducting an investigation?
9    A.   No.
10   Q.   Are you aware that the City of Beaumont is
11   claiming in this lawsuit that Urban Logic overcharged
12   the City millions of dollars?
13   A.   As the employee, no.
14   Q.   And I -- thank you for pointing that out.  I
15   should have clarified.
16        As the resources director and then as the
17   Interim City Manager and the transit director and the
18   community services director, did you ever come to
19   learn, with respect to those roles that you had at
20   the City, that the City is claiming that Urban Logic
21   overcharged them millions of dollars?
22   A.   I believe I learned that from you, with our
23   initial conversation.  I don't think it was specific
24   to Urban Logic.
25   Q.   And what do you mean by -- by it not being



Page 206

1           I, Mimi Murray, a licensed Certified Shorthand
2    Reporter, duly qualified and certified as such by the
3    State of California, do hereby certify:
4           That prior to being examined, the witness
5    named in the foregoing proceedings was, by me, duly
6    sworn to testify to the truth, the whole truth, and
7    nothing but the truth;
8           That the said proceedings were, by me,
9    recorded stenographically at the time and place first
10   therein mentioned; and the foregoing pages constitute a
11   full, true, complete and correct record of the
12   testimony given by the said witness;
13          That I am a disinterested person, not being in
14   any way interested in the outcome of said action, not
15   connected with, nor related to any of the parties in
16   said action, or to their respective counsel, in any
17   manner whatsoever.
18          IN WITNESS WHEREOF, I have subscribed my name
19   this 2nd day of June, 2022.
20
21                          _____
                            Mimi Murray / CSR No. 13985
22
23
24
25

