# EXHIBIT 7

Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CASE NO. 5:20-CV-02164-GW(KKx)

_____
                                            )
WESTERN RIVERSIDE COUNCIL OF GOVERNMENTS,   )
a California Joint Powers Authority,        )
                                            )
                    Plaintiff,              )
vs.                                         )
                                            )
NATIONAL UNION FIRE INSURANCE COMPANY       )
OF PITTSBURGH, PA, and DOES 1 through       )
50, inclusive,                              )
                                            )
                    Defendants.             )
_____)


Videotaped Deposition of

JAMES GREGG

(Conducted Remotely)

Tuesday, April 26, 2022

10:01 a.m. PDT


Magna Legal Services
(866) 624-6221
www.MagnaLS.com

Job No.: 822124

Reported by: BRENDA MATZOV, CSR NO. 9243



Page 2

1          Videotaped deposition of JAMES
2  GREGG, taken remotely in the above-entitled
3  cause pending in the United States District
4  Court, Central District of California, before
5  BRENDA MATZOV, CSR NO. 9243, and simultaneously
6  in the participants' remote locations, on Tuesday,
7  the 26th day of April, 2022, at 10:01 a.m. PDT.
8
9
10  APPEARANCES:
11  FOR PLAINTIFF:
12          BEST BEST & KRIEGER, LLP
            By:  CHRISTOPHER E. DEAL, ESQ.
13          18101 Von Karman Avenue
            Suite 1000
14          Irvine, California 92612
            (949) 263-2600
15          chris.deal@bbklaw.com
16
17  FOR DEFENDANT:
18          GORDON REES SCULLY MANSUKHANI, LLP
            By:  SCOTT L. SCHMOOKLER, ESQ.
19          5 Park Plaza
            Suite 1100
20          Irvine, California 92614
            (949) 255-6950
21          sschmookler@grsm.com
22
23
24
25



```
                                                              Page 3
 1    APPEARANCES (Continued):
 2    FOR THE WITNESS:
 3              RAINS LUCIA STERN ST. PHALLE & SILVER, PC
                By:  BRIAN P. ROSS, ESQ.
 4              1428 Second Street
                Suite 200
 5              Santa Monica, California 90401-2367
                (310) 393-1486
 6              bross@rlslawyers.com
 7
 8    ALSO PRESENT:
 9              NICHOLAS HEMPHILL, Videographer
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



Page 12

```
 1                TUESDAY, APRIL 26, 2022
 2                    10:01 A.M. PDT
 3
 4           THE VIDEOGRAPHER:  Good morning.
 5           We are now on the record.  This
 6   begins the deposition of James Gregg, in
 7   the matter of Western Riverside Council of
 8   Governments, et al., versus National Union
 9   Fire Insurance, et al., in the United States
10   District Court, Central District of California.
11           Today's date is Tuesday, April 26,
12   2022.  And the time is 10:01.  This deposition
13   is being taken virtually at the request of Best
14   Best & Krieger, LLP.
15           The videographer is Nicholas Hemphill,
16   of Magna Legal Services.  And the court reporter
17   is Brenda Matzov, of Magna Legal Services.
18           Will counsel and all parties present
19   state their appearance and whom they represent,
20   after which will the court reporter please swear
21   in the witness.
22           MR. DEAL:  This is Christopher Deal,
23   for the plaintiff -- plaintiffs.
24           MR. SCHMOOKLER:  Scott Schmookler,
25   for the defendant.
```



```
 1            MR. ROSS:  This is Brian Ross,
 2   from Rains Lucia Stern St. Phalle & Silver,
 3   representing the deponent James Gregg.
 4
 5                   JAMES GREGG,
 6           called as a witness, being duly
 7           sworn remotely, was examined and
 8           testified as hereinafter set forth.
 9
10                   EXAMINATION
11   BY MR. DEAL:
12       Q.   Good morning, Mr. Gregg.
13       A.   Good morning.
14       Q.   My name is Chris Deal.  I represent
15   WRCOG.
16            You're familiar with WRCOG; correct?
17       A.   Yeah.  Uh-huh.
18       Q.   What's -- have you ever had your
19   deposition taken before?
20       A.   No.
21       Q.   Are you a lawyer?
22       A.   I am.
23       Q.   Despite that fact, I'm going to go
24   over some of the basic rules of deposition
25   with you.
```



