# EXHIBIT E

Scott L. Schmookler, *Pro Hac Vice*
sschmookler@grsm.com
(312) 980-6779
Gordon Rees Scully Mansukhani, LLP
5 Park Plaza Suite 1100
Irvine, CA 92614
Attorneys for Defendant,
NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION

| | |
|---|---|
| WESTERN RIVERSIDE COUNCIL OF GOVERNMENTS, a California Joint Powers Authority; CITY OF BEAUMONT, a public entity in the State of California,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, and DOES 1 through 50, inclusive,<br><br>Defendants. | Case No. 5:20-cv-02164- GW (KKx)<br><br>**Declaration of Lawrence Dressel** |

I, LAWRENCE DRESSEL, declare as follows:

1. I have personal knowledge of the matters and facts set forth below and am competent to testify to such matters and facts.

2. I am a resident of the Mentone, California and served on the Beaumont City Council from 2001 to 2010. Based upon my tenure on the Beaumont City Council, I had knowledge of and was aware prior to 2011 of the following facts set forth in paragraph 3 through paragraph 23.

3. On an annual basis, the City Council reviewed and approved Capital Improvement Plans. Capital Improvement Plans were a component of the

-1-

budgeting process and identified the capital improvement projects that the City (either itself or through the Beaumont Utility Authority) would undertake. Capital Improvement Plans were prepared by the Public Works Department in conjunction with input from other agencies as needed for various projects. The Capital Improvement Plans included a preliminary engineer's estimate of the cost for each project, an allocation of funds and a budget summary that categorized the costs associated with each project. The Capital Improvement Plans also included a list of professional services contractors that were approved to perform the work for the projects identified in the plans.

4. While I was on City Council from 2001 through 2010, the City Council reviewed and approved the Capital Improvement Plans. As a member of the City Council, I personally reviewed the Capital Improvement Plans for fiscal year 2001 through fiscal year 2010. Those Capital Improvement Plans included a budget summary that categorized the costs associated with each project, and the cost for the services associated with each project identified in the Capital Improvement Plans.

5. The Capital Improvement Plans were treated as the governing agreement for each project. The City Council could amend and adopt the Capital Improvement Plans through a Resolution. After reviewing the Capital Improvement Plans for fiscal years 2001 through 2010, the City Council voted to approve each plan. Through that approval, the City Council authorized the City Manager, staff, financing team, and qualified professional services contractors identified in the plans to take all necessary actions and expend funds as directed and authorized to complete the projects as set forth in the Capital Improvement Plans.

6. While I served on the City Council, the City of Beaumont contracted with Urban Logic Consultants ("ULC") and paid ULC to provide planning,

-2-

economic development, construction management and engineering services. While I served on the City Council, Ernest Egger, David Dillon, and Deepak Moorjani ("ULC Principals") owned ULC. ULC was a qualified professional services contractor approved by the City Council during my tenure on the council.

7. Throughout my time on the City Council, I understood that: Mr. Dillon served as the City of Beaumont's Economic Development Director during the time he held an ownership interest in ULC and while ULC contracted with City of Beaumont; Mr. Moorjani served as the City of Beaumont's Public Works Director during the time he held an ownership interest in ULC and while ULC contracted with City of Beaumont; and Mr. Egger served as the City of Beaumont's Planning Director during the time he held an ownership interest in ULC and while ULC contracted with City of Beaumont.

8. The City of Beaumont and ULC entered into an agreement in September 1993. (See Agreement for Planning, Economic Development and Public Works Services, dated September 27, 1993, attached here as Exhibit A.) Pursuant to Section V of the agreement ("Plan Checking and Construction Inspection"), ULC contracted with the City to provide all necessary plan checking and inspection services for public works projects in the City of Beaumont. (Exhibit A, Section V.) Pursuant to Section IX of the agreement ("Compensation to Consultant"), ULC's fees for services set forth in Section V were subject to a 4.5% cap of the confirmed construction cost of the public improvements to be constructed. (Exhibit A, Section IX, par. 2.)

9. In 1994, the agreement between the City of Beaumont and ULC was amended. (See Agreement Amending the Agreement for Planning, Economic Development and Public Works Services, dated April 11, 1994, attached here as Exhibit B.) Pursuant to the 1994 amendment, ULC contracted with the City to provide construction management services during all phases of public works

-3-

construction for each public works project, as set forth in Section V.1 ("Public Works Construction Management"). (See Exhibit B, pg. 2.) Pursuant to the 1994 amendment, ULC's fees for services set forth in Section V.1 were subject to a 4.5% cap of the bid price awarded by the City of Beaumont for each public works project. (See Exhibit B, pg. 3.)

10. The 4.5% cap on fees for services set forth in Section V and V.1 generally applied to day-to-day services that ULC provided on public works projects relating to plan checking; construction inspection; and construction management ("Section V and Section V.1 services").

11. ULC performed or outsourced engineering; surveying; and/or other contractor services that were billed on an hourly rate schedule and not subject to the 4.5% fee cap.

