# EXHIBIT G

1 | Scott L. Schmookler, *Pro Hac Vice*
sschmookler@grsm.com
2 | (312) 980-6779
Gordon Rees Scully Mansukhani, LLP
3 | 5 Park Plaza Suite 1100
Irvine, CA 92614
4 | Attorneys for Defendant,
NATIONAL UNION FIRE INSURANCE
5 | COMPANY OF PITTSBURGH, PA

6

7 | UNITED STATES DISTRICT COURT

8 | CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION

9

10 | WESTERN RIVERSIDE COUNCIL OF GOVERNMENTS, a California Joint Powers Authority; CITY OF BEAUMONT, a public entity in the State of California, | Case No. 5:20-cv-02164- GW (KKx)

11 | | **Declaration of Brian E. DeForge**

12

13 | Plaintiffs,

14 | v.

15 | NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, and DOES 1 through 50, inclusive,

16

17 | Defendants.

18

19 | I, BRIAN E. DEFORGE, declare as follows:

20 | 1.     I have personal knowledge of the matters and facts set forth below

21 | and am competent to testify to such matters and facts.

22 | 2.     I am a resident of the City of Beaumont, California and served on the

23 | Beaumont City Council from 1999 to 2014. Based upon my tenure on the

24 | Beaumont City Council, I had knowledge of and was aware prior to 2011 of the

25 | following facts set forth in paragraph 3 through paragraph 15.

26 | 3.     The City of Beaumont did not maintain a separate risk management

27 | or insurance department. The City Council had final authority over the City's

28

Gordon Rees Scully Mansukhani, LLP
5 Park Plaza, Suite 1100
Irvine, CA 92614

-1-


Δ π EXHIBIT 3
Deponent DeForge
4|28|22 Rptr.
Date
WWW.DEPOBOOKPRODUCTS.COM

Gordon Rees Scully Mansukhani, LLP
5 Park Plaza, Suite 1100
Irvine, CA 92614

insurance. The City Council would consider whether to pursue an insurance claim in private session and upon reaching a conclusion, announce the decision in public session.

4.     The City of Beaumont contracted with Urban Logic Consultants ("ULC") to perform general administrative functions, construction management, design and inspection work for the City of Beaumont. Ernest Egger, David Dillon, and Deepak Moorjani ("ULC Principals") owned ULC.

5.     Mr. Dillon served as the City of Beaumont's Economic Development Director during the time he held an ownership interest in ULC and while ULC contracted with City of Beaumont. Mr. Moorjani served as the City of Beaumont's Public Works Director during the time he held an ownership interest in ULC and while ULC contracted with City of Beaumont. Mr. Egger served as the City of Beaumont's Planning Director during the time he held an ownership interest in ULC and while ULC contracted with City of Beaumont.

6.     The ULC Principals had offices at City Hall and City of Beaumont business cards. They had day-to-day control of their respective departments, oversaw staff and reported to City Council.

7.     The City of Beaumont paid ULC to provide planning, economic development and engineering services. As city officers, Mr. Egger, Mr. Dillon and Mr. Moorjani participated in the making of contracts between the City of Beaumont and ULC, and supervision of work by ULC. As owners of ULC, I understood that Mr. Egger, Mr. Dillion and Mr. Moorjani received a financial benefit from ULC's contracts with the City of Beaumont.

8.     While I served as Mayor on the City Council, I also served as a Chairperson on the Beaumont Financing Authority. While I served as Chairperson on the Beaumont Financing Authority, Beaumont Financing Authority issued a series of revenue bonds. As a Chairperson on the Beaumont

-2-

1
2  Financing Authority, I have knowledge of these bonds and reviewed official
3  statements associated with these bonds.

4  　　　9.　　The ULC Principals, in their official capacity for the City,
5  participated in the making of revenue bonds, including the drafting and
6  negotiation of the bond offering documents. The ULC Principals, in their official
7  capacity for the City, worked with bond counsel and financial analysists in
   preparation of the bonds. Official statements in the bond documents identified
8  ULC as the "Project Engineer," disclosed that ULC was responsible for (among
9  other things) engineering services, and disclosed that fees paid to ULC were
10 contingent upon the sale and delivery of the bonds.
11
   　　　10.　　At the time the ULC Principals participated in the making of these
12 bonds, the ULC Principals had a financial interest in the bonds, because ULC
13 received money from bond proceeds. Mr. Dillon, Mr. Egger and Mr. Moorjani
14 each received a financial benefit (in the form of payments to ULC from bond
15 proceeds) in excess of $25,000 while serving in an official capacity for the City
16 of Beaumont.
17
   　　　11.　　Prior to Beaumont Finance Authority's issuance of the revenue
18 bonds, Mr. Egger, Mr. Dillon and Mr. Moorjani (in their official capacity for the
19 City of Beaumont) consulted with Beaumont Financing Authority on the revenue
20 bonds and the infrastructure being developed through the bond offering.  As
21 reflected in official statements, I understood that the revenue bonds would
22 generate funds for the development of infrastructure and that those funds would
23 be used, in part, to pay ULC for planning and engineering services. At that time,
24 I understood that Mr. Egger, Mr. Dillon and Mr. Moorjani owned ULC and
25 would therefore receive financial benefit from fees generated by the revenue
26 bonds.
27
28

Gordon Rees Scully Mansukhani, LLP
5 Park Plaza, Suite 1100
Irvine, CA 92614

-3-

NUFIC_049199

Gordon Rees Scully Mansukhani, LLP
5 Park Plaza, Suite 1100
Irvine, CA 92614

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

12.    Each bond was approved and issued by the Beaumont Financing Authority. Once approved and issued by the Financing Authority, the bonds were sold to and purchased by investors. The funds created by these bonds sales were then placed with the trustee, Union Bank of California. Bond money could be accessed by sending a requisition to the bond trustee. The bond trustee would pay the requisition. Typically, City Manager Alan Kapanicas would send requisition forms to Union Bank. The invoice for payment would be signed by Dillon, Egger, Moorjani or Kapanicas as department heads.

13.    Prior to 2011, at least one member of the public (Judith Bingham) appeared during at least one City Council meeting and publicly stated that the retention of ULC created a conflict of interest that violated California law. I understood that California law provided that city officers shall not be financially interested in any contract made by them in their official capacity, or by any body or board of which they are members.

14.    The City Council considered whether to continue retaining Mr. Egger, Mr. Moorjani and Mr. Dillon in an official capacity. Although Mr. Egger, Mr. Moorjani and Mr. Dillon had a financial interest in the bonds issued by the City in which ULC was the Project Engineer and participated in the making of the bond, the City Council decided to continue retaining ULC and did not remove Mr. Egger, Mr. Moorjani and Mr. Dillon from their official positions with the City of Beaumont.

15.    As a City Councilmember, I was informed on or after March 29, 2010 that Western Riverside Council of Governments ("WRCOG") filed suit against the City of Beaumont. I was informed that on or after May 22, 2014, the judge issued a finding in this case that the City of Beaumont had not remitted TUMF funds. I am aware that during the public comment period of the June 3, 2014 Beaumont City Council meeting, a citizen read from portion of the decision

-4-

NUFIC_049200

as follows: "evidence and testimony reveals that City management and staff engaged in a pattern and practice of deception that transcends the typical give and take of dispute negotiation", and that "[h]ad this been a typical civil trial containing allegations of fraud, I would have found fraud by clear and convincing evidence as against the City."

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this _24_ th day of January, 2022.

Brian E. DeForge

-5-

NUFIC_049201