# EXHIBIT B

Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

_____ )
WESTERN RIVERSIDE COUNCIL OF        )
GOVERNMENTS, a California Joint     )
Powers Authority,                   )
                                    )
              Plaintiff,            )
                                    )
     vs.                            ) CASE NO. 5:20-CV-02164-
                                    )           GW(KKx)
NATIONAL UNION FIRE INSURANCE       )
COMPANY OF PITTSBURGH, PA, and DOES )
 through 50, inclusive,             )
                                    )
              Defendants.           )
_____ )


VIDEOTAPED DEPOSITION OF

NANCY GALL


April 29, 2022

10:03 a.m.


3390 University Avenue
5th Floor
Riverside, California


Kelly M. Bates, CSR NO. 12935

MAGNA LEGAL SERVICES
(866)624-6221
www.MagnaLS.com



Page 2

```
 1            APPEARANCES OF COUNSEL
 2
 3   For the Plaintiff:
 4
        BEST, BEST & KRIEGER, LLP
 5      JEFFREY V. DUNN, ESQ.
        18101 Von Karman Avenue
 6      Suite 1000
        Irvine, California 92612
 7      949.263.2600
        jeffrey.dunn@bbklaw.com
 8
 9   For the Defendants:
10
        GORDON, REES, SCULLY & MANSUKHANI, LLP
11      MEAGAN VANDERWEELE, ESQ.
        5 Park Plaza
12      Suite 1100
        Irvine, California 92614
13      312.980.6779
        mvanderweele@grsm.com
14
15
16   VIDEOGRAPHER:
17      SERGIO ESPARZA
18
19
20
21
22
23
24
25
```

Page 3

```
 1              INDEX OF EXAMINATION
 2
 3   WITNESS:  NANCY GALL
 4   EXAMINATION                           PAGE
 5   By Mr. Dunn                             6
 6   By Ms. VanderWeele                     89
 7
 8
 9             INFORMATION REQUESTED
10                (None)
11
12
13   QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER
14                (None)
15
16
17                   * * *
18
19
20
21
22
23
24
25
```

Page 4

```
 1             INDEX TO EXHIBITS
 2
 3   Exhibit      Description            Page
 4
       1       Subpoena                    11
 5
 6
       2       Declaration of Nancy Gall   61
 7
 8
       3       Declaration of Nancy Gall   63
 9
10
       4       Correspondence              67
11
12                    * * *
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1          VIDEOTAPED DEPOSITION OF NANCY GALL
 2                  April 29, 2022
 3
 4        THE VIDEOGRAPHER:  Good morning.  We are on the
 5   record.  This begins Video No. 1 in the deposition of
 6   Nancy Gall in the matter of Western Riverside Council of
 7   Governments versus National Union Fire Insurance in the
 8   United States District Court, Central District of
 9   California.  Today's date is April 29th, 2022, and the
10   time is 10:03 a.m.  This deposition is being taken at
11   3390 University Avenue, 5th Floor, in Riverside,
12   California at the request of Best, Best & Krieger.  The
13   videographer is Sergio Esparza of Magna Legal Services,
14   and the court reporter is Kelly Bates of Magna Legal
15   Services.  Will counsel and all parties present state
16   their appearances and whom they represent.
17        MR. DUNN:  Yes.  Good morning.  My name is
18   Jeffrey Dunn, and I represent the City of Beaumont and
19   Western Riverside Council of Governments commonly known
20   as WRCOG.
21        MS. VANDERWEELE:  Meaghan VanderWeele on behalf
22   of the Defendant National Union Fire Insurance Company
23   of Pittsburgh, PA.
24        THE WITNESS:  My name is Nancy Gall.  I'm here
25   because I -- in 2008 to 2012 I was on the council for
```

2 (Pages 2 to 5)



