JEFFREY V. DUNN, Bar No. 131926
jeffrey.dunn@bbklaw.com
CHRISTOPHER E. DEAL, Bar No. 186754
chris.deal@bbklaw.com
DANIEL L. RICHARDS, Bar No. 315552
daniel.richards@bbklaw.com
BEST BEST & KRIEGER LLP
18101 Von Karman Avenue
Suite 1000
Irvine, California 92612
Telephone: (949) 263-2600
Facsimile: (949) 260-0972

Attorneys for Plaintiffs
Western Riverside Council of Governments
and City of Beaumont

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WESTERN RIVERSIDE COUNCIL OF GOVERNMENTS, a California Joint Powers Authority,<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, and DOES 1 through 50, inclusive,<br><br>Defendants. | Case No. 5:20-cv-02164- GW (KKx)<br><br>**PLAINTIFFS' REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION IN LIMINE NO. 4 TO EXCLUDE TESTIMONY OR EVIDENCE FROM JUDITH BINGHAM AND NANCY HALL**<br><br>Date: September 1, 2022<br>Time: 8:30 a.m.<br>Courtroom: 9D |

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ........................................................................................ 1
II. LEGAL ARGUMENT ................................................................................. 3
   A. THE CITY COUNCIL IS NOT A DEPARTMENT ........................ 3
   B. THE CITY COUNCIL DID NOT "HANDLE" INSURANCE MATTERS ........................................................................................ 5
   C. THE DISCOVERY AND TERMINATION CLAUSES OF THE POLICIES CANNOT BE TRIGGERED BEFORE THE INCEPTION OF THE POLICIES. ...................................................... 7
   D. BINGHAM AND HALL'S TESTIMONY ARE INSUFFICIENT TO TRIGGER ANY DISCOVERY OR TERMINATION CLAUSE ............................................................... 11
   E. BINGHAM AND HALL'S TESTIMONY IS INADMISSIBLE UNDER FEDERAL RULES OF EVIDENCE 401 AND 403. .......... 14
III. CONCLUSION .......................................................................................... 15

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

# TABLE OF AUTHORITIES

Page

**Federal Cases**

*California Union Ins. Co. v. Am. Diversified Sav. Bank*
   948 F.2d 556 (9th Cir. 1991) ................................................................................ 11

*Eaglepitcher Mgmt. Co. v. Zurich Am. Ins. Co.*
   640 F. Supp. 2d 1109 (D. Ariz. 2009) .................................................................. 10

*Federal Deposit Ins. Corp. v. Aetna Cas. & Sur. Co.*
   903 F.2d 1073 (6th Cir.1990) ................................................................................ 12

*Fidelity Nat. Financial, Inc. v. National Union Fire Ins. Co. of Pittsburg, PA*
   2014 WL 4909103 (S.D. Cal., Sept. 30, 2014) .............................................. 11, 12

*Fidelity Sav. & Loan Ass'n v. Aetna Life & Cas. Co.*
   647 F.2d 933 (9th Cir.1981) .................................................................................. 12

*Gulf USA Corp. v. Federal Ins. Co.*
   259 F.3d 1049 (9th Cir. 2001) ........................................................................ 11, 12

*United States Fidelity & Guar. Co. v. Empire State Bank*
   448 F.2d 360 (8th Cir.1971) .................................................................................. 12

*Waupaca Northwoods, LLC v. Travelers Cas. & Sur. Co. of Am.*
   2011 WL 1563278 (E.D. Wis. Apr. 25, 2011) .......................................... 2, 8, 10

**State Cases**

*AIU Ins. Co. v. Superior Court*
   51 Cal. 3d 807 (1990) ............................................................................................. 8

*Aydin Corp. v. First State Ins. Co.*
   18 Cal. 4th 1183 (1998) .......................................................................................... 8

*E.M.M.I., Inc. v. Zurich Am. Ins. Co.*
   32 Cal. 4th 465 (2004) ............................................................................................ 8

*Home Sav. Bank v. Colonial Am. Cas. & Sur. Co.*
   598 S.E. 2d 265 (N.C. Ct. App. 2004) ............................................................ 9, 10