```
 1      A.    That's the approach --
 2      Q.    -- of play it by ear.
 3      A.    -- I have to take, you know --
 4            THE COURT REPORTER:  Wait.
 5            THE WITNESS:  -- at this point.
 6            THE COURT REPORTER:  Wait.
 7            THE WITNESS:  Yeah.
 8            THE COURT REPORTER:  You guys are
 9   talking at the same time.
10   BY MR. DEAL:
11      Q.    Let's play it by ear and kind of
12   go question by question and see what we can
13   do.
14            Your -- your general practice was,
15   once a claim was worked up, it would be
16   submitted to the city attorney?
17      A.    No.  The city attorney already had
18   the claim.
19      Q.    But you did some work-up and you
20   would essentially present that to him to be
21   looked at in conjunction with a claim?
22      A.    We would discuss all claims.
23      Q.    And then Al -- was Alan Kapanicas
24   involved in that process?
25      A.    There would be discussions with the
```



1  city manager on -- on how to handle claims.
2      Q.   Who would have the ultimate authority
3  as to whether to submit a claim or not?
4          MR. SCHMOOKLER:  Object to form.
5          THE WITNESS:  I don't know.
6  BY MR. DEAL:
7      Q.   Well, let me give you a hypothetical.
8          You -- you presented this package
9  or your work-up to Mr. Aklufi.  Mr. Kapanicas
10 let's say he's involved in this claim.  You
11 recommend that a claim is submitted.
12         Does Mr. Kapanicas have the ability
13 to say no, we're not going to submit that
14 claim, for whatever reason?
15         MR. SCHMOOKLER:  Object to form.
16 Calls for a hypothetical.
17         THE WITNESS:  The city attorney
18 and the city manager would advise me, one
19 or the other, whether or not to -- to file
20 the claim.  They -- they work together.
21 So -- and their conversations oftentimes
22 I was not privy to.
23 BY MR. DEAL:
24     Q.   Okay.  Is -- is -- is there any
25 circumstances in which, if Mr. Kapanicas



Page 39

```
 1   or Mr. Aklufi instructed you not to submit
 2   a claim, that you would still do so?
 3        A.   No.
 4             MR. SCHMOOKLER:  Object to form.
 5   BY MR. DEAL:
 6        Q.   Did the city council play any
 7   part in analyzing claims or making any
 8   type of determination as to whether to
 9   submit a claim?
10             MR. SCHMOOKLER:  Object to form.
11             THE WITNESS:  I only know that
12   the city attorney would discuss claims in
13   closed session.  What those discussions
14   were I have no idea.  I was never privy
15   to those.  So I --
16   BY MR. DEAL:
17        Q.   Were you ever -- did you ever
18   participate in closed-session meetings?
19        A.   No.
20        Q.   Do you know if Mr. Kapanicas
21   needed -- well, strike that.
22             Do you know if Mr. Kapanicas
23   or Mr. Aklufi needed the city council's
24   permission to submit a claim?
25             MR. SCHMOOKLER:  Object to form.
```



Page 61

```
 1       Q.    Were you aware of any allegations
 2   that Mr. Kapanicas had stolen money from --
 3   strike that.
 4             Were you aware in May 2015 of any
 5   allegations that Urban Logic Consultants had
 6   stolen money from the city?
 7             MR. SCHMOOKLER:  Object to --
 8             THE WITNESS:  No.
 9             MR. SCHMOOKLER:  -- form.
10             THE WITNESS:  Oh, excuse me.  I'm
11   sorry.
12   BY MR. DEAL:
13       Q.    Had you heard of any allegations
14   that they were over-charging or over-billing
15   for projects?
16             MR. SCHMOOKLER:  Object to form.
17             THE WITNESS:  There had been some
18   citizens that had raised issues and concerns
19   in the past at council meetings.  But it
20   wasn't something that was generally accepted
21   or -- or general knowledge or acceptance of
22   that.
23   BY MR. DEAL:
24       Q.    Okay.  I -- I -- there were a couple
25   gadflies that would raise issues periodically
```



Page 77

```
 1              MR. SCHMOOKLER:  Hold on, sir.
 2   Sir, you've got to let me get my objections.
 3   I apologize --
 4              THE WITNESS:  I apologize.
 5              MR. SCHMOOKLER:  -- for interrupting
 6   you.
 7              Object to form.
 8              THE COURT REPORTER:  And I don't
 9   have the end of the question either.
10   BY MR. DEAL:
11       Q.   So in May 2015, in your mind, did
12   you have any concern that Dillon, Moorjani,
13   or Egger had over-charged the city for
14   services or stolen from the city?
15              MR. SCHMOOKLER:  Object to form.
16              THE WITNESS:  I -- I did not have
17   those concerns at that point.  No.
18   BY MR. DEAL:
19       Q.   And did you at any time discuss
20   with Dillon, Moorjani, or Egger any allegations
21   that they had acted -- strike that.
22              Had you -- at any point before
23   leaving the city, did you have any discussions
24   with Egger, Moorjani, or Dillon about allegations
25   that they over-charged the city for services?
```



Page 82