12. ULC also performed services for private development projects that were outside of its agreement with the City. Services for private development projects were billed on an hourly rate schedule and not subject to a 4.5% fee cap.

13. The Capital Improvement Plans provided a budget for services ULC performed on a yearly, as-needed basis, including a budget for Section V and Section V.1 services. The budget summary incorporated into each Capital Improvement Plan set forth the estimated cost for the services associated with each project identified in the Capital Improvement Plan, including the Section V and Section V.1 services that ULC provided.

14. As reflected in the Capital Improvement Plans and as approved by the City Council, the fees that ULC charged for Section V and Section V.1 services exceeded 4.5% of the total project budget/bid price/cost. The fees that ULC charged for Section V and Section V.1 services exceeded the 4.5% fee cap because of the nature and scope of the City's public works projects as the City expanded and grew.

NUFIC_049372

15. As a member of City Council, I knew that the fees ULC charged for Section V and Section V.1 services exceeded 4.5% of the total project budget/bid price/cost. The amount of ULC's fees for Section V and V.1 services, and the fact that those fees exceeded the 4.5% fee cap, were disclosed to and approved by the City Council.

16. During my time on the City Council, the City Council received reports on and discussed construction projects within the City of Beaumont. Those reports included presentations by and discussions with Mr. Egger, Mr. Dillon and Mr. Moorjani, in their role as city officials, about work performed by ULC and/or funding and approval of projects on which ULC was an approved contractor.

17. While serving in an official capacity for the City and acting on behalf of the City, Mr. Egger, Mr. Dillon and Mr. Moorjani:

   a. Recommended that the City adopt resolutions approving Capital Improvement Plans that provided funding for projects on which ULC was listed among the qualified contractors;

   b. Participated in the discussions about, negotiations over and solicitation of bids in connection with construction projects in which ULC would provide planning, engineering, inspection and construction management services for a fee;

   c. Participated in the discussions about bids submitted by ULC;

   d. Participated in discussions about bids submitted by other contractors in which ULC would provide planning, engineering, inspection and construction management services for a fee;

   e. Recommended that the City award contracts to other contractors on projects in which ULC was paid a fee to provide planning, inspection and construction management services for those projects; and

Gordon Rees Scully Mansukhani, LLP
5 Park Plaza, Suite 1100
Irvine, CA 92614

NUFIC_049373

  f. Supervised work performed by ULC that was valued in excess of $25,000

18. I understood that Mr. Egger, Mr. Dillon and Mr. Moorjani, as owners of ULC, received a financial benefit from the construction projects and work awarded by the City of Beaumont to ULC and from the contracts and work awarded to other contractors in which ULC provided planning, engineering, inspection and construction management services for a fee. The total work awarded to ULC during my time on the City Council exceeded $25,000. I therefore understood that Mr. Dillon, Mr. Egger and Mr. Moorjani received a financial benefit from the construction projects and work awarded by the City of Beaumont to ULC in excess of $25,000.

19. At the time that Mr. Egger, Mr. Dillon and Mr. Moorjani were owners and principals of ULC and in their official capacities as Department Heads for the City of Beaumont, they participated in the preliminary discussion, planning, negotiation and/or solicitation of bids in connection with the making of bonds issued by the Beaumont Financing Authority.

20. At the time that Mr. Egger, Mr. Dillon and Mr. Moorjani were owners and principals of ULC and were engaged as Department Heads for the City of Beaumont, the Beaumont Financing Authority issued bonds that listed ULC as the project engineer.

21. Due to their ownership interest in ULC, Mr. Egger, Mr. Dillon and Mr. Moorjani financially benefitted from ULC's work as a project engineer on bonds issued by the Beaumont Financing Authority in an amount in excess of $25,000.

22. Prior to 2011, members of the public, including Judith Bingham and Nancy Hall, appeared during city council meetings and publicly stated that in their opinion the retention of ULC created a conflict of interest that violated California

NUFIC_049374

law. Members of the public advised City Council that the ULC Principals' participation, as city officials, in planning, negotiating, recommending and awarding work to ULC; the ULC Principals' supervision, as city officials, of the work ULC performed; and the ULC Principals' financial interest in the construction projects and work awarded to ULC was a conflict of interest that violated California law.

23. The City Council considered whether to continue retaining Mr. Egger, Mr. Moorjani and Mr. Dillon in an official capacity. The City Council knew that Mr. Egger, Mr. Moorjani and Mr. Dillon had a financial interest in construction projects and work awarded by the City to ULC, participated (as city officers) in planning, negotiating, recommending and awarding projects and work to ULC, and supervised (as city officers) the work performed by ULC. The City Council decided to continue retaining ULC and did not remove Mr. Egger, Mr. Moorjani and Mr. Dillon from their official positions with the City of Beaumont.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 5th day of ~~March~~ APRIL, 2022.

Lawrence Dressel

NUFIC_049375