## Page 6

1  Beaumont.
2       THE VIDEOGRAPHER: Thank you. Would you court
3  reporter please administer the oath.
4              NANCY GALL,
5    having been first duly sworn, testifies as follows:
6
7              EXAMINATION
8  BY MR. DUNN:
9     Q. Good morning, Ms. Gall. As I previously
10  introduced myself, my name is Jeffrey Dunn and I
11  represent the City of Beaumont and Western Riverside
12  Council of Governments in this lawsuit in which you are
13  now giving a deposition. And we have a few documents
14  that I'll show you. Mainly just two. And then I'll ask
15  you some questions today. And counsel -- the other
16  counsel present today may have some questions for you as
17  well.
18       I don't anticipate we will be here very long
19  today. Maybe past noon. So for a couple hours perhaps.
20       Maybe a little bit longer. But if you want to
21  take a break at any time for any reason, just let us
22  know. You can take a break anytime you want. And
23  that's very common in a deposition to take a break if
24  you need to stretch your legs or for whatever reason.
25       Have you ever had your deposition taken before?

## Page 7

1     A. Yes, I have in the past. Yeah.
2     Q. Okay. Do you remember how many times?
3     A. No.
4     Q. One of the things that we will do today is when
5  we ask questions we'll be asking for your best
6  testimony, your best recollection. We don't want you to
7  guess or speculate, but we may ask a series of questions
8  to sort of help you remember. And it's not unusual
9  particularly when events happened sometime in the past
10  for a person who's answering questions in a deposition
11  to maybe not in the first question be able to remember
12  everything about the response to the question, but
13  sometimes with a series of questions it sort of jogs or
14  prompts the memory and the memory starts to come back.
15       So today we don't want you to guess or
16  speculate, but we do want to get your best remembrance,
17  your best recollection.
18     A. Uh-huh.
19     Q. Now, speculation or guessing would take place
20  if I asked you or someone asked you a question about
21  something that you were never involved with or had no
22  connection to at all. So, for example, if I were to ask
23  you, for example, have you ever been to Australia?
24     A. No.
25     Q. Okay. So if I asked you --

## Page 8

1     A. I would have liked to be.
2     Q. So if I were to ask you any questions about
3  Australia, you know, what it looks like and whatever,
4  unless you had seen it in a book or somewhere else, you
5  wouldn't be able to answer because you would tell me
6  "I've never been to Australia. I couldn't tell you."
7       Yeah, so that's the difference. Now, if you
8  had been to Australia, let's say, when you were much
9  younger, maybe a child, you might have some recollection
10  or remembrance of what it was like to either live in
11  Australia or visit Australia and you might be able to
12  say "Well, I remember this or that."
13       And I might ask you a few follow-up questions
14  and that help you remember something more, but that's
15  the difference between guessing, speculating on the one
16  hand and testing and trying to get your best
17  recollection and memory on the other hand. Does that
18  make sense to you?
19     A. Yes.
20     Q. Yeah. Okay. Also, when we go through this
21  process today, if you have any questions, particularly
22  if you don't understand any question that I may ask you,
23  please let me know. I'm happy to repeat the question.
24       I'm happy to rephrase it, try to clarify it.
25       Our purpose here today is to get information.

## Page 9

1  It's not to -- it's not to make this a confusing or
2  unnecessarily stressful experience. Is that okay?
3     A. Okay.
4     Q. And so one of the things I want to share with
5  you is unless you let me or the other attorney know that
6  you don't understand the question, it will be assumed
7  that the question the way it was given to you was
8  understood. So it's important to let us know if you
9  have any questions or confusion about the questions.
10       Okay?
11     A. Uh-huh.
12     Q. All right. Now, one of the other aspects of a
13  deposition -- and I'm sure our court reporter is giving
14  me this look right now is -- our court reporter is
15  carefully taking down every word that is being said here
16  today.
17     A. Oh, okay.
18     Q. So for that reason some of the types of
19  communication that we commonly use like nods of the head
20  or mmm-hmms or uh-huhs, those do not get transcribed
21  very well on the deposition transcript. So from time to
22  time I or the other attorney or even the court reporter
23  may ask you is that a yes or is that a no or could you
24  articulate or give a verbal response. And that's not to
25  annoy you. It's just to make sure that we have a full

3 (Pages 6 to 9)