# TABLE OF AUTHORITIES
(continued)

**Page**

*Pacific–Southern Mortg. Trust Co. v. Ins. Co. of N. Am.*
   166 Cal.App.3d 703 (1985) ................................................................. 11, 12, 14

*Shepard v. CalFarm Life Ins. Co.*
   5 Cal.App.4th 1067 (1992) .................................................................................. 8

*State Farm Mut. Auto. Ins. Co. v. Partridge*
   10 Cal.3d 94 (1973) ............................................................................................ 8

*White v. Western Title Ins. Co.*
   40 Cal.3d 870 (1985) .......................................................................................... 8

**State Statutes**

Beaumont Municipal Code, § 2.12.060 ................................................................. 2, 4

**Rules**

Federal Rule of Evidence 401 .............................................................................. 3, 14

Federal Rule of Evidence 403 .............................................................................. 3, 14

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
18101 VON KARMAN AVENUE, SUITE 1000
IRVINE, CALIFORNIA 92612

## I. INTRODUCTION

National Union seeks to present evidence at trial that the City Council learned of dishonesty or theft from Judith Bingham and Nancy Hall, in order to pursue a theory that the "termination" and "discovery" clauses of the operative insurance policies were triggered sometime before 2006. Plaintiffs seek to preclude National Union from offering this evidence and confusing the trier of fact, because the policies were not issued until 2014 and because at all relevant times James Gregg was the City's Risk Manager, and the only person in the City's "Risk Management Department or Other Department Designated to Handle Insurance Matters for the Named Insured" whose knowledge could trigger the discovery and termination clauses.

While the issue is somewhat narrower, the flaws in National Union's opposition to Plaintiffs' Motion in Limine No. 2 are the same flaws present in National Union's Opposition to Motion in Limine No. 4.

The gravamen of National Union's opposition is that City Council's knowledge of accusations made by and Bingham is relevant, because James Gregg was only hired in 2006. Notably, National Union does not argue or demonstrate that Gregg himself had knowledge of dishonesty or theft based on the allegations of Bingham or Hall. *See, e.g.*, Opp. at 13:8–20 ("First, while Plaintiffs' focus on Mr. Gregg's knowledge, Beaumont did not hire Mr. Gregg until July 1, 2006 . . . . Importantly, Ms. Bingham and Ms. Hall's reports of a conflict of interest began prior to July 1, 2006. . . . Mr. Gregg did not work for Beaumont as its risk manager at the time of Ms. Hall's communication and therefore his knowledge cannot be dispositive.")

Instead, National Union relies upon an argument that before 2006, the City Council of the City of Beaumont was the "Risk Management Department or Other Department Designated to Handle Insurance Matters for the Named Insured," and

1  thus the City Council "Department's" pre-2006 knowledge allegedly acquired from
2  Hall and Bingham could trigger a termination clause in a policy that would not be
3  issued until 2014.

4      This argument is meritless, and fails for many reasons. First, the City Council
5  of the City of Beaumont is not the "Department Designated to Handle Insurance
6  Matters for the Named Insured." It is not any department at all - it is the legislative
7  and executive head of the City of Beaumont. The City Council oversees the City
8  Manager, who in turns "exercise[s] control over **all departments** of the City
9  government." Request for Judicial Notice ("RJN") Ex. E at § 2.12.060 (emphasis
10 added). The City Council is not a "Department Designated to Handle Insurance
11 Matters for the Named Insured" or anything like it, and as a matter of common
12 sense, and consistent with the reasonable expectations of the insured, its knowledge
13 cannot trigger any termination or discovery clause.