```
 1        A.   No.
 2        Q.   In 2009, were you at all aware
 3   of allegations that were being made by Judy,
 4   Victor, and Chris against Urban Logic and/or
 5   Alan Kapanicas?
 6        A.   I -- I don't know who Chris is.
 7   I believe Victor was another local citizen.
 8   And Judy Bingham obviously we've discussed.
 9   I don't recall -- you know, there was kind
10   of an ongoing issue overtime.  So I don't
11   recall this in particular.
12        Q.   Well, at this time, did you consider
13   making any claim under the crime policy?
14        A.   I had no reason to consider that
15   at this point.
16        Q.   Well, would it be a -- a fair
17   statement that, during the entire period
18   of your employment with Beaumont, you did
19   not see any conduct by Dillon, Moorjani,
20   Egger, or Mr. Kapanicas that would have
21   caused you to recommend filing a claim
22   under the crime policy?
23        A.   That's --
24             MR. SCHMOOKLER:  Object to --
25             THE WITNESS:  -- correct.
```



```
 1              MR. SCHMOOKLER:  -- form.
 2              THE WITNESS:  Oh, sorry.
 3              That's correct.
 4     BY MR. DEAL:
 5         Q.   If you could look at what I'm
 6     going to mark as Exhibit 14, which is 2783.
 7     Hopefully we -- I can find that.
 8              And, Mr. Gregg --
 9              MR. SCHMOOKLER:  Already marked
10     this one.
11              MR. DEAL:  Did we?
12              MR. SCHMOOKLER:  Yeah.  It's --
13     I don't remember what exhibit.
14              MR. DEAL:  I think you're -- I
15     think you're right.
16              THE COURT REPORTER:  Scott, I
17     didn't understand what you said.
18              MR. SCHMOOKLER:  Exhibit 8.
19              THE COURT REPORTER:  Thank you.
20              MR. DEAL:  All right.  I'll pull
21     this one back.
22              (Exhibit 15 marked.)
23     BY MR. DEAL:
24         Q.   Exhibit 15 is 3256.
25         A.   I've got it.  (Examining.)
```



```
 1   in excess of $25,000 to supervise and manage
 2   projects that Mr. Dillon ... and Mr. Moorjani ...
 3   had discussed and recommended to the city
 4   council."  (As read.)
 5           Are you basing this on any specific
 6   documents or just your generalized understanding
 7   of how the city operated?
 8       A.  That would be my generalized -- what --
 9   whatever you said -- generalized understanding
10   of how the city operated.
11       Q.  And we -- we can conclude it's over
12   $25,000 because we know that ULC certainly did
13   projects worth more than $25,000 collectively;
14   right?
15       A.  That's correct.
16       Q.  It says here:
17           "ULC was paid fees in excess of
18   $25,000."
19           Do you see that?
20       A.  I do.
21       Q.  Are you aware of ULC stealing
22   monies, securities, or other property in
23   excess of $25,000 in connection with their
24   work for the city?
25           MR. SCHMOOKLER:  Object to form.
```



```
 1              THE WITNESS:  No.
 2   BY MR. DEAL:
 3        Q.   And you were never aware of such
 4   conduct prior to leaving the city?
 5              MR. SCHMOOKLER:  Object to form.
 6              THE WITNESS:  No.
 7   BY MR. DEAL:
 8        Q.   Paragraph 12:
 9              "I" understand "that the city council
10   had the authority to consider whether Messrs.
11   Egger, Dillon, and Moorjani violated California
12   law and whether to remove Messrs. Egger, Dillon,
13   and Moorjani."  (As read.)
14              Where did you reach that understanding
15   from?
16        A.   That's my general educational background
17   that, you know, powers not to -- powers inherent
18   with the city council remain with the council.
19   And so ultimate power results -- resides there.
20              In a council manager form of government,
21   such as in Beaumont, much of the administrative
22   activities are handled by the city manager.  But
23   the ultimate authority in these things are with
24   the city council.  So it's simply a -- a general
25   statement of my understanding of how cities work.
```



1  do with some edits of -- and I -- I believe
2  I indicated that that was a legal conclusion
3  that I couldn't make because -- and I told
4  her I wasn't convinced that there was, you
5  know, a conflict of interest or a crime.
6  I don't know.
7           I explained to her that, you
8  know, in my experience, that there are
9  a number of different places where folks
10 make recommendations to council and then
11 manage the process thereafter, not -- not
12 the least of which, in my area, was city
13 attorneys.  They may be a partner in a firm,
14 and then they refer the litigation out to,
15 you know, litigation counsel in their own
16 firm.  And they may be sharing in that.  So
17 I don't know the rules in -- in that regard.
18      Q.   Fair enough.
19           So would it be fair to say that
20 vis-a-vis, with respect to Mr. Kapanicas,
21 for the entire time that you worked at the
22 city and even after your role as ERMAC, you
23 do not know whether he violated any applicable
24 conflict of interest laws?
25      A.   That's --