Page 26

1  investigating what they were doing and we went to the
2  FBI because of -- several times.  And we --
3     Q.  Was that before or after you got --
4        MS. VANDERWEELE:  You gotta let her finish,
5  Jeff.
6        MR. DUNN:  Oh, I thought she was finished.
7     Q.  Let me just stop you.  When you went to the
8  FBI, was that before or after you got on the city
9  council?
10    A.  Well, it was after, but other people that
11 were -- there was another lady that has a name almost
12 like mine called Nancy Hall.  And she had been to the --
13 she had gone to the FBI several times.  And then I went
14 when they -- because I saw something that I knew was
15 wrong, very wrong.
16       We were -- between -- they had gotten in the
17 middle of my thing in 2000 -- 8000 -- whatever.  And
18 right in the middle of my term they changed some of the
19 people there and we got another councilperson and stuff.
20       And the police chief -- and this was the police
21 chief that was doing it at the time.  And he doesn't --
22 he's not a police chief now, but they -- this man that
23 came out of the jail, it wasn't -- the jail just in
24 the -- in the building.
25       It wasn't -- they didn't even take him to the

Page 27

1  jail, but anyhow he -- he wanted them to return his
2  clothes and his -- all that kind of stuff to him.
3  Return his stuff.  And they didn't think we should even
4  talk about it.
5        And he had a right to talk to the council.
6        Anybody does.  And I said that.  I said "Look,
7  he can come and talk to us now."  And he didn't.  And
8  then the police chief and another policeman that was in
9  the -- in there, they lifted him up and they took him
10 out and when we -- when the meeting ended and we went
11 home, there was blood all over the stairs leaving that
12 place.
13       And it was -- I don't know.  We tried to find
14 out where he was or -- I mean, I really did.  I made a
15 big -- but I don't know.  I think he -- they take him to
16 some other county and dropped him off there or whatever
17 they do and -- but it wasn't right.  And none of it was
18 right.
19       And it was just so -- the people that were
20 elected at that time, they were happy with and they
21 wanted to have this big old party across the hall from
22 the city council.  And I thought this is -- I didn't go
23 to their party.  But they were having a -- maybe I
24 should have seen what was happening, but -- I don't
25 know, but I was very upset with them for that because I

Page 28

1  don't know.
2        And so because of that and because I found out
3  that he was pretty well beaten up, I went to the FBI.
4        And, actually, that FBI office couldn't help
5  with that because it was -- and -- but then he said --
6  he told me about all the other stuff because it had to
7  go to L.A. because of the way it was.  I don't know.
8        But he told me that it would go -- if you could
9  go to L.A. and do that that's what you have to do
10 because we don't handle that kind of stuff.  But --
11 and -- but there were several other times.  I went, I
12 think, three or four times to see the FBI.
13    Q.  This -- was this when you were on the council?
14    A.  Uh-huh.
15    Q.  Did any other council member go with you?
16    A.  Not with me, but -- they weren't councilmen.
17       Because they didn't care.  The other four
18 people didn't care.
19    Q.  Did you think that you were alone in the way
20 that you saw how the city was being operated?  Alone in
21 the sense that you were the only one on the council that
22 you think thought that way?
23    A.  Oh, yeah, I was alone on that, but I knew that.
24 I knew that was going to happen when I went on because
25 we only -- we needed to -- we needed to have three

Page 29

1  people that thought like we did.
2     Q.  Did you ever have those three people when you
3  were on the council?
4     A.  No.  No.
5     Q.  During that entire time that you were on the
6  council, did you think that not only were you the lone
7  person that thought the way you did particularly on a
8  4-1 vote but that the city was being controlled by the
9  other council members and by Mr. Kapanicas and Urban
10 Logic?
11       MS. VANDERWEELE:  Objection.  Form.
12       THE WITNESS:  Well, it wasn't really -- we
13 didn't control much, I didn't think, because Alan
14 Kapanicas would come and tell us what we're going to do
15 really and we -- so I don't know.  There was times when
16 I thought I don't know why we have the city council
17 because we're not doing anything to improve the city.
18 BY MR. DUNN:
19    Q.  Did you think that was because Mr. Kapanicas
20 and Urban Logic were in control?
21       MS. VANDERWEELE:  Form.
22       THE WITNESS: Yes.  That's -- yes.
23 BY MR. DUNN:
24    Q.  Did you think that they had influence over the
25 other four members of the council?