14     More fundamentally, National Union's argument relies upon a chronological
15 absurdity – that knowledge acquired from Bingham and Hall before 2006 could
16 trigger a "Discovery" or "Termination" clause that would not exist until 2014.
17 Courts have rejected this type of illogical gamesmanship. *See, e.g. Waupaca*
18 *Northwoods, LLC v. Travelers Cas. & Sur. Co. of Am.,* 2011 WL 1563278, at *4
19 (E.D. Wis. Apr. 25, 2011) ("[W]hen the policy says that it will 'terminate' upon a
20 manager becoming aware of dishonesty (as opposed to a clause 'excluding'
21 coverage) the policy suggests that coverage will exist for some given period of time
22 before it could terminate. . . Given that the triggering event for the termination is
23 stated in the words 'as soon as' the manager 'becomes aware,' a reasonable person
24 would likely expect that the provision is aimed only at knowledge that is gained
25 after the effective date of the policy, not before. It is just such an expectation on the
26 part of an insured that Wisconsin courts look to in construing ambiguous provisions
27 in insurance policies. . . . Accordingly, Travelers' motion for summary judgment on
28 that basis is DENIED").

- 2 -

5:20-CV-02164- GW (KKX)
OPPOS. TO MOTION IN LIMINE NO. 2

Notably, the Policy at issue originally contained an exclusion for "acts of employee **learned of by you prior to the policy period**." *See* ECF No. 49-4 at ECF pp. 6, 293 (emphasis added). This exclusion would have accomplished precisely what National Union seeks – excluding losses caused by employees the City "knew" were dishonest before the policy period. However, National Union chose to sell the City an endorsement that expressly deleted this exclusion: "In Section D, Exclusions, exclusion 1.b. Acts of Employees Learned of By You Prior to the Policy Period is hereby deleted in its entirety." *Id.* at ECF pp. 249, 539.

National Union cannot rely upon an exclusion that it made the choice to delete through an exclusion, and it cannot rely upon the knowledge of the City Council because the City Council is not a "department." Because the knowledge of the City Council was irrelevant at all times – before and after the retention of Gregg – the motion in limine should be granted in full.

Finally, because the theory which National Union will offer Bingham and Hall's testimony in support of fails as a matter of law, their testimony should excluded under Federal Rules of Evidence rules 401 and 403. Their testimony has no tendency to make any fact of consequence more or less likely. To the extent there is any minimal relevance to the testimony of Bingham and Hall, it is substantially outweighed by the risk of confusing the issues and misleading the jury. The only possible purpose of presenting the testimony of Hall and Bingham would be to attempt to inflame the passions of the jury and invite them to render a verdict based on misplaced anger at the City of Beaumont for "ignoring" the baseless and legally incorrect warnings of the citizens Bingham and Hall.

## II. LEGAL ARGUMENT

### A. The City Council is Not a Department

The City Council is not a "Department" whose knowledge could trigger the discovery or termination clauses, and is in fact two steps removed from any department in the City. The City Council oversees the City Manager, who in turn

exercises control over all departments in the City. Beaumont Municipal Code ("BMC"), section 2.12.060, outlines the functions of the City Manager. In relevant part, it provides:

> The **City Manager** shall be the administrative head of the City government **under the direction and control of the City Council**, except as otherwise provided in this chapter. He shall be responsible for the efficient administration of all the affairs of the City which are under his control. In addition to his general powers as administrative head, and not as a limitation thereon, it shall be his duty and he shall the power:
>
> […]
>
> B.  To control, order and give directions to all **head of departments**, subordinate officers and employees of the City, except the City Clerk, City employees from one **department** to another; and to consolidate or combine offices, positions, **departments** or units under his direction;
>
> […]
>
> D.  **To exercise control over all departments** of the City government and over all appointive officers and employees thereof, except the City Clerk, City Treasurer, City Attorney, and members of the planning commission[.]

RJN Ex. E at § 2.12.060) (emphasis added). The City Manager controls *all* departments of the City, and he is subordinate to the City Council. The City Council is not a department - it controls the officer (City Manager) who controls all departments of the City. Unsurprisingly, the Beaumont Municipal Code never once refers to City Council as a "department." However, the Beaumont Municipal Code does identify several departments, e.g., Community Development Department (RJN Ex. F at § 2.24.080), Department of Transportation (RJN Ex. G at § 16.08.050), and Public Works Department (*Id.* at § 16.08.100).