```
                                                  Page 136
 1            MR. SCHMOOKLER:  Object to --
 2            THE WITNESS:  -- correct.
 3            MR. SCHMOOKLER:  -- form.
 4            THE WITNESS:  Oh, sorry.
 5            That's correct.
 6  BY MR. DEAL:
 7       Q.   How about Mr. Moorjani, same
 8  question?
 9            MR. SCHMOOKLER:  Same objection.
10            THE WITNESS:  That's correct.
11  BY MR. DEAL:
12       Q.   Same question for Mr. Dillon?
13            MR. SCHMOOKLER:  Same objection.
14            THE WITNESS:  That's correct.
15  BY MR. DEAL:
16       Q.   And same question for Mr. Egger?
17            MR. SCHMOOKLER:  Same objection.
18            THE WITNESS:  That's correct.
19  BY MR. DEAL:
20       Q.   And I don't -- Mr. Aklufi, do you
21  believe he was in any -- any type of conflict
22  of interest?
23       A.   I don't [audio fades] --
24            MR. SCHMOOKLER:  Same objection.
25            Sorry.
```



Page 137

```
 1              THE COURT REPORTER:  I don't have
 2   an answer.
 3              THE WITNESS:  "No."
 4   BY MR. DEAL:
 5       Q.   Did you ever have any discussions
 6   with anyone at Urban Logic about your feelings
 7   that perhaps there were conflict of issues
 8   here?
 9            Let -- let me rephrase that.
10            In paragraphs 11 -- in paragraphs
11   9 through 12 of your declaration, you're
12   certainly discussing conflict of interest
13   issues; right?
14       A.   In those paragraphs, I'm simply
15   trying to outline the facts that I know.
16   I don't know -- I -- I never drew any
17   conclusions about whether or not conflicts
18   of interest were occurring.  I'm not -- I'm
19   not inferring that.  I'm not stating that.
20   I'm just stating this is what I knew in the
21   process.  Whether that was or not, I -- I
22   can't tell you.
23       Q.   Okay.  And -- and I totally understand
24   that.  I'm just trying to figure out whether
25   any of the stuff that's outlined in paragraphs
```



Page 138

```
 1   9 through 12, whether you had any discussions
 2   with Mr. Kapanicas, Mr. Dillon, any of these
 3   gentlemen, regarding the matter that's in
 4   paragraphs 9 through 12?
 5        A.   I never had any discussions with
 6   anyone regarding conflicts of interest.  I
 7   did not -- those types of issues were -- I
 8   had never raised them, nor did I have concerns
 9   about them that I -- I'm aware of.  And so no,
10   I have not had any discussions with any of
11   these folks about conflicts of interest.
12        Q.   Thank you.
13             Do you have -- do you -- do you
14   know what the entity BSI Consultants, Inc.,
15   is?
16        A.   Say that again, please.
17             THE COURT REPORTER:  I -- I didn't
18   get it either.
19   BY MR. DEAL:
20        Q.   BSI Consultants, Inc.
21        A.   That sounds familiar.  But I --
22   I just don't recall.
23        Q.   Okay.  And you were the agent for --
24   for service of process for GGMS?
25        A.   I was.
```



```
                                                         Page 214
 1              CERTIFICATE OF REPORTER
 2
 3          I, BRENDA MATZOV, CSR NO. 9243, do hereby
 4   certify:
 5          That, prior to being examined, the witness
 6   named in the foregoing deposition was remotely duly
 7   sworn by me to testify the truth, the whole truth,
 8   and nothing but the truth;
 9          That the foregoing deposition was taken
10   remotely/virtually before me, at which time the
11   aforesaid proceedings were stenographically recorded
12   by me and thereafter transcribed by me;
13          That the foregoing transcript, as typed,
14   is a true record of the said proceedings;
15          And I further certify that I am not
16   interested in the action.
17
18          Dated this 10th day of May, 2022.
19
20          _Brenda Matzov_____
            BRENDA MATZOV, CSR NO. 9243
21
22
23
24
25
```