MAGNA LEGAL SERVICES

Page 30

1      A.  Oh, yes.
2      Q.  Did you think that the other four members of
3  the council were essentially doing what -- pretty much
4  whatever Mr. Kapanicas and Urban Logic wanted them to
5  do?
6      A.  Oh, yeah, they would.
7      Q.  Did you think they were being controlled by the
8  four members of the council -- the other four members
9  were being controlled by Urban Logic and/or Mr.
10 Kapanicas?
11         MS. VANDERWEELE:  Asked and answered.
12         THE WITNESS:  Yes.
13 BY MR. DUNN:
14     Q.  And that was based on what you saw as a member
15 of the city council during your tenure?
16     A.  Uh-huh.  Yes.
17     Q.  And that concerned you, did it not?
18     A.  Oh, yeah, because the city council should have
19 had a much more -- much better saying about what's going
20 to happen and they didn't.  But the one reason they
21 didn't is because they only had one person like me,
22 but -- and I was wondering if there was a way we could
23 get to hire or elect two more council people.
24         I thought -- I thought we could because if we
25 could get three people, then you can do what you want

Page 31

1  more than if you're only one person.  Because that's the
2  way it works.  I mean, that's not good or bad, but it
3  does work that way.
4      Q.  Remember when you just told me that you went to
5  the FBI?
6      A.  Yeah.
7      Q.  You did that personally; correct?
8      A.  Yes.  I -- well, I talked to someone from my
9  church because I didn't know what to do.  And -- a man
10 from my church that's very nice.  He's not alive now,
11 but he was then.  And he said -- and I said "What shall
12 I do?"  I mean, it's the -- it's the head of the police
13 department that's doing it.
14         And he said, well, you'll have to, you know,
15 you know get some -- something.  And so I -- he
16 recommended that I go to the FBI, and I did.  And the
17 FBI had heard from us before.  The people that were not
18 happy with.
19     Q.  These are people that were not happy with the
20 government -- the city government?
21     A.  Yeah.
22     Q.  Ms. Gall, did you go to the FBI yourself
23 because you knew that the other members of the council
24 and the city government, Mr. Kapanicas and Urban Logic,
25 they weren't going to go tell the FBI?

Page 32

1      A.  No, they wouldn't.  They wouldn't have gone,
2  no.
3      Q.  So you had to do it yourself?
4      A.  Yeah.
5      Q.  And you did it because the other four members
6  of the city council were under the influence and control
7  of Mr. Kapanicas and Urban Logic; right?
8      A.  Yeah.
9         MS. VANDERWEELE:  Form.
10        THE WITNESS:  Yeah.  There wasn't another
11 person I could trust to come with me, I mean, that's in
12 the city.  I mean, there were people in the community
13 that I could trust.
14 BY MR. DUNN:
15     Q.  Could you trust Mr. Kapanicas?
16     A.  No.
17     Q.  Could you trust Urban Logic principals?
18     A.  No.
19     Q.  Could you even trust the other four members of
20 the city council?
21     A.  No, not completely.  We had that one person
22 that got -- we thought got elected.  And I was looking
23 forward to that because I think he would have been a
24 square.  But it only lasted for about two or three
25 meetings.

Page 33

1      Q.  Did it feel lonely at times once you were on
2  the city council being a city council member?
3      A.  I knew it was going to be that way.  I knew I
4  was going on and I knew it was going to be.
5      Q.  How did you get along with Mr. Kapanicas once
6  you were on the city council, if at all?
7      A.  Oh, we talked to each other.  Not very often.
8         He knew -- and he tried to be very nice
9  sometimes, but -- I don't know.  I don't think we -- if
10 he had been an honest person and a good person, I think
11 I would have -- I would have gone and discussed some of
12 the problems of the city with him.
13     Q.  Did you ever discuss some of those problems or
14 concerns you had with the city with Mr. Kapanicas?
15     A.  I can't remember doing it.  I mean, I -- I
16 might have told him some of the situations that he might
17 have not known about, yeah.
18     Q.  When you were on the city council, did you ever
19 think that Mr. Kapanicas was hiding information from you
20 and other members of the council?
21     A.  Oh, of course he was, yeah.
22     Q.  How about Urban Logic?  Now, when I say Urban
23 Logic, let me run some names by you.  Mr. Egger?
24     A.  Yeah.
25     Q.  Mr. Dillon?