In the face of this common sense understanding of the term "department" and the clear import of the Beaumont Municipal Code and the organization of the City of Beaumont it provides for, National Union fails to offer any competent evidence

- 4 -

5:20-CV-02164- GW (KKX)
OPPOS. TO MOTION IN LIMINE NO. 2

1 or applicable authority suggesting that before the retention of Gregg the City
2 Council by "default" was the department responsible for handling insurance
3 matters.

4     Further, contrary to National Union's assertion that it based its motion for
5 summary judgment on Gregg's knowledge, National Union *did*, in fact, premise its
6 argument regarding the triggering of the Discovery Clause on City Council's
7 knowledge. *See* Dkt. 49, at p. 14:4, p. 20:11-13. However, only after Plaintiffs'
8 opposition did National Union shift tack, and effectively concede that Gregg's
9 knowledge was all that mattered in terms of triggering the discovery and
10 termination clauses. Dkt. 56 (Reply In Support of Defendant's Motion for
11 Summary Judgment) at pp. 11-14. Now, National Union seeks to resurrect its once
12 abandoned argument that the City Council's knowledge somehow triggered the
13 discovery clause; in the same breath, National Union also suggests that this
14 question was never presented to the Court and never decided upon.

15     Again, in its motion for summary judgment, National Union asserted that the
16 City Council's knowledge constituted "discovery." *See* Dkt. 49, at p. 14:4, p. 20:11-
17 13). The Court, instead, implicitly found that Gregg's knowledge was the only
18 relevant knowledge: "Defendants' argument relies on a logical principle: that
19 Gregg's alleged knowledge of the ULC Principals' self-dealing constitutes
20 knowledge of 'a loss of a type covered by this policy' under the Discovery Clause."
21 Dkt. 64, at p. 8. This Court should reject National Union's implicit request for
22 reconsideration, and should preclude National Union from confusing the trier of
23 fact with legally and factually meritless arguments concerning the knowledge of the
24 City Council.

25     **B.**     <u>**The City Council did not "Handle" Insurance Matters**</u>

26     National Union seeks to justify its position by relying upon an amalgamation
27 of unrelated facts. National Union relies on the argument that the City did not
28 maintain a risk management department and therefore, by virtue of the "plain

language" of the Policies, the duty of "handling insurance matters" somehow falls to City Council. (Dkt. 89, at p. 10:13-14, p. 10:25–11:10). This argument is meritless, and relies only on the subjective opinions of a few lay former Councilmembers on matters of law. *See e.g.* Dkt. 49-5 (Deposition of Roger Berg) at pp. 29:22-30:5. Notably, not a single Councilmember is a legal professional, insurance expert, or had any training in risk management.

National Union misleadingly argues that final authority for *purchasing* insurance is somehow identical to having exclusive oversight of insurance handling. Even then, such argument is premised on out-of-context deposition excerpts of lay councilmembers subjective understanding. (*See e.g.* Dkt. 89 at p. 7:8; *cf.* Declaration of Christopher E. Deal ("Deal Decl.") Ex. A (Deposition of David Castaldo) at p. 54:7-17; Deal Decl. Ex. B (Deposition of Brian DeForge) at pp. 50:10-21, 51:10-52:1. National Union offers no analysis of the City's ordinances, which outline City Council's role and function, nor any reasonable articulation of how a City Council falls within the plain meaning of the term "department." And while National Union accuses Plaintiffs of "cherry-picking a single sentence from this Court's order" (Dkt. 89, at p. 8 ln. 7-8 (referencing Dkt. 64, at p. 7)), National Union relies exclusively on misleading and out-of-context deposition excerpts of the lay testimony of former councilmembers. This testimony does not establish, or even suggest, that the City Council was the "department" responsible for handling insurance matters.

Even if National Union had shown the "City Council Department" was responsible for handling insurance matter (again, no such department exists), National Union's theory of pre-2006 termination or discovery is meritless, and contrary to the plain language of the policies and endorsements it sold the City.