Page 34

```
 1       A.  Yeah.
 2       Q.  Mr. Moorjani?
 3       A.  Mr. Moorjani I scarcely knew.  I only --
 4  because he never came to the meetings or anything at
 5  all.  And I met -- I met him when we were at a
 6  convention, you know, those -- the convention's supposed
 7  to teach you things.
 8       Q.  Oh, like League of Cities?
 9       A.  Yeah.
10       Q.  Yeah.
11       A.  And that's the only time I met him.  And we had
12  a -- had dinner together.  And then they told us that we
13  can't -- couldn't have dinner.  We had -- you had to pay
14  for your own dinner.  And that really upset some people
15  because that was the truth.  They felt that...
16       Q.  There was another person at the city.  There
17  was a city attorney named Mr. Aklufi.  Do you remember
18  Mr. Aklufi?
19       A.  Yeah.
20       Q.  Did you think Mr. Maklufi -- did you think that
21  Mr. Aklufi was part of the group of Mr. Kapanicas and
22  Urban Logic?
23       A.  Yes.  Yes.  Yes, I did.  I thought he wasn't a
24  very good lawyer either.  I can't remember some of the
25  things on him, but he wasn't...
```

Page 35

```
 1       Q.  Do you think he worked with Mr. Kapanicas at
 2  times to keep information from you and other members of
 3  the city council? -- Mr. Aklufi did.
 4       A.  I'm not -- I don't know.  He just wasn't a
 5  good -- I wouldn't have -- if I needed a lawyer, that
 6  would be the last one I'd go to because I don't think
 7  he -- I don't know.  I don't think he -- well, he had a
 8  license, I think.
 9       Q.  Did you think you could trust him?
10       A.  No.  No.  I would never trust him.  I never...
11       Q.  Did you think that -- when you saw things that
12  you thought were wrong at the city, did you think you
13  could go to Mr. Aklufi as the city attorney and tell
14  him?
15       A.  No.
16       Q.  Why not?
17       A.  Just the way he was.  I think he was swallowed
18  up by Kapanicas, too.  But -- yeah.
19       Q.  Did it appear to you that Mr. Aklufi was
20  working really more for Mr. Kapanicas than he was for
21  the city council?
22       A.  Probably.
23       Q.  Did it appear that to you -- or that way to
24  you?
25       A.  I can't quite remember that.  I know that I --
```

Page 36

```
 1  it wasn't just me.  It was the rest of the council, too,
 2  didn't think he was a good lawyer.  And I don't know why
 3  we -- I don't know why we didn't get rid of him unless
 4  it was just that Kapanicas wanted him for some other
 5  purpose.
 6       Q.  Did it appear to you or did you know that Mr.
 7  Kapanicas wanted to keep Mr. Aklufi as the city attorney
 8  when you were on the city council?
 9       A.  Perhaps.  Perhaps.
10       Q.  Did Mr. Kapanicas ever talk about removing
11  Mr. Aklufi as the city attorney?
12       A.  No.  I don't remember any.
13       Q.  When you -- Ms. Gall, when you got on the city
14  council, did you know even more so than before you were
15  on the city council that your concerns about city
16  government were justified?
17       A.  Oh, yeah.  I learned a lot of -- I learned a
18  lot about -- they -- the city wasn't like other cities
19  because of the way they did things.  And the other
20  people had it right.
21       Q.  When you were on the city council, did you ever
22  have an opportunity to serve in other positions to
23  represent the city?  For example, were you ever on RCTC,
24  or WRCOG or League of Cities?  Did you ever get
25  appointed to any of those representative positions for
```