### C. The Discovery and Termination Clauses of the Policies cannot be Triggered before the Inception of the Policies.

The provisions of the Policies are substantively identical. The discovery clauses provide:

> As soon as:
>
> [RISK MANAGEMENT DEPARTMENT OR OTHER DEPARTMENT DESIGNATED TO HANDLE INSURANCE MATTERS FOR THE NAMED INSURED] first become[s] aware of facts which would cause a reasonable person to assume that a loss of a type covered by this policy has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred, even though the exact amount or details or loss may not be known.

*See* ECF No. 40-4 at pp. 248–49, 538–39. The "termination clauses" provides for termination of coverage:

> As soon as:
>
> RISK MANAGEMENT DEPARTMENT OR OTHER DEPARTMENT DESIGNATED TO HANDLE INSURANCE MATTERS FOR THE NAMED INSURED learns of "theft" or any other dishonest act committed by the "employee" whether before or after becoming employed by you provided that such conduct involved Loss of "Money, "Securities" or "Other property" valued at … [$25,000] or more.

*Id.* Notably, exclusion D.1.b of the policies *originally* provided that;

> This policy does not cover:
>
> b. **Acts Of Employees Learned Of By You Prior To The Policy Period**.
>
> Loss cause by an "employee" if the "employee" had also committee "theft" or any other dishonest act prior to the effective date of this policy and you or any of your officials, not in collusion with the "employee," learned of that theft" or dishonest act prior to the Policy Period shown in the Declaration."

Dkt. 49-4, at pp. 6, 293.

Critically, **section D.1.b. was deleted by Endorsement 8**. *Id.* at ECF pp. 249, 539. Several features of insurance contracts and their interpretation are

1 important here. Any ambiguity in the policy is resolved against the insurance
2 company and "if semantically permissible, the contract will be given such
3 consideration as will fairly achieve its objective of providing indemnity for the loss
4 to which the insurance relates." *White v. Western Title Ins. Co.*, 40 Cal.3d 870, 881
5 (1985). In interpreting an insurance policy, the court must consider the reasonable
6 expectations of the public and the insured. *Id.* at 881, 882 n.7. Coverage clauses are
7 interpreted broadly so as to afford the greatest possible protection to the insured;
8 exclusionary clauses, like the discovery clause and termination clause,[1] are
9 interpreted narrowly against the insurer. *State Farm Mut. Auto. Ins. Co. v.*
10 *Partridge*, 10 Cal.3d 94, 101-02 (1973). To the extent there is any ambiguity in the
11 policy language, such ambiguity must be resolved in favor of insured. *AIU Ins. Co.*
12 *v. Superior Court*, 51 Cal. 3d 807, 821-22 (1990); *White*, 40 Cal.3d at pp. 881-82 n.
13 7 (1985); *State Farm Mut. Auto. Ins. Co. v. Partridge*, 10 Cal. 3d 94, 101-02
14 (1973); *Aydin Corp. v. First State Ins. Co.*, 18 Cal. 4th 1183, 1188 (1998);
15 *E.M.M.I., Inc. v. Zurich Am. Ins. Co.*, 32 Cal. 4th 465, 470 (2004).

16       The City reasonably understood that its purchase of an endorsement deleting
17 an exclusion for pre-policy knowledge of dishonesty would have the effect of
18 precluding termination for pre-policy knowledge of dishonesty, and National
19 Union's expansive and illogical interpretation of the discovery and termination
20 clause is contrary to black letter law regarding the interpretation of exclusions in
21 insurance policies.

22       More fundamentally, a termination clause and discovery clause cannot, as a
23 matter of law and common sense, be triggered before the policy and the termination
24 clause exist. *See e.g. Waupaca Northwoods, LLC v. Travelers Cas. & Sur. Co. of*

---

[1] Even when not expressly labeled an "exclusion," condition and clauses that serve to bar coverage when triggered are treated as exclusions and subject to a narrow construction. *See, e.g.*, *Shepard v. CalFarm Life Ins. Co.*, 5 Cal.App.4th 1067, 1076 (1992) (holding that a "transfer provision," which was placed under the heading "PLAN B MEDICARE SUPPLEMENT" and terminated coverage when the insured qualified for Medicare, was to be treated as an exclusion).