Page 37

```
 1  the city?
 2       A.  No.
 3       Q.  Do you think -- go ahead.
 4       A.  Because they would have had to do it and that
 5  wasn't going to happen.  And I knew that going in.
 6       Q.  In other words, you thought that they weren't
 7  going to appoint you because you were the 4-1 -- you
 8  were the l of the 4-1 votes.  They weren't going to
 9  support you and let you have those positions; correct?
10       A.  Yeah.  But I wasn't anxious to have them.  I
11  mean, I was anxious to find out what was going on there
12  really and I was anxious to help the people in the
13  community that were having troubles with the city.
14           One time they -- the police department -- the
15  police department was -- well, I already told you about
16  that he wasn't very good.  And we had -- but there was a
17  lot of those issues when the police stopped cars and
18  there was complaints that came into the city of how the
19  policemen were working there and -- but they kept trying
20  to cover it up and say, oh, and -- it was -- it was just
21  not a good government for a city --
22       Q.  Did you ever --
23       A.  -- in any way.
24       Q.  When you were on the council, did you ever have
25  any conversations with any of the council members over
```

10 (Pages 34 to 37)



Page 90

1    A.  Yes.
2    Q.  When we spoke on the phone initially and in a
3 subsequent conversation, did I tell you that the City of
4 Beaumont had sued my client the insurance company?
5    A.  I'm sorry.  Say that again.
6    Q.  Sure.  When we have spoken, Nancy, have I told
7 you that the City of Beaumont had sued my client the
8 insurance company?
9    A.  No, I didn't know that they did.
10   Q.  So let me go back.  So, Nancy, I represent the
11 insurance company.  You understand that?
12   A.  Yeah.
13   Q.  And the City of Beaumont has sued the insurance
14 company.  Do you understand that?
15   A.  The City of Beaumont is suing the insurance
16 company?
17   Q.  Correct.
18   A.  Right now?
19   Q.  Correct, which is what's on the caption on the
20 declaration.
21   A.  Oh, okay.
22   Q.  Did I ever tell you in any of our conversations
23 that Urban Logic had filed the lawsuit, or is that just
24 your understanding based on what you know?
25   A.  I thought they had, but I don't know why.

Page 91

1    Q.  Did I ever tell you that Urban Logic was the
2 one that filed this lawsuit?
3    A.  No.
4    Q.  Okay.  Before you signed this declaration --
5    A.  Yes.
6    Q.  -- did you review it?
7    A.  Yes, I read it.
8    Q.  Did you review it several times?
9    A.  Yes.
10   Q.  And before you signed the declaration do you
11 recall having a telephone conversation with me when we
12 went through this declaration line by line word for
13 word?
14   A.  Yeah, that's true.
15   Q.  And then I mailed you a copy of the
16 declaration.  I think two copies; correct?
17   A.  Yeah, because I signed one in February.  That's
18 what it says.
19   Q.  And then we talked about the declaration before
20 you signed it again.  Do you remember that?
21   A.  Yeah.
22   Q.  And then you signed the declaration and sent it
23 back to my firm via mail, I believe.  Do you remember
24 that?
25   A.  Yeah.  Yeah, whatever address you had.

Page 92

1    Q.  And since -- and after you signed the
2 declaration to prepare for this deposition, did you
3 review the declaration again?
4    A.  Yes.
5    Q.  Several times?
6    A.  Yes.
7    Q.  And is everything that you -- that is stated in
8 this declaration, is it all true and correct based on
9 your knowledge and belief?
10   A.  Based on my knowledge and belief, yes.
11        MS. VANDERWEELE:  Okay.  Those are all the
12 questions I have for you.
13        MR. DUNN:  Thank you, Ms. Gall.
14        MS. VANDERWEELE:  Thank you.
15        THE VIDEOGRAPHER:  Off the record.  The time is
16 12:29 p.m.
17        MS. VANDERWEELE:  I'll take a copy, please.
18        (The deposition concluded at 12:29 p.m.)
19                      * * *

Page 93

1             REPORTER'S CERTIFICATION
2
3        I, KELLY M. BATES, a Certified Shorthand
4 Reporter in and for the State of California, do hereby
5 certify:
6        That the foregoing witness was by me duly
7 sworn; that the deposition was then taken before me at
8 the time and place herein set forth; that the testimony
9 and proceedings were reported stenographically by me and
10 later transcribed into typewriting under my direction;
11 that the foregoing is a true record of the testimony and
12 proceedings taken at that time.
13
14       IN WITNESS WHEREOF, I have subscribed my name
15 this 29th day of April, 2022.
16
17
18  _____
19  Kelly M. Bates, CSR No. 12935