*Am.*, 2011 WL 1563278, at *4 (E.D. Wis. Apr. 25, 2011) ("The policy terminates when a manager 'becomes aware of any dishonest or fraudulent employment related act,' which seems to suggest that if a manager became aware of a dishonest act prior to coverage, the clause is not triggered").

The operative language of the Policies' termination clause – the policy "terminates as to any Employee . . . [a]s soon as Risk Management or Other Department designated to handle insurance matter . . . learns of any 'theft' or dishonest act . . ." – is written in the present tense. Substantially identical termination provisions have been interpreted to apply only to the discovery of an employee's dishonest or fraudulent acts **after** the commencement of the relevant bond period. *See Home Sav. Bank v. Colonial Am. Cas. & Sur. Co.*, 598 S.E. 2d 265, 270 (N.C. Ct. App. 2004).

In *Home Savings*, prior to purchasing the bond, Home Savings Bank was aware that one of its tellers had a conviction for embezzlement. When this employee was found to have later embezzled more than one million dollars from the bank, Colonial denied coverage on the grounds that the bank had already known about the employee's prior conviction at the time it purchased the policy. The termination clause in the applicable bond had the same "as soon as" language as the policy in the present case. The North Carolina Court of Appeals rejected the notion that the bond's termination clause was triggered by knowledge that pre-existed the bond's purchase:

> Significantly, the termination clause provides that the bond "terminates ... as soon as" Home Savings "learns" of any dishonest conduct by an employee. Use of the present, rather than past, tense here suggests an intent by the parties that coverage under the bond must first commence before discovery of an employee's dishonest conduct will operate to terminate it.

*Id*. at 270. At a minimum, *Home Savings* concluded that the policy language was ambiguous, and under principles of insurance contract construction any

1  ambiguity must be resolved in favor of coverage. *Id*; *see also Waupaca*
2  *Northwoods, LLC*, *supra*, at *9 (following *Home Savings*, and stating that
3  "[a]lthough coverage logically can be excluded based on knowledge of prior events,
4  a provision that 'terminates' coverage based on prior events make no sense.");
5  *Eaglepitcher Mgmt. Co. v. Zurich Am. Ins. Co.*, 640 F. Supp. 2d 1109, 1120 (D.
6  Ariz. 2009) (termination provision "is to relieve the insurer of responsibility for
7  loss caused by dishonest acts of an employee which are committed *after* the
8  employer has learned that the employee is dishonest") (emphasis in the original).
9  National Union points to no provision of the Policies that exclude coverage for an
10 employee whose theft or dishonest act was discovered prior to its commencement.

11       Like *Waupaca*, this case involves a policy that "terminates;" it does not
12 exclude or cancel like in the Fourth Circuit holdings. The "discovery clause"
13 similarly operated in the present tense, and provides that discovery occurred when
14 the Risk Management Department becomes aware" of facts which would cause a
15 reasonable person to assume that a loss of a type covered by this policy has been or
16 will be incurred." A "loss of a type covered by this policy" cannot exist before "this
17 policy" exists.

18       Accordingly, assuming the testimony of Hall and Bingham was sufficient to
19 prove to the City Council to "dishonesty" or "theft" (it was not), National Union's
20 termination argument would still fail as a matter of law. Therefore, allowing the
21 irrelevant (but inflammatory) testimony of Bingham and Hall would only serve to
22 cause unfair prejudice and confuse the jury.

23       Notably, National Union is presumably aware of the authority discussed
24 above, and originally drafted the policy to preclude coverage when employee
25 dishonest is learned of prior to the policy period. Again, section D.1.b originally
26 provided an exclusion for "Acts Of Employees Learned Of By You Prior To The
27 Policy Period." However, section D.1.b. was deleted. National Union knew that
28 language like that in Section D.1.b was necessary to exclude coverage for pre-

policy discovery, and made the conscious choice to sell an endorsement deleting that language. That choice, and the City's choice to purchase that endorsement, must be given effect.

### D. Bingham and Hall's Testimony are Insufficient to Trigger Any Discovery or Termination Clause

The Discovery Clause is not triggered on the mere discovery of purported "dishonesty" as National Union seemingly suggests. Instead, it is triggered when a "loss of the type covered by" the Policy is discovered. In *California Union Ins. Co. v. Am. Diversified Sav. Bank*, 948 F.2d 556 (9th Cir. 1991), the court held that, in the context of a fidelity policy, discovery turned not on mere discovery of *potential* evidence of dishonesty, but on "specific facts to indicate . . . knowledge beyond suspicion on the part of the Insured that *covered losses occurred.*" *Id*. at 564-65 (emphasis added).

More broadly, under California law, "[t]he test for discovery [under a crime policy] blends a subjective standard (i.e., the insured's actual awareness and knowledge of facts and circumstances) and an objective one (i.e., would a reasonable person conclude that fraud occurred). Mere suspicion of wrongdoing is not sufficient." *Fidelity Nat. Financial, Inc. v. National Union Fire Ins. Co. of Pittsburg, PA,* 2014 WL 4909103, at *20 (S.D. Cal., Sept. 30, 2014) (*citing Pacific–Southern Mortg. Trust Co. v. Ins. Co. of N. Am.*, 166 Cal.App.3d 703, 709, 713 (1985); *Gulf USA Corp. v. Federal Ins. Co*., 259 F.3d 1049, 1058 (9th Cir. 2001). To constitute discovery of fraud or criminal acts, the insured must know enough facts to justify charging the employee with dishonesty, fraud, or theft. *Gulf USA Corp.*, 259 F.3d at 1059–60.

There is no "duty to investigate suspicious facts" and an insured is not charged with the knowledge they would have discovered if they had investigated. This standard is based in part on the public policy that "California law permits the employer to trust its employees by presuming they made an innocent mistake rather

than jumping to the conclusion that they intended to defraud their employer."
*Fidelity Nat. Financial, Inc.*, 2014 WL 4909103 at *65 (internal citations omitted);
*see also Gulf USA Corp.*, 259 F.3d at 1059 ("[A] careful and prudent person does
not lightly charge another with committing fraud or an act of dishonesty")

In *Aetna*, the Sixth Circuit stated that "discovery of loss does not occur until
the insured discovers facts showing that dishonest acts occurred and appreciates the
significance of those facts; suspicion of loss is not enough." *Federal Deposit Ins.
Corp. v. Aetna Cas. & Sur. Co.*, 903 F.2d 1073, 1079 (6th Cir.1990) (citing *United
States Fidelity & Guar. Co. v. Empire State Bank*, 448 F.2d 360, 364–66 (8th
Cir.1971)) (other citations omitted).

The court in *Pacific–Southern Mortgage Trust Co. v. Insurance Co. of N.
Am.*, 166 Cal.App.3d 703 (1985) held that "[t]o constitute 'discovery' of the loss,
the insured must have more than a mere suspicion that a covered loss has occurred."
166 Cal. App. 3d at 709 (citations omitted). Further, the court found that "[t]here
must be discovery of both the loss and the dishonesty." (*Id.* (citing *Fidelity Sav. &
Loan Ass'n v. Aetna Life & Cas. Co.*, 647 F.2d 933, 938 (9th Cir.1981))).

Contrary to National Union's argument, the letters written by Hall and
Bingham and appearances at City Council meetings are insufficient as a matter of
law to establish discovery or termination, and this evidence would serve only to
confuse the jury and cause unfair prejudice.

While National Union relies on former Councilmembers' subjective opinions
as to City Council's involvement in overseeing insurance claims, it simultaneously
ignores those same Councilmembers' testimony regarding *lack* of knowledge of
dishonest conduct. For example, DeForge testified:

> Q:  As far as you were concerned at the time you were on the council there weren't any conflicts of interest by these individuals; correct?
> A:  Not that I was aware of, no.

Deal Decl. Ex. B at pp. 65:23-66:1.

      Moreover, the Councilmembers who were deposed were all familiar with Bingham and Hall. Despite Bingham and Hall's public comments, the members of the City Council did not find proof of dishonesty or loss within the meaning of California law:

> Q: Are you familiar with the term gadfly?
>
> A: Yes. . . .
>
> Q: Did you have sort of gadfly individuals who would show up in your city council meetings?
>
> A: Yes, we did.
>
> Q: Would it be fair to characterize in your opinion, Ms. Bingham as one of those gadflies?
>
> A: Yes.
>
> Q: And from what I understand would make all sorts of accusations and allegations is that fair to say?
>
> A: That's correct.
>
> Q: And in your mind just because somebody makes an accusation or allegation doesn't mean that he or she is guilty of something that they're being accused of; correct?
>
> A: That's correct.

Deal Decl. Ex. B at pp. 64:5-24, 65:6-13. Berg similarly testified:

> Q: Did you talk with other City Council members about a potential conflict of interest involving Urban Logic?
>
> A: Yes, we did, because it was brought to the public comment by Mrs. Hall. And we looked into the matter and … we didn't feel it was a conflict because it was a professional services contract. . . .
>
> Q: For that entire time that you were on the City Council, at no time did you ever think that Mr. Kapanicas had a conflict of interest; is that correct?
>
> A: I don't think he ever had a conflict of interest, no.
>
> Q: How about Mr. Dillon, Mr. Egger, and Moorjani, same question?
>
> A: No.
>
> Q: Do you think they ever did anything illegal or criminal?

A: No.

(Dkt. 49-5, Berg Depo., at 106:19-107:3, 230:23-231:1-9). Moreover, Bingham and Hall themselves were not witnesses to any purported conflicts of interest, and the only possible testimony they could offer would be hearsay and lacking any personal knowledge of foundation. Indeed, there has been no showing that Bingham or Hall's public remarks were based on evidence, investigation, or personal knowledge.

In sum, despite Bingham and Hall's repeated accusations, any testimony they could offer would not and could not establish discovery within the meaning of California law (especially in light of the fatal flaws in National Union's underling theory, as discussed in Sections III.A–C. *See e.g. Pacific-Southern Mortgage Trust Co.*, 166 Cal.App.3d at 711 (holding that the phrase "discovery of *the* loss refers to "that time when the insured discovers it has *suffered a loss*, not that time when it discovers it has a *potential loss*") (emphasis in the original).

### E. Bingham and Hall's Testimony is Inadmissible under Federal Rules of Evidence 401 and 403.

Federal Rule of Evidence 401 provides that evidence is relevant if (a) it has any tendency to make a fact more or less probably than it would be without the evidence; and (b) the fact is of consequence in determining the action. National Union invites a debate on whether Bingham and Hall's testimony satisfies Federal Rule of Evidence 403 provides that "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

As is discussed above, the testimony of Bingham and Hall have no tendency to make it any more or less probable that the discovery or termination clause were triggered, because there is no evidence Gregg had any awareness of this testimony or the various letters written by Bingham and Hall.

To the extent there is any minimal relevance to the testimony of Bingham and Hall, it is substantially outweighed by the risk of confusing the issues and misleading the jury. Given the fatal flaws in the legal theories underpinning National Union's defense on the basis of termination or discovery, the only possible purpose of presenting the testimony of Hall and Bingham would be to attempt to inflame the passions of the jury and invite them to render a verdict based on misplaced anger at the City of Beaumont for "ignoring" the baseless and legally incorrect warning of the citizenry.

### III. CONCLUSION

For the reasons stated herein, Plaintiffs respectfully request that the Court grant its Motion in Limine No. 4.

Dated: August 26, 2022　　　　　　　　　　BEST BEST & KRIEGER LLP

By: */ s / Christopher E. Deal*
　　JEFFREY V. DUNN
　　CHRISTOPHER E. DEAL
　　DANIEL L. RICHARDS
　　Attorneys for Plaintiffs
　　Western Riverside Council of
　　Governments and City of Beaumont